1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
2
SAN DIEGO COUNTY

3
DARRYL DUNSMORE, ERNEST                )
4
ARCHULETA, ANTHONY EDWARDS,             )
REANNA LEVY, JOSUE LOPEZ,               )
5
CHRISTOPHER NELSON, CHRISTOPHER         )
NORWOOD, and LAURE ZOERNER, on behalf   )
6
of themselves and all others similarly situated  )
                                        )
7
         Plaintiffs,                    )
                                        )
8
   v.                                   )   Cause No. 3:20-cv-00406-AJB-WVG
9
                                        )
SAN DIEGO COUNTY SHERIFF'S              )
10
DEPARTMENT, COUNTY OF SAN DIEGO,        )
CORRECTIONAL HEALTHCARE                 )
11
PARTNERS, INC., LIBERTY HEALTHCARE,     )
12
INC., MID-AMERICA HEALTH, INC., LOGAN   )
HAAK, M.D., INC., SAN DIEGO COUNTY      )
13
PROBATION DEPARTMENT, and DOES          )
1 to 20, inclusive,.                    )
14
                                        )
15
         Defendants.                    )
                                        )
16
_____ )

17
**DEFENDANT MID-AMERICA HEALTH, INC.'S**
18
**ANSWER AND AFFIRMATIVE DEFENSES**

19
   Defendant Mid-America Health, Inc. ("MAH") answers Plaintiffs' Complaint for
20
Declaratory and Injunctive Relief (the "Complaint") as follows:
21

22
**NATURE OF ACTION**

23
1.  San Diego County residents are unnecessarily suffering and dying in the County's jail
24
    facilities ("the Jail") due to extraordinarily dangerous and deadly conditions, policies, and
25
    practices that have been allowed to persist for many years. While the death rate in the Jail
26

27

28
1

has for years exceeded the rates nationally and in other large California jails, it reached chilling heights in 2021 when 18 people died, amounting to a death rate of 458 incarcerated people per 100,000. The Jail's death rate in 2021 was almost triple the national rate in jails—154 per 100,000 people— according to the most recent data from the Bureau of Justice Statistics, and more than double the 2011-2020 death rates in other large California jails. New York City's Rikers Island—which has received widespread national media attention and has a larger average daily population than the San Diego County Jail—had fewer deaths (16) than the San Diego County Jail (18) last year.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 1 of the Complaint and, therefore, denies the averments.

2. The crisis at the Jail is not a new development. Since 2009, the Jail has averaged more than one death per month, for a total of at least 173 in-custody deaths since 2009. The California State Auditor's February 3, 2022 report ("State Audit Report") found that for years, "the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody."[1] Observing that "systemic deficiencies" in Jail policies and practices for "intake screenings, medical and mental health care, safety checks, and responses to emergencies likely contributed to these deaths,"[2] the State Auditor warned that until meaningful changes are made, "the weaknesses in [the Sheriff's Department's] policies and practices will continue to jeopardize the health and lives of the individuals in its custody."[3] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 2 of the Complaint and, therefore, denies the averments.

3. As in previous years, Jail deaths in 2021 were often attributable to suicide, overdoses, homicide, and medical neglect, and many involved persons with a mental illness. Lester Marroquin, for example, drowned himself shortly after custody staff ordered him to be transferred from a relatively high-observation safety cell directly into an administrative segregation cell, even though Jail staff knew he had a history of attempting to commit suicide by water intoxication when left alone. Richard Salyers was choked to death by his cellmate just days after Salyers arrived at the Jail on a low-level, nonviolent charge. Dominique McCoy was killed by his cellmate, days after McCoy arrived at the Jail on nonviolent drug charges. Robert Moniger died after custody and medical staff ignored his and his cellmate's pleas for medical assistance. Omar Moreno Arroyo choked on his COVID-19 mask and died while in the Jail on a book-and-release charge because Jail staff and contractors failed to adequately monitor him, even though he was experiencing a mental health crisis and under the influence of methamphetamine. Rafael Hernandez hanged himself in a mental health unit after being detained while awaiting trial for almost a year. Jerry Aleman, Saxon Rodriguez, Ronaldino Estrada, and Jonathan Whitlock died by overdose of fentanyl, a synthetic opioid that is widely available inside the Jail.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 3 of the Complaint and, therefore, denies the averments.

4.  These deaths irreparably harm incarcerated people and their families and loved ones, and they impose staggering costs that are borne by San Diego County taxpayers. Rather than remedy systemic failures that harm the people incarcerated at the Jail, Defendants San Diego County Sheriff's Department ("Sheriff's Department") and the County of San Diego ("County" or "San Diego County") (collectively, "County Defendants") pay millions of dollars to resolve their wrongdoing through individual settlements.[4] In 2020 and 2021, County Defendants paid $17 million to resolve cases involving deaths and serious injuries at the Jail, including the death of Heron Moriarty, who died by suicide even after Moriarty's wife called the Jail 30 times stating that he was suicidal. Custody staff overruled medical staff's recommendation to place Moriarty under close suicide observation. County Defendants paid $1 million to Ivan Ortiz's family after Ortiz committed suicide with a plastic bag erroneously provided to him, while he was left unmonitored despite having tried to hang himself earlier in the day and telling Jail staff that he was hearing voices telling him to kill himself. County Defendants paid over $3 million to the family of Paul Silva, who was in a mental health crisis when he was killed by Sheriff's deputies during a cell extraction. Last year, several new lawsuits were filed against County Defendants concerning deaths and horrific injuries at the Jail, including one in which video shows Jail staff idly watching and even taking a cell phone video while Tanya Suarez—who has mental illness and was in a drug-induced psychosis— gouged out and removed her own eyeballs. Suarez is now permanently blind. Another recently-filed lawsuit concerns Joseph Morton, who died by suicide after Jail staff and contractors removed him from close observation despite his history of suicide attempts

and suicidal statements. As of August 2021, there were approximately 30 pending lawsuits against the Sheriff's Department. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 4 of the Complaint and, therefore, denies the averments.

5. County Defendants and their medical and mental health contractors Correctional Healthcare Partners, Inc., Tri-City Medical Center, Liberty Healthcare, Inc., Mid-America Health, Inc., and Logan Haak, M.D., Inc. ("Contractor Defendants") knowingly provide inadequate security, medical care, mental health care, and dental care to the individuals incarcerated (hereinafter, "incarcerated people") in the Jail, which exposes incarcerated people to substantial, unreasonable, and life-threatening risks of harm. Defendants routinely discriminate against and fail to accommodate incarcerated people with disabilities, excluding them from programs, services, and activities offered in the Jail. County Defendants interfere with incarcerated people's access to the courts and their attorneys.

**Answer:** MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 5 of the Complaint as alleged against the County Defendants and the other Contractor Defendants and, therefore, denies those averments.  To the extent the averments in Paragraph 5 of the Complaint implicate MAH, MAH states that it provides adequate dental care to the individuals incarcerated in the Jail and makes all required

accommodations in a non-discriminatory manner, and any averments to the contrary are denied.

6. This civil rights class action lawsuit seeks to remedy the dangerous, discriminatory, and unconstitutional conditions in the Jail. Plaintiffs Darryl Dunsmore, Ernest Archuleta, Anthony Edwards, Reanna Levy, Josue Lopez, Christopher Nelson, Christopher Norwood, and Laura Zoerner (collectively "Plaintiffs") bring this action against Defendants on behalf of themselves and the approximately 4,000 incarcerated people who are similarly situated on any given day.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 6 of the Complaint and, therefore, denies the averments.

7. Plaintiffs seek declaratory and injunctive relief under the United States and California constitutions against the County and Contractor Defendants for their deliberate indifference to their obligation to provide incarcerated people with minimally adequate medical care. The Jail suffers from chronic and dangerous understaffing of medical professionals. In December 2020, nurses at one Jail facility wrote, in a desperate request for "any kind of help we can get," that understaffing was "putting our licenses in danger not to mention patient care," and asked command staff to "understand that people's lives are put at risk" by understaffing. An October 2021 letter from the Service Employees International Union ("SEIU") Local 221, which represents Jail health care workers, to the Citizens Law Enforcement Review Board ("CLERB") explained that understaffing

1   created "dangerous and inhumane" conditions for incarcerated people and medical staff

2   alike. As of late 2021, 216 medical positions at the Jail—more than 41% of authorized

3   positions—remained vacant, and existing medical staff have been on mandatory overtime

4   for months.

5

6   **Answer**: MAH denies the averments in Paragraph 7 as alleged against MAH. MAH is

7   without sufficient knowledge or information to admit or deny the averments in Paragraph

8   7 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies

9   those averments.

10

11   8.   Compounding the problem, custody staff, rather than health care professionals, can and

12   do make final decisions about the health care services that incarcerated people receive.

13   People at the Jail are not adequately screened for medical needs and do not timely receive

14   essential medication or treatment. For example, Michael Wilson died in 2019 after Jail

15   staff and contractors failed to ensure that Wilson received his life-saving heart

16   medication, even though a judge had specifically ordered the Jail to provide Wilson with

17   his medication. Incarcerated people fail to receive timely or appropriate treatment once in

18   the Jail, resulting in unnecessary and prolonged pain, suffering, worsening of their

19   conditions, and sometimes even death. In 2019, the *San Diego Union-Tribune* found that

20   "[r]eports show multiple inmates dying from treatable conditions like diabetes,

21   pneumonia and stomach ulcers."[5] The Jail's practices for treating and monitoring

22   individuals experiencing withdrawal from drugs or alcohol are inadequate, and at least

23   four incarcerated people have died while experiencing withdrawal in recent years. For

example, 24-year-old Elisa Serna died alone in the Jail in 2019 after she fell and struck her head while experiencing withdrawal, and Jail staff failed to timely intervene. Jail staff and Contractor Defendants also fail to provide adequate treatment to incarcerated people with substance use disorders, which has contributed to the surge in overdoses in the Jail, including four fatal overdoses in 2021. At least three incarcerated people have died from COVID-19 since December 2020, and the Jail's inadequate COVID-19 response is the subject of a separate lawsuit pending in state court.[6] [footnotes omitted]

**Answer**: MAH denies the averments in Paragraph 8 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 8 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

9. Plaintiffs seek declaratory and injunctive relief under the United States and California constitutions against County Defendants' and Defendant Liberty Healthcare's deliberate indifference to their failure to provide incarcerated people with minimally adequate mental health care. Those Defendants' failures to assess and address suicide risks have led to an inordinate number of suicides in the Jail. From 2011 to 2020, 39 people committed suicide in the Jail, for a suicide rate of approximately 74 deaths by suicide per 100,000 people, which is more than 1.5 times the national average. Exhaustive reports from outside experts—Lindsay Hayes's *Report on Suicide Prevention Practices Within The San Diego County Jail System* ("Hayes Report")[7] and Disability Rights California's *Suicides in San Diego County Jail: A System Failing People with Mental Illness* ("DRC Report")[8]—have

repeatedly criticized the Jail's suicide prevention policies and practices, but the Jail maintains many of the same deadly policies and practices, in particular the dangerous misuse of isolation. The Sheriff's Department fails to maintain time limits on stays in "safety cells" and enhanced observation cells, where incarcerated people are stripped of their clothes and denied access to programs and social contact. The Sheriff's Department regularly houses people in these cells for several days, contrary to modern practices, and in many cases even after a mental health clinician has determined that they are no longer at acute risk of suicide. The Jail's mental health program is woefully inadequate and understaffed. In May 2021, the Sheriff's Department estimated that at least one-third of incarcerated people have a form of mental illness that requires medication,[9] and in December 2021, 1,432 incarcerated people at the Jail were prescribed psychotropic medications.[10] Yet the Sheriff's Department maintains only 25 mental health clinicians. With backbreaking caseloads and insufficient support, at least eight clinicians quit in 2021. The vast majority of mental health encounters are brief, non-confidential wellness checks that provide little or no therapeutic benefit. One investigation found that "[o]nly when [incarcerated people] reach the point of engaging in acts of self-harm or having an acute breakdown do they receive an enhanced level of care. Such a system is cruel and counterproductive[.]"[11] The waitlist for the Jail's Psychiatric Stabilization Unit ("PSU")[12]—which provides the highest level of care—is so long that one clinician resorted to erasing other patients' names and moving her patients' names higher on the list. To make matters worse, conditions in the Jail's mental health units are filthy and barbaric, as demonstrated by the below photographs.[13] [footnotes and photographs omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 9 of the Complaint and, therefore, denies the averments.

10.  Under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Rehabilitation Act"), California Government Code § 11135, and California's Unruh Act, Plaintiffs seek declaratory and injunctive relief against Defendants as a remedy for their systemic and willful discrimination against, and failure to provide reasonable accommodations in, programs, services, and activities to incarcerated people in the Jail who have disabilities. Defendants fail to identify and track incarcerated people with disabilities and the accommodations those people require. The Jail fails to house incarcerated people with mobility disabilities in accessible housing. Incarcerated people who use wheelchairs are housed in cells with metal stools bolted to the floor in front of desks, making the desks inaccessible. Similar bolted-down stools preclude use of common area tables and telephones, and even if individuals can sidle up to the phones, their cords are too short for use from a wheelchair. At the Central Jail facility, the elevators that provide access to professional and family visitation are regularly broken; when this occurs, Jail staff fail to provide incarcerated people who cannot navigate stairs with alternative access to contact with their attorneys and family members. Jail staff often refuse to permit incarcerated people to possess needed assistive devices, in one case even confiscating and throwing away an incarcerated person's prosthetic limb. Jail staff fail to provide effective communication assistance to incarcerated people with disabilities, such as sign language interpretation for people with hearing disabilities.

Defendants' systemic failure to accommodate incarcerated people with disabilities results in the widespread exclusion of incarcerated people with disabilities from programs, services, and activities offered in the Jail, including health care services, attorney representation, meals, exercise, religious services, sleeping, and educational and vocational programs. Moreover, the lack of accommodations makes incarcerated people with disabilities reliant on other incarcerated individuals, placing them in vulnerable situations and exposing them to exploitation and violence.

**Answer**: MAH denies the averments in Paragraph 10 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 10 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

11.  Plaintiffs seek declaratory and injunctive relief under the United States and California constitutions against County Defendants' deliberate indifference to their failure to ensure the safety and security of incarcerated people against other unreasonably dangerous conditions in the Jail. Filthy conditions and environmental hazards expose people to infection and illness. Custody staff do not timely or adequately respond to calls for help. The Sheriff's faulty classification process places individuals charged with routine, low-level offenses in cells with violent individuals, as evidenced by the 2021 deaths of Robert Salyers and Dominique McCoy, who were killed by their cellmates. Kristina Frost, a transgender woman, was attacked in 2020 after deputies housed her in a holding cell with men, in callous disregard of her gender identity. Plaintiffs face an unreasonable

risk of death or serious harm from contraband in the Jail, as County Defendants fail to detect and prevent the flow of contraband into the Jail—in 2021, the Jail reported 204 suspected opiate overdoses, despite visitation being severely restricted. As a result of inadequate training and a lack of functioning video coverage in the Jail, when incarcerated people are in danger, custody staff fail to timely render aid. Emergency call buttons in cells often do not work or are ignored. In several recent deaths at the Jail, custody staff failed to timely and adequately monitor individuals known to be a danger to themselves. A disturbing number of Sheriff's deputies are openly hostile to many of the groups incarcerated in the Jail. Responses to a Sheriff's union survey about the upcoming Sheriff's election included numerous anti-Black Lives Matter comments (one calling Black Lives Matter a "domestic terror" group) and homophobic comments (worrying that the Sheriff's Department will promote the LGBTQ "lifestyle"), as well as several professing admiration for Chad Bianco, another California sheriff who was formerly a member of the Oath Keepers antigovernment militia. Conditions in the Jail are made more dangerous by staffing shortages due to COVID-19 and a low vaccination rate among Jail staff. As of December 2021, about 43% of Sheriff's deputies had yet to provide proof of vaccination against COVID-19.[14] County Defendants have failed to reduce the Jail population to account for these shortages, placing incarcerated people at substantial risk of serious harm. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 11 of the Complaint and, therefore, denies the averments.

1    12.  Plaintiffs seek declaratory and injunctive relief under the United States and California
2         constitutions against County Defendants' and Defendant Mid-America Health's
3         deliberate indifference to their failure to provide incarcerated people with adequate dental
4         care. Dental professionals from Mid-America are at most Jail facilities for no more than
5         two dental clinics per month. As a result, dental care is often untimely. By policy and
6         practice, treatment for dental problems is almost exclusively limited to tooth extractions,
7         forcing incarcerated people to choose between living with tooth decay and pain (often
8         treated only with Tylenol), or losing their teeth permanently. Basic dental treatments like
9         fillings are almost nonexistent in the Jail. County Defendants and Defendant Mid-
10        America fail to provide routine dental cleaning, evaluations, or preventive care—even to
11        individuals who have been incarcerated for years.
12
13        **Answer**: MAH states that Paragraph 12 is unclear and vague; to the extent that MAH
14        understands the averments set forth in Paragraph 12, MAH denies the averments in
15        Paragraph 12 as alleged against MAH. MAH is without sufficient knowledge or
16        information to admit or deny the averments in Paragraph 12 of the Complaint to the
17        extent they apply to the other Defendants, and, therefore, denies those averments.
18
19    13. Plaintiffs seek injunctive relief under the United States and California constitutions
20        against County Defendants' interference with Plaintiffs' right to effective assistance of
21        counsel and right to access the courts. County Defendants, by their policies and practices,
22        confiscate incarcerated people's legal materials, including legal materials in pending
23        cases in which those incarcerated people are proceeding without legal representation.

1    County Defendants also unreasonably and unjustifiably deny incarcerated people access

2    to confidential communications with their attorneys. Despite their policy that incarcerated

3    people have unlimited access to telephone calls with their attorneys, Sheriff's Department

4    staff have repeatedly failed to notify Plaintiff Edwards, Plaintiff Nelson, and other

5    incarcerated people about professional call requests from their attorneys, effectively

6    interfering with necessary attorney-client communications. In late 2021, the *San Diego*

7    *Union-Tribune* obtained internal emails showing that Sheriff's deputies recorded and

8    listened to privileged telephone calls between attorneys and their incarcerated clients.[15]

9    [footnotes omitted]

10

11    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

12    averments in Paragraph 13 of the Complaint and, therefore, denies the averments.

13

14    14. County Defendants' and Defendant San Diego County Probation Department's

15    ("Probation Department") failed policies and practices have led to the disproportionate

16    mass incarceration of people of color and people with mental health disabilities in San

17    Diego County. As one County Supervisor has acknowledged, "Mass incarceration

18    disproportionately impacts the poor, homeless, mentally ill and people of color and does

19    not make us safer."[16] The Jail is the County's largest mental health services provider

20    because County Defendants do not provide sufficient community-based mental health

21    services. The effects of even a short incarceration in the Jail—especially given the

22    terrible conditions detailed herein—are destabilizing to a person's health, residence,

23    livelihood, and family. Yet County Defendants have failed to implement adequate

alternatives-to-incarceration programs, adequate reentry programs, and other evidence-based policies to stop their mass incarceration. County Defendants' and the Probation Department's alternatives-to-incarceration programs—such as home detention—are available to far too few individuals who could participate in a way consistent with public safety. These failures create a cycle of reincarceration for people with serious medical or mental health needs who can be served safely in the community. Even with the COVID-19 pandemic, the Sheriff's Department continues to jail people for minor charges, including disturbing the peace and evading trolley fares.[17] County Defendants' failed policies violate the ADA's integration mandate and other protections against discrimination by denying people with disabilities the community-based diversion, treatment, and reentry services for which they would be eligible. County Defendants must significantly expand alternatives to incarceration and other programs to shift the pipeline away from the Jail and towards adequate community-based resources that can prevent unnecessary detention. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 14 of the Complaint and, therefore, denies the averments.

15. The unnecessary and dangerous detention practices in San Diego County also disproportionately harm Black and Latinx people. For example, in December 2021, over 20% of people incarcerated at the Jail were Black, whereas only around 5% of County residents are Black, and 43% of people incarcerated at the Jail were Latinx, whereas only 34% of County residents are Latinx.[18] Even once arrested, Black and Latinx arrestees are

1     incarcerated at higher rates than White arrestees and, upon information and belief, are

2     more likely to be incarcerated at the Jail for longer. Upon information and belief, the

3     disproportionate incarceration of Black and Latinx arrestees results from County

4     Defendants' and the Probation Department's policies for administering their alternative to

5     incarceration programs for pretrial detainees—including their use of a racially biased risk

6     assessment tool— and County Defendants' and the Probation Department's policies for

7     administering their early release and reentry programs. [footnotes omitted]

8

9     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

10    averments in Paragraph 15 of the Complaint and, therefore, denies the averments.

11

12                           **JURISDICTION**

13

14   16. This Court has jurisdiction over the claims brought under federal law pursuant to 28

15     U.S.C. §§ 1331 and 1343.

16

17     **Answer**: MAH admits the averments set forth in Paragraph 16 of the Complaint.

18

19   17. This Court has jurisdiction over the claims brought under California law pursuant to

20     28 U.S.C. § 1367.

21

22     **Answer**: MAH admits the averments set forth in Paragraph 17 of the Complaint.

23

1 18. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202,

2 42 U.S.C. §12101 *et seq.*, 29 U.S.C. § 794a, 42 U.S.C. §§ 1983 and 12117(a), Fed. R.

3 Civ. P. 65, California Government Code § 11135, California Civil Code § 51, and Article

4 1, Sections 7, 15, and 17 of the California Constitution.

5

6 **Answer**: Paragraph 18 of the Complaint is a statement regarding Plaintiffs' requested

7 relief to which no response is required. To the extent a response is required, MAH denies

8 that Plaintiffs are entitled to this, or any, relief.

9

10          **VENUE**

11 19.  Venue is properly in this Court, pursuant to Title 28 U.S.C. § 1391(b)(1), in that

12 Plaintiffs' claims for relief arose in this District and one or all of the Defendants

13 reside in this District.

14

15 **Answer**: MAH admits the averments in Paragraph 19 as alleged against MAH. MAH

16 is without sufficient knowledge or information to admit or deny the averments in

17 Paragraph 19 of the Complaint to the extent they apply to the other Defendants, and,

18 therefore, denies those averments.

19

20          **PARTIES**

21 20.  Plaintiff DARRYL DUNSMORE has been incarcerated at the Jail twice recently

22 while seeking re-sentencing, and on several prior occasions as well. Most recently,

23 DUNSMORE was incarcerated at the Jail from August 16, 2018 to September 19,

1    2018, and then again from December 13, 2019 to April 21, 2021. DUNSMORE was

2    incarcerated at the Jail when this action was initiated on March 20, 2020 and when

3    the First Amended Complaint was filed on July 23, 2020. DUNSMORE is currently

4    incarcerated at California Health Care Facility, a California Department of

5    Corrections and Rehabilitation ("CDCR") facility in Stockton, California.

6    DUNSMORE has two pending habeas petitions and an active appeal of a petition

7    under SB 775, and anticipates returning to the Jail in the near future for resentencing

8    or other proceedings under one or more of his pending petitions. DUNSMORE will

9    also be incarcerated at the Jail if he is transported from CDCR out to court to serve

10   as a witness. If DUNSMORE is released from CDCR on state parole or under Post

11   Release Community Supervision ("PRCS"), he is subject to being referred to the Jail

12   as San Diego is his county of commitment. DUNSMORE has been diagnosed with

13   ankylosing spondylitis ("AS"), a severe and advanced form of arthritis that causes

14   back pain and inflammation, and reduces the feeling in DUNSMORE's hands, arms,

15   and upper extremities. The severity of DUNSMORE's symptoms fluctuates; some

16   days he is in a state of paralysis, while other days he is able to engage in various

17   forms of physical activity. Regular physical activity helps DUNSMORE stay mobile.

18   DUNSMORE uses a modified spoon to eat and uses a modified pencil with foam

19   handles to write. DUNSMORE also uses a wheelchair. On September 10, 2018,

20   custody staff confiscated DUNSMORE's modified spoon and wheelchair because

21   they decided he did not need them, causing DUNSMORE to become distraught.

22   DUNSMORE, who experiences depression and anxiety, decompensated and told

23   staff he was suicidal. Staff then placed DUNSMORE in a filthy isolation cell without

his property and without his assistive eating device for several days, which led DUNSMORE to refuse food rather than be forced to eat like an animal. The cell lacked grab bars by the toilet, and DUNSMORE urinated and defecated on the cell floor. In December 2019, after the Jail failed to provide DUNSMORE with his necessary ground medical diet, DUNSMORE's spoon broke when he was trying to cut up food into smaller, manageable pieces, and the Jail did not give him a proper replacement for months. When DUNSMORE arrived at the Jail in December 2019 for resentencing, he came with several boxes of legal materials. A sergeant at the Jail confiscated all of DUNSMORE's legal materials. Despite repeated requests for the return of all of his legal materials, the Jail failed to return discovery material related to DUNSMORE's underlying conviction, which he has been challenging in court, as well as complaints against the Jail from his 2018 incarceration and other legal material relevant to civil cases he was prosecuting. DUNSMORE is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 20 of the Complaint and, therefore, denies the averments.

21.  Plaintiff ERNEST ARCHULETA has been incarcerated at the Jail since July 6, 2019. ARCHULETA has been sentenced. If he is transferred to CDCR custody, ARCHULETA will be housed at the Jail while out-to-court for any proceedings related to his underlying conviction or to serve as a witness in a case in San Diego

County. If ARCHULETA is released from CDCR on state parole or under PRCS, he is subject to being referred to the Jail as San Diego is his county of commitment. At the time ARCHULETA entered the Jail, he had been referred for neck surgery by a specialist, and during booking he informed intake staff that he needed neck surgery. Without surgery, ARCHULETA has difficulty turning his head and cannot sit upright. A medical evaluation conducted in August 2019 confirmed that ARCHULETA has "severe degenerative disc disease," but the Jail has failed to provide ARCHULETA neck surgery or even to obtain outside records from his neck specialist. ARCHULETA also has severe osteoarthritis in his left knee and left hip, and uses a wheelchair to travel longer distances. The Jail made ARCHULETA choose between having crutches, which ARCHULETA used in the community to help him to build strength and walk on his own, and a wheelchair— rather than permitting both assistive devices. ARCHULETA was not allowed use of his wheelchair to travel to a presentencing hearing and, because ARCHULETA cannot walk long distances, the hearing had to be postponed. Prior to his incarceration, a specialist recommended ARCHULETA have knee replacement surgery. An August 2019 medical evaluation confirmed his degenerative knee issues; however, the Jail has failed to refer ARCHULETA to a surgeon, and one doctor told him that the SHERIFF'S DEPARTMENT would not pay for knee surgery because ARCHULETA is awaiting transfer to CDCR custody. On multiple occasions, the Jail has run out of the medication ARCHULETA takes daily to manage his blood pressure, causing dangerous gaps in medication continuity. ARCHULETA sought mental health care shortly after he was incarcerated in July 2019. Although he was

1    seen by a mental health clinician in August 2019, he was not seen by a psychiatrist

2    until December 2019. ARCHULETA is a person with a disability as defined in 42

3    U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

4

5    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6    averments in Paragraph 21 of the Complaint and, therefore, denies the averments.

7

8    22.  Plaintiff ANTHONY EDWARDS has been incarcerated at the Jail eight times since

9    2011. Most recently, EDWARDS has been incarcerated at the Jail since July 2, 2019.

10   For the majority of his present incarceration, EDWARDS has been a pre-trial

11   detainee. If he is transferred to CDCR custody, EDWARDS will be housed at the Jail

12   while out-to-court for any proceedings related to his underlying conviction or to

13   serve as a witness in a case in San Diego County. If EDWARDS is released from

14   CDCR on state parole or under PRCS, he is subject to being referred to the Jail as

15   San Diego is his county of commitment. EDWARDS has severe sleep apnea and

16   informed the Jail upon intake, and in subsequent grievances, that he requires a CPAP

17   machine to sleep at night. However, the Jail did not facilitate a sleep study until

18   August 2020, and then did not provide EDWARDS a CPAP machine until August

19   2021. Without a CPAP machine for over two years, EDWARDS frequently stopped

20   breathing in the middle of the night during episodes that he describes as "mini heart

21   attacks" due to terrible chest and head pain. After these episodes, EDWARDS has

22   trouble sleeping and thinking properly. EDWARDS now experiences memory loss.

23   When EDWARDS had tooth pain in late 2020, the Jail's dental contractor extracted

1    the tooth rather than provide other treatment options that would have allowed

2    EDWARDS to keep his tooth. In late 2021, EDWARDS developed severe pain in his

3    lower left molar, and he has been forced to endure the pain because he does not want

4    to lose another tooth and has no other treatment options at the Jail. Although

5    EDWARDS has been incarcerated for more than two and a half years, the Jail has

6    never provided him with a dental cleaning or preventive checkup. EDWARDS has

7    depression and tries to access mental health care at the Jail. Due to frequent mental

8    health staff turnover and poor continuity of care, EDWARDS is routinely forced to

9    explain his trauma and mental health issues over and over again to new clinicians,

10   which prevents him from making progress managing his depression. Between

11   October and December 2021, the Sheriff's Department failed to communicate

12   several confidential call requests from EDWARDS's attorneys to him, which

13   prevented EDWARDS from discussing important matters with his attorneys.

14   EDWARDS only learned that the attorneys had been attempting to reach him when

15   he later received a letter from them. County Defendants and the Probation

16   Department also failed to provide adequate alternatives to incarceration and reentry

17   programming to EDWARDS, contributing to EDWARDS's repeated reincarceration

18   at the Jail on charges related to his addiction and mental illness. EDWARDS is a

19   person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and

20   California Government Code § 12926(l).

21

22   **Answer:** MAH admits that on November 23, 2020, Plaintiff Edwards consented to a

23   tooth extraction which was then performed. Otherwise, MAH denies the averments in

1   Paragraph 22 as may be alleged or impliedly against MAH. MAH is without sufficient

2   knowledge or information to admit or deny the averments in Paragraph 22 of the

3   Complaint to the extent they apply to the other Defendants, and, therefore, denies those

4   averments.

5

6  23. Plaintiff REANNA LEVY has been incarcerated at the Jail eight times since 2006.

7   Most recently, LEVY was incarcerated at the Jail from June 27, 2018 until February

8   3, 2022. LEVY has a history of pituitary brain tumors, including one that required

9   brain surgery at an outside hospital during a 2015 incarceration at the Jail. When

10   LEVY returned to the Jail in February 2015, LEVY was not housed in the medical

11   unit while she recovered because the medical unit was full. LEVY became

12   dehydrated and had hallucinations, and had to be transferred to the emergency room.

13   In late 2019, when LEVY complained again of symptoms similar to her prior

14   pituitary tumor symptoms, Jail staff failed to take LEVY's complaints seriously.

15   Another pituitary tumor grew and led to severe headaches, which LEVY was forced

16   to endure without adequate treatment until the summer of 2021, when LEVY was

17   finally able to see an endocrinologist. The Jail failed to provide LEVY adequate

18   mental health care for her depression. Her mental health encounters are brief and

19   non-confidential, with deputies always present for LEVY's conversations with

20   mental health clinicians. This setting prevents LEVY from fully communicating to

21   mental health clinicians about her mental health issues, including difficult life events

22   that have affected her mental health. County Defendants and the Probation

23   Department also failed to provide adequate alternatives to incarceration and reentry

1    programming to LEVY, contributing to her repeated reincarceration at the Jail on

2    charges related to her addiction and mental illness, and placing her at continuing risk

3    of reincarceration. LEVY is a person with a disability as defined in 42 U.S.C. §

4    12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

5

6    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

7    averments in Paragraph 23 of the Complaint and, therefore, denies the averments.

8

9    24.  Plaintiff JOSUE LOPEZ was incarcerated at the Jail from October 18, 2019 to May

10    12, 2021, while awaiting trial. LOPEZ has been released on bail, is still awaiting

11    trial, and could be incarcerated at the Jail again depending on factors related to his

12    bail and criminal case. LOPEZ is Deaf and relies on American Sign Language

13    ("ASL") to communicate. LOPEZ requires an ASL interpreter to communicate

14    effectively with persons who do not know ASL. However, during his incarceration,

15    Plaintiff LOPEZ was consistently denied accommodations for his hearing disability.

16    On numerous occasions, Jail staff failed to provide functioning Video Relay Service

17    ("VRS") or Video Remote Interpreting ("VRI") services to allow LOPEZ to

18    communicate with his family, and failed to provide LOPEZ with ASL interpretive

19    services during important appointments with medical and mental health staff.

20    Custody staff stood in the same room while LOPEZ communicated over video with

21    his attorney and a sign language interpreter. The Jail failed to ensure effective

22    communication with LOPEZ during numerous interactions with medical and custody

23    staff. Instead, medical and custody staff forced LOPEZ to communicate with them

1      through other incarcerated people, causing LOPEZ distress and putting his safety at

2      risk because they learned confidential information about him. Jail medical staff and

3      contractors often failed to provide LOPEZ, who had a kidney transplant prior to his

4      arrest, with medications essential to ensuring his body accepts the transplanted

5      kidney. That failure contributed to LOPEZ's need for repeated visits to an outside

6      kidney specialist in April 2020 for dangerous weight loss, excessive thirst, and

7      fatigue. LOPEZ's criminal defense attorney had to seek a court order simply to

8      ensure the Jail provided appropriate medication. When LOPEZ and others in his

9      housing unit were attempting to file a grievance about treatment and conditions at the

10      Jail, a deputy told them, "Whoever you want to write up, don't." LOPEZ is a person

11      with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and

12      California Government Code § 12926(l).

13

14      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

15      averments in Paragraph 24 of the Complaint and, therefore, denies the averments.

16

17      25.  Plaintiff CHRISTOPHER NELSON has been incarcerated at the Jail since March 2,

18      2021. NELSON was detained awaiting trial until September 2021 and is now housed

19      at the Jail while awaiting transfer to CDCR. While in CDCR custody, NELSON will

20      be housed at the Jail if he is out-to-court for any proceedings related to his

21      underlying conviction or to serve as a witness in a case in San Diego County. If

22      NELSON is released from CDCR on state parole or under PRCS, he is subject to

23      being referred to the Jail as San Diego is his county of commitment. NELSON

1   suffers from osteonecrosis in his hips and knees, which means his bones are

2   deteriorating, and he has had two hip replacement surgeries. As a result of his

3   medical conditions and injuries from a vehicle accident, NELSON cannot stand or

4   walk without experiencing significant pain, and he requires a wheelchair in the Jail.

5   Jail medical staff and contractors abruptly discontinued the pain medication that

6   doctors at an outside hospital prescribed to treat NELSON's car collision injuries,

7   and instead gave him varying dosages of less effective medications that left

8   NELSON in excruciating pain during his first weeks in the Jail and put him in danger

9   of withdrawal complications. The Jail has repeatedly housed NELSON in

10  inaccessible units and staff have unreasonably taken away his accommodations. In

11  one housing unit, NELSON was repeatedly shocked on the arm by the metal table

12  connected to the phones, which led to open sores that became infected. NELSON has

13  clinical depression and anxiety, but his sick call slips for mental health care were

14  ignored for more than a month. NELSON did not receive access to mental health

15  services for more than seven weeks, and only after he escalated his repeated requests

16  for help. County Defendants have interfered with NELSON's access to his criminal

17  defense attorney and other attorneys, including by failing to communicate numerous

18  callback requests from his criminal defense attorneys and failing to communicate

19  several callback requests from his civil attorneys. The Sheriff's Department deprived

20  NELSON access to a professional visit in spring 2021, allegedly due to the elevators

21  not operating and staff being unable to otherwise transport NELSON to a visitation

22  room on account of his wheelchair. In 2021, a deputy tried to prevent NELSON from

23  attending a professional visit by not letting NELSON out of his cell and falsely

1      telling his attorney that NELSON did not want to visit with the attorney. NELSON is

2      a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B),

3      and California Government Code § 12926(l).

4

5      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6      averments in Paragraph 25 of the Complaint and, therefore, denies the averments.

7

8      26.  Plaintiff CHRISTOPHER NORWOOD has been incarcerated at the jail 15 times

9      since 2005. Most recently, NORWOOD has been incarcerated at the Jail since June

10      22, 2021. NORWOOD was first detained at the Jail for several months awaiting trial

11      and is now awaiting transfer to CDCR. While in CDCR custody, NORWOOD will

12      be housed at the Jail if he is out-to-court from any proceedings related to his

13      underlying conviction or to serve as a witness in a case in San Diego County. If

14      NORWOOD is released from CDCR on state parole or under PRCS, he is subject to

15      being referred to the Jail as San Diego is his county of commitment. NORWOOD

16      has been diagnosed with opioid dependence, and was receiving medication assisted

17      treatment ("MAT") in the community, but the Jail failed to continue MAT when

18      NORWOOD arrived at the Jail. Although NORWOOD has serious mental illness

19      and requested mental health care when he entered the Jail, NORWOOD faced delays

20      in being seen by a mental health clinician in a confidential space. The Jail failed to

21      provide NORWOOD with any substance use counseling, programming, or literature.

22      County Defendants and the Probation Department have failed to provide adequate

23      alternatives to incarceration and reentry programming to NORWOOD, leading to his

repeated reincarceration at the Jail— often on charges related to his addiction.

NORWOOD is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C.

§ 705(9)(B), and California Government Code § 12926(l).

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 26 of the Complaint and, therefore, denies the averments.

27.  Plaintiff LAURA ZOERNER has been incarcerated in the Jail 21 times since 2010, including six times in 2021. Most recently, ZOERNER was incarcerated at the Jail from May 4, 2021 to November 2, 2021. ZOERNER is serving the remainder of her local sentence at the McAllister Institute's Kiva Learning Center in Lemon Grove. ZOERNER is an alcoholic, is frequently homeless, and was homeless prior to her most recent incarceration. ZOERNER has been diagnosed with bipolar disorder, major depressive disorder, schizoaffective disorder, and post-traumatic stress disorder ("PTSD"). ZOERNER also has a learning disability. During her most recent incarceration, ZOERNER experienced severe dental pain due to an abscess, but was not seen by a dentist for almost three weeks despite ZOERNER's repeated requests and grievances. Once the tooth was extracted, ZOERNER continued to experience severe pain, because the delay in treating the abscess likely contributed to inflammation in her jaw. The continuing pain and feelings of neglect led ZOERNER to report feeling suicidal, and she was placed in restrictive isolation cells without access to people, property, programs, or dental care, which caused her to further decompensate. Around the same time, the Jail changed ZOERNER's medication

regimen, which also contributed to her decompensation. ZOERNER was sent out for
a dental operation in June 2021, but when she returned from the hospital, staff then
stopped providing her with medications to treat her mental illness. ZOERNER began
to suffer from heart palpitations and did not receive responses when she pushed the
emergency button in her cell to ask for assistance. The combination of neglect and
changes in ZOERNER's medication contributed to a psychotic episode that lasted
from mid-June to early July. County Defendants and the Probation Department have
failed to provide adequate alternatives to incarceration and reentry programming to
ZOERNER, leading to her repeated reincarceration at the Jail, often on charges
related to her alcohol addiction. ZOERNER is a person with a disability as defined in
42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code §
12926(l).

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 27 of the Complaint and, therefore, denies the averments.

28.  Defendant SAN DIEGO COUNTY SHERIFF'S DEPARTMENT ("SHERIFF'S
DEPARTMENT") is a public entity, duly organized and existing under the laws of the
State of California. The SHERIFF'S DEPARTMENT is responsible for the day-to-day
operations of the Jail, including promulgating policies and procedures for the operation of
all Jail facilities, the implementation thereof, as well as the training and supervision of all
persons working in the Jail. The SHERIFF'S DEPARTMENT has contracted with third
parties to provide certain medical, mental health, and dental care services in the Jail, but

1   by law retains the ultimate authority over and responsibility for the health care, treatment,

2   disability accommodations, and safekeeping of incarcerated people in the Jail. The

3   SHERIFF'S DEPARTMENT employs 50 or more persons.

4

5   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6   averments in Paragraph 28 of the Complaint and, therefore, denies the averments.

7

8   29.  Defendant COUNTY OF SAN DIEGO (the "COUNTY") is a public entity, duly

9   organized and existing under the laws of the State of California. Under its authority,

10  Defendant COUNTY operates and manages the Jail and is, and was at all relevant

11  times mentioned herein, responsible for the actions and/or inactions and the policies,

12  procedures, practices, and customs of the SHERIFF'S DEPARTMENT and its

13  respective employees and/or agents. The COUNTY authorized and approved the

14  contracts between Defendant SHERIFF'S DEPARTMENT and third-party

15  contractors to provide certain medical, mental health, and dental care to incarcerated

16  people in the Jail. The COUNTY by law retains the ultimate authority over and

17  responsibility for the health care, treatment, disability accommodations, and

18  safekeeping of Plaintiffs and the class they seek to represent. The COUNTY employs

19  50 or more persons.

20

21  **Answer**: MAH is without sufficient knowledge or information to admit or deny the

22  averments in Paragraph 29 of the Complaint and, therefore, denies the averments.

23

30. Together, Defendants COUNTY and SHERIFF'S DEPARTMENT (collectively, "COUNTY DEFENDANTS") are responsible for operation of all San Diego County Jail facilities, which for the decade from 2011 to 2020 housed an average of 5,232 incarcerated people at any given time.[19] In 2021, the average daily population of the Jail was 3,927, lower than the average daily population of the last decade, as a result of the COVID-19 pandemic. Even so, the population is still high enough that incarcerated people have reported in the Jail COVID-19 lawsuit that social distancing is not possible, as some of the Jail facilities are regularly at or over their rated capacities.[20] And the Jail population is increasing again: 4,422 people were incarcerated as of February 9, 2022. The Jail is comprised of six facilities: San Diego Central Jail ("Central"), George Bailey Detention Facility ("George Bailey"), Vista Detention Facility ("Vista"), Las Colinas Detention and Reentry Facility ("Las Colinas"), South Bay Detention Facility ("South Bay"), and East Mesa Reentry Facility ("East Mesa"). A seventh facility, Facility 8 Detention Facility ("Facility 8"), was part of the Jail system until recently but closed in the last year and/or currently houses no incarcerated people. COUNTY DEFENDANTS plan to open a new facility, Rock Mountain Detention Facility ("Rock Mountain"), to replace South Bay, although its opening is years behind schedule.[21] Central, Vista, and Las Colinas are booking facilities for newly-arriving incarcerated people. Central, George Bailey, South Bay, and East Mesa are male-only facilities. Las Colinas is usually a female-only facility, although it has housed males during the pandemic. Male and female incarcerated people may be booked and housed at Vista, although the vast majority of female incarcerated people are housed at Las Colinas. Although there are several

1    facilities, the SHERIFF'S DEPARTMENT has stated it operates the Jail system

2    "collectively as one system" and transfers people "fluidly within the system."

3    [footnotes omitted]

4

5    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6    averments in Paragraph 30 of the Complaint and, therefore, denies the averments.

7

8    31.  Defendant CORRECTIONAL HEALTHCARE PARTNERS, INC.

9    ("CORRECTIONAL HEALTHCARE PARTNERS") is a California corporation that

10   provides medical care staffing and services at the Jail pursuant to a contract with

11   COUNTY DEFENDANTS. Pursuant to the contract, CORRECTIONAL

12   HEALTHCARE PARTNERS provides on-site health care providers at the Jail for

13   primary and urgent care as part of sick call, specialty clinic services, and on-call

14   services during periods outside of scheduled on-site sick call hours.

15   CORRECTIONAL HEALTHCARE PARTNERS is responsible for ensuring all

16   scheduled clinics at the Jail have physician coverage and appropriately staffing them

17   to avoid clinic rescheduling and cancellations. CORRECTIONAL HEALTHCARE

18   PARTNERS' physicians are responsible for prescribing and monitoring medications

19   in accordance with the SHERIFF'S DEPARTMENT's policies and procedures.

20   CORRECTIONAL HEALTHCARE PARTNERS is responsible, along with the

21   SHERIFF'S DEPARTMENT, for peer review, quality assurance monitoring, quality

22   improvement, utilization review, and clinical policy and procedure development and

23   implementation. CORRECTIONAL HEALTHCARE PARTNERS is also required to

1    provide qualified administrative, management, and professional staffing in the

2    performance of on-site services. CORRECTIONAL HEALTHCARE PARTNERS

3    must comply with the ADA and other disability anti-discrimination laws. At all times

4    when CORRECTIONAL HEALTHCARE PARTNERS and its employees provide

5    medical care to incarcerated people in the Jail, CORRECTIONAL HEALTHCARE

6    PARTNERS and its employees have acted and continue to act under color of state

7    law.

8

9    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

10   averments in Paragraph 31 of the Complaint and, therefore, denies the averments.

11

12   32.  Defendant TRI-CITY MEDICAL CENTER ("TRI-CITY") is a California

13   corporation that provides health care staffing and services at the Jail and inpatient

14   and outpatient hospital services, pursuant to a contract with COUNTY

15   DEFENDANTS. Pursuant to the contract, TRI-CITY provides a minimum of six on-

16   site physicians for primary and urgent care at the Jail as part of sick call, specialty

17   clinic services, and on-call services during periods outside of scheduled on-site sick

18   call hours. TRI-CITY is responsible for ensuring all of its scheduled clinics at the

19   Jail have physician coverage and appropriately staffing them to avoid clinic

20   rescheduling and cancellations. TRI-CITY's physicians are responsible for

21   prescribing and monitoring medications in accordance with the SHERIFF'S

22   DEPARTMENT's policies and procedures. TRI-CITY is responsible, along with the

23   SHERIFF'S DEPARTMENT, for peer review, quality assurance monitoring, quality

improvement, utilization review, and clinical policy and procedure development and

implementation. TRI-CITY physicians make referrals for off-site tests and

procedures, and they coordinate those referrals with the SHERIFF'S

DEPARTMENT. TRI-CITY is required to provide qualified administrative,

management, and professional staffing in the performance of on-site services. TRI-

CITY also provides inpatient and outpatient hospital services to incarcerated people

at TRI-CITY's hospital in Oceanside, upon referral and transport by the SHERIFF'S

DEPARTMENT. TRI-CITY provides a hospital ward specifically for inpatient

hospitalization of incarcerated people in SHERIFF'S DEPARTMENT custody. At

the hospital, TRI-CITY provides services such as inpatient and outpatient care,

emergency services, and trauma care. TRI-CITY must provide discharge summaries

and discharge treatment planning for all incarcerated people released from TRI-

CITY's care. TRI-CITY must comply with the ADA and other disability anti-

discrimination laws. At all times when TRI-CITY and its employees provide medical

care to incarcerated people, TRI-CITY and its employees have acted and continue to

act under color of state law.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 32 of the Complaint and, therefore, denies the averments.

33. Defendant LIBERTY HEALTHCARE, INC. ("LIBERTY") is a Pennsylvania

corporation that provides mental health care staffing and services at the Jail pursuant

to a contract with COUNTY DEFENDANTS. Pursuant to that contract, LIBERTY

1    provides "comprehensive mental health and programming services" for incarcerated

2    people on-site, on-call, and via video. Those services include, but are not limited to,

3    identifying mental health needs at booking, providing comprehensive mental health

4    evaluations, conducting psychiatric evaluations of incarcerated people on suicide

5    watch, diagnosing and providing psychotropic medications, providing individual and

6    group counseling, and providing program services such as substance use

7    rehabilitation, aid for people with intellectual and developmental disabilities, and

8    violence reduction. LIBERTY must adhere to relevant mental health care standards

9    and provide coordinated services to incarcerated people. LIBERTY staff include a

10   chief psychiatrist, psychiatrists, clinical director, psychologists, nurse practitioners,

11   and licensed vocational nurses. LIBERTY must comply with the ADA and other

12   disability anti-discrimination laws. At all times when LIBERTY and its employees

13   provide mental health care to incarcerated people at the Jail, LIBERTY and its

14   employees have acted and continue to act under color of state law.

15

16   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17   averments in Paragraph 33 of the Complaint and, therefore, denies the averments.

18

19   34.  Defendant MID-AMERICA HEALTH, INC. also known as Mid America

20   Professional Group, P.C.[22] ("MID-AMERICA") is an Indiana corporation that

21   provides dental care staffing and services at the Jail pursuant to a contract with

22   COUNTY DEFENDANTS. Pursuant to its contract with COUNTY DEFENDANTS,

23   MID-AMERICA provides both on-site dental services during dental clinics at the

1    Jail and off-site referral dental services for more complex procedures. MID-

2    AMERICA is responsible for providing its own dental assistants and, along with

3    COUNTY DEFENDANTS, for ensuring that dental clinics are not interrupted or

4    dental services not provided due to any vacancies in MID-AMERICA staff. MID-

5    AMERICA is responsible for adequately supervising its staff. The on-site services

6    MID-AMERICA is required to provide include, but are not limited to, oral

7    examinations, temporary restorative procedures, extractions, medication, emergency

8    care, and preventive dental services. MID-AMERICA may refer patients for off-site

9    procedures when they cannot be completed on-site, subject to pre-authorization from

10   the SHERIFF'S DEPARTMENT. MID-AMERICA provides those off-site dental

11   services. MID-AMERICA must comply with the ADA and other disability anti-

12   discrimination laws. At all times when MID-AMERICA and its employees provide

13   dental care to incarcerated people, MID-AMERICA and its employees have acted

14   and continue to act under color of state law. [footnote omitted]

15

16   **Answer:**  MAH denies that it is also known as Mid America Professional Group,

17   P.C.  MAH admits that it is an Indiana corporation.  MAH admits that it and the

18   County of San Diego entered into that certain contract titled "County Contract

19   Number 555204 Agreement with Mid America Health, Inc. for Dental Services" and

20   dated December 30, 2016.  MAH further answers that "County Contract Number

21   555204 Agreement with Mid America Health, Inc. for Dental Services" speaks for

22   itself and any representations to the contrary in Paragraph 34 are expressly denied.

23   MAH states that Paragraph 34 is otherwise unclear and vague and that MAH is

1      without sufficient knowledge or information to admit or deny the remaining

2      averments in Paragraph 34 of the Complaint and, therefore, denies those averments.

3

4     35.  Defendant LOGAN HAAK, M.D., INC. ("LOGAN HAAK") is a California

5      corporation that provides vision care staffing and services to incarcerated people

6      pursuant to a contract with COUNTY DEFENDANTS. Pursuant to that contract,

7      LOGAN HAAK provides on-site ophthalmology care at the Jail, including

8      screening, prevention, and treatment services, during ophthalmology clinics

9      scheduled by the SHERIFF'S DEPARTMENT. Ophthalmology services must be

10     authorized or referred by the SHERIFF'S DEPARTMENT. LOGAN HAAK is

11     required to provide the licensed staff and medical equipment necessary to operate

12     those on-site clinics. Pursuant to the contract, the ophthalmology clinics are held at

13     Central and Las Colinas on alternating Saturday mornings and last four hours.

14     LOGAN HAAK can also recommend an incarcerated person's referral to an outside

15     treatment facility for more complex treatments, subject to approval by the

16     SHERIFF'S DEPARTMENT. LOGAN HAAK must comply with the ADA and

17     other disability anti-discrimination laws. At all times when LOGAN HAAK and its

18     employees provide vision care to incarcerated people, LOGAN HAAK and its

19     employees have acted and continue to act under color of state law.

20

21     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

22     averments in Paragraph 35 of the Complaint and, therefore, denies the averments.

23

1    36. Defendant SAN DIEGO COUNTY PROBATION DEPARTMENT ("PROBATION

2        DEPARTMENT") is a public entity, duly organized and existing under the laws of

3        the State of California. Defendant PROBATION DEPARTMENT, through its

4        division for Adult Reintegration and Community Supervision Services, is

5        responsible for supervising many individuals before and after their release from the

6        Jail and providing them with services to assist their reentry into the community. The

7        PROBATION DEPARTMENT is responsible for preparing presentence reports and

8        recommendations on the sentence options and community interventions available to

9        incarcerated people. The PROBATION DEPARTMENT is also responsible for

10      certain pre-trial diversion programming, including a pre-trial mental health diversion

11      program. The PROBATION DEPARTMENT employs 50 or more persons.

12

13      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

14      averments in Paragraph 36 of the Complaint and, therefore, denies the averments.

15

16    37. Plaintiffs are ignorant of the true names and capacities of Defendants sued in this

17        complaint as DOES 1 through 20, inclusive, and therefore sue these Defendants by

18        such fictitious names. Plaintiffs will amend this complaint to allege their true names

19        and capacities when ascertained. Plaintiffs are informed and believe and thereon

20        allege that each of the fictitiously named Defendants is personally responsible in

21        some manner for the occurrences alleged in this complaint.

22

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 37 of the Complaint and, therefore, denies the averments.

38.  At all times mentioned in this complaint, each Defendant was the agent of the others, was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them was committed on behalf of every other Defendant. Throughout the complaint, allegations of a Defendant's failure to train includes that the Defendant failed to adequately supervise.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 38 of the Complaint and, therefore, denies the averments.

## FACTUAL ALLEGATIONS

### I. DEFENDANTS FAIL TO PROVIDE ADEQUATE MEDICAL CARE TO INCARCERATED PEOPLE

39.  Incarcerated people in the Jail are entirely dependent on the SHERIFF'S DEPARTMENT, CORRECTIONAL HEALTHCARE PARTNERS, TRI-CITY, and LOGAN HAAK for medical care. By policy and practice, those Defendants fail to provide adequate medical care to incarcerated people in the Jail, and are deliberately indifferent to the fact that their failure to provide adequate medical care subjects incarcerated people to a substantial risk of unnecessary suffering, serious injury, clinical deterioration, and/or death. These Defendants are aware of the severe, system-wide medical care deficiencies that have caused and continue to cause significant harm to the incarcerated people in their custody, and have failed to

1    adequately train and supervise their staff to prevent such harm. In 2017, the National

2    Commission on Correctional Health Care ("NCCHC") found in an exhaustive 139-

3    page report ("NCCHC Report")[23] that the Jail failed to meet nearly all of the

4    standards for adequate medical care, including on Access to Care, Initial Health

5    Assessment, and Intoxication and Withdrawal. In reviewing Jail deaths, the State

6    Audit Report raised concerns about the Jail's "ability to provide adequate safety and

7    medical care to those it incarcerates."[24]  [footnotes omitted]

8

9    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

10    averments in Paragraph 39 of the Complaint and, therefore, denies the averments.

11

12    40.  The SHERIFF'S DEPARTMENT operates a Medical Services Division ("MSD")

13    that is responsible for providing health care services to all incarcerated people at the

14    Jail. MSD health care staff include registered nurses, nurse practitioners, and a

15    nursing supervisor. The MSD has promulgated a Division Operations Manual that

16    sets forth policies and procedures for medical care at the Jails. The MSD has also

17    issued Standard Nursing Procedures, which specify treatment procedures that its

18    nurses should follow for certain conditions. Within the MSD, the Managed Care

19    Group is responsible for the review of all outpatient referrals and for managing

20    inpatient hospitalizations.

21

22    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

23    averments in Paragraph 40 of the Complaint and, therefore, denies the averments.

1

2   41. COUNTY DEFENDANTS have contracted with several of the CONTRACTOR

3   DEFENDANTS to provide health care staffing and health care services at the Jail.

4   Generally, on-site physicians are contractors from CORRECTIONAL

5   HEALTHCARE PARTNERS or TRI-CITY. Pursuant to their contracts with

6   COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS and

7   TRI-CITY must provide care according to the SHERIFF'S DEPARTMENT's

8   policies and procedures. Pursuant to its contract with COUNTY DEFENDANTS,

9   TRI-CITY provides health care services to incarcerated people requiring inpatient

10   hospitalization for medical care. COUNTY DEFENDANTS determine whether to

11   refer incarcerated people to TRI-CITY for inpatient medical care. COUNTY

12   DEFENDANTS also contract with LOGAN HAAK to provide ophthalmology

13   services to incarcerated people. LOGAN HAAK must provide services to patients

14   referred by the SHERIFF'S DEPARTMENT, and must do so in accordance with the

15   SHERIFF'S DEPARTMENT's policies and procedures.

16

17   **Answer**: MAH denies the averments in Paragraph 41 as alleged against MAH. MAH

18   is without sufficient knowledge or information to admit or deny the averments in

19   Paragraph 41 of the Complaint to the extent they apply to the other Defendants, and,

20   therefore, denies those averments.

21   **A. County Defendants, Correctional Healthcare Partners, and Tri-**
22   **City Systematically Fail to Maintain Sufficient Numbers of**
23   **Adequately Trained Health Care Professionals**

24

42.  COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, and TRI-CITY maintain insufficient numbers of health care professionals to provide minimally adequate care to the more than 4,000 incarcerated people in the Jail. As of October 2021, 216 of the approximately 500 allocated health care positions in the SHERIFF'S DEPARTMENT were vacant, a rate of more than 41%. There are not sufficient health care staff to timely respond to incarcerated people's requests for medical evaluations and treatment, to adequately screen, monitor, and provide follow-up care to incarcerated people who have serious and chronic illnesses, or to treat incarcerated people when medical emergencies occur.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 42 of the Complaint and, therefore, denies the averments.

43.  COUNTY DEFENDANTS have long been aware that the Jail's medical staffing is deficient and jeopardizes patient safety. NCCHC's 2017 report found that medical understaffing may be contributing to untimely medical care at the Jail.[25] The failure to provide timely care also reflects CORRECTIONAL HEALTH PARTNERS' and TRI-CITY's failure to fulfill their contractual obligation to staff clinics so that they are not canceled or rescheduled. After the NCCHC Report, the SHERIFF'S DEPARTMENT publicly acknowledged that it needed to hire more medical staff to provide adequate care and comply with NCCHC standards.[26] COUNTY DEFENDANTS have failed to hire and retain sufficient medical staff, as the SHERIFF'S DEPARTMENT has admitted through its Undersheriff,[27] and as the

1     current number of vacancies makes clear. CORRECTIONAL HEALTHCARE

2     PARTNERS and TRI-CITY also fail to provide sufficient staff to stem the

3     understaffing crisis. [footnotes omitted]

4

5     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6     averments in Paragraph 43 of the Complaint and, therefore, denies the averments.

7

8    44. Understaffing of health care professionals translates to dangerous conditions and

9     inadequate medical care for incarcerated people. In December 2020, understaffing

10    prompted nursing staff at Vista to write a desperate plea to Jail command staff for

11    "any kind of help we can get." The nurses' letter explained that during certain shifts,

12    Vista had only two registered nurses available—one permanently stationed at

13    intake—for the 600 people incarcerated at the facility. As a result, the nurses wrote,

14    "this environment for patient care is not even close to standard," and "[p]atients are

15    being neglected and not being given the care that they need and deserve." The nurses

16    implored command staff to "understand that people's lives are put at risk" by the

17    dangerous understaffing at the Jail.

18

19    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

20    averments in Paragraph 44 of the Complaint and, therefore, denies the averments.

21

22    45. Pervasive understaffing is not limited to the Vista facility. For example, during one

23    week in February 2021, at least four Jail facilities were severely understaffed. At

1    George Bailey, which houses approximately 1,500 incarcerated people at any given

2    time, the Jail had no nurse case manager (an essential position) for the day shift all

3    week long, and the licensed vocational nurses ("LVNs") were assigned to cover four

4    different roles due to short-staffing. At South Bay, only one nurse was available

5    during many day shifts, and no medical staff were on site at night. At Vista, all three

6    medical intake screening nurse positions remained vacant, and nurses assigned to

7    sick call were forced to handle intake. And at Central, 8 of 21 medical positions were

8    vacant. Two of the three nurse positions in the PSU at Central were vacant during

9    second shift all week, such that an intake nurse had to cover care in the PSU. During

10   another shift in February 2021, only LVNs, who are entry-level providers not

11   qualified to do their own patient evaluations or assessments, were assigned to the

12   medical observation unit and the PSU at Central. Due to understaffing, COUNTY

13   DEFENDANTS improperly allow untrained nurses to perform mental health

14   evaluation gatekeeping functions. Many nurses are uncomfortable being asked to

15   serve this role. As noted in the Introduction, the October 2021 letter from the Service

16   Employees International Union ("SEIU") Local 221, which represents Jail health

17   care workers, to CLERB, explained that understaffing created "dangerous and

18   inhumane" conditions for incarcerated people and medical staff alike.

19

20   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

21   averments in Paragraph 45 of the Complaint and, therefore, denies the averments.

22

1    46.  The Central PSU—the inpatient mental health unit for male incarcerated people

2         with the most serious mental health needs—is supposed to have three registered

3         nurses per shift to provide medical care to those housed in the PSU. However, the

4         unit rarely has three nurses available and on many occasions zero nurses are

5         available to provide care. Upon information and belief, on Christmas Day 2021,

6         there was an extreme shortage of nurses on duty for the entire Central facility; a

7         single supervising nurse came in to cover. In January 2022, the PSU went

8         approximately 12 hours with no nursing staff, leaving the unit with only deputies.

9

10        **Answer**: MAH is without sufficient knowledge or information to admit or deny the

11        averments in Paragraph 46 of the Complaint and, therefore, denies the averments.

12

13   47.  Because of its failure to hire and retain sufficient medical staff, the SHERIFF'S

14        DEPARTMENT relies on a system of mandatory overtime, which causes medical

15        staff burnout, results in high turnover, and places incarcerated people at further risk

16        of harm. SHERIFF'S DEPARTMENT medical employees have been on mandatory

17        overtime because of chronic staffing deficits. Medical staff often call in sick due to

18        burnout, which leaves incarcerated people with even fewer medical professionals

19        available to provide care. Mandatory overtime and other workplace stressors are so

20        severe that medical staff often quit. Even when the SHERIFF'S DEPARTMENT

21        hires new medical staff, it is unable to retain new employees due to these impossible

22        work conditions. COVID-19 causes staffing shortages that further exacerbate the

23        problem.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 47 of the Complaint and, therefore, denies the averments.

48. The CONTRACTOR DEFENDANTS supply only a small number of additional medical staff, which is insufficient to alleviate the Jail's medical understaffing problems and address the hundreds of vacant SHERIFF'S DEPARTMENT positions. For example, COUNTY DEFENDANTS' latest contract with TRI-CITY provides that TRI-CITY need only provide six physicians to cover sick call clinics at six Jail facilities. In addition, some contractors and staff leave early from their scheduled shifts, and commit other serious misconduct during work hours without consequence. For example, one nurse at Central had an affair with a SHERIFF'S DEPARTMENT captain and, on information and belief, was discovered having sex with him inside the Jail during work hours, harming morale and undermining accountability.

**Answer**: MAH denies the averments in Paragraph 48 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 48 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

49.  The failure to maintain sufficient medical staff causes disruptions and delays in the care of incarcerated people's serious medical needs. For example, due to staffing

1    shortages, Plaintiff LOPEZ often did not receive his daily medications— which he

2    was required to take in the morning—until the afternoon or evening, if at all.

3    LOPEZ's medications ensure that his body does not reject a kidney transplant he

4    received before being incarcerated. The Jail did not maintain adequate stock of

5    LOPEZ's medications and delayed in ordering refills, which meant that LOPEZ

6    sometimes went as long as three days without his daily medications. These failures

7    contributed to a decline in LOPEZ's health, as he lost 15-20 pounds and had to make

8    several visits to a kidney specialist at an outside hospital in April 2020. LOPEZ's

9    attorney ultimately had to seek a superior court order to force the Jail to sufficiently

10   stockpile his medications and timely provide them.

11

12   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

13   averments in Paragraph 49 of the Complaint and, therefore, denies the averments.

14

15   50.  Many of the systematic and dangerous practices in the Jail outlined in this

16        complaint—including the failure to adequately continue essential medications and

17        treatments, the failure to provide adequate treatment and observation for incarcerated

18        people in withdrawal, the failure to provide adequate discharge planning, the failure

19        to conduct adequate intake screenings, and many others—stem from COUNTY

20        DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS', and TRI-

21        CITY's failure to maintain sufficient numbers of health care staff and contractors in

22        the Jail.

23

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 50 of the Complaint and, therefore, denies the averments.

**B. Custody Staff Interfere With and Undermine the Health Care Professionals in the Jail**

51. By policy and practice, COUNTY DEFENDANTS fail to ensure that clinical medical decisions about medical care for incarcerated people are made by medical professionals, rather than sworn custody staff. Although the SHERIFF'S written policies purport to leave authority for medical decisions with medical professionals, sworn command staff oversee all health care professionals and contractors within the SHERIFF'S DEPARTMENT, as reflected in the SHERIFF'S organizational chart.[28] In practice, custody staff often make decisions determining what medical care is provided to individual patients, as well as about policies, practices, and procedures for medical care in the Jail. Medical professionals are implicitly and expressly informed that if command staff and/or custody staff give orders about the medical care of an incarcerated person, the medical staff must follow those orders. The October 12, 2021 letter written by the SEIU, the union representing COUNTY DEFENDANTS' health care staff, complains of the Jail's "lack of adherence to general practice protocols such as direction of health care service providers by licensed medical professionals rather than law enforcement." [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 51 of the Complaint and, therefore, denies the averments.

52. COUNTY DEFENDANTS' policy and practice of allowing custody staff with no
medical licensing, credentials, or training to make medical decisions places
incarcerated people in the Jail at substantial risk of serious harm. Custody staff at
times deny incarcerated people clinically necessary treatments for their serious
medical needs.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 52 of the Complaint and, therefore, denies the averments.

53. The SHERIFF'S DEPARTMENT's policy and practice of interference with medical
professionals and clinical judgment sidelines medical staff and has a chilling effect
that dissuades medical professionals from contradicting custody staff, even when
medically necessary. Medical professionals at the Jail who have repeatedly been
overruled by custody staff are, in effect, implicitly trained not to advocate for better
treatment of incarcerated people because they know that their advocacy is futile.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 53 of the Complaint and, therefore, denies the averments.

54. Custody staff, many of whom are not vaccinated, fail to protect incarcerated people
against COVID-19. Incarcerated people have reported that deputies sometimes

refute to provide cleaning supplies, and command staff admitted they had not created any educational materials to address vaccine hesitancy.[29] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 54 of the Complaint and, therefore, denies the averments.

### C. The Jail's Inadequate Screening and Intake Process Fails to Identify and Treat Medical Care Problems of Newly Arriving Incarcerated People

55. By policy and practice, the SHERIFF'S DEPARTMENT fails to adequately identify and treat the medical issues of newly arriving incarcerated people during the screening and intake process. The SHERIFF'S DEPARTMENT does not adequately train or supervise intake staff to adequately identify and treat the medical issues of newly arriving incarcerated people. These policies and practices place incarcerated people at risk of serious harm or death. The State Audit Report studied 30 in-custody deaths in recent years and found that at least eight individuals "had serious medical or mental health needs that health staff did not identify or communicate to detention staff at intake." Several of those people died within days of entering the Jail. In one instance, the intake nurse identified possible symptoms of drug withdrawal in an arriving person, but failed to communicate the conclusion to other staff, and the individual died a day later from complications of overdose—without ever receiving medical care.[30] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 55 of the Complaint and, therefore, denies the averments.

56. The Jail fails to timely conduct intake screening of newly arriving incarcerated people. The NCCHC Report found that the Jail was not compliant with NCCHC standards on medical intake and screening. According to NCCHC, the booking process often takes 8 hours after arrival, and can sometimes take 30 hours, which delays access to care for incarcerated people with medical needs.[31] Intake screening remains untimely to this day. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 56 of the Complaint and, therefore, denies the averments.

57. COUNTY DEFENDANTS lack adequate policies and practices to ensure that intake medical screening is confidential. A 2018 report by suicide prevention expert Lindsay Hayes found that intake screening areas at all three booking Jail facilities lacked sound confidentiality, which compromises a patient's ability to respond candidly to medical and mental health intake questions and prevents medical staff from adequately identifying the person's serious medical needs.[32] Upon information and belief, the SHERIFF'S DEPARTMENT has failed to ensure that all intake booking areas at the Jail facilities are confidential. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 57 of the Complaint and, therefore, denies the averments.

58. COUNTY DEFENDANTS lack adequate policies and practices for reviewing arriving incarcerated people's medical history. The SHERIFF'S DEPARTMENT fails to ensure continuity of medical care for the many incarcerated people receiving care through other COUNTY agencies or community providers. The SHERIFF'S DEPARTMENT does not adequately train or supervise intake staff to review an incarcerated person's prior medical records. As a result, Jail intake staff fail to conduct adequate reviews of prior booking information, which contributes to the Jail's failure to identify current medical needs and to act to treat them.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 58 of the Complaint and, therefore, denies the averments.

59. COUNTY DEFENDANTS' policies and practices undermine continuity of care when patients transfer between Jail facilities. For example, when an incarcerated person has a health care request pending at one facility and is transferred to another, health care staff and contractors at the transferring facility frequently shred and discard the person's pending health care request, rather than transmit the request to the receiving facility. Health care staff and contractors at the transferring facility do not adequately communicate with staff and contractors at the receiving facility about the person's pending health care requests and needs. As a result, COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, and TRI-CITY fail to timely treat the serious and chronic medical needs of people transferred between the Jail facilities.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 59 of the Complaint and, therefore, denies the averments.

**D. The Jail Fails to Provide Adequate Medical Care for Incarcerated People With Substance Use Disorders**

60. By policy and practice, COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, and TRI-CITY fail to provide adequate medical treatment for incarcerated people with substance use disorders. These Defendants fail to continue medically necessary treatments for people who were receiving care for substance use disorders prior to being booked into the Jail. The SHERIFF'S DEPARTMENT lack adequate policies and practices for the tracking and treatment of people with substance use disorders. Upon information and belief, the COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, and TRI-CITY do not adequately train or supervise their staff how to evaluate and treat incarcerated people with substance use disorders.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 60 of the Complaint and, therefore, denies the averments.

61. Medication assisted treatment ("MAT") is a clinical course of treatment for opioid use disorder ("OUD"). MAT combines the provision of FDA-approved medications with counseling and therapy. As noted by one of the health care companies bidding to provide services in the Jail in 2021, "three forms of FDA-approved medication

(methadone, buprenorphine, and naltrexone) should ideally be available so that the best course of treatment can be determined for each individual." Buprenorphine is known by the brand name Suboxone, which is a combination medication that also includes the opioid blocker Naloxone to blunt intoxication and prevent cravings.[33] Naltrexone is known by the brand name Vivitrol. These MAT medications must be taken regularly to prevent individuals with OUD from experiencing cravings for opioids. Counseling and therapy, including in individual and group settings, are essential components of MAT that increase the patient's likelihood of avoiding relapse. MAT saves lives by preventing accidental overdoses and can also reduce recidivism. A National Institute of Health-funded study released in January 2022 found that in two Massachusetts jails, providing Suboxone to incarcerated people led to a 32% reduction in probation violations, reincarcerations, and court charges for those incarcerated people receiving Suboxone, as compared to incarcerated people who did not receive Suboxone.[34] Yet the Jail fails to provide timely access to Suboxone and other OUD treatments, even when clinically necessary. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 61 of the Complaint and, therefore, denies the averments.

62.  One Supervisor for the COUNTY admitted in 2021 that in practice, the Jail facilities "presently don't do medication for addiction treatment ["MAT"], so if you come in and have substance use issues, you don't get the services and treatment you need to

1    actually help you medically withdraw and then get on a program of sustained drug

2    treatment when you come out."[35] The Jail's failure to implement a comprehensive

3    MAT program places incarcerated people at risk of serious harm and also constitutes

4    discrimination in violation of the ADA. [footnote omitted]

5

6    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

7    averments in Paragraph 62 of the Complaint and, therefore, denies the averments.

8

9    63.  The medical staff and contractor deficits in providing necessary substance use

10    treatment and interventions at the Jail are acute. Survey results indicate that almost

11    80% of incarcerated people booked into the Jail test positive for at least one illicit

12    substance upon booking.[36] Without adequate treatment for substance use disorders,

13    including MAT, incarcerated people are more likely to relapse—a problem

14    exacerbated by the ready availability of fentanyl and other drugs inside the Jail. In

15    2021, there were at least 204 suspected overdoses in the Jail,[37] at least four of them

16    fatal. Since 2019, at least 15 people have died in the Jail from drug overdoses.

17    [footnotes omitted]

18

19    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

20    averments in Paragraph 63 of the Complaint and, therefore, denies the averments.

21

22    64.  Even when Jail staff or contractors do offer medication for substance use disorders,

23    it is untimely, reactive, and not paired with addiction counseling or therapy. For

example, Plaintiff NORWOOD has been addicted to heroin for over a decade and diagnosed with opioid dependence. In the community, an addiction specialist prescribed Suboxone to NORWOOD about ten years ago and NORWOOD has had Suboxone prescriptions regularly since that time. Suboxone helps NORWOOD manage his cravings for opioids, avoid using heroin, and live a normal, functioning life. When NORWOOD is managing his addiction well in the community, he takes Suboxone daily. When NORWOOD arrived at the Jail on June 22, 2021, he was clean and had last used heroin three months prior.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 64 of the Complaint and, therefore, denies the averments.

65.  On July 3, 2021, NORWOOD asked a health care staff member about receiving Suboxone to help manage his cravings. NORWOOD was informed that the Jail would not provide him Suboxone. Without Suboxone or any other medication for his opioid dependence, or any substance use counseling, NORWOOD experienced cravings. On July 17, 2021, NORWOOD had a fentanyl overdose at the Jail. NORWOOD lost consciousness and was rushed to the hospital. Only after NORWOOD's overdose did Jail medical staff offer NORWOOD Vivitrol—not Suboxone, which NORWOOD finds works better for him—for his opioid dependence. In August 2021, NORWOOD asked to see an addiction specialist and a nurse told him that he was scheduled for the specialist. However, as of February 2022, NORWOOD has still not seen an addiction

1    specialist. The Jail continues to provide no substance use counseling or groups to help

2    him manage his disorder.

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 65 of the Complaint and, therefore, denies the averments.

6

7    **E. The Jail Fails to Provide Adequate Medical Care for Incarcerated People**
8    **Withdrawing from Alcohol and Drugs**
9

10   66.  By policy and practice, COUNTY DEFENDANTS, CORRECTIONAL

11   HEALTHCARE PARTNERS, and TRI-CITY fail to provide adequate withdrawal

12   treatment for incarcerated people who enter the Jail under the influence of alcohol,

13   opiates, benzodiazepines, and other substances. These Defendants' policies, practices,

14   and procedures for monitoring and treating incarcerated people in withdrawal are

15   inadequate. These Defendants do not adequately train staff, including custody staff,

16   how to evaluate, treat, and monitor incarcerated people in withdrawal. These

17   Defendants are well aware that newly booked persons require adequate withdrawal

18   protocols: a formal survey indicated that in 2020, approximately 80% of incarcerated

19   people arriving at the Jail tested positive for at least one substance.[38] [footnote

20   omitted]

21

22   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

23   averments in Paragraph 66 of the Complaint and, therefore, denies the averments.

24

67.  COUNTY DEFENDANTS', CORRECTIONAL HEALTHCARE PARTNERS', and TRI-CITY's practices and training for implementing alcohol and opiate withdrawal protocols are inadequate. For example, although the SHERIFF'S DEPARTMENT's written protocol provides that incarcerated people in withdrawal from alcohol should receive Librium for several days, many incarcerated people in alcohol withdrawal do not receive Librium when clinically indicated, and the Jail's policies do not require physician consultation before initiating Librium. The Jail has been providing Valium rather than Librium for several months because Librium is not available from the Jail's pharmacy provider. Similarly, although the SHERIFF'S DEPARTMENT's written protocol provides that incarcerated people in withdrawal from opiates should receive medications including Benadryl, Imodium, and Zofran, in practice, many incarcerated people in opiate withdrawal do not receive those medications. Nor does the Jail's protocol include medications that are more effective in preventing opiate withdrawal, such as methadone. These systemic practices and failures to adequately train and supervise staff and contractors place incarcerated people at risk of serious harm or death.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 67 of the Complaint and, therefore, denies the averments.

68.  The SHERIFF'S DEPARTMENT also lacks adequate policies and practices for observing incarcerated people in withdrawal. In 2017, the NCCHC Report found that nurse stations at the Jail do not enable medical staff to visually monitor incarcerated

people in withdrawal.[39] NCCHC also found that custody staff are not informed when incarcerated people are in withdrawal. Still today, the Jail's protocols and practices provide only that incarcerated people in alcohol or opiate withdrawal should be in clustered housing "if feasible." Although the booking Jail facilities have designated areas for incarcerated people actively under the influence of substances, incarcerated people who are withdrawing from alcohol and drugs are regularly scattered throughout various housing units in the Jail facilities, preventing adequate monitoring and timely interventions. The Jail lacks adequate observation cells where custody and medical staff can regularly observe incarcerated people in alcohol or opiate withdrawal. This makes it more difficult for medical staff to track and monitor incarcerated people in withdrawal. In practice, medical staff fail to regularly monitor incarcerated people in alcohol withdrawal, and instead often perform monitoring checks at most once per shift (which is far below modern standards). By policy, people on alcohol withdrawal protocols may go 48 hours without being seen by a registered nurse. Moreover, by policy and practice, a person can be kept in a sobering cell for more than 24 hours before they are even evaluated by a physician. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 68 of the Complaint and, therefore, denies the averments.

69.  These inadequate withdrawal practices and inadequate training place incarcerated people at risk of serious harm or even death. For example, Elisa Serna died at Las

Colinas in November 2019 after she did not receive prompt and adequate withdrawal treatment. Serna informed Jail medical staff during booking that she had used heroin, Xanax, and alcohol in the hours before her arrest, but she received only nausea medication and was instructed to drink water, according to a lawsuit filed by Serna's family. After booking, Serna suffered for days from severe dehydration and other medical issues without adequate medical attention for her withdrawal symptoms. While in this state of crisis, Serna collapsed in her cell and hit her head. She died alone after a deputy and nurse witnessed Serna fall but failed to provide medical care.[40] Serna died as a result of the very problems with the Jail's practices and training for treating incarcerated people in withdrawal of which the SHERIFF'S DEPARTMENT and its contractors have long been aware. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 69 of the Complaint and, therefore, denies the averments.

70.  In 2015, a jury awarded $3 million to the family of Daniel Sisson, who died at Vista after having an asthma attack precipitated by heroin withdrawal. Sisson's family had alleged that Jail staff failed to adequately monitor Sisson while he was in withdrawal.[41] CLERB found that in 2017, Jail staff failed to timely place Bruce Stucki on an alcohol withdrawal protocol, even though Stucki had been arrested for public intoxication and was known to have alcohol dependence. Two days after booking, Jail staff found Stucki "hallucinating in his cell" and finally gave him medication to ease the symptoms of alcohol withdrawal. Jail staff's intervention came

far too late, and Stucki died several hours later.[42] In 2018, James Athos and Alan Christopher Washam each died from perforated ulcers while in heroin withdrawal. Perforated ulcers can occur upon the sudden cessation of opiate use. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 70 of the Complaint and, therefore, denies the averments.

71.  The availability of illicit and dangerous drugs in the Jail, like fentanyl, compounds the failures of the SHERIFF'S DEPARTMENT's withdrawal practices and training. Upon information and belief, where the Jail fails to provide withdrawal treatment, incarcerated people in withdrawal seek out contraband and drugs in the Jail to relieve their symptoms. For example, Saxon Rodriguez—who was homeless and had mental illness—died of a fentanyl overdose in July 2021 just days after arriving at Central. In a news article, Rodriguez's sister stated that Rodriguez was likely withdrawing and that he did not receive adequate medical care.[43] That same month, Ronaldino Estrada died of a fentanyl overdose at Vista, just three days after arriving at the Jail.[44] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 71 of the Complaint and, therefore, denies the averments.

**F. Jail Medical Providers Lack Adequate Policies and Practices for the Medical Care of Incarcerated People Who Arrive at the Jail Under the Influence of Drugs or Alcohol**

72. In addition to COUNTY DEFENDANTS', CORRECTIONAL HEALTHCARE PARTNERS', and TRI-CITY's inadequate withdrawal policies and practices, these Defendants lack adequate policies and practices to ensure that incarcerated people who are under the influence of drugs or alcohol when they arrive at the Jail receive prompt and adequate medical treatment. Defendants do not adequately train staff how to evaluate and treat incarcerated people under the influence of drugs or alcohol. Upon information and belief, the SHERIFF'S DEPARTMENT's, CORRECTIONAL HEALTHCARE PARTNERS', and TRI-CITY's policies and practices for the use of sobering cells and observation of incarcerated people in sobering cells or holding cells are inadequate. These inadequate policies and practices have deadly consequences.

**Answer**: MAH denies the averments in Paragraph 72 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 72 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

73. For example, in 2014, medical staff at Central left Ronnie Sandoval unmonitored for eight hours while he was under the influence of methamphetamine. Medical staff also failed to seek emergency medical attention for Sandoval when they discovered him in medical crisis. Sandoval later died. In 2021, the Ninth Circuit upheld claims

1    against the SHERIFF'S DEPARTMENT and Jail staff members for their deliberate

2    indifference contributing to Sandoval's death.[45] [footnote omitted]

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 73 of the Complaint and, therefore, denies the averments.

6

7    74.  In the same month as the Ninth Circuit's decision in Sandoval's case, Omar

8    Moreno Arroyo died at Central while under the influence of methamphetamine after

9    Jail staff failed to adequately monitor him or provide him any medical care. Moreno

10   Arroyo's widow had originally called police because Moreno Arroyo was acting

11   bizarrely and was in a mental health crisis. Moreno Arroyo was booked into the Jail

12   on charges of being under the influence of methamphetamine and possessing a pipe.

13   According to a lawsuit by Moreno Arroyo's widow, despite his obvious

14   intoxication—as evidenced by his charge—he was left in a holding cell, and not

15   placed under medical observation. Staff also failed to provide Moreno Arroyo any

16   medical attention for his unusually high heart rate, even though his widow informed

17   deputies that he had a heart condition and gave them Moreno Arroyo's medication.

18   While in the holding cell, intoxicated and unmonitored, Moreno Arroyo choked on

19   his COVID-19 mask and died.[46] [footnote omitted]

20

21   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

22   averments in Paragraph 74 of the Complaint and, therefore, denies the averments.

23

**G. Jail Medical Providers Fail to Continue Medically Necessary Medications and Treatments for Incarcerated People Upon Their Arrival at the Jail**

75.  COUNTY DEFENDANTS', CORRECTIONAL HEALTHCARE PARTNERS', and TRI-CITY's policies and practices for continuing medically necessary treatments for incarcerated people who arrive at the Jail are inadequate. These Defendants fail to continue medically necessary treatments for incarcerated people who were in the process of undergoing care for chronic or serious conditions immediately prior to being booked into the Jail. Upon information and belief, these Defendants do not adequately train medical staff how to evaluate and treat incarcerated people who were undergoing care for chronic or serious conditions immediately prior to being booked into the Jail.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 75 of the Complaint and, therefore, denies the averments.

76.  Jail staff and contractors routinely refuse to provide medications that incarcerated people have been using to treat conditions outside of the Jail, even when the incarcerated people themselves, doctors, family members, or other persons bring their medications and/or valid prescriptions to the Jail. The NCCHC Report found that the SHERIFF'S DEPARTMENT fails to timely provide essential medications to incarcerated people.[47] The NCCHC Report also found that during lockdowns at the Jail, nurses are unable to provide medications to incarcerated people, and that the SHERIFF'S DEPARTMENT lacks procedures to determine which medications are

1   essential during those lockdowns.[48] Currently during the pandemic, lockdowns occur

2   on a frequent basis and further disrupt incarcerated people's access to essential

3   medical treatments. [footnote omitted]

4

5   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6   averments in Paragraph 76 of the Complaint and, therefore, denies the averments.

7

8   77.  The failure to ensure adequate continuity of care, treatment, and medication places

9   incarcerated people at substantial risk of serious harm. For example, Michael Wilson

10   died in February 2019 after Jail staff and contractors failed to provide him with

11   medically necessary treatment for his chronic heart condition. According to a lawsuit

12   filed by Wilson's family, he had hypertrophic cardiomyopathy and regularly took

13   medications that kept him alive. Wilson was booked into Central to serve a two-week

14   sentence for a minor offense. The judge in Wilson's case even ordered Jail staff to

15   ensure that Wilson received treatment and attention for his serious medical issues.

16   However, staff failed to ensure that Wilson received his heart medications, and

17   instead gave him cough syrup. Within a few days of arriving at Central, Wilson

18   collapsed and died.[49] [footnote omitted]

19

20   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

21   averments in Paragraph 77 of the Complaint and, therefore, denies the averments.

22

1    78.  Plaintiff LOPEZ received a kidney transplant in November 2001 and since then has

2         taken medication daily to ensure that his body does not reject the transplant. After

3         LOPEZ arrived at Vista in October 2019, Jail staff failed to provide LOPEZ with his

4         medications for at least four days. Even after LOPEZ eventually began receiving his

5         medication, Jail staff and contractors were often untimely in providing it. The Jail did

6         not maintain adequate stock of LOPEZ's medications and delayed in ordering refills,

7         which meant that LOPEZ sometimes went three days without taking his daily

8         medications. This failure contributed to a decline in LOPEZ's health in April 2020.

9         He lost 15-20 pounds, had a low sodium count, was physically weak and constantly

10        thirsty, and had to be seen several times in the hospital by a kidney specialist. As a

11        result of the Jail's consistent failures to provide LOPEZ with his essential

12        medications, the judge in LOPEZ's criminal case issued a court order requiring the

13        Jail to keep a stockpile of LOPEZ's medications on site to ensure they did not run out.

14

15        **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16        averments in Paragraph 78 of the Complaint and, therefore, denies the averments.

17

18    79.  Similarly, Plaintiff ARCHULETA has hypertension and takes medication to

19        maintain his blood pressure at a healthy level. On numerous occasions, the Jail failed

20        to continue ARCHULETA's blood pressure medication for several days, apparently

21        because they forgot to reorder the medication and did not have an adequate backup

22        supply on hand. In May 2021, for example, the Jail ran out of ARCHULETA's

medication and did not reorder it until ARCHULETA filed a grievance asking about the medication.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 79 of the Complaint and, therefore, denies the averments.

80.  COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, and TRI-CITY fail to provide other medically necessary treatments for incarcerated people with chronic diseases and conditions. For example, in 2014, Jerry Cochran died at Central from untreated diabetic ketoacidosis. On September 16, 2014, Cochran was brought to the Jail and was so weak that deputies had to carry him inside. Although Cochran went through initial medical screening and was wearing a medical bracelet alerting staff that he had diabetes, Cochran was placed in a holding cell with several other people. Cochran collapsed in the cell and died, having never received any insulin or other treatment to address his diabetic ketoacidosis, which was causing obvious symptoms.[50] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 80 of the Complaint and, therefore, denies the averments.

81.  Similarly, Plaintiff DUNSMORE has been diagnosed with diabetes. Immediately prior to being incarcerated at the Jail in December 2019, DUNSMORE was receiving four shots of insulin daily to treat his diabetes. However, shortly after DUNSMORE

1   arrived at the Jail, medical providers terminated DUNSMORE's daily insulin shots

2   and instead provided DUNSMORE with insulin shots only after his blood sugar was

3   measured over 250 mg/dL. This change caused DUNSMORE to become fatigued,

4   lethargic, thirsty, and in need of frequent urination. This sort of diabetes management

5   regimen is completely inconsistent with modern standards of care, including in

6   detention settings.[51] [footnote omitted]

7

8   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

9   averments in Paragraph 81 of the Complaint and, therefore, denies the averments.

10

11   82.  For over two years, the Jail failed to provide Plaintiff EDWARDS with a CPAP

12   machine which he uses to breathe at night due to his severe sleep apnea. EDWARDS

13   informed staff of this when he arrived at the Jail in July 2019, but the Jail refused to

14   provide him with a CPAP machine. EDWARDS filed sick call slips and urgent

15   grievances for months. The Jail initially responded by stating that they first needed to

16   monitor his oxygen in the medical unit before referring him out for a sleep study.

17   Because the medical unit was full and had a waitlist, EDWARDS waited two months

18   before being admitted to the medical unit for the oxygen monitoring. However, after

19   monitoring his oxygen, the Jail failed to refer EDWARDS to a formal sleep study or

20   provide a CPAP machine. EDWARDS continued to file grievances, noting in a

21   February 2020 grievance that "I'm having bad episodes, when I sleep I stop

22   breathing. I wake up clenching my heart ... Need CPAP." When the Jail finally

23   referred EDWARDS to a sleep study at Sleep Data Diagnostics, an outside provider,

1      on August 28, 2020, the study confirmed that he has sleep apnea and stated that a

2      CPAP machine "is the most effective therapy for obstructive sleep apnea." Even then,

3      the Jail did not give EDWARDS a CPAP machine until August 2021—a full year

4      later and over two years after he was booked. During those two years, EDWARDS

5      was unable to get a full night's sleep, leading to migraines, dizziness, and confusion.

6      He often woke up gasping for air; sometimes his cellmates would have to wake him

7      when he stopped breathing. EDWARDS also had pains and a racing heart, which he

8      describes as feeling like "mini-heart attacks." EDWARDS now has short-term

9      memory loss. Upon information and belief, Defendants continue to deny incarcerated

10      people at the Jail access to a CPAP machine when clinically necessary to this day, for

11      reasons that include waitlists for housing units with electrical access to operate a

12      CPAP machine. Incarcerated people face unnecessary pain and risks of grave harm as

13      a result.

14

15      **Answer**: MAH denies the averments in Paragraph 83 as alleged against MAH. MAH

16      is without sufficient knowledge or information to admit or deny the averments in

17      Paragraph 83 of the Complaint to the extent they apply to the other Defendants, and,

18      therefore, denies those averments.

19

20      83. Even where Jail staff and contractors do continue community- prescribed

21      medications or treatments, the Jail lacks adequate policies and practices to prevent

22      gaps in medication and treatment. For example, a person who was incarcerated at

23      Central in or around September 2021 uses catheters for a medical condition.

1   However, the Jail initially refused to provide that incarcerated person with more than

2   one catheter at a time, forcing him to frequently reuse the catheters when

3   replacements were not available, which caused infections. When the Jail eventually

4   gave the incarcerated person two catheters at a time, the Jail failed to give him clean

5   medical gloves to use when changing the catheters. That practice continued to put the

6   incarcerated person at risk of infection—especially given the filthy conditions in his

7   cell, which was piled high with trash that the Jail failed to remove.

8

9   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

10   averments in Paragraph 83 of the Complaint and, therefore, denies the averments.

11

12   84.  Although COUNTY DEFENDANTS have contracted with a third-party provider to

13   furnish medication for incarcerated people in the Jail, COUNTY DEFENDANTS are

14   ultimately responsible for ensuring that incarcerated people timely receive

15   medications and other essential treatments. COUNTY DEFENDANTS' contract

16   with Diamond Drugs, Inc. ("Diamond") states that the SHERIFF'S DEPARTMENT

17   is responsible for "providing drugs and medication supplies and timely filling and

18   refilling of prescription medications." The contract specifies how Diamond is to

19   fulfill those services at the SHERIFF'S DEPARTMENT's direction and requires that

20   Diamond follow the SHERIFF'S DEPARTMENT's medical policies and

21   procedures. COUNTY DEFENDANTS fail to maintain adequate supplies of

22   essential medications so that incarcerated people have timely access to medications

23   in the event that there are delays obtaining medication from Diamond. Frequently,

1    health care staff fail to take remedial actions when medications are delayed. Nurses

2    who deliver medications mark records as "no medications available" for days at a

3    time, but fail to take steps to obtain those medications for their patients.

4

5    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6    averments in Paragraph 84 of the Complaint and, therefore, denies the averments.

7

8    **H. The Jail Does Not Provide Incarcerated People with a Reliable and Timely**
9    **Way to Alert Health Care Staff of Their Medical Needs**
10

11    85.  By policy and practice, COUNTY DEFENDANTS, CORRECTIONAL

12    HEALTHCARE PARTNERS, and TRI-CITY fail to provide a timely and reliable

13    way for incarcerated people to alert health care staff and contractors of their need for

14    evaluation of medical problems. These Defendants have failed to implement

15    appropriate triage procedures to ensure that emergent and urgent medical needs

16    receive timely care, and that non-emergency medical needs are attended to before

17    they develop into emergencies. Upon information and belief, these Defendants fail to

18    adequately train staff how to timely and adequately respond to incarcerated people's

19    requests for medical evaluation.

20

21    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

22    averments in Paragraph 85 of the Complaint and, therefore, denies the averments.

23

86.  To request medical care, incarcerated people at the Jail submit a form called a "sick call request." Once medical staff receive the request form, medical staff assign the request a triage level without assessing the patient's symptoms in person. NCCHC found that many incarcerated people wait over a week to see a nurse or physician after submitting a sick call request, and that some wait well over two weeks before being seen.[52] NCCHC found George Bailey had a backlog of over 300 sick call requests that had not yet been addressed in person and meant that "patients' serious health care needs are being delayed."[53] NCCHC also found Las Colinas had a backlog of over 150 sick call requests. There, incarcerated people waited an average of 4-8 days to see medical staff even for requests triaged as Level 1 – the most urgent requests that require same-day or next-day evaluation.[54] These delays in responding to sick call requests persist. The State Audit Report found that the SHERIFF'S DEPARTMENT often failed to follow up on requests for medical or mental health services "even though these individuals often had serious needs that, when unmet, may have contributed to their deaths."[55] In multiple cases, individuals reported symptoms several times over a period of weeks, but did not receive physician attention for those symptoms before dying.[56] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 86 of the Complaint and, therefore, denies the averments.

87.  Jail staff and contractors' failure to timely respond to health care requests is caused, at least in part, by the Jail's failure to create an effective tracking and scheduling

1      system for health care appointments. In practice, no standardized protocols are used

2      to determine when incarcerated people should receive a face-to-face appointment

3      with a nurse or other medical staff member. Consequently, health care providers

4      arbitrarily determine whether the content of a sick call request form, often written by

5      an incarcerated person who may not be able to adequately express themselves in

6      writing, warrants an examination. The SHERIFF'S DEPARTMENT,

7      CORRECTIONAL HEALTHCARE PARTNERS, and TRI-CITY do not adequately

8      train health care providers how to review, process, and respond to health care request

9      forms submitted by incarcerated people. Medical staff's failure to timely respond to

10     health care requests—or in some cases to fail to respond at all to health care

11     requests—jeopardizes the health and safety of incarcerated people.

12

13     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

14     averments in Paragraph 87 of the Complaint and, therefore, denies the averments.

15

16  88.  For example, Plaintiff EDWARDS submitted several sick call requests in late 2020

17     and early 2021 about his sleep apnea and need for a CPAP machine, but Jail staff

18     failed to respond to many of his sick call requests and at other times told EDWARDS

19     he was scheduled for a future appointment, which was not actually made available to

20     him for almost five months. Without a CPAP machine to treat his sleep apnea,

21     EDWARDS suffered for two years from heart pains, fitful sleep, and frequent

22     terrifying episodes where he was unable to breathe.

23

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 88 of the Complaint and, therefore, denies the averments.

3

4    89.  In emergent situations, incarcerated people sometimes request health care from the

5    nurses who pass out medication. However, rather than immediately contact the sick

6    call nurses or physicians on duty, medication pass nurses often dismiss the person's

7    request and instruct them to fill out a sick call request, which delays their access to

8    care. For example, in 2021, one person began to develop an infection in a wound he

9    had suffered in an attack from another incarcerated person. For days, nurses

10   distributing medication ignored the person's pleas that they further examine the

11   wound, as it was inflamed and oozing pus. Once the man finally received medical

12   attention, he was immediately transferred to an outside for hospital for multiple

13   surgeries to remove MRSA in the wound.

14

15   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16   averments in Paragraph 89 of the Complaint and, therefore, denies the averments.

17

18   90.  In other emergency situations, incarcerated people sometimes request health care

19   from custody staff when medical staff are not immediately available. Rather than

20   immediately contact health care staff to determine whether emergency care is

21   required, custody staff often dismiss the person's request and instruct them to fill out

22   a sick call request. Custody staff do not adequately respond to requests from

23   incarcerated people for medical care. For example, in the lawsuit over COVID-19

1    conditions at the Jail, Thomas Foster reported that he received no response to his sick

2    call request reporting symptoms of COVID-19. Foster had a headache and lost his

3    sense of taste and smell. Foster asked staff for Tylenol, but was told he had to submit

4    a sick call request form. Foster submitted a sick call request, but he never received a

5    response and never received any Tylenol.

6

7    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

8    averments in Paragraph 90 of the Complaint and, therefore, denies the averments.

9

10   91.  At times, custody staff ignore or silence the emergency call buttons in incarcerated

11       people's cells at the Jail and fail to respond to oral requests for emergency care. This

12       practice places incarcerated people at risk of serious harm or death. For example, in

13       late November 2021, Robert Moniger was housed in a COVID-19 quarantine unit at

14       Central, unit 5D. Upon information and belief, Moniger began to have trouble

15       breathing and complained of a pounding headache. Moniger used up all of the

16       medication in his two inhalers. In distress, Moniger pushed the call button to request

17       assistance from deputies, but received no response. A day or two later, Moniger's

18       cellmate pushed the button to call for help from custody staff. By the time deputies

19       responded, Moniger was on the cell floor and could not walk. Custody staff placed

20       Moniger in a wheelchair and took him to a side cell, but did not provide him with

21       any medical attention. Upon information and belief, Moniger died the next morning

22       without receiving any medical care.

23

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 91 of the Complaint and, therefore, denies the averments.

92.  In January 2021, CLERB found that Anthony Chon died after two deputies failed to adequately respond to his requests for medical assistance. Chon, who was housed in a special mental health unit at the Jail, complained to one deputy of trouble breathing. The deputy told Chon he would seek medical help for him, but in fact passed that duty on to another deputy. The second deputy chose not to call for medical attention, but instead brought Chon to the recreation area for fresh air[57] because the deputy decided that Chon had anxiety about his confinement. Minutes after arriving at the recreation area, Chon collapsed, and he died that day of a pulmonary embolism.[58] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 92 of the Complaint and, therefore, denies the averments.

93.  To take another example, Plaintiff ZOERNER began to experience heart palpitations, common in persons with alcohol dependence, in June 2021. Medical staff at Tri-City Hospital treated ZOERNER by replenishing her magnesium levels and instructed her to request assistance from Jail staff if she experienced heart palpitations once back at the Jail. When ZOERNER returned to the Jail and had a heart palpitation episode, she pushed the emergency call button located in her cell, but custody staff did not respond. ZOERNER was scared and overwhelmed by the heart palpitations, and began to bang on

1    the walls of the cell. She continued to push the emergency call button, but received no

2    response. ZOERNER thereafter began to bang her head against the cell window, drawing

3    blood. Only once ZOERNER began to self-harm did staff respond and then transport her

4    to the hospital to address the heart palpitations.

5

6    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

7    averments in Paragraph 93 of the Complaint and, therefore, denies the averments.

8

9    94.  Custody staff at times respond callously to requests for emergency assistance. In one

10    instance in 2021, after a man who is HIV positive was deprived of his medication, he

11    had to yell to custody staff that he needed HIV medication. The deputy laughed at

12    the man and said aloud to the entire housing unit "That guy is yelling that he has

13    AIDS."

14

15    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16    averments in Paragraph 94 of the Complaint and, therefore, denies the averments.

17

18    **I. Jail Medical Providers Fail to Maintain Adequate, Accurate, and Complete**
19    **Medical Records**
20

21    95.  By policy and practice, COUNTY DEFENDANTS, CORRECTIONAL

22    HEALTHCARE PARTNERS, TRI-CITY, and LOGAN HAAK fail to maintain

23    adequate, accurate, and complete medical records. These Defendants' policies and

24    practices for maintaining adequate medical records are inadequate. Upon information

1    and belief, these Defendants fail to adequately train staff how to maintain adequate

2    medical records. As a result of the failure to maintain adequate medical records,

3    incarcerated people suffer from a substantial risk of misdiagnosis, dangerous

4    mistakes, and unnecessary delays in care.

5

6    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

7    averments in Paragraph 95 of the Complaint and, therefore, denies the averments.

8

9    96.  The NCCHC Report found that Jail medical staff and contractors failed to document

10    when or whether medical staff screened an incarcerated person arriving from a

11    different Jail facility.[59] NCCHC found that the Jail lacked logs and tracking processes

12    to ensure that incarcerated people referred to mental health evaluations were actually

13    seen by the mental health team.[60] In addition, NCCHC found that Jail medical staff

14    failed to document in medical records any medical checks of incarcerated people in

15    administrative segregation units.[61] [footnotes omitted]

16

17    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18    averments in Paragraph 96 of the Complaint and, therefore, denies the averments.

19

20    97.  Similarly, the DRC Report found that incarcerated people's medical records often

21    contain no information about the criteria staff used to refer people for mental health

22    and suicide risk evaluations.[62] The Jail's inadequate policies and practices for the

23    maintenance of medical records lead to poor communication among health care staff

1    and between health care staff and custody staff, which prevents effective treatment

2    and continuity of care. [footnote omitted]

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 97 of the Complaint and, therefore, denies the averments.

6
7    **J. County Defendants Lack Sufficient Contracts with Community**
8    **Providers to Provide Adequate Medical Care to Incarcerated People**
9

10   98. COUNTY DEFENDANTS fail to maintain sufficient contracts with community

11   medical providers to allow the Jail to refer incarcerated people with chronic and

12   emergent medical needs to those community providers when the Jail medical units

13   are full. Frequently, the Jail has more individuals requiring placement in medical

14   housing units than beds available. Medical housing units are designed for

15   incarcerated people who require significant daily monitoring, medication, and/or

16   therapy, or assistance with activities of daily living (*e.g.*, skilled nursing), such as

17   people with open wounds that require regular cleaning and changing, those who have

18   returned from an outside hospital, or who use medical devices like a CPAP machine.

19   However, due to insufficient medical housing beds, incarcerated people are placed

20   on waitlists for medical housing beds. By policy, SHERIFF'S DEPARTMENT

21   custody or command staff can place a person classified for administrative

22   segregation in a medical observation unit. This policy removes medical staff from

23   decisions about placement in medical units and limits access to the medical unit for

24   people with serious medical needs. These practices place incarcerated people at risk

25   of serious harm.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 98 of the Complaint and, therefore, denies the averments.

99. For example, in or around January 2022, a man at Central with sleep apnea and who requires a CPAP machine was denied access to a machine because the medication observation unit was full. Incarcerated people with CPAP machines must be housed in the medical observation unit, but staff told the person that the unit was full. At that time, at least two of the people in the Central medical observation unit were housed there not for medical reasons, but rather based on custody staff's decision to house them in the medical unit—where they are single-celled—due to behavioral issues or because their case is high-profile. This custody-driven practice directly undermines the delivery of medical care to those who need it.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 99 of the Complaint and, therefore, denies the averments.

100. Because COUNTY DEFENDANTS lack adequate medical beds within the Jail, the SHERIFF'S DEPARTMENT sometimes uses administrative segregation cells as "medical overflow." For example, one incarcerated person who had surgery at TRI-CITY Hospital in 2021 was returned to Vista's medical unit for two weeks, and then—before healing—transferred to a "medical overflow" administrative segregation cell. In segregation, the person was subject to punitive conditions with

1     very little out-of-cell time, and did not receive adequate medical attention. Later, the

2     person had to return to the hospital for additional surgeries when his wound became

3     reinfected after he had been in the "medical overflow" administrative segregation

4     cell.

5

6     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

7     averments in Paragraph 100 of the Complaint and, therefore, denies the averments.

8

9     101.     During a prior incarceration at the Jail, in early 2015, Plaintiff LEVY had

10     surgery at an outside hospital to remove a pituitary brain tumor. When LEVY

11     returned to Las Colinas from the hospital in February 2015, LEVY was not housed in

12     the medical unit. According to LEVY's medical records, the medical observation

13     unit was full and had no bed available for her. Instead, Jail staff housed LEVY in

14     general population, where she did not receive adequate care or observation from

15     health care staff. Shortly after returning to the Jail, LEVY began to have

16     hallucinations. LEVY repeatedly complained to medical staff of chest pain, anxiety,

17     exhaustion, and light-headedness, to little avail. Only after finally testing LEVY's

18     urine did medical staff determine that her electrolytes were dangerously low, and

19     only then did they transport her to the emergency room at an outside hospital.

20

21     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

22     averments in Paragraph 101 of the Complaint and, therefore, denies the averments.

23

**K. Jail Medical Providers Fail to Provide Medical Care in Confidential Spaces**

102.     COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, TRI-CITY, and LOGAN HAAK fail to provide medical care in confidential settings. These Defendants' policies and practices for medical encounters between incarcerated patients and medical staff are inadequate. These Defendants fail to train medical care staff how to conduct confidential meetings with incarcerated patients. The NCCHC Report found in 2017 that encounters between medical staff and incarcerated people were frequently not confidential.[63] During medical encounters, custody staff were nearby, which "compromises privacy and may prevent a provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis."[64] Years later, Jail medical staff and contractors still hold medical appointments in non-confidential settings. For example, Plaintiff LEVY's medical encounters with physicians, nurses, and mental health clinicians all occurred through the food slot in her cell. During these encounters, a deputy stands directly outside the cell. Deputies sometimes even chime in with comments on the conversations between incarcerated people and medical staff and contractors. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 102 of the Complaint and, therefore, denies the averments.

**L. Jail Medical Providers Fail to Provide Adequate Diagnostic Care to Incarcerated People, Including Failing to Appropriately Refer Incarcerated People to Outside Specialists When Necessary**

1    103.        By policy and practice, COUNTY DEFENDANTS, CORRECTIONAL

2          HEALTHCARE PARTNERS, TRI-CITY, and LOGAN HAAK fail to order

3          diagnostic testing when medically necessary, creating an unreasonable risk of harm

4          to incarcerated people. These Defendants fail to adequately train staff as to when,

5          and under what circumstances, to order diagnostic testing. As described above, Jail

6          staff took over a year to order a sleep study for Plaintiff EDWARDS, which

7          confirmed his sleep apnea diagnosis and need for a CPAP machine. Jail medical staff

8          and contractors also fail to refer incarcerated people to medical specialists or to an

9          outside medical center when medically necessary. The SHERIFF'S

10         DEPARTMENT's policies and practices for referring incarcerated people to

11         specialists or outside providers are inadequate. Upon information and belief, the

12         SHERIFF'S DEPARTMENT and CONTRACTOR DEFENDANTS fail to

13         adequately train medical staff and contractors regarding when it is appropriate to

14         refer incarcerated people to medical specialists or outside medical centers.

15

16         **Answer**: MAH denies the averments in Paragraph 103 as alleged against MAH.

17         MAH is without sufficient knowledge or information to admit or deny the averments

18         in Paragraph 103 of the Complaint to the extent they apply to the other Defendants,

19         and, therefore, denies those averments.

20

21    104.        Plaintiff LEVY—who had surgery for a pituitary brain tumor while

22         incarcerated at the Jail in 2015—began to experience familiar symptoms of pituitary

23         gland growth in late 2019. LEVY had severe headaches and was dizzy, and her

1   menstruation cycle was irregular. Lab results showed elevated prolactin levels,

2   which are indicative of tumor growth. When LEVY asked a medical staff member at

3   the Jail about seeing an endocrinologist, she was told "You're not dying, not an

4   emergency." Throughout 2020, LEVY wrote sick call requests and grievances asking

5   to see a specialist for her ongoing headaches. Jail staff repeatedly told LEVY that she

6   was scheduled, but in fact LEVY did not see an endocrinologist during 2020. In

7   February 2021, after long delays, Jail medical staff referred LEVY for an MRI,

8   which revealed a pituitary tumor and led to an "urgent" follow-up referral to the

9   endocrinologist. Even then, LEVY was not actually seen by the endocrinologist for

10   treatment until June 2021.

11

12   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

13   averments in Paragraph 104 of the Complaint and, therefore, denies the averments.

14

15   105.      Prior to his incarceration, Plaintiff ARCHULETA had been referred for neck

16   surgery by Dr. David J. Smith of the San Diego Comprehensive Pain Management

17   Center. The day ARCHULETA arrived at the Jail in July 2019, wearing a neck brace,

18   he informed medical staff that he had a spinal injury that requires neck surgery.

19   However, the Jail failed to obtain any records related to Dr. Smith's care of

20   ARCHULETA, even after he submitted another sick call request form in late July

21   2019 reminding them of his neck issues. Without surgery, ARCHULETA has trouble

22   turning his head to the left and cannot sit upright for extended periods of time. In

23   August 2019, medical scans taken by the Jail noted "severe degenerative disc disease"

1      in ARCHULETA'S cervical spine. Yet the Jail has failed to refer ARCHULETA for

2      surgery or outside treatment. Nor has the Jail provided ARCHULETA physical

3      therapy.

4

5      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6      averments in Paragraph 105 of the Complaint and, therefore, denies the averments.

7

8      106.      ARCHULETA also has severe osteoarthritis in his left knee, as confirmed by a

9      medical scan performed in August 2019 while ARCHULETA was incarcerated at the

10      Jail. Prior to his incarceration, a specialist had recommended knee surgery.

11      ARCHULETA reported to Jail staff that he needed knee surgery, but the Jail has not

12      referred ARCHULETA to an orthopedic specialist for surgery or other treatment.

13

14      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

15      averments in Paragraph 106 of the Complaint and, therefore, denies the averments.

16
17      **M. Jail Medical Providers Fail to Timely Provide Incarcerated People with**
18      **Medically Required Eyeglasses**
19

20      107.      By policy and practice, COUNTY DEFENDANTS and LOGAN HAAK fail to

21      timely provide eyeglasses to incarcerated people who require them. These Defendants

22      fail to train staff how to timely evaluate incarcerated people for vision needs and

23      provide eyeglasses to those incarcerated people who require eyeglasses to see and

24      access activities in the Jail. For example, in 2021, one person waited at least three

25      months to receive eyeglasses after being evaluated for them. Also in 2021, a person

1     requested an evaluation for eyeglasses on four occasions without seeing the

2     ophthalmologist or receiving an eye examination. COUNTY DEFENDANTS and

3     LOGAN HAAK also fail to provide magnifying glasses as interim accommodations for

4     incarcerated people who require but do not have eyeglasses.

5     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6     averments in Paragraph 107 of the Complaint and, therefore, denies the averments.

7

8     **N. Jail Medical Providers Fail to Provide Adequate Follow-Up Medical Treatment**
9     **to Incarcerated People**
10

11     108.     By policy and practice, COUNTY DEFENDANTS, CORRECTIONAL

12     HEALTHCARE PARTNERS, TRI-CITY, and LOGAN HAAK fail to provide adequate

13     follow-up treatment to incarcerated people when they return to the Jail after receiving

14     care from outside medical specialists. These Defendants' policies and practices for

15     treatment of incarcerated people receiving care from outside specialists are inadequate.

16     These Defendants fail to adequately train staff how to provide follow-up care to

17     incarcerated people. For example, Plaintiff LOPEZ received treatment at an outside

18     hospital in April 2020 for a serious kidney condition and symptoms including weight

19     loss and dehydration. A kidney specialist informed LOPEZ that to maintain his health he

20     should drink <u>more than</u> two liters of water per day. However, when LOPEZ returned to

21     the Jail, medical staff and contractors failed to follow the specialist's instruction and

22     limited LOPEZ to <u>no  more than</u> two liters of water per day. To avoid again becoming

23     severely dehydrated—which had contributed to LOPEZ's referral to the kidney

24     specialist— LOPEZ had to resort to drinking water in secret.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 108 of the Complaint and, therefore, denies the averments.

109.     Although a specialist at the University of California – San Diego ("UCSD") Hospital diagnosed Plaintiff NELSON with a torn rotator cuff, Jail medical staff and contractors have failed to provide NELSON with any follow-up treatment, putting him at risk for long-term damage. The specialist prescribed a physical therapy regimen that Plaintiff NELSON has not been able to complete because the exercises require the use of bands and other tools that the Jail forbids him to have and refuses to provide**.** NELSON continues to have trouble sleeping and trouble cleaning himself after toileting due to his untreated rotator cuff injury. The injury also affects his ability to safety transfer from his wheelchair and frequently places him at risk of falling in everyday situations such as using the bathroom. Follow-up treatment for NELSON's rotator cuff injury was also necessary given that NELSON relies on his arms for mobility because he uses a wheelchair as a result of disabilities affecting his lower body.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 109 of the Complaint and, therefore, denies the averments.

110.     Separately, an ophthalmologist recommended EDWARDS receive cataract surgery for glaucoma and deteriorating vision, but the Jail later refused to cover any such surgery. There was a lengthy two-month delay between medical staff becoming

aware of EDWARDS' need for surgery and informing him that surgery would not be offered. In approximately October 2021, EDWARDS was scheduled to see an eye specialist but he was not able to attend due to the Jail refusing to provide him a cane or other mobility assistance to attend the appointment due to his severe back pain. Upon information and belief, the SHERIFF'S DEPARTMENT has a policy and practice of declining to refer incarcerated people for surgeries for serious medical needs when incarcerated people may soon transfer out of the Jail. To this day, EDWARDS experiences severe eye pain, and his vision continues to deteriorate.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 110 of the Complaint and, therefore, denies the averments.

**O. Jail Medical Providers Fail to Provide Adequate Discharge Instructions and Medication for Incarcerated People Released from the Jail**

111.     By policy and practice, COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, TRI-CITY, and LOGAN HAAK fail to ensure adequate patient discharge planning. These Defendants' policies and practices for the provision of continuing medical care services upon an incarcerated person's release are inadequate. Upon information and belief, these Defendants fail to adequately train staff how to prepare for release of incarcerated people with serious medical concerns so that such individuals can continue their medical care without dangerous interruption. The NCCHC Report found that the Jail had inadequate discharge planning processes.[65] According to the NCCHC Report, Jail medical staff do not document discharge plans for incarcerated

people.[66] Medical records indicate that Jail medical staff and contractors continue to fail to document discharge plans for incarcerated people discharged from the Jail. For example, although Plaintiff LEVY has been incarcerated at the Jail eight times, and had a pituitary brain tumor on one occasion, her medical records contain no apparent documentation of any Jail discharge planning, instructions, or community linkages for LEVY. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 111 of the Complaint and, therefore, denies the averments.

112.     Jail medical providers routinely release incarcerated people with serious medical conditions from the Jail without providing them with linkages to services to ensure that their medical care is not disrupted. Jail medical staff and contractors do not schedule follow-up appointments in the community, nor are incarcerated people provided with sufficient referrals or linkages about where they may receive medical care services or medications. Upon information and belief, the Jail fails to help people sign up for Medi-Cal coverage under the Affordable Care Act.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 112 of the Complaint and, therefore, denies the averments.

113.     For those incarcerated people who are prescribed medications at the Jail, SHERIFF'S DEPARTMENT policy provides that incarcerated people receive only a

1     10-day supply of medication, and only for certain limited medications, defined vaguely

2     as "critical medications." For many medications, a 10-day supply of medication is

3     insufficient. Incarcerated people released from the Jail are often unable to secure

4     medical care in the community and a refill of essential medications within 10 days. As

5     a point of comparison, CDCR has long provided a 30-day supply of medication to

6     people released from prison with an up to a 60-day supply of medication for people

7     released to a reentry program.[67] CDCR recently agreed to provide everyone released

8     from prison with a 60-day supply of medication. Many California jail systems provide

9     at least a 30-day supply of medication, with linkages to community providers to

10     facilitate continuity of care. [footnote omitted]

12     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

13     averments in Paragraph 113 of the Complaint and, therefore, denies the averments.

15     **P. Jail Medical Providers Fail to Maintain Adequate Quality Assurance/Quality**
16     **Improvement Processes to Ensure Appropriate and Timely Medical Care**
17

18    114.     COUNTY DEFENDANTS, CORRECTIONAL HEALTHCARE

19     PARTNERS, and TRI-CITY fail to engage in meaningful Quality Assurance/ Quality

20     Control ("QA/QC") processes. The NCCHC Report found that COUNTY

21     DEFENDANTS lacked a formal peer review process for SHERIFF'S DEPARTMENT

22     and contracted medical staff, and that COUNTY DEFENDANTS lacked a continuous

23     quality improvement ("CQI") process for reviewing untimely medical care.[68] The

24     NCCHC Report found that COUNTY DEFENDANTS' quarterly CQI program lacked

1    documentation of the effectiveness of any plans undertaken as a result of the CQI

2    program, including any notes or minutes from reviewing Jail suicide prevention

3    policies.[69] The DRC Report also found that COUNTY DEFENDANTS lacked a

4    "functioning or effective quality improvement program."[70] Upon information and

5    belief, COUNTY DEFENDANTS', CORRECTIONAL HEALTHCARE

6    PARTNERS', and TRI-CITY's quality improvement policies and practices remain

7    inadequate. [footnotes omitted]

8

9    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

10   averments in Paragraph 114 of the Complaint and, therefore, denies the averments.

11

12   115.    COUNTY DEFENDANTS lack adequate policies and practices for

13   reviewing deaths in the Jail, informing staff of the results, and implementing

14   improvements to Jail processes as a result. NCCHC found that medical staff were

15   "not being informed of any results of death reviews in their facilities."[71] Even now,

16   the SHERIFF'S DEPARTMENT still fails to share substantively important

17   information about deaths with health care staff. [footnote omitted]

18

19   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

20   averments in Paragraph 115 of the Complaint and, therefore, denies the averments.

21

22   116.    The DRC Report's experts found the Jail's death review process to be inadequate

23   in several respects, including its failure to direct how any findings and corrective action

1   plans will be acted upon and how proposed corrective actions will be enforced. What this

2   means in practice is that Defendants fail to learn from past mistakes and fail to implement

3   changes to prevent similar mistakes and resultant harms in the future.

4

5   **Answer**: MAH denies the averments in Paragraph 116 as alleged against MAH. MAH is

6   without sufficient knowledge or information to admit or deny the averments in Paragraph

7   116 of the Complaint to the extent they apply to the other Defendants, and, therefore,

8   denies those averments.

9

10   117.   COUNTY DEFENDANTS', CORRECTIONAL HEALTHCARE

11   PARTNERS', and TRI-CITY's failure to engage in meaningful QA/QC processes

12   further undermines their ability to adequately train custody and medical staff how to

13   provide appropriate and timely medical care to incarcerated people.

14

15   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16   averments in Paragraph 117 of the Complaint and, therefore, denies the averments.

17

18   **II. DEFENDANTS FAIL TO PROVIDE MINIMALLY ADEQUATE MENTAL**
19   **HEALTH CARE TO INCARCERATED PEOPLE**

20

21   118.   COUNTY DEFENDANTS and LIBERTY are not meeting their constitutional

22   obligation to provide adequate mental health care to the people incarcerated at the Jail.

23   COUNTY DEFENDANTS contract with Defendant LIBERTY to provide psychiatric

24   staff and services to incarcerated people at the Jail, and together, COUNTY

1    DEFENDANTS and LIBERTY are responsible for all mental health care in the Jail. The

2    mental health care provided in the Jail is woefully inadequate and subjects incarcerated

3    people to a substantial risk of deteriorating psychiatric conditions, extreme anguish and

4    suffering, and in some cases, even death. In fall 2021, one of the COUNTY's elected

5    supervisors admitted that in the Jail, "arrestees with mental illness typically receive

6    inadequate mental health services while incarcerated."[72] By policy and practice, the

7    Jail's mental health care system falls far short of the minimum elements of a

8    constitutional mental health system. [footnotes omitted]

9

10    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

11    averments in Paragraph 118 of the Complaint and, therefore, denies the averments.

12

13    119.      The mental health care system in the Jail includes two inpatient PSUs, one at Las

14    Colinas for women (32 beds) and one at Central for men (30 beds). There are also

15    outpatient "stepdown" units for incarcerated people who have been discharged from

16    more acute mental health treatment environments, such as having been subject to a 5150

17    hold. Separate from the PSU, the SHERIFF'S DEPARTMENT and LIBERTY operate

18    an Inmate Safety Program ("ISP"), for incarcerated people staff have identified as at risk

19    of suicide.

20

21    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

22    averments in Paragraph 119 of the Complaint and, therefore, denies the averments.

23

1      120.      Inadequacies with the Jail's mental health care system, including its suicide

2      prevention practices, are well-documented. The NCCHC Report found that the Jail failed

3      to comply with nearly all of NCCHC's essential standards for an adequate correctional

4      mental health care system. NCCHC also found that the Jail lacked sufficient mental

5      health staff for the incarcerated people at the Jail. For example, at Central, mental health

6      professionals "primarily respond to crises and try to provide two, four-hour 'mental

7      health clinics' each per week, but these are often interrupted or not held due to facility

8      needs or other issues, including lack of staff or lock-downs on individual housing

9      modules."[73] NCCHC found that the Jail lacked adequate procedures for monitoring of

10     incarcerated people at risk of suicide, which "represents a high risk to the safety of

11     inmates who are suicidal, and a risk to the facility."[74] Overall, NCCHC found that

12     "[s]uicide prevention is inadequate" at each Jail facility it visited.[75] In addition, NCCHC

13     also observed the lack of confidentiality when mental health staff met with incarcerated

14     people.[76] All of these problems persist today. [footnotes omitted]

15

16     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17     averments in Paragraph 120 of the Complaint and, therefore, denies the averments.

18

19     121.      In April 2018, after a multi-year investigation of Jail policies and conditions,

20     the non-profit Disability Rights California released a report on suicides in the Jail. DRC

21     retained two experts on correctional mental health care and suicide prevention

22     practices, Dr. Karen Higgins and Dr. Robert D. Canning (collectively, "DRC Experts"),

23     to assess individual suicides of incarcerated people and the Jail's suicide prevention

practices. The DRC Report and DRC Experts found that the Jail's suicide rate

exceeded national averages and those of other large jails in California.[77] From 2011-

2020, the suicide rate in the Jail was approximately 74 per 100,000 incarcerated

people,[78] sixty percent higher than the national average (just under 46 per 100,000

incarcerated people) over the most recent decade with statistics available.[79] The Jail's

suicide rate over that period was almost five times the suicide rate in Orange County

(approximately 15 per 100,000 incarcerated people), and higher than suicide rates at all

other large California jails.[80] The Jail had the same number of suicides as Los Angeles

County, even though the Los Angeles County jails house more than three times as

many people. Many of the problems with the Jail's policies, practices, and procedures

that the DRC Report criticized—inappropriate overuse of isolation, the failure to

conduct constant observation of individuals at risk for suicide, mental health encounters

consisting of brief wellness checks—continue today. Remarkably, the SHERIFF'S

DEPARTMENT's response to DRC's Report and recommendations for systemic

improvements was a statistician's report challenging DRC's statistical method (which

was the same method used by the United States Department of Justice) for calculating

the Jail's historical suicide rates. [footnotes omitted]


**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 121 of the Complaint and, therefore, denies the averments.


122.     An internal SHERIFF'S DEPARTMENT document indicates that the SHERIFF'S

DEPARTMENT continues to refuse to implement 8 of the 18 DRC Report

1      recommendations, such as preparing a written treatment plan for each patient requiring

2      mental health services.

3

4      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5      averments in Paragraph 122 of the Complaint and, therefore, denies the averments.

6

7      123.      In the wake of the DRC Report, COUNTY DEFENDANTS solicited a report

8      from Lindsay Hayes, a national expert on suicide prevention in jails. The Hayes Report

9      also identified widespread deficiencies in the SHERIFF'S DEPARTMENT's mental

10      health and suicide prevention policies, practices, and procedures. For example, Hayes

11      criticized the Jail's lack of confidential intake screening spaces, undue restrictions on

12      programs and property for individuals on suicide precautions, and failure to impose time

13      limits on stays in hyper-isolation cells.[81] Despite Hayes's criticism, these practices

14      persist. [footnote omitted]

15

16      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17      averments in Paragraph 123 of the Complaint and, therefore, denies the averments.

18

19      124.      Today, the Jail's policies and practices for mental health care remain woefully

20      inadequate. COUNTY DEFENDANTS and their mental health contractor, LIBERTY,

21      have failed to implement many of the recommendations in the NCCHC Report, DRC

22      Report, and Hayes Report, including several that the State Audit Report found are

23      "essential for ensuring the welfare and safety of incarcerated individuals ...."[82] The

1     SHERIFF'S DEPARTMENT and LIBERTY have also failed to adequately train and

2     supervise their staff on the policies that were revised in response to the reports.

3     Together, COUNTY DEFENDANTS' and LIBERTY's shortcomings have tragic

4     consequences. Over 40 people have committed suicide while incarcerated in the Jail

5     since 2010. Upon information and belief, many of these suicides—and other attempted

6     suicides—were preventable. COUNTY DEFENDANTS and LIBERTY are well aware

7     of severe system-wide deficiencies that have caused and continue to cause significant

8     harm to the incarcerated people in their custody, yet they have failed to take reasonable

9     measures to abate this impermissible risk of harm. [footnote omitted]

10

11    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

12    averments in Paragraph 124 of the Complaint and, therefore, denies the averments.

13

14    **A. The Sheriff's Department Fails to Adequately Identify and Track Incarcerated**
15    **People in Need of Mental Health Care**

16

17   125.     By policy and practice, the COUNTY DEFENDANTS fail to adequately identify,

18    track, and treat incarcerated people's mental health needs. The SHERIFF'S

19    DEPARTMENT's policies and practices for mental health screening and tracking are

20    inadequate. The SHERIFF'S DEPARTMENT fails to adequately train its intake nurses,

21    who are not mental health professionals, how to identify incarcerated people with mental

22    health needs.

23

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 125 of the Complaint and, therefore, denies the averments.

126.     The Jail's intake screening process is inadequate to identify incarcerated people in need of mental health care. Intake nurses are not properly trained to consistently identify an incarcerated person's prior mental health history, and frequently fail to do so. Jail intake staff frequently do not review past incarceration records or county behavioral health records in connection with booking, which means that intake staff lack important information about arriving incarcerated people's prior mental health history. As a result, people in need of mental health care at admission are either denied care, or their care is delayed. These deficiencies cause unnecessary suffering or even death. For example, the DRC Report found that one individual who arrived at the Jail "with symptoms of florid psychosis and mania" committed suicide after he was housed in a punitive administrative segregation unit—intended for disciplinary purposes—rather than a mental health unit or safe observation cell.[83] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 126 of the Complaint and, therefore, denies the averments.

127.     Even when the Jail's initial screening process does identify an incarcerated person in need of mental health care, the Jail fails to provide a timely comprehensive mental health assessment. The Jail's screening policies fail to provide for timely *assessment* and—just as important—fail to facilitate delivery of clinically necessary *treatment*.

1

2       **Answer**: MAH is without sufficient knowledge or information to admit or deny the

3       averments in Paragraph 127 of the Complaint and, therefore, denies the averments.

4

5 128.      A mental health professional from the SHERIFF'S DEPARTMENT speaks

6       with an incarcerated person at intake only if the intake nurse determines the person

7       may need to be placed on suicide precautions. The mental health professional—called

8       the "gatekeeper"—conducts an initial suicide risk assessment, not a comprehensive

9       mental health assessment. That assessment, by policy and practice, serves only to

10       evaluate for placement on suicide precautions, not for clinically necessary mental

11       health treatment.

12

13       **Answer**: MAH is without sufficient knowledge or information to admit or deny the

14       averments in Paragraph 128 of the Complaint and, therefore, denies the averments.

15

16 129.      By policy and practice, there is no system for triaging new arrivals with

17       emergent or urgent mental health care needs. Instead, under Medical Services

18       Division policy E.5.1, anyone who "screen[s] positive to [sic] mental health concerns

19       will be scheduled by intake nursing staff for '30-day []' clinic type for further

20       assessment." The NCCHC Report observed that the SHERIFF'S DEPARTMENT

21       fails to conduct a comprehensive mental health intake within 14 days of booking.[84] In

22       fact, by policy, when intake staff determine at intake that an incarcerated person

23       should be referred for further mental health evaluation, follow-up is only required

within *30 days*, without any expedited timeline where clinically indicated. That 30-day wait is far too long to initially evaluate someone, especially given that entering the Jail is a traumatic event that can exacerbate existing mental health symptoms. For example, the State Audit Report found that an intake nurse referred an arriving incarcerated person for mental health services. The next day, the person made an urgent request for mental health services, but the request was denied because a referral was in process. Two days later, the person died by suicide, having never seen a mental health professional.[85] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 129 of the Complaint and, therefore, denies the averments.

**B. County Defendants and Liberty Fail to Maintain Sufficient Numbers of Qualified Mental Health Professionals to Meet the Current Need for Mental Health Treatment**

130.     COUNTY DEFENDANTS' and LIBERTY's policies and practices for mental health care staffing are inadequate. COUNTY DEFENDANTS and LIBERTY fail to maintain sufficient numbers of mental health care professionals to provide minimally adequate care to the more than 4,000 incarcerated people in the Jail. According to the SHERIFF'S DEPARTMENT, the Jail has long been the largest mental health care provider in San Diego County.[86] In May 2021, the SHERIFF'S DEPARTMENT estimated that at least a third of incarcerated people had mental health needs.[87] In December 2021, 1,432 incarcerated people at the Jail—almost 35%—were prescribed psychotropic medications.[88] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 130 of the Complaint and, therefore, denies the averments.

131.     COUNTY DEFENDANTS have failed to maintain sufficient numbers of mental health staff and contractors to adequately provide mental health care to the many incarcerated people in need. As of August 30, 2021, the SHERIFF'S DEPARTMENT employed only 25 mental health staff members across the entire system. COUNTY DEFENDANTS contract with LIBERTY to provide approximately 22 additional mental health staff at the Jail, many with responsibilities limited to medication management. Because of insufficient staffing, mental health staff employed by the SHERIFF'S DEPARTMENT have long been required to work mandatory overtime hours. Mandatory overtime reduces the quality of mental health care provided to incarcerated people and increases staff burnout. On information and belief, at least eight mental health clinicians quit in 2021.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 131 of the Complaint and, therefore, denies the averments.

132.     COUNTY DEFENDANTS and LIBERTY are well aware that they have failed to hire, train, supervise, and retain adequate mental health staff. The NCCHC Report found that COUNTY DEFENDANTS maintained insufficient mental health staff to provide adequate care to people incarcerated at the Jail. For example, at George Bailey, only three clinicians were managing "suicide watches, evaluations, programs, requests

1    for care, [and] crisis intervention," and had additional responsibilities for

2    approximately 1,500 incarcerated people.[89] Clinicians often had to cancel individual

3    counseling sessions and instead focus on tasks like "wellness checks, segregation

4    monitoring and crisis management."[90] The report further found that some incarcerated

5    people "go for weeks without being seen following a referral or scheduled

6    appointment."[91] San Diego County's June 2017 Grand Jury report similarly noted that

7    "[o]nly three counselors serve 1,500+ inmates."[92] The DRC Report found that

8    insufficient mental health staffing contributed to care consisting largely of "brief, non-

9    confidential 'check-ins' with mental health staff, often through a cell door."[93] DRC

10   recommended that COUNTY DEFENDANTS "substantially increase mental health

11   staffing."[94] They have failed to do so. In October 2021, the Undersheriff publicly

12   acknowledged that the SHERIFF'S DEPARTMENT needs to hire more mental health

13   staff.[95] [footnotes omitted]

14

15   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16   averments in Paragraph 132 of the Complaint and, therefore, denies the averments.

17

18   133.    COUNTY DEFENDANTS and LIBERTY have failed to take necessary action to

19   address the insufficient numbers of qualified mental health professionals at the Jail—

20   whether by hiring additional mental health staff, retaining existing staff, contracting with

21   third-party providers, diverting incarcerated people with mental illness to community

22   providers, or supporting mental health-based alternatives to incarceration. COUNTY

23   DEFENDANTS' failure to maintain adequate mental health care staffing or to contract

1    with community mental health care providers denies incarcerated people timely access to

2    adequate mental health care. Mental health care throughout much of the Jail still suffers

3    from the same defects that DRC criticized in 2018: non-confidential check-ins that are all

4    too brief to provide meaningful benefit, lack of individualized treatment plans, a near-

5    complete absence of structured treatment programming, and more. In addition, due to

6    inadequate staffing, a mental health clinician is often not available overnight at Central to

7    conduct even the intake "gatekeeping" screening for incarcerated people the intake nurse

8    identifies as at risk for suicide. The screening then falls to the nurse, rather than a mental

9    health professional.

10

11   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

12   averments in Paragraph 133 of the Complaint and, therefore, denies the averments.

13

14   134.    COUNTY DEFENDANTS and LIBERTY also fail to retain the mental health

15   staff that have been hired, causing a lack of continuity of care. For example, Plaintiff

16   EDWARDS has been diagnosed with depression for which he is prescribed Prozac and

17   Remeron. EDWARDS sought counseling several times, but due to significant turnover

18   among the clinicians, EDWARDS often spends sessions recounting basic facts and

19   background details to the new clinician. Because these sessions, some which occur cell-

20   side, are typically only a few minutes long and often involve a new mental health staff

21   member, EDWARDS has not made progress in managing his depression. Plaintiff

22   ARCHULETA has experienced a deterioration in his mental health since the psychologist

23   that met with him for wellness checks and counseling retired in or around July 2021.

1    Since then, ARCHULETA has not been able to consistently see a mental health staff

2    member, despite reporting that counseling helps him manage his mental health

3    symptoms.

4

5    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6    averments in Paragraph 134 of the Complaint and, therefore, denies the averments.

7

8    135.    In the wake of the DRC, Hayes, and NCCHC reports, COUNTY DEFENDANTS

9    designated outpatient stepdown units, ostensibly to address gaps in the delivery of care.

10   But the resources, programming, and structure of those units have been so deficient as to

11   be a failure. In the outpatient stepdown units, clinicians carry unreasonable caseloads of

12   more than 100 incarcerated people with mental health needs. COUNTY DEFENDANTS'

13   and LIBERTY's failure to maintain adequate numbers of mental health staff places

14   incarcerated people at risk of serious harm or death. For example, Rafael Hernandez, who

15   had psychosis, was initially found incompetent to stand trial and placed in the Jail's

16   competency restoration program. After he was found competent in July 2021, although

17   still experiencing psychosis, Hernandez was moved to one of the outpatient mental health

18   stepdown units at Central for further treatment. There, Hernandez stayed for months and

19   did not improve, as mental health staff lack the resources to see Hernandez and other

20   incarcerated people with serious mental health needs frequently enough to provide

21   adequate care. On October 13, 2021, having been at the Jail for almost a year, Hernandez

22   hanged himself in his cell, and he died several days later. The Jail's outpatient mental

health stepdown units set mental health staff up to fail and put patients at extraordinary risk.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 135 of the Complaint and, therefore, denies the averments.

**C. Law Enforcement Staff Improperly Control Mental Health Care Decisions**

136.       COUNTY DEFENDANTS fail to ensure that clinical decisions about mental health care for incarcerated people are made by mental health professionals, rather than custody staff. The SHERIFF'S DEPARTMENT's organizational chart reflects that sworn custody staff oversee the entire medical division, including SHERIFF'S DEPARTMENT and LIBERTY mental health staff.[96] This structure is out of step with modern practice. In practice, too, custody staff implicitly and expressly inform mental health staff and contractors that they must follow custody orders regarding mental health decisions. Although custody staff are not equipped to identify behaviors and other signs showing mental illness, they often overrule mental health providers or otherwise make decisions affecting the mental health care provided at the Jail in an effort to control incarcerated people they deem problematic.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 136 of the Complaint and, therefore, denies the averments.

137.      Custody staff have expressly dictated when and how mental health clinicians treat incarcerated people—even recommending "forced meds" for at least one incarcerated person. This practice was criticized in an October 12, 2021, letter from the SEIU, the union representing SHERIFF'S DEPARTMENT mental health staff at the Jail. The letter warns about the Jail's "lack of adherence to general practice protocols such as direction of health care service providers by licensed medical professionals rather than law enforcement." Having custody staff make decisions about mental health care places incarcerated people at risk of serious harm, with custody operations and administrative convenience trumping the clinical judgment of a mental health professional in ways that are dangerous.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 137 of the Complaint and, therefore, denies the averments.

138.      In other instances, custody staff exercise their authority to deny mental health care to incarcerated people. For example, when limited group programming was available in the Jail prior to the pandemic, custody staff routinely refused to escort incarcerated people to group counseling, and sometimes would falsely report to mental health staff that a patient refused to attend when the deputy did not want to escort the person. Other times, custody staff refused to unlock a closet where reading material was kept, which prevented clinicians from distributing them to their patients. Custody staff have bullied and belittled mental health staff who advocate for patients' wellbeing by calling them "inmate lovers."

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 138 of the Complaint and, therefore, denies the averments.

139.    Custody staff also dictate the treatment that patients receive in the ISP, the Jail's suicide precaution program. Custody staff frequently assert final authority over whether to place or keep people in a safety cell or enhanced observation housing ("EOH") cell, and frequently override the recommendation of mental health staff.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 139 of the Complaint and, therefore, denies the averments.

140.    For example, Heron Moriarty died by suicide after custody staff overruled health care staff's recommendation to place Moriarty on suicide precautions. Moriarty had been diagnosed with psychosis, bipolar disorder, and mania. He was arrested and booked into Vista in May 2016 after experiencing a psychotic break. Moriarty's wife called Vista about 30 times over the next three days to warn them that Moriarty was suicidal. A nurse practitioner recommended that the Jail place Moriarty on suicide precautions, but a sergeant overruled the recommendation. A records clerk at Vista later testified that a sergeant rejected her request to place Moriarty on suicide precautions after Moriarty had been howling through the Jail for two days. Due to custody staff's interference with clinical judgment, Moriarty was never placed on suicide precautions and committed suicide on May 31, 2016. The records clerk testified that custody staff threatened her with

retaliation if she spoke about the circumstances leading to Moriarty's death. In October

2021, the COUNTY agreed to pay almost $3 million to settle a lawsuit over Moriarty's

death.[97] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 140 of the Complaint and, therefore, denies the averments.

141.    Custody staff improperly exercise control over when incarcerated people are

removed from suicide precaution protocols and placements. For example, on May 30,

2021, Lester Marroquin committed suicide at Central after custody staff decided to move

Marroquin, who had a mental illness and had repeatedly attempted suicide, from the

highest level of suicide observation directly into an administrative segregation cell—on a

Sunday, with little planning for Marroquin's discharge. Although Marroquin was moved

from a safety cell, custody staff still forced Marroquin to wear a safety smock rather than

his normal clothing in the segregation cell. This action directly contradicts suicide expert

Lindsay Hayes's recommendation to the SHERIFF'S DEPARTMENT in 2018. Hayes

recommended that the Jail only use safety smocks for incarcerated people "at high risk for

suicide by hanging."[98] Marroquin's prior suicide attempts were by water intoxication, not

hanging. Hayes also recommended that the Jail should "return full clothing to the inmate

prior to their discharge from suicide precautions."[99] In all, the custody-driven management

of Marroquin during his mental health crisis was incoherent and clinically deficient.

Shortly after Marroquin was moved from the safety cell to the segregation cell, he died by

suicide. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 141 of the Complaint and, therefore, denies the averments.

142.     Custody staff also determine whether to house incarcerated people in the PSU, which provides the most intensive level of mental health care in the Jail. The DRC Report found that custody staff "unilaterally place patients in the PSU's 'observation units,' which amount to a solitary confinement setting without access to the PSU's treatment programming"—even when mental health staff make contrary clinical recommendations.[100] DRC discovered that incarcerated people in those observation cells were decompensating and "smearing food, feces, and urine on the walls and floor."[101] Although the SHERIFF'S DEPARTMENT has revised their written policies and procedures since the DRC report, custody staff often use their position of authority to dictate placements for people with acute mental health needs. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 142 of the Complaint and, therefore, denies the averments.

**D. County Defendants and Liberty Fail to Continue Incarcerated People's Community Mental Health Medications**

143.     By policy and practice, COUNTY DEFENDANTS and LIBERTY fail to ensure that incarcerated people arriving at the Jail with active prescriptions for mental health medications are able to timely continue on those medications. The SHERIFF'S

1   DEPARTMENT and LIBERTY fail to adequately train staff to identify incarcerated

2   people's active mental health medications and ensure that they are continued in a timely

3   manner. NCCHC found that incarcerated people who enter the Jail with active

4   prescriptions for psychotropic medication "frequently" fail to receive their medication in

5   a timely manner.[102] This continues to happen. [footnote omitted]

6

7   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

8   averments in Paragraph 143 of the Complaint and, therefore, denies the averments.

9

10   144.   Once mental health medications are prescribed by Jail mental health staff, the

11   SHERIFF'S DEPARTMENT and LIBERTY fail to ensure that patients receive those

12   medications in a timely manner. Often, incarcerated people prescribed psychotropic

13   medications in the Jail for their mental health needs wait up to a week or longer for those

14   medications to arrive. In the interim, incarcerated people decompensate during those

15   delays, leading to safety cell or EOH placements, as well as avoidable suicide attempts and

16   incidents of serious self-harm.

17

18   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

19   averments in Paragraph 144 of the Complaint and, therefore, denies the averments.

20

21   **E. The Jail Fails to Provide Incarcerated People with Timely Access to Adequate**
22   **Mental Health Care**
23

145.     The COUNTY DEFENDANTS and LIBERTY lack adequate policies and

practices to timely respond to incarcerated people's requests for mental health care. The

COUNTY DEFENDANTS and LIBERTY fail to adequately train their staff, and to

provide adequate resources, to timely address and respond to incarcerated people's

requests for mental health care. Incarcerated people may request mental health care by

submitting a sick call request form. However, the Jail lacks an adequate triage system to

address mental health care requests. The triage process begins with a psych office

assistant scanning and assigning all mental health care requests to mental health

clinicians. If the clinician assigned to a given request is unavailable, out sick, or on

vacation, the Jail lacks an adequate system to ensure that another clinician addresses the

person's mental health needs. Any "backup" occurs, if at all, on an *ad hoc* basis. Nor

does the Jail's triage process include any system or procedure for prioritizing sick call

requests based on whether they are emergent, urgent, or routine. Staff members are

trained only to look for suicide risk language, without attention paid to patient needs for

treatment to prevent decompensation.


**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 145 of the Complaint and, therefore, denies the averments.


146.     This inadequate triage system, in combination with the chronic understaffing of

mental health professionals, results in many mental health care requests going largely

unaddressed unless and until incarcerated people threaten self-harm. The DRC Report

found that: "Only when [incarcerated people] reach the point of engaging in acts of

1    self-harm or having an acute breakdown do they receive an enhanced level of care.

2    Such a system is cruel and counterproductive[.]"[103] Otherwise, incarcerated people

3    "remain in harsh, non-therapeutic settings without adequate treatment until their

4    condition deteriorates."[104] NCCHC similarly found that the Jail's mental health system

5    reflects a "disproportionate focus on those with psychotic disorders" and neglect of

6    "other, less severely mentally ill inmates."[105] [footnote omitted]

7

8    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

9    averments in Paragraph 146 of the Complaint and, therefore, denies the averments.

10

11   147.       These deficiencies persist. As of early February 2022, the mental health clinic

12   backlog is approximately 300 patients at Central, causing delays upwards of 25 days for

13   patients to be seen. At George Bailey, the mental health clinic backlog has reached nearly

14   500 patients. These backlogs harm people. In November 2021, one incarcerated person at

15   Central submitted numerous urgent requests for mental health care because he was

16   struggling with the upcoming anniversary of a tragic death in his family. The Jail failed to

17   send a mental health clinician to see the person or to provide any treatment. Only when

18   the person's family reported that he was feeling suicidal—at least five days after the

19   person submitted his first sick call request—was a mental health staff member dispatched

20   to talk to him.

21

22   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

23   averments in Paragraph 147 of the Complaint and, therefore, denies the averments.

1

2    148.      Upon information and belief, Plaintiff NELSON similarly submitted did not

3     receive responses to multiple sick call requests, and was forced by the Jail's lack of

4     response to ultimately yell at and beg for deputies to allow him to see mental health staff.

5     Shortly after arriving at the Jail on March 2, 2021, NELSON filed two sick call request

6     slips asking for mental health care for his depression and anxiety. In his second sick call

7     slip NELSON wrote that he urgently needed to see a psychiatrist. NELSON received no

8     response to those requests, and fell into a deep depression. Having not received any

9     response in almost seven weeks and in a desperate attempt to get mental health care, on

10     or around April 20, 2021, NELSON begged each custody staff member passing his cell

11     for more than one and a half days to allow him to see a mental health provider, which

12     caused him significant anxiety because he feared physical harm from his cellmates and

13     neighbors for disturbing the housing unit. Shortly thereafter, on April 22, 2021, NELSON

14     was finally seen for an initial evaluation, although he was not seen by a psychiatrist until

15     May 10, 2021.

16

17     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18     averments in Paragraph 148 of the Complaint and, therefore, denies the averments.

19

20    149.      Plaintiff ARCHULETA requested mental health care shortly after he was

21     incarcerated in July 2019. Although ARCHULETA saw a mental health clinician in

22     August 2019, he was not seen by a psychiatrist until December 2019. One mental health

1    staff member apologized to ARCHULETA about the delays in care and explained that

2    the Jail was severely understaffed.

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 149 of the Complaint and, therefore, denies the averments.

6

7    150.    By policy and practice, there is poor coordination of care for incarcerated people

8    with mental health needs. Neither medical nor custody staff appropriately or timely refer

9    to mental health staff incarcerated people who exhibit symptoms of mental illness during

10   encounters with medical and custody staff. As a result, many incarcerated people who

11   exhibit symptoms of mental illness never receive treatment. The SHERIFF'S

12   DEPARTMENT and LIBERTY fail to adequately train medical and custody staff to

13   recognize signs and symptoms of mental illness, and to refer to mental health staff

14   incarcerated people exhibiting such signs and symptoms.

15

16   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17   averments in Paragraph 150 of the Complaint and, therefore, denies the averments.

18

19   151.    Upon information and belief, the SHERIFF'S DEPARTMENT and LIBERTY do

20   not maintain any central list, electronic or otherwise, of incarcerated people with mental

21   illness and the treatment they require. The SHERIFF'S DEPARTMENT and LIBERTY

22   do not maintain adequate information about incarcerated people's mental health needs in

23   their custody and/or medical files. To the extent that the Jail maintains information about

an incarcerated person's mental health needs in any form, custody, medical, and mental health staff are not provided with access to the information in a manner that would timely and effectively inform them of a patient's mental health concerns and treatment needs.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 151 of the Complaint and, therefore, denies the averments.

152.     The SHERIFF'S DEPARTMENT and LIBERTY lack adequate policies and procedures for providing timely mental health care to incarcerated people who are transferred between Jail facilities with sick call requests pending. The Jail maintains no policy, procedure, or consistent practice for the transfer of those sick call requests from one Jail facility to another. On an *ad hoc* basis, some clinicians at the transferring facility try to email clinicians at the receiving facility, but this is not policy or even a widespread practice. Upon information and belief, most clinicians at the transferring facility refuse to look at a pending slip or become involved if an incarcerated person is transferred.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 152 of the Complaint and, therefore, denies the averments.

**F. Jail Providers Fail to Provide Adequate Mental Health Care to Incarcerated People with Mental Illness, and Continue to Rely on a Crisis-Response System**

153.     The COUNTY DEFENDANTS' and LIBERTY's policies and practices for providing mental health care to incarcerated people are inadequate. The COUNTY DEFENDANTS and LIBERTY fail to adequately train mental health staff how to

monitor incarcerated people with mental illness and the treatment they require. These inadequate policies and procedures place incarcerated people at substantial risk of serious harm.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 153 of the Complaint and, therefore, denies the averments.

154.     The COUNTY DEFENDANTS and LIBERTY lack a coherent system for identifying the mental health care needs of incarcerated people and implementing appropriate treatment plans and programming for each individual. Although the DRC Report recommended that Jail staff prepare and follow a written, individualized treatment plan for each incarcerated person requiring mental health care,[106] the SHERIFF'S DEPARTMENT and LIBERTY continue to fail to maintain adequate treatment plans for mentally ill patients. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 154 of the Complaint and, therefore, denies the averments.

155.     In October 2018, clinical leadership gave a presentation to SHERIFF'S DEPARTMENT command staff proposing that the Jail implement a level of care system for mental health care (and other medical care) at the Jail. A level of care system is necessary to assess an incarcerated person's treatment needs and then provide clinical interventions that match those treatment needs. Specifically, clinical leadership proposed

assigning each person at the Jail a mental health needs score, along with a system of

subcodes to indicate important mental health/disability factors, such as a developmental

disability or history of traumatic brain injury. Under the proposed system, each person

would receive care based on their mental health need score. However, the SHERIFF'S

DEPARTMENT chose not to implement a level of care system due to concerns about

mental health understaffing and the SHERIFF'S DEPARTMENT's lack of commitment

to providing clinically necessary care.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 155 of the Complaint and, therefore, denies the averments.

156.     On occasion, the SHERIFF'S DEPARTMENT or LIBERTY mental health staff

complete a "BH Assessment" form to assess the mental health needs of incarcerated

people who have reported mental health symptoms while at the Jail. However, staff

completing the BH Assessment fail to appropriately assess patients' mental health needs

and prescribe an adequate course of treatment. For example, a SHERIFF'S

DEPARTMENT mental health clinician prepared a BH Assessment form of Plaintiff

NORWOOD on July 3, 2021, after NORWOOD requested mental health attention.

NORWOOD was never given a copy of the BH Assessment, nor were its contents ever

disclosed to him. The mental health clinician noted that NORWOOD had a past history of

inpatient mental health care, active symptoms of psychosis such as hallucinations, and a

history of depression and anxiety, and noted NORWOOD's mental health acuity level as

"moderate." Nevertheless, the mental health clinician wrote that NORWOOD needed only

"wellness checks" every 3-6 weeks. At the Jail, wellness checks are generally brief, cell-side encounters that last anywhere from one to five minutes, and provide no therapeutic benefit. It should have been obvious to any reasonable clinician based on the stated history that NORWOOD required more frequent, intensive treatment for his mental health needs. Before NORWOOD's next "wellness check" was scheduled, and in part because NORWOOD was having trouble coping with his mental illness, NORWOOD overdosed on fentanyl at the Jail on July 17, 2021.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 156 of the Complaint and, therefore, denies the averments.

157.     These non-therapeutic "wellness checks" are often the extent of the Jail's mental health "programming" for most incarcerated people with mental health needs. Therapy or counseling in an individual or group setting is rarely offered or provided to incarcerated people, regardless of whether they were receiving therapy or counseling as a part of their treatment for mental illness outside of the Jail. The SHERIFF'S DEPARTMENT and LIBERTY have been deliberately indifferent to these inadequate practices for years. As the DRC Report documented, many incarcerated people with mental health needs "expressed to us an interest in group or individual out-of-cell therapeutic activities."[107] One patient asked to discontinue his medication and try counseling, but instead "mental health staff increased his medication dosage and ignored his request for counseling."[108] [footnotes omitted]

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 157 of the Complaint and, therefore, denies the averments.

3

4    158.    COUNTY DEFENDANTS and LIBERTY continue to operate a crisis- reactive

5    system, without structured mental health programming for the vast majority of patients

6    with mental health treatment needs. The Jail's Detention Outpatient Psychiatric Services

7    ("DOPS") policy confirms this failure—to wit, the *only* "modes of treatment" set forth in

8    policy are (1) "Pharmacotherapy" (*i.e.*, medication), (2) "Crisis intervention," and (3)

9    "Release from outpatient service." Defendants deny patients the structured, clinically

10   driven programming that other jail systems provide and that many patients need, putting

11   them at risk of avoidable psychological decompensation and harm. On information and

12   belief, Defendants are aware that such programming is provided by other jail facilities,

13   but choose to implement their substandard DOPS policy.

14

15   **Answer**: MAH denies the averments in Paragraph 158 as alleged against MAH. MAH is

16   without sufficient knowledge or information to admit or deny the averments in Paragraph

17   158 of the Complaint to the extent they apply to the other Defendants, and, therefore,

18   denies those averments.

19

20   159.    The SHERIFF'S DEPARTMENT's and LIBERTY's policies and procedures for

21   communication between mental health staff and custody staff about the treatment needs

22   of incarcerated people with mental illness are inadequate. These inadequate policies and

procedures lead to inadequate mental health care and place incarcerated people at
substantial risk of serious harm.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 159 of the Complaint and, therefore, denies the averments.

160.       For example, in 2015, Ruben Nunez died by suicide at Central after mental health
providers and custody staff failed to adequately communicate about Nunez's mental health
needs. While in a state psychiatric hospital, Nunez had been diagnosed with psychogenic
polydipsia, which caused him to drink water uncontrollably. According to a lawsuit filed
by Nunez's family, although Jail mental health officials knew about Nunez's condition
when he transferred to the Jail from the state psychiatric hospital, his condition was not
adequately communicated to mental health and custody staff at Central. There, staff failed
to prevent him from having unlimited access to water. Nunez died of water intoxication
five days after booking.[109] In 2021, a remarkably similar suicide occurred: Lester
Marroquin drowned himself in his toilet even though Jail staff knew that Marroquin had
attempted suicide in a similar manner on previous occasions.[110] Marroquin was at least the
*third* person in a decade to die from water intoxication in the Jail. In 2011, 34-year-old
Abraham Clark ingested enough water to kill himself.[111] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 160 of the Complaint and, therefore, denies the averments.

161.     As a result of the SHERIFF'S DEPARTMENT's and LIBERTY's failure to track and monitor incarcerated people and the mental health treatment they require, incarcerated people experience disruptions in prescribed treatment and are exposed to a substantial risk of serious harm. For example, in or around January 2022, a patient with serious mental illness was moved from the outpatient stepdown unit at Central to a COVID-19 quarantine unit. When the person returned to the outpatient stepdown unit, he was wearing another person's wristband and had not received his psychiatric medication for at least five days while in quarantine. Evidently, no staff noticed that the person was wearing the wrong wristband and needed his medication. As a result, the person had decompensated by the time he returned to the stepdown unit, and was kicking his cell and screaming.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 161 of the Complaint and, therefore, denies the averments.

162.     Plaintiff ZOERNER has been diagnosed with depression, bipolar disorder, and PTSD, and for several years she has taken Prozac and Lamictal to treat those conditions. In mid-June 2021, Jail staff added Tramadol to ZOERNER's existing medications, although Tramadol is contraindicated with Prozac and Lamictal. ZOERNER was kept on that new regimen for multiple days until she went to the hospital for a dental procedure on June 15, 2021. Medical records indicate that Jail staff recognized that this medication regimen may have contributed to a psychotic episode. After ZOERNER returned from the hospital on June 20, 2021, Jail staff suddenly stopped providing ZOERNER with

1    Prozac and Lamictal because of their contraindication with Tramadol. However, rather

2    than prescribing ZOERNER a pain medication that she could take with her existing

3    psychiatric medications, medical staff discontinued those psychiatric medications

4    altogether. ZOERNER decompensated, began to bang on the walls of her cell and cry,

5    and banged her head against the cell window until she began bleeding.

6

7    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

8    averments in Paragraph 162 of the Complaint and, therefore, denies the averments.

9

10   **G. The Sheriff's Department and Liberty Fail to Provide Confidential Mental**
11   **Health Care in Adequate Physical Spaces**
12

13   163.    The COUNTY DEFENDANTS and LIBERTY fail to provide mental health care

14   in confidential spaces. This practice undermines the delivery of mental health care

15   because an incarcerated person's candid discussion of their mental health needs in earshot

16   of custody staff or other incarcerated people places their safety at risk. A person could be

17   victimized by custody staff or other incarcerated people for personal information they are

18   overheard sharing with a mental health professional. The COUNTY DEFENDANTS and

19   LIBERTY are deliberately indifferent to the harms of non-confidential mental health

20   encounters, for which outside experts have repeatedly criticized the Jail. Even in Jail

21   facilities that include spaces for confidential visits with mental health staff, custody staff

22   frequently refuse to escort incarcerated people to those clinical spaces.

23

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 163 of the Complaint and, therefore, denies the averments.

3

4    164.    The NCCHC Report found that mental health staff often spoke to patients through

5    the cell window, which means the person's cellmate and other nearby incarcerated people

6    or custody staff can overhear the conversation.[112] NCCHC recommended that the Jail

7    provide confidential spaces for mental health staff to meet with incarcerated people. The

8    Hayes Report similarly documented frequent non-confidential interviews, even for people

9    on suicide precautions.[113] The DRC Report criticized the SHERIFF'S DEPARTMENT's

10   practice of non-confidential mental health encounters because it precludes incarcerated

11   people from disclosing "sensitive information about their mental health history or current

12   situation"—information that is necessary to provide adequate mental health treatment.[114]

13   The DRC Experts recommended that the SHERIFF'S DEPARTMENT ensure mental

14   health treatment occurs in confidential spaces.[115] [footnotes omitted]

15

16   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17   averments in Paragraph 164 of the Complaint and, therefore, denies the averments.

18

19   165.    Despite these recommendations, the majority of mental health encounters in the

20   Jail continue to be at the cell door, and the vast majority of mental health encounters are

21   non-confidential. Incarcerated people with mental illness must speak to mental health staff

22   in view of and within hearing range of other incarcerated people and custody staff. This

23   practice forces incarcerated people to choose between being candid about their mental

1    health needs and risking their safety within the Jail. Even the PSU at Central—where

2    incarcerated people with the most serious mental health needs are housed—lacks space for

3    confidential mental health visits. For example, the clinical treatment room in the PSU

4    lacks auditory privacy, which means that custody staff can overhear conversations

5    between mental health staff and incarcerated people. Some concerned mental health staff

6    have resorted to asking clients to whisper or to write notes as a workaround for

7    confidential communication. Many incarcerated people describe being unable to speak

8    about their serious mental health needs, and having their conditions deteriorate, due to

9    lack of confidentiality.

10

11    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

12    averments in Paragraph 165 of the Complaint and, therefore, denies the averments.

13

14    166.    For example, Plaintiff LEVY has been diagnosed with depression and takes

15    Wellbutrin. LEVY desired therapy in the Jail, but she was not able to meet with a mental

16    health clinician in a confidential setting. Appointments with the clinician took place at

17    LEVY's cell. The clinician stood outside the cell, LEVY was inside, and a deputy stood

18    directly outside the cell with the clinician. LEVY worried that custody staff would share

19    her confidential information and so she did not feel comfortable discussing her mental

20    health issues in detail. Upon information and belief, custody staff share information

21    about the nature of patients' medical issues, mental health diagnoses, and criminal

22    charges with other persons in the same housing unit. Nor was there time for LEVY to

23    discuss her issues in-depth with clinicians, as most encounters last five minutes at most

due in part to deputies' insistence on rushing the meetings. LEVY's father died in late 2021 while she was incarcerated. Yet because of the non-confidential environment, LEVY was unable to fully discuss her father's death and its effect on her.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 166 of the Complaint and, therefore, denies the averments.

167.     Plaintiff NORWOOD requested mental health care in late June 2021 because he was experiencing anxiety, hearing voices, and also had not received any medical treatment for opioid dependence. Several days later, a mental health clinician came to NORWOOD's cell to ask about his symptoms, but the two spoke through the cell window and a deputy was right outside the cell with the clinician. Both the deputy and other incarcerated people nearby could hear the conversation. In that setting, NORWOOD did not feel comfortable explaining how he was feeling and could not adequately process his anxiety. NORWOOD did not see a mental health professional in a confidential setting until well over a month after he arrived at the Jail. By that time, NORWOOD had overdosed on fentanyl, in part because he was having trouble coping with his mental illness.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 167 of the Complaint and, therefore, denies the averments.

**H. Incarcerated People at Risk of Suicide Are Housed in Punitive Isolation Units**

168.        COUNTY DEFENDANTS routinely house incarcerated people at risk of suicide in conditions that exacerbate symptoms of their mental illness, deteriorate their mental health, violate notions of minimally adequate mental health care and basic human dignity, and are incompatible with civilized standards of humanity and decency. The SHERIFF'S DEPARTMENT's policies and practices for housing incarcerated people who are suicidal are constitutionally inadequate. COUNTY DEFENDANTS' overuse of isolation harms incarcerated people and violates the federal and state Constitutions. Voluminous psychiatric literature has documented the adverse mental health effects of isolation, particularly on people with mental health disabilities. As suicide expert Lindsay Hayes wrote in his report on the Jail, isolation "escalates the inmate's sense of isolation[.]"[116] Isolation can exacerbate, and in some cases cause, physical and/or psychiatric disabilities, including gastrointestinal disorders, insomnia, eyesight deterioration, heart palpitations, migraines, and profound fatigue. Even those who endure the effects of isolation better than others are subjected to intolerable conditions, as they are forced to endure the hallucinations and screaming of other incarcerated people suffering the debilitating effects of isolation. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 168 of the Complaint and, therefore, denies the averments.

169.        Nonetheless, the SHERIFF'S DEPARTMENT's Inmate Safety Program ("ISP") relies exclusively on harsh isolation settings to house patients in crisis. The ISP has two

types of restrictive cells. For a person who is "actively self-harming or actively

assaultive," a safety cell is recommended. Safety cells are small, windowless cells with

no furniture and rubberized walls. Rather than a toilet, incarcerated people must defecate

or urinate through a grate in the center of the floor. The Jail's safety cells are frequently

covered in feces, blood, urine, and/or other bodily fluids. The second type of restrictive

cells, Enhanced Observation Housing ("EOH") cells, are recommended for a person

"with suicide risk but [who] is not actively self-harming or actively assaultive." Although

EOH cells include a toilet, they are often as filthy as safety cells. People in crisis have

been placed in a cell that still has someone else's feces smeared on the walls.[117] In both

safety cells and EOH cells, incarcerated people are typically stripped naked and forced to

wear a safety smock regardless of whether such a smock is clinically appropriate. Patients

in safety cells and EOH cells are on near-total lockdown, deprived of access to their

property, and denied programs, showers, phone calls, family visits, social interaction, and

recreation. Patients at this acute risk of suicide should receive therapy and access to

human interaction. The Jail provides the opposite: extreme isolation in degrading

conditions, which is counterproductive and punishes incarcerated people for feeling

suicidal.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 169 of the Complaint and, therefore, denies the averments.

170.     The sheer number of people placed in these conditions in San Diego County,

combined with the level of deprivation in the safety cell and EOH settings, is

1    unparalleled in other county jail systems. COUNTY DEFENDANTS and LIBERTY are

2    deliberately indifferent to these dangerous conditions, which they have been warned

3    about repeatedly by suicide prevention experts.

4

5    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6    averments in Paragraph 170 of the Complaint and, therefore, denies the averments.

7

8    171.    Suicide expert Lindsay Hayes criticized the isolation conditions in safety cells and

9    EOH cells in his 2018 report, which he called "overly restrictive and seemingly punitive"

10   and "harsher than for those [incarcerated people] on segregation status."[118] As Hayes

11   found, isolation "not only escalates the inmate's sense of alienation, but also further

12   serves to remove the individual from proper staff supervision."[119] Given conditions in

13   safety cells, "it is hard to imagine how any individual would not feel that their expressed

14   suicidal ideation was being responded to in a punitive, non-therapeutic manner."[120] Hayes

15   noted "the real possibility that [EOH] measures were contributing to an inmate's

16   debilitating mental illness."[121] Hayes also observed that visits with mental health staff

17   were non-confidential and cell-side, even in safety cells and EOH cells. As Hayes wrote,

18   this practice makes it impossible to adequately assess whether and why a person is

19   suicidal, and many incarcerated people will deny suicidal ideation just to get out of

20   isolation:

21        Take, for example, the scenario of a clinician interviewing an inmate on

22        suicide precaution. The inmate has been in the cell for a day or two,

23        clothed only in a safety smock. The clinician approaches the inmate cell-

side, within easy hearing distance from both other inmates and non-
healthcare professionals, and asks: "Are you suicidal?" Given the
circumstances he or she finds themselves in, the likelihood of an inmate
answering affirmatively to that question, the result of which will be their
continued placement under these conditions, is highly questionable.[122]

[footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny
the averments in Paragraph 171 of the Complaint and, therefore, denies the
averments.

172.     Hayes recommended that COUNTY DEFENDANTS house incarcerated people at
risk of suicide, if possible, in "the general population, mental health unit, or medical
infirmary, located in close proximity to staff."[123] When placements in safety cells or EOH
cells become necessary, Hayes recommended the SHERIFF'S DEPARTMENT ensure
incarcerated people maintain routine privileges like showers, family visits, access to
recreation, and their normal clothing, rather than being stripped naked and forced to wear
a safety smock.[124] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 172 of the Complaint and, therefore, denies the averments.

1    173.        The DRC Report included similar findings. Incarcerated people in EOH

2    "complained about extremely limited time outside their cell and excessive isolation."[125]

3    DRC noted that mental health staff were aware of the problems with EOH cells: one

4    mental health chart included a psychiatrist's observation that EOH "isolation is inhumane

5    and likely to compromise [the person] psychologically."[126] In several instances,

6    incarcerated people in EOH did not even receive a safety smock or blanket.[127] DRC

7    "found extremely disturbing the levels of deprivation and isolation for so many

8    individuals [in EOH], without access to any therapeutic or recreational activities."[128] As

9    DRC documented, isolation conditions expose incarcerated people to a substantial risk of

10   serious harm or death. DRC found that at least six suicides only over a three-year period

11   occurred in solitary confinement housing, and several others occurred in units with

12   isolation conditions.[129] DRC also observed the shocking overuse of safety cells: in 2017,

13   incarcerated people were placed in safety cells more than 6,700 times.[130] [footnotes

14   omitted]

15

16   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17   averments in Paragraph 173 of the Complaint and, therefore, denies the averments.

18

19   174.        COUNTY DEFENDANTS have failed to remedy the isolation conditions in

20   safety cells and EOH cells, to the detriment of incarcerated people with serious mental

21   health needs. According to the SHERIFF'S DEPARTMENT, as of December 26, 2021,

22   people were placed in EOH cells 2,846 times in 2021, and hundreds more were placed in

23   safety cells. Although the SHERIFF'S DEPARTMENT's written policies now state that

incarcerated people in EOH cells may access telephone calls and certain other programs, in practice, people incarcerated in EOH are still regularly denied out-of-cell time to use telephones, to take a shower, or to interact with other individuals. By policy and practice, the SHERIFF'S DEPARTMENT continues to deny incarcerated people in EOH access to their own property, recreation time, and family visits. People in safety cells and EOH cells are also still stripped naked and forced to wear safety smocks. Isolation conditions in the Jail continue to expose people to a significant risk of serious harm.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 174 of the Complaint and, therefore, denies the averments.

175.     For example, Lester Marroquin died by suicide on May 30, 2021 after he was repeatedly isolated in the Jail's safety cells. On May 25 or May 26, Marroquin had spoken to his mother and "expressed that he was upset because he had not been allowed phone calls to call her and that speaking to her helped him," according to a report. Marroquin was not allowed to speak to his mother again, including while housed in the safety cell.[131] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 175 of the Complaint and, therefore, denies the averments.

176.     The isolating and degrading conditions in safety cells and EOH cells dissuade Plaintiff ZOERNER from reporting suicidal or homicidal ideation, even when she has

such feelings. In June and July 2021, ZOERNER was housed in safety and EOH cells—

alternating between the two—for at least five consecutive days. Jail staff took all of

ZOERNER's property and clothes, and forced her to wear a safety smock, which she

describes as "humiliating." The cell was very cold and ZOERNER slept on a thin

mattress on the ground. As a result of these experiences, ZOERNER is less likely to

report suicidal thoughts to Jail staff.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 176 of the Complaint and, therefore, denies the averments.

177.    The SHERIFF'S DEPARTMENT lacks adequate policies and practices for

limiting the use of isolating safety cells and EOH cells. Upon information and belief, the

SHERIFF'S DEPARTMENT fails to adequately train and supervise staff and LIBERTY

contractors on policies and procedures to limit the use of isolation. The Jail's current

practices contradict recommendations from experts to impose limits on the amount of time

an incarcerated person can spend in both safety cells and EOH cells. For safety cells, the

Hayes Report found that the SHERIFF'S DEPARTMENT was housing incarcerated

people in safety cells for up to three days at a time.[132] Hayes recommended that the Jail

limit time in a safety cell to no more than six hours.[133] For EOH cells, the DRC Experts

recommended that the SHERIFF limit stays in EOH to a maximum of 48 hours and refer a

patient in EOH to the PSU if their condition does not stabilize after 48 hours in EOH.[134]

[footnotes omitted]

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 177 of the Complaint and, therefore, denies the averments.

3

4    178.    Despite these recommendations, the SHERIFF'S DEPARTMENT's policies and

5    procedures still include no set limit on how long a person can spend in a safety cell or

6    EOH cell. In fact, the SHERIFF'S DEPARTMENT does not track the average amount of

7    time that incarcerated people spend in safety cells or EOH cells. One incarcerated person

8    was kept in a safety cell for several days in a row, even when he was not actively self-

9    harming. Instead, custody staff placed him in the safety cell as a form of "behavior

10   management." It is not unusual for a person to spend a week or more in EOH.

11

12   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

13   averments in Paragraph 178 of the Complaint and, therefore, denies the averments.

14

15   179.    The SHERIFF'S DEPARTMENT lacks adequate policies and procedures to

16   timely remove people from isolation safety and EOH cells once cleared by mental health

17   staff. Custody staff regularly prolong such placements even after clinicians determine a

18   person is no longer at heightened risk of suicide. For example, in or around November

19   2021, at least eight people clinically cleared from EOH at Central were kept in EOH for

20   days after their clearance date—two of them for five more days. This is a regular

21   occurrence. On another occasion, after mental health staff at Central cleared a patient

22   from EOH, custody staff delayed the person's transfer and placed him in a safety cell

23   without conferring with mental health staff. Housing incarcerated people in the

1  restrictive EOH environment, in the absence of any clinical justification for their

2  continued stay in EOH, is dangerous and punitive.

3

4  **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5  averments in Paragraph 179 of the Complaint and, therefore, denies the averments.

6

7  180.   The SHERIFF'S DEPARTMENT's failure to provide socialization and programs

8  to incarcerated people in safety cells and EOH also constitutes discrimination against

9  people with disabilities, in violation of the ADA and Unruh Act. On information and

10  belief, the majority of individuals in the ISP have mental illness, intellectual disabilities,

11  and/or other ADA-qualifying disabilities. By denying programs to people in ISP, the

12  SHERIFF'S DEPARTMENT denies incarcerated people with disabilities equal access to

13  programs and services at the Jail.

14

15  **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16  averments in Paragraph 180 of the Complaint and, therefore, denies the averments.

17

18  181.   For example, Plaintiff DUNSMORE is a person with a disability. The

19  SHERIFF'S DEPARTMENT placed DUNSMORE in an EOH cell in 2018 after he

20  decompensated following custody staff's confiscation of DUNSMORE's eating and

21  writing assistive devices. Jail staff forced DUNSMORE to strip naked and did not

22  allow him to have any of his clothes in the EOH cell. DUNSMORE had access to only

23  a thin mattress and a toilet. DUNSMORE did not have access to his wheelchair and the

cell lacked grab bars, which made it very difficult for DUNSMORE to use the toilet.
He often made a mess in the cell and was forced to sleep among his own feces and
other trash in the filthy cell. Jail staff failed to provide DUNSMORE with the modified
spoon and modified straw he uses to eat for several days. Rather than eat with his bare
hands like an animal, DUNSMORE refused the food brought to him in the EOH cell.
DUNSMORE requires regular exercise and movement to ward off the debilitating
symptoms of his arthritic condition, but lacked any opportunity for exercise or yard.
Lying down for long periods in the EOH cell, without anything else to do, exacerbated
DUNSMORE's arthritic condition. During this time in the EOH cell, DUNSMORE
had no opportunity for socialization and was not allowed to use the telephone or access
reading materials.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 181 of the Complaint and, therefore, denies the averments.

**I. The Sheriff's Department and Liberty Lack Adequate Policies and Procedures to Identify, Treat, Track, and Supervise Incarcerated People at Risk for Suicide**

182.     The SHERIFF'S DEPARTMENT and LIBERTY lack adequate policies,
procedures, and practices for screening, supervising, and treating incarcerated
people at risk for suicide. The SHERIFF'S DEPARTMENT and LIBERTY fail
to properly train custody, medical, and mental health staff how to screen,
supervise, and treat incarcerated people at risk for suicide. As a result, the

1     SHERIFF'S DEPARTMENT and LIBERTY fail to adequately identify,

2     supervise, and treat incarcerated people who are at risk for suicide.

3

4     **Answer**: MAH is without sufficient knowledge or information to admit or deny

5     the averments in Paragraph 182 of the Complaint and, therefore, denies the

6     averments.

7

8          **1.     The Jail Fails to Adequately Identify Incarcerated People at**
9          **Risk for Suicide**
10

11    183.     Intake evaluations at the Jail are conducted by nurses rather than health

12     professionals. A mental health "gatekeeper" is called only for a suicide risk

13     assessment if the intake nurse determines a risk assessment is necessary.

14     However, intake nurses are not adequately trained how to identify suicidal

15     persons, nor are they adequately trained to identify when a patient should be

16     referred for a risk assessment. As found by the DRC Experts, intake nurses

17     often fail to refer incarcerated people in drug or alcohol withdrawal to a

18     suicide risk assessment, even though people in withdrawal are at greater risk of

19     suicide.[135] Together, these systematic failures expose incarcerated people to a

20     substantial risk of serious harm. [footnotes omitted]

21

22     **Answer**: MAH is without sufficient knowledge or information to admit or deny

23     the averments in Paragraph 183 of the Complaint and, therefore, denies the

24     averments.

184.     For example, Jason Nishimoto committed suicide at Vista in 2015 after

Nishimoto was not placed under suicide precautions, even though he told an intake nurse

that he had attempted suicide by swallowing a bottle of pills just before his arrest.

Nishimoto also made other suicidal statements at the time of his arrest. However,

Nishimoto was not placed under suicide precautions and the nurse did not communicate

Nishimoto's suicidal statements to other medical staff. Instead, Nishimoto was placed in

a single-occupancy cell where he received only one hour per day of out-of-cell time. Just

three days after his arrest, Nishimoto died by hanging.[136] [footnote omitted]


**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 184 of the Complaint and, therefore, denies the averments.


185.     In 2020, Joseph Morton informed an intake nurse that he "wished he could go to

sleep and never wake up," and the arresting deputies also informed her that Morton had

made suicidal statements.[137] However, the intake nurse did not flag Morton as a high

suicide risk. Morton was placed in an EOH cell only after he self-reported suicidal

ideation to a deputy.[138] [footnotes omitted]


**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 185 of the Complaint and, therefore, denies the averments.

186.     By policy and practice, the SHERIFF'S DEPARTMENT and LIBERTY lack an adequate suicide risk assessment tool, and fail to properly train their staff how to adequately assess suicide risk. The Jail's risk assessment tool lacks any scoring mechanism or objective means for assessing a patient's suicide risk based on the answers to the questions in the risk assessment tool. Instead, the staff member completing the risk assessment tool must make a subjective decision about the person's suicide risk. Compounding the problem, the tool's suicide risk levels are circular and ill-defined. The SHERIFF'S DEPARTMENT's policies and procedures define "acute low risk" as "the patient is currently deemed at low imminent risk of suicide," whereas "acute high risk" is defined as "the patient is currently deemed at imminent high risk for suicide." In practice, staff regularly fail to ask all of the questions on the risk assessment tool, further hampering accurate risk assessment.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 186 of the Complaint and, therefore, denies the averments.

187.     The NCCHC Report observed that: "It appears that the clinicians do not maintain an awareness of suicide risk over time, instead judging or evaluating each incident as being isolated from the individual's history within the facility and within the community."[139] The DRC Report also concluded that mental health staff failed to adequately document suicide risk factors, suggesting also that the mental health staff are inadequately trained.[140]

[footnotes omitted]

138

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 187 of the Complaint and, therefore, denies the averments.

188.     These problems persist. For example, although the intake nurse failed to flag Joseph Morton as a suicide risk at Vista in 2020, Morton eventually was placed in an EOH cell after he self-reported suicidal ideation. A Jail mental health staff member then visited Morton to conduct an evaluation. That clinician assessed Morton and determined that his statements about needing withdrawal medication meant he had changed his mind about suicide. Morton was moved into a single cell for COVID-19 precautions. Another psychologist who visited Morton wrote that he had been lying about being suicidal to get access to a phone, even though all mainline housing units have phone access and people in EOH cells generally do not have that access. Morton remained in quarantine without adequate suicide precautions until May 17, when he committed suicide.[141] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 188 of the Complaint and, therefore, denies the averments.

### 2. The Sheriff's Department and Liberty Fail to Adequately Monitor Incarcerated People at Risk for Suicide

189.     The SHERIFF'S DEPARTMENT and LIBERTY lack adequate policies and procedures for the observation of incarcerated people at risk of suicide. The Hayes Report recommended that the SHERIFF'S DEPARTMENT revise its policies to provide for constant observation of incarcerated people at the highest level of suicide risk.[142] The

1    NCCHC Report also criticized the complete absence of constant observation of

2    incarcerated people who were actively self-harming.[143] The DRC Experts likewise

3    recommended that the SHERIFF'S DEPARTMENT provide for constant observation of

4    incarcerated people when necessary.[144] The DRC Report recounted video of a person in

5    EOH preparing for over 14 minutes to jump from his cell desk, until the person finally

6    jumped and landed on his head.[145] Constant observation could have led to earlier

7    intervention and possibly prevented the suicide attempt. [footnotes omitted]

8

9    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

10   averments in Paragraph 189 of the Complaint and, therefore, denies the averments.

11

12   190.      The SHERIFF'S DEPARTMENT still lacks any policy or practice providing for

13   the constant observation of incarcerated people who are actively suicidal, either

14   threatening to or engaging in the act of suicide. The SHERIFF'S DEPARTMENT also

15   fails to adequately train and supervise custody staff on suicide prevention, observation,

16   and intervention. These inadequate policies and practices place incarcerated people at risk

17   of serious harm or death.

18

19   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

20   averments in Paragraph 190 of the Complaint and, therefore, denies the averments.

21   **3.     The Sheriff's Department and Liberty Fail to Provide**
22   **Adequate Follow-up Care for Incarcerated People Released from**
23   **Suicide Precautions**

24

191. The SHERIFF'S DEPARTMENT and LIBERTY lack adequate policies and practices for providing follow-up mental health care once patients are discharged from the ISP. The SHERIFF'S DEPARTMENT and LIBERTY fail to adequately train staff to provide follow-up mental health care to patients discharged from the ISP. The Hayes Report found that the ISP follow-up protocol was "confusing and unnecessarily cumbersome."[146] Hayes also found that Jail staff consistently failed to document adequate treatment plans for incarcerated people released from the ISP. An adequate treatment plan would describe "signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur."[147] These failures place incarcerated people at substantial risk of serious harm. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 191 of the Complaint and, therefore, denies the averments.

192. For example, DRC found that one person's treatment record included no information about his heightened risk for suicide, even though custody staff knew the individual had attempted suicide three weeks earlier and had been in the ISP after that suicide attempt. The person was anxious about his upcoming extradition, and died by suicide the day before the extradition was scheduled.[148] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 192 of the Complaint and, therefore, denies the averments.

193.      To ensure adequate follow-up care, the DRC Experts recommended that the SHERIFF'S DEPARTMENT ensure all incarcerated people released from the ISP to other housing units in the Jail are seen by a mental health professional within one day.[149] The Jail's policies and practices remain deficient and follow-up care remains untimely. The State Audit Report found that under the Sheriff's Department's current policies, a person previously housed in a safety cell or EOH cell might eventually receive follow-up appointments only once every 90 days.[150] Upon information and belief, custody staff are unavailable or unwilling to transport incarcerated people to follow-up visits with mental health professionals, or even to assist mental health staff with opening doors or food flaps so that they can have cell-side follow-up encounters with incarcerated people released from ISP. This practice delays follow-up mental health care to those incarcerated people released from ISP. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 193 of the Complaint and, therefore, denies the averments.

**J. The Jail Fails to Provide Adequate Care to Incarcerated People with Acute Mental Health Needs**

194.      Upon information and belief, the COUNTY DEFENDANTS and LIBERTY fail to provide adequate mental health treatment to incarcerated people with acute mental health needs. The COUNTY DEFENDANTS and LIBERTY fail to adequately train staff to provide mental health treatment to incarcerated people with acute treatment needs. The

1    PSUs at Central and Las Colinas are intended to provide an inpatient level of care to

2    incarcerated people requiring the most intensive mental health care. However, the PSUs

3    lack sufficient space for the number of incarcerated people requiring that level of mental

4    health care. Incarcerated people with serious mental illness have to wait days for a referral

5    to the PSU, and then join a lengthy waitlist for admission. The problem is so acute that

6    one psychologist in the PSU at Central would regularly sneak in and move her patient's

7    name up the list (written on a whiteboard), to ensure that her patients actually received

8    PSU-level care. The system's deficiencies force clinicians into a terrible Hobson's choice

9    – engage in unethical manipulation of the system or see their patients go without the

10   treatment they need.

11

12   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

13   averments in Paragraph 194 of the Complaint and, therefore, denies the averments.

14

15   195.    While waiting for referral or admission to the PSU, patients requiring more

16   intensive mental health care are sometimes placed in other housing units used as

17   "overflow." For example, Plaintiff LEVY reported that her housing unit at Las Colinas,

18   4A, is used as "overflow" when the PSU lacks capacity for incarcerated people referred

19   to the PSU. Unit 4A is a high-security unit with restrictions on privileges, which means

20   that patients referred to the PSU—deemed to require the most intensive mental health

21   care available in the Jail system—are instead subject to punitive housing conditions while

22   waiting to get care. Other times, incarcerated people in mental health crisis are locked

1    down in their existing housing unit— depriving them of access to programs and

2    services—while they await a psychiatric evaluation for potential admission to the PSU.

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 195 of the Complaint and, therefore, denies the averments.

6

7    196.    Upon information and belief, COUNTY DEFENDANTS have failed to execute

8    any contracts with community mental health providers to allow the Jail to refer

9    incarcerated people with emergent medical and mental health needs to those community

10   providers when the Jail's PSUs and medical units are full.

11

12   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

13   averments in Paragraph 196 of the Complaint and, therefore, denies the averments.

14

15   197.    COUNTY DEFENDANTS' failure to maintain sufficient numbers of mental

16   health staff creates pronounced problems in the PSU, as well as in the Jail's mental health

17   stepdown units, where many other patients requiring high levels of mental health care are

18   housed. Although PSU patients often require daily one-on-one treatment, there are not

19   enough assigned PSU mental health staff or contractors to provide daily treatment. The

20   Women's PSU at Las Colinas has been regularly understaffed, with patient-to-staff ratios

21   nearly twice the community standard. Staff turnover is rampant at the PSU: a new

22   clinician assigned to the PSU in 2021 quit after only two months, and it took the Jail

23   another two months to hire a replacement.

1

2       **Answer**: MAH is without sufficient knowledge or information to admit or deny the

3       averments in Paragraph 197 of the Complaint and, therefore, denies the averments.

4

5   198.      Making matters worse, the SHERIFF'S DEPARTMENT lacks adequate policies

6       and practices for providing mental health care in the PSUs during lockdowns, which are

7       frequent. The NCCHC Report found that mental health care was often interrupted by

8       lockdowns.[151] The SHERIFF'S DEPARTMENT has failed to implement adequate policies

9       and procedures to remedy the problem: lockdowns remain frequent in the Jail—including

10      in the PSUs—which prevents patients with the highest need for mental health care from

11      receiving treatment. [footnote omitted]

12

13       **Answer**: MAH is without sufficient knowledge or information to admit or deny the

14       averments in Paragraph 198 of the Complaint and, therefore, denies the averments.

15

16   199.      The SHERIFF'S DEPARTMENT also fails to house patients with serious mental

17       illness in appropriate, therapeutic settings. In violation of the ADA, Rehab Act, and

18       Unruh Act, the SHERIFF'S DEPARTMENT has a policy and practice of placing people

19       with mental health disabilities in isolation rather than individually determining the most

20       integrated environment in which a person can be safely housed. For example, the PSU

21       contains four observation cells that custody staff often use to punish incarcerated people

22       for perceived behavioral issues, rather than because such placement is clinically

23       indicated. These observation cells are often dirty isolation environments in which a

person is stripped naked and given a safety smock to wear. The below photo shows a man deprived of his clothes in the PSU, using a roll of toilet paper to rest his head on the floor. [photograph omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 199 of the Complaint and, therefore, denies the averments.

200.     On other occasions, after mental health staff clear a person from the observation cells, custody staff delay the person's move from the observation cells back to the rest of the PSU for as long as a week, which causes those incarcerated people to further decompensate.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 200 of the Complaint and, therefore, denies the averments.

201.     Cells in the mental health outpatient stepdown units, which house individuals with serious mental illness but do not provide a structured mental health treatment program, are barbaric and filthy. The below photographs from one cell at the Central Jail facility in November 2021 demonstrate how these cells are frequently covered in trash and not fit for human habitation, let alone for incarcerated people with grave mental health needs. [photograph omitted]

1      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2      averments in Paragraph 201 of the Complaint and, therefore, denies the averments.

3

4    202.     The SHERIFF'S DEPARTMENT fails to provide adequate training and

5      supervision to custody staff assigned in the PSU. This leads to systematic violations of

6      Jail policy and to other practices that place incarcerated people at risk of serious harm or

7      death. For example, in 2019, Ivan Ortiz died by suicide in a PSU observation cell after a

8      deputy, in violation of policy, left a plastic bag in Ortiz's cell.[152] Ortiz used the plastic

9      bag to suffocate himself to death. On other occasions, custody staff prevent clinicians in

10      the PSU from providing care to incarcerated people, including by refusing to escort

11      incarcerated people to mental health encounters, or by refusing to unlock the closet that

12      contains reading material for the clinician to provide to incarcerated people.

13

14      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

15      averments in Paragraph 202 of the Complaint and, therefore, denies the averments.

16

17    203.     The SHERIFF'S DEPARTMENT and LIBERTY lack adequate policies and

18      procedures for providing follow-up care to patients discharged from the PSU. Upon

19      information and belief, the SHERIFF'S DEPARTMENT and LIBERTY fail to properly

20      train their staff how to provide adequate follow-up care to incarcerated people discharged

21      from the PSU. In practice, mental health staff fail to prepare adequate discharge plans for

22      incarcerated people released from the PSU back to other housing units. This practice

23      places incarcerated people at significant risk of serious harm.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 203 of the Complaint and, therefore, denies the averments

**K. The Sheriff's Department Discriminates Against and Unfairly Punishes Incarcerated People with Mental Illness in Administrative Segregation Housing**

204.     Pursuant to the ADA and the Rehabilitation Act, patients with serious psychiatric disabilities and intellectual disabilities must be housed in the most integrated and least restrictive setting appropriate to their needs. By policy and practice, the COUNTY DEFENDANTS discriminate against incarcerated people with mental health disabilities and intellectual disabilities by placing them in isolation units solely because of their disabilities. The SHERIFF'S DEPARTMENT fails to adequately train staff how to appropriately house incarcerated people with mental health disabilities. Instead, the SHERIFF'S DEPARTMENT frequently houses people with mental health disabilities in isolation units known as "administrative segregation." These administrative segregation cells are generally intended for incarcerated people who have violated Jail rules, been violent toward incarcerated people or staff, or failed to conform to the "minimum standards" of other Jail housing units. The SHERIFF'S DEPARTMENT's Jail Population Management Unit also retains discretion to place people in segregation.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 204 of the Complaint and, therefore, denies the averments.

205.        In segregation, people are held in lockdown conditions, and are supposed to

receive only 60 minutes of out-of-cell time every 24 hours; even this minimal out-of-cell

time is often not provided. Incarcerated people in segregation have even less freedom to

interact with other incarcerated people and have extremely limited access to programs

and services at the Jail. Access to mental health care in administrative segregation is

limited, as visits with mental health staff and contractors are usually brief and conducted

through the food slot in the door. For incarcerated people with acute and/or chronic

mental illness, the appropriate standard of care includes, and they should be provided

with, psychosocial rehabilitation services, which include structured out-of-cell

programming that addresses their symptoms of mental illness, reduces their isolation, and

promotes adherence with treatment and medications. Segregation provides the opposite,

and incarcerated people with serious mental illness are denied access to programs and

services because they are placed in administrative segregation cells.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 205 of the Complaint and, therefore, denies the averments.

206.        Experts have criticized the SHERIFF'S DEPARTMENT for using segregation to

house people with mental illness, thereby placing them at risk of serious harm. The

NCCHC Report found that the SHERIFF'S DEPARTMENT housed incarcerated people in

segregation units solely because they have a mental illness, rather than for disciplinary

infractions.[153] The DRC Report found that at least six incarcerated people killed themselves

at the Jail between 2014-2016 while in segregation units.[154] The DRC Report further found that one person committed suicide after spending six consecutive weeks in administrative segregation, and four months overall.[155] The person's medical record indicated that staff failed to notice the significant mental health issues the person developed while in segregation. Another person with mental illness committed suicide in administrative segregation after waiting days to see mental health staff and being denied out-of-cell time.[156] DRC urged the SHERIFF'S DEPARTMENT to "take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances."[157] Expert Lindsay Hayes also noted "the strong association between inmate suicide and segregation housing" and urged the SHERIFF'S DEPARTMENT to ensure that mental health staff timely evaluate whether segregation is contraindicated by a person's mental health needs.[158] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 206 of the Complaint and, therefore, denies the averments.

207.     Clinical leadership at the Jail themselves recommended, and attempted to direct, that people with significant mental health needs not be placed in isolation housing. The SHERIFF'S DEPARTMENT rejected these recommendations and continues to house people with serious mental illness in administrative segregation. For example, at George Bailey, unit 5C is an administrative segregation unit that frequently houses incarcerated people with mental illness. On average in 2021, nearly half of the administrative

1    segregation units on the fifth and sixth floor at Central were occupied by incarcerated

2    people with serious mental health needs. The SHERIFF'S DEPARTMENT routinely

3    places incarcerated people in administrative segregation for reasons related to their

4    mental illness, such as "erratic behavior" or "causing tension in the module." One person

5    with serious mental illness at Central was kept in administrative segregation for at least

6    six months during 2021, not due to any disciplinary infraction but rather due to his mental

7    health-related behaviors. He repeatedly asked to be let out of segregation because the

8    isolation was causing him to decompensate. In January 2022, a patient who had been

9    without his psychiatric medication for at least five days was placed in administrative

10   segregation as punishment for behavior based on his mental health disability.

11

12   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

13   averments in Paragraph 207 of the Complaint and, therefore, denies the averments.

14

15   208.    The SHERIFF'S DEPARTMENT also lacks adequate policies and practices to

16   ensure the safety of incarcerated people who are placed in administrative segregation.

17   Once a person is transferred to administrative segregation, the Jail's written policy

18   provides that custody staff must notify health care staff, who are supposed to review the

19   person's health record. However, mental health staff cannot recommend that a person be

20   removed from administrative segregation even if such placement is clinically

21   contraindicated. Matthew Mark Godfrey, a man with serious mental illness, died in filthy

22   conditions in administrative segregation in November 2019. Godfrey died in 6E, the same

23   unit as Lester Marroquin, who died by suicide in May 2021. The harmful effects of

isolation on Godfrey's mental health were manifest from the condition in which he died. Godfrey was wearing five pairs of underwear and three pairs of socks. He was found with torn clothing around his neck and a rope in his pants. Although Jail medical staff initially reported Godfrey's death as a suicide, the medical examiner determined he died from a heart condition. According to the medical examiner's report, Godfrey's cell "was dirty and unkempt with paper waste and food debris strewn along the walls and floor."

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 208 of the Complaint and, therefore, denies the averments.

**L. The Sheriff's Department and Liberty Fail to Provide Incarcerated People with Adequate Mental Health Discharge Planning and Resources**

209.     The COUNTY DEFENDANTS and LIBERTY's policies and practices for the provision of continuing mental health care services upon an incarcerated person's release are inadequate. The SHERIFF'S DEPARTMENT and LIBERTY fail to adequately train staff how to appropriately release incarcerated people with serious mental health needs so that such individuals can continue their mental health care in the community.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 209 of the Complaint and, therefore, denies the averments.

210.     The Jail does not provide adequate discharge planning to incarcerated people with mental health needs. For example, the SHERIFF'S DEPARTMENT routinely releases

1     incarcerated people with serious mental illness from the Jail (including from the PSU) in

2     the middle of the night, with no discharge plan, no linkage to mental health services, and

3     no one to pick them up. The SHERIFF'S DEPARTMENT and LIBERTY do not

4     sufficiently or adequately schedule follow-up appointments in the community, nor are

5     incarcerated people provided with sufficient referrals or information about where they

6     may receive access to Medi-Cal, mental health care services, or medications. The Jail's

7     discharge planners have little contact with mental health staff, and the Jail lacks any

8     formal procedure for ensuring that incarcerated people are connected with mental health

9     services in the community. On very rare occasions, Jail staff will connect an incarcerated

10     person with an assertive community treatment ("ACT") team, which provides

11     comprehensive, multi-disciplinary services.

12

13     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

14     averments in Paragraph 210 of the Complaint and, therefore, denies the averments.

15

16     211.     The SHERIFF'S DEPARTMENT and LIBERTY do not provide incarcerated

17     people with an adequate supply of their necessary mental health medications. For those

18     incarcerated people who are prescribed medications at the Jail, SHERIFF'S

19     DEPARTMENT policy provides that incarcerated people only receive a 10-day supply

20     of medication upon release, and only for certain medications, defined vaguely as

21     "critical medications." However, in practice, Jail staff provide incarcerated people with

22     only 7 days of most medications. This is insufficient, as incarcerated people released

23     from the Jail are often unable to secure medical care in the community and a refill of

essential medications within 7 days. As a point of comparison, CDCR has long

provided people releasing from prison with a 30-day supply of medication and recently

agreed to supply people releasing from prison with a 60-day supply of medication.

Other California county jail systems provide medication supplies of 30 days or more

upon release.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 211 of the Complaint and, therefore, denies the averments.

**III. DEFENDANTS DISCRIMINATE AGAINST, FAIL TO ACCOMMODATE, AND VIOLATE THE CONSTITUTIONAL AND STATUTORY RIGHTS OF INCARCERATED PEOPLE WITH**

212.    COUNTY DEFENDANTS incarcerate significant numbers of individuals with

disabilities, as that term is defined in the ADA, the Rehabilitation Act, and California's

Unruh Act. By policy and practice, COUNTY DEFENDANTS and CONTRACTOR

DEFENDANTS routinely fail to provide incarcerated people with disabilities reasonable

accommodations and to ensure meaningful and equal access to all of the programs and

services offered by the Jail. These actions and inactions significantly increase the risk of

substantial harm to incarcerated people with disabilities. Moreover, COUNTY

DEFENDANTS' and CONTRACTOR DEFENDANTS' refusal to accommodate

incarcerated people with disabilities results in the provision of inadequate medical, mental

health, and dental care.

1       **Answer**: MAH denies the averments in Paragraph 212 as alleged against MAH. MAH is

2       without sufficient knowledge or information to admit or deny the averments in Paragraph

3       212 of the Complaint to the extent they apply to the other Defendants, and, therefore,

4       denies those averments.

5       **A. The Jail Lacks Adequate Policies and Practices to Identify and Track**
6       **Incarcerated People with Disabilities**

7

8    213.      Under the ADA and the Rehabilitation Act, the COUNTY DEFENDANTS must

9       create and maintain a system to identify and track individuals with disabilities and the

10      accommodations they require. However, by policy and practice, the COUNTY

11      DEFENDANTS and CONTRACTOR DEFENDANTS fail to adequately identify

12      individuals with disabilities and the reasonable accommodations they require. During the

13      intake process, Jail staff gather information about newly arriving people, and use this

14      information to make a number of determinations, including for classification, housing,

15      and treatment decisions. The staff responsible for intake are not adequately trained by

16      the SHERIFF'S DEPARTMENT about how to identify and track people with

17      disabilities, and therefore frequently fail to identify people with disabilities or the

18      accommodations they need to access programs and services in the Jail. The Jail intake

19      questions are inadequate to document if a person has a disability and requires

20      accommodations.

21

22      **Answer**: MAH denies the averments in Paragraph 213 as alleged against MAH. MAH is

23      without sufficient knowledge or information to admit or deny the averments in Paragraph

1    213 of the Complaint to the extent they apply to the other Defendants, and, therefore,

2    denies those averments.

3

4    214.    As a result of these inadequate policies and procedures, Defendants fail to

5    identify newly arriving people's disabilities and needed accommodations during the

6    intake process, which results in the denial of accommodations mandated by the ADA

7    and the Rehabilitation Act and places people with disabilities at risk of discrimination,

8    injury, and/or exploitation.

9

10    **Answer**: MAH denies the averments in Paragraph 214 as alleged against MAH. MAH is

11    without sufficient knowledge or information to admit or deny the averments in Paragraph

12    214 of the Complaint to the extent they apply to the other Defendants, and, therefore,

13    denies those averments.

14

15    215.    For example, Plaintiff LOPEZ is Deaf and uses ASL as his primary form of

16    communication. During the booking process, LOPEZ informed the intake nurse by

17    written notes that he is Deaf and uses ASL; however, LOPEZ's medical records indicate

18    that as of June 2020—eight months after he was arrested and booked—the Jail did not

19    have a record that LOPEZ is Deaf and uses ASL to communicate. The Jail intake form

20    completed upon LOPEZ's arrival contains an incorrectly checked "No" in response to the

21    question of whether LOPEZ has hearing limitations. Jail custody and medical staff,

22    including employees of CONTRACTOR DEFENDANTS, lacked critical information in

23    LOPEZ's medical records and in the Jail's tracking systems about the accommodations

1    necessary for him to access programs and services at the Jail. For several months, when a

2    new nurse was assigned to work with LOPEZ, the staff member often failed to

3    communicate effectively with LOPEZ because they apparently did not know that LOPEZ

4    is Deaf.

5

6    **Answer**: MAH denies the averments in Paragraph 215 as alleged against MAH. MAH is

7    without sufficient knowledge or information to admit or deny the averments in Paragraph

8    215 of the Complaint to the extent they apply to the other Defendants, and, therefore,

9    denies those averments.

10

11    216.    Upon information and belief, the SHERIFF'S DEPARTMENT does not maintain

12    an effective central tracking system, electronic or otherwise, of incarcerated people with

13    disabilities and the accommodations they require. The SHERIFF'S DEPARTMENT does

14    not maintain adequate information about incarcerated people's disabilities and related

15    accommodations in custody and/or medical files. Upon information and belief, to the

16    extent that the SHERIFF'S DEPARTMENT maintains information about a person's

17    disabilities in any form, custody, medical, and clerical staff are not provided access to the

18    information in a manner that would timely and effectively inform them of the person's

19    disabilities and appropriate accommodations. The SHERIFF'S DEPARTMENT and

20    CONTRACTOR DEFENDANTS do not adequately train staff to maintain records or

21    information about incarcerated people's disabilities and related accommodations.

22

**Answer**: MAH denies the averments in Paragraph 216 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 216 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

217.   The lack of an adequate disability and accommodation tracking system results in substantial injuries to incarcerated people with disabilities. Without an adequate tracking system, custody, medical, and mental health staff and contractors have no easily accessible means to determine whether a person has a disability, and what, if any, accommodations that person requires. Consequently, the SHERIFF'S DEPARTMENT and CONTRACTOR DEFENDANTS fail to provide people with accommodations and/or take away accommodations that have already been provided without justification.

**Answer**: MAH denies the averments in Paragraph 217 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 217 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

218.   For example, Plaintiff DUNSMORE has ankylosing spondylitis, a form of arthritis that, over time, can cause spinal deformities. DUNSMORE started to have back pain decades ago and has already had sections of his spine fuse together. Due to his condition, DUNSMORE also experiences inflammation, pain, and stiffness in his hands and feet. He is slowly losing feeling in both of his hands, and he struggles to grip items. He uses a

modified spoon with a foam handle to eat and a modified pencil with a foam handle to write. Without those devices, DUNSMORE struggles to eat and write. DUNSMORE also cannot tip his head back to drink because his spine is fused, so he uses a straw to drink. DUNSMORE receives injections that have enabled him to be more mobile than untreated patients with his condition. Regular physical activity helps DUNSMORE to stay mobile when his condition allows. Even so, DUNSMORE's disability-related limitations wax and wane. On some days, he is more easily able to move around than other days. Sometimes, his condition flares up so significantly that the pain places DUNSMORE in a state of paralysis. Because his condition fluctuates, DUNSMORE often needs a wheelchair, cane, or walker to move around. When DUNSMORE arrived at the Jail on August 16, 2018 from CDCR, DUNSMORE had all of his assistive devices: a wheelchair, cane, walker, modified spoon, modified pencil, and straw. On September 10, 2018, Jail staff confiscated DUNSMORE's wheelchair and modified spoon because a deputy watched a video of DUNSMORE ambulating unassisted in the recreation area at a moment when he was capable of doing so. Because the Jail lacks an adequate system for tracking DUNSMORE's disability and his required accommodations, Jail staff did not understand the nature of DUNSMORE's disability and how his mobility fluctuates. The Jail's confiscation of DUNSMORE's devices caused his psychological state to decompensate to the point where he was placed in a dirty EOH cell for several days without any of his assistive devices or property. Thereafter, DUNSMORE changed his behavior to try to hide the nature of his disability out of concern that staff would call him a liar and again confiscate his assistive devices if they saw him at a time when he was capable of unassisted movement.

1

2          **Answer**: MAH is without sufficient knowledge or information to admit or deny the

3          averments in Paragraph 218 of the Complaint and, therefore, denies the averments.

4

5     219.        When Plaintiff DUNSMORE returned to the Jail again in December 2019 for

6          resentencing, he came with all of the assistive devices he uses in CDCR, including his

7          modified spoon, straw, wheelchair, and cane. Despite the fact that DUNSMORE has been

8          prescribed these devices in CDCR on a permanent basis, Jail staff immediately

9          confiscated DUNSMORE's modified spoon, straw, and cane. Because DUNSMORE had

10         been incarcerated at the Jail on previous occasions, including in 2018, the Jail had

11         knowledge of DUNSMORE's disability and need for accommodations. DUNSMORE did

12         not receive his cane for the entirety of his stay at the Jail, from December 2019 to April

13         2021. DUNSMORE also requires assistance changing his shirts, but Jail staff frequently

14         refused to provide DUNSMORE with help during his incarceration at the Jail, so he often

15         wore the same dirty shirt for months at a time.

16

17         **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18         averments in Paragraph 219 of the Complaint and, therefore, denies the averments.

19

20    220.        As another example, one person at George Bailey, who has lower back pain and

21         nerve damage resulting from his long career in the military, has a prescription for a

22         wheelchair when he has to travel long distances or stand for a long time, such as when

23         going out to court. In or around October 2021, when this person was going to court,

custody staff forced him to walk from the Jail to the bus transporting people to court, rather than providing him his wheelchair, despite his requests. Custody staff did not believe that the person had a chrono (authorizing documentation) for a wheelchair. When he returned from court, deputies again refused to provide him a wheelchair, and he had to walk to the bus again. Walking caused the person a significant amount of pain. One deputy told the person, "You were in the military, you can handle the pain."

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 220 of the Complaint and, therefore, denies the averments.

221.    Similarly, Plaintiff ARCHULETA was denied use of his wheelchair while waiting in the court holding area at Central. A deputy took away the wheelchair and tried to force ARCHULETA to walk to the hearing. However, ARCHULETA cannot walk long distances, and because he was unable to walk to the hearing, the court hearing had to be postponed.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 221 of the Complaint and, therefore, denies the averments.

**B. The Jail Fails to Accommodate Incarcerated People with Hearing and Speech Disabilities**

222.    Incarcerated people with hearing, speech, and other communication disabilities have difficulty effectively communicating with Jail staff and require accommodations to

ensure effective communication with staff as well as equal access to programs and

services offered by the Jail. By policy and practice, the COUNTY DEFENDANTS and

CONTRACTOR DEFENDANTS fail to provide such accommodations. The COUNTY

DEFENDANTS and CONTRACTOR DEFENDANTS fail to adequately train staff how

and when to provide such accommodations. The COUNTY DEFENDANTS and

CONTRACTOR DEFENDANTS regularly fail to provide incarcerated people with

hearing and speech disabilities with sign language interpreters, hearing aids, or other

auxiliary aids.

**Answer**: MAH denies the averments in Paragraph 222 as alleged against MAH. MAH is

without sufficient knowledge or information to admit or deny the averments in Paragraph

222 of the Complaint to the extent they apply to the other Defendants, and, therefore,

denies those averments.

223.     The COUNTY DEFENDANTS and CONTRACTOR DEFENDANTS do not

provide incarcerated people with hearing and speech disabilities with sign language

interpreters, hearing aids, or other auxiliary aids during the booking and intake process,

which harms these incarcerated people by preventing them from communicating specific

concerns, including emergency medical issues, and understanding the Jail's policies and

practices. For example, Plaintiff LOPEZ, who is Deaf and uses ASL to communicate,

was booked into Vista on or around October 8, 2019. LOPEZ was not provided a sign

language interpreter during the booking process; instead, he was forced to communicate

with medical staff via written notes, a method of communication that is less effective for

1     him. During the intake process, a deputy was dispatched to sign with LOPEZ, but the

2     deputy lacked the skill and qualifications to effectively communicate with Deaf

3     individuals. Later, LOPEZ attended an initial mental health appointment during which

4     custody staff handcuffed him to a bar in the room, which made it impossible for him to

5     use his hands to sign effectively with the in-person interpreter about his mental health.

6

7     **Answer**: MAH denies the averments in Paragraph 223 as alleged against MAH. MAH is

8     without sufficient knowledge or information to admit or deny the averments in Paragraph

9     223 of the Complaint to the extent they apply to the other Defendants, and, therefore,

10    denies those averments.

11

12    224.     The COUNTY DEFENDANTS and CONTRACTOR DEFENDANTS fail to

13    provide equal access to telephone services to incarcerated people who are Deaf or hard of

14    hearing. Incarcerated people without disabilities generally have access to standard

15    telephones when they are in the common area of their housing unit. By policy and

16    practice, an incarcerated person may make unlimited telephone calls, unless restrictions

17    are necessary to preserve safety and security. In contrast, the COUNTY DEFENDANTS

18    fail to provide anything close to the same level of access to functioning Video Relay

19    Service ("VRS") or Video Remote Interpreting ("VRI"), or even to the now-outmoded

20    Telecommunications Device for the Deaf ("TTY") phones, to incarcerated people who

21    are hard of hearing. The SHERIFF'S DEPARTMENT's policies and practices for equal

22    access to telephone services are inadequate, and the SHERIFF'S DEPARTMENT fails to

23    adequately train staff how to provide equal access to telephone services.

1

2       **Answer**: MAH denies the averments in Paragraph 224 as alleged against MAH. MAH is

3       without sufficient knowledge or information to admit or deny the averments in Paragraph

4       224 of the Complaint to the extent they apply to the other Defendants, and, therefore,

5       denies those averments.

6

7   225.       For example, Plaintiff LOPEZ could not keep in regular contact with his wife or

8       attorney because Vista did not have any VRS and its TTY machine was not in working

9       order. A few days after arriving at Vista, LOPEZ tried to use the Jail's TTY, but it was

10      broken. When LOPEZ asked deputies about the TTY, none of them knew how to operate

11      it—and they ignored LOPEZ's repeated requests to fix the TTY machine. Because of the

12      lack of communication options, LOPEZ was forced to ask other incarcerated people to

13      make phone calls on his behalf and to relay important messages.

14

15      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16      averments in Paragraph 225 of the Complaint and, therefore, denies the averments.

17

18  226.       LOPEZ later transferred to George Bailey, which also had an antiquated TTY that

19      staff did not know how to make operable. When the Jail suspended social visits for long

20      periods during LOPEZ's incarceration, he had to rely on the TTY to communicate with

21      his family. But the TTY at George Bailey did not work properly; there was usually a poor

22      signal that stopped all communication, and even when the signal worked, words often

23      became garbled when two people spoke at the same time, messing up the translation.

1   Because of these problems, LOPEZ's conversations over the TTY took much longer than

2   normal voice phone calls, but Jail staff would regularly rush LOPEZ to end his calls and

3   prevent him from finishing conversations with his loved ones or attorneys. Deputies also

4   frequently refused LOPEZ's requests to use the TTY. LOPEZ estimates that staff refused

5   him access to the TTY at least 100 times during his incarceration. In some cases, he

6   waited as long as three days from his request to when he could use the TTY.

7

8   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

9   averments in Paragraph 226 of the Complaint and, therefore, denies the averments.

10

11   227.      The COUNTY DEFENDANTS and CONTRACTOR DEFENDANTS fail to

12   provide incarcerated people with hearing and/or speech disabilities with sign language

13   interpreters, hearing aids, or other auxiliary aids to permit participation in programs and

14   services at the Jail, including but not limited to appointments with medical staff. For

15   example, Jail staff did not provide Plaintiff LOPEZ a sign language interpreter during

16   numerous interactions with nursing and medical staff, despite his multiple requests.

17   LOPEZ never received an interpreter for routine medical contacts inside the Jail. Instead,

18   LOPEZ had to rely on handwritten notes to understand the complex medical issues and

19   the provider's advice. For the majority of these appointments, LOPEZ did not understand

20   what medical staff tried to communicate. Sometimes, medical staff did not write any

21   information for LOPEZ, and he could not read their lips because staff wore masks for

22   most interactions. If a new nurse was assigned to work with LOPEZ, they often failed to

23   communicate effectively because they did not know, and apparently had no way of

knowing due to the Jail's deficient disability identification and tracking processes, that

LOPEZ is Deaf. Custody staff at the Jail had other incarcerated people write down staff's

questions and responses for LOPEZ to read. Custody staff often told another incarcerated

person what to communicate to LOPEZ and then left before LOPEZ had an opportunity

to respond, which prevented LOPEZ from asking follow-up questions. This practice also

placed LOPEZ at a substantial risk of serious harm because other incarcerated people

learned confidential information about him, and he could not trust that other incarcerated

people would write down information accurately. LOPEZ was constantly fearful that

having other incarcerated people involved in his communications with deputies put him

at extreme risk of being harmed. LOPEZ could not control whether incarcerated people

would communicate sensitive and confidential information about him to other

incarcerated persons at the Jail. In internal documents, SHERIFF'S DEPARTMENT staff

recognized the same danger. In May 2021, a sergeant wrote to Jail supervisors that "using

other inmates to try and communicate with [a Deaf person] could lead to issues down the

road," because it "could pose a danger to him if deputies are using other inmates to rely

conversations they (other inmates) should not be privy to."

**Answer**: MAH denies the averments in Paragraph 227 as alleged against MAH. MAH is

without sufficient knowledge or information to admit or deny the averments in Paragraph

227 of the Complaint to the extent they apply to the other Defendants, and, therefore,

denies those averments.

228.    The SHERIFF'S DEPARTMENT does not provide equal access to television to incarcerated people who have hearing disabilities or are Deaf. Upon information and belief, most non-disciplinary housing units have televisions installed for incarcerated people to watch, but in many instances, the SHERIFF'S DEPARTMENT has either not installed televisions with the capability to display closed captioning or failed to ensure the televisions are set to display closed captioning.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 228 of the Complaint and, therefore, denies the averments.

**C. The Jail Routinely Fails to Provide Assistive Devices to Incarcerated People with Disabilities**

229.    By policy and practice, the COUNTY DEFENDANTS and CONTRACTOR DEFENDANTS fail to ensure that incarcerated people with disabilities who require assistive devices as accommodations are provided with and allowed to retain those devices, including, but not limited to, wheelchairs, walkers, eyeglasses, magnifiers, screen readers, crutches, canes, braces, tapping canes, hearing aids, and pocket talkers. The SHERIFF'S DEPARTMENT and CONTRACTOR DEFENDANTS fail to consider incarcerated people's specific needs and abilities in assigning assistive devices, to the detriment of those people's overall health and safety. The SHERIFF'S DEPARTMENT and CONTRACTOR DEFENDANTS also fail to adequately train staff how to timely and appropriately provide assistive devices to people with disabilities.

1      **Answer**: MAH denies the averments in Paragraph 229 as alleged against MAH. MAH

2      is without sufficient knowledge or information to admit or deny the averments in

3      Paragraph 229 of the Complaint to the extent they apply to the other Defendants, and,

4      therefore, denies those averments.

5

6      230.      For example, Plaintiff NELSON has had multiple hip replacements, has

7      osteoarthritis, and sustained a serious spinal injury immediately before being booked into

8      the Jail. As a result, NELSON requires use of a wheelchair to get around. Jail staff initially

9      provided NELSON with a wheelchair that had such small wheels that NELSON could not

10     push himself around using his arms. Instead, NELSON had to use his legs to kick the floor

11     in order to propel the wheelchair—even though it is painful to do so and his legs have

12     little strength. To avoid pain, NELSON would rely on other incarcerated people to push

13     him around in his wheelchair. Eventually, after about four months, Jail staff finally

14     provided NELSON a replacement wheelchair. Before the replacement wheelchair was

15     provided, NELSON was required to rest his forearms directly on the rubber wheels that

16     come in contact with the floor, an unsanitary practice. Over time, this became painful for

17     NELSON and the friction from the rubber wheels reopened and sometimes caused sores

18     on his arms.

19

20     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

21     averments in Paragraph 230 of the Complaint and, therefore, denies the averments.

22

231.    The SHERIFF'S DEPARTMENT's policy on incarcerated people with

disabilities includes no definition of auxiliary aids and services, although the ADA

regulations require that public entities give primary consideration to a person with

disabilities' preferred auxiliary aids and services. 28 C.F.R. § 35.160. In addition, the

SHERIFF'S DEPARTMENT's medical operations manual does not define "aids to

impairment," but instead only includes a short, non-exhaustive list of potential aids. Staff

using these policies, especially those who are not well-trained and not familiar with the

range of assistive devices a person with disabilities might require, improperly decline to

provide incarcerated people with their requested assistive devices.


**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 231 of the Complaint and, therefore, denies the averments.


232.    For example, Plaintiff DUNSMORE uses a modified spoon with a foam handle to

eat because his arthritic condition has caused his grip to weaken. DUNSMORE has

dysphagia, which makes it difficult to swallow foods on his own and requires that he have

a ground medical diet. When DUNSMORE arrived at the Jail in December 2019, Jail staff

failed to place him on a medical diet. DUNSMORE was forced to use his modified spoon

to cut the food into small enough pieces for him to eat, causing his modified spoon to

break in February 2020. After more than a month, in response to his request for a new

spoon, Jail staff gave DUNSMORE a tiny pediatric spoon, which was ineffective and

made it more difficult for him to eat. DUNSMORE told the Jail the pediatric spoon was

1    ineffective, and staff said they would search for a more appropriate spoon. However, in

2    December 2020, staff gave DUNSMORE the same pediatric spoon.

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 232 of the Complaint and, therefore, denies the averments.

6

7    233.    By policy and practice, the SHERIFF'S DEPARTMENT improperly applies a

8    "medical necessity" standard to determine whether to provide assistive devices to

9    incarcerated people. Specifically, the SHERIFF'S DEPARTMENT's policy on

10   incarcerated people with disabilities, M.39, states that accommodations instructions are

11   added to a person's medical record when "the recommended instructions are necessary

12   for the safety and/or welfare of a disabled inmate." That medical necessity standard is

13   narrower than the ADA's reasonable accommodation requirement that a public entity

14   provide assistive devices or other accommodations as necessary to ensure meaningful

15   access to programs, services, and activities, provided that doing so is reasonable. Because

16   of the SHERIFF'S DEPARTMENT's improper standard, people with disabilities do not

17   receive needed assistive devices and cannot access the programs and services offered at

18   the Jail.

19

20   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

21   averments in Paragraph 233 of the Complaint and, therefore, denies the averments.

22

234.     For example, the Jail repeatedly took away an extra mattress that had been

provided to Plaintiff NELSON, who has a mobility disability. (NELSON has been

prescribed one on a permanent basis by CDCR.) NELSON's request for the extra mattress

was reasonable, especially because his pain and discomfort was far more acute at the Jail

than when he was incarcerated in CDCR due to the spinal injury he suffered immediately

before booking. When NELSON arrived at the Jail on March 2, 2021, the SHERIFF'S

DEPARTMENT received an email notification from CDCR that he requires an extra

mattress. NELSON initially received the extra mattress, but it was taken from his cell four

or five times during his first two months at the Jail by custody staff conducting searches.

Each time the extra mattress was taken away, NELSON had to plead for its return with

deputies who often ignored him. During the times that he was without an extra mattress,

NELSON suffered from substantial pain and discomfort without his reasonable

accommodation.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 234 of the Complaint and, therefore, denies the averments.

235.     Plaintiff ARCHULETA has severe osteoarthritis in his left knee, and his left leg is

shorter than his right leg. ARCHULETA also has degenerative disc disease. As a result,

he uses a wheelchair to travel long distances. Crutches help him to ambulate and build

strength in his legs. In September 2019, ARCHULETA requested "crutches for therapy"

in a sick call request that noted his mobility disability. In response, Jail staff told

1    ARCHULETA that he had to choose between crutches and a wheelchair, and could not

2    have both. This prevents him from using crutches to help build up his leg strength.

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 235 of the Complaint and, therefore, denies the averments.

6

7    236.    By policy and practice, the SHERIFF'S DEPARTMENT and CONTRACTOR

8    DEFENDANTS frequently deny incarcerated people assistive devices or take them away

9    when they have been issued. For example, in 2019, custody staff at Central confiscated

10    and threw away the prosthetic leg of one individual while he was out to court. Without

11    that prosthetic, the person was unable to ambulate on his own and was forced to use a

12    wheelchair. Custody staff confiscated the person's prosthetic even though the Jail had

13    documentation from a prior incarceration that he required one in order to walk. Using a

14    wheelchair reduces this person's ability to build strength in his other leg and also reduces

15    his access to programs and services at the Jail, as many elements of housing units at the

16    Jail are inaccessible to people in wheelchairs.

17

18    **Answer**: MAH denies the averments in Paragraph 236 as alleged against MAH. MAH is

19    without sufficient knowledge or information to admit or deny the averments in Paragraph

20    236 of the Complaint to the extent they apply to the other Defendants, and, therefore,

21    denies those averments.

22

237.     The SHERIFF'S DEPARTMENT's written policies permit staff to remove devices based on "safety and security" concerns. Inadequacies in the policies lead to the unjustified removal of assistive devices. The policies include no provision requiring staff to document a specific safety or security concern arising from a person's assistive device. Nor do the policies require staff to attempt to provide the person with an alternative accommodation that does not implicate the same safety concerns.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 237 of the Complaint and, therefore, denies the averments.

**D. The Jail Fails to Provide Equal Access to Programs and Services, Including Safe and Accessible Facilities, to Incarcerated People with Disabilities**

238.     The COUNTY DEFENDANTS fail to ensure that incarcerated people with disabilities have equal access to all programs and services offered at the Jail. The SHERIFF'S DEPARTMENT fails to ensure that people with disabilities are housed in units and assigned to beds that are accessible and safe. Physical accessibility deficiencies throughout the Jail facilities prevent people with disabilities from safely accessing programs and services. The SHERIFF'S DEPARTMENT fails to adequately train staff to house people with disabilities in accessible and safe housing.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 238 of the Complaint and, therefore, denies the averments.

239.     Each of the Jail facilities contains multiple housing units. The housing units differ in their design, and importantly, in their accessibility to people with disabilities. Some housing units consist of celled housing, where the unit is divided into a number of cells with doors, in which one, two, or three incarcerated people are housed. Other housing units are dorm housing units, where many beds, including bunk beds, are placed into an open area shared by the people in that unit.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 239 of the Complaint and, therefore, denies the averments.

240.     The SHERIFF'S DEPARTMENT controls housing unit assignments. In housing units with celled housing, the SHERIFF'S DEPARTMENT assigns people to a particular cell. By policy and practice, custody staff make decisions about where to house a particular person without taking into account the person's disability-related abilities and needs. Because of the SHERIFF'S DEPARTMENT's general failure to identify and track people with disabilities, custody staff decide where to house a person without sufficient information regarding the person's needs; this practice significantly increases the risk that the person will be assigned to a housing unit that is not accessible, because, for example, it lacks adequate toilets or grab bars in the shower, or lacks space for a wheelchair.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 240 of the Complaint and, therefore, denies the averments.

241.      For example, Plaintiff NELSON has repeatedly been housed in inaccessible units. NELSON uses a wheelchair due to his mobility disability. Jail custody staff initially assigned NELSON to a cell on the fifth floor at Central that was inaccessible to him. A stool was bolted in front of the desk in the cell, which meant that NELSON's wheelchair could not fit in front of the desk. To use the desk, NELSON would have to make the difficult transfer from his wheelchair to the stool, which put him at risk of falling to the floor, just to use the desk. NELSON fell and hurt his wrist in his cell in July 2021. This was a double occupancy cell in unit 5A housing three people. The Board of State and Community Corrections ("BSCC") has repeatedly criticized the Jail for housing three incarcerated people in cells rated only for double occupancy.[159] In NELSON's small cell, his wheelchair took up a significant amount of space, which caused his cellmates to frequently become angry with him. Although the Jail used the cell as an "ADA cell," it was not the actual ADA cell in the housing unit, and the desk was too short for NELSON to pull his wheelchair close and use the desk. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 241 of the Complaint and, therefore, denies the averments.

242.      While housed in unit 5A, NELSON also could not access the four telephones in the dayroom because stools were placed in front of all of the telephones. NELSON could not fit his wheelchair close enough to use the telephones because the cords connecting the phone to the receiver were too short. The seats at tables in the dayroom are also bolted down and include no accessible space for a person in a wheelchair to approach and sit at a

1    table. To access these programs and services, NELSON had to transfer from his

2    wheelchair to the bolted seats, which is difficult, painful, and places him at risk of falling.

3    At least one individual in a wheelchair at Central has fallen and seriously injured himself

4    while attempting to transfer from his wheelchair to the telephone stool.

5

6    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

7    averments in Paragraph 242 of the Complaint and, therefore, denies the averments.

8

9    243.    The shower in housing unit 5A lacks a shower chair for people with mobility

10    disabilities. When NELSON was housed in that unit, he had to stand in the shower, which

11    is painful for him because of his medical conditions and mobility limitations, and he was

12    at risk of falling. The grab bar in the 5A shower is often slippery and filthy, and does not

13    provide support to people with mobility disabilities like NELSON.

14

15    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16    averments in Paragraph 243 of the Complaint and, therefore, denies the averments.

17

18    244.    On or around October 12, 2021, custody staff again moved NELSON, this time to

19    housing unit 8C at Central. Housing unit 8C is a medical dorm that houses a significant

20    number of people with disabilities. In October 2021, around 15 people in wheelchairs

21    were housed in unit 8C. Although the dayroom tables in 8C have some spaces for people

22    with wheelchairs to sit while they eat, there are far too few spaces to accommodate all of

23    the incarcerated people in 8C who use wheelchairs. This means that NELSON and other

1    people cannot all eat at the dayroom tables, and must instead place their trays on benches

2    in the dayroom and lean forward to eat from them. Eating in such a fashion is painful for

3    NELSON. Upon information and belief, many housing units throughout the Jail are

4    similarly inaccessible to people in wheelchairs.

5

6    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

7    averments in Paragraph 244 of the Complaint and, therefore, denies the averments.

8

9    245.        COUNTY DEFENDANTS house many people with mobility disabilities at

10   Central, which is the tallest construction project ever undertaken by the County of San

11   Diego. It consists of 11 floors with a total of 17 levels including the mezzanines and

12   basement.[160] Some programs at Central, including recreation, social visits, and attorney

13   visits, are on mezzanine floors separate from the housing units and are accessible only via

14   stairs or the elevator. However, the elevators are often broken and not functioning.

15   Although custody staff can use an elevator that they have designated for "staff elevator

16   use" to transport an incarcerated person with a mobility disability to the recreation area, a

17   social visit, or an attorney visit, custody staff frequently refuse to transport people in the

18   staff elevator. These practices prevent people with mobility disabilities from accessing

19   programs and services at the Jail, including but not limited to recreation, social visits, and

20   professional visits. [footnote omitted]

21

22   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

23   averments in Paragraph 245 of the Complaint and, therefore, denies the averments.

246.      For example, Plaintiff NELSON relies on elevators to access programs on other floors in Central, including social visits, professional visits, and recreation. NELSON often has to wait to access programs because the non-staff elevator is broken. On one occasion, NELSON missed an important professional visit with a detective because the elevator was broken and deputies would not take NELSON in the staff elevator (the detective never returned). Even when the elevators are working and NELSON can access the recreation area, the limited exercise equipment available—a rowing machine, dip bars, and a stationary bike—are not accessible to NELSON due to his mobility disability. The Jail does not offer accessible equipment that NELSON could use. Without exercise, NELSON is at risk of worsening pain and disability.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 246 of the Complaint and, therefore, denies the averments.

247.      In August 2019, Plaintiff ARCHULETA was forced to walk up the stairs to attend a visit, rather than use the elevators. When walking back down the stairs, ARCHULETA lost his balance, fell, and struck his head. Similarly, in or around October 2021, a person who uses a walker to ambulate around the Jail was denied access to the staff elevator to accommodate his disability. Instead, Jail staff required that this person walk upstairs, with his walker folded up, to attend a professional visit at Central. The man was at risk of falling while taking the stairs without the assistance of his walker, and arrived at the professional visit exhausted and out of breath.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 247 of the Complaint and, therefore, denies the averments.

248.     The SHERIFF'S DEPARTMENT lacks adequate policies and practices for ensuring that people who require lower bunk bed assignments actually receive lower bunk bed assignments and are able to sleep in lower bunks. The SHERIFF'S DEPARTMENT fails to train staff to ensure that people who require lower bunk bed assignments receive lower bunk beds. As a result, people who require lower bunk assignments as accommodations for their disabilities are at times forced to sleep on upper bunks, which places them in danger.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 248 of the Complaint and, therefore, denies the averments.

249.     For example, in 2018, Frankie Greer had a catastrophic brain injury after Jail staff failed to ensure that he was placed in a lower bunk, according to a lawsuit that Greer filed. Greer had been diagnosed with a seizure disorder, about which he informed staff when arriving at Central. Greer requested a lower bunk because he worried that his seizure disorder would cause him to fall off an upper bunk, and intake staff noted this in paperwork. However, this written note was not incorporated into the electronic records system, and Greer was assigned to a top bunk. A deputy refused Greer's request to move to a lower bunk despite Greer explaining that he had previously fallen off a top bunk. The

next day, Greer had a seizure, fell off his top bunk, and hit his head on the concrete floor. Greer fell into a coma and suffered facial fractures and a brain injury.[161] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 249 of the Complaint and, therefore, denies the averments.

250.    Another person, an elderly wheelchair user with mobility disabilities and a lower bunk assignment in CDCR, had a similar fall at Central in 2021. This man was forced to sleep on the top bunk because his cellmates refused to yield the lower bunks, and a deputy refused to intervene. Shortly after taking the top bunk, the person fell off of it and injured his leg.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 250 of the Complaint and, therefore, denies the averments.

**E. The Jail Lacks an Effective Procedure for Incarcerated People to Request Reasonable Disability Accommodations**

251.    The COUNTY DEFENDANTS and the CONTRACTOR DEFENDANTS neither provide an effective or functional grievance system for incarcerated people with disabilities as required by the ADA and the Rehabilitation Act nor provide people with adequate notice of how to request reasonable accommodations for their disabilities. Upon information and belief, people with disabilities are not informed of any specific

1    process for complaining about disability discrimination or requesting disability

2    accommodations. Instead, people with disabilities must use the Jail's general grievance

3    procedure, which lacks any field for an incarcerated person to note that the grievance

4    concerns disability accommodations. Nor does the Jail's policy for people with

5    disabilities state that the grievance process can be used to appeal the denial of an

6    accommodation.

7

8    **Answer**: MAH denies the averments in Paragraph 251 as alleged against MAH. MAH

9    is without sufficient knowledge or information to admit or deny the averments in

10   Paragraph 251 of the Complaint to the extent they apply to the other Defendants, and,

11   therefore, denies those averments.

12

13   252.       The SHERIFF'S DEPARTMENT lacks adequate policies and procedures for

14   responding to grievances, including ADA-related grievances, and fails to maintain

15   adequate, complete, and accurate records of grievances submitted by incarcerated people.

16   The SHERIFF'S DEPARTMENT fails to timely and adequately respond to grievances.

17   The SHERIFF'S DEPARTMENT also fails to adequately train staff and CONTRACTOR

18   DEFENDANTS how to receive, track, and respond to grievances.

19

20   **Answer**: MAH denies the averments in Paragraph 252 as alleged against MAH. MAH is

21   without sufficient knowledge or information to admit or deny the averments in Paragraph

22   252 of the Complaint to the extent they apply to the other Defendants, and, therefore,

23   denies those averments.

253.     Although the Jail's written policies provide that people can physically hand grievances to a staff member and receive a receipt, in practice SHERIFF'S DEPARTMENT's staff refuse to accept grievance forms directly. Instead, Jail staff instruct people to place grievance forms into a specific box in the person's housing unit. But Jail staff usually fail to provide them a receipt for the grievance(s) they place in the housing unit box. At times, Jail staff more overtly interfere with the grievance process. For example, on February 13, 2021, Plaintiff LOPEZ—who has a hearing disability—and other incarcerated people in his unit asked for grievance forms. A deputy warned LOPEZ and others, saying "whoever you want to write up, don't." In 2021, when Plaintiff NELSON attempted to file a grievance, the deputy told him that he needed "to let the Sergeant sign this" before accepting and processing the grievance. However, the SHERIFF'S DEPARTMENT's policies include no such requirement.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 253 of the Complaint and, therefore, denies the averments.

254.     Jail staff regularly fail to adequately and timely respond to grievances, including ADA-related grievances. By the SHERIFF'S DEPARTMENT's written policy, Jail staff must respond to a person's written grievance within 7 days. However, staff often do not respond at all to grievances. On occasions when Jail staff do respond to grievances, their responses are often not adequate, comprehensive, or timely, and may be arbitrary and counterproductive.

1

2      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

3      averments in Paragraph 254 of the Complaint and, therefore, denies the averments.

4

5      255.      For example, Jail staff regularly argue that grievances filed on the Jail's

6      grievance forms are not in fact grievances, which means that the grievances are neither

7      logged in the Jail's information system nor responded to. On April 24, 2020, Plaintiff

8      LOPEZ submitted a grievance about Jail staff's consistent failure to timely provide him

9      with his daily kidney medications. LOPEZ complained about prior failures to timely

10     provide him with his daily kidney medication, explained that Jail staff's failures put his

11     health at risk, and asked Jail staff to ensure that he timely received his kidney

12     medication. LOPEZ expressly stated that: "This is not an inmate request" in order for his

13     grievance to be treated as a grievance. In response, a Jail staff member checked a box for

14     "This submission is not a grievance," but failed to specify how the submission should be

15     categorized, and failed to clearly sign their name. Many other proper grievances

16     submitted by Plaintiffs and others are similarly marked "This submission is not a

17     grievance" and then marked as "inmate requests." Upon information and belief, the

18     SHERIFF'S DEPARTMENT has no written policy instructing when a grievance is

19     treated as an "inmate request," thereby enabling Jail staff to treat any grievance as an

20     "inmate request" when they wish to remove it from the existing grievance process. The

21     SHERIFF'S DEPARTMENT's failure to adequately and timely respond to grievances,

22     including ADA-related grievances, prolongs people's suffering and time without

23     necessary accommodations.

1

2          **Answer**: MAH is without sufficient knowledge or information to admit or deny the

3          averments in Paragraph 255 of the Complaint and, therefore, denies the averments.

4

5     256.        For example, Plaintiff DUNSMORE submitted several grievances confiscated his

6          assistive devices in August 2018. However, for most of the grievances DUNSMORE

7          filed, Jail staff never responded in writing and failed to provide DUNSMORE with the

8          accommodations he requested. In 2019, DUNSMORE brought with him to the Jail

9          writing utensils with long handles, which allow him to grip the utensils and write given

10         the arthritic condition in his hands. Those writing utensils were confiscated when

11         DUNSMORE arrived at the Jail. When DUNSMORE requested a replacement, Jail staff

12         failed to provide DUNSMORE with any replacement for almost a year. Even then, the

13         Jail gave DUNSMORE a device that was unfamiliar to him and failed to provide

14         instructions on how to use it. Before DUNSMORE could receive any such instructions, a

15         deputy searching DUNSMORE's cell determined the device was contraband and took it.

16

17         **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18         averments in Paragraph 256 of the Complaint and, therefore, denies the averments.

19

20    257.        In 2019, the SHERIFF'S DEPARTMENT failed to process three grievances that

21         Miguel Lucas submitted about another person's misclassification.[162] The other person was

22         incorrectly housed, and assaulted Lucas after Jail staff failed to respond to any of his three

grievances. Later, the SHERIFF'S DEPARTMENT apologized and admitted that they failed to process Lucas's grievances. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 257 of the Complaint and, therefore, denies the averments.

258.     Multiple court orders in the Southern District similarly reflect that the Jail consistently fails to respond to grievances. In *Goolsby v. County of San Diego*, 2020 WL 1673036, at *6-7 (S.D. Cal. Apr. 26, 2020), the Court found "no evidence in the record" that Jail staff responded to an incarcerated person's grievance, and the person stated under oath that Jail staff never responded to his grievance. *See also Williams v. Gore*, 2017 WL 1354695, at *6 (S.D. Cal. March 24, 2017) (this Court noting that plaintiff stated in sworn testimony that he had not received responses to six separate grievances).

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 258 of the Complaint and, therefore, denies the averments.

259.     Even when Jail staff do respond to grievances, the process fails to result in appropriate resolution. In late 2019 and early 2020, Plaintiff EDWARDS submitted several grievances about his severe sleep apnea and need for a CPAP machine. The Jail's responses failed to address EDWARDS' primary complaint, which was that he had been without a CPAP machine for several months and that his symptoms—including having trouble breathing and headaches—were getting worse. Jail staff responded to one of the grievances

approximately a month after EDWARDS submitted it and well past the SHERIFF'S

DEPARTMENT's one-week deadline to respond. EDWARDS did not receive a CPAP

machine until 2021 and suffered while he waited.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 259 of the Complaint and, therefore, denies the averments.

260.    The SHERIFF'S DEPARTMENT has long been on notice of its deficient

procedures for tracking and responding to grievances, including ADA grievances. In

2017, NCCHC found that the SHERIFF'S DEPARTMENT's records did not include

"any indication" that grievances received an appropriate response.[163] In separate cases in

2016 and 2018, CLERB found that custody staff failed to respond to grievances.[164]

[footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 260 of the Complaint and, therefore, denies the averments.

261.    Of particular note, COUNTY DEFENDANTS' contracts with CONTRACTOR

DEFENDANTS are facially incompatible with the SHERIFF'S DEPARTMENT's stated

grievance policies and procedures. According to the SHERIFF'S DEPARTMENT's

grievance form and policies, Jail staff must respond to a grievance within 7 days of

submission. However, each of COUNTY DEFENDANTS' contracts with

CONTRACTOR DEFENDANTS allow those providers to respond to health care

1    grievances within *10 days* after the Chief Medical Officer informs the provider of the

2    grievance. This deadline delays the SHERIFF'S DEPARTMENT's response to these

3    grievances, if the SHERIFF'S DEPARTMENT responds at all.

4

5    **Answer:**  MAH admits that it and the County of San Diego entered into that certain

6    contract titled "County Contract Number 555204 Agreement with Mid America Health,

7    Inc. for Dental Services" and dated December 30, 2016. MAH further answers that

8    "County Contract Number 555204 Agreement with Mid America Health, Inc. for Dental

9    Services" speaks for itself and any representations to the contrary in Paragraph 261 are

10    expressly denied.  MAH is without sufficient knowledge or information to admit or deny

11    the remaining averments in Paragraph 261 of the Complaint and, therefore, denies those

12    averments.

13

14    262.     The systematic unavailability of the grievance process, including for ADA-

15    related grievances, means that grievances are not a functional means for people with

16    disabilities to request and receive accommodations for their disabilities.

17

18    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

19    averments in Paragraph 262 of the Complaint and, therefore, denies the averments.

20

21    263.     The SHERIFF'S DEPARTMENT and CONTRACTOR DEFENDANTS also

22    lack adequate policies and procedures instructing medical staff and custody staff how to

23    respond if people request accommodations through means other than the grievance

process. The SHERIFF'S DEPARTMENT and CONTRACTOR DEFENDANTS fail to adequately train staff how to provide accommodations through means other than the grievance process. For example, the Jail's policy sets forth no procedure—other than "notifying" health care staff—if custody staff are unable to accommodate a person's disability and accommodation needs. This means that people with disabilities may not receive an accommodation if custody staff are unable to provide it in the first instance. Further, the Jail's policy states that accommodation requests will be "acted upon" within 72 hours, but that appears to mean only that the Jail will provide a response within 72 hours—not that the Jail will actually provide a reasonable accommodation within 72 hours or any other set time frame. The experiences of Plaintiffs and others affirmatively demonstrate that the delays in providing requested accommodations can last weeks or months.

**Answer**: MAH denies the averments in Paragraph 263 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 263 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

**F. People with Disabilities Are Subjected to Dangerous Conditions in the Jail**

264.    By policy and practice, COUNTY DEFENDANTS and CONTRACTOR DEFENDANTS fail to provide people with hearing and speech disabilities with sign language interpreters, hearing aids, or other auxiliary aids for interactions with Jail

1   medical and mental health care staff, despite the grave importance of the interactions.

2   These Defendants fail to adequately train staff to provide people with hearing and speech

3   disabilities with sign language interpreters, hearing aids, or other auxiliary aids for these

4   interactions. These Defendants fail to provide such accommodations despite having

5   knowledge that individuals with disabilities cannot effectively communicate with staff

6   without the accommodations and that the failure to communicate effectively places them

7   at an increased risk that medical or mental health issues will not be diagnosed or will be

8   misdiagnosed.

9

10   **Answer**: MAH denies the averments in Paragraph 264 as alleged against MAH. MAH is

11   without sufficient knowledge or information to admit or deny the averments in Paragraph

12   264 of the Complaint to the extent they apply to the other Defendants, and, therefore,

13   denies those averments.

14

15   265.      For example, Plaintiff LOPEZ is Deaf and uses ASL to communicate. However,

16   Jail staff failed to provide LOPEZ with a sign language interpreter during interactions

17   with nursing and medical staff, despite his requests. Jail staff never provided LOPEZ

18   with an interpreter for routine medical contacts inside the facility. Instead, he had to rely

19   on written notes to understand complex medical issues and advice that the provider was

20   trying to discuss. For the majority of these appointments, LOPEZ did not understand

21   what medical staff tried to communicate to him. Sometimes, health care staff did not

22   write any information down for LOPEZ. He could not read their lips because the majority

23   of interactions occurred while staff wore masks.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 265 of the Complaint and, therefore, denies the averments.

266.     The SHERIFF'S DEPARTMENT endangers incarcerated people with hearing disabilities by failing to institute any system for quickly identifying people with hearing disabilities. Incarcerated people with communication disabilities, like Plaintiff LOPEZ, are not capable of understanding without accommodations and assistive devices, and therefore are less likely to comply with alarms and oral orders from Jail staff. If a fight breaks out in a housing unit, custody staff may order all incarcerated people to get down on the ground or to line up against a wall. For any number of reasons, custody staff may also order a specific person to cease or engage in certain behavior. Without a visual identification system (*e.g.*, vests) or other mechanism by which staff can quickly identify people with communication disabilities, there is an increased risk that staff will not recognize that a person has a hearing disability and will interpret such person's actions as a failure to comply with an order, rather than as a failure to hear and/or understand the order. As a result, people with hearing disabilities are at increased risk that staff will initiate disciplinary proceedings and/or use force for failure to comply with an order that they have not heard. Pursuant to Jail policy, the use of force for failure to comply with an order can include the use of cell extraction, non-lethal firearms, and lethal firearms.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 266 of the Complaint and, therefore, denies the averments.

267.     Upon information and belief, COUNTY DEFENDANTS lack any policy, practice, or system for notifying people with disabilities of emergencies, including alarms, fires, and earthquakes, and evacuating them. Upon information and belief, the SHERIFF'S DEPARTMENT and CONTRACTOR DEFENDANTS fail to adequately train staff how to notify people with disabilities of emergencies and how to evacuate them. Upon information and belief, the Jail facilities do not have visual or tactile alarm systems installed to alert people with disabilities. Because the Jail lacks a system for identifying people with disabilities, including those with hearing disabilities, or notifying people with disabilities of an emergency, these people may not be aware of an emergency, or may need assistance during the emergency, and are therefore at increased risk of injury or death should one occur.

**Answer**: MAH denies the averments in Paragraph 267 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 267 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

268.     Upon information and belief, the SHERIFF'S DEPARTMENT lacks any policies or practices to ensure that people with difficulty walking, including people in wheelchairs, are safely evacuated from the Jail in the event of an emergency. Upon information and belief, the SHERIFF'S DEPARTMENT and CONTRACTOR DEFENDANTS fail to adequately train staff how to ensure that people with mobility

1   disabilities are safely evacuated from the Jail in an emergency. Upon information and

2   belief, the emergency exits in the Jail, to the extent they exist, are not accessible to people

3   in wheelchairs. As a result, people with mobility disabilities are at increased risk of injury

4   or death if an emergency, like a fire or earthquake, were to occur.

5

6   **Answer**: MAH denies the averments in Paragraph 268 as alleged against MAH. MAH is

7   without sufficient knowledge or information to admit or deny the averments in Paragraph

8   268 of the Complaint to the extent they apply to the other Defendants, and, therefore,

9   denies those averments.

10

11   269.       The SHERIFF'S DEPARTMENT endangers incarcerated people with mobility

12   disabilities by failing to institute any system for staff to visually identify people with

13   mobility disabilities. Upon information and belief, the SHERIFF'S DEPARTMENT and

14   CONTRACTOR DEFENDANTS fail to adequately train staff how to visually identify

15   people with mobility disabilities. Upon information and belief, in response to alarms or

16   other incidents in the Jail, custody staff frequently order people to lay down on the

17   ground, face down. Upon information and belief, custody staff are authorized to initiate

18   disciplinary proceedings and/or use force against people who fail to prone out when

19   ordered to do so even when it is physically impossible for them.

20

21   **Answer**: MAH denies the averments in Paragraph 269 as alleged against MAH. MAH is

22   without sufficient knowledge or information to admit or deny the averments in Paragraph

1    269 of the Complaint to the extent they apply to the other Defendants, and, therefore,

2    denies those averments.

3

4    270.    Some people with mobility disabilities, like Plaintiffs NELSON and

5    DUNSMORE, are incapable of complying with an order to lay prone because of their

6    mobility disabilities. Without a system by which staff can identify people with such

7    mobility disabilities, there is an increased risk that custody staff will not recognize that a

8    person has a mobility disability and will interpret such a person's failure to prone out as a

9    failure to comply with an order, rather than an inability to comply with the order. As a

10   result, people with mobility disabilities are at increased risk that staff will initiate

11   disciplinary proceedings and/or use force for failure to comply with an order to prone out

12   with which they cannot comply because of their disability.

13

14   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

15   averments in Paragraph 2701 of the Complaint and, therefore, denies the averments.

16

17   271.    People with disabilities that are not accommodated are susceptible to exploitation.

18   For example, in exchange for help getting to the toilet or shower, obtaining meals, or

19   communicating with Jail staff, people with disabilities may be required to pay their peers

20   or provide a service, potentially leading to increased risk of violence or even sexual

21   assault.

22

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 271 of the Complaint and, therefore, denies the averments.

## IV. COUNTY DEFENDANTS FAIL TO ENSURE ADEQUATE ENVIRONMENTAL HEALTH AND SAFETY CONDITIONS

272.    By policy and practice, COUNTY DEFENDANTS subject incarcerated facilities and depriving individuals of the ability to support basic personal hygiene. Upon information and belief, the SHERIFF'S DEPARTMENT fails to properly train staff how to maintain sanitary facilities and ensure that individuals are not exposed to environmentally unsafe conditions. COUNTY DEFENDANTS have failed to exercise meaningful oversight over the environmental health conditions and practices at the Jail.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 272 of the Complaint and, therefore, denies the averments.

### A. The Jail Is Filthy and Ripe for the Spread of Disease

273.    Overcrowded and unsanitary conditions at the Jail create a substantial risk of transmission of infectious diseases (including COVID-19), bacterial infections, and other serious conditions including scabies and lice. COUNTY DEFENDANTS routinely fail to remove and dispose of trash from housing units, creating a substantial risk of food-borne illness. The below photographs from January and February 2022 at Central show that common areas and cells are riddled with piles of trash, including days-old rotting food:
[photos omitted]

1

2       **Answer**: MAH is without sufficient knowledge or information to admit or deny the

3       averments in Paragraph 273 of the Complaint and, therefore, denies the averments.

4

5       274.        COUNTY DEFENDANTS fail to timely clean human waste and bodily fluids

6               from cells in which people reside. Jail staff place people in cells that have other

7               peoples' feces smeared along the walls and windows, and staff permit filthy cells to

8               remain dirty for long periods of time. The below photo shows a patient with mental

9               disabilities under his bunk in a cell covered in graffiti written in feces. [photo omitted]

10

11      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

12      averments in Paragraph 274 of the Complaint and, therefore, denies the averments.

13

14      275.        COUNTY DEFENDANTS fail to take adequate measures to eradicate vermin and

15              insects from Jail facilities, including housing units where rats can be heard running across

16              the ceilings at night. Ceiling tiles in Vista's medical unit are stained with rodent urine.

17              The below photos show a cockroach crawling down one of the Jail's walls as well as a

18              dead rat found in a sink in one of Vista's medical examination rooms. [photos omitted]

19

20      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

21      averments in Paragraph 275 of the Complaint and, therefore, denies the averments.

22

276.     Poor ventilation and the accumulation of dirt and mold facilitate the transmission of infectious disease and cause or exacerbate serious respiratory conditions, including asthma. COUNTY DEFENDANTS regularly fail to clean air flow vents, which allows spores and other particulates to spread throughout living facilities. The below photos depict a dirty air vent in an administrative area of the Jail as well as black mold covering a ceiling tile. [photos omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 276 of the Complaint and, therefore, denies the averments.

277.     One person housed in a cell with feces on the walls and who observed black mold growing on hand rails in the showers said that the Jail was the "filthiest place I've ever been." Multiple other incarcerated people have complained about black mold in showers at the Jail. In describing the filthy conditions in the Jail, one staff person reported that "not even dogs in kennels are kept like this." COUNTY DEFENDANTS' failure to keep the Jail clean places incarcerated people at serious risk of harm. For example, in 2021, multiple people developed serious, preventable infections that required hospitalization. Another person returned from surgery that involved the removal of infected tissue and was placed in a cell that he reported was infested with flies and ants, and that had a moldy toilet. A few weeks later, the person again developed infections in the same wound and had to be transported to an outside hospital for additional surgeries.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 277 of the Complaint and, therefore, denies the averments.

278.    Another incarcerated person with incontinence reported that his cell had three feet of trash piled inside of it. Despite the filth in his cell, Jail staff refused to give the person gloves to wear when inserting catheters. On multiple occasions at the Jail, this person developed bacterial infections. When another incarcerated person arrived at his cell at the Jail, it was littered with trash from the people who were housed there before him.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 278 of the Complaint and, therefore, denies the averments.

279.    Overcrowding exacerbates the likelihood that people will fall ill at the Jail from poor environmental conditions. In a separate lawsuit about a lack of COVID-19 protections, numerous incarcerated people testified in January 2022 about their inability to socially distance in full housing units where people can reach out and touch the person sleeping next to them.[165] One person submitted a declaration explaining that custody staff sometimes refuse to provide cleaning supplies to an entire housing unit as discipline because one of the residents "act[ed] up."[166] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 279 of the Complaint and, therefore, denies the averments.

**B. County Defendants Fail to Remedy Dangerous Electrical and Plumbing Hazards**

280.     COUNTY DEFENDANTS do not timely remedy known plumbing and electrical

hazards at the Jail. For example, Plaintiff NELSON was repeatedly shocked when he rested

his arm on the metal table connected to the telephones in his housing unit. If someone else

was talking on another phone and hung it up, a shock would go through the phone and the

metal table and shock other phone users. The shocks caused blister-like sores to form on

NELSON's arm, which became infected.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 280 of the Complaint and, therefore, denies the averments.

281.     Another person incarcerated at George Bailey filed a declaration in the COVID-

19 lawsuit stating that his housing unit had only one working toilet for 32 people. The

person further testified that the urinal had been out of service for months, the showers

were "so backed up [that] when you would stand in them, the water went up your

ankles," and there "were also little worms that would crawl up out of the sink drains."[167]

[footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 281 of the Complaint and, therefore, denies the averments.

282.     COUNTY DEFENDANTS' inadequate laundry and linen exchange practices

mean that people are forced to endure filth and unhygienic conditions that contribute to

dangerous skin conditions and other illness. People who soil their linens are often not provided clean linens for days. For example, one person regularly defecated and/or urinated on himself due to his disabilities and medical issues. Despite his increased need for regular showers and clean clothes, custody staff often denied him access to the shower or to clean clothes, forcing him to sit in his soiled clothes for hours or days at a time.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 282 of the Complaint and, therefore, denies the averments.

## V. COUNTY DEFENDANTS FAIL TO ADEQUATELY ENSURE THAT THE JAIL FACILITIES ARE SAFE AND SECURE FOR INCARCERATED PERSONS

283.     Incarcerated people at the Jail face a substantial risk of serious harm or death from COUNTY DEFENDANTS' inadequate policies and practices for the classification of incarcerated people; protecting people from dangerous drugs in the Jail; and maintaining clean, functioning, and adequate Jail facilities. Upon information and belief, the SHERIFF'S DEPARTMENT fails to properly train staff how to protect people against serious harm or death. COUNTY DEFENDANTS have failed to exercise meaningful oversight of the Jail and to ensure adequate, independent review of all deaths and alleged misconduct in the Jail.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 283 of the Complaint and, therefore, denies the averments.

**A. The Sheriff's Department Fails to Adequately Classify and Assign People to Housing Locations Where They Will be Safe from Violence and Injury**

284.    The SHERIFF'S DEPARTMENT fails to adequately evaluate people for placement in housing locations where they will be safe from injury and violence. By policy and practice, the Jail uses a faulty classification process to assign people to certain Jail facility locations and housing units. This classification process is based on a number of factors including one's criminal charges, gang affiliation, race, and history of violence. These classification procedures are often inappropriate and ineffective, however, and people who are incompatible for various reasons, including a history of assaultive behaviors, are housed together in the Jail. People with disabilities are at increased risk of being the victims of violence from others because of their perceived or actual inability to defend themselves. The SHERIFF'S DEPARTMENT fails to adequately train classification staff how to properly classify and house people to keep them safe.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 284 of the Complaint and, therefore, denies the averments.

285.    This past year, two people were apparently murdered by their cellmates just days after entering the Jail. On August 18, 2021, Richard Lee Salyers was booked into Central on suspicion of contempt of court. The SHERIFF'S DEPARTMENT housed Salyers in a quarantine cell with Steven Young, who had at least one recent conviction for a violent crime. On August 22, 2021, just a few days after the two were each booked into the Jail,

1    Young is alleged to have strangled Salyers to death.[168] The cell in which the alleged

2    murder occurred was covered in urine and feces. [footnote omitted]

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 285 of the Complaint and, therefore, denies the averments.

6

7    286.        A similar alleged murder arising from poor classification decisions happened just

8    a few months later. On December 23, 2021, Dominique McCoy, a 38-year-old resident of

9    San Diego, was booked into the Jail on drug charges. The SHERIFF'S DEPARTMENT

10   housed McCoy in a COVID-19 quarantine cell with John Medina, who had been booked

11   into Jail for three violent charges: child cruelty, cruelty to animals, and assault with a

12   deadly weapon. On December 29, 2021, Medina is alleged to have murdered McCoy.[169]

13   The deaths of Salyers and McCoy are in addition to at least six other incarcerated people

14   who have been killed in the Jail by other incarcerated people in the past decade. [footnote

15   omitted]

16

17   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18   averments in Paragraph 286 of the Complaint and, therefore, denies the averments.

19

20   287.        In 2019, the *San Diego Union-Tribune* reported on 70-year-old Russell Hartsaw,

21   who was gay, had mental illness, and had previously been designated "Keep Separate

22   All"—meant to protect him from other incarcerated people—when housed at the Jail. The

1       SHERIFF'S DEPARTMENT housed Hartsaw with an incarcerated gang member

2       nicknamed "Evil." Hartsaw's cellmate killed him within one day.[170] [footnote omitted]

3

4       **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5       averments in Paragraph 287 of the Complaint and, therefore, denies the averments.

6

7      288.     The SHERIFF'S DEPARTMENT's misclassification of incarcerated people has

8       also led to other serious injuries. For example, in November 2020, the SHERIFF'S

9       DEPARTMENT housed a transgender woman with men, who violently attacked her.

10      According to a lawsuit filed by Kristina Frost, who is transgender, she was arrested and

11      booked into Central in November 2020. Frost repeatedly informed custody staff of her

12      gender and asked not to be housed with men. However, Jail staff classified Frost

13      incorrectly and placed her in a minimally monitored cell with three men. Frost was

14      repeatedly attacked by one of her male cellmates and suffered serious injuries. According

15      to Frost's lawsuit, custody staff failed to adequately monitor the cell and also did not

16      intervene quickly when Frost was attacked.[171] [footnote omitted]

17

18      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

19      averments in Paragraph 288 of the Complaint and, therefore, denies the averments.

20

21      289.     In 2019, Miguel Lucas was attacked by another person in his housing unit and had

22      part of his face bitten off after the SHERIFF'S DEPARTMENT failed to adequately

23      classify the other person. The other person had a serious mental illness and, as a deputy

1    told Lucas, should have been housed in a different unit rather than Lucas's low-security

2    unit.[172] [footnote omitted]

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 289 of the Complaint and, therefore, denies the averments.

6

7    290.        CLERB has also found on multiple occasions that the SHERIFF'S

8    DEPARTMENT misclassified people and placed them at risk of violence. People may be

9    classified to be placed in protective custody based on characteristics that make them more

10    vulnerable to violence. In 2018, CLERB found that a person who should have been

11    placed in protective custody was inappropriately placed in mainline housing. The person

12    alleged that staff placed him in mainline due to a grudge against him, and in mainline, he

13    was attacked by his cellmate.[173] In 2019, CLERB found that Jail staff improperly placed

14    someone classified as protective custody in the law library with other people from

15    general population, which put the person's safety at risk.[174] [footnotes omitted]

16

17    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18    averments in Paragraph 290 of the Complaint and, therefore, denies the averments.

19

20    291.        Overcrowding in Jail facilities increases the risk of violence between

21    incarcerated people who have been misclassified by placing them in closer quarters.

22    Tensions are extremely high due to reduced out-of-cell time and the lack of programs

23    and services during frequent facility-wide lockdowns, which are commonplace even

absent COVID-19 surges. Although COUNTY DEFENDANTS have reduced the
population in the Jail in response to the pandemic, they have also closed one of the
facilities—Facility 8—which condenses the population in the remaining facilities.
Even during the pandemic, Central and George Bailey have held numbers of
incarcerated people that exceed their rated capacities, as the SHERIFF'S
DEPARTMENT continues to lock up people for low-level crimes. For example, on
December 2, 2021, when the Sheriff announced a COVID-19 outbreak at the Jail,
Central held 973 incarcerated people (exceeding its rated capacity of 944) and George
Bailey held 1,469 incarcerated people (exceeding its rated capacity of 1,380).[175] The
following week, George Bailey held over 1,500 incarcerated people. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 291 of the Complaint and, therefore, denies the averments.

**B. The Sheriff's Department Has Failed to Protect People from Fentanyl and
Other Dangerous Contraband in the Jail**

292.      Faced with a deadly overdose crisis in the Jail, the SHERIFF'S DEPARTMENT
has failed to adequately protect incarcerated people from access to dangerous drugs like
fentanyl, a synthetic opioid. The SHERIFF'S DEPARTMENT's policies and practices
for detecting and preventing contraband from entering the Jail are inadequate. The
SHERIFF'S DEPARTMENT fails to adequately train staff how to detect and prevent
contraband from entering the Jail and fails to employ body-worn cameras and sufficient
audiovisual surveillance to reduce contraband in the Jail. The SHERIFF'S

1   DEPARTMENT is deliberately indifferent to the unconstitutional risk of harm

2   incarcerated people face as a result of deadly contraband in the Jail.

3

4   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5   averments in Paragraph 292 of the Complaint and, therefore, denies the averments.

6

7   293.   According to the *San Diego Union-Tribune*, "[i]llegal drug use has exploded in

8   San Diego County jails."[176] In 2018, there were 11 drug overdoses in the Jail.[177]

9   According to the SHERIFF'S DEPARTMENT's data, 204 incarcerated people are

10   suspected to have overdosed on opioids in the Jail during 2021 and required the

11   administration of Naloxone, a spray used to reverse opioid overdoses.[178] That total does

12   not include overdoses from other deadly, dangerous drugs, such as methamphetamine.

13   Since 2019, at least 15 people have died from drug overdoses in the Jail. Many more have

14   been hospitalized, including Plaintiff NORWOOD who was hospitalized in July 2021

15   after a fentanyl overdose at George Bailey. NORWOOD was one of several people to

16   overdose that day—the second mass overdose at George Bailey in a two month period.[179]

17   [footnotes omitted]

18

19   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

20   averments in Paragraph 293 of the Complaint and, therefore, denies the averments.

21

22   294.   Despite this constitutionally unacceptable risk of harm and death, the SHERIFF'S

23   DEPARTMENT has failed to take effective action. The SHERIFF'S DEPARTMENT's

policies and procedures for screening arriving people and Jail staff for contraband are inadequate. Upon information and belief, custody staff bring in contraband to sell. The SHERIFF'S DEPARTMENT admitted that its drug detection system had "limitations" in 2019.[180] Nevertheless, the Undersheriff stated late last year that the SHERIFF'S DEPARTMENT's body scanners remain inadequate to detect contraband carried by incarcerated people and Jail staff alike.[181] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 294 of the Complaint and, therefore, denies the averments.

295.    The SHERIFF'S DEPARTMENT has also failed to adequately train custody staff to timely and properly prevent and respond to deadly overdoses in the Jail, and failed to make Naloxone readily available. For example, in July 2021, CLERB found that a deputy failed to conduct appropriate safety checks on someone who then died from an overdose.[182] Later in 2021, CLERB found that two deputies failed to administer life-saving measures to someone dying of a fentanyl overdose in 2020. The SHERIFF'S DEPARTMENT initially lied about the circumstances of the death, stating that deputies "immediately performed life-saving measures." That was later shown to be false.[183] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 295 of the Complaint and, therefore, denies the averments.

**C. The Sheriff's Department is Ill-Equipped to Handle the Overdose Crisis Inside the Jail**

296.      In July 2021, in the midst of the ongoing overdose crisis, the SHERIFF'S DEPARTMENT published a video in which it claimed that a deputy had overdosed when handling fentanyl while making an arrest, even though the deputy did not ingest any fentanyl. Shortly after the video was published, numerous experts pointed out that a person cannot overdose from fentanyl through skin contact or exposure, and that overdosing can occur only through actually ingesting the drug. Later, it was revealed that the deputy who allegedly overdosed never took a toxicology test.[184] This episode engenders little confidence in the SHERIFF'S DEPARTMENT's training, policies, and practices concerning the prevention of overdoses in the Jail.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 296 of the Complaint and, therefore, denies the averments.

**D. County Defendants Fail to Maintain Functioning Safety Features at the Jail**

297.      COUNTY DEFENDANTS' policies and practices for maintaining safe and functioning Jail facilities are inadequate. The SHERIFF'S DEPARTMENT fails to adequately train staff to maintain safe facilities. As a result, important safety features at the Jail are often broken, making the Jail even more dangerous for incarcerated people.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 297 of the Complaint and, therefore, denies the averments.

298.     Video camera coverage in detention facilities helps keep people safe by enabling custody staff to monitor all areas of the Jail, and quickly respond to dangerous situations such as fights and rapes. Video footage also helps provide staff with a clear record of incidents in the Jail, which better enables the SHERIFF'S DEPARTMENT to improve policies and practices in response, to provide training when necessary, and to hold staff and incarcerated people accountable for misconduct. For this reason, video surveillance—both via stationary cameras and through body-worn cameras that pick up sound and capture tight spaces—has become commonplace in jails and prisons across the county.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 298 of the Complaint and, therefore, denies the averments.

299.     COUNTY DEFENDANTS lack adequate policies and practices for providing comprehensive video coverage in the Jail. Many of the video cameras in the Jail are not functioning. In December 2021, the SHERIFF'S DEPARTMENT admitted that the Jail lacks operable cameras: "Our inability to tell the entire story or to be completely transparent when incidents in the jail occur, is unacceptable.... The cameras throughout the jail system are aging and are not always reliable." (emphasis added).[185] In multiple cases, inadequate video coverage has prevented CLERB from adequately investigating

1     deaths at the Jail, including Lazaro Alvarez's overdose death at George Bailey in

2     November 2020 and Joseph Morton's death by suicide at Vista in May 2020. In Morton's

3     case, for example, CLERB stated that inoperable video cameras prevented it from

4     assessing whether custody staff performed timely safety checks before Morton was found

5     hanging in his cell.[186] [footnotes omitted]

6

7     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

8     averments in Paragraph 299 of the Complaint and, therefore, denies the averments.

9

10    300.     Certain spaces in the Jail are not covered at all by video cameras. People in the

11     Jail are aware of these unmonitored spaces and use them to administer "discipline"

12     against others. For example, one person at Vista reported that after members of a gang

13     discovered his charges, they took him to an area in his dorm housing module in the South

14     building to administer discipline because they knew that specific area was out of camera

15     view. They then beat him, causing injuries. No custody staff members intervened.

16     Another person reported that in 5C at Central, incarcerated people are aware of a cell that

17     lacks camera coverage. That person was attacked in 5C by approximately 5 or 6 people

18     he identified as gang members because they believed that his charges involved another

19     member. No custody staff intervened and the person was only protected from further

20     harm when his cellmate intervened. Upon information and belief, custody staff do not

21     regularly wear body-worn cameras in the Jail. The State Audit Report criticized the

22     Sheriff's Department's deliberate indifference to the inadequacies in its ability to

23     monitor incarcerated people, noting that the San Diego County Grand Jury's 2014 and

1  2017 recommendations to update the Jail's surveillance system have been met with

2  inaction: "we find it concerning that it has not yet replaced the surveillance system, even

3  though its age is a major safety issue."[187] [footnotes omitted]

4

5  **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6  averments in Paragraph 300 of the Complaint and, therefore, denies the averments.

7

8  301.      Jail cells are equipped with one or more emergency call buttons, used to

9  summon help from custody staff. The call buttons are supposed to connect to the deputy

10  control tower in the unit. However, these call buttons often do not work. The

11  SHERIFF'S DEPARTMENT's policies and procedures for maintaining functioning

12  emergency call buttons are inadequate. Upon information and belief, the SHERIFF'S

13  DEPARTMENT fails to adequately train staff how to maintain functioning emergency

14  call buttons in Jail cells and how to respond to them.

15

16  **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17  averments in Paragraph 301 of the Complaint and, therefore, denies the averments.

18

19  302.      For example, Plaintiff DUNSMORE was housed in a medical observation unit

20  during his 2019-2021 incarceration at the Jail. DUNSMORE's cell had three emergency

21  call buttons to summon help from custody staff. One call button was next to the bed,

22  one by the toilet, and one on the wall near a speaker. However, only the call button by

23  the toilet worked, as DUNSMORE discovered when he started to choke at one point.

1    DUNSMORE was unable to breathe and pushed the call buttons by his bed and the

2    wall, but received no response from custody staff. Only once DUNSMORE pushed the

3    call button by the toilet did custody staff respond to render aid.

4

5    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6    averments in Paragraph 302 of the Complaint and, therefore, denies the averments.

7

8    303.    Even when the emergency call buttons do work, custody staff do not respond—

9    whether because they are not in the control tower to receive the call, because there is

10    insufficient staff coverage, or because staff choose to ignore calls for help. DRC found

11    that monitoring panels in the control towers "were at times set to mute."[188] In 2017,

12    CLERB found that custody staff failed to respond to a deceased person's cell for at least

13    10 minutes, even though the deceased person's cellmate pushed the emergency call button

14    in their cell at least four times. In 2021, one person pushed the emergency call button in

15    his cell at Vista while he was being physically attacked by his cellmate. Custody staff

16    failed to respond to the call button and did not assist the person until meal time, by which

17    point he had been bloodied and injured by his cellmate. Custody staff told the man that no

18    deputy was available in the control tower when he pushed the button. In or around

19    September 2021, another person being attacked by his cellmate pushed the emergency call

20    button, but custody staff did not answer. [footnote omitted]

21

22    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

23    averments in Paragraph 303 of the Complaint and, therefore, denies the averments.

304.     The SHERIFF'S DEPARTMENT's policies and practices for maintaining the elevators at the Jail are inadequate. Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff how to maintain elevators at the Jail. Central is a tower facility with 11 floors accessible only via stairs or the elevator. The lack of functioning elevators places incarcerated people—especially the many who have mobility disabilities—at substantial risk of harm in the event that they are injured, and custody and medical staff cannot timely respond to render aid.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 304 of the Complaint and, therefore, denies the averments.

**E. The Sheriff's Department Fails to Provide Timely Welfare Checks and Respond to People in Distress**

305.     By policy and practice, the SHERIFF'S DEPARTMENT fails to conduct timely welfare checks and to adequately respond to incarcerated people in distress. The SHERIFF'S DEPARTMENT does not adequately train custody staff how to prevent and appropriately respond to violence between people or other emergency situations. As a result of a lack of adequate training, staff: do not timely respond to violent incidents at the Jail; allow security lapses that endanger incarcerated people; fail to appropriately intervene when assaults and security breaches occur; and fail to appropriately monitor the wellbeing of incarcerated people.

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 305 of the Complaint and, therefore, denies the averments.

3

4    306.    By policy and practice, custody staff at the Jail fail to conduct timely and adequate

5    welfare checks. When investigating deaths at the Jail, CLERB has on several occasions

6    found that custody failed to conduct proper welfare checks. For example, in 2017, CLERB

7    found that a deputy committed misconduct when he lied about conducting a count of

8    people. One person had committed suicide, and the deputy could have responded to render

9    aid earlier had he done his job.[189] In 2019, CLERB found that deputies failed to obtain a

10   verbal or physical acknowledgment of life from a person later found dead.[190] In 2020,

11   another deputy failed to confirm signs of life from all three people in a cell. When the cell

12   was opened in the morning for medication distribution, Blake Wilson was discovered in

13   the cell, dead from an overdose.[191] The DRC Experts documented a similar incident in

14   which two deputies completed welfare checks of 40 cells in just 17 seconds—far too

15   quickly to meaningfully assess the welfare of all people in each of those cells. One of the

16   deputies did not look into any cells after the first.[192] In 2022, the State Audit Report

17   documented "multiple instances in which staff spent no more than one second glancing

18   into the individuals' cells, sometimes without breaking stride," and that when staff

19   checked more closely, "some of these individuals showed signs of having been dead for

20   several hours."[193] The State Audit Report stated that the Sheriff's Department lacks any

21   formal policy for confirming that custody staff actually complete checks.[194] [footnotes

22   omitted]

23

1   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2   averments in Paragraph 306 of the Complaint and, therefore, denies the averments.

3

4   307.      By policy and practice, custody staff fail to adequately respond and intervene to

5   provide lifesaving measures when incarcerated people are in distress. The SHERIFF'S

6   DEPARTMENT fails to adequately train custody staff to intervene and provide aid when

7   people are in distress.

8

9   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

10   averments in Paragraph 307 of the Complaint and, therefore, denies the averments.

11

12   308.      For example, in May 2019, Tanya Suarez—a 23-year-old student at San Diego

13   State University—was booked into Las Colinas. Suarez was under the influence of

14   methamphetamine and was experiencing psychotic delusions.

15

16   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17   averments in Paragraph 308 of the Complaint and, therefore, denies the averments.

18

19   309.      Although Suarez was placed in a safety cell, custody staff restrained her, cut

20   her acrylic nails after she attempted to gouge out one of her eyes, and placed her

21   naked into a safety cell. According to Suarez's civil lawsuit, surveillance video from

22   the Jail shows that on rounds, a deputy went to the window of Suarez's safety cell.

23   That deputy used her personal cell phone to record video of Suarez, who was naked

1    and gesturing toward her eyes. That deputy walked away without intervening. A few

2    minutes later, another deputy came to the cell window and saw that Suarez was

3    attempting to remove her right eyeball. The deputy did not intervene, even after

4    watching Suarez in fact remove her right eyeball. Then, the deputy walked away and

5    returned with other deputies a full two minutes later, by which time Suarez had

6    removed her other eye. If deputies been properly trained to intervene, staff could have

7    stopped Suarez from harming herself. Instead, Suarez is now permanently blind.[195]

8    [footnotes omitted]

9

10    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

11    averments in Paragraph 309 of the Complaint and, therefore, denies the averments.

12

13    310.    These problems persist. In December 2021, CLERB found that two deputies

14    failed to render emergency aid to Lazaro Alvarez, who suffered a heart attack from

15    fentanyl and methamphetamine intoxication at the Jail in November 2020. Although

16    deputies responded to Alvarez, one deputy started and then quickly stopped chest

17    compressions, and a second deputy provided no aid. Nor was the first deputy carrying

18    Naloxone. CLERB's findings contradict the SHERIFF'S DEPARTMENT's initial report,

19    which was that deputies "immediately" performed life-saving measures.[197] In January

20    2022, CLERB found that deputies failed to summon medical attention for Anthony Chon,

21    who complained of shortness of breath at the Jail in October 2020. Instead of obtaining

22    medical help, a deputy brought Chon to the recreation area, where he collapsed and died

23    of a pulmonary embolism.[198] The State Auditor found that in almost a third of the deaths

1    it reviewed, "issues with the response time of sworn staff or medical staff may have

2    resulted in unnecessary delays in performing lifesaving measures."[199] [footnotes omitted]

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 310 of the Complaint and, therefore, denies the averments.

6

7    **F. The Sheriff's Department Fails to Prevent and Address Misconduct by Custody**
8    **Staff**

9

10   311.    By policy and practice, the SHERIFF'S DEPARTMENT fails to prevent and

11   address misconduct against incarcerated people by custody staff. The SHERIFF'S

12   DEPARTMENT does not adequately train custody staff how to prevent and address

13   misconduct in its ranks. As a result, custody staff regularly commit misconduct that

14   directly harms incarcerated people.

15

16   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17   averments in Paragraph 311 of the Complaint and, therefore, denies the averments.

18

19   312.    This misconduct can take the form of lockdowns or other tactics that  deprive

20   incarcerated people of programs and privileges. For example, custody staff punish people,

21   including people with mental health disabilities, without following any formal discipline

22   system, by refusing to provide meals, refusing to let them out for showers, refusing to

23   take them out to court, or denying professional visits. In practice, this is often performed

24   pursuant to an unofficial but widely used system called "bypass," under which a person is

1   essentially placed on individualized lockdown, and denied access to out-of-cell time. The

2   person's cellmate is removed and the person's cell door is not opened for access to

3   programs or dayroom. The bypass system is not memorialized in any written policy but is

4   a longtime practice administered by some custody staff. A person can be placed on

5   bypass for months.

6

7   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

8   averments in Paragraph 312 of the Complaint and, therefore, denies the averments.

9

10   313.      Staff misconduct takes the form of violence against incarcerated people. For

11   example, in 2018, Oscar Leal died at the Jail after custody staff used restraints on Leal, in

12   a death ruled a homicide by the medical examiner.[200] That same year, Earl McNeil died at

13   Central after a deputy covered McNeil's mouth with a shirt, even though he was already

14   restrained in a WRAP device, with a spit sock over his head. This compromised McNeil's

15   respiratory functions and contributed to his death.[201] CLERB found that the deputy used

16   excessive force. CLERB also found that a deputy used excessive force when he used a

17   flashlight to strike an incarcerated person in the head while that person was restrained by

18   five other deputies. Upon information and belief, the custody staff involved were not

19   disciplined. [footnotes omitted]

20

21   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

22   averments in Paragraph 313 of the Complaint and, therefore, denies the averments.

23

314.      Custody staff discriminate against incarcerated people with mental illness by emotionally, verbally, and/or physically abusing them. In 2021, in a mental health unit, a custody staff member slammed the food tray slot on a man's hands and trapped his hands in the slot for a significant period of time. Another person with mental health needs reported that in 2021 a deputy tried to slam his arm in the food tray slot. When the person wrote a grievance, the deputy falsely wrote him up for a disciplinary infraction. In or around August 2021, a deputy told an incarcerated veteran with PTSD that he would have to "get over" his PTSD like everybody else on the outside.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 314 of the Complaint and, therefore, denies the averments.

315.      Custody staff also create situations that increase the likelihood that they will use force against incarcerated people. For example, custody staff sometimes "pop" the cell doors of people who are violent and actively psychotic when they are speaking with mental health staff. In January 2022, a deputy opened the cell door of a person who was acting aggressively and erratically during a mental health episode, and the deputy ended up using a Taser against that person and leaving him bloodied. Custody staff's actions and inactions increase the likelihood that they will have to intervene and use force against people with mental health disabilities.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 315 of the Complaint and, therefore, denies the averments.

316.     COUNTY DEFENDANTS have been repeatedly informed about the above and other consequences of their failure to adequately train, supervise, and discipline custody staff, including through lawsuits, grievances, and CLERB findings, but are deliberately indifferent and have failed to take effective action to prevent and address misconduct, including through holding custody staff accountable via progressive discipline.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 316 of the Complaint and, therefore, denies the averments.

**G. The County Has Failed to Ensure Adequate Independent Oversight of the Jails**

317.     Despite the well-documented deaths and conditions in the Jail, COUNTY DEFENDANTS have failed for years to take effective action to address the inadequate policies, procedures, practices, and lack of training and supervision that make the Jail so dangerous. These failures stem at least in part from the COUNTY's failure to ensure meaningful, independent oversight of the SHERIFF'S DEPARTMENT and its staff.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 317 of the Complaint and, therefore, denies the averments.

318.     CLERB is the outside agency that the COUNTY has tasked with investigating allegations of misconduct by custody staff and all deaths in the Jails. However, the COUNTY has failed to provide CLERB with adequate resources and authority to do its

job. A judge of this Court has already found that although the County "has established a board to investigate the widely known problem of in-custody deaths, it has also failed to enable the board to carry out its stated responsibilities."[202] The COUNTY has systematically understaffed CLERB and prevented it from carrying out its responsibilities. The State Audit Report found that CLERB's investigations have not been "independent, thorough, or timely,"[203] and that in the last 15 years, CLERB has failed to investigate 57 in-custody deaths.[204] CLERB has never inspected the Jail in its nearly three decades in existence. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 318 of the Complaint and, therefore, denies the averments.

319.        Despite its best efforts to investigate deaths, CLERB lacks authority to investigate the conduct of Jail medical staff and lacks the ability to review a deceased person's entire medical records. CLERB cannot interview any Jail medical staff, and custody staff can choose to refuse to meet with CLERB. Instead, CLERB interviews custody staff through written questionnaires. Investigators from CLERB do not themselves visit the scenes of deaths at the Jail, and instead must rely on evidence from the SHERIFF'S DEPARTMENT. By the time it receives any such evidence, witnesses may be unavailable. CLERB sought to expand its oversight to address many of these deficits in October 2021, but to date COUNTY DEFENDANTS have failed to implement these critically needed improvements.[205] These restrictions on CLERB's authority and power prevent the agency from meaningfully investigating misconduct at the Jail and deprive

1    CLERB of the ability to formulate meaningful findings and recommendations to hold the

2    SHERIFF'S DEPARTMENT accountable. Indeed, the State Audit Report found that

3    CLERB's reports to the Board of Supervisors "do not include any significant discussion

4    or analysis that might point to deficiencies in the Sheriff's Department policies or

5    practices."[206] The need for effective, independent oversight is clear, as the State Audit

6    Report also found that the SHERIFF'S DEPARTMENT's internal investigations and

7    reports on deaths "have been insufficient and have lacked transparency."[207] [footnotes

8    omitted]

9

10    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

11    averments in Paragraph 319 of the Complaint and, therefore, denies the averments.

12
13    **VI. DEFENDANTS FAIL TO PROVIDE ADEQUATE DENTAL CARE TO**
14    **INCARCERATED PEOPLE**
15

16    320.    COUNTY DEFENDANTS and MID-AMERICA have a policy and practice of

17    failing to provide adequate dental care to people incarcerated in the Jail. COUNTY

18    DEFENDANTS and MID-AMERICA are deliberately indifferent to the dental care needs

19    of incarcerated people, and place them at a substantial risk of unnecessary suffering,

20    serious injury, and clinical deterioration. People incarcerated in the Jail are entirely

21    dependent on COUNTY DEFENDANTS and MID-AMERICA for all dental care.

22

23    **Answer**: MAH denies the averments in Paragraph 320 as alleged against MAH. MAH is

24    without sufficient knowledge or information to admit or deny the averments in Paragraph

1    320 of the Complaint to the extent they apply to the other Defendants, and, therefore,

2    denies those averments.

3

4    321.        Pursuant to a contract between COUNTY DEFENDANTS and MID-AMERICA,

5    dental care in the Jail is provided by the SHERIFF'S DEPARTMENT's medical staff and

6    by MID-AMERICA staff. Under that contract, the SHERIFF'S DEPARTMENT

7    schedules all on-site dental services, which are provided in clinics at the Jail facilities.

8    Although MID-AMERICA may refer patients for off-site dental services, such as oral

9    surgery, the SHERIFF'S DEPARTMENT exercises final authority over those referrals.

10   Dental professionals from MID-AMERICA provide on-site and off-site dental services.

11   According to the contract, services that MID-AMERICA must provide include oral exams,

12   treatment planning, temporary restorative procedures, extractions, medications, and

13   emergency care. MID-AMERICA must also provide sufficient dental staff including

14   dentists and dental technicians necessary to cover the dental clinics at the Jail, which are

15   eight-hour clinics occurring once a month at East Mesa, twice a month at Central, three

16   times a month at Vista, weekly at Las Colinas, and twice-weekly at George Bailey.

17

18   **Answer:**  MAH admits that it and the County of San Diego entered into that certain

19   contract titled "County Contract Number 555204 Agreement with Mid America Health,

20   Inc. for Dental Services" and dated December 30, 2016. MAH further answers that

21   "County Contract Number 555204 Agreement with Mid America Health, Inc. for Dental

22   Services" speaks for itself and any representations to the contrary in Paragraph 321 are

expressly denied.  MAH denies the remaining averments in Paragraph 321 of the Complaint.

322.     COUNTY DEFENDANTS and MID-AMERICA maintain insufficient numbers of dental professionals to provide minimally adequate care to the more than 4,000 incarcerated people in the Jail. There are insufficient dental staff to timely respond to requests for dental evaluations and treatment; to adequately screen, monitor, and provide follow-up care to people with serious dental conditions; and to treat people on an emergency basis. The SHERIFF'S DEPARTMENT and MID-AMERICA fail to adequately train and supervise their staff to ensure that dental care is provided on a timely basis. The SHERIFF'S DEPARTMENT fails to schedule a sufficient number of dental clinics to timely serve all people requiring dental care. If a person at Central, for example, is not scheduled for a given dental clinic, they will have to wait at least two weeks until another dental clinic is held at the Jail. NCCHC found that people may wait as long as two months for dental care from the time an appointment is made.[208] Upon information and belief, people continue to have to wait as long as two months from an appointment to receive dental care. The contract between the SHERIFF'S DEPARTMENT and MID-AMERICA includes no minimum timeline for a person to be seen after submitting a request for dental care. In addition, per Jail policy, people requesting dental care are often first seen or triaged by undefined "health staff"—not a dentist—who are not capable of evaluating a person's dental needs. [footnote omitted]

1   **Answer:**  MAH admits that it and the County of San Diego entered into that certain

2   contract titled "County Contract Number 555204 Agreement with Mid America Health,

3   Inc. for Dental Services" and dated December 30, 2016. MAH further answers that

4   "County Contract Number 555204 Agreement with Mid America Health, Inc. for Dental

5   Services" speaks for itself and any representations to the contrary in Paragraph 322 are

6   expressly denied. Likewise, MAH answers that the NCCHC Report speaks for itself and

7   any representations to the contrary in Paragraph 322 are expressly denied.  MAH denies

8   that it fails to adequately train and supervise its staff. MAH states that the Paragraph 322

9   is otherwise unclear and vague and that MAH is without sufficient knowledge or

10   information to admit or deny the remaining averments in Paragraph 322 of the Complaint

11   and, therefore, denies those averments.

12

13   323.       For example, Plaintiff ZOERNER began to notice severe pain in her mouth shortly

14   after she was booked into Las Colinas in early May 2021. ZOERNER had been living on

15   the streets and drinking heavily due to her alcoholism, and she did not notice the pain in

16   her teeth until she was incarcerated and sober. The pain became so excruciating that

17   ZOERNER could not sleep. Beginning on or around May 20, 2021 ZOERNER submitted

18   several sick call requests and grievances with crying faces to describe the severe pain.

19   ZOERNER was scheduled to see the dentist on May 25, 2021 but the appointment was

20   rescheduled without explanation. On June 7, 2021, ZOERNER told a nurse that "I'm tired

21   of [you] telling me that I'm scheduled for Dental but it didn't happen. Tylenol or Motrin

22   doesn't help for the pain." Only then was ZOERNER designated "must see" for dental

23   sick call. On June 8, 2021, the dentist diagnosed ZOERNER with an abscessed tooth and

removed it. However, the multi-week delay in treating the abscess likely contributed to the development of osteomyelitis, or inflammation of the jaw. ZOERNER's pain soon returned and the area where her tooth was extracted became swollen. The pain and neglect ZOERNER had experienced affected her mental health and she became depressed. On or around June 12, 2021, ZOERNER began to feel as if she would rather die than live with such excruciating pain, and felt that she would only get attention for her serious medical and dental needs by taking extreme actions. ZOERNER went "man down" in the dayroom in order to obtain dental care, but was told that the dentist was out. ZOERNER then reported feeling suicidal and was transferred to a safety cell and then an EOH cell. Days later, ZOERNER was finally seen by a dentist, who ordered that she immediately be transported to Tri-City Hospital for an operation to address the osteomyelitis in her jaw.

**Answer:** MAH admits that on June 8, 2021, Plaintiff Zoerner consented to a tooth extraction which was then performed. MAH is without sufficient knowledge or information to admit or deny the remaining averments in Paragraph 323 of the Complaint and, therefore, denies those averments.

324.     The SHERIFF'S DEPARTMENT and MID-AMERICA HEALTH fail to provide minimally adequate dental treatment to incarcerated people. Dental care and treatment available for people incarcerated in the Jail is almost exclusively limited to extracting teeth, even if a much less invasive procedure is medically appropriate. Rarely are other treatments provided, despite incarcerated people's requests for services such as fillings and root canals, rather than extraction. In 2017, NCCHC found in that the "dentist

completes extractions and provides fillings, albeit rarely."[209] Upon information and

belief, the SHERIFF'S DEPARTMENT's and MID-AMERICA's dental care regimen

continues to consist almost exclusively of extractions, even though the contract between

MID-AMERICA and COUNTY DEFENDANTS provides that services at the Jail must

include "temporary restorative procedures" and other emergency treatment outside of

extractions. The contract between MID-AMERICA and COUNTY DEFENDANTS does

not explicitly include routine fillings among the services that MID-AMERICA will

provide. Nor does the Jail's dental services policy provide any description of the routine

dental care provided; instead, it focuses almost exclusively on emergency care.

Incarcerated people face the terrible dilemma of keeping a tooth and suffering pain, or

ending the pain and losing a tooth that otherwise could be saved. [footnote omitted]

Extractions of teeth that could be salvaged are so common that many incarcerated people

with dental pain will not visit the dentist because they know they will lose their teeth,

regardless of the underlying problem.

**Answer:**  MAH admits that it and the County of San Diego entered into that certain

contract titled "County Contract Number 555204 Agreement with Mid America Health,

Inc. for Dental Services" and dated December 30, 2016. MAH further answers that

"County Contract Number 555204 Agreement with Mid America Health, Inc. for Dental

Services" speaks for itself and any representations to the contrary in Paragraph 324 are

expressly denied.  Likewise, MAH answers that the NCCHC Report speaks for itself and

any representations to the contrary in Paragraph 324 are expressly denied.  MAH denies

that it fails to provide adequate dental treatment to incarcerated people. MAH states that

1    Paragraph 324 is otherwise unclear and vague and that MAH is without sufficient

2    knowledge or information to admit or deny the remaining averments in Paragraph 324 of

3    the Complaint and, therefore, denies those averments.

4

5    325.    For example, Plaintiff NORWOOD began to experience significant tooth pain in

6    or around October 12, 2021. NORWOOD submitted two to three sick call requests, and

7    was told he was "scheduled" to see the dentist, but he did not see the dentist for over a

8    month. When NORWOOD finally saw the dentist, in late November 2021, the dentist

9    informed him that he needed a root canal—but that the only treatment the Jail dentist

10   could provide was to pull his teeth. Though he initially declined this procedure, within

11   two weeks the pain in NORWOOD's tooth became unbearable and he again requested to

12   see the dentist in or around early December 2021. After waiting a full month,

13   NORWOOD was finally able to see the dentist and have his tooth pulled in early January.

14   NORWOOD likely could have kept his tooth had the Jail provided him with adequate

15   dental care. NORWOOD was unable to identify the dentist because the dentist, like many

16   medical staff members, was wearing his name badge backwards so that incarcerated

17   people could not identify him.

18

19   **Answer:** MAH admits that on January 6, 2022, a tooth extraction was performed on

20   Plaintiff Norwood.  MAH is without sufficient knowledge or information to admit or

21   deny the remaining averments in Paragraph 325 of the Complaint and, therefore, denies

22   those averments.

23

1    326.        In November 2020, Plaintiff EDWARDS saw the dentist at the Jail for pain in his

2          right molar. The only treatment the dentist offered was an extraction, and EDWARDS

3          had the tooth removed a few days later. In or around September 2021, EDWARDS

4          developed severe pain in his lower left molar, and decided not to seek care from the

5          dentist because he does not want to lose another tooth to extraction. As a result,

6          EDWARDS must manage the pain in his lower left molar until he is out of Jail custody.

7

8          **Answer:** MAH admits that on November 4, 2020, Plaintiff Edwards submitted a medical

9          request complaining of, and was seen for, dental pain.  MAH admits that on November

10         23, 2020, Plaintiff Edwards consented to a tooth extraction which was then performed.

11         MAH is without sufficient knowledge or information to admit or deny the remaining

12         averments in Paragraph 326 of the Complaint and, therefore, denies those averments.

13

14    327.        The SHERIFF'S DEPARTMENT's and MID-AMERICA's policies and

15         procedures for preventive dental care are inadequate. Upon information and belief, the

16         SHERIFF'S DEPARTMENT and MID-AMERICA fail to adequately train staff how to

17         provide preventive dental care to incarcerated people. As a result, incarcerated people at

18         the Jail do not receive preventive dental services. According to the contract between the

19         parties, MID-AMERICA shall also provide "preventive dental services" to "long-term

20         prisoners," defined as people incarcerated for more than 18 months in the Jail. However,

21         MID-AMERICA may only provide those preventive services if the person requests them.

22         In addition, the preventive services are "subject to referral and utilization management" by

23         the SHERIFF'S DEPARTMENT. The NCCHC Report found that incarcerated people are

not informed about oral hygiene, preventive oral education, or dental services during the booking process.[210] NCCHC recommended that the SHERIFF'S DEPARTMENT ensure that people incarcerated in the Jail on a long-term basis receive dental care by affirmatively scheduling those people for a dental evaluation.[211] Upon information and belief, the SHERIFF'S DEPARTMENT and MID-AMERICA do not affirmatively schedule people for preventive dental care or regular examinations. The SHERIFF'S DEPARTMENT and MID-AMERICA do not tell people that they can request preventive care nor, upon information and belief, does the SHERIFF'S DEPARTMENT approve preventive dental services for people who do request preventive dental care. [footnotes omitted]

**Answer:**  MAH admits that it and the County of San Diego entered into that certain contract titled "County Contract Number 555204 Agreement with Mid America Health, Inc. for Dental Services" and dated December 30, 2016. MAH further answers that "County Contract Number 555204 Agreement with Mid America Health, Inc. for Dental Services," speaks for itself, as do any quotations of it, and any representations to the contrary in Paragraph 327 are expressly denied.  Likewise, MAH answers that the NCCHC Report speaks for itself and any representations to the contrary in Paragraph 327 are expressly denied.  MAH denies that its policies and procedures for preventive dental care are inadequate, that it fails to adequately train staff how to provide preventive dental care to incarcerated people, and that as a result incarcerated people at the Jail do not receive preventive dental services. MAH states that Paragraph 327 is otherwise unclear and vague and that MAH is without sufficient knowledge or information to admit or deny

1    the remaining averments in Paragraph 327 of the Complaint and, therefore, denies those

2    averments.

3

4    328.    For example, Plaintiff LEVY was incarcerated at the Jail for more than three

5    years, but did not receive any preventive dental care or regular cleanings. Plaintiff

6    EDWARDS has been incarcerated at the Jail for over two and a half years, but has never

7    received a regular dental examination, dental cleaning, or treatment options other than

8    extraction. EDWARDS requested a dental cleaning, but Jail staff failed to timely respond

9    to his request and EDWARDS remains waiting for a dental cleaning. Plaintiff

10   ARCHULETA has been at the Jail for over two and a half years, and has never been

11   offered a cleaning or routine dental examination.

12

13   **Answer:** MAH answers that on at least two occasions Plaintiff Levy refused to attend

14   scheduled dental appointments. MAH further answers that on November 30, 2021,

15   Plaintiff Levy attended a scheduled dental appointment. MAH admits that on November

16   4, 2020, Plaintiff Edwards submitted a medical request complaining of, and was seen for,

17   dental pain. MAH admits that on November 23, 2020, Plaintiff Edwards consented to a

18   tooth extraction which was then performed. MAH is without sufficient knowledge or

19   information to admit or deny the remaining averments in Paragraph 328 of the Complaint

20   and, therefore, denies those averments.

21

22   329.    The SHERIFF'S DEPARTMENT's and MID-AMERICA's policies, procedures,

23   and practices place incarcerated people at risk of serious harm, as serious dental problems

1    may go unnoticed and cause incarcerated people to suffer severe pain, loss of their teeth,

2    or long-term damage to their dental health.

3

4    **Answer**: MAH denies the averments in Paragraph 329 as alleged against MAH.

5    MAH is without sufficient knowledge or information to admit or deny the averments

6    in Paragraph 329 of the Complaint to the extent they apply to the Sheriff's

7    Department, and, therefore, denies those averments.

8

9    **VII. COUNTY DEFENDANTS OVERINCARCERATE PEOPLE IN THE**
10   **JAIL, PARTICULARLY PEOPLE WITH DISABILITIES, BY DENYING**
11   **THEM ACCESS TO COMMUNITY-BASED SERVICES FOR WHICH**
12   **THEY WOULD BE ELIGIBLE AND CAN SUCCESSFULLY**
13   **PARTICIPATE**

14

15   330.     As alleged above, the unconstitutional and discriminatory conditions in the Jail

16   harm or threaten to harm thousands of incarcerated people each year. Yet COUNTY

17   DEFENDANTS have created a cycle of reincarceration and overincarceration that

18   exacerbates the problems in the Jail and exposes more people than necessary to the harms

19   within the Jail walls. COUNTY DEFENDANTS fail to provide adequate alternatives to

20   incarceration and adequate re-entry programming and assistance for people who are

21   incarcerated in the Jail. This failure contributes to many people being repeatedly

22   reincarcerated in the Jail. Plaintiffs NORWOOD and ZOERNER each have been

23   incarcerated at the Jail more than 10 times over the last decade. Each incarceration

24   disrupts a person's access to services, employment, and stable housing. In particular,

25   COUNTY DEFENDANTS overincarcerate people with disabilities, often on minor

26   charges that are disability-related. This practice violates the ADA's integration mandate

and deepens the crisis of inadequate treatment and dangerous conditions inside the Jail facilities.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 330 of the Complaint and, therefore, denies the averments.

**A. County Defendants' Incarceration Practices Disproportionately Harm People with Disabilities, the Homeless, and People of Color**

331.     The ADA and the Rehabilitation Act prohibit all forms of discrimination against people with disabilities. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act includes similar protections. *See* 29 U.S.C. § 794(a). Implementing regulations for both the ADA and the Rehabilitation Act prohibit public entities from utilizing "methods of administration" that "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or that "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b(3). Implementing regulations further require the Jail to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d); *see also* 45 C.F.R. 84.4(b)(2).

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 331 of the Complaint and, therefore, denies the averments.

3

4    332.    In enacting the ADA, Congress found that "historically, society has tended to

5    isolate and segregate individuals with disabilities, and, despite some improvements, such

6    forms of discrimination against individuals with disabilities continue to be a serious and

7    pervasive social problem[.]" 42 U.S.C. § 12101(a)(2). "[I]ndividuals with disabilities

8    continually encounter various forms of discrimination, including ..., segregation, and

9    relegation to lesser services, programs, activities, benefits, jobs or other opportunities[.]"

10    42 U.S.C. § 12101(a)(5). According to Congress, "the Nation's proper goals regarding

11    individuals with disabilities are to assure equality of opportunity, full participation,

12    independent living, and economic self-sufficiency for such individuals." 42 U.S.C. §

13    12101(a)(7).

14

15    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16    averments in Paragraph 332 of the Complaint and, therefore, denies the averments.

17

18    333.    COUNTY DEFENDANTS' failure to provide people with disabilities adequate

19    community-based alternatives to incarceration results in discrimination that violates the

20    ADA, Rehabilitation Act, and California law, as COUNTY DEFENDANTS' failed

21    policies and practices lead to the repeated incarceration in the Jail of people with

22    disabilities, including mental health disabilities.

23

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 333 of the Complaint and, therefore, denies the averments.

334.     Providing community-based alternatives to incarceration in the Jail is appropriate and necessary. In 2019, the SHERIFF'S DEPARTMENT admitted that the Jail is the largest mental health service provider in San Diego County.[212] DRC observed that the 62 PSU beds at Central and Las Colinas make the Jail the County's largest provider of inpatient psychiatric services.[213] In October 2021, County Supervisor Terra Lawson-Remer stated that the Jail is currently used "as a first line response to issues like homelessness, poverty, substance use, and mental health."[214] The COUNTY is well aware that its overincarceration of low-income persons with disabilities in need of community services creates its own cycle of additional incarcerations. In an October 2021 legislative proposal, Supervisor Lawson-Remer acknowledged that even a day or two in jail "can result in more, not less, future contact with the criminal justice system."[215] According to Supervisor Lawson-Remer, the COUNTY suffers from an "unknown" gap in substance abuse services.[216] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 334 of the Complaint and, therefore, denies the averments.

335.     Supervisor Lawson-Remer's proposal, which was approved by the Board of Supervisors, also acknowledged that "[m]ass incarceration disproportionately impacts the poor, homeless, mentally ill and people of color and does not make us safer."[217] This is

especially true in San Diego County where almost 35% of incarcerated people in the Jail receive psychotropic medication.[218] 21% of people incarcerated at the Jail are Black, whereas only 5% of County residents are Black. Moreover, the State Audit Report found that between 2018–2020, Black individuals in the Jail died at a disproportionately high rate.[219] 43% of people incarcerated at the Jail are Latinx, whereas only 34% of County residents are Latinx.[220] Supervisor Lawson-Remer recently stated that overincarceration is "completely inappropriate; it is ineffective; it doesn't help individuals have a second chance and build a better future."[221] Yet COUNTY DEFENDANTS continue to overincarcerate individuals with mental health disabilities, people experiencing homelessness, and people of color rather than fund and make available alternatives to incarceration. Even during the COVID-19 pandemic, COUNTY DEFENDANTS are incarcerating people for minor, non-violent charges such as disturbing the peace and illegal lodging.[222] [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 335 of the Complaint and, therefore, denies the averments.

336.     COUNTY DEFENDANTS' overreliance on incarceration, especially of people with mental health disabilities, has received widespread criticism. In 2016, the San Diego County Grand Jury recommended that the COUNTY increase spending on community-based mental health services.[223] The DRC Report criticized COUNTY DEFENDANTS' "dangerous, costly, and counter-productive over-incarceration of people with mental health-related disabilities."[224] The DRC Report recommended that COUNTY

1    DEFENDANTS (1) ensure that the County's mental health system supports people with

2    mental illness and prevents them from entering the criminal justice system; (2) when

3    people with mental illness come into contact with law enforcement, ensure that those

4    people are diverted away from the Jail and toward mental health services; and (3) ensure

5    continuity of care and access to services once people with mental illness are released from

6    Jail, if incarceration is necessary, so that they can successfully reenter their communities.[225]

7    These recommendations have not been implemented, and the SHERIFF'S

8    DEPARTMENT's internal documents indicate that "no action [is] needed" on these

9    recommendations. In the interim, in 2021, the *San Diego Union-Tribune* reported on

10   Steven Olson, one County resident with mental illness who was booked into the Jail 188

11   times over the course of his life.[226] Last year, Olson died in a confrontation with police,

12   having cycled in and out of the Jail—his condition only deteriorating— for years.

13   [footnotes omitted]

14

15   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16   averments in Paragraph 336 of the Complaint and, therefore, denies the averments.

17

18   337.    The deaths and injuries to people with mental illness described throughout this

19   Complaint show how the Jail is not equipped to safely house people with serious mental

20   illness. Yet COUNTY DEFENDANTS' failure to provide sufficient available community-

21   based services means that the Jail is often where people with mental illness end up, to their

22   severe detriment. For example, in June 2020, Spiros Fonseca, a 26-year-old man, attempted

23   to seek evaluation at a mental health facility operated by the COUNTY. However, upon

information and belief, the facility refused to treat Fonseca because he was under the influence of a substance. Two days later, Fonseca was arrested and "expressed to officers that he was being followed."[227] Fonseca was booked into the Jail and not provided any mental health treatment, or placed under observation. Just two days after his incarceration, and four days after he sought community mental health services but was denied, Fonseca hanged himself in the Jail. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 337 of the Complaint and, therefore, denies the averments.

338.    As another example, in 2019, Reginald Harmon, who has serious mental health issues, and who had been in and out of jails and psychiatric hospitals, attacked another incarcerated person in his housing unit at Central. The victim's mother, a licensed mental health clinician, said that Harmon "should never, ever have gone to jail.... He should have gone to a mental health provider."[228] Yet COUNTY DEFENDANTS incarcerated him at the Jail and failed to even house him in a unit with access to a higher level of mental health services. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 338 of the Complaint and, therefore, denies the averments.

339.    COUNTY DEFENDANTS repeatedly and unnecessarily expose people like Olson, Fonseca, Harmon, and Plaintiffs to the Jail's constitutionally inadequate medical and

mental health care systems, to disability discrimination in the Jail, and to an environment that is much more deadly than other jails around the country.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 339 of the Complaint and, therefore, denies the averments.

**B. County Defendants Must Provide Adequate Capacity and Timely Access to Alternatives to Incarceration Programs in the County to Comply with the ADA's Integration Mandate and End Other Forms of Disability-Based Discrimination**

340.     COUNTY DEFENDANTS and the PROBATION DEPARTMENT fail to provide adequate alternatives to incarceration to prevent the unnecessary incarceration of people with disabilities, including mental health disabilities. For pre-trial detainees, COUNTY DEFENDANTS fail to provide adequate alternatives to pre-trial custody in the Jail. For persons serving sentences in the Jail, COUNTY DEFENDANTS and the PROBATION DEPARTMENT fail to provide adequate out-of-custody programs through which they can serve their sentences, due to lack of capacity and other systemic deficiencies. The COUNTY's Community Corrections Partnership Plan has recognized the need to expand and "[e]nhance prevention, diversion and alternatives to custody" to limit the use of Jail for only the most serious offenders.[229] Although COUNTY DEFENDANTS and the PROBATION DEPARTMENT currently maintain some alternatives to incarceration programs, they are insufficient in size, scope, and funding, and must be expanded so that people with disabilities who can be effectively and appropriately diverted from the Jail are able to participate. The current deficiencies in these programs, including insufficient capacity, mean that COUNTY DEFENDANTS and the PROBATION DEPARTMENT

1    are essentially rationing services, particularly those designed to benefit people with

2    mental health and other disabilities, leading to repeated incarcerations. [footnote omitted]

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 340 of the Complaint and, therefore, denies the averments.

6

7    341.        For example, the SHERIFF'S DEPARTMENT maintains a program known as

8    County Parole and Alternative Custody ("CPAC"). CPAC includes a "Home Detention"

9    program available to pretrial detainees. Under Home Detention, a person may reside at

10   their home with a GPS monitor in lieu of confinement at the Jail. When a judge orders a

11   person to be screened for eligibility in Home Detention, the SHERIFF'S

12   DEPARTMENT conducts the eligibility screening and decides whether a person will

13   participate in the program. Upon information and belief, the SHERIFF'S

14   DEPARTMENT uses discriminatory eligibility criteria that unnecessarily limit the

15   people who may receive Home Detention. For example, a "minimum qualification" for

16   participation is a landline telephone, which disqualifies people who are poor, people who

17   only have cell phones, individuals without stable housing, and many others. The

18   SHERIFF'S DEPARTMENT also relies on the Pretrial Release Risk Scale ("PRRS"), a

19   score generated by a predictive screening algorithm, in considering Home Detention

20   eligibility. The SHERIFF'S DEPARTMENT regularly rejects individuals with low

21   PRRS scores from participating in Home Detention, and in so doing, provides little or no

22   explanation to the person or their attorney as to what factor or factors resulted in

23   exclusion.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 341 of the Complaint and, therefore, denies the averments.

342.      Upon information and belief, the SHERIFF'S DEPARTMENT can and should accept more people in the Home Detention program. The COUNTY has the authority to expand eligibility for Home Detention. The Home Detention program is authorized by California Penal Code § 1203.018. Under Penal Code § 1203.018(d), a "board of supervisors, after consulting with the sheriff and district attorney, may prescribe reasonable rules and regulations under which an electronic monitoring program ... may operate." COUNTY DEFENDANTS' rules unreasonably exclude too many people from Home Detention, and instead steer them toward the Jail. Even during the COVID-19 pandemic, use of home detention has *decreased*, rather than be increasingly relied upon to limit incarceration at the Jail.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 342 of the Complaint and, therefore, denies the averments.

343.      The SHERIFF'S DEPARTMENT's pretrial services unit conducts assessments of new arrestees and can recommend release on Supervised Own Recognizance ("SOR") release. However, in 2021, only 1,389 individuals were released on SOR, whether pursuant to a court order or granted by the pretrial services unit. By comparison, 48,283 individuals were booked into the Jail in calendar year 2021.[230] [footnote omitted]

1

2      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

3      averments in Paragraph 343 of the Complaint and, therefore, denies the averments.

4

5      344.      Other COUNTY alternatives to incarceration programs lack sufficient funding

6      and capacity to provide meaningful access to those who would be eligible and benefit

7      from such programs, in particular as to people with mental health disabilities. For

8      example, the COUNTY has a pre-trial mental health diversion program, but it is available

9      to at most 30 participants at any given time.[231] The COUNTY provides Crisis

10      Stabilization Units, which are available for law enforcement drop-offs as a "safe

11      alternative to a jail or hospitalization."[232] However, the limited number of Crisis

12      Stabilization Unit placements are severely inadequate. If these programs and services

13      were provided with sufficient capacity and reach, many people incarcerated at the Jail

14      who have serious mental health needs would be able to access them and avoid damaging

15      and dangerous periods of incarceration. [footnotes omitted]

16

17      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18      averments in Paragraph 344 of the Complaint and, therefore, denies the averments.

19

20      345.      Programs to divert people with substance use issues from Jail are also insufficient.

21      The COUNTY and PROBATION DEPARTMENT provide a Drug Court program that

22      offers substance use disorder treatment for people who have committed a non-violent,

23      drug-related crime. However, upon information and belief, Drug Court has the capacity to

serve only a small percentage of the people who qualify. A disproportionate number of people with substance use disorder needs have mental health disabilities and are not provided the opportunity to participate in the program due to lack of capacity, discriminatory eligibility criteria, and other systemic deficiencies, causing them to end up incarcerated in the Jail. Similarly, the COUNTY's Serial Inebriate Program for people facing misdemeanor drug and disorderly conduct offenses is limited to only 15-20 participants[233]—a tiny fraction of those pre-trial detainees booked at the Jail on misdemeanor drug and disorderly conduct charges. [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 345 of the Complaint and, therefore, denies the averments.

346.    For people serving sentences, the COUNTY's alternative-to- incarceration programs are extremely limited. COUNTY DEFENDANTS and the PROBATION DEPARTMENT have discontinued the Residential Reentry Center program, which allowed incarcerated people to work or attend school while serving their sentence. In 2021, only 20 people in the SHERIFF'S DEPARTMENT's custody were allowed to participate in the Fire Camp program.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 346 of the Complaint and, therefore, denies the averments.

347.     COUNTY DEFENDANTS' insufficient alternatives to incarceration contribute to the unnecessary and harmful incarceration of people with disabilities in the Jail when the provision of adequate community-based services would allow them to receive such services for which they qualify instead of face damaging and dangerous periods of incarceration at the Jail.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 347 of the Complaint and, therefore, denies the averments.

**C. County Defendants' and the Probation Department's Reentry Programming is Inadequate to Prevent Repeated Reincarceration**

348.     COUNTY DEFENDANTS and the PROBATION DEPARTMENT do not provide adequate reentry programming or planning for people being released from the Jail. COUNTY DEFENDANTS recognize the importance of providing "evidence-based reentry services striving to reduce recidivism and increase public safety in collaboration with criminal justice partners and community agencies." Yet they fail to provide such services with sufficient capacity and reach to serve people with mental health and other disabilities who would be eligible for such services, setting up such individuals for further and repeated incarcerations.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 348 of the Complaint and, therefore, denies the averments.

1    349.      COUNTY DEFENDANTS and the PROBATION DEPARTMENT do not

2    provide adequate reentry programming or planning for people being released from the

3    Jail. COUNTY DEFENDANTS and the PROBATION DEPARTMENT do not provide

4    incarcerated people with adequate resources to ensure that they have access to

5    employment, housing, medical care, and other basic needs once released from the Jail. As

6    detailed above, the SHERIFF'S DEPARTMENT does not provide incarcerated people

7    with serious medical and mental health needs with adequate discharge resources.

8    COUNTY DEFENDANTS' and the PROBATION DEPARTMENT'S reentry programs

9    are inadequate to prevent repeated and unnecessary reincarceration, particularly regarding

10   people with disabilities. In 2021, for example, at least 83 people were booked 10 or more

11   times in a single year's time.

12

13   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

14   averments in Paragraph 349 of the Complaint and, therefore, denies the averments.

15

16   350.      The SHERIFF'S DEPARTMENT's Reentry Services Division is responsible for

17   providing reentry services to people incarcerated at the Jail. The Reentry Services

18   Division is intended to provide vocational, education, wellness, and behavioral assistance

19   to incarcerated people.[234] However, people often do not have access to these programs

20   due to insufficient capacity, inadequate staffing, discriminatory eligibility criteria, and

21   other systemic deficiencies, and do not receive reentry assistance until after they have left

22   the Jail. The number of people who participated in all Reentry Services Division

23   programs in 2021—just 372 individuals—is strikingly small compared with the over

1    48,000 people booked at the Jail. Only 57 unique individuals participated in education

2    programming, only 80 in vocational programs, only 105 in wellness programs, and only

3    125 in behavioral programs. The vast majority of people at the Jail in 2021 did not have

4    access to any of those programs to assist their reentry into the community. The

5    SHERIFF'S DEPARTMENT can refer people to Project In-Reach, a program of

6    Neighborhood House Association that provides services to help incarcerated people with

7    substance use and mental health needs in preparation for their re-entry. However, there

8    were only 135 Project In-Reach participants in 2021.

9

10   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

11   averments in Paragraph 350 of the Complaint and, therefore, denies the averments.

12

13   351.    For individuals who are most frequently incarcerated at the Jail— averaging 10 or

14   more bookings per year for three years—the "Sheriff's – Supporting Individual

15   Transitions" (S-SIT) program is intended to connect these individuals to providers.

16   However, the 2021-2022 Community Corrections Partnership Plan includes little detail

17   about whether the program is effective. The Plan states that "811 total annual contacts

18   were made with S-SIT participants," but offers no information about the actual number of

19   participants actually connected with services and whether the program has succeeded in

20   diverting any participants from repeated incarceration in the Jail.[235] [footnote omitted]

21

22   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

23   averments in Paragraph 351 of the Complaint and, therefore, denies the averments.

352.     The COUNTY's and PROBATION DEPARTMENT's programs to provide

services to people reentering the community from Jail are similarly limited. Their

Behavioral Health Court program is available after Jail release to people with serious

mental illness who are probation-eligible. In Behavioral Health Court, participants

receive intensive mental health treatment, treatment for substance use issues, and

assistance finding resources for housing and employment.[236] However, space is limited to

only 60 people, when well over 1,000 people in the Jail at any given time have mental

health treatment needs.[237] [footnotes omitted]


**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 352 of the Complaint and, therefore, denies the averments.


353.     Other COUNTY and PROBATION DEPARTMENT services—such as Center

Star Assertive Community Treatment, which provides comprehensive mental health

services for people in contact with the justice system who have mental illness, and

Reentry Court, which "engages" people with substance use disorders and possible co-

occurring mental health conditions who have violated terms of probation[238]—also lack

sufficient capacity to provide adequate services to all people who need and would benefit

from them. The number of people in Jail with substance use disorders and serious mental

health needs demonstrates that the COUNTY's and the PROBATION DEPARTMENT's

current programs are not meeting the overwhelming demand for such services. Likewise,

the PROBATION DEPARTMENT's mandatory supervision program, which is meant to

provide reentry assistance before and after release for people subject to the PROBATION

DEPARTMENT's supervision, fails to provide adequate services, particularly for people

with mental health disabilities and related needs. As a result, people with mental health

disabilities face unnecessary reincarceration, and are also at risk for unnecessary

psychiatric institutionalization, a further violation of the ADA's integration mandate. *See*

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) (requiring that people with

disabilities receive services in the least restrictive and most integrated setting appropriate,

and finding that denial of services that put people "at risk" or unnecessary

institutionalization violates the ADA). [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 353 of the Complaint and, therefore, denies the averments.

354.     In other instances, people are not linked with services because COUNTY

DEFENDANTS' sworn law enforcement staff are not properly trained on them. The

COUNTY's Sobering Center "provides a safe alternative to custody to individuals who

are inebriated in public," and law enforcement may transport them to the center.[239]

However, given the high number of people who end up in the Jail on book-and-release

charges of being under the influence—and sometimes die there, as in the case of Omar

Moreno Arroyo—the Sobering Center is underutilized as an alternative to incarceration.

[footnote omitted]

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 354 of the Complaint and, therefore, denies the averments.

3

4    355.        COUNTY DEFENDANTS' and the PROBATION DEPARTMENT's failure to

5    provide and fund adequate reentry programs causes people to repeatedly become

6    incarcerated at the Jail, and may also place people at risk for unnecessary psychiatric

7    institutionalization, as they do not have access to the services they need to thrive upon

8    release into the community. COUNTY DEFENDANTS and the PROBATION

9    DEPARTMENT must invest in strengthening and expanding their reentry programs to

10   prevent avoidable incarceration and institutionalization of people with disabilities.

11

12   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

13   averments in Paragraph 355 of the Complaint and, therefore, denies the averments.

14

15   356.        Incarcerated people who would benefit from alternatives to incarceration and

16   reentry programs are instead steered into the Jail, which cannot adequately address their

17   needs. For example, Plaintiff NORWOOD has been incarcerated at the Jail 15 times in

18   the last decade and a half, including several times on low-level drug charges related to his

19   addiction. At the Jail, NORWOOD does not have access to Narcotics Anonymous or

20   other substance use education programs, although he wishes the Jail would make them

21   available. Instead, he relies on a sobriety book from outside the Jail and is working on his

22   own to try to stay clean and sober. NORWOOD also has not received adequate treatment

23   for his opioid use disorder, such as MAT, or adequate mental health care to treat his

1    serious mental health needs. He would like to participate in alternatives to incarceration

2    and reentry programs, in part because he feels that being incarcerated has made his

3    addiction worse.

4

5    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

6    averments in Paragraph 356 of the Complaint and, therefore, denies the averments.

7

8    357.     Plaintiff ZOERNER has been incarcerated in the Jail 20 times since 2010.

9    ZOERNER is an alcoholic and has often been incarcerated at the Jail on charges related

10   to her addiction, including public intoxication. She is frequently homeless and was

11   homeless prior to her most recent incarceration. ZOERNER has been diagnosed with

12   bipolar disorder, manic depression, and severe PTSD. She also has a learning disability.

13   ZOERNER did not have access to substance use education programs while incarcerated

14   at Las Colinas. Nor did she receive adequate treatment for her serious mental health

15   needs. ZOERNER would like to participate in alternatives to incarceration.

16

17   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18   averments in Paragraph 357 of the Complaint and, therefore, denies the averments.

19

20   358.     Plaintiff LEVY has been incarcerated at the Jail eight times since 2014. She has

21   not been offered alternatives to incarceration while awaiting trial, although she would

22   have liked to participate in Home Detention or other alternatives. During her most recent

23   incarceration, LEVY requested reentry programming but the SHERIFF'S

1      DEPARTMENT did not offer her any such programming and released her without notice

2      on February 3, 3022.

3

4      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5      averments in Paragraph 358 of the Complaint and, therefore, denies the averments.

6

7      359.      For many individuals who come in contact with the criminal justice system,

8      including individuals with serious mental health needs and other people with disabilities,

9      incarceration should be a last resort. Instead, COUNTY DEFENDANTS' and the

10      PROBATION DEPARTMENT'S failure to provide reasonable alternatives ensures that

11      the Jail is the first and only option for many people. COUNTY DEFENDANTS and the

12      PROBATION DEPARTMENT can and should provide adequate alternatives to

13      incarceration and adequate reentry programming to stop the cycle of reincarceration and

14      overincarceration in the Jail, and prevent the unnecessary institutionalization of people

15      with disabilities.

16

17      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

18      averments in Paragraph 359 of the Complaint and, therefore, denies the averments.

19

20      **D. Black and Latinx Arrestees are Disproportionately Incarcerated in the Jail**

21

22      360.      California Government Code Section 11135 bans discrimination in state-funded

23      programs. COUNTY DEFENDANTS and the PROBATION DEPARTMENT administer

1        state-funded programs that cause Black and Latinx individuals to be disproportionately

2        incarcerated in the Jail as compared to White individuals.

3

4        **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5        averments in Paragraph 360 of the Complaint and, therefore, denies the averments.

6

7    361.       Upon information and belief, COUNTY DEFENDANTS and the PROBATION

8        DEPARTMENT use state funds to over-police Black and Latinx communities, including

9        by targeting patrolling activities in Black communities to detain and arrest individuals

10       suspected of gang-related activities. This results in Black and Latinx individuals being

11       stopped and arrested at disproportionately high rates. For example, in 2020, 16% of all

12       arrestees in the San Diego region were Black despite the fact that only 5% of County

13       residents were Black. Analyzing data provided by the SHERIFF'S DEPARTMENT, the

14       Center for Policing Equity ("CPE") observed that Black people, who make up 5% of the

15       population of San Diego County, made up 11% of all people stopped in non-traffic stops

16       by law enforcement between 2018-Q3 and 2020-Q2.[240] Taking into account the influence

17       of neighborhood crime rates, poverty, and share of Black residents, CPE found that Black

18       people were stopped by law enforcement 3.5 times as often as White people. CPE also

19       found that once stopped, Latinx people were arrested 1.2 times as often as White people.

20       [footnote omitted]

21

22       **Answer**: MAH is without sufficient knowledge or information to admit or deny the

23       averments in Paragraph 361 of the Complaint and, therefore, denies the averments.

362.     Upon information and belief, COUNTY DEFENDANTS and the PROBATION
DEPARTMENT use state funds on policies and practices that overincarcerate Black and
Latinx people in the Jail. Black and Latinx *arrestees* are disproportionately more likely to
be booked into the Jail and, upon information and belief, to stay incarcerated at the Jail,
than White arrestees. Although Black individuals constituted 16% of arrestees in the
region, Black individuals accounted for 21% of people incarcerated at the Jail in the most
recent month where statistics are available. Likewise, although Latinx individuals
constituted 35% of arrestees in 2020 in the San Diego region, Latinx individuals
accounted for 43% of incarcerated people. By contrast, White arrestees are
disproportionately likely to avoid pretrial incarceration and, upon information and belief,
to be released earlier. White individuals constituted 41% of arrestees in 2020, but
accounted for only 30% of people in the Jail in the most recent month where statistics are
available—even though 46% of the County's population is White.[241] [footnote omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the
averments in Paragraph 362 of the Complaint and, therefore, denies the averments.

363.     Upon information and belief, the disproportionate incarceration of Black and Latinx
individuals is also caused by COUNTY DEFENDANTS' and the PROBATION
DEPARTMENT'S administration of state-funded pretrial alternatives to incarceration
programs, reentry programming, and alternatives to incarceration programs for sentenced
individuals. Upon information and belief, COUNTY DEFENDANTS' and the

PROBATION DEPARTMENT's policies for administering these state-funded programs— including their use of risk assessment tools and eligibility criteria—contribute to the overincarceration of Black and Latinx individuals in the Jail relative to comparable White individuals.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 363 of the Complaint and, therefore, denies the averments.

364.     For example, both the SHERIFF'S DEPARTMENT and the PROBATION DEPARTMENT employ a risk assessment tool that is known to have racial bias. For all arrestees, the SHERIFF'S DEPARTMENT's Pretrial Unit prepares a pretrial report, and presents to the court "a tailored individualized recommendation regarding release options." As part of that pretrial report, the SHERIFF'S DEPARTMENT conducts a pre-trial risk assessment using the Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS") PRRS-II tool developed by Northpointe (now known as Equivant). Although the SHERIFF'S DEPARTMENT is validating a new tool, the California Pretrial Assessment ("CAPA"), the CAPA is based on COMPAS's tool.[242] Studies have found racial biases in the COMPAS tool[243] and cast doubt on whether COMPAS is at all effective in predicting a person's risk of recidivism.[244] A 2016 study found that the tool was more likely to wrongly flag Black defendants as high risk than to do so for White defendants. In 2018, another study found that COMPAS was no more accurate at predicting recidivism than a random group of volunteers. In internal SHERIFF'S DEPARTMENT emails, employees have shared these studies about bias in Northpointe's

assessment tools—with one employee noting that "using past data to inform future decisions can continue the bias that may exist in the previous data." Although the SHERIFF'S DEPARTMENT Pretrial Unit has stated that it intends to remove bias from the CAPA, the disproportionate incarceration of Black and Latinx arrestees suggests that is not the case. [footnotes omitted]

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 364 of the Complaint and, therefore, denies the averments.

365.     Upon information and belief, the COMPAS risk assessment tool is used for other programs that affect whether a person is incarcerated in the Jail, including as part of the eligibility criteria for home detention through the SHERIFF'S DEPARTMENT's County Parole and Alternative Custody program. The SHERIFF'S DEPARTMENT alone determines who participates in CPAC. Upon information and belief, other eligibility criteria that prohibit eligibility for CPAC, such as being a documented prison gang member or having a residence that does not meet the SHERIFF'S DEPARTMENT's minimum qualifications, also contribute to the disproportionate pretrial incarceration of Black and Latinx arrestees.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 365 of the Complaint and, therefore, denies the averments.

366.　　　COUNTY DEFENDANTS' and the PROBATION DEPARTMENT'S reentry programs and alternatives to custody programs for sentenced individuals also rely on the COMPAS tool and other eligibility criteria that result in disparate incarceration rates by race and ethnicity. For example, the PROBATION DEPARTMENT relies on the COMPAS tool to determine the level of supervision and community interventions available to a person under the PROBATION DEPARTMENT'S supervision. Upon information and belief, the results of the risk assessment contribute to whether a person is considered for early release from the Jail. Upon information and belief, these policies and eligibility criteria contribute to the disproportionate incarceration of Black and Latinx individuals, and keep them in the Jail longer than comparable White individuals.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 366 of the Complaint and, therefore, denies the averments.

## VIII. DEFENDANTS INTERFERE WITH INCARCERATED PEOPLE'S ACCESS TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO THE COURTS

367.　　　COUNTY DEFENDANTS interfere with and impede people incarcerated in the Jail from exercising their right to effective assistance of counsel under the United States and California constitutions. COUNTY DEFENDANTS also interfere with incarcerated people's due process rights under the United States and California constitutions to access the civil courts and their legal representatives.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 367 of the Complaint and, therefore, denies the averments.

**A. County Defendants Fail to Ensure That Incarcerated People Can Adequately Communicate Confidentially With Their Attorneys**

368.     The SHERIFF'S DEPARTMENT's policies and procedures for confidential communications between incarcerated people and their attorneys are inadequate. The SHERIFF'S DEPARTMENT fails to adequately train custody staff on its policies and procedures for allowing confidential communications between incarcerated people and their attorneys. Although the SHERIFF'S DEPARTMENT purports to offer multiple means for people and their attorneys to communicate confidentially, the SHERIFF'S DEPARTMENT's practices systematically impede and interfere with such communication.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 368 of the Complaint and, therefore, denies the averments.

369.     The SHERIFF'S DEPARTMENT fails to provide adequate access to telephone communications between incarcerated people and their attorneys. The SHERIFF'S DEPARTMENT's policies and procedures state that people have "unlimited" telephone access to communicate with their attorneys, and require Jail personnel to ensure that incarcerated people have access to "confidential consultation with attorneys." Procedurally, to speak confidentially with an incarcerated client over the telephone, an

1  attorney must call the front desk of the Jail facility where the person is incarcerated and

2  request a "callback" from the client. Then, the front desk clerk communicates the

3  callback request to custody staff in the person's housing unit. However, on information

4  and belief, it is rare for people to actually speak over the phone confidentially to their

5  attorney.

6

7  **Answer**: MAH is without sufficient knowledge or information to admit or deny the

8  averments in Paragraph 369 of the Complaint and, therefore, denies the averments.

9

10  370.      Frequently, custody staff fail to communicate callback requests to incarcerated

11  people. For example, Plaintiff NELSON's criminal defense attorney placed

12  approximately one dozen callback requests, none of which were communicated to

13  NELSON. Other attorneys placed callbacks for NELSON, and he also was not notified

14  about those calls. Likewise, Plaintiff EDWARDS was not notified of approximately six

15  callback requests placed by an attorney over the course of several weeks, and he only

16  knew the attorney was calling him once he received physical mail from the attorney.

17

18  **Answer**: MAH is without sufficient knowledge or information to admit or deny the

19  averments in Paragraph 370 of the Complaint and, therefore, denies the averments.

20

21  371.      On other occasions, custody staff communicate callback requests to incarcerated

22  people only after normal business hours, when the attorney's office is closed, and then

23  custody staff refuse to honor the callback request the next day. Because an attorney

1    cannot schedule a confidential call, and may not be available if and when the deputy

2    informs the incarcerated client about the request, the SHERIFF'S DEPARTMENT's

3    practice substantially reduces the likelihood that the client and their attorney can speak

4    confidentially. This practice prevents people from obtaining effective assistance of

5    counsel in their criminal cases and prevents them from vindicating their civil rights in

6    court.

7

8    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

9    averments in Paragraph 371 of the Complaint and, therefore, denies the averments.

10

11    372.    When calls between an attorney and incarcerated person do occur, the

12    SHERIFF'S DEPARTMENT often fails to protect the confidential attorney-client

13    relationship. For example, Plaintiff LOPEZ, who is deaf and uses ASL to communicate,

14    experienced significant challenges setting up confidential calls with his criminal defense

15    attorney. Sometimes, deputies stayed in the same room while LOPEZ spoke over video

16    with his attorney and a sign language interpreter. Even at court hearings, when LOPEZ

17    needed short but important confidential appointments with his attorney, SHERIFF'S

18    DEPARTMENT deputies remained in the same room while LOPEZ talked over video

19    with his attorney. Deputies refused LOPEZ's attorney's request that they leave the room.

20    Deputies also kept LOPEZ handcuffed during many of the calls, which prevented him

21    from signing and communicating effectively to the interpreter.

22

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 372 of the Complaint and, therefore, denies the averments.

373.     Instead of providing a reliable telephone means for people to confer with their attorneys, the SHERIFF'S DEPARTMENT has stated that the only guaranteed means to meet with an attorney is through an in-person visit. However, this apparent policy is highly unreasonable in light of the ongoing COVID-19 pandemic. It forces criminal defense attorneys and civil attorneys to choose between visiting their clients in-person in the Jail—which have been subject to regular COVID-19 outbreaks with incarcerated people and custody staff not being vaccinated or mask-compliant—or potentially failing to connect with their clients about important case developments. This policy unnecessarily forces attorneys to travel significant distances to and from widely-dispersed the Jail facilities. In-person professional visits are not even a guaranteed means to meet with a client due to substantial restrictions on visits purportedly due to the pandemic. Due to limited physical space at the Jail, the professional visit rooms are first-come, first-serve, and are not exclusive to attorneys. This means an attorney may spend several hours of their day traveling and waiting just to have a brief discussion with their incarcerated client, which reduces the time that the attorney can spend on other substantive aspects of the client's case. Counsel in this case have traveled to visit with clients at George Bailey, but were informed that the backup in the visiting area was so long that counsel would have to come back another day. The combined effect of providing illusory callbacks and denying in-person visits results in situations in which incarcerated people cannot

communicate with their attorneys for extended periods or at critical junctures of their cases.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 373 of the Complaint and, therefore, denies the averments.

374.     The SHERIFF'S DEPARTMENT has also compromised the attorney- client relationship during professional visits by recording confidential calls, which prevents the effective assistance of counsel. For example, in fall 2021, deputies from the SHERIFF'S DEPARTMENT recorded at least 37 phone calls between incarcerated people and their attorneys. At the time, professional visits between incarcerated people and their attorneys took place in the Jail's social visiting areas, via telephone.[245] While social visits are ordinarily recorded, Jail staff stated to attorneys that the recording function had been turned off—even though that was not true in many cases. This was not an isolated incident. In the *San Diego Union-Tribune*'s article on the incident, one attorney noted that he has stopped meeting with clients in the social visiting areas for fear of the conversations being taped, which "has affected at least 20 clients, delaying proceedings while they remain in custody."[246] As that attorney noted: "If you have clients who are accused of a serious crime, how do you effectively represent them if you can't see them and can't talk to them?" This practice improperly prevents people from accessing and speaking to their attorneys. [footnotes omitted]

1      **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2      averments in Paragraph 374 of the Complaint and, therefore, denies the averments.

3

4      375.      Custody staff also purposefully prevent incarcerated people from attending

5      professional visits. In September 2021, a custody staff member retaliated against Plaintiff

6      NELSON by attempting to prevent him from attending a professional visit. Earlier in the

7      day, NELSON had opened the tray slot in his cell to let in fresh air, as his three-person,

8      approximately 8x10 cell was humid and smelly. A deputy ordered NELSON to close the

9      tray slot, and NELSON thereafter complained to the deputy. Later, when NELSON's

10     attorney appeared for a professional visit, the deputy falsely told the attorney that

11     NELSON did not want to visit and asked what the attorney wanted to talk about with

12     NELSON. Only after the attorney demanded to see NELSON for a privileged discussion

13     did the deputy relent and allow NELSON to attend the professional visit.

14

15     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16     averments in Paragraph 375 of the Complaint and, therefore, denies the averments.

17

18     376.      In or around November 2021, counsel in this case received a legal mail envelope

19     from a person at the Jail. However, the envelope arrived empty and opened, suggesting

20     that the SHERIFF'S DEPARTMENT had opened and removed the mail before it was

21     sent to counsel in this case.

22

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 376 of the Complaint and, therefore, denies the averments.

377.     The SHERIFF'S DEPARTMENT's inadequate and unlawful policies and practices for attorney-client contact prevent incarcerated people and their attorneys from meeting or speaking confidentially. As a result of these inadequate policies and procedures, incarcerated people are unable to enjoy effective assistance of counsel in their criminal cases and prevented from vindicating their civil rights in court. Upon information and belief, these policies and procedures restricting confidential attorney-client communications are not justified by any legitimate penological interest, and in part due to the SHERIFF'S DEPARTMENT's failure to train and supervise its staff.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 377 of the Complaint and, therefore, denies the averments.

**B. The Sheriff's Department Interferes with People's Access to the Courts**

378.     The SHERIFF'S DEPARTMENT's policies and procedures for incarcerated people with legal materials are inadequate. Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff in how to protect incarcerated people's legal materials and their right of access to the courts.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 378 of the Complaint and, therefore, denies the averments.

379.     Jail staff unlawfully interfere with incarcerated people's legal materials. For example, when DUNSMORE arrived at the Jail for resentencing in December 2019, he brought a significant amount of his legal materials with him. However, the Jail immediately confiscated DUNSMORE's legal papers, including complaints against the Jail from DUNSMORE's previous incarceration in 2018. DUNSMORE did not receive any legal papers back for 2-3 weeks, after repeatedly asking. Even then, staff only let him have a small portion of his legal papers. DUNSMORE did not receive the rest of his legal papers back until at least 90 days after he arrived at the Jail. When DUNSMORE received the papers back, he discovered that some of his legal papers were missing. Among the material lost and not returned was a box with discovery material crucial to DUNSMORE's continuing court challenges to his underlying conviction, complaints to CLERB, and grievances about DUNSMORE's treatment at the Jail in 2018.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 379 of the Complaint and, therefore, denies the averments.

380.     COUNTY DEFENDANTS lack adequate policies and procedures for providing legal materials to *pro se* litigants. Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train Jail staff to provide pro se litigants with the assistance they should receive in the Jail. For example, Plaintiff DUNSMORE was recognized as a pro per litigant by the California Court of Appeal's Fourth Appellate District and was also proceeding pro se on his federal habeas petitions while at the Jail.

However, the Jail did not provide DUNSMORE with pro per privileges, including access to the law library for several hours each week, access to copying and printing services, and legal materials like pleading paper and legal-size envelopes. DUNSMORE had no access to a computer for legal research for his active cases. This lack of access prevented DUNSMORE from developing an adequate record in court, contributed to the dismissal of several of his civil claims, and caused him to incur filing fee debts.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 380 of the Complaint and, therefore, denies the averments.

**CLASS ACTION ALLEGATIONS**

**Incarcerated People Class**

381.     Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all others similarly situated. Plaintiffs bring the claims articulated herein on behalf of all adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People Class"). All incarcerated people are at risk of substantial harm due to the following policies and practices:

      a.     Denial of minimally adequate medical care;

      b.     Denial of minimally adequate mental health care;

      c.     Denial of minimally adequate dental care;

1           d.      Imposition of filthy, unhealthy, and dangerous conditions of

2  confinement;

3           e.      Denial of protection from injury and violence in the Jail;

4           f.      Denial of access to counsel and the courts; and

5           g.      Disproportionate incarceration based upon race, ethnicity, and/or

6  national origin.

7      **Answer**: MAH denies the averments in Paragraph 381 and its subparts a.-g.  as

8      alleged or impliedly alleged against MAH. MAH is without sufficient knowledge

9      or information to admit or deny the averments in Paragraph 381 and its subparts a.-

10     g. of the Complaint to the extent they apply to the other Defendants, and, therefore,

11     denies those averments.

12                   <u>Numerosity: Fed. R. Civ. P. 23(a)(1)</u>

13

14  382.      The proposed class as defined is sufficiently numerous that joinder of all members

15      of the class is impracticable and unfeasible. Currently, there are approximately 4,400

16      incarcerated people in the Jail, as well as thousands of individuals in the community on

17      probation, mandatory supervision, and home confinement, who are subject to being

18      returned to the Jail at any time on an alleged violation or revocation of their supervision.

19      Due to Defendants' policies and practices, all incarcerated people receive or are at

20      substantial risk of receiving inadequate medical, dental, and mental health care. Due to

21      Defendants' policies and practices, all incarcerated people are at risk of injury in the Jail.

1   Due to Defendants' policies and practices, all incarcerated people are at substantial risk

2   of being denied access to their attorneys or the courts.

3

4   **Answer**: MAH denies the averments in Paragraph 382 as alleged against MAH. MAH is

5   without sufficient knowledge or information to admit or deny the averments in Paragraph

6   382 of the Complaint to the extent they apply to the other Defendants, and, therefore,

7   denies those averments.

8

9   383.      Although the proposed class is transitory and people will cycle into and out of the

10   jails, the thousands of members of the proposed class at any given time will be readily

11   identifiable using records maintained in the ordinary course of business by Defendants.

12

13   **Answer**: MAH denies the averments in Paragraph 383 as alleged against MAH. MAH is

14   without sufficient knowledge or information to admit or deny the averments in Paragraph

15   383 of the Complaint to the extent they apply to the other Defendants, and, therefore,

16   denies those averments.

17                    <u>Commonality: Fed. R. Civ. P. 23(a)(2)</u>

18   384.      There are questions of law and fact common to the Incarcerated People Class,

19   including, but not limited to:

20

21        a.      Whether Defendants' failure to provide minimally adequate medical care to

22              incarcerated people violates the Due Process Clause of the Fourteenth

23              Amendment and the Cruel and Unusual Punishment Clause of the Eighth

1          Amendment to the United States Constitution, and Article 1, Sections 7 and

2          17 of the California Constitution;

3     b.    Whether Defendants' failure to provide minimally adequate mental health

4          care to incarcerated people violates the Due Process Clause of the Fourteenth

5          Amendment and the Cruel and Unusual Punishment Clause of the Eighth

6          Amendment to the United States Constitution, and Article 1, Sections 7 and

7          17 of the California Constitution;

8     c.    Whether Defendants' failure to provide minimally adequate dental care to

9          incarcerated people violates the Due Process Clause of the Fourteenth

10         Amendment and the Cruel and Unusual Punishment Clause of the Eighth

11         Amendment to the United States Constitution, and Article 1, Sections 7 and

12         17 of the California Constitution;

13    d.    Whether the imposition of filthy, unhealthy, and dangerous conditions of

14         confinement violates the Due Process Clause of the Fourteenth

15         Amendment and the Cruel and Unusual Punishment Clause of the Eighth

16         Amendment to the United States Constitution, and Article 1, Sections 7

17         and 17 of the California Constitution;

18    e.    Whether Defendants' failure to protect incarcerated people from violence

19         and injury violates the Due Process Clause of the Fourteenth Amendment

20         and the Cruel and Unusual Punishment Clause of the Eighth Amendment to

21         the United States Constitution, and Article 1, Sections 7 and 17 of the

22         California Constitution;

f.      Whether Defendants' failure to ensure incarcerated people have access to counsel and the courts violates the Due Process Clause of the Fourteenth Amendment and the Sixth Amendment right to counsel, and Article 1, Sections 7 and 15 of the California Constitution; and

g.      Whether disproportionate incarceration of people based on their race, ethnicity, and/or national origins violates California Government Code Section 11135.

**Answer:** Paragraph 384 and its subparts a.-g. of the Complaint are statements to which no response is required. To the extent a response is required, MAH denies the averments in Paragraph 384 and its subparts a.-g.

## Typicality: Fed. R. Civ. P. 23(a)(3)

385.    The claims of the named Plaintiffs are typical of the claims of the members of the proposed class. Plaintiffs and all other members of the class have sustained similar injuries arising out of and caused by Defendants' common course of conduct and policies in violation of the law as alleged herein.

**Answer**: MAH denies the averments in Paragraph 385 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 385 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

1

<u>Adequacy: Fed. R. Civ. P. 23(a)(4)</u>

2   386.     Plaintiffs are members of the class and will fairly and adequately represent and

3   protect the interests of the putative class members because they have no disabling

4   conflict(s) of interest that would be antagonistic to those of the other class members.

5   Plaintiffs, as well as plaintiff class members, seek to enjoin the unlawful acts and

6   omissions of Defendants. Plaintiffs have retained counsel who are competent and

7   experienced in complex class action litigation and litigation on behalf of incarcerated

8   people.

9

10   **Answer**: MAH denies the averments in Paragraph 386 as alleged against MAH. MAH

11   is without sufficient knowledge or information to admit or deny the averments in

12   Paragraph 386 of the Complaint to the extent they apply to the other Defendants, and,

13   therefore, denies those averments.

14

15

<u>Fed. R. Civ. P. 23(b)(1)(A) and (B)</u>

16   387.     Since the number of class members is over 4,000 on any given day, separate

17   actions by individuals could result in inconsistent and varying decisions, which in turn

18   would result in conflicting and incompatible standards of conduct for Defendants.

19   Plaintiffs challenge Defendants' policies and practices that apply generally to the class,

20   so that final injunctive relief or corresponding declaratory relief is appropriate respecting

21   the class as a whole.

22

**Answer**: MAH denies the averments in Paragraph 387 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 387 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

<u>Fed. R. Civ. P. 23(b)(2)</u>

388.     This action is maintainable as a class action pursuant to Federal Rule Civil Procedure 23(b)(2) because Defendants have acted and failed to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class and will apply to all members of the class.

**Answer**: MAH denies the averments in Paragraph 388 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 388 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

**Incarcerated People with Disabilities Subclass**

389.     All Plaintiffs (all of whom are people with disabilities) bring this action on their own behalf and, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (l), and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities ("Incarcerated People with Disabilities Subclass"). All incarcerated

people with disabilities at the Jail are at risk of harm as a result of the following policies and practices of Defendants:

a.    Denial of reasonable accommodations and equal access to programs, services, and activities;

b.    Discrimination on the basis of their disabilities;

c.    Denial of adequate alternatives to incarceration in Jail custody;

d.    Denial of adequate programs and services to prevent reincarceration.

**Answer**: MAH denies the averments in Paragraph 389, and its subparts a.-d.  as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 389, and its subparts a.-d. of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

Numerosity: Fed. R. Civ. P. 23(a)(1)

390.    The proposed subclass as defined is sufficiently numerous that joinder of all members of the subclass is impracticable and unfeasible. The exact number of members of the Incarcerated People with Disabilities Subclass is unknown. According to data from the Sheriff's Department, around 34.9% of incarcerated people at the Jail in December 2021 were taking psychotropic medications for mental health disabilities. This figure likely undercounts the number of incarcerated people with mental health disabilities, and does not include incarcerated people with other disabilities, such as mobility disabilities,

hearing disabilities, vision disabilities, and intellectual/developmental disabilities. At least 34.9%, and likely more, of the incarcerated people in the Jail are qualified individuals with disabilities as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (l).

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 390 of the Complaint and, therefore, denies the averments.

391.     Although the proposed Incarcerated People with Disabilities Subclass is transitory and will include people with disabilities who cycle into and out of the jails, the members of the proposed subclass at any given time will be readily identifiable using records maintained in the ordinary course of business by Defendants.

**Answer**: MAH denies the averments in Paragraph 391 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 391 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

<u>Commonality: Fed. R. Civ. P. 23(a)(2)</u>

392.     There are questions of law and fact common to the Incarcerated People with Disabilities Subclass, including, but not limited to:

a.     Whether Defendants' failure to reasonably accommodate incarcerated people with disabilities violates the Americans with Disabilities Act, Section 504 of

1    the Rehabilitation Act, California Government Code § 11135, and the Unruh

2    Act;

3    b.    Whether Defendants' discrimination against incarcerated people with

4          disabilities violates the Americans with Disabilities Act, Section 504 of the

5          Rehabilitation Act, California Government Code § 11135, and the Unruh Act.

6    c.    Whether Defendants' failure to ensure that incarcerated people are able to

7          access all programs and services at the Jail and communicate effectively

8          during classification, disciplinary hearings, and all programs and services

9          violates the Americans with Disabilities Act, Section 504 of the Rehabilitation

10         Act, Government Code § 11135, and the Unruh Act; and

11   d.    Whether Defendants' failure to house people with disabilities in the most

12         integrated environment and provide adequate alternatives to incarceration and

13         reentry programming violates the Americans with Disabilities Act, Section

14         504 of the Rehabilitation Act, and Government Code § 11135.

15

16   **Answer:** Paragraph 392 and its subparts a.-d. of the Complaint are statements to which no

17   response is required.  To the extent a response is required, MAH denies the averments in

18   Paragraph 392 and its subparts a.-d.

19

20   393.    Defendants are expected to raise common defenses to these claims, including

21   denying that their actions violated the law.

22

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 393 of the Complaint and, therefore, denies the averments.

3

4                    Typicality: Fed. R. Civ. P. 23(a)(3)

5

6    394.    The claims of the named Plaintiffs are typical of the claims of the members of the

7    proposed subclass. Plaintiffs and all other members of the subclass have sustained similar

8    injuries arising out of and caused by Defendants' common course of conduct and policies

9    in violation of the law as alleged herein.

10

11   **Answer**: MAH denies the averments in Paragraph 394 as alleged against MAH. MAH is

12   without sufficient knowledge or information to admit or deny the averments in Paragraph

13   394 of the Complaint to the extent they apply to the other Defendants, and, therefore,

14   denies those averments.

15

16                    Adequacy: Fed. R. Civ. P. 23(a)(4)

17

18   395.    Plaintiffs are members of the subclass and will fairly and adequately represent and

19   protect the interests of the putative subclass members because they have no disabling

20   conflict(s) of interest that would be antagonistic to those of the other subclass members.

21   Plaintiffs, as well as Incarcerated People with Disabilities Subclass members, seek to

22   enjoin the unlawful acts and omissions of Defendants. Plaintiffs have retained counsel

who are competent and experienced in complex class action litigation and litigation on

behalf of incarcerated people.

**Answer**: MAH denies the averments in Paragraph 395 as alleged against MAH. MAH is

without sufficient knowledge or information to admit or deny the averments in Paragraph

395 of the Complaint to the extent they apply to the other Defendants, and, therefore,

denies those averments.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

396.       Since the subclass consists of at least 36% of the population in the Jail, separate

actions by individuals could result in inconsistent and varying decisions, which in turn

would result in conflicting and incompatible standards of conduct for Defendants.

**Answer**: MAH denies the averments in Paragraph 396 as alleged against MAH. MAH is

without sufficient knowledge or information to admit or deny the averments in Paragraph

396 of the Complaint to the extent they apply to the other Defendants, and, therefore,

denies those averments.

## Fed. R. Civ. P. 23(b)(2)

397.       This action is also maintainable as a class action pursuant to Fed. R. Civ. P.

23(b)(2) because Defendants have acted and refused to act on grounds that apply

generally to the subclass, so that final injunctive relief or corresponding declaratory

relief is appropriate respecting the subclass and will apply to all members of the class

and subclass.

**Answer**: MAH denies the averments in Paragraph 397 as alleged against MAH. MAH

is without sufficient knowledge or information to admit or deny the averments in

Paragraph 397 of the Complaint to the extent they apply to the other Defendants, and,

therefore, denies those averments.

## FIRST CAUSE OF ACTION
**(Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated People Class Against Defendants SHERIFF'S DEPARTMENT, COUNTY, CORRECTIONAL HEALTHCARE PARTNERS, TRI-CITY, LIBERTY, MID-AMERICA, and LOGAN HAAK**

398.        PLAINTIFFS re-allege and incorporate by reference herein all allegations

previously made in paragraphs 1 through 397 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 397 of this

Answer as though set forth in full herein.

399.      By their policies, practices, and failures to train staff described above, Defendants

subject PLAINTIFFS and the Incarcerated People Class they represent to a substantial

risk of harm and injury from inadequate medical, mental health, and dental care, and

other unreasonable dangers at the Jail. These policies and practices have and continue to

be implemented by Defendants and their agents or employees in their official capacities,

and are the proximate cause of PLAINTIFFS' and the PLAINTIFF class's ongoing

deprivation of rights secured by the United States Constitution under the Eighth

Amendment.

**Answer**: MAH denies the averments in Paragraph 399 as alleged against MAH. MAH is

without sufficient knowledge or information to admit or deny the averments in Paragraph

399 of the Complaint to the extent they apply to the other Defendants, and, therefore,

denies those averments.

400.     Defendants have been and are aware of all of the deprivations complained of

herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, PLAINTIFFS and the Class they seek to represent request

relief as outlined below.

**Answer**: MAH denies the averments in Paragraph 400 as alleged against MAH.

MAH is without sufficient knowledge or information to admit or deny the averments

in Paragraph 400 of the Complaint to the extent they apply to the other Defendants,

and, therefore, denies those averments.

**SECOND CAUSE OF ACTION**
**(Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
**EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**

**CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated People Class Against Defendants SHERIFF'S DEPARTMENT, COUNTY, CORRECTIONAL HEALTH PARTNERS, TRI-CITY, LIBERTY, MID-AMERICA, and LOGAN HAAK**

401.    PLAINTIFFS re-allege and incorporate by reference herein allegations previously made in paragraphs 1 through 400 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 400 of this Answer as though set forth in full herein..

402.    By their policies, practices, and failures to train staff described above, Defendants subject PLAINTIFFS and the Incarcerated People Class they represent to a substantial risk of harm and injury from inadequate medical, mental health, and dental care, and other unreasonable dangers at the Jail. These policies and practices have and continue to be implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of PLAINTIFFS' and the PLAINTIFF class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

**Answer**: MAH denies the averments in Paragraph 399 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 324 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

403.       Defendants have been and are aware of all of the deprivations complained of

herein, and have condoned or been deliberately indifferent to such conduct. It should be

obvious to Defendants and to any reasonable person that the conditions imposed on

PLAINTIFFS and the Incarcerated People Class cause tremendous mental anguish,

suffering, and pain to such individuals.

        WHEREFORE, PLAINTIFFS and the Class they represent request relief as

outlined below.

**Answer**: MAH denies the averments in Paragraph 403 as alleged against MAH. MAH is

without sufficient knowledge or information to admit or deny the averments in Paragraph

403 of the Complaint to the extent they apply to the other Defendants, and, therefore,

denies those averments.

**THIRD CAUSE OF ACTION**
**(Article 1, Section 7 of the California Constitution)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
**EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
**CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
**People Class Against Defendants SHERIFF'S DEPARTMENT, COUNTY,**
**CORRECTIONAL HEALTHCARE PARTNERS, TRI-CITY, LIBERTY,**
**MID-AMERICA, and LOGAN HAAK**

404.       PLAINTIFFS re-allege and incorporate by reference herein allegations

previously made in paragraphs 1 through 403 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 403 of this

Answer as though set forth in full herein.

279

405.     By their policies, practices, and failures to train staff described above, Defendants subject PLAINTIFFS and the Incarcerated People Class they represent to a substantial risk of harm and injury from inadequate medical, mental health, and dental care, and other unreasonable dangers at the Jail. These policies and practices have and continue to be implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of PLAINTIFFS' and the PLAINTIFF class's ongoing deprivation of rights secured by the California Constitution, Article 1, Section 7.

**Answer**: MAH denies the averments in Paragraph 405 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 405 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

406.     Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, PLAINTIFFS and the Class they represent request relief as outlined below.

**Answer**: MAH denies the averments in Paragraph 406 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 406 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

**FOURTH CAUSE OF ACTION**
**(Article 1, Section 17 of the California Constitution)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
**EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
**CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
**People Class Against Defendants SHERIFF'S DEPARTMENT, COUNTY,**
**CORRECTIONAL HEALTHCARE PARTNERS, TRI-CITY, LIBERTY,**
**MID-AMERICA, and LOGAN HAAK**

407.     PLAINTIFFS re-allege and incorporate by reference herein allegations previously made in paragraphs 1 through 406 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 406 of this Answer as though set forth in full herein.

408.     By their policies, practices, and failures to train staff described above, Defendants subject PLAINTIFFS and the Incarcerated People Class they represent to a substantial risk of harm and injury from inadequate medical, mental health, and dental care, and other unreasonable dangers at the Jail. These policies and practices have and continue to be implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of PLAINTIFFS' and the PLAINTIFF class's ongoing deprivation of rights secured by the California Constitution, Article 1, Section 17.

**Answer**: MAH denies the averments in Paragraph 408 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 408 of the Complaint to the extent they apply to the other Defendants, and, therefore, denies those averments.

409.     Defendants have been and are aware of all of the deprivations complained of

herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, PLAINTIFFS and the Class they represent request relief as

outlined below.

**Answer**: MAH denies the averments in Paragraph 409 as alleged against MAH.

MAH is without sufficient knowledge or information to admit or deny the averments

in Paragraph 409 of the Complaint to the extent they apply to the other Defendants,

and, therefore, denies those averments.

**FIFTH CAUSE OF ACTION**
**(Americans with Disabilities Act, 42 U.S.C. §§ 12132, 12203)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
**EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
**CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
**People with Disabilities Subclass Against Defendants SHERIFF'S**
**DEPARTMENT and COUNTY**

410.     PLAINTIFFS re-allege and incorporate by reference herein all allegations

previously made in paragraphs 1 through 409 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 409 of this

Answer as though set forth in full herein.

411.     The ADA prohibits public entities, including the COUNTY and the SHERIFF'S

DEPARTMENT, from denying "a qualified individual with a disability ... the benefits of

the services, programs, or activities of [the] public entity" because of the individual's

1  disability and from discriminating against people with disabilities based on their

2  disability. 42 U.S.C. § 12132.

3

4  **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5  averments in Paragraph 411 of the Complaint and, therefore, denies the averments.

6

7  412.     The COUNTY and SHERIFF'S DEPARTMENT are legally responsible for not

8  only their own violations of the ADA, but also those violations of the ADA committed by

9  CONTRACTOR DEFENDANTS in the course of performing their duties under their

10  contractual arrangements with the COUNTY and SHERIFF'S DEPARTMENT to

11  provide medical, mental health, and dental care services to incarcerated people. *See* 28

12  C.F.R. § 35.130(b)(1).

13

14  **Answer**: MAH denies the averments in Paragraph 412 as alleged against MAH. MAH is

15  without sufficient knowledge or information to admit or deny the averments in Paragraph

16  412 of the Complaint to the extent they apply to the other Defendants, and, therefore,

17  denies those averments.

18

19  413.     The ADA defines "a qualified individual with a disability" as a person who has a

20  "physical or mental impairment that substantially limits one or more major life

21  activities," including, but not limited to, "caring for oneself, performing manual tasks,

22  seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing,

23  learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §

12102(1)(A), (2)(A). The ADA Amendments Act of 2008 expanded the definition of "major life activities" to also include: "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." All Plaintiffs are qualified individuals with disabilities as defined in the ADA and ADA Amendments Act of 2008, as they have disabilities that substantially limit one or more major life activities.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 413 of the Complaint and, therefore, denies the averments.

414.      The programs, services, and activities that the COUNTY and SHERIFF'S DEPARTMENT provide to incarcerated people include, but are not limited to, sleeping; eating; showering; toileting; communicating with those outside the Jail by mail and telephone; exercising; entertainment; safety and security; the Jail's administrative, disciplinary, and classification proceedings; medical, mental health, and dental services; the library; educational, vocational, substance use, and anger management classes; and discharge services. These programs, services, and activities are covered by the ADA.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 414 of the Complaint and, therefore, denies the averments.

415.     Under Title II of the ADA, the COUNTY and SHERIFF'S DEPARTMENT must provide PLAINTIFFS and the Incarcerated People with Disabilities Subclass reasonable accommodations and modifications so that they can avail themselves of and participate in all programs and activities offered by the Jail.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 415 of the Complaint and, therefore, denies the averments.

416.     Under the ADA's anti-interference provision, a public entity cannot "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, of any right granted or protected by this chapter." 42 U.S.C. § 12203(b). The anti-interference clause prohibits conduct that has a chilling effect on a person's exercise of their ADA rights. Nor can a public entity retaliate against an individual for exercising their ADA rights. 42 U.S.C. § 12203(a).

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 416 of the Complaint and, therefore, denies the averments.

417.     By failing to reasonably accommodate, discriminating against, and interfering with the ADA rights of PLAINTIFFS and the Incarcerated People with Disabilities

1     Subclass as described above, the COUNTY and SHERIFF'S DEPARTMENT violate the

2     ADA, including by:

3         a.    failing to "ensure that qualified inmates or detainees with disabilities shall

4               not, because a facility is inaccessible to or unusable by individuals with

5               disabilities, be excluded from participation in, or be denied the benefits of,

6               the services, programs, or activities of a public entity, or be subjected to

7               discrimination by any public entity." 28 C.F.R. § 35.152(b)(1);

8         b.    failing to "ensure that inmates or detainees with disabilities are housed in the

9               most integrated setting appropriate to the needs of the individuals." 28 C.F.R.

10              § 35.152(b)(2);

11        c.    failing to "implement reasonable policies, including physical modifications

12              to additional cells in accordance with the 2010 [accessibility] Standards, so

13              as to ensure that each inmate with a disability is housed in a cell with the

14              accessible elements necessary to afford the inmate access to safe,

15              appropriate housing." 28 C.F.R. § 35.152(b)(3);

16         d.    failing or refusing to provide PLAINTIFFS and the Incarcerated People

17              with Disabilities Subclass with reasonable accommodations and other

18              services related to their disabilities, *see generally* 28 C.F.R. § 35.130(a);

19         e.    failing or refusing to provide equally effective communication, *see generally*

20              28 C.F.R. § 35.160(a);

21         f.    denying PLAINTIFFS and the Incarcerated People with Disabilities

22              Subclass they represent "the opportunity to participate in or benefit from

23              [an] aid, benefit, or service" provided by the COUNTY and SHERIFF'S

1                   DEPARTMENT, 28 C.F.R. § 35.130(b)(1)(i); using criteria or methods of

2                   administration that have the effect of subjecting Incarcerated People with

3                   Disabilities to discrimination on the basis of disability, 28 C.F.R. §

4                   35.130(b)(3);

5       g.       failing to make "reasonable modifications in policies, practices, or

6                   procedures when the modifications are necessary to avoid discrimination

7                   on the basis of disability ...." 28 C.F.R. § 35.130(b)(7);

8       h.       failing to make available information to PLAINTIFFS and the Incarcerated

9                   People with Disabilities Subclass about their rights under the ADA while

10                detained in the Jail, 28 C.F.R. § 35.106;

11      i.       failing to "adopt and publish grievance procedures providing for prompt

12                and equitable resolution of complaints alleging any action that would be

13                prohibited by ... [the ADA]." 28 C.F.R. § 35.107(b);

14      j.       interfering with PLAINTIFFS' and the Incarcerated People with

15                Disabilities Subclass's use of the grievance process to assert their ADA

16                rights, 42 U.S.C. § 12203(b);

17      k.       failing to "maintain in operable working condition those features of

18                facilities and equipment that are required to be readily accessible to and

19                usable by persons with disabilities by the [ADA]." 28 C.F.R. § 35.133(a);

20                and

21      l.     l.   failing to "furnish appropriate auxiliary aids and services where

22                necessary to afford individuals with disabilities ... an equal opportunity to

participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 417 of the Complaint and, therefore, denies the averments.

418.     As a result of the COUNTY's and SHERIFF'S DEPARTMENT's policy and practice failing to provide reasonable accommodations to, discriminating against, and interfering with the ADA rights of incarcerated people with disabilities, PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent do not have equal access to Jail activities, programs, and services for which they are otherwise qualified.

WHEREFORE, PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent request relief as outlined below.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 418 of the Complaint and, therefore, denies the averments.

**SIXTH CAUSE OF ACTION**
**(Americans with Disabilities Act, 42 U.S.C. 12188)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
**EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
**CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
**People with Disabilities Subclass Against CONTRACTOR DEFENDANTS**

419.     PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 418 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 418 of this Answer as though set forth in full herein.

420.     CONTRACTOR DEFENDANTS are public accommodations that own, lease, lease to, or operate a professional office of a health care provider, hospital, or other service establishment within the meaning of 42 U.S.C. §§ 12181(7)(F), and Title III of the ADA's implementing regulations, 28 C.F.R. § 36.104.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 420 of the Complaint and, therefore, denies the same.

421.     PLAINTIFFS are all individuals with a disability and covered by Title III of the ADA, 42 U.S.C. § 12102(1), 12182(b); 28 C.F.R. § 36.104.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 421 of the Complaint and, therefore, denies the averments.

422.     By their policies and practices described above, CONTRACTOR DEFENDANTS violate Title III of the ADA, 42 U.S.C. §§ 12181-12189, by discriminating against individuals with disabilities on the basis of disability, in the full and equal enjoyment of CONTRACTOR DEFENDANTS' goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(a); 28 C.F.R., Part 36.

1

2          WHEREFORE, PLAINTIFFS and the Incarcerated People with Disabilities

3   Subclass they represent request relief as outlined below.

4

5          **Answer**: MAH denies the averments in Paragraph 422 as alleged against MAH. MAH is

6   without sufficient knowledge or information to admit or deny the averments in Paragraph

7   422 of the Complaint to the extent they apply to the other Contractor Defendants, and,

8   therefore, denies those averments.

9

10                             **SEVENTH CAUSE OF ACTION**
11                          **(Rehabilitation Act, 29 U.S.C. § 794)**
12          **By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
13          **EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
14          **CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
15   **People with Disabilities Subclass Against Defendants SHERIFF'S DEPARTMENT and**
16                                        **COUNTY**
17

18   423.       PLAINTIFFS re-allege and incorporate by reference herein all

19   allegations previously made in paragraphs 1 through 422 above.

20

21          **Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through

22   422 of this Answer as though set forth in full herein.

23

24   424.       By their policy and practice of discriminating against and failing to reasonably

25          accommodate incarcerated people with disabilities, the COUNTY and SHERIFF'S

26          DEPARTMENT violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

27

1     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2     averments in Paragraph 424 of the Complaint and, therefore, denies the averments.

3

4    425.     PLAINTIFFS and the Incarcerated People with Disabilities Subclass they

5     represent are qualified individuals with disabilities as defined in the Rehabilitation Act.

6

7     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

8     averments in Paragraph 425 of the Complaint and, therefore, denies the averments.

9

10    426.     At all times relevant to this action, the COUNTY and SHERIFF'S

11     DEPARTMENT were recipients of federal funding within the meaning of the

12     Rehabilitation Act. As recipients of federal funds, they are required to reasonably

13     accommodate inmates with disabilities in their facilities, program activities, and services,

14     and to provide a grievance procedure.

15

16     **Answer**: MAH is without sufficient knowledge or information to admit or deny the

17     averments in Paragraph 426 of the Complaint and, therefore, denies the averments.

18

19    427.     As a result of the COUNTY and SHERIFF'S DEPARTMENT discriminating

20     against them and failing to provide a grievance procedure and reasonable

21     accommodations, PLAINTIFFS and the Incarcerated People with Disabilities Subclass

22     they represent do not have equal access to Jail activities, programs, and services for which

23     they are otherwise qualified.

1            WHEREFORE, PLAINTIFFS and the Incarcerated People with Disabilities

2    Subclass they represent request relief as outlined below.

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 427 of the Complaint and, therefore, denies the averments.

6

7                     **EIGHTH CAUSE OF ACTION**
8        **(Unruh Civil Rights Act, California Civil Code §§ 51 *et seq.*)**
9    **By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
10   **EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
11   **CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
12   **People with Disabilities Subclass Against Defendants SHERIFF'S  DEPARTMENT,**
13   **COUNTY, CORRECTIONAL HEALTHCARE  PARTNERS, TRI-CITY,**
14   **LIBERTY, MID-AMERICA, and LOGAN HAAK**
15

16   428.     PLAINTIFFS re-allege and incorporate by reference herein all

17   allegations previously made in paragraphs 1 through 427 above.

18

19   **Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through

20   427 of this Answer as though set forth in full herein.

21

22   429.     California Civil Code § 51(b) provides in pertinent part that "All persons

23   within the jurisdiction of this state are free and equal, and no matter what

24   their...disability or medical condition are entitled to the full and equal

25   accommodations, advantages, facilities, privileges, or services in all business

26   establishments of every kind whatsoever."

27

1    **Answer:** Paragraph 429 of the Complaint is a statement of law to which no response is

2    required.  To the extent a response is required, MAH denies the averments in

3    Paragraph 429.

4

5    430.        Pursuant to California Civil Code § 51(f), a violation of the ADA also

6    constitutes a violation of California Civil Code §§ 51 *et seq.*

7

8    **Answer:** Paragraph 430 of the Complaint is a statement of law to which no response is

9    required.  To the extent a response is required, MAH denies the averments in Paragraph

10   430.

11

12   431.        Defendants own, operate, and/or manage business establishments within

13   the meaning of the Unruh Civil Rights Act.

14

15   **Answer**: MAH is without sufficient knowledge or information to admit or deny

16   the averments in Paragraph 431 of the Complaint and, therefore, denies the

17   averments.

18

19   432.        Defendants provide services, privileges, advantages and accommodations to the

20   general public. Defendants have failed and refused to provide PLAINTIFFS with full and

21   equal access to and enjoyment of the benefits of their goods, services, facilities, benefits,

22   advantages, and accommodations, and have done so by reason of PLAINTIFFS'

23   disabilities.

**Answer**: MAH denies the averments in Paragraph 432 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 432 of the Complaint to the extent they apply to the other Contractor Defendants, and, therefore, denies those averments.

433.     Defendants have discriminated against persons with disabilities in violation of California Civil Code §§ 51 *et seq.* by failing to operate their facilities and services in full compliance with the requirements of the ADA as set forth above.

**Answer**: MAH denies the averments in Paragraph 433 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 433 of the Complaint to the extent they apply to the other Contractor Defendants, and, therefore, denies those averments.

434.     Defendants, by their actions and inactions alleged in this Complaint, have directly discriminated against persons with disabilities.

**Answer**: MAH denies the averments in Paragraph 434 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 434 of the Complaint to the extent they apply to the other Contractor Defendants, and, therefore, denies those averments.

435.     The actions of Defendants were and are in violation of the Unruh Civil Rights Act, Cal. Civ. Code §§ 51 *et seq.*, and therefore PLAINTIFFS and the Incarcerated People with Disabilities Subclass are also entitled to injunctive relief and reasonable attorneys' fees, costs and expenses.

WHEREFORE PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent request relief as outlined below.

**Answer**: MAH denies the averments in Paragraph 435 as alleged against MAH. MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 435 of the Complaint to the extent they apply to the other Contractor Defendants, and, therefore, denies those averments.

**NINTH CAUSE OF ACTION**
**(<u>Cal Gov't</u> Code § 11135)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated People with Disabilities Subclass Against Defendants SHERIFF'S DEPARTMENT, COUNTY, and TRI-CITY**

436.     PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 435 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 435 of this Answer as though set forth in full herein.

437.     The COUNTY, SHERIFF'S DEPARTMENT and TRI-CITY receive financial assistance from the State of California as part of Realignment Legislation, Government Code §§ 30025, 30026, and 30029, and through other statutes and funding mechanisms. PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent are all persons with disabilities within the meaning of Government Code § 11135.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 437 of the Complaint and, therefore, denies the averments.

438.     As described in this Complaint, the COUNTY, SHERIFF'S DEPARTMENT, and TRI-CITY deny all PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent full access to the benefits of the Jail's programs and activities that receive financial assistance from the State of California and unlawfully subject PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent to discrimination within the meaning of Government Code § 11135(a) on the basis of their disabilities.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 438 of the Complaint and, therefore, denies the averments.

439.     From at least August 2021 to January 2022, through grievances submitted to the Jail, PLAINTIFFS and the Incarcerated People Class they represent demanded that the COUNTY, SHERIFF'S DEPARTMENT, and TRI-CITY stop their unlawful

1    discriminatory conduct described above, but the COUNTY, SHERIFF'S DEPARTMENT,

2    and TRI-CITY refused and still refuse to refrain from that conduct.

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 439 of the Complaint and, therefore, denies the averments.

6

7    440.      The COUNTY, SHERIFF'S DEPARTMENT, and TRI-CITY's unlawful and

8    discriminatory conduct, described above, unless and until enjoined and restrained by

9    order of this Court, will cause great and irreparable injury to all PLAINTIFFS and the

10    Incarcerated People with Disabilities Subclass they represent in that PLAINTIFFS and

11    the Incarcerated People with Disabilities Subclass are repeatedly subjected to

12    discrimination, risk of injury, and denial of full and equal access to the benefits, programs

13    and services provided by the Jail.

14

15    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

16    averments in Paragraph 440 of the Complaint and, therefore, denies the averments.

17

18    441.      PLAINTIFFS and the Incarcerated People with Disabilities Subclass they

19    represent have no adequate remedy at law for the injuries described above in that they

20    are continually subjected to discrimination on the basis of their disabilities and at

21    increased risk for danger and injury and denied full and equal access to programs,

22    services and activities offered at the Jail.

1    WHEREFORE, PLAINTIFFS and the Incarcerated People with Disabilities

2    Subclass they represent request relief as outlined below.

3

4    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

5    averments in Paragraph 441 of the Complaint and, therefore, denies the averments.

6                                **TENTH CAUSE OF ACTION**
7              **(Sixth Amendment to the United States Constitution, 42 U.S.C. § 1983)**
8               **By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
9               **EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
10             **CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
11    **People with Disabilities Subclass Against Defendants SHERIFF'S DEPARTMENT and**
12                                        **COUNTY**
13

14    442.    PLAINTIFFS re-allege and incorporate by reference herein allegations

15    previously made in paragraphs 1 through 441 above.

16

17    **Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 441 of this

18    Answer as though set forth in full herein.

19

20    443.    By their policies, practices, and failures to train staff described above, the

21    SHERIFF'S DEPARTMENT and COUNTY deprive PLAINTIFFS and the Incarcerated

22    People Class of their right to adequate representation by an attorney. These policies and

23    practices have and continue to be implemented by the SHERIFF'S DEPARTMENT and

24    COUNTY and their agents or employees in their official capacities, and are the proximate

25    cause of PLAINTIFFS' and the PLAINTIFF class's ongoing deprivation of rights secured

26    by the United States Constitution under the Sixth Amendment.

WHEREFORE, PLAINTIFFS and the Class they represent request relief as outlined below.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 443 of the Complaint and, therefore, denies the averments.

**ELEVENTH CAUSE OF ACTION**
**(Section 15 of the California Constitution)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated People Class Against Defendants SHERIFF'S DEPARTMENT and COUNTY**

444.     PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 443 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 443 of this Answer as though set forth in full herein.

445.     By their policies, practices, and failures to train staff described above, the SHERIFF'S DEPARTMENT and COUNTY deprive PLAINTIFFS and the Incarcerated People Class of their right to adequate representation by an attorney. These policies and practices have and continue to be implemented by the SHERIFF'S DEPARTMENT and COUNTY and their agents or employees in their official capacities, and are the proximate cause of PLAINTIFFS' and the PLAINTIFF class's ongoing deprivation of rights secured by Section 9 of the California Constitution.

WHEREFORE, PLAINTIFFS and the Class they represent request relief as outlined below.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 445 of the Complaint and, therefore, denies the averments.

## TWELFTH CAUSE OF ACTION

**(Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983) By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated People Class Against Defendants SHERIFF'S DEPARTMENT and COUNTY**

446.     PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 445 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 445 of this Answer as though set forth in full herein.

447.     By their policies, practices, and failures to train staff described above, the SHERIFF'S DEPARTMENT and COUNTY deprive PLAINTIFFS and the Incarcerated People Class of access to the courts and counsel to prosecute their civil claims. These policies and practices have and continue to be implemented by the SHERIFF'S DEPARTMENT and COUNTY and their agents or employees in their official capacities, and are the proximate cause of PLAINTIFFS' and the PLAINTIFF class's ongoing

1    deprivation of rights secured by the United States Constitution under the Fourteenth

2    Amendment.

3              WHEREFORE, PLAINTIFFS and the Class they represent request relief as

4    outlined below.

5

6    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

7    averments in Paragraph 447 of the Complaint and, therefore, denies the averments.

8

9                          **THIRTEENTH CAUSE OF ACTION**
10                          **(Section 7 of the California Constitution)**
11           **By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
12           **EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
13           **CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
14           **People Class Against Defendants SHERIFF'S DEPARTMENT and COUNTY**

15

16    448.      PLAINTIFFS re-allege and incorporate by reference herein all allegations

17    previously made in paragraphs 1 through 447 above.

18

19    **Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 447 of this

20    Answer as though set forth in full herein.

21

22    449.      By their policies and practices described above, the SHERIFF'S

23    DEPARTMENT and COUNTY deprive PLAINTIFFS and the Incarcerated People

24    Class of access to the courts and counsel to prosecute their civil claims. These policies

25    and practices have and continue to be implemented by the SHERIFF'S

26    DEPARTMENT and COUNTY and their agents or employees in their official

capacities, and are the proximate cause of PLAINTIFFS' and the PLAINTIFF class's

ongoing deprivation of rights secured by the United States Constitution under the

Fourteenth Amendment.

WHEREFORE, PLAINTIFFS and the Class they represent request relief as

outlined below.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the

averments in Paragraph 449 of the Complaint and, therefore, denies the averments.

**FOURTEENTH CAUSE OF ACTION**
**(Discrimination Under Americans with Disabilities Act Contributing to**
**Unnecessary Incarceration and Institutionalization)**
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY**
**EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON,**
**CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated**
**People with Disabilities Subclass Against Defendants SHERIFF'S**
**DEPARTMENT, COUNTY, and PROBATION DEPARTMENT**

450.     PLAINTIFFS re-allege and incorporate by reference herein all

allegations previously made in paragraphs 1 through 449 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through

449 of this Answer as though set forth in full herein.

451.     PLAINTIFFS and the Incarcerated People with Disabilities Subclass are qualified

individuals with disabilities within the meaning of Title II of the ADA.

1    **Answer**: MAH is without sufficient knowledge or information to admit or deny the

2    averments in Paragraph 451 of the Complaint and, therefore, denies the averments.

3

4    452.    The SHERIFF'S DEPARTMENT, COUNTY, and PROBATION

5    DEPARTMENT are public entities subject to Title II, 42 U.S.C. § 12131(1).

6

7    **Answer:** Paragraph 452 of the Complaint is a statement of law to which no

8    response is required.  To the extent a response is required, MAH denies the

9    averments in Paragraph 452.

10

11   453.    The SHERIFF'S DEPARTMENT, COUNTY, and PROBATION DEPARTMENT

12   violate the ADA, and its implementing regulations, including, by utilizing methods of

13   administering their programs in ways that deny PLAINTIFFS and the Incarcerated People

14   with Disabilities Subclass access to services and programs for which they would be

15   eligible, resulting in avoidable incarcerations, 28 C.F.R. § 35.130(b)(3), and placing them

16   at unnecessary risk of institutionalization in violation of the ADA's Integration Mandate

17   and *Olmstead*, 28 C.F.R. § 35.130(d).

18

19   **Answer**: MAH is without sufficient knowledge or information to admit or deny the

20   averments in Paragraph 453 of the Complaint and, therefore, denies the averments.

21

22   454.    The lack of adequate capacity and reach regarding diversion and reentry services

23   for people with mental health and other disabilities leads to the rationing of services that

is arbitrary and/or discriminates against people based on the severity of their disability, in violation of the ADA and other relevant disability law.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 454 of the Complaint and, therefore, denies the averments.

455.     Providing PLAINTIFFS and the Incarcerated People with Disabilities Subclass with the alternatives to incarceration programs and reentry programs they need and for which they would be eligible would not fundamentally alter the SHERIFF'S DEPARTMENT's, COUNTY's, and PROBATION DEPARTMENT's programs, services, or activities.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 455 of the Complaint and, therefore, denies the averments.

456.     PLAINTIFFS and the Incarcerated People with Disabilities Subclass have suffered and will suffer injury as a proximate result of the SHERIFF'S DEPARTMENT's, COUNTY's, and PROBATION DEPARTMENT's violation of their rights under the ADA.

WHEREFORE, PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent request relief as outlined below.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 456 of the Complaint and, therefore, denies the averments.

## FIFTEENTH CAUSE OF ACTION
### (Discriminatory Impact Under Cal Gov't Code § 11135)
**By Plaintiffs DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER and the Incarcerated People with Disabilities Subclass Against Defendants SHERIFF'S DEPARTMENT, COUNTY, and PROBATION DEPARTMENT**

457.    PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 456 above.

**Answer**: MAH repeats and reasserts its responses to Paragraphs 1 through 456 of this Answer as though set forth in full herein.

458.    Under Government Code § 11135, a person may not be denied, on account of their race, color, national origin, or ethnic group identification, "full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is ... funded directly by the state, or receives any financial assistance from the state."

**Answer:** Paragraph 458 of the Complaint is a statement of law to which no response is required.  To the extent a response is required, MAH denies the averments in Paragraph 458.

459.      A violation of Section 11135 is enforceable by a civil action for equitable relief. Cal. Gov. Code § 11139.

**Answer:** Paragraph 459 of the Complaint is a statement of law to which no response is required.  To the extent a response is required, MAH denies the averments in Paragraph 459.

460.      The COUNTY, SHERIFF DEPARTMENT, and PROBATION DEPARTMENT administer State-funded programs that cause Black and Latinx persons to be disproportionately incarcerated in the Jail and are thus subject to Section 11135 and its implementing regulations.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 460 of the Complaint and, therefore, denies the averments.

461.      In carrying out their policing programs, alternatives to pre-trial custody programs, early release programs, and re-entry programs, the COUNTY, SHERIFF'S DEPARTMENT, and PROBATION DEPARTMENT violate Section 11135 by causing a disproportionate adverse effect on the basis of race, color, national origin, or ethnic group identification.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 461 of the Complaint and, therefore, denies the averments.

462.     In carrying out their policing programs, alternatives to pre-trial custody programs, early release programs, and re-entry programs, the COUNTY, SHERIFF'S DEPARTMENT, and PROBATION DEPARTMENT violate 2 Cal. Code Regs. § 11154(i) because they use criteria or methods of administration that have the purpose or effect of subjecting a person to discrimination on the basis of race, color, national origin, or ethnic group identification.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 462 of the Complaint and, therefore, denies the averments.

463.     PLAINTIFFS and the Incarcerated People Class have suffered and will suffer injury as a proximate result of the COUNTY's, SHERIFF'S DEPARTMENT's, and PROBATION DEPARTMENT's violation of their rights under § 11135.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 463 of the Complaint and, therefore, denies the averments.

464.     WHEREFORE, PLAINTIFFS and the Incarcerated People Class they represent request relief as outlined below.

**Answer**: MAH is without sufficient knowledge or information to admit or deny the averments in Paragraph 464 of the Complaint and, therefore, denies the averments.

**PRAYER FOR RELIEF**

Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiffs are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the Constitution and laws of the United States and the State of California.

WHEREFORE, Plaintiffs DUNSMORE, ARCHULETA, EDWARDS, LEVY, LOPEZ, NELSON, NORWOOD, and ZOERNER, on behalf of themselves, the proposed Incarcerated People Class, the proposed Incarcerated People with Disabilities Subclass, and all others similarly situated, pray for judgment and the following specific relief against Defendants SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, TRI-CITY, LIBERTY, MID-AMERICA, LOGAN HAAK, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 through 20 as follows:

1. An order certifying that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23;

**Answer:** Paragraph 1 of the Prayer for Relief is a statement regarding Plaintiffs'
position and relief sought to which no response is required.  To the extent a response is
required, MAH denies that Plaintiffs are entitled to this, or any, relief.

2. A declaratory judgment that the conditions, acts, omissions, policies, and practices
described above are in violation of the rights of Plaintiffs and the class and subclass they
represent under the ADA, Rehabilitation Act, the Eighth and Fourteenth Amendments to
the United States Constitution, California Government Code § 11135, California Civil
Code § 51, and Article 1, Sections 7, 15, and 17 of the California Constitution;

**Answer:** Paragraph 2 of the Prayer for Relief is a statement regarding Plaintiffs' position
and relief sought to which no response is required.  To the extent a response is required,
MAH denies that Plaintiffs are entitled to this, or any, relief.

3. An order requiring Defendants, their agents, officials, employees, and all persons acting
in concert with them under color of state law or otherwise to provide minimally adequate
health care to incarcerated people; to provide minimally adequate mental health care to
incarcerated people; to cease discriminating against, interfering with the ADA rights of,
and failing to provide accommodations to incarcerated people with disabilities and
violating their due process rights; to ensure adequate environmental health and safety
conditions consistent with modern public health standards; to provide minimally adequate
protections against violence and other serious harm; to cease violating the Sixth
Amendment and due process rights of incarcerated people; to provide alternatives-to-

1   custody and reentry services to people with disabilities in the most integrated, least

2   restrictive environment; and to cease their policies and practices that disproportionately

3   and discriminatorily overincarcerate Black and Latinx people.

4

5   **Answer:** Paragraph 3 of the Prayer for Relief is a statement regarding Plaintiffs' position

6   and relief sought to which no response is required.  To the extent a response is required,

7   MAH denies that Plaintiffs are entitled to this, or any, relief.

8

9   4.   An order enjoining Defendants, their agents, officials, employees, and all persons acting in

10      concert with them under color of state law or otherwise, from continuing the unlawful acts,

11      conditions, and practices described in this Complaint;

12

13   **Answer:** Paragraph 4 of the Prayer for Relief is a statement regarding Plaintiffs' position

14      and relief sought to which no response is required.  To the extent a response is required,

15      MAH denies that Plaintiffs are entitled to this, or any, relief.

16

17   5.   An order requiring Defendants and their agents, employees, officials, and all persons acting

18      in concert with them under color of state law or otherwise to develop and implement, as

19      soon as practical, a plan to eliminate the substantial risk of harm, discrimination, and

20      statutory violations that Plaintiffs and members of the class and subclass they represent

21      suffer due to the unlawful acts, omissions, conditions and practices described in this

22      Complaint. Defendants' plan shall include at a minimum the following:

a.   Medical Care: Ensure adequate medical care to treat the serious medical needs of the Jail population.

b.   Access to Care: Ensure timely access to appropriately trained providers and staff to adequately treat incarcerated people's serious medical needs.

c.   Medical Staffing: Ensure adequate numbers of staff by discipline to ensure the timely and appropriate treatment of the Jail population's serious medical needs.

d.   Emergency Care: Ensure timely access to appropriate emergency care of incarcerated people's emergent medical needs.

e.   Medical Autonomy: Ensure that medical and mental health care professionals make clinical decisions about incarcerated people's serious medical and mental health needs without interference from custody staff.

f.   Chronic Care: Ensure appropriate and timely monitoring and care of incarcerated people's chronic conditions.

g.   Medical Records: Ensure appropriate and complete medical records are maintained as necessary to ensure adequate treatment of incarcerated people's serious medical needs.

h.   Specialists and Outside Treatment: Ensure appropriate and timely access to specialists and outside treatment and hospitalization for incarcerated people who cannot be adequately treated at the Jail.

i.   Medical Training: Ensure that all staff are adequately trained to carry out their duties to provide adequate medical care to the Jail population.

j.    Mental Health Care: Ensure timely access to necessary treatment by qualified staff for serious mental illness, including appropriate medication practices, appropriate therapies, access to hospitalization and inpatient care, appropriate suicide prevention practices and policies, appropriate use of seclusion and restraints, appropriate disciplinary policies and practices regarding the mentally ill, and appropriate training of corrections and mental health staff to recognize and treat incarcerated people's mental illness.

k.    Mental Health Staffing: Ensure adequate numbers of staff by discipline to ensure the timely and appropriate treatment of the Jail population's serious mental health needs.

l.    Mental Health Training: Ensure that all staff are adequately trained to carry out their duties to provide adequate mental health care to the Jail population.

m.    Quality Assurance: Ensure a system that regularly assesses the performance of health care and custodial staff regarding the provision of health services at the Jail against a set of established and appropriate criteria, so that errors and deficiencies in the Jail's health care system are identified and corrected timely.

n.    Environmental Health and Safety: Ensure adequate environmental health and safety conditions consistent with modern public health standards, including appropriate physical plant conditions; policies and procedures for sanitation and environmental health; prevention of infectious disease transmission; and regular cleaning, maintenance, and remediation of dangerous conditions.

o.   Dental care: Ensure timely access to dental care to treat the serious dental needs of the Jail population.

p.   Population: Implement appropriate population management so that the number of incarcerated people is kept at a level that can be safely managed.

q.   Physical Plant: Remedy all physical plant problems that endanger the safety and security of the Jail population.

r.   Protection from Harm: Take all steps to ensure that incarcerated people are safe from harm from fellow incarcerated people.

s.   Training: Ensure that custody staff are adequately trained to carry out their duties to ensure the safety and security of the Jail population.

t.   Classification and Housing: Appropriately classify and house incarcerated people to ensure their safety and security.

u.   Accommodation for Incarcerated People with Disabilities: Ensure that the members of the Incarcerated People with Disabilities Subclass are not denied the benefits of, or participation in, programs, services, and activities at the Jail; that incarcerated people with disabilities are timely identified and tracked; have their disabilities accommodated; not discriminated against or have their rights interfered with; are provided with an effective grievance procedure; are provided with all needed assistive devices and other accommodations; receive accessible transportation to the Jail and to outside appointments; and receive effective communication in all medical, mental health, and due process settings and encounters.

v.   Alternatives to Incarceration for People with Disabilities: Ensure that community-based alternatives to incarceration programs are funded, created, and expanded in size and scope, to reduce incarceration of people with disabilities in the Jail; and ensure that reentry programs are funded, created, and expanded to reduce the reincarceration of people with disabilities in the Jail.

w.   Alternatives to Incarceration for All Incarcerated People: Ensure that community-based alternatives to incarceration programs and re-entry programs are made available to people of all races on an equitable basis; study the disparate impacts of eligibility criteria for community-based alternatives to incarceration programs and re-entry programs, and amend eligibility criteria to prevent such disparate impact; train staff to ensure that community-based alternatives to incarceration programs and re-entry programs are administered in a manner that does not have a disproportionate impact on Black and Latinx individuals.

x.   Access to Attorneys and Courts: Ensure that all incarcerated people have adequate access to confidential communication with their criminal defense attorneys and their civil attorneys; and that all incarcerated people's legal property and materials are not interfered with by Jail staff.

**Answer:** Paragraph 5 and all sub-parts, a.-x., of the Prayer for Relief are statements regarding Plaintiffs' position and relief sought to which no response is required.  To the extent a response is required, MAH denies that Plaintiffs are entitled to this, or any, relief.

6. An award to Plaintiffs, pursuant to 29 U.S.C. § 794a, 42 U.S.C. §§ 1988, 12205, and California Code of Civil Procedure § 1021.5, of the costs of this suit and reasonable attorneys' fees and litigation expenses;

**Answer:** Paragraph 6 of the Prayer for Relief is a statement regarding Plaintiffs' position and relief sought to which no response is required.  To the extent a response is required, MAH denies that Plaintiffs are entitled to this, or any, relief.

7. An order retaining jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

**Answer:** Paragraph 7 of the Prayer for Relief is a statement regarding Plaintiffs' position and relief sought to which no response is required.  To the extent a response is required, MAH denies that Plaintiffs are entitled to this, or any, relief.

8. An award to Plaintiffs of such other and further relief as the Court deems just and proper.

**Answer:** Paragraph 8 of the Prayer for Relief is a statement regarding Plaintiffs' position and relief sought to which no response is required.  To the extent a response is required, MAH denies that Plaintiffs are entitled to this, or any, relief.

### **MAH'S AFFIRMATIVE DEFENSES**

MAH asserts the following affirmative defenses:

1.      MAH asserts the right to add additional affirmative defenses.

2.      MAH asserts that Plaintiffs did not clearly state the issues in this case, making it difficult for MAH to respond. Due to this ambiguity, MAH requests that this Court grant leave to amend this Answer to allow additional defenses once additional information is discovered which will allow any other defenses to be known by MAH at that time.

3.      To the extent that MAH has not responded to any allegations contained in the Complaint, MAH specifically denies them at this time.

4.      Plaintiffs' Complaint fails to state any claim against MAH on which relief may be granted.

5.      Plaintiffs' claims are barred or diminished, in whole or in part, by the doctrines of unclean hands, estoppel, assumed risk, laches, and waiver.

6.      MAH has no obligation in connection with the acts or omissions of any other party or non-party.

7.      Plaintiffs' claims are barred or diminished, in whole or in part, by their own acts or omissions, and Plaintiffs' own comparative and contributory negligence was a cause or contributing factor to their own alleged injuries and deprivations.

8.      Although MAH denies liability, any liability imposed by the Court should be apportioned taking into consideration the acts or omissions of any other party or non-party.

9.      Plaintiffs' claims are barred or diminished, in whole or in part, to the extent they have received or will receive payment, reimbursement, or other compensation from other sources or persons for any alleged costs, damages, or harms.

1        10.    Plaintiffs' claims are barred or diminished, in whole or in part, due to a lack of

2   causation that MAH caused or contributed to any acts, omissions, or circumstances creating or

3   contributing to the basis for Plaintiffs' claims.

4        11.    Plaintiffs' claims are barred due to a lack of standing.

5        12.    MAH asserts that it performed all duties owed, other than any duties which were

6   prevented, frustrated, or excused, and therefore MAH never failed to fulfill the duties it owed.

7   Although MAH asserts that it performed all duties owed, any liability imposed by the Court

8   owing to a failure to perform all duties owed is due to the prevention and frustration of

9   performance, in whole or in part, owing to the acts or omissions of other parties outside of

10   MAH's control.

11        13.    MAH asserts that any liability imposed by the Court is diminished, in whole or in

12   part, by the comparative fault of Plaintiffs or other third parties, and by intervening and

13   superseding causes outside of MAH's control.

14        14.    MAH substantially complied by the terms of the contract, and substantially

15   complied with any other obligations it owed.

16        15.    Plaintiffs' claims are barred or diminished, in whole or in part, due to false claims

17   alleged by Plaintiffs.

18        16.    Plaintiffs' claims are barred or diminished, in whole or in part, by applicable

19   statutes of limitations and/or statutes of repose.

20

Respectfully submitted,

*/s/ William P. Sweet*
David L. Guevara, Atty. No. 26388-49
William P. Sweet, Atty. No. 36086-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone: (317) 713-3500
Email: cgrohman@taftlaw.com
      dguevara@taftlaw.com
      wsweet@taftlaw.com

Christopher T. Grohman, Atty. No. 254450
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Email: cgrohman@taftlaw.com

*Counsel for Defendant Mid America Health, Inc.*

## CERTIFICATE OF SERVICE

    I hereby certify that on March 4, 2022, a true and correct copy of the foregoing was filed though the Court's electronic filing system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                         */s/ William P. Sweet*