GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email:      ggrunfeld@rbgg.com
            vswearingen@rbgg.com
            pkaul@rbgg.com
            eanderson@rbgg.com
            hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California  94704-1165
Telephone:  (510) 806-7366
Facsimile:  (510) 694-6314
Email:      ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 3:20-cv-00406-AJB-WVG <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** <br><br> Judge:    Hon. Anthony J. Battaglia <br><br> Date:    June 16, 2022 <br> Time:    2:00 p.m. <br> Ctrm.:   4A |

[3892284.19]

Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1 | *(counsel continued from preceding page)*

2 | CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
3 | OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4 | 401 B Street, Suite 1700
San Diego, California  92101-4297
5 | Telephone:  (619) 699-2700
Facsimile:  (619) 699-2701
6 | Email:       christopher.young@dlapiper.com
             isabella.neal@dlapiper.com
7 |              oliver.kiefer@dlapiper.com

8 | BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
9 | ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
10 | 2760 Fifth Avenue, Suite 300
San Diego, California  92103-6330
11 | Telephone:  (619) 232-2121
Email:       bvakili@aclusandiego.org
12 |              jmarkovitz@aclusandiego.org

13 | Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3892284.19]

Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

TABLE OF ACRONYMS ...................................................................................... viii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

I. Plaintiffs Are at Substantial Risk of Serious Harm Due to Defendants' Failure to Prevent Drug Overdoses at the Jail ...................................................... 4

    A. Defendants Fail to Interdict Drugs Entering the Jail ............................. 4

    B. Defendants Fail to Prevent Overdose Deaths ........................................ 5

II. Plaintiffs Are at Substantial Risk of Serious Harm Due to Defendants' Failure to Conduct Adequate and Timely Safety Checks ................................. 7

    A. Defendants Fail to Conduct Adequate Safety Checks ........................... 7

    B. Defendants Fail to Conduct Sufficiently Frequent Safety Checks in Administration Segregation Units ........................................................ 8

III. Plaintiffs Are at a Substantial Risk of Serious Harm From Defendants' Deficient Intercom and Video Surveillance Systems ...................................... 9

    A. Defendants' Intercom System Practices Are Ineffective ...................... 9

    B. Defendants' Video Surveillance Practices Are Ineffective ................. 10

IV. Plaintiffs Are at Substantial Risk of Serious Harm Due to Defendants' Failures to Consider Mental Health Staff's Clinical Input ............................. 12

    A. Defendants' Practice of Placing People with Mental Illness in Segregated Housing Units Is Dangerous ............................................. 12

    B. Defendants' Exclusion of Patients with Mental Illness from OPSD if They are Designated as Protective Custody Is Dangerous ......................................................................................... 13

    C. Defendants' Practice of Placing People in EOH and Denying Clothing, Property, and Privileges Contrary to Clinical Judgment Puts Patients at Substantial Risk of Serious Harm ............................... 14

V. Plaintiffs Are at Substantial Risk of Serious Harm Due to Defendants' Failure to Provide Mental Health Care in Confidential Settings for Patients in Mental Health Housing Units ......................................................... 15

VI. Defendants Deny Incarcerated People with Mobility Disabilities Access to Critical Programs, Services, and Activities ............................................... 16

ARGUMENT ....................................................................................................... 19

[3892284.19]

i

Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I.    Plaintiffs Are Likely to Prevail on Their Claims ............................................. 19

      A.    Plaintiffs Are Likely to Prevail on Their Constitutional Claims .......... 19

            1.    Defendants Are Deliberately Indifferent by Failing to
                  Prevent Drug Overdoses ........................................................ 20

                  (a)    Failure to Interdict Drugs from Entering the Jail ............. 20

                  (b)    Failure to Medically Prevent and Address
                         Overdoses ............................................................. 21

            2.    Defendants Are Deliberately Indifferent by Failing to
                  Conduct Adequate and Timely Safety Checks ........................... 22

                  (a)    Failure to Conduct Adequate Safety Checks ................... 22

                  (b)    Failure to Conduct Sufficiently Frequent Safety
                         Checks in Administrative Segregation Units ................... 22

            3.    Defendants Are Deliberately Indifferent by Maintaining
                  Deficient Intercom and Video Surveillance Systems ................. 23

            4.    Defendants Are Deliberately Indifferent by Failing to
                  Consider Mental Health Clinicians' Housing Input ................... 24

                  (a)    Dangerous Practice of Placing People with Mental
                         Illness in Segregated Housing Units ............................. 24

                  (b)    Dangerous Practice of Excluding Individuals with
                         Mental Illness from OPSD if They are Designated
                         as Protective Custody ............................................. 24

                  (c)    Dangerous Practice of Placing People in EOH and
                         Denying Clothing, Property, and Family Visits/Calls
                         Contrary to Clinical Judgment ................................... 25

            5.    Defendants Are Deliberately Indifferent by Not Providing
                  Confidentiality for Mental Health Contacts ............................. 25

      B.    Plaintiffs Are Likely to Prevail on Their ADA Claims ...................... 26

II.   Plaintiffs Suffer Irreparable Harm Absent Preliminary Injunctive Relief ...... 28

III.  The Balance of Hardships Weighs Heavily in Plaintiffs' Favor .................... 29

IV.   A Preliminary Injunction is in the Public Interest ..................................... 30

V.    The Court Should Waive the Security Bond Under Rule 65(c) ..................... 30

VI.   The Requested Relief is Consistent With the PLRA ................................. 30

VII.  This Court Should Certify a Provisional Class and Subclass for
      Purposes of the Preliminary Injunction ................................................. 31

[3892284.19]

ii                                    Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

A.    The Proposed Class and Subclass Are Sufficiently Numerous ............ 32

B.    The Proposed Class and Subclass Have Common Questions .............. 32

C.    Plaintiffs' Claims Are Typical of the Proposed Class and
      Subclass ................................................................................. 33

D.    Plaintiffs and Counsel Are Adequate Representatives ....................... 34

E.    Defendants' Generally Applicable Conduct Requires Relief .............. 34

CONCLUSION ......................................................................................... 35

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*A.B. v. Haw. State Dep't of Educ.*,
— F.4th —, 2022 WL 996575 (9th Cir. 2022) ................................................32

*Abdullah v. U.S. Sec. Assocs., Inc.*,
731 F.3d 952 (9th Cir. 2013) ........................................................................32

*Amoco Prod. Co. v. Gambell*,
480 U.S. 531 (1987) ......................................................................................29

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) ........................................................................32

*Armstrong v. Schwarzenegger*,
622 F.3d 1058 (9th Cir. 2010) ................................................................27, 31

*Bell v. Wolfish*,
441 U.S. 520 (1979) ......................................................................................20

*Braggs v. Dunn*,
257 F. Supp. 3d 1171 (M.D. Ala. 2017) ......................................................25

*Cohen v. City of Culver City*,
754 F.3d 690 (9th Cir. 2014) ........................................................................26

*Coleman v. Brown*,
28 F. Supp. 3d 1068 (E.D. Cal. 2014) ........................................................24

*Coleman v. Brown*,
938 F. Supp. 2d 955 (E.D. Cal. 2013) ........................................................22

*Cortez v. Skol*,
776 F.3d 1046 (9th Cir. 2015) ......................................................................24

*D.R. v. Antelope Valley Union High Sch. Dist.*,
746 F. Supp. 2d 1132 (C.D. Cal. 2010) ......................................................29

*Elrod v. Burns*,
427 U.S. 347 (1976) ......................................................................................28

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
630 F.3d 1153 (9th Cir. 2011) ......................................................................30

*Estelle v. Gamble*,
429 U.S. 97 (1976) ........................................................................................21

*Farmer v. Brennan*,
511 U.S. 825 (1994) ......................................................................................19

*Farris v. Seabrook,*
    677 F.3d 858 (9th Cir. 2012) ................................................................ 19

*Germaine-McIver v. Cnty. of Orange,*
    No. SACV 16-01201-CJC (GJSx), 2018 WL 6258896 (C.D. Cal. Oct.
    31, 2018) ............................................................................................. 22

*Gomez v. Vernon,*
    255 F.3d 1118 (9th Cir. 2001) .............................................................. 31

*Gordon v. Cnty. of Orange,*
    888 F.3d 1118 (9th Cir. 2018) ......................................................... 20, 21

*Gray v. Cnty. of Riverside,*
    No. EDCV 13-00444, 2014 WL 5304915 (C.D. Cal. Sept. 2, 2014) ........... 25

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) ................................................................ 34

*Harris v. Bd. of Supervisors, Los Angeles Cnty.,*
    366 F.3d 754 (9th Cir. 2004) ........................................................... 28, 29

*Helling v. McKinney,*
    509 U.S. 25 (1993) ............................................................................... 20

*Hernandez v. Cnty. of Monterey,*
    110 F. Supp. 3d 929 (N.D. Cal. 2015) .......................................... passim

*Hernandez v. Cnty. of Monterey,*
    305 F.R.D. 132 (N.D. Cal. 2015) .......................................................... 33

*Hoptowit v. Ray,*
    682 F.2d 1237 (9th Cir. 1982) .............................................................. 23

*In re Cooper Cos. Sec. Litig.,*
    254 F.R.D. 627 (C.D. Cal. 2009) .......................................................... 32

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ................................................................ 30

*Lemire v. California Dep't of Corr. & Rehab.,*
    726 F.3d 1062 (9th Cir. 2013) .............................................................. 22

*Lonberg v. City of Riverside,*
    EDCV970237SGLAJWX, 2007 WL 2005177 (C.D. Cal. May 16,
    2007) .................................................................................................. 29

*Lyon v. ICE,*
    308 F.R.D. 203 (N.D. Cal. 2014) .......................................................... 33

*Madrid v. Gomez,*
    889 F. Supp. 1146 (N.D. Cal. 1995) .............................................. 24, 25

*May v. Higgins*,
    No. 4:20-00826, 2020 WL 4919562 (E.D. Ark. Aug. 7, 2020), *report and recommendation adopted*, 2020 WL 4905833 (E.D. Ark. Aug. 20, 2020)....................................................................................................................23

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)...............................................................28, 30

