GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:      ggrunfeld@rbgg.com
            vswearingen@rbgg.com
            pkaul@rbgg.com
            eanderson@rbgg.com
            hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email:      ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:   Hon. Anthony J. Battaglia<br><br>Trial Date:   None Set |

[3893941.7]

1  *(counsel continued from preceding page)*

2  CHRISTOPHER M. YOUNG – 163319
   ISABELLA NEAL – 328323
3  OLIVER KIEFER – 332830
   DLA PIPER LLP (US)
4  401 B Street, Suite 1700
   San Diego, California  92101-4297
5  Telephone:   (619) 699-2700
   Facsimile:   (619) 699-2701
6  Email:        christopher.young@dlapiper.com
                 isabella.neal@dlapiper.com
7                oliver.kiefer@dlapiper.com

8  BARDIS VAKILI – 247783
   JONATHAN MARKOVITZ – 301767
9  ACLU FOUNDATION OF SAN DIEGO &
   IMPERIAL COUNTIES
10 2760 Fifth Avenue, Suite 300
   San Diego, California  92103-6330
11 Telephone:   (619) 232-2121
   Email:        bvakili@aclusandiego.org
12               jmarkovitz@aclusandiego.org

13 Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3893941.7]

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, Van Swearingen, declare:

1.     I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification ("Plaintiffs' Motions").  Plaintiffs' Motions seek to address particularly harmful policies, procedures, practices, and training that regularly threaten the lives of people incarcerated in the San Diego County Jail (the "Jail").  As described herein, Defendants San Diego County Sheriff's Department ("Sheriff's Department"), County of San Diego (with the Sheriff's Department, "County Defendants"), Correctional Healthcare Partners, Inc., and Liberty Healthcare Corporation (collectively, "Defendants") have long been aware of the problems at issue in Plaintiffs' Motions.

## I.     Plaintiffs' Proposed Order Reflects a Targeted Preliminary Injunction to Address Some of the Most Pressing Dangerous and Deadly Conditions in the Jail

2.     Attached as **Exhibit A** is a true and correct copy of the Proposed Order Plaintiffs are submitting to the Court in connection with Plaintiffs' Motions.  Through the targeted reforms identified in the Proposed Order, Plaintiffs seek to require changes to Defendants' inadequate policies, procedures, practices, and training for: (1) the prevention of drug overdoses; (2) adequate and timely safety checks; (3) audio intercom and video surveillance systems, and related responses to emergencies; (4) the consideration of mental health staff's clinically-based housing placement recommendations for people with mental illness; (5) the provision of mental health care in confidential settings for people with mental illness; and (6) the provision of safe and accessible housing and programming to people with mobility disabilities.  The Proposed Order would permit Plaintiffs and their experts to monitor Defendants' compliance with the requested remedial actions.  The Proposed

1  Order would also grant provisional class certification in support of the requested

2  injunction to ensure that the rights of all people incarcerated in the Jail are protected.

3  **II.    The February 2022 State Audit Report Found That, Absent Changes to
        the Sheriff's Department Policies and Practices, People Would Continue
4        to Die in Custody**

5          3.      Attached as **Exhibit B** is a true and correct copy of the California State

6  Auditor's February 3, 2022 report No. 2021-109, titled "San Diego County Sheriff's

7  Department: It Has Failed to Adequately Prevent and Respond to the Deaths of

8  Individuals in Its Custody" ("State Audit Report").  The State Audit Report includes

9  the Sheriff's Department's response to the State Audit Report (beginning at page 83

10  of the State Audit Report).  The State Audit Report concluded that "the Sheriff's

11  Department has failed to adequately prevent and respond to the deaths of individuals

12  in its custody." *Id.* at iii.  The State Audit Report "found that deficiencies in the

13  Sheriff's Department's policies and practices related to intake screenings, medical

14  and mental health care, safety checks, and responses to emergencies likely

15  contributed to these [in-custody] deaths." *Id.* at 53.  The State Audit Report noted

16  that the Sheriff's Department did not implement prior recommendations related to

17  safety checks. *Id.* at 39.  The State Audit Report discussed prior grand jury

18  recommendations for the Sheriff's Department to "updat[e] equipment for

19  monitoring the safety of incarcerated individuals" and found it "concerning that [the

20  Sheriff's Department] has not yet replaced the surveillance system, even though its

21  age is a major safety issue." *Id.* at 40.  The State Audit Report recommended

22  changes to improve mental health care in the Jail, to require safety checks to

23  confirm that an individual is still alive, and to require supervising staff to audit

24  safety checks to ensure that they actually occurred and were completed adequately.

25  *Id.* at 54-55.  The State Audit Report warned that absent changes, "the weaknesses

26  in [the Sheriff's Department's] policies and practices will continue to jeopardize the

27  health and lives of the individuals in its custody." *Id.* at 3.

28

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

III.    **An April 2022 Study Commissioned by a San Diego County Jail Oversight Agency Found That the Death Rate in the Jail is Extraordinarily High**

4.    Attached as **Exhibit C** is a true and correct copy of the April 2022 Report titled "San Diego County In-Custody Death Study," prepared for the County of San Diego's Citizens' Law Enforcement Review Board ("CLERB") by Analytica Consulting.  CLERB is the county agency responsible for investigating all deaths in custody at the Jail, as well as accusations of misconduct by Sheriff's Department employees.  CLERB retained Analytica Consulting to compare deaths in the Jail to deaths in other large California counties' jails.  *Id.* at ii, 2-7.  The report rejected the Sheriff's Department's suggestion, made in response to the State Audit Report (State Audit Report at 99), that San Diego County has any unique mortality rate explaining the high number of deaths in the Jail.  *Id.* at iii.  Rather, the report found that after considering county morality rates in California's twelve most populous counties, "San Diego jails have the highest number of unexplained deaths," and San Diego County was "the only county with a statistically significant number of excess deaths."  *Id.* at iii-iv.  Between 2010-2020, 24 more people died in the Jail than would be expected based on county mortality rates.  *Id.* at iv, 10.  The report found that twice as many incarcerated people died by overdose from 2010-2020 (27) as would be expected (13) based on the county's mortality rates.  *Id.* at v, 13.  The report also found that although only 9 suicides would be expected between 2010-2020 based on the county's mortality rates, 40 people committed suicide in the Jail between 2010-2020, for 31 excess suicide deaths.  *Id.* at vi, 8.  The report is publicly available on CLERB's website:

https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/in-custody-death-study/Att.G-CLERB%20In-Custody%20Death%20Study.pdf.

/ / /

/ / /

/ / /

**IV.    Since the State Audit Report Was Released, Eight People Have Died at the Jail**

5.    Attached as **Exhibit D** is a true and correct copy of the Sheriff's Department's April 27, 2022 announcement that Omar Ornelas died at George Bailey Detention Facility on the morning of April 27.  According to the announcement, Ornelas had been in Jail custody for over three years while awaiting trial.  The SDSD reported that Ornelas and another incarcerated person "were located inside of a cell unresponsive during a security check."  Ornelas died. Naloxone was administered to the other incarcerated person, who was transported to a local hospital and survived.  The announcement is available on the Sheriff's Department's website at:

https://www.sdsheriff.gov/Home/Components/News/News/1190/16.

6.    Attached as **Exhibit E** is a true and correct copy of an April 28, 2022 article published by KPBS in San Diego.  The article states that the death of Omar Ornelas on April 27, 2022 was the eighth death in Jail custody in 2022.  The article is available at: https://www.kpbs.org/news/local/2022/04/28/another-inmate-dies-in-custody-at-a-san-diego-county-jail.

**V.    The Sheriff's Department Has Been Repeatedly Advised in Oversight Agency Reports, Expert Reports, and Grand Jury Reports About the Dangerous and Deadly Conditions at the Jail**

7.    Attached as **Exhibit F** is a true and correct copy of the April 2018 Disability Rights California ("DRC") report titled "Suicides in San Diego County Jail: A System Failing People with Mental Illness" ("DRC Report").  DRC is the "designated protection and advocacy system charged with protecting the rights of people with disabilities in California."  *Id.* at 1.  DRC toured the Jail facilities, interviewed staff, reviewed records, and retained two subject-matter experts to review individual suicide cases and the Jail's policies.  *Id.* at 1-2.  The DRC Report found that at least six suicides occurred in isolation units between 2014-2016, as "extreme isolation and deprivations of solitary confinement increase suicidal

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

ideation and self-harming behavior." *Id.* at 14-15. DRC found that custody staff conducted inadequate safety checks "in a number of cases in which inmates died by suicide." *Id.* at Appx. A-15-16. The report stated that it is "standard custodial practice" to conduct more frequent safety checks of incarcerated people in segregation, and recommended that the Sheriff's Department audit the adequacy and timeliness of safety checks in the Jail. *Id.* at Appx. A-16. The DRC Report also criticized the practice in the Jail of non-confidential mental health appointments, finding that a "substantial number" of mental health contacts are non-confidential, *id.* at Appx. A-10, and stating that "[n]on-confidential clinical contacts undermine treatment, as prisoners are reluctant to disclose sensitive information about their mental health history or current situation." *Id.* at 23. The DRC Report recommended that the Jail provide space for confidential mental health treatment. *Id.* at Appx. A-10. DRC provided the DRC Report, along with confidential expert reviews of individual suicides at the Jail, to the Sheriff's Department before the DRC Report was published to the public. The report is publicly available on Disability Rights California's website, at https://www.disabilityrightsca.org/public-reports/san-diego-jail-suicides-report.

8.      Attached as **Exhibit G** is a true and correct copy of the June 22, 2018 report by Lindsay Hayes titled, "Report on Suicide Prevention Practices Within the San Diego County Jail System," and the Sheriff's Department's response. The Sheriff's Department's response is on pages 1-14 of the PDF and the Hayes Report begins at page 15 of the PDF. Lindsay Hayes is a nationally recognized expert on suicide prevention in jails and prisons, as acknowledged in the Sheriff's Department's response to the Hayes Report. Response at 1. Hayes wrote that "given the strong association between inmate suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that DSB officials give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals." Hayes at 57. The Sheriff's Department

wrote that it would not implement this strong recommendation.  Response at 12.
Hayes found that even for incarcerated people at serious risk of suicide and placed
in Enhanced Observation Housing, "individual assessments by mental health
clinicians are routinely conducted cell-side, thus compromising reasonable privacy
and confidentiality."  Hayes at 39.  Elsewhere, Hayes stated that it "would not be
unusual for an otherwise suicidal inmate to deny suicidal ideation when questioned
in a physical environment that lacks both privacy and confidentiality."  *Id.* at 19.
The report and response are publicly available on the Sheriff's Department's
website at https://www.sdsheriff.gov/bureaus/detention-services-bureau/preventing-
jail-suicides.

9.    Attached as **Exhibit H** is a true and correct copy of the January 2017
Technical Assistance Report prepared for the Sheriff's Department by the National
Commission on Correctional Health Care ("NCCHC"), the leading standards
organization for correctional health care.  The Sheriff's Department commissioned
the report from NCCHC, which inspected San Diego Central Jail, George Bailey
Detention Facility, Vista Detention Facility, and Las Colinas Detention & Reentry
Facility.  *Id.* at 2.  NCCHC found that each of the Jail facilities failed to meet more
than half of NCCHC's essential standards for a correctional health services system.
*Id.* at 3-4, 37-38, 70-71, 104-05.  Among its many findings, NCCHC found that
medical and mental health care in the Jail "does not meet the requirements for 'sight
and sound' confidentiality."  *Id.* at 35, 68, 135.  This lack of confidentiality
"compromises privacy and may prevent a provider or nurse from obtaining an
inmate's full description of his or her problem to make a diagnosis."  *Id.* at 8-9, 43,
109.  The Sheriff's Department did not meet the NCCHC standard for mental health
care for incarcerated people in segregation because "[m]ental health staff are not
reviewing inmate records prior to placement in segregation for any possible
contraindications to placement in segregation."  *Id.* at 36, 68, 101-02, 136.  NCCHC
found that custody staff "are placing inmates in segregation because they are

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

mentally ill, not due to disciplinary standards, which violates NCCHC standards." *Id.* at 68. " NCCHC's report is publicly available on the Sheriff's Department website, at the following link:

https://www.sdsheriff.gov/home/showpublisheddocument/48/637309633674230000

10.     Attached as **Exhibit I** is a true and correct copy of Community Oriented Correctional Health Services's ("COCHS") May 30, 2020 report to Dorothy Thrush, Chief Operating Officer, Office of Public Safety, County of San Diego. COCHS was retained by the County to provide a review of best practices in correctional health care. *Id.* at 1. Dr. Homer Venters, then-president of COCHS and the former medical director at Rikers Island, wrote the report based on inspections of the Jail and interviews with staff. *Id.* Dr. Venters wrote about the benefits of placing Jail health care within the local health department, rather than under custody staff. Doing so allows the County "to integrate the jail health services with other community-based initiatives that focus on reducing recidivism, promoting stable housing, community mental health services and ultimately, reducing reliance on jails as a site of custody for people who are struggling with serious mental illness, substance use disorders and housing concerns." *Id.* at 8. Dr. Venters also noted that medication assisted treatment for opioid dependence is becoming "more prevalent in county jail settings." *Id.* at 9. Dr. Venters wrote that "patients with serious mental illness in the jail setting benefit from engagement with multiple types of therapy, including one-on-one talk therapy, psychiatric care with medication management, nursing support, group therapy, art and movement therapy." *Id.* at 16.

11.     Attached as **Exhibit J** is a true and correct copy of the San Diego County Civil Grand Jury report "San Diego County Detention Facilities Condition and Management," dated May 19, 2014. The Grand Jury toured the Jail facilities and found that at South Bay Detention Facility, "[t]he control room video equipment is old and lacks the ability to zoom in on particular areas of interest." *Id.* at 9. The

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1    Grand Jury recommended the Sheriff's Department update the video equipment.  *Id.*
2    The Grand Jury also found that the video surveillance system at George Bailey
3    Detention Facility was outdated because "the equipment is antiquated and produces
4    very fuzzy images."  *Id.* at 12.  The Grand Jury stated there was an "urgent need" to
5    update the video surveillance equipment at George Bailey and recommended the
6    Sheriff's Department do so.  *Id.* at 14.

7           12.     Attached as **Exhibit K** is a true and correct copy of the San Diego
8    County Civil Grand Jury report "Adult Detention Facilities – San Diego County,"
9    dated June 1, 2017.  The Grand Jury toured the Jail facilities and "noticed significant
10   repair and maintenance issues, including nonfunctional security cameras at George
11   Bailey Detention Facility."  *Id.* at 1.  Specifically, the Grand Jury found that "[h]alf
12   of the security cameras throughout the facility appeared nonfunctional as the glass
13   covering the cameras was cloudy, creating a safety and security issue."  *Id.* at 4.

14          13.     Attached as **Exhibit L** is a true and correct copy of the San Diego
15   County Civil Grand Jury report "San Diego County Detention Facilities: Inspection
16   Report and Inmate Mental Health," dated May 28, 2019.  The Grand Jury found that
17   "the body scanner at the Central Jail used to screen for concealed drugs and
18   weapons needs updated software."  *Id.* at 6.  The Grand Jury recommended that the
19   Sheriff's Department "find a way to update the scanners."  *Id.*

20   **VI.   CLERB Documents Include Repeated Findings About Deficiencies in the**
     **Sheriff's Department's Policies, Procedures, Practices, and Training**
21   **Contributing to Preventable Deaths at the Jail**

22          14.     Attached as **Exhibit M** is a true and correct copy of CLERB's April
23   2022 findings.  Therein, CLERB investigated the May 30, 2021 death of Lester
24   Marroquin at San Diego Central Jail.  *Id.* at 6.  Marroquin had been in Enhanced
25   Observation Housing ("EOH") cells 17 times and in safety cells 11 times during his
26   incarceration at the Jail, as he had attempted suicide on multiple occasions.  *Id.*
27   CLERB found that "it was obvious to the Department, sworn staff and medical staff,
28   that Marroquin was a danger to himself."  *Id.*  On Sunday, May 30, Marroquin was

1    transferred to administrative segregation, where he committed suicide by water

2    intoxication.  *Id.*

3        15.    Attached as **Exhibit N** is a true and correct copy of CLERB's agenda

4    for its March 2022 meeting.  The document includes CLERB's recommended

5    findings in the January 6, 2021 death of Omar Moreno Arroyo at San Diego Central

6    Jail.  CLERB stated that Moreno died of choking on his COVID-19 face mask, with

7    acute methamphetamine intoxication as a contributing factor.  *Id.* at 4.  CLERB

8    found that the officer responsible for the body scanner at Central Jail committed

9    misconduct by failing to inquire about an anomaly indicated on the scan of

10   Moreno's body.  The medical examiner's report referred to the anomaly as a

11   "possible baggy of illicit substance."  CLERB reported that the medical examiner

12   stated that if the bag was in Moreno's body for seven hours, it could have dissolved

13   in his body.  *Id.* at 5.  CLERB also found that an officer conducted an "incomplete

14   safety check" before Moreno died.  *Id.* at 4.

15       16.    Attached as **Exhibit O** is a true and correct copy of CLERB's January

16   2022 findings.  Therein, CLERB investigated the death of Omar Hasenin at George

17   Bailey Detention Facility on November 3, 2020, and stated that Hasenin died of a

18   fentanyl overdose.  *Id.* at 2-3.  CLERB found that "there is no doubt that Hasenin,

19   while as an inmate in the custody and under the care of the SDSD, either acquired or

20   possessed and subsequently self-administered fentanyl, which resulted in his death,"

21   and that as such, Hasenin's death was "preventable."  *Id.* at 3.  CLERB's report

22   reveals that only four of the six active Jail facilities have body scanners.  *Id.*

23       17.    Attached as **Exhibit P** is a true and correct copy of CLERB's

24   December 2021 findings.  Therein, CLERB investigated the November 22, 2020

25   death of Lazaro Alvarez at San Diego Central Jail.  *Id.* at 1-2.  CLERB found that

26   Alvarez died of a heart attack caused by methamphetamine and fentanyl overdose.

27   *Id.* at 2.  When a deputy found Alvarez unresponsive, the deputy was not carrying

28   naloxone and could not use that to attempt to revive Alvarez.  *Id.*  CLERB also

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  found that two deputies committed misconduct by failing to provide Alvarez with

2  emergency medical care and instead waiting until medical staff arrived.  *Id.*

3      18.    Attached as **Exhibit Q** is a true and correct copy of CLERB's

4  November 2021 findings.  CLERB investigated the November 24, 2020 death of

5  Antonio Miguel Gonzaba at Vista Detention Facility, who overdosed on substances

6  including fentanyl.  *Id.* at 1-2.  CLERB found that video from the Jail showed

7  "inmates passing items to Gonzaba under his cell door" shortly before he died.  *Id.*

8  at 2.

9      19.    Attached as **Exhibit R** is a true and correct copy of CLERB's

10  September 2021 findings.  Therein, CLERB investigated the May 17, 2020 death by

11  suicide of Joseph Morton at Vista Detention Facility.  *Id.* at 2-3.  Although a deputy

12  documented conducting a safety check approximately an hour before Morton was

13  discovered unresponsive, CLERB could not confirm via video that the check

14  actually happened because "the video surveillance system was sporadically

15  malfunctioning, which caused time lapses in the recorded video footage."  *Id.* at 3.

16      20.    Attached as **Exhibit S** is a true and correct copy of CLERB's July 2021

17  findings.  Therein, CLERB investigated the January 26, 2020 death of Blake Wilson

18  at San Diego Central Jail, and found that he died of a fentanyl and heroin overdose.

19  *Id.* at 1-2.  CLERB stated that Wilson had reported daily use of heroin and alcohol

20  during his intake screening.  *Id.* at 2.  CLERB found that Wilson was able to obtain

21  heroin and fentanyl in the Jail.  *Id.*  CLERB also sustained a finding of misconduct

22  against a Sheriff's Department deputy for a deficient safety check.  *Id.*  That deputy

23  looked into Wilson's cell for "approximately one second," which CLERB said was

24  "not sufficient or long enough to obtain verbal or physical acknowledgement from

25  all three inmates, including inmate Wilson."  *Id.*

26      21.    Attached as **Exhibit T** is a true and correct copy of CLERB's

27  September 2020 findings.  Therein, CLERB investigated the July 2, 2019 death of

28  Michael Bush.  CLERB found that Bush died of acute methamphetamine

intoxication "due to a ruptured plastic bag in the stomach." *Id.* at 3.  When CLERB was arrested and booked into the Jail the night before his death, "his Body Scan image did not detect contraband." *Id.*

22.  Attached as **Exhibit U** is a true and correct copy of CLERB's June 2020 findings.  Therein, CLERB investigated the December 24, 2017 death of Joseph Carroll Horsey. *Id.* at 2-4.  Horsey was found unresponsive in his bed at 3:50 a.m. on December 24. *Id.* at 2.  CLERB stated that according to the medical examiner, "the decedent's body had undergone postmortem changes that suggested that Horsey had been dead hours before he was discovered." *Id.* at 3.  CLERB sustained a finding of misconduct against multiple deputies because the "jail surveillance video recordings showed sworn staff and nursing personnel walking by the module, versus physically entering the unit to observe each inmate for obvious signs of medical distress." *Id.*

23.  Attached as **Exhibit V** is a true and correct copy of CLERB's September 2019 findings.  Therein, CLERB investigated the February 7, 2019 death of Joseph Castiglione, who died of acute methamphetamine intoxication. *Id.* at 9. CLERB found that Castiglione was arrested for possession of methamphetamine and booked into San Diego Central Jail. *Id.*  When Castiglione was screened at intake, "his Body Scan image did not detect any contraband." *Id.*  Eight hours after being booked into the Jail, Castiglione died of methamphetamine intoxication, and his autopsy later revealed a "small plastic baggie" in his small intestine. *Id.*

24.  Attached as **Exhibit W** is a true and correct copy of CLERB's February 2019 findings.  Therein, CLERB investigated the September 25, 2017 death of Michael Macabinlar, who died of acute methamphetamine intoxication. *Id.* at 4-5.  CLERB found that that "Macabinlar obtained the illicit drugs while in custody." *Id.* at 4.  CLERB found, "Per video surveillance, Macabinlar was last seen alive in his cell on 09-24-17 at 1:00pm; 20 hours later his body was discovered." *Id.*  CLERB sustained findings of misconduct against three Sheriff's

Department deputies in connection with Macabinlar's death.  *Id.* at 4-5.  During a safety check, one deputy "did not stop at the door" to Macabinlar's cell, and two other deputies failed to obtain confirmation that Macabinlar was alive during their safety checks.  *Id.*

25.    Attached as **Exhibit X** is a true and correct copy of CLERB's October 2017 findings.  Therein, CLERB investigated the March 11, 2016 death of Brandon Moyer, who died of a heroin overdose.  *Id.* at 5.  In investigating the allegation that a deputy failed to conduct a proper safety check on Moyer, CLERB found that the video evidence related to Moyer's death was "grainy and inconclusive," which prevented CLERB from determining whether the safety check was adequate.  *Id.*

26.    Attached as **Exhibit Y** is a true and correct copy of an October 12, 2021 letter to CLERB from the Services Employees International Union ("SEIU"), Local 221, the union representing medical and mental health staff at the Jail.  The letter concerns dangerously low health staffing levels and custody staff interference with medical and mental health care.  SEIU wrote, "The conditions in the jails continue to be unsafe for detainees and workers alike.  This is due to the lack of adequate staffing levels, and a lack of adherence to general practice protocols such as direction of health care service providers by licensed medical professionals rather than law enforcement."  SEIU submitted the letter in advance of CLERB's October 2021 meeting.

**VII.    The Sheriff's Department Has Acknowledged an Extraordinarily High Number of Overdoses in the Jail, Including at Least 16 Fatal Overdoses Since 2019**

27.    Attached as **Exhibit Z** are true and correct copies of the BCIA 713 Death in Custody Reporting Forms submitted by the Sheriff's Department to the California Department of Justice from 2019-2021.  These reporting forms were produced by the Sheriff's Department to Plaintiffs' counsel in response to Public Records Act requests on May 10, 2021 (the 2019 and 2020 forms) and on February 28, 2022 (the 2021 forms).  The BCIA 713 forms show the number of people who

died in the Jail from overdoses in 2019, 2020, and 2021. The 16 people who died from overdoses are Joseph Castiglione, Jeremy Thomas, Michael Bush, Michael Hossfeld, Jose Sevilla, Daniel Pickett, Franklin July, Blake Wilson, Adam Rogers, Omar Hasenin, Lazaro Alvarez, Antonio Gonzaba, Jonathan Whitlock, Jerry Aleman, Ronaldino Estrada, and Saxon Rodriguez. Although Whitlock's form states "other" for means of death and Aleman's says "pending investigation," the Sheriff's Department has publicly announced that Whitlock died of a fentanyl overdose, as reflected in **Exhibit AA**, and that Aleman presumptively tested positive for fentanyl, as reflected in **Exhibit BB**.

28. Attached as **Exhibit AA** is a true and correct copy of the Sheriff's Department's August 5, 2021 announcement that Jonathan Whitlock died of a fentanyl overdose at George Bailey Detention Facility on April 27, 2021. The announcement is available on the Sheriff's Department's website at: https://www.sdsheriff.gov/Home/Components/News/News/565/16.

29. Attached as **Exhibit BB** is a true and correct copy of the Sheriff's Department's June 10, 2021 announcement that Jerry Aleman died at George Bailey Detention Facility on June 9, 2021 and tested presumptively positive for fentanyl. The announcement is available on the Sheriff's Department's website at: https://www.sdsheriff.gov/Home/Components/News/News/432/514.

30. Attached as **Exhibit CC** is a true and correct copy of the Sheriff's Department Detention Services Bureau report on "Suspected Overdose Incidents with Naloxone Deployment," dated April 29, 2022. The document states that as of April 28, 2022, there have been 68 suspected overdose incidents in the Jail where an individual had naloxone administered to them. This report, like all weekly overdose reports published by the Sheriff's Department, is publicly available on the Sheriff's Department's website at https://www.sdsheriff.gov/resources/jail-population-data.

31. Attached as **Exhibit DD** is a true and correct copy of the Sheriff's Department Detention Services Bureau report on "Suspected Overdose Incidents

with Naloxone Deployment," dated December 30, 2021.  The document states that as of December 30, 2021, there were 204 suspected overdose incidents in the Jail where an individual had naloxone administered to them.  This report was publicly posted on the Sheriff's Department's website at https://www.sdsheriff.gov/resources/jail-population-data and is now available at the following link: https://www.sdsheriff.gov/home/showpublisheddocument/4611.

## VIII.  Government Agency Documents Show That Most People Booked into the Jail Test Positive for Illicit Substances

32.    Attached as **Exhibit EE** is a true and correct copy of the San Diego Association of Government's ("SANDAG") August 2021 report titled, "2020 Adult Arrestee Drug Use in the San Diego Region."  The report stems from a survey of over 300 incarcerated people being booked into the Jail facilities in 2020.  *Id.* at 4.  Based on that survey, SANDAG found that 82% of male individuals being booked into the Jail "tested positive for at least one illicit substance." *Id.* at 3.  67% of female individuals tested positive for an illicit substance.  *Id.*  SANDAG also found that 37% of arrestees reported having been diagnosed with a mental or psychiatric disorder. *Id.* at 15.

33.    Attached as **Exhibit FF** is a true and correct copy of the Sheriff's Department's Jail Population Statistics report for February 2022.  The report shows that the average daily jail population during February 2022 was 4,410 people.  That population was 22% Black, 43% Hispanic, 30% White, and 6% "Other."  The report indicates that there was 6 suicide attempts in the Jail in February and that 1,551 people were receiving psychotropic medications as of February 28, 2022.  The report is available on the Sheriff's Department's website at: https://www.sdsheriff.gov/home/showpublisheddocument/4944/637847709095170000.

## IX. Family Members of People Who Have Died in the Jail Have Been Calling for Reform at the Jail for Years

34.     Attached as **Exhibit GG** is a true and correct copy of excerpts from an April 7, 2022 town hall forum on Zoom, hosted by the Racial Justice Coalition and North County Equity and Justice Coalition.  The forum was recorded and the recording was provided to Plaintiffs' counsel by the organizers of the forum.  The excerpts include testimony from the families of individuals who have died at the Jail in recent years.  At 00:13, Paloma Serna speaks about the death of her daughter, Elisa Serna, at Las Colinas Detention & Reentry Facility in November 2019.  At 8:54, Tammy Wilson speaks about the death of her husband, Omar Moreno Arroyo, at San Diego Central Jail in January 2021.  At 15:28, AC Mills speaks about the death of his son, Kevin Mills, at San Diego Central Jail in November 2020.  This video is not able to be filed electronically and is a subject of Plaintiffs' Application for Leave to Allow Non-Electronic Filing of Exhibits, filed concurrently with Plaintiffs' Motions.

## X. Newspaper Articles Identify the Extraordinarily High Death Rate at the Jail, Deaths from Overdoses, and the Need for Medication Assisted Treatment at the Jail

35.     Attached as **Exhibit HH** is a true and correct copy of a September 20, 2019 article in the *San Diego Union-Tribune* article, titled "Rate of jail inmate deaths in San Diego County far exceeds other large California counties."  The article is the culmination of a six-month investigation, which found that the "county's jail mortality rate is the highest among California's largest county jail systems" and that the Sheriff's Department "has been slow to make more obvious fixes" to prevent death in the Jail.  The article found that in the decade prior to the article, deaths in the Jail and suicides specifically had increased substantially from the prior decade. The article is part of the *Union-Tribune*'s "Dying Behind Bars" series based on its six-month investigation, which includes a timeline of deaths at the Jail from 2009-2019 and several other articles.  The entire series is available at:

1  https://www.sandiegouniontribune.com/topic/dying-behind-bars.

2      36.    Attached as **Exhibit II** is a true and correct copy of a June 1, 2021

3  article in the *San Diego Union-Tribune*, titled "Number of drug overdoses in San

4  Diego County jails jumps sharply."  The article found that between 2018 and 2019,

5  overdoses in the Jail "jumped more than five-fold" and that through only five

6  months of 2021, there were 53 overdoses based on the Sheriff's Department's

7  records.  The articles quotes a Sheriff's Department's official referring to "increased

8  demand and market for fentanyl inside of our jails."  According to the Sheriff's

9  Department, "drugs are hidden inside people's bodies as they are being booked into

10  jail," or are "sent in through the mail or brought in by jail staff."  The article states

11  that the Sheriff's Department admitted body scanners at the Jail are inadequate: "Jail

12  officials rely on body scanners when arrestees are booked into custody, but the

13  machines do not always identify contraband as it is being snuck in, the department

14  said."  The article states that an unnamed deputy said that "many of his colleagues

15  have yet to be properly trained to find everything that appears in the images" from

16  the body scanner.  The article notes that "many jail and prison systems" have

17  implemented medication assisted treatment ("MAT").  The Sheriff's Department

18  told the *Union-Tribune* in 2019 that it was receiving training on implementing

19  MAT, but in 2021, said the program was "still being developed."  The article is

20  available at: https://www.sandiegouniontribune.com/news/watchdog/story/2021-06-

21  01/number-of-drug-overdoses-in-san-diego-county-jails-jumps-sharply.

22      37.    Attached as **Exhibit JJ** is a true and correct copy of a May 19, 2021

23  *San Diego Union-Tribune* article titled "8 inmates at Otay Mesa jail hospitalized

24  after overdosing on fentanyl."  The article states that on May 18, 2021, eight people

25  at George Bailey Detention Facility were hospitalized after being believed to have

26  overdosed on fentanyl.  All eight people were revived with naloxone.  The article is

27  available at: https://www.sandiegouniontribune.com/news/public-safety/story/2021-

28  05-19/8-inmates-at-otay-mesa-jail-hospitalized-after-overdosing-on-fentanyl-san-

diego-deputies-use-narcan.

38.    Attached as **Exhibit KK** is a true and correct copy of a July 18, 2021 article in the *San Diego Union-Tribune*, titled "Seven Otay Mesa jail inmates hospitalized for drug overdose."  The article states that seven people at George Bailey Detention Facility were hospitalized on July 17, 2021 after being believed to have overdosed on fentanyl.  The article states that all seven recovered after receiving doses of Naloxone.  The article is available at: https://www.sandiegouniontribune.com/news/public-safety/story/2021-07-18/seven-otay-mesa-jail-inmates-hospitalized-for-drug-overdose.

39.    Attached as **Exhibit LL** is a true and correct copy of a December 6, 2021 article in the *San Diego Union-Tribune*, titled "Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds."  The article reports on CLERB's findings in the death of Lazaro Alvarez, *see* **Exhibit P**, and includes statements from CLERB and the Sheriff's Department about problems with the Jail video surveillance system.  The article reports CLERB's executive director said "[b]roken or non-operational surveillance cameras inside county jails have been a recurring problem for the Sheriff's Department."  The article quotes the Sheriff's Department as stating that "cameras throughout the jail system are aging and are not always reliable."  The article is available at: https://www.sandiegouniontribune.com/news/watchdog/story/2021-12-06/two-san-diego-sheriffs-deputies-failed-to-provide-medical-aid-to-inmate-before-he-died-review-board-finds.

XI.    **Sheriff's Department Documents and Officials Acknowledge Deficiencies in the Cameras at the Jail, Scanners to Prevent Drugs from Entering the Jail, and Treatment for Individuals with Substance Use Disorders**

40.    Attached as **Exhibit MM** is a true and correct copy of a December 6, 2021 email thread between Sheriff's Department personnel, including Undersheriff Kelly Martinez and Erika Frierson, who at the time was Assistant Sheriff responsible for the Jail.  This email was produced to Plaintiffs' counsel on February

18, 2022, in response to a California Public Records Act request.  The email thread concerns the Sheriff's Department's response to a reporter's inquiry about CLERB findings that officers failed to provide medical aid to Lazaro Alvarez after his drug overdose, and CLERB's statement that the camera system at the Jail was inoperable. *See id.* at 4.  An email from Undersheriff Martinez to Frierson and two other Sheriff's Department employees, Amber Baggs and Michelle Craig, states the Sheriff's Department's proposed response, apparently drafted by Undersheriff Martinez.  *Id.* at 3.  The response stated in part that "[t]he Sheriff's Department is not satisfied in anyway with our current camera system or recording capabilities," and that cameras "are aging and are not always reliable," and that "the coverage [cameras] provide is far from optimal in all circumstances."  *Id.*   Frierson made one edit to the email, but not the section about cameras.  *Id.* at 2-3.  Martinez later added two more sentences and then approved the statement.  *Id.* at 1-2.

41.    Attached as **Exhibit NN** is a true and correct copy of excerpts from an email thread from May 26-27, 2021 involving Sheriff's Department personnel.  The email thread was produced to Plaintiffs' counsel by the Sheriff's Department on February 28, 2022, in response to a California Public Records Act request.  The first email in the thread includes the Sheriff's Department's Media Relations Director's response to an inquiry about drug overdoses at the Jail.  The email states that "drugs are making their way into our facilities," from jail staff, inside the bodies of people being booked, and via the mail.  *Id.* at 7.  The Sheriff's Department also wrote that the body scanners available at some of the Jail facilities are "not perfect and at times items are not detected."  *Id.*  The email concedes that MAT is "available only in a limited capacity."  *Id.*  In later emails in the thread, the Jail's Chief Medical Officer Jon Montgomery corresponds with custody staff, including Captain Billy Duke, about MAT at the Jail.  *See id.* at 1-5.  Montgomery concedes that only on "rare" occasions has the Sheriff's Department even been able "to continue an individual in a MAT program" when the individual was receiving MAT in the

community.  *Id.* at 2-3.

42.    **Exhibit OO** is a true and correct copy of an excerpt from an October 21, 2021 debate between three candidates for the office of San Diego County Sheriff.  The primary election is June 7, 2022.  The debate was hosted by the *Voice of San Diego* news website and the entire video is publicly available at https://www.youtube.com/watch?v=idmGH03C0Sg.  Current Undersheriff Kelly Martinez is a candidate for Sheriff and participated in the debate.  Undersheriff Martinez was asked about and discusses overdoses at the Jail.  Martinez acknowledged that despite the Sheriff's Department's efforts, drugs make it into the facilities because Jail screening procedures "don't get them all."  *Id.* at 0:05-0:08.  She states, "if the state audit can bring forth some, you know, some recommendations, we would really like to see that."  *Id.* at 0:33-0:43.  Martinez discussed the SANDAG report's findings on substance use among arrestees, *see* **Exhibit EE**, and acknowledged that "to come into a jail setting and go through withdrawals really drives someone who's got a substance use disorder issue to want drugs."  *Id.* at 1:05-1:25.  Martinez claimed that MAT was active at Las Colinas and would be in other Jail facilities "soon."  *Id.* at 2:14-2:30.  This video is not able to be filed electronically and is a subject of Plaintiffs' Application for Leave to Allow Non-Electronic Filing of Exhibits, filed concurrently with Plaintiffs' Motions.

**XII.    Providing Naloxone and Medication Assisted Treatment to Incarcerated People Are Important Ways to Prevent and Address Overdoses**

43.    Attached as **Exhibit PP** is a true and correct copy of excerpts from the Sheriff's Department February 18, 2022 written response to a California Public Records Act request from Plaintiffs' counsel.  Request No. 28 was for "Documents sufficient to show the number of incarcerated people enrolled in the Medication Assisted Treatment program at Las Colinas Detention and Reentry Facility from January 1, 2021 to the present."  The Sheriff's Department wrote in response that it "does not currently have a formal number, or records," as "[t]he MAT program has

not been officially implemented to date and is currently in the process of being formatted and integrality [sic] into our facilities." The Sheriff's Department continued: "The program currently being operated at LCDRF operates similar to, and with the MAT program in mind, but again the MAT program has yet to be fully implemented and logistics, record keeping, etc., are still in the process of being vetted and tested." The Sheriff's Department produced no documents responsive to the request.

44.    Attached as **Exhibit QQ** is a true and correct copy of a May 27, 2021 news release from the Los Angeles County Sheriff's Department and a video embedded with the article. The release describes how two men at a Los Angeles County Jail facility survived a possible opioid overdose because naloxone was available to other incarcerated people in the facility, who provided a dose when the two men became unresponsive. The release states that the Los Angeles County Sheriff's Department "recently implemented a program that provides inmates access to Narcan [naloxone], a medication that, if administered quickly, can be highly effective in reversing an opioid overdose." The embedded video shows the events in question. The video can be played by double-clicking inside the frame of the PDF, and then confirming that the user "trusts" the content of the file. The news release and video are available at: https://lasd.org/sheriffs-naloxone-custody-pilot-project-saves-inmates-from-overdose/.

45.    Attached as **Exhibit RR** is a true and correct copy of an April 2, 2022 *Associated Press* article titled "California inmate overdoses plummet under drug program." The article discusses the medication assisted treatment program in the California Department of Corrections and Rehabilitation ("CDCR"), which started in 2020. CDCR reported that in the first two years of the program, "overdose deaths dropped 58% after the program began" and "[h]ospitalizations were 48% lower among those receiving the anti-craving drugs than among those waiting to begin treatment." The article states that before the MAT program began, in 2019, CDCR

had the highest rate of overdoses among all state prison systems.

**XIII. The Sheriff's Department's Policies, Procedures, Practices, and Training are Deficient, as Discussed in Plaintiffs' Motions and their Accompanying Expert Declarations**

46.    Attached as **Exhibit SS** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure I.2, Intercom Systems. The policy states that the intercom system is primarily for "relaying and/or summoning emergency assistance" to incarcerated people," and that intercoms "shall not be routinely muted or silenced." *Id.* at 1.  This and all Detention Services Bureau policies and procedures are available on the Sheriff's Department's website at the following link:

https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Detentions%20Policy%20and%20Procedure%20Sections/.

47.    Attached as **Exhibit TT** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure M.6, Life Threatening Emergencies: Code Blue.  M.6 states that "an opioid overdose requires immediate medical attention." *Id.* at 2.  The policy requires all Sheriff's Department deputies to carry naloxone, which helps in reversing opioid overdoses: "Deputies shall carry the naloxone on their person, in a department approved holster during the course of their normal duties." *Id.* at 3.

48.    Attached as **Exhibit UU** is a true and correct copy of Sheriff's Department Medical Services Division Standard Nursing Procedure H.4, Heroin/Opiate Withdrawal.  The Standard Nursing Procedure is available on the Sheriff's Department website at:

https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Medical%20Services%20Division/Standard%20Nursing%20Procedures.pdf.

49.    Attached as **Exhibit VV** is a true and correct copy of Sheriff's Department Medical Services Division Operations Manual policy MSD.A.2,

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

Addicted Arrestee Care, in redacted form.  Policy MSD.A.2 restricts medication assisted treatment ("MAT") eligibility to:  (1) people who are currently obtaining methadone treatment from a pre-approved outpatient clinic; and (2) females who are pregnant, heroin dependent, and not currently in an outpatient methadone treatment program.  This means that all other people booked into the Jail are ineligible for MAT.  The Department Operations Manual and the policy are available in redacted form on the Sheriff's Department website, at the following link: https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Medical%20Services%20Division/Medical%20Services%20Division%20Operations%20Manual.pdf.  The Sheriff's Department has not provided an unredacted version of the policy to Plaintiffs.

50.    Attached as **Exhibit WW** is a true and correct copy of Sheriff's Department Medical Services Division Operations Manual policy MSD.G.2.1, Segregated Inmates.

51.    Attached as **Exhibit XX** is a true and correct copy of Sheriff's Department Detention Services Bureau policy MSD.D.4, Detention Outpatient Psychiatric Services (DOPS).

52.    Attached as **Exhibit YY** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure I.64, Safety Checks: Inmates, Housing, and Holding Areas.  The policy states that a safety check in the Jail should occur every 60 minutes and should "consist of looking at the inmates for any obvious signs of medical distress, trauma or criminal activity."  *Id.* at 1.  The policy does not require the safety check to confirm that the incarcerated person is actually alive.  The policy has not been updated since December 30, 2019.  *Id.*

53.    Attached as **Exhibit ZZ** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure J.3, Segregation: Definition and Use.  J.3 governs the placement of incarcerated people in administrative segregation.  The policy includes no provision for mental health staff

to recommend against a person's placement in administrative segregation based on their mental health needs.  The policy provides only that for a person placed in administrative segregation by custody staff, mental health staff will evaluate the person to determine if "mental health needs require accommodation." *Id.* at 2, 5.

54.    Attached as **Exhibit AAA** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure G.3, Elevators.  It has not been updated since March 3, 2011.  *See id.*

55.    Attached as **Exhibit BBB** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure I.57, Transportation of Inmates.

56.    Attached as **Exhibit CCC** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure M.9, Receiving Screening.  The policy states that arrestees "confined in or needing the use of a wheelchair" can only be booked at San Diego Central Jail or Las Colinas Detention & Reentry Facility, and cannot be accepted at Vista Detention Facility.  *Id.* at 2.

57.    Attached as **Exhibit DDD** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure M.39, Disabled Inmates.

58.    Attached as **Exhibit EEE** is a true and correct copy of Sheriff's Department Detention Services Bureau policy and procedure Q.55, Property Received with Inmates.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1        59.    Attached as **Exhibit FFF** is a true and correct copy of Sheriff's

2  Department Detention Services Bureau MSD.P.7, Prostheses, Orthoses and Other

3  Aids to Impairment.

4        I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct, and that this declaration is executed

6  at San Francisco, California this 30th day of April, 2022.

7

8  _____

9        Van Swearingen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| A | Proposed Order | 1 |
| B | California State Auditor Report 2021-109, February 2022 | 13 |
| C | CLERB Analytica Consulting Report | 140 |
| D | Sheriff's Announcement of Omar Ornelas Death | 204 |
| E | Another inmate dies in custody at a San Diego County jail, KPBS Public Media | 207 |
| F | Disability Rights California Report | 211 |
| G | Lindsay Hayes Report on Suicide Prevention Practices in San Diego County Jails | 283 |
| H | NCCHC Technical Assistance Report | 384 |
| I | COCHS Report | 524 |
| J | May 19, 2014 Grand Jury Report - Condition and Management, SD County Detention Facilities | 552 |
| K | June 1, 2017 Grand Jury Report - Adult Detention Facilities, San Diego County | 583 |
| L | May 28, 2019 Grand Jury Report - San Diego County Detention Facilities and Inmate Mental Health | 595 |
| M | April 2022 CLERB Findings | 607 |
| N | March 2022 CLERB Agenda | 623 |
| O | January 2022 CLERB Findings | 636 |
| P | December 2021 CLERB Findings | 643 |

**TABLE OF CONTENTS**

EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Q | November 2021 CLERB Findings | 658 |
| R | September 2021 CLERB Findings | 667 |
| S | July 2021 CLERB Findings | 689 |
| T | September 2020 CLERB Findings | 707 |
| U | June 2020 CLERB Findings | 716 |
| V | September 2019 CLERB Findings | 728 |
| W | February 2019 CLERB Findings | 739 |
| X | October 2017 CLERB Findings | 769 |
| Y | October 12, 2021 Letter to CLERB from SEIU Local 221 | 781 |
| Z | Death in Custody Reporting Forms 2019-2021 | 784 |
| VOLUME II | | |
| AA | Jonathan Whitlock Death Investigation - San Diego County Sheriff | 853 |
| BB | Jerry Aleman Death Investigation - San Diego County Sheriff | 856 |
| CC | Suspected Overdose Incidents with Naloxone Deployment, 04-29-2022 | 859 |
| DD | Suspected Overdose Incidents with Naloxone Deployment, 12-30-2021 | 861 |
| EE | SANDAG, 2020 Adult Arrestee Drug Use in the San Diego Region | 863 |

**TABLE OF CONTENTS**

EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| FF | February 2022 SDSD Average Jail Population Statistics | 881 |
| GG | Excerpts from April 7, 2022 Town Hall Forum | 883 |
| HH | Rate of jail inmate deaths in San Diego County far exceeds other large California counties, *San Diego Union-Tribune*, 09-20-2019 | 884 |
| II | Number of drug overdoses in San Diego County jails jumps sharply, *San Diego Union-Tribune*, 06-01-2021 | 911 |
| JJ | 8 Inmates at Otay Mesa jail hospitalized after overdosing on fentanyl, *San Diego Union-Tribune*, 05-19-2021 | 919 |
| KK | Seven Otay Mesa jail inmates hospitalized for drug overdose, *San Diego Union-Tribune*, 07-18-2021 | 923 |
| LL | Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds, *San Diego Union-Tribune*, 12-06-2021 | 926 |
| MM | Sheriff's Department Email Thread, December 6, 2021 | 933 |
| NN | Sheriff's Department Email Thread, May 26-27, 2021 | 938 |
| OO | October 21, 2021 Sheriff's Debate Excerpts | 949 |
| PP | Excerpts from Sheriff's Department's February 18, 2022 PRA Response | 950 |
| QQ | L.A. County Sheriff's Naloxone Video | 953 |
| RR | California inmate overdoses plummet under drug program, Associated Press, 04-26-2022 | 957 |

**TABLE OF CONTENTS**

EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT
OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND
PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| SS | DSB Policy: I.2, Intercom System | 963 |
| TT | DSB Policy: M.6, Life Threatening Emergencies - Code Blue | 966 |
| UU | Standard Nursing Procedure H.4, Heroin Opiate Withdrawal | 971 |
| VV | MSD Policy MSD.A.2, Addicted Arrestee Care | 976 |
| WW | MSD Policy MSD.G.2.1, Segregated Inmates | 980 |
| XX | MSD Policy MSD.D.4, Detention Outpatient Psychiatric Services (DOPS) | 983 |
| YY | DSB Policy: I.64, Safety Checks - Inmates, Housing and Holding Areas | 987 |
| ZZ | DSB Policy: J.3, Segregation - Definition and Use | 991 |
| AAA | DSB Policy: G.3, Elevators | 997 |
| BBB | DSB Policy: I.57, Transportation of Inmates | 999 |
| CCC | DSB Policy: M.9, Receiving Screening | 1003 |
| DDD | DSB Policy: M.39, Disabled Inmates | 1008 |
| EEE | DSB Policy: Q.55, Property Received with Inmates | 1012 |
| FFF | MSD Policy MSD.P.7, Prostheses, Orthoses and Other Aids to Impairment | 1017 |

# EXHIBIT A

1

2

3

4

5

6

7

8               **UNITED STATES DISTRICT COURT**

9               **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  DARRYL DUNSMORE, ERNEST            Case No. 3:20-cv-00406-AJB-WVG
    ARCHULETA, ANTHONY EDWARDS,
12  REANNA LEVY, JOSUE LOPEZ,          **ORDER GRANTING**
    CHRISTOPHER NELSON,                **PLAINTIFFS' MOTIONS FOR A**
13  CHRISTOPHER NORWOOD, and           **PRELIMINARY INJUNCTION**
    LAURA ZOERNER, on behalf of        **AND PROVISIONAL CLASS**
14  themselves and all others similarly situated,   **CERTIFICATION**

15              Plaintiffs,            Judge:    Hon. Anthony J. Battaglia

16         v.                          Trial Date:   None Set

17  SAN DIEGO COUNTY SHERIFF'S
    DEPARTMENT, COUNTY OF SAN
    DIEGO, CORRECTIONAL
18  HEALTHCARE PARTNERS, INC.,
    LIBERTY HEALTHCARE, INC., MID-
19  AMERICA HEALTH, INC., LOGAN
    HAAK, M.D., INC., SAN DIEGO
20  COUNTY PROBATION DEPARTMENT,
    and DOES 1 to 20, inclusive,

21              Defendants.

22

23

24

25

26

27

28

1    Plaintiffs' Motions for a Preliminary Injunction and Provisional Class
2    Certification came on for hearing before this Court on _____ at ___.  The Court,
3    having considered the parties' pleadings, the arguments of counsel, and the entire
4    record in this case, and good cause existing therefor, **GRANTS** Plaintiffs' motions
5    and makes the following findings and orders.

6        **THE COURT HEREBY FINDS:**

7        1.    A preliminary injunction should issue where a plaintiff demonstrates
8    "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer
9    irreparable harm in the absence of preliminary relief, [3] that the balance of equities
10   tips in his favor, and [4] that an injunction is in the public interest."  *Winter v.*
11   *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

12       2.    The San Diego County Jail system (the "Jail") is extraordinarily
13   dangerous for the people incarcerated there.  Not yet three months have passed since
14   the filing of the Second Amended Complaint in this case and since the release of a
15   California State Auditor's Report finding that without changes, weaknesses in the
16   Sheriff's Department's policies and practices "will continue to jeopardize the health
17   and lives of the individuals in its custody."  In those three months, eight more
18   people have died at the Jail.  The death rate in 2022 so far exceeds the death rate in
19   2021, when 18 people died, for a death rate that was more than double the national
20   rate of deaths in Jail.  Action is warranted to remedy these dangerous conditions.

21       3.    Plaintiffs have demonstrated that they have a likelihood of succeeding
22   on the merits of their claims that (1) Defendants San Diego County Sheriff's
23   Department ("Sheriff's Department"), County of San Diego ("County"),
24   Correctional Healthcare Partners, Inc., and Liberty Healthcare (collectively,
25   "Defendants") are deliberately indifferent to the serious risk of harm posed to all
26   incarcerated people at the San Diego County Jail ("Jail") by Defendants' inadequate
27   policies and practices for preventing drug overdoses and overdose deaths at the Jail;
28   (2) Defendants are deliberately indifferent to the serious risk of harm from

1  Defendants' failures to provide timely and adequate safety checks in units housing
2  people with serious mental illness and at risk of suicide and self-harm; (3)
3  Defendants are deliberately indifferent to the serious risk of harm from Defendants'
4  failures to provide timely and adequate safety checks to protect the lives of people at
5  risk of suicide, self-harm, and/or emergent physical/medical harm; (4) Defendants
6  are deliberately indifferent to the serious risk of harm caused by Defendants' policy
7  of failing to consider mental health staff's clinically-based housing placement
8  recommendations for people with mental illness; (5) Defendants are deliberately
9  indifferent to the serious risk of harm posed to all incarcerated people, and
10 especially people at risk of suicide or self-harm, by Defendants' failure to ensure
11 that mental health care is provided in a confidential setting; (6) and Defendants
12 violate the Americans with Disabilities Act ("ADA") and are deliberately indifferent
13 to the needs of incarcerated people with mobility disabilities by denying them access
14 to programs and services by reason of their disability, and by clustering them in
15 crowded inaccessible housing at Central Jail.

16      4.      Plaintiffs have no adequate remedy at law and only injunctive relief
17 will alleviate the risks at which they are placed by Defendants' acts and omissions.

18      5.      Plaintiffs are suffering irreparable harm from ongoing violations of
19 their constitutional and statutory rights, and from ongoing pain and suffering and
20 increased health risks due to inadequate care for mental health needs, dangerous
21 housing placements for people with mental illness, increased exposure to deadly
22 contraband in the Jail and deficient care in preventing and addressing overdoses, and
23 untimely access to protective interventions due to deficient intercom, surveillance,
24 and safety check systems.  Incarcerated people who have mobility disabilities are
25 suffering irreparable harm from ongoing violations of their rights under the ADA,
26 and from ongoing denials of access to programs and services at the Jail.

27      6.      Given Plaintiffs' likelihood of success on the merits, the irreparable
28 harm caused by denying Plaintiffs' Motion for Preliminary Injunction outweighs

1  any harm experienced by Defendants as a result of complying with the terms of this

2  Order.

3          7.      The public has a strong interest in the preventing the deaths of

4  incarcerated people and in correctional facilities' compliance with the ADA, and

5  this public interest weighs in favor of granting the Motion for Preliminary

6  Injunction.

7          8.      These remedies are all consistent with the Prison Litigation Reform

8  Act's requirement that the Court's orders be narrowly drawn and extend no further

9  than necessary to remedy the current and ongoing violations of incarcerated

10  people's federal rights by Defendants.  The relief ordered is the least intrusive

11  means necessary to correct these violations as it grants considerable leeway to

12  Defendants to craft a remedy that complies with the terms of this Order.  *See* 18

13  U.S.C. § 3626(a)(1)(A).  Anything short of these remedies will fail to put an end to

14  Defendants' dangerous violations of Plaintiffs' rights.

15          9.      Plaintiffs have also moved to provisionally certify an Incarcerated

16  People Class and an Incarcerated People with Disabilities Subclass.  *See Meyer v.*

17  *Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012).  The Incarcerated

18  People Class is defined as all adults who are now, or will be in the future,

19  incarcerated in the Jail.  The Incarcerated People with Disabilities Subclass is

20  defined as all qualified individuals with a disability, as that term is defined in 42

21  U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j)

22  and (m), and who are now, or will be in the future, incarcerated in the Jail.

23          10.     The Court finds that both the Class and Subclass are so numerous that

24  joinder of all members is impracticable.  The Class consists of more than 4,000

25  current and an unascertainable number of future individuals.  The Subclass consists

26  of more than 1,000 current and an unascertainable number of future individuals.

27  Fed. R. Civ. P. 23(a)(1).

28          11.     There are questions of law and fact common to the Class and the

Subclass.  Fed. R. Civ. P. 23(a)(2).  For purposes of preliminary relief, questions of law and fact common to the Class include:  (1) Do Defendants, through their security policies and practices or lack thereof, expose all incarcerated people in the Jail to a serious risk of harm or death from violence, neglect, or overdose?  (2) Do Defendants, through their medical and mental health policies and practices or lack thereof, expose all incarcerated people in the Jail to a substantial risk of suffering, deterioration of medical and mental health condition, and death?

12.    For purposes of preliminary relief, questions of law and fact common to the Subclass include:  Do Defendants, through their disability-related policies and practices or lack thereof, deny qualified people with mobility disabilities access to programs, services, and activities at the Jail and/or discriminate against qualified incarcerated people with mobility disabilities?

13.    The proposed class representatives have claims sufficiently typical of the class and subclass they seek to represent.  Fed. R. Civ. P. 23(a)(3).  The claims and defenses of Plaintiffs Darryl Dunsmore, Ernest Archuleta, Anthony Edwards, Reanna Levy, Josue Lopez, Christopher Nelson, Christopher Norwood, and Laura Zoerner (collectively "the putative class representatives") are typical of the claims and defenses of the Class and the Subclass.  All of the putative class representatives either have been or currently are incarcerated in the Jail.  They suffer the same injuries as the Class under the United States Constitution because Defendants expose the putative class representatives and the Class to the same substantial risk of serious harm.  All of the putative subclass representatives also suffer the same injuries under the ADA as the Subclass.  The putative subclass representatives and the members of the Subclass are qualified individuals with disabilities, as defined by federal and California law.  Moreover, the putative subclass representatives and the members of the Subclass are all subject to the same policies, procedures, and practices of Defendants that deny them access to Jail programs, services, and activities and discriminate against them because of their disabilities.

14.    The class representatives will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).  The class representatives, who seek only preliminary injunctive relief at this stage, have no conflict with the class and subclass they seek to represent.  The class representatives are knowledgeable and involved in the lawsuit.

15.    Defendants have acted and refused to act on grounds that apply generally to the Class and Subclass, so that preliminary injunctive relief is appropriate respecting the Class and the Subclass as wholes.  Fed. R. Civ. P. 23(b)(2).

**WHEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Plaintiffs' Motion for Preliminary Injunction is GRANTED.

2.    IT IS FURTHER ORDERED that within thirty (30) days of this Order, Defendants shall develop a plan to remedy the constitutional and statutory violations, described above, that includes, at a minimum, the following elements:

**Response to Emergencies**

a.    Defendants shall immediately repair any non-functional elements of the intercom and emergency button system (including visual and audio notifications to custody staff) and regularly test the system to ensure functionality and identify and remediate inoperable components;

b.    Defendants shall develop a plan to ensure that when any elements of the intercom and emergency button system become inoperable, they are promptly repaired;

c.    Defendants shall develop a plan to ensure that custody staff timely respond to emergencies in the Jail, including revising Defendants' policies and procedures and training materials as necessary;

d.    Defendants shall develop a plan for the replacement of all outdated and non-functional elements of the video surveillance system at the Jail;

e.    Defendants shall develop a plan to ensure that when any

video surveillance equipment at the Jail becomes non-functional in the future, the non-functional equipment is timely identified and repaired;

f.    Defendants shall not house incarcerated people in any units without adequate video surveillance coverage;

g.    Defendants shall conduct safety checks at least once every 30 minutes at irregular and unpredictable intervals of all incarcerated people held in isolation (*i.e.*, cells with 2 hours or less daily out-of-cell time, including in Administrative Segregation, in Administrative Segregation Overflow, or on Lockdown (or "Bypass") status);

h.    Defendants shall reform their policies and procedures for safety checks to require that staff ascertain that the individual is still alive without disrupting the individual's sleep;

i.    Defendants shall develop formal policies and procedures for supervisors to audit safety checks by custody staff and ensure that they have actually occurred in a timely and adequate manner, with appropriate accountability and quality assurance measures taken to address deficiencies;

**Overdose Prevention, Addiction Treatment**

j.    Defendants shall develop a plan to revise Defendants' policies, procedures, practices, and training for the interdiction of drug contraband being brought into the Jail so as to significantly reduce the amount of drugs entering the Jail;

k.    Defendants shall develop a plan to maintain fully-functioning body scanners located at all Jail facilities, ensure that all people who enter the facility are properly scanned, and ensure all staff who operate scanners are properly trained;

l.    Defendants shall develop a plan to implement a medication assisted treatment ("MAT") program available to all incarcerated people for whom it is clinically appropriate and at all facilities;

m.    Defendants shall develop a plan to expand and ensure access to naloxone ("Narcan") for incarcerated people, including by supplying naloxone directly to people at risk of overdose and making naloxone available to incarcerated people in the intake and housing areas with appropriate guidance on its use in case of emergency;

**Mental Health Care and Clinical Input in Placement Decisions**

n.    Defendants shall revise their policies, procedures, practices, and training to ensure that mental health staff's input is meaningfully considered prior to and during any placement of an incarcerated person in isolation/segregation housing (*i.e.*, cells with 2 hours or less daily out-of-cell time, including in Administrative Segregation, in Administrative Segregation Overflow, and on Lockdown (or "Bypass") status);

o.    Defendants shall revise their policies, procedures, practices, and training to ensure that mental health staff have primary authority in determining the placement of an incarcerated person with mental illness in a mental health-designated program or housing unit (*e.g.*, Outpatient Step Down Program, Enhanced Observation Housing), and in determining the clinically appropriate provision of clothing, property, and privileges for patients at risk of suicide, without any custodial blanket exclusions or interference with clinical judgment;

p.    Defendants shall develop a plan to ensure that all mental health clinical contacts and intake interviews between incarcerated people and mental health professionals, including mental health clinicians, psychologists, and psychiatrists, are conducted in a confidential setting;

**Meaningful Program Access for People with Mobility Disabilities**

q.    Defendants shall offer all programs, services, and activities, including but not limited to exercise, recreation, day room, classes, religious services, professional and social visitation, and drug or alcohol use disorder treatment, in locations that do not require incarcerated people to climb

1   stairs in order to access the programs, services, and activities, and shall ensure that

2   all elevators used by incarcerated people to access programs, services, and activities

3   are promptly repaired whenever broken;

4                    r.        Defendants shall develop a plan to ensure that Jail

5   facilities are accessible to incarcerated people with mobility disabilities, including in

6   the housing units, and in program and activity areas; and

7                    s.        Defendants shall develop a plan to train custody and health

8   care staff on the rights of incarcerated people with mobility disabilities to use

9   assistive devices in working order, such as canes, crutches, wheelchairs, walkers,

10  and prostheses, and shall ensure that individuals may retain an assistive device

11  unless Jail staff identify and document with specificity why such device poses an

12  immediate threat to safety or security, and in such cases health care and custody

13  staff shall determine an appropriate alternative device or accommodation.

14       3.       Defendants and their employees are prohibited from retaliating against

15  the Plaintiffs, declarants, other incarcerated people, or their own staff, including

16  medical and mental health professionals, at the Jail for participating in Plaintiffs'

17  Motions.  If the Court finds that retaliation has occurred, the Court will issue

18  appropriate relief.

19       4.       Plaintiffs' Motion for Provisional Class Certification is GRANTED.

20  The Court provisionally certifies both the Class and the Subclass.  The Court

21  appoints the putative class representatives as provisional class representatives for the

22  Class and the Subclass.

23       5.       The Court appoints Plaintiffs' counsel—Gay Grunfeld and Van

24  Swearingen of Rosen Bien Galvan & Grunfeld LLP, Aaron Fischer of Law Office of

25  Aaron J. Fischer, Christopher Young of DLA Piper LLP, and Bardis Vakili of the

26  American Civil Liberties Union Foundation of San Diego & Imperial Counties—as

27  provisional class counsel.  Fed. R. Civ. P. 23(g)(1) and (4).  Plaintiffs' counsel have

28  already devoted significant resources to identifying and investigating potential

ORDER GRANTING PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION AND PROVISIONAL
CLASS CERTIFICATION                                              Ex. A - 10

1  claims in the action; have significant experience handling class actions, other

2  complex litigation, and the types of civil rights and disability rights claims asserted

3  in this action; have substantial knowledge of the applicable federal and California

4  laws; will commit significant resources to the continued prosecution of this action;

5  and will fairly and adequately represent the interests of the class and subclass.

6      6.    IT IS FURTHER ORDERED that within thirty (30) days of the date of

7  this Order, Defendants shall submit to the Court and to Plaintiffs the plan for

8  implementing the provisions of this Order.  Plaintiffs shall have ten (10) days to file

9  objections to the proposed plan with the Court.  The Court thereafter shall enter an

10  Order adopting the plan, as revised (if at all) by the Court.

11      7.    After the Court issues the Order adopting the plan, Plaintiffs will, upon

12  reasonable notice, be entitled to monitor Defendants' compliance with this Order

13  and the Order adopting the plan.  Reasonable monitoring shall include, but not be

14  limited to, the rights to inspect all of the Jail facilities with retained medical, mental

15  health, safety and security, and ADA experts within 30 days of the Order adopting

16  the plan, to interview staff, to review all custody and medical records from

17  individuals who have died in the Jail in the last five years, and to observe practices

18  related to Defendants' compliance with the provisions of this Order.

19      8.    IT IS FURTHER ORDERED that the bond requirement is waived.

20      9.    This Order shall apply to Defendants, their agents, contractors,

21  employees, successors in office, and all persons with knowledge of it.  No person

22  who has notice of this injunction shall fail to comply with it, nor shall any person

23  subvert the injunction by any sham, indirection, or other artifice.

24      10.   The Court shall retain jurisdiction to enforce the terms of this

25  Injunction.

26  //

27  //

28  //

[3888144.6]                                    9                    Case No. 3:20-cv-00406-AJB-WVG

ORDER GRANTING PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION AND PROVISIONAL
CLASS CERTIFICATION                                              Ex. A - 11

1    11.    Consistent with 18 U.S.C. § 3626(a)(2), the Court will consider

2  whether to make this Order final within 90 days of today's date.

3

4  **IT IS SO ORDERED.**

5

6  DATED:  _____, 2022      _____

7                                 The Honorable Anthony J. Battaglia
                                   U.S. District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B



# San Diego County Sheriff's Department

It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody

*February 2022*

**REPORT 2021-109**



 **CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814

 **916.445.0255** | TTY **916.445.0033**

 For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* **auditor.ca.gov**

*For questions regarding the contents of this report, please contact our* Public Affairs Office *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternative format reports available upon request | Permission is granted to reproduce reports

Ex. B - 15

**Michael S. Tilden** *Acting State Auditor*



February 3, 2022
*2021-109*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the San Diego County Sheriff's Department (Sheriff's Department) to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps it took to address these deaths. The following report details our conclusion that the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody.

From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

Furthermore, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action. In addition, the Citizens' Law Enforcement Review Board (CLERB)—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. CLERB also failed to investigate nearly one-third of the deaths of incarcerated individuals in the past 15 years, which means that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

In light of the ongoing risk to inmate safety, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

## Selected Abbreviations Used in This Report

| | |
|---|---|
| ADP | average daily population |
| BSCC | Board of State and Community Corrections |
| CDCR | California Department of Corrections and Rehabilitation |
| CLERB | Citizens' Law Enforcement Review Board |
| POBR | Public Safety Officers Procedural Bill of Rights |

# Contents

Summary                                                                                                                     1

Introduction                                                                                                              7

Chapter 1
The San Diego County Sheriff's Department Did Not Take Sufficient
Steps to Prevent the High Number of Deaths in Its Jails                                             13

Chapter 2
Neither the Sheriff's Department nor CLERB Has Taken Adequate
Action in Response to the Deaths of Incarcerated Individuals                                   33

Conclusions and Recommendations                                                                            53

Appendix A
In-Custody Deaths in California's 15 Largest Counties                                             59

Appendix B
Scope and Methodology                                                                                            61

Responses to the Audit
Board of State and Community Corrections                                                             65

    California State Auditor's Comments on the Response From
    the Board of State and Community Corrections                                                 71

Citizens' Law Enforcement Review Board                                                                 75

    California State Auditor's Comments on the Response From
    the Citizens' Law Enforcement Review Board                                                     79

California Department of Justice                                                                               81

San Diego County Sheriff's Department                                                                    83

    California State Auditor's Comments on the Response From
    the San Diego County Sheriff's Department                                                       115

Blank page inserted for reproduction purposes only.

# Summary

### Results in Brief

In accordance with federal constitutional law, the San Diego County Sheriff's Department (Sheriff's Department) has a responsibility to provide adequate medical care for individuals while they are in its custody. Nonetheless, from 2006 through 2020, a total of 185 people died in San Diego County's jails—more than in nearly any other county across the State. Some of these individuals were in custody for only a few days to a few months; others were waiting to be sentenced, set to be released, or about to be transferred to different facilities. Although any death is a tragedy, the high rate of deaths in San Diego County's jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices have undermined its ability to ensure the health and safety of the individuals in its custody.

Significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails. For example, studies on health care at correctional facilities have demonstrated that identifying individuals' medical and mental health needs at intake—the initial screening process—is critical to ensuring their safety in custody. Nonetheless, our review of 30 individuals' deaths from 2006 through 2020 found that some of these individuals had serious medical or mental health needs that the Sheriff's Department's health staff did not identify during the intake process. Some of these individuals died within four days of their arrest. Moreover, in one case we reviewed, an incident between two cellmates resulted in one's death. In this instance, the intake nurse did not identify that the perpetrator had a history of mental health issues. Had the perpetrator's mental health issues been identified properly at intake, the department's staff might have placed this individual in a different cell, leading to a different outcome.

When we evaluated the intake practices of three comparable counties, we found that the counties had procedures that are more comprehensive. For example, the San Diego Sheriff's Department relies on registered nurses to perform the mental health portion of its intake screening, even though these nurses may not specialize in mental health care. In contrast, the Riverside County Sheriff's Department's policy requires that a mental health clinician evaluate every individual at intake. Implementing similar policies could help the San Diego Sheriff's Department to more effectively identify mental health needs early.

*Audit Highlights . . .*

*Our audit of the San Diego County Sheriff's Department's response to deaths of individuals in its custody highlighted the following:*

» *Until the Sheriff's Department implements meaningful change to improve its provision of medical and mental health care in its detention facilities, it will continue to jeopardize the safety and lives of individuals in its custody.*

• *We found multiple instances of individuals who requested or required medical and mental health care and did not receive it at all or in a timely manner.*

• *In our review of deaths that occurred in the department's custody, deputies performed inadequate safety checks to ensure the well-being of those individuals.*

» *Some of the Sheriff's Department's policy deficiencies are the result of statewide corrections standards that are insufficient for maintaining the safety of incarcerated individuals.*

• *The Board of State and Community Corrections should require mental health evaluations to be performed by mental health professionals at intake, and it should clarify and improve procedures for safety checks.*

» *The entities responsible for investigating in-custody deaths are not doing so in a thorough, timely, or transparent manner.*

• *The department's Critical Incident Review Board should consistently review deaths by natural causes, increase public transparency, and take substantive steps to prevent similar future deaths.*

*continued on next page . . .*

• *CLERB should prioritize the investigations of all deaths that occur in the department's custody and complete those investigations within the one-year statutory limit.*

In addition, the Sheriff Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not always follow up consistently—such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

For example, one individual urgently requested mental health services shortly after entering the jail. However, the nurse had not identified any significant mental health issues at intake and determined that the individual did not qualify for an immediate appointment. The individual died by suicide two days later—only four days after entering the jail. Although the Sheriff's Department's policy indicates that a face-to-face appraisal with an incarcerated individual should take place within 24 hours of a mental health care request to determine the urgency of that request, the department has not always had this policy. Further, this policy only applies to mental health requests and not medical health care requests. Thus, the Sheriff's Department does not ensure that it provides prompt care for all types of needs.

In addition to providing adequate health care, performing safety checks is a key component of ensuring the well-being of individuals in detention facilities. Conducting these checks—which state law requires hourly through direct visual observation—is the Sheriff's Department's most consistent means of monitoring for medical distress and criminal activity. Nonetheless, in our review of 30 in-custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy. In contrast, the Riverside County Sheriff's Department has a formal policy that requires supervising staff to regularly review videos of safety checks being performed, and it is thus in a better position to assess the quality of safety checks.

The problems we identified with the Sheriff's Department's policies are in part the result of statewide corrections standards that are not sufficiently robust. The Board of State and Community Corrections

(BSCC) establishes in regulation the minimum standards that local detention facilities must follow. Every local jail system throughout the State uses these standards to create policies for inmate safety and care. However, some of the standards are insufficient for maintaining the safety of incarcerated individuals. For example, they do not explicitly require that mental health professionals perform the mental health screenings during the intake process. Further, they do not describe the actions that constitute an adequate safety check: rather, they simply state that safety checks must be conducted at least hourly through direct visual observation. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving the statewide standards is essential to ensuring the health and safety of individuals in custody in all counties.

In addition to its failure to adequately prevent the deaths of individuals in its custody, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action related to preventing deaths. The Sheriff's Department's internal entity for reviewing critical incidents, such as in-custody deaths, and identifying corrective measures—the Critical Incident Review Board—has not always taken substantive steps to prevent similar future deaths in the cases we examined. The primary focus of this board is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals. Further, this board generally does not review deaths from natural causes, which represented nearly half of the deaths of individuals in the custody of the Sheriff's Department during the 15-year period of our review. We are concerned that the Sheriff's Department considers the Critical Incident Review Board's reviews to be confidential under the attorney-client privilege and does not have a process to report the results publicly. Consequently, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future.

The Sheriff's Department has also not implemented certain key recommendations from external oversight entities. From 2006 through 2020, multiple external entities—including the San Diego County Grand Jury—have made recommendations to the Sheriff's Department in areas related to inmate safety. Although the Sheriff's Department implemented several of these recommendations, it did not take action on others, even though they were critical to improving the safety of individuals in its custody. For example, it did not implement recommendations that involved enhancing its safety checks and improving the way it communicates incarcerated individuals' mental health needs to its staff.

To restore public confidence in county law enforcement, San Diego County voters approved the Citizens' Law Enforcement Review Board (CLERB) in 1990, a citizen-governed board. CLERB is responsible for reviewing complaints of misconduct and investigating deaths arising in connection with the actions of officers employed by the Sheriff's Department or Probation Department. However, CLERB has failed to provide effective, independent oversight of in-custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. CLERB has not independently interviewed witnesses or visited the initial scenes of the deaths. Further, it has not consistently performed thorough investigations, and it relies largely on the reviews the Sheriff's Department conducts.

Moreover, CLERB failed to review dozens of deaths in the Sheriff's Department's jails. State law generally requires that CLERB's investigations be performed within a year of discovery of the death or misconduct. Because CLERB did not consistently prioritize its investigations of deaths over other complaints of misconduct, it did not review 13 cases involving deaths in the Sheriff's Department's jails within the required time limit. Further, CLERB did not investigate an additional 40 deaths because it did not believe its rules and regulations required it to review natural deaths. As a result, it did not identify any weaknesses in the Sheriff's Department's policies or processes that may have contributed to these deaths nor develop any recommendations to address these weaknesses. Although CLERB currently reviews natural deaths, it lacks specific language in its rules and regulations requiring it to do so, thus raising concerns about whether its staff could exclude those reviews in the future.

Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes. Until the Sheriff's Department makes such changes, the weaknesses in its policies and practices will continue to jeopardize the health and lives of the individuals in its custody.

**Summary of Key Recommendations**

*Legislature*

The Legislature should amend state law to require the Sheriff's Department to revise its policies to align with best practices related to performing intake health evaluations (including requiring that mental health professionals perform mental health evaluations), providing follow-up medical and mental health care, conducting safety checks, and addressing the other deficiencies that we identify in this report.

The Legislature should amend state law to require BSCC to amend its regulations to ensure that county sheriff departments have mental health professionals perform incarcerated individuals' mental health evaluations at intake and have staff conduct safety checks that are sufficiently detailed to determine that incarcerated individuals are alive.

The Legislature should amend state law to require the Sheriff's Department's Critical Incident Review Board to review natural deaths and develop a process to make public the facts discovered and recommendations made in response to all in-custody deaths.

*CLERB*

To ensure that it completes investigations of all deaths that occur in the Sheriff's Department's custody within the one-year time limit, CLERB should revise its rules and regulations by May 2022 to prioritize these investigations above all other investigations.

CLERB should revise its rules and regulations by May 2022 to include investigating natural deaths as part of its responsibilities.

**Agency Comments**

Although the Sheriff's Department generally agreed with our recommendations, it questioned our audit approach and disagreed with our findings and conclusions. BSCC disagreed with our findings and recommendations but indicated that it would discuss whether amendments to its regulations are warranted. The Department of Justice and CLERB agreed with our recommendations.

California State Auditor Report 2021-109
February 2022

Blank page inserted for reproduction purposes only.

# Introduction

### Background

The mission of the San Diego County Sheriff's Department (Sheriff's Department) is to provide high-quality public safety services necessary to make San Diego the safest urban county in the nation. As the text box describes, the Sheriff's Department operates a system of seven detention facilities. It also operates patrol stations, a crime laboratory, and an array of support operations. The Sheriff's Department's fiscal year 2020–21 adopted budget includes more than 2,000 employees who work in its detention facilities, including correctional staff (sworn staff), medical and mental health care staff (health staff), and administrative staff. In this report, we refer to all of these staff members collectively as *detention staff*.

San Diego County residents elect a sheriff to a four-year term to serve as the chief executive of the Sheriff's Department. The current elected sheriff has been in office since 2009. Under the elected sheriff's guidance, the department must follow standards for jail conditions and treatment of incarcerated individuals set in regulation by the Board of State and Community Corrections (BSCC). The board also establishes local corrections training requirements and performs inspections of local detention facilities, to which the Sheriff's Department is subject.

Deaths can happen in detention facilities for various reasons. The California Department of Justice asks counties to classify in-custody deaths into seven main categories: natural death, homicide by law enforcement, homicide by other inmate, suicide, accidental death, pending investigation, or cannot be determined/other. Regardless of the category, different entities in San Diego County have responsibilities to prevent, respond to, and investigate deaths of incarcerated individuals, as we discuss below.

### The Sheriff's Department's Role in Preventing and Responding to the Deaths of Incarcerated Individuals

As Figure 1 shows, the incarceration process starts when a law enforcement officer arrests an individual in San Diego County and brings him or her to a jail for processing, which is also known as *booking.* One of the most important steps in the intake process that follows is the individual's health screening. This screening is the Sheriff's Department's first opportunity to identify an individual's

**The Sheriff's Department's Detention Facilities**

- The department operates a system of seven detention facilities throughout San Diego County.

- Three of the detention facilities both process (book) individuals entering the jail system and house them.

- The other four facilities house individuals who are transferred after being booked.

- During our audit period from 2006 through 2020, the seven facilities collectively housed an average of about 5,200 individuals daily (average daily population) and booked an average of about 85,000 individuals annually.

Source: Sheriff's Department documents and BSCC data.

---

**Examples of Housing Types in the Sheriff's Department's Facilities**

• **Safety Cell/Enhanced Observation Housing:** Temporary housing units constructed to maximize safety by removing physical features that could be used to inflict harm. These units are recommended for individuals who are actively self-harming, assaultive, or at risk of suicide. Staff closely monitor individuals at random intervals.

• **Medical Observation Beds:** Beds located close to a nursing station for individuals whose condition necessitates hourly monitoring by health staff.

• **Segregation Housing:** Housing areas where individuals are placed in cells isolated from the general population and receive services and activities apart from others. Staff may place individuals in this housing for their own safety, staff safety, facility security, or pending a disciplinary action hearing.

• **Mainline Housing:** Housing areas for individuals who are classified as general population and therefore do not need to be isolated from others for security reasons or for medical or mental health reasons.

Source: Sheriff's Department policies and state law.

---

medical and mental health needs. After this health screening, the next major step is classification, which determines an individual's housing assignment. As the text box shows, the Sheriff's Department has various types of housing in its facilities. An individual's housing assignment is critical to safety and care because it indicates to detention staff whether that individual has special needs or characteristics that warrant precaution.

To determine an initial housing assignment, sworn staff interview the individual; review the person's current booking information, complete criminal history, and past incidents in custody; and consider any information or instructions provided by health staff members regarding restrictions related to medical or mental health needs. The department may subsequently change an individual's housing assignment if circumstances require reclassification.

When individuals are in custody, the Sheriff's Department is responsible for providing basic health care services and for performing safety checks at least every hour to provide for their health and welfare. Incarcerated individuals may request medical or mental health attention, or dental care, as needs arise. Providing care on an ongoing basis and performing adequate safety checks are vital to ensuring the safety of incarcerated individuals.

When an individual dies in the custody of the Sheriff's Department, its homicide unit (homicide unit) investigates the death and assists the San Diego County Medical Examiner's Office (Medical Examiner's Office) by attending the autopsy and answering any questions surrounding the circumstances of the death. The Medical Examiner's Office, an agency independent of the Sheriff's Department, investigates all deaths of persons in custody. The Medical Examiner's Office's main function is to determine the manner of death—such as accidental—and the cause of the death—such as by drug overdose.

The Sheriff's Department also performs other internal reviews of in-custody deaths. For instance, within 30 days following a death, it must review the circumstances surrounding the incident and pertinent medical and mental health services and reports (30-day medical review). It must also complete a critical incident review for all deaths except natural deaths. Most of these reviews could result in the Sheriff's Department taking corrective action, such as

changing policies or initiating employee discipline. We discuss the Sheriff's Department's internal reviews in detail later in this report.

**Figure 1**
**The Sheriff's Department's Booking Process**



1  After an individual is arrested, the arresting officer transports him or her to one of the Sheriff's Department's three booking facilities.

2  A registered nurse performs a preliminary medical and mental health screening during the intake process to determine whether the individual is medically fit for booking and to identify whether there are any known illnesses and medications. If the individual is experiencing a medical or mental health emergency that cannot be managed by the Sheriff's Department, he or she may be sent to the hospital. Individuals in need of further evaluation or more urgent medical care will receive a secondary nurse assessment within a few hours of their first screening.

3  Based on the intake assessment, a nurse can write a mental health referral or schedule a medical follow-up with a doctor, as needed, at a later date.

4  The individual proceeds to classification, which determines his or her housing assignment.

Source: Sheriff's Department policies and procedures.

### The Citizens' Law Enforcement Review Board's Responsibilities Related to the Deaths of Incarcerated Individuals

The Citizens' Law Enforcement Review Board (CLERB) is a key county entity that provides external oversight when an incarcerated individual dies in San Diego County. San Diego County voters amended the county charter in 1990 to require the County Board of Supervisors (county board) to establish CLERB to investigate complaints against officers employed by the Sheriff's Department and Probation Department. CLERB's mission is to increase the accountability of and public confidence in peace officers employed by the San Diego County's Sheriff's Department and the Probation Department. As the text box describes, CLERB is responsible for achieving its mission by conducting independent, thorough, timely, and impartial reviews of complaints of misconduct, among other things. This audit focuses only on CLERB's investigations of deaths in the Sheriff's Department's jails. The San Diego County Charter establishes CLERB's power to subpoena, administer oaths, and require the attendance of witnesses and the production of books and papers pertinent to its investigations.

CLERB currently consists of 11 board members nominated by San Diego County's chief administrative officer and appointed by the county board for three-year terms. Serving without compensation, CLERB members must be qualified electors of San Diego County, possess reputations for integrity and responsibility, and demonstrate an active interest in public affairs and service. County rules prohibit its employees or individuals employed as peace officers from serving. CLERB makes advisory findings on complaints and recommendations for policy and procedure changes to the sheriff, chief probation officer, and the county board. CLERB has also established rules and regulations to further facilitate its operations, which the county board has approved.

CLERB's staff support the CLERB members by conducting complaint investigations, preparing written reports with findings and recommended policy changes, and transmitting the final reports to the Sheriff's Department, Probation Department, and the county board. CLERB's staff currently includes five special investigators, one supervising special investigator, an administrative secretary, and an executive officer. CLERB members appoint its executive officer, to whom they have delegated most of their authority over the other staff.

---

#### CLERB's Responsibilities

Investigating complaints against peace officers that involve the following allegations:

- Use of excessive force, discrimination, or sexual harassment towards members of the public.
- The improper discharge of a firearm.
- Illegal search or seizure.
- False arrest.
- False reporting.
- Criminal conduct or misconduct.

Reviewing, investigating, and reporting on the following incidents, regardless of whether a citizen files a complaint:

- The death of any individual arising out of or in connection with actions of peace officers.
- Incidents involving the discharge of a firearm.
- Use of force by peace officers resulting in great bodily injury.
- Use of force by peace officers at protests or other events protected by the First Amendment.

Source: CLERB rules and regulations.

---

CLERB's executive officer must possess a bachelor's degree and five years of management-level experience. CLERB's special investigators must have five years of experience performing investigations for a law enforcement agency, district attorney's office, or other governmental agency or organization.

### The Attorney General's and County Board's Oversight of the Sheriff's Department

The county board is the governing body of San Diego County and is composed of an elected supervisor from each of the county's five districts. State law gives the county board the authority to supervise the official conduct of all county officers, as well as officers of all districts and other subdivisions of the county, including CLERB. However, the county board's oversight of the county sheriff has limitations, as Figure 2 shows. The California Constitution and state law provide that the county sheriff is an elected county official with certain independent functions and duties with which the county board cannot interfere. Nonetheless, state law establishes the county board's budgetary authority over the Sheriff's Department, and it also exercises some oversight—albeit minimal—through its establishment and oversight of CLERB.

Although the county board has limited oversight of the sheriff, the state constitution designates the State's attorney general as the chief law officer of the State. Specific statutes describe the attorney general's authority. For example, state law requires the Sheriff's Department to report to the attorney general all facts concerning the death of an individual while in its custody within 10 days of that death. To ensure uniform and adequate enforcement of the laws of the State, the attorney general may also call into conference all of the sheriffs, district attorneys, and chiefs of police in the State for the purpose of discussing the duties of their respective offices. Further, the attorney general may bring a civil action to eliminate the pattern or practice of conduct by law enforcement officers that deprives any person of rights protected by law or the constitution. Finally, when necessary for the public interest, the attorney general is authorized to direct sheriff activities related to the investigation or detection of crime within a county.

**Figure 2**
**The County and State Have Oversight of the Deaths of Incarcerated Individuals**



# COUNTY BOARD OF SUPERVISORS

State law gives the county board the authority to supervise the conduct of all county officers, including CLERB members.

However, the California Constitution and state law give the sheriff independent functions and duties with which the county board cannot interfere.

*State law provides the county board with authority to approve the Sheriff's Department's budget, but it otherwise has ==limited authority== over the Sheriff's Department.*



## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

- Eleven-member citizens' board established by voter-approved proposition in 1990 (members appointed by county board).

- CLERB special investigators—who must have at least five years of investigative experience—review in-custody deaths and complaints of misconduct by officers of the Sheriff's Department.

- CLERB makes **advisory** findings and recommendations related to death cases—**however, the Sheriff's Department ultimately decides whether to take action.**

- The board submits investigative reports to the county board and the Sheriff's Department.



## SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

The Sheriff's Department performs various internal reviews after an incarcerated individual's death.

- Its homicide unit investigates all types of deaths in jails.

- Its Critical Incident Review Board reviews suicides, homicides, and accidental deaths, but not natural deaths.

- Its medical staff performs an assessment of care provided before each death.

# THE STATE ALSO HAS OVERSIGHT …



## ATTORNEY GENERAL

- The California Constitution designates the State's attorney general as the chief law officer of the State.

- The attorney general may bring a civil action to eliminate the pattern or practice of conduct by law enforcement officers that deprives any person of rights protected by law or the constitution.

- Sheriff's departments must report in-custody deaths to the attorney general within 10 days. The California Department of Justice collects and posts to its website data pertaining to these in-custody deaths.

Source: California Constitution, San Diego County charter, state law, CLERB's rules and regulations, and Sheriff's Department policies.

# Chapter 1

## THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT DID NOT TAKE SUFFICIENT STEPS TO PREVENT THE HIGH NUMBER OF DEATHS IN ITS JAILS

### Chapter Summary

From 2006 through 2020, a total of 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with the way the Sheriff's Department provides care for and protects incarcerated individuals that likely contributed to deaths in its jails. These deficiencies related to its provision of medical and mental health care, as well as its performance of checks to ensure the safety and health of individuals in its custody. When we evaluated the policies of three comparable counties, we found that some have adopted procedures that could address weaknesses we identified at the San Diego Sheriff's Department. That said, the problems we identified with the Sheriff's Department's policies are in part the result of certain statewide corrections standards that are not robust or specific enough, leaving the establishment of effective practices to the discretion of the individual counties. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving statewide standards is essential to ensuring the health and safety of incarcerated individuals in all counties.

### In the Past 15 Years, More Individuals Died While in the San Diego Sheriff's Department's Custody Than in the Custody of Nearly Any Comparable County in the State

State data on deaths in custody at county jails show that San Diego County reported the second-highest number of in-custody deaths over the past 15 years.[1] It followed only Los Angeles County, which is significantly larger. Further, there continues to be a substantial number of deaths in San Diego County's jails, as Figure 3 shows. Many of the individuals who died were in the Sheriff's Department's

---

[1]  State law requires a law enforcement agency or an agency in charge of a correctional facility, including county sheriff's departments, to report any case in which a person dies in its custody to the Office of the Attorney General within 10 days after the death. We present an interactive dashboard for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

custody for only a few days to a few months before their deaths. Some of these individuals were awaiting trial, or scheduled to be released or transferred to state hospitals.

**Figure 3**
**There Continues to Be a Substantial Number of Deaths in San Diego County's Jails**



Source: California Department of Justice in-custody death data, BSCC data, and Sheriff's Department information.

\* We use the Sheriff's Department's information on in-custody deaths in 2021 because it was not included in the California Department of Justice data, which is as of May 2021. We use ADP information from the Sheriff's Department for 2021 because BSCC did not have complete ADP data for 2021.

In comparison to similar counties, more individuals died in the San Diego Sheriff's Department's custody in the past 15 years as Figure 4 shows. We identified the Alameda County Sheriff's Office (Alameda Sheriff's Office), Orange County Sheriff's Department (Orange Sheriff's Department), and Riverside County Sheriff's Department (Riverside Sheriff's Department) as comparable considering their size, geographical location, and other factors. The text box shows the average daily population (ADP) and bookings from 2006 through 2020 for each of these four counties.[2] From 2006 through 2020, 185 incarcerated individuals died in the San Diego Sheriff's Department's jails, in comparison to 99 in the jails of the Alameda Sheriff's Office, 111 in Orange Sheriff's Department's jails, and 104 in Riverside Sheriff's Department's jails. More recently, from 2016 through 2020, 72 people died while in the care of the San Diego Sheriff's Department, whereas 25 people died in the care of the Alameda Sheriff's Office, 46 in Orange Sheriff's Department, and 37 in Riverside Sheriff's Department. Even when considering each of these counties' jail systems' ADP and number of bookings, the rate of deaths reported by the San Diego Sheriff's Department still exceeded that of the comparable counties. In fact, we reviewed data from the 15 largest counties in the State and found that the rate of deaths in San Diego County was among the highest.[3] Although any death is a tragedy, the high rate of deaths at San Diego County compared to other counties is particularly concerning.

**Average Annual ADP and Bookings From 2006 Through 2020**

| | ADP | BOOKINGS |
|---|---|---|
| Alameda Sheriff's Office | 3,325 | 51,842 |
| Orange Sheriff's Department | 5,877 | 59,263 |
| Riverside Sheriff's Department | 3,668 | 54,025 |
| San Diego Sheriff's Department | 5,162 | 85,631 |

Source: BSCC data and San Diego Sheriff's Department bookings data.

When we reviewed the manner of death, the San Diego Sheriff's Department had a notably higher number of suicides and natural deaths than the comparable counties, as Table 1 shows.[4] Alarmingly, a total of 52 individuals in the San Diego Sheriff's Department's jails died by suicide over the past 15 years, which is more than twice the number in each of the comparable counties. Additionally, more individuals died of natural and accidental causes in the custody of the San Diego Sheriff's Department than in the custody of each of the comparable counties, raising concerns about its ability to provide adequate safety and medical care to those it incarcerates. Natural deaths can include deaths from pre-existing

---

2  The ADP represents the number of incarcerated individuals housed in a jail system for any given day over a period of time and is used to determine whether a jail is operating at or near capacity. Bookings represent the total number of individuals who were processed through the county jail system.

3  Appendix A provides the number and rate of deaths in the 15 largest counties in relation to their ADPs and bookings.

4  We present an interactive dashboard for viewing data on the age, race, and gender of the individuals who have died in each county detention facilities system at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

medical conditions and deaths resulting from inadequate care. After adjusting the comparisons based on each county's ADP, the San Diego Sheriff's Department still has historically had the highest rate of natural deaths and suicides.

**Figure 4**
**Over the Past 15 Years, More Individuals Died in San Diego County's Jails Than in Those of Comparable Counties**



TAKING INTO CONSIDERATION THE NUMBER OF BOOKINGS AND THE ADP AT EACH COUNTY JAIL SYSTEM, SAN DIEGO STILL HAD THE HIGHEST RATE OF DEATHS, BOTH IN THE PAST 15 YEARS AND IN THE MOST RECENT FIVE YEARS.

Source: California Department of Justice in-custody death data and BSCC data.

We present interactive dashboards for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Based on data the Sheriff's Department provided, in the most recent three years—2018 through 2020—the percentage of deaths of Black individuals in the Sheriff's Department's custody was disproportionately higher than their overall composition of the jail population. White individuals died at proportionally higher rates in 2007, 2009 through 2014, 2016, 2017, and 2020. In 2006, 2008, and 2015, the percentage of deaths among Hispanic individuals exceeded their population percentage. Although racial bias was not the focus of this report, our review of the Sheriff's Department's policies and procedures identified widespread deficiencies in its policies and practices for ensuring the health and safety of the individuals of all races and ages in its care.

**Table 1**

**More Individuals in San Diego County's Jails Died by Suicide or Natural Causes Than Individuals in the Custody of Comparable Counties**

| MANNER OF DEATH | SAN DIEGO | ALAMEDA | ORANGE | RIVERSIDE |
|---|---|---|---|---|
| Total Deaths by County Sheriff's Department From 2006 Through 2020 | | | | |
| Accidental | 31 | 19 | 13 | 21 |
| Homicide (by law enforcement) | 4 | 0 | 1 | 2 |
| Homicide (by other inmate) | 8 | 4 | 4 | 6 |
| Natural | 88 | 52 | 77 | 51 |
| Suicide | 52 | 22 | 14 | 23 |
| Other | 2 | 2 | 2 | 1 |
| **Totals** | **185** | **99** | **111** | **104** |

Source: California Department of Justice in-custody death data.

We present interactive dashboards for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Note: In San Diego County, accidental deaths mainly included drug overdoses. The two deaths shown as other include one pending investigation and one undetermined manner of death.

We also found that sheriff's departments did not report some deaths that occurred after incidents in jails because the individuals were released before their deaths. For example, we found instances in which the coroner or medical examiner's offices described individuals dying in hospitals after incidents in the county jails, such as attempted suicide or medical emergencies. However, the respective counties did not report these deaths to the attorney general because the state law requiring reporting of in-custody deaths requires sheriff's departments to report only those individuals who died while in custody at the time of death and not individuals who died after having been released.[5]

---

[5] For example, state law allows sheriff's departments to compassionately release individuals from custody who would not reasonably pose a threat to public safety, and the incarcerated individual upon diagnosis by the examining physician, is deemed to have a life expectancy of six months or less.

**18**    California State Auditor Report 2021-109
February 2022

---

**Example of a Death That State Law
Does Not Require to Be Reported**

**July 1**–An individual attempted suicide in a county jail but initially survived. The individual was transported to the hospital.

**July 10**–The sheriff's department compassionately released the individual from custody.

**July 15**–The individual later died in the hospital as a result of the injuries from the attempted suicide.

Source: Records from sheriff's departments.

---

The text box provides an example in which sheriff's departments would not need to report a death to the attorney general. Consequently, sheriff's departments may be underreporting to the attorney general and to the public the number of deaths occurring from incidents in the jails.

**The Sheriff's Department's Failure to Consistently Provide Adequate Care Likely Contributed to Its In‑Custody Deaths**

We selected 30 individuals who died in the Sheriff's Department's jails from 2006 through 2020, weighted toward deaths that occurred in the last four years. Our selection included natural deaths, accidental deaths, suicides, and homicides.[6] Our review of the associated case files identified numerous problems with the Sheriff's Department's care of these individuals, starting with the inadequate health screenings it performed upon their initial arrivals through its insufficient responses to their medical emergencies, as Figure 5 shows. The deficiencies we identified in these areas for all types of deaths—including deaths classified as natural—suggest that the problems with the Sheriff's Department's care for incarcerated individuals are systemic.

The assistant sheriff of detentions at the Sheriff's Department asserted that the department is aware that its policies are not followed all of the time and recognizes that employees make mistakes, but it holds employees accountable when violations are discovered and makes every effort to provide additional training to prevent a recurrence. However, as the cases in our review show, failing to follow policies even in limited instances can result in the loss of life.

When we evaluated the policies at the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department, we identified instances in which these entities have procedures that are more robust than those of the San Diego Sheriff's Department. If the San Diego Sheriff's Department followed these procedures, it could better ensure the health and safety of the individuals in its custody.

---

[6]    To comply with audit standards, we did not select cases involved in active litigation, including cases related to COVID-19, in order to avoid interfering with ongoing legal proceedings. Although the Sheriff's Department had reported one death in 2020 and one death in 2021 that were related to COVID-19, it indicated that the manner of death has not yet been determined for 11 other cases in 2021, as of January 2022.

**Figure 5**
Significant Deficiencies in the Sheriff's Department's Policies and Procedures Likely Contributed to the Deaths of Individuals in Its Custody



**INSUFFICIENT HEALTH EVALUATIONS AT INTAKE**
Health staff did not always properly identify incarcerated individuals' medical and mental health needs at intake. Consequently, some of these individuals did not receive proper care, likely contributing to their deaths.

**INCONSISTENT FOLLOW-UP CARE**
Detentions staff did not consistently follow up after individuals received or requested medical or mental health services, even though they often had serious needs that, when unmet, may have contributed to their deaths.

**INADEQUATE SAFETY CHECKS**
Sworn staff did not always adequately check on incarcerated individuals. Some individuals were found hours after their deaths, negating the opportunity for lifesaving measures.

**UNNECESSARY DELAYS IN PERFORMING LIFESAVING MEASURES**
Sworn staff's and medical personnel's slow response time to administer aid during medical emergencies may have contributed to unnecessary delays in lifesaving measures.

Source: The Sheriff's Department's jail records, surveillance videos, medical records, medical examiner reports, and homicide investigation documents related to a selection of 30 deaths of incarcerated individuals.

### The Sheriff's Department Did Not Ensure That It Identified Individuals' Medical and Mental Health Needs at Intake

Because the Sheriff's Department did not always properly identify the medical and mental health needs of individuals in our review at intake, some of them did not receive the care they required. Studies on health care at correctional facilities indicate that identifying individuals' health needs at intake is critical to ensuring their safety in custody. For example, one of the keys to identifying potential suicidal behavior is through inquiry during the intake screening.

**20**

California State Auditor Report 2021-109
February 2022

In at least eight of the 30 cases we reviewed, individuals had serious medical or mental health needs that health staff did not identify or communicate to detention staff at intake. Five of these individuals died within four days of their arrest. For example, in one case, an intake nurse determined that an individual needed to have a secondary nurse evaluation because the individual exhibited possible symptoms of drug withdrawal. However, there is no evidence in the case records that the intake nurse communicated this conclusion to other staff. The case records and video surveillance indicate that the individual died 24 hours after completing booking from complications resulting from a drug overdose without having seen another health professional.

*In some cases, the Sheriff's Department did not promptly and properly identify individuals' mental health needs, because mental health professionals generally do not participate in its intake health screenings.*

In some of the cases we reviewed, the Sheriff's Department did not promptly and properly identify individuals' mental health needs because mental health professionals generally do not participate in its intake health screenings. Registered nurses perform the medical and mental health screenings at intake—asking both mental health and medical questions. These nurses are trained medically but do not necessarily specialize in mental health, which means that they may miss key signs of mental health needs. According to policy, if the registered nurse identifies an individual as having mental health needs at intake, the nurse refers the individual for further evaluation by a qualified mental health professional. However, even if the nurse identifies a need for a further mental health assessment, the Sheriff's Department's policy may not require the individual to receive that assessment sooner than 30 days after intake, depending on the severity of an individual's symptoms. We noted one county had adopted more robust intake screening practices. Unlike the San Diego Sheriff's Department, the Riverside Sheriff's Department policy requires that a mental health clinician evaluate every individual before being housed, which could help to more effectively identify mental health needs early.

The San Diego Sheriff's Department is currently advertising to hire additional mental health staff, and its director of mental health indicated that the Sheriff's Department is aiming to have a qualified mental health professional, such as a mental health clinician or a psychologist, complete the mental health evaluations at intake. The county board approved additional funding in June 2021 for the Sheriff's Department to hire a substantial number of additional nurses and mental health professionals.

In addition, the Sheriff's Department's intake nurses sometimes have not obtained complete medical and mental health history information on individuals. Although they may ask the individuals to sign a release of information that provides the department access to their medical and mental health records, individuals can refuse to sign. Historically, Sheriff's Department nurses have not had

immediate access to county health records, which could be key to identifying health needs at intake. For example, the text box describes a case involving two cellmates that resulted in one's death. In this instance, a different outcome might have resulted had staff identified the perpetrator's mental health history at intake.

The Sheriff's Department entered into an agreement in September 2021 with the county Health and Human Services Agency to share behavioral health and medical information. The assistant sheriff of detentions stated that the Sheriff's Department is in the process of getting access to this information. However, the Sheriff's Department does not currently plan to require its intake nurses to look up each individual in the system. We believe this should be a standard step in the intake process to better ensure that the Sheriff's Department has a more comprehensive health history for each individual who comes into its care. In fact, the Riverside Sheriff's Department's policy requires mental health staff to review Riverside County's electronic health record system to determine whether an incarcerated individual has a history of receiving behavioral health care in Riverside County.

> **In-Custody Death: *Case Example 1***
>
> An intake nurse did not identify an individual's mental health needs and did not have access to the individual's mental health history. Once incarcerated, that individual killed their cellmate.
>
> After the cellmate's death, the Sheriff's Department discovered the perpetrator's history of mental illness. Had staff known about this history, they likely would have placed the perpetrator in a different cell, where they could better meet the individual's mental health needs and better ensure others' safety.
>
> Source: Records from the Sheriff's Department.

### The Sheriff's Department Did Not Consistently Follow Up With Individuals Who Needed Medical and Mental Health Services

Our case review found that Sheriff's Department staff did not always follow up after individuals previously received or requested medical or mental health services, even though these individuals often had serious needs that, when unmet, may have contributed to their deaths. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not consistently follow up—such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

In some of the cases we reviewed, individuals reported to health staff that they were experiencing persistent symptoms, yet they did not receive timely evaluations from a physician. For example, in two cases involving natural deaths, individuals reported symptoms multiple times over the course of one to three weeks. Although these individuals were treated for a number of other medical and mental health issues, medical records show that they did not receive prompt attention from a physician for the symptoms that related to their deaths. Nurses originally assessed and treated

California State Auditor Report 2021-109
February 2022

these individuals for these symptoms. However, these individuals' medical conditions worsened, and medical records show that they did not receive a physician's evaluation before dying. Guidelines from the National Commission on Correctional Health Care (National Commission)—an organization that establishes standards for health services in correctional facilities—state that generally if an incarcerated individual reports to the nurse for evaluation more than twice for the same complaint and has not seen a physician, the individual should be scheduled to do so. However, this did not happen in these two cases. The Sheriff's Department's handling of these cases raises concerns over its follow-up process for individuals experiencing persistent symptoms.

In other cases, potential deficiencies in the Sheriff's Department's policies related to mental and behavioral health treatment resulted in individuals not receiving services or needed follow-up. For example, in one case, an incarcerated individual who had previously threatened suicide was released from a safety cell placement and enhanced observation housing. Although placement in a safety cell indicates that individuals are a danger to themselves or others, the Sheriff Department's policy at that time did not specify time frames for ongoing follow-up after such placement. In this case, mental health staff followed up only once with the individual after release from enhanced observation housing, and they assessed that the individual was low-risk. Two weeks after the individual's discharge from enhanced observation housing and about 12 days after the individual's lone follow-up encounter with a mental health clinician, the individual died by suicide.

Subsequently, the Sheriff's Department revised its policy in 2019 for follow-up care after release from a safety cell, but studies suggest that its revised policy may still be inadequate. Its revised policy delineates the follow-up process for individuals after discharge from a safety cell or enhanced observation housing at a variety of intervals depending on certain conditions—every 24 hours, every three to seven days, and every seven to 14 days. Individuals may continue to receive follow-up care at one of these intervals if certain conditions are met, including if it is their first time in detention, if they have recently attempted suicide, or if they have been charged with certain types of crimes. Although these follow-ups can decrease in frequency, all of these individuals must have a follow-up at least every 90 days. However, all individuals who have been placed into a safety cell or enhanced observation housing have demonstrated that they have significant mental health needs. While this policy is an improvement over its past policy, the Sheriff's Department should reconsider the minimum ongoing follow-up required. Reports and studies related to mental health indicate that more frequent psychological follow-up, such as check-ins performed weekly rather than every 90 days, leads to faster recovery and is more effective.

*While the Sheriff's Department's revised policy for the follow-up process after an individual's discharge from a safety cell is an improvement over its past policy, the department should reconsider the minimum ongoing follow-up required.*

Moreover, although the Sheriff's Department's policy indicates that a nurse should conduct a face-to-face appraisal with an incarcerated individual within 24 hours of a mental health care request to determine the urgency of that request, it has not always had this policy. As the case example in the text box describes, in one of the cases we reviewed the department's weak policy likely contributed to the individual's death by suicide, and the department revised this policy several months later. However, the revised policy still only requires a 24-hour face-to-face appraisal for mental health requests, not medical health care requests. Therefore, inmates with urgent medical needs may not get prompt care. Best practices indicate that a face-to-face appraisal should apply to all nonemergency health care requests.

> **In-Custody Death: *Case Example 2***
>
> **Day 1:** At an intake screening, a nurse determined that an individual was mentally stable but initiated a referral for mental health services.
>
> **Day 2:** The individual urgently requested mental health services. Staff denied the request, stating that the individual would be seen as soon as their referral was processed.
>
> **Day 4:** The individual died by suicide without having seen a mental health professional.
>
> Source: Records from the Sheriff's Department.

When we evaluated the policies of other counties, we identified a number of improvements the Sheriff's Department should make to its policies and protocols related to following up on individuals' medical and mental health care needs. For instance, the Orange Sheriff's Department has a policy for assigning a behavioral health acuity level rating (acuity level rating) to each person who sees a mental health clinician during intake or whose mental health status alters during their stay in custody, necessitating a mental health assessment. This acuity level rating, which rates the severity of mental health needs, helps to inform housing location, the provision of mental health services, and discharge planning for when people leave custody. Such a system could help to identify mental health needs, track those needs, and communicate this information to appropriate staff to ensure that these needs are met, likely reducing the risk of death to the individual or others.

In addition, all three comparable counties have stronger policies for instances when incarcerated individuals refuse medical or mental health care. For some of the cases we reviewed, these refusals were frequent, despite the individual's need for consistent care. The San Diego Sheriff's Department and the three comparable counties have policies that require detention staff to witness and document an individual's refusal to accept medical treatment or care. However, the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department also require a health staff member to witness and sign the refusal. In contrast, San Diego allows a single sworn staff member to be the only signer if health staff are unavailable to serve as the second witness to the verbal refusal of care. Consequently, we identified several instances in which sworn staff were the only witnesses when incarcerated individuals refused to sign the refusals. Because follow-up care is important, it is critical that the desire to refuse care be shared with health staff who are in a better position

to ask appropriate questions, explain the adverse consequences to health that may occur as a result of the refusal, and assess whether an individual has critical health needs that should be addressed.

The chief medical officer of the Sheriff's Department asserted that many of the issues we identified through our review are case-specific and should not be used to draw generalizations about the department's provision of health care. He also stated that the Sheriff's Department has made a significant number of improvements to its health care system in recent years, such as adding an electronic medical record system and increasing physician and nursing support. He explained that the Sheriff's Department is in the process of obtaining accreditation from the National Commission. To attain accreditation, the Sheriff's Department must meet certain standards related to health care services and support, governance and administration, personnel and training, and other areas.

When the National Commission reviewed the Sheriff's Department's jails in 2017, it found that they did not meet many of its standards, particularly those related to mental health. The chief medical officer indicated that the Sheriff's Department plans to contract with an outside health care organization to consolidate current services and expand its capabilities for the provision of comprehensive health care services, which may help it meet the requirements for accreditation. He further stated that the Sheriff's Department is participating in a university research study that could lead to some facilities receiving accreditation sooner. Nonetheless, the department may be a couple of years away from obtaining full accreditation for all of its facilities.

*Although seeking accreditation from the National Commission may address some of the problems we identify in this report, the Sheriff's Department should not wait to implement key changes that would improve the safety of incarcerated individuals.*

Although seeking accreditation from the National Commission may address some of the problems we identify in this report, the Sheriff's Department should not wait to implement key changes that would improve the safety of incarcerated individuals. We are concerned that this trend will continue if the Sheriff's Department fails to quickly implement significant changes. In fact, the Sheriff's Department indicated that the number of in-custody deaths increased to 18 in 2021—the highest in 15 years.

### The Sheriff's Department Performed Insufficient Safety Checks

Performing safety checks is the Sheriff's Department's most consistent means of monitoring for medical distress and crime occurring in its jails. According to state law, local detention facilities must conduct safety checks at least hourly through direct visual observation of all incarcerated individuals. They must also have a written plan to document routine safety checks. Nonetheless, in our

review of 30 in-custody deaths, we found that sworn staff did not always perform safety checks adequately. As a result, they did not realize several individuals had died until hours afterward.

In fact, in several of the cases in our review for which the Sheriff's Department has video files of safety checks, we found instances when sworn staff performed checks inadequately for the purpose of ensuring the safety of the individuals involved. Department policy requires that staff who are conducting safety checks look for any obvious signs of medical distress, trauma, or criminal activity. Although some video files were unavailable or incomplete for the 30 cases we reviewed, we reviewed the safety check logs and available video surveillance footage of sworn staff conducting checks.

Based on our review of video surveillance footage, we observed multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked through the housing module, as we describe in the text box. Staff later discovered individuals unresponsive in their cells, some with signs of having died several hours earlier, as detention staff described some of these individuals as stiff and cold to the touch.

In another example, the Sheriff's Department's records indicate that a deputy did not perform a required safety check in a housing area, in part because of poor communication between this deputy and the station deputy. One hour after the deputy should have performed this check, sworn staff found an individual in this housing area unresponsive after attempting suicide. A physician pronounced this individual deceased at the scene after staff and paramedics were unsuccessful at saving the individual's life.

> **In-Custody Death: *Case Example 3***
>
> **2 a.m.** Deputy quickly walked past each cell and glanced twice into the individual's cell but moved on after the second glance.
>
> **3 a.m.** Deputy stopped briefly at the individual's cell, glancing through the window for a split second.
>
> **4 a.m.** Deputy walked quickly past the individual's cell without breaking stride, glancing through the window for less than a second.
>
> **5 a.m.** Deputies found the individual unresponsive in their cell during a safety check, with signs of having died several hours earlier.
>
> Source: Records from the Sheriff's Department.

Sworn staff conducted safety checks inadequately in part because of weaknesses in the Sheriff's Department's policy. Its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, as described in the case example above, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.

The Sheriff's Department's assistant sheriff of detentions indicated that the department's policy is sufficient but that individual sworn staff members do not always follow it. The department's safety check policy requires supervisors to review logs to ensure safety checks

were logged and conducted at varying intervals within the required time periods, but it does not stipulate that this review should include examining video surveillance to confirm checks were conducted in a timely and appropriate manner. The assistant sheriff of detentions indicated that the department has an informal process for assessing the quality of safety checks, which can include watching video footage. However, the Sheriff's Department has not documented this assessment process in its policy, and establishing an informal practice does not ensure that each facility's management team will consistently verify the quality of safety checks.

The State and Orange Sheriff's Department have more robust policies or additional detail in their policies that may be more effective in ensuring that incarcerated individuals are alive and well. For example, the California Department of Corrections and Rehabilitation (CDCR) requires staff who perform hourly checks to count a living, breathing person whom they see in person. Further, the Orange Sheriff's Department requires staff who conduct safety checks to be close enough to each individual to ascertain the individual's presence and apparent physical condition. According to Orange Sheriff's Department's assistant sheriff of detentions, a safety check must be performed from a sufficiently close vantage point to determine the person's presence in their assigned location and whether the individual's visible physical condition indicates the need for medical treatment or signs of being in medical distress. The detail described in these requirements could provide clearer expectations to San Diego Sheriff's Department's sworn staff for what constitutes an adequate safety check, especially during the night.

In addition, the Riverside Sheriff's Department has a formal policy that requires regular video review of safety checks. For example, supervisors from each shift must randomly review two safety checks conducted during the prior shift. Establishing a similar process could help the San Diego Sheriff's Department to identify sworn staff who do not consistently conform to policy when conducting their checks so that it can designate them for further action, such as additional training or disciplinary measures. Until it strengthens its safety check policy and formalizes a process for ensuring that sworn staff adhere to this policy, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies or other crises.

*Until it strengthens its safety check policy and formalizes its process, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies.*

### The Sheriff's Department Did Not Always Provide Prompt Lifesaving Measures to Unresponsive Individuals

In slightly less than a third of the 30 cases we reviewed, issues with the response time of sworn staff or medical staff may have resulted in unnecessary delays in performing lifesaving measures. The early moments in a medical emergency are critical. A 2020 study found that

one of the top five predictors of survival in a cardiac arrest occurring away from a hospital was someone performing cardiopulmonary resuscitation (CPR) immediately.[7] In addition, a 2021 study found that for each five-minute delay in calling emergency medical services, the odds of surviving a cardiac arrest decreased by 41 percent.[8] Nonetheless, in some of the cases we reviewed, sworn staff failed to begin CPR immediately or before the arrival of medical staff, or were slow to respond to the scene of the medical emergency.

In a number of instances, sworn staff either did not perform or delayed lifesaving measures. Generally, Sheriff's Department's policy directs that sworn staff immediately provide basic life support, such as CPR, to an unresponsive individual, unless they observe certain obvious signs of death. In some of the cases we reviewed, Sheriff's Department sworn staff did not begin CPR because they thought the individual was dead. However, when department medical staff arrived minutes later, they began lifesaving measures, including CPR. This fact calls into question the ability of sworn staff to assess whether unresponsive individuals might benefit from such potentially lifesaving measures.

In contrast to the Sheriff's Department, CDCR requires its custodial staff to provide immediate life support to incarcerated individuals until medical staff arrive. It revised its policy in response to a 2005 California district court order requiring it to do so. The Sheriff's Department's chief medical officer acknowledged that sworn staff are trained to be first responders and agreed that they should begin CPR while waiting for health staff to arrive.

*The Sheriff's Department's chief medical officer agreed that sworn staff should begin CPR while waiting for health staff to arrive.*

In addition, in some of the cases we reviewed, we noted a delay in the response time of sworn and medical staff when an individual was in medical distress. Sheriff's Department policy requires that all detention staff are responsible for recognizing, reporting, and responding to an incarcerated individual's emergency medical needs. The policy specifically requires that if an individual's condition is believed to be life-threatening, sworn staff must immediately alert on-duty health staff, provide basic life support and first aid care, and place a 911 request for a paramedic emergency response. In one case we reviewed, the homicide unit's investigation reported that an incarcerated individual indicated to a deputy that they were experiencing shortness of breath. The individual had recently been seen by health staff several times for these symptoms. According to the investigation, the deputy was somewhat familiar with the individual's medical conditions but indicated he was not aware of certain treatment the individual

---

[7]  Study from the *Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine.*

[8]  Study from the *American Journal of Emergency Medicine.*

---

**In-Custody Death: *Case Example 4***

**6:51 a.m.** After the individual informed deputy about experiencing shortness of breath, deputy escorted the individual to a different area instead of medical clinic and then left area.

**6:52 a.m.** Individual collapsed in that area.

**6:54 a.m.** Deputies entered area to check on the individual.

**7:00 a.m.** Medical staff arrived. They began lifesaving measures within a few minutes.

**7:10 a.m.** Emergency medical personnel arrived.

**7:33 a.m.** Paramedics transported the individual to the hospital, where a doctor pronounced the individual deceased.

Source: Records from the Sheriff's Department.

---

previously received related to shortness of breath. Nevertheless, the deputy indicated that he believed that the individual was experiencing anxiety and escorted the individual to a different area instead of the medical unit. Shortly afterward, the individual collapsed and sworn staff did not respond for a couple more minutes, as the case example in the text box describes. A health staff member finally arrived several minutes later and began lifesaving measures within a few minutes. The individual was pronounced deceased shortly after arrival to the hospital.

In another example, our review of video surveillance footage—in combination with the homicide unit's investigative report containing statements from involved staff and inmate witnesses—found that the first deputy did not arrive at the scene of the incarcerated individual in medical distress until about five minutes after another incarcerated individual went to alert staff. Sheriff's Department medical staff did not arrive until five minutes after that. Paramedics—who are trained in advanced cardiac life support measures—did not arrive for another five minutes—a total of approximately 15 minutes after sworn staff were first alerted. According to the chief medical officer, some type of communication shortcoming may have delayed the arrival of medical staff, but the exact cause is unknown. However, the initial delay followed by the slow response time of medical staff may have been detrimental to the individual's likelihood of survival. In the Sheriff's Department's interviews of witnesses, other incarcerated individuals commented on the slow response of department staff.

The last two examples we describe emphasize the need for the Sheriff's Department to take action to ensure that it promptly responds to emergencies. Specifically, sworn staff need additional training for immediately starting CPR and how to properly alert medical staff.

**The Sheriff's Department's Inadequate Policies Are in Part the Result of Weaknesses in Statewide Corrections Standards**

As Figure 6 shows, weaknesses in statewide corrections standards likely contributed to the problems we identified with the Sheriff's Department's policies. The BSCC establishes in regulation the minimum standards for jail conditions and treatment of incarcerated individuals that local detention facilities must follow. Every local jail system in the State uses these standards as a basis to create policies for inmate safety and care, although counties may choose to make their policies more robust. However, some of these standards may not be adequate for ensuring incarcerated individuals' health and safety.

Further, BSCC's inconsistent continuing education requirements
may not be sufficient to ensure that sworn staff adequately care for
incarcerated individuals. Given the increase in the annual number
of in-custody deaths across the State from 130 in 2006 to 156 in
2020, improving statewide standards related to health and safety
and training requirements is essential to ensuring the health and
safety of incarcerated individuals in all counties.

**Figure 6**
**Poor Statewide Standards Contributed to Inconsistencies in the Sheriff's Departments' Policies**



BSCC designs the standards for treatment of incarcerated
individuals to be a minimum that all counties can achieve,
regardless of variation in resources at the local level.

The San Diego Sheriff's Department and all other
county sheriff's departments develop their own
policies for jails that comply with BSCC's standards.

Because BSCC's standards are minimal, we found inconsistencies
in the policies across the four counties we reviewed, with some
policies going beyond the standard more than others, yet even
these policies were still insufficient.

*For example:*



STANDARD: **Safety Checks**
*(BSCC's standard requires only **C** to be included)*

| Orange | San Diego | Alameda | Riverside |
|--------|-----------|---------|-----------|
| A B C | C D | C | C |

**DESPITE VARIATION AMONG COUNTIES, NONE OF THE POLICIES
NOR THE BSCC STANDARD SPECIFY THAT STAFF ARE REQUIRED
TO CHECK FOR PROOF OF LIFE DURING SAFETY CHECKS.**

Source: State regulations and policies at Alameda, Orange, Riverside, and San Diego sheriff's departments.

California State Auditor Report 2021-109
February 2022

Although the Sheriff's Department's policies generally align with BSCC's standards related to health, safety, and personnel training, those standards are not specific enough in certain areas to ensure inmate safety. For example, BSCC's standards do not explicitly require that a mental health professional should perform mental health screenings. As a result, the San Diego Sheriff's Department's, Alameda Sheriff's Office's, and Orange Sheriff's Department's policies allow medical nurses and health clinicians rather than mental health professionals to perform mental health screenings at intake. In these counties, the health staff generally will refer an incarcerated individual for a mental health evaluation if they observe general signs necessitating the referral or if the individual self-reports mental health concerns. In contrast, the Riverside Sheriff's Department's policy requires a mental health professional to conduct the mental health screening in all instances, which is a best practice.

*The Riverside Sheriff's Department's policy requires a mental health professional to conduct the mental health screening in all instances, which is a best practice.*

In another example, BSCC's standards do not describe the actions that constitute an adequate safety check. Instead, the standards simply state that safety checks must be conducted at least hourly through direct visual observation of all inmates and that observation through a video camera alone is not sufficient. The four counties we reviewed based their policies on different interpretations of this standard, as Table 2 shows. The Alameda Sheriff's Office and Riverside Sheriff's Department require hourly direct visual observation of incarcerated individuals, but their policies do not expand much further on the standard. As we discuss previously, the San Diego Sheriff's Department's policy provides more detail, defining what staff should look for during the direct visual observation. The Orange Sheriff's Department's policy is more robust than the minimum standard: it directs sworn staff to be close enough to each individual to ascertain their presence and apparent physical condition. Moreover, CDCR requires its staff to count living, breathing individuals whom they see in person. This count is an hourly check that is the equivalent to what BSCC's standards refer to as a safety check. Although BSCC is currently revising the safety check standard, its proposed revision still does not specify that a safety check must include verifying that an individual is alive, which is essential to ensuring the safety of incarcerated individuals across the State.

Additionally, state law does not require that BSCC have medical or mental health professionals on its board, despite its responsibility for creating standards in these areas. The qualifications for almost all of the board member positions are related to law enforcement in a detention setting. State law requires BSCC to seek the advice of medical and mental health professionals when establishing minimum standards and when reviewing and making revisions every two years. However, because the standards have so much

impact on the lives of incarcerated individuals, we believe that having medical and mental health representation on the board is critical. Similar boards in other states, such as the New York City Board of Corrections and the Texas Commission on Jail Standards, have medical experts serving as members.

**Table 2**
**A Lack of Specificity in Statewide Standards Has Resulted in Inconsistencies Among Counties' Policies**

| ENTITY WITH POLICY | SAFETY CHECKS POLICY EXCERPT |
|---|---|
| BSCC | Safety checks shall be conducted at least hourly through **direct visual observation** of all incarcerated individuals. Observation through a video camera alone does not constitute a safety check. |
| Alameda Sheriff's Office | Supervision of all incarcerated individuals shall include **direct visual observation** of each incarcerated individual by a deputy at random times each hour. |
| Orange Sheriff's Department | A safety check is a **direct visual observation** of each incarcerated individual located in an area of responsibility every hour. **Safety checks must be conducted from a location which provides a clear, direct view of each incarcerated individual. Staff shall be close enough to each incarcerated individual to ascertain his or her presence and apparent physical condition.** |
| Riverside Sheriff's Department | Security checks shall be completed to ensure there is **direct visual supervision** of all incarcerated individuals housed within a jail facility every hour. |
| San Diego Sheriff's Department | Sworn staff will conduct safety checks of incarcerated individuals every hour through **direct visual observation** without the aid of audio and video equipment. Safety checks of incarcerated individuals consist of looking at the incarcerated individuals for **any obvious signs of medical distress, trauma, or criminal activity.** |

Source:  State law and policies from the Alameda, Orange, Riverside, and San Diego sheriff's departments.

In addition, BSCC's required training hours for sworn staff working in local detention facilities do not align with their standards for similar positions. BSCC's regulations require only 24 hours annually of continuing professional education training for adult correctional officers, supervisors, and managers, even though it requires 40 hours of continuing training for probation officers and juvenile correctional supervisors and managers. Requiring fewer hours for adult corrections personnel does not make sense when thousands of individuals are incarcerated in these facilities and the number of individuals who have died has increased over the past 15 years. Based on our review of how San Diego Sheriff's Department's sworn staff responded to medical, mental health, and safety needs, we recommend increasing the number of training hours to align with similar professions to allow sheriff's departments to better protect and keep incarcerated individuals safe. Further, BSCC

California State Auditor Report 2021-109
February 2022

does not require that any of the 24 hours of training cover topics pertaining to mental health, even though best practices suggest staff should receive at least four hours of mental health training annually. Without such a requirement, law enforcement staff may not be sufficiently prepared to provide care to and properly monitor individuals with mental health needs.

In response to our concerns that some of its standards are not robust enough to ensure the safety of incarcerated individuals in local detention facilities across the State, BSCC's deputy director of Facilities Standards and Operations told us it is the responsibility of each individual county to establish policies that exceed the minimum standards, should they decide to do so. Further, she said that BSCC designs the standards to be a minimum that all counties can achieve, regardless of variation in resources at the local level. However, this approach enables counties that house large numbers of incarcerated individuals to provide lower levels of care. An alternative approach could be for BSCC to establish separate standards for counties with smaller incarcerated populations, and set higher standards for counties with larger incarcerated populations. For example, BSCC could create more stringent requirements for the larger counties in the State, such as those with ADPs of more than 1,000 individuals. This threshold would include the county jail systems housing more than 80 percent of the State's jail population in local detention facilities. Further, some solutions—such as more robust safety checks—do not require significant resources. Improving statewide standards and training requirements is essential to ensuring the health and safety of incarcerated individuals in all counties.

# Chapter 2

## NEITHER THE SHERIFF'S DEPARTMENT NOR CLERB HAS TAKEN ADEQUATE ACTION IN RESPONSE TO THE DEATHS OF INCARCERATED INDIVIDUALS

### Chapter Summary

The Sheriff's Department has not consistently taken meaningful action in response when in-custody deaths have occurred. Specifically, its reviews of in-custody deaths have been insufficient and have lacked transparency. As a result, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future. In addition, CLERB—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. Moreover, CLERB failed to investigate nearly a third of the deaths of incarcerated individuals in the past 15 years, meaning that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

### The Sheriff's Department Has Not Consistently Implemented the Meaningful Changes Necessary to Respond to the Deaths of Individuals in Its Custody

The Sheriff's Department has not responded to incarcerated individuals' deaths in a manner that demonstrates its commitment to improving health and safety at its detention facilities. Every death of an individual in its custody should require a thorough review to determine whether changes to its processes are warranted. Nonetheless, the department's reviews of deaths are insufficient and have not always led to meaningful corrective action. Further, although the Sheriff's Department has implemented some key recommendations provided by external entities, it did not implement others that are critical to improving the safety of incarcerated individuals. San Diego County has paid millions of dollars in settlements related to deaths in the Sheriff's Department's jails that highlighted many of the same problems we have identified related to inadequate safety checks and medical and mental health care.

*San Diego County has paid millions of dollars in settlements related to deaths in the Sheriff's Department's jails that related to inadequate safety checks and health care.*

### The Sheriff's Department's Processes for Investigating and Reviewing In-Custody Deaths are Ineffective, Structurally Problematic, and Lacking in Transparency

The Sheriff's Department has not performed adequate reviews or implemented sufficient changes in response to the deaths of incarcerated individuals. As we show in Figure 7, the department conducts up to four different reviews: a 30-day medical review, a Critical Incident Review Board review, a homicide death investigation, and an internal affairs investigation. However, because all of these reviews are generated from within the Sheriff's Department, they may be viewed by the public as lacking objectivity. Further, we identified deficiencies in certain reviews that call into question their ability to prompt meaningful change to prevent additional deaths.

One of the Sheriff's Department's reviews—the 30-day medical review—involves reviewing the circumstances surrounding the incident and pertinent medical and mental health services and reports. According to state law, the Sheriff's Department must review every in-custody death within 30 days to determine the appropriateness of clinical care; to assess whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study. To fulfill this requirement, Sheriff's Department policy states that the medical services administrator, in consultation with the chief medical officer, is responsible for reviewing all in-custody deaths within 30 days. In practice, the chief medical officer—who is a licensed physician—indicated that he currently conducts the reviews with input from other health staff regarding the individuals' clinical histories. Although the chief medical officer is also required to review suicide deaths, the department's policy has specified since late 2018 that the chief mental health officer will also present findings on suicides.

However, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given; identified whether any concerns required further study; or stated whether changes to policies, procedures, or practices were warranted. The documents we obtained for most of these 22 cases were either presentation slides or meeting agendas. Neither type of document included findings about the cases or recommended changes to policies, procedures, or practices. For some of the more recent cases in 2019 and 2020, the Sheriff's Department provided us with the chief medical officer's and medical staff members' typed notes, which included conclusions about the medical care its staff had provided to the incarcerated individuals, as well as some recommendations. However, most of these reviews did not document whether the recommendations led to the department taking action, or whether the recommendations had been implemented.

*Most of the Sheriff's Department's reviews of in-custody deaths did not document whether recommended changes to policies, procedures, or practices had been implemented or led to the department taking action.*

**Figure 7**
**The Sheriff's Department's Internal Reviews Have Not Led to Meaningful Action in Response to Individuals' Deaths**

Sheriff's Department's Reviews of In-Custody Deaths

**30-DAY MEDICAL REVIEW**



- Performed by Sheriff's Department medical staff within 30 days of the death as required by state law.
- For suicides, mental health staff also review the deaths.
- No requirement for a formally documented report.
- Does not consistently document findings and recommendations and does not document follow-up to any recommendations.

**CRITICAL INCIDENT REVIEW BOARD REVIEW**



- Entity within the Sheriff's Department, so it is not independent.
- Staff present facts of the cases to Sheriff's Department's management and legal counsel.
- All reports are considered attorney-client privileged and are nondiscloseable.
- Purpose of board is to assess legal liability.
- Has not consistently taken meaningful corrective action and does not review natural deaths.

**HOMICIDE INVESTIGATION**



- Investigations performed by Sheriff's Department staff.
- Presents facts of the case to the Critical Incident Review Board but is rarely involved in developing policy recommendations.

**INTERNAL AFFAIRS INVESTIGATION**

- Becomes involved generally based on complaints of alleged misconduct.
- Has reviewed very few cases involving in-custody deaths.

Source: Sheriff's Department's policies and procedures and other documentation related to these reviews.

We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow-up care before an individual's death, such as those we discuss in Chapter 1. The chief medical officer agreed that the reviews, if properly documented, could be useful as an educational and quality assurance tool. However, he indicated that he would

have reservations about formalizing these reports in a written format without some form of protection against using these documents as evidence in litigation. He stated that without such protection, staff members would be reluctant to point out any form of mistake or error, leading to lost learning opportunities. Regardless of the department's position, we believe the reviews should be formalized for internal use to help the department better track its identification of deficiencies and recommendations for improvements to its clinical care. Other counties we reviewed have policies for documenting these 30-day reviews.

In addition to the 30-day medical review, in-custody deaths—except natural deaths—are also subject to review by the Critical Incident Review Board, which is the Sheriff's Department's internal review committee. The board consists of three voting members—commanders from the Law Enforcement, Court Services, and Detention Services bureaus—and two nonvoting members—the chief legal advisor and a commander from the human resources bureau. The stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals.

Moreover, the board is an entity within the Sheriff's Department, so it is not independent. The Sheriff's Department's investigators present to the board the facts and circumstances related to an in-custody death. According to department policy, the board then carefully reviews the incident from multiple perspectives, including training, tactics, policies, and procedures. Its ultimate goal is identifying problem areas and recommending remedial actions—such as posting a training bulletin or changing a policy—so that potential liability can be avoided in the future. According to policy, if the board votes to determine that any policy violations exist, it will forward the case to Internal Affairs.

*After the Critical Incident Review Board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with policies and practices.*

However, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Of the 18 cases we reviewed for which the department held a Critical Incident Review Board meeting, the board reported taking action related to 13. However, only six resulted in substantive actions, such as changes to policy and procedures or training, related to preventing inmate deaths. The remaining seven resulted predominantly in minor administrative actions or recommendations for training that would not have far-reaching effects on the welfare of individuals in custody.

Moreover, even though the board discussed critical issues in some meetings, it ultimately concluded them without making recommendations for addressing these issues. For example, in

six of the 18 cases, the board indicated that the events surrounding the deaths in question could merit changes to policy and procedures; however, it did not recommend any related actions. According to the assistant sheriff of detentions, the Sheriff's Department may make immediate changes to policies following a death if it identifies a need, so additional recommendations from the board are sometimes unnecessary. However, the minutes of the Critical Incident Review Board meetings do not always discuss these types of policy changes. We question why the review board did not discuss the need for changes in some instances or discuss whether any changes made address the problems identified.

Further, the Critical Incident Review Board generally does not review natural deaths. Instead, it primarily reviews suicides, homicides, and accidental in-custody deaths. According to the Sheriff's Department's chief legal advisor, the board does not review natural deaths in part because the risk of legal liability in those incidents is low. He further stated that because the Medical Examiner's Office has made a determination that an individual's death was from natural causes, it rules out other human factors. However, we found in our review of 30 case files that the Medical Examiner's Office typically reviews events preceding individuals' deaths and their medical records, but it does not make conclusions about the appropriateness of care provided by the Sheriff's Department. We find the Sheriff's Department's decision not to hold critical incident reviews for natural deaths concerning given that these deaths accounted for nearly 50 percent of all deaths in the department's facilities in the period of our review. Further, as we note in Chapter 1, we identified significant deficiencies in the Sheriff's Department's handling of care leading to all types of deaths, including natural deaths. By not requiring the Critical Incident Review Board to review these cases, the department is not doing everything it can to protect incarcerated individuals.

Finally, the Critical Incident Review Board is not transparent. It does not make its reports and investigations public. The board's reports are classified as attorney-client privileged, meaning that they are confidential and cannot be disclosed without the Sheriff's Department's consent. The purpose of attorney-client privilege is to ensure that clients can fully disclose information to their lawyer without fear that it will be revealed to others, enabling them to receive competent legal advice. Although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.

*By keeping the findings and recommendations of the Critical Incident Review Board confidential, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.*

Although the Sheriff's Department's homicide unit is rarely involved in developing policy recommendations, it typically presents facts about in-custody deaths to the Critical Incident Review Board. The homicide unit investigates deaths that occur in custody by, in part, inspecting the scene of the incident, interviewing any witnesses and detention staff, and reviewing video surveillance and reports written by sworn staff. Even though the information that the homicide unit presents to the Critical Incident Review Board is a key component of the Sheriff's Department's review of in-custody deaths, the Critical Incident Review Board ultimately decides whether to take further action.

The Sheriff's Department's internal affairs unit may also investigate detention staff—including health staff—for alleged misconduct related to an in-custody death. The internal affairs unit receives complaints that are initiated by a member of the community or by the Sheriff's Department. The Critical Incident Review Board can also initiate an internal affairs investigation if it votes that a policy violation may have occurred.

*The Sheriff's Department's internal affairs unit indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.*

However, the Sheriff's Department has performed very few such investigations. Specifically, it reported to us that it conducted only four internal affairs investigations related to the 30 cases we reviewed, even though we identified a number of potential violations or concerns in some of the other 26 cases that could justify further investigation. Further, internal affairs indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.

Thus, the Sheriff's Department does not complete internal affairs investigations frequently enough for it to provide significant value. Although internal affairs indicates that its investigations are generally complaint-driven, the small number of investigations related to death cases—coupled with the lack of meaningful changes arising from the 30-day medical review and the Critical Incident Review Board meeting—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

### The Sheriff's Department Has Not Implemented Key Recommendations From External Entities Related to Incarcerated Individuals' Welfare and Safety

The Sheriff's Department has not implemented a number of key recommendations from external entities that are essential for ensuring the welfare and safety of incarcerated individuals, as Table 3 shows. We reviewed recommendations from 2006 through 2020 that the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention

Case 3:20-cv-00406-AJB-DDL    Document 119-3    Filed 05/02/22    PageID.1178    Page 88 of 882

California State Auditor Report 2021-109    39
February 2022

consultant (consultant) made to the Sheriff's Department.[9] Many of these recommendations were in response either to a specific death or to the general health and safety conditions of the jails. When we looked at recommendations that pertained to the safety of incarcerated individuals, the Sheriff's Department had implemented a number of them. For example, it modified a use-of-force policy to prevent compromising an incarcerated individual's ability to breathe and revised its intake screening to include additional questions related to suicide prevention. However, some of the recommendations that the Sheriff's Department failed to fully implement are connected to problems we identify in this report.

**Table 3**
**The Sheriff's Department Has Not Implemented Certain Key Recommendations From External Entities**

| ENTITY PROVIDING RECOMMENDATION | EXAMPLE OF RECOMMENDATION | CURRENT IMPLEMENTATION STATUS |
|---|---|---|
| San Diego County Grand Jury–2014/2015 | The Sheriff's Department deputy detention staff has an imbalance in experience levels and facility assignments, such as too many inexperienced staff at one facility. Develop and implement a staff rotation policy for all detention facilities. | Not implemented |
| Consultant reviewing suicide prevention practices–2018 | Given the strong association between in-custody suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that the Sheriff's Department give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals. | Not implemented |
| CLERB–2018 | Sheriff's Department staff did not have pertinent information about an incarcerated individual's previous suicide attempt and allowed that individual access to something that resulted in self-harm and ultimately suicide. The Sheriff's Department should revise its policy to use identifying wristbands to indicate a prior suicide attempt. | Not implemented |
| Disability Rights California–2018 | Revise policies to allow individuals in Enhanced Observation Housing to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs. | Not implemented |

Source:  San Diego County Grand Jury reports from 2006 through 2019, a consultant's report on suicide prevention practices, CLERB investigations and recommendations from 2006 through 2020, and a Disability Rights California report.

Specifically, the Sheriff's Department did not implement recommendations related to safety checks, intake screenings, and suicide prevention efforts—the last of which is particularly concerning given the department's high rate of suicides compared to other counties. For example, in response to a specific death, CLERB recommended in 2020 that the Sheriff's Department require additional steps in safety checks of individuals residing in special mental health housing to ensure that they are alive and well, such as requiring nurses to accompany deputies on each round to ensure incarcerated individuals' safety. However, the department stated it would not implement this recommendation because it

---

[9]   We discuss CLERB's process for investigating deaths in the sections that follow.

believed that its current policies were adequate. Additionally, San Diego County contracted with a consultant in 2018 to assess suicide prevention practices within the Sheriff's Department's jail system. One of the consultant's recommendations was for the Sheriff's Department to consider increasing safety checks of individuals who are housed in isolated housing units from every 60 minutes to every 30 minutes, given the association between suicide and isolated housing placement. However, the department responded that making this change was not feasible because of the physical layout of its jail facilities, the number of inmates, and the required staffing.

The Sheriff's Department's justifications for choosing not to implement crucial recommendations have not always addressed the underlying issues involved and do not offer alternatives for addressing the concern. For example, following another death, CLERB recommended in 2018 that the Sheriff's Department provide identifying wristbands to individuals with prior suicide attempts. In its response, the department indicated it would not implement this recommendation because doing so would violate individuals' privacy and be contrary to best practices for suicide prevention. However, the Sheriff's Department did not address or offer an alternative solution to the underlying problem, which is that sworn staff may not be familiar with the mental health histories of the individuals they oversee. As we discuss in Chapter 1, another county has addressed this problem by assigning individuals with mental health needs an acuity level rating that could help communicate this information to sworn staff.

*Although the department's policies and procedures related to facility maintenance generally align with state standards, it has not yet replaced the surveillance system at its largest detention facility, even though its age is a major safety issue.*

Another key, recurring recommendation that the Sheriff's Department has not implemented for nearly a decade relates to updating equipment for monitoring the safety of incarcerated individuals. In 2014 the San Diego County Grand Jury recommended that the Sheriff's Department update the surveillance system for monitoring activity at its largest male detention facility, which is a maximum security jail. The San Diego County Grand Jury made a similar recommendation in 2017, but the department has yet to replace the system. Although the department's policies and procedures related to facility maintenance generally align with state standards, we find it concerning that it has not yet replaced the surveillance system, even though its age is a major safety issue. In 2021 the Sheriff's Department indicated that the replacement effort would likely not begin until the summer of 2022. According to the assistant sheriff of detentions, the department did not implement this recommendation sooner because of its prioritization of other projects, such as building a new detention facility. However, we believe that the Sheriff's Department should prioritize implementing or resolving all recommendations intended to keep individuals in its custody safe.

Lastly, many of the lawsuits we reviewed that San Diego County settled have highlighted some of the same problems at the Sheriff's Department that we have identified related to inadequate safety checks, mental health treatment, and medical care. From 2006 through 2020, there were 22 lawsuits filed related to the deaths of incarcerated individuals at the Sheriff's Department's detention facilities. San Diego County has settled 11 of these, for a total cost of $9.2 million.[10] Payments for these cases ranged from $10,000 to $3.5 million for an average of $838,000 per settlement. Table 4 compares San Diego County's settlements to those in the other three counties we reviewed. By not promptly addressing the underlying issues on which both litigation and external recommendations have focused, the San Diego Sheriff's Department continues to place the individuals in its custody at risk.

**Table 4**
**Settlements Related to In-Custody Deaths Varied Among the Comparable Counties**

| SETTLEMENTS RELATED TO IN-CUSTODY DEATHS (2006–2020) | ALAMEDA | ORANGE | RIVERSIDE | SAN DIEGO |
|---|---|---|---|---|
| Number of settlements | 15 | 9 | 7 | 11 |
| Settlement amount (total) | $17,863,000 | $7,799,000 | $3,871,000 | $9,223,000 |
| Settlement amount (average) | $1,116,000 | $867,000 | $553,000 | $838,000 |
| Range of settlements | $10,000 to $5 million | $200,000 to $2.75 million | $46,000 to $975,000 | $10,000 to $3.5 million |

Source: Court documents from each of the four counties.

## CLERB Has Failed to Provide Effective Oversight of the Deaths of Individuals in the Sheriff's Department's Custody

Despite its mission to increase public confidence in county law enforcement officers, CLERB has failed to provide effective, independent oversight of the deaths of individuals in the Sheriff's Department's custody. In violation of its own rules and regulations, CLERB's investigations are not independent, timely, or thorough, as Figure 8 shows. Our review found that CLERB rarely independently interviews witnesses or visits the initial scenes of the deaths, has not consistently prioritized cases involving deaths, and has sometimes failed to thoroughly investigate or follow up on discrepancies it discovers in the course of its investigations of deaths. CLERB's failure to conduct adequate investigations has resulted in a lack of independent scrutiny of dozens of deaths of incarcerated individuals, calling into question its effectiveness as a key oversight body for San Diego County law enforcement.

---

[10]  The other 11 lawsuits are either ongoing or have been appealed.

**Figure 8**
**CLERB Has Failed to Provide Adequate Oversight of the Deaths of Individuals in the Sheriff's Department's Custody**



## CLERB's rules and regulations require it to be:

**INDEPENDENT** — Relies primarily on evidence provided by the Sheriff's Department, rather than independently interviewing witnesses or visiting the initial scene of the death.

**TIMELY** — Has not always prioritized conducting investigations of death cases.

**THOROUGH** — Does not always thoroughly investigate death cases or follow up on key discrepancies that arise during the investigation.

**ETHICAL** — We did not identify concerns with the investigations we reviewed being conducted in an unethical manner.

**FAIR/IMPARTIAL** — We did not identify concerns with the investigations we reviewed being unfair or biased.

Source: CLERB's rules and regulations, county policies, and analysis of CLERB investigations.

### CLERB Does Not Conduct Independent Investigations

San Diego County voters established CLERB to provide independent oversight of the county's law enforcement agencies. However, CLERB's investigations of in-custody deaths are not independent. In particular, it does not conduct interviews with Sheriff's Department sworn staff or visit the initial scene of the death. Rather, it relies almost entirely upon documents that the Sheriff's Department provides. The county charter—as well as its own rules and regulations—establishes CLERB's power to issue subpoenas, administer oaths, and require the attendance of witnesses and the production of books and papers pertinent

to its investigations. CLERB's rules and regulations further state that its investigations may include interviewing witnesses and subject officers, examining the scene, and reviewing and preserving other physical evidence. However, in practice, CLERB's investigations of in-custody deaths reflect neither its authority nor its stated processes.

We reviewed a selection of six CLERB investigations of incarcerated individuals' deaths in the Sheriff's Department jails occurring from 2016 through 2019 that had investigations performed in 2017 through 2020. We found that for all of these cases—which, in total, included dozens of potential witnesses—CLERB investigators referenced conducting an interview of an incarcerated individual in only one instance. They did not independently interview staff from the Sheriff's Department in any of the six cases, although in a few limited instances, they used written questionnaires to obtain information from sworn staff about their involvement in an incident leading up to an incarcerated individual's death.

CLERB uses these questionnaires in lieu of performing in-person interviews as the result of an agreement it reached with the Sheriff's Department and the Deputy Sheriff's Association of San Diego County (labor organization). However, this agreement has hindered CLERB's independence and undermined voters' approval of CLERB's creation. As we show in Figure 9, the erosion of CLERB's independence began in the 1990s. According to its current executive officer, CLERB was concerned at that time that its investigations were one-sided and lacked legitimacy without participation by Sheriff's Department sworn staff. According to CLERB annual reports and internal documents, CLERB attempted to interview Sheriff's Department sworn staff in the course of its investigations to seek their perspective. Although both San Diego County's Administrative Code and CLERB's rules and regulations entitle CLERB to complete and prompt cooperation from the Sheriff's Department, the sworn staff members refused to participate in interviews with CLERB investigators. In response, CLERB exercised its power to subpoena and administer oaths by calling sworn staff members to testify in public hearings. However, CLERB documents indicate that the sworn staff continued to refuse to answer any questions, invoking their Fifth Amendment right against self-incrimination.

*In practice, CLERB's investigations of in-custody deaths reflect neither its authority nor its stated processes.*

**Figure 9**
**CLERB's Ability to Conduct Independent Investigations Has Been Eroded Over Time**



| | |
|---|---|
| **1990** | Voters approved Proposition A to create CLERB and give it power to subpoena and require attendance of witnesses and the production of books and papers pertinent to its investigations, as well as to administer oaths. |
| **1991–95** | Sworn staff involved in CLERB investigations refused to answer questions, citing their Fifth Amendment rights, and CLERB defended itself against litigation related to its authority to perform investigations. |
| **1998** | CLERB, the Sheriff's Department, and the labor organization agreed to a process for CLERB investigators to question sworn staff through interviews or written questionnaires. |
| **2003** | CLERB adopted a waiver form allowing sworn staff to opt out of in-person interviews with its investigators. |
| **2021** | CLERB continues to not directly interview sworn staff involved in in-custody deaths, compromising the independence and thoroughness of its investigations. |

Source:  Proposition voter materials, agreement documents, legal documentation, and CLERB's investigations documentation.

Faced with the prospect of more costly litigation and continued legal challenges, CLERB discussed a framework with the Sheriff's Department and the labor organization in 1998 that ultimately led to an agreed-upon process for CLERB investigators to question Sheriff's Department sworn staff through interviews or written questionnaires (1998 agreement). Further, in 2003, CLERB adopted a waiver form for sworn staff, allowing them to opt out of in-person interviews with CLERB investigators altogether (2003 waiver form).

The 1998 agreement and 2003 waiver form constitute CLERB's current process for involving Sheriff's Department sworn staff in its investigations. Consequently, CLERB investigators do not conduct independent interviews of sworn staff but rather request

responses from specific department employees through a written questionnaire. This approach has hindered CLERB's ability to perform independent investigations.

CLERB's executive officer acknowledged that having its investigators conduct independent interviews would be preferable but also asserted that they are generally able to obtain necessary information through the questionnaire process. However, we question this position. Although written responses may provide some pertinent information, they do not allow investigators to assess the credibility of a witness or to ask immediate follow-up or clarifying questions. In fact, CLERB's current process allows department staff up to 14 days to respond to the questionnaires. CLERB's executive officer indicated that investigators generally submit another questionnaire with the same turnaround time if they have any subsequent inquiries or clarifying questions to the responses from the initial questionnaire. Such protocol is counterintuitive to the nature of an investigation, which requires interactive communication and prompt responses.

Moreover, although the Sheriff's Department generally notifies CLERB of in-custody deaths, it does not do so until after various department entities have processed the scene. As a result, CLERB investigators are not able to be present at the initial scene of the death. Instead, shortly after receiving notification of an in-custody death, CLERB issues a subpoena to the Sheriff's Department for the homicide unit's investigation file. The Sheriff's Department forwards it to CLERB once it has completed its criminal investigation, usually about two to eight months after the death occurs. As a result, CLERB's investigators generally do not learn about potential witnesses or have the opportunity to visit the scene until months after the death of an incarcerated individual, severely limiting their ability to conduct an independent and thorough investigation. In fact, when we reviewed a selection of CLERB's investigations, we found that its investigators either did not visit the scenes of the deaths at all or did not do so until more than a year after the death occurred.

*CLERB's investigators generally do not learn about potential witnesses or have the opportunity to visit the scene until months after the death of an incarcerated individual.*

Without the ability to independently interview witnesses or the opportunity to visit the initial scenes of the deaths, CLERB must conduct its investigation based primarily on information that the Sheriff's Department's internal investigators provide, such as photographs and videos. For the cases we reviewed, CLERB's investigators' only other sources of evidence were statements from the decedents' families, reports from the medical examiner, and—in only one case—a direct interview with an incarcerated individual who was a witness.

*CLERB's nearly exclusive reliance on evidence provided by the Sheriff's Department precludes its investigators from reaching independent conclusions on in-custody deaths and providing truly external oversight of county law enforcement.*

San Diego County voters established CLERB in response to perceived inadequacies in the Sheriff's Department's internal investigations, yet CLERB's nearly exclusive reliance on evidence provided by the department precludes its investigators from reaching independent conclusions on in-custody deaths and providing truly external oversight of county law enforcement. For CLERB to carry out this function, its processes must change and the Sheriff's Department must fully cooperate.

CLERB's members and its executive officer are currently pursuing several policy changes to increase its independence, including issuing a policy recommendation in October 2021 to the Sheriff's Department requesting that it allow a CLERB staff member with extensive death investigation experience to be present at the initial scene of the death. However, CLERB's recommendations to the Sheriff's Department are advisory and require the Sheriff's Department's approval for implementation. CLERB's members and executive officer are also working with the county board to expand CLERB's authority to investigate complaints against non-sworn staff, including medical personnel. However, such an expansion of CLERB's authority requires approval by the county board. Furthermore, although these changes would increase the independence of CLERB's investigations, they would not enable CLERB's investigators to directly interview sworn staff, which we believe is critical.

### CLERB Failed to Investigate 57 In-Custody Deaths From 2006 to 2017

CLERB failed to investigate a significant number of deaths of individuals in Sheriff's Department custody. For example, CLERB failed to investigate 13 deaths of incarcerated individuals from 2011 through 2016 because it misinterpreted a state-mandated deadline for completing its investigations and did not properly prioritize its caseload. The Legislature established a one-year statute of limitations for investigations of law enforcement misconduct when it amended the Public Safety Officers Procedural Bill of Rights Act (POBR) in 1997. As the Introduction explains, CLERB is responsible for investigating complaints, as well as deaths arising out of or in connection with actions of peace officers, which can include deaths in custody. As a result of the amendment to POBR, CLERB must complete its investigations within one year after it receives a complaint against a peace officer or notification of an in-custody death.[11]

---

[11]  POBR requires the investigation to be completed within one year of discovery of the alleged misconduct, and the one-year deadline may be suspended under certain circumstances, such as when the misconduct is the subject of a criminal investigation. Because the Sheriff's Department performs a criminal investigation of every in-custody death, CLERB's one-year time frame to complete its investigation does not start until after the Sheriff's Department completes its investigation.

Nevertheless, CLERB did not realize until 2010 that the one-year time frame applied to its investigations of complaints, at which time it started to dismiss cases for expiration of this time limit. In fact, from 2010 through 2016, CLERB reported that it had to dismiss nearly 100 complaints against county law enforcement members because it did not complete its investigations within the required time frame. Although CLERB did not report that any of these 100 complaints involved in-custody deaths, its failure to conduct these investigations demonstrates that it has struggled to effectively perform its duties in a timely manner.

Further, CLERB's records and San Diego County Grand Jury documents indicate that CLERB staff were not aware that the POBR statute of limitations also applied to its investigations of in-custody deaths until 2017. Consequently, it did not always prioritize these cases, and it reported that its backlog of open investigations of deaths steadily increased from seven cases in 2010 to 46 cases by 2016. After CLERB learned in 2017 that the one-year time limit also applied to investigations of deaths, it had to dismiss 22 of these cases because they had exceeded the time limit. Of these 22 deaths, 13 occurred while the individuals were in custody at Sheriff's Department detention facilities.[12] Because of CLERB's failure to investigate these 13 deaths, it did not have the opportunity to identify problems with the Sheriff's Department's policies and procedures and to make policy recommendations that could have helped prevent future in-custody deaths.

CLERB did not investigate an additional 40 in-custody deaths classified as natural from 2006 through 2016 because it was not conducting investigations of this type during that time. According to CLERB's current executive officer, it did not review deaths classified as natural during this period because its former executive officers generally interpreted its jurisdiction over in-custody deaths to exclude these types of deaths. In fact, CLERB's rules and regulations do not clearly specify whether CLERB should investigate natural deaths. However, the concerns we discuss with the Sheriff Department's inadequate prevention of natural deaths underscore the importance of CLERB providing external oversight of these cases. Since 2017 CLERB has been consistently reviewing natural deaths. However, the lack of specificity in its rules and regulations could result in CLERB reverting to its past practice in the future.

In addition, CLERB did not investigate four other in-custody deaths—two that were classified as accidental, one as homicide by law enforcement, and one as suicide—from 2009 through 2011. CLERB's executive officer said that it did not investigate these deaths because

*Since 2017 CLERB has been consistently reviewing natural deaths. However, the lack of specificity in its rules and regulations could result in CLERB reverting to its past practice of not reviewing natural deaths in the future.*

---

[12] The remaining nine deaths occurred in San Diego County law enforcement areas and probation facilities.

California State Auditor Report 2021-109
February 2022

the Sheriff's Department failed to inform CLERB of their occurrence. Although the Sheriff's Department indicated that it did not have information on notifications for this period, we find the lack of review of these cases concerning. In 2011 CLERB made a policy recommendation requesting that the Sheriff's Department include it in all in-custody death notifications. Although the Sheriff's Department declined to modify its policies to include CLERB in its initial death notifications, which includes the county district attorney and Medical Examiner's Office, it did direct a specific unit to inform CLERB of all in-custody deaths, usually within a few days of their occurrence. However, as we discuss above, when the Sheriff's Department does not notify CLERB of deaths immediately, CLERB investigators do not have the opportunity to visit the initial scenes of the incidents shortly after the death occurred.

As we show in Figure 10, CLERB failed to investigate a total of 57 deaths of incarcerated individuals in Sheriff's Department jails from 2006 through 2017—nearly a third of all its in-custody deaths in the past 15 years. This is unacceptable given that CLERB is a key county entity outside of the Sheriff's Department that reviews in-custody deaths. Although CLERB recently added policies and procedures establishing its prioritization of death cases over all other cases, it did not do so until August 2021. Moreover, because policies can easily be changed when leadership changes, it is important that CLERB include requirements in its rules and regulations for how it prioritizes cases.

**Figure 10**
**CLERB Did Not Investigate Nearly a Third of All In-Custody Deaths in the Past 15 Years**



## 57 Out of 185 Deaths
### in San Diego County Jails Not Reviewed

**13 DEATHS** not investigated because the statutory 1-year time limit for CLERB to complete the investigations expired.

**+**

**40 DEATHS** not investigated because CLERB did not believe it needed to investigate natural deaths.

**+**

**4 DEATHS** not investigated because the Sheriff's Department failed to inform CLERB of their occurrence.

**=**

**57 DEATHS** NOT REVIEWED

Source: California Department of Justice in-custody death data, CLERB list of investigations, and CLERB investigative reports.

Despite CLERB's efforts since 2017 to ensure that it appropriately prioritizes and fully investigates in-custody deaths, it has still struggled to complete its investigations in a timely manner. As we previously explained, CLERB investigators generally begin investigating an in-custody death after the Sheriff's Department's homicide unit has completed its own investigation and forwarded the homicide investigation file to CLERB. Upon receipt of the homicide investigation file, CLERB must complete its investigation within one year to meet the POBR time limit. However, our review of the six in-custody death investigations found that CLERB investigators did not begin their casework until an average of seven months after they received the homicide investigation file from the Sheriff's Department. As we note earlier, the Sheriff's Department usually does not provide the file to CLERB until two to eight months after the death of an incarcerated individual. Consequently, CLERB investigators did not complete their investigations of the cases we reviewed until an average of nearly a year and a half after the death occurred.

CLERB's executive officer indicated that CLERB staff have not historically prioritized beginning investigations of deaths, but he has made recent efforts to ensure that staff start their investigations as soon as they receive a homicide file. Although CLERB's policy does not provide instruction for how quickly the staff must start working on investigations of deaths, the executive officer told us that his goal is for these investigations to be complete within 90 days of CLERB receiving the homicide investigation file. To make relevant recommendations and hold individuals accountable for wrongdoing, CLERB must take steps to complete its investigations of in-custody deaths in a timely manner.

*To make relevant recommendations and hold individuals accountable for wrongdoing, CLERB must take steps to complete its investigations of in-custody deaths in a timely manner.*

### CLERB Did Not Always Thoroughly Investigate In-Custody Deaths

CLERB's rules and regulations require its investigations to be thorough. However, in some of the cases we selected, CLERB's investigators did not appear to consider all the circumstances leading up to the deaths, did not examine all the relevant Sheriff's Department policies, and did not follow up on discrepancies they discovered in the course of their investigations. For example, in one case, an altercation between two cellmates resulted in the death of one of the individuals. However, the investigator did not appear to scrutinize or independently verify evidence, such as the victim's mental health history, that might have affected their classification status. Without this information, the investigator could not sufficiently determine whether the Sheriff's Department had violated policies or procedures by housing these individuals in the same cell. Consequently, the investigator found that there was no evidence to support an allegation of a procedural violation, misconduct, or negligence on the part of the Sheriff's Department.

When failing to thoroughly examine all the evidence in a case, CLERB investigators may miss important opportunities to identify deficient policies and practices and to make recommendations to improve the safety of incarcerated individuals. CLERB's executive officer explained that because CLERB investigators are often working against the POBR statute of limitations, they do not consistently follow up on discrepancies they discover in the course of their investigations. However, we find this explanation problematic given the critical nature of the investigations. Further, as we previously discuss, investigators often failed to begin their investigations until months after receiving the homicide files. By starting their investigations sooner, they could increase the time available to them.

*CLERB should develop a comprehensive training manual for its investigators that includes guidance for evaluating the circumstances leading up to the death.*

Although CLERB developed policies and procedures in August 2021 that outline specific documents—such as medical records—investigators should obtain in the course of an in-custody death investigation, we believe further action is necessary. Specifically, CLERB should develop a comprehensive training manual for its investigators that includes guidance for evaluating the circumstances leading up to the death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment. Such changes could help ensure that its investigations are complete and thorough.

### Until Recently, the County Board Provided Insufficient Oversight of CLERB

The county board has a number of responsibilities related to CLERB. It appoints CLERB members and can remove individual members by a majority vote at any time. The county board also establishes CLERB's duties and approves its rules and regulations. However, despite its critical role in overseeing CLERB, the county board rarely discussed in-custody deaths or raised concerns about CLERB, based on its meeting minutes from 2006 through 2019, including after CLERB dismissed 22 death cases in 2017.

The county board has only recently begun to discuss in-custody deaths. Its current chair stated that the board's composition changed recently and that it now has an increased interest in addressing deaths in San Diego County jails. In 2020 the county board approved changes intended to strengthen CLERB's oversight of the Sheriff's Department and Probation Department, including increasing the number of investigative staff. It also approved a request for CLERB to revise its member nomination process to make it more transparent and better incorporate community input.

Although the current county board has recently been more engaged in monitoring in-custody deaths, CLERB has not effectively communicated the pressing issues related to deaths in county jails to the county board. The county charter requires CLERB to prepare an annual report for the county board, the sheriff, and the county probation officer that summarizes its activities and recommendations, including the tracking and identification of trends with respect to complaints received and investigated. Even though CLERB has included in its annual reports year-to-year comparisons of the number of new death cases and complaints, its reports lack critical information that would enhance their usefulness. For example, the reports summarize information on the causes of death and certain categories of allegations of misconduct but do not include any significant discussion or analysis that might point to deficiencies in the Sheriff's Department policies or practices. Further, they do not include any demographic information related to deaths that CLERB investigates.

Although CLERB's reporting and recommendation practices generally align with requirements in its rules and regulations, it could make its annual reports and recommendations more useful. Other law enforcement oversight entities in the State include more robust information in their annual reports, such as comprehensive analyses and discussions of overall trends in discrimination, misconduct, and excessive force allegations, as well as demographic information. Additionally, as an advisory board, CLERB's primary means of improving the safety of incarcerated individuals and providing oversight of in-custody deaths is the recommendations for policy or procedural changes that it makes to the Sheriff's Department based on the deficiencies it detects in the course of its investigations. However, CLERB generally makes recommendations based on individual cases rather than on trends it identifies through analysis of its investigations. Making recommendations based on trends could help resolve more systemic concerns at the Sheriff's Department.

CLERB's executive officer indicated that he would like to include more analyses of overall trends in the annual report but explained that he has prioritized other issues, such as resolving the case backlog and developing training materials for new investigators. As a key oversight entity for county law enforcement, CLERB must improve its reporting and analyses to better inform county leadership and the public. Even more importantly, it must make recommendations that address systemic issues to help prevent deaths of incarcerated individuals.

*CLERB must improve its reporting and analyses to better inform county leadership and the public.*

52

California State Auditor Report 2021-109

February 2022

Blank page inserted for reproduction purposes only.

# Conclusions and Recommendations

The San Diego Sheriff's Department has a constitutional responsibility to provide adequate medical care to the individuals whom it incarcerates. Nonetheless, more people have died while in its custody over the past 15 years than in nearly any other county in the State—an average of about one death per month. Our audit found that deficiencies in the Sheriff's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies likely contributed to these deaths. The high rate of deaths in San Diego County jails compared to other counties' jails suggests that these systemic deficiencies have undermined the Sheriff's Department's ability to ensure the health and safety of the individuals in its custody. We are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic problems. Although external entities—such as CLERB and the San Diego County Grand Jury—have made recommendations in the past to address some of the deficiencies we describe, the Sheriff's Department has not implemented a number of them.

No single entity has sufficient oversight authority over the Sheriff's Department to require it to make meaningful changes. Absent explicit legislative direction, neither the county board nor the State's attorney general is well positioned to compel the Sheriff's Department to implement the recommendations we include in this report. Given the ongoing risk to incarcerated individuals' safety, we believe that the Legislature should direct the Sheriff's Department to implement the changes we detail below.

**Recommendations**

*Legislature—All Sheriff's Departments and the California Department of Justice*

To ensure that all sheriff's departments accurately report deaths that occur from incidents or conditions in county jails, the Legislature should amend state law to require sheriff's departments to report to the attorney general individuals who are released from custody after being transported directly to a hospital or similar medical facility and subsequently die in the facility. It should also amend state law to require sheriff's departments to provide the attorney general with all facts concerning the death, such as the cause and manner. The California Department of Justice should annually publish this information on its website.

***Legislature—San Diego Sheriff's Department***

To ensure that the San Diego Sheriff's Department identifies individuals' medical and mental health needs at intake, the Legislature should require it to revise its policies to better align with best practices, as follows:

- Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them.

- Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.

To ensure that the Sheriff's Department provides the necessary medical and mental health care to individuals incarcerated in its facilities, the Legislature should require it to do the following:

- Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.

- Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request.

- Revise its policy to require more frequent psychological follow-up after release from the inmate safety program, including at least monthly check-ins.

- Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.

To ensure that sworn staff properly perform safety checks, the Legislature should require the Sheriff's Department to do the following:

- Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.

- Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff members perform.

To ensure that department staff promptly respond to unresponsive individuals, the Legislature should require the Sheriff's Department to revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow. The Legislature should also require that the Sheriff's Department provide sworn staff with additional training for starting CPR immediately and how to properly alert medical staff.

To ensure that the Sheriff's Department properly assesses the reasons for each in-custody death and makes prompt changes as necessary in response, the Legislature should require it to revise its policy to specify the following:

- Staff will provide a written report of each 30-day medical review to its management.

- When warranted, the report should specify recommendations for changes to prevent further deaths.

- The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and identify issues that require further study.

To improve oversight of in-custody deaths and encourage meaningful action to prevent future deaths, the Legislature should require the Sheriff's Department to revise its policy to require that the Critical Incident Review Board review natural deaths.

To increase the transparency of the Sheriff's Department's reviews of in-custody deaths, the Legislature should require the Sheriff's Department to either make public the facts it discusses and recommendations it decides upon in the relevant Critical Incident Review Board meetings or to establish a separate public process for internally reviewing deaths and making necessary changes.

To ensure that the Sheriff's Department provides complete and prompt assistance to CLERB's investigations, the Legislature should require the Sheriff's Department to do the following:

- Revise its policy to include CLERB in its immediate death notification process.

- Revise its policy to allow a CLERB investigator to be present at the initial death scene.

- Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.

The Legislature should implement the recommendations related to the Sheriff's Department described above in a manner consistent with the form of governance applicable to San Diego County.

### Legislature—BSCC

To ensure that standards of care for incarcerated individuals are adequate and consistent across the State, the Legislature should amend state law to require BSCC to amend certain regulations to address the following:

- County sheriff's departments with jails that have an average daily population of more than 1,000 must have a mental health professional perform mental health evaluations at intake.

- Safety checks must include a procedure for checking to see that each individual is alive.

To ensure the involvement of experts in the areas of medical and mental health care in approving BSCC's regulations and training standards related to the health and safety of incarcerated individuals, the Legislature should change the composition of BSCC to include a medical professional and a mental health professional.

To ensure that BSCC's regulations, guidance, and training align with medical and mental health care best practices, the Legislature should require BSCC to evaluate and update all of its regulations and training as needed once its composition includes a medical professional and a mental health professional.

To ensure that all local correctional officers in the State receive sufficient continuing professional education, the Legislature should require BSCC to amend its regulations to require that local correctional officers working in local detention systems with an

average daily population of more than 1,000, complete 40 hours
of training annually and that at least four of those hours relate to
mental and behavioral health.

### CLERB

To ensure its investigations are independent, timely, and thorough,
CLERB should do the following by May 2022:

- Discuss and modify its current agreement with the Sheriff's
  Department and the labor organization to allow CLERB's
  investigators to conduct independent interviews of Sheriff's
  Department sworn staff.

- Develop a comprehensive training manual for its investigators
  that outlines standard procedures for investigations. The manual
  should include a specific section dedicated to investigations
  of in-custody deaths, including guidance for evaluating the
  circumstances leading up to an in-custody death, such as the
  decedent's mental health history and the appropriateness of the
  decedent's housing assignment.

- Create policies and procedures to require its investigators to
  finish casework on in-custody death investigations within three
  months of receiving the homicide investigation file. These
  policies and procedures should also require investigators to
  attempt to independently verify any information they receive
  from the Sheriff's Department, to thoroughly review deputy
  statements and reports from the homicide investigation file, and
  to request interviews with relevant detention staff and other
  witnesses in all instances in which they identify discrepancies or
  missing information.

To ensure that it fully investigates all in-custody deaths, CLERB
should revise its rules and regulations by May 2022 to include
the following:

- Prioritization criteria for investigating in-custody deaths above
  all other investigations.

- Clarification that its investigations of in-custody deaths includes
  those classified as natural deaths.

To ensure that it provides effective oversight of the deaths of
individuals in the Sheriff's Department's custody, CLERB should
perform an analysis of overall trends related to these deaths,
including demographic information, and determine whether the
trends suggest deficiencies in the Sheriff's Department's policies

and procedures. Based on these trends, it should also identify policy recommendations for improving the safety of the individuals in the Sheriff's Department's custody. To increase transparency, CLERB should include these trends and analyses in its annual reports starting with its 2021 report, which it should publish in 2022.

We conducted this performance audit in accordance with generally accepted government auditing standards and under the authority vested in the California State Auditor by Government Code sections 8543 et seq. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on the audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

February 3, 2022

# Appendix A

### In-Custody Deaths in California's 15 Largest Counties

The Joint Legislative Audit Committee (Audit Committee) directed us to compare the in-custody death rate in San Diego County to the rates in other comparable California counties for the past 15 years—2006 through 2020. Table A.1 presents the rate of deaths per average daily population (ADP) in each of these county sheriff jail systems from 2006 through 2020. As we previously explain, the ADP represents the number of incarcerated individuals housed in a jail system on any given day over a period of time.

**Table A.1**
**In-Custody Deaths and ADPs From 2006 Through 2020**

| COUNTY SHERIFF'S DEPARTMENT | ADP 15-YEAR AVERAGE (2006–2020) | TOTAL DEATHS | AVERAGE DEATHS PER YEAR | AVERAGE DEATHS PER 1,000 ADP |
|---|---|---|---|---|
| San Diego | 5,162 | 185 | 12.33 | 2.39 |
| Fresno | 2,752 | 86 | 5.73 | 2.08 |
| Ventura | 1,537 | 47 | 3.13 | 2.04 |
| Kern | 2,266 | 69 | 4.60 | 2.03 |
| Alameda | 3,325 | 99 | 6.60 | 1.98 |
| Contra Costa | 1,446 | 43 | 2.87 | 1.98 |
| Riverside | 3,668 | 104 | 6.93 | 1.89 |
| San Francisco | 1,492 | 39 | 2.60 | 1.74 |
| San Joaquin | 1,367 | 34 | 2.27 | 1.66 |
| Los Angeles | 17,044 | 421 | 28.07 | 1.65 |
| San Bernardino | 5,490 | 124 | 8.27 | 1.51 |
| Santa Clara | 3,732 | 84 | 5.60 | 1.50 |
| Orange | 5,877 | 111 | 7.40 | 1.26 |
| Tulare | 1,510 | 26 | 1.73 | 1.15 |
| Sacramento | 4,008 | 62 | 4.13 | 1.03 |

Source:  California Department of Justice in-custody death data and BSCC data.

We present information on additional counties in our interactive dashboards at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Table A.2 presents the rate of deaths per the number of individuals booked in each county sheriff's jail system from 2006 through 2020. The number of bookings is the total number of individuals who were processed through the jail system.

**Table A.2**
**In-Custody Deaths and Bookings From 2006 Through 2020**

| COUNTY SHERIFF'S DEPARTMENT | TOTAL BOOKED | AVERAGE BOOKED PER YEAR | TOTAL DEATHS | TOTAL DEATHS PER 100,000 BOOKED |
|---|---|---|---|---|
| Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| Fresno | 551,624 | 36,775 | 86 | 15.59 |
| **San Diego** | **1,284,462** | **85,631** | **185** | **14.40** |
| Kern | 520,074 | 34,672 | 69 | 13.27 |
| Riverside | 810,376 | 54,025 | 104 | 12.83 |
| Alameda | 777,627 | 51,842 | 99 | 12.73 |
| Orange | 888,951 | 59,263 | 111 | 12.49 |
| Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| Ventura | 424,978 | 28,332 | 47 | 11.06 |
| San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| Tulare | 333,941 | 22,263 | 26 | 7.79 |

Source:  California Department of Justice in-custody death data, BSCC data, and San Diego Sheriff's Department bookings data.

# Appendix B

## Scope and Methodology

The Audit Committee directed the California State Auditor to conduct an audit of the San Diego Sheriff's Department to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps taken by the Sheriff's Department to address these deaths. The table below lists the objectives that the Audit Committee approved and the methods we used to address them.

**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | Reviewed and evaluated the laws, rules, and regulations related to detention facilities and significant to the audit objectives. |
| 2 | Evaluate the Sheriff's Department's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to incarcerated individuals. To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to incarcerated individuals. | • Interviewed staff and reviewed the Sheriff's Department's documented policies and procedures regarding personnel training, facility maintenance and safety, and the provision of health care to incarcerated individuals. Determined whether those policies and procedures meet the requirements established by BSCC and state law, including reviewing BSCC's biennial inspections.<br><br>• Reviewed the Sheriff's Department's policies and procedures, in combination with reviewing in-custody deaths under Objective 3, to determine whether its policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to incarcerated individuals.<br><br>• Reviewed BSCC's board composition and whether BSCC's standards are strong enough to ensure the safety of incarcerated individuals.<br><br>• Interviewed staff of BSCC regarding its review process to update and revise standards. |
| 3 | To the extent possible, for a selection of in-custody deaths from the past 15 years—including suicides, murders, and in-custody or in-transit deaths—determine the following:<br><br>a. The circumstances, such as the cause for each death.<br><br>b. Whether correctional facility staff followed applicable policies and procedures related to in-custody safety.<br><br>c. Whether the Sheriff's Department reviewed the circumstances of these deaths and took corrective action to improve in-custody safety. | • Using a complete list of in-custody deaths in the Sheriff's Department's jails, selected 30 deaths for review from 2006 through 2020 taking into consideration factors such as gender, race, age, location of death, type of death, and date of death. The Sheriff's Department did not report any in-transit deaths related to its jails. In accordance with audit standards, we did not select cases involved in active litigation in order to avoid interfering with ongoing legal proceedings.<br><br>• For the selection of 30 in-custody deaths, reviewed jail files, medical records, and other relevant reports to determine the circumstances around each death—including the cause of each death, such as suicide, homicide, or natural death.<br><br>• For the selection of 30 in-custody deaths, reviewed case file documentation to determine whether detention staff followed applicable policies and procedures related to the safety of and the provision of health care to incarcerated individuals.<br><br>• For the selection of 30 in-custody deaths, reviewed investigative reports from various entities and units to identify whether the Sheriff's Department reviewed the circumstances of each death. Evaluated whether it took appropriate corrective action to improve in-custody safety in response to the death. |

*continued on next page . . .*

| AUDIT OBJECTIVE | METHOD |
|---|---|
| 4   To the extent possible, evaluate available demographic information—including the race and age of the incarcerated individuals—and identify any relevant trends for all in-custody deaths from the past 15 years. Compare the in-custody death rate in San Diego County to the rates in other comparable California counties. | • Identified three comparable county sheriff's departments—the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department—considering relative size, geographical location, and other factors.<br><br>• Interviewed staff at each county's sheriff's department to understand its policies and practices as well as to identify challenges with ensuring the health and safety of incarcerated individuals.<br><br>• For comparative analysis to identify best practices, obtained and reviewed policies and procedures related to in-custody health care and detention facilities from the three comparable sheriff's departments, along with the policies at CDCR.<br><br>• For all deaths of incarcerated individuals from 2006 through 2020 at the San Diego Sheriff's Department and the three comparable county sheriff's departments, compared the number and types of deaths, and interviewed staff knowledgeable about the data.<br><br>• Obtained data from the California Department of Justice and BSCC, including race of incarcerated individuals, age of incarcerated individuals, and the frequency and cause of death. We used these data to create interactive dashboards that present this information. We present those interactive dashboards at https://www.auditor.ca.gov/reports/2021-109/supplemental.html. We did not identify any notable trends in the deaths of incarcerated individuals by age but include information about their ages in an interactive dashboard. |
| 5   Review allegations from the past 15 years that led to wrongful death suits and determine the number of settlements, the average settlement amount, and, to the extent possible, how settlement awards compare to similar settlements from other comparable counties in California. | • Obtained and reviewed documentation from San Diego County and each of the three comparable counties to identify all settlements related to deaths in detention facilities from 2006 through 2020. For all settlements, we determined the average settlement award and the type and circumstances of the death.<br><br>• Interviewed staff at the comparable counties regarding the total number of settlements in response to in-custody deaths.<br><br>• Compared the settlements in San Diego County to the three comparable counties. |
| 6   To the extent possible, determine which policies specified in settlement agreements or in grand jury recommendations have been implemented and which have not. As part of this determination, also identify whether the Sheriff's Department has suspended, revoked, or amended any such policies in a manner inconsistent with past settlement agreements or grand jury recommendations. | • Identified recommendations regarding policy changes from various entities, including the San Diego County Grand Jury, from 2006 through 2020. For key recommendations related to in-custody health and safety, we determined whether the Sheriff's Department implemented the recommendations. If it did not, we documented and evaluated its rationale.<br><br>• Reviewed current policies and determined that the Sheriff's Department has not suspended, revoked, or amended its policies in a manner inconsistent with past recommendations we reviewed.<br><br>• Determined that the county's settlement agreements generally did not include recommendations. |
| 7   Evaluate the extent to which CLERB has provided recommendations to the Sheriff's Department regarding in-custody safety and followed up to determine whether the Sheriff's Department has implemented those recommendations. | • Reviewed recommendations from CLERB to the Sheriff's Department from 2006 through 2020 and identified key recommendations related to the safety of incarcerated individuals.<br><br>• Reviewed policies and other relevant documents to determine whether the Sheriff's Department implemented key recommendations from CLERB. |

| AUDIT OBJECTIVE | METHOD |
|---|---|
| **8** Evaluate CLERB's review of in-custody death cases in 2017 and assess whether CLERB had sufficient staff and resources to perform its oversight role appropriately. | • Obtained a complete list of death cases CLERB investigated from 2006 through 2020 and compared it to the lists of deaths from the Sheriff's Department and Medical Examiner's Office. Although we found that CLERB did not investigate 57 deaths during this period, as we discuss beginning on page 46, the list of investigations it did perform was sufficient for our purposes. Using the list, we selected six cases from 2016 through 2020 for review based on factors such as the year the investigation was performed, type of death, and result of investigation. |
| | • For the six selected cases, reviewed the full investigative file to determine whether CLERB's staff followed its rules and regulations and other relevant standards when investigating the cases. |
| | • CLERB's rules and regulations require its investigations to be ethical, fair, and impartial. CLERB follows the county's Conflict of Interest Code and Incompatible Activities Rules, which require its members and certain staff members to disclose certain income, employment, economic interests, and gifts. CLERB also has its staff members review and sign the county's code of ethics. We did not identify concerns with the ethics, fairness or impartiality of the CLERB investigations we reviewed. |
| | • Interviewed staff and reviewed documentation to determine why CLERB summarily dismissed 22 death cases in 2017 and whether staff appropriately prioritized death cases. |
| | • We did not evaluate CLERB's investigators' caseloads and staffing because we found issues with the thoroughness and prioritization of its investigations. |
| | • Reviewed the county board's oversight of CLERB and whether it took action to increase oversight in response to increases in deaths of incarcerated individuals. |
| **9** Review and assess any other issues that are significant to the audit. | None identified. |

Source: Audit workpapers.

### *Assessment of Data Reliability*

The U.S. Government Accountability Office, whose standards we are statutorily obligated to follow, requires us to assess the sufficiency and appropriateness of computer-processed information we use to support our findings, conclusions, and recommendations. In performing this audit, we relied on electronic data files that we obtained from the California Department of Justice related to in-custody deaths in jails of the San Diego Sheriff's Department, the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department from 2006 through 2020. To evaluate the data, we reviewed existing information about the data, interviewed staff knowledgeable about the data, and performed testing of the data. Specifically, we compared data from the counties and the California Department of Justice to data we obtained from the Medical Examiner's Office and coroner's office in each respective county.

Although the state law requiring reporting of in-custody deaths does not require sheriff's departments to report deaths after an individual is released from jail, as we discuss on page 17, we found

that the data supporting the number of in-custody deaths from the California Department of Justice related to the San Diego Sheriff's Department and the Orange Sheriff's Department to be sufficiently reliable for our audit purposes. We found some inaccuracies in the categorization of manner of death, but the inaccuracies do not change our conclusion, and therefore the data are sufficiently reliable for our audit purposes. We performed limited testing of the Alameda Sheriff's Office's and the Riverside Sheriff's Department's data and found them to be of undetermined reliability because of how the counties record and track the information. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.

In addition, we obtained data from BSCC related to the ADPs and annual bookings of the San Diego Sheriff's Department, the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department. We used these data to identify and compare the number of in-custody deaths at each department, taking into consideration the number of individuals incarcerated in its jail facilities. We interviewed staff knowledgeable about the data and performed general testing of the data. We found the data to be of undetermined reliability because the data are self-reported from each county to BSCC. However, we found that the San Diego Sheriff's Department overreported to BSCC the bookings data for 2006 through 2010. Therefore, we obtained additional data from the Sheriff's Department to more accurately reflect bookings in our analyses. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.

Lastly, we obtained statewide data from the California Department of Justice and BSCC related to in-custody deaths and ADP for presentation on our interactive dashboards. We found the data to be of undetermined reliability because the data are self-reported by each county. The dashboard is for informative purposes only; we do not present findings, conclusions, or recommendations on it.

 **BSCC** BOARD OF STATE AND COMMUNITY CORRECTIONS 

January 14, 2022

Honorable Michael S. Tilden[*]
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, California 95814

**SUBJECT: RESPONSE – SAN DIEGO COUNTY SHERIFF'S DEPARTMENT AUDIT REPORT 2021-109**

Dear Mr. Tilden,

The Board of State and Community Corrections is required to establish minimum standards for local detention facilities. (Pen. Code, § 6030.) Providing for safe and constitutional facilities is central to the Board's regulations, which are continuously examined and revised on a biennial basis. The Audit of the San Diego County Sheriff's Department (Report 2021-109) focuses on deaths in custody, which is a topic of utmost concern that merits serious attention. Having not been given an opportunity to review the findings in San Diego as part of this response, we are unable to comment on whether the deaths in custody in San Diego County were caused by the county adhering to BSCC regulations that were deficient or whether other operational or personnel issues may have contributed to the audit findings. The Board will undertake a review once the unredacted findings are available to determine to what extent the Board's existing regulations merit revision. However, we disagree with the Auditor's conclusions that the Board's existing training standards are inadequate and that the BSCC's regulations for the operation of adult local detention facilities that are proposed to be revised are insufficient for maintaining the safety of people who are incarcerated.

<u>**Mental Health Screenings**</u>    ①

The Auditor states the Board's standards are insufficient to maintaining the safety incarcerated individuals, specifically citing that the regulations "do not explicitly require that mental health professionals perform mental health screenings." We assume the Auditor is referring to "intake screenings," where Section 1207 of Title 15 of the California Code of Regulations provides:

> With the exception of inmates transferred directly within a custody system with documented receiving screening, a screening shall be completed on all inmates at the time of intake. This screening shall be completed in accordance with written procedures and shall include but not be limited to medical and mental

[*] California State Auditor's comments begin on page 71.

Tilden, Michael
Page 2

health problems, developmental disabilities, tuberculosis and other communicable diseases. The screening shall be performed by licensed health personnel or trained facility staff, with documentation of staff training regarding site specific forms with appropriate disposition based on responses to questions and observations made at the time of screening. The training depends on the role staff are expected to play in the receiving screening process.

This regulation is aligned with National Commission on Correctional Health Care (NCCHC) J-E-02 which allows for "receiving screening to be conducted by health-trained correctional staff members when health staff are not on duty." NCCHC standards are nationally recognized as best practice.

In addition, Sections 1206 and 1209 of Title 15 of the California Code of Regulations detail requirements of additional mental health screenings that may occur after the initial screening at intake.  These requirements do require licensed medical and mental health care professionals to conduct mental health screening and require facilities to provide care for persons with mental health needs.

The Auditor appears to recognize that it may be impractical or impossible for all local detention facilities to have mental health professionals on staff 24/7 for intake, so the report recommends that facilities with average daily populations of 1,000 be required to have these requirements because counties with smaller incarcerated populations have "less risk."  While larger counties may be able to provide a higher level of service than other counties, establishing lesser standards for smaller counties is problematic and would create additional inequities within county criminal justice systems.

② **Safety Checks**

The Auditor argues that the current safety check regulation (and proposed revisions) are insufficient to protect the safety and welfare of inmates.  The Auditor points to the fact that some counties' policies are more detailed than the Board's regulations.  In addition, the Auditor notes the California Department of Corrections and Rehabilitation (CDCR) requires its staff to count "living, breathing" individuals.  The fact that some counties may elect to explicitly detail what goes into a safety check in its policies does not mean the Board's minimum standards do not provide for adequate safety. The Board's regulations are designed to give counties flexibility to address their needs while adhering to constitutional standards.  In addition, it is important to note that the requirements for counting individuals in the CDCR Department of Operations Manual (§§ 52020.5.5 and 52020.5) are not "safety checks."  They are merely instructions on staff to ensure a proper population count.

Section 1027.5 of Title 15 of the California Code of Regulations requires a written plan at each facility that includes documentation of safety checks. Title 15 section 1006,

Tilden, Michael
Page 3

Definitions, provides detail for how safety checks must be conducted and defines both direct visual observation and safety checks:

> "Direct visual observation" means direct personal view of the inmate in the context of his/her surroundings without the aid of audio/video equipment. Audio/video monitoring may supplement but not substitute for direct visual observation.

> "Safety checks" means direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of inmates.

As part of the most recent regulation revisions adopted at the most recent BSCC board meeting, the Board revised section 1027.5 to require enhancements to safety checks, which, once approved by the Office of Administrative Law, will read, as follows:

> § 1027.5 Safety Checks.
>     The facility administrator shall develop and implement policy and procedures for conducting safety checks that include but are not limited to the following:
> Safety checks will determine the safety and well-being of individuals and shall be conducted at least hourly through direct visual observation of all people held and housed in the facility.
> (a) There shall be no more than a 60- minute lapse between safety checks.
> (b) Safety checks for people in sobering cells, safety cells, and restraints shall occur more frequently as outlined in the relevant regulations.
> (c) Safety checks shall occur at random or varied intervals.
> (d) There shall be a written plan that includes the documentation of all safety checks. Documentation shall include:
>     (1) the actual time at which each individual safety check occurred;
>     (2) the location where each individual safety check occurred, such as a cell, module, or dormitory number; and,
>     (3) Initials or employee identification number of staff who completed the safety check(s).
> (e) A documented process by which safety checks are reviewed at regular defined intervals by a supervisor or facility manager, including methods of mitigating patterns of inconsistent documentation, or untimely completion of, safety checks.

In this revision, the regulation will explicitly require that safety checks "determine the safety and well-being of individuals." The BSCC revised regulation exceeds many other states' safety check regulations, and is aligned with best practices for safety checks.

Tilden, Michael
Page 4

In short, safety checks allow for potential interventions when people are in distress, but it is also important to balance the needs of people who are incarcerated from overly intrusive and unnecessary checks. Counties have been subject to litigation over allegations of failing to conduct adequate safety checks and also for unnecessarily interrupting sleep as part of rigorous safety check programs. The Board's regulation and proposed revision strikes the appropriate balance in providing for the safety of people who are incarcerated and meeting county operational needs.

③ **Training Standards**

The Auditor states that the BSCC's training standards are insufficient for maintaining the safety of incarcerated individuals. The Auditor solely relies on the total increase in the number of deaths in county jails from 2006 to 2020 to conclude training is insufficient. Based on the information provided in the redacted report, the BSCC is unable to determine whether a lack of specific training caused any of the deaths examined in San Diego and to what extent additional training requirements would have been beneficial or prevented these situations. Instead, the report states that "weaknesses in statewide corrections standards likely contributed to the problems we identified with (redacted) policies" without any specific detail. Without a clear nexus between a deficiency in the training standards and a bad outcome such as a preventable death, it is incorrect to assume that higher standards will better ensure the health and safety of incarcerated individuals.

The Auditor states that the Board's continuing education requirements across job classifications (adult correctional officer, juvenile correctional officer, and probation officer) are inconsistent and recommends that the adult correctional officer should receive 40 hours of annual training on par with probation officers. In addition, the Auditor recommends that agencies with average daily populations of 1,000 or more should require 4 hours of mental health training annually.

The characterization of the continuing education requirements as inconsistent is incorrect. BSCC sets standards for adult corrections officers, juvenile corrections officers, and probations officers and their managers and supervisors. Those jobs are not interchangeable nor are their training requirements. The "inconsistencies" noted in the report are deliberate decisions based on the differences in positions. Requiring the same number of hours across all classifications is arbitrary and not based on job-specific requirements. Furthermore, the number of required hours for the adult corrections officer is on trend nationally and exceeds the number of continuing education hours required by the California Commission on Peace Officer Standards and Training for other peace officer positions.

The report recommends that continuing education include a minimum of 40 hours training annually and at least four hours of mental health training for adult corrections officers for agencies with an ADP of 1,000. First, it should be noted that the BSCC standards already require 21 hours of Behavioral Health training for every officer upon

Tilden, Michael
Page 5

hire.  It includes training in suicide prevention, stigma and bias, trauma, emotional survival, interventions and resources, and recognizing signs and symptoms of mental illness and trauma.

Second, we question the premise that more hours of annual training, regardless of the topic or need, will always yield better results.  Continuing education hours are deliberately left to the discretion of the agency so that they can identify the specific training needs of an employee, including performance management, and to support organizational priorities or training gaps. Training is not a static need and it should remain flexible to ensure critical gaps are addressed.  Training is a critical tool that can improve employee performance and organizational success.  However, it is only effective when used appropriately.  Problems must be assessed to determine if training can be an effective part of the solution.  Culture, ineffective policies, and employees deliberately acting outside of policy are some examples of when training is not an appropriate solution.   The portions of the audit we were able to review do not provide an assessment that shows that what was at issue in San Diego was a training failure that will improve by mandating four hours of mental health training each year for all adult corrections officers.

Finally, as with the recommendation to have lesser screening standards for smaller counties, we also disagree with setting lesser training standards for correctional officers in smaller counties.

To be sure, the BSCC continually evaluates the need for entry-level training and annual training.  We will take the recommendation under advisement when evaluating the next revision of our training standards to determine whether adding annual mental health training would be beneficial.

In closing, the BSCC appreciates the Auditor's review of its standards and recommendations.  At the time of responding to the draft audit, the Board itself has not had the opportunity to meet and discuss.  We will discuss the final report with the Board upon release and whether amendments to the BSCC regulations are warranted.

Sincerely,

KATHLEEN T. HOWARD
Executive Director

Blank page inserted for reproduction purposes only.

# Comments

### CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE BOARD OF STATE AND COMMUNITY CORRECTIONS

To provide clarity and perspective, we are commenting on the BSCC's response to our audit. The numbers below correspond to the numbers we have placed in the margin of its response. Rather than comment on all of the individual areas of its response that we believe are deficient or misleading, we have summarized our comments according to the respective sections in its response.

We stand by our recommendation that the Legislature should amend state law to require sheriff's departments with larger jail populations to have mental health professionals perform mental health evaluations at intake. We based this recommendation on the problems identified in our review of the San Diego Sheriff's Department and the variation of policies among the three comparable counties. As we state on page 20, in some of the cases we reviewed, the Sheriff's Department did not promptly and properly identify individuals' mental health needs because mental health professionals generally do not participate in its intake health screenings. In contrast, we noted that one county has adopted more robust intake screening practices, as we state on page 20. For example, Riverside Sheriff's Department policy requires that a mental health clinician evaluate every individual before being housed, which could help to more effectively identify mental health needs early.

①

Further, BSCC infers our recommendation is to establish lesser standards of mental health staffing for smaller counties. On the contrary, we did not propose any changes to these standards for smaller counties, but instead recommend that BSCC should raise the standard for the larger counties, as we describe on page 32.

BSCC suggests that counties electing to have more robust safety checks policies does not mean that its minimum standards are inadequate. We disagree. As we state on page 30, BSCC's standards do not describe the actions that constitute an adequate safety check. Instead, the standards simply state that safety checks must be conducted at least hourly through direct visual observation of all inmates and that observation through a video camera alone is not sufficient. Consequently, we found the four counties we reviewed based their policies on different interpretations of this standard. Further, as we state on page 25, based on our review of video of San Diego Sheriff's Department, we observed multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked

②

through the housing module. Staff later discovered individuals unresponsive in their cells, some with signs of having died several hours earlier.

Further, as we state on page 25, we concluded that sworn staff conducted safety checks inadequately in part because of weaknesses in the San Diego Sheriff's Department's policy. In particular, its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.

Moreover, BSCC asserts that our report references a CDCR policy that merely serves as instructions for a proper population count. However, CDCR's policy is a requirement for an hourly check that is equivalent to what BSCC refers to as a safety check. We revised the report text on page 30 to be more explicit that the CDCR policy is for an hourly check of incarcerated individuals.

Finally, BSCC states that its proposed regulations exceed the standards in other states and are aligned with best practices. However, it falls short of the State's best practice. For example, as we state on page 30, CDCR requires its staff during its hourly checks to count a living, breathing individual whom they see in person. BSCC's proposed regulations are insufficient because, as we state on page 30, it fails to specify that a safety check must include verifying that an individual is alive, which is essential to ensuring the safety of incarcerated individuals across the State.

③    Our recommendation to increase the required number of continuing education hours for local correctional officers is based on concerns observed in our review of how San Diego Sheriff's Department sworn staff responded to medical, mental health, and safety needs. Further, as we state on page 29, given the increase in the annual number of in-custody deaths across the State from 130 in 2006 to 156 in 2020, improving statewide standards related to health and safety and training requirements is essential to ensuring the health and safety of incarcerated individuals.

BSCC's statement that its standards require 21 hours of behavioral health training is misleading because this training pertains only to initial hires. The point of continuing education is to provide local correctional officers with ongoing training to expand their

foundation of knowledge to promote health and safety within the jails and to stay up-to-date on new information that would help in that effort.

We stand by our conclusion that the continuing education requirements are inconsistent. As we state on page 31, BSCC's required training hours for sworn staff working in local detention facilities do not align with their standards for similar positions. Requiring fewer hours for adult corrections personnel does not make sense when thousands of individuals are incarcerated in these facilities and the number of individuals who have died has increased over the past 15 years. Further, BSCC does not require that any of the annual training cover topics pertaining to mental health, even though best practices suggest staff should receive at least four hours of mental health training annually. Increasing the number of training hours to align with similar professions, including mandating mental health training hours, could allow sheriff's departments to better protect and keep incarcerated individuals safe.

Similar to our recommendation for having mental health professionals perform mental health assessments at intake, BSCC should increase the required continuing education hours for counties that house the majority of individuals in the county jail systems. Moreover, contrary to BSCC's assertion, we did not propose any changes to these standards for smaller counties but instead recommend that it should raise the standard for the larger counties, as we describe on page 32.

Blank page inserted for reproduction purposes only.



**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III

# County of San Diego
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD
555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776     FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

January 14, 2022

Michael S. Tilden, CPA*
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

RE:     Response to California State Auditor's Draft Report 2021-109: San Diego County Sheriff's Department

Dear Mr. Tilden:

The Citizens' Law Enforcement Review Board (CLERB) welcomes the opportunity and has authorized me to respond to the California State Auditor's (CSA) draft report, titled, "San Diego County Sheriff's Department," in which analyses and recommendations about CLERB were documented.

CLERB's responses to your specific recommendations, of which the CSA proposes completion by May 2022, are set forth below:

- **Recommendation One: Discuss and modify its current agreement with the Sheriff's Department and the labor organization to allow CLERB's investigators to conduct independent interviews of Sheriff's Department sworn staff.**

  Agree. In the last quarter of 2021, the current CLERB Executive Officer (EO), the Deputy Sheriff's Association (DSA) President, DSA Counsel, and CLERB Outside Counsel met to discuss the agreement for the purpose of conducting in-person interviews with Sheriff's Department sworn staff. Additional discussions are forthcoming.

- **Recommendation Two: Develop a comprehensive training manual for its investigators that outlines standard procedures for investigations. The manual should include a specific section dedicated to investigations of in-custody deaths, including guidance for evaluating the circumstances leading up to an in-custody death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment.**

  Agree. While it is true that there does not exist a physical stand-alone comprehensive training manual, new CLERB Special Investigators are currently provided with copies of CLERB's internal documented policies and procedures (P&P), database user guide, investigative report templates, and a comprehensive resource manual containing the following materials: ①
    o County structure
    o CLERB historical perspective
    o County Charter, Section 606
    o County Administrative Code, Section 340
    o CLERB Rules and Regulations
    o Civil Service Commission Rule XV
    o Case Law Including and impacting CLERB

*"SERVING THE COMMUNITY AND THE JUSTICE SYSTEM"*

_____
* California State Auditor's comments begin on page 79.

Ex. B - 94

- o  Public Safety Officer Procedural Bill of Rights (POBOR)
- o  Statutes Pertaining to Peace Officer Records
- o  San Diego County Grand Jury Reports Pertaining to CLERB
- o  Ralph M. Brown Act
- o  San Diego County Operational Plan Pertaining to CLERB

The P&P, user guide, report templates, and topics contained within the resource manual are thoroughly discussed and reviewed with the trainee during his/her training program. These materials will be incorporated into the referenced stand-alone training manual, which will also include evaluations of a trainee's performance and documentation as to his/her progress, or lack thereof.

① The comprehensive training manual will also include a specific section dedicated to investigations of in-custody deaths. Despite the current absence of the stand-alone training manual, trainees are specifically instructed, during their training programs, to evaluate the circumstances leading up to an in-custody death, and to include a review of the decedent's mental health history and the appropriateness of the decedent's housing assignment. In addition to these critical topics, trainees are also instructed to evaluate the timeliness and thoroughness of welfare checks conducted on the decedent by deputies and assess whether deputies appropriately determined that a life-threatening emergency existed and responded accordingly.

- **Recommendation Three: Create policies and procedures to require its investigators to finish casework on in-custody death investigations within three months of receiving the homicide investigation file. These policies and procedures should also require investigators to attempt to independently verify any information they receive from the Sheriff's Department; to thoroughly review deputy statements and reports from the homicide investigation file; and to request interviews with relevant detentions staff and other witnesses in all instances where they identify discrepancies or missing information.**

② Agree. The current CLERB EO directed that the completion of in-custody death investigations within three months of receiving the homicide investigation file would take effect when CLERB filled its third and final CLERB Special Investigator vacancy. As that vacancy was filled on January 10, 2022, this mandate will now be incorporated into existing CLERB Policy #300.5, entitled, "Death Investigations." The independent verification of information received from the Sheriff's Department and the already existing practices of thoroughly reviewing deputy statements and reports from the homicide file and requesting interviews from witnesses, when contact information is known and time constraints do not exist, will be codified into P&P.

- **Recommendation Four: CLERB should revise its rules and regulations to include prioritization criteria for investigating in-custody deaths above all other investigations.**

③ Agree. The Policy Statement in CLERB Policy #300.5, entitled, "Death Investigations," issued by the current EO on August 27, 2021, indicates that it is the policy of CLERB "that death cases will take priority over any other CLERB case." During the current EO's previous tenure as EO from June 2017 to September 2018, he implemented this practice, and all death cases were made the highest priority. During his absence from September 2018 to November 2020, for unknown reasons, death cases were not handled as the highest priority. To ensure that the investigation of death cases remains the highest priority after any future executive management changes, a five-tiered case categorization system should be documented in the Rules and Regulations, with "Category I" being the highest priority and "Category V" being the lowest priority. Death investigations should be classified as "Category I."

- **Recommendation Five: CLERB should revise its rules and regulations to include clarification that its investigations of in-custody deaths includes those classified as natural deaths.**

Agree. During the current EO's previous tenure as EO from June 2017 to September 2018, he implemented the practice of invoking CLERB's jurisdiction on every in-custody-related death, to include

*"SERVING THE COMMUNITY AND THE JUSTICE SYSTEM"*

those that the Medical Examiner's Office determined to be due to natural causes. To ensure that the investigation of all in-custody-related deaths continue after any future executive management changes, CLERB's Rules and Regulations should not only be revised to clarify that in-custody natural deaths are within CLERB's jurisdiction, but that all deaths occurring in the custody of the Sheriff's Department or related to instances or occurrences within the Sheriff's Department detention facilities are within CLERB's jurisdiction. As these proposed Rules and Regulations changes may first require the amendment of the County Charter and/or the County Administrative Code, the CLERB EO will need to work with CLERB's legal counsel to pursue implementation of this recommendation.

- **Recommendation Six: CLERB should perform an analysis of overall trends related to these deaths, including demographic information, and determine whether the trends suggest deficiencies in the Sheriff's Department's policies and procedures. It should also identify policy recommendations for improving the safety of individuals in the Sheriff's Department's custody. CLERB should include these trends and analysis in its annual reports starting with its 2021 report.**

  Agree. The current EO has prioritized in-custody death investigations and the analysis of overall trends related to the deaths, to include demographic information. Upon his return to CLERB in late 2019, he authored CLERB's 2020 Annual Report and provided a detailed breakdown of the 18 death cases CLERB opened in 2019 and the 15 death cases CLERB opened in 2020 (this breakdown is documented on pages 10 and 11 of the Annual Report). In addition, he provided a list of all death cases opened by CLERB in 2019 and 2020 and closed by CLERB in 2019 and 2020. The list included the decedent's name, type of death, detention facility/patrol area, and cause of death (this list is documented on pages 28 thru 33 of the Annual Report). After the finalization of the 2020 Annual Report and its presentation to the Board of Supervisors, the current EO committed to expanding the reporting to include an analysis of overall trends related to deaths, including demographic information, in the 2021 Annual Report.

  CLERB has averaged 10 policy recommendations per calendar year over the past three years. The majority of the recommendations pertained to the Sheriff's Department's detention facilities. Finally, it should be noted that CLERB will, for the first time in its 30-plus year history, conduct detention facility inspections in 2022. The scope of the inspections will be specifically tailored to each detention facility based upon the complaints received from its inmates, great bodily injuries received from deputies' uses of force, and deaths occurring at or stemming from incarceration within it.    ④

We look forward to updating the CSA on progress made within six months. Our commitment to continuing the proactivity started at the end of 2020 to improve upon the invaluable civilian oversight role we provide to the public, the Sheriff's Department, and the County is unwavering. The implementation of the CSA recommendations will assist with CLERB's provision of independent, timely, full, and thorough investigations into in-custody deaths which may, in turn, prevent future deaths.

Thank you for the opportunity to provide this response and for the professionalism and courtesy shown by your staff throughout this process.

Sincerely,

Paul R. Parker III
Executive Officer, CLERB

cc:    CLERB Members
       Shiri Hoffman and Aurelia Razo, Senior Deputies County Counsel
       James Sandler; Sandler, Lasry, Laube, Byer & Valdez LLP

*"SERVING THE COMMUNITY AND THE JUSTICE SYSTEM"*

**78** California State Auditor Report 2021-109
**February 2022**

Blank page inserted for reproduction purposes only.

# Comments

### CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE CITIZENS' LAW ENFORCEMENT REVIEW BOARD

To provide clarity and perspective, we are commenting on CLERB's response to our audit. The numbers below correspond to the numbers we have placed in the margin of its response.

① Although CLERB states that it provides various materials and training to its staff, we found some cases in which CLERB's investigators did not appear to consider all the circumstances leading up to the deaths, did not examine all the relevant Sheriff's Department policies, and did not follow up on discrepancies they discovered in the course of their investigations, as we discuss on page 49. Accordingly, our recommendation is for CLERB to develop a comprehensive training manual to ensure that its investigations are complete and thorough.

② Contrary to its response, we found that CLERB did not always independently verify information from the Sheriff's Department. As we note in the example on page 49, when investigating an altercation between two cellmates resulted in the death of one of the individuals, we found the CLERB investigator did not appear to scrutinize or independently verify evidence that could have sufficiently determined whether the Sheriff's Department's actions violated policies or procedures. Further, we question CLERB's statement that it thoroughly verifies deputies' statements. As we state on page 43, CLERB did not independently interview staff from the Sheriff's Department in any of the six cases we reviewed.

③ As we state on page 48, although CLERB recently added policies and procedures establishing its prioritization of death cases over all other cases, it did not do so until August 2021. Moreover, because policies can easily be changed when leadership changes, it is important that CLERB include requirements in its rules and regulations for how it prioritizes cases.

④ CLERB's statement that it has averaged 10 policy recommendations per calendar year is primarily referring to the recommendations it makes based on individual cases. As we state on page 51, CLERB generally makes recommendations based on individual cases rather than on trends it identifies through analysis of its investigations. Making recommendations based on trends could help resolve more systemic concerns at the Sheriff's Department.

Blank page inserted for reproduction purposes only.



**Rob Bonta**
**Attorney General**

**State of California**
**DEPARTMENT OF JUSTICE**

1300 I STREET
SACRAMENTO, CA  95815-4524
Public: (916) 210-5000
Fax (916) 227-3079
Email:  Joe.Dominic@doj.ca.gov

January 14, 2022

Michael S. Tilden, CPA
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

Re:    Draft Audit Report - California State Auditor Report 2021-109; San Diego County
Sheriff's Department –Inmate Custody Death

Dear Mr. Tilden,

The Department of Justice (DOJ) appreciates the opportunity to review the above-mentioned
draft audit report.

*The audit recommends that to ensure that all sheriff's departments accurately report deaths that
occur from incidents or conditions in county jails, the Legislature should amend state law to
require sheriff's departments to report to the attorney general individuals who are released from
custody after being transported directly to a hospital or similar medical facility, and
subsequently dies in the facility. It should also amend state law to require sheriff's departments
to provide the attorney general with all facts concerning the death, such as the cause and
manner."*

DOJ supports increased transparency of data reporting. As the audit notes, there is currently no
statutory requirement in place to require sheriff's departments to report individuals released from
custody after being transported directly to a medical facility who subsequently dies in the
facility.  Express authority from the Legislature and funding is needed to implement this new
data reporting recommendation.  Furthermore, should the Legislature implement the
recommendation requiring sheriff's department disclose the cause and manner of the death, DOJ
will work with the Legislature to ensure that any policies comply with all applicable
confidentiality laws.

If you have any questions or concerns regarding this matter, you may contact me at the
telephone number listed above.

Sincerely,

2022.01.14 16:46:08
-08'00'

Joe Dominic, Chief
California Justice Information Services Division

January 14, 2022
California State Auditor Report 2021-109
Page 2


               For    ROB BONTA
                       Attorney General


cc:  Venus D. Johnson, Chief Deputy Attorney General
     Chris Prasad, CPA, Director, Office of Program Oversight and Accountability



## San Diego County Sheriff's Department

Post Office Box 939062  •  San Diego, California 92193-9062

### William D. Gore, Sheriff



January 14, 2022

Ms. Elaine M. Howle*
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, California 95814

State Auditor Howle:

Attached please find the response from the San Diego County Sheriff's Department in reference to your draft audit report on the San Diego County jails.

Sincerely,

William W Gore

William D. Gore, Sheriff

*Keeping the Peace Since 1850*

---
\* California State Auditor's comments begin on page 115.

**Preliminary Comment**

① **THE CALIFORNIA STATE AUDITOR DID NOT PROVIDE SUFFICIENT OPPORTUNITY FOR THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT TO REVIEW AND RESPOND TO THE AUDIT**

② ▓▓▓▓▓▓▓▓▓▓▓ the San Diego Sheriff's Department received a draft copy of the State Auditor's Report 2021-109 ▓▓▓▓▓▓▓▓▓ for the stated purpose of allowing the Department to review and respond to the audit.  The Sheriff's Department was afforded less than five (5) days to review and respond to the draft report, as the audit was received late in the morning on Monday and the response was due back by 5:00 p.m. on Friday.

③ The 2018 revision of *Government Auditing Standards*, commonly referred to as generally accepted government auditing standards (GAGAS), is effective for performance audits beginning on or after July 1, 2019, such as the instant engagement.  GAGAS section 9.50 provides that "Auditors should obtain and report the views of responsible officials of the audited entity concerning the findings, conclusions, and recommendations in the audit report, as well as any planned corrective actions."  The highly redacted version of the draft report, coupled with the short time afforded for review and response, and the lack of supporting documentation, makes it difficult for the Sheriff's Department, as the audited entity, to submit a meaningful, comprehensive response to the draft report.

① Accordingly, the Sheriff's Department reserves the right to submit a more comprehensive response after the final report and any supporting documentation and information are published, as none of the supporting documentation and information was included with the draft report transmission.

## Introduction

The gravity and seriousness of in-custody deaths and the importance of identifying and improving deficiencies when they occur is not lost on the San Diego Sheriff's Department. We have been transparent in our response to the Joint Legislative Audit Committee's recommendation that the California State Auditor review in-custody deaths in San Diego County. During the audit, we cooperated fully and provided complete access to our records, facilities, and personnel.

The Sheriff's Department was pleased to see that the auditors' findings confirm that the Department's policies and procedures align with the minimum standards established through state law and other applicable guidance. That said, while the Sheriff's Department appreciates the work and recommendations of the auditors, the Department maintains concerns regarding the findings, as well as the conclusions and recommendations contained in the draft report and the way the audit was conducted. ④ ⑤

## I.    THE AUDIT FAILED TO CONFORM WITH GENERALLY ACCEPTED GOVERNMENT AUDITING STANDARDS ⑥

California Government Code section 8546.1(c) requires that the State Auditor "complete any audit in a timely manner and pursuant to the 'Government Auditing Standards' published by the Comptroller General of the United States." While the State Auditor recognizes that the instant engagement is undertaken pursuant to GAGAS, it failed to conform to the requisite standards.

### A.    The auditors failed to comply with reporting standards for performance audits ⑥

GAGAS section 9.03 provides, "[w]hen auditors comply with all applicable GAGAS requirements, they should use the following language, which represents an unmodified GAGAS compliance statement, in the audit report to indicate that they conducted the audit in accordance with GAGAS:

> We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

The section 9.03 compliance statement is notably absent from the draft report.

In the event auditors do not comply with all applicable GAGAS requirements, section 9.05 provides, "they should include a modified GAGAS compliance statement in the audit report. For performance audits, auditors should use a statement that includes either (1) the language in paragraph 9.03, modified to indicate the requirements that were not followed, or (2) language indicating that the auditors did not follow GAGAS."

Similarly, a section 9.05 alternate compliance statement is also absent from the draft report.

⑥
**B. The auditors have declined to adopt the GAGAS report quality elements of accurate, objective, complete, convincing, and timely in developing and writing the audit report**

Chapter 9 of the GAGAS addresses the reporting standards for performance audits such as the instant engagement. GAGAS section 9.17 provides that "[t]he auditor may use the report quality elements of accurate, objective, complete, convincing, clear, concise, and timely when developing and writing the audit report as the subject permits." For purposes of the instant engagement, the auditors failed to adopt the report quality elements of accurate, objective, complete, convincing and timely in developing and writing the audit report.

⑦
**a. Accuracy**

Section 9.17(a) regarding report quality element "Accurate" states, in pertinent part, "[a]n accurate report is supported by sufficient, appropriate evidence with key facts, figures, and findings being traceable to the audit evidence. Reports that are fact-based, with a clear statement of sources, methods, and assumptions so that report users can judge how much weight to give the evidence reported, assist in achieving accuracy."

Consistent with this standard, the Auditor makes recommendations to the legislature for policy revisions "to better align with best practices, as follows." There is no data or evidence cited to support the best practices recommendations. Data and evidence-based approaches to medical, mental health and correctional care policies are necessary to ensure the best health and safety outcomes for incarcerated individuals. In other sections, the auditor states "[r]eports and studies related to mental health indicate that…" There is no reference to which studies and reports are being relied upon for the assertions.

The audit states, "that deficiencies in the Sheriff's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies *likely contributed to these deaths*," the report is devoid of any evidence that the deaths were cause by a failure of the department's policies or practices.

While no death is acceptable, the Sheriff recognizes that some incarcerated individuals have pre-existing conditions, age or other maladies which lead to natural death.  These deaths made up nearly half of all the deaths that occurred during the 15-year audit period.  The report does not explain if a failure on the part of the department caused the death or if those individuals could have died in the community from the same pre-existing condition.

The Sheriff's Department has implemented extensive programs, training, and policies to prevent suicide in the jails. The jails disproportionately house individuals suffering from mental illness, and substance use disorder. The identification of individuals who wish to do themselves harm is one key to prevention and removing the ability to commit self-harm is the second. Individuals bent on harming themselves creates obstacles to identification and prevention. Similarly, substance use disorder is an enormous driver for behavior.  It could be argued that in-custody individuals are even more driven to use substances to alleviate the strain and monotony of incarceration.  The Sheriff's Department has created extensive layers and policies to interdict and prevent contraband from being smuggled into the jail system. We have instituted the use of naloxone to save lives when someone is successful in circumventing those interdiction efforts.  While the Sheriff's Department can always do better, the audit does little to document or provide context for those efforts and the complexity of keeping individuals safe from themselves.

### b.  Objectivity

⑥

Section 9.17(b) regarding report quality element "Objective" states, in pertinent part, "[o]bjective means that the presentation of the report is balanced in content and tone. A report's credibility is significantly enhanced when it presents evidence in an unbiased manner and in the proper context. This means presenting the audit results impartially and fairly. The tone of reports may encourage decision makers to act on the auditors' findings and recommendations. This balanced tone can be achieved when reports present sufficient, appropriate evidence to support conclusions **while refraining from using adjectives or adverbs that characterize evidence in a way that implies criticism or unsupported conclusions**." (Emphasis added).

Despite the fact that section 9.17(b) specifically counsels against using such adjectives and adverbs, the draft report is replete with such unsupported criticism (e.g. "*likely* contributed to the deaths," "*inadequate* response to deaths," "*might* have placed this individual," "lack of *effective* independent oversight," "*meaningful* changes," "*meaningful* corrective action," "few *substantive* steps," "have not consistently led to *significant* corrective action," "failure to *adequately* prevent the deaths," "*could* help," and "*could* be useful").  Use of such terms, in contravention of the GAGAS guidance, calls into question and undercuts the objectivity of the engagement and the resulting instant report.

Section 9.17(b) goes on to provide, "[a]udit reports are more objective when they demonstrate that the work has been performed by professional, unbiased, independent, and **knowledgeable** personnel." (Emphasis added). As discussed more fully below, the auditors lack the requisite knowledge, skills and abilities necessary to competently conduct the instant engagement.

⑥        c. **Completeness**

Section 9.17(c) regarding the report quality element "Complete" states, in pertinent part, "complete means that the report contains sufficient, appropriate evidence needed to satisfy the audit objectives and promote an understanding of the matters reported. **It also means the report states evidence** and findings **without omission of significant relevant information** related to the audit objectives. Providing report users with an understanding means providing perspective on the extent and significance of reported findings, such as the frequency of occurrence relative to the number of cases or transactions tested and the relationship of the findings to the entity's operations." (Emphasis added).

⑧ The auditors' summary of the event outlined in Case Example 4 illustrates the omission of significant relevant information in an effort to paint a picture that deputies stood idly by while CPR was medically indicated for the incarcerated individual. Based on our review of Case Example 4, we believe the auditors are referring to Sheriff's case number █████████

② 

⑧ 

The auditors' description of the event depicted in the chart above misleads the reader, is an example of the lack of completeness and objectivity that is present in the draft report and fails to meet the report quality elements outlined in GAGAS sections 9.17(b) and 9.17(c).

### d. Convincing

⑥

Section 9.17(d) regarding report quality element "Convincing" states, in pertinent part, "convincing means that the audit results are responsive to the audit objectives, that the findings are presented persuasively, and that the conclusions and recommendations flow logically from the facts presented. **The validity of the findings, the reasonableness of the conclusions, and the benefit of implementing the recommendations are more convincing when supported by sufficient, appropriate evidence.**"

While the draft report speaks to best practices, the draft contains no such policies, best practices, or sample language, nor the jurisdiction(s) where such best practices were or are being implemented.  As discussed in Section C. below, while good intentioned, best practices suggested by auditors without the requisite knowledge, skills, and abilities, may violate the constitutional rights of incarcerated individuals, cause harm to the mental health of incarcerated individuals and ultimately result in increased liability to the County.  By not including copies of the best practices referenced throughout the draft report, it is difficult for the Sheriff's Department to ascertain whether the suggested best practices comport with state law, Title 15 regulations and the constitutional rights guaranteed to incarcerated individuals.

The draft report does contain one table (Table 2) with excerpts of safety check policies, however, while excerpts from the BSCC policy and the Sheriff's Department policy are unredacted, the policies and names of the three other entities are redacted in their entirety.

③

②



90  California State Auditor Report 2021-109
February 2022

③

      **i. The Auditor Improperly Redacted Public Documents and Refused to Provide the Documents to the Sheriff's Department Necessary for the Department to Provide a Meaningful Response**

②



For purposes of an engagement under GAGAS, the terms "auditee" and "audited entity" are interchangeable.  GAGAS section 1.27(e) defines an "audited entity" as "[t]he entity that is subject to a GAGAS engagement, whether that engagement is a financial audit, attestation engagement, review of financial statements, or performance audit."

The Joint Legislative Audit Committee (JLAC) charged the auditor with conducting an audit of the San Diego Sheriff's Department and the County of San Diego Citizens Law Enforcement Review Board (CLERB).  The auditor confirmed the scope of its engagement in the document entitled 2021-109 Audit Scope and Objectives, identifying the audited entities as the San Diego County Sheriff's Department and the CLERB.  No other agencies were identified as audited entities (or auditees).

⑨

Based upon the GAGAS standards, and the JLAC referral, Alameda, Orange County, and Riverside are not auditees.  However, even if they were, the information relied upon should have been given to the Sheriff's Department, as the auditee, to respond to the draft report, because it is public information.

California State Auditor Report 2021-109
February 2022

91

The Sheriff's Department must meet Title 15 standards for its detention facilities, as do other local detention facilities throughout the State of California. For the redacted policy excerpts to be relevant to the auditors' engagement, the redacted excerpts are presumably from other law enforcement agencies in the state.

Policies of a California law enforcement agency are public record. Senate Bill 978 (SB 978) added section 13650 to the Government Code, which requires "...each local law enforcement agency shall conspicuously post on their Internet Web sites all current standards, policies, practices, operating procedures, and education and training materials that would otherwise be available to the public if a request was made pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code)." As such, each California law enforcement agency is required to publicly post, on its website, all its policies and procedures, such as its detention facilities safety check policy.

It is well settled that a governmental agency cannot shield records that are subject to public disclosure simply by putting those publicly available records in a file it stamps "confidential." Therefore, the auditor should have provided the policies which it relied on in creating its report.    ⑩

Similarly, it was improper for the auditor to redact and withhold from disclosure settlement information it obtained, admittedly, from publicly available court documents regarding the three selected counties it designated as comparable counties.    ⑩

    ②



     **e.  Timeliness**

Section 9.17(g) regarding report quality element "Timely" states, in pertinent part, "[t]o be of maximum use, providing relevant evidence in time to respond to officials of the audited entity, legislative officials, and other users' legitimate needs is the auditors' goal. Likewise, **the evidence provided in the report is more helpful if it is current.**"

⑪ While it is certainly helpful from a historical perspective to discuss changes in policies or procedures, it is unclear whether the auditors' findings and conclusions are based on the policies and procedures as they existed at the time of the incident under review or present-day policies and procedures. For example, the draft report states, "...although the Sheriff's Department's policy indicates that a nurse should conduct a face-to-face appraisal with an incarcerated individual within 24 hours of a mental health care request to determine the urgency of that request, it has not always had this policy." The Sheriff's Department believes this change in policy was a positive step, but it is unclear whether the auditors' findings and recommendations are based on current policies and procedures, or policies and procedures that were in place at the time of the incident under review.

⑥ **C. The Auditors' Lack of Requisite Knowledge, Skills and Abilities Necessary to Conduct the Instant Engagement Raise Ethical and Competence Issues under the Generally Accepted Government Auditing Standards**

Chapter 3 of the GAGAS sets forth fundamental ethical principles for auditors in the government environment.

Section 3.04 relating to ethical principles provides that "[p]erforming audit work in accordance with ethical principles is a matter of personal and organizational responsibility." The section goes on to clearly state that ethical principles apply in "taking on only work that the audit organization is competent to perform..."

To ensure that an audited entity is afforded a fair, unbiased and meaningful audit, Chapter 4 of the GAGAS requires that the auditors collectively possess the competence needed to address the engagement objectives and perform their work in accordance with GAGAS. The knowledge, skills, and abilities needed when conducting an engagement in accordance with GAGAS include the understanding necessary to proficiently apply a. GAGAS; b. standards, statutory requirements, regulations, criteria, and guidance applicable to auditing or the objectives for the engagement(s) being conducted; and c. *techniques, tools, and guidance related to professional expertise applicable to the work being performed.* (Emphasis added). (GAGAS section 4.07).

GAGAS section 4.08 provides, "[a]chieving the knowledge, skills, and abilities needed to conduct a GAGAS engagement may include: a. having prior experience in the subject matter or type of engagement; b. completing [continuing professional education] related to the subject matter or type of engagement; and c. obtaining degrees or certifications relevant to the subject matter or type of engagement."

The instant engagement requires knowledge, skills, and abilities regarding varied areas in the detentions or corrections environment including, but not limited to, detentions custodial operations, detentions medical services and detentions mental health functions.

This knowledge is so important that state law requires that a deputy complete an introductory training course by the Commission on Peace Officer Standards and Training, additional training by the Board of State and Community Corrections, and specialized training for custodial personnel of local detention facilities pursuant to Title 15 of the California Code of Regulations. In addition to this initial 16 weeks of academy training, deputies are next assigned to phase training where they are paired up with seasoned training officers before they can function on their own.  After these initial academy and training phases, detentions deputies are required by state law to complete a minimum of 24 hours of annual training to maintain their proficiency and certification.

The professional qualifications necessary for detentions medical doctors, registered nurses, licensed vocational nurses, and mental health clinicians must satisfy not only the educational requirements of their field which often includes many years of studies, and successfully passing the tests required by their licensing authority, but also continuing professional education in order to maintain their license or certification.

Additionally, the field of corrections is a highly regulated field of law comprised of state and federal Constitutional standards and laws, as well as case law issued by the U.S. Supreme Court, federal, and state courts.  Changes in department policies can impact an inmate's constitutional rights, and a lack of knowledge regarding correctional law can lead to flawed policies and constitutional violations.

②

The requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions custodial operations would be satisfied by either an auditor, or a specialist[1] engaged

---

[1] "Some engagements may necessitate the use of specialized techniques or methods that call for the skills of specialists. *Specialists do not include individuals with special skill or knowledge related to specialized areas within the field of accounting or auditing,* such as income taxation and information technology. *Such individuals are considered auditors.*"  (Emphasis added).  GAGAS section 4.13.

"The competence and qualifications of specialists significantly affect whether their work will be adequate for the engagement team's purposes and will meet GAGAS requirements. Competence of specialists relates to the nature and level of expertise. Qualifications of specialists relate to their professional certifications, reputations, and previous work in the subject matter. Other relevant factors include the ability of specialists to exercise competence in the circumstances of the engagement and the effects that bias, conflict of interest, or the influence of others may have on the specialists' professional judgment."  GAGAS section 4.14.

"Sources that may inform the auditors' assessment of the competence and professional qualifications of a specialist include the following:  *a. the professional certification, license, or other recognition of the competence of*

② to assist the audit team, who was certified by the State of California, Bureau of State and Community Corrections (BSCC), Standards and Trainings for Corrections (STC). ███████ ███████████████████ it does not appear that any of the audit team members possess such training or certification.

It is further generally recognized that the function of providing medical services in the correctional setting is different than in a public setting.  According to the American Academy of Family Physicians, "[i]nmates in correctional facilities have significantly higher rates of disease than the general population, and … tend[] to suffer in greater numbers from infectious disease, mental health problems, and substance use and addiction." The requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions medical services would be satisfied by either an auditor, or a specialist engaged to assist the audit team, who is, or was, a medical doctor or registered nurse in a detentions or corrections environment.  In our discussions with the auditors, it does not appear that any of the audit team members possess such training or experience.

② Similarly, the requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions mental health functions would be satisfied by either an auditor, or a specialist engaged to assist the audit team, who is or was a qualified mental health provider (QMHP) or mental health clinician (MHC) in a detentions or corrections environment. ████████ ██████████████████████ it does not appear that any of the audit team members possess such training or experience.

By way of example, the Sheriff's Department was previously reviewed by subject matter experts who possessed the requisite knowledge, skills, and abilities necessary for the scope of their

_____

*the specialist in his or her field, as appropriate*; b. the reputation and standing of the specialist in the views of peers and others familiar with the specialist's capability or performance; *c. the specialist's experience and previous work in the subject matter; d. the auditors' assessment of the specialist's knowledge and qualification based on prior experience in using the specialist's work; e. the specialist's knowledge of any technical performance standards or other professional or industry requirements in the specialist's field (for example, ethical standards and other membership requirements of a professional body or industry association, accreditation standards of a licensing body, or requirements imposed by law or regulation)*; f. the knowledge of the specialist with respect to relevant auditing standards; and g. the assessment of unexpected events, changes in conditions, or the evidence obtained from the results of engagement procedures that indicate it may be necessary to reconsider the initial evaluation of the competence and qualifications of a specialist as the engagement progresses." (Emphasis added).  GAGAS section 4.15.

engagement.  One review was conducted by Mr. Lindsey Hayes[2], the other review was conducted by the National Commission on Correctional Health Care (NCCHC)[3].



---

[2] Lindsay M. Hayes is a Project Director of the National Center on Institutions and Alternatives (NCIA) and is nationally recognized as an expert in the field of suicide prevention within jails, prisons, and juvenile facilities. He has been a consultant to the U.S. Justice Department's Civil Rights Division in its investigations of conditions of confinement in both adult and juvenile correctional facilities throughout the country. He has also been appointed as a Federal Court Monitor in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. He has served as an expert witness/consultant in litigation cases involving the suicide of incarcerated individuals, and his expertise has allowed him to conduct training seminars and assessments of adult and juvenile suicide prevention practices within correctional facilities throughout the country.

Hayes is a published author with over 60 publications in the area of suicide prevention within adult and juvenile correctional facilities and has conducted the only five national studies of jail, prison, and juvenile suicide  (*And Darkness Closes In…National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, *Juvenile Suicide in Confinement: A National Survey* in 2004, and *National Study of Jail Suicide: 20 Years Later* in 2009).

Hayes has reviewed over 3,000 cases of suicide in jail, prison, and juvenile facilities throughout the country over the past 30 years. He was awarded the National Commission on Correctional Health Care's Award of Excellence in 2001, for his contribution in the field of suicide prevention in correctional facilities. His work has been cited in several state and national correctional health care standards, and numerous suicide prevention training curricula, including the National Institute of Correction (NIC).

[3] The National Commission on Correctional Health Care (NCCHC) is a non-profit 501(c)(3) organization whose mission is to improve the quality of health care in jails, prisons, and juvenile confinement facilities. The NCCHC establishes standards for health services in correctional facilities, produces resource publications, conducts educational conferences, offers a certification for correctional health professionals and a voluntary accreditation program for institutions that meet their standards. The NCCHC is supported by numerous major national organizations in the fields of health, law, and corrections.

The NCCHC has a multidisciplinary governing structure, which addresses the complexities of correctional health care, and whose standards for health services in correctional facilities is widely recognized. NCCHC's standards address areas of care and treatment, health records, administration, personnel and medical-legal issues; and offer voluntary health services accreditation based on its standards. NCCHC also hold conferences with educational programs that address topics such as mental health and substance abuse services. The NCCHC publishes periodicals such as the *Journal of Correctional Health Care* and *CorrectCare*, which are the leading periodicals in this field. The NCCHC offers consultation and assistances to facilities with issues preparing for accreditation, developing policies and procedures, and assessing alternative solutions to problems.

In order to demonstrate that the auditors assigned to this engagement possessed the requisite knowledge, skills, and abilities in detentions custodial operations, detentions medical services and detentions mental health functions, as required by GAGAS, the Sheriff's Department requests that the State Auditor include in its final report the curricula vitae for each auditor and specialist assigned to the instant engagement, including any relevant continuing professional education regarding the subject matter of the engagement.

## II.    THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT HAS TAKEN APPROPRIATE AND REASONABLE MEASURES TO PREVENT AND RESPOND TO DEATHS OF INDIVIDUALS IN CUSTODY

### a.    The Auditor's Conclusion That the In-Custody Deaths Were the Result of Inadequate Medical Care is Misleading

⑦

While the first sentence of the draft report begins with the recognition that the Sheriff's Department is responsible for providing medical care to individuals in its custody, the next sentence goes on to state:  "Nonetheless, from 2006 through 2020, 185 people died in San Diego County jails – more than in nearly any other county across the state."  The transition from the statement that the Sheriff's Department is responsible for providing adequate medical care to the statement that "nonetheless" 185 people died in San Diego County jails is misleading and implies that the deaths were the result of inadequate medical care.

⑦

The draft report does not identify which deaths were the result of "inadequate" medical care. Natural deaths comprise nearly half, the highest percentage, of in-custody deaths identified by the auditors. ███████████████████████████████████

②

███████████ the draft report does not identify what medical care was inadequate, nor does it identify what medical care the Sheriff's Department should have provided that would have avoided individuals from dying of natural causes, such as heart disease, cancer, chronic lower respiratory disease (COPD, emphysema, chronic bronchitis), and stroke.  Just as individuals with these conditions die from their conditions in the community setting, incarcerated individuals with these conditions often die from their conditions while in custody, not as the result of incarceration or the medical care they receive while incarcerated but as a natural and expected progression of their condition.

Similarly, while accidental deaths account for 31 of the total in-custody deaths during the audited period, the draft report does not identify any medical care that was "inadequate" resulting in an individual's death.  As the auditors are aware, most of the accidental deaths were the result of individuals overdosing on drugs, not due to "inadequate" medical care.  In response to the opioid epidemic, the San Diego Sheriff's Department was one of the first departments in the state to equip not only its detentions medical staff but also detentions

deputies with NARCAN® (naloxone HCL) nasal spray to combat the surge in opioid overdoses. To ensure immediate availability of this highly effective opioid antagonist, NARCAN is not only available in detentions medical areas and in deputy control stations but detentions deputies are also required to carry NARCAN on their person during their shifts. During calendar years 2020 and 2021 alone, Sheriff's Department employees in the jails responded to 314 incidents of suspected opioid overdose deploying 848 doses of NARCAN and saving countless lives. In conjunction with its community partners, the Sheriff's Department also makes this lifesaving drug available to incarcerated individuals upon their discharge from Sheriff's custody.

⑫

**b. The Number of In-Custody Deaths Experienced by the San Diego Sheriff's Department is Consistent with its Position of Having the Second Highest Number of Total Bookings and Overall Deaths in California Counties**

The San Diego Sheriff's Department's position as having the second highest number of in-custody deaths of counties in the state is consistent with its position as having the second highest number of bookings of counties in the state. As demonstrated by Table 1 below, the trend is consistent for at least the top six counties, exhibiting that as the number of bookings goes up, so do the number of in-custody deaths. Additionally, as demonstrated by Table 2 below, as the second most populous county in the state, the County of San Diego also maintains the position as having the second highest number of deaths in the community.

**i. Table B is intentionally misleading**

The auditors chose to include a table in APPENDIX A which they identify as focusing on two primary categories, "In Custody Deaths and Bookings From 2006 Through 2020." In so doing, they state that the table "presents the rate of deaths per the number of individuals booked in each of the county sheriff's jail systems from 2006 through 2020." They go on to state that "[t]he number of bookings is the ***total number*** of individuals who were processed through the jail system." (Emphasis added). However, when the auditors sort the chart, they don't sort it by the column entitled "Total Booked", or even the "Total Deaths" column, both of which would clearly show the correlation between the two (see resorted Table 1 below), but instead they chose to sort by the "Total Deaths per 100,000 Booked" which makes the first three columns appear to have no correlation.

②



However, the exact same data sorted by the "Total Number of Bookings" column, *or* the "Total In-Custody Deaths," column **<u>clearly</u>** shows a correlation between bookings and the number of actual deaths for the six counties with the most bookings in the State of California.

⑬ **Table 1**



| | County Sheriff's Department | Total Number of Bookings | Average Bookings Per Year | Total In-Custody Deaths | Deaths per 100,000 Bookings |
|---|---|---|---|---|---|
| 1 | Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| 2 | San Diego | 1,284,462 | 85,631 | 185 | 14.40 |
| 3 | San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| 4 | Orange | 888,951 | 59,263 | 111 | 12.49 |
| 5 | Riverside | 810,376 | 54,025 | 104 | 12.83 |
| 6 | Alameda | 777,627 | 51,842 | 99 | 12.73 |
| 7 | Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| 8 | Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| 9 | Fresno | 551,624 | 36,775 | 86 | 15.59 |
| 10 | Kern | 520,074 | 34,672 | 70 | 13.46 |
| 11 | Ventura | 424,978 | 28,332 | 47 | 11.06 |
| 12 | San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| 13 | Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| 14 | San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| 15 | Tulare | 333,941 | 22,263 | 26 | 7.79 |

### ii. The top 5 counties with the most deaths countywide are also the same

As jails are a microcosm of the communities in which they are located, it should come as no surprise that as deaths in the community increase, deaths in-custody will increase as well. This is particularly true for in-custody deaths due to natural causes, suicide, and accidental deaths due to overdose. As greater numbers of individuals in a community are sick, experience suicidal ideations or are afflicted by substance use disorders, those increased numbers can be expected to replicate themselves in the detention systems serving those communities. As reflected in Table 1 above, the number of in-custody deaths experienced by the Sheriff's Department is not disproportionate to the number of deaths experienced in the San Diego County community regardless of custody status (See Table 2).    ⑫

**Table 2**    ⑬

#### Deaths in California Counties From 2006 Through 2020

| | County | Est. County Population (2020) | Average County Population (2006-2020) | Total Deaths (2006-2020) | Average Deaths Per Year | Deaths per 100,000 Population |
|---|---|---|---|---|---|---|
| 1 | Los Angeles | 10,135,614 | 9,991,660 | 939,073 | 62,605 | 626.6 |
| 2 | San Diego | 3,331,279 | 3,181,752 | 320,562 | 21,371 | 671.7 |
| 3 | Orange | 3,180,491 | 3,084,349 | 292,178 | 19,479 | 631.5 |
| 4 | Riverside | 2,440,719 | 2,251,242 | 224,078 | 14,939 | 663.6 |
| 5 | San Bernardino | 2,175,424 | 2,079,014 | 206,764 | 13,784 | 663.0 |
| 6 | Sacramento | 1,553,157 | 1,457,469 | 170,958 | 11,397 | 782.0 |
| 7 | Santa Clara | 1,945,166 | 1,848,744 | 157,224 | 10,482 | 567.0 |
| 8 | Alameda | 1,663,114 | 1,568,059 | 144,734 | 9,649 | 615.3 |
| 9 | Fresno | 1,020,292 | 955,030 | 104,127 | 6,942 | 726.9 |

This data table reports the annual number of deaths that occurred in each County regardless of the place of residence (by occurrence).

### iii. The Comparator Counties Selected by the Auditors Do Not Accurately Reflect the Relevant Peer Group Departments    ⑭

Considering county size, geographic location and "other factors" the auditors selected the Alameda County Sheriff's Office, Orange County Sheriff's Department and Riverside County Sheriff's Department as comparator departments. From the report, it is unclear how geographic location factored into the selection of the Alameda Sheriff's Office as a comparator department as the county seats of San Diego County and Alameda County are approximately 490 miles from each other. Similarly, the auditors' selection of similar *counties*, based on what appears to be total county population, rather than similar *booking numbers* is inappropriate. It is unclear how total county population factored into the selection of the Alameda Sheriff's

Office as a comparator department when the County of Alameda has less than half the average county population of San Diego County.

The comparator peer group should be based on the total number of individuals encountered (booked) by each department rather than county population. As reflected in Table 3 below, an analysis of the departments, based on total number of bookings, reveals that the statistically relevant departments are the Los Angeles Sheriff's Department, San Bernardino Sheriff's Department and Orange County Sheriff's Department. The San Diego County Sheriff's Department's total bookings for the reviewed 15-year period are within 65% of what the Los Angeles County Sheriff's Department booked for the same period. Similarly, San Bernardino and Orange County Sheriff's Departments booked at least 65% of the total number of bookings that the San Diego County Sheriffs' Department booked.

However, the Riverside County Sheriff's Department and Alameda Sheriff's Office, each booked **less** than 65% of the total number of bookings that the San Diego County Sheriff's Department booked for the same time. By excluding the Los Angeles Sheriff's Department and San Bernardino Sheriff's Department, in favor of Riverside County and Alameda County, the auditors excluded the only other departments in the state that booked in excess of 1,000,000 individuals during the audit period. By excluding the Los Angeles Sheriff's Department and San Bernardino Sheriff's Department, the auditors also excluded the other two departments with the highest number of in-custody deaths in the state during the audit period in favor of departments having the fifth and sixth highest number of in-custody deaths.

⑬

### TABLE 3
**Top Three Counties With Total Bookings**
**Within 35 Percent of San Diego County Bookings**



### c. The San Diego Sheriff's Department's Review of In-Custody Deaths Exceeds the Standards Set by the State of California ④

The Auditor's stated purpose[4] for the instant engagement is, in pertinent part, to "[e]valuate the San Diego Sheriff's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to inmates. *To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance*. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to inmates." (Emphasis added).

The auditors' findings confirm that the San Diego Sheriff's Department not only meets the minimum standards established through state law and other applicable guidance but, in fact, exceeds those requirements regarding its review of in-custody deaths.

### i. The Auditor's Conclusion that the Department's Review of In-Custody Deaths has been Insufficient is Misplaced ⑮ ④

The auditors' findings confirm that the Sheriff's Department meets and exceeds the minimum state standards for review of in-custody deaths.

As noted by the auditors, state law requires the Sheriff's Department to conduct a clinical care review within thirty (30) days of every death. The Sheriff's Department meets this requirement by conducting a Mortality/Morbidity Review. The auditors' findings did not reveal any failure on the part of the Sheriff's Department to comply with applicable law with either the timeliness or the substance of the Department's reviews.

Except in the case of a suspected homicide, no other review or investigation is required. In the case of an in-custody death in which homicide is suspected, the Sheriff is statutorily required to

---

[4]

> **2021-109 AUDIT SCOPE AND OBJECTIVES**
> **San Diego County Sheriff's Department**
>
> The audit by the California State Auditor will provide independently developed and verified information related to the death of inmates in the custody of the San Diego County Sheriff's Department (San Diego Sheriff). The audit's scope will include, but not be limited to, the following activities:
>
> 1. Review and evaluate the laws, rules, and regulations significant to the audit objectives.
>
> 2. Evaluate the San Diego Sheriff's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to inmates. To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to inmates.

investigate the death. That investigation is conducted by the Sheriff's Homicide Unit. The auditors' findings did not reveal any failure on the part of the Sheriff's Department to investigate any in-custody death in which homicide was suspected.

No other reviews by the Sheriff's Department are mandated by state law for in-custody deaths.

While no other reviews are mandated, the Sheriff's Department created and implemented its own multilayer review above and beyond the minimum state standards for review of in-custody deaths.

Although not required for in-custody deaths where homicide is not suspected, the Sheriff's Department, as a matter of practice, conducts an investigation by the Homicide Unit into every in-custody death, not just those deaths where homicide is suspected.

In addition to the Homicide Unit investigation, the Sheriff's Department created its own Critical Incident Review Board (CIRB). The CIRB's role is not limited to reviews of in-custody deaths but includes the review of a variety of critical incidents including uses of force, pursuits, K-9 deployments, overdoses, and other significant events. In-custody deaths due to natural causes are generally not reviewed by the CIRB, unless other issues are identified, as deaths due to natural causes are more appropriately reviewed by the statutorily mandated thirty (30) day Mortality/Morbidity Review conducted by the Department. A further discussion regarding the recommendation that the CIRB review natural deaths is discussed below.

If the CIRB or any member of the Sheriff's Department believes an in-custody death implicates potential misconduct or a failure to meet standards on the part of an employee, the CIRB or any member of the Sheriff's Department can file a Department Generated Complaint requesting that Internal Affairs investigate the matter.

Penal Code section 832.5 requires every law enforcement agency in the state to establish a procedure to investigate complaints lodged *by members of the public* against personnel of the agency. In addition to investigating complaints from members of the public, the Sheriff's Department investigates "department generated" complaints, which can be lodged by any member of the department, in the same manner as it investigates a complaint by a member of the public. If there is potential misconduct or a failure to meet standards on the part of an employee related to an in-custody death, the Sheriff's Department does not wait for a member of the public to file a complaint but can and does initiate an Internal Affairs investigation based on a department generated complaint.

As the auditors' findings make clear, the reviews conducted by the Sheriff's Department not only meet the minimum standards established by the state, the multilayered approach adopted by the Sheriff's Department far exceeds those minimum standards. Any deficiencies in the state's minimum standards regarding the review of in-custody deaths is most appropriately

addressed to the Legislature and/or the BSCC, not to the Sheriff's Department as the audited entity.

### ii. The Critical Incident Review Board's Roles of Preventing Future Litigation and Improving the Health and Welfare of Incarcerated Individuals are Not Mutually Exclusive

⑯

The auditors stated there should be more transparency regarding the process and findings of the Sheriff's CIRB Board. The CIRB reviews occur within the confines of the attorney-client relationship and are not reported out publicly. Every governmental entity, even those such as the State Legislature or a Board of Supervisors, both of which are subject to the *Brown Act's* open meeting requirements, are afforded the opportunity to engage in candid conversations with its counsel within the confines of the attorney-client relationship.

Notwithstanding the auditors' particular concern regarding the existence of the attorney-client privilege, the CIRB's role of preventing future litigation compliments rather than undercuts the Department's goal of improving the health and welfare of incarcerated individuals entrusted to the care and custody of the Sheriff. As items of concern are identified during a critical incident, such as an in-custody death, the CIRB review is focused with an eye towards what changes have already been implemented by the chain of command to remedy any deficiencies before the matter made it to the CIRB for review, as well as any changes the chain of command may not have already identified and/or implemented to minimize the risk of a recurrence. If the CIRB identifies any best practices or changes not previously identified and implemented by the chain of command prior to its review, the CIRB is empowered to make such recommendations.

As it relates specifically to in custody deaths, the CIRB concentrates not only on the death itself, but also considers the handling of the inmate from the time the inmate was originally booked. The Board looks to determine whether any warning signs existed, whether appropriate and timely safety checks occurred, and whether there were any risk reduction lessons that could be derived from the incident.

While the focus of the CIRB may be risk management, the mechanism by which risk management is ultimately accomplished is clearly through the promotion of best practices and policies that improve the health and welfare of incarcerated individuals and holding staff accountable.

While the Auditor was "particularly concerned" that the Sheriff's Department does not publicly report out its CIRB discussions, all Sheriff's Department policies, procedures, training, and education materials are published on the Sheriff's Department's website. Any changes to Sheriff's policies, procedures, training, or education, whether recommended by the CIRB or implemented by management prior to or without the need for a CIRB review, are published and available for the public to access on the Sheriff's Department's website. In addition to the

attorney-client privileged nature of the CIRB discussions, the Sheriff's Department would also be prohibited by state statutory and constitutional privacy considerations from disclosing any discussions by the CIRB regarding employee misconduct or Internal Affairs investigations.

⑰

### d. In Addition to Its Own Internal Reviews, the Sheriff's Department is Already Subject to Independent Oversight by Multiple External Organizations

Local detention facilities are subject to a myriad set of regulations and laws based on statutory law, constitutional guarantees, and case law.  In order to ensure county detention facilities, comply with these requirements, the BSCC promulgates regulations under Title 15 of the California Code of Regulations, establishing statewide standards for detention facilities.  In order for facilities to maintain their certification to operate, counties are subject to bi-annual inspections by the BSCC.  The auditors' findings confirm that the Sheriff's Department meets the standards established by the BSCC under Title 15.

④

In addition to the bi-annual inspections by the BSCC, pursuant to its authority under Penal Code section 919, the San Diego County Grand Jury conducts an annual inspection of the Sheriff's Department detention facilities.

The San Diego County Citizens Law Enforcement Review Board, pursuant to its County Charter authority, is also empowered to, and does, investigate in-custody deaths.

⑰

### e. In its continuing efforts to enhance medical and mental healthcare, and exceed the standards set by the State of California, the Sheriff's Department engaged reviews by multiple separate external entities specializing in correctional healthcare

The Sheriff's Department was reviewed by two entities in pursuit of enhancing system operations related to medical and mental health care.  These included a look at suicide prevention practices by nationally recognized expert, Mr. Lindsay Hayes, and a preliminary review by the National Commission on Correctional Healthcare (NCCHC).  Both entities produced reports for the Sheriff's Department that have been used to enhance policies and procedures to align with best practices and meet recommendations.  The reports are available on the Sheriff's Department public website at www.sdsheriff.gov.

### III.    RECOMMENDATIONS    ⑤

#### a.    Intake Screening

*CSA Recommendation:*

*Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity rating as it assigns to individuals to all detentions staff overseeing them.*

The Sheriff's Department concurs with the auditor's assessment that Qualified Mental Health Providers (QMHP) are the more appropriate staff to conduct the mental health screening portion of the intake process. The Medical Services Division (MSD) received funding for additional staffing in July 2021 and is currently in the process of recruiting and hiring from a limited pool of candidates. Additional staffing will allow us to provide a comprehensive screening process utilizing the electronic health record, in accordance with National Commission for Correctional Health Care (NCCHC) standards. Some identified QMHP staffing duties would be to conduct the Behavioral Health (BH) screening, complete a risk/needs assessment, to include substance use disorder (SUD). The assessment would determine a behavioral health acuity rating, schedule psychiatric appointments, schedule follow up QMHP appointments, assess for the need of placement into our Inmate Safety Program (ISP) and obtain Release of Information authorizations. QMHPs and nursing staff working in collaboration at the initial intake assessment and throughout a patient's incarceration promotes a comprehensive whole person model of care.

Ongoing effective communication between medical staff and sworn staff is paramount in ensuring the safety and wellbeing of our patients. Our plan is to implement bidirectional communication with our Jail Information Management System to ensure sworn staff are aware of the mental health recommendations. All staff are responsible for the appropriate and timely care of our patients. Further analysis will need to be done to evaluate the impact this acuity rating system would have on our system of jail classification and housing needs.

*CSA Recommendation:*

*Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.*

San Diego County does not have an interconnected health information exchange. Hospital centers and medical systems independently manage their data systems and may or may not voluntarily participate or contribute to a health information exchange.  Our health staff currently have access to the following county databases:

### i.  Health and Human Services Agency – Cerner Community Behavioral Health (CCBH)

Cerner Community Behavioral Health is a behavioral health-specific electronic health record that specializes in the delivery of community mental health, inpatient mental health, outpatient mental health, substance use disorder and developmental disabilities care. Although there may be some patients who are not in the database and do not have data entered, we continue to review and enter data referencing our patient encounters while in our care.

As of April 2021, all QMHPs (mental health clinicians, psychologists, psychiatrists, psychiatric technicians) have "read" access to Cerner Community Behavioral Health (CCBH). QMHPs can review records at any point in the patient's stay. The planned integration of a QMHP into the intake process for behavioral health screening will fulfill this recommendation.  In addition to having access to review community behavioral health records, the Sheriff's Detention Services Bureau contributes to this community database by recording and entering mental health care provided while the patient is in our custody as part of the county's continuum of care.  The Sheriff's Medical Services Division intends to adhere to the NCCHC standards for the referral process.

### ii.  Health and Human Services Agency – San Diego Immunization Registry

The San Diego Immunization Registry (SDIR) is a County system that offers Sheriff's Department health staff the ability to verify a patient's vaccination status. SDIR is limited to vaccinations given in San Diego County. If a patient receives an immunization outside of San Diego County or opts to "lock" their record, health staff will not have the ability to verify vaccination status. Currently we have sufficient access to SDIR.

### iii.  San Diego Health Connect

San Diego Health Connect was originally designed to allow for medical information to be exchanged between community clinics.  The database only covers medical (not mental

health/behavioral health issues) and each patient must consent to participate. Very few patients are registered in the system, and the system is undergoing restructuring.

### b. Medical & Mental Health Follow-Up

*CSA Recommendation:*

*Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.*

The Sheriff's Department concurs with the auditors' assessment that a revision is necessary to address the process for medical/mental health referral after two requests. The Sheriff's Medical Services Division intends to implement a health care requests and services process in accordance with NCCHC standards. Patients will be referred to a provider to be evaluated. When a patient presents for health care services more than two times with the same complaint and has not seen a provider, they will receive an appointment to do so. Some mental health patients need assistance with advocating for their medical care. Regular follow-up and ongoing engagement with QMHPs is essential to identifying patients who face these challenges.

*CSA Recommendation:*

*Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request. Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.*

The Sheriff's Department concurs a timely medical response to patient concerns is extremely important, and that repetitive patient refusals or an abject delay in follow-on scheduling of medical care are concerning issues and could potentially precipitate an adverse condition or event. We are committed to the health and well-being of our patients, and are developing safeguards to ensure a timely, efficient re-engagement of both medical and mental health services.

The Sheriff's Department is currently focused on a more nursing centric model. For health staff, we are in the process of embedding nursing staff at the ward level, assigning nursing staff to most housing units in support for the Primary Care nursing model. Nurses will be there to perform face-to-face assessments of their assigned patients (on the floors and during sick call)

and involved in counseling and advocacy efforts for every refusal. We have worked with our
contracted medical providers to develop daily rounds in designated modules to address acute
and ongoing assessments for specified patients. We continue to pursue accreditation from the
NCCHC which requires a face-to-face assessment withing 24 hours of a medical request being
filed (NCCHC Standards J-E-07).

*CSA Recommendation:*

*Revise its policy to require more frequent psychological follow up after release from the inmate
safety program to at least monthly check-ins.*

The Sheriff's Department will reevaluate our policies on psychological follow-up. Our current
Inmate Safety Program policy reflects the recommendations from Mr. Lindsey Hayes regarding
our follow up protocol. Mr. Hayes is nationally recognized as an expert in the field of suicide
prevention within custodial settings and has served as a Federal Court Monitor. While
placement into any of our Inmate Safety Program specialized housing requires a mental health
response and establishes a basis for continued follow-up; the Sheriff's Department's current
planned expansion and hiring of additional mental health professionals will allow for more
frequent encounters and the investment of time necessary for higher quality mental health
care.

⑱    Mr. Hayes specifically states, "it is recommended that the follow-up schedule be simplified and
revised as follows: follow-up within 24 hours, again within 72 hours, again within 1 week, and
then periodically as determined by the clinician until release from custody." As a nationally
recognized expert, SDSD has adhered to Mr. Hayes' recommendation.

###    c.    **Safety Checks**

*CSA Recommendation:*

*Revise the safety check policy to include the requirement for staff to check that an individual is
still alive without disrupting the individual's sleep.*

The Sheriff's Department will reevaluate current policy and incorporate best practices. SDSD is
exploring technologies to assist with monitoring a "proof of life" for all incarcerated individuals
with minimal sleep interruption through staff contact. The Sheriff's Department is evaluating
industry capabilities, and in the process of developing a more robust facility Wi-Fi system

capable of supporting technological advancements in monitoring the welfare of our population. The Sheriff's Department's planned integration of Bodyworn Cameras (BWC) into the custodial setting will greatly assist in showing the point of view each deputy has during the safety checks.

*CSA Recommendation:*

*Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff perform.*

Sheriff's Department line supervisors conduct electronic log reviews every shift.  This review includes ensuring the timeliness of safety checks in accordance with established Policy & Procedures.  The Sheriff's Department's current practice requires supervisors conduct video audits of random safety checks and will formalize this into policy.

### d. Sworn Discovery of Medical Emergency

*CSA Recommendation:*

*Revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow.*

Sworn staff does not require approval from medical to start CPR.  Current DSB P&P M.5 I.B. states, "When the severity of the medical emergency requires it, and as soon as it is safe to do so (unless death is obvious, such as decapitation, obvious rigor mortis, etc.), deputies acting as first responders will provide basic life support and first aid. Upon arrival, facility health staff will assess the severity of the inmate's injury/distress, provide first-aid, and may assist or take over cardiopulmonary resuscitation (CPR) responsibilities as directed and/or needed." This policy in its current form has been in effect since January 2012.     (19)

The Sheriff's Detention Services Bureau In-Service Training Unit distributed a training bulletin on Signs of Medical Distress and Life-Threatening Emergencies on June 18, 2021.  The purpose of the training bulletin was to familiarize staff with signs of death or near death and appropriate actions of sworn staff when observing such signs of medical distress. Per DSB Policy and

Procedure section M.6, "Any life-threatening medical emergency shall trigger a 911 request for a paramedic emergency response team. Sworn and health staff shall initiate emergency response and basic lifesaving measures until relieved by the paramedic emergency response team."

### e.  In-Custody Death Follow-Up

*CSA Recommendation:*

*Staff will provide a written report of each 30-day medical review to its management.*

The Sheriff's Department concurs with this recommendation.

*CSA Recommendation:*

*When warranted, the report should specify recommendations for changes to prevent future deaths.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case.

*CSA Recommendation:*

*The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and to identify issued that require further study.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case.  There are other processes currently in place to look for policy, training, or accountability issues following critical incidents.

### f. Critical Incident Review Board

_CSA Recommendation:_

_Revise its policy to require that the Critical Incident Review Board review natural deaths._

In July of 2021, the Division of Inspectional Services (DIS), Sheriff's Legal Affairs, and CIRB board members evaluated potential updates to policy and procedures section 4.23 – Department Committees and Review Boards. This assessment included reviewing in-custody deaths deemed natural by the Medical Examiner's Office, as the auditors recommend. This, along with other changes are anticipated to be in a pilot phase beginning February 2022. Historically, if a natural death is deemed to have potential issues of any nature it may be presented to CIRB at the discretion of the board members. Also, the Chief Medical Officer and appropriate medical staff conduct a mortality/morbidity review of each in-custody death for their determination of any changes that are needed related to medical care for incarcerated individuals.

_CSA Recommendation:_

_Require the Sheriff's Department to make public the facts it discusses and recommendations it decides upon in the Critical Incident Review Board meetings to establish a separate public process for reviewing deaths and making necessary changes._

CIRB presentations allow the Sheriff's legal advisor and the various commands the ability to review critical incidents to identify issues that should be addressed in various areas, including, but not limited to, training, policies, procedures, staffing, and equipment. The confidential environment provided by the CIRB is essential to the free exchange of ideas, and concerns, in anticipation of future litigation because of a given incident, and in order to avoid future litigation through implementation of best practices. Effectiveness and thoroughness of presentations would likely be diminished if the attorney-client privilege is removed, or information is required to be disclosed during pending, or anticipated litigation. Much of the information presented in CIRBs is intended for individuals who have a vast familiarity and understanding of law enforcement or detention operations, department policies, and state and federal laws, and may contain confidential information including criminal history, medical history, and peace officer personnel records.

⑯

### g. Citizen's Law Enforcement Review Board Integration

*CSA Recommendation:*

*Revise its policy to include CLERB in its immediate death notification process.*

*Revise its policy to allow a CLERB investigator to be present at the initial death scene.*

The Sheriff's Department is currently evaluating a process to integrate the CLERB investigator into the initial notification and response to in-custody deaths, to include a scene walkthrough and incident brief.

*CSA Recommendation:*

*Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.*

The CLERB has subpoena powers for in person sworn staff interviews. In 2003, the CLERB discontinued issuing Sheriff's Department sworn staff interview subpoenas and opted for written responses due to Public Safety Officers Procedural Bill of Rights (POBAR) conflicts where ultimately the interviews did not benefit the CLERB's investigations. The CLERB continues to have subpoena powers. This recommendation should be re-directed to the CLERB for its review to change its current practice and exercise its authority to issue subpoenas to Sheriff's sworn staff.

⟨20⟩

## IV.    CONCLUSION                                                                     ⑤

The Sheriff's Department takes seriously its responsibility to maintain a safe and healthy environment in the county jails.

The Sheriff's Department has welcomed and consistently made itself available for, and cooperated with, reviews by numerous entities including the Disability Rights California, Lindsay Hayes, the NCCHC, the San Diego County Grand Jury, and the Citizens Law Enforcement Review     ⑰ Board. We did the same with the California State Audit. After every review, the Department seriously considers every recommendation and implements those that are appropriate and possible, given existing laws, infrastructure, staffing limitations, and best practices. During the 15-year audit period the Department has taken numerous steps towards providing the best care for those detained in the jail system. To date, the following improvements have been made:

- Changing our pharmacy business processes
- Implementing a new electronic health record system
- The continuous review and updates to both Detentions Services and Medical Services policies and procedures.
- Increased medical service provider coverage
- Enhanced communication and collaboration between medical and sworn staff which includes the:
    - o  Implementation of a medical "scene manager" to ensure relevant communication during critical incidents
    - o  Issuance of facility communication equipment in the nursing stations to expedite response
    - o  Development of collaborative training between sworn and health staff related to health emergencies
- Developing and mandating an 8-hour suicide prevention training and a 2-hour refresher training
- Enhancing our suicide assessment and monitoring
- Enhancing the continuity of care for inmates removed from suicide precautions; and
- Enhancing the quality assurance process for intake screening related to suicide prevention

We recognize that we cannot rest on the things that we have done. As the Sheriff's Department shared with the auditors, the Department is pursuing accreditation by the National Commission on Correctional Health Care (NCCHC). The Sheriff's Department currently meets the standards established by the State of California, final accreditation by the NCCHC would add yet another layer of continuing, independent, external oversight. However, our goal is to

exceed all standards.  We strive to provide a better than community standard in the medical and mental health care of incarcerated individuals.

The San Diego Sheriff's Department recognizes that comparisons will be made among counties in California.  We regularly confer with other counties in the state and across the country to identify best practices.  We remain focused on what we can improve and are committed to do so.  It is with this attitude that the San Diego County Sheriff's Department will go forward in assessing the recommendations made by the auditor in the draft report.

Sincerely,

William D. Gore, Sheriff

# Comments

### CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

To provide clarity and perspective, we are commenting on the Sheriff Department's response to our audit. The numbers below correspond to the numbers we have placed in the margin of the Sheriff's Department's response. In certain areas of its response, we have summarized our comments according to the respective sections in its response rather than comment on all of the individual areas of its response that we believe are deficient or misleading.

We provided the Sheriff's Department five business days to review and provide a formal response to the draft audit report, which is our standard practice for all audited entities. As part of our audit process and in accordance with generally accepted government auditing standards, we also met with the staff of the Sheriff's Department, including the Sheriff and other executive management personnel, on numerous occasions during the audit to ensure they were fully briefed on our findings, conclusions, and recommendations.

①

We have redacted portions of the Sheriff's Department's response containing information that is deliberative in nature or reflects confidential discussions not used in support of the audit report. Additionally, some of the redacted text contains excerpts from the draft report. In accordance with Government Code sections 6254, 8545, and 8545.1, it was necessary for us to make these redactions to protect our confidential work and because the improper disclosure of draft audit documents is a misdemeanor.

②

The Sheriff's Department states that the highly redacted version of the draft report made it difficult for it to submit a meaningful, comprehensive response. On the contrary, the report that we provided contained all findings, conclusions, and recommendations pertaining to the Sheriff's Department—all of which we had previously shared with its management on numerous occasions. The sections we redacted pertained to other audited entities, such as CLERB, which were not relevant for the Sheriff's Department's response. Further, because state law makes it a crime to improperly disclose ongoing audit information, when the California State Auditor's Office sends draft sections of an audit report to an audited agency for its comment, we redact from the draft those provisions that concern the other agencies being audited. Moreover, the Sheriff's Department misunderstands the purpose of an audit report, which is to summarize the results of our audit work that the Audit Committee directed us to perform. Our working

③

papers contain the documentation and analyses that support the findings, conclusions, and recommendations in the audit report. Additionally, Government Code section 8545, prohibits the public release of any work papers pertaining to an audit that has not yet been completed. Until the audit report is published, we are required to hold any supporting work papers in strict confidence.

④ Although we concluded that the Sheriff's Department's policies generally align with BSCC standards, we found significant deficiencies that we discuss throughout the report. Moreover, as we state on page 32, BSCC designs the standards to be a minimum that all counties can achieve, regardless of variation in resources at the local level. However, we found that BSCC's approach enables counties that house large numbers of incarcerated individuals to provide lower levels of care. Therefore, to improve the level of care in local detention facilities, we made recommendations to address weaknesses in the Sheriff's Department's policies and procedures as well as in BSCC's standards.

⑤ The Sheriff's Department's concerns related to our findings and conclusions contradicts its agreement with our recommendations. Under generally accepted government auditing standards, which we are required to follow, the findings and conclusions of an audit form the basis for recommendations.

⑥ The Sheriff's Department incorrectly states that we do not comply with audit standards, which it asserts on pages 85 through 96. We conducted this audit in accordance with generally accepted government auditing standards, which we are required to follow, and the California State Auditor's thorough quality control process. In following audit standards, we are required to obtain sufficient and appropriate audit evidence to support our conclusions and recommendations. As with all of our audits, we engaged in extensive research and analysis for this audit to ensure that our report presented a thorough and accurate representation of the facts, and included all relevant information. We stand by the statements in our report, which are based on sufficient and appropriate evidence. Further, as with all of our audits, our public report includes the required statement indicating that we performed this audit in compliance with audit standards.

Moreover, as part of our adherence to audit standards, our staff possess the collective knowledge, skills, and abilities to conduct performance audits, including those of local law enforcement entities.

⑦ The Sheriff's Department's comments questioning the accuracy of our report are unfounded. As we state on page 13, the high rate of deaths in San Diego County's jails compared to other

counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. Throughout Chapter 1 we provide numerous examples of deficiencies in the department's policies and procedures that likely contributed to the deaths of some incarcerated individuals and how these policies and procedures do not align with certain best practices used by comparable counties and other entities. Specifically, in the examples on pages 21 through 24, we describe how the Sheriff's Department did not consistently follow up with individuals who needed medical and mental health services, and that lack of attention may have contributed to their deaths. Finally, although the Sheriff's Department indicates that our audit does little to document or provide context of its efforts to respond to deaths, we describe on page 39 the improvements the Sheriff's Department has made. Because we found that weaknesses continue to exist in the Sheriff's Department's policies and procedures, we made recommendations to address those weaknesses.

Because the Sheriff's Department's response included specific details about an in-custody death, such as the case number and a more detailed description of the incident, we redacted this text because it contained confidential information and to protect the privacy of the individuals involved. We clarified our report to make it clear that our concern in this case is related to timeliness of its response to the emergency and not the issue of who provided CPR. ⑧

The Sheriff's Department incorrectly states that it was not given information about the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department. The draft report that we sent to the San Diego Sheriff's Department contained primarily publicly available information for these counties to provide context for the Sheriff's Department's findings. ⑨

When multiple entities are examined in an audit, the California State Auditor's Office is required under state law to maintain confidentiality with each of those entities. Maintaining confidentiality among multiple subjects of an audit is essential to ensuring the integrity and quality of the evidence upon which the audit's conclusions are based. Moreover, based on its misunderstanding of state law, the Sheriff's Department wrongly asserts that our office was required to provide it with supporting documentation pertaining to other auditees because they are public records. Government Code section 8545 prohibits the public release of any work papers or documents pertaining to an audit that has not yet been completed. Until the audit report is published, any supporting documents are held in strict confidence. ⑩

⑪   The Sheriff's Department's concern regarding which version of policies and procedures we based our findings on is unfounded. Our analysis included identifying the policies applicable at the time of the incident we reviewed and determining whether they were subsequently updated to address our concerns. For example, as we state on page 23, we identified a weak policy for mental health services that contributed to an individual's death by suicide and determined that the Sheriff's Department subsequent revision to that policy did not fully address our concerns.

⑫   The Sheriff's Department's approach does not allow for a fair comparison between counties. In Table A.2 on page 60, we present the rate of in-custody deaths based on the relative size of 15 counties. We believe that this objective presentation allows a reader of the report to compare the counties in a more meaningful way. Nevertheless, in both presentations, the Sheriff's Department is among the highest in number and rate of deaths in its jails.

⑬   Table 1, Table 2, and Table 3 on pages 98 to 100 were created by the Sheriff's Department and are not part of our report. We do not attest to the accuracy of the information the Sheriff's Department presents.

⑭   We stand by our selection of the comparable counties referenced in our audit. As we state in the Scope and Methodology on page 62, we selected these counties considering relative size, geographical location, and other factors. We also used professional judgement in selecting a large county in a different region to obtain broad perspective. Our selection of counties satisfied the audit objectives and resulted in sufficient and appropriate evidence to support our findings, conclusions, and recommendations.

⑮   We stand by our conclusion that the Sheriff's Department's reviews of in-custody deaths are insufficient. As we state on page 34, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given, identified whether any concerns required further study, or stated whether changes to policies, procedures, or practices are warranted. We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow-up care before an individual's death, such as those we discuss in Chapter 1.

Further, as we discuss on page 38, the Sheriff's Department does not complete internal affairs investigations related to in-custody deaths frequently enough for it to provide significant value. The small number of these investigations related to deaths—coupled with the lack of meaningful changes arising from the Critical Incident Review Board meeting and the 30-day medical review—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

The Sheriff's Department mischaracterizes our point about its Critical Incident Review Board. To clarify, as we state on page 36, the stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals.    ⑯

Further, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Specifically, as we state on page 36, even though the board discussed critical issues in some meetings, it did not always make recommendations for addressing these issues.

Moreover, as we discuss on page 37, although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents. Further, the Sheriff's Department is disingenuous in its response that it provides all changes to policies, procedures, training, or education on its website. The policies posted on its website do not communicate changes it made in response to in-custody deaths. Having its policies available online in their entirety without specifically identifying those changes that it made in response to in-custody deaths is not transparent in this respect.

Even though the Sheriff's Department was reviewed by external entities, we found it has failed to implement key recommendations from external entities, including recommendations from the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention consultant, as we describe on page 38. Some of the recommendations that the Sheriff's Department failed to implement are related to weaknesses in its policies and    ⑰

procedures that we identify in this report. Accordingly, we are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic weaknesses.

⑱  The timeframes that the Sheriff's Department refers to are unrelated to our recommendation. Our recommendation is for the Sheriff's Department to update the minimum ongoing follow-up in its policy from 90 days to at least monthly. As we state on page 22, reports and studies related to mental health indicate that more frequent psychological follow-up, such as check-ins performed weekly to rather than every 90 days, leads to faster recovery and is more effective for individuals with mental health needs.

⑲  Although the Sheriff's Department asserts that its current policy appropriately addresses safety concerns regarding sworn staff administering CPR to incarcerated individuals, we had concerns with this policy during our audit. As we state on page 27, in some instances, sworn staff did not perform lifesaving measures because they thought the individual was dead. However, when department medical staff arrived minutes later, they immediately began lifesaving measures on the individual, including CPR. This fact calls into question the ability of sworn staff to assess whether unresponsive individuals might benefit from such potentially lifesaving measures.

⑳  We explain on pages 42 through 45 our concerns with CLERB not directly interviewing sworn staff. Our recommendation to the Sheriff's Department to encourage its staff to cooperate with CLERB's investigations aligns with our recommendation on page 57 to CLERB.

# EXHIBIT C

**2022**

## San Diego County
# In-Custody Death Study

Produced by Analytica Consulting for the San Diego Citizens' Law Enforcement Review Board

April 2022





# 2022 County of San Diego – In-Custody Death Study

The San Diego County Citizens' Law Enforcement Review Board (CLERB) contracted Analytica Consulting to conduct an independent analysis of in-custody death data over the last 10 years and provide a report of an "apples-to-apples" comparison of San Diego County Sherriff's Department (SDSD) to other California County Sheriff Departments. While the enclosed report contains a detailed analysis on the issue of in-custody deaths, it should be noted that **this report does not make any conclusions regarding any *specific* in-custody death.**

Analytica independently performed all analysis and authored this report. Input on the process, methods, and ultimate findings was provided by members of CLERB, the Sheriff's Department, and experts in academia; nevertheless, Analytica had the final say on the content of this report. Therefore, **any views expressed in this report are those of Analytica Consulting and do not reflect any official statement or policy of San Diego County or any of its employees.**

Analytica Consulting
San Diego, CA
April 2022

 **Michael Marks**

 **Mikael Pelz, PhD**

 **Jennifer De La Cruz**



# Executive Summary

In-custody deaths in California county jails have become an increasingly contentious topic. Reporting by journalists and advocacy organizations conclude that the risk of death is highest in San Diego County jails. Based on data from the California Department of Justice, one inmate dies about every month in San Diego jails; however, research has raised important questions on how to study these deaths. One of these concerns is how best to compare in-custody deaths across different counties. Given that jails primarily admit those from the immediate county, how do mortality rates among the county population influence the total deaths within county jails?

We address this question by applying countywide mortality rates to the in-custody population of the 12 most populous counties in California. Our countywide mortality rates encompass nearly 200 unique groups based on gender, race-ethnicity, and age characteristics and four manners of death. Using arrest and jail population data, we then estimate the distribution of these groups in county jails. This approach allows us to arrive at an expected number of in-custody deaths for each county jail. These expected total deaths provide a baseline for evaluating deaths in San Diego jails and other county jails.

Our final analysis compares the expected deaths to the actual deaths in county jails from 2010-2020. Because the focus of this study is San Diego, we scale each county jail's population to reflect what they would be if they had the same number of inmates as San Diego County (unscaled results can be found in Appendix H). Using this approach, we can identify which county jails have more or less deaths than is expected as well as compare San Diego's total deaths to that of other counties. The analysis and findings have also been peer-reviewed by leading experts in criminology and biostatistics (see Appendix E for these reviews). Our main findings are found below.

## Finding #1: Residents of San Diego County are no more likely to die than residents of other California counties.

Previous research has suggested that San Diego County's general population has unique mortality rates, which may explain the number of in-custody deaths in the county. Our comparison of mortality rates among the 12 most populous counties in California shows that San Diego County has similar death rates to other large counties in the state and metropolitan counties in the Western United States. This finding applies to all manners of death including suicides, overdose/accidental deaths, homicides, and natural deaths.



*Overall County Mortality Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*

## Finding #2: After considering countywide mortality rates, San Diego jails have the highest number of unexplained deaths

When analyzing overall in-custody deaths, we find that total deaths in San Diego jails surpass the deaths expected based on the county's mortality rates. We compare San Diego to other counties by standardizing their jail population to the size of San Diego jails (approximately 5000 inmates). The number of excess deaths resulting from the actual and expected death difference is the highest in San Diego County.

Analytica
CONSULTING

Ex. C - 143

Additionally, San Diego County is the only county with a statistically significant number of excess deaths.[1] Most other counties have generally fewer total deaths than what is projected by their county mortality rates. This finding corroborates previous reporting suggesting that in-custody deaths are the most acute in San Diego County.



## Finding #3: In San Diego County, Whites are more likely to *die* in jail; Blacks are more likely to *be* in jail.

When comparing the race of those who have died in-custody to the racial distribution of the jail population, deaths in San Diego occur disproportionately among Whites. The percentage of jail deaths among both Blacks and Hispanics is less than their percentage of the jail population. Given the large racial disparities between jail populations and county populations (Subramanian, Riley, and Mai 2018), the jail population is the most appropriate population to evaluate the racial proportionality of in-custody deaths.

Our analysis shows that racial disproportionality is introduced into the jail system through arrest rates. For example, the proportion of Black inmates in San Diego is three times higher than their proportion of the county population. However, the proportion of White, Hispanic, and other race inmates are all equal or less than their proportion of the county population.



*San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



---

[1] Statistical significance means that the observed result was unlikely to occur by chance and is likely attributable to some underlying cause. When we report that the difference between actual and expected deaths is statistically significant, we are stating that these differences are highly unlikely to be a matter of random chance.

Analytica
CONSULTING

# Finding #4: The risk of overdose/accidental deaths is the greatest in San Diego jails





When comparing overdose/accidental death rates among the counties in our study, inmates in San Diego jails have the highest death rates.[2] An inmate in San Diego is two times more likely to die in this manner of death than what is expected based on county mortality rates. This discrepancy results in the highest number of excess deaths among all 12 counties in this study. The actual and expected overdose/accidental deaths for San Diego are also statistically different. The same cannot be said for the other counties that have more overdose/accidental deaths than what is anticipated.

---

[2] The California Department of Justice broadly refers to these deaths as accidental deaths. Most of these deaths involve overdoses. A much smaller number of these deaths involve other circumstances such as blunt force, falls, and choking. For a complete distribution of these deaths, see Appendix C.

Analytica
CONSULTING

# Finding #5: San Diego is one of many counties with high suicide rates in jails.

San Diego County has an elevated suicide rate that is not unlike several other counties in this study. Reported suicides are four times the expected suicides in many of these counties. All 12 counties have more suicides than what is projected, but the number of excess deaths varies from county to county. These findings confirm that suicide remains a severe risk for those in-custody in county jails, a pronounced trend among county jails nationally (Abderhalden 2022).



Expected number of **suicide** deaths from 2010-2020 in a sample of the county's general population comparable in size and demographics to the county's jail population (~5000 people)



Expected vs Actual
**Suicide** Jail Deaths, 2010-2020

# Finding #6: Elevated risk of death appears to be isolated to the unsentenced jail population

When comparing jail deaths between unsentenced and sentenced inmates, excess deaths only appear among those who have not yet been sentenced. This finding particularly applies to San Diego County, which had 51 excess deaths among unsentenced inmates and none among sentenced inmates. These results suggest that individuals are the most vulnerable to death when they enter the jail system and/or in the time between when they are convicted and when they are sentenced.



# Finding #7: Public oversight of in-custody deaths lacks key information

This study would not have been possible without the diligent and comprehensive data collection efforts of the California Board of State and Community Corrections (BSCC) and the California Department of Justice. Nonetheless, we have found that this reporting lacks key information on the circumstances surrounding these deaths. Reporting could be expanded to include additional information about inmates and jail facilities such as:

- Processing dates of those who died in-custody including the date of the inmate's arrest, booking, conviction, and sentencing

- Name of facility where the death took place

- Average daily jail population by race-ethnicity and age

- Average daily population of city jails (the state discontinued collecting these data in 2020)

- Complete list of the manner of death without missing values

- Number and type of mental health staff at jail facilities

Analytica CONSULTING
Ex. C - 147

# 2022 San Diego County In-Custody Death Study

*Analytica Consulting*

Michael Marks, Mikael Pelz PhD, and Jennifer De La Cruz

April 2022

Executive Summary ................................................................................................................. iii

Finding #1: Residents of San Diego County are no more likely to die than residents of other California counties. iii
Finding #2: After considering countywide mortality rates, San Diego jails have the highest number of unexplained deaths ...iii
Finding #3: In San Diego County, Whites are more likely to *die* in jail; Blacks are more likely to *be* in jail. ........... iv
Finding #4: The risk of overdose/accidental deaths is the greatest in San Diego jails ............................................ v
Finding #5: San Diego is one of many counties with high suicide rates in jails. ..................................................... vi
Finding #6: Elevated risk of death appears to be isolated to the unsentenced jail population ................................vii
Finding #7: Public oversight of in-custody deaths lacks key information ................................................................vii

1. Introduction ............................................................................................................................ 2
2. In-Custody Deaths in California Jails ...................................................................................... 3
3. County Mortality Rates ........................................................................................................... 4
4. Who is in the Jails from the County Population? .................................................................... 6
5. Expected vs Actual In-Custody Deaths ................................................................................. 7
6. Differences Between Unsentenced and Sentenced Inmates ................................................ 11
7. Future Research .................................................................................................................... 14
References ................................................................................................................................ 17

Appendix A: Selection of Counties ........................................................................................... 18
Appendix B: ADP vs. ARP ....................................................................................................... 19
Appendix C: A Closer Look at Overdose/Accidental Deaths .................................................. 20
Appendix D: Estimated vs Actual San Diego Jail Population .................................................. 21
Appendix E: Peer-Review Letters ............................................................................................ 22
Appendix F: Response from San Diego Sheriff's Department ................................................. 25
Appendix G: Deaths in City Jails ............................................................................................. 27
Appendix H: Detailed Results .................................................................................................. 28

Expected vs Actual Statistical Test Results............................................................................. 28
Jail Profiles of Each County in The Study ............................................................................... 31
Mortality Rates Over Time ....................................................................................................... 43
Comparisons of San Diego Inmate Population to Other California Counties ........................... 44
County Demographics .............................................................................................................. 45
Unstandardized Average Time between Deaths ...................................................................... 46

Appendix I: Email Correspondence with Dr. Elizabeth Carson (U.S. Bureau of Justice Statistics)............ 46
Appendix J: Data Inclusion Criteria ......................................................................................... 50
Appendix K: Relevant Policy Changes Provided by the San Diego Sheriff's Department (2014-2021)......51
List of Tables ........................................................................................................................... 55
List of Figures .......................................................................................................................... 56

Analytica
CONSULTING

Ex. C - 148

# 1. Introduction

The number of deaths in California's county jails has been a subject of increasing debate. This discussion has put sheriff's departments, who oversee these facilities, in sharp focus. Initial research on sheriff's departments has highlighted the apparent disparities in death rates among California county jails (Brannon 2020). San Diego County has received considerable scrutiny in these investigations. Reporting by local media and advocacy groups suggests the death rate in San Diego jails surpasses the death rates in all other large county jails in California (McDonald, Davis, and Schroeder 2019). Based on data from the California Department of Justice, about one inmate dies every month on average in San Diego jails.

Throughout this public debate, several important questions regarding how to evaluate county jail death rates have been raised. What population should these deaths be compared to when calculating jail mortality rates? Nearly all previous studies use the average daily jail population (ADP), which adds the daily count of inmates together for the month and then divides it by the number of days in that month.[3] Furthermore, what manners of deaths should be the focus of this research? Suicides have received the most attention in this work. Natural deaths and, to a smaller degree, homicides and accidental deaths also occur in jails. However, one of the primary questions on this topic is how best to compare in-custody deaths across different counties. For instance, some research has considered the racial proportions of counties when explaining these death rates (Kelly 2018). What other county factors should be incorporated into a comparison of jail death rates?

Given that jails primarily admit those from the immediate county, the particulars within a county will likely impact in-custody death rates. As the San Diego Sheriff's Department wrote in response to a recent state audit:

> "As jails are a microcosm of the communities in which they are located, it should come as no surprise that as deaths in the community increase, deaths in-custody will increase as well." (2022)(p.99)

We seek to understand this argument by exploring the relationship between county death rates and jail death rates. Counties have different populations, which exhibit varying levels of risk of death based on demographic profiles, associated behaviors, and the level of services available to residents in the county. Specifically, we seek to answer the following question: do differences in county mortality rates help explain the differences we see in county jail mortality rates?

To address this question, we establish an expected number of total deaths in jails by applying countywide mortality rates to the county's in-custody population. Our countywide mortality rates encompass nearly 200 unique groups based on gender, age, and race-ethnicity and four different manners of death. As such, they capture the distinctive health risks within a county. We then determine the distribution of these groups in county jails using a combination of arrest and jail population data. This step enables us to report the expected number of deaths for each county jail in our study. These expected values provide a county-level baseline for evaluating and comparing in-custody deaths across county jails.

---

[3] To fairly compare in-custody deaths across counties, we must account for the different number of inmates in each county's jail system. Nearly all studies utilize the Average Daily Population (ADP) for this calculation. We were able to find only two analyses that use the At-Risk Population (ARP) (Kelly 2018). For more discussion on ADP vs. ARP, see Appendix B.

Analytica CONSULTING

Ex. C - 149

## 2. In-Custody Deaths in California Jails

To provide some initial context on in-custody deaths in California jails, we examine total deaths between 2010-2020 among the 12 most populous counties. These 12 counties were chosen for this study because they have an adequate sample size of in-custody deaths over time (see Appendix A for more discussion). The first chart in Figure 1 displays the total jail deaths. The number of deaths in these counties varies substantially.[4] San Francisco, Contra Costa, and Sacramento counties have relatively low numbers of total deaths. Los Angeles County has the highest total deaths at 290. San Diego County has the second highest total deaths at 141.



*Figure 1: Total Deaths in Various California County Jails (2010-2020) Compared to San Diego County.*

In order to fairly compare these numbers of deaths, we consider the size of the jail population in each county. We use the average daily population (ADP), which adds the daily inmate count for the month (typically taken around midnight each day) and then divides by the number of days in the month. The average ADP from 2010-2020 for each county is listed next to the county name in Figure 1. Another infrequently used measure, at-risk population (ARP), combines the January 1 count with the number of annual admissions. While neither measure offers individual-level information on inmates, the average daily population provides a unique number of the jail population without counting many who are re-admitted to jail. As such, the U.S. Bureau of Justice Statistics believes that ADP is "the best alternative" (Carson 2021) (see Appendix B and Appendix I for more discussion).

The second chart in Figure 1 factors the average daily population by displaying total deaths if jail populations were the same size as the San Diego jail population (5180 inmates). Viewing total deaths in this manner allows us to better compare other counties to San Diego. When we base in-custody deaths on a jail population of 5180 inmates, San Diego is now the county with the greatest number of deaths over the past decade. Fresno County has a comparable number of deaths at 140.

Measuring total deaths does not fully describe the nature and circumstances surrounding these deaths. To better compare in-custody deaths among these 12 counties, we break down these deaths by the manner of death. Table 1 presents the average time between deaths for the four major manners of death: natural deaths, suicides, overdose/accidental deaths, and homicides.[5,6] Comparing the average time between death accentuates the frequency of these death. For instance, deaths are more common if the length of

---

[4] Deaths exclude individuals in custody who died in transit or individuals who died in the process of being arrested. See Appendix J for full list of data inclusions.

[5] For homicides, we only include willful deaths committed by other inmates or law enforcement staff. Two other categories–undetermined and pending investigation—are nondescript and therefore not included in our analysis.

[6] An overwhelming majority of overdose/accidental deaths are drug-related. The remaining deaths in this category are associated with blunt force, choking, and medically-related circumstances. See Appendix C for a full breakdown of these deaths.

Analytica
CONSULTING

time between deaths is only two months versus 2.1 years. The values on Table 1 are also based on the size of the San Diego jail population.

***Table 1****: Average Standardized Time Between Deaths by Manner[7] (2010-2020)\**

| County | Natural | Suicide | Overdose/Accidental | Homicide |
|--------|---------|---------|---------------------|----------|
| Alameda | 2 months | 4 months | 7 months | 2.1 years |
| Contra Costa | 5 months | 3 months | 3 years | |
| Fresno | 2 months | 4 months | 7 months | 1.1 years |
| Kern | 2 months | 4 months | 8 months | 2.4 years |
| Los Angeles | 3 months | 9 months | 9 months | 2.5 years |
| Orange | 3 months | 1.4 years | 1.2 years | 4.1 years |
| Riverside | 3 months | 5 months | 6 months | 1.3 years |
| Sacramento | 5 months | 10 months | 1.2 years | 1.2 years |
| San Bernardino | 3 months | 6 months | 1.4 years | 1.9 years |
| **San Diego** | **2 months** | **3 months** | **5 months** | **1.4 years** |
| San Francisco | 3 months | 4 months | 8 months | |
| Santa Clara | 2 months | 6 months | 2.4 years | 7.3 years |

*\*To enable an apples-to-apples comparison, all values are standardized to represent what the value would be if that county jail was the same size as the San Diego County jails. See Appendix H for unstandardized values*

The table above reveals that the shortest periods of time between deaths is among natural deaths. On average, there is a natural death in many county jails including San Diego every two months. Suicides also occur in jails with some frequency. Over half of these county jails have a suicide every three to four months. This table also suggests that overdose/accidental deaths and homicides are relatively rare in jails. Many counties go 8 to 12 months without an overdose/accidental death. However, both San Diego and Riverside report this type of death about every five months. Homicides are even rarer occurrences in jails, often happening every two years or more. In fact, two counties (Contra Costa and San Francisco) did not report a single homicide over this eleven-year period. San Diego had a homicide on average every 16 months.

Table 1 also puts in-custody deaths in San Diego County in clearer focus. Inmates die more frequently of natural and overdose/accidental causes in San Diego than in any other county. In addition, San Diego has the second fewest months between suicides and the fourth fewest months between homicides. Are these rates informed by the broader mortality rates among San Diego County's general population? We seek to answer this question by applying county mortality rates to the jail population of each county.

# 3. County Mortality Rates

An explanation for in-custody deaths may be the residents of the counties themselves. County populations exhibit varying levels of mortality risk based on demographic profiles, associated behaviors, and the level of services available to residents in the county. As a result, mortality rates among the county population may be a useful criterion for comparing in-custody deaths among these 12 counties. For instance, a county jail may experience a high number of suicides because of a high prevalence of suicide in the county at large.

If one looks at San Diego County, several notable demographic features may have implications for mortality rates in the county. San Diego County's White population is almost 10 percent higher than the average White population among the other counties in this study. Consequently, it has fewer Black and Hispanic residents by 2-3 percentage points than these other counties. (See Appendix H for complete comparisons of county demographics.)

---

[7] Out of the 990 total in-custody deaths in-scope for our study, 64 had a manner of death listed as *Pending Investigation*. Most of these came from three counties: San Bernardino (24), Los Angeles (18), and Santa Clara (9). To obtain missing manner of death values, we filed Public Records Act requests with the coroner/medical examiner of all the counties in our study. We then matched the data we received with the data from the California Department of Justice using death date, race, gender, and birth date as the matching fields. Using this method, we were able to identify the manner of death for 31 of the 64 listed as *Pending Investigation*.

Analytica CONSULTING

To systematically study different county mortality rates, we use data from the U.S. Centers for Disease Control and Prevention WONDER data base ("Underlying Cause of Death Data, 1999-2020" 2021) to calculate the mortality rates for each manner of death using gender, race-ethnicity, and age as our primary demographic characteristics. For example, one distinct stratum is Black males from age 18-29. Together, these strata form 48 distinct demographic groups which, when combined with our four manners of death, result in 192 different death rates for each county. To maximize the number of observations per stratum, we utilize data ranging from 1999-2020. Mortality rates are measured by counting the yearly number of deaths per 10,000 residents.

Figure 2 displays the general population mortality rates for the 12 counties in our study.[8] These figures also compare these county mortality rates to the Western United States metropolitan county average. The value of 17.5 for San Diego indicates that about 17 people per 10,000 residents die in the county each year on average. In general, the mortality rate for San Diego is between that of Orange County and Alameda County and below the Western United States metropolitan county average. Kern County has the highest overall mortality rate at 26.7 per 10,000 residents.



*Figure 2: Overall County Mortality Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*



To understand the differences in mortality rates by manner of death, Figure 3 displays the county mortality rates for overdose/accidental deaths, homicides, and suicides. Natural deaths are excluded from this figure because they skew heavily toward older populations and are included in the overall rates in Figure 2. This figure provides a more nuanced picture of mortality rates in San Diego County. Specifically, the County has higher mortality rates for overdose/accidental deaths and suicides than most of the other California counties in this study; however, it largely mirrors the broader Western metropolitan county average in these manners of death. San Diego has one of the lowest homicide rates, closely resembling the homicide rates of Santa Clara and Orange counties.

*Figure 3: Suicide, Homicide, and Accidental Death Rates*
*(Deaths per 10k/year, Ages 18-59, 1999-2020)*

---

[8] We restrict these figures to ages 18-59 to focus the analysis on age groups that make up over 97% of jail populations. Additionally, the rates of death increase dramatically over the age of 60 and skew heavily towards natural death.

Analytica
CONSULTING

# 4. Who is in the Jails from the County Population?

For various reasons, county general populations and jail populations will likely vary, particularly on certain demographic attributes (Tonry 2011). To capture unique jail populations and estimate their mortality rates, we rely on arrest data from 2010-2020 obtained by California's Department of Justice OpenJustice portal. We first create the same demographic groupings used to measure county mortality rates.[9] Then, we calculate the percentage of felony and misdemeanor county arrests that occurred among each group. For example, our analysis estimates that White males and females aged 40-59 constituted nearly 18% of arrests in San Diego County.

However, these arrest rates need to be transformed into jail populations because not all those arrested will remain in-custody at county jails. By comparing each group's felony and misdemeanor arrest rates to the county's felony and misdemeanor average daily population (ADP), we can estimate the population of each group in county jails.[10] After we complete these steps, we estimate that White males and females aged 40-59 make up about 15% of the San Diego jail population.

Figure 4 compares the county population[11] and jail population in San Diego by race-ethnicity and age. Two general trends are clear from this figure. First, racial-ethnic minority groups are disproportionately represented in jail. The most glaring example of this is Blacks aged 18-39. This group makes up only 1.7% of the county population but constitutes about 12% of the jail population. Similar discrepancies exist for other minority strata. Second, the jail population skews younger than the county population. We find that nearly 69% of the jail population is between the ages of 18 and 39. This segment is only 32% of the general population in San Diego County.



*Note: Jail population is estimated using arrest data and reported jail population from 2010-2020*

*Figure 4: Comparing the Jail and General Population in San Diego County*

---

[9] To generate more accurate expected death rates, we weigh the arrest data age category of 40-69 into three distinct groups—40-49 (66%), 50-59 (26%), and 60-69 (8%). In the California general population, a 69 year old individual is about 15 times more likely to die of natural causes than a 40 year old.("Underlying Cause of Death Data, 1999-2020" 2021). We would expect this 40-69 year old age group to skew much younger in the jail population. Nationwide, people over age 55 make up just 7.3% of inmates while those age 35-54 make up 38.9% of inmates.("Jail Inmates in 2020 – Statistical Tables" 2021). We show a comparison of our resultant estimates to actual values for San Diego County in Appendix D.

[10] A variant of this method for estimating jail populations was also used in Kelly's analysis on suicides in San Diego County (Kelly 2018). Additionally, we used detailed booking data provided by SDSD to evaluate the accuracy of these estimates. See Appendix B for this comparison.

[11] All general population estimates come from averaging 2010-2020 population projections provided by the California Department of Finance. These are the estimates used by all State of California government entities.

Analytica
CONSULTING

# 5. Expected vs Actual In-Custody Deaths

Our primary interest is to determine if countywide mortality rates can help explain total in-custody county deaths. Now that we have mortality rates for the different demographic groups in these counties and know what proportion of these groups are in jails, we can calculate the expected total jail deaths between 2010-2020.[12] We generate expected total deaths for each manner of death as well as overall total deaths. While these expected total deaths account for the underlying health conditions of the surrounding county population, they do not capture some of the unique problems among incarcerated individuals like substance abuse, poor mental health, and chronic/communicable diseases (Binswanger, Krueger, and Steiner 2009;Faze and Danesh 2002;Vaughn et al. 2014). Mortality rates for people with these types of conditions are not readily available.

These expected total deaths are then compared to the actual total deaths in jails. Both measures are based on the San Diego jail population size. If actual deaths are greater than expected deaths, we classify the difference between these two values as *excess deaths*. It is these deaths that are not explained by county mortality rates. We also conduct statistical tests to determine if expected values and actual values are statistically different.[13,14]

Figure 5 first displays the results for suicides. The bars on the left represent the expected total deaths for each county jail. One helpful way to think about what this bar represents for San Diego is to imagine a town in San Diego County of about 5,000 people, 4,000 of which are men under the age of sixty. Like any other town, death is a natural part of life there, so you'd expect a certain number of people to die between 2010 and 2020. For the other counties, the bars represent what this approximately 5000-person town would look like in each respective county if the town's demographics mirrored the demographics of the county's jails.

The bars on the right compare expected total deaths to actual total deaths. We also show the number of excess deaths on the far right if the expected and actual values are statistically different. Figure 5 illustrates that the number of suicides in jails eclipses the expected number of suicides in every county, indicating that suicides are a severe problem in county jails. The disparities between these two values varies by county. The expected total number of suicides for San Diego is nine while the actual total number of suicides was 40 over this period of time. This four-fold difference of 31 excess deaths is also statistically significant. Only Contra Costa has more excess deaths than San Diego at 32 when their jail population is scaled to match the size of San Diego's jail population.

---

[13] We used Byar's approximation to test the statistical difference between expected and actual in-custody deaths. This statistical test allows us to compare an expected mortality rate to an actual one to see if they are the same. The null hypotheses for this test is that the rates are the same.

[14] Some of our statistical tests point to negative excess deaths (i.e. actual deaths are statistically less than expected deaths). See Appendix H for the full results of our statistical tests. Negative excess deaths are generally associated with some type of intervention. For example, negative excess deaths during the COVID-19 pandemic have occurred in New Zealand because the country's widespread mask wearing and social distancing also reduced deaths from things like the flu. These types of interventions in the context of county jails are beyond the scope of this study.

Analytica
CONSULTING



Figure 5: Expected vs Actual Jail Suicides between 2010 and 2020

Overdose/accidental deaths and homicides account for a small proportion of jail deaths. Given the small sample sizes for these manners of death, many of the differences between expected and actual total deaths are not statistically significant. Figure 6 displays the results for overdose/accidental deaths in jail. Here San Diego is one of the counties with a high number of excess deaths. In fact, it has the highest number of excess deaths at 14 out of all the counties in this study. The number of actual deaths is double the number of expected deaths and is the only difference that is statistically significant.



Figure 6: Expected vs Actual Jail Accidental Deaths between 2010 and 2020

It is clear from the bar graphs on the right in Figure 7 that homicides occur infrequently in county jails. For this manner of death, San Diego has the highest number of excess deaths at three although expected and actual values are not statistically different. No other county has more homicides than what is projected by their countywide mortality rates. Riverside County's actual deaths equal their expected deaths.



Figure 7: Expected vs Actual Jail Homicides between 2010 and 2020

Figure 8 displays the results for natural deaths. Based on the bars on the right, actual deaths are lower than expected deaths for every county. In other words, natural deaths in jails are lower than what we would expect based on each county's mortality rates over the past decade. For example, we projected that San Diego County would have 90 natural deaths between 2010-2020. The actual number of deaths was only 65. San Francisco and Contra Costa counties are considerably below their projected number of deaths. These differences may be explained by people with certain medical conditions being deemed not fit for jail, and therefore, not being booked; however, more research is required to better understand this phenomenon.



Figure 8: Expected vs Actual Jail Natural Deaths between 2010 and 2020

The last figure presents the overall total deaths. Based on Figure 9, San Diego County has the highest number of excess deaths out of all 12 counties. Specifically, 24 in-custody deaths cannot be explained by county mortality rates. When scaled to the size of San Diego's jail population, both Fresno County and Santa Clara County have the closest number of excess deaths at three. Unlike San Diego, the differences for these two counties are not statistically significant. The remaining counties on Figure 9 have fewer total deaths than what is projected by countywide mortality rates



*Figure 9: Overall Expected vs Actual Jail Deaths between 2010 and 2020*

Together, these figures suggest that those in-custody in San Diego County jails are at a greater risk of death than those in-custody in other California counties. Our analysis suggests that the number of deaths in San Diego jails easily surpasses the number of deaths one would expect based on the county's mortality rates. In other words, even after controlling for county mortality rates and jail population, San Diego still has the highest number of total deaths out of the 12 most populous counties in California.

That said, our analysis indicates the level of risk in San Diego jails varies among the different manners of death. This risk is the highest for overdose/accidental deaths. Inmates in San Diego jails may also be at greater hazard for homicides than in other county jails; however, the low sample sizes don't give us sufficient evidence to say with confidence. Finally, the risk for suicides in San Diego jails is high but not dissimilar to other counties in this study. San Diego is one of a handful of counties that report a large number of excessive suicides in their jails.

Analytica CONSULTING
Ex. C - 157

## 6. Differences Between Unsentenced and Sentenced Inmates

Up to this point, this study has examined deaths among the overall jail population without making any distinctions between inmates themselves. One important distinction we can measure and may impact death rates is whether an inmate has been sentenced for the crime(s) for which they have been charged. Generally, those sentenced have been in jail longer than those not yet sentenced. Unfortunately, arrest dates and booking dates are not collected by the state's reporting of in-custody deaths; however, the sentenced/unsentenced classification offers a rough approximation of who has been in jail for longer periods of time. To consider the length of time an inmate has been in jail, we conduct the same expected vs actual analysis comparing unsentenced and sentenced inmates.



*Figure 10: Overall Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced*

Figure 10 shows the extent to which the unsentenced/sentenced distinction matters to in-custody deaths. This figure summarizes overall deaths. The bar graphs for unsentenced inmates on the left reveal that San Diego jails had 51 excess deaths among this group. The difference between actual and expected total deaths are statistically significant for the county. Kern, Fresno, Santa Clara, and Orange county jails also have more actual deaths than expected deaths but these differences do not reach the level of statistical significance. The bar graphs on the right for sentenced inmates present a contradictory account. All county jails including San Diego have fewer deaths than what is expected based on county mortality rates.

We also conduct this same analysis for each manner of death. The disparities in excess deaths between unsentenced and sentenced inmates varies by the manner of death. On one hand, Figure 11 shows relatively small differences in natural deaths between these two groups. San Diego is the only county with actual natural deaths exceeding expected natural deaths. On the other hand, Figure 12 shows vast differences in suicides between the sentenced and unsentenced. This figure demonstrates how vulnerable the unsentenced are to suicide. Actual total deaths far exceed the expected total deaths in every county. San Diego is the most lopsided county in this regard. The number of actual suicides is nearly seven times the expected suicides. Only a few counties have excess suicides among the sentenced population.

Analytica
CONSULTING



2022 In-Custody Death Study



*Figure 11: Natural Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced*



*Figure 12: Suicide Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced*

The gaps in overdose/accidental deaths and homicides among the unsentenced and sentenced are more subtle. Figure 13 confirms excess overdose and accidental deaths occur for both unsentenced and sentenced in several counties although there are more overall deaths among those not sentenced. Riverside and San Diego jails have the highest numbers of excess deaths among the unsentenced. Finally, Figure 14 presents a mixed picture for homicides. Among inmates not sentenced, San Diego is the only county with actual total deaths exceeding expected total deaths. Among inmates sentenced, both Sacramento and Riverside counties have more actual deaths than what is expected.

Overall, these findings strongly suggest that those not yet sentenced and in jail less time are more at risk of death than those sentenced and in jail longer. Specifically, these unsentenced inmates are at greater risk of suicide and overdose/accidental deaths. From a policy perspective, these findings highlight the

Analytica
CONSULTING
Ex. C - 159

importance of providing support for inmates at critical times during their jail incarceration, including when they first enter jail and when they are found guilty but not yet sentenced for a crime.



Figure 13: Overdose/Accidental Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced



Figure 14: Homicide Expected vs Actual Jail Deaths between 2010 and 2020 - Sentenced and Unsentenced

# 7. Future Research

The focus of this project has been to consider countywide mortality rates in evaluating in-custody deaths in San Diego and other counties. Toward this end, we have collected and analyzed an extensive amount of data to examine the complex relationships between jail deaths and county mortality rates. As with any research project, this focus has certain limitations that we hope future research can meaningfully address.

First, the questions we could pursue in this study were limited by the data that was available. In estimating county mortality rates, we stratify county populations by several important demographic factors and manners of death. To obtain more precise county mortality rates, other factors should be included in these rates. For example, incorporating the impact of homelessness, mental illness, and other health-related conditions would add more granularity to these mortality rates. Currently, these data are not readily available.

In addition, this study was constrained by time and scope. While our research has delineated the differences in deaths among county jails, we have yet to explain *why* they are different. The latter necessitates analyzing the operations and specific policies of county jails, which are also likely to vary considerably from county to county. Throughout this project, we have amassed data to begin to measure this dimension including:

- Current and rated capacity of each detention facility

- Number of assaults on law enforcement

- Utilization of medical and mental health services among inmates

- Number of mental and health care staff in detention facilities

- Individual-level booking data with a record of admissions and releases

In particular, the data above could be utilized to generate a snapshot of a detention facility at a given moment in time. This snapshot could help county leadership and investigators understand what was happening in a facility at the time a death occurs. Below are sample visualizations of two of these factors that could potentially be part of an operational dashboard. Figure 15 graphs the actual ADP with the rated capacity over time for detention facilities in San Diego.

San Diego County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 15: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021)*

Analytica CONSULTING
Ex. C - 161

Figure 16 charts the average number of bookings and releases over the course of a day in San Diego jails. This figure shows spikes in the number of releases at 8 am and 8 pm. Dynamically tracking these types of changes would offer insights into the pressure points in the day-to-day operations of detention facilities, instances in which facilities may lack sufficient staffing or support.



*Figure 16: Average Number of Bookings and Releases by Hour of Day in San Diego County (2010-2020)*

Finally, this project does not touch upon the complex interactions between race and in-custody deaths. We have confirmed that arrest rates and jail populations are heavily skewed toward racial-ethnic minorities. But how does this disproportionality in jails impact the nature and events leading up to these deaths? Expanding the analysis to discern differences in these deaths based on the race of victims could introduce another set of overlooked factors into this body of research.

**Suggested Areas of Research for Future In-Custody Deaths Studies**

1.  When are inmates most vulnerable to the risk of death? Is it after they are first admitted to jail, after they are found guilty of the crime, or based on another important event?

2.  What are the in-custody death rates among inmates with a history of mental illness?

3.  What is the underlying relationship between mental health services in jails and in-custody deaths? Does having more available mental health services and related staff reduce in-custody deaths?

4.  What role do law enforcement staffing levels play in the number of in-custody deaths?

5.  What institutional stresses are associated with in-custody deaths including:

    a)  Overcapacity of a jail facility

    b)  Processing of new admissions and releases

    c)  Frequency of assaults on staff

    d)  Extraordinary events such as the COVID-19 pandemic

6.  Is there a relationship between re-admissions and in-custody deaths at both an individual and facility level?

7.  Are in-custody deaths more prevalent among those charged with a certain type of crime?

8.  Does the race, gender or age of an inmate play a role in the circumstances surrounding in-custody deaths and subsequent investigations?

9.  What has been the impact of new programs enacted by the San Diego Sheriff's Department on in-custody deaths over time?

10. Why is there a lag in reporting the manner of an in-custody death in several counties?

Analytica
CONSULTING

Ex. C - 162

11. What is the role of county mental health services and other public services such as public housing on jail deaths?

12. How does the fact that San Diego is a border town impact in-custody deaths? Are these issues present in other border towns?

13. What are the in-custody death rates among inmates with a history of homelessness?

14. What is the impact of compassionate releases on the nature and number of in-custody deaths?

15. How has realignment in California in 2011 shaped in-custody deaths in county jails?

# References

Abderhalden, Frances P. 2022. "Challenging Normal Science: An Interdisciplinary Approach to Jailed Individuals Self-Report of Lifetime and in-Jail Suicidal Ideations." *Crime &Amp; Delinquency*.

Binswanger, I A, P M Krueger, and J F Steiner. 2009. "Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the Usa Compared with the General Population." *Journal of Epidemiology and Community Health.* 63 (11): 912–19.

Bird, Mia, Magnus Lofstrom, Brandon Martin, Steven Raphael, and Viet Nguyen. 2018. *The Impact of Proposition 47 on Crime and Recidivism*. Public Policy Institute of California.

Brannon, Matt. 2020. "Analysis Reveals Disparities Among Death Rates in California County Jails." *Redding Record Searchlight*, October. https://eu.redding.com/in-depth/news/local/2020/10/02/california-jails-inmate-deaths-shasta-county-mental-health-care/5539531002/.

Carson, Elizabeth. 2021. *Your Feedback on Measures of Inmate Mortality Rates*.

Close, Melanie, Olive Lu, Shannon Tomascak, Preeti Chauhan, and Erica Bond. 2021. *Understanding Trends in Jail Populations, 2014 to 2019: A Multi-Site Analysis*. Data Collaborative for Justice. John Jay College of Criminal Justice.

California Department of Finance. 2021. "P-3: Complete State and County Projections Dataset." July. Accessed January 2022. https://dof.ca.gov/forecasting/demographics/projections/.

Faze, S, and J Danesh. 2002. "Serious Mental Disorder in 23000 Prisoners: A Systematic Review of 62 Surveys." *Lancet* 359 (9306): 545–50.

"Jail Inmates in 2020 – Statistical Tables." 2021. US Bureau of Justice Statistics. https://bjs.ojp.gov/content/pub/pdf/ji20st.pdf.

Kelly, Colleen. 2018. *REVIEW AND CRITIQUE OF THE DISABILITY RIGHTS CALIFORNIA'S REPORT*.

McDonald, Jeff, Kelly Davis, and Lauryn Schroeder. 2019. "Rate of Jail Inmate Deaths in San Diego County Far Exceeds Other Large California Counties." *The San Diego Union Tribune*, September. https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

Subramanian, Ram, Kristine Riley, and Chris Mai. 2018. *Divided Justice: Trends in Black and White Jail Incarceration, 1990-2013*. Vera Institute of Justice.

Tonry, Michael H. 2011. *Punishing Race: A Continuing American Dilemma*. Oxford University Press.

"Underlying Cause of Death Data, 1999-2020." 2021. Centers for Disease Control; Prevention. https://wonder.cdc.gov/ucd-icd10.html.

Vaughn, Michael, Christopher P Salas-wright, Matt Delisi, and Alex R Piquero. 2014. "Health Associations of Drug-Involved and Criminal-Justice-Involved Adults in the United States." *Criminal Justice and Behavior* 41 (3): 318–36.

2022. *San Diego Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*. California State Auditor.

**Analytica**

Ex. C - 164


# Appendix A: Selection of Counties

Following the approach of other studies examining in-custody deaths in California, we compare San Diego County to other populous counties in the State. These counties include Kern, Fresno, Alameda, Sacramento, San Francisco, Orange, Los Angeles, San Bernardino, Riverside, Contra Costa, and Santa Clara.

We decided to choose these counties for this study because they have an adequate number of in-custody deaths between 2010-2020 for us to conduct a rigorous statistical analysis. The number of deaths in each of these counties roughly correspond to their ADP population. See the table below for select characteristics of the 20 most populous counties in California. Our selection of counties is in bold.

Our primary interest in using these counties is to explore the relationships between their in-custody deaths and countywide mortality rates. These mortality rates are the only areas of county variation we examine in relation to jail deaths in this study.

*Table 2: Select Characteristics of Most Populous California Counties (2010-2020)*

| County | Total Jail Deaths | Population | Avg Yearly Bookings | Avg Yearly ADP |
|---|---|---|---|---|
| **Los Angeles** | **290** | **11,026,820** | **115,514** | **16,504** |
| **San Diego** | **141** | **3,559,702** | **80,535** | **5,231** |
| **Orange** | **81** | **3,427,546** | **57,295** | **5,895** |
| **Riverside** | **78** | **2,553,899** | **52,013** | **3,735** |
| **San Bernardino** | **94** | **2,317,913** | **65,529** | **5,448** |
| **Santa Clara** | **65** | **2,081,267** | **41,058** | **3,428** |
| **Alameda** | **67** | **1,761,754** | **45,232** | **2,871** |
| **Sacramento** | **48** | **1,631,895** | **42,998** | **3,832** |
| **Contra Costa** | **28** | **1,216,381** | **23,424** | **1,383** |
| **Fresno** | **72** | **1,072,876** | **33,706** | **2,733** |
| **Kern** | **55** | **963,614** | **32,320** | **2,253** |
| **San Francisco** | **25** | **944,846** | **19,058** | **1,284** |
| Ventura | 38 | 919,196 | 27,762 | 1,496 |
| San Mateo | 12 | 828,364 | 14,723 | 954 |
| San Joaquin | 25 | 799,517 | 22,823 | 1,314 |
| Stanislaus | 40 | 588,189 | 19,177 | 1,150 |
| Sonoma | 24 | 540,923 | 16,878 | 1,005 |
| Tulare | 19 | 506,732 | 21,083 | 1,526 |
| Santa Barbara | 18 | 481,891 | 14,946 | 929 |
| Monterey | 25 | 472,944 | 12,185 | 941 |

**Analytica** CONSULTING

Ex. C - 165

# Appendix B: ADP vs. ARP

Average daily Jail population (ADP) measures the average number of individuals in custody each day, typically reported on a monthly basis. According to the California Board of State and Community Corrections, this is calculated by taking the daily inmate count (usually at or near midnight), adding these daily counts together for the month and dividing by the number of days in that month. At-risk population (ARP) measures the number of individuals admitted to a detention facility.

**Table 3**: ADP vs. ARP by County (2011-2020)

| County | Avg Yearly ADP | Avg Yearly ARP | ARP/ADP Ratio |
|---|---|---|---|
| Alameda | 2,872 | 48,148 | 17 |
| Contra Costa | 1,383 | 24,802 | 18 |
| Fresno | 2,733 | 36,378 | 13 |
| Kern | 2,254 | 34,586 | 15 |
| Los Angeles | 16,505 | 131,953 | 8 |
| Orange | 5,896 | 63,156 | 11 |
| Riverside | 3,735 | 55,741 | 15 |
| Sacramento | 3,833 | 46,821 | 12 |
| San Bernardino | 5,448 | 70,901 | 13 |
| San Diego | 5,232 | 85,726 | 16 |
| San Francisco | 1,284 | | |
| Santa Clara | 3,428 | 48,124 | 14 |

This is typically calculated by adding the inmate count at the beginning of the year with the total bookings for each month. As a result, a county's ARP is much higher than their ADP. The vast difference between these two denominators would certainly impact the standardized in-custody death rate. See below (the dates of 2011-2020 were selected because San Diego County changed how they measured bookings in 2010).

ARP comes with the advantage of measuring new and potentially high-risk entrants into the jail system; however, it does not measure unique inmates in jails over time. A significant portion of those admitted to county jails will be re-booked within a short period of time. For example, Public Policy Institute of California found that the two-year rearrest rate was 70.8% for 12 California counties in 2011-2012 (Bird et al. 2018). Comparable studies on other counties in other states point to similar results (Close et al. 2021).

ADP addresses this shortcoming by measuring unique persons in-custody. Neither measure reflects inmates' length of stay, which would require individual-level data. Bereft of an individual-level data set that would allow of the calculation of unique person-days exposed, the U.S. Bureau of Justice Statistics believes "ADP is the best alternative." (Carson 2021) (See Appendix I for the correspondence between Analytica Consulting and the U.S. Bureau of Justice Statistics.)

While we use ADP per the BJS guidance, ADP data is not available by demographic group, which is a key dimension of our analysis. We therefore assume the makeup of arrestees fairly represents the jail population for a given year, and apply arrest proportions by demographic group to estimate ADP by group (see Appendix D).

**Analytica** CONSULTING

# Appendix C: A Closer Look at Overdose/Accidental Deaths

Overdose/accidental death is a manner of death that includes various types of circumstances. While we exclude transportation-related accidents from this category, there are still several distinct types of accidents. The tables below break down these deaths further.

It is clear from both tables that drug overdoses make up a substantial portion of these deaths. For example, drug overdoses are 89% of deaths in San Diego jails and 76% of deaths among San Diego's general population.

**Table 4**: *A Closer Look at Overdose/Accidental Jail Deaths, 2010-2020*

| County | Total Accidental Deaths | Drug Overdose | Choking / Asphyxiation | Medically Related | Other / Pending | Fall or Blunt Force |
|---|---|---|---|---|---|---|
| Alameda | 11 | 72.7% | 9.1% | 9.1% | 9.1% | – |
| Contra Costa | 1 | 100.0% | – | – | – | – |
| Fresno | 9 | 88.9% | – | – | 11.1% | – |
| Kern | 7 | 57.1% | – | – | 42.9% | – |
| Los Angeles | 47 | 66.0% | 2.1% | 8.5% | 14.9% | 8.5% |
| Orange | 10 | 80.0% | 10.0% | – | – | 10.0% |
| Riverside | 16 | 87.5% | – | 6.2% | – | 6.2% |
| Sacramento | 7 | 57.1% | – | 14.3% | 14.3% | 14.3% |
| San Bernardino | 8 | 12.5% | – | – | 87.5% | – |
| San Diego | 27 | 88.9% | – | – | 11.1% | – |
| San Francisco | 4 | 75.0% | – | – | 25.0% | – |
| Santa Clara | 3 | 66.7% | – | – | 33.3% | – |
| | 150 | 72.0% | 2.0% | 4.7% | 16.7% | 4.7% |

**Table 5**: *Countywide Accidental Death Breakdown (1999-2020)*

| County | Deaths per 10k/year | Drug Overdose | Choking / Asphyxiation | Medically Related | Other* | Fall or Blunt Force |
|---|---|---|---|---|---|---|
| Alameda | 1.7 | 75.1% | 2.8% | – | 15.0% | 7.0% |
| Contra Costa | 1.8 | 76.8% | 1.4% | – | 13.8% | 8.0% |
| Fresno | 2.2 | 75.7% | 1.0% | – | 17.0% | 6.3% |
| Kern | 3.2 | 83.7% | 1.3% | – | 10.1% | 5.0% |
| Los Angeles | 1.5 | 73.0% | 1.7% | – | 14.4% | 11.0% |
| Orange | 1.6 | 78.7% | 2.3% | – | 10.6% | 8.4% |
| Riverside | 2.2 | 78.4% | 1.5% | – | 13.0% | 7.1% |
| Sacramento | 2.3 | 75.3% | 2.1% | – | 16.3% | 6.3% |
| San Bernardino | 1.3 | 60.8% | 1.7% | – | 24.8% | 12.6% |
| San Diego | 2.0 | 76.4% | 1.6% | – | 12.8% | 9.2% |
| San Francisco | 3.0 | 84.8% | 1.6% | – | 7.1% | 6.5% |
| Santa Clara | 1.2 | 70.5% | 2.5% | – | 17.2% | 9.8% |
| | 1.8 | 75.4% | 1.8% | – | 13.9% | 8.9% |

*Mostly consists of drownings, fire/smoke exposure, electrocution, firearm discharges, and poisoning (non-overdose)*

Analytica CONSULTING

# Appendix D: Estimated vs Actual San Diego Jail Population

We estimate county jail populations using a combination of arrest and average daily jail population (ADP) data. To assess the accuracy of these estimates, we compared them with the actual San Diego average daily jail population (ADP). We calculated San Diego's actual ADP using detailed booking data from 2010-2022 provided by the San Diego Sheriff's Department (SDSD). To ensure our ADP calculations didn't exclude people booked before our data began in 2010 and who are still in jail, our estimates are for years 2014-2020. Additionally, the age groups in the data provided by SDSD did not exactly match the age groups in our data (e.g., 18-30 vs. 18-29).

This comparison was only used to validate our assumptions since we did not have detailed booking data for other counties. We still use our estimates for the analysis, so our approach is the same for each county in the study.

Below are these comparisons for the five different age groups in our data set.

**Table 6**: Actual vs Estimated San Diego ADP
*(Ages 18-29, 2014-2020)*

| Gender | Race/Ethnicity | Actual (Age 18-30) | Estimated (Age 18-29) |
|--------|---------------|------|-----------|
| M | Hispanic | 17.1% | 14.0% |
| M | White | 9.0% | 9.5% |
| M | Black | 6.7% | 5.7% |
| F | White | 2.7% | 3.7% |
| F | Hispanic | 2.2% | 3.2% |
| M | Other | 1.7% | 1.8% |
| F | Black | 1.0% | 1.6% |
| F | Other | 0.3% | 0.6% |
| Total | - | 40.6% | 40.1% |

**Table 7**: Actual vs Estimated San Diego ADP
*(Ages 30-39, 2014-2020)*

| Gender | Race/Ethnicity | Actual (Age 31-40) | Estimated (Age 30-39) |
|--------|---------------|------|-----------|
| M | Hispanic | 9.2% | 8.1% |
| M | White | 8.5% | 8.8% |
| M | Black | 4.3% | 3.7% |
| F | White | 2.4% | 3.1% |
| F | Hispanic | 1.6% | 2.0% |
| M | Other | 1.6% | 1.5% |
| F | Black | 0.8% | 1.0% |
| F | Other | 0.3% | 0.5% |
| Total | - | 28.7% | 28.8% |

**Table 8**: Actual vs Estimated San Diego ADP
*(Ages 40-49, 2014-2020)*

| Gender | Race/Ethnicity | Actual (Age 41-50) | Estimated (Age 40-49) |
|--------|---------------|------|-----------|
| M | White | 6.1% | 7.8% |
| M | Hispanic | 4.2% | 3.7% |
| M | Black | 3.1% | 3.4% |
| F | White | 1.7% | 2.4% |
| M | Other | 1.0% | 1.0% |
| F | Hispanic | 0.7% | 0.9% |
| F | Black | 0.5% | 0.7% |
| F | Other | 0.1% | 0.3% |
| Total | - | 17.5% | 20.2% |

**Table 9**: Actual vs Estimated San Diego ADP
*(Ages 50-59, 2014-2020)*

| Gender | Race/Ethnicity | Actual (Age 51-60) | Estimated (Age 50-59) |
|--------|---------------|------|-----------|
| M | White | 4.5% | 3.1% |
| M | Black | 2.5% | 1.4% |
| M | Hispanic | 1.9% | 1.5% |
| F | White | 0.8% | 0.9% |
| M | Other | 0.4% | 0.4% |
| F | Black | 0.3% | 0.3% |
| F | Hispanic | 0.2% | 0.4% |
| F | Other | 0.0% | 0.1% |
| Total | - | 10.6% | 8.0% |

**Table 10**: Actual vs Estimated San Diego ADP
*(Ages 60+, 2014-2020)*

| Gender | Race/Ethnicity | Actual (Age 61+) | Estimated (Age 60+) |
|--------|---------------|------|-----------|
| M | White | 1.2% | 1.2% |
| M | Black | 0.5% | 0.5% |
| M | Hispanic | 0.4% | 0.5% |
| F | White | 0.2% | 0.4% |
| M | Other | 0.1% | 0.2% |
| F | Hispanic | 0.1% | 0.1% |
| F | Black | 0.0% | 0.1% |
| F | Other | 0.0% | 0.0% |
| Total | - | 2.6% | 2.9% |

Ex. C - 168

# Appendix E: Peer-Review Letters



March 18, 2022


To Whom It May Concern:

I am writing this letter to endorse the statistical methods used in the draft "In-Custody Death Study". This draft and supporting materials are authored by Analytica Consulting. This analysis uses county mortality rates to estimate the total number of expected jail deaths between 2010-2020 in San Diego and other large counties in California. It then statistically compares the values of expected jail deaths with the values of actual jail deaths.

My area of expertise is in biostatistics including statistical data interpretation and statistical modeling. I am a Professor of Biostatistics, Department of Family Medicine and Public Health, Director of Biostatistics at the Stein Institute for Research on Aging, and Co-Director of the UCSD CTRI Biostatistics Core, UCSD. I hold a master's and PhD in statistics and numerical analysis from Duke University and completed postdoctoral studies at Harvard School of Public Health. I have co-authored over 290 peer-reviewed publications, two textbooks and two edited volumes in the fields of U- statistics, categorical data analysis, clinical trials, and social network analysis. My research on statistical methodology includes a wide range of topics such as semiparametric models for longitudinal data with informative missing follow-up data, causal inference, and high throughput data.

I have peer-reviewed the draft "In-Custody Death Study" and the underlying statistical methods. Based on my thorough reading of these materials, I find that the statistical methods utilized are appropriate and sound. In particular, the authors' use of Byar's approximation to test the statistical difference between expected and actual death rates in county jails is the best methodological approach for comparing these values. This method produces results that are both valid and instructive.

Please contact me if you have any questions regarding this professional endorsement.

Sincerely,


Professor of Biostatistics
Division of Biostatistics and Bioinformatics
Herbert Wertheim School of Public Health and Human Longevity Science
UC San Diego Institute for Research on Aging
UC San Diego CTRI Biostatistics
UC San Diego Health Sciences
Naval Health Research Center
E-mail:  x2tu@health.ucsd.edu

Herbert Wertheim School of Public Health and Human Longevity Science
9500 Gilman Drive #0628, La Jolla, California 92093-0628 Tel: (858) 534-8363 Fax: (858) 534-7517

Page 22

Ex. C - 169

Analytica
CONSULTING



School of Criminal Justice and Criminalistics

March 25, 2022

To Whom it May Concern:

I was requested to ad hoc peer review the In-Custody Death Study from Analytica Consulting. My expertise on custody related deaths includes: 16 peer-reviewed publications, long term three-phase suicidal behaviors project with the Illinois Department of Corrections which includes Governor approval, partnership with three large urban jail facilities to evaluate risk on death in custody and self-reported information, expert witness consulting on high profile death by suicide cases within jails and prisons, consulting on national and international suicide prevention and intervention programs, grants, and scholarship. As such, I provided feedback, recommendations, and suggestions on the In-Custody Death Study.

Overall, my review finds that this report is well-done, appropriately analyzed, and to the same rigor and standard of much larger national reviews on death in custody. The findings align well within the empirical literature surrounding in-custody mortality rates, and suggest that the counties under study in this report are similar to national death records for incarcerated populations. However, the findings also suggest some insight into the particular populations held in Southern California jails, which provides a unique opportunity for policy recommendations related to public health, safety and security of facilities, and returning healthy citizens into the community.

Nationally, in a report by Carson (2021), between 2000 and 2019 there were 20,413 deaths in county jails in the United States, with an overall mortality rate of 142 per 100,000. By this metric, it would suggest that the counties reported in this report are consistent with deaths in custody to the national averages. In addition, nationally white non-Hispanic individuals accounted for 56% of the deaths in custody, which have a larger proportion of mortality, compared to the national level statistics (Carson, 2021). This finding is also supported in the report and the evaluation of the twelve counties in question. Interestingly, accidental deaths account for a significant number of deaths in San Diego jails, but I suggest this is simply a measurement and operationalization difference between the national level data which accounts drug overdoses as their own category, and does not consider them accidental.

The finding related to elevated suicide in San Diego, and throughout all twelve counties, is consistent with national level jail information surrounding death by suicide. While the numbers are concerning, the rate of death by suicide in the jail nationally is nearly four times as high (49 per 100,000) as the national general population rate of death by suicide (13 per 100,000) (Carson, 2021). This suggests that while suicide deaths are elevated in the twelve counties in the current report, the trend is in alignment with national reporting and not an outlier for elevated risk due to the counties themselves, rather that jail is nationally a risk factor for death by suicide. Suicide is the leading cause of death in jails annually at the national level, so this finding while extreme in first appearance with the excess deaths, is statistically, empirically, and clinically found across the board with jail incarcerated populations (Abderhalden, 2022a; 2022b).

Throughout the report, the references are appropriate and an accurate depiction of empirical evidence related to mortality in jails. The authors did a nice job incorporating the most up-to-date information in their analyses. I see no issues with how any of the information is relayed or interpreted. The analyses are strong and provide a valid and reliable approach to assessing mortality rates of expected and actual information.

In the future research section, I agree with the authors that one of the next steps for this project should be to assess *why* we see differences in death among these counties. In particular, using anecdotal evidence from some of my own ongoing work, we see

the importance of mental and health care policies, including access to care and transitional care to be an important factor to create more protective factors related to death. In addition, shift changes and type of detention cell are important considerations to assess for the suicide deaths in custody, with relatively simple and effective policy changes, should shift times demonstrate a higher risk for death by suicide.

All of this to say, there are policy implications by the work in this report that could be considered to improve the safety and security of the facilities using health based information. In particular, policies that decrease the bodily fluid exposure of other incarcerated individuals to each other, or to correctional staff, can improve the environmental health and lead to a reduction in deaths in custody. In addition, the concern about public health is directly linked to the implications of mortality in custody, and something that this report does a nice job of capturing the differences in custody deaths compared to county mortality rates. Using this information there is a real opportunity for policy to be implemented to address this disparity and begin to work toward a lower mortality rate for incarcerated individuals.

Additionally, as the authors note, an evaluation of race and gender could be a beneficial avenue to further parse out just how these policies could be directly impactful for the specific jail populations within, and between, these twelve counties. In particular, by matching counties to each other to evaluate why San Diego has different rates of mortality compared to their counterparts, could be beneficial for resource allocation and policy recommendations in order to improve the overall health of the population.

In closing, it was a pleasure to review this empirically and statistically sound report. I have no hesitations in supporting the analyses and information provided in this report as being accurate and thorough. I would be happy to answer any further questions, or provide any additional insight, should there be any. Thank you for the opportunity to review.


Sincerely,

FRANCES P. ABDERHALDEN, PH.D.

Assistant Professor

School of Criminal Justice & Criminalistics

California State University, Los Angeles

5151 State University Drive, Los Angeles, CA 90032

E: fabderh@calstatela.edu

Office: 323.379.4698

Mobile: 630.641.9994

## References

Abderhalden, F. P. (2022a). Challenging Normal Science: An Interdisciplinary Approach to Jailed Individuals Self-Report of Lifetime and in-Jail Suicidal Ideations. *Crime & Delinquency*, 00111287211072442.

Abderhalden, F. P. (2022b). Environmental and Psychological Correlates of Self-Injurious Thoughts and Behaviors among Jail Detainees. *Corrections*, 1-24.

Carson, E. A. (2021). Mortality in Local Jails, 2000-2019-Statistical Tables. *NCJ, 301368*.

# Appendix F: Response from San Diego Sheriff's Department



## San Diego County Sheriff's Department

### *William D. Gore, Sheriff*



*Kelly A. Martinez*
*Undersheriff*

March 16, 2022

Michael Marks, Principal Data Scientist
Analytica Consulting
9810 Scripps Lake Dr., Suite F
San Diego, CA 92131

**ANALYTICA CONSULTING: IN-CUSTODY DEATH STUDY RESPONSE**

Dear Mr. Marks,

Thank you for the statistical analysis on the San Diego Sheriff's Department's incarcerated population, specific to the number of in-custody deaths from 2010-2020. The Sheriff's Department appreciates the work of the auditors and takes this information to heart.

Acting Sheriff Martinez has made it her priority to implement best practices and to provide a safe and fully staffed work environment to care for individuals in our custody. Along those lines, she has begun to implement the recommendations from the California State Auditor's report.

The Sheriff's Department is currently working on a more rigorous health screening process upon intake as well as continued medical and mental health care for all individuals in our custody. Acting Sheriff Martinez has said and believes no one in our custody should be denied proper health care.

In addition to quality health services, high-quality safety and proof of life checks are necessary to provide incarcerated persons a safe environment. The Department is making every effort to ensure safety checks are conducted thoroughly and consistently by staff.

Already in 2022, the Sheriff's Department has implemented the following projects in our detention facilities:

- Medicated Assisted Treatment Program
- Body Worn Camera (BWC) Pilot-Program in Jail Facilities
- Upgrades to the Wireless Systems in all Jail Facilities
- Critical Incident Review Board (CIRB) also now reviewing all-natural deaths
- George Bailey Detention Facility Renovations scheduled to begin Summer 2022

*Keeping the Peace Since 1850*
Post Office Box 939062  •  San Diego, California 92193-9062

ANALYTICA CONSULTING: IN-CUSTODY DEATH STUDY RESPONSE
Page 2
March 16, 2022

- SDSD and CLERB Memorandum of Understanding signed for CLERB Investigator to respond to in-custody death scenes and deputy involved shootings where death occurs
- Prioritizing hiring and retention of detention facilities employees

The Sheriff's Department is continuing to identify new technology, concepts, and procedures which will significantly reduce or remedy deaths occurring in detention facilities. We ask CLERB and the public to continue to work with us to make the positive changes that will shape the future of our detention facilities, and ultimately reduce the in-custody death rates.

Sincerely,

KELLY A. MARTINEZ, ACTING SHERIFF

Michelle Craig, Lieutenant
Office of the Sheriff
Division of Inspectional Services

KAM:mc

# Appendix G: Deaths in City Jails

In conducting this study, we discovered that over 100 deaths have occurred in city-run jails since 2005. These jails are classified as Type 1 facilities.[15] It is difficult to obtain current information on the inmate population of these facilities given that BSCC discontinued surveying these facilities in 2020. According to BSCC, the decision to discontinue this survey was due to several reasons including a lack of a statutory requirement to collect these data, little incentive for facilities to report these data, a poor response rate, questionable accuracy of these data, and a general lack of interest or requests for these data.

After contacting BSCC, we were able to obtain the data for Type 1 facilities from previous years of the survey (2010-2018). As the table below indicates, several counties have many of these facilities with a notably high ADP. Los Angeles County has the most facilities (62) and, on average, over 1,000 inmates in these facilities. Orange County has the second highest number of facilities (8) and over 100 inmates in these facilities at any given time. Moreover, a clear majority of the inmates in these facilities are unsentenced and thus are likely at greater risk of death.

*Table 9: ADP and Bookings by Type 1 Facilities (2010-2018)*

| County | Type 1 Facilities | Avg ADP | Avg Unsentenced | Avg Sentenced | Avg Yearly Bookings |
|---|---|---|---|---|---|
| Alameda | 4 | 47 | 43 | 0 | 14,776 |
| Kern | 3 | 10 | 10 | 0 | 3,338 |
| Los Angeles | 62 | 1,170 | 918 | 186 | 258,917 |
| Orange | 8 | 104 | 77 | 9 | 28,550 |
| Riverside | 1 | 11 | 11 | 0 | 4,189 |
| San Bernardino | 4 | 84 | 63 | 13 | 23,997 |
| San Diego | 1 | 47 | 13 | 0 | 3,138 |

We also estimate the expected total deaths for these county Type 1 facilities. The table below compares the total expected deaths with the actual total deaths. It also reports whether the differences between these two values are statistically significant. Los Angeles, Orange, and Riverside counties all have higher total deaths than expected at statistically significant levels. These findings suggest that in-custody deaths are an issue of concern in certain county Type 1 facilities in addition to county jails.

*Table 10: Deaths in Type 1 Facilities (2010-2020)*

| County | Actual Deaths | Expected Deaths | Mortality Ratio | 95% Conf Interval | p-value |
|---|---|---|---|---|---|
| Alameda | 2 | 1.6 | 1.28 | 0.21-4.22 | 0.67 |
| Kern | 0 | 0.3 | | | |
| Los Angeles | 48 | 30.8 | 1.56 | 1.15-2.07 | 0.00 |
| Orange | 12 | 1.8 | 6.72 | 3.47-11.73 | 0.00 |
| Riverside | 3 | 0.3 | 11.64 | 2.96-31.68 | 0.00 |
| San Bernardino | 1 | 2.3 | 0.44 | 0.02-2.18 | 0.44 |
| San Diego | 1 | 1.1 | 0.94 | 0.05-4.64 | 1.00 |



**County Jails Only** - Expected vs Actual

San Diego  117  **141** 24 Excess Deaths*

*Other County Jails if Same Size as SD Jails*

Alameda  **116**  173
Kern  **126**  145
San Bernardino  **89**  139
Los Angeles  **91**  136
Riverside  **109**  121
Orange  **71**  88

*Statistically significant difference between actual and expected deaths*

**County and City Jails Combined** - Expected vs Actual

San Diego  118  **142** 24 Excess Deaths*

*Other County Jails if Same Size as SD Jails*

Alameda  **119**  174
Kern  **127**  145
San Bernardino  **90**  140
Los Angeles  **100**  138
Riverside  **114**  122
Orange  **81**  89

*Statistically significant difference between actual and expected deaths*

*Figure 17: County Expected vs Actual Jail Deaths Including City Jails*

---

[15] Type 1 facilities are used to detain individuals for not more than 96 hours. These facilities may also be used for short-term sentences.

# Appendix H: Detailed Results

## Expected vs Actual Statistical Test Results

Below are detailed results and confidence intervals for the statistical differences between expected and actual total in-custody deaths. Confidence intervals provide a range of values for these differences at a 95% confidence interval. Any value over one indicates that actual total deaths surpass expected total deaths in that specific county. We display confidence interval values for overall deaths, suicides, and overdose/accidental deaths.

*Table 11*: Overall Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | *Difference (95% Conf.)* | *Ratio (95% Conf.)* | |
| San Diego | 141 | 117 | 24 (2 – 51) | 1.21 (1.02 – 1.43) | **0.029** |
| Santa Clara | 65 | 63 | 2 (-12 – 21) | 1.04 (0.81 – 1.33) | 0.770 |
| Fresno | 72 | 70 | 2 (-13 – 21) | 1.03 (0.82 – 1.31) | 0.786 |
| Riverside | 78 | 87 | -9 (-24 – 11) | 0.9 (0.72 – 1.13) | 0.376 |
| Kern | 55 | 63 | -8 (-21 – 9) | 0.88 (0.67 – 1.14) | 0.330 |
| Contra Costa | 28 | 39 | -11 (-16 – 10) | 0.87 (0.6 – 1.26) | 0.468 |
| Orange | 80 | 99 | -19 (-35 – 1) | 0.81 (0.64 – 1.01) | 0.059 |
| Alameda | 67 | 99 | -32 (-47 – -14) | 0.67 (0.53 – 0.86) | **0.001** |
| Los Angeles | 290 | 434 | -144 (-177 – -106) | 0.67 (0.59 – 0.75) | **<0.001** |
| San Bernardino | 94 | 147 | -53 (-70 – -31) | 0.64 (0.52 – 0.79) | **<0.001** |
| San Francisco | 25 | 59 | -34 (-41 – -19) | 0.45 (0.3 – 0.67) | **<0.001** |
| Sacramento | 48 | 117 | -69 (-81 – -53) | 0.41 (0.31 – 0.54) | **<0.001** |

*Table 12*: Suicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | *Difference (95% Conf.)* | *Ratio (95% Conf.)* | |
| Contra Costa | 11 | 2 | 9 (4 – 18) | 4.77 (2.59 – 8.78) | **<0.001** |
| Alameda | 19 | 4 | 15 (8 – 26) | 4.53 (2.8 – 7.29) | **<0.001** |
| San Diego | 40 | 9 | 31 (19 – 47) | 4.44 (3.15 – 6.26) | **<0.001** |
| Fresno | 19 | 4 | 15 (7 – 26) | 4.33 (2.7 – 6.97) | **<0.001** |
| Kern | 16 | 4 | 12 (5 – 22) | 3.59 (2.16 – 5.98) | **<0.001** |
| Santa Clara | 14 | 4 | 10 (4 – 20) | 3.25 (1.88 – 5.67) | **<0.001** |
| San Francisco | 8 | 2 | 6 (1 – 13) | 3.21 (1.58 – 6.51) | **<0.001** |
| Riverside | 20 | 6 | 14 (6 – 26) | 3.2 (2.01 – 5.08) | **<0.001** |
| San Bernardino | 25 | 9 | 16 (7 – 29) | 2.69 (1.77 – 4.1) | **<0.001** |
| Los Angeles | 45 | 21 | 24 (11 – 42) | 2.14 (1.52 – 3) | **<0.001** |
| Sacramento | 10 | 8 | 2 (-2 – 11) | 1.31 (0.69 – 2.47) | 0.404 |
| Orange | 9 | 8 | 1 (-3 – 9) | 1.11 (0.57 – 2.18) | 0.756 |

2022 In-Custody Death Study

**Table 13**: *Overdose/Accidental Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | *Difference (95% Conf.)* | *Ratio (95% Conf.)* | |
| San Diego | 27 | 13 | 14 (5 – 27) | 2.09 (1.41 – 3.11) | **<0.001** |
| Riverside | 16 | 10 | 6 (-1 – 16) | 1.57 (0.95 – 2.6) | 0.076 |
| Los Angeles | 47 | 35 | 12 (0 – 30) | 1.36 (0.99 – 1.86) | 0.057 |
| Fresno | 9 | 7 | 2 (-2 – 11) | 1.29 (0.67 – 2.51) | 0.446 |
| Alameda | 11 | 9 | 2 (-3 – 11) | 1.21 (0.66 – 2.2) | 0.537 |
| San Bernardino | 8 | 9 | -1 (-5 – 7) | 0.85 (0.42 – 1.73) | 0.657 |
| Kern | 7 | 9 | -2 (-5 – 6) | 0.82 (0.39 – 1.72) | 0.592 |
| Orange | 10 | 13 | -3 (-7 – 6) | 0.79 (0.42 – 1.48) | 0.452 |
| Sacramento | 7 | 12 | -5 (-8 – 3) | 0.59 (0.28 – 1.25) | 0.167 |
| Santa Clara | 3 | 6 | -3 (-5 – 3) | 0.49 (0.16 – 1.55) | 0.218 |
| San Francisco | 4 | 8 | -4 (-7 – 1) | 0.44 (0.16 – 1.18) | 0.092 |
| Contra Costa | 1 | 4 | -3 (-4 – 3) | 0.27 (0.04 – 1.92) | 0.161 |

**Table 14**: *Natural Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | *Difference (95% Conf.)* | *Ratio (95% Conf.)* | |
| Orange | 57 | 74 | -17 (-30 – 0) | 0.77 (0.59 – 1) | **0.048** |
| Santa Clara | 36 | 49 | -13 (-23 – 1) | 0.74 (0.53 – 1.03) | 0.073 |
| San Diego | 65 | 90 | -25 (-39 – -7) | 0.72 (0.56 – 0.93) | **0.010** |
| Fresno | 36 | 51 | -15 (-25 – -1) | 0.7 (0.51 – 0.98) | **0.036** |
| Kern | 25 | 44 | -19 (-27 – -7) | 0.57 (0.39 – 0.85) | **0.005** |
| Riverside | 36 | 64 | -28 (-38 – -14) | 0.56 (0.4 – 0.78) | **<0.001** |
| Los Angeles | 166 | 318 | -152 (-176 – -124) | 0.52 (0.45 – 0.61) | **<0.001** |
| Alameda | 33 | 69 | -36 (-45 – -22) | 0.48 (0.34 – 0.68) | **<0.001** |
| San Bernardino | 50 | 114 | -64 (-76 – -48) | 0.44 (0.33 – 0.58) | **<0.001** |
| San Francisco | 12 | 41 | -29 (-34 – -21) | 0.28 (0.16 – 0.49) | **<0.001** |
| Contra Costa | 7 | 26 | -19 (-23 – -11) | 0.27 (0.13 – 0.56) | **<0.001** |
| Sacramento | 21 | 87 | -66 (-73 – -54) | 0.24 (0.16 – 0.37) | **<0.001** |

**Table 15**: *Homicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020*

| County | Actual Deaths | Expected Deaths | Actual vs Expected | | p-value |
|---|---|---|---|---|---|
| | | | *Difference (95% Conf)* | *Ratio (95% Conf)* | |
| San Diego | 8 | 5 | 3 (-1 – 12) | 1.66 (0.81 – 3.42) | 0.164 |
| Riverside | 6 | 6 | 0 (-3 – 8) | 1.06 (0.47 – 2.41) | 0.877 |
| Orange | 3 | 4 | -1 (-3 – 5) | 0.74 (0.24 – 2.37) | 0.620 |
| Sacramento | 7 | 10 | -3 (-7 – 5) | 0.7 (0.33 – 1.48) | 0.351 |
| Fresno | 5 | 7 | -2 (-5 – 5) | 0.69 (0.28 – 1.66) | 0.403 |
| San Bernardino | 6 | 13 | -7 (-11 – 0) | 0.45 (0.2 – 1.02) | **0.050** |
| Kern | 2 | 6 | -4 (-6 – 2) | 0.33 (0.08 – 1.32) | 0.098 |
| Santa Clara | 1 | 3 | -2 (-3 – 4) | 0.33 (0.05 – 2.36) | 0.244 |
| Los Angeles | 14 | 58 | -44 (-50 – -35) | 0.24 (0.14 – 0.41) | **<0.001** |
| Alameda | 3 | 17 | -14 (-16 – -8) | 0.18 (0.06 – 0.54) | **<0.001** |
| Contra Costa | 0 | 7 | – | – | – |
| San Francisco | 0 | 7 | – | – | – |

Analytica CONSULTING
Ex. C - 176

2022 In-Custody Death Study



The line on either side of the point indicates the 95% confidence interval of the true value. When the 95% confidence interval does not include 1, we conclude that there is a statistically significant difference between actual and expected deaths.

*Figure 18: Confidence Intervals of Standardized Mortality Ratios*

# Jail Profiles of Each County in The Study

## Alameda

**Table 16**: Top 15 Alameda County Jail Demographic Groups with Associated Death Rates

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Black | 18-29 | 14.6% | 29.7 | 4.9 | 2.3 | 2.0 | 20.4 |
| Male | Hispanic | 18-29 | 9.8% | 8.1 | 2.0 | 1.6 | 1.0 | 3.5 |
| Male | Black | 30-39 | 8.4% | 32.7 | 15.4 | 4.1 | 1.5 | 11.5 |
| Male | Black | 40-49 | 7.7% | 59.7 | 45.8 | 6.8 | 1.1 | 5.7 |
| Male | White | 18-29 | 5.8% | 6.9 | 2.1 | 2.2 | 1.8 | 0.7 |
| Male | Hispanic | 30-39 | 5.6% | 9.4 | 4.8 | 2.2 | 1.0 | 1.2 |
| Male | White | 30-39 | 4.5% | 10.4 | 5.4 | 2.4 | 2.0 | 0.5 |
| Male | White | 40-49 | 4.5% | 24.4 | 18.3 | 3.0 | 2.5 | 0.4 |
| Female | Black | 18-29 | 4.2% | 6.7 | 3.5 | 0.7 | 0.6 | 1.9 |
| Male | Other | 18-29 | 3.2% | 4.2 | 1.4 | 1.0 | 1.1 | 0.7 |
| Male | Black | 50-59 | 3.0% | 126.4 | 112.9 | 8.5 | 1.2 | 3.5 |
| Male | Hispanic | 40-49 | 2.7% | 21.1 | 16.1 | 3.0 | 0.9 | 0.9 |
| Female | Black | 30-39 | 2.5% | 15.6 | 12.0 | 2.1 | 0.5 | 0.9 |
| Male | Other | 30-39 | 2.3% | 5.8 | 3.8 | 0.7 | 0.8 | 0.4 |
| Female | White | 18-29 | 2.2% | 2.7 | 1.4 | 0.6 | 0.5 | †0.1 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 19: Alameda County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*





*Figure 20: Rated Capacity vs ADP at Alameda County Detention Facilities (2010-2021)*

Analytica
CONSULTING

Ex. C - 178

## Contra Costa

*Table 17*: Top 15 Contra Costa County Jail Demographic Groups with Associated Death Rates

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Black | 18-29 | 11.4% | 30.9 | 4.4 | 2.3 | 1.5 | 22.5 |
| Male | Hispanic | 18-29 | 9.9% | 8.5 | 2.3 | 1.6 | 1.3 | 3.2 |
| Male | White | 18-29 | 9.7% | 9.0 | 2.8 | 2.9 | 2.2 | 0.9 |
| Male | White | 30-39 | 7.9% | 12.7 | 6.5 | 2.9 | 2.6 | 0.6 |
| Male | Black | 30-39 | 6.7% | 32.8 | 15.7 | 3.4 | 1.5 | 12.0 |
| Male | White | 40-49 | 6.7% | 23.6 | 17.2 | 3.3 | 2.5 | 0.5 |
| Male | Hispanic | 30-39 | 5.8% | 9.0 | 4.6 | 1.5 | 1.3 | 1.3 |
| Male | Black | 40-49 | 5.5% | 49.7 | 38.1 | 4.6 | 1.3 | 5.4 |
| Female | White | 18-29 | 3.5% | 3.7 | 1.9 | 0.9 | 0.5 | 0.3 |
| Female | Black | 18-29 | 3.3% | 7.4 | 3.6 | 1.0 | 0.7 | 2.0 |
| Female | White | 30-39 | 2.8% | 6.7 | 4.5 | 1.1 | 0.8 | 0.2 |
| Male | White | 50-59 | 2.6% | 52.4 | 45.8 | 3.4 | 2.8 | 0.2 |
| Male | Hispanic | 40-49 | 2.5% | 17.3 | 12.9 | 2.3 | 1.2 | 0.7 |
| Male | Black | 50-59 | 2.2% | 104.8 | 95.4 | 5.3 | 1.1 | 2.7 |
| Male | Other | 18-29 | 2.1% | 4.7 | 1.5 | 0.9 | 1.6 | 0.7 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).



Figure 21: Contra Costa County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity

Contra Costa County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



Figure 22: Rated Capacity vs ADP at Contra Costa County Detention Facilities (2010-2021)

Analytica CONSULTING

## Fresno

***Table 18**: Top 15 Fresno County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
|---|---|---|---|---|---|---|---|---|
| Male | Hispanic | 18-29 | 21.9% | 8.4 | 2.8 | 1.2 | 1.4 | 2.9 |
| Male | Hispanic | 30-39 | 13.9% | 14.1 | 7.9 | 2.4 | 1.6 | 2.1 |
| Male | Hispanic | 40-49 | 6.6% | 31.6 | 24.8 | 3.8 | 1.3 | 1.5 |
| Male | White | 18-29 | 6.3% | 9.1 | 3.1 | 2.4 | 2.6 | 0.8 |
| Male | Black | 18-29 | 5.7% | 22.7 | 5.7 | 1.7 | 1.6 | 13.5 |
| Male | White | 30-39 | 5.2% | 16.6 | 9.3 | 3.7 | 2.7 | 0.6 |
| Female | Hispanic | 18-29 | 4.7% | 2.7 | 1.8 | 0.2 | 0.3 | 0.3 |
| Male | White | 40-49 | 4.2% | 34.8 | 26.0 | 5.1 | 2.8 | 0.7 |
| Female | Hispanic | 30-39 | 3.5% | 6.1 | 5.0 | 0.5 | 0.3 | 0.2 |
| Male | Black | 30-39 | 2.9% | 32.0 | 17.4 | 3.7 | 1.9 | 8.8 |
| Male | Hispanic | 50-59 | 2.6% | 72.2 | 65.8 | 4.5 | 1.0 | 0.9 |
| Female | White | 18-29 | 2.4% | 5.1 | 3.2 | 1.0 | 0.4 | 0.3 |
| Male | Other | 18-29 | 2.0% | 9.3 | 3.9 | 1.7 | 1.9 | 1.8 |
| Male | Black | 40-49 | 2.0% | 57.8 | 46.8 | 4.5 | †1.3 | 4.9 |
| Female | White | 30-39 | 1.9% | 9.4 | 6.4 | 1.9 | 0.7 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*
*†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.*



*Figure 23: Fresno County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Fresno County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 24: Rated Capacity vs ADP at Fresno County Detention Facilities (2010-2021)*



## Kern

*Table 19*: Top 15 Kern County Jail Demographic Groups with Associated Death Rates

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | Hispanic | 18-29 | 20.3% | 9.6 | 2.7 | 1.7 | 1.6 | 3.5 |
| Male | White | 18-29 | 11.0% | 12.8 | 4.3 | 4.5 | 2.8 | 1.0 |
| Male | Hispanic | 30-39 | 10.8% | 13.6 | 6.8 | 2.4 | 1.4 | 2.8 |
| Male | White | 30-39 | 7.9% | 19.9 | 9.5 | 5.7 | 3.1 | 1.5 |
| Male | White | 40-49 | 6.1% | 43.2 | 31.1 | 7.7 | 3.1 | 1.1 |
| Male | Black | 18-29 | 5.8% | 19.8 | 5.0 | 1.9 | 2.0 | 10.7 |
| Male | Hispanic | 40-49 | 4.3% | 26.4 | 19.9 | 3.5 | 1.4 | 1.5 |
| Female | White | 18-29 | 3.7% | 5.3 | 2.8 | 1.4 | 0.7 | 0.4 |
| Female | Hispanic | 18-29 | 3.7% | 3.2 | 2.1 | 0.4 | 0.2 | 0.4 |
| Female | White | 30-39 | 2.9% | 14.1 | 9.0 | 3.6 | 1.0 | 0.4 |
| Male | Black | 30-39 | 2.8% | 23.0 | 11.9 | 3.3 | †1.0 | 6.6 |
| Female | Hispanic | 30-39 | 2.5% | 6.4 | 5.1 | 0.6 | 0.2 | 0.5 |
| Male | White | 50-59 | 2.4% | 100.7 | 85.1 | 9.9 | 4.6 | 0.8 |
| Male | Black | 40-49 | 2.0% | 46.2 | 35.0 | 5.6 | †1.1 | 4.2 |
| Female | White | 40-49 | 1.8% | 31.3 | 24.5 | 4.8 | 1.5 | 0.3 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



*Figure 25: Kern County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 26: Rated Capacity vs ADP at Kern County Detention Facilities (2010-2021)*

## Los Angeles

***Table 20**: Top 15 Los Angeles County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | *Overall* | *Natural* | *Accidental\** | *Suicide* | *Homicide* |
| Male | Hispanic | 18-29 | 22.5% | 9.1 | 2.7 | 1.3 | 1.1 | 3.9 |
| Male | Hispanic | 30-39 | 11.6% | 11.9 | 7.1 | 1.9 | 1.0 | 1.8 |
| Male | Black | 18-29 | 8.4% | 22.1 | 5.2 | 1.4 | 1.5 | 13.9 |
| Male | Hispanic | 40-49 | 5.5% | 24.6 | 19.8 | 2.8 | 0.9 | 1.1 |
| Male | White | 18-29 | 4.9% | 7.1 | 2.3 | 2.4 | 1.5 | 0.8 |
| Female | Hispanic | 18-29 | 4.7% | 2.4 | 1.7 | 0.2 | 0.2 | 0.3 |
| Male | Black | 30-39 | 4.3% | 30.0 | 16.4 | 2.5 | 1.7 | 9.2 |
| Male | Black | 40-49 | 4.1% | 57.0 | 45.2 | 4.3 | 1.4 | 5.7 |
| Male | White | 40-49 | 3.8% | 28.8 | 21.6 | 3.8 | 2.7 | 0.5 |
| Male | White | 30-39 | 3.8% | 12.3 | 6.6 | 3.0 | 2.0 | 0.6 |
| Female | Hispanic | 30-39 | 2.6% | 5.0 | 4.2 | 0.3 | 0.2 | 0.3 |
| Female | Black | 18-29 | 2.4% | 6.0 | 4.0 | 0.4 | 0.3 | 1.2 |
| Male | Hispanic | 50-59 | 2.2% | 55.9 | 51.4 | 2.9 | 0.9 | 0.7 |
| Female | White | 18-29 | 1.8% | 2.8 | 1.5 | 0.7 | 0.4 | 0.2 |
| Male | Black | 50-59 | 1.6% | 124.0 | 113.3 | 6.0 | 1.3 | 3.3 |

*\*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 27: Los Angeles County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 28: Rated Capacity vs ADP at Los Angeles County Detention Facilities (2010-2021)*

## Orange

***Table 21****: Top 15 Orange County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | *Overall* | *Natural* | *Accidental** | *Suicide* | *Homicide* |
| Male | Hispanic | 18-29 | 20.0% | 6.5 | 2.5 | 1.4 | 0.9 | 1.6 |
| Male | White | 18-29 | 11.8% | 8.1 | 2.6 | 3.2 | 1.8 | 0.3 |
| Male | Hispanic | 30-39 | 9.3% | 9.1 | 5.7 | 1.8 | 0.8 | 0.7 |
| Male | White | 30-39 | 7.5% | 11.9 | 6.1 | 3.2 | 2.2 | 0.2 |
| Male | White | 40-49 | 7.4% | 23.9 | 17.3 | 3.6 | 2.6 | 0.2 |
| Female | White | 18-29 | 4.7% | 3.1 | 1.5 | 0.9 | 0.5 | 0.1 |
| Female | Hispanic | 18-29 | 4.2% | 2.1 | 1.4 | 0.3 | 0.2 | 0.2 |
| Male | Hispanic | 40-49 | 4.1% | 18.6 | 15.0 | 2.2 | 0.8 | 0.5 |
| Female | White | 30-39 | 3.0% | 6.2 | 4.1 | 1.1 | 0.7 | 0.1 |
| Male | White | 50-59 | 2.9% | 54.0 | 46.5 | 3.8 | 3.2 | 0.2 |
| Male | Other | 18-29 | 2.7% | 3.8 | 1.4 | 0.9 | 1.0 | 0.4 |
| Male | Black | 18-29 | 2.4% | 8.2 | 3.0 | 1.8 | 1.8 | 1.5 |
| Female | White | 40-49 | 2.4% | 15.0 | 11.7 | 1.9 | 1.1 | 0.1 |
| Female | Hispanic | 30-39 | 2.2% | 4.1 | 3.3 | 0.4 | 0.2 | 0.1 |
| Male | Other | 30-39 | 1.8% | 6.1 | 4.0 | 0.8 | 1.0 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 29: Orange County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Orange County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 30: Rated Capacity vs ADP at Orange County Detention Facilities (2010-2021)*

Analytica
CONSULTING
Ex. C - 183

## Riverside

***Table 22****: Top 15 Riverside County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | *Overall* | *Natural* | *Accidental\** | *Suicide* | *Homicide* |
| Male | Hispanic | 18-29 | 19.6% | 8.2 | 2.8 | 1.7 | 1.4 | 2.3 |
| Male | Hispanic | 30-39 | 11.0% | 11.4 | 6.4 | 2.3 | 1.2 | 1.4 |
| Male | White | 18-29 | 9.7% | 10.1 | 3.5 | 3.2 | 2.5 | 0.8 |
| Male | White | 30-39 | 6.7% | 16.1 | 8.8 | 3.8 | 2.7 | 0.7 |
| Male | White | 40-49 | 6.2% | 35.0 | 26.0 | 5.0 | 3.2 | 0.6 |
| Male | Black | 18-29 | 5.5% | 14.4 | 5.3 | 2.1 | 1.5 | 5.4 |
| Male | Hispanic | 40-49 | 5.0% | 22.2 | 17.2 | 3.1 | 1.0 | 0.8 |
| Female | Hispanic | 18-29 | 4.1% | 2.6 | 1.7 | 0.3 | 0.3 | 0.3 |
| Female | White | 18-29 | 3.6% | 4.2 | 2.2 | 1.1 | 0.6 | 0.2 |
| Male | Black | 30-39 | 2.9% | 20.0 | 11.8 | 2.3 | 1.3 | 4.4 |
| Female | Hispanic | 30-39 | 2.8% | 5.2 | 4.2 | 0.5 | 0.2 | 0.2 |
| Female | White | 30-39 | 2.6% | 9.5 | 6.6 | 1.8 | 0.8 | 0.3 |
| Male | White | 50-59 | 2.4% | 79.6 | 69.1 | 6.0 | 3.9 | 0.5 |
| Female | White | 40-49 | 2.1% | 21.9 | 17.7 | 2.6 | 1.2 | 0.3 |
| Male | Black | 40-49 | 2.0% | 38.3 | 31.6 | 2.9 | 1.2 | 2.3 |

*\*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 31: Riverside County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*



*Figure 32: Rated Capacity vs ADP at Riverside County Detention Facilities (2010-2021)*

Analytica
CONSULTING

## Sacramento

**Table 23**: *Top 15 Sacramento County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/ Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | *Overall* | *Natural* | *Accidental\** | *Suicide* | *Homicide* |
| Male | Black | 18-29 | 11.8% | 18.5 | 5.2 | 2.5 | 1.9 | 8.8 |
| Male | White | 18-29 | 10.7% | 9.2 | 3.3 | 2.3 | 2.3 | 1.0 |
| Male | White | 30-39 | 8.7% | 15.2 | 7.9 | 3.2 | 3.0 | 0.8 |
| Male | Hispanic | 18-29 | 7.4% | 8.3 | 2.1 | 1.7 | 1.3 | 3.1 |
| Male | White | 40-49 | 6.9% | 35.0 | 25.5 | 4.6 | 3.7 | 0.8 |
| Male | Black | 30-39 | 6.6% | 25.7 | 14.8 | 3.3 | 1.7 | 5.6 |
| Male | Black | 40-49 | 5.2% | 50.1 | 40.7 | 4.8 | 1.3 | 3.0 |
| Male | Hispanic | 30-39 | 4.3% | 11.3 | 6.2 | 2.1 | 1.4 | 1.3 |
| Female | White | 18-29 | 3.9% | 3.7 | 2.0 | 0.7 | 0.6 | 0.2 |
| Female | White | 30-39 | 3.2% | 8.3 | 5.7 | 1.4 | 0.8 | 0.3 |
| Female | Black | 18-29 | 3.1% | 7.0 | 4.7 | 0.5 | 0.4 | 1.3 |
| Male | White | 50-59 | 2.7% | 80.3 | 69.2 | 5.9 | 4.1 | 0.5 |
| Male | Other | 18-29 | 2.5% | 7.3 | 2.8 | 1.3 | 1.5 | 1.6 |
| Male | Hispanic | 40-49 | 2.4% | 24.8 | 18.9 | 3.3 | 1.6 | 0.8 |
| Female | White | 40-49 | 2.1% | 21.6 | 17.2 | 2.4 | 1.4 | 0.2 |

*\*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 33: Sacramento County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

Sacramento County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 34: Rated Capacity vs ADP at Sacramento County Detention Facilities (2010-2021)*

## San Bernardino

**Table 24**: *Top 15 San Bernardino County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | *Overall* | *Natural* | *Accidental\** | *Suicide* | *Homicide* |
| Male | Hispanic | 18-29 | 18.4% | 8.6 | 3.2 | 1.3 | 1.3 | 2.7 |
| Male | Hispanic | 30-39 | 10.6% | 12.0 | 7.8 | 1.3 | 1.2 | 1.7 |
| Male | White | 18-29 | 8.3% | 9.3 | 4.0 | 1.8 | 2.3 | 1.0 |
| Male | Black | 18-29 | 6.9% | 19.2 | 5.9 | 1.5 | 1.3 | 10.4 |
| Male | White | 30-39 | 5.9% | 17.9 | 11.0 | 2.5 | 3.3 | 1.0 |
| Male | White | 40-49 | 5.5% | 40.0 | 32.0 | 3.0 | 3.9 | 1.0 |
| Male | Hispanic | 40-49 | 5.1% | 25.2 | 20.9 | 1.7 | 1.3 | 1.2 |
| Female | Hispanic | 18-29 | 4.4% | 2.9 | 2.1 | 0.2 | 0.2 | 0.3 |
| Male | Black | 30-39 | 3.8% | 26.9 | 16.2 | 1.9 | 2.0 | 6.7 |
| Female | White | 18-29 | 3.1% | 4.5 | 2.9 | 0.7 | 0.5 | 0.4 |
| Female | Hispanic | 30-39 | 3.1% | 5.9 | 4.9 | 0.3 | 0.3 | 0.3 |
| Male | Black | 40-49 | 2.6% | 46.8 | 37.9 | 2.8 | 1.3 | 4.4 |
| Female | White | 30-39 | 2.4% | 11.0 | 8.7 | 0.9 | 0.9 | 0.3 |
| Female | Black | 18-29 | 2.2% | 7.5 | 5.6 | 0.4 | 0.4 | 1.0 |
| Male | White | 50-59 | 2.2% | 89.7 | 81.7 | 3.2 | 3.9 | 0.7 |

*\*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



*Figure 35: San Bernardino County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

San Bernardino Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 36: Rated Capacity vs ADP at San Bernardino County Detention Facilities (2010-2021)*

## San Diego

**Table 25**: *Top 15 San Diego County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|--------|----------------|-----------|----------------------|---------|---------|-------------|---------|----------|
| | | | | *Overall* | *Natural* | *Accidental\** | *Suicide* | *Homicide* |
| Male | Hispanic | 18-29 | 13.8% | 6.0 | 2.2 | 1.2 | 1.2 | 1.3 |
| Male | White | 18-29 | 10.9% | 6.4 | 1.8 | 2.3 | 1.9 | 0.4 |
| Male | White | 30-39 | 8.1% | 11.7 | 5.8 | 3.2 | 2.3 | 0.3 |
| Male | White | 40-49 | 8.0% | 26.7 | 18.9 | 4.1 | 3.2 | 0.4 |
| Male | Hispanic | 30-39 | 7.3% | 9.5 | 5.4 | 2.2 | 1.1 | 0.7 |
| Male | Black | 18-29 | 5.8% | 10.1 | 3.0 | 1.3 | 1.8 | 3.7 |
| Female | White | 18-29 | 4.1% | 2.7 | 1.3 | 0.6 | 0.6 | 0.1 |
| Male | Hispanic | 40-49 | 3.5% | 20.7 | 16.5 | 2.6 | 1.0 | 0.5 |
| Male | Black | 30-39 | 3.4% | 16.2 | 9.2 | 2.3 | 2.0 | 2.5 |
| Male | Black | 40-49 | 3.4% | 39.7 | 31.7 | 4.0 | 1.8 | 1.9 |
| Female | Hispanic | 18-29 | 3.3% | 2.4 | 1.6 | 0.3 | 0.3 | 0.2 |
| Male | White | 50-59 | 3.1% | 62.8 | 53.2 | 5.3 | 3.8 | 0.4 |
| Female | White | 30-39 | 2.9% | 6.4 | 4.2 | 1.2 | 0.8 | 0.1 |
| Female | White | 40-49 | 2.5% | 17.3 | 13.4 | 2.3 | 1.3 | 0.2 |
| Male | Other | 18-29 | 2.0% | 4.2 | 1.3 | 0.7 | 1.5 | 0.6 |

*\*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*



Figure 37: San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity

San Diego County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 38: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021)*

Analytica CONSULTING
Ex. C - 187

## San Francisco

*Table 26*: *Top 15 San Francisco County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Overall | Natural | Accidental* | Suicide | Homicide |
| Male | White | 18-29 | 13.4% | 5.3 | 1.6 | 1.9 | 1.3 | 0.5 |
| Male | Black | 18-29 | 12.2% | 36.0 | 5.7 | 3.2 | 1.7 | 25.2 |
| Male | White | 30-39 | 11.3% | 10.8 | 5.4 | 3.5 | 1.4 | 0.3 |
| Male | Black | 40-49 | 9.5% | 96.7 | 68.1 | 18.0 | 2.7 | 6.4 |
| Male | Black | 30-39 | 8.1% | 43.3 | 22.5 | 7.2 | 2.7 | 10.7 |
| Male | White | 40-49 | 7.9% | 36.0 | 24.9 | 7.1 | 3.2 | 0.4 |
| Male | Other | 18-29 | 4.5% | 3.8 | 1.4 | 0.7 | 1.0 | 0.7 |
| Male | Black | 50-59 | 3.7% | 179.0 | 146.4 | 27.1 | 1.4 | 3.9 |
| Female | Black | 18-29 | 3.4% | 7.0 | 3.6 | 1.3 | †0.5 | 1.6 |
| Male | White | 50-59 | 3.1% | 76.1 | 62.4 | 8.9 | 3.7 | 0.6 |
| Male | Other | 30-39 | 3.1% | 6.7 | 4.0 | 1.2 | 0.9 | 0.5 |
| Female | White | 18-29 | 2.7% | 2.0 | 0.6 | 0.9 | 0.3 | †0.1 |
| Male | Other | 40-49 | 2.2% | 18.4 | 14.9 | 2.0 | 1.1 | 0.3 |
| Female | Black | 30-39 | 2.1% | 18.2 | 13.0 | 3.2 | †0.5 | 1.4 |
| Female | White | 30-39 | 2.0% | 4.4 | 2.4 | 1.1 | 0.7 | †0.1 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).
†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.



Figure 39: San Francisco County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity

San Francisco County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



Figure 40: Rated Capacity vs ADP at San Francisco County Detention Facilities (2010-2021)

Analytica
CONSULTING
Ex. C - 188

## Santa Clara

**Table 27**: *Top 15 Santa Clara County Jail Demographic Groups with Associated Death Rates*

| Gender | Race/Ethnicity | Age Group | Est. % Jail Population | County General Population Death Rate per 10k | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | *Overall* | *Natural* | *Accidental\** | *Suicide* | *Homicide* |
| Male | Hispanic | 18-29 | 19.3% | 6.0 | 2.1 | 1.0 | 1.0 | 1.8 |
| Male | Hispanic | 30-39 | 11.5% | 9.1 | 5.5 | 1.5 | 1.1 | 0.8 |
| Male | White | 18-29 | 6.5% | 5.9 | 2.0 | 1.7 | 1.7 | 0.4 |
| Male | Hispanic | 40-49 | 6.2% | 20.8 | 16.2 | 2.5 | 1.0 | 0.7 |
| Male | White | 40-49 | 5.4% | 21.6 | 16.0 | 2.8 | 2.3 | 0.3 |
| Male | White | 30-39 | 5.0% | 9.0 | 4.8 | 1.8 | 1.9 | 0.3 |
| Female | Hispanic | 18-29 | 4.2% | 2.0 | 1.2 | 0.3 | 0.2 | 0.2 |
| Male | Other | 18-29 | 3.7% | 3.2 | 1.3 | 0.5 | 0.9 | 0.5 |
| Male | Black | 18-29 | 3.6% | 7.2 | 2.0 | †0.8 | 2.2 | 2.1 |
| Male | Other | 30-39 | 3.0% | 4.3 | 2.7 | 0.5 | 0.8 | 0.2 |
| Female | Hispanic | 30-39 | 2.7% | 4.5 | 3.5 | 0.4 | 0.4 | 0.2 |
| Female | White | 18-29 | 2.5% | 2.6 | 1.3 | 0.5 | 0.6 | †0.1 |
| Male | Hispanic | 50-59 | 2.4% | 55.4 | 48.8 | 4.5 | 1.1 | 0.7 |
| Male | Black | 30-39 | 2.4% | 13.8 | 9.2 | 2.0 | †1.0 | 1.4 |
| Male | Other | 40-49 | 2.2% | 11.1 | 9.4 | 0.7 | 0.7 | 0.2 |

*Includes overdoses and other drug-related deaths. Excludes transport related accidents (e.g., motor vehicle accidents).*

*†Less than 10 deaths occurred (1999-2020), so exact value is redacted by CDC. Rate is estimated via all metropolitan counties in Western U.S.*



*Figure 41: Santa Clara County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity*

## Santa Clara County Jail Facilities - Average Daily Population vs Rated Capacity (2010-2021)



*Figure 42: Rated Capacity vs ADP at Santa Clara County Detention Facilities (2010-2021)*

Analytica
CONSULTING

# Mortality Rates Over Time

This study measures county mortality rates between 1999-2020 to estimate total expected jail deaths. The focus of this study is to compare the total expected jail deaths in San Diego County to that of other counties in California. This approach largely assumes that mortality rates between San Diego and other California counties follow a similar pattern over time.

To test whether this is the case, we graph the mortality rates for each manner of death over time. Below are the figures for overdose/accidental deaths, homicides, natural deaths, and suicides. In general, these figures show that the morality rates for San Diego County and the other counties in this study have a similar trajectory over the past two decades. In other words, San Diego does not deviate from the trend lines of other counties. San Diego County consistently has a much lower homicide rate than the other counties. It also has a moderately higher suicide rate than the other counties.



*Figure 43: Mortality Rates Over Time, San Diego vs California, Ages 18-59 (2000-2020)*

## Comparisons of San Diego Inmate Population to Other California Counties

The jail population has generally higher needs than the general population. Attending to these needs may strain the limited capacity of county jails and, as a result, may be a contributing cause to in-custody deaths. We pursue this argument by comparing the mental health cases and violent proclivities of inmates in San Diego jails to that of other California counties between 2010-2020.

We first track reported mental health utilization using the average monthly mental health cases and the average new monthly mental health cases over time. Inmates in San Diego jails have considerably increased their usage of mental health services starting in 2019. This rate of growth is not as steep in other county jails. This increase in mental health services in San Diego is also reflected in the new mental health cases, which, after several years of declines, began to tick up in 2017. The increase in new mental health cases is not as large in other counties.

Violence among inmates is measure by the percent of violent felony arrests in a county and the average yearly assaults on law enforcement staff. San Diego County closely mirror the percent of violent felony arrests in other counties. All counties experienced a significant jump in these arrests in 2014. In terms of assaults on staff, San Diego has a moderate number of average assaults when compared to the other counties. Five counties have a higher average number of assaults than San Diego.









*Figure 44: Additional Inmate Comparison Measures, San Diego vs California*

Analytica CONSULTING
Ex. C - 191

## County Demographics

### Percent of County Population by Race/Ethnicity (2010-2020)



*Figure 45: Percent of Each County Population by Race/Ethnicity (2010-2020)*

### Percent of County Population by Age Group (2010-2020)



*Figure 46: Percent of Each County Population by Age Group (2010-2020)*

**Table 28**: *Percent of County Population by Gender (2010-2020)*

| County | Male | Female |
|---|---|---|
| Alameda | 49.2% | 50.8% |
| Contra Costa | 49% | 51% |
| Fresno | 50.1% | 49.9% |
| Kern | 51.4% | 48.6% |
| Los Angeles | 49.5% | 50.5% |
| Orange | 49.7% | 50.3% |
| Riverside | 49.8% | 50.2% |
| Sacramento | 49.2% | 50.8% |
| San Bernardino | 49.8% | 50.2% |
| San Diego | 50.3% | 49.7% |
| San Francisco | 50.7% | 49.3% |
| Santa Clara | 50.5% | 49.5% |

## Unstandardized Average Time between Deaths

*Table 29: Average Unstandardized Days between Deaths (2010-2020)*

| County | Natural Death | Suicide | Overdose/Accidental Death | Homicide |
|--------|--------------|---------|---------------------------|----------|
| Alameda | 4 months | 7 months | 1 years | 3.7 years |
| Contra Costa | 1.6 years | 1 years | 11 years | |
| Fresno | 4 months | 7 months | 1.2 years | 2.2 years |
| Kern | 5 months | 8 months | 1.6 years | 5.5 years |
| Los Angeles | 1 months | 3 months | 3 months | 9 months |
| Orange | 2 months | 1.2 years | 1.1 years | 3.7 years |
| Riverside | 4 months | 7 months | 8 months | 1.8 years |
| Sacramento | 6 months | 1.1 years | 1.6 years | 1.6 years |
| San Bernardino | 3 months | 5 months | 1.4 years | 1.8 years |
| San Diego | 2 months | 3 months | 5 months | 1.4 years |
| San Francisco | 11 months | 1.4 years | 2.7 years | |
| Santa Clara | 4 months | 9 months | 3.7 years | 11 years |

# Appendix I: Email Correspondence with Dr. Elizabeth Carson (U.S. Bureau of Justice Statistics)

To better understand the advantages and disadvantages of different measures used to compare mortality rates among inmate populations, we corresponded with Dr. Elizabeth Carson via email. She is a statistician at the U.S. Bureau of Justice Statistics. Below is the content of this correspondence.

FROM: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

TO: Elizabeth Carson <elizabeth.carson@usdoj.gov>

DATE: 12/15/2021

SUBJECT: Your feedback on measures of inmate mortality rates

Dear Ms. Carson,

I am part of a research team at Analytica Consulting studying inmate deaths in California county jails. The goal of this study is to make apples-to-apples comparisons of inmate mortality rates across multiple counties. In our reading of the literature on this topic, we have found that researchers differ on how best to measure mortality rates among inmate populations.

Drawing upon your expertise on this topic, would you be able to provide your input on the three different measures below?

**Average Daily Population (ADP)**: Although most commonly used, some have criticized this measure for not accounting for differences in length of stay. How does this measure capture high turnover rates in jails, particularly if the unit of analysis is an inmate year?

**Total Admissions (or At-Risk Population):** An alternative measure is to use total admissions as the denominator for mortality rates in jails. In your opinion, what are the weaknesses of using this measure compared to ADP? Does this generate accurate mortality rates?

**Standardized Resident Death Rates:** A BJS Special Report from 2005 ("Suicide and Homicide in State Prisons and Local Jails.") outlines weighing subgroups who are at higher risk of suicide (i.e. gender, race, age) to calculate inmate mortality rates. We don't see this method being used very often. Do you know why researchers stopped utilizing this method? The California Department of Justice collects a wealth of crime statistics so we could stratify this type of measure in other ways too.

We would welcome any input you can provide on these three different measures as we design the scope of our study. Our first draft of the study is due *Jan. 28* so your timely response would be greatly appreciated.

Please feel free to reach out if you have any follow-up questions regarding this request.

Ex. C - 193

Analytica
CONSULTING

Thanks again,

Mike

–

**Mike Pelz, PhD**

**Senior Data Consultant | Analytica Consulting**

<http://www.analyticaconsulting.com>

FROM: Carson, Elizabeth (OJP) <Elizabeth.Carson@usdoj.gov>

TO: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

DATE: 12/16/2021

SUBJECT: RE: [EXTERNAL] Your feedback on measures of inmate mortality rates

Dear Dr. Pelz,

Thank you for contacting the Bureau of Justice Statistics. BJS uses the ADP measure, since it is the only count we have of *unique* persons in jails. BJS is investigating whether to try to collect individual-level records for all jail admissions and releases, which would (theoretically) allow us to locate people who recidivate multiple times per year, and only count them once. That would give you the unique number of persons exposed to the jail setting in a given year, and probably the best mortality rate per persons exposed.

The problem with using admissions is that this does NOT measure unique individuals in the denominator. You have a small number of people returning time after time to jail, which drives the 11 million admissions/year. So I suppose if you wanted to calculate the rate for any exposure to the jail setting, with the understanding that a person can have multiple exposures per year, you could use admissions – a long as you recognize you're comparing unique deaths in the numerator to non-unique persons in the denominator. As with the ADP, this doesn't take length of stay into account.

The most accurate method would be to use individual-level records from everyone who was admitted in a given year, calculate the days of exposure to the jail setting (and sum the days for those who were in more than once), and get the rate per person-days exposed. Unfortunately, we're not there yet in terms of having the individual-level data for the nation's jails.

In terms of the resident population standardization, because prisons and jails differ so drastically from the U.S. resident population in terms of age, sex, and race/ethnicity, if you want to make a direct comparison between the two you have to standardize the U.S. residents to "look like" the prison or jail population to which you are comparing (it has nothing to do with which groups are more likely to commit suicide, but rather the demographic makeup of the whole population). This is actually very common in epidemiological analyses – it removes the affects of different age, sex, and race/ethnicity distributions on the death rate. We show this comparison in our annual reports on prison (Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables | Bureau of Justice Statistics (ojp.gov)) and jail deaths (Mortality in Local Jails, 2000–2019 – Statistical Tables | Bureau of Justice Statistics (ojp.gov)).

Please let me know if you have any questions.

Thank you,

Ann

E. Ann Carson

Statistician, Corrections Statistics Unit

Bureau of Justice Statistics

U.S. Department of Justice

810 Seventh Street, NW

Washington, DC 20531

FROM: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

TO: Elizabeth Carson <Elizabeth.Carson@usdoj.gov>

DATE: 12/17/2021

SUBJECT: Re: [EXTERNAL] Your feedback on measures of inmate mortality rates

Hi Dr. Carson,

Thanks so much for your quick response and valuable insights on these different measures. It would be ideal to have individual-level data. If you don't mind, I have two follow-up questions that would help us substantiate which measure to use for our study.

In our study, we are looking to engage two arguments regarding ADP from a report by the San Diego County Sheriff's Department. You might be familiar with this report–it was conducted by another statistician by the name of Dr. Colleen Kelly. I have attached a copy of this report to this email.

Specifically, we would like to address two arguments found on page 3 of this report. First, she states that the number of inmates passing through San Diego's jails far exceeds ADP. If we wanted to quantify how many of these admissions had multiple exposures or arrests, could we just use recidivism rates for a given calendar year? If so, do you know if this statistic is typically tracked by sheriff's departments?

The second related argument regards ADP accounting for shorter lengths of stay. Dr. Kelly asserts that ADP "is flawed when making comparisons across jails with different lengths of stay." In your opinion, would you consider this to be a fair statement? Does ADP fail to address shorter lengths of stay?

Thanks again for lending us your expertise. We really appreciate it!

Best,

Mike

FROM: Elizabeth Carson <Elizabeth.Carson@usdoj.gov>

TO: Mikael Pelz <mikaelpelz@analyticaconsulting.com>

DATE: 12/21/2021

SUBJECT: RE: [EXTERNAL] Your feedback on measures of inmate mortality rates

Dear Dr. Pelz,

We have no good estimates of the number of persons who cycle through jail in a given year – as I said, this would require individual-level records that could be linked to unique individuals. In the absence of a national estimate of within-year recidivism, if you have that value for San Diego, I would suggest you use that. Recidivism across years is *not* going to tell you how many of the 11 million admissions to jail within a given year are repeat offenders.

As far as the question of short stays, the risk of death in a jail actually depends on a number of factors. Chief among them is the question of exposure: do you have an increased risk of exposure simply by being in the jail for one hour? Or does a prolonged exposure increase your odds of death?

I would argue it depends on the cause of death – deaths by intoxication typically occur within the first 24 hours of custody because the inmate enters the jail in an intoxicated state – so staying 10 days or 10 weeks makes no difference. The same is not true for deaths by homicide or suicide – in 2015-2019, 25% of suicides occurred after the first month of custody. The median time served for homicides in local jails from 2000-2019 was 30 days. For these causes of death,

time exposed to jail (being in custody) can have some effect on mortality. For illness deaths, depending on the level of health care provided by the jail, it could be argued that being in jail lends a protective effect by providing access to stable medical care and medicines.  Other factors include the size of the jail, the mix of persons held (do the police in a given jurisdiction place more or less priority on arresting people for particular crimes – like possessing small amounts of marijuana, public drunkenness, theft of small dollar amounts – compared to others?), the jurisdiction's policies on bond and bail, even the physical layout of the jail and the staff to inmate ratio.

Another way of thinking of this is to use an analogy to COVID infection rates in jails: the denominator for most COVID-infection rates in jail is the number of people exposed (the number of people who cycled through the jail over a given period of time, regardless of how long they stayed). For rates using this denominator, it is simply presence or absence in the jail that determines whether a person is counted in the denominator, and baked into this measure is the assumption that it doesn't matter whether you spent 6 hours or 6 months exposed – you have the same overall chance of catching COVID. Most epidemiologists, however, would argue that the amount of time exposed DOES matter for COVID – if you stay longer, you have a greater chance of catching the disease (and this is where the analogy with mortality breaks down, given what I said above regarding different times served for different causes of death). But other factors are at work as well – vaccination status of the inmates and staff, ability to social distance and use other protective equipment, overcrowding, cleanliness of the facility, etc. So even using a denominator that measures the total number of hours all inmates collectively were in custody wouldn't give you the whole picture of risk of catching COVID.

The same is true for mortality – simply being in jail (whether you measure the denominator as time served or just jail/no jail) doesn't confer the same risk of death for every inmate admitted. Basically, I'm saying that it's not an easy answer of ADP versus time in custody. As I said in my last email, you need individual-level records to calculate time served in jail, and we don't have those. In their absence, ADP is the best alternative in BJS's opinion.

Thank you,

Ann

# Appendix J: Data Inclusion Criteria

The primary focus of this study is in-custody deaths within county jails. To ensure our data only captures these types of events, we made several exclusions from the original data sets obtained for this study.

California Department of Justice Inmate Deaths Data, 2005-2020 (n = 11,553)

- Reporting agency equals 'sheriff' (n = 2,719)

- Year equals 2010 through 2020 (n = 1,930)

- Custody status not equal to 'in transit' or 'process of arrest' (n = 1,481)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 1,069)

- Custody status not equal to 'other' and custodial responsibility at the time of death not equal to 'other' (n = 1,048)

- Manner of death not equal to 'Homicide Justified (Law Enforcement Staff) (n = 1,044)

- Manner of death not equal to 'Pending Investigation' (n = 990) (Note: Only excluded when analyzing by manner of death)

- Manner of death not equal to 'Undetermined' (n = 968) (Note: Only excluded when analyzing by manner of death)

California Board of State and Community Corrections Monthly Jail Survey, 2005-June 2021 (n = 11,730)

- Year equals 2010 through 2020 (n = 7,752)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 1,584)

California Department of Justice Arrest Disposition Data, 1980-2020 (n = 291,925)

- Arrest disposition code not equal to 'to other agency' (n = 189,914)

- Year equals 2010 through 2020 (n = 52,298)

- Jurisdiction equals San Diego, Los Angeles, San Bernardino, Riverside, San Clara, Orange, Sacramento, Alameda, Fresno, Kern, Contra Costa, San Francisco (n = 13,867)

Analytica CONSULTING

Ex. C - 197

# Appendix K: Relevant Policy Changes Provided by the San Diego Sheriff's Department (2014-2021)

This list of major policy changes between 2014-2021 was provided to us by the San Diego Sheriff's Department. We utilized this list to understand policy changes in San Diego jails over time.

**2014**

- TRI-CITY MEDICAL CENTER. Entered into a contract with Tri-City Medical Center (TCMC). Contracts with both UCSD and TCMC provide the department with additional resources for inpatient hospitalization and specialty medical services.

- NALOXONE PROJECT. San Diego Sheriff's law enforcement deputies in patrol were one of the first law enforcement agencies to train deputies to administer naloxone, an opiate overdose antidote, to individuals who may have overdosed on opiates such as heroin. The department partnered with the County's Emergency Medical Services to launch this program.

- HOSPITAL GUARD UNIT. TCMC's contract provided the department with access to a 40-bed locked and secured medical ward in its facility. The ward is referred to as the Progressive Unit which the department shares with CDCR.

**2015**

- INMATE SAFETY PROGRAM (ISP). Designed an Inmate Safety Program to include standardized assessments for self-harm based on risk factors and designated housing units (i.e. Enhanced Observation Housing –EOH) where inmates are monitored in an environment that minimizes risk of self-harm. This program included structural modifications to the housing and the cells for patient safety.

- RESTORATION OF COMPETENCY (SAN BERNARDINO). Patients who needed to be restored to competency were sent to San Bernardino for restoration in addition to Patton State Hospital. This helped expedite the process for patients who were accepted to San Bernardino and needing restoration to competency.

- OPIATE REDUCTION. As part of the Hoarding and Cheeking Policy, evaluated the narcotic formulary and instituted ongoing education of onsite doctors on zero tolerance.

**2016**

- JAIL INTAKE SUICIDAL PILOT EXPANSION. Due to the ISP, the department began accepting arrestees into custody without outright rejection and directing the law enforcement officers to County Mental Hospital (CMH) for clearance.

- INTAKE PROCESS REDESIGN. Unlike other counties such as Orange County, Riverside, and Los Angeles County, San Diego had a two-stage medical intake process. Redesigned the medical intake process to condense both steps into one without compromising the quality of the medical and mental health assessments. Mental health questions were revised to reflect guidelines from the Columbia Suicide Severity Rating Scale (CSSRS).

- JAIL BASED COMPETENCY TREATMENT (JBCT) PROGRAM. The State Department of State Hospitals (DSH) contracted with the Sheriff's Department to have San Diego Central Jail serve as a JBCT site. The State contracted for 30-beds for male inmates who are 1368 and 1370s needing treatment.

- NALOXONE IN DETENTION FACILITIES. In response to the increasing incidents of heroin overdoses in jail, detention facilities were now equipped with Naloxone (Narcan) kits for deputies to use. Detentions Training Unit (DTU) developed a policy a training video and bulletin.

- MENTAL HEALTH MULTI-DISCIPLINARY GROUPS (MDG). MDG meetings are a forum where both sworn and clinical identify and discuss high risk mental health patients to get them the care and services they need in a timely manner. These meetings take place twice a month at each facility.

- LICENSED MENTAL HEALTH CLINICIAN POSITIONS. Six (6) FTE positions were added to the budget to improve the mental health services and assessments conducted in the jails.

- MAIL PROCESSING CENTER. Creation of Mail Processing Center with special equipment and deputies trained in detecting drug-soaked letters, cards, and other contraband.

**2017**

- JAIL BASED COMPETENCY TREATMENT (JBCT) PROGRAM. Liberty Healthcare was also chosen as the subcontractor to establish a 30-bed JBCT program at SDCJ that will treat 1370s in custody in a more effective and expeditious manner. While it does not prevent patients from being admitted to Patton State Hospital, the program serves as an important adjunct in the spectrum of services that is provided to this population.

- NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (NCCHC) TECHNICAL REVIEW. A panel of NCCHC surveyors conducted a one-week evaluation of the jails to help the department prepare for accreditation in the future. NCCHC visited all sites and made recommendations for change to assist the department with compliance with national correctional standards. The two top recommendations that required immediate attention was the acquisition of a new pharmacy business process and an electronic health record.

- DIAMOND PHARMACY. The department eliminated its pharmacy and practice of purchasing bulk medications and having LVNs prepare and administer medications to inmates which according to NCCHC was out of compliance with the LVN licensure. Under Diamond, medications were pre- packaged in unit-dose identifying the inmate's name. This process reduced errors for dispensing of medications when bulk medications are used

- PSYCHIATRIC STEP DOWN UNIT. A one-time funding from Public Safety Group was added to budget to develop a Psychiatric Step-Down Unit at SDCJ with 40 beds.

- PSYCHIATRIC EMERGENCY RESPONSE TRAINING (PERT). Nurses who were assigned to the Psychiatric Stabilization Units (PSU) at both SDCJ and LCDRF were sent to attend PERT classes. PERT served as another training to help staff deal effectively with individuals suffering from mental health conditions.

**2018**

- INMATE SAFETY PROGRAM (ISP) REVISION. The policy was revised to comply with NCCHC standards and Lindsay Hayes recommendations.

- SUICIDE PREVENTION TRAINING. The department developed an 8-hour training course that is patterned after Lindsay Hayes' training curriculum.

- SUICIDE PREVENTION FOCUSED RESPONSE TEAM. Creation of this workgroup. This workgroup consisting of representatives from sworn, medical, mental health, training, etc. meet once a month to discuss best evidence practices and implement strategies for reducing suicide in custody. This group also reviews suicide and/or suicide attempt incidents to evaluate for training opportunities and policy changes if needed.

- COMBINED & COMPREHENSIVE INTAKE SCREENING PLATFORM. The intake screening questions were further revised based on Lindsay Hayes' recommendation and still incorporates the Columbia Suicide Severity Rating Scale (CSSRS).

- LICENSED MENTAL HEALTH CLINICIANS. 15 (FTE) positions were added into the budget.

- SCENE MANAGER NURSING TRAINING. A program was developed to train a nurse to serve as a scene manager during emergency response and man-downs.

- ELECTRONIC HEALTH RECORD. The department procured a contract with Naphcare. TechCare is the name of the new electronic health record. Rollout is expected in 2019.

- CHIEF LICENSED MENTAL HEALTH CLINICIAN. A 1-FTE position was added to the budget and a second Chief Licensed Mental Health Clinician was appointed to manage the span of control of 27 licensed mental health positions.

- MENTAL HEALTH DEPUTIES. The department received 4 FTE deputy positions dedicated for mental health services.

- NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (NCCHC) ACCREDITATION REVIEW. The department intends to pursue accreditation and has dedicated a project team to spearhead efforts for its preparation. A detentions captain and sergeant were embedded in Medical Services to assist with this effort.

- IMPROVEMENTS TO HOUSING AREAS AND FACILITIES. Created and designed clinic areas at SDCJ, VDF, and GBDF to create a more therapeutic physical environment for clinicians and patients.

- MENTAL HEALTH ADVOCACY HOTLINE. A central phone line was established for use by criminal justice stakeholders and community partners for reporting.

- SUICIDE PREVENTION AND MENTAL AWARENESS POSTERS IN HOUSING AREAS. Posted in housing units, public lobbies, clinic areas and staff breakrooms/briefing rooms.

- CHIEF MENTAL HEALTH CLINICIAN. Addition of a 2nd Chief Mental Health Clinician, enhanced oversight of QMHP timely delivery of care

- REVIEW OF SELF HARM REPORTS. Chief Mental Health Clinicians review all NetRMS cases (Incident reports written by sworn staff) involving self-harm, determination of self-harm vs. suicide attempt being reviewed by a QMHP, allows for follow with QMHP staff for corrective action counseling if needed.

- WELLNESS CHECKS. SNP revised to mandate nurses completing wellness rounds in all Administrative Housing units 3x weekly for all patients

**2019**

- BODY SCANNERS. Upgraded six high tech x-ray body scanners

- ELECTRONIC HEALTH CARE. EHR goes live in September. EHR project was a strategic initiative to improve Medical and Mental Health care within our jails by moving medical care management from the 17-year-old integrated JIMS environment to a modern, agile software platform that incorporates better efficiency, care, and alignment with national standards like those of the National Commission on Correctional Health Standards.

- SOBERING CELL CHECKS. Standard Nursing Protocols (SNP) revised to include nurses taking vital signs of all sobering cell patients twice daily

- PRIVATE CLINIC SPACE. Construction project to expand privacy in intake screening areas for our patients during booking

- ISP POLICY REVISION. Policy state QMHP (non-sworn) staff admit and discharge from ISP only, only under extenuating circumstances shall sworn intervene in this decision. Follow-up appointment protocols were also revised.

- INTAKE SCREENING MODIFIED. Modified intake screening criteria Intake screening to improve acceptance/emergency transfer criteria relating to gate rejects

**2020**

- MENTAL HEALTH DIRECTOR. Selection of a Medical Director, Mental Health Services.

- WITHDRAWAL PROTOCALS. MSD revised standard nursing protocols related to alcohol and opioid withdrawal to prevent deaths associated with substance use disorders.

- TELEPSYCH. Expanded tele-psych to deal with the increased demand for mental health services and manage the COVID 19 pandemic

- CONTRACTED MEDICAL PROVIDER. MSD changed medical providers (Coastal to CHP) which increased the number of providers systemwide.

**2021**

- NALOXONE PROGRAM EXPANSION. All sworn members assigned to the detentions bureau were issued 2 naloxone kits to carry on their uniform belt.

- HEALTH AND HUMAN SERVICES AGENCY – CERNER COMMUNITY BEHAVIORAL HEALTH (CCBH). In April, QMHP's gained access to county mental health database CCBH, enhances continuity of care. Cerner Community Behavioral Health is behavioral health-specific electronic health record that specialize in the delivery of community mental health, inpatient mental health, outpatient mental health, substance use disorder

Analytica CONSULTING

Ex. C - 200


and developmental disabilities care. Although there may be some patients who are not in the database and do not have data entered, we continue to review and enter data referencing our patient encounters while in our care.

•   ADDITIONAL RN and MHC POSITIONS. Funding approved in July for 146 new Sheriff's health staff positions to support our on-going priority of building a robust medical and mental health system. With this additional staffing, our plan is to enhance overall care, by implementing a Primary Care Model, Medicated Assisted Treatment (MAT) program and ultimately achieving National Commission of Correctional Health Care (NCCHC) accreditation.

•   MAT DEPUTY POSITIONS. 8 detention deputy positions funded in July

•   COMPREHENSIVE HEALTHCARE CONTRACT. Sheriff's Department awarded a comprehensive contract to Naphcare on September 1, 2021. This contract will consolidate and expand workflows relating to primary and specialty health care services, oral care, mental health, and related ancillary services to all patients in custody. We are projecting the contract consolidation to be fully operational in fiscal year 2022.

•   MOU with HHSA. In September, the sheriff signed a Memorandum of Understanding (MOU) to work collaboratively to expand Medication Assisted Treatment services to our population.

•   ENHANCED COVID MONITORING. In December, MSD began utilizing better technology to treat patients in COVID-19 housing modules. This new device captures oxygen levels which will give nurses more accurate information to determine treatment.

•   ENHANCED COVID TREATMENT. In December, MSD collaborated with HHSA to on a new treatment for select COVID-19 positive patients. Monoclonal antibody treatment is FDA approved (EUA) and intended to reduce serious side effects of COVID-19.

•   CHRONIC CARE ENHANCEMENT. In December, MSD improved the management of diabetic patients in our system under a directive from the CMO.

**2022**

•   MEDICATED ASSISTED TREATMENT PILOT PROGRAM. Will be starting a pilot project at LCDRF to expand MAT related services to our female population. MSD will expand MAT services to our remaining population once our comprehensive vendor is established in 2022.

Analytica
CONSULTING
Ex. C - 201

# List of Tables

**Table 1**: Average Standardized Time Between Deaths by Manner (2010-2020)*.......................................4
**Table 2**: Select Characteristics of Most Populous California Counties (2010-2020)..................................18
**Table 3**: ADP vs. ARP by County (2011-2020) ........................................................................................19
**Table 4**: A Closer Look at Overdose/Accidental Jail Deaths, 2010-2020.................................................20
**Table 5**: Countywide Accidental Death Breakdown (1999-2020)..............................................................20
**Table 6**: Actual vs Estimated San Diego ADP .........................................................................................21
**Table 7**: Actual vs Estimated San Diego ADP .........................................................................................21
**Table 8**: Actual vs Estimated San Diego ADP .........................................................................................21
**Table 9**: Actual vs Estimated San Diego ADP .........................................................................................21
**Table 10**: Actual vs Estimated San Diego ADP .......................................................................................21
**Table 11**: ADP and Bookings by Type 1 Facilities (2010-2018)...............................................................27
**Table 12**: Deaths in Type 1 Facilities (2010-2020)..................................................................................27
**Table 13**: Overall Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ..................................28
**Table 14**: Suicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ..................................28
**Table 15**: Overdose/Accidental Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ...............29
**Table 16**: Natural Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020 ..................................29
**Table 17**: Homicide Jail Deaths, Expected vs Actual, Detailed Results, 2010-2020................................29
**Table 18**: Top 15 Alameda County Jail Demographic Groups with Associated Death Rates....................31
**Table 19**: Top 15 Contra Costa County Jail Demographic Groups with Associated Death Rates.............32
**Table 20**: Top 15 Fresno County Jail Demographic Groups with Associated Death Rates.......................33
**Table 21**: Top 15 Kern County Jail Demographic Groups with Associated Death Rates ..........................34
**Table 22**: Top 15 Los Angeles County Jail Demographic Groups with Associated Death Rates ..............35
**Table 23**: Top 15 Orange County Jail Demographic Groups with Associated Death Rates......................36
**Table 24**: Top 15 Riverside County Jail Demographic Groups with Associated Death Rates...................37
**Table 25**: Top 15 Sacramento County Jail Demographic Groups with Associated Death Rates ...............38
**Table 26**: Top 15 San Bernardino County Jail Demographic Groups with Associated Death Rates ..........39
**Table 27**: Top 15 San Diego County Jail Demographic Groups with Associated Death Rates .................40
**Table 28**: Top 15 San Francisco County Jail Demographic Groups with Associated Death Rates ...........41
**Table 29**: Top 15 Santa Clara County Jail Demographic Groups with Associated Death Rates...............42
**Table 30**: Percent of County Population by Gender (2010-2020)..............................................................45
**Table 31**: Average Unstandardized Days between Deaths (2010-2020)...................................................46

# List of Figures

Figure 1: Total Deaths in Various California County Jails (2010-2020) Compared to San Diego County.....3
Figure 2: Overall County Mortality Rates................................................................................5
Figure 3: Suicide, Homicide, and Accidental Death Rates.............................................................5
Figure 4: Comparing the Jail and General Population in San Diego County.............................................6
Figure 5: Expected vs Actual Jail Suicides between 2010 and 2020 ...................................................8
Figure 6: Expected vs Actual Jail Accidental Deaths between 2010 and 2020 ...........................................8
Figure 7: Expected vs Actual Jail Homicides between 2010 and 2020 ...................................................9
Figure 8: Expected vs Actual Jail Natural Deaths between 2010 and 2020 ..............................................9
Figure 9: Overall Expected vs Actual Jail Deaths between 2010 and 2020 .............................................10
Figure 10: Overall Expected vs Actual Jail Deaths - Sentenced and Unsentenced .....................................11
Figure 11: Natural Expected vs Actual Jail Deaths - Sentenced and Unsentenced .....................................12
Figure 12: Suicide Expected vs Actual Jail Deaths - Sentenced and Unsentenced .....................................12
Figure 13: Overdose/Accidental Expected vs Actual Jail Deaths - Sentenced and Unsentenced .........................13
Figure 14: Homicide Expected vs Actual Jail Deaths - Sentenced and Unsentenced.....................................13
Figure 15: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021) .............................14
Figure 16: Average Number of Bookings and Releases by Hour of Day in San Diego County .............................15
Figure 17: County Expected vs Actual Jail Deaths Including City Jails...............................................27
Figure 18: Confidence Intervals of Standardized Mortality Ratios...................................................30
Figure 19: Alameda County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity.......................31
Figure 20: Rated Capacity vs ADP at Alameda County Detention Facilities (2010-2021)................................31
Figure 21: Contra Costa County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .................32
Figure 22: Rated Capacity vs ADP at Contra Costa County Detention Facilities (2010-2021) ..........................32
Figure 23: Fresno County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity.......................33
Figure 24: Rated Capacity vs ADP at Fresno County Detention Facilities (2010-2021)..................................33
Figure 25: Kern County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .........................34
Figure 26: Rated Capacity vs ADP at Kern County Detention Facilities (2010-2021) ...................................34
Figure 27: Los Angeles County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ..................35
Figure 28: Rated Capacity vs ADP at Los Angeles County Detention Facilities (2010-2021) ...........................35
Figure 29: Orange County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ......................36
Figure 30: Rated Capacity vs ADP at Orange County Detention Facilities (2010-2021).................................36
Figure 31: Riverside County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity ...................37
Figure 32: Rated Capacity vs ADP at Riverside County Detention Facilities (2010-2021) .............................37
Figure 33: Sacramento County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity...................38
Figure 34: Rated Capacity vs ADP at Sacramento County Detention Facilities (2010-2021).............................38
Figure 35: San Bernardino County Population, Jail Pop, and In-Custody Deaths by Race/Ethnicity......................39
Figure 36: Rated Capacity vs ADP at San Bernardino County Detention Facilities (2010-2021) ........................39
Figure 37: San Diego County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .....................40
Figure 38: Rated Capacity vs ADP at San Diego County Detention Facilities (2010-2021) ..............................40
Figure 39: San Francisco County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .41
Figure 40: Rated Capacity vs ADP at San Francisco County Detention Facilities (2010-2021)..........................41
Figure 41: Santa Clara County Population, Jail Population, and In-Custody Deaths by Race/Ethnicity .....42
Figure 42: Rated Capacity vs ADP at Santa Clara County Detention Facilities (2010-2021) ...........................42
Figure 43: Mortality Rates Over Time, San Diego vs California, Ages 18-59 (2000-2020)...............................43
Figure 44: Additional Inmate Comparison Measures, San Diego vs California ..........................................44
Figure 45: Percent of Each County Population by Race/Ethnicity (2010-2020) .........................................45
Figure 46: Percent of Each County Population by Age Group (2010-2020)...............................................45

# EXHIBIT D

## News List

# In-Custody Death – George Bailey Detention Facility

**Post Date:**  04/27/2022 8:07 PM

The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.

On November 27, 2018, twenty-five-year-old Omar Ornelas was arrested and booked into the Vista Detention Facility by San Diego County Probation Department for a probation violation. The probation violation was for 594(A)(B)(2)(A) PC – Vandalism less than $400 and 186.22(D) PC – commit a crime for the benefit of a gang.

On December 18, 2018, Oceanside Police Department filed the following additional charges against Ornelas: 187(A) PC – Murder, 12022.53(D) PC – Discharge of a firearm, 29800(A)(1) PC – Felon in possession of a firearm and 186.22(B) PC – commit a crime for the benefit of a gang. Ornelas was transferred to the George Bailey Detention Facility on December 27, 2021.

On April 27, 2022, just before 8:00 a.m., two incarcerated persons were located inside of a cell unresponsive during a security check.  One of the incarcerated persons was revived with the use of Naloxone and transported to a local hospital.  Life saving measures were administered to Omar Ornelas, by deputies, medical staff, and Paramedics. Unfortunately, Omar did not survive.

The Homicide Unit responded to investigate the incident. As a matter of practice, the Sheriff's Homicide Unit investigates all deaths of persons in custody at the time of their passing. The cause and manner of death are still under investigation. The Medical Examiner's Office has been notified of the death. The autopsy is scheduled tomorrow, April 28, 2022.

Omar's family have been notified. Omar was a resident in the City of San Marcos, Ca.

The Citizens Law Enforcement Review Board was notified of the death and responded to the George Bailey Detention Facility.

Media Contact: Chris Steffen, Lieutenant

Email Address of Contact: Chris.Steffen@sdsheriff.org

Name of Station/Unit and Contact Phone Number: Homicide Unit / 858-285-6330

*Return to full list >>*

## SUBSCRIBE

Subscribe to receive updates.

| Email | ▾ |
| --- | --- |

> Email Address

**SUBMIT**

# EXHIBIT E



☰                                                              **Give Now**

# Another inmate dies in custody at a San Diego County jail

**By John Carroll / General Assignment Reporter & Anchor**
**Contributors: Roland Lizarondo**



Published April 28, 2022 at 5:38 PM PDT

---

## The eighth death this year happened Wednesday morning at the George Bailey Detention Center in Otay Mesa.

An autopsy was being performed Thursday on an inmate who died while in custody at the largest jail run by the Sheriff's Department, the George Bailey Detention Center in Otay Mesa.

Sheriff's homicide detective Lt. Chris Steffen explained what happened after the two men were discovered by deputies.

"One of the incarcerated persons was revived by some naloxone. ... And life-saving measures continued to be administered to the other incarcerated person, which was Omar Ornelas," Steffen said.

Ornelas was first booked into the Vista facility in November of 2018, charged with a probation violation. Later that year, Oceanside police charged him with a number of crimes, including murder. He was transferred to George Bailey late last year.

Steffen said jail medical staff at Bailey and paramedics did all they could to save the 28-year-old, but were unsuccessful.

"The first thing to my mind is: Oh no, we are in a deep crisis," Yusef Miller, of the North County Equity & Justice Coalition, said on Thursday afternoon.

Just the day before, KPBS covered a news conference led by Miller on the steps of the Hall of Justice in downtown San Diego. The subject: in-custody deaths in jails run by the Sheriff's Department.

A recent state audit found that San Diego County's jail deaths ranked among the highest in California. And a new report commissioned by the Citizens' Law Enforcement Review Board, which investigates citizen complaints against the Sheriff's Department, found that deaths in county jails happen primarily among people who have yet to be sentenced.

**RELATED: New report reveals details about who is dying in San Diego County jails**

On Thursday, Miller said a number of reforms would need to happen immediately.

"We want better protocols for drugs, rehab and drug interaction," he said. "We want better mental health staff, better medical staff."

Miller said the Sheriff's Department wasn't doing its job in preventing drugs from getting into the detention facilities.

"They have a responsibility to keep drugs out of jail, to make sure that they monitor the packages that are coming in, people that are coming in. ... So how did they get the drugs?" he said. "It's a failure in the system."

But Steffen rejected criticism of jail staff.

"We try and figure out how narcotics are getting into the jails and do our best effort to keep that from happening, but the deputies are doing as good a job as they can," he said.

Thursday's autopsy will be an important part of the investigation into how yet another person died while in custody at a jail run by the San Diego County Sheriff's Department.





# EXHIBIT F



# SUICIDES IN SAN DIEGO COUNTY JAIL

A System Failing People with Mental Illness

April 2018

A *Disability Rights California* Investigation Report

Ex. F - 212

## Report prepared by:
Aaron J. Fischer, Litigation Counsel
Rebecca Cervenak, Staff Attorney
Kim Swain, Managing Attorney


With special thanks to:
Hayley Jones, DRC Legal Secretary


## DRC Subject Matter Experts
Karen Higgins, M.D.
Robert Canning, Ph.D., CCHP


An accessible electronic version of this report is available at:
http://www.disabilityrightsca.org/JailsReports/SDsuicideReportAccessible.pdf

A print copy of this report is available at:
http://www.disabilityrightsca.org/JailsReports/SDsuicideReport.pdf

For more information about Disability Rights California, visit our website at:
www.disabilityrightsca.org


*Cover Photo: Mental Health Enhanced Observation Housing (EOH) Unit at the Las Colinas Detention and Reentry Facility*

# TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ..................................................................... 1

II.  A TROUBLED HISTORY OF SUICIDES IN THE COUNTY JAILS ....... 3

   A. Inmate Suicides: A Crisis by Any Measure .............................. 3

   B. Repeated Calls for Action ......................................................... 5

III. SCOPE OF DRC INVESTIGATION AND EXPERTS ......................... 7

   A. DRC Investigation Process ........................................................ 7

   B. Expert Analysis on San Diego Jails' Suicide Crisis ................... 7

IV. DRC FINDINGS AND RECOMMENDATIONS ................................ 9

   A. San Diego County Should End Its Over-Incarceration of People with Mental Illness and Improve Its System of Community-Based Mental Health Services .... 9

   B. San Diego County Should Address Systemic Deficiencies Illustrated by the High Rate of Inmate Suicides .... 12

      1. Screening for Suicide Risk and Related Mental Health Needs .... 12

      2. Clinical Assessment and Intervention .............................. 13

      3. Staff Communication ...................................................... 13

      4. Addressing the Heightened Risks of Restrictive Housing .... 14

      5. Supervision of At-Risk Inmates ....................................... 15

      6. Timely Emergency Response ........................................... 16

      7. Suicide Prevention Training ............................................ 16

      8. Internal Review of Inmate Suicides ................................. 16

      9. Quality Improvement Program ........................................ 17

   C. San Diego County Should Provide Adequate Treatment and Services to Inmates with Mental Health Needs. .... 17

      1. Overview of San Diego County's Jail Mental Health System .... 18

      2. Safety Cells ................................................................... 18

      3. Psychiatric Security Units (PSU) ...................................... 19

      4. Enhanced Observation Housing (EOH) Units .................... 21

      5. Lack of Mental Health Treatment Programs ..................... 23

      6. Undue and Excessive Solitary Confinement ..................... 25

   D. San Diego County Should Establish Meaningful Independent Oversight of Jail Conditions and Treatment of Inmates

V.  SUMMARY OF RECOMMENDATIONS

   ENDNOTES

   DRC Experts' Report on Suicides at San Diego County Jail

     -Karen Higgins, M.D., Robert Canning, Ph.D., CCHP

# I. EXECUTIVE SUMMARY

San Diego County faces a crisis in its jail system. It has the highest reported number of suicides in a California jail system over several years – more than 30 suicide deaths since 2010. The inmate suicide rate has been many times higher than the rate in similarly sized county jails in California, the State prison system, and jails nationally. This is a crisis demanding meaningful action.

While the County reported just one inmate suicide in 2017, which is a welcome decrease compared to previous years, the system remains deeply challenged. The incidence of inmate suicide attempts and serious self-harm remains extremely high - a rate of approximately two (2) per week. The frequency of suicide attempts indicates that the County must improve its treatment of people with mental health needs.

Recognition that San Diego County has a problem with suicides and other deaths at the jail is not new. There has been a steady drumbeat of calls to action, from the County's grand juries, the media, and people who have been incarcerated at the jail and their loved ones.

As the designated protection and advocacy system charged with protecting the rights of people with disabilities in California, Disability Rights California (DRC) opened an investigation into conditions at the San Diego County jails in 2015. We conducted tours of the County's jail facilities, and completed extensive interviews with Sheriff's Department leadership, jail staff, and jail inmates. We have reviewed thousands of pages of relevant policies and procedures, Sheriff's Department records, and individual inmate records.

Our investigation focuses on four interconnected aspects of San Diego's County jail and mental health systems. We provide specific Recommendations regarding each.

**Over-Incarceration of People with Mental Health Needs.** First, we found that there is an extremely high number of jail inmates with significant mental health treatment needs. The County's mental health care system, both inside and outside of the jail, has long operated in a way that leads to the dangerous, costly, and counter-productive over-incarceration of people with mental health-related disabilities. This includes a historical failure to provide sufficient community-based mental health services and supports that help individuals with mental health needs to thrive and avoid entanglement with the criminal justice system and incarceration. There is an urgent need for a better approach. We found that the County's recently developed Mental Health Services Act Plan and related initiatives – including increased community based-services and diversion/reentry efforts – provide a reason for optimism. Of course, the County's efforts will be judged on outcomes in the months and years ahead.

Ex. F - 216

**Deficiencies in Suicide Prevention.** Second, our two subject matter experts, who reviewed inmate suicide cases as well as relevant policies, identified significant deficiencies in the County's suicide prevention practices. These experts, Karen Higgins, M.D., and Robert Canning, Ph.D., CCHP, have considerable expertise in suicide prevention and mental health treatment in detention facilities. They have completed a detailed written report (Appendix A), which identifies twenty-four (24) Key Deficiencies in the County's system and provides forty-six (46) Recommendations to address those deficiencies. While we are convinced that the Sheriff's Department has begun to take the issue of suicide prevention seriously, there remain many aspects of the system's treatment of people at risk of suicide that require urgent action.

**Failure to Provide Adequate Mental Health Treatment.** Third, we found that the County's jail system subjects inmates with mental health needs to a grave risk of psychological and other harms by failing to provide adequate mental health treatment. Making matters worse, the County subjects inmates to dangerous solitary confinement conditions that take an enormous toll on individuals' mental health and well-being. A substantial number of the suicides in San Diego County's jails have occurred in designated segregation units and other units with solitary confinement conditions. Even with committed jail leadership and staff efforts to reduce solitary confinement and improve conditions, insufficient staffing and lack of other critical resources have caused these problems to persist.

**Lack of Meaningful, Independent Oversight.** Fourth, we found that the existing systems of jail oversight have failed. The time has come for the County to create an independent and professional oversight entity to monitor jail conditions, suicide prevention and mental health treatment practices, and other jail operations. A truly effective independent oversight entity, building on the models developed in Los Angeles County, Santa Clara County, Sonoma County, and other jurisdictions across the country, would enhance the County's efforts to address its historical challenges in its jails, help to achieve and solidify system improvements, and strengthen the trust of the community through greater transparency.

We have found that the County's jails have the great advantage of committed mental health staff and a number of strong leaders within the Sheriff's Department. They will need sustained investment and support from the County – along with true transparency and accountability – to achieve a durable solution to the inmate suicide crisis, the deficiencies in mental health treatment inside the jail, and the over-incarceration of people with mental health needs.

## II. A TROUBLED HISTORY OF SUICIDES IN THE COUNTY JAILS

### A. Inmate Suicides: A Crisis by Any Measure

San Diego County Jail has had one of the highest incidences of suicides in a California county jail system over several years – more than 30 suicide deaths since 2010.[1] By any measure, the number of suicide deaths in San Diego County's jails over a period of many years indicates a crisis demanding meaningful action.

DRC investigated inmate suicides during the three-year period from 2014 to 2016. Seventeen (17) people died by suicide in a San Diego County Jail facility during this time period. Among those deaths:

- Fourteen (14) people (82.3%) had a clear history and indication of mental health needs. Several had attempted suicide in the past, sometimes while in the community and often during earlier periods of incarceration.
- Nine (9) people (52.9%) were in jail on non-violent charges, including several cases involving only drug-related offenses.
- Fifteen (15) people (88.2%) were in jail awaiting trial. (One other was in jail for a brief "flash incarceration" related to a probation violation.) These individuals were not in jail because of a criminal conviction at the time of their death. They maintained the presumption of innocence embedded in our laws.
- At least six (6) people (35.3%) were housed in designated solitary confinement housing at the time of their suicide. Several more were in units that we observed to have solitary confinement conditions.
- At least four (4) people (23.5%) had one or more serious medical conditions at the time of their suicide death.

San Diego County's inmate suicide rate has been staggeringly high compared with national, statewide, and local data. In 2016, the County's jail inmate suicide rate was approximately 93.8 per 100,000, similar to the rates for 2015 and 2014 (120.3 and 106.2 per 100,000, respectively).[2] The average annual inmate suicide rate for San Diego County during this three-year period (107 per 100,000) is more than double the jail inmate suicide rate nationally for 2014 (50 per 100,000), the last year for which complete data is available.[3]

From 2014 to 2016, the seventeen (17) inmate suicide deaths in San Diego County far outpaced other large California county jail systems. For example,



**Jail Inmate Suicide Rates**
Similarly-Sized California Counties
(Annual rate per 100,000)
2014-2016

| | | | | | |
|---|---|---|---|---|---|
| Santa Clara ADP: 3757 — 30 | Riverside ADP: 3842 — 26 | Sacramento ADP: 4070 — 25 | San Diego ADP: 5320 — 107 | San Bernardino ADP: 5424 — 13 | Orange ADP: 6055 — 6 |

ADP = Average Daily Population

the Orange County Jail system had one suicide and the Riverside and Sacramento County Jail systems each had three (3) suicides during this three-year period.[4]

Even the Los Angeles County Jail system, which has an inmate population more than three (3) times larger than the San Diego County Jail population and a history of significant problems related to inadequate suicide prevention and treatment of people with mental health needs, had eight (8) suicide deaths during this three-year period, less than half as many as San Diego County.[5]

San Diego County's jail inmate suicide rate has also vastly exceeded (by a factor of 5) the annual inmate suicide rate in California's State prison system (21.8 per 100,000 from 2013 to 2016).[6] While local jails generally have higher inmate suicide rates than state prisons, we note that California's prison system has itself been under federal court supervision based in part on the prevalence of inmate suicides.

*San Diego County Jail inmates are*

**8X**

*more likely to die by suicide than the average San Diego County resident.*

Detention in San Diego County Jail facilities appears to increase the risk of suicide significantly for San Diego County residents. The jail system's inmate suicide rate has been nearly eight (8) times higher than the overall suicide rate for San Diego County (13.1 out of 100,000).[7]

As of this writing, San Diego County has reported one jail inmate suicide during 2017. Another inmate suicide reportedly occurred in March 2018. While this is a decrease in the number of suicide deaths compared to previous years, it does not establish that the County has achieved an enduring solution. Suicide rates are most meaningful when viewed over a sustained period of time. Although the number of inmate suicides in a given year is no doubt an important indicator as to the adequacy of a system's policies and practices, it is not the sole barometer by which a system's adequacy should be measured.

There are additional reasons for caution with respect to the reported decrease in inmate suicides. First, the County has had other periods with few or no suicides, only to see a return to previous levels. For example, a seven-and-one-half month period without a San Diego jail inmate suicide death (January 2015 - August 2015) was followed by a spate of suicide deaths in late 2015 and into 2016.

Second, our investigation



**Suicide Rates in San Diego Jails, Other Jails, State Prison, and the Community**

(Annual Rate per 100,000)

revealed that there continue to be a significant number of inmate suicide attempts and serious acts of self-harm. We reviewed 73 San Diego County Sheriff's Department incident reports that document distinct "Suicide Attempts" which occurred between the beginning of January 2017 and September 11, 2017. Many of these incidents were very serious and required emergency medical care. They include dozens of attempted hangings and self-strangulations, many jumps off the top tiers of jail housing units, and attempted overdoses. Such incidents occurred at a rate of approximately two (2) per week, which is consistent with the rate of "suicide attempts" reported for previous years – 107 in 2016, and 82 in 2015.

The County has stated to DRC that it began utilizing new definitions for "Suicide Attempt" and "Non-Suicidal Self Injury" in 2017. Under these definitions, the County determined that just 10 of the 73 incidents reported as "Suicide Attempts" were in fact suicide attempts under the new definition.

However such incidents are categorized, the continued frequency of inmate suicide attempts and serious acts of self-harm indicates that the treatment of people with mental health needs requires significant improvement.

### *Suicide Rate Calculations*

In examining suicide rates, DRC follows the methodology for calculating annual mortality rates, per 100,000 inmates, which is used by the United States Department of Justice. Experts in the field have found that this methodology is useful and "enhances our understanding of the jail suicide problem."[8]

The County has suggested an alternative method of calculating inmate suicide rate, which considers the estimated "racial distribution" of the inmate population in San Diego County's jails and in other county jail systems. The basis for this methodology is that San Diego County has an uncommonly high percentage of white inmates, who are statistically at higher risk of suicide compared to African American and Latino inmates.

The fact that San Diego County may have a higher-than-average number of inmates at elevated risk of suicide only *adds* urgency to the need for action. As Raymond F. Patterson, M.D., a national expert in forensic psychiatry and correctional suicide prevention, has written:

> If [a detention system] do[es] in fact house groups of persons who tend to have higher rates of suicide, [the system] is therefore on notice of this elevated suicide risk factor and has a duty to address that risk in its suicide prevention efforts. Awareness of a higher propensity to suicide among certain groups requires greater vigilance on the part of [the system], not a reason for acquiescence.[9]

Whatever the methodology for evaluating suicide rates, the number of suicides in San Diego County's jails in recent years is a cause for extreme concern.

## B. Repeated Calls for Action

Local advocates and media have called attention to the dangerous conditions and large number of suicides and other deaths in San Diego County Jail facilities. There is an extensive public record documenting the tragic loss of lives, systemic failures, and inadequacy of oversight.[10]  Families of those who have died have filed lawsuits alleging that the County and jail staff acted with deliberate indifference to inmates' serious mental health, medical, and related needs.[11]

Under the leadership of Dr. Alfred Joshua, the chief medical officer, the Sheriff's Department implemented a new Inmate Safety Program in 2015. This program included a number of changes to policy and training, and created new "Enhanced Observation Housing" (EOH) units for individuals meeting criteria indicating possible suicide risk. In spite of these efforts, the number of suicides remained high through 2016. (As discussed in Section IV.C.4, we have serious concerns regarding the harsh conditions and lack of mental health treatment in the EOH units.)

In Spring 2017, a San Diego Grand Jury issued a report regarding the alarmingly high inmate suicide rate. The Grand Jury found that "46 people have committed suicide in San Diego County jails in the past 12 years," noting that the County's inmate suicide rate is "the highest in all of California's large county jail systems."[12]

The Grand Jury recognized a number of steps the Sheriff's Department has taken in response to the inmate suicide crisis, including the addition of EOH units, Safety Cells (which, as we discuss later, are essentially small, empty padded rooms), and medical isolation cells, with related updates to policies and procedures.[13]

At the same time, the Grand Jury found that the Sheriff's Department continues to have inadequate suicide prevention training for jail staff, problematic gaps in personnel, and deficiencies in oversight. The Grand Jury concluded that "increased efforts in suicide prevention are required."[14]

On June 29, 2017, Sheriff Gore filed a Response to the Grand Jury's report. He promised a comprehensive suicide prevention policy, additional suicide prevention training, and formation of a Suicide Prevention Response & Improvement Team (SPRIT) to update policies and oversee staff training.[15]

Through our investigation, we are convinced that the Sheriff's Department has begun to take the issue of suicide prevention seriously. However, there remain many aspects of the system's treatment of people who have mental health needs, or who are at risk of suicide, that require urgent action. Individuals with mental health needs continue to suffer in San Diego County's jails, and remain at extraordinary risk of harm.

# III.  SCOPE OF DRC INVESTIGATION AND EXPERTS

## A. DRC Investigation Process

Disability Rights California (DRC) is the state's designated protection and advocacy system, charged with protecting the rights of people with disabilities in California.[16]  DRC has the legal authority to inspect and monitor conditions in any facility that holds people with disabilities.[17]

Pursuant to this authority, DRC opened its investigation into San Diego County Jail based on reports from advocacy groups and community members, individuals with disabilities who have been incarcerated in the County's jails, as well as public and media reports regarding conditions in the County's jail system.

DRC toured four San Diego County Jail facilities that contain units designated for inmates with mental illness: (1) Central Jail, (2) George F. Bailey Detention Facility, (3) Vista Detention Facility, and (4) Las Colinas Detention and Reentry Facility. We toured facilities on May 5 and 6, 2015 and returned for follow-up inspections on November 2 and 3, 2016. We viewed areas accessible to inmates, including the booking/intake area, holding cells, sobering cells, safety cells, health care treatment areas, recreational and program areas, visitation areas, and housing units. During the tour, staff provided information and answered questions about the facilities and programs. We spoke with scores of inmates in the housing units, either at cell-front or face-to-face in common areas. We also conducted confidential interviews with numerous inmates throughout our investigation.

DRC reviewed publicly available documents and obtained records from the Sheriff's Department through California Public Records Act requests, DRC's access authority[18], and signed releases from inmates. We reviewed thousands of pages of relevant policies and procedures, Sheriff's Department records, and individual inmate records.

Based on our initial inspection of the facilities, and pursuant to our protection and advocacy system authority, we found probable cause to conclude that prisoners with disabilities are subjected to abuse and/or neglect in the San Diego County Jail.[19] We continued our investigation, leading to this report.

## B. Expert Analysis on San Diego Jails' Suicide Crisis

While the recent investigation efforts of the Grand Jury and other entities have been admirable and provide important recommendations, we determined that the County's inmate suicide crisis and related issues with inadequate mental health treatment warranted an independent, in-depth expert assessment.

DRC retained two subject matter experts to review inmate suicide cases

7

going back to 2014 as well as relevant policies and procedures. These experts, Karen Higgins, M.D., and Robert Canning, Ph.D., CCHP ("DRC Experts"), have considerable experience and expertise in mental health treatment and suicide prevention in detention facilities.

Dr. Higgins served as the lead psychiatrist for the Denver City and County Jail system. She has also served as the statewide Chief Psychiatrist for the California Department of Corrections and Rehabilitation (CDCR). She has played leading roles in the development of policies related to correctional mental health care and suicide prevention.

Dr. Canning served as CDCR's statewide Suicide Prevention Coordinator for more than a decade, chairing the statewide suicide prevention committee, designing mental health and suicide prevention trainings, leading suicide prevention policy reforms, and building CDCR's quality improvement systems.

Dr. Higgins and Dr. Canning offer an important and independent perspective on San Diego County Jail's system. Their report (Appendix A) identifies twenty-four (24) Key Deficiencies and provides forty-six (46) Recommendations to address those deficiencies. See Section IV.B, below.

Dr. Higgins and Dr. Canning also completed two detailed reports on recent individual inmate suicides. These two reports, provided confidentially to the County, offer a model structure for the County to use to strengthen its own internal critical incident and suicide review processes for the future.

## IV. DRC FINDINGS AND RECOMMENDATIONS

### A. San Diego County Should End Its Over-Incarceration of People with Mental Illness and Improve Its System of Community-Based Mental Health Services.

As is the case in many counties, the jail facilities in San Diego County were not designed to provide adequate treatment to inmates with mental health needs.[20]

Yet, San Diego County incarcerates an enormous number of people with mental illness. The Sheriff's Department has reported that approximately 40% of the jail population has a mental illness.[21] That means there are some 2,000 people with mental illness in the County's jails at any one time, many of whom have very significant treatment needs.

The disproportionately high number of inmates with mental health needs is a problem that begins outside the jail system. Far too many people with serious mental health needs are ending up in San Diego County's jails. The County's recent planning and funding priorities for mental health services appear to take this challenge head-on, after years of lack of attention and investment. Of course, the County's efforts will be judged on outcomes.

By providing appropriate mental health services and taking proactive steps to keep people with mental health needs out of jail, communities can lower incarceration and recidivism rates and improve people's lives. When effective, such efforts are good for families, constitute smart utilization of public monies, and in fact enhance public safety.

In 2017, the County created a jail-based mental competency restoration program at the Central Jail, to provide restoration of competency services to inmates with pending criminal charges who are found "Incompetent to Stand Trial" (IST). The new program is a response to the lack of

> *DRC emphasizes three strategies for counties to end the dangerous, costly, and counter-productive over-incarceration of individuals with mental health needs:*
>
> 1. Ensure a robust community mental health system that supports people with mental illness in ways that keep them out of the criminal justice system in the first place.
>
> 2. Divert individuals with mental illness who come into contact with law enforcement away from jail and into appropriate placements with services.
>
> 3. Help individuals with mental illness safely and successfully reenter their communities after being incarcerated, with effective continuity-of-care and services to assist with housing, food, and other basic needs.

9

available beds in the state hospital system and resulting delays in providing court-ordered treatment to the IST population.

The County has not, however, taken similar steps to create capacity for a community-based restoration of competency program. Jail-based programs are compromised by their non-therapeutic carceral setting, and can themselves be dangerous places.[22] In contrast, community-based programs offer a cost-efficient, effective means of restoring IST patients to competency, while reducing unnecessary incarceration and improving mental health outcomes.[23]

Historically, San Diego County's efforts with respect to community-based mental health services have fallen short. The County failed to invest available state funding for mental health services, including over $100 million of Mental Health Services Act (MHSA) funding in 2017, with an additional $42 million in reserves.[24]

In June 2016, a Grand Jury documented the County's under-utilization of MHSA monies. The Grand Jury recommended that the County "appropriate a larger percentage of MHSA funds each year in order to improve services to a larger number of seriously mentally ill and at-risk county residents."[25]

The last few months have shown some reason for optimism, with the County taking steps to substantially increase investment. In October 2017, the County approved its Mental Health Services Act Three-Year Program and Expenditure Plan: Fiscal Years 2017-18 through 2019-20 ("San Diego MHSA Plan").[26] This plan would represent a major investment, nearly $570 million, in community-based mental health services and housing.[27] It includes over $33 million for mental health programs targeted to help youth and adults entangled in the criminal justice system.[28] The plan marks an important step toward addressing the overrepresentation of people with mental health needs in the criminal justice system and subjected to incarceration.

The San Diego MHSA Plan provides for increased outreach to people with mental health needs in jail and links to community-based services, including Full Service Partnership (FSP)[29] and Assertive Community Treatment (ACT)[30] programs, mental health and substance abuse treatment, health care, and housing. Additional programs are aimed at diversion from jail, reducing recidivism, and court-sponsored alternatives to incarceration. Examples include the Collaborative Behavioral Health Court and ACT program, the Psychiatric Emergency Response Team (PERT), the Serial Inebriate Program (SIP), and Courage to Call, a veteran peer support program.[31]

The County appears to be exploring other programs to decrease the number of people with mental health needs in jail. In July 2017, the Board funded an alternative custody and community transition pilot program designed for people with mental health needs and co-occurring substance abuse disorders incarcerated for non-violent misdemeanor offenses. The program is designed to link participants with community-based mental health

10

treatment and reentry services, with the goal of reducing recidivism. The pilot program is funded to serve 24 individuals at a time.[32]

The County's plans also recognize the importance of better data collection and outcome-based program evaluation. For example, the County recently passed a resolution supporting *Stepping Up: A National Initiative to Reduce the Number of People with Mental Illness in Jails*, which encourages development of a data-driven plan to achieve reductions in the number of people with mental illness in jail.[33]

Implementation of the *Stepping Up* Initiative and programs included in the MHSA Plan remain in the early stages, and should move forward expeditiously. These efforts will require sustained funding in the months and years to come, adequate transparency, and self-critical analysis of progress and of where additional resources may be needed.

---

### RECOMMENDATIONS

**Ending Over-Incarceration of People with Mental Illness and Strengthening Community-Based Mental Health Services**

**Recommendation 1.**   Fully implement the County's three-year Mental Health Services Act (MHSA) Plan, with adequate transparency as to spending and program outcomes.

**Recommendation 2.**   Focus investment on community-based services and treatment programming that help individuals with mental health needs to thrive and to avoid incarceration and entanglement with the criminal justice system.

**Recommendation 3.**   Develop capacity for community-based competency restoration programs for individuals found Incompetent to Stand Trial (IST), so they can receive treatment in the least restrictive setting appropriate and do not languish unnecessarily in jail.

**Recommendation 4.**   Strengthen reentry programming for individuals with disabilities to ensure continuity of care, including with respect to medication and other treatment, and access to job opportunities, housing, food, and other basic needs for successful reintegration into the community.

**Recommendation 5.**   Ensure that the County's mental health programs are subject to rigorous data collection and self-critical analysis of progress and where additional resources may be needed.

## B. San Diego County Should Address Systemic Deficiencies Illustrated by the High Rate of Inmate Suicides.

The DRC Experts, Dr. Higgins and Dr. Canning, reviewed jail policies as well as individual records for all suicides that occurred between December 2014 and the end of 2016. They identified twenty-four (24) "Key Deficiencies" in San Diego County Jail's system, covering nine (9) components of an effective correctional suicide prevention program. They provide forty-six (46) Recommendations to improve the County's suicide prevention and related mental health treatment delivery efforts. Their full Report is attached as Appendix A.

---

**The DRC Experts found that San Diego County must improve its Jail Suicide Prevention efforts in nine (9) areas:**

1. Screening for Suicide Risk and Related Mental Health Needs
2. Clinical Assessment and Intervention
3. Staff Communication
4. Addressing the Heightened Risks of Restrictive Housing
5. Supervision of At-Risk Inmates
6. Timely Emergency Response
7. Suicide Prevention Training
8. Internal Review of Inmate Suicides
9. Quality Improvement Program

---

The DRC Experts commended the County for some of its recent efforts to revamp its mental health and suicide prevention policies and practices. They have encouraged the County to continue to strengthen those efforts, while taking steps to address the identified Key Deficiencies, summarized here.

### 1. Screening for Suicide Risk and Related Mental Health Needs

Screening for suicide risk and related mental health needs is a critically important part of any suicide prevention program. Effective screening to determine if a person might be at risk of suicide is essential at the time of jail booking, as the initial period of detention carries heightened risk of suicide. Screening is also necessary at particular high-risk moments during a person's incarceration.

The DRC Experts identified problems with the County's suicide risk screening procedures at booking, at key transition events that carry elevated risk (e.g., placement in solitary confinement), and at other high-stress, high-risk moments (e.g., inmates receiving "bad news" about their criminal court case, moving to prison, or being extradited).

12



In one tragic and illustrative case reviewed by the DRC experts, an inmate arrived at the jail with symptoms of florid psychosis and mania. He was not referred for admission to the Psychiatric Security Unit. He was instead placed in an Administrative Segregation unit. He died by suicide a few days later without receiving an adequate screening for suicide risk.

## 2. Clinical Assessment and Intervention

Jails must effectively identify and monitor inmates' mental health needs and timely provide clinically indicated treatment, both in the event of an acute psychiatric episode and on an ongoing basis.

The DRC Experts identified several deficiencies in San Diego County's clinical referral and evaluation practices.

The experts also found that San Diego County Jail inmates do not receive an adequate individualized mental health treatment plan, a violation of state law[34], and do not have access to care that can prevent decompensation and reduce the risk of suicidal thinking and behavior.

## 3. Staff Communication

Communication between and among custodial staff and health care professionals working in the jail is another important aspect of suicide prevention. The DRC Experts found that San Diego County has lacked an effective system for custodial staff, mental health staff, and other health care staff to communicate about an inmate's decompensating condition, potential risk of suicide or self-harm, and mental health treatment needs.

In one case, a man died by suicide the day before his transfer to another state to face criminal charges. The DRC Experts found that custody staff knew he had made a credible suicide attempt a few weeks earlier, and that he was experiencing considerable stress about being extradited. Yet the inmate's treatment record did not reflect any sense of heightened risk requiring closer observation, monitoring, and clinical follow-up. The DRC Experts determined that this suicide death may have been preventable had there been better communication among custody and mental health staff about the inmate's situation.

13

## 4. <u>Addressing the Heightened Risks of Restrictive Housing</u>

The placement of inmates, particularly those with mental health needs, in segregated or restrictive housing increases the risk of suicidal and self-harming behavior, isolates individuals, and impedes normal interpersonal interactions that are essential to psychological health and adequate treatment.[35] At least six (6) inmates who died by suicide in the last four years were housed in designated solitary confinement units in San Diego County Jail, and several more were housed in units with solitary confinement conditions.





*Segregation Cell Door (Las Colinas)*

*Housing Unit for Prisoners with Mental Illness (Central)*

The experts found that San Diego County Jail lacks an adequate process to screen inmates for increased suicide risk prior to and during placement in solitary confinement. This means that jail staff may be placing inmates who are at greatest risk of suicide in solitary confinement without identifying and considering those risks.

In one case, an inmate was housed in Administrative Segregation for over four months. The DRC Experts found that this inmate appeared to suffer the ill effects of prolonged isolation and had significant symptoms of mental illness that were not detected by staff. After a series of emergency placements in the jail's "Safety Cell," the inmate was again placed in Administrative Segregation, where he spent the last six weeks of his life before hanging himself.

The DRC Experts also identified problems with custodial practices in monitoring inmates in solitary confinement to ensure that those inmates are safe and not engaging in self-harming behavior. They found failures to monitor inmates' safety and cases of malfunctioning communication equipment in the segregation units. In some cases, the result was delays in discovering and responding to inmates' ultimately fatal suicide attempts.

14

DRC observed video footage of one troubling suicide attempt in an Enhanced Observation Housing (EOH) Unit, which houses inmates at risk of suicide with solitary confinement conditions (as discussed in Section IV.C.4). Inmates are monitored by overhead video camera and per Department policy, should receive in-person checks at least once every 15 minutes. The video shows the inmate standing naked on the cell's desk, praying and preparing to jump, for over 14 minutes. He then dove head-first onto the floor. Four more minutes passed before custody staff appeared and summoned emergency medical care. Had the policy regarding in-person checks been followed, or the surveillance video been monitored, staff could have intervened prior to the inmate's jumping, and there would likely have been a more timely discovery and emergency response.

The extreme isolation and deprivations of solitary confinement increase suicidal ideation and self-harming behavior. Records indicate that such conditions contributed to inmates attempting suicide. In one suicide case, an inmate housed alone in Administrative Segregation was allowed just one hour out of his cell every 48 hours. He requested psychiatric services but two days later, he still had not been seen by mental health staff. He asked a deputy through the cell's intercom when he would get out of his cell and into the dayroom. He was told that he must remain in his cell. Forty-five minutes later, he was found hanging in his cell. Prior to hanging himself, he had urinated on the floor, stuck food and feces on the ceiling, and scrawled a suicide note on the cell walls using his own blood.

## 5. Supervision of At-Risk Inmates

When an inmate has suicidal thoughts, or engages in suicidal or self-harming behavior, staff must adequately supervise the inmate to ensure that the individual is safe.

The DRC Experts found several deficiencies regarding supervision of such inmates. For example, the experts found problematic the County's policies directing that custodial staff, rather than clinical staff, have final decision-making authority about where to house inmates identified as at risk of suicide.

Custody staff too often interfere with clinical decision-making regarding inmates with acute mental health needs. In one case, an inmate was booked while having acutely manic and psychotic symptoms. He had been hospitalized twice shortly before his incarceration and had been off his medications for several days prior to arrest. There was a two-day delay before he received a psychiatric evaluation and medications. The inmate made repeated statements about hurting himself, and he refused to take medications when they were finally ordered. A nurse practitioner recommended that the inmate be placed in a Safety Cell based on his condition. However, a sergeant refused to move him. He remained in an Administrative Segregation cell, where he died by suicide that evening.

## 6. Timely Emergency Response

When an inmate engages in a serious suicide attempt, the facility staff's emergency response will often determine if the person lives or dies. The DRC Experts found, in nearly half the emergency responses to lethal suicide attempts they reviewed, poor coordination of lifesaving efforts, delays in starting CPR, and/or malfunctioning medical equipment. They cited several troubling examples among recent suicide deaths.

In one case, medical staff were unable to initiate life-saving efforts due to malfunctioning automated external defibrillator (AED) equipment.

In a second suicide case, deputies waited seven minutes after discovering an inmate hanging in his cell, and then prevented nursing staff from evaluating the inmate's condition or using the AED.

In yet another case, the DRC Experts observed video of approximately 11 deputies standing at the scene of a suicide attempt for several minutes without initiating life-saving measures.

The DRC Experts also found that San Diego County Jail lacks an adequate program of drills for medical emergencies, including those stemming from serious suicide attempts.

## 7. Suicide Prevention Training

Custodial, medical, nursing, and mental health staff need strong training on the signs of mental illness and suicide risk, and on responding to inmates who are potentially at risk of suicide.

While the County has in recent months taken affirmative steps to enhance its suicide prevention training program in the wake of the Grand Jury's 2017 findings, the DRC Experts found that the County's training program is not well coordinated, tracked, or evaluated.

The DRC Experts found additional deficiencies with respect to the training of mental health clinicians. For example, records indicate that clinicians frequently use "contracts for safety," which ask patients to agree verbally or in writing that they will not engage in self-harm. According to suicide prevention experts, this practice has not been shown to decrease the risk of suicide attempts or to provide protection for clinicians. In fact, San Diego County Jail clinicians used these "contracts for safety" with multiple inmates who subsequently died by suicide while in custody.

## 8. Internal Review of Inmate Suicides

All inmate suicide deaths and medically serious suicide attempts should be subject to a rigorous review process, with the objective of identifying necessary improvements that can be made to enhance suicide prevention and inmate safety moving forward.

The DRC Experts found that the County's internal suicide review process, including as proposed in its recently revised Suicide Prevention Policy, is inadequate. They found that the policy does not sufficiently outline an internal

16

review process, and that it fails to identify how findings and corrective action plans will be acted upon.

It is problematic that the Sheriff's Department Critical Incident Review Board does not conduct a formal review of all serious suicide attempts. This is a missed opportunity to learn from experience and to strengthen policy, procedure, and training moving forward.

The DRC Experts also expressed concerns about the San Diego County Citizens' Law Enforcement Review Board (CLERB), finding that it does not serve a meaningful or sufficient role in the provision of external, independent oversight with respect to suicide prevention. (We strongly agree with this finding, and recommend a new model of independent oversight. See Section IV.D.)

### 9. Quality Improvement Program

Jail systems with a robust continuous quality improvement (CQI) program will be in the best position to identify problems and implement effective solutions, including with respect to suicide prevention. The DRC Experts found that the County has begun to take positive steps in this area, but that important work remains.

---

**RECOMMENDATIONS**

Improving Suicide Prevention in Jails

**Recommendation 6.**   Develop a plan for timely implementation of the DRC Experts' forty-six (46) Recommendations to address deficiencies in San Diego County Jail's suicide prevention policies, practices, and training.

**Recommendation 7.**   Strengthen the County's internal review process and quality improvement program to ensure implementation of necessary changes to enhance suicide prevention and inmate safety.

---

## C. San Diego County Should Provide Adequate Treatment and Services to Inmates with Mental Health Needs.

Our investigation found that there are a large number of San Diego County Jail inmates with significant mental health needs. With few exceptions, enhanced mental health treatment programming is provided only to those with critically acute needs. In many cases, inmates remain in harsh, non-therapeutic settings without adequate treatment until their condition deteriorates. Only when they reach the point of engaging in acts of self-harm or having an acute breakdown do they receive an enhanced level of care. Such a system is cruel and counterproductive, and does not meet constitutional and legal requirements.

17

The County must take reasonable steps to ensure that it safeguards the rights of inmates with mental illness under the United States Constitution, the Americans with Disabilities Act, and other relevant laws. The County's compliance with state regulations – including Title 15 of the California Code of Regulations regarding jail operations – is important, but it does not demonstrate compliance with Constitutional and other legal requirements.[36]

## 1. <u>Overview of San Diego County's Jail Mental Health System</u>

The Sheriff's Department utilizes a partnership of County staff and contract health professionals to provide mental health services. Liberty Healthcare Corporation, a private contractor, assists in the hiring of staff and management of the mental health programs. Of course, it remains the County's responsibility to ensure that inmates are provided adequate care based on individual clinical needs.

The jail system has two units, called Psychiatric Security Units, that have on-site mental health clinicians and daily treatment programming, serving up to thirty (30) men and thirty-two (32) women with the most critically acute mental health conditions.

The County's jails also rely heavily on Safety Cells and Enhanced Observation Housing (EOH) units to manage inmates identified as acting out or at risk of self-harm or suicide. These are severe and punitive-feeling placements, without meaningful treatment. They raise serious concerns.

There are other designated mental health "cluster" units that house people with mental illness. In general, these units do not provide meaningful treatment programming.

A Jail-Based Mental Competency Program, a 25-bed program at the Central Jail for inmates deemed Incompetent to Stand Trial (IST), opened in March 2017. DRC did not tour or assess this program.

 

*Safety Cell Doors and Barren Cell Interior, with Grate in Floor Serving as Inmate's Toilet (Central Jail)*

## 2. Safety Cells

We have significant concerns about the County's placement of large numbers of inmates in the jails' "Safety Cells."

By policy, Safety Cells are used for people who: (1) verbalize suicidal ideation or make suicidal gestures and are belligerent or intoxicated; (2) are combative or violent to a point that they may injure themselves, other patients or staff; or (3) are unable to function in the regular or specialized housing areas due to behavior which jeopardizes their safety.

These Safety Cells are extraordinarily harsh settings. They are small, windowless rooms with rubberized walls. There is no furniture or bedding, leaving the individual to sit or lie on the floor. Safety Cell doors contain a food slot and a small viewing window that faces a hallway. Cells have a ceiling light that is illuminated 24/7, and a camera for remote observation by custody staff.

The cells are completely barren, with no sink, toilet, or running water. Inmates defecate and urinate in a grate on the ground. In June 2017, a Grand Jury evaluation of jail conditions found a "very strong" smell of urine surrounding the Safety Cells.[37]

Inmates placed in these Safety Cells are stripped naked and given only a "safety smock" made from heavy tear-free material fastened with straps or Velcro. The garment is open at the bottom, and no underwear is provided. Inmates receive no books or any other personal property while in a Safety Cell.

Placements in a Safety Cell are approved by the Watch Commander, in consultation with medical staff. An initial medical assessment must be done within 30 minutes after medical staff is notified. Department policies require observation of inmates placed in Safety Cells by custody staff at least twice every 30-minute period and by medical staff every four (4) hours. The jail's policy is for a mental health consultation to occur within 12 hours of placement, and a medical evaluation every 24 hours.

There is no time limit for how long an inmate may be kept in a Safety Cell. Record reviews show that many inmates are held in Safety Cells for much longer than 24 hours, and in some cases up to four days. Many inmates cycle in and out of Safety Cell placement multiple times. In 2017, inmates were placed in a Safety Cell more than 6,700 times.

## 3. Psychiatric Security Units (PSU)

The County has two jail-based inpatient mental health units, known as Psychiatric Security Units (PSU), at the Central Jail (30 beds for men, including four beds in "observation cells") and at the Las Colinas Detention and Reentry Facility (32 beds for women, plus six nearby beds in "observation cells"). Strikingly, these two units make the Sheriff's Department the County's largest provider of inpatient psychiatric services.

We observed a high level of acuity among the patients in these inpatient units, with some placed in troubling solitary confinement conditions.

At the same time, we found that the PSUs do have some positive treatment programming. For example, at Central Jail, the PSU has clinical staff on-site, along with deputy staff that receive specialized mental health training. The PSU has operated weekly "Love on a Leash" therapeutic programs with specially trained dogs.



*Men's Psychiatric Security Unit (Central Jail)*

At Las Colinas, the PSU has considerable treatment and programming space. Therapeutic programming has included yoga and arts/crafts. Patients receive weekly multi-disciplinary treatment group meetings and regular clinical contact.

The County Jail's PSUs are the only units we observed that provide enhanced mental health treatment to inmates. They are available only to inmates demonstrating an extremely high level of acuity.




*Women's Psychiatric Security Unit Cells (Las Colinas)*

A deeply problematic practice impacting access to treatment in the PSU is the inappropriate influence of custody staff, often contrary to mental health providers' clinical recommendations. For example, we received multiple reports that custody staff unilaterally place patients in the PSU's "observation units," which amount to a solitary confinement setting without access to the PSU's treatment programming. Inmates in these cells have been observed, by us and by others, smearing food, feces, and urine on the walls and floor.

Custody staff have in some cases prevented PSU patients from having social visits or accessing the outdoor area for recreational activity, overruling clinicians' judgment as to what is safe and clinically appropriate based on the

20






*Psychiatric Security Unit Observation Cells*
*(Las Colinas)*

*Psychiatric Security Unit Observation Cells*
*(Central Jail)*

patient's individual circumstances. Such disregard of clinical judgment is deeply counterproductive to treatment efforts.

The DRC Experts also found problematic the number of inmates in mental health crisis who are not referred for placement in the PSU. There are large numbers of inmates cycling in and out of Safety Cells, many remaining in those cells for extended periods of time. But Safety Cells are harsh, barren, and isolating. They are not designed to provide clinical evaluation or treatment.

Inmates exhibiting suicidal or self-harming behavior, or other manifestations of acute mental illness, should be timely assessed for placement in the PSUs. The County should ensure that these units are being fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically-driven treatment.

### 4. <u>Enhanced Observation Housing (EOH) Units</u>

With the County's development of the Inmate Safety Program in 2015 came the creation of Enhanced Observation Housing (EOH) units. These units, located at four jail facilities (Central, Las Colinas, George Bailey, Vista), are designated for observation and assessment of inmates who may be at elevated risk for suicide. Even though EOH inmates, in contrast to inmates in Safety Cells, generally have access to a toilet, they too endure conditions of extreme isolation and deprivation.

We observed and met with several inmates in EOH units. Consistent with County policy, all clothes and underwear are taken away, and inmates receive a safety smock, two blankets, and shower shoes. However, we reviewed multiple records documenting that EOH inmates were left naked, with no safety smock, and in some cases not even provided a blanket. Some are forced to sleep on a thin mat placed on the floor. Many inmates complained about being cold, even with the smock and blankets.

Inmates have no access to personal property, television, recreation yard time, or visits from family. Inmates in the EOH units eat from paper trays and

21

a paper safety spoon, and in some cases are restricted to eating without any utensil.

Inmates in the EOH units with individual cells complained about extremely limited time outside their cell and excessive isolation.



*Women's EOH Cell in Medical Isolation (Las Colinas)*

Mental health staff appear to recognize the extreme conditions in the EOH units. In one inmate's chart we reviewed, a psychiatrist recommended that the facility "discontinue EOH as the isolation is inhumane and likely to compromise [this inmate] psychologically." We learned that some inmates deny having suicidal thoughts so they can get out of the EOH unit, or avoid placement there, given the harsh conditions.

The number of inmates who pass through the EOH unit, with all its deprivations, is remarkable and far beyond what we have observed in other jails. In 2016, the County logged 5,269 EOH placements. The rate was similar in 2017, based on partial data provided to us. In hundreds of cases, the inmate spent three days or more in the EOH unit, including a substantial number with lengths of stay of one week or more.

Inmates in EOH units are given a risk designation of either "high" or "low." When we toured the facility in November 2016, mental health clinicians evaluated inmates every 24 hours if they were designated as "low" risk. We were alarmed to see that for inmates designated as "high" risk, clinicians would evaluate them only every 48 hours, on the purported basis that they needed more time to "cool down." We understand that the Department recently updated their policies to ensure that all inmates are seen at least every 24 hours.

Still, there is no limit as to how long an inmate can be held in EOH housing. Frequently, the inmate charts we reviewed simply noted "Continue to Observe (CTO)," with no clinical justification or plan for treatment. Mental health staff who cover the EOH units spend their time evaluating and re-evaluating potential suicide risk, but little to no time engaging with inmates to reduce that risk.

We are well aware of the County's important objective to prevent inmate suicide deaths, and that removal of clothing, property, and privileges can reduce the opportunities that an inmate may have to engage in self-harming behavior. That being said, we found extremely disturbing the levels of deprivation and isolation for so many individuals, without access to any therapeutic or recreational activities. These individuals, remember, have been specifically identified as having potential mental health needs. They require

22

frequent assessment and sustained therapeutic intervention. While the County has taken steps to better assess inmates' suicide risk, more must be done to provide necessary treatment.

## 5.  <u>Lack of Mental Health Treatment Programs</u>

Through our investigation, a major theme that emerged was that inmates do not have timely access to adequate mental health care, including counseling, psychiatric medications, and other treatment programming.

The County has recently created designated mental health "cluster" units, which seem to provide some benefit to inmates with mental health needs who may be vulnerable to abuse or exploitation in general population units.

However, these designated mental health units lack formal treatment programming. Written guidelines for the largest such unit, at Central Jail, confirmed these limitations, stating that it "had no additional staff, doesn't provide additional treatment, or different follow-up guidelines. . . . [The unit] is simply psychiatric housing where inmates are less subjected to stigma if acting in a manner that would reveal their thought process impairments."

Mental health staff leadership shared with us that increased access to structured individual and group treatment activities would be beneficial to their patients, but that there is insufficient mental health staffing and related resources to deliver such a program.

Access to mental health treatment remains extremely limited outside the inpatient PSUs. It generally consists of medication management and brief, non-confidential "check-ins" with mental health staff, often through a cell door. Non-confidential clinical contacts undermine treatment, as prisoners are reluctant to disclose sensitive information about their mental health history or current situation. What is more, effective communication through the thick metal cell doors is extremely difficult – people must speak very loudly to be heard at all. (We observed psychiatrists meeting with some patients privately outside of their cell, which is a positive practice.)

Many inmates on the jail's mental health caseload expressed to us an interest in group or individual out-of-cell therapeutic activities. In one case, a patient's record documented that he requested to discontinue his antidepressant medication and try counseling. Instead, mental health staff increased his medication dosage and ignored his request for counseling.

The lack of access to mental health treatment activities and appropriate levels of care violates minimum standards of care for inmates with mental health needs.[38] The National Commission on Correctional Health Care has adopted a standard requiring that "[r]egardless of facility size or type, basic on-site outpatient [mental health] services include, at a minimum, individual counseling, group counseling and psychosocial/psychoeducational programs."[39]

23

The County has reported that the jail system has recently increased mental health staffing. Any increase is a step in the right direction. It is clear that a significant increase in staffing and related resources is necessary to deliver meaningful treatment, including structured individual and group treatment programming, to the approximately 2,000 people with mental health needs inside the jails.

> ### The Veterans Moving Forward Program
> One notable exception to the lack of mental health programming in the San Diego County jails is the Veterans Moving Forward Program at Vista. The unit is decorated with artwork and displays flags representing each branch of service. Up to 64 inmates who are veterans participate in the program, which covers substance abuse, stress management, yoga, career planning, mentoring, financial planning, and journalism. A counselor from the Veterans Administration is assigned to the unit.
>
> The Veterans Moving Forward Program excludes inmates with serious medical conditions and non-veterans. Many inmates, both veterans and non-veterans, would benefit from this sort of program but are unable to participate due to the lack of capacity and restrictive criteria.

We also found that inmates have faced significant delays in receiving prescribed psychiatric medications. Such delays can be dangerous and lead to mental health decompensation. The jail adopted a new pharmacy system in the summer of 2017. We received reports, confirmed by the County, of problematic delays between prescription and arrival of a medication for patients. The County has indicated that such problems have been addressed through the use of local pharmacies, particularly for urgent prescriptions. However, we continue to receive reports that medications are delayed.

Overall, the DRC Experts found that the County's jail mental health program "remains fragmented and without good continuity of care." They recommend development of a consolidated mental health treatment program that offers an appropriate spectrum of levels of care.

Specifically, the DRC Experts recommend creation of an "intermediate" level of mental health care, with sufficient capacity to ensure timely access for those individuals who need enhanced treatment programming. The program would serve patients "stepping down" from Safety Cell, EOH, or PSU admissions, as well as patients with a mental health condition that makes it difficult for them to function in a general population jail setting. The program would require a substantial increase in mental health clinician staffing to provide a structured treatment program that includes individual and group therapy to meet the clinical needs of the inmate population. Treatment must be provided pursuant

24

to individualized treatment plans, as required by Title 15 of the California Code of Regulations (Section 1210). The DRC Experts found the jail's treatment plans to be consistently inadequate. This was consistent with our review of dozens of inmates' jail mental health records.

DRC strongly encourages the County to implement an enhanced and structured outpatient treatment program. It would have enormous benefit with respect to the safety and well-being of inmates, jail operations, and reentry efforts. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.[40]

## 6. Undue and Excessive Solitary Confinement

Our investigation uncovered significant problems regarding the use of solitary confinement, particularly for inmates with mental health needs. Solitary confinement is generally defined as a placement in which inmates are held in their cells, alone or with a cellmate, for 22 to 24 hours per day.[41] San Diego County Jail inmates may be held in these conditions, for example, in maximum security units, Administrative Segregation units, "Keep Separate All" units, EOH units, or disciplinary units.

There is growing consensus that the isolation of prisoners with mental illness should be avoided due to serious psychological and physical risks of harm.[42] Solitary confinement is an extremely dangerous place for someone with mental health needs. At least six (6) jail inmates died by suicide in segregation units in recent years, a group that includes individuals with a known history of mental illness and suicide attempts. Several other inmates died in units with solitary confinement conditions.

Jail staff report that their goal is to meet the requirements of Title 15, a state regulation that mandates at least three (3) hours per week of exercise time in a space designed for recreation.[43] Segregated inmates are also typically scheduled to receive 50-60 minutes per day out of their cells to shower and use the phone. They spend the remaining 1,380-1,390 minutes of their days inside their cell. This is an extreme level of isolation.

We found that "lockdowns" are remarkably common in San Diego County's jails. During lockdowns, inmates in an entire unit or portion of a facility can be confined to their cells. The number of inmates reporting extended periods of cell confinement during lockdowns was astonishing. We saw multiple records showing inmates subjected to long-term lockdown conditions.

25

> ### The Experience of Being on "Lockdown"
> One inmate filed a grievance after her unit faced the tenth lockdown in two weeks. She wrote:
>
> > *This treatment is worse than people treat . . . animals. You guys are messing with our mental state . . . We are on lockdown with no explanation as to why. We barely get to come out as is and to be completely locked away and ignored by officers is unnerving. Being locked in jail inside a box inside of another box can do things to a person's mental state.*

We also received information regarding a problematic practice that staff referred to as "Bypass." Under this practice, jail staff would not document the lockdown of individual inmates – including many with mental illness. In other words, people outside of designated segregation units were held in solitary confinement conditions without it being tracked anywhere in the system. The County has indicated that this practice has been ended.

One positive practice we learned about was a segregation placement email alert system, which notifies mental health staff when any inmate is placed in a segregation unit or individual cell lockdown. We urge the County to build on this practice, which started in September 2017. There should be a documented process for mental health staff to recommend against segregation placements for inmates at risk of psychological harm or suicide in such conditions, and for such a recommendation to be followed absent a specific security risk. Jail leadership has indicated that such a process occurs on an *ad hoc* basis, and that they would consider formalizing it with proper documentation.

Jail leadership shared with us their perspective that the creation of the mental health "cluster" units has helped to reduce the number of people with mental illness in segregation units. We have not seen data to support this statement. And we remain deeply concerned about the lack of treatment, recreation, and other programming provided to inmates in the mental health "cluster" units.

We urge the County to continue to take affirmative steps to reduce the use of solitary confinement, and to eliminate the practice for inmates with mental illness. The County should track and analyze data on segregation placements, lengths of stay, and outcomes for inmates – particularly those with mental illness.

26

## RECOMMENDATIONS
**Improving Mental Health Treatment and Ending Harmful Use of Solitary Confinement**

**Recommendation 8.**     Substantially increase mental health staffing and related resources to ensure that individuals with mental illness in the jail receive clinically indicated treatment.

**Recommendation 9.**     Ensure that the inpatient Psychiatric Security Units (PSUs) are fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically-driven treatment.

**Recommendation 10.**     Greatly reduce the use of "Safety Cells" for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU).

**Recommendation 11.**     Revise policies and practices for the Enhanced Observation Housing (EOH) units to make them less harsh and inhumane, with a greater focus on delivery of treatment designed to reduce the risk of suicide and mental health decompensation.

**Recommendation 12.**     Revise policies to allow individuals in EOH to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs.

**Recommendation 13.**     Implement a consolidated mental health treatment program that offers a spectrum of levels of care. The program should include the creation of an "intermediate" level of mental health care for individuals who need enhanced treatment programming. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

**Recommendation 14.**     Provide a written individualized treatment plan for each person requiring mental health services at the jail, as required by Title 15, Section 1210 of the California Code of Regulations. Ensure that clinically indicated treatment prescribed in the treatment plan is provided.

**Recommendation 15.**     Reduce the use of solitary confinement segregation housing, and take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances.

**Recommendation 16.**     Track and analyze data on all segregation housing placements and lockdowns, including lengths of stay and outcomes for inmates – particularly those with mental illness. Take corrective action to eliminate unnecessary segregation placements and lockdowns as part of ongoing quality improvement efforts.

**Recommendation 17.**     Reduce the harsh isolation conditions in segregation and other restrictive housing units. Provide individuals in such units a minimum of four (4) hours per day of out-of-cell time, along with access to treatment, recreation, and other activities necessary to ensure their health and well-being.

## D. San Diego County Should Establish Meaningful Independent Oversight of Jail Conditions and Treatment of Inmates.

The time has come for San Diego County to create a meaningful, professional, and independent oversight entity to monitor and report on jail conditions, including as to mental health care and suicide prevention.

Even as San Diego County has begun to tackle the challenges of reducing the number of suicides in its jails and addressing the mental health treatment of people in the community and those who end up in jail, such efforts are unlikely to lead to a durable solution on their own.

The need for stronger independent oversight is clear.

**First, the sheer number of people dying in San Diego jails demands better oversight**. The County's recent track record includes an extraordinarily high number of deaths – more than 30 inmate suicides since 2010, and many other inmate deaths. Several inmate deaths (suicide and non-suicide) have led to lawsuits costing the County millions of dollars. The situation has led to a lack of trust in the jail system across the community.[44]

**Second, even with the efforts by Dr. Joshua and others in the Sheriff's Department, there remain significant challenges regarding jail suicide prevention and mental health care.** Among those challenges, the DRC Experts found that the County's internal suicide review process is undeveloped. Independent oversight can play an important and complementary role in strengthening internal review efforts, identifying the Department's need for additional resources, and helping the County achieve and solidify progress.

**Third, the County's Citizens' Law Enforcement Review Board (CLERB) does not provide adequate or effective oversight**. The County's citizenry has long recognized the value of independent oversight of the jail system. The public voted to establish the Citizens' Law Enforcement Review Board (CLERB) in 1990 to independently investigate citizen complaints against Sheriff's deputies and probation officers, as well as deaths of jail inmates.[45]

But the CLERB has proven ineffective. The CLERB is sparsely staffed, with just three employees: an executive officer, an investigator, and an administrative assistant.[46]  The CLERB is composed of eleven volunteers, who are not required to have previous special training or experience in investigations or other relevant topics.[47]  The CLERB does not control its budget. It cannot hire additional investigative staff itself, even if needed to complete its work.

The CLERB has failed to keep up with the demands of its mission. Despite its authority to "annually inspect county adult detention facilities and annually file a report of such visitations together with pertinent recommendations" on issues that include "detention, care, custody, training, and treatment" of inmates,[48] the CLERB has *never* inspected the County's jail facilities in its more than 25 years.

28

The CLERB has also proven unable to complete its individual case investigations. At the beginning of 2011, the CLERB had six open death investigations.[49]  That number grew to 19 by the end of 2014,[50] then to 35 in December 2015,[51] and to 46 by the end of 2016.[52]  By October 2017, the CLERB had 59 open death investigations – including one dating back six years. Many of these long-delayed and unfinished death investigations are inmate suicides.

Given its tremendous backlog, the CLERB announced on November 11, 2017, that it was summarily dismissing eight (8) suicide death cases and fourteen (14) other cases of people dying in detention or while being taken into custody. The CLERB's stated reason for this action was that the investigation was not completed within the statutory one-year time limitation for imposing officer discipline for misconduct.[53]  The CLERB asserted that this meant it lacked jurisdiction and could not complete its investigation.[54]  (Oddly, the County's own web site for CLERB states that "death cases and other complex investigations often take more than one year to complete."[55])

In any event, CLERB's failure to complete its investigations means that these deaths will not face independent scrutiny.

The community response has been one of severe disapproval. One local editorial board called the CLERB's decision to summarily dismiss these cases "outrageous" and "insulting to victims' family members," noting that it "only reduces the likelihood of improved responses and practices" in the future.[56]

Even with the reported addition of a newly funded CLERB Investigator position as of March 2018, it is DRC's assessment that the CLERB will not be able to adequately fulfill its mission as the County Jail system's sole oversight entity.

### Benefits of Effective Independent Oversight:

- *Public identification of problems with conditions and operations and timely solutions, resulting in jail facilities that are safer, operated in conformance with the Constitution, other laws, and up-to-date correctional practices.*
- *Early detection of issues that may have been overlooked inside jail facilities before they become major problems.*
- *Cost-effective and proactive means to avert lawsuits challenging the legality of conditions of confinement or the treatment of prisoners.*
- *Independent input on the need for funds requested by Sheriff's Department and other public officials.*
- *Better-informed policy decisions.*[57]

California counties like Los Angeles, Santa Clara, and Sonoma, the California State prison system, the City and County of Denver, and King County (Washington State) have implemented or are implementing a professional entity that provides independent oversight of jail operations. The Los Angeles County Office of Inspector General, created in 2014, provides an especially useful model.[58] Santa Clara County recently approved the creation

29

of a county Office of Correction and Law Enforcement Monitoring, along with an accompanying community advisory committee,[59] based on expert recommendations.[60]

A professional, independent oversight entity would offer a critical benefit that CLERB has not – a proactive method to evaluate and improve systemwide practices in the County's jails, going beyond a mere after-the-fact investigation of individual deaths.

It may be that the CLERB can play some positive and important role in monitoring the San Diego County Jail system moving forward. It can enhance the work of a professional oversight entity, similar to other systems like Denver's, which provides for complementary roles by the Office of the Independent Monitor and a Citizen Oversight Board. But on its own, the CLERB cannot provide adequate oversight that ensures effectiveness, transparency, and accountability in the operation of San Diego County's jails, or pave the way for necessary systemic improvements.

Meaningful, professional, and independent oversight would enhance the County's efforts to address its historical weaknesses and challenges in its jails, help to achieve and solidify improvements, and strengthen the trust of the community through greater transparency. This, more than anything, may be the key to achieving a system that meets legal and constitutional standards, and that properly cares for people with mental health needs.

## RECOMMENDATION

**Meaningful, Independent Oversight of Jail System**

**Recommendation 18.** The County should establish a professional independent oversight entity that has the authority and duty to monitor the treatment of inmates with mental health needs, suicide prevention, and other aspects of jail operations affecting inmates with disabilities, with periodic reporting to the Board of Supervisors and regular outreach to the public.

# V. SUMMARY OF RECOMMENDATIONS

## 1. End Over-Incarceration of People with Mental Illness, Strengthen Community-Based Mental Health Services

**Recommendation 1.** Fully implement the County's three-year Mental Health Services Act (MHSA) Plan, with adequate transparency as to spending and program outcomes.

**Recommendation 2.** Focus investment on community-based services and treatment programming that help individuals with mental health needs to thrive and to avoid incarceration and entanglement with the criminal justice system.

**Recommendation 3.** Develop capacity for community-based competency restoration programs for individuals found Incompetent to Stand Trial (IST), so that they can receive treatment in the least restrictive setting appropriate and do not languish unnecessarily in jail.

**Recommendation 4.** Strengthen reentry programming for individuals with disabilities to ensure continuity of care, including with respect to medication and other treatment, and access to job opportunities, housing, food, and other basic needs for successful reintegration into the community.

**Recommendation 5.** Ensure that the County's mental health programs are subject to rigorous data collection and self-critical analysis of progress and where additional resources may be needed.

## 2. Improve Suicide Prevention Practices

**Recommendation 6.** Develop a plan for timely implementation of the DRC Experts' forty-six (46) Recommendations to address deficiencies in San Diego County Jail's suicide prevention policies, practices, and training.

**Recommendation 7.** Strengthen the County's internal review process and quality improvement program to ensure implementation of necessary changes to enhance suicide prevention and inmate safety.

## 3. Improve Mental Health Treatment, End the Harmful Use of Solitary Confinement

**Recommendation 8.** Substantially increase mental health staffing and related resources to ensure that individuals with mental illness in the jail receive clinically indicated treatment.

**Recommendation 9.** Ensure that the inpatient Psychiatric Security Units (PSUs) are fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically-driven treatment.

**Recommendation 10.** Greatly reduce the use of "Safety Cells" for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU).

**Recommendation 11.** Revise policies and practices for the Enhanced Observation Housing (EOH) units to make them less harsh and inhumane, with a greater focus on delivery of treatment designed to reduce the risk of suicide and mental health decompensation.

**Recommendation 12.** Revise policies to allow individuals in EOH to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs.

**Recommendation 13.** Implement a consolidated mental health treatment program that offers a spectrum of levels of care. The program should include the creation of an "intermediate" level of mental health care for individuals who need enhanced treatment programming. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

**Recommendation 14.** Provide a written individualized treatment plan for each person requiring mental health services at the jail, as required by Title 15, Section 1210 of the California Code of Regulations. Ensure that clinically indicated treatment prescribed in the treatment plan is provided.

**Recommendation 15.** Reduce the use of solitary confinement segregation housing, and take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances.

**Recommendation 16.** Track and analyze data on all segregation housing placements and lockdowns, including lengths of stay and outcomes for inmates – particularly those with mental illness. Take corrective action to eliminate unnecessary segregation placements and lockdowns as part of ongoing quality improvement efforts.

**Recommendation 17.**  Reduce the harsh isolation conditions in segregation and other restrictive housing units. Provide individuals in such units a minimum of four (4) hours per day of out-of-cell time, along with access to treatment, recreation, and other activities necessary to ensure their health and well-being.

## 4. Ensure Meaningful Independent Oversight of Jail System

**Recommendation 18.**  The County should establish a professional independent oversight entity that has the authority and duty to monitor the treatment of inmates with mental health needs, suicide prevention, and other aspects of jail operations affecting inmates with disabilities, with periodic reporting to the Board of Supervisors and regular outreach to the public.

# ENDNOTES

1 State of California, Department of Justice, Death in Custody & Arrest-Related Deaths Data,
2005-2016 (April 2017), **https://openjustice.doj.ca.gov/data** [hereinafter "Cal. DOJ
Death Data"]; San Diego County Grand Jury 2016/2017, *Amended Grand Jury Report,
Examining the Issue of Suicides in San Diego Jails*, at 1, (May 4, 2017), **https://
www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2016-2017/
SuicidesinSanDiegoJails.pdf** [hereinafter "Grand Jury 2017 Suicide Report"].

2 Suicide rates calculated using the average daily population as reported in: Jail Profile Survey,
January 2002–December 2016, Board of State and Community Corrections, **http://www.
bscc.ca.gov/s_fsojailprofilesurvey.php**; Cal. Board of State and Community Corrections
(BSCC), Jail Population Trends, **https://public.tableau.com/profile/kstevens#!/vizhome/
ACJROctober2013/ADPRatedCapacity**.

3 Margaret E. Noonan, Bureau of Justice Statistics United States Department of Justice,
*Mortality in State Prisons, 2001-2014 - Statistical Tables* (Dec. 15, 2016), **https://www.bjs.
gov/index.cfm?ty=pbdetail&iid=5866.**

4 Cal. DOJ Death Data.

5 Id.

6 Coleman v. Brown, Case No. 2:90-cv-0520-KJM-DB, *The Second Re-Audit and Update of
Suicide Prevention Practices in the Prisons of the California Department of Corrections and
Rehabilitation at 21*, Lindsay M. Hayes, M.S., Docket No. 5672, Sept. 7, 2017.

7 Kenny Goldberg, Following 2014 Decline, Suicide Rate In San Diego County Holds Steady,
KPBS (Sept. 7, 2016), **http://www.kpbs.org/news/2016/sep/07/suicides-san-diego-
county-so-help-seeking-behavior/**, citing *San Diego County Suicide Prevention Council,
Annual Report to the Community 2017 at 1* (Sept. 1, 2017), **http://www.sdchip.org/wp-
content/uploads/2015/12/SPC-Report-Card-2017-FINAL_9-1-17.pdf.**

8 Lindsay Hayes, *National Study of Jail Suicides: 20 Years Later at 46*, National Center on
Institutions and Alternatives (2010).

9 See Coleman v. Brown, Case No. 2:90-cv-00520-LKK-JFM, *Report on Suicides Completed
in the California Department of Corrections and Rehabilitation, January 1, 2012 - June 30,
2012 at 15, Docket No. 4376, Mar. 13, 2013.* The federal court in the Coleman case
agreed: "Where, as here, defendants know that they house prison inmates at risk for
suicide, they are required to take all reasonable steps to prevent the harm of suicide."
Coleman v. Brown, 938 F.Supp.2d 955, 975 (E.D. Cal. 2013).

10 Kelly Davis & Dave Maass, *Suicide in the cell*, San Diego City Beat (Apr. 24, 2013), **http://
sdcitybeat.com/news-and-opinion/news/suicide-cell/**; Dave Maass & Kelly Davis, *How
many inmate deaths is too many*, San Diego City Beat (Mar. 27, 2013), **http://sdcitybeat.
com/news-and-opinion/news/many-inmate-deaths-many/**; Editorial: *Too many dead
inmates in San Diego jails*, San Diego City Beat (May 8, 2013), **http://sdcitybeat.com/
news-and-opinion/many-dead-inmates-san-diego-jails/**; Kelly Davis & Dave Maass,
*Death's in the Details*, San Diego City Beat (June 12, 2013), **http://sdcitybeat.com/news-
and-opinion/news/death-s-details/**; Kelly Davis, *Watchdog weighs in, sort of*, San Diego
City Beat (July 31, 2013), **http://sdcitybeat.com/news-and-opinion/news/watchdog-
weighs-in-sort/**; Kelly Davis, *10 more dead inmates*, San Diego City Beat (Oct. 16,
2013), **http://sdcitybeat.com/news-and-opinion/news/10-dead-inmates/**; Kelly Davis,
*An interview with the sheriff's chief medical officer,* San Diego City Beat (July 16, 2014),
**http://sdcitybeat.com/news-and-opinion/news/interview-sheriff-s-chief-medical-
officer/**; Kelly Davis, *San Diego County sets a dubious record for jail deaths*, San Diego
City Beat (Dec. 22, 2014), **http://sdcitybeat.com/news-and-opinion/news/san-diego-
county-sets-dubious-record-jail-deaths/**; Tom Jones, *Families Struggle to Get
Information After Loved Ones Die In Jail*, NBC San Diego (May 14, 2015), **https://www.**

nbcsandiego.com/news/local/Families-Struggle-to-Get-Information-After-Loved-Ones-Die-In-Jail-303822051.html; Kelly Davis, *Solitary in California Jails Still Hellish Despite State Reform*, The Intercept (Oct. 29, 2015) https://theintercept.com/2015/10/29/solitary-in-california-jails-still-hellish-despite-state-reforms/; Kelly Davis, *Suicides still plague the county jails*, San Diego Union Tribune (Dec. 16, 2015), http://www.sandiegouniontribune.com/news/watchdog/sdut-jail-suicides-2015dec16-htmlstory.html; Kelly Davis, *Jail death from excess water drinking raises questions*, San Diego Union Tribune (May 23, 2016), http://www.sandiegouniontribune.com/news/watchdog/sdut-nunez-water-death-2016may23-story.html; Lisa Pickoff-White & Julie Small, *When Jail Becomes a Death Sentence*, KQED News (Aug. 22, 2016), https://ww2.kqed.org/news/2016/08/22/when-jail-becomes-a-death-sentence/; Kenny Goldberg, *Following 2014 Decline, Suicide Rate In San Diego County Holds Steady*, KPBS (Sept. 7, 2016), www.kpbs.org/news/2016/sep/07/suicides-san-diego-county-so-help-seeking-behavior/; Kelly Davis, *People are still dying in the San Diego county jails*, San Diego City Beat (Nov.14, 2016); Rebekah Kearn, http://sdcitybeat.com/news-and-opinion/news/people-still-dying-san-diego-county-jails/; *San Diego County Lashed for Jail Suicides*, Courthouse News Service (Nov. 15, 2016), https://www.courthousenews.com/san-diego-county-lashed-for-jail-suicides/; Kelly Davis, *Two Men at Obvious Risk of Suicide, Two Deaths – and Investigators Just Cleared Both Cases*, Voice of San Diego (Mar. 27, 2017), https://www.voiceofsandiego.org/topics/public-safety/two-men-at-obvious-risk-of-suicide-two-deaths-and-investigators-just-cleared-both-cases/; Dana Littlefield, *San Diego County jails make changes to treat mentally ill inmates, curb suicides*, San Diego Union Tribune (Apr. 29, 2017), http://www.sandiegouniontribune.com/news/public-safety/sd-me-jail-health-20170429-story.html; Doug Porter, *County Jail Deaths Don't Matter in San Diego*, San Diego Free Press (Nov. 16, 2017).

[11] Kelly Davis, *Marine's widow sues over jail death*, San Diego Union Tribune (Apr. 13, 2015), http://www.sandiegouniontribune.com/news/watchdog/sdut-lawsuit-jail-should-have-prevented-suicide-2015apr13-htmlstory.html; Tom Jones, *Families Struggle to Get Information After Loved Ones Die In Jail*, NBC San Diego, (May 14, 2015), https://www.nbcsandiego.com/news/local/Families-Struggle-to-Get-Information-After-Loved-Ones-Die-In-Jail-303822051.html.

[12] Grand Jury 2017 *Suicide Report at 1.*

[13] Id. at 2.

[14] Id. at 5.

[15] San Diego County Sheriff's Department, *Response to the San Diego County Grand Jury Report: "Suicides in San Diego Jails"* Dated May 4, 2017 (June 29, 2017), http://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2016-2017/SuicidesinSanDiegoJails_response1.pdf.

[16] 42 U.S.C. § 10801, et seq.; 42 C.F.R. § 51; Cal. Welf. & Inst. Code § 4900 et seq.

[17] 42 U.S.C. § 10805(a)(3); 42 C.F.R. § 51.42 (b); Cal. Welf. & Inst. Code § 4902(b)(2).

[18] 42 U.S.C. § 10805(a)(4)(B)(iii).

[19] Cal. Welf. & Inst. Code § 4900(h); 42 U.S.C. §§ 10802(1) & (5); 42 C.F.R. § 51.2; Cal. Welf. & Inst. Code §§ 4900 & 15610.07.

[20] Mental Health Services Oversight & Accountability Commission (MHSOAC), *Together We Can, Reducing Criminal Justice Involvement for People with Mental Illness at 2* (Nov. 2017), http://mhsoac.ca.gov/document/2017-12/criminal-justice-and-mental-health-project-report [hereinafter "MHSOAC Report"].

36

[21] See also Dana Littlefield, *Back Story: How San Diego County treats mentally ill inmates in jail*, San Diego Union Tribune (Apr. 19, 2017), **http://www.sandiegouniontribune.com/ news/public-safety/sd-me-jails-backstory-20170429-story.html**.

[22] *Inmate found dead of apparent suicide at West Valley Detention Center*, Inland Valley Daily Bulletin, (Feb. 27, 2017), **https://www.dailybulletin.com/2017/02/27/inmate-found- dead-of-apparent-suicide-at-west-valley-detention-center/** (suicide of inmate while in San Bernardino County Jail's competency restoration program).

[23] Disability Rights California, *Placement of Individuals Found Incompetent to Stand Trial: A review of competency programs and recommendations*, **http://www.disabilityrightsca. org/pubs/CM5201.pdf**; Nicole R. Johnson, et al., *Outpatient Competence Restoration: A Model and Outcomes, 5 World J. Psychiatry 2 at 229* (July 22, 2015), **http://www. wjgnet.com/2220-3206/full/v5/i2/228.htm**; W. Neil Gowensmith, et al., *Lookin' for Beds in All the Wrong Places: Outpatient Competency Restoration as a Promising Approach to Modern Challenges, Psychology, Public Policy, and Law at 9* (June 6, 2016), **http://dx.doi.org/10.1037/law0000088**.

[24] Lisa Halverstadt, Fact Check: *More than $100M for Mental Health is Sitting in the Bank*, Voice of San Diego (Nov. 3, 2017), **https://www.voiceofsandiego.org/topics/ government/fact-check-100m-mental**; Lisa Halverstadt, *County Finds Early Struggles as it Tackles the Hardest Problem in Homelessness*, Voice of San Diego (Jan. 31, 2017), **https://www.voiceofsandiego.org/topics/government/county-finds-early-struggles- tackles-hardest-problem-homelessness/**.

[25] San Diego Grand Jury 2015/2016, *The Mental Health Services Act in San Diego County, Unspent Funds, Ongoing Needs* (June 9, 2016), **http://www.sandiegocounty.gov/ content/dam/sdc/grandjury/reports/2015-2016/MHSAinSanDiegoCountyReport.pdf**.

[26] County of San Diego MHSA *Three-Year Program and Expenditure Plan: Fiscal Years 2017-18 through 2019-20* (Oct. 10, 2017), **https://www.sandiegocounty.gov/content/dam/sdc/ hhsa/programs/bhs/homepage/MHSA/MHSA%20CERTIFIED%203%20Year%20 Plan%20FY%2017_20%20.pdf** [hereinafter "San Diego MHSA Plan"].

[27] Id. at 8.

[28] Id. at 22.

[29] *Full Service Partnership (FSP) programs advance goals to reduce institutionalization and incarceration, reduce homelessness, and provide timely access to help by providing intensive wraparound treatment, rehabilitation, and case management services. Services provided may include mental health treatment, housing, medical care, and job- or life- skills training. San Diego MHSA Plan at 20*; see also Cal. Code Regs., tit. 9, § 3200.130 ("Full Service Partnership").

[30] *Assertive Community Treatment (ACT) programs provide an array of services to individuals in the community that include intensive case management, mental health services, vocational services, integrated services for mental health and substance abuse issues, peer counseling/support, and housing services.*

[31] San Diego MHSA Plan at 444.

[32] *Addressing Mental Health Needs of Offenders With an Alternative Custody and Reentry Pilot Program, County of San Diego Board of Supervisors, July 18, 2017 Meeting Agenda at 2* (July 18, 2017), **https://content.govdelivery.com/attachments/ CASAND/2017/07/12/file_attachments/845965/18%2BJul%2B2017_Regular_agenda. pdf**.

[33] *The Stepping Up Initiative, Fact Sheet*, **http://www.counties.org/sites/main/files/file- attachments/stepping_up_two-pager_final.pdf**; see also National Association of Counties (NACO), *Stepping Up Initiative Overview and Resources*, **http://www.naco.**

org/resources/signature-projects/stepping-initiative; Risë Haneberg, et al., *Reducing the Number of People with Mental Illnesses in Jail, Six Questions County Leaders Need to Ask* (Jan. 2017), **https://stepuptogether.org/wp-content/uploads/2017/01/Reducing-the-Number-of-People-with-Mental-Illnesses-in-Jail_Six-Questions.pdf**; *Stepping Up Initiative, Resources Toolkit*, **https://stepuptogether.org/toolkit**.

[34] Cal. Code Regs, tit. 15, § 1210.

[35] National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences at 183-87* (2014). Washington, DC: The National Academies Press, **https://doi.org/10.17226/18613**.

[36] See, e.g., Hernandez v. County of Monterey, 110 F.Supp.3d 929, 945 (N.D. Cal. 2015) (holding that compliance with California's Title 15 regulations does not prevent finding of constitutional violations in jail system: "[T]he Supremacy Clause makes it very simple: the Constitution controls.").

[37] San Diego County Grand Jury, *Adult Detention Facilities at 2* (June 1, 2017), **http://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2016-2017/AdultDetentionFacilitiesReport.pdf.**

[38] Brown v. Plata, 563 U.S. 493, 516 (2011); Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).

[39] National Commission on Correctional Health Care (NCCHC), *Standards for Health Services in Jails (2014), Standard J-G-04.*

[40] Ellen Garrison, *As Need Skyrockets, Sacramento Jail to Expand Aid to Mentally Ill*, Sacramento Bee (Mar. 23, 2017), **http://www.sacbee.com/news/local/crime/article140363113.html.**

[41] See, e.g., United States Department of Justice, *Investigation of State Correctional Institution at Cresson at 5* (May 13, 2013), **http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf** ("[T]erms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others. … An isolation unit means a unit where either all or most of those housed in the unit are subjected to isolation."); Wilkinson v. Austin, 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day); Tillery v. Owens, 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day).

[42] United States Department of Justice, *Reports and Recommendations Concerning the Use of Restrictive Housing – Final Report at 99* (January 2016); National Commission on Correctional Health Care, *Position Statement - Solitary Confinement (Isolation)* (2016); American Bar Association, *Standards for Criminal Justice: Treatment of Prisoners* (3d ed. 2011), Standard 23-2.8 *Segregated Housing and Mental Health*; American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012).

[43] Cal. Code Regs., tit. 15, § 1065.

[44] Doug Porter, *County Jail Deaths Don't Matter in San Diego*, San Diego Free Press (Nov. 16, 2017) (since March 2015, San Diego County has paid more than $6 million in settlements relating to fatalities while in custody), **https://sandiegofreepress.org/2017/11/county-jail-deaths-dont-matter-in-san-diego/**; Kelly Davis, *County settles jail meth death for $2.3 million*, San Diego Union Tribune (Aug. 30, 2016), **www.sandiegouniontribune.com/news/watchdog/sdut-bernard-victorianne-settlement-2016aug30-story.html**; Kelly Davis, *Two Men at Obvious Risk of Suicide, Two Deaths – and Investigators Just Cleared Both Cases*, Voice of San Diego (Mar. 27, 2017); Tom Jones, *Families Struggle to Get Information After Loved Ones Die In Jail*, NBC San Diego

(May 14, 2015), **https://www.nbcsandiego.com/news/local/Families-Struggle-to-Get-Information-After-Loved-Ones-Die-In-Jail-303822051.html**.

[45] San Diego County Charter, Section 606, **http://www.sandiegocounty.gov/clerb/docs/Section606.pdf.**

[46] Citizen's Law Enforcement Review Board (CLERB), Frequently Asked Questions, *CLERB FAQs: What is the Review Board?*, **http://www.sandiegocounty.gov/content/sdc/clerb/faqs/faqs_page.html.**

[47] CLERB FAQs: *What is the Review Board?*; CLERB FAQs: *How can I become a Review Board Member?*

[48] CLERB *Rules and Regulations*, Section 4.7(d).

[49] Kelly Davis, *Police Oversight Group is Drowning in Death cases*, Voice of San Diego (Jan. 30, 2017), **https://www.voiceofsandiego.org/topics/public-safety/police-oversight-group-is-drowning-in-death-cases/**.

[50] CLERB, *Investigation Workload and Classification Report* (Dec. 2014), **https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2014/1214workload.pdf**.

[51] CLERB, *Investigation Workload and Classification Report* (Dec. 2015), **https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2015/1215workload.pdf**.

[52] CLERB, *Investigation Workload & Classification Report* (Dec. 2016), **https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2016/1216workload.pdf**.

[53] CLERB *Findings* (Nov. 2017), **https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2017/1117findings.pdf** (citing Cal. Gov't Code § 3304(d)).

[54] Id.; Editorial: *San Diego County panel's dismissal of death investigations an outrage*, San Diego Union Tribune (Nov. 15, 2017), **www.sandiegouniontribune.com/opinion/editorials/sd-law-enforcement-review-board-death-investigations-20171115-story.html**.

[55] CLERB, Frequently Asked Questions, *How long does an investigation take to complete?* **https://www.sandiegocounty.gov/content/sdc/clerb/faqs/faqs_page.html**.

[56] Editorial: *San Diego County panel's dismissal of death investigations an outrage*, San Diego Union Tribune (Nov. 15, 2017), **www.sandiegouniontribune.com/opinion/editorials/sd-law-enforcement-review-board-death-investigations-20171115-story.html**.

[57] American Bar Association, Resolution 104B, *Effective Monitoring of Correctional and Detention Facilities* (2008), **https://www.americanbar.org/content/dam/aba/directories/policy/2008_am_104b.authcheckdam.pdf**.

[58] L.A. County Ordinance 2014-0034, **https://oig.lacounty.gov/Portals/OIG/Reports/Certified%20OIG%20Ordinance.pdf**.

[59] Robert Salonga, *Reform-inspired jail oversight, building plan approved in Santa Clara County*, San Jose Mercury (Jan. 23, 2018), **https://www.mercurynews.com/2018/01/23/reform-inspired-jail-oversight-building-plan-approved-in-santa-clara-county**.

[60] Memorandum *Re: Final Recommendations of the Blue Ribbon Commission on Improving Custody Operations* (Apr. 12, 2016), **http://sccgov.iqm2.com/Citizens/Detail_Meeting.aspx?ID=7189**; Aaron B. Zisser, *Santa Clara County Jail Grievance and Complaint Process: Expert Consultant's Review and Recommendations for the Blue Ribbon Commission on Improving Custody Operations at 34-38* (Finding 9: Independent Oversight) (Feb. 27, 2016), **http://www.sanjoseinside.com/wp-content/uploads/2016/02/Zisser-Final-Report.pdf**.

Ex. F - 254

# Appendix A

# DRC EXPERTS' FINDINGS AND RECOMMENDATIONS REGARDING SUICIDES IN SAN DIEGO COUNTY JAIL FACILITIES, MENTAL HEALTH AND SUICIDE PREVENTION POLICIES AND PROGRAMS

Karen Higgins, M.D.
Robert D. Canning, Ph.D., CCHP

## I.  INTRODUCTION

Suicide among persons held in correctional facilities is a significant public health problem which is complicated by the legal constraints placed upon correctional systems nationally. Although significant progress has been made in the last forty years, suicide remains the number one cause of death in American jails. Improvements in jail mental health service delivery systems continue to be needed to further decrease the rate of jail suicide deaths. In addition, changes in the conditions of confinement for inmates with mental health disabilities and needs, improved staff training, and facilities improvements can also contribute to reducing the suicide rate in jails.

DRC engaged us to review suicide deaths in the San Diego County Jail system from December 2014 through 2016, and to evaluate the adequacy of mental health services, emergency responses, and the system's overall suicide prevention program. Our review found that disjointed policies addressing suicidal inmates, lapses in continuity of mental health care, poor emergency response, inconsistent monitoring, and some physical plant issues contributed to the suicide deaths we reviewed.

Spurred by the high number of suicide deaths and the scrutiny they brought, the San Diego County Sheriff's Department ("Department") has made significant efforts to revamp its mental health policies and practices to allow consistency in treatment and better coordination between custodial and medical/mental health staff.  These efforts should continue and be strengthened, to address the historically high number of inmates who make serious suicide attempts in the County's jails.

## II.  BACKGROUND

The San Diego County Jail system has seven facilities.  From 2010 to the end of 2016, the average daily population of the jail system rose from 4,646 inmates to 5,362, an increase of 15 percent. The County's Grand Jury found that the jail system has had 46 inmate suicide deaths in the 12 years ending in 2016, with almost 50 percent occurring from 2013 through 2016. The recent spike in inmate suicide deaths has brought increased scrutiny to the jail system's procedures and particularly its mental health system. It is important to understand why rates have increased so dramatically over this period and to take proactive steps to prevent future suicides.

Taking a broad view, after the California legislature enacted Criminal Justice Realignment (AB109) in 2011, the state transferred jurisdiction for many inmates from state prisons to county jails. San Diego has seen a relatively small net increase in average daily population in its jail facilities: from 5,087 inmates in 2012, the first full year after AB109 took effect, to 5,362 inmates in 2016.

Jail suicide deaths typically occur soon after an individual's entry into the jail system. San Diego County Jail's experience appears to be no exception. Of the 17 suicides occurring in the San Diego Jail system from the beginning of 2014 through the end of 2016, 11 occurred within six days of the inmate's entry.

All suicide deaths since 2014 were of male inmates and occurred in three facilities: Central Jail (seven), Vista Detention Facility (six), and George Bailey Detention Facility (four). One inmate died by suffocation, three jumped from a second tier and died from massive head injuries, and the remaining 13 died of asphyxiation by ligature hanging. Eight of the inmates were housed in dormitories or multiple-person cells, and eight were housed in single cells. One inmate died in a holding cell.

Four inmates who died by suicide were housed in segregated housing (including one who was housed as psychiatric "overflow" in a segregated housing unit).

We understand that, as of this writing, there was one confirmed suicide death in San Diego County Jail facilities in 2017. This is a decrease from recent years, which is a positive development. Nevertheless, it is important for the system to engage in a meaningful analysis of its policies, to learn from the suicides that have occurred in recent years, and to continue to take proactive steps where necessary.

### III. QUALIFICATION OF EXPERTS

<u>Karen Higgins, M.D.</u>
Dr. Higgins is a board-certified, General and Forensic psychiatrist who has been involved with correctional care services since 2001. From 2001 to 2004, she served as the lead psychiatrist for the Denver City and County jail systems. Within that time, she was a key participant in their mental health system, including suicide prevention. In addition, for more than six years, Dr. Higgins served as both the Statewide Senior Supervising Psychiatrist, and then the Statewide Chief Psychiatrist for the California Department of Corrections and Rehabilitation (CDCR). During this time, Dr. Higgins oversaw for program development at 33 prisons serving 150,000 inmates; acted as the subject matter expert for the Department on psychiatric and mental health related issues; played a key role in the development of Departmental policies and procedures related to mental health care and suicide prevention; was a member of the Departmental suicide prevention committee, which involved review of many psychological autopsies of inmate suicide deaths; worked with the California Attorney General on legal matters related to inmate care; and supported numerous Departmental quality of care improvement initiatives.

<u>Robert D. Canning, Ph.D., CCHP</u>
Dr. Canning has been involved in correctional suicide prevention work for more than 12 years. From 2005 to 2015, he was the suicide prevention coordinator for the CDCR. He was the Department's subject matter expert on correctional suicide prevention and in this role contributed to the Department's ongoing mental health litigation.  He chaired the statewide suicide prevention committee, designed trainings for clinicians, wrote and oversaw the implementation of many policies and procedures about suicide prevention, and conducted quality improvement programs to improve screening of inmates. He re-designed the Department's suicide risk assessment documentation and designed and implemented a self-harm surveillance system that has received national attention. As

part of his work for CDCR, Dr. Canning has conducted over 35 psychological autopsies of inmate suicide deaths.

Dr. Canning has made presentations on suicide prevention in correctional settings at national meetings of the National Commission on Correctional Health Care (NCCHC) and the American Association of Suicidology (AAS). He recently co-authored a chapter on suicide prevention in correctional settings for the *Oxford Handbook of Prisons and Imprisonment*. He is an active member of the AAS and is one of five instructors of its two-day course on suicide risk assessment and management, entitled Recognizing and Responding to Suicide Risk (RRSR). Dr. Canning has taught the RRSR course to over 1,000 clinicians in both the U.S. and Canada. Finally, he has acted as a forensic expert on jail suicide to Los Angeles County.

Dr. Canning received his doctorate in Clinical Psychology in 1993 and completed a National Institute of Mental Health fellowship in psychiatric epidemiology in 1995. He has been licensed to practice in California since 1997 and prior to joining the CDCR worked for the Veterans Administration Northern California Health Care System and the U.C. Davis Medical Center.

## IV. EXPERTS' ASSIGNMENT AND SCOPE OF REVIEW

DRC engaged us to review and analyze (1) individual suicide cases at the San Diego County Jail, with a focus on suicide deaths since December 2014, and (2) the jail's policies and procedures related to mental health care and suicide prevention. Our task was to prepare a report identifying systemic deficiencies in the provision of mental health care and suicide prevention, with recommendations for improvements.

We reviewed medical, mental health, and custodial records of all San Diego County Jail inmates who died by suicide since December 2014. Video of inmate housing units was viewed to observe the circumstances of the suicides, including emergency response and custodial welfare checks. Coroner reports, homicide investigation reports, and other documents (such as court proceedings and police reports for each inmate) were also reviewed. The suicide deaths served as an important starting point for our findings and recommendations throughout the report.

In addition to the records of the inmates who died by suicide during the review period, we reviewed policies and procedures of the Medical Services Division (MSD) and the Detention Services Bureau (DSB). Through DRC, we requested from the Sheriff's Department updated policies and procedures regarding mental health care and suicide prevention, and we have reviewed all materials that were provided. "Green sheets" (facility-specific procedures) were reviewed, as were a variety of training documents pertaining to suicide prevention. We have also reviewed relevant media reports, San Diego County Grand Jury reports (and the County's response), and Citizens' Law Enforcement Review Board (CLERB) reports.

On September 29, 2017, we participated in a two-hour conference call with custodial, mental health and medical staff from San Diego County (and its contractor Liberty Health), legal counsel for the County, and DRC, to discuss aspects of mental health care and suicide prevention in the jails and to clarify particular policies and practices. We did not conduct a site visit as part of this review.

All of the suicide deaths reviewed were of male inmates. Although the context of many findings and recommendations applies to issues identified in the male facilities, they should be applied equally to the treatment of female inmates in the San Diego County Jail system.

## V. EXPERTS' ANALYSIS

Our findings and recommendations are based on materials received as of November 2017. Policy changes occurring after that date will not be reflected in our report.

Our analysis is divided into nine requisite components of a successful comprehensive correctional suicide prevention program,[1] and contains findings and recommendations to improve the Department's suicide prevention and mental health treatment delivery efforts. The components covered by this review are:

1. Screening for Suicide Risk and Related Mental Health Needs

2. Clinical Assessment and Interventions

3. Communication

4. Restrictive Housing and Monitoring of Inmates

5. Levels of Supervision of At-Risk Inmates

6. Emergency Response

7. Staff Training

8. Review of Suicide Deaths and Serious Suicide Attempts

9. Quality Improvement

Below, we provide our analysis. For each review component, we identify Key Deficiencies that were apparent through our review of suicides and relevant policies. We then provide specific Findings and Recommendations for systemic improvements addressing Key Deficiency areas.[2] In addition, we have completed two detailed individual reviews of recent suicides at the San Diego County Jail, to be provided directly to the County. These individual reviews may serve as models for the County's own quality improvement efforts moving forward.

---

[1]    Hayes, Lindsay. (2017). *Guide to Developing and Revising Suicide Prevention Protocols within Jails and Prisons.* National Commission on Correctional Health Care, http://www.ncchc.org/other-resources. Accessed October 21, 2017, and Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) *The Oxford Handbook of Prisons and Imprisonment.* New York City: Oxford University Press.

[2]    Inmate names are not provided in this report. References to specific cases will be identified in a separate version of this report that is provided to the County.

# 1. SCREENING FOR SUICIDE RISK AND RELATED MENTAL HEALTH NEEDS

Screening for suicide risk and related mental health needs is an important part of any suicide prevention program. In jails, thorough screening upon entry ("booking") is extremely important. Research shows that almost one-quarter of jail suicides occur in the first 24 hours of incarceration and an additional quarter within 14 days.[3]  Of the 12 suicide deaths that occurred at San Diego County Jail from December 2014 through 2016, eight (67%) occurred within 10 ten days of booking.

In addition to screening at the time of booking, screening should be administered for all inmates at important transition moments throughout their confinement. Screening should be administered by medical or mental health staff. (Trained custody staff can effectively administer appropriate initial booking screening with standard scoring that provide clear guidance for referral and further assessment.)

For many inmates, the initial period of incarceration is a period of extremely high risk.  As time passes in jail, the risk of suicidal behavior tends to decrease but may rise quickly and suddenly due to transitions that inmates encounter – court dates, visits, receipt of bad news, transfers to other housing units or facilities, and placement in segregated settings. Thus, screening should occur at significant transition moments, the results of which should be available to clinical staff to track changes over time. A process for recurrent screening based on individual circumstances and events is important because research suggests that many individuals who die by suicide communicate their intent in the period before their deaths.[4] That is to say, warning signs of suicide risk and related psychiatric distress are often identifiable with effective screening.

Screening should be systematic and use standardized questionnaires. They should be short, valid, and target psychological symptoms and risk factors most appropriate for the correctional settings in which they are used.[5] Staff should be trained to ask questions clearly and uniformly, and forms should be available in English, Spanish, and other languages. Staff should not rely only on verbal responses, but should be trained to document contextual factors such as behavior and appearance, the inmate's attention to the questions, information from arresting officers, family members, friends, or other individuals associated with the inmate, and other factors that provide important information about suicide risk.  Finally, documentation of adequate screening is also legal documentation for the protection of both the facility and staff.

---

[3]     Hayes, Lindsay M. (2010). National study of jail suicide: 20 years later. *Journal of Correctional Health Care, 18*, 233-245.

[4]     Ibid.

[5]     Maloney, M.P., Dvoskin, J., and Metzner, J.L. (2015). Mental health screening and brief assessments. In R.L. Trestman, K.L. Appelbaum, and J.L. Metzner (Eds.) *Oxford Textbook of Correctional Psychiatry.* New York: Oxford University Press.

## KEY DEFICIENCIES: SCREENING

1. The initial booking screening questions are poorly worded, are not designed in a way that effectively elicits important information, and lack important elements, such as inquiry regarding history of psychiatric hospitalization.

2. The system has lacked an adequate policy or procedure for conducting a suicide risk/ mental health screening for individuals at transition events that carry elevated risk, such as when they are placed in segregation or moved to a new facility.

3. The system has lacked an adequate procedure for screening inmates returning from court (where they may have received bad news), moving to prison, or being extradited. These are events that may elevate an inmate's risk of suicide.

## FINDINGS AND RECOMMENDATIONS: SCREENING

**FINDING 1.1.** Of the twelve (12) San Diego County Jail inmates who died by suicide from December 2014 through 2016, we identified a number of problems with the initial suicide risk screening and referral process. For example, one had a 24-hour delay before his initial screening. Of the six inmates who screened positive for mental health problems during their initial screening, one had no referral for further evaluation.

Six inmates denied any mental health problems during their initial screening. Among this group, one inmate had indicators that would have warranted a mental health referral, yet we found no record of a referral being made.

One particularly troubling case stood out. The inmate had a diagnosis of bipolar disorder and was screened, but even though he demonstrated signs and symptoms of florid psychosis and mania, he was not referred for evaluation and admission to the Psychiatric Security Unit. He was placed in a Safety Cell, was later released to general population, and died on Day Six of his confinement while still floridly psychotic and manic, despite a request to custodial staff earlier in the day for safety cell placement. Jail staff did not complete a separate assessment of suicide risk despite this inmate's extreme mental state and need for evaluation and treatment. Individuals suffering from bipolar disorder have some of the highest rates of suicide compared to other mental disorders. The inmate's documented mental health history and his symptomology at the jail were such that he should have received urgent psychiatric attention and been referred for inpatient care.

> *RECOMMENDATION: The Department should adopt a standardized screening measure such as the Brief Jail Mental Health Screen[6] and augment it with a suicide risk screening measure such as the Columbia-Suicide Severity Rating Scale[7] or a series of suicide-specific questions (current suicidality, past attempts, etc.).*

---

[6]     The screener can be obtained from: https://www.prainc.com/?product=brief-jail-mental-health-screen.

[7]     The C-SSRS can be obtained from http://cssrs.columbia.edu/the-columbia-scale-c-ssrs/cssrs-for-communities-and-healthcare/#filter=.general-use.english.

*RECOMMENDATION: Suicide prevention policies and procedures should contain a specific section devoted to screening – including guidance on measures, locations, and times. The section should explain when and who administers screening in the range of potential situations. This section will guide staff actions and decrease the number of "false negative" screenings, which are the ones most costly to a system.[8] The policies should include a checklist with criteria that guides staff when to refer for evaluation by the jail's designated "Gatekeeper" (generally, a Registered Nurse or mental health clinician) and guides Gatekeepers on when to refer for further evaluation by the mental health program.*

**FINDING 1.2.** We identified four suicide deaths for which the inmates screened positive for drug and/or alcohol withdrawal but were not targeted for a more comprehensive suicide risk assessment. There is evidence showing that such inmates are at increased risk of suicide and self-harm. These individuals should have been further assessed.[9]

*RECOMMENDATION: New arrivals withdrawing from alcohol and/or drugs should be specifically assessed for psychiatric disorders and suicide risk. While the Jail's policy (MSD.S.10) lists "Intoxication/Withdrawal Symptoms" as among "Other Risk Factors That Could Cause Circumstantial Concerns," review of the jail's recent suicide deaths indicate the need for revision of this policy to ensure that such symptoms trigger a comprehensive suicide risk assessment.*

**FINDING 1.3.** The San Diego County Jail system lacks an effective quality improvement program with respect to mental health/suicide risk screening.

*RECOMMENDATION: Because mental health and suicide risk screening is a component of effective quality improvement programs in health care settings, procedures should be developed to track both when screening occurs and the results of the screening. Rates of screening and referrals should be a key indicator in the Department's quality improvement program.*

---

[8]    In general, screening measures should err on the side of false positives since it is less costly to complete an extra evaluation than deal with the aftermath of a preventable suicide death. Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) The Oxford Handbook of Prisons and Imprisonment. New York City: Oxford University Press.

[9]    Rivlin, A., Ferris, R., Marzano, L., Fazel, S., and Hawton, K. (2013). A typology of male prisoners making near-lethal suicide attempts. Crisis, 13, 335-347.

## 2. CLINICAL ASSESSMENT AND INTERVENTION

Treatment planning and management of prisoners potentially at risk of suicide relies on effective clinical assessment. Effective clinical assessment of suicide risk requires clinicians to 1) gather data on risk and protective factors and warning signs; 2) perform a suicide inquiry in which they ascertain the extent of planning, intent, and the quality and character of suicidal ideation, if present; 3) come to a judgment of risk with a rationale for this level; and 4) develop a treatment plan for management of the suicidal patient. Each assessment (especially those conducted in response to a crisis evaluation) should include a short-term "safety plan" that emphasizes enhancement of protective factors, reduction of acute and/or modifiable risk factors (possibly housing issues or issues involving recent transfers), and treatment of current distress and agitation. These safety plans can be modeled after brief interventions used in emergency departments in the community[10], but should be specifically tailored to correctional settings. Treatment planning should include specific timeframes for review and updating. Referrals for mental health treatment should have specific timeframes for response by mental health staff.

It is important for jail staff – custodial, mental health, and medical – to monitor and treat identified mental health problems. This requires staff to provide clinically indicated treatment and to respond quickly and effectively to crises as they arise. Even after an inmate's crisis subsides, there is a continued need to address mental health treatment needs. An inmate should be transitioned into a structured mental health program that addresses their level of symptoms and functioning in the correctional environment. In addition, if an inmate is assessed to be at elevated suicide risk, they should continue to be evaluated for this risk as they continue in confinement, with an individualized treatment plan and safety plan.

### KEY DEFICIENCIES: CLINICAL ASSESSMENT AND INTERVENTION

1. Although inmates are often referred for further mental health and suicide risk evaluations after positive screening results, it is not clear from the records or the County's policies and procedures what (if any) criteria have been used or what timeframes have been required for referrals and evaluations.

2. The documentation of risk evaluations has been poor and inconsistent, hindering effective treatment and continuity of care among providers and between jail facilities.

3. Mental health staff do not adequately consider previous risk evaluations and changes to inmates' conditions during the course of confinement.

4. Inmates who have required mental health treatment and remained in custody for significant periods do not have individualized mental health treatment plans in their charts or access to an adequate level of mental health care programming.

---

[10]    Stanley, Barbara and Brown, Gregory K. (2012). Safety Planning Intervention: A Brief Intervention to Mitigate Suicide Risk. *Cognitive and Behavioral Practice 19*. 256-264.

## FINDINGS AND RECOMMENDATIONS: CLINICAL ASSESSMENT AND INTERVENTION

**FINDING 2.1.** The San Diego County Jail policies do not provide adequate guidance, including clear timelines, regarding the evaluation process for inmates who screen positive for mental health needs or suicide risk at booking. For example, in one case reviewed, the inmate was brought to the jail after a serious suicide attempt. Though he was seen for further evaluation after the initial screening, it was unclear who performed the evaluation or what the rationale for it was.

> *RECOMMENDATION: Policies and procedures should provide specific timelines for referral and completion of evaluations after referral. For instance, the policy should establish timelines for response to referrals – standard guidelines, for example, may be for evaluations that are "emergent" to be completed within four hours, "urgent" within 24 hours, and "routine" referrals within five business days. Data about these referral timelines and completion rates should be reviewed regularly to gauge access to care as part of a quality improvement program.*

**FINDING 2.2.** The quality of suicide risk evaluations varied among the records reviewed. Although the policies provide criteria for categorizing an inmate as "High" risk for suicidal behavior, we found that risk factors were not adequately documented, even as several inmates had a clear history of suicidal behavior and/or a known psychiatric history.

> *RECOMMENDATION: To improve the quality of suicide risk evaluations, the Department should create a standardized suicide risk evaluation form or template in the electronic record. This would facilitate improved documentation by mental health clinicians with respect to their risk assessments. This form or template should include the following sections:*
>
> *1. The reason for evaluation along with time, date, and location*
>
> *2. Sources of information*
>
> *3. Discrete sections for Warning Signs such as the AAS' IS PATH WARM, and acute and chronic (or static) risk factors*
>
> *4. Protective factors*
>
> *5. Questions about planning or a desire for death*
>
> *6. A mental status exam*
>
> *7. Judgment of risk and a rationale for the judgment*
>
> *8. A safety plan that addresses modifiable risk factors and warning signs.*

**FINDING 2.3.** Mental health staff do not clearly or adequately document inmates' suicide risk levels. In some cases, the assigned suicide risk levels were problematic. For example, one inmate was incorrectly rated as "Low" risk just two days after a serious suicide attempt. In addition, the jail system's two-level stratification of risk ("High" or "Low" risk) is inconsistent with common practice. Many healthcare systems (e.g., California Department of Corrections and Rehabilitation, United States Department of Defense, U.S. Department of Veterans Affairs) use at least a three-level stratification – such as Low, Medium, High – or four-part – such as Low, Medium, High, Extreme.

> *RECOMMENDATION: Because a judgment of risk drives treatment decisions (i.e. what to do), the County should utilize a three-level rating system that more realistically describes the continuum of risk and will allow clinicians to devise treatments that better fit the needs of the patient. The addition of a "Medium" risk level will alert other staff that a patient's risk for suicidal behavior is significant and requires more attention and alertness.*

**FINDING 2.4.** We could identify no standardized procedure for placing, monitoring, and releasing inmates from various levels of suicide monitoring. For instance, one inmate who died by suicide had four Safety Cell placements based on suicide risk over a period of four months. Each time, he was released without adequate documentation of the clinician's judgment of risk and the rationale for the decision. The situation for another inmate's two Safety Cell placements prior to his suicide was similar.

> *RECOMMENDATION: The Department should ensure adequate and consistent documentation of suicide risk assessments when adjusting an inmate's level of observation.*

**FINDING 2.5.** The San Diego County Jail's policies for addressing inmate medication refusals are vague and inadequate.  In at least one reviewed case, the inmate's refusal of psychiatric medication was not addressed in a timely fashion.

> *RECOMMENDATION: The Department should implement procedures, with specific timelines, for when an inmate refuses prescribed psychiatric medications.*

**FINDING 2.6.** We identified deficiencies with the process and setting of clinical contacts for prisoners at risk of suicide. Although a number of inmates we reviewed were seen by mental health staff, it was unclear if there was a standard interval between mental health visits, or if they were done on an *ad hoc* basis, or if they were simply up to the individual clinician's discretion. A substantial number of mental health clinical visits appear to have been conducted inside the housing units, including at cell-front. This setting does not provide adequate auditory and visual privacy and confidentiality necessary for meaningful clinical interactions.

> *RECOMMENDATION: The Department should establish standard intervals for mental health visits, which can be made more frequent pursuant to individual clinical need.*

> *RECOMMENDATION: Because interviewing inmates at cell-front decreases the chance for a frank and open conversation with a patient, the Department should provide confidential treatment space for inmates being followed by mental health.*

**FINDING 2.7.** We have significant concern about the lack of required follow-up for prisoners identified as at risk of suicide after they are discharged from the San Diego County Jail's Inmate Safety Program (ISP), including from the Psychiatric Security Unit, Safety Cells, and Enhanced Observation Housing (EOH). The use of specific risk factors to determine follow-up processes for such inmates is questionable in our estimation. Although we understand the rationale, we believe that the program runs the risk of false negatives, which are much costlier than false positives when it comes to suicide attempts and deaths. Prisoners who have required placement in the Inmate Safety Program based on an identified risk of self-harm should, as a rule, be provided clinical follow-up and, as appropriate, clinically indicated treatment interventions.

> *RECOMMENDATION: The ISP Follow Up Protocol should provide that all inmates released from EOH should be seen by a mental health clinician within 24 hours of release and have their safety plan reviewed and updated if necessary.*

> *RECOMMENDATION: Decisions regarding clinical follow-up after release from the Inmate Safety Program (including EOH) should not be left to a "clinician's discretion." We believe a best practice is to have a specific follow-up schedule that all clinicians follow, e.g. daily clinical "check-ins" for five days after a housing change, followed by weekly check-ins for two weeks.*

> *RECOMMENDATION: Inmates who are being followed by the mental health program after release from the Inmate Safety Program (including EOH) should have specific timeframes for clinical contacts outside the specific follow-up procedure. This would allow for a more in-depth interview to cover treatment plans and medication compliance, for instance.*

**FINDING 2.8.** Four inmates who died by suicide suffered differing levels of drug/alcohol withdrawal symptoms, but only two inmates were housed in Medical Observation Beds (MOB). The policy on MOB placement for patients "experiencing severe symptoms" of drug withdrawal does not mention concurrent treatment by psychiatry except in passing. The section notes that these inmates "should be considered a high risk for suicide" but notes only that nurses will round "once a shift" on the MOB. That is, there is a significant gap in the provision of mental health treatment and suicide prevention monitoring for prisoners at risk who are also experiencing withdrawal symptoms.

> *RECOMMENDATION: We recommend a higher level of observation, including clinically indicated mental health treatment, for inmates experiencing both mental health problems and withdrawal symptoms.*

**FINDING 2.9.** The Inmate Safety Program policies lack sufficient direction regarding the timeframes for assessment and release from the Enhanced Observation Housing (EOH) units. It is essential that inmates placed in EOH be reviewed and transferred to less restrictive settings at the earliest time appropriate based on their condition.

*RECOMMENDATION: Policies should give specific direction to staff about the criteria for placing and assessing inmates in EOH units. For instance, we believe this type of housing is appropriate for inmates voicing suicidal thoughts and deemed at medium or high risk of acting on these thoughts in the very short-term (minutes to hours). We recommend that the schedule for re-assessment of inmates in EOH should not be categorical, but based on evaluations conducted by mental health professionals at regular intervals. While we commend the Jail for recently modifying its policy to ensure that all EOH prisoners are re-assessed for suicide risk, at a minimum, at least once in each 24-hour period, when clinical presentation dictates closer monitoring, clinicians must make a judgment of current risk including any changes since the last assessment. Decisions to transfer an EOH inmate to either general population or a mental health housing unit must take into account past behavior, current symptoms, and the context of confinement (charges, court date, pending transfer, etc.), and must include a written safety plan.*

*RECOMMENDATION: Stays in the EOH should not exceed 48 hours. If the inmate is not stabilized within that time period, they should be evaluated for referral to inpatient psychiatric treatment (i.e., the Psychiatric Security Unit). However, if the placement in EOH housing extends beyond 48 hours, the withholding of out-of-cell time, personal property, social visits, and clothing should be based on individualized clinical assessment and safety concerns.*

FINDING 2.10. Inmates who have required mental health treatment and remained in custody for significant periods did not have documented, individualized mental health treatment plans in their charts or access to an adequate level of mental health care programming.

The Department is making efforts to improve how inmates are evaluated and at elevated risk for suicide are monitored, but overall the mental health program remains fragmented and without good continuity of care, which can lead to poor outcomes. For instance, as noted above, it was unclear to us why some inmates would be placed in Safety Cells and some in EOH. Further, based on our experience with suicidal inmates in correctional settings, we did not understand why inmates deemed at high risk of suicide were not more often evaluated for placement in the Jail's inpatient level of care unit.

*RECOMMENDATION: The Department should take steps towards development of a consolidated mental health treatment environment which combines the Safety Cell program, Enhanced Observation Housing, and an enhanced outpatient mental health program.*

*Many systems have adopted a "level of care" system to provide mental health services and to clarify hand-offs and treatment programs. The Department appears to have created categories of mental health needs, but without formalizing a system in policy and procedure that provides for an appropriate spectrum of levels of care. The PSU is the highest level of care. There are mental health "cluster" units, as on the sixth floor at the Central Jail, but without formal treatment programming. There is also the Detention Outpatient Psychiatric Services (DOPS), which appears to include the lion's share of inmates requiring some level of ongoing mental health attention.*

*It would be useful and important to create an "intermediate" level of care, located in enough San Diego County Jail facilities to ensure timely access for those with mental health needs that warrant enhanced treatment programming. The program would serve as a "step-down" for people with recent Safety Cell, EOH, or PSU admissions, as well as for people with a serious mental illness that makes it difficult for them to function in a general population jail setting. The program would have sufficient mental health staffing to provide a structured treatment program that includes individual and group therapy, guided by individualized treatment plans (as required by Title 15, Sec. 1210 of the California Code of Regulations) that identify mental health problems, treatment goals, and a plan to accomplish those goals.*

## 3. COMMUNICATION

Communication between and among correctional staff and other professionals working in the jail environment is an important aspect of suicide prevention. Suicide prevention expert Lindsay Hayes lists three categories of communication: (1) getting information about the inmate's behavior at the time of arrest and transport; (2) communication between correctional staff and clinical staff about changes in an inmate's status and condition; and (3) communication between all staff and inmates who may be suicidal. Poor communication practices can result in poor outcomes. Hayes recommends a multidisciplinary approach to working with suicidal individuals that notes:

> Poor communication between and among correctional, medical, and mental health personnel, as outside entities…is a common factor found in the reviews of many custodial suicides. Communication problems are often caused by lack of respect, personality conflicts, and boundary issues. Simply stated, facilities that maintain a multidisciplinary approach avoid preventable suicides.[11]

### KEY DEFICIENCIES: COMMUNICATION

1. The San Diego County Jail system has lacked an effective way for custodial staff and mental health staff to communicate about important changes in an inmate's status (e.g. results of court proceedings, "bad news," impending transfers, etc.).

2. The lack of standardization in clinical documentation has hampered effective communication between treating clinicians and other health care staff.

---

[11]     Hayes, L. (2017). *Guide to Developing and Revising Suicide Prevention Protocols within Jails and Prisons.* National Commission on Correctional Health Care, http://www.ncchc.org/other-resources. Accessed October 21, 2017.

## FINDINGS AND RECOMMENDATIONS: COMMUNICATION

**FINDING 3.1.** Several inmates who died by suicide in jail had significant events ("bad news") during their incarceration that may have significantly increased their suicide risk. Inmates may have multiple court dates with mixed results and many are sentenced to terms either locally or in state prisons. These developments can have a significant impact on an inmate's psychological state and contribute to elevated risk of suicide or self-harm. For instance, one hanged himself a few days before he was to transfer to state prison. Another committed suicide the day before his transfer to another state to face criminal charges. This case was particularly egregious because it was known among staff that he had made a credible suicide attempt in a similar manner just two weeks earlier, and that he was experiencing considerable stress about being extradited to another state to face criminal charges.  Yet, as the date of his extradition approached, the clinical record did not reflect any sense that this could be a period of heightened risk requiring closer observation, monitoring, and clinical follow-up. From our review, this was a suicide death that with adequate communication was preventable.\Our review of San Diego County Jail policies and procedures found no specific mechanism for communication in these kinds of situations.

> *RECOMMENDATION: Communication and coordination among custodial staff and health care staff regarding inmates at risk of suicide and psychiatric decompensation need improvement. Custodial staff must maintain awareness, share information, and make appropriate referrals to mental health and medical staff. Multidisciplinary teams should meet on a regular basis to discuss the status of inmates with significant mental health needs or who demonstrate significant suicide risk factors.*

**FINDING 3.2.** Mention of significant events was scant in the treatment records we reviewed. Given the vulnerability to external events that many inmates experience (and their inability to control many of them), evaluations of risk should include information about such events and how they may impact the inmate's risk.

> *RECOMMENDATION: Treatment plans should include substantive discussion, including potentially a specific section, regarding significant events that could affect the inmate's treatment needs and/or risk of suicide.*

## 4. RESTRICTIVE HOUSING AND MONITORING OF INMATES

The housing placement of inmates can have profound impacts on their mental well-being and produce changes in their risk of self-injury and suicide. Our experience with jail and prison facilities, along with extensive research, has shown that placement in segregated housing increases the risk of suicidal and self-harming behavior, isolates individuals, and impedes normal interpersonal interactions that are essential to psychological health and adequate treatment.

Policies and procedures should take this known risk into account and include mental health and suicide risk information when housing decisions are made. Housing inmates in isolated settings may increase their sense of hopelessness and desperation, increasing the potential for suicidal thinking and behavior. In addition, the housing of individuals with intellectual disabilities in such settings can trigger suicidal thoughts and behavior. Placing inmates with mental illness in solitary confinement-type housing (i.e. housing situations where an inmate is limited to a few hours of out-of-cell time or less per day, has reduced privileges, and has minimal opportunity for normal social interactions) can exacerbate symptoms and lead to

negative outcomes. The placement of inmates with mental illness or elevated suicide risk in solitary confinement settings should be avoided whenever possible. When such placements are deemed necessary, adequate monitoring and enhanced mental health treatment are essential.

In addition, the monitoring of inmates in housing units, particularly units with solitary confinement-type conditions, is a standard custodial practice. Adequate welfare and/ or safety checks involve observing inmates and noting their status and welfare. Inmates housed in segregated housing are often monitored at more frequent intervals than those in general population settings.

The construction of jail cells in segregation units should account for the risk presented by attachment points – such as ventilation grates and bed frames – that are commonly used for hanging attempts.

KEY DEFICIENCIES: RESTRICTIVE HOUSING

1. San Diego County Jail lacks an adequate process to screen inmates for increased suicide risk prior to placement into Administrative Segregation (AdSeg) or Keep Separate All (KSA) housing.

2. Security/welfare checks of inmates in housing units were observed to be inadequate. In several cases, they were poorly performed and in others they were not completed in a timely fashion.

3. San Diego County Jail lacks an effective system to monitor and to provide necessary treatment of inmates on the mental health caseload who are housed in AdSeg or KSA housing, increasing the risk of suicide and psychological deterioration in these settings.

FINDINGS AND RECOMMENDATIONS: RESTRICTIVE HOUSING

FINDING 4.1. There is not an adequate process for mental health screening before inmates are placed into AdSeg or KSA housing, which are known to carry significant risks for people with mental illness.

> RECOMMENDATION: *Given the harsh setting and restrictions inherent in restrictive housing units and the impact this may have on inmates, the Jail should institute screening of all inmates prior to their placement in such units. This screening could be included with a medical screening completed by nursing staff. The screening would ask simple questions addressing current distress and thoughts of suicide, and provide an opportunity for mental health staff to identify treatment needs and to provide input into housing decisions.*

FINDING 4.2. Inadequate security/welfare checks (also known as "proof of life checks") were observed via video review in a number of cases in which inmates died by suicide. In at least one case, hourly safety checks were not completed pursuant to Jail policy during the time period the inmate died by suicide. In video and record reviews of at least three inmates who died, checks were completed inadequately – either not completed timely or in manner that failed to meaningfully assess the welfare of the inmate. For instance, in one case, the video showed two deputies enter the housing unit and separate to allow one to check the upper tier and one the lower. The deputies completed their checks of 40 cells in

17 seconds, far too quickly to complete meaningful checks. The deputy checking the upper tier did not stop except at the first cell and did not appear to take enough time to establish that the inmates in each cell were alive and safe.

*RECOMMENDATION: The Department should provide annual training for sworn staff that includes reminders about the requirement for assuring the welfare of inmates during security/welfare checks.*

*RECOMMENDATION: The Department should implement a method to track and audit the timeliness and adequacy of security/welfare checks, such as reviewing videos.*

**FINDING 4.3.** The San Diego County Jail lacks adequate policies or procedures for monitoring and treatment of inmates with mental illness in restrictive housing. Policies lack direction regarding how mental health information should be incorporated into housing decisions. For example, one inmate was housed in AdSeg for over four months, but his segregated housing status was not mentioned in his clinical documentation. This inmate, who appeared to suffer the ill effects of prolonged isolation, had significant symptoms of mental illness that were not detected by staff until he voiced suicidal ideation two months after his incarceration. After several more Safety Cell placements and adjudication of his criminal charges, he professed to have safety concerns and was housed in AdSeg for the last six weeks of his incarceration and life. He hanged himself several days before he was to be transferred to state prison.

*RECOMMENDATION: The Department should implement procedures that ensure appropriate monitoring of inmates in segregated housing units to timely identify inmates with deteriorating mental health, and implement a program that delivers necessary treatment for inmates on the mental health caseload in restrictive housing units.*

**FINDING 4.4.** The suicide death of one inmate revealed that monitoring panels in control booths were at times set to mute and staff did not adequately monitor alert lights in the control booths. In this case and others, such practices can result in staff missing emergencies and calls for help from inmates.

*RECOMMENDATION: The Jail should train all housing staff to properly maintain alert systems and monitors in housing unit control booths, and to respond appropriately when alerted.*

**FINDING 4.5.** Eight inmates died by hanging from December 2014 through 2016. In all of these cases, ligatures were attached to ventilation grills or looped around beds that had a separation from the cell wall.

*RECOMMENDATION: The Department should take affirmative steps to address the known risk of suicide attempts associated with the presence of attachment points in cells, particularly in segregated housing. This may include retrofitting cell ventilation grates and beds (so that the bed is flush against the cell wall) and avoiding attachment points in future construction, such that ligature material cannot be passed through gaps for suicide attempts by hanging.*

## 5. LEVELS OF SUPERVISION OF AT-RISK INMATES

Adequate monitoring of suicidal inmates is a crucial component of a comprehensive suicide prevention program. As the World Health Organization has recognized: "The level of monitoring should match the level of risk. Inmates judged to be actively suicidal require constant supervision. Inmates who have raised staff suspicions of suicide but who do not admit to being actively suicidal, may not require constant supervision but will need to be observed more frequently."[12]

### KEY DEFICIENCIES: SUPERVISION

1. The Department's policies lack sufficient clarity about the levels of risk and the levels of observation specified for each level of risk. The policy should provide for constant observation of inmates at high risk whenever clinically indicated.

2. The Department's policies and procedures for monitoring inmates in Safety Cells and EOH are unclear and at times give conflicting guidance for staff, which can lead to poor decision-making and poor continuity of care for at-risk inmates.

3. Monitoring schedules for the County's jail facilities do not match the system-wide policies and procedures manual, which creates confusion and inconsistency in practices.

4. The Department's policy and practices do not ensure that health care staff have authority to determine the appropriate level of care and observation (absent clear and documented security concerns), with custodial staff primarily authorized to make such decisions. This is problematic. Decision-making regarding the level of suicide risk for inmates is the responsibility of the mental health and medical programs. Although safety and security need to be taken into account, the welfare of inmates is a top priority.

### FINDINGS AND RECOMMENDATIONS: SUPERVISION

**FINDING 5.1.** The Department's policies lack sufficient clarity about the levels of risk and the levels of observation specified for each level of risk.

> *RECOMMENDATION: Levels of observation for suicidal inmates should progress from the highest level of observation – constant, direct, visual observation (also called 1:1 or Suicide Watch) – and be stepped down from that level. Inmates requiring 1:1 observation are inmates who are currently attempting to harm themselves, or who express suicidal thoughts with a well-developed plan and available means, and continue to espouse the intent to carry out their plan. This most intense level of observation is reserved for those inmates who are at the gravest risk and need immediate psychiatric inpatient care (either in the PSU or offsite inpatient facility).*

---

[12]     World Health Organization. (2007). Preventing Suicide in Jails and Prisons. World Health Organization & International Association for Suicide Prevention. Geneva, Switzerland.

**RECOMMENDATION:** *Inmates requiring a less stringent level of observation are those inmates who may have stated suicidal thoughts and/or intentions but do not have the means or well-developed plan, but are agitated and in great distress. These inmates, still at high risk, should be placed on Suicide Precaution, which requires staggered 15-minute checks (rather than "twice in every 30 minute period" as appears to have been the practice at some San Diego County jail facilities).[13] Staggered 15 minute checks means that an inmate must be observed at least once in every 15-minute interval and there should never be more than 15 minutes between observations. In practice, inmates housed in Safety Cells or the EOH for suicidal thinking or behavior should always be placed on Suicide Precaution status unless they are being evaluated for referral to the PSU, in which case they should be placed on continuous visual observation until transferred.*

**RECOMMENDATION:** *Decisions to move an inmate from a higher level of observation to a lower one should always require a clinical assessment of current risk and a justification by a mental health clinician.*

**FINDING 5.2.** Recent proposed changes to the suicide prevention policy specifying three levels of Suicide Watch and certain frequencies of monitoring/observation represent a positive step by the Department. The policy should continue to be refined to provide adequate clarity regarding applicable criteria for the levels of risk and observation.

**RECOMMENDATION:** *Policy should provide clear guidance regarding the criteria for levels of risk and observation. Policy should also provide for constant, visual observation (also called 1:1 observation) when clinically indicated. For instance, in the proposed policy we reviewed, the observation schedules for inmates identified as "Level I" is the same as that for inmates identified as "Level II," and neither provide for constant visual observation. The policy should specify observation levels based on risk and housing (e.g., inmates who are voicing suicidal thoughts and intention to act, and are housed in Safety Cells, should be on 1:1 Observation, while inmates housed in EOH and having intermittent suicidal thoughts should be on Suicide Precaution).*

**RECOMMENDATION:** *Inmates placed in safety cells should be re-evaluated for stepdown or inpatient placement no more than 12 hours after placement.*

**FINDING 5.3.** Individual facility policies regarding monitoring of inmates at elevated risk of suicide are in some cases inconsistent with the Department's system-wide policies. For example, the Department's policies specify that sworn staff will monitor inmates in Safety Cells a minimum of twice per 30 minutes, yet the "Green Sheets" for the Las Colinas Detention and Reentry Facility and the Vista Detention Facility do not.

> *RECOMMENDATION: The Department must ensure that all facilities' Green Sheets are consistent with system-wide policies and procedures for monitoring inmates housed in Safety Cells and EOH.*

**FINDING 5.4.** The Department's policies do not provide health care staff a sufficient role in some decisions regarding release from EOH or Safety Cell Housing of inmates evaluated for increased risk of self-injury. DSB Policy Section J.1 states that "[e]very four hours, the watch commander or designee will evaluate the inmate for continued retention in a safety cell." In another section regarding removal of inmates from Safety Cells, the watch commander is to consult with a mental health provider "to determine whether the inmate, if removed from the safety cell, is likely to pose a threat to himself/herself or others." Additionally, Sections J.4 (Enhanced Observation Housing) and J.5 (Inmate Safety Program) note that *custodial* personnel make the decision about housing inmates in either setting – albeit with input from a Gatekeeper.

> *RECOMMENDATION: Decisions regarding housing of inmates at elevated risk for suicidal behavior should primarily be the responsibility of medical and mental health staff, unless safety and security override these concerns (e.g., an agitated, violent, and suicidal patient). Where such safety and security concerns exist, custodial staff should consult with medical/mental health staff when making housing decisions.*

## 6. EMERGENCY RESPONSE

When a medical emergency occurs inside a jail, the level of training and response of custodial and medical staff will often determine if an inmate lives or dies. National correctional standards acknowledge that a facility's policy regarding intervention should be threefold. First, all staff who come in contact with inmates should be trained in standard first aid procedures and CPR. Second, any staff member who discovers an inmate attempting suicide should immediately survey the scene to ensure the emergency is genuine, alert other staff to call for medical personnel, and begin standard first aid and/or CPR.  Third, staff should never presume that the inmate is dead but rather should initiate and continue life-saving measures until relieved by medical personnel.[13]

## KEY DEFICIENCIES: EMERGENCY RESPONSE

1. Almost half of the emergency responses to lethal suicide attempts from December 2014 through 2016 featured poor coordination of lifesaving efforts, delays in starting CPR, or malfunctioning equipment.

2. The Department does not appear to have a program of drills to improve readiness and response in the case of medical emergencies.

---

[13]    Hayes, L. (1995). *Prison Suicide: An Overview and Guide to Prevention*. United States Department of Justice, National Institute of Corrections. Washington, DC.

## FINDINGS AND RECOMMENDATIONS: EMERGENCY RESPONSE

**FINDING 6.1.** Review of records and video footage of suicide deaths of seven inmates (58.3% of those reviewed) demonstrated serious problems with emergency response. In one case, health care staff were unable to utilize the automated electronic defibrillator (AED) due to malfunctioning equipment. In another case, there was a nearly seven-minute delay in using the AED prior to the arrival of the paramedics. Deputies discovered one inmate hanging in his cell but waited seven minutes to cut the inmate down and then prevented nursing staff from evaluating the inmate's condition or using the AED. There were two cases involving a delay in starting cardiopulmonary resuscitation (CPR), in one case for several minutes while approximately 11 deputies stood around without initiating life-saving measures.

Good coordination between custodial and medical staff is important because brain damage from asphyxiation can occur within 4 minutes, with death often resulting within 5-6 minutes. Timely initiation of effective life-saving measures can save lives. This did not occur in many San Diego jail suicide cases.

Our review found that not all staff understand their role in emergency responses to suicide attempts. Language in the Department's policies for Medical Emergencies is not clear. For example, it states that medical personnel "*may* assist or take over CPR responsibilities" (emphasis added). The policy language should be changed to give medical personnel the responsibility of emergency response when they arrive on scene.

> **RECOMMENDATION:** *All staff should be thoroughly trained, including periodic refresher training, in their specific emergency response roles:*
>
> a. Sworn staff should not assume an inmate is dead, but should start lifesaving measures except in well-delineated circumstances (electrocution, etc.)
>
> b. Any staff member should sound the alarm and notify 911.
>
> c. Sworn staff should be trained on how to use emergency equipment such as AEDs and cut down tools.
>
> d. Sworn staff should continue lifesaving measures until relieved and/or directed by medical staff.
>
> e. Medical staff should assume control of the emergency response as soon as they arrive on the scene.
>
> f. Declaration of death is the responsibility of a licensed physician.

> **RECOMMENDATION:** *Multi-disciplinary drills should be regularly conducted in housing units to assure that emergency response readiness is maintained and that staff understand their roles.*

> **RECOMMENDATION:** *Emergency response equipment should be audited regularly and maintained in working condition.*

## 7. STAFF TRAINING

"The framework for a comprehensive suicide prevention program includes substantial staff training."[14] All custodial, medical, nursing, and mental health staff should undergo systematic and ongoing training on the signs of mental illness and elevated suicide risk. All staff who have significant contact with inmates "should be trained to recognize verbal and behavioral cues that indicate potential suicide."[15]

We reviewed numerous San Diego County Jail materials related to suicide prevention, including PowerPoint presentations, handouts, brief trainings, scenarios, lesson plan, and booklets.

### KEY DEFICIENCIES: STAFF TRAINING

1. The Department's training programs for custodial and medical/mental health staff is not well coordinated. It is not clear what the training schedule is, what the training requirements are, how training records are kept, and how trainings should be evaluated.

2. Training for mental health clinicians on principles of suicide risk assessment and treatment should adhere to accepted clinical standards, with reference to the professional literature about risk assessment and the treatment of suicidal patients.

### FINDINGS AND RECOMMENDATIONS: STAFF TRAINING

**FINDING 7.1.** Currently there is no consolidated training program that encompasses all aspects of suicide prevention, including suicide warning sign awareness, how to work with inmates with mental illness, principles of suicide risk assessment, correctional suicide prevention, treatment of suicidal inmates, and emergency response.

> *RECOMMENDATION: The Department should implement a training program that includes modules for custody cadets, custodial staff, and medical/mental health staff (including contract staff). Policies should be written that cover training for all staff and that includes timeframes, content requirements, and evaluation strategies. In addition, a system should be put in place that tracks trainings and ensures that all staff are current on required trainings.*

**FINDING 7.2.** Generally, the training materials we reviewed indicate that there are gaps in the training for medical and mental health staff, who must be prepared to assess suicide risk and identify appropriate interventions.

> *RECOMMENDATION: The Department's training unit should be charged with developing a set of curricula covering all aspects of mental health treatment and suicide risk assessment and treatment.*



---

14      Metzner, J. and Hughes, K. (2015). Suicide risk management. In R.L. Trestman, K.L. Appelbaum, and J.L. Metzner (Eds.) *Oxford Textbook of Correctional Psychiatry*. New York: Oxford University Press.
15      Ibid.

*RECOMMENDATION: All staff who have regular contact with inmates should be required to have standard first aid cardiopulmonary resuscitation (CPR) training and be trained in the use of various emergency equipment (cut down tools, automated external defibrillators (AEDs), etc.). This will help ensure that staff understand their roles in emergency response and can respond appropriately.*

*RECOMMENDATION: The Department should use a standardized and best practice training protocol for sworn staff, such as that developed by Lindsay Hayes.[16]*

**FINDING 7.3.** Review of the suicides between December 2014 and 2016 revealed both strengths and weaknesses in clinical documentation, which could be improved with training and the use of guidelines for documentation. Risk assessments were often brief and did not include important information about the inmates, such as history of suicidal behavior or protective factors, and were often shortened to "Denies SI."

The records of multiple inmates revealed poor staff practices, such as the use of "contracting for safety." This practice has not been shown to decrease the risk of suicide attempts or to provide any protection for clinicians and should be discouraged by medical and mental health staff.

*RECOMMENDATION: Mental health staff should have specific suicide risk assessment training that adopts best practices in training, such as the Recognizing and Responding to Suicide Risk course from the American Association for Suicidology.[17] The training should be included in onboarding for new employees and should be required periodically for current staff.*

---

[16]     Hayes, L. (2016). Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities. Available from the National Center on Institutions and Alternatives. http://www.ncianet.org/criminal-justice-services/suicide-prevention-in-custody/publications/training-curriculum-and-program-guide-2016.

[17]     See Recognizing and Responding to Suicide Risk for Correctional Clinicians. American Association for Suicidology. http://www.suicidology.org/training-accreditation/rrsr-c.

## 8. REVIEW OF SUICIDE DEATHS AND SERIOUS SUICIDE ATTEMPTS

All suicide deaths and medically serious suicide attempts should be subject to a rigorous review process to identify any improvements that can be made to suicide prevention and patient safety. Review should cover medical and custodial procedures, training protocols and records, and mental health treatment (if any), and should lead to recommendations for changes in policy, procedure, and training. The review should be grounded in the principles of a "just culture" – a review that "balances the need for an open and honest reporting environment with the end of a quality learning environment and culture… Just culture requires a change in focus from errors and outcomes to system design and management of the behavioral choices of all employees."[18]

### KEY DEFICIENCIES: REVIEW OF SUICIDES

1. The existing suicide review process as proposed in the recently developed Suicide Prevention Policy is incomplete and requires improvement.

2. The reports issued by the San Diego County Citizens' Law Enforcement Review Board (CLERB) do not serve a meaningful or sufficient role in reviewing suicide deaths and serious suicide attempts at the Jail. The CLERB has a narrow mandate for investigation and can, at best, only provide limited insight to problems of patient care and emergency response.

3. We identified a number of problems with respect to the accuracy and quality of CLERB reports regarding suicide deaths at the Jail.

### FINDINGS AND RECOMMENDATIONS: REVIEW OF SUICIDES

**FINDING 8.1.** The proposed suicide review process is inadequate. It does not address what elements of the death will be examined and by whom. In addition, although the proposal designates the organizational bodies who are to review the death, it does not identify how any findings and corrective action plans will be acted upon and how proposed corrective actions will be enforced.



> *RECOMMENDATION: The suicide review process should be designed to include all stakeholders and fit within the Department's quality improvement program. It should have a mechanism to make sure suggested improvements are completed, and lay out in detail the structure of the review (content, timeline for review, and approval).*

> *RECOMMENDATION: The policy should lengthen the preliminary review period from 24 to 72 hours to provide sufficient opportunity to address the complexity of these incidents and the organization in which they occur.*

**FINDING 8.2.** The CLERB reports provide limited utility in reviewing suicide deaths and guiding corrective action to avoid repeated problems. The CLERB does not adequately address the appropriateness of mental health treatment and suicide prevention policy or practices. This is a role that the Department must take on itself.

---

[18]     Boysen, P.G. (2013). Just culture: A foundation for balanced accountability and patient safety. *The Ochsner Journal, 13*: 400-4006.

> *RECOMMENDATION: The Department should implement a robust process for review of suicide deaths and serious suicide attempts that involves a generally accepted methodology (e.g. psychological autopsy or root cause analysis). Both the psychological autopsy and root cause analysis have substantial support for their use in quality improvement and as responses to suicide deaths in custody. (The Department has indicated that a psychological autopsy was completed for at least one recent suicide, but we were not provided a copy of that report.)*

## 9. QUALITY IMPROVEMENT

The purpose of continuous quality improvement (CQI) programs is to improve health care by identifying problems, implementing and monitoring corrective action, and studying its effectiveness. Key components of CQI include identification of key indicators and processes, a system to collect data about these components, an analytical strategy for the data, and a way to feed the findings back into everyday practice to improve care. The CQI program must be systematic and include all aspects of care.

<u>KEY DEFICIENCIES: QUALITY IMPROVEMENT</u>

1. The Department has taken some positive steps regarding quality improvement but does not yet have a fully functioning or effective quality improvement program.

<u>FINDINGS AND RECOMMENDATIONS: QUALITY IMPROVEMENT</u>

**FINDING 9.1.** The Department does not have a functioning quality improvement program. As discussed in this report, there is a need for improved quality improvement processes regarding mental health/suicide risk screening, clinical assessments, individual suicide and suicide attempt reviews, and other aspects of a correctional mental health care and suicide prevention program.

> *RECOMMENDATION: The Department should ensure that it has an effective system to track clinical data within the mental health and medical systems in the jail system. In addition, the Department should develop a system to track important custodial indicators related to suicide prevention. This tracking should be part of a larger quality improvement program.[19]*

**FINDING 9.2.** We were encouraged to see that the Department is taking steps to implement and enhance its Suicide Prevention Response & Improvement Team (SPRIT) to monitor suicide attempts and also evaluate suicide deaths.

> *RECOMMENDATION: The policy should describe the composition of the SPRIT and its responsibilities and reporting structure. The SPRIT should be part of the Department's larger quality improvement program and should have primary responsibility for the oversight of the Department's programs to prevent suicide.[20]*

---

[19] See Section IV.B.3 in Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) *The Oxford Handbook of Prisons and Imprisonment.* New York City: Oxford University Press.
[20] Ibid. Section IV.B.2.

## 10. CONCLUSION

The San Diego County Jail has made notable improvements in its suicide prevention program in the last two years.  We believe the recommendations we have outlined will solidify these gains and go a long way to prevent more suicides in San Diego County Jail facilities.

Respectfully submitted,
Karen Higgins, M.D.
Robert Canning, Ph.D., CCHP

April, 2018

# EXHIBIT G

In April of 2018, the San Diego Office of County Counsel requested Lindsay Hayes to independently assess suicide prevention practices within the Sheriff's Jail system, as well as, to offer any appropriate recommendations for the revision of suicide prevention policies and procedures.  Mr. Hayes is nationally regarded as an expert in the field of suicide prevention within jails, prisons and juvenile facilities, and has been appointed as a Federal Court Monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction.  Mr. Hayes conducted an on-site assessment at four Sheriff's jail facilities from April 23 thru April 28, 2018.

In June of 2018, the Sheriff's Department received Mr. Hayes report entitled "Report on Suicide Prevention Practices within the San Diego County Jail System." The report focused on eight (8) critical components of a suicide prevention policy which include staff training, identification/screening, communication, housing, levels of supervision/management, intervention, and follow-up/mortality-morbidity review.   Based on his on-site assessment, as well as a review of various San Diego County Sheriff's Department policies and procedures related to suicide prevention, Mr. Hayes' produced a report containing 32 actionable recommendations.

Since receiving Mr. Hayes' report, the Sheriff's Department has been diligently working to address each of the recommendations.  The following is a list of the recommendations contained within the Hayes report, as well as a synopsis as to what the Sheriff's Department has done to implement the recommendations, and the current status of those recommendations that have yet to be completed.  The italicized and bolded language below is taken from the "Summary of Recommendations" from the Lindsay Hayes report.

## Mr. Lindsay Hayes' full report begins on page 15.

### _Staff Training_

***1) It is strongly recommended that the ISP policy be revised to include a more robust description of the requirements for both pre-service and annual suicide prevention training, to include the duration of each workshop and an overview of the required topics.***

Detentions Policy and Procedure was updated to require "Suicide Detection and Prevention" training annually.  This is accomplished in an 8 hour initial training as well as a 2 hour refresher course.  In addition, professional staff members receive training on "Suicide Detection and Prevention" as part of their orientation.

***2) It is strongly recommended that the joint efforts of the Medical Services Division (MSD) and Detention In-Service Training unit (DTU) to consolidate this writer's 10-hour Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison***

*Facilities  into an 8-hour classroom training for all current SDCSD deputies be expanded to include all new employees (i.e., medical and mental health personnel) working within the San Diego County Jail System.*

This recommendation was implemented through a collaborative effort between the Detentions Training Unit, Sheriff's mental health staff, and contracted mental health staff to create a curriculum of training utilizing the Lindsay Hayes program guide.  This course is required for all Sheriff's Detention assigned staff.

*3) It is strongly recommended that the MSD and DTU jointly collaborate on the development of a 2-hour annual suicide prevention curriculum based upon this writer's Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities. At a minimum, the curriculum should include a review of: 1) avoiding obstacles (negative attitudes) to prevention, 2) predisposing risk factors, 3) warning signs and symptoms, 4) identifying suicidal inmates despite the denial of risk, and 5) review of any changes to the ISP policy. The annual training should also include general discussion of any recent suicides and/or serious suicide attempts in the San Diego County Jail System.*

This recommendation was implemented. A two hour curriculum was separated into four 30 minute parts and will be required briefing training to meet the refresher training recommendation.

*4) It is strongly recommended that the annual suicide prevention training be required for all custody, medical, and mental health personnel (including LHC contracted psychologists and psychiatrists). Suicide prevention is all about collaboration, and requiring custody, medical, and mental health personnel to sit together in a classroom environment is not only symbolically appropriate, but instills the philosophy that all professionals, regardless of credentials, have an equal responsibility for inmate suicide prevention and can learn from one another's backgrounds, insights, and experiences.*

This recommendation was implemented.  All staff listed above are required to attend the course that was collaboratively designed utilizing the Lindsay Hayes curriculum.

### Intake Screening/Assessment

*5) It is strongly recommended that Detention Services Bureau (DSB) and MSD officials look at options to better ensure reasonable sound privacy in the booking areas of the three intake facilities when multiple nurses are conducting intake screening at the same time. As demonstrated in the SDCJ, if the inmate is secured within the nursing booth and the door is closed with the officer stationed outside, reasonable privacy and confidentiality can occur while ensuring staff safety.*

This recommendation has been partially implemented.  The only remaining booking facility that does not allow for private interview space at booking is the Vista Detention Facility (VDF).  The project is currently on the capital improvement list.

*6) It is strongly recommended that the current suicide risk inquiry contained in the "Medical Intake Questions" form embedded in the JIMS be revised to include the following:*

- *Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?*

- *Has a family member/close friend ever attempted or committed suicide?*

- *Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?*

This recommendation has been implemented.  The questions listed above were added to the Jail Information Management System and are asked during the booking process by nursing staff.

*7) It is strongly recommended that MSD officials reconsider the utility of the Columbia-Suicide Severity Rating Scale (C-SSRS) during the intake screening process. Although the C-SSRS has become a popular screening form in some jail facilities throughout the country, its effectiveness remains questionable. It is this writer's opinion that the structure of the questions creates awkwardness between the screener and inmate, and more importantly, questions that limit responses to the "past month" are potentially very dangerous (e.g., the suicidal ideation of an inmate that was experienced more than a month ago would not be captured during the screening process). Intake screening questions by nursing staff should be open-ended and not time-sensitive; it is responsibility of a mental health clinician during a subsequent assessment to determine the degree of relevancy of prior suicide risk to current risk. With addition of the three questions offered above, the current intake screening form would be more than adequate without the necessity of the C-SSRS.*

This recommendation has been completed.  The Sheriff's Department has reconsidered the utility of the Columbia-Suicide Severity Rating Scale (C-SSRS) during the intake process and determined that it will continue to utilize the C-SSRS, in addition to the questions added in the previous recommendation.   The C-SSRS has been normed for the correctional environment and is a tool to drive further assessment by a qualified mental health provider.  Further, the C-SSRS is part of the County of San Diego suicide prevention strategic plan and utilized by other justice partners.

*8) Although this writer would defer to MSD officials as to whether to designate either a charge nurse or mental health clinician to be the ISP gatekeeper, it is strongly recommended that, if the charge nurse is a gatekeeper, they should always immediately notify an on-site mental health clinician when an inmate has been identified as potentially suicidal. The clinician, in turn, should respond and conduct the suicide risk assessment and determine the appropriateness of suicide precautions. Unless exigent circumstances exist and/or mental health personnel are not on-site, the determination of placing a potentially suicidal inmate in either a safety cell and/or the EOH unit should be made by the mental health clinician.*

Detentions Policy and Procedure has been updated to reflect the recommendation related to the roles of a qualified mental health provider. The service hours of the mental health clinicians have been expanded for greater coverage and plans to have mental health staff available 24/7 at the intake facilities (San Diego Central Jail, Vista Detention Facility and Las Colinas Detention and Reentry Facility) are in the works and will be accomplished through the hiring of new staff as well as through expanded hours of contract staff.

*9) It is strongly recommended that DSB and MSD officials revise the "automatic triggers" criteria contained within the ISP policy to require only criteria No. 3 ("The inmate states he/she is suicidal and or made suicidal statements to sworn staff, medical, family, etc.) to result in placement on suicide precautions. Although the other four criteria could be potential suicide risk factors, they should be considered criteria for a mental health referral, and not necessarily automatic placement on suicide precautions.*

This recommendation is not necessary. The "automatic triggers" referred to in the recommendation report were not triggers for placement on suicide precautions. They were triggers to require an assessment for the need for placement on suicide precautions. These triggers give both sworn and medical staff a tool in determining if a referral for assessment is needed, and are consistent with the recommendation.

*10) Consistent with the SDCSD philosophy that a previous suicide attempt documented in JIMS could be a factor for current suicide risk, an inmate's previous placement on suicide precautions within the San Diego County Jail System is equally important. As such, regardless of the inmate's behavior or answers given during intake screening, a mental health referral should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during an inmate's prior confinement within the San Diego County Jail System. As such, it is strongly recommended that determination of whether the inmate was "on suicide precautions during prior confinement in a SDCSD facility?" should be independently verified through review of the JIMS by nursing staff. An "alert" screen on JIMS and protocol should be created according to the following procedures:*

- *Any inmate placed on suicide precautions should be tagged on the JIMS "alert" screen by mental health staff (e.g., "ISP June 2018");*

- *Nursing staff conducting intake screening should always review the inmate's "alert" screen to verify whether they were previously confined in a SDCSD facility and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and*

- *Regardless of the inmate's behavior or answers given during intake screening, further assessment by mental health staff should always be initiated based on documentation reflecting suicidal behavior/ placement on suicide precautions during the inmate's prior SDCSD confinement.*

Changes to Detentions Policy and Procedure are in process to reflect the recommendation regarding a mental health referral for a previous suicide attempt during an inmate's prior confinement in the San Diego County Jail system.    Alert flags in the Jail Information Management System advise nursing staff of previous in custody suicide attempts, and Psychiatric Stabilization Unit housing, which will alert nursing staff to schedule an urgent Qualified Mental Health Provider assessment.  These flags, in addition to a newly created flag for those previously housed within the Inmate Safety Program will be within the Electronic Health Record system once operational in mid-September.   These flags will alert both nursing and mental health providers of the patient's prior and current mental health status.

*11) It is strongly recommended that MSD officials initiate a continuous quality assurance plan to periodically audit the intake screening process to ensure that nursing staff are accurately completing the "Medical Intake Questions" form, and not using abbreviated inquiry, as well as soliciting responses to the four arresting officer questions.*

This recommendation has been implemented.  Nursing audits by supervising nurses have been adjusted to include periodic audits of the intake screening process at intake facilities.  The results of these audits are reported at  quarterly quality assurance meetings.

*12) It is strongly recommended that MSD officials develop a mental health triage and referral protocol. Although there is no standard of care that consistently specifies time frames to respond to mental health referrals, one suggested schedule would be as follows: Emergent - immediate or within 1 hour; Urgent - within 24 hours; and Routine - within 72 hours.   In addition, mental health leadership should develop a mental health triage policy that defines response levels, sets timetables for each level, and defines the acuity of behavior(s) that dictates a specific response level. Of course, any inmate expressing current suicidal ideation*

*and/or current suicidal/self-injurious behavior should result in an <u>Emergent</u> mental health referral.*

An acuity referral system for mental health treatment and Inmate Safety Program already exist in policy and will be built into the Electronic Health Record system.  Mental Health staff will continue operating under the current protocols as we continue to evaluate and enhance our mental health services.

*13) Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, it is strongly recommended that medical personnel review the medical section of JIMS to determine whether existing medical and/or mental health needs contraindicate the placement or require accommodation. In addition, a "best practice" would be that any inmate assigned to such a special management housing unit receive a brief assessment for suicide risk by nursing staff upon admission to such placement. The following are recommended questions for the brief assessment:*

- *Are you currently having thoughts of harming yourself?*

- *Have you previously tried to harm yourself because of a segregation placement?*

- *Is the inmate speaking incoherently; expressing bizarre thoughts; unable to sit still or pay attention; or is disoriented to time, place, or person?*

*Affirmative responses to any of these questions should result in an Emergent mental health referral.*

Business processes are being developed, and policies are being updated, to provide for real time notification to Qualified Mental Health Providers so assessments can be accomplished in a timely manner.

<u>Communication</u>

*14) It is strongly recommended that the MSD establish a weekly mental health team meeting at each facility that includes MSD mental health clinicians and LHC psychologists and psychiatrists. The primary purpose of the weekly meeting is to identify and manage the treatment needs of suicidal and/or seriously mentally ill patients.*

This recommendation will not be implemented.  The NCCHC recommendation relating to mental and medical health patient care meetings between staff is that they are to occur once per month.  The San Diego County Sheriff's Department exceeds this standard by holding bi-

weekly Multi-Disciplinary Group (MDG) meetings at the San Diego Central Jail, George Bailey Detention Facility, Vista Detention Facility, and Las Colinas Detention and Reentry Facility.  In addition, each of these facilities also have monthly Patient Care Coordinating Committee meetings, daily Psychiatric Stabilization Unit meetings (SDCJ, LCDRF), and weekly outpatient stepdown unit meetings (SDCJ,LCDRF).  Additionally, ad hoc meetings can be called when urgent inmate care issues arise.

### *Housing*

**15) As this writer inspected a vast array of differing physical environments for the housing of suicidal inmates in the four jail facilities (i.e., safety cells, EOH single cells and dormitories, MOB, and PSU observation cells, etc.), it is strongly recommended that DSB officials conduct a comprehensive physical plant review of all jail cells utilized for the housing of suicidal inmates to ensure that they are reasonably suicide-resistant. This writer's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities," included as Appendix A of this report, can be utilized as a guideline for such an inspection.**

A comprehensive physical plant review of all specialty and segregated housing was conducted. Construction plans for modifications to these housing areas were submitted to General Services for implementation.

**16) Due to the limited positive attributes of safety cell use, it is strongly recommended that, if utilized, the maximum length of stay in a safety cell be limited to no more than six (6) hours. In addition, use of a safety cell should not be the first option available, rather it should only be utilized in exigent circumstances in which the inmate is out of control and at immediate, continuing risk to self and others. Current SDCSD policies should be appropriately revised.**

Revisions were made to the Inmate Safety Cell policy to ensure safety cells are not the first option of placement for those identified as having a suicide risk.  The placement criteria was changed in the policy to use safety cells only for inmates who are actively self-harming or actively assaultive.  The policy now requires a Qualified Mental Health Provider assessment for retention in a safety cell to be conducted every 4 hours.

**17) It is strongly recommended that MSB officials instruct their clinical staff on the appropriate use of safety smocks, i.e., they should not be utilized as a default, and not to be used as a tool in a behavior management plan (i.e., to punish and/or attempt to change perceived manipulative behavior).  Rather, safety smocks should only be utilized when a clinician believes that the inmate is at high risk for suicide by hanging. Should an inmate be placed in a safety smock, the goal should be to return full clothing to the inmate prior to their discharge from suicide precautions. Finally, custody personnel should never place an inmate**

*in a safety smock unless it had been previously approved by medical and/or mental health personnel. Current SDCSD policies should be appropriately revised.*

This recommendation has not yet been implemented. The Sheriff's Department has changed the criteria for admission into a safety cell. As a result of these changes, there are fewer placements into a safety cell, and inmates are spending significantly less time. The Department is seeking additional clarification from Mr. Hayes as it relates to the changes and this recommendation.

*18) It is strongly recommended that possessions and privileges provided to inmates on suicide precautions should be individualized and commensurate with their level of risk. As such, current SDCSD policies should be appropriately revised, as follows:*

- *All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk as determined on a case-by-case basis by mental health clinicians and documented in JIMS;*

- *If a mental health clinician determines that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock and safety blanket;*

- *A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended (i.e., attempting to tamper with/destroy, utilize to obstruct visibility into the cell, etc.);*

- *All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction;*

- *All inmates on suicide precautions shall be allowed to attend court hearings unless exigent circumstances exist in which the inmate is out of control and at immediate, continuing risk to self and others, and*

- *Inmates on suicide precautions shall not automatically be locked down. They should be allowed dayroom and/or out-of-cell access commensurate with their security level and clinical judgment of mental health clinicians.*

This recommendation has been implemented in part. Inmates placed in safety cells are not allowed privileges since the only inmates placed in safety cells are those who are actively self-harming or actively assaultive. Inmates placed in Enhanced Observation Housing (EOH) are

allowed dayroom time, television time, and social phone calls. Additionally, inmates in EOH have access to reading materials such as books and periodicals. Inmates who are designated as low risk in EOH may attend court. This recommendation is still being reviewed for its efficacy in our system.

*19) Although SDCSD Policy J.4: Enhanced Observation Housing (EOH), Definition and Use requires that "EOH units shall be clean and disinfected using facility approved disinfectants or bleach solution after every use or as needed," this writer's inspection of cells in several facilities found them to be quite dirty and unsanitary. As such, it is strongly recommended that DSB officials reinforce the above directive and that shift supervisors at each facility ensure that cells utilized to house suicidal inmates are reasonably clean and sanitary.*

Enhanced Observation Housing policy was updated to add a daily cleaning as well as after each use. Facility supervisor and management staff are required to check for compliance.

**<u>Levels of Supervision/Management</u>**

*20) It is strongly recommended that all DSB and MSD suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:*

- *Close Observation is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific plan) and/or has a recent prior history of self-destructive behavior and would be considered a low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10-15 minutes, and should be documented as it occurs.*

- *Constant Observation is reserved for the inmate who is actively suicidal, either by threatening (with a plan) or engaging in self-injury, and considered a high risk for suicide. This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals.*

This recommendation has been implemented in part. Close observation is conducted for those inmates in Enhanced Observation Housing and in Safety Cells. Constant Observation can be utilized for those inmates in the Psychiatric Stabilization Units when warranted.

*21) It is strongly recommended that, with the adaption of the two-level observation system as offered above, reference to the ill-defined "high" and "low" suicide risk categories are no longer necessary and should be deleted from all SDCSD policies.*

Levels of observation are currently outlined in policy.  After internal discussion and review of this recommendation, SDSD has opted to keep both "high and "low" risk indicators.

*22) It is strongly recommended that the narrative of "twice every 30 minutes" currently contained within some SDCSD policies be replaced with "staggered intervals that do not exceed 10-15 minutes."*

This recommendation was implemented to include language in Detention Policy and Procedure regarding staggered safety checks not to exceed 15 minutes.

*23) It is strongly recommended that SDCSD policies should be revised to eliminate the necessity of "a minimum of two assessments by mental health provider with time interval between assessments and for clearance based on high/low risk designation after first assessment." In other words, consistent with the standard of care, an inmate identified as potentially suicidal (or placed on suicide precautions after hours by non-mental health personnel) should be immediately referred to a mental health clinician for completion of a suicide risk assessment. The assessment should be completed immediately if mental health personnel are on-site or during the next business day morning if they are off-site at the time of the referral. Should the clinician's initial suicide risk assessment find that the inmate is not suicidal and does not require either initiation/continuation of suicide precautions, the inmate should be released to appropriate rehousing. Should the clinician's suicide risk assessment find that the inmate is suicidal, the inmate should be placed on suicide precautions and seen on a daily basis by a mental health clinician until a determination is made that they are no longer suicidal. Daily assessments of suicide risk should be documented in SOAP-formatted progress notes. When the clinician determines that an inmate is no longer suicidal and can be discharged from suicide precautions, documentation of such clinical judgment should occur in a suicide risk assessment form. In addition, the MSD document entitled "ISP Clarifications, March 29, 2018" (which speaks to "two consecutive low risk assessments by two different providers," as well as assessments occurring between 4 and 6 hours of each other) should also be deleted from SDCSD policies as it will no longer be relevant.*

This recommendation was implemented in part.  Policy and Procedure revisions were made to require an assessment to be completed immediately if mental health personnel are on-site or during the next business day morning if they are off-site at the time of the referral. As it relates to a second assessment, the second assessment will occur within 12-24 hours but no more than 24 hour intervals between assessments.

*24) It is strongly recommended that the MSD utilize only one version of the suicide risk assessment forms currently being utilized by MSD mental health clinicians and LHC psychologists (i.e., LMHC ISP Risk Assessment Form, Psychologist EOH Evaluation, Psychologist ISP Evaluation, etc.). The Psychologist ISP Evaluation template that this writer reviewed at GBDF appears to be the most comprehensive. As recommended above, the selected suicide risk assessment form template should be utilized as justification for an inmate's initial placement on suicide precautions, as well as justification for an inmate's discharge from suicide precautions.*

The Chief Mental Health Clinicians developed a standardized suicide risk assessment template which will be embedded into the Electronic Health Record system.  Training was provided to all QMHP's and contracted mental health staff.

*25) It is strongly recommended that, consistent with NCCHC and other national correctional standards, all clinicians develop treatment plans for inmates discharged from suicide precautions that describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur. A treatment plan should be contained in the discharging suicide risk assessment.*

The Chief Mental Health Clinicians developed a standardized treatment plan template which will be embedded into the Electronic Health Record system.  Training was provided to all QMHP's and contracted mental health staff.

*26) It is strongly recommended that reasonable efforts should be made, particularly when considering the discharge of an inmate from suicide precautions, to avoid a cell-side encounters; rather, suicide risk assessments should be made in a private and confidential setting. Should an inmate refuse a private interview, the reason(s) for the refusal should be documented in JIMS.*

This recommendation has been implemented in part Policy and procedure changes were made to eliminate cell-side encounters except in situations where doing so could jeopardize the safety of the inmate or staff.   There is a pending construction project at the Vista Detention Facility that will provide additional confidential setting options in the booking area.

*27) It is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on the mental health caseload and receive regularly scheduled follow-up assessments by clinicians until their release from custody.  As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), it is recommended that the follow-*

*up schedule be simplified and revised as follows:  follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically as determined by the clinician until release from custody.*

This recommendation has been implemented.  All inmates placed into and subsequently released from the Inmate Safety Program are maintained on a Qualified Mental Health Provider's caseload and are followed up with as clinically indicated.

*28) Given the strong association between inmate suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that DSB officials give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals.*

This recommendation has been implemented.  The Sheriff Department has given strong consideration to increasing deputy rounds of restricted housing units from 60 minutes to 30 minute intervals.  However, given the challenges regarding the physical layout of jail facilities, the numbers of inmates, and care necessary to properly conduct these checks, the Department has determined that it would not be feasible at this time to make this change.  This recommendation requires the potential of cohorting inmates in administrative segregation, and disciplinary isolation areas of facilities to make implementation feasible.  The Department continues to assess the feasibility of this recommendation.

*29) It is strongly recommended that both mental health and nursing personnel be instructed to refrain from utilizing terms such "contracting for safety" or "vouching for his safety" with patients when assessing suicide risk. SDCSD policy should also be revised accordingly to prohibit its use.It is strongly recommended that both the SCSD and JPS suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:*

This recommendation was implemented by a directive to contract mental health staff and Sheriff's mental health clinicians to eliminate the use of "contracted for safety" or "vouching for his safety" practices and verbiage from their clinical notes.

*Intervention*

*None*

*Reporting*

*None*

*Follow-Up/Mortality-Morbidity Review*

*30) It is strongly recommended that either the Critical Incident Review Board (CIRB) or the Suicide Prevention and Focused Response Team (SPFRT) be responsible for conducting mortality reviews of any inmate suicide, as well as morbidity reviews of any serious suicide attempts (defined as necessitating medical treatment outside the facility). Such reviews should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When recommendations are accepted for implementation, a corrective action plan should be created that identifies each recommendation, followed by identified responsible staff, status(s) and deadline(s) for implementation. Every effort should be made to complete mortality-morbidity review process within 30 days of the incident. As such, should the mortality-morbidity review process become the responsibility of the CIRB, review of the suicide should be moved from the current 14-day deadline to a more reasonable 30-day deadline. Both the DSB's Policy M.7: Inmate Deaths and MSD's Policy Death of an Inmate On-Site should be revised to reflect the above 6-step review process. To assist either of the CIRB or SPRFT in these processes, this writer's "Mortality-Morbidity Review of Inmate Suicides/Serious Suicide Attempts Checklist" is offered for consideration in Appendix B.*

MSD's Policy titled "Death of an Inmate On-Site" has been revised to require a mortality review within 30 days as recommended for cases involving suicide and serious suicide attempts.

*31) It is strongly recommended MSD's clinical review of an inmate suicide that is currently entitled "psychological autopsy" be renamed as either a "suicide report" or "clinical suicide report." In the alternative, should MSD officials decide to commit to a psychological autopsy process, consistent with NCCHC standards, the review should include the MSD chief mental health clinician's prompt examination of the suicide site (including cell contents), as well as interviews with relevant staff, inmates, and family members of the decedent (when appropriate).  Every effort should be made to complete the psychological autopsy within 30 days of the incident for presentation at the mortality review meeting.*

The Chief Mental Health Clinicians will be collaborating with the Sheriff's Homicide Unit in conducting and completing a "suicide death report" within 30 days.  In the event that the 30 day timeline cannot be adhered to, at a minimum, an administrative mortality review will be conducted.

*32) It is strongly recommended that SDCSD officials consider slightly revising the SPFRT responsibility to "track and review all self-harm incidents, attempt suicides and suicides."*

*Although it would be reasonable to "track" all incidences of self-harm and attempted suicides, given the large size of the San Diego County Jail system, it would be unreasonable to expect that the SPRFT could adequately "review" all incidents of self-harm and attempted suicide. As such, the following revision is offered: "Track all incidents of self-harm and attempted suicide; Review all serious suicide attempts (defined as incidents of self-harm and/or attempted suicide that result in medical treatment outside of the jail facility) and suicides."*

The Detention Services Bureau Policy and Procedure was revised to reflect the recommendation.

While it is impossible to prevent all suicides, the Sheriff's Department is committed to reducing suicide risk and self-harm incidents in our jail system.  It is important to note that the Sheriff's Department has always been compliant with meeting State standards related to the operation of our detention facilities and that we remain steadfast in our pursuit of implementing best practices for a safe and humane environment.  The assessment by Lindsay Hayes and his ensuing report, as well as the changes made by the Department based on his recommendations, are examples of the Department's ongoing commitment to continuously improve how we manage our jails and work to enhance the safety of our inmate population.

# REPORT ON SUICIDE PREVENTION PRACTICES WITHIN THE SAN DIEGO COUNTY JAIL SYSTEM
San Diego, California

by

## Lindsay M. Hayes
40 Lantern Lane
Mansfield, MA 02048
(508) 337-8806
e-mail: Lhayesta@msn.com

June 22, 2018

# TABLE OF CONTENTS

A.  **<u>Introduction</u>**……………………………………………………………3-7

B.  **<u>Qualifications</u>**……………………………………………………………..8-9

C.  **<u>Findings and Recommendations</u>**…………………………………...10-11

   1) **Staff Training**…………………………………………………12-18
   2) **Intake Screening/Assessment**………………………………18-32
   3) **Communication**………………………………………………32-34
   4) **Housing**………………………………………………………34-45
   5) **Levels of Supervision/Management**…………………………45-58
   6) **Intervention**…………………………………………………58-59
   7) **Reporting**……………………………………………………..60
   8) **Follow-up/Mortality-Morbidity Review**…………………...61-67

D.  **<u>Summary of Recommendations</u>**……………………………………68-76

E.  **<u>Conclusion</u>**…………………………………………………………..77-78

**Appendices**

### REPORT ON SUICIDE PREVENTION PRACTICES WITHIN THE SAN DIEGO COUNTY JAIL SYSTEM
San Diego, California

## A.    <u>INTRODUCTION</u>

The following is a summary of the observations, findings, and recommendations of Lindsay M. Hayes following an assessment of suicide prevention practices within the San Diego County Jail System operated by the San Diego County Sheriff's Department in San Diego, California. Due to a high number of inmate suicides in the jail system beginning in approximately 2013 and as reported in the local media, Disability Rights California (DRC) initiated an investigation that included an initial tour of several facilities in May 2015. DRC subsequently enlisted two subject matter experts to review all inmate suicides in the San Diego County Jail System from 2014 through 2016, as well as critique relevant policies and procedures in the area of mental health care and suicide prevention. The subject matter expert review did not include an on-site assessment of suicide prevention practices within the jail system. A draft copy of the DRC report, entitled *Suicides in San Diego County Jail: A System Failing People with Mental Illness*, was presented to both the San Diego County Sheriff's Department and the Office of the County Counsel for San Diego County in early March 2018.[1]

As a result of the findings within the draft DRC report, the Office of the County Counsel requested this writer's services to independently assess *current* suicide prevention practices, as well as offer any appropriate recommendations for the revision of suicide prevention policies and procedures. In conducting the on-site assessment, this writer met with and/or interviewed

---

[1]The final DRC report was released on April 25, 2018. Of note, this writer is well acquainted with the DRC lead Litigation Counsel in this case, as well as the two subject matter experts. They are all well-respected within their fields of expertise.

4

numerous correctional, medical, and mental health officials and staff from the San Diego County Sheriff's Department (SCDSD), Medical Services Division (MSD), and Liberty Healthcare Corporation (LHC);[2] reviewed numerous policies and procedures related to suicide prevention, screening/assessment protocols, and training materials; reviewed various medical charts, incident reports, and available investigative reviews of six (6) inmate suicides between 2016 and 2017;[3] reviewed various medical charts of inmates on suicide precautions during the on-site assessment; and toured four jail facilities: San Diego Central Jail (SDCJ), Las Colinas Detention and Reentry Facility (LCDRF), Vista Detention Facility (VDF), and George Bailey Detention Facility (GBDF). This writer's on-site assessment was conducted from April 23 thru April 28, 2018.[4]

As of May 2018, the San Diego County Jail System had a yearly average daily population of 5,621 inmates, making it one of the largest county jail systems in California, as well as in the United States. As shown by Table 1, the San Diego County Jail System had 20 inmate suicides during the 5-year period of 2014 thru May 2018.  Based upon the average daily population during this same time period, the suicide rate within the San Diego County Jail System was 73.2 deaths per 100,000 inmates  --  a rate that was higher than that of county jails of varying size throughout the United States.[5]

---

[2]Medical and mental health services are provided to inmates by the SDCSD's Medical Services Division. Since February 2017, psychologists (doctorate-level) and psychiatrists have provided additional mental health services to inmates through the SDCSD's contractual agreement with Liberty Healthcare Corporation. A previous contractor, Correctional Physicians Medical Group, provided psychiatric care to inmates from approximately 2014 through 2016.

[3]Of note, the San Diego County Jail System sustained two additional suicides in March and May 2018. Complete records from those deaths were not available for review at the time of the writing of this report.

[4]It is important to note that, with the exception of reviewing the inmate suicides in 2016-2017, the assessment encompassed review of suicide prevention practices *currently* in operation within the San Diego County Jail System as of April 2018, and did not include review of practices prior to that date.

[5]By comparison, the most recent data on jail suicide in county jails throughout the country is approximately 46 per 100,000 inmates, Noonan, M., Rohloff, H. and Ginder, S. (2015), *Mortality in Local Jails and State Prisons, 2000-2013 - Statistical Tables*, Washington, DC: Bureau of Justice Statistics (BJS), U.S. Department of Justice, Office of Justice Programs. As of June 2018, more recent BJS data was unavailable.

**TABLE 1**
**AVERAGE DAILY POPULATION, YEARLY ADMISSIONS, SUICIDES, AND**
**SUICIDE RATE**
**WITHIN THE SAN DIEGO COUNTY JAIL SYSTEM**
**2014 THRU 2018[6]**

| Year | ADP | Yearly Admissions | Suicides | Suicide Rate |
|---|---|---|---|---|
| 2014 | 5,649 | 85,503 | 6 | 106.2 |
| 2015 | 4,986 | 81,313 | 6 | 120.3 |
| 2016 | 5,360 | 80,005 | 5 | 93.2 |
| 2017 | 5,687 | 80,286 | 1 | 17.6 |
| 2018 (May) | 5,621 | 19,884 | 2 | 35.6 |
| 2014-2018 (May) | 27,303 | 346,991 | 20 | 73.2 |

**A Word About Suicide Rates**

There has been a great deal of discussion and controversy regarding the calculation of inmate suicide rates within the San Diego County Jail System. The DRC report, as well as local media coverage of the jail system, utilized the methodology commonly cited by the U.S. Justice Department's Bureau of Justice Statistics (BJS) in its annual mortality review reports (as cited above).[7] As shown in Table 1 above, that methodology uses the average daily population (ADP) of the jail system as the denominator. Based upon the BJS methodology, the DRC report concluded that "San Diego County's inmate suicide rate has been staggeringly high compared with national, statewide, and local data" from 2014 through 2016, and that the jail system was in "crisis." In response, the Office of the County Counsel had previously retained a statistical

---

[6]Data regarding average daily population, yearly admissions, and number of inmates suicides made available by the San Diego County Sheriff's Department.
[7]See Footnote 5.

6

consultant (Colleen Kelly, PhD) to provide an alternative method for calculating the jail suicide rate, who subsequently opined that the ADP "method used to calculate the suicide rate does not yield a meaningful measure and is not appropriate for comparisons across diverse counties……Unfortunately, the ADP suicide rate has several flaws that make it inappropriate for comparing diverse jail systems….The 'at-risk' suicide rate calculation should be used instead of the ADP calculation."[8] According to Dr. Kelly, when the "at risk" methodology is utilized, the inmate suicide rate within the San Diego County Jail System is not statistically different from the average of other large California county jail systems.

This writer does not offer any opinion regarding the preferred methodology for calculating suicide rates (i.e., ADP v. "at-risk"). However, it is ironic that lost in the controversy is the fact that there has been a dramatic decrease in the number of inmate suicides in the San Diego County Jail System during the past few years. As noted in Table 1, there were 17 inmate suicides from 2014 through 2016, arguably a high number that was cited throughout the DRC report. Since that time, however, data from January 2017 through May 2018 indicates only three (3) inmate suicides. Although a small snapshot, this reduction is significant.

Of course, caution should always be exercised when viewing inmate suicide data. Suicide rates (regardless of calculation method) are most meaningful when viewed over a sustained period of time and, although the total number of inmate suicides and the corresponding suicide rate in any jail or prison system can be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured.  The best

---

[8]Kelly, Colleen, "Review and Critique of the Disability Rights California's Report - *Suicides at San Diego County Jail: A System Failing People with Mental Illness*," April 6, 2018.

methodology for determining whether a correctional system has a reasonable suicide prevention program continues to be (1) the on-site assessment of suicide prevention practices within each facility, and (2) a review of each inmate suicide in relation to practices in the facility and determining its degree of preventability.

B.    <u>**QUALIFICATIONS**</u>

This writer is a Project Director of the National Center on Institutions and Alternatives, with an office in Mansfield, Massachusetts.  This writer is nationally recognized as an expert in the field of suicide prevention within jails, prisons and juvenile facilities, and has been appointed as a Federal Court Monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. This writer has also served as a suicide prevention consultant to the U.S. Justice Department's Civil Rights Division (Special Litigation Section) and to the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security (Immigration and Customs Enforcement) in their investigations of conditions of confinement in both adult and juvenile correctional facilities throughout the country. This writer also serves as an expert witness/consultant in inmate suicide litigation cases, as well as serving as a technical assistance consultant/expert by conducting training seminars and assessing inmate and juvenile suicide prevention practices in various state and local jurisdictions throughout the country.

This writer has conducted the only five national studies of jail, prison, and juvenile suicide (*And Darkness Closes In...National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, *Juvenile Suicide in Confinement: A National Survey* in 2004, and *National Study of Jail Suicide: 20 Years Later* in 2010).  The jail and prison suicide studies were conducted through contracts with the National Institute of Corrections (NIC), U.S. Justice Department; whereas the first national study of juvenile suicide in confinement was conducted through a contract with the Office of Juvenile Justice and Delinquency Prevention, U.S. Justice Department.

9

This writer served as editor/project director of the *Jail Suicide/Mental Health Update*, a quarterly newsletter devoted to research, training, prevention, and litigation that was funded by NIC from 1986 thru 2008; and was a consulting editor and editorial board member of *Suicide and Life-Threatening Behavior*, the official scientific journal of the American Association of Suicidology, as well as current editorial board member of *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, the official scientific journal of the International Association of Suicide Prevention.  This writer has authored over 100 publications in the area of suicide prevention within jail, prison and juvenile facilities, including model training curricula on both adult inmate and juvenile suicide prevention.  This writer's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Juvenile Detention/Correctional Facilities and Residential Programs: Instructor's Manual* was released in April 2013; whereas the *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities: Instructor's Manual* was released in March 2016.

As a result of research, technical assistance, and expert witness consultant work in the area of suicide prevention in correctional facilities, this writer has reviewed and/or examined over 3,500 cases of suicide in jail, prison, and juvenile facilities throughout the country during the past 38 years.  This writer was a past recipient of the National Commission on Correctional Health Care's Award of Excellence for outstanding contribution in the field of suicide prevention in correctional facilities.  This writer's work has been cited in the suicide prevention sections of various state and national correctional health care standards, as well as numerous suicide prevention training curricula.

## C.    **FINDINGS AND RECOMMENDATIONS**

Detailed below is this writer's assessment of suicide prevention practices within the San

Diego County Jail System.  It is formatted according to this writer's eight (8) critical components

of a suicide prevention policy: staff training, identification/screening, communication, housing,

levels of supervision/management, intervention, reporting, and follow-up/mortality-morbidity

review.  This protocol was previously developed by this writer and is consistent with national

correctional standards, including those of the American Correctional Association's *Performance-*

*Based Standards for Adult Local Detention Facilities* (2004); Standard J-G-05 of the National

Commission on Correctional Health Care's *Standards for Health Services in Jails* (2014);

"Suicide Prevention and Intervention Standard" of the U.S. Department of Homeland Security's

*Operations Manual ICE Performance-Based National Detention Standards* (2011),[9] California

Board of State and Community Corrections' *Minimum Standards for Local Detention Facilities*

(2017) as outlined in Titles 15 and 24, California Code of Regulations,[10] and "312: Suicide

Prevention" section of the California Institute for Medical Quality's *Health Care Accreditation*

---

[9]American Correctional Association (2004), *Performance-Based Standards for Adult Local Detention Facilities*, 4th
Edition, Lanham, MD: Author; National Commission on Correctional Health Care (2014), *Standards for Health
Services in Jails*, 9th Edition, Chicago, IL: Author; and U.S. Department of Homeland Security (2011), Immigration
and Customs Enforcement, *Operations Manual ICE Performance-Based National Detention Standards*, Washington,
DC: Author.
[10]See *Title 15 Minimum Standards for Local Detention Facilities*, effective April 1, 2017. According to Section
1030: Suicide Prevention Program – "The facility shall have a comprehensive written suicide prevention program
developed by the facility administrator, in conjunction with the health authority and mental health director, to
identify, monitor, and provide treatment to those inmates who present a suicide risk. The program shall include the
following: (a) Suicide prevention training for all staff that have direct contact with inmates. (b) Intake screening for
suicide risk immediately upon intake and prior to housing assignment. (c) Provisions facilitating communication
among arresting/transporting officers, facility staff, medical and mental health personnel in relation to suicide risk.
(d) Housing recommendations for inmates at risk of suicide. (e) Supervision depending on level of suicide risk.
(f) Suicide attempt and suicide intervention policies and procedures. (g) Provisions for reporting suicides and
suicides attempts. (h) Multi-disciplinary administrative review of suicides and attempted suicides as defined by the
facility administrator."

*Standards for Adult Detention Facilities* (2013).[11] Where indicated, recommendations are also provided.

Finally, this writer reviewed various San Diego County Sheriff's Department policies and procedures related to suicide prevention, including:

### Detention Services Bureau (DSB)

- J.5: Inmate Suicide Prevention Practices and Inmate Safety Program, last revised January 26, 2018;
- J.4: Enhanced Observation Housing (EOH), Definition and Use, last revised December 28, 2017;
- J.1: Safety Cells, Definition and Use, last revised October 9, 2017;
- M.4: Suicide Prevention and Focused Response Team, issued March 14, 2018;
- M.25: Psychiatric Security Units (PSU/WPSU), last revised June 27, 2017;

### Medical Services Division (MSD)

- MSD.S.10: Suicide Prevention and Inmate Safety Program, last revised November 30, 2016;
- MSD.S.1: Safety Cells Use, last revised June 30, 2017;
- MSD.P.8: Psychiatric Security Unit (PSU), last revised December 23, 2015;
- MSD.I.3: Intake Receiving/Screening Assessment, last revised March 30, 2017.

The Detention Services Bureau (DSB)'s "J.5: Inmate Suicide Prevention Practices and Inmate Safety Program" and Medical Services Division (MSD)'s "MSD.S.10: Suicide Prevention and Inmate Safety Program" are virtually identical. As such, they will be collectively referred to throughout this report as the "Inmate Safety Program (ISP)" policy.

---

[11]California Institute for Medical Quality (2013), *Health Care Accreditation Standards for Adult Detention Facilities*, San Francisco, CA: Author. Unfortunately, the Institute for Medical Quality's suicide prevention standards is unhelpful and simply state that "Written policy and defined procedures require a suicide prevention program which is developed by the facility administrator, health authority and mental health professional to identify, monitor, and provide treatment to those inmates who present a suicide risk."

12

1)    **Staff Training**

*All* **correctional, medical, and mental health staff should receive eight (8) hours of initial suicide prevention training, followed by two (2) hours of annual training. At a minimum, training should include guiding principles to suicide prevention, avoiding negative attitudes to suicide prevention, inmate suicide research, why correctional environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, identifying suicidal inmates despite the denial of risk, components of the agency's suicide prevention policy, and liability issues associated with inmate suicide.**

The key to any suicide prevention program is properly trained correctional staff, who form the backbone of any correctional system. Very few suicides are actually prevented by mental health, medical or other professional staff. Because inmates attempt suicide in their housing units, often during late afternoon or evening, as well as on weekends, they are generally outside the purview of program staff. Therefore, these incidents must be thwarted by correctional staff who have been trained in suicide prevention and are able to demonstrate an intuitive sense regarding the inmates under their care. Simply stated, correctional officers are often the only staff available 24 hours a day; thus they form the front line of defense in suicide prevention.

Both the American Correctional Association (ACA) and National Commission on Correctional Health Care (NCCHC) standards stress the importance of training as a critical component to any suicide prevention program. ACA Standard 4-ALDF-7B-10 requires that all correctional staff receive both initial and annual training in the "signs of suicide risk" and "suicide precautions;" while Standard 4-ALDF-4C-32 requires that staff be trained in the implementation of the suicide prevention program. As stressed in NCCHC Standard J-G-05  --

"All staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least biennial training are provided, although annual training is highly recommended." Finally, the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* require that all staff receive both pre-service and annual training in the following areas: recognizing verbal and behavioral cues that indicate potential suicide; demographic, cultural, and precipitating factors of suicidal behavior; responding to suicidal and depressed detainees; effective communication between correctional and health care personnel; necessary referral procedures; constant observation and suicide-watch procedures; follow-up monitoring of detainees who have already attempted suicide; and reporting and written documentation procedures."

**FINDINGS:** The suicide prevention training requirements found within Title 15 are vague, simply stating that correctional officers must complete the "Adult Corrections Officer Core Course" (which includes a 4-hour block on suicide prevention) within one year of employment. Although Title 15 requires annual training, the content of such training is unspecified. The San Diego County Sheriff's Department (SDCSD)'s Inmate Safety Program (ISP) policy does not adequately address the requirements for both pre-service and annual suicide prevention training for SDCSD personnel. Due to the vague language contained within Title 15, the ISP policy, and other agency directives, this writer conferred with several medical and mental health officials, as well as Detention In-Service Training Unit (DTU) personnel, responsible for the provision of suicide prevention training within the SDCSD. Various training

curricula were also reviewed. The review found that, although a bit disjointed, the SDCSD offered numerous opportunities for both suicide prevention and mental health training of its staff.

All new deputies are required to attend the SDCSD Detentions/Court Services Academy at Miramar College in San Diego. Since at least 2005, the mental health (including the 4-hour suicide prevention training block required by Title 15) portion of the "Adult Corrections Officer Core Course" has been instructed by a MSD mental health clinician. This pre-service training curriculum, previously referred to as "Psychiatric Behavior in Custody," was given to new deputies between 2005 and 2014. In late 2014, the curriculum was revised as a 99-slide PowerPoint presentation entitled "Mental Health in Custody." The three-part workshop, which was again revised in 2016, included an Overview of Mental Health Disorders, the Inmate Safety Program, and Multi-Disciplinary Group Meeting and Administrative Segregation Housing.

In addition, a 29-slide PowerPoint presentation entitled "Suicide Prevention in Custody" was developed in November 2006. The curriculum, accompanied by a videotape, was provided to an unknown number of SDCSD personnel from 2006-2007 and then from 2013 to the present. In addition, from 2010 through 2014, a 2-hour suicide prevention workshop entitled "Suicide Prevention and Awareness for Inmates: Briefing Training" was offered. According to the DTU, approximately 1,926 deputies received this training. Further, beginning in 2010, a 2-hour suicide prevention training entitled "Inmate Safety Program: Intensified Format Training" has been offered to SDCSD deputies. The training was revised in September 2017 and approximately 651 deputies have been trained since then. Finally, "Psychiatric Emergency Response Team" (PERT)

training has been provided to all deputies regularly assigned to the psychiatric security units and administrative segregation units within the San Diego County Jail System.

With regard to MSD nursing personnel, the "New Employee Orientation" curriculum is completed by all medical staff and includes instruction on the Inmate Safety Program, Safety Cell Use, and Enhanced Observation Housing. Further, an 8-hour classroom training entitled "Addressing Mental Health Issues in Jail" was provided to medical personnel, as well as custody and mental health personnel in late 2016. The 63-slide PowerPoint presentation was developed by a prior MSD mental health clinician. In addition, a 2-hour, 32-slide PowerPoint presentation entitled "Practical Use of Diagnostic Tools to Identify Medical and Psychiatric Conditions" has also been provided to medical personnel. In addition, approximately 83 percent of nursing personnel have completed an e-learning workshop entitled "Mental Health 1." Developed by Elsevier Publishing, topics include aggressive patients, agitation and disruptive behavior, crisis intervention, suicide assessment and precaution.

With regard to MSD mental health personnel, in addition to the "New Employee Orientation" curriculum that is completed by all mental health clinicians and includes instruction on the Inmate Safety Program, Safety Cell Use, and Enhanced Observation Housing, an extended 16-hour classroom presentation of the above referenced "Addressing Mental Health Issues in Jail" training was completed by clinicians in August 2016. In addition, Dialectic Behavioral Therapy (DBT) training was provided to clinicians in December 2016 by an outside consultant. MSD mental health clinicians have not been provided any agency-sponsored suicide prevention training since then. Finally, according to Liberty Healthcare Corporation (LHC) officials, in

addition to a 1-day SDCSD contractor orientation, LHC psychologists receive new employee training by the contractor that includes instruction on suicide prevention.[12]

Finally, according to SDCSD training data, approximately 31 percent of deputies, 73 percent of medical personnel, and no mental health clinicians received annual suicide prevention training during 2017.

In sum, as indicated above, the SDCSD has historically offered an abundance of both mental health and suicide prevention training to its employees. This training has been offered on both a pre-service and annual basis, although provision of some of the annual training has been inconsistent. In addition, although there has been a plethora of mental health training provided, it was difficult to ascertain the percentage of current personnel that had received training to date. The percentage of SDCSD personnel receiving annual suicide prevention training during 2017 was problematic. In response, the MSD and DTU are jointly working to consolidate this writer's 10-hour *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities*[13] into an 8-hour classroom training workshop for the approximate 1,200 SDCSD deputies working within the jail system. Once launched, the training initiative is scheduled to be completed within three years.

**RECOMMENDATIONS**:  Although the SDCSD appears compliant with most Title 15 requirements, a few recommendations are offered to strengthen both the content and

---

[12]The curriculum and/or training materials utilized in any LHC suicide prevention training were not available for review.
[13]See Hayes, L. M. (2016), *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities,*www.ncianet.org/suicide-prevention/publications/training-curriculum-and-program-guide-on-suicide-detection-and-prevention-in-jail-and-prison-facilities.

deliverability of suicide prevention training offered to both custody and health care personnel. *First*, it is strongly recommended that the ISP policy be revised to include a more robust description of the requirements for both pre-service and annual suicide prevention training, to include the duration of each workshop and an overview of the required topics. *Second*, it is strongly recommended that the joint efforts of the Medical Services Division (MSD) and Detention In-Service Training unit (DTU) to consolidate this writer's 10-hour *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities* into an 8-hour classroom training for all current SDCSD deputies be expanded to include all <u>new</u> employees (i.e., medical and mental health personnel) working within the San Diego County Jail System.

*Third*, it is strongly recommended that the MSD and DTU jointly collaborate on the development of a 2-hour annual suicide prevention curriculum based upon this writer's *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities.* At a minimum, the curriculum should include a review of: 1) avoiding obstacles (negative attitudes) to prevention, 2) predisposing risk factors, 3) warning signs and symptoms, 4) identifying suicidal inmates despite the denial of risk, and 5) review of any changes to the ISP policy. The annual training should also include general discussion of any recent suicides and/or serious suicide attempts in the San Diego County Jail System.

*Fourth*, it is strongly recommended that the annual suicide prevention training be required for all <u>all</u> custody, medical, and mental health personnel (including LHC contracted psychologists and psychiatrists). Suicide prevention is all about collaboration, and requiring

custody, medical, and mental health personnel to sit together in a classroom environment is not only symbolically appropriate, but instills the philosophy that all professionals, regardless of credentials, have an equal responsibility for inmate suicide prevention and can learn from one another's backgrounds, insights, and experiences.

**2)      Intake Screening/Assessment**

> **Intake screening for suicide risk must take place immediately upon confinement and prior to housing assignment. This process may be contained within the medical screening form or as a separate form, and must include inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; prior mental health treatment/hospitalization; recent significant loss (job, relationship, death of family member/ close friend, etc.); history of suicidal behavior by family member/close friend; suicide risk during prior confinement; and transporting officer(s) information regarding inmate's suicide risk.  The intake screening process should include procedures for referral to mental health and/or medical personnel. Reasonable efforts should be made to ensure privacy and confidentiality (from both other inmates and non-health care personnel) during the intake screening process. Any inmate assigned to a segregation unit should be screened to ensure that there are no medical and/or mental health contraindications for such placement.**

Intake screening/assessment is also critical to a correctional system's suicide prevention efforts.  An inmate can attempt suicide at any point during incarceration  -- beginning immediately following reception and continuing through a stressful aspect of confinement. Although there is disagreement within the psychiatric and medical communities as to which factors are most predictive of suicide in general, research in the area of jail and prison suicides has identified a number of characteristics that are strongly related to suicide, including: intoxication, emotional state, family history of suicide, recent significant loss, limited prior incarceration, lack of social support system, psychiatric history, and various "stressors of

confinement."[14]   Most importantly, prior research has consistently reported that at least two thirds of all suicide victims communicate their intent some time prior to death, and that any individual with a history of one or more suicide attempts is at a much greater risk for suicide than those who have never made an attempt.[15] In addition, according to the most recent national research on inmate suicide, at least one-third of all inmate suicide victims had prior histories of both mental illness and suicidal behavior.[16] The key to identifying potentially suicidal behavior in inmates is through inquiry during both the intake screening/assessment phase, as well as other high-risk periods of incarceration.

Further, it would not be unusual for an otherwise suicidal inmate to deny suicidal ideation when questioned in a physical environment that lacks both privacy and confidentiality. The booking area of any jail is traditionally both chaotic and noisy; an environment where staff feel pressure to process a high number of arrestees in a short period of time. Two key ingredients for identifying suicidal behavior  - time and privacy - are at a minimum. The ability to carefully assess the potential for suicide by asking the inmate a series of questions, interpreting their response (including gauging the truthfulness of their denial of suicide risk), and observing their behavior is grossly compromised by an impersonal environment that lends itself to something quite the opposite. As a result, the clearly suicidal behavior of many arrestees, as well as circumstances that may lend themselves to potential self-injury, are lost. As such, reasonable

---

[14]Bonner, R. (1992), "Isolation, Seclusion, and Psychological Vulnerability as Risk Factors for Suicide Behind Bars," in R. Maris et. al. (Editors) *Assessment and Prediction of Suicide*, New York, NY: Guilford Press, 398-419.
[15]Clark, D. and S.L. Horton-Deutsch (1992), "Assessment in Absentia: The Value of the Psychological Autopsy Method for Studying Antecedents of Suicide and Predicting Future Suicides," in R. Maris et. al. (Editors) *Assessment and Prediction of Suicide*, New York, NY: Guilford Press, 144-182.
[16]Hayes, L.M. (2012), "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3).

efforts should be made to ensure privacy and confidentiality (from both other inmates and non-health care personnel) during the intake screening process.[17]

Finally, given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, any inmate assigned to such a special housing unit should receive a brief assessment for suicide risk by health care staff upon admission to such placement. For example, both the ACA and NCCHC standards address the issue of assessing inmates assigned to segregation.  According to ACA Standard 4-ALDF-2A-45: "When an inmate is transferred to segregation, health care personnel are informed immediately and provide assessment and review as indicated by the protocol as established by the health authority."  NCCHC Standard J-E-09 states that "Upon notification that an inmate is placed in segregation, a qualified health care professional reviews the inmate's health record to determine whether existing medical, dental, or mental health needs contraindicate the placement or require accommodation."

**FINDINGS:**  Both the ISP policy and MSD.I.3: Intake Receiving/Screening Assessment policy provided generally adequate procedures regarding the intake screening process to identify suicidal inmates. However, because current practices have evolved since issuance of both policies (in 2016 and 2017), they are in need of further revision. For example, the MSD is currently transitioning from a two-part (pre-screening/standard screening) intake screening process to a "combined medical screening" process. For purposes of clarity, this writer will refer only to the combined medical screening form. In addition, the combined form (entitled "Medical

---

[17]See Hayes, L.M. (2013), "Suicide Prevention in Correctional Facilities: Reflections and Next Steps," *International Journal of Law and Psychiatry* 36: 188-194.

Intake Questions"), embedded in the medical section of the Jail Information Management System (JIMS), now includes a 6-question Columbia-Suicide Severity Rating Scale (C-SSRS). During the on-site assessment, this writer observed a variety of practices during the transition of the intake screening process.[18]

As previously noted in Table 1, over 80,000 inmates are admitted into the San Diego County Jail System every year. All newly admitted inmates are processed through the booking and intake areas of three facilities: San Diego Central Jail (SDCJ), Las Colinas Detention and Reentry Facility (LCDRF), and Vista Detention Facility (VDF). Nursing staff are available at these facilities 24 hours a day respond to the booking areas and complete the intake screening process. As explained below, the physical location of the intake screening, as well as the degree of privacy and confidentiality, varied at each facility. The "Medical Intake Questions" form contains a variety of medical, mental health, and suicide risk questions, some of which are repetitive. The following mental health and suicide risk questions are contained in the form:

- You have any psychiatric problems?
- Are you a client of the Regional Center for developmentally disabled?
- Are you feeling suicidal?
- Do you have any current psychiatric/mental health problems?
- Do you have any previous mental health history?
- Do you know your psychiatrist/clinic name?
- Any visual hallucinations?
- Any auditory hallucinations?
- Any suicidal ideation?
- Any homicidal ideation?
- Any prior suicide attempts?
- Are you currently taking any psychiatric medications?

---

[18]Although informed that the C-SSRS was required to be utilized by intake nurses at the three intake facilities, this writer did not observe the form being used.

The following Columbia-Suicide Severity Rating Scale questions are also embedded in the screening form:

- Have you wished you were dead or wished you could go to sleep and not wake up? (Past month)
- Have you had any actual thoughts of killings yourself? (Past month)
- Have you been thinking how you might do this?
- Have you had these thoughts and had some intention of acting on them?
- Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?
- Have you ever done anything, started to do anything, or prepared to do anything to end your life? If yes, was this within the past three months?

Further, the screening form includes the following four questions that are directed to the arresting officer:

- Did the arresting officer witness anything to believe the arrestee may be at risk for a medical condition, intellectual disability, or suicide?
- By your observation, does he arrestee appear to be under the influence of drugs or alcohol?
- Was he arrestee combative at the time of arrest?
- Is there any information that you can provide to us to better care for this arrestee and ensure his/her health and safety?

Affirmative responses to any of the above questions related to current suicide risk are required to result in notification to the facility's "gatekeeper," often the charge nurse.[19] Following consultation between the charge nurse and custody shift supervisor, the inmate is normally placed on suicide precautions (often in a safety cell) and referred to a mental health clinician for further assessment.

---

[19]For reasons that were unclear to this writer, the ISP policy allows for a charge nurse or mental health clinician to be the facility gatekeeper at SDCJ and LCDRF, but only the charge nurse is designated as the gatekeeper at both GBDF and VDF.

23

Finally, pursuant to the ISP policy and in addition to affirmative responses on the medical screening form, the following criteria are deemed high-risk "automatic triggers" and almost invariably result in placement on suicide precautions:

1) High publicity case with possible evasion of arrest or SWAT/SED standoff with serious felony charges, including but not limited to: homicide, rape, or child victim crimes;
2) Severe, life or death sentences;
3) The inmate states he/she is suicidal and or made suicidal statements to sworn staff, medical, family, etc.;
4) Previous suicide attempts (within the past five years); and
5) Staff observation of depressed/emotional turmoil.

This writer spent considerable time observing the intake screening process at all three facilities.[20] At San Diego Central Jail (SDCJ), two nursing booths were located in the booking and intake area. Each booth was enclosed with a window panel that separated the nurse from the inmate. When the inmate entered the booth, they were situated in a chair, handcuffed and chained to a wall eyebolt. Although each booth contained a windowed door, the door remained open during the screening process, with the arresting officer often either straddling the inmate or remaining in the open doorway. Privacy and confidentiality were compromised by this practice, but could easily be remedied by the door simply being closed, the inmate remaining shackled, and the officer providing security from outside the door.[21] During this writer's observation of the screening process, nurses were observed accessing the JIMS to determine whether the newly admitted inmate had received a chest x-ray in the previous six months, as well as checking the "current problem" list in the medical record to determine whether the inmate had a documented prior suicide attempt within the past five years. A list of the four arresting officer questions was

---

[20]Although this writer was unable to observe any newly admitted inmates being screened at LCDRF, considerable time was spent in the booking area with multiple nursing staff detailing current practices.
[21]It should be noted that the shield of privacy and confidentiality extends not only between inmate and inmate, but inmate and non-health care personnel (e.g., custody staff).

taped to the wall of each nursing booth and arresting officers were consistently referred to the list for a response. Nurses were observed to be appropriately completing the "Medical Intake Questions" form in each case. Finally, supplemental medical screening was observed on the 2ⁿᵈ floor of the SDCJ. Similar nursing booths were located in the corridor, with doors remaining open and deputies observed in the doorway.

At <u>Las Colinas Detention and Reentry Facility</u> (LCDRF), this writer was informed that the combined medical screening process was scheduled to begin in the near future. Currently, the two-part (pre-screening/standard screening) intake screening process was completed on opposite sides of a large rectangular-shaped nursing station. During the pre-screening process, privacy and confidentiality were compromised with arresting officers said to be positioned behind each newly admitted inmate. Once the inmate was accepted into custody, the standard screening was conducted on the opposite side of the nursing station. This writer was also informed that a current medical examination room adjacent to the nursing station was being converted into an intake area for the combined medical screening. As explained to this writer, the door to this medical room would remain open during the screening process, with the arresting officer stationed in the doorway. Such a proposed practice would also impact privacy and confidentiality. Finally, this writer was also informed that the four arresting officer questions described above were <u>not</u> asked to arresting officer personnel by LCDRF nurses. The reason for this practice was unclear.

At <u>Vista Detention Facility</u> (VDF), medical screening was conducted in a small, congested open area, with no individual nursing booths. Up to two nurses were assigned to

25

conduct screening at a counter. During the process, numerous law-enforcement officers and inmates were milling around a small area. Prior to being screened, inmates were  instructed to sit on a bench which was located less than 6 feet from the nurses' counter. There is no privacy or confidentiality. This writer was informed that a construction project was forthcoming (with funding secured, but no start-up date) to completely renovate the area and make it more "HIPAA-friendly" as coined by one supervisor. Plans were to construct three nursing stations/cubicles, as well as remove the bench (with arrestees remaining in patrol cars in the sally port area until the initiation of their individual screening).

As observed by this writer, VDF nurses did <u>not</u> ask all of the required "Medical Intake Questions" from the combined screening form embedded into JIMS. Rather, nursing staff had previously created an abbreviated hard copy sheet that listed 23 health care issues. Even with this abbreviated sheet, nurses were observed to be asking only limited questions regarding mental health and suicide risk, i.e., consistently simply asking: "Any psych problems, Feeling suicidal?" Nurses were observed reviewing the JIMS to determine if the inmate had a documented prior suicide attempt. In addition, the four arresting officer questions described above were <u>not</u> asked to arresting officer personnel by VDF nurses. The observed screening process was very problematic.

Further, and as noted above, all three intake facilities (<u>SDCJ</u>, <u>LCDRF</u>, and <u>VDF</u>) utilized charge nurses as gatekeepers for an inmate's placement on suicide precautions. However, despite the fact that mental health clinicians were on-site during normal business hours, consultation was normally only between the charge nurse and custody shift supervisor, with mental health

personnel often excluded from the process until the inmate was already placed on suicide precautions. As witnessed by this writer, the following two examples reflected current practices, albeit inconsistent.

At SDCJ, a nurse was completing the medical screening of an inmate arrested on several sexual assault charges. The inmate denied any current or prior mental health issues, as well as denying any current or prior suicidal behavior. The nurse's review of JIMS did not find any documented prior suicide attempts. However, due to the seriousness of his charges, the protocol required that the inmate be considered "high risk" for suicide, with further medical assessment needed to determine if placement on suicide precautions was necessary, either in a safety cell or the Enhanced Observation Housing (EOH) unit. The inmate was escorted up to the 2nd floor, received further screening by a second nurse and, as explained to this writer by a custody shift supervisor, was presumably going to be placed in a safety cell. According to the second nurse, the inmate reported some anxiety and prior treatment for post-traumatic stress disorder (PTSD), and was going to be referred to a mental health clinician for further assessment. Shortly thereafter, a mental health clinician arrived at the 2nd floor nursing station and completed an assessment of the inmate. As the clinician subsequently informed this writer, the screening found that the inmate was not currently suicidal nor did he have a history of suicidal behavior. To the apparent surprise of the custody shift supervisor, the inmate was not placed in either a safety cell or the EOH unit, rather he was cleared for classification. This writer was subsequently informed by the shift supervisor that what we observed was unusual, and that on-site mental health clinicians were not automatically called down to the nurses' station for further assessment. Rather, inmates were initially placed in a safety cell or the EOH unit and then referred to mental

health. In fact, if the above inmate had arrived at SDCJ when mental health personnel were not on-site, he would have been automatically placed on suicide precautions based solely on the severity of his charges.

In the second case, an inmate arrived at VDF and during the medical screening process, became very demonstrative, claimed to be suicidal and wanted to be "5150'd" to a private hospital. The inmate appeared to be under the influence of an unknown substance, and was arguably manipulative. As observed by this writer, the intake nurse subsequently conversed with both the charge nurse and shift supervisor in separate telephone conversations. As a result, the inmate was placed in a safety cell. Although mental health personnel were on-site, they were <u>not</u> consulted during this process. This writer was informed that a mental health clinician would probably assess the inmate the following morning. When subsequently discussing the observed case with a VDF clinician, this writer was informed that there was a previous practice by which a LHC psychologist would respond to such a situation and complete an assessment prior to any decision to initiate suicide precautions. For reasons that remained unclear, the practice was stopped, mental health clinicians no longer immediately responded to such situations, and inmates were placed on suicide precautions (in either a safety cell or EOH unit) and then referred to mental health.

Finally, this writer was informed that the MSD had recently initiated a practice of requiring any inmate housed in a segregation unit be assessed by a mental health clinician within 24 hours of placement. In addition, mental health personnel conducted weekly rounds in all

segregation units, whereas nursing personnel conducted segregation unit rounds three times a week. These were all very good practices.

In conclusion, although policies provided generally adequate procedures regarding the intake screening process to identify suicidal inmates, and suicide risk inquiry contained within the "Medical Intake Questions" form was consistent with Title 15 requirements, there were various problems observed relating to privacy and confidentiality, inconsistent practices regarding soliciting arresting officer opinions regarding the health of the inmate, automatic triggers for suicide precautions absent actual suicidal ideation, and a charge nurse "gatekeeping" protocol that often excluded consultation with on-site mental health clinicians.

**RECOMMENDATIONS:** Several recommendations are offered to improve the intake screening/assessment process within the San Diego County Jail System. *First*, it is strongly recommended that Detention Services Bureau (DSB) and MSD officials look at options to better ensure reasonable sound privacy in the booking areas of the three intake facilities when multiple nurses are conducting intake screening at the same time. As demonstrated in the SDCJ, <u>if</u> the inmate is secured within the nursing booth <u>and</u> the door is closed with the officer stationed outside, reasonable privacy and confidentiality can occur while ensuring staff safety.

*Second*, it is strongly recommended that the current suicide risk inquiry contained in the "Medical Intake Questions" form embedded in the JIMS be revised to include the following:

- Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?
- Has a family member/close friend ever attempted or committed suicide?

- Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?

*Third*, it is strongly recommended that MSD officials reconsider the utility of the Columbia-Suicide Severity Rating Scale (C-SSRS) during the intake screening process. Although the C-SSRS has become a popular screening form in some jail facilities throughout the country, its effectiveness remains questionable. It is this writer's opinion that the structure of the questions creates awkwardness between the screener and inmate, and more importantly, questions that limit responses to the "past month" are potentially very dangerous (e.g., the suicidal ideation of an inmate that was experienced <u>more</u> than a month ago would not be captured during the screening process). Intake screening questions by nursing staff should be open-ended and not time-sensitive; it is responsibility of a mental health clinician during a subsequent assessment to determine the degree of relevancy of prior suicide risk to current risk. With addition of the three questions offered above, the current intake screening form would be more than adequate without the necessity of the C-SSRS.

*Fourth*, although this writer would defer to MSD officials as to whether to designate either a charge nurse or mental health clinician to be the ISP gatekeeper, it is strongly recommended that, if the charge nurse is a gatekeeper, they should always immediately notify an on-site mental health clinician when an inmate has been identified as potentially suicidal. The clinician, in turn, should respond and conduct the suicide risk assessment and determine the appropriateness of suicide precautions. Unless exigent circumstances exist and/or mental health personnel are not on-site, the determination of placing a potentially suicidal inmate in either a safety cell and/or the EOH unit should be made by the mental health clinician.

*Fifth*, it is strongly recommended that DSB and MSD officials revise the "automatic triggers" criteria contained within the ISP policy to require only criteria No. 3 ("The inmate states he/she is suicidal and or made suicidal statements to sworn staff, medical, family, etc.) to result in placement on suicide precautions. Although the other four criteria could be potential suicide risk factors, they should be considered criteria for a mental health referral, and <u>not</u> necessarily automatic placement on suicide precautions.

*Sixth*, consistent with the SDCSD philosophy that a previous suicide attempt documented in JIMS could be a factor for current suicide risk, an inmate's previous placement on suicide precautions within the San Diego County Jail System is equally important. As such, regardless of the inmate's behavior or answers given during intake screening, a mental health referral should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during an inmate's prior confinement within the San Diego County Jail System.  As such, it is strongly recommended that determination of whether the inmate was "on suicide precautions during prior confinement in a SDCSD facility?" should be independently verified through review of the JIMS by nursing staff.  An "alert" screen on JIMS and protocol should be created according to the following procedures:

- Any inmate placed on suicide precautions should be tagged on the JIMS "alert" screen by mental health staff (e.g., "ISP June 2018");

- Nursing staff conducting intake screening should always review the inmate's "alert" screen to verify whether they were previously confined in a SDCSD facility and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and

- Regardless of the inmate's behavior or answers given during intake screening, further assessment by mental health staff should always be initiated based on documentation reflecting suicidal behavior/ placement on suicide precautions during the inmate's prior SDCSD confinement.

*Seventh*, it is strongly recommended that MSD officials initiate a continuous quality assurance plan to periodically audit the intake screening process to ensure that nursing staff are accurately completing the "Medical Intake Questions" form, and not using abbreviated inquiry, as well as soliciting responses to the four arresting officer questions.

*Eighth*, it is strongly recommended that MSD officials develop a mental health triage and referral protocol. Although there is no standard of care that consistently specifies time frames to respond to mental health referrals, one suggested schedule would be as follows: Emergent - immediate or within 1 hour; Urgent - within 24 hours; and Routine - within 72 hours.[22]   In addition, mental health leadership should develop a mental health triage policy that defines response levels, sets timetables for each level, and defines the acuity of behavior(s) that dictates a specific response level. Of course, any inmate expressing current suicidal ideation and/or current suicidal/self-injurious behavior should result in an Emergent mental health referral.

*Ninth*, given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, it is strongly recommended that medical personnel review the medical section of JIMS to determine whether existing medical and/or mental health needs contraindicate the placement or require accommodation. In addition, a "best practice" would be that any inmate assigned to such a

---

[22]Other acceptable schedules allow for up to 7 days to respond to a Routine mental health referral.

special management housing unit receive a brief assessment for suicide risk by nursing staff upon admission to such placement. The following are recommended questions for the brief assessment:

- Are you currently having thoughts of harming yourself?
- Have you previously tried to harm yourself because of a segregation placement?
- Is the inmate speaking incoherently; expressing bizarre thoughts; unable to sit still or pay attention; or is disoriented to time, place, or person?

Affirmative responses to any of these questions should result in an Emergent mental health referral.

**3)** **Communication**

**Procedures that enhance communication at three levels: 1) between the sending institution/arresting-transporting officer(s) and correctional staff; 2) between and among staff (including medical and mental health personnel); and 3) between staff and the suicidal inmate.**

Certain signs exhibited by the inmate can often foretell a possible suicide and, if detected and communicated to others, can prevent such an incident. There are essentially three levels of communication in preventing inmate suicides: 1) between the sending institution/arresting-transporting officer and correctional staff; 2) between and among staff (including mental health and medical personnel); and 3) between staff and the suicidal inmate. Further, because inmates can become suicidal at any point in their incarceration, correctional staff must maintain awareness, share information and make appropriate referrals to mental health and medical staff.

**FINDINGS:** Effective communication between correctional, medical, and mental health staff is not an issue that can be easily written as a policy directive, and is often dealt with more

effectively through examples of multidisciplinary problem-solving. Although on-site for only five days, with one notable exception, this writer sensed that correctional, medical, and mental health personnel had a good working relationship.[23] There were numerous examples of effective communication within the San Diego County Jail System. For example, as previously detailed in this report, the intake nurse is required to ask several questions to the arresting officer regarding any observed health care needs of the newly arrived inmate. In addition, there were multi-disciplinary group (MDG) meetings held at each facility twice a month. The purpose of the MDG meetings is to identify inmates who present various management problems within the facility, and can include inmates housed in segregation, exhibiting serious mental illness, and/or suicidal behavior. In addition, each facility housing a Psychiatric Security Unit (PSU) conducts regular multi-disciplinary treatment team meetings. This writer observed such a meeting in the PSU at LCDRF and found it to be comprehensive and informative. Further, a multi-disciplinary Patient Care Coordination meeting occurs on a monthly basis at each facility. The MSD holds Quality Improvement Committee meetings approximately twice a year at headquarters that is attended by medical and mental health leadership, and includes representation from LHC. This writer's review of meeting minutes from 2016 through 2018, including the most recent meeting on February 21, 2018, found that the meetings routinely discussed the issue of suicide prevention. Finally, as will be discussed later in this report, the SDCSD recently initiated a Suicide Prevention and Focus Response Team (pursuant to Policy M.4: Suicide Prevention and Focused Response Team, issued March 14, 2018). The multi-disciplinary team includes representation from the DSB, MSD, DTU, and LHC, as well as other stakeholders. The first meeting occurred on May 1, 2018.

---

[23]The notable exception was this writer's finding of an adversarial relationship between MSD mental health clinicians and LHC psychologists in a few facilities. These findings were subsequently shared with MSD officials for expedited resolution.

Finally, the JIMS database contains pertinent records that better ensures communication between deputies and health care personnel, as well as between medical and mental health personnel (i.e., the medical chart). These were all excellent practices.

**RECOMMENDATION**: Only one recommendation offered. It is strongly recommended that the MSD establish a weekly mental health team meeting at each facility that includes MSD mental health clinicians and LHC psychologists and psychiatrists. The primary purpose of the weekly meeting is to identify and manage the treatment needs of suicidal and/or seriously mentally ill patients.

    4)    **<u>Housing</u>**

> **Isolation should be avoided. Whenever possible, house in general population, mental health unit, or medical infirmary, located in close proximity to staff. Inmates should be housed in suicide-resistant, protrusion-free cells. Removal of an inmate's clothing (excluding belts and shoelaces), as well as use of physical restraints (e.g. restraint chairs/boards, straitjackets, leather straps, etc.) and cancellation of routine privileges (showers, visits, telephone calls, recreation, etc.), should be avoided whenever possible, and only utilized as a last resort for periods in which the inmate is physically engaging in self-destructive behavior.**

In determining the most appropriate location to house a suicidal inmate, there is often the tendency for correctional officials in general to physically isolate the individual. This response may be more convenient for staff, but it is detrimental to the inmate. The use of isolation not only escalates the inmate's sense of alienation, but also further serves to remove the individual from proper staff supervision. National correctional standards stress that, to every extent

possible, suicidal inmates should be housed in the general population, mental health unit, or medical infirmary, located in close proximity to staff.

Of course, housing a suicidal inmate in a general population unit when their security level prohibits such assignment raises a difficult issue.  The result, of course, will be the assignment of the suicidal inmate to a housing unit commensurate with their security level.  Within a correctional system, this assignment might be a "special housing" unit, e.g., restrictive housing, disciplinary confinement, administrative segregation, etc. Yet, housing assignments should not be based on decisions that heighten depersonalizing aspects of incarceration, rather they should be based on the ability to maximize staff interaction with inmates.  With that said, *the most important consideration is that suicidal inmates must be housed in suicide-resistant, protrusion-free cells*.  Further, cancellation of routine privileges (showers, visits, telephone calls, recreation, etc.), removal of clothing (excluding belts and shoelaces), as well as the use of physical restraints (e.g., restraint chairs/boards, straitjackets, leather straps, etc.) should be avoided whenever possible, and only utilized as a last resort for periods in which the inmate is physically engaging in self-destructive behavior.  Finally, unless exigent circumstances exist, court hearings should not be postponed for inmates on suicide precautions.

**FINDINGS:** The SDCSD has various policies and procedures that address the housing of suicidal inmates: J.5: Inmate Suicide Prevention Practices and Inmate Safety Program (last revised January 26, 2018); J.4: Enhanced Observation Housing (EOH), Definition and Use (last revised December 28, 2017); J.1: Safety Cells, Definition and Use (last revised October 9, 2017); M.25: Psychiatric Security Units (last revised June 27, 2017); MSD.S.10: Suicide

Prevention and Inmate Safety Program (last revised November 30, 2016); MSD.S.1: Safety Cells Use (last revised June 30, 2017); and MSD.P.8: Psychiatric Security Unit (last revised December 23, 2015). These policies allow for the placement of suicidal inmates in Safety Cells, Enhanced Observation Housing (EOH), Medical Observation Beds (MOB), and Psychiatric Security Units (PSU).

The following is a list of housing options for suicidal inmates in the four inspected jail facilities, including the degree to which this writer found each to be suicide-resistant (i.e., did not contain obvious anchoring points from which an inmate could utilize in a suicide attempt by hanging):

### SDCJ

**Safety Cells**: There were 6 safety cells located at the SDCJ; 4 on the 2nd floor and 2 on the 3rd floor. As the cells were dry (i.e., not containing a sink or toilet), and did not contain bunks, they were suicide-resistant. Each cell had closed circuit television (CCTV) monitoring.

**EOH Unit**: Located on the 6th floor, with the exception of wall ventilation grills being approximately ¼ inch in diameter (in excess of the industry standard 3/16 of an inch), each cell had tall ceilings, and were otherwise suicide-resistant. Each cell had CCTV monitoring. Inspection of several cells found that they were quite dirty and unsanitary, with feces found on the walls in close proximity to the CCTV monitor.

**PSU Observation Cells**: 4 wet cells (containing a sink or toilet) were located adjacent to the 30-bed PSU and could be utilized for PSU patients who became suicidal. Each cell had a raised platform with a mattress for sleeping and CCTV monitoring. Because all 4 cells were occupied at the time of the inspection, cell interiors could not be observed to determine if they were suicide-resistant.

**MOB Cells:** Located in the 3rd floor Medical Unit, Cells 6 and 11 could be utilized for suicide precautions for EOH and PSU patients. Although the cells had CCTV monitoring, they were not suicide-resistant because there were various protrusions conducive to suicide by hanging.

## LCDRF

**Safety Cells**: There were 5 safety cells located at the LCDRF; 3 in Intake and 2 in the Infirmary. As the cells were dry (i.e., not containing a sink or toilet), and did not contain bunks, they were suicide-resistant. Each cell had CCTV monitoring.

**EOH Unit**: A 5-bed EOH dorm was located across from the nurses' station in the Infirmary. Although not completely suicide-resistant because of individual bunks, this potential hazard was offset by the dormitory environment and good visibility from the nurses' station. There were also two "high-level" wet isolation cells near the nurses' station that could be utilized for EOH patients whose classification status prohibited dormitory housing.

**PSU Observation Cells**: Two wet cells (No. 23 and No. 26) were located adjacent to the 22-room PSU (with a combination of single and double-occupancy) and could be utilized for PSU patients who became suicidal. Each cell had molded hard plastic beds, a tall ceiling, CCTV monitoring, and was suicide-resistant.

## VDF

**Safety Cells**: There were 6 safety cells located at the VDF; 4 in Intake (with one reserved for female inmates) and 2 in the Medical Unit. As the cells were dry (i.e., not containing a sink or toilet), and did not contain bunks, they were suicide-resistant. Each cell had CCTV monitoring.

**EOH Unit**: An 8-bed EOH dorm was located on the 2nd floor. Although not completely suicide-resistant because of individual bunks, this potential hazard was partially offset by the dormitory environment.

**MOB Cells**: Located in the Medical Unit, there were 5 MOB cells that could be utilized for suicide precautions for EOH and PSU patients. Although the cells had CCTV monitoring, they were not suicide-resistant because they contained various protrusions conducive to suicide by hanging (e.g., open metal bunks, ceiling ventilation rates with holes in excess of 3/16 inch in diameter, sprinkler head covers, etc.).

## GBDF

**Safety Cells**: There were 4 safety cells located at the GBDF; 2 in Intake and 2 in the Medical Unit "isolation corridor." As the cells were dry (i.e., not containing a sink or toilet), and did not contain bunks, they were suicide-resistant. Inspection of the 2 safety cells (No. 117 and No.118) in the Medical Unit isolation corridor found that they were quite dirty and unsanitary. Each cell had CCTV monitoring.

**EOH Unit**: A 12-bed EOH dorm (Cell No. 115) was located on the 1st floor. Although not completely suicide-resistant because of individual bunks, this potential hazard was partially offset by the dormitory environment. There were also 2 "high-level" wet isolation cells (No. 108 and No. 112) in the Medical Unit isolation corridor that could be utilized for EOH patients whose classification status prohibited dormitory housing. The cells were not suicide-resistant because they contained various protrusions conducive to suicide by hanging (e.g., bunk holes, ceiling ventilation grates with holes in excess of 3/16 inch in diameter, conduit piping in the ceiling, gap between the wall and the bunks, etc.).

## Use of Safety Cells

It would be this writer's opinion that utilizing a safety cell to house a suicidal inmate beyond a few hours is very problematic. Because they are dry (i.e., lacking both a sink and toilet), safety cells were not designed for long-term use. Because there is no timeclock on the length of an inmate's suicidal ideation, a correctional system cannot make the presumption that a suicidal inmate will only remain suicidal for a specific period of time (e.g., 4 hours, 12 hours, 24 hours, 48 hours etc.). Although Title 15, as well as SDCSD's Safety Cell policy requires that "In no case shall the safety cell be used for punishment or as a substitute for treatment," when current practices reflect inmates housed in safety cells from 12 to 72 hours (as observed by this writer in the four inspected facilities), stripped of their clothing and issued only a safety smock/blanket, forced to defecate in a floor grate, and not permitted to shower, it is hard to imagine how any individual would not feel that their expressed suicidal ideation was being responded to in a punitive, non-therapeutic manner.

Of note, although Title 15 allows for the retention of clothing in a safety cell (specifically stating that "Inmates shall be allowed to retain sufficient clothing, or be provided with a suitably designed 'safety garment'"), SDCSD policy mandates at all inmates placed in safety cells are

required to stripped naked and issued only a safety smock and safety blanket. It would be this writer's opinion that, as long as the cell is suicide-resistant, suicidal inmates assigned to a safety cell should be permitted to retain their clothing unless a clinical decision on an individual case suggests otherwise.

## Use of Enhanced Observation Housing (EOH)

Enhanced Observation Housing (EOH) was initiated in February 2015 as part of the Inmate Safety Program. As detailed above, EOH can occur in single cells, multiple occupancy cells or dormitory, or in medical observation beds. With one exception, inmates placed in EOH are stripped of all clothing and issued only a safety smock and safety blanket.[24] Although permitted an initial telephone call and shower prior to cell placement, they are otherwise locked down in their cell 24 hours a day. As such, out-of-cell activities such as dayroom, recreation yard, and family visits are prohibited. Group treatment is not available and individual assessments by mental health clinicians are routinely conducted cell-side, thus compromising reasonable privacy and confidentiality. In addition, court hearings are often canceled for inmates considered to be at "high risk" (which as detailed in the following section is not defined) for suicide. Although data regarding length of stay in EOH was not available, this writer was informed that most inmates generally stay for approximately 48 hours.

## Conclusion

In many ways, the conditions for suicidal inmates placed in safety cells and EOH cells (excluding dormitory housing) were harsher than for those on segregation status, and it would be

---

[24]The exception would be the PSU observation cells located at LCDRF in which inmates on suicide precautions could be clothed in either regular uniforms or safety smocks.

this writer's opinion that current management of inmates placed on suicide precautions under these conditions within the San Diego County Jail System was generally overly restrictive and seemingly punitive. Confining a suicidal inmate to their cell 24 hours a day only enhances isolation and is anti-therapeutic.  Under these conditions, it is also difficult, if not impossible, to accurately gauge the source of an inmate's suicidal ideation.  Take, for example, the scenario of a clinician interviewing an inmate on suicide precautions.  The inmate has been in the cell for a day or two, clothed only in a safety smock.  The clinician approaches the inmate cell-side, within easy hearing distance from both other inmates and non-healthcare professionals, and asks:  "Are you suicidal?"  Given the circumstances he or she finds themselves in, the likelihood of an inmate answering affirmatively to that question, the result of which will be their continued placement under these conditions, is highly questionable. In addition, an additional reason why a suicidal inmate would deny that they were suicidal while placed in either a safety cell or EOH cell is the possibility of their court hearing being canceled due to their status.  As such, it is certainly not surprising that the length of stay under these conditions is generally 48 hours.

Recent research suggests that suicidal inmates are often reluctant to discuss their suicidal thoughts because of the likelihood of being exposed to the harsh conditions of suicide precautions, with almost 75 percent of inmates reporting that they did <u>not</u> want to be transferred to an observation cell.  According to the authors:

> "Possible reasons inmates dislike observation cells are numerous. For GP patients they can suffer taunting from other inmates with the identification of being in a mental health crisis after they return from the OB (observation). Further, an inmate-patient is removed from his more familiar surroundings of a single cell with his books, writing material, and own clothes, and his normal routine of recreation and work assignment. In the OB he often can no longer wear his clothes, and books and recreation are limited. In an OB cell a patient often is dressed in a special gown and the room may only contain a special mattress.

Privacy is limited, since often all four sides of the OB are available for observation whereas in his own cell only one side is open for observation. Finally, admission in an OB can create anxiety and fear for the patient as it may be an unknown environment, and because the OB is the place the psychiatrists decide if patient is to be involuntarily transferred to the distant inpatient unit."[25]

This writer was informed by various SDCSD officials and staff that the conditions of suicide precautions were not intentionally punitive, but driven by concern for the safety of the inmate. The SDCSD's commitment to safety is not being challenged here.  Safety of the inmate is, of course, of utmost concern when developing a suicide prevention policy.  But the number and types of restrictions (e.g., exclusive reliance on safety smocks, denying all out-of-cell, visitation and telephone privileges, court hearings, etc.) imposed in the name of safety must be reasonable and commensurate with the inmate's level of suicide risk.

Officials might also have argued (although they did not to this writer) that the rationale for these restrictions was that suicidal inmates were unpredictable and bad news received during a family visit, telephone call, or court hearing might trigger suicidal ideation and result in an increased risk for suicide.  This rationale, however, ignores the obvious  --  what better opportunity was there to observe an inmate's reaction to potentially negative news then when they were on suicide precautions, as well as the fact that interaction with the outside world can be therapeutic and reduce isolation  --  a leading cause of suicidal behavior. Staff might also have argued (although they did not to this writer) that most inmates who were mentally ill and on suicide precautions were so debilitated by their illness that "they did not care" how they were treated (i.e., the withholding of basic privileges).  Of course, this assumption was not only

[25]See Way, B., Kaufman, A., Knoll, J., and Chlebowski, S. (2013), "Suicidal Ideation Among Inmate-Patients in State Prison: Prevalence, Reluctance to Report, and Treatment Preferences," *Behavioral Sciences and the Law*, 30: 230-238.

42

unsupported but ignored the real possibility that these measures were contributing to an inmate's debilitating mental illness.

Further, some might also argue that these highly restrictive measures were effective in managing those inmates suspected as being manipulative or malingering. As should be discussed during suicide prevention training workshops, although distinguishable, manipulative behavior and suicidal behavior were not mutually exclusive. Both types of behavior could occur (or overlap) in the same individual and cause serious injury and death. Several studies of self-harm and suicide in the correctional environment have found "substantial co-existence of manipulative motive with both suicidal intent and potentially high lethality of self-harming behavior."[26] As one observer has stated, "There are no reliable bases upon which we can differentiate 'manipulative' suicide attempts posing no threat to the inmate's life from those 'true, non-manipulative' attempts which may end in death. The term 'manipulative' is simply useless in understanding, and destructive in attempting to manage, the suicidal behavior of inmates (or of anybody else).[27] Self-harm is often a complex, multifaceted behavior, rather than simply manipulative behavior motivated by secondary gain. At a minimum, any inmate who would go to the extreme of threatening suicide or engaging in self-harming behavior is suffering from at least an emotional imbalance that requires special attention. They may also be seriously mentally ill. Simply stated, inmates labeled as manipulative still commit suicide.

---

[26]Dear G, Thomson D, Hills A. (2000), "Self-Harm in Prison: Manipulators Can Also Be Suicide Attempters," *Criminal Justice and Behavior*, 27: 160-175.
[27]Haycock J. (1992), "Listening to 'Attention Seekers:' The Clinical Management of People Threatening Suicide," *Jail Suicide Update*, 4 (4): 8-11.

**RECOMMENDATIONS:** The following recommendations are offered to improve the housing and management of inmates on suicide precautions within the San Diego County Jail System. *First*, as this writer inspected a vast array of differing physical environments for the housing of suicidal inmates in the four jail facilities (i.e., safety cells, EOH single cells and dormitories, MOB, and PSU observation cells, etc.), it is strongly recommended that DSB officials conduct a comprehensive physical plant review of all jail cells utilized for the housing of suicidal inmates to ensure that they are reasonably suicide-resistant. This writer's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities," included as Appendix A of this report, can be utilized as a guideline for such an inspection.

*Second*, due to the limited positive attributes of safety cell use, it is strongly recommended that, if utilized, the maximum length of stay in a safety cell be limited to no more than six (6) hours.[28] In addition, use of a safety cell should not be the first option available, rather it should only be utilized in exigent circumstances in which the inmate is out of control and at immediate, continuing risk to self and others. Current SDCSD policies should be appropriately revised.

*Third*, it is strongly recommended that MSB officials instruct their clinical staff on the appropriate use of safety smocks, i.e., they should not be utilized as a default, and not to be used as a tool in a behavior management plan (i.e., to punish and/or attempt to change perceived manipulative behavior). Rather, safety smocks should only be utilized when a clinician believes that the inmate is at high risk for suicide by hanging. Should an inmate be placed in a safety

---

[28]Such a limit is consistent with this writer's consultation with a comparably-sized California county jail system, as well as a recommendation cited in the recent DRC report.

smock, the goal should be to return full clothing to the inmate prior to their discharge from suicide precautions. Finally, custody personnel should never place an inmate in a safety smock unless it had been previously approved by medical and/or mental health personnel. Current SDCSD policies should be appropriately revised.

*Fourth*, it is strongly recommended that possessions and privileges provided to inmates on suicide precautions should be individualized and commensurate with their level of risk. As such, current SDCSD policies should be appropriately revised, as follows:

- All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk *as determined on a case-by-case basis by mental health clinicians and documented in JIMS*;

- If a mental health clinician determines that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock and safety blanket;

- A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended (i.e., attempting to tamper with/destroy, utilize to obstruct visibility into the cell, etc.);

- All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction;

- All inmates on suicide precautions shall be allowed to attend court hearings unless exigent circumstances exist in which the inmate is out of control and at immediate, continuing risk to self and others, and

- Inmates on suicide precautions shall not automatically be locked down. They should be allowed dayroom and/or out-of-cell access commensurate with their security level and clinical judgment of mental health clinicians.

*Fifth*, although SDCSD Policy J.4: Enhanced Observation Housing (EOH), Definition and Use requires that "EOH units shall be clean and disinfected using facility approved disinfectants or bleach solution after every use or as needed," this writer's inspection of cells in several facilities found them to be quite dirty and unsanitary. As such, it is strongly recommended that DSB officials reinforce the above directive and that shift supervisors at each facility ensure that cells utilized to house suicidal inmates are reasonably clean and sanitary.

5)     **Levels of Supervision/Management**

**Two levels of supervision are generally recommended for suicidal inmates -- *close observation* and *constant observation*. *Close Observation* is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a plan) and/or has a recent prior history of self-destructive behavior. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10-15 minutes. *Constant Observation* is reserved for the inmate who is actively suicidal, either by threatening (with a plan) or engaging in self-injury. This inmate should be observed by a staff member on a continuous, uninterrupted basis. Other supervision aids (e.g., closed circuit television, inmate companions/watchers, etc.) can be utilized as a supplement to, but never as a substitute for, these observation levels. Inmates on suicide precautions should be reassessed on a daily basis. Reasonable efforts should be made, particularly when considering the discharge of an inmate from suicide precautions, to avoid a cell-side encounters; rather, such assessments should be made in a private and confidential setting.**

Experience has shown that prompt, effective emergency medical service can save lives. Research indicates that the overwhelming majority of suicide attempts in custody is by

hanging.[29]  Medical experts warn that brain damage from asphyxiation can occur within four minutes, with death often resulting within five to six minutes.  In inmate suicide attempts, the promptness of the response is often driven by the level of supervision afforded the inmate.  Both the ACA and NCCHC standards address *levels of supervision*, although the degree of specificity varies.   ACA Standard 4-ALDF-2A-52 vaguely requires that "suicidal inmates are under continuous observation," while NCCHC Standard J-G-05 requires physical observation ranging from "constant supervision" to "every 15 minutes or more frequently if necessary."  According to the Suicide Prevention and Intervention Standard from the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards*, "Suicidal detainees will be monitored by the assigned security officers who maintain constant one-on-one visual observation, 24 hours a day, until the detainee is released from suicide watch. The assigned security officer makes notations every 15 minutes on the behavioral observation checklist."

In addition, the component of "Levels of Supervision" encompasses the overall management of the inmate on suicide precautions and includes the appropriate level of observation, timely and comprehensive suicide risk assessments that include reasonable efforts to provide private and confidential settings, downgrading the level of observation following a period of stability, and providing periodic follow-up assessments following discharge from suicide precautions based upon an individualized treatment plan.

**FINDINGS:** The SDCSD's various suicide prevention policies provide limited guidance regarding the observation of suicidal inmates, simply stating that custody personnel are required

---

[29]Hayes, L.M. (2010), "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3).

to provide direct visual observation of suicidal inmates "at least twice in every thirty (30) minute period" (J.1: Safety Cells, Definition and Use) and "inmates in EOH shall be closely monitored and directly observed by sworn staff at least once every 15-minute period" (J.4: Enhanced Observation Housing (EOH), Definition and Use). There is <u>no</u> option in any SDCSD policy for constant and continuous observation of inmates at the highest risk for suicide. Of note, nursing personnel are required to make rounds every four (4) hours of inmates housed in either a safety cell or EOH.

In addition, although there is language within various SDCSD policies that use terminology of "high" and "low" risk for suicide, these two risk levels are <u>not</u> adequately defined. For example, as previously discussed in this report, there are five (5) criteria defined in the ISP policy as deemed "high suicide risk factors" (i.e., "automatic triggers") that almost invariably result in placement on suicide precautions:

1) High publicity case with possible evasion of arrest or SWAT/SED standoff with serious felony charges, including but not limited to: homicide, rape, or child victim crimes;
2) Severe, life or death sentences;
3) The inmate states he/she is suicidal and or made suicidal statements to sworn staff, medical, family, etc.;
4) Previous suicide attempts (within the past five years); and
5) Staff observation of depressed/emotional turmoil.

It would be this writer's opinion that, although the above five criteria are certainly possible risk factors for suicide, with the exception of No. 3 ("The inmate states he/she is suicidal and or made suicidal statements to sworn staff, medical, family, etc."), there is no research that supports these criteria as exemplifying "high" risk factors for suicide necessitating automatic placement on suicide questions.

Further, as previously discussed in this report, the facility gatekeeper (either the charge nurse or a mental health clinician), in consultation with the watch commander, determines whether the suicidal inmate will be placed in a safety cell or EOH. Following placement on suicide precautions, current ISP policies (and practices observed by this writer) often require completion of at least two assessments before an inmate can be discharged from suicide precautions. (These assessments are often provided cell-side despite the fact that private interview rooms might be available.)[30] In practice, the first assessment is often completed by a MSD mental health clinician, whereas the second assessment is completed by a LHC psychologist. There are also various other procedures (which this writer will not summarize) regarding the completion of these two assessments and their relationship to movement between a safety cell and EOH placement, and for assessing "high" and "low" risk suicidal inmates.

In an effort to clarify a seemingly confusing and cumbersome procedure for the assessment of suicidal inmates, the MSD recently developed a document entitled "ISP Clarifications, March 29, 2018" that apparently supplements SDCSD Policy MSD.S.10: Suicide Prevention and Inmate Safety Program, last revised November 30, 2016. This supplemental document states the following:

1) 24-hour limit on safety cell before psychiatrist med/PSU admission eval.
2) 72-hour limit on ISP (EOH, or EOH and safety cell combined) before psychiatric med/PSU admission eval.
3) Two consecutive low risk assessments by two different providers are needed for clearance from ISP. If only one provider is available,

---

[30] At VDF, for example, this writer observed six (6) professional interview rooms/booths located on both the 1st and 2nd floors of the facility. Despite the fact that most of these rooms remained unoccupied throughout the day of this writer's on-site assessment, they apparently remained unavailable for use by mental health clinicians.

clearance by that provider (after consecutive low risk assessments) can be done with documentation of phone consult with on-call psychiatrist.

4) Maximum of 6 hours between safety cell assessments when providers are on-site. All safety cell inmates must be assessed no more than 6 hours apart when providers are on-site. Minimum time between safety cell assessments 4 hours, but no more than 6 hours apart when providers are on-site.

5) Safety cell for actively self-harming and/or danger to others only.

6) EOH inmates must be seen daily (already in prior P an P).

7) Assessment placement does NOT count as first assessment. First assessment is the one that occurs AFTER I/P is placed in ISP.

It would be this writer's opinion that the criteria contained within the above "ISP Clarifications, March 29, 2018" document further confuses an already cumbersome process. In addition, conducting assessments within 6 hours of each other is unhelpful because it is unrealistic to expect a suicidal inmate's behavior to substantially change during such a short time period (unless, of course, they are simply denying suicidal ideation in order to be discharged from a seemingly punitive circumstance). This writer also found that, contrary to the above directive, SDCSD Policy MSD.S.10: Suicide Prevention and Inmate Safety Program allowed for subsequent suicide risk assessments of "high risk" inmates assigned to the EOH to be completed after 48 hours of the initial assessment. This practice was confirmed by staff interviews. The rationale for such a policy and practice was unclear, and contrary to the standard of care that requires daily assessments.

Further, the standard of care requires that documentation of a comprehensive assessment of suicide risk includes sufficient description of the current behavior and justification for either placement on, or discharge from, suicide precautions. For example, the assessment should include a brief mental status examination (MSE), listing of chronic and acute risk factors (including prior history of suicidal behavior), listing of any protective factors, level of suicide

risk (e.g., low, medium, or high), and a treatment plan.[31]   According to national correctional standards, the "treatment plan" for an inmate discharged from suicide precautions should "describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur" (see NCCHC, 2014).

Within the San Diego County Jail System, this writer's review of several medical charts found that there were varying and slightly different suicide risk assessments utilized by MSD mental health clinicians and  LHC psychologists. For example, in reviewing an inmate chart at VDF, one version of an LMHC ISP Risk Assessment Form had the following domains:

- I/P presentation and interaction
- recent substance abuse/withdrawal symptoms
- court date, legal charges and I/P perception of charges if relevant
- self-harm/DTO inquiry
- future orientation
- I/P perception of stability of family/social support
- distress tolerance/coping skills
- risk factors
- protective factors
- current risk designation
- follow-up need

A subsequently completed Psychologist EOH Evaluation for the same patient a short time later had the following slightly different domains:

- history of present illness
- mental health history
- substance abuse history
- support
- current mental status
- diagnostic

---

[31]See American Psychiatric Association (2003), "Practice Guideline for the Assessment and Treatment of Patients with Suicidal Behaviors," *American Journal of Psychiatry*, (160) 11: 1-60 (Supplement).

- current risk
- risk factors
- protective factors
- plan

At GBDF, the LMHC ISP Risk Assessment Form had slightly different domains:

- I/P presentation and interaction:
- recent substance abuse
- self-harm/DTO inquiry
- court date/legal issues
- risk factors
- coping skills
- family/social support
- protective factors
- future orientation
- risk designation

A subsequently completed Psychologist ISP Evaluation for the same patient the next day had the following domains:

- Identifying data
- review of systems/relevant HX
- chief complaint/reason for placement
- mental status
- prior suicide attempts and/or SIB
- current medications
- medical history
- psychiatric history
- substance abuse history
- family psychiatric history
- legal history
- social history
- risk assessment (risk factors and protective factors)
- provisional diagnostic impression
- plan/recommendations

Of note, the above Psychologist ISP Evaluation template completed at GBDF was slightly different and more comprehensive than the Psychologist EOH Evaluation template completed at VDF.

Further, the ISP policy requires that all inmates released from suicide precautions receive follow-up assessments by a mental health clinician. In practice, follow-up is provided by LHC psychologist. An "ISP Follow-Up Protocol" was created as a supplement to Policy MSD.S.10: Suicide Prevention and Inmate Safety Program, and contains a schedule for follow-up of 24 hours, 3-7 days, and 7-14 days that are based upon various risk factors. Several mental health clinicians and LHC psychologists confided to this writer that the follow-up schedule was confusing and not always consistently performed. In addition, a few psychologists stated that they did not utilize the follow-up schedule, rather they utilized their clinical judgment to determine the schedule, if any, for follow-up that would be provided on a case-by-case basis. This writer would agree that the ISP Follow-Up Protocol is confusing and unnecessarily cumbersome. It is also problematic that clinicians may be creating their own follow-up schedule contrary to the ISP policy.

As previously stated, this writer reviewed the charts of several inmates who were placed on, and subsequently discharged from, suicide precautions. Without critiquing the clinical judgment utilized by any mental health clinician, this writer found that, with a few exceptions, the reviewed ISP assessments (even with their varying templates) provided reasonably adequate documentation of justification for placement on, and discharge from suicide precautions.

One of the exceptions was the lack of treatment planning found in the reviewed medical charts. For example, in one case, the plan contained at the end of the Psychologist ISP Evaluation stated the following: "Patient does not present to be a danger to self/others, or gravely

disabled. Patient vouching for his safety. Patient states he will inform staff if suicidal. Patient agrees with plan." In another case, the plan contained at the end of the Psychologist EOH Evaluation simply stated: "Clear from EOH to classification, follow-up within 3 days." Contrary to NCCHC standards, these were certainly <u>not</u> examples of adequate treatment plans that described signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.

In addition, it was noteworthy that review of medical chart documentation from both mental health and nursing personnel found occasional use of the term "contracted for safety" or "vouching for his safety." There are several problems associated with contracting for safety. First, most correctional systems do not have any written policies and procedures authorizing its use. In fact, the issue is not even addressed in any national correctional standards. Most systems do not utilize "safety contracts" because they have been found to be ineffective in the management of suicidal individuals. While there may be some positive therapeutic aspects to safety contracts, most experts agree that once a patient becomes suicidal, their written or verbal assurances are no longer sufficient to counter suicidal impulses.

In addition, most legal experts opine that a safety contract is simply a self-serving sheet of paper that does not provide an agency or clinician with any legal protection. As succinctly stated by several clinicians:

> "The contract for safety is an aspect of suicide risk management that has been given too much weight over the past several decades. What appears to have been created primarily as an assessment tool has become a sort of checkbox, detracting from the clinician's own judgment and formulation of risk. It has been taken out

of its original context and is now used in virtually any setting, with any type of
patient population despite the lack of clinical evidence to prove it is useful and an
abundance of literature warning that it is not."[32]

Finally, inmates housed in segregation throughout the San Diego County Jail System
were required to be seen by custody personnel at 60-minute intervals, weekly by mental health
conditions, and three times a week during nursing rounds. With the exception of 60-minute
custody rounds, these were very good practices.

**RECOMMENDATIONS:**  This writer would offer several recommendations to both
strengthen and simplify policies and procedures regarding the observation and management of
inmates identified as suicidal and/or exhibiting self-injurious behavior within the San Diego
County Jail System.  *First*, it is strongly recommended that all DSB and MSD suicide prevention
policies be revised to include two levels of observation that specify descriptions of behavior
warranting each level of observation. A proposed revision is offered as follows:

> **Close Observation** is reserved for the inmate who is not actively suicidal, but
> expresses suicidal ideation (e.g., expressing a wish to die without a specific threat
> or plan) and/or has a recent prior history of self-destructive behavior. In addition,
> an inmate who denies suicidal ideation or does not threaten suicide, but
> demonstrates other concerning behavior (through actions, current circumstances,
> or recent history) indicating the potential for self-injury, should be placed under
> close observation. This inmate should be observed by staff at staggered intervals
> not to exceed every 10-15 minutes, and should be documented as it occurs.

> **Constant Observation** is reserved for the inmate who is actively suicidal, either
> by threatening (with a plan) or engaging in self-injury, *and* considered a high risk
> for suicide.  *This inmate should be observed by an assigned staff member on a
> continuous, uninterrupted basis.* The observation should be documented at 15-
> minute intervals.

---

[32]Garvey, K, Penn, J, Campbell, A, Esposito, C, and A. Spirito (2009), "Contracting for Safety With Patients:
Clinical Practice and Forensic Implication," *Journal of the American Academy of Psychiatry and the Law*, 37:363-
370.

*Second*, it is strongly recommended that, with the adaption of the two-level observation system as offered above, reference to the ill-defined "high" and "low" suicide risk categories are no longer necessary and should be deleted from all SDCSD policies.

*Third*, it is strongly recommended that the narrative of "twice every 30 minutes" currently contained within some SDCSD policies be replaced with "staggered intervals that do not exceed 10-15 minutes."

*Fourth*, it is strongly recommended that SDCSD policies should be revised to eliminate the necessity of "a minimum of two assessments by mental health provider with time interval between assessments and for clearance based on high/low risk designation after first assessment." In other words, consistent with the standard of care, an inmate identified as potentially suicidal (or placed on suicide precautions after hours by non-mental health personnel) should be immediately referred to a mental health clinician for completion of a suicide risk assessment. The assessment should be completed immediately if mental health personnel are on-site or during the next business day morning if they are off-site at the time of the referral. Should the clinician's initial suicide risk assessment find that the inmate is not suicidal and does not require either initiation/continuation of suicide precautions, the inmate should be released to appropriate rehousing. Should the clinician's suicide risk assessment find that the inmate is suicidal, the inmate should be placed on suicide precautions and seen on a daily basis by a mental health clinician until a determination is made that they are no longer suicidal. Daily assessments of suicide risk should be documented in SOAP-formatted progress notes. When the clinician determines that an inmate is no longer suicidal and can be discharged from suicide

precautions, documentation of such clinical judgment should occur in a suicide risk assessment form. In addition, the MSD document entitled "ISP Clarifications, March 29, 2018" (which speaks to "two consecutive low risk assessments by two different providers," as well as assessments occurring between 4 and 6 hours of each other) should also be deleted from SDCSD policies as it will no longer be relevant.

*Fifth*, it is strongly recommended that the MSD utilize only <u>one</u> version of the suicide risk assessment forms currently being utilized by MSD mental health clinicians and LHC psychologists (i.e., LMHC ISP Risk Assessment Form, Psychologist EOH Evaluation, Psychologist ISP Evaluation, etc.). The Psychologist ISP Evaluation template that this writer reviewed at GBDF appears to be the most comprehensive. As recommended above, the selected suicide risk assessment form template should be utilized as justification for an inmate's initial placement on suicide precautions, as well as justification for an inmate's discharge from suicide precautions.

*Sixth*, it is strongly recommended that, consistent with NCCHC and other national correctional standards, all clinicians develop treatment plans for inmates discharged from suicide precautions that describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur. A treatment plan should be contained in the discharging suicide risk assessment.

*Seventh*, is strongly recommended that reasonable efforts should be made, particularly when considering the discharge of an inmate from suicide precautions, to avoid a cell-side encounters; rather, suicide risk assessments should be made in a private and confidential setting. Should an inmate refuse a private interview, the reason(s) for the refusal should be documented in JIMS.

*Eighth*, it is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on the mental health caseload and receive regularly scheduled follow-up assessments by clinicians until their release from custody.  As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), it is recommended that the follow-up schedule be simplified and revised as follows:  follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically as determined by the clinician until release from custody.

*Ninth*, given the strong association between inmate suicide and segregation housing and consistent with national correctional standards,[33] it is strongly recommended that DSB officials give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals.

---

[33]See American Correctional Association (2004), *Performance-Based Standards for Adult Local Detention Facilities*, 4th Edition, Lanham, MD: "All special management (segregation) inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule" (4-ALDF-2A-52).

*Tenth*, it is strongly recommended that both mental health and nursing personnel be instructed to refrain from utilizing terms such "contracting for safety" or "vouching for his safety" with patients when assessing suicide risk. SDCSD policy should also be revised accordingly to prohibit its use.

**6)    Intervention**

> **A facility's policy regarding intervention should be threefold: 1) all staff who come into contact with inmates should be trained in standard first aid and cardiopulmonary resuscitation (CPR); 2) any staff member who discovers an inmate attempting suicide should immediately respond, survey the scene to ensure the emergency is genuine, alert other staff to call for medical personnel, and begin standard first aid and/or CPR; and 3) staff should never presume that the inmate is dead, but rather initiate and continue appropriate life-saving measures until relieved by arriving medical personnel.   In addition, all housing units should contain a first aid kit, pocket mask or mouth shield, Ambu bag, and rescue tool (to quickly cut through fibrous material).   All staff should be trained in the use of the emergency equipment.   Finally, in an effort to ensure an efficient emergency response to suicide attempts, "mock drills" should be incorporated into both initial and refresher training for all staff.**

Following a suicide attempt, the degree and promptness of intervention provided by staff often foretells whether the victim will survive.   Although both ACA and NCCHC standards address the issue of intervention, neither are elaborative in offering specific protocols.   For example, ACA Standard 4-ALDF-4D-08 requires that -- "Correctional and health care personnel are trained to respond to health-related situations within a four-minute response time.   The training program...includes the following: recognition of signs and symptoms, and knowledge of action required in potential emergency situations; administration of basic first aid and certification in cardiopulmonary resuscitation (CPR)..."   NCCHC Standard J-G-05 states   --

"Intervention: There are procedures addressing how to handle a suicide attempt in progress, including appropriate first-aid measures."

**FINDINGS:** The SDCSD has various policies related to the proper emergency response to a suicide attempt of an inmate, including Policy MSD.M.1: Medical Emergency, last revised March 27, 2013; Policy MSD.F.2: First-Aid Kits/Emergency Response Bags, last revised June 15, 2016, and Policy MSD.C.2: Code Blue: Life Threatening Emergencies, last revised December 23, 2015.  In addition, this writer observed that jail deputies had CPR pocket masks and cut-down tools (utilized to quickly cut through fibrous material) on their uniform belts. Oxygen tanks and automated external defibrillators (AEDs) were found in various locations in each of the four inspected jail facilities. According to recent training data reviewed by this writer, approximately 100 percent of both custody and nursing personnel were currently certified in cardiopulmonary resuscitation (CPR) and AED use. This writer's review of investigative files for the six (6) inmate suicides between 2016 and 2017 found that proper emergency responses were found in each case.

**RECOMMENDATIONS:** None

**7)**    <u>**Reporting**</u>

**In the event of a suicide attempt or suicide, all appropriate correctional officials should be notified through the chain of command. Following the incident, the victim's family should be immediately notified, as well as appropriate outside authorities. All staff who came into contact with the victim prior to the incident should be required to submit a statement as to their full knowledge of the inmate and incident.**

<u>**FINDINGS**</u>: This writer's review of investigative reports and other documentation from the six (6) inmate suicides between 2016 and 2017 found that all reporting requirements appeared to have been appropriately followed.

<u>**RECOMMENDATIONS**</u>: None

8)    **Follow-up/Mortality-Morbidity Review**

**Every completed suicide, as well as serious suicide attempt (i.e., requiring medical treatment outside the facility), should be examined by a morbidity-mortality review. (If resources permit, clinical review through a psychological autopsy is also recommended.)  The review, separate and apart from other formal investigations that may be required to determine the cause of death, should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. Further, all staff involved in the incident should be offered critical incident stress debriefing.**

Experience has demonstrated that many correctional systems have reduced the likelihood of future suicides by critically reviewing the circumstances surrounding incidents as they occur. While all deaths are investigated either internally or by outside agencies to ensure impartiality, these investigations are normally limited to determining the cause of death and whether there was any criminal wrongdoing. *The primary focus of a morbidity-mortality review should be two-fold: What happened in the case under review and what can be learned to help prevent future incidents?*  To be successful, the morbidity-mortality review team must be multidisciplinary and include representatives of both line and management level staff from the corrections, medical and mental health divisions.

**FINDINGS:**  Although DSB's Policy M.7: Inmate Deaths, last revised November 16, 2017, and MSD's Policy Death of an Inmate On-Site, last revised March 30, 2017, provide adequate summaries of the administrative review process for all inmate deaths (including

suicides), the mortality review process for an inmate suicide is only vaguely referenced in SDCSD policies. For example, DSB's Policy M.7: Inmate Deaths requires that the Critical Incident Review Board (CIRB) review inmate suicides and make recommendations, when appropriate, to the Suicide Prevention Oversight Committee. Membership to the CIRB was unclear in the policy, as well as reference to the Suicide Prevention Oversight Committee (which this writer assumes is now related to the recently enacted Suicide Prevention and Focused Response Team, see below).

In practice, all inmate deaths (including suicides) are investigated by the Homicide Detail Team within the SDCSD's Law Enforcement Bureau. The Homicide Detail Team is assisted by both the Detentions Investigations Unit and the Division of Inspectional Services. The investigation includes review of the incident scene (e.g., cell contents) and all relevant custody-related documents pertaining to the inmate, including, but not limited to, arrest, classification, custody records, medical records, housing unit log books, CCTV monitoring, telephone calls between the inmate and others. In addition, relevant inmates, custody, medical, and mental health personnel are interviewed, as well as family members of the decedent (if appropriate). The investigative process can take up to 90 days to complete. This writer reviewed the Homicide Detail Team investigative reports of the six (6) inmate suicides that occurred within the San Diego County Jail System in 2016 and 2017. Each report was quite thorough and comprehensive.

In addition, each inmate suicide is also reviewed by the aforementioned the Critical Incident Review Board (CIRB) within 14 days of the death. The CIRB is composed of DSB command staff, SDCSD legal counsel, homicide investigator, MSD medical director, and MSD

chief mental health clinician. According to DSB's Policy M.7: Inmate Deaths, the CIRB "will carefully review in custody deaths from multiple perspectives, including training, tactics, policies, and procedures with the ultimate goal of identifying problems and recommending remedial actions."

Further, the SDCSD has initiated a "psychological autopsy" review process for inmate suicides. The reports are developed by the MSD chief mental health clinician, the first of which was completed in April 2017 on an inmate suicide that occurred in November 2016. (A few other "psychological autopsy' reports were pending at the time of this writer's report.) The psychological autopsy report reviewed by this writer included reference to the Homicide Detail Team investigative report, JIMS records, and County Behavioral Health records of the decedent. In addition, the report author also reviewed a variety of suicidology research in the community. The report was formatted to include background information, family information, criminal history, housing information (as derived from interviews of other inmates by SDCSD investigators), medical and psychiatric history, the suicide event, hypotheses for the suicide, and systemic areas of concern and recommendations. According to MSD officials, findings from the psychological autopsy report are meant to be subsequently shared with the MSD's Quality Improvement Committee, as well as at quarterly Detentions Commanders meetings.

This writer's review of the 11-page psychological autopsy report (of the November 2016 suicide) found it to be well-written and very comprehensive. The report, however, was not a

"psychological autopsy" as currently envisioned within the correctional community.[34] According

to NCCHC standards, the –

> "Psychological autopsy, sometimes referred to as a psychological reconstruction
> or postmortem, is a written reconstruction of an individual's life with an emphasis
> on factors that led up to and may have contributed to the individual's death. It is
> usually conducted by a psychologist or other qualified mental health
> professional…..A psychological autopsy for each suicide should be completed
> within 30 days of the event. The typical psychological autopsy is based on a
> detailed review of all file information on the inmate; a careful examination of the
> suicide site; and interviews with staff, inmates, and family members familiar with
> the deceased."[35]

Although very comprehensive, the report written on the November 2016 suicide did not include

examination of the suicide site, nor did the clinician interview any staff, inmates, or family

members of the decedent. The report should have been more appropriately entitled a "suicide

report" or "clinical suicide report."

Finally, it was noteworthy that the SDCSD recently initiated a Suicide Prevention and

Focused Response Team (SPFRT) in March 2018. According to DSB Policy M.4: Suicide

Prevention and Focused Response Team, the multi-disciplinary SPFRT is composed of

representatives from the DSB (including the Division of Inspectional Services, Jail Population

Management Unit, Detention In-Service Training Unit, Reentry Services Center, and Detention

Support Division, MSD (including medical and mental health personnel), and the Liberty Health

Corporation program director or designee. The SPFRT is required to meet on a monthly basis  to:

> "1) Ensure compliance with all Department and Bureau policies and procedures
> related to suicide prevention and response; 2) Review Inmate Safety Program

---

[34]See, for example, the National Commission on Correctional Health Care (2014), *Standards for Health Services in Jails*, 9th Edition, Chicago, IL: Author; Aufderheide, D.H. (2000), "Conducting the Psychological Autopsy in Correctional Settings," *Journal of Correctional Health Care*, 7 (1): 5-36.
[35]National Commission on Correctional Health Care (2014), *Standards for Health Services in Jails*, 9th Edition, Chicago, IL: Author, pages 22 and 121.

(ISP) procedures to ensure that they are carried out consistently; 3) Track and
review all self-harm incidents, attempt suicides and suicides; 4) Evaluate medical
procedures performed (e.g., CPR etc.), as well as cell entry and cut-down
procedures to ensure Department and National Commission on Correctional
Health Care (NCCHC) standards were met; and 5) Ensure all required
documentation for suicide death reporting is reviewed within 30 days in
adherence with NCCHC standards."

In addition, the SPFRT would be responsible for working in collaboration with the CIRB in
implementing recommendations arising out of inmate suicides. The first SPRFT meeting was
held on May 1, 2018. The meeting minutes reflected discussion of current suicide prevention
practices, and overview of preliminary findings from this writer's recent on-site assessment,
proposed timelines for review of policies and training curricula, and preliminary review of
suicides and suicide attempts during 2018.

In conclusion, although the recent DRC report was critical of the SDCSD's review
process for inmate suicides, as well as critical of reports issued by the San Diego County
Citizens Law Enforcement Review Board (CLERB), this writer would disagree. Although
recommendations to strengthen both the mortality review and psychological autopsy processes
are offered below, the Homicide Detail Team's investigative review process was very
comprehensive, and the Critical Incident Review Board process was adequate. In addition, the
DRC report's criticism of the CLERB as it relates to the SDCSD appears to be misplaced
because the CLERB is an independent body that, although county-funded, is not affiliated with
the SDCSD, and the SDCSD is not responsible for its practices.[36]

---

[36]Because the SDCSD is not responsible for CLERB practices, this writer did not review any CLERB reports on
inmate suicides.

**RECOMMENDATIONS:** A few recommendations are offered to improve the mortality-morbidity review process for inmate suicides within the SDCSD. *First*, it is strongly recommended that either the Critical Incident Review Board (CIRB) or the Suicide Prevention and Focused Response Team (SPFRT) be responsible for conducting mortality reviews of any inmate suicide, as well as morbidity reviews of any serious suicide attempts (defined as necessitating medical treatment outside the facility). Such reviews should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When recommendations are accepted for implementation, a corrective action plan should be created that identifies each recommendation, followed by identified responsible staff, status(s) and deadline(s) for implementation. Every effort should be made to complete mortality-morbidity review process within 30 days of the incident. As such, should the mortality-morbidity review process become the responsibility of the CIRB, review of the suicide should be moved from the current 14-day deadline to a more reasonable 30-day deadline. Both the DSB's Policy M.7: Inmate Deaths and MSD's Policy Death of an Inmate On-Site should be revised to reflect the above 6-step review process. To assist either of the CIRB or SPRFT in these processes, this writer's "Mortality-Morbidity Review of Inmate Suicides/Serious Suicide Attempts Checklist" is offered for consideration in Appendix B.

67

*Second*, it is strongly recommended MSD's clinical review of an inmate suicide that is currently entitled "psychological autopsy" be renamed as either a "suicide report" or "clinical suicide report." In the alternative, should MSD officials decide to commit to a psychological autopsy process, consistent with NCCHC standards, the review should include the MSD chief mental health clinician's prompt examination of the suicide site (including cell contents), as well as interviews with relevant staff, inmates, and family members of the decedent (when appropriate). Every effort should be made to complete the psychological autopsy within 30 days of the incident for presentation at the mortality review meeting.

*Third*, it is strongly recommended that SDCSD officials consider slightly revising the SPFRT responsibility to "track and review all self-harm incidents, attempt suicides and suicides." Although it would be reasonable to "track" all incidences of self-harm and attempted suicides, given the large size of the San Diego County Jail system, it would be unreasonable to expect that the SPRFT could adequately "review" *all* incidents of self-harm and attempted suicide. As such, the following revision is offered: "Track all incidents of self-harm and attempted suicide; Review all serious suicide attempts (defined as incidents of self-harm and/or attempted suicide that result in medical treatment outside of the jail facility) and suicides."

D.    **SUMMARY OF RECOMMENDATIONS**

**Staff Training**

1) It is strongly recommended that the ISP policy be revised to include a more robust description of the requirements for both pre-service and annual suicide prevention training, to include the duration of each workshop and an overview of the required topics.

2) It is strongly recommended that the joint efforts of the Medical Services Division (MSD) and Detention In-Service Training unit (DTU) to consolidate this writer's 10-hour Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities  into an 8-hour classroom training for all current SDCSD deputies be expanded to include all new employees (i.e., medical and mental health personnel) working within the San Diego County Jail System.

3) It is strongly recommended that the MSD and DTU jointly collaborate on the development of a 2-hour annual suicide prevention curriculum based upon this writer's Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities. At a minimum, the curriculum should include a review of: 1) avoiding obstacles (negative attitudes) to prevention, 2) predisposing risk factors, 3) warning signs and symptoms, 4) identifying suicidal inmates despite the denial of risk, and 5) review of any changes to the ISP policy. The annual training should also include general discussion of any recent suicides and/or serious suicide attempts in the San Diego County Jail System.

4) It is strongly recommended that the annual suicide prevention training be required for all custody, medical, and mental health personnel (including LHC contracted psychologists and psychiatrists). Suicide prevention is all about collaboration, and requiring custody, medical, and mental health personnel to sit together in a classroom environment is not only symbolically appropriate, but instills the philosophy that all professionals, regardless of credentials, have an equal responsibility for inmate suicide prevention and can learn from one another's backgrounds, insights, and experiences.

**Intake Screening/Assessment**

5) It is strongly recommended that Detention Services Bureau (DSB) and MSD officials look at options to better ensure reasonable sound privacy in the booking areas of the three intake facilities when multiple nurses are conducting intake screening at the same time. As demonstrated in the SDCJ, if the inmate is secured within the nursing booth and the door is closed with the officer stationed outside, reasonable privacy and confidentiality can occur while ensuring staff safety.

6) It is strongly recommended that the current suicide risk inquiry contained in the "Medical Intake Questions" form embedded in the JIMS be revised to include the following:

- Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?
- Has a family member/close friend ever attempted or committed suicide?
- Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?

7) It is strongly recommended that MSD officials reconsider the utility of the Columbia-Suicide Severity Rating Scale (C-SSRS) during the intake screening process. Although the C-SSRS has become a popular screening form in some jail facilities throughout the country, its effectiveness remains questionable. It is this writer's opinion that the structure of the questions creates awkwardness between the screener and inmate, and more importantly, questions that limit responses to the "past month" are potentially very dangerous (e.g., the suicidal ideation of an inmate that was experienced more than a month ago would not be captured during the screening process). Intake screening questions by nursing staff should be open-ended and not time-sensitive; it is responsibility of a mental health clinician during a subsequent assessment to determine the degree of relevancy of prior suicide risk to current risk. With addition of the three questions offered above, the current intake screening form would be more than adequate without the necessity of the C-SSRS.

8) Although this writer would defer to MSD officials as to whether to designate either a charge nurse or mental health clinician to be the ISP gatekeeper, it is strongly recommended that, if the charge nurse is a gatekeeper, they should always immediately notify an on-site mental health clinician when an inmate has been identified as potentially suicidal. The clinician, in turn, should respond and conduct the suicide risk assessment and determine the appropriateness of suicide precautions. Unless exigent circumstances exist and/or mental health personnel are not on-site, the determination of placing a potentially suicidal inmate in either a safety cell and/or the EOH unit should be made by the mental health clinician.

9) It is strongly recommended that DSB and MSD officials revise the "automatic triggers" criteria contained within the ISP policy to require only criteria No. 3 ("The inmate states he/she is suicidal and or made suicidal statements to sworn staff, medical, family, etc.) to result in placement on suicide precautions. Although the other four criteria could be potential suicide risk factors, they should be considered criteria for a mental health referral, and not necessarily automatic placement on suicide precautions.

10) Consistent with the SDCSD philosophy that a previous suicide attempt documented in JIMS could be a factor for current suicide risk, an inmate's

previous placement on suicide precautions within the San Diego County Jail System is equally important. As such, regardless of the inmate's behavior or answers given during intake screening, a mental health referral should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during an inmate's prior confinement within the San Diego County Jail System. As such, it is strongly recommended that determination of whether the inmate was "on suicide precautions during prior confinement in a SDCSD facility?" should be independently verified through review of the JIMS by nursing staff. An "alert" screen on JIMS and protocol should be created according to the following procedures:

- Any inmate placed on suicide precautions should be tagged on the JIMS "alert" screen by mental health staff (e.g., "ISP June 2018");

- Nursing staff conducting intake screening should always review the inmate's "alert" screen to verify whether they were previously confined in a SDCSD facility and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and

- Regardless of the inmate's behavior or answers given during intake screening, further assessment by mental health staff should always be initiated based on documentation reflecting suicidal behavior/ placement on suicide precautions during the inmate's prior SDCSD confinement.

11) It is strongly recommended that MSD officials initiate a continuous quality assurance plan to periodically audit the intake screening process to ensure that nursing staff are accurately completing the "Medical Intake Questions" form, and not using abbreviated inquiry, as well as soliciting responses to the four arresting officer questions.

12) It is strongly recommended that MSD officials develop a mental health triage and referral protocol. Although there is no standard of care that consistently specifies time frames to respond to mental health referrals, one suggested schedule would be as follows: Emergent - immediate or within 1 hour; Urgent - within 24 hours; and Routine - within 72 hours. In addition, mental health leadership should develop a mental health triage policy that defines response levels, sets timetables for each level, and defines the acuity of behavior(s) that dictates a specific response level. Of course, any inmate expressing current suicidal ideation and/or current suicidal/self-injurious behavior should result in an Emergent mental health referral.

13) Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, it is strongly recommended that medical personnel review the medical section of

JIMS to determine whether existing medical and/or mental health needs contraindicate the placement or require accommodation. In addition, a "best practice" would be that any inmate assigned to such a special management housing unit receive a brief assessment for suicide risk by nursing staff upon admission to such placement. The following are recommended questions for the brief assessment:

- Are you currently having thoughts of harming yourself?
- Have you previously tried to harm yourself because of a segregation placement?
- Is the inmate speaking incoherently; expressing bizarre thoughts; unable to sit still or pay attention; or is disoriented to time, place, or person?

Affirmative responses to any of these questions should result in an Emergent mental health referral.

## Communication

14) It is strongly recommended that the MSD establish a weekly mental health team meeting at each facility that includes MSD mental health clinicians and LHC psychologists and psychiatrists. The primary purpose of the weekly meeting is to identify and manage the treatment needs of suicidal and/or seriously mentally ill patients.

## Housing

15) As this writer inspected a vast array of differing physical environments for the housing of suicidal inmates in the four jail facilities (i.e., safety cells, EOH single cells and dormitories, MOB, and PSU observation cells, etc.), it is strongly recommended that DSB officials conduct a comprehensive physical plant review of all jail cells utilized for the housing of suicidal inmates to ensure that they are reasonably suicide-resistant. This writer's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities," included as Appendix A of this report, can be utilized as a guideline for such an inspection.

16) Due to the limited positive attributes of safety cell use, it is strongly recommended that, if utilized, the maximum length of stay in a safety cell be limited to no more than six (6) hours.  In addition, use of a safety cell should not be the first option available, rather it should only be utilized in exigent circumstances in which the inmate is out of control and at immediate, continuing risk to self and others. Current SDCSD policies should be appropriately revised.

17) It is strongly recommended that MSB officials instruct their clinical staff on the appropriate use of safety smocks, i.e., they should not be utilized as a default, and not to be used as a tool in a behavior management plan (i.e., to punish and/or

attempt to change perceived manipulative behavior).  Rather, safety smocks should only be utilized when a clinician believes that the inmate is at high risk for suicide by hanging. Should an inmate be placed in a safety smock, the goal should be to return full clothing to the inmate prior to their discharge from suicide precautions. Finally, custody personnel should never place an inmate in a safety smock unless it had been previously approved by medical and/or mental health personnel. Current SDCSD policies should be appropriately revised.

18) It is strongly recommended that possessions and privileges provided to inmates on suicide precautions should be individualized and commensurate with their level of risk. As such, current SDCSD policies should be appropriately revised, as follows:

- All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk as determined on a case-by-case basis by mental health clinicians and documented in JIMS;

- If a mental health clinician determines that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock and safety blanket;

- A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended (i.e., attempting to tamper with/destroy, utilize to obstruct visibility into the cell, etc.);

- All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction;

- All inmates on suicide precautions shall be allowed to attend court hearings unless exigent circumstances exist in which the inmate is out of control and at immediate, continuing risk to self and others, and

- Inmates on suicide precautions shall not automatically be locked down.  They should be allowed dayroom and/or out-of-cell access commensurate with their security level and clinical judgment of mental health clinicians.

19) Although SDCSD Policy J.4: Enhanced Observation Housing (EOH), Definition and Use requires that "EOH units shall be clean and disinfected using facility approved disinfectants or bleach solution after every use or as needed," this writer's inspection of cells in several facilities found them to be quite dirty

and unsanitary. As such, it is strongly recommended that DSB officials reinforce the above directive and that shift supervisors at each facility ensure that cells utilized to house suicidal inmates are reasonably clean and sanitary.

## Levels of Supervision/Management

20) It is strongly recommended that all DSB and MSD suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:

- *Close Observation* is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific plan) and/or has a recent prior history of self-destructive behavior and would be considered a low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10-15 minutes, and should be documented as it occurs.

- *Constant Observation* is reserved for the inmate who is actively suicidal, either by threatening (with a plan) or engaging in self-injury, and considered a high risk for suicide. This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals.

21) It is strongly recommended that, with the adaption of the two-level observation system as offered above, reference to the ill-defined "high" and "low" suicide risk categories are no longer necessary and should be deleted from all SDCSD policies.

22) It is strongly recommended that the narrative of "twice every 30 minutes" currently contained within some SDCSD policies be replaced with "staggered intervals that do not exceed 10-15 minutes."

23) It is strongly recommended that SDCSD policies should be revised to eliminate the necessity of "a minimum of two assessments by mental health provider with time interval between assessments and for clearance based on high/low risk designation after first assessment." In other words, consistent with the standard of care, an inmate identified as potentially suicidal (or placed on suicide precautions after hours by non-mental health personnel) should be immediately referred to a mental health clinician for completion of a suicide risk assessment. The assessment should be completed immediately if mental health personnel are on-site or during the next business day morning if they are off-site

at the time of the referral. Should the clinician's initial suicide risk assessment find that the inmate is not suicidal and does not require either initiation/continuation of suicide precautions, the inmate should be released to appropriate rehousing. Should the clinician's suicide risk assessment find that the inmate is suicidal, the inmate should be placed on suicide precautions and seen on a daily basis by a mental health clinician until a determination is made that they are no longer suicidal. Daily assessments of suicide risk should be documented in SOAP-formatted progress notes. When the clinician determines that an inmate is no longer suicidal and can be discharged from suicide precautions, documentation of such clinical judgment should occur in a suicide risk assessment form. In addition, the MSD document entitled "ISP Clarifications, March 29, 2018" (which speaks to "two consecutive low risk assessments by two different providers," as well as assessments occurring between 4 and 6 hours of each other) should also be deleted from SDCSD policies as it will no longer be relevant.

24) It is strongly recommended that the MSD utilize only one version of the suicide risk assessment forms currently being utilized by MSD mental health clinicians and LHC psychologists (i.e., LMHC ISP Risk Assessment Form, Psychologist EOH Evaluation, Psychologist ISP Evaluation, etc.). The Psychologist ISP Evaluation template that this writer reviewed at GBDF appears to be the most comprehensive. As recommended above, the selected suicide risk assessment form template should be utilized as justification for an inmate's initial placement on suicide precautions, as well as justification for an inmate's discharge from suicide precautions.

25) It is strongly recommended that, consistent with NCCHC and other national correctional standards, all clinicians develop treatment plans for inmates discharged from suicide precautions that describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur. A treatment plan should be contained in the discharging suicide risk assessment.

26) It is strongly recommended that reasonable efforts should be made, particularly when considering the discharge of an inmate from suicide precautions, to avoid a cell-side encounters; rather, suicide risk assessments should be made in a private and confidential setting. Should an inmate refuse a private interview, the reason(s) for the refusal should be documented in JIMS.

27) It is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on the mental health caseload and receive regularly scheduled follow-up assessments by clinicians until their release from custody. As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), it is recommended that

the follow-up schedule be simplified and revised as follows: follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically as determined by the clinician until release from custody.

28) Given the strong association between inmate suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that DSB officials give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals.

29) It is strongly recommended that both mental health and nursing personnel be instructed to refrain from utilizing terms such "contracting for safety" or "vouching for his safety" with patients when assessing suicide risk. SDCSD policy should also be revised accordingly to prohibit its use.It is strongly recommended that both the SCSD and JPS suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:

**Intervention**

None

**Reporting**

None

**Follow-Up/Mortality-Morbidity Review**

30) It is strongly recommended that either the Critical Incident Review Board (CIRB) or the Suicide Prevention and Focused Response Team (SPFRT) be responsible for conducting mortality reviews of any inmate suicide, as well as morbidity reviews of any serious suicide attempts (defined as necessitating medical treatment outside the facility). Such reviews should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When recommendations are accepted for implementation, a corrective action plan should be created that identifies each recommendation, followed by identified responsible staff, status(s) and deadline(s) for implementation. Every effort should be made to complete mortality-morbidity review process within 30 days of the incident. As such, should the mortality-morbidity review process become the responsibility of the CIRB, review of the suicide should be moved from the current 14-day deadline to a more reasonable 30-day deadline. Both the DSB's Policy M.7: Inmate Deaths

and MSD's Policy Death of an Inmate On-Site should be revised to reflect the above 6-step review process. To assist either of the CIRB or SPRFT in these processes, this writer's "Mortality-Morbidity Review of Inmate Suicides/Serious Suicide Attempts Checklist" is offered for consideration in Appendix B.

31) It is strongly recommended MSD's clinical review of an inmate suicide that is currently entitled "psychological autopsy" be renamed as either a "suicide report" or "clinical suicide report." In the alternative, should MSD officials decide to commit to a psychological autopsy process, consistent with NCCHC standards, the review should include the MSD chief mental health clinician's prompt examination of the suicide site (including cell contents), as well as interviews with relevant staff, inmates, and family members of the decedent (when appropriate). Every effort should be made to complete the psychological autopsy within 30 days of the incident for presentation at the mortality review meeting.

32) It is strongly recommended that SDCSD officials consider slightly revising the SPFRT responsibility to "track and review all self-harm incidents, attempt suicides and suicides." Although it would be reasonable to "track" all incidences of self-harm and attempted suicides, given the large size of the San Diego County Jail system, it would be unreasonable to expect that the SPRFT could adequately "review" all incidents of self-harm and attempted suicide. As such, the following revision is offered: "Track all incidents of self-harm and attempted suicide; Review all serious suicide attempts (defined as incidents of self-harm and/or attempted suicide that result in medical treatment outside of the jail facility) and suicides."

E.    **CONCLUSION**

It is hoped that the suicide prevention assessment provided by this writer, as well as the recommendations contained within this report, will be of assistance to the San Diego County Sheriff's Department (SDCSD). As previously shared with SDCSD leadership officials, this writer met numerous DSB and MSD officials and supervisors, as well as deputies, nurses, and mental health personnel (both MSD clinicians and LHC psychologists and psychiatrists), who appeared genuinely concerned about inmate suicide and committed to taking whatever actions were necessary to reduce the opportunity for such tragedy in the future. Those efforts have already resulted in a significant decrease in the number of inmate suicides since late 2016. Although there are numerous recommendations contained within this report, as well as the need to revise several ISP policies, this writer found that the San Diego County Jail System had the foundation of a good suicide prevention program. Based upon the recently enacted Suicide Prevention and Focused Response Team, this writer is confident that full implementation of the recommendations contained within this report will result in continued successful efforts to reducing inmate suicides within the San Diego County Jail System.

Finally, this writer was informed that the Board of Supervisors for San Diego County had recently approved funding for the hiring of approximately 15 additional mental health clinician and 4 jail deputy positions to supplement mental health and suicide prevention program services within the San Diego County Jail System. Such a commitment to additional staffing should be applauded. Although a staffing analysis was outside the purview of this writer's suicide prevention assessment, given the anticipated influx of these mental health clinician positions, as well as the fact that the San Diego County Jail System is one of the largest county jail systems in

California (and the United States), *it would be this writer's opinion that the SDCSD's Medical Services Division is in need of a full-time mental health director to oversee the mental health and suicide prevention services provided to jail inmates*. The considerable day-to-day responsibilities of a mental health director could not reasonably be managed by a medical director. This writer would also hope that, with the hiring of additional mental health personnel, an on-site mental health supervisor  (or lead clinician) could be designated at each jail facility to coordinate services.


In conclusion, this writer would be remiss by not extending sincere appreciation to John Ingrassia, Assistant Sheriff/DSB, Mike Hernandez, Commander/DSB, Barbara Lee, MSD Medical Administrator, Alfred Joshua, MD, MSD Chief Medical Officer, and Peter Fischetti, MSD Chief Mental Health Clinician. Without the total candor, cooperation and assistance of these individuals, as well as from all other personnel that were interviewed, this writer would not have been able to complete this technical assistance assignment.


Respectfully Submitted By:


/s/ Lindsay M. Hayes
Lindsay M. Hayes

June 22, 2018

# APPENDIX A

## CHECKLIST FOR THE "SUICIDE-RESISTANT" DESIGN OF CORRECTIONAL FACILITIES

### Lindsay M. Hayes
©National Center on Institutions and Alternatives, 2018

The safe housing of suicidal inmates is an important component to a correctional facility's comprehensive suicide prevention policy. Although impossible to create a "suicide-proof" cell environment within any correctional facility, given the fact that almost all inmate suicides occur by hanging, it is certainly reasonable to ensure that all cells utilized to house potentially suicidal inmates are free of all obvious protrusions. And while it is more common for ligatures to be affixed to air vents and window bars (or grates), *all* cell fixtures should be scrutinized, since bed frames/holes, shelves with clothing hooks, sprinkler heads, door hinge/knobs, towel racks, water faucet lips, and light fixtures have been used as anchoring devices in hanging attempts. As such, to ensure that inmates placed on suicide precautions are housed in "suicide-resistant" cells, facility officials are strongly encouraged to address the following architectural and environmental issues:

1) Cell doors should have large-vision panels of Lexan (or low-abrasion polycarbonate) to allow for unobstructed view of the entire cell interior at all times. These windows should *never* be covered (even for reasons of privacy, discipline, etc.) If door sliders are not used, door interiors should not have handles/knobs; rather they should have recessed door pulls. Any door containing a food pass should be closed and locked.

Interior door hinges should bevel down so as not to permit being used as an anchoring device. Door frames should be rounded and smooth on the top edges. The frame should be grouted into the wall with as little edge exposed as possible.

In older, antiquated facilities with cell fronts, walls and/or cell doors made of steel bars, Lexan paneling (or low-abrasion polycarbonate) or security screening (that has holes that are ideally 1/8 inches wide and no more than 3/16 inches wide or 16-mesh per square inch) should be installed from the *interior* of the cell.

Solid cell fronts must be modified to include large-vision Lexan panels or security screens with small mesh;

2) Vents, ducts, grilles, and light fixtures should be protrusion-free and covered with screening that has holes that are ideally 1/8 inches wide, and no more than 3/16 inches wide or 16-mesh per square inch;

3) If cells have floor drains, they should also have holes that are ideally 1/8 inches wide, and no more than 3/16 inches wide or 16-mesh per square inch (inmates have been known to weave one end of a ligature through the floor drain with the other end tied

around their neck, then lay on the floor and spin in a circular motion as the ligature tightens);

4) Wall-mounted corded telephones should _not_ be placed inside cells.  Telephone cords of varying length have been utilized in hanging attempts;

5) Cells should _not_ contain any clothing hooks. The traditional, pull-down or collapsible hook can be easily jammed and/or its side supports utilized as an anchor;

6) A stainless steel combo toilet-sink (with concealed plumbing and outside control valve) should be used. The fixture should _not_ contain an anti-squirt slit, toothbrush holder, toilet paper rod, and/or towel bar;

7) Beds should ideally be either heavy molded plastic or solid concrete slab with rounded edges, totally enclosed underneath.

If metal bunks are utilized, they should be bolted flush to the wall with the frame constructed to prevent its use as an anchoring device. Bunk holes should be covered; ladders should be removed.  (Traditional metal beds with holes in the bottom, not built flush to the wall and open underneath, have often been used to attach suicide nooses. Lying flat on the floor, the inmate attaches the noose from above, runs it under his neck, turns over on his stomach and asphyxiates himself within minutes.);

8) Electricity should be turned off from wall outlets outside of the cell;

9) Light fixtures should be recessed into the ceiling and tamper-proof.  Some fixtures can be securely anchored into ceiling or wall corners when remodeling prohibits recessed lighting. All fixtures should be caulked or grouted with tamper-resistant security grade caulking or grout.

Ample light for reading (at least 20 foot-candles at desk level) should be provided. Low-wattage night light bulbs should be used (except in special, high-risk housing units where sufficient lighting 24 hours per day should be provided to allow closed-circuit television (CCTV) cameras to identify movements and forms).

An alternative is to install an infrared filter over the ceiling light to produce total darkness, allowing inmates to sleep at night.  Various cameras are then able to have total observation as if it were daylight.  This filter should be used only at night because sensitivity can otherwise develop and produce aftereffects;

10) CCTV monitoring does _not_ prevent a suicide, it only identifies a suicide attempt in progress. If utilized, CCTV monitoring should _only_ supplement the physical observation by staff. The camera should obviously be enclosed in a box that is tamper-proof and does not contain anchoring points. It should be placed in a high corner location of the cell and all edges around the housing should be caulked or grouted.

Cells containing CCTV monitoring should be painted in pastel colors to allow for better visibility.  To reduce camera glare and provide a contrast in monitoring, the headers above cell doors should be painted black or some other dark color.

CCTV cameras should provide a clear and unobstructed view of the entire cell interior, including _all_ four corners of the room.  Camera lens should have the capacity for both night or low light level vision;

11) Cells should have a smoke detector mounted flush in the ceiling, with an audible alarm at the control desk.  Some cells have a security screening mesh to protect the smoke detector from vandalism. The protective coverings should be high enough to be outside the reach of an inmate and far enough away from the toilet so that the fixture could not be used as a ladder to access the smoke detector and screen.  Ceiling height for new construction should be 10 feet to make such a reasonable accommodation. Existing facilities with lower ceilings should carefully select the protective device to make sure it cannot be tampered with, or have mesh openings large enough to thread a noose through.

Water sprinkler heads should not be exposed.  Some have protective cones; others are flush with the ceiling and drop down when set off; some are the breakaway type;

12) Cells should have an audio monitoring intercom for listening to calls of distress (_only_ as a supplement to physical observation by staff).  While the inmate is on suicide precautions, intercoms should be turned up high (as hanging victims can often be heard to be gurgling, gasping for air, their body hitting the wall/floor, etc.);

13) Cells utilized for suicide precautions should be located as close as possible to a control desk to allow for additional audio and visual monitoring;

14) If modesty walls or shields are utilized, they should have triangular, rounded or sloping tops to prevent anchoring.  The walls should allow visibility of both the head and feet;

15) Some inmates hang themselves under desks, benches, tables or stools/pull-out seats. Potential suicide-resistant remedies are:  (a) Extending the bed slab for use as a seat; (b) Cylinder-shaped concrete seat anchored to floor, with rounded edges; (c) Triangular corner desk top anchored to the two walls; and (d) Rectangular desk top, with triangular end plates, anchored to the wall.  Towel racks should also be removed from any desk area;

16) All shelf tops and exposed hinges should have solid, triangular end-plates which preclude a ligature being applied;

17) Cells should have security windows with an outside view.  The ability to identify time of day via sunlight helps re-establish perception and natural thinking, while minimizing disorientation.

If cell windows contain security bars that are not completely flush with window panel (thus allowing a gap between the glass and bar for use as an anchoring device), they should be covered with Lexan (or low-abrasion polycarbonate) paneling to prevent access to the bars, or the gap, should be closed with caulking, glazing tape, etc.

If window screening or grating is used, covering should have holes that are ideally 1/8 inches wide, and no more than 3/16 inches wide or 16-mesh per square inch;

18) The mattress should be fire retardant and not produce toxic smoke. The seam should be tear-resistant so that it cannot be used as a ligature;

19) Given the fact that the risk of self-harm utilizing a laundry bag string outweighs its usefulness for holding dirty clothes off the floor, laundry bag strings should be removed from the cell;

20) Mirrors should be of brushed, polished metal, attached with tamper-proof screws;

21) Padding of cell walls is prohibited in many states. Check with your fire marshal. If permitted, padded walls must be of fire-retardant materials that are not combustible and do not produce toxic gasses; and

22) Ceiling and wall joints should be sealed with neoprene rubber gasket or sealed with tamper-resistant security grade caulking or grout for preventing the attachment of an anchoring device through the joints.


NOTE: A portion of this checklist was originally derived from R. Atlas (1989), "Reducing the Opportunity for Inmate Suicide: A Design Guide," *Psychiatric Quarterly*, 60 (2): 161-171. Additions and modifications were made by Lindsay M. Hayes, and updated by Randall Atlas, Ph.D., a registered architect. See also Hayes, L.M. (2003), "Suicide Prevention and "Protrusion-Free Design of Correctional Facilities," *Jail Suicide/Mental Health Update*, 12 (3): 1-5. Last revised Lindsay M. Hayes in February 2016.

## APPENDIX  B

## MORTALITY/MORBIDITY REVIEW OF INMATE SUICIDES/ SERIES SUICIDE ATTEMPTS CHECKLIST*
**Lindsay M. Hayes**
©National Center on Institutions and Alternatives, 2018

**1)    Training**

- Had all correctional, medical, and mental health staff involved in the incident received both basic and annual training in the area of suicide prevention prior to the incident?

- Had all staff who responded to the incident received training (and were currently certified) in standard first aid and cardiopulmonary resuscitation (CPR) prior to the incident?

**2)    Identification/Referral/Assessment**

- Upon this inmate's initial entry into the facility, were the arresting/transporting officer(s) asked whether they believed the inmate was at risk for suicide? If so, what was the response?

- Had inmate been screened for potentially suicidal behavior upon entry into the facility?

- Did the screening form include inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; sense of immediate future (inmate expressing helplessness and/or hopelessness); prior mental health treatment/hospitalization; recent significant loss (job, relationship, death of family member/close friend, etc.); and history of suicidal behavior by family member/close friend?

- If the screening process indicated a potential risk for suicide, was inmate properly referred to mental health/medical personnel?

- Had inmate received any post-admission mental health screening/assessment?

- Was the inmate provided reasonable privacy and confidentiality during the intake screening process, as well as during any subsequent screening and/or assessment?

- Had inmate previously been confined in the facility/system? If so, had the inmate been on suicide precautions during a prior confinement in the facility/system? Was such information available to staff responsible for the current intake screening and mental health assessments?

---

*A *morbidity* review should be conducted for a serious suicide attempt, defined here as referring to an incident of self-harm serious enough to require medical treatment outside the correctional facility.

3)    **Communication**

- Was there information regarding inmate's prior and/or current suicide risk from outside agencies that was not communicated to the facility?

- Was there information regarding inmate's prior and/or current suicide risk from correctional, mental health and/or medical personnel that was not communicated throughout the facility to appropriate personnel?

- Did inmate engage in any type of behavior that might have been indicative of a potential risk of suicide? If so, was this observed behavior communicated throughout the facility to appropriate personnel?

4)    **Housing**

- Where was inmate housed and why were they assigned to this housing unit?

- If the inmate was on suicide precautions at the time of the incident, was the inmate housed in a suicide resistant, protrusion-free cell?

- Was inmate on "segregation" status at the time of the incident?

- If placed was on "segregation" or any "special management" (e.g., disciplinary and/or administrative segregation) status, had he/she received a written assessment for suicide risk by mental health and/or medical staff due to this status?

- Was there anything regarding the physical design of inmate's cell that contributed to the incident (e.g., poor visibility, protrusions conducive to hanging attempts, etc.)?

5)    **Levels of Observation/Management**

- What level and frequency of supervision was inmate under immediate prior to the incident?

- Given inmate's observed behavior prior to the incident, was the level of supervision appropriate?

- When was inmate last physically observed by staff prior to incident?

- Was there any reason to question the accuracy of the last reported observation by staff?

- If inmate was not physically observed within the required time interval prior to the incident, what reason(s) was determined to cause the delay in supervision?

- Was inmate on a mental health and/or medical caseload? If so, what was frequency of contact between inmate and mental health and/or medical personnel?

- When was inmate last seen by mental health and/or medical personnel?

- Was there any reason to question the accuracy of the last reported observation by mental health and/or medical personnel?

- If inmate was not on a mental health and/or medical caseload, should he/she have been?

- If inmate was not on suicide precautions at the time of the incident, should he/she have been?

**6)    Intervention**

- Did staff member(s) who discovered the inmate follow proper intervention procedures, i.e., surveyed the scene to ensure the emergency was genuine, called for back-up support, ensured that medical personnel were immediately notified, and initiated standard first aid and/or CPR?

- Did staff initiate standard first aid and/or CPR within four (4) minutes following discovery of the incident?

- Did the inmate's housing unit contain proper emergency equipment for staff to effectively respond to a suicide attempt, i.e., first aid kit, gloves, pocket mask or Ambu bag, and rescue tool (to quickly cut through fibrous material)?

- Were there any delays in either correctional or medical personnel immediately responding to the incident? Were medical personnel properly notified as to nature of emergency and did they respond with appropriate equipment? Was all the medical equipment working properly?

- Were there any delays in notifying outside emergency medical services personnel (i.e., 911)?

**7)    Reporting**

- Were all appropriate officials and personnel notified of incident in a timely manner?

- Were other notifications, including inmate's family and appropriate outside authorities, made in a timely manner?

- Did all staff who came into contact with inmate prior to the incident submit a report and/or statement as to their full knowledge of inmate and incident? Was there any reason to question the accuracy and/or completeness of any report and/or statement?

**8)** <u>**Follow-Up/Mortality-Morbidity Review**</u>

- Were all affected staff and inmates offered crisis intervention services following the incident?

- Were there any other investigations conducted (or that should be authorized) into incident that may be helpful to the mortality-morbidity review?

- As a result of this mortality-morbidity review, were there any possible precipitating factors (e.g., circumstances which may have caused victim to commit suicide or engage in the serious suicide attempt) offered and discussed?

- Were there any findings and/or recommendations from previous mortality-morbidity reviews that are relevant to this review?

- As result of this review, what recommendations (if any) are necessary for revisions in policy, training, physical plant, medical or mental health services, and operational procedures to reduce the likelihood of future incidents.

- What are specific corrective active plans (CAP) for each recommendation, who is responsible party for each CAP, and what is expected timeframe to complete each CAP?

Last revised: June 2018

# EXHIBIT H



# Technical Assistance Report

## San Diego Sheriff's Department

*This report details findings from site visits to four (4) San Diego Sheriff's Department facilities and presents recommendations for quality improvement.*

Developed by NCCHC Resources, Inc.

*January 2017*

# TECHNICAL ASSISTANCE REPORT:
# SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

| CONTENTS |
|---|

INTRODUCTION ................................................................................................ 2

TECHNICAL ASSISTANCE REPORTS

   San Diego Central Jail (SDCJ) ...................................................................... 3

   George F. Bailey Detention Facility (GBC) ....................................................37

   Las Colinas Detention and Re-Entry Faculty (LCDRF) ..................................70

   Vista Detention Center (VDF) .....................................................................104

DISCLAIMER ..................................................................................................138

ABOUT NCCHC RESOURCES, INC. ...............................................................138

Ex. H - 386



# TECHNICAL ASSISTANCE REPORT:
## SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

### INTRODUCTION

**Origin of Project**

The San Diego County Sheriff's Department conducted a request for proposal and selected NCCHC Resources, Inc., to provide technical assistance to help San Diego County Sheriff's Department accomplish this goal. This report presents the results of the technical assistance.

**Plan of Action**

NRI provided a team of correctional health care experts to assess operational policies and practices for four selected jails within the San Diego County Sheriff's Department. The aim was for NRI to recommend how the county may deliver health care to inmates and improve their physical and behavioral health outcomes.

**Designated Facilities**

The NRI team scheduled site visits in 2017 and requested security clearances for the four (4) designated jails through the San Diego County Sheriff's Department. The site visit schedule was as follows:

- San Diego Central Jail (SDCJ)                                        January 3-4, 2017
- George F. Bailey Detention Facility (GBCF)                 January 5, 2017
- Las Colinas Detention and Re-Entry Faculty (LCDRF)    January 6, 2017
- Vista Detention Center (VDF)                                      January 7, 2017

Ex. H - 387

San Diego Sheriff's Department
San Diego Central Jail (SDCJ)
Technical Assistance Report
January 3 & 4, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails*. On January 3-4, 2017, NRI conducted its review for the San Diego Central Jail (SDCJ). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 38 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 26 essential standards:

Essential Standards
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services

Ex. H - 388

J-E-12  Continuity and Coordination of Care During Incarceration
J-E-13  Discharge Planning
J-G-01  Chronic Disease Services
J-G-03  Infirmary Care
J-G-04  Basic Mental Health Services
J-G-05  Suicide Prevention Program
J-G-06  Patient with Alcohol and Other Drug Problems
J-G-07  Intoxication and Withdrawal
J-I-01  Restraint and Seclusion
J-I-02  Emergency Psychotropic Medication

Essential Standard Not Applicable
J-G-09  Counseling and Care of the Pregnant Inmate
J-E-02  Receiving Screening

There are 27 important standards and 25 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09  Privacy of Care
J-A-10  Procedure in the Event of An Inmate Death
J-A-11  Grievance Mechanism for Health Complaints
J-B-02  Patient Safety
J-B-03  Staff Safety
J-C-02  Clinical Performance Enhancement
J-C-09  Orientation for Health Staff
J-D-04  Diagnostic Services
J-E-09  Segregated Inmates
J-E-10  Patient Escort
J-E-11  Nursing Assessment Protocols
J-F-01  Healthy Lifestyle Promotion
J-F-02  Medical Diets
J-G-11  Care For the Terminally Ill
J-H-04  Access to Custody Information
J-I-03  Forensic Information
J-I-04  End-of-Life Decision Making
J-I-05  Informed Consent and Right to Refuse
J-I-06  Medical and Other Research

Important Standards Not Applicable
J-C-08  Health Care Liaison
J-G-08  Contraception

---

**Evaluation Method**

We toured the clinic area, inmate housing areas, receiving area, medical observation areas, mental health and segregation. We reviewed 68 health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meetings; job descriptions; statistical and health services personnel and correctional officer (CO) training. We interviewed the jail commander, command staff with the sheriff, responsible physician, director of nursing, CQI nurse, infection control/training nurse, psychiatrist, psychologist, mental health clinicians, dentist, medical records clerk, 11 health staff, six COs, and 11 inmates selected at random.

**Facility Description**:

**Location:** Southwest
**Built:** 1998
**Security:** Maximum Security
**Supervision Style:** Indirect and Remote Supervision
**Bookings:** 122/ day   44,549 annually
**Layout:** Modular and Dormitory Housing
**Capacity:** 1159          **ADP:** 914
**Males:** 970             **Females:** none
**Custody Staff Total:** 222    **Shifts:** Days, Evenings, Nights

**Findings and Comments**

***Special Note:** A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.*

## A. GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. Some areas of the program are not timely such as the receiving screening and the face-to-face evaluation after a request for care is triaged. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. As this is a maximum security jail, patients are occasionally on "lock down" status, and the nurses and mental health clinicians do not have access to them. Patients are subsequently rescheduled for their appointments, and medication administration is delayed. Also, the provider has ordered four-times-a-day diabetic checks, with the night check being completed at 2:00 a.m.

---

Ex. H - 390

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices (and rarely at the facilities). The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody and medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented, with action items, and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and procedure

meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization; these reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific.
It is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken; however, documentation is lacking. The identified studies are not documented, nor are the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and re-monitors performance after implementing improvement strategies.

Ex. H - 392

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The same drill scenarios were used, but there was no documentation. The 2016 scenarios included an active shooter, use of the restraint chair in a medical emergency, hostage scenarios, and inmate disturbance. The scenarios are developed centrally and sent to the facility staff to conduct. The drills were critiqued and shared with staff via training bulletins and at weekly staff meetings.

An actual riot involving 33 inmates and staff, some of whom were treated at the emergency room, occurred. This was not documented, but could have been.

Man-down drills are planned to occur monthly or every other month. They do occur on each shift and are described as "man on the floor", "man down in video court", or cell extractions. They are also critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, much as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a

---

Technical Assistance Report: San Diego County Sheriff's Department                                    8

provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis. Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.

The facilities have a large numbers of cells assigned to segregation, so it is difficult to transfer segregated inmates to a clinic or interview room for care.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2 and # 3 require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA concerns and confidentiality.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There have been 13 deaths in the last two years; eight were reported to be of natural causes, one was a homicide, and four were suicides. The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The three compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, and autopsies and sharing with staff would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

At this facility the numbers of health and mental health related grievances filed per month or year were not available.

Inmates may appeal, with a standard guideline of level one (seven days to respond) and level two (10 days to respond).

**Recommendations**: Compliance indictors # 1 and # 2 are met, however, we recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging the grievances in the central data base, health staff maintains its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends (either monthly or quarterly) for possible patient care issues.

---

Ex. H - 394

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room (for total isolation). The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked: sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. Due to his man y assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA proactively implements programs to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus; knowing a woman's pregnancy status before administering medications is imperative.

---

Ex. H - 395

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. The jail is well lit, clean and well maintained for an older jail. The space for health is limited, but the health staff has made great efforts to keep it organized and to maximize the available space. It should be an on-going effort to keep areas free of clutter and prevent overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios or a call system to be notified in emergencies, or to call if in an emergency. Examination rooms do not have call buttons. Because of this, officer presence is essential for the safety of clinical staff.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail reported that this occurs very rarely.

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

---

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility for providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits, and all were current in cardiopulmonary resuscitation (CPR) training. Additionally, there is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

***J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3 describe the training program for health staff so they are appropriately trained in administering medications. This training is required to be approved by the responsible health authority, facility administrator and designated physician. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** This facility does not use inmate workers in the medical observation beds area or the clinical areas. Nurses clean these areas. There are no peer health-related programs. Nurses clean the clinic spaces and medical observation beds. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for this assignment, and earn their food handler certifications.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff are scheduled to work 10-hour shifts with every other weekend off at this facility. Full-time staffing consists of forty-six (46) RNs and eighteen (18) LPNs. Ten (10) RNs are scheduled for the day shift and eight (8) are scheduled on the night shift. Four (4) LPNs are scheduled for each shift. Actual working hours may vary depending on the work load or medication round schedule. The contract physicians hold clinic seven days a week, and are on call on a rotating schedule 24 hours a day. Mental health staff consists of three full-time clinicians.

At the time of our visit, vacancies consisted of two (2) RNs, two (2) LPNs, and the chief psychiatrist. One (1) newly hired nurse was scheduled for orientation. Temporary agency staff is employed to fill vacancies.

**There are no** recommendations regarding this standard. Timely staff response to patient needs requires continual monitoring and evaluation. The length of time of medication rounds, wait times for dentist or physician appointments, or time spent in booking for an evaluation, are all components that may determine the program's staffing needs. We noted there are very few mental health clinicians given the population.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two (2) weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six (6) weeks are spent in on-site orientation and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LPN Preceptor Toolkit which consists of check lists along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two (2) years by the responsible health authority. The current procedure was last revised in 2013.

## D. HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours services. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks, and once a year to inspect and inventory the medication rooms.

At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the eleven (11) compliance indicators in the standard along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers.  The room was furnished with a refrigerator and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs # 2, # 4, # 5, # 7, # 8, and # 10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

Ex. H - 399

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance #  6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Two other areas of concern were: 1) over-the-counter medications in the nursing protocols were all prescription doses and 2) incoming detainees wait three days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LPNs put doses of medication into labeled envelopes before taking the cart or basket to the housing areas for administration. Since this process is time-consuming, LPNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task. Automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to lock-down status. Nurses are not able to see patients during lock-down periods. There is no written procedure to determine what medications are necessary during lock-down. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be verified. Likewise, audits will insure that medications are prescribed only when clinically indicated as stated in CI # 4.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them. There is no safety check for names or allergies or which medications are to be administered at that time. This is actually dispensing and only pharmacists and providers may dispense. This violation of nursing practice is serious and a violation of the Nurse Practice Act. A change to individual patient-specific or individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery) that are ordered, which medications are delivered, and when a medication container is empty.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two dental operatory chairs, a dentist's office, a medication room, a records room, space for telemedicine/laboratory services, a patient waiting room, a radiology/x-ray room, three dialysis chairs, the nurses' area, examination space for orthopedics and sick call, and storage space. Mental health staff stated they have some office space for patient counseling. The booking area also has some space for medical services. The "second floor" has space for patient evaluations and care delivery and a few housing areas had a nurse's exam room in the central hall for nurse sick call, diabetic care and emergencies.

Nurses (one going off duty and one coming on duty) count items subject to abuse on each shift. We verified these were accurate. The three emergency crash carts are checked each shift. We counted three automated external defibrillators (AED) strategically placed around the facility.

We noted that some storage areas, if re-organized, could become interview or exam rooms for staff use.

The clinic contained all the equipment necessary to take care of the patients.

**There are no** recommendations regarding this standard.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, and drug screen urine dipstick and multiple-test dipstick urinalysis. Pregnancy test kits are not necessary as the population at this facility is male.

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans, and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment, and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** An access-to-care sign was posted in the upstairs area of receiving. Inmates receive instructions on access to care, the fee structure, and grievances by watching an orientation video (available in English and Spanish) in each housing area. No written information is provided as, reportedly, the inmates used it to disrupt the plumbing. Inmates who speak other languages or have a hearing impairment can use an AT&T

language line and TTY, respectively, and a few staff members are also conversant in sign
language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given
written instructions on access to care, the fee-for-service policy, and the grievance process. An
inmate manual or handout should be developed. Some facilities have a manual that inmates
may borrow and return, and others have it posted. Based on the results of inmate interviews,
surveying the inmates to evaluate the effectiveness of the orientation video would be a good
CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02   Receiving Screening (E).** When new admissions arrive directly from the community to
the jail, the booking process consists of multiple steps. In the first stage, upon arrival, the inmate
sees a nurse behind a privacy screen for "pre-booking or medical clearance" screening. The
nurse takes vital signs and asks questions such as injuries, risk for suicide, medications, health
problems, and recent hospitalizations. An arrestee who is semi-conscious, bleeding, or severely
intoxicated will be sent to the emergency room for treatment, first. If the arrestee is stable, they
are cleared for the next stage of booking.

"Fast booking" allows a person with identified health issues to advance through the booking
process more quickly. There could be others who do not tell the nurse they have major health
issues and could have a crisis when the normal process takes 12 or more hours.

The second stage occurs upstairs. This includes the custody booking process and a more
extensive receiving screening by a nurse. The three (3) nurses assigned to booking interview
arrestees as soon as possible for the screening. The full medical evaluation includes a body
scan for contraband, a chest x-ray for tuberculosis, and housing in a sobering cell, if needed.
Safety cells are used to observe for possible suicidal behavior. Our chart reviews and the
interviews we conducted confirmed the booking process takes from eight (8) to twelve (12)
hours (sometimes up to 30 hours) to complete before inmates go to housing. A nurse
practitioner is assigned to this area to see patients and order medications. When there is no
nurse practitioner, the nurses order medications based on nursing assessment protocols.

Under the current booking process, some of the compliance indicators are met. CI # 1
addresses the pre-screening, which occurs as soon as someone exits the vehicle. CI # 2 and CI
# 3 are met. CI # 4 is not applicable, as this is a booking facility for men. CI # 5 refers to the
timeliness of the booking process, which can take up to eight (8), twelve (12), and sometimes
up to 30 hours to complete. CI # 6 and CI # 7 are not met because some of the questions and
observations required in the standard are not part of the procedure. CI # 8 through CI # 11 are
met. CI # 12 addresses the regular monitoring of receiving screening, but there was no
evidence of reviews of the process.

**Recommendations:** After considering the length of time most detainees spend in the booking
process without being evaluated by health staff, and a plan of care developed, we looked at the
booking process closely. The goal is met in that a newly arriving person is seen by a nurse right
away after arrival, but this is merely the first step.

Reportedly, another nurse's station was being planned for the stage 1 area, so that two nurses
could complete the initial receiving screening. This will help with the backlog. This, combined
with a fully complete questionnaire, would significantly reduce the backlog and improve

timeliness. If all the receiving screening was completed at the first stage, resources could be shifted from the second floor.

CI # 6 a-k addresses the elements needed on the receiving screening form. Most are on the form already and adding dietary needs and recent communicable diseases symptoms would meet compliance.

CI # 8 describes the disposition of the inmate. This is not part of the receiving form and should be added. It communicates whether the person would go to general housing, medical observation beds, sobering cells, safety sells, etc. This is important for the next health care person to know what was present in booking.

CI # 12 requires that health should regularly monitor the effectiveness and safety of the receiving screening process. This can be done in quality improvement committee meetings or in another fashion.

**J-E-03  Transfer Screening (E).** Reportedly, there are 50 to 100 transfers a day to this facility from others. A transfer review procedure was initiated three months ago with a goal of a nurse's review within twelve (12) hours. This procedure was not listed in the policy and procedure manual.

The nursing staff receives a list of transferring inmates from classification staff when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said, "cleared by RN and chart checked by MD," at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, they will be evaluated at the receiving facility in a timely manner. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with a "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week as documented by a very short note. If an initial health assessment was in place when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through CI # 4, and the individual health assessment requires compliance with CI # 5 through CI # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during stage 2 of receiving screening. There is no 14 day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first, and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place.

**Recommendations:** The mental health screening form requires revision to include all the required questions and observations. RNs should be trained by a mental health staff. When all the questions from the standard are incorporated into the forms, revisions would comply with the 14 day mental health screening. Part of compliance is documenting those seen and still to be seen in logs or lists, to assure no one misses their evaluation when a mental health problem is identified.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking although there is no inspection of the inmate's mouth. This could be added to the first stage as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12 month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site two days a month and sees patients upon a nurse's referral. They dentist completes extractions and provides fillings, albeit rarely. The dental list shows from the time of the appointment until the patient is seen varies from five (5) to ten (10) days to two (2) months.

CI # 4 through CI # 6 are in place.

**Recommendations**: CI # 1 and CI # 2 can be addressed by incorporating oral screening into the initial health assessment standard implementation. The dentist can train the nurses to

complete the oral screening. The oral hygiene handout can be given at this time as well. CI # 3 can be met by preparing a list of inmates who are going to be in the facility for twelve (12) months and scheduling them for a dental evaluation.

The initial health assessment, mental health screening and evaluation, and oral care may all be accomplished by having a trained nurse or qualified health care professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves slips each night and brings them to medical services where they are date stamped, triaged as to the nature of the complaint (health, dental, or mental health), and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day, or next day, to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two (2) to four (4) days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven (7) to fourteen (14) days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight (8)days to see the nurse and in some cases waits were twelve (12) to eighteen (18) days. For the physician, the lists were five (5) days out, with some at eight (8) to twelve (12) days.

At this facility all inmates have access to the locked boxes to place requests for care confidentiality except in the segregation area. These inmates remain in their room and are screened in for walk and/or shower time. They have to give their requests for care to an officer, so confidentiality is not guaranteed. CI # 2 through CI # 5 are met.

**Recommendations**: CI # 1 requires that a qualified health care professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a qualified health care professional to see the patient before assigning the plan of care or level of care needed. General examples of the risk of current practices could include what appears to be a tension headache for the patient could be a symptom of stroke and what appears to be constipation could in fact be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and make sure there are no backlogs of forms not triaged.

CI # 3 assures all inmates, no matter which housing area, have access to care and timely evaluations. Evaluating those in segregation with no access to confidentially submit a form should be investigated.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day. They can respond to emergencies in the facility. The emergency carts are stocked with suction, AED, and other emergency medications. 911 services are called, as needed, and the hospital is within 15 miles. CI # 1 through CI # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** This facility has a significant number of segregation, administrative segregation, and personal protection cells. A nurse checks these inmates three (3) times a week and signs off on the list of inmates in that housing area. There are no notes as to their condition or if they are having a problem coping with isolation. Mental health staff also checks segregation inmates.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are escorted to on-site and off-site clinical appointments in a timely manner. The segregation areas require numerous staff to escort patients and this can be a complication. Transporting officers are alerted to special accommodations (such as medication administration or communicable diseases) for their protection. Patients' health records are sealed in an envelope, and returned the same way. CI # 1 to CI # 3 are met.

**Recommendations:** Lack of deputies may delay escort from occurring or allowing mental health staff to see a patient and should be investigated to improve timeliness.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols (also known as standardized nursing procedures in this program) include prescription medications for emergency situations, as well as routine health conditions of alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format) with guidelines for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included protocols to diagnose and prescribe medications to

patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols (although those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering). CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered, and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. Since the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based, and implemented in a timely manner. CI # 1, CI # 3, CI # 4, CI # 6, and CI # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place; however, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs

for Naltrexone for extended-release injectable suspension ™, etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Instead, information is clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

Representatives of community programs come on-site for classes on HIV, hepatitis, parenting, and GED preparation. We observed a few posters in the housing areas about access to care, PREA, and smoking cessation. A closed-circuit television system is in place and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that the health record documents that patients receive individual health education and instruction in self-care for their health condition. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than ten (10) special medical diets offered.

At the time of our visit, approximately 166 special diets were ordered at this facility. A registered dietitian reviews the medical diet menus annually (in July). At the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference.

CI # 1, CI # 3, CI # 4 and CI # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months and whenever a substantial change in the menus is made. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

### G.  SPECIAL NEEDS AND SERVICES

> The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard is that when someone with a chronic disease enters a corrections facility, he or she is identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component, with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications and "return to clinic" appointments as set.

This program has one chronic disease pathway for hypertension which was revised in 2014. It is in the procedure manual and guides the nurses' care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines," which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases and/or medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases which, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on. Forms should be developed for better documentation by providers and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test and the frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Ex. H - 410

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC offer treatment guidelines and forms that can be revised to fit a particular program.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to the frequency of follow-up for medical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens and, when appropriate, instructions about diet, exercise, adaptation to the correctional environment, and medication, is needed. A review of inmates with active medical instructions indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called Medical Observation Beds (MOB). Seventeen (17) or these beds are for medical patients and thirty (30) are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patients should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols. The protocol instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients and felt some of them were at infirmary level of care, and required a physician directing the care plan and medications.

The responsible physician and RHA, should review the use of the MOB and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds and sheltered housing. The discussion section further explains what

infirmary care is and the alternatives. Some programs have a low level of care and have shelter housing beds where nurses may admit. Others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CI # 3 and CI # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define and distinguish admissions to the infirmary from observation and/or shelter beds from outside hospital admissions. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CI # 8 and CI # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use. This includes lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and are referred to the onsite mental health program staff. A mental health clinician is in the stage 2 booking level daily to evaluate those inmates with mental health conditions. There are some safety cells (suicide watch or violence watch) if needed. There are also enhanced observation cells for special housing. The staffing included a position for a supervising psychiatrist (vacant at the time of our visit), and the chief clinician. Three mental health licensed clinicians respond to patients needs for evaluations. The psychiatric team is supplemented with contract psychiatrists who receive referrals and calls for evaluations and who order medications. The team provides some programming for patients, as well, to include the PET or puppies therapy sessions.

CI # 1, CI # 3, CI # 4, CI # 5, and CI # 6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five (5) areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor, and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or

medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program.

In the last two years, the facility has had thirteen (13) deaths, four (4) of which were suicides. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were completed for the cases of suicide but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit and was to continue until all health, mental health, and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health, and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings. During these meetings, special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CI # 1 and CI # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled. CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective, assessment, and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells (on the second floor, above booking), but does not address those inmates going through withdrawal in general housing, segregation, or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours (if not symptomatic in booking).

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care. The nurses manage the withdrawal using the protocol. When a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

Ex. H - 413

This is a men's facility. The pregnant opiate patient discussed in CI # 7 is not applicable.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CI # 3, CI # 4, and CI # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring, and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension ™, and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** The population at this facility is all male. The standard is **not applicable.**

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** The population at this facility is all male. The standard is **not applicable**.

**J-G-10  Aids to Impairment (I).** During the visit, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs approximately six (6) to eight (8) times a year. There is no formal procedure. Staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program. If a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CI # 1, CI # 2, and CI # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and/or emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room which is accessible to the clerical staff who manage the records, and the electronic record is password-protected. Health and custody staff undergo annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two (2) senior medical records technicians, ten (10) technicians, one (1)  clerk and one (1) office assistant. Some of the staff are located in the central administrative office and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**There are no** recommendations regarding this standard. We recommended that you continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a written policy and defined procedures specify which health services staff have access to custody records and under what circumstances.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one (1) hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four (4) hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four (4) hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every fifteen (15) minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Restraint is reportedly rarely applied. There are two restraint chairs in the facility and deputies carry TASERs™ and handcuffs. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CI # 1, CI # 2, and CI # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place.

---

According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every fifteen (15) minutes for four (4) hours when a medication is given to someone in an emergency.

There is a process in place, through the courts, for forced medications. The PSU had approximately six (6) to eight(8) patients on this program system-wide. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed, revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** It was reported that health staff does not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice, the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four (4) compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions, or living wills that an inmate arrives with, would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: In this standard, Inmates approaching the end of life are permitted to execute advance directives including living wills, health care proxies, and "do not resuscitate" (DNR) orders. CI # 1 through CI # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d. emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

Ex. H - 417

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research or a patient on a medical trial or participant in a research project.

## Mental Health Report:

**SAN DIEGO CENTRAL JAIL**

**Staffing:**   **3.0 FTE Psychiatrists**
**1.0 FTE Psychologist**
**3.0 FTE Mental Health Clinicians (includes system Mental Health Director)**

**Overview:** The mental health services at Central Jail are primarily provided by nurses, who complete the mental health screenings and determine the acuity of the mental health needs, and by the psychiatrists, who complete the 14-day assessment, and monitor medications. There is one psychologist, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has three mental health professionals (master's level, licensed at Marriage and Family Therapists) who primarily respond to crises and try to provide two, four-hour "mental health clinics" each per week, but these are often interrupted or not held due to facility needs or other issues, including lack of staff or lock-downs on individual housing modules.

Mental health staff members (including psychiatrists and the mental health professionals) respond to inmate requests for service, and see inmates who are scheduled by nursing staff in response to requests or referrals. It was reported, and noted in chart reviews, that 10% of scheduled appointments with mental health staff members are cancelled, and 60% of the charts we reviewed indicated at least one missed appointment. It was further reported that it takes at least one week for an inmate to be seen following a request or a referral, which is outside of the time frame required by NCCHC.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There was much confusion across facilities, and including at the Central Jail, about the requirements of the program and how to implement it. The expressed understanding of it at the Central Jail is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and his involvement in the Safety Program is his only duty. Staff members did not express an

understanding of the design of the Safety Program as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the program, however, is that inmates who are identified as high risk cannot be released prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute monitoring if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

A review of inmate charts indicated inappropriate assessment of suicide risk. It appears that the clinicians do not maintain an awareness of suicide risk over time, instead judging or evaluating each incident as being isolated from the individual's history within the facility and within the community. There are inconsistencies in designating the level of risk that do not follow from the current and historical data from inmates who are being assessed. This results in insufficient or inaccurate designations of suicide risk, and ultimately a higher risk of inmates attempting or completing suicide.

The sworn staff members reportedly are not trained in suicide prevention training. While an eight-hour class on mental health in the jail has been initiated, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate that is above the national average over the past two years; in 2015, it was 33:100,000, which is right at the national average, and in 2016, it was 99:100,000 in 2016, nearly three times the national average. The average for the last two years is 61:100,000, which is nearly double the national average of 36:100,000 in jails in the United States.

## Psychiatric Services:
Psychiatrists do a very good job assessing the mental health status and needs of inmates who are in the facility for at least 14 days. The 14-day assessments are thorough and completed in a timely manner. The documentation we reviewed indicated that they provide quality treatment to inmates, although as noted above, this is not always in a timely manner as a result of cancelled appointments and the heavy inmate/patient load.

Dr. Badre, who is responsible for the Psychiatric Security Unit, which is essentially an inpatient mental health unit, has reportedly done a great job reducing the length of stay in this unit, and has modified it so it functions very similarly to psychiatric hospitals in the community. In addition to the services provided on the PSU, there is a step-down unit on the sixth floor that serves to monitor and maintain inmates who are psychotic or gravely disabled and yet not in need of the highly acute services provided on the PSU. This is a very effective utilization of services, and meets the needs of those inmates who continue to be psychotic and gravely disabled. Additionally, the psychiatrists maintain data on the number of inmates in segregation who have psychotic disorders; as a result of diligent monitoring, this number has been consistently reduced, which is appropriate for those with severe mental illness.

---

It was reported that inmates who enter the Central Jail and are taking psychotropic medication frequently do not have that medication continued in a timely manner. This results in instability and risk for the inmate, for custody staff and for the facility. Additionally, it was reported that psychiatrists receive requested laboratory reports less than 50% of the time.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. Unfortunately, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia). The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01:  Access to Care:**                                  **Not Met for Mental Health**
    Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:  Procedure in the Event of an Inmate Death:**       **Not Met for Mental Health**
    There is no psychological autopsy for completed suicides.

**J-A-11:  Grievance Mechanism for Health Complaints:  Not Met for Mental Health**
    There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:  Health Training for Correctional Officers:**       **Not Met for Mental Health**
    Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:  Mental Health Screening and Evaluation:**          **Not Met for Mental Health**
    Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**JE-07:  Nonemergency Health Care Requests and Services:  Not Met for Mental Health**
    Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:  Segregated Inmates:**                                **Partially Met for Mental Health**

Segregation rounds are provided by nursing staff, which meets NCCHC standards.  Mental health staff are not reviewing inmate records prior to placement in segregation for any possible contraindications to placement in segregation.

**J-E-13:  Discharge Planning:**                                **Not Met for Mental Health**

Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:  Basic Mental Health Services:**                      **Not Met for Mental Health**

Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**JG-05:  Suicide Prevention Program:**                         **Not Met for Mental Health**

There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.


**RECOMMENDATIONS:**

1. It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate.
2. It is recommended that the facility implement the CIWA and COWS protocols for alcohol and opiate withdrawal.
3. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
4. It is recommended that nursing staff that do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
5. It is recommended that mental health staff members see and address mental health grievances.
6. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
7. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

San Diego Sheriff's Department
George F. Bailey Detention Facility (GBCF)
Technical Assistance Report
January 5, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails.* On January 5, 2017, NRI conducted its review for the George F. Bailey Detention Facility (GBCF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 39 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 28 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-02   Clinical Performance Enhancement
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care

J-E-07   Nonemergency Health Care Requests and Services
J-E-08   Emergency Services
J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patients With Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
J-G-09   Counseling and Care of the Pregnant Inmate

There are 27 important standards and 25 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure In the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care For the Terminally Ill
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison
J-G-08   Contraception

**Evaluation Method**

We toured the clinic area, inmate housing areas, transfer area, mental health housing/PSU, segregation/administration segregation and MOB (medical observation area). We reviewed thirty-one (31) health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical reports; and health services personnel training and licensure logs. We interviewed the day shift sergeant, contract physician, facility nursing supervisor, CQI nurse, psychiatrist, psychologist, dentist, eleven (11) health staff, five (5) COs, and nine (9) inmates selected at random.

**Facility Description**

**Location:** Southwest
**Built:** 1993
**Security:** Maximum
**Supervision Style:** Indirect Supervision
**Bookings/Transfers:** 50 to 75 transfers in per day
**Lay Out:** Modular
**Capacity:** 1852
**Males:** 1653   **Females:** none   **Juveniles:** none
**Custody Staff: Total:** 189 over three shifts

**Findings and Comments**
***Special Note:*** *A mental health report summary and comments about the standard related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.*

## B.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

***J-A-01  Access to Care (E).*** Inmates have access to daily health care via written request slip or notifying officers. Patients see a qualified clinician and receive care for their serious medical, mental health, and dental needs. Physician and nurse sick call is held daily. As this is a maximum security jail, patients are occasionally on "lock down" status and the nurses and mental health clinicians do not have access to them. When this occurs, patients are subsequently rescheduled for their appointments, and medication administration is delayed. Approximately 20% to 30% of mental health appointments were not completed, based on our review.

---

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard. A back-up plan should also be developed for lock-down times to ensure critically ill patients receive their necessary care.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator who is normally in the administrative offices and rarely at the facilities. The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody, medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings (some system-wide and some facility-specific) which are all documented with action items and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI meeting, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and

---

Ex. H - 425

procedure meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization; these reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise, and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas and discussion and action steps to be taken. Documentation in this area is lacking. The identified studies are not documented, nor are the effectiveness of the corrective action plans. The committee identifies

---

problems, establishes thresholds, designs monitoring activities, analyzes the results and remonitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2, and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities, and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes. This jail's staff expressed concern about the staffing allocation, especially in reflection of the backlog of medical requests for care. A CQI audit and study of the staffing, workload, overtime, turnover, rescheduling and work flow and access to the patients would assist in evaluating and recommending any staffing or procedural changes. Documenting the complete quality improvement process or outcome study alerts everyone as to the problem and how a solution or new process was reached. Quality improvement is a continuous process (Problem, Do, Study, Act) and when the procedure is re-audited, it is possible to determine if it has been successful, or further research is required.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills were on the day shift, but there was no documentation. The 2016 drills were described as an active shooter, use of a restraint chair in a medical emergency, hostage scenarios, and inmate disturbance. The scenarios are developed centrally and sent to facility staff to conduct. The drills were critiqued and the results were shared with staff via the training bulletins and weekly staff meetings.

There was a real riot event that involved 33 inmates and staff, some of whom were sent to the emergency room. This was not written up as real disaster event, but could be an example of using actual events, and should be critiqued and the results shared with staff.

Man-down drills are planned to occur monthly or every other month. They do occur on each shift and the scenarios are described as "man on the floor," "man down in video court," and cell extraction. These have also been critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1g describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually where health staff are regularly assigned. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. There are exam rooms in each modular area of the jail so nursing staff may see patients in privacy with an officer stationed nearby. In the clinic exam rooms, they "try to do exams in private as much as possible." By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a provider, or nurse, from obtaining an inmate's full description of his or her problem to make a diagnosis. Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.

The facilities have a large numbers of cells assigned to segregation, so it is difficult to transfer segregated inmates to a clinic or interview room for care.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2, and # 3 require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA concerns and confidentiality.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There have been eight inmate deaths in this facility. Five (5) were reported to be of natural causes and three (3) by suicide (two by hanging and one inmate jumped from a top tier). The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

It was estimated that the jails have around 15 to 25 complaints per week. We reviewed the handwritten grievance log at this facility for December 2016. Nineteen (19) grievances were recorded. If this log were to be maintained, it would facilitate identifying trends.

Inmates may appeal, with a standard guideline of level one (seven days to respond), and levels two (10 days to respond each).

**Recommendations**: Compliance indictors # 1 and # 2 are met. We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail or in the positive pressure room (for total isolation). The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked. Sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** This jail has a small medical unit and the storage organization is poor. We observed boxes and carts in the halls that were used to hold doors open. The storage area is crammed and things could fall off hooks. Even though the area appeared clean and well lit, the clutter presents an injury risk. It is important to keep areas free of clutter and overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios, which were not available at the time of the visit, or implementing a call system in order to be notified of emergencies or to call if in an emergency. Exam rooms do not have call buttons. Officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail reported that this occurs very rarely.

**There are no** recommendations regarding this standard.

**C.  PERSONNEL AND TRAINING**

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits and all were current in cardiopulmonary resuscitation (CPR) training. There is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LVNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LVNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3, describe the medication administration training program to be approved by the responsible health authority, facility administrator and designated physician. The pharmacist would be an important component for evaluating the knowledge level of the LVN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** This facility does not use inmate workers in the medical observation beds area or the clinical areas. Nurses clean these areas. There are no peer health-related programs. Nurses clean the clinic spaces and medical observation beds. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for this assignment, and earn their food handler certifications.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff work 10.5 hour shifts with every other weekend off at this facility. The nurses total 33 full-time RNs and 20 full-time LVNs. Nine (9) RNs are scheduled for the day shift and seven (7) on the night shift. Five (5) LVNs are scheduled for each shift. The actual work hours may be staggered to accommodate work load or medication round schedules. The contracted physicians hold clinic daily and two (2) are in the clinic on Thursdays. They are also on call. Mental health staff consisted of two (2) clinicians.

At the time of our visit, vacancies consisted of four (4) RNs, one (1) LVN, and the chief psychiatrist, although two (2) RN positions and the LVN position were pending hires. Temporary agency staff are employed to fill vacancies.

**There are no** recommendations regarding this standard. Timely staff response to patient needs requires continual monitoring and evaluation. The length of time of medication rounds, waiting lists for dentist or physician appointments, or time spent in booking for an evaluation, are all components that may determine staffing needs. We noted there are very few mental health clinicians given the population.

---

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two (2) weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six (6) weeks are spent in on-site orientation and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LVN Preceptor Toolkit which consists of check lists, along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two (2) years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LVNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LVNs put doses of medication into labeled envelopes before taking the cart or basket to

the housing areas for administration. Since this process is time-consuming, LVNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to "lock-down" status. Nurses are not able to see patients during lock-down periods. There is no procedure in place to evaluate who is on essential medications or how to work with custody staff for a solution. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be validated.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing, and only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery), or require reordering.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two (2) clinic exam rooms, a medication room, one (1) dental chair, a records room, a mental health interview room and a radiology/x-ray room in the transfer area (with additional services from an outside provider that comes on site twice a week). The nurses' area has five (5) stations. It is next to an open storage cubby area where the emergency response stretcher and other equipment, plus boxes of supplies, crutches, etc. are stored. This area had quite a lot of overspill during the visit. The nurse's station is also central to the MOB and mental health housing area. There are also offices for mental health staff, the charge nurse, nursing supervisor, and a clerical area for charts and files.

We counted the sharps and needles with staff and found them to be accurate.

The two (2) emergency crash carts are checked each shift and we counted three (3) automated external defibrillators (AED) strategically placed around the facility.

The clinic contained all the equipment necessary to take care of the patients.

**There are no** recommendations regarding this standard.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, and drug screen urine dipstick and multiple-test dipstick urinalysis. (Pregnancy test kits are not necessary as the population at this facility is male.)

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care and the various fees and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return and others have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** This facility is designated as a transfer facility as it only received detainees from other jails within the system. When the nurses complete the transfer screening, they should ensure the receiving screening is completed and if not, schedule the inmate appropriately.

The standard is **not applicable**.

**J-E-03  Transfer Screening (E).** This program has multiple jails so it is reported that there are 50 to 100 transfers a day from other facilities to this jail. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours. This procedure was not listed in the policy and procedure manual.

The nursing staff receives from classification staff a list of transferring inmates when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said "cleared by RN and chart checked by MD" at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, the receiving nurse schedules the inmate and sees that it is

completed in a timely manner. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4 and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The nurse at the booking facility completes the mental health screening, which a nurse at the transfer jail reviews upon the inmate's arrival. The 14-day evaluation program is not in place: however, the mental health team should have a mechanism in place to track positive mental health screenings so these patients are seen for their evaluation before 14 days. This second step of reviewing the screenings and making the evaluation appointments may be completed by a qualified health professional or a clinician. This review and referral would assure that some inmates with mental health problems and a referral were not missed by the intake nurse. The current, lengthy process does identify most mental health patients, however. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first and refer to a psychiatrist or psychologist. CIs # 3 through # 7 are in place and the policy and procedure revision may include all the questions needed and the evaluation.

**Recommendations:** The mental health screening form requires revision to include all the required questions and observations. RNs should be trained by a mental health staff. The referrals from booking to mental health could reflect a 14-day evaluation if that program was in place. If a formal program was in place, there would be a policy and procedure tracking logs/lists and staff assigned to complete the evaluations by the 14th day of incarceration. The

mental health team does complete many evaluations for those with positive screenings, although they are not tracked for timeliness.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening occurs at the second stage of booking before inmates are transferred to this facility. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications. The dentist was not on duty the day of the consultation

There is no twelve (12) month oral examination by a dentist. The standard states that a trained health care professional may complete the screening before fourteen (14) days. A procedure can be set up to complete the health, mental health, and dental screening at the same time. The dentist completes extractions and sometimes provides a filling.

There is no evidence of any handouts for the inmates regarding oral hygiene and preventive oral education. CIs # 4 through # 6 are in place.

**Recommendations**: CI # 1 and # 2 can be addressed by incorporating oral screening and education into the booking process. The dentist can train the nurses to conduct the screening. CI # 3 can be met by preparing a list of inmates who have been at the facility for eleven (11) months and scheduling them for a dental examination to occur before their anniversary. The initial health assessment, mental health screening and evaluation, and oral care may all be accomplished by having a trained nurse or qualified healthcare professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves them each night and brings them to medical services, where they are date stamped and triaged as to the nature of the complaint (health, dental, or mental health), and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day or next day to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two (2) to four (4) days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven (7) to fourteen (14) days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight (8) days to see the nurse and some were twelve (12) to eighteen (18) days. For the physician, the lists were five (5) days out, with some at eight (8) to twelve (12) days.

Segregated inmates at this facility can also deposit request slips in the box during their hour "out of cell."

CIs # 2 through # 5 are met.

**Recommendations**: Compliance indictor # 1 requires that a qualified health professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What seems a head ache for the patient could be a symptom of stroke. Constipation could actually be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

CI # 3 assures all inmates, no matter which housing area, have access to care and timely evaluations.

One serious issue we identified is the backlog of 300 medical request slips that have not been answered with a face-to-face evaluation. Some were assigned a triage level and rescheduled over and over. This situation should be investigated and resolved as patients' serious health care needs are being delayed. We reviewed eleven (11) medical requests for care and most were answered by a nurse in two (2) to three (3) days. The plan of care was appropriate, and there were two (2) in which the nurse started a prescription medication.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day. They can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called, as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** This facility has a significant number of segregation/administrative segregation and personal protection cells. A nurse checks these inmates three (3) times a week and signs off on the list of inmates in that housing area. There are no notes as to their condition or if they are having a problem coping with isolation. Mental health staff also checks segregation inmates.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are usually escorted to on-site and off-site clinical appointments in a timely manner. Transporting officers are alerted to special accommodations (such as medication administration or communicable diseases) for their protection. Patients' health records are sealed in an envelope during transport and returned the same way. In this facility's general housing areas, patient escort seems to occur efficiently. CIs # 1 to # 3 are met.

**Recommendations:** One area to look at in this facility are the segregation areas where a lack of deputies may delay escorts from escorting a patient to the clinic or allowing mental health in to see a patient.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols (also known as standardized nursing procedures in this program) include prescription medications for emergency situations, well as routine health conditions, alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format), with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016; most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included diagnosing and prescribing medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations. CI # 3 addresses prescription medications that should not be present in the protocols except those for those used in emergency responses, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year. The last time was in 2013, but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no

evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place; however, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs for Naltrexone for extended-release injectable suspension ™, etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Information is instead clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

Representatives of community programs come on site for classes on HIV and hepatitis, parenting, and GED preparation. We observed a few posters in the housing areas about access to care, PREA, and smoking cessation. A closed-circuit television system is in place and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen, under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than ten (10) special medical diets offered.

At the time of our visit, approximately 166 special diets were ordered at this facility. A registered dietitian reviews the medical diet menus annually, in July, but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference.

CIs # 1, # 3, # 4, and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

### G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, they are identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care for the goal of stability. Some programs have a formal chronic disease component with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect where the physicians follow approved guidelines and order labs, treatment, medications, and "return to clinic" appointments as set.

This program has one chronic disease pathway for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines" which address areas like blood borne pathogens, suboxone, blood

pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard, and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers, and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory tests, frequency of orders, what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care, as reflected in the health record, appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with active medical instructions, according to need indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has 30 designated medical beds called "Medical Observation Beds (MOB) for those with medical needs or those who are handicapped. Eight (8)

are for low acuity medical patients and are located close to the nurses' station and twelve (12) enhanced observation beds are used for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patients should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal and directs the nurses to use the standard nursing protocols. The protocols instruct them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients and felt some of them were actually at infirmary level of care and required a physician directing the care plan and medications.

The responsible physician and RHA should review the use of the MOB and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds, and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds where nurses may admit, while others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The ten (10) compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation/shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use. These include lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and are referred to the on-site mental health program staff. A mental health clinician is in the stage 2 booking level daily to evaluate those inmates with mental health conditions. There are some safety cells for suicide watch or violence watch, if needed. There are also enhanced observation cells for special housing. The staffing included a position for a supervising psychiatrist, which was vacant at the time of our visit, and the chief clinician. Three mental health licensed clinicians respond to patients' needs for evaluations. The psychiatric

team is supplemented with contract psychiatrists who receive referrals and calls for evaluations and who order medications. The team provides some programming for patients as well.

CIs # 1, # 3, # 4, # 5 # 6 are all met, with the caveat that there are three (3) clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five (5) areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee, and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor, and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program.

In the last two years, the facility has had 13 deaths, four of which were suicides. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were completed for the cases of suicide, but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit, and was to continue until all health, mental health and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings, where special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CIs # 1 and # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled.

Ex. H - 446

CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective, assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, above booking, but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours, if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care. The nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a men's facility. The pregnant opiate patient discussed in CI # 7 is not applicable.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring, and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** The population at this facility is male. The standard is **not applicable.**

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** The population at this facility is male. The standard is **not applicable**.

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints, and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting and a list of patients using various appliances is maintained. It is also documented in the health record and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs approximately six (6) to eight (8) times a year. There is no formal procedure. Staff explained that the first step, after diagnosing such a condition and that the patient can no longer care for himself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program. If a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

### H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the records and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although, a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room and are accessible to the clerical staff who manage the records. The electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two (2) senior medical records technicians, ten (10) technicians, one (1) clerk and one (1) office assistant. Some of the staff is located in the central administrative

office, and others are in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended continuing the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The CI requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.   The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LVN to monitor the patient's mental and psychological status at least every 15 minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, restraints are not often applied in this system. A chair and a gurney can be used when necessary for a short period of time. The day shift sergeant reported that, thanks to the excellent crisis intervention training they receive, there have been few situations that required

the use of restraints, and then only for a short period of time. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2 and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency.

There is a process in place, through the courts, for forced medications. The PSU had approximately six to eight patients on this program system-wide. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed, revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** The day shift sergeant reported that that health staff do not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions or living wills that an inmate arrives with would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or do not resuscitate order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign consent for treatment when they go through the booking process; this consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and

documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program, and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research, a patient on a medical trial, or a participant in a research project.

## Mental Health Report:

**GEORGE BAILEY CORRECTIONAL FACILITY**

**Staffing:**   **1.2 FTE Psychiatrists**
          **1.0 FTE Psychologist**
          **2.0 FTE Mental Health Clinicians**

**Overview:** The mental health services at George Bailey are primarily provided by the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. They hold mental health clinics during the week to provide individual counseling, but the clinics are often cancelled and are not sufficient to meet the need for mental health services. The number of mental health clinicians doubled recently, from 1.0 to 2.0 FTE, but this is still insufficient to meet the need for mental health treatment. There are two psychologists, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 1.2 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at George Bailey, about the requirements of the program and how to implement it. The expressed understanding of it at the Central Jail is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30

minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and involvement in the safety program is his only duty. Staff members did not express an understanding of the design of the safety program as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the safety program, however, is that inmates who are identified as high risk cannot be released from the program prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the safety program, which may not include even 15-minute observation status in a safety cell if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly are not trained on suicide prevention. While an eight-hour mental health class has been implemented, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate at George Bailey that is above the national average over the past two years: in 2015, it was 200:100,000, nearly six times the national average, and in 2016, it was 100:100,000, which is nearly three times the national average. Combined for the last two years, it average is 150:100,000 per year, which is nearly five times the national average of 36:100,000 in American jails.

### Psychiatric Services:
Psychiatrists effectively treat inmates who are on psychotropic medications. Unlike at the Central Jail, the mental health clinicians and nursing staff typically refer inmates to see the psychiatrist, rather than seeing them for the mental health assessment.

George Bailey only has 1.0 FTE psychiatrist staff, which appears to be insufficient to meet the population's needs. Reportedly, the waiting list consists of 150 people, and one to three weeks.

Reportedly, 10 - 20% of inmates at the facility do not have their medications continued in a timely manner. Although this is better than the reported 50% or more who do not have their medications continued at Central Jail, this is still inadequate and is not meeting the mental health needs of those incarcerated in this facility.

The system emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. Unfortunately, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**

There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness, such as bipolar disorder or schizophrenia. The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

Mental health professionals reported that they see approximately 100 inmates per week, although as noted above, most of these are "wellness checks" and not appropriate counseling or more comprehensive mental health services.

It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**Segregation:**

The mental health professionals reported that they conduct segregation rounds three times per week, which exceeds the NCCHC requirement. This is very positive, and should help to ensure that inmates do not decompensate while in segregation. Unfortunately, segregation at George Bailey is used not only for disciplinary infractions, but also for inmates who simply have a mental illness, on the grounds it keeps them safe.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01:**    **Access to Care:**                          **Not Met for Mental Health**
Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:**    **Procedure in the Event of an Inmate Death:**    **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**    **Grievance Mechanism for Health Complaints:**    **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**    **Health Training for Correctional Officers:**    **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**    **Mental Health Screening and Evaluation:**    **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**    **Nonemergency Health Care Requests Services: Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**    **Segregated Inmates:**                    **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.  Additionally, security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards.

**J-E-13:**        **Discharge Planning:**        **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**        **Basic Mental Health Services:**        **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**        **Suicide Prevention Program:**        **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate.
2. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
3. It is recommended that nursing staff who do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
4. It is recommended that mental health staff members see and address mental health grievances.
5. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
6. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

San Diego Sheriff's Department
Las Colinas Detention and Re-Entry Facility (LCDRF)
Technical Assistance Report
January 6, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails.* On January 6, 2017, NRI conducted its review for the Las Colinas Detention and Re-Entry Faculty (LCDRF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 40 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 28 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services

J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patients with Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-G-08   Counseling and Care of the Pregnant Inmate
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
None

There are 27 important standards and 26 are applicable to this facility. Eighty-five percent or
more of the applicable important standards must be met in order to attain NCCHC accreditation.
Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-03   Clinic Space, Equipment and Supplies
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-08   Contraception
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison

---

Technical Assistance Report: San Diego County Sheriff's Department                          71

**Evaluation Method**

We toured the clinic area, the many inmate housing areas, segregation/administrative segregation, intake/receiving area, administration, library, psychiatric security unit, MOB (medical observation housing), industries, reentry service building and their recreation building. We reviewed 25 health records; policies and procedures; provider & nursing licenses; administrative, health staff, continuous quality improvement (CQI) meeting minutes; and statistical reports. We interviewed the jails administrative lieutenant, physician, nursing supervisor, CQI nurse, psychiatrist, psychologist, dentist, medical records clerk, five correctional officers (COs), nine other health staff, and 15 inmates selected at random.

**Facility Description**

**Location:** West/Southwest
**Built:** 2014
**Security:** Six levels/ from minimum to maximum
**Supervision Style**: Direct supervision
**Bookings:** 46/day
**Lay Out:** Campus-style with 24 housing areas around the parameter, and many service buildings inside the parameter. Half the population is able to walk to medical services, dining hall, industries, etc. The higher security females are escorted.
**Capacity:** 1270   **ADP** 730   Few units closed
**Males:** none        **Females:** 731   **Juveniles:** none
**Custody staff:   Total:** 204 working 12 hour shifts   **Days:** 46      **Nights:** 45

**Findings and Comments**
**\*Special Note**: A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an \* in front of the standard.

## C.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. The staff at this jail complies with timeliness of receiving screening and transfers. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. Although this is a minimum-to-maximum security jail, "lock-down" and subsequent delays to care are not an issue here.

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** The staff at this facility responds in a timely manner to inmates who come to the clinic, and during medication rounds and other treatment. However, processing requests for care is problematic. The "hands-off" triage procedure used in this system results in many requests being scheduled further and further "out." The patient then submits more requests and the problem becomes compounded, with a backlog of 150 requests for care at the time of NRI's visit. A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices and rarely at the facilities. The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) #2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody and medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented, with action items, and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers and public
health meetings, the monthly contractors and transportation meetings, the policy and procedure
meeting, and the site-specific weekly meetings of the patient care coordinating committee and
multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive
monthly statistical reports of health services utilization. These reports are used to monitor trends
in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire
system, with a few procedures describing site-specific items. The policies are well written, with
clear subject headings, purpose, policy, and procedure using the subjective, objective,
assessment and plan organization. They note the compliance with the state's legal corrections
standards. If accreditation were pursued, the addition of the NCCHC standard to each policy
and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and
update procedures in sections. The index of policies and procedures lists the revised and
reviewed annual dates of each policy. In the current index, most were reviewed in 2015,
although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the
procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the
procedures, it is recommended to review the use of the procedures and include those areas
specific to a certain facility. When it is added to the general procedures, it decreases the need
for sites to have their own procedures. Each jail has unique processes that should be
documented in the standard. Some facilities list the various jails at the end of the procedure,
and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible
physician. Either a cover sheet documenting annual review by the RHA and responsible
physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E)**. The CQI program meets quarterly
both at the central office and at each jail. The central committee chairperson coordinates the
meetings and activities of the committee, which is comprised of the medical administrator,
responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental
health representative. Facility-specific quality meetings include custody, medical and mental
health representatives, with the medical supervisor as the chairperson. The minutes of the main
CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to
be taken, although documentation is lacking. The identified studies are not documented, nor is

Ex. H - 459

the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and remonitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities, and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills were on the day shift, but there was no documentation. For this jail, the last four drills were scenarios of an active shooter, a hostage situation, an evacuation, and a fire drill. The scenarios are developed centrally and sent to facility staff to conduct. The drills were critiqued and the results were shared with staff via the training bulletins and weekly staff meetings.

Man-down drills are planned to occur monthly or every other month on each shift, but documentation was not available.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan.CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The on-site contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information in this facility provides the necessary privacy for patient care. The clinical area is large, with a nurse's station in the center. Curtains are pulled when exams are being conducted, while the officer waits near the nurse's station. Since most of the jail houses inmates of minimum to medium

Ex. H - 460

security levels, patients can walk freely around the campus and go to medical and mental health appointments. If there are security concerns, however, the patient is escorted and the officer waits in the hall for the encounter to end.

Most of the housing areas also have an exam room for nurse sick call, and privacy is respected by closing the door.

In the open receiving/booking area, two nurses are located alongside custody staff. This provides an opportunity for custody staff to overhear the booking procedure.

**Recommendations:** CI # 1 discusses the need for patient care to occur in private, which is the case in the clinic, but not during the second stage of booking. If a privacy screen, or barrier to hearing patient's health information were to be installed in that area, compliance would be achieved. There is privacy during the first stage of booking. CIs # 2 through # 5 are met.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There has been one inmate death in the last two years (reportedly due to natural causes). The administrative review was completed, but not in a timely manner. There was no clinical mortality review, however. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days, and cases of suicide require a psychological autopsy in addition to the administrative and clinical mortality review. Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level and as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints and give the inmate a copy of the results. All grievances, health and custody-related, are logged into the central computer system.

At this facility, an average of 20 health-related grievances is filed per week. The charge nurse answers first, the nursing supervisor second, and the chief medical officer is the third level of appeal. As described in the policy and procedure, the time intervals for responding are seven days for level one, and 10 days for levels two and three.

**Recommendations**: CIs #1 and #2 are met, however, we recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

> The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room for total isolation. The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked: sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports. They are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. The jail is well lit, clean and well maintained for an older jail. The space for health is limited, but the health staff makes great efforts to keep it organized and to maximize space.  It is important to keep areas free of clutter and overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios. They were not available at the time of the visit. The facility may consider implementing a call system in order to be notified of emergencies or to call if in an emergency. The exam rooms do not have call buttons. Officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented, and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail (which houses females) reported this has not occurred.

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. This includes the obstetrical/gynecological physician who comes to this facility. Copies of licenses are maintained

Ex. H - 463

in the central administrative office and on site, with each nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits, and all were current in cardiopulmonary resuscitation (CPR) training. An annual training program, consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

Ex. H - 464

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3 describe the training program to be approved by the responsible health authority, facility administrator and designated physician, for health staff so they are appropriately trained in administering medications. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects, and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** Inmates workers do not generally work in the MOB or clinic areas, although staff reported that they mop the floors and empty the trash under a nurse's supervision. Nurses clean the clinic tables and equipment. Inmate workers may also clean an empty bed after the patient has left. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for the assignment, and can earn their food handler certifications. This facility specializes in offering the inmates training in sewing, and other educational and vocational programming. There was no mention of any peer related programming.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** All the staff at this facility is full-time and is scheduled for 10-hour shifts, with every other weekend off. There are 40 RNs and 16 LPNs. Nine RNs are scheduled for the night shift and 11 for the day shift. Four LPNs are scheduled on each shift. Actual working hours may be staggered to accommodate work load or medication round schedules.

The contract physicians hold clinic seven days a week, and are on call on a rotating schedule 24 hours a day. Two OB/GYN physician clinics are held each week. On Tuesdays, only patients with gynecological problems are seen, and on Thursdays, only pregnant women are seen. Mental health staffing consists of three full-time clinicians. At the time of our visit, there were five RN vacancies (note the schedule shows five RN vacancies and the global report says five LPN vacancies). One nurse was waiting to begin orientation. Temporary agency staff is employed to fill vacancies.

**There are no** recommendations regarding this standard.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six weeks are spent in on-site orientation, and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LPN Preceptor Toolkit, which consists of check lists, along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CIs # 2 requires that the orientation program policy and procedure be reviewed once every two years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services at this jail are provided in a timely, safe and sufficient manner. There are two methods of medication administration at this facility. More than half of the inmate population may walk to the pill call window at routine (morning, afternoon & evening) times during the day. The LPNs also go out to the PSU, segregation and school/work areas to deliver medications. The central pharmacy receives all orders and sends medication to the medication room in bulk or unit doses. In preparing medication rounds, LPNs label envelopes, into which they put the dose. The nurse takes a cart or a basket to the housing areas for administration. Pre-pouring is also the means of administering at the pill call window.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Two staff members count controlled medications on each shift, and we verified the accuracy during the visit.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

CI # 2 is in met as there are no barriers to inmates receiving their medications. Lock-down is not a practice at this facility, and in receiving, the nurses have time to order prescriptions.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CI # 2 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of contract physicians' ordering practices, this cannot be validated. With regard to quality audits to assure safe practices, CI # 4 can be verified with audits.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing. Only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications order and delivery.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** This large, new clinic area includes three exam rooms, one room for emergencies, two dental chairs, six mental health offices, a medication room, a records room, a telemedicine area, a laboratory, and a room for biohazard storage. The large nursing station has six areas for nurses to work, and space for files and reference books. There are also five offices, a staff lounge, two storage areas, and bathrooms for inmates and staff. The booking area has an examination room, three sober and three safety cells, and a digital chest x-ray machine.

All of the housing areas except one have an exam room. In one program dormitory, the nurses use an interview room. All the exam rooms provide privacy.

There two emergency crash carts, one in the clinic, and one in receiving, are checked each shift. Eight automated external defibrillators (AED) were strategically place around the facility.

The clinic contained all the equipment necessary to take care of the patients.

Our inspection indicated that the counts of items subject to abuse, such as needles and scissors, were not accurate, however.

**Recommendations:** CI #7 requires those items of abuse to be inventoried and accounted for. The needle counts in both the dental and clinical areas were not accurate. A review of the policy and in service for staff may result in compliance with this indicator.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, pregnancy tests, drug screen urine dipstick and multiple-test dipstick urinalysis.

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking, and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

In addition to obstetrical/gynecological specialists who provide routine clinics on-site. Services are available in the community as needed. The clinic exam room includes an ultrasound machine for OB/GYN patients.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment, and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart, and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care and the various fees, and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return, and other have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).**  The receiving or booking process in this jail is very organized and timely. The booking style is open, where the individual sees a nurse as soon as she arrives and a decision is made to either accept her or refer her for emergency room care and clearance. After the detainee is cleared for acceptance, she waits to be called for the rest of the booking process. The same nurses complete the first part of the booking evaluation (pre-screening), and the second part (with a more thorough evaluation, recording of vital signs, development of a care plan, and follow-up appointments). The nurses said they have called the provider for orders, but they still initiate the standard nursing procedures when they are applicable and begin prescriptions on their own.

Safety and sobering cells are available if a detainee needs monitoring for intoxication or suicide risk.

Our chart reviews, and the results of interviews, indicated this process takes six to eight hours, which includes all the custody interviews, and the chest ray and contraband screenings. The nurses' screening is completed within an hour or two, depending on the number of arrivals. There are generally 45 to 60 bookings a day.

CIs # 1, through # 9, and # 13 are met in this jail. CI # 4 is met as there is routine pregnancy testing of incoming women.

CI# 11 is not applicable to this jail, as nurses complete the receiving screening.

**Recommendations:** CIs # 4, # 5, # 6, # 10 and # 12 are not met. The receiving screening procedure in this jail is reflective of the intent of this standard. The nurses complete the prescreening and rest of the screening in a timely manner.

When the screening forms are updated to reflect all the questions in CI# 6 and CI# 7, full compliance will be achieved.

During the tour, we observed nurses completing the receiving screening with three custody personnel completing their interviews. This represents a potential breach of confidentiality. Adding a privacy screen or Plexiglas barrier between the nursing desks would provide auditory privacy. The same receiving screening form is used in all the facilities, and should be compared to the standard to ensure it is complete. Because of the efficient use of space in this jail, the receiving screening could be completed in one step, or a quick check as they come off the bus or out of the police car for clearance, and then the full screening completed when they are inside.

**Special Note:** The use of resources for the booking process (stage 1 and stage 2) should be evaluated with consideration to the standards J-E-04 Initial Health Screening, J-E-05 Mental Health Screening and Evaluation, and J-E-06 Oral Care. When timeliness is not met for receiving screening, this affects other standards. When considering the use of a nurse practitioner's resources to start and continue medication during receiving, consideration should also be made for standard J-E-11 Nursing Assessment Protocols.

**J-E-03  Transfer Screening (E).** Reportedly, 50 to 100 transfers a day arrive at this facility from the others. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours. This procedure was not listed in the policy and procedure manual.

The nursing staff at this facility receives transfers from another jail that does house some females. The procedure is that the transferring inmate goes through receiving and the nurse reviews the electronic record for medications and any pending appointments. There was no supporting documentation that this occurred during chart reviews.

**Recommendations**: The receiving screening at this facility should be reviewed and staff retrained to ensure compliance with the procedures.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information, and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for

Ex. H - 471

the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4, and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during the stage 2 of receiving screening. The nurse asks a few questions during stage 1. There is no 14-day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first, and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place. With the revision of the forms to include questions from CI# 1 and CI# 2, the standard would be met.

**Recommendations:** The mental health screening form requires revision to include all the required questions/observations. RNs should be trained by a mental health staff. If the receiving screening forms are revised to include the mental health screening questions, then the mental health screening is complete. With the referral of positive mental health problems to the mental health clinician, then the evaluation is complete.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking, although there is no inspection of the inmate's mouth. This could be added to the first stage, as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12-month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site one day a week, and sees patient upon a nurse's referral. They dentist completes extractions and provides the rare filling. The dental list shows from the time of the appointment until the patient is seen varies from five days to 10 days to two months.

CIs #4 through #6 are in place.

**Recommendations**: CIs #1 and #2 can be addressed by incorporating oral screening/education into the booking process, and the dentist can train the nurses to conduct the screening. CI # 3 can address met by preparing a list of inmates who have been at the facility for 11 months and scheduling them for a dental examination to occur before their anniversary. The initial health assessment, mental health screening and evaluation and oral care may all be accomplished by having a trained nurse/qualified healthcare professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

---

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** A formal procedure is in place for the inmates to request care. There is a two copy form available in housing areas and from the nursing staff that the inmates fill out and place in a locked box on each housing area. Each night shift, a nurse picks up the forms and bring them to medical. They are date stamped in and triaged as to the complaint, dental or mental health. The nurse assigns a triage level to the complaint. Level 1 is urgent and schedule same day or next day to be seen. Triage Level 2 is semi-urgent and schedule two to four days out. Level 2 is non-urgent and schedule in seven to 14 days to see a provider. There are published guidelines for the nurses to decide which level to assign. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists it was an average of 4-8 days to see the nurse and those were the ones in triage 1 level.

At this facility all inmates have access to the locked boxes to place requests for care confidentially, even in segregation. CIs # 2 through # 5 are met.

**Recommendations**: CI # 1 requires that a qualified health professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What seems a head ache for the patient could be a symptom of stroke, or constipation could actually be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

**Note:** There was a backlog of 150 requests for care at this facility in which the patient has not seen a health care professional for an evaluation. The patient is assigned a triage level, however. When a patient is not seen after making a request, they repeat the process and the procedure falls out of control

**J-E-08  Emergency Services (E).** As nursing staff is on-duty 24 hours a day, they can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** There are 32 segregation cells at this facility, and on the day of the visit, 31 were occupied. The level of security is that of NCCHC's # 2.b., as the inmate has some contact with others and an hour out of their cell daily. A nurse checks these inmates three times a week, and dates and signs the list of inmates in that housing area. Mental health staff checks these inmates as well. There were, however, no notes as to their condition or if they were having issues coping with isolation.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients at this facility may self-escort to an appointment if they are classified as minimum or medium security. Maximum security-level patients are escorted by an officer. The health staff reported that the patients arrived for their appointments on time and were rarely refused. The custody staff is responsive to their health needs.

Escort to an off-site appointment is completed unless there is an emergency. The patients' paperwork is sealed in an envelope and returned the same way. Paperwork sent with a patient is in a sealed envelope and returned to medical in a sealed envelope for confidentiality.

**There are no** recommendations regarding this standard.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols, also known as standardized nursing procedures in this program, include prescription medications for emergency situations, well as routine health conditions, alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format), with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols/procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included to diagnose and prescribe medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols (although those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** Because the female inmates are housed in one facility, the continuity of care is better, especially for the pregnant females and those with gynecological problems, who see the same provider. For women's general health issues, we confirmed care of episodic, as most appointments are made after a request for care has been submitted. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are few physician-ordered "return to clinic appointments" to evaluate the effectiveness a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered, and the samples are sent to a contracted laboratory. The results are faxed back to the facility, and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based, and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** This facility's re-entry program aims to facilitate inmates' return to society as smooth as possible. Almost all the activities emphasize personal responsibility, education, obeying orders, and life planning. Medical and mental health staff have input into the women's health care plans for their release. The infection control nurse works with representatives of the health department, STD and HIV clinics to arrange patient referrals. TB clinic staff is alerted as to who requires follow-up. Discharging inmates can receive assistance in applying for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place. However, there was no evidence of this in the medical records we reviewed. Since this facility focuses on re-entry to society, a procedure to document medical and mental health plans is important. Special programs such as those for Naltrexone for extended-release injectable suspension  or others should also be documented in the health record.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, educational handouts are not given as inmates have used them to damage the plumbing in the past. Instead, information is clearly posted. The health record includes a box for nurses to check that patient education has been provided, but no space to describe the subject. We saw no evidence of physician-provided education.

A variety of programs are offered at this jail, including educational and vocational programs, so some written reference material is in fact available. In some of the women's housing areas, there were posters that were not available in the men's institutions. We saw posters addressing access to care, PREA and smoking cessation. Representatives from community programs come on site to provide classes on HIV and hepatitis, parenting, and GED preparation. A closed-circuit television system is in place, and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen under the training and supervision of the dietary staff. They receive a food handler's card which can assist them obtaining employment when they are released. There are more than 10 special medical diets offered.

At this facility, more than half the inmate population can walk to the cafeteria and they choose their diets. Some of the inmates have their food brought to them on carts.

A registered dietitian reviews the medical diet menus annually in July, but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference. We were given an extensive list of special diets, although it did not include the number of medical diets for this jail. CIs # 1, # 3, # 4 and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

---

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, he is identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component, with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications and "return to clinic" appointments as set.

This program has one chronic disease pathway, for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines," which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard, and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI #1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers, and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test and the frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete

transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs, and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with active medical instructions (according to need) indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called "Medical Observation Beds (MOB)". Thirty are for medical patients and 26 are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patient should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. MOB patients have access to a call button-type system to summon nurses; the nurses' station is not within sight or sound of the patients.

This facility's observation beds have piped-in oxygen and suction with hospital beds and over-bed tables. There is a central nurse's station, so the nurses are within sight and sound of the patients. This MOB area could be an infirmary, as it is set up as one with medical beds, piped in oxygen and suction, and nurses within sight and sound. The procedure could reflect the care of sheltered housing or infirmary/skilled nursing care depending on the patients health needs.

If the acuity of the patients qualified as infirmary, then the compliance indicators would have to be met and a procedure be put in place, with physician oversight.

The responsible physician and RHA should review the use of the MOBs and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds, where nurses may admit; others have a high acuity infirmary. Some places use a matrix to for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation, shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician, and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use, such as lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and referred to the onsite mental health program staff. A mental health clinician will see them as soon after booking as possible. There are some safety cells, holding cells and sobering cells for patient needs in booking. In this jail, there are 26 beds designated as mental health or a psychiatric secure unit/PSU. This is a large area with day rooms, interview rooms, recreation/activities rooms. There are three levels of observations for patient safety.

Three mental health licensed clinicians respond to patients needs for evaluations. The psychiatric team is supplemented with contracted psychiatrists, who receive referrals and calls for evaluations, and who order medications. The team provides programming for patients, which includes several vocational and education opportunities for patients in these units.

CIs # 1, # 3, # 4, # 5 #6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all 5 areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee, and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each

facility has an assigned gatekeeper who oversees the care of patients in the safety program. At this jail, it is the psychiatric unit's charge nurse or mental health clinician.

In the last two years, there has been one inmate death which was not a suicide. While the risk is less with women, it still exists. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide.

**Recommendations**:
See the mental health report at the end of the standards for recommendations.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicate and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. Various re-entry programs are offered as well. CIs # 1, # 3, # 4, and # 5 are met.

**Recommendations:** CI # 2 recommends custody receives information on the effects of alcohol and drugs on the populations. This could be true for health and provider staff to receive more training so diagnosis and referral is accurate and differentiated from mental health.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective and objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, above booking, but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a women's facility. The nurses reported that they conduct pregnancy testing on all substance abusing women and those on prescription drugs.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in

Ex. H - 480

the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** There is no policy and procedure that guides the staff to continue women's prescription upon arrival, or if emergency contraception is available. It would be available in the community hospital, but this should be explained in a procedure for staff reference.

Since this jail has a re-entry program, it would be appropriate to address the women's contraception needs before they leave custody. With over 20 pregnant women in custody at any time, the need for contraception planning is necessary. There are community resources regarding pregnancy options and contraception, if needed.

**Recommendations:** CI # 4 requires a policy and procedure to guide staff in the contraceptive practices of the program and addresses the components of the standard. It should also include where emergency contraception is available.

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** Comprehensive counseling services are available to pregnant inmates through the services of contracted obstetrical/gynecological physicians who come on site weekly. Prenatal care, specialized obstetrical services when indicated, and postpartum care are available. Pregnant women deliver in the community hospital, and then return to jail to be observed until stable. The staff said restraints are not applied during labor. CIs # 1 through # 5 are met.

**Recommendation:** CI # 6 requires a policy and procedure to guide staff in the care of a pregnant woman and addresses the components of the standard**.**

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs occasionally. There is no formal procedure, although staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, the responsible physician or health administrator would advocate to the courts for a compassionate release. There is no formal hospice program, so if a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, and # 3 are met.

Ex. H - 481

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

**H. HEALTH RECORDS**

> The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared basis among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room (accessible to the clerical staff who manage the records), and the electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two senior medical records technicians, 10 technicians, one clerk and one office assistant. Some of the staff is located in the central administrative office, and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended that the facility continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system, or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours, and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every 15 minutes, and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, custody-ordered restraints are rare. A restraint chair is available for a maximum of two hours, with 15-minute intervals of monitoring by nurses. The lieutenant reported that in booking, occasionally a distraught inmate is placed in a holding cell until they calm down.

Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2, and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of

restraints, and we would recommend re-examining the practice of a nurse removing restraints, or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency.

There is a process in place through the courts for forced medications. We could not determine if there was anyone in this program. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed and revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** The facility lieutenant reported that health staff do not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice, the CIs seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions or living wills that an inmate arrives with would be honored. The provider notes in the health record that such instructions exist; there are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or do not resuscitate order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to

counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at this facility. During the second step of the receiving screening, the nurse may discover a new arrival is on an experimental medication. The usual procedure is to notify the responsible physician to guide the staff and patient in this community program.

**Recommendations**: A policy and procedure should be developed for medical research in the program. Using the compliance indicators, decisions may be put in place so staff has a clear idea of how to handle any request for research, or if a patient arrives on a medical trial or as a participant in a research project.

# Mental Health Report:

**LAS COLINAS RE-ENTRY AND DETENTION FACILITY**

**Staffing:** **2.0 FTE Psychiatrists**
                **1.0 FTE Psychologist**
                **2.0 Mental Health Clinicians**

**Overview:** The mental health services at Las Colinas are provided by the psychiatrists, who conduct the 14-day assessments, prescribe and monitor psychotropic medications, and the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. They hold mental health clinics during the week, which are intended for individual counseling, but are often cancelled and are not sufficient to meet the need for mental health services. There is one psychologist whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 2.0 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications, 14-day assessments, and managing and operating the Psychiatric Security Unit (PSU) for women.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at LCDRF, about the requirements of the Safety Program and how to implement it. The expressed understanding at the LCDRF is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and his only duty is involvement in the Safety Program. Staff members did not express an understanding of the design of the Safety Program, as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the Safety Program, however, is that inmates who are identified as high risk cannot be released from the Safety Program prior

to 48 hours, while those who identified as being at low risk can be released from the program in 24 hours.

Inmates who have attempted suicide are not automatically placed on one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute observation status in a safety cell if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly do not receive suicide prevention training. It is a positive sign that they have started to receive an eight-hour class on the topic of mental health in jail, but apparently this does not include any suicide prevention training. Additionally, the mental health clinicians dare not trained to assess and manage suicide risk in the jail.

Despite the lack of an appropriate suicide prevention program, there have been no suicides at LCDRF in the past two years. The suicide prevention program requires significant improvement if this is to continue.

**Psychiatric Services:**
Psychiatrists do a good job of assessing inmates, treating those on psychotropic medications, and managing the PSU.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. However, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There appears to be a sufficient number of mental health professionals in the facility to meet the needs of the mentally ill, but it appears there is no system to ensure that their time is utilized to appropriately meet the needs of the mentally ill. It was reported that they only sporadically receive inmate requests for services, and that at times, it can be weeks before they receive these requests.

LDCRF has an impressive facility, and an area that is ideally suited for providing mental health treatment. It provides the appropriate level of confidentiality for mental health services, unlike any other facility in the system. If the system for referrals and provision of services can be improved, there is good opportunity to appropriately meet the mental health needs of the women incarcerated at this facility.

**Segregation:**
The mental health professionals reported that they have just begun doing segregation rounds weekly. This is a good step, and should help to ensure that inmates are not decompensating while in segregation. The mental health staff does not, however, screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement.

**PSU:**

The services provided at the PSU are much like what would be provided at a residential treatment facility. The inmates have groups five hours per day, and the natural light and set-up of the unit is conducive to stabilizing and improving the mental health of the participants.

The physical structure of the unit provides an opportunity for a therapeutic community program for more stable women. They are often on the unit for several months or longer, and could benefit from the therapeutic community model.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01:**    **Access to Care:**                    **Not Met for Mental Health**
Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:**    **Procedure in the Event of an Inmate Death:**    **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**    **Grievance Mechanism for Health Complaints:**    **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**    **Health Training for Correctional Officers:**    **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**    **Mental Health Screening and Evaluation:**    **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**    **Nonemergency Health Care Requests/Services: Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**    **Segregated Inmates:**                    **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.

**J-E-13:**    **Discharge Planning:**                    **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**    **Basic Mental Health Services:**            **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**    **Suicide Prevention Program:**            **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

**RECOMMENDATIONS:**

1. It is recommended that the system for providing mental health services be improved so that the adequate number of staff can meet the mental health needs of the inmates in this facility.

2. It is recommended that nursing staff who do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.

3. It is recommended that mental health staff members see and address mental health grievances.

4. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.

5. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

6. It is recommended that the facility consider developing a therapeutic community program for inmates in the PSU.

San Diego Sheriff's Department
Vista Detention Facility (VDF)
Technical Assistance Report
January 7, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails.* On January 7, 2017, NRI conducted its review for the Vista Detention Center (VDF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 39 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 26 essential standards:

<u>Essential Standards</u>
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services
J-E-12   Continuity and Coordination of Care During Incarceration

Ex. H - 489

J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patient With Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01    Restraint and Seclusion
J-I-02    Emergency Psychotropic Medications


Essential Standard Not Applicable
J-C-09   Counseling and Care of the Pregnant Inmate


There are 27 important standards and 26 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 20 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-03   Clinic Space, Equipment, and Supplies
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care for the Terminally Ill
J-H-04   Access to Custody Information
J-I-03    Forensic Information
J-I-04    End-of-Life Decision Making
J-I-05    Informed Consent and Right to Refuse
J-I-06    Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison

**Evaluation Method**

We toured the booking/receiving area, medical observation area, clinic area, dental area, indoor recreation area, inmate housing areas, mental health housing areas, and segregation. We reviewed 17 health records; policies and procedures; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical and health services personnel and correctional officer (CO) training records. We interviewed the, day shift sergeant, physician, nursing supervisor, psychiatrist, psychologist, dentist, two COs, and eight inmates selected at random.

**Facility Description**

**Location:**  Southwest
**Built:**  1978 and expanded in 1989
**Security:**  Level 2 or medium
**Supervision Style:**  Direct and Indirect Supervision
**Bookings:**  32 to 50 a day/male and female
**Lay Out:**  Modular and Dormitory Housing
**Capacity:**  886 is the court ordered capacity
**Males:** 708    **Females:** 76    **Juveniles:** none
**Custody Staff:**  Not available; staffed days, evenings and nights

**Findings and Comments:**
**Special Note:** A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard**.**

## D.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. Some areas are not timely, however, such as the receiving screening and the face-to-face evaluation after a request is triaged. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. This is a medium-security facility, and "lock-down" is used as needed, but health and custody staff works together regarding the inmates' health needs regardless.

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**There are no** recommendations regarding this standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices (and rarely at the facilities). The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody, medical, and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented with action items and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers, public health meetings, monthly contractors, transportation meetings, policy and procedure meeting, site-specific weekly meetings of the patient care coordinating committee, and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization. These reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

---

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system, with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, and objective assessment plan organization. They note compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. A cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken, although documentation is lacking. The identified studies are not documented, nor is the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and monitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring and implementation. With the physician's guidance, the committee establishes monitoring activities and thresholds for studies, and completes those studies. CI # 4 explains process and outcome

studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills occurred on the day shift, but there was no documentation. The scenarios were described as an active shooter, use of the restraint chair in a medical emergency, hostage scenarios, and an inmate disturbance. The scenarios are developed centrally and sent to the facilities for staff to conduct. The drills were critiqued and shared with staff via the training bulletins and at the weekly staff meetings.

The facilities plan a monthly or every other month man-down drill. They do occur on each shift and are described as man on the floor, man down in video court, cell extraction. They are all drills, critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information is usually conducted in privacy. In this jail, the deputy escorts the patient to the clinic and remains in the hall during the appointment. Only when the patient is unstable, do officers remain in the room. Health encounters in the housing areas are as confidential as possible. At this jail, the mental health clinicians mentioned that they conduct many interviews through glass windows in the doors, which means staff or other inmates can overhear.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2 and # 3 require procedures to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA and confidentiality; however, facility practices do not allow for confidentiality to occur in all areas of the jail.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** For the last two years, 2015 and 2016, there have been eight inmate deaths, of which four were reported to be of natural causes,

Ex. H - 494

and four by suicide. The administrative review and clinical mortality reviews were not completed in a timely manner. Also, there was no evidence that the results of the reviews, when completed, were shared with staff at the facility. The nursing supervisor attended the mortality review for the suicide that occurred in 2016 and shared the information with the staff.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

At this facility, an average of six health-related grievances, including mental health, are filed a day (more than 150 a month), which seems excessive. This would be a good topic for a CQI study in order to identify trends. The standard appeal procedure is seven days for level one and 10 days for levels two and three.

**Recommendations**: Compliance indictors # 1 and # 2 are met. We recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room (for total isolation). The negative airflow

Ex. H - 495

isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff for review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked. Sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. The nursing supervisor at this jail reports that staff does report safety issues and discusses them in staff meetings. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** Health staff appear to work under safe and sanitary conditions. The jail is well lit, clean, and well maintained for an older jail. The space for health is limited, but the health staff has made great effort to keep it organized and to maximize space. The nurse's station is next to the clinics and the MOB area. The health staff work together to ensure assignments are completed when assistance is needed, which in turn ensures timeliness of care and safety for the nurses.

**Recommendations:** Staff may benefit from wearing radios (not available at the time of the visit), or implementing a call system in order to be notified of emergencies or to call if in an emergency. The exam rooms do not have call buttons. Because of this, officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We

Ex. H - 496

observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. The nursing supervisor reported that there have not been any incidents in the jail for "a long time".

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license. The nursing supervisor reported that copies of licenses for all licensed staff were in his office.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits and all were current in cardiopulmonary resuscitation (CPR) training. There is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses and LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years and specifies the required topics. Health staff should insure that all health related training is completed. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3, describe the training program to be approved by the responsible health authority, facility administrator, and designated physician, for health staff so they are appropriately trained in administering medications. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** Inmate workers are not employed in a health care delivery capacity, either in the MOB or clinical areas. They clean the floors and empty the trash. Nurses clean the clinic spaces. Inmate workers work in the kitchen and have been trained to do so by the kitchen supervisors. They can earn their food handler certification. There are no peer health-related programs at this facility.

Ex. H - 498

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff is scheduled for 10-hour shifts with every other weekend off. Full-time staff includes 25 RNs and 12 LPNs. Seven RNs are scheduled for the day shift and five for the night shift. Three LPNs are scheduled for each shift. Actual working hours may vary to accommodate the work load or medication round schedules. The contract physicians hold clinic seven days a week from 8:00 am until 12:00 pm and are on call on a rotating schedule 24 hours a day. Mental health staff consists of two full-time clinicians, including a psychiatrist.

At the time of our visit, vacancies consisted of three RN positions. Two new hires were pending orientation. Temporary agency staff is also used to fill vacancies.

This jail is unique in that staff rotates assignments and cooperate particularly well to balance the work load. The nursing supervisor attributes their ability to keep up with requests for care, emergencies, and bookings to teamwork and good communication amongst the staff. He reported turnover is rare, and that the vacancies were recent.

**There are no** recommendations regarding this standard.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two weeks orientation at the central administrative offices. This includes personnel, benefits, medical records, emergency response, and readiness for onsite orientation. The next six weeks are spent in orientation at the facility of assignment, where new staff is assigned a preceptor. They review all aspects of the facility: security, inmate population, job description, and skills competencies. Each new hire, is given an RN or LPN Preceptor Toolkit that consists of check lists along with procedures and skills information. These check lists are reviewed before the orientation ends with the nursing supervisor in order to determine if more time is needed. All compliance indicators, except CI # 2 are met.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once

a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

---

Ex. H - 500

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LPNs put doses of medication into labeled envelopes before taking the cart or basket to the housing areas for administration. Since this process is time-consuming, LPNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to "lock-down" status. Nurses are not able to see patients during lock-down periods. There is no procedure in place to evaluate who is on essential medications or how to work with custody staff for a solution. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be validated.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure

does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing, and only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery), or require reordering.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two exam rooms, a dental chair, a medication room, a records room in the nurses' station, a lab area in a clinic room, a patient waiting room, a radiology/x-ray room (digital in the receiving area), a small nurse's station with records space, and a couple of supply rooms. The nursing supervisor reported that mental health clinicians have a private area to see patients and sometimes they go to the cell to evaluate a patient, especially when the patient is in segregation. The booking area also has some medical space, including sobering and safety cells, and two nursing areas.

Items subject to abuse are not counted each shift. Three emergency crash carts are checked each shift. Five automated external defibrillators (AED) were strategically placed around the facility.

The clinic contained all the equipment necessary to take care of the patients.

**Recommendations:** Compliance indicator # 7 requires that weekly inventories on items subject to abuse (syringes, needles, scissors etc.) This procedure should be put in place and maintained.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, pregnancy test kits, and drug screen urine dipstick and multiple-test dipstick urinalysis. Males and females are housed at this facility.

The AEDs are checked regularly. There is no manual of laboratory tests or equipment in the clinic area.

The dental operatory is fully equipped with everything except an oxygen tank, although one is nearby in the clinic. As there was no dental staff on site, we were unable to verify the dental sharps count.

A representative from an outside laboratory service retrieves samples regularly and returns the results by phone or fax. X-ray services can be provided in the booking area. A contracted technician comes daily. Panoramic dental x-rays can be taken in the clinic. Optometry, CAT scans, and ultrasound examinations are offered in the community. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections, and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care, and the various fees, and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return and other have it posted. Based on the results of inmate interviews,

surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** When new admissions arrive directly from the community two nurses complete the receiving screen immediately upon arrival. The pre-booking or "medical clearance" screening is accomplished as part of the complete screening. They complete the two forms at the same time. If the nurse feels an arrestee needs to go to the hospital, he/she works with custody staff and the arresting agency to arrange this.

Inmates of both genders are "booked" at this facility. Females are tested for pregnancy, and if positive and necessary, begin the opiate protocol. Pregnant females are transferred immediately to a facility that can meet their needs.

If someone arrives on methadone, an oral methadone bridge is used until a plan with a community clinic can be arranged.

The nurse takes vital signs and asks questions about injuries, suicide risk, medications, recent hospitalizations, and other health problems. If the arrestee is semi-conscious, bleeding or severely intoxicated, s/he will be sent to the emergency room. The nursing supervisor explained that there still is an issue with nurses completing pregnancy test and a urine drug screen before starting the inmate on prescriptions medications.

The full booking procedure at this facility takes from two to six hours. It includes contraband screening, a chest x-ray to rule out tuberculosis, and housing in a sobering cell if needed. Safety cells can also be used to monitor inmates for their behavior.

The nurses initiate the standard nursing procedures when identified and call the on-call physician for orders to continue medications after they have been verified.

CIs # 1 through # 9 and # 13 are met at this jail due to the timeliness of the complete screening. CI # 4 is met as the nurse completes pregnancy testing on the incoming females. Since CI # 11 references corrections officers completing the screening. It is not applicable as nurses do the screenings at this facility.

**Recommendations:** This jail complies closely to the intent of the standard. Two and sometimes three nurses complete the screening and follow up with a plan of care. Some areas of the form are not complete and need to be revised to include the mental health and dental questions. The receiving screening procedure at this jail assures timely screenings for each new arrival. As with the other reports, there were no access-to-care signs in the receiving area. When all the appropriate questions are added to the receiving screening, the facility will be in compliance.

CI # 6 (a) though (k) address the required elements for the receiving screening form. While most are included, adding dietary needs and recent communicable diseases symptoms, along with the mental health and dental questions, would meet the needs for compliance.

CI # 8 describes the disposition of the inmate. This is not part of the receiving form and should be added. It communicates whether the person would go to general housing, medical observation beds, or to sobering/safety cells. This is important for the next health care person to know what was present in booking.

CI # 12 requires that health staff should regularly monitor the effectiveness and safety of the receiving screening process. This can be done in quality improvement committee or in another format.

**Special Note:** The booking/receiving screening process at this jail may be used as an example for the quality study of a coordinated, timely, and thorough screening of incoming detainees. This is the safety net to ensure the health status of newly arrived inmates is known and to prevent crisis/death.

**J-E-03  Transfer Screening (E).** Reportedly, 50 to 100 transfers a day arrive at this facility from the others. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours.

The nursing staff receives from classification staff a list of transferring inmates when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said "cleared by RN and chart checked by MD" at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, the receiving nurse schedules the inmate and sees that it is completed. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a

Ex. H - 505

nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4, and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during the stage 2 of receiving screening. (The nurse asks a few questions during stage 1.) There is no 14-day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place and the policy and procedure revision may include all the questions needed and the evaluation.

**Recommendations:** The mental health screening form requires revision to include all the required questions/observations. RNs should be trained by a mental health staff. The referrals from booking to mental health could reflect a 14-day evaluation if that program was in place. If a formal program was in place, there would be policy and procedure, tracking logs/lists, and staff assigned to complete the evaluations by the 14th day of incarceration. The mental health team does complete many evaluations for those with positive screenings, although they are not tracked for timeliness.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking, although there is no inspection of the inmate's mouth. This could be added to the first stage, as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12-month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site one day a week, and sees patient upon a nurse's referral. The dentist completes extractions and provides the rare filling. The dentist also may send complex patients to another jail with more dental time. The dental list shows there is no backlog of dental appointments and they are seen in a timely interval.

**Recommendations**: CI # 1 and # 2 can be met by incorporating oral screening/education into the upfront booking process and the dentist can train the nurses to conduct the screening. CI # 3 can be met by pulling a list of inmates in the facility for 11 months and schedule for a dental exam by 12 months. Since the timeliness of the oral screen is 14 days, and oral hygiene instructions are 30 days, the screening can be completed by the trained nurse during the initial health assessment. The initial health assessment, mental health screening and evaluation and oral care may all be accomplished by having a trained nurse complete the assessment.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves them

each night and brings them to medical services where they are date stamped and triaged as to the nature of the complaint (health, dental, or mental health) and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day or next to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two to four days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven to 14 days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight days to see the nurse and some were 12 to 18 days. For the physician, the lists were five days out, with some at eight to 12 days.

At this facility all inmates have access to the locked boxes for their requests to remain confidential. Also, there were no backlog of requests. The nurses pick up, triage, and see the patients as indicated in the procedure. While the procedure does not require a face-to-face assessment within 24 hours of triage, the inmates are seen by a nurse.  CIs # 2 through # 5 are met

**Recommendations**: Compliance indictor # 1 requires that a qualified health professional has a face to face encounter with the patient within 48 hours of receiving request that describe a clinical symptom. This is not completed. The nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What may be a headache to the patient may be a stroke symptom or constipation a symptom of an infected appendix. The intent of the standard is for those requesting care be evaluated first. The request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day and can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** There were approximately 235 inmates in segregation/administration segregation and protective housing cells. The mental health staff conducts weekly segregation checks, and they note on the list whether the patient has been seen and if they are on the mental health case load. There was no notation about their mental condition, hygiene, orientation, or how they were adjusting. The nursing supervisor reported that nurses go on segregation rounds three times a week, although there was no documentation to support this.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These

---

checks must be documented in the health records as to date, time, and relevant observations.
There are a variety of ways to comply with the standard, including to use a form for each inmate
in isolation to document the checks from the beginning to release. This record should be
scanned into the electronic health record. At the time of the visit, there was no notation of
segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation
and isolation.

**J-E-10  Patient Escort (I).** Patients are escorted to on-site and off-site clinical appointments in
a timely manner. Custody staff was proud of their support for medical services, particularly
regarding patient transport on-site and off-site). Transporting officers are alerted to special
accommodations such as medication administration or communicable diseases. Paperwork is
sealed in an envelope and returned to medical services the same way to protect confidentiality.

CIs # 1 to # 3 are met.

**There are** no recommendations regarding this standard.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols, also known as
standardized nursing procedures in this program, include prescription medications for
emergency situations, as well as routine health conditions: alcohol withdrawal, chronic care, and
infections. They are drafted in sections (patient condition, subjective, objective, assessment and
plan format) with guideline for the nurses to evaluate the patient's complaint. The treatment plan
section includes over-the-counter and prescription medication, including Librium, Dilantin,
insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a
few were written in June 2016. The nurses are trained in the procedures, along with policies and
procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by
the health administrator and responsible physician. Only a few had been reviewed in 2016. Most
had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the
nurses have been trained, it included to diagnose and prescribe medications to patients without
an order. The training must be applicable to state laws and Board of Nursing rules and
regulations.

CI # 3 addresses prescription medications that should not be present in the protocols except
those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included,
provided a clinician order is obtained before administering. CI # 4 requires that a policy and
procedure should be in place. The procedure states that guidelines are reviewed every other
year (last time 2013), but does not state if the responsible physician has developed the
guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that
there was a system of episodic care, instead of continuity of care, with most appointments being
made after a request for care was submitted by the patient. Care is coordinated with nurses
doing sick call evaluations and setting clinic appointments for the physicians. There are a few

physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** Compliance indictor # 1 states that there is a discharge planning process in place. However, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs for Naltrexone for extended-release injectable suspension , etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

### F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Information is instead clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has

been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

In this jail, a variety of written literature, including books, are provided by the Veterans Program and the Incentive Housing Unit. The inmates also participate in day-long formal programming to prepare them for re-entry into society. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen, under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than 10 special medical diets offered.

At the time of our visit, approximately 82 special diets were ordered at this jail. A registered dietitian reviews the medical diet menus annually (in July), but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference. CIs # 1, # 3, # 4, and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03   Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, they are identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component with designated clinics for specific diseases and a nurse who coordinates appointments, labs, and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications, and "return to clinic" appointments as set.

Ex. H - 510

This program has one chronic disease pathway, for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines" which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test, frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with

active medical instructions (according to need) indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called "Medical Observation Beds (MOB)". Twenty-seven are for medical patients (five negative pressure rooms, two safety cells, and 20 with intercom communication), and eight beds are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patient should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients, and felt some of them were actually at infirmary level of care, and required a physician directing the care plan and medications.

The responsible physician and RHA, should review the use of the MOB, and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds, and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds where nurses may admit. Others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation/shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use, such as lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and referred to the onsite mental health program staff. There are some safety cells (suicide watch or violence watch) if needed in that area. There are also enhanced observation cells available for special housing. Staffing included a vacant position for a supervising psychiatrist, and a chief clinician. Two mental health licensed clinicians respond to patients' needs for evaluation. The psychiatric team is supplemented with contract psychiatrists and psychologists, who receive referrals for evaluations and who order medications. The team provides some programming for patients.

CIs # 1, # 3, # 4, # 5 # 6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five areas are covered. Some group counseling sessions are ongoing.

**Recommendations:** See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program. At this jail, it is the psychiatric unit's charge nurse or mental health clinician.

In the last two years, there have been eight inmate deaths, four of which were due to suicide. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were conducted on the cases of suicide, but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit, and would continue until all health, mental health and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings, where special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the

Ex. H - 513

corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CIs # 1 and # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled. CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells (on the second floor, above booking), but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This facility houses males and females. A pregnant opiate patient receives a pregnancy test and a urine drug screen during receiving. If the female is on methadone upon arrival, the policy is to continue oral methadone as a bridge until a program can be arranged with a community methadone clinic. If the pregnant inmate goes to the emergency room for an evaluation and methadone is prescribed, the facility health staff will "bridge" with oral methadone until a program can be put in place to continue it. If anyone arrives in a state of severe intoxication or withdrawal, they are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** There is no policy and procedure that guides the staff to continue the prescriptions of a woman who arrives at this facility or if emergency contraception is

---

available. It would be in the community hospital, but this should be explained in a procedure for staff reference.

Since this jail houses women, it would be appropriate to address the contraception needs before they leave custody. Pregnant women are transferred to the women's facility, where comprehensive services are available. There are community resources regarding pregnancy options and contraception if needed.

**Recommendations:** CI # 4 requires a policy and procedure to guide staff in the contraceptive practices of the program and addresses the components of the standard. It should also include where emergency contraception is available.

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** As soon as a woman tests positive for pregnancy, she is sent to the women's facility where comprehensive prenatal and counseling services are available through the services of contracted obstetrical/gynecological physicians who come into the clinic weekly. The standard is **not applicable** for this jail.

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it occasionally occurs. There is no formal procedure. Staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program, so if a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared basis among providers. At a minimum, a listing of current problems and medications should be common to all medical,

dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions; the paper records are locked in a secure room (accessible to the clerical staff who manage the records), and the electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two senior medical records technicians, 10 technicians, one clerk and one office assistant. Some of the staff is located in the central administrative office, and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended to continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every 15 minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, restraints are rarely applied. There is one restraint chair and deputies carry Tasers and handcuffs. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2 and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency. The nursing supervisor stated that this only occurs two to four times a year and usually the patient is transferred to a setting with more mental health resources.

There is a process through the courts for forced medications, and the nursing supervisor indicated that when someone is given forced medications, they are transferred to the PSU at another jail. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

---

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed and revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** It was reported that health staff does not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations, verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions, or living wills that an inmate arrives with, would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or a do not resuscitate (DNR) order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d. emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program, and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research, a patient on a medical trial, or a participant in a research project.

## Mental Health Report:

**VISTA DETENTION FACILITY**

**Staffing:**     1.2 FTE Psychiatrists
1.0 FTE Psychologist
2.0 Mental Health Clinicians

**Overview:** The mental health services at Vista are primarily provided by the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. The mental health clinics are intended to provide individual counseling, but the clinics are often cancelled and are not sufficient to meet the need for mental health services. It is very positive that the number of mental health clinicians has doubled recently, from 1.0 to 2.0 FTE, but this is still insufficient to meet the population's needs. There is one psychologist, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 1.2 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at Vista, about the requirements of the Safety Program and how to implement it. The expressed understanding of it at Vista is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15-minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards and at other facilities across the country. The facility psychologist is the only one who can remove somebody from suicide watch, and his only duty is  involvement in the Safety Program. Staff members did not express an understanding of the design of the Safety Program as described by the system medical director. Staff members are under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the Safety Program, however, is that inmates who are identified as high risk cannot be released prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute monitoring if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly are not trained on suicide prevention. Although an eight-hours class on mental health in jail has been initiated, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate at Vista that is above the national average over the past two years. The suicide rate in 2015 was 300:100,000, which is nearly nine times the national average, and 100:100,000 in 2016, which is nearly three times the national average. The average for the past two years is 200:100,000, which is more than five times the national average of 36:100,000 in jails in the United States.

**Psychiatric Services:**

Psychiatrists at this facility do a good job treating inmates who are on psychotropic medications. Unlike the Central Jail and LCDRF, the mental health clinicians and nursing staff typically refer inmates to see the psychiatrist, rather than seeing them for the mental health assessment as happens at the intake facilities.

Vista only has 1.2 FTE psychiatrist staffing time, which appears to be sufficient to meet the needs of the inmate population. Staff was not aware of a waiting list to see the psychiatrist, and believes inmates are able to see the psychiatrist regularly.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and does a good job managing them appropriately. However, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**

There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia). The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

Mental health professionals reported that they see approximately 50 inmates per week, although as noted above, most of these are "wellness checks," and not counseling or more comprehensive mental health services. It is probably not sufficient for them to see only 50 inmates per week, and it appears that one of the issues is there is no deputy assigned to bring inmates to see mental health staff members. This limits the number of people they are able to see, and means that inmate mental health needs are likely not being met appropriately. It was reported, and demonstrated in the chart reviews, that many appointments are cancelled, and that an inmate may go for weeks without being seen following a referral or scheduled appointment. It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**Segregation:**

The mental health professionals reported that they conduct segregation rounds three times per week, which exceeds the NCCHC requirement. This is very positive and should help to ensure that inmates do not decompensate while in segregation.

## NCCHC STANDARDS RELATING TO MENTAL HEALTH:

**J-A-10:**    **Procedure in the Event of an Inmate Death:**    **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**    **Grievance Mechanism for Health Complaints:**    **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**    **Health Training for Correctional Officers:**    **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**    **Mental Health Screening and Evaluation:**    **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**    **Nonemergency Health Care Requests/Services:** **Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**    **Segregated Inmates:**    **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.  Additionally, security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards.

**J-E-13:**    **Discharge Planning:**    **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**    **Basic Mental Health Services:**    **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**    **Suicide Prevention Program:**    **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility improve the system for inmates to see mental health, so that they can effectively use the staff members they have and provide individual counseling as appropriate.
2. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
3. It is recommended that nursing staff that do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
4. It is recommended that mental health staff members see and address mental health grievances.
5. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.

6.  It is recommended that sworn staff receive annual suicide prevention training, and that
    mental health clinicians (psychiatrists, psychologists and master's level clinicians)
    receive training on suicide prevention in corrections to ensure they are appropriately
    identifying and classifying those inmates who are at risk of suicide.

Ex. H - 522



NCCHC Resources, Inc.

Disclaimer

## DISCLAIMER

Technical assistance by NCCHC Resources, Inc., is a professional activity that is completely separate from accreditation by the National Commission on Correctional Health Care and in no way guarantees accreditation, reaccreditation, or any other outcome of a survey.

## ABOUT NCCHC RESOURCES, INC.

Leveraging NCCHC's expertise in correctional health care, NCCHC Resources, Inc., provides customized education and training, preparation for accreditation and professional certification, performance improvement initiatives and technical assistance to correctional facilities interested in health care quality improvement. NRI will put together a team of experts – clinicians, educators, administrators or other thought leaders – to address any sized project or challenge. A nonprofit organization, NRI works to strengthen NCCHC's mission: to improve the quality of health care in prisons, jails and juvenile detention and confinement facilities.

For more information, contact us at info@ncchcresources.org or call (773) 880-1460.

Ex. H - 523

# EXHIBIT I

Community Oriented Correctional Health Services

To: Dorothy Thrush, Chief Operating Officer Office of Public Safety, San Diego County

From: Community Oriented Correctional Health Services (COCHS)

Date: 3/30/2020

Subject: Best Practices Review

Dear Ms. Thrush;

Please find below our review of best practices for jail operations for San Diego County. This review was conducted in response to contract 561562 and involved a review of best practices from existing literature, and well as a site visit to the San Diego jail and discussions with security and health staff. The scope of this review is based on the framework of the initial RFQ 9947 and subsequent discussions with County representatives. Thank you for the opportunity to conduct this work on behalf of San Diego County.

Sincerely,

Homer Venters MD, MS

President, COCHS

1

Community Oriented Correctional Health Services

A Review of Best Practices for Jail Operations for San Diego County

A. <u>Introduction and methods</u>

The purpose of this assessment by Community Oriented Correctional Health Services (COCHS) is to provide a literature review and report the best practices for jail administration in large counties (at least 500,000 people) that are associated with improvements in morbidity and mortality. The scope and format of this report is responsive to the requirements of San Diego County and the terms of work outlined in Contract 561562. As detailed in the initial RFQ 9947 scope of services, COCHS staff have drawn information from several publicly available reports in preparation of this best practices review, and have also conducted a two-day series of meetings and process reviews in San Diego, including observation of several areas of two of the current jail facilities. Discussions with San Diego County representatives has identified five domains of best practice for this review;

- Quality promotion and oversight
- Initial Intake screening and assessment
- Staff training
- Medication management
- Housing inmates with various health needs

Best practices included in this review reflect evidence-based approaches to health care delivery or health promotion that have been successfully implemented in multiple correctional settings. Citations are provided throughout the report to note the support and evidence behind these practices. Databases utilized to conduct this best practices review include the guidelines of the National Commission on Correctional Health Care, the United States National Library of

2

Community Oriented Correctional Health Services

Medicine and the National Institute of Corrections. These best practices are presented for consideration of the San Diego jail as it works to reduce rates of mortality and morbidity.

B.  Quality Promotion and Oversight

Selecting the best practices for promotion of quality metrics depends upon the perspective taken by the jurisdiction. The perspective of correctional health care which views its goal as providing short-term, acute, triage-based care does not lend itself to easy adoption of a comprehensive set of community health quality metrics. A jail that views itself as a part of the continuum of care will face a different set of decisions regarding its best practices. While a community health facility can expect to spend years developing a relationship with patients that would lead to better health outcomes, as well as the opportunity for follow-up visits and warm hand offs, jails have played the function of a warehouse for some of our highest need individuals, they remain bounded by that function. Best practices in promoting quality in correctional health services, however, share many elements of evidence-based quality promotion practices in community health settings.[1] The sheer number of evidence-based quality approaches, together with the complexity of adapting them to a correctional setting, has resulted in a slow uptake of many best practices in the community into jail health care.[2] A central question at the heart of best practices in jail settings is whether the lens of health is limited to reducing mortality and morbidity during the time and place of incarceration, or extends beyond the walls of the jail to the community. This determination can guide which best practices are applicable to a correctional setting.

---

[1] Dzau, V. Improving the Safety and Quality of Healthcare. National Academy of Medicine, 09/2016. Available at https://www.ahrq.gov/sites/default/files/wysiwyg/news/events/ahrq-research-summit/dzau-summit2016.pdf.
[2] Stern M, Greifinger R, Mellow J, Patient Safety: Moving the Bar in Prison Health Care Standards. Am J Pub Health. 11/2010. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2951964/.

Ex. I - 527

Community Oriented Correctional Health Services

Promoting quality in correctional health services requires that several areas of jail policy and workflow be designed to support and complement each other, both in daily practice and in response to sentinel events such as death and serious illness. By linking evidence-based policies and procedures to measurable process and health outcomes, and referring poorly performing outcomes to quality improvement projects and sentinel event analysis, community health systems have made significant gains in reducing death and illness in numerous domains, including preventable hospital deaths, maternal illness and death and nursing home patient safety.[3] Conversely, when policies and procedures are not directly linked to regular performance monitoring and other basic elements of quality promotion, jail administrators and other stakeholders cannot have confidence that these policies and procedures are appropriate to the stated mission, or that they are being implemented.

For correctional health services, best practices in quality promotion require clear policies and procedures that guide all types of staff in their work.[4,5] Correctional health services commonly rely on performance metrics that can be measured monthly to determine whether these policies and procedures are being followed. These metrics often include monitoring of access/timeliness as well as quality of care across medical, nursing, mental health, substance use and pharmacy

---

[3] National Initiative Aimed at Reducing Maternal Deaths Shows Early Signs of Improvement in Severe Maternal Morbidity. American College of Obstetrics and Gynecology. 02/2018, Available at https://www.acog.org/About-ACOG/News-Room/News-Releases/2017/National-Initiative-Aimed-at-Reducing-Maternal-Deaths?IsMobileSet=false.
and
Reducing Preventable Inpatient Mortality. The Joint Commission, Journal on Quality and Patient Safety, 09/2013. Available at https://www.jcrinc.com/-/media/deprecated-unorganized/imported-assets/jcr/default-folders/items/journal_sample_articlepdf.pdf?db=web&hash=37FBE6328F9862C8C2E3B9E6AD565A74.
and
Improving Patient Safety in Nursing Homes. Agency for Healthcare Research and Quality (AHRQ), 02/2016. Available at https://www.ahrq.gov/sites/default/files/wysiwyg/professionals/quality-patient-safety/patientsafetyculture/nursing-home/resources/nhimpptsaf.pdf.
[4] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-05.
[5] Implementing Evidence-Based Practice in Community Corrections: Quality Assurance Manual
Accession Number: 021258 2005. National Institute of Corrections. Available at https://nicic.gov/implementing-evidence-based-practice-community-corrections-quality-assurance-manual-0.

Ex. I - 528

Community Oriented Correctional Health Services

services. These metrics also measure whether expectations are met for discrete types of health encounter, including the medication administration, intake assessments, nursing and medical sick call encounters, as well as chronic care, emergency, mental health and substance use encounters. For areas that merit new or altered workflows or process changes, quality improvement projects, based on retrospective analysis of relevant data, and designed with outcomes measurements are utilized to make improvements to areas of concern.[6] Each branch of the health service may have multiple individual quality metrics as well as several shared metrics that reflect their intersection with other parts of the health services, all of which are generally reviewed and approved in a monthly or quarterly service-wide quality committee. The review of sentinel events including deaths, injuries and self-harm is also an important best practice in reducing mortality and morbidity in jail settings, and these reviews and their corrective action plans can be included in the service-wide quality meetings.[7,8] An additional area of best practice involves actively surveying staff and patients about their engagement with the correctional health service.[9]

---

[6] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-06.

[7] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-09.

[8] Sentinel Events Approach to Addressing Suicide and Self Harm in Jail. Vera Institute of Justice, Available at https://www.vera.org/projects/a-sentinel-events-approach-to-addressing-suicide-and-self-harm-in-jail/learn-more

[9] Spinaris C, Denhof M, Countering Staff Stress. Impact of Trauma Exposure. National Jail Exchange, National Institute of Corrections. 2015. Available at https://info.nicic.gov/virt/sites/info.nicic.gov.virt/files/06Impact_of_Traumatic_Exposure.pdf.
And
Jacobs LA, Giordano SNJ. "It's Not Like Therapy": Patient-Inmate Perspectives on Jail Psychiatric Services. Adm Policy Ment Health. 04/2018 Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5811330/.
And
Tanguay S, Trestman R, Weiskopf C. Patient health satisfaction survey in Connecticut correctional facilities. J Correct Health Care. 04/2014  Available athttps://www.ncbi.nlm.nih.gov/pubmed/24659759.
And
Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, Venters H. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. J Correct Health Care. 10/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/27742860.
And
Sauter J, Vogel J, Seewald K, Hausam J, Dahle KP. Occupational Factors and their Correlates to Prison Climate and Inmates' Attitudes Towards Treatment. Front Psychiatry, 10/2019. Available at https://www.ncbi.nlm.nih.gov/pubmed/31736801.
And

Community Oriented Correctional Health Services

Promoting quality in jail health services relies on accountability of the health service for delivery and outcomes of care. This best practice can be achieved with several mechanisms. One approach to ensuring accountability of the health service involves reporting of performance measures to a health authority outside the correctional health service. In New York City, Seattle, Chicago and Los Angeles, select core metrics of health service delivery are aggregated by the correctional health services and integrated in county or city-wide review of health care.[10] Another option for correctional health accountability involves an independent monitoring system that actively conducts reviews of health services and health care quality. This approach is utilized in multiple jail settings including the Health Officer Inspection reports of California jails and the NYC Board of Correction.[11] A third approach to promoting accountability of correctional health services involves creating contract language for proprietary staffing vendors that clearly delineates the expected performance measurements that will be employed and includes liquidated financial penalties for poor performance.[12]

These best practices in correctional health quality promotion require robust data systems. The core of these data systems is a certified electronic health record (EHR) that can be tailored to produce aggregate reports on the monthly performance measures for each branch of the health

---

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. LGBT Health. 04/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/26745813.
[10] Cook County Performance by Office, Star Report. 01/2011. Available at https://www.ccachicago.org/wp-content/uploads/2015/08/STAR_Performance_by_Office_110701.pdf.
And
New York City Health and Hospitals, Board of Directors Meeting Minutes, p53. 10/2016. Available at https://www.nychealthandhospitals.org/wp-content/uploads/2016/10/201610-board.pdf.

[11] Health Officer Inspection Report, Alameda County Jail. 11/8/2018. Available at http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg_11_8_18/PUBLIC%20PROTECTION/Regular%20Calendar/Health_officer_jail_inspection_reports_11_8_18.pdf.
And
Access to Health and Mental Health Care (January-December 2018) 06/2019, NYC Board of Correction. Available at https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/Health_Access/4b_Access%20Report%202018%20Review_Final_June%202019.pdf.
[12] Jails: Inadvertent Healthcare Providers. Report from The Pew Charitable Trust. 01/2018. Available at https://www.pewtrusts.org/en/research-and-analysis/reports/2018/01/jails-inadvertent-health-care-providers.

Community Oriented Correctional Health Services

service, medical, nursing, mental health, substance use and pharmacy. In community settings, harnessing the EHR to promote quality has been extensively detailed, and is central to two of the 'Key Drivers' of quality identified by the Agency for Healthcare Research and Quality.[13] Inside a correctional setting, the EHR is crucial to monitoring monthly performance measures as well as implementing recommendations from quality improvement projects and review of sentinel events including mortality reviews.[14] When an EHR is used effectively, individual performance measures can be automatically extracted and based on the entire sample of relevant health encounters, instead of a traditional practice of compiling a representative sample with a sufficiently high confidence level to serve in the place of the entire sample.

An EHR also provides the foundation for connecting health information inside jail with the care in the community, through health information exchange.[15] The EHR further allows for matching of jail-based data to community records to identify trends in health and social service outcomes after release that bear on mortality.[16] Additional information systems are required to track

---

[13] Agency for Healthcare Research and Quality Key Drivers 2 (Data-driven quality improvement) and 3 (Optimize health information systems to drive data-driven practice). Available at https://www.ahrq.gov/evidencenow/tools/ehr-data-quality.html.

[14] MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, Venters H. Feasibility of Treating Hepatitis C in a Transient Jail Population. Open Forum Infect Dis. 07/2017.Available at https://www.ncbi.nlm.nih.gov/pubmed/28852680.
And
Abe CM, Aguwa M, Zhao M, Sullivan J, Porsa E, Nijhawan AE. Public Health Rep. Hepatitis C Virus Infection in the Dallas County Jail: Implications for Screening, Prevention, and Linkage to Care. Available at https://www.ncbi.nlm.nih.gov/pubmed/31530093.

[15] Hinchman A, Hodges S, Backus J Jr, Warholak T Implementation of Health Information Exchange at the Pima County Adult Detention Complex: Lessons Learned J Correct Health Care. 04/2018.
Available at https://www.ncbi.nlm.nih.gov/pubmed/29661107.
And
Butler B. Health Information Exchange between Jails and their Communities. Perspectives in Health Information Management. Winter 2013. Available at http://bok.ahima.org/doc?oid=301194#.XjQ9WGhKg2w.

[16] Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, Venters H, MacDonald R. Death After Jail Release.
J Correct Health Care. 01/2017. Available at https://www.ncbi.nlm.nih.gov/pubmed/28040993.
And
Seijeoung K,  et. al. Deaths in the Cook County Jail: 10-Year Report, 1995–2004. *Journal of Urban Health. 04/2007.* Available at https://link.springer.com/article/10.1007%2Fs11524-006-9115-9.
And
Brittain J[1], Axelrod G, Venters H. Deaths in New York City jails, 2001-2009. Am J Public Health. 02/2013. Available

Community Oriented Correctional Health Services

responses and substantiation of patient medical grievances as well as medication profiling for quality assurance and improvement efforts.

Promotion of health service quality and reducing mortality and morbidity inside jail settings are also impacted by the model of correctional health. Many large jail settings have developed a public health model that places correctional health within the local health department or other health authority. This model is in place in multiple large jail settings, including Los Angeles, Chicago, New York City and Seattle. A primary virtue of this model is the ability to integrate the jail health services with other community-based initiatives that focus on reducing recidivism, promoting stable housing, community mental health services and ultimately, reducing reliance on jails as a site of custody for people who are struggling with serious mental illness, substance use disorders and housing concerns. In this model, the scope of health being promoted is that of the entire community, so that efforts to address chronic medical problems and behavioral health concerns are a priority and linked to community care. This approach is also helpful for coordinating local responses to community-wide infectious and communicable disease initiatives, including influenza, active and latent tuberculosis, gonorrhea, chlamydia and hepatitis.

Another model of jail health services involves the correctional health service being part of sheriff's office or correctional department. For jail health services, this model generally relies on individual health staffing vendors to be selected by security staff, as is the case with the Philadelphia jail system.[17] This model requires that the security authority hire sufficient staff to monitor and improve the quality of care and is often implemented when the focus is health outcomes limited to the time and place of incarceration. In this model, health and security staff

---

at https://www.ncbi.nlm.nih.gov/pubmed/23409900.
[17] Annual report to Budget Committee from Philadelphia Department of Prisons. 5/1/2018. Available at http://phlcouncil.com/wp-content/uploads/2018/04/FY19-Testimony_Prisons_submitted-to-Council-4.27.pdf.

Ex. I - 532

Community Oriented Correctional Health Services

may be more integrated in their daily operations as the health staff often report to security leadership at some level.

Numerous hybrids of these two models exist, with a mixture of public and proprietary staffing vendors utilized in the same site. Particular areas of care that are often provided by an outside vendor in either model include dental care, dialysis, telehealth specialty care and pharmacy packaging. In Alameda County, California, responsibility for provision of physical and mental health services is split between a proprietary vendor and county health staff. As medication assisted treatment for opiate use disorder becomes more prevalent in county jail settings, this is another area of subcontracting. As jail systems integrate proprietary vendors and public staffing models, they can integrate all providers of care via their policies, procedures and performance measures.

C.  Initial Intake screening and assessment

The process of identifying the health needs of patients arriving into a jail setting is critical to lowering mortality and morbidity. There are two basic steps to the intake screening and assessment during jail admission, a pre-admission health screening, an initial intake health assessment. While the completion of a comprehensive intake screening and assessment represents a best practice in jail settings, this objective can be met by combining these steps in different workflows. The lens of mortality and morbidity reduction may be limited to the time and place of incarceration and can inform the type and timing of work conducted during the intake process. Because many people entering a jail setting leave within 24-48 hours, and because this period represents an extremely high-risk time for death from physical and behavioral health problems, the intake process represents one of the jail's most important opportunities to reduce mortality and morbidity among patients. The strength of the intake screening and assessment steps relies not only on the performance of standardized encounters, but the flow of information

9

Community Oriented Correctional Health Services

from one encounter to the next, and from sources of information outside the jail into these encounters, including hospitalizations, community prescriptions, medical observations from the courts and police, and the state or county health information exchange.

The pre-admission health screening encounter (also referred to a 'safe to detain' and 'receiving screening' encounter) occurs before a person enters the jail custody and serves the purpose of identifying high risk patients who merit direct referral to a higher level of care outside the jail before admission, or who can be expedited for subsequent intake care after admission.[18] This process focuses on using a standardized screening  tool to collect information about current medications recent injury, acute illness and any serious medical or behavioral health problems, including withdrawal-related concerns. Screenings that occur before entry to the jail, also represent the first spot on the intake workflow for health staff to access prior medical records, community pharmacy records, and the State's health information exchange to obtain information that would inform hospital transfer, expediting of subsequent care, or diversion to community-based treatment and enrollment with Medicaid.[19] Reducing in-jail mortality at this point requires the ability to refer high-risk patients to appropriate settings, including Emergency Departments. An emerging best practice includes the diversion of people with the sole problem of intoxication to recovery centers that can provide medical monitoring, connection to treatment and other support in a manner that is safer and more cost effective than the jail intake process.[20]

---

[18] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JE-02.
[19] Arraignment Screening Unit. Vera Justice Institute. 2/2017. Available at https://www.vera.org/publications/the-enhanced-pre-arraignment-screening-unit.
And
The Patient Protection Act and Jail Intake Enrollment. National Association of Pretrial Services. 2/2016. Available at http://www2.centerforhealthandjustice.org/sites/www2.centerforhealthandjustice.org/files/publications/ACA%20and%20the%20Pretrial%20System%20(Appendix%20A-%20Cook%20County)%20-%20NAPSA%202014%20(1).pdf
[20] Jarvis S. et. al. Public Intoxication: Sobering Centers as an Alternative to Incarceration, Houston 2010-2017. 4/2019. Available at https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2018.304907
And
Kaplan T, New Twist on Drunk Tank to Open in San Jose. Mercury News. 8/8/17. Available at https://www.mercurynews.com/2017/07/31/new-twist-on-drunk-tank-to-open-in-san-jose/

Ex. I - 534

Community Oriented Correctional Health Services

The next step in the intake and screening assessment is the initial health assessment. This encounter is the first contact between correctional health staff and a patient who has been admitted into the jail. This encounter is generally protocol-driven, conducted by nursing staff, and occurs before a patient is housed in the facility, with a focus on finding acute and chronic medical issues, ensuring timely access to medications, and referral to physician evaluation and other assessments or care that are urgent. Patients are generally asked standardized questions about physical and behavioral health history during these encounters, have their vital signs checked, and may have some brief or focused physical examination also performed, such as auscultation of lungs and peak flow testing for patients who report asthma. This also represents the point in time when initial withdrawal screening tools are conducted to initiate symptom surveillance. Patients who present with abnormal vital signs or who meet pre-defined criteria in nursing protocols are referred for immediate evaluation by a physician or mid-level provider, while patients with low risk profiles are cleared for housing. Patients who present without any abnormal vital signs or other concerning signs and symptoms, but who report chronic medical or mental health concerns during this encounter are referred for chronic care clinic or mental health encounters, and nursing protocols guide the urgency of these referrals.[21]

For patients who meet criteria for higher level assessment based on abnormal vital signs and history or symptoms of acute and chronic health problems, nursing staff refer patients for evaluation by physicians or mid-level providers including physician assistants and nurse practitioners. These encounters involve obtaining a complete medical, surgical, oral health and behavioral health history from each patient, conducting a comprehensive physical examination,

And
Information regarding the HIE in CA is available at https://www.ca-hie.org/initiatives/hie-in-ca/

[21] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JE-04.

Ex. I - 535

Community Oriented Correctional Health Services

obtaining vital signs and laboratory tests, and making referrals for chronic care, specialty care
and other needed treatment. In jail systems that take a public health approach, this higher-level
encounter can be routine for every newly admitted patient at the time of intake. This approach
requires a greater investment in physician and mid-level staffing, but is used when the lens of
mortality and morbidity reduction extends beyond the time and place of incarceration. Another
approach is to wait up to 14 days for a higher-level assessment, which generally results in at
least half of all people admitted to jail leaving without this encounter. This promotes cost savings
for the jail health services, but misses the opportunity to identify and address serious health
problems after release (by facilitating initiation of care or continuity of care). Conducting a more
comprehensive assessment during the initial intake time also allows for more accurate
identification of complex or co-morbid health problems, including very commonly overlapping
issues from mental health crises, substance use intoxication and withdrawal and medical
problems from liver disease, epilepsy, diabetes and cardiovascular disease.

The ability of these processes to identify high-risk patients and lower their risk of death or
disability relies not only on the integrity of the individual encounters, but the system of
information transfer that ensures information is integrated between encounters and results in
appropriate action. For example, encounters with a patient may elicit a concerning medical
history, abnormal vital signs, and prior medical health crisis documented in the medical record.
If these elements are detected at different encounters, there must be a process whereby each
encounter includes review of the prior records, and failure to conduct this review is knowable by
quality assurance staff. Use of a standardized template in the electronic medical record allows
for this type of review and can also include a dedicated question for staff about whether they
reviewed prior/relevant records during each encounter. This approach, combined with policies
about the timeframes and completeness of these encounters that are linked to monthly

12

measurement of performance on these metrics, is critical to ensuring the quality of the intake

process.

D.  Staff training

Appropriate training of correctional health and security staff represents a best practice for

reducing mortality and morbidity among incarcerated people.[22] Training of staff is essential

during the initial orientation period, but ongoing, regular training is also required for health and

security staff. Many of the basic elements of health staff training that are routine in community

settings are also critical in correctional settings, including infection control and patient safety.

Health staff require training on the expectations of their roles, and how their roles intersect with

other parts of the health service, as well as the security service.

Many elements of staff training are most effective when security and health staff train together.

One of the most critical areas of training for all uniform and civilian staff in a jail is suicide

prevention.[23] Suicide is the leading cause of death in U.S. jails, and a best practice is for all jail

staff to be trained on suicide prevention. For staff who often respond to patients in mental health

crisis, implementation of crisis intervention teams (CIT) that involve co-response by security and

health staff is an important tool for reducing morbidity and mortality. Other standard areas of

staff training that support mortality and morbidity reduction include sexual abuse training (that

meets Prison Rape Elimination Act standards) and training on disability accommodation.

For staff who respond to medical emergencies, the use of 'man down' drills help ensure a timely

and appropriate response to medical emergencies. These unannounced drills generally include

medical, nursing and security staff, the same team that would respond to an actual medical

---

[22] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JC-01-09.

[23] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2015, MH-01-08.

Ex. I - 537

Community Oriented Correctional Health Services

emergency. Health staff also benefit from structured training on medical ethics that identifies the issues of abuse, neglect and dual loyalty that contribute to patient mortality and morbidity in correctional settings.[24] This training can be integrated or stand-alone from the training also required for prevention and reporting of sexual abuse, much of which is detailed in the Prison Rape Elimination Act.

Prior to the initiation of initial hiring, and during ongoing annual review, a best practice involves the review of the credentials of all health staff to ensure compliance with mandated laws, professional requirements and policies and procedures.[25]

E. Medication management

Access to appropriate medications in a clinically appropriate timeframe represents a best practice in reducing mortality and morbidity in jail settings.[26] Medication management starts with the first contact between health staff who screen patients before entry to the jail, and includes medical, nursing and pharmacy staff throughout their incarceration. Basic elements of medication management include prescribing by physicians and mid-level providers, review and profiling of prescriptions by pharmacy staff, and administration/dispensing/education about medications to patients by nursing and pharmacy staff. Best practices provide several tools for ensuring continuity of medications in jail. One option employed by some settings is to contract with community services that can verify the current and recent medication prescription for incoming patients. Another method involves use of an electronic medication administration

---

[24] Correctional Health Professionals' Response to Inmate Abuse. NCCHC Position Statement. 10/2007. Available at https://www.ncchc.org/correctional-health-care-professionals%E2%80%99-response-to-inmate-abuse. And
Glowa Kollisch S. et. al. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Health of Vulnerable Patients in Jail. HHR. 7/2015. Available at https://www.hhrjournal.org/2015/03/data-driven-human-rights-using-dual-loyalty-trainings-to-promote-the-care-of-vulnerable-patients-in-jail/.
[25] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JC-01.
[26] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JD-01,02

14

Community Oriented Correctional Health Services

record inside the jail that triggers a clinical encounter when medications are missed or refused. Another approach to this best practice involves establishing a clear policy for intake providers on how and when to prescribe bridge medications when a patient arrives in jail but has not yet been seen by mental health, substance use disorder or specialty providers. Another strategy to promoting medication management involves a 'keep on person' approach that allows many patients to pick up their medications once a week and take their medications on their own, as prescribed.[27] This approach is particularly common for patients with chronic medical problems who take daily medications and serves to increase engagement of patients in their own care. This approach is often matched to the panel of patients who are seen in the chronic jail care clinic, but can also be utilized for short term medication needs, such as pain relief after minor injuries. For patients who require more support around medications, daily administration with nursing or pharmacy staff may be preferable, including patients with uncontrolled symptoms of medical and mental health problems. In addition, DEA controlled substances or medications that are commonly diverted, such as suboxone, methadone, opiate based pain medicines, are generally administered with nursing contact.

A pharmacy committee comprised of members from all disciplines of the health service, including medical, nursing, mental health and addiction is part of medication management and works to establish the overall program and review the drug formulary, policies and procedures, performance measures and sentinel events relevant to pharmacy and medication concerns. Performance measures of medication management often include the timeliness of medication administration and adequacy of missed medication documentation. In the San Francisco jail, the Pharmacy and Therapeutics Committee is a multidisciplinary group that meets quarterly to review availability of medications, the formulary and data concerning medication access,

---

[27] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JD-01,02

Community Oriented Correctional Health Services

utilization and outcomes.[28] One aspect of this work that relates to whether the focus of the correctional health service is limited to the time and place of incarceration is how and when community medications are continued inside jail. This area of work can include the use of bridge orders and verification of community prescriptions to promote continuity of medications.


F.  Housing inmates with various health needs

Best practices in jail settings often includes several types of health-related housing programs. In general, creation and staffing of dedicated jail housing units for patients with medical, mental health and substance use concerns allows for provision of higher levels of care and increased surveillance and monitoring. These housing areas are designed to increase contact, surveillance and engagement between health staff and their patients and  the general approach with these units is to increase health engagement and decrease isolation of patients.


Best practices for specialized housing relating to mental health care may include more than one type of housing area.[29] For example, patients with serious mental illness in the jail setting benefit from engagement with multiple types of therapy, including one-on-one talk therapy, psychiatric care with medication management, nursing support, group therapy, art and movement therapy. These approaches increase engagement in health services and decrease injuries from use of force incidents.[30] Most large jails benefit from more than one level or type of enhanced mental health housing area, and the ability to deliver care on these units relies on clear distinctions about the profile of patients who will be housed on these units, and the training

---

[28] Introduction to JHS of San Francisco. 2011. Available at https://www.sfdph.org/dph/hc/HCAgen/HCAgen2011/February%201/feburary%201%20jhs%20Overview%204-10.pdf.
[29] NCCHC Suicide Prevention Resource Guide. 2020. Available at https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf.
[30] Glowa-Kollisch S, et. al. From Punishment to Treatment; Clinical Alternatives to Punitive Segregation. Int J Pub Hlth Res. 2/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/26848667.

Ex. I - 540

Community Oriented Correctional Health Services

and roles of the health and security staff.[31] For patients who require higher levels of care for

mental health crisis, those who are psychotic or acutely suicidal, best practices include

assessment for referral to hospital inpatient care. Within the jail setting, two levels of housing

are beneficial for patients with signs and symptoms of serious mental illness. A high-level unit

that replicates much of the features of inpatient settings, including use of psychiatric

technicians, multiple modalities of mental health services (individual, group, art, movement) and

nursing and medical support is beneficial for patients with the most serious concerns. A step-

down unit that allows for increased support and structure for patients who are more stable, but

not able to be safe in general population settings is also important. While these units may be

comprised of cell or dorm housing units, neither of them is operated as a lock-in unit, meaning

that patients are not to be confined to cells for most of the day. An important feature of these

units is that when patients express suicidal thoughts or engage in self-harm, the primary

response does not involve  them being locked into a cell, whether the cell is labelled as a

suicide watch or safety cell.[32,33]


Patients with higher levels of medical concerns are often held in a jail infirmary. This type of unit

does not replace or provide a hospital level of care, but provides a place where 24-hour nursing

and medical coverage can ensure safe return from hospital admission, as well as care for

patients who are too ill to be in other settings.[34] Medical infirmaries also provide a setting where

patients who need intravenous antibiotics, regular medical monitoring, wound care, or other

higher levels of care can be more safely housed than general population housing areas.

Admission to and discharge from medical infirmaries are clinical decisions, and fidelity to the

---

[31] NCCHC Suicide Prevention Resource Guide. 2020. Available at
https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf.
[32] NCCHC Suicide Prevention Resource Guide. 2020.
https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf
[33] Hayes L. Report on Suicide Prevention. 6/2018 Available at
https://www.sdsheriff.net/documents/hayesreport.pdf.
[34] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JF-02.

Community Oriented Correctional Health Services

clinical guidelines is important to ensure that patients who need this level of care are able to

receive it. Major concerns in medical infirmaries include adequacy/level of staffing, infection

control and potential interruption of care that is not delivered on the unit, such as mental health

and substance use disorder treatment.

Dedicated housing areas are often utilized in jails for identification and treatment of both

substance use withdrawal and substance use disorders. Prevention and treatment of withdrawal

represents a high-risk area of care, since withdrawal from alcohol, benzodiazepine and opiates

can be fatal and treatment of withdrawal requires a highly protocolized approach, administered

under physician supervision, and with clear expectations about when patients will be transferred

to the hospital.[35] In general, jail health services employ symptom severity tools such for patients

in dedicated housing areas who are being treated for withdrawal. These units often have full

time or at least regular nursing presence, as well as correctional staff with specialized training

on the signs and symptoms of withdrawal. For patients receiving treatment for substance use

disorder, the use of dedicated housing areas may be beneficial but is not essential. Specialized

housing areas for people with co-occurring mental health and substance use diagnoses are

often utilized, as is the case in the San Francisco jail.[36]

Best practices also include a clear plan for cohorting high-risk patients during influenza season

or other communicable and infectious disease responses.[37] A best practice involves review of

these plans before the start of every flu season with the local health authority as well as in

response to novel threats, including the novel coronavirus, given the reality that the jail is part

---

[35] National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JG-06.
[36] Introduction to JHS of San Francisco. 2011. Available at
https://www.sfdph.org/dph/hc/HCAgen/HCAgen2011/February%201/feburary%201%20jhs%20Overview%204-
10.pdf.
[37] Maruschak L. et.al. Pandemic Influenza and Jail Facilities and Populations. Am J Pub Hlth. 10/2009. Available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4504367/

Ex. I - 542

Community Oriented Correctional Health Services

of, and impacted by outbreaks in the community. An important element to these plans involves use of the electronic medical records to identify high-risk patients and how they will be transferred and subject to increased medical surveillance, as well as what physical and staffing resources would be needed per housing area of cohorting.

Additional housing area cohorts may be developed that include women who are pregnant, jail-based nurseries for women and their infant children, persons with disabilities and sheltered housing for older or infirm patients.

The success of any of these specialized health-related housing approaches is based on cooperation and communication between health and security staff. While legitimate issues  exist about protecting the rights of patients to confidentiality, these concerns are addressable when all staff who work on the units undergo joint training based on clear policies about roles and responsibilities and also conduct regular unit team meetings.

### G.  Summary and recommendations

These recommendations reflect COCHS effort to collect and promulgate the best practices for large jail systems that may reduce the rate of mortality and morbidity in the San Diego jail system. COCHS has not conducted a financial analysis of the costs of these recommendations and has not analyzed which services could be eligible for alternative funding. We recommend that the policy makers of San Diego County determine the following in order to apply these best practices:

1. Determine whether it is the policy of the Board of Supervisors and the Sheriff to limit health services delivery to use the place and point of incarceration or is it the policy to use the place at point of incarceration as an opportunity to improve overall public health and the health status of incarcerated individuals?

19

Community Oriented Correctional Health Services

2. Determine based on the broad policy above, how San Diego can design policies to meet the goals limited to place and point of incarceration or policies to use incarceration as one point in a continuum of health services for justice-involved individuals, i.e., is the policy goal to embed a robust clinical quality improvement program with the performance metrics in all areas identified above?

3. Determine whether and how the policies of the Board of Supervisors and the Sheriff allow for clear hierarchy development and for the funding of capital and operational needs in order to implement best practices based on the broader policy issues, because integrating best practices into a correctional setting requires both capital and operational investments.

As the policy makers in San Diego address these three elements, the appropriate model of care can be designed, with best practices tailored to the model. Consideration of a single concern, infectious disease, can exemplify how different standards would apply depending on interpretation of the questions above. If health concerns are limited solely to the time and place of incarceration, jail health services would generally confine their work to identification of active pulmonary tuberculosis, active HIV, Hepatitis as well as symptomatic sexually transmitted infections including chlamydia and gonorrhea and syphilis. This would focus correctional health services on detecting and treating health problems most likely to create short term morbidity and mortality. For example, this approach might include reliance on a PPD skin test for tuberculosis screening only after the first week of incarceration, to avoid testing patients who leave quickly, and to focus care only on patients who have a positive PPD followed by an x-ray raising concerns for pulmonary tuberculosis, not for patients with latent tuberculosis infection. If these questions were determined in to include health concerns beyond the time and place of incarceration, then the jail health service would screen for latent tuberculosis infection and likely switch to a blood test so that people can have their results recorded and integrated into care even if they leave the jail. Screening and treatment for Hepatitis C and asymptomatic sexually

20

Community Oriented Correctional Health Services

transmitted infections would also become a priority in a broader model, and people identified with these concerns would be connected to care upon release, and their results shared with their providers.

The covid19 Pandemic underscores the challenges that San Diego county faces in the absence of having set an implicit or explicit policy about the role of correctional health services within the overall healthcare delivery system of San Diego county

If the jail health services are limited to a point of time and place, the strategic investments The County would make in reference to the pandemic are different than the investments that the county would make if they perceive the jail as part of the overall healthcare delivery system in The County. For example, is the overall strategic goal in reference to the pandemic and corrections to limit the spread of covid19 within the jail versus an overall strategic goal to make sure that individuals who are infected and released from the jail don't spread the infection to the community?

The scope of COCHS Engagement did not enable us to determine which model is actually operational in the jail nor to determine the extent to which the procedures and processes were conforming to policies that had been implicitly or explicitly selected by either the board or the San Diego County Sheriff.

Ex. I - 545

Community Oriented Correctional Health Services

**Examples of Best Practices that are Cited or Referred to in this Report**

The following represent examples of best practices that may be relevant to the San Diego Jail system. Because of the large number of possible best practices, the first step towards determining which of these, and other standards are relevant requires that the County first determine the answers to the questions posed in the summary section. That will allow for design of a model of care, and determination of which best practices should apply.

Quality Promotion and Oversight
*Community quality assurance and improvement.* Dzau, V. Improving the Safety and Quality of Healthcare. National Academy of Medicine, 09/2016. Available at https://www.ahrq.gov/sites/default/files/wysiwyg/news/events/ahrq-research-summit/dzau-summit2016.pdf.

*Correctional quality assurance and improvement.* Stern M, Greifinger R, Mellow J, Patient Safety: Moving the Bar in Prison Health Care Standards. Am J Pub Health. 11/2010. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2951964/.

*Community quality assurance and improvement.* National Initiative Aimed at Reducing Maternal Deaths Shows Early Signs of Improvement in Severe Maternal Morbidity. American College of Obstetrics and Gynecology. 02/2018, Available at https://www.acog.org/About-ACOG/News-Room/News-Releases/2017/National-Initiative-Aimed-at-Reducing-Maternal-Deaths?IsMobileSet=false.

*Community quality assurance and improvement.* Reducing Preventable Inpatient Mortality. The Joint Commission, Journal on Quality and Patient Safety, 09/2013. Available at https://www.jcrinc.com/-/media/deprecated-unorganized/imported-assets/jcr/default-folders/items/journal_sample_articlepdf.pdf?db=web&hash=37FBE6328F9862C8C2E3B9E6AD565A74.

*Community quality assurance and improvement.* Improving Patient Safety in Nursing Homes. Agency for Healthcare Research and Quality (AHRQ), 02/2016. Available at https://www.ahrq.gov/sites/default/files/wysiwyg/professionals/quality-patient-safety/patientsafetyculture/nursing-home/resources/nhimpptsaf.pdf.

*Correctional quality assurance and improvement.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-05.

*Correctional quality assurance and improvement.* Implementing Evidence-Based Practice in Community Corrections: Quality Assurance Manual
Accession Number: 021258 2005. National Institute of Corrections. Available at https://nicic.gov/implementing-evidence-based-practice-community-corrections-quality-assurance-manual-0.

Ex. I - 546

Community Oriented Correctional Health Services

*Correctional quality assurance and improvement.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-06.

*Correctional quality assurance and improvement.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JA-09.

*Correctional quality assurance and improvement.* Sentinel Events Approach to Addressing Suicide and Self Harm in Jail. Vera Institute of Justice, Available at https://www.vera.org/projects/a-sentinel-events-approach-to-addressing-suicide-and-self-harm-in-jail/learn-more

*Correctional quality assurance and improvement.*  Spinaris C, Denhof M, Countering Staff Stress. Impact of Trauma Exposure. National Jail Exchange, National Institute of Corrections. 2015. Available at https://info.nicic.gov/virt/sites/info.nicic.gov.virt/files/06Impact_of_Traumatic_Exposure.pdf.

*Correctional quality assurance and improvement.* Jacobs LA, Giordano SNJ. "It's Not Like Therapy": Patient-Inmate Perspectives on Jail Psychiatric Services. Adm Policy Ment Health. 04/2018 Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5811330/.

*Correctional quality assurance and improvement.* Tanguay S, Trestman R, Weiskopf C. Patient health satisfaction survey in Connecticut correctional facilities. J Correct Health Care. 04/2014  Available athttps://www.ncbi.nlm.nih.gov/pubmed/24659759.

*Correctional quality assurance and improvement.* Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, Venters H. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. J Correct Health Care. 10/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/27742860.

*Correctional quality assurance and improvement.* Sauter J, Vogel J, Seewald K, Hausam J, Dahle KP. Occupational Factors and their Correlates to Prison Climate and Inmates' Attitudes Towards Treatment. Front Psychiatry, 10/2019. Available at https://www.ncbi.nlm.nih.gov/pubmed/31736801.

*Correctional quality assurance and improvement.* Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. LGBT Health. 04/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/26745813.

*Correctional oversight.* Cook County Performance by Office, Star Report. 01/2011. Available at https://www.ccachicago.org/wp-content/uploads/2015/08/STAR_Performance_by_Office_110701.pdf.

Community Oriented Correctional Health Services

*Correctional oversight.* New York City Health and Hospitals, Board of Directors Meeting Minutes, p53. 10/2016. Available at https://www.nychealthandhospitals.org/wp-content/uploads/2016/10/201610-board.pdf.

*Correctional oversight.* Health Officer Inspection Report, Alameda County Jail. 11/8/2018. Available at http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg_11_8_18/PUBLIC%20PROTECTION/Regular%20Calendar/Health_officer_jail_inspection_reports_11_8_18.pdf.

*Correctional oversight.* Access to Health and Mental Health Care (January-December 2018) 06/2019, NYC Board of Correction. Available at https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/Health_Access/4b_Access%20Report%202018%20Review_Final_June%202019.pdf.

Initial Intake Screening and Assessment

*Jail health services and structure.* Jails: Inadvertent Healthcare Providers. Report from The Pew Charitable Trust. 01/2018. Available at https://www.pewtrusts.org/en/research-and-analysis/reports/2018/01/jails-inadvertent-health-care-providers.

*Community health quality metrics.* Agency for Healthcare Research and Quality Key Drivers 2 (Data-driven quality improvement) and 3 (Optimize health information systems to drive data-driven practice). Available at https://www.ahrq.gov/evidencenow/tools/ehr-data-quality.html.

*Jail health services and structure.* MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, Venters H. Feasibility of Treating Hepatitis C in a Transient Jail Population. Open Forum Infect Dis. 07/2017.Available at https://www.ncbi.nlm.nih.gov/pubmed/28852680.

*Jail health services and structure.* Abe CM, Aguwa M, Zhao M, Sullivan J, Porsa E, Nijhawan AE. Public Health Rep. Hepatitis C Virus Infection in the Dallas County Jail: Implications for Screening, Prevention, and Linkage to Care. Available at https://www.ncbi.nlm.nih.gov/pubmed/31530093.

*Jail health services and structure.* Hinchman A, Hodges S, Backus J Jr, Warholak T Implementation of Health Information Exchange at the Pima County Adult Detention Complex: Lessons Learned J Correct Health Care. 04/2018. Available at https://www.ncbi.nlm.nih.gov/pubmed/29661107.

*Jail health information systems.* Butler B. Health Information Exchange between Jails and their Communities. Perspectives in Health Information Management. Winter 2013. Available at http://bok.ahima.org/doc?oid=301194#.XjQ9WGhKg2w.

*Jail mortality.* Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, Venters H, MacDonald R. Death After Jail Release.

24

Community Oriented Correctional Health Services

J Correct Health Care. 01/2017. Available at https://www.ncbi.nlm.nih.gov/pubmed/28040993.

*Jail mortality.* Seijeoung K,  et. al. Deaths in the Cook County Jail: 10-Year Report, 1995–2004. *Journal of Urban Health. 04/2007.* Available at https://link.springer.com/article/10.1007%2Fs11524-006-9115-9.

*Jail mortality.* Brittain J[1], Axelrod G, Venters H. Deaths in New York City jails, 2001-2009. Am J Public Health. 02/2013. Available at https://www.ncbi.nlm.nih.gov/pubmed/23409900.

*Jail health services and structure.* Annual report to Budget Committee from Philadelphia Department of Prisons. 5/1/2018. Available at http://phlcouncil.com/wp-content/uploads/2018/04/FY19-Testimony_Prisons_submitted-to-Council-4.27.pdf.National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JE-02.

*Jail health services and structure.* Arraignment Screening Unit. Vera Justice Institute. 2/2017. Available at https://www.vera.org/publications/the-enhanced-pre-arraignment-screening-unit.

*Jail health services and structure.* The Patient Protection Act and Jail Intake Enrollment. National Association of Pretrial Services. 2/2016. Available at http://www2.centerforhealthandjustice.org/sites/www2.centerforhealthandjustice.org/files/publications/ACA%20and%20the%20Pretrial%20System%20(Appendix%20A-%20Cook%20County)%20-%20NAPSA%202014%20(1).pdf

*Jail health services and structure.* Jarvis S. et. al. Public Intoxication: Sobering Centers as an Alternative to Incarceration, Houston 2010-2017. 4/2019. Available at https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2018.304907

*Jail health services and structure.* Kaplan T, New Twist on Drunk Tank to Open in San Jose. Mercury News. 8/8/17. Available at https://www.mercurynews.com/2017/07/31/new-twist-on-drunk-tank-to-open-in-san-jose/

*Jail health information systems.* Information regarding the HIE in CA is available at https://www.ca-hie.org/initiatives/hie-in-ca/

*Jail health services and structure.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JE-04.

<u>Staff Training</u>
*Correctional training.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JC-01-09.

*Correctional training.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2015, MH-01-08.

Community Oriented Correctional Health Services

*Abuse reporting and mitigation.* Correctional Health Professionals' Response to Inmate Abuse. NCCHC Position Statement. 10/2007. Available at https://www.ncchc.org/correctional-health-care-professionals%E2%80%99-response-to-inmate-abuse.

*Abuse reporting and mitigation.* Glowa Kollisch S. et. al. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Health of Vulnerable Patients in Jail. HHR. 7/2015. Available at https://www.hhrjournal.org/2015/03/data-driven-human-rights-using-dual-loyalty-trainings-to-promote-the-care-of-vulnerable-patients-in-jail/.

Medication Management
*Pharmacy and medication ordering.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JC-01.

*Pharmacy and medication ordering.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JD-01,02

*Jail health structure and services.* Introduction to JHS of San Francisco. 2011. Available at https://www.sfdph.org/dph/hc/HCAgen/HCAgen2011/February%201/feburary%201%20jhs%20Overview%204-10.pdf.

Housing Inmates with Various Health Needs
*Self-harm and suicide prevention.* NCCHC Suicide Prevention Resource Guide. 2020. Available at https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf.

*Self-harm and suicide prevention.* Glowa-Kollisch S, et. al. From Punishment to Treatment; Clinical Alternatives to Punitive Segregation. Int J Pub Hlth Res. 2/2016. Available at https://www.ncbi.nlm.nih.gov/pubmed/26848667.

*Self-harm and suicide prevention.* NCCHC Suicide Prevention Resource Guide. 2020. Available at https://www.ncchc.org/filebin/Publications/Suicide_Prevention_Resource_Guide_2.pdf.

*Self-harm and suicide prevention.* Hayes L. Report on Suicide Prevention. 6/2018 Available at https://www.sdsheriff.net/documents/hayesreport.pdf.

*Medical housing.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JF-02.

*Medical housing.* National Commission on Correctional Health Care, Standards for Health Services in Jails, 2018, JG-06.

*Medical housing.* Introduction to JHS of San Francisco. 2011. Available at https://www.sfdph.org/dph/hc/HCAgen/HCAgen2011/February%201/feburary%201%20jhs%20Overview%204-10.pdf.

Community Oriented Correctional Health Services

*Outbreak response.* Maruschak L. et.al. Pandemic Influenza and Jail Facilities and Populations. Am J Pub Hlth. 10/2009. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4504367/

# EXHIBIT J

# SAN DIEGO COUNTY DETENTION FACILITIES CONDITION AND MANAGEMENT

## SUMMARY

It is mandated by California State law that the County Grand Jury "inquire into the condition and management of the public prisons within the county."[1]  To fulfill this requirement, the 2013-2014 San Diego County Grand Jury visited six adult detention facilities operated by the San Diego County Sheriff's Department, and five juvenile facilities operated by the San Diego County Probation Department.  The Grand Jury also visited holding cells operated by local municipal police departments and other agencies.

Without exception, the Grand Jury found the detention facilities to be operated by a highly professional, well-trained and motivated staff.  Detention facility inmates receive a well-balanced, nutritious diet.  Strict food handling and storage procedures ensure adequate health and sanitary conditions.  Food handlers wear clean clothes, gloves and hair coverings and have been cleared by medical staff before being assigned to food handling duties.  This experience can earn them a certificate that qualifies them for employment upon release from custody.

Inmates receive required medical and psychiatric care during their incarceration.  The number and makeup of the medical staff varies from facility to facility.  A large percentage of inmates suffer from mental illnesses and addictions.  Medical staff strictly adheres to the established guidelines for storing and securing medications.  Inmates receiving psychotropic medications are provided a prescription which is called into the CVS Pharmacy closest to their residence or of their choice and is filled at the expense of the County.  Other prescriptions for medications are issued on a case by case basis when it has been determined that the inmate has a serious medical condition.  This policy and practice is followed at all County of San Diego detention facilities.  Many mentally-ill inmates are on psychotropic drugs, and interestingly, only 25–30 percent of the prescriptions for those drugs are ever refilled upon inmate release.  According to detention facility staff, 60–70 percent of all discharged prisoners (including those who are not mentally ill) do not continue with medication and physician/clinic follow-ups as recommended upon their release.

Of particular interest to this year's Grand Jury is the impact of the Public Safety Realignment Act (PSRA) of 2011, also known as the AB 109 realignment of the prison system, which became effective on October 1, 2011.  Under PSRA, people who are convicted locally of non-violent, non-serious, non-sexual crimes (referred to as "non- non- non's") are serving their time in San Diego County jails instead of state prisons, regardless of the length of the sentence.  In the past, inmates sentenced to more than 365 days in custody were sent to state prisons.  That limitation no longer applies; County jails now retain most, but not all, inmates serving lengthy sentences.  In addition, many non-non-non inmates who are released on parole from state prisons (to comply with court-ordered reduction of the prison population) must now be supervised by the San Diego County Probation Department instead of State parole officers.  With few exceptions, when a parole violation occurs, the parolee is not returned to state prison, but becomes the responsibility

---

[1] California Penal Code §919(b)

of local detention facilities. The impact is clearly being felt by local law enforcement agencies. For instance, the average daily population of the San Diego County adult detention facilities has increased from 4,672 in the pre-realignment period to 5,694 on September 30, 2013.[2] Approximately 31 percent of the total jail population was made up of realigned offenders as of that date.

Implementation of AB 109 at the County level has been facilitated by the formation of a Community Corrections Partnership (CCP) made up principally of the Sheriff's Department, the Probation Department and the District Attorney. The CCP also collaborates with the County Health and Human Services Agency (HHSA) and local law enforcement agencies. One of the basic foundations of the realignment effort is the utilization of evidence-based practices in the services to be provided to the inmates or those on probation. Evidence-based practices places an emphasis on achieving measurable outcomes and making sure that the services provided and the resources used are effective. It involves using research and scientific studies to identify interventions that reliably produce significant reductions in recidivism. The goals of the CCP are:
- To efficiently utilize jail capacity
- To incorporate reentry principles into in-custody programming
- To incorporate evidence-based practices into supervision, case management and sentencing of offenders.

In addition to the active detention facilities operating in the County, the 2013-2014 San Diego County Grand Jury had the opportunity to visually review a closed facility at Descanso. This facility remains an asset, though not currently active as a County detention facility, as the County continues to deal with the space requirements needed as the result of AB 109.

The Sheriff's Department is focusing the bulk of its rehabilitation programs at the longer term detention facilities (including the East Mesa Reentry Facility and the County Women's Detention and Reentry Facility) where the inmate's length of stay is more conducive to longer term rehabilitation efforts.

Although the Sheriff's Department and the Probation Department are doing an excellent job absorbing the additional workload, they are fast approaching the maximum available capacities of the County's jails and the sworn personnel available to manage them. On a positive note, construction is currently underway on a new, much needed facility to replace the aging Women's Detention and Reentry Facility at Las Colinas, which will add a net 400 beds to that facility, giving it a total of 1216 beds for females in County custody.

The expansion of the Women's facility, while needed and welcome, poses a significant staffing challenge for the Sheriff's Department: Approximately 250 additional female deputies must be recruited and trained to serve at the facility in order to comply with existing staffing regulations. With construction completion expected in 2015, this is a high priority task which the Sheriff's Department is addressing.

---

[2] Source: San Diego Sheriff's Department Detention Facility Fact Sheets prepared for the 2013-2014 San Diego County Grand Jury and Probation Department report to the Board of Supervisors dated 9/30/2013.

2

Also, a transformation is taking place at the adult male facility at East Mesa. Formerly known as the East Mesa Detention Facility, the facility has been renamed the East Mesa Reentry Facility to reflect the Sheriff's new strategy of dealing with the inmates. In-custody programming and treatment now focuses on preparing offenders to return to their communities, ensuring that there is a smooth transition upon their release. An additional 400 beds are under construction at the East Mesa Reentry Facility, with completion anticipated in May 2014.

Another positive innovation is currently in progress: In cooperation with the Veterans Administration, the Sheriff's Department is reserving one wing of the Vista Detention Facility to house inmates who are military veterans. The wing is being decorated with patriotic themes, and the Sheriff's support staff will offer programs and services to meet the special needs of veterans.

## *PROCEDURE*

The Grand Jury utilized existing questionnaire review forms to obtain information from facility directors and managers. This included data on staffing and inmate populations before and after implementation of AB 109. The Grand Jury collected/reviewed:

- Questionnaire responses from facility directors
- Inspection forms completed during site visits
- California Department of Corrections and Rehabilitation's Corrections Standards Authority inspection reports
- Title 15 and Title 24 of the California Code of Regulations
- Fire Safety On-Site Inspection, Environmental Health On-Site Inspection, Medical/Mental Health On-Site Inspection, and Nutritional Health On-Site Inspection
- Public Safety Realignment Act (AB 109)
- County of San Diego Juvenile Justice Commission reports
- Various other documents relating to facilities, operations, staff, and inmates.

Members of the Grand Jury reviewed relevant documents and visited the following adult detention facilities operated by the Sheriff's Department:

- San Diego Central Jail
- South Bay Detention Facility
- Women's Detention and Reentry Facility (Las Colinas)
- George F. Bailey Detention Facility
- East Mesa Reentry Facility
- Vista Detention Facility

In addition, the Grand Jury conducted reviews of the following juvenile detention facilities operated by the San Diego County Probation Department:

- East Mesa Juvenile Detention Facility
- Rancho del Campo Juvenile Ranch Facility
- Camp Barrett Juvenile Ranch Facility
- Kearny Mesa Juvenile Detention Facility

3

- Kearny Mesa Girls Rehabilitation Facility

The Grand Jury toured the following holding facilities managed by local cities and other agencies:
- San Diego Airport-Harbor Police
- Carlsbad Police Department
- Chula Vista Police Department
- Escondido Police Department
- La Mesa Police Department
- Oceanside Police Department
- San Diego Police Department

The Grand Jury also visited two non-detention facilities operated by the County Health and Human Services Agency under the Child Welfare Services Division, and one privately-operated substance abuse treatment facility:
- A.B. and Jesse Polinsky Children's Center
- San Pasqual Academy
- Phoenix House Academy, Descanso

The following operational and support facilities were visited:
- San Diego County Medical Examiner's Office
- San Diego Police Crime Laboratory
- San Diego County Sheriff's Crime Laboratory
- East Mesa Food Processing and Laundry Facility
- San Diego County Probation Department Work Furlough Program
- San Diego County Community Transition Center

## *INMATE DEATHS 2009 – 2013*

The Grand Jury reviewed specific data on inmate deaths from all causes in San Diego County detention facilities for the past five calendar years. The County's detention facilities have experienced a steady decline in inmate deaths in custody despite the ever-increasing population of inmates in custody as a result of AB 109. That trend is reflected in the table at the end of this section.

Among the six adult detention facilities operated by the Sheriff's Department, the San Diego Central Jail had the most deaths during this five-year period, 28, followed by the Vista Detention Facility with 12. George Bailey Detention Facility and the adjacent Facility 8 combined had eight deaths, the Women's Detention and Reentry Facility had four, and the East Mesa Reentry Facility had one death. No deaths were reported at the South Bay Detention Facility.

**Total Deaths in San Diego County Sheriff Detention Facilities, Calendar Years 2009-2013[3]**

---

[3] San Diego County Sheriff's Fact Sheets prepared for use of the Grand Jury. The figures for 2010 and 2013 have been updated since the Interim Detention Facilities Report was released on May 19, 2014.

4

| Totals for all Facilities | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| # of suicides | 4 | 2 | 4 | 2 | 5 |
| # of Homicides | 1 | 0 | 1 | 1 | 0 |
| # of Natural Causes | 4 | 9 | 3 | 3 | 4 |
| Other* | 3 | 0 | 2 | 2 | 3 |
| **Total Deaths** | **12** | **11** | **10** | **8** | **12** |

*Deaths where there was no clear intent to commit suicide (overdose) or deaths that were accidental (during use of force or medical treatment) where there was no clear intent to kill the person.

## *COMMENDATION*

Based on information received during visits to the detention facilities, personal observations, and review of operational documentation provided by the facilities' staff, the 2013/2014 San Diego County Grand Jury commends the dedicated professional staffs of the San Diego County Sheriff's Department and the San Diego County Probation Department for their efficient service to our community. Without exception, the detention facilities reviewed by the Grand Jury are meeting the requirements of the Board and State of Community Corrections (BSCC), providing a clean and safe environment for the inmates housed there, and adjusting their educational and counseling programs to meet the reentry success goals under AB 109. We also commend the command staffs of the Sheriff's Department and the Probation Department for proactively creating a progressive roadmap for implementing AB 109, utilizing existing limited resources to reduce recidivism and, by extension, the state's prison population.

# ADULT FACILITIES VISITED

## *SAN DIEGO CENTRAL JAIL*

The Grand Jury visited the San Diego Central Jail (SDCJ) on July 31, 2013. The Sheriff's Department provided an extensive briefing that included a PowerPoint presentation and an overview of all adult detention facilities throughout San Diego County. In addition, facility commanders and department heads each provided a summary of their respective facilities and duties.

The SDCJ covers 417,000 square feet. It was opened in 1998. The facility houses males only, including inmates of all risk levels. It is supervised by the Facility Commander with a sworn staff of 233. Sworn staff works 12.5-hour shifts and there are 45 deputies on duty at any one time.

SDCJ has a Board and State of Community Corrections (BSCC) rated capacity of 944 inmates. On the day of the Grand Jury's visit, the average daily population was 872. Since the prison realignment bill became effective in 2011, the average daily population has increased by 80. The maximum population has been as high as 941. The facility averages over 56,000 annual bookings. Approximately 43 percent of the inmates have already been sentenced and 57percent are being held pending trial. The average stay of an inmate is 70 days for those sentenced and 8.5 days for those being held pretrial. The inmate with the longest sentence as of the date of our visit was serving 1,879 days. Prior to AB 109, the longest serving inmate was sentenced to 365 days. At the time of the Grand Jury visit, other pertinent facts included:

5

Number of identified gang members:[4]                                                   168
Number of inmates in Immigration & Customs Enforcement (ICE) violations:    45
Number of inmates in protective custody:                                         104

Inmates are classified on a scale from 1-6 (1 = low risk, 6 = extreme violence, threat to public safety). The process of inmate classification is evidentiary, based on the severity of their past and current offenses, personal interviews and their behavior in custody. Inmate risk level classification begins at initial intake (booking) at SDCJ where extensive medical and psychological screening is conducted. An inmate's classification provides a composite profile that allows appropriate assessment of inmate needs (housing, counseling and training) while at SDCJ and once they are transferred to East Mesa, South Bay or George Bailey detention facilities. While in custody, inmates are provided color-coded clothing and wristbands that identify their classification and are segregated appropriately. This is done in the interest of both protecting low-risk inmates and segregating high-risk inmates to reduce inmate-to-inmate and potential inmate-to-deputy violence. During an inmate's incarceration, his classification is evaluated periodically for the purpose of upgrade or downgrade based upon behavior while in custody.

The SDCJ central command center uses state-of-the-art touch-screen controls and video surveillance. From induction to final release, all critical inmate data is maintained in the Jail Information Management System (JIMS). In the event of any emergency or major system failure, the command center has the capability of electronically controlling all jail operations with backup generators. These generators can provide the needed power for this facility for at least three days.

SDCJ has the largest medical/psychiatric care unit of all the detention facilities in the County and the capacity for a wide range of medical and psychiatric services, including on-site dialysis, infectious disease control, and dental care. SDCJ dedicates one complete floor to inmates who have medical issues. Services are provided under contract by the University of California San Diego (UCSD) Medical Center. The facility is staffed with a full-time physician daily, 52 Registered Nurses (RNs), and 13 Licensed Vocational Nurses (LVNs). While there is not a full-time psychiatrist on staff, one is available 24 hours a day. There are two full-time social workers on staff.

The licenses of the RNs and LVNs are verified annually. They follow approved standardized nursing procedures. Medical personnel properly inventory and distribute prescribed medications according to physician's orders. All medications are stored in a secured location. Documentation of health care for the inmates is handled via electronic medical records.

Inmate meals are prepared at the Central Food Kitchen located in the East Mesa Central Production Center. They are either served in the inmates' own dayrooms, or cafeteria style, and inmates are given 30 – 45 minutes for meals.

---

[4]San Diego County Sheriff's Fact Sheets prepared for use of the Grand Jury.

6

The Grand Jury found the grievance log up to date. The Penal Code strictly defines and limits discipline options.

Despite SDCJ being primarily an in-take facility with the average stay of an inmate spanning only 70 days, there are limited formal rehabilitation (educational) programs available to inmates including GED readiness, basic computer skills and life skills counseling. Participation in these programs is voluntary and qualification is based on both the inmate's classification (risk level) and behavior while in custody. Involvement in these programs can then be continued upon release or upon transfer to a long-term detention facility.

SDCJ was last inspected by the Board and State of Community Corrections (BSCC) on January 27, 2012. Findings at that time included non-compliance with the following:

Title 24, Section 470A.2.2: Temporary Holding Cells
- Two of the temporary holding cells exceeded their capacity of 16 inmates at the time of the inspection.

Title 24, Section 470A.2.8: Dormitories
- Nine beds were added to each of four dormitories in Level 8 Housing, exceeding the limit of sixty-four inmates.

The 2013-2014 Grand Jury revisited the SDCJ on September 19, 2013, to review the status of compliance to the above Title 24 requirements. SDCJ staff has made changes in their practices to accommodate the Title 24 requirements of having no more than 16 inmates in a holding cell and sixty-four in a dormitory at any time.

During our return visit, we reviewed the process for transfer of inmates to the adjacent court house for trial. We learned that there are plans to install state-of-the-art body scanning equipment to be used at intake and in the process of transferring inmates to/from court, to insure all contraband items (drugs and weapons) are discovered.

## *SOUTH BAY DETENTION FACILITY*

South Bay Detention Facility (SBDF) opened in 1982 and is part of the South Bay Regional Justice Center in Chula Vista. It is a non-booking facility and houses low, medium and high level inmate classifications. It has a CSA-rated capacity of 386, and a court-ordered capacity of 431. There are four housing modules, theoretically providing beds for 576. However, some of the space is currently being used for property storage (typically, the clothing/possessions of inmates), and SBDF has a "keep separate" list of inmates who must be isolated from others. This includes known gang members and sexual predators. Inmate-on-inmate assaults are relatively rare. Each housing module has two sections; each section consists of 24 cells with three beds each. SBDF has 57 sworn staff.

SBDF is not a long-term housing facility. Average time spent here by inmates is typically short, ranging from a few days to a few weeks. SBDF has a very good safety record and there is public transit available, making family visitation much easier here than at some other detention facilities.

7

There is a concerted effort by staff to prepare inmates to rejoin society. A GED education program is available, run by the Grossmont Union High School District. If an inmate doesn't complete the GED requirements while in custody, he can be given a voucher to complete it when he is released and can take the test at a local high school (Foothill). SBDF has the highest GED completion rate in the County. It is a new program (one year) but there are already plans to expand it. The Grand Jury was impressed by the staff's sincere attempt to help inmates rebuild their lives.

There is only one classroom which holds 18 students per session. Although multiple sessions are offered per day, the staff is still limited by the lack of classrooms. In addition to GED courses, Narcotics Anonymous and Alcoholics Anonymous recovery programs are conducted by certified instructors in both English and Spanish. Parenting and "life skills" courses such as anger management are also offered. Daily bilingual worship services and Bible study classes are available.

Because the inmates are generally healthy, minimal but adequate medical care is available. There is a nurse (RN) on duty. A doctor visits the site once a week. The medical staff holds regular HIV, orthopedic and dental clinics on site.

Control rooms located in the center of each module have cameras observing and recording activities in all sections of the module. If there is an incident, facility officials have the ability to go back and study the video to determine what led up to the incident and its progression. Inmates have a panic button available to them if they feel threatened or have a medical emergency. The camera system is relatively old and lacks the ability to zoom in on particular areas, but still is a valuable tool to help staff keep things under control.

Inmates eat in the day rooms in shifts (tiers); each tier is given 15 minutes to eat. Food is transported to the modules in carts which maintain the food at the correct temperatures. The kitchen was clean and well-organized. Meals are served at 4:00 a.m., 10:30 a.m., and 4:00 p.m. The Grand Jury had lunch at SBDF, and ate the same food served to the inmates.

Facility rules are clearly articulated to the inmates, and are posted in English and Spanish. The postings include both the rules and the penalties for breaking them. The most common form of discipline is loss of privileges. There is a grievance procedure inmates can use to record their dissatisfaction or complaints.

There is on-site storage of first responder fire equipment which staff members use in case of a fire. A Chula Vista fire station is nearby. Quarterly fire drills are held. Tactical gear consisting of vests, helmets, pepper ball guns, rubber bullets, TASERS®, shields, etc. is stored on site and can be used by staff in an emergency.

There is no outdoor recreational area, but the facility has a gym for inmates' use. Each inmate receives 1-1/2 hours of recreation time each week. Otherwise, they are confined to cells and day rooms in the modules.

8

The Grand Jury found SBDF to be a well-run and well-maintained facility, taking advantage of the limited space available at this site.

## FACTS AND FINDINGS

**Fact**: The control room video equipment is old and lacks the ability to zoom in on particular areas of interest.

**Finding 01:** The ability to have close-up views of activities in the modules would improve the ability of staff to determine at close range what caused the situation and how to control it.

## RECOMMENDATION

**The 2013/2014 San Diego County Grand Jury recommends the San Diego County Sheriff:**

**14-61:** **Update the capabilities of the control room video equipment to include the ability for close-up monitoring of activities in the modules.**

## WOMEN'S DETENTION AND REENTRY FACILITY
### (FORMERLY LAS COLINAS)

The Grand Jury visited the San Diego Women's Detention and Reentry Facility (WDF) on August 16, 2013. This facility, formerly known as the Las Colinas Detention Facility, houses female inmates of all custody levels and serves as the primary location for women prisoners in the County. The majority of the buildings were built in 1967 as a juvenile facility and converted to an adult women's institution in 1979.

The construction of a new facility across the street was started in 2012 and Phase 1 is expected to open in the summer of 2014. Phase 2 buildings are expected to be completed in 2015. This new facility is direly needed because of the age and condition of the current facility. The older buildings in use at the time of the Grand Jury's visit appeared neat and clean. The grounds were mostly swept dirt with very little landscaping, which is understandable, considering these old buildings will be torn down when the new facility opens.

Housing is dormitory style with bunk beds and shared bathrooms and shower facilities in each building. The kitchen appeared adequate for its age.

On the date of the Grand Jury's visit the inmate population was 465 with the BSCC rated capacity of 432. There were 140 sworn staff with 24 unfilled positions open on the day of our visit. The Grand Jury was informed that the Sheriff's Department is having difficulty filling female sworn staff positions at this time.

The mental health ward was very active on the day of the Grand Jury's visit. Two officers (one male and one female) were on duty inside the enclosed ward. One psychiatric nurse was on duty at the time. The number of inmates with psychiatric conditions is growing each year, according to facility staff. Physicians and psychiatrists are contracted on an as-needed basis. Clinics are conducted as needed.

9

A number of educational and counseling programs are offered at the facility but because of lack of classroom space they cannot be offered as often as needed. WDF currently has only two classrooms and the library which can be used as a classroom. In the new facility, an academic building which will be completed in Phase 1 will have five classrooms. There will be an additional ten multipurpose rooms which can be used for program classes and religious services. The Psychiatric Security Unit will also have its own classroom. When Phase 2 is completed in 2015, an additional three classrooms will be added. This will enhance the ability to provide more counseling and training which is expected to reduce the recidivism of inmates.

Some of the rehabilitation programs need to be updated. For instance, the sewing class is outdated and unrealistic for the San Diego area, which is not known for its clothing industry. However, the inmates sew all the uniforms for the detainees at all the detention centers in San Diego County. This is a significant cost savings to the County.

Overall the facility is well run and clean and neat. The shortcomings of the current facility are understood by the Grand Jury which is looking forward to touring the new facility when it opens. Hopefully, by that time the Sheriff's Department will have been able to recruit and train the additional female deputies who will be needed.

## *EAST MESA REENTRY FACILITY*

The Grand Jury visited the East Mesa Reentry Facility (East Mesa) on September 13, 2013. Formerly known as the East Mesa Detention Facility, the name change symbolizes a change in both the functions and mission of the facility and reflects the reality of having inmates who are serving lengthy sentences under AB 109 prison realignment. There is now a significant emphasis on actively preparing inmates for their reentry into society and reducing recidivism.

To accomplish these goals, the Sheriff's Department recently created a Reentry Services Division and selected a Reentry Services Manager. This Division will provide programs focusing on cognitive behavioral therapy. This includes a new "Thinking For A Change" curriculum, aimed at developing personal skills needed in the real world. Classes range from anger management to parenting to English as a second language and numerous other offerings. The curriculum trains inmates to think first and respond rationally, rather than emotionally, to outside stimuli.

Inmates are assisted with basic information about obtaining needed documents such as a social security card or a driver's license, how to find housing, how to find and keep a job, substance abuse counseling and other social support programs. East Mesa staff works with local employers to identify opportunities for the inmates being released.

Both the sworn staff and the civilian staff displayed a very positive attitude, offered encouragement to inmates and seemed to be genuinely interested in helping inmates make a successful transition from the penal system to civilian society.

10

East Mesa is capable of housing a maximum population of 562. The average daily population during the period January 1, 2012 – July 25, 2013, was 474, approximately 140 more than in the period immediately preceding the implementation of AB109.

Low-level to medium-level offenders are assigned to East Mesa when they have two years or less left on their sentences. The length of stay ranges from a few days to more than 700 days. Educational, vocational and behavioral training are offered, along with individual counseling to guide the inmates to the appropriate classes to prepare them for release and successful reintegration into the community.

In addition to a sworn staff of 92, East Mesa has four canine units. This results in a very efficient use of manpower: One deputy with one canine unit can handle the same number of inmates as four deputies without a canine unit.

East Mesa is a camp-style facility with a large, open and nicely landscaped courtyard. Inmates are housed in four dormitory buildings surrounding the courtyard where they are free to move about the sleeping area, the day room area, and the bathroom/shower room.

Adjoining the housing area are a food preparation facility, a laundry facility and a print shop. A number of the inmates work in these facilities and in maintaining the facility's landscaping. More than eight million nutritious meals are prepared in the food preparation facility each year, enough to feed all of the inmates in the County detention system. The average cost per meal is $1.13. Inmate workers are required to wear hairnets and plastic gloves to meet safe food handling standards. They also undergo health screening prior to being accepted in the food preparation program. Bakery training was recently added and the Grand Jury was impressed by the attractive and tasty baked goods being produced which are served to the staff. Laundry for most of the County detention facilities is done at East Mesa; some 8,000 – 10,000 pounds of laundry is processed each day. The food preparation and laundry services result in a significant cost savings for the County.

Inmate training for the print shop is conducted by faculty from the Grossmont Union High School District. Inmates are trained in press operations, silk screening, and engraving. These are desirable work assignments, and inmates work hard to get and keep them. The shop produces printed materials for the County and also contracts work for outside non-profit groups. Any profit derived from these jobs goes to the inmate welfare fund.

A commissary is maintained at East Mesa where orders from inmates around the County are processed. A very strict accounting procedure is used to ensure that orders, primarily made up of snacks, are correctly filled and appropriate charges made against the inmate's personal funds account. The cost of items from the commissary are similar to or lower than those available outside the institution, and any resulting profit is placed in the inmate welfare fund.

The inmate welfare fund is used for items needed in the detention facilities operated by the Sheriff's Department. After approval by the Inmate Welfare Committee, money from the inmate welfare fund was used to buy replacement industrial washing machines last year, and two new

11

printing machines were recently purchased for the print shop. These purchases make vocational training available for the inmates, in addition to reducing detention facility operating costs.

In addition to its change in mission, another major transformation is currently taking place at East Mesa: Construction of facilities to house an additional 400 inmates is in progress. The construction is expected to be completed by May 2014. In addition to the new housing modules, four badly needed classrooms are being added to supplement the five classrooms that already exist. This will support the current class offerings and provide space for a wider range of offerings, including computer skills and other technology courses. Space will also be available to add ten additional corrections counselors, bringing the total number of counselors up to 18.

## *GEORGE BAILEY DETENTION FACILITY*

The 2013-2014 Grand Jury visited the George Bailey Detention Facility (GBDF) on August 30, 2013. The commander of the facility and his staff provided information during a briefing at the beginning of our inspection. The GBDF staff was very impressive, highly professional, well-trained and very candid about their operations; they were perfectly willing to show anything the Grand Jury wanted to see. Also in attendance was the manager of the adjacent Facility 8 custody unit. The visit was well-balanced, with a look at administratively segregated modules, the regular modules, and the medical ward. Overall the Grand Jury found the facility to be clean, well-maintained, and operating efficiently.

The Sheriff's Department operates GBDF as one of three adult detention facilities in the East Mesa Detention Complex. GBDF shares the complex with East Mesa Reentry Facility (EMRF) and the Facility 8 Detention Facility. A Probation Department facility, East Mesa Juvenile Detention Facility (EMJDF), and Donovan State Prison are also located on the East Mesa site.

GBDF, opened in 1991, is the largest detention facility in the County and is a maximum-security facility. It houses male inmates considered to pose high risks for violence, escape, or other serious threats. GBDF operates under a Facility Commander with a sworn staff of 172. Staff can observe all areas of the facility using existing surveillance video equipment. However, the equipment is antiquated and produces very fuzzy images. The current system also lacks the touch screen enlargement/zoom capabilities found in more modern equipment. The recordings can be maintained for a two year period or longer, but the image quality is so poor that without significant quality enhancement it is impossible to look at unfolding events such as a fight and identify the participants.

GBDF has a Board and State of Community Corrections (BSCC) rated capacity of 1,380 inmates. Since AB 109 went into effect, the average daily population has increased by 76 inmates from 1,604 to 1,680, with the longest serving inmate having a 2,031-day sentence. Prior to AB 109, the longest sentence being served at GBDF was 365 days. The average stay of an inmate is 74 days for those sentenced and 5.4 days for those being held pending trial. At the time of our visit other pertinent facts included:

12

Number of identified gang members:[5]                                        520
Number of inmates in Immigration & Customs Enforcement (ICE) violations:      67
Number of inmates in protective custody:                                     334
Number of attempted suicides/successful suicides:                            5/0

Inmates in each section are allowed 30 minutes in the day room for meals. Two inmate workers from each section hand out the meals and clean up afterward. Shower time is limited. Inmates who are trained as barbers provide haircuts for other inmates. Visiting rooms are adequate for both inmates' families and professional visitors. Closed circuit television is available for conferencing between inmates and attorneys.

The clinic has a 24-bed infirmary and negative pressure rooms for contagious disease isolation. Recently installed equipment allows for dental and medical evaluations that, in the past, would have required transport to the San Diego Central Jail. Vaccinations, HIV testing, mental health and emergency care are available 24/7. Routine mental health care is offered eight hours per day. Dental care is provided on Mondays for eight hours. The facility subcontracts medical care to UCSD Medical Center and an orthopedic doctor is available monthly. Medical/ psychiatric staff is regularly scheduled and readily available.

With the exception of a spike in 2011, when there were four inmate deaths (by all causes) at GBDF, the number of deaths over the period 2009 to 2013 has remained very low.

Inmate disciplinary actions are usually handled with a hearing and, if warranted, loss of canteen and/or phone privileges, and/or possible lockdown for 23 hours a day. GBDF has what they described as a forward-looking policy vis-à-vis rewards to encourage good behavior: Privileges are given up front, and inmates lose them if they misbehave.

With the impact of AB 109, GBDF has had to reorganize its inmate housing so as to maximize the use of available beds, while considering the classification of each individual inmate. Generally inmates are not segregated by groups such as race or gangs and are left to sort things out among themselves. At the time of our visit, there were approximately 520 gang members who are closely monitored as the result of the co-mingling of the inmate population.

The facility has an orientation video for all prisoners which, among other things, announces the availability of educational programs to obtain a GED, and training in areas such as the culinary arts, construction, landscaping, and English as a Second Language (ESL).

GBDF staff is reviewing their in-house educational programs with the intent of helping provide realistic job prospects for newly released inmates. They are hoping to forge relationships between prison officials and local companies in an effort to convince businesses to take a chance on hiring newly released inmates. Some "felony friendly" hiring entities have already been identified. GBDF provides this information to inmates upon discharge. If successful, this could contribute to reducing the high recidivism rate the County and State are experiencing. GBDF

---

[5] San Diego County Sheriff's Fact Sheets prepared for use of the Grand Jury.

**SAN DIEGO COUNTY GRAND JURY 2013/2014 (filed May 19, 2014)**

staff also refers inmates being released to the 211 telephone information program which can help them in all areas of need including housing, training, and mental health.

## FACTS AND FINDINGS

***Fact***:  GBDF has antiquated video surveillance equipment that allows staff to monitor all areas of the facility but produces very fuzzy images and lacks modern capabilities such as touch screens.

**Finding 01:**  There is an urgent need for updated video surveillance equipment at GBDF to support staff's efforts to monitor the activities occurring at this maximum security detention facility.

## RECOMMENDATIONS

**The 2013-2014 San Diego County Grand Jury recommends the San Diego County Sheriff:**

**14-62:**       **Update digital surveillance system with modern performance features and improved image quality.**

## VISTA DETENTION FACILITY

The Grand Jury visited the Vista Detention Facility (VDF) on September 27, 2013.  The detention facility opened in 1978.  It is the second oldest jail in the County.  VDF was built so that it is physically connected to the Vista Superior Courts.  This proximity to the courts simplifies transportation of those in jail awaiting trial.

VDF has a court ordered (BSCC) capacity of 825 inmates.  The facility's average daily population is 811.  The average length of sentence has remained fairly constant following the implementation of AB109 (74 days vs. 70 days).  The average length of stay for pre-trial inmates is 8.5 days.  VDF now houses inmates with sentences longer than 365 days, the pre-realignment standard; the longest sentence currently being served there under AB 109 is 1,476 days.

The primary receiving facility for all North County arrests, VDF houses male inmates of all classification levels.  VDF averages 24,000 bookings a year of both adult males and females.  Once female inmates finish their booking process they are immediately transported to the San Diego Women's Detention and Reentry Facility (formerly known as Las Colinas Detention Center).

The inmate population at the time of our visit included:[6]

| | |
|---|---:|
| Documented gang members | 222 |
| Inmates on Immigration and Customs Enforcement | 34 |
| Inmates in protective custody and administrative segregation | 194 |

The Grand Jury noted that there had been nine attempted suicides and two successful suicides at VDF in the six months prior to our visit.  This relatively high number was attributed to inmates

---

[6] San Diego County Sheriff's Fact Sheets prepared for use of the Grand Jury.

14

being distraught upon entering the penal system for the first time, the severity of the criminal charges pending, or inmates still under the influence of drugs or alcohol. Alcohol and drug counseling services are also available to the inmates.

The interior and exterior of the facility were in satisfactory condition. All of the security cameras were connected to recording devices, and the recordings are retained for approximately two years. Rules and regulations are fully explained to inmates upon arrival, and are prominently posted in both English and Spanish throughout the facility.

Inmates being booked are medically screened prior to leaving the intake area to prevent the spread of communicable diseases such as tuberculosis and MRSA, and to identify inmates needing mental health services. Inmates who are HIV positive or have any other urgent medical needs are transferred to San Diego Central Jail for treatment.

VDF recently underwent a renovation that enlarged the kitchen storage areas and increased the work area. They have old equipment that appears to be working well. Freezers and refrigerators all meet the regulatory standards for food temperatures. Qualified teachers who use video tapes and DVDs for training purposes supervise classes for inmates working in the kitchen. Inmates are tested upon completion of the course, allowing them to earn certificates that will assist them in obtaining employment upon release.

Inmates are aware that authorities screen their mail at this and other County detention facilities. The facility provides postage for indigent inmates. Currently, the only type of mail that inmates can send or receive is post cards, which is consistent with other detention facilities in the County. The only exception is communication between attorney and inmate which can still take the form of a letter. When sending mail to their attorney or other professionals such as clergy or judges, inmates prepare their letter and a deputy seals the envelope.

A special veterans' unit is currently being planned for VDF. Inmates in the County jail system who are veterans will be eligible to be housed in this unit. Planned in coordination with the Veteran's Administration, special services specific to the veterans' needs will be offered.

VDF has 24-hour medical staff coverage. Inmates who are in need of medical, dental, vision, and mental health assistance must sign up for sick call. A physician is available six days a week. A dentist is available the second and fourth Wednesday of each month. A psychiatrist is available seven days a week. VDF contracts with Tri-City Hospital and Palomar Hospital, with UCSD Medical Center as a backup for some professional services. There are 22 RNs, 13 LVNs and one LMHC (Licensed Mental Health Clinician), four office assistants and one medical records clerk. All nurses and medical staff are licensed.

Medication is stored under lock and key. A licensed nurse dispenses all medication. Inmate medication is accounted for and only given by physician's order. Electronic medical records are used to document healthcare for inmates. There are five isolation rooms for respiratory and other infectious diseases, 27 medical observation beds and two treatment rooms. VDF has a voluntary flu vaccination program.

15

Although the average length of stay is fairly short, VDF offers some educational and reentry services to inmates. A lending library with books in both English and Spanish is available to the inmates. Inmates who qualify are transferred to the East Mesa Reentry Facility prior to their release where a broader range of educational and reentry services are available.

The VDF Mental Health clinician works with various community agencies to assist in the placement of inmates with mental health or psychiatric issues. If placement is not identified prior to release and the inmate has severe mental health issues they may be taken to County mental health or any local emergency hospital.

The educational and counseling programs available to inmates at VDF and most of the other County adult detention facilities include:

- Adult Basic Education (GED preparation)
- Narcotics Anonymous
- Alcoholics Anonymous
- HIV/AIDS awareness
- Thinking For A Change cognitive skills curriculum

These programs are being reviewed by the Sheriff's staff and enhanced where space and staff are available, coordinated through the newly-created Reentry Services Division of the Sheriff's Department.

## CHULA VISTA CITY JAIL

Members of the 2013-2014 San Diego County Grand Jury visited facilities operated by the Chula Vista Police Department on November 22, 2013. The purpose of the visit was two-fold: 1) To review juvenile holding and transportation documents on file, along with a physical review of the areas utilized for that purpose, and 2) To tour the Chula Vista City Jail (CVCJ), which at this time is the only city-operated detention facility in the County of San Diego. All other municipal police departments in the County utilize the County Sheriff's booking/intake/detention facilities. The Chula Vista facility is current and compliant with all required state, county and city inspections.

The jail facility was constructed in 2004 and is rated as a Type I facility by the Board and State of Community Corrections (BSCC). It has a rated capacity of 46, with an average population of 44 inmates.

The City of Chula Vista has a contract program with the U.S. Marshal's Service to house up to 44 federal female inmates. Typical length of stay for these inmates is less than one year. The contract results in approximately $1.7 million in revenue to the City of Chula Vista from the U.S. Marshal's Service. While rated a Type I facility, the jail effectively and efficiently operates as a Type II facility because of its longer term contract inmates. It has a rated capacity of 46, with an average population of 44 inmates.

16

Males and females arrested by the Chula Vista Police Department are rarely held more than a few hours; they are transported to the appropriate County jail facility by a private company under contract to the city.

The federal inmates, all female, do not work within the facility. They have access to the day room and other inmates nine hours a day. Visitation is available seven days a week. They participate in English classes or spend time with other inmates at will. TV and exercise equipment is available. A laundry room is also available for their use.

The federal inmates' basic medical needs are met by CVCJ health care personnel and on duty service officer personnel. The Marshal's Service screens the female inmates prior to their placement at CVCJ, and handles all unexpected or special medical services for each of the inmates.

Food service is provided under contract by a private vendor who provides two hot meals daily using menus approved for a Type II facility. The service meets or exceeds the requirements for the facility. Frozen meals and other components are delivered weekly to the facility. The CVCJ service personnel prepare the food in the kitchen area and serve it to the inmates. Special dietary requirements are met as needed. A commissary list was recently added which provides the women a variety of personal items to purchase.

Overall, the Chula Vista City Jail is an efficient and positive operational asset to the City of Chula Vista.

Grand Jury members reviewed the procedures utilized at CVCJ for holding and transporting juveniles. The jurors found all the detention logs and procedure/policy information current, in addition to all required inspections by various agencies and commissions. The current standard Juvenile Justice and Delinquency Prevention Act Compliance report was reviewed by CSA as it applies to the detention of juveniles by Chula Vista Police within the facility. No violations were identified by CSA.

## *DESCANSO FACILITY (NON-OPERATIONAL)*

On December 18, 2013, Grand Jury members took the opportunity to visit the non-operational County of San Diego property located on Campbell Ranch Road in Descanso, near Alpine. It was originally operated as a World War II Japanese internment camp. After World War II, it served as a Probation Department camp until 1980. After closure of the probation camp, the Descanso facility was operated by the County Sheriff as a detention facility for adult males from 1980 until 2009.

Due to its location in the east part of the county, it operated with well water from onsite wells and utilized a small wastewater treatment system, all of which still remain, although in a state of disrepair. All useful equipment and hardware were removed at the time of closure in 2009. Minimal site caretaking is now being provided by the County of San Diego General Services Facilities Management.

17

The most recent assessment of the property and its structures came as the result of an inspection requested by the Sheriff's Department in November 2006. It was completed under contract with a project management consultant through the Department of General Services.[7] The report related that the majority of the 35 buildings on site are 40-plus years old. Several of the structures had been remodeled over the years while under the auspices of the Sheriff's Department. The purpose of the survey was to determine through assessment and visual inspection the physical condition of the facility by identification of capital repair deficiencies. This resulted in a list of deficiencies with recommendations, cost estimates and other useful information as to the potential continued utilization of the facility.

The property is near an Interstate Highway 8 off-ramp, and is approximately 35 miles from downtown San Diego. The Grand Jury concluded that with remodeling, the property is potentially suited for continued use as a detention facility within the Sheriff's Department or the Probation Department. The location is also closer to San Diego than two juvenile detention facilities currently being used and is more accessible to family members who may be visiting individuals detained there, whether adult or juvenile.

The most likely future utilization of the facility site could be for consolidating existing detention facilities currently in use which are in need of remodeling as the result of age and extended use by a variety of tenants. A current assessment of the location and functional utilization of the site by the controlling department (Sheriff or Probation) and the corresponding budget from which funds can be utilized for the detention facility consolidation and rebuilding effort would be very useful.

Such an evaluation would allow projections to be made at the site regarding its possible future role in a beneficial strategy of consolidating existing detention facilities, as well as designing it to accommodate a variety of uses to maximize its utilization within the County of San Diego detention facility system, whether it is operated by the Sheriff's Department or the Probation Department.

## FACTS AND FINDINGS

**Fact**: The Descanso facility is very old and needs to be remodeled/rebuilt in order to be useful and provide the basic water and sanitation needs for tenants.

**Finding 01:** The facility's accessible location and potential utilization, upon rebuilding, could be very useful in the consolidation and closing of two existing Probation Department juvenile facilities in the east county area.

## RECOMMENDATION
**The 2013/2014 San Diego County Grand Jury recommends the San Diego County Board of Supervisors:**

---

[7] County of San Diego Sheriff – 2007 Facility Condition Survey, Descanso Detention Facility.

18

14-63:          **Direct the Probation Department to undertake a feasibility study into the utilization of the Descanso property as a consolidation site for closure of two existing east county juvenile probation sites.**

# JUVENILE DETENTION FACILITIES VISITED

The five juvenile detention facilities in San Diego County are operated by the San Diego County Probation Department.  Youths as young as eight years old have been detained there but the typical age of juvenile offenders held in the facilities is 13 – 18.  The juvenile facilities are less formidable than the adult facilities, but detainees must follow strict procedures and obey disciplinary rules.  All must attend school five days a week.  Three nutritious meals plus snacks are provided every day.  Basic health and dental services are provided, along with life skills training and psychological counseling as needed.

The population of the state's juvenile detention facilities has seen a steady decline over the past five years, according to a report published by the Criminal Justice Research Division of SANDAG.[8]  The decline statewide went from 53.1 arrests per 1,000 population in 2008 to 30.8 per 1,000 in 2012.  No county-by-county statistics were available, but anecdotal evidence suggests that this also reflects San Diego County's experience.  The report referenced did not offer any hypothesis as to why this is happening, but it is encouraging, nevertheless.

# *USE OF OLEORESIN CAPSICUM (OC) (PEPPER SPRAY) IN JUVENILE FACILITIES*

The Probation Department has policies and procedures in place that are intended to guide the staff's actions in achieving compliance of youths assigned there to the established rules of behavior in the five juvenile detention facilities it operates.  The goal is to bring diverse groups of youths together in a controlled environment without conflict.  With their different backgrounds in family situations, neighborhoods, gang affiliations and peer pressure, the methods of achieving this goal are tested daily as the youths complete their sentences.  The Probation Department staff provides programs based on positive reinforcement that are designed to assist the youths in replacing negative behavior with more socially acceptable alternatives.

All youths are expected to be in daily compliance with the rules.  Any violation is taken very seriously and dealt with on an incident response/control basis to ensure the safety of all individuals involved, both youths and staff.  In a review of the Probation Department's Use of Force policies, it is noted that one authorized option is the use of the non-lethal spray, Oleoresin Capsicum (OC), more commonly known as pepper spray.

The policies and procedures manual of the department sets forth the authorization and conditions of use by staff members trained in the application of the spray.  Conditions where staff intervention is required occur frequently.  Most of the incidents do not result in the application of

---

[8] *Arrests 2012:  Law Enforcement Response to Crime in the San Diego Region,* Cynthia Burke, Ph.D., SANDAG Division Director, November 2013.

OC by staff.  The conditions are assessed by the staff members involved and they react with positive actions to quell the situation, maintaining safety and control without major injury.  The "COVER" command requires all youths to assume a certain position in place, and to cease all contact and conversation until verbally released by staff.  The "COVER – OC" command announces the staff's intent to apply the spray, and will normally bring compliance by the youths without any spray being applied.

If individual youths involved in physical contact fail to respond to the command, the staff may apply a short burst of OC spray to the facial areas of those involved.  However, if conditions are not clear, for instance if the area is a closed location or overspray is possible, the staff member is not allowed to use the spray.  In that case, hands-on physical contact is used to control and bring the youths into compliance with staff's commands.  The purpose for using the spray is to limit physical contact with the youths and bring them into compliance with rules or commands given.

The Grand Jury reviewed reports filed as the result of numerous incidents of conflict that have occurred in County juvenile detention facilities involving verbal, physical and/or OC responses by staff.  The number of reported incidents has been decreasing over the past two years.  Adherence to policies and procedures is strict, with management review of every incident involving physical contact and/or the use of OC.  Training and retraining issues are noted for staff members involved, as well as a documented procedure for decontamination if the situation required the use of OC spray.  The Grand Jury found no incidents of excessive use of OC, and no violations of existing policies in any of the reported incidents.  In general, the staff's use of OC was in keeping with the intent to limit the physical contact required to bring control to the situation.

There are varying opinions on the appropriateness of using OC in juvenile facilities.  However, the application of a non-lethal spray to establish control with minor discomfort to the individual is the preferred method to avoid physical contact and possible injury.

## *EAST MESA JUVENILE DETENTION FACILITY*

The Grand Jury visited the East Mesa Juvenile Detention Facility (EMJDF) on October 18, 2013.  One of the newer detention facilities in the County, EMJDF was built in 2004, is in excellent condition and has a staff of 121.  It is located in the Otay Mesa area near the Mexican border amid several adult detention facilities.  Its capacity is rated at 290 by the Correctional Standards Authority, and there was a population of 175 on the day of the Grand Jury's visit.  Only males ages 12 – 20 are housed at EMJDF. The staff-to-inmate ratio at EMJDF is 30:185.  By way of contrast, the staff-to-inmate ratio at the nearby adult male detention facility is 30:1600.

EMJDF has seven self-contained housing units with attached recreation areas in use.  One or two youths live in separate rooms containing beds, a toilet, a sink and a drinking fountain.  Each housing unit has a shower area and a central common area utilized for meetings, meals and indoor recreation.  Housing assignments are made according to personal and custodial needs.  Each unit has a lower level of rooms and an upper level of rooms.  Television is irregular and most of the viewing consists of sports activities.  No news programs are viewed and no magazines or newspapers are permitted.

20

The units range from one which is designated as the Youthful Offender Unit (YOU), to one which houses older, more serious offenders.  YOU detainees typically spend nine months at EMJDF, but the average stay for all inmates is about 60 days.  Rather than serving a specified period of time (sentence) at EMJDF, detainees are required to complete assigned personal improvement programs which, when completed, will qualify them for release or transfer to what is considered a more desirable facility such as a camp.

There are 240 surveillance cameras which are monitored 24 hours a day by personnel in the control room.  This location is a "lockdown" facility on 25.7 acres. Every door is controlled.  Closed circuit televisions monitor the entire facility.  There are two surveillance cameras in several of the rooms in each housing unit in each "pod." The rooms with cameras are normally reserved for youths with possible seizure disorders or those who might cause harm to themselves.

Education at EMJDF is provided by the San Diego County Office of Education, and consists of a continuum of educational offerings based on an established curriculum and the needs of the individual students.  There are two 20-student classrooms per housing unit.  Currently 14 teachers are providing classes in four core subjects, and the new Common Core curriculum is being implemented.  Four special education teachers provide training for detainees as needed.  Detainees have some access to technology, which is in the process of being expanded.  School attendance is mandatory from 8:00 a.m. to 2:00 p.m. on Monday through Friday.  Classroom training is followed by meetings with individual counselors.

Some occupational training is available, primarily in kitchen work, horticulture, and laundry operations where the detainees can gain experience, skills and in some cases, a certificate which will assist in obtaining employment in the future.

Religious visitation occurs on a regularly scheduled basis or as requested.  Sick slips and complaint forms are provided and can be put in a sealed box.  There is a small library which is utilized for the most part by individual requests.  There are some books on shelves in the day rooms/lunch rooms.

Training is also offered in life skills that are needed to successfully reenter mainstream society:
- Gang intervention and personal character development
- Substance abuse counseling
- Independent living skills
- Anger management
- Literacy programs
- Personal health education
- Victim awareness.

Currently there is increased emphasis on preventing sexual harassment and/or sexual assaults as required by the Prison Rape Elimination Act (PREA) of 2003.  Provisions are in place to make reporting such incidents easy and non-threatening.  A general grievance procedure is also in place and easily available to the youths.

21

EMJDF provides 24-hour medical and mental health services.  Almost one-quarter of the youths have been on psychotropic medications for a year or more.  Three psychiatrists are on site four days a week, and a full range of medical and dental services are available.

Approximately 35 percent of the detainees are gang members.  No effort is made to segregate the youths according to gang affiliation or ethnic background.  Instead, staff endeavors to keep a balance in each housing unit.  According to Probation Department staff, the recidivism rate for this population is 30 per cent.

Three well-balanced, nutritious meals are served each day plus a snack at bed time.  The food is prepared in the nearby food processing facility, quick chilled and then transported to EMJDF for reheating and serving.

Although there are regular visiting hours and parents are encouraged to visit, relatively few of them do.  This is because of the distance and remote location of the facility, the fact that no public transportation is available, and possibly the immigration status of the parents.

## *KEARNY MESA JUVENILE DETENTION FACILITY*

The Grand Jury visited the Kearny Mesa Juvenile Detention Facility (KMJDF) on October 4, 2013.  It is a facility for males with a capacity of 359.  The average daily population over the last year has been 218.  There are 162 sworn deputies and 57 civilian staff at KMJDF.  Co-located with KMJDF is the Kearny Mesa Girls' Rehabilitation Facility for young female detainees which will be discussed separately.

KMJDF is the primary booking location for juveniles and provides short-term detention with an average stay of 21 – 26 days.  Juveniles with longer sentences are generally transferred to one of the other juvenile detention facilities in the County, and those with short sentences can be released to a Probation Officer until they are 21.  They can only remain in physical custody at this facility until they are 18.  Youths as young as eight years old have been held at KMJDF.

There is a major emphasis at KMJDF on a program established under the National Prison Rape Elimination Act (PREA).  This program requires extensive documentation of any potential rape incident which must be reported to both the State of California and the federal government.  In the three years since its implementation at KMJDF, only one serious sexual assault incident has been reported.

School attendance is mandatory at the Sarah Anthony School which is located on site.  Course offerings provided by the San Diego County Office of Education are designed to complete requirements for high school graduation.  Classes are held from 8:00 a.m. to 2:00 p.m., five days a week.  Some youths are currently enrolled in online courses at a local community college.

Medical, dental and mental health care is provided by private contractors and some County employees.  A psychiatrist employed by San Diego County makes regular visits to the facility.  A double-wide trailer has been moved onto the site to provide additional space for individual

22

counseling.  Experience has shown that keeping the youths engaged in positive activities such as education and recreation is the best way to have a calm, safe environment.

When the Grand Jury visited the Kearny Mesa juvenile facility in October 2013, the review omitted the three girl's units at the complex.  As of February 19, 2014, the girls' Youthful Offender Unit (YOU) located in Unit 70 housed 13 girls.  Units 700 and 900 housed an additional 42 girls.  The San Diego County Office of Education runs the educational programs in the girls' units as it does in the boys' units under the Sarah Anthony School within the Kearny Mesa facility.

Built in 1954, the physical plant at KMJDF is showing its age and appears to be in need of additional maintenance.  For instance, one hallway water fountain was barely attached to the wall and in danger of falling, representing a safety hazard.  Although the interior spaces appeared clean and freshly painted, the exterior of the buildings was not.  Peeling paint was visible in many locations.  The surface of the recreation area has been newly restored, removing the safety hazard noted by the 2011-2012 Grand Jury.

## FACTS AND FINDINGS
*Fact:*  The exterior walls of the facility are characterized by peeling paint.

**Finding 01:**  The exterior walls of the facility need additional maintenance

*Fact:*  A water fountain attached to an interior wall is in danger of falling.

**Finding 02:**  Additional attention needs to be given to maintenance needs of the interior rooms.

## RECOMMENDATIONS:
**The 2013/2014 San Diego County Grand Jury recommends that the San Diego County Probation Department:**

**14-64:**        **Provide additional maintenance to the exterior of the facility, including repainting the walls.**

**14-65:**        **Provide needed maintenance to the interior of the facility, including repairing wall-mounted water fountain.**

## KEARNY MESA GIRLS REHABILITATION FACILITY

The Grand Jury visited the Kearny Mesa Girls Rehabilitation Facility (GRF) on October 4, 2013.  Co-located with the Kearny Mesa Juvenile Detention Facility for boys this all-girls facility is quite different from the boys facility.  It is so-called "camp" style housing, with the girls living in multiple-bed dormitories without locked doors.  Unfortunately, there is no real camp facility such as Camp Barrett available for females.  GRF has a maximum capacity of 50, with a population of 26 on the day of the Grand Jury's visit.

23

Low-level to medium-level offenders are assigned to GRF.  There are 20 sworn staff and three civilian staff members, enabling facility management to maintain a staffing ratio of one probation officer to ten youths during the daytime hours, and one officer per 30 youths at night.  Incoming females are allowed three telephone calls (family, school, and employer) and one call per week after booking.  They are allowed in the outside recreation area for three hours on week days, and five hours on the weekends.

All detainees are required to attend school five days a week, with classes provided by San Diego County Education Department employees who serve as teachers and tutors.  A wide range of academic and self-help classes are offered.

Under California Title 15, every inmate must be visually checked every 15 minutes.  In spite of this precaution, one suicide recently occurred at GRF, prompting a detailed review of policies and procedures currently in place to prevent such tragedies.  There is a sincere effort on the part of the staff to keep the youths safe and secure, and prepare them to be a contributing member of society upon their release.

## *RANCHO DEL CAMPO JUVENILE RANCH FACILITY*

Rancho del Campo Juvenile Ranch Facility (RDC) is a minimum security facility for boys ranging in age from 13 to 18.  There are no perimeter fences, nor any surveillance cameras at the site.  RDC has a staff of 63 sworn Probation Department officers and four support staff.  Medical and counseling services are provided by a registered nurse and a psychologist who are on site every day.  A doctor visits the ranch once a week.  Rancho del Campo has a maximum capacity of 250 if all five dorms are open; however, two dorms are currently closed.  The three open dorms have a capacity of 135 and had a population of 106 on the day of the Grand Jury's visit, November 15, 2013.

Remotely located in the mountains of East San Diego County near the Mexican border, most of the RDC buildings were constructed in the 1940's and have historic significance as the former home of the Buffalo Soldiers and housing for Italian prisoners during World War II.  This historical designation severely restricts the types of repairs and improvements that can be made there.  For instance, the outside walls of most of the buildings are covered with a ragged assortment of asbestos tiles which cannot be replaced because of the historical designation of the site and also the known health hazards associated with handling asbestos.  An annual asbestos audit is performed at the facility to ensure that residents are not exposed to unhealthy levels of asbestos.

Although the buildings are dilapidated in appearance, they were in clean and orderly condition otherwise, with the exception of extensive tagging of the windows in the dining hall.  Requests for funds to replace the windows have been made in the past several years' budget requests, but to date no funds have been made available.

The facility staff has plans to improve both the living conditions and the security of the camp when budgets allow.  This would include installing privacy partitions in the showers in each dorm to replace the shower curtains currently being used, repaving the basketball courts and road

24

ways in the camp, and installing both internal and external security cameras and a camp-wide communications alert system.  Up to the date of our visit, there had been seven escapes in 2013.

The youths serve sentences established by the court.  Rewards in the form of a one day shortening of sentences ("kicks") are given for good behavior and achievements such as making the honor roll in school, taking on a leadership position in the dorm and other positive behaviors.  On the other hand, youths can lose points through corrective actions taken by the staff ("markdowns") based on the youths' behavior and attitude.  Too many markdowns in a day are considered a "failure of the day" and the youth will not be given credit for that day against his sentence.

According to facility staff, a high percentage of the youths have drug and alcohol problems which must be addressed.  RDC has a robust substance abuse program operated by Phoenix House, a private non-profit organization, under the supervision of the San Diego County Probation Department.  A full range of educational services are provided by the San Diego County Office of Education, including special education (IEP) services.  All detainees must attend school five days a week, and if they do not receive their GED or high school diploma prior to their release, are required to attend community schools to complete their education.

Behavior modification programs and workforce preparation training are also offered in an attempt to prevent recidivism.  The philosophy behind these programs is to train youths in techniques and skills that will allow them to transition from the detention system to a positive place in the community upon release.

Although the camp's remote location has some disadvantages such as making visitation by families difficult, it provides a positive living environment and the structure that these young men need in their lives.  The Grand Jury compliments the staff at RDC for the excellent assistance and encouragement they give to the youths in their charge.

## FACTS AND FINDINGS

*Fact:*  The windows of the dining hall are covered with tagging etched into the glass.

**Finding 01:**  Tagging, especially gang-related tagging, is a negative influence.

*Fact:*  Showers are currently screened by shower curtains which do not provide privacy.

**Finding 02:**  Additional privacy would be provided by installation of privacy partitions in the showers.

*Fact:*  There are no internal or external security cameras on the site.

**Finding 03:**  Security cameras would make the site more secure and reduce the number of escapes.

## RECOMMENDATIONS

25

**The 2013/2014 San Diego County Grand Jury recommends that the San Diego County Probation Department:**

**14-66:**         **Replace windows that have been marked with tagging.**

**14-67:**         **Install privacy partitions in the showers.**

**14-68:**         **Install both internal and external video surveillance cameras with lengthy capture and review capabilities.**

## *CAMP BARRETT JUVENILE FACILITY*

The Grand Jury visited Camp Barrett on November 1, 2013. This facility is located in the rural community of Alpine near Descanso. Camp Barrett provides an option to Juvenile Court for seriously delinquent males, ages 16.5 to 21 years of age. On the day of the Grand Jury's visit there were 109 youths being housed there. The camp has a maximum capacity of 134 youths, and the current director of the camp had been on the job for just six months.

With the exception of the classrooms which were added after the initial construction, the facility is more than forty years old. Despite their age, the buildings appeared to be in good condition with a few spots of peeling paint. The classrooms were clean and neat and free of any obvious graffiti. Most of the visible graffiti was due to scratches on the windows and desks. Staff members explained that the youths use rocks from the yard and screws taken from chairs and desks to scratch the surfaces. The staff is now gluing the screws into the chairs and desks as a deterrent. The grounds were very neat and clean with the exception of the small brick planters. Many bricks were loose and broken. These represent a trip hazard and could be utilized as weapons.

Housing is dormitory style, with bunk beds lining the walls. Each dorm has a probation officer on duty, with showers and toilets located behind the officer's desk. The showers are old and some of the tiles were cracked or missing. Staff members mentioned plans to have partitions installed in the showers to provide more privacy for the youths. Currently, the individual showers are separated only by curtains. The dormitory rooms were neat and clean. Visitors are only allowed on Sundays. Exceptions can be made if cleared through the Director's office in advance. Visitors are limited to parents, grandparents and legal guardians. Appointments must be made for all visits.

The San Diego County Office of Education oversees the educational program at Camp Barrett. There are nine credentialed teachers, two of whom are special education instructors. The ratio of teacher to students is about 1:13. Youths attend school five days a week year round. Youths can work toward a GED, high school diploma, or take online college courses. They can also participate in the courses for culinary arts, horticulture, construction/building skills, graphic arts and fire science. (The fire science program was recently reinstituted at Camp Barrett after having been cut due to budgetary constraints.) The building/construction skills class is located in an extremely small shop, allowing only about five people to move around comfortably at one time. The kitchen where all the food preparation for the camp takes place was neat and clean.

26

Thirty youths have Individualized Education Programs (IEPs) that have followed them from their previous schools. The IEP youths are mainstreamed with the rest of the students with the two special education teachers coming into classrooms to help with those programs.

Youths must complete a demanding, structured program at Camp Barrett in order to increase the likelihood of successful reentry into the community. The program includes the following:

- Aggression Replacement Training
- Social Tolerance/Gang Awareness
- Character Counts
- Thinking for a Change
- Teen Relationship Violence (TRV)
- Horticulture and Culinary Arts ROP Programs
- Work Readiness
- Parenting Class

A very successful Work Readiness Program has been launched at Camp Barrett. Since January 2013, four eight-week classes had been completed, and a fifth was underway at the time of our visit. During these classes, young men aged 16 – 19 learn how to structure their short- and long-term career goals, how to fill out a job application and write a resume. They are made aware of the resources that are available to them in the community, are taught the practical skills of interviewing, and how to keep a job once they have one. This training provides an excellent means for a successful transition into the community.

As measured by pre- and post-program testing, the students become significantly more confident that they are competent in a particular job skill and are good candidates for a job. Among the first 174 youths to complete the program, 82 have already found employment, according to Camp Barrett staff. The staff has identified more than 30 employers willing to work with the students. They include some major retail corporations, large hospitality industry companies, and a laborers apprenticeship program, among others.

Health care is provided by an outside contractor. Youths are seen on the same day they file a health issue request with the staff. Dental care is provided on Fridays. Mental health services are provided on site with the exception of psychiatric care being available only through a SKYPE-type on-line program.

The remote location of the camp does not facilitate visitation by parents. This might be addressed by enhancing the SKYPE-type contact to involve parents who cannot physically visit on site.

## FACTS AND FINDINGS

**Fact:** Some of the tiles in the showers are cracked or missing.

**Finding 01:** The broken/missing tiles represent a health and safety hazard.

**Fact:** There are broken and loose bricks in the facility's landscaped area.

27

**Finding 02:**  Broken and loose bricks represent a safety hazard and could be used as weapons.

*Fact:*  Psychiatric care is available only via an internet communication application.

**Finding 03:**  Face-to-face interactions between the psychiatrist and the youths would be more beneficial for those with severe mental issues.

*Fact:*  The camp is in a remote location.

*Fact:*  There is limited visitation to the camp by parents.

**Finding 04:**  The physical location of the camp, along with the legal status of some parents, limits the visitation to the youth housed there.

## RECOMMENDATIONS

**The 2013/2014 San Diego County Grand Jury recommends that the San Diego County Probation Department:**

**14-69:**       **Refurbish or replace the tiles in the shower facilities.**

**14-70:**       **Replace or remove broken and loose bricks.**

**14-71:**       **Arrange to have psychiatric appointments in person.**

**14-72:**       **Explore the practicality of providing SKYPE-type contacts between the youths housed there and their parents.**

## *JUVENILES IN CUSTODY IN TEMPORARY HOLDING FACILITIES*

During its term, the 2013-2014 San Diego County Grand Jury reviewed the temporary holding facilities operated by local municipalities and their law enforcement agencies.  The focus was primarily on juveniles in custody as to their care and movement within the facilities pursuant to California code guidelines.  Also reviewed were inspection reports by the State Corrections Standards Authority as well as county and municipal records at the facilities visited.

The municipal law enforcement agencies that were the subjects of our visits were without exception very professional and extremely caring in their treatment of juveniles in their custody. They are to be commended for their handling of juveniles in difficult situations and ensuring that due process is applied according to existing laws.  The Grand Jury found the professionalism and dedication of those officers and agencies reviewed met the highest standards under the law involving juveniles in custody, and commends them for their performance.  These efforts are yet another example of the County law enforcement community delivering exemplary professional services in support of the quality of life within the county.

28

## REQUIREMENTS AND INSTRUCTIONS

The California Penal Code §933(c) requires any public agency which the Grand Jury has reviewed, and about which it has issued a final report, to comment to the Presiding Judge of the Superior Court on the findings and recommendations pertaining to matters under the control of the agency. Such comment shall be made no later than 90 days after the Grand Jury publishes its report (filed with the Clerk of the Court); except that in the case of a report containing findings and recommendations pertaining to a department or agency headed by an elected County official (e.g. District Attorney, Sheriff, etc.), such comment shall be made within 60 days to the Presiding Judge with an information copy sent to the Board of Supervisors.

Furthermore, California Penal Code §933.05(a), (b), (c), details, as follows, the manner in which such comment(s) are to be made:

(a) As to each grand jury finding, the responding person or entity shall indicate one of the following:

(1) The respondent agrees with the finding

(2) The respondent disagrees wholly or partially with the finding, in which case the response shall specify the portion of the finding that is disputed and shall include an explanation of the reasons therefor.

(b) As to each grand jury recommendation, the responding person or entity shall report one of the following actions:

(1) The recommendation has been implemented, with a summary regarding the implemented action.

(2) The recommendation has not yet been implemented, but will be implemented in the future, with a time frame for implementation.

(3) The recommendation requires further analysis, with an explanation and the scope and parameters of an analysis or study, and a time frame for the matter to be prepared for discussion by the officer or head of the agency or department being investigated or reviewed, including the governing body of the public agency when applicable. This time frame shall not exceed six months from the date of publication of the grand jury report.

(4) The recommendation will not be implemented because it is not warranted or is not reasonable, with an explanation therefor.

(c) If a finding or recommendation of the grand jury addresses budgetary or personnel matters of a county agency or department headed by an elected officer, both the agency or department head and the Board of Supervisors shall respond if requested by the grand jury, but the response of the Board of Supervisors shall address only those budgetary or personnel matters over which it has some decision making authority. The response of the elected agency or department head shall address all aspects of the findings or recommendations affecting his or her agency or department.

Comments to the Presiding Judge of the Superior Court in compliance with Penal Code §933.05 are required from:

| Responding Agency | Recommendations | Due Date |
|---|---|---|
| San Diego County Sheriff | 14-61, 14-62 | 07/18/14 |

29

| | | |
|---|---|---|
| **San Diego County Board of Supervisors** | **14-63** | **08/18/14** |
| **San Diego County Probation Department** | **14-64 through 14-72** | **08/18/14** |

**SAN DIEGO COUNTY GRAND JURY 2013/2014 (filed May 19, 2014)**

# EXHIBIT K

# ADULT DETENTION FACILITIES—SAN DIEGO COUNTY

## *SUMMARY*

California State Penal Code Section 919(b) mandates that the San Diego County Grand Jury inquire into the condition and management of the detention facilities in the county every year. The 2016/2017 San Diego County Grand Jury (Grand Jury) toured seven adult detention facilities operated by the San Diego Sheriff's Department.

At two of the facilities, the Grand Jury noticed significant repair and maintenance issues, including nonfunctional security cameras at George Bailey Detention Facility and an inoperable elevator and sally port door at the Vista Detention Facility. According to the Sheriff's Department Policies and Procedures Manual, emergency maintenance is advisable for repairs that "significantly impair the operation of the facility or the safety of the staff or inmates." The Grand Jury believes that repair of the observed malfunctioning items should be a priority and recommends that all such repairs be addressed immediately, if not completed already.

## *PROCEDURE*

During each facility visit, the Grand Jury interviewed staff members, spoke with inmates, and noted the physical condition and management of the facility, inquired about programs available to inmates, and evaluated the overall conditions.

The Grand Jury toured the following adult detention facilities:

- San Diego Central Jail
- Facility 8 Detention Facility
- George Bailey Detention Facility
- South Bay Detention Facility
- East Mesa Re-entry Facility
- Vista Detention Facility
- Las Colinas Detention and Re-entry Facility

## *DISCUSSION*
### *San Diego Central Jail (August 3, 2016)*

The San Diego County Central Jail (SDCJ) is primarily a booking facility, although it also houses some longer-term inmates as a result of AB 109. It also houses inmates awaiting arraignment or transfer to another facility. At the time of the Grand Jury's visit to SDCJ, the observed areas were clean and the inmate population was below capacity. The Grand Jury acknowledges that the presence of long-term prisoners creates a unique and complicated situation for the sheriff's department and for staff.

The Grand Jury observed several stages of the booking process, which takes places on different levels of the facility. Jurors were also shown various sections of the jail, including holding cells, safety cells, administration segregation units, as well as medical and mental health units. Jurors

1

Ex. K - 584

also learned about the intake procedure to screen all arriving inmates for mental health problems and suicidal tendencies.

**Positive**

- The medical facility was large, adequately staffed, and equipped to treat a multitude of health issues, including dental services and dialysis.

- Inmates are continuously evaluated for suitability for transfer to re-entry programs.

**Negative**

- Although much attention is paid to mental health care, and the available services seem adequate, on-site psychiatric services are provided for only eight hours daily. During off hours, off-site contracted psychiatric services are available only through teleconferencing.

- A lot of activity takes place in the booking area, which is small for the intended purpose. If more than one person is being processed at the same time, there did not appear to be enough security to avoid a possible dangerous situation.

- Suicide assessment procedures undergo continual revision, with different models being employed. Care has been given to inmates at risk of suicide, with the means to commit suicide mostly eliminated. For example, the second tier in dual-level cells has been enclosed to eliminate the possibility of inmates jumping. Nevertheless, the suicide rate at SDCJ continues to be significantly higher than in other counties, even counties larger than San Diego, such as Los Angeles.

- The odor of urine was very strong surrounding the safety cells.

- Although tables and stools were available in the common areas that the Grand Jury observed, there was no evidence of books, puzzles, or games that the jury had been advised were available to inmates. Jurors were told that books are available by purchase through Amazon or Barnes and Noble, or from family members.

- Recreation facilities and opportunities are sorely lacking, consisting of a small concrete area with only a pull-up bar for exercise. During the Grand Jury's visit no one was using that space.

### Facility 8 Detention Facility (August 17, 2016)

Facility 8 is a medium-security facility that houses approximately 200 inmates, a number that routinely fluctuates. The buildings consist of six modules, some of which are dormitory style, with the remainder consisting of single-person cells. Inmates are classified as level 1 through 4, with level 1 being those presenting the least risk. Most inmates are awaiting trial or sentencing;

2

however, some are serving sentences as long as four years. Inmates can work in the laundry, facility, the kitchen, or in landscaping.

The facility appeared clean and well-maintained, with outdoor recreation areas for fresh air and sunshine. The Grand Jury inspected the observation tower and the outside recreation areas, and observed the common areas and multipurpose room, where classes and other activities take place. The jury was told that mental health assessment is ongoing. Medical facilities are limited. Inmates with severe medical conditions are typically assigned to the George Bailey Detention Facility.

**Positive**

- In the areas the Grand Jury observed, board games, playing cards, newspapers, and books were available in the common areas outside of cells for inmates to use.

- The common areas the Grand Jury observed also contained Coke machines and a phone bank.

- High School Equivalency Test (HiSET), religious, anger management, and Alcoholics and Narcotics Anonymous programs were provided.

- Equipment is on order to provide more options for recreation (step-up boxes, treadmills, rowing machines).

**Negative**

- Only one multipurpose room for 200 inmates.

- No re-entry programming; however, low-level inmates transfer to the East Mesa facility for such programs.

- No organized recreational activities.

### George Bailey Detention Facility (August 17, 2016)

George Bailey Detention Facility (GBDF) is a maximum-security facility physically identical to Facility 8; however, it houses an average of more than 1,500 inmates, with a rated capacity of only 1,380. Approximately 300 inmates are classified and placed in protective custody (protected from other inmates) because of high-profile crimes, crimes against children, or diminished capacity. More than 350 inmates are identified as gang members. Inmates at GBDF are classified from levels 1 through 6, with level 1 being the lowest-risk prisoners and level 6 the highest. Like Facility 8, some modules are dormitory style while others consisted of single-person cells. GBDF also has an administrative segregation module, whose inmates are reviewed every seven days to determine housing suitability.

3

Ex. K - 586

A contracted psychiatrist is on-site eight hours daily, with video psychiatric conferencing available at other times. Inmates can have jobs ranging from simple labor to kitchen duties. Housing in one unit is provided for ADA and older inmates with medical conditions.

The areas that the Grand Jury observed were clean and well-maintained, except for a broken window in the Enhanced Observation Room, which rendered the room unusable. One multipurpose classroom exists that is used primarily for book storage and one computer. Inmates do not seem to have access to this room.

Based on jurors' observations of areas shown, the following was noted:

**Positive**
- Incentive-based programs allow those inmates who qualify to have access to dorm modules, which contain phone banks, vending machines, and a game room.

- Video conferencing is available for attorney and clergy visits.

- Competing gang members are identified so that each gang can be housed in separate units and not allowed to mingle during meals or common-area time.

- Family visits are face-to-face, albeit on a telephone through a glass wall.

**Negative**
- Only three counselors serve 1,500+ inmates.

- Broken glass in the enhanced observation room is a safety and security hazard.

- As with Facility 8, the recreation areas contained only a pull-up bar, although jurors were assured that additional exercise equipment was on order.

- Half of the security cameras throughout the facility appeared nonfunctional as the glass covering the cameras was cloudy, creating a safety and security issue.

- The analog door-opening system appeared to be at least 25 years old.

- Technology in the observation tower is far inferior to that in Facility 8. The technology is old, outdated, and the Grand Jury was told that it is expensive to maintain.

### South Bay Detention Facility (August 31, 2016)

The South Bay Detention Facility (SBDF) is for housing only; it has no booking/intake function. It is an incentive-based facility for mostly level 4 and 5 inmates. The jail has four identical modules, each containing approximately 100 inmates. The entire facility is located underground,

4

**SAN DIEGO COUNTY GRAND JURY (filed June 1, 2017)**

beneath the South Bay Regional Justice Center, and areas that the Grand Jury observed appeared clean and well-maintained.

The jail has limited medical facilities, with a contracted doctor on-site only four hours every Wednesday morning. Doctors are on call at other times. There are three staff nurses, which means care is available 24/7.

In order for an inmate to be housed in an incentive-based module, which can lead to a work position in the facility, he must pass an interview and agree to all components of a learning program. The program takes place five days a week and includes HiSET training, yoga, meditation, cognitive behavior therapy (CBT), food handling, and anger management courses. Many of the courses are taught by Grossmont Adult Education.

If an inmate agrees to participate in the program, he is able to spend up to 10 hours daily with other inmates in the common area outside the cells. A chaplain is on-site with an office directly attached to the classroom.

The Grand Jury had the opportunity to speak with inmates in one of the common areas. All inmates commented on how this facility differed from others, and all agreed being better equipped for re-entry into society after release. They felt better prepared to find jobs and stay away from bad influences. One inmate commented that the classes and therapy sessions he had taken would give him the tools to reintegrate with society and stay out of jail.

Areas the Grand Jury observed were evaluated as follows:

**Positive**
- The facility is well-lit and did not have the feel of being underground.

- Programs are designed to prepare inmates for life outside of detention.

- The recreation area had pull-up machines, a rowing machine, a handball court, and a ping-pong table.

- Eighteen laptops are available for inmate use.

- Inmates working in the kitchen can receive food-prep certification from the Grossmont School District.

**Negative**
- Second tier walkways are not enclosed, which presents a suicide risk. However, inmates identified as being at risk for suicide are not housed in this facility.

### East Mesa Re-entry Facility (September 7, 2016)

The East Mesa Re-entry Facility is a medium-security facility geared toward successfully reintegrating inmates into society on release. The facility provides incentive-based housing

5

**SAN DIEGO COUNTY GRAND JURY (filed June 1, 2017)**

(IBH) that allows AB 109 and mainline inmates more freedom and re-entry preparation if they agree to a full range of programming, including HiSET preparation and cognitive behavioral therapy. These inmates also have access to jobs in the print shop, yard, laundry, commissary, or meal preparation/bakery. Inmates receive individualized counseling to design a case plan that will prepare them for re-entry into society once their sentences are complete.

The facility consists of six housing units, two of which house newly arrived inmates. Those housed in these two units must earn points through good behavior and participation in programs to move to one of the housing units for working inmates. Once in the less-restrictive units, inmates have access to a large outdoor recreation area with exercise equipment as well as increased privileges. Inmates in dorms A, C, and D must be enrolled in a program administered by Grossmont Adult Education. There are two classrooms per dorm, along with one probation officer, who assists only those inmates classified as AB 109, and two drug and alcohol specialists.

Each unit in the IBH has counselors that use "Thinking for a Change" curriculum. Inmates with 90 days or fewer remaining in their sentence use the job center training program, sponsored by the "Second Chance" program, which ties inmates to outside resources for help in housing and jobs.

Medical and mental health services are limited at this facility. A contracted psychiatrist is on site every Wednesday, but those with greater needs are transferred to the George Bailey Detention Facility.

Jurors had the opportunity to talk with an inmate who praised the programming provided. He indicated that he had been incarcerated for most of his adult life but now, for the first time, was hopeful of successfully reintegrating into society upon his release.

Based on the areas the jurors observed, the following was noted:

**Positive**
- A wide range of programming is offered to inmates, and the incentive-based housing model appears to have a positive effect, inspiring personal responsibility and accountability.

- Many work opportunities are available for inmates.

- Grossmont Adult School provides classes and training, some of which offer skill certificates.

- The recreation area is well-equipped.

**Negative**
- The jury noted a rotted support beam along one walkway. This was also noted in the 2015-2016 Grand Jury Detention Facilities report, but it has not yet been corrected.

6

**SAN DIEGO COUNTY GRAND JURY (filed June 1, 2017)**

- Some maintenance work is needed in the meal production/bakery facility. Rust was observed in a couple of areas. Workers also stated that additional freezer space is needed, which would allow them to work six days a week instead of seven.

*Vista Detention Facility (September 14, 2016)*

The Vista Detention Facility (VDF) in the North County is a booking and housing facility that provides housing for some long-term inmates, both male and female. It is attached to the Vista Courthouse.

The Grand Jury was provided a tour of selected housing areas. Most observed areas of the facility consisted of old construction, and many areas were in need of repair. One area in particular was the door mechanism in the intake sally port that leads to the medical screening area, which was nonfunctional and presented a safety and security hazard for staff. Also, the staff elevator was out of order on the day of the Grand Jury's visit, forcing staff to use the elevator reserved for inmate transport. The Grand Jury was told that the elevators are old and they are having difficulty in securing parts and getting them repaired.

The booking process at VDF is similar to that of the San Diego Central Jail, and the facility has safety cells for suicidal inmates. Incoming inmates are screened for hepatitis, and each one receives a chest X-ray to screen for tuberculosis.

The Grand Jury observed worker inmates housed in dormitory-style rooms containing triple-high bunks. Worker inmates attend classes Monday through Friday and receive cognitive behavioral therapy. Some mainline inmates that the Grand Jury observed were housed in either single-bed or double-bed cells.

In one area that consisted of six modules, two of the modules housed military veterans who are enrolled in a program called "Veterans Moving Forward." They participate in one-on-one counseling and group therapy, and they interact with former military officers who visit this facility and volunteer their time. The modules are brightly painted in red, white, and blue, unlike the rest of the facility, which is in drab beige and blue trim. The Grand Jury spoke with two inmates in the veterans' modules who stated that the program gives them hope for successful re-entry into society. The veterans' post-release progress is tracked for one year, and post-release support and resources are also available.

**Positive**
- The veterans' modules provide a humane and proactive approach to successfully reintegrating inmates into society.

**Negative**
- It appears that maintenance has been deferred, resulting in some safety and security issues. (Staff elevator was not working; sally port door was stuck in an open position because the closing mechanism was not working)

7

**SAN DIEGO COUNTY GRAND JURY (filed June 1, 2017)**

- 

***Las Colinas Detention and Re-entry Facility (October 5, 2016)***

Las Colinas is a booking/holding facility for women, located in Santee that also has a re-entry program. It is a model jail for women carefully designed not only to satisfy present needs but also equipped to meet long-term requirements. As in other detention facilities, inmates are examined for physical and mental problems upon booking. Safety and enhanced-observation cells, as well as administrative segregation areas, are also available for inmates exhibiting suicidal tendencies or aggressive behaviors.

Medical services include physician, dental, and psychiatric, and a lab is on the premises. Non-emergency medical situations are handled by Tri-City Hospital in Oceanside, while inmates with emergencies are sent to Grossmont Hospital in La Mesa.

The facility has an open, campus- like setting, and inmates have some freedom to move around without direct supervision. Inmates have access to 23 courses, including HiSET, some college courses, nutrition, yoga, self-care, and healthy living, among others. As part of the facility's re-entry programming, four vocational programs are available: industrial laundry, sewing, landscaping, and culinary arts. Upon completion of these programs, inmates receive certificates from Grossmont Adult Education.

Las Colinas has two levels of housing, for low-risk (1-3) and high-risk (4-6) inmates. Lower-risk inmate workers reside in the least restrictive, dormitory-style housing.

The areas that the Grand Jury observed provided the following:

**Positive**
- Open-campus environment that allows low-level inmates to roam freely with controls to maintain security.

- Available classes and counseling support are exceptional.

- Staff that the Grand Jury observed, both sworn and administrative, had positive attitudes toward helping inmates succeed after release, and seem to enjoy their work.

**Negative**

- Inmates who need nonemergency medical care are transported to a hospital 43 miles away.

## CONCLUSION

Overall, the Grand Jury believes that the Sheriff's Department manages the adult detention facilities well, especially considering the effect AB 109 has had on the inmate population as well

8

---

**SAN DIEGO COUNTY GRAND JURY (filed June 1, 2017)**

as the ongoing impact of inmates' mental health issues. The exception is the status of significant repair and maintenance items, several of which pose a threat to the safety and security of staff and inmates.

In the George Bailey Detention Facility, the Grand Jury observed a broken window separating the enhanced observation room from the hallway outside of it, which rendered the room unusable. Also, the Grand Jury noted that approximately half of the security cameras throughout the facility appeared to be nonfunctional, as the glass covering the cameras was cloudy and opaque. Finally, technology in the facility—the analog door-opening system and the technology in the observation tower—is old and outdated. The Grand Jury was informed that these systems are expensive to maintain.

The Grand Jury is aware that a proposal has been included in San Diego County's 2016-2018 CAO Recommended Operational Plan to replace security controls and cameras at George Bailey Detention Facility. The Grand Jury supports this plan and encourages its completion.

In the Vista Detention Facility, the Grand Jury noticed that one sally port door was stuck in an open position because the closing mechanism was not working. Additionally, the staff elevator was out of order, requiring staff to use the elevator designated for inmate transport. Staff informed the Grand Jury that because replacement parts were difficult to obtain, the elevator had not been functioning for some time.

The California Department of Corrections and Rehabilitation Code of Regulations, Title 15, states, "The facility administrator shall develop written policies and procedures for the maintenance of an acceptable level of cleanliness, repair and safety throughout the facility." The San Diego County Sheriff's Department Policies and Procedures Manual has such a policy, and it further states, "At the discretion of the Watch Commander, an emergency maintenance 'Call-out' may be initiated for those repairs, which, if not performed would significantly impair the operation of the facility or the safety of the staff or inmates."

The Sheriff's Department Policies and Procedures Manual also has a full section devoted to elevator maintenance, which says in part ,"Due to the volume of elevator use, and the impact of facility operations, repair of elevators is of great concern and shall be handled expeditiously."

The Grand Jury believes that the Sheriff's Department's own procedures for repair and maintenance should be adhered to and given top priority for the safety and security of both staff and inmates.

## FACTS AND FINDINGS

*Fact:* The George Bailey Detention Facility had a broken window at the time of the Grand Jury's visit, rendering the enhanced observation room unusable.

**Finding 01:** Broken windows should be repaired as soon as possible to ensure safety and security of staff and inmates.

9

Ex. K - 592

*Fact:* Security and technology systems at the George Bailey Detention Facility are outdated and expensive to maintain.

**Finding 02:** Outdated technology systems increase safety and security risks for staff and inmates.

*Fact:* The Vista Detention Facility had a broken sally port door at the time of the Grand Jury's visit.

*Fact:* The Vista Detention Facility had a nonfunctional staff elevator at the time of the Grand Jury's visit.

**Finding 03:** Nonfunctional sally ports and elevators increase safety and security risks for both staff and inmates.

## RECOMMENDATIONS
**The 2016/2017 San Diego County Grand Jury recommends that the San Diego Sheriff's Department:**

**17-50:** **Review the Policies and Procedures manual to evaluate and reassess whether repairs and maintenance could be completed in a timelier manner.**

**17-51:** **Follow through with the County's CAO Recommended Operational Plan to replace outdated technology systems at George Bailey Detention Facility.**

**17-52:** **Expedite necessary repairs at the Vista Detention Facility.**

## REQUIREMENTS AND INSTRUCTIONS
The California Penal Code §933(c) requires any public agency which the Grand Jury has reviewed, and about which it has issued a final report, to comment to the Presiding Judge of the Superior Court on the findings and recommendations pertaining to matters under the control of the agency. Such comment shall be made *no later than 90 days* after the Grand Jury publishes its report (filed with the Clerk of the Court); except that in the case of a report containing findings and recommendations pertaining to a department or agency headed by an <u>elected</u> County official (e.g. District Attorney, Sheriff, etc.), such comment shall be made *within 60 days* to the Presiding Judge with an information copy sent to the Board of Supervisors.

Furthermore, California Penal Code §933.05(a), (b), (c), details, as follows, the manner in which such comment(s) are to be made:
    (a) As to each grand jury finding, the responding person or entity shall indicate one of the following:
        (1) The respondent agrees with the finding
        (2) The respondent disagrees wholly or partially with the finding, in which case the response shall specify the portion of the finding that is disputed and shall include an explanation of the reasons therefor.

10

**SAN DIEGO COUNTY GRAND JURY (filed June 1, 2017)**

(b) As to each grand jury recommendation, the responding person or entity shall report one of the following actions:

    (1) The recommendation has been implemented, with a summary regarding the implemented action.

    (2) The recommendation has not yet been implemented, but will be implemented in the future, with a time frame for implementation.

    (3) The recommendation requires further analysis, with an explanation and the scope and parameters of an analysis or study, and a time frame for the matter to be prepared for discussion by the officer or head of the agency or department being investigated or reviewed, including the governing body of the public agency when applicable. This time frame shall not exceed six months from the date of publication of the grand jury report.

    (4) The recommendation will not be implemented because it is not warranted or is not reasonable, with an explanation therefor.

(c) If a finding or recommendation of the grand jury addresses budgetary or personnel matters of a county agency or department headed by an elected officer, both the agency or department head and the Board of Supervisors shall respond if requested by the grand jury, but the response of the Board of Supervisors shall address only those budgetary or personnel matters over which it has some decision making authority. The response of the elected agency or department head shall address all aspects of the findings or recommendations affecting his or her agency or department.

Comments to the Presiding Judge of the Superior Court in compliance with the Penal Code §933.05 are required from the:

| Responding Agency | Recommendations | Date |
|---|---|---|
| **San Diego Sheriff's Department** | **17-50 through 17-52** | **7/31/17** |

**SAN DIEGO COUNTY GRAND JURY (filed June 1, 2017)**

# EXHIBIT L

# San Diego County Detention Facilities
## Inspection Report and Inmate Mental Health

### EXECUTIVE SUMMARY

The 2018/2019 San Diego County Grand Jury (Grand Jury) inspected the San Diego County (County) detention facilities as mandated by California Penal Code 919(b). In general, the Grand Jury found that the facilities were clean and, from our observation, the staff appeared to be following established procedures. The Grand Jury saw no evidence of inmate mistreatment. Inmates had access to medical, dental, and mental health care at most locations. At some locations, access to care was only available based on the schedule of provider visits to that facility.

This year the Grand Jury focused on mental health issues in jails including the issue of suicides. Both adult and juvenile facilities were inspected. The Grand Jury was impressed by the programs for rehabilitation and reentry for inmates returning to society. The Grand Jury recommends that further efforts be made to identify that part of the inmate population that would benefit from mental health treatment rather than incarceration.

The Grand Jury also identified improvements that could be made to some of the older, outdated facilities.

### BACKGROUND

All California Grand Juries are required to investigate the condition and management of their county's detention facilities. The recent County endorsement of *Stepping Up*, a national initiative to reduce the number of people with mental illnesses in jail, has made the mental health of inmates a particular concern.

### METHODOLOGY

The Grand Jury reviewed:
- California Code of Regulations Title 15, "Minimum Standards for Local Detention Facilities"
- Board of State and Community Corrections (BSCC) inspection reports for each facility
- The San Diego County Sheriff's Department Detention Services Manual of Policies and Procedures
- Detention Facility Fact Sheets provided for each detention facility
- Reports from national and local community mental health resources and relevant media accounts

As required by law, the Grand Jury visited and inspected all seven County-operated adult detention centers:
- East Mesa Detention and Reentry Facility (EMDF)

1

Ex. L - 596

- Facility 8 Detention Facility (F8DF)
- George Bailey Detention Facility (GBDF)
- Las Colinas Detention and Reentry Facility (LCDF)
- South Bay Detention Facility (SBDF)
- San Diego Central Jail (SDCJ)
- Vista Detention Facility (VDF)

The Grand Jury visited and inspected all three juvenile facilities:
- Kearny Mesa Juvenile Hall
- East Mesa Juvenile Detention Facility
- Urban Camp

The Grand Jury interviewed:
- Individual Sheriff's personnel and community mental health authorities on specific correctional issues under investigation. Note: During inspections, we addressed questions to officers and staff regarding the operations of that facility. [1]

## *DISCUSSION*

### *Declining Inmate Numbers*

The Grand Jury's inspections of the County detention facilities included escorted walk-throughs of the adult jails operated by the Sheriff's Department, as well as juvenile facilities operated by the Probation Department. Both adult and juvenile facilities have been affected by passage of California Assembly Bill 109, (AB 109) the "California Public Safety Realignment Initiative," which became effective in 2011.

AB 109 diverted certain categories of felons to serve their sentences in county jails instead of state prisons, which means that inmates traditionally sentenced to state prison for most non-violent or non-sexual felonies are now housed in County jails. With the exception of the Central Jail, all of the adult institutions the Grand Jury visited are currently under their maximum capacity and the number of inmates is steadily decreasing. The reasons for this decline include the following voter-approved changes to California law:

- **Proposition 36** made many non-violent drug offenders eligible for probation rather than incarceration.
- **Proposition 47** provides for the reclassification of many previously filed felonies, which are now being charged as misdemeanors.
- **Proposition 57** changed juvenile policies to emphasize rehabilitation over placement at Juvenile Hall.

---

[1] California Penal Code section 929 mandates that reports of the Civil Grand Jury not contain the name of any person or facts leading to the identity of any person who provides information to the Grand Jury.

2

### Inmate Housing

The San Diego County Sheriff's Department uses a classification system to house inmates.[2] Classifications take into account such factors as age, gender, health, gang affiliation, criminal sophistication, the need for protective custody, and many other factors. This system results in inmates being assigned one of six different levels of security risk.

San Diego Central Jail (built in 1998), Vista Detention Facility (built in 1978) and South Bay Detention Facility (built in 1982) are outdated jails originally intended for booking and housing misdemeanor offenders and inmates awaiting court proceedings. Felons doing sentences of one year or longer were sent to state prisons. Inmates were rarely incarcerated at county jails for more than one year. However, due to the mandates of AB 109, inmates with longer sentences are now housed in facilities never designed nor intended for long-term occupancy.

Several County detention centers are located in Otay Mesa, adjacent to the U.S./Mexico border. These include the George Bailey Detention Center, Facility 8 and the East Mesa Reentry Facility. Another nearly identical adult facility, Rock Mountain, also at Otay Mesa, is projected to open soon, but the completion date continues to be delayed. The Sheriff's plan is for Rock Mountain to replace South Bay Detention Facility.

Facility 8 and George Bailey Detention Centers are nearly identical in design. However, George Bailey houses over 1,000 inmates of various types and classifications, and Facility 8 accepts only low- and medium- risk inmates, housing only 183 inmates at the time of Grand Jury inspection. Outside yards for recreation are available at these facilities. Inmates with mental health or serious medical issues are not sent to Facility 8.

Most female inmates are housed at the Las Colinas Detention Facility. This is the newest County detention facility and is modeled after a college campus. Some females are booked into the Vista Detention Facility and, if detained, transported later to Las Colinas. Mental health services are available at Las Colinas and 32 beds are dedicated for "return to competency" treatment.

### Mental Health Concerns

All California counties are required, by law, to provide psychiatric services during incarceration, and after parole from state prisons. Failure to provide needed mental health care has been ruled as constituting "cruel and unusual punishment."[3]

The Lanterman-Petris-Short Act (LPS), codified in the California Welfare and Institutions Code, allows for individuals to be placed, involuntarily, in a locked psychiatric unit if they are found *gravely disabled* or a danger to themselves or others. Sections 5150 and 5250 describe 72-hour and 14-day holds, respectively, that can be placed on individuals after assessment by a peace

---

[2] San Diego Sheriff's Department Detention Services Bureau Manual of Policies and Procedures (2018) (https://www.sdsheriff.net/documents/dsb-201503.pdf)

[3] Supreme Court of the United States, *Brown v. LaPlata, et al*, (2011) 563 U.S. 493

officer, registered nurse, medical doctor, or certain other categories of people. Inmates subject to this kind of hold may also be housed in the San Diego Central Jail Psychiatric Stabilization Unit (PSU). Inmates with less serious psychiatric problems may be housed in other detention facilities. Inmates with mental health needs are dispersed throughout the correctional system, depending on specific housing determinations. For example, a relatively stable inmate with depression may have a classification which only allows housing in a particular facility.

San Diego Central Jail (SDCJ) is the largest mental health facility in the County. The sixth floor houses a PSU, with 180 beds dedicated to inmates with serious mental health needs. Thirty of those beds are reserved for "return to competency" treatment. Many inmates found mentally incompetent to stand trial are housed in the San Diego Central Jail. These inmates would normally be transported to state hospitals, but those institutions have limited availability and long waiting lists for admission.

About 30% of the County's approximately 6,000 inmates are on prescribed psychotropic medication. In 2017, Sheriff Bill Gore publicly stated, "*On any given day about 2,000 county inmates are on some kind of psychotropic drug.*"[4] A relatively small percentage of those medicated are housed in psychiatric units. Other inmates have some access to treatment when requested, such as appointments when professionals are available. Realizing the need for change, on November 15, 2016, the San Diego County Board of Supervisors adopted a resolution to support the *Stepping Up* initiative, a nationwide effort to provide mental health services in lieu of incarceration.[5]

Booking procedures at Central, Vista (VDF) and Las Colinas (LCDF) jails screen for mental health issues. Arrestees suffering psychiatric emergencies are transported to the County Psychiatric Hospital, just as those with serious medical conditions are transferred to local emergency rooms. Treatment programs for inmates with mental health issues are increasingly necessary in California as their percentage of the jail population has increased. [6]

Concurrent conditions of drug use and mental health issues, or "dual diagnosis," present a difficulty for mental health professionals. Methamphetamine addiction, in particular, contributes to the number of inmates with psychiatric problems. Withdrawal from drugs can be fatal and requires qualified medical personnel on staff.[7] The Grand Jury learned that psychiatric professionals are in such high demand that the County has a problem recruiting and retaining

---

[4] Alvarez, J. A. (July 19, 2017). *CountyNewsCenter.* Retrieved from CountyNewsCenter.com.

[5] Rise Haneberg,et al, "*Reducing the Number of People with Mental Ilnesses in Jail*" January 2017 (https://stepuptogether.org/wp-content/uploads/2017/01/Reducing-the-Number-of-People-with-Mental-Illnesses-in-Jail_Six-Questions.pdf )

[6] Stanford Justice Advocacy Project (2018) *The Prevalence and Severity of Mental illness among California Prisoners on the Rise (*https://law.stanford.edu/publications/the-prevalence-and-severity-of-mental-illness-among-california-prisoners-on-the-rise/)

[7] Federal Bureau of Prisons (2018) *Detoxification of Chemically Dependent Inmates* (https://www.bop.gov/resources/pdfs/detoxification.pdf)

4

sufficient staff. Witnesses testified that the shortage of psychiatric professionals is a growing nationwide problem.

A situation arises for inmates who have served their sentences but still remain gravely disabled and/or are a danger to themselves or others or were never restored to competency. These individuals may be found "non-restorable," and a judge can order that they remain incarcerated. Because they no longer serve criminal sentences, different rules apply for their housing and hours, and their status requiring incarceration is also regularly reviewed by the court pursuant to California Penal Code 1370(c)(1). [8]

The County of Los Angeles faced a similar challenge caring for the mental health of a large number of inmates. Following a public outcry, the Los Angeles County Board of Supervisors recently voted to tear down its aging Men's Central Jail holding over 4,000 inmates in favor of a Mental Health Treatment Center able to house over 3,800 patients, including inmates. The final design may not consist of one facility, but instead construction of several localized sites using those funds. The Los Angeles Department of Mental Health will staff the facility with a limited number of deputies providing security.[9]

A number of programs are being introduced in San Diego County to intervene before mental illness results in incarceration. A Behavioral Health Court is available for diversion into counseling and psychiatric services, while offenders are placed on probation for various offenses. A new California law, codified in Penal Code sections 1001.35 and 1001.36, opens up pre-trial diversion for certain mentally ill defendants.[10] The Sheriff also uses Programming for Reentry, Support and Stability (PROGRESS), for inmates already incarcerated who can be rehabilitated better in treatment programs than in jail. Inmates with mental health issues spend a longer time in jail than other inmates. The *Stepping Up* Initiative hopes to alleviate that situation.[11] Reduced inmate population raises the question of how best to utilize facilities operating well below rated capacity. Major changes may be necessary to accommodate the increasing need for psychiatric care.

### The Reality of Suicide

Suicide is a leading cause of death among inmates in local jails in the United States.[12] San Diego County jails have been criticized many times over the past decade for their high suicide rates.[13] Disability Rights California (DRC), a non-profit agency that advocates for people with disabilities,

---

[8] California Penal Code section 1370 et seq.

[9] Lau, M., Los Angeles Times (February 13, 2019) *County Oks Central Jail Tear Down* (https://www.pressreader.com/)

[10] Wahn, A.K., (2018) *California's New Mental Health Diversion Law* (http://www.aleidalaw.com/californias-new-mental-health-diversion-law-criminal-offenders-receive-treatment/)

[11] Rise Haneberg, et al, pg. 7,"*Reducing the Number of People with Mental Ilnesses in Jail*" January 2017 (Ibid)

[12] Gallagher, M. (2018). *Suicide in Prisons and Jails: A Growing Concern. O'Neill Institute for National and Global Health Law*. (http://oneill.law.georgetown.edu/suicide-in-prisons-and-jails-a-growing-concern/ )

[13] Hacket, A. (June 11, 2018) Pacific Standard *"Is San Diego County Failing Its Most Vulnerable Inmate Population"* (https://psmag.com/social-justice/is-san-diego-county-failing-its-most-vulnerable-inmate-population)

5

Ex. L - 600

conducted an investigation of suicides in San Diego County jails and published a critical report in April of 2018. San Diego County jails have seen more than 120 deaths since 2007, including 30 suicides.[14] After a San Diego *City Beat* investigation[15] determined the average mortality rate in local jails over six years was the highest among California's 10 largest lockups, the Sheriffs' department put new measures in place to better identify and monitor suicidal inmates.[16]

Four suicides occurred at San Diego County jails in 2018. On October 8, 2018 an inmate killed himself the same day he was booked into San Diego Central Jail. The Sheriff's Department reported he used food to suffocate himself while he was being housed in a unit designed for suicidal inmates.[17] On March 28, 2018 an inmate killed himself at South Bay Detention Facility (SBDF), using cloth from bedding strung through a vent cover in the inmate's cell.

The design defect with vent covers in the cells at SBDF, i.e., the ability to use them to support a ligature, was known prior to the March suicide, and a program to replace/modify the vent covers had begun but was stopped due to budgetary concerns. To date the Sherriff's Department has not remedied the problem. The explanation provided to this Grand Jury was that the vent repair project was placed on hold due to the cost and a delay in renovation of Rock Mountain, which is expected to replace SBDF.[18]

The aforementioned Rock Mountain Facility is a County detention facility, previously leased to a private detention company, but currently unoccupied and undergoing renovations. The Sheriff's Department has reported that Rock Mountain will be opening soon, but the date has been delayed.

### Other Issues

The Grand Jury was advised that the body scanner at the Central Jail used to screen for concealed drugs and weapons needs updated software. The software is available, but the County is prevented from acquiring it due to the terms of their maintenance contract for the body scanner.[19]  The Grand Jury recommends the Sheriff's Department find a way to update the scanners.

The designs of the Vista and South Bay detention facilities include little or no outside area where the sky is visible. At SDCJ the roof was previously used for inmate recreation, but now the recreation area is an enclosed concrete room with large windows high above the floor. The Grand Jury recommends inmates should not be housed in these older facilities for more than

---

[14] Id. (Hacket, 2018)

[15] City Beat (March 27, 2013) *How Many Inmate Deaths is Too Many (Part One of Five Parts)* (http://sdcitybeat.com/news-and-opinion/news/many-inmate-deaths-many/)

[16] San Diego Union Tribune (September 16, 2018) *Recent Inmate Death was Third Jail Suicide this Year.* (https://www.sandiegouniontribune.com/news/public-safety/sd-me-jefferson-suicide-20180913-story.html)

[17] Id. (San Diego Union Tribune)

[18] California Penal Code section 929 requires that reports of the Civil Grand Jury not contain the name of any person or facts leading to the identity of any person who provides information to the Grand Jury.

[19] Id.

one year at a time due to lack of adequate natural sunlight and/or outdoor recreation. This deficiency has been noted in prior San Diego County Grand Jury Reports (2017/2018, filed May 29, 2018) and has yet to be adequately addressed.  Older facilities could be used for booking, holding inmates incarcerated for shorter terms and for housing during specific rehabilitation programs.

### Rehabilitation and Reentry

The Grand Jury wishes to commend the various efforts at rehabilitation and reentry that it observed during its visits. The San Diego County Sheriff's Detention Services unit has instituted rehabilitation and reentry programming throughout the system. The East Mesa Reentry Center located at Otay Mesa is designated to serve inmates willing to participate in rehabilitative programs. These programs offer inmates incentives such as personal privileges, less restrictive housing, opportunities to work outdoors, and shortened sentences for good conduct. The reentry programs include drug rehabilitation and mental health counseling programs, academic classes, work within the facilities for a small wage, and vocational training for placement outside. At the Vista Detention Center, it is noted that The Veterans Moving Forward Program continues to be recognized for its rehabilitative value.

The Central Production Plant, which handles most of the food preparation for both adult and juvenile detention facilities, is also located in Otay Mesa. The Central Production Plant contains food preparation and storage operations for thousands of inmate meals per week, a working print shop able to satisfy many of the County's printing needs, laundry facilities, wood shops and bicycle repair. Some inmates work at Central Production, and inmates also do maintenance and janitorial work at other detention facilities, under supervision by Sheriff's officers or civilian staff.

Reentry programs are also available for Las Colinas inmates, with incentives to progress into much less restrictive housing, and ultimately, placements after release from jail. Many inmates are given the liberty to walk unescorted outdoors between buildings to get to the mess hall, to classrooms, or to vocational training areas. In general, the reentry programs available at both Las Colinas and East Mesa Reentry facility should reduce recidivism, particularly if the general economy has jobs for inmates upon release.

### Family Visitation

Family visitation is an important tool of rehabilitation, especially for juveniles. Four County detention facilities (3 adult and 1 juvenile) with a combined total of approximately 3,000 inmates are located in Otay Mesa.  In addition, a state and federal prison, as well as immigration detention facilities are located in Otay Mesa.

Visitation for families of inmates to Otay Mesa is difficult. The closest Metropolitan Transit System (MTS) bus line terminates 5.4 miles away. The nearest trolley station is over 10 miles away. Downtown San Diego is over 20 miles away.

7

Ex. L - 602

The Grand Jury suggests that the County, in coordination with the San Diego Sheriffs' and Probation Department, explore options for providing transportation alternatives for family visitation to the Otay Mesa detention facilities. Options for them to study could include utilizing the County's iCommute program, small County buses, ride share transportation etc. Given the proximity of state and federal facilities, it may be beneficial to coordinate efforts with state and federal authorities.

### Juvenile Facilities and Services

The juvenile facilities (Juvenile Hall, East Mesa Juvenile Detention Facility and Urban Camp) are operated by the San Diego County Probation Department (Probation). Juveniles are required to attend classes regularly and much of their day revolves around schooling, recreation and meals. The East Mesa Juvenile facility is only for boys. There were 112 juveniles housed there at the time of inspection by the Grand Jury. Forty boys were housed there for long terms, resulting from serious offenses, or were there awaiting court proceedings. Most juveniles are in custody for a much shorter time than adults. At the Kearny Mesa Juvenile Detention Center, the average stay in custody is only 18 to 21 days. The population of juveniles at that facility was 83 boys and 42 girls, with separate housing units for each. There is a third separate program at the Kearny Mesa location called Urban Camp.

In order to intervene before minors become involved in the justice system, San Diego County has begun to use the *Youth in Custody Practice Model* (YICPM) developed by Georgetown University. [20] Informed by research on "what works" in serving youth in custody, as well as professional standards and the field's preeminent thinking on best practices, the Youth in Custody Practice Model (YICPM) initiative is designed to assist state and county juvenile correctional agencies and facility providers to implement a comprehensive and effective service delivery approach.[21] The Crossover Youth Practice Model (CYPM) is also being used for youth coming out of foster care. As a result of these efforts and others, the juvenile system in San Diego County has undergone a transformation resulting in a significant reduction in the juvenile population in detention. The juvenile facilities were operating with approximately half the population the facilities were designed to hold.

## FINDINGS

**Finding 01:** A preventable suicide risk exists at South Bay Detention Facility.

**Finding 02:** The San Diego County Sheriff's Department provides mental health treatment to an increasing number of inmates, some of whom could be better rehabilitated in other facilities.

**Finding 03:** The older facilities were not designed for inmates serving long sentences and are outdated for current use.

---

[20] Georgetown University, McCourt School of Public Policy, Center for Juvenile Justice Reform, 2019 (https://cjjr.georgetown.edu/our-work/yicpm/)
[21] *Youth in Custody Practice Model*, id.

8

**Finding 04:** Several detention facilities, both adult and juvenile, are located at Otay Mesa, an isolated area which is difficult for families of inmates to visit.

### RECOMMENDATIONS

**The 2018/2019 San Diego County Grand Jury recommends that the San Diego County Sheriff's Department:**

**19-20:** **As soon as possible replace or modify the vent covers at South Bay Detention Facility (using 24-hour emergency purchasing procedures) to prevent further loss of life.**

**19-21:** **Study and consider the decision made by the Los Angeles County Board of Supervisors to centralize mental health treatment of inmates.**

**19-22:** **Study and consider transportation options for family visitation to the Otay Mesa detention facilities.**

**The 2018/2019 San Diego County Grand Jury recommends that the San Diego County Probation Department:**

**19-23:** **Study and consider transportation options for family visitation to the Otay Mesa detention facilities.**

### REQUIREMENTS AND INSTRUCTIONS

The California Penal Code §933(c) requires any public agency which the Grand Jury has reviewed, and about which it has issued a final report, to comment to the Presiding Judge of the Superior Court on the findings and recommendations pertaining to matters under the control of the agency. Such comment shall be made *no later than 90 days* after the Grand Jury publishes its report (filed with the Clerk of the Court); except that in the case of a report containing findings and recommendations pertaining to a department or agency headed by an <u>elected</u> County official (e.g. District Attorney, Sheriff, etc.), such comment shall be made *within 60 days* to the Presiding Judge with an information copy sent to the Board of Supervisors.

Furthermore, California Penal Code §933.05(a), (b), (c), details, as follows, the manner in which such comment(s) are to be made:

    (a) As to each grand jury finding, the responding person or entity shall indicate one of the following:

        (1) The respondent agrees with the finding

        (2) The respondent disagrees wholly or partially with the finding, in which case the response shall specify the portion of the finding that is disputed and shall include an explanation of the reasons therefor.

    (b) As to each grand jury recommendation, the responding person or entity shall report one of the following actions:

9

(1) The recommendation has been implemented, with a summary regarding the implemented action.

(2) The recommendation has not yet been implemented, but will be implemented in the future, with a time frame for implementation.

(3) The recommendation requires further analysis, with an explanation and the scope and parameters of an analysis or study, and a time frame for the matter to be prepared for discussion by the officer or head of the agency or department being investigated or reviewed, including the governing body of the public agency when applicable. This time frame shall not exceed six months from the date of publication of the grand jury report.

(4) The recommendation will not be implemented because it is not warranted or is not reasonable, with an explanation therefor.

(c) If a finding or recommendation of the grand jury addresses budgetary or personnel matters of a county agency or department headed by an elected officer, both the agency or department head and the Board of Supervisors shall respond if requested by the grand jury, but the response of the Board of Supervisors shall address only those budgetary or personnel matters over which it has some decision making authority. The response of the elected agency or department head shall address all aspects of the findings or recommendations affecting his or her agency or department.

Comments to the Presiding Judge of the Superior Court in compliance with the Penal Code §933.05 are required from the:

| Responding Agency | Recommendations | Date |
|---|---|---|
| **San Diego County Sheriff's Dept.** | **19-20 through 19-22** | **7/29/19** |
| **San Diego County Probation Dept.** | **19-23** | **8/14/19** |

## *Works Cited*

Alvarez, J. A. (2017, July 18). *CountyNewsCenter.* Retrieved from CountyNewsCenter.com.

Board of State Community Corrections. (2018).

Center for Juvenile Justice Reform. (2019). Retrieved from Youth in CustodyPpractice Model.

Federal Bureau of Prisons. (2014 (updated 2018)). *Detoxification of Chemically Dependent Inmates.*

10

Gallagher, M. (2018). Suicide in Prisons and Jails: A Growing Concern. *O'Neill Institute for National and Global Health Law*.

Hacket, A. (2018, June 11). *Is San Diego County Failing Its Most Vulnerable Inmate Population*. Retrieved from Pacific Standard.

Lau, M. (February 13, 2019). County OKs Central Jail tear-down. *Los Angeles Times*.

National Alliance on Mental Illness. (2019). *Jailing People with mental Illness.*

Rise Haneberg, D. F. (2017). *Reducing the Number of People with Mental Illnesses in Jail.*

San Diego Sheriffs Department Detention Services Bureau Manual of Policies and Procedures. (2018).

Stanford Justice Advocacy Project. (2018). *The Prevalence and Severity of Mental Illness Among California Prisoners On the Rise.*

Supreme Court of the United States, Brown v. La Plata, et al.,563 U.S. 493. (2011). Brown v. La Plata, et al.,563 U.S. 493.

Wahn, A. K. (2018, September). *California's New Mental Health Diversion Law: Criminal Offenders Receive Treatment Instead of Prosecution*. Retrieved from Law and Beyond Blog.

11

# EXHIBIT M

**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III



# *County of San Diego*
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776      FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its April 12, 2022, meeting held via the Zoom Platform. Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

## CLOSED SESSION

a)  PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
    **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASES FOR SUMMARY HEARING (10)

### ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE

### 21-014

1.  Death Investigation/Traffic Pursuit – Deputies 1-3 pursued a stolen vehicle that subsequently collided with another vehicle resulting in the death of Isabella Nicole Calhoun.

    Board Finding: Action Justified
    Rationale: On 02-12-21, at approximately 9:58pm, deputies received notification of a stolen vehicle in the vicinity of the SDSD Spring Valley Storefront. Deputy 2 soon located and followed the stolen vehicle while waiting for additional units (Deputies 1 and 3) to arrive in anticipation of a high-risk vehicle stop. Deputy 2 activated his emergency lights to initiate a traffic stop when the stolen vehicle suddenly stopped, however, the vehicle sped away and then failed to yield at a stop sign. The stolen vehicle increased its speed from 45 to 60 mph and drove through a red light. The stolen vehicle passed in-between stopped vehicles at a red light and traveled at its highest rate of speed of 90mph while approaching a red light at Jamacha Road. Deputy 2 observed at least four other vehicles having the right of way and driving through the intersection. The stolen vehicle went into the left turn lanes, braked for a split second just before it collided into Nicole Calhoun's vehicle. Responding deputies removed Calhoun from her vehicle and initiated aggressive lifesaving efforts. She was transported to Scripps Mercy Hospital where she was later pronounced

    *-continued on next page-*

Ex. M - 608

deceased shortly upon arrival due to blunt force trauma. Upon review of all known evidence, deputies initiated the pursuit in compliance with SDSD P&P 6.43, Vehicle Pursuit, which states that a pursuit may be initiated when an individual clearly exhibits the intention of avoiding police contact or arrest by using a vehicle to flee; and the deputy has reasonable suspicion that the individual has committed a crime. Deputies must consider all public safety factors applicable to the particular facts and circumstances, and may consider other applicable public safety factor conditions such as location familiarity, traffic, roadway conditions, speed, time of day, vehicles involved, juvenile occupants, seriousness of the offense and its relationship to community safety, etc. A pursuit may be discontinued at any time at the discretion of the initiating deputy and when the danger posed by continued pursuit, to the deputy, the suspect, or the community, is greater than the value of apprehending the suspect(s). Per the Automatic Vehicle Location (AVL) records, the lead patrol vehicle pursued at speeds of 52, 43 and 69 mph; the secondary unit at speeds of 86, 61, 66, and 27 mph; and the final vehicle, tracked speeds of 61, 75, 84, and 86 mph. Additionally, surveillance video footage from two nearby businesses were analyzed based on known landmarks and determined the pre-impact speed of the stolen vehicle into Calhoun's vehicle was a minimum of 81mph and a maximum of 95mph. The pursuit lasted approximately 2 minutes and 13 seconds, with the last 13 seconds being crucial as the suspect significantly increased his speed while attempting to run a red light at the intersection; albeit Deputy 2 decreased his speed per the AVL records. Body Worn Camera (BWC) evidence detailed the continual assessment of public safety factors to include location, traffic, road conditions, and speed in compliance with SDSD policies. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of SDSD sworn personnel.

**POLICY RECOMMENDATIONS:**

1. It is recommended that SDSD modify P&P Section 6.43 – Vehicle Pursuit, to mandate that deputies shall not initiate or participate in a pursuit in which the only known offense at the time of the initiation or subsequent participation is a non-violent crime, to include a stolen vehicle.

2. It is recommended that SDSD modify P&P Section 6.43 – Vehicle Pursuit, to indicate that when initiating a pursuit, a deputy must not only consider all public safety factors applicable to the particular facts and circumstances, but "shall" (as opposed to the current standard of "may") consider the applicable public safety factors listed in the P&P.

---

**21-038**

1. Death Investigation/In-Custody Drug Related – Jonathan Robert Whitlock died while in the custody of the San Diego County Sheriff's Department (SDSD) on 04-27-21.

Board Finding: Not Sustained
Rationale: On 02-13-20, Jonathan Robert Whitlock was arrested by San Diego Police Department (SDPD) officers for Arson: Inhabited Structure/Property Penal Code PC§ 451 and Health & Safety Code HS§ 11550 Under Influence of Controlled Substance. On 04-27-21, Whitlock was housed at the George Bailey Detention Facility (GBDF) when he was witnessed, by inmates, to go unresponsive and stop breathing. Inmates moved Whitlock to the floor and started CPR. Deputies responded within two minutes and took over life-saving measures. Another deputy responded within three minutes and administered one dose of Naloxone. Jail medical staff responded, administered two additional doses of Naloxone and one dose of Epinephrine. The automated external defibrillator (AED) was utilized, however did not advise a shock. Records indicated during life-saving measures, a faint pulse was felt briefly. Fire/paramedics responded and continued advanced life-saving measures. Paramedics administered an additional six doses of Epinephrine and transported Whitlock to a hospital. Despite continued advanced life-saving efforts, Whitlock was unable to be revived and his death was pronounced, in the emergency department, by a doctor at 6:43pm. Detectives interviewed inmates who provided testimony that Whitlock took fentanyl approximately 20 minutes before he went unresponsive. When questioned by detectives, about the fentanyl and where it came from, several inmates identified a person of interest. According to SDSD

records, a thorough search was conducted by 22 sworn staff, in the module where Whitlock was housed, in accordance with SDSD DSB P&P Section I.41 Inmate Cell Searches, unscheduled searches, for the purpose of providing a safe and secure environment free of contraband. Initially, a K-9 was requested for the search, however, denied due the potential presence of fentanyl. Additionally, and in compliance with SDSD DSB P&P Section I.52 Inmate Searches, all the inmates were patted down, stripped searched, and body scanned, which included clothing exchange. During the search of all four quads, and each inmate, no drugs were found. Although several inmates identified a person of interest, detectives were unable to obtain any physical evidence or a confession. Without a confession or physical evidence, there was not enough probable cause for an arrest or connection of Whitlock's death to any one person. On 04-28-21, the San Diego County Medical Examiner's Office (SDCMEO) conducted an autopsy. Whitlock's toxicological test results detected fentanyl and fentanyl metabolites. Whitlock's cause of death was acute fentanyl intoxication, with obesity as contributing, and the manner of death was accident. According to SDSD records, Jail Inmate Management System (JIMS) Area Activity Logs and corroborated through jail surveillance video, deputies took immediate and appropriate action in compliance with policy as they recognized and responded to Whitlock's medical emergency. Additionally, they completed all required safety and security checks timely, in accordance with SDSD DSB P&P Section I.43 Inmate Count Procedure and Section I.64 Safety Checks of Inmates in Housing Units and Holding Cells. Additionally, records indicated Whitlock was classified and housed in accordance with policy throughout his incarceration. Although SDSD has implemented and taken measures to deter drugs from entering their jails, Whitlock acquired fentanyl which consequently contributed to his death. A SDSD News Release, "Stopping Drug Smuggling in County Jails," dated 04-19-21, outlined some of the methods used to intercept drugs and provide education, such as Body Scanners at all intake facilities and George Bailey Detention Facility and inmate screening and flagging of potential smugglers. Despite all interdiction efforts, there is no doubt that Whitlock, while as an inmate in the custody and under the care of the SDSD, acquired and took fentanyl, which resulted in his death. As such, Whitlock's death was preventable. As the investigation failed to confirm how the fentanyl entered the detection facility, the evidence was insufficient to prove or disprove misconduct on the part of SDSD sworn personnel.

**POLICY RECOMMENDATION**:

1. It is recommended that the San Diego Sheriff Department revise Detention Services Bureau (DSB) P&P Section I.50 Body Scanners and X-Rays, as it pertains to Subsection III C and mandate that body scans be completed to include inmates transferred between facilities.

---

**21-044**

1. Misconduct/Procedure – Unidentified deputies returned mail addressed to Complainant Roditi.

   Board Finding: Action Justified
   Rationale: Jeanne Gold reported that on 04-19-21 she mailed three 10" x13" envelopes with "case material" to Jack Roditi, but one was returned to her and labeled "unable to forward." SDSD Documentation showed that Roditi received several notices that explained the reason certain contents of mail were unacceptable. On 06-24-21, a letter/postcard was returned to Gold due to an "unknown substance" (scents, fluids, etc.) and "watermarks, stains, heavy cologne." On 07-02-21, 08-10-21 and 08-14-21 letters and/or postcards were returned to sender (Gold) due to "glue, glitter, ribbon, string or bows, stickers"; further explanation was provided and stated, "multiple stickers-only sticker allowed is USPS stamp." DBS P&P, P.3 Inmate Mail states that incoming U.S. Mail will be rejected if the mail is marked with paint, crayon, glitter, labels, cloth, string, watermarks, stains, lipstick, cosmetics, perfume, or stickers. Evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

2. Misconduct/Procedure – Unidentified deputies removed a section of correspondence addressed to Complainant Roditi.

   Board Finding: Not Sustained

Rationale: Jeanne Gold reported that some of the pages she sent to Jack Roditi were removed. She explained that she mails him "case materials" and the last page was removed. SDSD Documentation showed mail was returned to sender, there was no documentation that noted portions of the mail were removed. There was insufficient evidence to either prove or disprove the allegation. Also see Rationale #1.

3.  Misconduct/Procedure – Unidentified deputies failed to return Complainant Gold's phone calls.

    Board Finding: Not Sustained
    Rationale: Jeanne Gold reported that she called the jail to ask questions on several occasions but was directed to the Sheriff's Office and/or told that someone would call her back. In addition, she said that she was not able to leave a message for command staff and did not receive any callback. Gold did not provide any dates or names pertaining to this allegation. Due to the volume of inquiries received by SDSD, there was insufficient information for CLERB to investigate this matter further. There was insufficient evidence to either prove or disprove the allegation.

4.  False Reporting – Deputies 1 & 2 reported that Complainant Roditi refused cell mates.

    Board Finding: Action Justified
    Rationale: Jeanne Gold reported that deputies approached Jack Roditi with a new cell mate, and the cell mate refused to be bunked with Roditi, but deputies claimed Roditi was the one who refused a cell mate. According to SDSD documentation, Roditi received four rule violations because he refused a cell mate. On 05-02-21, Deputies 1 & 2 reported that Roditi refused to take any new cell mates and used profanity towards them. Pursuant to DSB P&P O.3 Inmate Rules & Regulations, Roditi was in violation of the following categories: 102-Inmates shall obey staff instructions, 105-Inmates shall not take part in boisterous activity, and 701-Inmates shall not engage in any activity that impairs or interferes with the operation of the facility. Evidence showed that Roditi refused a cell mate on more than one occasion; therefore, deputies did not produce a false report, but evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

5.  False Reporting – Deputy 3 reported that Complainant Roditi refused cell mates.

    Board Finding: Action Justified
    Rationale: Jeanne Gold reported that deputies approached Jack Roditi with a new cell mate, and the cell mate refused to be bunked with Roditi, but deputies claimed Roditi is the one who refused a cell mate. Gold alleged that the deputy was not truthful in his report. According to SDSD documentation, Roditi received four rule violations because he refused a cell mate. On 05-04-21, Deputy 3 reported Roditi refused his cell mate and was warned by the deputy of the repercussions, but Roditi responded that he did not care. Pursuant to DSB P&P O.3 Inmate Rules & Regulations, Roditi was in violation of the following categories: 102-Inmates shall obey staff instructions, 105-Inmates shall not take part in boisterous activity, and 701-Inmates shall not engage in any activity that impairs or interferes with the operation of the facility. Evidence showed that Roditi refused a cell mate on more than one occasion; therefore, deputies did not produce a false report, but evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

6.  Misconduct/Retaliation –Deputy 3 placed Complainant Roditi in "solitary confinement."

    Board Finding: Action Justified
    Rationale: Jeanne Gold stated that Jack Roditi was moved to "solitary confinement" (Administrative Segregation/Ad-Seg) as a form of retaliation due to her initial on-line complaint to SDSD. SDSD documentation showed that Deputy 3 warned Roditi he would be moved to Ad-Seg if he continued to refuse a cell mate. Roditi was moved to Ad-Seg on 05-04-21 because he refused to accept cell mates four times within two months and because he showed aggression towards deputies. DSB P&P Section J.3 defines Ad-Seg as separate and secure housing and is designated for inmates that are pending a hearing and/or investigation for a rule violation and for those that fail to adjust/conform to minimum standards.

Roditi continued to violate DSB P&P O.3 Inmate Rules and Regulations, category 701-Inmates shall not engage in any activity that impairs or interferes with the operation of the facility. Per SDSD documentation, Roditi was placed in Ad-Seg as a result of his rule violations. There was no evidence that deputies acted in retaliation, but evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

7. Misconduct/Procedure – Unidentified deputies did not respond to Complainant Roditi's grievance/request for review.

   Board Finding: Unfounded
   Rationale: Jeanne Gold reported that Jack Roditi submitted a grievance/requested a review, but he did not receive a response from SDSD. On 06-26-21, Roditi wrote a grievance in response to the "Contents Unacceptable Notice" he received due to an "unknown substance" and/or "watermark, stain, heavy cologne" on his mail.  A sergeant responded to Roditi's grievance and stated that the mail was rejected for safety reasons due to the contents being stained with an unknown substance. There was no evidence of any additional grievances written by Roditi. In addition, SDSD documentation showed that Roditi received several "Ad-Seg" reviews because he continually refused to comply with jail operations. Evidence showed that the alleged act or conduct did not occur.

8. Misconduct/Procedure – SDSD refused books that were mailed to Complainant Roditi.

   Board Finding: Action Justified
   Rationale: Jeanne Gold reported that she mailed Jack Roditi books, but they were refused due to "spiral binding. "Gold stated that the publisher, American Law Institute, said the books were "perfect bound." According to SDSD documentation, Jack Roditi received a "Contents Unacceptable Notice", dated 05-06-21 that noted the contents were "returned to sender" due to "spiral bound" (plastic or metal.)  DSB P&P, P.3 Inmate Mail states that softcover books with wire and/or spiral binding are not usually allowed inside the facility due to their construction. Evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

9. Misconduct/Procedure – SDSD did not deliver Complainant Roditi's (legal) mail.

   Board Finding: Action Justified
   Rationale: Jack Roditi reported that around 06-03-21, his mother sent him legal materials that were marked "legal mail", but he only received 3 out of the 4 envelopes she sent. In addition, Jack Gold stated he had trouble receiving his "legal mail" as it takes more than a month to receive the materials. According to SDSD P&P, Section P.3 Inmate Mail, Confidential/Legal Mail is authorized correspondence between inmates and state/federal courts, any member of the State Bar or holder of public office, the Citizen's Law Enforcement Review Board (CLERB), Internal Affairs, and other specified authorized agencies. Although Roditi was a Pro Per inmate (acted as his own attorney), DSB P&P N.7 Pro Per Inmates states each Pro Per inmate may be authorized a legal runner/paralegal, investigator and/or a person authorized to aid them, and who is subject to approval by the court. There was no evidence that Gold was approved by the court to aid Roditi with his case; therefore, although Gold labeled the materials "legal mail" it was not authorized as such. Evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

10. Misconduct/Procedure – SDSD "mishandled" Complainant Roditi's (legal) mail.

   Board Finding: Unfounded
   Rationale: Jack Roditi reported that around 06-03-21, his mother sent him legal materials that were marked "legal mail", but he only received 3 out of the 4 envelopes she sent. Roditi reported he was concerned his mail was "mishandled." In addition, Roditi stated he had trouble receiving his "legal mail" as it takes more than a month to receive the materials. The There was no evidence that Roditi's mail was mishandled. Roditi received several "Contents Unacceptable Notices" that explained why he did not receive some of his mail. The evidence showed that the alleged act or conduct did not occur. Please see allegation #1 & #9.

## 21-051

1. Death Investigation/In-Custody Suicide – Inmate Lester Daniel Marroquin, while in the custody of the Sheriff's Department, committed suicide via water intoxication on 05-30-21.

Board Finding: Action Justified
Rationale: Inmate Lester Daniel Marroquin was booked into Sheriff's custody on 12-18-20. He was housed at the Sheriff's San Diego Central Jail. Marroquin had a psychiatric medical history significant for mental illness and during his incarceration he had been placed in the jail's Safety Cells 11 times and had been housed in the jail's Enhanced Observation Housing (EOH) unit 17 times for expressing and attempting suicide on numerous occasions. On 05-30-21, after having been cleared from the Safety Cell and the EOH unit, Marroquin was transferred to his housing unit in Administrative Segregation housing. He was housed alone. While performing a routine Safety/Security check in the housing unit, deputies found Marroquin down and unresponsive in his jail cell. Upon being discovered, deputies and medical staff immediately performed life-saving measures until relieved by fire department personnel. Despite their efforts, Marroquin was pronounced deceased at the facility. The evidence indicated that Marroquin was properly classified upon his entry into the SDSD jail system after his arrest. Due to Marroquin's documented assaultive history, his current arrest charges, and his volatile psychiatric history, Marroquin was clad in jail issued green attire (greenbander) and was placed in Administrative Segregation housing. In review of the evidence, deputy submitted reports, jail surveillance video recordings, and medical records, it was obvious to the Department, sworn staff and medical staff, that Marroquin was a danger to himself. Marroquin was incapable of looking after his own health or caring for himself properly. Based on his prior incarcerations and his documented history of numerous suicide attempts, the Department, as a whole, attempted to intervene and protect Marroquin from himself. There was an emphasis in this investigation on the assessment and decision-making of sworn staff and medical staff, an important issue, which predominated this case, as it was medical staff who carried the role of determining if Marroquin was safe to remove from the Safety Cell, EOH, and to be placed in Administrative Segregation housing. There was particular need to be clear about the boundaries of sworn and professional roles, medical vs sworn staff, as CLERB does not have jurisdiction to evaluate the roles of Sheriff's medical staff, particularly in the duties and responsibilities in relation to the care of people who have mental disorders. According to SDSD DSB P&P Section M.4 titled, "Suicide Prevention and Focused Response Team," the SDSD recognizes that suicide prevention is a collaborative effort of all employees regardless of professional discipline or job title. Once Marroquin was cleared to be placed in Administrative Segregation housing, deputies performed their hourly safety/security checks in accordance with in SDSD DSB P&P Section I.64 titled, "Safety Checks: Inmates, Housing and Holding Areas." Upon being found down and unresponsive in his cell, sworn personnel expeditiously responded and immediately initiated life-saving measures. The evidence showed that the alleged act or conduct that occurred was lawful, justified and proper.

## 21-054

1. Misconduct/Procedure – Deputies 1 and 2 arrived on scene "unaccompanied" by PERT.

Board Finding: Action Justified
Rationale: The complainant stated when she arrived at her client's home, she found Barnes gravely disabled and was concerned for her mental health and/or possible drug use. The complainant called the Sheriff's non-emergency number and asked for a Psychiatric Emergency Response Team (PERT) to respond and evaluate Barnes. SDSD documentation showed that the complainant did request PERT, but deputies arrived without them. SDSD Patrol Procedures Manual, Policy 23. States that PERT requests are coordinated through the Communications Center and deputies will be dispatched if PERT Team is not available. SDSD Emergency Services Dispatchers were questioned and provided the following relevant information. One Dispatcher reported that if PERT is available, PERT is dispatched; otherwise, only deputies will respond. Another Dispatcher stated that a PERT unit was not available at the time of the

incident, so patrol units were dispatched and made aware of the reporting party's initial request for PERT. The dispatcher also reported after patrol units respond and evaluate, they may request a PERT unit if it is deemed beneficial to do so. Deputy 2 provided information during the course of CLERB's investigation that was also considered in arriving at the recommended finding. The evidence showed PERT was not available at the time the request was made by the complainant, and deputies were within their right to respond without them. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

2.  Illegal Search & Seizure – Deputy 2 approached Barnes and instructed her to place her hands behind her back.

    Board Finding: Action Justified
    Rationale: The complainant stated that two deputies approached Barnes and pushed her up against the hood of a patrol vehicle. The complainant reported that the deputies asked Barnes to put her hands behind her back then tried to "forcibly" place her hands behind her back. According to SDSD documentation, Barnes had a previous encounter with deputies where she was not compliant, under the influence, had weapons on her person, and engaged in a physical altercation with deputies. Deputy 1 and Deputy 2 were aware of Barnes' history. Deputy 2 reported as he exited his patrol vehicle Barnes appeared to be under the influence and he was concerned that they were both standing in the middle of the roadway on Alpine Blvd. Deputy 2 was also concerned that Barnes could have a weapon concealed in her baggy clothing. The deputy used verbal commands and arm guidance to move Barnes away from the street and ensure she was not carrying any knives. Because Deputy 2 was aware of Barnes' history of carrying weapons, he stated it was imperative to gain control and escort her out of the road and to prevent her from reaching inside of her sweater. Deputy 2 reported he wanted to make the scene safe to evaluate Barnes. Barnes then pulled away from the deputy and kneed him in the groin area. Barnes continued to resist and failed to comply. Deputy 2 attempted to escort Barnes away from the street, but she immediately pulled away and became combative. Deputy 1 arrived on scene and assisted Deputy 2. The sergeant reported that when he grabbed Barnes by the arm, she pulled away from him. These statements were corroborated with BWC. Deputies had reasonable suspicion to detain Barnes due to the nature of the call, her demeanor, and her history. The moment Barnes resisted deputies; they had the authority to detain her for resisting an executive officer.  The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

3.  Excessive Force – Deputy 1 punched Barnes multiple times.

    Board Finding: Action Justified
    Rationale: The complainant reported as deputies restrained Barnes, Deputy 1 punched the aggrieved in the face/mouth area three times. The complainant stated she was shocked and disgusted in what she believed was Sgt's excessive use of force. According to SDSD documentation, Barnes had a previous encounter with deputies where she was not compliant, under the influence, had weapons on her person, and engaged in a physical altercation with deputies. Deputy 1 was aware of Barnes' history. Per SDSD documentation, Deputy 1 reported he witnessed Barnes pull away from Deputy 2, so he attempted to place her hands behind her back, but she pulled away from him too and then they all fell to the ground. Deputy 1 reported Barnes tried to stand up and she moved her left hand towards her waistline, which prompted him to strike her face with his hand. Deputy 1 reported he feared Barnes would reach into her waistline and produce a dirk or dagger. Deputy 1 stated Barnes exhibited unusual strength, continued to resist, and was not compliant to verbal commands. Deputy 1 reported he administered more closed fist hand strikes as she continued to reach into her waistline. SDSD Addendum F, Use of Force Guidelines explains that deputies should chose a force option which is reasonable and necessary for the circumstances. It also states, "Subjects must not gain the advantage in a physical confrontation; therefore, deputies may need to use a force option that exceeds the subject's force level." In addition, a fist strike to a subject's face when reasonable and necessary is not prohibited, per Addendum F. Barnes was not compliant and actively resisted deputies; therefore, her actions warranted the use of force that was administered to subdue her. Barnes continued to move and twist her body around while she was on the ground while deputies attempted to detain her. Per Addendum F, Use of Force Guidelines there was no violation of policy during

-7-

this use of force incident. Deputy 1 utilized an amount of force that was reasonable and necessary to subdue Barnes who exhibited unusual strength while under the influence of methamphetamine. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

4.  Misconduct/Procedure – Deputies 1 and/or 2 failed to utilize de-escalation techniques.

    Board Finding: Unfounded
    Rationale: The complainant stated, "There were zero engagement techniques used and zero de-escalation techniques." SDSD documentation and BWC showed when Deputy 2 arrived on scene, Barnes was in the middle of the roadway, so he attempted to verbalize commands with Barnes for her to get out of the street. Addendum F, Use of Force Guidelines states when verbalization proves ineffective, arm guidance may be used. Deputy 2 grabbed Barnes by the arm and placed one hand on her back/shoulder area to guide her toward the patrol vehicle. BWC showed that Deputy 2's immediate actions were to ensure everyone was safe and out of the road. In addition, Addendum F, Use of Force Guidelines, de-escalation is defined as actions taken in an attempt to stabilize an incident in order to try and reduce the immediacy of a threat. De-escalation techniques *should* only be used when it is safe and feasible to do so. (The word *should* means that deputies were not mandated to use de-escalation techniques.) Please note, Addendum F Use of Force Guidelines, De-escalation policy was updated on 12-31-21 to, "De-escalation techniques shall only be used when it is safe and feasible to do so." The nature/location of the call and Barnes' history with deputies did not deem a safe and feasible environment for all parties involved in the incident. Deputy 2 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. The evidence showed that the alleged act or conduct did not occur.

5.  Criminal Conduct – Deputies 1 and/or 2 violated Barnes' constitutional/civil rights.

    Board Finding: Unfounded
    Rationale: The complainant stated that she believed several of Barnes' constitutional rights were violated. During CLERB's investigation, the complainant elaborated that the rights violated were unreasonable search and seizure, false arrest, direct violent actions and/or failure to intervene. The Fourth Amendment prohibits "unreasonable" searches and seizures of people. A "seizure" of a person occurs when a peace officer physically applies force with the intent to restrain. SDSD documentation showed that a seizure took place, but evidence showed that the deputies' actions were reasonable. Deputy 2 was aware of Barnes history with deputies and history of drug use; therefore, due to safety reasons, and the nature of the initial call the deputy had reasonable suspicion that she had a concealed weapon on her person which led to his actions to gain control of her. In addition, Deputy 2 stated he wanted to escort her out of the road. Furthermore, the complainant alleged that deputies violated their constitutional duty to protect Barnes' civil rights in Title 18, U.S.C., Section 242 by either direct violent actions or failing to intervene. Title 18, Section 242 states, "It is a crime for a person acting under color of any law to willfully deprive a person or privilege protected by the Constitution or laws of the United States." There was no evidence that deputies violated any constitutional and/or civil rights by their actions. Deputies responded to a call and acted upon their knowledge and experience with Barnes. Deputy 2 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. The evidence showed that the alleged act or conduct did not occur.

---

**21-058**

1.  Death Investigation/Drug-Related – David Sawyer was contacted, searched, and found in possession of methamphetamine by Deputy 1. While being placed under arrest, Sawyer attempted to flee and ingested the methamphetamine. Paramedics were contacted and Sawyer was transported to a hospital where he was pronounced deceased.

    Board Finding: Action Justified
    Rationale: David Sawyer was a 55-year-old Caucasian male who resided in the El Cajon area with his elderly mother. Sawyer had several health issues, suffered a traumatic brain injury about 20 years ago

and had an extensive history of illicit drug use. On 06-21-21, at approximately 11:50 am deputies responded to a call of an intoxicated male swinging a rake and banging on a house. Deputy 1 arrived on scene and approached Sawyer, who was sitting inside of his vehicle. Deputy 1 engaged in dialogue with Sawyer, where he consented to be searched by the deputy. The deputy allowed Sawyer to grab his cane from the back seat of his convertible, as he had trouble standing up on his own. Deputy 1 searched Sawyer and found a plastic sandwich bag with methamphetamine on his person. Sawyer denied it was methamphetamine and the deputy placed the bag of methamphetamine on the trunk of the car and gave Sawyer a verbal command to give him his hands. Sawyer then grabbed the bag from the trunk and attempted to quickly walk/limp away from the deputy. Sawyer was able to take about four to five steps until Deputy 1 reached out and grabbed Sawyer's arm/shoulder, which caused Sawyer to plunge towards the ground. Sawyer laid face down on the pavement with his forearms tucked under his chest. Deputy 1 gave verbal commands to Sawyer to place his hands behind his back, but Sawyer attempted to lift himself up from the ground so the deputy used force and applied downward pressure with his hand on the back of Sawyer's head to gain control and ensure Sawyer would not try to escape again or attack him. Pursuant to SDSD P&P Use of Force Addendum F, Force Options, "Subjects must not gain the advantage in a physical confrontation; therefore, deputies may need to use a force option that exceeds the subject's force level." Sawyer actively resisted the deputy when he attempted to escape and averted from placing his hands behind his back by giving himself leverage with his arms as he tucked them under his chest/torso area when he fell on the ground. The force used by Deputy 1 was in accordance with SDSD policies and was applied in a reasonable manner for him to gain control of Sawyer. Deputy 1 reported he noticed Sawyer had the bag of methamphetamine in his mouth, told him to let go and ripped the bag away from Sawyer. A second deputy arrived on scene and assisted; the deputies continued to give Sawyer verbal commands to place his hands behind his back. Sawyer ultimately complied and was handcuffed. The second deputy dispatched for paramedics and notified a supervisor about the use of force. As reported by deputies and as observed on Body Worn Camera, Sawyer had an abrasion on his forehead due the use of force. After Sawyer was handcuffed, he seemed cooperative and was engaged in dialogue with the deputies. Sawyer expressed his concerns about his family, the consequences for his actions, and even thanked the deputies for the way they spoke with him. Sawyer agreed to allow the paramedics to transport him to the hospital and signed the citation with a promise to appear in court for possession of a controlled substance. Medics transported Sawyer to Alvarado Hospital's Emergency Department where he was observed and treated for the ingestion of methamphetamine, unstable vital signs, and cardiorespiratory and neurological status. Sawyer subsequently became unresponsive, resuscitative efforts were administered, but he was pronounced deceased at 4:03 pm. Based on the autopsy findings, the cause of death was toxic effects of methamphetamine with a contributing factor of hypertensive cardiovascular disease; obesity, and the manner of death was determined to be an accident. According to all available evidence, deputies followed procedure during their interaction with Sawyer. Deputies responded to a radio call, Deputy 1 asked for consent to search, and reasonable force was used to gain control of Sawyer after he attempted to escape and was not compliant to verbal commands. Deputies ensured that Sawyer received medical attention to treat the scrape/abrasion on his forehead and be monitored for the methamphetamine he ingested. An autopsy noted an abrasion to the decedent's forehead (which was a result of the use of force), but no trauma was noted within the skull. Deputy 1 and a Department Information Source also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of the Sheriff's Department sworn personnel.

---

## 21-078

1. Use of Force Resulting in Great Bodily Injury – Deputies 1 and 2 used force to effect the arrest of Jacqueline Marcia Blakeney.

   Board Finding: Action Justified
   Rationale: There was no complaint of misconduct, and this case was reviewed in accordance with CLERB Rules & Regulations 4.3, Complaint Not Required: Jurisdiction with Respect to Specified Incidents. According to Blakeney's San Diego Sheriff's Department (SDSD) Arrest Report, Blakeney was involved in

a physical assault on another. She was determined to be the aggressor/assaulter, was arrested, and transported to the Las Colinas Detention and Reentry Facility (LCDRF) in Santee. Upon arriving at the jail, Blakeney refused to get out of the patrol vehicle. Paramedics were summoned to evaluate Blakeney as she had complaints of not feeling well. Upon medic's arrival, Blakeney was assisted onto a gurney, where she willfully slumped off the gurney. In an attempt to assist Blakeney, Deputy 2 unhandcuffed her. Blakeney "completely unprovoked," spat on Deputy 1. Blakeney's spit hit the left side of Deputy 1's face and shoulder. Being aware of Blakeney's lifestyle, Deputy 2 expressed a concern for the transmission of pathogens from exposure to Blakeney's bodily fluids and other potentially infectious materials. Deputy 2 held Blakeney's unhandcuffed left arm and attempted to pin it on the gurney, to prevent Blakeney from escaping, fearing she might physically assault him, Deputy 1, or the paramedics. According to the written reports, Blakeney wiggled and thrashed around and resisted their efforts in an effort to free herself from Deputy 2's grasp. Deputy 2 instructed Blakeney to stop struggling and to calm down. While restraining Blakeney's arm, Deputy 2 "heard a popping sound and Blakeney stopped fighting." When Blakeney ceased resisting, Deputy 2 was able to handcuff Blakeney's left arm to the gurney's rail. Blakeney was subdued and was medically assessed by the on-scene paramedics. Paramedics informed the deputies that Blakeney probably sustained a broken left arm. Blakeney was immediately transported to the hospital where she was medically evaluated and her injury was confirmed; she had sustained an upper left arm fracture. Blakeney was booked into custody while at the hospital and remained at the hospital while she was treated for her injury. Jail surveillance video was provided from the SDSD. The video recording was provided in a timely manner and clear; however, once the fire truck arrived on scene, the fire truck blocked the view of Deputy 1's patrol vehicle and the use of force involving Blakeney was unviewable. CLERB sought an interview and/or statement from the involved Santee Fire Department officers and paramedics; however, after many attempts they did not respond. Based on the evidence provided, the force used against Blakeney, was necessary, appropriate, effective, and reasonable for the circumstances at the time in gaining compliance. During the incident, Blakeney exhibited psychological intimidation, passive resistance, active resistance, and assaultive behavior towards the deputies. In response, the deputies executed hands-on control techniques. Once control was established, Blakeney was immediately evaluated by emergency personnel and was transported to the hospital for examination by a physician. The actions executed by the deputies were in accordance with SDSD Policies and Procedures and there was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

2.  Misconduct/Procedure - Deputies 1 and 2 failed to activate their Body Worn Cameras (BWC).

    Board Finding: Action Justified
    Rationale: During the aforementioned use of force, Deputies 1 and 2 did not activate their BWC during the incident and subsequent use of force. According to SDSD P&P Section 6.131 titled "Body Worn Camera," it is the intent of the Sheriff's Department to record all law enforcement related contacts, and other contacts deemed appropriate. When responding to a call for service, a deputy shall activate their BWC in record mode prior to arriving on scene or upon arrival and prior to exiting their patrol vehicle. Deputies should also begin recording prior to initiating any law enforcement related contact. Deputies shall activate the BWC to record all law enforcement related contacts. According to the policy, deputies shall begin recording prior to arriving to an incident if the call has the potential to involve immediate enforcement action upon arrival. In Deputy 1's written report, she documented that it was not her usual/typical practice to activate her BWC when booking an arrestee into jail. Deputy 1 reported that she believed "*Blakeney was only going to receive medical attention*" and she did not activate her BWC to be sensitive to the arrestee's medical information and privacy. The policy states that deputies shall be sensitive to patients' rights to privacy when in a hospital or medical facility setting and attempt to avoid recording persons other than the victim, witness or suspect. Though the policy advised deputies not to record patients during medical or psychological evaluations by a clinician or similar professional or during treatment, Deputy 1 had not yet escorted Blakeney to the jail's medical intake, as Blakeney refused to exit her patrol vehicle. Deputy 1 also stated, "*The use of force began unprovoked with the spitting and therefore I just reacted to the assault and did not have time to activate the BWC.*" Deputy 1 was at a SDSD facility when the incident occurred. The SDSD policy states that while away from department facilities, deputies shall keep their BWC powered on and in stand-by mode, anticipating law enforcement related contacts. In Deputy 2's written report, Deputy

-10-

2 reported that he had his BWC activated [turned on and in the standby mode] after his previous call of service. When he initially spoke with Deputy 1, he muted his BWC so he could collect information and to discuss "*a possible action plan.*" During the use of force, Deputy 2 looked down at his BWC and noticed that it was turned off. Deputy 2 explained that he was not sure if he had "*turned it off earlier, to stop the recording from my other incident and start a new one and just forgotten to re start the camera, or if the camera was turned off during the melee [commotion] with Blakeney.*" According to the policy, if for confidential or personal reasons, deputies feel the need to power-off their BWC momentarily (i.e. phone call, email or bathroom break) while away from department facilities, they need to remember to power-on and reactivate their BWC after their reasoning for powering-off has concluded. The record mode of the camera should be activated prior to actual contact with a citizen (victim/witness/suspect), or as soon as safely possible, and continue recording until the contact is completed. The policy also states that in situations where activation was not accomplished prior to arriving on scene, those reasons shall be articulated in writing via case related report, or if no report, in CAD. In accordance with the policy, both deputies articulated in their written reports why their BWC were not turned on. Though the policy as written at the time of the incident gives exceptions to situations when BWC's need not be activated, CLERB believed that regardless of the setting, in a department facility or not, deputies confronting, or the potential to confront, a violent or assaultive suspect, or anticipating using force, shall activate their BWC's to record the encounter. Though this was not done, there was no violation of the policy as it was written at the time of the incident.

**POLICY RECOMMENDATION**:

1. It is recommended that the San Diego Sheriff's Department (SDSD) change SDSD P&P Section 6.131 titled "Body Worn Camera," to direct that deputies *shall* begin recording prior to initiating any law enforcement related contact.

---

**21-079**

1. Use of Force Resulting in Great Bodily Injury – Deputy 1 deployed his Sheriff's Canine on Stephen Wayne Beshirs, which resulted in Stephen sustaining dog bites.

Board Finding: Action Justified
Rationale: Mrs. Beshirs had a restraining order against her husband, Mr. Beshirs; Mr. Beshirs was the restrained party in a served Domestic Violence Criminal Protective Order protecting Mrs. Beshirs. On 07-23-21, Mr. Beshirs was under the influence of alcohol when he used a replica gun and broke a window into Mrs. Beshirs' motorhome. Once in her home, Mr. Beshirs assaulted Mrs. Beshirs. Sheriff's deputies were summoned to the residence. Mr. Beshirs attempted to evade arrest and barricaded himself in a residential detached garage. Given Mr. Beshirs aggressive demeanor and his willfulness to evade apprehension, additional force and potential injury to the deputies would have been imminent. Mr. Beshirs had a tactical advantage due to knowing the property and layout of the residence which left deputies vulnerable to ambush. Additionally, Mr. Beshirs demonstrated an eagerness and desperation to avoid capture. Based on Deputy 1's training and experience, coupled with the totality of the circumstances, the decision was made to deploy Deputy 1's Sheriff's Canine. The Sheriff's canine unit quickly located Mr. Beshirs and engaged him, which resulted in Mr. Beshirs sustaining dog bites. Deputy 1 used a "break stick" to release the dog's bite. Once Mr. Beshirs was detained, paramedics were summoned to the scene and Mr. Beshirs was transported to the hospital where he underwent medical treatment. Mr. Beshirs was arrested for assault with a deadly weapon with force, domestic violence battery, vandalism, and violation of a criminal protective order. After being treated at the hospital, Mr. Beshirs was transported to jail where he was booked into custody. Mr. Beshirs and Mrs. Beshirs were interviewed and provided a statement. Both parties reported that the use of the Sheriff's canine was excessive, and that the injuries Mr. Beshirs sustained were unnecessary and unwarranted. In review of evidence in this case, which included numerous Body Worn Camera recordings, audio recordings, photographs, reports, and statements, the force used against Mr. Beshirs was necessary, appropriate, effective, and reasonable for the circumstances at the time in gaining compliance. During the incident, Mr. Beshirs exhibited active

resistance and assaultive behavior towards the deputies. In response, the deputies executed less-then-lethal control techniques. Once control has been established, Mr. Beshirs was immediately evaluated by emergency personnel and was transported to the hospital for examination by a physician. The actions executed by the deputies were in accordance with SDSD Policies and Procedures. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel. The deputies who responded to the scene acted within policy and procedure and law. The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

---

## 21-106

1. Misconduct/Discourtesy – Deputy 1 implied and/or blamed that (Encinitas) "residents were the problem" on 05-20-20.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, in regard to the Safe Parking Program, "He (Deputy 1) said that Program, that he/she knew moved transients into most of our hotels and marketed them to migrate to Encinitas, had no impact whatsoever on crime and he/she implied the "residents were the problem ". On 10-07-21, CLERB received a signed complaint regarding allegations against Deputy 1. The incident giving rise to the complaint occurred on 05-20-20, however the complainant reportedly was not made aware until June of 2020 following the publication of a SANDAG (San Diego's Regional Planning Agency) report. Per CLERB rules and regulations 4.1.2 Complaints, CLERB shall not have jurisdiction to take any action in respect to Complaints received more than one year after the date of the incident giving rise to the Complaint, except that if the person filing the Complaint was incarcerated or physically or mentally incapacitated from filing a Complaint following the incident giving rise to the Complaint, the time duration of such incarceration or incapacity shall not be counted in determining whether the one year period for filing the Complaint has expired. The Review Board lacks jurisdiction or the complaint clearly lacks merit.

2. Misconduct/Procedure – Deputy 1 showed unfair treatment to non-profit organizations.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "Deputy 1 appeared to be controlled by the powerful nonprofits." See Rationale #1.

3. False Reporting – Deputy 1 "lied/misled the community" about crime statistics.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated Deputy 1 lied and misled the community. See Rationale #1.

4. Misconduct/Procedure – Deputy 1 mismanaged the North Coastal Station when crime rose during the time period of 01-01-20 through 06-30-20.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "In sum, during 6 months from 01-01-20 to 06-30-20, Encinitas went from the #1 safest town in San Diego to the #1 fastest growing crime town in San Diego. This happened under Deputy 1's watch." See Rationale #1.

5. False Reporting – Deputy 1 utilized "false information" which impacted contract renewals.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated Deputy 1 utilized "false information" which impacted contract renewals. See Rationale #1.

6. Misconduct/Truthfulness – The "Sheriff"/Deputy 1 lied to the community.

-12-

Board Finding: Summary Dismissal
Rationale: The complainant stated, "When the Sheriff lied to the community this allowed the nonprofits and Mayor free reign to expand and continue exploiting our town for state grants and made the Mayor look better for her Senate Run." See Rationale #1.

7.  Misconduct/Truthfulness – Mayor Blakespear "forced our Sheriff to lie/mislead us about crime."

    Board Finding: Summary Dismissal
    Rationale: The complainant provided a YouTube video link with his signed statement. The YouTube link was entitled "Cather Blakespear: She Forced Our Sheriff to Lie and/or Mislead Is About Crime [sic]." Per CLERB rules and regulations 4.1 Complaints: Authority. Pursuant to the Ordinance, CLERB shall have authority to receive, review, investigate, and report on Complaints filed against Peace Officers or Custodial Officers employed by the County of San Diego in the Sheriff's Department. Mayor Blakespear is not a Peace Officer or Custodial Officer employed by the County of San Diego in the Sheriff's Department. The Review Board lacks jurisdiction.

8.  Misconduct/Discourtesy – Deputy 1 "ignored" email correspondence from the complainant numerous times.

    Board Finding: Unfounded
    Rationale: The complainant stated, "I've tried infinite times to communicate with him and he/she'd ignore me." The complainant provided emails to Deputy 1 as evidence in communication attempts. The complainant's email to Deputy 1 on 10-06-21, stated "What do you say? I don't expect an answer, but only straight people are persistent in seeking the truth "first" seeing what their alternatives are". SDSD P&P 2.1 Rules of Conduct for Members of the SDSD, states, "All employees shall conform to Federal, State, and Local laws, as well as to the policies of this Department. It shall be the responsibility of all employees to familiarize themselves and comply with all such policies, orders, directives, rules and regulations of this Department". SDSD P&P 7.13 Sheriff's Use and Support of Information Technology has a section entitled E-mail usage which states, "E-mail is a recognized form of business communication and shall be accessed and answered in a timely manner." Deputy 1 provided confidential information during CLERB's investigation that was considered in arriving at the recommended finding. The evidence showed that the alleged act or conduct did not occur.

---

## 21-112

1.  Misconduct/Procedure – Deputy 1 failed to write a report.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "I was a victim of a hate crime while delivering for Axelhire on October 14th at 6:45PM". According to the complainant, he pulled into a nearby homeowner's driveway to drop off a package nearby, due to lack of ample parking. When he returned to his vehicle, the homeowner returned home, blocked the complainant's vehicle, and accused the complainant of stealing packages. Once the homeowner moved his vehicle and the complainant drove away, the complainant yelled out the car window about being held captive due to his skin color and the way he looked. The homeowner followed him and smashed his rear window which had a sticker that said "DISCRIMI**NATION**" with the word "nation" highlighted. According to the complainant he was a victim of vandalism, false imprisonment, and a hate crime. As per SDSD P&P 6.71 entitled "Crime Case Reports," A crime/incident report shall be completed for the following Uniform Crime Reporting: Part 2 Crimes: All other reported misdemeanor crimes. Deputy's Reports: An Officer's Report may be completed to report a miscellaneous incident or provide supplemental information when appropriate. According to BWC footage, Deputy 1 asked Osawa if he was looking to get the window replaced through insurance or prosecution. Osawa expressed concern about going through his insurance. After a brief discussion with Osawa, Deputy 1 went to his Field Training Officer (FTO) and discussed Osawa's desire for prosecution. Deputy 1 broadly explained the Citizen's Arrest process and

Osawa asked if there was another option since he was concerned about the effect on his insurance. As per SDSD P&P 6.110 entitled Private Person Arrest, "When a private person notifies a Deputy Sheriff of his/her desire to make a lawful arrest, for a misdemeanor not committed in a deputy's presence, he/she shall advise the private person that they may make a physical arrest or file a crime report." After the discussion, Deputy 1 asked if Osawa wanted him to get the information or if he wanted to prosecute. Osawa did not answer the question but based on his comments, it appeared he did not want to do a Citizen's Arrest due to potential attorney costs and potential for increased insurance premiums. BWC footage showed when Deputy 1 interviewed the homeowner to get his information, it was discovered the homeowner's foot was run over during the altercation and he broke the window as a reaction to the pain. Deputy 1 provided confidential information during CLERB's investigation that was also considered in arriving at the recommend finding. Though there was no violation of the law or Sheriff's policy for not taking a written report, a miscellaneous incident report could have been taken at the time of the incident which specified the events that occurred. BWC evidence was provided of a phone call on 10-15-21 from a Sergeant to Osawa which SDSD offered several times to send officers out and take a report following the incident, but Osawa declined. According to SDSD Policy and Procedure (P&P) Section 2.23 titled "Request for Assistance," when any person requests assistance or advice, or makes complaints or reports, either by telephone or in person, all pertinent information will be obtained in an official and courteous manner and will be properly and judiciously acted upon consistent with established Department procedures. Through the course of investigation, it was discovered a crime report was eventually written due to a follow-up on a complaint and the case will be prosecuted by the District Attorney. The case is currently scheduled for a misdemeanor readiness hearing on 05-01-22 at the San Diego Superior Court East County Regional Center. There was insufficient evidence to either prove or disprove the allegation.

2.  Misconduct/Procedure– Deputy 1 failed to investigate a "Hate Crime".

    Board Finding: Not Sustained
    Rationale: The complainant stated he was a victim of a hate crime while delivering packages on 10-14-21. As per SDSD P&P 6.101 entitled Hate Crimes, a hate or bias crime is "Any act of intimidation, harassment, physical force, or threat of physical force directed against any person, or family, or their property or advocate, motivated either in whole or in part by hostility to their real or perceived race, ethnic background, national origin, religious belief, sex, age, disability, or sexual orientation, with the intention of causing fear or intimidation, or to deter the free exercise or enjoyment of any rights or privileges  secured by the Constitution or the laws of the United States or the state of California whether or not performed under color of law." As per PEN§ 422.55, "Hate crime" means a criminal act committed, in whole or in part, because of one or more of the following actual or perceived characteristics of the victim: (1) Disability (2) Gender (3) Nationality (4) Race or ethnicity (5) Religion (6) Sexual orientation (7) Association with a person or group with one or more of these actual or perceived characteristics. "Hate crime" includes, but is not limited to, a violation of Section 422.6." Penal Code 422.6 is the California Hate Crime statue that makes it illegal to interfere with another person's civil rights simply because of items 1-6 listed above. As per SDSD BWC footage, there was insufficient evidence to prove any crime had occurred. The suspect reported to SDSD deputies that his residence had prior issues with theft, and he believed Osawa was stealing his packages. There was insufficient evidence to prove the suspects actions were result of racial bias. Furthermore, SDSD deputies did not feel the elements of crime were met that required a report to be taken. *See Rationale 1.* There was insufficient evidence to prove or disprove that a crime occurred.

3.  Misconduct/Procedure – Deputy 1 failed to obtain information from a suspect.

    Board Finding: Unfounded
    Rationale: The complainant stated, "Also was told that no police report was taken the officer that arrived on the scene never got the other person information and body cam couldn't be found." BWC footage showed Deputy 1 obtained the name, date of birth, and phone number of the suspect. The evidence showed the alleged act or conduct did not occur.

4.  Misconduct/Truthfulness – Deputy 1 lied to the complainant.

    Board Finding: Not Sustained

Rationale: The complainant stated, "The officers who arrived on the scene completely disregarded my safety, lied to me, and told me they wrote the guy a ticket for vandalism which didn't happen also ignore the fact a false imprisonment occurred." The complainant also stated, "he also told me he gave the guy a ticket". BWC evidence showed Deputy 1 told Osawa "all I am going to do is give him a ticket, that's it." At the time of the incident, COVID-19 Booking Acceptance Criteria would not allow Citizen's Arrests to be booked for misdemeanor offenses, and only citations to appear in court could be given by SDSD. The evidence showed there may have been a miscommunication between Osawa and SDSD regarding the Citizen's Arrest Process. According to SDSD 2.46 entitled Truthfulness, "When asked by the Sheriff, the Sheriff's designee or any supervisor, employees will always answer questions, whether orally or in writing, truthfully and to the fullest extent of their knowledge. All written and verbal reports shall be truthful and complete". Deputy 1 provided confidential information during CLERB's investigation that was also considered in arriving at the recommend finding. There was insufficient evidence to prove or disprove the allegation.

5.  Misconduct/Discourtesy – Deputy 2 was disrespectful/unprofessional.

    Board Finding: Not Sustained
    Rationale: The complainant stated, Deputy 2 "insulted me verbally by saying this should be a learning lesson for you to not park in people's driveways. Also stated if he was the officer that arrived on scene he would of marked it as no more than a civil case left us to handle the insurance exchange. He was completely disrespectful and unprofessional to me when all I was trying to do is get the other person's info so I can get my car fixed". SDSD P&P Section 2.22 entitled Courtesy, states "Employees shall be courteous to the public and fellow employees. They shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation." Deputy 2 provided confidential information during CLERB's investigation that was considered in arriving at the recommend finding. There was no BWC or audio recordings of conversations between Deputy 2 and Osawa and as such there was insufficient evidence to either prove or disprove the allegation.

6.  Misconduct/Procedure – SDSD reported to complainant that Body Worn Camera (BWC) could not be found for the incident on 10-14-21.

    Board Finding: Action Justified
    Rationale: The complainant stated he was told body cam footage could not be found. As per SDSD P&P 6.131 Body Worn Cameras, "When responding to a call for service, a deputy/CSO shall activate their BWC in record mode prior to arriving on scene or upon arrival and prior to exiting their patrol vehicle." CLERB requested all BWC footage for the incident that occurred on 10-14-21. Initially CLERB was told Deputy 1' BWC was malfunctioning at the time, but the footage was later provided to CLERB. SDSD CLERB Liaison provided all associated BWC footage from all deputies that responded to incident. As per 6.131 BWC, Data Integrity, "It is incumbent upon deputies, CSO's, and supervisors to maintain the integrity of the BWC videos which are produced. The Field Operations Manual identifies those functions specific to entering metadata and labeling videos appropriately. Deputies, CSO's, and supervisors shall be responsible for ensuring BWC's are assigned to the correct user and that all metadata is entered correctly. To that end, each video that is produced shall be checked for accuracy by the producing deputy. Any discrepancies or missing data shall be corrected as soon as possible but no later than the end of each work week. Supervisors shall periodically review the metadata of deputies/CSO's within their assigned unit and are responsible for ensuring discrepancies are remedied in a timely manner." The evidence shows that the alleged act or conduct did occur but was lawful, justified and proper.

*End of Report*

**NOTICE**

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

Ex. M - 622

# EXHIBIT N

**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III



# County of San Diego
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD
555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776    FAX: (619) 238-6775
**www.sdcounty.ca.gov/clerb**

## MEETING AGENDA
### Tuesday, March 8, 2022, 5:30 p.m.
**Remote Meeting Zoom Platform**
**https://zoom.us/j/97947871945?pwd=ODdZSDVYRUZaNUFGWUpNNm9Dc1R2UT09**
**Telephone:**
**+1 669 900 6833**
**Webinar ID: 979 4787 1945**
**Passcode: 853791**

Pursuant to Government Code Section 54954.2 the Citizens' Law Enforcement Review Board will conduct a meeting at the above time and place for the purpose of transacting or discussing business as identified on this agenda. Complainants, subject officers, representatives, or any member of the public wishing to address the Board should submit a "Request to Speak" form prior to the commencement of the meeting.

### DISABLED ACCESS TO MEETING
A request for a disability-related modification or accommodation, including auxiliary aids or services, may be made by a person with a disability who requires a modification or accommodation in order to participate in the public meeting. Any such request must be made to CLERB at (619) 238-6776 at least 24 hours before the meeting.

### WRITINGS DISTRIBUTED TO THE BOARD
Pursuant to Government Code Section 54957.5, written materials distributed to CLERB in connection with this agenda less than 72 hours before the meeting will be available to the public at the CLERB office located at 555 W Beech Street, Ste. 220, San Diego, CA.

## 1. ROLL CALL

## 2. PUBLIC COMMENTS

This is an opportunity for members of the public to address the Board on any subject matter that is within the Board's jurisdiction but not an item on today's open session agenda. **Each speaker shall complete and submit an online "Request to Speak" form.** Each speaker will be limited to three minutes. This meeting will be held remotely via the Zoom Platform. Click the below link to access the meeting using the **Google Chrome web browser**: https://zoom.us/j/97947871945?pwd=ODdZSDVYRUZaNUFGWUpNNm9Dc1R2UT09. Contact CLERB at clerb@sdcounty.ca.gov or 619-238-6776 if you have questions.

## 3. MINUTES APPROVAL (Attachment A)

## 4. PRESENTATION/TRAINING

a) San Diego County Department of General Services Role in San Diego County Detention Facility Camera Maintenance and Repair by CLERB Executive Officer Paul Parker

-1-

5. **EXECUTIVE OFFICER'S REPORT**

a) Overview of Activities of CLERB Executive Officer and Staff

b) Workload Report – Open Complaints/Investigations Report (Attachment B)

c) Case Progress and Status Report (Attachment C)

d) Executive Officer Correspondence to Full CLERB (Attachment D)

e) Policy Recommendation Pending Responses

   i. 20-113 / Alvarez (Death) – SDSD
   - It is recommended that the San Diego Sheriff's Department (SDSD) revise its Detention Policies and Procedures Section I. 64, entitled, "Safety Checks: Inmates, Housing, and Holding Areas," to mandate proof of life verification through visual checks every 60 minutes during the booking process.
   - It is recommended that the San Diego Central Jail (SDCJ) only utilize cells with operable cameras unless all cells with operable cameras are in use.

   ii. 21-060 / Meadows – SDSD
   - It is recommended that the San Diego Sheriff's Department (SDSD) create a policy that mandates conducting all Detentions Investigative Unit (DIU) interviews in a private area, out of view from other inmates.

   iii. CLERB Staff Response to Death Scenes – Probation
   - Allow a CLERB staff member with extensive death investigation experience to be present at the initial death scene and any related incident scene and, without compromising or obstructing the law enforcement investigation, receive a briefing, participate in a scene walk-thru, and have any questions about the circumstances surrounding the events leading up to, and including the death, answered.

f) Policy Recommendation Response

   i. 20-063 / Morton (Death) – SDSD (Attachment E)
   - It is recommended that the San Diego Sheriff Department update its Detention Services Bureau (DSB) P&P Section I.19 Security Video Systems, to mandate that sworn staff document and keep a record of video system checks.

   ii. CLERB Staff Response to Death Scenes – SDSD (Attachment F)
   - Allow a CLERB staff member with extensive death investigation experience to be present at the initial death scene and any related incident scene and, without compromising or obstructing the law enforcement investigation, receive a briefing, participate in a scene walk-thru, and have any questions about the circumstances surrounding the events leading up to, and including the death, answered.

g) Sustained Finding Pending Responses

   i. 20-104 / Chon (Death) – SDSD

h) Sustained Finding Response

   i. 20-113 / Alvarez (Death) – SDSD (Attachment G)

   ii. 21-087 / Grino-Watson – SDSD (Attachment H)

6. **BOARD CHAIR'S REPORT**

-2-

## 7. NEW BUSINESS

a) SDSD Report Back: Address Concerns Identified in Center for Policing Equity Report (Attachment I)

b) San Diegans for Justice Report: CLERB – Assessment of Strengths and Opportunities (Attachment J)

c) CLERB Town Hall Considerations

d) Finalize CLERB Town Hall: In-Custody Deaths

## 8. UNFINISHED BUSINESS

a) Update: Authority for the Executive Officer to Work with County Staff to Pursue Legislation and/or to Add a Policy to the County Legislative Program in Support of Increased Transparency in Civilian Oversight of Peace Officers and Custodial Officers

b) Update: Authority for the Executive Officer to Work with County Staff to Request that the County Board of Supervisors Expand CLERB's Jurisdiction to Include Personnel Involved in Providing Medical Care in County Detention Facilities

c) Update: Racial Disparity and Racial Profiling Subcommittee

d) Update: In-Custody Death Data Review Subcommittee

## 9. BOARD MEMBER COMMENTS

## 10. SHERIFF/PROBATION LIAISON QUERY

## 11. CLOSED SESSION

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
**Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
| --- | --- |
| Action Justified | The evidence shows that the alleged act or conduct did occur but was lawful, justified and proper. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

**NOTICE: THE CITIZENS LAW ENFORCEMENT REVIEW BOARD (CLERB) MAY TAKE ANY ACTION WITH RESPECT TO THE ITEMS INCLUDED ON THIS AGENDA. RECOMMENDATIONS MADE BY STAFF DO NOT LIMIT ACTIONS THAT THE CLERB MAY TAKE. MEMBERS OF THE PUBLIC SHOULD NOT RELY UPON THE RECOMMENDATIONS IN THE AGENDA AS DETERMINATIVE OF THE ACTION THE CLERB MAY TAKE ON A PARTICULAR MATTER.**

## CASES FOR SUMMARY HEARING (5)

Ex. N - 626

**21-004**

1. Death Investigation/In-Custody Drug Related – Omar Moreno was found unresponsive in a holding cell at San Diego Central Jail (SDCJ) on 01-06-21.

   Recommended Finding: Sustained
   Rationale: The evidence supported that Omar Moreno was classified as "book and release" (B&R) upon his entry into the SDSD jail system on 01-06-21. Both of Moreno's original charges of HSC§ 11364, Possession of Opium Pipe or Controlled Substance Paraphernalia and HSC§ 11550, Under the Influence of a Controlled Substance were not bookable under Emergency Booking Acceptance Criteria-COVID-19 Precaution effective 12-04-20 to 01-08-21. Moreno's charge of HSC§ 11550 was changed to PEN§ 647(f) drunk in public in order to be accepted into custody. Once the transporting deputy realized this was not an appropriate charge, an attempt was made to release Moreno mid-booking process. The release was not allowable per booking staff. The evidence showed the operator of the body scanner never identified or inquired with Moreno about anomalies on his body scan. There was no evidence that Moreno expressed any concerns about his mental or physical well-being to any member of the SDSD, sworn or professional. There was no indication in SDSD medical records that Moreno was in mental distress or an altered mental state. Moreno completed a medical intake screening and was cleared as "fit for booking," per medical staff. Safety checks were conducted within policy, including one incomplete check due to an unrelated incident that involved an inmate use of force on a deputy. The incomplete check was documented in accordance with policy. Response from the SDSD is currently pending. Video surveillance showed Moreno walked around Dressout Holding Cell #1 at approximately 9:36PM. Moreno appeared to have a white mask on during this time. Moreno appeared to take his mask off and sat on the bench at 9:37PM. He then slouched down and appeared to put something in his mouth, (possibly the mask). At 9:38PM Moreno stood up and it appeared his hand goes to his mouth; his mask can no longer be seen on his face or hands. Moreno paced around and got up and down from the bench several times. Moreno appeared to grab something off the bench at 9:40PM, but due to poor video quality, there was no way to determine what the object was or if there was any object at all. At 9:41PM Moreno collapsed forward off the bench onto the floor in front of him and had seizure-like activity until approximately 9:42PM. One final body movement was observed at 9:44PM. None of the other inmates inside the cell assisted or called for assistance. Moreno was discovered unresponsive at 10:49PM during night hard count. Upon discovering Moreno unresponsive, sworn personnel expeditiously responded and immediately initiated life-saving measures. SDSD deputies initiated and continued life-saving measures until relieved by SDCJ medical staff, and subsequently EMS paramedics. There was no indication that Moreno choked until examined by the Medical Examiner. The cause of death was choking due to airway obstruction by ingestion of cloth mask and food bolus, with acute methamphetamine intoxication as contributing and the manner of death was an accident. While there was no one point of failure that led to Moreno's death, he should not have been taken into custody at the time of this incident per COVID-19 Booking Criteria. Additionally, there was no way to determine if the body scan operators' action would have prevented Moreno's death. Furthermore, there was no way to determine if the incomplete safety check would have also prevented Moreno's death. It was previously recommended SDSD revise its Detention Services Bureau Policy and Procedures (DSB P&P) "I.64 entitled Safety Checks: Inmates, Housing, and Holding Areas" to visually verify proof of life during the booking process on a prior case (Case #20-113 Alvarez); the SDSD response is pending. The evidence supported the allegation and the act or conduct was not justified.

2. Misconduct/Procedure – Deputy 2 did not familiarize himself and/or comply with SDSD Emergency Booking Acceptance Criteria effective 12-04-20.

   Recommended Finding: Sustained
   Rationale: As per the Emergency Booking Acceptance Criteria in place on 01-06-21, a charge of HSC§ 11550(a) and HSC§ 11364 were listed under charges "to be processed as "cite and release" in the field and ONLY accepted with 1) Watch Commander approval, or 2) Comes in with additional bookable field arrest charges or 3) An approved request for bail increase." As per SDSD P&P 2.1 entitled Rules of Conduct for Members of SDSD, "All employees shall conform to Federal, State, and Local laws, as well as to the policies of this Department. It shall be the responsibility of all employees to familiarize themselves and comply with all such policies, orders, directives, rules and regulations of this Department." Furthermore, SDSD P&P 2.3

-4-

entitled Violation of Rules, "Employees shall not commit or omit any acts which constitute a violation of any of the rules, regulations, directives, orders or policies of this Department, whether stated in these Rules of Conduct or elsewhere." Additionally, SDSD P&P 10.6 Continuing Professional Training-Sworn, states it is the responsibility of all employees to remain current, and each command will ensure line-uptraining includes policy and procedure changes. Deputy 2 provided confidential information during CLERB's investigation that was considered in arriving at the recommended finding. On 01-31-22, CLERB requested an interview with Deputy 2 which was declined on 02-03-22. Deputy 2 exercised his right to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The evidence supports the allegation and the act or conduct was not justified.

3.  Misconduct/Procedure - Deputy 1 did not familiarize himself and/or comply with SDSD Emergency Booking Acceptance Criteria effective 12-04-20.

    Recommended Finding: Sustained
    Rationale: As per the Emergency Booking Acceptance Criteria in place on 01-06-21, a charge of HSC§ 11550(a) and HSC§ 11364 were listed under charges "to be processed as "cite and release" in the field and ONLY accepted with 1) Watch Commander approval, or 2) Comes in with additional bookable field arrest charges or 3) An approved request for bail increase." As per SDSD P&P 2.1 entitled Rules of Conduct for Members of SDSD, "All employees shall conform to Federal, State, and Local laws, as well as to the policies of this Department. It shall be the responsibility of all employees to familiarize themselves and comply with all such policies, orders, directives, rules and regulations of this Department." Furthermore, SDSD P&P 2.3 entitled Violation of Rules, "Employees shall not commit or omit any acts which constitute a violation of any of the rules, regulations, directives, orders or policies of this Department, whether stated in these Rules of Conduct or elsewhere." Additionally, SDSD P&P 10.6 Continuing Professional Training-Sworn, states it is the responsibility of all employees to remain current, and each command will ensure line-uptraining includes policy and procedure changes. Deputy 1 provided confidential information during CLERB's investigation that was considered in arriving at the recommended finding. On 01-31-22, CLERB requested an interview with Deputy 1 which was declined on 02-06-22. Deputy 1 exercised his right to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The evidence supports the allegation and the act or conduct was not justified.

4.  Misconduct/Procedure - Deputy 4 did not familiarize himself and/or comply with SDSD Emergency Booking Acceptance Criteria effective 12-04-20.

    Recommended Finding: Sustained
    Rationale: As per the Emergency Booking Acceptance Criteria in place on 01-06-21, a charge of HSC§ 11550(a) and HSC§ 11364 were listed under charges "to be processed as "cite and release" in the field and ONLY accepted with 1) Watch Commander approval, or 2) Comes in with additional bookable field arrest charges or 3) An approved request for bail increase." As per SDSD P&P 2.1 entitled Rules of Conduct for Members of SDSD, "All employees shall conform to Federal, State, and Local laws, as well as to the policies of this Department. It shall be the responsibility of all employees to familiarize themselves and comply with all such policies, orders, directives, rules and regulations of this Department." Furthermore, SDSD P&P 2.3 entitled Violation of Rules, "Employees shall not commit or omit any acts which constitute a violation of any of the rules, regulations, directives, orders or policies of this Department, whether stated in these Rules of Conduct or elsewhere." Additionally, SDSD P&P 10.6 Continuing Professional Training-Sworn, states it is the responsibility of all employees to remain current, and each command will ensure line-uptraining includes policy and procedure changes. Deputy 4 provided confidential information during CLERB's investigation that was considered in arriving at the recommended finding. On 01-31-22, CLERB requested an interview with Deputy 4 which was declined on 02-16-22. Deputy 4 exercised his right to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The evidence supports the allegation and the act or conduct was not justified.

5.  Misconduct/Procedure - Deputy 3 failed to identify and/or inquire with Inmate Moreno about an anomaly (or anomalies).

    Recommended Finding: Sustained

Rationale: SDSD records showed on 01-06-21 Deputy 3 performed a Body Scan of Omar Moreno as required by DSB Policy I.50 Body Scanner and X- Rays. According to SDSD video surveillance footage, Moreno entered the Body Scan room at 2:00PM. The operator was seen continuously looking at paperwork while he conducted the scan. He then brightened the scan and simultaneously walked away from the machine. CLERB was unable to determine if the operator merely glanced at or ever saw the final image, but no subsequent action was taken. The results of the scan appeared to show some type of anomaly, which the Medical Examiner (ME) records suggested was a "possible baggy of illicit substance". The summary of the ME report stated, "Jail staff informed me that there appeared to be a foreign object in his abdomen on an x-ray that appears to be possible 'baggy' of illicit substance". Furthermore, the Opinion section of the Autopsy Report states, "Upon entering the jail, staff was informed that there appeared to be a foreign object in his abdomen on an x-ray that appeared to be a possible baggie of illicit substance". There was no formal documentation notating the anomaly until after Moreno's death. Furthermore, a SDSD Follow-up Investigative Report stated, "I asked [Deputy Medical Examiner] if the foreign object was a "baggie" and if it was in his body for over seven hours after the scan, was possible it may have dissolved in Moreno's body. [Deputy Medical Examiner] said it would depend on the material, but it was possible." I.50 entitled Body Scanner and X-rays, III. Body Scan Anomalies, states in part,

A. In the event an anomaly appears within a subject's body, the deputy conducting the scan will inquire with the arrestee to identify the anomaly.

   1. If the anomaly is believed to be concealed contraband, the deputy will ask the arrestee to voluntarily turn over the item(s). The deputy will utilize a private area to obtain the contraband.

      a. If the arrestee refuses to voluntarily turn over the concealed item(s), the watch commander will have the overall authority to accept or reject the arrestee in compliance with DSB P&P section M.9.

   2. Once the deputy has obtained the item(s), the arrestee will need to be re-scanned (secondary body scan) to verify all contraband was removed.

   3. Staff operating the body scanner will save the image in the "positive tab folder" with a descriptive label for future reference and/or comparison.

B. If the anomaly is still present on a secondary body scan, and the arrestee is approved for acceptance into the facility, the arrestee shall be assessed for placement on contraband watch per DSB P&P section J.8. If deemed necessary, a search warrant will be obtained for the retrieval of the contraband.

Furthermore, there was no indication of possible contraband identified on Moreno's scan, as such he was never put on contraband watch. SDSD records indicated Deputy 3 completed Soter RS Operator Training on 05-06-20. According to the training, an anomaly is any abnormality, inconsistency, or a non-human shape. The training suggests any differences that are not consistent on both sides of the body would also be an anomaly. Moreno's scan was not symmetrical, and included non-human shapes (i.e. triangles and ovals). According to Soter RS Operator Training, these parts of the image should have been analyzed further using the different image analysis tools. Additionally, based on the results of the further analysis, Moreno should have been rescanned to see if the anomaly was still present after 30 minutes to determine if the anomaly was body waste or gas. The evidence suggested the image analysis tools were not fully used. SDSD confirmed there was only one image scan, and it was not flagged as a positive scan. Furthermore, a Soter RS Body Scanner Subject Matter Expert confirmed the image had enough anomalies to justify any operator to be alarmed. On 11-15-21, CLERB requested an interview with Deputy 3 which was declined on 11-26-21 pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The evidence supported that the alleged act did occur and was not justified.

**POLICY RECOMMENDATION**:

1. It is recommended that the San Diego Sheriff's Department (SDSD) identify who answers the "Arresting Officer Questions" on the Receiving Screening Questionnaire during the booking process.

---

**21-084**

1. Death Investigation/In-Custody Medical – Glenn William Davey died of natural causes while in the custody of the San Diego Sheriff's Department (SDSD) at the San Diego Central Jail (SDCJ).

   Recommended Finding: Action Justified
   Rationale: On 08-27-21, Glenn William Davey was arrested by El Cajon Police Department (ECPD) officers on an active felony warrant, Penal Code PC§ 3056 Parole Violation and booked into custody at SDCJ. During the booking process, Davey denied any medical issues. Davey was cleared by medical to continue through the booking process. Davey was housed, with two other inmates, in a quarantine module, for a seven-day mandatory quarantine, per COVID-19 Detention Facility guidelines. On 08-30-21, at approximately 5:32pm, 10-15 minutes after Davey's cellmates reported seeing Davey alive, deputies entered the module to conduct a safety check "soft count" when Davey was discovered unresponsive in his assigned cell. SDSD DSB P&P Section I.43 titled, Inmate Count Procedure, states in part, "Soft Count, a count of the number of inmates in a facility or housing unit which verifies each inmate's well-being through verbal or physical acknowledgment from the inmate." Deputies began life-saving measures, activated 911 and requested jail medical staff. Jail medical staff and fire/paramedic responded and continued advanced life-saving measures. Davey was unable to be revived and his death was pronounced, via radio, by a UCSD Medical Center doctor at 6:01pm. Deputies involved in the incident and interviewed by homicide detectives, reported there were no issues and/or concerns with Davey and he never expressed need for medical assistance. Additionally, Davey's two cellmates were interviewed and reported Davey never asked for medical assistance and did not attempt to access the intercom. On 09-01-21, the San Diego County Medical Examiner's Office (SDCMEO) conducted an autopsy on Davey. Davey's toxicological test results detected no alcohol or common drugs of abuse and based on the autopsy findings and the circumstances surrounding the death, Davey's cause of death was listed as Hypertensive and Atherosclerotic Cardiovascular Disease, with obesity listed as contributing, and the manner of death was natural. Safety checks prior to Davey being found unresponsive were conducted per policy, and confirmed through video surveillance in conjunction with the Jail Inmate Management System (JIMS) Area Activity Log. The evidence supported that Davey was properly classified upon his entry into the SDSD jail system after his 08-27-21 arrest. There was no evidence that Davey expressed any concerns about his mental or physical well-being to his cellmates or any member of the SDSD, sworn or professional. According to all available evidence, Davey was classified and housed in accordance with policy. Deputies took immediate and appropriate action, in compliance with policy, when they discovered Davey unresponsive and responded to Davey's medical emergency without hesitation. Additionally, all required safety and security checks were completed as evidenced by SDSD documentation and jail surveillance video. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

2. Misconduct/Medical (I/O) – Jail medical staff failed to identify and address Davey's medical and/or mental health needs.

   Recommended Finding: Summary Dismissal
   Rationale: Potential misconduct discovered through the course of investigation involving the actions or inactions of medical personnel did not appear to contribute to Davey's death, however, this matter is referred to SDSD for follow-up. Medical staff are non-sworn personnel and therefore, CLERB lacks jurisdiction to investigate this allegation. CLERB Rules & Regulations: 4.1 titled, Complaints: Authority, CLERB shall have authority to receive, review, investigate, and report on Complaints filed against peace officers or custodial officers employed by the County in the Sheriff's Department or the Probation Department. The Review Board lacks jurisdiction as the allegation did not involve any sworn personnel employed by the County Sheriff's Department or the Probation Department.

**21-089**

1. Misconduct/Discourtesy – Deputy 3 "demanded" identifying information from the complainant on/around 08-19-21.

   Recommended Finding: Unfounded
   Rationale: The complainant stated, "before leaving he demanded that I give him my CDL" and "my new address". The California Police Officers Legal Sourcebook, Report Writing and Investigative Evidence section states, "always get the name, address and means of contacting all witnesses you interview". Obtaining the name and address of the reporting party/witness is common practice for deputies when taking a crime report.  As per SDSD P&P Section 2.22 entitled Courtesy, "Employees shall be courteous to the public and fellow employees. They shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation."  Deputy 3 provided information, via questionnaire and a subsequent interview, during CLERB's investigation that were considered in arriving at the recommended finding. The evidence showed that the alleged act or conduct did not occur.

2. Misconduct/ Procedure – Deputy 3 "ran" the complainant using SDSD Databases.

   Recommended Finding: Action Justified
   Rationale: The complainant stated, "SDSD ran me as the RP of the thrift store incident". SDSD indicated a query was conducted on the complainant using California Law Enforcement Telecommunications System (CLETS) on 08-11-21. As per SDSD P&P 7.6 use of CLETS-NCIC-ARJIS and Local information, "Only authorized Sheriff's Department personnel shall access Law Enforcement computer information. Information derived from this source shall only be used within the course of official duties as designated by the Sheriff's Department." As the reporting party of a crime, the complainant was run in conjunction with official duties designated by the SDSD and an ongoing criminal investigation. Deputy 3 provided information, via questionnaire and a subsequent interview, during CLERB's investigation that were considered in arriving at the recommended finding. The evidence showed the alleged act or conduct did occur but was lawful, justified, and proper.

3. Misconduct/Procedure – Deputy 3 exposed the complainant's "new" address.

   Recommended Finding: Unfounded
   Rationale: The complainant stated he was "ran" through the system and it "exposed his new address and whereabouts to the dirtbag detectives that are intent on ruining him and ultimately erasing him".  SDSD records showed a CLETS query was conducted on 08-11-21 as the reporting party of a break and enter. According to SDSD P&P 6.24 Law Enforcement Data base and Criminal Record Dissemination, "The Sheriff's Records & ID Division shall disseminate criminal offender record information to any authorized person/agency upon the verification of a "right to know" and a "need to know."" Additionally, SDSD P&P 2.37 entitled Dissemination of Information, states, "Employees shall treat the official business of this Department as confidential. Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established Departmental procedures. Employees may remove or copy official records or reports from any law enforcement installation only in accordance with established Departmental procedures. Employees shall not divulge the identity of persons giving confidential information, except to their supervisors." The evidence showed the complainant's new address was not exposed due to the CLETS query. Furthermore, Deputy 3 provided information, via questionnaire and a subsequent interview, during CLERB's investigation that were considered in arriving at the recommended finding. The evidence showed that the alleged act or conduct did not occur.

4. Misconduct/Procedure – Deputy 3 failed to activate his Body Worn Camera (BWC).

   Recommended Finding: Sustained

Rationale: Through the course of CLERB's investigation, it was discovered Deputy 3 did not activate his BWC while taking a statement from Chris Rau in regard to an investigation of a PC-459 Burglary. As per SDSD P&P 6.131 Body Worn Camera, "It is the intent of the Sheriff's Department to record all law enforcement related contacts, and other contacts deemed appropriate". Furthermore, SDSD P&P 6.131 defines law enforcement related contacts to include but are not limited to the following: traffic stops, field interviews, vehicle tows, issuing of citations, issuing of parking tickets, detentions, arrests, persons present at radio calls who are accused of crimes, serving court orders or civil papers, investigative interviews, deputy initiated consensual encounters and private person-initiated contacts of a confrontational nature. Furthermore, 6.131 states, "Deputies/CSO shall record all victim, witness, and suspect interviews on their BWC's and use the recordings to assist them with report writing." Deputy 3 provided information during the course of CLERB's investigation, via written questionnaire and a subsequent interview, that was considered in arriving at the recommended finding. The evidence supports the allegation, and the act or conduct was not justified.

5. Misconduct/Procedure – Deputy 2 failed to take a vandalism report on/around 08-23-21.

Recommended Finding: Action Justified
Rationale: The complainant stated, "he briefly surveyed the damage to my car and was quick to determine the damage was caused by rock chips usually caused by cars that frequent the freeway. I explained to him that I had just washed my car the day prior, and there was no damage to the car, and that the car does not drive on the freeway much and if any at all." As per SDSD P&P Section 6.71 entitled "Crime Case Reports," states a Crime/Incident Report shall be completed for the following Uniform Crime Reporting: Part 2 Crimes: All other reported misdemeanor crimes. Based on the CAD notes and BWC footage, there was no clear damage and/or "vandalism" on the vehicle that substantiated for a report to be written. Additionally, statements were provided by two independent witnesses who expressed the damage was done by rock chips. The evidence showed the alleged act did occur, but was lawful, justified, and proper.

6. Misconduct/Procedure- Deputy 2 activated his Body Worn Camera (BWC).

Recommended Finding: Action Justified
Rationale: The complainant stated, "upon arriving he activated his body worn camara to record the reporting of vandalism." As per SDSD P&P 6.131 Body Worn Cameras, "When responding to a call for service, a deputy/CSO shall activate their BWC in record mode prior to arriving on scene or upon arrival and prior to exiting their patrol vehicle." The activation of Deputy 2's BWC was within policy and warranted under "law enforcement related contacts". The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

7. Misconduct/Discourtesy – Deputy 2 "insulted the complainant's integrity".

Recommended Finding: Unfounded
Rationale. The complainant stated, "With that, he insulted my integrity again, briefly looking over the damage and saying that the damaged look to be from rocks falling on my car and therefore he would not be writing a report about the vandalism at all." SDSD P&P Section 2.22 entitled Courtesy, states "Employees shall be courteous to the public and fellow employees. They shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation." BWC video footage showed Deputy 2 spoke to Rau respectfully and courteously throughout the entire interaction. The evidence showed that the alleged act or conduct did not occur.

8. Misconduct/Truthfulness – Deputy 1 denied the complainant's information was run through SDSD databases.

Recommended Finding: Action Justified
Rationale: The complainant stated, "clearly the SDCSO ran me as the RP of the thrift store incident (which Deputy 1 vehemently denies and refuses to investigate my claims UNTIL there is a report made about my car". As per SDSD P&P section 2.46 entitled, Truthfulness, "When asked by the Sheriff, the Sheriff's designee or any supervisor, employees will always answer questions, whether orally or in writing, truthfully and to the fullest extent of their knowledge." Deputy 1 provided confidential information during CLERB's investigation

that was considered in arriving at the recommended finding. The evidence showed that the alleged act did occur but was lawful, justified and proper.

9. Misconduct/Procedure - Deputy 1 refused to investigate the complainant's claim(s).

Recommended Finding: Action Justified
Rationale: The complainant stated, ""clearly the SDCSO ran me as the RP of the thrift store incident (which Deputy 1 vehemently denies and refuses to investigate my claims UNTIL there is a report made about my car". SDSD P&P Section 6.71 entitled "Crime Case Reports," states a Crime/Incident Report shall be completed for the following Uniform Crime Reporting: Part 2 Crimes: All other reported misdemeanor crimes. The initial evaluation by Deputy 2 via CAD notes stated "damage caused by driving. Very small dings in various locations" which did not warrant a report. Statements were provided by various witnesses throughout the course of the investigation and all witnesses indicated the damage was from "rock chips" and not vandalism. The evidence showed the act did occur, but was justified, lawful, and proper.

10. Criminal Conduct – Members of the Ventura County Sheriff's Department and/or District Attorney's Office committed criminal acts.

Recommended Finding: Summary Dismissal
Rationale: The complainant made various allegations about members of the Ventura County Sheriff's Department and the Ventura County District Attorney's Office. Per CLERB rules and regulations 4.1 Complaints: Authority. Pursuant to the Ordinance, CLERB shall have authority to receive, review, investigate, and report on Complaints filed against peace officers or custodial officers employed by the County of San Diego in the Sheriff's Department. CLERB has no jurisdiction over Ventura County Sheriff's Department and/or the Ventura County District Attorney's Office and, as such, was unable to investigate these claims. The Review Board lacks jurisdiction.

## 21-128

1. Misconduct/Procedure – "P. Liuchan" told the complainant he must leave the park.

Recommended Finding: Summary Dismissal
Rationale: The complainant stated that while he was at West Side Park in Escondido, a "deputy" approached him, told him to leave the premises and asked him to sit on the curb until the Escondido Police Department arrived on scene. San Diego Sheriff's Department (SDSD) did not have any record of the alleged incident, nor was there a deputy by the name "P. Liuchan" employed by SDSD. CLERB attempted to refer this complaint to the proper agency, but Escondido Police Department Internal Affairs was also unable to verify any association with the reported incident. CLERB was unable to identify the law enforcement agency involved in the alleged incident. Pursuant to CLERB Rules and Regulations, Section 4.1 Complaints: Authority, CLERB has authority to investigate complaints filed against peace/custodial officers employed by the San Diego Sheriff's Department, therefore CLERB lacks jurisdiction and is unable to continue the investigation.

2. False Arrest - Escondido Police Department arrested the complainant.

Recommended Finding: Summary Dismissal
Rationale: The complainant stated that the Escondido Police Department arrived at the park, arrested him and took him to the Escondido Jail. CLERB attempted to refer this complaint to the proper agency, but Escondido Police Department was unable to verify any association with the reported incident. CLERB was unable to identify the law enforcement agency involved in the alleged incident. Pursuant to CLERB Rules and Regulations, Section 4.1 Complaints: Authority, CLERB has authority to investigate complaints filed against peace/custodial officers employed by the San Diego Sheriff's Department, therefore CLERB lacks jurisdiction and is unable to continue the investigation.

**22-003**

1. Criminal Conduct - Deputy 1 posted (confidential) SDSD information to social media account(s).

   Recommended Finding: Summary Dismissal.
   Rationale: The complainant stated, "On 11-16-21, Deputy 1 posted to his personal Snapchat account security footage of him assaulting incarcerated individuals with captions that glorified the violence displayed in the videos. This was the second time he posted something of this nature. The first time was in April 2021. I have attached the November video to this letter for reference." The complainant also stated, "Both videos are no doubt violations of jail policy, as well as violations of state laws and regulations. Incarcerated individuals are entitled to privacy, and security footage may not generally be posted to social media for the general public." At the time of the complaint, Deputy 1 was an active employee of the San Diego Sheriff's Department. However, on 02-25-22, CLERB was notified, via email correspondence by the Division of Inspection Services that Deputy 1 resigned on 02-28-22. Pursuant to CLERB Rules and Regulations, Section 4.1 Complaints: Authority, stipulates that CLERB only has authority to investigate complaints filed against peace/custodial officers employed by the San Diego Sheriff's Department, therefore the Review Board lacks jurisdiction and is unable to continue the investigation. As per CLERB's Rules and Regulations Section 5.8 Termination, Resignation or Retirement of Subject Officer, "CLERB shall have the discretion to continue or terminate an investigation, if, after a Complaint is filed and before CLERB completes its investigation, the Subject Officer terminates employment with the Sheriff's Department or the Probation Department. The Sheriff or the Chief Probation Officer or the Subject Officer shall notify CLERB when the Subject Officer's employment is terminated." The Review Board lacks jurisdiction.

2. Misconduct/Procedure – Deputy 1 posted captions that "glorified" violence.

   Recommended Finding: Summary Dismissal.
   Rationale: The complainant stated, "On November 16, 2021, Deputy 1 posted to his personal Snapchat account security footage of him assaulting incarcerated individuals with captions that glorified the violence displayed in the videos." **See Rationale 1.**

3. Excessive Force - Deputy 1 displayed aggressive behavior toward inmates.

   Recommended Finding: Summary Dismissal.
   Rationale: The complainant stated, "Deputy 1's postings are aggressive displays of violence that should not be tolerated by any peace officer. They reflect troublingly aggressive behavior and a tendency to use excessive force toward incarcerated individuals." **See Rationale 1.**

4. Misconduct/Procedure - Deputy 1 used "poor judgement and disrespected humanity".

   Recommended Finding: Summary Dismissal.
   Rationale: The complainant stated, "At the very least, these videos reflect an officer's poor judgment and disrespect for humanity." **See Rationale 1.**

5. Misconduct/Procedure - Unidentified deputies consented/approved of Deputy 1's actions and/or failed to prevent his misconduct.

   Recommended Finding: Summary Dismissal.
   Rationale: The complainant stated, the video postings "raises serious questions about whether Deputy 1's superiors consented or approved of his actions, and why they failed to prevent his misconduct." **See Rationale 1.**

6. Misconduct/Procedure – Deputy 1 posted confidential personnel information to his snapchat account on 01-26-22.

   Recommended Finding: Summary Dismissal.

Ex. N - 634

Rationale: On 02-02-22, the complainant submitted supplemental information and additional allegations to CLERB. The complainant submitted "(1) a text message thread between Deputy 1 and a co-worker discussing this personnel complaint; and (2) email correspondence between Deputy 1 and a Sergeant regarding this personnel complaint. Both of these communications were posted by Deputy 1 to his personal Snapchat account on January 26, 2022." **See Rationale 1.**

7. Misconduct/Procedure – Deputy 1 demonstrated lack of judgement and professionalism.

   Recommended Finding: Summary Dismissal.
   Rationale: On 02-02-22, the complainant submitted supplemental information and additional allegations to CLERB. The complainant submitted "(1) a text message thread between Deputy 1 and a co-worker discussing this personnel complaint; and (2) email correspondence between Deputy 1 and a Sergeant regarding this personnel complaint. Both of these communications were posted by Deputy 1 to his personal Snapchat account on January 26, 2022." The complainant stated, "These posts demonstrate a startling lack of sound judgment and professionalism." **See Rationale 1.**

8. Misconduct/Procedure - Deputy 2 (commented on) "discussed a personnel matter."

   Recommended Finding: Summary Dismissal.
   Rationale: On 02-02-22 the complainant submitted supplemental information and additional allegations to CLERB. The complainant submitted "(1) a text message thread between Deputy 1 and a co-worker discussing this personnel complaint; and (2) email correspondence between Deputy 1 and a Sergeant regarding this personnel complaint. Both of these communications were posted by Deputy 1 to his personal Snapchat account on 01-26-22." The complainant stated, "Importantly, they may also implicate others in the San Diego County Sheriff's Department, as well as a systemic failure to train, discipline, and supervise correctional officers. We ask that you fully investigate this new information, including the Department leadership and anyone associated with these problematic postings." At the time of the complaint, Deputy 2 was an active employee of the San Diego Sheriff's Department. However, on 02-25-22, CLERB was notified, via email correspondence by the Division of Inspection Services that Deputy 2 retired 02-24-22. Pursuant to CLERB Rules and Regulations, Section 4.1 Complaints: Authority, stipulates that CLERB only has authority to investigate complaints filed against peace/custodial officers employed by the San Diego Sheriff's Department, therefore the Review Board lacks jurisdiction and is unable to continue the investigation. As per CLERB's Rules and Regulations Section 5.8 Termination, Resignation or Retirement of Subject Officer, "CLERB shall have the discretion to continue or terminate an investigation, if, after a Complaint is filed and before CLERB completes its investigation, the Subject Officer terminates employment with the Sheriff's Department or the Probation Department. The Sheriff or the Chief Probation Officer or the Subject Officer shall notify CLERB when the Subject Officer's employment is terminated." The Review Board lacks jurisdiction.

---

*End of Report*

Ex. N - 635

# EXHIBIT O

**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III



# County of San Diego
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776      FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its January 11, 2022, meeting held via the Zoom Platform. Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its nextmeeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

**CLOSED SESSION**

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
**Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was <u>insufficient evidence</u> to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASES FOR SUMMARY HEARING (6)

**ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE**

**20-104**

1. Death Investigation/In-Custody Medical – Inmate Anthony Chon collapsed in a Recreation Yard at the San Diego Central Jail on 10-16-20.

   <u>Board Finding</u>: Not Sustained
   <u>Rationale</u>: On 02-27-20, Chon was arrested by the San Diego Police Department and charged with Arson, Possession of a Non-Narcotic substance, and Under the Influence of a Controlled Substance. Chon disclosed he had previously received treatment and was hospitalized for psychiatric disorders. SDSD subsequently classified and housed Chon in a specialized Jail Based Competency Treatment (JBCT) unit. On 10-16-20, during a welfare check at approximately 6:48am, Chon made a complaint of "shortness of breath." Inmates in this module routinely suffer from anxiety from confinement and Chon was escorted to a Recreation (Rec) Yard for some fresh air because he reportedly "did not appear to be in distress and did not request medical attention." After Rec Yard placement, Chon stumbled then fell face down to the ground at about 6:52am. Responding deputies assessed Chon who reportedly was breathing and had a pulse. Deputies remained with Chon and called for medical response. SDSD Medical Staff assessed Chon and then initiated life-saving

measures when they discovered Chon without breath and pulse. The Fire Department assumed care until paramedics arrived and transported Chon to UCSD where resuscitation efforts were ceased and Chon was declared deceased at 7:54am. An autopsy was performed and determined the cause of death was a pulmonary embolism due to deep venous thrombosis of the left leg and an enlarged heart and liver were contributing factors to this natural death. Toxicology testing detected the presence of olanzapine (an antipsychotic drug used to treat schizophrenia) and a nasopharyngeal swab was negative for COVID-19. There was insufficient evidence to determine any different outcome had Chon been provided medical care upon his complaint of "shortness of breath (difficulty breathing)."

2.  Misconduct/Procedure – Deputy 3 failed to recognize and/or respond to a medical emergency.

    Board Finding: Sustained
    Rationale: According to SDSD records, during a Safety Check and Soft Count, Inmate Chon reportedly complained of "shortness of breath." Deputy 1 responded that he would contact Medical, but instead notified Deputy 3. Deputy 3 acknowledged that he was informed Chon was "having trouble breathing" and reported that inmates housed in this specific module suffer from anxiety and it is "common" (practice) for inmates to be placed in the Rec Yard for fresh air. Deputy 3 said Chon did not appear to be in any distress nor did he request medical attention. Chon was taken to the Rec Yard where he collapsed and died from a pulmonary embolism of which shortness of breath is a warning sign. Detentions Policy M.5 mandates that all facility staff shall be responsible for taking appropriate action in recognizing, reporting or responding to an inmate's emergency medical needs, and that emergency medical care shall be provided with efficiency and speed, and if an inmate's condition is believed to be life-threatening, sworn staff shall immediately notify on-duty health staff. Notably, Chon received medical treatment on each of the three days prior to his death. Deputy 3 provided information during CLERB's investigation that was considered in arriving at the recommended finding, however the information is confidential per the Peace Officer Bill of Rights. Deputy 3 then exercised his option to decline participation in an interview for clarifying information pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. Based upon all known information, the evidence supported the allegation and the act or conduct was not justified.

3.  Misconduct/Procedure – Deputies 2 and 3 failed to provide emergency medical care to Inmate Anthony Chon

    Board Finding: Unfounded
    Rationale: Per video evidence, Inmate Chon collapsed at approximately 6:52:50. Deputies 2 and 3 entered the Recreation Yard to assess Chon at approximately 6:54:27. Chon was rolled onto his back at approximately 6:56:44, and was then placed into a "recovery" position at approximately 6:57:22. SDSD Medical Staff arrived at approximately 7:00:12 and initiated CPR at about 7:02:08; approximately 10 minutes after Chon first collapsed. Deputies reported Chon was breathing and had a pulse and they monitored him with while awaiting medical response. The Detentions policy in place at the time of this incident, M.6 Life Threatening Emergencies: Code Blue, mandated that sworn staff assess the victim's condition, call for help without leaving the victim, administer naloxone if opioid overdose was suspected, start CPR as needed, and provide the watch commander with a brief description of the incident. Video evidence confirmed deputies remained with the inmate, applied sternal rubs, rolled Chon onto his back, followed by placement into the recovery position until medical staff's arrival. Upon arrival of a nurse practitioner (NP), she recognized Chon from previous care and called out his name, but he did not respond. The NP asked what happened and deputies reported Chon complained of "'shortness of breath' so they placed him on the Recreation Yard for fresh air." When the NP assessed Chon's condition, she saw he was not breathing and was absent a pulse so she initiated CPR. Deputies provided information during CLERB's investigation that was also considered in arriving at the recommended finding. Deputies exercised their option to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The evidence showed that deputies were in compliance with policy and the alleged act or conduct did not occur.

---

**20-107**

1.  Death Investigation/Drug Related - Omar Hasenin was found unresponsive in his cell at the George Bailey Detention Facility on 11-03-20.

Ex. O - 638

Board Finding: Not Sustained
Rationale: On 09-04-20, Omar Hasenin was arrested by the San Diego Police Department for burglary, receiving stolen property, violation of parole and booked into the San Diego Central Jail. During the booking process, Hasenin denied any psychiatric, medical or substance abuse issues although additional medical records showed a long history of psychiatric and substance abuse issues. On 09-12-20, Hasenin was transferred to George Bailey Detention Facility (GBDF) where he was seen by jail medical and received services. Hasenin was housed in House 3, Module C (top tier) and did not have a cellmate. On 11-03-20 at approximately 03:05 pm while the bottom tier inmates had dayroom access, jail surveillance video showed several inmates crowded around Hasenin's cell. A few minutes later, an inmate ran down the stairs, where he notified the Control Deputy via intercom notification that there was a man down in cell #235. The Control Deputy initiated a radio call to floor deputies and requested medical staff to respond. About two minutes later, deputies responded and stated that they found Hasenin sitting on a desk in a slouched position, with his hands rested to his side and his eyes closed. Deputies said his skin coloration seemed normal and he was warm to touch but he was unresponsive and had no pulse. Deputies reported that they began chest compressions, which was verified by both sworn and non-sworn personnel. Several deputies and medical staff responded and performed life-saving measures to include CPR, AED, Narcan, Oxygen, etc., until paramedics arrived and took over resuscitative efforts. Hasenin showed no signs of life, and he was pronounced deceased at 03:48 pm. An autopsy confirmed the accidental cause of death was toxic effects of fentanyl with a contributing factor of atherosclerotic cardiovascular disease. Toxicology tests showed presumptive positive for fentanyl. Deputies took immediate and appropriate action as they recognized and responded to Hasenin's emergency medical needs in accordance with policy. All security checks were completed in compliance with policy as evidenced by SDSD documentation and jail surveillance video. Detectives searched Hasenin's cell and interviewed the other inmates in the module but did not find anything of evidentiary value. A few inmates stated there was "talk of fentanyl" in the module but they did not disclose any further information. (Due to jail politics, it is common for inmates not to disclose any information about illegal activity.) According to SDSD documentation, on 11-02-20, the day before the incident, there were three cell inspections supervised by command staff in House 3. According to the SDSD News Release, "Stopping Drug Smuggling in County Jails", dated 04-19-21, the SDSD is active in their attempts to intercept drugs into the facilities. Some efforts being made are the use of body scanners at all intake facilities and GBDF, inmate screening and flagging of potential smugglers. Also, the mail processing center has special equipment for drug detection, drug detection K-9's, and a "no questions asked" drug drop box. SDSD also provides drug education and awareness in the facilities. Additionally, in accordance with DSB P&P I.41, Inmate Cell Searches, cell searches are performed in an effort to provide a safe and secure environment free of contraband. Although SDSD has implemented numerous measures to deter drugs from entering its detention facilities, there is no doubt that Hasenin, while as an inmate in the custody and under the care of the SDSD, either acquired or possessed and subsequently self-administered fentanyl, which resulted in his death. Despite all interdiction efforts, fentanyl, in part, contributed to Hasenin's death, and, therefore, this death was preventable. As the investigation failed to determine how the fentanyl contributing to Hasenin's death entered the detention facility, there was insufficient evidence to either prove or disprove misconduct on the part of SDSD sworn personnel.

---

**21-019**

1. Use of Force Resulting in Great Bodily Injury – Deputies 1-6 used force to effect the arrest of Steven McCoy.

Board Finding: Action Justified
Rationale: According to SDSD Records and a witness statement, on 01-11-21, around 8:30 am, Steven McCoy urinated in a flowerbed outside a business, and then confronted the reporting party with a pocket knife. Deputies responded and observed the suspect walking westbound on the street while looking over his shoulder; McCoy then dropped a methamphetamine pipe in the bushes. When contacted at gunpoint, McCoy lifted his shirt to reveal two beer cans tucked into his front waistband that he had stolen from the market. McCoy was ordered to the ground several times but did not comply. When Deputy 4 grabbed McCoy for handcuffing, Deputy 5 holstered his weapon and McCoy then displayed active resistance and assaultive behavior that prevented handcuffing. Deputies utilized hands on control, knee strikes, and baton strikes to

overcome McCoy's resistance; McCoy suffered a hairline fracture of his scapula. A suspect has "no right to resist" a lawful detention. In accordance with SDSD policies, and as documented in their reports and as observed on Body Worn Camera (BWC), deputies utilized an amount of force that was reasonable and necessary to subdue and control McCoy's non-compliant behavior. The force utilized was in accordance with law and established Departmental procedures which deputies expressed as necessary and reasonable to effect the arrest and overcome resistance when McCoy refused to comply with their lawful commands. The evidence showed the conduct that occurred was lawful, justified and proper.

---

## 21-020

1. Use of Force Resulting in Great Bodily Injury – Deputies 1 and 2 utilized force to gain compliance from Inmate William Bounds.

Board Finding: Action Justified
Rationale: According to SDSD documents, Inmate William Bounds was incarcerated at the San Diego Central Jail (SDCJ) on 01-15-21. After his dayroom time had ended and at approximately 7:30am, Bounds refused to lockdown stating he did not feel safe inside his cell. Inmate Rules and Regulations, DSB O.3, requires inmates to obey staff instructions, and prohibits them from engaging in boisterous activity, and threatening or assaulting staff. Deputies 1 and 2 documented their actions in accordance with applicable use of force policies and stated Bounds stood up, faced them with clenched fists, took a fighting stance and resisted Deputy 1's efforts to control him. Deputy 1 took Bounds to the ground and attempted to move Bounds onto his chest for handcuffing, but Bounds refused to comply with verbal commands, thrashed his body about, and attempted to get up off the floor. Deputies delivered closed fist strikes to Bounds' chest and back to prevent him from standing, and applied downward pressure to Bounds' head and legs until additional deputies arrived and assisted with handcuffing the inmate. A jail surveillance video recording of the incident was reviewed and corroborated the information documented in deputies written reports, and confirmed the force utilized by Deputies 1 and 2 to subdue Bounds was necessary and reasonable to overcome his resistance. Medical records confirmed Bounds was subsequently treated for a comminuted displaced right lateral clavicular fracture. The evidence showed that the actions that occurred were lawful, justified and proper.

---

## 21-026

1. Use of Force Resulting in Great Bodily Injury – Deputy 1 used force to subdue and handcuff Christopher Brown.

Board Finding: Action Justified
Rationale: On the night of 02-27-21, Deputy 1 responded to a radio call in Spring Valley and consensually contacted Christopher Brown. Brown matched the description from the radio call; however, Brown declined to speak with Deputy 1 and the call was closed. Minutes later, Deputy 1 recontacted Brown in reference to illegally crossing the roadway. During the second contact, a methamphetamine pipe was observed on Brown's person in plain sight. Brown was arrested for possession of paraphernalia and was transported to the Rancho San Diego Station for processing. While at the Rancho San Diego Station, Brown "tensed" up while being searched and turned toward deputies during a search of his person. Brown refused to comply with the deputies' commands and resisted their efforts. In review of Deputy 1's BWC recording, Brown and Deputy 1 were in close proximity of each other and were face to face with one another. In Deputy 1's report, he stated that he and Brown were close enough that Brown could have easily kicked him or hit him with his head. Deputy 1 immediately used both of his hands to push Brown away from him to create distance, while he maintained positive control of him. In another deputy BWC recording, Deputy 1 was viewed to use both hands to push Brown away in the chest area. Brown's body was pushed back, with his back hitting the cell door. Brown recovered and advanced forward and towards Deputy 1. Deputy 1 pushed Brown a second time. Deputy 1 explained that he tried to pin Brown against the cell door. When that was unsuccessful, he immediately used both hands to pull Brown's body to the ground. Brown landed on the ground on his left side, in a semi-prone position. Deputy 1 repositioned himself and used his body weight to weigh Brown down; preventing him from standing up. Force was used to subdue and handcuff Brown. In accordance with SDSD

Ex. O - 640

Policy and Procedures Section 2.49 titled, "Use of Force," Deputy 1 did not use more force than was reasonably necessary under the circumstances. Deputy 1 used force in accordance with law and established Departmental procedures and reported their use of force in writing. In accordance with SDSD Policy and Procedures Section 6.48 titled, "Physical Force,'" Deputy 1, while in the performance of official law enforcement duties, was authorized and when deemed it necessary to utilize physical force, as that force was believed to be necessary and objectively reasonable to effect the arrest, prevent escape, and overcome resistance when Brown resisted. Deputy 1 utilized appropriate control techniques and tactics which employed maximum effectiveness with minimum force to effectively terminate, or afford the deputy control of, the confrontation incident. According to SDSD Policy and Procedures Addendum F titled, "Use of Force," it shall be the policy of this Department whenever any Deputy Sheriff, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force, the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies shall not lose their right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or overcome resistance. Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident. The use of force and subsequent reporting must be in accordance with the procedures set forth in these guidelines. The investigation revealed that the force used by Deputy 1 was necessary, reasonable, lawful, justified, and proper. After the use of force, Brown was transported to the hospital where he was found to have sustained a nose fracture. It was noted in both Deputy 1's written report, as well as deputies BWC recordings that Brown had sustained a previous facial injury prior to his contact with deputies and the subsequent use of force. In the Body Worn Camera recordings, Brown had obvious dried blood to his nose, mouth, and face, with blood stains to his sweater. Deputy 1 did not report that he struck Brown in the face. In review of the deputies' BWC recordings, Deputy 1, nor any other was viewed to strike Brown in the face. It was unknown if the injury that Brown sustained was the result of the force used by deputies or from a previous incident.

---

## 21-050

1. Use of Force Resulting in Great Bodily Injury – Deputies 1-4 used force to subdue and handcuff Michael Ian Mallory.

Board Finding: Action Justified
Rationale: On the evening of 04-15-21, a resident of Unincorporated El Cajon called the San Diego Sheriff's Communication Center after witnessing Michael Ian Mallory climb into their yard, then climb over into a neighbor's yard. Deputies responded to the location and contacted Mallory. During their interview with Mallory, deputies noticed that Mallory exhibited signs/symptoms of being under the influence of a controlled substance. Mallory quickly became very agitated and uncooperative with deputies. When deputies attempted to detain Mallory, he resisted their detention and attempted to run into the roadway, pulling deputies with him. A use of force ensued. During the use of force and according to Deputy 3's report, in an attempt to stop Mallory from entering the roadway and to prevent Mallory from pulling himself and Deputy 2 with him, Deputy 3 hit both sides of Mallory's face with a closed fist about eight times. The strikes had no effect on Mallory; Mallory continued to fight. When Deputy 3 tried to bring Mallory's right arm behind his back, Mallory was able to pull away. According to Deputy 3's report, Mallory reached under his body with his right hand. Because Deputy 3's punches to Mallory's face had no effect, and due to the possibility that Mallory was reaching for a weapon, coupled with them being close to the roadway, Deputy 3 hit the right side of Mallory's ribcage with his left knee. Deputy 3 hit Mallory approximately three times, but Mallory continued pushing off the ground, lifting Deputy 3 with him. Deputy 3 hit Mallory with his knee one additional time. At this point, Mallory stopped trying to get up. Mallory was subdued with the use of the WRAP device. After the incident, paramedics were summoned, and Mallory was transported to the hospital to be assessed. Mallory was found to have sustained three fractured ribs, a collapsed lung, a lacerated liver, and swelling to his right cheek bone. Mallory was arrested for being under the influence while in public, prowling, and resisting arrest with minor injury to the involved deputies. In accordance with SDSD Policy and Procedures Section 2.49 titled, "Use of Force," Deputies 1, 2, 3, and 4 did not use more force than was reasonably necessary under the circumstances. The deputies used force in accordance with law and established Departmental procedures and reported their use of force in writing. In accordance with SDSD Policy and Procedures Section 6.48 titled, "Physical Force,'"

Deputies 1, 2, 3, and 4, while in the performance of their official law enforcement duties, were authorized and deemed it necessary to utilize physical force, as that force was believed to be necessary and objectively reasonable to effect the arrest, prevent escape, and overcome resistance when Mallory resisted. Deputies 1, 2, 3, and 4 utilized appropriate control techniques and tactics which employed maximum effectiveness to afford the deputies control of the confrontation incident. According to SDSD Policy and Procedures Addendum F titled, "Use of Force," it shall be the policy of this Department whenever any Deputy Sheriff, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force, the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies shall not lose their right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or overcome resistance. Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident. The use of force and subsequent reporting must be in accordance with the procedures set forth in these guidelines. The investigation revealed that the force used by Deputies 1, 2, 3, and 4 was necessary, reasonable, lawful, justified, and proper. After the use of force, Mallory was transported to the hospital where he was found to have sustained injuries. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

*End of Report*

## NOTICE

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California orthe United States.

Ex. O - 642

# EXHIBIT P

**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III



# County of San Diego
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA  92101-2938
TELEPHONE: (619) 238-6776      FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its December 7, 2021, meeting held via the Zoom Platform.  Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

**CLOSED SESSION**

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
   **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASES FOR SUMMARY HEARING (9)

**ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE**

**20-113**

1. Death Investigation/In-Custody Drug Related - Lazaro Javier Alvarez was found unresponsive in a holding cell at San Diego Central Jail (SDCJ) on 11-22-20. He was transported via ground ambulance to UCSD Medical Center where he was pronounced dead shortly after arrival.

   Board Finding: Not Sustained
   Rationale: The evidence supported that Lazaro Alvarez was properly classified as "book and release" (B&R) upon his entry into the SDSD jail system after a trespassing arrest by the San Diego Police Department. There was no evidence that Alvarez expressed any concerns about his mental or physical well-being to any member of the SDSD, sworn or professional. Safety checks were conducted in accordance with policy at 12:13AM, 1:08AM, 2:04AM, and 3:00AM. Since safety checks do not require proof of life, the last time Alvarez was known to be alive was 11-21-20 at 11:20PM after an interaction

*-continued on next page-*

with a release deputy. Upon discovering Alvarez was unresponsive in his cell, the deputies conducting a "welfare check" failed to provide emergency medical care until relieved by either SDCJ medical staff or medics as required by DSB Policy M.6 Life Threatening Emergencies: Code Blue. Deputy 1 indicated he attempted CPR for two quick compressions but stopped due to not wanting to disrupt a crime scene. As per POST training, CPR should be administered when there is any doubt on whether or not the victim is alive. Deputy 1 indicated that he did not administer naloxone since he did not have it on him at the time. Since the incident, section M.6 has been updated to require deputies to carry naloxone on their person. Additionally, it should be noted it does not appear there is any formal documentation in place to notify deputies when an inmate is under opioid withdrawal protocol. The cause of death was sudden cardiac arrest due to acute myocardial infarction and methamphetamine and fentanyl toxicity and the manner of death was accident. As such, the evidence was insufficient to either prove or disprove that the deputies' appropriate application of CPR could have prevented Alvarez's death.

2. Misconduct/Procedure –Deputy 1 failed to provide emergency medical care to Inmate Lazaro Alvarez.

Board Finding: Sustained
Rationale: Deputy 1 failed to provide emergency medical care to Alvarez. According to Commission on Peace Officer Standards and Training (POST), when the situation involves a medical emergency, peace officers assume the role of EMS first responder. POST training states if any doubt exists as to whether or not the victim is alive, then CPR should be started. As per M.6 Life Threatening Emergencies: Code Blue that was in place at the time, CPR should be initiated by sworn staff and continued until additional help has arrived, by way of switching to two-person CPR and/or relieved by MSD staff or paramedic emergency response team. Deputy 1 did not continue CPR until medical arrived, and only performed "two quick chest compressions".  SDSD DSB P&P Section M.5 entitled, "Medical Emergencies," in effect at the time states "when the severity of the medical emergency requires it, and as soon as it is safe to do so (unless death is obvious, such as decapitation, obvious rigor mortis, etc.), deputies acting as first responders will provide basic life support and first aid." Deputy 1 provided information during CLERB's investigation that was also considered in arriving at this recommended finding.  Deputy 1 exercised his option to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. Based on SDSD records, interviews and policy, a preponderance of evidence showed Deputy 1 failed to continue CPR on Inmate Alvarez and these actions were not justified. Policy mandated for Deputy 1 to initiate and continue life-saving measures until relieved, and his actions were not justified.

3. Misconduct/Procedure –Deputy 2 failed to provide emergency medical care to Inmate Lazaro Alvarez.

Board Finding: Sustained
Rationale: Deputy 2 failed to provide emergency medical care to Alvarez. According to Commission on Peace Officer Standards and Training (POST), when the situation involves a medical emergency, peace officers assume the role of EMS first responder. POST training states if any doubt exists as to whether or not the victim is alive, then CPR should be started. As per M.6 Life Threatening Emergencies: Code Blue that was in place at the time, CPR should be initiated by sworn staff and continued until additional help has arrived, by way of switching to two-person CPR and/or when relieved by MSD staff or paramedic emergency response team. Deputy 2 did not initiate CPR at all. SDSD DSB P&P Section M.5 entitled, "Medical Emergencies," in effect at the time states "when the severity of the medical emergency requires it, and as soon as it is safe to do so (unless death is obvious, such as decapitation, obvious rigor mortis, etc.), deputies acting as first responders will provide basic life support and first aid." Deputy 2 agreed with Deputy 1 that Alvarez was already deceased and did not initiate any life-saving measures. Deputy 2 provided information during CLERB's investigation that was also considered in arriving at this recommended finding.  Deputy 2 exercised his option to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. Based on SDSD records, interviews and policy, a preponderance of evidence showed Deputy 2 failed to initiate and/or continue CPR on Inmate Alvarez and these actions were not justified. Policy mandated for Deputy 2 to initiate or continue life-saving measures until relieved, and his actions were not justified.

**POLICY RECOMMENDATIONS**:

1. It is recommended that the San Diego Sheriff's Department (SDSD) revise its Detention Policies and Procedures Section I. 64, entitled, "Safety Checks: Inmates, Housing, and Holding Areas," to mandate proof of life verification through visual checks every 60 minutes during the booking process.

2. It is recommended that San Diego Central Jail (SDCJ) only utilize cells with operable cameras unless all cells with operable cameras are in use.

---

**20-116**

1. Misconduct/Procedure – Deputies 1 and 2 refused to take a report.

   Board Finding: ~~Action Justified~~ Not Sustained
   Rationale: In the complainant's written report, he stated, "*On December 4th and December 7th, 2020 I went to the local Rancho San Diego Sheriff Station to report threats of gun violence and great bodily injury, together with documented threats of stalking coordinated and to be performed by a group of people. I asked to initiate a police Report there as I physically reside in Spring Valley, CA. These threats are being made by postings on internet and specifically on publically* [publicly] *available social media platforms and targeted to the geographically close area audience. I stated to the Sheriff's office that I take these threats very seriously, especially when there are posting like "Those dogs oughta be shot," "The dogs needs to be put down…. I also wish we could put the owners down as well, if not first", and "I will join you in the stalking, Sara! It makes me want to find this guy and punch him in the throat." I stated that myself and my household lives in fear, and a loud pop sound from the street caused almost a panic at the house. We have to check out surrounding and live in danger of violent acts against us and our domestic pets. On December 4th, 2020 on around 2pm I spoke with a plain closed deputy behind the plexiglass at the Station (deputy 2) and a uniform deputy dispatched to speak with me as the Station asked me to use the lobby phone and to report my presence to a dispatch. Both deputies stated that they will not initiate a police Report as the threats have to be imminent only and that "people can post and say anything on internet," and "there are no laws of protection against threats of violence and stalking published on internet." I returned on December 7th on around 12pm to same Station with a print out of appropriate statutes in California law stating that threats of violence, gun violence, and other violations are offenses under multiple statutes. I requested to initiate a police Report. 2 uniformed officers were dispatched. I told him I assert I am a victim of threats of gun violence and have a credible fear for myself and my household. Both deputies stated that they will not initiate a police Report as the threats have to be imminent only and that "people can post and say anything on internet," and "there are no laws of protection against threats of violence and stalking published on internet." I presented the print out to point out the other statutes…. I told him I was a citizen who made a serious decision to come to report a crime, and a victim of a crime.*" Deputies 1 and 2 responded to Sheriff's Employee Response Forms (SERFs) with signed statements and provided information in response to CLERB questions. According to SDSD P&P Section 6.71 titled "Crime Case Reports," a Crime/Incident Report shall be completed for the following Uniform Crime Reporting: Part 2 Crimes: All other reported misdemeanor crimes. Deputy's Reports: An Officer's Report may be completed to report a miscellaneous incident or provide supplemental information when appropriate. Though there was no violation of the law or Sheriff's policy by not taking a written report, CLERB believed it would have been obliging and at the very least would have given the complainant peace of mind, if a miscellaneous incident report had been taken. According to SDSD Policy and Procedure (P&P) Section 2.23 titled "Request for Assistance," when any person requests assistance or advice, or makes complaints or reports, either by telephone or in person, all pertinent information will be obtained in an official and courteous manner, and will be properly and judiciously acted upon consistent with established Department procedures. ~~The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.~~ There was insufficient evidence to either prove or disprove the allegation.

2. Misconduct/Discourtesy - Deputy 1 was rude to the complainant.

Board Finding: Not Sustained

Rationale: The complainant reported that Deputy 1 was rude to him. In the complainant's written report, he stated, "*The supervising officer, deputy 1 was abrasive, aggressive, interrupted me midsentence, and in acted to escalate the conversation and situation when a deputy ought to deescalate. deputy 1 was talking about and he got very irritated, exhibiting behavior unbecoming of a sheriff deputy. I filed an online complaint with SDC Sheriff regarding deputy 1 unwarranted behavior and unbecoming a police officer. While Dep 1's partner remains courteous, calm and expressed compassion Deputy 1 was abrasive, aggressive, interrupted me midsentence, and in acted to escalate the conversation and situation when a depute ought to deescalate. I remained calm when Deputy 1's behavior was completely unwarranted. Based on what I observed I attest Deputy 1 is prone to quick anger, unreasonable actions and others in contradiction of deescalating tactics a deputy should follow. If he behaves in such manner with a victim of the crime, I have grave concerns about his fitness for duty, carry deadly weapons and to administer his duties carefully and thoughtfully.*" In review of Deputies 1's BWC recording, as well as his trainee's BWC recordings, Deputy 1 was abrasive, aggressive, assertive and repeatedly interrupted the complainant as he spoke. Deputy 1's display of disrespect was illustrated when he first addressed the complainant. Deputy 1 stepped close to the complainant, took his documentation, then told the complainant to step away from him. There was a minimal amount of room where the complainant was standing, and it would have been more feasible and more appropriate if Deputy 1 stepped away from the complainant and returned to his stance. Rudeness is generally defined as a display of disrespect, a breaking of social norms or expectations, or a breach of etiquette. Rudeness may be measured by behaving inconsiderately, aggressively or deliberately offensively. Nonetheless, rudeness is the perception of the other person as to whether a statement or action is rude. Essentially, rudeness is measured in the eyes of the offended party. It's truly a matter of perception. It should be noted that Deputy 1 verbally addressed Deputy 2 in the same fashion as he addressed the complainant, therefore an argument could be made that this was Deputy 1's professional tone. Deputy 1 responded to a Sheriff's Employee Response Form (SERF) with a signed statement and provided relevant information in response to CLERB questions. According to SDSD P&P Section 2.22 titled "Courtesy," employees shall be courteous to the public and fellow employees. They shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation. There was insufficient evidence to either prove or disprove the allegation.

3.  Discrimination/Other – Deputy 1 was biased toward the complainant.

    Board Finding: Not Sustained

    Rationale: During his interaction with Deputies 1 and 2, the complainant expressed a feeling of bias. In his written statement, the complainant reported, "*Both deputies stated that they will not initiate a police Report as the threats have to be imminent only and that "people can post and say anything on internet ", and "there are no laws of protection against threats of violence and stalking published on internet." I told him I assert I am a victim of threats of gun violence and have a credible fear for myself and my household. Both deputies stated that they will not initiate a police Report as the threats have to be imminent only and that "people can post and say anything on internet ", and "there are no laws of protection against threats of violence and stalking published on internet". I presented the print out to point out the other statutes besides 495 deputy 1 was talking about and he got very irritated, exhibiting behavior unbecoming of a sheriff deputy.*" In a follow-up telephonic interview, the complainant explained that he did not want to play "the race card," but felt that he was not treated fairly or judiciously by Deputy 1. In review of the available BWC recordings, the complainant appeared fair complexed; however, he spoke with a very heavy accent. The complainant felt that his accent may have made Deputy 1 dissociate with him. Deputy 1 responded to a SERF with a signed statement and provided relevant and conflicting information in response to CLERB questions. According to SDSD P&P Section 2.55 titled "Non-Biased Based Policing," except as provided in this procedure, employees shall not consider race, ethnicity, religion, national origin, sexual orientation, gender, or lifestyle in establishing either reasonable suspicion or probable cause. There was insufficient evidence to either prove or disprove the allegation that Deputy 1 was biased toward the complainant.

4. Misconduct/Procedure – SDSD "systematically does not take reports, deputies offer incorrect legal advice to citizens, and that deputies 'mistreat citizens/victims' of crime".

Board Finding: Not Sustained
Rationale: In the complainant's written statement, he explained, "*Based on what I observed and my experiences on Dec 4 and Dec 7, I believe SDC Sheriff Office has a systemic problems of 1) not taking a police Report, even when threats of gun violence and great bodily injury, and stalking are involved; 2) offering an incorrect legal advice and disregard to the CA law statutes when presented related to grave threats issued over internet; 3) mistreating citizens when they present themselves at the station as victims of crimes. I believe an inappropriate stance of the Sheriff's deputies to…make legal determination and to offer legal advice, which turned out to be incorrect. offering incorrect legal advice and disregard to the CA law statutes.*" In the complainant's written statement, he explained, "*Based on what I observed and my experiences on Dec 4 and Dec 7, I believe SDC Sheriff Office has a systemic problems of 1) not taking a police Report, even when threats of gun violence and great bodily injury, and stalking are involved; 2) offering an incorrect legal advice and disregard to the CA law statutes when presented related to grave threats issued over internet; 3) mistreating citizens when they present themselves at the station as victims of crimes. I believe an inappropriate stance of the Sheriff's deputies to…make legal determination and to offer legal advice, which turned out to be incorrect. offering incorrect legal advice and disregard to the CA law statutes.*" Deputies 1 and 2, as well as a witness deputy responded to SERFs with a signed statement and provided relevant information in response to CLERB questions. A determination of whether or not the Department or the Sheriff's Rancho Station has a systemic problem of not taking crime reports when appropriate, of deputies offering unsolicited and/or incorrect legal advice, and/or mistreating victims/citizens would require a multifaceted approach, including an inspection of processes and an audit of the Department's operations which is not within CLERB's jurisdiction. These allegations and concerns were forwarded to the Department for follow-up. There was insufficient evidence to either prove or disprove the allegation.

**21-003**

1. Misconduct/Procedure – SDSD Maintenance Division failed to service inmate showers.

Board Finding: Summary Dismissal
Rationale: The complainant stated, "The shower room has been broken for over a week without maintenance. Inmates have to use a broom to move the dirty shower water to the next drain before, during, and after each shower because the drain has not been fixed." Detentions Policy G.1, Maintenance Procedures, establishes guidelines for expeditious handling of maintenance requests with routine maintenance performed by the Department of General Services, Facilities Maintenance. Facility maintenance is performed by non-sworn personnel over which CLERB has no authority. The Review Board lacks jurisdiction.

2. Misconduct/Procedure – Inmate workers failed to clean facility showers.

Board Finding: Summary Dismissal
Rationale: The complainant stated, "The workers are not cleaning the shower areas they have just been spraying disinfectant." SDSD has publicly reported in the media that "since the start of COVID-19, they have put in place pandemic-related safeguards to protect the inmate population such as the stepped-up cleaning of modules, with a focus on high touch areas such as tables and floors." A review of the Sheriff's Press Releases and associated Training Bulletins pertaining to the COVID-19 virus indicated that inmate services were restricted to be in compliance with the Governor's and Chief Health Officer's orders related to isolation/quarantine, testing/tracking, temperature checks, face coverings, social distancing, and cleaning & sanitization of the facilities; in a collective effort to protect inmates and staff. Title 15 Guidelines in accordance with detention policies specified the procedures pertaining to Inmate Rights and Services/Programs, which were reduced/restricted during the COVID-19 pandemic by order of the Health Officer and per Detentions Policy M.37, Standard Precautions and Infectious Agents/Communicable

-5-

Disease Control. Additionally, according to Detentions Policy M.37, section IV, "facility staff are responsible for ensuring all suspected/known contaminated surfaces are clean." Inmate Workers are non-sworn personnel and the Review Board lacks jurisdiction.

3.  Misconduct/Procedure – Deputy 1 placed the facility on lockdown.

    Board Finding: Action Justified
    Rationale: The complainant stated, "Inmates have been on lockdown for over 30 days." According to SDSD records, an email correspondence dated 12-11-20 from Deputy 1 "with the current outbreak we are dealing with at our facility, I am going to make an attempt in preventing a bad situation from getting worse". The lockdown was ordered to prevent further outbreak and was appropriate.  Dayroom use was suspended until 02-08-21, followed by a modified tier program. SDSD implemented measures to prevent further outbreak by order of the Chief Health Officer and per Detentions Policy M.37, Standard Precautions and Infectious Agents/Communicable Disease Control. The evidence showed that the actions that occurred were lawful, justified and proper.

4.  Misconduct/Procedure – Unidentified deputies failed to distribute hygiene packs.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "inmate has only received 2 hygiene packs." Detention Policy, L.11 entitled Personal Hygiene, states only inmates with less than $2.00 on their account during the previous week will be issued hygiene packs. An Account Activity report documented the complainant's commissary purchases from October 2019 through December 2020 and showed two hygiene packs were delivered to the aggrieved. After 12-14-20, Commissary was suspended in an effort to protect inmates and staff due to a COVID-19 outbreak. However, during that time period, welfare packs that included hygiene items were distributed to every inmate. Without further clarifying information from the aggrieved, there was no way to investigate further. The evidence was insufficient to either prove or disprove the allegation.

5.  Misconduct/Procedure – SDSD restricted Commissary.

    Board Finding: Action Justified
    Rationale: The complainant stated, "Inmates do not have access to canteen since lock down so have not been permitted to purchase their own essential items, food, or envelopes to mail letters to friends and family during lockdown." Inmates may purchase a variety of commissary items to be delivered to them in their housing units. The items available for purchase include, but are not limited to: food items, hygiene products, stationery, reading glasses, pre-paid telephone time and over-the-counter medication. An Account Activity Report documented the complainant's commissary purchases from October 2019 through December 2020. Inter-Departmental Correspondence entitled "COVID-19 Continuity of Operations Phase Plan" dated 12-14-20 stated commissary was suspended in an effort to protect inmates and staff due to COVID-19, furthermore welfare packs were distributed once a week for all inmates during lockdown. Detentions Policy T.9, Commissary, states that Commissary staff are solely responsible for delivering commissary with deputies standing by for security only and they will not assist with deliveries. Inmates may address any disputes and/or discrepancies via a J-21 form addressed to commissary staff. Commissary staff are non-sworn personnel over whom CLERB maintains no jurisdiction. The evidence showed that SDSD restricted Commissary due to COVID-19 precautions and the actions were lawful, justified and proper.

6.  Misconduct/Procedure – SDSD failed to quarantine inmates exposed to COVID-19.

    Board Finding: Summary Dismissal
    Rationale: The complainant stated, "Since lockdown, they first removed 14 people from the facility who tested positive for COVID, after two weeks they tested again and removed the 7 people who tested positive for COVID, leaving behind their cellmates because they tested negative but who were obviously exposed since they have been in 24hour lockdown in the cells for over a month." M.37 Standard Precautions and Infectious Agents/Communicable disease control states the detention facility health staff

identifies inmates with health problems and indicates when an inmate needs special housing. Facility health staff are non-sworn personnel over whom CLERB has no jurisdiction. The Review Board lacks jurisdiction.

7.  Misconduct/Procedure – Unidentified deputies instructed Inmate Workers to serve inmate meals on the floor.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "Deputies ordered workers to serve food on the floor in front of the door and then open the door for the inmates to retrieve the trays off the floor." Video evidence corroborated that inmate workers served food on the floor on 12-28-20. A review of Sheriff's Policies, specifically 2.4-Unbecoming Conduct, 2.22-Courtesy, and 2.48-Treatment of Persons in Custody did not support any policy violation(s). A similar allegation was made in CLERB case #20-047 and CLERB recommended Detentions Services Bureau (DSB) P&P K.15 be updated to reflect a requirement to distribute meals in a sanitary manner. On 09-27-21, SDSD reported the policy was modified to include distribution of meals "in a sanitary manner". While the evidence showed an inmate meal was served on the floor, there was insufficient evidence to prove whether it was at the direction of sworn personnel or at the discretion of inmate workers. There was also no specific policy in place at the time of the incident covering the action(s) as alleged. There was insufficient evidence to either prove or disprove this allegation.

8.  Misconduct/Procedure – Deputy 2 instructed Inmate Workers to serve inmate meals on the floor on 12-28-20.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "Deputies ordered workers to serve food on the floor in front of the door and then open the door for the inmates to retrieve the trays off the floor. Deputy 2 in particular on 12-28-20." Surveillance video dated 12-28-20, confirmed that food was served on the floor. A review of Detention policies showed no violations in effect at the time of this incident. Deputy 2 provided information during CLERB's investigation that was considered in arriving at the recommended finding. There was insufficient evidence to either prove or disprove this allegation.

9.  Misconduct/Procedure – Sheriff's Food Services failed to serve proper meals.

    Board Finding: Summary Dismissal
    Rationale: The complainant stated, "food portions are not well-balanced. They have not been proportioned to fill a person and do not have extra food because there has not been store. The food has thrown on the trays and not into the compartments making a mess." Detentions Policy K.1, Provision of a Nutritionally Adequate Diet, states the Sheriff's Food Services Manager compiles a cyclical menu that meets or exceeds Title 15 regulations. Sheriff's Food Service Managers are non-sworn staff and as such do not fall under CLERB's jurisdiction. The Review Board lacks jurisdiction.

10. Misconduct/Procedure – SDSD failed to provide cleaning supplies.

    Board Finding: Summary Dismissal
    Rationale: The complainant stated, "Workers are only given a limited amount of towels to clean up. They have to use the same towels to wipe down tables and clean the spoons therefore causing cross-contamination." Detentions Policy K.25 Safety and Protection Standards states the Food Service Supervisor at each facility is responsible for proper and safe food handling. The Food Service Supervisor is non-sworn staff and as such CLERB has no jurisdiction. The Review Board lacks jurisdiction.

11. Misconduct/Procedure – SDSD and/or unidentified deputies failed to abide by social distancing guidelines.

    Board Finding: Summary Dismissal

Rationale: The complainant stated, "They are not following quarantine procedures in the jail. They are using the crossover to entire the next module when it clearly states not to." Also, "When inmates are transported to court they are placed in holding cells with 10 or more inmates not abiding by social distancing guidelines." M.37 Standard Precautions and Infectious Agents/Communicable disease control states the detention facility health staff identifies inmates with health problems and indicates when an inmate needs special housing. Facility health staff are non-sworn personnel over whom CLERB has no jurisdiction. The Review Board lacks jurisdiction.

12. Misconduct/Procedure – SDSD failed to provide soap.

Board Finding: Not Sustained
Rationale: The complainant stated, "They are not given access to soap even after using the restroom." M.37 Standard Precautions and Infectious Agents/Communicable disease control states "hand washing is an effective means of infection control. When properly done, hand washing removes infectious organisms. Any hand washing product, whether antibacterial or microbial, will achieve this goal". Without further clarifying information from the aggrieved, there was no way to determine if deputies did not deliver soap. The evidence was insufficient to either prove or disprove the allegation.

13. Misconduct/Procedure -SDSD failed to respond to inmate grievances.

Board Finding: Not Sustained
Rationale: The complainant stated, "these grievances were placed by the inmate multiple times over the last 30 days and has not received a response". SDSD records produced one grievance with a submission date of 01-06-21, related to covid exposure, broken shower, and hygiene packs. The grievance was acted upon by a deputy and addressed on 01-14-21. In the response from a deputy, he noted the facility was COVID free, the shower had been unclogged for weeks, and confirmed hygiene pack delivery in the module. As it was unknown if other grievances were not logged in accordance with policy, there was insufficient evidence to either prove or disprove the allegation.

---

**21-033**

1. Misconduct/Procedure – Deputy 1 ordered the complainant to remove his face mask.

Board Finding: Action Justified
Rationale: The complainant stated that a Judge and Deputy 1 asked him to remove his mask during a virtual court hearing and he responded, "No, it's against the law." Witnesses were interviewed and reported that in order for the Court to properly identify a defendant (inmate), the Judges would order them to remove their masks. If a defendant did not comply, the Judge would then order the deputy to remove the mask. Deputy 1 and another deputy provided information during the course of CLERB's investigation that was also considered in arriving at the recommended finding. The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

2. Excessive Force – Deputy 1 hit the complainant.

Board Finding: Unfounded
Rationale: The complainant stated that in a "fit of rage", Deputy 1 struck his right cheek and neck area. DSB P&P Section 1.89 Use of Force, requires that all use of force incidents be documented with a report; furthermore, there was no evidence that there was force used on the complainant. Witness statements refuted the excessive force allegation(s). Deputy 1 and another deputy provided information during the course of CLERB's investigation that was also considered in arriving at the recommended finding. The evidence showed that the alleged act or conduct did not occur.

3. Excessive Force – Deputy 1 used force to remove the complainant's face mask.

Board Finding: Unfounded
Rationale: The complainant stated that Deputy 1 "forcefully removed his mask." DSB P&P Section 1.89 Use of Force, states that during the course of their official duties, DSB sworn staff, may use objectively reasonable force to maintain or restore order. In addition, deputies are required to document their actions in a written report. A witness did not corroborate the complainant's allegation. There were no written reports related to this incident. Witnesses were interviewed and reported that in order for the Court to properly identify a defendant (inmate), the Judges would order them to remove their masks. If a defendant did not comply, the Judge would then order the deputy to remove the mask. Deputy 1 and another deputy provided information during the course of CLERB's investigation that was also considered in arriving at the recommended finding. The evidence showed that the alleged act or conduct did not occur.

4. Misconduct/Medical (I/O) – Health staff denied the complainant's request(s) for medical services.

    Board Finding: Summary Dismissal
    Rationale: The complainant stated that his neck hurt, so he put on three sick calls requests and all were denied. Jail Medical staff are non-sworn employees of the SDSD in which CLERB has no authority per CLERB Rules & Regulations 4.1 Complaints: Authority. The Review Board lacks jurisdiction.

---

**21-046**

1. Misconduct/Procedure – Unidentified deputies failed to follow COVID protocol.

    Board Finding: Summary Dismissal
    Rationale: The complainant stated, "There have been numerous COVID outbreaks due to the ill and inappropriate response to COVID-19 by the Sheriff. COVID cleaning is mostly insufficient or VOID." The complainant failed to provide any identification of sworn personnel and he did not provide where or when these alleged incidents occurred. Attempts to obtain this information were unsuccessful. The evidence provided did not establish a prima facie showing of misconduct arising out of the performance of sworn personnel's duties. As such, this case is submitted for summary dismissal in accordance with CLERB Rules and Regulations Section 4.1 titled, Complaints Authority, "Pursuant to the Ordinance, CLERB shall only have authority to receive, review, investigate, and report on complaints filed against peace officers or custodial officers employed by the County in the Sheriff's Department or the Probation Department," and Section 15 titled, Summary Dismissal, which states in part, "After reviewing the Investigative Report and records, CLERB may summarily dismiss a case, ("Summary Dismissal") upon recommendation of the Executive Officer, its own motion, or that of the Subject Officer. Parties to the Complaint shall be notified of a proposed Summary Dismissal, and may appear to argue for or against Summary Dismissal. Summary Dismissal may be appropriate in the following circumstances: Lack of cooperation by the Complainant such that CLERB is unable to continue its investigation, such as a failure by the Complainant to respond to repeated inquiries when such response is necessary to the ongoing investigation." The Review Board lacks jurisdiction.

2. Misconduct/Procedure – Unidentified deputies denied inmates food, clothing, bedding, day room, recreation yard, and/or showers.

    Board Finding: Summary Dismissal
    Rationale: The complainant stated, "We are denied sufficient food, sufficient clothing, sufficient bedding, day room, recreation yard, showers. Everything leads to mental and physical injuries to prisoners without any care of concern by Sheriff." See rationale #1.

3. Misconduct/Procedure – Unidentified deputies did not follow grievance procedures.

    Board Finding: Summary Dismissal
    Rationale: The complainant stated, "Custodial staff do not honor, respect or follow Grievances and Procedures." See rationale #1.

4. Misconduct/Procedure – Unidentified deputies searched legal documents and confiscated evidence.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "The District Attorney had deputies search my legal documents without my being present to remove evidence. I informed the judge of this and he refused to take proper action, once again abusing his power and discretion." See rationale #1.

5. Misconduct/Discourtesy – Unidentified deputies used the PA system to single out inmates.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "Deputies are disrespectful and single out the inmate and offense over the P.A. system which is a deliberate and intentional act to incite hostility amongst inmates." See rationale #1.

6. Misconduct/Harassment – Unidentified deputies created hostile living conditions.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "Custodial staff create hostile living conditions, they cuss at inmates, threaten inmates, provoke inmates, incite inmates and demean inmates on a daily basis." See rationale #1.

7. Misconduct/Procedure – Unidentified deputies delayed distribution of grievance forms.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "Custodial staff often refuse to process grievances properly. When inmates ask for Grievance forms they're told, 'in a minute' or 'next time I come around, in a little while or when I get time.'" See rationale #1.

---

## 21-060

1. Misconduct/Procedure- Unidentified deputies failed to properly classify the aggrieved.

   Board Finding: Unfounded
   Rationale: The complainants stated, "the failure on the part of the San Diego Sheriff's Department to properly classify my son and review his incarceration history to protect him from further assault is unacceptable." SDSD records show the aggrieved was properly classified as a level "4 High" in accordance with Detentions Policy Section R.1, Inmate Classification due to his prior assaultive charges. Upon review of his incarceration history, only one incident which occurred on 11-07-19 had a suspect identified and a Keep Separate (K/S) order was issued on the classification record of the aggrieved. In an interview with the aggrieved and a Detentions Investigations Unit (DIU) detective, the aggrieved identified the source of the 06-21-21 and 12-27-19 assaults were due to an investigative interview (relating to the 11-07-19 incident) at San Diego Central Jail (SDCJ) which occurred in the module where other inmates could view. The other inmates assumed the aggrieved was a "snitch" even though he did not identify any further aggressors. The subsequential assaults that occurred on 12-27-19 and 06-21-21 yielded no suspects due to the aggrieved's unwillingness to participate in the investigation and identify suspects. Additionally, the one inmate identified in the prior K/S was not present at either assault. The aggrieved was offered protective custody for the incident that occurred on 06-21-21 but refused. The evidence shows that the alleged act did not occur, and the aggrieved was properly classified.

**POLICY RECOMMENDATION**:

1. It is recommended that the San Diego Sheriff's Department (SDSD) create a policy that mandates conducting all Detentions Investigative Unit (DIU) interviews in a private area, out of view from other inmates.

## 21-066

1. Use of Force Resulting in Great Bodily Injury – Deputy 1 deployed his K-9 partner on Derik Reyes and as a result, Reyes suffered K-9 bites.

Board Finding: Action Justified
Rationale: On 06-11-21, at approximately 6:50pm, Derik Reyes entered the home of the victim and attempted to rape her. The victim's Ring camera, located at the front entrance of her home, captured audio of the incident and video of the front door entrance, the driveway, and the front gate of her property. When the victim was unable to fight off Reyes, she screamed for help. Neighbors heard her screams and ran to her aid. Neighbor 1 had a handgun and ordered Reyes to get off of the victim. Reyes became aggressive toward neighbor 1 and attempted to take the gun. Reyes stated to neighbor 1, "shoot me." Reyes' parents arrived on scene and attempted to take him away. Another neighbor, neighbor 2, arrived and he and neighbor 1 held Reyes at gunpoint to prevent him from leaving before deputies arrived. When deputies arrived, Reyes was seated in the passenger side of his parents' truck. Not knowing if Reyes had any weapons, deputies positioned themselves, with lethal and less lethal weapons drawn, prepared to apprehend Reyes. K-9 Deputy 1 announced "You in the truck, this is the Sheriff's department with K-9. Do exactly as I say or I am going to send my dog and he will bite you. Slowly get out of the vehicle, with your hands up and face away from me." Reyes exited the vehicle, however, he faced the deputies and was ordered, again, to turn around and face away. Deputy 1 stated, "Hands up, face away from me or you're going to get bit by the dog. Slowly step back toward the sound of my voice. Keep coming, straight back." Reyes complied, until he was approximately 10 feet away from deputies. Reyes turned, faced the deputies and started toward Deputy 1 and his K-9 partner. Deputies yelled for Reyes to get on the ground. Reyes did not comply and continued forward. Deputy 1 deployed his K-9 and immediately followed and tackled Reyes to the ground. Deputies were able to subdue and handcuff Reyes. The great bodily injury Reyes suffered were solely K-9 bites. Reyes was transported and treated at the hospital. Reyes was medically cleared and booked into custody at the Vista Detention Facility (VDF). Upon review of this incident, in its entirety, there was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn Personnel. The evidence, BWC videos, Ring videos and documented reports, verified that the K-9 use of force used, was lawful, justified and proper.

## 21-067

1. Use of Force Resulting in Great Bodily Injury – Deputies 1-8 used force to subdue and handcuff Inmate Pablo Santiago.

Board Finding: Action Justified
Rationale: According to jail documents, Inmate Pablo Santiago was incarcerated at the San Diego Sheriff's Department (SDSD) George Bailey Detention Facility (GBDF). On 01-09-21, Santiago was booked into custody for corporal injury to spouse/cohabitant, criminal threats, false imprisonment with violence and assault with force likely to cause great bodily injury. On 06-18-21, Santiago assaulted deputies when they responded to reports of inmates fighting in a cell. When deputies attempted to de-escalate the situation and subdue Santiago, he resisted, became argumentative, yelled obscenities and displayed aggression toward deputies. Deputy 5 utilized his Conductive Energy Device (CED), in an attempt to gain Santiago's compliance. SDSD Addendum F Policy titled, Use of Force Guidelines, states in part, "the CED shall only be used as a means of subduing and gaining control of a subject displaying assaultive behavior." The attempt was ineffective, and due to Santiago's assaultive behavior and continued resistance, deputies utilized the WRAP device to subdue Santiago. SDSD DSB P&P Section I.93 titled, Restraint Devices, states in part, "A restraint device is a device utilized to maximally secure an inmate due to their violent or

uncontrollable actions when it appears less restrictive alternatives would be ineffective. Restraint devices include the restraint chair, cord cuffs and the WRAP restraint system." During the placement of the WRAP, Santiago attempted to bite Deputy 2, and he spat saliva and blood that made contact with Deputy 2's and Deputy 3's face, mouth and eyes. SDSD DSB P&P Section I.89 titled, Use of Force, states in part, "During the course of their official duties, DSB sworn staff, may use objectively reasonable force to effect an arrest, prevent escape, overcome resistance, and maintain or restore order. Sworn staff shall use Department approved techniques, equipment and tactics in controlling the inmate or incident." Several deputies noted in their reports, "based on their training and experience," that Santiago displayed symptoms likened to being under the influence of jail-made alcohol, with bloodshot eyes and slurred speech. According to Deputy 6's Officer Report, Santiago admitted to being under the influence of "pruno" (jail-made alcohol), and stated, "Man I took like six cups of pruno." As a result of force used, Santiago sustained a small right orbital floor fracture and right eyelid laceration. Several deputies sustained injuries, all of whom advised they desired prosecution. Santiago was admonished his Miranda Rights. As a result of his actions, Santiago was found to be in violation of California Penal Code PC§ 69 Resisting Executive Officer, PC§ 243.9 (A) Battery by Gassing and PC§ 4573.8 Possession Drugs/Alcoholic Beverage in Prison/Jail. The force executed by the deputies to overcome Santiago's resistance and gain his compliance was noted to be necessary, and objectively reasonable. The preponderance of evidence, based on the video surveillance, deputy reports and the investigative follow-up, showed deputies acted according to policy and there was no evidence to support any procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel. The evidence showed that force was utilized, and the force was lawful, justified, and proper.

---

### 21-087

1. False Reporting – Deputy 1's report was inaccurate and/or incomplete.

   Board Finding: Sustained
   Rationale: The complainant stated, "In summary, the report is incorrect and incomplete. The most glaring omission from the report is its failure to document in any way that this was a hit and run traffic incident. I was rear-ended at the intersection of Manchester and El Camino real, as the report states. But the report fails to say that the suspect fled the scene and only was identified by me chasing after him along Manchester, calling 911, and relaying his license plate to the 911 operator." According to California Highway Patrol (CHP) Collision Investigation Manual, Chapter 3, Instructions for Completing a Traffic Collision Report, section 4, states "Mark an "X" in the applicable box when the facts and evidence indicate either a felony or a misdemeanor hit and run violation was committed. A collision resulting in "Complaint of Pain" or "Other Visible Injury" should be investigated as a felony hit and run. The District Attorney's Office will ultimately decide which charges will be filed." Deputy 1 failed to mark an "X" in the applicable box even though the facts and evidence indicated a misdemeanor hit and run violation was committed. VEH§ 20002. Duty Where Property Damaged, states, "the driver of any vehicle involved in an accident resulting only in damage to any property, including vehicles, shall immediately stop the vehicle at the nearest location that will not impede traffic or otherwise jeopardize the safety of other motorists". SDSD P&P 2.41 Departmental Reports states, "Employees shall submit all necessary reports on time and in accordance with established Departmental procedures. Reports submitted by employees shall be truthful and complete; no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information, nor omit pertinent information reasonably expected to be included." Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Deputy statements are protected by the Peace Officer Bill of Rights and cannot be publicly disclosed. An interview was requested with Deputy 1 to see if there was any further information that can be provided as to why the accident was not marked a hit and run, but he exercised his right to decline pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The evidence supported the allegation, and the act was not justified.

2. Misconduct/Procedure - SDSD failed to report "charges"/information to the District Attorney's (DA) office.

Board Finding: Unfounded

Rationale: The complainant stated the Sheriff's office was "not interested in reporting or allowing the District Attorney (DA) the chance to prosecute, and ultimately justice is not being done". As per the SDSD records a Crime/Incident Report was completed on 09-01-21 and reviewed 09-07-21 documenting the hit and run with property damage. Additionally, a declaration in support of arrest warrant for the suspect with a charge of 20002(A) CVC-Misdemeanor Hit and Run was executed on 09-01-21. The evidence showed the discovery package was shared with the DA on 09-28-21. SDSD reported the charges to the DA, the DA office ultimately decides if/which charges will be filed. The evidence showed that the alleged act did not occur.

3. Misconduct/Procedure – Deputy 1 disclosed the complainant's personal information.

Board Finding: Action Justified

Rationale: The complainant stated, "Deputy 1 also shared my personal information with the other driver; my name, phone, and address. Deputy 1 told me this was standard procedure, but I can't believe that in the case of a crime the victim's information is shared with another party." Body Worn Camera evidence confirmed Deputy 1 provided the suspect with the complainant's name and phone number. SDSD P&P 2.37 Dissemination of Information states, "Employees shall treat the official business of this Department as confidential. Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established Departmental procedures." According to California Code VEH§ 20012 entitled "Reports Confidential: Exceptions", the law enforcement agency to whom the accident was reported shall disclose the entire contents of the reports, including, but not limited to the names and addresses of persons involved to any person who may have a proper interest. PEN§ 841.5, Nondisclosure of Victim Information (d) states, "Nothing in this section shall preclude a law enforcement agency from releasing the entire contents of an accident report as required by Section 20012 of the Vehicle Code." Additionally, GOV§ 6254 Exceptions to Disclosure of Records, does not list a victim of a crime defined by VEH§ 20002 Duty Where Property Damage as an exempt from disclosure. As such, the contact information was disseminated in accordance with policy. The evidence showed the disclosure of the complainant's personal information was in compliance with Sheriff's Policies and Procedures as well as California Code; the alleged action was justified.

4. Misconduct/Procedure – Deputy 1 showed preferential treatment/professional courtesy to the suspect.

Board Finding: Sustained

Rationale: BWC evidence showed Deputy 1 expressed not arresting the suspect due to his father being prior law enforcement. As per SDSD P&P core values, Fairness, "we are just and impartial in all of our interactions. Our decisions are made without personal favoritism." In BWC footage, Deputy 1 stated, "how we typically handle hit and runs is, the driver gets arrested for hit and run and the vehicle gets impounded. Okay, so that was the plan because that is usually what the program is. But I sent my partner up to your home and he spoke with your dad. Out of respect for your dad and his wishes, we decided to go a different route. So we got your info now and I am going to pass that along to the other driver. But quite honestly, dude, your dad really stepped in and defended you. Based on his history and his service and stuff like that and our respect for him. That's the only reason you're not being arrested, and your car is not being impounded." As per SDSD P&P Core Values, Fairness, "we are just and impartial in all of our interactions. Our decisions are made without personal favoritism." As per SDSD P&P, 2.4 Unbecoming Conduct states "unbecoming conduct shall include that which tends to bring this Department into disrepute or reflects discredit upon the employee as a member of this Department, or that which tends to impair the operation and efficiency of this Department or employee." Additionally, SDSD P&P 2.30 Failure to Meet Standards states "employees shall properly perform their duties and assume the responsibilities of their positions. Employees shall perform their duties in a manner which will tend to establish and maintain the highest standards of efficiency in carrying out the mission, functions, and objectives of this Department". Furthermore, it states "failure to meet standards can be demonstrated by the failure to take appropriate action on the occasion of a crime". The evidence confirmed Deputy 1 extended a professional courtesy to the suspect based on his father's history in law enforcement.  Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. An interview

-13-

was requested with Deputy 1 to see if there was any further information that could be provided but he declined pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The evidence supported that the alleged act did occur and was not justified.

*End of Report*

## NOTICE

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

# EXHIBIT Q

**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON



**EXECUTIVE OFFICER**
PAUL R. PARKER III

# *County of San Diego*

## Citizens' Law Enforcement Review Board

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA  92101-2938
TELEPHONE: (619) 238-6776     FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its November 9, 2021, meeting held via the BlueJeans Platform.  Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

## CLOSED SESSION

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
   **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASES FOR SUMMARY HEARING (8)

## ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE

### 20-114

1. Death Investigation/In-Custody Drug Related – Antonio Miguel Gonzaba died while in the custody of the San Diego County Sheriff's Department (SDSD) on 11-24-20.

   Board Finding: Action Justified
   Rationale: On 10-04-19, San Diego Police Department (SDPD) officers arrested Antonio Miguel Gonzaba for multiple related sex crimes, robbery, burglary, and other violent offenses. On 11-18-20, Gonzaba pled guilty to the most serious crime and was facing an approximate 35-year prison sentence. On 11-24-20, Vista Detention Facility (VDF) deputies were conducting a safety check when they discovered Gonzaba unresponsive in his cell. Sheriff deputies along with jail medical staff, responded, began life-saving measures and 911 was activated. Two doses of Naloxone were administered, with negative results. When paramedics arrived on scene, they initiated advanced cardiac life support (ACLS). Despite aggressive

*-continued on next page-*

attempts at resuscitation, Gonzaba could not be revived, and his death was pronounced, via radio, by a doctor with Tri-City Hospital. Prior to Gonzaba being discovered unresponsive, jail surveillance video captured inmates passing items to Gonzaba under his cell door. Detectives conducted interviews with the inmates involved, all of whom denied any passing of illicit substances. Following the incident, a strip search was conducted with the involved inmates, and one was found to be in possession of methamphetamine. That inmate was charged, however, refused to talk to detectives. According to a review of jail documents and jail surveillance video recordings, security checks were performed in a timely manner and in compliance with San Diego Sheriff's Department Policies and Procedures (SDSD P&P). An autopsy was performed on Gonzaba's body, by a San Diego County Medical Examiner. No trauma or foul play was noted and Gonzaba's cause of death was determined to be fentanyl, bupropion, gabapentin, and trazodone toxicity with hypertrophic cardiomyopathy listed as a contributing condition. The manner of death was listed as accident. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

## 21-013

1. Misconduct/Procedure – San Diego Police Officers (SDPD) failed to transport the complainant to a hospital.

   Board Finding: Summary Dismissal
   Rationale: On 02-06-20, Oscar Chavez was arrested by the SDPD and booked into the San Diego Central Jail. The complainant stated the arresting officer declined his request to be taken to the hospital. CLERB has no authority over members of the SDPD, per CLERB Rules & Regulations 4.1 Complaints: Authority. The Review Board lacks jurisdiction.

2. Misconduct/Procedure – An unidentified deputy failed to summon jail medical staff.

   Board Finding: Not Sustained
   Rationale: The complainant stated he advised an unidentified deputy in a hallway that his blood pressure was high, that he felt sick, anxious and asked them to summon medical personnel to his holding cell, but no one ever responded. Jail video surveillance was reviewed and showed the complainant in a holding cell, but offered no other evidentiary evidence. Prior to the holding cell placement, the complainant was screened by medical personnel and provided with a red wristband signifying he was a medical inmate. This colored wristband is utilized when the health of an inmate could be adversely affected if the inmate is exposed to simple physical stress, per DSB P&P section M.21 Medical Wristbands. An Intake Deputy provided information during the course of CLERB's investigation that was also considered in arriving at the recommended finding. There was insufficient evidence to either prove or disprove this allegation.

3. Misconduct/Procedure – Jail Medical staff did not provide medication or monitor the complainant for his high blood pressure.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated that medical did not re-check his blood pressure, nor did they provide him with medication to bring down his blood pressure. Jail Medical staff are non-sworn employees of the SDSD in which CLERB has no authority per CLERB Rules & Regulations 4.1 Complaints: Authority. The Review Board lacks jurisdiction.

## 21-023

1. Misconduct/Medical - Unidentified jail medical staff refused to provide the complainant with medical treatment.

   Board Finding: Summary Dismissal

Rationale: The complainant stated that he had injuries after his arrest and the intake nurse refused to provide him medical treatment. Jail medical staff are non-sworn members of the San Diego Sheriff's Department, over whom CLERB has no authority per CLERB Rules & Regulations 4.1 Complaints: Authority. The Review Board lacks jurisdiction.

2. Misconduct/Procedure - Unidentified deputies refused to provide the complainant with a wheelchair.

   Board Finding: Not Sustained
   Rationale: The complainant stated that he asked the deputies who searched him at intake for a wheelchair and they refused, however, he failed to describe or provide any further identifying information. Also, the complainant refused to provide access to his medical records which limited the scope of investigation. Jail surveillance video showed that Mascorro was placed into a wheelchair by a San Diego Police Department Officer once he arrived at the San Diego Central Jail vehicle sallyport area. The officer pushed Mascorro in the wheelchair until they arrived at the body scan room, where Mascorro stood up and walked without any assistance. Booking paperwork confirmed the complainant was medically screened and cleared for booking in accordance with Detention Services Bureau (DSB), Policy & Procedure (P&P), M.9 Receiving Screening. This policy specified that any arrestee who has any immediate/emergent medical needs will be refused and sent to an emergency department for clearance prior to booking. Absent medical records and audio evidence, there was insufficient evidence to prove or disprove the allegation.

3. Misconduct/Intimidation – Deputy 1 and/or 3 threatened the complainant.

   Board Finding: Unfounded
   Rationale: The complainant stated that Deputy 1 and 3 threatened to call a K-9 to attack/torture him because he asked for a wheelchair and threatened to break his arm if he did not get up. Jail surveillance video showed that Deputies 1 and 3 interacted with Mascorro when he was in a holding cell and the complainant in an exaggerated fashion, fell to the floor. While the video did not have audio capabilities, there were no visible signs or actions that deputies threatened the inmate. In accordance with the SDSD Canine P&P Manual, canines are not authorized for uses of force in the detention facilities. Deputies 1 and 3 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding; deputy statements are protected by the Peace Officer Bill of Rights and cannot be publicly disclosed. The complainant was found not to be credible in his recall of these events and the evidence showed that the alleged act or conduct did not occur.

4. Excessive Force - Deputies 1 and 3 grabbed the complainant's arm and dragged him.

   Board Finding: Unfounded
   Rationale: The complainant stated that Deputy 1 and 3 grabbed and twisted his wrist from his "broken" arm and dragged him to the fingerprint area. DSB P&P Section I.89 Use of Force, requires that all use of force incidents be documented with a report. There was no evidence that Mascorro's arm was twisted or that he was dragged. Jail surveillance video confirmed that Deputies 1 and 3 assisted Mascorro off the holding cell floor by grabbing onto his arms and lifting him up. The deputies then escorted the complainant from the cell to the fingerprint area as they walked beside him, held his arms and sat him down on a bench. Deputies 1 and 3 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding; deputy statements are protected by the Peace Officer Bill of Rights and cannot be publicly disclosed. The complainant was found not to be credible in his recall of these events and the evidence showed that the alleged act or conduct did not occur.

5. Misconduct/Procedure - Deputy 2 denied the complainant's request for Protective Custody (PC).

   Board Finding: Action Justified
   Rationale: The complainant said that he requested to be placed in protective custody because he had been attacked in jail before, but they refused; he also reported this information to a Classification Deputy. PC is the voluntary or involuntary placement of an inmate into separate and secure housing when there

is a verified threat against their life. SDSD records confirmed that a Classification Deputy interviewed the complainant who reported he was previously assaulted and did not want to return to a specific jail; the facility restriction was documented in accordance with policy. Furthermore, DSB P&P, Section J.3 Segregation: Definition and Use, explains that inmates shall be segregated when they are classified for safety and/or security reasons, are pending disciplinary action, or for investigative purposes. The complainant's safety concern was granted without the need to be placed in PC. Deputy 2 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding; deputy statements are protected by the Peace Officer Bill of Rights and cannot be publicly disclosed. SDSD records confirmed the complainant was properly interviewed and classified with restrictions in place for his protection. The evidence showed the actions that occurred were lawful, justified and proper.

6.  Misconduct/Procedure - Unidentified deputies refused to provide the complainant with writing tools.

    Board Finding: Action Justified
    Rationale: The complainant stated that he does not have any full names or badge numbers of deputies because they refused to provide him anything to write with. DSB P&P Section Q.7 Inmate Processing explains that inmates are searched, and all property seized; therefore, they are not permitted any items on their person during the booking process. In addition, DSB P&P Section I.52 Inmate Searches explains that all inmate searches shall be conducted with the purpose of providing a safe and secure environment for inmates and staff. Therefore, inmates would not be provided with an instrument that could be used as a weapon. Deputies 1 and 3 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding; deputy statements are protected by the Peace Officer Bill of Rights and cannot be publicly disclosed. The evidence showed the conduct that occurred was lawful, justified and proper.

## 21-025

1.  Use of Force Resulting in Great Bodily Injury – Deputies 1-6 used force to subdue and handcuff Inmate Marius Anthony Migdalski.

    Board Finding: Action Justified
    Rationale: According to jail documents, Inmate Marius Migdalski was incarcerated at the San Diego Sheriff's Department's San Diego Central Jail. On 01-06-21, at 4:21pm, Migdalski was booked into custody for obstruct/resist executive officer and one count of vandalism over $400. On 01-06-21, Deputy 3 conducted a security/safety check in the holding cell when Migdalski exited the cell against Deputy 3's instructions and pushed his body past Deputy 3 as he entered into the hallway. Deputy 3 instructed Migdalski to stop, but Migdalski continued down the hallway. Migdalski crossed the hallway diagonally and grabbed a large push broom. According to Deputy 3, it appeared Migdalski attempted to use the push broom as a weapon, and a struggle over the push broom ensued. Migdalski's assaultive behavior escalated as he began to kick and punch Deputy 3. During the struggle, Migdalski picked up Deputy 3's fallen, large metal flashlight and used it against him; Migdalski used the flashlight to strike Deputy 3 on his left thigh, the left side of his head, and once to the back of his head. Deputies 1,2,4,5, and 6 responded to the incident and Migdalski was subdued and placed in handcuffs. Jail surveillance video recordings of the incident were reviewed. The force executed by the deputies to subdue and arrest Migdalski was captured in the jail surveillance video recordings, as well as noted in the numerous reports submitted by the involved deputies. The deputies' reports mirrored what was witnessed in the jail surveillance video recordings. The force used against Migdalski was noted to be minimal, necessary, and objectively reasonable to effect the arrest and overcome resistance. No deputy was witnessed to strike Migdalski in the face or jaw. The SDSD notified CLERB that Migdalski lost a tooth after the incident. The evidence showed that the alleged act did occur, and it was lawful, justified and proper.

## 21-068

1.  Use of Force Resulting in Great Bodily Injury – On 06-20-21, Luke Roberts fled the scene of a reported
    burglary. In order to apprehend Roberts, deputy use of force, including Taser and K-9 contact was utilized,
    which resulted in great bodily injury to Roberts.

    Board Finding: Action Justified

    Rationale: On 06-20-21, at approximately 1:08pm, an off-duty Sheriff deputy placed a call to the Sheriff's
    911 Communications Center, to report suspicious behavior of a subject, Luke Roberts. The deputy
    reported the following: "Roberts, exited a parked vehicle, acting odd and possibly under the influence of a
    controlled substance. Roberts went car to car, looked into car windows and tried to open the doors. He
    was observed in one of the vehicles and exited with items in his hands." Sheriff's ASTREA (Aerial Support
    to Regional Enforcement Agencies) responded, located Roberts, and provided his location to Deputy 2
    when he arrived on scene. Deputy 2 intercepted Roberts and informed him that he was being detained,
    directed Roberts to face away from him and place his hands behind his back. Roberts backed away.
    Deputy 2's body worn camera (BWC), with audio, captured the entirety of the incident. Deputy 2 continued
    to issue lawful commands for Roberts to stop, turn away from him and place his hands behind his back.
    Roberts fled, and a foot pursuit ensued. The California Peace Officers Legal Sourcebook (CPOLS),
    Section 2 titled, Search and Seizure Persons, states, in part, "You can base a detention on information
    you receive from an eyewitness, victim, police officer, dispatcher, or if accurate other official channels
    because the law generally considers such persons or sources to be automatically reliable. A suspect has
    'no right to resist' a lawful detention. If the suspect does not stop, he has violated Penal Code section 148
    by obstructing or delaying you in the performance of your duties and you may use whatever physical force
    is necessary to make him stop." Deputy 2 drew his Conducted Energy Device (CED), commonly referred
    to as a "Taser," and pointed it at Roberts. Roberts continued to run. An off-duty CHP officer joined the foot
    pursuit and tackled Roberts to the ground. Deputy 2 provided the following in his Arrest Report, "I gave
    Roberts commands to get onto his stomach. Roberts said he would comply, but he continued to struggle
    against our actions to safely detain him." Deputy 2's BWC captured his command's, warning Roberts he
    would be tased if he did not comply. Roberts continued to resist and Deputy 2 deployed his taser, in drive-
    stun mode, however, it was ineffective. SDSD P&P Addendum F Section titled, Use of Force Guidelines,
    states, in part, "As a force option, the CED shall only be used as a means of subduing and gaining control
    where there is an immediate threat justifying an intermediate level of force. The CED may be used in
    'drive-stun' mode (placing the unit in direct contact with the suspect) if reasonable to protect the deputies
    or others from injury and to gain control of the suspect/inmate." According to the AXON Taser X2 User
    Manual, "Drive-stun mode is not designed to cause incapacitation and primarily becomes a pain
    compliance option." When K-9 Deputy 3 arrived on scene, he observed Deputy 2 and the CHP officer on
    the ground struggling with Roberts. Deputy 3 was heard on his BWC, "Stop fighting, Sheriff's Department
    with a canine, stop fighting or you're going to get bit, turn over or you're going to get bit." Deputy 3 provided
    the following statement in his Officer's Report: "Based on Roberts' assaultive actions, continued active
    resistance, refusal to comply with simple commands and the ineffectiveness of the CED, I determined the
    use of my canine partner would now be the safest option to detain Roberts. I deployed my K-9 partner
    towards Roberts' right leg and gave the bite command." SDSD P&P Addendum F Section titled, Use of
    Force Guidelines, states, in part, "Law enforcement trained canines are a viable intermediate force option
    when employed under the direction of their handlers for deputy protection and for apprehension of fleeing
    subjects wherein this degree of force is justifiable." Two additional deputies, 1 and 4 arrived on scene and
    assisted to apprehend Roberts. They applied direct downward pressure to Roberts person, to force his
    compliance and handcuff him. SDSD P&P Section 6.48 titled, Physical Force, states, "It shall be the policy
    of this Department whenever any Deputy Sheriff of this Department, while in the performance of his/her
    official law enforcement duties, deems it necessary to utilize any degree of physical force shall only be
    that which the Deputy Sheriff believes necessary and objectively reasonable to effect the arrest, prevent
    escape or overcome resistance." BWC and ASTREA video corroborated deputies documented reports of
    the incident and justification for the use of force. There was no evidence to support an allegation of
    procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn Personnel. The
    deputies' actions were lawful, justified and proper.

**21-090**

1. False Arrest - Unidentified deputies arrested the complainant on 10-28-17.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated that on 10-28-17, while at the Santa Sophia Catholic Church she was arrested by unknown sheriff Deputies and taken to the Las Colinas Reentry Detention Facility (LCRDF). The complainant stated she was at LCRDF for three days for being drunk in public but denied she was under the influence and denied she was charged with any crime; therefore, stated she was falsely arrested. The complainant also reported she suffers from a brain injury. Per CLERB Rules and Regulations, Section 4.1.2 Complaints, CLERB shall not have jurisdiction to take any action in respect to Complaints received more than one year after the date of the incident giving rise to the Complaint, except that if the person filing the Complaint was incarcerated or physically or mentally incapacitated from filing a Complaint following the incident giving rise to the Complaint, the time duration of such incarceration or incapacity shall not be counted in determining whether the one year period for filing the Complaint has expired. The Complainant shall bear the burden of demonstrating that he/she was prevented from timely filing a Complaint by reason of incarceration or physical or mental incapacity. Mental incapacity shall be proven by qualified medical opinion, and not based on the Complainant's unskilled observations or general averments. Physician's declarations should contain a comprehensive diagnosis of the Complainant's condition during the filing period and, additionally, should focus on whether the incapacity prevented the Complainant from filing a Complaint. The Review Board lacks jurisdiction as the complaint was untimely and the complainant failed to provide documentation for an exemption.

**21-091**

1. Excessive Force – Unidentified deputies utilized force to place the complainant into a safety cell on 10-28-17.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated that she was placed into a "white rubber room" where three white female deputies tackled her, cut off her clothes with a razor, restrained her face down on a gurney and stomped on her bare feet with their boots. The complainant further explained she was at the Las Colinas Reentry Detention Facility (LCDRF) for 3 days for being drunk in public but denied that she was under the influence and was never charged. She stated she was upset and yelling because she felt she was falsely arrested and explained she suffers from a brain injury. Per CLERB Rules and Regulations, Section 4.1.2 Complaints, CLERB shall not have jurisdiction to take any action in respect to Complaints received more than one year after the date of the incident giving rise to the Complaint, except that if the person filing the Complaint was incarcerated or physically or mentally incapacitated from filing a Complaint following the incident giving rise to the Complaint, the time duration of such incarceration or incapacity shall not be counted in determining whether the one year period for filing the Complaint has expired. The Complainant shall bear the burden of demonstrating that he/she was prevented from timely filing a Complaint by reason of incarceration or physical or mental incapacity. Mental incapacity shall be proven by qualified medical opinion, and not based on the Complainant's unskilled observations or general averments. Physician's declarations should contain a comprehensive diagnosis of the Complainant's condition during the filing period and, additionally, should focus on whether the incapacity prevented the Complainant from filing a Complaint. The statement submitted to CLERB pursuant to this section shall be in writing and attested to under penalty of perjury as provided by Section 5.5 of these rules. The Review Board lacks jurisdiction as the complaint was untimely and the complainant failed to provide documentation for an exemption.

2. Excessive Force – Unidentified deputies cut the complainants clothes off with a razor and caused injury.

   Board Finding: Summary Dismissal

Rationale: The complainant stated deputies cut her clothes off with a razor that resulted in a cut on her back. See Rationale #1

3. Misconduct/Procedure - Unidentified deputies utilized force and did not provide medical care.

Board Finding: Summary Dismissal
Rationale: The complainant stated she was left naked, had a cut on her back from the razor, and the bones in her feet were shattered/broken as a result of the stomping; she denied receiving any medical care after the incident. See Rationale #1.

---

**21-109**

1. Misconduct/Procedure – Classification deputies placed the aggrieved at the George Bailey Detention Facility.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "My son was moved to George Bailey before his "arraignment" due to COVID-no courts". On 10-12-21, CLERB received a signed complaint with an incident date of 01-17-20; no exemptions apply to this complaint. Per CLERB rules and regulations 4.1.2 Complaints, CLERB shall not have jurisdiction to take any action in respect to Complaints received more than one year after the date of the incident giving rise to the Complaint, except that if the person filing the Complaint was incarcerated or physically or mentally incapacitated from filing a Complaint following the incident giving rise to the Complaint, the time duration of such incarceration or incapacity shall not be counted in determining whether the one year period for filing the Complaint has expired. The Review Board lacks jurisdiction as the complaint was untimely.

2. Misconduct/Procedure – Unidentified deputies "tagged" the aggrieved with a wristband.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "Upon arrival (at GBDF), he was tagged with some kind of wrist band." See Rationale #1.

3. Misconduct/Procedure – Unidentified deputies failed to protect the aggrieved.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "He was badly beaten, concussion, and his nose is now lopsided. He was set up by Guards, when inmates were done beating him they buzzed for the Guards". See Rationale #1.

4. Misconduct/Procedure – SDSD released the aggrieved from custody without charges.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "He was taken to medical for a week and discharged-no charges." See Rationale #1.

5. Misconduct/Procedure – SDSD released a mentally ill inmate without resources.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "George Bailey wanted to release a conserved mentally ill person to the street-in the middle of the night with other men. He had no phone, no money, no glasses. I had to fight to get him transferred to a psychiatric hospital in lieu of streets." (See Rationale #1)

6. Misconduct/Procedure – SDSD failed to release funds.

Board Finding: Summary Dismissal
Rationale: The complainant stated, "he never received funds- see all attached. I did complain to jail at the time No Response!!" See Rationale #1.

7. Misconduct/Procedure – SDSD failed to respond to the complainant's various complaints.

Board Finding: Summary Dismissal
Rationale: The complainant stated, "Attached documents show various complaints without a response." See Rationale #1.

8. Misconduct/Medical – SDSD staff did not provide the aggrieved with medication(s).

Board Finding: Summary Dismissal
Rationale: The complainant stated, "he never received meds when in jail". See Rationale #1.

---

*End of Report*

**NOTICE**

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

# EXHIBIT R

**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
MICHAEL GRAY
BONNIE KENK
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III



# *County of San Diego*
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA  92101-2938
TELEPHONE: (619) 238-6776      FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its September 14, 2021, meeting held via the BlueJeans Platform.  Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

**CLOSED SESSION**

a)  PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
   **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## <u>CASES FOR SUMMARY HEARING</u> (14)

**ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE**

<u>20-057</u>

1.  Misconduct/Procedure – Deputy 1 failed to serve the complainant's Restraining Order.

   <u>Board Finding</u>: Action Justified
   <u>Rationale</u>: The complainant filed a Temporary Restraining Order (TRO) against other residents within her apartment complex and had requested that a Sheriff's deputy serve the other parties. In the complainant's written statement, she alleged that Deputy 1 failed to serve the restrained party. The complainant stated, "*…when came she walked up and down hallway. Like she was looking for someone, then she walked up to Stephanie and other female states I am at it again looking for people who does live here. I was coming out of my unit* [when] *I noticed a reddish brown haired sheriff deputy serving Stephanie C. Asking her for her ID and spelling of her name.  The restraining order was served on Stephanie C and her daughter* [for] *weapon charges with* [a] *friend. Restraining order was approved as served."*  Deputy 1's Body Worn

*-continued on next page-*

Ex. R - 668

Camera recording was viewed. Deputy 1 responded to the residence and addressed the occupants. Deputy 1 asked for the restrained party by the name listed on the TRO documents; however, she learned that the names on the documents were incorrect. Deputy 1 advised that she would not relinquish the court documents to the residents due to the difference in the restraining party's name. The evidence indicated that the complainant failed to provide correct names or correct addresses for the parties that were to be served with the TRO. The information that the complainant provided to the courts was inaccurate. The evidence indicated that Deputy 1 attempted to serve the complainant's TRO; however, the information provided by the complainant was inaccurate and thus Deputy 1 was unable to complete the service. As such, the evidence showed that the alleged act or conduct did occur, and it was lawful, justified, and proper.

2.  Misconduct/Procedure – Deputy 1 informed another how to lawfully violate a Restraining Order.

    Board Finding: Unfounded
    Rationale: The complainant filed a TRO against other residents within her apartment complex and had requested that a Sheriff's deputy serve the other parties. The complainant alleged that while serving one of the parties, Deputy 1 informed that other party on how to lawfully violate the TRO. In the complainant's written statement, she reported, *"She exited out of the building. Two females sit outside asking questions. About what you can and can't do be a person of interest."* Deputy 1's Body Worn Camera recording was viewed. Deputy 1 was observed to address a female resident of an apartment that she attempted to serve the TRO, filed by the complainant. After learning of the incorrect identification of the recipient, Deputy 1 informed a female that she would not serve her the court documents, as the female's name was different then the name listed on the documents. Deputy 1 further acknowledged that she suspected the female was the correct recipient of the court documents; however, due to the different name, she would not complete service of the service. Additionally, Deputy 1 advised the female that she would not inform the complainant of her correct name. Deputy 1 informed the female that the courts would notify the complainant that no service was made, and that the complainant may make another attempt to have the TRO served. The evidence showed that the alleged act or conduct did not occur.

---

## 20-063

1.  Death Investigation/In-Custody Suicide – Joseph Earl Morton hanged himself by the neck in his cell at the Vista Detention Facility (VDF) on 05-17-20.

    Board Finding: Not Sustained
    Rationale: On 05-11-20, Joseph Earl Morton was arrested and booked into San Diego Sheriff Department (SDSD) custody at the Vista Detention Facility (VDF). At the time of his arrest, Morton made suicidal statements to the arresting deputies. Upon his booking into custody, arresting deputies alerted jail medical staff and intake deputies of the statements Morton had made. Morton reported, during the booking process, that he had been released the day prior from a psychiatric hospital, after being placed on a 5150 hold, for a suicide attempt. California Welfare and Institutions Code Section (WIC§) 5150 titled, In-custody 72-hour Treatment and Evaluation for Mentally Disordered Person, states in part, "When a person, as a result of a mental health disorder, is a danger to himself or herself, a peace officer, professional person in charge of a facility designated by the county for evaluation and treatment, designated members of a mobile crisis team, or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention." During his intake screening, Morton was evaluated by a Qualified Mental Health Practitioner (QMHP). The QMHP determined Morton should be placed in the Enhanced Observation Housing (EOH) Unit, however, as low risk, based on, "He is not actively suicidal at the present time and does not have any plans." SDSD DSB P&P Section J.5 titled, Inmate Suicide Prevention Practices & Inmate Safety Program, states in part, "Suicide risk assessment for the Inmate Safety Program (ISP) will be conducted by the facility gatekeeper. The gatekeeper is a Qualified Mental Health Provider (QMHP), or assigned designee in their absence." Additionally, DSB P&P Section J.4 titled, Enhanced Observation Housing, states in part, "Inmates who have been determined by the facility gatekeeper to warrant placement in the

Inmate Safety Program (ISP) because they present an increased risk for suicide and who do not require placement in a safety cell, shall be temporarily housed in Enhanced Observation Housing for the purpose of receiving closer observation and assessment for permanent housing. Within 24 hours of placement into EOH, and every 24 hours thereafter, an inmate shall have a mental health consultation/evaluation by a QMHP to determine the inmate's need for mental health services and their suitability for continued retention in the ISP." On 05-12-20, Morton was re-evaluated by a QMHP and cleared from EOH to the Jail Population Management Unit (JPMU), based on, "Inmate denied suicidal ideation. He has hopefulness about future, has plans to return to rehab and desires to resume psych meds." SDSD CLERB liaison provided the following information, the Enhanced Observation Housing (EOH) Unit has a "High" and a "Low" designation level. The QMHP conducts assessments to determine which level is appropriate for the inmate. Inmates designated "High" require more assessments by a QMHP than inmates with a "Low" designation. Inmates must have two consecutive "Low" level assessments prior to being cleared to mainline housing. Morton had two consecutive "Low" level QMHP assessments prior to release from EOH to mainline housing. CLERB has no jurisdiction over QMHP personnel or their decisions. The Out Patient Step Down (OPSD) Unit is not the same as EOH and the criteria for placement into the OPSD Unit is not the same as the EOH. OPSD is available to all inmates, however, only offered at San Diego Central Jail (SDCJ) and Las Colinas Detention and Reentry Facility (LCDRF). Inmates assessed by a QMHP and meeting the criteria for OPSD placement are transferred to SDCJ or LCDRF. Morton was not placed in the OPSD unit as he did not meet the criteria. Morton was placed into a single occupancy cell for a seven-day mandatory quarantine, per COVID-19 protocol. After his release from EOH, jail records produced a documented incident, the same day, where Morton stated to a deputy that he was suicidal. Morton was escorted to the QMHP office for evaluation for possible placement back into EOH. Upon conclusion of the evaluation, the QMHP did not recommend placement back into EOH, based on Morton's statements that he was "not suicidal," and "that what he really wanted was to make some phone calls." Jail phone log records documented that Morton made 43 phone calls between 05-11-20 and 05-17-20. 32 of those calls were to bail bond companies. The remaining calls were to his mother and girlfriend. Morton stated, to both his mother and girlfriend his intentions to "end it all," if they did not bail him out. Jail records did not produce any evidence that Morton expressed any concerns about his mental or physical well-being to any member of the SDSD, sworn or professional, after his release from the EOH unit. On 05-17-20, SDSD records documented, at 6:55pm, as the last time Morton is seen on jail surveillance video, alive, at his cell window. Review of the jail surveillance confirmed this. SDSD DSB P&P Section I.64 titled, Safety Checks, requires deputies to look for obvious signs of medical distress, trauma or criminal activity with each inmate, every 60 minutes. SDSD records documented required safety checks were conducted at 7:40pm and 8:36pm. The 8:36pm safety check, although recorded on the jail Area Activity Summary Report, was unable to be confirmed through jail surveillance. During the course of the investigation, it was discovered that the video surveillance system was sporadically malfunctioning, which caused time lapses in the recorded video footage. The deputy that conducted the safety check, approximately one hour before Morton was discovered unresponsive, was not captured on video due to a lapse in recording. The deputy reported there was nothing obstructing his view into Morton's cell, he observed Morton and did not see anything concerning. At approximately 9:40pm deputies discovered Morton, in his cell, unresponsive, with a blanket wrapped around his neck, tied to the bunk above his. Deputies immediately cut the blanket, began CPR, summoned jail medical staff and activated 911. Despite attempts at resuscitation by deputies, jail medical staff and paramedics, Morton failed to respond and his death was pronounced. The cause of death was due to hanging and the manner of death was suicide. Due to the video surveillance malfunctioning, CLERB was unable to confirm that the safety check conducted approximately one hour prior to Morton being found unresponsive, was completed as documented. SDSD sworn staff are required to check the video surveillance system at the beginning of each shift, however, there is no requirement that those checks be logged. Therefore, the evidence was insufficient to either prove or disprove an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

## PROPOSED POLICY RECOMMENDATION:

1. It is recommended that the San Diego Sheriff Department update its Detention Services Bureau (DSB) P&P Section I.19 Security Video Systems, to mandate that sworn staff document and keep a record of video system checks.

**20-065**

1. Misconduct/Procedure – Unidentified deputies failed to protect the complainant.

   Board Finding: Unfounded
   Rationale: The complainant alleged he was attacked by another inmate who was a convicted felon (his cellmate) and he was not protected by deputies. According to a Crime Report dated 02-10-20, the complainant stabbed his cellmate two times in the face with a pencil. The cellmate overpowered the complainant, pushed him to the floor and punched the complainant multiple times until he was unconscious. The cellmate was medically treated at a hospital with five sutures for his nose, liquid adhesive above his ear, and for cuts to the inside of his mouth and redness to his stomach. The complainant was also taken to a hospital for an evaluation due to loss of consciousness and observation of a suspected concussion. A review of Sheriff's documentation confirmed the complainant and his cellmate were both classified as Level 5-Maximum; defined as having a combination of two of the following: current assaultive charges, prior assaultive history, are deemed an institutional behavior problem or an escape risk, per Detentions Policy R.3, Inmate Classification Code–Descriptor Definitions. Per the Jail Management Information System, (JIMS) there was no prohibition for the two inmates being housed together. While deputies were inside the module, a deputy was alerted to this incident by screams coming from inside the cell. He responded, gave commands to "stop fighting," called for back-up, and subsequently escorted the complainant by gurney to Medical for evaluation; all in compliance with detention policies. The Detentions Investigations Unit (DIU) conducted an investigation and determined the complainant was the aggressor and forwarded the case to the District Attorney's Office for evaluation of 245(A)(1), Assault with a Deadly Weapon. The evidence showed that deputies did not fail to protect the complainant and the alleged act or conduct did not occur.

2. Misconduct/Procedure – Unidentified deputies "allowed" the complainant's property to be "stolen."

   Board Finding: Not Sustained
   Rationale: The complainant reported, "County of San Diego deputies allowed his property to be stolen by the same person that attacked him on 02-11-20 [*sic*]." On 02-10-20, the complainant was involved in a physical altercation with his cellmate and was taken to a hospital for observation until the following day. Upon return to the detention facility on 02-11-20, he was housed in a different module/cell. Detentions Policy Q.63, Lost Inmate Money or Property states a Watch Commander must be notified whenever an inmate claims to be missing personal or module property; if the claim is not immediately resolved, a crime report must be completed. A review of Sheriff's records did not locate any documentation pertaining to this issue and the complainant failed to identify the missing items and/or involved personnel. There was insufficient evidence to investigate the allegation further.

3. Misconduct/Procedure – Deputies 1 and 2 placed the complainant in "the hole."

   Board Finding: Action Justified
   Rationale: The complainant stated he was taken to medical and then the hospital for his injuries and when released, he was taken to the "hole." Following medical intervention, the complainant was placed into Administrative Segregation pending a hearing/investigation for a rule violation/criminal act, and in accordance with Detentions Policy J.3, Segregation: Definition & Use. During a subsequent hearing, the complainant admitted assaulting his cellmate, but said it was done in self-defense. Due to the severity of the fight and delay in facility operations, 10 days of disciplinary separation was recommended. Detentions Policy O.1. Disciplinary Action, states that discipline should be progressive and commensurate with the seriousness of the violation and the behavioral history of the inmate. The evidence showed that the conduct that occurred was lawful, justified and proper.

4. Misconduct/Procedure – County of San Diego policies "violated" the complainant's constitutional rights.

Board Finding: Unfounded

Rationale: The complainant reported he is a pre-trial detainee awaiting trial. "My California Constitutional Rights in Art 1§§1, 3, 7(a), 13 and 17 were violated by the policies adopted by County of San Diego on 02-11-20 ongoing. The complainant is awaiting release from jail." The Articles delineated by the complainant include having the right(s) to: §1–be free/independent and have inalienable rights, §3–instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good, §7(a)–not to be deprived of life, liberty, or property without due process of law, §13–be secure in their persons, houses, papers, and effects against unreasonable seizures and searches, and §17–no infliction of cruel and unusual punishment or excessive fines imposed. The complainant was arrested by warrant on 09-20-19 and extradited to San Diego to await trial for murder. According to Court documents, the court denied bail and found the defendant to be a danger to public safety and a flight risk. While incarcerated, the complainant was charged with another crime related to the events discussed in rationales 1-3. The SDSD detention policies applied were lawful, justified and proper. The evidence showed the complainant's rights were not violated and the allegation did not occur.

---

## 20-070

1. Misconduct/Procedure - Deputies 1 and 2 failed to respond to the complainant's call of service in a timely fashion.

Board Finding: Not Sustained

Rationale: According to the complainant, he summoned San Diego Sheriff's Department (SDSD) Sheriff's deputies to his apartment complex regarding a suspected case of elder abuse. In the complainant's written statement, he alleged that the responding Deputies 1 and 2 failed to respond to his call of service in a timely fashion. The complaint reported, "*I left and called the Sheriff. They arrived an hour later.* On another occasion, "*Subsequently on May 18, I called the sheriffs on him for a noise complaint which has been happening in the form of dropping heavy objects on the [floor] ceiling, loud obnoxious scratching noises and pounding football as well. The sheriff arrived an hour +45 minutes later.*" During the course of this investigation, CLERB sent the SDSD a request for records for all SDSD Communication Center reports, including the SDSD Background Event Chronology Event record, which would illustrate the date and time when a deputy was dispatched to a call, and when the deputy arrived on scene. In response to CLERB's request, the SDSD advised that pursuant to California Welfare & Institute (W&I) Code Sections 15633 and 15633.5, the SDSD cannot and would not release the documents for this investigation. According to California W&I Code Sections 15633 and 15633.5, reports of suspected abuse of an elder or dependent adult, and information contained therein, will not be disclosed. Reports of elder abuse shall be confidential and may not be disclosed except to certain agencies/entities as detailed in the code section. This section does not allow disclosure of any reports or records relevant to the reports of abuse of an elder or dependent adult if the disclosure would be prohibited by any other provisions of state or federal law. Information relevant to the incident of elder or dependent adult abuse shall only be given to an investigator from an adult protective services agency, a local law enforcement agency, the office of the district attorney, the office of the public guardian, the probate court, the bureau, the Department of Business Oversight, or an investigator of the Department of Consumer Affairs, Division of Investigation who is investigating a known or suspected case of elder or dependent adult abuse. Neither the complainant, nor CLERB, were identified as persons/entities who were permitted to obtain the records. For these reasons, the SDSD declined to disclose records or evidence that were pertinent to investigating the complaint. There was insufficient evidence to either prove or disprove the allegation.

2. Misconduct/Procedure – Deputies 1 and/or 2 omitted information in his report.

Board Finding: Not Sustained

Rationale: In the complainant's written statement, he reported that Deputies 1 and/or 2 failed to document his information in their reports. In his written statement, the complainant stated, "*I intercepted the two officers, gave them my name, driver license and a description of the male who threaten me. "John Doe" is 5'10", 200 pounds, black hair, black eyes, white male with a black stubble shadow of a beard. He drives a*

*four-door, gray hybrid car with the license plate number* [XXXXX]. *He lives directly upstairs* [from my residence]. *I followed up with the sheriffs to get a copy of the case report so that I could file a restraining order and my property management could start signal processing against the neighbor. The case report copy was denied to me because my name is not on the report. How could it not be on the report when I gave the officer, identification and neighbor description to the deputies? They failed in doing their job by not taking down the facts."* The complainant was the reporting party in a call for service made to the SDSD. During the course of this investigation, CLERB sent the SDSD a request for the incident reports written by Deputies 1 and/or 2 and any audio and/or video recordings, to include Body Worn Camera (BWC) footage that pertained to the incident that the complainant was involved in on 05-04-20. CLERB's request for records/evidence were declined, pursuant to California W&I Code Sections 15633 and 15633.5. CLERB's liaison with the SDSD explained, via email, that Deputies 1 and 2 did take a report and they contacted all persons required. The deputies received a request for a welfare check and conducted the welfare check as requested.  The welfare check was documented in a department case report. There was insufficient evidence to either prove or disprove the allegation.

3.  Misconduct/Truthfulness – Deputies 1 and/or 2 and/or unidentified deputies provided false information to the complainant

    Board Finding: Not Sustained
    Rationale: In the complainant's written statement, he documented that Deputies 1, 2, and other unidentified deputies gave him false information. The complainant reported, ("*In all my attempts to push this case forward I have been told misinformation by five different sheriff representatives about how to approach the situation.*" According to the complainant's written statement, he wanted documentation of his calls of service to the SDSD to support his filing of a restraining order against his neighbor and so his property management could start civil processing against the neighbor. However, the SDSD declined his request for evidence and reports. CLERB's liaison with the SDSD confirmed, via email, that the complainant was not given copies of the investigation, as he had requested, as "the complainant was not part of the investigation." CLERB's liaison explained that the complainant fell under the same provision of California W&I Code Sections 15633 and 15633.5, "as he is not part of the case report." There was insufficient evidence to either prove or disprove the allegation that the complainant was provided misinformation.

4.  Discrimination – Unidentified members of the Department discriminated against the complainant.

    Board Finding: Unfounded
    Rationale: According to the complainant's written statement, he felt the SDSD discriminated against him because of his appearance and his economic status. The complainant stated, "*I believe I am being discriminated against by the Sheriff's Department because they can tell by the looks of this apartment complex but I do not have the funds at the time to get an attorney. As well, I believe I am being discriminated against because I have long hair.*" According to California Welfare & Institute (W&I) Code Sections 15633 and 15633.5, any evidence, reports, or documentation that fall under this section shall be confidential and may be disclosed only as provided to those persons or entities as described in the subdivision. Any violation of the confidentiality required by this chapter is a misdemeanor punishable by not more than six months in the county jail, by a fine of five hundred dollars ($500), or by both that fine and imprisonment. The complainant was not identified as a person as provided in the subdivision section. For this reason, he was not provided with the evidence he sought from the SDSD. The evidence shows that the alleged act or conduct did not occur.

---

**20-072**

1.  Death Investigation/Drug Related – Joseph Nathanielle Jimenez was behaving erratically on a public street when contacted by Deputy 2 who utilized force to effect an arrest. Jimenez was restrained and during paramedic transport to a hospital, he went into medical distress. Life saving measures were taken, but Jimenez remained unresponsive and was on life support until he died on 02-24-20.

Board Finding: Action Justified
Rationale: On 02-18-20, Deputy 2 responded to a radio call of a subject running through the streets who appeared to be under the influence of methamphetamine. Several witnesses reported that Jimenez was in danger of passing motorists. Deputy 2 instructed Jimenez to lay on his stomach, and he complied. Jimenez was rigid, clenched his teeth, made unintelligible noises, and was sweating profusely. The deputy attempted to guide Jimenez' hands behind his back while giving verbal commands but Jimenez started to kick his feet. Deputy 2 felt he was losing control of Jimenez who had "superhuman strength and a thousand-yard stare." Deputy 2 utilized a carotid restraint to render Jimenez unconscious and gain control while awaiting cover deputies. The application of the carotid for a subject who was mentally ill or exhibiting excited delirium was permissible and allowed the deputy to gain control and handcuff Jimenez. Additional deputies arrived and a Cordcuff restraint was utilized to stop Jimenez from kicking the first responders. Paramedics also applied a Spit Sock to stop the transmission of any fluids. Jimenez was placed on a gurney, handcuffed in the prone position, with Cordcuff restraint and a Spit Sock for transport. Enroute to a hospital, Jimenez stopped breathing and oxygen was administered. Paramedics started chest compressions upon arrival to the hospital and medical care was turned over to hospital staff. Jimenez's condition worsened until he was pronounced dead on 02-24-20. An autopsy was conducted and determined the cause of death was anoxic-ischemic encephalopathy due to resuscitated cardiopulmonary arrest due to acute methamphetamine intoxication. The manner of death was determined to be an accident. The evidence confirmed that neither the carotid restraint nor the prone positioning caused or contributed to the death of Jimenez. When this incident occurred, the carotid restraint was included as a permissible option in the SDSD Use of Force Guidelines; as of June of 2020 its use has been prohibited. The application of the carotid restraint for a subject who was mentally ill or exhibiting excited delirium was permissible and allowed Deputy 2 to gain control and handcuff Jimenez. Deputy 2 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. After review of all known evidence there were no policy violations and/or misconduct found on behalf of the SDSD, and the conduct that occurred was lawful, justified and proper.

2. Excessive Force – Deputies 1, 2 and 3 utilized force to arrest Joseph Jimenez.

Board Finding: Action Justified
Rationale: The complainant reported, "Based on information and belief, on or around February 17, 2020, Joseph Jimenez had an interaction with San Diego County Sheriff's Department with deputies whose identities are currently unknown, while he was arrested at or near the City of Vista, California. During this interaction with deputies, responding deputies used excessive force, battered, falsely imprisoned, knowingly, negligently, and/or recklessly failed to care for his impaired condition, and failed to provide sufficient and/or emergency medical treatment to Mr. Jimenez while restraining him, such that he sustained substantial injuries. After and due to the misconduct of deputies, and while detained or arrested by such deputies, and in their custody and care, Mr. Jimenez suffered acute respiratory failure and anoxic encephalopathy, which ultimately led to his death. As a result of San Diego County Sheriff's Department's and its deputies' improper and/or false detention, arrest, and imprisonment of Joseph Jimenez, their failure to exercise due care, their intentional infliction of wounds to Joseph Jimenez' body, their failure to provide sufficient and/or emergency medical care, their deliberate indifference to Joseph Jimenez' medical needs, and their battery or and excessive force on Joseph Jimenez, in violation of law and his civil rights, Mr. Jimenez suffered grievous injuries to his body resulting in his wrongful death." **See Rationale #1**. Deputy 2's use of a carotid restraint to render Jimenez unconscious was permissible, reasonable and necessary to gain control and handcuff Jimenez. Deputies 1 and 3's application of a Cordcuff restraint was reasonable and necessary to cease/subdue Jimenez from kicking. A paramedic placed a mesh sock over Jimenez's head and there was no deputy involvement. Jimenez became combative when an attempt was made to place him into a recovery position. The evidence showed the applications of force were within policy and lawful, justified and proper.

3. False Arrest – Deputies 1, 2 and 3 "falsely imprisoned" Joseph Jimenez.

Board Finding: Action Justified

Ex. R - 674

Rationale: The complainant reported, "Based on information and belief, on or around February 17, 2020, Joseph Jimenez had an interaction with San Diego County Sheriff's Department with deputies whose identities are currently unknown, while he was arrested at or near the City of Vista, California. During this interaction with deputies, responding deputies used excessive force, battered, falsely imprisoned, knowingly, negligently, and/or recklessly failed to care for his impaired condition, and failed to provide sufficient and/or emergency medical treatment to Mr. Jimenez while restraining him, such that he sustained substantial injuries. After and due to the misconduct of deputies, and while detained or arrested by such deputies, and in their custody and care, Mr. Jimenez suffered acute respiratory failure and anoxic encephalopathy, which ultimately led to his death. As a result of San Diego County Sheriff's Department's and its deputies' improper and/or false detention, arrest, and imprisonment of Joseph Jimenez, their failure to exercise due care, their intentional infliction of wounds to Joseph Jimenez' body, their failure to provide sufficient and/or emergency medical care, their deliberate indifference to Joseph Jimenez' medical needs, and their battery or and excessive force on Joseph Jimenez, in violation of law and his civil rights, Mr. Jimenez suffered grievous injuries to his body resulting in his wrongful death." **See Rationale #1**. SDSD P&P 2.51 Arrest, Search and Seizure states that employees shall not make any arrest, search or seizure, nor conduct any investigation or official Department business, in a manner which they know or ought to know is not in accordance with law and established Department policies and procedures. Jimenez was a danger to himself and or others while under the influence of methamphetamine. He was detained/arrested for Obstruction/Resist Executive Officer, 69 PC and Under the Influence of a Controlled Substance, 11550(A). The evidence showed his arrest was lawful, justified and proper.

4.  Misconduct/Procedure – Deputies 1, 2, and/or 3 failed to provide medical treatment to Joseph Jimenez.

    Board Finding: Unfounded
    Rationale: The complainant reported, "Based on information and belief, on or around February 17, 2020, Joseph Jimenez had an interaction with San Diego County Sheriff's Department with deputies whose identities are currently unknown, while he was arrested at or near the City of Vista, California. During this interaction with deputies, responding deputies used excessive force, battered, falsely imprisoned, knowingly, negligently, and/or recklessly failed to care for his impaired condition, and failed to provide sufficient and/or emergency medical treatment to Mr. Jimenez while restraining him, such that he sustained substantial injuries. After and due to the misconduct of deputies, and while detained or arrested by such deputies, and in their custody and care, Jimenez suffered acute respiratory failure and anoxic encephalopathy, which ultimately led to his death. As a result of San Diego County Sheriff's Department's and its deputies' improper and/or false detention, arrest, and imprisonment of Joseph Jimenez, their failure to exercise due care, their intentional infliction of wounds to Joseph Jimenez' body, their failure to provide sufficient and/or emergency medical care, their deliberate indifference to Joseph Jimenez' medical needs, and their battery or and excessive force on Joseph Jimenez, in violation of law and his civil rights, Mr. Jimenez suffered grievous injuries to his body resulting in his wrongful death." **See Rationale #1**. After Jimenez was subdued, Deputy 2 requested emergency medical response and attempted to place him into a recovery position but was unable due to Jimenez's non-compliance. Paramedics responded and assessed Jimenez on scene and then transported Jimenez by ambulance to a hospital where hospital personnel assumed care. The evidence shows that the alleged act or conduct did not occur.

___

**20-080**

1.  Misconduct/Procedure – Deputy 2 failed to investigate a call for service made by the complainant.

    Board Finding: Unfounded
    Rationale: In the complainant's written statement, she advised, "*a Sheriff's deputy vehicle entered the parking lot where this event was taking place, drove around the parking lot without stopping to speak to the individuals. the 1st Deputy left the scene without talking to anyone or doing anything to enforce the public health officer's orders.*" According to an email from CLERB's liaison with the SDSD, Deputy 2 was

identified as the deputy who drove through the area on the date and time of the incident. Deputy 1's Body Worn Camera (BWC) was viewed. The recording illustrated the callback that Deputy 1 made to the complainant addressing the allegation that Deputy 2 failed to investigate a call for service made by the complainant. During the callback, the complainant informed Deputy 1 that deputies were requested to respond to the incident location, and that one deputy "did a lap around the parking lot, did not say anything to a crowd of nearly one hundred people." The complainant demanded to know why the deputy did not address the crowd for their lack of social distancing or mask wearing. The complainant advised that the crowd violated the public health order, that the community felt unsafe, and that even though there was "photo and video evidence," the responding deputy did not investigate the call.  According to the SDSD Training Bulletin: Enforcement of the General Public Health Orders, dated 06-30-20, individuals were required to follow Governor Newsom's Executive Orders, the Orders of the State Public Health Officer, and the County of San Diego Order of the Health Officer and Emergency Regulations. The San Diego County Public Health Order specified and ordered as follows: All persons are to remain in their homes or at their place of residence, except for employees or customers travelling to and from a reopened or essential business, or essential activity, or to participate in individual or family outdoor activity as allowed by the Order. All public or private events or convenings that bring together more than one person in a single room or single indoor or outdoor space at the same time, are prohibited. Mandatory Face Covering: All persons two years old or older shall have possession of a face covering when they leave their home or place of residence and shall wear the face covering in accordance with the California Department of Public Health Face Covering Guidance as set forth above. According to the Enforcement of Governor's Executive Order and County Public Health Order, all individuals were to follow the Governor's Executive order to stay home. Violations of either order were enforceable under Government Code Section 8665, which provided that any person who violated any of the provisions of the California Emergency Services Act or who refused or willfully neglected to obey any lawful order or regulation promulgated or issued as provided in the Act, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine of not to exceed one thousand dollars ($1,000) or by imprisonment for not to exceed six months or by both such fine and imprisonment. Per their instruction, when deputies encountered a group that was in violation of an order, deputies were encouraged to use their discretion related to officer safety and their ability to manage the situation. If the group was involved in an unauthorized organized meeting, deputies were advised to attempt to detain and cite the organizer(s) to prevent future violations. The goal was to conduct enforcement that would deter future violations or dampen the public's interest in holding gatherings in violation of the orders. Deputy 1 counseled that if someone exercises their first amendment right, they will be allowed to, that deputies will provide education on the County Health Order, and there will be no enforcement order or citations made. Deputy 1 informed the complainant that he and his lieutenant had previously contacted the event organizer and counseled them on the County's Health Order. If the event organizer and demonstrator failed to abide by the Health Orders, deputies would not enforce the order for the sake of allowing the demonstrators to exercise their first amendment. According to SDSD Policy and Procedure section 2.23 titled, "Request for Assistance," when any person requests assistance or advice, or makes complaints or reports, either by telephone or in person, all pertinent information will be obtained in an official and courteous manner, and will be properly and judiciously acted upon consistent with established Department procedures. According to SDSD Policy and Procedure section 2.30 titled, "Failure to Meet Standards," employees shall properly perform their duties and assume the responsibilities of their positions. Employees shall perform their duties in a manner which will tend to establish and maintain the highest standards of efficiency in carrying out the mission, functions, and objectives of this Department. Failure to meet standards may be demonstrated by a lack of knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; or the failure to take appropriate action on the occasion of a crime, disorder, or other condition deserving police attention. According to SDSD Policy and Procedure section 6.31 titled, "Community Oriented Policing & Problem Solving," station/division commanders will be responsible for working with their staff, community and/or other identified "stake holders", to develop the most effective strategies for collaborative efforts in dealing with problems/issues of mutual interest. The evidence indicated that Deputy 2 was dispatched to investigate the call for service made by the complainant. She responded to the scene and was unable to establish the existence of a crime. It was determined that the crowd was authorized to gather; they had previously notified the city of the protest/demonstration, which was within

their first amendment right. For these reasons, the crowd was allowed to congregate. The evidence showed that the alleged act or conduct did not occur.

2. Criminal Conduct – An unidentified deputy failed to stop at a stop sign.

   Board Finding: Not Sustained
   Rationale: In the complainant's written statement, she alleged, "*A 2nd Deputy approached the scene traveling on Riverwalk Drive towards Cuyamaca Street. That deputy did not enter the YMCA parking lot, instead choosing to blow through the stop sign at the corner of Riverwalk and Canopy Park.*" According to SDSD P&P Section 2.6 titled, "Conformance to Laws," employees shall obey all laws of the United States, of this state, and of local jurisdictions. According to SDSD P&P Section 2.30 titled, "Failure to Meet Standards," employees shall properly perform their duties and assume the responsibilities of their positions. Employees shall perform their duties in a manner which will tend to establish and maintain the highest standards of efficiency in carrying out the mission, functions, and objectives of this Department. According to the Santee Substation's Daily Deputy Deployment Log, 33 deputies were assigned to work the day of the incident. Thirty-three deputies filled the various positions of patrol, traffic, etc. Without any other identifying information, CLERB was unable to identify what deputy may have failed to stop at a stop sign at the corner of Riverwalk and Canopy Park. There was insufficient evidence to either prove or disprove the allegation.

3. Misconduct/Procedure – Deputy 1 and unidentified deputies failed to enforce the State's Public Health Officer's order and failed to enforce the County's Ordinance.

   Board Finding: Action Justified
   Rationale: In the complainant's written statement, she reported, "*I asked* [Deputy 1] *why his deputy did nothing to enforce the Public Health Officer's order to which he responded that there is no enforcement of the order if individuals are exercising their first amendment right to assemble. I disputed this claim to no avail.* [Deputy 1] *said that his deputies were under instruction to "provide education" at gatherings such as this. that it wasn't necessary because both he and his lieutenant both spoke to the gathering organizer the day prior and they had provided education at that time.* [Deputy 1], *in his official capacity as a sworn peace officer, refused to protect and serve the community as required, instead choosing to side with a "pro-law-enforcement" crowd that was not only in clear violation of the Public Health Officer's orders, but also the specific individual that was documented on video committing multiple offenses.*" On 03-04-20, the Governor of the State of California proclaimed a State of Emergency as a result of the threat of COVID-19. The County Health Officer ordered all individuals living in the County to shelter in their place of their residence, except to provide or receive certain essential services, engage in certain essential activities, and work for essential businesses and governmental services (Order No. C-19-03). This health order was issued on evidence of increasing occurrence of COVID-19 within the community, and the need to slow the rate of transmission to protect the most vulnerable and prevent the health care system from being overwhelmed. Violations of Public Health Orders present an immediate threat to the public health and safety and increased the likelihood that the COVID-19 virus would spread throughout the County and overwhelm our health care systems, cause preventable illnesses and deaths, and inflict other significant harms, including economic and social effects, on our community. In an effort to slow the spread of COVID-19, state and local officials followed the advice of public health experts to impose restrictions, such as social distancing and shelter-at-home orders. Violations of either order were enforceable under Government Code Section 8665. Government Code Section 8665 provides that any person who violates any of the provisions of the California Emergency Services Act or who refuses or willfully neglects to obey any lawful order or regulation promulgated or issued as provided in the Act, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine of not to exceed one thousand dollars ($1,000) or by imprisonment for not to exceed six months or by both such fine and imprisonment. The ordinances gave the county the ability to enforce current local and state health orders. The Department exercised discretion in enforcing the ordinances. According to the SDSD Training Bulletin: Enforcement of the General Public Health Orders, dated 07-14-20, when encountering a group that is in violation of an order, deputies were encouraged to use their discretion related to officer safety and their ability to manage the situation. It was recommended that deputies attempt to detain and cite the

event organizer(s) to prevent future violations. The goal was to conduct enforcement which would deter future violations or dampen the public interest in holding gatherings in violation of the orders. According to SDSD Patrol Procedures Manual, Policy 1 titled, "Use of Discretion," when deputies are faced with a situation where discretion can be exercised, they must evaluate the circumstances, consider the available resources, and rely on their training, Sheriff's Department policies and procedures, statutory law, information-led policing, and supervision in making the appropriate decision. In addition, within each situation, the appropriate decision should be the least restrictive that still accomplishes the intent of the law, complies with the Sheriff's Department policy, and does not compromise the deputies' safety. The Department issued numerous training bulletins, press/media releases, and their 'Blueprint for a Safer Economy' outlines to illustrate their goals. The SDSD reported that their goal of these tactics was to promote public awareness, instead of making custodial arrests. Deputies were encouraged to explain the rules, issue warnings, and engage the community through education. Although some public health orders gave deputies the authority to issue citations, deputies were encouraged to manage the orders through voluntary compliance, education, dialogue, and cooperation, informing the public of social distancing practices rather than enforcement. According to SDSD Policy & Procedure Section 2.30 titled, "Failure to Meet Standards," employees shall properly perform their duties and assume the responsibilities of their positions. Employees shall perform their duties in a manner which will tend to establish and maintain the highest standards of efficiency in carrying out the mission, functions, and objectives of this Department. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

4.  Discrimination (Other) – Deputy 1 failed to enforce the law.

Board Finding: Action Justified
Rationale: In the complainant's written statement, she reported, "*I then advised* [Deputy 1] *that this individual was guilty of false imprisonment and trespassing on private property to which he stated they were not. that they are preventing the movement of community members who wish to leave/enter the community, but* [Deputy 1] *maintained that he would take no action to stop this criminal behavior. I asked several times for this individual to be cited/arrested for this crime, but* [Deputy 1] *refused, staling that no actions would be taken against those participating in this (pro-law-enforcement) gathering. I stated to* [Deputy 1] *that if he would not do something about the false imprisonment that I had documented on video, than to at least come out and cite/remove this individual for trespassing as he was not a member of our private community, was not invited by any community members, and was not conducting business within our community.* [Deputy 1] *advised me that this individual was not trespassing because the streets within the Riverwalk community were public streets that this individual free to occupy as he wished. I disputed this, advising* [Deputy 1] *that if that were the case, the speed limits would be set by the city/county and not the HOA, and that the HOA would not be responsible for paying for traffic signs within the community.* [Deputy 1] *insisted that I was wrong and suggested that I contact the city to discuss my complaint. I advised that I didn't need to contact the city for anything because I have read the CC&Rs of my community and fully understand the private nature of Riverwalk community streets. I even reminded* [Deputy 1] *that his deputies attended an HOA meeting in summer 2019 to inform the community that they were unable to proactively patrol the community to address trespassers unless the HOA signed an agreement with the Sheriff's department OR a community resident called to report specific instances of trespassing when they were taking place.* [Deputy 1] *insisted that I was wrong and that the individual was NOT in fact trespassing therefore he would not be cited or removed. Even if* [Deputy 1] *did not believe the crime amounted to felony false imprisonment as defined under California Penal Code § 236, it definitely amounted to a misdemeanor under California Penal Code§ 237, which reads, "(a) False imprisonment is punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail for not more than one year, or by both that fine and imprisonment. If the false imprisonment be effected [affected] by violence, menace, fraud, or deceit, it shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170.*" According to California Penal Code Section 236, false imprisonment is defined as the unlawful violation of the personal liberty of another. Meaning that one person restrains, detains, or confines another person without their consent. Five elements of the crime of false imprisonment included: Was the person intentionally restrained, detained, or confined someone, the restraint, detention, or confinement forced the victim to stay or go somewhere, did the victim did not consent, was the victim was harmed, and was the suspects actions a factor in causing the

-11-

victim's harm. According to California Penal Code Section 602, trespassing is defined as entering the owner's land or property without permission. The elements of trespass are an unlawful intrusion or invasion upon a property and intent. In review of Deputy 1's BWC, he was witnessed to address the complainant in a telephonic interview. During the interview, Deputy 1 gathered information on the situation to determine if the elements of the two alleged crimes were met. During his interview, the complainant reported that a semi-truck was stalled along the street, blocking the entrance to the community entrance which was a public street within the City of Santee. The street entered into the private community. Upon determining that the elements for the crime of false imprisonment and trespassing were not meant, Deputy 1 advised that he would dispatch a deputy to investigate the incident as a traffic infraction/violation for blocking traffic. Prior to Deputy 1 dispatching a deputy to investigate, the complainant advised that the semitruck was moving away from the community's entrance. As such, a deputy was not dispatched to investigate. According to SDSD Policy and Procedure Section 2.30 titled, "Failure to Meet Standards," employees shall properly perform their duties and assume the responsibilities of their positions. Employees shall perform their duties in a manner which will tend to establish and maintain the highest standards of efficiency in carrying out the mission, functions, and objectives of this Department. According to SDSD Policy and Procedure Section 6.31 titled, "Community Oriented Policing & Problem Solving," station/division commanders will be responsible for working with their staff, community and/or other identified "stake holders", to develop the most effective strategies for collaborative efforts in dealing with problems/issues of mutual interest. The evidence showed that the alleged act or conduct did occur and was lawful, justified, and proper.

5.  Discrimination (Other) – Deputy 1 failed to enforce the law.

    Board Finding: Action Justified
    Rationale: In the complainant's written statement, she reported, "[Deputy 1]*, in his official capacity as a sworn peace officer, refused to protect and serve the community as required, instead choosing to side with a "pro law-enforcement" crowd that was not only in clear violation of the Public Health Officer's orders, but also the specific individual that was documented on video committing multiple offenses.* [Deputy 1] *is guilty of the following: Failure to carry out obligation of protecting and serving the community - Despite my stating that I had video, clear convincing evidence of multiple crimes in progress,* [Deputy 1] *decided that we (residents of Riverwalk, myself, my disabled girlfriend) were not entitled to protection by the law enforcement agency tasked with doing just that. An acknowledgment of Santee Sheriff station pattern of ignoring crimes committed by white supremacists, even in the face of clear and convincing evidence. This pattern of unfair enforcement of the law only serves to embolden and empower white supremacists that carry out criminal acts, while alienating the rest of the community."* According to SDSD Policy and Procedure Section 2.53 titled, "Discrimination," employees shall not express any prejudice or harassment concerning race, religious creed, color, national origin, ancestry, physical or mental disability, medical condition, pregnancy, marital status, gender, age, political beliefs, sexual orientation, lifestyle or similar personal characteristics. In review of Deputy 1's BWC recording of his telephonic interview with the complainant, Deputy 1 advised that he understood her frustration, but advised that as a law enforcement officer, they must remain neutral. Additionally, he counseled that if someone exercises their first amendment right, they will be allowed to, that deputies will provide education on the County Health Order, and there will be no enforcement order or citations made. If the event organizer and demonstrators failed to abide by the Health Orders, deputies would not enforce the order for the sake of allowing the demonstrators to exercise their 4th amendment. The Department exercised discretion in enforcing the ordinances. The SDSD reported that their goal was to promote public awareness, instead of making custodial arrests. Deputies were encouraged to explain the rules, issue warnings, and engage the community through education. Although some public health orders give deputies the authority to issue citations, deputies were encouraged to manage the orders through voluntary compliance, education, dialogue, and cooperation, informing the public of social distancing practices rather than enforcement.

6.  Misconduct/Truthfulness – Deputy 1 lied to the complainant.

    Board Finding: Unfounded

Rationale: In the complainant's written statement, she advised, "[Deputy 1] *LIED to a constituent seeking assistance to justify his dismissal his own responsibility to take action. Not only does this amount to gaslighting, but is a clear example of official misconduct.* [Deputy 1] *is guilty of the following: Lying in official capacity -* [Deputy 1] *stated that the individual restricting access to/from my community was entitled to do so, and was not guilty of false imprisonment. California Penal Code§ 236 reads, "False imprisonment is the unlawful violation of the personal liberty of another." California Penal code§ 236.1 (h) (3) reads, "'Deprivation or violation of the personal liberty of another' includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out.": California Penal Code § 236.1 (i) reads, "The total circumstances, including the age of the victim, the relationship between the victim and the trafficker or agents of the trafficker, and any handicap or disability of the victim, shall be factors to consider in determining the presence of "deprivation or violation of the personal liberty of another," "duress," and "coercion" as described in this section."* [Deputy 1] *also lied in his official capacity by claiming that our community streets were open to the public and that myself as a residence of this community had no right to have an individual cited/removed for trespassing within my community. I have confirmed with my HOA and the city that the streets within our community are privately owned property that is maintained entirely by community resident funding with no allocations from the city of Santee or county of San Diego.*" The semi-private community is located within the City of Santee. The community has a population of 2504 residents of both homeowners and apartment renters. There is one entrance to the community which is opened to the public and is not gated. Canopy Park Lane enters the community from Riverpark Drive. The residential community does not have a strictly controlled entrance for pedestrians, bicycles, or vehicles. In review of Deputy 1's BWC recording of his telephonic interview with the complainant, Deputy 1 informed the complainant that the street outside the community of Riverwalk, Riverwalk Drive, was not a private street. The complainant reported, "the truck was parked all along the entrance [Riverpark Drive], completely blocking the entrance and exit" of the community. Upon explanation, Deputy 1 told the complainant that he would dispatch a deputy; however, the complainant went on to press for criminal charges to be pressed against the driver of the semitruck. According to SDSD Policy and Procedure Section 2.46 titled, "Truthfulness," when asked by the Sheriff, the Sheriff's designee or any supervisor, employees will always answer questions, whether orally or in writing, truthfully and to the fullest extent of their knowledge. All written and verbal reports shall be truthful and complete. The evidence showed that the alleged act or conduct did not occur.

7.  Misconduct/Procedure – Deputy 1 failed to assist the complainant who summoned deputies for assistance.

    Board Finding: Unfounded
    Rationale: In the complainant's written statement, she alleged, "[Deputy 1] *is guilty of the following: Failure to carry out obligation of protecting and serving the community - Despite my stating that I had video, clear convincing evidence of multiple crimes in progress,* [Deputy 1] *decided that we (residents of Riverwalk, myself, my disabled girlfriend) were not entitled to protection by the law enforcement agency tasked with doing just that. Not only was this presence menacing because of the deprivation of liberty, but especially concerning due to the inability of a disabled individual to freely leave their own community.* [Deputy 1] *refused to take appropriate action regarding this offense, further victimizing myself, my girlfriend, and our community - leaving us with no recourse or entity to call for help.*" According to SDSD Policy and Procedure Section 2.23 titled, "Request for Assistance," when any person requests assistance or advice, or makes complaints or reports, either by telephone or in person, all pertinent information will be obtained in an official and courteous manner, and will be properly and judiciously acted upon consistent with established Department procedures. In review of Deputy 1's BWC recording of his telephonic interview with the complainant, Deputy 1 informed the complainant that would dispatch a deputy to investigate the complaint of a semitruck blocking the entrance and exit to the Community of Riverwalk. Moments after gathering the information to responded to the scene, the complainant advised that the semitruck had moved away from the entrance and exit to the community. In regard to the complainant's allegations of unlawful congregation and her press for deputies to respond and issue citations to the congregating

crowd, deputies were dispatched to the location to view and monitor the crowd; however, based on instruction and discretion, no citations were issued. The evidence showed that the alleged act or conduct did not occur.

---

## 20-087

1. Misconduct/Procedure – Mail Processing Center deputies delayed and/or rejected the complainant's mail.

   Board Finding: Action Justified
   Rationale: The complainant stated, "My complaint is regarding possible misconduct by Sheriff's Dept. Mail Operation Personnel. We are told deputies review/process all mail at Las Colinas Det. Facility, Mail Operations. Since last March 2020, and with increasing frequency, especially, since Jun/July, I have experienced a pattern of mail (letters, glasses, books, magazines) losses and disruptions that seems to be unsolable. I have gone thru channels, using inmate requests (no help) and periodic inmate grievances, but problems continue, unabated!" SDSD DSB P&P Section P.3 titled, Inmate Mail, states in part, "All incoming non-legal inmate mail will be routed to the Mail Processing Center (MPC) warehouse located at Las Colinas Detention and Reentry Facility. Deputies assigned to the MPC and Prisoner Transportation Detail (PTD) will work collaboratively with detention facilities' staff to provide the reasonably prompt delivery of incoming materials. Inmates shall be allowed to receive and possess U.S. mail, incoming letters, confidential/legal mail and mail from official government agencies. Inmates may also receive electronic email messages, periodicals, magazines, and new books." SDSD records produced fourteen Contents Unacceptable Notices (Form J-320) for items sent to the complainant that were rejected and returned to sender. According to DSB P&P Inmate Mail, "In cases in which incoming mail is withheld, both the inmate and sender will receive a copy of a Contents Unacceptable Notice (J-320) form. Any of the following will cause incoming U.S. mail to be rejected: mail marked with paint, crayon, glitter, labels, cloth, string, watermarks, stains, lipstick, cosmetics, perfume, or stickers (excluding US postage stamps). Hard bound and leathered books of any nature. All items deemed to contain contraband or determined to be unacceptable will not be delivered to the inmate but will be retained pending the conclusion of the internal appeal process." The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

2. Misconduct/Procedure – Mail Processing Center deputies "tampered" with the complainant's mail.

   Board Finding: Unfounded
   Rationale: The complainant stated, "With limited funds, I subscribe to TIME and Grapevine magazines. To date, I am missing 'Grapevine' magazines, issues May and June 2020." This is a recovery publication so for anonymity the mailing label is not placed on the cover. The envelope, therefore, cannot be destroyed. If the envelope wasn't trashed, I may not be missing the May and June 2020 issues." SDSD DSB P&P Section P.3 titled, Inmate Mail, states in part, "All non-confidential/legal mail is subject to being scanned, copied, and read when there is a valid security concern and the facility commander approves." The complainant filed eight grievances regarding issues with his mail. SDSD DSB P&P Section N.1 titled, Grievance Procedure, states in part, "Written grievances can often be resolved without the intervention of a supervisor, and every effort should be made by a deputy or staff member who receives a grievance to handle it at his or her level." In a grievance dated 04-14-20, the complainant stated, "Mail & Email missing. 18 days at Vista, one letter no email! I feel my mail and email (to me) is in mail room at GBDF, Las Colinas (here)?" A Detentions Sergeant responded, stating, "All mail is delivered as soon as it is processed. If you recently transferred there could be delays. You will be informed of rejected mail in writing." In another grievance dated 07-19-20, the complainant stated, "Still missing May and June 2020 issues of 'Grapevine,' is envelope being thrown away? I got two old ones: No envelope." The grievance was responded to by a Detentions Deputy, who stated, "MPC does not throw away magazines, MPC forwards all mail to inmates as it comes in." The evidence showed that the alleged act or conduct did not occur.

---

## 20-089

Ex. R – 681

1. Illegal Search and Seizure – Deputies conducted a strip search on the complainant.

   Board Finding: Action Justified
   Rationale: The complainant stated, "I was hurt by Dep's coming in to this jail, very badly, on a elegal strip search." SDSD DSB P&P Section I.52 titled, Inmate Searches, states in part, "All inmate searches shall be conducted with the purpose of providing a safe and secure environment for inmates and staff in compliance with legal standards. Any inmate may be strip searched before it is determined that he or she will be placed in general population housing, if a deputy has reasonable suspicion to believe the inmate is concealing contraband or weapons in a manner that would not be detectible by a pat down search." Additionally, SDSD DSB SDCJ Green Sheet I.52.C.1 titled, Inmate Searches, states in part, "No strip search will be conducted on an inmate, unless a minimum of three hours has elapsed from the time of initial booking. After the minimum waiting period has elapsed, inmates will continue through the booking process, starting with a strip search." The evidence showed the alleged act  did occur and was lawful, justified and proper.

2. Excessive Force – Deputies placed chains on the complainant's ankles.

   Board Finding: Unfounded
   Rationale: The complainant stated, "When I was stripped searched #5-deputies took me in a room placed a big chain on my ankles very tight and then started pulling on the chain so very hard." DSB P&P Section I.52, states in part, "Prior to strip searching non-cooperative inmates, deputies shall notify a supervisor and receive approval. The supervisor will have forced strip searches of non-cooperating inmates digitally recorded on a handheld device. The digital recording shall capture the supervisor explaining to the inmate that he/she is being recorded and requesting the inmate to voluntarily cooperate with the strip search procedures. A NetRMS Use of Force Report will be completed per Addendum F and Detention P&P I.89." SDSD DSB P&P Section I.89 titled, Use of Force, states in part, "On every occasion when physical force has been applied to overcome a subject's resistance, deputies (or other employees involved) must verbally inform their supervisor as soon as practical. All deputies (or other employees) involved in the Use of Force incident must clearly articulate in written form, all facts surrounding the incident. After the use of any restraint equipment, defensive device, impact weapon or chemical agent upon a subject, a medical evaluation is required and the resulting treatment will be documented in the necessary reports." SDSD records did not produce any Use of Force Reports and there was no documentation that force was used on the complainant during his incarceration. Jail medical records had no documented evaluation for any use of force incidents. Based on the complainant's inconsistent statements, and recall of the alleged events, he was found not to be credible. The evidence showed that the alleged act or conduct did not occur.

3. Misconduct/Procedure – Deputy 1 "assigned" the complainant to a top bunk.

   Board Finding: Unfounded
   Rationale: The complainant stated, "I was told to move out of my room on unit 5-C cell 8 at approximately 11:30PM 9-1-2020 in to cell 4 on 5-c to a top Bunk by staff. He rabed my bed and move my things hisself, so I had to. Elegally assigned to a top bunk." A review of the complainant's jail medical records did not indicate any "lower bunk" orders. Additionally, the complainant's Jail Information Management System (JIMS) Hazards & Instructions, available to Classification and/or Housing Deputies, did not indicate "lower bunk." The complainant's Inmate History Summary Report (IHSR) documented that he was moved, within the same module from one cell to another, however, he was assigned the middle bunk as he was in the previous cell. The evidence refuted the complainant's allegation. Based on the complainant's inconsistent statements, and recall of the alleged events, he was found not to be credible. The evidence showed that the alleged act or conduct did not occur.

4. Misconduct/Intimidation – Deputies "threatened" the complainant.

   Board Finding: Not Sustained

Rationale: The complainant stated, "I have been told over and over my Grievances will get me hurt or kill in this jail by Staff and inmate if I'm not careful." SDSD P&P Section 2.48 titled, Treatment of Persons in Custody, states, "Employees shall not mistreat, nor abuse physically or verbally, persons who are in their custody. Employees shall handle such persons in accordance with law and established Departmental procedures." The complainant did not provide information about when he was threatened and did not identify any deputies. Additionally, there were no witnesses and no audio of the conversations between the complainant and deputies. Therefore, there was insufficient evidence to either prove or disprove the allegation.

5.  Misconduct/Procedure – Deputies did not return the complainant's grievances.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "A lot of my grievances do no come back I see." SDSD DSB P&P Section N.1 titled, Grievance Procedure, states in part, "The deputy or other employee who initially receives a grievance will sign his or her name and ARJIS number on the J-22 form along with the date and time. The second page of the J-22 form will immediately be given to the inmate as a signed receipt for the grievance." A review of SDSD records confirmed that the complainant submitted nine grievances. Seven of them were determined not to be a grievance, but inmate requests. The complainant did not present any evidence to support his allegation, therefore, there was insufficient evidence to determine if additional grievances were submitted and/or there was a violation of policy for lack of a response.

---

## 20-097

1.  Discrimination/Racial – Deputy 1 "racially targeted" the aggrieved on 10-01-20.

    Board Finding: Unfounded
    Rationale: The complainant stated, "On 10-01-20 the aggrieved was racially targeted by Dep. 1." The aggrieved/her counsel were contacted for a direct account of what occurred, but her statement was never forthcoming. SDSD employees are prohibited from expressing any prejudice or harassment concerning race. All investigative detentions, traffic stops, arrests, searches, and seizures of property by employees will be based on a standard of reasonable suspicion or probable cause as required by the Fourth Amendment of the U.S. Constitution, applicable case law and relevant statutory authority. The aggrieved was stopped due to an inoperable third light. She then refused to provide identification or comply with lawful orders issued by Deputy 1. Per the vehicle code, no person shall drive a motor vehicle upon a highway, unless he or she holds a valid driver's license. Furthermore, it is unlawful to willfully fail or refuse to comply with a lawful order, signal, or direction of a peace officer per VEH§ 2800, Obedience to Traffic Officers. The aggrieved was non-compliant in her words/actions and failed to provide her driver's license or submit to Deputy 1's authority as a peace officer. Combined with the aggrieved's traffic violation and failure to comply with lawful orders, absent derogatory comments or racial slurs and without the ability to analyze the perceived race data of Deputy 1's stops and contacts and compare it to other deputies working the same area, there was no evidence that the aggrieved was racially profiled/targeted and the alleged act or conduct did not occur.

2.  Illegal Search & Seizure – Deputy 1 entered the aggrieved's vehicle and removed her seatbelt.

    Board Finding: Action Justified
    Rationale: The complainant stated, "A video the aggrieved posted to Facebook shows (Deputy) 1 telling the aggrieved she is not under arrest, yet he touches her and reaches into her car to remove her seatbelt". The aggrieved/her counsel were contacted for a direct account of what occurred, but her statement was never forthcoming. Body Worn Camera (BWC) evidence verified the aggrieved ignored the deputies multiple requests for her driver's license, as well as the deputy's commands for her to exit the vehicle. U.S. Supreme Court: Pennsylvania v. Mimms, 434 U.S. 106 (1977), "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Vehicle Code Section

(CVC) 12951(b): Failing To Present A Driver's License. The driver of a motor vehicle shall present his or her license for examination upon demand of a peace officer enforcing the provisions of this code. Per the CA vehicle code, no person shall drive a motor vehicle upon a highway, unless he or she holds a valid driver's license. Furthermore, it is unlawful to willfully fail or refuse to comply with a lawful order, signal, or direction of a peace officer per VEH§ 2800, Obedience to Traffic Officers. The aggrieved was non-compliant in her words/actions and failed to provide her driver's license or submit to Deputy 1's authority as a peace officer, which escalated the traffic infraction to an arrestable crime and gave Deputy 1 probable cause to conduct a search & seizure of the aggrieved and her vehicle. The evidence showed that the conduct that occurred was lawful, justified and proper.

3.  Excessive Force – Deputy 1 pulled the aggrieved's hair.

    Board Finding: Action Justified
    Rationale: The complainant stated, "Picture posted show injuries from the aggrieved's interaction with (Deputy) 1 and she states that he pulled her by her hair." The aggrieved/her counsel were contacted for a direct account of what occurred, but her statement was never forthcoming. Body Worn Camera and scene photographs submitted into evidence confirmed the aggrieved's hair was pulled. Per SDSD policies, employees are only to use the amount of force that is reasonably necessary and are prohibited from mistreating or physically abusing anyone in their custody. Deputy 1 documented in his report and BWC evidence confirmed that the deputy gave lawful commands, provided a warning that force would be used, and then effected an arrest with the use of arm guidance, handcuffs, and arm control. Although not specifically listed as a use of force option, the pulling of hair is not prohibited by policy. Per the vehicle code, a driver must comply when a peace officer requests a driver's license and to step out of the vehicle. The aggrieved was in violation of PC 148 and CVC 12951(b), when she ignored lawful commands and delayed the deputy in the performance of his duties. The force utilized was in compliance with policy and based upon the aggrieved's active resistance. The evidence showed that the conduct that occurred was lawful, justified and proper.

4.  Misconduct/Procedure – Deputy 1 refused the aggrieved's request for a supervisor.

    Board Finding: Action Justified
    Rationale: The complainant stated, "She (aggrieved) repeatedly calmly requests his supervisor and ignores her requests though she states that she does not feel safe." The aggrieved/her counsel were contacted for a direct account of what occurred, but her statement was never forthcoming. BWC video confirmed the aggrieved repeatedly asked for a supervisor. While there is no policy that command staff be summoned, Computer Assisted Dispatch (CAD) records and Body Worn Camera evidence confirmed that Deputy 1's sergeant subsequently responded to the scene. Deputy 1 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding, however it is privileged information per the Peace Officer Bill of Rights and cannot be publicly disclosed. As there was no policy requirement for a supervisor to be called, and one did respond, the evidence confirmed the action that occurred was lawful, justified, and proper.

5.  Illegal Search & Seizure – Deputy 1 "held" (detained) the aggrieved for several hours.

    Board Finding: Action Justified
    Rationale: The complainant stated, "Additionally, she states that (Deputy) 1 tried to book her into jail and the jail refused to. He then held her for several hours." The aggrieved/her counsel were contacted for a direct account of what occurred, but her statement was never forthcoming. Deputy 1 effected an arrest and transported the aggrieved to a detention facility for booking. Due to COVID-19 precautions, the jail refused acceptance and she was taken to a hospital for assessment. While there, the aggrieved refused to identify herself or be treated, and she was released from the hospital against medical advice. The aggrieved was then taken back to jail for booking but refused to exit the patrol vehicle. In lieu of another use of force to overcome her resistance, jail staff refused acceptance once again. The aggrieved was given a certificate of release per PC849(b)(1) and released from custody at a trolley station, which provided telephone and transportation services. Per the penal code, when an arrest is made without a

-17-

warrant, the suspect must be taken before a magistrate without delay to face charges. A certificate of release authorizes a suspect to be released from custody without going before a magistrate, if the officer is satisfied that there are insufficient grounds for making a criminal complaint; the arrest is then deemed a detention only. CAD records confirmed this process took approximately five hours. The evidence showed that the conduct that occurred was lawful, justified and proper.

6.  Misconduct/Procedure – Deputy 1 released the aggrieved away from her vehicle.

Board Finding: Action Justified
Rationale: The complainant stated, "He then held her for several hours then dropped her away from her car." The aggrieved/her counsel were contacted for a direct account of what occurred, but her statement was never forthcoming. The aggrieved's vehicle was impounded pursuant to her arrest. SDSD Policy dictates that when a vehicle is impounded, any occupants not placed in custody will fall under the provision of Policy 6.78, Stranded Motorist Assistance, which requires providing assistance to see them to a place of safety. After her release, the complainant reportedly denied knowing any person in the San Diego area, so she was transported to the Santee Trolley Square due to it being well light, having payphones and bus and trolley transportation. The evidence showed that the conduct that occurred was lawful, justified and proper.

7.  Illegal Search & Seizure – Deputy 1 released the aggrieved without her cell phone.

Board Finding: Action Justified
Rationale: The complainant stated, "He then held her for several hours then dropped her away from her car without her phone." The aggrieved/her counsel were contacted for a direct account of what occurred, but her statement was never forthcoming. Another deputy completed the tow form documentation and attached photo and video evidence that displayed a cell phone within the vehicle at the time it was towed/impounded. There is no policy stating that deputies must retrieve an arrestee's cell phone from an impounded car. The complainant was released at an area that had payphone services. The evidence showed that the conduct that occurred was lawful, justified and proper.

**POLICY RECOMMENDATION:**

1.  It is recommended that the San Diego Sheriff's Department (SDSD) revise its Policies and Procedures Manual, Addendum F, entitled, "Use of Force Guidelines," to mandate the use of de-escalation techniques ("shall") when it is safe and reasonable to do so.

---

**20-105**

1.  Death Investigation/In-Custody Medical – On 10-16-20, Nathan Lee Brogan, an inmate at the Vista Detention Facility (VDF), collapsed unresponsive in a housing module dayroom. He was transported to Tri-City Medical Center where he was pronounced dead the next day.

Board Finding: Action Justified
Rationale: On 09-03-18, Nathan Lee Brogan was arrested by the San Diego Police Department (SDPD) for attempted murder and other firearm related offenses. During the court proceedings, Brogan was deemed to be unfit to stand trial. On 02-20-20, Brogan was committed to Patton State Hospital. While at Patton State Hospital, Brogan was eventually deemed competent and transferred from Patton State Hospital and booked into San Diego Central Jail (SDCJ) on 09-17-20. Brogan was assessed for Outpatient Stepdown (OPSD) services but was deemed ineligible due to his age and the belief he would fare better in a protected module for older inmates. On 09-24-20, he was transferred to VDF. On 10-16-20, he exited his cell and sat on a table in the module dayroom where he was witnessed to become unresponsive a few moments later. Deputies and medical staff immediately responded and initiated lifesaving measures. Medics arrived and transported Brogan to Tri-City Medical Center (TCMC) via ground ambulance. He was admitted to the TCMC Intensive Care Unit where his condition continued to deteriorate, and he was

pronounced dead on 10-17-20. The cause of death was myocardial infarction (heart attack) due to atherosclerotic cardiovascular disease. The manner of death was natural. Toxicology testing of hospital admission blood was not performed. All evidence indicated that Brogan was properly medically screened and housed after his booking. The evidence also indicated that facility staff appropriately recognized and responded to Brogan's emergency medical needs. Sworn staff immediately worked with on-duty health staff and assisted with the provision of basic life support. There was no evidence to support an allegation of misconduct or negligence on the part of Sheriff's Department sworn personnel.

---

## 20-112

1. Death Investigation/In-Custody Medical – Edel Corrales Loredo died of natural causes at Sharp Chula Vista Medical Center following his incarceration at the George Bailey Detention Facility (GBDF).

Board Finding: Action Justified
Rationale: On 07-21-20, Edel Corrales Loredo was arrested by the San Diego Police Department and booked into San Diego Sheriff Department (SDSD) custody at the George Bailey Detention Facility (GBDF). On 11-13-20, Loredo informed a deputy that he was having difficulty breathing and he was escorted to medical for an evaluation. He was tested at the jail for COVID-19 and transported via ambulance to Sharp Chula Vista Medical Center. COVID-19 was subsequently detected later (from the test at the jail) when Loredo was at the hospital. Loredo was admitted and his health deteriorated until his death on 11-21-20. There was no evidence that Loredo expressed any concerns about respiratory issues to any member of the SDSD, sworn or professional, prior to the day he was transported to Sharp Chula Vista Medical Center. Upon being advised that Loredo was not feeling well, sworn personnel immediately notified medical staff and Loredo was transported to a hospital. The cause of death was respiratory failure, due to COVID-19 with asthma, diabetes mellitus, and hypertension contributing and the manner of death was natural. It should be noted that Loredo rejected medical care several times throughout his incarceration and continued to refuse medical care when he was transported to Sharp Chula Vista Medical Center. Upon review of all evidence associated with COVID-19 protocol, GBDF had implemented pandemic-related safeguards to protect the inmate population. Care/Treatment of the COVID-19 virus is a medical issue and medical staff and their decision(s) reside outside CLERB's purview. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel and their actions were lawful, proper, and justified.

---

## 21-015

1. Death Investigation/Barricade – On 02-16-21, Guillermo Vallin Morales shot himself and died at the scene while San Diego Sheriff's Department (SDSD) Special Enforcement Detail (SED) personnel conducted a search warrant at his Jamul residence in response to Vallin Morales shooting the homeowner a few hours earlier.

Board Finding: Action Justified
Rationale: According to SDSD records, Guillermo Vallin Morales was a caretaker for the owner of the home in which he resided. The property owner had died approximately five months earlier and the homeowner's son, Bruce Mueller, placed the property up for sale. Vallin Morales was to vacate the property and on 02-15-21, Mueller went to the residence and asked him to leave. Vallin Morales responded by shooting Mueller in the back. 9-1-1 was called and emergency personnel responded, including SED. Vallin Morales barricaded himself in the residence and deputies used less lethal weapons in their effort to have him exit the house. With no response by Vallin, a law enforcement canine was released into the attic where Vallin Morales was barricaded. After the canine entered the attic, he was heard to cry out and a single gunshot was heard. Deputies entered the attic and found Vallin unresponsive with a firearm in his right hand and a suicide note on scene. An autopsy determined the cause of death was a penetrating gunshot wound of the head, and the manner of death was suicide. Traumatic injuries consistent with a dog bite were noted to Vallin Morales's lower legs. All evidence indicated that SDSD personnel followed all

applicable policies and procedures pertaining to this 17-hour barricaded subject incident. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of SDSD sworn personnel.

## 21-024

1. Misconduct/Procedure – Deputy 2 took picture(s) of the complainant.

   Board Finding: Action Justified
   Rationale: The complainant reported, "On Monday, March 1st at 1:10 PM, I was filming two sheriff's vehicles parked next to the Dempsey-Holder Safety Center/ Lifeguard Tower in Imperial Beach. I observed a sheriff deputy walking west on Elder towards the two parked vehicles. While walking, the deputy took a picture of me with a cellphone and then walked to the driver's side window of the parked vehicle to speak with the deputy sitting in the driver's seat. I observed the deputy, whose back was to me, take several "selfies" of his own face and I could see from where I was standing on the sidewalk that I was visible in the background of the photos. I was uncomfortable and it was unclear to me whether the cellphone was government issued. His intentions in photographing me were unclear and I felt he may intend to use these photos to try to intimidate or stalk me as a private female citizen." The portion of the complainant's statement referencing "intent" was a belief that was unsupported by any evidence. Photography is protected in the U.S. by the First Amendment to the Constitution and it is generally permissible for people, including law enforcement, to take photographs at any public place. Deputies 1 and 2 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Deputy statements are protected by the Peace officer Bill of Rights and cannot be disclosed. The evidence showed that the conduct that occurred was lawful, justified and proper.

2. Misconduct/Discourtesy - Deputy 2 refused to acknowledge the complainant.

   Board Finding: Sustained
   Rationale: The complainant reported that she said "Excuse me, Officer" 4-6 times, and neither of the two deputies acknowledged her presence in any way." The complainant also submitted video and audio evidence that corroborated her allegation and proved that she politely requested identifying information from the deputies almost 20 times. Deputies 1 and 2 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Deputy statements are protected by the Peace Officer Bill of Rights and cannot be publicly disclosed. Sheriff's Policy 2.22-Courtesy mandates that employees be courteous to the public. Deputy 2's failure to acknowledge or respond to the complainant was discourteous. Deputy 2 exercised his option to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The complainant submitted video/audio evidence that supported the finding and Deputy 2's conduct was not justified.

3. Misconduct/Discourtesy - Deputy 1 refused to acknowledge the complainant.

   Board Finding: Unfounded
   Rationale: The complainant reported, "I moved closer so I was about 10 feet away from the deputy and asked for his name and badge number. The officer was in uniform and on duty but refused to acknowledge my presence in any way or to comply with a basic service at the request of a citizen which is required by law. I insistently but politely asked for this information repeatedly and was completely ignored by the officer standing outside the vehicle. The officer seated inside the vehicle then asked whether he could assist me. His nametag identified him as Deputy 1. I asked why the other officer refused to acknowledge me. Deputy 1 said "I can't speak for him." He then asked me if there was something else he could assist me with. I said no." Sheriff's Policy 2.23-Request for Assistance, states when any person requests assistance or advice, all pertinent information will be obtained in an official and courteous manner, and will be properly and judiciously acted upon consistent with established Department procedures. Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the

recommended finding. Deputy statements are protected by the Peace Officer Bill of Rights and cannot be disclosed. The complainant acknowledged that Deputy 1 ultimately asked if he could assist her with something which she refused. The evidence showed that Deputy 1 responded to the complainant and the allegation did not occur.

4. Misconduct/Procedure - Deputy 2 refused to provide identification upon request.

Board Finding: Sustained
Rationale: The complainant reported, "I moved closer so I was about 10 feet away from the deputy and asked for his name and badge number. The officer was in uniform and on duty but refused to acknowledge my presence in any way or to comply with a basic service at the request of a citizen which is required by law. I insistently but politely asked for this information repeatedly and was completely ignored by the officer standing outside the vehicle." The complainant submitted audio evidence in which she specifically requested Deputy 2's name and badge number 3 times, and attempted to get his attention almost 20 times. Sheriff's Policy 2.20-Identification, states in part that while on duty, all employees shall furnish their first and last name or ARJIS number to any person requesting his or her identity, except when the withholding of such information is necessary for the performance of police duties. Deputy 2 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding Deputy 2 exercised his option to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. The evidence supported the allegation and the act or conduct was not justified.

---

**21-080**

1. Misconduct/Procedure – Allegations alleged against the San Diego Police Department.

Board Finding: Summary Dismissal
Rationale: On August 13, 2021, CLERB received a signed complaint concerning allegations against San Diego Police Department personnel. Per CLERB Rules & Regulations 4.1 Complaints: Authority. Pursuant to the Ordinance, CLERB shall have authority to receive, review, investigate, and report on Complaints filed against peace officers or custodial officers employed by the County in the Sheriff's Department or the Probation Department… Summary Dismissal per Section 15(a), CLERB does not have jurisdiction over the subject matter of the complaint.

---

*End of Report*

NOTICE

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

Ex. R - 688

# EXHIBIT S

BOARD MEMBERS
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
MICHAEL GRAY
BONNIE KENK
TIM WARE
GARY I. WILSON

EXECUTIVE OFFICER
PAUL R. PARKER III



# County of San Diego
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776    FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its July 13, 2021, meeting held via the BlueJeans Platform. Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

## CLOSED SESSION

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
   **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

b) CONFERENCE WITH LEGAL COUNSEL – EXISTING LITIGATION
   (Subdivision (c) of Government Code Section 54956.9)
   - **Appeal to the County's Civil Service Commission re: CLERB Case #17-150/Horsey**

| DEFINITION OF FINDINGS | |
| --- | --- |
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASES FOR SUMMARY HEARING (8)

## ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE

### 20-012

1. Death Investigation/In-Custody Drug Related – Blake Edward Wilson died while in the custody of the San Diego County Sheriff's Department (SDSD) on 01-26-20.

   Board Finding: Not Sustained
   Rationale: On 01-16-20, upon his entry into Sheriff's custody, and during his medical intake screening, Blake Edward Wilson reported daily use of heroin and alcohol consumption. Based on his screening, Wilson was placed on Standard Nursing Procedure for Heroin/Opiate Withdrawal. On 01-26-20, Wilson

*-continued on next page-*

Ex. S - 690

was found down and unresponsive in his cell at the San Diego Central Jail. Deputies immediately began cardiopulmonary resuscitation (CPR), summoned jail medical staff and activated 911. Jail medical staff provided life-saving measures, including the administration of Naloxone. SDSD DSB P&P Section M.6 titled, Life Threatening Emergencies, states in part, an opioid overdose requires immediate medical attention. Naloxone is the antagonist of choice for the reversal of acute opioid toxicity. Naloxone should be administered to any inmate who presents with signs of opioid overdose or when opioid overdose is suspected. When paramedics arrived on scene, they took over advanced life-saving measures and administered several rounds of epinephrine. Despite aggressive attempts at resuscitation, Wilson failed to respond and his death was pronounced via radio by a UCSD Medical Center doctor. Wilson was transported to the San Diego County Medical Examiner and on 01-27-20, an autopsy was performed on Wilson. No trauma or foul play was noted. Based on the autopsy findings, toxicologic tests and circumstances surrounding Wilson's death, the cause of death was ruled acute fentanyl, acetyl fentanyl, butyryl fentanyl, and heroin intoxication and the manner of death was an Accident. Review of jail records and inmate witness statement/interviews, revealed that Wilson obtained the heroin with fentanyl from another inmate. The inmate confessed to providing the drugs to Wilson and he was charged with sale/furnishing of fentanyl and personal infliction of great bodily injury, in connection with Wilson's death. He pled guilty to the charges. Records indicated Wilson was housed appropriately during his incarceration. Wilson was last known to be alive, at approximately 10:51pm, when deputies entered his cell and conducted a hard count. At 10:53pm, the cell door to Wilson's cell closed and did not open again until approximately 8:20am the next morning, for medication distribution. According to jail records and jail surveillance videos, security and safety checks were conducted hourly, as required by policy, however, a "proof of life" soft count check at 4:43am, although conducted, was not done per policy. SDSD DSB P&P Section I.43 titled, Inmate Count Procedure, states in part, Soft Count ["proof of life"] – A count of the number of inmates in a facility or housing unit which verifies each inmate's well-being through verbal or physical acknowledgement from the inmate. The deputy conducting the "proof of life" soft count was unable to confirm that he viewed "signs of life" from the inmates in Wilson's cell. As such, the evidence was insufficient to either prove or disprove that deputy actions could have prevented Wilson's death.

2. Misconduct/Procedure – Deputy 1 failed to conduct an inmate "Soft Count."

Board Finding: Sustained
Rationale: On 01-26-20, detention records indicated that an inmate "proof of life" soft count was conducted at 4:43am. Sheriff's Detentions Policy I.43 titled, Inmate Count Procedure, requires that Hard and Soft Counts of inmates are regularly conducted throughout the day and evening to physically count and verify the well-being of all inmates within the facility. All soft and hard counts require sworn staff to verify each inmate's well-being through verbal or physical acknowledgement from the inmate. Deputy 1 conducted the "proof of life" count on the bottom tier, where Wilson's cell was located. Jail surveillance video showed Deputy 1 at Wilson's cell, that housed three inmates, from 04:27:01–04:27:02. Following this incident, Homicide Detectives interviewed Deputy 1 to confirm compliance with detention policies and specifically signs for "proof of life" during the soft count. While "not confident" he observed "proof of life," Deputy 1 confirmed it was his practice to do so. Additionally, Section I.64 titled, Safety Checks of Inmates in Housing Units and Holding Cells, states in part, sworn staff shall conduct safety checks of inmates through direct visual means observing the inmates for any obvious signs of medical distress, trauma or criminal activity. In cell style housing modules, sworn staff shall stop at or enter each cell and observe each inmate. As evidenced in the jail surveillance video, Deputy 1 did not enter the cell but stopped and looked into it for approximately one second. CLERB believes that this action was not sufficient or long enough to obtain verbal or physical acknowledgement from all three inmates, including inmate Wilson. Deputy 1 provided information during the course of CLERB's investigation, that was considered in arriving at the recommended finding, however, it is privileged per the Peace Officer Bill of Rights (POBR) and cannot be publicly disclosed. Deputy 1 exercised his right to decline participation in an interview with CLERB investigators present pursuant to Penal Code Sections 832.5, 832.7, and the Public Safety Officers Procedural Bill of Rights, Government Code Sections 3300 et. Seq. Based upon surveillance video, interviews, and policy review, a preponderance of evidence showed that Deputy 1 failed to conduct an inmate "Proof of Life" Soft Count and his actions were not justified.

**20-040**

1. Excessive Force – Deputy 2 "punched" the complainant.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "on Oct-19-18, I see Deputy 2 coming in the cell fixing his gloves he puts a foot on the bottom bunk grabs on to the top bunk. All I see was his fists coming towards me." CLERB Rules & Regulations 4.1.2, Complaints: Jurisdiction, stipulates that CLERB shall not have jurisdiction to take any action in respect to complaints received more than one year after the date of the incident giving rise to the complaint, except that if the person filing the complaint was incarcerated or physically or mentally incapacitated from filing a Complaint following the incident giving rise to the complaint, the time duration of such incarceration or incapacity shall not be counted in determining whether the one year period for filing the complaint has expired. According to information from the Division of Inspectional Services and confirmed through the complainant's SDSD booking records, this allegation was from a prior incarceration, where the complainant was booked on 10-18-18 and released on 11-28-18. As such, the complaint was not filed timely and the Review Board lacks jurisdiction.

2. Excessive Force – Deputies "slammed" the complainant's head on the ground.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "on Oct-19-18, I was on the ground getting punched with several deputies on me yelling to stop resisting then slammed my head on the ground." See Rationale #1.

3. Misconduct/Procedure – Deputies kept the complainant in "the hole" for five days.

   Board Finding: Summary Dismissal
   Rationale: The complainant stated, "I refused to sign some papers so they kept me in the hold for 5 days." See Rationale #1.

4. Misconduct/Procedure – Deputies placed a "mentally unstable" inmate in mainline housing.

   Board Finding: Action Justified
   Rationale: The complainant stated, "They put an inmate in my cell that was 'mentally unstable.' I talked to him and he told me he had mental issues and needed his medication. He felt that everyone was out to get him." SDSD records, as well as jail surveillance video, documented, on 10-12-19, that the alleged "mentally unstable" inmate assaulted the complainant, which caused a fight to break out amongst several inmates in the module dayroom. According to SDSD DSB P&P Section Q.51 titled, Crimes Committed by "In Custody" Inmates, whenever sufficient information becomes available to charge an inmate with a crime, appropriate detention facility staff will complete appropriate reports. All assaults, whether prosecution is desired or not, will be documented in a crime report. The Crime Report indicated the "mentally unstable" inmate was identified as the instigator, as such, he was read his Miranda Rights and charged. The complainant reported that he had been telling deputies that the inmate was acting "paranoid and stressed." Jail records produced one filed grievance, by the complainant, for an unrelated issue. There was no documented evidence to corroborate the complainant's report that he had been alerting deputies to the inmate's behavior. The complainant reported he did not believe the inmate should have been housed in general population housing because he was "mentally unstable," and for that reason he did not desire to press charges. SDSD DSB P&P Section R.1 titled, Inmate Classification, states in part, an inmate's initial classification is determined by their original booking charges, criminal history information, medical and psychiatric issues or additional special conditions, and information obtained from the inmate interview. The inmate will be assigned to the most appropriate housing location based on their classification designation. As CLERB did not have a signed complaint from the other inmate, CLERB was not privy to his records, however, a Classification Deputy responded to a Sheriff Employee Response Form with a signed statement, and confirmed the inmate was properly classified at the time of this incident. The evidence showed deputies actions were conducted per policy and were lawful, justified and proper.

5.  Misconduct/Procedure – Deputies shortened the complainant's dayroom time.

    Board Finding: Action Justified
    Rationale: The complainant stated, "Due to this Corona virus, they have us on modified program where we get 1 hour in the morning, 1 in the afternoon and 1 at night, however, they let us out at 1:15 and lock us back up at 1:45." Sheriff's Press Releases and associated Training Bulletins pertaining to the COVID-19 virus indicated that inmate services were restricted to be in compliance with the Governor's and Chief Health Officer's orders related to isolation/quarantine, testing/tracking, temperature checks, face coverings, social distancing, and cleaning & sanitization of the facilities; in a collective effort to protect inmates and staff. Title 15 Guidelines in accordance with detention policies specifies the procedures pertaining to Inmate Rights and Services/Programs, which were reduced/restricted during the COVID-19 pandemic and per DSB Policy M.37, Communicable Disease Control. Dayroom restrictions were deployed for the protection of inmates and staff. The evidence showed that the conduct that occurred was lawful, justified and proper.

6.  Misconduct/Retaliation – Deputies transferred the complainant because he complained about "shortened dayroom time."

    Board Finding: Unfounded
    Rationale: During his incarceration, the complainant was transferred between facilities. He alleged the transfer was retaliatory in nature, and stated, "I had the floor deputies call the sergeant's so we could talk about [shortened dayroom time], and they said we'll talk to the lieutenant, give us 3 days. Ok fine next day they ask me to transfer to another facility." According to SDSD records, the complainant was a known gang member and the transfer was a result of gang conflicts and his high influence over other inmates. Additionally, inmates are routinely transferred to different detention facilities based upon the inmate census and a variety of other individualized factors. The evidence showed that the complainant was not transferred as retaliation for complaining but as a result of gang conflicts and high influence over other inmates. The alleged conduct did not occur and was, therefore, unfounded.

7.  Excessive Force – Deputies 5 and 6 shot the complainant with less lethal munition rounds.

    Board Finding: Action Justified
    Rationale: The complainant stated, "On May 7, 2020, a riot happened in the dayroom and I ended getting shot over 13 times." According to SDSD records, after the fight broke out and in an attempt to gain control of the situation, deputies issued commands for the inmates to stop fighting, return to their cells and lock down. Several of the inmates, including the complainant, ignored commands and continued to fight. Upon entering the module, deputies continued to issue commands to the complainant to get on the ground, however, he entered a cell, took a fighting stance and stated, "Lets fucking go, Fuck you, I'm not getting on the floor!" The complainant was in violation of Inmate Rules and Regulations for disobeying staff instructions, engaged in aggressive behavior and interfering with jail operations. Deputies 5 and 6 shot a total of 16 less lethal munition rounds at the complainant, targeting his abdomen, back and legs, however, they were ineffective in gaining his compliance. In his Use of Force Report, Deputy 5 provided that he deployed a total of 11 rounds at the complainant and another inmate, as both were refusing to "turn around and place their hands behind their back. Deputy 5 did not specify or identify how many rounds actually made contact with the complainant. Sheriff's Addendum Section F Policy titled, Use of Force Guidelines, states in part, "less lethal specialty munitions are projectiles used to stop assaultive behavior, which if not stopped, may result in injury or death." When used properly, by trained personnel, this type of munition is less likely to result in death or serious injury. Additionally, Detentions Policy I.85, Use of Defensive Devices, states in part, when targeting, deputies should avoid aiming for the head, neck, throat, spine or groin. Inmates subjected to any of the less lethal devices will be assessed/treated by medical staff as soon as practical. The complainant's injuries were documented, photographed and he was taken to medical immediately following the incident. The complainant was referred to the hospital for follow-up care, however, he refused to go and signed a Refusal to Accept Medical Care/Treatment, and stated reason as, "I'm good, no X-ray & No E.R." The evidence showed that Deputies 5 and 6's use of force was reasonable

-4-

and necessary per Detentions Policy I.89, Use of Force, Detention Services personnel may use physical force to the extent that is necessary and objectively reasonable to overcome resistance, and maintain or restore order. The evidence showed that Deputy 5 and 6's conduct was lawful, justified and proper.

8. Excessive Force – Deputy 1 sprayed the complainant with Oleoresin Capsicum (OC) spray.

   Board Finding: Action Justified
   Rationale: The complainant stated, "There was nobody around me or was anyone in danger. I sat on the toilet and passed out to wake to them spraying pepper spray." According to SDSD records, jail surveillance video, and the timeline of events, there was no evidence to corroborate the complainant's statement that he "passed out," prior to Deputy 1 using OC spray. Detentions Policy I.85, authorizes deputy use of defensive devices to gain compliance and overcome resistance. As deputies repeatedly issued commands to the complainant, to "get on the ground," and after less lethal munition rounds were ineffective, and as a result of the complainant's continued defiance, Deputy 1 utilized OC spray on the complainant in an attempt to gain compliance. In his Use of Force Report, Deputy 1 provided that the use of the OC spray was partially effective in that it caused the complainant to close his eyes, however, he remained standing with his fists clenched. The evidence showed that Deputy 1's actions were lawful, justified and proper.

9. Excessive Force – Deputies 1, 4, 3 and 7 "punched and/or kicked" the complainant.

   Board Finding: Action Justified
   Rationale: The complainant stated, "I passed out and woke to them punching me kicking me." SDSD DSB P&P Section I.89 titled, Use of Force, states in part, during the course of their official duties, Detention Services Bureau personnel, may use physical force to the extent that is necessary and objectively reasonable to overcome resistance, and maintain or restore order. Personnel shall use the Department approved techniques, equipment and tactics in controlling the inmate or incident. Additionally, SDSD DSB P&P Section O.3 titled, Inmate Rules and Regulations, states in part, Inmates shall obey staff instructions, shall not take part in aggressive or boisterous activity, shall not threaten, assault, or attempt to intimidate jail staff and inmates shall not engage in any activity that impairs or interferes with the operation of the facility. The complainant was in violation of these Rules and Regulations. According to Deputy 1, 4, 3 and 7, as documented in their Use of Force Reports, due to the complainant's active resistance and defiance to obey staff instructions, force was utilized nine times to gain his compliance. Deputy 1 provided that after spraying the complainant with OC spray and due to the complainant's refusal to follow commands, as well as assaultive behavior, he entered the cell and delivered one closed fist strike to the complainant's head. Deputy 7 provided that the complainant, after the PepperBall rounds and OC spray were ineffective, remained in a fighting stance and screamed obscenities at deputies. Deputy 7 entered the cell and delivered three strikes with his leg to the right side of the complainant's body but they were ineffective. Deputy 4 provided that he entered the cell and grabbed the complainant and began pulling him to the floor. The complainant remained on his hands and knees and resisted being placed in a prone position. Due to the complainant's assaultive behavior and refusal to follow commands, Deputy 4 delivered three knee strikes to the side of the complainant's torso. Deputy 3 provided that he was able to get the complainant on his stomach but when he attempted to place handcuffs on the complainant, the complainant resisted and pulled his hands under him. Deputy 3, in a closed fist, delivered two strikes to the side of the complainant's torso. The complainant then put his hands at his side, allowing deputies to secure the handcuffs on him. The evidence showed that the alleged conduct did occur and was lawful, justified and proper.

---

**20-041**

1. Misconduct/Procedure – Deputy 4 took the complainant's "manufactured" shorts.

   Board Finding: Action Justified
   Rationale: The complainant stated, "The deputy 4 noticed I had on some manufacture shortz what I wear to bed. Me and the deputy couldn't come to an agreement. He took tha shortz. I ripped them up before

-5-

giving them to him." According to SDSD records, the complainant had several jail issued t-shirts that he had "manufactured" into pants. When Deputy 4 instructed the complainant to give him the "pants," the complainant, before giving them to Deputy 4, ripped them up and then called Deputy 4 a "faggot." SDSD DSB P&P Section O.3 titled, Inmate Rules and Regulations, states in part, Clothing and bedding shall be used for intended purposes only, and shall not be damaged or destroyed in any way. Additionally, the policy states, inmates shall treat members of facility staff in a civil fashion and obey staff instructions. The evidence showed that the alleged act or conduct did occur and that Deputy 4's actions were lawful, justified and proper.

2.  Misconduct/Procedure – Deputy 4 placed the complainant in Ad-Seg (Administrative Segregation).

    Board Finding: Action Justified
    Rationale: The complainant stated, "The deputy [4] got mad and placed me in Ad-Seg Lyin' saying, I'm a kill him to somethin' I can make in my sleep (now I'm in greenz fighter a fake threat charge)." On 04-18-19, during an inmate safety check, Deputy 4 noticed that the complainant was wearing "manufactured" shorts that he made from several jail issued t-shirts. Inmate Rules and Regulations directs that clothing shall he used for intended purposes only. SDSD records provided that when Deputy 4 instructed the complainant to give him the shorts, the complainant used profanity and threatened him. When Deputy 4 addressed the rule violations and placed the complainant in an isolation cell pending a hearing, the complainant threatened Deputy 4's life, in the presence of two other deputies. SDSD DSB P&P Section J.3 titled, Segregation; Definition and Use, states in part, Disciplinary Separation may be used pending a hearing or investigation for a rule violation or criminal act. Furthermore, when administrative segregation housing is used as pre-disciplinary housing pending a hearing, the decision must be based on the need to segregate for security reasons, rather than an attempt to limit privileges pending a hearing. The evidence showed that the actions taken by Deputy 4 were lawful, justified and proper.

3.  Misconduct/Procedure – Unidentified deputies failed to respond to the complainant's grievances.

    Board Finding: Unfounded
    Rationale: The complainant stated, "I started writing grievances, more than six grievances I wrote about health and hygiene matterz." SDSD DSB P&P Section N.1 titled, Grievance Procedure, states in part, Informal resolution of an issue before it becomes a written grievance is both desirable and recommended. Furthermore, written grievances can often be resolved without the intervention of a supervisor, and every effort should be made by a deputy or staff member who receives a grievance to handle it at his or her level. Informal resolution of an issue before it becomes a written grievance is both desirable and recommended. SDSD records produced 17 grievances submitted by the complainant. Each of the 17 grievances was responded to by a sergeant, with a copy provided to the complainant, acknowledging the grievance and confirming corrective action. The evidence refuted the complainant's allegation and showed that the alleged conduct did not occur.

4.  Misconduct/Discourtesy – Deputy 3 mocked the complainant.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "Deputy 3 walked the top tier being unprofessional sayin', all you do is cryin' and write grievancez." SDSD P&P Section 2.2 titled, Courtesy, states in part, Employees shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation. Except when necessary to establish control during a violent or dangerous situation, no member shall use coarse, profane or violent language. In review of the complainant's filed grievances and his complaints against sworn staff, none documented this alleged incident. Attempts were made to contact the complainant for an interview to obtain additional information and/or witness contacts, however, the complainant is currently in custody at a California Department of Corrections and Rehabilitation (CDCR) facility and attempts to arrange a phone interview were unsuccessful. Absent an independent witness or available audio of the verbal exchanges between the complainant and Deputy 3, there was insufficient evidence to prove or disprove the allegation.

5.  Misconduct/Procedure – Deputies 3 and 5 placed the complainant on "lock-down."

    Board Finding: Action Justified
    Rationale: The complainant stated, "Yes I did reply telling that deputy 3 to shut tha fuck up little boy. At 1:00 Deputy 5 and 3 came to my door placing me on lock-down." According to SDSD records, the complainant was placed on lock down for disrespect to staff, threatening staff and interfering with jail operations. SDSD DSB P&P Section O.1 titled, Disciplinary Action, states in part, a sworn supervisor may make the determination an inmate is required to be placed in administrative segregation housing while the incident report is being written and pending the disciplinary hearing. Additionally, SDSD DSB P&P Section J.3 titled, Segregation: Definition and Use, states in part, when administrative segregation housing is used as pre-disciplinary housing pending a hearing, the decision must be based on the need to segregate for security reasons, rather than an attempt to limit privileges pending a hearing. According to SDSD records, the complainant was placed on "lock-down" thirteen different times for continued rule violations and failure to conform to the minimum standards expected of inmates in mainline housing, as well as his unpredictable, aggressive and threatening behavior. The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

6.  Misconduct/Intimidation – Deputy 3 threatened the complainant.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "After dinner Deputy 3 walked in tha unit turning off tha television so tha hole unit 5-C could hear his threat. 'You guys want to keep writing grievances, I'll take your family from ya'll.' I grievanced him for that." In review of the complainant's filed grievances and his complaints against sworn staff, none documented this alleged incident. Attempts were made to contact the complainant for an interview to obtain additional information and/or witness contacts, however, the complainant is currently in custody at a California Department of Corrections and Rehabilitation (CDCR) facility and attempts to arrange a phone interview were unsuccessful. Absent an independent witness or available audio of the verbal exchanges between the complainant and Deputy 3, there was insufficient evidence to prove or disprove the allegation.

7.  Misconduct/Procedure – Deputy 6 failed to investigate a deputy who threatened the complainant's family.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "A deputy threatened my family and when I wrote him up, tha Deputy 6 DIDN'T investigate my claimez." In review of the complainant's filed grievances and his complaints against sworn staff, none documented this alleged incident. Attempts were made to contact the complainant for an interview to obtain additional information and/or witness contacts, however, the complainant is currently in custody at a California Department of Corrections and Rehabilitation (CDCR) facility and attempts to arrange a phone interview were unsuccessful. Absent an independent witness or available audio of the verbal exchanges between the complainant and Deputy 3, there was insufficient evidence to prove or disprove the allegation.

8.  Misconduct/Truthfulness – Unidentified deputies lied.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "Five deputies came to my cell door all hourz of tha day LYING loquaciously like I understand B.S." SDSD P&P Section 2.46 titled, Truthfulness, requires that all written and verbal reports will be truthful and complete. In review of the complainant's filed grievances and his complaints against sworn staff, none documented this alleged incident. The complainant transferred to a CDCR State prison and  attempts were made to make contact, however, he was unavailable for clarification. There was insufficient evidence to either prove or disprove the allegation.

9.  Misconduct/Procedure – Deputy 2 did not sign the complainant's grievance form.

    Board Finding: Not Sustained

Rationale: The complainant stated, "On 2-24-2020 I asked Deputy 2 to only sign a grievance so I can get my yellow copy 'instead' he walked away with my grievance to bring it back with a response. I grievance him." SDSD DSB P&P Section N.1 titled, Grievance Procedures, states in part, the deputy or other employee who initially receives a grievance will sign his or her name and ARJIS number on the J-22 form along with the date and time. The second page of the J-22 form will immediately be given to the inmate as a signed receipt for the grievance. The deputy or other staff member who receives and signs for a grievance will be responsible for entering it into the Jail Information Management System (JIMS), making sure to link the inmate(s) to the grievance report. According to SDSD records, all the complainant's grievances, on file, were signed by the receiving deputy and entered into the JIMS system. As the complainant was not available for clarification or to provide evidence of unsigned grievances, there was insufficient evidence to either prove or disprove the allegation.

10. Misconduct/Retaliation – Deputy 2 placed the complainant in Ad-Seg (Administrative Segregation).

Board Finding: Action Justified
Rationale: The complainant stated, "The next day [02-25-2020] he [Deputy 2] placed me in Ad-Seg because tha unit boarded up. Deputy 2 stated, I was tha initial instigator when tha module boarded up." According to SDSD records, the complainant was deemed the instigator in a documented incident where he and other inmates covered their cell windows. The incident report noted, "the complainant has violated the Inmate Rules and Regulations on a consistent basis and shown that he has influence over the other inmates." SDSD DSB P&P Section O.3 titled, Inmate Rules and Regulations, states in part, Inmates shall not cover vents, intercoms, lights, windows, etc. Additionally, DSB P&P Section J.3 titled, Segregation: Definition and Use, states in part, the following are types of inmates who may be placed into administrative segregation, inmates who demonstrate influence over other inmates, including influence to promote or direct action or behavior that is criminal or disruptive to the safety and security of other inmates and/or facility staff, as well as to the safe operation of the facility. The evidence showed Deputy 2's placement of the complainant into Ad-Seg was lawful, justified and proper.

11. Misconduct/Procedure – "Team One" did not provide cleaning supplies.

Board Finding: Unfounded
Rationale: The complainant stated, "On 2-29-2020, team one didn't give unitz cleaning cartz on inspection 'knowing' most inmatez is dirty. First officer I'd asked was 3, then 2, 1, and last 5… I wrote a grievance and deputy 5 started responding on it seeing it state, give to deputy." According to SDSD records, the complainant filed repeated grievances about not getting cleaning supplies. On the day in question, 02-29-20, a JIMS Incident Report noted the complainant gave his grievance to Deputy 5, grieving that cleaning supplies were not provided, even before the actual required time per policy. According to the records, the cleaning cart was provided and available as required per policy. SDSD DSB P&P Section L.4 titled, Housekeeping Plan, states, each facility will have a plan, written on a policy green sheet, explaining the daily cleaning and housekeeping activities that will occur on a regular basis. SDSD San Diego Central Jail (SDCJ) Green Sheet Policy titled, Housekeeping Plan – Module Cleaning Carts, states in part, a fully stocked cleaning cart will be placed into all mainline inmate housing modules during the restricted movement time between 11:00am and 1:00pm and during the lockdown time after night count. Records indicated the cleaning cart was provided at 12:30pm. The evidence showed that the alleged act or conduct did not occur.

12. Misconduct/Retaliation – Team one was "unprofessional" toward the complainant.

Board Finding: Not Sustained
Rationale: The complainant stated, "Team one started being unprofessional towardz me for writing up their deputy." The complainant did not offer and evidence to support his allegation. Attempts were made to make contact with the complainant for additional information regarding the alleged "unprofessional" conduct by deputies, but he was unavailable. Absent witnesses and/or audio evidence of the verbal exchanges between the complainant and deputies, and as the complainant was unavailable for clarification, there was insufficient information to prove or disprove the allegation.

Ex. S - 697

13. Misconduct/Retaliation – Team One deputies placed the complainant in Ad-Seg.

Board Finding: Action Justified
Rationale: The complainant stated, "Team One was taking me back to Ad-Seg retaliating with Deputy 6 approval." SDSD records documented numerous rule violations by the complainant resulting in his placement into Ad-Seg. SDSD records provided that the complainant consistently violated the Inmate Rules and Regulations, he threatened and attempted to intimidate deputies, he wrote vexatious grievances and encouraged other inmates to do the same, he consistently interrupted jail operations and exhibited unwillingness to conform to the minimum standards expected of inmates in mainline housing. SDSD DSB P&P Section J.3 titled, Segregation; Definition and Use, states in part, the following are types of inmates who may be placed into administrative segregation. Those who have displayed a continual failure to adjust and conform to the minimum standards expected of those in mainline housing or designated special housing. The inmate's behavior is either criminal in nature or disruptive to the safe operation of the facility. Those who have shown a propensity for violence towards other inmates and/or staff, or participatory action in a conspiracy, or known premeditated thoughts or indications by a single inmate, to assault or harm other inmates and/or staff. Those who demonstrate influence over other inmates, including influence to promote or direct action or behavior that is criminal or disruptive to the safety and security of other inmates and/or facility staff, as well as to the safe operation of the facility. The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

14. Misconduct/Procedure – The Vista Detention Facility (VDF) did not provide video visits for inmates in Administrative Segregation (Ad-Seg).

Board Finding: Action Justified
Rationale: The complainant reported, "Vista don't get video visit being in Ad-Seg why? I'm really in Ad-Seg because I'm a clean man and I gotta TNA paper trail to prove it too." According to the Sheriff's website: VDF offers Home User video visitation for most housing units. With video visitation, you can visit remotely using a computer with a web camera connected to the Internet. Video visits at the facility are 20 minutes in length, with no visitation on Wednesdays; all other days and times vary according to the housing unit. The complainant was housed in Upper West 5 which allowed visits on Monday and Saturday, however, according to SDSD DSB P&P Section O.1 titled, Disciplinary Action, inmates placed in Ad-Seg for disciplinary reasons are only allowed professional visits. The evidence confirmed the complainant was placed in Ad-Seg for disciplinary reasons and he was ineligible for video visits. The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

---

**20-054**

1. Misconduct/Procedure – PO 1 required the complainant to attend an in-patient drug program during the pandemic.

Board Finding: Action Justified
Rationale: In the complainant's written statement, he reported, "*My P.O has been putting me in unnecessary danger during this pandemic by forcing me to attend drug inpatient program. This program has larger population making it riskier compared to staying at home. I think any rational judge would agree with me on this matter because we are only being prudent by staying at home. Just the same as everyone in the state under stay at home order and school is not in session. This rehab can always be completed on a later date or change. My PO claims that the rehab is safe but let me address this by saying that [is] untrue. The first thing that concerns me is fact that the rehab has larger population. The state has policy of no crowds over 2 people at anyone time while at rehab (TFC) has currently population of around 40 clients. The risk goes up the bigger the crowd. Now they quarantine new clients for 20 days (which sounds unpleasant) but there is also big flaw in this plan the employees are free to come and go as they please that makes quarantine almost ineffective. Staying at home with far less people coming and going is safer. Ask any doctor. I don't think any place with large population like rehab can be safe during a pandemic and*"

*there are alternative treatments to inpatient. I will repeat again I don't feel like my safety made number one priority. There are differences between taking a risk yourself and forcing that same risk on someone else. I think any reasonable judge would agree with me to at least delay treatment until it's safer or look into other treatments options.*" As a condition of his early release from his incarceration, the complainant agreed to certain terms. According to the complainant's terms of his probation, in addition to other terms, the complainant agreed to the following: Follow such course of action of conduct that the PO communicates to the defendant, Participate and comply with any assessment program if directed by the PO, Participate in treatment, therapy, counseling, or other courses of contact suggested by validated assessment test, Attend and successfully complete psychiatric, individual, group, Substance abuse, dual diagnosis, and programs provided by the PO as directed or if directed by the PO. Complete a program a residential treatment and aftercare as directed by the probation officer, and to attend and successfully complete a counseling program for individual, stalker, probation departments certified 52-week better program as directed by the PO authorize the counselor to provide progress reports to the PO when requested. According to the complainant's PO's contact notes, the complainant was informed that the rehabilitation program he was assigned to undergo was taking precautions to quarantine new intakes and all programs were abiding by the imposed state and federal regulations. PO 1 reminded the complainant that she could not change his case plan, that any change to his plan was not to be altered by her. The complainant's case plan was determined via a substance abuse assessment. According to a SDCPD Department Information Source, probationers were ordered by the Court to participate with a Residential Drug Treatment Program (RTP) during the Coronavirus Pandemic. If a client was required to participate in an RTP (either by the Court or as determined by the ASAM Substance Abuse Assessment), Probation directed the probationer to comply with this requirement. Local RTP's remained open and all programs-imposed procedures (per CDC guidelines and complied with the Governor's Orders) to prevent the spread of Coronavirus during the pandemic. The terms of the complainant's probation were not dictated by PO 1. As a probation officer, PO 1 was responsible for supervising and disciplining the complainant who was to complete a probation program as one of the conditions of his sentencing. PO 1's duties included recommending rehabilitation programs, conducting drug tests, and monitoring the complainant's location. The complainant's case plan, which was determined through the courts, required him to maintain his mental health and to enroll, participate, and complete a residential drug treatment program. The evidence showed that the alleged act did occur, and it was lawful, justified, and proper.

2.  Discrimination/Other - PO 1 treated the complainant "unfairly."

    Board Finding: Unfounded
    Rationale: In the complainant's written statement, he reported, *"I have also heard from reliable sources that most probationers are allowed to stay at home during this crisis. I believe that my physical health should be first priority along with the safety of others and I feel like my health is not being made a first priority just because I am on probation. My other concern here is that she is not treating me fairly. I called The fellowship center and they said most probationers are allowed to stay home during the pandemic. Why is my po policy so drastically different from everyone else? Is my safety not same as other probationers? She also says all rehabs are in session again not true. I think I deserve to be treated fairly. I also have uneasy feeling she might be harder on me. All po are suppose help there probationers pass probation. I do think I should be given a chance to stay with my family during this pandemic before being punished and moved to riskier situation. I have had issues with inpatient in past but I think those issues are irrelevant to the situation. Far as I know stay at home order is still active and will be for a while. Why put me in unnecessary risk? Staying at home is safest option for me and everyone else.* According to the complainant's PO's contact notes, PO 1 inquired about the complainant's health, recommended he seek medical attention, and routinely requested updates on his medical concerns and treatment. The evidence indicated that PO 1 was concerned and prioritized the complainant's mental and physical health during the course of his probation. According to the San Diego Probation Department's Policy and Procedures Manual, Policy 400 was adopted to ensure officers utilize Evidence Based Practices (EBP) for Community Corrections, the Department's Supervision Practice Model, and a balanced approach to monitor offenders in the community. Probationers are assessed using EBP for Community Corrections; approaches and interventions that have been scientifically tested in controlled studies and proven effective with at least one offender subgroup. The complainant was assessed and was determined to be a high-risk re-offender.

Ex. S - 699

The complainant was supervised on high-risk supervision due to the Ontario Domestic Assault Risk Assessment, which determined he was high risk for domestic violence recidivism. The case plan required the complainant to maintain his mental health and participate in residential drug treatment programs. The complainant was non-compliant with the terms of his probation. Coupled with the complainant's high-risk status, PO 1 determined that the best course of his rehabilitation was to for him to abide by the terms of his probation. The evidence showed PO 1 treated the high-risk complainant/offender in compliance with departmental policy. The evidence showed that PO 1 did not treat the complainant "unfairly."

---

## 20-056

1. Excessive Force – Deputy 1 used force when he arrested the complainant.

Board Finding: Action Justified
Rationale: In the complainant's written statement, she reported, "*I was basically wanting to see about the damages that was caused which caused me to lose my teeth from him. I'm just traumatized by everything that just happened that happened at night… the abuse that he was causing me… with using all that fours [force] now causing me to lose my teeth I have sharp pains in my neck.*" The complainant was the suspect in a criminal case. Upon locating the complainant, who had fled the scene, Deputy 1 attempted to detain the complainant. The complainant resisted Deputy 1's detention, and Deputy 1 used force to subdue her and arrest her. According to California case law, regarding duty to stop and use of force to stop a suspect, a peace officer has the legal authority to detain someone to investigate reasonable suspicion or to issue a "cite and release" citation. In both situations, the suspect has an obligation to stop and has "no right to resist" a lawful detention. If a suspect does not stop, they have violated Penal Code section 148 by obstructing or delaying an officer in the performance of their duties and physical force may be used to make them stop. According to Deputy 1's SDSD Arrest Report, the complainant began violently kicking her legs around and saying, "*Get off of me.*" In order to prevent the complainant from kicking, Deputy 1 placed his right knee on the complainant's legs and applied downward pressure. The pressure he applied to the complainant's legs was effective in allowing Deputy 1 to gain control of the complainant and prevent her from kicking. During the course of this investigation, Deputy 1's Body Worn Camera (BWC) was reviewed. In the BWC recording, the complainant was observed to be noncompliant with Deputy 1 when he attempted to detain her. The complainant was observed to actively resist deputies' detention and her subsequent arrest, resulting in force being used to subdue and restrain her. The force that Deputy 1 used coincided with the wording in his report. The force used was not excessive. Deputy 1 restrained the complainant's legs from kicking and her arms and wrist when placed in handcuffs. The complainant's face was not assaulted. In the BWC recordings, the complainant spoke freely and clearly and did not complain of facial or jaw pain. The complainant's jail medical records were reviewed, as she was transported immediately after the incident. Due to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) that information will not be disclosed, so as to protect sensitive patient health information. According to SDSD P&P Section 2.48 titled "Treatment of Persons in Custody," employees shall not mistreat, nor abuse physically or verbally, persons who are in their custody. Employees shall handle such persons in accordance with law and established Departmental procedures. According to SDSD P&P Section 2.49 titled "Use of Force," employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and established Departmental procedures, and report all use of force in writing. According to SDSD P&P Addendum "F" titled "Use of Force Guidelines," the enforcement of law and performance of law enforcement duties may require the use of physical force and physical restraint. Both law and department policy authorize the use of force. It shall be the policy of this Department whenever any Deputy Sheriff, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force, the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident. The use of force and subsequent reporting must be in accordance with the procedures set forth in these guidelines. The evidence showed that the alleged act did occur, and it was lawful, justified, and proper.

Ex. S - 700

2.  False Reporting - Deputy 1 "fabricated" information in a police report.

    Board Finding: Unfounded
    Rationale: In the complainant's written statement, she reported, "*The way that he wrote up that police report which pretty much the victim only had to take Tylenol and ice. The way he wrote that report maybe seem like I physically hurt somebody which I really didn't so he fabricated on the police report…*" In Deputy 1's SDSD Arrest Report, he articulated the chronology of events based on witness statements; the statements of the complainant's grandmother and aunt who witnessed the assault. Additionally, Deputy 1 documented the scene in which the alleged assault occurred, documenting the evidence that supported and confirmed the witness statements. The elderly victim in the case, whom the complainant allegedly assaulted, was transported to a hospital where she was medically accessed for being battered and choked. The victim had complaints of soreness to her neck, a sore throat, and spoke to the investigating deputy with "a raspy, very low, soft voice." The victim was noted to have sustained swelling and bruising to both eyes, bruising to her cheeks, and bruising to her right hand. In conformance with California Penal Code, SDSD Policy and Procedures, and SDSD Patrol Manual Procedures, Deputy 1 filed a Report of Suspected Dependent Adult/Elder and notified Adult Protective Services Elder Abuse, as well as a host of other agencies.  In a follow-up investigation, it was noted that the elderly victim complained of severe headache, eye twitch, and bodily pain. She underwent a Domestic Assault Forensic Examination. During the course of this investigation, Deputy 1's Body Worn Camera (BWC) was reviewed. In the BWC recording, Deputy 1 was witnessed to interview the victim in the case. The victim spoke in a raspy voice and had complaints of pain. According to SDSD P&P Section 2.46 titled "Truthfulness," when asked by the Sheriff, the Sheriff's designee or any supervisor, employees will always answer questions, whether orally or in writing, truthfully and to the fullest extent of their knowledge. All written and verbal reports shall be truthful and complete. The evidence showed that Deputy 1 did not "fabricate" information in a police report.

3.  Misconduct/Procedure - Deputy 1 failed to take into account the complainant's disability.

    Board Finding: Action Justified
    Rationale: In the complainant's written statement, she reported, "*I also come from a background of abuse from my husband abused as a childhood and causing me to be disable which I was letting him know that I would was disable and wondering why he didn't handed [handled] me a certain type away.*" During the course of this investigation, Deputy 1's Body Worn Camera (BWC) was reviewed. In the first BWC recording, after the use of force, the complainant was handcuffed and assisted to her feet. Once upright, she again began to kick, thrash, and resist the deputies. In an attempt to restrain the complainant, she was pinned against the exterior building wall. While pinned against the wall and actively resisting the deputies, the complainant informed the deputies that she was disable, but did not elaborate on the time of disability, physical or mental. In the third BWC, after being escorted to jail and as Deputy 1 departed the jail, the complainant again informed Deputy 1 that she was disable. Deputy 1 suggested that if the complainant did not want to engage deputies in a use of force, and to protect herself from injury, he recommended that she comply with their instructions. During the course of this investigation, the complainant submitted documents that confirmed her temporary disability. Due to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) that information will not be disclosed, so as to protect sensitive patient health information. According to SDSD P&P Section 2.22 titled "Courtesy," employees shall be courteous to the public and fellow employees. They shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation. According to SDSD P&P Section 2.48 titled "Treatment of Persons in Custody," employees shall not mistreat, nor abuse physically or verbally, persons who are in their custody. Employees shall handle such persons in accordance with law and established Departmental procedures. According to SDSD P&P Section 2.49 titled "Use of Force," employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and established Departmental procedures, and report all use of force in writing. The evidence showed that the alleged act or conduct did occur, but was lawful, justified and proper.

Ex. S - 701

**NOTE:** Potential misconduct discovered through the course of investigation included: 1) Misconduct/Procedure - Deputy 1 failed to activate his BWC in a timely manner. Failing to activate his BWC upon arrival to the scene resulted in the loss of crucial evidence. According to SDSD P&P Section 6.131 titled, "Body Worn Camera," it is the intent of the Sheriff's Department to record all law enforcement related contacts, and other contacts deemed appropriate. Deputies/community services officers shall activate the BWC to record all law enforcement related contacts. The record mode of the camera should be activated prior to actual contact with a citizen (victim/witness/suspect), or as soon as safely possible, and continue recording until the contact is completed. Deputies should begin recording prior to arriving to an incident if the call has the potential to involve immediate enforcement action upon arrival. The aforementioned violation was not a part of this complaint against the deputy but was discovered during the course of investigation and will be referred back to the SDSD.

---

## 20-073

1. Discrimination/Racial – Deputies 1-4 treated a black male differently from a white male.

   Board Finding: Action Justified
   Rationale: The complainant forwarded a video that was taken on June 13, 2020 in Lemon Grove, CA. where a protest took place. "As the protesters came near a park on School Lane and Center Avenue, a young White male spoke out loudly saying 'I hope that they don't come here with this Black Lives Matter shit.' A young Black male spoke to the White male and said 'what do you mean man'. The complainant was told the White male begin calling the Black male the nigger word. This argument started a fight between the 2 of them. I'm told the White male stroke 1st the Black male. Four sheriff officers on bikes came to the scene because they were nearby. I believe they may have been assigned to the protest. Three officers I'm told taser the Black male, held him down on the ground face down on hot pavement and handcuffed him. The Black male begin to tell them he was having difficulty breathing and his heart was hurting. The witnesses said the officers never taser the White male not one time." Deputies on a Special Detail Bike Patrol observed a verbal confrontation that progressed into a physical altercation. Body Worn Camera (BWC) evidence confirmed that deputies intervened, tasered a black male, placed both men prone on the ground for handcuffing, then separated each for questioning. The two parties offered different accounts of what led up to the altercation and witness statements corroborated different aspects of the conflicting statements. Deputies determined the black male was the dominant aggressor based upon their observations and his own admission of holding the victim by his hair and throat. Deputies issued commands for the black man to "let go," but he failed to comply. As it was not heard on BWC audio, which is delayed by 30 seconds, it was unknown whether deputies announced their presence to two combatants who were actively involved in a physical altercation. The black man reported he did not let go because he was unaware deputies were on scene and "thought he was getting jumped." Neither of the men desired prosecution and were released. Fire Department personnel responded to the scene and assessed the black male who refused further medical treatment. The BWC evidence confirmed that the men were treated differently based upon their conduct and the ensuing actions of the deputies were lawful, justified, and proper.

2. Excessive Force/Taser – Deputy 4 "tasered" a black male.

   Board Finding: Action Justified
   Rationale: This was a third party complaint with no association to the involved parties. The complainant was told by witnesses at a protest that three deputies tasered a black male multiple times. A Taser or Conducted Energy Device (CED) is an "intermediate" force option that produces 50,000 volts of electricity that cause involuntary muscle contraction and temporarily incapacitates a subject. As a force option, the CED shall only be used as a means of subduing and gaining control where there is an immediate threat justifying an intermediate level of force. Use of the CED shall be restricted for use under circumstances where it is deemed reasonable and necessary to minimize the potential for human injury. Deputies on a special enforcement bike patrol overheard and observed a verbal altercation between two male subjects who were yelling profanities at each other. As deputies approached, the males began to hit one another

-13-

with their fists. Six citizens attempted to pull the two fighters apart. Deputies gave verbal commands to "let go, let go" and attempted to separate the males, but the black male pulled the white males hair violently causing them to fall to the ground and would not release his grip on the victims hair and throat. Deputy 4 reported that after observing the dominant aggressor and in an attempt to immediately stop his assaultive behavior toward the victim, he made the decision to deploy his department issued CED. Due to the close proximity, he anticipated deploying both cartridges from the CED to effectively achieve neuromuscular incapacitation (NMI). Deputy 4 deployed the first cartridge toward the suspect's chest area with successful contact made, but it was unsuccessful in achieving NMI. He simultaneously aimed the CED toward the suspect's buttocks area as he turned around and deployed the second cartridge from the CED. The second cartridge successfully contacted the suspects right buttocks and achieved NMI. Deputy 4 reported he only deployed one simultaneous, five (5) second electrical cycle with both cartridges from his CED. After the suspect landed on the ground, he was detained in handcuffs. Body Worn Camera (BWC) and the Taser download evidence corroborated the reported information. The evidence showed that the conduct that occurred was within policy.

3.  Illegal Search & Seizure – Deputies 2 and 3 restrained a black male.

    Board Finding: Action Justified
    Rationale: The complainant reported she was told by protest witnesses that deputies held a black male facedown on the hot pavement and handcuffed him. A "seizure" of a person occurs when a peace officer physically applies force or when a person voluntarily submits to a peace officer's authority. A detention may not last longer than is necessary to resolve the circumstances that justified its initiation. Body Worn Camera (BWC) evidence corroborated that both males were placed prone on the ground and handcuffed. The victim was subsequently led away from the scene and placed sitting on a transformer box on the sidewalk. In compliance with policy following a taser application, the suspect was rolled onto his side into a recovery position. When he complained about the hot pavement, he was assisted into a sitting and then standing position. Deputies obtained statements and then released both males. The evidence showed the conduct that occurred was lawful, justified and proper.

4.  Misconduct/Procedure – The San Diego Sheriff's Department (SDSD) failed to document/record an excessive force incident on 06-13-20.

    Board Finding: Unfounded
    Rationale: The complainant reported she called the Lemon Grove Sheriff's Station and spoke to several dispatchers to obtain the names of the officers and the Black male who was tasered. When no one called her back she called again and said there was no report filed nor could she get an event number of the incident. "Nothing to my understanding is on file." The complainant did not provide identifying information for whom Communication records, Deputy reports and Body Worn Camera (BWC) evidence documented this event that occurred on 06-13-20, in Lemon Grove. The evidence proved that the event was documented/recorded and there was no failure by SDSD.

NOTE: Potential misconduct discovered through the course of investigation included: 1) There was insufficient evidence to determine if Deputies 1-4 announced their presence. 2) Deputy 4 neglected to have his Body Worn Camera (BWC) "due to an oversight." 3) Deputy 1 failed to activate BWC until after a use of force. Policy states that the record mode of the camera should be activated prior to actual contact with a citizen and/or prior to arrival to an incident if the call has the potential to involve immediate enforcement action upon arrival. These issues discovered through the course of CLERB's investigation were referred back to the Sheriff's Department for review.

---

## 20-076

1.  Misconduct/Procedure – Deputy 4 stopped the complainant's phone call.

    Board Finding: Action Justified

3e9690e54ee83c56

Rationale: The complainant stated, "On March 28th, 2020 around 3:15 at George Bailey, I was in the Day room on the phone and the tower Deputy shut the phone off on me.  I then raised one hand to the tower shaking it back and forth… After that I went back into the Dorm and push the call box, the deputy said ("awe what happened"), I said you must be a Rookie, he said talk to the Deputy when they walk, so when officer 3 did his next walk I explained that By the tower Doing that and saying that kind of things it makes it unsafe for all of us." An Incident Report dated 03-28-20, documented this event in which the complainant failed to comply with Inmate Rules and Regulations to lockdown when dayroom time ended. When Deputy 4 turned off the module phone(s) the complainant threatened him and later complained to Deputy 3. SDSD DSB P&P Section O.3 titled, Inmate Rules and Regulations, states in part, "Inmates shall obey staff instructions, and shall not threaten, assault, or attempt to intimidate any other inmate or any member of the Jail Staff." The evidence showed that the alleged conduct did occur and was lawful, justified and proper.

2.  Misconduct/Discourtesy – Deputy 4 "mocked" the complainant.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "…I then raised one hand to the tower shaking it back and forth, after that I went back into the Dorm and push the call box, the deputy said ("awe what happened")." SDSD P&P Section 2.22 titled, Courtesy, states, "Employees shall be courteous to the public and fellow employees. They shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation." There was no available audio of the verbal exchanges between the complainant and Deputy 4. Additionally, there were no independent witness statements to corroborate the complainant's allegation. Absent audio and/or any independent witness statements, the evidence was insufficient to prove or disprove the allegation.

3.  Misconduct/Intimidation – Deputies 2 and 3 threatened the complainant.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "…after dinner deputies 2 and 3 walk in and say "come with us to the Rec Yard I can finish eating. He said no get of your bunk or we will take you off your bunk. "…2 says your going to the hole, I say no I want to speak with a sergent he said when you get their you can, I said I'm not going till I speak to a sergent, he said "that's what I want to hear" stand up and cuff up…" SDSD P&P Section 2.48 titled, Treatment of Persons in Custody, states, "Employees shall not mistreat, nor abuse physically or verbally, persons who are in their custody. Employees shall handle such persons in accordance with law and established Departmental procedures." There was no available audio of the verbal exchanges between the complainant and Deputies 2 and 3. Additionally, there were no independent witness statements to corroborate the complainant's allegation. Absent audio and/or any independent witness statements, the evidence was insufficient to prove or disprove the allegation.

4.  Excessive Force – Deputies 2 and 3 handcuffed the complainant.

    Board Finding: Action Justified
    Rationale: The complainant stated, "I said I need two pairs of cuffs I can't fit into one, I put my shoes in front of me stand up and put my hands in the air 2 grabs my right wrist and puts one hand cuff on turns me around with 3 on my left arm the trys and force my arms into one set of cuffs… I put Both my arms under my stomach… they Forced one set of handcuffs on me." SDSD DSB P&P Section I.89 titled, Use of Force, states in part, "During the course of their official duties, Detention Services Bureau personnel, may use physical force to the extent that is necessary and objectively reasonable to effect an arrest, prevent escape, overcome resistance, and maintain or restore order. Personnel shall use the Department approved techniques, equipment and tactics in controlling the inmate or incident." Deputy 2's Use of Force Report documented the complainant's refusal to place his hands behind his back. When Deputies 2 and 3 attempted to get the complainant's compliance and secure him in cuffs, the complainant stated, "you're not putting me in handcuffs," and violently pulled his right arm away, which still had an unsecured handcuff attached to it." Jail surveillance video captured the incident. The evidence was consistent with, and corroborated deputy reports. The evidence showed that the alleged conduct by Deputies 2 and 3 did happen and was lawful, justified and proper.

5. Excessive Force – Deputy 3 "choked" the complainant.

    Board Finding: Unfounded
    Rationale: The complainant stated, "…they continue to Force one cuff deputy 3 puts his Finger on my nose, the trys to choke me by rear naked head lock." The complainant identified "deputy 3" as the deputy who "choked" him, however the evidence identified Deputy 2. The evidence showed the alleged conduct against Deputy 3 did not occur.

6. Excessive Force – Deputy 2 "choked" the complainant.

    Board Finding: Action Justified
    Rationale: The complainant stated, "…they continue to Force one cuff deputy 3 puts his Finger on my nose, the trys to choke me by rear naked head lock." Video surveillance captured the incident and showed the complainant moving around, attempting to prevent the deputies from putting handcuffs on him. In his Use of Force Report, Deputy 2  documented, "Knowing that he could use the handcuff as a weapon and to gain control, I encircled the complainant's neck with my left arm and pulled him onto the ground." SDSD Addendum Section F titled, Use of Force Guidelines, states in part, "Deputies shall not lose their right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or overcome resistance (per 835(a) P.C.). Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident. The use of force and subsequent reporting must be in accordance with the procedures set forth in these guidelines. The evidence reviewed on the jail surveillance video showed that Deputy 2 encircled the complainant's neck and immediately took him to the ground. Video showed that once on the ground, the complainant thrashed and bucked his body and continued to resist. The evidence showed the alleged act or conduct did occur and was lawful, justified and proper.

7. Excessive Force – Deputy 3 "slammed" the complainant to the ground.

    Board Finding: Unfounded
    Rational: The complainant stated, "…he then slams me to the ground I put Both my arms under my stomach." The complainant identified "deputy 3" as the deputy who "slammed" him to the ground, however the evidence identified Deputy 2. The evidence showed the alleged conduct against Deputy 3 did not occur.

8. Excessive Force – Deputy 2 "slammed" the complainant to the ground.

    Board Finding: Action Justified
    Rationale: The complainant stated, "…he then slams me to the ground I put Both my arms under my stomach." The complainant admits he was not going to comply with the order to cuff up. See Rationale #6.

9. Excessive Force – Deputy 2 "kneed and punched" the complainant's face.

    Board Finding: Action Justified
    Rationale: The complainant stated, "…he then slams me to the ground I put Both my arms under my stomach and officer 3 is holding me down while 2 is kneeing and punching me in the face." SDSD DSB P&P Section I.89, states in part, "If the employee determines that the use of force is necessary, he/she shall use only that force which is necessary and objectively reasonable for the situation. Force shall never be used as a form of punishment or discipline. In all circumstances the force used must be consistent with Addendum F." According to Deputy 2's Use of Force Report, and as evidenced in the jail surveillance video, the complainant continued to fight by kicking his legs and thrashing his body around. Deputy 2 documented the following in his Use of Force Report, "The purpose of my strikes was to overcome the complainant's resistance and quickly neutralize the immediate threat to my partners and myself. These strikes proved effective allowing Deputy 3 to pull his left arm behind his back while I pulled his right arm behind his back. Once both of his arms were placed behind his back I was able to secure them in

-16-

handcuffs." The jail surveillance video corroborated the documentation of the incident. The evidence showed the alleged conduct did occur and was lawful, justified and proper.

10. Excessive Force – Deputy 1 shackled the complainant's legs.

Board Finding: Action Justified
Rationale: The complainant stated, "…they Forced one set of handcuffs on me, and officer 1 putt shackles on my legs." According to his Use of Force Report, Deputy 1 heard yelling in the House 2 Recreation Yard. He went to the recreation yard to provide security for Deputies 2 and 3. Deputy 1 stated, "While attempting to secure the complainant into handcuffs a use of force ensued and Deputies 2 and 3 took the complainant to the ground. Once the complainant was lying face down on the ground, I grabbed the complainant's ankles to prevent him from kicking me or anyone else. Once he was secured in handcuffs, I applied the leg chains to his ankles. The evidence showed the alleged conduct did occur and was lawful, justified and proper.

11. Excessive Force – Deputy 2 placed a spit sock on the complainant.

Board Finding: Action Justified
Rationale: The complainant stated, "…they then put me on a gurney and put a spit mask on me cause my face was poaring Blood." According to his Use of Force Report, Deputy 2 documented that the spit sock was placed on the complainant for precautionary reasons, to protect deputies, due to the fact that the complainant was bleeding from his nose and yelling, which was causing blood and spit to spray. Deputy 2 recorded that the spit sock was on the complainant for approximately 10 minutes and was utilized to avoid blood contamination. SDSD Addendum Section F, Use of Force Guidelines – Spit Sock, states in part, "When placed over a subject's head and face, neither vision nor breathing is impaired; however, saliva will not penetrate the material." The evidence showed the alleged conduct did occur and was lawful, justified and proper.

---

## 20-093

1. Misconduct/Procedure – Deputy 1 failed to provide his name and badge number to the complainant.

Board Finding: Not Sustained
Rationale: The complainant reported that Deputy 1 failed to provide his badge number and responded, "Why do you need my badge number?" Sheriff's Policy 2.20 Identification, mandates that while on duty, all employees shall furnish their first and last name and ARJIS number to any person requesting that information, except when the withholding of such information is necessary for the performance of police duties. According to Sheriff's records and surveillance video, Deputy 1, a Classification Deputy, conducted a weekly Administration Segregation review with the complainant on 08-30-20. Deputy 1 also provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Deputy statements are protected by the Peace Officer Bill of Rights and cannot be publicly disclosed. Due to the absence of an audio-recording of the conversation between Deputy 1 and the complainant, there is insufficient evidence to prove/disprove the allegation.

---

*End of Report*

## NOTICE

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

# EXHIBIT T

**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
DAVE ALBERGA
EDWARD COLLINS
MICHAEL GRAY
BONNIE KENK
F. JAVIER SALIAZ
LOURDES N. SILVA
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
JULIO ESTRADA



# *County of San Diego*

## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776     FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its September 8, 2020, meeting held via the BlueJeans Platform. Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

**CLOSED SESSION**

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
   **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASES FOR SUMMARY HEARING (6)

**ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE**

**19-070**

1. Misconduct/Procedure – PO 1 evicted the complainant from his house.

   Board Finding: Action Justified
   Rationale: The complainant stated, "I was falsely accused of verbally threatening the maintenance guy in the condominium community. Based on this false accusation, my probation officer told me I had to vacate my home within 24 hours when he came to my residence with several probation officers, or else I would be arrested and sent to jail." On 06-07-18, per the San Diego County Probation Department Policy 363.5, Search by Waivers, PO 1 conducted an unannounced contact visit with the complainant at his residence. As part of his duties, PO 1 also interviewed the maintenance employees at the condominium complex the complainant lived in. The employees relayed to PO 1 that the complainant had accused him of closing the automated gate on him and had threatened them. The complainant told the maintenance worker, "you better watch yourself; I am not kidding." The maintenance worker and his wife had previously filed a Temporary Restraining Order (TRO) against the complainant for previous threats. The maintenance worker contacted the Sheriff's Department and although no crime report was written, the maintenance worker was given a Sheriff's Department Incident Number. PO 1 believed the complainant posed an imminent risk to them, and therefore directed him to move out of the house. Per Probation Department Policy 16.14, Arrest Powers, and per Penal Code Section 1203.2(a), which gives Probation Officers authority to re-arrest probationers during the probation period (for probation violations,) PO 1 lawfully told the complainant that per

*-continued on next page-*

Ex. T - 708

739 of 882

Probation Policy 402.3, Violations of Supervision, he would be arrested if he failed to vacate the home. The evidence showed that the alleged act or conduct did occur but was lawful, justified, and proper.

2.  Misconduct/Procedure – PO 1 required a second psychiatric opinion.

    Board Finding: Action Justified
    Rationale: The complainant stated, "PO 1 told me to leave my home. He said that I would need to get a psych evaluation stating that I am stable to be able to go back to my home." Per the Superior Court of California Court, the complainant was sentenced to be placed on Supervised Probation in lieu of prison time. The terms of his probation included, but were not limited to: Follow such course of conduct that the Probation Officer communicates to the defendant, which included to participate in treatment, therapy, counseling, or other course of conduct as suggested by validated assessment tests and to attend and successfully complete psychiatric, individual, group, substance abuse dual diagnosis and cognitive behavioral therapy as directed. The complainant was directed to move out of his residence, and he complied. The complainant was also directed to contact an independent forensic psychiatrist for a second forensic psychiatric evaluation. The evidence showed that the alleged act or conduct did occur but was lawful, justified, and proper.

3.  Misconduct Procedure – PO 1 did not allow the complainant to return to his house.

    Board Finding: Action Justified
    Rationale: The complainant stated, "A doctor evaluation stated I was healthy and stable. I then tried to contact PO 1 to inform him that my psychiatrist did an evaluation and she wrote that I am stable. Finally, after a week of trying to contact PO 1, I got a hold of him. When I told him I did what he said I needed to do to be allowed back at my house, by getting cleared as stable (not in a manic state), he still wouldn't allow me to go back to my house. He lied, and then stated I now had to get a second opinion on my mental health by another mental health professional." The complainant provided two clinical notes from the psychiatrist he was seeing. Both clinical notes were reviewed during this investigation and confirmed the complainant's diagnosis and stated that the symptoms that typically accompany the disease, were stable. The doctor confirmed that one of the characteristics of the disease was a manic state, which the complainant had admitted having. Despite the medical notes and the explanation provided by the complainant, he was ultimately not allowed to continue to live in his residence due to the allegations made against him. Probation contact notes do not list a psychiatric evaluation as a condition for the complainant to return to his residence. The reason for not being allowed to return was the violation of the terms of his condition, which included "do not use threats, or violence on another person." The evidence showed that the alleged act or conduct did occur but was lawful, justified, and proper.

4.  Misconduct/Procedure – PO 1 required weekly appointments for the complainant when he was not going to be available.

    Board Finding: Action Justified
    Rationale: The complainant stated, "During this time, PO 1 also would make appointments for me to go see him on a weekly basis. Sometimes he wouldn't even be there when I came for our appointments." The evidence documented a total of 76 Contact Reports from 04-17-17 through 10-29-18, with the complainant at various Probation Offices and with various Probation Officers. PO 1 first contacted the complainant on 08-18-17 and saw him on more consistent basis as evidenced in the Probation Contact Log.  All 76 contacts were reviewed and none of them showed PO 1 being unavailable for the complainant. Towards the end of his probation term, the complainant was given appointments at the North County Probation Office, as that office was closer to where the complainant was living. Conversely there were several notes indicating that the complainant failed to answer his phone when called by PO 1. The terms of the complainant's condition included to report to the PO as directed and follow such course of conduct that the PO communicates to the complainant. The evidence shows that the alleged act or conduct did occur but was lawful, justified and proper.

5.  Misconduct/Procedure – PO 1 required the complainant return to San Diego from Los Angeles.

    Board Finding: Action Justified
    Rationale: The complainant stated, "Even during my transfer to Los Angeles, he would make me drive to San Diego to just check in, which was a waste of my time." The evidence revealed that on 07-11-18, the complainant's petition to transfer his supervised probation to the County of Los Angeles was accepted. By 08-14-18, the complainant had yet to submit the required documentation for transfer and failed to follow up on other requirements to complete his transfer. The complainant was given a 30-day travel pass to reside with his aunt in Los Angeles County. On 09-10-18, the complainant was notified that the court date to complete the transfer was set for November. The complainant was provided another 30-day travel pass for Los Angeles County. The complainant was given an appointment in

October at the North County Probation Office. The Complainant continued to receive 30-day travel passes in anticipation of the Jurisdictional Transfer being granted. PO 1 reminded him of the upcoming jurisdictional hearing scheduled for 11-09-18 and that until the transfer was authorized for the court, per the County of San Diego Probation Department Policy 400.10 Transfers While Under Supervision, the complainant still needed to report as needed to the San Diego Probation Offices. He was told by PO 1, based on living outside the county, that for his convenience, he will report to a Probation Department Office in the North County on 10-12-18. The complainant reported as directed. When the Jurisdictional Transfer to Los Angeles County was completed, there were no further request to return to San Diego to report to any of the San Diego County Probation offices. The evidence shows that the alleged act or conduct did occur but was lawful, justified, and proper.

---

**19-078**

1.  Death Investigation/In-Custody Drug-Related – Michael Bush was found unresponsive in a holding cell at the San Diego Central Jail (SDCJ) on 07-02-19.

    Board Finding: Action Justified
    Rationale: On 07-01-19, Michael Bush was involved in a domestic disturbance with his girlfriend's family members in Imperial Beach, and was placed under citizen's arrest by the Sheriff's Department. At approximately 9:22pm, Bush was scanned and booked into custody at SDCJ. During his medical evaluation, Bush was noted to have an elevated blood pressure reading, 191/110, and was placed into a holding cell on the second floor of the jail. On 07-02-19, during breakfast distribution at approximately 4:17am, a deputy discovered Bush unresponsive. Verified by surveillance video, Bush slid down the wall to the floor of his cell at about 3:20am and did not move again after 3:30am. Life-saving measures were undertaken by deputies, medical staff, and emergency personnel until approximately 4:46am, when Bush was pronounced dead. An autopsy was conducted and a plastic baggie was found near the exit of Bush's stomach. The cause of death was acute methamphetamine intoxication due to a ruptured plastic bag in the stomach with ischemic cardiomyopathy listed as contributing, and the manner of death was accidental. Toxicology testing was positive for methamphetamine, amphetamine, and doxylamine. According to Bush's estranged spouse, the decedent had a medical history significant for hypertension, unspecified cardiac issues, and past illicit drug abuse. The evidence supported that Bush was a Book and Release (B&R) inmate who was properly classified upon his entry into the SDSD jail system, and that hourly security checks were conducted in compliance with policy and there were no late entries. When specifically asked during his medical intake screening, Bush denied that he swallowed or hid drugs in any body cavity, and his Body Scan image did not detect contraband. Bush told another inmate that he had "swallowed his stash," but there was no evidence that Bush or the cellmate expressed any concerns about Bush's well-being to medical or sworn personnel. Surveillance video inside the holding cell, provided evidence of the measures taken upon discovery by deputies and medical staff, who followed medical emergency protocol in compliance with detention policies. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel. The evidence showed that the actions that occurred were lawful, justified, and proper.

---

**19-079**

1.  Misconduct/Procedure – Unidentified deputies denied the complainant mail.

    Board Finding: Not Sustained
    Rationale: The complainant stated, "I been deprived of my manhood since day one. To be also denied my personal mail and other items such as books, phone calls, commissary etc. for no reason is sinister." On 05-08-19, the complainant received mail from Amazon that was rejected and returned to sender. The content of that mail was a hard bound book. According to SDSD DSB P&P Section P.3 titled, Inmate Mail, Inmates shall be allowed to receive and possess U.S. mail, incoming letters, confidential/legal mail and mail from official government agencies. Inmates may also receive electronic email messages, periodicals, magazines, and new books. Magazines, periodicals, and new soft covered books delivered to the facility by publishers or bookstores via the U.S. Postal Service may be accepted. All parcels containing new books will be forwarded to the watch commander or designee for inspection and approval. The subject matter of some magazines, periodicals and new soft covered books shall establish whether or not they are allowed in the detention facility housing units. The following items are not usually allowed inside the facility due to their construction or subject matter, hardbound books of any nature. Other than the item rejected per policy, there was no evidence that any additional correspondence and/or packages were rejected. The evidence received and reviewed did not support the allegations that the complainant was deprived of his mail. Attempts were made to obtain additional information from the complainant, however, after he was released from custody he failed

to maintain contact with CLERB. Absent additional information from the complainant, there was insufficient evidence to either prove or disprove the allegation.

2. Misconduct/Procedure – Unidentified deputies denied the complainant commissary.

Board Finding: Not Sustained
Rational: The complainant stated, "I been deprived of my manhood since day one. To be also denied my personal mail and other items such as books, phone calls, commissary etc. for no reason is sinister." SDSD Detention records received during CLERB's investigation included the complainant's commissary activity and invoices. The activity showed regular deposits to his account, providing him the opportunity, as indicated by the invoices, to make frequent commissary purchases for food and hygiene products. According to SDSD DSB P&P Section T.9 titled, Sheriff's Commissary, the ability to order from commissary will be offered to inmates at all detention facilities. Inmates are limited to a bi-weekly purchase not to exceed $200 or $100 per order. Purchases of phone time and orders placed via website, by an outside party, are independent of these caps and can be ordered in unlimited quantities. The evidence received and reviewed did not support the allegation that the complainant was deprived of his commissary. Attempts were made to obtain additional information from the complainant, however, after he was released from custody he failed to maintain contact with CLERB. Absent additional information from the complainant, there was insufficient evidence to either prove or disprove the allegation.

3. Misconduct/Procedure – Unidentified deputies denied the complainant telephone calls.

Board Finding: Not Sustained
Rationale: The complainant stated, "I been deprived of my manhood since day one. To be also denied my personal mail and other items such as books, phone calls, commissary etc. for no reason is sinister." Detention records received during CLERB's investigation included the complainant's commissary activity and invoices. The activity showed regular deposits to his account, providing him the opportunity, as indicated by the invoices, to purchase phone time on a frequent basis. Forty-two purchases for phone time were made by the complainant. The evidence received and reviewed did not support the allegations that the complainant was deprived of his phone calls. Attempts were made to obtain additional information from the complainant, however, after he was released from custody he failed to maintain contact with CLERB. Absent additional information from the complainant, there was insufficient evidence to either prove or disprove the allegation.

---

**19-095**

1. Misconduct/Discourtesy – Deputy 1 "exuded violence and hatred" toward the complainant.

Board Finding: Unfounded
Rationale: The complainant stated, "ma'am I don't know how to describe this, this man was exuding just violence and hatred, I mean from the moment he spoke to me it was not like any other cop that had spoken to me before, just incredibly hostile." According to SDSD P&P Section 2.22 titled, Courtesy, employees shall be courteous to the public and fellow employees. They shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation. Except when necessary to establish control during a violent or dangerous situation, no member shall use coarse, profane or violent language. Employees shall not use insolent language or gestures in the performance of his or her duties. Body Worn Camera (BWC) footage was reviewed of the incident. The complainant, from the beginning of the interaction with Deputy 1 was observed to be extremely disrespectful toward Deputy 1. In the BWC footage, the complainant displayed extreme anger and threatening behavior throughout the encounter. Deputy 1 was observed to be courteous, patient and was not disrespectful, violent or angry with the complainant. The BWC footage refuted the complainant's allegation that Deputy 1 was disrespectful toward him. The evidence showed the alleged act or conduct did not occur.

2. Misconduct/Procedure – Deputy 1 gave no verbal instructions or warnings to the complainant.

Board Finding: Unfounded
Rationale: The complainant stated, "He was not being terribly communicative. He wasn't really issuing any orders, he just said we're taking the van, you have five minutes to get your stuff out of there." From the time of the encounter with the complainant, Deputy 1 communicated with the complainant, informing him that his vehicle was being towed due to the registration having been expired over six months and parked on a public street. Deputy 1 instructed the complainant several times to remove the items he wanted to take with him before the tow truck arrived. The complainant, displayed extreme anger and frustration due to his vehicle being towed and Deputy 1 listened while the complainant vented. Deputy 1 remained professional and displayed patience with the complainant, even when

the complainant was yelling, using foul language and making threats. Deputy 1 provided information to the complainant about what steps he would need to take to get his vehicle back. Deputy 1 instructed the complainant several times to gather what property he wanted out of his vehicle. According to California Vehicle Code (VC) Section §22651 titled, Circumstances Permitting Removal of Vehicle, a peace officer may remove a vehicle located within the territorial limits in which the officer or employee may act, under the following circumstances: If a vehicle is found or operated upon a highway, public land, or an off-street parking facility with a registration expiration date in excess of six months. Additionally, according to SDSD P&P Section 6.37 titled, Towing Policy, when vehicles are towed and/or stored, the removal shall be in compliance with Vehicle Code Section 22651 or other lawful authority. Under no circumstances shall the act of towing and/or storing of a vehicle be used as a means of punishment against any citizen. Deputy 1 did not tell the complainant he had five minutes to get his belongings. Deputy 1 did inform the complainant that he had the time until the tow truck arrived. Once the tow truck arrived, additional time was given to the complainant. The BWC evidence refuted the complainant's allegation that Deputy 1 provide no verbal instructions. The evidence showed the alleged act or conduct did not occur.

3.  Illegal Search and Seizure – Deputy 1 broke the window on the complainant's vehicle.

    Board Finding: Action Justified
    Rationale: The complainant stated, "at some point I got into the vehicle and just out of force of habit I slid the door closed and opened the widow at which point he attacked the side of the vehicle grabbing the window, broke the plastic tilt out latches and tried to put the window under his shoulder and shove it up to break the glass off the side of the door." Although the complainant stated he closed the door out of habit, BWC video showed that he had been sitting in the back seat off and on during the duration of his encounter with Deputy 1 and did not close the door. The complainant was sitting in the back seat when the tow truck arrived. As soon as the complainant saw the tow truck, he jumped up out of the back seat, checked the front door to make sure it was locked, then got back into the back seat and closed the sliding door. Deputy 1 informed the complainant that they would have to break the door if he continued. Per his Arrest Report, Deputy 1 stated, "The complainant then entered the van and closed and locked the side sliding door. I told the complainant to exit the van. The complainant refused. I could not see what the complainant was doing so I disengaged the bottom latched of the window attached to the sliding door. The complainant had put a towel up in front of the window so I could not see inside. I reached in and removed the towel and told the complainant to exit the van." Per BWC, Deputy 1 approached the sliding door, took a hold of the window, that was tilted out and pulled on it, causing the closure window latches to be pulled to the outside of the window. According to SDSD P&P Section 2.51 titled, Arrest Search and Seizure, employees shall not make any arrest, search or seizure, nor conduct any investigation or official Department business, in a manner which they know or ought to know is not in accordance with law and established Department policies and procedures. The California Peace Officers Legal Sourcebook (CPOLS) Section 4.18 titled, Search and Seizure – Vehicles, states in part, California law enforcement officers under certain conditions are authorized to impound a motor vehicle.   An individual officer's decision to impound must be exercised according to standardized criteria, which include statutory authority for the impound, i.e., Vehicle Code Section 22651. The complainant had placed a towel, hanging on the inside, in front of the window that prevented sight into the vehicle. Deputy 1 reached in removed the towel and was able to hold the window open enough to keep an eye on the complainant. Deputy 1 asked the complainant several times to come out of the vehicle to which he finally complied. The evidence showed that the alleged act or misconduct did occur and was lawful, justified and proper.

4.  Excessive Force – Deputies 1 and 2 grabbed the complainant and "slammed him flat into the ground."

    Board Finding: Action Justified
    Rationale: The complainant stated, "This is not the behavior on my part who was trying to resist arrest or someone who was doing anything other than collecting my property. In just a matter of a few seconds or a minute at the most they basically snuck up behind me. I did not see him at all, I guess I was grabbed by her, by my right arm and it was twisted inward rotated counter clockwise towards my body and he must have been right behind me and he must have had his hand on my head and drove me flat and into the ground and I was instantly paralyzed." Per BWC footage, in the process of retrieving items from his vehicle, the complainant aggressively threw the bumper cover behind him, where Deputy 1 was standing. According to Deputy 1's report, the car part hit him on the lower legs. BWC footage showed the complainant aggressively throwing the car part, however the footage did not show Deputy 1 getting hit as the deputy's legs were out of view of the BWC. According to his Arrest Report, Deputy 1 believed the complainant was displaying assaultive behavior and he was going to reach for a larger object in the back of his vehicle to throw at him or Deputy 2 and attempt to cause them harm or great bodily injury. According to Penal Code Section §69 titled, Resisting Executive Officer, every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a

-5-

county jail not exceeding one year, or by both such fine and imprisonment. Additionally, Penal Code Section §835(a) titled, Peace Officer Use of Force to Arrest, states in part, a peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance. SDSD P&P Addendum F titled, Use of Force Guidelines, states, it shall be the policy of this Department whenever any deputy Sheriff, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force, the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies should choose the available force option, which is reasonable and necessary for the circumstances at the time. Subjects must not gain the advantage in a physical confrontation; therefore, deputies may need to use a force option that exceeds the subjects force level. Active resistance refers to overt physical actions intended to prevent a deputy's control. Assaultive behavior is represented by conduct that suggest the potential for human injury. Such behavior may be conveyed through body language, verbal threats and/or physical actions. Aggravated active aggression refers to subject actions that will potentially result in serious injury or death to a deputy or any other person. A deputy encountering any of these suspect actions, can choose a **reasonable** (**emphasis added**) response to control that subject: Verbal direction or redirection. Refers to verbiage or command given by a deputy. Hands-on control is used as a means of overcoming resistive or assaultive behavior. Hard hands control, powerful hand or leg strikes, carotid restraint, etc., are techniques used to control more assaultive suspects. The BWC footage viewed provided evidence that the complainant was extremely upset about his vehicle getting towed and showed him get increasingly agitated, angry, aggressive and threatening throughout the encounter with deputies. The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

5. Excessive Force – Deputy 2 "pulled the complainant's head up, said, 'You're not hurt, get up,' and dropped the complainant's head back on the pavement."

   Board Finding: Unfounded
   Rationale: The complainant stated, "I kept saying I couldn't breathe and my head was hanging forward and she pulled my head up and said, 'you're not hurt, get up,' and of course I couldn't, and finally she said, 'I'm not going to hold your weight up,' and dropped my head back on the pavement." After the use of force incident, Deputy 2 stayed with the complainant until emergency medical assistance arrived. The BWC footage showed Deputy 2 assisting the complainant, sitting him up and holding him in different positions. In the BWC footage, the complainant is heard asking Deputy 2 to place him in different positions so he is able to breathe better. According to her Officer Report, Deputy 2 stated, "the complainant began to yell for help and claimed he was paralyzed and could not breathe. I assured the complainant that medics were on the way. The complainant continued to say he could not breathe and even asked me to place him in certain upright positions which I agreed. After a few minutes with the complainant, he appeared to be breathing normally.  A few minutes later paramedics arrived." The BWC footage refuted the complainant's allegation. The evidence showed that the alleged act or misconduct did not occur.

---

**19-103**

1. False Arrest – Probation Officer (PO) 1 re-arrested the aggrieved.

   Board Finding: Action Justified
   Rationale: The complainant reported the following, "My son and I were victims to false accusation and charges. He was a lovely man, he was not a criminal. The charges were false. We were dragged through 2 years of hell backward. He was convicted of some phoney misdemeanor and ended up being placed in jail. He is not jail material." Based upon a San Diego Police Report dated 10-06-18, the aggrieved was re-arrested at a Probation Office by PO 1 when he violated the terms of his probation. According to Probation records, the probationer damaged a bedroom door, stole from his mother, dissuaded her from reporting the crime, and evaded police by hiding in the residence. Subsequent to the issuance of a Criminal Protective Order (CPO), the probationer violated the CPO on multiple occasions and there were several hundred calls for law enforcement service to the residence regarding family disturbances. According to the report, of particular concern was that the probationer was only out of custody for a couple of weeks prior to violating the Court issued CPO, and demonstrated a complete disregard for the Criminal Protective Order, the safety of the victim, and for the Court ordered conditions of Probation. The evidence showed that the probationer violated the terms of his probation and his arrest was lawful, justified, and proper.

2. Misconduct/Procedure – Deputy 2 failed to submit report(s) to the District Attorney's Office.

   Board Finding: Action Justified

Rationale: The complainant stated, "I received information that after a three month delay from the date of death Deputy 2 said he referred the case for prosecution against a suspect to the District Attorney office with the recommendation for prosecution because he strongly believed the suspect prescribed the aggrieved fatal drugs. This was after the token arrest of the suspect for the probation violation made in March even though the suspect admitted the violation of probation in December.? I contacted the DA recently and they responded the reason DA never evaluated the case was they never got the reports submitted and the Sheriff Deputy 1 said he could not determine the seller." Sheriff's Policy 2.41, Departmental reports requires that employees submit all necessary reports on time and in accordance with established Departmental procedures. Reports submitted by employees shall be truthful and complete; no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information, nor omit pertinent information reasonably expected to be included. Deputy 2 was part of a narcotics task force working in conjunction with local and federal authorities. Deputy 2 gathered evidence and presented this case to the District Attorney and US State Attorney's Office for review. The evidence showed that the actions taken by the detective were lawful, justified, and proper.

3.  Misconduct/Truthfulness – Deputy 2 "lied" to the complainant.

    Board Finding: Unfounded
    Rationale: The complainant stated, "Deputy 2 outright lied to me about this referral he said he made .. It was never made. Obviously the DA could not evaluate case. Many Times Deputy 2 represented to me that the suspect was the seller of the drugs that killed the aggrieved. That he was not an informant and sent to the aggrieved and Deputy 2 said he wanted to see suspect charged for this crime. Now I fear suspect a two times felon on probation for the sale of Heroin and Cocaine, (twice) at the time was working with someone else who is protecting him from prosecution for this offense and that is why the referral was not made." Sheriff's Policy 2.46, Truthfulness, requires that all written and verbal reports will be truthful and complete. Deputy 2 was part of a narcotics task force working in conjunction with local and federal authorities. Deputy 2 gathered evidence regarding the illicit substances involved in the aggrieved's overdose, and presented the case to the District Attorney and US State Attorney's Office for review. Absent an audio-recording there was insufficient evidence to corroborate the conversation(s) that occurred between the complainant and the detective. However, the evidence confirmed that the referral(s) were made and the alleged act did not occur.

4.  Misconduct/Procedure – Deputy 2 failed to bring forth or file charges against a suspect in the aggrieved's death.

    Board Finding: Action Justified
    Rationale: The complainant stated, "I pressed Deputy 2 on charge the suspect and investigate others for death of aggrieved." When a crime is committed, it is the responsibility of law enforcement to investigate the crime and arrest the suspect(s). Sheriff's Policy 6.29, Property Control System, outlines the chain of custody and acquisition of evidence, to include narcotics. Once a criminal investigation is finalized, the case is submitted to the District Attorney's (DA) Office who evaluates whether there is enough evidence to support the charges. The Deputy District Attorney (DDA) represents the People of the State of California and is the entity responsible for bringing forth criminal charges against suspects in courts of law. The San Diego County District Attorney's Office has the responsibility and authority to investigate and prosecute all felonies in San Diego County, however, they may decline to prosecute or "reject" a case when there is insufficient evidence. According to Deputy 2's Follow-Up Report, he submitted this case to the DA's office, as well as the US Attorney's Office; both the local and federal entities declined to prosecute because of the lack of evidence. On 04-08-19, Deputy 2 informed the complainant that the case was declined because there was no definitive cause of death other than the mixture of narcotics, and because there was no way to prove who provided her son with the drugs that caused his death. The complainant twice refused to confer with the DDA reportedly because "the DA's office and the judges were corrupt." The evidence showed that the alleged act or conduct did occur, but was lawful, justified, and proper.

5.  Misconduct/Procedure – The Sheriff's Department "stonewalled/delayed" a case for prosecution.

    Board Finding: Action Justified
    Rationale: According to the complainant, "Sheriff stonewalled and delayed this case never pushing for prosecution as he stated I gave him I gave him a suspect on a "plate" I do not feel death accidental. Death was a planned event. Sheriff did opposite of what he said did not even investigate "blunt trauma" inaccurate external autopsy "another person" I want a criminally investigate and charges brought for death of my son" I got delays and no resolution at all. The suspect is free and back at "selling" not giving Heroin I do not believe the sheriff dept was candid "about death investigation" and intentionally delayed case…" The Medical Examiner's (ME) Office conducted an autopsy and determined "the decedent died of a mixed drug intoxication due to the combined toxic effects of heroin, methamphetamine, cocaine, and alprazolam. There was no evidence of suicidal intent with his fatal drug overdose, and the manner of death was classified as accidental." According to the ME report, the only traumatic injuries were

-7-

several small abrasions on the head and chest, however, they did not contribute to his death. Pertinent dates in Deputy 2's Follow-Up Report indicated that the death occurred on 12-21-18, and a suspect was interviewed on 01-15-19. Cell phone evidence was forensically evaluated on 02-22-19, but offered no evidentiary value. An additional voluntary statement from the complainant was obtained on 02-28-19. An additional voluntary statement from a suspect was obtained on 04-01-19. The case was forwarded to the DA's Office and to the US Attorney's Office, but both declined to prosecute. Sheriff's Policy 6.95, Criminal Case Rejections: Review Procedure, states that each Sheriff's command submitting cases to the District Attorney for issuance of a criminal case will establish a system for review of cases that are rejected and will ensure each complaint rejection is analyzed for legal/procedural improprieties and/or any necessary follow-up investigation. Copies of individual case rejections are forwarded to the reporting/arresting deputy and a supervisor for a critique, with the goal of improving performance and identifying training needs. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel, and the actions taken were lawful, justified, and proper.

---

**20-077**

1. Misconduct/Procedure – Unidentified Probation employees "monitored" the complainant.

    Board Finding: Summary Dismissal
    Rationale: The complainant contacted CLERB and lodged a complaint on 07-23-20, alleging unidentified Probation Department employees were "illegally, continuously and electronically monitoring him." After receiving the signed lodge packet, this investigator completed a request to the Probation Department for records. According to information/verification from the Probation Department, after they reviewed the complaint, it was determined the complainant was not active to probation. Additionally, it did not appear as though the complainant had ever been supervised by the San Diego County Probation Department. The search in Probation records database did show one document from 02-28-96 which was a Presentence Investigation. There was also another case in the Probation system from 1994, however, there were no documents pertaining to it. CLERB Probation liaison conducted an additional check of SDLaw to see if there was any additional information which might help locate information pertaining to the complainant, but those searches did not reveal anything of relevance. Additionally, as the complainant's complaint did not identify any specific officer or officers, Probation was unable to ascertain if someone may have contacted the complainant as a collateral contact. When Probation searched the complainant's address, it returned 76 offenders who have provided that address at some point in time to probation. CLERB Probation liaison reached out to Parole and reported that the complainant was not active to Parole either. This case is submitted for Summary Dismissal per CLERB's Rules and Regulations Section 15 (e) Summary Dismissal; The complaint is so clearly without merit that not reasonable person could sustain a finding based on the facts.

---

*End of Report*

## NOTICE

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

# EXHIBIT U



**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
P. DARREL HARRISON
Vice Chair
ROBERT SPRIGGS JR.
Secretary
DAVE ALBERGA
GARY BROWN
EILEEN DELANEY
MICHAEL GRAY
LOURDES N. SILVA
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
JULIO ESTRADA

# County of San Diego
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA  92101-2938
TELEPHONE: (619) 238-6776     FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its June 9, 2020, meeting held via the BlueJeans Platform.  Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

**CLOSED SESSION**

a)  PUBLIC EMPLOYEE PERFORMANCE EVALUATION
    Notice pursuant to Government Code Section 54957
    Title: Executive Officer, CLERB

b)  RECONSIDERATION OF FINAL REPORT
    Per CLERB Rules and Regulations 16.5
    Title: CLERB Case 17-150

c)  CONFERNCE WITH LEGAL COUNSEL
    Notice pursuant to Government Code Section 54956.9 Subdivision (c)
    Title: Existing Litigation

d)  PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
    **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASES FOR SUMMARY HEARING (7)

**ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE**

### 17-101

1. Death Investigation/Inmate Homicide – Keith Gill was twice assaulted by inmates at the San Diego Central Jail and subsequently died from his injuries.

   Board Finding: Action Justified
   Rationale: There was no complaint of misconduct in this case. Jurisdiction was invoked pursuant to the

*-continued on next page-*

Ex. U - 717

County of San Diego Charter, Article VI, Section 606, which authorizes CLERB to investigate the death of any individual arising out of or in connection with actions of peace officers employed by the Sheriff's Department, regardless of whether a citizen's complaint has been filed. On 05-28-17, Transient Keith Gill was arrested by the San Diego Police Department for Battery with Bodily Injury and booked into the San Diego Central Jail. While incarcerated, he was often disruptive and staff referred him for psychological evaluations, but Gill repeatedly refused medication and/or treatment. A psychiatric evaluation was conducted on 07-28-17, at which time Gill said he was doing fine and did not need anything; staff also reported that Gill was caring for food, clothing and hygiene appropriately. Gill then had a sick call visit on 08-02-17 for a tooth abscess, which had been an ongoing issue according to his file. Non-sworn personnel, to include medical staff/practices, reside outside of CLERB's purview. On 08-11-20, inmates assaulted Gill and he sustained cuts and bruising. After being treated by jail medical staff, Gill was separated from his aggressors and moved to a different floor and housing module. Post assault, Gill was observed on surveillance video moving freely about in the dayroom. He leaned against a pillar while watching television, sat/read at a table, and walked/exercised around the dayroom before returning to his cell. Gill did not appear to be afraid or paranoid of his surroundings or other inmates. Approximately twelve hours after the first assault, a different inmate attacked Gill and severely injured him. Upon discovery post assault, sworn personnel responded and initiated life-saving measures. Gill remained hospitalized until he succumbed to his injuries and died on 09-23-17. According to the Medical Examiner's records, the death was attributed to complications following blunt force injury of the head with diffuse traumatic brain injury, and heart disease was a significant contributory factor. The manner of death was classified as a homicide. A review of the evidence contained in the Homicide file revealed that Gill was labeled by other inmates as a "snitch/rat," and that he was "crazy." Detentions Policy R.1, Inmate Classification stated that any employee who received information that could change an inmate's classification code and/or housing assignment had the responsibility of advising a JPMU (Jail Population Management Unit) deputy, who would then evaluate the information to determine whether it required the inmate to be reclassified. During the Homicide investigation, some inmates expressed concerns about Gill's mental and physical well-being, but did not state that they relayed that information to sworn staff prior to the assaults. The evidence supported that Gill was properly classified upon his entry into the SDSD jail system, after subsequent interactions with SDSD medical personnel - to include psychiatric staff, and also after he was victimized. The Detentions Investigations Unit (DIU) gathered all available evidence and submitted the case to the District Attorney's Office for review for prosecution. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

---

**17-150**

1. Death Investigation/Natural – While in the custody of the Sheriff's Department at the San Diego Central Jail, Inmate Joseph Carroll Horsey was found unresponsive in his bed on 12-24-17.

Board Finding: Action Justified
Rationale: Per CLERB Rules and Regulations Section 17, In cases involving death arising out of or in connection with activities of peace officers or custodial officers employed by the County in the Sheriff's Department or the Probation Department, and in such other matters where CLERB is authorized to act pursuant to the Ordinance, CLERB shall review, investigate, and report regardless of whether a Complaint has been filed. Joseph Carroll Horsey was being treated at Patton State Hospital after he was found mentally incompetent to stand trial. While at Patton State Hospital, Horsey experienced a seizure and this medical event was added to his medical history. The evidence supported that Horsey was properly classified upon his transfer from Patton State Hospital to the SDSD jail system on 11-17-17. His medical history justified him being housed in the Psychiatric Security Unit (PSU). During his incarceration, Horsey continued to receive the medications he was prescribed at Patton State Hospital. He did not show any decline in his health and there were no new symptoms, complaints, or recent injuries. Jail Surveillance video footage on 12-23-17, showed he retired to bed after using the restroom at 7:45 p.m., and never woke up. On 12-23-17 at 11:59 p.m., his cellmate noted that Horsey showed labored breathing and movements that appeared to be consistent with a seizure event. The cellmate thought that Horsey was "throwing a tantrum." On 12-24-17, at 3:50 a.m., Horsey was found unresponsive in his bed. Jail nurses and

Ex. U - 718

responding paramedic personnel provided resuscitative efforts, but when Horsey failed to respond, his death was pronounced at 4:24 a.m. An autopsy revealed a bite on his tongue. According to the autopsy report, "the activity described as 'heavy breathing' and 'convulsing' may have been agonal respirations and nonspecific terminal movements. However, "it is also possible that this truly represented seizure activity, despite the lack of an established and documented ongoing seizure disorder. The apparent bite mark on the tongue could support this." Policy M.6, Life Threatening Emergencies, Code Blue states, "Upon discovery of a victim, sworn staff shall, assess the victim's condition without leaving the victim, immediately call for help." During the course of CLERB's investigation, Deputy #2 provided information that was considered in arriving at the recommended finding. While policy stipulated a deputy was not to leave the victim, the deputy's actions did not impact or cause Horsey's death and were reasonable given he was the only deputy present with unsecured psychiatric patients. According to the Medical Examiner's Office reports, during the initial body examination at the scene, the decedent's body had undergone postmortem changes that suggested that Horsey had been dead hours before he was discovered. Resuscitative efforts were impractical as rigor mortis and livor mortis had already set in. The autopsy determined that the cause of death was arteriosclerotic cardiovascular disease and the manner of death was classified as natural. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

2. Misconduct/Procedure – Deputies 1, 2, and 3 violated Detentions Policies I.43 Inmate Count Procedure and I.64 Security Checks of Housing Units and Holding Cells.

Board Finding: Sustained
Rationale: Inmate Joseph Carroll Horsey was found unresponsive in his bed inside the San Diego Central Jail Psychiatric Security Unit. DSB P&P Section I.43, mandates a hard count be conducted. A Hard Count is a count which verifies each inmate's well-being, and uses a Bar Code Reader, an Emergency Evacuation List, Face Cards or Floor Sheets to confirm the identity of the inmate. Likewise, DSB P&P Section I.64, mandates that sworn staff will observe each inmate for any obvious signs of medical distress, trauma, or criminal activity. During safety checks in cell style housing modules, sworn staff will physically enter each module and look in each cell; sworn staff are required to stop at, or enter a cell/holding area, to properly observe the inmate(s). Additionally, the policy states, "During safety checks in dorm style housing, sworn staff will walk by each bunk in a manner that permits them to observe each inmate for any obvious signs of medical distress, trauma, or criminal activity. This may require sworn staff to stop at a bunk to properly observe the inmate(s)." A review of the Jail Information Management Systems Area Activities Reports indicated that on 12-23-17 and 12-24-17, Deputy 1 documented that all safety/security checks were logged. However, the jail surveillance video recordings showed sworn staff and nursing personnel walking by the module, versus physically entering the unit to observe each inmate for obvious signs of medical distress. The jail surveillance video recordings did not reveal any deputy entering the module to conduct a Hard Count; counting inmates with the use of a Bar Code Reader, an Emergency Evacuation List, Face Cards or Floor Sheets to confirm the identity. Deployment logs confirmed that Deputies 1, 2, and 3 were assigned/responsible for performing and logging in all security and safety checks. The video evidence supported the allegation and the act or conduct was not justified.

3. False Reporting – Deputies 1, 2, and 3 falsified Jail Information Management System entries.

Board Finding: Not Sustained
Rationale: Inmate Horsey was found unresponsive in his bed in the San Diego Central Jail Psychiatric Security Unit (PSU). According to the JIMS Area Activities Report all security/safety checks were documented as being conducted in accordance with DSB P&P. However, a review of jail documents and in reviewing jail surveillance video recordings, the investigation revealed that the security/safety checks were not performed in accordance with DSB P&P 1.43 and I.64.
The deputies' actions were in violation of SDSD P&P Section 2.41, Departmental Reports, Employees shall submit all necessary reports on time and in accordance with established Departmental procedures. The policy mandates that all San Diego Sheriff's Department Employees shall be truthful and complete; no employee shall knowingly enter or cause to be entered any inaccurate, false, or improper information, nor omit pertinent information reasonably expected to be included. After this investigation had concluded,

CLERB obtained new evidence related to different and unpublished standards that apply to the security checks performed in the psychiatric housing unit. This unwritten standard stated that the Detention deputies assigned to the psychiatric unit need not physically enter each cell, or wake up each inmate, given the security concerns for this particular housing unit. Further analysis of the video surveillance indicated that a security check was performed; however, no deputy entered the module to conduct a Hard Count; counting inmates with the use of a Bar Code Reader, an Emergency Evacuation List, Face Cards or Floor Sheets to confirm the identity. A different type of security/safety check was performed; the security check that was performed at that time, was not according to SDSD P&P. There was insufficient evidence to either prove or disprove the allegation.

___

**18-137**

1. Death Investigation/Officer Involved Shooting – On 11-12-18, Deputies 1, 2, and 3 shot and killed Daniel Ayala.

Board Finding: Action Justified
Rationale: On the afternoon of 11-12-18, Ayala was involved in a verbal altercation with another male. Neighbors and the apartment manager called 911 and summoned law enforcement officers to the scene to intervene and diffuse the altercation. San Diego Sheriff Deputies 1, 2, and 3 arrived on scene and began their investigation. The deputies attempted to contact Ayala at his apartment; however, Ayala refused to comply with the deputies' instructions. For unknown reasons, Ayala stabbed a large butcher/kitchen knife through the metal screen of his front door. A second later, Ayala emerged from the apartment and advanced towards the deputies while brandishing the large knife, lunging at the deputies with the knife. In response to Ayala's actions, Deputies 1, 2, and 3 fired their department assigned .40 caliber Glock guns at him. Ayala sustained multiple gunshot wounds and collapsed on the balcony. The deputies immediately radioed to the San Diego Sheriff Communications Center and reported the incident. Additionally, the deputies initiated cardiopulmonary resuscitation (CPR) and summoned paramedics to the scene for assistance. A fire department engine and paramedic unit arrived and assumed resuscitative efforts. Despite aggressive life-saving attempts, Ayala could not be revived, and his death was pronounced on scene. The San Diego County Medical Examiner's Office was notified of the death and invoked jurisdiction. On 11-13-18, and autopsy was performed on Ayala's body. Multiple gunshot wounds were noted to the body. According to the Medical Examiner's autopsy report, thirteen gunshot wounds were documented on the body. There were six penetrating gunshot wounds of the torso, with five entrance wounds on the right and left chest regions, and a single entrance wound on the right mid back. The cause of death was multiple gunshot wounds, and the manner of death was homicide. Toxicology testing detected a blood alcohol level of 0.13%. Additionally, the following drugs of abuse were also detected in Ayala's body: Methamphetamine, amphetamine, cannabinoid, heroin, morphine, and codeine. Based on the facts, evidence, and the law, the use of deadly force by Deputies 1, 2, and 3 was reasonable and did not bear criminal liability for their actions. Deputies 1, 2, and 3's use of deadly force was appropriate, as Ayala's actions posed a clear deadly threat to on-scene peace officers. SDSD P&P Section 2.49 entitled, "Use of Force," states, "employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and established Departmental procedures, and report all use of force in writing." SDSD P&P Section 2.50 entitled, "Use of Lethal/Less Lethal Weapons," states, "employees shall not use or handle lethal in a careless or imprudent manner. Employees shall use these weapons in accordance with law and established Departmental procedures. The applicable content of SDSD P&P Section 8.1 entitled, "Use of Firearms/Deadly Force," states, "it is the policy of the San Diego County Sheriff's Department that deputies shall use deadly force only as a last resort and only after the deputy reasonably believes that the force used is necessary: In defense of human life, including the deputy's own; or, In defense of any person in immediate danger of death, or the threat of serious physical injury. Moreover, SDSD P&P Addendum F Section entitled, "Use of Force Guidelines," states, "Deputies shall use deadly force only after the deputy reasonably believes that the force used is necessary. Lastly, according to California PC§ 196 entitled "Justifiable Homicide by Public Officer," homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance, or when necessarily committed in overcoming actual resistance to the execution of some

legal process, or in the discharge of any other legal duty. The facts, evidence, and perceptions of each deputy justified the use of deadly force against Ayala. Absent conflicting witness statements, there was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

---

## 19-001

1. Misconduct/Procedure –  Deputies 1, 5, 11 and 18 delayed documentation of a crime committed against the complainant.

   Board Finding: Action Justified
   Rationale: The complainant alleged unidentified deputies delayed the process of taking a courtesy crime report on his behalf to be sent to the San Diego Police Department (SDPD). The complainant alleged that he began requesting this courtesy report in August 2018, stating "through several verbal request and several grievances thru many deputies and Sgts. It took 4 months being on 12/5-6/2018 for the San Diego Sheriff Department to figure a simple reference letter from SDPD, for the SD Sheriff staff to provide and assist me with filing a courtesy police report or complaint and forward it to SDPD for processing." The complainant reported that he had been the victim of repeated sexual assault between 2014 and 2016. The complainant stated, "this complaint affects my case in a positive and exculpatory way to explain away my guilt." On 12-05-18, the complainant reported that he showed Deputy 18 the letter from SDPD requesting a courtesy report by SDSD. On 12-05-18, Deputy 18 directed Deputy 1 to interview the complainant. On 12-05-18 and 12-06-18, Deputy 1 met with the complainant, interviewed him and completed the courtesy report. SDSD jail documents provided that the courtesy report was faxed to SDPD on 12-11-18 by Deputy 5. Additionally, a second courtesy report was completed on 06-26-19, by Deputy 11, after the complainant requested it. Deputy 5 faxed the second courtesy report to SDPD on 07-11-19. In review of jail documents, there was no record indicating that the complainant requested a courtesy report prior to December 2018. The evidence showed that the alleged act or conduct that occurred was lawful, justified and proper.

2. Misconduct/Procedure – Unidentified deputies lost the complainant's property.

   Board Finding: Not Sustained
   Rationale: The complainant stated, "I have suffered a loss of material evidence due to the SD Sheriff Department delivering my property to me 15 days after being taken to the hospital for surgery." The complainant reported that the property lost was significant for his court case and provided exculpatory evidence that would dismiss the charges against him. Court documents reviewed, noted the following: "The Court is aware of the claims that the Sheriff lost or destroyed property, but there is an insufficient description of the property and no explanation of why the property has exculpatory value for trial." The complainant alleged that these documents were lost during his hospitalization. SDSD P&P DSB Section I.41 titled, "Inmate Cell Searches," states in part, To ensure protection for inmates and staff by providing a safe and secure environment free of contraband, weapons, excessive personal property (which would provide fuel for fire), contagious diseases and vermin and to protect inmates from unreasonable searches. While conducting inmate cell searches and/or inspections, privileged communications (i.e. correspondence from State and Federal courts, any member of the State Bar or holder of public office, Citizens Law Enforcement Review Board (CLERB), Internal Affairs, Office of the Sheriff, the Board of State and Community Corrections (BSCC), PREA Auditor and facility commander or the assistant facility commander) may be examined for contraband pursuant to the search and/or inspection. However, privileged communications shall only be scanned for security concerns and validation of privileged content in the presence of the inmate. SDSD P&P DSB Section N.7 titled, "In Propria Persona Status (Pro Per Inmates), states in part, All facilities will provide fair and equitable treatment for inmates in propria persona status. SDSD P&P DSB Section P.3 titled, "Inmate Mail," states in part, Inmates shall be allowed to receive and possess U.S. mail, incoming letters, confidential/legal mail and mail from official government agencies. There shall be no limit on the amount of mail an inmate may send, and no limit on the amount of mail that an inmate may receive, except to the extent that possession of such materials may constitute a fire hazard, or pose an unacceptable security risk by providing the means to hide contraband. Each inmate shall be

Ex. U - 721

allowed to possess up to a combination of six (6) magazines and/or new soft cover books. The inmate shall choose to have all excess periodicals and/or books be donated to the jail library, thrown away, or mailed out of the facility at the inmate's expense. Inmates shall not be allowed to release reading material to outside parties or to have the items placed in their property prior to release. This total does not include any authorized religious or legal material. According to SDSD Incident Report by Deputy 16, the complainant filed a grievance about receiving his personal property several days late. Deputy 16 noted on the grievance response, "when an inmate moves to another jail facility or has a housing unit change, we strive to move the property with the inmate however, there are delays due to jail operations or other factors and in the complainant's case, he eventually received all of his property." The complainant never provided a description of what was lost, other than "material evidence," as stated in his grievance. SDSD JIMS Inmate History Report had no entries for property collection or movement at the time the complainant went to the hospital and returned to the detention facility. SDSD DSB P&P titled, "Transfer of Inmate Property," states in part, When transferring inmate property between facilities/agencies, employees shall observe proper handling procedures to minimize damage or loss. Once all inmate transfers for the day have been scheduled in the Jail Information Management System (JIMS), the housing deputy will print out the daily transportation list. Absent a lost property claim form and insufficient property records, there was insufficient evidence to either prove or disprove the allegation.

3.  Misconduct/Procedure – Unidentified deputies failed to issue a warrant for the arrest of an inmate that attacked the complainant.

    Board Finding: Action Justified
    Rationale: The complainant alleged that he was physically attacked by another inmate, stating, "Around December 19, 2016, while housed at the detention facility and between 6pm – 9pm, I was physically attacked with fist punches by another inmate." In his written statement, the complainant reported he was informed a warrant could be issued at the prison the alleged perpetrator was located at. According to his written statement, the complainant stated that he did not file a report at the time of the attack stating, "I requested pain meds from medical, but didn't report the incident from concern of more attacks due to snitch rule." A year later, in December 2017, the complainant reported the attack and Deputy 2 documented the incident in a Crime/Incident Report, dated 12-19-17. Deputy 2 asked the complainant if he desired prosecution and the complainant stated that he did. On 12-27-17, a deputy, who is no longer with the SDSD, conducted a follow-up investigation regarding this alleged incident. The deputy reported that he talked with the complainant and told him that he needed to know the exact month the alleged attack occurred to determine whether this fell within the statute of limitations. The complainant reported that the assault happened in the first week of December 2016. The deputy informed the complainant that his year to prosecute was up and there was nothing that could be done. The deputy also told the complainant the chances of the District Attorney brining the suspect back for a misdemeanor assault was unlikely. The deputy reported that the complainant changed his mind about prosecution and reported the case closed by exception. California PC§ 240 titled, "Assault," states, An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another. Most California misdemeanors have a statute of limitations of one year. Based on the timeline of when the incident occurred and when the complainant reported the incident, the evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

4.  Misconduct/Procedure – Deputy 4 groped the complainant during a pat-down.

    Board Finding: Action Justified
    Rationale: The complainant alleged that Deputy 4 "groped" him while conducting a pat-down search of his person prior to being escorted to court. On 11-30-17, Deputy 12, completed a Crime/Incident Report of the alleged incident. Deputy 12 asked the complainant how he was inappropriately touched, and the complainant stated, "the deputy, swiped and flicked my genital area with her right hand, and again with her left." The complainant identified the deputy, "4, by the name tag on their uniform." According to Deputy 15, he reviewed Deputy 12's report, which documented the complainant's statement about having his genitals "inappropriately touched." Deputy 15 obtained and reviewed jail surveillance video, interviewed witnesses, and met with the complainant in the presence of his attorney for an interview to obtain additional

detailed information. In his report, Deputy 15 stated, "I watched this pat-down numerous times while preparing this investigative report. I did not observe any "swiping or flicking" of the complainant's genitals by Deputy 4's' left or right hands, as the complainant indicated in his statement to Deputy 12. I did not observe any other type of inappropriate touching by Deputy 4." On 12-13-17, Deputy 15 attempted to interview the complainant in the presence of his attorney, stating, "the complainant refused to speak to me citing, "Shady things were going around him involving Sheriff's Deputies." The complainant's attorney also explained his rights to him, to include he did not have to speak to me if he did not want to. I informed the complainant I was there to speak to him as a victim in this investigation. The complainant told me he did not want to speak to me." Additionally, in his investigative report, Deputy 15 concluded, "Upon obtaining statements of both witnesses present during the pat-down and reviewing the video surveillance of this incident, the evidence shows there was no inappropriate touching of the complainant and no "swiping or flicking" of the complainant's genitals by Deputy 4 or any of the other deputies present." SDSD P&P DSB Section I.52 titled, "Inmate Searches" states in part, all inmate searches shall be conducted with the purpose of providing a safe and secure environment for inmates and staff in compliance with legal standards. Absent exigent circumstances, deputies will at a minimum, pat down inmates under the following conditions: Prior to the inmate being transported out of the facility. Prior to a professional or social contact visit. Following a professional or social contact visit. Returning to housing unit from programs. At any time, all inmates are subject to pat down searches, metal detector screenings, and examinations of their clothing and belongings. Video and audio recordings refuted the complainant's allegation that Deputy 4 "groped him," or "touched him inappropriately." The evidence showed that the pat-down did occur and was lawful, justified and proper.

5.   Misconduct/Retaliation – Unidentified deputies retaliated against the complainant for reporting deputy abuse.

     Board Finding: Action Justified
     Rationale: The complainant alleged that detention deputies retaliated against him, took his snacks, for reporting the groping incident by Deputy 4. According to the grievance the complainant filed, he stated, "the deputy grabbed my paper bag and removed 2-3 bread packs and lettuce. I told the deputy my medical condition and he said it's not for diabetes cause med call hasn't started." The complainant stated he saved the items from the night prior because he is diabetic, and the snacks help him control his sugar levels. The grievance response indicated that diabetics are allowed to keep their snacks, that they receive in the morning during medication pass, however, medication pass had not been completed yet, therefore, the complainant should not have been in possession of multiple bread packs. According to SDSD P&P Section O.3 titled, "Inmate Rules and Regulations," states in part, "Inmates shall not save food from the daily meals for future consumption. Any food not consumed shall be removed with the meal carts." Additionally, the complainant stated, "Commissary is allowed in the dorm, but we all can't afford it." Commissary invoice were reviewed and confirmed that the complainant made frequent snack purchases from the commissary, several times each month, throughout his incarceration. The evidence showed that the items were removed per policy, not "stolen" in retaliation as the complainant alleged. The alleged act or conduct did occur and was lawful, justified and proper.

6.   Misconduct/Procedure – Deputy 5 failed to respond to the complainant.

     Board Finding: Action Justified
     Rationale: The complainant alleged that Deputy 5 failed to respond to him, stating, "Deputy 5 who has not followed up with me presently even after inmate request and letter to her directly." Deputy 5 was the detective assigned on the two Crime/Incident Reports that were written on the complainant's behalf, as a courtesy, for the San Diego Police Department (SDPD). According to information obtained from the SDSD Information Source, an investigator is always assigned to Crime/Incident Reports, regardless if it for the SDSD or as a courtesy for another agency. Crime/Incident Reports, as a courtesy, do not require that the assigned investigator contact the victim. The detective assigned to the case ensures that the courtesy report is forwarded to the investigating agency. SDSD jail records indicated that Deputy 5 forwarded both Crime/Incident Reports to the SDPD. As Deputy 5 had no requirement to follow up with the complainant,

the evidence supported that the actions of the alleged act or conduct did occur and were lawful, justified and proper.

7.  Misconduct/Procedure – Unidentified deputies failed to respond to the complainant's grievances.

Board Finding: Unfounded
Rationale: In the complainant's written statement, he stated that unidentified deputies never responded to his numerous grievances. The complainant reported, "I've filed several grievances, with no response." A review of jail documents revealed that the complainant had filed numerous grievances and each one was properly addressed by jail staff. Additionally, a report dated 06-12-18, documented an incident where the complainant handed a jail nurse three grievances during morning medication distribution. The deputy who provided security during medication distribution noticed that the complainant had a 1-inch stack of grievances on his desk, with "1 of 3" written on the top. The deputy reported that he asked the complainant if he could address any grievances or issues for the complainant. The deputy reported that the complainant responded by laughing and stating, "Not yet, but stand by its going to be an everyday thing." SDSD DSB P&P Section N.1 titled, "Grievance Procedures," stated in part, Inmate Grievances can be submitted in writing by any inmate. Inmates may submit written grievances directly to deputies or other employees at any time. Absent exigent circumstances, any deputy or other staff member who is presented with a written grievance will accept it. The deputy or other employee who initially receives a grievance will sign his or her name and ARJIS number on the J-22 form along with the date and time. The second page of the J-22 form will immediately be given to the inmate as a signed receipt for the grievance. As an alternate means for submitting grievances, secured boxes may be provided for inmates to deposit their grievances into. Any grievance retrieved from one of these dedicated grievance boxes will be signed by the sergeant or designee who collected it, and the signed second page of the J-22 form will be returned to the corresponding inmate as soon as practical. The deputy or other staff member who receives and signs for a grievance will be responsible for entering it into JIMS, making sure to link the inmate(s) to the grievance report. The evidence showed the alleged act or misconduct did not occur.

---

**19-056**

1.  Misconduct/Procedure – Deputy 1 failed to investigate the complainant's allegation that she was being stalked.

Board Finding: Action Justified
Rationale: In her written statement, the complainant stated, "*The next morning on May 8, I contacted the Sheriff Department to see if the video from the previous night had been reviewed, but instead I was informed the report written by Deputy 1 stated that my claim was "unfounded", which to my understanding means the event had never occurred. To my knowledge at the time Deputy 1 wrote her report she had not reviewed any of the video footage, nor preformed any investigative inquiries that could have led her to conclusion of "unfounded" at that point. Essentially, Deputy 1 carelessly used the loaded term "unfounded" on an official written report without having performed any due diligence to ascertain the facts of the matter. I believe that the Sheriff Department has engaged in obstruction of justice by refusing to obtain the requested video footage related to my complaint for the very reason that it may involve law enforcement officers. I have made a claim of stalking and harassment, and I have stated that I have seen this man on prior occasions, at different locations, several miles apart from one another.*" According to a SDSD Background Event Chronology, as well as the associated audio recording, the complainant reported that an unknown male was following her around a store. Deputy 1 was dispatched to the store. She contacted the complainant who stated that she believed the unknown male subject followed her for a short period while she was in the store. The complainant advised Deputy 1 that she had an ongoing case with the FBI in Los Angeles and that she believed she was being harassed and stalked by law enforcement officers from the San Diego and Los Angeles area. At the conclusion of her interaction with the complainant, Deputy 1 advised that no crime had been committed and the complainant was possibly mentally ill. The call was closed, and Deputy 1 did not take a report for the complainant's allegation. During the course of this investigation, Deputy 1 responded to a Sheriff's Employee Response Form (SERF) and provided

relevant information in response to CLERB questioning finding; however, due to confidentiality statues per the Peace Officer Bill of Rights (POBR), that information cannot be publicly disclosed. The information provided was considered in arriving at the recommended finding. According to SDSD P&P Section 2.23 titled, "Request for Assistance," when any person requests assistance or advice, all pertinent information will be obtained in an official and courteous manner, and will be properly and judiciously acted upon consistent with established Department procedures. According to California Penal Code Section 646.9, any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety is guilty of stalking. The complainant had the burden of proof to prove that she had been stalked. The complainant had to prove that the suspected male willfully, maliciously, and repeatedly followed or harassed her, the suspected male made a credible threat, and the suspected male who made the threat did so with the specific intent to place the complainant in reasonable fear for her safety. The evidence indicated that Deputy 1 responded to the scene and interviewed the complainant. Upon completion of Deputy 1's investigation, she determined that a crime had not been committed. Based on her oral report to Deputy 1, the complainant was unable to prove that the elements of a stalk had occurred. The evidence showed that Deputy 1 did investigate the complainant's stalking allegation and it was lawful, justified and proper.

2.  Misconduct/Discourtesy – Deputy 1 laughed at the complainant when she interviewed her.

    Board Finding: Not Sustained
    Rationale: In her written statement, the complainant reported, "*While explaining the situation to the deputy I noticed that she was laughing as I described the past and present events related to the service call. When I remarked that the matter was not funny, but actually very serious she responded that she was laughing because I said that it might be police harassment, or that police were involved in some manner.*" According to a letter from the SDSD Internal Affairs division, written to the complainant, the investigating lieutenant wrote, "The initial responding deputy's lack of empathy or concern will be addressed within her command." During the course of this investigation, Deputy 1 responded to a SERF and provided relevant and conflicting information in response to CLERB questioning; however, due to confidentiality statues per the Peace Officer Bill of Rights (POBR), that information cannot be publicly disclosed. The information provided was considered in arriving at the recommended finding. According to SDSD P&P Section 2.4 titled, "Unbecoming Conduct," employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on this Department. Unbecoming conduct shall include that which tends to bring this Department into disrepute or reflects discredit upon the employee as a member of this Department, or that which tends to impair the operation and efficiency of this Department or employee. According to SDSD P&P Section 2.22 titled "Courtesy," employees shall be courteous to the public and fellow employees. They shall be tactful in the performance of their duties, exercise patience and discretion. Absent any audio or video recordings of the contact between the complainant and Deputy 1, or any additional information provided by an independent witness to the incident, there was insufficient evidence to prove or disprove the allegation that Deputy 1 laughed at the complainant.

3.  Misconduct/Procedure – Deputy 2 failed to investigate the complainant's allegation that she was being stalked.

    Board Finding: Action Justified
    Rationale: In her written complaint the complainant stated, "*I asked to speak with the Duty Sargent, and later received a call from Deputy 2. I explained the above situation to him, and formally requested that the Sheriff Department obtain the footage from the store of the events from the previous night. I explained to him that the report in question was made in reference to the incident that had occurred – he then stated that he had no evidence leading him to believe that a stalking occurred because I had to know the person in question to be stalked by them. I asked Deputy 2 if he had seen any of the footage that I was requesting BE OBTAINED AS EVIDENCE, which could help establish that stalking had occurred, and his response was that he had not.*" Deputy 2's supervisory duty was to oversee that Deputy 1 had completed her duties as a peace officer. In doing so, Deputy 2 re-interviewed the complainant, and upon completion of his interview with her, he, like Deputy 1 determined that a crime had not been committed. The evidence indicated that Deputy 2 did conduct an investigation. The evidence showed that the alleged act or conduct

did occur and was lawful, justified and proper.

4. Misconduct/Procedure – Deputy 3 "interrogated" the complainant.

Board Finding: Action Justified
Rationale: In her written complaint, the complainant reported, "*I spoke with Deputy 3 again three days later (after the holiday weekend), and after asking me several identifying and probing questions, Deputy 3 had already determined that he was not going to help me, but yet subjected me to what could be considered a soft interrogation to gather facts for whatever reason he required.*" In a telephonic interview with a liaison for the SDSD, it was learned that when the complainant was unsatisfied with both Deputy 1's and Deputy 2's response to her request to further investigate her allegation, she was referred to the area detective, Deputy 3. In doing so, Deputy 3 re-interviewed the complainant, and upon completion of his interview with her, he, like Deputy 1 and Deputy 2 before him, determined that the elements of a crime had not been committed. In re-interviewing the complainant and to gather additional information, Deputy 3 questioned the complainant with the goal of eliciting useful information. The evidence indicated that the complainant was interviewed, versus interrogated; the difference being that the interview was less formal and accusatory conversation with the main purpose to elicit information, whereas an interrogation would have been formal and is typically designed when addressing a suspect. By contrast, an interrogation is an interaction between police officers and a suspect. The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

## 19-061

1. Misconduct/Procedure – Unidentified deputies failed to keep the complainant safe.

Board Finding: Action Justified
Rationale: The complainant reported, "On 4 June 2018 I was arrested and housed in An (Ad-Seg) Module due to me not agreeing to be housed in (General Population) or wanting to be around other inmates due to past assaults and being hospitalized. Each time I advised classification Deputy's of my concerns and even had a family member call with further concerns. My concerns were being given a blind eye, and I was verbally forced to be housed back around other inmates. I sent multiple (request slips) to classification Deputy's regarding my concerns, I've even approached Sargents, luetenits, and a Captain. Even though my concerns have been addressed to classification by myself, my mother, and even Detectives with the San Diego County Sheriff's Department. As of 26 May 2019 Class attempted to get me to go to a (General Population) Housing unit. Ignoring my concerns and asking why am I in Ad-Seg. Allow me to state before the last past 2 assaults occurred Deputy Sheriffs had knowledge that it was likely to have had happen and made no attempt to stop it. …I wrote everything down on line paper that I wanted to address to classification due to the confidentiality of it, stating detectives have me housed, and are keeping me away from a few inmates etc. stuff I can't openly speak due to other inmates that can over-hear in all the other tanks it's a small and tight hallway on the 1st floor at S.D.C.J. and all words echo. I than say I'm just trying to be sure I'm safe. They then leave without acknowledging my concerns and facts. What happens soon as I get to G.B.D.F. I got to a module that I was not supose to go to. Around inmates I was not supose to be around per detectives. If they would have just listened to my concerns it could have been prevented. They cant just keep doing this to me. I have my mom calling, I have mental healthy clinicians and Detectives talking to Classification Sargents and Lutenits to no avail, nor respect to what had been addressed to them and all this is in the month of June 2019. I feel that they are retaliating against me due to my complaints. Classification Deputy's are not even listening to there own regarding all my concerns. Some things need to happen." During a prior incarceration, separate from this complaint, a Crime Report dated 03/23/17, confirmed a battery against the complainant by three other inmates. However, the District Attorney's Office did not move forward with prosecution based upon the complainant's non-cooperation as a victim/witness to the event. Following that assault, "Keep Separate" orders were placed into the Jail Information Management System (JIMS) that prohibited housing with known enemies. Upon the complainant's subsequent booking in June 2019, and in accordance with Classification policies, the Jail Population Management Unit (JPMU) assessed the complainant's charges

Ex. U - 726

and past history and designated placement into Administrative Segregation (AD-SEG) housing where he remained until his release from custody. AD-SEG inmates are segregated from the inmate general population for their own safety. Staff conducted weekly placement reviews and according to all associated documentation, advised further segregation into Protective Custody (PC), but the complainant repeatedly refused PC placement. The complainant left custody without maintaining contact with CLERB and was unavailable for clarification. Evidence supported that the complainant had a history of attempting to manipulate inmates and housing, and also displayed a high level of criminal sophistication, which caused limited housing options. The evidence showed that the complainant was properly classified, and deputies actions were lawful, justified and proper.

## 19-089

1. Misconduct/Procedure – Unidentified deputies contacted the complainant using synthetic telepathy, as well as using electromagnetic energy and other DEWs (Directed Energy Weapons).

   Board Finding: Summary Dismissal
   Rationale: On 07-23-19, CLERB received a signed complaint in which the complainant alleged that unidentified deputies and/or other law enforcement agencies were contacting him "using synthetic telepathy, Electromagnetic energy, and other DEWs (Directed Energy Weapons)." Additionally, the complainant contacted CLERB in September 2019 and alleged that unidentified deputies and/or other law enforcement agencies were contacting him via a radio attenuator (a device consisting of an arrangement of resistors which reduces the strength of a radio or audio signal.) In the previous investigation conducted by CLERB, as well as this investigation, it was determined that there was no report of wrongdoing, and/or evidence of misconduct.  The following CLERB rules and regulations apply: Rule 9.2 titled "Screening of Complaints," 5.) "Category V" Complaints not alleging facts establishing prima facie showing of misconduct. Such complaints may be referred to the Review Board for Summary Dismissal. Additionally, Section 15 titled Summary Dismissal states that after reviewing the Investigative Report and records, the Review Board may summarily dismiss a Complaint by majority vote, upon recommendation of the Executive Officer, its own motion, or that of the Subject Officer.  Summary dismissal will be appropriate in the following circumstances: (c) The Complaint is so clearly without merit that no reasonable person could sustain a finding based on the facts.

*End of Report*

## NOTICE

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

# EXHIBIT V



BOARD MEMBERS
SUSAN N. YOUNGFLESH
Interim Chair
P. DARREL HARRISON
Interim Vice Chair
VACANT
Secretary
GARY BROWN
MICHAEL FLITTERMAN
MICHAEL GRAY
LOURDES N. SILVA
ROBERT SPRIGGS JR.
GARY I. WILSON

EXECUTIVE OFFICER
JULIO ESTRADA

# *County of San Diego*
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 505, SAN DIEGO, CA 92101-2940
TELEPHONE: (619) 238-6776    FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its September 10, 2019, meeting held at the San Diego County Administration Center, 1600 Pacific Highway, Room 302/303, San Diego, CA 92101. Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

## CLOSED SESSION

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
   **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## <u>CASES FOR SUMMARY HEARING</u> (6)

## ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE

### <u>18-122</u>

1. Misconduct/Harassment – Unidentified staff mistreated the complainant.

   <u>Board Finding</u>: Not Sustained
   <u>Rationale</u>: The complainant said, "…she is a "gender variant inmate" (an individual that does not match masculine and feminine gender norms) and she was verbally and physically harassed and stalked by staff and inmates." However, the complainant did not produce evidence to corroborate the alleged mistreatment and also failed to provide specific details as to date, time, place, or persons associated with this allegation. Detentions Policy F.16, Sexual Assault Case Assignments & Investigations, mandates that whenever an allegation of sexual assault is reported, whether from an inmate/detainee, proper notifications and documentation shall be completed in a timely manner. There was no documentation of sexual harassment found pertaining to the complainant. Without further clarifying information, there was insufficient evidence to either prove or disprove this allegation.

2. Misconduct/Procedure – Unidentified deputies placed the complainant in Ad-Seg (Administrative Segregation).

   <u>Board Finding</u>: Action Justified
   <u>Rationale</u>: The complainant said, "she requested to be moved due to ongoing issues and write-ups. They put her in adseg 'unfairly,' when she could have been moved elsewhere, and she was 'misclassified'." According to Sheriff's

*-continued on next page-*

records, the complainant submitted grievances in which she expressed that staff locked her down due to her race, but her documented history showed disregard for staff and authority, and she continually expressed race-related profanities toward staff of different ethnicities; all violations of Inmate Rules & Regulations. Detentions Policy J.3, Segregation: Definition and Use stipulates that the guidelines for inmate segregation shall conform to all local and state laws. Inmates shall not be segregated solely because of race, color, creed, national origin, gender identity (lesbian, gay, bisexual, transgender, intersex [LGBTI]) or sexual orientation, as defined. Each inmate housing assignment is based on an individual assessment. Segregation is used only for those inmates who are classified for safety and/or security reasons, or who are pending disciplinary action or for investigative purposes. Based upon all available documentation, the complainant was determined to be properly housed. There were numerous Segregated Housing Orders by various sergeants pending a hearing/investigation for the complainant's rule violations; she displayed a continual inability to conform to the minimal standards expected of those in mainline housing. An Inmate History Summary Report documented the complainant's reviews from 07-15-18 through 09-16-18, and were conducted at least every seven days in compliance with Detentions Policy J.3. The evidence showed the complainant was properly classified and the actions taken were lawful, justified and proper.

3.   Misconduct/Procedure – Deputies 1-10 "stole" from the complainant.

     Board Finding: Action Justified
     Rationale: The complainant reported that officers "stole" her mail, snacks, account deposits, commissary, visits etc. All have been involved in "theft" of her items, and food, and property, etc. She asked, "Please help me retrieve my deposit, email and mail that were taken 'illegally. Please review the salary paycheck and credit card records of all officers in this complaint. Money laundering, theft, stalking are serious crimes even when done by staff. Border law enforcement can also get involved as some staff involved are sending stolen funds to foreign receivers, possibly and most likely." She said, "I am not in jail to fund any activities." The complainant submitted numerous jail grievances expressing her thoughts/beliefs pertaining to this allegation. Command staff responded to the grievances in accordance with Detentions Policy N.1 Grievance Procedure. In those responses to the complainant, jail staff documented that the complainant failed to cooperate with their investigation; there was no basis for her beliefs; or they determined there were no violations with what had occurred. Specifically, the complainant's medically approved snack was reduced from three to one per day; she did not receive any legal mail; her account balance was reduced after commissary order(s); and her visitation was suspended during disciplinary separation. The evidence showed that the actions that occurred were lawful, justified and proper.

4.   Excessive Force – Deputy 4 pulled the handcuffed complainant through a food slot.

     Board Finding: Action Justified
     Rationale: The complainant reported Deputy 4 "pulled her through a tray slot" while allegedly removing waist chain and cuffs, after court in/around May or June 2018. The complainant said she "sustained trauma and injuries, and disciplinary penalty." An incident report by Deputy 4 documented that while at a Courthouse, the unprovoked complainant began yelling at other female inmates and was placed in a separate cell due to tension, and then placed on the bus separately to prevent further confrontation. Once back to the detention facility, she was also placed into a cell by herself where Deputy 4 asked her to back up to the door to remove her waist chains. Reportedly, the complainant became extremely agitated and began to yell. Deputy 4 asked her to turn and place her hands through the food access port to remove her handcuffs. The complainant only slightly placed her hands out before she quickly pulled the chains back into the cell. Another deputy assisted in holding the chains to prevent her from pulling them back into the cell again. During this time, the complainant yelled racial profanities and threatened Deputy 4. Later, during each security check, the complainant continued yelling derogatory and incoherent phrases at Deputy 4. The complainant then submitted a grievance to which a sergeant responded that he reviewed video of the incident and there was no evidence of misconduct by Deputy 4. "The video showed you pulled away as deputies attempted to remove the waist chains and there was no evidence you were 'brutally attacked.' You were in violation of rules and regulations and were placed on lockdown pending a hearing." On May 24, 2018, a sergeant attempted to conduct a hearing, but the complainant was uncooperative with the hearing process and was found guilty. The evidence showed that the conduct that occurred was lawful, justified and proper.

5.   Misconduct/Intimidation – Deputy 3 threatened the complainant with a Taser.

     Board Finding: Action Justified
     Rationale: The complainant said that Deputy 3 cancelled her dayroom time and pulled a taser threatening to shoot/taze her. The complainant said she felt this was extreme due to the possibility of her being pregnant. According to medical records, while the complainant professed she was pregnant, she refused all pregnancy tests, received no prenatal care, and requested sanitary products for her menstrual cycle. An incident report by Deputy 7 dated 08-11-18 documented that the complainant was let out for her dayroom time and instructed to go inside the South bubble

dayroom. The complainant did not follow instructions and went to speak with another inmate in the main dayroom. Deputy 3 and a corporal instructed the complainant to go into the bubble, but she refused. The complainant yelled, cursed, and made threatening statements toward the deputies who then escorted her back to her cell. There was no use of a taser during this incident and threat of use would have been appropriate to gain compliance from the complainant who was found to be in violation of Inmate rules & regulations of threatening to assault staff, disobeying staff instructions, and interfering with jail operations. The evidence showed that the conduct that occurred was lawful, justified and proper.

6.  Misconduct/Procedure – Deputies 2, 3, 7, 8 and 9 placed inmates and staff at risk.

    Board Finding: Summary Dismissal
    Rationale: The complainant stated, "What my theory is, for these aggressive issues against me is that these officers were prostitutes and probably still are. They were looking for ways to get extra money to support their habits, etc. I suggest that these deputies be drug, alcohol, HIV and polygraph tested soon. They are a viral risk and annoyance to staff and inmates, etc." The allegation as stated by the complainant was her "theory," and was made without any supporting evidence; she was found not to be credible. CLERB Rules & Regulations 9.2 Screening of Complaints, states that complaints not alleging facts establishing a prima facie showing of misconduct may be referred to the Review Board for Summary Dismissal. In addition, Section 15: the complaint is so clearly without merit that no reasonable person could sustain a finding based on the facts; this allegation clearly lacks merit.

7.  Misconduct/Procedure – Unidentified deputies denied the complainant various things.

    Board Finding: Action Justified
    Rationale: The complainant asked that we "investigate classification sergeants who may have her booking, bond, property, and account records wrongfully incorrect, delaying her release, visits, commissary, etc." The investigation determined the complainant was not credible and formulated her beliefs without any supporting evidence. The complainant submitted numerous Inmate Grievances related to these issues that were addressed in compliance with Detentions Policy N.1, Grievance Procedure. A Detentions Processing Technician also informed the complainant that documentation from the arresting agency, booking records, and court records verified that her bail was set at $50,000, and when/if paid would facilitate her release. An Inmate History report verified the complainant's professional visits in compliance with P.15, Professional Contact Visits, and Policy T.9, Sheriff's Commissary, enabled the complainant to purchase personal items, snacks and stationary with sufficient funds unless her commissary privileges were suspended for disciplinary reason. The evidence showed that the conduct that occurred was lawful, justified and proper.

**18-129**

1.  Misconduct/Procedure – Unidentified deputies did not provide the complainant with a proper PIN to access the telephones.

    Board Finding: Action Justified
    Rationale: The complainant stated, *"After 4 day of being in 6A suicide watch, I was put on 4th floor. I couldn't use my PIN # for the phone I asked the deputy, a corporal told me he reset it 3 times still no did work but everybody elsles (sic) did after 2 more unsuccessful attempts I was moved to 6B still no pin #."* Per the San Diego Sheriff's Department Policy & Procedure Section P.2, Telephone Access, and as prescribed by Penal Code§ 851.5, all inmates are provided access to a telephone upon being arrested, to call family or an attorney. Beyond those telephone calls, inmates are provided with a PIN number to use the jail telephones. Deputies provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding: Upon arrival to the San Diego Central Jail, an inmate is automatically issued a PIN to use the phones and make free phone calls from the housing units. As per the complainant, he was furnished with a PIN, but it was inoperable. The complainant admitted that sworn personnel made several efforts to assist him in resetting his PIN, but to no avail. PINs are automatically issued by the Detention Processing Technicians, who are non-sworn personnel. It was possible that the event was an isolated incident, as the complainant himself stated that other inmates were able to use their PIN. It was also unknown if the complainant attempted to make other calls on the other PIN he was issued; however, he was eventually provided with a valid PIN, which functioned properly, and eventually, he was able to make phone calls.  Evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

2.  Misconduct/Procedure – An unidentified deputy violated the complainant's Attorney-Client privilege on 08-20-18.

    Board Finding: Not Sustained

Ex. V - 731

Rationale: As per the complainant, while at the San Diego Central Jail, he was visited by his attorney on 08-30-18. During the visit, "*a deputy was all in my conversation (at the door) violating attorney/client privacy. He stated something to my attorney she laugh, I got mad.*" As per the SDSD Detentions Services Bureau Policy & Procedure (DSB P&P), Section P.15 entitled, Professional Contact Visits, professional contact visits with inmates are permitted when such visits are necessary to the administration of justice. The complainant's attorney verified that she visited the complainant while she was at the jail for unrelated business. She added that the visit was not in the Professional Visit Room, but outside the complainant's "pod" and a deputy was present "standing by" during their conversation. The attorney nor the complainant were able to identify the involved deputy. The attorney provided additional information in regards to the nature of the visit and she reiterated that the information discussed was not confidential. SDSD had no documentation/verification of this visit as required by their policies, however, it appeared to be a happenstance type of encounter and a single/isolated incident.  Absent an audio recording, there was insufficient information to determine the context of the conversation as it pertained to attorney/client privilege. There was insufficient evidence to either prove or disprove the allegation.

3.   Misconduct/Procedure – Unidentified deputies failed to send out the complainant's mail.

Board Finding: Not Sustained

Rationale: The complainant stated that he sent out outgoing mail; two periodicals and to two envelopes to two public officials. He reported, "*Don't no (sic) if any got letters, were all sealed and marked legal mail. Mail started taking long time*" The complainant requested that CLERB weather or not his letters were sent to the intended recipients. CLERB followed up and as per the Governor's Staff Office, there was no way to verify the receipt of the letter. A voicemail was left with the clerk of the Judge the complainant mentioned, and as of the completion of this report, no return calls were received to verify the receipt of the letter. Per the Detentions Services Bureau Policy & Procedure (P&P) Section P.1 entitled, Custody Information, the detention facility Custody Information Office shall screen inmate inquiries, clear jail visitors, sort incoming mail, and process incoming and outgoing inmate property, and other duties as assigned. As per the SDSD Detentions Services Bureau Policy & Procedure Section P.3, Inmate's Mail, Detention facilities shall provide for the reasonably prompt delivery of incoming materials and outgoing correspondence. SDSD Department Information Sources provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Due to this enhanced security process, the mail may be delayed one to a few days. As no deputies were identified, and no specific dates were provided, there was insufficient evidence to either prove or disprove the allegation.

4.   Misconduct/Procedure – Unidentified deputies did not provide the complainant with incoming e-mail messages.

Board Finding: Not Sustained.

Rationale: The complainant stated, "*A Email from one Christina Lacroix on 09-07-2018 I did not received until 09-13-18. I checked my other and a few people in this tank received Emails within 24 hours from it being sent.*" According to a telephonic interview between a CLERB Special Investigator and a SDSD Departmental Information Source, incoming inmate emails are received by non-sworn jail staff. The emails are printed by the non-sworn, professional staff on printers funded by the inmate welfare funded. Professional staff distribute the emails to the addressed facility and the individual housing units. Deputies collect the received emails and distribute the emails with the mail during nightshift. As per the SDSD Detentions Services Bureau Policy and Procedure P.3, Inmate's Mail, inmates should be allowed to received U.S. Mail, letters and electronic mail.  Detention facilities shall provide for the reasonably prompt delivery of incoming materials. The Custody Information Office is in charge of processing incoming mail. E-mails get forwarded to the housing deputies. The complainant's s e-mail was received on Friday, September 8, 2018 and delivered on Thursday, September 13, 2019; there was a weekend in between. As per SDSD Departmental Information Source, it takes approximately six days to complete the delivery of an e-mail, not including weekends. The complainant received his e-mail in five days. The Sheriff's Department public website https://www.sdsheriff.net/emailaninmate.html has instructions to send inmates e-mail and a disclaimer stating that Inmates will not receive the message electronically. The message will be received by jail staff, printed and delivered in printed form to the inmate. The evidence showed that the process was completed, and the complainant ultimately received his e-mail. However, other than his statement, there is no documentation of when he received it as such, there was insufficient evidence to either prove or disprove the allegation.

5.   Misconduct/Procedure – Unidentified deputies did not inform the complainant that his attorney requested a call back.

Board Finding: Not Sustained

Rationale: The complainant stated, *"My Public Pretender (sic) sent me an e-mail stating, never received any message stating I needed to call her or any at all."* The complainant provided a copy of an e-mail sent to him by his attorney in which she stated that she had attempted to call him back, but she had not received any return calls from him. As per the SDSD Detentions Services Bureau Policy and Procedure P.3, Inmate's Mail, inmates should be allowed to

-4-

received U.S. Mail, letters and electronic mail. Detention facilities shall provide for the reasonably prompt delivery of incoming materials. Deputies provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding: When the first floor Information Lobby Detention Information Assistants field a call form an attorney, who would like to speak with their client, an "attorney Call Back" message (written note) is generated and sent to the housing floor. As soon as it is practical, the message is to be relayed to the inmate so he can contact his attorney. Documents provided by the Division of Inspectional Services were thoroughly reviewed and there was no documentation of any calls or messages from the attorney to the complainant. There was insufficient evidence to either prove or disprove the allegation.

---

## 18-142

1. Misconduct/Truthfulness – Deputy 5 lied to the complainants.

   Board Finding: Action Justified
   Rationale: In the complainant's written statement, they alleged that Deputy 5 lied to them. According to the complainant's, they "*informed him* [Deputy 5] *I would rather he would make it on Thursday because we were going to be gone that Friday and felt better if his dad and I were present when he would be able to come. He said he would try to aim for Thursday or so, but did not know for sure when he would make it. Deputy 5 assured us that they only wanted to TALK and that he would not be touching the aggrieved. He only wanted to get information from the aggrieved. DEPUTY 5, NEVER CALLED US BACK. Deputy 5 assured us that he would phone us as soon as they met with our son. He never phoned us back! The deputy did not return our call for more than two days after we went to his unit and complained about the way this was handled and the dishonesty of a deputy!*" In Deputy 5's written report, he advised, I did not tell them the circumstances or that the aggrieved was wanted, in fear they would notify him [of the pending arrest] and escalate the probability for a confrontation. Additionally, the complainant's reported, During the course of this investigation, Deputy 5 responded to a Sheriff's Employee Response Form (SERF) and provided relevant and conflicting information in response to CLERB questioning. In the complainant's written statement, they contradicted their statement regarding Deputy 5 failure to return their calls. Initially, they advised that Deputy 5 "never" returned their call. Then, the complainant's reported that Deputy 5 returned their call two days later, after they complained to "his unit." According to SDSD P&P Section 2.46 entitled, "Truthfulness," when asked by the Sheriff, the Sheriff's designee or any supervisor, employees will always answer questions, whether orally or in writing, truthfully and to the fullest extent of their knowledge. All written and verbal reports shall be truthful and complete. Essentially, a Sheriff's deputy is not required to be truthful or forthcoming when addressing the public, as information may be of a sensitive and/or confidential in nature. A Sheriff's deputy needs only to be truthful when addressing a superior and in their written report. Deputy 5 lying to the complainant's was not a violation of SDSD P&P. The aggrieved was an adult; he was not a minor, he was not a legally designated public conservator, nor was he an adult dependent under the legal authority of his parent's authority. As such, Deputy 5 was not obligated to contact an adult arrestee's parents post arrest. Whereas it would have be a courtesy to communicate with the complainants, Deputy 5 did do just that two days later. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

2. Misconduct/Procedure – Deputy 5 did not request the assistance of PERT when taking the aggrieved into custody.

   Board Finding: Action Justified
   Rationale: The complainants alleged that Deputy 5 did not request the assistance of PERT when taking the aggrieved into custody. In the complainant's written statement, they stated, "*I immediately told him [Deputy 5], our son the aggrieved was mentally challenged and needed to have a PERT Team present when questioned at our house. I reiterated to him once again with an importance that I would rather he visit the aggrieved with a PERT Team and when we were also home. Deputy 5 assured us a Carlsbad PERT Team person would be available. Twice he assured us that PERT would be involved. All of this could have been avoided it Deputy 5 would of kept his promise of bringing a PERT Team and waiting for us to be home!!*" According to the SDSD reports associated with the aggrieved's arrest, the aggrieved made criminal threats towards a private citizen. In the past, the aggrieved had become combative and resisted. The use of a Taser was needed to subdue the aggrieved. The aggrieved was placed on a psychiatric hold. During that incident, the aggrieved was combative with deputies. Carlsbad Police Department (CPD) had contacted the SDSD in an officer safety notification and warned that the aggrieved had a propensity for violence and showed he would violently resist. For these reasons, it was determined that contacting the aggrieved would be a potentially dangerous situation and inappropriate for a PERT clinician. The aggrieved's propensity towards violence substantiated his credibility to his threats. PERT was deemed not the appropriate resource to utilize for initial contact with the aggrieved. According to P&P Section 6.113 entitled, "Psychiatric Emergency Response Team (PERT)," the Sheriff's Department is committed to providing a regional mobile response to the crisis needs of the mentally ill. The Sheriff's Department will participate in a multi-disciplinary partnership to provide regional crisis mobile response for

the mentally ill. This partnership will be identified as the Psychiatric Emergency Response Team (PERT). The PERT teams provide the most humane and appropriate dispositions for mentally disordered persons who have come to the attention of law enforcement. PERT teams will respond to any patrol units request for assistance when the unit is handling the mentally ill or individuals in crisis. PERT personnel will assess the situation, evaluate the individual(s) in question, and as appropriate, make referral(s) to community-based resources or treatment facilities. According to SDSD Patrol Procedures Manual, Policy 23 entitled, "Psychiatric Emergency Response Team (PERT)," the responding deputies, the PERT Unit advises patrol deputies on psychiatric issues that arise in the course of their law enforcement duties, and assists in transportation and processing of individuals deemed to need inpatient psychiatric treatment. The PERT Teams may be used to respond to calls/requests for assistance from Sheriff's or other police agencies' patrol units regarding individuals who may be in need of mental health assessment or crisis intervention. PERT's website provided an overview of its mission, history, law enforcement partners (of which SDSD is one), and law enforcement trainings. The PERT Director indicated there are calls in which a PERT Team cannot respond due to safety concerns, therefore they would be unable to assist. The requesting of a PERT Team is an option to deputies as detailed in the SDSD Patrol Procedures Manual, and the SDSD P&P, and are permissive actions, not mandatory requirements, therefore there was no evidence to support an allegation of misconduct or negligence on the part of Sheriff's Department sworn personnel.  The evidence shows that the alleged act or conduct did occur but was lawful, justified and proper.

3.   Illegal Search and Seizure – Deputy 5 instructed deputies to illegally enter the complainant's home.

Board Finding: Not Sustained
Rationale: The complainants alleged that Deputies 1-4, under direction from Deputy 5, entered their home without knocking or announcing their presence. In the complainant's written statement, they described, *"Later we found out, the sheriffs under Deputy 5's leadership entered our home with seven police units, WITHOUT KNOCKING and scared the aggrieved, who was in the kitchen at the time. NO DOORBELL WAS RUNG! Dear sirs, who on earth would allow police officers to enter any home unannounced, without ringing the doorbell and surprised a mentally challenged son? The aggrieved is in the police system with a note of his mental challenges; any police officer could see that."* In Deputy 5's Arrest Report, he noted, "They [the complainants] gave me verbal permission to enter their residence to contact the aggrieved. We approached the residence and found the front door unlocked. Deputy 1 opened the door and announced our presence." In Deputy 4's Officer Report, he wrote, "On 06-20-18, Deputy 1 had received consent from the complainants to enter the residence to contact and arrest the aggrieved. Deputies arrived on scene and Deputy 1 was able to open the front door which was left unlocked. Deputy 1 opened the door and was able to make announcements." In Deputy 3's Officer Report, he reported, "On 06-20-2018, at about 1620 hours [4:20pm], the team of deputies arrived at the residence, and entered the residence through the unlocked front door while announcing their presence." According to Deputy 2's Officer Report, he reported, "Upon arrival at the aforementioned location, entry was made by deputies through an unlocked front door." According to Deputy 1's Officer Report, he reported, "We arrived on scene and discovered the front door of the residence was open. I opened the door and we made announcements." During the course of this investigation, Deputy 5 responded to a SERF and provided relevant information in response to CLERB questioning. In viewing the Body Worn Camera recordings, which the SDSD supplied to CLERB, the recordings revealed that upon arriving on scene, Deputy 1 opened the unlocked door and before entering the home, the deputies very loudly and clearly announced their presence four times. According to SDSD P&P Section 2.51 entitled, "Arrest, Search and Seizure," employees shall not make any arrest, search or seizure, nor conduct any investigation or official Department business, in a manner which they know or ought to know is not in accordance with law and established Department policies and procedures. According to the applicable content of P.C. § 1531, a peace officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance. According to the applicable content of P.C. § 1532, the peace officer may break open any outer or inner door or window of a house, for the purpose of liberating a person who, having entered to aid him in the execution of the warrant, is detained therein, or when necessary for his own liberation. California's search and seizure laws as applied to houses and other residences have their origin in the Fourth Amendment to the U.S. Constitution and in Article I, Section 13, of the California Constitution. These constitutional sections provide that all Californians have the right to be free from "unreasonable searches and seizures." The knock and announce rule is a legal rule mandating that police cannot force entry into someone's home/dwelling in order to execute a search warrant. Under the knock and announce rule, a peace officer needs to knock on the door, announce their authority, and wait a reasonable period of time before they enter. Pursuant to California Penal Code 1531, an officer of the law may use force to enter your home, car or place of business to execute the search warrant, only if, after notice of his authority and purpose, he/she is refused entry. In the aggrieved's case, deputies did not have a warrant. According to Deputy 5, he had the complainant's consent to enter the home. Consent is an exception to the knock and announce requirement. If someone in the home consents to the officer's entry, the officer does not need to proceed with knock-notice requirements. If a peace officer came to a home/dwelling to question a resident in connection with a case, they may only enter with an invitation. Absent information provided by an independent witness to the incident or additional

video or audio recordings of the interaction, there was insufficient evidence to confirm or refute that the complainant's gave Deputy 5 permission to enter their residence. There was insufficient evidence to either prove or disprove the allegation.

4.    Excessive Force – Unidentified deputies used force when they took the aggrieved into custody.

Board Finding: Action Justified
Rationale: Deputies 1-5 used force when they took the aggrieved into custody. In the complainant's written statement, they advised that deputies used "excessive force," including less than lethal force, when they took the aggrieved into custody. In the complainant's written statement, they conveyed, *"SEVEN Sheriff units with the intent of taking him down one way or another. Is it NORMAL to take SEVEN police units for two misdemeanors? We found out the aggrieved was taken to an area hospital and had to be subdued! Believe me, Citizens' Law Enforcement Review Board, when we got home, there was evidence that was so hurtful, shocking and disheartening that our son was taken by force, chased, and thrown some kind of white powdery substance at within our house! Chairs were out of place from our kitchen table, a screen had been bent and from our sun room from one of the officers trying to catch him. Out on our patio was this white powdery substance, that when I try to sweep it, it caused all of us to cough severely and bring us to tears! The powder was all over our backyard when we got home. He was also tasered three to five times!!! At one point the aggrieved asked an officer why they were trying to arrest him, and the officer punched him in the face. I don't know if this was before or after he was handcuffed. This is not the way to treat a human being with a mental disorder, especially when they were well informed of his health and mental state of mind, well in advance!"* According to Deputy 5's Arrest Report, a use of force ensued when the aggrieved became non-compliant. The aggrieved refused to comply with the deputies' orders and attempted to evade arrest. In response, Deputy 1 deployed pepperball rounds. Deputies grabbed the aggrieved and attempted to take him to the ground. The aggrieved continued to resist and fight by flailing his legs violently and tried to hit and kick the deputies off of him. Deputy 1 deployed his Conducted Energy Device (CED) twice. The aggrieved was eventually subdued and was placed in handcuffs. He was placed in a WRAP device, rendering him immobile, and a "spit sock" was placed over the aggrieved's head. It was noted that the amount of force used was necessary to overcome the aggrieved's passive, active, and assaultive behavior. The initial force used was ineffective in controlling the aggrieved, requiring an escalation in the force used. If force had not been used to overcome the aggrieved's passive and resistance, the aggrieved would have been able to evade arrest. Due to the seriousness in the aggrieved's charges and his threats, he was an immediate threat to public safety and it was imperative that deputies apprehended him as quickly as possible. After the use of force, paramedics were summoned and treated the aggrieved while he was still on scene. In viewing the BWC recordings, the recordings confirmed the deputies use of force and coincided with what was reported in Deputy 5's Arrest Report and in Deputies 1-4's Officer Reports. The aggrieved was shot with a pepperball. A CED was deployed multiple times, he sustained knee strikes and closed fist strikes, his hair was pulled, and at one point, he was briefly placed in a "choke-hold." According to SDSD P&P Section 2.48 entitled, "Treatment of Persons in Custody," employees shall not mistreat, nor abuse physically or verbally, persons who are in their custody. Employees shall handle such persons in accordance with law and established Departmental procedures. According to SDSD P&P Section 2.49 entitled, "Use of Force," employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and established Departmental procedures, and report all use of force in writing. According to SDSD P&P Section 2.50 entitled, "Use of Lethal/less Lethal Weapons," employees shall not use or handle lethal or less lethal weapons (including chemical agents, saps, batons, taser guns, etc.,) in a careless or imprudent manner. Employees shall use these weapons in accordance with law and established Departmental procedures. According to SDSD P&P Section 6.48 entitled, "Physical Force," it shall be the policy of this Department whenever any Deputy Sheriff of this Department, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force shall only be that which the Deputy Sheriff believes necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance (per 835(a) PC). Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate, or afford the Deputy control of, the confrontation incident. According to SDSD P&P Section Addendum Section F, Use of Force Guidelines, the use of force must always be considered secondary to the desirability of voluntary compliance to law. It shall be the policy of this Department whenever any Deputy Sheriff, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force, the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force. Force options are choices available to deputies concerning the methods outlined in these guidelines. Deputies should choose the available force option, which is reasonable and necessary for the circumstances at the time. Department issued Oleoresin Capsicum (OC) spray, PepperBall and Conducted Energy Device (CED) are authorize for use and are far less potential for injury than other less lethal munitions. Peace officers may use non-lethal chemical agents in an offensive manner. Punching techniques may be necessary. A fist strike to a subject's face when reasonable and necessary is not prohibited. Kicking techniques may be appropriate when a subject is judged to be assaultive. The carotid restraint

-7-

may be used on subjects who are actively resisting or assaultive. The intent of the hold is to render the subject unconscious to allow the deputy time to gain control. In certain situations, such as those involving a subject who is mentally ill, the carotid restraint may be more effective than using an impact weapon. Caution must be used in applying the carotid restraint. Deputies must take all precautions to ensure that the hold does not slip into windpipe chokehold. If circumstances do not permit proper application of the hold, it should not be attempted. If, during application of the hold, the deputy's arm slips, the deputy must make the necessary adjustments for proper application or release the hold and resort to another form of control. None of the aforementioned SDSD P&P discriminate against persons with mental health issues, as persons with mental health issues do not pose any less of a danger to peace officers. The evidence showed that the alleged acts or conduct did occur but was lawful, justified and proper.

5.  Misconduct/Discourtesy – Deputy 5 did not return the complainant's phone calls.

    Board Finding: Action Justified
    Rationale: Deputy 5 did not return phone calls to the complainants. In the complainant's written statement, they reported, "*Deputy 5 assured us that he would phone us as soon as they met with our son. He never phoned us back! The deputy did not return our call for more than two days after we went to his unit and complained. Another deputy said that Deputy 5 should have phoned us by now and that he or their lieutenant would be phoning us. It was a few days for Deputy 5 to call us and left his voice message, but by then the harm had been done, and decided upon a formal complaint.*" During the course of this investigation, Deputy 5 responded to a SERF and provided relevant information in response to CLERB questioning. According to SDSD Policy & Procedure (P&P) Section 2.22 entitled, "Courtesy," employees shall be courteous to the public and fellow employees. Deputy 5 was not obligated to return a call to the complainants, and him not doing so was not a violation of SDSD P&P or California law. Deputy 5 did return a call to the complainants two days after the incident and at the request of his command after the complainants complained. In keeping a positive interaction between peace officers and the public, and as a courtesy to the complainants, a timely return phone call would have also been suitable. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

    (Please note: Other procedural violations not brought forth by the complainant but discovered through the course of investigation were referred to the dept for investigation and resolution).

---

## 18-145

1.  Misconduct/Procedure – Deputy 1 failed to investigate the complainant's grievance against a subject deputy.

    Board Finding: Unfounded
    Rationale: In the complainant's written statement to CLERB, she alleged that an Internal Affairs deputy failed to investigate her complaint against a Sheriff's deputy. According to SDSD P&P Section 2.21 entitled, "Citizen Complaints," employees shall courteously and promptly accept any complaint made by a citizen against any employee or any Department policy or procedure. The Internal Affairs Unit is the central controlling point for logging, assigning, investigating, and filing complaints. According to SDSD P&P Section 2.23 entitled, "Request for Assistance," when any person makes complaints, all pertinent information will be obtained in an official and courteous manner, and will be properly and judiciously acted upon consistent with established Department procedures. According to SDSD P&P Section 3.2 entitled, "Complaints Against Sheriff's Employees Policy," the Sheriff's Department will accept complaints of inadequate service or alleged employee misconduct, and process those complaints according to procedure. Complaint investigations shall be conducted in a fair, thorough, impartial, and timely manner. The Internal Affairs Unit is the central controlling point for logging, assigning, investigating, and filing complaints. All formal complaints shall be forwarded immediately to Internal Affairs. Investigations shall be conducted into off-duty criminal allegations. At the conclusion of the investigation, it shall be the responsibility of the Internal Affairs Lieutenant to notify the complainant of the complaint conclusion. Complaint Conclusion; the burden of proof in an administrative investigation is "preponderance of evidence," which is defined as such evidence, when weighed with that opposed to it, has more convincing force and the greater probability of truth. According to the SDSD Internal Affairs P&P Manual Section 2.4 entitled, "Complaints," the Internal Affairs Unit is responsible for the administration of all formal complaints which includes review the complaint for classification and assignment, review of the completed investigations, filing of completed investigations, and maintaining an index of all complaints. It is the responsibility of the Internal Affairs Unit to notify the complainant in writing that their complaint has been received and if the allegations will be investigated. Details of investigations will not be discussed with complainant. At the conclusion of an investigation, the Internal Affairs Unit will notify the complainant in writing of the disposition. According to the SDSD Internal Affairs P&P Manual Section 2.5 entitled, "Investigations," the Internal Affairs Unit has the primary responsibility for the investigation of all complaints. The Internal Affairs Lieutenant will make the

determination where the complaint will be investigated. Internal Affairs Unit will typically investigate complaints alleging criminal or serious misconduct, complaints alleging misconduct by officers holding the rank of Lieutenant or above, and complaints that could be compromised by a conflict of interest. Due to California's Police Officer's Bill of Rights, the details of the complainant's investigation regarding the subject deputy was not disclosed to CLERB. According to a Correspondence Letter from the SDSD, an administrative investigation was conducted, and the final disposition of the complaint was made on 07-03-19. In accordance with State law, the complainant was given written notification of the disposition of her complaint. The complainant was informed that the investigation resulted in the disposition of "Not Sustained" against the subject deputy as "the facts revealed in the investigation do not substantiate the allegation, or that insufficient evidence is available to prove the allegation and support disciplinary action against the employee." Additionally, the letter advised that "state law restricts the extent that additional information may be disclosed concerning citizen's complaints and law enforcement personnel records. For that reason, the San Diego Sheriff's Department may only disclose the final disposition of the complaint." The allegation that Deputy 1 failed to investigate the complainant's grievance was untrue/unfounded. The evidence showed that the alleged act or conduct did not occur.

---

### 19-015

1.  Death Investigation/Accidental – On February 7, 2019, approximately seven hours after being brought into Sheriff's custody, Joseph Castiglione was discovered in medical distress.

    Board Finding: Action Justified
    Rationale: On 02-07-19, parolee Joseph Castiglione was arrested and booked into custody at 1:49 a.m. for possession of paraphernalia and substance consistent with methamphetamine. He reportedly did not exhibit signs or symptoms of being under the influence, which was corroborated by Body Worn Camera (BWC) evidence. At 8:45 a.m., Castiglione's cellmates alerted deputies to a medical emergency and life saving measures were initiated in compliance with policy M.6, Life Threatening Emergencies: Code Blue. An Intake Deputy was first on scene and observed Castiglione sweating profusely and said he appeared dazed as he stared at the walls/ceiling. The deputy removed the other four cellmates to an adjacent cell and requested assistance. Castiglione was repeatedly asked if he ingested any drugs, but was unable to respond. Castiglione's blood pressure was over 200 and medical staff determined he needed to go to a hospital. Narcan (Naloxone) was administered to counteract a possible drug overdose. Cellmates later reported Castiglione was initially sleeping and then was unable to stay still, shaking, agitated, sweated profusely, stumbled, and hit the back of his head on a sink so they alerted deputies. Deputies noted Castiglione sweated profusely, was dazed, mumbling, grunting, and unresponsive to questions. Castiglione resisted the oxygen by moving his head side to side. When his face turned purple, paramedics were called and CPR was initiated when Castiglione stopped breathing. He was transported to a hospital where Castiglione died at 9:52 a.m. During an autopsy, an exam of the small intestine revealed a small clear baggie with a zip closure. The bag appeared to be sealed and contained a small amount of translucent whitish fluid. Castiglione's toxicological testing detected a high level of methamphetamine and amphetamine. According to the Medical Examiner records, the cause of death was acute methamphetamine intoxication, with heart disease and obesity listed as contributing conditions, and the manner of death was accidental. The evidence supported that Castiglione was properly screened upon his entry into the SDSD jail system. When specifically asked during his medical intake screening, Castiglione denied that he swallowed or hid any drugs in any body cavity, and his Body Scan image did not detect any contraband. There was no evidence that Castiglione expressed any concerns about his well-being to any cellmates or any other member of the SDSD, sworn or professional. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

---

### 19-097

1.  Criminal Conduct - Unidentified deputies and/or San Diego Police officers "sexually assaulted" the complainant daily with a "radio attenuator" (a device consisting of an arrangement of resistors which reduces the strength of a radio or audio signal).

    Board Finding: Summary Dismissal
    Rationale: According to the complainant: "…the sheriff's deputies and/or members of SDPD are sexually assaulting me every day and night using a radio attenuator, where I take up house keeping in private. I know this for a fact because they talk to me while molesting me and I can feel it. There are several witnesses as well. I also know this because two off duty SDPD officers came to my house a month ago, and told me they they never heard of a radio attenuator and could not help me, flat out refused to protect and serve. One officer was about 6' tall, 175 lbs, white

guy with dark hair and said he, "I can't help it if someone is shoving shit up your ass." He was accompanied by another officer about 6' tall 200lbs, shorter lighter hair, maybe a little gray, white. They said they were responding to a call from a female who reported rape wrote on house window. The police and or sheriff deputies are aiding and abetting because I have a protection order that has never been served and is over a month old and I listen to these officers talk to me everyday using synthetic telepathy. I know all about synthetic telepathy and DEWs (Directed Energy Weapons) because I have 3 friends who sell this equipment and work with some of these people who are members of Harassment agencies such as DRT. These people know I know them and what they do to people. I however am not on a gov't list of people to be harassed. These people have used psychotronic weapons on me, this is mind control. This led to me being raped. All these people talking to me know this is what happened. They also know that I know this is what happened. These people are all too afraid to turn off the mind tap, because they are afraid I will get help and sue them. They have thwarted my attempts to get help from any public agency, including the FBI. All this (illegible) due to housing discrimination. I have reported this to crime stoppers, FBI, and HUD. They are destroying my public title in order to stop me from getting relief, remedy, or justice. I have sustained major (illegible) and need help that is being denied by officers for fear of prosecution, in effect keeping me isolated or feeling kidnapped as I am sexually assaulted everywhere I go, I listen to these people set me up with fake phone conversations, using synthetic telepathy and a cell phone to "whitewash" an investigation. I will not be denied justice. I will not be tricked or duped by attempts to cover up an investigation. Due to the nature of these crimes a proper investigation must entail a in person conversation with me and at least one of the witnesses. I have listened to at least 30 different people talking to me over this time and I have never seen anyones authority. These perpetrators tell me that all of them are tired of doing this but they never stop. I have a lot of hard evidence any many witnesses. I have been raped and sexually assaulted for years now. This by every definition known as terrorism, ritual abuse, sex slavery, kid napping, sexual assault, discrimination, and conspiracy against rights, to name a few. These are federal crimes. I have evidence that needs to be reviewed but I have no idea who I can trust as these are members of police, army, sheriff deputies, other gov't agencies. These are serious crimes and I will not stop reported them until they are taking seriously as you and I both know these crimes are being reported all over California. They are claiming to defame my character so I will seem crazy to any agency I seek help from. The difference with me is I know who the perpetrators are and it's only a matter of time before I will be heard."

The following CLERB rules and regulations apply:

**4.1 Citizen Complaints: Authority**. Pursuant to Ordinance #7880, as amended, (Article XVIII, Section 340 340.9 of the San Diego County Administrative Code), the Review Board shall have authority to receive, review, investigate and report on citizen complaints filed against peace officers or custodial officers employed by the County in the Sheriff's Department or the Probation Department…

**4.4 Citizen Complaints: Jurisdiction**. The Review Board shall have jurisdiction in respect to all citizen complaints arising out of incidents occurring on or after November 7, 1990; provided, however, that the Review Board shall not have jurisdiction to take any action in respect to complaints received more than one year after the date of the incident giving rise to the complaint, except that if the person filing the complaint was incarcerated or physically or mentally incapacitated from filing a complaint following the incident giving rise to the complaint, the period of incarceration or incapacity shall not be counted in determining whether the one year period for filing the complaint has expired.

**9.2 Screening of Complaints**.

5. "Category V" Complaints not alleging facts establishing a prima facie showing of misconduct. Such complaints may be referred to the Review Board for Summary Dismissal.

**SECTION 15: SUMMARY DISMISSAL**.

After reviewing the Investigative Report and records, the Review Board may summarily dismiss a Complaint by majority vote, upon recommendation of the Executive Officer, its own motion, or that of the Subject Officer. Parties to the Complaint shall be notified of a proposed summary dismissal, and may appear to argue for or against summary disposition. Summary dismissal will be appropriate in the following circumstances:

(c) The Complaint is so clearly without merit that no reasonable person could sustain a finding based on the facts.

---

*End of Report*

## NOTICE

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

# EXHIBIT W

**BOARD MEMBERS**
KIM-THOA HOANG
Chair
JORDAN GASCON
Vice Chair
SUSAN N. YOUNGFLESH
Secretary
SANDRA I. ARKIN
GARY BROWN
DELORES CHAVEZ-HARMES
P. DARREL HARRISON
JAMES LASSWELL
LOURDES N. SILVA
ROBERT SPRIGGS JR.
GARY I. WILSON

**EXECUTIVE OFFICER**
JULIO ESTRADA



# *County of San Diego*
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 505, SAN DIEGO, CA 92101-2940
TELEPHONE: (619) 238-6776     FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its February 12, 2019, meeting held at the San Diego County Administration Center, 1600 Pacific Highway, Room 302/303, San Diego, CA 92101. Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

## CLOSED SESSION

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
**Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASES FOR SUMMARY HEARING (13)

## ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE

### 17-035

1. Death Investigation/Officer-Involved Shooting (OIS) - On 05-15-17, Emmanuel Omar Ibarra was a suspect in an assault with a deadly weapon incident that occurred at a fast food restaurant in Solana Beach. He fled the scene and was later found by deputies holding a knife in his hand. Ibarra was given commands to relinquish the weapon but refused to comply. He failed to follow deputies' commands and advanced toward deputies with the knife. Deputy 1 fired five rounds from his service weapon and struck Ibarra who then fell to the ground. Paramedics arrived and rendered aid to Ibarra, who was transported by ambulance to the hospital where he died from his injuries. The cause of death was multiple gunshot wounds and the manner of death was homicide.

Board Finding: Action Justified
Rationale: Emmanuel Omar Ibarra, who had a history of mental illness and violent behavior, often frequented a fast food restaurant in Solana Beach. He regularly asked for food which was provided on multiple occasions by staff members. On one occasion, Ibarra pulled out a knife and displayed it to an employee. On the day of the incident, Ibarra returned to the restaurant and when asked to leave he became violent and stabbed an employee in the head with a knife. He fled the scene and subsequently was pursued by Deputies 1 and a second deputy. The deputies found Ibarra next to a cement pillar, adjacent to train tracks, located across the highway from the fast food restaurant. Ibarra surprised deputies and charged at the second deputy who lost his footing and fell. Deputy 1 drew Ibarra's attention away from his partner, and Ibarra charged at Deputy 1 with a "possessed" look in his face. Deputy 1 saw

*-continued on next page-*

Ibarra holding a knife and fired his duty weapon five times at the suspect. The second deputy could not confirm in his report that he saw a weapon, but he did see Ibarra "charge" at Deputy 1. After the suspect was shot, deputies handcuffed Ibarra and provided medical aid until paramedics arrived. A knife was later found where Ibarra had been shot and that fit the description of what Deputy 1 stated he saw prior to the shooting. According to PC835a, deputies had the right to use reasonable force to effect the arrest, prevent escape and overcome resistance. They also are not required to retreat or desist from their efforts due to the actions of the suspect. The deputies also had their right to self-defense and cannot be deemed an aggressor. They had every right to pursue Ibarra and attempt to arrest him. Once Ibarra pulled a knife and charged at deputies, the reasonable use of force escalated to that of deadly force to stop the threat. Deputy 1 was justified in his actions, per PC196, which stated that homicide is justifiable when committed by public officers in arresting persons charged with felony and who are fleeing from justice or resisting such arrest. In this case, Ibarra was suspected of committing a felony; he stabbed a fast food restaurant employee in the head with a knife and fled. Deputies pursued him and he then failed to follow commands, resisted arrest, and charged at deputies with a weapon. SDSD P&P Addendum F entitled, "Use of Firearms Force" states that deputies shall use deadly force only after a deputy reasonably believes that the force is necessary in defense of human life, including the deputy's own. Also, it can be used in defense of any person in immediate danger of death or the threat of serious physical injury. In this matter, Deputy 1 and a second deputy pursued a fleeing suspect who was in possession of a knife. The suspect refused to follow commands. Deputy 1 stated he was in fear for his life when the suspect charged at him with a knife and he fired his weapon at the suspect to protect himself and the second deputy. The use of lethal force utilized by Deputy 1 was in compliance with policy and case law. The evidence showed the use of deadly force by Deputy 1 was justified and there was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

## 17-043

1. Death Investigation/Officer Involved Shooting – On 06-04-17, Bruce Wayne Dawley called Sheriff's Communication Center and advised the dispatcher of his intent to commit suicide. Sheriff deputies were dispatched to Mr. Dawley's residence and, upon their arrival, they attempted to communicate with him. During their interaction, Mr. Dawley produced a gun. He aimed the gun at both Deputy 1 and another deputy. Additionally, he shot at Deputy 1. Deputy 1 responded by discharging his department issued shotgun at Mr. Dawley who retreated back into his residence. Mr. Dawley was subsequently found unresponsive in his residence and was pronounced dead at the scene.

Board Finding: Action Justified
Rationale: San Diego Sheriff's Department (SDSD) Communication Center received a call from Mr. Dawley. During the telephonic conversation, Mr. Dawley advised of his intent to commit suicide. Deputy 1 and two other deputies were dispatched to the residence. Upon their arrival, they surrounded the residence and attempted to communicate with Mr. Dawley. Sheriff deputies attempted to communicated with Mr. Dawley in an attempt to resolve the situation without incident. Mr. Dawley acknowledged the deputies, but yelled obscenities at them and refused to comply with their verbal commands to exit the home. Mr. Dawley instructed deputies to leave his residence, advised that he had a gun, and made suicidal statements. During a verbal confrontation with deputies, Mr. Dawley presented a gun and pointed it at one of the deputies who ducked under cover. Mr. Dawley then turned the gun towards Deputy 1 and fired two rounds toward Deputy 1. Deputy 1 discharged his firearm at Mr. Dawley immediately after Mr. Dawley shot at him. Deputy 1 returned fire with his department issued shotgun. According to Deputy 1's documented statement, Deputy 1 returned fire for his safety and the safety of his fellow deputies; Deputy 1 said he had to fire his shotgun to stop the threat as he or his partners might have been shot. After Deputy 1 fired his shotgun, a second deputy stood up to re-acquire the target with his handgun; however, Mr. Dawley had fallen out of view of both deputies. Special Enforcement Detail (SED) deputies were subsequently requested and responded to the residence. SED deputies made entry into Mr. Dawley's residence and found Mr. Dawley down and unresponsive with a gunshot wound. Paramedics were summoned to the residence and confirmed Mr. Dawley's death without medical intervention. A pathologist from the Medical Examiner's Office performed an examination. The cause of death was listed as "Shotgun Wound of the Abdomen" and the manner of death was Homicide. For death certification purposes, a "homicide" manner is not synonymous with murder or manslaughter and implies no criminal culpability.

In this case, deputies were called to the scene by an individual who threatened to shoot himself while intoxicated and under the influence of marijuana. Mr. Dawley's actions on the day of the incident indicated he had intent on shooting any deputy that responded to his residence and or having deputies kill him. His pointing and firing his pistol at deputies caused deputies to realize they were in danger of being killed or seriously injured. Deputy 1's use of deadly force in this instance was reasonable and he bore no criminal liability for his actions. The evidence confirmed that Mr. Dawley did fire his weapon during the incident. Mr. Dawley's actions posed a clear threat to on-scene deputies and nearby residents, thus resulting in the deputies' use of lethal force against Mr. Dawley. The facts, evidence, and perceptions of Deputy 1 justified the use of deadly force against Mr. Dawley. Deputies expeditiously responded to this incident

and despite their timely, lawful and proper actions, Dawley was shot and killed. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

---

**17-102**

1. Death Investigation/Overdose – While an inmate at the Vista Detention Facility (VDF), Michael Macabinlar was found dead inside of his cell.

   Board Finding: Not Sustained
   Rationale: On 09-19-17, 34-year-old Michael Macabinlar, was arrested and booked into VDF, at 9:09pm. At that time, he denied drug usage and reported he was noncompliant with Diabetes protocol. Medical staff ordered five different medications, as well as a diabetic and cardiac diet. Medical records confirmed Macabinlar refused sick call on 09-20-18. On 09-25-17, at about 9:00am, Macabinlar did not respond to medication distribution and an inmate found him lying unresponsive in his bunk. Help was summoned and nursing staff found Macabinlar not breathing with rigor mortis. Per protocol, staff transferred him to the floor and began life-saving measures. Paramedics responded to the scene and confirmed death without further medical intervention at 9:26am. The evidence indicated that the inmate was properly classified upon his entry into jail. Per video surveillance, Macabinlar was last seen alive in his cell on 09-24-17 at 1:00pm; 20 hours later his body was discovered. Based on the autopsy findings, the cause of death was acute methamphetamine intoxication with dilated cardiomyopathy and hypertensive and atherosclerotic cardiovascular disease listed as contributing, and the manner of death was accidental. Toxicological testing detected methamphetamine and amphetamine in the peripheral blood, but it was undetermined how Macabinlar attained the illicit drugs while in custody. During the review of this death investigation, policy violations were discovered and are addressed below. There was inadequate evidence to prove that the failure to conduct proper Hard and Soft Counts would have led to a sooner initiation of CPR or would have prevented this death, and therefore, there was insufficient evidence to either prove or disprove this allegation.

2. Misconduct/Procedure – Deputy 3 failed to conduct a proper Soft Count.

   Board Finding: Sustained
   Rationale: When conducting Soft Counts, on the date of this incident, deputies were required to verify Macabinlar's well-being through "verbal or physical acknowledgement" from Macabinlar. During Soft Counts, one deputy conducts the Soft Count of the cells on the top tier and one deputy simultaneously conducts the Soft Count of the cells on the bottom tier. Video surveillance showed Deputy 3 appeared to look in Macabinlar's cell and checked the handle on the door. He did not stop at the door. He continued walking, after checking the door, towards the next cell and did not return to Macabinlar's cell. Deputy 3 admitted in an investigative report that he was "looking for obvious signs from the inmates including checking to make sure everyone's alive, not hanging, bleeding or in medical distress." Based on surveillance video, a follow-up investigative report and information provided by Deputy 3 during the course of CLERB's investigation, there was a violation of DSB P&P I.43 with regard to conducting a Soft Count of Macabinlar's cell on 09-25-17 at around 5:03pm. The was no evidence that showed Deputy 3 obtained a physical or verbal acknowledgement from Macabinlar during the Soft Count in violation of the Sheriff's Department Policies and Procedures.

3. Misconduct/Procedure – Deputy 2 failed to conduct a proper Soft Count.

   Board Finding: Sustained
   Rationale: When conducting Soft Counts, on the date of this incident, deputies were required to verify Macabinlar's well-being through "verbal or physical acknowledgement" from Macabinlar. During Soft Counts, one deputy conducts the Soft Count of the cells on the top tier and one deputy simultaneously conducts the Soft Count of the cells on the bottom tier. Video surveillance and reports provided by the SDSD showed that at approximately 6:58pm, on 09-24-17, a Soft Count was conducted by Deputy 2 at Macabinlar's cell which was on the top tier. Based on the surveillance video, and information provided by Deputy 2 during the course of CLERB's investigation, evidence showed there was a violation of DSB P&P I.43 "Inmate Count Procedures" with regards to conducting a Soft Count. Deputy 2 failed to obtain a physical or verbal acknowledgement of Macabinlar during the Soft Count and the conduct was not justified.

4. Misconduct/Procedure – An unidentified deputy failed to conduct a proper Soft Count.

   Board Finding: Sustained
   Rationale: On the date of this incident, when conducting a Soft Count, deputies were required to verify Macabinlar's well-being through "verbal or physical acknowledgement" from the inmate. During this process, one deputy conducts a Soft Count of the cells on the top tier, and one deputy simultaneously conducts a Soft Count of the cells on the

bottom tier. Video surveillance showed that at 4:23am, on 09-25-17, a deputy opened Macabinlar's cell and brought breakfast inside. According to a follow-up investigative report, a cellmate stated the deputy delivered breakfast in the cell. He entered and said "breakfast, breakfast," but Macabinlar did not move. Based on surveillance video that could not conclusively identify the responsible deputy, audio recordings of interviews with deputies, follow-up investigative reports, and information provided by Deputies 1 and 2 during the course of CLERB's investigation, there was a violation of DSB P&P I.43 with regard to conducting the Soft Count. However, there was conflicting information with regard to which deputy failed to perform this action, either Deputy 1 or Deputy 2. The evidence showed that a deputy left Macabinlar's cell without obtaining a physical or verbal acknowledgement from the inmate during the Soft Count, and the action was not justified.

5.  Misconduct/Procedure – Deputy 2 failed to conduct a proper Hard Count.

    Board Finding: Not Sustained
    Rationale: When conducting Hard Counts on the date of this incident, deputies were required to verify Macabinlar's well-being through "verbal or physical acknowledgement" and use a Bar Code Reader, an Emergency Evacuation List, Face Cards or Floor Sheets to confirm the identity of Macabinlar. During Hard Counts, one deputy conducts the Hard Count of the cells on the top tier and one deputy simultaneously conducts the Hard Count of the cells on the bottom tier. Video surveillance and reports provided by the SDSD revealed that at 9:42pm, on 9-24-17, a Hard Count was conducted by Deputy 2 on the top tier. He stopped at Macabinlar's cell for about eight seconds. Deputy 2 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Based on Deputy 2's responses and video surveillance, it was unclear whether he obtained a physical or verbal acknowledgement from Macabinlar. Therefore, without further evidence it was not possible to determine whether there was a violation of DSB P&P I.43 with regards to conducting a proper Hard Count.

## 18-026

1.  False Reporting - Deputy 6 lied in his written report.

    Board Finding: Unfounded
    Rationale: According to the complainant, Deputy 6 lied in his written report when he wrote, "Deputy 4 arrived on scene and attempted to detain [the complainant]." The complainant alleged that that was incorrect and stated, in third person, "Deputy 4 attempted to deprive [the complainant] from exercising his first amendment and attempted detainment to stop [the complainant] from recording with his phone." According to the complainant, Deputy 6 covered up and systematically concealed the truth" in his written report in an attempt to support other deputies' false allegations and reporting. More in depth, the complainant advised that Deputy 6 "covered up the facts" by reporting "false allegations and wrote a bias report backing up his brothers in blue." The complainant went on to state that Deputy 6's report was "a conspirator cover up of the facts of the case." According to Deputy 4's written report, he articulated his reasonings for initially detaining the complainant; he was the suspect of an assault case. While interviewing a witness, Deputy 4 noticed that the complainant was recording the witness. The witness was reluctant to speak with Deputy 4 and advised that he felt intimidated by the complainant recording him. For those reasons, Deputy 4 detained the complainant and advised that he would be impounding the complainant's cell phone as evidence. Neither in his written report, nor viewed in his Body Worn Camera (BWC), did Deputy 4 attempt to stop the complainant from recording with his phone. In reading Deputy 6's report, and in comparison to the other deputies report, coupled with the BWC recordings, Deputy 6's report was found to be truthful, comprehensive, and factual. The allegation that Deputy 6 covered up and systematically concealed the truth in his written report in an attempt to support other deputies' false allegations and reporting" was found to be untrue. The evidence showed that the alleged act or conduct did not occur.

2.  False Reporting - Deputy 6 accused the complainant of crimes he did not commit.

    Board Finding: Unfounded
    Rationale: The complainant alleged that in Deputy 6's written report, Deputy 6 stated that the complainant "assaulted several deputies" when he was taken into custody. In his written statement, the complainant wrote in third person, "[The complainant] did not combat with Sheriffs. [The complainant] did not resist Sheriff's. [The complainant] did not even attempt to have altercations with Sheriff's." In his written report, Deputy 6 stated that the complainant "physically resisted deputies" when they escorted him down the hillside. In the BWC of numerous deputies on scene, the complainant was observed to assault the deputies when he fought when they attempted to detain him. The complainant was observed to attempt to pry off the deputies grasp by pulling their fingers, hands, and wrist, from off him. Additionally, the complainant was observed to physically resist deputies when they escorted him down the hillside. Moreover, in the deputies' BWC the complainant was heard explaining his reasons for him pushing deputies. Lastly, in the deputies' BWC, the complainant was observed to forcefully and aggressively pull away from Deputy 4

when Deputy 4 initially attempted to detain him. When the complainant forcefully pulled away from Deputy 4, he swung his elbow back toward Deputy 4, nearly missing Deputy 4's head. Numerous BWC recordings were viewed and the complainant's actions, as well as the deputies' actions, corroborated with was reported by the deputies and by Deputy 6. The evidence showed that the allegation that Deputy 6 accused the complainant of crimes he did not commit did not occur.

3.  Misconduct/Procedure - Deputy 6 attempted to conceal the injuries to the complainant's face and body.

    Board Finding: Not Sustained
    Rationale: The complainant alleged that Deputy 6 attempted to conceal the injuries to his face by cleaning his face prior to being interviewed. In his written statement, the complainant wrote, "Deputy 6 shut off his BWC upon his arrival so that he could first clean me up for his bias interview. Deputy 6 cleaned me up to hide the taser prong mark in my face and all the other seemingly endless bruises, lesions, injuries covering my face and torso. Deputy 6 did this for only one purpose and that purpose was to hide the fact of cop brutality." Deputy 6 responded to a Sheriff's Employee Response Form (SERF) and provided information that was used in determining the recommended finding. There was insufficient evidence to either prove or disprove the allegation.

4.  Misconduct/Procedure - Deputy 4 detained the complainant in an attempt to stop him from recording the incident.

    Board Finding: Action Justified
    Rationale: The complainant detailed that on 11-23-17, he arrived at the property he owned and managed to ensure it was being maintained. While he was there, he engaged in an altercation with one of his tenants and Sheriff's deputies were summoned to the scene. During his interaction with Deputy 4, he videotaped the deputy in the performance of his duties. Once Deputy 4 noticed he was being videotaped, Deputy 4 "immediately [became] enraged and wrongfully ordered me to put my hands behind my back as he 'bull-rushed' me." The complainant further stated that Deputy 4 attempted to "deny" him of his First Amendment Right "by abusing his authority" to stop the complainant from filming. According to Deputy 4's Deputy Report, Deputy 4 advised that he was interviewing a witness when he noticed a female and the complainant using her cellular phone to record the witness. Based on the witness' apprehensiveness to speak with Deputy 4 in front of other people, Deputy 4 suspected that the complainant was attempting to intimidate the witness by filming him. For this reason, Deputy 4 stated to the complainant, "Just so you know, everything you're videotaping is evidence, so I need to take your phone when I am done." As previously stated, Deputy 4 believed that if the complainant was allowed to record the witness while he spoke with him that the witness would no longer be willing to provide a statement implicating the complainant in a crime or that the complainant would video recordings against the witness. For this reason, coupled with preliminary information that the complainant was the aggressor in the altercation, Deputy 4 attempted to detain the complainant. Deputy 4 ordered the complainant to put his hands behind his back. The complainant responded, "No!" The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper

5.  Excessive Force - Deputy 4 deployed his CED on the complainant.

    Board Finding: Action Justified
    Rationale: The complainant stated Deputy 4 deployed his Conductive Energy Device (CED) on him. Per the complainant's recount of events, he admitted to evading the deputies. He stated that he ran from Deputy 4 and Deputy 2 to the safety of his security gate, which was on his property. Upon reaching the security gate, the complainant secured himself on the other side of the gate. In the complainant's written statement, he advised, "Deputy 4 attempted to rip off the gate off its hinges, but when that failed, he retrieved his taser, pointed it at me, and point blank shot me in the face and chest." The complainant advised that he evaded the deputies because he was afraid for his safety. In Deputy 4's written statement, he advised that he instructed the complainant to put his hands behind his back. The complainant refused to comply with his orders and ran from him. When Deputy 4 caught up with the complainant, Deputy 4 detailed how the complainant "swung his right elbow back towards my head." Deputy 4 ducked from the strike, drew his department issued CED, and reengaged the complainant who ran away. The complainant entered his backyard and closed the gate behind him. Deputy 4 and the complainant struggled back and forth over control of the fence/gate. As illustrated in Deputy 4's written report, the complainant displayed his willingness to continue fight with Deputy 4. Based on that fact, coupled with the complainant's angry and combative demeanor and his attempted assault on Deputy 4, Deputy 4 deployed one cartridge from his CED. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

6.  Illegal Search & Seizure - Deputy 4 confiscated the complainant's cellular phone.

    Board Finding: Action Justified

Rationale: The complainant stated Deputy 4 confiscated his cellular phone. While investigating the altercation between the complainant and his tenants, Deputy 4 said to the complainant, "Just so you know, everything you're videotaping is evidence, so I need to take your phones when you're done." The complainant responded, "You can't stop us from recording. You're not gonna take our phones." In his written statement, the complainant advised, "I know my right of the First Amendment that's why I refused to stop recording." The complainant alleged that Deputy 4 attempted to detain and arrest him because he was recording the deputy's interview of the witness. The complainant stated, "I refused to stop recording so Officer [Deputy] 4 tried to put handcuffs on me for videotaping." In Deputy 4's written report, he articulated his reasons for confiscating the complainant's cell phone. Deputy 4 advised that he was interviewing the witness when he noticed a female and the complainant using her cellular phones to record the witness. Deputy 4 noticed the flash on the phone was illuminated, leading him to believe that the phone was recording. Based on the witness' apprehensiveness to speak with Deputy 4 in front of other people, Deputy 4 suspected that the complainant was attempting to intimidate the witness by filming him. For this reason, Deputy 4 stated, "Just so you know, everything you're videotaping is evidence, so I need to take your phone when I am done." Deputy 4 believed that if he allowed the complainant to continue to record his interview with the witness, that the witness would no longer be willing to provide a statement implicating the complainant in a crime or that the complainant would video recordings against the witness. After the complainant's arrest, Deputy 4 secured the complainant's cell phone into evidence. Deputy 4's written report, he advised that the cell phone was seized as evidence in the event that the phone contained video evidence of the initial incident between the complainant and his tenants, recorded statements from the witnesses, or injury information discussed between the witness and the paramedics. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

7. Excessive Force - Deputy 4 deployed his CED on the complainant's dog.

   Board Finding: Action Justified
   Rationale: The complainant alleged that Deputy 4 assaulted his dog. In his written statement, the complainant stated, "Officer 4 assaulted my dog who was posing zero threat." In Deputy 4's written report, he stated that the complainant's dog had already bitten two people prior to his arrival on scene. While Deputy 4 attempted to apprehend the complainant, the complainant's dog began barking at the deputies while "displaying signals of agitation." Deputy 2 noticed that the complainant's dog was approaching Deputy 4 and they both believed that the dog was going to bite Deputy 4. For this reason, Deputy 2, not Deputy 4, deployed a cartridge from her CED at the dog to prevent the dog from attacking Deputy 4. According to Deputy 2's and Deputy 4's BWC, Deputy 4 did not deploy his CED towards the complainant's dog, nor did he assault the dog in any way. The incident, which was captured on the deputies' BWC, correlated with their statements. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

8. False Reporting - Deputy 4 lied in his written report.

   Board Finding: Unfounded
   Rationale: The complainant alleged that Deputy 4 lied in his written report. In the complainant's written statement, he wrote, "Officer 4's police report is a complete fabrication of events." He further explained that Deputy 4 "created a false foundation for his reasoning; a false premise" to justify his actions and his arrest of the complainant. The complainant claimed that Deputy 4's entire report was "false documentation." "Officer [Deputy] 4 slants his entire police report against me in an effort to condone his unlawful assaultive actions attempting to falsify make me the assaultive person to cover up his psychotic episode. Upon viewing the BWC and reading Deputy 4's written report, it was found that Deputy 4 clearly articulated the chronological sequence of events in his written report. Deputy 4's report corroborated with the BWC that was obtained from numerous deputies and the statements from the witnesses.

9. Criminal Conduct - Deputy 4 deleted the recordings off the complainant's cellular phone.

   Board Finding: Not Sustained
   Rationale: The complainant alleged that Deputy 4 deleted the recordings from off of his cellular phone. The complainant claimed that Deputy 4, "confiscated his cell phone then committed a federal offence" when he "erased my video recording off my phone once he gained possession of it." The complainant said he reviewed his recordings on his cell phone of Deputy 4's physical attack on him while he was on the mountainside and he "personally witnessed" that he did indeed have the evidence recorded. The complainant advised that he kept the phone recording through all of Deputy 4's assaults, and only stopped the camera to climb the mountain. He then reviewed the footage while on the mountain and verified that it had recorded. However, since obtaining his cell phones from the SDSD Evidence on 01-08-2018, the complainant noticed the recordings were missing. Additionally, the complainant claimed that Deputy 4 altered the evidence by making still photos and erasing other photos. The complainant alleged that Deputy 4 tampered with evidence. Deputy 4 responded to questioning with a signed statement and provided relevant information in response to CLERB questions. Absent any additional audio or video recordings of the contact between

the complainant and Deputy 4 or the testimony of an independent witness to these contacts, there was insufficient evidence to either prove or disprove the allegation.

10.  Excessive Force - Deputies 1, 4, and 5 executed excessive force when they took the complainant into custody.

Board Finding: Unfounded
Rationale: The complainant alleged that Deputies 1, 4, and 5 used excessive force when they took him into custody. The complainant claimed that Deputies 1, 4, and 5 assaulted him by hitting and punching him in the face, by "gouging" his pressure points, and by tasering him. In his written statement, the complainant described the use of force techniques as "torture tactics." In the complainant's written statement, he acknowledged and confirmed that he was noncompliant with the deputies' verbal commands, that he was passively resistant to their commands, and that he actively resisted the deputies' directions; he evaded arrest, he refused to comply with their commands, and he assaulted the Sheriff's canine by punching him numerous times. The complainant denied being assaultive towards the deputies. According to the SDSD Addendum F, which described the use of force guidelines, deputies are authorized to use force "that which is necessary and objectively reasonable to effect the arrest, prevent escape, or overcome resistance." According to the deputies' written reports, the aforementioned deputies articulated the various and escalating control techniques they implemented while trying to overcome the complainant's passive and active resistance, his attempt to escape, and his numerous attempts to elude arrest. The force that was implemented by the deputies was documented in the deputies' written reports and it correlated with what was observed on the deputies' BWC. The deputies utilized appropriate control techniques and tactics which employed effectiveness for the deputies to take control of the complainant. In the BWC, the deputies were observed to employ various hand techniques, which included punching the complainant with a closed fist, use of pressure points, and deploying their Conducted Energy Devices (CED) which proved effective in temporarily immobilizing the combative complainant who was ultimately subdued for arrest. All use of force was accurately documented in writing. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

11.  Misconduct/Intimidation - Deputy 4 "intimidated" a witness by threatening to impound her cellular phone if she did not cease recording the incident.

Board Finding: Unfounded
Rationale: The complainant alleged that Deputy 4 intimidated a witness by threatening to impound her cellular phone if she did not cease recording the incident. The complainant advised that Deputy 4 threatened to take the witness' phone from her, claiming it was evidence. "He physically stepped towards her in an act of intimidation, stating that he would take her phone for his investigation. He did this to stop her from videotaping the incident." According to the complainant, "Deputy 4 was "trying to use his position of invested authority to criminally prevent me [and the female] from exercising our first amendment right." During the course of this investigation CLERB was unable to contact the female witness for a statement/interview. As such, her opinion was not included in this investigation. In Deputy 4's BWC recording entitled, "2017-11-23-21-08-45-97b19e6325.mp4," at the 11 minute, 43 second mark, Deputy 4 was observed to inform an unidentified female that her cellular phone would be impounded as evidence in the case. Deputy 4 was heard to say, "Just so you know everything you are videotaping is evidence, so I need to take your phone when you are done." The unidentified female said, "I'm not videotaping nothing." Deputy 4 responded, "Absolutely you are. You had a light on your phone. I was born at night, but not last night. Thank you." The unidentified female replied to Deputy 4, but it was unintelligible on Deputy 4's BWC due to their distance apart. Deputy 4 responded, "Okay, well I will need to see that you didn't and I won't take your phone as evidence. Is that clear?" At this time, the complainant, who was standing some distance away from both Deputy 4 and the unidentified female, was heard to chime into the conversation. Deputy 4 turned to face the complainant; he directed his attention and his BWC towards the complainant. Deputy 4 did not engage the unidentified female any further. He was not observed to instruct or demand that the female witness cease using her cellular phone to record. Deputy 4 did not "physically stepped towards her in an act of intimidation," as stated by the complainant. According to the BWC, Deputy 4 did not "trying to use his position of invested authority to criminally prevent" neither the complainant, nor the unidentified female from exercising their first amendment right. The evidence showed that the allegation that Deputy 4 intimidated a witness did not occur.

12.  Criminal Conduct - Deputies 1, 4, and 5 "conspired" against the complainant and collaborated their stories to conceal the truth of the incident.

Board Finding: Unfounded
Rationale: The complainant stated that Deputies 1, 4, and 5 conspired against the complainant and collaborated their stories to conceal the truth of the incident. The complainant advised that Deputies 1, 4, and 5 physically assaulted him, battered, and harmed him. They then conspired against the complainant and collaborated their stories to conceal the truth of the incident. The deputies articulated their actions and reasonings in their perspective reports. The written

reports corroborated with what was observed in their BWC recordings of the incident. The allegation that Deputies 1, 4, and 5 conspired against the complainant and collaborated their stories to conceal the truth of the incident was found to be untrue/unfounded.

13.    Misconduct/Procedure - Deputy 4 "coached" witnesses.

Board Finding: Unfounded
Rationale: The complainant alleged that Deputy 4 "coached" two witnesses in their interviews and he assisted in the wording of their Citizen's Arrest Declarations in their arrest against the complainant. According to the complainant's written statement, a witness "admitted" to the complainant that Deputy 4 turned off his BWC and coached her in saying that she witnessed the complainant attempt to punch Deputy 4. In a telephonic interview with the witness, she advised that Deputy 4 did not "coach" neither she nor the second witness in their interviews, nor did Deputy 4 assist in the wording of their Citizen's Arrest Declarations in their arrest against the complainant. Deputy 4 responded to questioning with a signed statement and provided relevant information in response to CLERB questions. The evidence showed that the alleged act or conduct did not occur.

14.    Misconduct/Intimidation - Deputy 4 "threatened" the complainant with bodily harm if he did not comply with his orders.

Board Finding: Action Justified
Rationale: The complainant alleged that Deputy 4 "threatened" him with bodily harm if he did not comply with his orders. The complainant advised that Deputy 4 "menacingly stated that they [Deputies 1, 3, and 5] were going to use pressure points to get me to stand up and walk down the hill." In Deputy 4's written report, he stated, "Deputy 1 again advised the complainant that force would be used against him if he fled or disobeyed commands." Deputy 4 confirmed that he did advise the complainant that if he did not comply with his orders, control tactics, including the use of pressure points, would be used. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

15.    Excessive Force - Deputy 4 attempted to choke the complainant.

Board Finding: Unfounded
Rationale: The complainant alleged that Deputy 4 attempted to choke him. The complainant stated that while on the hillside, "The officers attempted to choke me out, but I would not let them do so." In Deputy 4's written report, he detailed what force he implemented on the complainant during the use of force. According to the SDSD Addendum F, the carotid restraint technique is a method of rendering a subject unconscious by restricting the flow of blood to the brain by compressing the carotid sheath on the side of the subject's neck. Deputy 4 did not note in his written report that he attempted to place the complainant in a carotid restraint in his report. Upon viewing the BWCs, Deputy 4, was not observed place his arm around the complainant's neck. In the BWC recording titled, "2017-11-23-21-32-55-240ecb0903.mp4," the deputies were seen engaging in a use of force with the complainant. During the use of force, no deputy was observed to place his arm around the complainant's neck. The evidence showed that the alleged act or conduct did not occur.

16.    Criminal Conduct - Deputy 4 stole money from the complainant.

Board Finding: Unfounded
Rationale: The complainant alleged that Deputy 4 stole money from him. The complainant advised that when Deputy 4 impounded his cellular phone, he also witnessed Deputy 4 take his bank envelope, which the complainant claimed contained $3,500. In Deputy 4's written report, he advised that after the incident, he returned to the Sheriff's Substation where he secured the complainant's cell phone into an evidence locker. The complainant's cell phone was later turned over to Deputy 7. Deputy 4 did not impound any other property from off the complainant's person. According to Deputy 7's Arrest Report, hospital staff located the complainant's wallet in the hospital room that he was treated in, prior to him going to jail. The wallet was later impounded by the SDSD. According to Deputy 7's written report, she impounded a compact disc (CD) with photos, a "K9 unit CD with photos," two Citizen Arrest Declarations, the deputies' BWC videos, the complainant's wallet, his cell phone, and the complainant's currency. According to her report, the currency was listed as Property Item #7 and noted that 32 bills were impounded, totaling $581.00. The complainant's wallet and money were confiscated for "safekeeping," and were not seized as evidence. The evidence was impounded at the Sheriff's Substation and the items confiscated for safekeeping were released to the complainant. Furthermore, and according to Deputy 4's BWC, he was viewed to conduct a pat down search on the complainant when he was first arrested on the hillside. Deputy 4 was observed to locate the complainant's cellular phone and a set of keys in the complainant's right front pant pocket. The cellular phone was impounded, and the keys were placed back in the complainant's pocket. Deputy 4 responded to questioning with a signed statement and

provided relevant information in response to CLERB questions. The evidence showed that the alleged act or conduct did not occur.

17.   False Arrest – Deputy 4 "arrested and falsely imprisoned" the complainant.

Board Finding: Unfounded

Rationale: The complainant alleged that Deputy 4 "arrested and falsely imprisoned" him. In his written statement, the complainant claimed, "Officer [Deputy] 4 not only falsely charged me with crimes I did not commit, but also arrested me and falsely imprisoned me in jail." According an Arrest/Juvenile Contact Report, written by a deputy, the complainant was arrested for California Penal Code Sections: PC§ 69 – Obstruct/Resist Executive Officer with Minor Injury, PC§ 245(A)(4) – Assault with a Deadly Weapon with Force: Possible Great Bodily Injury, PC§ 243(A) – Battery on Person, PC§ 243(B) – Battery on Peace Officer/Emergency Personnel, PC§ 600(A) – Willfully Harm Peace Officers Horse/Dog without Serious Injury, and PC§ 835a – Peace Officer Use of Force to Arrest. The following California Penal Code Sections read as follows: Per the complainant's own admission in his written statement, he confirmed that willfully resisted and attempted to prevent Deputy 4 from performing the duty imposed upon the officer. Additionally, the complainant knowingly resists Deputy 4, by the use of force or violence, in the performance of his duty. In Deputy 4's written report, he illustrated how the complainant refused to put his hands behind his back or comply with his commands. For these reasons, the complainant was in violation of California Penal Code Section 69. According to the witnesses' statement, the complainant was accused of assaulting the witness when he punched the witness in the face. The witness exhibited injuries to his face that correlated with an assault. The two witnesses placed the complainant under Citizen's Arrest for the assault they claimed the complainant perpetrated. For this reason, the complainant was in violation of California Penal Code Section 243(A). According to Deputy 7's report, as well as the reports written by Deputies 1, 2, 4, 5, and 6, the complainant was described to physically resist and fight the deputies. In Deputy 6's report, he reported that the complainant "attempted to punch Deputy 4." In Deputy 4's written report, he stated that the complainant "swung" his right elbow towards him in an attempt to hit Deputy 4 in the head. In Deputy 2's written report, she reported that she observed the complainant "attempt to elbow strike Deputy 4 in the face." Furthermore, after locating the complainant on a hillside, Deputy 4 stated that the complainant "began to fight with both Deputies 1 and 5" while they attempted to place handcuffs on the complainant. According to Deputy 1's written report, he witnessed the complainant "resist and assault Deputy 5 by grabbing onto [Deputy 5's] hands and pulling them away from him." When Deputy 1 intervened and attempted to assist Deputy 5, Deputy 1 reported that the complainant "hit me in my chest area with a cliched fist, knocking me back…" Deputy 1 advised that the complainant continued to assault him and Deputy 5 when he "kept grabbing our hands and pushed them." Deputy 1 advised that the complainant "grabbed Deputy 5's hand" and tried to break free from his grasp. In Deputy 5's written report, reported that the complainant repeatedly grabbed his hand and push he and Deputy 1 back, "attempting to push us down the hillside." Deputy 5 reported that the complainant fought with him to avoid being handcuffed. For these acts against the deputies, the complainant was in violation of California Penal Code Sections 245(a)(4) and 243(b). A deputy flew in the Sheriff's helicopter and assisted the deputies on the ground with locating the complainant as he hid in the thick brush. According to the helicopter deputy's written report, upon locating the complainant, he observed the complainant "repeatedly punching a Sheriff's canine on his face and body." The complainant "kept punching him [the dog] with his fist and kicking him." Per the complainant's own recognizance, in his recorded verbal interview with Deputy 6, he confirmed that he willfully "punched the K9 at most three times to keep it from biting him." Additionally, the complainant stated in his written statement that he punched the dog "to cease the beast's constant attack on me by whatever means necessary to protect myself… the unconstrained attack animal found me irresistibly tasty." For these acts against the Sheriff's canine, the complainant was in violation of California Penal Code Section 600(A). For the allegation that Deputy 4 falsely charge the complainant with crimes he did not commit, and that Deputy 4 "arrested and falsely imprisoned" the complainant, the evidence showed that the alleged act or conduct did not occur. The complainant was properly arrested for the charges brought against him. The allegation that Deputy 4 "arrested and falsely imprisoned" the complainant was unfounded.

18.   Criminal Conduct – Deputy 4 violated the law when he imprisonment the complainant, tampered with witnesses, falsified official reports, tampered with the complainant's electronic device, assault and battery the complainant while under the color of authority, committed theft/grand theft, and committed attempted homicide.

Board Finding: Unfounded

Rationale: The complainant detailed that Deputy 4 violated the law when he imprisonment the complainant, tampered with witnesses, falsified official reports, tampered with the complainant's electronic device, assault and battery the complainant while under the color of authority, committed theft/grand theft, and committed attempted homicide. The complainant contended that "Deputy 4 violated the law and should be arrested for false imprisonment, witness tampering, falsification of official reports, federal charges of tampering with electronic device, assault and battery on a person while under the color of authority, theft, grand theft, and attempted homicide." The evidence showed that the alleged act or conduct did not occur. The allegations that Deputy 4 violated the law when he imprisonment the

-9-

complainant, tampered with witnesses, falsified official reports, tampered with the complainant's electronic device, assault and battery the complainant while under the color of authority, committed theft/grand theft, and committed attempted homicide is unfounded.

19.  Excessive Force - Deputy 5 used excessive force when he arrested the complainant.

Board Finding: Unfounded
Rationale: The complainant alleged that Deputy 5 used excessive force when he arrested him. In his written report, the complainant stated, "Officer [Deputy] 5 lost control over himself completely and began closed fist striking me in my face and head. In Deputy 5's written report, he advised, "I warned [the complainant] I would be using pressure points on him if he did not comply." When the complainant refused to comply, Deputy 5 applied pressure to the complainant's various pressure points in an attempt to submit him into complying. The complainant pulled away in retaliation and began to fight the deputies. In the BWC recording entitles, "2017-11-23-21-32-55-240ecb0903.mp4" at approximately the 28 minute and 17 second mark, the complainant was observed to resist the deputies and fought with them when they attempted to escort the complainant down the hillside. Deputy 5 applied pressure to the complainant's Mandibular Nerve as he attempted to gain control of the complainant and re-handcuff him. As he attempted to do so, the complainant was observed to forcefully pull away from Deputy 5 and grab ahold of Deputy 5's hands. Additionally, deputies assisted Deputy 5 in gaining control of the complainant. In the BWC recording, the complainant was observed to push away at Deputies 1 and 5 as he attempted to avoid being handcuffed. At this time, Deputy 1 used his CED on the complainant to no avail. Deputy 5 unholstered his CED and presented it to the complainant and advised that he would deploy it if the complainant continued to be non-compliant. The complainant complied, and he was handcuffed. Deputy 5 advised that if had not used force, the complainant could have injured he and his partners. He further advised that the complainant was strong, was willing to fight, and was able to overpower the deputies' physical actions. According to SDSD P&P Section 2.49 entitled, "Use of Force," Employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and established Departmental procedures, and report all use of force in writing. According to SDSD P&P Section 2.50 entitled, "Use of Lethal/less Lethal Weapons," employees shall not use or handle lethal or less lethal weapons in a careless or imprudent manner. Employees shall use these weapons in accordance with law and established Departmental procedures. According to SDSD P&P Addendum F entitled, "Use of Force Guidelines, "…the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies shall not lose their right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or overcome resistance (per 835(a) P.C.). Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident." The alleged act of "excessive force" did not occur and the finding was unfounded. Additionally, and in accordance with SDSD P&P, Deputy 5 documented his use of force in writing.  The evidence indicated that Deputy 5 used force that was reasonable and necessary and in accordance with SDSD P&P.

20.  False Report - Deputy 5 lied in his written report.

Board Finding: Unfounded
Rationale: The complainant stated that Deputy 5 lied in his written report. According to the complainant's written statement, Deputy 5 stated that he observed the complainant "reach over and strike Deputy 4 on the back." The complainant stated that that statement was "false testimonial" and that it did not occur. The complainant claimed that he "reached out and gently padded Officer [Deputy] 4's right shoulder. The complainant alleged that Deputy 5's statement "committed criminal deception, filed false report, bared false witness, and was a false accusation of criminal proportions…" There were a number of other instances in the complainant's written statement that he claimed false reporting against Deputy 5's written report. In the BWC recording entitles, "2017-11-23-21-32-55-240ecb0903.mp4" at approximately the 27 minute and 50 second mark, the complainant was observed to pat Deputy 5 on his left shoulder as he walked passed him. In his written report, Deputy 5 advised that the physical contact expressed by the complainant was not friendly or warranted, especially after already assaulting the deputies. The evidence shows that the allegation that Deputy 5 lied in his written report did not occur.

21.  Excessive Force - Deputy 5 attempted to choke the complainant.

Board Finding: Unfounded
Rationale: The complainant declared that Deputy 5 attempted to choke him. The complainant stated that while on the hillside, "The officers attempted to choke me out, but I would not let them do so." In Deputy 5's written report, he advised that during the use of force on the hillside, in an attempt to stand the complainant upright, he stood behind the complainant and used his left hand "to cradle his head." He then used his right thumb to apply pressure under the complainant's right ear, on his Mandibular Nerve. In Deputy 4's written report, he detailed what force he

implemented on the complainant during the use of force. According to the SDSD Addendum F, the carotid restraint technique is a method of rendering a subject unconscious by restricting the flow of blood to the brain by compressing the carotid sheath on the side of the subject's neck. Deputy 4 did not note that he attempted to place the complainant in a carotid restraint in his report. Upon viewing the BWCs, Deputy 5, was not observed place his arm around the complainant's neck. The evidence showed that the alleged act or conduct did not occur.

22. Misconduct/Truthfulness – Deputy 7 lied in her written report.

Board Finding: Unfounded
Rationale: The complainant declared that Deputy 7 lied in her written report. In the complainant's written statement, he stated that Deputy 7' written report was "a recertification of incorrect facts." The complainant said that Deputy 7 reported that he evaded arrest. The complainant argued that he did not evade arrest, but that he "fled from assaultive officers." The complainant further advised that he "fled from his assault to the assumed safety of his security fence." Per his own recount of events, the complainant confirmed that he evaded the Sheriff's deputies. The allegation that Deputy 7 lied in her written report was untrue/unfounded. The evidence showed that the alleged act or conduct did not occur.

23. Misconduct Procedure - Deputy 3 allowed his canine to attack the complainant for an extended duration of time.

Board Finding: Action Justified
Rationale: The complainant stated that Deputy 3 allowed his Sheriff's canine to attack the complainant approximately 5-15 minutes. According to the complainant's written statement, he described the canine as "…an attack trained animal [who] was without a handler to halt the unrelenting assault upon my person…" The complainant alleged that he was "continuously assaulted by the dog without let up for a seemingly interminable hellish period." Deputy 3 was not present with the dog to cease his attack on the complainant. According to Deputy 3's written report, he had assisted in the search for the complainant who had evaded officers. Deputy 3 was accompanied by his canine partner who was "actively tracking" the complainant's scent. While searching for the complainant and according to his written statement, Deputy 3 noted that "the brush became increasingly thick" as he continued and was unable to maintain control of the dog's lead/leash. Deputy 3 decided to drop the lead to allow the dog to continue ahead of him. Allowing the dog to track, freed the deputy to navigate through the thick vegetation more safely and allowed the dog to search the path ahead of Deputy 3. Once ASTREA located the complainant, Deputy 3 attempted to summon the dog, but the helicopter was too loud, and the dog did not return to Deputy 3. Deputy 3 worked his way through "approximately forty feet of extremely thick brush" in order to make his way to his dog and the complainant. Upon reaching the dog and the complainant, the dog ran up to Deputy 3 and he took control of the dog's leash. In the Deputy 3's BWC, when he reached the complainant and the dog, the dog was not observed to currently bite the complainant. The dog greeted Deputy 3 who took possession of his leash. According to the SDSD K9 P&P Manuel 4.3, "Control- handlers must exercise good judgment and maintain control of their canine at all times, whether on duty or off." According to the SDSD K9 P&P Manuel 4.3, "Canines certified and approved for department use may be used under the following conditions: For the protection of the handler, other law enforcement officers and citizens, to locate, apprehend or control a felony suspect when it would be unsafe for the deputies to proceed into the area, and to locate, apprehend or control armed misdemeanor suspects." Though Deputy 3 released the dog's lead, given the situation and the circumstances, Deputy 3 maintained control of his dog to the best of his ability. The allegation that Deputy 3 allowed his K9 to attack the complainant for an extended duration of time was justified. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

24. Excessive Force - Deputy 1 used excessive force when he arrested the complainant.

Board Finding: Action Justified
Rationale: The complainant alleged Deputy 1 used excessive force when he arrested him. The complainant stated, Officer [Deputy] 1 "got pissed off that I would not stand up and he stood over me while I was lying on the ground face up he stated, "I'm tired of this" and drew his taser gun and point blank shot me in the chest while I was lying on the ground presenting no threat." The complainant described Deputy 1 as "out of control, utilizing over-aggressive assaultive tactics against a defenseless citizen." Deputy 1 tasered the complainant while they were on the hillside. The complainant alleged that Deputy 1 used excessive force when he arrested the complainant. In his written report, the complainant stated, "Officer [Deputy] 1 lost control over himself completely and began closed fist striking me in my face and head. According to Deputy 1's written report, he and other deputies were attempting to walk the complainant down a steep hillside when the complainant ceased complying with their orders and "sat down in anger." The deputies ordered the complainant to stand up numerous times. When the complainant refused to comply with their orders, escalating uses of force were used on the complainant. The complainant continued to resist and assault the deputies. In response to the complainant's actions and "fearing" the physical altercation would get "extremely dangerous" on the steep incline, Deputy 1 drew his CED and deployed one cartridge towards the complainant, striking

-11-

him. "The prongs made good contact" and the complainant was described to experienced full Neuromuscular Incapacitation. According to SDSD P&P Section 2.49 entitled, "Use of Force," Employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and established Departmental procedures, and report all use of force in writing. According to SDSD P&P Section 2.50 entitled, "Use of Lethal/less Lethal Weapons," employees shall not use or handle lethal or less lethal weapons in a careless or imprudent manner. Employees shall use these weapons in accordance with law and established Departmental procedures. According to SDSD P&P Addendum F entitled, "Use of Force Guidelines," It shall be the policy of this Department whenever any Deputy Sheriff, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force, the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies shall not lose their right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or overcome resistance (per 835(a) P.C.). Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident. The use of force and subsequent reporting must be in accordance with the procedures set forth in these guidelines (see Policy and Procedures Section 6.48). In accordance with SDSD P&P, Deputy 1 documented his use of force in writing. Additionally, Deputy 1 advised that he activated his BWC for evidence. Deputy 1 reported that he reviewed the BWC recording for accuracy for his report. The BWC recordings were viewed and correlated with the use of force actions that were documented in Deputy 1's written report. The evidence indicated that Deputy 1 used force that was reasonable and necessary and in accordance with SDSD P&P. The evidence showed that Deputy 1 did not used excessive force when he arrested the complainant. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

25.  False Reporting - Deputy 1 lied in his written report.

     Board Finding: Unfounded
     Rationale: The complainant alleged that Deputy 1 lied in his written report. The complainant alleged that Deputy 1 lied regarding his recount of events as illustrated in his written report and stated that the BWC would prove Deputy 1 "to be a biased prevaricator; another cop that corruptly conspires with other cops to create a continuous fictitious phony, fraudulent official report…" The complainant went on to state that "Officer [Deputy] 1's narrative of events was entirely false. Officer [Deputy] 1 is a shameless liar attempting to make up stories to save his neck from the noose that he himself has knotted by his beastly behavior of assaultive actions which were unwarranted and unlawful. Officer [Deputy] 1 states the essential opposite of everything that happened." The complainant referred to Deputy 1 as a "bold-faced liar and a consummate liar," and advised that Deputy 1's "fabricated report" is made up by Deputy 1's "fictional imagination." Deputy 1 advised that he activated his BWC for evidence and that he reviewed the BWC recording for accuracy for his report. The BWC recordings were viewed and corroborated with the use of force actions that were documented in Deputy 1's written report. The evidence showed that Deputy 1 did not lied in his written report

26.  Excessive Force - Deputy 1 punched the complainant in the face.

     Board Finding: Action Justified
     Rationale: The complainant alleged Deputy 1 punched the complainant in the face. The complainant alleged that Deputy 1 punched him "because none of the other officer's aggressive assault tactics were working." Per Deputy 1's written report, he stated, "I tried pulling [the complainant's] arm behind his back, but he hit me in the chest area with a clenched fist, knocking me back and forcing my BWC to fall to the ground. Fearing for my safety, I pushed [the complainant] forward from behind and punched him on the right side of his face one time." While attempting to handcuff the complainant, he continued to resist and assault the deputies. Deputy 1 reported that he punched the complainant "three more times, but they had no effect" on the complainant. The BWC recordings were viewed and corroborated with the use of force actions that were documented in Deputy 1's written report. The allegation that Deputy 1 punched the complainant in the face did occur but was lawful, justified and proper.

27.  Excessive Force - Deputy 1 deployed his CED on the complainant.

     Board Finding: Action Justified
     Rationale: The complainant alleged that Deputy 1 deployed his CED on him. In the complainant's written statement, he reported that he never presented himself as a threat to any officers at any time. The complainant said he was already lying on the ground, flat on his back when Deputy 1 tasered him. Per Deputy 1's written report, he feared the physical altercation that the complainant and the deputies were in was getting extremely dangerous on such a steep hill. For this reason, Deputy 1 drew his CED and deployed his first cartridge striking the complainant. While attempting to handcuff the complainant, he again resisted and assaulted the deputies. Deputy 1 activated his CED and tasered the complainant, but it had no effect because the cables had snapped and tangled on the nearby bushes. As such,

Deputy 1 used his CED to do a "drive stun" for about two seconds on the complainant to assist Deputy 5 in gaining control over him. The complainant continued to not follow the deputies' instruction and struggled with the deputies. Fearing the complainant would seriously injury Deputy 5 or fall down the hill, Deputy 1 deployed his second CED cartridge at the complainant. The prongs "made good contact" on the complainant again and full Neuromuscular Incapacitation was achieved again. Deputy 1 went on to explain that he not used that type of force on the complainant, that either he or the other deputies could have been seriously injured or killed. Deputy 1 explained that he was unable to use his other force options (i.e. Oleoresin Capsicum (OC) spray, baton, or pistol) because of the nature of the elements while on scene. The BWC recordings were viewed and correlated with the use of force actions that were documented in Deputy 1's written report. The allegation that Deputy 1 deployed his CED at the complainant did occur and was lawful, justified and proper.

28. Excessive Force - Deputies 1, 4, and 5 applied pressure points on the complainant.

Board Finding: Action Justified
Rationale: The complainant alleged that Deputies 1, 4, and 5 applied pressure points on the complainant. While the decedent was sitting/laying on the hillside, refusing to comply with deputies' orders to stand and walk, he advised that deputies 1, 4, and 5 "were bending my fingers back, choking me, gouging me, bending my arms back…." Later, in his written statement, the complainant stated, "I was beat to a bloody mess." Deputies 1, 4, and 5 submitted written reports that articulated their reasoning for using escalating methods of force on the complainant. When the complainant continually refused to comply with their orders, escalating uses of force were used on the complainant. The complainant continually retaliated by resisting and assaulting the deputies. In response to the complainant's actions multiple methods of force were used to get the complainant to comply. According to SDSD P&P Section 2.49 entitled, "Use of Force," Employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and established Departmental procedures, and report all use of force in writing. According to SDSD P&P Section 2.50 entitled, "Use of Lethal/less Lethal Weapons," employees shall not use or handle lethal or less lethal weapons in a careless or imprudent manner. Employees shall use these weapons in accordance with law and established Departmental procedures. According to SDSD P&P Addendum F entitled, "Use of Force Guidelines," It shall be the policy of this Department whenever any Deputy Sheriff, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force, the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies shall not lose their right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or overcome resistance (per 835(a) P.C.). Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident. The use of force and subsequent reporting must be in accordance with the procedures set forth in these guidelines (see Policy and Procedures Section 6.48). In accordance with SDSD P&P, Deputies 1, 4, and 5 documented their uses of force in writing. The deputies were equipped with BWC. The BWC recordings were viewed and correlated with their uses of force actions that were documented in their written report. The evidence indicated that Deputies 1, 4, and 5 uses force were reasonable and necessary and in accordance with SDSD P&P. The allegation that Deputies 1, 4, and 5 applied pressure points on the complainant did occur and was lawful, justified and proper.

29. Excessive Force - Deputy 2 deployed her CED on the complainant

Board Finding: Action Justified
Rationale: The complainant stated Deputy 2 deployed her CED at him. In the complainant's letter, he reported that "Deputy 2 assaulted me with potentially lethal force, tasering me while I was posing no threat to her nor any other officer." According to Deputy 2's written report, she reported she observed the complainant refuse to comply with Deputy 4's commands and resisted arrest. Additionally, she witnessed the complainant attempt to assault Deputy 4. She witnessed Deputy 4 deploy his CED. When his CED did not make contact, she deployed her CED at the complainant "in an attempt to gain control and effect an arrest." Deputy 2's CED also did not make contact with the complainant. Deputy 2 advised that it was necessary for her to use force in an attempt to gain compliance of the complainant. Based on the circumstances and as illustrated in her written report, she believed it was necessary for the safety and welfare of the public, herself, and her fellow deputies. At that time, she did not know if the complainant had any weapons that could have posed a threat or caused injury, or possibly death to herself or others. Additionally, the complainant posed an immediate threat to Deputy 4 and herself "as he was engaging in felonious criminal activity, was not searched, and was uncooperative." The BWC recordings were viewed and corroborated with their uses of force actions that were documented in their written report. The evidence indicated that Deputy 2's use force was reasonable and necessary and in accordance with SDSD P&P. The allegation that Deputy 2 deployed her CED at the complainant did occur and was lawful, justified and proper.

30. Excessive Force - Deputy 2 "assaulted" the complainant.

-13-

Board Finding: Action Justified

Rationale: The complainant alleged that Deputy 2 assaulted him. In his written statement, the complainant advised that Deputy 2 "willing joined in the aggressive assault instead of trying to keep the peace. She failed to check her subordinate Officer [Deputy] 4's reign of truculent aggressions." Additionally, the complainant advised that, "Deputy 2 broke from duty and became a rogue cop, acting outside of the boundaries of the law and abetted Officer [Deputy] 4 in a criminal assault." According to Deputy 2's written report, she witnessed the complainant refused to comply with Deputy 4's orders and evaded Deputy 4. Deputy 2 witnessed the complainant take "a fighting stance and attempted to strike Deputy 4 with his right elbow." After witnessing an attempted aggravated assault on Deputy 4, Deputy 2 removed her CED and chased after the complainant. Deputy 2 observed Deputy 4 deploy his CED and noticed that the probes did not make contact, so she deployed her CED in an attempt to gain control of the complainant and effect an arrest. In her written report, Deputy 2 advised that it was necessary for her to use force in an attempt to gain compliance of the complainant. She believed it was necessary for the safety and welfare of the public, herself, and her fellow deputies. At the time that she used force on the complainant, it was unknown if the complainant had any kind of weapon that could have posed a threat or caused injury or death. For these reasons, Deputy 2 assisted Deputy 4 in his use of force. The BWC recordings were viewed and corroborated with their uses of force actions that were documented in their written report. The evidence indicated that Deputy 2's use force was reasonable and necessary and in accordance with SDSD P&P.  The allegation that Deputy 2 deployed her CED at the complainant did occur and was lawful, justified and proper.

31.  Excessive Force - Deputy 2 deployed her CED on the complainant's dog.

Board Finding: Action Justified

Rationale: The complainant alleged that Deputy 2 deployed her CED on his dog. As noted above, Deputy 2 assisted Deputy 4 in his use of force. During the use of force, while the complainant evaded the deputies, Deputy 2 noticed that the complainant's dog was approaching Deputy 4. The dog had already bitten the complainant and a witness and had caused "significant injuries" to both of them. The dog barked as it approached Deputy 4 and Deputy 4 believed that he was going to be bitten by the dog. Deputy 2 deployed a cartridge from her CED at the dog to prevent the dog from attacking Deputy 4. One probe of the CED probe made contact with the dog. The dog yelped and scampered away. Due to the aggressive nature of the dog, neither Deputy 2 or Deputy 4 entered the backyard. Deputy 2 deployed her CED at the complainant's dog for both her safety, as well as her partner's safety. In the BWC recording entitled, "2017-11-23-21-08-45-97b19e6325.mp4, at the 12 minute, 23 second mark, Deputy 2 was observed to deploy her CED at the complainant's dog. Prior to deploying her CED, the complainant's dog was observed to aggressively approach Deputy 4, barking hostilely. The allegation that Deputy 2 deployed her CED on the complainant did occur but was lawful, justified and proper.

32.  False Reporting - Deputy 8 lied in his written report.

Board Finding: Unfounded

Rationale: The complainant alleged that Deputy 8 lied in his written report when he misquoted a witness. In his written statement, the complainant alleged that Deputy 8's report was "another fabrication of facts, ugly lies, and a false report." He further stated that Deputy 8's "entire report is false and a gross manipulation of an official report." The complainant alleged that Deputy 8 misquoted a witness; however, the complainant was not present when Deputy 8 interviewed the witness and therefore, would have no knowledge of what was said to Deputy 8. In Deputy 8's written report, he interviewed a witness. That witnesses' statement was recorded in Deputy 8's report, which read, "[The complainant] told Brandon that he had pushed a deputy after the deputy attempted to take his cell phone away. [The complainant] also told a witness he was evading law enforcement," among other allegations. Deputy 8 merely reported what was told to him in a statement. The allegation that Deputy 8 lied in his written report when he misquoted a witness is unfounded. The evidence showed that the alleged act or conduct did not occur.

33.  Misconduct/Procedure - Unidentified deputies in Internal Affairs "ignored" the complainant's complaints against Deputy 4.

Board Finding: Unfounded

Rationale: The complainant alleged that unidentified deputies in the SDSD Internal Affairs division "ignored" his complaints against Deputy 4. In the complainant's written statement, he alleged that unidentified Internal Affairs deputies failed to investigate his complaint. According to a deputy of the SDSD Department of Inspectional Services, the complainant had filed a complaint with the SDSD Internal Affairs division. The complaint was closed, via correspondence, with no formal investigation performed, as the allegation was found not have been a policy or law violation. Nonetheless, the applicable content of SDSD Internal Affairs P&P Manuel Section 2.4 entitled, "Complaints," reads in part as follows: The Internal Affairs Unit is responsible for the administration of all formal

-14-

complaints which includes: review the complaint for classification and assignment, review of the completed investigations, filing of completed investigations, and maintain an index of all complaints. Reasons for not immediately investigating a complaint may include: Pending criminal case which would conflict with the investigation, inmate grievance procedure not followed, frivolous complaint (per 832.5 PC) or no nexus to employment, and no policy or law violation. It shall be the policy of this Department not to investigate those complaints, of a minor nature, which are received 30 days or more after the date of the alleged incident. If a complaint of this nature is received in writing, it shall be the responsibility of Internal Affairs to respond to the complainant. (emphasis added) Additionally, the applicable content of SDSD Internal Affairs P&P Manuel Section 2.5 entitled, "Investigations," reads in part as follows: The Internal Affairs Unit has the primary responsibility for the investigation of all complaints. The Internal Affairs Lieutenant will make the determination where the complaint will be investigated. The SDSD was contacted and an "Investigation Acknowledgment Letter" was requested. It was advised a complaint had not been filed by the complainant. If the complainant had filed a complaint, then he would have received the correspondence letter. The letter essentially means that a cursory investigation was initiated, and no policy or criminal law violation was not found upon receipt of the initial complaint. The allegation that that unidentified deputies in the SDSD Internal Affairs division "ignored" his complaints against Deputy 4 is untrue/unfounded. The evidence showed that the alleged act or conduct did not occur.

34.  Misconduct/Procedure - Unidentified deputies in Internal Affairs denied the complainant access to case related evidence.

     Board Finding: Action Justified
     Rationale: The complainant alleged that unidentified deputies in the SDSD Internal Affairs division denied him access to case related evidence. In the complainant's written statement, he stated, "Internal Affairs has unreasonably denied me access to the BWC. I have repeatedly requested, demanded, and have placed a court motion for the BWC evidence. It is out right conspiratorial by the SDSD to deny me the BWC evidence." The applicable content of SDSD P&P Section 6.131 entitled, "Body Worn Camera," reads as follows: All audio, images and media associated with the BWC are the property of the San Diego County Sheriff's Department and will not be copied, released or disseminated in any form or manner outside the parameters of this policy without the express written release from the San Diego County Sheriff or his/her designee. Sheriff's Detectives assigned to conduct criminal investigations, creating a secondary copy of a BWC recording subsequent to an official investigation, are exempt from the above. Under no circumstances will any employee of the San Diego County Sheriff's Department make a personal copy of any recorded event. All digital evidence collected using the BWC is considered property of the San Diego County Sheriff's Department and is for official use only. Accessing, copying, forwarding or releasing any digital evidence for other than official law enforcement use, or contrary to this procedure, is strictly prohibited. Public release of digital evidence is prohibited unless approved by the Sheriff or his designee. Deputies will typically not allow citizens to review recordings; however, deputy discretion is allowed to replay the recording for citizens at the scene in order to mitigate possible minor complaints. Detectives are responsible for reviewing, tracking digital evidence associated with their assigned cases, and forwarding digital evidence to the District Attorney or City Attorney when appropriate. Digital evidence captured by BWC shall be treated as official investigative records and handled pursuant to existing Department policies and procedures. According to the above policy, it is the SDSD policy to not release BWC recordings to the public, with the exception of officer involved shootings. BWC recordings are generally not releasable to preserve the integrity of the investigation and for the privacy of those involved. The video evidence released is exempt under the California Public Records Act and law enforcement's decision to release certain portions of the video evidence does not otherwise waive that privilege. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

35.  Misconduct/Procedure - The Sheriff's Department refused to supply the complainant with case related evidence.

     Board Finding: Action Justified
     Rationale: The complainant advised that the Sheriff's Department refused to supply him with case related evidence. The complainant advised that he requested a copy of the recordings from the incident, including deputies BWC, ASTREA recordings, radio call log, etc. but has been denied. The applicable content of SDSD P&P Section 2.37 entitled, "Dissemination of Information," reads as follows: Employees shall treat the official business of this Department as confidential. Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established Departmental procedures. The applicable content of SDSD P&P Section 3.1 entitled, "Release of Information Concerning Sheriff's Department Personnel," reads in part as follows: Personal information pertaining to Departmental personnel is considered to be confidential. All inquiries from outside the Sheriff's Department, concerning Sheriff's employees, shall be directed to the Sheriff's Personnel Division. The Personnel Division shall release information at its discretion and may request the inquiring party to mail his/her *request* on letterhead stationery. Additionally, the policy states, "….the Personnel Division shall consult with the Assistant Sheriff, Human Resource Services Bureau regarding the release of information. The complainant was not

a member of the media, but was a private person requesting the records for his personal review. Nonetheless, the following policy is relevant to his allegation: The applicable content of SDSD P&P Section 7.3 entitled, "Media Public Relations," reads in part as follows: Detective Unit supervisors are responsible for the dissemination of follow-up investigation information. Except as otherwise provided in this policy, no other member of the Department shall release any information pertaining to cases which are under investigation. Previously disseminated news releases by the Department may be reiterated by any department member. The Public Records Act and Government Code Section 6254(f) require that specific information be released to the public. The release of any information regarding an internal investigation of alleged misconduct by members of the Department or disciplinary action taken as a result of any such investigation shall be made only by the Sheriff's Internal Affairs Division or their designee. The following documents shall generally be made available for public examination: Activity Logs, Arrest Reports, and Crime/Incident Reports. The complainant was given a copy of all case related report; crime and incident reports. The allegation that the Sheriff's Department refused to supply the complainant with case related evidence is untrue/unfounded. The evidence indicated that the complainant was given all crime and incident reports. He was not given the video recordings per policy. The evidence showed that the alleged act or conduct did occur but was lawful, justified and proper.

36.  Misconduct/Procedure - The District Attorney's Office denied the complainant access to case related evidence.

Board Finding: Summary Dismissal
Rationale: The complainant alleged that unidentified persons from the District Attorney's Office denied him access to case related evidence. "The District Attorney's Office has unreasonably denied me access to the BWC. I have repeatedly requested, demanded, and have placed a court motion for the BWC evidence. It is out right conspiratorial to deny me the BWC evidence. The Review Board lacks jurisdiction Per CLERB R&R 4.1: the Review Board shall have authority to receive, review, investigate and report on citizen complaints filed against peace officers or custodial officers employed by the County in the Sheriff's Department or the Probation Department; CLERB lacks authority over the DA's office.

37.  Misconduct/Procedure - The Supreme Court denied the complainant access to case related evidence.

Board Finding: Summary Dismissal
Rationale: The complainant alleged that unidentified persons from the Supreme Court have denied him access to case related evidence. In his written statement the complainant stated, "The Supreme Court has unreasonably denied me access to the BWC. I have repeatedly requested, demanded, and have placed a court motion for the BWC evidence. It is out right conspiratorial to deny me the BWC evidence." As noted above, The Review Board lacks jurisdiction Per CLERB R&R 4.1: the Review Board shall have authority to receive, review, investigate and report on citizen complaints filed against peace officers or custodial officers employed by the County in the Sheriff's Department or the Probation Department; CLERB lacks authority over the Supreme Court.

---

**18-029**

1.  Misconduct/Procedure – The aggrieved was not given his magazine/periodicals on 02-17-18.

Board Finding: Action Justified
Rationale: The complainant alleged that the aggrieved had not received any of the magazines that she had ordered on his behalf. The complainant said she had ordered "Maxim and/or Spice" magazines. She suspected that unidentified deputies refused to give the aggrieved his mail because they were "bias and prejudice." Though the complainant alleged that the incident occurred on 02-14-18, during the course of the investigation, it was discovered that the aggrieved's mail was withheld on 02-17-18. According to records received from the SDSD, it was noted that an unidentified deputy completed a SDSD Contents Unacceptable Notice (J-320 form) while at the jail. On the form, the deputy identified the sender as "Inmatemags.com" and it was stated that the mail was "returned to sender" due to the mail containing "nudity, sexual activity." The applicable content of the SDSD Detention Services Policies and Procedures (DSB P&P) Section P.3 entitled, "Inmate Mail," states, "Any of the following will cause incoming U.S. mail to be rejected: (c.) U.S. mail depicting nudity, obscenities, suggestive images, or other offensive materials. II. Procedures for handling magazines, periodicals, and books: Magazines, periodicals, and new soft covered books delivered to the facility by publishers, bookstores, or book clubs via the U.S. Postal Service may be accepted. The subject matter of some magazines, periodicals and new soft covered books shall establish whether or not they are allowed in the detention facility housing units. (A.) The following items are not usually allowed inside the facility due to their construction or subject matter. 6. Inmates are prohibited from possessing or receiving materials that show frontal nudity of either gender as described herein.  Prohibited materials include personal photographs, drawings, magazines and/or pictorials. Frontal nudity includes either the exposed female breast(s) and/or the genitalia of either

-16-

gender. III. Rejection/Appeal Process: (C.) In cases in which incoming mail is withheld (other than drugs/narcotics items), the housing deputy is to enter a mail rejected "MREJ" event type into the receiving inmate's JIMS history. The entry will include the name and address of origin and the specific reason the article was not deliverable. The evidence showed that the allegation that the aggrieved was not given his magazine/periodicals on 02-17-18 did occur but was lawful, justified and proper.

2. Misconduct/Procedure – The aggrieved did not receive his magazines and/or mail.

   Board Finding: Summary Dismissal
   Rationale: The complainant alleged that the aggrieved had not received mail that she had sent to him, nor had she received mail that she claimed was sent from him to her. She suspected that unidentified deputies refused to give the aggrieved his mail because they were "bias and prejudice." While investigating the allegations, it was discovered that the allegations regarding the aggrieved's mail were all incidents that occurred in 2015 and 2016. The issues with the aggrieved's mail were documented in Inmate Grievances, Grievance Responses, on Contents Unacceptable Notice, and in entries noted in the computerized jail management systems (History of Mail Rejected). All documented incidents were dated 09-06-15 and 05-18-16. The Review Board does not have jurisdiction because the complaint was not timely filed. The following CLERB rules apply: 4.4 Citizen Complaints: Jurisdiction. The Review Board shall have jurisdiction in respect to all citizen complaints arising out of incidents occurring on or after November 7, 1990; provided, however, that the Review Board shall not have jurisdiction to take any action in respect to complaints received more than one year after the date of the incident giving rise to the complaint, except that if the person filing the complaint was incarcerated or physically or mentally incapacitated from filing a complaint following the incident giving rise to the complaint, the period of incarceration or incapacity shall not be counted in determining whether the one year period for filing the complaint has expired. CLERB lacks jurisdiction.

3. Discrimination/Other – Unidentified deputies did not "retrieve" the aggrieved's property because they were "biased and prejudiced."

   Board Finding: Unfounded
   Rationale: The complainant alleged that unidentified deputies refused to retrieve property from the aggrieved's property bag. The complainant described the unidentified deputies' actions as "heinous and hateful." Though the complainant alleged that the incident occurred on 02-14-18, during CLERB's investigation, it was discovered that the aggrieved's property was retrieved on 03-26-17 and on 04-12-17. In a telephonic interview with the complainant, she explained that prior to the close of this investigation, she was able to retrieve the aggrieved's property when he was released from jail. The evidence showed that the allegation that unidentified deputies did not "retrieve" the aggrieved's property because they were "biased and prejudiced" was unfounded.

4. Misconduct/Procedure – The aggrieved reported to the complainant that toilets at the detention facility did not work for three days or more.

   Board Finding: Summary Dismissal
   Rationale: The complainant advised, "I received a call from my son. He called me and told me the plumbing (toilets) haven't been working for 48 hours. Today (02-15-18) is the 3rd day." CLERB lacks jurisdiction over the maintenance of jail facilities. The allegation of the plumbing/toilets not working, does not describe any deputy misconduct and was referred to the Sheriff's Department for follow-up. The Review Board lacks jurisdiction as it cannot take any action in respect to complaints per CLERB Rules & Regulations 4.1 and 4.4. CLERB lacks authority over facility maintenance issues and jurisdiction over the incident giving rise to this complaint that occurred on or prior to 12-14-18.

---

**18-033**

1. Misconduct/Procedure – PO 1 did not inform the complainant why he was arrested.

   Board Finding: Unfounded
   Rationale: The complainant alleged that PO 1 failed to advise him why he was being arrested. In the complainant's written statement, he advised, "I asked why [I was being taken to jail] and was told by PO 1 and his supervisor that they have ten days to file a charge. If not, then I would be released." In PO 1's written report, he stated, "The undersigned informed the offender he would be returned to custody for the violations of leaving the county, for using alcohol, and for possession of the folding knife. Additionally, PO 1 further advised that during the compliance check "the offender admitted to traveling [outside the county lines] on 12-09-17. The undersigned admonished the offender regarding his violation…" In the complainant's written statement, he did not refute two of the three violation charges against him; that he violated the terms of his probation when he consumed alcohol, or that he had traveled outside

of the county. The evidence shows that the allegation that PO 1 failed to advise him why he was being arrested did not occur.

2.  False Reporting – Probation PO 1 lied in his Probation Report.

    Board Finding: Unfounded
    Rationale: The complainant alleged that PO 1 lied in his written report when he stated that officers "found a weapon (firearm, knife)" inside his vehicle. The complainant was arrested for the violation, went to jail, and ultimately went to court. The complainant attended his court hearing on 12-21-17, and advised that his lawyer requested pictures of the evidence. The complainant advised that no pictures were provided by the Probation Department because that evidence "did not exist." The complainant stated that while at court, the lack of proof of evidence was argued and the allegations against the complainant were dismissed. According to PO 1's written report, "A search of the offender's vehicle was conducted, which revealed a folding knife located in the driver's side door." On an 'Adult Field Service Search Report and Contraband Receipt,' PO 1 detailed the items that were seized from the possession of or from the premises controlled by the complainant. On the receipt, PO 1 noted item #3 as a "folding knife found in the vehicle driver's side door." Along with the contraband receipt, PO 1 included a photo of a pocket knife. A copy of the photo was provided to CLERB. The black and white photo copy was of a partially unfolded 'Gerber' pocket knife with a black grip. Contrary to the complainant's statement, court documents dated 12-21-17, revealed that the complainant admitted to the violations of conditions of his mandatory supervision. He waived his hearing and his mandatory supervision was summarily revoked; he was to serve his remaining term in custody. The complainant was remanded to custody without bail. The evidence showed that the allegation that PO 1 lied in his written report did not occur.

3.  False Reporting – Probation PO 1 wrote a second report in which he did not note the complainant's probation violations.

    Board Finding: Unfounded
    Rationale: The complainant alleged that PO 1 "wrote a new Probation Report removing these fictional items from the report." In his written statement, the complainant alleged that PO 1 wrote a second report, in which he did not note the violation that the complainant possessed "a firearm, ammunition, or deadly weapon." On 02-28-18, CLERB contacted the Probation Department and requested "Any and all investigative report(s) relating to the search at the home on 12-11-2017, to include evidence seized." In response, the San Diego County Probation Department (SDCPD) supplied numerous reports, including one Mandatory Supervision Sentencing After Revocation Report. On 01-04-19, an email was sent to the SDCPD confirming that only one report was written, as the complainant had alleged that PO 1 wrote a second report in which he did not note the complainant's probation violations. In an electronic mail correspondence from the Probation Department, it was confirmed that PO 1 only submitted one report. Evidence showed that PO 1 only submitted one report and the allegation was unfounded.

4.  False Arrest – PO 1 arrested the complainant for a crime he did not commit.

    Board Finding: Unfounded
    Rationale: The complainant alleged that PO 1 arrested him for a crime he did not commit; that he was not in possession of a knife. On 12-11-17 a 'Probation Compliance Visit' was conducted at the complainant's home. During the search, and according to PO 1's written report, "A search of the offender's vehicle was conducted, which revealed a folding knife located in the driver's side door." On an 'Adult Field Service Search Report and Contraband Receipt,' PO 1 detailed the items that were seized from the possession of or from the premises controlled by the complainant. On the receipt, PO 1 noted item #3 as a "folding knife found in the vehicle driver's side door." Along with the contraband receipt, PO 1 included a photo of a pocket knife. A copy of the photo was provided to CLERB. The black and white photo copy was of a partially unfolded 'Gerber' pocket knife with a black grip. As such, the complainant was arrested for violating the terms of his probation. According to the complainant, he alleged that the charge of possessing "a firearm, ammunition, or deadly weapon" was a false charge. Court documents confirmed that the complainant attended his court hearing on 12-21-17. Contrary to the complainant's statement, court documents dated 12-21-17, revealed that the complainant admitted to the violations of conditions of his mandatory supervision. He waived his hearing and his mandatory supervision was summarily revoked; he was to serve his remaining term in custody. He was remanded to custody without bail. The evidence showed that the allegation that PO 1 arrested the complainant for a crime he did not commit did not occur.

---

**18-039**

1.  Misconduct/Procedure – Deputies 1 and 2 "provoked" an inmate to start a fight with the aggrieved.

Board Finding: Unfounded

Rationale: Per the complainant's written statement, she stated, unidentified deputies, later identified as Deputies 1-2, "provoked" another inmate to start a fight with the aggrieved. The complainant advised that she had witnesses, inmates who were housed with the aggrieved, inform her that deputies provoked inmates to start a fight or bullying the aggrieved. Neither the complainant nor her witnesses specify how deputies "provoked" the other inmate into fighting the aggrieved; however, the complainant stated, "I have speculation that he was set up by the deputies who I've heard are aggressive and like to bully and set up the inmates." According to jail surveillance video titled, 10-50-39-0.cx3," at the start of the video, two deputies were observed to enter the module and perform a security check. During the performance of their duties, the deputies were observed to walk through the common area, dayroom, bathroom, and sleeping area of the housing unit. The surveillance videos were without sound. The deputies were not observed to engage inmates in conversation or stay for a prolonged visit. According to an Incident Report, deputies had only become aware of the altercation/assault when the victim brought the assault to their attention. According to an Incident/Crime Report, the inmate contacted deputies and informed them that he needed to be moved from the dorm after an argument over a newspaper. Evidence indicated that the allegation that Deputies 1 and 2 "provoked" the victim to start a fight with the aggrieved was unfounded. The evidence shows that the alleged act or conduct did not occur.

2. Misconduct/Procedure – Deputies 1 and 2 segregated the aggrieved from other inmates "as punishment."

Board Finding: Action Justified

Rationale: Per the complainant's written statement, she alleged, the aggrieved was segregated from other inmates "as punishment." The complainant explained that she received a "disturbing call" from other inmates housed with the aggrieved. The inmates explained that the aggrieved was involved in an altercation with another inmate and "he [the aggrieved] was put in a 'hole.' The complainant said she called the jail and an unidentified non-sworn, professional staff member informed her "that he [the aggrieved] was in a restricted area. [The aggrieved] was then put in a "hole," a restricted room, by himself and no one else is to be put in there with him as a punishment." The complainant was informed that the aggrieved was involved in a "fight." The complainant argued that the aggrieved was "defending himself from this violent inmate." According to an Incident Report (the aggrieved's Segregated Housing Order), after the incident, the aggrieved was transferred to Administrative Segregation (Ad-Seg), pending an investigation and a disciplinary hearing for jail rule violations and criminal act. The aggrieved was initially charged with violating Jail Rules and Regulations #103 – Threaten/Assault Staff/Inmate and #701 – Interfering with Jail Operations. The report detailed that the aggrieved was determined to be the suspect in the battery. At the conclusion of the investigation, the aggrieved was transferred back to his prior status and housing. Evidence indicated that the allegation that the aggrieved was segregated from other inmates "as punishment" did occur and was justified and proper.

---

**18-043**

1. Death Investigation/Natural Death – While in the custody of the Sheriff's Department at the Vista Detention Facility, Stephen Clifford Maas was found lying unresponsive in his bed.

Board Finding: Action Justified

Rationale: On 03-21-18, 69-year-old Stephan Maas was arrested and booked on five counts of PC§ 288, Lewd Act upon a Child; he had no prior criminal history. Medical staff evaluated Maas who told them he had preexisting COPD (chronic obstructive pulmonary disease), lung cancer, and throat cancer. He was classified and housed in EOH (Enhanced Observation Housing) due to his charges, high bail, and first time in jail. On 03-22-18, at about 2:40 a.m., Inmate Maas was found unresponsive in his cell. Life-saving measures were administered and Maas was transported to Tri-City Medical Center where he was pronounced deceased. There were no visible signs of trauma and his death appeared to be of natural causes. An external autopsy was performed and the Medical Examiner determined the cause of death was Atherosclerotic Cardiovascular disease with the contributing factor of Lung Cancer and COPD (chronic obstructive pulmonary disease). The manner of death was natural. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

---

**18-046**

1. Misconduct/Discourtesy – Deputy 1 was angry and disrespectful toward the complainant.

Board Finding: Not Sustained

Rationale: The complainant said that Deputy 1 angrily accused him of being disrespectful to his (deputy's) intelligence and ordered him to get out of his truck. Deputy 1 provided information during the course of CLERB's investigation that conflicted with that of the complainant. Sheriff's Policy 2.22, Courtesy requires that employees be courteous to the public, tactful in the performance of their duties, and that they must control their tempers, and exercise patience and discretion even in the face of extreme provocation. The Body Worn Camera (BWC) footage of this incident was partial and only recorded the ending of this incident; it did not support the allegation. As attitudes are subjective in nature and there was no evidence to support a violation of policy, there was insufficient evidence to prove or disprove the allegation.

2.  Excessive Force – Deputy 1 "forcibly" removed the complainant from his vehicle, shoved him against a door jamb, and pulled his handcuffed arms up behind his back.

    Board Finding: Action Justified
    Rationale: The complainant said, "When I started to exit the vehicle Deputy 1 grabbed my arm and pulled me from my truck and forcibly shoved me against the door jam of the truck, and handcuffed me with my hands behind my back and painfully pulled my arms up my back behind me - all of this is happening in the road..." Deputy 1 provided information during the course of CLERB's investigation that conflicted with that of the complainant. Sheriff's Policy 2.49, Use of Force stipulates that employees shall not use more force in any situation than is reasonably necessary under the circumstances, be in accordance with law and established Departmental procedures, and that it must be reported in writing. There were no Use of Force reports associated with this incident. The actions described by both the complainant and the deputy, which were utilized by Deputy 1 in response to the complainant's non-compliance were within the Use of Force Guidelines which states that when verbalization proves ineffective, arm guidance or a firm grip may suffice to overcome resistance; and only that which results in injury must be documented. The evidence showed the guidance actions taken by Deputy 1 in response to the complainant's non-compliance were lawful, justified and proper.

3.  Misconduct/Intimidation – Deputy 1 applied pressure to the handcuffed complainant and said, "Do you see how fast this can escalate."

    Board Finding: Action Justified
    Rationale: The complainant said that "while causing him physical pain by shoving his handcuffed arms up in the air behind his back, Deputy 1 asked me if he "had not been professional enough", and then taunted me by asking me "do you see how fast this can escalate?" to which I reply 'yes sir'." The definition of "intimidate" is to frighten or threaten someone, usually in order to persuade the person to do something he or she does not wish to do. Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. The evidence showed the actions taken by Deputy 1 in response to the complainant's non-compliance were lawful, justified and proper.

4.  Misconduct/Procedure – Deputy 1 denied the complainant's request for his shirt and shoes.

    Board Finding: Action Justified
    Rationale: The complainant said, "I asked Deputy 1 if I could put on my shoes and shirt before going to jail and he said no. I had just finished surfing before this encounter and my hair was still wet and I was only wearing my jeans." Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. The evidence showed the actions taken by Deputy 1 were lawful, justified and proper.

5.  Excessive Force – Deputy 1 forced the complainant over the hood of his truck with his arms behind him.

    Board Finding: Action Justified
    Rationale: The complainant said, "At this time another San Diego Sheriff arrives and stands on the sidewalk facing me and I am moved by Deputy 1 from the being shoved against the door jam to being forced over the hood of my truck with my arms behind me." Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Sheriff's Policy 2.49, Use of Force stipulates that employees shall not use more force in any situation than is reasonably necessary under the circumstances, be in accordance with law and established Departmental procedures, and that it must be reported in writing. There were no Use of Force reports associated with this incident. The actions described by both the complainant and the deputy, which were utilized by Deputy 1 in response to the complainant's non-compliance were within the Use of Force Guidelines which states that when verbalization proves ineffective, arm guidance or a firm grip may suffice to overcome resistance; and only that which results in injury must be documented. The evidence showed the guidance actions taken by Deputy 1 in response to the complainant's non-compliance were lawful, justified and proper.

Ex. W - 759

<u>**18-069**</u>

1.  Misconduct/Discourtesy - A non-sworn Sheriff's employee laughed at the complainant.

    <u>Board Finding</u>: Summary Dismissal
    <u>Rationale</u>: On 04-28-18, the complainant attempted to visit the aggrieved who was incarcerated at the GBDF.  While at the facility the complainant said she was "literally laughed at" by one of the visitation staff members.  As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

2.  Misconduct/Discourtesy – A non-sworn Sheriff's employee hung up on the complainant.

    <u>Board Finding</u>: Summary Dismissal
    <u>Rationale</u>: After the complainant's visit to the GBDF, she attempted to contact a supervisor by phone.  According to the complainant, when she called GBDF and asked to speak with the booking supervisor, an employee hung up on her.  As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

3.  Misconduct/Discourtesy - A non-sworn Sheriff's employee did not provide the complainant with a response to her inquiry.

    <u>Board Finding</u>: Summary Dismissal
    <u>Rationale</u>: While at the GBDF to visit the aggrieved the complainant arrived late and visiting hours were over.  The complainant said when she asked a Sheriff's employee if there was a hotel nearby, the employee replied, "You have a phone.  GPS should be able to help you with that."  As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

4.  Misconduct/Procedure - A non-sworn Sheriff's employee did not provide information to the complainant about the mail room at GBDF.

    <u>Board Finding</u>: Summary Dismissal
    <u>Rationale</u>: When attempting to visit the aggrieved at the GBDF, the complainant spoke with a non-sworn Sheriff's employee.  The complainant stated that the employee did not explain to her that the GBDF mail room was shut down and all mail was being forwarded to Las Colinas Detention and Reentry Facility and then sent back to GBDF.  As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

5.  Misconduct/Truthfulness – A non-sworn staff member's "lied" to the complainant.

    <u>Board Finding</u>: Summary Dismissal
    <u>Rationale</u>: The complainant stated that on 05-06-18, she went to the GBDF to visit the aggrieved. While attempting to schedule a visit, the complainant said she was instructed by a non-sworn Sheriff's employee to wait in the visit waiting room to see if anyone had canceled a visit, that way she could take their visit time in their absence. The complainant later learned that she was not allowed to take another's scheduled visit time; she alleged that she was lied to and was given misinformation. Additionally, she was informed that visits with inmates by appointment only. As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

6.  Misconduct/Procedure – Unidentified Sheriff's deputies only allowed the aggrieved one call in three days and provided him with an incorrect pin number.

    <u>Board Finding</u>: Not Sustained
    <u>Rationale</u>: The complainant alleged the aggrieved was only allowed one call every three days, while in custody at the GBDF, and was not given the correct PIN number for the phone after requesting it from multiple deputies. Reports provided by the Sheriff's Department showed the aggrieved was booked into the San Diego Central Jail (SDCJ) on 04-25-18. He was moved twice on that day and his classification was changed from level four to level five.  There were no entries referencing phone usage or dayroom access.  On 04-26-18, the aggrieved was moved from SDCJ to GBDF and was given dayroom time at around 8 p.m. where he would have had access to a phone. On 04-27-18, there were no documentation showing whether the aggrieved had access to a phone that day. According to the

Sheriff's Department, sometimes GBDF is so busy that not all dayroom times are logged into the computer system. If an inmate, who is in Ad-Seg, had access to the dayroom, they would also have had access to phones. According to SDSD Patrol Procedures Manual Section P.2, "Collect calls and debit systems will be available for use on telephones. Debit time will be purchased by the inmates through the Sheriff's Commissary." There was no documentation in the policy and procedure manual that stated deputies would have knowledge of, or provide, pin numbers for phone usage to inmates. Therefore, since there was not enough evidence to prove that the aggrieved did or did not access to the dayroom or phones, on the days mentioned above, the allegation was not sustained.

7.  Misconduct/Procedure – A non-sworn SDSD employee was unable to adequately address the complainant's questions.

    Board Finding: Summary Dismissal
    Rationale: While attempting to visit the aggrieved at the GBDF, the complainant stated she asked the booking clerk questions but "he did not have a single answer" except to verify that the aggrieved was at GBDF and in the system. She further stated, "He fumbled over his words and didn't know anything." As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

8.  Misconduct/Truthfulness- Unidentified Sheriff's employees gave the complainant "false information."

    Board Finding: Not Sustained
    Rationale: After her attempt to visit the aggrieved at the GBDF, the complainant stated she called GBDF multiple times and was given false information when she asked for the Watch Commander's name or information. The complainant provided no further information with regards to who she spoke with. According to CLERB's liaison with the SDSD, the main phone line is typically answered by civilian/non-sworn staff. Based on documentation provided by the SDSD, Deputy 3 was identified as the deputy assigned to the position of Visit Deputy on the day of the allegation. Deputy 3 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Without further evidence it was not possible to confirm whether the allegation occurred, and the complaint was not sustained.

9.  Misconduct/Procedure - Unidentified Sheriff's employees or deputies did not provide the aggrieved mail, including legal documents, for three weeks while he was housed at GBDF.

    Board Finding: Not Sustained
    Rationale: The complainant alleged that during the three weeks the aggrieved was housed at the GBDF he had not received any of her mail and it still had not been returned to her. Also, legal documents, sent by the aggrieved's attorney, did not reach the aggrieved. Information provided by the Sheriff's Department did not confirm any mail restrictions during the period the aggrieved was housed at GBDF. According to the Administrative Lieutenant from the Las Colinas Detention and Reentry Facility, where the county jail mail room was located; there were no known mail issues in April 2018. There was no evidence that showed the mail room was shut down for three weeks. According to a phone interview with the aggrieved, he stated he did not receive two books sent to him. He also stated the complainant sent him stamps and envelopes, which was not allowed in custody. The stamps and envelopes were not given to the complainant, nor were they returned to the sender. Documents showed that on 05-11-18, a letter was received from the complainant. The mailing was rejected due to it containing blank envelopes. The evidence showed that that particular mailing was rejected, due to policy violation, but there was no other evidence indicating that other mailings were rejected and/or not received by the aggrieved. Mail was rerouted through LCDRF; however, there was no indication the mail room was "shut down" for any period of time. Therefore, without further evidence the allegation was not sustained.

10. Misconduct/Discourtesy – A non-sworn staff member responded rudely to the complainant's request.

    Board Finding: Summary Dismissal
    Rationale: The complainant attempted to schedule a visit with the aggrieved and claimed to have waited for "over an hour." She claimed to have repeatedly asked for an update, but was ignored and was responded to "rudely" by a non-sworn staff member. In an email correspondence from CLERB's liaison with the SDSD, it was advised that that staff members in the visiting area consist of sworn and non-sworn staff. Typically, there is one deputy assigned as a Visit Deputy to provide security for the visitors and lets them into their visits. Deputy 3 was identified as the Visit Deputy on the day of the allegation. The allegation was not against Deputy 3; however, he was identified as a witness and provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

11. Excessive Force - Deputy 1 grabbed the aggrieved's waist chain and "jerked him out of his seat" during a visit.

Board Finding: Not Sustained
Rationale: The complainant stated that on 05-06-18, she went to the GBDF to visit the aggrieved. During the visit, she requested that Deputy 1 loosen the aggrieved's handcuffs, as she claimed she could see his hands turn purple. The complainant further stated, "The deputy rolled his eyes, walked up and took the cuffs off one at a time and then cranked them tighter." The complainant spoke out and became extremely upset. In response, the deputy pulled on the chain that was attached to the aggrieved's waist and then locked the device on the wall behind him. The complainant said, "This caused him [the aggrieved] to jerk back out of his seat while he was seated at the phone. This was not only cruelty, but it was witnessed and uncalled for." Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. There was no available surveillance video documenting the interactions between Deputy 1 and the aggrieved during her visit.  During a phone interview, the aggrieved advised that he was finishing a non-contact visit with the complainant when the incident occurred.  He did not stand up right away as he was saying goodbye to the complainant. The deputy pulled on his waist chain and said it was time to go. The incident was witnessed by the complainant. The aggrieved said he sustained bruises on his waist from the incident; however, he did not mention sustaining any bruising or discoloration on his hands as a result of the chain being pulled. Evidence showed that the deputy did pull on the aggrieved's chain. There was a lack of evidence proving the aggrieved was "jerked" out of his seat as claimed by the complainant. Absent information provided by an independent witness to the incident or video or audio recordings of the interaction there was insufficient evidence to prove or disprove the allegation.

12. Misconduct/Procedure - Deputy 1 refused to provide the complainant his name and badge number.

Board Finding: Not Sustained
Rationale: During a visit with the aggrieved at the GBDF, the complainant stated she addressed Deputy 1 by yelling at him, as she demanded his name and badge number.  According to the complainant, Deputy 1 made eye contact with her, but ignored her.  Deputy 1 ignored the complainant as he unhooked the aggrieved's waist chain and allowed the aggrieved to walk out of the visiting area. Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. During a phone interview, the aggrieved stated that after the visit, he heard the complainant say something from behind the glass partition, but he could not clearly hear what she said. The incident occurred in the non-contact area and, as such, without using the phone that separated the glass partition in the visiting area, one could not hear what the person on the other side of the glass said.  If the complainant asked for the deputy's name and badge number, it would be comprehensible that one was not able to hear what was said.  There was no available surveillance video documenting the interactions between Deputy 1 and the aggrieved during her visit.   Absent information provided by an independent witness to the incident or video or audio recordings of the interaction there was insufficient evidence to prove or disprove the allegation.

13. Misconduct/Procedure – Non-sworn Visiting room staff members provided incorrect information to the complainant when she asked about "sending books" and the "protocol for a confidential marriage and notary's information."

Board Finding: Summary Dismissal
Rationale: The complainant stated that as she walked into the visiting waiting area at the GBDF, she stopped and asked a non-sworn staff member questions regarding "sending books, the protocol for a confidential marriage ceremony, and notary information."  The complainant alleged that she was told incorrect information and was provided documents that were outdated; the document given to her regarding confidential marriage ceremonies was dated from 2014. As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

14. Misconduct/Procedure - A non-sworn Sheriff's employee refused to provide the complainant the name of the booking supervisor.

Board Finding: Summary Dismissal
Rationale: While at the GBDF, the complainant stated that on 05-09-18, when she spoke with a non-sworn Sheriff's employee that she requested the name of the booking supervisor. The non-sworn employee kept demanding that she provide him with the inmate's information and her last name.  Since the booking clerk did not provide the information she was asking for, she hung up on him.  As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

15. Misconduct/Truthfulness - A non-sworn Sheriff's employee "lied" to the complainant.

Board Finding: Summary Dismissal
Rationale: While at the GBDF, the complainant stated she was lied when she asked to speak with a certain sergeant. The complainant was advised that that particular sergeant "does not work at the facility and there was no chain of command in general on the premises to speak to." As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

16.  Misconduct/Procedure - Unidentified deputies only allowed the complainant a 15-minute visit with the aggrieved as opposed to the 30 minutes she was told she would receive.

Board Finding: Not Sustained
Rationale: The complainant visited the aggrieved at the GBDF on 05-12-18. During the visit, the complainant alleged that the duration of the visit was "at maximum 15 minutes." Documentation provided by the SDSD confirmed that the complainant visited the aggrieved 05-12-18.  The report documented two times, 7:25 p.m. and 8:30 p.m., with regards to her visit.  No details were provided to determine the duration of the visit.  Video surveillance was not available of the visit. Deputies 2 and 4 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. In a telephonic interview, the aggrieved confirmed that his visit started as scheduled and continued for approximately 10-15 minutes. At that time, an unidentified deputy announced that visits would end in a few minutes. Moments later, the deputy returned and said time was up; visits were over and the aggrieved was escorted back to his cell.  The unidentified deputy did not provide an explanation as to why the visit was cut short. The aggrieved claimed the visit was less than 30 minutes.  There was no video provided of the actual visit. According to Title 15, inmates in a Type II facility, such as GBDF, are allowed no fewer than two visits totaling at least one hour per inmate each week. Section P.9.1G from the SDSD Detention Services Bureau Green Sheets, entitled "Social Visiting" stated "Inmates will be allowed two visits per week/one visit per day, at thirty minutes per visit." The aggrieved had two visits scheduled during the week of 05-06-18 through 05-12-18. There were no citations documenting the duration of the visits. If second visit was less than 30 minutes and the first visit was more than 30 minutes, for a combined total of at least one hour, it would have been in compliance with Title 15. Evidence showed that the aggrieved had two visits scheduled during the week; however, without additional evidence, CLERB was unable to determine if those visits were in compliance with Title 15. Therefore, the allegation was Not Sustained.

17.  Misconduct/Discourtesy – Deputy 2 had an "attitude" when speaking with the complainant.

Board Finding: Not Sustained
Rationale: While speaking with Deputy 2 at the GBDF, the complainant stated that "Deputy 2 had an attitude from the moment she approached me." The complainant further explained, "She is not anything to me and I do not have to address her accordingly if I do not feel the need to do so.  She apparently did not like that." Deputy 2 and two other deputies provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding.  There was no available surveillance video documenting the interactions between Deputy 2 and the complainant.  Absent information provided by an independent witness to the incident or video or audio recordings of the interaction there was insufficient evidence to prove or disprove the allegation.

18.  Misconduct/Truthfulness - Unidentified deputies called in a "fake code" emergency so they could excuse themselves from talking with the complainant.

Board Finding: Unfounded
Rationale: While speaking with Deputy 2 at the GBDF, the complainant alleged that unidentified deputies "called out some code and pretended that they had an emergency to attend to. The code they called was a fake code." Deputy 2 and another deputy provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding.  Documentation provided by the SDSD revealed an incident occurred on campus on 05-12-18, at 10:22pm. A facility wide protocol was enacted and all inmates in the involved housing were secured. The evidence showed that an incident did occur within the facility which interfered with the facilities usually activities and operations. As such, the allegation that a "fake code was called" was unfounded.

19.  Misconduct/Procedure - Unidentified deputies improperly classified the aggrieved at GBDF.

Board Finding: Action Justified
Rationale: The complainant stated the aggrieved was misclassified upon his admission into Sheriff's custody. The aggrieved was not classified as an Administrative Segregation (Ad-Seg) inmate while he was incarcerated in the state prison system. However, upon his admission into the SDSD, he was classified as Ad-Seg. According to the complainant, "based on a 114-D form from Donovan State Prison that was old and stated he removed himself off of

his yard due to a known enemy and his safety. Therefore, he should not have been placed in housing unit 5-A." According to documentation from the SDSD, upon his admission into jail, a classification deputy interviewed the aggrieved and determined his proper housing assignment. According to the California Department of Corrections (CDC), the aggrieved was classified as Sensitive Needs Yard (SNY) and was housed in Ad-Seg while in prison. In order to ensure his safety and the safety of others, and in compliance with DSB P&P Section J.3, the aggrieved was housed in Ad-Seg and Protective Custody (PC). His Ad-Seg status was evaluated on a weekly basis while he was in the Sheriff's custody. The aggrieved's protected status would remain until his release from Sheriff's custody. The evidence showed the aggrieved's housing classification was justified, lawful and proper.

20. Misconduct/Discourtesy - Unidentified professional staff members disrespected the complainant.

Board Finding: Summary Dismissal
Rationale: On 05-12-18, during the complainant's attempt at scheduling a visit with the aggrieved at the GBDF, the complainant advised that there were "seven employees …who laughed at her, that were staring at her and the situation as opposed to working." They were described as being disrespectful to the complainant. As CLERB has no authority over non-sworn personnel per CLERB Rules & Regulations 4.1 Citizen Complaints: Authority, this allegation of misconduct will be referred to the Sheriff's Department.

21. Misconduct/Discourtesy - Unidentified deputies disrespected and laughed at the complainant.

Board Finding: Not Sustained
Rationale: On 05-12-18, during the complainant's attempt at scheduling a visit with the aggrieved at the GBDF, the complainant advised that there were unidentified deputies who laughed at and disrespected her, that were staring at her and the situation as opposed to working." The complainant detailed how one unidentified deputy laughed at her when she asked to speak with a Watch Commander. Video surveillance from the GBDF Visiting Area was requested to confirm or either confirm or deny the allegations. According to CLERB's liaison with the SDSD, it was advised that the only video surveillance in the visiting area was too far away from the window and did not capture the incident. Based on a video screen shot, provided by the SDSD, there was no way to identify a deputy from the video recording. Deputies 3, 4 and two other deputies provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Without further information to determine which deputy the complainant was referring to the allegation was not sustained.

---

**18-076**

1. Death Investigation/Suicide – On May 19, 2018, while in the custody of the Sheriff's Department at the San Diego Central Jail, Jon Nelson hanged himself by the neck.

Board Finding: Action Justified
Rationale: This 52-year-old male was arrested on 05-16-18, and taken to jail where he was placed into a medical observation cell due to seizure activity from alcohol and heroin withdrawal. During the medical intake screening and subsequent interactions with deputies and/or medical personnel, Nelson never expressed suicidal intent or any type of self-harm. On 05-19-18, a deputy found the inmate hanged by the neck with a sheet tied to the shower head in his cell, cut him down, and began Cardiopulmonary Resuscitation (CPR). Nelson was transported to UCSD Medical Center where he was found to have an anoxic brain injury. On the evening of 05-24-18, care was withdrawn and Nelson's death was pronounced. The cause of death was anoxic encephalopathy (brain damage) due to hanging and the manner of death was suicide. The evidence supported that Nelson was properly screened and classified upon his entry into the jail system and that safety checks were done every 60 minutes in accordance with Sheriff's policies. There was no evidence to indicate that Nelson expressed any concerns about his mental or physical well-being with deputies, medical personnel, and/or other inmates. Upon discovery, sworn personnel expeditiously responded and immediately initiated life-saving measures. There was no evidence to support an allegation of procedural violation, misconduct, or negligence on the part of Sheriff's Department sworn personnel.

---

**18-079**

1. False Reporting – Deputy 1 "deliberately lied" on an arrest report.

Board Finding: Not Sustained

Rationale: The complainant stated Deputy 1 deliberately lied on the complainant's arrest report about several small children playing in the cul-de-sac on scooters and bikes that could have easily been struck and killed by the vehicle he was driving. The complainant further stated the deputy lied about him speeding, running red lights and running stop signs. According to the complainant, this was done in an attempt to aggravate the events surrounding the crime. The evidence showed that the complainant was involved in a high-speed pursuit in a residential area of San Diego where the speed limit was 25 miles per hour. Two deputies confirmed that the complainant failed to yield at stop signs. They also stated the complainant's rate of speed was far above the posted limit and could have posed a danger to other drivers and pedestrians. Upon entering the cul-de-sac there was at least one confirmed child present. Deputy 1 and another deputy provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Since two different deputies and one independent witness provided differing statements with regards to who was in the cul-de-sac there was not enough evidence to show whether multiple children were present, or in danger, from the complainant prior to coming to a stop in his vehicle. The statement from the independent witness interviewed on scene, and later by an investigator from the public defender's office, also differed in content. In a statement to the deputies the witness said he was scared for his son's safety and yelled to him to get out of the way. He then stood up and ran to pull his son out of harm's way. The witness confirmed he yelled to his son, but he was able to get back into the house on his own without the witness pulling him out of harm's way. There was no mention of further children in the street. Regardless of whether there was one child, or multiple children in the cul-de-sac, it was apparent, based on witness and deputy statements, that the complainant was driving at a high rate of speed in a residential neighborhood and ran more than one stop sign. His vehicle came to a stop, unattended, at the end of a cul-de-sac where at least one confirmed child was on a bicycle. Other than that statement, regarding "children" in the street, everything else in Deputy 1's report appeared accurate. Whether Deputy 1 was mistaken about seeing one versus multiple children, in the cul-de-sac, or whether he lied in his report cannot be determined by the evidence. A "10 News" article stated Deputy 1 had run-ins with internal affairs for inaccurate report writing and excessive force. Evidence is not clear whether Deputy 1 deliberately lied in his report and because of the history of Deputy 1's inaccurate report writing and conflicting statements provided by witnesses the allegation is not sustained.

---

## 18-092

1.  Misconduct/Harassment – Deputy 3 made remarks against the complainant's family.

    Board Finding: Not Sustained
    Rationale: The complainant stated that while at a convenience store in Ramona, on an unidentified date, Deputy 3 made remarks against the complainant's family. He allegedly encouraged a patron of the store to not have any dealings with the complainant's family because "nothing good would become of it." Deputy 3 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Evidence showed that Deputy 3 did make a comment to the complainant. There was no evidence or witnesses provided by the complainant that could verify any comments made at that location. However, the wording of the comment and/or how it was perceived, was not a violation of any San Diego Sheriff's Department Policy or Procedure (SDSD P&P). Without further evidence, such as an independent witness or video footage, the allegation was not sustained.

2.  Misconduct/Intimidation – Deputy 1 said to the complainant's son, "I beat the shit out of your father five years ago and put him in the hospital."

    Board Finding: Not Sustained
    Rationale: The complainant said Deputy 1 told her son, "I beat the shit out of your father five years ago and put him in the hospital," or words to that effect. The complainant said her husband was never "beaten up" by any Sheriff's deputy. She stated there was a man named "(redacted)" that was "beaten up" by a Sheriff's deputy and the Department was sued. According to an Arrest Report dated 06-21-18, the complainant's son and another juvenile were involved in a physical altercation in Ramona. The juvenile picked up the complainant's son by the legs and slammed his head and body onto the ground. In addition, the juvenile punched the complainant's son in the face which caused him to fall to the ground and lose consciousness. The complainant's son was transported to a hospital where he was treated for his injuries. An Arrest/Juvenile Contact Report dated 07-26-08, confirmed that a man named "(redacted)" was arrested on 07-26-08, at a bar in Ramona. During his arrest, force was used, and he was struck by a deputy's flashlight multiple times, prior to being handcuffed and arrested. There was no mention of Deputy 1 being on scene at that incident. No other incident was found involving Mr. (redacted) and Deputy 1. Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. The complainant's son was interviewed by phone and he provided the following information: While at the hospital, Deputy 1 asked him how his father was doing. The complainant's son advised that the deputy then said something similar to, "The last time I talked to him I beat him up and put him in the hospital." The complainant described the

statement as if Deputy 1 was bragging about it. The complainant's son's girlfriend was also present during the interview. She stated that Deputy 1 talked with the complainant's son at the hospital by the ambulance entrance. No one else was present besides her, Deputy 1, and the complainant's son. Regarding the complainant's son's father, Deputy 1 said something similar to, "I haven't seen him in a while, since the last incident because of an outburst," and "…since the last time I put him in the hospital." The complainant's girlfriend had nothing further to add. Evidence confirmed that Deputy 1 did make comments about the complainant's husband, yet based on interviews with Deputy 1, the complainant's son, and his girlfriend, it was unclear as to the actual statement made by Deputy 1. The complainant's son claimed that Deputy 1 said he beat his father up. The complainant's son's girlfriend did not mention anything about 1 saying he beat up the complainant's husband. There was insufficient evidence to either prove or disprove the allegation that Deputy 1 said, "I beat the shit out of your father five years ago and put him in the hospital." Therefore, the allegation in not sustained.

3.  Misconduct/Procedure – Deputies 4 and 5 did not take a witness statement from the complainant's husband.

    Board Finding: Unfounded
    Rationale: The complainant stated her husband tried to give a statement to two female deputies, (later identified as Deputies 4 and 5) on five separate occasions, but they refused to take it and said they were too busy during the incident on–06-21-18. According to a follow up report, the complainant's husband and the complainant's son's girlfriend made their way to the incident location. When they arrived, they found the complainant's son lying unconscious in the street. During a phone interview with the complainant's husband, dated 08-30-18, he provided the following information: He stated he tried to give his statement to two female deputies five times, but they kept telling him to wait. The complainant's husband told them he was a material witness and asked if he could at least point out the suspects who assaulted his son. The complainant stated that no deputy took his statement. Deputies 2 and 5 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. A review of the Body Worn Camera (BWC) footage confirmed that Deputy 5 was interviewing a witness when the complainant's husband approached her. A male deputy near Deputy 5 responded to the complainant's husband's comments. It appeared Deputy 5 then said something to the complainant's husband though it was unintelligible on the video. He walked away. Deputy 5 completed her witness interview and then went to interview another witness. There was no BWC showing any statements provided by the complainant's husband to Deputy 5. Deputy 4 can be seen on the (BWC) footage requesting a driver's license from the complainant's husband. He provided the driver's license to Deputy 4 and she wrote down information on a notepad she was holding. At that time, a blue Jeep approached the scene and the complainant's husband told the deputies that the occupants of the vehicle were friends of his and he walked toward the Jeep. After a few minutes, he returned to speak with Deputy 5 and she requested his phone number. The complainant's husband walked away from Deputy 5 again. He crossed the street and stated he was going home. He never returned to speak with Deputy 5. In the BWC, no deputy was seen making a statement that they were too busy to take the complainant's husband's statement. The complainant's husband was observed on the BWC footage making various comments about the assailants to Sheriff's deputies. According to the BWC footage, deputies responded to his comments, though a formal statement was not taken. Evidence showed that deputies responded to the complainant's husband's request to make a statement and Deputy 4 further responded by taking down his personal information. In the BWC, the complainant's husband was observed to make comments to the deputies but was not seen asking the deputies to take his statement. When he was in a position to provide a statement to Deputy 4, the complainant's husband walked away and said he was going home. Neither Deputies 4 nor 5 stated on video that they were too busy to take the complainant's husband's statement and no deputy was shown to refuse to take his statement. The evidence showed the allegation did not happen and therefore was unfounded.

4.  False Reporting – Unidentified deputies misstated facts in a report.

    Board Finding: Unfounded
    Rationale: The complainant stated the report from the incident said a car hit her son, which according to video surveillance and witness statements, did not happen during the assault. Initial reports from Sheriff's Communication Center records stated that an individual was hit by a car. Other witnesses later confirmed there was a physical altercation and no vehicle involved. The Arrest Report dated 06-21-18, stated that a juvenile and the complainant's son were involved in a physical altercation in Ramona. There was no mention of a car hitting the complainant's son. According to records from the Sheriff's Communication Center, the call for service was initially dispatched as a vehicle versus pedestrian. The call was later confirmed to be a physical altercation with one person down in the roadway. There was no written report documented by the SDSD that stated otherwise; there was no evidence in any report that the complainant's son was hit by a car and therefore the allegation was unfounded.

5.  Misconduct/Procedure – Deputy 1 and/or other unidentified deputies failed to provide the complainant's son with information from the Victim's Assistant Program or a copy of Marsy's Law.

Board Finding: Sustained

Rationale: The complainant alleged that neither her husband, nor her son were provided with any victim's assistance information or a copy of Marsy's Law by deputies. During a phone interview with the complainant's son, he confirmed after he was assaulted on 06-21-18, that he was never provided with information from the Victim's Assistant Program nor was he given a copy Marsy's Law by Deputy 1, when he was interviewed at the hospital. He was never provided with information from the Victim's Assistant Program by any SDSD deputy. The California Peace Officers Legal Sourcebook (CPOLS) Section 13 titled, "Criminal Law, Victim's Rights" states: "The provision requires that all victims of crime be given a list of crime victims' rights referred to as "Marsy's Rights. Every law enforcement agency investigating a criminal act and every agency prosecuting a criminal act shall at the time of initial contact with a crime victim, during follow-up investigation, or as soon thereafter as deemed appropriate by investigating officers or prosecuting attorneys, provide or make available to each victim of the criminal act without charge or cost a 'Marsy Rights' card." Deputy 1 provided information during the course of CLERB's investigation that supported the recommended finding. The evidence showed that the complainant's son was not given a copy of Marsy's law or information from the Victim's Assistant Program and therefore the allegation is sustained.

6.  Misconduct/Procedure –An unidentified Sergeant failed to return the complainant's phone calls.

    Board Finding: Unfounded

    Rationale: On 06-22-18, the complainant alleged that she tried to follow up with Deputy 1's supervisor at the time of the incident. The complainant could not confirm the name of the deputy she spoke with, however, she left messages and the Sergeant never called her back. Records provided by the SDSD showed that Deputy 1 worked overtime during the date of the incident and he was under the supervision of a sergeant who was a Patrol Sergeant from the Ramona Substation. Deputy 1 normally worked out of Poway and was under a Supervising Sergeant. There was also a Detective Sergeant in Ramona at the time. All three sergeants mentioned above provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Since the complainant was unable to provide a name of the sergeant she left a message for, or any other details about the allegation, and the evidence could not confirm the allegation and therefore the allegation was unfounded.

7.  Misconduct/Procedure – Deputy 2 failed to investigate threats against the complainant.

    Board Finding: Action Justified

    Rationale:  On 06-28-18, the complainant spoke with Deputy 2 about a threat her son received from his assailant. The assailant allegedly said to her son, "Delete his mother on Facebook or that was a life he would take."  Deputy 2 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. County Private Counsel Attorney provided the following legal analysis: "Whether a threat rises to criminal liability under PC 422 depends on context. While (the assailant's) message, on its face, could support finding a possible violation of PC 422, the passage of a full week [week's conversation] between Facebook message and the complainant's contact with Deputy 2 is a strong factor in support of his conclusion that the requirements of PC 422 have not been met. Other factors supporting the conclusion that PC 422 requirements are not met are (the assailant's age 17), the underlying backdrop of the Facebook "threat" arising from the adolescent's emotional response to the earlier fistfight paired with the belligerent attitude of the complainants in dealing with Deputy 2 all tend to make the entire situation seem like an extended emotional dispute between teenagers as opposed to a criminal violation. Thus, although a Facebook message can qualify for violation of PC 422, the determination that no violation existed here is legally supportable and appropriate." Evidence showed that based on the message, information provided by Deputy 2 and Counsel's legal analysis, the threat received was not a violation of law and therefore no investigation was conducted. The actions by Deputy 2 were lawful, justified and proper.

8.  Misconduct/Discourtesy – Deputy 2 hung up while speaking with the complainant.

    Board Finding: Action Justified

    Rationale: On 06-28-18, the complainant spoke with Deputy 2, via a telephonic conversation. During the conversation, Deputy 2 attempted to inform the complainant why the Facebook message/threat did not arise to the level of terrorist threats; Deputy 2 he said the threat did not meet the criteria for a criminal threat. At some point during the telephonic conversation, the complainant alleged that Deputy 2 purposefully "hung up" on her, ending their conversation. Deputy 2 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Based on the evidence Deputy 2's actions of terminating the call was justified, lawful and proper.

***End of Report***

Ex. W - 767

**<u>NOTICE</u>**

In accordance with Penal Code Section 832.7, this notification shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court or judge of California or the United States.

# EXHIBIT X

**BOARD MEMBERS**
SANDRA I. ARKIN
Chair
DELORES CHAVEZ-HARMES
Vice Chair
KIM-THOA HOANG
Secretary
GARY BROWN
JORDAN GASCON
P. DARREL HARRISON
JAMES LASSWELL
LOURDES N. SILVA
ROBERT SPRIGGS JR.
GARY I. WILSON
SUSAN N. YOUNGFLESH

**EXECUTIVE OFFICER**
PAUL R. PARKER III



# *County of San Diego*
## CITIZENS' LAW ENFORCEMENT REVIEW BOARD
555 W BEECH STREET, SUITE 505, SAN DIEGO, CA 92101-2940
TELEPHONE: (619) 238-6776      FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

The Citizens' Law Enforcement Review Board made the following findings in the closed session portion of its August 8, 2017 meeting, held at the San Diego County Administration Center, 1600 Pacific Highway, Room 302/303, San Diego, CA 92101. Minutes of the open session portion of this meeting will be available following the Review Board's review and adoption of the minutes at its next meeting. Meeting agendas, minutes, and other information about the Review Board are available upon request or at www.sdcounty.ca.gov/clerb.

**CLOSED SESSION**

a) **Request for Reconsideration:** Pursuant to CLERB Rules & Regulations: 16.9 Reconsideration of Final Report. Upon request by the complainant, subject officer or their representatives, the Final Report may be re-opened for reconsideration by the Review Board provided that: (a) previously unknown relevant evidence is discovered which was not available to the Review Board before it issued its Final Report, and; (b) there is a reasonable likelihood the new evidence will alter the findings and recommendations contained in the Final Report.

b) **Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Action Justified | The evidence shows the alleged act or conduct did occur but was lawful, justified and proper. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

## CASE FOR RECONSIDERATION (1)

**ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE**

<u>16-027</u>

1. Death Investigation/Inmate Suicide –Richard Boulanger was found in his cell hanged by the neck with a sheet attached to the bed frame.

   Board Finding: Not Sustained
   Rationale: There was no complaint of wrongdoing in this death investigation; a review was conducted in accordance with CLERB Rules & Regulations, 4.6 Citizen Complaint Not Required: Jurisdiction with Respect to Actions involving Death. On February 12, 2016, Boulanger's cellmate awoke to find him hanging from the bunk bed with what appeared to be a rope fabricated from a sheet around his neck. The cellmate reported that he pressed the intercom button 4-5 times to call for help. When no one answered the intercom, he stated that he started banging on

*-continued on next page-*

Ex. X - 770

the door and yelling for help. Per the cellmate's account, it took approximately 10 to 20 minutes before deputies arrived. The cellmate was observed on surveillance video standing in front of his cell door for approximately 5 minutes before contacted by deputies during their opening shift count. Upon being alerted, detentions staff responded quickly to secure the unit and allow medical staff to begin resuscitative efforts. Boulanger was subsequently transported to UCSD Medical Center, but his condition continued to decline as he developed multisystem organ failure. On February 14, 2016, he became pulseless and apneic and his death was pronounced. The Medical Examiner attributed the cause of death to acute diffuse anoxic/ischemic encephalopathy, due to resuscitated cardiac arrest, due to ligature hanging, and the manner of death is classified as suicide. Detentions staff classified and housed the decedent according to Department policies and procedures; however, there is insufficient evidence to prove or disprove to what extent identified policy violations impacted Boulanger's suicide death.

2. Misconduct/Truthfulness – Deputy 2 was untruthful when he reported conducting a well-being check on the module.

   Board Finding: ~~Sustained~~ Unfounded
   Rationale: Department Policy and Procedure 2.46, Truthfulness, requires all personnel, "…to answer questions, whether orally or in writing, truthfully and to the fullest extent of their knowledge." Deputy 2 reported during an interview and in a written response to CLERB that he had conducted a Soft Count – which is an inmate count that "verifies each inmate's well-being through verbal or physical acknowledgement from the inmate" – between the hours of 5:15 and 5:35pm. ~~Video surveillance of that time frame disproved the actions he described and Deputy 2 declined an interview to provide an explanation for his statement and actions. The evidence supported the allegation, and the conduct was not justified.~~ **Video surveillance of that time frame confirms the actions described by Deputy 2 and provide clear evidence that the alleged act or conduct did not occur.**

3. Misconduct/Procedure – Deputy 2 failed to conduct an end of shift Soft Count according to policy.

   Board Finding: ~~Sustained~~ Unfounded
   Rationale: Sheriff's Detentions Policy I.43, Inmate Count Procedure, establishes a uniform procedure for physically counting and verifying the well-being of all inmates within the facility. A Soft Count is one of the three types of inmate counts and requires that detentions staff verifies each inmate's well-being through verbal or physical acknowledgement from the inmate. Three Soft Counts are required each day and are to occur during the time periods of 1700-1800, 1830 – 1900 and 0400 – 0430 hours.  San Diego Central Jail's Green Sheet policy further requires that a Soft Count is conducted **as a Closing Count for the Day-Shift Count.** ~~at the beginning and end of every shift, and that a printed Operations Report (Count Sheet) is utilized while conducting these Soft Counts. Deputy 2 reported conducting a security check, also known as a Head Count, during his end of shift count, and did not conduct a Soft Count as required by policy. Moreover, Deputy 2 did not utilize a printed Operations Report during this count, which is also required by policy.~~ **Deputy 2 conducted a Soft Count at 1718 hours, which was within the time frame required by policy and verified the well-being of the decedent and his cell mates.** ~~Deputy 2 declined an interview to provide an explanation for his actions.~~ Surveillance video of Deputy 2's end of shift count verifies that he **conducted a Soft Count according to policy and shows clear evidence that the alleged act or conduct did not occur.** ~~did not conduct a Soft Count as required, and this act was not justified.~~

4. Misconduct/Procedure - Deputy 1 failed to respond to an inmate's attempt to contact him through the jail's intercom system.

   Board Finding: Sustained
   Rationale: Sheriff's Detentions Policy I.1, Emergency Alarms Systems, provides a means for detention facility staff and inmates to summon emergency assistance. Alarm buttons located in inmate cells are required to be connected to a central control area to ensure a constant monitoring of the alarms with appropriate, timely assistance dispatched to the scene of any alarm. The Control deputy is tasked to monitor this alarm system and is required to dispatch assistance when the alarm is activated. Boulanger's cellmate reported that upon discovering the decedent's body hanging from the bunk bed with what appeared to be a rope fabricated from a sheet around his neck, he pressed the intercom button 4-10 times to call for help, but no one answered. Per the cellmate's account, it took approximately 10 to 20 minutes before deputies arrived. The cellmate was observed on surveillance video standing in front of his cell door for approximately 5 minutes before contacted by deputies during their opening shift count. Deputy 1 was

the assigned Control deputy at the time of this incident. He reported that sometime prior to his shift; the audio alert function of the inmate intercom system had been muted, with the volume turned all the way down. This prevented him from hearing the cellmate's attempted contact. Visual alerts from the decedent's cell, however, had been triggered and were observable on the intercom monitor; but according to Deputy 1, he customarily does not check the monitor until approximately 30 minutes after arriving in the control room, and after performing his pre-check duties. On this particular day, he had not observed the monitor prior to being contacted by housing deputies requesting that he open the decedent's cell door. When opening the cell door, Deputy 1 then observed the flashing red light on the monitor that corresponded to the decedent's cell. Deputy 1 declined an interview to provide an explanation for his actions. Policy requires that the Control deputy monitors the emergency alarm system and immediately dispatch assistance when an alarm is activated. The decedent's cellmate activated the alarm, but Deputy 1 failed to respond and this act was not justified.

# CASES FOR SUMMARY HEARING (11)

**ALLEGATIONS, RECOMMENDED FINDINGS & RATIONALE**

**16-015**

1. Illegal Search & Seizure – Deputy 3 broke into the complainant's bedroom and damaged the door.

   Board Finding: Action Justified
   Rationale: The complainant alleged that an unidentified deputy broke into her bedroom and damaged the door while executing a search warrant at her home. The Poway Criminal Apprehension Team (PCAT) assisted the High Intensity Drug Traffic Area/Tactical Narcotics Team (HIDTA/TNT) with serving a search warrant at the home of the complainant, where the subject of the search warrant – a known narcotics dealer - resided. The subject was contacted and detained in the garage while deputies conducted a protective sweep of the residence. A "protective sweep" is a limited, quick, visual inspection of those places where a person who poses a danger to officers or others might be hiding and are generally conducted when officers are inside a residence to effect an arrest or perform other inherently at-risk duties. The complainant's bedroom door was locked and subsequently forced open as officers needed to clear the room for potential safety threats. Penal Code Section 1531, Entry into House, authorizes officers to break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a warrant. Thirteen deputies were involved in this operation, and those queried could not identify the deputy who actually breached the door. That withstanding, the evidence showed that the act did occur but was lawful, justified and proper.

2. Illegal Search & Seizure – Deputy 2 confiscated $500 that the aggrieved had reportedly won at a casino.

   Board Finding: Action Justified
   Rationale: The complainant alleged that deputies confiscated $500 during their search of her home that the aggrieved had won at a casino, and this money was reportedly not related to any drug activity. The complainant's 49-year-old son resided with her in her home and was the subject of a search warrant. The aggrieved was a known drug dealer and the signed search warrant authorized deputies to search and seize any controlled substances, currency and other contraband named in the warrant. During the search of the aggrieved's bedroom closet, deputies found together drugs, numerous Ziploc baggies and $548 in mixed currencies believed to be associated with drug sales. This money and other contraband were confiscated as evidence. According to Title 21 of the United States Section Code 881 (a) (6), subject to government forfeiture are a*ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance… all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.* A court order is required for the release of evidence taken under a warrant. The evidence showed that Deputy 2 confiscated money and other contraband during the execution of a search warrant, and this act was lawful, justified and proper.

3. Misconduct/Procedure – Deputy 2 failed to document items seized from the complainant's home.

Board Finding: Unfounded
Rationale: The complainant alleged that deputies failed to document items seized from her home while executing a search warrant. The complainant was not home during this search, and in a subsequent conversation with the CLERB Investigator, reported that she was unsure as to whether or not a receipt for property seized had been provided; she had not discussed this with the aggrieved who was present during the search. Deputy 2 documented on a Superior Court Receipt and Inventory sheet by sworn assertion, the specific items seized during the search of the complainant's home. This sworn documentation is evidence that shows that the alleged act did not occur.

4.  Misconduct/Procedure – Deputy 2 failed to return the complainant's security camera.

    Board Finding: Action Justified
    Rationale: The complainant reported that Deputy 2 did not return a security camera confiscated while executing a search warrant. During the search of the complainant's home and areas of the home commonly shared by the subject of the search warrant, Deputy 2 observed a security camera which provided a live feed to a television monitor. This monitor was not hooked up to a recording device in typical fashion to retain video for security purposes. From his training and experience, Deputy 2 knew that security cameras hooked up in this manner were typically used by narcotics dealers to alert them to police activity taking place outside their home. The wire to the camera was cut, and the camera was seized as evidence. According to Title 21 of the United States Section Code 881 (a) (6), *any appurtenances which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter, is subject to government forfeiture.* Deputy 2 believed that the security camera attached to the front of the complainant's home was being used to facilitate the commission of crimes. He confiscated the camera as evidence, and this act was lawful, justified and proper.

5.  Misconduct/Procedure – Deputy 1 broke into the complainant's front door without giving her adequate time to respond to deputies' knock and notice.

    Board Finding: Not Sustained
    Rationale: The complainant alleged that deputies broke into her front door without allowing her ample time to respond to their knocks. While conducting a 4th Waiver Search on the aggrieved who resided in the complainant's home, the Poway Criminal Apprehension Team (PCAT) breached the front to gain entry into the complainant's home. A 4th Waiver Search authorizes Peace Officers to search any person on searchable probation, and any property under his or her control. Before entering the home, however, officers must: knock (or do something else that will alert the people inside to your presence); identify themselves as a police officer; explain the purpose of the contact, and demand entry, waiting a reasonable period before entering. A member of the criminal apprehension team documented in an arrest report that he knocked on the front door of the complainant's residence several times and announced in a loud, clear voice, "Sheriff's Department, 4th Waiver search, demanding entry!" He reportedly knocked and made this complete announcement three times before Deputy 1 was authorized to breach the door. Case law authorizes officers to force entry into a home when they are refused admittance; an unreasonable delay in responding qualifies as a refusal. The response time afforded the complainant could not be determined without an audio or video recording of this contact; there is insufficient evidence to either prove or disprove the allegation.

6.  Misconduct/Procedure – Deputy 3 damaged the complainant's security camera during the search of her home.

    Board Finding: Not Sustained
    Rationale: The complainant alleged that an unidentified deputy damaged a security camera during the search of her home. An arrest report from this incident documented that only the front door and a padlock on a storage shed were damaged during this probation search. Deputy 1 was unaware of damage to the complainant's security camera, and the complainant stated in a subsequent conversation with the CLERB Investigator, that a neighbor glued and repaired the crack reportedly found on the security camera. The complainant did not provide photos of the alleged damage, leaving insufficient evidence to either prove or disprove the allegation.

**16-036**

1. Death Investigation/Drug Overdose – Brandon Moyer was found unresponsive during medical staff's morning welfare check.

   Board Finding: Action Justified
   Rationale: There was no complaint of wrongdoing in this death investigation; a review was conducted in accordance with CLERB Rules & Regulations, 4.6 Citizen Complaint Not Required: Jurisdiction with Respect to Actions involving Death. On October 7, 2015 Brandon Moyer was arrested by the San Diego Sheriff's Department on numerous drug related charges. He was booked into San Diego Central Jail and later transferred to George Bailey Detention Facility where he was classified and housed appropriately. During medical intake, Moyer reported to medical staff that he was not suicidal or homicidal, nor had he had any previous suicide attempts. He also denied using drugs or alcohol despite his drug-related charges. Moyer's cellmates denied that drugs were present in their cell or on the module, and denied that Moyer expressed any suicidal ideation. On March 11, 2016 at approximately 2:40AM, deputies responded to Moyer's cell to check on him after his cellmates reported that Moyer had been vomiting and was now unresponsive. Medical staff and Paramedics responded, provided treatment and once revived, recommended to Moyer that he be transported to a local hospital for further treatment. Moyer refused to be transported to the hospital, but was moved to the facility's Medical Isolation Unit where he could be closely monitored every half hour. Later that morning at approximately 8:30 AM, medical staff was conducting their welfare checks on the inmates in medical isolation, when a nurse arrived at Moyer's cell and found him unresponsive. Cardiopulmonary resuscitation was initiated by medical staff, and paramedics began advanced cardiac life support upon arrival at 8:44AM. Despite their efforts, Moyer could not be revived, and his death was pronounced at 9:03AM. The Medical Examiner attributed Moyer's death to acute heroin intoxication with aspiration pneumonia included as contributing, and the manner of death was accidental. There is no evidence to support an allegation of misconduct or negligence on the part of Sheriff's Department personnel. The actions of deputies were lawful, justified and proper.

2. Misconduct/Procedure – Deputy 1 failed to conduct a meal time Soft Count according to policy.

   Board Finding: Not Sustained
   Rationale: Sheriff's Detentions Policy I.43, Inmate Count Procedure, establishes a uniform procedure for physically counting and verifying the well-being of all inmates within the facility. A Soft Count is one of the three types of inmate counts and requires that detentions staff verifies each inmate's "well-being" through verbal or physical acknowledgement from the inmate. There is however, no specific definition of "well-being" that includes objective criteria for the assessment of an inmate's condition. Deputy 1 provided information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Surveillance video of this Soft Count was grainy and inconclusive, leaving insufficient evidence to either prove or disprove the allegation.

**POLICY RECOMMENDATION:**

1. It is recommended that the San Diego Sheriff's Department modify Policy I.43, Inmate Count Procedure, as it specifically relates to the Soft Count definition, to include an expanded, specific and objective definition of "well-being" that would include objective criteria for the assessment of an inmate's condition. This modified definition would serve to eliminate random subjectivity in the analysis of an inmate's well-being, and standardize detentions staff's evaluation processes.

---

## 16-074

1. Misconduct/Discourtesy – Deputy 2 stated to the complainant, "What the fuck are you doing?", or used words to that effect.

   Board Finding: Not Sustained
   Rationale: The complainant alleged that Deputy 2 stated to him, "What the fuck are you doing?", or used words to that effect, when he was returning to his bunk as instructed. Deputy 2 and other deputies responded to the complainant's quad after a fight between two other inmates was reported. Inmates had been instructed to lie on their assigned bunks in order for deputies to investigate the incident, when Deputy 2 reported in a Crime/Incident Report

that he observed the complainant walking out of the bathroom. Deputy 2 reported that he and other deputies instructed the complainant to go to his assigned bunk, but the complainant refused to comply and allegedly stated to deputies, "fuck off" and "go to hell." Deputy 2 again instructed the complainant to get on his bed, but he reportedly continued to yell disrespectful comments toward the deputy. Per Deputy 2, the complainant's behavior began to incite other inmates, necessitating his removal from the quad to prevent further incidents from occurring. Sheriff's Policy 2.22, Courtesy, permits the use of coarse, profane or violent language when necessary to establish control during a violent or dangerous situation. Deputy 2 was concerned that the complainant's statements and conduct were incendiary, requiring an immediate response. The investigation of this complaint yielded insufficient evidence to assess the danger level and potential for violence present in the complainant's quad following this inmate conflict. There was also insufficient evidence to assess the propriety of Deputy 2's responses to the complainant's behavior, leaving insufficient evidence to determine if there was a violation of sheriff's policy.

2. Excessive Force – Deputy 2 "rammed" the complainant into a module door while escorting him out of the module.

   Board Finding: Sustained
   Rationale: The complainant alleged that Deputy 2 rammed him into a module door to open it while escorting him out of the module. Deputy 2 reported in a Crime/Incident Report that as he and Deputy 1 were escorting the complainant out of the module, he tried to turn toward them and began to rock his upper body back and forth. As the complainant pulled his body forward, Deputy 2 reported, he pushed the complainant through the module door to escort him out of the module. Surveillance video of the incident showed the complainant look toward Deputy 2 as he was being escorted, but his body appeared to remain facing forward and he appeared to be fully controlled by Deputy 2 at that time. Surveillance video did not show the complainant rocking back and forth and pulling his body forward as reported by Deputy 2. The video did appear to show Deputy 2 control the complainant and use the complainant's body to open the module door. The complainant's chest, and possibly his face, was observed contacting the module door and Deputy 2 is observed continuing to push Williams after they pass through the door. Deputy 2 provided confidential information to CLERB that was considered in arriving at the recommended finding. Detentions Policy I.89, Use of Force, allows detentions deputies to use any physical force necessary and objectively reasonable in the defense of self or others, and to overcome resistance. Sheriff's Policy 2.49, Use of Force, further states that "Employees shall not use more force in any situation than is reasonably necessary under the circumstances, and shall use force in accordance with law and established Departmental procedures." Video evidence showed that Deputy 2 used excessive force in pushing the complainant into the module door to open it, and this force was unreasonable and not justified.

3. Excessive Force – Deputy 2 threw the complainant to the ground when he was not resisting deputies.

   Board Finding: Not Sustained
   Rationale: The complainant alleged that Deputy 2 threw him to the ground when he was not resisting deputies. Both deputies reported that the complainant continued to threaten them and attempted to break free of their grasp while being escorted to a processing area. They reported that in an effort to maintain control of the complainant, Deputy 2 pushed him into a nearby fence and then took him to the ground. Surveillance video of this incident was grainy and captured from a distance which limited its evidentiary value in determining whether or not the force used by Deputy 2 was reasonable. There is insufficient evidence to either prove or disprove the allegation.

4. Excessive Force – Deputy 1 threw the complainant to the ground when he was not resisting deputies.

   Board Finding: Unfounded
   Rationale: The complainant alleged that Deputy 1 threw him to the ground when he was not resisting deputies. Both deputies reported that the complainant continued to threaten them and attempted to break free of their grasp while being escorted to a processing area. They both reported that in an effort to maintain control of the complainant, Deputy 2 pushed him into a nearby fence and then took him to the ground. Once on the ground, Deputy 1 secured the complainant's legs by crossing his ankles and pinning them to the ground. Surveillance video of this incident was grainy and captured from a distance, however it showed that Deputy 1 was not involved in taking the complainant to the ground. The video evidence showed that the act as attributed to Deputy 1 did not occur.

**16-075**

1. Misconduct/Procedure – Deputy 2 allegedly "did nothing" when the complainant's neighbor was physically violent toward her.

   Board Finding: Unfounded
   Rationale: The complainant alleged that Deputy 2 failed to act when she reported that her neighbor had physically attacked her. The complainant and her neighbor became engaged in a physical altercation after their dogs began to fight. The complainant reported using a water hose to separate the pets when her neighbor reportedly grabbed her by the wrist and began screaming at her. The complainant's neighbor offered a different account of this incident alleging that the complainant attacked him first. After taking their respective statements, Deputy 2 determined that the complainant's neighbor was the primary aggressor, and after securing a signed Citizen's Arrest Declaration from the complainant, he arrested the neighbor for PC § 243(a) Simple Battery. The neighbor was released from the scene based on his promise to appear in court. Deputy 2's Arrest Report documented this arrest and showed that the alleged act or conduct did not occur.

2. Misconduct/Procedure – Deputy 1 allegedly failed to take a report and/or act when the complainant's property was vandalized.

   Board Finding: Action Justified
   Rationale: The complainant alleged that Deputy 1 failed to take a report or act when her neighbor allegedly vandalized her property. Deputy 1 contacted the complainant and her husband at their home and was shown glue that was allegedly placed on their fence by their neighbor. The complainant's husband informed Deputy 1 that the substance could be cleaned off with no permanent damage and he declined filing a report on the alleged vandalism. This declination was documented by Deputy 1 in the dispatch record and confirmed by the CLERB Investigator during a phone conversation with the complainant's husband. Deputy 1 provided the complainant an incident number documenting the call and contacted their neighbor regarding the restraining order. Deputy 1 did not take a report of this incident because the complainant's husband declined filing a report. Deputy 1's actions during this contact were lawful, justified and proper.

3. Misconduct/Procedure – Deputy 1 allegedly failed to properly file the proof of service of a Temporary Restraining Order (TRO) against the complainant's neighbor.

   Board Finding: Action Justified
   Rationale: The complainant alleged that Deputy 1 failed to properly file a proof of service of a TRO, resulting in the department's inability to cite the neighbor when he later violated conditions of the TRO. After speaking with the complainant and her husband, Deputy 1 contacted the restrained party and served a TRO on 8/6/2016. He attempted to contact Sheriff's Records and Inquiry to have the TRO documented as served; however, Inquiry was unable to locate a TRO on file related to the complainant and her neighbor. The supervisor of Records reported documentation of Deputy 1's attempts for a proof of service, but the restraining order was not in the system due to clerical errors related to the courts. Deputy 1's attempt for proof of service was also documented in sheriff's dispatch records. It was not until 8/17/2016 that a re-scanned TRO was placed in the system by the court and available for confirmation. Deputy 1 exercised due diligence in his attempt to file for proof of TRO service through a means prescribed by Policy 6.55, Protective Orders, and his actions were lawful, justified and proper.

---

**16-084**

1. Misconduct/Procedure – Deputy 1 told the complainants that the grand theft crime they reported was a civil matter.

   Board Finding: Action Justified
   Rationale: The complainants are business owners who stated that their gift shop items were given away by their landlord without permission. Deputy 1 responded to the call, gathered information, and determined there was not probable cause to make an arrest, because the merchandise was not missing, but being stored while the complainants

were unavailable to conduct business. A landlord/tenant dispute is a civil matter and the evidence showed that Deputy 1's actions at the time of this incident were lawful, justified and proper.

2. Misconduct/Procedure – Deputy 1 failed to investigate a crime and refused to review evidence presented by the complainants.

   Board Finding: Action Justified
   Rationale: The complainants stated that immediately after responding to their call, Deputy 1 determined their report of theft was a civil matter. They said the deputy refused to look at their video recording, would not interview their employees, and would not allow them to show him where the missing items were located. There was no dispute that the complainants produced receipt evidence, identified witnesses, and proffered video for the deputy's review. CAD records corroborated this incident as lasting for over an hour and notated that it was cleared as a civil matter. Because an investigation is not warranted in a civil matter, Deputy 1's actions were lawful, justified and proper.

3. Misconduct/Procedure – Deputy 1 changed his report.

   Board Finding: Action Justified
   Rationale: The complainants stated that Deputy 1 was asked to rewrite his report by higher officials. All submitted reports are reviewed by command staff and routinely rewritten. County personnel were informed of the situation and the District Attorney's office requested that a Grand Theft case be written. Deputy 1 was then asked to write a theft report, which he did, and it was subsequently rejected for prosecution. The evidence showed the alleged act or conduct did occur, but was lawful, justified and proper.

---

**16-085**

1. Misconduct/Procedure – Deputy 1 refused to move the complainant who reported he was in danger. The complainant was then beaten by other inmates and hospitalized for his injuries.

   Board Finding: Not Sustained
   Rationale: The complainant stated that he asked Deputy 1 to assist him with a cell change because he felt threatened, but the deputy refused in retaliation for the complainant's grievance against him. Crime Report #16144412 documented this inmate-on-inmate battery. The report documented the complainant's request for a "convenience move" that was reportedly denied prior to deputies conducting a hard count. The complainant's cellmates were identified as the suspects, but invoked their Miranda rights and declined to comment. Deputy 1 refuted the allegation as stated by the complainant. There was no other evidence available to corroborate either the complainant's or the deputy's version of events and therefore insufficient evidence to prove or disprove the allegation.

2. Misconduct/Retaliation – Deputy 1 retaliated against the complainant for filing a complaint against him.

   Board Finding: Not Sustained
   Rationale: The complainant said that Deputy 1 "held grudges and retaliated against those citizens who exercised their freedom of impartiality and independent and unbiased citizen complaints." The complainant did not provide any further clarification, (other than allegation stated above) or evidence to support his assertion. Deputy 1 refuted the allegation as stated by the complainant; and with no further evidence known at this time, there was insufficient evidence to render any other finding.

---

**16-087**

1. Illegal Search & Seizure – Deputy 1 detained the complainant.

   Board Finding: Action Justified
   Rationale: The complainant alleged that Deputy 1 detained him without cause. The complainant reported that he was walking home through a commercial district at approximately 4:00 AM, when he was contacted by Deputies 1 and

2. The complainant had earlier been consuming a few beers with friends but reported that he was not intoxicated. Photographs were taken during this incident and documented that the complainant was not wearing a shirt when contacted. According to Case Law 2.8, Search and Seizure – Persons, for an investigative stop or detention to be valid, a law enforcement officer must have "reasonable suspicion" that: (1) criminal activity may be afoot and (2) the person you are about to detain is connected with that possible criminal activity. Deputy 1 provided information during the course of this investigation that supported the complainant's report of his alcohol consumption prior to this contact and raised concerns with respect to PC § 647(F), Disorderly Conduct, as it specifically related to public intoxication. Additionally, Sergeant 3 stated to the complainant in a recorded conversation, that there was activity at the same time and in the same area where he was contacted that led deputies to believe that he may have been associated with a subject pulled over in a traffic stop. This particular subject had an active bench warrant and an extensive criminal history, and may have been involved in committing burglaries in the area. Deputy 1 had legal justification to detain the complainant based on possible PC § 647(F) implications and his possible association with this other subject. The evidence showed that the act did occur but was lawful, justified and proper.

2. **Illegal Search & Seizure** – Deputy 1 patted down the complainant and searched his person during a contact.

   Board Finding: Not Sustained
   Rationale: The complainant reported that Deputy 1 patted him down and searched his person during a subject stop. Pursuant to Case Law 2.20, Search and Seizure – Persons, specifically as it relates to searches during detentions (Patdowns/Frisks), in potentially dangerous situations, officers are authorized to conduct a pat down or limited weapons search of the outer clothing of someone who has been detained, but (1) only for weapons, (2) only of his outer clothing, and (3) only if they have specific facts that would make a reasonable officer feel in danger. During a detention, officers have no power to conduct a general, full, exploratory search of the suspect. The complainant reported that during this contact, Deputy 1 emptied the contents of his pockets and placed them on the hood of his patrol vehicle. This level of search is only permissible if the person is subject to a search clause or voluntary consent is given. The complainant could not recall the events from a year ago when he had admittedly been drinking, and was ambiguous as to whether or not he gave consent for the search of his person. Deputy 1's account conflicted with the information provided by the complainant, leaving insufficient evidence to either prove or disprove the allegation.

3. **Excessive Force** – Deputy 2 forced the complainant's arms near his head while removing his cuffs, causing tremendous pain and possibly dislocating his shoulders.

   Board Finding: Not Sustained
   Rationale: The complainant alleged that Deputy 2 forced his arms up near his head while removing his handcuffs, causing tremendous pain and possibly dislocating his shoulders. During the course of this investigation, Deputy 2 provided an account that conflicted with information reported by the complainant. The complainant failed to provide medical information supportive of his allegations; however, any medical information provided would have in all likelihood lacked evidentiary value as the complainant had reported that the problems with his shoulder pre-existed this incident and was reportedly exacerbated by Deputy 2's alleged actions. Absent a video recording of this incident or an independent witness, there was insufficient evidence to either prove or disprove the allegation.

4. **Misconduct/Discourtesy** – Deputy 3 stated to the complainant that he was "looking for a hand out," or used words to that effect.

   Board Finding: Not Sustained
   Rationale: The complainant alleged that Deputy 3 accused him of "looking for a hand out" as the reason behind his complaint related to Deputies 1 and 2's conduct. Deputy 3 was not heard making this comment during the review of two audio recordings of conversations between him and the complainant. Furthermore, Deputy 3 provided information during the course of CLERB's investigation that conflicted with information reported by the complainant. Absent an audio recording of this conversation, there was insufficient evidence to either prove or disprove the allegation.

**17-047**

1. Misconduct/Procedure – An unidentified deputy asked the complainant's son about the nature of his crime while in front of other Protective Custody inmates.

   Board Finding: Summary Dismissal
   Rationale: The complainant reported to CLERB on behalf of her son, that an unidentified deputy approached him, and in front of other Protective Custody inmates, asked the aggrieved about the nature of his crime. According to the complainant, this frightened her son and endangered his life. The complainant provided no specific date and time of this alleged incident.  An email and complaint packet was sent to the aggrieved requesting the date, time and details of this incident. He was informed at that time and in a subsequent email that CLERB could not proceed without more specific information related to this alleged incident. To date, however, the aggrieved has not responded. This complaint could not be investigated because the aggrieved failed to cooperate with the investigation by providing pivotal information. Such complaints are referred to the Review Board for Summary Dismissal.

---

**17-084**

1. Misconduct/Procedure – Deputy 1 failed to provide legal assistance for the complainant's son.

   Board Finding: Summary Dismissal
   Rationale: The complainant alleged on behalf of her son, that members of the Office of Assigned Counsel failed to provide required assistance in processing her son's legal mail. The complainant also alleged that medical personnel at San Diego Central Jail withheld her son's medication without disclosing a reason. CLERB does not have authority to investigate this complaint based upon the following CLERB Rules & Regulations:  Section 4: Authority, Jurisdiction, Duties, and Responsibilities of Review Board, Section 9: Screening of Complaints, and Section 15: Summary Dismissal. CLERB does not have jurisdiction over the subject matter of the Complaint.

2. Misconduct/Medical – Medical staff at San Diego Central Jail failed to provide medication for the aggrieved.

   Board Finding: Summary Dismissal
   Rationale: See Rationale #1

---

**17-085**

1. Misconduct/Procedure – An unidentified deputy failed to provide to the complainant a copy of her son's police report.

   Board Finding: Summary Dismissal
   Rationale: The complainant reported that a member of the Office of Assigned Counsel failed to provide her a copy of her son's police report.  CLERB does not have authority to investigate this complaint based upon the following CLERB Rules & Regulations:  Section 4: Authority, Jurisdiction, Duties, and Responsibilities of Review Board, Section 9: Screening of Complaints, and Section 15: Summary Dismissal. CLERB does not have jurisdiction over the subject matter of the Complaint.

---

**17-097**

1. Excessive Force/Canine – Deputy 1 deployed his canine unit on the complainant without issuing any warnings, causing severe injuries.

   Board Finding: Summary Dismissal
   Rationale: The complainant alleged that Deputy 1 deployed his canine unit on him without issuing any warnings. This incident took place in July, 2016 which is outside of the one year jurisdictional limit for filing complaints with the Review Board (CLERB). CLERB does not have authority to investigate this complaint based upon the following CLERB Rules & Regulations: Section 4: Authority, Jurisdiction, Duties, and Responsibilities of Review Board;

Section 9: Screening of Complaints, and Section 15: Summary Dismissal. CLERB does not have jurisdiction because the Complaint was not timely filed.

*End of Report*

# EXHIBIT Y

# SEIU
**Stronger Together**

# LOCAL 221
## Service Employees International Union, CLC

October 12, 2021

Paul Parker, Executive Officer
Citizens Law Enforcement Review Board

**Re: Proposals to Expand CLERB Jurisdiction**

Mr. Parker,

The Service Employees International Union, Local 221, representing health care workers in San Diego County Jails, has a long-standing public record of advocacy for improving the workplace health and safety of our health care service professionals, the humane treatment of detainees, and an improved health care delivery system in our county jails.

This is why we pushed for approval of an audit before the California State Legislature's Joint Legislative Audit Committee, earlier this year. The audit was approved and is set to be completed in 2022.

Our members' experience providing essential health care services to detainees in the San Diego County Jails, particularly during the pandemic, has and continues to give us great cause for concern. The conditions in the jails continue to be unsafe for detainees and workers alike. This is due to the lack of adequate staffing levels, and a lack of adherence to general practice protocols such as direction of health care service providers by licensed medical professionals rather than law enforcement.

The conditions in the San Diego County jails are not just dangerous and inhumane for the detainees, they are dangerous and inhumane for the staff. The jails are currently so short staffed that our members are subject to mandatory overtime, leaving them exhausted, resulting in unnecessary burn-out related turnover.

Our members are deeply concerned that despite their best efforts, they simply cannot provide the high-quality level of care demanded by this high-risk patient population long-term, when they are this overworked and exhausted due to inadequate staffing levels.

We urge the board and county staff to include our recommendations relating to the oversight of medical staff. Specifically, we would like any investigation into medical staff to include an investigation into (1) whether medical staff was directed by law enforcement, by licensed medical professionals, or by a combination of the two, (2) whether staffing ratios have been established based on best clinical practices, (3) whether those staffing ratios were adhered to at all times during the care of the detainee,

San Diego ~ Imperial Counties

4004 Kearny Mesa Road ~ San Diego, CA 92111 ~ (858) 560-0151 ~ Fax (858) 560-1299

(4) whether staff were subject to mandatory overtime at the time of the incident, (5) whether there is a complaint process by which medical staff may raise issues of concern regarding the lack adherence to best clinical practices and other issues of concern, and whether such complaint system includes review by licensed medical professionals.

We strongly recommend that changes to CLERB's jurisdiction include these recommendations so that important information might come to light regarding the unsafe conditions at the San Diego County Jails. We hope that this transparency will lead to necessary changes at the San Diego County Jails, that will better ensure both an adequate and appropriate health care delivery system, and the health and safety of detainees and workers alike.

Thank you,

Crystal Irving
SEIU 221 President

# EXHIBIT Z

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL   ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
7 / 2 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Bush, Michael Leval
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
10 / 21 / 1967
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian
☑ Black
☐ Chinese
☐ Cambodian
☐ Filipino
☐ Guamanian
☐ Hispanic
☐ American Indian
☐ Japanese
☐ Korean
☐ Laotian
☐ Other
☐ Pacific Islander
☐ Samoan
☐ Hawaiian
☐ Vietnamese
☐ White
☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
243(A) P. C.

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☑ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 785

State of California

## DEATH IN CUSTODY REPORTING FORM

Department of Justice

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**   ☐ **AMENDMENT**

---

**DOJ USE ONLY**

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DATE OF DEATH**

7 / 2 / 2019
MM / DD / YYYY

**SUBJECT NAME**

Bush, Michael Leval

Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

10 / 21 / 1967
MM / DD / YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☑ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

243(A) P. C.

---

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☐ Facility -- Living
- ☐ Facility -- Common
- ☑ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

---

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Paula Hawkins

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6232

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 786

State of California
Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

## DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DOJ USE ONLY**

**DATE OF DEATH**
2 / 7 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Castiglione, Joseph
Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**
3 / 7 / 1962
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian     ☐ Korean
☐ Black           ☐ Laotian
☐ Chinese         ☐ Other
☐ Cambodian       ☐ Pacific Islander
☐ Filipino        ☐ Samoan
☐ Guamanian       ☐ Hawaiian
☐ Hispanic        ☐ Vietnamese
☐ American Indian ☑ White
☐ Japanese        ☐ Asian Indian

**CUSTODY OFFENSE**
11550 HS; 11377 HS

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☑ Awaiting Booking
☐ Booked - No Charges Filed
☐ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☑ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip    **Title:** Se. Crime & Intelligence Analyst

**Agency:** San Diego Sheriff's Department    **Telephone:** (858) 285-6321

**Address:** 5590 Overland Avenue, San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 787

State of California
Department of Justice

# DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

## DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DOJ USE ONLY**

**DATE OF DEATH**
2 / 7 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Castiglione, Joseph
Last        First        Middle

**CII NUMBER**

_____

**DATE OF BIRTH**
3 / 7 / 1962
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☐ Hispanic           ☐ Vietnamese
☐ American Indian    ☑ White
☐ Japanese           ☐ Asian Indian

**CUSTODY OFFENSE**
11550 HS; 11377 HS

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☑ Awaiting Booking
☐ Booked - No Charges Filed
☐ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☑ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information:*)

**Name:** Jeffrey S Vandersip    **Title:** Se. Crime & Intelligence Analyst

**Agency:** San Diego Sheriff's Department    **Telephone:** (858) 285-6321

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 788

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**   ☐ **AMENDMENT**

---

**DOJ USE ONLY**

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

---

**DATE OF DEATH**
2 / 7 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Castiglione, Joseph
Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**
3 / 7 / 1962
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian      ☐ Korean
☐ Black            ☐ Laotian
☐ Chinese          ☐ Other
☐ Cambodian        ☐ Pacific Islander
☐ Filipino         ☐ Samoan
☐ Guamanian        ☐ Hawaiian
☐ Hispanic         ☐ Vietnamese
☐ American Indian  ☑ White
☐ Japanese         ☐ Asian Indian

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**
11550 HS; 11377 HS

---

**CUSTODY STATUS**
(Check One)
☐ Process of Arrest
☐ In Transit
☑ Awaiting Booking
☐ Booked - No Charges Filed
☐ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(Check One)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(Check One)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☑ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

---

**FACILITY OF DEATH**
(Check One)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(Check One)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(Check One)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (Please print the following information):

**Name:** Paula Hawkins

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6232

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 789

State of California

# DEATH IN CUSTODY REPORTING FORM

Department of Justice

BCIA 713 (rev. 11/05)

☐ ORIGINAL   ☑ AMENDMENT

## DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DOJ USE ONLY**

**DATE OF DEATH**

5 / 13 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Curry, Dennis Lee

Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

11 / 2 / 1955
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☑ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

**CUSTODY OFFENSE**

23152(F)VC DUI:Drugs

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☐ Facility -- Living
- ☑ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☑ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☑ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Yvette Pena

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6111

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 790

State of California

**DEATH IN CUSTODY REPORTING FORM**

Department of Justice

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

---

## DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

---

**DATE OF DEATH**

5 / 13 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Curry, Dennis Lee

Last                First                Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

11 / 2 / 1955
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☑ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

23152(F)VC DUI:Drugs

---

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☐ Facility -- Living
- ☑ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

---

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☑ Local Hospital
- ☐ City Jail
- ☐ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☐ Pending Investigation
- ☑ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☐ Pending Investigation
- ☑ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 791

State of California                                                                           Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**      ☐ **AMENDMENT**

┌─────────────────────────────┐
│ ### DOJ USE ONLY            │
│ **RECORD KEY**              │
│ _____     │
│                             │
│ **AGENCY TYPE**             │
│ ☐ Police                    │
│ ☐ Sheriff                   │
│ ☐ Probation                 │
│ ☐ State                     │
│ ☐ Other Local               │
│ **AGENCY NCIC NUMBER**      │
│ _____     │
│                             │
│ **COUNTY**                  │
└─────────────────────────────┘

**DATE OF DEATH**          **SUBJECT NAME**

  5  /  13  /  2019        Curry, Dennis Lee
 MM    DD     YYYY         Last                First          Middle

**CII NUMBER**             **DATE OF BIRTH**

                            11  /  2  /  1955
                           MM     DD    YYYY

**GENDER**                 **RACE/ETHNICITY** (Check One)
☑ Male                     ☐ Other Asian        ☐ Korean
☐ Female                   ☑ Black              ☐ Laotian
                           ☐ Chinese            ☐ Other
                           ☐ Cambodian          ☐ Pacific Islander
                           ☐ Filipino           ☐ Samoan
                           ☐ Guamanian          ☐ Hawaiian
                           ☐ Hispanic           ☐ Vietnamese
                           ☐ American Indian     ☐ White
                           ☐ Japanese           ☐ Asian Indian

┌──────────────────┐
│ **DOJ USE ONLY** │
│                  │
└──────────────────┘
**CUSTODY OFFENSE**

23152(F)VC DUI:Drugs

**CUSTODY STATUS**                  **CUSTODIAL RESPONSIBILITY**           **LOCATION WHERE CAUSE**
(Check One)                         **AT TIME OF DEATH**                   **OF DEATH OCCURRED**
☐ Process of Arrest                 (Check One)                            (Check One)
☐ In Transit                        ☐ Process of Arrest                    ☐ Not Applicable (Natural)
☐ Awaiting Booking                  ☐ City Jail                            ☐ Crime/Arrest Scene
☐ Booked - No Charges Filed         ☑ County Jail                          ☐ Facility -- Administrative
☑ Booked - Awaiting Trial           ☐ Adult Camp or Ranch                  ☐ Facility -- Booking
☐ Sentenced                         ☐ Local Juvenile Facility/Camp         ☐ Facility -- Living
☐ Out to Court                      ☐ Adult Operations and Adult Programs (formerly CDC)  ☑ Facility -- Common
☐ Other                             ☐ Division of Juvenile Justice (formerly CYA)         ☐ Facility -- Holding
                                    ☐ State Hospital                       ☐ Facility -- Medical Treatment
                                    ☐ Other                                ☐ Other

**FACILITY OF DEATH**               **MANNER OF DEATH**                    **MEANS OF DEATH**
(Check One)                         (Check One)                            (Check One)
☐ Crime/Arrest Scene                ☑ Pending Investigation                ☑ Pending Investigation
☐ Local Hospital                    ☐ Natural                              ☐ Not Applicable (Natural)
☐ City Jail                         ☐ Accidental -- Injury to Self         ☐ Handgun
☑ County Jail                       ☐ Accidental -- Injury by Other        ☐ Rifle/Shotgun
☐ Adult Camp or Ranch               ☐ Suicide                              ☐ Club, Blunt Instrument
☐ Local Juvenile Facility/Camp      ☐ Homicide Willful (Law Enforcement Staff)  ☐ Hands, Feet, Fists
☐ Adult Operations and Adult        ☐ Homicide Willful (Other Inmate)      ☐ Knife, Cutting Instrument
   Programs (formerly CDC)          ☐ Homicide Justified (Law Enforcement Staff)  ☐ Hanging, Strangulation
☐ Division of Juvenile Justice      ☐ Homicide Justified (Other Inmate)    ☐ Alcohol/Drug Overdose
   (formerly CYA)                   ☐ Execution                            ☐ Execution: Lethal Gas/Injection
☐ State Hospital                    ☐ Cannot Be Determined                 ☐ Cannot Be Determined
☐ Other                             ☐ Other                                ☐ Other

┌───────────────────────────────────────────────────────────────────────────────────┐
│ **DATA SUPPLIED BY** (Please print the following information):                     │
│                                                                                   │
│ **Name:** Yvette Pena              **Title:** Administrative Secretary II          │
│                                                                                   │
│ **Agency:** San Diego Sheriff's Department    **Telephone:** (858) 285-6111       │
│                                                                                   │
│ **Address:** 5590 Overland Avenue, San Diego, CA 92123                            │
└───────────────────────────────────────────────────────────────────────────────────┘

**Send completed form to: Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 792

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL  ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

273.6 (A) PC

---

**DATE OF DEATH**

11 / 27 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Godfrey, Matthew Mark
Last            First            Middle

**CII NUMBER**

**DATE OF BIRTH**

9 / 11 / 1973
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian       ☐ Korean
☐ Black             ☐ Laotian
☐ Chinese           ☐ Other
☐ Cambodian         ☐ Pacific Islander
☐ Filipino          ☐ Samoan
☐ Guamanian         ☐ Hawaiian
☑ Hispanic          ☐ Vietnamese
☐ American Indian   ☐ White
☐ Japanese          ☐ Asian Indian

---

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

---

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
   Programs (formerly CDC)
☐ Division of Juvenile Justice
   (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 793

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL　　☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

11 / 27 / 2019
MM　DD　YYYY

**SUBJECT NAME**

Godfrey, Matthew Mark
Last　　　　First　　　　Middle

**CII NUMBER**

**DATE OF BIRTH**

9 / 11 / 1973
MM　DD　YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☑ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**

273.6 (A) PC

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☑ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☑ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-9321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 794

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

11 / 24 / 2019
MM / DD / YYYY

**SUBJECT NAME**

Godfrey, Matthew Mark
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

9 / 11 / 1973
MM / DD / YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian       ☐ Korean
☐ Black             ☐ Laotian
☐ Chinese           ☐ Other
☐ Cambodian         ☐ Pacific Islander
☐ Filipino          ☐ Samoan
☐ Guamanian         ☐ Hawaiian
☑ Hispanic          ☐ Vietnamese
☐ American Indian   ☐ White
☐ Japanese          ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**

273.6 (A) PC

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
Programs (formerly CDC)
☐ Division of Juvenile Justice
(formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 795

State of California                                                                                          Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☐ ORIGINAL      ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DATE OF DEATH**

8 / 3 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Hossfeld, Michael James

Last            First            Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

11 / 30 / 1977
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**

245(B) PC

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☑ Local Hospital
- ☐ City Jail
- ☐ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☐ Natural
- ☑ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☑ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Paula Hawkins                    **Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department          **Telephone:** (858) 285-6232

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 796

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

---

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

245(B) PC

---

**DATE OF DEATH**

8 / 3 / 2019
MM / DD / YYYY

**SUBJECT NAME**

Hossfeld, Michael James

Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

11 / 30 / 1977
MM / DD / YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (Check One)
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

---

**CUSTODY STATUS**
(Check One)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(Check One)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(Check One)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

---

**FACILITY OF DEATH**
(Check One)
- ☐ Crime/Arrest Scene
- ☑ Local Hospital
- ☐ City Jail
- ☐ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(Check One)
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(Check One)
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (Please print the following information):

**Name:** Paula Hawkins

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6232

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA   94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 797

State of California                                                                        Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☐ ORIGINAL     ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**
_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**
_____

**COUNTY**
_____

### DOJ USE ONLY

**CUSTODY OFFENSE**
11379 HS

**DATE OF DEATH**
9 / 16 / 2019
MM   DD   YYYY

**SUBJECT NAME**
July Franklin James
Last            First            Middle

**CII NUMBER**
_____

**DATE OF BIRTH**
9 / 27 / 1990
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian     ☐ Korean
☑ Black           ☐ Laotian
☐ Chinese         ☐ Other
☐ Cambodian       ☐ Pacific Islander
☐ Filipino        ☐ Samoan
☐ Guamanian       ☐ Hawaiian
☐ Hispanic        ☐ Vietnamese
☐ American Indian ☐ White
☐ Japanese        ☐ Asian Indian

**CUSTODY STATUS**
(Check One)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(Check One)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(Check One)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(Check One)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(Check One)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(Check One)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☑ Other

### DATA SUPPLIED BY (Please print the following information):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 798

State of California
Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

RECORD KEY
_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**
_____

**COUNTY**
_____

### DOJ USE ONLY

**CUSTODY OFFENSE**

11379 HS

**DATE OF DEATH**

9 / 16 / 2019
MM  DD  YYYY

**CII NUMBER**
_____

**SUBJECT NAME**

July Franklin James
Last            First            Middle

**DATE OF BIRTH**

9 / 27 / 1990
MM  DD  YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian
☑ Black
☐ Chinese
☐ Cambodian
☐ Filipino
☐ Guamanian
☐ Hispanic
☐ American Indian
☐ Japanese
☐ Korean
☐ Laotian
☐ Other
☐ Pacific Islander
☐ Samoan
☐ Hawaiian
☐ Vietnamese
☐ White
☐ Asian Indian

**CUSTODY STATUS**
(Check One)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(Check One)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(Check One)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(Check One)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(Check One)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(Check One)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☑ Other

---

**DATA SUPPLIED BY** (Please print the following information):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 799

State of California

Department of Justice

# DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

## DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

9 / 16 / 2019
MM    DD    YYYY

**SUBJECT NAME**

July, Franklin James
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

9 / 27 / 1990
MM    DD    YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☑ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**

11379(A) HS

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☐ Pending Investigation
- ☑ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 800

State of California                                                            Department of Justice
## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

┌─────────────────────────────┐
│ **DOJ USE ONLY** │
│ **RECORD KEY** │
│ │
│ **AGENCY TYPE** │
│ ☐ Police │
│ ☐ Sheriff │
│ ☐ Probation │
│ ☐ State │
│ ☐ Other Local │
│ **AGENCY NCIC NUMBER** │
│ │
│ **COUNTY** │
└─────────────────────────────┘

**DATE OF DEATH**
2 / 16 / 2019
MM   DD   YYYY

**SUBJECT NAME**
King, Derek Oak
Last            First            Middle

**CII NUMBER**

**DATE OF BIRTH**
2 / 18 / 1973
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian      ☐ Korean
☐ Black            ☐ Laotian
☐ Chinese          ☐ Other
☐ Cambodian        ☐ Pacific Islander
☐ Filipino         ☐ Samoan
☐ Guamanian        ☐ Hawaiian
☐ Hispanic         ☐ Vietnamese
☐ American Indian  ☑ White
☐ Japanese         ☐ Asian Indian

┌─────────────────────────────┐
│ **DOJ USE ONLY** │
└─────────────────────────────┘

**CUSTODY OFFENSE**
187(A) PC; 206 PC

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☑ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☑ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☑ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

┌──────────────────────────────────────────────────────────────────────┐
│ **DATA SUPPLIED BY** (*Please print the following information*): │
│ │
│ **Name:** Paula Hawkins    **Title:** Administrative Secretary II │
│ │
│ **Agency:** San Diego Sheriff's Department    **Telephone:** (858) 285-6232 │
│ │
│ **Address:** 5590 Overland Avenue, San Diego, CA 92123 │
└──────────────────────────────────────────────────────────────────────┘

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 801

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL     ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DATE OF DEATH**

8 / 26 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Lopez, Julio Ortiz

Last                First                Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

1 / 9 / 1971
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☑ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**

647F PC

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☑ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☑ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 802

State of California                                                                  Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

**DOJ USE ONLY**

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
8 / 26 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Lopez, Julio Ortiz
Last              First              Middle

**CII NUMBER**

**DATE OF BIRTH**
1 / 9 / 1971
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☑ Hispanic           ☐ Vietnamese
☐ American Indian    ☐ White
☐ Japanese           ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**
647F PC

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S Vandersip
**Title:** Sr. Crime & Intelligence Analyst
**Agency:** San Diego County Sheriff
**Telephone:** (858) 285-6321
**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 803

State of California                                                                                              Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

---

**DOJ USE ONLY**

RECORD KEY

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DATE OF DEATH**

3 / 18 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Ortiz, Ivan Arturo

Last                    First                    Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

1 / 28 / 1993
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*

☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☑ Hispanic           ☐ Vietnamese
☐ American Indian    ☐ White
☐ Japanese           ☐ Asian Indian

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

187(a) PC, 148(A)(1) PC

---

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☑ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

---

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☐ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☑ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☑ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Paula Hawkins

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6232

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 804

State of California                                                                   Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**    ☑ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

11350/51/52 HS

---

**DATE OF DEATH**
9 / 6 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Pickett Daniel james
Last            First            Middle

**CII NUMBER**

_____

**DATE OF BIRTH**
9 / 27 / 1990
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian       ☐ Korean
☐ Black             ☐ Laotian
☐ Chinese           ☐ Other
☐ Cambodian         ☐ Pacific Islander
☐ Filipino          ☐ Samoan
☐ Guamanian         ☐ Hawaiian
☐ Hispanic          ☐ Vietnamese
☐ American Indian   ☑ White
☐ Japanese          ☐ Asian Indian

---

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

---

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
  Programs (formerly CDC)
☐ Division of Juvenile Justice
  (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S Vandersip          **Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff   **Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 805

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
9 / 6 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Pickett Daniel James
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
9 / 27 / 1990
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian
☐ Black
☐ Chinese
☐ Cambodian
☐ Filipino
☐ Guamanian
☐ Hispanic
☐ American Indian
☐ Japanese
☐ Korean
☐ Laotian
☐ Other
☐ Pacific Islander
☐ Samoan
☐ Hawaiian
☐ Vietnamese
☑ White
☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
11350/51/52 HS

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
   Programs (formerly CDC)
☐ Division of Juvenile Justice
   (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

### DATA SUPPLIED BY (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

**Send completed form to: Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 806

State of California

Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☑ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
10 / 26 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Ralph Don John
Last        First        Middle

**CII NUMBER**

**DATE OF BIRTH**
12 / 5 / 1966
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
243(D) PC

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☐ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☑ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☐ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☑ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Department

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 807

State of California

Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

## DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☑ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

243(D) PC

---

**DATE OF DEATH**

10 / 26 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Ralph Don John
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

12 / 5 / 1966
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☐ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☑ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:**

**Agency:**

**Address:**

**Title:**

**Telephone:**

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 808

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL      ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

11 / 11 / 2019
MM / DD / YYYY

**SUBJECT NAME**

Serna, Elisa Beatrice
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

2 / 25 / 1995
MM / DD / YYYY

**GENDER**
☐ Male
☑ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian
☐ Black
☐ Chinese
☐ Cambodian
☐ Filipino
☐ Guamanian
☐ Hispanic
☐ American Indian
☐ Japanese

☐ Korean
☐ Laotian
☐ Other
☐ Pacific Islander
☐ Samoan
☐ Hawaiian
☐ Vietnamese
☑ White
☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**

487 (A) PC

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☑ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☑ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☑ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 809

State of California

Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**    ☐ **AMENDMENT**

## DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

---

**DATE OF DEATH**

11 / 11 / 2019
MM    DD    YYYY

**SUBJECT NAME**

Serna, Elisa

Last            First            Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

2 / 25 / 1995
MM    DD    YYYY

**GENDER**
- ☐ Male
- ☑ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

## DOJ USE ONLY

**CUSTODY OFFENSE**

487(A) PC

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☐ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☑ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego CA 92123

---

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 810

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

RECORD KEY

AGENCY TYPE
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

AGENCY NCIC NUMBER

COUNTY

### DOJ USE ONLY

**DATE OF DEATH**

8 / 26 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Sevilla, Jose Alfego
Last           First           Middle

**CII NUMBER**

**DATE OF BIRTH**

9 / 3 / 1979
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian         ☐ Korean
☐ Black               ☐ Laotian
☐ Chinese             ☐ Other
☐ Cambodian           ☐ Pacific Islander
☐ Filipino            ☐ Samoan
☐ Guamanian           ☐ Hawaiian
☑ Hispanic            ☐ Vietnamese
☐ American Indian     ☐ White
☐ Japanese            ☐ Asian Indian

**CUSTODY OFFENSE**

459 P.C.

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☐ Booked - Awaiting Trial
☑ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Paula Hawkins

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 974-2430

**Address:** P. O. Box 939062, San Diego, CA 92193-9062

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 811

State of California                                                                Department of Justice

# DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**   ☐ **AMENDMENT**

## DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DOJ USE ONLY**

**CUSTODY OFFENSE**

459 P.C.

---

**DATE OF DEATH**

8 / 26 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Sevilla, Jose Alfego
Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

9 / 3 / 1979
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☑ Hispanic           ☐ Vietnamese
☐ American Indian    ☐ White
☐ Japanese           ☐ Asian Indian

## CUSTODY STATUS
(Check One)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☐ Booked - Awaiting Trial
☑ Sentenced
☐ Out to Court
☐ Other

## CUSTODIAL RESPONSIBILITY AT TIME OF DEATH
(Check One)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

## LOCATION WHERE CAUSE OF DEATH OCCURRED
(Check One)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

## FACILITY OF DEATH
(Check One)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

## MANNER OF DEATH
(Check One)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

## MEANS OF DEATH
(Check One)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (Please print the following information):

**Name:** Paula Hawkins

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 974-2430

**Address:** P. O. Box 939062, San Diego, CA 92193-9062

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 812

State of California                                                                    Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**    ☑ **AMENDMENT**

**DOJ USE ONLY**

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DOJ USE ONLY**

| | |
|---|---|
| **DATE OF DEATH** | **SUBJECT NAME** |
| 5 / 29 / 2019 | Thomas, Jeremy |
| MM  DD  YYYY | Last          First          Middle |

**CII NUMBER**

**DATE OF BIRTH**
2 / 23 / 1991
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☐ Hispanic           ☐ Vietnamese
☐ American Indian    ☑ White
☐ Japanese           ☐ Asian Indian

**CUSTODY OFFENSE**
11378 HS; 11364 HS

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
  Programs (formerly CDC)
☐ Division of Juvenile Justice
  (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** (*Please print the following information:*)

**Name:** Jeffrey Vandersip                    **Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego Sheriff's Department     **Telephone:** (858) 285-6321

**Address:** 5590 Overland Avenue, San Diego, CA 92123

**Send completed form to: Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 813

State of California

Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

## DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DOJ USE ONLY**

**DATE OF DEATH**
5 / 29 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Thomas, Jeremy
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
2 / 23 / 1991
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian      ☐ Korean
☐ Black            ☐ Laotian
☐ Chinese          ☐ Other
☐ Cambodian        ☐ Pacific Islander
☐ Filipino         ☐ Samoan
☐ Guamanian        ☐ Hawaiian
☐ Hispanic         ☐ Vietnamese
☐ American Indian  ☑ White
☐ Japanese         ☐ Asian Indian

**CUSTODY OFFENSE**
11378 HS; 11364 HS

**CUSTODY STATUS**
(Check One)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(Check One)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(Check One)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(Check One)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(Check One)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(Check One)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** (Please print the following information):

**Name:** Jeffrey Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Avenue, San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 814

State of California

Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

<table>
<tr><td rowspan="8">

**DOJ USE ONLY**

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

</td></tr>
</table>

**DATE OF DEATH**

5 / 29 / 2019
MM   DD   YYYY

**SUBJECT NAME**

Thomas, Jeremy

Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

2 / 23 / 1991
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian    ☐ Korean
☐ Black          ☐ Laotian
☐ Chinese        ☐ Other
☐ Cambodian      ☐ Pacific Islander
☐ Filipino       ☐ Samoan
☐ Guamanian      ☐ Hawaiian
☐ Hispanic       ☐ Vietnamese
☐ American Indian ☑ White
☐ Japanese       ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**

11378 HS; 11364 HS

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Paula Hawkins

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6232

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 815

State of California                                                                          Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DOJ USE ONLY**

**DATE OF DEATH**
4 / 13 / 2019
MM   DD   YYYY

**SUBJECT NAME**
White, Victor
Last            First            Middle

**CII NUMBER**

**DATE OF BIRTH**
1 / 4 / 1960
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian          ☐ Korean
☑ Black                ☐ Laotian
☐ Chinese              ☐ Other
☐ Cambodian            ☐ Pacific Islander
☑ Filipino             ☐ Samoan
☐ Guamanian            ☐ Hawaiian
☐ Hispanic             ☐ Vietnamese
☐ American Indian      ☐ White
☐ Japanese             ☐ Asian Indian

**CUSTODY OFFENSE**
3455(A) P.C.; 3453(Q)

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☐ Booked - Awaiting Trial
☑ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☐ Pending Investigation
☑ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☐ Pending Investigation
☑ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S Vandersip          **Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego Sheriff's Department          **Telephone:** (858) 285-6321

**Address:** 5590 Overland Avenue, San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 816

State of California                                                                 Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

**DOJ USE ONLY**

**RECORD KEY**

_____

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DATE OF DEATH**

4 / 13 / 2019
MM   DD   YYYY

**SUBJECT NAME**

White, Victor
Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

1 / 4 / 1960
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☑ Black
- ☐ Chinese
- ☐ Cambodian
- ☑ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**

3455(A) P.C.; 3453(Q)

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☐ Booked - Awaiting Trial
- ☑ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☑ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☑ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Paula Hawkins                    **Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department          **Telephone:** (858) 285-6232

**Address:** 5590 Overland Avenue, San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 817

State of California                                                                     Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**    ☑ **AMENDMENT**

┌─────────────────────────────┐
│ ## DOJ USE ONLY             │
│ **RECORD KEY**              │
│                             │
│ **AGENCY TYPE**             │
│ ☐ Police                    │
│ ☐ Sheriff                   │
│ ☐ Probation                 │
│ ☐ State                     │
│ ☐ Other Local               │
│ **AGENCY NCIC NUMBER**      │
│                             │
│ **COUNTY**                  │
└─────────────────────────────┘

**DATE OF DEATH**     **SUBJECT NAME**
  2  /  14  /  2019    Wilson, Michael Richard
 MM    DD     YYYY     Last          First        Middle

**CII NUMBER**         **DATE OF BIRTH**
                        12  /  13  /  1986
                        MM    DD     YYYY

**GENDER**             **RACE/ETHNICITY** *(Check One)*
☑ Male                 ☐ Other Asian        ☐ Korean
☐ Female               ☑ Black              ☐ Laotian
                       ☐ Chinese            ☐ Other
                       ☐ Cambodian          ☐ Pacific Islander
                       ☐ Filipino           ☐ Samoan
                       ☐ Guamanian          ☐ Hawaiian
                       ☐ Hispanic           ☐ Vietnamese
                       ☐ American Indian     ☐ White
                       ☐ Japanese           ☐ Asian Indian

┌─────────────────────────┐
│ **DOJ USE ONLY**        │     **CUSTODY OFFENSE**
│                         │     245(A)(4)Assault w/force
└─────────────────────────┘

**CUSTODY STATUS**              **CUSTODIAL RESPONSIBILITY**      **LOCATION WHERE CAUSE**
*(Check One)*                   **AT TIME OF DEATH**              **OF DEATH OCCURRED**
☐ Process of Arrest             *(Check One)*                     *(Check One)*
☐ In Transit                    ☐ Process of Arrest               ☐ Not Applicable (Natural)
☐ Awaiting Booking              ☐ City Jail                       ☐ Crime/Arrest Scene
☐ Booked - No Charges Filed     ☑ County Jail                     ☐ Facility -- Administrative
☑ Booked - Awaiting Trial       ☐ Adult Camp or Ranch             ☐ Facility -- Booking
☐ Sentenced                     ☐ Local Juvenile Facility/Camp    ☑ Facility -- Living
☐ Out to Court                  ☐ Adult Operations and Adult Programs (formerly CDC)  ☐ Facility -- Common
☐ Other                         ☐ Division of Juvenile Justice (formerly CYA)  ☐ Facility -- Holding
                                ☐ State Hospital                  ☐ Facility -- Medical Treatment
                                ☐ Other                           ☐ Other

**FACILITY OF DEATH**           **MANNER OF DEATH**               **MEANS OF DEATH**
*(Check One)*                   *(Check One)*                     *(Check One)*
☐ Crime/Arrest Scene            ☐ Pending Investigation           ☐ Pending Investigation
☐ Local Hospital                ☑ Natural                         ☑ Not Applicable (Natural)
☐ City Jail                     ☐ Accidental -- Injury to Self    ☐ Handgun
☑ County Jail                   ☐ Accidental -- Injury by Other   ☐ Rifle/Shotgun
☐ Adult Camp or Ranch           ☐ Suicide                         ☐ Club, Blunt Instrument
☐ Local Juvenile Facility/Camp  ☐ Homicide Willful (Law Enforcement Staff)  ☐ Hands, Feet, Fists
☐ Adult Operations and Adult    ☐ Homicide Willful (Other Inmate)  ☐ Knife, Cutting Instrument
  Programs (formerly CDC)       ☐ Homicide Justified (Law Enforcement Staff)  ☐ Hanging, Strangulation
☐ Division of Juvenile Justice  ☐ Homicide Justified (Other Inmate)  ☐ Alcohol/Drug Overdose
  (formerly CYA)                ☐ Execution                       ☐ Execution: Lethal Gas/Injection
☐ State Hospital                ☐ Cannot Be Determined            ☐ Cannot Be Determined
☐ Other                         ☐ Other                           ☐ Other

┌──────────────────────────────────────────────────────────────────────────────────┐
│ **DATA SUPPLIED BY** *(Please print the following information):*                   │
│                                                                                    │
│ **Name:** Jeffrey Vandersip          **Title:** Sr. Crime & Intelligence Analyst  │
│                                                                                    │
│ **Agency:** San Diego Sheriff's Department   **Telephone:** (858) 285-6321        │
│                                                                                    │
│ **Address:** 5590 Overland Avenue San Diego, CA 92123                             │
└──────────────────────────────────────────────────────────────────────────────────┘

**Send completed form to: Department of Justice**
                         **Criminal Justice Statistics Center**
                         **P.O. Box 903427**
                         **Sacramento, CA  94203-4270**
                         **Facsimile: (916) 227-0427 or 227-3561**
                         **Telephone: (916) 227-3545**

Ex. Z - 818

State of California
Department of Justice

# DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
2 / 14 / 2019
MM   DD   YYYY

**SUBJECT NAME**
Wilson, Michael Richard
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
12 / 13 / 1986
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☑ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
245(A)(4)Assault w/force

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Yvette Pena

**Title:** Administrative Secretary II

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6111

**Address:** 5590 Overland Avenue San Diego, CA 92123

---

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 819

State of California                                                                                  Department of Justice
## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
11 / 22 / 2020
MM / DD / YYYY

**SUBJECT NAME**
Alvarez Lazaro Javier
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
2 / 12 / 1980
MM / DD / YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☑ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
602 PC

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☐ Facility -- Living
- ☐ Facility -- Common
- ☑ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☐ Pending Investigation
- ☐ Natural
- ☑ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☐ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☑ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 820

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DOJ USE ONLY**

**CUSTODY OFFENSE**

602 PC

**DATE OF DEATH**

11 / 22 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Alvarez Lazaro Javier

Last         First         Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

2 / 12 / 1980
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☑ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☐ Facility -- Living
- ☐ Facility -- Common
- ☑ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 821

State of California

**DEATH IN CUSTODY REPORTING FORM**

Department of Justice

BCIA 713 (rev. 11/05)

☐ ORIGINAL  ☑ AMENDMENT

**DOJ USE ONLY**

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

10 / 17 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Brogan Nathan Lee

Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

12 / 8 / 1938
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian      ☐ Korean
☐ Black            ☐ Laotian
☐ Chinese          ☐ Other
☐ Cambodian        ☐ Pacific Islander
☐ Filipino         ☐ Samoan
☐ Guamanian        ☐ Hawaiian
☐ Hispanic         ☐ Vietnamese
☐ American Indian  ☑ White
☐ Japanese         ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**

666-187 PC

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☑ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
  Programs (formerly CDC)
☐ Division of Juvenile Justice
  (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☑ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☑ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

**Send completed form to: Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 822

State of California                                                                          Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

---

**DOJ USE ONLY**

RECORD KEY

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

---

**DATE OF DEATH**

10 / 17 / 2020
MM    DD    YYYY

**SUBJECT NAME**

Brogan Nathan Lee

Last                    First                    Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

12 / 8 / 1938
MM    DD    YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian          ☐ Korean
☐ Black                ☐ Laotian
☐ Chinese              ☐ Other
☐ Cambodian            ☐ Pacific Islander
☐ Filipino             ☐ Samoan
☐ Guamanian            ☐ Hawaiian
☐ Hispanic             ☐ Vietnamese
☐ American Indian      ☑ White
☐ Japanese             ☐ Asian Indian

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

666-187(A) PC

---

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☑ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

---

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
  Programs (formerly CDC)
☐ Division of Juvenile Justice
  (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip          **Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.    **Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 823

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

RECORD KEY
_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**
_____

**COUNTY**
_____

### DOJ USE ONLY

**CUSTODY OFFENSE**

451 (C) PC

**DATE OF DEATH**

10 / 16 / 2020
MM    DD    YYYY

**SUBJECT NAME**

Chon    Anthony
Last                    First                    Middle

**CII NUMBER**
_____

**DATE OF BIRTH**

11 / 3 / 1976
MM    DD    YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian          ☐ Korean
☑ Black                ☐ Laotian
☐ Chinese              ☐ Other
☐ Cambodian            ☐ Pacific Islander
☐ Filipino             ☐ Samoan
☐ Guamanian            ☐ Hawaiian
☐ Hispanic             ☐ Vietnamese
☐ American Indian      ☐ White
☐ Japanese             ☐ Asian Indian

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☑ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☐ Pending Investigation
☑ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☐ Pending Investigation
☑ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S. Vandersip    **Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.    **Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 824

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DOJ USE ONLY**

**CUSTODY OFFENSE**

451 (C) PC

---

**DATE OF DEATH**

10 / 16 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Chon   Anthony
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

11 / 3 / 1976
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☑ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

---

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☐ Facility -- Living
- ☑ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

---

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☑ Local Hospital
- ☐ City Jail
- ☐ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information:*)

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 825

State of California
Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
9 / 11 / 2020
MM  DD  YYYY

**SUBJECT NAME**
Flores Javier Solis
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
8 / 2 / 2001
MM  DD  YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian      ☐ Korean
☐ Black            ☐ Laotian
☐ Chinese          ☐ Other
☐ Cambodian        ☐ Pacific Islander
☐ Filipino         ☐ Samoan
☐ Guamanian        ☐ Hawaiian
☑ Hispanic         ☐ Vietnamese
☐ American Indian  ☐ White
☐ Japanese         ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
664-187 PC

**CUSTODY STATUS**
(Check One)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(Check One)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(Check One)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(Check One)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(Check One)
☐ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(Check One)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☑ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (Please print the following information):

**Name:** Jeffrey S Vandersip

**Title:** Senior Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 826

State of California

## DEATH IN CUSTODY REPORTING FORM

Department of Justice

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**     ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

459 PC

---

**DATE OF DEATH**
6 / 9 / 2020
MM / DD / YYYY

**SUBJECT NAME**
Fonseca  Spiros Stavros
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
10 / 18 / 1993
MM / DD / YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian      ☐ Korean
☐ Black            ☐ Laotian
☐ Chinese          ☐ Other
☐ Cambodian        ☐ Pacific Islander
☐ Filipino         ☐ Samoan
☐ Guamanian        ☐ Hawaiian
☐ Hispanic         ☐ Vietnamese
☐ American Indian  ☑ White
☐ Japanese         ☐ Asian Indian

---

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

---

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☑ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☑ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 827

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL     ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
11 / 24 / 2020
MM   DD   YYYY

**SUBJECT NAME**
Gonzaba Antonio Miguel
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
1 / 9 / 1981
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☑ Hispanic           ☐ Vietnamese
☐ American Indian    ☐ White
☐ Japanese           ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
261(A)(2) PC

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 828

State of California

**DEATH IN CUSTODY REPORTING FORM**

Department of Justice

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

11 / 24 / 2020
MM    DD    YYYY

**SUBJECT NAME**

Gonzaba Antonio Miguel
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

1 / 9 / 1981
MM    DD    YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☑ Hispanic           ☐ Vietnamese
☐ American Indian    ☐ White
☐ Japanese           ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**

261(A)(2) PC

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 829

State of California

**DEATH IN CUSTODY REPORTING FORM**

BCIA 713 (rev. 11/05)

Department of Justice

☐ ORIGINAL    ☑ AMENDMENT

**DOJ USE ONLY**

RECORD KEY

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DATE OF DEATH**

11 / 3 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Hasenin Omar Younes

Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

8 / 16 / 1979
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian          ☐ Korean
☐ Black                ☐ Laotian
☐ Chinese              ☑ Other
☐ Cambodian            ☐ Pacific Islander
☐ Filipino             ☐ Samoan
☐ Guamanian            ☐ Hawaiian
☐ Hispanic             ☐ Vietnamese
☐ American Indian      ☐ White
☐ Japanese             ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**

459 PC

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** (*Please print the following information*):

Name: Jeffrey S. Vandersip

Title: Sr. Crime & Intelligence Analyst

Agency: San Diego County Sheriff's Dept.

Telephone: (858) 285-6321

Address: 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 830

State of California
Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**     ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

459 PC

---

**DATE OF DEATH**

11 / 3 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Hasenin Omar Younes
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

8 / 16 / 1979
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian          ☑ Korean
☐ Black                ☐ Laotian
☐ Chinese              ☐ Other
☐ Cambodian            ☐ Pacific Islander
☐ Filipino             ☐ Samoan
☐ Guamanian            ☐ Hawaiian
☐ Hispanic             ☐ Vietnamese
☐ American Indian      ☑ White
☐ Japanese             ☐ Asian Indian

---

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

---

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
   Programs (formerly CDC)
☐ Division of Juvenile Justice
   (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S. Vandersip          **Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.          **Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 831

State of California

Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

11 / 21 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Loredo Edel Corrales

Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

2 / 10 / 1958
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian      ☐ Korean
☑ Black            ☐ Laotian
☐ Chinese          ☐ Other
☐ Cambodian        ☐ Pacific Islander
☐ Filipino         ☐ Samoan
☐ Guamanian        ☐ Hawaiian
☐ Hispanic         ☐ Vietnamese
☐ American Indian  ☐ White
☐ Japanese         ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**

11379 HS

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☑ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
  Programs (formerly CDC)
☐ Division of Juvenile Justice
  (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☐ Pending Investigation
☑ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☐ Pending Investigation
☑ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 832

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**      ☐ **AMENDMENT**

┌─────────────────────────────┐
│ ## DOJ USE ONLY             │
│ **RECORD KEY**              │
│                             │
│ **AGENCY TYPE**             │
│   ☐ Police                  │
│   ☐ Sheriff                 │
│   ☐ Probation               │
│   ☐ State                   │
│   ☐ Other Local             │
│ **AGENCY NCIC NUMBER**      │
│                             │
│ **COUNTY**                  │
└─────────────────────────────┘

**DATE OF DEATH**
11 / 22 / 2020
MM   DD   YYYY

**SUBJECT NAME**
Loredo Edel Corrales
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
1 / 10 / 1958
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian       ☐ Korean
☑ Black             ☐ Laotian
☐ Chinese           ☐ Other
☐ Cambodian         ☐ Pacific Islander
☐ Filipino          ☐ Samoan
☐ Guamanian         ☐ Hawaiian
☐ Hispanic          ☐ Vietnamese
☐ American Indian   ☐ White
☐ Japanese          ☐ Asian Indian

┌──────────────────┐
│ **DOJ USE ONLY** │
└──────────────────┘
**CUSTODY OFFENSE**
11379 HS

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☑ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

┌─────────────────────────────────────────────────────────────┐
│ **DATA SUPPLIED BY** (*Please print the following information:*) │
│                                                              │
│ **Name:** Jeffrey S. Vandersip    **Title:** Sr. Crime & Intelligence Analyst │
│                                                              │
│ **Agency:** San Diego County Sheriff's Dept.    **Telephone:** (858) 285-6321 │
│                                                              │
│ **Address:** 5590 Overland Ave., San Diego, CA 92123         │
└─────────────────────────────────────────────────────────────┘

**Send completed form to: Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 833

State of California                                                                    Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

RECORD KEY
_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**
_____

**COUNTY**
_____

### DOJ USE ONLY

**CUSTODY OFFENSE**
245(A)(1) PC

**DATE OF DEATH**
11 / 11 / 2020
MM   DD   YYYY

**SUBJECT NAME**
Mills  Kevin Lamar
Last            First            Middle

**CII NUMBER**
_____

**DATE OF BIRTH**
6 / 8 / 1961
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian
☑ Black
☐ Chinese
☐ Cambodian
☐ Filipino
☐ Guamanian
☐ Hispanic
☐ American Indian
☐ Japanese
☐ Korean
☐ Laotian
☐ Other
☐ Pacific Islander
☐ Samoan
☐ Hawaiian
☐ Vietnamese
☐ White
☐ Asian Indian

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
  Programs (formerly CDC)
☐ Division of Juvenile Justice
  (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☐ Pending Investigation
☑ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☐ Pending Investigation
☑ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

### DATA SUPPLIED BY *(Please print the following information):*

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 834

State of California

## DEATH IN CUSTODY REPORTING FORM

Department of Justice

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

11 / 11 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Mills  Kevin Lamar
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**

1 / 1 / 1962
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian     ☐ Korean
☑ Black           ☐ Laotian
☐ Chinese         ☐ Other
☐ Cambodian       ☐ Pacific Islander
☐ Filipino        ☐ Samoan
☐ Guamanian       ☐ Hawaiian
☐ Hispanic        ☐ Vietnamese
☐ American Indian ☐ White
☐ Japanese        ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**

245(A)(1) PC

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
   Programs (formerly CDC)
☐ Division of Juvenile Justice
   (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S. Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA 94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 835

State of California                                                                    Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**        ☐ **AMENDMENT**

### DOJ USE ONLY

RECORD KEY

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

211 PC

---

**DATE OF DEATH**

5 / 17 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Morton, Joseph Earl

Last              First              Middle

**CII NUMBER**

**DATE OF BIRTH**

4 / 21 / 1987
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian        ☑ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☐ Hispanic           ☐ Vietnamese
☐ American Indian    ☑ White
☐ Japanese           ☐ Asian Indian

**CUSTODY STATUS**
(Check One)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(Check One)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(Check One)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(Check One)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
  Programs (formerly CDC)
☐ Division of Juvenile Justice
  (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(Check One)
☐ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☑ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(Check One)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☑ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (Please print the following information):

**Name:** Jeffrey S Vandersip                 **Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff          **Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 836

State of California

Department of Justice

# DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**    ☑ **AMENDMENT**

| DOJ USE ONLY |
| --- |
| **RECORD KEY** |
| |
| **AGENCY TYPE** |
| ☐ Police |
| ☐ Sheriff |
| ☐ Probation |
| ☐ State |
| ☐ Other Local |
| **AGENCY NCIC NUMBER** |
| |
| **COUNTY** |

**DATE OF DEATH**

10 / 7 / 2020
MM   DD   YYYY

**SUBJECT NAME**

Rogers    Adam Terrance
Last         First         Middle

**CII NUMBER**

**DATE OF BIRTH**

4 / 18 / 1989
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☐ Hispanic           ☐ Vietnamese
☐ American Indian    ☑ White
☐ Japanese           ☐ Asian Indian

| DOJ USE ONLY |
| --- |

**CUSTODY OFFENSE**

220(A) PC

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
  Programs (formerly CDC)
☐ Division of Juvenile Justice
  (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☑ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

| **DATA SUPPLIED BY** (*Please print the following information*): |
| --- |
| **Name:** Jeffrey S Vandersip    **Title:** Sr. Crime & Intelligence Analyst |
| **Agency:** San Diego County Sheriff    **Telephone:** (858) 285-6321 |
| **Address:** 5590 Overland Ave., San Diego, CA 92123 |

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 837

State of California                                                                              Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

---

**DOJ USE ONLY**

**CUSTODY OFFENSE**

220(A) PC

---

**DATE OF DEATH**

10 / 7 / 2020
MM / DD / YYYY

**SUBJECT NAME**

Rogers    Adam Terrance
Last      First      Middle

**CII NUMBER**

**DATE OF BIRTH**

4 / 18 / 1989
MM / DD / YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

---

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

---

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 838

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
1 / 26 / 2020
MM   DD   YYYY

**SUBJECT NAME**
Wilson, Blake Edward
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
11 / 6 / 1974
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☑ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
11350(A) HS

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☐ Booked - Awaiting Trial
- ☑ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☐ Natural
- ☑ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☐ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☑ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 839

State of California                                                                    Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

| DOJ USE ONLY | |
|---|---|

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

| DOJ USE ONLY |
|---|

**CUSTODY OFFENSE**
11350(A) HS

**DATE OF DEATH**
1 / 26 / 2020
MM   DD   YYYY

**SUBJECT NAME**
Wilson, Blake Edward
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
11 / 6 / 1974
MM   DD   YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** *(Check One)*
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

**CUSTODY STATUS**
*(Check One)*
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☐ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
*(Check One)*
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
*(Check One)*
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
*(Check One)*
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Jeffrey S Vandersip

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff

**Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 840

State of California

**DEATH IN CUSTODY REPORTING FORM**

Department of Justice

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DOJ USE ONLY**

**CUSTODY OFFENSE**

PC470

**DATE OF DEATH**
6 / 9 / 2021
MM   DD   YYYY

**SUBJECT NAME**
Aleman, Jerry
Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**
4 / 28 / 1980
MM   DD   YYYY

**GENDER**
☒ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian       ☒ Korean
☐ Black             ☐ Laotian
☐ Chinese           ☐ Other
☐ Cambodian         ☐ Pacific Islander
☐ Filipino          ☐ Samoan
☐ Guamanian         ☐ Hawaiian
☐ Hispanic          ☐ Vietnamese
☐ American Indian   ☒ White
☐ Japanese          ☐ Asian Indian

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☒ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☒ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☒ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☒ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☒ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☒ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Anette Cabral

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6359

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 841

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

**DOJ USE ONLY**

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**

8 / 30 / 2021
MM    DD    YYYY

**SUBJECT NAME**

Davey, Glen William

Last        First        Middle

**CII NUMBER**

**DATE OF BIRTH**

11 / 7 / 1965
MM    DD    YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (*Check One*)
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☐ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☑ White
- ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**

3056PC

**CUSTODY STATUS**
(*Check One*)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(*Check One*)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(*Check One*)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☑ Facility -- Living
- ☐ Facility -- Common
- ☐ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
(*Check One*)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(*Check One*)
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Anette Cabral

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6359

**Address:** 5590 Overland Ave., San Diego, CA 92123

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA 94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 842

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**        ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
7 / 5 / 2021
MM / DD / YYYY

**SUBJECT NAME**
Estrada, Ronaldino
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
2 / 9 / 1997
MM / DD / YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian       ☐ Korean
☐ Black             ☐ Laotian
☐ Chinese           ☐ Other
☐ Cambodian         ☐ Pacific Islander
☐ Filipino          ☐ Samoan
☐ Guamanian         ☐ Hawaiian
☑ Hispanic          ☐ Vietnamese
☐ American Indian   ☐ White
☐ Japanese          ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
23153(B) VC

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
Programs (formerly CDC)
☐ Division of Juvenile Justice
(formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Anette Cabral

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6359

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 843

State of California
Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

### DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DATE OF DEATH**
3 / 14 / 2021
MM   DD   YYYY

**SUBJECT NAME**
Gomez  Luis Ahyule
Last            First            Middle

**CII NUMBER**

**DATE OF BIRTH**
1 / 6 / 1978
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian
☐ Black
☐ Chinese
☐ Cambodian
☐ Filipino
☐ Guamanian
☑ Hispanic
☐ American Indian
☐ Japanese
☐ Korean
☐ Laotian
☐ Other
☐ Pacific Islander
☐ Samoan
☐ Hawaiian
☐ Vietnamese
☐ White
☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
220(A)(1) PC

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
   Programs (formerly CDC)
☐ Division of Juvenile Justice
   (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☐ Pending Investigation
☑ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☑ Other

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Anette Cabral

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6359

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 844

State of California                                                                    Department of Justice

## DEATH IN CUSTODY REPORTING FORM
BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

┌─────────────────────────────┐
│ **DOJ USE ONLY** │
│ RECORD KEY │
│                             │
│ ─────────────────────────── │
│ **AGENCY TYPE** │
│  ☐ Police │
│  ☐ Sheriff │
│  ☐ Probation │
│  ☐ State │
│  ☐ Other Local │
│ **AGENCY NCIC NUMBER** │
│                             │
│ ─────────────────────────── │
│ **COUNTY** │
│                             │
│ ─────────────────────────── │
└─────────────────────────────┘

**DATE OF DEATH**

3 / 14 / 2021
MM   DD   YYYY

**SUBJECT NAME**

Gomez  Luis Ahyule
Last            First            Middle

**CII NUMBER**

**DATE OF BIRTH**

1 / 6 / 1978
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☑ Hispanic           ☐ Vietnamese
☐ American Indian    ☐ White
☐ Japanese           ☐ Asian Indian

┌──────────────────┐
│ **DOJ USE ONLY** │
│                  │
│                  │
└──────────────────┘

**CUSTODY OFFENSE**

220(A)(1) PC

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

┌─────────────────────────────────────────────────────────────────────────┐
│ **DATA SUPPLIED BY** *(Please print the following information):* │
│                                                                           │
│ **Name:** Jeffrey S. Vandersip        **Title:** Sr. Crime & Intelligence Analyst │
│                                                                           │
│ **Agency:** San Diego County Sheriff's Dept.  **Telephone:** (858) 285-6321 │
│                                                                           │
│ **Address:** 5590 Overland Ave., San Diego, CA 92123 │
└─────────────────────────────────────────────────────────────────────────┘

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 845

State of California                                                                          Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**          ☐ **AMENDMENT**

**DOJ USE ONLY**

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DATE OF DEATH**

5 / 30 / 2021
MM   DD   YYYY

**CII NUMBER**

_____

**SUBJECT NAME**

Marroquin, Lester
Last                First                Middle

**DATE OF BIRTH**

5 / 8 / 1986
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian          ☐ Korean
☐ Black                ☐ Laotian
☐ Chinese              ☐ Other
☐ Cambodian            ☐ Pacific Islander
☐ Filipino             ☐ Samoan
☐ Guamanian            ☐ Hawaiian
☑ Hispanic             ☐ Vietnamese
☐ American Indian      ☐ White
☐ Japanese             ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**

PC245(A)4, PC243(D)

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
   Programs (formerly CDC)
☐ Division of Juvenile Justice
   (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Anette Cabral

**Title:** Sr. Crime and Intel Analyst

**Agency:** San Diego Sheriff's Department

**Telephone:** (858) 285-6359

**Address:** 5590 Overland Avenue, San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 846

State of California

**DEATH IN CUSTODY REPORTING FORM**

Department of Justice

BCIA 713 (rev. 11/05)

☐ ORIGINAL    ☑ AMENDMENT

**DOJ USE ONLY**

RECORD KEY

AGENCY TYPE
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

AGENCY NCIC NUMBER

COUNTY

**DATE OF DEATH**
1 / 6 / 2021
MM / DD / YYYY

**SUBJECT NAME**
Moreno Omar Arroyo
Last              First              Middle

**CII NUMBER**

**DATE OF BIRTH**
7 / 25 / 1987
MM / DD / YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☑ Hispanic           ☐ Vietnamese
☐ American Indian    ☐ White
☐ Japanese           ☐ Asian Indian

**DOJ USE ONLY**

**CUSTODY OFFENSE**
11364 HS

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☐ Facility -- Living
☐ Facility -- Common
☑ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☑ Other

**DATA SUPPLIED BY** *(Please print the following information):*

Name: Jeffrey S. Vandersip

Title: Sr. Crime & Intelligence Analyst

Agency: San Diego County Sheriff's Dept.

Telephone: (858) 285-6321

Address: 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 847

State of California

# DEATH IN CUSTODY REPORTING FORM

Department of Justice

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**   ☐ **AMENDMENT**

## DOJ USE ONLY

**RECORD KEY**

**AGENCY TYPE**
- ☐ Police
- ☐ Sheriff
- ☐ Probation
- ☐ State
- ☐ Other Local

**AGENCY NCIC NUMBER**

**COUNTY**

**DOJ USE ONLY**

**CUSTODY OFFENSE**

11364 HS

**DATE OF DEATH**
1 / 7 / 2021
MM / DD / YYYY

**SUBJECT NAME**
Moreno Omar Arroyo
Last          First          Middle

**CII NUMBER**

**DATE OF BIRTH**
7 / 25 / 1987
MM / DD / YYYY

**GENDER**
- ☑ Male
- ☐ Female

**RACE/ETHNICITY** (Check One)
- ☐ Other Asian
- ☐ Black
- ☐ Chinese
- ☐ Cambodian
- ☐ Filipino
- ☐ Guamanian
- ☑ Hispanic
- ☐ American Indian
- ☐ Japanese
- ☐ Korean
- ☐ Laotian
- ☐ Other
- ☐ Pacific Islander
- ☐ Samoan
- ☐ Hawaiian
- ☐ Vietnamese
- ☐ White
- ☐ Asian Indian

**CUSTODY STATUS**
(Check One)
- ☐ Process of Arrest
- ☐ In Transit
- ☐ Awaiting Booking
- ☐ Booked - No Charges Filed
- ☑ Booked - Awaiting Trial
- ☐ Sentenced
- ☐ Out to Court
- ☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(Check One)
- ☐ Process of Arrest
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(Check One)
- ☐ Not Applicable (Natural)
- ☐ Crime/Arrest Scene
- ☐ Facility -- Administrative
- ☐ Facility -- Booking
- ☐ Facility -- Living
- ☐ Facility -- Common
- ☑ Facility -- Holding
- ☐ Facility -- Medical Treatment
- ☐ Other

**FACILITY OF DEATH**
(Check One)
- ☐ Crime/Arrest Scene
- ☐ Local Hospital
- ☐ City Jail
- ☑ County Jail
- ☐ Adult Camp or Ranch
- ☐ Local Juvenile Facility/Camp
- ☐ Adult Operations and Adult Programs (formerly CDC)
- ☐ Division of Juvenile Justice (formerly CYA)
- ☐ State Hospital
- ☐ Other

**MANNER OF DEATH**
(Check One)
- ☑ Pending Investigation
- ☐ Natural
- ☐ Accidental -- Injury to Self
- ☐ Accidental -- Injury by Other
- ☐ Suicide
- ☐ Homicide Willful (Law Enforcement Staff)
- ☐ Homicide Willful (Other Inmate)
- ☐ Homicide Justified (Law Enforcement Staff)
- ☐ Homicide Justified (Other Inmate)
- ☐ Execution
- ☐ Cannot Be Determined
- ☐ Other

**MEANS OF DEATH**
(Check One)
- ☑ Pending Investigation
- ☐ Not Applicable (Natural)
- ☐ Handgun
- ☐ Rifle/Shotgun
- ☐ Club, Blunt Instrument
- ☐ Hands, Feet, Fists
- ☐ Knife, Cutting Instrument
- ☐ Hanging, Strangulation
- ☐ Alcohol/Drug Overdose
- ☐ Execution: Lethal Gas/Injection
- ☐ Cannot Be Determined
- ☐ Other

**DATA SUPPLIED BY** (Please print the following information):

**Name:** Jeffrey S. Vandersip     **Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.     **Telephone:** (858) 285-6321

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 848

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

### DOJ USE ONLY

RECORD KEY

AGENCY TYPE
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

AGENCY NCIC NUMBER

COUNTY

DATE OF DEATH

7 / 20 / 2021
MM   DD   YYYY

SUBJECT NAME

Rodriguez, Saxon Frederick
Last          First          Middle

CII NUMBER

DATE OF BIRTH

7 / 1 / 1999
MM   DD   YYYY

GENDER
☑ Male
☐ Female

RACE/ETHNICITY *(Check One)*
☐ Other Asian          ☐ Korean
☐ Black                ☐ Laotian
☐ Chinese              ☐ Other
☐ Cambodian            ☐ Pacific Islander
☐ Filipino             ☐ Samoan
☐ Guamanian            ☐ Hawaiian
☑ Hispanic             ☐ Vietnamese
☐ American Indian      ☐ White
☐ Japanese             ☐ Asian Indian

### DOJ USE ONLY

CUSTODY OFFENSE

245(a)(1) PC, 314.1 PC

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Anette Cabral

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6359

**Address:** 5590 Overland Ave., San Diego, CA 92123

Send completed form to: **Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA   94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 849

State of California

Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**    ☐ **AMENDMENT**

---

### DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

---

**DOJ USE ONLY**

---

**DATE OF DEATH**

8 / 22 / 2021
MM   DD   YYYY

**CII NUMBER**

_____

**SUBJECT NAME**

Salyers          Richard          Lee
Last            First            Middle

**DATE OF BIRTH**

9 / 23 / 1974
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (*Check One*)
☐ Other Asian       ☐ Korean
☐ Black             ☐ Laotian
☐ Chinese           ☐ Other
☐ Cambodian         ☐ Pacific Islander
☐ Filipino          ☐ Samoan
☐ Guamanian         ☐ Hawaiian
☐ Hispanic          ☐ Vietnamese
☐ American Indian   ☑ White
☐ Japanese          ☐ Asian Indian

**CUSTODY OFFENSE**

1209 PC

---

**CUSTODY STATUS**
(*Check One*)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
(*Check One*)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
(*Check One*)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(*Check One*)
☐ Crime/Arrest Scene
☐ Local Hospital
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult
Programs (formerly CDC)
☐ Division of Juvenile Justice
(formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(*Check One*)
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** (*Please print the following information*):

**Name:** Anette Cabral

**Title:** Sr. Crime & Intelligence Analyst

**Agency:** San Diego County Sheriff's Dept.

**Telephone:** (858) 285-6359

**Address:** 5590 Overland Ave., San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA 94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 850

State of California
Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☐ **ORIGINAL**   ☑ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

**DATE OF DEATH**
4 / 27 / 2021
MM   DD   YYYY

**SUBJECT NAME**
Whitlock, Jonathan Robert
Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**
12 / 17 / 1985
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** (Check One)
☐ Other Asian        ☐ Korean
☐ Black              ☐ Laotian
☐ Chinese            ☐ Other
☐ Cambodian          ☐ Pacific Islander
☐ Filipino           ☐ Samoan
☐ Guamanian          ☐ Hawaiian
☐ Hispanic           ☐ Vietnamese
☐ American Indian    ☑ White
☐ Japanese           ☐ Asian Indian

### DOJ USE ONLY

**CUSTODY OFFENSE**
PC451(B)

**CUSTODY STATUS**
(Check One)
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY AT TIME OF DEATH**
(Check One)
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE OF DEATH OCCURRED**
(Check One)
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
(Check One)
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
(Check One)
☐ Pending Investigation
☐ Natural
☑ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
(Check One)
☐ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☑ Other

### DATA SUPPLIED BY (Please print the following information):

**Name:** Anette Cabral
**Title:** Sr. Crime and Intel Analyst
**Agency:** San Diego Sheriff's Department
**Telephone:** (858) 285-6359
**Address:** 5590 Overland Avenue, San Diego, CA 92123

**Send completed form to: Department of Justice**
**Criminal Justice Statistics Center**
**P.O. Box 903427**
**Sacramento, CA  94203-4270**
**Facsimile: (916) 227-0427 or 227-3561**
**Telephone: (916) 227-3545**

Ex. Z - 851

State of California
Department of Justice

## DEATH IN CUSTODY REPORTING FORM

BCIA 713 (rev. 11/05)

☑ **ORIGINAL**   ☐ **AMENDMENT**

### DOJ USE ONLY

**RECORD KEY**

_____

**AGENCY TYPE**
☐ Police
☐ Sheriff
☐ Probation
☐ State
☐ Other Local

**AGENCY NCIC NUMBER**

_____

**COUNTY**

_____

### DOJ USE ONLY

**CUSTODY OFFENSE**

PC451(B)

**DATE OF DEATH**

4 / 27 / 2021
MM   DD   YYYY

**SUBJECT NAME**

Whitlock, Jonathan Robert
Last          First          Middle

**CII NUMBER**

_____

**DATE OF BIRTH**

12 / 17 / 1985
MM   DD   YYYY

**GENDER**
☑ Male
☐ Female

**RACE/ETHNICITY** *(Check One)*
☐ Other Asian     ☐ Korean
☐ Black           ☐ Laotian
☐ Chinese         ☐ Other
☐ Cambodian       ☐ Pacific Islander
☐ Filipino        ☐ Samoan
☐ Guamanian       ☐ Hawaiian
☐ Hispanic        ☐ Vietnamese
☐ American Indian ☑ White
☐ Japanese        ☐ Asian Indian

**CUSTODY STATUS**
*(Check One)*
☐ Process of Arrest
☐ In Transit
☐ Awaiting Booking
☐ Booked - No Charges Filed
☑ Booked - Awaiting Trial
☐ Sentenced
☐ Out to Court
☐ Other

**CUSTODIAL RESPONSIBILITY
AT TIME OF DEATH**
*(Check One)*
☐ Process of Arrest
☐ City Jail
☑ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**LOCATION WHERE CAUSE
OF DEATH OCCURRED**
*(Check One)*
☐ Not Applicable (Natural)
☐ Crime/Arrest Scene
☐ Facility -- Administrative
☐ Facility -- Booking
☑ Facility -- Living
☐ Facility -- Common
☐ Facility -- Holding
☐ Facility -- Medical Treatment
☐ Other

**FACILITY OF DEATH**
*(Check One)*
☐ Crime/Arrest Scene
☑ Local Hospital
☐ City Jail
☐ County Jail
☐ Adult Camp or Ranch
☐ Local Juvenile Facility/Camp
☐ Adult Operations and Adult Programs (formerly CDC)
☐ Division of Juvenile Justice (formerly CYA)
☐ State Hospital
☐ Other

**MANNER OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Natural
☐ Accidental -- Injury to Self
☐ Accidental -- Injury by Other
☐ Suicide
☐ Homicide Willful (Law Enforcement Staff)
☐ Homicide Willful (Other Inmate)
☐ Homicide Justified (Law Enforcement Staff)
☐ Homicide Justified (Other Inmate)
☐ Execution
☐ Cannot Be Determined
☐ Other

**MEANS OF DEATH**
*(Check One)*
☑ Pending Investigation
☐ Not Applicable (Natural)
☐ Handgun
☐ Rifle/Shotgun
☐ Club, Blunt Instrument
☐ Hands, Feet, Fists
☐ Knife, Cutting Instrument
☐ Hanging, Strangulation
☐ Alcohol/Drug Overdose
☐ Execution: Lethal Gas/Injection
☐ Cannot Be Determined
☐ Other

---

**DATA SUPPLIED BY** *(Please print the following information):*

**Name:** Anette Cabral     **Title:** Sr. Crime and Intel Analyst

**Agency:** San Diego Sheriff's Department     **Telephone:** (858) 285-6359

**Address:** 5590 Overland Avenue, San Diego, CA 92123

---

Send completed form to: **Department of Justice
Criminal Justice Statistics Center
P.O. Box 903427
Sacramento, CA  94203-4270
Facsimile: (916) 227-0427 or 227-3561
Telephone: (916) 227-3545**

Ex. Z - 852