GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email:       ggrunfeld@rbgg.com
             vswearingen@rbgg.com
             pkaul@rbgg.com
             eanderson@rbgg.com
             hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone:  (510) 806-7366
Facsimile:  (510) 694-6314
Email:       ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**VOLUME II – EXHIBITS TO DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:      Hon. Anthony J. Battaglia<br><br>Trial Date:  None Set |

[3904578.1]

1

Case No. 3:20-cv-00406-AJB-WVG

VOL. 2 – EXHIBITS TO DECL. OF VAN SWEARINGEN ISO OF PLS.' MOTIONS FOR PRELIM INJUNCTION & PROVISIONAL CLASS CERTIFICATION

(*counsel continued from preceding page*)

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California  92101-4297
Telephone:   (619) 699-2700
Facsimile:   (619) 699-2701
Email:        christopher.young@dlapiper.com
              isabella.neal@dlapiper.com
              oliver.kiefer@dlapiper.com

BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
2760 Fifth Avenue, Suite 300
San Diego, California  92103-6330
Telephone:   (619) 232-2121
Email:        bvakili@aclusandiego.org
              jmarkovitz@aclusandiego.org

Attorneys for Plaintiffs

# TABLE OF CONTENTS

EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT
OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND
PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| A | Proposed Order | 1 |
| B | California State Auditor Report 2021-109, February 2022 | 13 |
| C | CLERB Analytica Consulting Report | 140 |
| D | Sheriff's Announcement of Omar Ornelas Death | 204 |
| E | Another inmate dies in custody at a San Diego County jail, KPBS Public Media | 207 |
| F | Disability Rights California Report | 211 |
| G | Lindsay Hayes Report on Suicide Prevention Practices in San Diego County Jails | 283 |
| H | NCCHC Technical Assistance Report | 384 |
| I | COCHS Report | 524 |
| J | May 19, 2014 Grand Jury Report - Condition and Management, SD County Detention Facilities | 552 |
| K | June 1, 2017 Grand Jury Report - Adult Detention Facilities, San Diego County | 583 |
| L | May 28, 2019 Grand Jury Report - San Diego County Detention Facilities and Inmate Mental Health | 595 |
| M | April 2022 CLERB Findings | 607 |
| N | March 2022 CLERB Agenda | 623 |
| O | January 2022 CLERB Findings | 636 |
| P | December 2021 CLERB Findings | 643 |

# TABLE OF CONTENTS

### EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Q | November 2021 CLERB Findings | 658 |
| R | September 2021 CLERB Findings | 667 |
| S | July 2021 CLERB Findings | 689 |
| T | September 2020 CLERB Findings | 707 |
| U | June 2020 CLERB Findings | 716 |
| V | September 2019 CLERB Findings | 728 |
| W | February 2019 CLERB Findings | 739 |
| X | October 2017 CLERB Findings | 769 |
| Y | October 12, 2021 Letter to CLERB from SEIU Local 221 | 781 |
| Z | Death in Custody Reporting Forms 2019-2021 | 784 |
| VOLUME II | | |
| AA | Jonathan Whitlock Death Investigation - San Diego County Sheriff | 853 |
| BB | Jerry Aleman Death Investigation - San Diego County Sheriff | 856 |
| CC | Suspected Overdose Incidents with Naloxone Deployment, 04-29-2022 | 859 |
| DD | Suspected Overdose Incidents with Naloxone Deployment, 12-30-2021 | 861 |
| EE | SANDAG, 2020 Adult Arrestee Drug Use in the San Diego Region | 863 |

## TABLE OF CONTENTS

EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| FF | February 2022 SDSD Average Jail Population Statistics | 881 |
| GG | Excerpts from April 7, 2022 Town Hall Forum | 883 |
| HH | Rate of jail inmate deaths in San Diego County far exceeds other large California counties, *San Diego Union-Tribune*, 09-20-2019 | 884 |
| II | Number of drug overdoses in San Diego County jails jumps sharply, *San Diego Union-Tribune*, 06-01-2021 | 911 |
| JJ | 8 Inmates at Otay Mesa jail hospitalized after overdosing on fentanyl, *San Diego Union-Tribune*, 05-19-2021 | 919 |
| KK | Seven Otay Mesa jail inmates hospitalized for drug overdose, *San Diego Union-Tribune*, 07-18-2021 | 923 |
| LL | Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds, *San Diego Union-Tribune*, 12-06-2021 | 926 |
| MM | Sheriff's Department Email Thread, December 6, 2021 | 933 |
| NN | Sheriff's Department Email Thread, May 26-27, 2021 | 938 |
| OO | October 21, 2021 Sheriff's Debate Excerpts | 949 |
| PP | Excerpts from Sheriff's Department's February 18, 2022 PRA Response | 950 |
| QQ | L.A. County Sheriff's Naloxone Video | 953 |
| RR | California inmate overdoses plummet under drug program, Associated Press, 04-26-2022 | 957 |

**TABLE OF CONTENTS**

EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| SS | DSB Policy: I.2, Intercom System | 963 |
| TT | DSB Policy: M.6, Life Threatening Emergencies - Code Blue | 966 |
| UU | Standard Nursing Procedure H.4, Heroin Opiate Withdrawal | 971 |
| VV | MSD Policy MSD.A.2, Addicted Arrestee Care | 976 |
| WW | MSD Policy MSD.G.2.1, Segregated Inmates | 980 |
| XX | MSD Policy MSD.D.4, Detention Outpatient Psychiatric Services (DOPS) | 983 |
| YY | DSB Policy: I.64, Safety Checks - Inmates, Housing and Holding Areas | 987 |
| ZZ | DSB Policy: J.3, Segregation - Definition and Use | 991 |
| AAA | DSB Policy: G.3, Elevators | 997 |
| BBB | DSB Policy: I.57, Transportation of Inmates | 999 |
| CCC | DSB Policy: M.9, Receiving Screening | 1003 |
| DDD | DSB Policy: M.39, Disabled Inmates | 1008 |
| EEE | DSB Policy: Q.55, Property Received with Inmates | 1012 |
| FFF | MSD Policy MSD.P.7, Prostheses, Orthoses and Other Aids to Impairment | 1017 |

# EXHIBIT AA

# News List

# Death Investigation - Update #1 - George Bailey Detention Facility

**Post Date:**              08/05/2021 5:02 PM

The Medical Examiner's Office completed the autopsy for Jonathan Whitlock. They determined the cause of death to be acute fentanyl intoxication with obesity as a contributing factor. The manner of death was determined to be an accident.

Information from prior release:

*On April 27, 2021, at about 5:45 p.m., deputies at the George F. Bailey Detention Facility immediately responded to assist an inmate, thirty-five-year-old Jonathan Robert Whitlock, when he collapsed in his housing unit. Deputies and medical staff immediately performed lifesaving measures until relieved by fire department personnel. Whitlock was transported by ambulance to a local area hospital for treatment. Unfortunately, Whitlock was pronounced deceased shortly after arriving.*

*Whitlock was booked into custody by the San Diego Police Department on February 13, 2020, and was in custody for the charges of:*

*451(b) PC – Arson of an Inhabited Structure*

*451(c) PC – Arson of Forest Land*

*11550(a) HS – Under the Influence of a Controlled Substance*

*1203.2(a) PC – Probation Violation*

*The Homicide Unit responded to investigate the death. The investigation is ongoing.*

*The Medical Examiner's Office conducted the autopsy today. Whitlock tested positive for Fentanyl during a presumptive test. However, further laboratory testing is required to confirm this. The cause and manner of death are pending laboratory results and further evaluation. There were no signs of trauma.*

*Whitlock is a resident of the city of San Diego. The victim's family has been notified of his death.*

Media Contact: Lt. Thomas Seiver
Homicide Unit (858) 285-6330
Thomas.Seiver@sdsheriff.org

*Return to full list >>*

**SUBSCRIBE**



Ex. AA - 854

Subscribe to receive updates.

| Email | ⌄ |

Email Address

SUBMIT

Ex. AA - 855



# EXHIBIT BB

Ex. BB - 856

## Most Recent News Releases

# Death Investigation - George Bailey Detention Facility

**Post Date:**            06/10/2021 4:04 PM

**LOCATION:**     **446 Alta Road #5330, San Diego**

**DECEASED:**     **Jerry Aleman, 41-years-old**

On June 9, 2021, just before 5:00 p.m., deputies at the George F. Bailey Detention Facility immediately responded to assist an inmate, forty-one-year-old Jerry Aleman, when he was found unresponsive in his dormitory module. Deputies and medical staff performed lifesaving measures until relieved by fire department personnel. Unfortunately, Aleman was pronounced deceased at the facility.

Aleman was booked into custody by the Carlsbad Police Department on January 18, 2021, and was in custody for the charges of:

14 counts of 530.5(c)(2) PC – Identity Theft with Priors

2 counts of 530.5(c)(3) PC – Identity Theft over 10 People

2 counts of 530.5(a) PC – Identity Theft

2 counts of 470(d) PC – Forgery over $950

470b PC – Possession of Driver's License or ID to Commit Forgery

470(b) PC – Forge Handwriting

537(a) PC – Defrauding an Innkeeper under $400

529 PC – False Personation

496(a) PC – Receiving Stolen Property over $950

The Homicide Unit responded to investigate the death. The investigation is ongoing.

The Medical Examiner's Office conducted the autopsy today. Aleman tested positive for Fentanyl during a presumptive test. However, further laboratory testing is required to confirm this. The cause and manner of death are pending laboratory results and further evaluation.

Aleman is a resident of the city of Perris, California. Aleman's family has been notified of his death.

Prepared by:  Thomas Seiver, Lieutenant

Sheriff's Homicide Unit   (858) 285- 6330



Ex. BB - 857

Return to full list >>

## SUBSCRIBE

Subscribe to receive updates.

| Email ⌄ |
| --- |

| Email Address |
| --- |

[ SUBMIT ]



# EXHIBIT CC

Ex. CC - 859

**San Diego County Sheriff's Department**

Detention Services Bureau

Suspected Overdose Incidents with

Naloxone Deployment*

**CY 2022**

Data as of:

04/28/2022



Suspected Overdoses in the Last 7 Days
By Facility

SUSPECTED OVERDOSES IN THE LAST 7 DAYS

7



Suspected Overdoses Year-to-Date
By Facility

TOTAL SUSPECTED OVERDOSES YEAR-TO-DATE

68

---

* These figures reflect the number of individuals that had Naloxone administered to them as a result of a suspected overdose incident. Naloxone is administered to any individual who presents signs of opioid overdose or when opioid overdose is suspected. Medical follow-up on suspected overdoses is completed on an individual basis and is notated in the individual's medical records. This data is not tracked at the aggregate level.

■ Source: NetRMS; Jail Informa on Management System. Includes only incidents from reports that were approved and submi ed as of report date. Totals are subject to change due to data reconcilia on and updates made to incident reports.

■ Data from all San Diego County deten on facili es are included in this report. San Diego Central Jail (SDCJ); George Bailey Deten on Facility (GBDF); East Mesa Re-Entry Facility (EMRF); Vista Deten on Facility (VDF); Las Colinas Deten on and Re-Entry Facility (LCDRF); South Bay Deten on Facility (SBDF); & Facility 8 Deten on Facility (FAC8).

■ Incidents that occurred during transit or while the individual was out at court are logged under the origina ng/assigned facility.

Ex. CC - 860

# EXHIBIT DD

# San Diego County Sheriff's Department

## Detention Services Bureau

### Suspected Overdose Incidents with
### Naloxone Deployment*

CY 2021
Data as of:
12/30/2021



Suspected Overdoses in the Last 7 Days
By Facility

**SUSPECTED OVERDOSES IN THE LAST 7 DAYS**

**1**

1 — SDCJ



Suspected Overdoses Year-to-Date
By Facility

**TOTAL SUSPECTED OVERDOSES YEAR-TO-DATE**

**204**

SDCJ 101 | GBDF 40 | VDF 38 | LCDRF 19 | EMRF 6

* These figures reflect the number of individuals that had Naloxone administered to them as a result of a suspected overdose incident. Naloxone is administered to any individual who presents signs of opioid overdose or when opioid overdose is suspected. Medical follow-up on suspected overdoses is completed on an individual basis and is notated in the individual's medical records. This data is not tracked at the aggregate level.

▪ Source: NetRMS; Jail Informa on Management System. Includes only incidents from reports that were approved and submi ed as of report date.  Totals are subject to change due to data reconcilia on and updates made to incident reports.

▪ Data from all San Diego County deten on facili es are included in this report. San Diego Central Jail (SDCJ); George Bailey Deten on Facility (GBDF); East Mesa Re-Entry Facility (EMRF); Vista Deten on Facility (VDF); Las Colinas Deten on and Re-Entry Facility (LCDRF); South Bay Deten on Facility (SBDF); & Facility 8 Deten on Facility (FAC8).

▪ Incidents that occurred during transit or while the individual was out at court are logged under the origina ng/assigned facility.

# EXHIBIT EE

Ex. EE - 863



**SANDAG**



# 2020 Adult Arrestee Drug Use in the San Diego Region

## AUGUST 2021

Research findings from the Criminal Justice Clearinghouse

401 B STREET, SUITE 800 | SAN DIEGO, CA 92101-4231 | T (619) 699-1900 | F (619) 699-6905 | SANDAG.ORG/CJ

Ex. EE - 864

*Page intentionally left blank*

Ex. EE - 865

# Highlights

## Drug use is at a 21-year high for males

In 2020, 82% of adult males tested positive for at least one illicit substance. This 3% increase from 2019 brings male drug use to a new 21-year high. Two-thirds (67%) of adult females tested positive for a substance, a significant decrease from the 82% reported in 2019 and the lowest positive rate for adult females since 2015. This large decrease could reflect booking policies that were modified as a result of the pandemic which impacted who was available to be interviewed for this project.

## Methamphetamine remains drug of choice for adults with justice system contact

Despite regional efforts to combat methamphetamine (meth) use, it remained the drug of choice for adults with justice contact, with 57% of males and 53% of females positive in 2020. The male rate was an increase of 2% from 2019 and a 21-year high, while the female rate represented a drop from 2019 (when it was 66%).

## Despite legalization, arrestees continue to obtain marijuana illegally

In 2020, 62% of arrestees reported obtaining marijuana in multiple ways, with the most common methods including through a recreational dispensary (95%) and illegally on the street (74%). Sixty-fix percent (65%) reported that marijuana was "**VERY EASY**" to obtain.

## Fentanyl remains a concern in the region

While only 15% of arrestees said they had ever used fentanyl without a prescription, it was the most common illegally used prescription drug in the past 30 days and around one in four (27%) arrestees reported that they thought a drug they had used contained it, even though they did not purchase it with the intent of buying fentanyl.

## About 1 in 3 adult arrestees report mental health issues

In 2020, 37% of the arrestees interviewed reported they had ever been diagnosed with a mental health or psychiatric disorder, 31% reported they had previously stayed at least overnight for mental health treatment, and 23% had previously tried to commit suicide. Eighteen percent (18%) said they had experienced a psychiatric episode after drug use.

Ex. EE - 866

# Background

This CJ Bulletin, 2020 Adult Arrestee Drug Use in the San Diego Region, is one in a series highlighting findings from data collected as part of the San Diego County Substance Abuse Monitoring (SAM) program.

Since 2004, when federal funding for the Arrestee Drug Abuse Monitoring (ADAM) program was suspended, San Diego has been the only site to continue this project uninterrupted. With funding from the SANDAG Criminal Justice Clearinghouse, these data have been reported on an annual basis, providing useful information to policy makers, law enforcement, prevention, and treatment professionals regarding drug use trends and involvement in other risky or illegal behavior over time. In 2020, this data collection effort was generously supported by the San Diego-Imperial HIDTA (High Intensity Drug Trafficking Area); Health and Human Services Agency, Behavioral Health Services; the District Attorney's Office; and the Public Safety Group. Their support, as well as the cooperation of the San Diego County Sheriff's Department, is gratefully acknowledged.

As part of this project, arrestees are approached (using a random sampling method) within 48 hours of their booking into jail. If the arrestee is available and willing to participate in a confidential interview, she/he/they is asked a series of questions related to drug use history and to provide a urine sample for drug testing. In 2020, 233 male arrestees were interviewed at the Central Jail and 85 female arrestees at Las Colinas. Of these 318 arrestees, 308 (97%) completed the interview and provided a valid urine sample for analysis.

It is important to note that the pandemic affected this project in 2020. While the interviews were able to continue, administrative procedures and survey methodologies were refined to ensure the health and safety of both the interviewers and those being interviewed, including administering a shortened interview instrument. These changes, coupled with changes in terms of who was booked into jails at this time, may affect the statistics presented here and limit the validity of comparisons to prior years.

**What information is collected through these interviews?**

Positive drug rates for any and multiple drugs (page 5)

Positive rates for marijuana, methamphetamine, cocaine, and opiates over time (page 7)

Self-reported initiation patterns of drug use (page 9)

Drug market dynamics (page 11)

Prescription drug abuse (page 12)

Binge drinking (page 14)

Risk factors to recidivate (page 15)

## How has testing positive for any drug changed over time for male and female arrestees?

In 2020, 82% of male arrestees and 67% of female arrestees tested positive for an illicit drug, which includes marijuana,[1] meth, cocaine, opiates, and PCP. The 2020 female positive rate of 67% was a decrease from the 82% reported in 2019 (which could reflect changed booking policies) and the lowest rate since 2015. The 2020 male positive rate of 82% was a 21-year high and 3% higher than the 2019 rate (Figure 1).

Figure 1

**Drug use for adult males up in 2020, but down for adult females**



*Note: Prior to 2013 and since 2015, percent positive was based on marijuana, meth, cocaine, opiates, and PCP. In 2013 and 2014, the PCP test was replaced with a test for alcohol.*

*Source: SANDAG, 2021*

---

**What were the characteristics of the arrestees interviewed?**

Of the 308 arrestees with completed interviews, 227 (74%) were male and 81 (26%) were female. Thirty-nine percent (39%) were Hispanic, 37% White, 20% Black, and 4% "other". Four percent (4%) of the interviews were conducted in Spanish. Seventeen percent (17%) of those interviewed were under the age of 25, 53% between 25 and 39, and 31% 40 and older. The mean age was 35.9 (range 18 to 72). Two-thirds (66%) were single, 19% divorced, separated, or widowed, and 16% married.

Forty-five percent (45%) were booked for a violent offense, 22% for an "other" offense, 18% for a property offense, and 15% for a drug offense. Thirty-two percent (32%) reported living in the Central Major Statistical Area of the County, 21% in East Suburban, 15% in South Suburban, 11% in North City, 5% in North County East, 5% in North County West, 3% in East County, and 10% out of County.

---

1   The drug test panel continues to include marijuana even though California voters approved Proposition 64 on November 8, 2016. Marijuana will continue to be tested because it remains illegal federally and because changes in use pre- and post-legalization among this population is expected to continue to be an issue of interest.

## How many arrestees are polydrug[2] users?

Around 1 in 3 (37% of male and 22% of female) arrestees tested positive for more than one drug in 2020 (Figure 2). Of these, 78% tested positive for two and 22% tested positive for three drugs. Of those who tested positive for multiple substances, 91% were positive for meth, 83% marijuana, 29% opiates, 17% cocaine/crack, and 2% PCP.

## How does testing positive vary by the arrestee's highest booking charge?

As Figure 3 shows, regardless of crime type, around three-quarters or more of arrestees tested positive for a drug in 2020 and around 1 in 3 or more tested positive for multiple drugs. There was no significant difference in the percent positive for any or multiple drugs by highest booking charge.

Figure 2
**Around 1 in 3 arrestees tested positive for more than one drug in 2020**

Figure 3
**No difference in positive rates by highest booking charge**



Note: Percentages may not equal 100 due to rounding.

Source: SANDAG, 2021



*Significant at p < .05.

Source: SANDAG, 2021

### Takeaway

Regardless of why someone is booked into jail, substance use is an issue for many arrestees, with four-fifths testing positive for at least one drug overall. In addition, about 1 in 3 of the males and 1 in 5 of the females interviewed were current polydrug users. Among polydrug users, meth and marijuana were used more than any other drug combination.

---

2   Polydrug use refers to the use of two or more psychoactive drugs in combination to achieve a particular effect.

Ex. EE - 869

## How have positive rates by drug type changed over time?

The percent of male arrestees positive for marijuana was up 6% in 2020, with 51% positive for the drug, compared to 45% in 2019. This was a new 21-year high. However, for female arrestees, the percent positive decreased 8%, to 31% (from 39% in 2019), the lowest rate since 2015 (Figure 4). Arrestees under the age of 25 were significantly more likely to test positive for marijuana (65%), compared to those between 25 and 39 (41%) and 40 years of age and older (43%). Arrestees who identified as Black were also significantly more likely to test positive for marijuana (60%), compared to 43% of those who identified as White and 41% who identified as Hispanic.

**How many arrestees tested positive for just marijuana?**

39% of the adult arrestees who tested positive for marijuana in 2020 did not test positive for anything else, but 61% did – either meth, opiates, crack/cocaine, or some combination.

Figure 4

**Marijuana use up for adult males, down for adult females**



*Source: SANDAG, 2021*

For meth, the percent of males that tested positive increased from 55% in 2019 to 57% in 2020, a new 21-year high. The female rate decreased from 66% in 2019 to 53% in 2020, the lowest rate since 2015 (Figure 5). Recent meth use also varied significantly by an arrestee's age. Specifically, older arrestees (58% of those 25 to 39 and 62% of those 40 and older) were more likely to test positive for meth than those under the age of 25 (41%).

Figure 5

**Meth positive rates at all-time high for males in 2020**



*Source: SANDAG, 2021*

Ex. EE - 870

The percent of arrestees positive for cocaine was up slightly for males (8% in 2020, compared to 6% in 2019), but down for females (2% in 2020, compared to 5% in 2019) (Figure 6). There were no differences in cocaine use by age, but there was by ethnicity, with 15% of Black individuals positive, compared to 6% of White and 4% of Hispanic individuals.

Figure 6
**Cocaine positive rates up for males, down for females**



*Source: SANDAG, 2021*

For opiates,[3] the percent of males that were positive remained steady at 11% in 2020, but the percent of females positive decreased to 6%, from 15% in 2019 (Figure 7). There were also variation in use that approached significance in terms of age (18% of those under 25, compared to 10% of those 25 to 39, and 5% of those 40 and older) and ethnicity (15% for individuals who identified as White, 10% Black, and 6% Hispanic).

Figure 7
**Males more likely than females to test positive for opiates in 2020**



*Source: SANDAG, 2021*

In addition, 1% of adult arrestees tested positive for PCP in 2020, which included 1% of females and <1% of males.

---

3  It should be noted that a positive opiate drug test could indicate use of opiates other than heroin, including morphine, hydrocodone, hydromorphone, and codeine.

**Takeaway**

In 2020, meth remained the drug of choice for San Diego County arrestees, with more than half of adult males and females positive for the drug. Marijuana and cocaine use also were up slightly for male arrestees.

Ex. EE - 871

## How does history of drug use vary by drug type?

Marijuana was the drug most commonly tried by arrestees (89%) and also was tried at the earliest age (14.6) – about five years earlier than any other drug. Those who used it in the past 30 days used it an average of 16.0 days (Table 1).

Meth was tried by two-thirds (66%) of the arrestees and was reported by the highest percent (83%) as having been used in the last year. Meth users reported using it an average of 17.9 days out of the past 30, more often than any other drug.

Cocaine was tried by over half (56%) of arrestees and at the youngest average age (19.4), following marijuana. Thirty percent (30%) reported using cocaine in the past year and the average use in the past month was 4.1 days.

Heroin was tried by 31% of arrestees, about three-fifths (58%) of whom had used it in the past year. Heroin was used an average of 17.2 days in the past 30 of those who had used it.

Crack was tried by 29% of arrestees and was least likely to be used in the last year (6%). Those who used it in the past month did so an average of 4.5 days.

Table 1
**Self-reported drug use history varies by drug**

| How many have ever tried? | What was the average age at first use? | Of those who've tried it, how many used in the last year? | Of those who used in the past 30 days, how many days did they use on average? |
|---|---|---|---|
| **89%** marijuana | **14.6** marijuana | **72%** marijuana | **16.0** marijuana |
| **66%** meth | **21.3** meth | **83%** meth | **17.9** meth |
| **56%** cocaine | **19.4** cocaine | **30%** cocaine | **4.1** cocaine |
| **31%** heroin | **24.1** heroin | **58%** heroin | **17.2** heroin |
| **29%** crack | **21.3** crack | **6%** crack | **4.5** crack |

*Source: SANDAG, 2021*

Ex. EE - 872

In addition to these five drugs, around half (53%) arrestees reported having ever tried at least one of nine other illicit substances, including ecstasy (31%), hallucinogens (29%), LSD (28%), spice (17%), PCP (14%), GHB (12%), inhalants (12%), ketamine (10%), and kratom (4%). When those who had ever used an illegal substance were asked if they had used it in the past 30 days, LSD (14%), PCP (12%), GHB (11%), and hallucinogens (10%) were the most common answers (Figure 8).

