GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California  94704-1165
Telephone:  (510) 806-7366
Facsimile:   (510) 649-6314
ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT; and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20 cv-00406-AJB-WVG<br><br>**DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:  Hon. Anthony J. Battaglia<br><br>Trial Date:   None Set |

1   (*counsel continued from preceding page*)

2   CHRISTOPHER M. YOUNG – 163319
3   ISABELLA NEAL – 328323
    OLIVER KIEFER – 332830
4   DLA PIPER LLP (US)
5   401 B Street, Suite 1700
    San Diego, California 92101-4297
6   Telephone:  (619) 699-2700
7   Facsimile:  (619) 699-2701
    christopher.young@dlapiper.com
8   isabella.neal@dlapiper.com
9   oliver.kiefer@dlapiper.com

10

11  BARDIS VAKILI – 247783
    JONATHAN MARKOVITZ – 301767
12  ACLU FOUNDATION OF SAN DIEGO &
13  IMPERIAL COUNTIES
    2760 Fifth Avenue, Suite 300
14  San Diego, California 92103-6330
15  Telephone: (619) 232-2121
    bvakili@aclusandiego.org
16  jmarkovitz@aclusandiego.org

17

18  Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28

I, James Austin, declare:

1.      I am currently employed by the JFA Institute, a research organization that I founded in 2003.  The JFA Institute works in partnership with federal, state, and local government agencies and philanthropic foundations to evaluate criminal justice practices and design research-based policy solutions related to, among other things, prison population simulation modeling and projections, offender risk assessment and classification systems, and parole and probation guidelines.  My curriculum vitae is attached hereto as **Exhibit A**.

2.      I previously served as the Director of the Institute of Crime, Justice and Corrections at the George Washington University (1999 to 2003); and as the Executive Vice President for the National Council on Crime and Delinquency (1982-1998).  From 1970 – 1975, I was employed by the Illinois Department of Corrections at Stateville and Joliet prisons as a correctional sociologist.  I received my Ph.D. in sociology from the University of California, at Davis.

3.      I have implemented inmate classification systems for juvenile and adult custody in over 30 local and state correctional systems.  I have also collaborated with corrections officials in the States of Ohio, Mississippi, Colorado, Georgia, Illinois and New York to reduce the number of prisoners assigned to administrative segregation.

4.      I served as an expert in the *Plata et al., v. Brown* case, where the California prison population has been safely and significantly reduced by over 40,000 prisoners.  My expert opinions in that matter were cited by the three-judge court's decision, which mandated that the State of California must reduce its prison population.  My expert opinions were also cited in the U.S. Supreme Court's decision, *Brown v. Plata*, which affirmed the three-judge court's order mandating a prison population reduction.

5.      I have served as the project director of the corrections options technical assistance program of the Bureau of Justice Assistance (BJA), an arm of

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

the US Department of Justice that provides a wide variety of assistance to local

jails, probation, parole, and prison systems.  I directed two BJA projects that

focused on juveniles in adult correctional facilities and a national assessment of

adult and juvenile private correctional facilities.

6.    In 1991, I was named by the American Correctional Association as its

recipient of the Peter P. Leijins Research Award.  In 1999, I received the Western

Society of Criminology Paul Tappin award for outstanding contributions in the

field of criminology.  In 2009, I was the Recipient of the Marguerite Q. Warren and

Ted B. Palmer Differential Intervention Award, American Society of Criminology,

Corrections and Sentencing Division.

7.    I served as the Chair of the National Policy Council for the American

Society of Criminology.  In 2007, I was appointed to the California Department of

Corrections and Rehabilitation Expert Panel on Adult Offender Recidivism

Reduction Programs.

8.    I have been asked by the attorneys representing the plaintiffs in this

action to provide my opinions regarding the policies and practices of the County of

San Diego and the San Diego County Sheriff's Department, and their agents as they

relate to safety and security of people incarcerated in the San Diego County jail

system (the "Jail").  I make this declaration in support of Plaintiffs' Motion for

Preliminary Injunction and Provisional Class Certification.

9.    In order to prepare this report, I have been provided with the following

materials:

    a.    Plaintiffs' Second Amended Complaint.

    b.    County of San Diego, Citizens' Law Enforcement Review

        Board's reports dated October 2017; September 2019; July

        2020; September 2020; November 2020; January 2021;

        February 2021; July 2021; September 2021; Oct. 2021;

        November 2021; Dec. 2021; January 2022; Nov. 2021; March

1                                2022 Agenda; and April 2022 Agenda.

2        c.      Auditor of the State of California, San Diego County Sheriff's

3                 Department, *It Has Failed to Adequately Prevent and Respond*

4                 *to the Deaths of Individuals in Its Custody*, February 2022,

5                 Report 2021-109.

6        d.      Disability Rights California, *Suicides in San Diego County Jail*,

7                 April 2018.

8        e.      San Diego County Grand Jury report 2013/2014 (filed May 19,

9                 2014).

10       f.      Declaration of Darryl Lee Dunsmore.

11       g.      Declaration of Dylan Lacroix.

12       h.      Declaration of Isaiah Glenn.

13       i.      Declaration of Jose Antonio Lopez.

14       j.      Declaration of Michael Keavney.

15       k.      Declaration of Gustavo A. Sepulveda.

16       l.      *Two San Diego County sheriff's deputies failed to provide*

17                 *medical aid to inmate before he died, review board finds*, THE

18                 SAN DIEGO UNION-TRIBUNE, Kelly Davis and Jeff McDonald,

19                 December 6, 2021.

20      m.     Email correspondence re: media request/San Diego Union-

21                 Tribune, December 6, 2021.

22       n.      *Rate of jail inmate deaths in San Diego County far exceeds*

23                 *other large California counties*, THE SAN DIEGO UNION-

24                 TRIBUNE, Jeff McDonald, Kelly Davis, and Lauryn Schroeder,

25                 September 20, 2019.

26       o.      Email correspondence re: Lazaro Alvarez: Jail death, December

27                 10, 2021.

28       p.      San Diego County Sheriff's Department Detention Services

1 | Bureau – Manual of Policies and Procedures.

2 | q. | San Diego County Sheriff's Department – Policies and

3 | Procedures issued by George Bailey Detention Facility, San

4 | Diego Central Jail, and Las Colinas Detention and Reentry

5 | Facility.

6 | r. | Death in Custody Reporting Forms, 2019 to 2021.

7 | s. | *Authorities say man who died at Otay Mesa jail overdosed on*

8 | *fentanyl*, Alex Riggins, THE SAN DIEGO UNION-TRIBUNE,

9 | January 13, 2021.

10 | t. | *Deceased inmate was facing dozens of charges at time of death,*

11 | *prosecutors say*, Jeff McDonald, THE SAN DIEGO UNION-

12 | TRIBUNE, December 16, 2020.

13 | u. | *Man Dies at San Diego Jail After Ingesting Meth; Plastic Bag*

14 | *Found in Stomach: Sheriff's Dept.*, KTLA, August 15, 2019

15 | v. | Email correspondence re: Five Patient OD at George-Bailey

16 | Prison, May 19, 2021.

17 | w. | Email correspondence re: drugs entering jails/San Diego Union-

18 | Tribune, May 24, 2021 to June 28, 2021.

19 | x. | *Seven San Diego County Jail Inmates Overdose on Fentanyl*,

20 | NBC 7 San Diego, July 19, 2021.

21 | y. | San Diego County Sheriff's Department, Detention Services

22 | Bureau, Suspected Overdose Incidents with Naloxone.

23 | Deployment, December 30, 2021; April 7, 2022; April 15, 2022

24 | z. | San Diego County Grand Jury report 2018/2019 (filed May 28,

25 | 2019).

26 | aa. | *Debate: Who Should be Sheriff? – Politifest 2021*, Voice of San

27 | Diego, YouTube, October 22, 2021.

28 | bb. | *San Diego County In-Custody Death Study*, Analytica

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1    Consulting, April 2022.

2    cc.    County of San Diego, April 26, 2022 Board of Supervisors

3    Agenda Item re Sheriff's Department – Request to Waive Board

4    Policy A-87 and Enter a Contract with Axon for Body-Worn

5    Camera System.

6    dd.    Legal opinion in *Armstrong v. Newsom*, Case No. 94-cv-02307,

7    2021 WL 933106 (N.D. Cal. March 11, 2021).

8    ee.    Incarcerated Person vs. Incarcerated Person Assaults – 2020,

9    San Diego County Sheriff's Department.

10    ff.    Incarcerated Person vs. LE Staff Assaults – 2020, San Diego

11    County Sheriff's Department.

12    gg.    Inmate Population Demographics (Average), San Diego County

13    Sheriff's Department, January 1, 2019 to December 31, 2019

14    and January 1, 2020 to December 31, 2020.

15    10.    My opinions set forth below are based upon the documents and other

16    evidence listed above and on my professional knowledge and my experiences

17    working in correctional settings.

18    11.    This case is still in a very early stage.  I am informed that the parties

19    have not yet exchanged any formal discovery.  I have not conducted any inspection

20    of the Jail facilities, I have not interviewed any staff or incarcerated people, and I

21    have only reviewed a small number of records and declarations.  As a result, I have

22    not been able to form opinions regarding certain elements of the security and

23    custody system at the Jail.

24    12.    I would like to inspect all six of the Jail's facilities to better assess the

25    current contraband screening, intercom, video systems, and safety check practices.

26    Typically, such an inspection would include evaluation of the technology at issue,

27    speaking with staff knowledgeable of the Jail's policies and practices, reviewing

28    relevant documentation, and inspecting all areas in which the technology is used.  If

5    Case No. 3:20 cv-00406-AJB-WVG

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

allowed access to these facilities, I could make specific recommendations on which particular features should be remedied as well as the timing and urgency of these remedies.

13.    Based upon the documents and information I have received, however, I am able to offer the opinions set forth below.  I reserve the right to supplement or modify these opinions as more information becomes available.

14.    My opinions set forth below are based upon my preliminary review of the documents and other evidence listed above and on my professional knowledge and my experiences working in and studying correctional settings.

