GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:       ggrunfeld@rbgg.com
             vswearingen@rbgg.com
             pkaul@rbgg.com
             eanderson@rbgg.com
             hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone:   (510) 806-7366
Facsimile:   (510) 694-6314
Email:       ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:    Hon. Anthony J. Battaglia<br><br>Trial Date:   None Set |

[3903105.1]

1 | (*counsel continued from preceding page*)

2 | CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
3 | OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4 | 401 B Street, Suite 1700
San Diego, California  92101-4297
5 | Telephone:   (619) 699-2700
Facsimile:   (619) 699-2701
6 | Email:       christopher.young@dlapiper.com
              isabella.neal@dlapiper.com
7 |           oliver.kiefer@dlapiper.com

8 | BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
9 | ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
10 | 2760 Fifth Avenue, Suite 300
San Diego, California  92103-6330
11 | Telephone:   (619) 232-2121
Email:       bvakili@aclusandiego.org
12 |           jmarkovitz@aclusandiego.org

13 | Attorneys for Plaintiffs

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, Pablo Stewart, M.D., declare:

1.     I am a board-certified Attending Psychiatrist and Clinical Professor at the University of Hawaii, John A. Burns School of Medicine.  My curriculum vitae is attached hereto as **Exhibit A**.  I have approximately 36 years of experience in correctional mental health care, including serving as a court-recognized and court-appointed expert in class action cases regarding the provision of mental health care to incarcerated people.

2.     I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

## I.     Relevant Experience and Expertise

3.     In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland. In 1982, I received my Doctor of Medicine from the University of California San Francisco (UCSF), School of Medicine.  In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of the UCSF, School of Medicine.  In 1985-1986, I served as the Chief Resident of the UCSF Department of Psychiatry at San Francisco General Hospital.

4.     Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illness in correctional and other institutional contexts.  In my work, I have specialized in community and correctional treatment programs for individuals with chronic and serious mental illness, as well as substance use and related disorders.

5.     I have extensive experience managing, monitoring, and reforming mental health systems in detention settings.  I am currently the federal court-appointed monitor in *Rasho v. Baldwin* (C.D. Ill.), a class case involving the

provision of mental health care to the incarcerated population of the Illinois
Department of Corrections.  I have also been the federal court-appointed expert
monitor in *Madrid v. Gomez* (N.D. Cal.) and *Gates v. Deukmejian* (E.D. Cal.), two
cases that addressed the use of solitary confinement placements and treatment of
people with mental health needs in California prison facilities.

6.     Between 1986 and 1990, I was the Senior Attending Psychiatrist for the
Forensic Unit of the University of California, San Francisco, which was located at
San Francisco General Hospital.  In that capacity, I had administrative and clinical
responsibility for a 12-bed maximum-security psychiatric ward and worked as the
liaison with the Jail Psychiatric Services of the City and County of San Francisco.
My duties in that position included advising the San Francisco City Attorney on
issues pertaining to forensic psychiatry.

7.     In 2007 and 2008, I prepared expert statements and testified before the
court and the three-judge panel in the *Coleman/Plata* overcrowding litigation. My
expert report in that case was cited twice in the United States Supreme Court
decision upholding the three-judge court's imposition of an order requiring
California to reduce overcrowding to address constitutional violations.  *Brown v.
Plata*, 563 U.S. 493, 519 n.6 & 522 (2011).  I have served as an expert in several
federal court class action cases regarding mental health care in jails and prisons,
including *Hernandez, et al. v. County of Monterey* (N.D. Cal.), *Coleman v. Brown*
(E.D. Cal.), *Parsons v. Ryan* (D. Ariz.), and *Graves v. Arpaio* (D. Ariz.).

8.     Between July 1998 and February 2004, I served as a psychiatric
consultant to the National Council on Crime and Delinquency (NCCD) and
subsequently for the Institute on Crime, Justice and Corrections at Washington
University (when it took over monitoring responsibilities from NCCD) in their
efforts to monitor juvenile detention and treatment facilities operated by the State of
Georgia.  In that case, I monitored an Agreement between the United States
Department of Justice and the State of Georgia designed to improve the quality of

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1    care in its juvenile detention facilities. The Agreement encompassed mental health

2    care, medical care, educational services, and treatment programs.

3         9.    I have designed and taught courses in correctional psychiatry at the

4    University of California, San Francisco. I have also designed and taught courses on

5    the protocols for identifying and treating psychiatric patients and have supervised

6    psychiatric residents in teaching hospitals. I have worked closely with local, state

7    and federal governmental bodies to design and present educational programs about

8    psychiatry, substance use, and preventative medicine.

9         10.    I have presented numerous papers before mental health professionals,

10   prosecuting and criminal defense attorneys, probation officers, and judges, and have

11   published in professional and peer-reviewed journals on topics including prison

12   mental health services, dual diagnosis, mental illness, alcohol and drug use, and the

13   treatment of substance use disorders.  These presentations and publications include:

14   "Alcohol and Other Drugs and the Courts" (2010), "The Mentally-Ill Offender in

15   Reentry Courts" (2010); "Mental Health Aspects of Diminished Capacity and

16   Competency" (2007); "Methamphetamine-Induced Dual Diagnosis Issues" (2006);

17   "Proper Assessment of Drug Court Clients" (2006); "Classification of High Risk

18   and Special Management Prisoners, A National Assessment of Current Practices"

19   (2004); "Cultural Considerations in Working with the Latino Patient" (2002);

20   "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The

21   Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders"

22   (2001); "Managing People of Different Pathologies in Mental Health Courts"

23   (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-

24   Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-

25   Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting,

26   Learning to Detect Malingering" (1999); "Working With the Substance Abuser in

27   the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999);

28   "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

Justice and Substance Abuse" (1999); "Impulse Control Disorders" (1999); "Major
Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder"
(1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment
Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High
Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention
Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues"
(1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994).

11.    I have been asked to provide my opinion regarding the policies and
practices of San Diego County, the San Diego County Sheriff's Department, and
their contractors and agents as they relate to the provision of mental health care and
practices impacting incarcerated people with mental health needs in the San Diego
County Jail system (the "Jail").

12.    In order to prepare this report, I have reviewed the following materials:

(a)    Plaintiffs' Second Amended Complaint

(b)    *San Diego County Sheriff's Department: It Has Failed to
Adequately Prevent and  Respond to the Deaths of Individuals in Its Custody*,
California State Auditor (February 2022)

(c)    *Report on Suicide Prevention Practices within the San Diego
County Jail System*, Lindsay Hayes (June 2018)

(d)    *Suicides in San Diego County Jail: A System Failing People with
Mental Illness*, Disability Rights California Investigation Report (April 2018)

(e)    *Technical Assistance Report: San Diego Sheriff's Department*,
National Commission on Correctional Health Care (January 2017)

(f)    San Diego County In-Custody Death Study, Produced by
Analytica Consulting for the San Diego Citizens' Law Enforcement Review Board
(CLERB) (April 2022)

(g)    Community Oriented Correctional Health Services (COCHS)
Report to Dorothy Thrush, Chief Operating Officer Office of Public Safety, San

1    Diego County (Mar. 30, 2020)

2                (h)    San Diego County Sheriff's Department, Medical Services

3    Division Operations Manual Policies

4                (i)    San Diego County Sheriff's Department, Detention Services

5    Bureau Policies and Procedures

6                (j)    San Diego County Sheriff's Department Data on Suicide

7    Attempts 2018-Present

8                (k)    County of San Diego, Citizens' Law Enforcement Review Board

9    Findings (September 14, 2021)

10                (l)    County of  San Diego, Citizens' Law Enforcement Review

11    Board Findings (July 13, 2021)

12                (m)    County of  San Diego, Citizens' Law Enforcement Review

13    Board Findings (June 9, 2020)

14                (n)    County of  San Diego, Citizens' Law Enforcement Review

15    Board Annual Report 2020

16                (o)    County of San Diego Inter-Departmental Correspondence re:

17    Detention Services Bureau Biennial Inspection 20-22 Cycle-1st Inspection (Apr. 6,

18    2021)

19                (p)    Sheriff Gore Letter re CLERB Case Number: 17-150 (Aug. 25,

20    2020)

21                (q)    Examples of completed ADSEG Template for Mental Health

22    Clinician (MHC), San Diego County Jail

23                (r)    John Montgomery Email Re: Agenda Item 8 / SD Health

24    Connect (Nov. 1, 2021) (Public Record)

25                (s)    Billy Duke Email Re: Attempt 11-45/Self Harm (June 8, 2021)

26    (Public Record)

27                (t)    Suicide Attempt Criteria, San Diego Sheriff's Department

28                (u)    San Diego County Response to Public Records Act Request,

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  Reference #S002022-122421

2          (v)     Policies from the San Diego County Sheriff's Department

3  Detention Services Bureau – Manual of Policies and Procedures

4          (w)     Policies from the San Diego County Sheriff's Department,

5  Medical Services Division Operations Manual

6          (x)     Declaration of Christopher Nelson

7          (y)     Declaration of David F. Smith

8          (z)     Declaration of Anthony Edwards

9          (aa)    Declaration of Ernest Archuleta

10         (bb)    Declaration of Gustavo Sepulveda

11         (cc)    Declaration of Nikki Yach

12         (dd)    Declaration of Mark Baker

13         (ee)    Declaration of Joshua Roberts

14         (ff)    Declaration of Gary Bartlett

15         (gg)    Declaration of James Clark

16         (hh)    Declaration of Cedrick Jones

17         (ii)    Declaration of Karina Rios

18         (jj)    Declaration of Jennifer Alonso, LCSW

19         (kk)    Declaration of Christine Evans, M.D.

20      13.    My opinions set forth below are based upon the documents and other

21  evidence listed above and on my professional knowledge and my experience

22  working in and evaluating detention settings.

