1  GAY CROSTHWAIT GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  PRIYAH KAUL – 307956
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   ROSEN BIEN GALVAN & GRUNFELD LLP
4  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
5  Telephone:  (415) 433-6830
   Facsimile:  (415) 433-7104
6  Email:      ggrunfeld@rbgg.com
               vswearingen@rbgg.com
7              pkaul@rbgg.com
               eanderson@rbgg.com
8              hchartoff@rbgg.com

9  AARON J. FISCHER – 247391
   LAW OFFICE OF
10 AARON J. FISCHER
   2001 Addison Street, Suite 300
11 Berkeley, California  94704-1165
   Telephone:  (510) 806-7366
12 Facsimile:  (510) 694-6314
   Email:      ajf@aaronfischerlaw.com

13
   (*additional counsel on following page*)
14 Attorneys for Plaintiffs

15              UNITED STATES DISTRICT COURT

16            SOUTHERN DISTRICT OF CALIFORNIA

17 DARRYL DUNSMORE, ERNEST            Case No. 3:20-cv-00406-AJB-WVG
   ARCHULETA, ANTHONY EDWARDS,
18 REANNA LEVY, JOSUE LOPEZ,          **DECLARATION OF ROBERT**
   CHRISTOPHER NELSON,                **COHEN IN SUPPORT OF**
19 CHRISTOPHER NORWOOD, and           **PLAINTIFFS' MOTIONS FOR**
   LAURA ZOERNER, on behalf of        **PRELIMINARY INJUNCTION**
20 themselves and all others similarly **AND PROVISIONAL CLASS**
   situated,                          **CERTIFICATION**
21              Plaintiffs,
                                       Judge:  Hon. Anthony J. Battaglia
22         v.
                                       Trial Date:   None Set
23 SAN DIEGO COUNTY SHERIFF'S
   DEPARTMENT, COUNTY OF SAN
24 DIEGO, CORRECTIONAL
   HEALTHCARE PARTNERS, INC.,
25 LIBERTY HEALTHCARE, INC., MID-
   AMERICA HEALTH, INC., LOGAN
26 HAAK, M.D., INC., SAN DIEGO
   COUNTY PROBATION
27 DEPARTMENT, and DOES 1 to 20,
   inclusive,
28              Defendants.

1730-01 3896815.12

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  (*counsel continued from preceding page*)

2  CHRISTOPHER M. YOUNG – 163319
   ISABELLA NEAL – 328323
3  OLIVER KIEFER – 332830
   DLA PIPER LLP (US)
4  401 B Street, Suite 1700
   San Diego, California 92101-4297
5  Telephone: (619) 699-2700
   Facsimile: (619) 699-2701
6  christopher.young@dlapiper.com
   isabella.neal@dlapiper.com
7  oliver.kiefer@dlapiper.com

8  BARDIS VAKILI – 247783
   JONATHAN MARKOVITZ – 301767
9  ACLU FOUNDATION OF SAN DIEGO &
   IMPERIAL COUNTIES
10 2760 Fifth Avenue, Suite 300
   San Diego, California 92103-6330
11 Telephone: (619) 232-2121
   bvakili@aclusandiego.org
12 jmarkovitz@aclusandiego.org

13 Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, Robert L. Cohen, M.D., declare:

1.     I have been retained by Plaintiffs' counsel to provide expert opinion concerning the adequacy of policies, procedures, and practices regarding treatment of opioid withdrawal and prevention of overdose deaths at the San Diego County Jail ("the Jail"). I make this declaration in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification ("Plaintiffs' Motions").

2.     I am a board-certified medical doctor of internal medicine and an expert in the field of correctional medicine. I have approximately forty years of experience in correctional medicine. A copy of my curriculum vitae is attached as **Exhibit A**.

3.     I have practiced medicine and served as the Director of the Montefiore Medical Center for five years at the Rikers Island Jail in New York City, during which time I supervised and was responsible for the provision of medical and mental health services for more than 13,000 incarcerated people in New York City. I am one of the nine members of the New York City Board of Corrections, an independent civilian board that oversees the operations and creates the rules governing the Department of Corrections including those governing medical and mental health services; these rules have the force of law in New York City. As a member of the Board, I have 24-hour access to all of the jails in New York City.

4.     I served as vice president for medical operations of the New York City Health and Hospitals Corporation, a governmental agency that operated eleven public hospitals in New York City, in which capacity I was responsible for oversight of all physician services, nursing, quality assistance, and prison healthcare. I have practiced medicine in Cook County Jail and on Rikers Island.

5.     I have served since 1989 as a federal or state court-appointed monitor for medical care in a number of jail and prison systems, including the medical services in the Philadelphia jail system, with a population of 9,000 to 10,000; for all people incarcerated in prisons in the State of Florida; and for prisons in New York

1730-01 3896815.12

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

State, Michigan, Ohio, and Connecticut.  As court-appointed monitor, I have monitored care in order to improve it to meet constitutional standards.

6.      I served on the board of the National Commission of Correctional Health Care ("NCCHC") for 17 years, representing the American Public Health Association

7.      Attached hereto as **Exhibit B** is a full list of all materials I reviewed in order to prepare this declaration and in my work as Plaintiffs' expert in this case. My opinions set forth below are based upon the materials listed in this exhibit and on my professional knowledge and my experiences working in correctional settings.

8.      This case is in a very early stage.  I am informed that the parties have not yet exchanged any formal discovery.  I have not had the opportunity to conduct any inspection of the Jail facilities, I have not interviewed any staff or incarcerated people, and I have only reviewed a limited number of documents regarding specific incarcerated people.  As a result, I have not been able to form opinions regarding certain elements of the medical care system at the Jail as it relates to drug overdoses. For example, at the present time, I do not have access to the information necessary to form opinions regarding the entire scope of medication-assisted treatment ("MAT") available to persons incarcerated at the Jail, to the extent MAT is available.  I would expect to consider this and other issues not addressed in this declaration in the future once Plaintiffs propound discovery.  Based upon the documents and information I have reviewed, however, I am able to offer the following opinions.  I reserve the right to supplement or modify these opinions as more information becomes available.

