1  GAY CROSTHWAIT GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  PRIYAH KAUL – 307956
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   ROSEN BIEN GALVAN & GRUNFELD LLP
4  101 Mission Street, Sixth Floor
   San Francisco, California 94105-1738
5  Telephone:  (415) 433-6830
   Facsimile:  (415) 433-7104
6  Email:       ggrunfeld@rbgg.com
                vswearingen@rbgg.com
7                pkaul@rbgg.com
                eanderson@rbgg.com
8                hchartoff@rbgg.com

9  AARON J. FISCHER – 247391
   LAW OFFICE OF
10 AARON J. FISCHER
   2001 Addison Street, Suite 300
11 Berkeley, California 94704-1165
   Telephone:  (510) 806-7366
12 Facsimile:  (510) 694-6314
   Email:       ajf@aaronfischerlaw.com
13
   (*additional counsel on following page*)
14
   Attorneys for Plaintiffs
15

16            UNITED STATES DISTRICT COURT

17           SOUTHERN DISTRICT OF CALIFORNIA

18 DARRYL DUNSMORE, ERNEST              Case No. 3:20-cv-00406-AJB-WVG
   ARCHULETA, ANTHONY EDWARDS,
19 REANNA LEVY, JOSUE LOPEZ,            **DECLARATION OF SYROUN
   CHRISTOPHER NELSON,                  SANOSSIAN IN SUPPORT OF
20 CHRISTOPHER NORWOOD, and             PLAINTIFFS' MOTIONS FOR
   LAURA ZOERNER, on behalf of          PRELIMINARY INJUNCTION
21 themselves and all others similarly situated,  AND PROVISIONAL CLASS
                                        CERTIFICATION**
22              Plaintiffs,
                                        Judge:     Hon. Anthony J. Battaglia
23    v.
                                        Trial Date:  None Set
24 SAN DIEGO COUNTY SHERIFF'S
   DEPARTMENT, COUNTY OF SAN
25 DIEGO, CORRECTIONAL
   HEALTHCARE PARTNERS, INC.,
26 LIBERTY HEALTHCARE, INC., MID-
   AMERICA HEALTH, INC., LOGAN
27 HAAK, M.D., INC., SAN DIEGO
   COUNTY PROBATION DEPARTMENT,
28 and DOES 1 to 20, inclusive,

                Defendants.

[3903205.1]                                        Case No. 3:20-cv-00406-AJB-WVG

1   (*counsel continued from preceding page*)

2   CHRISTOPHER M. YOUNG – 163319
    ISABELLA NEAL – 328323
3   OLIVER KIEFER – 332830
    DLA PIPER LLP (US)
4   401 B Street, Suite 1700
    San Diego, California  92101-4297
5   Telephone:   (619) 699-2700
    Facsimile:   (619) 699-2701
6   Email:        christopher.young@dlapiper.com
                  isabella.neal@dlapiper.com
7                 oliver.kiefer@dlapiper.com

8   BARDIS VAKILI – 247783
    JONATHAN MARKOVITZ – 301767
9   ACLU FOUNDATION OF SAN DIEGO &
    IMPERIAL COUNTIES
10  2760 Fifth Avenue, Suite 300
    San Diego, California  92103-6330
11  Telephone:   (619) 232-2121
    Email:        bvakili@aclusandiego.org
12                jmarkovitz@aclusandiego.org

13  Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3903205.1]                                                                  Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, Syroun Sanossian, declare:

1.      I am the founder and principal of SZS Engineering Access, Inc. ("SZS"). Attached as **Exhibit A** is an SZS firm brochure, which includes my resumé. I have 24 years of experience in disability access evaluation and consulting, including 19 years as principal of my own firm. SZS and I have extensive experience conducting inspections and preparing evaluations to ensure public agency compliance with the Americans with Disabilities Act ("ADA") and California's Unruh Act. I am a DSA Certified Access Specialist ("CASp") and served as the first Disability Compliance Officer for the California Administrative Office of the Courts, Office of Court Construction and Management. I am a member of the American Society of Mechanical Engineers and serve as a voting member of the ASME A18 National Standards Committee which promulgates model code for North America governing wheelchair lifts, and a member of the Certified Access Specialist Institute, among other professional affiliations. I have prepared ADA and Unruh Act self-evaluations, transition plans, master access plans and CASp inspections for numerous counties, municipal agencies, large public universities, community colleges and ADA Title III entities.

2.      I also have experience conducting inspections and preparing reports on disability access in correctional facilities, including city and county jails in California. My firm recently provided expertise to Humboldt County as an Independent Licensed Architect (ILA) approved by the United States Department of Justice to certify ADA access compliance at the county's correctional facilities under the second *U.S. v. Humboldt* consent decree Case No. 16-CV-05139, including the jail and juvenile detention center. I have also served as the neutral expert in a federal class action lawsuit about disability access at the Monterey County Jail, *Hernandez, et al. v. County of Monterey, et al.*, Case No. 13-CV-02354-BLF (N.D. Cal.). In the Monterey case, we conducted a multi-day inspection of that county's jail facility, including interviews with facility personnel. We then

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  produced a 702-page report that assessed every aspect of the physical facilities and

2  their accessibility to individuals with mobility disabilities in these facilities

3  constructed under the 1992 ADAAG requirements.  Our assessment and reporting

4  also evaluated the County's policies and procedures from an ADA perspective.

5       3.       I have been retained by Plaintiffs' counsel to provide expert opinions

6  concerning the adequacy of policies, procedures, and practices for the

7  accommodation of incarcerated people with disabilities in the San Diego County Jail

8  facilities (collectively, the "Jail").  At the present time, my assignment is limited to

9  the consideration of how people with mobility disabilities access the programs,

10  services, and activities at the Jail.  As described *infra* at paragraphs 71-72, at a later

11  date, I will ask to review all aspects of the Jail's disability program.

12       4.       I make this declaration in support of Plaintiffs' Motions for Preliminary

13  Injunction and Provisional Class Certification.  My opinions set forth below are

14  based upon the documents and other evidence provided to me, see *infra* at paragraph

15  11, and on my professional knowledge and experience working on disability access

16  in carceral settings.

17       5.       Based on my initial review of policies, practices and the seven

18  declarations provided by incarcerated individuals with disabilities at San Diego jail

19  facilities, and my prior experience in analyzing similar facilities, these incarcerated

20  individuals and others like them who are housed in these facilities suffer from an

21  egregious lack of basic services such as toileting, showering, and the ability to move

22  around.  The barriers to access detailed by these individuals constitute a lack of

23  respect for basic human dignity.  Such barriers to access can and often do cause

24  injury, as detailed by these individuals, which will continue to incur both additional

25  risk and cost for the County.

26       6.       Staff also suffer under such conditions. When staff are not properly

27  trained and supported to bear the burden that these positions carry, they too suffer

28  under the deprivation of knowing that they are unable to perform their required tasks

[3903205.1]    2    Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

to their own satisfaction. The lack of essential guidance that basic policies and practices can afford make their already difficult job tasks almost insurmountable. Retaining competent, caring staff is essential to the proper function of a detention facility. When staff lack the tools necessary to perform their functions properly, both staff and incarcerated individuals suffer.

**I.    The San Diego County Sheriff's Department Detention Services Bureau Fails to Comply with the ADA and California's Unruh Act With Regard to Mobility Disabilities in Both Policy and Practice**

7.    According to the San Diego County Sheriff's Department's ("Sheriff's Department") website, the Jail system is comprised of six different facilities in use at this time. The San Diego Central Jail in downtown San Diego was built in 1998 and is the primary booking facility for male incarcerated people. It is a tower with several floors of housing units, which often house between 800-1,000 incarcerated people at any given time. Vista Detention Facility is another booking facility. It houses incarcerated people of all genders, and is the oldest jail, having been built in 1978. Las Colinas Detention & Reentry Facility was built in 2014 and is the primary booking facility for female incarcerated people. Other Jail facilities for male incarcerated people include George Bailey Detention Facility (opened in 1993), South Bay Detention Facility (opened in 1982), and East Mesa Reentry Facility (opened in 1991). George Bailey is the largest of these facilities, and often houses more than 1,500 people at any given time. South Bay and East Mesa house much smaller populations.

8.    The Sheriff's Department is also in the process of renovating a seventh facility, Rock Mountain Detention Facility, which is in the southeastern corner of San Diego County near George Bailey. This facility was previously operated by CDCR and was constructed in 1978. The renovation of Rock Mountain has been ongoing for several years and I am informed that the facility is not yet housing any incarcerated people on behalf of the County of San Diego.

9.    I was provided with a site accessibility evaluation of Rock Mountain

1 Correctional Facility (the facility that will become Rock Mountain Detention

2 Facility) under the ADA and Title 24 and Part 2 – California Building Code.

3 According to a public records search, the facility was constructed in 1978 and

4 previously owned and operated by the CDRD.  This evaluation is dated March 1,

5 2019 and was conducted by John Battista of Anderson Pena for Matt Smith of San

6 Diego County.  This analysis of the facility appears to be incomplete.  I have

7 experience analyzing thousands of facilities that are the age of this facility, which

8 was designed and constructed prior to the development of accessibility regulations

9 contained in both the CBC and ADA.  The Rock Mountain facility is a facility

10 significant in size that was designed and constructed to house over 3,300

11 incarcerated individuals.  No indication was provided in the report of any prior

12 alterations at the facility by CDRD to provide access to incarcerated individuals

13 with mobility impairments, yet the report lists very few instances where barriers to

14 access were identified in areas where essential programs and services are provided,

15 such as elevators, sanitary facilities (toilet and shower rooms), dining and common

16 areas or cells.  Photos show showers that are unusable for incarcerated individuals,

17 but the single barrier listed is a lack of accessible controls with reach.  No reporting

18 on the lack of required shower dimensions, seat, grab bars, and showerhead was

19 contained in the report.  Overall, the report indicates that the facility complies in

20 most respects to accessibility regulations that did not exist at the time of

21 construction.  If alterations are being performed to provide access in this facility

22 based on this report, no wheelchair accessible showers will exist in the facility.

23 Other serious lapses are likely to exist.  I am informed that, in response to California

24 Public Records Act requests, the Sheriff's Department did not produce any similar

25 evaluation for the six facilities that are currently in use.  I am also informed that the

26 Sheriff's Department stated it does not have any Transition Plans (under the ADA or

27 1973 Rehab Act) for the Jail facilities.

