GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email: ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**DECLARATION OF CHRISTINE EVANS, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge: Hon. Anthony J. Battaglia<br><br>Trial Date: None Set |

(*counsel continued from preceding page*)

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California 92101-4297
Telephone: (619) 699-2700
Facsimile: (619) 699-2701
Email: christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
2760 Fifth Avenue, Suite 300
San Diego, California 92103-6330
Telephone: (619) 232-2121
Email: bvakili@aclusandiego.org
jmarkovitz@aclusandiego.org

Attorneys for Plaintiffs

I, Christine Evans, M.D., hereby declare as follows:

1. I am a doctor and practicing psychiatrist. I am a resident of San Diego County, California. I spent three years working as Medical Director (July 2017-July 2019) and Chief Psychiatrist (September 2020-August 2021) at the San Diego County Jail (the "Jail").

2. The statements made in this declaration are made of my own personal knowledge. If called as a witness, I could and would testify competently to the facts set forth in this declaration. I make this declaration in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

### I. My Professional Background

3. I graduated from George Washington University School of Medicine. I completed a Family Medicine and Psychiatry Combined Residency at the University of California San Diego. In addition to completing all Board requirements for specialization in both Family Medicine as well as Psychiatry & Neurology, I also served as Chief Resident in my final year.

4. My career in medicine has been and continues to be dedicated to treating underserved and at-risk patients with mental illness, substance dependance and complex healthcare needs, many of whom are or have been entangled with California's criminal and carceral systems.

5. In addition to my work with San Diego Sheriff's Jail Mental Health Services referenced above, I have also worked as a Staff Psychiatrist for the California Department of Corrections' Department of Adult Parole Operations, where I was responsible for managing approximately 500 parolee-patients with a broad range of mental health issues, including many people with severe mental illness. I also led an integrated team of licensed clinicians and therapists, providing oversight of multi-disciplinary comprehensive treatment plans for our patients.

6. I have also worked as the Chief Clinical Officer for Wellpath's Correctional Collaborative Care initiative. Wellpath is a private health care provider

that contracts to provide medical and mental health care in more than 300 detention facilities in the State of California and throughout the country. I was tasked with oversight and development of the Collaborative Care Management methodology for Wellpath Adult Jail Healthcare contracts. This effort focused on improving outcomes for incarcerated patients with mental illness, special medical needs, and high-risk chronic conditions, both for the duration of their incarceration and upon release back to their communities.

7. After having spent a total of approximately three years working with San Diego Sheriff's Jail Mental Health Services, I resigned from my position there in August 2021. I am currently practicing as a contract psychiatrist at the San Diego County Psychiatric Hospital, which treats adults who are experiencing a mental health emergency or crisis.

**II.   My Positions and Responsibilities at the San Diego County Jail, and Why I Left**

8. In July 2017, I was hired by Liberty Healthcare to work at the Jail subject to a county contract. For two years, I served as the Medical Director overseeing mental health care for the Jail system. In this role, I provided clinical supervision to approximately 16 full-time and 7 part-time Psychology and Psychiatry providers working at the Jail, participated in biweekly and monthly multi-disciplinary team meetings and served as Liberty's clinical liaison to relevant administrative meetings at both facility and County Operations level.

9. I spearheaded a proposal for a quantitative and qualitative Mental Health and Medical levels-of-care system for Jail Medical Services, to optimize resource utilization and improve patient care and outcomes. To my dismay and disappointment, the Jail's Command staff declined to implement the proposal I developed, or any other Mental Health and Medical levels-of-care system. I left the Jail Medical Director role in July 2019, to work as the Chief Clinical Officer for Wellpath, as described above.

10. In September 2020, I returned to work at San Diego County Jail, again through the Liberty Healthcare contract, this time as the Chief Psychiatrist responsible for the women's acute mental health care program, with my primary focus being management of services and care within the Women's Psychiatric Stabilization Unit (WPSU).

11. I left the Chief Psychiatrist position in July 2021 voluntarily after multiple unsuccessful attempts to elevate and resolve staffing, programming and disposition issues I deemed critical to the safe and appropriate care of my patients. Specifically, I had routinely observed our daily Patient-to-Clinical Staff/Nursing ratios significantly exceed the maximum ratios per State regulations, due to staffing shortages. This problem resulted in our nursing staff being overloaded and increased the risk of critical clinical care oversights and errors. In addition to staffing shortages on WPSU, the rigid Classification and Housing policies at the Custody level restricted my options for providing safe and appropriate dispositions for my WPSU patients who no longer required inpatient care. As such, the WPSU unit routinely held more patients than the unit was staffed to safely manage. I communicated these concerns on multiple occasions to the Chief Clinician at Las Colinas Detention and Re-entry facility, and was informed that no action would be taken. As such, I determined that I could not continue to be the provider of record under these conditions and tendered my resignation.

