GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:      ggrunfeld@rbgg.com
            vswearingen@rbgg.com
            pkaul@rbgg.com
            eanderson@rbgg.com
            hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email:      ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00406-AJB-WVG |
| Plaintiffs, | **DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** |
| v. | |
| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, | Judge:     Hon. Anthony J. Battaglia |
| | Trial Date:   None Set |
| Defendants. | |

[3902455.1]

1

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1   (*counsel continued from preceding page*)

2   CHRISTOPHER M. YOUNG – 163319
    ISABELLA NEAL – 328323
3   OLIVER KIEFER – 332830
    DLA PIPER LLP (US)
4   401 B Street, Suite 1700
    San Diego, California  92101-4297
5   Telephone:  (619) 699-2700
    Facsimile:  (619) 699-2701
6   Email:      christopher.young@dlapiper.com
                isabella.neal@dlapiper.com
7               oliver.kiefer@dlapiper.com

8   BARDIS VAKILI – 247783
    JONATHAN MARKOVITZ – 301767
9   ACLU FOUNDATION OF SAN DIEGO &
    IMPERIAL COUNTIES
10  2760 Fifth Avenue, Suite 300
    San Diego, California  92103-6330
11  Telephone:  (619) 232-2121
    Email:      bvakili@aclusandiego.org
12              jmarkovitz@aclusandiego.org

13  Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3902455.1]                                    2                        Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, Jennifer Alonso, LCSW, hereby declare as follows:

1.     I am a Licensed Clinical Social Worker and a resident of San Diego County, California.  I spent three years (April 2019-April 2022) working as a mental health clinician at the San Diego County Jail (the "Jail").

2.     The statements made in this declaration are made of my own personal knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this declaration.  I make this declaration in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

## I.     My Professional Background

3.     I have dedicated my professional career to providing clinical care to patients with mental illness.

4.     I became a Licensed Master Social Worker ("LMSW") in 2007 for the States of Illinois and New York.  I was licensed as a Licensed Clinical Social Worker ("LCSW") for the State of California in 2014.

5.     I have worked as a social worker and mental health clinician since 2008, in positions treating patients in the community, in inpatient psychiatric facilities, and in the jail setting.

6.     From January 2016 to April 2019, prior to working as a Jail clinician for the San Diego County Sheriff's Department, I was a social worker at the California Department of State Hospitals facility in Atascadero.  There, I worked directly with a highly complex forensic patient population.  In this position, I completed clinical assessments and participated in multidisciplinary clinical meetings to develop individualized treatment plans, behavioral plans, and discharge plans for my patients.  I provided individual therapy and led psychotherapeutic groups and sex offender treatment (Cognitive Behavioral Interventions) programming.

## II.  My Position and Responsibilities as Mental Health Clinician at San Diego County Jail, and Why I Left

7.     Starting in April 2019, I was hired by the San Diego Sheriff's Department as a full-time Detentions Licensed Mental Health Clinician working at the Jail.  Based on my clinical experience, including for the patient population at Department of State Hospitals-Atascadero, the Sheriff's Department hired me primarily to develop and provide care in the Jail's Outpatient Step Down ("OPSD") unit.

8.     In this role, I took on several job responsibilities, including: (a) Performing mental health screenings; (b) Responding to psychiatric crises within the facility; (c) Clinically evaluating and assessing patients' psychiatric condition during wellness checks, clinical encounters and suicide assessments; and (d) Developing and implementing the Jail system's OPSD Unit, which houses people with chronic mental illness who are unable to house safely with higher functioning people in Jail custody.

9.     The OPSD units at the Jail were designed to serve incarcerated people with serious mental illness who are unable to safely house with other incarcerated people, including because their condition makes them vulnerable to exploitation, assault, and other forms of victimization.  Many patients in OPSD experience hallucinations, delusions, and other symptoms of mental illness.  Patients can be transferred from any of the other Jail facilities in the system for placement in an OPSD unit based on their need for OPSD housing.  The male OPSD units where I worked are located in designated units at Central Jail.

10.     As a mental health clinician for the OPSD units at Central Jail, I carried a caseload of between approximately 140 and 160 patients.  This patient caseload was so large that it was impossible to deliver anything remotely close to adequate mental health care given the needs of this population.  Based on my experience and clinical knowledge, I believe a caseload of no more than

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

approximately 60-70 patients would be appropriate for clinicians providing care to the OPSD population.

