GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email: ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**DECLARATION OF CHRISTOPHER NELSON IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge: Hon. Anthony J. Battaglia<br><br>Trial Date: None Set |

[3903205.1]

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF CHRISTOPHER NELSON IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

(*counsel continued from preceding page*)

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California 92101-4297
Telephone: (619) 699-2700
Facsimile: (619) 699-2701
Email: christopher.young@dlapiper.com
 isabella.neal@dlapiper.com
 oliver.kiefer@dlapiper.com

BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
2760 Fifth Avenue, Suite 300
San Diego, California 92103-6330
Telephone: (619) 232-2121
Email: bvakili@aclusandiego.org
 jmarkovitz@aclusandiego.org

Attorneys for Plaintiffs

[3903205.1]

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF CHRISTOPHER NELSON IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

**DECLARATION OF CHRISTOPHER NELSON**

I, Christopher Nelson, declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. I have been incarcerated at the San Diego County Jail ("Jail") since approximately March 2, 2021. I am currently housed in module 8C, which is a medical dorm. I was previously housed in module 5A. My booking number is 21107181. I am 45 years old.

3. I have been incarcerated in the Jail approximately five times since 2012. I was detained at the Jail awaiting trial on the charges brought against me until September 2021. I am currently waiting to transfer to the custody of the California Department of Corrections and Rehabilitation ("CDCR"). It is my understanding that I could be sent back to the Jail if I ever need to be present in court related to my criminal case. I could also be sent back to the Jail if it is necessary for me to testify in this case about the problems I experienced in the Jail. In addition, I also will parole from prison at some point in the future. When I parole, I will be sent back to San Diego County, the county in which I was convicted and where I lived prior to my arrest. When I am on parole, I can be arrested and returned to the Jail for allegedly violating the terms and conditions of my parole, whether or not the alleged violation constitutes a violation of a criminal law. I am concerned that, if I am sent back to the Jail in the future, I will experience problems similar to the problems I have been experiencing for months.

4. I have stage four osteonecrosis in my hips and knees, which means my bones are deteriorating. Attached hereto as **Exhibit A** is a true and correct copy of excerpts from my Jail medical records showing that my osteonecrosis diagnosis dates back as far as 2017. I have previously been prescribed bilateral knee braces. I use a wheelchair at the Jail. I used to use a

[3871883.1]

1
DECLARATION OF CHRISTOPHER NELSON

wheelchair for long-distance travel only, but after suffering a spinal injury prior to my incarceration, I now use a wheelchair for even short distances. When I first came to the Jail in 2021, I could not climb stairs. I now have the ability to walk up stairs with the support of a handrail, and I cannot sleep on a top bunk.

5.  During a prior incarceration in CDCR, I had two hip replacement surgeries. Before this most recent incarceration at the Jail, I took 10 milligrams of the pain medication Norco three times per day to alleviate severe pain associated with my arthritis and hip surgeries. Attached hereto as **Exhibit B** is a true and correct copy of an initial Jail booking screening form confirming that I took this amount of pain medication for the two years prior to my incarceration. On the night of my arrest, on or about March 1, 2021, I was in a car crash and seriously injured my spine, which worsened my already poor mobility. I was transported to Scripps Hospital before booking into the Jail. Because of my medical conditions and recent injury, I could not and still cannot stand or walk without experiencing significant pain.

6.  I have mental health disabilities. I was diagnosed with clinical depression and anxiety in 2012, and access mental health care services in the Jail. During my most recent CDCR incarceration, I was prescribed Zoloft and Abilify. Currently at the Jail, I have prescriptions for Wellbutrin and Remron.

7.  In my experience, the Jail is an unsafe and unfair place for incarcerated people with disabilities. During my first four to five months at the Jail, the wheelchair the Jail gave me had very small wheels and lacked arm rests. Because the chair had no arm rests and I was unable to grip the wheels, I was forced to use my feet to push myself in the wheelchair. I have little strength in my legs due to my hip condition and spinal injury, making it very painful to use them. To avoid further pain, I often relied on other incarcerated people to push me in my wheelchair. I felt very unsafe when I had to rely on other

incarcerated people to push me in my wheelchair. It is hard to trust people while in Jail and I am already vulnerable because of my physical disabilities and medical conditions. I received a replacement wheelchair with arm rests on or around July 2021 – four months after I first arrived at the Jail.

