1  GAY CROSTHWAIT GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  PRIYAH KAUL – 307956
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   ROSEN BIEN GALVAN & GRUNFELD LLP
4  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
5  Telephone:  (415) 433-6830
   Facsimile:  (415) 433-7104
6  Email:      ggrunfeld@rbgg.com
               vswearingen@rbgg.com
7              pkaul@rbgg.com
               eanderson@rbgg.com
8              hchartoff@rbgg.com

9  AARON J. FISCHER – 247391
   LAW OFFICE OF
10 AARON J. FISCHER
   2001 Addison Street, Suite 300
11 Berkeley, California  94704-1165
   Telephone:  (510) 806-7366
12 Facsimile:  (510) 694-6314
   Email:      ajf@aaronfischerlaw.com

13 (*additional counsel on following page*)

14 Attorneys for Plaintiffs

15

16                UNITED STATES DISTRICT COURT

17              SOUTHERN DISTRICT OF CALIFORNIA

18 DARRYL DUNSMORE, ERNEST            Case No. 3:20-cv-00406-AJB-WVG
   ARCHULETA, ANTHONY EDWARDS,
19 REANNA LEVY, JOSUE LOPEZ,          **DECLARATION OF JOSUE**
   CHRISTOPHER NELSON,                **LOPEZ IN SUPPORT OF**
20 CHRISTOPHER NORWOOD, and           **PLAINTIFFS' MOTIONS FOR**
   LAURA ZOERNER, on behalf of        **PRELIMINARY INJUNCTION**
21 themselves and all others similarly situated,  **AND PROVISIONAL CLASS**
                                      **CERTIFICATION**
22              Plaintiffs,
                                      Judge:    Hon. Anthony J. Battaglia
23    v.
                                      Trial Date:  None Set
   SAN DIEGO COUNTY SHERIFF'S
24 DEPARTMENT, COUNTY OF SAN
   DIEGO, CORRECTIONAL
25 HEALTHCARE PARTNERS, INC.,
   LIBERTY HEALTHCARE, INC., MID-
26 AMERICA HEALTH, INC., LOGAN
   HAAK, M.D., INC., SAN DIEGO
27 COUNTY PROBATION DEPARTMENT,
   and DOES 1 to 20, inclusive,
28              Defendants.

[3903205.1]

1  (*counsel continued from preceding page*)

2  CHRISTOPHER M. YOUNG – 163319
   ISABELLA NEAL – 328323
3  OLIVER KIEFER – 332830
   DLA PIPER LLP (US)
4  401 B Street, Suite 1700
   San Diego, California 92101-4297
5  Telephone:   (619) 699-2700
   Facsimile:   (619) 699-2701
6  Email:       christopher.young@dlapiper.com
                isabella.neal@dlapiper.com
7               oliver.kiefer@dlapiper.com

8  BARDIS VAKILI – 247783
   JONATHAN MARKOVITZ – 301767
9  ACLU FOUNDATION OF SAN DIEGO &
   IMPERIAL COUNTIES
10 2760 Fifth Avenue, Suite 300
   San Diego, California 92103-6330
11 Telephone:   (619) 232-2121
   Email:       bvakili@aclusandiego.org
12              jmarkovitz@aclusandiego.org

13 Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3903205.1]

DECLARATION OF JOSUE LOPEZ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1        **DECLARATION OF JOSUE LOPEZ**

2        I, Josue Lopez, declare:

3        1.      I have personal knowledge of the matters set forth herein, and if called

4  as a witness, I could and would competently so testify.

5        2.      I was incarcerated in the San Diego County Jail (the "Jail") from

6  October 8, 2019 until May 12, 2021.  During that time, I was awaiting trial.  I was

7  released on bail on May 12, 2021.

8        3.      From my experiences, the Jail is a very unsafe and inaccessible place

9  for incarcerated people with disabilities.  I am deaf and my primary method of

10 communication is American Sign Language ("ASL").  I can rely on written notes in

11 the absence of a sign language interpreter.  I am not fluent in lip-reading in English,

12 but I am able to understand some information.  The Jail consistently refused to

13 accommodate my hearing disability while I was incarcerated.

14       4.      I was booked into Vista Detention Facility ("Vista") on or around

15 October 8, 2019.  Shortly after my arrival, I attended an initial mental health

16 appointment during which custodial staff kept me handcuffed to a bar in the room

17 which made it impossible for me to use my hands to sign effectively with the in-

18 person interpreter about my mental health.

19       5.      At Vista, I could not keep in regular contact with my wife or attorney

20 because the facility did not have any interpreting services or Video Relay services,

21 and its Telecommunication Device for the Deaf ("TTY") machine was not in

22 working order.  The Jail had a sign that said deaf people can access the TTY to

23 communicate, but when I asked correctional staff about it, no one knew how to

24 operate it.  I tried to use it a few days after arriving at the Jail, but it did not work.

25 Several times I complained to staff about its non-working condition as well as the

26 lack of access to communication devices, but they ignored my repeated requests for

27 help fixing the machine.  Because of the lack of communication options, I

28

1    sometimes asked fellow incarcerated people to make phone calls for me in order to

2    relay important messages.

3        6.    I transferred to George Bailey Detention Center ("George Bailey") on

4    or around December 12, 2019.  During the first few months of my time at the

5    facility, the most effective point of contact I had with my wife was through short, in-

6    person visits.  But because the facilities were overcrowded, it was difficult to

7    schedule visits.  There was a TTY at George Bailey, but staff did not know how to

8    operate it.  When I tried to ask staff to use the TTY, they often refused to allow me

9    to use it.  Staff never once offered me access to the TTY.  There was also a thirty-

10   minute video conferencing method called Securus.  During my time in the Jail, these

11   video conferencing calls were expensive for me and my family.  It was around $100

12   a month to participate in frequent calls with my loved ones.  These calls also had

13   poor network connectivity, so it was hard to use this method.  When the COVID-19

14   pandemic began in March 2020, George Bailey suspended all in-person social

15   visiting.  They suspended in-person social visits from March 2020 until July 2020,

16   and then again in November 2020 until May 2021.  In December 2020, they

17   suspended all video visits as well.

18       7.    When the Jail suspended social visits, I had to rely on just the TTY to

19   communicate with my family.  The TTY is a special device, similar to a typewriter,

20   that allows speech-to-text communication.  The TTY was not effective for

21   communication; there was usually a poor signal which stopped all communication,

22   and even when the signal worked, words often became garbled when two people

23   spoke at the same time, messing up the translation.  My conversations over the TTY

24   took much longer than normal voice phone calls.

25       8.    Many deputies at George Bailey became visibly frustrated with me

26   when I asked to use the TTY.  Deputies frequently denied me access to the TTY

27   when I requested it.  They said they were "too busy" or "short-staffed" to take me to

28   use it.  They also delayed my request by stating they would help me "later" or they

1  "needed to ask the team" if I was allowed to use the TTY.  When I finally did get to

2  use the TTY, and it was slow to operate because of poor network connection, the

3  deputies rushed me to end my call and did not allow me to finish my conversations

4  with my loved ones or attorneys.  To take one example, on March 16, 2021, I

5  requested to use the TTY several times.  I waited hours, and was not allowed to use

6  the TTY to call my wife until 11:45 pm.  I was unable to reach my wife because she

7  was most likely asleep by the time I called her.  I asked to use the TTY the next day

8  and explained that I could not reach my wife due to the late hour that I called the

9  night before.  Staff originally accepted my request, but later came back and told me

10 the TTY had been moved to a different area of the Jail, without my knowledge.