*Meyer v. Portfolio Recovery Assoc., LLC*,
    707 F.3d 1036 (9th Cir. 2012).......................................................................31

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
    422 F.3d 782 (9th Cir. 2005).........................................................................19

*Orantes–Hernandez v. Smith*,
    541 F. Supp. 351 (C.D. Cal. 1982)..............................................................30

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998) .......................................................................................27

*Pajas v. Cnty. of Monterey*,
    2016 WL 3648686 (N.D. Cal. July 8, 2016)..............................................21

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014)...................................................................25, 34

*Pell v. Procunier*,
    417 U.S. 817 (1974) .......................................................................................20

*Pesce v. Coppinger*,
    355 F. Supp. 3d 35 (D. Mass. 2018) ...........................................................21

*Pierce v. Cnty. of Orange*,
    761 F. Supp. 2d 915 (C.D. Cal. 2011).........................................................31

*Sandin v. Conner*,
    515 U.S. 472 (1995) .......................................................................................23

*Smith v. Aroostook Cnty.*,
    376 F. Supp. 3d 146 (D. Me. 2019), *aff'd* 922 F.3d 41 (1st Cir. 2019) .........21

*Toussaint v. Rushen*,
    553 F. Supp. 1365 (N.D. Cal. 1983) ...........................................................19

*Toussaint v. Yockey*,
    722 F.2d 1490 (9th Cir. 1984)......................................................................19

*Turner v. Cook Cnty. Sheriff's Office by and through Dart*,
    No. 19-CV-5441, 2020 WL 1166186 (N.D. Ill. Mar. 11, 2020)..................20

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .......................................................................................35

*Wilk v. Neven*,
    956 F.3d 1143 (9th Cir. 2020).......................................................................24

[3892284.19]

vi

Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ....................................................................................19, 29

*Witcherman v. City of Philadelphia*,
 2019 WL 3216609 (E.D. Pa. July 17, 2019)..................................................21


**STATUTES**

18 U.S.C. § 3626.................................................................................................30

28 C.F.R. § 35.149.............................................................................................26

29 U.S.C. § 705..................................................................................................31

42 U.S.C. § 12102..............................................................................................31

42 U.S.C. § 12131..............................................................................................27

California Government Code § 12926.................................................................31


**RULES**

Fed. R. Civ. P. 23.................................................................................32, 33, 34


**MISCELLANEOUS**

William B. Rubenstein, Newberg on Class Actions § 4:28 (5th ed. 2018)..............35

Wright & Miller, Federal Practice & Proc. § 1768 (4th ed. 2022)...........................34

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# TABLE OF ACRONYMS

| | |
|---|---|
| ADA | Americans with Disabilities Act |
| CLERB | Citizens' Law Enforcement Review Board |
| DRC | Disability Rights California |
| EOH | Enhanced Observation Housing |
| LACSD | Los Angeles County Sheriff's Department |
| MAT | Medication-Assisted Treatment |
| NCCHC | National Commission on Correctional Health Care |
| OPSD | Outpatient Step Down |
| PLRA | Prison Litigation Reform Act |
| PC | Protective Custody |
| PSU | Psychiatric Stabilization Unit |
| SDSD | San Diego County Sheriff's Department |

[3892284.19]

viii

Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

## INTRODUCTION

The crisis of people dying and suffering inside the San Diego County Jail system ("Jail") is urgent and undeniable.  For years, the Jail's death rate has exceeded death rates nationally and in other large California jails.  Last year, 18 people died at the Jail, amounting to a death rate of 454 incarcerated people per 100,000—approximately triple the national jail rate.  On February 3, 2022, the California State Auditor issued a scathing indictment of those responsible for the welfare of people confined at the Jail, concluding that "the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody." Declaration of Van Swearingen ("Swearingen Decl.") ¶ 3, Ex. B (*San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody* ("State Audit Report")) at iii.  The State Auditor warned that until "systemic deficiencies" are remedied, "the weaknesses in [the Sheriff's Department's] policies and practices will continue to jeopardize the health and lives of the individuals in its custody." *Id*. ¶ 3, Ex. B at 4, 53.

In the three months since the State Audit Report issued, another eight people died in custody.  Swearingen Decl. ¶ 6, Ex. E.  If these trends continue, 24 people will die by year's end, significantly more than last year.  Defendants San Diego County Sheriff's Department ("SDSD"), County of San Diego (with SDSD, "County Defendants"), Correctional Healthcare Partners, Inc., and Liberty Healthcare, Inc. (collectively, "Defendants") have failed to remedy dangerous and deadly conditions despite many warnings over many years by many experts and public officials.  As deaths mount, families are left to grieve with no explanation from the billion dollar County entities and their private contractors who are responsible.  The extraordinarily high number of in-custody deaths and misery at the Jail will continue without this Court's intervention.

Plaintiffs respectfully ask the Court to enter a targeted preliminary injunction to ameliorate inadequate and  harmful policies, procedures, practices, and training at

the Jail pertaining to:  (1) the prevention of drug overdose deaths; (2) adequate and timely safety checks; (3) audio intercom and video surveillance systems, and related staff responses to emergencies; (4) the consideration of mental health staff's clinically-based recommendations for people with mental health needs; (5) the provision of mental health care in confidential settings; and (6) the provision of safe and accessible housing and programming to people with mobility disabilities. Plaintiffs' Proposed Order asks that the Court permit Plaintiffs and their experts to monitor Defendants' compliance.  Swearingen Decl., ¶ 2, Ex. A .  Plaintiffs also seek provisional class certification as described *infra* at 31-35.

The systemic failures targeted through these motions threaten the lives and safety of incarcerated people, and have been recognized by experts and oversight entities as particularly harmful.[1]  All people incarcerated in the Jail are exposed to the same policies and practices that create these problems, and, as described in putative class members' declarations, face irreparable harm.

## STATEMENT OF FACTS

Following the shocking number of Jail deaths in recent years, oversight agencies, experts, journalists, community groups, and family members have repeatedly sounded the alarm, demanding many of the reforms this motion seeks in order to protect San Diego County residents from suffering and dying due to Defendants' deliberate indifference.  The San Diego Grand Jury issued reports finding the Jail's body scanner and video surveillance technology deficient, which in

---

[1] Plaintiffs submit declarations of 24 brave incarcerated people who have experienced, and continue to face, serious harm due to Defendants' failures.  Two committed mental health professionals who each worked at the Jail for three years— one as Medical Director and Chief Psychiatrist (Christine Evans, M.D.), the other as a Mental Health Clinician (Jennifer Alonso, LCSW)—have come forward as whistleblowers to testify to the Jail's deficiencies and the harms they saw their patients suffer.  Four nationally recognized experts, on correctional medical care, correctional mental health care, custody operations, and disability access, have also submitted declarations in support of Plaintiffs' motions.  Plaintiffs' Proposed Order requests that the Court enter an order that prohibits Defendants from retaliating against incarcerated people and whistleblowers for their participation in this lawsuit.

1  turn contributes to overdose and other deaths.  Swearingen Decl. ¶¶ 11-13, Exs. J-L.

2  In 2018, Disability Rights California issued a report calling the Jail's suicide rate a

3  "crisis demanding meaningful action," and recommending confidential mental

4  health visits, clinician input in housing placement decisions and conditions of

5  confinement, and timely and adequate safety checks.  *Id.* ¶ 7, Ex. F (*Suicides in San*

6  *Diego County Jail: A System Failing People with Mental Illness* ("DRC Report")) at

7  1, 3, Appx. A-10, 14-16.  The County then retained suicide prevention expert

8  Lindsay Hayes, who found that the Jail's suicide rate "was higher than that of

9  county jails of varying size throughout the United States."  *Id.* ¶ 8, Ex. G (*Report on*

10  *Suicide Prevention Practices Within The San Diego County Jail System* ("Hayes

11  Report")) at 4.  He also recommended patient-provider confidentiality, clinician-

12  informed housing placements and conditions of confinement, and improved safety

13  checks.  *Id.* ¶ 8, Ex. G at 28, 31-32, 55.

14      Over the past several years, the Citizens' Law Enforcement Review Board

15  ("CLERB") has found that County Defendants' body scanners fail to catch drugs

16  that lead to overdose deaths, that intercom and video camera deficiencies result in

17  staff not responding to deadly emergencies, and that deputies fail to conduct

18  adequate safety checks to ensure people are not in medical or psychiatric distress.

19  *Id.* ¶¶ 14-26, Exs. M-Y.  In 2019, the San Diego Union-Tribune published an award-

20  winning "Dying Behind Bars" series about Jail deaths.  *Id.* ¶ 35, Ex. HH.  Family

21  members of people who died at the Jail are also calling for reforms.  *Id.* ¶ 34,

22  Ex. GG (video of three grieving family members at April 7, 2022 event).

23      In response to mounting deaths and community pressure, the California State

24  Auditor investigated the 185 in-custody deaths from 2006 through 2020, finding that

25  "deficiencies in the Sheriff's Department's policies and practices related to …

26  mental health care, safety checks, and responses to emergencies likely contributed to

27  these deaths."  State Audit Report at 53.  The State Auditor criticized the SDSD for

28  inadequate safety checks (at 39-40) and not "updating equipment for monitoring the

[3892284.19]                                    3                    Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

safety of incarcerated individuals" (at 40).  The report called for policy changes and formal audits to ensure effective safety checks (at 54-55), and for CLERB death reviews to investigate "the decedent's mental health history and the appropriateness of the decedent's housing assignment."  *Id*. at 50.

## I.   Plaintiffs Are at Substantial Risk of Serious Harm Due to Defendants' Failure to Prevent Drug Overdoses at the Jail

The Jail is experiencing an epidemic of drug overdoses.  Swearingen Decl. ¶ 36, Ex. II.  From 2010 to 2020, the Jail averaged approximately one overdose death every five months.  State Audit Report at 14.  Since 2019, at least 16 incarcerated people have died from drug overdoses, amounting to one death every two to three months.  *See* Swearingen Decl. ¶ 27, Ex. C.  In 2021, 204 people were suspected of having overdosed on opiates in the Jail, including two mass overdoses at George Bailey.  *Id.* ¶¶ 31, 37, 38, Exs. DD, JJ, KK.  An April 2022 CLERB report found that the risk of "overdose/accidental *deaths*" is higher at the Jail than any other jail in the state's 12 most populous counties.  *Id.* ¶ 4, Ex. C at v, 10.