> Kratom use was added to the interview in 2019. Kratom is a tropical tree native to Southeast Asia with leaves that contain compounds with psychotropic effects. Kratom is not illegal at the time of this report and is sold as an extract or gum.

Figure 8

**Percent of arrestees who have tried other illicit drugs ever and in the past 30 days**



*Note: Cases with missing information not included.*

*Source: SANDAG, 2021*

Due to the increased attention to combatting synthetic drug use in San Diego County, questions were added to the instrument to better understand why individuals use spice. Specifically, 50% of those who ever used spice said they use it as an alternative to marijuana and 40% said they use it to avoid a positive drug test.

### Takeaway

Among arrestees, drug use history and current use varies by drug. Of those who ever tried a drug, meth users were most likely to report use in the last year and most frequent use in the last 30 days. Among other illicit drugs ever tried, ecstasy and other hallucinogens were most common, but LSD was among the other types of drugs arrestees were most likely to have recently used.

Ex. EE - 873

## How easy is it to obtain different drugs, according to arrestees?

Over the years, a number of standard questions have been asked of arrestees regarding drugs they may have obtained, including what they traded to get it (cash and/or non-cash means), how easy it was to obtain, and if they got it in the same area in which they lived. In 2020, the only question in this series that was asked pertained to how easy it was to obtain different drugs. Just under two-thirds (65%) of individuals said it was "**VERY EASY**" to obtain marijuana, followed by those who said it was "**VERY EASY**" to obtain crack (46%), meth (44%), heroin (35%), and cocaine (33%).

In addition, more detailed questions have been added since recreational use was legalized regarding marijuana, including how individuals obtain the drug.

- Almost two-thirds (62%) of arrestees reported they obtained marijuana in more than one way in 2020, with 38% saying they had just one preferred way. Of those who said they just obtained it only one way, the most common was illegally on the street (44%), followed by a recreational dispensary (26%), medical dispensary (26%), other ways (6%), and delivery from a dispensary (3%). For those who obtained it multiple ways, 95% used a recreational dispensary, 74% illegally on the street, 73% from a medical dispensary, 52% delivery from a dispensary, and 7% other ways (Figure 9).

Figure 9

**Arrestees report obtaining marijuana in a variety of ways in the past 12 months**



*Source: SANDAG, 2021*

Ex. EE - 874

- When asked their **preferred method**, those who obtained it only one way most often said illegally on the street (40%). The preferred method for those who used multiple ways was legal dispensary (45%), with 15% saying illegally on the street.
- When asked the reasons behind their preferred method, the most common for recreational dispensaries was that it was easier, for those who preferred medical dispensaries, the most common reason cited was the quality, for those who preferred illegally on the street, it was because this was the quickest method, and for those who preferred delivery, the most often cited reason was that it was convenient.

## What do we know about prescription drug abuse by the arrestee population?

In 2020, 46% of arrestees reported they had ever abused prescription drugs, with the most commonly abused including tranquilizers (i.e., benzodiazepines), OxyContin, fentanyl, Vicodin, Percocet, and codeine (Figure 10). When those who had ever abused a prescription drug were asked if they had abused it in the past 30 days, the top five drugs currently being abused included fentanyl (61%), tranquilizers (17%), Suboxone (11%), methadone (10%), and barbiturates (7%).

Figure 10

**Tranquilizers, OxyContin, fentanyl, and Vicodin, among most commonly abused prescription drugs**



Tranquilizers 23%
OxyContin 18%
Fentanyl 15%
Vicodin 14%
Percocet 13%
Codeine 13%
Suboxone 12%
Morphine 10%
Tramadol 9%
Somas 9%
Amphetamines 7%
Dilaudid 6%
Methadone 6%
Barbiturates 4%
Darvon/Darvocet 3%
Anti-depressants 2%
Demerol 1%

Total = 301–306

*Source: SANDAG, 2021*

Arrestees who abused prescription drugs were significantly more likely to test positive for marijuana (57% versus 35%) and meth (69% versus 44%).

When asked to describe how they had obtained the prescription drugs, the most common ways included that they were given it (81%), they bought it from someone illegally (64%), or they took it from someone (24%). When asked how difficult it was to obtain prescription drugs illegally, over three-fifths said it was "**VERY EASY**" or "**EASY**" (Figure 11).

Figure 11

**Most arrestees say prescription drugs are easy to get**



Source: SANDAG, 2021

Just over 1 in 4 (26%) heroin users said they were hooked on prescription opiates before they began using the street drug and of these, 83% said they began to use heroin as a substitute for prescription opiates.

Given the recent national attention to the dangers of fentanyl, new questions were added to the SAM questionnaire including "*If you knew a drug contained fentanyl, would you purchase it?*" Overall, 91% of the arrestees said they would not purchase it, but 9% said they would When asked if they had used a drug they thought contained fentanyl, even if they were not told it did, just over one in four (27%) said they thought they had.

In another series of questions, arrestees were asked if they had ever used fentanyl test strips to see if their drugs contained fentanyl, and if they had not, would they. While only 5% of arrestees said they had used these strips, almost half (46%) said they would if they were available.

**Takeaway**

In addition to using illicit drugs, a number of arrestees have a history of abusing prescription drugs, including those later addicted to heroin. Fentanyl was used most often in the past 30 days by those who had abused prescription drugs and around one in four arrestees thought a drug they had purchased had fentanyl in it. The most common way of obtaining a prescription drug was to be given it.

Ex. EE - 876

## What do we know about arrestee use of alcohol?

The majority of both male and female arrestees reported at least one prior binge drinking episode (defined as five drinks or more for males and four drinks or more for females), with males doing so at an earlier age (16.2) than females (18.3). Around 1 in 3 of both genders reported drinking any alcohol in the 24 hours prior to their arrest. Additional analyses revealed that individuals who reported binge drinking in the past 30 days were more likely to test positive for cocaine (13% versus 4%).

Figure 12
**Male and female arrestee alcohol use history**

| Male | | Female | |
|---|---|---|---|
| **81% ever binge drank** | | **86% ever binge drank** | |
| 16.2 average age first binge* | 5.2 average number of drinks in past 24 hours | 18.3 average age first binge* | 4.3 average number of drinks in past 24 hours |
| 38% binge drank past 30 days | 35% self-report drinking any alcohol in the past 24 hours | 35% binge drank past 30 days | 35% self-report drinking any alcohol in the past 24 hours |

*Significant at p < .05
Note: Cases with missing information not included.
Source: SANDAG, 2021

**Takeaway**

Alcohol remains the drug of choice for many adults in the justice system, with more than 4 in 5 arrestees reporting ever binge drinking. Around one-third drank alcohol within 24 hours of their arrest.

## What do we know about vaping?

Given the growth in e-cigarettes and vaping over the past several years, new questions were added to the interview in 2019 regarding their history of vaping, the types of products vaped, and the frequency of use of vaping products. In 2020, arrestees were only asked about whether they had ever vaped and 59% reported they had. Arrestees under 25 were significantly more likely to report ever vaping (73%), compared to those 25 to 39 (63%), and those over the age of 40 (46%). Those who identified as White were also more likely to report vaping (70%), compared to those who identified as Black (63%) or Hispanic (46%).

Ex. EE - 877

## What other underlying factors or needs do these arrestees have that can shed light on the risk to recidivate?

*Prior arrests and incarcerations*

- Eighty-eight percent (88%) of arrestees reported having a previous arrest (90% of males and 81% of females).

- Just over four-fifths (82%) reported previously serving time in jail (85% of males and 74% of females).

*Involvement in drug distribution*

- Just over one in three (37%) said they had ever been involved in selling drugs.

*Exchanging sex/pimping/pandering*

- Fifteen percent (15%) report they have ever been approached by someone to pimp/prostitute them, including 33% of females and 9% of males.

*Mental health issues*

- Over one-third (37%) of the arrestees reported they had ever been diagnosed with a mental or psychiatric disorder and 31% reported they had previously stayed at least overnight for mental health treatment at a hospital or other facility.

- Having a mental health diagnosis was significantly related to race. Arrestees identified as White were significantly more likely to report having a diagnosis (45%), compared to Blacks (37%) and Hispanics (29%).

- Of those who had ever been admitted to a mental health or psychiatric facility for at least an overnight stay, the mean number of stays was 4.1 (range 1 to 50).

- Almost one in four (23%) arrestees reported they had ever tried to commit suicide (33% of females and 19% of males). In addition, 35% said they had seriously thought about it. Those who reported a mental health diagnosis were more likely to say they had tried to commit suicide (41% versus 12% without a diagnosis).

- Arrestees were asked if they had ever taken a drug that led to a psychotic episode. Eighteen percent (18%) said they had, with meth being the drug most often mentioned as leading to this occurrence (62%).

Figure 13

**Many adults interviewed have common risk factors to be addressed**

**4 in 5**
Have been previously arrested or in jail

**3 in 4**
Not employed

**2 in 3**
Have been homeless

**1 in 2**
Of those who overdosed on heroin have been administered naloxone (and 1 in 3 of those have received 3 or more times)

**2 in 5**
Have received drug treatment previously

**1 in 3**
Have sold drugs, had a mental health diagnosis, or contact with Child Welfare Services

**1 in 5**
Have injected drugs, had a drug overdose or had a psychotic episode related to drug use

*Source: SANDAG, 2021*

## Education, employment, and insurance

- Thirteen percent (13%) did not have a high school degree or equivalent and 27% reported they were employed (full-time, part-time, or as active military) at the time of their arrest. Nineteen percent (19%) said they currently did not have health insurance.

## Homelessness

- Seventy percent (70%) of those interviewed reported ever being homeless and 31% described themselves as being homeless in the past 30 days.

- Twenty-four percent (24%) said they had stayed in a shelter in the past 12 months (up from 14% the year prior). When asked why they had not stayed in a shelter, 48% said they just did not want to, 21% concerns for safety, 20% because of restrictions and rules at the shelter, 9% wait lists, 4% because they have family, friends, or a pet that is not allowed to stay there, and 17% provided an "other" answer (that included have someplace else to stay, personal pride, and don't know how to).

- When those who were primarily homeless in the past 30 days were asked what they thought their housing status would be a year from now, 51% said they thought they would be living in a stable housing situation, 32% thought they would still be homeless, and 18% described some other housing status that was temporary or a group setting.

## Drug treatment needs

- Overall, 40% of the arrestees said they had received drug treatment in the past.

- For 55% of those who had received treatment, the last program was court-ordered (as opposed to voluntary). Individuals who reported having a prior arrest (44% versus 14%) were more likely to have received treatment.

- In a new question added in 2020, 27% of arrestees reported they knew what medically assisted treatment was (use of medicine in combination with counseling and behavioral therapy) and of these, 27% had received it.

- Seventy percent (70%) of the arrestees reported that every time they had sought drug treatment, it had been available. Fifty-five percent (55%) said they could benefit from treatment now.

## Dependent children

- Fifty-eight percent (58%) of arrestees reported having children, including 54% of males and 70% of females.

- Around 1 in 5 (19%) reported they currently live with a child, whether or not their own. Females were more likely to report living with a child, compared to males (27% versus 16%).

- Almost half (45%) of female arrestees and 21% of males reported prior Child Welfare System (CWS) contact (29% overall).

Ex. EE - 879

### Driving under the influence

Twenty-nine percent (29%) of arrestees reported they had ever been arrested for driving under the influence (DUI) as an adult. When asked what they were under the influence of (the most recent time they were arrested for a DUI if more than once), 74% said alcohol, 16% drugs, and 11% both. When further asked what drug they had used, 36% said marijuana, 36% meth, 23% prescription drugs (they were not prescribed), and 5% each crack, heroin, and cocaine.

### Injecting drugs

Around one in five (21%) of those interviewed said they had ever injected drugs, with those who identified as White most likely to do so (29%), followed by those who identify as Hispanic (20%), and Black (5%). Twenty-eight percent (28%) of those who said they ever injected reported they had injected in the past year and 28% of these individuals reported they had shared their needle or works in the last year.

### Overdosing and naloxone

Overall, around one in five (19%) arrestees said they had ever overdosed on a drug and 25% reported having to visit an emergency room because of an alcohol- or other drug-related incident. Just under half (45%) of arrestees who had ever overdosed reported they had been administered naloxone; a medication designed to rapidly reverse opioid overdose at least once. Additional questions about naloxone, included:

- How many times they had been administered it, with 58% getting it once, 12% twice, and 31% three or more times.
- Who administered it, with responses including emergency medical services or EMS (38%), friends (35%), healthcare providers (19%), law enforcement (19%), and family (4%).
- Whether the person who gave them naloxone talked to them about getting treatment for their addiction, over half (54%) said they had overall.

**Takeaway**

Many of the arrestees booked into local jails have a prior history of justice system involvement, homelessness, drug and mental health treatment needs, employment and housing challenges, and/or children who are dependent on them. Understanding and documenting these underlying risk factors is important in ensuring that individuals can be assisted as they reenter the community from incarceration.

Ex. EE - 880

# EXHIBIT FF

Ex. FF  - 881

# San Diego County Sheriff's Department
## Jail Population Statistics
## February 2022

## Average Jail Population by Facility



| George Bailey Detention Facility | San Diego Central Jail | Vista Detention Facility | Las Colinas Detention & Reentry Facility | East Mesa Reentry Facility | South Bay Detention Facility |
|---|---|---|---|---|---|
| 1,534 | 931 | 669 | 561 | 376 | 339 |

## Average Jail Population by Gender and Ethnicity



- Male
- Female

Male 89%, Female 11%

- Hispanic
- White
- Black
- Other

Hispanic 43%, White 30%, Black 22%, Other 6%

| | |
|---|---|
| Average Jail Population | 4,410 |
| Total persons booked this month* | 3,824 |
| Number of individuals receiving psychotropic medications** | 1,551 |
| Suspected overdose incidents with Naloxone deployment*** | 14 |
| Number of suicide attempts | 6 |

Source: Board of State and Community Corrections; SDSD Jail Information Management System; SDSD Medical Services Division;  NetRMS Records Management System
*Total facility bookings- does not include alternative custody programs and individuals deemed not fit for jail.
**Number of individuals, on the last day of the month, receiving psychotropic medication for a mental health disorder.
***These figures reflect the number of individuals that had Naloxone administered to them as a result of a suspected overdose incident. Naloxone is administered to any individual who presents signs of opioid overdose or when opioid overdose is suspected. Medical follow-up on suspected overdoses is completed on an individual basis and is notated in the individual's medical records; therefore, this data is not tracked at the aggregate level. Includes only incident reports that were approved and generated as of report date. Totals are subject to change due to data reconciliation and updates made to incident reports. Percentages may not total 100 due to rounding.

Ex. FF-882

SUBMITTED WITH
PLAINTIFFS' APPLICATION FOR
LEAVE TO ALLOW NON-
ELECTRONIC FILING

# EXHIBIT GG

# EXHIBIT HH

5/1/22, 12:24 PM    Rate of jail inmate deaths in San Diego County far exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/03/22    PageID.2011    Page 39 of 173




The San Diego Union-Tribune

SPONSOR A STUDENT
DONATE

WATCHDOG

# Rate of jail inmate deaths in San Diego County far exceeds other large California counties



Jail's leading mortality rate is costing county millions of dollars in lawsuit payouts

BY JEFF MCDONALD, KELLY DAVIS, LAURYN SCHROEDER

SEPT. 20, 2019 5 AM PT

  

Case 3:20-cv-00406-AJB-DDL   Document 119-4   Filed 05/03/22   PageID.2012   Page
40 of 173

At least 140 people have died in San Diego County jails since 2009, the year Bill Gore took over as sheriff. That's an average higher than one inmate per month, every month, over the past 10 years.

Some are claimed by natural causes — chronic health conditions like heart disease and diabetes often found in people who end up in jail. Others are murdered or overdose on drugs.

Dozens have taken their own lives even though Gore and his top command staff say they do everything they can to identify suicidal inmates and treat mental illness.

"The Sheriff's Department is committed to keeping inmates safe and is continuously looking for best practices in the delivery of mental health care," the department said in a video posted on its website in May.

A six-month investigation by The San Diego Union-Tribune shows that the county's jail mortality rate is the highest among California's largest county jail systems. The grim history shows no sign of waning.

 **Hear the reporters discuss the investigation**

Fifteen inmates died in county custody in each of the past two years, out of a
population of more than 5,000. Twelve inmates have died so far this year.

There is no easy explanation.

Over the past several years, the department has improved training, changed health
care providers and brought in new equipment. But it has been slow to make more
obvious fixes, like installing fencing to prevent suicidal inmates from jumping, or
bolstering its mental health staff to provide around-the-clock care.

Despite years of controversy over departmental lapses and repeated promises of
reform, deaths this year include:

- A young man who repeatedly threatened to commit suicide and had access to a
  plastic bag to suffocate himself after being found earlier in the day with a noose
  in his cell.
- A 34-year-old with a serious heart condition who was given cough syrup instead
  of his prescription medication when he told staff he was having trouble
  breathing.
- A young veteran who struggled with opiate and methamphetamine addiction
  after his hand was blown off in Afghanistan. He died with withdrawal symptoms
  less than an hour after being returned to his cell from the infirmary.

As recently as Friday, the Sheriff's Department acknowledged in response to a
records request that 29-year-old Daniel James Pickett of Cashmere, Washington,
died Sept. 6 in custody on drug possession charges. The cause was not made public.

5/1/22, 12:34 PM    Dozens of jail inmate deaths in San Diego County Jail exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DDL   Document 119-4   Filed 05/02/22   PageID.5014   Page
42 of 173

The deaths overwhelmingly occurred among those like Pickett who were booked but not convicted, Sheriff's Department data show.Since 2009, 115 of the 140 inmates who died behind bars were awaiting trial.

---

**DYING BEHIND BARS**  ›




The loss of life causes more than anguish for friends and relatives of those who perish. The deaths cost taxpayers millions of dollars in legal settlements and attorney fees.

Over the past decade, the county paid at least $7.9 million to families of people who died or were badly injured in jail. That's more than four times the $1.9 million cost of similar legal actions in the prior decade, before Gore took over as sheriff.

The total does not include a $12 million jury verdict awarded in July to a North County man who suffered brain damage from a fall after being arrested and booked

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/03/22    PageID.5005    Page
43 of 173

into jail.

San Diego County is defending itself in at least a dozen other state and federal lawsuits brought by inmates and family members. Some recent deaths also are likely headed to court.

The continuing deaths and lawsuits are reflective of the county's indifference, critics say.

"A measure of society is how we treat our most vulnerable. By that measure, San Diego County is failing miserably," said Julia Yoo, a San Diego attorney who has sued the sheriff repeatedly on behalf of deceased inmates' families.



William Gore  (Union-Tribune)

Ex. HH - 889

5/1/22, 12:45 PM    Dying behind bars: Inmate deaths in San Diego County jail exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DEB   Document 119-4   Filed 05/02/22   PageID.2016   Page
44 of 173

# Deaths, suicides on the rise

According to Sheriff's Department reports, 140 people have died in the county's seven detention facilities since 2009, the year Gore was promoted from undersheriff by the Board of Supervisors after the mid-term resignation of William Kolender.

One inmate killed himself July 3, 2009 — Gore's first official day in charge.

In the 10 calendar years before Gore's appointment, 101 inmates died in county custody, department records show.

The rise in jail suicides was even more pronounced. In the decade between 1999 and 2008, 23 inmates killed themselves, the Sheriff's Department said. The number of suicides between 2009 and 2018 increased to 39, a 70 percent increase.

## *"We don't want any suicides in our facilities. We want to be able to stop all of them."*

**— Capt. Alan Kneeshaw**

Multiple inmates killed themselves after sheriff's deputies were warned they were suicidal and needed frequent monitoring.

5/1/22, 12:23 AM                    Dying behind bars: jail and prison deaths in San Diego County far exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DEB   Document 119-4   Filed 05/02/22   PageID.2017   Page
45 of 173

Several died after jumping from upper floors in the county's three largest jails. The department has not installed protective fencing on all the upper floors of its detention centers, although officials said they modified some railings.

An active-duty sailor wanted for a crime in Colorado threatened to jump off the San Diego-Coronado Bridge in 2016. He was successfully talked off the ledge and ended up in the George Bailey Detention Facility in Otay Mesa pending extradition. He jumped headfirst off a second-story ledge to his death.

The incident came three years after the county paid $80,000 to settle a lawsuit filed by the parents of Robert Lubsen, 26, who was jailed after stealing laptops from Cal State San Marcos.

Despite bearing bright red ligature marks from an earlier suicide attempt in his booking photo, Lubsen was not flagged as a suicide risk and managed to leap to his death as well.

As part of the legal settlement, Lubsen's family insisted on meeting with Gore to prevent others from suffering the same fate.

# 20 years of jail deaths in San Diego County

The mortality rate in San Diego County jails has increased since Bill Gore was appointed sheriff in 2009. According to Sheriff's Department records, 101 people died in custody between 1999 and 2008. Since 2009, 140 people died in sheriff's custody, according to county reports to the state.



Source: San Diego County Sheriff's Department

MICHELLE GILCHRIST U-T

# 'An abundance of notice'

San Diego County's overall mortality rate over the past decade is the highest among California's six largest jail systems, according to data those departments are required to report to the state Department of Justice.

The county recorded an average of 12.8 deaths per year, for an annual mortality rate of 246 per 100,000 inmates.

By comparison, Los Angeles County, whose jail system is three times larger than San Diego County's, had an inmate mortality rate of 158. San Bernardino County's was 149 and Sacramento County's was 94.

The most prominent reported reason for jail deaths is natural causes.

Of the 140 deaths in San Diego County jails since 2009, nearly half were attributed to natural causes. Autopsy reports suggest some of those deaths might have been

5/1/22, 12:08 AM    Dying behind bars: Inmate deaths in San Diego County jail exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/02/22    PageID.2019    Page
47 of 173

prevented if inmates had received better medical care. Reports show multiple inmates dying from treatable conditions like diabetes, pneumonia and stomach ulcers.

The second most common cause of death was suicide. San Diego County's jail suicide rate is higher than the other five large counties, at 75 per 100,000 over 10 years.

In Los Angeles County, the rate was 26 per 100,000. The rates in San Bernardino and Sacramento counties were 44 and 23 respectively, and Orange County reported the lowest at 15.

The Sheriff's Department argues that the demographics of local jail populations account for the differences in suicide rates across the state. Either way, the stories of jail suicide are harrowing examples of an undeniable mental health crisis within the criminal justice system.

Among the 40 men and women who took their lives in San Diego County jails over the past decade, many suffered from mental illness, according to autopsy reports.



5/1/22, 12:46 PM    Blue-on-jail-inmate deaths in San Diego County jail exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/02/22    PageID.2021    Page 49 of 173



Kristopher Nesmith, a Marine veteran who killed himself in San Diego County jail. (Courtesy photo)

Kristopher Nesmith's wife warned sheriff's deputies before he was sent to the Vista Detention Facility in 2013 that her husband had tried to kill himself. The former Marine with a history of mental illness hung himself behind bars in early 2014.

"VDF staff in this case had an abundance of notice that Kris was suicidal and posed an immediate danger to himself," U.S. District Court Judge Janis Sammartino wrote in a March ruling denying San Diego County's request to dismiss the wrongful-death lawsuit.

At least 17 inmates have died from drug overdoses since 2009. Seven were able to obtain a lethal amount of drugs in jail, autopsy records show. The others ingested drugs before their arrest.

Gore has said publicly that stopping the smuggling of drugs into jails presents a continuing challenge.

"You can't imagine the ingenuity of inmates," the sheriff told the Citizens' Law Enforcement Review Board at an April meeting of the oversight panel.

Five years ago, Gore spent more than $1.5 million in asset-forfeiture funds on a jail X-ray system designed to find drugs hidden or ingested by inmates before booking. While it has helped, it has limitations, jail officials said.

This past February, Joseph Castiglione swallowed a large amount of methamphetamine wrapped in plastic, investigators said. The 56-year-old man died after being shackled and placed face down on a gurney by deputies at the Vista jail.