## I.    The Jail's Drug Contraband Screening Policies and Practices are Inadequate

15.    Based on a review of the available documents, the Jail's contraband screening policies and practices are inadequate and contribute to the significant danger to the health and safety of incarcerated people in the Jail.

### A.    The Jail Has an Extraordinarily High Death Rate from Overdoses

16.    It is imperative that correctional facilities enact effective policies and practices to prevent staff and incarcerated people from bringing contraband, particularly drugs, into such facilities.  A high percentage of incarcerated people entering jails nationwide have a history of drug use.  In 2020, 82% of adult males booked into the San Diego County Jail tested positive for at least one illicit substance.  2020 Adult Arrestee Drug Use in the San Diego Region, SANDAG, https://www.sandag.org/uploads/publicationid/publicationid_4790_29577.pdf, at 3 (August 2021).

17.    Incarcerated people face a significant risk of overdose when drugs are available within the Jail.  Incarcerated persons at the Jail report that drugs, including heroin, fentanyl and methamphetamine, are widely available in the Jail. *See e.g.,* Norwood Decl. at ¶ 6.  It is difficult for incarcerated people with a history

of addiction to stay sober "in an environment like the Jail where opioids are easily available." *Id.* at ¶ 8.

18.     In 2021, 18 deaths occurred in the Jail system. *Review Board Study Finds Large Number of 'Excess Deaths' in San Diego County Jail*, Jeff McDonald and Kelly Davis, THE SAN DIEGO UNION-TRIBUNE, April 11, 2022. As the Jail had an average population in 2021 of 3,967, the morbidity rate among the 2021 Jail population was 454 per 100,00. 2021 Annual Report, San Diego County Sheriff's Department, https://www.sdsheriff.gov/home/showpublisheddocument/4912/637842465915230000, at 32. This morbidity rate is more than *three times* the most recent national jail mortality rate of 149 per 100,000 jail population, as reported by the Bureau of Justice Statistics, U.S. Department of Justice. *Mortality in Local Jails, 2000-2016 – Statistical Tables* (February 2020).

19.     As discussed more fully below, there appear to have been at least 16 overdose deaths at the Jail since 2019.

20.     An April 2022 report by Analytica Consulting found that, when comparing overdose/accidental[1] death rates among 12 large county jail systems in California, incarcerated people in the San Diego Jail system have the highest death rates. San Diego County In-Custody Death Study at v. Many of the counties in the study go eight to 12 months without an overdose/accidental death; yet the Jail reports this type of death about once every five months. *Id.* at 4. Between 2010-2020, there were approximately 24 drug overdose deaths in the Jail. *See id.* at 20.

**B.    The Jail Has Historically Failed to Ensure Fully-Functional Body Scanners at All Jail Facilities**

21.     Most jail and prison systems today employ body scanners to detect and prevent illegal drugs, cell phones, weapons and other forms of contraband that, if

---

[1] The California Department of Justice broadly refers to these deaths as accidental deaths but most of these deaths involve overdoses. A much smaller number of these deaths involve circumstances such as blunt force, falls and choking.

1   smuggled into the facility, will likely result in deaths or serious injuries to both staff

2   and incarcerated people. Upon entering a correctional facility, all persons (staff,

3   visitors, maintenance personnel, contractors and incarcerated people) should be

4   scanned.  Modern scanning devices are able to accurately identify anomalies within

5   a person's body—even small bags of drugs that may have been ingested by an

6   incarcerated person.  If staff are properly trained in the use of these devices and the

7   scanner is used on all entrants, it is virtually impossible for contraband to enter a

8   correctional facility through the major facility entry and exit locations.  If scanners

9   are working properly but drugs and other contraband continue to be found in the

10  facility, it would suggest that staff are not adequately trained in the use of the

11  scanners, the scanners are not working properly, or staff are not consistently

12  following security procedures.

13       22.    Some of the Jail facilities use Soter RS body scanners during the

14  booking process.  *See* Email from Amber Baggs to Kelly Davis and Jeff McDonald

15  (May 26, 2021).  I understand that the Central, Vista, Las Colinas Detention &

16  Reentry Facility ("Las Colinas") and George Bailey Jail facilities use Soter RS

17  body scanners, and that the other Jail facilities (East Mesa and South Bay) do not

18  use any body scanners during the booking process.  *Id.*

19       23.    The San Diego Sheriff's Department's (the "SDSD") use of body

20  scanners appears to fail to detect a significant amount of drugs entering these Jail

21  facilities.  This may be due to the body scanner being out of commission, the body

22  scanner software not being updated, the body scanner operators not being properly

23  trained or otherwise not analyzing the scan results correctly, or the body scanner

24  not being used on all people who enter the facility.

25       24.    Outdated scanner technology appears to have been a problem for the

26  SDSD, at least at one time.  A May 2019 grand jury report criticized the SDSD for

27  failing to upgrade the body scan system's software.  San Diego County Detention

28  Facilities, Inspection Report and Inmate Mental Health, May 28, 2019, at 6.  The

1    grand jury noted that the body scanner at the Central Jail needed a software update.

2    *Id.* The software was available, but the SDSD did not acquire it – apparently due to

3    the terms of the SDSD's maintenance contract for the body scanner. *Id.* The grand

4    jury recommended that the SDSD find a way to upgrade the scanners. *Id.* Based

5    on the available documents, it is unclear whether or when the SDSD completed this

6    update, nor is it clear whether or how many drugs were able to enter the Central Jail

7    while the software update was pending. It is also not clear whether this outdated

8    software issue is related to a body scanner that is currently in use, or if the body

9    scanner has subsequently been replaced. But the SDSD's failure to timely update

10   the software is indicative of the pattern of the SDSD's inability to enact measures

11   that effectively prevent the entry of contraband drugs into the Jail.

12       25.    In May 2021, the SDSD's Media Relations Director recognized that

13   "drugs are making their way into [the] facilities." *Id.* The SDSD has identified

14   several ways in which drugs enter the facilities, including: (a) being hidden inside

15   the bodies of incarcerated people during the booking process; (b) being sent in via

16   mail; (c) being smuggled in by Jail staff; and (d) being brought in by visitors. *Id.*

17   The Media Relations Director admitted that the body scanning system "is not

18   perfect" and that sometimes items "are not detected." *Id.* Referring to contraband

19   drugs, Undersheriff Kelly Martinez admitted in October 2021 that the Jail's

20   scanners "don't get them all." *Debate: Who Should be Sheriff? – Politifest 2021* at

21   34:50 to 37:50, VOICE OF SAN DIEGO, YouTube, October 22, 2021.

22       26.    Based on the Media Relations Director's and the Undersheriff's

23   statements, it appears that the scanners are not in proper working order and/or they

24   are not being used appropriately by staff.

25   **C.    The Jail's Policies for Drug Contraband Screening, Detection, and
         Prevention Are Inadequate**

26

27       27.    The SDSD's current contraband screening policies only require the

28   scanning of incarcerated people at the time of booking and not all other people

entering the facility.  *See* Policy I.50, Body Scanners and X-Rays.  Specifically, medical staff, custody staff, and contractors are not required to be scanned when they enter the Jail facilities.  *Id.*  This policy is inadequate, as it allows many people to enter the facility each day without undergoing any sort of body scanning.  As a result, contraband drugs are able to enter the Jails through all the people not subject to a body scan, resulting in serious risk of injuries and death from undetected contraband.  As discussed above, when body scan technology is used properly on all individuals entering a jail, it is nearly impossible for contraband to enter a correctional facility on or in a person's body.  The Jail could reduce the amount of contraband entering the facilities by modifying its contraband screening policies to require all individuals to undergo body scanning before entry.

28.    Further, current SDSD policies do not provide guidance to staff on how to select incarcerated people for discretionary pat searches or strip searches, how often they should be performed, and how staff are to be trained in their use – including as to prioritizing the use of scanners first, and then conducting more invasive physical searches if scan results show anomalies suggesting the presence of contraband.  It is not possible at this time to determine if certain staff are trained to perform pat searches in a consistent manner, if supervisors review the number of discretionary pat and strip searches, if there is any effort to assess the quality of such searches, or the scope of training required of staff conducting searches.

**D.    The Jail's Practices Fail to Prevent Lethal Drugs From Being Widely Available in the Jail**

29.    The documents I reviewed provided information about how inadequate policies and practices have led to overdose deaths at the Jail.  Since January 2019, there appear to have been at least 16 deaths at the Jail due to drug overdose.  The below examples discuss how contraband drugs are bought into the Jail and cause deadly overdoses.

30.    For instance, on February 7, 2019, Joseph Castiglione was arrested and

booked into custody at 1:49 a.m. for possession of paraphernalia and substance consistent with methamphetamine.  County of San Diego, Citizens' Law Enforcement Review Board ("CLERB") Findings, September 10, 2019, at 9.  He reportedly did not exhibit signs or symptoms of being under the influence at the time of his booking, which was corroborated by Body Worn Camera evidence.  *Id.*  Yet, at 8:45 a.m., seven hours after being booked, Mr. Castiglione's cellmates alerted deputies to a medical emergency and life saving measures were initiated.  *Id.*  Mr. Castiglione was transported to a hospital, where he died at 9:52 a.m.  *Id.*  During an autopsy, an exam of the small intestine revealed a small clear baggie with a zip closure.  *Id.*  The bag appeared to be sealed and contained a small amount of translucent whitish fluid.  *Id.*  Mr. Castiglione's toxicological testing detected a high level of methamphetamine and amphetamine.  *Id.*  According to the Medical Examiner records, the cause of death was acute methamphetamine intoxication, and the manner of death was accidental.  *Id.*  A body scan image did not detect the concealed drugs.  *Id.*  By failing to detect the bag in Mr. Castiglione's body, his incident illustrates that the Jail's body scanning equipment was not used, was not functioning properly and/or staff were not properly trained in its use.