23      14.    This case is in a very early stage.  I am informed that the parties have

24  not yet exchanged formal discovery.  I have not had the opportunity to conduct an

25  inspection of the Jail facilities.  I have not interviewed any staff or prisoners.  As a

26  result, I have not been able to form opinions regarding certain elements of the

27  mental health care system at the Jail.  I would expect to consider several issues

28  relating to the Jail's mental health care system not addressed in this report as

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

discovery in the case proceeds.  For example, the policies, records, and reports I have reviewed strongly suggest to me that the Jail has deficiencies with respect to the provision of clinically indicated structured mental health care programming for patients with mental illness.

15.    Based upon the documents and information I have reviewed, I am able to offer the following preliminary opinions.  I expect to supplement or modify these opinions as more information becomes available.

16.    Based on my current review, it is my opinion that the system to treat people with mental health disabilities and mental health treatment needs is inadequate and places people in the Jail at a substantial risk of serious harm.  Any person, whether they enter the Jail with a diagnosed mental illness or not, may develop symptoms of mental illness while in the Jail.  This is especially true given the harsh conditions, understaffing, and deficient policies and practices at the Jail. Any person with mental illness in custody at the Jail is endangered by these deficiencies.  Consequently, all people incarcerated at the Jail, not just people with already-diagnosed mental illness, are at substantial risk of serious harm.

## II.    Finding #1 - The Jail's Practice of Custody Staff Overruling Mental Health Clinicians on Placement Decisions for People with Mental Health Needs Is Inconsistent with the Standards of Care and Puts People at Substantial Risk of Serious Harm.

17.    It is a basic tenet of jail mental health care that clinical staff provide clinical input for patient placement decisions, to ensure that patients get the level of care they need and are not subjected to conditions that will cause serious harm to their mental health condition.  Systems where custody staff do not meaningfully consider mental health clinicians' input on clinically appropriate care, placement, and conditions for their patients will almost invariably see worse outcomes for patients with mental illness, including more frequent and preventable decompensation, increased incidents of self-harm and suicide attempts, increased incidents of assaults on staff, and suicides or other deaths that in many cases were

foreseeable and/or preventable.

18.    The declarations of recent Jail mental health staff members Jennifer Alonso (mental health clinician) and Dr. Christine Evans (Medical Director/Chief Psychiatrist) are remarkable on this topic.  Both of these Jail mental health providers make clear that the practice at the Jail is such that custody staff frequently overrule mental health staff's clinical judgment on placement and other decisions that greatly and negatively impact the health, safety, and well-being of people with mental illness.

19.    The troubling practices that these staff members describe are consistent with the deficient organizational structure of the Jail system as well as unsound written Jail policy.

20.    First, the Jail's organizational chart reveals a foundational deficiency in the delivery of mental health care (and health care more generally).  The organizational chart for Jail operations makes clear that mental health (and medical) leadership report directly to a Jail Captain and the Sheriff's Command team.  This organizational structure is inconsistent with modern correctional psychiatric practices and is extremely problematic.

21.    Clinical staff and leadership should have their own, separate chain of supervision, allowing them to work *side-by-side* with custody staff and leadership. The vast majority of medium- to large-California county jail systems of which I am aware have adopted a structure whereby mental health (and medical) staff do not report directly to custody leadership; rather, they report to medical and mental health leadership.  Such a structure is essential to operating an adequate jail mental health care system in which health care professionals have ultimate authority over health care policy, and can work collaboratively with sworn staff to ensure that patients' clinical needs are met.  As the chart below shows, San Diego County is an outlier with respect to its organizational structure by putting Sheriff's Command staff above (and not in partnership with) Mental Health Care staff.

**Examples of Health Care Agencies Operating the Jail Mental Health Care System Alongside the Sheriff's Department, Not as a Sheriff's Department "Medical Services Division" that Reports to Sheriff's Command Staff**

| County Jail System | Agency Overseeing Provision of Jail Mental Health Care |
|---|---|
| Contra Costa County | Contra Costa County Health Services |
| Los Angeles County | Department of Health Services |
| Orange County | Orange County Health Care Services |
| Riverside County | Public Health and Behavioral Health |
| Sacramento County | Department of Health Services |
| San Francisco County | Department of Public Health |
| Santa Clara County | County of Santa Clara Health System - |
| San Diego County | ***San Diego Sheriff's Department*** (Medical Services Division) |

22.    Second, written Jail policy indicates that custody staff control individual placement decisions that should be determined through clinical input in order to protect people with mental health needs from unnecessary and avoidable psychological, psychiatric, and physical harm, including suicide.

23.    The information contained in the materials I reviewed, including the declarations of the clinicians with first-hand experience working at the Jail, confirms that the Jail's deficient policy is in fact in practice, that it has been raised as a major concern previously, and that the Jail has failed to fix the problems that put people at substantial risk of serious harm.  Examples are discussed below.

**A.    Custody-Driven Placements in Administrative Segregation Without Consideration of Mental Health Input Put Patients at Substantial Risk of Serious Harm.**

24.    A major deficiency stems from San Diego County Jail's written policies that give custody staff sole authority regarding placement of people in Administrative Segregation, a housing status where people are confined to their cells for nearly the entire day and constitute a form of solitary confinement.

25.    Before discussing the specific policies and practices at San Diego County Jail, it bears emphasizing that it is well established that people with mental illness (and even those without a mental illness) are at a heightened risk to deteriorate and decompensate in segregation housing units defined by isolated conditions.[1]

26.    There is an increasing body of scientific literature that establishes the risk of harm posed to people with (and without) mental illness who are placed in solitary confinement or segregation.  The recognition of this risk has led professional health and mental health organizations to announce their opposition to the placement of people with mental illness in such segregated housing units or, if it

---

[1] "Solitary confinement," "segregation," and "isolation" are terms of art in correctional practice and scholarship.  The term is generally used to refer to conditions of extreme isolation from others.  Leading scholars have defined it as follows:

> [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (*i.e.*, contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.

Craig Haney, The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful, Prison Service Journal, 12 (Jan. 2009), at n.1.

1  is absolutely necessary (and only as a last resort) to confine them only with strict

2  limits, significant amounts of out-of-cell time, and enhanced access to care.

3      27.    The American Psychiatric Association has issued a Position Statement

4  on Segregation of Prisoners with Mental Illness, stating: "Prolonged segregation of

5  adult inmates with serious mental illness, with rare exceptions, should be avoided

6  due to the potential for harm to such inmates."   The American Public Health

7  Association has issued a similar statement: "Prisoners with serious mental illnesses

8  should be excluded from placement in solitary confinement. …  Prisoners should be

9  closely monitored and removed from solitary confinement if continued placement

10  becomes clinically contraindicated, if their physical or mental health deteriorates

11  because of continued placement in solitary confinement, or if necessary medical or

12  mental health services cannot be provided."[2]

13      28.    The U.N. Special Rapporteur on Torture and Other Cruel, Inhuman or

14  Degrading Treatment or Punishment has stated that "solitary confinement often

15  results in severe exacerbation of a previously existing mental condition" and that

16  "its imposition, of any duration, on persons with mental disabilities is cruel,

17  inhuman or degrading treatment."[3]

18      29.    These position statements reflect the now widely accepted reality that

19  people with (and without) mental illness placed in solitary confinement-type

20

21  [2] American Public Health Association, Solitary Confinement as a Public Health

22  Issue (Nov. 2013), available at https://apha.org/policies-and-advocacy/public-health-

23  policy-statements/policy-database/2014/07/14/13/30/solitary-confinement-as-a-

    public-health-

24  issue#:~:text=APHA%20calls%20upon%20federal%2C%20state,mental%20illness

25  es%20and%20chronic%20illnesses.

26  [3] Méndez, J. *Torture and other cruel, inhuman or degrading treatment or

    punishment.* Interim report of the Special Rapporteur of the Human Rights Council

27  on torture and other cruel, inhuman or degrading treatment or punishment at 21

    (2011), available at https://ccrjustice.org/sites/default/files/assets/UN-Special-

28  Rapporteur-Report-on-Solitary.pdf.

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

conditions are distinctively vulnerable to deterioration and decompensation that
worsen their mental health condition, intensify symptoms, and put people at
substantial risk of psychosis, self-harm, and suicide.

30.    Based on my review of the declarations, policies, reports, and other
relevant documents provided to me, the Administrative Segregation housing units in
the Jails generally constitute solitary confinement-type conditions, including as has
been defined by leading governmental and professional entities.  For example, the
United States Department of Justice ("U.S. DOJ") has stated that restrictive
housing-type segregation is characterized by (1) "Removal from the general inmate
population, whether voluntary or involuntary"; (2) "Placement in a locked room or
cell, whether alone or with another inmate"; and (3) "Inability to leave the room or
cell for the vast majority of the day, typically 22 hours or more."[4]

31.    Notably, the United States Department of Justice has itself
recommended that "Generally, inmates with serious mental illness (SMI) should not
be placed in restrictive housing."[5]  My review of San Diego County Jail's policies,
procedures, and practices indicate that the Jail fails to follow this federal guidance.

32.    The U.S. DOJ also provides detailed guidance as to the rare
circumstances under which a person with serious mental illness may be placed in
segregation-type housing:

- An inmate with SMI should not be placed in restrictive housing, unless:

  - The inmate presents such an immediate and serious danger that
    there is no reasonable alternative; or

  - A qualified mental health practitioner determines:

    - That such placement is not contraindicated;

---

[4] U.S. Department of Justice, *Report and Recommendations Concerning the Use of
Restrictive Housing* at 3 (Jan. 2016), available at
https://www.justice.gov/archives/dag/file/815551/download.
[5] *Id.* at 99-100.

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

- That the inmate is not a suicide risk;

- That the inmate does not have active psychotic symptoms; and

- In disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation.

- Inmates with SMI who are diverted from restrictive housing should be placed in a clinically appropriate alternative form of housing, such as a secure mental health unit or other residential psychology treatment program.[6]

33.     The U.S. DOJ's guidance is consistent with the practices I have observed in well-functioning detention systems. Mental health staff in a well-functioning jail system are required by policy and practice to screen people in advance of a prospective placement in Administrative Segregation or other segregation-type housing, to identify those for which such placement is clinically contraindicated, and to prevent the placement if such confinement is clinically contraindicated.