### The Risk of Opioid Overdose Death is High Within the Jail

9.      Substance use disorders occur when the recurrent use of drugs and/or alcohol causes clinically significant impairment.  In 2020, 18.4 million people in the United States aged 12 or older had an illicit drug use disorder, 2.7 million of which

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

had an opioid use disorder.[1]  Due to various factors, the population entering the Jail is at particularly high risk of suffering from a substance use disorder.  Over 80% of male individuals test positive for at least one illicit substance upon booking.[2]

10.    Drug overdose is a major cause of preventable death nationally.  It is estimated that more than 100,000 people died of drug overdose in the United States in a 12-month period ending in April 2021, an increase of 28.5% from the same period the year prior.[3]  Opioids are a main driver of these drug overdose deaths.  Opioids are a class of drugs that include heroin, fentanyl, and methadone.  Opioid overdose occurs when an individual consumes higher levels of opioids than the body can handle, resulting in a shut-down of the body's circulatory and respiratory systems.  Opioid overdose results in death from coma and cessation of breathing.  Between 2020 and 2021, fentanyl overdose was the number one cause of death of Americans aged 18 to 45.[4]

11.    Opioid use disorder is a chronic relapsing disorder, which is often fatal.  Opioid use disorder affects at least a quarter of the incarcerated population nationally.[5]  The risk of opioid overdose in the Jail is particularly serious.  Without

---

[1] U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health*, October 2021 at 28, 30, https://www.samhsa.gov/data/sites/default/files/reports/rpt35325/NSDUHFFRPDFWHTMLFiles2020/2020NSDUHFFR1PDFW102121.pdf.

[2] San Diego Association of Governments, *Report on 2020 Adult Arrestee Drug Use in the San Diego Region*, August 2021 at 5, https://www.sandag.org/uploads/publicationid/publicationid_4790_29577.pdf.

[3] Centers for Disease Control and Prevention, "Drug Overdose Deaths in the U.S. Top 100,000 Annually," Nov. 17, 2021, https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm.

[4] Families Against Fentanyl, "Fentanyl By Age: Report," Dec. 15, 2021, https://www.familiesagainstfentanyl.org.

[5] Christine Vestal, *New Momentum for Addiction Treatment Behind Bars*, PEW

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

access to opioids in the correctional setting, individuals experience symptoms of

withdrawal that are at best, extremely uncomfortable, and at worst, extremely

painful.  These symptoms, which can last for weeks, include insomnia, hot and cold

sweats, muscle aches and pains, nausea, vomiting, and diarrhea.  Opioid withdrawal

can lead to death if not properly treated, particularly in an individual with a

concurrent acute serious medical condition.  This co-morbidity is often seen in jails.

If not properly treated, individuals in opioid withdrawal also are likely to experience

strong cravings that may force them to seek out drugs.  Comprehensive treatment of

withdrawal includes identification, prevention, and treatment of symptoms.  The

denial of proper treatment puts individuals with opioid use disorders at much higher

risk of relapse and overdose.

12.    I am informed that from 2010 to 2020, the Jail averaged approximately

one drug overdose death every five months.  I am further informed that since 2019,

at least sixteen incarcerated people have died from drug overdose in the Jail,

amounting to one overdose every two to three months.  These numbers show that

the Jail's rate of overdose deaths has substantially increased over the past three

years.  Last year, 204 individuals in the Jail's custody were administered naloxone

as a result of a suspected overdose incident.  As of April 14, 2022, 57 individuals

have already received naloxone as a result of suspected overdose incidents at the Jail

this calendar year.  An individual is approximately two times more likely to die of

an accident/overdose in the Jail than what is expected based on county mortality

rates.  These statistics indicate not only that the Jail is failing to prevent dangerous

narcotics from entering the Jail, but through its policies and practices, the Jail is

failing to ensure that people experiencing opioid use disorder have access to

medication and therapy to relieve their cravings as well as medication to prevent

Stateline, Apr. 4, 2018, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/04/04/new-momentum-for-addiction-treatment-behind-bars.

1730-01 3896815.12

6

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

overdose deaths.

13.    Although the most effective way to prevent overdose deaths in the Jail is to prevent drugs from entering the facilities in the first place, there are other important steps the Jail should undertake to protect people who suffer from opioid use disorder from overdosing at the Jail.  Two safe, effective, and administrable ways the Jail can reduce the risk of overdose death for incarcerated people are: (1) establishing a comprehensive MAT program, and (2) expanding access to naloxone so that incarcerated people can administer it to others during an emergency.  Both MAT and naloxone are especially useful in jail settings where medical and custody staff may ignore or otherwise not timely respond to medical emergencies.

14.    According to guidance issued by the Civil Rights Division of the U.S. Department of Justice, the Americans with Disabilities Act covers, and protects from discrimination, individuals in treatment or recovery from opioid use disorder, including individuals receiving MAT.[6]

### The Jail Appears to Lack an Adequate MAT Program

15.    MAT is a highly effective method of treating substance use disorders, maintaining recovery, and preventing overdose.  MAT involves the use of medication, in combination with counseling and behavioral health therapies, to treat those with substance use disorders.  MAT medications relieve physiological cravings, prevent withdrawal, and block the euphoric effect of opioids.  The Food and Drug Administration has approved three medications to treat opioid dependence: buprenorphine, methadone, and naltrexone.   MAT medication has been found to be to be safe and effective, when combined with counseling and psychosocial support, in addressing and treating opioid use disorders.  MAT also

---

[6] U.S. Department of Justice, Civil Rights Division, *The Americans with Disabilities Act and the Opioid Crisis: Combating Discrimination Against People in Treatment or Recovery*, Apr. 5, 2022, https://www.ada.gov/opioid_guidance.pdf.

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1730-01 3896815.12

1  should include programming and wraparound services, such as the provision of

2  cognitive behavioral therapy and re-entry support.