28           10.    The Department of Justice's regulation implementing title II, subtitle A,

[3903205.1]    4    Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1    of the ADA was signed into law on July 26, 1990.  The ADA prohibits

2    discrimination on the basis of disability in all services, programs, and activities

3    provided to the public by State and local governments, except public transportation

4    services.  Facilities built after January 26, 1991 are required to fully comply with

5    new construction standards under the ADA.  Since 1968, California Government

6    Code §4450-4461 has required all buildings, structures, sidewalks, curbs, and

7    related facilities, constructed in this state by the use of state, county, or municipal

8    funds, or the funds of any political subdivision of the state to be accessible to and

9    usable by persons with disabilities.  The state of California also promulgated Access

10   Compliance standards eight years prior to the enforcement of the ADA Standards

11   which are currently contained in the California Code of Regulations, Title 24, Part 2

12   Section 11B (CBC).  The first California State Building Code Requirements

13   containing accessibility regulations were promulgated by the then Office of State

14   Architect (currently Division of State Architect) in the 1981 edition of the State

15   Building Code, Part 2, C.A.C, Office of State Handicapped Compliance, Section 11.

16   These requirements covered "*all buildings, structures, sidewalks curbs, and related*

17   *facilities constructed by the use of state, county or municipal funds, or the funds of*

18   *any political subdivision of the state, buildings or portions of buildings to be*

19   *accessible to the physically handicapped.*"  The *Special Standards on Accessibility*

20   contained in Section 11 included scoping requirements in the following chapters:

21   Chapter 2-812 (library and educational facilities), Chapter 2-1011 (medical

22   facilities), Chapter 2-1107 (recreation facilities), Chapter 1213 (dormitory housing),

23   Chapter 2-1711 (sanitary facilities).  Facilities constructed after 1981 are subject to

24   these scoping requirements.  Of the six adult jail facilities operated by the County of

25   San Diego, three facilities may have had construction that commenced after

26   January 26, 1991, and may thereby subject to new construction requirements under

27   the ADA which require full compliance. These facilities are:

28           a.    San Diego Central Jail (built in 1998)

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

b.    George Bailey Detention Facility (opened in 1993)

c.    Las Colinas Detention & Reentry Facility (built in 2014)

**A.    The San Diego County Sheriff's Department Detention Services Bureau's Manual of Policies and Procedures Fails to Comply with the ADA and Unruh Act**

11.    In connection with this assignment, I was provided policies and procedures produced by the Sheriff's Department's Detention Services Bureau ("DSB") pursuant to the California Public Records Act. A full list of all of the documents I reviewed, including these policies and procedures, is attached hereto as **Exhibit B**. Several of the policies relevant to mobility disabilities were redacted. I was informed that at the present time it is not possible to receive unredacted copies of the policies and procedures as the Sheriff's Department will not currently agree to discovery or a protective order.

12.    I am informed that male incarcerated people with mobility disabilities who use wheelchairs are almost exclusively clustered at San Diego Central Jail, built in 1998, which is defined as a post-ADA facility and is required to be fully compliant. While the 1991 ADA Accessibility Guidelines (ADAAG) did not originally contain specific scoping and technical requirements for cells in detention and correctional facilities, the ADAAG contained scoping and technical requirements for accessible routes and doors, stairways (95% of people with disabilities use stairways) and ramps, accessible drinking fountains, lavatories, urinals, toilets and showers, as well as the maneuvering clearance, transfer space and clear floor space required to position a wheelchair adjacent to such elements, and required toe clearance, knee clearance, and surface height for counters, tables, desks and other elements that people using wheelchairs pull under to use. Furthermore, Sheriff's Department DSB policy M.9, Receiving Screening, provides that any incarcerated person using a wheelchair will not be booked at Vista Detention Facility, which was constructed prior to enforcement of the ADA, but should instead be brought to Central Jail (if male) or Las Colinas (if female).

Consistent with this policy, Daniel Webb's declaration reflects that Mr. Webb, who uses a wheelchair due to a below-knee amputation, was moved from Vista to Central Jail because Vista was "not ADA compliant." It is unclear whether, during his wait to be transferred from Vista to Central Jail, Mr. Webb was provided with reasonable modifications in the intake area. Incarcerated individuals typically wait in the Receiving Screening area for hours before being processed. It is unclear as to whether the Vista facility has accessible sanitary facilities, drinking fountains or telephones for use by incarcerated individuals with disabilities as they wait to be processed and transferred to Central Jail or Las Colinas. It is my understanding that the wait time for incarcerated individuals at the weekends to be processed through intake can extend to over 10 hours. It is also unclear whether wheelchair accessible transportation between facilities is provided for incarcerated individuals with mobility disabilities during this Receiving Screening process.

13. I am informed that male incarcerated people with mobility disabilities are primarily housed at Central Jail in cell housing on the fifth floor, in cell housing on the seventh floor, or in dorm-style housing in unit 8C on the eighth floor. I am informed that incarcerated people who use a wheelchair but also require use of a continuous positive airway pressure ("CPAP") machine are housed in the medical observation bed ("MOB") unit at George Bailey, as that unit has the electrical outlets necessary for using a CPAP machine. The MOB unit at George Bailey is dorm-style housing, meaning that the incarcerated people in that unit sleep in bunks distributed within a large room.

14. Based on my review of the declarations of incarcerated people and policies and procedures provided to me, it is my opinion that the Sheriff's Department, the County, and the Sheriff's contractors at the Jail are failing to comply with the ADA and California's Unruh Act with regard to their treatment of incarcerated people with mobility disabilities. These violations and failures are causing serious and immediate harm to individuals with mobility disabilities in the

1    Jail system.

2    15.    Overall, the Sheriff's Department's policies and procedures are

3    excessively vague.  They lack standards, timelines and requirements for follow-

4    through.  They also use outdated terminology such as "telecommunication devices

5    for the deaf (T.D.D.)" that is no longer used by the disability community to describe

6    the Teletypewriter Device (TTY), suggesting a lack of attention to the evolving area

7    of disability access.

8    16.    For example, Sheriff's Department DSB policy I.57, Transportation of

9    Inmates, states that "All deputies must be aware of related policies for transportation

10   of inmates, restraint equipment, escape procedures, universal precautions and

11   report/document processing."   Nothing in the form refers to accommodation for a

12   disability that requires use of a wheelchair or other mobility assistive device.  No

13   reference is made to the procedure required for safe transport of incarcerated

14   individuals who use wheelchairs.  Specialized safety measures are required to secure

15   the wheelchairs for transport that protect both the incarcerated individual and their

16   wheelchair from harm, although according to Sheriff's Department DSB policy M.9,

17   Receiving Screening, all incarcerated individuals with mobility impairments are

18   transported from San Diego facilities to either the Central Jail or the Las Colinas

19   facility as a matter of policy.

20   17.    In another example, Sheriff's Department DSB policy M.39, Disabled

21   Inmates, contains an improperly limited definition of disability under the ADA,

22   which is less favorable than that used under California's Unruh Act.  California law

23   does not require a disability to "substantially" limit a major life activity.  This

24   definition also includes other improper restrictions involving disabilities other than

25   mobility or lacks any definition for well-documented disabilities, which I will

26   address at a later time. The Unruh Act defines disability as "any mental or physical

27   disability as defined in Sections 12926 and 12926.1 of the Government Code."

28   Subsequently, Government Code Section 12926, j (1) states that "Major life

activities shall be broadly construed and shall include physical, mental, and social activities and working." The term "substantially limits" does not apply under Unruh.

18.    DSB policy M.39 is deficient in other respects.  The policy is based on a definition of "Reasonable Accommodation." This term exists in the ADA Statute under Title I Employment.  It does not exist in the ADA Statute applicable to ADA Title II public entities.  Reasonable accommodations for employees are evaluated on a case-by-case basis, whereas Title II entities are required to provide accessible programs, services and activities at all times, rather than as a matter of a request. This higher standard for Title II is addressed through Reasonable Modifications under the ADAAG.  California Code of Regulations, Title 24, Part 2, Section 11B (CBC) also regulates accessibility provisions and while these requirements are extensive, they are minimum requirements.  Even in cases where full compliance with CBC requirements are met, programs, services and activities may not be accessible to incarcerated individuals without modifications.

19.    Another problem is that the Identification Procedure contained in M.39 states that "Based on their disability, each inmate covered under the ADA must be reasonably accommodated through some means…" after Health Care staff have made the determination of disability.  It is unclear as to when this determination is made.  M.39 indicates that this determination is made after incarcerated individuals are already housed in the facility which could result in the denial of essential services at the time of intake and processing.

20.    Instances may exist wherein incarcerated individuals become disabled during their time of incarceration.  M.39 states that "if sworn staff is unable to accommodate … housing recommendations [for people with mobility disabilities] health staff shall be notified."  *Id.* at 2.  However, the policy fails to explain what would happen after notification to health staff, and how staff will ensure that accommodations are provided to the incarcerated person.  M.39 also states that "a request for an assessment of accommodations will be forwarded to the MSD ADA

1   case manager for review … [and] requests will be acted upon within 72 hours ….”
2   *Id.* at 3.  This wording fails to explain how an incarcerated person will be informed
3   of the outcome and how the accommodation will be implemented in the Jail.  The
4   policy states that requests will be "acted upon" within 72 hours, but does not require
5   that accommodations actually be provided within a set time frame.

6       21.    M.39 refers to an "ADA grievance procedure," although it does not
7   specifically state that grievances can be used to appeal the denial of accommodation
8   requests.  *Id.* at 3.  According to M.39, "grievances will be handled according to
9   Detention Services Bureau Policies and Procedures Section M.1 and forwarded to a
10  MSD supervisor or designee.  All ADA related grievances will be forwarded to the
11  MSD ADA case manager for processing."  This language violates the ADA's
12  requirement for a workable grievance procedure.  28 U.S.C. § 35.107(b).  There is
13  no explanation of how to file the grievance, how quickly a response will occur, who
14  will act on the grievance, and whether the incarcerated person can appeal the
15  decision.

16      22.    To the extent the County expects incarcerated people with disabilities
17  to use their grievance form (J-22), that form is also inconsistent with the ADA.  The
18  form confusingly states that a grievance only involves "the inmate's health or
19  safety" or prevention of "the inmate's effective communication/participation in a
20  legal hearing."  The form further states that other types of concerns are not
21  grievances and instead are considered "an inmate request."  On the back, though, the
22  form states that an inmate "can file a grievance for any reason or condition."  The
23  boxes for a person to check to state the grievance topic do not identify "disability"
24  or "ADA" concerns as among the topics to grieve.  Nothing in the form refers to
25  accommodation for a disability.  This makes it unclear to the incarcerated person
26  how to raise a disability-related grievance, let alone whether a disability-related
27  concern is even a grievable topic.  The lack of any way for an incarcerated person to
28  identify the grievance as disability or ADA-related also leaves identifying the

1  grievance as an "ADA related grievance" (per M.39) up to the custody staff member

2  who receives it.  M.39 provides no parameters for how custody staff will identify

3  ADA-related grievances that should be forwarded to the ADA case manager.

4       23.     Other aspects of the grievance form are also confusing.  The

5  instructions set forth varying response times depending on whether staff define the

6  concern as a grievance or a request.  The instructions are also unclear on how the

7  appeals process would work.  The grievance form states that a grievance may be

8  appealed, but does not explain *how* to file an appeal and ensure that it is properly

9  tracked.  Finally, the instructions fail to explain what an incarcerated person would

10  do if a deputy or other staff member refuses to sign the form.

11       24.     DSB policy Q.55, Property Received with Inmates, appears to provide

12  the primary direction to custody staff about how to address assistive devices that

13  incarcerated people bring with them when booked into Jail.  That policy includes a

14  single paragraph on assistive devices, stating that "[m]edically indicated equipment

15  (e.g., prosthetic appliances, wheelchairs, canes, crutches, prescription eyewear,

16  hearing aids) will be evaluated by medical staff for the necessity to retain for use by

17  the inmate during confinement."  No mention is made of the provision of assistive

18  devices through a case-by-case analysis to ensure meaningful access to programs,

19  services and activities.  The standard for the provision of assistive devices should be

20  access, not simply medical necessity per 28 CFR 35.130(b)(7).  The policy provides

21  no guidance about when this evaluation will occur and what criteria medical staff

22  will apply to determine the "necessity" of an incarcerated person retaining their

23  assistive device.  This policy also appears to improperly adopt a medical necessity

24  standard, which is inconsistent with the ADA's reasonable modification standard,

25  and is therefore unlawful.  Application of such a standard nearly guarantees that

26  people who need and are legally entitled to a reasonable modification for their

27  disability will be denied such modification in many cases.