12. Below I describe my observations as to some of the most dangerous and harmful practices that my patients at the Jail have faced, and that, to my knowledge they continue to face to this day.

### III.   Custody and Command Staff Exert Inappropriate Control Over Clinical Decisions

13. A tremendous problem, and one of the root causes of the dysfunction and danger in San Diego County Jail as regarding people with mental health and other health care needs, is that, under San Diego County's current organizational

structure, Medical and Mental Health clinical officers and supervisors (and by proxy, their staff) tasked with delivery of services and care within the Jail facilities must report *directly* to a Command/officer within the Sheriff's Detention Services Bureau (DSB).

14. I am aware that this organizational structure is deeply problematic, a conclusion I have reached based on both my direct experiences as a clinical supervisor and provider within the Jail facilities as well as on my observations and knowledge of more accountable and established correctional health service systems, where health care operate as a parallel/equal division to that of custody-command (for example, CDCR's Correctional Health Care Services and correctional health services in the neighboring L.A. and Orange County Jail systems).

15. By contrast, the current structure in San Diego County (*i.e.*, Jail Medical Services subordinate to Custody/DSB Command) fails to empower clinical staff of meaningful agency and/or parity in final decisions that impact clinical service implementation, delivery and direct care. This has had a deleterious impact on care of patients across the entire system. Not only do Jail custody and Command staff lack the training, knowledge, or licensure to make or prioritize decisions relating to clinical management, their paradigm is markedly distinct from the clinical perspective.

16. In San Diego County Jail, Command staff regularly overrule clinical officers and staff, both on clinical care policy matters and individual clinical decisions. For example:

    a. **Lindsay Hayes' recommended modifications to EOH policy regarding clinician-approved privileges (dayroom, phone) and personal effects (clothing, select material items):** It was Mr. Hayes' expert recommendation that existing Jail policies be modified to allow clinical staff the discretion to approve or restore certain items and privileges to patients on Enhanced Observation Housing (EOH) Status due to elevated risk of danger-to-self or danger-to-others. Despite

mutual agreement by me in the role of JMHS Contract Medical Director, as well as the acting Chief Mental Health Clinician for Medical Services Division (MSD), which was communicated directly to members of the Suicide Prevention Task Force, this recommendation was *overruled* by Custody leadership, who cited concerns that doing so would present "too great a risk" to inmate-patients, despite their lack of expertise or proficient knowledge of relevant clinical evidence.

b. **Proposal for a Comprehensive Clinical "Level of Need" system:** In 2018 and 2019, my colleague Jake Villenueve (JMHS Program Director) and I co-authored a proposal for a quantitative and qualitative "Level of Need" designation system to be integrated into the Jail MSD's plans for a new Electronic Health Record (EHR). This proposal was, in great part, developed in response to the 2018 DRC recommendations that a large system such as San Diego County Jail would benefit from implementation of a data-driven methodology for monitoring population needs, stratifying types/frequency of services according to more objective measures of individual need, and improving allocation of limited clinical and facility resources. Our proposal was based on existing "best practice" models, including CDCR, Federal Bureau of Prisons, and the State of Connecticut's Mental Health Level of Care system. Over a period of 2 to 3 months, the "Comprehensive 'Level of Need'" proposal was presented to multiple stakeholders, including the Jail's Director of Nursing, the Director of Medical Records, the Director of Re-entry Services Division, other Jail administration officials, and the custody liaison to Medical Services. There was robust agreement that the proposed system, or at least some version of it, would greatly improve Jail health care staff's ability to not only better track and continue care for at-risk patients, optimize current resourcing and inform longitudinal planning of services. But despite agreement regarding the benefits of implementation, I was informed by the MSD Administrator that the Sheriff's "legal advisor" advised against implementing such a system. After multiple efforts to persuade Sheriff's Department leadership to reconsider, I was

DECLARATION OF CHRISTINE EVANS, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

eventually informed that they would allow the most rudimentary "level of acuity" (1-5) capability to be programmed into the planned electronic medical record system, but that the function would "remain disabled" and would not be implemented clinically through training or policy updates. At the time I left my position in mid-2021, I was not aware of it being used by clinical line staff as was initially proposed or in any meaningful way.