11.     When I started as a mental health clinician for the OPSD units, I was told that I would have the opportunity to develop a program with multiple treatment modalities, including structured therapeutic group programs and individualized one-to-one therapy.  However, given the overwhelming caseload, lack of resources, and lack of confidential treatment space, it was never possible for me, or any other clinician, to provide these sorts of care on a consistent basis or to meet the clinical needs of our patients.

12.     Adding to the challenge is that the Sheriff's Department, despite many requests from clinical staff, would not provide a designated custody staff member who was solely assigned to the OPSD units.  What this means is that there is not a custody staff member who is reliably and consistently available to escort OPSD patients to confidential treatment space for clinical encounters, or to provide necessary security for structured therapeutic activities.  As discussed below, nearly all of my clinical contacts were conducted through the cell door and were non-confidential.

13.     On April 23, 2022, I worked my last day as a mental health clinician at the Jail.  My decision to stop working at the Jail was one of the hardest decisions of my life.  I care deeply for my patients.  I have observed my patients decompensate, suffer in what can only be described as filthy, inhumane conditions, and in some cases, die by suicide.  My patients were subjected to terrible conditions and put at risk of great harm every day, and I felt powerless to give them the care they need and deserve.

14.     By my count, at least six (6) other mental health clinicians at the Central Jail facility have left their job at San Diego County Central Jail facility in the last year.  Other clinicians working at other San Diego County Jail facilities have also left.  I am aware that many of them, like me, left because of the terrible

system in which we have to work.  Many of us feel very badly leaving our patients, who we know are so vulnerable and in desperate need of care.  But it is simply impossible for us as mental health professionals to provide adequate care given how the San Diego County Sheriff's Department operates the Jail's mental health care system.

15.    Below I describe my observations as to some of the most dangerous and harmful practices that my patients at the Jail have faced, and that they continue to face to this day.

**III.    The Jail's Mental Health Clinicians Get Overruled by Custody Staff about Clinically Appropriate Placement of Patients, Putting People at Extreme Risk of Harm.**

16.    One of the most serious concerns I have for my patients is that custody staff are, by policy and practice, able to overrule mental health clinicians about where a patient is housed and how they are treated.  This happens on a consistent basis at the Jail.

17.    This problem begins with the organizational structure of the system. My supervisors at the Jail, the Chief Mental Health Clinician and the Mental Health Coordinator, report to Sheriff's Command staff, meaning that the custody staff have final say on mental health policy decisions and individual patient decisions.

18.    I have seen this "Custody Trumps Mental Health" dynamic play out in a number of ways, each of which are harmful to my patients:

**A.    Custody Places Patients with Mental Illness in Solitary Confinement-Type Administrative Segregation without Clinical Input.**

19.    Patients with mental illness are frequently placed in Administrative Segregation ("Ad-Seg") units, which are basically a form of solitary confinement that is supposed to address safety and security issues.  (Jail leadership recently began to call these units "Administrative Separation" or "Ad-Sep."  But there were no substantive changes to conditions that went along with this name change.)  People

placed in Ad-Seg units are confined to their cells close to 24 hours per day and have limited social interactions with other people.  Some people are housed in Ad-Seg "overflow" units because so many people are placed in the designated Ad-Seg units. Still other people are placed on "Lockdown" or "Bypass" status in their general population housing unit, meaning they are subjected to "Ad-Seg"-type conditions.  I have observed that solitary confinement exacerbates some of my patients' mental health symptoms, and many of my patients are psychologically and physically harmed in this extremely isolating setting.

20.     While some people in custody at the Jail do pose a danger to others based on aggressive behavior that requires that they be housed separately, many people with mental illness have been placed in Ad-Seg even when I and other clinicians determined that they could be housed safely in a non-Segregation unit (like OPSD), including with an individualized treatment or behavioral health plan. I have seen many people with mental illness deteriorate in the Ad-Seg units (some of which are located near the OPSD units where I am assigned).

21.     A few years ago, the Jail system's mental health co-coordinator (who hired me to work in the OPSD units) made a specific recommendation to the Sheriff's Department to stop putting people with mental illness in the solitary confinement-type Ad-Seg units, given the risks to their psychological and physical well-being there.  My understanding is that the Sheriff's Department Command staff refused to implement this recommendation.

22.     As mental health clinicians in San Diego County's jails, it was made very clear to us that we have no role in determining the housing placement for our patients, even when we know that a placement (like Ad-Seg or "Lockdown" or "Bypass") will put a particular patient at risk of harm, including suicide.  Unless a patient is in a mental health *crisis* situation requiring emergency placement in the acute care (PSU) or suicide risk observation (EOH) units, clinical input is often ignored.