8. The Jail has also failed to house me in cells that are accessible to me. For the first several months of my incarceration, the Jail assigned me to Cell 9 in module 5A on the fifth floor at Central Jail. The cell was about 10 feet by 8 feet, and I shared it with two other incarcerated people. My wheelchair took up a lot of space in the small cell and my cellmates frequently got angry with me, complaining that it was in their way. A stool was bolted in front of the desk in that cell. This meant my wheelchair could not fit in front of the desk. Having access to a desk is important to me so that I can cope with the stresses of incarceration by writing letters to my family. To use the desk, I had to transfer from my wheelchair to the stool. Making the transfer was difficult for me and put me at risk of falling. In July 2021, I fell while trying to transfer and I hurt my wrist. Attached hereto as **Exhibit C** is a true and correct copy of a medical evaluation a nurse conducted on my injured wrist.

9. Because of my physical disabilities, it was difficult for me to clean my cell. I had to rely on my cellmates to do my portion of the cleaning, which created constant disagreements. It felt like I was walking on egg shells with my cellmates and I was afraid they might hurt me. The Jail does not have a program that hires other incarcerated people to assist people with disabilities with tasks such as cleaning, carrying property, meals, or laundry. I know CDCR has such a program and I have benefitted from it while in state custody.

10. I could not access the four telephones in module 5A from my wheelchair because the telephone cord running between the phone and its receiver was too short for me to bring the receiver to my ear while sitting in

[3871883.1]

3
DECLARATION OF CHRISTOPHER NELSON

my wheelchair. Stools were also bolted to the ground in front of all telephones in 5A, which prevented me from being close to the telephone in my wheelchair. The seats for the tables in the dayroom, where people would eat their meals and socialize, were also bolted down. There was no cut out space for a person in a wheelchair to roll up to a table and participate in those activities. To use the telephones and dayroom tables, I had to transfer from my wheelchair to the bolted seats, which is difficult and painful, and placed me at risk of falling.

11. The shower in module 5A had no shower chair or stool for people with mobility disabilities, like myself, to use. When I was first booked into the Jail, I overheard another wheelchair user ask for a shower chair, but deputies ignored him. Without a stool or shower chair, I had no choice but to stand in the shower. I had to take very fast showers before the pain in my hips set in. There was a grab bar in the shower but it was very slippery, and often filthy with soap, water and anything others had washed off. It did not provide enough support for me while I stood.

12. On or around October 12, 2021, I moved to module 8C, where I currently live. 8C is a medical dorm. Many other people with mobility disabilities live in 8C. Although I am better able to move around in my cell in 8C, it is still difficult to use the dayroom tables during meals and recreation. There are often ten to fifteen other people in my dorm who use wheelchairs, and there is not enough cut out space for everyone with wheelchairs to eat at the tables. Due to the lack of space, many wheelchair users have to roll up and place their trays on stools that other people have sit on in the dayroom, and then lean down to eat from those stools. Having to eat like this is especially difficult for people like me who are in wheelchairs and also have upper extremity disabilities. Because of the lack of table space, I often take

[3871883.1]

4
DECLARATION OF CHRISTOPHER NELSON

my food back to my cell, and place my tray on a bunk and eat there. As a result, I have less time to socialize with other people in my module.

13. Custody staff also do not accommodate me and my mobility disability. I require an extra mattress for my disability and medical conditions, including my spinal injury. I have a chrono from CDCR for the extra mattress. Attached hereto as **Exhibit D** is a true and correct copy of an April 2021 notification the ADA coordinator at the Jail received from CDCR indicating I had a double mattress in their custody. When I booked into the Jail in March 2021, staff initially gave me my extra mattress. But during the first two months of my incarceration, deputies conducted cell searches and took my extra mattress away on four or five separate occasions. Each time, I had to advocate to get my mattress back, pleading with deputies who often ignored me. Attached hereto as **Exhibit E** is a true and correct copy of a grievance form I filed on April 1, 2021 requesting, among other items, my extra mattress. I finally received the extra mattress on or around April 16, 2021. During the times that I am without an extra mattress, including those two weeks in April, I experience severe pain and discomfort that interferes with my sleep.

14. Deputies sometimes take away my wheelchair and use it to transport other incarcerated people who may need a temporary wheelchair. I estimate this has occurred approximately 5 or 6 imes. When I am without my wheelchair, it is hard for me to get anywhere in my housing unit.

15. On several occasions, I have gone to court in connection with my criminal case. Each time, Jail staff has begun my transfer to court at around 4:00 a.m. Each trip involves several long waiting periods during which time I am stuck in my wheelchair for 3 to 4 hours at a time, without the ability to lay down. This exacerbates the stiffness and pain from my injuries. Instead of directly transferring me for the 5-10 minute court hearing, I have to endure a

total of about 6-12 hours stuck in my wheelchair in holding cells every time I go to court.

16. I cannot safely access the exercise equipment at the Jail. The Jail only provides dip bars, a rowing machine, and stationary bike (now removed), all of which I cannot use because of my mobility issues. Lack of exercise makes my physical condition and pain worse. I would use equipment like yoga mats, exercise balls, or light weights if they were available. The Jail does not provide any physical therapy, and I have gained approximately 45 pounds as a result of the inability to exercise.