11 Deputies did not escort me to the TTY's new location and I was unable to call my

12 wife for a second time.

13        9.      I tried to raise the issues of TTY access with staff on several occasions.

14 For example, on October 3, 2020, I spoke with Sergeant Cortes-Garcia about the

15 issue and he said he would help resolve it.  For a few days after my conversation

16 with the Sergeant, it was easier to access the TTY when I requested it from staff.

17 However, after those few days, custodial staff went back to refusing or delaying my

18 access.  Deputies continued to be dismissive or outright rude to me when I asked to

19 use the TTY, denying me contact with my family, friends, and legal counsel.  I

20 estimate that staff refused me access to the TTY at least 100 times, maybe more.

21 Wait times varied each day, but I estimate the average amount of time I waited to

22 use the TTY was two to three hours.  It was hard to predict how long I would have

23 to wait.  The longest time I had to wait to use the TTY was three days.  That

24 happened at least four or five times.  People who did not have hearing disabilities

25 never had to wait as long as I did when they requested to use the phone. Sometimes

26 my hearing friends told me that they would overhear the deputies talking badly of

27 me when they discussed the phone schedule.  My neighbors would say that the

28 deputies complained about how much I asked to use the TTY.

10.     There were also long delays to set up confidential videoconferencing calls with my defense attorney.  For a significant period of time, George Bailey only had two laptops to use for court and attorney-client meetings, making it very difficult to schedule a call with my attorney.

11.      Throughout my time at Vista and George Bailey, I had problems securing a video call with my attorney that was confidential.  Sometimes, deputies stood in the same room while I communicated with my attorney and a sign language interpreter over video.  This was especially bad during court appointments.  When I needed to have short but important confidential appointments with my attorney before a court hearing, deputies remained in the same room.  When my attorney asked if deputies could leave the room, they said they could not.  They also failed to accommodate my disability during many of these calls.  Some deputies kept me handcuffed, which prevented me from signing and communicating effectively to the interpreter.

12.     The Jail has also failed to accommodate my disability in other ways. The Jail did not provide a sign language interpreter during interactions with nursing and medical staff, despite my requests.  When I left the Jail to attend medical appointments at an outside hospital, I received an interpreter.  But the Jail never provided me with an interpreter for routine medical contacts inside the facility. Instead, I had to rely on written notes to understand the complex medical issues and advice that the provider was trying to discuss with me.  For the majority of these appointments, I did not understand what medical staff tried to communicated to me. Sometimes, the doctors did not write any information down for me.  I could not read their lips because the majority of interactions occurred while staff wore masks.  If a new nurse was assigned to me, they often failed to communicate effectively with me because they did not know, and apparently had no way of knowing, that I am deaf.

13.     Many of the deputies also did not know that I am deaf and rely on written notes and lip-reading in the absence of a sign language interpreter.  As a

1    result, many of the deputies tried to communicate with me while wearing their

2    masks.  Whenever staff did communicate with me via written notes, the notes would

3    be short and cryptic.  Staff always seemed rushed and acted like they did not want to

4    take the time to explain things to me.

5       14. Custody staff usually involved other incarcerated people when there

6    was reason to communicate with me.  Custody staff would have other incarcerated

7    people write down staff's questions and responses for me to read.  Custody staff

8    often told another incarcerated person what to communicate to me and then the staff

9    member would leave before I had an opportunity to respond.  This process was

10   ineffective because I often had follow-up questions I wanted to ask the deputy.  This

11   practice also placed me at a substantial risk of harm because other incarcerated

12   people learned confidential information about me whenever I needed to

13   communicate with Jail staff.  I also could not trust that these people would write

14   down accurate information.  I was especially vulnerable to other people incarcerated

15   in the Jail because of the nature of my charges, and was constantly fearful that

16   having them participate in my communications with deputies put me at an extreme

17   risk of being harmed.  I had no ability to control whether the other incarcerated

18   people who learned my confidential information from Jail staff would pass that

19   information on to other incarcerated persons at the Jail.

20      15. I have also experienced issues with the medical care treatment at the

21   Jail, which put my life at a substantial risk of harm.  Before I was arrested, I

22   received a kidney transplant in November 2001.  I take the following medications

23   every day to ensure that my body does not reject the transplant: cyclosporine,

24   mycophenolate and prednisone.  When I first arrived at Vista in October 2019, the

25   Jail failed to give me my medication for around four to five days.  I also had issues

26   with receiving my medication on a daily basis.  I was supposed to take my

27   medication in the mornings, but due to staffing shortages, I would sometimes

28   receive my meds in the afternoon or evening.  The Jail occasionally dealt with

1  inventory shortages; they did not have my medications in stock and there would be a

2  delay in ordering them.  This meant I sometimes went three days without taking my

3  medications.  Throughout the month of April 2020, I was in and out of the hospital

4  because I had lost around fifteen to twenty pounds and I had a low sodium count.

5  My body was shutting down and I was very sick.  I was physically weak and thirsty

6  all the time.  I believe the decline in my health, including my weight loss, was due in

7  part to the Jail's failure to provide me with my life-sustaining medications in a

8  timely manner.

9  16.    Medical staff at the Jail also ordered me to drink two liters of water per

10  day.  When I went to the outside hospital in April 2020, a kidney specialist at the

11  hospital told me that I needed to be drinking even more water.  When I returned to

12  the Jail and told medical that I needed to drink more water, they denied me access to

13  more water.  I do not know why they limited me to two liters and ignored the

14  specialist's advice.  I began to drink more water secretly, so that I could stay

15  hydrated.

16  17.    On June 9, 2020 and April 26, 2021, my defense attorney argued in

17  court about the Jail's failure to provide adequate medical care treatment for my

18  kidney transplant.  The court transcripts are attached hereto as **Exhibits A** and **B**.

19  The judge ordered that the Sheriff's Department address my medication issues by

20  ensuring they have a stockpile of medications on-site so that I receive them in a

21  timely manner.

22  18.    There were other conditions that placed my safety and survival at risk

23  in the Jail.  For example, on February 13, 2021, myself and others in my housing

24  unit asked for grievance forms.  A deputy threatened us that something bad would

25  happen if we filed grievances, saying, "whoever you want to write up, don't."

26  / / /

27  / / /

28  / / /

[3737812.7]                                6

1    19.    I want to help improve conditions for people with disabilities and

2  severe medical conditions who are incarcerated within the San Diego County Jail

3  system.

4        I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct, and that this declaration is executed

6  at San Diego, California on _____10/19/2021_____.