### A.   Defendants Fail to Interdict Drugs Entering the Jail

The extraordinarily high number of in-custody overdoses is fueled in part by County Defendants' failure to interdict drugs entering the Jail.  Declaration of James Austin ("Austin Decl.") ¶ 15; Swearingen Decl. ¶ 41, Ex. NN at 7 (SDSD admission that "drugs are making their way into [] facilities" through staff, visitors, mail, or hidden in body cavities of individuals being coming into custody).

Body scanners accurately identify anomalies—including small bags of drugs—within a person's body.  Austin Decl. ¶ 21.  Yet County Defendants fail to equip all facilities with scanners, maintain existing scanners, properly train staff on their use, or require everyone entering the Jail to be scanned.  A 2019 San Diego Grand Jury report observed out-of-date body scanner software and recommended the SDSD "find a way to update the scanners."  Swearingen Decl. ¶ 13, Ex. L at 6. The SDSD has conceded that "items are not detected," *id*. ¶ 13, Ex. L at 6, and last

1    fall, the Undersheriff admitted that the Jail's scanners "don't get them all," *id.* ¶ 42,

2    Ex. OO (video interview).  Scanners are used at only four of six Jail facilities.  *Id.*

3    ¶ 16, Ex. O (Jan. 2022 CLERB findings), at 3.

4         Inadequate body scanner policies and practices have led to overdose deaths at

5    the Jail.  *See* Austin Decl. ¶¶ 24-25, 29-43.  For example, Omar Moreno died in

6    January 2021, with acute methamphetamine intoxication a contributing factor, after

7    "the operator of the body scanner never identified or inquired with Moreno about

8    anomalies on his body scan."  Swearingen Decl. ¶ 15, Ex. N (Mar. 2022 CLERB

9    findings) at 4.  Joseph Castiglione died in February 2019 of acute methamphetamine

10   intoxication after a body scan did not detect a baggie in his small intestine.  *Id.* ¶ 23,

11   Ex. V (Sept. 2019 CLERB findings) at 9.

12        To effectively detect and prevent drugs from entering the Jail, body scanners

13   must be used at all Jail facilities, scanner software and technology must be

14   maintained, staff who operate the scanners must be properly trained, and everyone

15   entering the facilities must be scanned.  Austin Decl. ¶ 47.  Had these safeguards

16   been in effect previously, lives could have been saved.  *See id.*

17        **B.    Defendants Fail to Prevent Overdose Deaths**

18        Medical treatment and interventions are essential to address the crisis of

19   deadly overdoses in the Jail.  *See* Declaration of Robert Cohen ("Cohen Decl.")

20   ¶ 13.  Specifically, without two such interventions—(a) a comprehensive

21   medication-assisted treatment ("MAT") program, and (b) making naloxone

22   sufficiently accessible to incarcerated people who experience an overdose—the Jail

23   puts people at substantial risk of overdose and death.  *Id.*

24        MAT is one of the most effective methods of treating opioid use disorder,

25   maintaining recovery, and preventing overdose.  *Id.* ¶¶ 15-19.  MAT uses

26   medications that relieve withdrawal symptoms, psychological cravings, and the

27   euphoric effect of opioids, combined with therapy.  *Id.* ¶ 15.  MAT has been

28   demonstrated to reduce deaths in detention settings.  *Id.* ¶ 17 (citing 58% decrease in

[3892284.19]                                        5                    Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  overdoses during first two years of prison MAT program).

2  Despite the efficacy of MAT in treating substance use disorder, the Jail lacks

3  a comprehensive MAT program. *Id*. ¶¶ 22-28.  SDSD policy suggests MAT may be

4  available at three of six facilities. *Id*. ¶ 25 (citing SDSD Policy MSD.A.2).  But

5  SDSD acknowledged in February 2022 that a MAT program "has not been officially

6  implemented" at any facility.  Swearingen Decl. ¶ 43, Ex. PP, at 7.  To the extent the

7  Jail makes MAT available, SDSD Policy MSD.A.2 unnecessarily restricts MAT

8  only to pregnant women and certain people receiving methadone treatment prior to

9  their arrest.  Cohen Decl. ¶ 23.  Everyone else is excluded from receiving this highly

10  effective treatment. *Id*.  Left undertreated, people are at extreme risk. *Id*. ¶¶ 27-28;

11  *see also, e.g.*, Norwood Decl. ¶¶ 3, 6-8 (describing hospitalization for fentanyl

12  overdose after Jail failed to provide medication or substance use counseling).

13  A second critical intervention that can save lives from overdose is naloxone,

14  also known as "Narcan," an opioid antagonist that blocks the action of opioids,

15  resulting in a return to consciousness and resumption of breathing.  Cohen Decl.

16  ¶ 30.  Naloxone is safe, effective, and non-addictive. *Id*. ¶ 31.  It carries no risk of

17  misuse, cannot be used to "get high," and has not been found to have any effect on

18  people without opioids in their systems. *Id*.  Naloxone is relatively inexpensive and

19  simple to use. *Id*. ¶¶ 32, 38-39.  The SDSD already has deputies carry naloxone

20  nasal spray. *Id*. ¶ 36; *see* also Declaration of Pablo Stewart ("Stewart Decl.")

21  ¶¶ 108-09; Swearingen Decl. ¶¶ 39, 47, Exs. LL, TT.

22  For naloxone to be effective in treating overdose emergencies, however, it

23  must be administered immediately.  Cohen Decl. ¶ 30.  For Lazaro Alvarez, who

24  died of an overdose just hours after being booked into the Jail, and was found by

25  deputies who were not carrying naloxone, it was too late. *See id*. ¶ 36.  To avoid

26  such outcomes, and in response to a spike in overdose deaths, the Los Angeles

27  County Sheriff's Department ("LACSD") began a pilot program in 2021, in which it

28  placed naloxone inside jail housing units for incarcerated people to use if someone

appeared to overdose.  *Id.* ¶ 34; Stewart Decl. ¶ 114.  LACSD has reported positive outcomes and plans to expand the program to all custody facilities.  Cohen Decl. ¶ 34; Stewart Decl. ¶ 114.  The National Commission of Correctional Health Care ("NCCHC") recommends naloxone be readily available to incarcerated people. Cohen Decl. ¶ 33.  Yet the Jail fails to make naloxone sufficiently accessible for use by incarcerated people. *See id.* ¶ 36.  The Jail's own former Medical Director and Chief Psychiatrist describes provision of naloxone to patients as a common-sense, life-saving measure that the Jail can take right now to save lives.  Declaration of Christine Evans ("Evans Decl.") ¶¶ 44-49.

## II.    Plaintiffs Are at Substantial Risk of Serious Harm Due to Defendants' Failure to Conduct Adequate and Timely Safety Checks

### A.    Defendants Fail to Conduct Adequate Safety Checks

Safety checks entail "direct observation" of people "to ensure that they are alive and to check for signs of medical and psychiatric distress."  Stewart Decl. ¶ 85; *see also* Austin Decl. ¶ 74.  Safety checks are the "most consistent means of monitoring for [] distress" in the Jail, State Audit Report at 2, and are "essential to protect human life," Stewart Decl. ¶ 85.  A safety check that does not involve "meaningful observation of an individual" is "ineffective," "inadequate," and "negat[es] the opportunity for staff to undertake life-saving measures."  State Audit Report at 25; *see also* Austin Decl. ¶ 74; Declaration of Jennifer Alonso ("Alonso Decl.") ¶¶ 61-64.  SDSD's policies fail to require that safety checks involve observation sufficient to ensure that the observed person is alive, such as seeing the rising and falling of the person's chest when breathing.  *See* Austin Decl. ¶ 75; Alonso Decl. ¶ 62 (observing safety checks are "not thorough," with many staff "barely peer[ing] through the cell windows as they walk by").

Defendants have long known about these problems.  Stewart Decl. ¶¶ 85-103. The DRC report found that "[i]nadequate security/welfare checks [ ] were observed … in a number of cases in which inmates died by suicide."  DRC Report,

Appx. A-15-16.  CLERB found insufficient safety checks in the deaths of Blake Wilson, Joseph Carroll Horsey, and Michael Macabinlar.  Swearingen Decl. ¶¶ 10, 22, 24, Exs. S, U, W.  The State Auditor "observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module.  [S]ome … individuals showed signs of having been dead for several hours."  State Audit Report at 2.

The State Auditor recommends that the SDSD safety check policy be revised to require "staff to check that an individual is still alive without disrupting the individual's sleep," and that the SDSD develop and implement a safety check audit policy to ensure incarcerated people's safety.  State Audit Report at 54-55.  The "failure to make such improvements will lead to further unnecessary loss of life."  Stewart Decl. ¶ 96; *see also* Austin Decl. ¶¶ 77, 83.

## B. Defendants Fail to Conduct Sufficiently Frequent Safety Checks in Administration Segregation Units

Administrative segregation units and other forms of restrictive housing at the Jail ("segregation") are harsh and inhumane.  *See, e.g.*, Alonso Decl. ¶¶ 19-31; Evans Decl. ¶¶ 18-25.  "The extreme isolation and deprivations of solitary confinement increase suicidal ideation and self-harming behavior."  DRC Report at 25; *see also* Hayes Report at 57 (discusses the "strong association between inmate suicide and segregation housing"); Baker Decl. ¶ 13 (describing how his "mind gets stuck in suicidal thoughts" because "[t]here is nothing for me to pass the time").  At least six suicides occurred in segregation units between 2014 and 2016, with multiple additional deaths since then.  DRC Report at 15-16; Alonso Decl. ¶ 22.

Given the risks posed to people in segregation, "it is the modern standard that safety checks in those units occur *twice* every hour at intervals no longer than 30 minutes at unpredictable and intermittent times."  Stewart Decl. ¶ 88 (citing American Correctional Association standards); *id*. ¶ 94 (identifying several other

California jails with safety check monitoring every 30 minutes in segregation); *see also* DRC Report, Appx. A-15 (increased monitoring of individuals in units "with solitary confinement-type conditions" "is a standard custodial practice.").