Case 3:20-cv-00406-AJB-DDL Document 119-4 Filed 05/02/22 PageID.2022 Page 50 of 173

Three months later, a grand jury report chided the Sheriff's Department for failing to upgrade the X-ray system's software.



Oscar Leal, who later died in San Diego Sheriff's Department custody, is shown on an officer's body-worn camera.

# Inmate named 'Evil'

A smaller but growing number of inmates in San Diego jails have become homicide victims. The Sheriff's Department reported 10 in-custody homicides since 2009, a

Ex. HH - 896

Case 3:20-cv-00406-AJB-DEB    Document 119-4    Filed 05/02/22    PageID.3083    Page
51 of 173

five-fold increase over the prior decade.

Most of the victims were attacked by other inmates.

In one case, a 70-year-old mentally ill prisoner was beaten to death by a larger inmate nicknamed "Evil" who rallied four other inmates to join in the attack. A deputy had complied with the victim's request to be moved from protective custody into the jail's general population, despite orders to keep him segregated for his own safety.

In another case, the Medical Examiner's Office earlier this year released a previously sealed report on the 2018 death of Oscar Leal. The autopsy ruled Leal's death a homicide, caused by a heart attack triggered by his drug use and the way deputies restrained him. He was 37.

"There were minor blunt force injuries of the head, torso and extremities," the autopsy said, "as well as abrasions, bleeding under the skin and lacerations on both wrists consistent with handcuffs."

A video from the jail's sallyport shows deputies fumbling with leg restraints before noticing that Leal had stopped breathing.

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/03/22    PageID.5024    Page
52 of 173



Jeremy Thomas, who lost his hand to a roadside bomb in Afghanistan in 2011, died in a San Diego County jail. (Alejandro Tamayo / The San Diego Union-Tribune)

Gore took the unusual step of issuing a statement publicly rejecting the medical examiner's finding and blaming the death on Leal.

"Were it not for Mr. Leal's abuse of methamphetamine, he would be alive today," the sheriff said in a written statement.

Jeremy Thomas, a 28-year-old former Marine who died May 29 in the Central Jail, had been booked on drug charges.

Thomas lost his hand in Afghanistan in 2011 and was featured in a Union-Tribune story two years ago about veterans being over-prescribed opioids for pain.

J.R. Wilkinson, an attorney retained by the Thomas family, said the young man told medical staff that he was going through withdrawal.

"Rather than treating him for withdrawal and monitoring him, he was sent to his cell. Shortly after, he was pronounced dead," Wilkinson said. "As a wounded vet and father, Jeremy deserved better. The San Diego Sheriff's Department needs to be held accountable for his wrongful death."

Ex. HH - 899



# Jail deaths by status

More than 80 percent of the inmates who died in San Diego County jails
from 2009 to 2019* were awaiting trial.

| Pre-trial | Sentenced |
|-----------|-----------|
| 115 | 25 |

*Through Sept. 6

Sources: County of San Diego; U-T research

**MICHELLE GILCHRIST** U-T

## Attempted fixes

Over the years, the Sheriff's Department introduced tools and procedural changes
aimed at reducing jail deaths.

In early 2015, for example, following 11 suicides in less than two years, the
department developed a suicide-prevention program.

Officials strengthened intake screening so booking staff would ask more pointed
questions of arresting officers and of inmates. The idea was to ensure detainees were
housed in appropriate settings and steered into treatment.

The department also launched a video-based "telepsychiatry" program, so inmates
could speak to a doctor more often. That program ended due to data-security
concerns.

The jail also created "enhanced observation housing," so deputies could better
monitor inmates who express an intent to harm themselves. Inmates in these units
are given tear-proof smocks and blankets and sleep on mats or bunks that have been
modified to reduce the chance of hanging.

Ex. HH - 900        16/26

Success has been elusive.

By the end of 2015, six more inmates had killed themselves. In 2016, five inmates committed suicide, and at least half a dozen have taken their lives since 2017.

Ivan Ortiz managed to suffocate himself on March 18 while housed in the jail's psychiatric observation unit, its highest level of care for mentally ill inmates.

According to his autopsy report, Ortiz tried unsuccessfully to hang himself that morning and told jail staff he "felt like ending his life." That afternoon, according to surveillance video, he climbed under a sheet and put a plastic bag over his head and died. Nearly an hour passed before deputies checked on him. Ortiz's family has retained an attorney.

While sheriff's officials were telling plaintiffs' lawyers — and the public — that department practices were sound, internally there was concern that the number of suicides was too high, according to internal documents released as part of ongoing litigation.

"Is it a problem?" a department PowerPoint slide about jail suicides asked. "YES ... a definite problem."

Ex. HH - 901

5/1/22, 12:38 PM    Dying Behind Bars: Jail inmate deaths in San Diego County far exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DEB    Document 119-4    Filed 05/02/22    PageID.2028    Page
56 of 173

The undated presentation listed the main challenges: a lack of funding for mental health professionals, lack of training and knowledge for staff and contractors, undetected and under-reported cases of troubled inmates and 9-to-5 clinical hours for mental health providers.

Sheriff's officials subsequently expanded mental health clinicians' hours to be available from 6 a.m. to 10:30 p.m. They hope to have 24-hour coverage at most facilities once 15 new budgeted positions are filled and staff is increased to 27.

*"Suicide prevention is very important to all of us. Even if we lose one person, it's one too many. ... The sheri   has made it a priority for us to not only expand our mental health services, but to enhance our suicide prevention training."*

**— Cmdr. Erica Frierson, Sheri   's Department**

"In 2010, we only had four mental-health clinicians, so for us it's a big change," Cmdr. Erika Frierson, who manages jail operations including medical services and inmate processing, said in an interview.

The frequency of inmate suicides in San Diego County has drawn criticism from experts and lay people.

Last year, the nonprofit advocacy group Disability Rights California concluded in a report that the jail system was in crisis, recording suicides at a rate that was five times that of the state prison system, which, the report notes, has been under court supervision for its own problem with suicides.

"There is an extensive public record documenting the tragic loss of lives, systemic failures and inadequacy of oversight," the report says. "Families of those who have died have filed lawsuits alleging that the county and jail staff acted with deliberate indifference to inmates' serious mental health, medical and related needs."

The report singled out the department's "enhanced observation housing" program and the jails' padded safety cells, saying they isolate inmates indefinitely and fail to provide meaningful mental health care.

"We reviewed multiple records documenting that EOH inmates were left naked, with no safety smock, and in some cases not even provided a blanket," the researchers wrote. "Some are forced to sleep on a thin mat placed on the floor."

The report urged the department to allow inmates under enhanced observation to have visitors, participate in recreational activities and be allowed to wear clothing and keep personal items in their cells if a mental health clinician deemed it safe.

> *"The money you need to reform the system is being spent paying out lawsuits for people who are dying. You know, $7 million here, $1 million there, that adds up pretty quickly."*
>
> **— John Snook, Treatment Advocacy Center**

Lindsay Hayes, a consultant hired last year to assess the department's suicide prevention protocol, echoed these recommendations. His report describes enhanced

observation cells as "quite dirty and unsanitary, with feces found on the walls in close proximity to the CCTV monitor."

In response to Hayes' finding, the department said each cell would get a daily cleaning.

Disability Rights California issued dozens of recommendations, including improving mental-health treatment, boosting staff and ending the use of solitary confinement where, according to jail policies, inmates spend 47 hours in a cell before getting an hour of yard time.

The Sheriff's Department argues that the nature of jail populations makes certain comparisons misleading, but nonetheless has implemented some of the recommendations, such as changing policies to reduce use of isolated and austere "safety" cells and adding an internal team to review suicide responses.

A sheriff's spokeswoman also said a dip in suicides — to one — in 2017 was partially due to improved deputy training and increased access to inmate services.

Others called on the sheriff to establish meaningful independent oversight of jail conditions.

Ex. HH - 904

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/03/22    PageID.2061    Page 59 of 173

Two years ago, volunteer members of the county grand jury reviewed San Diego County jail operations and said the Sheriff's Department's suicide-prevention plan lacked provisions for adequate training. Jurors also urged the sheriff to appoint a full-time mental health officer.

"The recommendation will not be implemented because it is not warranted," the department said in response.



Paul Silva died in 2018 after a beating by deputies left him with a collapsed lung. The family is now suing the county. (Family photo)

## 'No, don't do it'

It's unclear if having a mental health officer might have helped Paul Silva, a 39-year-old diagnosed schizophrenic who did not survive his experience in sheriff's custody.

Ex. HH - 905

Silva's mother, Leslie Allen, called police to her San Diego home on Feb. 20, 2018, because her son was outside her home, yelling and agitated. She told the dispatcher her son was mentally ill and likely had not taken his medication. Allen wanted Silva transported to a mental health facility for treatment.

Instead, he was booked into the Central Jail on suspicion of being under the influence of illegal drugs. He received no treatment, the family's federal lawsuit states, and was kept in a temporary holding cell for 29 hours "with no shower, no toilet paper, no soap, no clean clothes, and no bed."

Footage from a hallway camera trained on the cell's window showed Silva pacing back and forth and "appearing to speak to the wall."

When a deputy found Silva yelling incoherently, he summoned help, the lawsuit said.

"Paul was Tased between four to nine times while six other members of the Tactical Team held him down with a body shield and pressed down on his torso," the lawsuit said. "At least six members were on or around his body with a shield placed on top of his torso, with two officers pushing down on the shield.

"One deputy instructed the other members to use 'downward pressure with the shield, get your body weight on it.' These deputies heard Paul yell 'No, don't do it, sir.'

Ex. HH - 906

Paul's voice then became faint and unintelligible," the lawsuit said.

*"No matter what the situation is, jail is likely to make things worse. If the person hasn't been receiving adequate treatment services, putting them in a harsh and dangerous setting like jail or solitary confinement is likely going to make them worse and certainly isn't going do much to make them better."*

**— Aaron Fischer, Disability Rights California**

Silva was transported to UC San Diego Medical Center, where he fell into a coma and died March 28, about five weeks after he was jailed.

The Medical Examiner's Office ruled the manner of death a homicide. Toxicology tests for alcohol, methamphetamine, opiates, barbiturates and cocaine were negative.

Attorney Eugene Iredale, who sued in U.S. District Court on behalf of the Silva family, said San Diego County elected leaders have a history of short-term thinking when it comes to providing inmate health care.

"The county has been trying to do things on the cheap," said Iredale, who has successfully sued the Sheriff's Department for other inmate deaths. "Instead of hiring good doctors at a good salary with institutional memories, they contract it out.

"If you look at the settlements and legal costs, they're not getting a bargain," he said. "They're buying the liability that comes with substandard care."

The District Attorney's Office last year cleared sheriff's deputies of negligence and misconduct in Paul Silva's death.

Case 3:20-cv-00406-AJB-DDL   Document 119-4   Filed 05/02/22   PageID.2064   Page
62 of 173

The county's motion to dismiss a lawsuit filed by Silva's parents was denied and the case is pending.

Despite initially rejecting the grand jury's recommendation, the Sheriff's Department recently said it has changed course and will appoint a new mental health leader.

"We recognized our growth has now created the need for both a chief medical officer to oversee our medical services as well as a mental health director to oversee mental health services," the department said in a statement. "Together they will be responsible for ensuring both disciplines provide collaborative, efficient and effective patient care."

Dr. Jon Montgomery recently took over as chief medical officer, the department said. The mental health director position has been funded and candidates are being interviewed.

# Next installments

**Monday:** Lapses in treatment, medical care spell horrific ends for mentally ill inmates

5/1/22, 12:33 AM | Blue-ribbon panel finds deaths in San Diego County jails exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/03/22    PageID.5085    Page 63 of 173

**Tuesday:** Jail deaths are routinely investigated, but public findings are hard to come by

---

### Updates

**11:44 a.m. Sept. 20, 2019:** This story was updated to add news of the death of Daniel James Pickett.

---

WATCHDOG   PUBLIC SAFETY   FOCUS   TOP STORIES   DYING BEHIND BARS   JAIL DEATHS

---



## Sign up for the weekly Watchdog newsletter

Investigative reporting and data journalism from San Diego County and beyond, every Monday morning. (7 a.m.)

**SIGN ME UP**

You may occasionally receive promotional content from the San Diego Union-Tribune.



### Jeff McDonald

🐦 Twitter      ✉ Email      f Facebook



### Kelly Davis

🐦 Twitter      ✉ Email



### Lauryn Schroeder

5/1/22, 12:06 PM    Dying behind bars: Rate of inmate deaths in San Diego County jail exceeds other large California counties - The San Diego Union-Tribune

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/03/22    PageID.2066    Page 64 of 173



Twitter    Email

**Show Comments**

Support our journalism        Submit a story tip        Report a problem with this story



The San Diego Union-Tribune

A California Times Publication

Privacy Policy

Terms of Service

Sign Up For Our Newsletters

Follow Us

About Us

Contact the Union-Tribune

Archives

E-Newspaper

Copyright © 2022, The San Diego Union-Tribune | CA Notice of Collection | Do Not Sell My Personal Information

# EXHIBIT II



The San Diego Union-Tribune

WATCHDOG

# Number of drug overdoses in San Diego County jails jumps sharply

Housing module in San Diego Central Jail.  (San Diego Union-Tribune file photo)

BY JEFF MCDONALD, KELLY DAVIS

JUNE 1, 2021 5 AM PT



In 2018, there were 11 overdoses on drugs in San Diego County jails, Sheriff's Department records show.

Already this year there have been 53 overdoses, including a 12-day spate in May in which 20 people at four different jails were administered naloxone, emergency medication to keep them from dying.

Illegal drug use has exploded in San Diego County jails, no more aggressively than over the past few weeks and months.

On May 18 alone, eight people incarcerated at the George Bailey Detention Facility overdosed on fentanyl, the department said. Even before then, the jails were on track to far outpace the number of times deputies and medical staff administered naloxone in 2020.

"It's worse than I've seen," said a jail guard who is not authorized to speak to reporters. "Inmates use the drugs even after watching guys OD the day before."

The number of in-custody overdoses jumped more than five-fold between 2018 and 2019, when 57 inmates were found in medical distress and given doses of naloxone. Last year the total of overdoses climbed to 75 people across the county's seven-jail system.

*Reporter Jeff McDonald discusses this story on San Diego News Fix:*



Many of this year's 53 inmate patients have been hospitalized, and so far only one person has died, according to department reports.

Traces of fentanyl were found in 35-year-old Jonathan Whitlock's blood, an April 28 Sheriff's Department news release said. He had been incarcerated at George Bailey.

Two other men have died behind bars this year: one suffocated on a face mask and the other's death has yet to be publicly disclosed.

Last year five men died fentanyl-related deaths in San Diego County custody.

Aides to Sheriff Bill Gore say the crush of jailhouse overdoses reflects the growing presence of fentanyl across the broader community. They say the department is doing everything it can to prevent overdoses and protect inmates.

## Suspected overdose incidents in San Diego County jails

Deputies and medical staff are more frequently administering naloxone, an emergency medication used to treat drug overdoses.



2021 number is through late May
Source: San Diego Sheriff's Department

U-T

"Many of the incidents we experience in our facilities mirror those found in the community," spokeswoman Lt. Amber Baggs said in an email. "This translates to an increased demand and market for fentanyl inside of our jails."

The assertion is backed up by county research which shows fentanyl-related deaths in the community tripled from about 150 in 2019 to more than 450 last year.

A separate report released by the San Diego Association of Governments in October said "fentanyl" was the most common answer when arrestees were asked if they had abused prescription drugs in the previous 30 days.

The Sheriff's Department acknowledges it has more work to do to protect people who are locked up and to prevent narcotics from being smuggled behind bars.

**Smuggled inside**

Fentanyl is a synthetic opioid that can be as much as 50 times stronger than heroin. Because a small amount can be deadly, it is difficult to find and confiscate, despite all the measures taken by the department.

"To keep illegal drugs from entering county jails, we've made investments in equipment and technology, utilizing specialized resources and integrating investigative methods to provide a safe environment for our staff and individuals in our custody," Baggs said.

"Despite these efforts, drugs are making their way into our facilities."

Sometimes drugs are hidden inside people's bodies as they are being booked into jail, the department said. They also have been sent in through the mail or brought in by jail staff.

Jail officials rely on body scanners when arrestees are booked into custody, but the machines do not always identify contraband as it is being snuck in, the department said. The intake process also includes verbally warning inmates that drugs can be dangerous — to use or to ingest as a means of hiding them.

Deputies also conduct random searches of cells that may include drug-sniffing dogs. The department also maintains "no questions asked" drop boxes, where illegal drugs can be placed without recrimination, Baggs said.

"There have also been instances of visitors bringing drugs onto jail property with the intent of getting the drugs inside the facilities," she said. "These incidents have resulted in criminal investigations and arrests."

The unnamed jail deputy said a new mail-screening system has cut back on what used to be the most prevalent way of sneaking drugs into jails.

Body scanners also have helped reduce the flow of illegal drugs into county jails, he said, although many of his colleagues have yet to be properly trained to find everything that appears in the images. And canine searches are rare, he said.

"The drug dogs are not allowed to be used during searches because they don't want to endanger the dogs," he said. "But it's OK to send in deputies to search for drugs."

Experts say one reason so many inmates appear to be using fentanyl and other substances behind bars is because they already are addicted to opioids when they arrive at jail.

As a result, many jail and prison systems have implemented a medication-assisted treatment program, or MAT, which includes regular doses of methadone or Suboxone to curb painful physical withdrawal symptoms. The medications alleviate a person's cravings for opiates without causing a high.

Leo Beletsky, a professor of law and health sciences at Northeastern University, said it is counter-productive to not employ medication-assisted treatment in jails and prisons.

"The fact that we incarcerate folks with substance use and do not provide them with adequate and scientifically based treatment — and essentially force them to go into withdrawal — is not just inhumane but dangerous for the people incarcerated and for the staff," he said.

In correctional settings, medication-assisted treatment "should be just like any other medication," Beletsky said. "They should be screening everyone for opioid use disorder and prescribing MAT. And, when people are being released, getting them connected to care."

But there is significant stigma tied to using medication-assisted treatment and a belief that overcoming addiction requires facing a difficult withdrawal process, he said.

"There's a lot of foot-dragging," Beletsky said. "The point is for people to get their lives back and be able to function. What someone else defines as 'sober' shouldn't have any bearing on someone's course of treatment."

**'Every intent'**

Gretchen Burns Bergman, the executive director of a Spring Valley nonprofit called A New PATH, for Parents for Addiction Treatment and Healing, has seen the benefits of medication-assisted treatment firsthand.

Bergman's son struggled with opiate addiction. Once, when he was in jail, Bergman was able to bring him Suboxone to help ease his withdrawal symptoms.

But during a subsequent incarceration, a sympathetic judge agreed to release the young man because he believed he would be better off continuing his treatment outside of jail due to the lack of in-jail services, Bergman said.

One of the chief missions for A New PATH is to make medication-assisted treatment more widely available, to people who are in custody and those who are released from jail without support services.

In an interview last week, Bergman told The San Diego Union-Tribune she thought the jails had implemented a medication-assisted treatment program. Indeed, the department told the Union-Tribune in 2019 that the department was "currently receiving training on how to effectively implement a medication assistance treatment program in our facilities."

More than 18 months later, the department said the program was still being developed. Bergman said it was infuriating to hear this.

"We're so far away from what we need to see with treatment on demand, it's just heartbreaking," she said. "Everybody understands the need for harm-reduction strategies. You have to meet people where they are."

Last summer, as hundreds of inmates were released early to prevent the spread of COVID-19, A New PATH gave the Sheriff's Department more than 1,000 naloxone kits, along with a short training video on the proper use of the life-saving nasal spray.

But the kits were never distributed. The department returned them in October because they had expired.

A New PATH then provided another 1,000-plus kits, but those also went unused.

"We thought we had all the details ironed out," Bergman said.

Baggs, the sheriff's spokeswoman, said the hold-up was due to a county rule that requires the sheriff to get approval from the Board of Supervisors to accept naloxone donations, a vote that did not happen until September.

Then, because the plan was to have medical staff distribute the naloxone, the department also needed the Service Employees International Union to sign off.

"To date, this process is not completed," Baggs said.

After contacting Sheriff Gore last week about the unused naloxone, Bergman was assured that deputies would be providing inmates with the naloxone kits upon release.

Baggs said the Sheriff's Department is currently participating in a statewide program that promotes medication-assisted treatment in jail systems across California, but the San Diego effort is so far limited to pregnant inmates who already are prescribed methadone.

"We have every intent to have a robust MAT program in the county jail system in the near future," she said.

---

Jeff McDonald

Kelly Davis

Show Comments

**MOST READ WATCHDOG STORIES** ›

# EXHIBIT JJ

The San Diego Union-Tribune

SPONSOR A STUDENT
DONATE




# 8 inmates at Otay Mesa jail hospitalized after overdosing on fentanyl



File photo of George F. Bailey Detention Center in Otay Mesa. (Nelvin C. Cepeda/San Diego Union-Tribune)

## Deputies at the county-operated George F. Bailey Detention Facility administered the overdose-reversing drug Narcan to the inmates

BY ALEX RIGGINS

MAY 19, 2021 6:52 PM PT





OTAY MESA — Eight inmates overdosed on fentanyl Tuesday night at George F. Bailey Detention Facility in Otay Mesa, sheriff's officials said.

Ex. JJ-920

Deputies and medical staff at the county jail administered the overdose-reversing drug naxolone to each of the inmates, according to sheriff's Lt. Jack Reynolds.

All eight were taken to hospitals and later returned to the jail on Alta Road, Reynolds said in a news release.

Fentanyl is a synthetic opioid up to 50 times stronger than heroin. Sheriff's officials offered no insight into how the drug made it into the jail, but highlighted the agency's "multi-faceted … (and) comprehensive approach to keep illegal drugs from entering county jails."

Those efforts include six X-ray body scanners and six drug-sniffing dogs, random searches of visitors, "no questions asked" drop boxes and equipment that can detect drugs sent through the mail, the Sheriff's Department said.

The first of Tuesday's overdoses was discovered around 7 p.m. when deputies conducting a safety check in a housing unit found an inmate having difficulty breathing, Reynolds said. Deputies notified medical staff and administered naloxone, a nasal spray often referred to by the brand name Narcan.

As jail staff was treating the first inmate, three others were discovered to be exhibiting the same symptoms, Reynolds said. The staff also administered naxolone to them.

The four overdoses sparked an investigation, and around 8:30 p.m., as deputies were searching sleeping areas for drugs and interviewing inmates about the overdoses, another inmate in a different housing unit was found unresponsive, Reynolds said. Jail staff performed CPR and gave him naxolone, then administered it to three more inmates who also began showing signs of drug intoxication.

Reynolds said in the statement that San Diego deputies were the first in the western United States to begin carrying the overdose-reversing nasal spray.

Ex. J, p. 921

Authorities say fentanyl is often pressed into counterfeit pills that resemble common prescription drugs of abuse, such as oxycodone. Or it can be laced into other illicit drugs, like methamphetamine, cocaine and heroin.

It is not uncommon for there to be clusters of overdoses, like in April 2020, when six people overdosed within two hours in San Diego. Authorities believed those who overdosed, including three who died, had taken cocaine laced with fentanyl.

Just a tiny amount of fentanyl can be deadly. In San Diego County, fentanyl deaths increased from 151 in 2019 to more than 450 in 2020, when overdose deaths spiked amid the pandemic.

---



Alex Riggins

Twitter    ✉ Email    f Facebook

**Show Comments**

Ex. JJ 922

# EXHIBIT KK

Case 3:20-cv-00406-AJB-DDL   Document 119-4   Filed 05/03/22   PageID.2050   Page 78 of 173

☰          *The San Diego Union-Tribune*          **SPONSOR A STUDENT DONATE**           

# Seven Otay Mesa jail inmates hospitalized for drug overdose

## Sheriff's deputies used the life-saving Narcan drug to rescue the inmates on Saturday afternoon

BY CITY NEWS SERVICE

JULY 18, 2021 11:32 AM PT

  

OTAY MESA — Seven inmates at the George Bailey Detention Facility in Otay Mesa were hospitalized after they were believed to have overdosed on fentanyl, authorities said today.

Deputies were alerted at 1:30 p.m. Saturday to a medical emergency inside a housing unit, according to the San Diego County Sheriff's Department.

One inmate was found unresponsive and medical staff administered Naloxone, also known as Narcan, to counter decreased breathing in an opioid overdose, officials said. Six more inmates had symptoms indicating they were under the influence of drugs and Naloxone was administered before they were taken to hospitals, officials said.

All were expected to recover.