31.    On July 2, 2019 (less than five months after Mr. Castiglione's death), Michael Bush was arrested, scanned and booked into custody at the San Diego Central Jail ("Central") at approximately 9:22 p.m.  CLERB Findings, September 8, 2020, at 3.  Six hours later, at 3:20 a.m., Mr. Bush slid down the wall to the floor of his cell and did not move again after 3:30 a.m.  *Id.*  Custody and medical personnel undertook life-saving measures, but Mr. Bush was pronounced dead at 4:46 a.m.  *Id.*  During an autopsy, a plastic baggie was found near the exit of Mr. Bush's stomach.  *Id.*  The cause of death was acute methamphetamine intoxication due to a ruptured plastic bag in the stomach, and the manner of death was accidental.  *Id.*  Prior to his death, Mr. Bush told another incarcerated person that he had "swallowed his stash."  *Id.*  As with Mr. Castiglione, the body scan image at

11    Case No. 3:20 cv-00406-AJB-WVG

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1   booking did not detect the contraband.  *Id.*

2        32.    On August 3, 2019 (approximately one month after Mr. Bush's death),

3   Michael Hossfeld died while incarcerated at the Jail.  CLERB Findings, November

4   10, 2020, at 1-2.  Mr. Hossfeld was arrested on September 14, 2017 and

5   incarcerated in Central for nearly two years preceding his death.  *Id.*  On July 20,

6   2019, he was found unresponsive in a common area in the Jail.  *Id.*  Despite medical

7   intervention, Mr. Hossfeld died on August 3, 2019.  *Id.*  The Medical Examiner

8   performed an autopsy and determined the cause of death to be anoxic

9   encephalopathy due to acute fentanyl toxicity and the manner of death to be

10  accidental.  *Id.*  The SDSD conducted follow-up investigations, which revealed

11  illicit drugs were located in the Jail.  *Id.*  The SDSD determined that illicit drugs

12  containing fentanyl (which were somehow brought into the Jail) were provided to

13  Mr. Hossfeld.  *Id.*  Approximately 20 minutes after Mr. Hossfeld was transported to

14  the hospital, a second incarcerated person from the same housing module was found

15  unresponsive due to a drug overdose.  *Id.*

16       33.    Jose Alfego Sevilla was arrested for possession of narcotics

17  paraphernalia on May 30, 2019.  CLERB Findings, January 19, 2021, at 1.  He

18  remained incarcerated at George Bailey Detention Facility ("George Bailey") until

19  his death on August 26, 2019.  *Id.*  An autopsy determined that his cause of death

20  was acute heroin intoxication and the manner of death was accidental.  *Id.*  The

21  SDSD's investigation was unable to determine when or how Mr. Sevilla obtained

22  the narcotics but, given the length of time before his arrest and his death, he clearly

23  obtained them from someone within the Jail.

24       34.    On September 6, 2019, Daniel James Pickett died while incarcerated in

25  the Jail.  CLERB Findings, February 9, 2021, at 1.  He was arrested on September

26  4, 2019 for charges of smuggling illicit drugs across the US/Mexico border and

27  booked in Central.  *Id.*  On September 6, 2019, he was found unresponsive in his

28  cell and was pronounced dead on the scene.  *Id.*  The Medical Examiner performed

1    an autopsy and determined the cause of death to be "toxic effects of

2    methamphetamine" and the manner of death was accidental. *Id.* at 2. The

3    Toxicology Report revealed positive results for amphetamines and opiates. *Id.*

4    During his medical intake screening and subsequent interactions with medical

5    personnel at the Jail, Mr. Pickett expressed a history of illicit drug use. *Id.* Yet,

6    despite the fact that Jail personnel were aware of Mr. Pickett's history of illicit drug

7    use, Mr. Pickett somehow ingested and overdosed on methamphetamine while in

8    the Jail, resulting in his death. *Id.*

9        35.    Blake Edward Wilson died on January 26, 2020, while incarcerated in

10   the Jail. CLERB Findings, July 13, 2021, at 2. Upon his entry into custody at

11   Central on January 16, 2020, he reported daily use of heroin and alcohol

12   consumption. *Id.* at 1. Based on his screening, he was placed on Standard Nursing

13   Procedure for Heroin/Opiate Withdrawal. *Id.* On January 26, 2020, after deputies

14   failed to perform hourly safety checks in accordance with Jail policies, Mr. Wilson

15   was found unresponsive in his cell. *Id.* at 2. Despite medical intervention, Mr.

16   Wilson died. *Id.* Based on subsequent autopsy findings, toxicologic tests and

17   circumstances surrounding his death, the cause of death was ruled acute fentanyl,

18   acetyl fentanyl, butyl fentanyl and heroin intoxication, and the manner of death was

19   an accident. *Id.* A review of jail records and witness statements revealed that Mr.

20   Wilson obtained the heroin with fentanyl from another incarcerated person (who

21   was able to bring the illicit drugs into the Jail, despite the Jail's screening

22   procedures). *Id.*

23       36.    Adam Terrance Rogers died due to an overdose while incarcerated at

24   Vista Detention Facility ("Vista"). CLERB Findings, October 12, 2021, at 7.

25   During the booking process on July 26, 2020, Mr. Rogers was screened by jail

26   medical staff and treated for heroin/opiate withdrawal. *Id.* Family members

27   subsequently confirmed that Mr. Rogers had an extensive history of drug use. *Id.*

28   On October 7, 2020, Mr. Rogers' cellmate notified deputies that Mr. Rogers was

having a medical emergency. *Id.* Despite medical intervention, Mr. Rogers died. *Id.* An autopsy confirmed the accidental cause of death was acute fentanyl, alcohol, and citalopram intoxication. *Id.* A search of Mr. Rogers' cell was conducted, where deputies found evidence of fentanyl. *Id.*

37.     On September 4, 2020, Omar Hasenin was arrested and booked in the Jail. CLERB Findings, January 11, 2022, at 3. Mr. Hasenin's medical records showed a long history of substance abuse issues. *Id.* On November 3, 2020, Mr. Hasenin was found unresponsive in his cell at George Bailey and was later pronounced deceased. *Id.* An autopsy confirmed the accidental cause of death was toxic effects of fentanyl. *Id.* Toxicology tests showed presumptive positive results for fentanyl. *Id.* During subsequent investigations, a few incarcerated people stated that there was "talk of fentanyl" in the housing module but did not disclose any further information. *Id.* The measures taken by the Jail to deter drugs from entering the facilities were insufficient, as CLERB stated that "there is no doubt that Hasenin, while as an inmate in the custody and under the care of the [San Diego County Sheriff's Department], either acquired or possessed and subsequently self-administered fentanyl, which resulted in his death." *Id.* CLERB went on to conclude that, "[d]espite all interdiction efforts, fentanyl, in part, contributed to Hasenin's death, and, therefore, his death was preventable." *Id.*

38.     On November 24, 2020, Antonio Miguel Gonzaba was discovered unresponsive in his cell in Vista. CLERB Findings, November 9, 2021, at 1. Despite medical interventions, he could not be revived and was pronounced dead. *Id.* at 2. The Medical Examiner performed an autopsy and determined Mr. Gonzaba's cause of death to be fentanyl, bupropion, gabapentin, and trazodone toxicity. *Id.* Prior to Mr. Gonzaba being found unresponsive, jail surveillance video captured incarcerated persons passing items to Mr. Gonzaba under his cell door. *Id.* Following the incident, a strip search was conducted with the involved incarcerated persons, and one was found to be in possession of methamphetamine.

1    *Id.*

2         39.    Omar Moreno was booked into Central on January 6, 2021.  CLERB

3    Findings, March 8, 2022, at 4.  Mr. Moreno underwent a body scan during the

4    booking process.  *Id.*  According to video surveillance footage, the body scan

5    operator was seen continuously looking at paperwork while he conducted the scan.

6    *Id.* at 6.  He then brightened the scan and simultaneously walked away from the

7    machine.  *Id.*  CLERB was unable to determine if the operator merely glanced at or

8    ever saw the final image, but no subsequent action was taken.  *Id.*  The results of

9    the scan appeared to show some type of anomaly in Mr. Moreno's abdomen, which

10   the Medical Examiner records suggested was a "possible baggy of illicit

11   substance," which the operator either missed or ignored.  *Id.*  Later that night, Mr.

12   Moreno was found unresponsive in his cell.  *Id.* at 4.  Despite life-saving measures,

13   Mr. Moreno died.  *Id.*  The Medical Examiner determined that the cause of death

14   was choking due to airway obstruction by ingestion of cloth mask and food bolus,

15   with acute methamphetamine intoxication as a contributing factor.  *Id.*  During a

16   follow-up investigation, the Medical Examiner stated that if the foreign object was

17   a "baggy" and it was in Mr. Moreno's body for over seven hours after the scan, it

18   was possible that it could have dissolved in Mr. Moreno's body (depending on the

19   material in the baggie).  *Id.* at 6.  CLERB determined that the deputy who

20   conducted the body scan violated the Jail's policy regarding the use of body

21   scanners and X-rays.  *Id.*

22        40.    The deputy performing Mr. Moreno's body scan did not properly

23   identify the contraband in Mr. Moreno's abdomen and did not place Mr. Moreno on

24   contraband watch.  *Id.*  The SDSD's records indicated that the deputy had

25   completed training for operation of the body scan machine; however, it appears that

26   the deputy did not properly analyze the results because he failed to recognize the

27   anomaly in Mr. Moreno's body scan.  *Id.*  According to Policy I.50 "Body Scanner

28   and X-Rays", if an anomaly appears within a subject's body, the deputy conducting

1    the scan must inquire with the incarcerated person to identify the anomaly.  If the

2    anomaly is believed to be contraband, the deputy must ask the incarcerated person

3    to voluntarily turn over the item(s).  *Id.*  Once the deputy has obtained the item(s),

4    the deputy must re-scan the incarcerated person to verify all contraband was

5    removed.  *Id.*  Mr. Moreno's scan was not symmetrical, and included non-human

6    shapes (*i.e.,* triangles and ovals).  *Id.*  These parts of the image were clearly

7    "anomalies" and should have been analyzed further using the different image

8    analysis tools.  The evidence suggested that the image analysis tools were "not fully

9    used."  CLERB Findings, March 8, 2022, at 4.  The SDSD confirmed there was

10    only one image scan, and it was not flagged as a positive scan.  *Id.*  Furthermore, a

11    body scan subject matter expert confirmed the "image had enough anomalies to

12    justify any operator to be alarmed."  *Id.*  Yet, Mr. Moreno was booked into the Jail,

13    with the contraband on his person.  These facts suggest that the SDSD staff are not

14    properly trained and supervised in the use of body scan machines and the

15    interpretation of their results.