34.     The Jail's policies are grossly deficient in this regard. San Diego County Sheriff's Department Detention Services Bureau (DSB) Policy J.3 (Segregation: Definition and Use) makes no mention of mental health clinical input being used to decide whether a person with mental illness or risk factors for suicide may be placed in Administrative Segregation. The closest the Jail policy comes to recognizing the role of mental health is in this passage:

> Upon placement of an inmate into administrative segregation housing or pre-disciplinary housing, sworn staff shall notify the facility charge nurse of the placement. A qualified health care professional will review the inmate's health record. If existing medical, dental or mental health needs require accommodation, sworn staff will be notified.

---

[6] *Id.* at 99-100.

Based on my experience and correctional mental health expertise, this policy fails to protect people who would be placed at substantial risk of serious harm in Administrative Segregation housing, for several consequential reasons: (1) the policy fails to direct that the treating clinician (who knows the patient) provide input; (2) it fails to direct the patient's *current* mental health condition be considered (relying only on a record review); and most importantly, (3) it makes no mention of a clinical assessment as to whether Administrative Segregation is contraindicated or whether the patient would be at heightened risk of suicide or other harm in segregation. The clinician's role is extremely limited, and the decision on Administrative Segregation placement lies exclusively with custody staff.

35.    Similarly, the San Diego County Sheriff's Department Medical Services Division Operations Manual Policy G.2.1 (Segregated Inmates) fails to protect patients from being placed in Administrative Segregation if such placement would put them at substantial risk of harm. Clinical staff are directed only to "review the patient's health record to determine whether existing medical, dental, or mental health needs require accommodation, … document the review, … and notify the watch commander of any accommodation needed." Even when the patient is actively deteriorating in Administrative Segregation, the policy directs only that "Health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health." The most favorable reading of the policy is that clinical staff are not to take any action until a person is noticeably "deteriorating" and their health is "failing" to warrant an emergency acute mental health or medical transfer. Without additional preventative protections, this is a dangerous and inappropriate correctional mental health care practice: adequate Jail mental health care requires processes to prevent avoidable deterioration and other harms to patients, not merely to respond to mental health crises.

36.    I have also reviewed examples of completed Mental Health Clinician

1    "AdSeg template" forms, which clinicians use when a person is placed into

2    Administrative Segregation.  The lack of any prompt for the clinician to assess

3    whether Administrative Segregation placement is clinically contraindicated for the

4    patient is a key deficiency.  Notably, the only check-box option for "Plan" on the

5    form, other than referrals to psychiatry and/or for acute inpatient care or suicide

6    precautions is "Continue to be monitored cellside."  The form fails to direct mental

7    health staff to provide input on the risk of Segregation placement or even to consider

8    an individualized treatment plan for the patient.  Such a process puts vulnerable

9    patients at substantial risk of serious harm.

10        37.    Remarkably, Policy G.2.1 (Segregated Inmates) contains a notation that

11   it is "in compliance with" National Commission on Correctional Health Care

12   (NCCHC) standards.  This notation is incorrect and misleading, in my opinion.  In

13   fact, the NCCHC Standards for Mental Health Services in Correctional Facilities'

14   Standard MH-E-07 (Segregated Inmates) begins with its first "Compliance

15   Indicator": "On notification that an inmate is placed in segregation, mental health

16   staff reviews the inmate's mental health record to determine ***whether existing***

17   ***mental health needs contraindicate the placement*** [in segregation] or require

18   accommodation" (emphasis added).  In short, the Sheriff's Department does not

19   meet NCCHC standards regarding consideration of patient needs as related to

20   segregation placements.  The Jail's policy creates substantial risks of serious harm

21   to vulnerable people, including those with mental health disabilities.

22        38.    This deficiency was identified long ago.  In January 2017, the National

23   Commission on Correctional Health Care (NCCHC) completed an assessment

24   leading to a Technical Assistance Report for the San Diego County Sheriff's

25   Department ("NCCHC Report").  The NCCHC Report found that the Jail's "mental

26   health staff does not [] screen inmates for any contraindications to placement in

27   segregation, which is an NCCHC requirement."  NCCHC Report at 101; see also id.

28   at 36, 68, 102, 136.

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

39.    The Jail's policy and practice remains to this day inconsistent with NCCHC and other modern correctional mental health standards in ways that put patients at substantial risk of serious harm.

40.    Jail leadership appears to have long been aware of the risks of harm of placing people with mental illness in Administrative Segregation.  The Disability Rights California report, *Suicides in San Diego County Jail: A System Failing People with Mental Illness* (April 2018) ("DRC Report"), documents that "the County subjects inmates to dangerous solitary confinement conditions that take an enormous toll on individuals' mental health and well-being.  A substantial number of the suicides in San Diego County's jails have occurred in designated segregation units and other units with solitary confinement conditions."  DRC Report at 2.

41.    The DRC Report goes on to find that at least six (6) people died by suicide in Segregation units between 2014 and 2016 (35.3% of the 17 suicides during that period), including "individuals with a known history of mental illness and suicide attempts.  Several other inmates died in units with solitary confinement conditions."  *Id.* at 23.  The report identifies deeply troubling incidents of suicide in Segregation housing:

- "In one tragic and illustrative case reviewed by the DRC experts, an inmate arrived at the jail with symptoms of florid psychosis and mania.  He was not referred for admission to the Psychiatric Security Unit.  He was instead placed in an Administrative Segregation unit.  He died by suicide a few days later without receiving an adequate screening for suicide risk."  *Id.* at 13.

- "[A]n inmate was housed in Administrative Segregation for over four months.  The DRC Experts found that this inmate appeared to suffer the ill effects of prolonged isolation and had significant symptoms of mental illness that were not detected by staff.  After a series of emergency placements in the jail's 'Safety Cell,' the inmate was again placed in Administrative Segregation, where he spent the last six weeks of his life before hanging himself."  *Id.* at 14.

- "In one suicide case, an inmate housed alone in Administrative Segregation was allowed just one hour out of his cell every 48 hours.

He requested psychiatric services but two days later, he still had not been seen by mental health staff. He asked a deputy through the cell's intercom when he would get out of his cell and into the dayroom. He was told that he must remain in his cell. Forty-five minutes later, he was found hanging in his cell. Prior to hanging himself, he had urinated on the floor, stuck food and feces on the ceiling, and scrawled a suicide note on the cell walls using his own blood." *Id.* at 15.

•   "Custody staff too often interfere with clinical decision-making regarding inmates with acute mental health needs. In one case, an inmate was booked while having acutely manic and psychotic symptoms. He had been hospitalized twice shortly before his incarceration and had been off his medications for several days prior to arrest. There was a two-day delay before he received a psychiatric evaluation and medications. The inmate made repeated statements about hurting himself, and he refused to take medications when they were finally ordered. A nurse practitioner recommended that the inmate be placed in a Safety Cell based on his condition. However, a sergeant refused to move him. He remained in an Administrative Segregation cell, where he died by suicide that evening." *Id.* at 15.

42.    The 2018 consultant report completed for the Sheriff's Department by Lindsay Hayes, a nationally recognized suicide prevention expert with whom I have worked, also recommended that the Jail act to prevent the placement of people with mental health conditions in Segregation housing where clinically contraindicated. He wrote after evaluating the Jail's policies and practices: "Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, ***it is strongly recommended that medical personnel review the medical section of JIMS to determine whether existing medical and/or mental health needs contraindicate the placement*** or require accommodation." Hayes Report at 71-72 (emphasis added). His report notes that this recommendation is consistent with NCCHC Standards. *Id.* at 20.

43.    The Sheriff's Department's public response to Mr. Hayes' report on this topic is disappointing: "Business processes are being developed, and policies

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  are being updated, to provide for real time notification to Qualified Mental Health

2  Providers so assessments can be accomplished in a timely manner." The response

3  completely ignores Mr. Hayes' recommendation (and the NCCHC standard) that

4  clinicians should provide input as to whether an Administrative Segregation

5  placement (or housing with similar restrictions) is contraindicated for a patient due

6  to mental health or other needs.

7      44.    Ms. Alonso, who worked at the Jail for three years up until April 2022,

8  notes that, a few years ago, the Jail's mental health co-coordinator made a "specific

9  recommendation to the Sheriff's Department to stop putting people with mental

10 illness in the solitary confinement-type Ad-Seg units," but that "Sheriff's

11 Department Command staff refused to implement this recommendation."

12     45.    Likewise, Dr. Evans, the former Medical Director and Chief

13 Psychiatrist at the Jail, describes how the Jail lacks a defined policy or procedure or

14 reliable system for clinicians to provide input regarding placement in Administrative

15 Segregation. She and other health care staff "raised concerns to custody staff about

16 our patients being placed in Administrative Segregation housing (or Administrative

17 Segregation 'overflow'), or on a 'Lockdown' or 'Bypass' status that was essentially

18 Administrative Segregation solitary confinement conditions." Yet clinical input was

19 regularly ignored, and Dr. Evans "saw many people being placed into

20 Administrative Segregation when clinicians knew and made known that such a

21 placement would be harmful."

22     46.    San Diego County's failure to implement the guidance of its own

23 suicide prevention consultant and its own mental health leadership and staff has

24 allowed a dangerous situation to persist. Ms. Alonso estimates that 50% of people

25 in the Administrative Segregation units she observed had mental illness. She

26 describes just the sort of real-world examples of how the practice continues to cause

27 harm to this day – like the suicide of Lester Marroquin, who died by suicide in an

28 Administrative Segregation cell on May 30, 2021. As Ms. Alonso recalls:

Mr. Marroquin had a significant history of mental illness and had repeatedly attempted suicide and engaged in acts of serious self-harm. He had decompensated while held in an Ad-Seg placement to the point that staff placed him on suicide precautions in a psychiatric observation cell.  I was asked to meet with him while he was being held in the psychiatric observation cell, which I did several times.  (Those clinical contacts were done at cell-front, with other patients in cells just a few feet away.)  He was struggling a great deal.  He had fears about being sent to prison, was hearing voices, was smearing his own feces in his cell, and was sticking his head in the toilet. **On Sunday, May 30, a day I was not working, Mr. Marroquin was removed from the psychiatric observation cell, and custody staff moved him back into Ad-Seg.  No one informed me about custody staff moving Mr. Marroquin back into the Ad-Seg housing where he had previously decompensated, and I was not consulted about whether it was clinically safe for him to be returned to Ad-Seg following his removal from psychiatric observation.**  That same day, Mr. Marroquin banged his head several times, placed his head in the toilet of his Ad-Seg cell, and finally died of acute water intoxication.  I still cry when I think about what happened to Mr. Marroquin; he should not have died.