3      16.    According to the Substance Abuse and Mental Health Services

4  Administration of the U.S. Department of Health and Human Services, MAT

5  combined with behavioral therapy has been shown to improve patient survival,

6  increase retention in treatment, promote recovery, and decrease illicit opiate use and

7  other criminal activity among people with substance use disorder.[7]

8      17.    MAT also has been demonstrated to reduce overdose deaths in

9  corrections settings for persons with opiate addiction.  For example, the California

10  Department of Corrections and Rehabilitation ("CDCR") offers MAT as part of its

11  Integrated Substance Use Disorder Treatment program.  MAT is available to

12  individuals who enter the prison system already taking MAT, individuals identified

13  as high risk, and individuals expected to release within 15-24 months.  Since the

14  program began in 2020, the rate of overdose deaths in California prisons dropped

15  58%.  This decrease in mortality due to overdose corresponded with the increase in

16  MAT participation.  Hospitalizations were 48% lower among those receiving MAT

17  than among those waiting to begin treatment.  Approximately 22,600 people

18  incarcerated in California prisons have received MAT in just the last two years, and

19  CDCR officials plan to expand access.  In addition to MAT, CDCR's program

20  involves four other core elements: substance use disorder screening and assessment,

21  cognitive behavioral interventions, supportive housing for recovery-focused living

22  during incarceration, and enhanced pre-release planning and transition services

23  aimed at coordinating care upon release.[8]

24

25  [7] U.S. Department of Health and Human Services, Substance Abuse and Mental
26  Health Services Administration, "Medication-Assisted Treatment (MAT)," Mar. 30,
    2022, https://www.samhsa.gov/medication-assisted-treatment.
27
    [8] California Department of Corrections and Rehabilitation and California
28  Correctional Health Care Services, *Transforming Substance Use Disorder*

18.    Researchers in New South Wales, Australia reviewed deaths in prison for opiate-dependent people imprisoned between 2000 and 2012.  Deaths from natural (non-overdose) causes occurred at similar rates whether persons were receiving MAT or not.  However, there was marked reduction of the rates of unnatural deaths, including suicide, overdose, and injury-related deaths, for those persons receiving MAT.  The researchers found that "[i]n the first 4 weeks of a prison episode, the all-cause mortality hazard was 94% lower while in MAT, compared to being out of MAT (adjusted HR (AHR): 0.06; 95% CI 0.01 to 0.48), regardless of gender, indigenous status, age, incarceration history or offending history."  A similar finding was observed in relation to unnatural deaths; during the first four weeks of a prison episode, while in [opioid substitution therapy], the hazard of unnatural death was 93% lower than while not in MAT (AHR 0.07; 95% CI 0.01 to 0.59)."  This effect persisted during the entire period of incarceration for those studied.  Specifically, "[a]cross all time in prison, compared with periods not in MAT, the hazard of unnatural death was 87% lower while in MAT."[9]

19.    Two studies in Rhode Island demonstrated that the value of a jail-based MAT program persisted after release.  People receiving MAT at the time of discharge were "more than twice as likely to return to treatment in a community methadone facility."  Additionally, researchers "observed a large and clinically meaningful reduction in post-incarceration deaths among inmates released from incarceration after implementation of a comprehensive MAT program."[10]

---

*Treatment in California's Prison System: Impacts of the Integrated Substance Use Disorder Treatment Program*, April 2022 at 4-6, 13, 15 19, https://cchcs.ca.gov/wp-content/uploads/sites/60/ISUDT/Impacts-ISUDT-Program2019-22.pdf.

[9] Sarah Larney, Natasa Gisev, et al., *Opioid substitution therapy as a strategy to reduce deaths in prison: retrospective cohort study*, 2014, https://bmjopen.bmj.com/content/4/4/e004666#T4.

[10] Josiah Rich, Michelle McKenzie, et al., *Methadone continuation versus forced*

1730-01 3896815.12

20.     The National Sheriffs' Association supports jail-based MAT.[11]  The Department of Justice also recently issued guidance stating that when a length of stay allows and circumstances dictate, management of withdrawal should include a continuum of interventions including MAT to initiate and maintain long-term recovery upon entry.[12]  For more than 40 years, all opiate dependent persons incarcerated in NYC jails have been eligible to receive methadone detoxification. Since 2017, **all** opiate dependent people incarcerated in New York City's jails have been eligible to participate in buprenorphine- or methadone-based MAT.  If they have not been in a community methadone program, MAT induction takes place in the jail.  If they are sentenced to prison in the New York State Department of Correction and Community Supervision, which at present does not provide MAT, they are medically withdrawn before transfer to state prison.

21.     According to the National Institute on Drug Abuse, every dollar invested in substance use disorder treatment yields a return on investment of $4-$7 in criminal justice costs, and when accounting for avoided health care costs, such treatment can yield a return on investment of 12 to 1.[13]

22.     Based on the policies and procedures I have reviewed, the Jail appears

*withdrawal on incarceration in a combined US prison and jail: a radomised, open-label trial*, May 28, 2015, https://doi.org/10.1016/S0140-6736(14)62338-2.

[11] National Sheriffs' Association, National Commission on Correctional Health Care, *Jail-Based Medication-Assisted Treatment: Promising Practices, Guidelines, and Resources for the Field*, October 2018 at 2, https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf.

[12] U.S. Department of Justice, Bureau of Justice Assistance, *Managing Substance Withdrawal in Jails: A Legal Brief*, February 2022 at 4, https://bja.ojp.gov/doc/managing-substance-withdrawal-in-jails.pdf.

[13] National Institute on Drug Abuse, "Principles of Drug Addiction Treatment: A Research-Based Guide (Third Edition), Is drug addiction treatment worth its cost?," January 2018, https://nida.nih.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/frequently-asked-questions/drug-addiction-treatment-worth-its-cost.