28       25.     The Sheriff's Department has a separate policy on the retention of

assistive devices, but it is similarly problematic and overly cursory. The Sheriff's Department's Medical Services Division ("MSD") sets policies for Sheriff's Department medical and mental health staff, along with Jail medical and mental health contractors. MSD policy P.7, Prostheses, Orthoses and Other Aids, states:

> Patients shall be allowed to keep/wear prescribed prosthesis, orthotic or aids to impairment unless it has been determined that it poses a risk to safety or security. Prostheses, orthoses or aids to impairment may be provided to patients upon request and if medically indicated. If a patient has previously violated the policy and was noncompliant with the use of a prosthesis, orthotic or an aid to impairment, clinical indication for the appliance will be re-evaluated.

This language raises many concerns:

- What are the procedures in place to determine whether an assistive device poses a risk to safety or security?

- Who is authorized to make this determination?

- How does staff training take place on this matter?

- What constitutes circumstances in which a patient has previously violated the policy?

- Who is authorized to make this determination?

- How does staff training take place on this matter?

- What constitutes noncompliance with the use of a prosthesis?

- Who is authorized to make this determination?

- How does staff training take place on this matter?

Without answers to these questions, the policy as drafted allows custody staff too much discretion to deny or remove needed assistive devices. The list of example assistive devices in this policy is also too short and not exhaustive, which fails to provide guidance to staff about the breadth and scope of what constitutes a disability aid. Finally, the section on housing recommendations consists of a single sentence stating that "[a]ppropriate accommodation for patients with prosthesis, orthotic or aid to impairment will be provided as indicated." That language is so vague and general that I am concerned it will not be effective in many instances. It does not provide examples or what types of housing accommodations are presumptively

1  appropriate or give any other guidance on how to determine whether a housing

2  accommodation is appropriate or necessary.  While housing accommodations often

3  focus on the type of dormitory bunk beds or cell which will be assigned to the

4  incarcerated individual, an essential element that must be determined is whether the

5  sleeping modifications provided are located on an accessible route.  It is unclear

6  whether incarcerated individuals assigned to housing that is focused on bedding

7  adequately addresses the question of whether the incarcerated individual can travel

8  to the sleeping area and other programs, services and activities required to be

9  accessible such as sanitary facilities, dining facilities, medical and dental care,

10 telephone services, social visits, trustee jobs or work release, recreation, religious

11 services, veterans services, library services and education.

12       26.      By contrast to San Diego's vague procedure, the California Department

13 of Corrections and Rehabilitation ("CDCR") has a policy on durable medical

14 equipment ("DME") that provides far greater guidance to staff and far greater

15 protection to incarcerated people with mobility disabilities.  According to the CDCR

16 policy, "healthcare staff will issue and remove DME and medical supplies as

17 ordered by the licensed practitioner."  The policy defines numerous types of DME

18 that are used by people with disabilities, including canes, walkers, wheelchairs,

19 CPAP machines, therapeutic shoes, pressure-reducing mattresses, wheelchair

20 gloves, and wheelchair seat cushions.  This type of specificity is important to have

21 in ADA policies.  The policy also says that "custody staff may not remove DME

22 from the inmate patient unless it poses an immediate threat to safety and security,

23 being used as evidence in a crime, or due to a healthcare provider's

24 determination. …  In the event DME is temporarily removed, healthcare staff will

25 be consulted for an interim accommodation."  Protections such as these, including

26 the language "immediate threat," are wholly missing from the Sheriff's

27 Department's policies.  CDCR's policy also provides that:

28            … [I]it is the expectation that staff utilize sound correctional decision

making in determining the reasonableness of the [inmate patient's] request, and understand that they should provide reasonable accommodations without relying on a Chrono or medical prescription. Examples of accommodations may include, but are not limited to: providing the [inmate patient] a shorter path of travel, allowing the [inmate patient] extra time/short breaks while getting to/from programs, extra time during meals, additional showers, providing additional set of clothing and/or linens if soiled.

By contrast, here again, the Sheriff's Department's policy lacks specificity and fails to provide sufficient guidance to custody or medical staff about how to accommodate mobility disabilities through assistive devices and alternative means such as shorter paths of travel, breaks when moving from place to place, and extra showers for those with incontinence, a condition that often affects wheelchair users.

27.    CDCR also posts clear directions in the housing units informing staff that they shall not take away medically prescribed healthcare appliances except under narrow circumstances which can be appealed.  I am not aware of any similar poster or instruction on display in the Jail.

28.    CDCR also has a wheelchair inspection and repair program.  Under this program, staff are regularly required to inspect the wheelchairs of incarcerated people with disabilities for various issues and initiate a repair with a wheelchair contractor.  I am not aware of any similar system of logging inspections and repairs in San Diego's jail system.

29.    Because incarcerated people who need wheelchairs are clustered at Central Jail, it is vital that the Jail have working elevators so that these individuals can access professional visit rooms and other programs or be evacuated in case of an emergency.  However, the County's DSB Policy G.3, "Elevators," lacks guidance to follow when elevators are not functioning.  The policy vaguely states that "repair of elevators is a great concern and will be handled expeditiously" but does not define "expeditiously" or provide a timeframe for repairs.  Nor does the policy provide guidance to staff on how to request service and what alternative method should be used when the elevators are not functioning.  The policy also vaguely states that

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

"[p]reventative maintenance shall be scheduled and completed in a timely manner." Here again, no definition is given for "timely manner." There is no response time for the vendor to perform repairs or maintenance and there is no explanation or guidance on what alternative access plan exists when the elevators are not functioning. The Central Jail's facility-specific procedure for elevators, G.3.C.1, "Elevators," is also problematic. The version I received is heavily redacted. It states that:

> If an elevator malfunctions and stops working during normal working hours, [the Central Command Center] CCC will notify the operations deputy and the on-duty watch commander of the malfunction. If the problem is not immediately fixed and further work is required, CCC will again notify the operations deputy and watch commander. When the elevator has been repaired and has resumed normal operations, CCC will notify the operations deputy and watch commander.

This policy fails to provide any detail about how the elevator will be repaired, how quickly that will occur, and what are the alternative accommodations for people in wheelchairs when the elevator is not functioning.

30.    As noted above, male incarcerated people in wheelchairs are not accepted at Vista and must be booked at Central Jail. This is problematic because I am informed the elevators are frequently broken at Central Jail and the elevator policies are insufficient to ensure their prompt repair. Nor do there appear to be any policies providing an alternative method of access for those in wheelchairs when the elevators are not functioning. Nothing in the form refers to the provision of evacuation wheelchairs or similar devices to be used by staff to evacuate incarcerated individuals with mobility disabilities in the case of an emergency, or for use in instances when elevators are not in service and undergoing repairs or maintenance. Segregating wheelchair users at Central and Las Colinas is also problematic because Vista has desirable programs, including one for veterans and a few cells for transgender individuals. In fact, a document, entitled "San Diego County Sheriff's Detention and Reentry Facilities Classes and Programs," was provided through a Public Records Act request and indicates that a total of 71

programs, services and activities are provided in San Diego County jail facilities, but only 16 are provided in the Central Jail. The lack of a working elevator and wheelchair accessible transportation combine to prevent access to these programs, services and activities for incarcerated individuals who are housed in segregated housing at the Central Jail. The Sheriff's Department's policies discriminate against people with mobility disabilities by preventing them from accessing desirable programs at other facilities.

31.     Because regulations implementing the ADA require a public entity to accommodate persons who are identified as having a disability, a tracking system is a necessary part of compliance. The Sheriff's Department must ensure incarcerated persons with disabilities and their required accommodations are properly identified to ensure staff are aware of incarcerated persons with disabilities and their accommodation needs and ensure they receive accommodations as required by the ADA. In addition, the Sheriff's Department must be aware of the disabled population and their accommodation needs in the event of a need to move or evacuate the incarcerated population during an emergency. If Sheriff's Department and contractor staff are not aware of the incarcerated persons with disabilities and their accommodation needs during an emergency, the incarcerated persons are at a heightened risk for harm. I am informed that the Sheriff's Department stated in response to a California Public Records Act request that it does not have a central system to track people with disabilities.

**B.    The Sheriff's Department's ADA Training Materials are Inadequate**

32.     In connection with this assignment, I was provided training materials from the Detentions Training Unit produced by the Sheriff's Department pursuant to the California Public Records Act. The Sheriff's Department's training materials on ADA compliance do little to remedy the problems with the Department's vague and limited ADA policies. Furthermore, the training materials reference federal ADA

standards which contain an improperly limited definition of disability, which is less favorable than that used under California's Unruh Act. These materials also lack other important distinctions and definitions that apply in California which present more stringent standards in comparison to the ADA.

33. One training bulletin, Briefing Training, states that "Screening for disabilities begins at intake." The next sentence in the document discusses housing accommodations, which indicates that a gap exists in policy and procedures or staff training to ensure that incarcerated individuals with disabilities are identified at intake for reasonable modifications, as needed, and for appropriate housing assignments. Accessible cells are defined in two types in housing units: cells with mobility features and cells with communications features. Nothing in the form indicates that policies or practices exist to set standards for Jail staff to apply when determining how to provide requests for modifications for incarcerated individuals who request housing cells that are accessible.

34. Nothing in the form refers to the provision of wheelchair accessible sanitary facilities (toilet rooms or showers), drinking fountains, telephones or service counters in the intake area, and interview rooms with desks in the intake area. Nothing in the form refers to accessible systems for essential services at intake such as livescan. Nothing in the form indicates the provision of accessible seating that is integrated with typical seating in the waiting area or prior to intake within the Sallyport or similar areas when overflow seating is made necessary during times of high volume intake of incarcerated individuals, such as at the weekend.

35. One training bulletin for custody staff, "Americans with Disabilities Act (ADA) in Detention Facilities," provides only a broad overview of the ADA. The instruction on housing incarcerated people with disabilities states that custody staff "play a role" in housing incarcerated people with disabilities. The bulletin provides that if a person cannot be accommodated in their current housing assignment, "MSD [medical] staff shall be notified so that a reassignment can

1 occur."  The bulletin provides no guidance to staff on how to determine when a

2 person's housing assignment cannot accommodate them and what to do to ensure

3 they are accommodated.  The bulletin also suggests that incarcerated people may be

4 "segregated **because** of their physical disabilities" (emphasis added).  This language

5 is discriminatory.

6      36.     Another training bulletin, "Americans with Disabilities Act (ADA)

7 Aids to Reduce Effects of Impairment," does not add further detail to the Sheriff's

8 Department's policies on taking assistive devices from incarcerated people with

9 mobility disabilities.  Rather, it merely restates the language of the MSD policy

10 P.7—"Inmates shall be allowed to keep/wear prescribed prosthesis, orthotic or aids

11 to impairment unless it has been determined that it poses a risk to safety or

12 security"—without providing any further insight on what procedures custody staff

13 should apply to determine when an assistive device poses a risk to safety or security.