      c.    **Direct Patient Care decisions:** I routinely observed custody staff to be resistant or unreceptive to clinical staff recommendations regarding patient placement into the acute PSU/WPSU treatment programming. At Central Jail in particular, custody often cited vague or clinically-irrelevant rationalizations as reasons they would not move patients from initial "acute observation" cells (which are isolating and lack access to confidential interview facilities as well as phone/visitation privileges) into less restrictive, clinically appropriate communal/therapeutic areas of the unit. In my role as Medical Director, I initially would engage the facility Captain to assist with resistant custody staff. However, over time this became problematic in my efforts to encourage collaboration, so I abandoned doing so. Similarly at WPSU, custody teams varied with respect to their receptiveness to integrating patients into unit treatment routines and activities. Vague or irrational concerns were often cited. Clinical staff who "pressed the issue" or went up custody chain of command to advocate for clinically appropriate integration of their patients risked being labelled as being "difficult" or not a "team player," and were sometimes the subject of "complaints" by WPSU custody to the facility's Captain. Finally, at Las Colinas in particular but also at other facilities, I was frequently asked by custody staff to "clear" patients from sobering cells, despite my observation that many of these patients remained acutely intoxicated and should continue to be monitored; that is, that they were not clinically ready to be cleared and moved into the general facility. Custody staff would often state that "we need the cell (for someone else)," despite frank evidence that the current occupant was

altered and continued to require observation. Although I did not modify my clinical recommendations to "fit" custody staff's expressed desire for "clearance," at times I later discovered that the patients were moved despite my clinical recommendation and order. I do not know if this was due to custody staff having sought an alternate clinician to provide a different opinion or if my recommendations were simply disregarded. But I did observe this sort of occurrence enough times to express concern to my direct supervisor.

17. Based on these experiences above, in addition to cumulative observations and experiences acquired both during my work at the San Diego County Jail and within other correctional systems over my career, it is my opinion that patients incarcerated in San Diego County Jail are imperiled within the system as it is currently organized. I believe that the existing system is fundamentally unable to balance clinical and operational needs to ensure safety, despite that the many staff who want things to be better. Without significant and meaningful change to this status quo, such that clinical services are empowered with equal agency to that of custody-command, these patients will remain in peril.

### A. Inappropriate Custodial Placements of Patients in Segregation without Clinical Input

18. Throughout my time working as Medical Director and later as Chief Psychiatrist, I was not aware of any defined policy or procedure or reliable system whereby clinical assessment or input from mental health staff was regularly sought prior to or at the time of placement in Administrative Segregation. It is my professional understanding that the provision of such clinical input in these placement decisions is standard policy in well-functioning state, federal, and county detention systems. The purpose for such input is to ensure there are no significant clinical contraindications to placement in isolative housing, such as serious mental illness, increased risk of suicidality, *etc*. As a general matter, at the San Diego County Jail, mental health staff's input was not sought or meaningfully considered.

19. I can recall several instances where mental health staff members and I raised concerns to custody staff about our patients being placed in Administrative Segregation housing (or Administrative Segregation "overflow"), or on a "Lockdown" or "Bypass" status that was essentially Administrative Segregation solitary confinement conditions – that is, no programming, minimal human contact, and little to no out-of-cell time at all.

20. Custody staff working within the Jail facilities were generally unreceptive to clinicians' recommendations about Segregation housing placements for our patients. When I could, as the Medical Director, I would raise concerns directly with custody leadership, who sometimes would work to address the clinical concern. But this process was not possible in all cases. In all, I saw many people being placed into Administrative Segregation when clinicians knew and made known that such a placement would be harmful.

21. In most cases, the only option that we as clinicians had – beyond acceding to custody staff – was to order that our patients be admitted to one of the Jail's LPS-commissioned Psychiatric Services Units ("PSU"/"WPSU") (locked acute inpatient unit) or to the Enhanced Observation Housing ("EOH") (the suicide precautions or crisis unit). But in many cases, admission to an acute or crisis bed was not clinically indicated because the patient was not currently acutely ill or actively suicidal. Rather, clinical recommendations to move patients from Administrative Segregation to an acute or crisis unit was due to observations that these patients were at significant risk of deterioration and becoming acutely ill or suicidal if they stayed in Administrative Segregation. (Meanwhile, the Jail's acute mental health units consistently have a waitlist and are overcrowded.) We were left with a Hobson's Choice, where custody staff would place a patient in Administrative Segregation, and we would be left to wait until the person became acutely ill and/or suicidal, then warranting a PSU or EOH referral.