23.     For example, in April 2022, just a few weeks before my last day working at the Jail, I received an email from custody staff about one of my patients who was experiencing significant psychiatric symptoms.  The email stated that the line custody staff thought my patient should be transferred to Ad-Seg housing.  No reason was provided.  The placement appeared more for the custody staff's convenience than the security or well-being of anyone.  No one asked me for my clinical input; custody staff simply directed me to modify the patient's record (removing the patient's OPSD status) so that custody could move the man into Ad-Seg.  Similar incidents happen multiple times each month.  My fellow mental health colleagues and I have been conditioned through our interactions with custody staff not to question such custody directives.

24.     I estimate that approximately 50% of the detainees in the Ad-Seg units have mental illness.

25.     I have seen how these Ad-Seg placements, with no clinical input from mental health staff and no mechanism for clinicians like me to protect our at-risk patients, have deadly consequences.

26.     For example, my patient, Lester Marroquin, died by suicide in an Ad-Seg cell on May 30, 2021.  Mr. Marroquin had a significant history of mental illness and had repeatedly attempted suicide and engaged in acts of serious self-harm.  He had decompensated while held in an Ad-Seg placement to the point that staff placed him on suicide precautions in a psychiatric observation cell.  I was asked to meet with him while he was being held in the psychiatric observation cell, which I did several times.  (Those clinical contacts were done at cell-front, with other patients in cells just a few feet away.)  He was struggling a great deal.  He had fears about being sent to prison, was hearing voices, was smearing his own feces in his cell, and was sticking his head in the toilet.  On Sunday, May 30, a day I was not working, Mr. Marroquin was removed from the psychiatric observation cell, and custody staff moved him back into Ad-Seg.  No one informed me about

custody staff moving Mr. Marroquin back into the Ad-Seg housing where he had
previously decompensated, and I was not consulted about whether it was clinically
safe for him to be returned to Ad-Seg following his removal from psychiatric
observation. That same day, Mr. Marroquin banged his head several times, placed
his head in the toilet of his Ad-Seg cell, and finally died of acute water
intoxication. I still cry when I think about what happened to Mr. Marroquin; he
should not have died.

27. Another patient who died after being moved to Ad-Seg by custody
staff without input from myself or other mental health clinicians was Lonnie
Rupard. Mr. Rupard had a mental health condition that had made him psychotic
and erratic. He had been placed on my OPSD caseload. After he tried to sharpen
an object that could be used as a weapon, I told custody staff that I was concerned
about the situation. Custody staff then moved him into an Ad-Seg "overflow" unit
at the Jail. (Ad-Seg units are frequently filled to capacity, leading to custody staff
operating other housing units as Ad-Seg "overflow" units.) Although I did have
concern about his remaining in the OPSD unit with my other OPSD patients, I did
not believe that Ad-Seg was a clinically appropriate placement for him. However,
I knew that custody staff had exclusive authority regarding the Ad-Seg placement
and that I could not advocate for another housing option. Really, Mr. Rupard
needed placement in a structured therapeutic outpatient setting that provided
sufficient security; such a unit does not exist at Central Jail.

28. Once he was in Ad-Seg, Mr. Rupard was no longer on my OPSD
caseload. I recall that the clinician assigned to the Ad-Seg unit was so
overwhelmed with her caseload and other clinical duties that she was unable to see
Mr. Rupard as frequently as was needed. My understanding is that Mr. Rupard
refused his medications and food while in Ad Seg. Feces were present all over his
cell and the toilet, and food trays and trash were strewn everywhere.

29. Mr. Rupard died while still in Ad-Seg, having lost a significant

1  amount of his body weight and in a medically compromised condition, about two

2  months after he was placed there.  Custody staff never consulted with me about

3  whether solitary confinement would put Mr. Rupard at risk of harm.  I knew that,

4  by policy and practice, I had no authority or avenue to recommend against his Ad-

5  Seg placement.

6      30.    Mr. Rupard's experience as a person with mental illness held in the

7  Jail's Ad-Seg housing units is not unusual.  I have observed many people with

8  mental illness decompensate in Ad-Seg.  They smear feces on the walls and cell

9  door windows, and their cells become horrifically filthy.  Custody staff regularly

10  stand by and watch this happen.