17. Because of my mobility disability, I rely on the elevator to access programs on other floors, including social visits, professional visits, and the recreation area. The non-staff elevator in the Jail frequently breaks down and I often have to wait until the staff elevator is available. On one occasion, the elevator was broken so custody staff could not take me for a professional visit with a detective with whom I had wished to speak. The detective also made multiple calls that were not communicated to me. I learned about the detective's attempt to communicate with me when I obtained discovery in connection with my criminal case.

18. The Jail's failure to fix electrical problems have caused problems for me. For example, the phones did not work properly for several months. In the housing units at Central Jail, the telephones are surrounded in a metal case. If someone else was talking on another phone and hung it up, an electrical shock would go through the phone and the metal case, shocking the bare arms of other phone users who rested their arms on the metal case. I have been repeatedly shocked when I rested my arm on the metal case connected to the telephones. These shocks caused blister-like sores to form on my arm, which became infected. Attached hereto as **Exhibit F** is a true

and correct copy of a nursing note from my file confirming the sores on my arms.

19. I have had difficulties receiving mental health care while incarcerated at the Jail. I experience depression and anxiety. I did not receive an initial psychiatric evaluation until almost two months after my arrival at the Jail. I also did not receive my psychiatric medication in a timely manner. Shortly after being booked into the Jail, my mental health worsened and I began to experience high levels of anxiety and depression. I submitted two sick call slips asking for mental health care in my first weeks at the Jail. In my second sick call slip, I wrote that I never received a response or attention from clinical staff. I began to feel very dejected. I thought I would never get help for my mental health. I fell into a deep depression. I felt like staff would only respond to me if I took drastic measures to show how badly I was feeling. On or around April 20, 2021, I started to yell out to each deputy passing by my cell, begging them to let me see mental health staff. This went on for about one and a half days. Finally, I received an initial mental health evaluation on April 22, 2021. Attached hereto as **Exhibit G** is a true and correct copy of that evaluation conducted by mental health counselor. I did not see a psychiatrist until May 10, 2021, more than three months after arriving at the Jail. After that May 10, 2021 meeting, the Jail started me on Wellbutrin. Attached hereto as **Exhibit H** is a true and correct copy of my initial psychiatric evaluation on May 10, 2021.

20. I have had problems receiving adequate medical care to treat my medical conditions, including my spinal injury. Before my arrest, I was in a car crash and taken to the emergency room at Scripps Hospital. Scripps medical staff discovered that I had a severely injured vertebrae, and contusions of the shoulder and hand. The treating physician prescribed me Norco to manage my pain. Attached hereto as **Exhibit I** are excerpts of my

treating records from Scripps showing this instruction. When I arrived at the Jail, instead of gradually adjusting my pain medications, medical staff discontinued my Norco prescription entirely and instead provided me 50 milligrams of Tramadol two times a day for the first five days of my incarceration. The Tramedol did not effectively manage my pain. The Jail then discontinued my Tramadol and prescribed me 400 milligrams of Gabapentin to take two times a day for 90 days. At CDCR and in the community I had 1200 milligrams of Gabapentin three times a day. The Jail's provision of Gabapentin was much less, and did not adequately address the pain I felt from my injuries. In mid-April 2021, the Jail took the Gabapentin entirely away and prescribed me 50 milligrams of Pregabalin to take once per day. Attached hereto as **Exhibit J** is a true and correct copy of excerpts from my Jail medication administration record confirming these dosages. These abrupt changes in my pain regimen, prescribing me drastically less pain medication over a short period of time, gave me profound withdrawals and left me in excruciating pain. It was agony trying to heal from a serious spinal injury without proper pain management. Attached hereto as **Exhibit K** are true and correct copies of two sick call slip requests I filed about my need for better pain management in the months after my accident.

21. I was booked into the Jail with a shoulder injury and told booking staff about the shoulder injury, which was exacerbated from the automobile crash that occurred immediately prior to my incarceration. After booking, I submitted numerous requests for care for my shoulder, but the Jail frequently did not respond to my requests. After several months, the Jail gave me one cortisol shot but it relieved the pain in my shoulder for only several days. After that, I submitted more sick call requests, but Jail staff did not respond. During this time, it was very difficult for me to get in and out of my wheelchair. It was not until October 2021 until I was finally referred to a

[3871883.1]

8
DECLARATION OF CHRISTOPHER NELSON

specialist at the University of California – San Diego Hospital who confirmed that I had a torn rotator cuff. Jail medical staff have failed to provide me with any follow-up treatment. The specialist prescribed a physical therapy regimen that I cannot complete because Jail staff do not allow me to use rubber bands and other accessories that the exercises require. My torn rotator cuff also makes daily activities very difficult; I have trouble sleeping and wiping myself after using the bathroom. Denying me treatment for this injury does not take into account that I have a wheelchair, and rely on my arms and upper body for mobility. I now struggle to safely transfer from my wheelchair and I am at risk of falling in daily situations, like using the bathroom or showering. I fear that the Jail's failure to treat this shoulder injury will result in long-term damage.