7

8

9                                                          Josue Lopez

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

```
 1            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                IN AND FOR THE COUNTY OF SAN DIEGO

 3   DEPARTMENT 25        BEFORE HON. HARRY M. ELIAS, JUDGE

 4   _____)

 5   THE PEOPLE,                      ) CERTIFIED TRANSCRIPT
                                      )
 6                  PLAINTIFF,        ) CASE NO.  CN405969
          VS.                         )
 7                                    )
     JOSUE LOPEZ,                     )
 8                                    )
                    DEFENDANT.        )
 9   _____)

10                   REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                          JUNE 9, 2020

12                       PAGES 1 THROUGH 11

13

14   APPEARANCES:

15

16   FOR THE PLAINTIFF:   SUMMER STEPHAN
                          DISTRICT ATTORNEY
17                        BY:  JENNIFER REISCHL
                          DEPUTY DISTRICT ATTORNEY
18                        325 S. MELROSE DRIVE, SUITE 5000
                          VISTA, CALIFORNIA 92081
19

20   FOR THE DEFENDANT:   HERBERT WESTON & TANYA WESTON
                          BY:  HERBERT WESTON
21                        378 VISTA VILLAGE DRIVE
                          VISTA, CALIFORNIA 92083
22

23

24

25

26

27                   DULCEMARIA DUARTE, CSR 13968
                         OFFICIAL COURT REPORTER
28
```

2

1    VISTA, CALIFORNIA; TUESDAY, JUNE 9, 2020; 11:02 A.M.

2    (THE FOLLOWING HEARING WAS REPORTED VIA VIDEO CONFERENCE PER

3    EMERGENCY RULE OF COURT 3(A).)

4    - oOo -

5    THE COURT:  Okay.  This is CN405969.  The *People*

6    *vs. Josue Lopez*.  Mr. Lopez is appearing by way of video

7    remote as are both counsel to a semi-closed courtroom

8    pursuant to California Emergency Rule of Court 3 and 5.

9    There's no member of the public present.  The public can

10    listen in on YouTube.  Mr. Lopez is being assisted by a

11    certified American Sign Language interpreter.

12    THE INTERPRETER:  Certified American Sign Language

13    interpreter, Nancie Alcock.  Qualified by 16 years in the

14    court, oath on file.

15    THE CLERK:  The interpreter's identification has

16    been verified by the Court.

17    THE COURT:  She has an oath on file and certified.

18    Mr. Weston, would you like to state your appearance, please.

19    MR. WESTON:  Yes.  Herbert Weston appearing on

20    behalf of Mr. Lopez.  I'm appearing by video from my office.

21    THE COURT:  And Ms. Reischl on behalf of the

22    People.

23    MS. REISCHL:  Yes, Your Honor.  Jennifer Reischl

24    appearing on behalf of the People.

25    THE COURT:  And Mr. Lopez, are you able to see the

26    American Sign Language interpreter and understand what we're

27    doing?

28    THE DEFENDANT:  Yes, I can, Your Honor.

1          THE COURT:  Thank you.  I believe we're here for
2    purposes of a prelim; is that correct?
3          MR. WESTON:  Well, I'm here to make a record about
4    my client being denied his constitutional right to have
5    effective representation and to address the issue of the
6    prelim.  I think they're both sort of together.
7          THE COURT:  Okay.  Why don't you fill me in,
8    Mr. Weston.
9          MR. WESTON:  Okay.  Your Honor, my client has been
10   in custody since the beginning of this case and I
11   understand -- just so that the record is clear, I understand
12   that he is not entitled to zero bail because of the charges.
13   However, back in February I went in to see my client prior
14   to the coronavirus.  We had a prelim date set.  I was having
15   good contact with my client.  I went in in March.  I believe
16   it was March the 20th.  At that point in time the jails had
17   shut down.  They weren't allowing any visits in.  The
18   problem for my client is that meant that he could not
19   communicate at all with his -- with his attorney.  We were
20   back in court on April the 23rd in front of Your Honor to
21   discuss the problems that I was having regarding, first of
22   all, his health, and I'm going to get into that in a moment,
23   but also my concern is that I cannot and I'm being prevented
24   from effectively representing my client.
25          I mean, I understand that it's a difficult
26   situation and I understand about the coronavirus.  With all
27   my other clients we've been able to sort of jerry-rig a --
28   the ability to communicate either by phone or by video.  The

4

1    jail has now set up video conferencing in some jails, but
2    they limit the people who are able to appear in those
3    videos.  So on April the 23rd I expressed my concern to this
4    Court regarding, first of all, my inability to effectively
5    represent him and secondly, his health conditions.   The
6    Court then said well -- that at this point in time the --
7    there -- he continue to be in custody, but if there were
8    continued issues to bring it back to the Court to address
9    those issues.  I've been contacting -- or trying to get
10   Mr. Lopez on the triage calendar for that specific purpose
11   to address those issues.

12          Since April the 23rd I have had no contact with my
13   client.  Today is the first time that I've been able to see
14   my client.  I've attempted probably every day to get a video
15   conference with him.  One of the problems is for awhile he
16   was in a facility that didn't have video conferencing.  Then
17   he got into a facility that has video conferencing, but they
18   won't video conference people from his particular cell.
19   They just -- for security or for medical reasons or for
20   whatever reasons, they don't really explain to me.  I can't
21   set up a video conference.  Obviously my client is disabled
22   in that he cannot hear.  He shouldn't be denied his
23   constitutional rights to effective counsel just because he
24   has a disability.  And the fact of the matter is how can we
25   go months?  It's now June the 9th.  I haven't talked to him
26   since February the 12th in person, though I did on April the
27   23rd.

28          We had the same type of a conference; we just had

5

1    for a period of time so I can at least explain to him what's

2    going on.  I do find it amazing that my client is able to

3    talk to his -- his -- his family sometimes but not to me,

4    and I don't understand why that is.  You know, I've been

5    told a few times that it's because the jail phones for

6    attorneys is not there.  I haven't the slightest idea what

7    they're doing with that, but I think that this Court is

8    mandated to do something to prevent this continuing on and

9    on and we have a prelim date set, and I'm not able to do a

10   prelim because I can't effectively represent him because we

11   haven't been able to talk about his case, just mere

12   communications.

13        I -- he also has a medical condition.  That's one

14   of the other issues that we addressed the last time.  He has

15   a -- a -- he has a kidney transplant, meaning that he has a

16   transplanted kidney.  He is at high risk.  The Court was

17   concerned about the medical conditions and we addressed

18   those the last time.  He has been getting treatment, but

19   again, he tells me that he has this medicine that he has to

20   take every day.  Unfortunately, sometimes the medicine

21   doesn't get to the jail.  So he wasn't been able to take his

22   medicine yesterday for the pills that keep him alive.

23        THE COURT:  Who has the responsibility of getting

24   the medication to the jail?

25        MR. WESTON:  The jail does.  They won't take --

26   they will not take any -- any private things.  We've asked

27   that the jail -- that he could bring his stuff -- that they

28   won't accept anything but their medicine.  He's been

1    hospitalized since April the 23rd twice in that he has a low

2    sodium count and he's lost -- my understanding is he's lost

3    somewhere between 15 and 20 pounds because his body is

4    shutting down and he's not functioning.  And so I'm asking

5    the Court for a lot -- for all of those different particular

6    reasons to make sure that -- that he's, you know, medically

7    protected, and I know that -- that the jail tries to do the

8    best they can, but with a high risk individual, they're just

9    overwhelmed trying to make sure the coronavirus doesn't get

10   there and they're overwhelmed because my client has extreme

11   medical needs and even though this case is very, very, very

12   serious, it doesn't mean he should die because he's in

13   custody.