The SDSD, however, requires staff to conduct safety checks only once per hour in segregation—the same frequency as in general population housing units. Austin Decl. ¶ 75; Stewart Decl. ¶ 89. This policy "places people in Administrative Segregation in great danger, especially those with mental illness, at risk of suicide, or with risk factors for drug/alcohol withdrawal or overdose." Stewart Decl. ¶ 90; s*ee also* DRC Report, Appx. A-15-16 (finding frequency of safety checks "inadequate," and describing in-custody deaths where inadequate safety checks occurred).

As recommended by the Hayes Report (at 57) and State Audit Report (at 39-40), and consistent with many other jails' policies, increasing the frequency of safety checks in segregation housing to at least once every 30 minutes, at unpredictable and intermittent times, is critical to protect incarcerated people at risk of grave harm and death. Stewart Decl. ¶ 105.

## III.    Plaintiffs Are at a Substantial Risk of Serious Harm From Defendants' Deficient Intercom and Video Surveillance Systems

### A.    Defendants' Intercom System Practices Are Ineffective

Jails equip cells and dorms with intercom call boxes that form part of a jail's safety system. Austin Decl. ¶ 48. To use the intercom, an incarcerated person pushes a button that alerts staff in the control room that the button has been pressed and opens an electronic communication channel between the incarcerated person and staff. *Id*. When staff are not physically nearby, an intercom may be the only way for a person to alert staff of an emergency and to ensure appropriate resources respond. *Id*. ¶ 49; *see also* Swearingen Decl. ¶ 46, Ex. SS (SDSD Policy I.2 providing that the intercom system is primarily for "relaying and/or summoning emergency assistance"). In the case of fights or medical or mental health

[3892284.19]    9    Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

emergencies, a properly functioning intercom system monitored by staff can mean the difference between staff intervening immediately as opposed to incarcerated people suffering at length before receiving assistance.  Austin Decl. ¶ 50.

Incarcerated people have died and suffered great harm due to Defendants' failures to maintain the intercom system and ensure that staff timely respond to emergency calls.  Austin Decl. ¶¶ 52, 56-57.   For example, Robert Moniger died after he and two of his cellmates used the intercom repeatedly over the course of several days without staff response.  Keavney Decl. ¶¶ 4-7; LaCroix Decl. ¶¶ 4-9. Jail staff did not respond to emergency intercom calls from Darryl Dunsmore until 20-30 minutes after he called for help while choking on food; he was later threatened with discipline if he used the button again.  Dunsmore Decl. ¶¶ 35-36. On March 12, 2022, a defective intercom prevented deputies from hearing a "man down" report during a fight that led to a man being placed on life support. Sepulveda Decl. ¶ 3.

To reduce the risk of preventable injury and death, SDSD must repair non-functional intercom system elements, regularly test the system, modify security procedures to ensure the intercom system functions effectively, and ensure that staff are trained to respond to emergency calls within the Jail will.  Austin Decl. ¶ 58.

## B.    Defendants' Video Surveillance Practices Are Ineffective

Video cameras, monitors, and recording devices are routinely used in correctional settings to help keep people safe by enabling custody staff to monitor multiple locations in the Jail simultaneously and quickly respond to dangerous situations, including emergencies.  Austin Decl. ¶ 59.  Video surveillance is also an important tool for re-constructing events after the fact, which better enables the Jail to investigate incidents, improve policies and practices, provide training when necessary, and hold accountable those individuals—including staff—who engage in activity that harms others.  *Id.* ¶ 60.

The Jail's video surveillance systems are inadequate, outdated, and overdue

for repair.  Austin Decl. ¶¶ 63-64, 68-69; Swearingen Decl. ¶ 39, Ex. LL (CLERB executive officer stating in December 2021 that broken or non-operational cameras inside the Jail have been a recurring problem); *see also id*. ¶ 11, Ex. J at 9, 12, 14 (2014 San Diego County Grand Jury report recommendation that the SDSD update the "antiquated" and "old" video surveillance equipment); State Audit Report at 40 (a "key, recurring recommendation that the Sheriff's Department has not implemented for nearly a decade relates to updating equipment for monitoring the safety of incarcerated individuals").  SDSD emails from December 2021 show officials describing the cameras throughout the Jail as "aging," "not always reliable," and "unable to provide optimal coverage;" officials say they are "not satisfied in anyway with [the] current camera system or recording capabilities." Swearingen Decl. ¶ 40, Ex. MM (SDSD Media Request response) at 3.

　　　　Nonworking cameras and insufficient coverage place vulnerable people at risk, as unmonitored spaces are frequently used to fight without fear of custody staff intervention.  Austin Decl. ¶ 65.  For example, the George Bailey Detention Facility is known as "the Thunderdome" because so many fights occur there.  Glenn Decl. ¶ 7.  These fights often occur in a part of the facility called "the Pocket" that cameras do not cover.  *Id.* ¶¶ 7-8.  Inoperable cameras and poor image quality impeded CLERB's investigations of the in-custody deaths of Joseph Morton, Lazaro Alvarez, and Brandon Moyer.  *See* Swearingen Decl. ¶ 19, Ex. R (Sept. 2021 CLERB findings:  "the video surveillance system [at Vista jail] was sporadically malfunctioning, which caused time lapses in the recorded video footage," making it impossible to verify if deputies properly checked on Morton during his last hours of life); *id*. ¶ 39, Ex. LL (quoting CLERB executive director as stating cameras were not working in the cell where Alvarez died of a heart attack ); *id*. ¶ 25, Ex. X (Oct. 2017 CLERB report finding footage of Moyer's death was too "grainy and inconclusive" to determine if deputies conducted adequate safety check).

　　　　To reduce the substantial risks of harm, Defendants must replace all outdated

1  and non-functional elements of the video surveillance system at the Jail, timely

2  identify and repair any video surveillance equipment that becomes non-functional,

3  and not house incarcerated people in any units without adequate video surveillance

4  coverage.  Austin Decl. ¶ 73.

5  **IV.    Plaintiffs Are at Substantial Risk of Serious Harm Due to Defendants'**

6  **Failures to Consider Mental Health Staff's Clinical Input**

7        When custody staff fail to consider mental health clinicians' input on

8  clinically appropriate housing placements, the Jail "will almost invariably see worse

9  outcomes for patients with mental illness" including increased suicide attempts and

10  deaths.  Stewart Decl. ¶ 17.  By policy and practice, custody staff fail to consider

11  clinicians' housing recommendations, placing the health and safety of patients with

12  mental illness at great risk.  *Id.* ¶ 18; Alonso Decl. ¶¶ 16-53; Evans Decl.¶¶ 18-38.

13        **A.    Defendants' Practice of Placing People with Mental Illness in**

14        **Segregated Housing Units Is Dangerous**

15        It is well established that when patients with mental illness are placed in

16  solitary confinement-type conditions, they are distinctly vulnerable to deterioration

17  and decompensation that worsen their condition, intensify symptoms, and put them

18  at risk of psychosis, self-harm, and suicide.  Stewart Decl. ¶¶ 27, 30-33 (citing

19  American Psychiatric Association, American Public Health Association, and U.S.

20  DOJ positions); *see also* DRC Report, Apps. A-14 (such placements can "produce[]

21  changes in [] risk of self-injury and suicide"); Hayes Report at 57 (emphasizing

22  association between suicide and segregated housing).

23        Custody staff frequently place people with mental illness in segregated

24  housing units without consulting with, or overruling the recommendation of, mental

25  health staff.  Alonso Decl. ¶¶ 19-29; Evans Decl. ¶¶ 18-25.  Approximately 50% of

26  those held in segregated housing units at the Jail have a mental illness.  Alonso

27  Decl. ¶¶ 24, 30.  Many people are housed in isolation even when clinicians find the

28  placement contraindicated and that the person can be safely housed elsewhere.  *Id.*

¶ 20.  People in the Jail's segregation units are confined to their cells close to 24 hours per day.  Alonso Decl. ¶ 19; Evans Decl. ¶ 19.

Allowing custody officers to place patients in segregated housing without clinicians' input "creates an extremely dangerous situation that puts a large number of vulnerable people at substantial risk of serious harm."  Stewart Decl. ¶ 49; *see also* Alonso Decl. ¶¶ 19-31; Evans Decl. ¶¶ 18-28.  Lonnie Rupard, who had a mental health condition that made him psychotic and erratic, was moved by custody staff to a segregation unit where he died in March 2022 with feces and trash covering the inside of his cell.  Alonso Decl. ¶¶ 27-31.  In 2021, custody staff moved Lester Marroquin, who had a history of suicide attempts, to an isolation cell after a period on suicide precautions during which he was hearing voices, smearing feces, and sticking his head in the toilet; he died later that day from suicide.  Alonso Decl. ¶ 26; *see also* Swearingen Decl. ¶ 14, Ex. M (Apr. 2022 CLERB findings noting that it was "obvious" that Marroquin was a danger to himself).

The SDSD has rejected mental health staff's recommendations that it stop placing people with mental illness in segregated housing units, and custody staff continue to place patients with mental illness in segregation without clinical input.  Alonso Decl. ¶¶ 19-31; Evans Decl. ¶¶ 18-25.  To avoid future harm and heath, the Jail must ensure that mental health staff's input is meaningfully considered prior to and during any placement of an incarcerated person in segregation conditions.  Stewart Decl. ¶ 50.