EX. KK 924

4/28/22, 1:42 PM
Case 3:20-cv-00406-AJB-DDL
Seven Otay Mesa jail inmates hospitalized for drug overdose - The San Diego Union-Tribune
Document 119-4
Filed 05/03/22
PageID.2051
Page 79 of 173

Show Comments

EX. KK 925

# EXHIBIT LL

12/7/21, 9:23 AM    Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds - The San Dieg…

Case 3:20-cv-00406-AJB-DDL    Document 110-4    Filed 05/02/22    PageID.2053    Page 81 of 173

The San Diego Union-Tribune

WATCHDOG

# Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds



Lazaro Alvarez died in the San Diego Central Jail last year. (U-T)

BY KELLY DAVIS, JEFF MCDONALD

DEC. 6, 2021 5:23 PM PT



Two San Diego County sheriff's deputies failed to administer medical aid to a man who was found unresponsive in his jail cell and died in custody, an independent oversight

EX. LL - 92

12/7/21, 9:32 AM    Two San Diego County Sheriff's deputies failed to provide medical aid to inmate before he died, review board finds - The San Dieg…

Case 3:20-cv-00406-AJB-DDL    Document 118-4    Filed 05/02/22    PageID.2054    Page
82 of 173

board has concluded.

Lazaro Alvarez, 40, died Nov. 22, 2020, just hours after being booked into custody on a charge of trespassing.

The Medical Examiner's Office later said Alvarez died from a heart attack caused by methamphetamine and fentanyl, and the death was ruled an accident.

One deputy started cardio-pulmonary resuscitation but stopped after administering two chest compressions, "due to not wanting to disrupt a crime scene," the county's Citizens' Law Enforcement Review Board said in a finding to be discussed at a public meeting Tuesday. A second deputy failed to help the inmate, the independent review said.

"Deputy 1 failed to provide emergency medical care to Alvarez," review board investigators found. "According to Commission on Peace Officer Standards and Training, when the situation involves a medical emergency, peace officers assume the role of EMS first responder.

"The POST training states that if any doubt exists as to whether a victim is alive, then CPR should be started," and continued until additional help has arrived, the review notes.

The findings also say that Deputy 1 was not carrying naloxone, a drug that can reverse an opiate overdose.

"Since the incident, (policy) has been updated to require deputies to carry naloxone on their person," review board investigators wrote.

The Citizens' Law Enforcement Review Board findings contradict the Sheriff's Department's statement when it announced Alvarez's death in March, four months after

12/7/21, 9:... Case 3:20-cv-60406-AJB-DDL ... Two San Diego Sheriff's deputies ... Document 110-4 ... police medical aid to inmate before he died, Review board finds Filed 05/02/23 San Dieg... PageID.2655 Page

83 of 173

he died.

"Just after 4 a.m. on Nov. 22, 2020, deputies at the San Diego Central Jail found an inmate, 40-year-old Lazaro Alvarez, unresponsive in his cell," the department said in its news release. "Deputies and medical staff immediately performed life-saving measures until relieved by fire department personnel."

The Sheriff's Department declined to respond to a request for comment on why the independent findings contradicted its March news release — beyond issuing a statement stating that officials appreciate the review board's work.

"The San Diego Sheriff's Department is very supportive of CLERB and their dedication to increase public confidence and accountability of peace officers," the statement said.

"We welcome their recommendations and continually strive to make improvements in all aspects of our department."

Both deputies, who were not identified due to state confidentiality laws, declined to be interviewed by review board investigators, as is their right under a longstanding agreement with the San Diego County Deputy Sheriffs' Association.

Alvarez had been arrested for trespassing on Nov. 21, 2020, and was due to be cited and released.

According to the review board investigation, deputies checked on Alvarez almost hourly beginning after 11 p.m. on the night of his arrest. The department mandates hourly "safety checks" but does not require deputies to confirm that an inmate is alive.

"Since safety checks do not require proof of life, the last time Alvarez was known to be alive was 11-21-20 at 11:20 p.m. after an interaction with a release deputy," the report says.

12/7/21, 9:35 AM                Two San Diego County Sheriff's deputies failed to provide medical aid to inmate before he died, review board finds - The San Dieg…

Case 3:20-cv-00406-AJB-DDL    Document 110-4    Filed 05/02/22    PageID.2056    Page
84 of 173

Paul Parker, the Citizens' Law Enforcement Review Board executive officer, said it became clear during his investigation that the camera inside the holding cell where Alvarez died was not working.

Broken or non-operational surveillance cameras inside county jails have been a recurring problem for the Sheriff's Department, the review board executive said.

"The camera in (Alvarez's) cell was inoperable and we want the San Diego Sheriff's Department to prioritize use of cells with cameras over those without cameras," Parker said in an email Monday.

Parker said the board has raised the issue of inoperable cameras at George Bailey Detention Facility and were told by the Sheriff's Department that the situation will be addressed after the new Rock Mountain jail opens.

The Rock Mountain facility in Otay Mesa is a former private prison being renovated by the Sheriff's Department. The project has cost millions of dollars and is years behind schedule, according to a prior county grand jury report.

The department statement said command staff is dissatisfied with the current surveillance system and recognizes the need for improvement.

"Our inability to tell the entire story or to be completely transparent when incidents in the jail occur, is unacceptable," it said. "The cameras throughout the jail system are aging and are not always reliable."

The department has identified a new wireless system and is currently exploring a system-wide upgrade, officials said, without providing a timeline.

In an investigation published earlier this year into the suicide death of 33-year-old Joseph Morton, the board found that video cameras inside the Vista Detention Facility

12/7/21, 9:28 AM    Two San Diego County Sheriff's deputies failed to provide medical aid to inmate before he died, review board finds - The San Dieg…

Case 3:20-cv-00406-AJB-DDL   Document 110-4   Filed 05/02/22   PageID.2057   Page 85 of 173

also were broken, meaning investigators could not verify if deputies properly checked on Morton during his last hours of life.

Morton's family filed a lawsuit against the county in August, arguing that jail medical staff failed to take Morton's threats to harm himself seriously.

In its report on Alvarez's death, the review board issued a pair of recommendations aimed at preventing future inmates from receiving the inadequate level of medical care the board said Alvarez was provided.

Specifically, the review board said the Sheriff's Department should mandate that deputies verify an inmate is alive during routine safety checks on vulnerable people.

The review board also recommends that San Diego Central Jail staff only use cells with operable cameras, unless all cells with working cameras are already being used.

Alvarez was one of 13 people who died in San Diego jail custody in 2020. So far this year, 16 people have died, making it one of the deadliest years in jail history despite a reduced inmate population due to COVID-19 protocols.

For more than a decade, the San Diego Sheriff's Department has had the highest jail mortality rate among California's largest counties, according to an analysis by The San Diego Union-Tribune.

Bill Gore, the three-time elected sheriff, announced earlier this year that he does not plan to seek re-election when his latest term expires next year.



Kelly Davis

EX. LL - 93

12/7/21, 9:35 AM two San Diego Sheriff's deputies failed to provide medical aid to man before he died, review board finds - The San Diego...

Case 3:20-cv-00406-AJB-DDL Document 110-4 Filed 05/02/22 PageID.3058 Page 86 of 173

Twitter    Email



Jeff McDonald

Twitter    Email    Facebook

Show Comments

EX. LL - 932

# EXHIBIT MM

| | |
|---|---|
| **From:** | Frierson, Erika |
| **To:** | Craig, Michelle; Baggs, Amber; Martinez, Kelly |
| **Subject:** | RE: media request/ San Diego Union-Tribune |
| **Date:** | Monday, December 6, 2021 3:37:12 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

Looks good to me too...

**From:** Craig, Michelle <Michelle.Craig@sdsheriff.org>
**Sent:** Monday, December 6, 2021 3:36 PM
**To:** Baggs, Amber <Amber.Baggs@sdsheriff.org>; Martinez, Kelly <Kelly.Martinez@sdsheriff.org>;
Frierson, Erika <Erika.Frierson@sdsheriff.org>
**Subject:** RE: media request/ San Diego Union-Tribune

Looks great to me.  Nice job all.

Michelle



**Michelle Craig**
Lieutenant
*Division of Inspectional Services*
Email: Michelle.Craig@SDSheriff.org

████████████████████████

www.sdsheriff.net
**SAN DIEGO COUNTY
SHERIFF'S DEPARTMENT**

**From:** Baggs, Amber <Amber.Baggs@sdsheriff.org>
**Sent:** Monday, December 6, 2021 3:34 PM
**To:** Martinez, Kelly <Kelly.Martinez@sdsheriff.org>; Frierson, Erika <Erika.Frierson@sdsheriff.org>;
Craig, Michelle <Michelle.Craig@sdsheriff.org>
**Subject:** RE: media request/ San Diego Union-Tribune

The additional sentences are good. Michelle caught one of my typos. I'll correct it then send over to
the reporter.

**From:** Martinez, Kelly <Kelly.Martinez@sdsheriff.org>
**Sent:** Monday, December 6, 2021 3:31 PM
**To:** Baggs, Amber <Amber.Baggs@sdsheriff.org>; Frierson, Erika <Erika.Frierson@sdsheriff.org>;
Craig, Michelle <Michelle.Craig@sdsheriff.org>
**Subject:** RE: media request/ San Diego Union-Tribune

I added two more sentences…I approve the below unless you have further.

**From:** Baggs, Amber <Amber.Baggs@sdsheriff.org>
**Sent:** Monday, December 6, 2021 3:16 PM
**To:** Frierson, Erika <Erika.Frierson@sdsheriff.org>; Martinez, Kelly <Kelly.Martinez@sdsheriff.org>; Craig, Michelle <Michelle.Craig@sdsheriff.org>
**Subject:** RE: media request/ San Diego Union-Tribune



**From:** Frierson, Erika <Erika.Frierson@sdsheriff.org>
**Sent:** Monday, December 6, 2021 3:06 PM
**To:** Martinez, Kelly <Kelly.Martinez@sdsheriff.org>; Baggs, Amber <Amber.Baggs@sdsheriff.org>; Craig, Michelle <Michelle.Craig@sdsheriff.org>
**Subject:** RE: media request/ San Diego Union-Tribune

One minor edit to clarify not all inmates require a second evaluation – only those identified at pre-intake.  I also included a sentence to make it clear there were two actual working groups.

Proposed:

The Sheriff's Department developed a working group to develop a process that ensures all individuals identified by the pre-intake nurse as needing a 2nd stage medical screening, to include individuals in the "book and releases" process, will receive their second medical evaluation in a timely manner.   The revised process and nursing protocols have recently been implemented.  In addition, a different working group was convened to review current safety check policies.  The research from this work group identified that safety checks in the medical areas will be increased to every 30 minutes.  The safety checks at intake will also be increased, however additional staffing needs have been identified to accomplish this at the Vista and Downtown jails.  Those captains are working to modify staff assignments in order to accomplish that.

---

**From:** Martinez, Kelly <Kelly.Martinez@sdsheriff.org>
**Sent:** Monday, December 6, 2021 2:39 PM
**To:** Baggs, Amber <Amber.Baggs@sdsheriff.org>; Frierson, Erika <Erika.Frierson@sdsheriff.org>; Craig, Michelle <Michelle.Craig@sdsheriff.org>
**Cc:** Frierson, Erika <Erika.Frierson@sdsheriff.org>
**Subject:** RE: media request/ San Diego Union-Tribune

Draft – please correct any inaccuracies, and let me know what you think.  Thanks.

Thank you for your inquiry.

The Sheriff's Department developed a working group to develop a process that ensures individuals in the book and release process receive a second medical evaluation in a timely manner.  The revised process and nursing protocols have recently been implemented.  The research identified that safety checks in the medical areas will be increased to every 30 minutes.  The safety checks at intake will also be increased, however additional staffing needs have been identified to accomplish this at the Vista and Downtown jails.  Those captains are working to modify staff assignments in order to accomplish that.

The Sheriff's Department is not satisfied in anyway with our current camera system or recording capabilities.  Our inability to tell the entire story or to be completely transparent when incidents in the jail occur, is unacceptable.  The cameras throughout the jail system are aging and are not always reliable.  In addition, the coverage they provide is far from optimal in all circumstances.  The Sheriff's Department has identified and is exploring system-wide wireless upgrades.  This upgrade will allow for a number of technological improvements, including improved camera systems, body-worn cameras for sworn staff, increased operability of computers, among other advancements.

---

**From:** Media Relations <MediaRelations@sdsheriff.org>
**Sent:** Monday, December 6, 2021 12:38 PM
**To:** Martinez, Kelly <Kelly.Martinez@sdsheriff.org>; Craig, Michelle <Michelle.Craig@sdsheriff.org>
**Cc:** Frierson, Erika <Erika.Frierson@sdsheriff.org>
**Subject:** FW: media request/ San Diego Union-Tribune

Deadline today:
Story coming regarding CLERB sustained findings on two deputies. I would like to respond with this :
*The San Diego Sheriff's Department is very supportive of CLERB and their dedication to increase public confidence and accountability of peace officers.*

I do not have the details as to the camera system issue, so unsure how to respond to this. Michelle-have we provided any updates to Paul on the cameras?

---

**From:** McDonald, Jeffrey <jeff.mcdonald@sduniontribune.com>
**Sent:** Monday, December 6, 2021 12:11 PM
**To:** Media Relations <MediaRelations@sdsheriff.org>
**Cc:** kellydaviswrites@gmail.com
**Subject:** media request/ San Diego Union-Tribune

Hi,
  Kelly and I are writing today about the latest CLERB findings that how two deputies failed to provide proper medical care to an inmate who died in sheriff's custody
https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/agendas/2021/1221%20Agenda.pdf
Does the department want to provide a response? Also, aul Parker said the review found the camera system was not operating – something CLERB has repeatedly found. Why is the camera system so often inoperable and what is the department explanation for this continue failure? Can you get us a response before close of business today?

Thank you as always,

Jeff

**Jeff McDonald | Reporter**
O: +1 (619) 293-1708
jeff.mcdonald@sduniontribune.com
600 B Street, Suite 1201, San Diego, CA 92101



# EXHIBIT NN

| From: | Kneeshaw, Alan |
|---|---|
| To: | Buchanan, Christopher |
| Cc: | Duke, Billy |
| Subject: | RE: drugs entering jails/ San Diego Union-Tribune |
| Date: | Thursday, May 27, 2021 1:49:00 PM |

Thanks Chris!

**From:** Buchanan, Christopher <Christopher.Buchanan@sdsheriff.org>
**Sent:** Thursday, May 27, 2021 1:46 PM
**To:** Kneeshaw, Alan <Alan.Kneeshaw@sdsheriff.org>
**Cc:** Duke, Billy <Billy.Duke@sdsheriff.org>
**Subject:** RE: drugs entering jails/ San Diego Union-Tribune

Alan,

I verified with Dr. Montgomery, inmates who self-report being part of an outside program are the target group. We make attempt to verify meds and participation through programs like health connect. Here's the rest of his input for this question……..

> *Captain,*
> *Good afternoon, hope things are going well for you. Just to follow up on the earlier conversation…*
>
> *We have always strived to provide continuity of care services for our patients, and continue with their previously prescribed medications if still clinically indicated. Although we do not yet have a comprehensive substance use disorder management program (which would include MAT treatment and therapy), we have had some success in just continuing an incoming MAT patient's medications.*
>
> *Such an individualized patient treatment plan would, by definition, be conducted on a limited case by case basis. The difficult part has actually been to identify/actually confirm that a patient has actually been prescribed one or more of MAT related medications, and is actually in a community care and treatment program. Once a patient has been identified… maintaining medications is fairly simple. It keeps the patient stable, meets the medical standard of care, and reduces any legal concerns/liabilities that could be construed from allegedly 'ignoring' a medical condition.*
>
> *The numbers to date have been very, very low… primarily because it is still a fairly new program element in the community (still rare/ they aren't ordering it very frequently), and it is still pretty difficult to confirm/verify the patient's prescription and medical history. We have been able to manage the one or two additional patients in the regular sick call, and do the observed therapy in the clinic.*
>
> *I apologize if there was any confusion.*

**From:** Kneeshaw, Alan <Alan.Kneeshaw@sdsheriff.org>
**Sent:** Thursday, May 27, 2021 1:10 PM
**To:** Buchanan, Christopher <Christopher.Buchanan@sdsheriff.org>
**Subject:** Re: drugs entering jails/ San Diego Union-Tribune

And we are actively doing the case by case?

> **Alan Kneeshaw**
> Captain
> *Detention Support*
> Email: alan.kneeshaw@sdsheriff.org
> ██████████████
> www.sdsheriff.net
> **SAN DIEGO COUNTY**
> **SHERIFF'S DEPARTMENT**

**From:** Buchanan, Christopher <Christopher.Buchanan@sdsheriff.org>
**Sent:** Thursday, May 27, 2021 1:07:08 PM
**To:** Kneeshaw, Alan <Alan.Kneeshaw@sdsheriff.org>
**Subject:** RE: drugs entering jails/ San Diego Union-Tribune

Yes.  As far as a comprehensive program, no. But for continuity of care we have the ability to
provided certain MAT related services on a case by case basis.

Chris

**From:** Kneeshaw, Alan <Alan.Kneeshaw@sdsheriff.org>
**Sent:** Thursday, May 27, 2021 12:26 PM
**To:** Buchanan, Christopher <Christopher.Buchanan@sdsheriff.org>
**Cc:** Duke, Billy <Billy.Duke@sdsheriff.org>
**Subject:** Fwd: drugs entering jails/ San Diego Union-Tribune

Chris,

Commander Duke did not think we were doing mat outside of LCDRF. From dr m's response it seems
like we are on a case by case basis? Please confirm.

Thanks,

Alan

> **Alan Kneeshaw**
> Captain
> *Detention Support*
> Email: alan.kneeshaw@sdsheriff.org
> Phone: ██████████
> www.sdsheriff.net
> **SAN DIEGO COUNTY**

**SHERIFF'S DEPARTMENT**

**From:** Montgomery, Jon <Jon.Montgomery@sdsheriff.org>
**Sent:** Thursday, May 27, 2021 11:04:21 AM
**To:** Kneeshaw, Alan <Alan.Kneeshaw@sdsheriff.org>; Buchanan, Christopher
<Christopher.Buchanan@sdsheriff.org>
**Cc:** Duke, Billy <Billy.Duke@sdsheriff.org>
**Subject:** RE: drugs entering jails/ San Diego Union-Tribune

Captain,
  Good morning, hope things are going well for you. Thank you for the email.

For brief background:
  Prior medical group (O'Brien) was extremely resistant to MAT and the use of opioids in general. Any form of MAT program would require their replacement. New medical group is knowledgeable concerning addiction medicine, and has the requisite legal/administrative credentialling in place. For those individual patients that are actively enrolled in a Community substance use management program, and that have been verified to be currently prescribed medications used in MAT, we are able to continue their medications. Once the department is authorized additional hours (conduct additional medical clinics), and has additional staff assigned (counselors, therapists, case managers and additional nursing staff to oversee observed therapy), we should be able to move beyond 'continuity of care' and provide therapy induction services.

Just as an observation from the article itself...
'hospitalizations' generally refers to actual admissions... rather than just ER visits. Regarding the large scale overdose event at GB- all the patients had responded to initial interventions and had achieved some level of consciousness prior to ER send out. All were subsequently returned to custody.

Specifically regarding the comments below.. discussion added in red.

\* Why has it taken so long to implement an MAT program? I think Jeff mentioned in his original email that we were told two years ago that a program was being implemented.

The Department was part of the Medication Assisted Treatment Learning Collaborative Cohort II established in collaboration with the California Department of Healthcare Services and Health Management Associates. We participated as part of a group of justice partners to expand MAT initiatives in each of our areas of work. In the jails specifically, we provide MAT services for pregnant females who are currently receiving Methadone treatments. We have also continued female inmates on other MAT treatment as requested through the court process. Our plans to expand MAT are still underway and were somewhat stalled due to the COVID 19 pandemic. We have every intent to have a robust MAT program in the

County Jail system in the near future.

I believe that the cohort is actually still ongoing, so we could use the present tense. It is certainly true that HMA's efforts to spearhead a grant project within the Jail system was significantly impacted by COVID, but that is being re-established as well. Grant management has been transferred from Acadia to RIHS (under SDSU) [Point of contact is Ms. Minola Manson]; there is 18 months left to conduct a 'MAT related project' associated with the County and the Sheriff's Department.  The take away would be: We are actively working with both county (HHSA) and community agencies to bring about Substance use disorder management programs for the health and welfare of our affected patients.

Perhaps it is not really relevant for the article, but… as a point of clarity- for pregnant females, we provide transportation to a community clinic (that actually HAS a methadone license) so that the patients might either initiate or continue their medication support. The clinic provides any therapy or counseling.

We have the ability to continue patients (either male or female) on MAT medications… if we are able to confirm their medication/prescription and participation in a community program. As medical record sharing within the community setting is still in its infancy… as of now, this type of notification/confirmation would normally come through either the courts or involved family representatives..

* In the absence of MAT, what options are available for people struggling with addiction?
     MAT is only one tool that can be used in addressing addiction. For many years we have had reentry service courses specifically geared toward working with addicted individuals. NEED INFO FROM RSD>

Agree.  Addiction medicine is certainly not new… we have had to manage substance use disorder for decades.  The idea (and physiology) behind MAT (medication assisted therapy/treatment) is not really all that new, either… it is just the methodology that has changed. Instead of using medications to treat the symptoms (managing withdrawal)… the idea is to try and prevent them from going into withdrawal in the first place.  It is also a perceptional and contextual shift… the realization that 'withdrawal' was not caused by the lack of the drug… that was actually incidental/ secondary intention.  The actual cause was the physiologic drop in dopamine.. which was creating the chronic medical condition.

-For the purpose of the question:  We provide counseling and therapy to everyone in our care, and use appropriate medications for symptom control/mitigation in the event managed withdrawal is needed.  (We may not wish to really comment on 'withdrawals'.) There are also specific 'addiction counselors' and rehab programs… but, as those elements fall under RSD, I will let them comment a little more in depth.

* If someone is enrolled in an MAT program and is arrested, are they able to continue getting treatment / medication in the jail?

At this point, we do not have a robust MAT program.  We have, at times, received requests from the court to continue an individual in a MAT program and have been successful in accomplishing the request.  We look to expand the availability of MAT to all our inmate population who want to participate in the near future.

<span style="color:red">True- we have received requests from the court. As stated above, we have been successful in continuing MAT therapy for other, previously recognized/established cases, but those are rare.</span>

Hope that helps a little, and not too verbose.  Please let me know if there are any questions, issues or concerns.
  Thanks,
    -Jon

**From:** Media Relations <MediaRelations@sdsheriff.org>
**Sent:** Thursday, May 27, 2021 6:14 AM
**To:** Kneeshaw, Alan <Alan.Kneeshaw@sdsheriff.org>; Duke, Billy <Billy.Duke@sdsheriff.org>
**Cc:** Navarro, Alejandro <Alejandro.Navarro@sdsheriff.org>
**Subject:** Fwd: drugs entering jails/ San Diego Union-Tribune

Good morning, there are a couple follow-up questions from Kelly Davis. I am out of the office today for training ...can you please work with Alex this morning to answer these questions?
I appreciate it.

Amber

Get Outlook for iOS

**From:** Kelly Davis <kellydaviswrites@gmail.com>
**Sent:** Wednesday, May 26, 2021 5:10 PM
**To:** Media Relations
**Cc:** McDonald, Jeffrey
**Subject:** Re: drugs entering jails/ San Diego Union-Tribune

Hi Amber,

Thanks for your response. I have a few follow-up questions:

* Why has it taken so long to implement an MAT program? I think Jeff mentioned in his original email that we were told two years ago that a program was being implemented.
* In the absence of MAT, what options are available for people struggling with addiction?

* If someone is enrolled in an MAT program and is arrested, are they able to continue getting
treatment / medication in the jail?
* Has SDSD seen any trends in how drugs are getting into jails?