16        41.    In addition to the ten overdose deaths identified above due to

17    contraband drugs being ingested at the Jail, there have been at least seven other

18    overdose deaths since 2019 including:  (1) the May 29, 2019 overdose death of

19    Jeremy Thomas; (2) the September 16, 2019 overdose death of Franklin July; (3)

20    the November 22, 20219 overdose death of Lazaro Alvarez; (4) the April 27, 2021

21    overdose death of Jonathan Whitlock; (5) the June 9, 2021 overdose death of Jerry

22    Aleman; (6) the July 5, 2021 overdose death of Ronaldino Estrada; and (7) the July

23    20, 2021 overdose death of Sazon Rodriguez.  A SDSD press release stated that on

24    April 27, 2021 Omar Ornelas died at the Jail.  The press release noted that "two

25    incarcerated persons were located inside of a cell unresponsive during a security

26    check.  One of the incarcerated persons was revived with the use of Naloxone and

27    transported to a local hospital. Life saving measures were administered to Omar

28    Ornelas, by deputies, medical staff, and Paramedics. Unfortunately, Omar did not

survive." This wording suggests that Mr. Ornelas and his cellmate were using opioids, that both experienced overdoses, and that Mr. Ornelas died from the overdose, whereas Jail staff were able to perform life saving measures on his cellmate. If so, Mr. Ornelas would be at least the 17th person to die at the Jail from an overdose since 2019.

42.    The high number of overdose deaths due to lethal drugs being available in the Jail is evidence that that Jail's contraband screening policies, practices, and training are inadequate.

43.    The Jail's current policies and practices pose a significant risk of harm to incarcerated people in the Jail because they fail to sufficiently detect and prevent drugs from entering the Jail facilities. If the Jail does not improve its contraband screening policies and practices, deaths like these will continue to occur.

44.    The deaths identified above likely reflect only a small percentage of the illegal drugs that are available in the Jail and used by its residents. In addition to deaths, there have been a number of high-profile mass overdoses at the Jail that occurred only because of the SDSD's inability to detect and interdict contraband drugs. In May 2021, there was a mass overdose incident at George Bailey. Alex Riggins, *8 inmates at a San Diego County jail hospitalized after overdosing on fentanyl*, L.A. TIMES (May 19, 2021), https://www.latimes.com/california/story/2021-05-19/8-inmate-at-otay-mesa-jail-hospitalized-after-overdoing-on-fentanyl-naxolone. Eight incarcerated people overdosed on fentanyl in a single night. *Id.* All eight were taken to hospitals and, fortunately, survived. *Id.* It is unclear how fentanyl entered the facility; however, the fact that such a large quantity of a lethal drug could enter the facility suggested inadequate contraband policies and procedures, and poses a substantial risk of serious harm to incarcerated people within the Jail.

45.    The number of drug overdoses that have occurred in recent years is extraordinarily high. For instance, in 2021, there were over 200 suspected

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1    overdoses in the Jail facilities.  San Diego County Sheriff's Department, Detention

2    Services Bureau, *Suspected Overdose Incidents with Naloxone Deployment*

3    (December 30, 2021).  Between May 10, 2021 and May 25, 2021, the Jail

4    experienced 20 suspected overdoses in its facilities, resulting in numerous

5    hospitalizations.  *See* Email from Amber Baggs to Kelly Davis and Jeff McDonald

6    (May 26, 2021).  In 2021, there were over 200 suspected overdoses in the Jail

7    facilities.  As of April 14, 2022, there had already been 57 suspected overdoses in

8    the Jail facilities since the beginning of 2022.  San Diego County Sheriff's

9    Department, Detention Services Bureau, *Suspected Overdose Incidents with*

10   *Naloxone Deployment* (April 14, 2022).

11   46.   Given the risk of serious medical consequences, hospitalization and

12   deaths that can and do occur as a result of illicit drugs entering the Jail, the SDSD

13   must ensure that properly working scanners are used at each Jail facility, scanner

14   operators are properly trained, and that every person entering the facility is

15   adequately scanned so that lethal drugs are interdicted instead of making their way

16   into the Jail facilities.  Based on the fact that overdose/accidental death rates are

17   significantly higher in the Jail than in other county jail systems in California, and

18   based on the specific facts involved in all of the overdose incidents discussed

19   above, the Jail's policies and practices appear to be inferior to those used in other

20   jail systems.

21   47.   I have reviewed the proposed preliminary injunction order that

22   Plaintiffs have requested in this case.  For contraband screening, Plaintiffs ask that

23   the SDSD develop a plan to revise Defendants' policies, procedures, practices, and

24   training for the interdiction of drug contraband being brought into the Jail so as to

25   significantly reduce the amount of drugs entering the Jail.  Plaintiffs also ask that

26   the SDSD develop a plan to maintain fully-functioning body scanners located at all

27   Jail facilities, ensure that all people who enter the facilities are properly scanned,

28   and ensure all staff who operate scanners are properly trained.  These are reforms

that the SDSD can institute to reduce the risk that contraband, specifically drugs, poses to incarcerated people in the Jail facilities.

## II.    The Jail's Audio Intercom System is Not Functioning and Threatens Safety

48.    Jails across the country equip cells and dorms with call boxes that form part of an intercom system.  Intercom systems are used primarily as a means of relaying emergencies and summoning emergency assistance.  Intercom systems in jails typically work by having a call box (or multiple call boxes) in a cell or dorm that are electronically connected to a control unit at a guard station.  To use the intercom, an incarcerated person pushes a button that alerts the control unit that the button has been pressed through an audio or visual alarm. The staff member monitoring the intercom system from the control unit can see or hear the alert, open a communication channel with the appropriate cell or dorm, and electronically communicate with the incarcerated person to understand the reason the intercom was activated.

49.    Intercoms are an important part of a jail's safety system, especially for people who are housed in cells (whether single, double, or triple-bunked cells).  In many jails, especially those that are understaffed or do not utilize direct supervision models, staff are not physically within line of sight or hearing distance for many incarcerated people.  While staff typically conduct regular rounds and safety checks, there are significant times during which staff are not located near a cell, dorm, or dayroom when an emergency may occur.  At those times, an intercom is the only way for incarcerated people to contact staff to alert jail staff of the emergency and ensure the appropriate personnel and resources respond.

50.    When intercom systems do not work properly or when appropriate policies are not in place or not followed to ensure timely responses, safety is compromised.  The time between safety checks and physical rounding can be too great to render appropriate assistance, for example in the case of a medical

emergency such as cardiac arrest or a suicide attempt.  Where people are double- or triple-celled, there may be an excessive delay in responding to an internal assault. If the intercom system is not functioning appropriately, it can cause a delay in staff response that can result in severe injury or death.  This is especially the case in San Diego where the safety check policy only requires hourly safety checks.

51.    Numerous problems involving the Jail's intercom system have been documented as far back as 2016.  Many of those appear to involve a combination of mechanical issues (i.e., pressing a call box does not send an audio or visual alert to the control unit) and policy and training issues (i.e., staff muting the audio or visual alerts in the control unit or outright ignoring those alerts).

52.    Specifically related to mechanical issues, a Detention Services Bureau report issued in 2020 indicated twenty-seven facility maintenance issues related to intercom systems across the Jail system.  As recently as March 12, 2022, a defective intercom prevented deputies from hearing a "man down" notice that resulted in an incarcerated person being placed on life support.  Sepulveda Decl., ¶ 3.  During a fight that broke out between two cellmates, one cellmate pressed the call box to report a "man down." *Id.*  Staff did not respond. *Id.*  A few minutes later, an incarcerated person in an adjacent cell heard what sounded like a head being slammed into a wall. *Id.*  The cellmate who participated in the fight then reported to another incarcerated person in the dayroom that he had just killed his cellmate. *Id.*  A few days later, the incarcerated person in the adjacent cell learned from staff that the intercom's audio indicator in the control room was not working, so when the intercom button was pushed during the fight, it did not make any sound to alert custody staff. *Id.* at ¶ 5.

53.    In addition to the documented mechanical problems with the Jail's intercom system, the Jail lacks appropriate policies, procedures, and training for regularly testing of the intercom systems, which for years have resulted in substantial harm and/or death to incarcerated people. For example, the current

policy states the following:

> "Intercoms should be observed by staff during safety checks and/or
> hygiene inspections.  If an intercom is found to be intermittently
> operable, it should be reported as soon as practical before it becomes
> completely inoperable."

Policy I.2, Intercom Systems.  This policy is vague and inadequate.  The policy
should mandate that staff proactively test the intercom system by conducting
regular audits of the intercom system.  The policy should also require that a
defective intercom be reported *immediately* to maintenance and that any cell with
an inoperative intercom unit receive accelerated safety checks (*e.g.,* every 30
minutes, depending on the type of housing unit) until the unit is repaired.

54.    The resulting effect of broken intercoms and staff inaction to
emergency calls is that the Jail is not following its own intercom policies.  For
example, the Jail's intercom policy requires "sworn staff assigned to positions
equipped with intercom systems [to] check their work area's touch screen panel,
control panel, etc. and ensure intercoms have not been silenced or muted."  Manual,
Policy I.2.  However, the DRC Experts' Report on the San Diego Sheriff's Suicide
Prevention Program found that "monitoring panels in control booths were at times
set to mute and staff did not adequately monitor alert lights in the control booths."
The result, the report found, was that staff can miss "emergencies and calls for help
from inmates."