47.     Lonnie Rupard also appears to have died following an Administrative Segregation placement that was clinically contraindicated, as Ms. Alonso describes:

Another patient who died after being moved to Ad-Seg by custody staff without input from myself or other mental health clinicians was Lonnie Rupard.  Mr. Rupard had a mental health condition that had made him psychotic and erratic.  He had been placed on my OPSD caseload. After he tried to sharpen an object to that could be used as a weapon, I told custody staff that I was concerned about the situation.  Ccustody staff then moved him into an Ad-Seg "overflow" unit at the Jail.  (Ad-Seg units are frequently filled to capacity, leading to custody staff operating other housing units as Ad-Seg "overflow" units.)  Although I did have concern about his remaining in the OPSD unit with my other OPSD patients, I did not believe that Ad-Seg was a clinically appropriate placement for him.  However, I knew that custody staff had exclusive authority regarding the Ad-Seg placement and that I could not advocate for another housing option.  Really, Mr. Rupard needed placement in a structured therapeutic outpatient setting that provided

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

sufficient security; such a unit does not exist at Central Jail.

Once he was in Ad-Seg, Mr. Rupard was no longer on my OPSD caseload.  I recall that the clinician assigned to the Ad-Seg unit was so overwhelmed with her caseload and other clinical duties that she was unable to see Mr. Rupard as frequently as was needed.  My understanding is that Mr. Rupard refused his medications and food while in Ad Seg.  Feces were present all over his cell and the toilet, and food trays and trash were strewn everywhere.

Mr. Rupard died while still in Ad-Seg, having lost a significant amount of his body weight and in a medically compromised condition, about two months after he was placed there.  **Custody staff never consulted with me about whether solitary confinement would put Mr. Rupard at risk of harm.  I knew that, by policy and practice, I had no authority or avenue to recommend against his Ad-Seg placement.**

48.     Instead of working to avoid placing people with mental illness or at risk of decompensation in Administrative Segregation unless absolutely necessary, the Jail appears to place patients like Mr. Rupard in Administrative Segregation without any regard to mental health-related risks.  This practice is outside the accepted norms of the correctional mental health care community, and places people at substantial risk of serious harm.

49.     It is my opinion that San Diego County Jail grossly overuses Administrative Segregation to house people who have mental illness and/or are at risk in isolation settings, and that the Jail's policy of custody driven-placement decisions creates an extremely dangerous situation that puts a large number of vulnerable people at substantial risk of serious harm.

50.     To address this dangerous policy and practice, the Sheriff's Department must revise its policies, procedures, practices, and training to ensure that mental health staff's input is meaningfully considered prior to and during any placement of an incarcerated person in Segregation conditions, consistent with the U.S. DOJ's definition (see above), whether in a designated Administrative Segregation unit or

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  elsewhere (i.e., confinement in Segregation "overflow," "bypass," "lockdown,"

2  etc.).

3  **B.    The Custodial Blanket Ban Policy Against Outpatient Step Down
4      Program (OPSD) Placement for People Classified as "Protective
       Custody" with Mental Health Housing Needs Puts Patients at
5      Substantial Risk of Serious Harm.**

6  51.    The improper and dangerous custodial control over clinical decisions

7  on patients' housing placement is also manifest in the Sheriff's Department's

8  blanket ban policy excluding "Protective Custody" patients from the Outpatient Step

9  Down Program.  This is yet another dangerous example of how custody staff, by

10 policy and practice, override clinical determinations as to appropriate placement.

11 52.    To be sure, the apparent lack of a mental health system with levels of

12 care is a major deficiency in the San Diego County Jail.  I understand that Dr. Evans

13 and others proposed the development of a mental health levels of care system, and

14 that Jail leadership elected not to implement such a system.

15 53.    Dr. Homer Venters, the former medical director at Rikers Island in

16 New York City, provided a consultant report to San Diego County in 2020 on

17 strategies to improve its Jail health care system.  Community Oriented Correctional

18 Health Services (COCHS) Report to Dorothy Thrush, Chief Operating Officer

19 Office of Public Safety, San Diego County (Mar. 30, 2020). Similar to Dr. Evans,

20 Dr. Venters recommended to San Diego County that it implement a levels of care

21 system to meet the needs of incarcerated people with mental illness:

22 [P]atients with serious mental illness in the jail setting benefit from
   engagement with multiple types of therapy, including one-on-one talk
23 therapy, psychiatric care with medication management, nursing
   support, group therapy, art and movement therapy. These approaches
24 increase engagement in health services and decrease injuries from use
   of force incidents. Most large jails benefit from more than one level or
25 type of enhanced mental health housing area, and the ability to deliver
26 care on these units relies on clear distinctions about the profile of
   patients who will be housed on these units, and the training and roles of
27 the health and security staff. For patients who require higher levels of
28

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

care for mental health crisis, those who are psychotic or acutely
suicidal, best practices include assessment for referral to hospital
inpatient care. Within the jail setting, two levels of housing are
beneficial for patients with signs and symptoms of serious mental
illness. A high-level unit that replicates much of the features of
inpatient settings, including use of psychiatric technicians, multiple
modalities of mental health services (individual, group, art, movement)
and nursing and medical support is beneficial for patients with the most
serious concerns. A step-down unit that allows for increased support
and structure for patients who are more stable, but not able to be safe in
general population settings is also important. While these units may be
comprised of cell or dorm housing units, neither of them is operated as
a lock-in unit, meaning that patients are not to be confined to cells for
most of the day. An important feature of these units is that when
patients express suicidal thoughts or engage in self-harm, the primary
response does not involve hem being locked into a cell, whether the cell
is labelled as a suicide watch or safety cell.

54.    Based on my review of policies, reports, and other documents, it is
apparent that the Sheriff's Department has not implemented this recommendation.
Outside of the Psychiatric Services Unit and the Enhanced Observation Housing
unit for patients with acute mental health needs and/or on highly restrictive suicide
precautions, the only mental health housing "program" in the system is Outpatient
Step Down (OPSD). But, based on the declarations and policies I reviewed, this
unit does not appear to provide an adequate structured treatment program to
patients.

55.    Based on my experience and expertise, it is apparent that the Jail lacks
a structured treatment program that delivers an enhanced outpatient level of care,
with treatment modalities like confidential individual talk therapy, nursing support,
group therapy, art therapy, and recreation therapy, as Dr. Venters recommends.
This is a systemic deficiency that itself must be addressed.

56.    Nevertheless, the OPSD units appear to provide the benefit of improved
safety from victimization for patients with mental illness. As discussed below, it is
thus clinically inappropriate that Sheriff's Department custodial policy bans

"Protective Custody"-designated patients from OPSD housing, placing them at a substantial risk of harm.

57.    The Sheriff's Department's Medical Services Division policy D.4 provides the following criteria for placement in the OPSD unit (also referred to as Detention Outpatient Psychiatric Services (DOPS) housing):

A.    In custody of the San Diego County Sheriff

B.    Based on clinical information, the patient may be able to benefit from being housed with other patients who has [sic] been diagnosed with a psychiatric condition in designated facilities.

C.    Patient may be housed in mainline [i.e., non-protective custody] housing.

58.    As Dr. Evans and Ms. Alonso indicate, a core clinical concept of the OPSD is that by clustering people with mental illness, patients are protected from other incarcerated individuals who may exploit, assault, or otherwise victimize people with mental illness who have difficulty programming and socializing safely within the Jail's general population.  In other words, it provides a measure of safety for patients who, "based on clinical information … may be able to benefit from being housed with other patients who ha[ve] been diagnosed with a psychiatric condition in designated facilities."  Sheriff's Department's Medical Services Division policy D.4.

59.    What is troubling with the policy is the custodial classification requirement that the person be eligible for "mainline housing."  I am well aware of the use of a "Protective Custody" classification in custodial settings.  Such a classification is generally applied for people with case factors that may create a security issue for them or others in the general population (or "mainline") setting, like being a member of law enforcement or having sensitive criminal or high-profile criminal charges.

60.    The San Diego County Sheriff's Department Detention Services Bureau Policy J.3 discusses the "Protective Custody" classification as follows:

A. Protective custody (P/C) is the voluntary or involuntary placement of an inmate into separate and secure housing when there is a verified threat against their life, whether stated or implied, or when an inmate's circumstances render them a target for physical violence. Examples of use would be when an inmate is a witness against another or the inmate's relationships or affiliations may be unpopular or considered threatening by the general population (e.g., a law enforcement officer or prior law enforcement officer).

B. Involuntary P/C housing should only be used after an assessment of all available housing alternatives have shown there are no other means of protecting the inmate. Involuntarily housed P/C inmates shall have all possible access to programs and services for which the inmate is otherwise eligible.

61.    Based on the policy and the materials I have reviewed, including the Jail mental health staff declarations, it is apparent that the Sheriff's Department's custodial policy automatically excludes patients who have a "Protective Custody" designation from placement in the OPSD unit, even if they meet clinical criteria based on their mental health condition.

62.    I understand that Dr. Evans, Ms. Alonso, and other clinicians working at the Jail have raised concerns about this Sheriff's Department policy and recommended that it end.  I agree that such a blanket exclusion is unjustifiable, and puts excluded patients who stand to clinically benefit from OPSD placement at risk of harm.

63.    The recent death of Derek Baker is an example of how this policy can lead to tragic harm, as Ms. Alonso recounts:

Mr. Baker had mental illness and was found clinically appropriate for OPSD housing.  However, because he was also deemed "Protective Custody," custody staff did not allow him to be housed in one of the OPSD housing units at the Jail.  Instead, he was put in a cell with another Protective Custody individual who did not have serious mental illness (that is, he did not meet OPSD clinical criteria) and was in custody based on allegations that he had assaulted and critically injured an elderly store clerk.  The cellmate violently assaulted Mr. Baker, who died from those injuries on March 29, 2022.