1730-01 3896815.12

10

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

to treat withdrawal primarily through use of medications like Benadryl, Imodium, and Zofran, combined with adjustments to diet and to place an individual on a lower bunk.  These are inadequate and ineffective to treat the experience of opioid withdrawal.

23.    Based on the documents I have reviewed, the Jail does not appear to have a comprehensive MAT program available to individuals with opioid use disorders.  The Jail's policies related to MAT primarily appear in MSD.A.2 of the San Diego County Sheriff's Department Operations Manual.  Policy MSD.A.2 restricts MAT eligibility to:  (1) people who are currently obtaining methadone treatment from a pre-approved outpatient clinic; and (2) females who are pregnant, heroin dependent, and not currently in an outpatient methadone treatment program. This means that all other people booked into the Jail are ineligible—including those who would benefit from methadone but are not currently being treated by a pre-approved outpatient clinic; those currently taking methadone, but not from a pre-approved clinic; those who are currently taking buprenorphine or naltrexone (as opposed to methadone); those who would benefit from buprenorphine or naltrexone; and pregnant females who are dependent on fentanyl or methamphetamines (as opposed to heroin).

24.    Even for a newly incarcerated person who is currently receiving methadone from a pre-approved outpatient clinic, the Jail's policies and procedures put the onus on the incarcerated person to coordinate continued treatment from their clinic.  Policy MSD.A.2 provides that "[o]n those occasions when assistance is needed" with continuing MAT, "nursing staff may assist the patient."  Pursuant to this policy, it is permissive, not required, that nursing staff assist incarcerated people.  Policy SNP.H.4 provides that if a person is an active participant of a methadone clinic and is not withdrawing from methadone, and "is unable to make arrangements for future dosing while incarcerated," nursing staff should start a protocol for opioid withdrawal—the policies do not direct nursing staff to assist

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1730-01 3896815.12

their patient with continuing MAT.  This is an inappropriate approach to continuing MAT in a jail setting.  People with opioid use disorders who are booked into the Jail often are under the influence of a substance or in withdrawal, suffering from mental health issues, distressed or disoriented, or otherwise unable to coordinate continued MAT from their outside clinic.

25.    Policy MSD.A.2 suggests that outside methadone clinics are responsible for supplying and administering methadone to persons incarcerated at the Jail—meaning that the Sheriff's Department does not itself order medication and ensure adequate supplies, administer mediation, or otherwise ensure medication continuity.  It appears the only thing medical staff is required to do as part of the MAT process is contact the incarcerated person's clinic to obtain clinical information.  The policies otherwise do not contemplate that medical staff will be involved in an incarcerated person continuing MAT.  Nor do the policies set forth what medical staff must do to ensure that appropriate counseling and behavioral health therapies are delivered to the patient in connection with MAT.  Policy MSD.A.2 further restricts outside methadone clinics to providing MAT treatment to individuals at only three jail facilities: San Diego Central Jail, Las Colinas Detention and Rehabilitation Facility, and Vista Detention Facility.

26.    I am informed the Sheriff's Department elsewhere has represented that an MAT program has not been officially implemented at any facility.  I also am informed that the Sheriff's Department has represented that MAT services are available in a limited capacity at Las Colinas, and on a case by case basis elsewhere for purposes of continuity of care, but that few incarcerated people are receiving MAT.

27.    Taken together, these policies and other representations indicate the Jail unnecessarily restricts the availability of MAT within the Jail.  This is an inappropriate approach to opioid use disorder, particularly in a jail with such a high instance of overdose death.  MAT, including medication and therapy, should be

1730-01 3896815.12

12

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

offered to all incarcerated persons for whom it is clinically appropriate, regardless of whether they have been receiving treatment prior to incarceration or are housed in a specific jail facility.

28.    In addition to the deficiencies in the Sheriff's Department's MAT policies and representations, the practices at the Jail show that opiate-dependent people at the Jail who would benefit from MAT have not received it. For example, Plaintiff Christopher Norwood self-identifies as having been addicted to heroin for over a decade and was diagnosed with opioid dependence. Outside of the Jail, he has used Suboxone to treat his addiction. Suboxone is a combination medication containing buprenorphine and naloxone, and is one of the main medications used to treat opioid addiction. The Jail did not provide Mr. Norwood with Suboxone or any other MAT therapy. Mr. Norwood overdosed on fentanyl while incarcerated at the Jail and was subsequently hospitalized. Even after being hospitalized, the Jail never provided Mr. Norwood with MAT-related therapy during his incarceration. Others who suffer from substance use issues who enter the Jail also have not received withdrawal medication, including MAT medication.[14]

29.    I understand that after the California State Auditor issued its February 3, 2022 report, the Sheriff's Department announced that it would expand its MAT program. I am not aware of the scope of the planned expansion, or the timeline. But at minimum, in order to save people from overdosing from opioids at the Jail, the Sheriff's Department should address the deficiencies identified above and ensure that MAT is made available in all Jail facilities to all incarcerated people who have opioid use disorder and would benefit from MAT medication and behavioral health therapy.

**The Jail Should Expand Access to Naloxone for Incarcerated People**

30.    Opioid overdose is reversible through the immediate administration of

[14] *See, e.g.*, Declaration of Waylon Cozart, ¶ 3.

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1730-01 3896815.12

a fast-acting opioid antagonist called naloxone, also known as "Narcan." Naloxone blocks the action of opioids, resulting in a return to consciousness and resumption of breathing. The emergency administration of naloxone saves lives and reduces the likelihood of medical complications of overdose, such as brain damage.

31.    Naloxone is safe, effective, and non-addictive. It can be administered as an injection (intramuscular) or through the nose (intranasal). It carries no risk of misuse, cannot be used to get high, and has not been found to have any effect on individuals who do not have opioids in their systems. Based on the documents I have reviewed, the Sheriff's Department appears to agree that naloxone is safe, effective, and easy to use.