14 The training bulletin adds no detail to the vague policy.

15      37.     These training materials suggest that the Sheriff's Department's

16 training on the ADA and disability accommodations for incarcerated people are

17 wholly deficient.  A robust training program would include in-person interactive

18 trainings every six months with far greater detail than the two documents I was

19 provided.

20 **C.**     **In Practice, the Department is Harming Incarcerated Individuals**

21 **with Mobility Disabilities by Denying Them Equal Access to Programs, Services and Activities**

22      38.     As reflected in **Exhibit B**, I reviewed the declarations of the following

23 incarcerated individuals with mobility disabilities:  Christopher Nelson, Daniel

24 Webb, Ernest Archuleta, James Clark, Darryl Lee Dunsmore, Nikki Yach, and Dion

25 Buckelew.  These seven individuals are not likely to be the only incarcerated

26 individuals with disabilities in San Diego County facilities.  Considering the fact

27 that an estimated 4,000 to 5,000 incarcerated individuals are housed in San Diego

28 County jail facilities, statistics indicate that many more individuals who are

[3903205.1]          18     Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

incarcerated in these have disabilities.  The Centers for Disease Control (CDC) have reported that 13.7% of all Americans have functional disability types that involve serious difficulty walking or climbing stairs.  An additional 3.7% of Americans have difficulty dressing or bathing.  These groups combined amount to 17.4% of all Americans who have mobility disabilities or require access improvements to use sanitary facilities.  Calculations on a low estimate of individuals incarcerated in County jails with these functional disability types indicates that 696 individuals who are incarcerated are housed in these facilities that do not provide meaningful access to programs, services and activities including basic functions such as toileting, showering, eating and moving around.  The implementing regulations for the ADA, 28 C.F.R. § 35.130(a), require that no qualified individual with a disability shall, on the basis of that disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

39.    The declarations indicate that individuals with mobility disabilities are being denied access to the Jail's programs, services and activities and discriminated against, which is not surprising given the vague policies and inadequate training materials I reviewed, as discussed above.

40.    At Central Jail, where individuals with mobility disabilities are clustered, I understand that elevators are available to transport incarcerated people to program areas, such as the social and professional visiting areas.  However, the declarations from incarcerated people indicate that these elevators are frequently broken, and incarcerated people are either forced to take the stairs to access those programs or are denied access.  For example, Ernest Archuleta uses a wheelchair due to neck and knee conditions that make it difficult for him to walk.  Mr. Archuleta, who is 63 years old, was forced multiple times to take the stairs to the professional and social visit area because deputies told him the elevator was broken.  No alternate means of travel was offered such as an evacuation wheelchair

for use in an emergency, which a non-functional elevator may constitute.  In 2019,
Mr. Archuleta fell and struck his head while taking the stairs, and suffered pain for
months thereafter.  In March 2022, with the elevator apparently not working,
Mr. Archuleta was forced to take the stairs again to a meeting with Plaintiffs'
counsel.  Christopher Nelson, who also uses a wheelchair, missed an important
professional visit in 2021 because the elevator in Central Jail was broken and
custody staff did not accommodate Mr. Nelson's professional visit via other means.

41.    In another instance, deputies did not allow Mr. Archuleta a wheelchair
for a presentencing hearing and tried to force him to walk.  Because Mr. Archuleta
cannot walk long distances on his own, the hearing was postponed.

42.    The declarations I have reviewed indicate that even though incarcerated
people with disabilities are clustered at Central Jail, the crowded housing units at
Central Jail are often not accessible to people with mobility disabilities, nor are
other programs and services at the jail.  Each of the housing units in which
incarcerated people who use wheelchairs are normally housed—floors 5, 7, and 8—
are inaccessible to people in wheelchairs.  On a daily basis, people in wheelchairs in
these units have to place themselves at risk of physical harm simply to access basic
services like a desk, telephone, the toilet, shower, and dayroom tables.

43.    In unit 7B, where Ernest Archuleta was housed, Mr. Archuleta's cell
had no grab bars to enable transfer to the toilet, which put him at danger of falling
when transferring to the toilet.  Under California Building Code, California Code of
Regulations, Title 24, Part 2, Section 11B-604.5, grab bars are required at toilets
(side and rear wall).  It is not known if compliant wheelchair turning space or
transfer space adjacent to the toilet (side, diagonal or front depending on capabilities
of the incarcerated individual) is provided to facilitate safe transfer in addition to
required grab bars.  The dayroom tables in 7B also apparently lack open seating
spaces at tables with fixed seating to allow wheelchair access.  Under California
Building Code, California Code of Regulations, Title 24, Part 2, Section 11B-902.4,

1  fixed seating at dining or work surfaces are required to provide compliant toe and

2  knee clearance, and clear floor space to accommodate the wheelchair width and

3  depth.  The surface height of the dining table or desk is also regulated for

4  accessibility for incarcerated individuals who use wheelchairs or for those of short

5  stature.  It is unclear whether compliant tables or desks would be compliant with the

6  removal of one or more fixed seat.  There is one designated "ADA" cell in 7B, but

7  Mr. Archuleta and other wheelchair users were not placed in the cell.  Mr. Archuleta

8  was incarcerated for approximately two and a half years in those conditions.

9      44.    The same problems are present in other areas of Central Jail where

10  wheelchair users are housed.  Christopher Nelson uses a wheelchair due to

11  deterioration in his hips and knees, as well as a spinal injury he had prior to his

12  incarceration.  In 5A, Mr. Nelson was in a three-person cell, and a stool was bolted

13  in front of the desk.  To use the desk, Mr. Nelson had to transfer to the stool.  He fell

14  while trying to transfer in July 2021 and hurt his wrist.  Stools are also bolted to the

15  ground in front of the telephones in 5A, which forced Mr. Nelson to have to transfer

16  to those stools.  Likewise, all of the dayroom tables—where incarcerated people eat

17  and socialize—have benches bolted in front of them.  They have no cut-out space

18  for a person in a wheelchair to roll up and use the table.  Under California Building

19  Code, California Code of Regulations, Title 24, Part 2, Section 11B-902.4, a fixed

20  stool at a dining or work surface would prevent the provision of compliant toe and

21  knee clearance, and clear floor space.  It is unclear whether the desk has compliant

22  surface height, toe and knee clearance or clear floor space to allow for a wheelchair

23  width and depth to fit under the desk.  Dion Buckelew similarly could not access the

24  telephones and dayroom tables when housed in 5A.

25      45.    The shower in 5A had no shower chair or stool, which meant that

26  Mr. Nelson had to stand in the shower and take very brief showers, until the pain in

27  his hips became too much to bear.  Under California Building Code, California

28  Code of Regulations, Title 24, Part 2, Section 11B-608.4, fixed seats are required in

1  showers.

2       46.    Mr. Nelson was later moved to unit 8C, a dorm-style housing unit that

3  houses many people with disabilities, including mobility disabilities.  Despite this,

4  8C appears to lack sufficient accessible features for people with mobility

5  disabilities.  The toilet in 8C that James Clark uses does not have grab bars, causing

6  Mr. Clark to frequently fall when he transfers from his wheelchair to the toilet.  The

7  telephones in 8C also have fixed stools in front of them, and the telephone receiver

8  cords are not long enough for Mr. Clark and Mr. Nelson to reach them from their

9  wheelchairs.  This means that Mr. Clark and Mr. Nelson must transfer from their

10  wheelchairs to the stool to talk to loved ones.  Mr. Clark has been unable to transfer

11  himself some days, causing him to miss telephone calls.  Both Mr. Clark and

12  Mr. Nelson fear falling while transferring.  It is unclear whether the telephone

13  controls are located within accessible reach ranges.  Under California Building

14  Code, California Code of Regulations, Title 24, Part 2, Section 11B-704, public

15  telephones must provide wheelchair access, which is defined as clear floor space to

16  accommodate wheelchairs, parallel or forward approach that accommodates

17  wheelchairs, operable parts that are accessible, minimum cord length and volume

18  control capabilities.

19       47.    Mr. Nelson's declaration states that at any given time, there are as

20  many as 10-15 wheelchair users in 8C.  This large concentration of wheelchair

21  users, combined with very limited accessible space in 8C, contributes to regular

22  denials of access to programs and services.  Although 8C has two showers, only one

23  is suitable for individuals with mobility disabilities like Mr. Clark who must use a

24  shower chair.  In 8C, there are so many people with wheelchairs who must use only

25  that shower that Mr. Clark is often unable to take a shower because there is not

26  enough time for all of the wheelchair users to take a shower.  When incarcerated

27  individuals with mobility disabilities are segregated into units, which appears to be

28  the practice here, relying on minimum ratios for elements that enable essential

1  services such as toileting and bathing requiring the provision of accessible plumbing

2  fixtures such as lavatories, urinals, toilets and showers where only one accessible

3  fixture is provided constitutes discrimination under the Unruh Act and ADA.

4        48.    In contrast to 5A and 7B, 8C has one dayroom table with space for

5  wheelchair users to roll up to the table.  However, that one dayroom table is not

6  sufficient for the number of wheelchair users in 8C.  The other tables have benches

7  in front of them that prevent wheelchair users from accessing the table top.

8  Accordingly, as Mr. Clark, Mr. Nelson, and Dion Buckelew report, the many

9  wheelchair users must compete for the limited number of seats at the one accessible

10  dayroom table.  Mr. Clark, Mr. Nelson, Mr. Buckelew and the other incarcerated

11  people in wheelchairs who do not get one of those seats must eat food out of their

12  laps.  These are daily indignities and dangers that these individuals have been

13  subjected to for months while in the Jail.

14        49.    The Sheriff's Department's practice of clustering people with mobility

15  disabilities at Central Jail places incarcerated people in unsafe situations.  Nikki

16  Yach is a trans woman who, until recently, was housed at Central Jail with men,

17  including a male cellmate.  Ms. Yach was groped by her first male cellmate at

18  Central Jail and fears further attacks.  Ms. Yach also has multiple sclerosis and

19  requires a wheelchair to move around when her MS relapses.  When she reported

20  the assault and was moved out of Central Jail to Vista, which has a few cells for

21  transgender individuals, Ms. Yach had to give up her wheelchair.  When Ms. Yach

22  asked for her wheelchair back, she was moved from Vista back to Central Jail,

23  including to the very unit where she had previously been assaulted by a male

24  cellmate.  Because Vista cannot house people with wheelchairs, Ms. Yach was not

25  housed at a facility that both feels safe for her gender identity and that

26  accommodates her need for a wheelchair.

27        50.    Research indicates that the Enhanced Observation Housing ("EOH")

28  unit at the Central Jail, which was created in response to the very high number of

[3903205.1]                                    23                    Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

people who have attempted suicide and committed suicide while incarcerated in San Diego County Jail, employs discriminatory practices in regards to incarcerated individuals with disabilities. According to a clinician who worked there, the EOH unit is defined by extreme deprivation and isolation. Incarcerated individuals in mental health crisis who are forced into the EOH are not allowed wheelchairs, assistive devices, or even prostheses in violation of the ADA. According to the declaration submitted by former mental health clinician Jennifer Alonso, "[p]eople with physical disabilities, including people with mental health treatment needs, face problems with accessibility and accommodations in ways that I found upsetting. For example, I am aware that patients with physical disabilities placed in the EOH unit at the Central Jail have had their mobility assistive devices removed, without any alternative accommodation provided. Custody staff confiscated the prosthetic limb belonging to one man held in EOH at the Central Jail. I recall seeing him having to hop around, including when I came by to try to meet with him." In addition, Ms. Alonso indicated that basic elements essential to safely transfer to toilets or shower seats were lacking in the EOH and PSU units: "I also observed that there is lack of accessible features in mental health units, like the EOH unit at Central Jail. Cells lack grab bars next to the toilet and showers lack bars or chairs to help people with mobility disabilities."