8

Case No. 3:20-cv-00406-AJB-WVG
DECLARATION OF CHRISTINE EVANS, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

22. One notable partial exception was the intake process for patients returning from the Department of State Hospitals to the Jail. In these instances, Classification deputies would typically have clinicians assess the patients and would consider clinical concerns related to housing placement. Even there, however, Custody staff would have the final word on a patient's placement. Still, in this very small subset of patient cases at the Jail, the collaboration between clinical and custody staff was better. There is no reason that such a collaboration should not apply to all segregated housing placements; in fact, such engagement with clinical staff on housing placements is absolutely essential.

23. I have kept in touch with mental health staff members who have continued to work at the Jail since my departure last year. I understand that there has been little to no meaningful change in this area. People with mental illness continue to be placed in solitary confinement-type Administrative Segregation housing without input from mental health staff. Mental health staff continue to feel powerless to protect their patients who are placed at risk of decompensation and even suicide in Administrative Segregation housing.

24. Based on my knowledge and experience providing care at the Jail, I strongly believe that there should be a requirement that custody staff consult a patient's mental health clinician before or at the time of placement of patients into Administrative Segregation housing (or Segregation-type "Lockdown" or "Bypass"). And if a mental health clinician finds that such a placement is significantly likely to result in clinical harm, an alternative placement – including in a structured mental health program unit – should be provided. Likewise, if a clinician finds that a person in Administrative Segregation housing (or Segregation-type "Lockdown" or "Bypass") is at risk of severe decompensation, the person should be removed and an appropriate alternative placement should be provided. My understanding is these practices constitute today's correctional mental health care standards.

25. I participated in several post-mortem death reviews regarding in-custody deaths, including suicides. I recall multiple cases in which the individual either died or was seriously injured while attempting suicide in Administrative Segregation.

### B. Clinically Inappropriate Exclusion of Patients from Outpatient Step Down (OPSD) Because of the Custodial Blanket Ban on People Whom Command Staff Designate as "Protective Custody"

26. While I was Medical Director and Chief Psychiatrist at the Jail, I expressed concerns to Command staff about the custody-based blanket exclusion from the Outpatient Step Down ("OPSD") mental health unit for people who are clinically appropriate for OPSD placement but are classified by custody as "Protective Custody."

27. The purpose of the OPSD unit was to house patients who may benefit from being housed with other patients who also have a mental health condition. These patients would be better protected from other incarcerated individuals who may exploit, assault, or otherwise victimize people with mental illness.

28. However, the Sheriff's Department excludes from OPSD anyone who is classified by custody staff as "Protective Custody."

29. By policy and practice, then, many patients who are clinically appropriate for OPSD – and who would be safer and/or otherwise clinically benefit from being in an OPSD unit – are denied such placement based on their "Protective Custody" designation. In essence, the custody designation automatically excludes those patients from a clinically appropriate mental health placement.

30. I and other clinical staff members expressed great concern to Jail leadership that vulnerable mental health patients who met clinical criteria for OPSD were being housed with people in custody not on the mental health caseload due to the "Protective Custody" classification. We observed that patients could be bullied to hand over their property and even medications, and be manipulated by other people who did not have a mental health diagnosis and were higher functioning. I

recall that these concerns were discussed and documented.

31. We presented the leadership with several practical solutions: for example, they could set aside a unit that was exclusively OPSD/protective custody; or they could have an OPSD unit that put Protective Custody patients and general population patients on separate tiers and program them separately. However, the Jail custody leadership would not address the issue, and they continued to mix low functioning mental health patients with people in mixed "Protective Custody" housing units.

32. Jail Command leadership told us that they could not mix Protective Custody and non-Protective Custody individuals, irrespective of mental health status. However, as Medical Director and Chief Psychiatrist, I was well aware that the Jail has long mixed these groups in the acute care Psychiatric Services Unit. They simply will not do so in the Outpatient Step Down program.

33. Based on my knowledge and experience providing care at the Jail, I strongly believe that a patient's clinical need for OPSD placement must be met and should not be neglected due to a custodial policy or administrative convenience. The Jail should provide clinically indicated placement and care *before* patients have an acute mental health crisis. My opinion is based on my knowledge of correctional mental health standards of care and of more well-functioning mental health care systems in the detention setting.

C. **Clinically Inappropriate. Custody-Driven Blanket Denials of Clothing, Property, and Privileges for Patients on Suicide Precautions, including in Enhanced Observation Housing (EOH)**

34. As Medical Director and Chief Psychiatrist at the Jail, I found conditions and practices regarding patients on suicide precautions, including in the Enhanced Observation Housing (EOH) units, to be harmful, clinically unwarranted, and out of step with correctional mental health standards of care.