11      31.    Recent photographs of Ad-Seg cells holding people with mental

12  illness are provided below:



*Figure 1 - Filthy, trash-filled Ad-Seg cell that housed patient with mental illness*

1
2
3
4
5
6
7
8
9
10
11
12



13 *Figure 2 - Cell holding Ad-Seg patient with no property, trash strewn across floor*

14     **B.**     **The Jail Excludes Patients from OPSD Because of a Custodial**
    **Blanket Ban on People that Custody Staff Designate as**
15     **"Protective Custody."**

16     32.     Another way I saw custody staff overrule clinical judgment in a

17 manner that harms patients is the blanket exclusion from OPSD for people who are

18 clinically appropriate for OPSD placement but excluded from the mental health

19 unit because they are classified by custody as "Protective Custody."

20     33.     I was responsible for determining whether patients met this clinical

21 criteria for OPSD placement. The key criterion for placement in the OPSD unit is

22 that based on clinical information, the patient may be able to benefit from being

23 housed with other patients who have been diagnosed with a psychiatric condition.

24 A core clinical concept is that by clustering people with mental illness in a unit,

25 patients are protected from other incarcerated individuals who may exploit, assault,

26 or otherwise victimize people with mental illness who have difficulty

27 programming and socializing safely within the Jail's general population.

28     34.     However, the Sheriff's Department excludes from OPSD anyone who

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

is classified by custody staff as "Protective Custody."  People may be classified as "Protective Custody" for any of a number of non-mental health reasons – including being a gang "drop-out" or being a member of law enforcement or having certain criminal charges (*e.g.*, child abuse, sex offenses) that create a security issue.

35.     By policy and practice, many patients who are clinically appropriate for OPSD – and who would be safer and/or otherwise benefit from being in an OPSD unit – are denied such placement based on their "Protective Custody" designation.  In essence, the custody designation automatically excludes those patients from a clinically appropriate mental health placement; they are instead housed with people who do *not* meet clinical criteria for OPSD and may *not* have mental illness at all.  This meant that my clinical assessment would be overruled by custody staff classification designations, excluding patients from an OPSD placement that would help them.

36.     Going back many months, other Jail clinicians and I have raised serious concerns about this Sheriff's Department policy and recommended that it end.  We said that our patients who were Protective Custody were not getting the OPSD placement they needed, and could be at risk of physical harm when mixed with the non-mental health population.

37.     In late 2021, we raised the concern in a meeting with Command staff.  We suggested that the Jail could house OPSD patients with OPSD-Protective Custody patients, or it could simply cluster the OPSD-Protective Custody patients separately from people who did not have a mental illness.  Command staff seemed to understand our concern but said they would not change the policy.  They made several excuses, including that it would be administratively difficult to figure things out.  I recall thinking in that meeting that I felt I was talking to a wall.

38.     The risks we identified with Command staff have sadly materialized.  In March 2022, Derek Baker, a patient who I treated, died following just the sort of incident I feared would result from the OPSD exclusionary custody policy.

[3902455.1]

12

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

Mr. Baker had mental illness and was found clinically appropriate for OPSD housing.  However, because he was also deemed "Protective Custody," custody staff did not allow him to be housed in one of the OPSD housing units at the Jail. Instead, he was put in a cell with another Protective Custody individual who did not have serious mental illness (*e.g.*, he did not meet OPSD clinical criteria) and was in custody based on allegations that he had assaulted and critically injured an elderly store clerk.  The cellmate violently assaulted Mr. Baker, who died from those injuries on March 29, 2022.

39.    I, along with my mental health staff colleagues, had asked that Jail Command staff change their policy so that people like Mr. Baker could be placed in the OPSD unit, which is safer and clinically appropriate for them.  Command staff overruled our request.

40.    After Mr. Baker's death, I asked for a meeting with Command and mental health leadership.  I again emphasized that the ban against placing Protective Custody individuals with mental illness in an OPSD-dedicated unit was dangerous and unjustifiable.  At least one Command-level staff member stated that the circumstances leading up to Mr. Baker's death concerned him.  But the Command staff told me that they had no plan to change policy or practice on this issue.

**C.    Custody Staff Overrule Clinical Staff on Placements in the Enhanced Observation Housing Unit.**

41.    A third way that custody staff dangerously overrule mental health staff's clinical judgment about the appropriateness of housing for patients is in the custody-directed placement of people in the Jail's Enhanced Observation Housing ("EOH") unit.

42.    The EOH unit was created in response to the very high number of people who have attempted suicide and committed suicide while incarcerated in San Diego County Jail.