22.  I have severe persistent respiratory distress (SPRD) and asthma, which has continued to bother me during my incarceration. Prior to my incarceration at the Jail, I have gone to the emergency room for issues related to my respiratory illnesses on numerous occasions. Outside the Jail, I regularly received nebulizer treatments. At the Jail, I have frequently had respiratory difficulties and have submitted multiple sick call requests about them. Attached as **Exhibit L** is an encounter note from September 2021 in which medical staff noted my history of asthma and that I had been wheezing for several days. The Jail has told me it is impossible for them to provide me nebulizer treatment in my cell. I regularly require nebulizer treatments and have to ask custody staff to get emergency treatment in the medical unit for breathing problems. Custody staff in turn regularly tell me that they will inform medical, but in actuality, they frequently either fail to do so or fail to ensure that I am actually sent to medical for a nebulizer treatment. Whether I actually make it to the medical floor and receive nebulizer treatments depends

[3871883.1]

9
DECLARATION OF CHRISTOPHER NELSON

Page 12 of 15

on the temperament and identity of the deputy working in my housing unit at that time.

23. The Jail has also prevented me from speaking with my attorneys confidentially. Typically, custody staff are supposed to inform an incarcerated person if their attorney has requested a professional call back. These phone calls should not be monitored by custody staff. In theory, once someone learns about a professional call back request placed for them, they are allowed to leave their cell and make a return call to their attorneys. My attorney in my criminal case informed me that they placed over a dozen professional callback requests. However, custody staff never notified me that my criminal attorney placed any of these call requests for me. My attorneys in this case have informed me and I understand that they placed eight call back requests for me on October 21, October 25, October 28, November 15, November 17, November 22, November 29, and December 7, 2021. I never received notice of any of those calls.

24. Further, in September 2021, a deputy attempted to prevent me from speaking with my attorney during a professional visit. I previously had issues with this deputy because, earlier that day, I had opened my tray slot in my cell to let in fresh air. At the time, the vents in my three-person cell were not working and it was becoming difficult to breathe in such a tight space. It was incredibly humid and smelly. The deputy ordered me to close the tray slot, and I complained to him about it. We got into a verbal argument. I understand that this deputy falsely told my attorney that I did not want to visit with my attorney and that the deputy asked my attorney why he wanted to speak with me. My attorney also informed me that only after he demanded to see me was I allowed out of my cell to attend my professional visit. I believe this deputy delayed my visit with my attorney in retaliation for his disagreement with me opening my cell's tray slot.

10
DECLARATION OF CHRISTOPHER NELSON

25. I have had many problems using the grievance process at the Jail. For example, on October 16, 2021, I filed a grievance about issues in the Jail related to ADA accommodations, mental health and medical care, and safety and security issues. The Jail never responded to my grievance. I usually do not receive any responses to my grievances. Similarly, when my grievances have been about a lack of medical or mental health care, the Jail typically does not respond.

26. In my experience, deputies are often reluctant to take grievances. One told me that they "need to let the sergeant sign this" before being able to accept and process a grievance. Nowhere on the grievance form does it say that a sergeant has to sign off on a grievance before the Jail can process it. A true and correct copy of a blank grievance form is attached hereto as **Exhibit M**. One deputy told me that he does not sign grievances.

27. During medical appointments, custody staff are always present and overhear my conversations about my medical issues. Sometimes when I talk to a medical professional, custody staff will chime in with their opinions and observations. In addition, custody staff sometimes openly discuss my medical issues in front of other incarcerated people. Custody staff will openly complain in front of other people in my housing unit about my medical and disability needs, and their obligation to accommodate them.

28. I agreed to be a class representative in this case because I want to help improve the medical, dental, and mental health care at the Jail, ensure that incarcerated people with disabilities are accommodated and treated fairly, and help make the Jail safe and secure for all incarcerated people. I have been cooperating fully with my counsel and am responding to all requests for information to the best of my ability and recollection, and will continue to do so in the future. My lawyers keep me updated on the progress of this case, and I will review all materials provided to me and provide my input to the

best of my ability.  When I have questions about the case, I will ask the attorneys for help to understand everything to the best of my ability.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct, and that this declaration is executed at the San Diego County Central Jail in California this 9th day of March, 2022.

*Chris Nelson*
_____
Christopher Nelson

[3871883.1]

12
DECLARATION OF CHRISTOPHER NELSON

# EXHIBITS A-M
## Filed Under Seal