14         I -- the Court does have to make sure that -- that

15   the public is safe.  I'm asking the Court to consider to

16   releasing him on zero bail and putting him under house

17   arrest because of these conditions.  At least I could then

18   go visit him with a signed interpreter.  I mean, I have --

19   the problem is even if I were to decide, and my daughter

20   would probably object to me saying this, even if I decide to

21   go visit him, which they don't allow right now, they don't

22   allow us to go in because they're worried we would bring in

23   the disease into the jail, but even if we somehow got that,

24   I would have to have a signed interpreter put their health

25   at risk when they're not supposed to be having that type of

26   a contact.

27         So I -- you know, I understand that back in April

28   we said, you know, let's try to do the best we can, but the

1    best we can is basically -- it's denying him his right to

2    have an effective attorney because as many times as I tried

3    and attempted to have that communication, it hasn't happened

4    and I don't think that that should happen in this day in age

5    when we could put him under house arrest and make sure he

6    isn't able to leave his house.  From my experience with the

7    electronic bracelet, whatever way we set it up, they're

8    pretty accurate.  They get almost immediate notice if you

9    were to leave that particular area and it's a GPS thing and

10   they would follow him.

11         And so I'm asking the Court to allow him to be

12   released so at some point in time he be able to communicate

13   and have effective communication.  Even if he's out of

14   custody we can do Zoom meetings like we're doing right now,

15   which the jail doesn't allow.  They're just incapable of

16   doing that and I can't blame the jail for that because I

17   don't know -- we were able to come up with this or have this

18   idea of what we needed to do.

19         THE COURT:  Okay.  Ms. Reischl?

20         MS. REISCHL:  Yes, Your Honor.  I'm opposed to any

21   reduction in bail.  I understand Mr. Weston's concerns, but

22   this is a very serious case with life talk allegations, and

23   I know Your Honor heard the bail arguments on April 23rd and

24   left bail at a million dollars.  And I believe this Court is

25   already familiar with the facts of this case, but the

26   defendant is a public safety -- a major public safety

27   concern.  In this case he had intercourse multiple times

28   with a victim who was five years old.  There was oral

1    copulation.  He apologized on video when confronted about

2    the charges.  There's also a potential additional 1108

3    victim, and when his phone was searched there was child porn

4    found on his phone.  So this is a very serious case.  I do

5    not think a reduction in bail is the solution here.  I don't

6    know what relief the Court can offer, but I think the

7    solution needs to be finding a way he can communication with

8    his attorney while remaining in custody.  If the Court wants

9    any additional facts about the fact --

10            THE COURT:  I want to know what you can do to

11    facilitate to -- yeah, you work with the Chief law

12    enforcement in the County of San Diego.  Your -- your Chief

13    Officer can probably direct or have directly with the

14    sheriff -- the sheriff an ability to make this work.  So

15    what can you do to make it work because otherwise you've got

16    an appeal right at the outset before you've even gotten a

17    prelim?

18            MS. REISCHL:  Does the Court have suggestions?  So

19    I don't know what the Court would suggest, but --

20            THE COURT:  I'm asking you what you can do.  I'm

21    not suggesting anything yet.

22            MS. REISCHL:  I don't know what we can do to make

23    the sheriff's department do anything.

24            THE COURT:  How about ask --

25            MS. REISCHL:  Yeah, we can ask --

26            THE COURT:  Has anybody asked -- has anybody

27    asked --

28            MS. REISCHL:  In past issues I've seen defense file

9

1    writs to the sheriff.  He's adept and that's what I've seen

2    when there is a complaint about the conditions or the

3    treatment and they've done the writ procedure.

4           THE COURT:  So I was -- I'm just making sure --

5           MS. REISCHL:  Yes, it's certainly something we can

6    look into.

7           THE COURT:  So now let me talk because you talked

8    over me three times.  I'm just making sure you're indicating

9    you will do nothing affirmative until the defendant seeks a

10    writ; is that correct?

11           MS. REISCHL:  No, Your Honor.  I'm happy to --

12           THE COURT:  So --

13           MS. REISCHL:  -- make inquires.

14           THE COURT:  So who's asked -- who from the DA's

15    office has asked the sheriff to do something?

16           MS. REISCHL:  I don't believe they have,

17    Your Honor.

18           THE COURT:  What do we have on the 11th -- here's

19    what I'm going to do:  I'm setting the matter for the 11th

20    at 1:30.  I don't know if it will go at 1:30.  An OSC

21    regarding contempt for failure to pre-provide his

22    medication, failure to receive medication when they've run

23    out -- I want someone from the sheriff's department on the

24    line so we can address Mr. Weston's ability to communicate.

25    I'll also reserve the rest of that afternoon for Mr. Weston

26    to continue with his communications with the client to avoid

27    a continuance of the prelim.  The People are to grease the

28    skids.  If it has to go all the way up to the DA, fine.  Do

10

1 something.  If I'm in a position come the 11th that nothing

2 has been done, I will take the only action I feel I can take

3 to preserve the constitutional integrity of this case.

4 Anybody have any doubts as to what we're talking about?

5    MR. WESTON:  No, Your Honor.

6    MS. REISCHL:  No.

7    THE COURT:  Okay.  All you guys have got work to do

8 the 11th at 1:30.

9    MR. WESTON:  Thank you, Your Honor.

10    THE COURT:  Ms. Reischl, you'll notify the sheriff

11 he's adept of the OSC?

12    MS. REISCHL:  Yes.

13    THE COURT:  Thank you.

14    MR. WESTON:  Thank you, Your Honor.

15    (The proceedings adjourned at 11:16 a.m.)

16

17

18

19

20

21

22

23

24

25

26

27

28

11

1   STATE OF CALIFORNIA)

2                    :  SS.
    COUNTY OF SAN DIEGO)

3

4

5

6        I, DULCEMARIA DUARTE, Official Reporter for the

7   Superior Court of the State of California, in and for the

8   County of San Diego, do hereby certify:

9        That as such reporter, I reported in machine

10  shorthand the proceedings held in the foregoing case;

11       That my notes were transcribed into computer format

12  under my direction, and the proceedings held on June 9,

13  2020, contained within Pages 1 through 11 are a true and

14  correct transcription.

15       Dated this 16th day of April, 2021.

16

17   _____

18        Dulcemaria Duarte, CSR 13968

19            OFFICIAL COURT REPORTER

20

21

22

23

24

25

26

27

28

# EXHIBIT B

*1*

Superior Court of the State of California

For the County of San Diego

Department 25    Hon. Harry M. Elias, Judge

| | |
|---|---|
| The People, | ) Certified Transcript |
| | ) |
| Plaintiff, | ) Case No. CN405969 |
| | ) |
| v. | ) |
| | ) |
| JOSUE LOPEZ, | ) |
| | ) |
| Defendant. | ) OSC Hearing |
| | ) |

Reporter's Transcript

June 11, 2020

Pages 1 through 26

Appearances:

For Plaintiff:        Summer Stephan
                      District Attorney
                      By:  Justine L. Santiago
                      Deputy District Attorney
                      325 South Melrose Drive, Suite 5000
                      Vista, California  92081-6691

For Defendant:        Weston Criminal Lawyers
                      By:  Herbert Weston
                      378 Vista Village Drive
                      Vista, California 92083

Stephanie Whitehead, RDR, CRR, CSR# 10093
Official Court Reporter

1    Vista, California; Thursday, June 11, 2020; 3:42 p.m.

2                                    -o0o-

3

4            THE COURT:    All right.  So this is CN405969.  The

5    People v. Josue Lopez.

6            Mr. Lopez is appearing by way of video remote to a

7    semi-closed courtroom pursuant to California Emergency Rule

8    of Court 3 and 5.  It's semi-closed in that the public are

9    not physically present; they are able to listen in by way of

10   YouTube.

11           Mr. Lopez is being assisted by a certified American

12   sign language interpreter who is?