**B.    Defendants' Exclusion of Patients with Mental Illness from OPSD if They are Designated as Protective Custody Is Dangerous**

The outpatient stepdown unit ("OPSD") holds people with chronic mental illness who, based on clinical information, may benefit from being housed with others who have been diagnosed with a psychiatric condition.  Alonso Decl. ¶ 33; Evans Decl. ¶ 27.  A "core clinical concept of the OPSD is that by clustering people with mental illness, patients are protected from other incarcerated individuals who

1  may exploit, assault, or otherwise victimize people with mental illness."  Stewart

2  Decl. ¶ 58; Alonso Decl. ¶ 33; Evans Decl. ¶ 27.

3        Defendants categorically exclude people with mental illness from OPSD if

4  custody staff classifies them as "protective custody" ("PC").  Alonso Decl. ¶¶ 32,

5  34-35; Evans Decl. ¶¶ 28-29.  Custody staff may classify a person as PC for reasons

6  unrelated to mental health, including because they are a former gang member or law

7  enforcement, or have been charged with crimes like sex offenses that render them a

8  target for violence.  Stewart Decl. ¶¶ 59-60 (discussing SDSD Policy J.3).  If

9  custody staff designate a person with mental illness as PC, that designation prevails

10  and the person is excluded from OPSD, even if it is clinically recommended by

11  mental health staff.  Alonso Decl. ¶¶ 32-35; Evans Decl. ¶¶ 28-29.

12        SDSD's "clinically inappropriate" exclusion of patients who are classified as

13  PC from OPSD placement puts those patients at a substantial risk of harm.  Stewart

14  Decl. ¶ 56; *see id.* ¶¶ 51-64; Alonso Decl. ¶¶ 36-40; Evans Decl. ¶¶ 30-33.  In

15  March, Derek Baker, who was found clinically appropriate for OPSD but excluded

16  due to his PC status, was killed by his PC cellmate who was in custody on charges

17  that he had assaulted an elderly store clerk.  Alonso Decl. ¶ 38.

18        Mental health staff raised concerns about the dangers of this policy and

19  presented practical recommendations like setting aside a unit exclusively for those

20  designated protective custody for whom OPSD is clinically appropriate; the SDSD

21  refused to change its policy, and people like Mr. Baker face grave harm as a result.

22  Alonso Decl. ¶¶ 36, 39-40; Evans Decl. ¶¶ 28-29; Stewart Decl. ¶ 65.

23      **C.**    **Defendants' Practice of Placing People in EOH and Denying**

24              **Clothing, Property, and Privileges Contrary to Clinical Judgment**
            **Puts Patients at Substantial Risk of Serious Harm**

25

26        The Jail's Enhanced Observation Housing ("EOH") unit was created in

27  response to the high number of in-custody suicides.  Alonso Decl. ¶¶ 42-43.  While

28  designed for observation and assessment of people at risk of suicide, the EOH is

defined by deprivation and isolation. *Every* patient's clothes (including underwear) are taken away, replaced with a heavy smock. *Every* patient is *by policy* denied access to recreation, family visits, and personal property that would help them cope, including assistive devices for those with mobility disabilities; patients are also frequently denied showers, dayroom, television, and access to phones to call their family. *Id.* ¶¶ 44-45; Smith Decl. ¶ 6; Evans Decl. ¶ 35. Jail clinician Jennifer Alonso describes EOH as "barbaric," explaining: "Even dogs held in kennels are treated better than patients in EOH…. I describe it as a *Game of Thrones*-style dungeon." Alonso Decl. ¶ 48.

There are two key deficiencies in custody staff's overruling clinical judgment in EOH. First, despite an SDSD policy that EOH placement be a clinical decision, "custody staff regularly order such placements – often, they overrule clinical judgment…. As a result, people are often being placed in EOH or being held in EOH when there is not a clinical indication for it." Alonso Decl. ¶ 49; *see also id*. ¶¶ 50-53; Evans Decl. ¶¶ 34, 37-38. Second, clinicians have *no* authority to allow a patient in EOH to have clothing or personal property, or to call family, even when clinicians find such things safe and clinically beneficial. Alonso Decl. ¶ 46; Evans Decl. ¶ 37. As Dr. Stewart notes, the County's consultant Lindsay Hayes found these policies deficient given the lack of mental health input; the State Auditor found the County has failed to address the deficiency. Stewart Decl. ¶¶ 73-75. Decisions on EOH placement, and the provision of clothing, property, and family visits or phone calls should be based on clinical judgment rather than blanket custodial policies or interference. *Id.* ¶ 76; Evans Decl. ¶¶ 36-38.

**V.    Plaintiffs Are at Substantial Risk of Serious Harm Due to Defendants' Failure to Provide Mental Health Care in Confidential Settings for Patients in Mental Health Housing Units**

"An adequate system of care in the Jail setting requires the provision of a private, confidential setting for patients to communicate openly with their clinician

1  or other care provider." Stewart Decl. ¶ 78. Non-confidential mental health

2  contacts undermine treatment, as people are reluctant to disclose sensitive

3  information in settings where others can hear them. *Id*. ¶¶ 77-78; Alonso Decl. ¶ 77;

4  DRC Report at 23; Hayes Report at 19 ("[I]t would not be unusual for an otherwise

5  suicidal inmate to deny suicidal ideation when questioned in a physical environment

6  that lacks both privacy and confidentiality.").

7       Defendants routinely fail to ensure that mental health care is provided in

8  confidential spaces. *See* Evans Decl. ¶ 39 ("nearly all mental clinical contacts

9  outside of the [PSU] are non-confidential"); Alonso Decl. ¶ 55 ("clinical contacts

10  with my patients were non-confidential 99% of the time"); *see also* Roberts Decl.

11  ¶ 6; Baker Decl. ¶ 15; Edwards Decl. ¶ 20; Norwood Decl. ¶ 5; Sepulveda Decl. ¶ 7;

12  Bartlett Decl. ¶¶ 3-4; Jones Decl. ¶¶ 3-4; Levy Decl. ¶¶ 3-7; Clark Decl. ¶¶ 11-12.

13  The State Auditor observed the connection between poor mental health care and the

14  high death rate. State Audit Report at 13.

15       The 2017 NCCHC report requested by the SDSD concluded that the Jail's

16  policy "compromises privacy and may prevent a provider or nurse from obtaining an

17  inmate's full description of his or her problem to make a diagnosis." Swearingen

18  Decl. ¶ 9, Ex. H at 8-9, 43, 109; Stewart Decl. ¶ 82. The Jail's policies "prevent[]

19  adequate care from being delivered in settings where patients are most vulnerable,

20  including in Administrative Segregation, Outpatient Stepdown, Enhanced

21  Observation Housing, and the Psychiatric Services Unit observation cells." Stewart

22  Decl. ¶ 81.

23       To provide adequate mental health care and to prevent substantial risk of

24  serious harm, Defendants must ensure that all mental health clinical contacts are

25  conducted in a confidential setting. Stewart Decl. ¶ 84.

26  **VI.  Defendants Deny Incarcerated People with Mobility Disabilities Access to Critical Programs, Services, and Activities**

27

28       Defendants exclude people with mobility disabilities from programs, services,

and activities at the Jail.   Declaration of Syroun Sanossian ("Sanossian Decl.") ¶¶ 7-59.  Structural barriers in the Jail's facilities cause serious harm to incarcerated people; Defendants' vague and outdated policies and inadequate training of staff regarding disability accommodations compound the problem.  *Id.*

Defendants cluster incarcerated people who use wheelchairs at Central Jail, where they typically are housed on the fifth, seventh, or eighth floor.  *Id.* ¶¶ 12-13.  The elevator meant to transport incarcerated people to program areas, such as social and professional visiting areas, is frequently broken.  *Id.* ¶¶ 30, 40; Archuleta Decl. ¶¶ 12-14.  Because the elevator was broken, and potentially in retaliation for his involvement in this case, Plaintiff Archuleta, a wheelchair user, was forced to try to walk up the stairs, where he previously had fallen.  Archuleta Decl. ¶ 19; Declaration of Gay Grunfeld ("Grunfeld Decl.") ¶ 30.  He was forced to navigate the stairs, which was unsafe for him, just to participate in his legal case.  *Id.*; *see also* Sanossian Decl. ¶ 40.  Moreover, the units that typically house individuals with mobility disabilities at Central Jail fail to accommodate them:  toilets lack grab bars, placing individuals in danger of falling when transferring from wheelchairs to the toilet; showers lack chairs or stools, meaning individuals must suffer pain during showers or compromise personal hygiene by not showering frequently; and telephone areas, dayroom tables, and desks in cells lack cut-out spaces for wheelchair access and/or have seats bolted in front of them that block wheelchair access.  Sanossian Decl. ¶¶ 38-52; Archuleta Decl. ¶¶ 11, 15; Nelson ¶¶ 8-18; Clark ¶¶ 5-8; Buckelew ¶¶ 8-9.  Clustering individuals at Central Jail itself is discriminatory, as people who would be safer or could participate in programs at other facilities are excluded due to their de facto placement at Central Jail, which lacks certain programs.  Sanossian Decl. ¶¶ 12, 30, 40, 42, 49; Yach Decl. ¶¶ 3-5.

The small number of individuals with wheelchairs who are housed at other Jail facilities also face accessibility hurdles.  Sanossian Decl. ¶ 52.  In the medical observation bed unit at George Bailey, for example, spaces between bunks and the

doorway to the bathroom are too narrow to accommodate wheelchairs, the shower chairs are too fragile to support an individual transferring from a wheelchair, and the dayroom has limited table space for wheelchair users. *Id*.; Buckelew Decl. ¶¶ 4-7. People with mobility disabilities who are in inaccessible spaces are likely to get injured when attempting to navigate structural challenges and are at risk when they have to rely on other incarcerated people for help. Sanossian Decl. ¶ 52.

Defendants also fail to provide needed assistive devices, fail to effectively replace assistive devices, and take away assistive devices when it is unwarranted. *Id*. ¶¶ 53-58. SDSD staff have confiscated multiple assistive devices from Plaintiff Dunsmore that he used to move around, eat, drink, and write. Dunsmore Decl. ¶¶ 16-17, 23-25, 30-31, 44. Wheelchairs are not timely replaced when ill-fitted or broken, causing injury and pain to users. Clark Decl. ¶ 9.

Defendants' policies and forms for individuals to appeal the denial of accommodations are inconsistent with Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, California Government Code § 11135, and the Unruh Act. *See* Sanossian Decl. ¶¶ 7-37. Policies and training materials improperly limit the definition of "disability" and fail to explain how people will be informed of the outcome of their grievance. *Id*. ¶¶ 17, 20, 32. The forms in use are confusing. *Id*. ¶ 21-22. The inadequate grievance procedure compounds the harm caused by the Jail's failure to accommodate disabilities. *Id*. ¶¶ 21-23, 69.