--kelly


*
kelly davis
freelance reporter/editor
619.850.4231
kellydavis.pressfolios.com


On Wed, May 26, 2021 at 4:33 PM Media Relations <MediaRelations@sdsheriff.org> wrote:

> Hello,
>
> Thank you both for your inquiry into these matters.
>
> Kelly,
> We have not yet determined how the fentanyl got into our jails and affected the 8 individuals
> from GBDF. The detectives are still investigating that. And regarding our body scanners, we
> upgraded to the Soter RS system in April of 2020. We have these scanners at SDCJ, Vista, Las
> Colinas, and GBDF.
>
> Jeff,
>
> You had several questions, so hopefully this will answer them all. Just so you're aware, we will also
> be doing a Press Release because there is a lot of valuable information to share with everyone.
>
> Our department is being proactive in trying to keep illegal drugs from entering county jails. The
> growing presence and use of fentanyl in the community is alarming and our facilities have been
> impacted as well.  Many of the incidents we experience in our facilities mirror those found in the
> community.  This translates to an increased demand and market for fentanyl inside of our jails.
> And as you are aware, Fentanyl is extremely dangerous in very small amounts which adds to the
> challenges in detecting and preventing it from entering our jails.
>
> In 2014- our deputies became the first in the Western United States to carry the Naloxone nasal
> spray for overdose victims.  Our deputies and jail staff have been trained and equipped with
> Naloxone and have used it on many occasions to save lives.
>
> Recently, County Public Health Officer, Dr. Wilma Wooten M.D., M.P.H., Board of Supervisors
> Chair Nathan Fletcher and County Director of Behavior Health Luke Bergmann partnered to sign a
> Naloxone Standing Order allowing community organizations to distribute nasal Naloxone.

To keep illegal drugs from entering county jails, we've made investments in equipment and technology, utilizing specialized resources and integrating investigative methods to provide a safe environment for our staff and individuals in our custody. Despite these efforts, drugs are making their way into our facilities.  Sometimes drugs are hidden inside the bodies of those being booked.  They have also been sent in via the mail.  We have identified cases where jail staff have smuggled drugs into our facilities.  There have also been instances of visitors bringing drugs onto jail property with the intent of getting the drugs inside the facilities. These incidents have resulted in criminal investigations and arrests.

In our continued effort to combat drugs in our facilities, Facility Commanders have instructed their staff to conduct random searches.  At times, these searches include the use of Sheriff's K-9 teams.  When drugs are found in or around our facilities, they are logged into evidence and a crime report is completed for follow up investigation.

Our jail body scanners are located at the San Diego Central Jail, Vista Detention Facility, Las Colinas Detention and Reentry Facility and the George Bailey Detention Facility. Body scanners have allowed us to successfully seize weapons and narcotics prior to their entry into our facilities. All arrestees, except for pregnant women, are processed through a body scanner as part of the intake process.  While the body scanning system works well, it is not perfect and at times items are not detected.

Our department is working towards a comprehensive MAT program. We are currently engaged with our partners in the Health and Human Services Agency to leverage resources needed to expand our MAT services.  These services are only available in a limited capacity at the LCDRF. We have contracted medical providers with a MAT waiver who are capable of prescribing MAT medication in support of our expansion.

There are a number of complexities to the jail system and the populations the our department manages.  We take our responsibility to protect this population seriously and we continue to strive to have a greater impact in the area of drug interdiction. We have implemented several prevention measures which are intended to intercept narcotics entering the jail system. We have trained staff on drug identification, under the influence symptoms, smuggling techniques and narcotic-related investigations.  We are increasing our proactive investigative efforts to include increasing the number of staff who are assigned the primary responsibility of drug investigations in the jails.

Between May 10 and May 25 of this year, we experienced 20 suspected overdoses in our facilities (see the chart below).  During the response, all were administered Naloxone and transported to local hospitals for further treatment.  One individual is still in the hospital pending follow up for a medical issue unrelated to the suspected overdose. All others have returned to their facilities.

Fentanyl Jail OD Chart May 2021



I hope this helps to answer your questions.  Again.... We will put this information out on Press
Release later this evening as well so that others have the same information.

Thank you both.



**Amber Baggs**
Lieutenant
Media Relations Director
Email: amber.baggs@sdsheriff.org

www.sdsheriff.net
**SAN DIEGO COUNTY
SHERIFF'S DEPARTMENT**

**From:** Kelly Davis <kellydaviswrites@gmail.com>
**Sent:** Monday, May 24, 2021 7:07 PM
**To:** McDonald, Jeffrey <jeff.mcdonald@sduniontribune.com>
**Cc:** Media Relations <MediaRelations@sdsheriff.org>
**Subject:** Re: media request/ San Diego Union-Tribune

To add to Jeff's questions:
* Have you determined how the fentanyl that caused the eight hospitalizations last week got into GBDF?
* Who manufactures the body scanners that the department uses and are these scanners at all seven jails? (If not, which jails have them?)

Thanks!
--kelly

*
kelly davis
freelance reporter/editor
619.850.4231
kellydavis.pressfolios.com

On Mon, May 24, 2021 at 4:03 PM McDonald, Jeffrey <jeff.mcdonald@sduniontribune.com> wrote:

> Hi,
>   We understand that overdoses in county jails have been especially problematic in recent days, even beyond the May 18 mass incident at George Bailey that affected eight inmates. These include two hospitalizations from east Mesa on May 19; another OD at GBDF on 5/20; one inmate OD'ing at Vista on 5/21 and four others at Central Jail the same day, including three hospitalizations, and 8 inmates at East Mesa on 5/21.
>   We previously requested historical data from the department in order to compare the recent spate of overdoses but have not received any information in response, as you opted to put that request through the CPRA process. We are planning a story for this weekend outlining these cases, and the Department's handling of them. Here are some questions, and hopefully we will collect the data we requested earlier this month to include in our report. We would request responses to these questions no later than close of business Wednesday.
>
>     1. What is your explanation for the rise in overdoses?
>     2. What is your explanation for how drugs are getting into county jails, and is the smuggling more common today than in recent years?
>     3. What if any new measures has the Department instituted to stop the flow of drugs into

its jails and protect inmates from overdoses?

4. Do deputies or other jail staff smuggle drugs into jails and have any been caught in recent months or years?

5. What directions or instructions are jail commanders giving staff to protect inmates and find contraband such as fentanyl, given the jump in cases?

6. What are the protocols for finding or disposing of illegal drugs and how often do staff find them?

7. The grand jury in 2019 found the Department never updated scanners bought to find hidden drugs during the intake process https://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2018-2019/DetentionFacilitiesReport.pdf Has this been corrected, why or why not?

8. After the NCCHC report recommended that the jail partner with a community clinic to offer methadone or naltrexone (an extended release drug used to treat opiate addiction — you get a shot once a month), the Department told us *"The department has acquired an evidence-based assessment tool in treating inmates undergoing withdrawal which will be implemented in the near future. **The department is currently receiving training on how to effectively implement a Medication Assistance Treatment (MAT) program in our facilities***. Has the Department implemented the MAT program in some or all facilities, why or why not?

Thank you as always and all best,

Jeff

**Jeff McDonald | Reporter**
O: +1 (619) 293-1708
jeff.mcdonald@sduniontribune.com
600 B Street, Suite 1201, San Diego, CA 92101



SUBMITTED WITH
PLAINTIFFS' APPLICATION FOR
LEAVE TO ALLOW NON-
ELECTRONIC FILING

# EXHIBIT OO

# EXHIBIT PP

## Message History (6)

✉ On 2/18/2022 11:44:18 AM, SDSD Public Records wrote:

**Subject:** [Records Center] Public Records Request :: S002022-122421
**Body:**
RE: Public Records Request of December 24, 2021, Reference # S002022-122421


Dear Ellie Heywood,

The San Diego County Sheriff's Department is in receipt of your California Public Records Act (CPRA) request dated and received on December 24, 2021.  This is a follow up response to The Sheriff's Department's initial response on January 20, 2022. This is also a follow up response to the requesters updated requests/criteria for certain requests provided to the Sheriff's Department on February 02, 2022.  The Sheriff's Department responds to each individual request as follows:

**Request 2:** *Any and all writings related to the Sheriff's Department's use or consideration of a Level of Care classification system, including but not limited to any presentations, memos, or analyses by the Sheriff's Department or its contractors since 2017, and including but not limited to a presentation titled "Beyond Silos: How Level of Care Classification Enables Cost-Effective and Collaborative Management Across Community and Jail Systems" and any documents related to that presentation.*

**Response 2:** The Sheriff's Department conducted a search for records utilizing the search terms *"Beyond Silos: How Level of Care Classification Enables Cost-Effective and Collaborative Management Across Community and Jail Systems"* or "Beyond silos presentation" or "level of care classification" or "Level of Care system". The Sheriff's Department has identified the following documents as responsive to your request:

📄 DRC report(3)_Redacted
📄 Fw_ FYI - Comprehensive LOC Presentation_Redacted
📄 FW_PsychMD eUHR(1)_Redacted
📄 FW_PsychMD eUHR
📄 FW_PsychMD eUHR_Redacted
📄 Fwd_PsychMD eUHR_Redacted
📄 LOC Presentation - Updated_Redacted
📄 Re_ PsychMD eUHR
📄 Re_ PsychMD eUHR_Redacted
📄 RE_PsychMD eUHR_Redacted

Phone numbers were redacted from responsive records pursuant to Government Code section 6255(a). Please contact the employing agency to contact a specific employee.



**Response 25:** The Sheriff's Department conducted a search for responsive documents utilizing the search criteria provided by the requester above, and in conjunction with the initial request, and found no related documents.

**Request 27:** *From updated criteria received from requester on February 02, 2022:*

*For Request No. 27, the Sheriff's Department states that an initial search has identified 16,125 files to review. We propose search terms to reduce the number of files that the Sheriff's Department must review. At a minimum, please search using the following terms: ("PSU" OR "WPSU") AND "waiting list."*

**Response 27:** The Sheriff's Department conducted a search of the files found for the terms/criteria provided by the requester as stated above and found the following responsive to the request:

- FW_ Discharge for (6)_Redacted
- FW_ Discharge for _Redacted
- RE_ 5)_Redacted

The above documents were redacted pursuant to California Government Code sections 6254( c ), (f), and (k) incorporating California Civil Code 56.10. The information redacted contained information related to the incarcerated persons booking information and medical history. To the extent that this request seeks individual inmate records, such records are exempt pursuant to Government Code sections 6254(f), (c), and (k), incorporating HIPAA and California Civil Code 56.10.

Phone numbers were redacted from responsive records pursuant to Government Code section 6255(a). Please contact the employing agency to contact a specific employee.

The following attachment was also redacted per the above mentioned, but also redacted pursuant to Government Code 6254(k), incorporating the attorney work-product and attorney-client privileges.

- RE_ Inmate(4)_Redacted

**Request 28:** *Documents sufficient to show the number of incarcerated people enrolled in the Medication Assisted Treatment program at Las Colinas Detention and Reentry Facility from January 1, 2021 to the present.*

**Response 28:** The Sheriff's Department and our Medical Services Division does not currently have a formal number, or records, to represent this request. The MAT program has not been officially implemented to date and is currently in the process of being formatted and integrality into our facilities. The program currently being operated at LCDRF operates similar to, and with the MAT program in mind, but again the MAT program has yet to be fully implemented and logistics, record keeping, etc., are still in the process of being vetted and tested.

**Request 29:** *Any and all documents related to the factors the Jail uses to determine whether an*



# EXHIBIT QQ

Ex. QQ - 953



BY SIB STAFF / MAY 27, 2021

**SHERIFF'S NALOXONE CUSTODY PILOT PROJECT SAVES INMATES FROM OVERDOSE**

Two inmates are alive today after being saved by two separate doses of Naloxone also known as Narcan, administered by fellow inmates. On Wednesday, May 26th, at approximately 5:37 pm, Deputies assigned to work the North County Correctional Facility (NCCF) were alerted of two inmates in medical distress. Deputies and custody medical staff immediately responded to the dorm and found two inmates on an upper-tier, unconscious, suffering from possible overdoses. However, this potential tragic outcome was averted by fellow inmates housed in the same dorm.

At the direction of Sheriff Alex Villanueva, the Los Angeles County Sheriff's Department recently implemented a program in the custodial environment that provides inmates access to Narcan, a medication that, if administered quickly, can be highly effective in reversing an opioid overdose. Inmates watch an instructional video on administering the medication during their Inmate Orientation program.

When Deputies arrived, the two unconscious inmates had just received a dose of Narcan, administered by fellow inmates. Minutes later, a third

Ex. QQ - 954

1/3

5/1/22, 3:40 PM          Sheriff's Naloxone Custody Pilot Project saves inmates from overdose | Los Angeles County Sheriff's Department

Case 3:20-cv-00406-AJB-DDL   Document 119-4   Filed 05/02/22   PageID.3081   Page 109 of 173

inmate began to complain of dizziness. All three inmates were treated by medical staff on scene and subsequently transported to a local hospital for further treatment. Hours later, they returned to their housing facility.

With opioid overdoses on the rise, the Los Angeles County Sheriff's Department wants to ensure that inmate safety is of utmost priority. Currently, two Narcan doses are being distributed in each of the dorms at NCCF.   If the pilot program continues to save lives, the Department plans to expand this program to all custody facilities.



VIDEO: Sheriff's Naloxone Custody Pilot Project saves Inmates from Overdose

Ex. QQ - 956

# EXHIBIT RR

California inmate overdoses plummet under drug program    about:reader?url=https%3A%2F%2Fapnews.com%2Farticle%2Fcovid-h...

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/02/22    PageID.2084    Page
112 of 173

apnews.com

# California inmate overdoses plummet under drug program

*By DON THOMPSON*

5-6 minutes

---

SACRAMENTO, Calif. (AP) — The spiraling number of overdose deaths and hospitalizations among California prison inmates fell dramatically during the first two years of a program that uses prescribed drugs to treat more incarcerated addicts than any such program in the country, officials said Tuesday.

The rate of overdose deaths dropped 58% after the program began in 2020. Hospitalizations were 48% lower among those receiving the anti-craving drugs than among those waiting to begin treatment. The promising results show the program was effective even after accounting for restrictions during the coronavirus pandemic, according to doctors and researchers with the state corrections system and the federal official who oversees medical care in California prisons.

The report says the large scale results "are trending in a

California inmate overdoses plummet under drug program      about:reader?url=https%3A%2F%2Fapnews.com%2Farticle%2Fcovid-h...

Case 3:20-cv-00406-AJB-DDL     Document 119-4     Filed 05/02/22     PageID.2085     Page
113 of 173

positive direction" and officials are "cautiously optimistic."

The findings come as Gov. Gavin Newsom's administration seeks $126.6 million in the next fiscal year and $162.5 million annually thereafter to expand treatment. The report said expanding the state's latest expensive attempt to curtail the prisons' pervasive drug problem is "at the highest priority level," given the impact on prisoner health, community safety upon inmates' release, and drug trafficking and violence it brings to prisons.

The state's approach includes the once-controversial step of using drugs including buprenorphine, naltrexone and methadone to dampen addicts' cravings and euphoria and relieve withdrawal symptoms while weening them off opioids. It took years of urging by lawmakers and treatment professionals for prison officials to try the program, although the approach is now widely used and has general support from California prosecutors and probation officers.

Early critics objected that the treatment substituted one drug for another, and that there could be a black market for some of the substitute drugs. In California, inmates are given the drugs in a sheet that dissolves under the tongue or by injection and are tested to make sure they are taking their medications.

More than 22,600 inmates have received the drugs and officials expect to eventually include 25,000 inmates annually, more than a quarter of the prison population. The

Ex. RR - 959
5/1/2022, 12:29 PM

California inmate overdoses plummet under drug program     about:reader?url=https%3A%2F%2Fapnews.com%2Farticle%2Fcovid-h...

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/02/22    PageID.2086    Page 114 of 173

program far exceeds the volume of treatments in any other U.S. correctional setting, California prison officials said.

In 2019, California's prison system had a record-high 51 overdose deaths per 100,000 inmates, more than double the overall death rate for other state prison systems. The death rate in California had been steadily climbing since 2012.

It fell to a rate of 21 deaths per 100,000 inmates in 2020 and to a preliminary estimate of 20 deaths per 100,000 inmates in 2021, with a final report on last year's deaths not expected until late this year.

Overdoses were the third-leading cause of death for California inmates before the program, but dropped to eighth in 2020, the lowest ranking in nine years.

"I'm not surprised at the results, because it's been proven to be an effective therapy that saves lives and reduces crime," said Don Specter, an attorney for inmates in some of the largest class-action lawsuits against the prison system.

J. Clark Kelso, the federal official who oversees inmate health, called the findings "a step in the right direction."

The results contrast with opioid deaths that increased across the U.S. as a whole. Driven largely by highly toxic fentanyl, overdose deaths rose from about 21,000 in 2010 to more than 100,000 last year.

Overdoses in California prisons began to drop about six months before the pandemic and continued after the

California inmate overdoses plummet under drug program     about:reader?url=https%3A%2F%2Fapnews.com%2Farticle%2Fcovid-h...

Case 3:20-cv-00406-AJB-DDL     Document 119-4     Filed 05/02/22     PageID.2087     Page
115 of 173

department eased restrictions on visits and inmate movements, officials said. They said other state prison systems with similar pandemic restrictions did not see similar declines in overdose deaths and hospitalizations.

The results track earlier outcomes after prison officials began treating 60 inmates with medication in 2016.

Officials estimate that at least 65% of inmates have a substance abuse problem.

The use of anti-craving drugs is part of an approach that includes what is known as "cognitive behavioral therapy," in which people talk with mental health counselors to identify and change their own self-destructive behavior.

The program also aims to ease former drug users' transition back into the community, helping more than 2,200 parolees so far arrange continued treatment after their release.

Steven Fama, another attorney who represents inmates and tracks prison treatment programs, said corrections officials have slowly but steadily increased treatment and reduced the waitlist over the last two years, although there still are tens of thousands of inmates awaiting screening to see if they qualify.

Corrections officials said their goal is now to reduce the backlog, while developing therapy for inmates serving short sentences. They also aim to improve the handoff of parolees to community based treatment.

California inmate overdoses plummet under drug program

about:reader?url=https%3A%2F%2Fapnews.com%2Farticle%2Fcovid-h...

Case 3:20-cv-00406-AJB-DDL    Document 119-4    Filed 05/02/22    PageID.2088    Page
116 of 173

# EXHIBIT SS

Ex. SS - 963

| | |
|---|---|
| **DATE:** | OCTOBER 28, 2020 |
| **NUMBER:** | I.2 |
| **SUBJECT:** | INTERCOM SYSTEMS |
| **RELATED SECTIONS:** | |

PURPOSE:

To provide a means of communication between sworn staff and inmates.

POLICY:

Intercoms are generally located in areas accessible by inmates (e.g., dayrooms, cells, classrooms, etc.). Each facility shall maintain an inmate intercom system for the purpose of providing a means of communication between sworn staff and inmates. Intercom systems should be primarily used as a means of relaying and or summoning emergency assistance. Intercoms shall not be routinely muted or silenced.

PROCEDURE:

I.    USE OF INTERCOM

    A.    At the beginning of each shift, sworn staff assigned to positions equipped with intercom systems (e.g., Housing Control, Central Control, etc.) shall check their work area's touch screen panel, control panel, etc. and ensure intercoms have not been silenced or muted. Intercom systems shall also be checked any time sworn staff takes over operations in such areas (e.g., relieves a deputy arriving late to work, during mealtime, leaving early, etc.).

    B.    In the event an intercom is silenced or muted, sworn staff must make an entry in the Area Activity log, utilizing the "ALARMS" drop-down in the Jail Information Management System (JIMS). At a minimum, the description field must include the cell number or inmate's name and booking number. The notes field must indicate the reason the intercom was silenced or muted.

    C.    The intercom system volume/audible sound will be set to a level that can be heard by the person responsible for operating such equipment.

    D.    In the event of an emergency or incident, an inmate is to depress the intercom call button which activates an alarm on the receiving end (e.g., Housing Control, Central Control, etc.). The alarm will alert sworn staff of a possible emergency or incident that necessitates their attention. Sworn staff will answer all intercom calls in an expeditious manner and follow-up on the nature of the call.

II.   MAINTENANCE AND REPAIR

    A.    Intercoms shall be kept clear of obstructions and not be covered in any manner. Intercoms should be observed by staff during safety checks and/or hygiene inspections. If an intercom is found to be intermittently operable, it should be reported as soon as practical before it becomes completely inoperable.

B.    In the event an intercom is inoperable, sworn staff shall report the issue to their respective administrative deputy or operations deputy. Upon notification of the issue, the administrative deputy or operations deputy will contact the security technician. The security technician will assess the issue and contact the contracted provider to remedy the problem. If the security technician is not available, the administrative deputy or operations deputy will relay the information to the Sheriff's Project Manager.

Ex. SS - 965

# EXHIBIT TT

<u>San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures</u>

| | |
|---|---|
| **DATE:** | JULY 26, 2021 |
| **NUMBER:** | M.6 |
| **SUBJECT**: | LIFE THREATENING EMERGENCIES: CODE BLUE |
| **RELATED SECTIONS**: | M.5, MSD.C.2, SDSD P&P 6.128 |

<u>PURPOSE</u>

To provide procedures when responding to a life threatening "code blue" medical emergency for inmates, staff, and/or visitors within the detention facilities.

<u>POLICY</u>

Any life-threatening medical emergency shall trigger a 911 request for a paramedic emergency response team. Absent rigor mortis or post-mortem lividity, all inmates with a potential for resuscitation shall be provided basic life saving measures.  Sworn and health staff shall initiate emergency response and basic lifesaving measures until relieved by the paramedic emergency response team.

<u>PROCEDURE</u>

I.      CODE BLUE

A code blue is generally used to indicate the need for resuscitation or immediate lifesaving medical attention. This includes, but is not limited to cardiac arrest, respiratory arrest and trauma emergencies.

Personnel responding to a code blue incident shall:

A.      Sworn Staff:

1.      Assess the victim's condition.

2.      Without leaving the victim, immediately call for help via radio or any other means of communication to notify health staff and/or request the activation of emergency medical services (911). Provide the location, victim status (e.g., breathing, pulse) and nature of any injury if known.

3.      If opioid overdose is suspected, initiate naloxone administration as outlined in Section II of this policy.

4.      Start cardiopulmonary resuscitation (CPR) as needed using a barrier device (e.g., PAM mask, pocket mask). Additional resuscitative equipment will be provided by health staff. Health staff will determine the appropriateness of utilizing additional emergency equipment including, but not limited to, the Automated External Defibrillator (AED).

5.      Switch to two-person CPR if additional help has arrived after the above notifications have been made. Continue CPR until relieved by health staff or the paramedic emergency response team.

6.      Provide the watch commander with a brief description of the incident.

B.    Health Staff:

1.      Respond to the scene with the appropriate emergency equipment.

2.      Assess the situation immediately.

3.      Manage the emergency response and monitor the victim's status continuously.

4.      Delegate as necessary. In addition to sworn staff, health staff, including any medical doctor (MD), registered nurse practitioner (RNP), registered nurse (RN) or licensed vocational nurse (LVN) shall have the authority to call 911 or other medical transport for any medical condition they deem necessary. If health staff calls 911, notification shall be made to the watch commander or designee.

5.      Document the sequence of events.

6.      If there is a MD or mid-level provider (e.g., RNP) in the facility, they shall be called to the scene.

7.      When the paramedic emergency response team arrives, health staff will provide information regarding the scene, emergency medical care provided to the inmate and any medical history obtained. Health staff will relinquish care to the paramedic emergency response team.

NOTE:  The paramedic emergency response team is required by law to transport to the nearest acute care emergency department.

II.    SUSPECTED OPIOID OVERDOSE AND NALOXONE

A.    An opioid overdose requires immediate medical attention. The most common signs of overdose include the following:

1.      Extreme sleepiness or unresponsiveness.

2.      Breathing problems that can range from slow to absent breathing.

3.      Fingernails and/or lips turning blue/purple.

4.      Extremely small "pinpoint" pupils.

5.      Slow heartbeat and/or low blood pressure.

B.    Naloxone should be administered to any inmate who presents with signs of opioid overdose or when opioid overdose is suspected. When administering naloxone, staff shall:

      1.      Maintain precautions against blood borne and respiratory pathogens.

      2.      Inform responding health staff that naloxone was administered, and the number of doses used.

      3.      Appropriately dispose of the naloxone applicator.

      4.      Request a replacement naloxone kit from the watch commander as soon as practical.

C.      All deputies assigned to the Detention Services Bureau will be issued two naloxone kits and one naloxone holster.  Deputies shall carry the naloxone on their person, in a department approved holster during the course of their normal duties.  Deputies are responsible for the condition of their individual naloxone kits.

D.      The watch commander will maintain a reserve supply of naloxone kits for issuance subsequent to usage.  At the beginning of each shift, the watch commander will make an entry in the Watch Commander's Log indicating all reserve naloxone kits were accounted for.  The naloxone (NARCAN) administrator will be notified each time a naloxone kit is issued from the reserve supply.

E.      Each facility/unit will outline, via a green sheet, the naloxone (NARCAN) administrator for their facility/unit. In accordance with Department Policy and Procedures section 6.128,  the naloxone (NARCAN) administrator will reorder new naloxone kits as needed and conduct a monthly inspection of the reserve supply.  Individually issued naloxone will be inspected annually during the formal line supervisory inspection.