55.    Similarly, the Jail's policy also requires Central Control to "monitor all
systems for facility alarms, radio traffic, intercoms and camera systems."  Manual,
Policy I.61.  It assigns Central Control primary responsibility "for reporting any
malfunctions or failures for repair [and requires] Central Control [to] utilize
systems to determine locations in need of assistance or investigation and will direct
staff to appropriate location."  *Id.*  Based on the incidents detailed below, this is
obviously not occurring at all times.

56.    For example, on February 12, 2016, an incarcerated person died after hanging himself in his cell.  The CLERB investigation into that matter found that the decedent's cellmate pressed the intercom button in his cell between four and ten times to call for help but no one answered the intercom.  The staff member responsible for monitoring the intercom system stated that the system had been muted prior to the beginning of his shift and that he did not customarily check the monitor to see if any incarcerated persons were seeking assistance until thirty minutes after he arrived in the control room to begin his shift.  Muting the call button for that long and not assessing the alert panel for thirty minutes violated the Jail's own internal policies.  *See* Manual, Policy I.2.

57.    Several incarcerated persons have reported that Jail staff routinely ignore intercom requests for assistance.  One individual reported that he was choking on food and pushed the call button, but no one responded for 20-30 minutes.  *See* Dunsmore Decl., ¶ 36.  In November 2021, two cellmates reported that for several *days*, they repeatedly pushed the call box in an attempt to obtain medical care for a cellmate who was having trouble breathing.  *See* LaCroix Decl., ¶ 6; Keavney Decl. ¶¶ 5-6.  After days of no response from custody staff to their emergency calls, their cellmate died.  *Id.*  Another person reported that in October 2021, the man in the cell next to him fainted.  *See* Lopez Decl., ¶ 8.  Several people in the housing unit pressed call boxes to summon staff; however, staff ignored the call and took more than five minutes to respond.  *Id.*  The man that people were concerned about had to be hospitalized due to staff's delays associated with this incident.  *Id.*  Staff have also ignored an incarcerated person's intercom request to use the toilet, after specifically directing him to use the intercom when he needed to use the bathroom given that the toilet in his cell was broken.  Sepulveda Decl. ¶ 4.

58.    I have reviewed the proposed preliminary injunction order that Plaintiffs have requested in this case.  For the intercom system, Plaintiffs ask that the SDSD develop a plan to repair any non-functional elements of the intercom and

emergency button system, regularly test the system to ensure functionality and identify and remediate inoperable intercom components, ensure that when any elements of the intercom and emergency button system becomes inoperable, they are timely repaired (*i.e.,* within 2 calendar days), ensure that Jail staff are properly trained to respond and do response to emergency calls within the Jail, and revise policies and procedures and training materials as necessary.  Doing so will reduce the risk of injury and death for residents of the Jail.

### III.    The Jail's Video Surveillance System Fail to Ensure Safety

59.    Video surveillance systems are a necessary component of a jail's safety and security program.  Jails throughout the country are equipped with video cameras, monitors, and recording devices to control movement and monitor events throughout the jail.  These cameras, monitors, and recording devices are part of a video surveillance system that enable staff to maintain safety and security by monitoring and recording areas in which staff cannot be at all times.

60.    In many jails, staff are not physically within the line of sight or hearing distance for the majority of incarcerated people.  While staff typically conduct regular rounds and safety checks, it is impossible for staff to be present in all spaces at all times.  A video surveillance system allows staff to monitor multiple locations simultaneously.  When emergencies do occur, a video surveillance system allows staff to be alerted immediately and to respond appropriately.  After an incident occurs, a video surveillance system also facilitates investigation by providing a visual record of what occurred.  Further, a well-functioning video system deters both staff and incarcerated people from engaging in assaultive behavior and other violations of jail policies.  In order to fulfill these purposes, an adequate video surveillance system must ensure comprehensive camera coverage, be functioning properly, and staff must be trained on how to properly operate the system.

61.    When video surveillance systems do not work properly or when appropriate policies are not in place or not followed, safety and security are

compromised.  If a video surveillance system is not functioning appropriately, it can cause a delay in staff response that can result in severe injury or death.  Staff and incarcerated people within a jail can also take advantage of an ineffective video surveillance system by finding areas not covered by cameras to violate policies and procedures, engage in physical violence, conceal contraband, or otherwise violate jail policies and jeopardize health and safety.  An insufficient video surveillance system also can erode public trust in law enforcement by impeding investigations into deaths and other incidents that occur within a jail.  In addition, the lack of well-functioning video system makes it difficult for supervisors to properly audit the frequency and quality of safety checks.

62.    The Jail's inadequate video surveillance and intercom systems, coupled with its ineffective safety check policies and practices, are resulting in a significant number of assaults within the Jail facilities.  In 2021, there were over 1,100 recorded assaults that were either resident-on-resident or resident-on-staff. With an average Jail population of 3,967 in 2021, the overall assault rate was 28.0 per 100 Jail population and the resident-on-resident assault rate was 24.5 per 100 Jail population.  Statistically, this means that if someone spends a year in the Jail, there is a 25% chance that the individual will be assaulted by another resident. These rates are extraordinarily high.  For example, the California Department of Corrections and Rehabilitation has an annual rate, on average, of 6 per 100 prison population.  Similarly, Santa Clara County jail system's average annual rate is only 11 per 100 jail population.

63.    Based on the documentation I have reviewed it appears that the Jail's video surveillance systems provide insufficient coverage, are outdated, and are overdue for repair.

64.    As early as 2013-2014, the San Diego County Grand Jury Report noted that existing video surveillance equipment at the Jail is antiquated and produces fuzzy picture quality.  It also lacks features found in modern equipment

such that personnel are unable to properly view unfolding events such as fights and be able to identify the participants.  In addition, video cameras do not capture all areas of the Jail facilities, compromising safety.

65.    The Jail's failure to maintain functional cameras and adequate coverage results in the substantial risk that incarcerated people will suffer harm and/or death.  Some incarcerated people described the Jail as a "very dangerous place because fights regularly occur without any intervention from custody staff." Glenn Decl., ¶ 7.  George Bailey has become widely known as "the Thunderdome" or "the Dome" because there are so many fights at this facility.  *Id.*  These fights often occur in a part of the housing unit called "the Pocket" that cameras do not cover.  *Id.*  Bad actors frequently use "the Pocket" to enforce informal disciplinary codes and otherwise settle scores.  *Id.*

66.    Broken cameras within the video surveillance system prevent investigations into whether staff adequately perform their responsibilities to ensure individuals' safety.  For example, on May 17, 2020, an incarcerated person committed suicide by hanging himself in his cell.  The CLERB investigation into the incident was hampered because the Jail's video surveillance system "lapsed," which prevented the Board from determining whether staff conducted an appropriate safety check on the decedent the hour before he was found unresponsive.

67.    News media have reported that on November 21, 2020, the camera inside a holding cell where an incarcerated person died of cardiac arrest was not functioning.  *See Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds*, THE SAN DIEGO UNION-TRIBUNE, Kelly Davis and Jeff McDonald, December 6, 2021.  The article indicates not only that the SDSD is aware that the cameras are inoperable and otherwise deficient, *but that SDSD does not intend to immediately remedy these issues*.

68.    In fact, the deficiencies in the Jail's video surveillance system have

1  been unaddressed for nearly a decade.  In 2014, the San Diego County Grand Jury

2  recommended the Jail update the surveillance system.  It made a similar

3  recommendation in 2017.  Nonetheless, the outdated video surveillance system

4  remains a significant problem.  In February 2022, the State Audit noted that the Jail

5  had "still not replaced the surveillance system at its largest detention facility, even

6  though its age is a major safety issue."

7      69.    The SDSD knows of the deficiencies with its video surveillance

8  system yet *nothing is being done to fix the problems*.  In a press release issued on

9  March 4, 2021, following the death of an incarcerated person, the SDSD indicated

10  it was "dissatisfied with our current camera system and recording capabilities, and

11  we recognize the need for improvements."  *See* Email from Media Relations to

12  William Gore, Kelly Martinez and Erika Frierson (December 10, 2021).  The SDSD

13  also recognized that its "inability to tell the entire story or to be completely

14  transparent when incidents in the jail occur, is unacceptable."  *Id.*  Nonetheless,

15  nine months later, an internal SDSD email indicated the ineffective cameras were

16  still an issue that had not been addressed.  *Id.*

17      70.    I understand that on April 26, 2022, the San Diego Board of

18  Supervisors authorized the SDSD to expand its body-worn camera pilot program to

19  all deputies in detention facilities.  County of San Diego, April 26, 2022 Board of

20  Supervisors Agenda Item re *Sheriff's Department – Request to Waive Board Policy*

21  *A-87 and Enter a Contract with Axon for Body-Worn Camera System*.  Body-worn

22  cameras are not in any way a substitute for a functional video surveillance system

23  (even if the video system uses fixed cameras that are active at all times).

24      71.    Body-worn cameras, when properly maintained and used by trained

25  staff who keep the cameras "on" during their shifts, are used to record events within

26  orientation and line of sight of the person wearing the camera.  Body-worn cameras

27  are helpful to improve evidence collection, to strengthen officer performance and

28  accountability, to enhance agency transparency, to document encounters between

1  police and the public, and to investigate and resolve complaints and officer-

2  involved incidents.  It remains to be seen how quickly the cameras are purchased

3  and deployed, how well trained the deputies are on the new equipment, and whether

4  the video is retained and useful.

5       72.    By themselves, body-worn cameras are incapable of performing the

6  vast majority of the functions of the video surveillance system discussed above.

7  Body-worn cameras do not monitor multiple locations simultaneously, assist with

8  controlling movement throughout the jail, or record areas in which an officer is not

9  present.  As Judge Wilkin recognized in her March 11, 2021 opinion in *Armstrong*

10  *v. Newsom*, body-worn cameras improve safety "particularly when used in

11  conjunction with surveillance cameras."  *Armstrong v. Newsom*, No. 94-cv-02307

12  CW, 2021 WL 933106 at *20 (N.D. Cal. March 11, 2021).  Despite their benefits,

13  body worn cameras by themselves will not solve the safety and security issues at

14  the Jail, especially, for example, if an officer is not present, is not within the line of

15  sight when a safety issue occurs, or does not have the body-worn camera turned on.