64.    Another incarcerated person who was in the unit when Mr. Baker was killed offers a chilling description of what happened to Mr. Baker. Gustavo Sepulveda recalls in his declaration:

> I heard an altercation in cell 5 through the wall in my cell. It sounded like the two guys were fighting.  A little while later, I heard someone in the cell next to me say "man down, man down" …. It was silent for a bit longer, and then I heard grunting and the sound of impact over and over again.  It sounded like a person's body or head being hit against an object like the ground or wall over and over again. The sound was bone-chilling. The sound stopped for a bit, and then resumed.  After a few more minutes, I heard [the man] call to another incarcerated person in the dayroom, and say something like, "go tell the cops that I killed my cellie."

65.    To address this dangerous policy and practice, the Sheriff's Department must revise its policies, procedures, practices, and training to ensure that mental health staff have primary authority in determining the placement of an incarcerated person with mental illness in a mental health-designated program or housing unit, including Outpatient Step Down (OPSD), without any custodial blanket exclusions or other interference with clinical judgment.

**C.    Custody Staff Interference with Clinical Judgment Regarding Placement and Conditions in the Enhanced Observation Housing (EOH) Unit Puts People with Mental Illness at Substantial Risk of Serious Harm.**

66.    An additional way that custody staff interferes with the appropriate exercise of clinical judgment is in the Jail's policy and practices regarding the Enhanced Observation Housing (EOH) unit.

67.    Based on my review, I understand that the EOH unit was created in response to the very high number of people who have attempted and committed suicide while incarcerated in San Diego County Jail.  The EOH unit was thus created for people who, as San Diego County Sheriff's Department Detention Services Bureau Policy J.4 describes, "present an increased risk for suicide and who do not require placement in a safety cell."  Such people are "temporarily housed in

EOH for the purpose of receiving closer observation and assessment for permanent housing."

68.    By policy, for any person housed in EOH, custody staff take away all clothes, including underwear, and give the person only a safety garment, two safety blankets, and shower shoes.  The safety garment is made from heavy tear-free material fastened with straps or Velcro.  The garment is open at the bottom; again, no underwear is provided.  It is an uncomfortable and humiliating thing to be forced to wear, and thus modern correctional mental health standards direct that it be used only when necessary to prevent a person from using their clothing to hang or strangle themselves.  By policy, when a person is placed in EOH, "access to personal property, recreation yard time or social visits is not permitted."

69.    The 2018 DRC Report described conditions in the EOH unit characterized by extreme deprivation and isolation:

> [W]e reviewed multiple records documenting that EOH inmates were left naked, with no safety smock, and in some cases not even provided a blanket. Some are forced to sleep on a thin mat placed on the floor. Many inmates complained about being cold, even with the smock and blankets.  Inmates have no access to personal property, television, recreation yard time, or visits from family.  Inmates in the EOH units eat from paper trays and a paper safety spoon, and in some cases are restricted to eating without any utensil.  Inmates in the EOH units with individual cells complained about extremely limited time outside their cell and excessive isolation.  Mental health staff appear to recognize the extreme conditions in the EOH units.  In one inmate's chart we reviewed, a psychiatrist recommended that the facility "discontinue EOH as the isolation is inhumane and likely to compromise [this inmate] psychologically."

70.    The mental health clinician Jennifer Alonso describes EOH conditions as "barbaric," explaining: "Even dogs held in kennels are treated better than patients in EOH.  When I am asked about what it feels like in the EOH unit, I describe it as a Game of Thrones-style dungeon.  Many of my patients told me they would say anything to get out of EOH."

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

71.    One patient, David F. Smith, describes the experience of being placed in EOH in stark terms:

> My clothes were taken away and I was placed into the cell naked, with a heavy green safety smock. The cell had a bed, mattress, and a blanket. I had to drink water that was trickling from a nub on the toilet, like a hamster. There was no toilet paper in the cell. I had no access to any reading material or the phone to call my family. The cell floor seemed dingy and dirty, like it had not been cleaned in a long time. The time in that cell was one of the worst nights of sleep in my life. People in the unit were screaming all night long. … The experience was so miserable that I resolved not to tell staff of suicidal thoughts in the future because I did not want to be placed in that cell again.

72.    While by written Sheriff's Department policy (J.4), placement in the EOH unit requires a clinical assessment and clinical order, Ms. Alonso described in detail how custody staff regularly order EOH placements, often overruling clinical judgment in doing so. What this means is that people are placed in EOH or held in EOH when there is not a clinical indication for it. Ms. Alonso provided one such incident:

> A recent example, from just a few weeks ago, is a patient who has mental illness for whom I was called to conduct an assessment. After Mr. Baker was killed in the unit where this man was housed, this patient became increasingly paranoid and fearful about being held in that housing unit and having a cellmate. One day, after his allotted time on the recreation yard, he told custody staff he did not want to go back to his housing unit because he was scared. A physical altercation ensued, and a deputy was struck in the face. Custody staff then restrained the patient and strapped him face down to a gurney, with his hands handcuffed behind his back. I was then called to meet with the man, which I did with several deputies present and the patient still lying on his stomach in handcuffs and restrained to the gurney.
>
> Based on my assessment, I determined that my patient was scared and paranoid and that, by placing him in another housing unit where he felt safe, he would neither be a suicide risk nor be assaultive. I informed staff that the patient did not meet clinical criteria for an EOH placement. Custody staff, however, overruled my clinical assessment and ordered that my patient be placed in EOH, documenting that my

patient "might be in fear of other person's [sic] attacking him" but an
"unprovoked attack[] on deputy sheriff's [sic] is un-justified and …
will be criminally charged. [Patient] will be placed into EOH."

My clinical assessment of this situation was that my patient's mental
illness was contributing to extreme paranoia and distress, which led to
the physical altercation with staff.  The placement in the EOH was not
clinically indicated.  This man was placed in a harmful situation by
being placed in EOH without clinical justification, and he was
essentially punished for his mental illness and his legitimate concerns
for his safety.

Each time custody staff overrule my clinical judgment, I feel that my
efforts to provide my patients with adequate care are undermined,
putting them at serious risk of harm.

73.     This practice of custody staff overruling clinical judgment on an EOH

placement is inconsistent with NCCHC and other modern mental health care

standards for jail facilities.  Notably, San Diego County's own suicide prevention

consultant, Lindsay Hayes, recommended that, "unless exigent circumstances exist

and/or mental health personnel are not on-site, the determination of placing a

potentially suicidal inmate in either a safety cell and/or the EOH unit ***should be

made by the mental health clinician***."  Hayes Report at 29 (emphasis added).

74.     It also bears emphasis that the provision of clothing, property, and

privileges for people on suicide precautions should be based on clinical judgment

rather than blanket custodial policies, and such clinical determinations should not be

subject custodial interference.  The Sheriff's Department's EOH policy directive

mandating that all patients placed in the EOH be stripped of all clothing (other than

the safety garment) and be denied access to all personal property, recreation yard

time, and social visits is thus deeply problematic, harmful, and inconsistent with

modern practice.  Provision of clothing, property, and privileges to people at risk of

suicide should be determined based on individual clinical judgment, not custodial

fiat.  Notably, Mr. Hayes' report and recommendation match my opinion on this

subject.  Hayes Report at 43-44 ("[S]afety smocks should only be utilized when a

clinician believes that the inmate is at high risk for suicide by hanging. Should an inmate be placed in a safety smock, the goal should be to return full clothing to the inmate prior to their discharge from suicide precautions.  Finally, custody personnel should never place an inmate in a safety smock unless it had been previously approved by medical and/or mental health personnel.  Current SDCSD policies should be appropriately revised."); id. at 44 ("All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk *as determined on a case-by-case basis by mental health clinicians*") (emphasis in original).

75.    The February 2022 California State Auditor's report indicates that the recommendation to "revise policies to allow individuals in Enhanced Observation Housing to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs" has, four years after the DRC and Hayes assessments, "Not [been] Implemented."  This remedial measure to ensure clinically-informed provision of clothing, property, and procedures to patients in EOH is urgently needed to address the ongoing harm and substantial risk of harm to patients.

76.    To address the dangerous current policy and practice, the Sheriff's Department must revise its policies, procedures, practices, and training to ensure that mental health staff have primary authority in determining the placement of an incarcerated person with mental illness in a mental health-designated housing unit, including the Enhanced Observation Housing (EOH) unit, and in determining clinically appropriate provision of clothing, property, and privileges for patients at risk of suicide, without custodial interference with clinical judgment.

## III.    Finding #2 - The Jail's System Fails to Provide Adequate Clinical Care, Including Due to the Lack of Confidential Settings for Clinical Encounters, which Puts People at Substantial Risk of Serious Harm.

77.    Patient candor is an essential aspect of effective clinical interaction. But a patient cannot reasonably be expected to communicate openly when clinical interactions occur in a non-private, non-confidential setting where other people can hear what is being discussed.  Clinical contacts conducted in such circumstances, including mental health assessments in which patients are asked to communicate sensitive and personal information to the mental health clinicians, are likely to be incomplete and inadequate because of the patient's understandable reluctance to speak candidly.

78.    Confidential mental health contacts are the standard of care, both in the community and in detention settings.  The failure to provide sufficient confidential treatment in San Diego County Jail places people at a substantial risk of serious harm by hindering their ability to request and receive adequate treatment.  An adequate system of care in the Jail setting requires the provision of a private, confidential setting for patients to communicate openly with their clinician or other care provider.

79.    The materials I have reviewed for this matter make plain the gross failure to provide patients with mental health needs a confidential setting for clinical encounters in San Diego County Jail.