32.    Naloxone nasal spray typically is sold commercially in a dispenser that fits in an adult's palm. It resembles the kind of over-the-counter nasal spray that people may buy to treat allergies. To administer the naloxone nasal spray, a person simply inserts the tip of the bottle into one nostril, presses a small "plunger" to release the spray, and repeats the process in the other nostril. The process is somewhat analogous to administering an asthma inhaler, which incarcerated people typically are able to keep in their possession and self-administer. Below is a photograph of a typical naloxone nasal spray dispenser:



33.    The NCCHC supports increased access to naloxone in correctional facilities and promotion of naloxone use in correctional facilities. It has published

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

several specific recommendations related to the topic. Among these is the NCCHC's recommendation that, in accordance with state laws, naloxone should be readily available to all people in a facility, including—optimally—people who are incarcerated. It also recommends that facilities provide training to all people, including those incarcerated, on opioid overdose and the correct technique for administration of naloxone.[15]

34.    Last year, in response to a spike in overdose deaths, the Los Angeles County Sheriff's Department began a pilot program in which it placed naloxone inside housing units in jails, making it available to incarcerated people. As part of this program, bottles of naloxone were attached to the wall in dormitory settings where anyone who saw another individual appearing to overdose could remove them and administer the medicine. The department has reported positive outcomes, including releasing video footage from inside one facility where incarcerated people administered Narcan to two individuals who collapsed of suspected overdoses, saving their lives. The department has stated that it plans to expand the program to all custody facilities.[16]

35.    Correctional Health Service staff in New York City train incarcerated people to use naloxone. Naloxone for use by incarcerated people is stored at the officer's station and is provided on request. Correctional Health Service staff in New York City train people who come to visit loved ones in jail in the use of naloxone.

36.    The Jail appears to require deputies to carry naloxone nasal spray for

---

[15] National Commission on Correctional Health Care, "Naloxone in Correctional Facilities for the Prevention of Opioid Overdose Deaths," Oct. 31, 2021, https://www.ncchc.org/naloxone-for-the-prevention-of-opioid-overdose-deaths.

[16] Los Angeles County Sheriff's Department, "Sheriff's Naloxone Custody Pilot Project Saves Inmates from Overdose," May 27, 2021, https://lasd.org/sheriffs-naloxone-custody-pilot-project-saves-inmates-from-overdose/.

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1730-01 3896815.12

use in the event of an overdose.  According to materials I reviewed, naloxone has been used by deputies and other staff on numerous occasions to save lives.  For example, in 2021, the Jail's staff administered naloxone over 200 times to individuals suspected of overdosing.  More lives could be saved, however, if incarcerated people in the Jail had access to naloxone to administer on others in the event of an emergency.  For example, I am aware that on November 22, 2020, a man named Lazaro Alvarez died just hours after being booked into the Jail.  The medical examiner stated Mr. Alvarez died from a heart attack caused by methamphetamine and fentanyl.  An investigation into the death found that one deputy started cardio-pulmonary resuscitation but stopped after administering two chest compressions, "due to not wanting to disrupt a crime scene."  A second deputy failed to help Mr. Alvarez.  The first deputy was not carrying naloxone.  After the death, policy was updated to require deputies to carry naloxone.  Had another person in the housing unit, such as an incarcerated person, had access to naloxone, Mr. Alvarez may have been saved.

37.    I am informed that on April 27, 2022, two incarcerated persons were found unresponsive inside of a cell at George Bailey.  One was revived with the use of naloxone, but the other, Omar Ornelas, did not survive despite deputies, medical staff, and paramedics attempting life-saving measures.  If naloxone had been available for use by incarcerated people, another person in the housing unit may have been able to administer it immediately and Ornelas' live may have been saved.

38.    I believe that with minimal training, nearly anyone could administer naloxone.  Many states, including California, permit pharmacies to provide naloxone without a prescription.[17]  I am informed that over-the-counter naloxone nasal spray sells for approximately $60 per dose.  Naloxone has been used regularly

---

[17] Centers for Disease Control and Prevention, "Lifesaving Naloxone," Feb. 23, 2022, https://www.cdc.gov/stopoverdose/naloxone/index.html.

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1730-01 3896815.12

1  for decades by medical providers and laypeople.  I have seen training and

2  educational materials regarding proper administration of naloxone that are

3  extremely easy to understand.  A short instructional document and/or brief video

4  likely would be sufficient to train individuals in the Jail, including incarcerated

5  people, to use naloxone.

6      39.    The Jail's policies indicate that incarcerated people are capable of

7  administering naloxone in that the policies require that incarcerated people are

8  provided a voucher to receive naloxone after their release.  This has become

9  common practice in jails and prisons across the county and is an important practice

10  to reduce the likelihood of overdose after incarcerated people are released into their

11  communities.  However, this Jail, with a documented overdose death rate

12  substantially higher than the rest of the state, should ensure that naloxone is

13  available to incarcerated people, including by supplying naloxone directly to people

14  at risk of overdose and making naloxone available to incarcerated people in the

15  intake and housing areas with appropriate guidance on its use in case of emergency.

16  Doing so will reduce the instances of overdose deaths in the Jail.  This is especially

17  important where the Jail has a track record of not timely responding to medical

18  emergencies.

19  **The Jail's Policies Suggest Deficiencies in Screening, Monitoring, and Treating**

20  **Opioid Use Disorder**

21      40.    Based on the materials I have reviewed, and my knowledge and

22  experience, I have additional concerns about the Jail's practices related to screening,

23  monitoring, and treating opioid use disorder.  For example, SNP.H.4 requires nurses

24  to contact qualified medical providers immediately if a patient's pulse, systolic

25  blood pressure, or diastolic pressure drop below a certain level, but it does not

26  explicitly require a physician to be notified if a patient's vitals *rise* above a certain

27  level, which it should.  This is particularly important when the patient is

28  withdrawing from opiates and alcohol at the same time.