51.    Policies of segregating incarcerated individuals with mobility disabilities in the Central Jail are discriminatory. The practice of forcing incarcerated individuals in mental health crisis to live in housing without the use of their mobility assist device is barbaric.

52.    Other areas of the Jail system where people with wheelchairs are housed are also not accessible. As stated above, a small number of people with mobility disabilities who use wheelchairs are apparently placed in the medical observation bed ("MOB") unit at George Bailey. That unit has electrical outlets required by CPAP machines. Declarant Dion Buckelew is a wheelchair user who

also uses a CPAP machine for his sleep apnea.  Mr. Buckelew, however, is not able
to navigate the MOB housing unit.  The spaces between the bunks are too narrow
for Mr. Buckelew to travel.  The United States Department of Justice ADA/Section
504 Design Guide for Accessible Cells in Correctional Facilities serves as a guide in
designing accessible elements within detention cells.  This Design Guide was first
published in 2006 and was updated in 2020.  *See*
https://www.ada.gov/accessiblecells.htm.  Mr. Buckelew's wheelchair also does not
fit through the doors of the communal bathroom in the MOB.  Under California
Building Code, California Code of Regulations, Title 24, Part 2, Section 11B-223,
medical facilities must be accessible to incarcerated individuals with disabilities,
including the provision of an accessible route to sanitary facilities.  To perform basic
activities like using the toilet, Mr. Buckelew must rely on other incarcerated people
to help him fold up his wheelchair and transfer from his bed to the chair to the toilet.
People with mobility disabilities can be put at risk when they have to rely on other
incarcerated people to assist with their disability needs.  The shower chair in MOB
is so flimsy that Mr. Buckelew has fallen multiple times while transferring from his
wheelchair to the chair.  Under California Building Code, California Code of
Regulations, Title 24, Part 2, Section 11B-610 requires shower seats to provide
structural strength to withstand at least 250 lbf of horizontal or vertical force.  The
dayroom in the MOB also has limited table space for wheelchair users.

53.    In addition, based on my review of the declarations, the Sheriff's
Department and its medical contractors appear to not provide needed assistive
devices, to fail to effectively replace assistive devices, and to take away assistive
devices when not warranted.  These practices are harmful, but not surprising given
the deficiencies in the Sheriff's Department's policies and procedures identified
above.  These problems are exacerbated by the lack of a workable disability
grievance procedure.

54.    In March 2021, Christopher Nelson was initially provided a wheelchair

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

with very small wheels and no arm rests. Mr. Nelson had to push himself around with his feet, which was very painful due to Mr. Nelson's hip condition and spinal injury. He often had to rely on other incarcerated people to push him around, which placed him at risk of abuse and exploitation by other incarcerated people. Mr. Nelson did not receive a replacement wheelchair until July 2021, four months after he arrived and was given the inadequate wheelchair.

55.    In March 2022, Jail staff did not quickly replace James Clark's broken wheelchair; in fact, I am informed it was only repaired after he met with Plaintiffs' counsel. Mr. Clark's experience demonstrates how important it is for the Sheriff's Department to have a functional process to promptly provide replacement assistive devices. Mr. Clark fell three times in the days he was waiting for a replacement wheelchair and using a broken wheelchair, causing injuries to his elbow. Mr. Clark could not travel long distances in the broken wheelchair and had to borrow another person's wheelchair for the meeting with Plaintiff's counsel. This failure is not isolated. Named plaintiff Darryl Dunsmore had to wait months to receive a replacement when the assistive spoon he used broke, and also had to devise his own writing utensil because the Sheriff's Department confiscated his custom writing utensil when he arrived at the Jail.

56.    Mr. Dunsmore's declaration indicates that Jail staff have confiscated his assistive devices on multiple occasions. Mr. Dunsmore has a rare form of arthritis, and uses a wheelchair to get around, as well as other assistive devices to write, eat, and drink. Mr. Dunsmore's disability waxes and wanes. When he is feeling better, regular physical activity helps him stay mobile. In 2018, the Sheriff's Department confiscated multiple assistive devices after they saw Mr. Dunsmore exercising. This caused Mr. Dunsmore to decompensate and he was placed into a restrictive isolation cell at Central Jail for several days. The toilet had no grab bars in the cell, which made it very hard for him to use the restroom and caused him to sometimes urinate or defecate on the floor of that cell. Mr. Dunsmore now feels he

1  has to "stay debilitated to prevent myself from being even more debilitated without

2  my assistive devices." In 2019, Jail staff again confiscated a number of

3  Mr. Dunsmore's assistive devices, including his cane for the duration of his

4  incarceration into 2021.

5      57.    The Sheriff's Department's confiscation of Mr. Dunsmore's assistive

6  devices indicates that Jail staff failed to adequately track Mr. Dunsmore's specific

7  disability and the assistive devices he needs. Similarly, for months, the Sheriff's

8  Department failed to communicate and track that named plaintiff Josue Lopez is

9  Deaf and requires use of a sign language interpreter.

10     58.    I am also concerned by the reports that Mr. Dunsmore's cane was

11 confiscated because, along with other declarations, it suggests the Jail may have a

12 practice of not permitting incarcerated people with mobility disabilities to have use

13 of multiple mobility assistive devices even when indicated or requested as an

14 accommodation. Like Mr. Dunsmore, Ernest Archuleta was not permitted to have

15 multiple assistive devices. When Mr. Archuleta asked for crutches, which he

16 wanted to use to help build up strength in his legs, Jail staff wrote that they would

17 "replace the wheelchair with a pair of crutches." Mr. Archuleta chose to keep his

18 wheelchair because he needs it, including when having to traverse long distances.

19 The denial of access to crutches that would allow him to build strength in his legs in

20 appropriate circumstances constitutes a wrongful blanket denial of an assistive

21 device for which Mr. Archuleta has indicated a preference for using and that

22 facilitates meaningful access for him.

23     59.    From reviewing the materials provided to me, I am aware of numerous

24 other issues with the Sheriff's Department's and County's compliance with the

25 ADA and Unruh Act. For example, the Sheriff's Department appears to lack

26 adequate policies, procedures, and practices to accommodate and ensure effective

27 communication with incarcerated people who are Deaf or hard of hearing. The

28 problems identified in this declaration only begin to scratch the surface of the

deficiencies with the Jail's disability program and policies.  This declaration is necessarily limited to the problems relevant to Plaintiffs' instant motion.  At other points in the case, I will review the entirety of the Jail's ADA policies, procedures, practices, and training, and offer my opinions on those.

### D.    Steps the Sheriff's Department Must Take Immediately to Provide Disability Access

60.    Given the level of human misery the Sheriff's Department's and its medical contractors' policies and practices are causing, these Defendants must take immediate steps to improve disability access for people with mobility disabilities. There are a number of steps the County and Sheriff's Department can take in the short run.  At the Central Jail, the County and Sheriff's Department should immediately update or improve their elevator repair contract to ensure emergency service and revise their policies to include instructions for staff on how to access and expedite repairs.

61.    Vertical Access:  These Defendants should create a plan for transporting people in wheelchairs to programs when the elevator is not functioning. The plan should include moving programs to the same floor as the incarcerated people in wheelchairs when elevators are inoperable to provide programmatic accessibility.  The plan should also spell out in detail how people in wheelchairs will be evacuated in the event of a fire, riot, or medical emergency.  The Sheriff's Department should purchase emergency evacuation chairs for use in an emergency, and potential use to transport incarcerated individuals with mobility impairments when elevators are non-functional.

62.    Use of Existing Accessible Cells:  At Central Jail, the Sheriff's Department should start housing incarcerated individuals with disabilities in the existing ADA-accessible cell in 7B and should begin making alterations to the other cells that house people in wheelchairs.  Where incarcerated individuals are segregated into single housing units, cells in those units should be altered to comply

1  in a number that would serve existing incarcerated individuals and additional

2  individuals who could be incarcerated at any time.

3      63.    Dayroom Tables:  The Sheriff's Department can also easily remove

4  fixed seats from dayroom tables to allow people in wheelchairs to use the tables in

5  numbers adequate to allow the existing incarcerated individuals to sit at a table for

6  meals and other activities.  Measurements must be taken to ensure that CBC

7  requirements for toe and knee clearance, and surface height are provided at the

8  tables where space is made open.  Another concern is to avoid creating sharp edges

9  when cutting metal table or stool surfaces that either could potentially come into

10  contact with the legs of users, or cause damage to floor surfaces that result in

11  changes in level (trip hazards) where bolts or other securement have been removed

12  with fixed stools.

13      64.    Dayroom Telephones:  The Sheriff's Department can easily purchase

14  longer telephone receiver cords so that people in wheelchairs can use telephones

15  blocked by fixed stools.  Per CBC, at least one fixed stool or 5% overall should be

16  removed in each units where incarcerated individuals are currently housed.  In

17  segregated units, the ratio may need to be increased to accommodate the number of

18  users.

19      65.    Desks in Cells:  The Sheriff's Department can easily remove the fixed

20  seats in front of desks in cells that block wheelchair access to ensure that

21  incarcerated individuals are not forced to transfer onto a small stool and risk injury.

22  This simple alteration should be performed to provide an accessible desk for each

23  incarcerated individual who uses a wheelchair.  While removing the fixed stool is

24  essential, measurements must be taken to ensure that the existing desk surfaces

25  provide compliant wheelchair access.  CBC requirements for toe and knee clearance

26  that correlate with clear floor space requirements under desk surfaces must

27  accommodate wheelchair width and depth to allow a wheelchair to pull under the

28  desk surface, and compliant desk surface height at the current mounting location

must also be verified.  If desk surfaces are not large enough to allow a wheelchair to fit under the surface between side braces or similar, or the surface is not mounted at an accessible height, new desk surfaces may be necessary or existing desks may need to be remounted to comply.  Another concern for the alterations process is to avoid damage to cell floor surfaces when removing fixed stools that could result in non-compliant changes in level (trip hazards) within required clear floor space after bolts or other securement have been removed.

66.    Shower Seats:  The Department should also purchase sturdy shower chairs that comply to CBC requirements for structural strength and make them available to all incarcerated people with mobility disabilities for use when showering to facilitate safe transfer.  These chairs are not expensive.

67.    Accessible Route:  The Sheriff's Department can also reposition fixed furniture such as bunk beds or other elements which may be bolted to the floor in the medical observation unit at George Bailey to enable people in wheelchairs free circulation through that unit by way of an accessible route.  These changes can also reduce the impact on staffing needs where assistance was previously required by incarcerated individuals with disabilities.  These and other modifications to current processes are especially critical because I am informed that the San Diego jails are woefully understaffed.  Without adequate staffing, incarcerated people with disabilities may be left to languish on inaccessible toilets or on the floor after they fall.