35. I was very troubled that the San Diego County Jail's custody policy and practice is such that all patients in EOH must go without clothing, personal property,

recreation, and family/social visits for their entire stay in the EOH unit. The custody-driven blanket denial of all clothing, including underwear, is particularly troubling; being placed in a suicide-resistant "safety garment" is, for most patients, uncomfortable, upsetting, and humiliating. As a general matter, I am aware that custody staff also do not provide patients in EOH with regular or sufficient access to showers, dayroom, or phone calls.

36. These policies and practices are out of step with correctional mental health standards of care, and they cause enormous distress and psychological harm to patients.

37. I agree with the recommendations of San Diego County's own suicide prevention consultant Lindsay Hayes and others who have stated that there should be a step-wise, clinically driven process to restore access to clothing, property, and privileges to patients on suicide precautions, based on individual clinical assessments. Restoring clothing, property, and privileges while a patient is still on suicide precautions (and thus under a higher level of observation) makes enormous sense from a clinical perspective: clinicians and custody staff are able to monitor how a patient does as these things are restored for the patient, before the patient is taken off suicide precautions and returned to their general population (or Segregation) housing unit.

38. There is no clinical justification for the Jail's blanket, custody-driven ban on clothing, property, and privileges for patients on Enhanced Observation status, and I have seen how it causes psychological harm to patients and undermines suicide prevention efforts.

### IV. The Jail Does Not Provide Confidentiality for Clinical Contacts, Preventing Delivery of Adequate Mental Health Care.

39. Based on my experience working as Medical Director and Chief Psychiatrist at the Jail, I am aware that nearly all mental clinical contacts outside of the acute care Psychiatric Service Unit are essentially always non-confidential (with

1. the possible exception of psychiatry medication review encounters). The lack of confidentiality serves to undermine clinical care and make mental health clinicians' jobs all but impossible. The provision of confidentiality for mental health clinical interactions is the long-accepted standard of care in the community. And it is even more important in the detention setting, where people are distinctively vulnerable to harm if sensitive information is disclosed to other incarcerated people or staff.

40. I observed that, for patients with longer stays in the PSU/WPSU acute care units, clinicians could often use a treatment area that provided for some confidential contacts, though I am aware that deputies frequently listen in on clinical contact sessions that are supposedly taking place in a confidential room. This is very disturbing for clinical staff.

41. There was, however, *no* confidential treatment space for PSU patients on heightened observation status. In my experience, this group of patients had the highest level of mental health care need, with clinicians needing to build trust and to ensure that they were getting a full picture of each patient's condition and risk factors.

42. It was thus a very big problem that custody staff would almost always tell mental health staff that their clinical contacts with PSU patients on heightened observation status would have to be at the cell door, through the food slot opening. I observed custody staff refuse to move these patients to a confidential setting even when mental health staff specifically requested it.

43. A similar deficit in confidential treatment exists in the EOH unit, which houses people identified as at heightened risk of suicide or self-harm. In the EOH unit, nearly all clinical contacts are at cell-front, making patient-clinician confidentiality impossible.

/ / /

/ / /

/ / /

Case 3:20-cv-00406-AJB-DDL   Document 119-10   Filed 05/02/22   PageID.2378
Page 16 of 17

## V. The Jail Fails to Prevent Drug Overdose Deaths and Should Expand Access to Life-Saving Naloxone.

44. I am aware of many opioid overdose deaths in recent months and years at the Jail. Such overdose deaths are generally preventable given modern medical science, including through timely delivery of naloxone (common brand name: Narcan). Based on my experiences at the Jail, it is clear that the Jail fails to provide people experiencing an overdose with timely or adequate access to this life-saving medication.

45. The community standard is now to provide naloxone to people with risk factors for opioid overdose. It has become routine in medicine to provide such patients naloxone and to give them basic information and guidance about its use.

46. I understand that the San Diego County Sheriff's Department has itself begun to prescribe naloxone to people being released from custody.

47. Yet people with drug addiction are still dying of overdoses inside the Jail facilities. It is essential that these people get the life-saving medication they need, including by empowering staff and incarcerated people to timely administer naloxone in an emergency.

48. The terrible reality is that the Jail has a significant overdose death problem, including because of the widespread presence of drugs in the Jail facilities and a dangerous lack of staffing to monitor people and provide timely intervention if someone is overdosing.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

14   Case No. 3:20-cv-00406-AJB-WVG
DECLARATION OF CHRISTINE EVANS, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

49.     A common-sense, life-saving measure that the Jail can take right now is to ensure timely access to naloxone by providing it to incarcerated patients, through targeted provision and/or through methods to provide adequate supply throughout the Jail's housing units in order to ensure prompt access in case of an emergency.

Executed on April 30th, 2022 at San Diego, California.

By: _____
Christine Evans, M.D.