43.    To address the high number of suicides in the Jail system, Jail leadership created the Inmate Safety Program, which includes the EOH units, designed to house patients who are at risk of suicide but are not actively self-harming or assaultive.

44.    The EOH unit is defined by extreme deprivation and isolation.  Every patient's clothes are taken away, replaced with a heavy smock that is meant to prevent people from using clothing to attempt hanging or self-strangulation. Patients are (by policy) denied access to any recreation or yard time, to visits with their family, to any socialization with other people in the EOH unit, or to personal property that would help them cope and pass the time.  Patients are also frequently denied showers, dayroom, any television or other stimulation, and access to phones to call their family (despite written policy stating that they should be offered these things regularly).  Only recently has custody staff begun allowing some patients to have a book.  However, we as clinicians would often have to advocate forcefully with custody staff to get our patients a book to read.

45.    Patients in EOH are held in a state of hyper-solitary confinement, stuck alone in their cells around the clock.  There are regularly 10-20 people in EOH at a given time; many can be held in EOH for several days, even a week or longer.  When I visited the EOH unit to see my patients, I could see that the people in the unit are having an extraordinarily difficult time coping.

46.    As clinicians, we have no authority to allow patients in EOH to keep their clothing, to have property, or to use the phone to call family, even where we find that such things are safe and clinically beneficial for them.

47.    In EOH, clinicians' contacts with patients are not confidential the vast majority of the time, including due to the lack of custody staff to escort them to a confidential space.  We must yell through the cell door such that other patients and custody staff can hear our every word.

48.    My clinician colleagues and I consider the EOH cells to be barbaric.

1  Even dogs held in kennels are treated better than patients in EOH.  When I am

2  asked about what it feels like in the EOH unit, I describe it as a *Game of Thrones*-

3  style dungeon.  Many of my patients told me they would say anything to get out of

4  EOH.

5  49.    By written Sheriff's Department policy, placement in the EOH unit

6  requires a clinical assessment and clinical determination that such placement is

7  warranted.  Despite this policy, custody staff regularly order such placements –

8  often, they overrule clinical judgment in doing so.  As a result, people are often

9  being placed in EOH or being held in EOH when there is not a clinical indication

10  for it.

11  50.    A recent example, from just a few weeks ago, is a patient who has

12  mental illness for whom I was called to conduct an assessment.  After Mr. Baker

13  was killed in the unit where this man was housed, this patient became increasingly

14  paranoid and fearful about being held in that housing unit and having a cellmate.

15  One day, after his allotted time on the recreation yard, he told custody staff he did

16  not want to go back to his housing unit because he was scared.  A physical

17  altercation ensued, and a deputy was struck in the face.  Custody staff then

18  restrained the patient and strapped him face down to a gurney, with his hands

19  handcuffed behind his back.  I was then called to meet with the man, which I did

20  with several deputies present and the patient still lying on his stomach in handcuffs

21  and restrained to the gurney.

22  51.    Based on my assessment, I determined that the patient was scared and

23  paranoid and that, by placing him in another housing unit where he felt safe, he

24  would neither be a suicide risk nor be assaultive.  I informed staff that the patient

25  did not meet clinical criteria for an EOH placement.  Custody staff, however,

26  overruled my clinical assessment and ordered that the man be placed in EOH,

27  documenting that my patient "might be in fear of other person's [sic] attacking

28  him" but an "unprovoked attack[] on deputy sheriff's [sic] is un-justified and …

1  will be criminally charged. [Patient] will be placed into EOH."

2      52.    My clinical assessment of this situation was that the patient's mental

3  health condition was contributing to extreme paranoia and distress, which led to

4  the physical altercation with staff.  The placement in the EOH was *not* clinically

5  indicated.  This man was placed in a harmful situation by being placed in EOH

6  without clinical justification, and he was essentially punished for his mental illness

7  and his legitimate concerns for his safety.

8      53.    Each time custody staff overrule my clinical judgment, I feel that my

9  efforts to provide my patients with adequate care are undermined, putting them at

10  serious risk of harm.

11  **IV.    Adequate Mental Health Treatment Is Impossible at the Jail, Including
Due to the Lack of Confidentiality.**

12

13      54.    As the mental health clinician assigned to the OPSD housing units, I

14  had a caseload of approximately 140-160 patients at a time.  I did my best to meet

15  with my patients as frequently as I could, to provide ongoing assessment and

16  necessary mental health supports.