13           THE INTERPRETER:    Certified American Sign Language

14   Interpreter Nancy Alcock.  Oath on file.

15           THE CLERK:    The interpreter's identification has

16   been verified by the Court.

17           THE COURT:    We're here at a hearing set by the

18   Court because we were in court two days ago.  One, I want to

19   thank Mr. Toyen for responding so quickly and being

20   available.

21           Present currently on the stream are Sanford Toyen,

22   the legal adviser to the Sheriff, Herb Weston, counsel for

23   Mr. Lopez, and Justine Santiago, counsel for the People.  I

24   know there are other people available.  We'll get to that in

25   a minute.

26           Mr. Toyen, let me give you a brief run-up to where

27   we're at and why I asked you to be present today.  I'm going

28   to give you a brief overview, and then I am going to let

1  Mr. Weston give you more detail. There are two issues of

2  some concern as it relates to me, which is why I asked for

3  this hearing.

4         The more important one to me is the fact that

5  Mr. Weston advised me Mr. Lopez has certain medical issues,

6  in particular he's a kidney transplant recipient. And,

7  therefore, as I understand most transplant patients require

8  significant medications, antirejection medications, other

9  medications so their transplant remains successful. That's

10  my primary concern.

11         The second, though, was Mr. Weston has indicated to

12  me an inability to be able to communicate with his client in

13  terms of preparation for the preliminary hearing. I mean,

14  we hear that on a number of occasions, but I think it's sort

15  of borne out here in the sense that it's clear Mr. Lopez

16  needs an American Sign Language interpreter. So, one, we

17  have to accommodate the interpreter's schedule to make that

18  work, and obviously the schedule of the facility, and the

19  ability so that Mr. Lopez can see the interpreter while

20  Mr. Weston is trying to communicate with her.

21         We've been able to accommodate that twice here in

22  court in that we've set up in a separate room a laptop so

23  that Mr. Weston can Microsoft Teams into the laptop, as can

24  the jail facility, and then Ms. Alcock has been here on both

25  occasions so she can serve as the link between Mr. Weston

26  and his client for those communications.

27         continue or to do that other than when we're in

28  the courtroom setting to make that work. And in light of

1   the fact that this is a multi-count life-top case, that's

2   sort of the third branch, if you will, in terms of the weigh

3   down on this issue.

4               So, Mr. Weston, I would ask for you, if you could,

5   to advise Mr. Toyen in more detail as it relates to, first,

6   the medication issue and then, second, the ability to

7   communicate with your client issue.

8               MR. WESTON:   Yes, your Honor.  During the pendency

9   of this particular case, since I got on, there's always been

10  a concern regarding the medical condition of my client.  And

11  I know that the Sheriff tries as best as they can -- I'm not

12  trying to think that they don't try at all on behalf of

13  Mr. Lopez.  However, I do get called quite a few times

14  regarding the fact that there's some medicine that he has

15  been on that he would miss on kind of a regular basis.  It

16  seems like it's a special medicine.

17              They have problems with either getting it or having

18  it in enough of a supply that he can't get his daily dose.

19  Like the other day, when he went to court he told me that he

20  had missed, I believe, a day or two where they had missed it

21  out.  Today they were -- they're supposed to give it in the

22  morning, and they gave it to him in the afternoon, right

23  about 1:30 today.

24              There's a concern about that.  It has been better,

25  his medical care, since they transferred him from a regular

26  jail cell to the medical facility.  It's better care there

27  because -- and not because the other -- (technical

28  difficulties with live stream) -- are not watching, but this

1   is an individual who needs extra care because of his medical

2   condition and that it would be severe health issues.

3           He has been going to the hospital.  He has a

4   lower -- and I thought it was salt, but I might not have

5   gotten to remember the exact one, but a lower reading which

6   causes a big concern.  Also the fact that he's been losing

7   weight because of the medical conditions that he has, that

8   that in fact has prevented him -- and when he was going to

9   the hospital they were trying to control that medical

10  condition, and, therefore, he was going back and forth to

11  the hospital.

12          My understanding that he's been back and forth to

13  the hospital a few times since our last court date on April

14  the 23rd where we went through and I addressed or was

15  concerned about the fact that there's this medical condition

16  that he has that doesn't seem to be being taken care of.

17          So I have a concern regarding his medical

18  condition.  I do get a call from his relatives.  That's how

19  I hear it because, of course, he can't communicate with me.

20  He does communicate with his relatives.  The other problem

21  is just that, the lack of communication.

22          When he was -- when the coronavirus wasn't present

23  I could take my American Sign interpreter and go down and

24  visit him, which we did.  But since that time we've been --

25  and again, I don't want to say this as if they're picking on

26  me in particular, but they basically have shut down the jail

27  from having visits that we are able to go.  And --

28          MR. TOYEN:   Mr. Weston?

1    MR. WESTON:   Yes.

2    MR. TOYEN:   I'm sorry. I don't want to interrupt

3  you, but I think we might be able to shortcut some of this.

4  I don't mean to dispute your experience, but I can tell you

5  that, you know, I've got the acting lieutenant of the Bailey

6  facility here as well as THE sergeant who's in charge of

7  supplementary services. And if you can come down to the

8  Bailey with your interpreter, you're not going to be --

9  you're not -- you'll be able to have your contact visit.

10    MR. WESTON:   Well, I mean --

11    MR. TOYEN:   I can tell you that right now.

12    MR. WESTON:   Well, I mean, the difficulty of that

13  is I have to make a decision that my -- that I'm putting

14  my -- I know the room that we go to. That room is not --

15  does not socially distance the three individuals who are

16  going to be in that room. I've been in that room numerous

17  times. I mean, they're physically not being able to do

18  that. Also the fact that during this time period we're not

19  supposed to be doing that type of contact. Whether I do it

20  is something that I decide, but I can't decide for my

21  interpreter. The fact of the matter is --

22    MR. TOYEN:   So are you -- is your claim that the

23  room isn't big enough? Because I thought it had to do with

24  you not -- a claim that you didn't have -- that you weren't

25  being allowed down at the facility to have a contact visit

26  with a sign language interpreter.

27    MR. WESTON:   Well, when we went to the jail to try

28  to accomplish that, we were told that there are no contact

7

1   visits.  There's no visits -- visiting.  Now, I mean, all's

2   I can do is -- they tell me that the jail was shut down for

3   visits of that type.  There is a way that we can do

4   through -- at least now or started to do -- (technical

5   difficulties with live stream) -- there was -- the Securus

6   has allowed us to do video visits with certain people at

7   George Bailey.  They do it at George Bailey and they do it

8   at Vista.  They don't do it at South Bay and downtown.