All people with disabilities incarcerated in the Jail—including all members of the Proposed Subclass—are exposed to the Jail's legally insufficient policies and practices for providing disability accommodations. Those policies and practices put the Proposed Subclass at substantial risk of serious harm. *See, e.g.*, Dunsmore Decl. ¶¶ 5-48; Nelson Decl. ¶¶ 4-18; Clark Decl. ¶¶ 4-9; Sanossian Decl. ¶¶ 7-59; Buckelew Decl. ¶¶ 4-9; Archuleta Decl. ¶¶ 11-15; Yach Decl. ¶¶ 3-5.

Structural and policy changes can be expeditiously implemented to make the Jail accessible to individuals with mobility disabilities. Sanossian Decl. ¶¶ 60-70.

**ARGUMENT**

Preliminary injunctive relief is necessary to protect Plaintiffs and all people incarcerated in the Jail—including the Proposed Class and Subclass—from suffering death or other serious harms from dangerous and unlawful conditions.  Plaintiffs meet the requirements for a preliminary injunction because (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tip in their favor, and (4) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (alternate "sliding scale" test).  Preliminary injunctions are appropriate to protect people from unconstitutional and illegal conditions of confinement that threaten their health and safety.  *See, e.g.*, *Toussaint v. Rushen*, 553 F. Supp. 1365, 1384-85 (N.D. Cal. 1983), *aff'd in part sub nom. Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984); *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 959-961 (N.D. Cal. 2015); *Von Colln v. Cnty. of Ventura*, 189 F.R.D. 583, 598-99 (C.D. Cal. 1999).

**I.     Plaintiffs Are Likely to Prevail on Their Claims**

To establish a substantial likelihood of success on the merits, a plaintiff need only show "a fair chance of success."  *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) (citation omitted).

**A.     Plaintiffs Are Likely to Prevail on Their Constitutional Claims**

Defendants violate the Eighth Amendment if they incarcerate people under conditions posing a substantial risk of serious harm to those persons' health or safety (the objective prong), and acted with deliberate indifference, that is, with conscious disregard for that risk (the subjective prong).  *Farmer v. Brennan*, 511 U.S. 825, 834, 839-40 (1994).  Unsafe conditions that "pose an unreasonable risk of serious damage to [an incarcerated person's] future health" or "personal safety" may satisfy this objective prong and show violation of the Eighth Amendment, even if the damage has not yet occurred and may not affect every person exposed to the

conditions.  *Helling v. McKinney*, 509 U.S. 25, 34-35 (1993).  The Jail's large pretrial population is entitled to greater protection from dangerous conditions than sentenced individuals.  *Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979); *see also Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018).

> 1. **Defendants Are Deliberately Indifferent by Failing to Prevent Drug Overdoses**
>
> > (a) **Failure to Interdict Drugs from Entering the Jail**

"[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."  *Pell v. Procunier*, 417 U.S. 817, 823 (1974).  Failing to enact policies and practices to protect incarcerated people from overdose deaths can constitute deliberate indifference.  *See Turner v. Cook Cnty. Sheriff's Office by and through Dart*, No. 19-CV-5441, 2020 WL 1166186 at *4 (N.D. Ill. Mar. 11, 2020).

Defendants are deliberately indifferent to the substantial risk of serious harm posed to incarcerated people, many of whom are suffering from opioid use disorder and/or withdrawal, by Defendants' failure to interdict deadly and dangerous contraband narcotics.  Prior to 2019, the Jail averaged approximately one overdose death every five months, and since then, the number has risen to one every two to three months.  *See supra*, at 4-5.  The Jail is on pace for more than 170 opioid overdoses this year.  *See id*.  Investigations into the in-custody deaths of Messrs. Castiglione, Bush, Hossfield, and Moreno, for example, show that many of these overdoses are caused by drugs that were not—but should have been—detected by the Jail's body scanning process.  *See id*.  Defendants have admitted that drugs enter the Jail in part because their body scanners, which are present in only four of six facilities and have been found to use out-of-date software, do not detect all items. *Id*.  In some cases, staff operating the body scanners fail to identify or inquire about anomalies on the scan.  *Id*.  Despite being well aware of the deadly consequences of illegal drugs entering the Jail, Defendants have failed to take simple but important

[3892284.19]   20   Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

steps to improve their processes for scanning to detect and prevent introduction of contraband. *See id*. Defendants' acts and omissions constitute deliberate indifference to the risk of overdose in the Jail.

### (b)   Failure to Medically Prevent and Address Overdoses

The Constitution requires prison and jail officials to provide adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976); *Gordon*, 888 F.3d at 1122-25. For example, opiate withdrawal "constitutes a serious medical need requiring appropriate medical care under the Eighth Amendment." *Pajas v. Cnty. of Monterey*, 2016 WL 3648686, at *10 (N.D. Cal. July 8, 2016) (collecting cases); *see also Hernandez,* 110 F. Supp. 3d at 948. In light of the overdose epidemic at the Jail, failing to provide treatments such as MAT and immediate access to naloxone unconstitutionally places incarcerated individuals at risk of death. *See, e.g.*, *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 47-48 (D. Mass. 2018) (policy prohibiting methadone treatment likely to succeed on Eighth Amendment claim); *see also Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146, 159-61 & n.20 (D. Me. 2019), *aff'd* 922 F.3d 41 (1st Cir. 2019); *Witcherman v. City of Philadelphia*, 2019 WL 3216609, at *10 (E.D. Pa. July 17, 2019).

The Jail lacks a comprehensive or adequate MAT program. *See supra*, at 5-7. Defendants recently admitted that they do not have a "robust" MAT program and offer MAT only on a "case by case basis," despite its proven efficacy in relieving withdrawal symptoms and preventing overdoses, but they have not taken any meaningful steps to rectify this deficiency. *Id*.

The Jail also fails to provide adequate access to naloxone, a safe, highly effective, easy-to-use medication that can block the action of opioids, for timely use by incarcerated people in the Jail. Defendants are aware that naloxone must be administered immediately when a person is overdosing, and that at times, the Jail's staff have been too late. *See id*. Experts recommend—and other correctional systems allow—naloxone to be made available directly to incarcerated people to

administer in the case of a suspected overdose, an intervention that could save lives in the Jail immediately. *Id.* By failing to implement this measure, Defendants are deliberately indifferent to risk of overdose death in their facilities.

### 2. Defendants Are Deliberately Indifferent by Failing to Conduct Adequate and Timely Safety Checks

#### (a) Failure to Conduct Adequate Safety Checks

Safety checks must be sufficiently thorough to ensure the safety, security, and well-being of incarcerated people. *See Gordon v. Cnty. of Orange*, 6 F.4th 961, 972-73 (9th Cir. 2021). Defendants are deliberately indifferent to the substantial risk of harm posed by their strikingly deficient safety checks. If the shocking deaths of incarcerated people found unresponsive hours after they were last known to be alive was not enough to put Defendants on notice of the inadequacies in their policies and practices regarding safety checks, repeated criticism by CLERB, the DRC Report, and the State Auditor certainly did. *See supra*, at 7-8. The SDSD has admitted that staff do not follow the Jail's policies regarding safety checks and that there is no documented policy for confirming the adequacy of such checks. *Id.* Absent relief, Defendants' conscious dereliction of their duty to ensure staff perform adequate safety checks puts the lives of incarcerated people in danger. *See id.*

#### (b) Failure to Conduct Sufficiently Frequent Safety Checks in Administrative Segregation Units

Officials at facilities where there are known suicide risks, including risks posed to individuals in segregated housing, "are required to take all reasonable steps to prevent the harm of suicide." *Coleman v. Brown*, 938 F. Supp. 2d 955, 975 (E.D. Cal. 2013). For at-risk people housed in isolation, safety checks must occur more frequently than the standard once per hour to satisfy constitutional standards. *See Germaine-McIver v. Cnty. of Orange*, No. SACV 16-01201-CJC (GJSx), 2018 WL 6258896, at *9 (C.D. Cal. Oct. 31, 2018); *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1079 (9th Cir. 2013). For years, Defendants knowingly

have failed to take life-saving measures to increase the frequency of safety checks in segregated housing within the Jail.  The DRC Report and Hayes Report sharply criticized safety check practices within the Jail, with Hayes "strongly recommend[ing]" implementation of 30-minute checks in segregated housing. *Supra*, at 8-9.  As the State Auditor explained, Defendants have ignored calls to address this "crucial" issue of not performing safety checks frequently enough in segregation units.  *See id*.  Defendants are deliberately indifferent in a way that puts the lives of people housed in isolated conditions at further risk of preventable death.

### 3.   Defendants Are Deliberately Indifferent by Maintaining Deficient Intercom and Video Surveillance Systems

Correctional staff show deliberate indifference to the serious needs of incarcerated people where such people are unable to make serious health or safety issues known to staff.  *See Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *May v. Higgins*, No. 4:20-00826, 2020 WL 4919562, at *1-2 (E.D. Ark. Aug. 7, 2020), *report and recommendation adopted*, 2020 WL 4905833 (E.D. Ark. Aug. 20, 2020) (allowing claim to proceed where plaintiff alleged he could not get help when feeling suicidal or otherwise needing assistance because emergency call button was broken and deputies came to his unit only three times per day).

Incarcerated individuals have attempted to use the Jail's intercom system during violent assaults and medical emergencies to no avail, resulting in significant harm and even death.  *See supra*, at 9-12.  The State Auditor called updating video surveillance equipment a "recurring" recommendation that the SDSD has failed to implement "for nearly a decade."  *Id*.  A grand jury and CLERB have demanded better video monitoring.  *See id*.  The SDSD has admitted the equipment is faulty. *Id*.  Defendants know about these deficiencies, but have disregarded them.  *See id*. Their acts and omissions constitute deliberate indifference to the risks that incarcerated people face of injury, death, medical neglect, or other harms.

**4.   Defendants Are Deliberately Indifferent by Failing to Consider Mental Health Clinicians' Housing Input**

**(a)   Dangerous Practice of Placing People with Mental Illness in Segregated Housing Units**

The "placement of seriously mentally ill prisoners in the harsh, restrictive and non-therapeutic conditions of [] administrative segregation units for non-disciplinary reasons for more than a minimal period … violates the Eighth Amendment." *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1099 (E.D. Cal. 2014); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995).