## III.   DOCUMENTATION

A.      Documentation of medical emergencies shall be completed in compliance with Detention Services Bureau Policies and Procedures section M.5.

B.      Naloxone administration by either sworn or health staff will be documented by a sworn staff member in a NetRMS report using the Offense Code "981157—ZZ-OVERDOSE-NALOXONE USE (JAILS ONLY)" and selecting the Special Studies box "NRI-Naloxone Related Event."  A Naloxone Usage Report (SO-195) form will be completed and attached to the NetRMS report.  Deputies will also document the incident in a JIMS Inmate Status Report (ISR) using NLX-Naloxone as the Incident Type Code. The narrative will contain a synopsis of the incident, indicate the staff who administered the naloxone, the number of doses administered and the NetRMS case number.  A separate crime/incident report is required for each inmate.

C.      Sworn staff involved in the naloxone administration should coordinate with the Detentions Investigation Unit (DIU) to follow-up on any possible investigations and/or crime/incident reports related to the suspected drug overdose that prompted the use of naloxone.  The "981157—ZZ-OVERDOSE-NALOXONE USE (JAILS ONLY)" report will be written separate from any related crime reports.

D.     The watch commander is responsible for ensuring the NetRMS case number and JIMS incident number are entered into the watch commander log.

# EXHIBIT UU

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Standardized Nursing Procedure | |
|---|---|---|
| **SUBJECT:** HEROIN/OPIATE WITHDRAWAL | **NUMBER:** | SNP.H.4 |
| **DATE:** 2/21/2020 | **PAGE:** | 1 |

PATIENT CONDITIONS

I.  History of heroin abuse as evidenced by needle track marks and/or symptoms of withdrawal.
II.  History of opiate abuse.
    **Examples of Opiates:** Methadone, Suboxone, Morphine (MS Contin), Norco, Vicodin, Oxycontin, Oxycodone, Percocet, Codeine, Fentanyl, Duragesic.
III.  DO NOT initiate protocol if
    A.  The patient is pregnant; Contact MD and refer to MSD.A.2 Addicted Arrestee Care.
    B.  The patient is an active participant of a methadone clinic and is not withdrawing from Methadone. If patient is unable to make arrangements for future dosing while incarcerated, schedule for RNSC within 24 hours to start the protocol for heroin/opiate withdrawal.
IV.  Polysubstance withdrawal:
    A.  If patient is withdrawing from both alcohol and heroin simultaneously, initiate both alcohol and heroin withdrawal protocols.  Follow the longer protocol (Opiate SNP.H.4) for housing/bed/tier assignments, and contact a qualified medical provider for guidance on medication use.
    B.  Schedule the patient for follow on assessment at MDSC.


SUBJECTIVE

I.  Obtain information from patient regarding the drug(s) taken: List the name(s), type, quantity, frequency of use, time of last dose, and how long has the substance been used.  Use comprehensive detoxification questionnaire at receiving/screening.
II.  Patient may relate symptoms or complaints secondary to withdrawal such as:
    A.  Anorexia
    B.  Cravings
    C.  Fatigue
    D.  Sleep Disturbance
    E.  Abdominal Cramps
III.  Obtain medical history (i.e. chronic disease and other drug use).
IV.  Identify if patient has history of Substance Use Disorder treatment:


OBJECTIVE

I.  Vital Signs
II.  Physical exam findings:  Assess for the following
    A.  Presence or absence of track marks and/ or skin abscesses.
    B.  Pupillary size
        i.  Dilated- continue with protocol

**HEROIN/OPIATE WITHDRAWAL**

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Standardized Nursing Procedure |
|---|---|

| SUBJECT: | HEROIN/OPIATE WITHDRAWAL | NUMBER: | SNP.H.4 |
|---|---|---|---|
| DATE: | 2/21/2020 | PAGE: | 2 |

      ii.  Constricted – contact medical provider

      iii.  Unequal (one larger than the other) – **CONTACT MEDICAL PROVIDER**

III. Lab test: FEMALES- conduct urine pregnancy test screening; if positive, contact the on-call physician for orders/guidance.

IV. Observe and document presence/absence of agitation, change in gait, affected speech, mental status exam: (e.g. state of consciousness, orientation, memory, presence of auditory/visual/tactile hallucinations).

V. Signs and symptoms of opiate withdrawal may include the following:
- A. Rhinorrhea
- B. Lacrimation
- C. Yawning
- D. Sneezing
- E. Diaphoresis (Sweating)
- F. Vomiting
- G. Fever
- H. Hypertension
- I. Tachycardia
- J. Increased respiratory rate
- K. Gooseflesh
- L. Agitation
- M. Myoclonus (especially kicking)
- N. Dilated pupils
- O. Diarrhea
- P. Tremors

ASSESSMENT

I. Potential nursing diagnosis for individuals withdrawing from Opioids:
- A. Alteration in nutrition: less than body requirements
- B. Potential risks for acute confusion
- C. Potential Risks for fluid deficit
- D. Alteration in comfort
- E. Risk of suicide
- F. Medical assessment: Acute withdrawal. If patient in acute distress, or has abnormal vitals, then contact a medical provider for orders/guidance and stabilize patient.

TREATMENT PLAN

I. Contact qualified medical provider **immediately** for the following conditions:
- A. Confirmed pregnancy – refer to MSD.A.2 Addicted Arrestee Care
- B. Patient is stuporous – responds to voice as evidenced by eye movement but no eye contact and does not attempt to speak when spoken to.
- C. Abnormal vital signs
  - Pulse less than 50 beats per minute

**HEROIN/OPIATE WITHDRAWAL**

| **SAN DIEGO COUNTY SHERIFF'S DEPARTMENT**<br>**MEDICAL SERVICES DIVISION** | **Standardized Nursing**<br>**Procedure** |
|---|---|

| SUBJECT: | HEROIN/OPIATE WITHDRAWAL | NUMBER: | SNP.H.4 |
|---|---|---|---|
| DATE: | 2/21/2020 | PAGE: | 3 |

- Systolic blood pressure below 90 and diastolic pressure below 60.
    D.  Patient also qualifies for alcohol or benzodiazepine protocol.

II. Please note the following considerations when patient states that they are currently taking an opiate for a medical condition such as chronic low back pain and staff is unable to substantiate prescription from pharmacy records:
    A.  Patient may be at risk for opiate withdrawal – consult with qualified health provider for recommendations which may include opioid tapering dose if indicated.

III. Initiate the following opiate withdrawal protocol unless patient is pregnant:
    A.  Benadryl 50 mg PO BID x 5 days
    B.  Imodium 2 mg PO BID x 5 days
    C.  Zofran 4 mg PO BID x 5 days
    D.  Lower bunk x 5 days
    E.  Diet as tolerated
    F.  For dehydration management, refer to SNP D.1 Dehydrated Patient

IV. Conduct follow-up assessment- Patient to be seen within 48 hours of protocol initiation for symptom review.

V. Add patient flag "COWS" in health record with an end date of 5 days.

VI. If feasible, patients should be in cohort housing for improved observation, management and ease of intervention.
    A.  If cohort housing is not possible, (e.g. due to space limitations, possible contagion, higher priority medical conditions, etc.) notify health staff for any logistical concerns.

<u>TRANSFERS</u>

I. Patient undergoing treatment for heroin/opiate withdrawal shall not be transferred to a detention facility that does not have 24-hour nursing care.

II. For a patient in a Methadone program prior to incarceration and is receiving tapered dosing administered by the Methadone clinic, transfer ██████████████████████ will be deferred.

<u>PATIENT EDUCATION</u>

I. Encourage patient to notify medical staff immediately when symptoms of withdrawal occur.

II. Instruct patient to increase food and fluid intake as tolerated.

III. Provide information on common medication side effects:
    A.  Benadryl – drowsiness, dizziness, blurred vision, fatigue, disturbed coordination, constipation, or dry mouth/nose/throat.
    B.  Imodium – dizziness, drowsiness, tiredness, or constipation.
    C.  Zofran – confusion, tachycardia, fever, headache, shortness of breath, dizziness, or weakness.

Implemented:    10/1/1995

**HEROIN/OPIATE WITHDRAWAL**

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Standardized Nursing Procedure |
|---|---|

| SUBJECT: | HEROIN/OPIATE WITHDRAWAL | NUMBER: | SNP.H.4 |
|---|---|---|---|
| DATE: | 2/21/2020 | PAGE: | 4 |

Reviewed:    10/1996, 8/2002, 8/18/2003, 8/9/2004, 8/12/2005, 7/31/2006, 7/10/2008, 8/11/2009
Revised:      4/9/1998, 8/5/1999, 8/10/2001, 1/20/2004, 10/11/2007, 4/8/2011, 5/21/2012, 5/13/2013, 3/27/2019, 2/13/2020, 2/21/2020

**HEROIN/OPIATE WITHDRAWAL**

# EXHIBIT VV

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual |
|---|---|

| SUBJECT: | ADDICTED ARRESTEE CARE | DATE: | 10/30/2020 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.A.2 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |

RELATED SECTIONS:
IN COMPLIANCE WITH:     CCR, TITLE 15, SECTION 1208 &1210; CALIFORNIA HEALTH AND SAFETY CODE SECTION
AND IMQ SECTIONS 303 AND 322.

PURPOSE

To ensure that individuals with substance use disorders are identified during the course of the detention admission process, and to coordinate initial medical care and treatment.

POLICY

Medical care shall be provided to patients exhibiting symptoms of addiction from recreational drugs, controlled substances or alcohol.

PROCEDURE

I.  During receiving screening, identify individuals that are potentially at risk for opioid withdrawal including but not limited to:
    A.  History of heroin or opioid abuse.
    B.  Current prescription of an opioid.
    C.  Currently presenting with signs/symptoms consistent with opioid withdrawal.
    D.  Patient request or notification from Drug court– prior participation in a community medication assistance program (MAT) [continuity of care]

II.  A subsequently identified individual will be monitored for signs, symptoms and complications of withdrawal. [See CIWA/COWS]

III.  An arrestee who prior to their incarceration was being treated at an Outpatient Treatment Center (Methadone clinic) for heroin dependence will have the opportunity to continue treatment (dosing) according to the Methadone Clinic's protocols.

IV.  The following processes should be followed when an individual state that they are currently in a Methadone Treatment Program.
    A.  Obtain permission from the patient to establish contact with the outpatient treatment center (methadone clinic).  Obtain clinical information, to include quantity and date of last dose.
    B.  On those occasions when assistance is needed, the nursing staff may assist the patient.
    C.  Methadone programs will only provide treatments for patients at the three booking detention facilities (SDCJ, LCDRF and VDF). Patients identified as requiring methadone treatment will not be eligible for transfer.
    D.  Patient's medical record shall be flagged as an Outpatient Treatment Center (Methadone clinic) patient and updated as needed.

**ADDICTED ARRESTEE CARE**

| **SAN DIEGO COUNTY SHERIFF'S DEPARTMENT** **MEDICAL SERVICES DIVISION** | **Operations Manual** |
|---|---|

| SUBJECT: | ADDICTED ARRESTEE CARE | DATE: | 10/30/2020 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.A.2 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 2 |

RELATED SECTIONS:
IN COMPLIANCE WITH:   CCR, TITLE 15, SECTION 1208 &1210; CALIFORNIA HEALTH AND SAFETY CODE SECTION
AND IMQ SECTIONS 303 AND 322.

E.  The Methadone Clinic Program will be responsible for supplying and administering Methadone as well as maintaining required records.

F.  The following are approved Outpatient Treatment Centers (Methadone clinics):



G.  Additional processes must be followed upon incarceration if the female patient is pregnant and heroin dependent and is not currently in a Methadone Treatment Program.
1.        Determine the patient's physical condition and estimated (fetal) gestational age.
2.        Contact the on-site provider or on-call physician to evaluate for potential emergency medication assisted therapy (MAT) or other treatment.

H.  In the event the female patient is pregnant and currently in a Methadone Treatment Program:
1.  Obtain Treatment Program's information and call the agency and advise them of their patient's incarceration.
2.  Arrange for the patient to continue receiving methadone treatment from the clinic.

**ADDICTED ARRESTEE CARE**

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual |
|---|---|

| SUBJECT: | ADDICTED ARRESTEE CARE | DATE: | 10/30/2020 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.A.2 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 3 |

RELATED SECTIONS:
IN COMPLIANCE WITH: CCR, TITLE 15, SECTION 1208 &1210; CALIFORNIA HEALTH AND SAFETY CODE SECTION
AND IMQ SECTIONS 303 AND 322.

I. Case manager will assist in coordinating services for the pregnant patient.
In the event a pregnant patient is transferred from a prison or agency and is currently receiving Methadone:
1. Review transfer medication information.
2. Notify the facility nursing supervisor and the director of nursing.
3. Call ███████████████ and give them a brief medical history of the patient. Included in this information should be a booking number.
4. Complete a form letter and fax ███████████ together with the order for Methadone from prison or outside county/state agency.
5. Notify facility on-site or on-call medical provider to obtain order for recommended treatment while awaiting appointment with the Methadone clinic.

J. In the event the pregnant patient is scheduled for court:
1. Provide notification via Chain of Command and recommend patient for remote/video court.
2. If remote/ video court is not available:  Notify facility on site or on-call provider about situation and obtain recommendations re: Methadone dose for the day.

K. In the event the pregnant patient comes into custody over a weekend:
1. Obtain the name and phone number of the patient's Methadone Clinic.
2. Contact ████████████████████ has limited hours on the weekends. **
3. After hours, notify on call provider and obtain treatment recommendations.
4. MSD staff member will fax information, including a release of information (ROI) to ███████████.
5. A follow-up call will be made by facility medical staff member to ███████████ ████████ o arrange dosing.

Implemented: 1/90

Reviewed:        9/19/97, 8/10/01, 9/18/02, 8/9/04, 8/12/05, 7/31/06, 7/31/07, 07/09/08, 7/13/09, 2/2/12, 2/12/13, 9/10/15,
8/1/2019,
Revised:        3/18/92, 2/26/93, 4/1194, 5/24/95, 1/29/96, 9/17/96, 9/18/98, 8/11/99, 7/31/00, 8/18/00, 5/21/07, 2/28/11,
9/30/15, 10/30/20

**ADDICTED ARRESTEE CARE**

# EXHIBIT WW

Ex. WW - 980

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual | |
|---|---|---|
| SUBJECT: SEGREGATED INMATES | DATE: | 10/30/2020 |
| CATEGORY: MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | G.2.1 |
| DISSEMINATION: MEDICAL SERVICES DIVISION | PAGE: | 1 |

RELATED SECTIONS:       DSB J.3
IN COMPLIANCE WITH:     NCCHC J-G-02

## PURPOSE

To ensure appropriate segregation practice.

## STANDARD

Any practice of segregation should not adversely affect an inmate's health.

## DEFINITIONS

*Segregated inmates* – are those isolated from the general population and who receive services and activities apart from other inmates. Facilities may refer to such conditions as administrative segregation, protected custody, or disciplinary segregation. For the purpose of this standard, the living and confinement conditions define the segregated status, not the reason an inmate was placed in segregation.

*Solitary confinement* – (also referred to as isolation) is an extreme form of segregation where an inmate is isolated and encounters staff or other inmates fewer than three times a day. NOTE: This type of segregation is referenced in NCCH J-G-02 standard but it is not a practice within the San Diego Sheriff's Department Detention Services Bureau.

## PROCEDURE

I.  Sworn staff shall notify the charge nurse or designee when placing an inmate in segregation. Upon notification, health staff will complete the following:
    A.  Review the patient's health record to determine whether existing medical, dental, or mental health needs require accommodation. Health staff shall document the review in the health record and notify the watch commander of any accommodation needed.
II. Inmates housed in segregation will be monitored by health staff based on established frequency.
    A.  Inmates who are segregated and receive services and activities apart from other inmates shall be monitored three days a week by nursing staff and a minimum of once a week by a qualified mental health provider (QMHP).
    B.  Documentation of segregation rounds (also known as "wellness checks") will be made in the "Segregation Admissions Queue" of the inmate's health record using the AdSeg Template for mental health clinicians (MHC) and creating a "Segregation Nursing" note type for nursing staff.

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT<br>MEDICAL SERVICES DIVISION | Operations Manual |
|---|---|

| SUBJECT: | SEGREGATED INMATES | DATE: | 10/30/2020 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | G.2.1 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 2 |

RELATED SECTIONS:    DSB J.3
IN COMPLIANCE WITH:    NCCHC J-G-02

C.  Documentation should include any significant health findings, signs of physical and/or psychological deterioration, other signs of failing health, the date and time of contact, and the signature or initials of the health staff member making the rounds. In addition to documenting in the health record, documentation may also be made on individual logs or cell cards.

D.  Health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health.

Implemented:    2/12/2020
Reviewed:    Enter Dates
Revised:    10/30/2020

# EXHIBIT XX

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual |
|---|---|

| SUBJECT: | DETENTION OUTPATIENT PSYCHIATRIC SERVICES (DOPS) | DATE: | 9/30/2014 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.D.4 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 3 |

| RELATED SECTIONS: | DSB P&P: R.3; MSD P&P: C.1, M.5. P.9, S.1, S.3, S.9 |
|---|---|
| IN COMPLIANCE WITH: | CCR, TITLE 15, SECTION 1208, 1210, 1211, AND 1219; WIC 5150. |

B.  Crisis intervention:
1.  Patients identified by sworn staff needing immediate mental health assessment are to be referred to the shift charge nurse. Shift charge nurse will determine the appropriate available provider to evaluate patient.
2.  In the absence of safety cell availability, patient at risk of suicide who are identified at intake may be admitted to W/PSU by a detention psychiatrist. If a detention psychiatrist is not available, the patient is diverted to Emergency Psychiatric Unit (EPU) for evaluation and for possible admission to the W/PSU pursuant to WIC 5150.
3.  All housing of outpatient psychiatric patients shall be the decision of security personnel with recommendations from the Medical/Mental Health staff.

C.  Release from outpatient service:
1.  When further treatment is not necessary it shall be documented in the progress note.
2.  Classification Psych hold shall be discontinued in JIMS instructions unless PSA has been instituted.
3.  Patients who are released from custody and may require continuing care, may be referred to community mental health clinics and other community based programs.
4.  A prescription for psychotropic medications shall be given to the patient or placed in the patient's property pursuant to MSD P&P: Pharmacy Contract Prescription Services.

Reviewed: 9/18/02, 8/12/05, 7/31/06, 07/30/07, 07/09/08, 2/28/11, 2.6.12, 3/7/13, 12/15/15, 8/15/19

Revised:  4/3/92, 6/4/93, 4/1/94, 5/24/95, 1/29/96, 9/19/96, 8/11/99, 5/10/00, 7/31/00, 8/10/01, 8/18/03, 8/9/04, 9/30/05,  7/21/09, 9/30/14

**DETENTION OUTPATIENT PSYCHIATRIC SERVICES (DOPS)**

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual |
|---|---|

| SUBJECT: DIETS, MEDICAL<br>CATEGORY: MEDICAL & PSYCHIATRIC SERVICES<br>DISSEMINATION: MEDICAL SERVICES DIVISION | DATE: 11/30/2017<br>NUMBER: MSD.D.5<br>PAGE: 1 |
|---|---|

| RELATED SECTIONS: DSB P&P: K.7 , K.8 & K.27. MSD. F.3<br>IN COMPLIANCE WITH: CAC Title 15, Sections 1241 and 1248, NCCHC J-F-02 |
|---|

PURPOSE

To provide medically prescribed diets to patients.

To monitor patients with food allergies.


POLICY

Medical diets for patients shall be provided as prescribed by a physician's orders including the type of diet, the duration for which it is to be provided, and special instructions, if any.

Medical diets and menus are to be reviewed for nutritional adequacy at least every 6 months and whenever a substantial change in the menus is made. Written documentation of menu reviews includes the date, signature, and title of the consulting dietitian.

When a patient refuses a prescribed diet, follow-up nutritional counseling by the dietitian is provided.


PROCEDURE

I.   Medical Diets
   A.   Medical diets shall be prescribed by a facility physician.
   B.   Medically prescribed diets shall be entered in the JIMS instruction section.
   C.   Religious diets or disciplinary diets may be contraindicated with prescribed diets. Consultation with the physician and dietitian is recommended prior to initiating religious diet or disciplinary diet. The facility correctional counselor will be notified of the determination regarding religious diet requests (see DSB.K.8).
   D.   If MSD personnel determines that a patient's medical needs are such that the patient must be kept on a medical diet, then medical staff will schedule an encounter with the patient to discuss the following:
       1.   Whether the patient's religious beliefs are sincerely held and if so:
           a.   How the patient's sincerely held religious beliefs can be reconciled with the dietary restrictions prescribed by MSD.
       After making a decision, MSD personnel will notify counseling staff if the patient has been approved or denied.
   E.   Patients who want to appeal the denial decision due to a medically prescribed diet will have to speak with medical personnel regarding their need for a religious diet.  The patient must submit a request to medical services.
   F.   Medical staff will schedule an encounter with the patient to discuss risks and concerns.  If after consultation with medical staff, the patient insists in terminating their medical diet in order to receive a religious diet, medical staff shall document the patient's understanding and refusal.  The patient must sign a Refusal to Accept Medical Care-Treatment (J-233) form. See Section C below for the termination of a prescribed diet.


**DIETS, MEDICAL**

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual |
|---|---|

| SUBJECT: DIETS, MEDICAL | DATE: 11/30/2017 |
|---|---|
| CATEGORY: MEDICAL & PSYCHIATRIC SERVICES | NUMBER: MSD.D.5 |
| DISSEMINATION: MEDICAL SERVICES DIVISION | PAGE: 2 |

| RELATED SECTIONS: | DSB P&P: K.7 , K.8 & K.27. MSD. F.3 |
|---|---|
| IN COMPLIANCE WITH: | CAC Title 15, Sections 1241 and 1248, NCCHC J-F-02 |

G. Medical staff will forward a copy of the signed J-233 form to the designated correctional counselor. The correctional counselor will initiate enrollment of the patient into the Religious Diet Program as outlined in DSB.K.8.

H. Medically prescribed diets, and allowable substitutes, are described in the Medical Diet Manual.

I. Medical diets shall be planned, prepared and served with consultation from a registered dietitian.

J. Workers who prepare medical diets are supervised in preparing the diets, including appropriate substitutions and portions.

K. It is the responsibility of the food services supervisor, or designee, at each facility to review the medical diet trays for compliance with the medical diet menu prior to the serving of each meal.

L. Medical diets are available in all facilities.

M. The Medical Diet Manual is available on the sheriff's intranet under the food services website.

II. Allergy Diets

A. At intake, the RN will obtain a history of any food allergies.

B. When a patient claims an allergy refer to MSD.F.3 for the appropriate intervention.

C. The RN will inform patient if the claimed food allergies are not served by the sheriff's detention food services.

   1. Sheriff's detentions food services does not provide meals that include tree nuts, shellfish, pork, strawberries, coconut and pineapple.

D. Medical staff member will advise patient that they are responsible for being aware of the ingredients in the items they purchase in their commissary orders.

E. When medical staff receives information from the dietitian, food services supervisor and/or sworn staff that casts doubt upon the patient's claimed allergy, medical staff will interview the patient, educate them regarding the ingredients contained in commissary food(s) specific to their allergy and document the encounter. A Food Allergy Non-Compliance form (J-283) will be completed, the original will be placed in the medical record and a copy will be given to the patient. If the dietitian or food services supervisor sees no change in the ordering of commissary foods, the patient will be removed from the allergy diet.

III. Termination of a prescribed diet:

A. If a patient requests to terminate or refuses a prescribed diet, patient must sign Refusal to Accept Medical Care/Treatment form (J223). A signed copy of form J223 will be forwarded to the facility medical staff for action and follow-up nutritional counseling.

B. The patient will continue on the prescribed diet until the order is terminated by the physician.

C. Physician may also terminate the prescribed diet if the patient violates the requirements of the prescribed diet.

IV. See DSB.K.27 Special disciplinary separation diet for the bureau's policy and procedure on disciplinary diets.

V. See DSB.K.8 Religious diets for the bureau's policy and procedure on religious diets.

Implemented: 1991
Reviewed: 9/97, 9/98, 8/99, 7/00, 8/01, 8/9/04, 8/12/05, 7/22/09, 2/17/11, 2/6/12, 2/15/13, 8/15/19
Revised: 3/92, 9/96, 9/18/02, 8/18/03, 7/31/06, 7/30/07, 07/09/08, 4/26/10, 6/20/11, 9/28/11, 8/27/13, 9/30/15, 11/15/17

**DIETS, MEDICAL**

# EXHIBIT YY

| | |
|---|---|
| **DATE:** | DECEMBER 30, 2019 |
| **NUMBER:** | I.64 |
| **SUBJECT:** | SAFETY CHECKS: INMATES, HOUSING AND HOLDING AREAS |
| **RELATED SECTIONS:** | Title 15 CCR § 1027.5; Penal Code § 4021; I.43, I.63 |

PURPOSE

To provide guidelines for conducting and documenting safety checks.