16  Body-worn cameras by their very nature require a deputy to be present, and thus

17  have a limited role.  Therefore, both up-to-date intercom and video camera systems

18  in housing units are still necessary to reduce the risk of harm to incarcerated

19  persons and to ensure safety checks are conducted properly.

20       73.    I have reviewed the proposed preliminary injunction order that

21  Plaintiffs have requested in this case.  For the video surveillance system, Plaintiffs

22  ask that the SDSD develop a plan to replace all outdated and non-functional

23  elements of the video surveillance system at the Jail; develop a plan to ensure that

24  when any video surveillance cameras at the Jail become non-functional in the

25  future, they are timely identified and repaired; and that individuals not be housed in

26  units without adequate video surveillance coverage.  Doing so will reduce the

27  substantial risks of harm that incarcerated persons face as a result of the Jail's

28  inadequate video surveillance system.

1

2

**IV.    The Jail's Safety Check Policies and Practices are Inadequate**

    **A.    The Inadequacy of Safety Checks Poses a Substantial Risk of
Harm to Incarcerated People**

3    74.    Performing adequate safety checks in the housing units – especially in

4    the cells – is a critical component of ensuring the wellbeing of incarcerated people.

5    Conducting adequate safety checks is one of the most effective means of routinely

6    monitoring for medical and mental health distress and criminal activity.

7    Nonetheless, the California State Auditor's recent review of 30 in-custody deaths in

8    the Jail found instances in which deputies performed these checks inadequately.

9    Auditor of the State of California, San Diego County Sheriff's Department, *It Has*

10    *Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its*

11    *Custody*, February 2022, Report 2021-109 (the "State Audit Report") at 2.  For

12    example, based on a review of video recordings, the State Auditor "observed

13    multiple instances in which staff spent no more than one second glancing into the

14    individuals' cells, sometimes without breaking stride, as they walked through the

15    house module." *Id.* In some instances, when staff members eventually checked

16    more closely, they found that the individuals showed signs of having been dead "for

17    several hours." *Id.*  If staff had performed adequate safety checks, they may have

18    been able to provide timely medical assistance to these individuals and prevented

19    their deaths.

20    75.    The Jail's current safety check policy merely requires staff members to

21    conduct safety checks "at least hourly through direct observation." *Id.* at 3; *see also*

22    Policy I.64, Safety Checks; Inmates, Housing and Holding Areas.  A proper policy

23    would require a more detailed and accelerated check that is based on the

24    classification level of the incarcerated person.  For example, people assigned to

25    restricted housing units should have safety checks ranging from 15 to 30 minutes as

26    opposed to hourly checks.

27    76.    Other observers have made the same recommendations. The State

28    Audit Report recommended that the SDSD revise its safety check policy to require

1    staff to check that an individual is still alive without disrupting the individual's
2    sleep. *Id.* at 54.  In response, the SDSD stated that it would "reevaluate" its current
3    policy and incorporate "best practices." *Id.* at 108.  SDSD did not explain how or
4    when it intends to modify its current policy, nor did it identify any specific "best
5    practices."  SDSD also stated that it was "exploring technologies to assist with
6    monitoring a 'proof of life' for all incarcerated individuals with minimal sleep
7    interruption through staff contact." *Id.*  The SDSD did not state the types of
8    technologies it was exploring or how it would ascertain "proof of life."

9       77.    I have reviewed the proposed preliminary injunction order that
10   Plaintiffs have requested in this case.  For safety checks, Plaintiffs ask that the
11   SDSD reform its policies and procedures to require custody staff to ascertain that
12   each individual is still alive without disrupting the individual's sleep.  Plaintiffs
13   request that safety checks occur at least once every 30 minutes at irregular and
14   unpredictable intervals of all incarcerated people held in isolation (*i.e.*, cells with 2
15   hours or less daily out-of-cell time, including in Administrative Segregation, in
16   Administrative Segregation Overflow, or on Lockdown (or "Bypass") status).
17   These reforms are necessary to ensure that security staff can adequately monitor the
18   Jail population for signs of safety, medical, or mental health distress, and intervene
19   in a timely manner if individuals are in need of assistance.

20       **B.    The Jail's Policies and Practices for Reviewing Safety Checks are**
21           **Inadequate and Ineffective**

22       78.    The Jail's policies for reviewing the adequacy of safety checks are
23   inappropriate and, in some instances, not documented.  The policies require
24   supervisors to review logs to ensure checks were recorded within the required time
25   periods, but they do not stipulate that this review should include examining video
26   surveillance to confirm checks were conducted in a "timely and appropriate
27   manner." *Id.* at 26; *see also* Policy I.64, Safety Checks; Inmates, Housing and
28   Holding Areas.  While the SDSD claims that it has an informal process for

1    assessing the quality of safety checks, which can include reviewing video footage,

2    this process has not been documented.  State Audit Report at 26.

3        79.    In order to ensure the adequacy of safety checks, there should be

4    regular audits of the quality of safety checks that go beyond a mere review of the

5    safety check logs.  Such audits should entail supervisors reviewing videos of

6    randomly selected units and shifts that capture staff conducting safety checks.  As

7    part of the Jail's re-classification process, incarcerated people should be asked if

8    they are aware that safety checks are being made and how often they occur.

9    However, the Jail has no formal reclassification process that would require all Jail

10    residents to be formally re-classified every 60 days (which is the standard used in

11    other jails).  The reclassification process should also require a face-to-face

12    interview with the resident, which would allow the classification staff to determine

13    any security issues that incarcerated people have regarding the availability of drugs

14    in the jail, safety checks, and other related safety and security issues.

15        80.    The State Audit Report also recommended that the SDSD develop and

16    implement a formal policy requiring that supervisors conduct audits of at least two

17    randomly selected safety checks from each prior shift.  *Id.* at 55.  According to the

18    State Audit Report, these audits should include a review of the applicable safety

19    check logs and video footage to determine whether the safety checks were

20    performed adequately.  *Id.*  In addition, the State Audit Report stated that the policy

21    should require higher-ranking staff to conduct weekly and monthly audits of safety

22    checks.  *Id.*  In response, the SDSD stated that its line supervisors already conduct

23    electronic log reviews each shift and that this review "includes ensuring the

24    timeliness of safety checks."  *Id.* at 109.

25        81.    Simply conducting log reviews to simply see if a cell was checked

26    every 60 minutes would not detect those staff falsifying the data or not conducting a

27    meaningful observation of the incarcerated people in each housing unit.  In the

28    absence of effective audits, staff often learn that failures to adhere to safety check

1    policy and protocol will not be detected by supervisors.

2         82.    The SDSD has stated that its current practice requires supervisors to

3    conduct video audits of random safety checks and that it would formalize this

4    practice into policy. *Id.* Until that audit process is formally documented and

5    implemented with the necessary level of staff training, one must assume that it is

6    inadequate.

7         83.    I have reviewed the proposed preliminary injunction order that

8    Plaintiffs have requested in this case. For safety check audits, Plaintiffs ask that the

9    SDSD develop formal policies and procedures for supervisors to audit safety

10   checks by custody staff to ensure those checks have actually occurred, with

11   appropriate accountability and quality assurance measures taken to address

12   deficiencies. From a safety and security standpoint, it is critical that safety checks

13   be conducted timely and effectively to protect incarcerated people. These formal

14   policies and procedures regarding safety check audits are necessary to ensure that

15   safety checks are being conducted properly.

16        I declare under penalty of perjury under the laws of the United States and the

17   State of California that the foregoing is true and correct, and that this declaration is

18   executed at Camden, South Carolina on May 1, 2022.

19

20                                                    James Austin

21

22

23

24

25

26

27

28

DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# EXHIBIT A

# James Austin, Ph.D.

## MAJOR POSITIONS HELD

| | |
|---|---|
| 2003 – Present | *Founder, The JFA Institute*, Washington, D.C. |
| 1999 -2003 | *Research Professor and Director, Institute for Crime, Justice, and Corrections*, Department of Sociology, The George Washington University, Washington, D.C. |
| 1982 - 1998 | *Executive Vice President*<br>National Council on Crime and Delinquency<br>San Francisco and Washington, D.C. |
| 1974 - 1982 | *Research Associate*<br>National Council on Crime and Delinquency<br>San Francisco |
| 1970 - 1974 | *Correctional Sociologist*<br>Illinois Department of Corrections<br>Joliet, Illinois |

## EDUCATION

| | |
|---|---|
| B.A. | 1970, Wheaton College, Wheaton, Illinois, Sociology |
| M.A. | 1975, De Paul University, Chicago, Illinois, Sociology |
| Ph.D. | 1980, University of California, Davis, California, Sociology |

## RELEVANT PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2019 – present | *Director*, Cost benefit analysis of the Los Angeles County Jail System to determine how best to lower the county jail population to allow closure of the Men's Central jail facility (funded by Los Angles County Auditor-Controller). |

| | |
|---|---|
| 2019 – present | Director, implementation of an objective jail classification system for the Alameda County Sheriff (funded by Alameda County). |
| 2015 – present | *Director,* MacArthur Foundation Safety and Justice Challenge in which JFA is responsible for working with 20 local counties to design and implement plans to lower current jail populations by 15-30%. |
| 2012 - present | *Director,* Orleans Parish Prison Population Projections and Jail Reduction Strategic Plan (City of New Orleans). |
| 2016 – 2019 | *Director,* Maryland Department of Public Safety and Correctional Services, Technical Assistance (Open Society Institute-Baltimore). |
| 2015 | *Director*, Court Services and Offender Supervision Agency  (CSOSA) Best Practices Evaluation. (CSOSA). |
| 2014 - 2018 | *Director,* Validation study of the San Francisco Adult Probation Risk and Needs Assessment System (COMPAS), San Francisco County. |
| 2005 – 2014 | Director, Design and Evaluation of the Maryland Department of Public Safety and Corrections (MDPSC) Risk and Case Management System (Parole, Probation and Prison).  MDPSC and Open Society Institute-Baltimore. |
| 2014 - 2015 | Master Jail Plan, Sonoma County. |
| 2011 – 2016 | Monitor, Consent Decree, Walnut Group Correctional Facility, Mississippi Department of Corrections (adult and juvenile populations) |
| 2010 – 2014 | Consultant. Technical Assistance on Solitary Confinement in Maryland, New Mexico, and Illinois. Vera Institute. |