80.    Several incarcerated people with mental health needs describe situations in which mental health staff attempt to engage with them in non-private, non-confidential settings, and the ways that this undermines and precludes effective care:

- Cedric Jones: "I met with the clinician on August 31 because I was feeling very depressed and had submitted a request slip saying so. I did not feel comfortable sharing much about what I was really feeling because the meeting was at my cell door and other people could hear

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

our conversation. On October 20, I told the clinician that r wanted to speak in a confidential setting, but that confidential meeting took another three weeks. On December 1, 2021, **I protested that a deputy was present for a meeting with a psychiatrist to discuss my medications. l asked to talk privately, but the request was rejected, and my appointment was rescheduled for over a week later.**"

- Gary Bartlett: "In administrative segregation, I get short visits at my cell door from a clinician, but those are just wellness checks and are very brief. **A deputy is with the clinician so I do not feel comfortable having therapy with the deputy there. … Since I was booked, I have not been able to have a confidential visit with any mental health professional.**"

- Karina Rios: "The Jail's mental health care is inadequate. I suffer from anxiety and depression. I am only able to see a psychiatrist once a month. **Those visits are conducted in a small room with an open door so others passing by can hear what is discussed. This prevents me from being able to communicate openly with the psychiatrist and makes my anxiety worse.** The visits are also too short. I usually am only allowed to speak with the psychiatrist for approximately three minutes, which is not enough time for them to understand my mental health condition."

- Gustavo Sepulveda: "I was not seen by a psychiatrist until March 3, 2021, but that was a cell-side visit, and it was not confidential. … The deputy outside the cell could hear what we were talking about. Other visits with mental health staff are not confidential. … **When visits with mental health staff are not confidential, I do not feel comfortable speaking freely and openly about the issues that I am facing. I do not feel safe with other incarcerated people or custody staff knowing these private issues from my case or my emotions.**"

- Mark Baker:  "The visits I receive from the mental health clinician are not confidential. **Instead, the clinician meets with me cell-front usually with a deputy by their side. I do not feel comfortable talking about the attack or my mental state with a custody officer present. Moreover, there are other people housed next to my cell in the medical observation unit. I do not want them to know my private details. and would not talk openly in front of them.** So, when the clinician comes by to talk, it is usually very brief - at most maybe three minutes. Usually, the clinician asks me how l am doing. For the above reasons, I do not open up and talk about how I really feel.

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

The clinician then tells me not to harm myself. The majority of the conversation is focused on, hen 1 can receive certain property items if [ continue to not harm myself- like when I can get a pencil or my clothing and what I have to do to get it back."

- Nikki Yach: "The clinician came to my cell along with a deputy to talk to me. **I refused that visit because I did not want to talk about my mental health needs in front of the deputy and everyone else in the housing unit. Sometimes when I have talked to medical staff about other issues, the deputy standing nearby has actually interjected into the conversation.**"

- Ernest Archuleta: "When I have interacted with psychiatrists and mental health personnel, they usually visit me quickly, cell-side, where other incarcerated people can hear. **Even more upsetting, typically a deputy is present for the entirety of the conversation. A deputy will stand between me and my provider. I do not trust custody staff with my personal information. The lack of confidentiality makes it very difficult to express my honest feelings with mental health staff**, and to feel like I am making progress in managing my depression."

- David F. Smith: "[T]he clinician met with me 'at MOB cell,' a non-confidential environment, 'due to lack of deputy assistance.' **The clinician wrote in her progress note that she would only be able to discuss all treatment options 'when in a private setting.' Meeting within earshot of other people makes it difficult for me to talk openly about the nature of my mental health issues.**"

81.    The Jail's mental health clinicians who submitted declarations describe the impossibility of providing adequate care without confidential settings for clinical encounters.  The lack of confidentiality appears to be the norm for clinical contacts at the Jail, preventing adequate care from being delivered in settings where patients are most vulnerable, including in Administrative Segregation, Outpatient Step Down, Enhanced Observation Housing, and the Psychiatric Services Unit observation cells.

82.    The Sheriff's Department has been aware of this deficiency for years. The January 2017 NCCHC Technical Assistance Report for the San Diego County Sheriff's Department contains findings on the lack of confidentiality in clinical

encounters that are highly critical:

> J-A-09  Privacy of Care (I). **Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis.** Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. **Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.**
>
> …
>
> Recommendations: **The areas of privacy and confidentiality of care need to be addressed.** [NCCHC Compliance Indicators] require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met.

NCCHC Report at 8-9; *see also id.* at 43, 109.

83.    Based on the materials I have reviewed, I am aware of no meaningful improvements in this area in the more than five (5) years since the NCCHC issued its findings.

84.    To address this clinically deficient policy and practice, the Sheriff's Department must ensure that all mental health clinical contacts and intake interviews between incarcerated people and mental health professionals, including mental health clinicians, psychologists, and psychiatrists, are conducted in a confidential setting.

IV.    **Finding #3 – Jail Custody Staff Fail to Conduct Adequate Safety Checks, Putting People at Substantial Risk of Serious Harm.**

85.    It is well established that, given the high incidence of suicide attempts and other medical or mental health emergencies in the jail setting, the practice of conducting meaningful "safety checks" is essential to protect human life.  Safety checks entail direct observation of each individual to ensure that they are alive and

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

to check for signs of medical and psychiatric distress.

86.     To be clear, the extraordinarily high number of deaths among people in custody at San Diego County Jail call out for decisive action to save lives.  A San Diego County-commissioned report by Analytica Consulting found in April 2022 that "San Diego jails have the highest number of unexplained deaths" among California counties reviewed, and that "San Diego County is the only county with a statistically significant number of excess deaths" in its jails as compared to countywide mortality rates.[7]

87.     As previous reports have detailed, the number of people who have died by suicide in San Diego County Jail far outpaces other county jail systems.  I am informed that since May 2020, there have been at least four (4) more completed suicides among incarcerated people.  I have also reviewed a Suicide Attempts data chart produced by San Diego County through a Public Records Act request that suggests that the number of suicide attempts is high, and trending upward. According to the County's data, there were 30 suicide attempts in 2018, 45 in 2019, 56 in 2020, and 53 in 2021.

88.     One essential place to start with respect to safety checks is in Administrative Segregation.  In recognition of the risks posed to people in Administrative Segregation and other forms of restrictive housing, it is the standard that safety checks in those units occur twice every hour at intervals no longer than 30 minutes at unpredictable and intermittent times.  The American Correctional Association, for example, advises the practice that "[a]ll special management (segregation) inmates are personally observed by a correctional officer at least every

---

[7] *San Diego County In-Custody Death Study*, Produced by Analytica Consulting for the San Diego Citizens' Law Enforcement Review Board (April 2022), available at https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/in-custody-death-study/Att.G-CLERB%20In-Custody%20Death%20Study.pdf.

1   30 minutes on an irregular schedule" (4-ALDF-2A-52).[8]

2       89.    The San Diego Sheriff's Department has failed to implement this basic,

3   common-sense practice that can save lives.  Pursuant to San Diego Sheriff's

4   Department policy I.64, custody staff conduct safety checks in Administrative

5   Segregation just once every hour, the same frequency as is supposed to occur in

6   general population housing units.

7       90.    It is my opinion that this policy for conducting safety checks in

8   Administrative Segregation only hourly, rather than at least every 30 minutes at

9   staggered intervals, places people in Administrative Segregation in great danger,

10  especially those with mental illness, at risk of suicide, or with risk factors for

11  drug/alcohol withdrawal or overdose.

12      91.    I am not the first outside reviewer to express this opinion.  Lindsay

13  Hayes, the national suicide prevention expert who reviewed the Jail's system in

14  2018, made the same finding and recommendation:

15      Given the strong association between inmate suicide and segregation
        housing and consistent with national correctional standards, it is
16      strongly recommended that DSB officials give strong consideration to
17      increasing deputy rounds of such housing units from 60-minute to 30-
        minute intervals.
18

19  Hayes Report at 57 (citing American Correctional Association standard).

20      92.    The Sheriff's Department's public response to the Hayes report's

21  recommendation was disconcerting.  The Sheriff's Department stated that "this

22  recommendation has been implemented," but only insofar as the "Sheriff

23  Department has given strong consideration to increasing deputy rounds of restricted

24  housing units from 60 minutes to 30 minute intervals. However, given the

25  challenges regarding the physical layout of jail facilities, the numbers of inmates,

26  and care necessary to properly conduct these checks, the Department has determined

27  

28  ------
[8] American Correctional Association (2004), Performance-Based Standards for
    Adult Local Detention Facilities, 4th Edition, Lanham, MD.

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  that it would not be feasible at this time to make this change." County Response to

2  Hayes Report at 12.

3      93.     In its February 2022 report, the California State Auditor notes, in its list

4  of "Certain Key Recommendations From External Entities" that the "Sheriff's

5  Department Has Not Implemented," that the current status of the Hayes

6  recommendation to increase frequency of safety checks in Segregation housing

7  remains "Not implemented." California State Auditor Report at 39.

8      94.     I am aware that other county jail systems have committed to conducting

9  safety checks for all people in Segregation housing at least every 30 minutes, at

10  staggered intervals, with timely documentation and regular auditing by supervisory

11  staff for quality assurance purposes. Examples include Los Angeles County,

12  Sacramento County, Santa Barbara County, and Orange County, among others.

13  California Department of Corrections and Rehabilitation (CDCR) Segregation

14  housing has also implemented this practice.

15      95.     My concerns about safety checks in the Jail go beyond the

16  Administrative Segregation units. Reports have consistently found that the Jail fails

17  to perform adequate safety checks as necessary to preserve human life. Most

18  recently, the California State Auditor issued scathing findings about, among other

19  things, the failures in performing safety checks in the San Diego County Jail.

20  Among the "significant deficiencies in the Sheriff's Department Policies and

21  Procedures [that] likely contributed to the deaths of individuals in its custody," the

22  State Auditor called out "inadequate safety checks," explaining that "sworn staff did

23  not always adequately check on incarcerated individuals. Some individuals were

24  found hours after their deaths, negating the opportunity for lifesaving measures."