1730-01 3896815.12

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

41.     SNP.H.4 also requires that the Clinical Opiate Withdrawal Scale ("COWS") be used for five days to monitor a patient in withdrawal.  This is an appropriate and validated instrument when used correctly, but the procedures do not set forth how often the COWS assessment is performed on each day of the five-day protocol.  The frequency of use may depend on the condition of the patient, but the standardized nursing procedures should set forth parameters that must be followed.  SNP.H.4 only directs the nursing staff to perform a COWS re-assessment within 48 hours of protocol evaluation.

42.     To assess how the Sheriff's Department's policies and procedures and training are implemented in practice, I would need to review additional information.  I likely could identify additional steps the Jail should consider to reduce the high rate of overdose death if I were able to review training documents, documents reflecting how medical staff monitors people in withdrawal, data regarding contraband drugs that are able to enter the Jail, medical records for individuals with opioid use disorders who died while in custody, and other documents currently in the sole possession of Defendants.  Information gained through Person Most Knowledgeable deposition transcripts, interviews with medical staff and custody officers, and reviewing the scope of any expansion of MAT currently underway would also assist my understanding.  I would also like to inspect all six of the facilities currently in use to assess where people experiencing withdrawal are housed, speak with staff about their understanding of withdrawal and overdose policies, and observe the intake process for people who have opioid use disorder.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1730-01 3896815.12

18

DECLARATION OF ROBERT COHEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1    **The Remedies Requested in Plaintiffs' Motions Are Reasonable and**
2                                   **Appropriate**

3        43.    I have reviewed the proposed preliminary injunction order that
4    Plaintiffs have requested in this case.  In relevant part, Plaintiffs request that the Jail
5    be required to develop a plan for preventing overdose deaths, including, but not
6    limited to, implementing a more robust MAT program and expanding access to
7    naloxone for incarcerated people.  The Jail should institute these medical practices
8    in order to reduce the significant risk of overdose death at the Jail.

9        I declare under penalty of perjury under the laws of the United States and the
10   State of California that the foregoing is true and correct, and that this declaration is
11   executed at ___New York NY___ this _1_ day of May, 2021.

12

13

14                                   Robert Cohen, M.D.

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        19

# EXHIBIT A

**Robert L. Cohen, MD**

130 Barrow Street
New York, NY 10014
BobbyCohen@aol.com

A.B., Princeton University, 1970
M.D., Rush Medical College, 1975

**POSTGRADUATE TRAINING**

Residency, Medicine, Cook County Hospital, 1978
Chief Residency, Cook County Hospital, 1979
Board Certification, Internal Medicine - 1978

**PROFESSIONAL EMPLOYMENT**

Clinical Practice in General Internal Medicine
New York City, 1988 – 2016

Medical Director
CAI
New York, NY, 2007 --

Attending Physician
Department of Medicine
Langone Medical Center, NYU 2010 - 2017

Attending Physician
St. Vincent's Hospital and Medical Center
New York, NY 1988-2010

Medical Director
AIDS Center
St. Vincent's Hospital and Medical Center, NYC
January 1989 - October 1990

Vice President for Medical Operations
New York City Health and Hospitals Corporation
1986-1988

Director
Montefiore Medical Center
Rikers Island Health Services
1982 - 1986

Associate Medical Director
Montefiore Medical Center
Rikers Island Health Services
1981 - 1982

Attending Physician
Department of Medicine Cook
County Hospital
1979 - 1981

**FACULTY APPOINTMENTS**

Clinical Assistant Professor
Department of Social Medicine and Clinical Epidemiology Albert
Einstein College of Medicine
1985 – 2008

Clinical Instructor Department
of Medicine
New York University School of Medicine
2010 –  2017

**BOARD MEMBERSHIP**

Member
NYC Board of Correction 2009 –

Member
Institutional Review Board
 City  University  of  New  York
2000 – 2014, 2017 --

Member, National Commission for Correctional Health Care
Representing the American Public Health Association
1994-2011

**MEDICAL EXPERT -- PRISON HEALTH**

**Federal Court Appointed Monitoring of Health Care in Prisons and Jails**

Michigan, *Hadix v. Johnson*, 2003 – 2013
Court Appointed monitor for oversight of medical care of in Jackson Prison

Ohio, *Austin v. Wilkinson*, 2002 -- 2005
Member of two-person Medical Monitoring Team to monitor compliance with
settlement agreement regarding medical care in Ohio State Penitentiary

Ex. A
3

Connecticut, *Doe v. Meachum*, 1990 -- present
Medical expert at trial and court appointed monitor of compliance with settlement
agreement covering care of all HIV infected prisoners in Connecticut.

New York State, *Milburn v. Coughlin*, 1989 -- 2014
Continuing review of compliance with health care consent agreement

Washington, D.C. 1986 - 2000
Court appointed medical expert involved in monitoring consent agreements regarding medical
care at the DC Jail as well as DC prisons at Lorton *(VA)*

Florida, *Costello v. Wainwright*, 1983 through 1988
Review of compliance with settlement agreement in all Florida Prisons State Court
Appointed Monitor

Philadelphia, PA, *Jackson v. Hendricks*, 1991 -- 1999
Review of compliance with consent agreement on medical care in Philadelphia jails
State Court Appointed Monitor


**US Department of Justice Appointed Medical Expert**

Cook County Jail, 1982 (Chicago, IL)

Essex County Youth House (NJ), 1995–99

Hampton Roads Regional Jail, (VA) 2017 -

San Luis Obispo Jail (CA) 2018 -

**RECENT PRESENTATIONS**

"Health and Justice Sectors Acting Together on Prisons Health:  Good National
Practices"
WHO Health in Prisons Project
Helsinki, Finland
March 27, 2019


Update on Deaths in Custody – USA
WHO Health in Prisons Program Regional Meeting
Copenhagen, Denmark
November 4, 2016

"Targeted Oversight of Correctional Health Care"
Out of the Shadows:  The Promise of Independent Prison Oversight
University of Texas, LBJ School of Public Affairs
November 17-19, 2016

"Medical Care"
2016 Prisoner's Advocates Conference
UCLA School of Law
Los Angeles,  California
September 24, 2016