68.    Training:  The Sheriff's Department must revise its ADA training and policy on assistive devices used by people with mobility disabilities.  The policy should more clearly state that incarcerated people are entitled to these devices, that they should be kept in good repair, and that they can only be removed if there is an immediate threat to safety or security and in consultation with medical staff.  The policy should also include an inspection and repair process, in addition to alternative accommodations if such devices must be temporarily removed.  Revisions to these

1  policies and training materials should be relatively cost-free and require little time

2  given the exemplars that are available from CDCR.

3      69.    Grievance Policy:  The Sheriff's Department should immediately revise

4  its grievance policy to clarify that it includes disability issues, including clarification

5  on the right to file a grievance when assistive devices have been taken from

6  incarcerated individuals for what is described as disciplinary action.  The

7  instructions for using the form must also be clarified.  Staff training must be

8  provided on how to respond to disability grievances and ensure accommodations are

9  granted in an expeditious manner.  Without staff training, the denial of services will

10 continue.  Without a clear and effective grievance procedure, individuals with

11 disabilities like those who have submitted declarations here will continue to suffer

12 needlessly due to the Jail's failure to accommodate their disabilities.

13     70.    Renovating Cells:  The County and Sheriff's Department can also

14 begin the planning process to renovate cells, dormitory housing areas and associated

15 sanitary facilities at Vista, and other facilities and to end the practice of segregation.

16 The US Department of Justice has provided Design Guidelines since 2006 to

17 facilitate the design and construction of compliant alterations to existing facilities

18 and new construction as referenced in https://www.ada.gov/accessiblecells.htm.

19 Efforts to provide compliant cells in these facilities should begin as soon as possible.

20 In the meantime, minor but meaningful barrier removal can be carried out by

21 County maintenance staff, in addition to the removal of fixed stools at desks, fixed

22 seating elements to create space for wheelchair use at tables and relocation of desk

23 surfaces discussed previously.  These additional barrier removal projects can be

24 accomplished until alterations to achieve full compliance are complete:

25         a.    Grab Bars: installing grab bars at toilets and in showers can

26 reduce the risk of falls when transferring and also reduce the burden on staff to

27 assist incarcerated individuals who require assistance to shower due to the lack of

28 these required transfer devices.

b.    Dispensers: Relocating these elements to provide access to the controls or mechanisms that operate the dispensers or allow incarcerated individuals to approach within required clear floor space that accommodates wheelchairs within required reach ranges.

c.    Shelves: Relocating these elements to allow incarcerated individuals to approach shelves within required clear floor space that accommodates wheelchairs within required reach ranges.

d.    Communication Systems: Controls that operate communication systems can be relocated within required clear floor space that accommodates wheelchairs within required reach ranges

e.    Mirrors: Where mirrors are provided, relocating them so that the bottom edge is low enough for incarcerated individuals to see their reflection in compliance with the ADA and CBC.

f.    Drinking Fountains: Providing a cup dispenser where a low fountain is not provided for incarcerated individuals who use wheelchairs or who are short in stature as an interim solution until two fountains in each housing unit are installed (high for standing persons and low for those of short stature/wheelchair users).

## II.    Need for Access to Additional Information and Monitoring

71.    To assess how the new policies and procedures and training are implemented and whether the Sheriff's Department moves into a position of compliance with the ADA and Unruh Act, I would need to review additional information.  This could take the form of a Person Most Knowledgeable deposition transcript and interviews with custody officers from housing units, staff assigned to medical intake triage, classification staff, staff that provides medical, mental health and dental treatment, staff assigned to the education department, veterans program, religious programs, education programs, program facilitators/providers, trustee job and work supervisors, Case Management staff, and any ADA coordinators at the Jail

1  or within the County, where experience dictates.  I would also need to review the

2  Sheriff's Department's electronic tracking system, JIMS, maintenance records for

3  elevators and unredacted versions of its policies and procedures.

4      72.    I would also like to inspect all six of the facilities currently in use to

5  assess ADA and Unruh Act compliance.  An urgent matter exists with the Rock

6  Mountain facility.  Considering the information in the assessment report provided

7  and the costly nature of alterations, a timely inspection of the facility will allow

8  verification of compliance in ongoing alterations that could help the County avoid

9  costly change orders or instances where new construction must be demolished and

10  replaced due to non-compliance.  The status of this project is especially concerning.

11  Typically, such an inspection would include all areas used by incarcerated

12  individuals, although a spot-check inspection in the Rock Mountain facility would

13  provide verification of either full compliance or necessary changes to existing plans,

14  all to the benefit of the County.  If allowed access to these facilities, I could make

15  recommendations on which particular assets and features should be renovated in the

16  short term to alleviate the potential for recurrent harm, as well as the timing and

17  urgency of these renovations.  I can also provide input on how to provide

18  programmatic accessibility, which may reduce the amount of physical barrier

19  remediation necessary within this detention system.

20      I declare under penalty of perjury under the laws of the State of California

21  that the foregoing is true and correct to the best of my knowledge, and that this

22  declaration is executed at Lancaster, California this 28th day of April, 2022.

23

24

25  _____

26  Syroun Sanossian

27

28

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# EXHIBIT A

# SZS ENGINEERING ACCESS



ROSEN BIEN GALVAN & GRUNFELD LLP

## STATEMENT OF QUALIFICATIONS

April 27, 2022

Ex A
2

**STATEMENT OF QUALIFICATIONS**

**Sacramento Office**
**770 L Street, Suite 950**
**Sacramento, CA 95814**
**Tel: 916.669.8750**
**Fax: 866.670.4961**
**www.szs-engineering**

**Palo Alto Office**
**3000 El Camino Real**
**Building 4, Suite 200**
**Palo Alto, CA 94306**
**Tel: 866.694.7637**
**Fax: 866.670.4961**

April 27, 2022

# RE: Statement of Qualifications

Dear Gay Grunfeld,

We are pleased to submit our qualifications for your review. SZS specializes in ADA Access Compliance with expertise in assisting clients with complaint resolution and legal action. Risk management is an overlying focus with an essential role in every project that we deliver. Our experience ranges from the evaluation of barriers to access in a wide array of facilities including the public rights-of-way. Our methodology is designed not only to assess facilities, but to provide a comprehensive approach to the entire remediation process. From assessment to plan review, construction monitoring and maintenance practices, policy practice review and development, SZS can ensure that our clients have the tools they need to reduce risk while achieving compliance.

The SZS team is comprised of in-house staff. Our firm has four California Certified Access Specialists (CASp) who can work on this project. SZS is a California certified SBE, and DBE certified firm.

Please contact me with any questions you may have. I am the company officer empowered to bind SZS Engineering Access, Inc. to any contract awarded.

Sincerely,

Syroun Z. Sanossian, Principal
SZS Engineering Access, Inc

**SZS**
ENGINEERING

**STATEMENT OF QUALIFICATIONS**

## 1. EXECUTIVE SUMMARY

The fundamental goal of the ADA is to ensure access to civic life for people with disabilities. Regulations and statutes intended to ensure equal protection under the ADA in Title II facilities are complex. SZS can provide the expertise necessary to navigate this process successfully.

We focus entirely on the Accessibility Space because we believe that public entities can benefit from expert consultation when considering the expenditure of public funds to improve access and how to best make those determinations.  We also see disabled access is a fundamental right that can have a profound impact on individual lives. Our goal is to ensure that public funds are used to construct accessible facilities the first time, rather than as a corrective measure.

Nationwide, facilities must be usable to and accessible by people with disabilities[1]. It isn't just about the ADA, and assuming that compliance is about one federal law alone can expose public entities to risk. This is where our expertise comes into play. We often provide services as a neutral party for both plaintiff and defendant, as a trusted resource. SZS also ensures that staff members perform research on a constant basis to stay abreast of changes in statutes, regulations and case law. This enables our decision-making process to remain at the cutting edge of innovation.

### CASp Inspection Expertise

ADA Access Compliance is our focus, not a side business. Our services focus on improving access using a comprehensive approach to the assessment, maintenance, and design process to create a realistic plan for remediation.

### State of the Art Technology

Innovation sets us apart. We have not been doing things the same way for the past 30 years. Field data contained in our customized database is designed to be used as a stand-alone platform neutral tool compatible with software that public entities use daily to reduce the learning curve required to maintain records over time. Also, we do not charge a fee for software licensing. Our database will be turned over with no kill switches or other tricks to charge our clients fees far into the future. GIS mapping contained in our standard reporting is performed in-house with state-of-the-art technology and ERSI ArcGIS® software in-house for seamless integration of data with existing GIS data layers and will be provided in a customized geodatabase.

### Litigation and Risk

We take risk management seriously. That expertise informs our assessment and design process because we know all too well where the problems arise, and we have the know-how to help clients revise their policies and practices to ensure that the same issues do not crop up in the future. We have assisted clients with cases in state and federal courts, including federal class action lawsuits and have worked as an Independent Licensed Architect (ILA) for US DOJ Project Civic Access cases. We have also resolved complaints for clients under the

---

[1] California Government Code 4450b. http://www.leginfo.ca.gov/cgi-bin/displaycode?section=gov&group=04001-05000&file=4450-4461

**SZS** ENGINEERING

**STATEMENT OF QUALIFICATIONS**

purview of the Federal Highway Administration (FHWA) and the US Department of Justice and Department of Education - Office of Civil Rights (OCR). Our expertise and common-sense approach enables our clients to conserve their efforts and resources by implementing cost-effective, tested methods to resolve conflicts.

## Training

The only constant in the field of ADA Access Consulting is **change.** A successful project, in our experience, always involves a significant training effort. SZS has provided training on the local, state and federal level, as part of professional service agreements and on a pro-bono basis for many organizations and institutions of higher learning. We know that an educated client will be more likely to understand the importance of implementing the important concepts on which our recommendations are based, so that they can go on to construct barrier-free facilities into the future.

## A Trusted Source

We obtain new projects primarily through client recommendations. That fact speaks to both our work product and our commitment to client services. Our systematic approach to ADA Access Compliance goes far beyond providing code deviation reports. Our efforts include Performance Standards (PS) based on a theoretical framework within a practical methodology that encourage actions to streamline design and construction, reduce time and expense while providing a higher degree of usability. We believe that it is the most effective way to improve access while conserving public funds. Our expertise is based on far more than opinions.

## Social Responsibility

SZS takes an active part in efforts to improve our profession by employing student interns each summer and providing pro-bono training seminars on ADA Access Compliance on the local, state, and international level. Our efforts in e*arly education* have had a positive effect on our profession at large.

## Project Experience

Our team members bring a wealth of professional experience to our clients by having worked with the federal Access Board developing federal standards, as disability compliance officers, plan reviewers, building inspectors, architects, civil engineers and GIS analysts for state and local agencies. SZS also has built significant working relationships with ADA Title II entities across the nation in preparing Master Access Plans and ADA Transition Plans and Self-evaluations for state and local agencies.

Our process is interactive; we provide methods and tools starting with assessment reports, but almost as important as the reporting, are the tools and methods that we teach our clients to use to improve efforts to streamline projects and improve outcomes for people with disabilities. One of the best ways that your organization can develop a dynamic and interactive community is by improving access for people with disabilities. But first, we must work to change the status quo.