17      55.    My clinical contacts with my patients were non-confidential 99% of

18  the time.  This was due to lack of available space, custody and clinical staff

19  shortages, and frequent custody staff refusals to move patients from their cells to a

20  confidential setting even when we specifically requested it.  (While there is very

21  limited space for mental health care at the Jail, there is a room that is available and

22  could be used for confidential contacts on the floor where I worked.  But mental

23  health clinicians like me do not have reliable access to this room.)

24      56.    I had to conduct my clinical contacts at the cell door, where my

25  patient and I must speak loudly to hear each other, such that other patients and

26  custody staff could hear us, too.  (We would try to communicate either through the

27  food port in the door or the small space between the cell door and the doorway.)

28  One patient, who was on my caseload until my last day at the Jail in April 2022,

was deaf and appeared to communicate through sign language. For this man, these cell-front contacts were impossible settings to communicate. To my knowledge, the Jail did not have procedures in place to obtain a sign language interpreter when needed for our clinical contacts.

57.    It is obvious that, without confidentiality, my patients will not communicate with me candidly and fully about their mental health condition – whether they are sad, hearing voices, or even thinking about hurting themselves or attempting suicide. The lack of confidentiality makes it impossible for me to provide mental health care at the level that I was trained to deliver and that I wish I had the opportunity to deliver.

58.    The Jail's failure to provide confidentiality affects other mental health providers, too. For example, recently, a court-appointed psychiatrist came to the Jail to complete a court-ordered competency evaluation. He requested that staff bring the patient to a confidential setting inside the Jail. Custody staff refused to move the patient from their cell, even after the psychiatrist informed them that he could not conduct an adequate evaluation at cell-front. He thus was unable to complete his evaluation that day. In my experience, this means that the patient's court proceedings will likely be significantly delayed, and his detention prolonged.

59.    I have observed that people with physical disabilities, including people with mental health treatment needs, face problems with accessibility and accommodations in ways that I found upsetting. For example, I am aware that patients with physical disabilities placed in the EOH unit at the Central Jail have had their mobility assistive devices removed, without any alternative accommodation provided. Custody staff confiscated the prosthetic limb belonging to one man held in EOH at the Central Jail. I recall seeing him having to hop around, including when I came by to try to meet with him.

60.    I also observed that there is lack of accessible features in mental health units, like the EOH unit at Central Jail. Cells lack grab bars next to the

[3902455.1]

17

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

toilet and showers lack bars or chairs to help people with mobility disabilities.

## V.    Jail Custody Staff Fail to Do Adequate Safety Checks.

61.    Working full-time to serve my patients in the Jail's housing units, I frequently observe custody staff conducting what are known as hourly "safety checks," during which they are supposed to look inside every cell to ensure the safety and well-being of every person in custody.

62.    Based on my observations, the safety checks that custody staff do are not thorough.  Many staff members barely peer through the cell windows as they walk by.  Sometimes, they will check to see if a person is breathing and okay, but often it appears to me that they do not do a meaningful check.

63.    What is clear to me is that many of the people whom the custody staff are supposed to check to ensure safety and well-being are in states of significant decompensation and distress.  One way to demonstrate this problem is the extreme filth of many cells holding people with mental illness.

64.    After seeing scores of my patients in states of psychological distress and extreme filth, and custody staff simply walking by their cells during the safety checks, I began to take photographs to document what I was seeing, including in an effort to get my patients the care and assistance they needed.  Here are several recent photographs of cells where my patients with mental illness were housed. These are the images that custody staff walk by during the safety checks. Most of the time, they would do nothing in response.

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Figure 3 - Filthy cell housing mental health patient*



*Figure 4 - Outpatient Step Down Cell with trash covering floor*

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION



*Figure 5 - Trash strewn across cell floor, Outpatient Step Down*



*Figure 6 - Trash on Outpatient Step Down Housing Unit common area*

[3902455.1]

20

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Figure 7 - Trash outside Outpatient Step Down cells*



*Figure 8 - Messy cell housing mental health patient*

/ / /

/ / /

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10



*Figure 9 - Outpatient Step Down cell window, covered in feces*

11
12  I declare under penalty of perjury under the laws of the United States of

13  America that the above is true and correct.

14

15  Executed on April 28, 2022 at San Diego, California.

16

17  By: _____

18      Jennifer Alonso, LCSW

19
20
21
22
23
24
25
26
27
28

DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY
INJUNCTION AND PROVISIONAL CLASS CERTIFICATION