9         When my client got to George Bailey, I tried to

10  avail myself of the video visits that way, and I kept

11  getting denied of the video visits; that he wasn't available

12  for -- to visit.  The procedure is I go in at midnight,

13  because there's a two-day span which I can ask for a visit.

14  On midnight, about three times a week, I go onto the Securus

15  website and I try to book a visit with my client within

16  those two days because that's the only two days that they

17  will allow me to have.

18        And every time -- I did -- was able to get two

19  times or, I believe, one time on this particular client that

20  I was able to get a visit, but then it wasn't -- he wasn't

21  brought there to be visited.  It isn't that we're not

22  trying.

23        MR. TOYEN:   This was at midnight?

24        MR. WESTON:    No, no, no.  This is where I have to

25  go on Securus.  You have to go on the form and demand a

26  time.  So you go on the form, they give you two days to

27  request a visit.  So if I'm on midnight, I've got that day

28  and the next day.  And those are the only two days that I

1    can make a visit for.  If there's no visiting available then

2    they tell me, "no visits available."  There's never a visit

3    within the first day.  Sometimes, for some people, there's a

4    visit on the next day.

5              On Mr. Lopez's matter, there was never a visit.

6    I've been on that website numerous times trying to get to

7    see him because I know I have to organize a visit.  And I'm

8    able to then, after I make an appointment, try to have an

9    interpreter ready to go so that I can then see him at least

10   through the phone, even though the phone screen, at least

11   from my experience, is not that -- at least it appears for

12   me, not that big.  But we might have some problems.  But

13   that's the problem is that every time I've attempted to try

14   to see my client, I've been told that we can't do that.

15             MR. TOYEN:    You're talking -- well, I just want to

16   make clear because there's a lot of things you're

17   throwing -- you're kind off putting up here.

18             Is the issue with in-person visit or the video

19   visits?

20             MR. WESTON:    I was told you can't do an in-person

21   visit.  Period.

22             MR. TOYEN:    You can.  You can.  We may not allow

23   that for -- we may not allow that for everybody, but, you

24   know, you clearly -- your client clearly has a situation

25   that's different, and we need to accommodate that and we

26   will.  You can come down for an in-person visit if that's

27   what you want.

28             THE COURT:    And Mr. Toyen, do you believe that were

9

1    that to occur you have a locale or a location where the

2    visit can occur where both his client, Mr. Weston, and the

3    interpreter could be sufficiently distant in terms of

4    meeting the Department of Public Health's requirements?

5              MR. TOYEN:   Yes.  So let me about put that -- I've

6    got the administrative lieutenant there -- here.  She can

7    confirm that.

8              MS. FARRIS:   Hi, this is Lieutenant Jill Farris,

9    and we are happy to accommodate any visit any time you need.

10   So we switched our professional visits to the social visit

11   room so that there would be the glass.  And if using an

12   interpreter, Mr. Lopez would be on one side of the glass,

13   you could be on the other side of the glass, and the

14   interpreter could be on that side of the glass, and that way

15   you'd be spread out if you need to be.  And the

16   interpretations can happen through the glass.

17             We can also do in-person contact visits like you

18   did back in February when you were down here.  So we can do

19   it that way.  If you're not comfortable doing an in-person,

20   then we could do it through the glass in the social visit

21   room as well.  I'm happy to accommodate whatever makes

22   everyone feel comfortable.  We really don't have a lot of

23   visits happening, so the space is really not an issue down

24   here.

25             THE COURT:   So Mr. Weston, let me ask you:  Between

26   the option of trying to do it on Securus with a video setup

27   or doing an in-person in a larger room that would allow all

28   three parties to be present socially distanced, consistent

1    with the requirements of the Department of Public Health,

2    which would you prefer to do?

3              MR. WESTON:    Well, first I'd have to figure out

4    what my interpreter would want.  I mean, it's not just me.

5    If it was just me, I'd probably go down to the room and do

6    it, but it's not just me.  So I'd have to make a

7    determination of what he -- he feels comfortable in doing

8    when I take him with me because there's three of us, me, him

9    and my --

10             THE COURT:    So you haven't inquired of that person

11   yet?

12             MR. WESTON:    Well, I did inquire.  When I asked him

13   if he would feel comfortable going down to a jail, and he

14   said no, I mean, I did inquire that way.  There isn't

15   that -- but I would tell the Court that was a couple weeks

16   ago.  I mean, there seems to be a more opening of our

17   society.  So I don't know what his -- what his experience

18   has been.  And I do notice that -- and I will tell the Court

19   since we last talked on, I believe, three days ago, they

20   have opened up Microsoft Teams to be able to do some visits

21   at the -- at the George Bailey facility similar to what we

22   have here.

23             We are having some difficulty though in the George

24   Bailey facility because it's not a confidential

25   communication, being that the -- my understanding is that

26   George Bailey's Microsoft system isn't tied down to a table.

27   So, like, I've done visits now at South Bay.  They put

28   the -- they turn the computer on.  It's either tied down and

1  then all of the Sheriffs go out of the room, and so I feel

2  comfortable that my client has a confidential communication

3  with me.

4              We tried that at George Bailey, and it appears --

5  and I don't know if it's just one room -- that in that

6  particular facility, the Microsoft Teams or the computer

7  that they have to leave a Sheriff within the room after --

8  even after they turn it off as opposed to whereas you can --

9  they can leave the room in other facilities.

10             I'm okay with Microsoft Teams because that's safe.

11  I just want to make sure it's a confidential communication

12  between me and my client and being able to have a room where

13  he's not there with a Sheriff.  Because I think if a

14  Sheriff's in the room, that that violates -- it's no longer

15  confidential.

16             THE COURT:    So Mr. Toyen, what can you tell me

17  about what, if anything, you know about the accessibility of

18  a Microsoft Teams interview or client contact similar to the

19  process we have here; one, if that can be done, and two, the

20  ability to keep it confidential so that the deputy need not

21  be in the room at the time they're communicating?

22             MR. TOYEN:    I'd have to -- I'd defer to Justine on

23  that because she's, you know, at the facility.  I don't know

24  is that -- it sounds to me like that's primarily for social

25  visits.

26             Justine, am I -- am I close?

27             MS. SANTIAGO:    And I think -- are you trying to get

28  information from Jill or myself?

1    MR. TOYEN:    Oh, sorry.

2    THE COURT:    You mean, Lieutenant Farris?

3    MR. TOYEN:    Yes, Lieutenant Farris.

4    MS. SANTIAGO:    Thank you.

5    MS. FARRIS:    Yes.  So it's my understanding there

6    are computers throughout the facility that we're doing

7    attorney-client meetings.  If the deputies are leaving the

8    door propped open or they're standing in there because

9    there's computer equipment and they don't want to leave the

10    inmate with the computer equipment unmonitored, then that is

11    an issue I can address on my end.  Obviously, our inmate can

12    be patted down, searched, before he goes in the room, after

13    he leaves the room so if there's an issue of computer

14    tampering we can address that.

15    THE COURT:    Right.

16    MS. FARRIS:    So if that's what you're seeing here

17    at Bailey, is that the deputy is staying in the room, it may

18    be to monitor the computer equipment, and I can fix that.