Defendants are aware that individuals with mental illness are placed in segregated housing even where mental health staff find it clinically contraindicated and dangerous. *See supra*, at 12-13. The many deaths that have occurred in segregated housing units in recent years, including Mr. Marroquin's tragic suicide after he was moved from suicide precautions to isolation, without treating clinician input and while he clearly was a danger to himself, put Defendants on notice of the grave risk of harm posed by placing individuals with mental illness in these units. *See id*. Defendants, however, disregard these known risks and allow custody staff to overrule and ignore mental health staff. *See id*. These acts and omissions constitute deliberate indifference. *See Hernandez*, 110 F. Supp. 3d at 946.

**(b)   Dangerous Practice of Excluding Individuals with Mental Illness from OPSD if They are Designated as Protective Custody**

Incarcerated people have a constitutional right to be protected from serious harm, including abuse by others. *See Hoptowit*, 682 F.2d at 1253; *Cortez v. Skol*, 776 F.3d 1046, 1049 (9th Cir. 2015); *Wilk v. Neven*, 956 F.3d 1143, 1150 (9th Cir. 2020).

Defendants know that OPSD is intended to house people with chronic mental illness in a safe environment separate from other incarcerated people who may

exploit, assault, or otherwise victimize them. *See supra*, at 13-14. Defendants also know—both because mental health staff raised the issue and in light of the circumstances leading to the death of Mr. Baker—that placing individuals with mental illness in protective custody exposes them to the exact dangers OPSD is designed to prevent. *See id*. Nonetheless, over the objections of mental health staff, Defendants categorically exclude from OPSD individuals who also are designated protective custody, to the great detriment of incarcerated people. *See id*. These policies and practices constitute deliberate indifference.

> ### (c)   Dangerous Practice of Placing People in EOH and Denying Clothing, Property, and Family Visits/Calls Contrary to Clinical Judgment

Incarcerated people have a constitutional right to clinically appropriate treatment and conditions that do not put them at substantial risk of harm. *Madrid*, 889 F. Supp. at 1257–58; *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014). Defendants know that custody-determined (a) placements in EOH and (b) categorical denial of clothing, property, and family visits or calls are inconsistent with NCCHC standards, modern jail mental health care standards, and even their own suicide prevention consultant's recommendations. *Supra*, at 14-15. Jail mental health staff describe such conditions as "barbaric," yet Defendants persist in allowing dangerous custodial practices to overrule clinical judgment and care. *Id.*

> ### 5.   Defendants Are Deliberately Indifferent by Not Providing Confidentiality for Mental Health Contacts

Confidential mental health contacts are a recognized component of a constitutionally adequate mental health care system. *See Gray v. Cnty. of Riverside*, No. EDCV 13-00444, 2014 WL 5304915, at *10 (C.D. Cal. Sept. 2, 2014); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1184, 1210-1212 (M.D. Ala. 2017). Defendants have been aware since at least 2017 and 2018, when NCCHC, DRC and Hayes issued their reports, that the lack of confidentiality during mental

[3892284.19]                                                     25                         Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

contacts in the Jail poses a danger to incarcerated individuals, and in particular, those vulnerable to suicide or self-harm.  *See supra*, at 15-16.  The SDSD represented that it had implemented in part Hayes' recommendation to avoid cell-side mental health encounters, but Defendants are aware that in practice, non-confidential visits are the norm.  *See id*.  Incarcerated people and mental health staff have raised this issue to no avail.  *Id*.  The practice has put people housed in mental health housing units at substantial risk of serious harm.  *See id*.  Defendants have been deliberately indifferent to incarcerated peoples' need and right to confidentiality during mental health contacts.

### B.   Plaintiffs Are Likely to Prevail on Their ADA Claims

"To prevail under Title II [of the ADA], [a] plaintiff must show that:  (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) this exclusion, denial, or discrimination was by reason of his disability."  *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014).  Title II's implementing regulations provide that "no qualified individual with a disability, shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."  28 C.F.R. § 35.149.  Title II regulations state that detention facilities may not exclude incarcerated people from participating in a program, service, or activity offered by the facility "[b]ecause a [detention] facility is inaccessible to or unusable by individuals with disabilities."  *Id.* § 35.152(b)(1).  Public entities must "make reasonable modifications in policies, practices, or procedures when modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  *Id.* § 35.130(b)(7).

Plaintiffs Dunsmore, Archuleta, and Nelson and other declarants are qualified individuals with mobility disabilities. *See* 42 U.S.C. § 12131(2); *see also* 28 C.F.R. § 35.104. Plaintiffs Dunsmore, Archuleta, and Nelson and other declarants use wheelchairs and have disabilities that make it impossible, difficult, painful, or dangerous to ambulate, maneuver around objects, or otherwise use certain motor skills. *See* Sanossian Decl. The programs, services, and activities at issue here—housing, toilets, showers, dayroom tables, telephones, visitation, and programs—are covered by the ADA. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010).

By offering these programs, services, and activities in conditions and locations inaccessible to people with mobility disabilities, Defendants unlawfully exclude and discriminate against Plaintiffs and members of the putative subclass. Incarcerated people in wheelchairs are clustered at Central, where elevators frequently do not work, forcing them to take the stairs or else miss visitation or programs; toilets lack grab bars; showers lack chairs or stools; and telephone areas, dayroom tables, and desks in cells lack cut-out spaces for wheelchair access and/or have seats bolted in front of them that block wheelchair access. *See supra*, at 16-18. Other Jail facilities with more desirable programs than Central are also not accessible for wheelchair users. *See id*. Defendants often fail to provide needed assistive devices, fail to effectively replace assistive devices, and take away assistive devices when it is unwarranted. *Id*. If Defendants offered accessible housing and programs, provided accommodations and assistive devices, and properly trained staff, incarcerated individuals with mobility disabilities would be able to perform basic, necessary activities of daily living without risk of serious injury, pain and suffering, and would be able to access all programs the Jail offers. *See id*. Defendants' policies and procedures regarding incarcerated individuals with mobility disabilities, including their grievance procedures, are vague and deficient and frequently do not appear to be followed. *See id*. As such, Plaintiffs are likely to

[3892284.19]                                    27                    Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  succeed on their claim that Defendants violate the ADA.

2  **II.     Plaintiffs Suffer Irreparable Harm Absent Preliminary Injunctive Relief**

3          Plaintiffs are suffering irreparable harm, including the risk of death, under

4  Defendants' existing policies and practices.  The nature of the risk to Plaintiffs

5  weighs heavily in favor of granting the motion.  *See Harris v. Bd. of Supervisors,*

6  *Los Angeles Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004); *Hernandez*, 110 F. Supp. 3d

7  at 956 (similar).  A constitutional violation itself also "unquestionably constitutes

8  irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)

9  (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

10         The risks posed to incarcerated people at the Jail are immediate and real.  The

11 State Audit Report sounded an urgent alarm on deadly conditions that have existed

12 unabated within the Jail for years.  The statistics are staggering, and the individual

13 stories harrowing.  Since 2019, at least 16 incarcerated people have died from

14 overdosing on drugs that apparently entered the Jail undetected.  *Supra*, at 4-7.

15 Messrs. Wilson, Macabinlar, and Horsey were found dead in their cells long after

16 staff failed to check on them properly.  *See id.* at 7-8.  Mr. Moniger died after he and

17 two of his cellmates used the intercom repeatedly over the course of several days

18 without staff response.  *See id.* at 10.  Mr. Marroquin committed suicide after he was

19 moved from an inpatient mental health unit to a segregation housing unit without so

20 much as a conversation with mental health staff.  *See id.* at 13.  Mr. Baker was the

21 victim of a deadly assault by his cellmate after staff placed him in protective custody

22 despite his mental illness.  *See id.* at 14.  Since the State Audit Report was issued on

23 February 3, 2022, eight people incarcerated at the Jail have died and countless

24 others are suffering from deteriorating mental health.  *See id.* at 1.  These harms are

25 irreversible.  They also illustrate ongoing problems in the Jail's policies and

26 practices.  Rather than remedying these problems, Defendants have disregarded the

27 risks, repeatedly refusing to implement the recommendations of experts and the

28 State Auditor.  *See id.* at 2-18.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

Plaintiffs and the putative class also suffer irreparable harm from Defendants' inadequate attention to the ADA.  Mr. Archuleta, for example, fell and struck his head when forced to take the stairs to professional and social visits while the elevator was broken at Central.  Mr. Buckelew must put himself at risk and rely on other incarcerated people to move him from his wheelchair to the toilet because his wheelchair does not fit through the doorway to the bathroom.  Ms. Yach was forced to house with a male in the same Jail where she was previously assaulted due to her need for a wheelchair.  These and other ADA violations constitute irreparable harm. *See Hernandez*, 110 F. Supp. 3d at 954-57; *D.R. v. Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1145-46 (C.D. Cal. 2010); *Lonberg v. City of Riverside*, EDCV970237SGLAJWX, 2007 WL 2005177, at *8 (C.D. Cal. May 16, 2007).

## III.   The Balance of Hardships Weighs Heavily in Plaintiffs' Favor

In considering a request for a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  The interest in protecting individuals from physical harm outweighs monetary costs to government entities. *See Harris*, 366 F.3d at 766.  The balance of hardships here strongly favors granting the motion.  Absent relief, Plaintiffs and the putative class likely face death or injury, outweighing any theoretical injury posed by the requested injunction to Defendants.  Those with untreated substance use disorder will find access to deadly contraband drugs that have entered the Jail undetected.  Those with mental health needs, including people housed in segregation, will remain at high risk of suicide or self-harm.  Emergencies in cells will go undetected until it is too late to save a life. And those with mobility disabilities will continue to be denied access to programs, services, and activities.

As compared to these significant hardships faced by incarcerated people, a preliminary injunction merely would require Defendants to devise and implement

remedial plans repeatedly recommended as necessary to save lives and reduce harm by the State Auditor, CLERB, and other experts.  Given the high taxpayer cost of emergency care, hospitalization, and wrongful death lawsuits, requiring Defendants to take precautionary and preventative steps may even result in future cost savings, apart from the saving of lives.