POLICY

Sworn staff will conduct safety checks of inmates, housing areas, holding areas and vacant cells through direct visual observation (i.e., direct personal view of the inmate/area without the aid of audio/video equipment). Safety checks of inmates consist of looking at the inmates for any obvious signs of medical distress, trauma or criminal activity. Safety checks shall be conducted at least once within every hour (60 minute) time period. The intervals of the safety checks, within the hour (60 minute) time period, shall vary and must be logged in the Jail Information Management System (JIMS). In addition to observing the safety and welfare of inmates, sworn staff shall also be attentive to security and maintenance issues as well as environmental factors (e.g., temperature, odors, cleanliness) while conducting safety checks.

PROCEDURE

I.    CONDUCTING SAFETY CHECKS

A.    California Penal Code section 4021, in part, mandates it is unlawful for a deputy to enter into the room or cell occupied by an inmate of the opposite gender, except when accompanied by a deputy of the same gender as the inmate. Sworn staff shall adhere to California Penal Code section 4021 while conducting safety checks of inmates. This does not preclude sworn staff of either gender from assisting each other, or excuse them from ensuring a check is completed.

Each detention facility will develop a facility green sheet identifying safety check procedures and the staff positions within the facility responsible for ensuring safety checks are initiated, conducted and documented.

B.    Staff of the opposite gender of inmates will be required to announce their presence when entering an area where inmates are likely to be showering, performing bodily functions or changing clothing. Inmates shall be able to shower, perform bodily functions and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks or genitalia, except when such viewing is incidental to routine safety checks or in exigent circumstances.

I.64  SAFETY CHECKS OF INMATES IN HOUSING UNITS AND HOLDING CELLS
#19//13

C.    When sworn staff conduct safety checks in a high-risk security level housing unit (e.g., administrative segregation), they should utilize the practice of contact and cover. Sworn staff should enter each module together on the same level and conduct the safety check as a team. Sworn staff should not split up in order to have one check the top tier and the other the bottom tier. Although recommended in high risk security level housing, contact and cover can be used in any housing unit/module when inmates are present in the dayroom. The cover deputy's primary responsibility is to provide security for the contact deputy during the safety check. While providing cover, this deputy is not expected to conduct the safety check.

D.    During safety checks in housing locations, sworn staff will physically enter each module and observe each inmate present in the common areas of the module (e.g., dayrooms, showers, exercise areas, holding areas). In cell style housing modules, sworn staff shall stop at or enter each cell and observe each inmate. In dorm style housing modules, sworn staff shall walk by each bunk in a manner that permits them to observe each inmate.

E.    Safety checks shall be completed in all non-housing locations designed as cells/holding areas for inmates (e.g., receiving, medical, release, court holding), even when unoccupied (the release area at Las Colinas Detention and Reentry Facility is excluded from this safety check requirement). Sworn staff shall stop at or enter each cell/holding area to conduct the safety check.

II.    LOGGING OF SAFETY CHECKS

A.    The start of a safety check will be logged in JIMS using the event type "11-53 Started." The description field of the entry shall include the name(s) and/or ARJIS numbers of the sworn staff conducting the safety check. If additional space is needed, the notes section may be used. Once all necessary fields are completed, the sworn staff making the entry will immediately close the "11-53 Started" entry

B.    At the conclusion of the safety check, an entry may be logged in JIMS using the event type "11-53 Notes," if there was anything encountered during the safety check. Items that necessitate documentation include, but are not limited to:

1.    Inmate in medical distress (e.g., asthma attack, chest pain, etc.),
2.    Inmate suffering medical trauma (e.g., bleeding, ligature marks, etc.),
3.    Criminal activity (e.g., drug usage, fighting, etc.),
4.    Facility damage (e.g., broken fixtures, graffiti, etc.),
5.    Maintenance issues (e.g., clogged toilet, running water),
6.    Different or additional sworn staff conducted the safety check,
7.    Anything that delayed the start or completion of the safety check.

C.    In the event a safety check requirement cannot be met, the deputy of the affected area will document an explanation as detailed in section II.B and will immediately notify the responsible supervisor. Upon notification, or as soon as practicable, the supervisor shall make a notation in the notes field utilizing the event type "Supervisor's Log Review." This entry shall state the supervisor is aware the safety check was conducted outside the required timeframe.

D.  Sergeants will review the JIMS Area Activity Logs and ensure safety checks were logged and conducted at varying intervals within the required time periods.

1.  Each supervisor's review of safety checks will extend back to the previous supervisor's log review entry.

2.  In the event the supervisor finds any discrepancies in their review, they will make a notation in the notes field of their "Supervisor's Log Review" entry.

3.  The watch commander will review the JIMS Area Activity Logs and ensure safety checks were conducted within the required time period.  The watch commander will make an entry in the JIMS Area Activity Log, documenting any discrepancies they find during their review utilizing the event type "Supervisor's Log Review."

# EXHIBIT ZZ

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| **DATE:** | SEPTEMBER 21, 2020 |
| **NUMBER:** | J.3 |
| **SUBJECT:** | SEGREGATION: DEFINITION AND USE |
| **RELATED SECTIONS:** | O.1, R.3, Q.9, M.25, M.26, PRISON RAPE ELIMINATION ACT OF 2003 |

PURPOSE

To ensure all inmates are assessed and screened with an objective screening instrument. After individual review of inmate history, criminal charges and information obtained from the inmate interview and/or health staff, specified inmates will be properly segregated from the inmate general population.  Reasons include, but are not limited to, inmates who require special housing for their own safety, staff safety, facility security, or those who are pending a disciplinary action hearing.

POLICY

The guidelines for inmate segregation shall conform to all local, state and federal laws. Inmates shall not be segregated solely because of their race, color, religion, national origin, gender identity or sexual orientation. Each inmate's housing assignment will be made based on an individual assessment. Segregation shall be used only for those inmates who are classified for safety and/or security reasons, are pending disciplinary action or for investigative purposes.

PROCEDURE

I.      DEFINITIONS

        Segregation is a general term used to encompass the following types of separate housing for inmates who cannot remain in the general inmate population:

        A.      Administrative segregation

        B.      Protective custody

        C.      Acute mental health (Psychiatric Stabilization Unit/Jail Based Competency Treatment)

        D.      Disciplinary separation

II.     ADMINISTRATIVE SEGREGATION

        A.      Administrative segregation shall consist of separate and secure housing, but shall not involve any other deprivation of privileges, other than is necessary to obtain the objective of protecting the inmates, staff, or public.

        B.      The following are types of inmates who may be placed into administrative segregation housing:

                1.      Those pending a hearing or investigation for a rule violation or criminal act.

2. Those who have displayed a continual failure to adjust and conform to the minimum standards expected of those in mainline housing or designated special housing. The inmate's behavior is either criminal in nature or disruptive to the safe operation of the facility.

3. Those who have shown a propensity for violence towards other inmates and/or staff, or participatory action in a conspiracy, or known premeditated thoughts or indications by a single inmate, to assault or harm other inmates and/or staff.

4. Inmates who have paroled from, been released from or are anticipated to be housed in a security housing unit (SHU) or administrative segregation unit (ASU) or similar restrictive housing in a correctional setting.

5. Those who have a case with a high profile nature or an extreme act of violence which jeopardizes public safety.

6. Those who demonstrate influence over other inmates, including influence to promote or direct action or behavior that is criminal or disruptive to the safety and security of other inmates and/or facility staff, as well as to the safe operation of the facility.

7. Those suspected of being a juvenile. Juveniles shall remain segregated until they are determined to be an adult or are transported to Juvenile Hall.

8. Inmates sentenced to death.

9. Per Jail Population Management Unit (JPMU) approval.

C. All inmates placed in administrative segregation housing will require a Jail Information Management System (JIMS) incident report or rule violation report, and a Segregated Housing Order (J-72) form. Inmates in administrative segregation housing shall be served a copy of the J-72 form signed by JPMU staff or a detentions supervisor.

D. When administrative segregation housing is used as pre-disciplinary housing pending a hearing, the decision must be based on the need to segregate for security reasons, rather than an attempt to limit privileges pending a hearing.

E. Upon placement of an inmate into administrative segregation housing or pre-disciplinary housing, sworn staff shall notify the facility charge nurse of the placement. A qualified health care professional will review the inmate's health record. If existing medical, dental or mental health needs require accommodation, sworn staff will be notified. Sworn staff will document the name and ARJIS number of the nurse who received notification in the incident report or rule violation report.

F. Inmates in administrative segregation housing may be eligible to share the dayroom with another compatible inmate or inmates housed in administrative segregation housing. JPMU will determine if the inmates are compatible based on their classification and will document the approval for shared dayroom in an inmate status report. Inmates who agree to share the dayroom may be provided with a three-hour block of dayroom time. A shared

dayroom program can serve as a step towards a return to mainline or designated special housing, but it is not required.

III.    PROTECTIVE CUSTODY

A.    Protective custody (P/C) is the voluntary or involuntary placement of an inmate into separate and secure housing when there is a verified threat against their life, whether stated or implied, or when an inmate's circumstances render them a target for physical violence. Examples of use would be when an inmate is a witness against another or the inmate's relationships or affiliations may be unpopular or considered threatening by the general population (e.g., a law enforcement officer or prior law enforcement officer).

B.    Involuntary P/C housing should only be used after an assessment of all available housing alternatives have shown there are no other means of protecting the inmate. Involuntarily housed P/C inmates shall have all possible access to programs and services for which the inmate is otherwise eligible.

C.    P/C shall consist of separate and secure housing but shall not involve any other deprivation of privileges other than is necessary to obtain the objective of protecting the inmates, staff or public. The following examples are types of inmates who may warrant placement into P/C:

1.    Has been determined by the mental health staff to be developmentally disabled, and does not require treatment for a disease, injury or psychiatric disorder (e.g., Regional Center Clients [RCC]).

2.    By virtue of their small size, advanced age, gender nonconformance or other risk factors and characteristics, may be in danger of abuse or sexual victimization from inmates in the general population.

3.    Has been accused of a crime of a nature and sufficient publicity that would place them in physical jeopardy if housed with the general population (e.g., child victim charges).

4.    Is a material witness in a high profile case.

5.    Employment in law enforcement (past or current).

6.    Are held pending the civil process under the sexually violent predator (SVP) law. SVP's shall be kept separate from all other inmates. When an SVP demonstrates a failure to conform to the rules of the facility or is a danger to staff or other SVP's, they may be placed into administrative segregation housing.

7.    Has paroled from or is anticipated to be housed in a P/C environment [e.g., sensitive needs yard (SNY)] in a correctional setting.

8.    Segregated at their own request after all other housing options have been exhausted and the inmate has been interviewed by JPMU staff (requires JPMU supervisor approval).

D.  "Keep separate all" (KSA) is a housing status that further restricts housing options within P/C. Although KSA inmates are to be kept separate from other inmates, they may be housed with other inmates with similar KSA criteria. The following inmates may be placed in KSA for the safety and security of the inmate and the facility:

1.  Prior or active members of law enforcement.

2.  Gang dropouts from Northern California gangs (e.g., "Norteños" or "Fresno Bulldogs").

3.  RCC inmates may be classified P/C or KSA if they require separate and secure housing from mainline inmates per a mental health staff evaluation. If mental health staff does not require separate and secure housing, RCC inmates will be housed in mainline or designated special housing.

4.  Additional exceptions may be approved by the JPMU lieutenant.

E.  Lesbian, gay, bisexual, transgender, questioning and "plus" (LGBTQ+) inmates will be individually assessed and placed in the most suitable housing, with consideration given to each individual's needs and the ability to maintain facility security. Staff will familiarize themselves with LGBTQ+ terminology to better understand LGBTQ+ individuals and make the best housing determination.

F.  Inmates initially being placed into P/C will require an incident report in JIMS and a J-72 form. Inmates returning to custody who will remain in P/C will not require an incident report but will need a new J-72 form. All P/C inmates shall be served a copy of the J-72 form signed by JPMU staff or a detentions supervisor.

## IV.  ACUTE MENTAL HEALTH

The Psychiatric Stabilization Unit (PSU/WPSU) and the Jail Based Competency Treatment (JBCT) consist of a mixed classification population, where some inmates may have safety concerns in other housing assignments. Inmates who are admitted to the PSU/WPSU or the JBCT require segregation from other populations. Inmates who are housed in the PSU/WPSU and the JBCT are admitted as patients, at the order of a mental health professional or by court order, without regard for the inmate's individual classification status. When an inmate is discharged from the PSU/WPSU or JBCT, JPMU must be consulted to determine the appropriate housing assignment for the inmate.

## V.  DISCIPLINARY SEPARATION

A.  Disciplinary separation may be used when other less stringent methods have failed to correct behavior or when the violation is of such a nature that other methods would be ineffective or inappropriate. The use of separation as a disciplinary measure should be reserved for major sanctions and/or multiple sustained offenses. Examples include assaultive behavior or violence towards staff.

B.  All disciplinary separation actions against inmates must be approved by the disciplinary review officer prior to the discipline being imposed.

VI.    BEDDING AND LINEN IN ADMINISTRATIVE SEGREGATION HOUSING

Cotton/wool blankets and sheets are prohibited in administrative segregation housing units. All inmates in administrative segregation housing will be provided with two safety blankets, one of which may be used as a mattress cover.

VII.    MONITORING

A.    Sworn staff:

1.    JPMU will ensure the status of each segregated inmate listed in sections II and III.D is reviewed at least every seven days. The objective is to return segregated inmates to the general inmate population or designated special housing when appropriate.

2.    The seven-day review will be documented in JIMS. Comments will be entered into each inmate's JIMS history to describe the need for continued placement. The removal of an inmate from administrative segregation housing will be documented in JIMS on an incident report.

3.    JPMU will monitor the inmate counts in all segregation modules and cells to ensure maximum effectiveness and compliance with the Armstrong lawsuit agreement.

4.    If a request for placement in P/C or administrative segregation housing is denied, it will be documented in JIMS on an incident report and approved by JPMU supervisors.

B.    Health Staff:

1.    Health staff and mental health staff will receive a JIMS notification an inmate was placed into administrative segregation housing based on a mental health recommendation due to an inmate's increased risk for self-harm. Mental health staff and medical staff will review the inmate's health record to determine whether existing medical, dental or mental health needs require accommodation. Examples of such conditions include, but are not limited to: withdrawal, dementia, Alzheimer's, diagnosed mental illness, history of self-harm, prior Inmate Safety Program (ISP) placement or diagnosed obstructive sleep apnea. Health staff will document the review in the inmate's health record and notify the watch commander of any accommodation needed.

2.    Health staff will monitor all inmates housed in administrative segregation housing. A qualified health care professional will conduct a "wellness check" three days each week on all segregated inmates. A Qualified Mental Health Provider (QMHP) will monitor and assess all segregated inmates at least one day each week. Documentation of segregation rounds will be made in the inmate's health record and will include: significant health findings, signs of physical and/or psychological deterioration and other signs or symptoms of failing health. Health staff shall notify the watch commander if any of the above are discovered during a "wellness check" (refer to Medical Services Division Operations Manual S.4, section I.D).

Ex. ZZ - 996

# EXHIBIT AAA

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| **DATE:** | MARCH 3, 2011 |
| **NUMBER:** | G.3 |
| **SUBJECT:** | ELEVATORS |
| **RELATED SECTIONS:** | |

## PURPOSE

To identify locations and use of elevators for daily operations within the detention facilities.  To provide for the safe removal of passengers in a non-functioning elevator.

## POLICY

The proper use of elevators will be determined by each facility to ensure efficiency in the movement of inmates, food, supplies, and staff.  Due to the volume of elevator use, and the impact on facility operations, repair of elevators is of great concern and shall be handled expeditiously.  Preventative maintenance shall be scheduled and completed in a timely manner.

## PROCEDURES

Each detention facility will establish procedures to meet the needs of the individual facility. The procedures should include, but not be limited to:

I.      Location and use of elevator(s).

II.     Maintenance procedures and use of the emergency override system.

III.    Evacuation of persons from a non-functioning elevator

IV.     Use of elevators during an emergency

V.      Elevator capacity limitations.

Ex. AAA - 998

# EXHIBIT BBB

| | |
|---|---|
| **DATE:** | OCTOBER 28, 2020 |
| **NUMBER:** | I.57 |
| **SUBJECT:** | TRANSPORTATION OF INMATES |
| **RELATED SECTIONS:** | I.5, I.31, I.45, I.47, I.52, I.93, M.2, M.9, R.1; SDSD P&P 5.5, 6.12; California Penal Code 3407 |

PURPOSE

To establish the appropriate level of security staffing, restraint equipment and security precautions when transporting inmates.

POLICY

All personnel responsible for transporting inmate(s) shall obtain pertinent security and/or classification information in order to determine appropriate security measures necessary to complete the transport. Universal precautions are to be followed when transporting inmates.

PROCEDURES

I.    RESPONSIBILITIES OF THE TRANSPORTING DEPUTY

A.    Deputies transporting inmates must be cognizant of the potential security risk of all inmates in their custody. After accepting custody of inmate(s) from a facility, the transporting deputy assumes the responsibility for the safety, welfare and security of the inmate under their supervision. The transporting deputy will ensure a search of the inmate and the transportation vehicle is conducted before and after every transport. If the inmate is of the opposite gender, the transporting deputy will take measures to follow appropriate procedures in accordance with Detention Services Bureau Policies and Procedures (DSB P&P) section I.52.

B.    All deputies must be aware of related policies for transportation of inmates, restraint equipment, escape procedures, universal precautions and report/document processing.

C.    Deputies must be aware of the inmate classification system and appropriate security measures to be used when transporting inmates.

D.    Seatbelts will be used to secure inmates, unless it would create a potential injury situation to the deputy and/or inmate.

E.    Deputies shall wear their assigned ballistic vest, be armed and possess the proper license to operate the vehicle they will be driving.

F.    Deputies transporting inmates will utilize the vehicle radio as well as portable radios and maintain contact with the Communications Center in accordance with DSB P&P section I.31. Deputies will advise the Communications Center they are in service; the number of inmates being transported and their destination.

Ex. BBB - 1000

G. If any unusual occurrences develop during the transport, the Communications Center shall be notified as soon as practical. The Communications Center shall notify the appropriate detention facility supervisor.

H. Health staff shall inform transporting deputies of any precautions to be taken (i.e., requiring the use of personal protective equipment, evaluating the type of restraints to be used on dialysis patients, etc.).

I. For inmates transferring to prison, the Confidential Medical/Mental Health Information Transfer Summary (J-204) form is to be placed inside the transfer envelope (J-270). The J-270 envelope is used to alert transporting deputies of inmates with universal and respiratory hazards in order for staff to take necessary precautions.

## II. GREENBAND TRANSPORTS

A. The only inmate with a higher security risk than a greenbander is an inmate without a wristband. This inmate should be treated as a greenbander until such time as the deputy can determine an appropriate status. Greenbanders should be handled as follows:

1. Research the reason the inmate is green banded.

2. Thoroughly pat down the inmate.

3. Two deputies are required to transport.

4. Always use the restricted padlock leg chains and waist chains. The inmate shall have their arms crisscrossed in front of them prior to having their hands cuffed with the waist chain cuffs.

B. When greenbanders are transported to a medical appointment, deputies will not relinquish supervision of the inmate to anyone. The inmate shall be chained to the bed with at least one leg or waist chain cuff, unless medically unfeasible. A hobble chain (as defined in DSB P&P section I.93) may also be used to limit mobility. Both deputies shall always remain within sight of the inmate. Removal of restraining equipment during medical examinations will be done at the request of the physician with the concurrence of a deputy. If it is medically necessary to remove restraints, the deputy will use the "Max Cuff" or the "Grip Restraint Device" as directed in DSB P&P section I.93. Green banded inmates shall never be completely unrestrained at any time. If problems are encountered, the deputy shall notify their supervisor.

## III. OTHER TRANSPORTS

A. Except where prohibited by this section, inmates should be transported in leg and waist chains with cuffs double locked, unless medically contraindicated. If deemed necessary, the inmate can be cross chained. Prior to departure, a deputy will conduct a pat down search of the inmate. Upon arrival to a medical facility, the inmate shall be chained to the bed by at least one leg or waist chain cuff, unless medically unfeasible. If medically necessary to remove restraints, the deputy will employ use of "Max Cuff" or "The Grip Restraint Device" as directed in DSB P&P section I.93. The transporting deputy shall always remain within sight of the inmate. Removal of restraining equipment during medical examinations will be done at the

request of the physician with the concurrence of a deputy. If problems are encountered, the deputy shall notify their supervisor.

B.    As per California Penal Code section 3407, an inmate known to be pregnant, or in recovery after delivery, shall not be restrained using leg irons, waist chains, or handcuffs behind the body. A pregnant inmate in labor, during delivery, or in recovery after delivery, shall not be restrained by the wrists, ankles, or both, unless deemed necessary for the safety and security of the inmate, the staff, or the public. For use of restraints on pregnant inmates, refer to DSB P&P section M.38.

C.    When sworn staff are required to transport an inmate to the hospital or other institution, it shall be the responsibility of the watch commander at the affected detention facility to evaluate the classification of the inmate and determine appropriate security measures to be taken.

D.    One deputy will generally transport no more than one inmate. The watch commander may authorize exceptions. In the instance of medically incapacitated pregnant inmates or releases, more than one inmate may be transported by one deputy. These instances will be evaluated on a case-by-case basis.

E.    All inmates transported for medical evaluation to an emergency department must stay until a medical decision is made regarding their care and treatment.

In the event an inmate is transported to a specialty appointment and is unable to complete the visit/evaluation, the following will be implemented:

1.    When the allotted waiting time of 30 minutes from the time of the appointment is exceeded, the deputy will contact the Prisoner Transportation Detail (PTD) sergeant.

2.    Prior to leaving the clinic, if the inmate refuses the appointment or the deputy is unable to wait the additional time, the deputy will contact the PTD sergeant.

3.    The PTD sergeant will coordinate with the appropriate clinic liaison as needed.

F.    Refer to DSB P&P sec tion I.45 if an inmate is admitted to the hospital.

Ex. BBB - 1002

# EXHIBIT CCC

Ex. CCC - 1003

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| DATE: | DECEMBER 18, 2019 |
| NUMBER: | M.9 |
| SUBJECT: | RECEIVING SCREENING |
| RELATED SECTIONS: | F.16, M.39, MSD E.2.1, MSD P.7, MSD.P.18, Americans with Disabilities Act of 1990, PREA 115.81 |
| IN COMPLIANCE WITH: | NCCHC J-E-02 |

PURPOSE

To establish  uniform procedures in assessing the medical needs of arrestees during the intake/booking process.

POLICY

All arrestees presented by arresting agencies shall be medically screened prior to acceptance for booking at a Sheriff's detention facility.  Arrestees who require urgent and immediate medical care shall not be accepted for booking.

DEFINITIONS

Medical Clearance – a documented clinical assessment of medical, dental and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to a hospital's emergency department (ED).

Receiving screening – a process of structured inquiry and observation intended to identify potential emergency situations among new arrestees, and to identify inmates with known illnesses and those on medications, for further assessment and continued treatment.

PROCEDURE

I.    RECEIVING SCREENING

    A.    The registered nurse (RN) assigned to receiving screening will complete a comprehensive assessment of the medical, dental and mental health needs of the arrestee and record the responses in the inmates' health record.

    B.    Medically unstable arrestees presenting signs of psychosis may be refused based on the RN's assessment.  Arrestees who are severely intoxicated, exhibiting symptoms of alcohol or drug withdrawal, or otherwise urgently in need of medical attention will be referred immediately for further evaluation, treatment and/or medical clearance at an ED (refer to Medical Services Division (MSD) Policy and Procedure E.2.1 for further details).

Ex. CCC - 1004

C.   Arrestees who arrive at receiving screening after being tased at the time of arrest, or confined in a restraint chair, maximum restraints or the WRAP device, shall be clinically assessed by the RN who will determine if the arrestee will be medically cleared for acceptance into the detention facility.

D.   Arrestees can return from the hospital with medical clearance paperwork and still be secured in a restraint chair, maximum restraints or the WRAP device. Nursing discretion and a clinical assessment will determine if the arrestee will be allowed admittance into the detention facility at that time.

E.   If an arrestee has been subjected to a restraint device, is combative or in such a state of intoxication or drug influence they cannot stand or walk on their own, the arrestee should remain in the arresting officer's (AO)'s vehicle (preferably in the recovery position) and monitored by the AO until the RN is ready to conduct a nursing assessment.  Upon notification, the RN will respond to the vehicle sally port. The AO shall remove the arrestee from the vehicle in order for a nursing assessment to be conducted for clearance into the detention facility.  Nursing staff will not conduct a nursing assessment while an arrestee is inside of a vehicle.   Nursing staff will generally reject arrestees who are unable to ambulate into the detention facility on their own due to intoxication, drug influence or other acute medical condition.

F.   Arrestees exhibiting signs of excited delirium, drug/alcohol overdose or other medical emergencies will be subject to refusal by the RN.  In the event of a life-threatening emergency, 911 will be called.

G.   Arrestees who have an immediate/emergent medical need, as determined by the RN, will be refused and sent to the ED for medical clearance.

H.   The watch commander will have the overall authority to accept or reject an arrestee after the arrestee has been evaluated by medical staff.

I.   The receiving screening RN will notify Inmate Processing Division (IPD) staff of an intake refusal.  IPD staff will release the arrestee from custody in the Jail Information Management System (JIMS) utilizing the disposition, "Not Fit For Jail" (NFFJ).

J.   Arrestees who have refused treatment against medical advice (AMA) at the ED may be returned to the detention facility accompanied by a treatment refusal form from the ED signed by the arrestee and witnessed by an ED physician or nurse.

K.   Any arrestee who is accepted into the detention facility after refusing treatment AMA at the ED will require expedited booking and may require placement in the detention facility's medical observation beds (MOB) housing.

L.   Arrestees confined in or needing the use of a wheelchair will only be accepted for booking at the San Diego Central Jail (SDCJ) or Las Colinas Detention and Reentry Facility (LCDRF). Nursing staff will refuse arrestees at the Vista Detention Facility (VDF) and advise the AO to transport the arrestee to SDCJ or LCDRF.

M.    Acceptance for booking will be indicated on the Booking Intake/Personal Property Inventory (J-15) form with a "Medical Cleared" stamp.

Arrestees in need of further evaluation or urgent medical care will have a red wristband reading "Clinically Indicated Assessment" placed on their right wrist by the RN. The RN will stamp "2nd Stage Medical" and staple an "Expedite" slip on the J-15 form. The RN will communicate to sworn staff how quickly the inmate must be taken to 2nd stage medical. Inmates requiring evaluation at 2nd stage medical will be seen no later than four hours from the time the RN stamped the J-15 form. Medical staff will remove the red wristband once the assessment is complete. The inmate may continue through the booking process with sworn staff, taking into consideration any recommendations given by medical staff.

Inmates who have been identified as potentially at risk for self-harm will have a pink wristband reading "ISP" placed on their right wrist by the RN. The RN will staple an "ISP Eval" slip to the J-15 form. The RN will refer the inmate to the gatekeeper for further evaluation. Sworn staff working intake will be notified immediately by the RN of the need for evaluation by the gatekeeper. The pink wristband will be removed by sworn or medical staff after the inmate is cleared by the gatekeeper or placed into the Inmate Safety Program (ISP).

Each facility will detail specific processes for "Clinically Indicated Assessment" and "ISP Eval" inmates in a green sheet. Refer to MSD Policy and Procedure E.2.1 and Detention Services Bureau Policies and Procedures (DSB P&P) J.5 for additional information regarding nursing assessment protocols and assessments for ISP housing.

N.    Any prescription medications brought in by an inmate will be put into their property in a separate property bag after the medications are reviewed and inventoried by the RN. Certain types of medications may be allowed into the detention facility with prior approval from medical staff.

O.    Patient flags (e.g., lower bunk, lower tier, precautions and chronic diseases, etc.) will be entered in the inmate's health record.

P.    Medically indicated equipment and or accommodations (e.g., wheelchairs, canes, crutches, oxygen, prosthetic appliances, prescription eyewear and hearing aids) will be evaluated by medical staff for the necessity to retain for use by the inmate during confinement. Medical staff will add the applicable patient flag in the inmate's health record, to include "ADA Mobility" (ADM). All inmates who are identified as requiring the aforementioned equipment will be housed by JPMU in a facility with appropriate accommodations.

Q.    Developmentally disabled inmates will be identified and reported to the San Diego Regional Center's developmental disability intake office the next business day. All arrestees who are identified as clients of the San Diego Regional Center will have the administrative alert "RCC" applied and will be housed accordingly.

R.    All inmates who have been screened and determined to be disabled must be reasonably accommodated. Medical staff shall enter medical instructions into the inmate's health

Ex. CCC - 1006

record. The MSD "ADA" case manager or designee will routinely review the medical instructions entered in the inmate's health record and make additional referrals as needed for further evaluation of accommodation and/or housing in compliance with DSB.P&P M.39.

S.    Any inmate who, through a review of medical history or physical examination, presents the possibility of communicable disease, will be seen immediately and their treatment needs, appropriate housing and/or referral to a physician will be initiated in compliance with DSB P&P M.37.

T.    An arrestee who advises the RN they have been a victim of sexual assault during a previous incarceration will be referred to a Qualified Mental Health Provider (QMHP) for appropriate intervention and to JPMU staff to determine housing needs.

U.    An inmate with a medical condition(s) who cannot be treated within the limitations of the detention facility will be transported to a contract hospital for diagnosis and treatment in order to provide the level of care available in the community.

## II.    SEXUAL ASSAULTS OCCURRING IN THE COMMUNITY

Medical and mental health staff shall obtain informed consent from the inmate before reporting information about prior sexual victimization that did not occur in an institutional setting and will provide the inmate with a PREA Incident Consent Form (J-316).

A.    The inmate may choose to not report the sexual victimization in the community to sworn staff.  If this option is chosen, the following shall occur:

1.    The J-316 form shall be completed and filed according to the distribution.

2.    Sworn staff will complete an incident report in JIMS, utilizing the incident type "PREA," to document completion of the J-316 form and will include the inmate has declined to report sexual victimization in the community.

3.    Sworn staff will notify the watch commander and JPMU of the incident.

4.    The watch commander or designee will be responsible for reviewing and approving PREA incident reports in JIMS.

B.    The inmate may choose to give consent for medical staff to share information related to sexual victimization in the community with sworn staff.  If the inmate chooses to report the incident, sworn staff will follow procedures outlined in DSB P&P F.16.

Ex. CCC - 1007

# EXHIBIT DDD

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| DATE: | MARCH 27, 2020 |
| NUMBER: | M.39 |
| SUBJECT: | DISABLED INMATES |
| RELATED SECTIONS: | C.1, M.9, CCR TITLE 15, SEC, 1057, CA Penal Code 2656, Americans with Disabilities Act |

PURPOSE

To establish uniform procedures to identify, evaluate and house disabled inmates in the safest manner possible while ensuring the accommodation of major life activities.

POLICY

The department recognizes disabled inmates are entitled to the same rights, privileges, and services as other inmates of the same classification level per the Americans with Disabilities Act (ADA). An inmate is covered by the ADA when the inmate has a permanent, temporary, or intermittent condition that impacts a major life activity.

Qualified inmates with disabilities shall not be excluded from participation in, denied the benefits of, or subjected to discrimination in any detention facility's services, programs, work assignments or activities, based on a disability. Each inmate identified as having a disability must be reasonably accommodated through some means.

ADA DEFINITIONS

DISABILITY - An individual has a disability if there is a physical or mental impairment that substantially limits one or more major life activities. The ADA also recognizes individuals with a record of impairment, or individuals regarded as having an impairment, as meeting the definition of disabled. Generally, such individuals will not require special accommodations.

PHYSICAL IMPAIRMENT - Includes any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin and endocrine.

MENTAL IMPAIRMENT - Includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

MAJOR LIFE ACTIVITIES - Includes but not limited to such functions as caring for oneself, reading, communicating, performing manual tasks, walking, seeing, hearing, speaking, and thinking.

CARING FOR ONESELF - Personal care such as toileting, dressing, bathing and feeding.

COGNITIVE DISABILITY - A broad term to describe conditions affecting types of mental tasks such as problem solving, reading comprehension, attention, and/or remembering. A cognitive disability is not the same as a mental disorder.

MENTAL DISABILITY - An individual who has a past medical record of, or is regarded as, having one or more mental disorders as defined in the American Psychiatric Association's Diagnostic Manual.

BLIND - An individual whose visual acuity in their best eye has an acuity of 20/200 or worse and/or if their peripheral vision is less than 20 degrees.

DEAF - An individual who cannot readily understand spoken language through hearing alone and who may have a speech defect that renders them unintelligible to most normal hearing people.

REASONABLE ACCOMMODATION - Any modification or adjustment that is effective in enabling an individual to perform the major life activities. Any change in the facility, policies, procedures, or the manner in which tasks are completed that enables a qualified individual with a disability to participate in and receive the same benefits from a program or service. Reasonable accommodation does not require fundamental alteration of the nature of a program or activity.

<u>PROCEDURE</u>

I.     IDENTIFICATION AND SCREENING

    A.     The identification of an individual with a disability generally will occur during the receiving screening process.  However, the identification of an individual with a disability can occur at any point during an inmate's incarceration (e.g., Jail Population Management Unit (JPMU) interview, outside agency, by the advisement of a family member, etc.).

    B.     Sheriff's health staff will evaluate and determine if an inmate qualifies as 'disabled.'

    C.     All inmates who have been screened and determined to be disabled will be housed in a facility with the appropriate accommodations.  Based on their disability, each inmate covered under the ADA must be reasonably accommodated through some means, such as but not limited to modified housing for wheelchair access, grab bars in bathrooms, shower chairs, closed-captioning on the television, interpreter services, telecommunications device for the deaf, assistive listening devices, magnification devices, large printed materials, and braille materials. Health screening staff shall enter health instructions into the inmate's health record. The shift charge nurse or designee will inform JPMU of the health instructions. They will also inform the Reentry Services Division (RSD) Manager or their designee via email with the names of those inmates who have an identified need for accommodations for adaptive or programming services.

    D.     A health recommendation (e.g. "lower bunk," "lower tier") shall be initiated and entered into the inmate's health record upon determination the recommended instructions are necessary for the safety and/or welfare of a disabled inmate.

    E.     If sworn staff is unable to accommodate the aforementioned housing recommendations, health staff shall be notified.

    F.     Re-evaluation of functional performance will be conducted by the registered nurses once a month for those inmates identified as having a temporary medical disability.  A possible reassignment of housing unit and/or facility may be recommended.

II.    ACCOMMODATIONS

Inmates requiring ADA accommodations will be assisted in receiving access to the following by either the Medical Services Division (MSD) or RSD staff:

A.    Medical services

B.    Psychiatric services

C.    Adaptive services to assist in participation in programs or services

D.    Adaptive services to report to health and/or sworn staff if they have been sexually assaulted.

III.    REQUEST FOR ACCOMMODATIONS

A.    A request for reasonable accommodation will be initiated by the individual, their family members, or an outside agency.

B.    A request for an assessment of accommodations will be forwarded to the MSD ADA case manager for review.  Assessments can be completed by either a registered nurse or by a physician. The findings and disposition will be documented in the inmate's health record.

C.    Requests will be acted upon within 72 hours

IV.    ADA GRIEVANCE PROCEDURE

Grievances will be handled according to Detention Services Bureau Policies and Procedures section N.1 and forwarded to a MSD supervisor or designee. All ADA related grievances will be forwarded to the MSD ADA case manager for processing.

# EXHIBIT EEE

Ex. EEE - 1012

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| **DATE:** | JANUARY 14, 2020 |
| **NUMBER:** | Q.55 |
| **SUBJECT:** | PROPERTY RECEIVED WITH INMATES |
| **RELATED SECTIONS**: | M.9, P.3, Q.7, Q.57, Q.59, Q.61, Q.63, Q.66 |

PURPOSE

To minimize the amount of, and to account for all, personal property received with new inmates accepted into the custody of the Sheriff.

POLICY

Only clothing, purses and small personal effects on the inmate's person will be accepted. Inventory and storage of personal property shall be handled per the following procedures.

PROCEDURE

I.    UNACCEPTABLE PROPERTY ITEMS

    A.    Unacceptable property items will not be accepted for any inmate booked into custody or already in custody. The following items are deemed unacceptable property items.

        1.    Bulk property (e.g., backpacks, boxes, luggage)
        2.    Electronic devices (e.g., computers, iPads, tablets, e-Readers)
        3.    Purses larger than 10"x10"x4"
        4.    Perishable items (e.g., food)
        5.    Tobacco products (e.g., cigarettes, cigars, etc.)
        6.    Marijuana in any form (e.g., prescription, edibles, oils, leaf, concentrate)
        7.    Alcoholic beverages
        8.    Weapons of any type
        9.    Cutting tools (e.g., knives, scissors, razors)
        10.   Incendiary items (e.g., explosives, vaping or electronic smoking devices (e-cigs), ammunition)

    B.    It will be the responsibility of the arresting/transporting officer to maintain custody of the inmate's bulk property as well as any other unacceptable property items.

II.   PERSONAL PROPERTY INVENTORY

    A.    It will be the responsibility of the arresting/transporting officer to accurately itemize all personal property items belonging to the arrestee.

    B.    The arresting/transporting officer will document the arrestee's personal items on a Booking Intake/Personal Property Inventory (J-15) form. The officer will verify items with the arrestee. Both the officer and the arrestee must sign the property receipt. If the arrestee refuses to sign the J-15 form, the arresting/transporting officer will write "refusal" on the inmate signature line and initial it.

C.   Jewelry or body adornments found on any inmate being booked into a facility will be removed and placed in the inmate's property.  Items such as rings, necklaces, bracelets and earrings visible during the initial intake process shall be removed.  If needed, the arrestee can be provided with any available hand lotion, hand cleaner, oil or soap to assist with the removal.

D.   The arresting/transporting officer will place all the arrestee's personal items and the money inventory receipt printed from the kiosk in a plastic bag (9 ½" x 12") and heat seal it.  The officer will print the inmate's name and date of birth in ink on a white label. The officer will place the label on the upper left-hand corner of the plastic bag and will give the sealed property bag to the detention processing technician (DPT).  The DPT assigned to the pre-book position will appropriately log the receipt of the sealed property bag in the Jail Information Management System (JIMS).  The sealed property bag will be forwarded to the property room.

E.   The inmate's property bag will remain sealed at all times.  If for any reason an inmate's sealed property bag is opened, the deputy opening the property bag will record in JIMS the date, time, and reason for the property bag being opened.  The deputy will then reseal the bag and return the sealed property bag to the property room.

## III.   MONEY INVENTORY

A.   It will be the responsibility of the arresting/transporting officer to accurately inventory the arrestee's money.  The officer will count and verify the money amount in the presence of the arrestee. The officer will deposit cash into the intake cash kiosk machine. All coin currency will be placed in the arrestee's plastic property bag and will not be placed on an inmate's funds account.  The machine will generate a receipt, which will be placed in the inmate's sealed property bag.  Cash deposited into the kiosk machine will be immediately reflected on the inmate's funds account.

B.   If the cash kiosk is not functioning, the officer will inventory the cash on the J-15 form and heat seal the money bag onto the sealed personal property bag.

C.   During the intake process, the officer will give the property bag and money bag (if not deposited at the kiosk) to the DPT assigned to the pre-book position.  All monies must be verified by the DPT prior to the officer leaving the detention facility.  It is the responsibility of the arresting/transporting officer to resolve all money discrepancies prior to acceptance of the arrestee. The arresting/transporting officer cannot leave the facility until they have received a copy of the J-15 form.

D.   If there is a discrepancy in the amount of money when the sealed money bag is opened, the watch commander or designee will be notified immediately.

E.   Contaminated/mutilated/soiled currency will not be posted to an inmate's account.  The arresting/transporting officer will be required to place the currency in a separate envelope and mark "contaminated" on it.  That envelope will be placed in the inmate's property bag prior to heat sealing and "contaminated money" will be indicated on the J-15 form.

## IV.    SPECIFIC ITEMS

A.    It will be the responsibility of the arresting/transporting officer to place all arrestee medication in the sealed property bag with the labels facing up so the reviewing nurse can easily identify them.  If the inmate has an excess amount of medication, the officer should use an additional sealed property bag.

B.    If a separate medication bag is required, the intake deputy will make a notation on the top of the J-15 form of "1MB" (one medication bag). This will indicate to booking staff the inmate has more than one sealed property bag.  The intake deputy will forward the bag to the stock clerk when the nurse has completed documentation of the inmate's medications.

C.    Miscellaneous items (e.g., paperwork, legal materials) will be accepted upon approval of the watch commander or sergeant. Such miscellaneous items will be noted in the property section of the computer record.

D.    Medically indicated equipment (e.g., prosthetic appliances, wheelchairs, canes, crutches, prescription eyewear, hearing aids) will be evaluated by medical staff for the necessity to retain for use by the inmate during confinement.  Medical equipment not approved for retention will either be returned to the arresting/transporting officer or sealed in the inmate's property bag.

E.    Items such as hairpieces, wigs or weaves that have been removed at intake will be the responsibility of the arresting/transporting officer.  If found subsequent to the initial property inventory, these items will be placed in the inmate's property with completed documentation.

## V.    JEWELRY AND BODY ADORNMENTS LOCATED AFTER PRE-BOOKING

A.    Jewelry and/or body adornments can pose a safety and security risk.  Every attempt will be made to have the inmate voluntarily remove all jewelry or body adornments utilizing any available hand lotion, hand cleaner, oil or soap.  Deputies can provide reasonable assistance to cooperative inmates with removing items that are not in the genitalia area. The removal of an inmate's body adornments from the genitalia area shall only be attempted by the inmate, and shall be conducted in an area of privacy in the presence of a deputy of the same gender.

B.    With the exception of rings, if the inmate will remain in Sheriff's custody and is unable to remove jewelry and/or adornments, the deputy will ensure the items are documented in JIMS by a DPT or stock clerk, by selecting the "kept" option in the "personal property" status section of the "booking maintenance navigator" module.

C.    All rings that cannot be removed using the steps previously outlined shall be removed by using the ring cutting tool.  Deputies should be aware that tungsten carbide and ceramic rings cannot be removed by cutting.  All ring cutting tools will be properly sanitized before and after each use with an aerosol disinfectant (e.g., Clippercide, Cavicide).  After removal, the deputy will follow procedures for placing the items in the inmate's sealed personal property bag and will document the removal in a JIMS inmate status report.  If attempts to cut a ring are unsuccessful, the deputy will ensure the steps outlined above for marking the item "kept" are followed and an inmate status report will be written.

VI.    TRANSFER BETWEEN SHERIFF'S FACILITIES

Upon transfer to another San Diego County Sheriff's facility, all personal property is to be sent to that facility with the inmate (exception: property for the inmates housed at Facility 8 is stored at the George Bailey Detention Facility).

VII.    ACCEPTANCE AND RELEASE OF INMATE PROPERTY

A.    Only property and money an inmate actually needs, and is allowed to use while in custody, will be accepted via the Custody Information Office.  Privately provided medications are generally not administered.  Medications will be provided through the detention facility pharmacy.  Should a member of the public wish to leave medications, the charge nurse will be notified.  The charge nurse or designee will come to the Custody Information Office and obtain any necessary information.

B.    Property received via the Custody Information Office will be delivered to the inmate or placed in their facility property bag as per facility procedures.  In all cases, an Incoming Property Receipt (J-53) form will be completed, signed and forwarded to the inmate.

C.    All inmates requesting to release their sealed property must complete and sign an Outgoing Property Receipt (J-54) form.  Personal property items contained in the inmate's sealed property bag will be released only on an "all or nothing" basis.  Medications contained in an inmate's sealed property bag will only be released to the inmate upon a release from custody.

D.    Inmates committed to state prison or to Sheriff's custody for a term longer than one (1) year may release their clothing to a designated person by completing a J-54 form.  Personal clothing may be accepted for these inmates no more than thirty days prior to the date due to be released from Sheriff's custody.  A J-53 form will be completed and the clothing must be inspected by sworn staff prior to acceptance.  If personal clothing is not available upon release, jail-issued release clothing will be provided.

E.    Any agency requesting to review items in an inmate's sealed property bag may do so in the presence of the facility stock clerk. Any agency requesting to remove items from an inmate's sealed property bag must provide a signed letter (using their department's letterhead) itemizing all contents removed.  Pursuant to court orders, departmental requests or other extenuating circumstances, the on-duty facility watch commander or designee will remove the items, insert the authorizing paperwork and reseal the bag.

# EXHIBIT FFF

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual |
|---|---|

| SUBJECT: | PROSTHESES, ORTHOSES AND OTHER AIDS TO IMPAIRMENT | DATE: | 3/30/2017 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.P.7 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |

| RELATED SECTIONS: | MSD P&P: S.3 |
|---|---|
| IN COMPLIANCE WITH: | CCR Title 15, Section 1206, 1215, NCCHC J-G-10 |

PURPOSE

To provide guidelines when a patient presents to booking with their personal prosthesis, orthotic or other aids to impairment. To provide guidelines when a patient requests or a provider considers the ordering of a prosthesis, orthotic or other aids to impairment. To provide guidelines for the housing of patients with clinically indicated prosthetic appliance. To provide guidelines in the event a patient has violated this policy. To define care abilities for those who are medically impaired.
Definitions:
- Prostheses are devices to replace missing body parts such as limbs, teeth, eyes, or heart valves.
- Orthoses are mechanical devices, such as braces, foot inserts, or hand splints, used to support or supplement weakened or abnormal joints or limbs.
- Aids to impairment include, but are not limited to eyeglasses, hearing aids, canes, crutches, and wheelchairs.

POLICY

Patients shall be allowed to keep/wear prescribed prosthesis, orthotic or aids to impairment unless it has been determined that it poses a risk to safety or security. Prostheses, orthoses or aids to impairment may be provided to patients upon request and if medically indicated. If a patient has previously violated the policy and was noncompliant with the use of a prosthesis, orthotic or an aid to impairment, clinical indication for the appliance will be re-evaluated.

PROCEDURE

I.  A Prosthetic Appliance Authorization (J284) is to be completed by a provider to request for a patient's appliance. Patients may submit a Sick Call Request (J212) to request evaluation for prosthesis or replacement.
     A.  Providers submitting a prosthesis request will include the following information:
          1.  The end dates whenever possible and appropriate.
          2.  The follow-up appointment for reassessment of need for the appliance.
     B.  Referrals for appliances may require a review by the Sheriff's Chief Medical Officer, and approval by the Medical Services Administrator.
II.  The removal of an appliance may occur if:
     A.  There is a safety and security concern/violation.
     B.  The patient is found to be noncompliant with prescribed regimen.
III.  In the event an appliance is removed:
     A.  The appliance should be placed immediately in the patient's property.

**PROSTHESES, ORTHOSES AND OTHER AIDS TO IMPAIRMENT**

Ex. FFF - 1018

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual |
|---|---|

| SUBJECT: | PROSTHESES, ORTHOSES AND OTHER AIDS TO IMPAIRMENT | DATE: | 3/30/2017 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.P.7 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 2 |

| RELATED SECTIONS: | MSD P&P: S.3 |
|---|---|
| IN COMPLIANCE WITH: | CCR Title 15, Section 1206, 1215, NCCHC J-G-10 |

  B. The medical services staff must be notified, and a note will be made in the alert section of the medical record.

IV. Appealing the removal of an appliance:

  A. The patient may appeal such removal by writing an Inmate Request/Grievance, stating the need.

  B. This written appeal request will be routed to the appeal's officer in the detention facility via the watch commander's office who will decide whether or not the appeal may be granted.

V. Housing Recommendations:

  A. Appropriate accommodation for patients with prosthesis, orthotic or aid to impairment will be provided as indicated.

| Implemented: | 10/90 |
|---|---|
| Reviewed: | 9/17/96, 9/19/97, 9/18/98, 8/11/99, 7/31/00, 8/18/03, 8/9/04, 8/12/05, 7/31/06, 7/31/07, 07/09/08, 2/24/11, 2/27/13, 9/6/19 |
| Revised: | 3/17/92, 10/20/92, 6/4/93, 4/1/94, 5/24/95, 1/29/96, 8/10/01, 9/18/02, 1/24/05, 7/28/09, 2/14/12, 2/24/14, 3/30/17 |

**PROSTHESES, ORTHOSES AND OTHER AIDS TO IMPAIRMENT**