Ex. A
3

| | |
|---|---|
| 2011 – 2015 | Director, Los Angeles County Sheriff Jail Population Projections and Impact of AB 109.  Funded by Public Welfare Foundation. |
| 2013-2014 | Evaluation of the Contra Costa Probation Department's Response to AB 109- Realignment. |
| 2012-2013 | Evaluation of Alternatives to Incarceration, San Diego County. |
| 2012 – 2013 | Evaluation of the Short-Term Technical Violation Pilot Study. U.S. Parole Commission. |
| 2012 | Co-Director. Evaluation of the Oklahoma Administrative Segregation System. Oklahoma Department of Corrections. |
| 2011 - 2012 | Consultant. Study of Colorado Administrative Segregation System. Colorado Department of Corrections and National Institute of Corrections, U.S. Department of Justice. |
| 2010 – 2011 | Co-Director, Revalidation of the Texas Pardon and Parole Board System. Texas Pardon and Parole Board. |
| 2009 – 2012 | Director, Prison Population-Justice Re-investment Initiative. Pew Charitable Trusts. |
| 2010 – 2011 | Special Consultant, Jail Population Projection Study, US Department of Justice and Orleans Paris. |
| 2008 – 2009 | Special Consultant, Administrative Segregation/Super Max Parchment Study. Mississippi Department of Corrections and ACLU |
| 1998 – 2011 | *Director,* Correctional Options Program (Bureau of Justice Assistance,  U.S. Department of Justice) |
| 2007 – 2008 | *Director*, Harris County Pretrial Services Re-Validation Risk Assessment Study. (Harris County, Texas). |
| 2006 | *Director,* Evaluation of Factors that Contribute to Halfway House Escapes, District of Columbia. (District of Columbia). |

Ex. A
4

| | |
|---|---|
| 2006 | *Director.  Evaluation of the District of Columbia* Department of Corrections Prisoner Classification System (DC DOC). |
| 2005 – 2008 | Director, Montgomery Pretrial Services Risk Assessment Validation Study. (Bureau of Justice Assistance,   U.S. Department of Justice). |
| 2003 – 2006 | *Director*, Assessment of Sexual Assault in the Texas Prison System. (National Institute of Justice). |
| 2002 | *Director,* District Of Columbia, Department of Corrections: Analysis Of Inmate Population And Ten-Year Population Projection 2002 – 2012 (DC Government). |
| 2002 – 2006 | *Director,* Parole Guidelines System Project, Maryland Parole Commission.  (Baltimore Open Society Institute). |
| 2003 – 2006 | *Director*, Validation Study of the Alameda County Juvenile Detention Risk Assessment System (Alameda County, California). |
| 2002—2006 | *Independent Expert,* Office of Youth Development, Louisiana Department of Public Safety and Corrections, Jointly Appointed by State of Louisiana and U.S. Department of Justice, Civil Rights Division |
| 2003-2004 | *Director,* Evaluation and Redesign Of Systems For Berks County Pretrial and Sentenced Populations. (Berks County, PA). |
| 2002 – 2003 | *Director*, Validation of the Pennsylvania Parole Guidelines. Pennsylvania Board of Probation and Parole. (Pennsylvania Commission on Crime and Delinquency). |
| 2001 – 2003 | *Director,* Development of the Kentucky Parole Risk Assessment System.  Kentucky Parole and Pardon Board. |

| 1998 – 2004 | *Monitor*, Georgia Juvenile Justice Corrections System, Jointly Appointed by State of Georgia and U.S. Department of Justice, Civil Rights Division. |
|---|---|
| 1997 - 2002 | *Director*, National Technical Assistance Program for External Prison Classification Systems (Oregon, Wisconsin, Virginia, Tennessee, Texas, Oklahoma, and Montana) (National Institute of Corrections) |
| 1996 - 2002 | *Director,* National Technical Assistance Program for Internal Prison Classification Systems (Washington State, Oregon, Missouri, South Dakota, Connecticut, Colorado, and Florida) |
| 1996 - 1999 | *Director*, National Survey of Juveniles in Adult Correctional Facilities (Bureau of Justice Assistance), GWU. |
| 1996 - 1999 | *Director,* National Multi-Site Boot Camp Evaluation (Adult and Juvenile) (National Institute of Justice), GWU. |
| 1995 - 1999 | *Director*, Evaluation of "Three Strikes and You're Out" Laws in California and Nationally, (National Institute of Justice), NCCD |
| 1996 - 1999 | *Director*, National Survey of Privatization in Corrections (adult and juvenile facilities) (Bureau of Justice Assistance), NCCD. |
| 1992 - 1997 | *Director*, Correctional Options Evaluation (National Institute of Justice and Bureau of Justice Assistance), NCCD |
| 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Youth Services Agency (YSA) operations, classification system, staffing levels, physical plant, mental health, information services and program services, (National Institute of Corrections, Bureau of Prisons), NCCD |
| 1992 - 1997 | *Director*, National Structured Sentencing Evaluation (Bureau of Justice Assistance), NCCD |
| 1995 - 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Corrections operations, |

classification system, staffing levels, and physical plant, including, comprehensive cost analysis of long-term options for the Lorton Complex, (National Institute of Corrections, Bureau of Prisons), NCCD

1991 - 1997       *Director*, Design and Implementation of the New York City Department of Corrections Objective Jail Classification System (Consent Decree, New York City Department of Corrections), NCCD

1991 - 1995       *Director*, Philadelphia Prison System Classification and Population Projections Project (Consent Decree, City of Philadelphia), NCCD

1991 - 1994       *Director*, Evaluation of Jail Drug Treatment Programs (National Institute of Justice), NCCD

1990 - 1993       *Director*, Evaluation of the Los Angeles Sheriff's Boot Camp Program (National Institute of Justice), NCCD

1991 - 1993       *Director*, Design and Implementation of the Cook County Objective Jail Classification System (Cook County Sheriff's Department), NCCD

1990 - 1991       *Director*, California Assessment of the Overrepresentation of Minority Youth in Juvenile Justice (Office of Criminal Justice Planning), NCCD

1988 - 1992       *Director*, Experimental Test of Electronic Monitoring Program, Oklahoma Department of Corrections (National Institute of Justice), NCCD

1987 - 1992       *Director*, Experimental Test of the Prison Management Classification System (National Institute of Corrections and Washington Department of Corrections), NCCD

1986 - 1990       *Director*, National Jail Classification Project (NIC), NCCD

1985 - 1987       *Co-Director*, California Youth Authority Parole Risk Study (Packard Foundation and CYA), NCCD

1984 - 1986       *Co-Director*, Study of Institutional Violence at San Quentin (Consent Decree, California Department of Corrections, NCCD

| 1982 - 1987 | *Co-Director*, Experimental Study of Juvenile Court Probation Services, Salt Lake City, Utah (OJJDP), NCCD |
| 1983 - 1985 | *Co-Director*, Illinois Department of Corrections Early Release Evaluation (NIJ), NCCD |
| 1980 - 1984 | *Co-Director*, Supervised Pretrial Release Test Program (NIJ/LEAA), NCCD |
| 1981 - 1983 | *Co-Director*, Evaluation of California AB2 Bail Reform Act (OCJP), NCCD |
| 1980 | *Senior Research Associate*, California Alternatives to Incarceration Study (State Legislature), NCCD |

## SPECIAL APPOINTMENTS

| 2006 – 2007 | Expert Panel on Adult Offender and Recidivism Reduction Programming, California Department of Corrections and Rehabilitation |
| 2003 | Advisory Committee, The Little Hoover Commission Report on California Prison System |
| 1999- 2003 | Chair, National Policy Committee, American Society of Criminology |
| 1987 - 1994 | Trustee, Robert Presley Institute of Corrections Research and Training |
| 1991 | Governor's Task Force on Prison Crowding, State of Nevada |
| 1988 | Governor's Task Force on Corrections, State of Oregon |
| 1981, 1986 | National Academy of Sciences, National Panels on Sentencing and Prison Overcrowding |

## EXPERT WITNESS/LITIGATION

Ex. A
8

| | |
|---|---|
| 1987 - 1989 | Office of the Special Masters, <u>Ruiz v. Lynaugh</u>, Evaluation of the TDC Classification System and Inmate Violence |
| | Appointed by Court to produce evaluation report of classification system to determine if inmate violence had been reduced. |
| 1989 - 1991 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. State of Florida: Florida Department of Corrections, et al.</u>, Case No. TCA 86-7330 (N.D. Fla) |
| | Expert Witness Retained by Plaintiffs to determine whether women should be excluded from certain post positions in the DOC. |
| 1990 - 1991 | King County (Seattle, Washington) District Attorney's Office, <u>Hammer v. King County</u> |
| | Expert Witness Retained by Defendants to determine if minority staff was being discriminated against. |
| 1990 - 1991 | Office of the Attorney General, State of Texas, <u>Lamar v. Collins</u> |
| | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1991 | Office of the Attorney General, State of Texas, <u>Alberti v. Sheriff of Harris County, et al.</u>, No. CA-H-72-1094 |
| | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1991 - 1992 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. The Parish of Orleans Criminal Sheriff's Office</u> |
| | Expert Witness Retained by Plaintiffs to determine the appropriateness of excluding females from certain post positions within the jail. |
| 1991 - 1994 | <u>Calvin R. vs. Illinois Department of Corrections</u>. Consent Decree. |

Appointed by Court to produce evaluation of classification system and to implement internal classification system to reduce inmate violence.

1995      <u>International Fidelity Insurance Co. et al. v. Charles Nobel et al</u>: In the United States District Court of the Southern District of Texas, Houston Division.

Expert Witness Retained by Defendants to determine the Failure to Appear rates for defendants released on surety bond versus O.R.

1995      <u>Sandra Herrera, et al., v Pierce County, et al.</u>

Retained by Plaintiffs to evaluate whether inmates were being properly classified and housed in the local jail.

1995 - 1996      <u>Montoya v. Gunter, et al.</u>

Retained by Defendants to determine whether inmate who was killed while incarcerated had been properly classified and housed.

1995 - 1997      <u>Inmates A,B,C and D v. Illinois Department of Corrections</u>
Consent Decree

Appointed by Court to produce evaluation of the level of control of housing and job assignments by gangs.

1995 - 2002      <u>USA v. Michigan</u> and <u>Cain v. Michigan</u> Consent Decrees

Expert witness retained by Defendants to help Department of Corrections reach compliance with court order regarding classification system.

1996      <u>Rentschler v. Carnahan et al.</u>

Retained by Defendants to evaluate the impact of crowding at the Colorado maximum security prison.

1997      <u>Carlos Morales Feliciano v. Pedro Rossello Gonzales</u>
Consent Decree

Ex. A
10

Retained by Special Master to conduct a comprehensive assessment of the inmate classification system that was designed and partially implemented by the Administration of Corrections.

1998 - 1999    Southern Ohio Correctional Facility (Civil Action No. C-1-93-436).

Retained by the Ohio Department of Rehabilitation and Correction to serve as an expert witness on classification issues as they pertain to the Lucasville riot.

1998 - 1999    Busey et al. v.  Corrections Corporation of America

Retained by CCA to develop an objective classification system for the Youngstown facility and have all inmate's properly classified according to the classification criteria. No expert report, deposition or court testimony.

1998 - 2000    Holloway, et al., v. King County

Retained by plaintiff's counsel to examine the validity of client's claims that sexual harassment of female correctional officers by male inmates was being encouraged by male correctional officers and departmental policy. Declaration and deposition.

2001    Gartrell et al., v. Ashcroft et al.

Retained by plaintiffs to examine if BOP inmates placed in Virginia Department of Corrections are unnecessarily having their expression of religious freedoms unnecessarily restricted? Report submitted but no deposition or court testimony.

2001 - 2005    Austin, et al., v. Wilkinson, et al.

Retained by defendants to examine the classification process used to assign inmates to the Ohio State Penitentiary – a high maximum security prison. Expert report but no deposition or testimony.

| 2008- present | Plato and Coleman v. Schwarzenegger. |
|---|---|
| | Retained by plaintiffs to develop plan to depopulate the California Prison Population. Reports submitted and deposed by defendants, two expert reports submitted and court testimony. |
| 2013 - 2014 | Coleman v. Brown |
| | Expert declaration, deposition and court testimony in support of plaintiff's motion regarding mentally ill inmates in segregation. |
| 2012 | Louis Henderson, et al., v. Kim Thomas |
| | Expert declaration and testimony on behalf of plaintiffs on the appropriateness of segregating inmates based on HIV status (Alabama). Court ruled in favor of plaintiffs. |
| 2016 - 2019 | Mark Duke, et al., vs. Jefferson S. Dunn |
| | Expert declaration on behalf of plaintiffs on proper classification of inmates at the St. Clair prison facility (Alabama). Stipulated agreement designated Dr. Austin as expert for the DOC to implement reforms. |
| 2016 - present | Stephen Rudisill v. Charles Ryan |
| | Appointed as expert to monitor stipulated agreement where the Arizona Department of Corrections agrees to desegregate their inmate population in housing and program assignments. |
| 2019 | Orange County (California) Jail DOJ Investigation |
| | Retained by the U.S. Department of Justice Civil Rights Division to conduct an evaluation of the Orange County Jail Inmate Classification System. |

# MAJOR PUBLICATIONS

## Books

| 2011 | It's About Time: America's Imprisonment Binge (with John Irwin), 4th Edition, Cengage, Publishing. |
|---|---|

| | |
|---|---|
| 1993 | <u>Reinventing Juvenile Justice</u> (with Barry Krisberg), Beverly Hills, CA: Sage Publications. |
| 1978 | <u>The Children of Ishmael: Critical Perspectives on Juvenile Justice</u> (with Barry Krisberg), |

## **<u>Articles</u>**

| | |
|---|---|
| 2010 | "Reducing America's Correctional Populations", 2001. Justice Research and Policy, Vol, 12, No. 1, pp,1-32. |
| 2009 | "Prisons and the Fear of Terrorism."  August 2009. Criminology and Public Policy. Vol., Issue 3: 641-649. |
| 2009 | "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs." 2009. Criminal Justice and Behavior. Vol. 36, No. 10: 1025-1037. |
| 2006 | "How Much Risk Can We Take?  The Misuse of Risk Assessment in Corrections."  2006.  Federal Probation. Vol. 70, No. 2: 58-63. |
| 2004 | Richards, Stephen C., James Austin, and Richard S. Jones. 2004. "Thinking About Prison Release and Budget Crisis in the Blue Grass State." Critical Criminology: An International Journal, Vol. 12, No.3: 243-263. |
| 2004 | Richards, Stephen C., James Austin, and Richard S. Jones. 2004. "Kentucky's Perpetual Prisoner Machine: It's All about Money." Review of Policy Research, Vol. 24, No. 1 (at press). |
| 2003 | "Why Criminology Is Irrelevant", <u>Criminology and Public Policy</u>, Vol. 2, No.3: 557-564 |
| 2003 | "Three Strikes Laws", in <u>Current Controversies in Criminology,</u> Ronald Weitzer, ed., Prentice Hall: Upper Saddle River, NJ. |
| 2003 | "The Use of Science to Justify The Imprisonment Binge", <u>Convict Criminology</u>, Jeffrey Ian Ross and Stephen C. Richards, eds., Wadsworth: Belmont, CA. |

| | |
|---|---|
| 2003 | "Its About Time:  America's Imprisonment Binge", <u>Punishment and Social Control</u>, Aldine De Gruyter: New York, NY. |
| 1999 | "Are We Better Off? Comparing Private and Public Prisons in the United States", <u>Current Issues in Criminal Justice</u>. Vol. 11 (2): 177-201. |
| 1999 | "The Impact of 'Three Strikes and You're Out'", <u>Punishment and Society</u>, Vol 1(2): 131-162. |
| 1998 | "The Limits of Prison Drug Treatment", <u>Corrections Management Quarterly</u>, Vol. 2, Issue 4, Fall 1998, pp. 66-74. |
| 1996 | "The Effect of 'Three Strikes and You're Out' on Corrections" in <u>Three Strikes and You're Out: Vengance as Public Policy</u>, David Shichor and Dale K. Sechrest, eds., Sage Publications: Thousand Oaks, CA. |
| 1996 | "Are Prisons A Bargain? The Case of Voodoo Economics", <u>Spectrum</u>, Spring 1996, pp. 6-24. |
| 1995 | "The Overrepresentation of Minority Youths in the California Juvenile Justice System:  Perceptions and Realities" in <u>Minorities in Juvenile Justice,</u> Kimberly Kempf Leonard, Carle E. Pope, and William H. Fyerherm, eds., Sage Publications: Thousand Oaks, CA. |
| 1994 | "Three Strikes and You're Out: The Likely Consequences".  <u>St. Louis University Public Law Review</u>, 14, 1, pp. 239-258. |
| 1993 | "Classification for Internal Purposes: The Washington Experience" (with Chris Baird, and Deborah Nuenfeldt), <u>Classification: A Tool for Managing Today's Offenders</u>, Laurel, MD: American Correctional Association. |
| 1993 | "Objective Prison Classification Systems: A Review", <u>Classification: A Tool for Managing Today's Offenders</u>, Laurel, MD: American Correctional Association. |

Ex. A
14

| | |
|---|---|
| 1986 | "Using Early Release to Relieve Prison Crowding: A Dilemma in Public Policy," Crime and Delinquency (October):404-501 |
| 1986 | "Evaluating How Well Your Classification System Is Operating," Crime and Delinquency (July):302-321 |
| 1985 | "Incarceration in the United States:  The Extent and Future of the Problem," The Annals (March):15-30 |
| 1983 | "Assessing the New Generation of Prison Classification Models," Crime and Delinquency (October):561-576 |
| 1982 | "Do We Really Want to Get 'Tough on Crime'?" Corrections Today, Vol. 44, No. 6:50-52 |
| 1982 | "Bail Reform in California:  The Passage of AB2" (with E. Lemert), Pretrial Services Annual Journal, 1982, Vol V:4-23 |
| 1982 | "Review of Fatal Remedies:  The Ironies of Social Intervention" (Sam D. Seiber) in Crime and Delinquency, Vol. 20, No. 4:639-641 |
| 1982 | "The Unmet Promise of Alternatives to Incarceration" (with B. Krisberg), Crime and Delinquency, Vol. 28, No. 3:374-409 |
| 1982 | "Promises and Realities of Jail Classification," Federal Probation, Vol. 46, No. 1:58-67 |
| 1981 | "Wider, stronger, and different nets:  the dialectics of criminal justice reform" (with B. A. Krisberg), Journal of Research in Crime and Delinquency, Vol. 18, No. 1:165-196 |
| 1980 | Instead of Justice:  Diversion, Ph.D. Dissertation, University of California, Davis |

# AWARDS

| | |
|---|---|
| 2009 | Recipient of the Marguerite Q. Warren and Ted B. Palmer Differential Intervention Award, American |

|  | Society of Criminology, Corrections and Sentencing Division |
|---|---|
| 1999 | Recipient of the Paul Tappin award for outstanding contributions in the field of criminology, Western Society of Criminology |
| 1991 | Recipient of the Peter P. Lejins Research Award, American Correctional Association |