25  California State Auditor Report at 19. The State Auditor went on:

26      Based on our review of video surveillance footage, we observed
27      multiple instances of sworn staff who spent no more than one second
        glancing into an individual's cell, sometimes without breaking stride as
28      they walked through the housing module …. Staff later discovered

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

individuals unresponsive in their cells, some with signs of having died
several hours earlier, as detention staff described some of these
individuals as stiff and cold to the touch.

In another example, the Sheriff's Department's records indicate that a
deputy did not perform a required safety check in a housing area, in
part because of poor communication between this deputy and the
station deputy. One hour after the deputy should have performed this
check, sworn staff found an individual in this housing area
unresponsive after attempting suicide. A physician pronounced this
individual deceased at the scene after staff and paramedics were
unsuccessful at saving the individual's life.

… [A] safety check that does not involve any meaningful observation
of an individual is ineffective and inadequate.

*Id.* at 25.

96.    I agree with the State Auditor and hold the opinion that safety check
policy and practice must improve, and that the failure to make such improvements
will lead to further unnecessary loss of life.

97.    The State Auditor noted deficiencies in the Sheriff's Department
written policy on safety checks as well as its lack of formal policy or practice to
audit the timeliness and quality of safety checks through review of video footage, as
other nearby counties do.  The State Auditor explained:

The Sheriff's Department's assistant sheriff of detentions indicated that
the department's policy is sufficient but that individual sworn staff
members do not always follow it. The department's safety check policy
requires supervisors to review logs to ensure safety checks were logged
and conducted at varying intervals within the required time periods, but
it does not stipulate that this review should include examining video
surveillance to confirm checks were conducted in a timely and
appropriate manner. The assistant sheriff of detentions indicated that
the department has an informal process for assessing the quality of
safety checks, which can include watching video footage. However, the
Sheriff's Department has not documented this assessment process in its
policy, and establishing an informal practice does not ensure that each
facility's management team will consistently verify the quality of safety
checks.

California State Auditor Report at 25-26.

98.     Troublingly, the State Auditor was not the first entity to raise alarm bells about the deficiencies in the Jail's safety check policies and practices.

99.     As the State Auditor noted, in the wake of San Diego County Grand Jury recommendations related to inmate safety, the Sheriff's failed to "implement recommendations that involved enhancing its safety checks."  California State Auditor Report at 3.

100.    The County's Citizens' Law Enforcement Review Board (CLERB) has also been critical of the deficient safety checks that Jail staff conduct.  Safety check failures have been found to have occurred surrounding multiple in-custody deaths.  For example, CLERB found that a deputy failed to conduct adequate safety checks in the unit where Blake Edward Wilson died of a drug overdose on January 26, 2020.  CLERB found:

> As evidenced in the jail surveillance video, Deputy 1 did not enter the cell but stopped and looked into it for approximately one second. CLERB believes that this action was not sufficient or long enough to obtain verbal or physical acknowledgement from all three inmates, including inmate Wilson. …  Based upon surveillance video, interviews, and policy review, a preponderance of evidence showed that Deputy 1 failed to conduct an inmate "Proof of Life" Soft Count and his actions were not justified.

101.    A June 9, 2020 CLERB report also found deficient safety checks in reviewing the death of Joseph Carroll Horsey, who died while in the Central Jail psychiatric unit on Christmas Eve, 2017.  Mr. Horsey was found unresponsive in his bed, apparently having been dead for multiple hours: "**According to the Medical Examiner's Office reports, during the initial body examination at the scene, the decedent's body had undergone postmortem changes that suggested that Horsey had been dead hours before he was discovered.**  Resuscitative efforts were impractical as rigor mortis and livor mortis had already set in."  CLERB found that "Deputy 1 documented that all safety/security checks were logged.  However,

the jail surveillance video recordings showed sworn staff and nursing personnel

walking by the module, versus physically entering the unit to observe each inmate

for obvious signs of medical distress. The jail surveillance video recordings did not

reveal any deputy entering the module to conduct [safety checks]….   The video

evidence supported the allegation and the act or conduct was not justified."

102.   In the 2018 Disability Rights California report on suicides at San Diego

County Jail, the correctional mental health experts identified significant concerns in

regarding the adequacy of safety checks:

> **Inadequate security/welfare checks (also known as "proof of life
> checks") were observed via video review in a number of cases in
> which inmates died by suicide.** In at least one case, hourly safety
> checks were not completed pursuant to Jail policy during the time
> period the inmate died by suicide. **In video and record reviews of at
> least three inmates who died, checks were completed inadequately
> – either not completed timely or in manner that failed to
> meaningfully assess the welfare of the inmate.**  For instance, in one
> case, the video showed two deputies enter the housing unit and separate
> to allow one to check the upper tier and one the lower.  **The deputies
> completed their checks of 40 cells in 17 seconds, far too quickly to
> complete meaningful checks.**  The deputy checking the upper tier did
> not stop except at the first cell and did not appear to take enough time
> to establish that the inmates in each cell were alive and safe.

DRC Report Appendix A at 15-16.

103.   The DRC Report, issued more than four years ago, contained

recommendations that are astonishingly similar to those in the State Auditor'

February 2022 report: (1) "The Department should provide annual training for

sworn staff that includes reminders about the requirement for assuring the welfare of

inmates during security/welfare checks"; and (2) "The Department should

implement a method to track and audit the timeliness and adequacy of

security/welfare checks, such as reviewing videos."  Such measures are still urgently

needed today.

104.   I agree with the State Auditor and Disability Rights California, and

1  hold the opinion that the Sheriff's Department must take proactive steps as soon as
2  possible to ensure that safety checks are conducted timely, meaningfully, and
3  effectively.

4       105.   To address the deficient policy and practices relating to safety checks at
5  the Jail, the Sheriff's Department must revise its policy to conduct safety checks at
6  least once every 30 minutes at irregular and unpredictable intervals of all
7  incarcerated people held in Segregation-type housing, it must improve its policies
8  and training, and it must develop formal procedures for supervisors to audit safety
9  checks and to ensure that they have actually occurred, with appropriate
10 accountability and quality assurance measures taken to address deficiencies.

11 **V.     Finding #4 – The Jail System Must Take Affirmative Steps to Protect
12     Against Preventable Drug Overdose Deaths.**

13      106.   I am informed that the San Diego County Jail has had many opioid
14 overdose deaths among its incarcerated population.

15      107.   I was the clinical director of the San Francisco Veterans' Affairs
16 Hospital substance abuse inpatient unit for over four years. I have written and taught
17 extensively on topics related to substance use, including detoxification and
18 overdose.  As an emergency room physician, I currently encounter and treat opioid
19 overdose cases on an extremely frequent basis.  I have considerable experience and
20 expertise in this area.

21      108.   With recent developments in medical science and medication
22 availability, these sorts of overdose deaths are in many cases preventable.  A critical
23 tool is access to and timely delivery of naloxone, which is commonly referred to by
24 its brand name, Narcan.  Many detention systems, health care centers, police
25 departments, homeless shelters, and other community-based service providers have
26 made great efforts to expand access to naloxone within their facilities to ensure that
27 people who experience an overdose may be timely treated with naloxone
28 administration.

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

109.    Among the strategies that detention systems have implemented is placing naloxone in accessible spots inside the facility for staff to quickly access in case of an overdose, and having staff carry naloxone on their person.  These strategies are in many systems smart and helpful in preventing in-custody overdose deaths.

110.    However, in a system like that in the San Diego County Jail, which I understand is plagued by chronic understaffing and failures to provide timely emergency response, these strategies to expand staff members' access to naloxone are insufficient.  That is because there is simply not enough staff to ensure that emergencies (like overdoses) are timely identified and responded to by staff members, as the State Auditor's findings on inadequate safety checks and emergency response indicate.

111.    Based on my experience and expertise, it is my opinion that a safe, effective, and life-saving measure that the Jail could implement right now would be to expand and ensure timely access to naloxone for incarcerated people at risk of overdose, with basic training provided to people in custody on how to administer it to someone experiencing an overdose.  It is a common and well-accepted practice to provide safe and effective medications to incarcerated people that require ready accessibility and for which there is not a significant risk of abuse.  Naloxone fits that criteria.

112.    Likewise, it is my opinion that a safe, effective, and life-saving measure would be to simply place naloxone in areas where incarcerated people are held (such as intake holding areas and housing units), and to provide basic information to incarcerated people about its administration.

113.    Timely administration of naloxone can save lives and reduce the likelihood of long-term complications of overdose, such as brain damage. Naloxone is safe and non-addictive, with no risk of misuse.

114.    Distribution of naloxone to incarcerated individuals has been

1 | implemented elsewhere, with positive effect.  The Los Angeles County Jail
2 | reportedly implemented a pilot program to provide Narcan to incarcerated people.
3 | After the lives of two men were saved after other men in their housing unit
4 | administered Narcan to them during an overdose in May 2021, the system placed
5 | Narcan in in dozens of housing units, with plans to continue to roll it out in other
6 | facilities.[9]

8 | I declare under penalty of perjury under the laws of the United States of America
9 | that the foregoing is true and correct to the best of my knowledge, and that this
10 | declaration is executed at Honolulu, Hawaii this 30ᵀᴴ day of April, 2022.

Pablo Stewart, M.D.

---

26 | [9] Alene Tchekmedyian, As opioid overdoses rise in L.A. jails, inmates get access to
27 | lifesaving drug, *Los Angeles Times*, June 7, 2021, available at
28 | https://www.latimes.com/california/story/2021-06-07/opioid-overdoses-sheriff-narcan-jails.

[3903105.1]                              42                 Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# EXHIBIT A

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***
**3021 La Pietra Circle**
**Honolulu, HI 96815**
**(808) 352-8074**
**(415) 264-0237**
**e-mail: pablo.stewart.md@gmail.com**
**(Updated July 2021)**

<u>Personal Statement:</u>    As evidenced in my CV, my psychiatric career is based on several guiding principles. These include but are not limited to a commitment to diversity at all levels of medical education, including medical students, residents and faculty members. Also, I have always believed that health care is a right and not a privilege. I have demonstrated this fact by my passion for social justice and health equity for everyone.

<u>Language Competency:</u>    Fluent in both Spanish and English.

<u>EDUCATION:</u>    University of California, San Francisco, Teaching Certificate in General Medical Education, 2017

University of California, San Francisco, School of Medicine, Department of Psychiatry, Psychiatric Residency Program, 1986

University of California, San Francisco, School of Medicine, M.D., 1982

United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry

<u>LICENSURE:</u>    California Medical License #GO50899
Hawai'i Medical License #MD-11784
Federal Drug Enforcement Administration #BS0546981
Hawaii Controlled Substances Certificate of Registration #E14341
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

<u>ACADEMIC APPOINTMENTS:</u>

July 1, 2019-
Present    <u>Academic Appointment:</u> Clinical Professor/Psychiatrist, University Health Partners (UHP), University of Hawaii, John A. Burns School of Medicine.

February 22, 2018-
February 22, 2019    <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of Hawaii, John A. Burns School of Medicine.

Ex. A
2

| | |
|---|---|
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco.<br>School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u>  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u>  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u>  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| July 2019-<br>Present | Attending Psychiatrist John A. Burns School of Medicine, Department of Psychiatry, University of Hawaii. Current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill inmate population housed at the Oahu Community Correctional Center. In this capacity I was also involved with local agencies in formulating the jail's response to Covid-19. I present a lecture series to the psychiatric residents regarding Forensic Psychiatry. I also serve as an Attending Psychiatrist in the Emergency Department and the Psychiatric Inpatient Unit at the Queens Medical Center. |
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues, extensive experience in all phases of capital litigation and correctional psychiatry. |
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project.</u>   Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>   Overall clinical/administrative responsibility for the IPCC, a community-based case management program.  Duties also |

2

include medical/psychiatric consultation to Veteran Comprehensive Homeless Center. This is a social work managed program that provides comprehensive social services to homeless veterans.

| | |
|---|---|
| April 1991 - February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department of Veterans Affairs Medical center, San Francisco.</u> Overall clinical/administrative responsibility for SAIU. |
| September 1990 - March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans Affairs Medical Center, San Francisco.</u> Clinical responsibility for patients admitted to SAIU. Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 - December 1989 | <u>Director, Forensic Psychiatric Services, City and County of San Francisco.</u> Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco. Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 - August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital.</u> Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward. Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco. Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |
| July 1985 June 1986 | <u>Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.</u> Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 - March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco, CA.</u> Responsibility for Crisis Center operations during assigned shifts, admitting privileges at Mount Zion Hospital. Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 - July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u> Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 - | <u>Physician Specialist, Mission Mental Health Crisis Center,</u> |

November 1984              <u>San Francisco, CA.</u>   Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues.

July 1982-                 <u>Psychiatric Resident, University of California, San Francisco.</u>
July 1985                  Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital.

June 1973 -                <u>Infantry Officer - United States Marine Corps.</u>
July 1978                  Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Officer in Charge of a Vietnamese Refugee Camp. Received an Honorable Discharge.  Highest rank attained was Captain.


<u>HONORS AND AWARDS:</u>

June 2020                  Recognized by the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii as the recipient ot the 2019-2020 Excellence in Teaching Award-Psychiatry.

June 2015                  Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015.

June 1995                  Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995.

June 1993                  Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993.

May 1993                   Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine.

May 1991                   Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991.

| | |
|---|---|
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.  Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000- May 2008 | California Association of Drug Court Professionals. |
| July 1997- June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 - June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 - June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 - April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 - June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 - June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 - January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000- April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001- September 2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002- June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003- April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003- January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004- June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004- January 2006; February 2017- October 2018 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006- January 2007; April 2013- January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007- March 2013; February 2015- 2017 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| June 2020- Present | Member of the John A. Burns School of Medicine, University of Hawaii Scholarship Committee. |
| June 2020- Present | Member of the resident selection committee for the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii. |

6

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

## TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2019-<br>present | Present a lecture series to the psychiatric residents of the Department of Psychiatriy, JABSOM, University of Hawaii on forensic psychiatry.  Psychotherapy supervisor Department of Psychiatriy, JABSOM, University of Hawaii. |

| | |
|---|---|
| December 2018-<br>May 2019 | Lecturer, Department of Psychiatry, JABSOM, University of Hawaii. |
| September 2016-<br>June 2018 | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014-<br>June 2018 | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003-<br>June 2018 | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| September 1990-<br>December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

Ex. A
9

| | |
|---|---|
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 - February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU) San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Alcoholism".  This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional.  This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital,  Department of Psychiatry.  Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric |

9

Clerkship 110 and Advanced Clinical Clerkship in Psychiatry
141.01.

July 1985 –
August 1990

Psychiatric Consultant to the General Medical Clinic,
University of California, San Francisco General Hospital.  Teach
and supervise medical residents in interviewing and
communication skills.  Provide instruction to the clinic on the
psychiatric aspects of ambulatory medical care.

## COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

May 2016-
Present

Court-appointed monitor in *Ashoor Rasho, et al. v. Director John
R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court,
Peoria, Illinois.) This case involves the provision of constitutional
mental health care to the inmate population of the Illinois
Department of Corrections.

June 2015-
May 2017

Senior Fellow, University of California, Criminal Justice & Health
Consortium.

April 2014-
Ocotber 2018

Plaintiffs' expert in *Hernandez, et al. v. County of Monterey,
et al.*, No.: CV 13 2354 PSG. This case involves the provision of
unconstitutional mental health and medical services to the inmate
population of Monterey County Jail.

January-December 2014

Federal Bureau of Prisons: Special Housing Unit Review and
Assessment. This was a year-long review of the quality of mental
health services in the segregated housing units of the BOP.

August 2012-present

Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court,
Phoenix, Arizona.) This case involves the provision of
unconstitutional mental health and medical services to the inmate
population of the Arizona Department of Corrections.

October 2007-
Present

Plaintiffs' expert in 2007-2010 overcrowding litigation
and in opposing current efforts by defendants to terminate the
injunctive relief in *Coleman v. Brown,* United States District Court,
Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM.
The litigation involves plaintiffs' claim that overcrowding is
causing unconstitutional medical and mental health care in the
California state prison system. Plaintiffs won an order requiring the
state to reduce its population by approximately 45,000 state
prisoners.  My expert opinion was cited several times in the
landmark United States Supreme Court decision upholding the
prison population reduction order.  *See Brown v. Plata,* ___U.S.
___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6,
994 (2011).

July/August 2008-Present

Plaintiff psychiatric expert in the case of Fred Graves, et al.,
plaintiffs v. Joseph Arpaio, et al., defendants (District Court,
Phoenix, Arizona.)  This case involved Federal oversight of the
mental health treatment provided to pre-trial detainees in the
Maricopa County Jails.

10

| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
|---|---|
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |

11

| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic.<br>Overall responsibility for psychiatric services at the clinic. |
|---|---|
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services,<br>Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
|---|---|
| September 1994 -<br>June 2002<br>June 1991-<br>June 1994 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA.<br>Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

Ex. A
13

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego.  Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists.  (9/10/94).  "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar.   (12/1/1994).  "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.   (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01).  "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered.  (3/10/1995).  "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995).  "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.   (11/23/95).  "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California.   (1/19/96).  "Understanding Alcoholism and its Impact on the Legal Profession."   MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.    Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.    Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.    DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34.    The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35.    The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36.    American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.    "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38.    "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.    Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.    Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.    Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.    "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.     Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.     "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.     9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.     Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.     Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.     California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.     California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.     Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.     1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.     "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.     Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.     "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58.     Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59. American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999).  Entry Level Process Group Leader.

60. "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61. "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62. "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63. "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64. Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66. "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67. California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68. "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69. State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71. 11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72. The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.    "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.    15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho.  (5/25/99)

76.    "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.    "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.    "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.    "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.    "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.    "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.    1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California.  (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui.  (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.   "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.   "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.   "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.   "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.   "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.   "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.   "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.   "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.   "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.   "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.   "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.   "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.  "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.  "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.  National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.  "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.  (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106.     "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.    "Wasn't One Problem Enough?"  Mental Health and Substance Abuse Issues.  2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California. (3/13/01)

114.    "Dual Diagnosis-Assessment and Treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115.    Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116.    National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."  I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA. (6/1-6/2/01)

117.    Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118.    Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119.    San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

Ex. A
21

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135.    "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.    Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.    Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.    "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.    Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.    "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.    "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.    "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.    "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.    "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.    "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.    "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.    "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.    "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.    "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.    "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

Ex. A
23

151.   Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.   2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.   Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.   Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.   2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.   2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.   Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.   Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.   "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.   San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161.   Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.   "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

163.   Mental Health & Death Penalty Training, Community Legal Aid Institute (LBH Masyarakat), Jakarta, Indonesia, February 12 -16, 2019.

<u>PUBLICATIONS:</u>

1)   Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients.* <u>Hospital and Community Psychiatry,</u> 39, 437-439.

2)   Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* <u>Group,</u> Volume 13, Number 2, Summer 1989, 67-73.

3)   Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* <u>Journal of Psychoactive Drugs,</u> Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)   Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. <u>Journal of Substance Abuse Treatment,</u> Vol. 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* <u>The Journal of Nervous and Mental Disease,</u> Vol. 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* <u>Journal of Psychoactive Drugs</u>, Vol. 28(3), pages 305-309, July-September 1996.

7)   Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* <u>Prevention,</u> (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)   Stewart, P. (1999). *<u>New Approaches and Future Strategies Toward Understanding Substance Abuse</u>.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)   Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *<u>Understanding Addictions-From Illness to Recovery and Rebirth,</u>* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)  Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *<u>Uppers, Downers, All Arounders, Fifth Edition</u>*, CNS Publications, Inc., Ashland, Oregon.

11)  James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* <u>National Institute of Corrections,</u> Accession Number 019468.

12)  Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as <u>AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)  Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14)  Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.

15)  Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16)  Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17)  Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)*  Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

*19)*  Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Plaintiff-Appellant Edgar Quintanilla v. Homer Bryson, Commissioner, State of Georgia's Department of Corrections, et al., On appeal from the United States District Court for the Southern District of Georgia, Case No. 6:17-cv-00004-JRH-RSB in the United States Court of Appeals for the Eleventh Circuit, No. 17-14141.