"Prison Health Care"
National Student Conference Physicians for Human Rights
Columbia University Medical School
November 7, 2015


"Assuring Equitable Health Care in Prison"
Directorate General for Prison Administration
Rabat, Morocco
October 27, 2015

"Medical Consequences of Mass Incarceration: What Do We Do Now?" Grand
Rounds, Department of Family Medicine, Mt. Sinai School of Medicine June 24,
2014

"Inhumane and Ineffective: Solitary Confinement in Michigan and Beyond."
University of Michigan Journal of Race and Law, Ann Arbor, Michigan,
February 2, 2013

"The Impact of Solitary Confinement on Prisoner Health", WHO Health in Prison Project,
Copenhagen, Denmark, October 12, 2012

Dialogues on Detention: "Applying Lessons from Criminal Justice Reform to the Immigration
Detention System", Human Rights First, University of Texas, Austin, TX, September 12, 2012

"Health Care for Detained Immigrants US and Europe", Health in Prison and
Throughcare: Provision and continuity of care for those in the criminal Justice
System, Albano Terme - Italy, October 7, 2011

Prisoners' Human Rights and Day to Day Correctional Health, 4th Academic and
Health Policy Conference on Correctional Health, March 10, 2011, , Boston, MA

Mass Incarceration and Correctional Medicine: The Dialectics of Caring for
Prisoners, Albert Einstein College of Medicine Social Medicine Lecture Series,
February 16, 2011

Strategies for assuring the civil rights of detained persons: U.S. andInternational
Perspectives; American Public Health Association, Denver, November 8, 2010

Why the United States Should Adopt the Optional Protocol to the Convention
Against Torture; International Conference on Prison Health Care/WHO Health in
Prison Project, Madrid, Spain, November, 2009

What is the Physician's Responsibility In an era of Mass Incarceration, Offender Health Research Network, Manchester, England, May 2009

Health Care for Immigration Detainees: What Should Be The Standard? Panel of the ABA Council on Immigration, American Bar Association February 13, 2009, Boston, MA

Medical Consequences of Mass Incarceration, 2ème Université d'Eté de Médecine en Milieu Pénitentiaire, Association of French Correctional Medicine Physicians, Perpignan France, May 21, 2008

American Exceptionalism: The Health Consequences of Mass Incarceration 2nd Annual Conference of the International Journal of Prison Health Care, Varna, Bulgaria, October 21, 2007

HIV/AIDS in Custody: Advocacy for Prevention, Care and Treatment In Correctional Settings and on Reentry, New York City Bar Association Wednesday, January 10, 2007


**PUBLICATIONS**

Cohen-R, deLone-M, Dubler-N, "Health Care Issues of Prisoners" in *Encyclopedia of Bioethics,* 4th *Edition.* Edited by Bruce Jennings. Farmington Hills, MI: Macmillan Reference USA, 2014.
Cohen-R, deLone-M, Dubler-N, "Health Care Issues of Prisoners" in *Encyclopedia of Bioethics,* 4th *Edition*. Edited by Bruce Jennings. Farmington Hills, MI: Macmillan Reference USA, 2014.

Allen-S, Wakeman-S, Cohen-R, Rich-J, Doctors in US Prisons in the Era of Mass Incarceration, International Journal of Prisoner Health, 6(3):99–106, 2010

Cohen-R., "Health and Public Health Advocacy for Prisoners" in Puisis-M, et.al, *Clinical Practice in Correctional Medicine*, Elsevier, 2006.

deLone-M, Cohen-R, et.al, Standards for Health Services in Correctional Institutions, 3rd edition, American Public Heatlh Association 2003

Cohen-R., The Medical Intake Examination, in Puisis-M, Cohen-R, et al, *Textbook of Correctional Medicine, Mosby, St. Louis, 1998.*

Frickhofen-N, Abkowitz-JL, Safford-M, Berry-M, Antunez-De-Mayolo-J., Astrow-A, Cohen-RL, King-LN,et.al., Persistent B19 Parvovirus Infection in Patients Infected with HIV-1: A treatable cause of anemia in AIDS., Annals of Internal Medicine, Vol. 113, No. 12, 926-933, Dec. 15, 1990.

Laudicina, S., Goldfield, N., Cohen, R., Financing for AIDS Care, The Journal of Ambulatory Care Management,Vol. II, No. 2, 55-66, May 1988.

Selwyn, Peter A., Feiner, Cheryl, Cox, Charles P., Lipshutz, Carl & Cohen, Robert L., Knowledge about AIDS and High-Risk Behavior Among Intravenous Drug Users in New York City, AIDS, Vol. 1, No. 4, 247-254, 1987.

Cohen, Robert L., Case Studies: A Prisoner in Need of a Bone Marrow Transplant, Hastings Center Report, Vol. 17, No. 5, 26-27, 1987.

Bayer, Ronald, Carol Levine, Susan M. Wolf et. al. HIV Anti-body Screening: An Ethical Framework for Evaluating Proposed Programs. JAMA Vol. 256, No. 3: 1768-1774, 1986.

Cohen, Robert L., Oliver Dennis, Pollard-Sigwanz, Cathy, Leukopenia and Anergy as Predictors of AIDS, JAMA, Vol. 255, No. 10, 1289, 1986.

Whitman S, King L, and Cohen R, Epilepsy and Violence: A Scientific and Social Analysis. In: Whitman S, and Hermann B, ed. The Social Dimensions of Psycho pathology. Oxford University Press, 1986.

Cohen, R., AIDS: The Impending Quarantine, Bulletin of the Health Policy Advisory Committee, Vol. 17, No. 3, 9-14, 1985.

Whitman S, Coleman T, Patron C, Desi B, Cohen R, King L, Epilepsy in Prison: Elevated Prevalence and No Relationship to Violence. Neurology, Vol. 34, No. 6, June, 1984.

Cohen, Robert L., Imprisoned Plasma Donors: A Medical-Ethical Case and Comment, Journal of Prison & Jail Health, Vol. 2, No. 1, 41-46, 1982

# EXHIBIT B

## INDEX OF DOCUMENTS REVIEWED BY ROBERT COHEN

| NO. | DOCUMENT NAME | DOCUMENT DATE |
|---|---|---|
| 1. | Second Amended Complaint for Declaratory and Injunctive Relief | February 9, 2022 |
| 2. | San Diego County Sheriff's Department, Medical Services Division, Operations Manual | Various |
| 3. | San Diego County Sheriff's Department, Medical Services Division, Standardized Nursing Procedure | Various |
| 4. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures | Various |
| 5. | County of San Diego, Citizens' Law Enforcement Review Board Findings (October 13, 2020) | October 13, 2020 |
| 6. | County of San Diego, Citizens' Law Enforcement Review Board Findings (February 9, 2021) | February 9, 2021 |
| 7. | County of San Diego, Citizens' Law Enforcement Review Board Findings (July 13, 2021) | July 13, 2021 |
| 8. | California State Auditor, *San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody* | February 2022 |
| 9. | Analytica Consulting, *San Diego County In-Custody Death Study* | April 2022 |
| 10. | Declaration of Waylon Cozart | April 2022 |
| 11. | Declaration of Christopher Norwood | April 2022 |
| 12. | U.S. Department of Justice, Civil Rights Division, *The Americans with Disabilities Act and the Opioid Crisis: Combating Discrimination Against People in Treatment or Recovery* | April 5, 2022 |
| 13. | San Diego County Sheriff's Department, Detention Services Bureau, *Suspected Overdose Incidents with Naloxone Deployment* | December 30, 2021; April 14, 2022 |
| 14. | Selected emails from Sheriff's Department's Response to Public Records Act request | September 23, 2020; April 14, 2021; May 27, 2021; September 7, 2021; October 29, 2021 |

| NO. | DOCUMENT NAME | DOCUMENT DATE |
|---|---|---|
| 15. | Excerpt of Sheriff's Department's Response to Public Records Act request | February 18, 2022 |
| 16. | Health Management Associates, *Contract #563474 Consultant for Medical and MH in Detention Facilities – Monthly Status Update* | January 19, 2021 |
| 17. | Kelly Davis, Jeff McDonald, *Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds*, San Diego Union Tribune | December 7, 2021 |
| 18. | American Civil Liberties Union, *Over-Jailed and Un-Treated, How the Failure to Provide Treatment for Substance Abuse in Prisons and Jails Fuels the Overdose Epidemic* | 2021 |
| 19. | Alene Tchekmedyian, *As opioid overdoses rise in L.A. jails, inmates get access to lifesaving drug*, Los Angeles Times | June 7, 2021 |
| 20. | Los Angeles County Sheriff's Department, *Sheriff's Naloxone Custody Pilot Project Saves Inmates from Overdose* | May 27, 2021 |
| 21. | National Commission on Correctional Health Care, "Naloxone in Correctional Facilities for the Prevention of Opioid Overdose Deaths" | October 31, 2021 |
| 22. | San Diego County Sheriff's Department, "Investment in San Diego County Jails, Update on implementation of jail audit recommendations" | March 14, 2022 |
| 23. | San Diego County Sheriff's Department, "Response to State Audit of County Jails, Recommendations already in place or underway" | February 3, 2022 |
| 24. | U.S. Department of Justice, Bureau of Justice Assistance, *Managing Substance Withdrawal in Jails: A Legal Brief* | February 2022 |
| 25. | U.S. Department of Health and Human Services, National Institutes of Health, *Offering buprenorphine medication to people with opioid use disorder in jail may reduce rearrest and reconviction* | January 18, 2022 |

| NO. | DOCUMENT NAME | DOCUMENT DATE |
| --- | --- | --- |
| 26. | California Department of Corrections and Rehabilitation and California Correctional Health Care Services, *Transforming Substance Use Disorder Treatment in California's Prison System: Impacts of the Integrated Substance Use Disorder Treatment Program* | April 2022 |
| 27. | San Diego County Sheriff's Department, "In-Custody Death – George Bailey Detention Facility, Twenty-five-year-old incarcerated man found dead in cell" | April 27, 2022 |
| 28. | U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health* | October 2021 |
| 29. | Centers for Disease Control and Prevention, "Drug Overdose Deaths in the U.S. Top 100,000 Annually" | November 17, 2021 |
| 30. | Families Against Fentanyl, "Fentanyl By Age: Report" | December 15, 2021 |
| 31. | Christine Vestal, *New Momentum for Addiction Treatment Behind Bars*, PEW Stateline | April 4, 2018 |
| 32. | U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, "Medication-Assisted Treatment (MAT)" | March 30, 2022 |
| 33. | Sarah Larney, Natasa Gisev, et al., *Opioid substitution therapy as a strategy to reduce deaths in prison: retrospective cohort study* | 2014 |
| 34. | Josiah Rich, Michelle McKenzie, et al., *Methadone continuation versus forced withdrawal on incarceration in a combined US prison and jail: a radomised, open-label trial* | May 28, 2015 |
| 35. | National Sheriffs' Association, National Commission on Correctional Health Care, *Jail-Based Medication-Assisted Treatment: Promising Practices, Guidelines, and Resources for the Field* | October 2018 |

| NO. | DOCUMENT NAME | DOCUMENT DATE |
| --- | --- | --- |
| 36. | U.S. Department of Justice, Bureau of Justice Assistance, *Managing Substance Withdrawal in Jails: A Legal Brief* | February 2022 |
| 37. | National Institute on Drug Abuse, "Principles of Drug Addiction Treatment: A Research-Based Guide (Third Edition), Is drug addiction treatment worth its cost?" | January 2018 |
| 38. | National Commission on Correctional Health Care, "Naloxone in Correctional Facilities for the Prevention of Opioid Overdose Deaths" | October 31, 2021 |
| 39. | Centers for Disease Control and Prevention, "Lifesaving Naloxone" | February 23, 2022 |