In our past professional work, our team members routinely saw a staggering level of non-compliance in existing facilities, as well as in new construction and alterations projects, which

signifies a major financial impact on public entities with little or no improvements to benefit people with disabilities. Compliance is the exception, not the rule. Our clients have realized that they have needed much more information than what they were accustomed to getting and the concept of developing and applying performance standards started to take shape. We started this firm with this reality in mind. The attitude of *business as usual* in design and construction needs to change and we work to help clients do just that.

SZS has worked with state and local agencies, law enforcement, community colleges, K-12 school districts, universities, and health care organizations to improve essential parts of their process, such as reviewing and updating standard construction details, inspection procedures, performing plan review and through instruction on the application of performance standards and universal design principles.

Today, we are a team of two dozen professionals working with clients throughout the nation. The services we provide are intended to help our clients deliver a comprehensive approach to ADA Access Compliance:

- ADA Self-Evaluations & Transition Plans
- ADA Access Compliance Plan Review
- Certified Access Specialist (CASp) Assessments
- CASp Plan Review
- Construction Monitoring
- Complaint Resolution
- Litigation Assistance
- Accessible Web Design and Auditing
- Training

The key to our approach is a comprehensive assessment process. Our team understands that minimum code requirements are not the only information to use when determining whether or not barriers to access exist, or if facilities are usable by and accessible to people with disabilities. In fact, reliance only on minimum code standards can be risky. Other standards and guidance exist and we have the expertise to ensure that clients have the information necessary to make informed decisions that not only improve access, but reduce risk as part of structured settlement agreements and into the future.

Our staff is not only able to produce reports detailing each barrier to access, but we also produce an essential part of each of our reports; an executive summary describing findings that barrier data records may not clearly illustrate. This summary section of each report describes in written format our findings, how they are prioritized and why, and where the most significant issues exist.

## Knowledge is Power

We know that when a client receives lengthy assessment reports that they can feel overwhelmed. Weeding through code deviation reports can be difficult, so we make sure that our clients get exactly what they pay for; information in a clear, concise and easy to use format that they can apply to projects with little effort.

SZS efforts do not end at that point. Without the use of fully compliant standard construction details and construction monitoring for alterations and new construction, barrier remediation may not result in accessible facilities. Our experience in performing plan review for more than 200 different A/E firms provides our firm with a wealth of knowledge on the standard of practice for architects and engineers. Reliance on minimum code requirements can overlook the actual needs and functionality of built elements that could be improved through simple changes.

We do not believe that the use of a cookie-cutter system fully serves the needs of our clients. Accurate field surveying involves both the use of trained experts who can precisely scope and identify physical barriers to access found in any given facility while considering building function and usage. No field investigation should be completed without both sets of information.

Our process focuses on the initial capture of all data for existing barriers as essential to the process of evaluating program access and barrier prioritization. If field investigators make judgments in the field as to whether or not certain barriers require removal before the client is able to review all physical barrier information into comprehensive whole, crucial information may be lost. The as-built dimensions we obtain in the field are essential for assessing the severity of barriers and establishing cost estimates. The informed decisions made with those field measurements serve an integral part in our process.

Our unique correlation of physical characteristics and facility function depicted through the use of customized report templates with concise barrier descriptions, as-built dimensions, code references and photo documentation produces superior CASp inspection reports and ADA Transition Plan with the level of detail necessary to our discerning clients.

This project requires not only expertise in physical access requirements, but also an in-depth understanding of the affect that operational policies have on disabled access in public facilities. We have extensive experience in correlating remediation methods for physical access barriers with efforts to ensure that policies and practices are not inadvertently discriminatory.

## 2. SZS HOURLY RATES

Hours associated with this project will be billed on a time and materials basis.

| SZS ENGINEERING ACCESS, INC. - HOURLY RATES | |
| --- | --- |
| Expert Witness Testimony (SME) | $ 350.00 |
| Policy & Practice Review and Development | $ 350.00 |
| Principal/Senior Project Manager | $ 200.00 |
| Project Engineer | $ 200.00 |
| Sr. Project Architect | $ 200.00 |
| Project Manager | $ 180.00 |
| Project Coordinator | $ 160.00 |
| GIS Analyst | $ 160.00 |
| Field Investigator | $ 130.00 |
| Technical Staff | $ 80.00 |

**STATEMENT OF QUALIFICATIONS**

## 3. RESUMES

**SYROUN SANOSSIAN**, Principal

Syroun Z. Sanossian is an ADA Access Compliance expert with graduate level training in both architecture and civil engineering. She started SZS in 2003 as a working principal with overall program management. She has acted as the disability compliance officer for the court construction and management department of the administrative office of the courts and program manager for ADA Transition Plan development with numerous public entities across the US. Litigation assistance, and policy and practice development are her primary focus in assisting clients with federal class action lawsuits, and Project Civic Access cases brought by the US Department of Justice, and Federal Highway Administration. She also serves as a voting member on the A18 National Standards committee for the American Society of Mechanical Engineers (ASME), which develops requirements for wheelchair lifts.

She provides services on a pro-bono basis to many non-profit entities including the Ronald McDonald House, as a commissioner on the San Mateo County Commission on Disabilities and provides training to local, state, and international organizations on various accessibility topics. Her hands-on management style defines the firm and continues to drive our staff to improve and expand their capabilities.

### EDUCATION
Architecture and Civil Engineering, Graduate Studies (Vor/Hauptdiplom)      1992 – 1997
- Technische Hochschule Darmstadt (TUD); Darmstadt, Germany
- Rheinische Westfalische Technische Hochschule (RWTH), Aachen, Germany

Graduate Studies, Architecture; University of Utah, Salt Lake City, UT      1990 – 1992
B.S. Political Science/Pre-Architecture, University of Utah      1990

### PROFESSIONAL AFFILIATIONS
DSA Certified Access Specialist (CASp) No. 69
American Society of Mechanical Engineers (ASME), member
ASME A18 National Standards Committee, voting member
International Code Council (ICC),member
Certified Access Specialist Institute (CASI), member
Association of Pedestrian and Bicycle Professionals (APBA), member
Association on Higher Education and Disability (AHEAD), member
International Association of Accessibility Professionals (IAAP), member

### EXPERIENCE
- **Principal, SZS Engineering Access Inc,**      2003 – present
  Sacramento/Palo Alto, CA
- **Disability Compliance Officer, Administrative Office of the Courts (AOC),**
  Office of Court Construction & Management (OCCM), San Francisco, CA    2006 – 2008
- **Project Manager, Gilda Puente-Peters Architect,**      2002 – 2003
  El Cerrito, CA
- **Project Manager, 3D/International,** Sacramento, CA      2002 – 2003
- **Project Manager, Sally Swanson Associates (SSA),** San Francisco, CA    2000 – 2002
- **Field Investigator, Building Analytics,** Glendale, CA      1997 – 1999

**STATEMENT OF QUALIFICATIONS**

## DETENTION AND CORRECTIONAL FACILITY PROJECTS

**Humboldt County Correctional Facility –** A facility assessment including an ADA Assessment was performed at this facility in 2017 on behalf of Humboldt County. The project also included monitoring of alterations under a US DOJ Project Civic Access Consent Decree to ensure compliance with ADA and the CBC. This facility was built in 1994-1995 and is considered new construction which required it to fully comply at the time it was built with the ADA and CBC. SZS identified over 1200 code violations at this facility.

**Monterey County Jail –** SZS was retained as the neutral 3rd party expert serving both plaintiff and defendant in 2013 to perform an ADA Access Compliance Assessment of this facility identify barriers to access, physical and programmatic, and advise legal counsel on the necessary corrections to bring the facility into compliance.

**Rio Cosumnes Correctional Facility -** An existing wing in this facility was planned for renovation to reduce inmate overcrowding and increase the number of accessible cells. Sacramento County retained SZS in 2009 to perform an ADA/Access Compliance building assessment that was used in the design and construction documents provided by county-designated architects. SZS also performed plan review of the design documents.

**Sacramento County Coroner's Office -** Sacramento County retained SZS to perform ADA/Access Compliance plan review and complaint resolution for this new construction project in 2005.

**Lorenzo Patiño Hall of Justice (Sacramento County Main Jail) -** Sacramento County retained SZS to perform an ADA/Access Compliance building assessment as part of the update to the existing ADA Transition Plan for Sacramento County in 2005. This assessment was performed in conjunction with the ADA/Access Compliance assessment of the Gordon D. Schaber Sacramento County Courthouse performed the same year.

**Gordon D. Schaber Sacramento County Courthouse -** Sacramento County retained SZS to perform an ADA/Access Compliance building assessment as part of the update to the existing ADA Transition Plan for Sacramento County in 2005.

**Sacramento County Juvenile Courthouse -** Sacramento County retained SZS to perform ADA/Access Compliance plan review and construction monitoring for this new construction project in 2004-2006.

**Sacramento County Juvenile Detention Center -** Sacramento County retained SZS to perform an ADA/Access Compliance building assessment as part of the update to the existing ADA Transition Plan for Sacramento County in 2004.

**Sacramento County Boy's Ranch -** Sacramento County retained SZS to perform an ADA/Access Compliance building assessment as part of the update to the existing ADA Transition Plan for Sacramento County in 2003.

**Carol Miller Justice Center -** Sacramento County retained SZS to perform an ADA/Access Compliance building assessment for this facility as part of the update to the existing ADA Transition Plan for Sacramento County in 2003-2004.

**Folsom State Prison (FSP) -** A facility assessment including an ADA assessment was performed for this facility in 2002 on behalf of 3D/International under the direction of the California State

**STATEMENT OF QUALIFICATIONS**

Department of Corrections and Rehabilitation (CDCR).

Multiple ADA/Access Compliance building assessments have been performed for city clients as part of ADA Transition Plan project, all of which involved holding cells, and other elements common to detention areas. Further information can be provided upon request.

**RECENT PROJECT EXPERIENCE**
**ADA TRANSITION PLANS AND SELF-EVALUATIONS – CITIES AND COUNTIES:**

- **City of Brisbane CA**                                                    2020 – present
- **City of Menlo Park CA**                                                  2020 – present
- **City of Fresno Transit Department (FAX)**                       2016 – present
- **City of Palo Alto**                                                          2016 – 2020
- **County of Lassen**                                                        2017 – present
- **City of Capitola**                                                         2017 – present

Prepared materials for kick-off meetings and subsequent meetings; assisted clients in developing statements of public commitment required by US DOJ to start the process, advised clients on publicizing process on city website and social media, maintained correspondence with clients, collaborated with clients on customization of SZS database tool for implementation process, advised clients on case law, state and federal regulations and provided training. Provided overall program management and oversight for Self-evaluation process. Developed questionnaires for public outreach, prepared public outreach presentation and held presentation in collaboration with clients, advised clients on prioritization process, annual phasing of transition plan and schedule. Provided training to staff. Ensured that program rollout was streamlined and cost efficient.

- **City of Sacramento Real Estate Division**                      2019 – present

Prepared materials for kick-off meeting and subsequent meetings. Responsible for overall methodology and developed field manual and checklists for field investigators. Developed and tested database tool for field use. Worked with client to customize ADA Transition plan data collection and reporting.

- **City of Sacramento Public Works**                                2019 – present

Prepared materials for kick-off meeting and subsequent meetings. Performed field investigations as CASp inspector. Responsible for overall methodology and developed field manual and checklists for field investigators. Developed and tested database tool for field use. Worked with client to customize ADA Transition plan data collection and reporting. Reviewed standard construction details and provided recommendations to make improvements.

**ADA TRANSITION PLANS and MASTER ACCESS PLANS – UNIVERSITIES:**

- **California State University, Sacramento**                        2013 – present
- **California State University, Stanislaus**                          2018 – 2019
- **California State University, Long Beach**                         2010 – 2018
- **Chico State University**                                                 2008 – 2010
- **California State University, Dominguez Hills**                  2008 – 2010
- **Humboldt State University**                                           2008 – 2010
- **California State University, East Bay**                            2008 – 2010
- **Fresno State University**                                               2008 – 2010
- **Cal Poly Pomona**                                                        2008 – 2010
- **San Diego State**                                                         2008 – 2010
- **California State University, Monterey Bay**                      2008 – 2010

Developed protocol with CSU Office of the Chancellor to develop Plans. Collaborated with CSU

**SZS**
ENGINEERING

**STATEMENT OF QUALIFICATIONS**

to develop ADA Design Guidelines in 2011. Prepared materials for kick-off meeting and subsequent meetings. Responsible for overall methodology and developed field manuals and checklists for field investigators. Developed and tested database tool for field use. Worked with client to customize collection and reporting. Provided training to client staff including database training, field investigation training and provided materials and references to ADA Access Compliance statute and regulation. Corresponded with client to provide input and revisions, as needed during the process of finalizing reports. Collaborated with chief building official and ADA Coordinator on policy and practice development and implementation. Prepared and presented materials for public outreach process. Reviewed and approved final ADA Transition Plan reports.

**CASp INSPECTION AND REPORTING**
- **San Jose State University**                                     2008 – present
- **California State University, Los Angeles**                      2008 – present
- **California State University, San Marcos**                       2008 – present

Held meetings with key stakeholders on campus prior to inspections. Performed field investigations as CASp inspector. Worked with client to customize ADA Transition plan data collection and reporting. Corresponded with client to provide input and revisions, as needed during the process of finalizing reports. Collaborated with inspectors of record during construction. Reviewed approved drawings and provided punchlist document and verification.

**PEDESTRIAN FACILITY ASSESSMENTS:**
**California State University Long Beach 2016 – 2017**
**Fresno State University 2008 – present**
**San Diego State University 2015-2016**

Prepared materials for kick-off meeting and subsequent meetings. Performed field investigations as CASp inspector pursuant to litigation case. Responsible for overall methodology and developed field manuals and checklists for field investigators. Worked with client to customize CASp inspection data collection and reporting for litigation reporting. Provided materials and references to ADA Access Compliance statute and regulation. Corresponded with client to provide input and revisions, as needed during the process of finalizing reports. Reviewed and approved final CASp inspection reports.

**ABA Assessment of the Pedestrian Facility – Undisclosed Federal Agency 2018 – 2020**
**Bus Stop Inventory/Design Improvements for Undisclosed Transit Agency - 2019 – present**

Responsible for overall methodology and development of field manuals and checklists for field investigators. Developed customized database tool for field use. Worked with client to customize ADA Transition plan data collection and reporting. Prepared materials for kick-off meeting and subsequent meetings. Provided materials, references and training on ADA Access Compliance statute and regulation to client and contractors working on existing projects. Reviewed final reporting and remediation schedule.

**ILA Services pursuant to a US DOJ Project Civic Access Consent Decree 2017-2020**

Managed responsibility and documentation required when serving as US DOJ approved Independent Licensed Architect (ILA) under the consent decree with mandated correspondence and reporting required by client and the US DOJ on monthly and bi-annual basis for 3-1/2-year consent decree timeline. Performed field investigations, plan review, construction monitoring and site inspections for alterations and new construction mandated by consent decree. Provided recommendations for standard construction details to improve standards and assist client in complying with the consent decree requirements for curb ramp compliance. Negotiated with the trial attorneys and inspectors at US DOJ Civil Rights Division on behalf of client to achieve more cost-efficient solutions for barrier remediation. Managed SZS architects and engineers required

**STATEMENT OF QUALIFICATIONS**

to report to the US DOJ within prescribed dates within the consent decree. Provided field training to client staff monthly to increase understanding of industry standard practices for data collection and ADA assessments and reporting pursuant to consent decree requirements, basis for construction tolerances and code requirements with the goal of improving likelihood that alterations and new construction would comply and thereby satisfy the terms of the consent decree. Provided recommendations to private building owners who leased facilities to the client to house the programs, services and activities operated by the client. Corresponded with and provided recommendations to legal counsel, building contractors, building inspectors, plan reviewers, architects, engineers, and administrators working for the client on their obligations under the consent decree. Provided input and training to Otis Elevator staff on-site and within corporate headquarters on basic elevator ADA accessibility requirements.

# EXHIBIT B

# INDEX OF DOCUMENTS
# REVIEWED BY SYROUN SANOSSIAN

| NO. | DOCUMENT NAME | DOCUMENT DATE |
|---|---|---|
| 1. | *Armstrong* Poster on Appliances | Not dated |
| 2. | California Correctional Health Care Services Revised Durable Medical Equipment Policy | March 5, 2020 |
| 3. | California Department of Corrections and Rehabilitation (CDCR) Memo re Wheelchair Safety and Security Inspection | May 11, 2016 |
| 4. | California State Auditor Report 2021-109: *San Diego County Sheriff's Department* – It Has Failed to Adequately Prevent and Respond to Deaths of Individuals in Its Custody | February 2022 |
| 5. | Declaration of Christopher Nelson | March 9, 2022 |
| 6. | Declaration of Daniel Webb | March 9, 2022 |
| 7. | Declaration of Darryl Lee Dunsmore | March 30, 2022 |
| 8. | Declaration of Dion Scott Buckelew | April 21, 2022 |
| 9. | Declaration of Ernest Archuleta | March 9, 2022 |
| 10. | Declaration of James Clark | April 21, 2022 |
| 11. | Declaration of Josue Lopez | October 19, 2021 |
| 12. | Declaration of Nikki Yach | April 19, 2022 |
| 13. | Letter from San Diego County Sheriff's Department to Shanel Assofi, Uprise Theatre re: Erich Louis Yach (Confidential / Redacted) | March 9, 2022 |
| 14. | Email thread between Sheriff's Department employees re Deaf Incarcerated Person (Redacted) | October 17-19, 2020 |

# INDEX OF DOCUMENTS
# REVIEWED BY SYROUN SANOSSIAN

| NO. | DOCUMENT NAME | DOCUMENT DATE |
|-----|---------------|---------------|
| 15. | San Diego County Sheriff, Detention Services Bureau, Detentions In-Service Training Unit Training Bulletin, Americans with Disabilities Act (ADA) Aids to Reduce Effects of Impairment (Redacted) | January 10, 2019 |
| 16. | San Diego County Sheriff, Detention Services Bureau, Detentions In-Service Training Unit Training Bulleting: ADA in Detention Facilities (Redacted) | February 10, 2017 |
| 17. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: G.03 Subject: Elevators | March 3, 2011 |
| 18. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: I.01 Subject: Emergency Alarm Systems (Redacted) | November 20, 2020 |
| 19. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: I.22 Subject: Lower Bunk/Lower Tier Assignment | December 9, 2020 |
| 20. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: I.47 Subject: Inmate Identification Wristbands and Clothing (Redacted) | December 30, 2020 |
| 21. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: I.57 Subject: Transportation Of Inmates | October 28, 2020 |

# INDEX OF DOCUMENTS
# REVIEWED BY SYROUN SANOSSIAN

| NO. | DOCUMENT NAME | DOCUMENT DATE |
|---|---|---|
| 22. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: M.09 Subject: Receiving Screening | December 18, 2019 |
| 23. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: M.39 Subject: Disabled Inmates | March 27, 2020 |
| 24. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: N.01 Subject: Grievance Procedure | December 23, 2020 |
| 25. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: P.11 Subject: Hearing Impaired Inmates | December 27, 2018 |
| 26. | San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures, Number: Q.55 Subject: Property Received with Inmates (Redacted) | January 14, 2020 |
| 27. | San Diego County Sheriff's Department, Form J-22:  Inmate Grievance/Appeal of Discipline | Rev. January 2015 |
| 28. | San Diego County Sheriff's Department, Medical Services Division, Operations Manual Number: MSD.F.1.2 Subject: - Lower Bunk / Lower Tier | December 9, 2020 |
| 29. | San Diego County Sheriff's Department, Medical Services Division, Operations Manual Number:  MSD.P.07 Subject:  Prostheses, Orthoses And Other Aids | March 30, 2017 |

Ex B
16

# INDEX OF DOCUMENTS
# REVIEWED BY SYROUN SANOSSIAN

| NO. | DOCUMENT NAME | DOCUMENT DATE |
|---|---|---|
| 30. | San Diego County Sheriff's Department, Medical Services Division, Operations Manual Number: MSD.M.13 Subject: Medical Observation Beds | November 30, 2016 |
| 31. | San Diego County Sheriff's Department, Medical Services Division, Operations Manual Number: MSD.M.09 Subject: Medical Wristbands (Redacted) | December 23, 2015 |
| 32. | San Diego Sheriff's Department Detention Services Bureau – Las Colinas Detention and Reentry Facility Green Sheet, Number: P.11.L Subject: Hearing Impaired Inmates | January 23, 2019 |
| 33. | San Diego Sheriff's Department Detention Services Bureau – George Bailey Detention Facility Green Sheet Number: P.11.G Subject: Hearing Impaired Inmates | April 26, 2021 |
| 34. | San Diego Sheriff's Department Detention Services Bureau – San Diego Central Jail Green Sheet Number. G.3.C.1 Subject: Elevators (Redacted) | July 24, 20219 |
| 35. | San Diego Sheriff's Department Detention Services Bureau – San Diego Central Jail Green Sheet Procedure Number. P.11.C.1 Subject: Hearing Impaired Inmates (Redacted) | October 17, 2019 |
| 36. | US Department of Justice, Civil Rights Division, *Examples and Resources to Support Criminal Justice Entities in Compliance with Title II of the Americans with Disabilities Act* | January 2017 |
| 37. | Excerpts from Preliminary Injunction Briefing in *Hernandez v. Monterey,* 70 F.Supp.3d 963 (N.D. Cal. 2014) | August18, 2015 |

# INDEX OF DOCUMENTS
# REVIEWED BY SYROUN SANOSSIAN

| NO. | DOCUMENT NAME | DOCUMENT DATE |
|-----|---------------|---------------|
| 38. | Excerpt of San Diego Sheriff's Department Response to Public Records Act request | May 10, 2021 |
| 39. | Excerpt of San Diego Sheriff's Department Response to Public Records Act request | April 1, 2022 |
| 40. | San Diego Sheriff's Department Response to Public Records Act, Request Number 12:  San Diego Sheriff's Department Classes & Programs (Rev. Oct. 2021) | April 1, 2022 |
| 41. | Excerpt of Declaration of Jennifer Alonso, LCSW | |
| 42. | Centers for Disease Control and Prevention Infographic: Disability Impacts ALL of US | |
| 43. | Second Amended Complaint for Declaratory and Injunctive Relief | February 9, 2022 |