19    That's no problem.  I can ask the deputies to secure the

20    door so there is no deputy monitoring your -- your meeting

21    with your client.

22    THE COURT:    So what I'm hearing -- and any one of

23    you feel free to correct me if I'm wrong.  What I'm hearing

24    is the Sheriff can accommodate a Microsoft Teams client --

25    attorney-client interview, maintain confidentiality, and

26    with the use of Microsoft Teams, have it also accessible to

27    a sign language interpreter so that Mr. Weston can

28    communicate with his client.

1    MS. FARRIS:   Mr. Weston would have to provide

2    the -- I don't have a sign language interpreter at George

3    Bailey.

4    THE COURT:   No, no, no.  That's him.

5    MS. FARRIS:   Okay.

6    THE COURT:   It's basically a three-party meeting.

7    The sign-language interpreter is to facilitate Mr. Weston's

8    ability to communicate with Mr. Lopez, Mr. Lopez's ability

9    to communicate back.  And when that meeting is ongoing,

10   Mr. Lopez will be in the room by himself, the deputy would

11   have had the ability to pat him down before, if they feel

12   appropriate, handcuff him to the chair so he at least can't

13   damage the computer, and then when it's done, he goes back

14   to his -- his room or his cell or his mod, and Mr. Weston

15   goes on with his.

16   Mr. Weston, will that meet your ability to have a

17   confidential client interview?

18   MR. WESTON:   It would, your Honor.  I do tell the

19   Court that it appears that the way we're doing that -- and

20   again, I apologize.  We just started it yesterday the 11th.

21   I had eight interviews with my clients that I've been doing

22   over -- that I haven't been communicating with except over

23   the phone.  So I've done eight of those.

24   Now, one of the issues is for Mr. Lopez's idea is

25   the slots are regulated by the public defender because I

26   believe they're the ones that set it up.

27   THE COURT:   I would think, based on what I'm

28   hearing, that if you had a direct communication with

1    Lieutenant Farris or any designee of hers, they could

2    facilitate that to expedite your ability to communicate with

3    your client.

4            MR. WESTON:   Thank you.  That was my other thing

5    that the slots are limited to 20 minutes.  So I was hoping

6    that I would be able to communicate with someone directly so

7    that we can set that up to have -- because of the sign

8    interpreter it takes longer, I believe, to communicate, as

9    opposed to the other times if they only give you 20-minute

10   slots which is okay; we just make more of them.  But if

11   they're available for us to make those arrangements or I

12   have someone to make the arrangements I'm happy to do it

13   that way.

14           THE COURT:   All right.  So let me now then go to

15   the --

16           MR. TOYEN:   Lieutenant, is that something we can

17   do?

18           MS. FARRIS:   Yes, I will get a hold of Ridgehaven.

19   They simply provide us with the schedule and make sure that

20   we -- after I know a good time for you and for the

21   interpreter and then we'll get that time slot saved for you.

22           MR. WESTON:   And if you could -- I'm happy to give

23   you my e-mail address so we can communicate e-mail or

24   however --

25           MS. FARRIS:   Absolutely, yeah.  Absolutely.

26           THE COURT:   All right.  So let me go back.

27   Mr. Toyen, I wonder if you could then go back and address

28   what you know or how you think we can help facilitate the

1   continued medical care and/or providing of medication to

2   Mr. Lopez. It sounds like there's already been an

3   improvement because he's been moved to a medical room or a

4   medical ward, if you will.

5          MR. TOYEN:   Yeah, and we -- Dr. Montgomery is here

6   just to back me up. We did a -- we looked at his medication

7   that he's supposed to be receiving, and I think -- I'm

8   probably going to mangle this. But Prednisone, cyclosporin,

9   and mycophenolate. It shows that he's regularly receiving

10   those. Those are -- those are the kidney medications. We

11   discovered, though, that, you know, because we've gone to a

12   new provider, pharmaceutical provider that basically just

13   does everything outside and ships it to us, my understanding

14   is in, you know, prepackaged dosages --

15          THE COURT:   Right. Like being in a nursing care

16   home.

17          MR. TOYEN:   Very similar to that is my

18   understanding. And we discovered that we didn't -- there

19   have been gaps where, you know, the shipment has taken

20   longer to arrive than we thought it was going to be -- than

21   we thought it was going to take. And that, I think,

22   accounts for the vast majority of the times when he didn't

23   appear to be getting his medicine -- his medication.

24          Now that we know that that's the issue, we're

25   working you know to make sure that happens including, you

26   know, keeping a stocked supply of certain medications

27   available. So if a shipment is late, you know, we've got a

28   replacement stockpile.

1    THE COURT:    So Mr. Weston, Prednisone,

2  cyclosporin -- I forget the name of the third one.  Are

3  those the three you're aware of, or are there more, or

4  something else you think that has not or is not being

5  provided?

6    MR. WESTON:    I believe that those are the ones that

7  my client was being -- was talking about.  The kidney

8  medication was the ones that they were concerned.  And I

9  believe what -- what he just described was exactly what my

10 client was saying.  They were telling him well, we're out of

11 it.  We'll get it to you as soon as we get another supply of

12 it, which is a concern is that they shouldn't run out of it

13 because it's real important.

14    I understand we're all human.  I'm not trying to

15 say there's some nefarious thing here.  I'm just worried

16 about the effect of lack of medication my client is --

17    THE COURT:    If I hear Mr. Toyen correctly, the

18 Sheriff's trying to remedy the situation by creating sort of

19 a stockpile so that they will have some available --

20    MR. TOYEN:    That's my understanding.

21    THE COURT:    -- of regular.

22    MR. TOYEN:    Dr. Montgomery, if you want to jump in.

23    DR. MONTGOMERY:    Yes.  Thank you, Mr. Toyen.  Your

24 Honor, Jon Montgomery, Medical Officer.  Thank you for

25 allowing me to join you today.

26    Just to clarify, Mr. Lopez is currently on three

27 separate medications, that's Prednisone, cyclosporine and

28 mycophenolate.  These medications are associated with the

1    chronic immunosuppression needed for the maintenance of his

2    transplant.

3            The issue has been with, as Mr. Toyen mentioned, we

4    have relatively recently moved to an outsourced

5    pharmaceutical service, and the two main medications, the

6    cyclosporin and mycophenolate, have been essentially just in

7    time, if you will, shipped in, as you were alluding to,

8    similar to a group home construct, in 30-day pill packages.

9    And they've been ordered for months at a time.

10           However, because of the logistical considerations,

11   sometimes it takes upwards of about three to five days for

12   some of the medications to arrive. And it does appear that

13   there has been several instances, unfortunately, that we

14   have run out by a day or so. Again, our primary reason for

15   being is for the appropriate medical care and treatment of

16   our patients.

17           So yes, we are taking direct action. We are

18   getting a stockpile of medications which is called our stock

19   or profile medications for all three of those. The intent

20   is if and when the patient-specific medications for whatever

21   reason are not readily available, we would shift over to the

22   stock medications to provide the buffer until the resupply

23   from Diamond comes into play.

24           THE COURT:   All right. So it sounds to me like the

25   Sheriff is making, one, the inability to deliver it is not

26   either intentional on their part or even a result of their

27   lack of effort; it's the inability of the pharmaceutical

28   company or the pharmaceutical provider to ship with a

1    consistent enough basis so it's always there on time.

2           I think any of us who have ever switched from one

3    health plan to another health plan or one Rx provider --

4    prescription provider to another runs into some of this.

5    But it sounds to me like they're making every effort in

6    creating the stockpile that if there's any further delay, it

7    will not affect him receiving his meds.

8           So then I guess my next then question is we

9    currently have a preliminary hearing date set for June 17.

10   And I want to hear from you, Mr. Weston.  Are you

11   comfortable proceeding then, or would you like additional

12   time so you can work out these Microsoft Teams meetings to

13   communicate with your client, or what would you like?

14           MR. WESTON:   No, your Honor.  It's always been our

15   intent to not have a prelim on the 17th.  This is the type

16   of case that we need to do a live prelim on, and so it's

17   never been our intention to go forward unless we had the

18   ability to do a live prelim.  Either way, I wouldn't be

19   ready to perform a prelim because of the lack of

20   preparation.

21           But I want to make sure that the record is clear

22   that our intention was, even before I couldn't communicate

23   with my client, that I don't believe having a video prelim

24   is proper in this type of case.  Especially with the

25   communication problems, being in another room is -- for him

26   would just be terrible in trying to figure out how to

27   communicate during a prelim.

28           So I'm going to waive time and set the matter over

1  to a time when we're at least going to have -- or have a

2  potential of having a live hearing, which I think is

3  sometime July or August.

4          THE COURT:    The longer we go the likelihood is

5  greater than we'll have something live in court.  If I had a

6  firm date when I knew we'd start, I'd tell you.

7          MR. WESTON:    No, I understand that, your Honor.

8          THE COURT:    But I don't know yet.

9          So Mr. Lopez, what I'd like to ask you is under the

10  law you have a right to a speedy preliminary hearing, under

11  the new emergency rules, within 30 days of when you are

12  arraigned and no later than 60 days from when you are

13  arraigned.

14          If you wish, you may give up your right to a speedy

15  preliminary hearing and agree to one at a later date.

16          Mr. Weston is trying to accommodate or find a date

17  when everyone could actually appear here in court.  But I

18  want to be very candid with you:  I can't guarantee that the

19  date we set would necessarily accomplish that.

20          Are you willing at this time, sir, to waive time to

21  a new date picked by Mr. Weston?

22          THE DEFENDANT:    Yes.  Yes, that would be fine.

23          THE COURT:    Thank you.

24          THE DEFENDANT:    Thank you, your Honor.

25          THE COURT:    Mr. Weston, you're in charge.

26          MR. WESTON:    Yes, your Honor.  I would suggest

27  maybe we can do the 26th of August which is like a

28  Wednesday.  That gives us enough time -- again, it might not

1  be a solid date, but I think that might be enough.

2        THE COURT:    All right.  Ms. Santiago, is that date

3  okay with the People?

4        MS. SANTIAGO:    Yes, your Honor, thank you.

5        THE COURT:    All right.  We'll set the matter for

6  preliminary hearing on August 26, 8:45 a.m. in Department 5

7  or whatever courtroom 5 sends it to.  As we get closer it

8  that August date, we'll know more as to whether we're having

9  live hearings or not.  Again, I want to thank Mr. Toyen on

10  behalf of the Sheriff's Department, Lieutenant Farris and

11  Dr. Montgomery for participating in this and helping us try

12  to reach some ability to assist both in Mr. Lopez's health

13  and also his ability to communicate with his client.

14        MR. WESTON:    Your Honor, I was wondering if -- I

15  don't want to give Lieutenant Farris's e-mail or contact --

16        THE COURT:    No, no.  We can go offline and I'll let

17  Ms. Santiago or Mr. Toyen, either one, be the link so that

18  you and Lieutenant Farris can be in touch.

19        MR. WESTON:    Okay.

20        MR. TOYEN:    I will act as the clearinghouse.  I

21  will send all the e-mails to Ms. Santiago.

22        THE COURT:    Thank you very much, Mr. Toyen.

23        MR. WESTON:    Okay.  That would be perfect.

24        THE COURT:    Thank you everybody.

25        MR. WESTON:    Your Honor, maybe we could set a

26  back-up readiness date with the idea that maybe that

27  would -- we can have a better idea whether or not the courts

28  are going to be open or not.

1      THE COURT:   Okay.

2      MR. WESTON:   And we could do a 977 waiver because

3   then that way least if we don't need Mr. Lopez and we're

4   only going to set new dates that we can take care of it.

5      THE COURT:   Do you want to take a 977 waiver from

6   Mr. Lopez at this time?

7      MR. WESTON:   Yes, your Honor.  May I go forward?

8      THE COURT:   Yes.

9      MR. WESTON:   Okay.  Mr. Lopez, we're going to be

10   setting an intervening court date.  We're asking that you

11   waive your right to come to court just to set new dates in

12   case the courts aren't open yet.

13      Is that okay for you to be -- basically allow me to

14   appear for you for the purposes of just setting dates?  Is

15   that all right?

16      THE DEFENDANT:   Yes, yes.  That would be fine.

17   Yes, that would be fine.

18      THE COURT:   All right.  Again, thank you everybody.

19   I appreciate the time you put in and waiting to hear this so

20   late in the afternoon so I could clear up the appropriate

21   room and get everybody involved.

22      MR. TOYEN:   You're welcome, your Honor.  Your

23   Honor, just on a personal matter would you be able to either

24   call me or contact me on Teams after you're done with your

25   calendar for the day?

26      THE COURT:   Yeah.

27      MR. TOYEN:   This has nothing to do with this case.

28      THE COURT:   Yeah.  Sure.  Why don't you stay -- can

1    he stay there and we lose everybody else?

2              THE BAILIFF:   I can do that.

3              THE CLERK:   What's the readiness date?

4              THE COURT:   Herb, what date do you want for that

5    readiness?

6              MR. WESTON:   Right.  I was just going to say, can

7    we have July 23rd?  That's a Thursday.  Is that okay,

8    Ms. Santiago?

9              MS. SANTIAGO:   That's fine.  Thank you.

10             THE COURT:   Okay.  Good.  Thanks.

11             MR. WESTON:   Thank you, your Honor.  Thank you,

12   everyone.

13             THE COURT:   Everybody bail out except Mr. Toyen.

14             (Proceedings concluded at 4:15 p.m.)

15                  -- oOo --

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1  State of California)
                          : SS.
 2  County of San Diego)

 3

 4

 5         I, Stephanie Whitehead, RDR, CRR, CSR #10093, an

 6  Official Court Reporter for the Superior Court of the State

 7  of California, in and for the County of San Diego, do hereby

 8  certify and declare:

 9

10         I reported the proceedings held in the foregoing

11  case by creating notes utilizing my stenographic machine;

12

13         That my notes were transcribed with proprietary

14  computer and formatted under my direction;

15

16         And the preceding hearing heard on June 11, 2020,

17  contained within pages 1 through 23, is a true and accurate

18  transcription.

19

20         Dated this 26th day of April 2021.

21

22

23

24         _____
           Stephanie Whitehead, RDR, CRR, CSR #10093
25         Official Court Reporter

26

27

28
```