## IV.    A Preliminary Injunction is in the Public Interest

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Melendres*, 695 F.3d at 1002.  The dangerous conditions described above violate the constitutional rights of Plaintiffs and the class. Protecting them from the resulting risk of death and serious harm while in Jail custody and is in the public interest.  A preliminary injunction enjoining Defendants' ADA violations would "serve[] the public's interest in enforcement of the ADA and in elimination of discrimination on the basis of disability."  *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011).

## V.    The Court Should Waive the Security Bond Under Rule 65(c)

"Rule 65(c) invests the district court with discretion as to the amount of security required, if any."  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation omitted).  District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people.  *See, e.g.*, *Toussaint*, 553 F. Supp. at 1383 (state prisoners); *Orantes–Hernandez v. Smith*, 541 F. Supp. 351, 385 n. 42 (C.D. Cal. 1982) (detained immigrants).  This Court should do the same here.

## VI.    The Requested Relief is Consistent With the PLRA

The Prison Litigation Reform Act ("PLRA") authorizes preliminary injunctive relief to address conditions of confinement in correctional facilities.  *See* 18 U.S.C. § 3626(a)(2).  Such relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct that harm."  *Id.*; *see also Armstrong*, 275 F.3d at

872 (citing *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001)).

The order Plaintiffs seek meets the PLRA.  The proposed order requires Defendants to devise their own remedial plans, addressing narrow issues that Defendants concede or the State has found to be dangerous and problematic using tried and true methods.  "Allowing defendants to develop policies and procedures to meet [their constitutional and statutory] requirements is precisely the type of process that the Supreme Court has indicated is appropriate for devising a suitable remedial plan in a prison litigation case." *Armstrong*, 622 F.3d at 1071; *see also Pierce v. Cnty. of Orange*, 761 F. Supp. 2d 915, 954 (C.D. Cal. 2011) ("[T]he least intrusive means to compel the County to remedy the physical barriers and disparate provision of programs, services, and activities to disabled detainees is to allow the County to draft a proposed plan that will address and correct each and every physical barrier identified in this Order ….").  Further, the requested relief would improve public safety and the operation of the criminal justice system by reducing death rates, recidivism, hospitalizations, and misery among incarcerated people with medical, mental health, and disability needs.

## VII.   This Court Should Certify a Provisional Class and Subclass for Purposes of the Preliminary Injunction

When issuing a preliminary injunction on a class-wide basis, courts may provisionally certify a class.  *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).  Plaintiffs seek provisional certification of an "Incarcerated People Class," defined as "all adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities" (hereafter "Proposed Class"), and an "Incarcerated People with Disabilities Subclass," defined as "all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities" ("Proposed Subclass").  Plaintiffs meet the Rule 23 requirements.

### A.   The Proposed Class and Subclass Are Sufficiently Numerous

A class may be certified if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); *A.B. v. Haw. State Dep't of Educ.*, — F.4th —, 2022 WL 996575, at *6 (9th Cir. 2022)).  "[N]umerosity is presumed where the plaintiff class contains forty or more members."  *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 627, 634 (C.D. Cal. 2009).

The Proposed Class and Subclass are so numerous that joinder would be impracticable.  The Proposed Class contains, at a minimum, approximately 4,400 people currently incarcerated in the jail facilities.  Swearingen Decl. ¶ 33, Ex. FF.  Historically, the average daily population of the Jail has been 5,200, and the jails booked an average of 85,000 individuals annually.  State Audit Report at 7.  The Subclass contains thousands of individuals.  Nearly 35% of incarcerated people at the Jail in December 2021 were taking psychotropic medications for mental health disabilities.  Swearingen Decl. ¶ 33, Ex. FF.  This figure likely undercounts the number of incarcerated people with mental health disabilities, and does not include people with other disabilities, such as mobility, hearing, vision, and intellectual/developmental disabilities.  There are likely persons with mobility disabilities at the Jail at any given time.  Sanossian Decl. ¶¶ 7, 47.

### B.   The Proposed Class and Subclass Have Common Questions

Provisional class certification requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2); *see also Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013).  Commonality exists where, as in this case, "the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."  *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).  Such suits "by their very nature often present common questions satisfying Rule 23(a)(2) ." 7A Mary J. Kane, Fed. Prac. & Proc. Civ. § 1763 (3d ed. 2018). Where system-wide practices exist, "individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Armstrong*, 275

[3892284.19]

32

Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

F.3d at 868; *see also Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 155-59 (N.D. Cal. 2015); *Lyon v. ICE*, 308 F.R.D. 203, 214 (N.D. Cal. 2014).

Plaintiffs and all members of the Proposed Class and Subclass share a common core of facts:  they are or will be detained in the Jail and thus subject to Defendants' system-wide failures to provide adequate safety and security, medical and mental health care, and disability accommodations.[2]  All Proposed Class and Subclass members are exposed to the policies and practices at issue by virtue of their incarceration, thus meeting the requirement of Rule 23(a)(2).  *See, Hernandez*, 305 F.R.D. at 157 ("[E]ach inmate suffers the same constitutional or statutory injury when exposed to a policy or practice that creates a substantial risk of harm.…  The identified 37 policies and practices to which all members are exposed hold together the putative class and subclass."); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled in part on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("The existence of shared legal issues with divergent factual predicates is sufficient.").

A central question common to all Class members is whether Defendants' systemic policies and practices identified above constitute deliberate indifference to a substantial risk of serious harm.  A central question common to all Subclass members is whether Defendants' systemic failure to provide accessible housing and programming violates the ADA and related statutes.

**C.    Plaintiffs' Claims Are Typical of the Proposed Class and Subclass**

Rule 23(a)(3) requires that "the claims … of the representative parties [be] typical of the claims … of the class."  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member

---

[2] *See, e.g.*, Roberts Decl. ¶¶ 2-6; Sepulveda Decl. ¶¶ 2-7; Bartlett Decl. ¶¶ 2-6; Jones Decl. ¶¶ 2-5; Yach Decl. ¶¶ 2-6; Dunsmore Decl. ¶¶ 2-48; Lopez ¶¶ 2-18; Keavney ¶¶ 2-11; LaCroix Decl. ¶¶ 2-10; Smith Decl. ¶¶ 2-13; Archuleta Decl. ¶¶ 2-22; Glenn Decl. ¶¶ 2-9; Edwards Decl. ¶¶ 2-21; Nelson Decl. ¶¶ 2-27; J.A. Lopez Decl. ¶¶ 2-10; Norwood Decl. ¶¶ 2-8.

1   makes similar legal arguments to prove the defendant's liability."  *Hanon v.*
2   *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation marks omitted);
3   *see also Parsons*, 754 F.3d at 685.

4       The typicality requirement is satisfied because the Proposed Class and
5   Subclass members are all subject to the same unconstitutional and illegal course of
6   conduct by Defendants—the failure to provide adequate safety, medical and mental
7   health treatment, and disability accommodations.  *See Parsons*, 754 F.3d at 686
8   ("[G]iven that every inmate in custody is highly likely to require medical, mental
9   health, and dental care, each of the named plaintiffs is similarly positioned to all
10  other … inmates with respect to a substantial risk of serious harm resulting from
11  exposure to the defendants' policies and practices governing health care.").

### D.   Plaintiffs and Counsel Are Adequate Representatives

13      Rule 23(a)(4) requires that "the representative parties will fairly and
14  adequately protect the interests of the class."  This factor requires that (1) proposed
15  representative plaintiffs not have conflicts of interest with the proposed class and
16  (2) plaintiffs be represented by qualified or competent counsel.  *Hanlon*, 150 F.3d at
17  1020; *see also* Wright & Miller, Federal Practice & Proc. § 1768 (4th ed. 2022).

18      Plaintiffs are not aware of any conflicts among the putative class
19  representatives and the Proposed Class and Subclass.  Plaintiffs' counsel have
20  extensive experience litigating complex litigation and class actions, including
21  complex litigation related to conditions of confinement in jails and prisons.
22  Grunfeld Decl. ¶¶ 8-27.  They have committed substantial resources to this
23  litigation, including retaining experts and e-discovery services.  *Id.* ¶¶ 2-7.

### E.   Defendants' Generally Applicable Conduct Requires Relief

25      Class certification is appropriate when "the party opposing the class has acted
26  or refused to act on grounds that apply generally to the class, so that final injunctive
27  relief or corresponding declaratory relief is appropriate respecting the class as a
28  whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is 'the indivisible

1  nature of the injunctive and declaratory remedy warranted—the notion that the

2  conduct is such that it can be enjoined or declared unlawful only as to all of the class

3  members or as to none of them.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

4  360 (2011) (quotation marks omitted); *see also* William B. Rubenstein, Newberg on

5  Class Actions § 4:28 (5th ed. 2018) (Rule 23(b)(2) "focuses on the defendant and

6  questions whether the defendant has a policy that affects everyone in the proposed

7  class in a similar fashion.").

8    The Proposed Class and Subclass meet Rule 23(b)(2) requirements.  All

9  Proposed Class and Subclass members are subject to Defendants' inadequate and

10  dangerous policies and practices.  Plaintiffs seek system-wide remedies.

11  <center>**CONCLUSION**</center>

12    This Court has the power to do what experts and oversight bodies have for

13  years been unable to do:  require Defendants to remedy some of the most dangerous

14  policies and practices at the Jail, stemming the tide of needless death and suffering

15  inflicted on incarcerated people and their families.  Plaintiffs respectfully request

16  that the Court grant these motions and enter the Proposed Order.

17

18  DATED:  May 2, 2022    Respectfully submitted,

19          ROSEN BIEN GALVAN & GRUNFELD LLP

20

21          By: */s/ Van Swearingen*

22           Gay Crosthwait Grunfeld

         Van Swearingen

23           Priyah Kaul

         Eric Monek Anderson

24           Hannah M. Chartoff

25          Attorneys for Plaintiffs[*]

26  [*]Additional counsel on caption page

27

28

[3892284.19]        35    Case No. 3:20-cv-00406-AJB-WVG

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION