1  Susan E. Coleman (SBN 171832)
   E-mail: scoleman@bwslaw.com
2  BURKE, WILLIAMS & SORENSEN, LLP
   444 South Flower Street, Suite 2400
3  Los Angeles, CA 90071-2953
   Tel: 213.236.0600    Fax: 213.236.2700
4
   Attorneys for Defendant
5  COUNTY OF SAN DIEGO (Also
   erroneously sued herein as SAN DIEGO
6  COUNTY SHERIFF'S DEPARTMENT, and
   SAN DIEGO COUNTY PROBATION
7  DEPARTMENT)

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  DARRYL DUNSMORE, ERNEST          Case No. 3:20-cv-00406-AJB-WVG
    ARCHULETA, ANTHONY
12  EDWARDS, REANNA LEVY,            **DECLARATION OF SUSAN E.**
    JOSUE LOPEZ, CHRISTOPHER         **COLEMAN IN SUPPORT OF**
13  NELSON, CHRISTOPHER              **DEFENDANT'S OPPOSITION TO**
    NORWOOD, and LAURA               **PLAINTIFFS' MOTIONS FOR**
14  ZOERNER, on behalf of themselves **PRELIMINARY INJUNCTION AND**
    and all others similarly situated, **PROVISIONAL CLASS**
15                                   **CERTIFICATION**
                                     
16              Plaintiffs,

17  v.

18  SAN DIEGO COUNTY SHERIFF'S
    DEPARTMENT, COUNTY OF
19  SAN DIEGO, CORRECTIONAL
    HEALTHCARE PARTNERS, INC.,
20  TRI-CITY MEDICAL CENTER,
    LIBERTY HEALTHCARE, INC.,
21  MID-AMERICA HEALTH, INC.,
    LOGAN HAAK, M.D., INC., SAN
22  DIEGO COUNTY PROBATION
    DEPARTMENT, and DOES 1 to 20,
23  inclusive,

24              Defendants.

25

26

27       I, SUSAN E. COLEMAN, declare as follows:

28       1.    I am an attorney licensed to practice law before this Court, and a

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4885-7206-1217 v1         - 1 -         3:20-CV-00406-AJB-WVG
                                            COLEMAN DECL. ISO OPPOSITION

Partner with the law firm of Burke, Williams & Sorensen, LLP, counsel of record
in this matter for Defendant COUNTY OF SAN DIEGO.  Unless otherwise stated,
the following statements are true of my own personal knowledge, and if called upon
to testify, I could and would testify competently thereto.

2.      In January 2017, the Sheriff's Department contacted with the National
Commission on Correctional Health Care (NCCHC) to provide technical assistance
to help San Diego County Sheriff's Department to assess operational policies and
practices for 4 of their jails and to recommend how the county may deliver health
care to inmates and improve their physical and behavioral health outcomes.
Recommendations were made on 26 standards; however, some items were
complimented and no recommendations were made.  Attached as **Exhibit A** is a
true and correct copy of the Technical Assistance Report.

3.      The Disability Rights California (DRC) issued a report in April 2018
entitled "Suicides in San Diego County Jail: A System Failing People with Mental
Illness."  *See* Exhibit F to Van Swearingen Decl. [Dkt. 119-3].  Plaintiffs provided
this report, but not any responses by the Sheriff's Department.

4.      Attached as **Exhibit B** is a true and correct copy of Dr. Colleen
Kelly's response to the suicide rate cited in DRC Report, dated April 6, 2018.  Dr.
Kelly has a Ph.D from the University of California, San Diego and is an Accredited
Professional Statistician with over 20 years of experience.  In her response, Dr.
Kelly demonstrates that the DRC's statistical analysis is flawed and inaccurate.  In
contrast to DRC's report, which contends San Diego County had the highest suicide
incidence among various counties for the period from 2010-2017, Dr. Kelly notes
that Los Angeles County actually had the highest reported total –34 compared to 30
in San Diego.  The largest counties will generally have the largest number of
suicides.

5.      Dr. Kelly notes that, in order to properly compare jail systems, the
suicide rate should be calculated using the number of suicides divided by the

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4885-7206-1217 v1                    - 2 -                    3:20-CV-00406-AJB-WVG
COLEMAN DECL. ISO OPPOSITION

number of inmates in the jail system.  Dr. Kelly also noted that the DRC report uses the average daily population (ADP) rather than the number of inmates at risk, which yields an average which is higher than the actual suicide rate.  The ADP suicide rate also uses a denominator of an inmate year, *i.e.* one inmate in the jail system for an entire year; however, the average length of stay for 2011-2017 in the San Diego County jails was 22 days, requiring 16.6 inmates strung together to make up each inmate-year in the denominator of the ADP suicide rate.  Using the ADP suicide rate yields numbers approximately 17 times the at-risk suicide rates. And because most suicides occur within the first 30 days of incarceration, it is not reasonable to compare the risk of suicide for one inmate in custody 365 days to the risk for 16.6 inmates in custody during that same year for shorter periods of time. Additionally, the demographics of the county jail systems differ throughout California.  San Diego has the highest percentage of Caucasian inmates (46%) of the 10 largest jail systems in California from 2010-2016 (based on arrest data) but Caucasian inmates are 6 times more likely to commit suicide than African-American inmates and 3 times more likely than Hispanic inmates.  The DRC rates fail to standardize by age, race and gender to foster better comparisons.  The DRC also used a 3 year period (2014-2016) instead of the larger 7 year period (2010-2017) available, despite its notation at page 4 of the report that "suicide rates are most meaningful when viewed over a sustained period of time."

6.    Dr. Kelly also notes that suicide rates in jails and prisons are not comparable because of the different length of stay and the higher risk at the beginning of incarceration.  Further, the county resident population is not comparable to the jail population; inmates are predominantly male and younger than the general population, which correlates to higher suicide risks.  The DRC compares the suicide rates of the San Diego jail system to (1) other California county jail systems, (2) the California prison system, (3) the national jail suicide rate, and (4) to the general San Diego population, and uses the flawed ADP suicide

rate.  This comparison is not a fair (apples-to-apples) comparison, nor do the DRC suicide rates demonstrate any correlation between suicide prevention policies and suicide rates since the suicide prevention policies of the different jail systems are not discussed or compared, making any causal relationship purely speculative.

7.     As Dr. Kelly points out, the statistics cited in the DRC report originated in a series of CityBeat articles, which were then generated by the Grand Jury Report and then the DRC report, without recognizing the length-of-stay, demographic, or cultural differences between San Diego jail inmates and other comparators, and without actually correlating the suicide rates to deficient policies. The logical fallacy in concluding there is a suicide prevention problem based solely on a difference in suicide rates is comparable to concluding that the USA was deficient in its Olympic Winter Training Program because Norway dominated the 2018 Winter Olympics.

8.     Sheriff Gore also issued a letter response to the DRC report on April 24, 2018, a true and correct copy of which is attached as **Exhibit C.**

9.     On the same date (April 24, 2018), the Sheriff's Department issued a Press Release entitled "Taking a Proactive Approach to Treating the Mentally-Ill in Jail."  A true and correct copy of this press release is attached as **Exhibit D**.

10.     The County retained Lindsay Hayes, an expert in the field of suicide prevention in correctional facilities, to evaluate its suicide prevention policies.  His report is cited by Plaintiffs  (Ex. G to Van Swearingen Declaration, Dkt. 119-3.)

11.     Following Mr. Hayes' report, the Sheriff's Department worked diligently to address each of his 32 recommendations.  The County issued a synopsis as to what the Sheriff's Department has done to implement Mr. Hayes' recommendations, and the current status of recommendations yet to be completed; a true and correct copy of this summary is attached as **Exhibit E**.  For example, the Department added annual training on suicide detection and prevention for new and existing staff, using Mr. Hayes' training curricula.  This includes custody staff,

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4885-7206-1217 v1                        - 4 -                        3:20-CV-00406-AJB-WVG
COLEMAN DECL. ISO OPPOSITION

1   mental health, and medical staff.  The Department also added additional questions

2   to the suicide risk inquiry on intake, following Mr. Hayes' specific

3   recommendations. Service hours of mental health clinicians were expanded for

4   greater coverage and plans were made to have mental health staff available 24/7 at

5   the intake facilities.  The Department now verifies in the JIMS database whether the

6   inmate was previously on suicide precautions during a prior confinement, and alert

7   flags advise nursing staff of previous in custody suicide attempts and PSU housing.

8   Nursing audits by supervising nurses were adjusted to include periodic audits of the

9   intake screening process. There were additional changes made, pursuant to the

10  recommendations of Mr. Hayes, as set forth in the Exhibit E - Response.

11        10.     In October 2019, the County published a list of improvements that

12  have been made following the Technical Assistant Report issued by the National

13  Commission on Correctional Health Care (MCCHC Resources, Inc.) in 2017.  It

14  noted that the NCCHC had updated and revised their standards in 2018, and the

15  County's implementation plan was adapted to meet these new standards.  Attached

16  as **Exhibit F** is a true and correct copy of the recommendations that had been

17  addressed and the specific changes made.  The Department indicated is was

18  undergoing a complete policy and procedure review process to ensure all required

19  NCCHC standards were covered and that the policies are site specific.  The

20  Sheriff's Department created an infection control plan and employed an infection

21  control nurse.  A peer review process was already in place for nursing staff, but a

22  process to implement a peer review process for medical and psychiatric contract

23  providers was initiated. There were additional changes made, pursuant to NCCHC

24  recommendations, as set forth in the Exhibit F - Response.

25        11.     In response to media about drug issues in the jail, the Sheriff's

26  Department issued a press release about their interdiction issues in December 2020.

27  Attached as **Exhibit G** is a true and correct copy of this press release.  This release

28  explained the dangers of fentanyl, and measures at the jails to prevent entry of

drugs into the facilities or to locate them such as body scanners, information provided during booking, screening of inmates and flagging of potential smugglers, a mail processing center with specialized equipment and trained deputies, drug-sniffing K-9s, an anonymous tip line, surprise cell searches, and other measures, as set forth in Exhibit G.

12.    In February 2022, the California State Auditor issued a report critical of the San Diego County Sheriff's Department efforts to prevent and respond to deaths of individuals in custody.  Plaintiffs cite this report heavily.  (Ex. B to Van Swearingen Decl., Dkt. 119-3.)

13.    The County responded to the Auditor's report, and noted changes that were in the process of being made as well as recommendations they agreed with. Attached as **Exhibit H** is a true and correct copy of this response. For example, the County agreed that qualified mental health providers (QMHP) should to the mental health screening portion of the intake process, and it is recruiting and hiring clinicians to fill these positions.  Having a QMHP in the intake process will also permit review and consideration of each individual's medical and mental health history from the county health system.  The County also stated it was planning to integrate body worn cameras into the custodial setting, which would help show the point of view of each deputy during the safety checks, and that video audits be conducted of random safety checks as well as reviewing electronic log entries.

14.    Attached as **Exhibit I** is a true and correct copy of an expert report by Andrew Hildreth, Ph.D., from Resolution Economics.  This report demonstrates that the California State Auditor's report fails to take into account differences between counties, omits the County of Los Angeles (the closest in size to San Diego) as a comparator, and artificially inflates the death rate by using ADP (average daily population) method which fails to take into account the turnover of the San Diego County jail population.  The average number of days each inmate is in custody in San Diego county jails is 22.02, whereas in Los Angeles it is 47.39, in

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4885-7206-1217 v1

- 6 -

3:20-CV-00406-AJB-WVG
COLEMAN DECL. ISO OPPOSITION

Orange County it is 36.22, and in San Bernardino it is 29.28.  Without controlling for the turnover in population, it is not equitable to compare the statistics in terms of the bald numbers and conclude there is any statistically higher risk of death in custody in San Diego; here, there are more inmates coming in and out of the jails. Additionally, as Mr. Hildreth explains, the age of inmates is higher than many other counties, leading to a higher natural death rate.

15.    Michael Keavney (booking #17104761) asserts that he filed a small claims lawsuit in 2020 against the jail concerning the loss of his personal property. (Keavney Decl. ¶ 9.) Mr. Keavney states he was unable to prosecute his federal lawsuit (No. 20-cv-1443-MMA-MSB) because the County delayed delivery of the court's order dismissing his case with 60 days leave to amend, and he did not receive it until nearly 10 months later.  (Keavney Decl. ¶ 10.)  However, based on the court docket, it appears that Mr. Keavney's case was dismissed because he failed to state a claim or identify individual defendants by name, and not because he failed to timely amend his complaint.  Keavney appealed the dismissal of the action to the Ninth Circuit, and that appeal is currently pending.  Attached as **Exhibit J** is a true and correct copy of the district court docket for Mr. Keavney's federal lawsuit; attached as **Exhibit K** is a true and correct copy of the Ninth Circuit docket for the same case on appeal.

16.    Mr. Keavney asserts that Exhibit C to his declaration is an envelope from the United States District Court showing "a note by the custody officer indicating that it was delivered March 1, 2022." (Keavney Decl. at ¶ 10.)  Mr. Keavney fails to mention that the envelope also has several crossed out notations on it, indicating the envelope may have been sent to other facilities for delivery.

///

///

///

///

17.     On June 9, 2020, Mr. Lopez appeared via video conference with his attorneys Herbert Weston and Tanya Weston before Judge Harry M. Elias, in the Superior Court of California, County of San Diego in Mr. Lopez' aggravated child molest matter, People v. Josue Lopez, CN405969.  (Lopez Decl. [Dkt.119-28], Exh. A.)  In a bid to have Mr. Lopez released from custody, Mr. Lopez' attorneys argued that they were unable to effectively meet with Mr. Lopez because the jails were shut down due to the COVID-19 pandemic.  (Lopez Decl., Exh. A, 2548:11-13; 2544: 13-17.)   Mr. Weston admitted the jail was not at fault. (Lopez Decl., Exh. A, 2548:15-18.)  Contrary to Mr. Lopez' claims that he had problems communicating with his attorney beginning Dec. 12, 2019, Mr. Weston admitted that he "had good contact with my client" up until the March 20, 2020 COVID shutdown.  *Id.*  Also, contrary to Mr. Lopez' claims herein, Mr. Weston relayed to the Court that Mr. Lopez was able to talk to his family.  (Lopez Decl., Exh. A, 2545:1-4; Exh. B, 2558:20-21.)

18.     Two days later on June 11, 2020, the San Diego's Sheriff's Department's legal counsel, Acting Lieutenant of the George Bailey Detention Facility, as well as the Sergeant in Charge of Supplemental Services appeared before Judge Elias and resolved all of Mr. Lopez' complaints to the satisfaction of Mr. Lopez and the Court. (Lopez Decl., Exh. B [Dkt. 119-28].)  The Sheriff's Department informed Mr. Weston that he would be able to go to GBDF with a Sign Language Interpreter and have confidential visits with Mr. Lopez, despite COVID restrictions.  (Lopez Decl., Exh. B, 2559:2-9; 2561:22-27.)  The Lieutenant of the Bailey Facility offered to accommodate any visits at any time, and further offered to provide a large room where social distancing could be practiced, as well as glass partitions for further safety, or any other configuration.  (Lopez Decl., Exh. B, 2562:8-24 ["I'm happy to accommodate whatever makes everyone feel comfortable"])   Mr. Weston declined noting his reservations due to COVID, which was his right to do, but cannot be attributed to any wrongdoing on the part of the

Jails.  (Lopez Decl., Exh. B, 2559:12-26)  Mr. Lopez' attorney Mr. Weston again did not blame the jail.  (Lopez Decl., Exh. B, 2557:10-13  ["I know that the Sheriff tries as best as they can…."]  The Lieutenant of GBDF further relayed that although deputies remain close to computers for telecommunications due to safety concerns, Mr. Lopez, due to his hearing disability, would be provided with special accommodations wherein Mr. Lopez could be alone in a room where a deputy would stand outside.  (Lopez Decl., Exh. B, 2565:5-21.)   Mr. Lopez' attorney agreed the accommodations provided by the Sheriff's Department would be satisfactory and the matter was resolved.  (Lopez Decl., Exh. B, 2566:6-18.)

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on May 31, 2022, at San Diego, California.

_   /s/  Susan E. Coleman_
Susan E. Coleman

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4885-7206-1217 v1                         - 9 -                    3:20-CV-00406-AJB-WVG
COLEMAN DECL. ISO OPPOSITION

EXHIBIT A



# Technical Assistance Report

# San Diego Sheriff's Department

*This report details findings from site visits to four (4) San Diego Sheriff's Department facilities and presents recommendations for quality improvement.*

Developed by NCCHC Resources, Inc.

*January 2017*



# TECHNICAL ASSISTANCE REPORT:
# SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

## CONTENTS

INTRODUCTION ................................................................................................. 2

TECHNICAL ASSISTANCE REPORTS

    San Diego Central Jail (SDCJ) .................................................................. 3

    George F. Bailey Detention Facility (GBC) ................................................ 37

    Las Colinas Detention and Re-Entry Faculty (LCDRF) .............................. 70

    Vista Detention Center (VDF) .................................................................. 104

DISCLAIMER ................................................................................................. 138

ABOUT NCCHC RESOURCES, INC. ............................................................... 138



# TECHNICAL ASSISTANCE REPORT:
# SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

## INTRODUCTION

### Origin of Project

The San Diego County Sheriff's Department conducted a request for proposal and selected NCCHC Resources, Inc., to provide technical assistance to help San Diego County Sheriff's Department accomplish this goal. This report presents the results of the technical assistance.

### Plan of Action

NRI provided a team of correctional health care experts to assess operational policies and practices for four selected jails within the San Diego County Sheriff's Department. The aim was for NRI to recommend how the county may deliver health care to inmates and improve their physical and behavioral health outcomes.

### Designated Facilities

The NRI team scheduled site visits in 2017 and requested security clearances for the four (4) designated jails through the San Diego County Sheriff's Department. The site visit schedule was as follows:

- San Diego Central Jail (SDCJ)                      January 3-4, 2017
- George F. Bailey Detention Facility (GBCF)          January 5, 2017
- Las Colinas Detention and Re-Entry Faculty (LCDRF)  January 6, 2017
- Vista Detention Center (VDF)                        January 7, 2017

San Diego Sheriff's Department
San Diego Central Jail (SDCJ)
Technical Assistance Report
January 3 & 4, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails*. On January 3-4, 2017, NRI conducted its review for the San Diego Central Jail (SDCJ). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 38 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 26 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services

J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patient with Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01    Restraint and Seclusion
J-I-02    Emergency Psychotropic Medication


Essential Standard Not Applicable
J-G-09   Counseling and Care of the Pregnant Inmate
J-E-02   Receiving Screening


There are 27 important standards and 25 are applicable to this facility. Eighty-five percent or
more of the applicable important standards must be met in order to attain NCCHC accreditation.
Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care For the Terminally Ill
J-H-04   Access to Custody Information
J-I-03    Forensic Information
J-I-04    End-of-Life Decision Making
J-I-05    Informed Consent and Right to Refuse
J-I-06    Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison
J-G-08   Contraception

**Evaluation Method**

We toured the clinic area, inmate housing areas, receiving area, medical observation areas, mental health and segregation. We reviewed 68 health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meetings; job descriptions; statistical and health services personnel and correctional officer (CO) training. We interviewed the jail commander, command staff with the sheriff, responsible physician, director of nursing, CQI nurse, infection control/training nurse, psychiatrist, psychologist, mental health clinicians, dentist, medical records clerk, 11 health staff, six COs, and 11 inmates selected at random.

**Facility Description**:

**Location:** Southwest
**Built:** 1998
**Security:** Maximum Security
**Supervision Style:** Indirect and Remote Supervision
**Bookings:** 122/ day   44,549 annually
**Layout:** Modular and Dormitory Housing
**Capacity:** 1159        **ADP:** 914
**Males:** 970            **Females:** none
**Custody Staff Total:** 222    **Shifts:** Days, Evenings, Nights

**Findings and Comments**

***Special Note:*** *A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.*

## A. GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

***J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. Some areas of the program are not timely such as the receiving screening and the face-to-face evaluation after a request for care is triaged. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. As this is a maximum security jail, patients are occasionally on "lock down" status, and the nurses and mental health clinicians do not have access to them. Patients are subsequently rescheduled for their appointments, and medication administration is delayed. Also, the provider has ordered four-times-a-day diabetic checks, with the night check being completed at 2:00 a.m.

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices (and rarely at the facilities). The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody and medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented, with action items, and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and procedure

meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization; these reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific.
It is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken; however, documentation is lacking. The identified studies are not documented, nor are the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and re-monitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The same drill scenarios were used, but there was no documentation. The 2016 scenarios included an active shooter, use of the restraint chair in a medical emergency, hostage scenarios, and inmate disturbance. The scenarios are developed centrally and sent to the facility staff to conduct. The drills were critiqued and shared with staff via training bulletins and at weekly staff meetings.

An actual riot involving 33 inmates and staff, some of whom were treated at the emergency room, occurred. This was not documented, but could have been.

Man-down drills are planned to occur monthly or every other month. They do occur on each shift and are described as "man on the floor", "man down in video court", or cell extractions. They are also critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, much as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a

provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis. Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.

The facilities have a large numbers of cells assigned to segregation, so it is difficult to transfer segregated inmates to a clinic or interview room for care.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2 and # 3 require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA concerns and confidentiality.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There have been 13 deaths in the last two years; eight were reported to be of natural causes, one was a homicide, and four were suicides. The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The three compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, and autopsies and sharing with staff would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

At this facility the numbers of health and mental health related grievances filed per month or year were not available.

Inmates may appeal, with a standard guideline of level one (seven days to respond) and level two (10 days to respond).

**Recommendations**: Compliance indictors # 1 and # 2 are met, however, we recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging the grievances in the central data base, health staff maintains its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends (either monthly or quarterly) for possible patient care issues.

## B. MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant. Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room (for total isolation). The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked: sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. Due to his man y assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA proactively implements programs to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus; knowing a woman's pregnancy status before administering medications is imperative.

---

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. The jail is well lit, clean and well maintained for an older jail. The space for health is limited, but the health staff has made great efforts to keep it organized and to maximize the available space. It should be an on-going effort to keep areas free of clutter and prevent overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios or a call system to be notified in emergencies, or to call if in an emergency. Examination rooms do not have call buttons. Because of this, officer presence is essential for the safety of clinical staff.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail reported that this occurs very rarely.

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process
evaluates the appropriateness of services delivered by all direct patient care clinicians,
registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal
training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility for providers (physicians,
psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health
employees undergo annual performance reviews, but there is no peer or direct patient care
review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for
direct care clinicians annually, reviews are documented and kept confidential, independent
review when there is serious concern about an individual's competence and procedures
implemented with competence action is necessary. Each clinician providing direct patient care
should have an annual review for performance in patient care which is completed by a
professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews
the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals
had the required number of continuing education credits, and all were current in
cardiopulmonary resuscitation (CPR) training. Additionally, there is an annual training program
consisting of monthly skills fairs, annual training sessions, and various policy and procedure
orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LPNs (30
hours every two years), physicians (75 hours every two years), and some for mental health and
dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the
required training in health-related topics and all were current in CPR (provided by certified
health staff). The training nurse works with the custody training officer to coordinate the training.
Annual health training topics include collaborative disaster, restraint chair, man-down, fire and
evacuation, and mental health patient issues. There does not seem to be a central log of
training. The training nurse coordinates training sessions and monitors compliance. Attendees
sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with
inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear
to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers
medications. When staff is hired, they are oriented to the medication delivery process. There
was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3 describe the training program for health staff so they are appropriately trained in administering medications. This training is required to be approved by the responsible health authority, facility administrator and designated physician. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** This facility does not use inmate workers in the medical observation beds area or the clinical areas. Nurses clean these areas. There are no peer health-related programs. Nurses clean the clinic spaces and medical observation beds. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for this assignment, and earn their food handler certifications.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff are scheduled to work 10-hour shifts with every other weekend off at this facility. Full-time staffing consists of forty-six (46) RNs and eighteen (18) LPNs. Ten (10) RNs are scheduled for the day shift and eight (8) are scheduled on the night shift. Four (4) LPNs are scheduled for each shift. Actual working hours may vary depending on the work load or medication round schedule. The contract physicians hold clinic seven days a week, and are on call on a rotating schedule 24 hours a day. Mental health staff consists of three full-time clinicians.

At the time of our visit, vacancies consisted of two (2) RNs, two (2) LPNs, and the chief psychiatrist. One (1) newly hired nurse was scheduled for orientation. Temporary agency staff is employed to fill vacancies.

**There are no** recommendations regarding this standard. Timely staff response to patient needs requires continual monitoring and evaluation. The length of time of medication rounds, wait times for dentist or physician appointments, or time spent in booking for an evaluation, are all components that may determine the program's staffing needs. We noted there are very few mental health clinicians given the population.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two (2) weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six (6) weeks are spent in on-site orientation and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LPN Preceptor Toolkit which consists of check lists along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two (2) years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours services. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks, and once a year to inspect and inventory the medication rooms.

At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the eleven (11) compliance indicators in the standard along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers.  The room was furnished with a refrigerator and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs # 2, # 4, # 5, # 7, # 8, and # 10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Two other areas of concern were: 1) over-the-counter medications in the nursing protocols were all prescription doses and 2) incoming detainees wait three days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LPNs put doses of medication into labeled envelopes before taking the cart or basket to the housing areas for administration. Since this process is time-consuming, LPNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task. Automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to lock-down status. Nurses are not able to see patients during lock-down periods. There is no written procedure to determine what medications are necessary during lock-down. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be verified. Likewise, audits will insure that medications are prescribed only when clinically indicated as stated in CI # 4.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them. There is no safety check for names or allergies or which medications are to be administered at that time. This is actually dispensing and only pharmacists and providers may dispense. This violation of nursing practice is serious and a violation of the Nurse Practice Act. A change to individual patient-specific or individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery) that are ordered, which medications are delivered, and when a medication container is empty.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two dental operatory chairs, a dentist's office, a medication room, a records room, space for telemedicine/laboratory services, a patient waiting room, a radiology/x-ray room, three dialysis chairs, the nurses' area, examination space for orthopedics and sick call, and storage space. Mental health staff stated they have some office space for patient counseling. The booking area also has some space for medical services. The "second floor" has space for patient evaluations and care delivery and a few housing areas had a nurse's exam room in the central hall for nurse sick call, diabetic care and emergencies.

Nurses (one going off duty and one coming on duty) count items subject to abuse on each shift. We verified these were accurate. The three emergency crash carts are checked each shift. We counted three automated external defibrillators (AED) strategically placed around the facility.

We noted that some storage areas, if re-organized, could become interview or exam rooms for staff use.

The clinic contained all the equipment necessary to take care of the patients.

**There are no** recommendations regarding this standard.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, and drug screen urine dipstick and multiple-test dipstick urinalysis. Pregnancy test kits are not necessary as the population at this facility is male.

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans, and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment, and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** An access-to-care sign was posted in the upstairs area of receiving. Inmates receive instructions on access to care, the fee structure, and grievances by watching an orientation video (available in English and Spanish) in each housing area. No written information is provided as, reportedly, the inmates used it to disrupt the plumbing. Inmates who speak other languages or have a hearing impairment can use an AT&T

language line and TTY, respectively, and a few staff members are also conversant in sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return, and others have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** When new admissions arrive directly from the community to the jail, the booking process consists of multiple steps. In the first stage, upon arrival, the inmate sees a nurse behind a privacy screen for "pre-booking or medical clearance" screening. The nurse takes vital signs and asks questions such as injuries, risk for suicide, medications, health problems, and recent hospitalizations. An arrestee who is semi-conscious, bleeding, or severely intoxicated will be sent to the emergency room for treatment, first. If the arrestee is stable, they are cleared for the next stage of booking.

"Fast booking" allows a person with identified health issues to advance through the booking process more quickly. There could be others who do not tell the nurse they have major health issues and could have a crisis when the normal process takes 12 or more hours.

The second stage occurs upstairs. This includes the custody booking process and a more extensive receiving screening by a nurse. The three (3) nurses assigned to booking interview arrestees as soon as possible for the screening. The full medical evaluation includes a body scan for contraband, a chest x-ray for tuberculosis, and housing in a sobering cell, if needed. Safety cells are used to observe for possible suicidal behavior. Our chart reviews and the interviews we conducted confirmed the booking process takes from eight (8) to twelve (12) hours (sometimes up to 30 hours) to complete before inmates go to housing. A nurse practitioner is assigned to this area to see patients and order medications. When there is no nurse practitioner, the nurses order medications based on nursing assessment protocols.

Under the current booking process, some of the compliance indicators are met. CI # 1 addresses the pre-screening, which occurs as soon as someone exits the vehicle. CI # 2 and CI # 3 are met. CI # 4 is not applicable, as this is a booking facility for men. CI # 5 refers to the timeliness of the booking process, which can take up to eight (8), twelve (12), and sometimes up to 30 hours to complete. CI # 6 and CI # 7 are not met because some of the questions and observations required in the standard are not part of the procedure. CI # 8 through CI # 11 are met. CI # 12 addresses the regular monitoring of receiving screening, but there was no evidence of reviews of the process.

**Recommendations:** After considering the length of time most detainees spend in the booking process without being evaluated by health staff, and a plan of care developed, we looked at the booking process closely**.** The goal is met in that a newly arriving person is seen by a nurse right away after arrival, but this is merely the first step.

Reportedly, another nurse's station was being planned for the stage 1 area, so that two nurses could complete the initial receiving screening. This will help with the backlog. This, combined with a fully complete questionnaire, would significantly reduce the backlog and improve

timeliness. If all the receiving screening was completed at the first stage, resources could be shifted from the second floor.

CI # 6 a-k addresses the elements needed on the receiving screening form. Most are on the form already and adding dietary needs and recent communicable diseases symptoms would meet compliance.

CI # 8 describes the disposition of the inmate. This is not part of the receiving form and should be added. It communicates whether the person would go to general housing, medical observation beds, sobering cells, safety sells, etc. This is important for the next health care person to know what was present in booking.

CI # 12 requires that health should regularly monitor the effectiveness and safety of the receiving screening process. This can be done in quality improvement committee meetings or in another fashion.

**J-E-03  Transfer Screening (E).** Reportedly, there are 50 to 100 transfers a day to this facility from others. A transfer review procedure was initiated three months ago with a goal of a nurse's review within twelve (12) hours. This procedure was not listed in the policy and procedure manual.

The nursing staff receives a list of transferring inmates from classification staff when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said, "cleared by RN and chart checked by MD," at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, they will be evaluated at the receiving facility in a timely manner. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with a "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week as documented by a very short note. If an initial health assessment was in place when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through CI # 4, and the individual health assessment requires compliance with CI # 5 through CI # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during stage 2 of receiving screening. There is no 14 day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first, and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place.

**Recommendations:** The mental health screening form requires revision to include all the required questions and observations. RNs should be trained by a mental health staff. When all the questions from the standard are incorporated into the forms, revisions would comply with the 14 day mental health screening. Part of compliance is documenting those seen and still to be seen in logs or lists, to assure no one misses their evaluation when a mental health problem is identified.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking although there is no inspection of the inmate's mouth. This could be added to the first stage as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12 month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site two days a month and sees patients upon a nurse's referral. They dentist completes extractions and provides fillings, albeit rarely. The dental list shows from the time of the appointment until the patient is seen varies from five (5) to ten (10) days to two (2) months.

CI # 4 through CI # 6 are in place.

**Recommendations**: CI # 1 and CI # 2 can be addressed by incorporating oral screening into the initial health assessment standard implementation. The dentist can train the nurses to

complete the oral screening. The oral hygiene handout can be given at this time as well. CI # 3 can be met by preparing a list of inmates who are going to be in the facility for twelve (12) months and scheduling them for a dental evaluation.

The initial health assessment, mental health screening and evaluation, and oral care may all be accomplished by having a trained nurse or qualified health care professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves slips each night and brings them to medical services where they are date stamped, triaged as to the nature of the complaint (health, dental, or mental health), and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day, or next day, to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two (2) to four (4) days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven (7) to fourteen (14) days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight (8)days to see the nurse and in some cases waits were twelve (12) to eighteen (18) days. For the physician, the lists were five (5) days out, with some at eight (8) to twelve (12) days.

At this facility all inmates have access to the locked boxes to place requests for care confidentiality except in the segregation area. These inmates remain in their room and are screened in for walk and/or shower time. They have to give their requests for care to an officer, so confidentiality is not guaranteed. CI # 2 through CI # 5 are met.

**Recommendations**: CI # 1 requires that a qualified health care professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a qualified health care professional to see the patient before assigning the plan of care or level of care needed. General examples of the risk of current practices could include what appears to be a tension headache for the patient could be a symptom of stroke and what appears to be constipation could in fact be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and make sure there are no backlogs of forms not triaged.

CI # 3 assures all inmates, no matter which housing area, have access to care and timely evaluations. Evaluating those in segregation with no access to confidentially submit a form should be investigated.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day. They can respond to emergencies in the facility. The emergency carts are stocked with suction, AED, and other emergency medications. 911 services are called, as needed, and the hospital is within 15 miles. CI # 1 through CI # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** This facility has a significant number of segregation, administrative segregation, and personal protection cells. A nurse checks these inmates three (3) times a week and signs off on the list of inmates in that housing area. There are no notes as to their condition or if they are having a problem coping with isolation. Mental health staff also checks segregation inmates.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are escorted to on-site and off-site clinical appointments in a timely manner. The segregation areas require numerous staff to escort patients and this can be a complication. Transporting officers are alerted to special accommodations (such as medication administration or communicable diseases) for their protection. Patients' health records are sealed in an envelope, and returned the same way. CI # 1 to CI # 3 are met.

**Recommendations:** Lack of deputies may delay escort from occurring or allowing mental health staff to see a patient and should be investigated to improve timeliness.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols (also known as standardized nursing procedures in this program) include prescription medications for emergency situations, as well as routine health conditions of alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format) with guidelines for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included protocols to diagnose and prescribe medications to

patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols (although those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering). CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered, and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. Since the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based, and implemented in a timely manner. CI # 1, CI # 3, CI # 4, CI # 6, and CI # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

\*J-E-13  **Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place; however, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs

for Naltrexone for extended-release injectable suspension ™, etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Instead, information is clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

Representatives of community programs come on-site for classes on HIV, hepatitis, parenting, and GED preparation. We observed a few posters in the housing areas about access to care, PREA, and smoking cessation. A closed-circuit television system is in place and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that the health record documents that patients receive individual health education and instruction in self-care for their health condition. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than ten (10) special medical diets offered.

At the time of our visit, approximately 166 special diets were ordered at this facility. A registered dietitian reviews the medical diet menus annually (in July). At the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference.

CI # 1, CI # 3, CI # 4 and CI # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months and whenever a substantial change in the menus is made. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard is that when someone with a chronic disease enters a corrections facility, he or she is identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component, with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications and "return to clinic" appointments as set.

This program has one chronic disease pathway for hypertension which was revised in 2014. It is in the procedure manual and guides the nurses' care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines," which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases and/or medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases which, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on. Forms should be developed for better documentation by providers and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test and the frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC offer treatment guidelines and forms that can be revised to fit a particular program.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to the frequency of follow-up for medical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens and, when appropriate, instructions about diet, exercise, adaptation to the correctional environment, and medication, is needed. A review of inmates with active medical instructions indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called Medical Observation Beds (MOB). Seventeen (17) or these beds are for medical patients and thirty (30) are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patients should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols. The protocol instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients and felt some of them were at infirmary level of care, and required a physician directing the care plan and medications.

The responsible physician and RHA, should review the use of the MOB and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds and sheltered housing. The discussion section further explains what

infirmary care is and the alternatives. Some programs have a low level of care and have shelter housing beds where nurses may admit. Others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CI # 3 and CI # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define and distinguish admissions to the infirmary from observation and/or shelter beds from outside hospital admissions. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CI # 8 and CI # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use. This includes lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and are referred to the onsite mental health program staff. A mental health clinician is in the stage 2 booking level daily to evaluate those inmates with mental health conditions. There are some safety cells (suicide watch or violence watch) if needed. There are also enhanced observation cells for special housing. The staffing included a position for a supervising psychiatrist (vacant at the time of our visit), and the chief clinician. Three mental health licensed clinicians respond to patients needs for evaluations. The psychiatric team is supplemented with contract psychiatrists who receive referrals and calls for evaluations and who order medications. The team provides some programming for patients, as well, to include the PET or puppies therapy sessions.

CI # 1, CI # 3, CI # 4, CI # 5, and CI # 6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five (5) areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor, and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or

medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program.

In the last two years, the facility has had thirteen (13) deaths, four (4) of which were suicides. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were completed for the cases of suicide but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit and was to continue until all health, mental health, and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health, and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings. During these meetings, special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CI # 1 and CI # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled. CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective, assessment, and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells (on the second floor, above booking), but does not address those inmates going through withdrawal in general housing, segregation, or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours (if not symptomatic in booking).

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care. The nurses manage the withdrawal using the protocol. When a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a men's facility. The pregnant opiate patient discussed in CI # 7 is not applicable.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CI # 3, CI # 4, and CI # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring, and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension ™, and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** The population at this facility is all male. The standard is **not applicable.**

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** The population at this facility is all male. The standard is **not applicable**.

**J-G-10  Aids to Impairment (I).** During the visit, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs approximately six (6) to eight (8) times a year. There is no formal procedure. Staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program. If a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CI # 1, CI # 2, and CI # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and/or emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.


**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room which is accessible to the clerical staff who manage the records, and the electronic record is password-protected. Health and custody staff undergo annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two (2) senior medical records technicians, ten (10) technicians, one (1)  clerk and one (1) office assistant. Some of the staff are located in the central administrative office and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**There are no** recommendations regarding this standard. We recommended that you continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a written policy and defined procedures specify which health services staff have access to custody records and under what circumstances.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one (1) hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four (4) hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four (4) hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every fifteen (15) minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Restraint is reportedly rarely applied. There are two restraint chairs in the facility and deputies carry TASERs™ and handcuffs. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CI # 1, CI # 2, and CI # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place.

According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every fifteen (15) minutes for four (4) hours when a medication is given to someone in an emergency.

There is a process in place, through the courts, for forced medications. The PSU had approximately six (6) to eight(8) patients on this program system-wide. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed, revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** It was reported that health staff does not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice, the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four (4) compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions, or living wills that an inmate arrives with, would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: In this standard, Inmates approaching the end of life are permitted to execute advance directives including living wills, health care proxies, and "do not resuscitate" (DNR) orders. CI # 1 through CI # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d. emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research or a patient on a medical trial or participant in a research project.

## Mental Health Report:

**SAN DIEGO CENTRAL JAIL**

**Staffing:**   **3.0 FTE Psychiatrists**
              **1.0 FTE Psychologist**
              **3.0 FTE Mental Health Clinicians (includes system Mental Health Director)**

**Overview:** The mental health services at Central Jail are primarily provided by nurses, who complete the mental health screenings and determine the acuity of the mental health needs, and by the psychiatrists, who complete the 14-day assessment, and monitor medications. There is one psychologist, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has three mental health professionals (master's level, licensed at Marriage and Family Therapists) who primarily respond to crises and try to provide two, four-hour "mental health clinics" each per week, but these are often interrupted or not held due to facility needs or other issues, including lack of staff or lock-downs on individual housing modules.

Mental health staff members (including psychiatrists and the mental health professionals) respond to inmate requests for service, and see inmates who are scheduled by nursing staff in response to requests or referrals. It was reported, and noted in chart reviews, that 10% of scheduled appointments with mental health staff members are cancelled, and 60% of the charts we reviewed indicated at least one missed appointment. It was further reported that it takes at least one week for an inmate to be seen following a request or a referral, which is outside of the time frame required by NCCHC.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There was much confusion across facilities, and including at the Central Jail, about the requirements of the program and how to implement it. The expressed understanding of it at the Central Jail is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and his involvement in the Safety Program is his only duty. Staff members did not express an

understanding of the design of the Safety Program as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the program, however, is that inmates who are identified as high risk cannot be released prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute monitoring if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

A review of inmate charts indicated inappropriate assessment of suicide risk. It appears that the clinicians do not maintain an awareness of suicide risk over time, instead judging or evaluating each incident as being isolated from the individual's history within the facility and within the community. There are inconsistencies in designating the level of risk that do not follow from the current and historical data from inmates who are being assessed. This results in insufficient or inaccurate designations of suicide risk, and ultimately a higher risk of inmates attempting or completing suicide.

The sworn staff members reportedly are not trained in suicide prevention training. While an eight-hour class on mental health in the jail has been initiated, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate that is above the national average over the past two years; in 2015, it was 33:100,000, which is right at the national average, and in 2016, it was 99:100,000 in 2016, nearly three times the national average. The average for the last two years is 61:100,000, which is nearly double the national average of 36:100,000 in jails in the United States.

## Psychiatric Services:
Psychiatrists do a very good job assessing the mental health status and needs of inmates who are in the facility for at least 14 days. The 14-day assessments are thorough and completed in a timely manner. The documentation we reviewed indicated that they provide quality treatment to inmates, although as noted above, this is not always in a timely manner as a result of cancelled appointments and the heavy inmate/patient load.

Dr. Badre, who is responsible for the Psychiatric Security Unit, which is essentially an inpatient mental health unit, has reportedly done a great job reducing the length of stay in this unit, and has modified it so it functions very similarly to psychiatric hospitals in the community. In addition to the services provided on the PSU, there is a step-down unit on the sixth floor that serves to monitor and maintain inmates who are psychotic or gravely disabled and yet not in need of the highly acute services provided on the PSU. This is a very effective utilization of services, and meets the needs of those inmates who continue to be psychotic and gravely disabled. Additionally, the psychiatrists maintain data on the number of inmates in segregation who have psychotic disorders; as a result of diligent monitoring, this number has been consistently reduced, which is appropriate for those with severe mental illness.

It was reported that inmates who enter the Central Jail and are taking psychotropic medication frequently do not have that medication continued in a timely manner. This results in instability and risk for the inmate, for custody staff and for the facility. Additionally, it was reported that psychiatrists receive requested laboratory reports less than 50% of the time.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. Unfortunately, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia). The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01:  Access to Care:**                                    **Not Met for Mental Health**
        Inmates do not have their requests or referrals for mental health services responded to in a timely manner.
**J-A-10:  Procedure in the Event of an Inmate Death:**       **Not Met for Mental Health**
        There is no psychological autopsy for completed suicides.
**J-A-11:  Grievance Mechanism for Health Complaints:  Not Met for Mental Health**
        There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.
**J-C-04:  Health Training for Correctional Officers:**        **Not Met for Mental Health**
        Suicide Prevention training is not provided for "sworn" staff/correctional officers.
**J-E-05:  Mental Health Screening and Evaluation:**          **Not Met for Mental Health**
        Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.
**JE-07:  Nonemergency Health Care Requests and Services:  Not Met for Mental Health**
        Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:  Segregated Inmates:**                                    **Partially Met for Mental Health**
              Segregation rounds are provided by nursing staff, which meets NCCHC
standards.  Mental health staff are not reviewing inmate records prior to
placement in segregation for any possible contraindications to placement in
segregation.

**J-E-13:  Discharge Planning:**                                    **Not Met for Mental Health**
              Mental health does not provide discharge planning and it was reported that there
is insufficient discharge planning for all inmates.

**J-G-04:  Basic Mental Health Services:**                          **Not Met for Mental Health**
              Mental health does not provide adequate individual counseling or group
counseling, and does not coordinate mental health, medical and substance
abuse treatment.

**JG-05:  Suicide Prevention Program:**                             **Not Met for Mental Health**
              There is inadequate training, evaluation, monitoring, review and debriefing in the
Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate.
2. It is recommended that the facility implement the CIWA and COWS protocols for alcohol and opiate withdrawal.
3. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
4. It is recommended that nursing staff that do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
5. It is recommended that mental health staff members see and address mental health grievances.
6. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
7. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

San Diego Sheriff's Department
George F. Bailey Detention Facility (GBCF)
Technical Assistance Report
January 5, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails.* On January 5, 2017, NRI conducted its review for the George F. Bailey Detention Facility (GBCF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 39 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 28 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-02   Clinical Performance Enhancement
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care

J-E-07   Nonemergency Health Care Requests and Services
J-E-08   Emergency Services
J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patients With Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
J-G-09   Counseling and Care of the Pregnant Inmate

There are 27 important standards and 25 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure In the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care For the Terminally Ill
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison
J-G-08   Contraception

**Evaluation Method**

We toured the clinic area, inmate housing areas, transfer area, mental health housing/PSU, segregation/administration segregation and MOB (medical observation area). We reviewed thirty-one (31) health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical reports; and health services personnel training and licensure logs. We interviewed the day shift sergeant, contract physician, facility nursing supervisor, CQI nurse, psychiatrist, psychologist, dentist, eleven (11) health staff, five (5) COs, and nine (9) inmates selected at random.

**Facility Description**

**Location:** Southwest
**Built:** 1993
**Security:** Maximum
**Supervision Style:** Indirect Supervision
**Bookings/Transfers:** 50 to 75 transfers in per day
**Lay Out:** Modular
**Capacity:** 1852
**Males:** 1653   **Females:** none   **Juveniles:** none
**Custody Staff: Total:** 189 over three shifts

**Findings and Comments**
*Special Note: A mental health report summary and comments about the standard related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard.*

## B.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip or notifying officers. Patients see a qualified clinician and receive care for their serious medical, mental health, and dental needs. Physician and nurse sick call is held daily. As this is a maximum security jail, patients are occasionally on "lock down" status and the nurses and mental health clinicians do not have access to them. When this occurs, patients are subsequently rescheduled for their appointments, and medication administration is delayed. Approximately 20% to 30% of mental health appointments were not completed, based on our review.

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.
A back-up plan should also be developed for lock-down times to ensure critically ill patients receive their necessary care.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator who is normally in the administrative offices and rarely at the facilities. The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody, medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings (some system-wide and some facility-specific) which are all documented with action items and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI meeting, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and

procedure meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization; these reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise, and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas and discussion and action steps to be taken. Documentation in this area is lacking. The identified studies are not documented, nor are the effectiveness of the corrective action plans. The committee identifies

problems, establishes thresholds, designs monitoring activities, analyzes the results and
remonitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and
procedure for a patient safety program to identify those inmates at risk for suicide. The
committee did not maintain any notes or minutes from the project, only the resulting policy and
procedures.

**Recommendations**: CIs # 1, # 2, and # 3 address all components of monitoring, and
implementation. With the physician's guidance, the committee establishes monitoring activities,
and thresholds for studies, and completes those studies. CI # 4 explains process and outcome
studies, and also emphasizes documentation of these steps, what action steps are to occur, and
what happened when re-studied. CI # 5 states that the CQI committees should evaluate the
effectiveness of the committee's work annually and document that in the minutes.
This jail's staff expressed concern about the staffing allocation, especially in reflection of the
backlog of medical requests for care. A CQI audit and study of the staffing, workload, overtime,
turnover, rescheduling and work flow and access to the patients would assist in evaluating and
recommending any staffing or procedural changes. Documenting the complete quality
improvement process or outcome study alerts everyone as to the problem and how a solution or
new process was reached. Quality improvement is a continuous process (Problem, Do, Study,
Act) and when the procedure is re-audited, it is possible to determine if it has been successful,
or further research is required.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have
approved the health aspects of the emergency response plan, which includes some of the
required elements. Health and custody staff work together to plan the drills in accordance with
the facility's emergency plan. The annual drills were on the day shift, but there was no
documentation. The 2016 drills were described as an active shooter, use of a restraint chair in a
medical emergency, hostage scenarios, and inmate disturbance. The scenarios are developed
centrally and sent to facility staff to conduct. The drills were critiqued and the results were
shared with staff via the training bulletins and weekly staff meetings.

There was a real riot event that involved 33 inmates and staff, some of whom were sent to the
emergency room. This was not written up as real disaster event, but could be an example of
using actual events, and should be critiqued and the results shared with staff.

Man-down drills are planned to occur monthly or every other month. They do occur on each shift
and the scenarios are described as "man on the floor," "man down in video court," and cell
extraction. These have also been critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency
plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1g describes time
frames for response. The onsite contract physicians do not participate in the drills and
consideration should be given to having a physician participate. CI # 2 describes that the drills
should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down
drills occurring once each shift annually where health staff are regularly assigned. In a large
facility, actual man down events would be a valuable tool and should be critiqued and shared
with staff afterwards.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy. There are exam rooms in each modular area of the jail so nursing staff may see patients in privacy with an officer stationed nearby. In the clinic exam rooms, they "try to do exams in private as much as possible." By custody policy, the officers feel they need to be within arm's length of a patient in the clinic. This compromises privacy and may prevent a provider, or nurse, from obtaining an inmate's full description of his or her problem to make a diagnosis. Health staff understands that a patient's security status may require the presence of a custody officer. But when a patient is cooperative, privacy should be maintained. Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.

The facilities have a large numbers of cells assigned to segregation, so it is difficult to transfer segregated inmates to a clinic or interview room for care.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2, and # 3 require that procedures be put in place to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA concerns and confidentiality.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There have been eight inmate deaths in this facility. Five (5) were reported to be of natural causes and three (3) by suicide (two by hanging and one inmate jumped from a top tier). The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

It was estimated that the jails have around 15 to 25 complaints per week. We reviewed the handwritten grievance log at this facility for December 2016. Nineteen (19) grievances were recorded. If this log were to be maintained, it would facilitate identifying trends.

Inmates may appeal, with a standard guideline of level one (seven days to respond), and levels two (10 days to respond each).

**Recommendations**: Compliance indictors # 1 and # 2 are met. We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail or in the positive pressure room (for total isolation). The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked. Sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** This jail has a small medical unit and the storage organization is poor. We observed boxes and carts in the halls that were used to hold doors open. The storage area is crammed and things could fall off hooks. Even though the area appeared clean and well lit, the clutter presents an injury risk. It is important to keep areas free of clutter and overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios, which were not available at the time of the visit, or implementing a call system in order to be notified of emergencies or to call if in an emergency. Exam rooms do not have call buttons. Officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail reported that this occurs very rarely.

**There are no** recommendations regarding this standard.

## C. PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff. Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits and all were current in cardiopulmonary resuscitation (CPR) training. There is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LVNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LVNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3, describe the medication administration training program to be approved by the responsible health authority, facility administrator and designated physician. The pharmacist would be an important component for evaluating the knowledge level of the LVN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** This facility does not use inmate workers in the medical observation beds area or the clinical areas. Nurses clean these areas. There are no peer health-related programs. Nurses clean the clinic spaces and medical observation beds. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for this assignment, and earn their food handler certifications.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff work 10.5 hour shifts with every other weekend off at this facility. The nurses total 33 full-time RNs and 20 full-time LVNs. Nine (9) RNs are scheduled for the day shift and seven (7) on the night shift. Five (5) LVNs are scheduled for each shift. The actual work hours may be staggered to accommodate work load or medication round schedules. The contracted physicians hold clinic daily and two (2) are in the clinic on Thursdays. They are also on call. Mental health staff consisted of two (2) clinicians.

At the time of our visit, vacancies consisted of four (4) RNs, one (1) LVN, and the chief psychiatrist, although two (2) RN positions and the LVN position were pending hires. Temporary agency staff are employed to fill vacancies.

**There are no** recommendations regarding this standard. Timely staff response to patient needs requires continual monitoring and evaluation. The length of time of medication rounds, waiting lists for dentist or physician appointments, or time spent in booking for an evaluation, are all components that may determine staffing needs. We noted there are very few mental health clinicians given the population.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two (2) weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six (6) weeks are spent in on-site orientation and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LVN Preceptor Toolkit which consists of check lists, along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two (2) years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LVNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LVNs put doses of medication into labeled envelopes before taking the cart or basket to

the housing areas for administration. Since this process is time-consuming, LVNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to "lock-down" status. Nurses are not able to see patients during lock-down periods. There is no procedure in place to evaluate who is on essential medications or how to work with custody staff for a solution. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be validated.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing, and only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery), or require reordering.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two (2) clinic exam rooms, a medication room, one (1) dental chair, a records room, a mental health interview room and a radiology/x-ray room in the transfer area (with additional services from an outside provider that comes on site twice a week). The nurses' area has five (5) stations. It is next to an open storage cubby area where the emergency response stretcher and other equipment, plus boxes of supplies, crutches, etc. are stored. This area had quite a lot of overspill during the visit. The nurse's station is also central to the MOB and mental health housing area. There are also offices for mental health staff, the charge nurse, nursing supervisor, and a clerical area for charts and files.

We counted the sharps and needles with staff and found them to be accurate.

The two (2) emergency crash carts are checked each shift and we counted three (3) automated external defibrillators (AED) strategically placed around the facility.

The clinic contained all the equipment necessary to take care of the patients.

**There are no** recommendations regarding this standard.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, and drug screen urine dipstick and multiple-test dipstick urinalysis. (Pregnancy test kits are not necessary as the population at this facility is male.)

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates
have access to health services, how they are to request emergency and non-emergency care,
that health histories are obtained, that assessments and care can be demonstrated to be
provided in a timely fashion, and that discharge planning is considered.  In short, health care for
the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have
had orientation to health services at the booking facility. At this facility, the inmate orientation
video is shown in all the housing areas. We noted there were signs in each housing area
addressing how to request care and the various fees and HIPPA. The signs and the video are
also in Spanish. Inmates who speak other languages or have a hearing impairment can use an
AT&T language line or TTY, respectively. A few staff members are also familiar with sign
language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given
written instructions on access to care, the fee-for-service policy, and the grievance process. An
inmate manual or handout should be developed. Some facilities have a manual that inmates
may borrow and return and others have it posted. Based on the results of inmate interviews,
surveying the inmates to evaluate the effectiveness of the orientation video would be a good
CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** This facility is designated as a transfer facility as it only
received detainees from other jails within the system. When the nurses complete the transfer
screening, they should ensure the receiving screening is completed and if not, schedule the
inmate appropriately.

The standard is **not applicable**.

**J-E-03  Transfer Screening (E).** This program has multiple jails so it is reported that there are
50 to 100 transfers a day from other facilities to this jail. A transfer review procedure was
initiated three months ago, with a goal of a nurse's review within 12 hours. This procedure was
not listed in the policy and procedure manual.

The nursing staff receives from classification staff a list of transferring inmates when they arrive.
The RN reviews each incoming patient's health record for problems, treatments, medications
and appointments. This is completed in the electronic jail management program that houses the
electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in
place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility.
Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there
was a note from the sending facility that the patient was going, but no note about a review when
they arrived. One chart said "cleared by RN and chart checked by MD" at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no
completed receiving screening, the receiving nurse schedules the inmate and sees that it is

completed in a timely manner. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4 and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The nurse at the booking facility completes the mental health screening, which a nurse at the transfer jail reviews upon the inmate's arrival. The 14-day evaluation program is not in place: however, the mental health team should have a mechanism in place to track positive mental health screenings so these patients are seen for their evaluation before 14 days. This second step of reviewing the screenings and making the evaluation appointments may be completed by a qualified health professional or a clinician. This review and referral would assure that some inmates with mental health problems and a referral were not missed by the intake nurse. The current, lengthy process does identify most mental health patients, however. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first and refer to a psychiatrist or psychologist. CIs # 3 through # 7 are in place and the policy and procedure revision may include all the questions needed and the evaluation.

**Recommendations:** The mental health screening form requires revision to include all the required questions and observations. RNs should be trained by a mental health staff. The referrals from booking to mental health could reflect a 14-day evaluation if that program was in place. If a formal program was in place, there would be a policy and procedure tracking logs/lists and staff assigned to complete the evaluations by the 14th day of incarceration. The

mental health team does complete many evaluations for those with positive screenings, although they are not tracked for timeliness.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening occurs at the second stage of booking before inmates are transferred to this facility. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications. The dentist was not on duty the day of the consultation

There is no twelve (12) month oral examination by a dentist. The standard states that a trained health care professional may complete the screening before fourteen (14) days. A procedure can be set up to complete the health, mental health, and dental screening at the same time. The dentist completes extractions and sometimes provides a filling.

There is no evidence of any handouts for the inmates regarding oral hygiene and preventive oral education. CIs # 4 through # 6 are in place.

**Recommendations**: CI # 1 and # 2 can be addressed by incorporating oral screening and education into the booking process. The dentist can train the nurses to conduct the screening. CI # 3 can be met by preparing a list of inmates who have been at the facility for eleven (11) months and scheduling them for a dental examination to occur before their anniversary. The initial health assessment, mental health screening and evaluation, and oral care may all be accomplished by having a trained nurse or qualified healthcare professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves them each night and brings them to medical services, where they are date stamped and triaged as to the nature of the complaint (health, dental, or mental health), and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day or next day to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two (2) to four (4) days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven (7) to fourteen (14) days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight (8) days to see the nurse and some were twelve (12) to eighteen (18) days. For the physician, the lists were five (5) days out, with some at eight (8) to twelve (12) days.

Segregated inmates at this facility can also deposit request slips in the box during their hour "out of cell."

CIs # 2 through # 5 are met.

**Recommendations**: Compliance indictor # 1 requires that a qualified health professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What seems a head ache for the patient could be a symptom of stroke. Constipation could actually be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

CI # 3 assures all inmates, no matter which housing area, have access to care and timely evaluations.

One serious issue we identified is the backlog of 300 medical request slips that have not been answered with a face-to-face evaluation. Some were assigned a triage level and rescheduled over and over. This situation should be investigated and resolved as patients' serious health care needs are being delayed. We reviewed eleven (11) medical requests for care and most were answered by a nurse in two (2) to three (3) days. The plan of care was appropriate, and there were two (2) in which the nurse started a prescription medication.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day. They can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called, as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** This facility has a significant number of segregation/administrative segregation and personal protection cells. A nurse checks these inmates three (3) times a week and signs off on the list of inmates in that housing area. There are no notes as to their condition or if they are having a problem coping with isolation. Mental health staff also checks segregation inmates.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are usually escorted to on-site and off-site clinical appointments in a timely manner. Transporting officers are alerted to special accommodations (such as medication administration or communicable diseases) for their protection. Patients' health records are sealed in an envelope during transport and returned the same way. In this facility's general housing areas, patient escort seems to occur efficiently. CIs # 1 to # 3 are met.

**Recommendations:** One area to look at in this facility are the segregation areas where a lack of deputies may delay escorts from escorting a patient to the clinic or allowing mental health in to see a patient.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols (also known as standardized nursing procedures in this program) include prescription medications for emergency situations, well as routine health conditions, alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format), with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016; most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included diagnosing and prescribing medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations. CI # 3 addresses prescription medications that should not be present in the protocols except those for those used in emergency responses, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year. The last time was in 2013, but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no

evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place; however, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs for Naltrexone for extended-release injectable suspension ™, etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Information is instead clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

Representatives of community programs come on site for classes on HIV and hepatitis, parenting, and GED preparation. We observed a few posters in the housing areas about access to care, PREA, and smoking cessation. A closed-circuit television system is in place and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen, under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than ten (10) special medical diets offered.

At the time of our visit, approximately 166 special diets were ordered at this facility. A registered dietitian reviews the medical diet menus annually, in July, but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference.

CIs # 1, # 3, # 4, and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, they are identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care for the goal of stability. Some programs have a formal chronic disease component with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect where the physicians follow approved guidelines and order labs, treatment, medications, and "return to clinic" appointments as set.

This program has one chronic disease pathway for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines" which address areas like blood borne pathogens, suboxone, blood

pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard, and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers, and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory tests, frequency of orders, what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care, as reflected in the health record, appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with active medical instructions, according to need indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has 30 designated medical beds called "Medical Observation Beds (MOB) for those with medical needs or those who are handicapped. Eight (8)

are for low acuity medical patients and are located close to the nurses' station and twelve (12) enhanced observation beds are used for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patients should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal and directs the nurses to use the standard nursing protocols. The protocols instruct them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients and felt some of them were actually at infirmary level of care and required a physician directing the care plan and medications.

The responsible physician and RHA should review the use of the MOB and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds, and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds where nurses may admit, while others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The ten (10) compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation/shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use. These include lab results, consent forms, and admission forms.

**\*J-G-04   Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and are referred to the on-site mental health program staff. A mental health clinician is in the stage 2 booking level daily to evaluate those inmates with mental health conditions. There are some safety cells for suicide watch or violence watch, if needed. There are also enhanced observation cells for special housing. The staffing included a position for a supervising psychiatrist, which was vacant at the time of our visit, and the chief clinician. Three mental health licensed clinicians respond to patients' needs for evaluations. The psychiatric

team is supplemented with contract psychiatrists who receive referrals and calls for evaluations and who order medications. The team provides some programming for patients as well.

CIs # 1, # 3, # 4, # 5 # 6 are all met, with the caveat that there are three (3) clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five (5) areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee, and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor, and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program.

In the last two years, the facility has had 13 deaths, four of which were suicides. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were completed for the cases of suicide, but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit, and was to continue until all health, mental health and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards**.**

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings, where special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CIs # 1 and # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled.

CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective, assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, above booking, but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours, if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care. The nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a men's facility. The pregnant opiate patient discussed in CI # 7 is not applicable.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring, and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** The population at this facility is male. The standard is **not applicable.**

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** The population at this facility is male. The standard is **not applicable**.

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints, and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting and a list of patients using various appliances is maintained. It is also documented in the health record and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs approximately six (6) to eight (8) times a year. There is no formal procedure. Staff explained that the first step, after diagnosing such a condition and that the patient can no longer care for himself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program. If a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the records and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although, a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room and are accessible to the clerical staff who manage the records. The electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two (2) senior medical records technicians, ten (10) technicians, one (1) clerk and one (1) office assistant. Some of the staff is located in the central administrative

office, and others are in each of the jails. An electronic health record is available for each patient
care encounter, as is the paper record, if necessary. There are administrative procedures for
health records, but they are not part of the general policies and procedures we reviewed for this
technical assistance.

A completely integrated electronic medical records program was being actively investigated at
the time of our visit. This would integrate all information into one chart. The electronic record
would provide more information for quality of care evaluations, as well as allow full patient
information access.

**Recommendations:** We recommended continuing the purchase of an integrated, complete
medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to
information in the inmate's custody record when such information may be relevant to the
inmate's health and course of treatment. Health staff can access information through the jail
management system or discuss matters with custody staff.

**Recommendations:** The CI requires that a policy and procedure be in place to guide staff
when they need more information than what is available in the jail management system.

**I.  MEDICAL-LEGAL ISSUES**

> The standards in this section address the most complex issues facing correctional health care
> providers.   While the rights of inmate-patients in a correctional setting are generally the same
> as those of a patient in the free world, the correctional setting often adds additional
> considerations when patient care is decided.  The rights of the patient, and the duty to protect
> that patient and others, may conflict; however, ethical guidelines, professional practice
> standards, and NCCHC's standards are the determining factors regarding these interventions
> and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion
in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint
and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or
others as a result of medical or mental illness. The policy addresses that the psychiatrist's
orders for the restraint must be written within one hour of initiation of the restraint and/or
seclusion. It also requires that a nurse assess the patient at that time. The order can be for a
maximum of four hours and may only be renewed for up to 24 hours. When the restraint is
continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist
write a continuing order. The monitoring parameters in the procedure are for the RN or LVN to
monitor the patient's mental and psychological status at least every 15 minutes and document
on the seclusion and restraint record. The procedure also states that the RN is responsible for
initiating the patient's removal from physician-ordered restraints when the treatment is no longer
necessary.

Reportedly, restraints are not often applied in this system. A chair and a gurney can be used
when necessary for a short period of time. The day shift sergeant reported that, thanks to the
excellent crisis intervention training they receive, there have been few situations that required

the use of restraints, and then only for a short period of time. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2 and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency.

There is a process in place, through the courts, for forced medications. The PSU had approximately six to eight patients on this program system-wide. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed, revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** The day shift sergeant reported that that health staff do not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions or living wills that an inmate arrives with would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or do not resuscitate order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign consent for treatment when they go through the booking process; this consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and

documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program, and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research, a patient on a medical trial, or a participant in a research project.

## Mental Health Report:

**GEORGE BAILEY CORRECTIONAL FACILITY**

**Staffing:**      **1.2 FTE Psychiatrists**
                 **1.0 FTE Psychologist**
                 **2.0 FTE Mental Health Clinicians**

**Overview:** The mental health services at George Bailey are primarily provided by the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. They hold mental health clinics during the week to provide individual counseling, but the clinics are often cancelled and are not sufficient to meet the need for mental health services. The number of mental health clinicians doubled recently, from 1.0 to 2.0 FTE, but this is still insufficient to meet the need for mental health treatment. There are two psychologists, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 1.2 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at George Bailey, about the requirements of the program and how to implement it. The expressed understanding of it at the Central Jail is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30

minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and involvement in the safety program is his only duty. Staff members did not express an understanding of the design of the safety program as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the safety program, however, is that inmates who are identified as high risk cannot be released from the program prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the safety program, which may not include even 15-minute observation status in a safety cell if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly are not trained on suicide prevention. While an eight-hour mental health class has been implemented, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate at George Bailey that is above the national average over the past two years: in 2015, it was 200:100,000, nearly six times the national average, and in 2016, it was 100:100,000, which is nearly three times the national average. Combined for the last two years, it average is 150:100,000 per year, which is nearly five times the national average of 36:100,000 in American jails.

**Psychiatric Services:**
Psychiatrists effectively treat inmates who are on psychotropic medications. Unlike at the Central Jail, the mental health clinicians and nursing staff typically refer inmates to see the psychiatrist, rather than seeing them for the mental health assessment.

George Bailey only has 1.0 FTE psychiatrist staff, which appears to be insufficient to meet the population's needs. Reportedly, the waiting list consists of 150 people, and one to three weeks.

Reportedly, 10 - 20% of inmates at the facility do not have their medications continued in a timely manner. Although this is better than the reported 50% or more who do not have their medications continued at Central Jail, this is still inadequate and is not meeting the mental health needs of those incarcerated in this facility.

The system emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. Unfortunately, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**

There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness, such as bipolar disorder or schizophrenia. The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

Mental health professionals reported that they see approximately 100 inmates per week, although as noted above, most of these are "wellness checks" and not appropriate counseling or more comprehensive mental health services.

It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**Segregation:**

The mental health professionals reported that they conduct segregation rounds three times per week, which exceeds the NCCHC requirement. This is very positive, and should help to ensure that inmates do not decompensate while in segregation. Unfortunately, segregation at George Bailey is used not only for disciplinary infractions, but also for inmates who simply have a mental illness, on the grounds it keeps them safe.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01:**  **Access to Care:**                    **Not Met for Mental Health**
Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:**  **Procedure in the Event of an Inmate Death:**    **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**  **Grievance Mechanism for Health Complaints:**    **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**  **Health Training for Correctional Officers:**    **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**  **Mental Health Screening and Evaluation:**    **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**  **Nonemergency Health Care Requests Services: Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**  **Segregated Inmates:**                **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.  Additionally, security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards.

**J-E-13:**      **Discharge Planning:**                    **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there
is insufficient discharge planning for all inmates.

**J-G-04:**      **Basic Mental Health Services:**              **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group
counseling, and does not coordinate mental health, medical and substance
abuse treatment.

**J-G-05:**      **Suicide Prevention Program:**                **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the
Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate.
2. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
3. It is recommended that nursing staff who do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
4. It is recommended that mental health staff members see and address mental health grievances.
5. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
6. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

San Diego Sheriff's Department
Las Colinas Detention and Re-Entry Facility (LCDRF)
Technical Assistance Report
January 6, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails.* On January 6, 2017, NRI conducted its review for the Las Colinas Detention and Re-Entry Faculty (LCDRF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 40 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 28 essential standards:

<u>Essential Standards</u>
J-A-01   Access to Care
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services

J-E-12   Continuity and Coordination of Care During Incarceration
J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patients with Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-G-08   Counseling and Care of the Pregnant Inmate
J-I-01   Restraint and Seclusion
J-I-02   Emergency Psychotropic Medication

Essential Standard Not Applicable
None


There are 27 important standards and 26 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 19 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-03   Clinic Space, Equipment and Supplies
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-08   Contraception
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison

**Evaluation Method**

We toured the clinic area, the many inmate housing areas, segregation/administrative segregation, intake/receiving area, administration, library, psychiatric security unit, MOB (medical observation housing), industries, reentry service building and their recreation building. We reviewed 25 health records; policies and procedures; provider & nursing licenses; administrative, health staff, continuous quality improvement (CQI) meeting minutes; and statistical reports. We interviewed the jails administrative lieutenant, physician, nursing supervisor, CQI nurse, psychiatrist, psychologist, dentist, medical records clerk, five correctional officers (COs), nine other health staff, and 15 inmates selected at random.

**Facility Description**

**Location:** West/Southwest
**Built:** 2014
**Security:** Six levels/ from minimum to maximum
**Supervision Style**: Direct supervision
**Bookings:** 46/day
**Lay Out:** Campus-style with 24 housing areas around the parameter, and many service buildings inside the parameter. Half the population is able to walk to medical services, dining hall, industries, etc. The higher security females are escorted.
**Capacity:** 1270   **ADP** 730   Few units closed
**Males:**  none          **Females:** 731   **Juveniles:** none
**Custody staff:   Total:** 204 working 12 hour shifts   **Days:** 46   **Nights:** 45

**Findings and Comments**
**\*Special Note**: A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an \* in front of the standard.

**C.  GOVERNANCE AND ADMINISTRATION**

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. The staff at this jail complies with timeliness of receiving screening and transfers. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. Although this is a minimum-to-maximum security jail, "lock-down" and subsequent delays to care are not an issue here.

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**Recommendations:** The staff at this facility responds in a timely manner to inmates who come to the clinic, and during medication rounds and other treatment. However, processing requests for care is problematic. The "hands-off" triage procedure used in this system results in many requests being scheduled further and further "out." The patient then submits more requests and the problem becomes compounded, with a backlog of 150 requests for care at the time of NRI's visit. A CQI process should be implemented to examine timeliness of care, as understaffing, or poorly organized systems may result in an inability to deliver appropriate and timely care, as discussed in paragraph four of the discussion area in the standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices and rarely at the facilities. The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) #2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody and medical and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented, with action items, and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers and public health meetings, the monthly contractors and transportation meetings, the policy and procedure meeting, and the site-specific weekly meetings of the patient care coordinating committee and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization. These reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system, with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, objective, assessment and plan organization. They note the compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. Either a cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E)**. The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken, although documentation is lacking. The identified studies are not documented, nor is

the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and remonitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring, and implementation. With the physician's guidance, the committee establishes monitoring activities, and thresholds for studies, and completes those studies. CI # 4 explains process and outcome studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills were on the day shift, but there was no documentation. For this jail, the last four drills were scenarios of an active shooter, a hostage situation, an evacuation, and a fire drill. The scenarios are developed centrally and sent to facility staff to conduct. The drills were critiqued and the results were shared with staff via the training bulletins and weekly staff meetings.

Man-down drills are planned to occur monthly or every other month on each shift, but documentation was not available.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan.CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The on-site contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information in this facility provides the necessary privacy for patient care. The clinical area is large, with a nurse's station in the center. Curtains are pulled when exams are being conducted, while the officer waits near the nurse's station. Since most of the jail houses inmates of minimum to medium

security levels, patients can walk freely around the campus and go to medical and mental health appointments. If there are security concerns, however, the patient is escorted and the officer waits in the hall for the encounter to end.

Most of the housing areas also have an exam room for nurse sick call, and privacy is respected by closing the door.

In the open receiving/booking area, two nurses are located alongside custody staff. This provides an opportunity for custody staff to overhear the booking procedure.

**Recommendations:** CI # 1 discusses the need for patient care to occur in private, which is the case in the clinic, but not during the second stage of booking. If a privacy screen, or barrier to hearing patient's health information were to be installed in that area, compliance would be achieved. There is privacy during the first stage of booking. CIs # 2 through # 5 are met.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** There has been one inmate death in the last two years (reportedly due to natural causes). The administrative review was completed, but not in a timely manner. There was no clinical mortality review, however. The treating and the health staff reported not being informed of any results of death reviews in their facilities.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days, and cases of suicide require a psychological autopsy in addition to the administrative and clinical mortality review. Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level and as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints and give the inmate a copy of the results. All grievances, health and custody-related, are logged into the central computer system.

At this facility, an average of 20 health-related grievances is filed per week. The charge nurse answers first, the nursing supervisor second, and the chief medical officer is the third level of appeal. As described in the policy and procedure, the time intervals for responding are seven days for level one, and 10 days for levels two and three.

**Recommendations**: CIs #1 and #2 are met, however, we recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

> The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room for total isolation. The negative airflow isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff to review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked: sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail/system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports. They are reviewed during CQI and staff meetings for trends. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. The jail is well lit, clean and well maintained for an older jail. The space for health is limited, but the health staff makes great efforts to keep it organized and to maximize space.  It is important to keep areas free of clutter and overflow into the hallways.

**Recommendations:** Staff may benefit from wearing radios. They were not available at the time of the visit. The facility may consider implementing a call system in order to be notified of emergencies or to call if in an emergency. The exam rooms do not have call buttons. Officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained annually in how to detect, assess, and respond to signs of sexual abuse and sexual harassment.

When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented, and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. Staff at this jail (which houses females) reported this has not occurred.

**There are no** recommendations regarding this standard.

**C.  PERSONNEL AND TRAINING**

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. This includes the obstetrical/gynecological physician who comes to this facility. Copies of licenses are maintained

in the central administrative office and on site, with each nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits, and all were current in cardiopulmonary resuscitation (CPR) training. An annual training program, consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses/LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years, and specifies the required topics. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3 describe the training program to be approved by the responsible health authority, facility administrator and designated physician, for health staff so they are appropriately trained in administering medications. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects, and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** Inmates workers do not generally work in the MOB or clinic areas, although staff reported that they mop the floors and empty the trash under a nurse's supervision. Nurses clean the clinic tables and equipment. Inmate workers may also clean an empty bed after the patient has left. Inmate workers are employed in the kitchen, are trained by kitchen supervisors for the assignment, and can earn their food handler certifications. This facility specializes in offering the inmates training in sewing, and other educational and vocational programming. There was no mention of any peer related programming.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** All the staff at this facility is full-time and is scheduled for 10-hour shifts, with every other weekend off. There are 40 RNs and 16 LPNs. Nine RNs are scheduled for the night shift and 11 for the day shift. Four LPNs are scheduled on each shift. Actual working hours may be staggered to accommodate work load or medication round schedules.

The contract physicians hold clinic seven days a week, and are on call on a rotating schedule 24 hours a day. Two OB/GYN physician clinics are held each week. On Tuesdays, only patients with gynecological problems are seen, and on Thursdays, only pregnant women are seen. Mental health staffing consists of three full-time clinicians. At the time of our visit, there were five RN vacancies (note the schedule shows five RN vacancies and the global report says five LPN vacancies). One nurse was waiting to begin orientation. Temporary agency staff is employed to fill vacancies.

**There are no** recommendations regarding this standard.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours a day. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two weeks of orientation at the central administrative offices. This includes policies and procedures, emergency response, and onsite orientation. The next six weeks are spent in on-site orientation, and a preceptor is assigned. They review all facets of the facility, including security, the inmate population, the job description, the shifts, and skills competencies. Each new hire is given an RN or LPN Preceptor Toolkit, which consists of check lists, along with procedures and skills information. These check lists are reviewed with the nursing supervisor before the orientation in order to determine if more time is needed.

**Recommendations:** CIs # 2 requires that the orientation program policy and procedure be reviewed once every two years by the responsible health authority. The current procedure was last revised in 2013.

## D. HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services at this jail are provided in a timely, safe and sufficient manner. There are two methods of medication administration at this facility. More than half of the inmate population may walk to the pill call window at routine (morning, afternoon & evening) times during the day. The LPNs also go out to the PSU, segregation and school/work areas to deliver medications. The central pharmacy receives all orders and sends medication to the medication room in bulk or unit doses. In preparing medication rounds, LPNs label envelopes, into which they put the dose. The nurse takes a cart or a basket to the housing areas for administration. Pre-pouring is also the means of administering at the pill call window.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Two staff members count controlled medications on each shift, and we verified the accuracy during the visit.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

CI # 2 is in met as there are no barriers to inmates receiving their medications. Lock-down is not a practice at this facility, and in receiving, the nurses have time to order prescriptions.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CI # 2 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of contract physicians' ordering practices, this cannot be validated. With regard to quality audits to assure safe practices, CI # 4 can be verified with audits.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing. Only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications order and delivery.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** This large, new clinic area includes three exam rooms, one room for emergencies, two dental chairs, six mental health offices, a medication room, a records room, a telemedicine area, a laboratory, and a room for biohazard storage. The large nursing station has six areas for nurses to work, and space for files and reference books. There are also five offices, a staff lounge, two storage areas, and bathrooms for inmates and staff. The booking area has an examination room, three sober and three safety cells, and a digital chest x-ray machine.

All of the housing areas except one have an exam room. In one program dormitory, the nurses use an interview room. All the exam rooms provide privacy.

There two emergency crash carts, one in the clinic, and one in receiving, are checked each shift. Eight automated external defibrillators (AED) were strategically place around the facility.

The clinic contained all the equipment necessary to take care of the patients.

Our inspection indicated that the counts of items subject to abuse, such as needles and scissors, were not accurate, however.

**Recommendations:** CI #7 requires those items of abuse to be inventoried and accounted for. The needle counts in both the dental and clinical areas were not accurate. A review of the policy and in service for staff may result in compliance with this indicator.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, pregnancy tests, drug screen urine dipstick and multiple-test dipstick urinalysis.

A representative from an outside laboratory retrieves specimens and returns the results by phone call or fax. X-ray services are offered on site. A digital x-ray machine is located in booking, and panoramic dental x-rays can be taken in the clinic. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

In addition to obstetrical/gynecological specialists who provide routine clinics on-site. Services are available in the community as needed. The clinic exam room includes an ultrasound machine for OB/GYN patients.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment, and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart, and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care and the various fees, and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return, and other have it posted. Based on the results of inmate interviews, surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).**  The receiving or booking process in this jail is very organized and timely. The booking style is open, where the individual sees a nurse as soon as she arrives and a decision is made to either accept her or refer her for emergency room care and clearance. After the detainee is cleared for acceptance, she waits to be called for the rest of the booking process. The same nurses complete the first part of the booking evaluation (pre-screening), and the second part (with a more thorough evaluation, recording of vital signs, development of a care plan, and follow-up appointments). The nurses said they have called the provider for orders, but they still initiate the standard nursing procedures when they are applicable and begin prescriptions on their own.

Safety and sobering cells are available if a detainee needs monitoring for intoxication or suicide risk.

Our chart reviews, and the results of interviews, indicated this process takes six to eight hours, which includes all the custody interviews, and the chest ray and contraband screenings. The nurses' screening is completed within an hour or two, depending on the number of arrivals. There are generally 45 to 60 bookings a day.

CIs # 1, through # 9, and # 13 are met in this jail. CI # 4 is met as there is routine pregnancy testing of incoming women.

CI# 11 is not applicable to this jail, as nurses complete the receiving screening.

**Recommendations:** CIs # 4, # 5, # 6, # 10 and # 12 are not met. The receiving screening procedure in this jail is reflective of the intent of this standard. The nurses complete the prescreening and rest of the screening in a timely manner.

When the screening forms are updated to reflect all the questions in CI# 6 and CI# 7, full compliance will be achieved.

During the tour, we observed nurses completing the receiving screening with three custody personnel completing their interviews. This represents a potential breach of confidentiality. Adding a privacy screen or Plexiglas barrier between the nursing desks would provide auditory privacy. The same receiving screening form is used in all the facilities, and should be compared to the standard to ensure it is complete. Because of the efficient use of space in this jail, the receiving screening could be completed in one step, or a quick check as they come off the bus or out of the police car for clearance, and then the full screening completed when they are inside.

**Special Note:** The use of resources for the booking process (stage 1 and stage 2) should be evaluated with consideration to the standards J-E-04 Initial Health Screening, J-E-05 Mental Health Screening and Evaluation, and J-E-06 Oral Care. When timeliness is not met for receiving screening, this affects other standards. When considering the use of a nurse practitioner's resources to start and continue medication during receiving, consideration should also be made for standard J-E-11 Nursing Assessment Protocols.

**J-E-03  Transfer Screening (E).** Reportedly, 50 to 100 transfers a day arrive at this facility from the others. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours. This procedure was not listed in the policy and procedure manual.

The nursing staff at this facility receives transfers from another jail that does house some females. The procedure is that the transferring inmate goes through receiving and the nurse reviews the electronic record for medications and any pending appointments. There was no supporting documentation that this occurred during chart reviews.

**Recommendations**: The receiving screening at this facility should be reviewed and staff retrained to ensure compliance with the procedures.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information, and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for

the first time, there would be history, verified medications, labs and physical information. If a nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4, and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during the stage 2 of receiving screening. The nurse asks a few questions during stage 1. There is no 14-day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first, and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place. With the revision of the forms to include questions from CI# 1 and CI# 2, the standard would be met.

**Recommendations:** The mental health screening form requires revision to include all the required questions/observations. RNs should be trained by a mental health staff. If the receiving screening forms are revised to include the mental health screening questions, then the mental health screening is complete. With the referral of positive mental health problems to the mental health clinician, then the evaluation is complete.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking, although there is no inspection of the inmate's mouth. This could be added to the first stage, as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12-month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site one day a week, and sees patient upon a nurse's referral. They dentist completes extractions and provides the rare filling. The dental list shows from the time of the appointment until the patient is seen varies from five days to 10 days to two months.

CIs #4 through #6 are in place.

**Recommendations**: CIs #1 and #2 can be addressed by incorporating oral screening/education into the booking process, and the dentist can train the nurses to conduct the screening. CI # 3 can address met by preparing a list of inmates who have been at the facility for 11 months and scheduling them for a dental examination to occur before their anniversary. The initial health assessment, mental health screening and evaluation and oral care may all be accomplished by having a trained nurse/qualified healthcare professional perform it. A tracking mechanism should be developed to ensure inmates are not overlooked in receiving these screens.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** A formal procedure is in place for the inmates to request care. There is a two copy form available in housing areas and from the nursing staff that the inmates fill out and place in a locked box on each housing area. Each night shift, a nurse picks up the forms and bring them to medical. They are date stamped in and triaged as to the complaint, dental or mental health. The nurse assigns a triage level to the complaint. Level 1 is urgent and schedule same day or next day to be seen. Triage Level 2 is semi-urgent and schedule two to four days out. Level 2 is non-urgent and schedule in seven to 14 days to see a provider. There are published guidelines for the nurses to decide which level to assign. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists it was an average of 4-8 days to see the nurse and those were the ones in triage 1 level.

At this facility all inmates have access to the locked boxes to place requests for care confidentially, even in segregation. CIs # 2 through # 5 are met.

**Recommendations**: CI # 1 requires that a qualified health professional has a face-to-face encounter with the patient within 48 hours of receiving requests with a clinical symptom. This is not the case, as the nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What seems a head ache for the patient could be a symptom of stroke, or constipation could actually be an infected appendix. The intent of the standard is for those requesting care be evaluated first. The sick call request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

**Note:** There was a backlog of 150 requests for care at this facility in which the patient has not seen a health care professional for an evaluation. The patient is assigned a triage level, however. When a patient is not seen after making a request, they repeat the process and the procedure falls out of control

**J-E-08  Emergency Services (E).** As nursing staff is on-duty 24 hours a day, they can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** There are 32 segregation cells at this facility, and on the day of the visit, 31 were occupied. The level of security is that of NCCHC's # 2.b., as the inmate has some contact with others and an hour out of their cell daily. A nurse checks these inmates three times a week, and dates and signs the list of inmates in that housing area. Mental health staff checks these inmates as well. There were, however, no notes as to their condition or if they were having issues coping with isolation.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients at this facility may self-escort to an appointment if they are classified as minimum or medium security. Maximum security-level patients are escorted by an officer. The health staff reported that the patients arrived for their appointments on time and were rarely refused. The custody staff is responsive to their health needs.

Escort to an off-site appointment is completed unless there is an emergency. The patients' paperwork is sealed in an envelope and returned the same way. Paperwork sent with a patient is in a sealed envelope and returned to medical in a sealed envelope for confidentiality.

**There are no** recommendations regarding this standard.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols, also known as standardized nursing procedures in this program, include prescription medications for emergency situations, well as routine health conditions, alcohol withdrawal, chronic care and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format), with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols/procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included to diagnose and prescribe medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols (although those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** Because the female inmates are housed in one facility, the continuity of care is better, especially for the pregnant females and those with gynecological problems, who see the same provider. For women's general health issues, we confirmed care of episodic, as most appointments are made after a request for care has been submitted. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are few physician-ordered "return to clinic appointments" to evaluate the effectiveness a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered, and the samples are sent to a contracted laboratory. The results are faxed back to the facility, and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based, and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** This facility's re-entry program aims to facilitate inmates' return to society as smooth as possible. Almost all the activities emphasize personal responsibility, education, obeying orders, and life planning. Medical and mental health staff have input into the women's health care plans for their release. The infection control nurse works with representatives of the health department, STD and HIV clinics to arrange patient referrals. TB clinic staff is alerted as to who requires follow-up. Discharging inmates can receive assistance in applying for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** CI # 1 states that there is a discharge planning process in place. However, there was no evidence of this in the medical records we reviewed. Since this facility focuses on re-entry to society, a procedure to document medical and mental health plans is important. Special programs such as those for Naltrexone for extended-release injectable suspension  or others should also be documented in the health record.


## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, educational handouts are not given as inmates have used them to damage the plumbing in the past. Instead, information is clearly posted. The health record includes a box for nurses to check that patient education has been provided, but no space to describe the subject. We saw no evidence of physician-provided education.

A variety of programs are offered at this jail, including educational and vocational programs, so some written reference material is in fact available. In some of the women's housing areas, there were posters that were not available in the men's institutions. We saw posters addressing access to care, PREA and smoking cessation. Representatives from community programs come on site to provide classes on HIV and hepatitis, parenting, and GED preparation. A closed-circuit television system is in place, and the staff indicated they planned to show some health educational videos. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen under the training and supervision of the dietary staff. They receive a food handler's card which can assist them obtaining employment when they are released. There are more than 10 special medical diets offered.

At this facility, more than half the inmate population can walk to the cafeteria and they choose their diets. Some of the inmates have their food brought to them on carts.

A registered dietitian reviews the medical diet menus annually in July, but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference. We were given an extensive list of special diets, although it did not include the number of medical diets for this jail. CIs # 1, # 3, # 4 and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, he is identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component, with designated clinics for specific diseases and a nurse who coordinates appointments, labs and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications and "return to clinic" appointments as set.

This program has one chronic disease pathway, for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines," which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard, and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI #1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers, and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test and the frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete

transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs, and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with active medical instructions (according to need) indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called "Medical Observation Beds (MOB)". Thirty are for medical patients and 26 are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patient should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. MOB patients have access to a call button-type system to summon nurses; the nurses' station is not within sight or sound of the patients.

This facility's observation beds have piped-in oxygen and suction with hospital beds and over-bed tables. There is a central nurse's station, so the nurses are within sight and sound of the patients. This MOB area could be an infirmary, as it is set up as one with medical beds, piped in oxygen and suction, and nurses within sight and sound. The procedure could reflect the care of sheltered housing or infirmary/skilled nursing care depending on the patients health needs.

If the acuity of the patients qualified as infirmary, then the compliance indicators would have to be met and a procedure be put in place, with physician oversight.

The responsible physician and RHA should review the use of the MOBs and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds, where nurses may admit; others have a high acuity infirmary. Some places use a matrix to for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation, shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician, and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use, such as lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and referred to the onsite mental health program staff. A mental health clinician will see them as soon after booking as possible. There are some safety cells, holding cells and sobering cells for patient needs in booking. In this jail, there are 26 beds designated as mental health or a psychiatric secure unit/PSU. This is a large area with day rooms, interview rooms, recreation/activities rooms. There are three levels of observations for patient safety.

Three mental health licensed clinicians respond to patients needs for evaluations. The psychiatric team is supplemented with contracted psychiatrists, who receive referrals and calls for evaluations, and who order medications. The team provides programming for patients, which includes several vocational and education opportunities for patients in these units.

CIs # 1, # 3, # 4, # 5 #6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all 5 areas are covered. Some group counseling sessions are ongoing.

**Recommendations:**
See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee, and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each

facility has an assigned gatekeeper who oversees the care of patients in the safety program. At this jail, it is the psychiatric unit's charge nurse or mental health clinician.

In the last two years, there has been one inmate death which was not a suicide. While the risk is less with women, it still exists. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide.

**Recommendations**:
See the mental health report at the end of the standards for recommendations.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicate and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the corrections counselor. Various re-entry programs are offered as well. CIs # 1, # 3, # 4, and # 5 are met.

**Recommendations:** CI # 2 recommends custody receives information on the effects of alcohol and drugs on the populations. This could be true for health and provider staff to receive more training so diagnosis and referral is accurate and differentiated from mental health.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective and objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, above booking, but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This is a women's facility. The nurses reported that they conduct pregnancy testing on all substance abusing women and those on prescription drugs.

Individuals experiencing severe intoxication or withdrawal are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in

the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** There is no policy and procedure that guides the staff to continue women's prescription upon arrival, or if emergency contraception is available. It would be available in the community hospital, but this should be explained in a procedure for staff reference.

Since this jail has a re-entry program, it would be appropriate to address the women's contraception needs before they leave custody. With over 20 pregnant women in custody at any time, the need for contraception planning is necessary. There are community resources regarding pregnancy options and contraception, if needed.

**Recommendations:** CI # 4 requires a policy and procedure to guide staff in the contraceptive practices of the program and addresses the components of the standard. It should also include where emergency contraception is available.

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** Comprehensive counseling services are available to pregnant inmates through the services of contracted obstetrical/gynecological physicians who come on site weekly. Prenatal care, specialized obstetrical services when indicated, and postpartum care are available. Pregnant women deliver in the community hospital, and then return to jail to be observed until stable. The staff said restraints are not applied during labor. CIs # 1 through # 5 are met.

**Recommendation:** CI # 6 requires a policy and procedure to guide staff in the care of a pregnant woman and addresses the components of the standard**.**

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it reportedly occurs occasionally. There is no formal procedure, although staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, the responsible physician or health administrator would advocate to the courts for a compassionate release. There is no formal hospice program, so if a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, and # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

### H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared basis among providers. At a minimum, a listing of current problems and medications should be common to all medical, dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions. The paper records are locked in a secure room (accessible to the clerical staff who manage the records), and the electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two senior medical records technicians, 10 technicians, one clerk and one office assistant. Some of the staff is located in the central administrative office, and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended that the facility continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system, or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours, and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every 15 minutes, and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, custody-ordered restraints are rare. A restraint chair is available for a maximum of two hours, with 15-minute intervals of monitoring by nurses. The lieutenant reported that in booking, occasionally a distraught inmate is placed in a holding cell until they calm down.

Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2, and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of

restraints, and we would recommend re-examining the practice of a nurse removing restraints, or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency.

There is a process in place through the courts for forced medications. We could not determine if there was anyone in this program. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed and revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** The facility lieutenant reported that health staff do not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice, the CIs seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions or living wills that an inmate arrives with would be honored. The provider notes in the health record that such instructions exist; there are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or do not resuscitate order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to

counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at this facility. During the second step of the receiving screening, the nurse may discover a new arrival is on an experimental medication. The usual procedure is to notify the responsible physician to guide the staff and patient in this community program.

**Recommendations**: A policy and procedure should be developed for medical research in the program. Using the compliance indicators, decisions may be put in place so staff has a clear idea of how to handle any request for research, or if a patient arrives on a medical trial or as a participant in a research project.

# Mental Health Report:

**LAS COLINAS RE-ENTRY AND DETENTION FACILITY**

**Staffing:   2.0 FTE Psychiatrists**
**1.0 FTE Psychologist**
**2.0 Mental Health Clinicians**

**Overview:** The mental health services at Las Colinas are provided by the psychiatrists, who conduct the 14-day assessments, prescribe and monitor psychotropic medications, and the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. They hold mental health clinics during the week, which are intended for individual counseling, but are often cancelled and are not sufficient to meet the need for mental health services. There is one psychologist whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 2.0 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications, 14-day assessments, and managing and operating the Psychiatric Security Unit (PSU) for women.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at LCDRF, about the requirements of the Safety Program and how to implement it. The expressed understanding at the LCDRF is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15 minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards. The facility psychologist is the only one who can remove somebody from suicide watch, and his only duty is involvement in the Safety Program. Staff members did not express an understanding of the design of the Safety Program, as described by the system medical director. Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the Safety Program, however, is that inmates who are identified as high risk cannot be released from the Safety Program prior

to 48 hours, while those who identified as being at low risk can be released from the program in 24 hours.

Inmates who have attempted suicide are not automatically placed on one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute observation status in a safety cell if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly do not receive suicide prevention training. It is a positive sign that they have started to receive an eight-hour class on the topic of mental health in jail, but apparently this does not include any suicide prevention training. Additionally, the mental health clinicians dare not trained to assess and manage suicide risk in the jail.

Despite the lack of an appropriate suicide prevention program, there have been no suicides at LCDRF in the past two years. The suicide prevention program requires significant improvement if this is to continue.

**Psychiatric Services:**
Psychiatrists do a good job of assessing inmates, treating those on psychotropic medications, and managing the PSU.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and manages them appropriately. However, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There appears to be a sufficient number of mental health professionals in the facility to meet the needs of the mentally ill, but it appears there is no system to ensure that their time is utilized to appropriately meet the needs of the mentally ill. It was reported that they only sporadically receive inmate requests for services, and that at times, it can be weeks before they receive these requests.

LDCRF has an impressive facility, and an area that is ideally suited for providing mental health treatment. It provides the appropriate level of confidentiality for mental health services, unlike any other facility in the system. If the system for referrals and provision of services can be improved, there is good opportunity to appropriately meet the mental health needs of the women incarcerated at this facility.

**Segregation:**
The mental health professionals reported that they have just begun doing segregation rounds weekly. This is a good step, and should help to ensure that inmates are not decompensating while in segregation. The mental health staff does not, however, screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement.

**PSU:**

The services provided at the PSU are much like what would be provided at a residential treatment facility. The inmates have groups five hours per day, and the natural light and set-up of the unit is conducive to stabilizing and improving the mental health of the participants.

The physical structure of the unit provides an opportunity for a therapeutic community program for more stable women. They are often on the unit for several months or longer, and could benefit from the therapeutic community model.

**NCCHC STANDARDS RELATING TO MENTAL HEALTH:**

**J-A-01:** **Access to Care:** **Not Met for Mental Health**
Inmates do not have their requests or referrals for mental health services responded to in a timely manner.

**J-A-10:** **Procedure in the Event of an Inmate Death:** **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:** **Grievance Mechanism for Health Complaints:** **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:** **Health Training for Correctional Officers:** **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:** **Mental Health Screening and Evaluation:** **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:** **Nonemergency Health Care Requests/Services:** **Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:** **Segregated Inmates:** **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit.

**J-E-13:** **Discharge Planning:** **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:** **Basic Mental Health Services:** **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:** **Suicide Prevention Program:** **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

**RECOMMENDATIONS:**

1. It is recommended that the system for providing mental health services be improved so that the adequate number of staff can meet the mental health needs of the inmates in this facility.
2. It is recommended that nursing staff who do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
3. It is recommended that mental health staff members see and address mental health grievances.
4. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.
5. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.
6. It is recommended that the facility consider developing a therapeutic community program for inmates in the PSU.

San Diego Sheriff's Department
Vista Detention Facility (VDF)
Technical Assistance Report
January 7, 2017

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system.

NCCHC Resources, Inc. (NRI) is a not-for-profit organization dedicated to education in the field of continuous improvement in the quality of health care in correctional facilities and other institutions. NCCHC Resources, Inc. carries out this mission by helping to improve health care delivery systems in jails, prisons, and juvenile detention and confinement systems. Its mission is based on a long tradition of standards set forth by NCCHC and quality assurance for health care services.

On November 8, 2016 the San Diego Sheriff's Department contracted with NRI for technical assistance regarding current compliance with the 2014 NCCHC *Standards for Health Services in Jails.* On January 7, 2017, NRI conducted its review for the Vista Detention Center (VDF). This report focuses on compliance with all essential and important standards. It is most effective when read in conjunction with the Standards manual. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards and 39 are applicable to this facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for each the following 26 essential standards:

<u>Essential Standards</u>
J-A-02   Responsible Health Authority
J-A-05   Policies and Procedures
J-A-06   Continuous Quality Improvement Program
J-A-07   Emergency Response Plan
J-B-01   Infection Prevention and Control Program
J-C-04   Health Training for Correctional Officers
J-C-05   Medication Administration Training
J-D-01   Pharmaceutical Operations
J-D-02   Medication Services
J-E-01   Information on Health Services
J-E-02   Receiving Screening
J-E-03   Transfer Screening
J-E-04   Initial Health Assessment
J-E-05   Mental Health Screening and Evaluation
J-E-06   Oral Care
J-E-07   Nonemergency Health Care Requests and Services
J-E-12   Continuity and Coordination of Care During Incarceration

J-E-13   Discharge Planning
J-G-01   Chronic Disease Services
J-G-03   Infirmary Care
J-G-04   Basic Mental Health Services
J-G-05   Suicide Prevention Program
J-G-06   Patient With Alcohol and Other Drug Problems
J-G-07   Intoxication and Withdrawal
J-I-01    Restraint and Seclusion
J-I-02    Emergency Psychotropic Medications

Essential Standard Not Applicable
J-C-09   Counseling and Care of the Pregnant Inmate

There are 27 important standards and 26 are applicable to this facility. Eighty-five percent or more of the applicable important standards must be met in order to attain NCCHC accreditation. Recommendations regarding compliance were made for the following 20 important standards:

Important Standards
J-A-09   Privacy of Care
J-A-10   Procedure in the Event of An Inmate Death
J-A-11   Grievance Mechanism for Health Complaints
J-B-02   Patient Safety
J-B-03   Staff Safety
J-C-02   Clinical Performance Enhancement
J-C-09   Orientation for Health Staff
J-D-03   Clinic Space, Equipment, and Supplies
J-D-04   Diagnostic Services
J-E-09   Segregated Inmates
J-E-10   Patient Escort
J-E-11   Nursing Assessment Protocols
J-F-01   Healthy Lifestyle Promotion
J-F-02   Medical Diets
J-G-11   Care for the Terminally Ill
J-H-04   Access to Custody Information
J-I-03   Forensic Information
J-I-04   End-of-Life Decision Making
J-I-05   Informed Consent and Right to Refuse
J-I-06   Medical and Other Research

Important Standards Not Applicable
J-C-08   Health Care Liaison

**Evaluation Method**

We toured the booking/receiving area, medical observation area, clinic area, dental area, indoor recreation area, inmate housing areas, mental health housing and segregation. We reviewed 17 health records; policies and procedures; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical and health services personnel and correctional officer (CO) training records. We interviewed the, day shift sergeant, physician, nursing supervisor, psychiatrist, psychologist, dentist, two COs, and eight inmates selected at random.

**Facility Description**

**Location:**  Southwest
**Built:**  1978 and expanded in 1989
**Security:**  Level 2 or medium
**Supervision Style:**  Direct and Indirect Supervision
**Bookings:**  32 to 50 a day/male and female
**Lay Out:**  Modular and Dormitory Housing
**Capacity:**  886 is the court ordered capacity
**Males:** 708     **Females:** 76     **Juveniles:** none
**Custody Staff:**  Not available; staffed days, evenings and nights

**Findings and Comments:**
**Special Note:** A mental health report summary and comments about the standards related to mental health care are at the end of this report. The standards that are addressed in this report have an * in front of the standard**.**

## D.  GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated.  Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**\*J-A-01  Access to Care (E).** Inmates have access to daily health care via written request slip, or notifying officers. Some areas are not timely, however, such as the receiving screening and the face-to-face evaluation after a request is triaged. Patients see a qualified clinician and receive care as ordered for their serious medical, mental health and dental needs. This is a medium-security facility, and "lock-down" is used as needed, but health and custody staff works together regarding the inmates' health needs regardless.

Inmates are charged a nominal fee of $3 for self-requested services and medications. Exceptions to the policy include clinic appointments, mental health care, and emergencies, amongst others. Indigent inmates receive care regardless of ability to pay. We also verified that inmates may file health-related grievances if necessary.

**There are no** recommendations regarding this standard.

**J-A-02  Responsible Health Authority (E).** The responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices (and rarely at the facilities). The on-site representative is the full-time nursing supervisor, who is also on call. Clinical judgments rest with a designated, full-time responsible physician, who is also normally in the administrative offices. There is no specifically designated, on-site responsible physician as the on-site physicians are contracted employees. Mental health service is integrated with medical services at all levels. Mental health clinicians are county employees, while the psychiatrist and psychologists have been contracted to provide services.

**Recommendations**: Compliance Indicator (CI) # 2 requires the RHA to be on-site at the facility at least weekly.

**J-A-03  Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. The program includes a formal utilization review process that responds to the patients' health needs appropriately.

We noted good cooperation between custody, medical, and mental health staff at all levels within the organization. Custody and health staff meets jointly to discuss the requirements of special needs and mental health patients. When appropriate, administrative decisions are coordinated with clinical needs so that patient care is not jeopardized.

Health staff participates in training with custody and are subject to the same security regulations as other facility employees.

**There are no** recommendations regarding this standard.

**J-A-04  Administrative Meetings and Reports (E).** This program is conducted through a variety of meetings, which are all documented with action items and distributed appropriately. The facility's monthly operations meeting (to discuss administrative matters) include medical representation. The entire detention service bureau meets monthly, with medical administrators in attendance, to discuss facility-wide issues. The medical director meets with all the clinicians every two weeks. The medical supervisors meet monthly with all facility supervisors, CQI, and infection control representatives. Health staff meets every week to discuss health services operations. Attendees include the onsite physician, nursing supervisors, charge nurses, mental health, and nursing staff.

Other meetings include the quarterly CQI, medical service administrative mangers, public health meetings, monthly contractors, transportation meetings, policy and procedure meeting, site-specific weekly meetings of the patient care coordinating committee, and multidisciplinary team to discuss service coordination between custody and health staff.

The facility administrator, supervisors, and custody administrative staff receive extensive monthly statistical reports of health services utilization. These reports are used to monitor trends in the delivery of health care.

**There are no** recommendations regarding this standard.

**J-A-05  Policies and Procedures (E).** The health services policy manual covers the entire system, with a few procedures describing site-specific items. The policies are well written, with clear subject headings, purpose, policy, and procedure using the subjective, and objective assessment plan organization. They note compliance with the state's legal corrections standards. If accreditation were pursued, the addition of the NCCHC standard to each policy and procedure would by recommended.

The multi-disciplinary Policy and Procedure Committee meets quarterly to review, revise and update procedures in sections. The index of policies and procedures lists the revised and reviewed annual dates of each policy. In the current index, most were reviewed in 2015, although some were reviewed in 2016 and 2013.

The policies are accessible to health staff online.

There is no document that recognizes the RHA and responsible physician's review of all the procedures.

**Recommendations:** CI # 1 requires the procedures to be site-specific. When reviewing the procedures, it is recommended to review the use of the procedures and include those areas specific to a certain facility. When it is added to the general procedures, it decreases the need for sites to have their own procedures. Each jail has unique processes that should be documented in the standard. Some facilities list the various jails at the end of the procedure, and note how they comply with the procedure.

CI # 2 recommends that the policies include the signature of the RHA and responsible physician. A cover sheet documenting annual review by the RHA and responsible physician may be used, or review by both can be documented on the individual policies.

**J-A-06  Continuous Quality Improvement Program (E).** The CQI program meets quarterly both at the central office and at each jail. The central committee chairperson coordinates the meetings and activities of the committee, which is comprised of the medical administrator, responsible physician, facility supervisors, medical records, clinicians, pharmacist, and mental health representative. Facility-specific quality meetings include custody, medical and mental health representatives, with the medical supervisor as the chairperson. The minutes of the main CQI meeting list each facility and the risk areas addressed at each for that month.

The committee minutes reflect monitoring activities of risk areas, discussion and action steps to be taken, although documentation is lacking. The identified studies are not documented, nor is the effectiveness of the corrective action plans. The committee identifies problems, establishes thresholds, designs monitoring activities, analyzes the results and monitors performance after implementing improvement strategies.

The CQI committee has completed some studies. One project resulted in a revised policy and procedure for a patient safety program to identify those inmates at risk for suicide. The committee did not maintain any notes or minutes from the project, only the resulting policy and procedures.

**Recommendations**: CIs # 1, # 2 and # 3 address all components of monitoring and implementation. With the physician's guidance, the committee establishes monitoring activities and thresholds for studies, and completes those studies. CI # 4 explains process and outcome

studies, and also emphasizes documentation of these steps, what action steps are to occur, and what happened when re-studied. CI # 5 states that the CQI committees should evaluate the effectiveness of the committee's work annually and document that in the minutes.

**J-A-07  Emergency Response Plan (E).** The RHA and the facility administrator have approved the health aspects of the emergency response plan, which includes some of the required elements. Health and custody staff work together to plan the drills in accordance with the facility's emergency plan. The annual drills occurred on the day shift, but there was no documentation. The scenarios were described as an active shooter, use of the restraint chair in a medical emergency, hostage scenarios, and an inmate disturbance. The scenarios are developed centrally and sent to the facilities for staff to conduct. The drills were critiqued and shared with staff via the training bulletins and at the weekly staff meetings.

The facilities plan a monthly or every other month man-down drill. They do occur on each shift and are described as man on the floor, man down in video court, cell extraction. They are all drills, critiqued and shared with staff.

**Recommendations**: Review the standard for elements that may be missing in the emergency plan. CI # 1d requires a list of health staff to call in an emergency. CI # 1f describes time frames for response. The onsite contract physicians do not participate in the drills and consideration should be given to having a physician participate. CI # 2 describes that the drills should occur on rotating shifts so each shift's staff may participate. CI # 3 addresses man-down drills occurring once each shift annually. In a large facility, actual man down events would be a valuable tool and should be critiqued and shared with staff afterwards, as an actual mass disaster event can be.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs via email, special needs/equipment lists, and verbally. The classification unit is reported to work well with medical staff regarding inmates' housing needs. The patient care coordination committee (PCCC) and the multidisciplinary team meetings (MDT) include the participation of custody and health staff, and they discuss inmates' special needs, including mental health.

**There are no** recommendations regarding this standard.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information is usually conducted in privacy. In this jail, the deputy escorts the patient to the clinic and remains in the hall during the appointment. Only when the patient is unstable, do officers remain in the room. Health encounters in the housing areas are as confidential as possible. At this jail, the mental health clinicians mentioned that they conduct many interviews through glass windows in the doors, which means staff or other inmates can overhear.

**Recommendations**: The areas of privacy and confidentiality of care need to be addressed. CIs # 1, # 2 and # 3 require procedures to assure confidentiality when health care is being delivered and discussed. These are not met. CI # 4 is met as staff is trained annually on HIPPA and confidentiality; however, facility practices do not allow for confidentiality to occur in all areas of the jail.

**\*J-A-10  Procedure in the Event of an Inmate Death (I).** For the last two years, 2015 and 2016, there have been eight inmate deaths, of which four were reported to be of natural causes,

and four by suicide. The administrative review and clinical mortality reviews were not completed in a timely manner. Also, there was no evidence that the results of the reviews, when completed, were shared with staff at the facility. The nursing supervisor attended the mortality review for the suicide that occurred in 2016 and shared the information with the staff.

**Recommendations**: The compliance indicators for this standard are not met. All deaths must be reviewed within 30 days and cases of suicide require a psychological autopsy (in addition to the administrative and clinical mortality review). Treating and general health staff must be informed of the review findings. Maintaining a log of dates of the death, review, autopsies and sharing with staff, would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews.

**\*J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated in the formal grievance program. The goal is to solve patient complaints at the staff level as soon as they become known. Inmates place their complaint slips in the medical grievance box, which a nurse empties once a day. They then triage and answer the complaints, and give the inmate a copy of the results. All grievances (health and custody-related) are logged into the central computer system. It was reported that this central list is long and it is hard to track or count the medical grievances. The numbers were not available at this facility.

At this facility, an average of six health-related grievances, including mental health, are filed a day (more than 150 a month), which seems excessive. This would be a good topic for a CQI study in order to identify trends. The standard appeal procedure is seven days for level one and 10 days for levels two and three.

**Recommendations**: Compliance indictors # 1 and # 2 are met. We recommend that grievances not be placed in the patients' health record as it will be subject to sharing with others when the records are requested.

We recommend that in addition to logging in the grievances in the central data base, health staff maintains their its own grievance data base for their respective facilities to facilitate tracking resolution and possible CQI trends, either monthly or quarterly, for possible patient care issues.

## B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

The standards in this section address the importance of preventative monitoring of the physical plant.  Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The policy and procedure manual outlines environmental cleaning and precautions to prevent infections. The infection control nurse/training nurse monitors and tracks all infectious diseases in all the jails. He also manages the tuberculosis program, prepares mandatory disease reports to the state health division, monitors the negative pressure rooms, and all laboratory results, especially any infections. Patients with communicable diseases are housed in one of the five negative pressure rooms in the MOB in the jail, or in the positive pressure room (for total isolation). The negative airflow

isolation rooms are checked annually by an outside company that specializes in airflow monitoring. They are also monitored daily. Ectoparasite treatment is carried out in accordance to procedure, with prescribed medications as indicated.

The sheriff's department risk management officer inspects the jail, including medical areas, monthly and submits a copy of the report to medical administration staff for review. We suggested that health staff develops a monthly medical area inspection checklist to ensure nothing is overlooked. Sharps containers, autoclave spore checks, biohazard containers, and refrigerator checks, amongst others, are not part of the monthly list.

**Recommendations:** CI # 1 requires a written infection control program that outlines the program in the jail system. The responsible physician is to approve this program. The infection control nurse should be a member of the CQI committee and report on activities at each meeting. CIs # 2 through # 9 are met as these surveillance activities are accomplished by the infection control nurse, along with release planning for those with communicable diseases. The infection control nurse is also responsible for training. Due to his many assignments, an analysis of this job description would be helpful to make sure all the program needs are met. CI # 9 would be enhanced with a focused environmental inspection for medical services by a health staff member, to encompass those areas not inspected by the risk management officer.

**J-B-02  Patient Safety (I).** The program includes an "occurrence report" to document adverse incidents, as well as a medication error report. Staff indicated no barriers to submitting such reports, which are reviewed during CQI and staff meetings for trends. The nursing supervisor at this jail reports that staff does report safety issues and discusses them in staff meetings. Other safety mechanisms include "watch medication" status for Coumadin, and mental health medications such as Librium.

**Recommendations:** As stated in the compliance indicators, the RHA could be involved in a program to improve patient safety. One means of improving patient safety would be to change the pharmacy program to eliminate bulk packaging by the nurses. Taking from a stock bottle and putting in an envelope to administer is not a safe, accountable practice. Another area would be the administration of prescribed medications to women prior to a pregnancy test being given. Many medications are harmful or potentially harmful to a fetus. Knowing a woman's pregnancy status before administering medications is imperative.

**J-B-03  Staff Safety (I).** Health staff appear to work under safe and sanitary conditions. The jail is well lit, clean, and well maintained for an older jail. The space for health is limited, but the health staff has made great effort to keep it organized and to maximize space. The nurse's station is next to the clinics and the MOB area. The health staff work together to ensure assignments are completed when assistance is needed, which in turn ensures timeliness of care and safety for the nurses.

**Recommendations:** Staff may benefit from wearing radios (not available at the time of the visit), or implementing a call system in order to be notified of emergencies or to call if in an emergency. The exam rooms do not have call buttons. Because of this, officer presence is necessary to ensure safety.

**J-B-04  Federal Sexual Abuse Regulations (E).** The sheriff and facility commander described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. We

observed posters in the housing areas, and the inmates also watch a PREA-related video during orientation. Health and custody ask personal history questions during the booking process.

**There are no** recommendations regarding this standard.

**J-B-05  Response to Sexual Abuse (I).** When an incident occurs, the victim is referred to the community facility for treatment and evidence collection. Upon the inmate's return, any discharge orders or medications are implemented and the inmate is referred to mental health services. Custody staff is also involved in each incident so that the authorities may effect a housing separation of the victim from the assailant. The nursing supervisor reported that there have not been any incidents in the jail for "a long time".

**There are no** recommendations regarding this standard.

## C.  PERSONNEL AND TRAINING

The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff.  Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. Staff in the Department of Human Resources checks the credentials of provider staff, the nursing supervisor at each site checks nurses and other certified staff to ensure the licenses are current and unencumbered. The various companies that have been contracted to provide the services of the providers (physician, psychiatrist, et. al.) complete the hiring process and send copies of the credentials to the jail's nursing supervisor, who keeps them on file with the other credentials. Copies of licenses are maintained in the central administrative office, as well as with each site's nursing supervisor. Human Resources and the nursing supervisors also check references for any sanctions or disciplinary actions, as well as the National Practitioner Data Bank. There was no one on staff with a limited license. The nursing supervisor reported that copies of licenses for all licensed staff were in his office.

**There are no** recommendations regarding this standard.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually.

There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or for nurses. All health employees undergo annual performance reviews, but there is no peer or direct patient care review component. Each nursing supervisor maintains a log of annual performance reviews.

**Recommendations**: Compliance indictors # 1 through # 5 specify clinical performances for direct care clinicians annually, reviews are documented and kept confidential, independent review when there is serious concern about an individual's competence and procedures implemented with competence action is necessary. Each clinician providing direct patient care should have an annual review for performance in patient care which is completed by a professional in the same classification, e.g., an RN reviews the work of an RN, a dentist reviews the work of the dentist, etc.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits and all were current in cardiopulmonary resuscitation (CPR) training. There is an annual training program consisting of monthly skills fairs, annual training sessions, and various policy and procedure orientations. Each staff member can log his or her training hours electronically or in writing.

The State of California requires mandatory continuing education hours for nurses and LPNs (30 hours every two years), physicians (75 hours every two years), and some for mental health and dental professionals. Eight health staff throughout the system was also CCHP-certified.

**There are no** recommendations regarding this standard.

**\*J-C-04  Health Training for Correctional Officers (E).** Correctional staff had most of the required training in health-related topics and all were current in CPR (provided by certified health staff). The training nurse works with the custody training officer to coordinate the training. Annual health training topics include collaborative disaster, restraint chair, man-down, fire and evacuation, and mental health patient issues. There does not seem to be a central log of training. The training nurse coordinates training sessions and monitors compliance. Attendees sign rosters to verify participation, and this is entered into individual training logs.

**Recommendations**: CI # 1 requires health-related training for all officers who work with inmates at least every two years and specifies the required topics. Health staff should insure that all health related training is completed. CIs # 2 through # 4 appear to be in compliance with the standard.

**J-C-05  Medication Administration Training (E).** Only health staff (usually LPNs) administers medications. When staff is hired, they are oriented to the medication delivery process. There was no notation on the checklist for state laws, side effects, and security matters.

**Recommendations:** CIs # 1 through # 3, describe the training program to be approved by the responsible health authority, facility administrator, and designated physician, for health staff so they are appropriately trained in administering medications. The pharmacist would be an important component for evaluating the knowledge level of the LPN staff as to the desired effects of medications and possible side effects and to provide patient education on these issues.

**J-C-06  Inmate Workers (E).** Inmate workers are not employed in a health care delivery capacity, either in the MOB or clinical areas. They clean the floors and empty the trash. Nurses clean the clinic spaces. Inmate workers work in the kitchen and have been trained to do so by the kitchen supervisors. They can earn their food handler certification. There are no peer health-related programs at this facility.

**There are no** recommendations regarding this standard.

**J-C-07  Staffing (I).** The heath staff is scheduled for 10-hour shifts with every other weekend off. Full-time staff includes 25 RNs and 12 LPNs. Seven RNs are scheduled for the day shift and five for the night shift. Three LPNs are scheduled for each shift. Actual working hours may vary to accommodate the work load or medication round schedules. The contract physicians hold clinic seven days a week from 8:00 am until 12:00 pm and are on call on a rotating schedule 24 hours a day. Mental health staff consists of two full-time clinicians, including a psychiatrist.

At the time of our visit, vacancies consisted of three RN positions. Two new hires were pending orientation. Temporary agency staff is also used to fill vacancies.

This jail is unique in that staff rotates assignments and cooperate particularly well to balance the work load. The nursing supervisor attributes their ability to keep up with requests for care, emergencies, and bookings to teamwork and good communication amongst the staff. He reported turnover is rare, and that the vacancies were recent.

**There are no** recommendations regarding this standard.

**J-C-08  Health Care Liaison (I).** Nurses are on site 24 hours. The standard is not applicable.

**J-C-09  Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new employee receives two weeks orientation at the central administrative offices. This includes personnel, benefits, medical records, emergency response, and readiness for onsite orientation. The next six weeks are spent in orientation at the facility of assignment, where new staff is assigned a preceptor. They review all aspects of the facility: security, inmate population, job description, and skills competencies. Each new hire, is given an RN or LPN Preceptor Toolkit that consists of check lists along with procedures and skills information. These check lists are reviewed before the orientation ends with the nursing supervisor in order to determine if more time is needed. All compliance indicators, except CI # 2 are met.

**Recommendations:** CI # 2 requires that the orientation program policy and procedure be reviewed once every two years by the responsible health authority. The current procedure was last revised in 2013.

## D.  HEALTH CARE SERVICES AND SUPPORT

The standards in this section address the manner in which health services are delivered–the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01  Pharmaceutical Operations (E).** An in-house pharmacy provides services for this system and a local pharmacy has also been contracted to provide emergency and/or after-hours service. Medications are ordered from a warehouse.

The staffing consists of two (2) full-time pharmacists, four (4) pharmacy technicians and one (1) pharmacy stock clerk. Daily support to all the facilities is available, but supplies delivery is once

a week. The nurses pull from stock if the ordered medication has not arrived yet. The pharmacy is located in the central administrative building and was not part of the tour.

We determined that the pharmacists do attend some administrative meetings, which is very important to coordinate service delivery.

Each facility has a medication room which varies in size from small to quite large. When orders are written by the providers, nurses enter them into the jail management health record via the "works" program. The medications are then delivered weekly in stock or unit dose packaging. When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk, with a sign out sheet to document who received that narcotic medication.

The pharmacy technician goes to each jail once a week to add main stock medications so a two-week supply is maintained. The supervising nurse at each facility inspects monthly. The pharmacist goes to each jail once a month to conduct random narcotic sign out checks and once a year to inspect and inventory the medication rooms.

When the medications arrive at the facility, they are placed in labeled bins. Controlled medications are sent out to the jails in bulk with a sign out sheet to document who received that narcotic medication. At the facility, the LPNs put medication labels on an envelope, and pre-pour medications from the stock into envelopes for their assigned rounds.

The 15-page policy and procedure for the pharmacy program, revised on October 13, 2016, addresses each of the 11 compliance indicators in the standard, along with information on discharge medication, error reporting, CQI, and returning medications to the pharmacy. At this facility, the medication room was organized with stock bottles and stock unit dose containers. The room was furnished with a refrigerator, and locked cupboards for narcotics. Medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. A standard medical and mental health formulary was in place, as was a non-formulary request procedure. CIs #2, #4, #5, #7, #8, and #10 were met.

**Recommendations:** Even though there is a detailed program in place to provide pharmaceutical services to detainees, various areas in the program should be evaluated for compliance with Board of Pharmacy, nursing, and DEA regulations, and staff safety.

CI # 1 requires compliance with state and federal regulations. This should be researched to verify nurses administering from stock bottles is an approved practice. Also, it should be verified that the pharmacist is authorized by law to change Coumadin orders based on the INR without consulting the physician.

CI # 3 describes accountability and control of medications. There does not seem to be any accountability when medications are received in the medication rooms. The nurses put them on the shelf, in the proper place, and fill envelopes from that stock. There is no inventory or other control when bottles or unit dose containers, when they are removed and by whom. There is a list of "watch take" medications, where the nurses watch the person take the medications and then check the mouth. Only psychotropic, narcotic and hepatitis C medications are checked, while other medications, some equally dangerous, are not as closely monitored.

Compliance # 6 requires medications be under the control of appropriate staff. We did not see any key accountability logs, or signing in and out of the medication room. It seemed that everyone had a key to the medication room.

CI # 9 requires a pharmacist to inspect the medication rooms at least quarterly. In this program, the pharmacist inspects annually. Review of the pharmacy rules would clarify if this is adequate, since the pharmacist is in the program. This CI may be met since the pharmacist does monthly narcotic checks at the facilities.

CI # 11 requires that the poison control numbers be posted for accessibility to staff.

Other areas of concern were the over-the-counter medications in the nursing protocols were all prescription doses. Also, incoming detainees wait three (3) days before receiving HIV medications, even when they are enrolled in a community program.

**J-D-02 Medication Services (E).** Medication services are provided in some areas of the system in a timely, safe and sufficient manner. As described above, the central pharmacy receives all orders and sends the bulk or unit dose medications to the medication rooms. For medication rounds, LPNs put doses of medication into labeled envelopes before taking the cart or basket to the housing areas for administration. Since this process is time-consuming, LPNs share medication rounds, one going first for a certain number of patients, and then the second nurse finishing.

The policy in place describes pharmacy services, but not time frames between ordering and receiving. The responsible physician and pharmacist are involved in pharmacy services and on committees, although we were unable to evaluate what policies were in place to order prescriptions, and what were the practices and oversight for providers' ordering practices.

Patients entering the facility are continued on their current medications, but it takes a few days to receive the orders and medications. HIV patients should receive their medications very soon after booking. A limited KOP (keep-on-person) medication program is in place, consisting mostly of creams, lotions, and ear or eye drops.

CI # 6 is in compliance as the pharmacist reviews all the records for renewals. This is a huge task, and automation or routine chart review schedules would help the providers schedule medication renewals.

**Recommendations**: CI # 1 is not in compliance as nurses use nursing protocols to decide about medications and administer them to patients without receiving an order first. (See J-E-11).

CIs # 2 and # 5 address medications being delivered in a timely fashion. Some essential medications are delayed due to the length of the booking process and some delays in administration due to "lock-down" status. Nurses are not able to see patients during lock-down periods. There is no procedure in place to evaluate who is on essential medications or how to work with custody staff for a solution. CI # 3 requires the responsible physician to determine prescribing practices. Without a peer review or chart audits of the contract physician's ordering practices, this cannot be validated.

The main standard description states that services are clinically appropriate and provided in a timely, safe and sufficient manner. This program is in need of evaluation as nurses' licensure

does not allow them to take from a stock bottle, and place it in an envelope to administer, unless it is an emergency or under the direct direction of a provider. Nurses in this system routinely do this. They do not take the MAR (medication administration record) with them, so there is no security check for names or allergies, or which medications are to be administered at that time. This is actually dispensing, and only pharmacists and providers may dispense. This violation of nursing practice is serious. A change to individual patient-specific/individually labeled medications must be considered to provide a safe pharmacy program. The lack of accountability is evident as there is no inventory control practice for medications (order and delivery), or require reordering.

**J-D-03  Clinic Space, Equipment, and Supplies (I).** The clinic area includes two exam rooms, a dental chair, a medication room, a records room in the nurses' station, a lab area in a clinic room, a patient waiting room, a radiology/x-ray room (digital in the receiving area), a small nurse's station with records space, and a couple of supply rooms. The nursing supervisor reported that mental health clinicians have a private area to see patients and sometimes they go to the cell to evaluate a patient, especially when the patient is in segregation. The booking area also has some medical space, including sobering and safety cells, and two nursing areas.

Items subject to abuse are not counted each shift. Three emergency crash carts are checked each shift. Five automated external defibrillators (AED) were strategically placed around the facility.

The clinic contained all the equipment necessary to take care of the patients.

**Recommendations:** Compliance indicator # 7 requires that weekly inventories on items subject to abuse (syringes, needles, scissors etc.) This procedure should be put in place and maintained.

**J-D-04  Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, pregnancy test kits, and drug screen urine dipstick and multiple-test dipstick urinalysis. Males and females are housed at this facility.

The AEDs are checked regularly. There is no manual of laboratory tests or equipment in the clinic area.

The dental operatory is fully equipped with everything except an oxygen tank, although one is nearby in the clinic. As there was no dental staff on site, we were unable to verify the dental sharps count.

A representative from an outside laboratory service retrieves samples regularly and returns the results by phone or fax. X-ray services can be provided in the booking area. A contracted technician comes daily. Panoramic dental x-rays can be taken in the clinic. Optometry, CAT scans, and ultrasound examinations are offered in the community. Other services such as CAT scans and ultrasound examinations are provided in the community. The responsible physician has ensured all licenses, inspections, and certifications necessary are maintained for all the equipment. A current CLIA waiver was posted. The x-ray license is current until June 30, 2017 and filed in administration offices.

**Recommendations:** CI # 2 requires a procedure manual for the use of equipment and a calibration manual for any x-ray machines.

It is recommended that a system be established for mental health staff to receive their lab results. Reportedly, they receive fewer than 50% of the results when such tests are ordered.

We also noted that lab results were not in the chart and nurses had to manually document the results on a chart review. A more effective system is necessary.

Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through records review that off-site facilities and health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns without instructions, the nurses call the provider's office and have it faxed to them. The nurses review the orders, call the on-call provider for orders, or arrange for the patient to be seen the next day.

Both telemedicine and mental health appointments are scheduled regularly. Two nearby hospitals provide care as needed. The responsible physician meets with the staff at one of the hospitals quarterly to assure procedures are followed and communication is open. Some services, such as optometry, are provided in the community.

**There are no** recommendations regarding this standard.

## E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Since this is a transfer facility, most inmates have had orientation to health services at the booking facility. At this facility, the inmate orientation video is shown in all the housing areas. We noted there were signs in each housing area addressing how to request care, and the various fees, and HIPPA. The signs and the video are also in Spanish. Inmates who speak other languages or have a hearing impairment can use an AT&T language line or TTY, respectively. A few staff members are also familiar with sign language.

**Recommendations:** CI # 2 states that within 24 hours of entering a facility, inmates are given written instructions on access to care, the fee-for-service policy, and the grievance process. An inmate manual or handout should be developed. Some facilities have a manual that inmates may borrow and return and other have it posted. Based on the results of inmate interviews,

surveying the inmates to evaluate the effectiveness of the orientation video would be a good CQI project. Most of the inmates we interviewed said they did not see it.

**J-E-02  Receiving Screening (E).** When new admissions arrive directly from the community two nurses complete the receiving screen immediately upon arrival. The pre-booking or "medical clearance" screening is accomplished as part of the complete screening. They complete the two forms at the same time. If the nurse feels an arrestee needs to go to the hospital, he/she works with custody staff and the arresting agency to arrange this.

Inmates of both genders are "booked" at this facility. Females are tested for pregnancy, and if positive and necessary, begin the opiate protocol. Pregnant females are transferred immediately to a facility that can meet their needs.

If someone arrives on methadone, an oral methadone bridge is used until a plan with a community clinic can be arranged.

The nurse takes vital signs and asks questions about injuries, suicide risk, medications, recent hospitalizations, and other health problems. If the arrestee is semi-conscious, bleeding or severely intoxicated, s/he will be sent to the emergency room. The nursing supervisor explained that there still is an issue with nurses completing pregnancy test and a urine drug screen before starting the inmate on prescriptions medications.

The full booking procedure at this facility takes from two to six hours. It includes contraband screening, a chest x-ray to rule out tuberculosis, and housing in a sobering cell if needed. Safety cells can also be used to monitor inmates for their behavior.

The nurses initiate the standard nursing procedures when identified and call the on-call physician for orders to continue medications after they have been verified.

CIs # 1 through # 9 and # 13 are met at this jail due to the timeliness of the complete screening. CI # 4 is met as the nurse completes pregnancy testing on the incoming females. Since CI # 11 references corrections officers completing the screening. It is not applicable as nurses do the screenings at this facility.

**Recommendations:** This jail complies closely to the intent of the standard. Two and sometimes three nurses complete the screening and follow up with a plan of care. Some areas of the form are not complete and need to be revised to include the mental health and dental questions. The receiving screening procedure at this jail assures timely screenings for each new arrival. As with the other reports, there were no access-to-care signs in the receiving area. When all the appropriate questions are added to the receiving screening, the facility will be in compliance.

CI # 6 (a) though (k) address the required elements for the receiving screening form. While most are included, adding dietary needs and recent communicable diseases symptoms, along with the mental health and dental questions, would meet the needs for compliance.

CI # 8 describes the disposition of the inmate. This is not part of the receiving form and should be added. It communicates whether the person would go to general housing, medical observation beds, or to sobering/safety cells. This is important for the next health care person to know what was present in booking.

CI # 12 requires that health staff should regularly monitor the effectiveness and safety of the receiving screening process. This can be done in quality improvement committee or in another format.

**Special Note:** The booking/receiving screening process at this jail may be used as an example for the quality study of a coordinated, timely, and thorough screening of incoming detainees. This is the safety net to ensure the health status of newly arrived inmates is known and to prevent crisis/death.

**J-E-03  Transfer Screening (E).** Reportedly, 50 to 100 transfers a day arrive at this facility from the others. A transfer review procedure was initiated three months ago, with a goal of a nurse's review within 12 hours.

The nursing staff receives from classification staff a list of transferring inmates when they arrive. The RN reviews each incoming patient's health record for problems, treatments, medications and appointments. This is completed in the electronic jail management program that houses the electronic record. A "Confidential Medical/Mental Health Information Transfer Summary" is in place for those inmates who are going to a state facility or a jail in another county.

**Recommendations**: CI # 1 sets the time for the review with the inmate's arrival at the facility. Our chart reviews indicated few notes concerning completion of the reviews. Sometimes there was a note from the sending facility that the patient was going, but no note about a review when they arrived. One chart said "cleared by RN and chart checked by MD" at the next facility.

CI # 2 requires that if someone is transferred from the booking facility to another jail with no completed receiving screening, the receiving nurse schedules the inmate and sees that it is completed. This is important for receiving facility health staff to be familiar with the health status of arriving inmates.

CI # 3 requires all the components are part of the policy and procedures. This should be added to the procedure manual index and staff trained on its importance to maintain continuity of care. Key elements are time-of-arrival notations, time of the review, and any plans for care in the new facility.

**J-E-04  Initial Health Assessment (E).** There is no program to ensure inmates receive an initial health assessment within 14 days of incarceration.

**Recommendations**: The standard should be reviewed to determine the best option for the staff and patients. The individual health assessment is quite different from the full population health assessment. While it is rare for a program or facility to qualify for the individual health assessment, it may be an option.

The full population health assessment is the most common, and with "stage 2" booking area and availability of RN and nurse practitioner staff, this should be considered. Average length of stays can help determine when the assessment should be completed.

The current process has the nurses making appointments for physicians from the booking information and the provider sees the chronic disease patients in about a week, with a very short note. If an initial health assessment was in place, when the providers saw the patient for the first time, there would be history, verified medications, labs and physical information. If a

nurse practitioner was completing these assessments soon after booking, orders for medications and chronic disease protocols could begin in preparation to see the physician.

The full-population health assessment requires compliance with CI # 1 through # 4, and the individual health assessment requires compliance with CI # 5 through # 8.

**\*J-E-05  Mental Health Screening and Evaluation (E).** The mental health screening is completed by the nurse during the stage 2 of receiving screening. (The nurse asks a few questions during stage 1.) There is no 14-day screening and evaluation program after the receiving screening is completed. The nurses refer anyone with mental health history to the mental health team, who then sees the patient and develops a care plan. The mental health clinicians see the patients first and refer them to a psychiatrist or psychologist. CIs # 3 through # 7 are in place and the policy and procedure revision may include all the questions needed and the evaluation.

**Recommendations:** The mental health screening form requires revision to include all the required questions/observations. RNs should be trained by a mental health staff. The referrals from booking to mental health could reflect a 14-day evaluation if that program was in place. If a formal program was in place, there would be policy and procedure, tracking logs/lists, and staff assigned to complete the evaluations by the 14th day of incarceration. The mental health team does complete many evaluations for those with positive screenings, although they are not tracked for timeliness.

CI # 1 requires that, within 14 days of admission to the correctional system, qualified mental health professionals or mental health staff conduct initial mental health screening. CI # 2 lists all the history and current status questions needed for the form. Some, but not all, questions are already asked at booking. Logs or other tracking process should be developed to ensure those patients with positive mental health screening are seen by the mental health team.

**J-E-06  Oral Care (E).** The oral screening questions are asked during the second stage of booking, although there is no inspection of the inmate's mouth. This could be added to the first stage, as described in the receiving screening standard. The nursing assessment protocol includes treatment for abscesses, for which the nurses order the medications.

There is no 12-month examination by a dentist. There is no evidence of inmate education on oral hygiene and preventive oral education. The dentist is on site one day a week, and sees patient upon a nurse's referral. The dentist completes extractions and provides the rare filling. The dentist also may send complex patients to another jail with more dental time. The dental list shows there is no backlog of dental appointments and they are seen in a timely interval.

**Recommendations**: CI # 1 and # 2 can be met by incorporating oral screening/education into the upfront booking process and the dentist can train the nurses to conduct the screening. CI # 3 can be met by pulling a list of inmates in the facility for 11 months and schedule for a dental exam by 12 months. Since the timeliness of the oral screen is 14 days, and oral hygiene instructions are 30 days, the screening can be completed by the trained nurse during the initial health assessment. The initial health assessment, mental health screening and evaluation and oral care may all be accomplished by having a trained nurse complete the assessment.

**\*J-E-07  Nonemergency Health Care Requests and Services (E).** Inmates request health care by placing a request slip in a locked box on each housing area. A nurse retrieves them

each night and brings them to medical services where they are date stamped and triaged as to the nature of the complaint (health, dental, or mental health) and assigned a triage level. Level 1 is urgent and the inmate is scheduled the same day or next to be seen. Level 2 is semi-urgent and the inmate is scheduled to be seen in two to four days. Level 3 is non-urgent and the inmate is scheduled to see a provider in seven to 14 days. The nurses assign the level based on published guidelines. Mental health is scheduled with similar levels. Mental health has a medical request triage system also. They schedule appointments in response to urgent, semi-urgent and non-urgent requests. When reviewing the clinic lists, we found an average of eight days to see the nurse and some were 12 to 18 days. For the physician, the lists were five days out, with some at eight to 12 days.

At this facility all inmates have access to the locked boxes for their requests to remain confidential. Also, there were no backlog of requests. The nurses pick up, triage, and see the patients as indicated in the procedure. While the procedure does not require a face-to-face assessment within 24 hours of triage, the inmates are seen by a nurse.  CIs # 2 through # 5 are met

**Recommendations**: Compliance indictor # 1 requires that a qualified health professional has a face to face encounter with the patient within 48 hours of receiving request that describe a clinical symptom. This is not completed. The nurse assigns a triage level without seeing the patient. This standard requires a trained professional to see the patient before assigning the plan of care or level of care needed. What may be a headache to the patient may be a stroke symptom or constipation a symptom of an infected appendix. The intent of the standard is for those requesting care be evaluated first. The request slip should be revised to include the date and time of receipt and triage. This would assist in quality improvement audits and administrative reviews for the timeliness of the procedure and to ensure no backlogs of forms triaged but not seen by a nurse.

**J-E-08  Emergency Services (E).** Nursing staff is on-duty 24 hours a day and can respond to emergencies in the facility. The emergency carts are stocked with suction, an AED, and other emergency medications. 911 services are called as needed, and the hospital is within 15 miles. CIs # 1 through # 3 are met.

**There are no** recommendations regarding this standard.

**\*J-E-09  Segregated Inmates (I).** There were approximately 235 inmates in segregation/administration segregation and protective housing cells. The mental health staff conducts weekly segregation checks, and they note on the list whether the patient has been seen and if they are on the mental health case load. There was no notation about their mental condition, hygiene, orientation, or how they were adjusting. The nursing supervisor reported that nurses go on segregation rounds three times a week, although there was no documentation to support this.

**Recommendations:** The intent of this standard is for those inmates housed in isolation to be monitored by health staff. The level of isolation is outlined in the standard, and on the tour, most areas seemed to be at the level of limited contact with staff or other inmates. This requires health rounds three times a week by a nurse or mental health staff member.

The standard states that it is necessary for health staff to be notified when an inmate is segregated so they can review the record and confirm the frequency of health rounds. These

checks must be documented in the health records as to date, time, and relevant observations. There are a variety of ways to comply with the standard, including to use a form for each inmate in isolation to document the checks from the beginning to release. This record should be scanned into the electronic health record. At the time of the visit, there was no notation of segregation checks in the health records.

Both custody and health staff acknowledged emerging research on the effects of segregation and isolation.

**J-E-10  Patient Escort (I).** Patients are escorted to on-site and off-site clinical appointments in a timely manner. Custody staff was proud of their support for medical services, particularly regarding patient transport on-site and off-site). Transporting officers are alerted to special accommodations such as medication administration or communicable diseases. Paperwork is sealed in an envelope and returned to medical services the same way to protect confidentiality.

CIs # 1 to # 3 are met.

**There are** no recommendations regarding this standard.

**J-E-11  Nursing Assessment Protocols (I).** Nursing assessment protocols, also known as standardized nursing procedures in this program, include prescription medications for emergency situations, as well as routine health conditions: alcohol withdrawal, chronic care, and infections. They are drafted in sections (patient condition, subjective, objective, assessment and plan format) with guideline for the nurses to evaluate the patient's complaint. The treatment plan section includes over-the-counter and prescription medication, including Librium, Dilantin, insulin and antibiotics. There are no instructions to call a physician before starting medications.

The responsible physician and nursing administrator last reviewed these in 2013, although a few were written in June 2016. The nurses are trained in the procedures, along with policies and procedures and other diagnostic and treatment skills, during monthly skills fairs.

**Recommendations:** CI # 1 assures that the protocols and procedures are reviewed annually by the health administrator and responsible physician. Only a few had been reviewed in 2016. Most had review dates of 2009 or 2013. CI # 2 assures nurses' training is documented. While the nurses have been trained, it included to diagnose and prescribe medications to patients without an order. The training must be applicable to state laws and Board of Nursing rules and regulations.

CI # 3 addresses prescription medications that should not be present in the protocols except those for emergency response, such as epinephrine, nitroglycerine or glucose, may be included, provided a clinician order is obtained before administering. CI # 4 requires that a policy and procedure should be in place. The procedure states that guidelines are reviewed every other year (last time 2013), but does not state if the responsible physician has developed the guidelines. It does state they were developed in collaboration with health professionals.

**J-E-12  Continuity and Coordination of Care During Incarceration (E).** We confirmed that there was a system of episodic care, instead of continuity of care, with most appointments being made after a request for care was submitted by the patient. Care is coordinated with nurses doing sick call evaluations and setting clinic appointments for the physicians. There are a few

physician-ordered "return to clinic" appointments to evaluate the result of a treatment or medication regime.

Nurses draw the diagnostic laboratory tests that are ordered and the samples are sent to a contracted laboratory. The results are faxed back to the facility and the nurse places a chart check note in the electronic record. However, as the lab results are paper and the health record is electronic, if the labs were not entered into a chart note, they may be missed. The orders are evidence-based and implemented in a timely manner. CI # 1, # 3, # 4, # 6, and # 7 are met.

**Recommendations:** CI # 2 and CI # 8 explain that deviations from standards of practice and treatment plans must be justified, documented, and explained to the patient. We saw no evidence of this documentation or discussion with the patient. CI # 5 requires treatment plans and diagnostic test results be shared with the patient. A mechanism is required to ensure all lab results, including normal results, are reported. CI # 9 reinforces that reviewing processes and clinic care pathways is important in quality improvement efforts. Chart reviews assure appropriateness of care and that all care is coordinated according to the treatment plan. CI # 10 establishes that the responsible physician determines the content and frequency of periodic health assessments. Protocols should be developed using nationally recognized guidelines. This is especially important since the state laws changed inmates' length of stay in jails to more than a year.

**\*J-E-13  Discharge Planning (E).** The discharge planning process varies, depending on the patient and the community services are identified. There is no formal plan documented in the chart for prison inmates. Mental health patients who need a community referral are instructed to have the community pharmacy coordinate with the jail so that the patient is provided with a 10-day prescription. The infection control nurse works with the representatives of the health department, STD clinic and HIV clinic for patient referrals. The TB clinic is alerted to who requires follow-up. Inmates with serious health issues can receive assistance to sign up for Medicaid. A recent program was initiated to give naltrexone for extended-release injectable suspension to opioid dependant inmates upon release and to refer them to a community provider.

**Recommendations:** Compliance indictor # 1 states that there is a discharge planning process in place. However, there was no evidence of this in the medical records we reviewed. Mental health staff and the infection control nurse should document their plans for discharge. The special release programs for Naltrexone for extended-release injectable suspension , etc., should be documented in the health record as well. It is recommended that patients on chronic care and in alcohol and drug problems should have some discharge planning if their pending release dates are known.

## F.  HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01  Healthy Lifestyle Promotion (I).** By policy, inmates are not given handouts as they have been used to damage the plumbing in the past. Information is instead clearly posted on the windows. While the health record includes a box for the nurses to check that the patient has

been educated, there is no means to describe the nature of the subject. We found no evidence of physician-provided education for patients.

In this jail, a variety of written literature, including books, are provided by the Veterans Program and the Incentive Housing Unit. The inmates also participate in day-long formal programming to prepare them for re-entry into society. CI # 2 is met.

**Recommendations**: CI # 1 requires that health education be documented in the health record by everyone. The continuous quality improvement committee should audit patient education and documentation, and follow up with retraining of all staff.

**J-F-02  Medical Diets (I).** The dietary program is under the responsibility of the sheriff's department. The dietitian and dietary supervisors are county employees. Inmates work in the kitchen, under the training and supervision of the dietary staff. They obtain a food handler's card, which can help them obtain employment after their release. There are more than 10 special medical diets offered.

At the time of our visit, approximately 82 special diets were ordered at this jail. A registered dietitian reviews the medical diet menus annually (in July), but at the time of the visit, she was rewriting the diets, so the review would be completed in February. If someone refused a medical diet, the dietitian on site would counsel the patient, and send an email to the nursing supervisor as to the result of the conference. CIs # 1, # 3, # 4, and # 5 are all met.

**Recommendations:** The standard requires that the dietitian review and sign the medical diets for nutritional adequacy every six months. The indicator lists what the dietitian must do to comply with this standard.

**J-F-03  Use of Tobacco (I).** Smoking is prohibited in all indoor areas. The compliance indicators are met.

**There are no** recommendations regarding this standard.

## G.  SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.  These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01  Chronic Disease Services (E).** The intent of this standard assures that when someone with a chronic disease enters a corrections facility, they are identified and enrolled in a chronic disease program based on national clinical protocols. Standard clinical protocols guide the person's care, for the goal of stability. Some programs have a formal chronic disease component with designated clinics for specific diseases and a nurse who coordinates appointments, labs, and treatments. Other programs have a more informal aspect, where the physicians follow approved guidelines and order labs, treatment, medications, and "return to clinic" appointments as set.

This program has one chronic disease pathway, for hypertension, which was revised in 2014. It is in the procedure manual and guides the nurses to care for these patients. There is an algorithm to follow for age and blood pressure readings, and plans range from putting a patient on the physician's clinic list to initiating the standardized nursing procedure, which directs the nurses to begin prescribed medications and have physician follow-up. There are no other chronic disease guidelines to guide providers. The standard also requires asthma, diabetes, high blood cholesterol, HIV, seizure disorder, tuberculosis, sickle cell, and major mental illness. The physicians we interviewed stated they do not know of any protocols. The program does use some "Physician Guidelines" which address areas like blood borne pathogens, suboxone, blood pressure checks, and non-formulary medication procedure, none of which are clinical chronic disease-specific. CI # 3 is met as chronic diseases are noted on the patients master problems list. Also, a list of patients with certain diseases/medications can be pulled from the electronic health record.

**Recommendations**: Chronic disease services must be developed according to this standard and patients identified in booking as having a chronic disease monitored according to the protocol. At this time, nurses diagnose and order medications from nursing protocols for some chronic diseases, which, as previously discussed, is not an acceptable practice.

CI # 1 discusses the nine chronic diseases based on nationally approved clinical practice guidelines. The responsible physician oversees the development of these protocols for all the conditions in the standard. Forms should be developed for better documentation by providers and the guidelines should cover patients for follow up as good, fair, and poor control. The protocols should include laboratory test, frequency of orders, as to what consultations are available, and the parameters for referral, such as optometric evaluations for diabetics, lipid levels for diabetics, or INR for those on Coumadin.

Many specialty organizations, such as the American Heart Association, American Diabetes Association, Cancer Societies, and CDC, offer treatment guidelines to refer to, and forms that can be revised to fit a particular program.

CI # 2 outlines the components for the providers to follow when caring for a chronic disease patient. This is what a new policy and procedure would be based on.

CI # 4 assures that a list of chronic disease patients is available to ensure everyone is seen according to their disease status. This list can also be useful for quality improvement studies and monthly statistics reports. In a large system with many transfers, the nurses who complete transfer screening need access to identify chronic disease patients and include them on the facility's list.

CI # 5 states that a policy and procedure will be in place to explain the chronic disease program. Care as reflected in the health record appears in compliance with current community standards.

**J-G-02  Patients With Special Health Needs (E).** When required by the patient's health condition(s), treatment plans define the individual's care. The health record is documented regarding a patient's special needs and custody staff is alerted, especially regarding special diets, frequent needs to come to the clinic, dialysis, and CPAP machines. The Patient Care Coordinating Committee meets weekly with health, mental health, and custody representation to discuss special needs patients. Special attention to documentation of the length of the special need and when a return to clinic appointment is needed is necessary. A review of inmates with

active medical instructions (according to need) indicated they all have a start date and approximately 25% have end dates. This assists in quality checks or audits of the program to ensure special needs patients are followed by providers.

**There are no** recommendations regarding this standard.

**J-G-03  Infirmary Care (E).** This facility has designated beds called "Medical Observation Beds (MOB)". Twenty-seven are for medical patients (five negative pressure rooms, two safety cells, and 20 with intercom communication), and eight beds are for mental health patients. A general policy and procedure outlines the nursing staff's roles and responsibilities in the unit. Patients are admitted by a nurse, who completes a J231 Medical Admission Record. The care plan is developed by the nurse and a consultation with a physician may occur for frequency of vital signs and intake/output monitoring. The procedure states that psychiatric and physician evaluations of these patient should occur when clinically indicated. The procedure defines the care in the MOB as "home health care." A section of the procedure discusses patients with severe alcohol withdrawal and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. Patients in the MOB unit have access to a call button to alert the nurse when they need assistance. The nurses' station is not within sight or sound of the patients.

We reviewed the medical records for the MOB patients, and felt some of them were actually at infirmary level of care, and required a physician directing the care plan and medications.

The responsible physician and RHA, should review the use of the MOB, and determine if it is indeed an observations unit or an infirmary. The standard explains the definitions for infirmary care, observation beds, and sheltered housing. The discussion section further explains what infirmary care is and the alternatives. Some programs have a low level of care and have shelter beds where nurses may admit. Others have a high acuity infirmary. Others use a matrix for the combination of patients they receive and respond with staffing and physician oversight according to patient acuity.

This facility has procedures in place for patient acuity reflective of sheltered housing or observation beds, although we noted that a few of the patients would qualify as infirmary patients. CIs # 3 and # 4 appear to be met and there is a policy and procedure, but it does not address infirmary level patients and the physician's involvement.

**Recommendations:** The 10 compliance indicators in this standard outline the components of infirmary care. CI # 1 is the most important to define admissions to the infirmary or observation/shelter beds, and hospital. Outlining acuity levels assists to ensure the right patient receives the correct level of care. CI # 2 requires patients are within sight or hearing of a nurse and that the patient can contact the staff when needs arise. CI # 5 requires a manual of nursing care procedures for reference. CI # 6 requires that a person be admitted to the infirmary upon an order by a physician and that a care plan be developed. CI # 7 clarifies that the frequency of physician and nursing rounds be specified in the procedure and related to the level of care. CIs # 8 and # 9 address the patient record while in the infirmary. Although the health record is electronic, some paper records are still in use, such as lab results, consent forms, and admission forms.

**\*J-G-04  Basic Mental Health Services (E).** Patients with mental health needs are evaluated in booking by the nurse and referred to the onsite mental health program staff. There are some safety cells (suicide watch or violence watch) if needed in that area. There are also enhanced observation cells available for special housing. Staffing included a vacant position for a supervising psychiatrist, and a chief clinician. Two mental health licensed clinicians respond to patients' needs for evaluation. The psychiatric team is supplemented with contract psychiatrists and psychologists, who receive referrals for evaluations and who order medications. The team provides some programming for patients.

CIs # 1, # 3, # 4, # 5 # 6 are all met, with the caveat that there are three clinicians to manage suicide watches, evaluations, programs, requests for care, crisis intervention and supporting many individuals in a large jail.

CI # 2 covers the range of psychiatric services available in the facility and all five areas are covered. Some group counseling sessions are ongoing.

**Recommendations:** See the mental health report at the end of the standards report.

**\*J-G-05  Suicide Prevention Program (E).** The system-wide Suicide Prevention and Inmate Safety Program was developed through the CQI Committee and the medical director guided its implementation in 2016. The six-page procedure explains how to identify, monitor and provide treatment to those patients who present a suicide risk. All jail employees are responsible to know this procedure and provide proper intervention. When an inmate with suicidal ideation is identified, the staff member, in consultation with mental health staff, will place the person in the inmate safety program and assign him to a safety cell, to enhanced observation housing or medical isolation cell. The safety cells are used to determine if the person has a mental illness, is intoxicated, is belligerent, or is under the affect of something else. Enhanced observation is used to determine the risk of self-harm, which is not influenced by substances or behavior. Medical observation is used when self-harm may be co-occurring with a medical condition. Each facility has an assigned gatekeeper who oversees the care of patients in the safety program. At this jail, it is the psychiatric unit's charge nurse or mental health clinician.

In the last two years, there have been eight inmate deaths, four of which were due to suicide. This safety program was put in place to more effectively identify and treat those with potential for self-harm or suicide. Mortality reviews were conducted on the cases of suicide, but there were no psychological autopsies under the guidance of the psychiatrist.

Training on this procedure was beginning at the time of our visit, and would continue until all health, mental health and custody staff were knowledgeable of the program components.

**Recommendations:** See the mental health report at the end of the standards.

**J-G-06  Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff is not formally trained to recognize inmates' AOD problems, but have received some substance abuse instruction during their annual training. Medical, mental health and custody staff communicates and coordinates with each other regarding patients' AOD care during meetings of the Patient Care Coordinating Committee and the Multi-Disciplinary Team Meetings, where special needs patients, including those in withdrawal, are discussed and followed. Representatives of some community substance abuse agencies come on site to conduct groups coordinated by the

corrections counselor. There did not seem to be any self-help substance abuse programs at this facility. CIs # 1 and # 3 are met.

**Recommendations:** CI # 2 recommends custody staff receives information on the effects of alcohol and drugs on the population. CI # 4 recommends groups and individual counseling. With the current staff allocated to mental health, individual counseling and groups are not scheduled. CI # 6 requires a procedure to explain the alcohol and drug services offered in the facility. We suggested that the program's administration look into partnering with a community methadone program to offer services in the jail, and also offer buprenorphine/Naltrexone for extended-release injectable suspension  for release planning.

**J-G-07  Intoxication and Withdrawal (E).** The responsible physician has approved current standardized nursing protocols for alcohol withdrawal. The most recent review occurred on July 10, 2008. The protocol is based on references from four articles. It explains the subjective, objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells (on the second floor, above booking), but does not address those inmates going through withdrawal in general housing, segregation or MOB. Usually, the people in the sobering cells are "short-term" detention or "book-and-release" status. The only reference in the procedure for housing is to use a lower bunk, lower tier housing slip. From housing, a referral is made for the nurse to see the patient in sick call that same day, or in 24-26 hours if not symptomatic in booking.

The treatment plan is very elaborate, with dosing of Librium and vital sign intervals. There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.

This facility houses males and females. A pregnant opiate patient receives a pregnancy test and a urine drug screen during receiving. If the female is on methadone upon arrival, the policy is to continue oral methadone as a bridge until a program can be arranged with a community methadone clinic. If the pregnant inmate goes to the emergency room for an evaluation and methadone is prescribed, the facility health staff will "bridge" with oral methadone until a program can be put in place to continue it. If anyone arrives in a state of severe intoxication or withdrawal, they are transferred immediately to a licensed, acute care hospital in the community. CIs # 3, # 4, and # 5 are met.

**Recommendations:** The intent of this standard is that a physician oversees the care of patients withdrawing from alcohol or other substances. CI # 1 addresses an established protocol describing the assessment, monitoring and management of those with symptoms of withdrawal. A protocol is in place in the standard nursing procedures, and the physician is not involved in the care of a patient with this serious condition. CI # 2 confirms that the protocols are consistent with national protocols. This should be researched, as there are new standards regarding methadone, Naltrexone for extended-release injectable suspension , and the physician's role in withdrawal management. CI # 8 requires the program to manage patients coming into the jail on methadone and similar substances. Directions on continuing or withdrawing must be clear for staff as these are serious medications to withdraw from.

**J-G-08  Contraception (I).** There is no policy and procedure that guides the staff to continue the prescriptions of a woman who arrives at this facility or if emergency contraception is

available. It would be in the community hospital, but this should be explained in a procedure for staff reference.

Since this jail houses women, it would be appropriate to address the contraception needs before they leave custody. Pregnant women are transferred to the women's facility, where comprehensive services are available. There are community resources regarding pregnancy options and contraception if needed.

**Recommendations:** CI # 4 requires a policy and procedure to guide staff in the contraceptive practices of the program and addresses the components of the standard. It should also include where emergency contraception is available.

**J-G-09  Counseling And Care Of The Pregnant Inmate (E).** As soon as a woman tests positive for pregnancy, she is sent to the women's facility where comprehensive prenatal and counseling services are available through the services of contracted obstetrical/gynecological physicians who come into the clinic weekly. The standard is **not applicable** for this jail**.**

**J-G-10  Aids to Impairment (I).** During the tour, we observed patients using wheelchairs, crutches, glasses, splints and a cast. Health staff mentioned that security staff approves all necessary appliances that do not have metal hinges. Patients' special needs are discussed during the patient care committee meeting, and a list of patients using various appliances is maintained. It is also documented in the health record, and on the master problem lists. We suggested that a discontinue date be included on the appliance list.

**There are no** recommendations regarding this standard.

**J-G-11  Care for the Terminally Ill (I).** It is rare for a terminally ill patient to be housed in this facility, although it occasionally occurs. There is no formal procedure. Staff explained that the first step after diagnosing such a condition, and the patient can no longer care for him/herself in the jail, is for the responsible physician or health administrator to advocate to the courts for a compassionate release. There is no formal hospice program, so if a release is not feasible, a community hospice program is contacted. The local hospital has a palliative care program.

If someone comes into jail with an advance directive, it is placed in the chart and honored if a terminal condition develops. CIs # 1, # 2, # 3 are met.

**Recommendations:** CI # 4 requires a procedure in place to guide staff when a terminally ill patient is identified and needs care.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01  Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in electronic and paper formats and shared basis among providers. At a minimum, a listing of current problems and medications should be common to all medical,

dental, and mental health records of an inmate. The jail management system includes medical records components for progress notes, problem lists, appointments, booking/evaluations, and mental health evaluations. There are paper records for lab results, x-rays, outside consultations, hospital, and emergency room visits. Medical records clerks oversee the record and scan the paper reports into the electronic record when the patient is released.

Both the paper and electronic records are available at all clinical encounters. The record is confidential and secure via password-protection, although a few screens are accessible to custody staff, such as appliance and transport lists.

**There are no** recommendations regarding this standard.

**J-H-02  Confidentiality of Health Records (E).** Health records are maintained under secure conditions; the paper records are locked in a secure room (accessible to the clerical staff who manage the records), and the electronic record is password-protected. Health and custody staff undergoes annual confidentiality reviews. The staff we interviewed showed they were knowledgeable about confidentiality issues.

**There are no** recommendations regarding this standard.

**J-H-03  Management of Health Records (I).** The chief of medical records oversees this system. Staffing includes two senior medical records technicians, 10 technicians, one clerk and one office assistant. Some of the staff is located in the central administrative office, and others in each of the jails. An electronic health record is available for each patient care encounter, as is the paper record, if necessary. There are administrative procedures for health records, but they are not part of the general policies and procedures we reviewed for this technical assistance.

A completely integrated electronic medical records program was being actively investigated at the time of our visit. This would integrate all information into one chart. The electronic record would provide more information for quality of care evaluations, as well as allow full patient information access.

**Recommendations:** We recommended to continue the purchase of an integrated, complete medical record.

**J-H-04  Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. Health staff can access information through the jail management system or discuss matters with custody staff.

**Recommendations:** The compliance indicator requires that a policy and procedure be in place to guide staff when they need more information than what is available in the jail management system.

## I.  MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers.   While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided.  The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** There is a policy and procedure for restraint and seclusion in the psychiatric secure unit (PSU). It was last reviewed on August 13, 2013. Clinical restraint and seclusion is only ordered for patients who exhibit behavior that is dangerous to self or others as a result of medical or mental illness. The policy addresses that the psychiatrist's orders for the restraint must be written within one hour of initiation of the restraint and/or seclusion. It also requires that a nurse assess the patient at that time. The order can be for a maximum of four hours and may only be renewed for up to 24 hours. When the restraint is continued beyond four hours, a trained nurse must reassess the patient and the psychiatrist write a continuing order. The monitoring parameters in the procedure are for the RN or LPN to monitor the patient's mental and psychological status at least every 15 minutes and document on the seclusion and restraint record. The procedure also states that the RN is responsible for initiating the patient's removal from physician-ordered restraints when the treatment is no longer necessary.

Reportedly, restraints are rarely applied. There is one restraint chair and deputies carry Tasers and handcuffs. Mental health staff uses a time-out-of-cell process to calm people and prevent escalation. When custody staff applies a restraint, they call medical staff immediately to evaluate the inmate and initiate monitoring.

The procedure covers most areas of the standard's CIs # 1, # 2 and # 3.

**Recommendations**: The procedure states that the RN decides when to remove the clinically ordered restraints. CI # 1d outlines that a treatment plan should be in place for the removal of restraints and we would recommend re-examining the practice of a nurse removing restraints or requesting the psychiatrist develop a plan with parameters for the nurse or psychiatrist to remove restraints.

**J-I-02  Emergency Psychotropic Medication (E).** There is no policy and procedure to guide staff in the use of emergency psychotropic medications, but staff reported a protocol is in place. According to staff, the psychiatrist has to be on site and order the medication. The nurses monitor the patient every 15 minutes for four hours when a medication is given to someone in an emergency. The nursing supervisor stated that this only occurs two to four times a year and usually the patient is transferred to a setting with more mental health resources.

There is a process through the courts for forced medications, and the nursing supervisor indicated that when someone is given forced medications, they are transferred to the PSU at another jail. The "Sedation Grid" form assists in documenting the patient's response to the medication. We reviewed no records of patients who had received forced medications.

**Recommendations**: The protocol or policy for emergency psychotropic medication should be reviewed and revised, and included in the manual for ease of access. It should address the standard's five compliance indicators.

**J-I-03  Forensic Information (I).** It was reported that health staff does not participate in any forensic collections or tests. Custody staff performs any court-ordered DNA tests. There are no body cavity searches. In practice the compliance indicators seem to be met, although there is no policy and procedure to document the role of health staff.

**Recommendations:** A policy and procedure that addresses the four compliance indicators needs to be developed to guide staff when such situations arise. We recommended that the program look at competency evaluations, verses restorations, to make sure they are not in conflict with patient advocacy.

**J-I-04  End-of-life Decision Making (I).** End-of-life instructions, or living wills that an inmate arrives with, would be honored. The provider notes in the health record that such instructions exist. There are no provisions to complete a living will, requiring the inmate to contact his or her attorney for assistance.

**Recommendations**: This standard outlines the procedure a process for inmates who are approaching the end of life decisions to execute a living will, advance directive, or a do not resuscitate (DNR) order. CIs # 1 through # 4 describe the steps required to support a patient's decisions. A policy and procedure will guide staff in this decision making.

**J-I-05  Informed Consent and Right to Refuse (I).** All incoming detainees sign a consent for treatment when they go through the booking process. This consent is placed in the paper chart. All other consents for treatment, especially for invasive procedures, are placed in the chart and documented in the progress notes. The policy and procedure for consent and refusal address the steps for staff to follow. A standardized form that complies with the components of a consent and refusal is used, with instructions, and space for the signatures of the patient and health staff witnesses. All consents and refusals are documented in the electronic record, as is counseling follow up. Copies are also filed in the paper record.

The procedure states that if an inmate refuses care, a nurse should sign the form "if available." The standard practice is that all refusals need to be made with a health staff in attendance to counsel the patient as to the possible health outcomes of a refusal of care. A deputy can be the second witness signature when the inmate refuses to sign the refusal form.

**Recommendations:** CI # 3d. emphasizes that the refusals should be signed by a health services staff to ensure the patient is counseled appropriately.

**J-I-06  Medical and Other Research (I).** No health-related research is conducted at any of the facilities. During step 2 of the receiving screening, the nurse may learn that a person is on an experimental medication or in treatment program in the community. The usual procedure is to notify the responsible physician to guide the staff and patient. The responsible physician would research the experimental or trial program, and decide on the plan while this person was in custody.

**Recommendations**: A policy and procedure for medical research in the program should be developed. Staff should have clear guidance on how to handle a request for research, a patient on a medical trial, or a participant in a research project.

## Mental Health Report:

**VISTA DETENTION FACILITY**

**Staffing:**     1.2 FTE Psychiatrists
               1.0 FTE Psychologist
               2.0 Mental Health Clinicians

**Overview:** The mental health services at Vista are primarily provided by the mental health professionals, whose work focuses on wellness checks, segregation monitoring and crisis management. The mental health clinics are intended to provide individual counseling, but the clinics are often cancelled and are not sufficient to meet the need for mental health services. It is very positive that the number of mental health clinicians has doubled recently, from 1.0 to 2.0 FTE, but this is still insufficient to meet the population's needs. There is one psychologist, whose exclusive duties are to monitor and release inmates who are or have been in the Inmate Safety Program. The facility has 1.2 FTE of psychiatric time, which is utilized primarily for monitoring and prescribing psychotropic medications.

Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program. There is much confusion across facilities, and including at Vista, about the requirements of the Safety Program and how to implement it. The expressed understanding of it at Vista is that inmates who are both suicidal and agitated are placed in a safety cell (which is a padded cell with no toilet, sink, or bunk), and are monitored at varying intervals not to exceed 15-minutes. Inmates who are suicidal and not agitated are placed in the Enhanced Observation Housing, which only provides for monitoring every 30 minutes, and not always at varying intervals. There is extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards and at other facilities across the country. The facility psychologist is the only one who can remove somebody from suicide watch, and his only duty is  involvement in the Safety Program. Staff members did not express an understanding of the design of the Safety Program as described by the system medical director. Staff members are under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours. The intent of the Safety Program, however, is that inmates who are identified as high risk cannot be released prior to 48 hours, while those who identified as being at low risk can be released in 24 hours.

Inmates who have attempted suicide are not automatically placed on a one-on-one observation status, but rather are placed in the Safety Program, which may not include even 15-minute monitoring if they are not agitated and suicidal. This represents a high risk to the safety of inmates who are suicidal, and a risk to the facility.

The sworn staff members reportedly are not trained on suicide prevention. Although an eight-hours class on mental health in jail has been initiated, it apparently does not include any suicide prevention training. Additionally, the mental health clinicians are not trained to assess and manage suicide risk in the jail.

The outcome of the inadequate suicide prevention program is a suicide rate at Vista that is above the national average over the past two years. The suicide rate in 2015 was 300:100,000, which is nearly nine times the national average, and 100:100,000 in 2016, which is nearly three times the national average. The average for the past two years is 200:100,000, which is more than five times the national average of 36:100,000 in jails in the United States.

**Psychiatric Services:**
Psychiatrists at this facility do a good job treating inmates who are on psychotropic medications. Unlike the Central Jail and LCDRF, the mental health clinicians and nursing staff typically refer inmates to see the psychiatrist, rather than seeing them for the mental health assessment as happens at the intake facilities.

Vista only has 1.2 FTE psychiatrist staffing time, which appears to be sufficient to meet the needs of the inmate population. Staff was not aware of a waiting list to see the psychiatrist, and believes inmates are able to see the psychiatrist regularly.

The system across jails emphasizes the needs of inmates who are psychotic and/or gravely disabled, and does a good job managing them appropriately. However, this emphasis does not carry over to other, less severely mentally ill inmates. A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

**Mental Health Professionals:**
There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia). The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists.

Mental health professionals reported that they see approximately 50 inmates per week, although as noted above, most of these are "wellness checks," and not counseling or more comprehensive mental health services. It is probably not sufficient for them to see only 50 inmates per week, and it appears that one of the issues is there is no deputy assigned to bring inmates to see mental health staff members. This limits the number of people they are able to see, and means that inmate mental health needs are likely not being met appropriately. It was reported, and demonstrated in the chart reviews, that many appointments are cancelled, and that an inmate may go for weeks without being seen following a referral or scheduled appointment. It was further noted that the current provision of mental health services does not meet the requirements for "sight and sound" confidentiality. Mental health professionals are often forced to talk to inmates with mental health concerns from outside their cell, which makes the conversation accessible to the inmate's cellmate and others on the housing module.

**Segregation:**
The mental health professionals reported that they conduct segregation rounds three times per week, which exceeds the NCCHC requirement. This is very positive and should help to ensure that inmates do not decompensate while in segregation.

## NCCHC STANDARDS RELATING TO MENTAL HEALTH:

**J-A-10:**     **Procedure in the Event of an Inmate Death:**    **Not Met for Mental Health**
There is no psychological autopsy for completed suicides.

**J-A-11:**     **Grievance Mechanism for Health Complaints:**    **Not Met for Mental Health**
There was no evidence of the number of grievances related to the provision of mental health care, nor any indication that those grievances receive an appropriate response.

**J-C-04:**     **Health Training for Correctional Officers:**    **Not Met for Mental Health**
Suicide Prevention training is not provided for "sworn" staff/correctional officers.

**J-E-05:**     **Mental Health Screening and Evaluation:**    **Not Met for Mental Health**
Although it is done in a timely manner, there is no screening for intellectual disability or other issues as required by NCCHC standards.

**J-E-07:**     **Nonemergency Health Care Requests/Services: Not Met for Mental Health**
Mental health does not respond to these requests within the time frames required by NCCHC.

**J-E-09:**     **Segregated Inmates:**    **Partially Met for Mental Health**
Mental health staff members are exceeding the requirement for segregation rounds, but are not screening or reviewing inmates for contraindications to segregation prior to their placement in that unit. Additionally, security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards.

**J-E-13:**     **Discharge Planning:**    **Not Met for Mental Health**
Mental health does not provide discharge planning and it was reported that there is insufficient discharge planning for all inmates.

**J-G-04:**     **Basic Mental Health Services:**    **Not Met for Mental Health**
Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment.

**J-G-05:**     **Suicide Prevention Program:**    **Not Met for Mental Health**
There is inadequate training, evaluation, monitoring, review and debriefing in the Suicide Prevention Program.

## RECOMMENDATIONS:

1. It is recommended that the facility improve the system for inmates to see mental health, so that they can effectively use the staff members they have and provide individual counseling as appropriate.
2. It is recommended that a space that allows sight and sound privacy be provided for mental health clinicians to meet with inmates.
3. It is recommended that nursing staff that do mental health screenings be provided with training to ensure mental health needs are being identified appropriately.
4. It is recommended that mental health staff members see and address mental health grievances.
5. It is recommended that mental health clinics be held whenever possible, including during facility lock downs whenever possible.

6. It is recommended that sworn staff receive annual suicide prevention training, and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide.

## DISCLAIMER

Technical assistance by NCCHC Resources, Inc., is a professional activity that is completely separate from accreditation by the National Commission on Correctional Health Care and in no way guarantees accreditation, reaccreditation, or any other outcome of a survey.

## ABOUT NCCHC RESOURCES, INC.

Leveraging NCCHC's expertise in correctional health care, NCCHC Resources, Inc., provides customized education and training, preparation for accreditation and professional certification, performance improvement initiatives and technical assistance to correctional facilities interested in health care quality improvement. NRI will put together a team of experts – clinicians, educators, administrators or other thought leaders – to address any sized project or challenge. A nonprofit organization, NRI works to strengthen NCCHC's mission: to improve the quality of health care in prisons, jails and juvenile detention and confinement facilities.

For more information, contact us at info@ncchcresources.org or call (773) 880-1460.

EXHIBIT B

REVIEW AND CRITIQUE OF THE DISABILITY RIGHTS CALIFORNIA'S REPORT

SUICIDES AT SAN DIEGO COUNTY JAIL: A SYSTEM FAILING PEOPLE WITH MENTAL ILLNESS

Expert Report by:
Colleen Kelly, Ph.D.

_____          _____
Colleen Kelly, PhD                        Date    4/6/18
Statistical Consultant

1

*Suicides at San Diego County Jail:  A Crisis by Any Measure?*

Disability Rights California (DRC) report "Suicides at San Diego County Jail: A System Failing People with Mental Illness" [1] uses a statistical analysis to support the premise that the San Diego County jail system has "a crisis by any measure."  The analysis, however, uses comparisons that appear to be specifically chosen to support the desired conclusion. Furthermore, the method used to calculate the suicide rate does not yield a meaningful measure and is not appropriate for comparisons across diverse counties.  Using a more appropriate method to calculate suicide rates and more complete data yields a completely different conclusion. We conducted a rigorous statistical analysis of the suicide data from the ten largest California County jail systems using a suicide rate calculation that yields "more appropriate comparison[s]" (BJS Special Report [2]) and find that San Diego jail system is, in fact, similar to other California counties and that its suicide rate is not the highest rate (see Figure 1).  Thus, one cannot conclude that San Diego jail system has "a crisis by any measure".



Figure 1:  A comparison of the suicide rates (standardized inmates at risk calculation) of the ten largest California counties for 2010-2017.

*What Measure is Appropriate to Compare Suicide Rates?*

The DRC report states [1 p. 3] "San Diego County Jail has the highest reported incidence of suicides in the California Jail System over several years – more than 30 suicide deaths since 2010". Actually, Los Angeles County had the highest reported number of suicides in this period (34), according to data obtained in a California Public Records Act Request for Records.  More importantly, comparing the number of suicides across jail systems is not appropriate because the jail systems are of different sizes, with different numbers of inmates.  The largest jail systems will generally have the largest numbers of suicides.  Calculating a suicide rate (the number of suicides divided by the number of inmates in the jail system) is a more fair method to compare the jail systems.  Suicide rates are generally calculated as the average number of suicides per year per 100,000 inmates at

risk. In fact, this is the definition of the incidence of suicide: the average number of suicides per year divided by the number of inmates at risk (the "at-risk rate").

The DRC report also compares the suicide rate of San Diego to other California jail systems, but they use the average daily population (ADP) of the jail system as the denominator (the ADP suicide rate) rather than the number of inmates at risk. Unfortunately, the ADP suicide rate has several flaws that make it inappropriate for comparing diverse jail systems. The *Bureau of Justice Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails* [2] mention that the ADP suicide rate methodology is less desirable than the at-risk rate (p.11), but concede that the ADP rate has been used historically when data to calculate the at-risk rate was unavailable. Other researchers [3, 4, 5 (p.28), 6 (p. 187), 7, 8 (p. 418)] have also pointed out the methodological flaws with the ADP calculation of the suicide rate.

### Why is an ADP Suicide Risk an Inappropriate Comparison?

The ADP suicide rate yields a statistic that is not easily interpretable. The interpretation of the at-risk suicide of San Diego in the period 2010-2017 of 3.7 suicides per 100,000 inmates is: on average 3.7 out of 100,000 inmates committed suicide per year. Since San Diego had an average of 92,000 inmates per year during this period (close to the 100,000 inmates in the statistic), the suicide rate is only slightly lower than the average number of suicides per year (3.9 suicides per year).

The ADP suicide rates quoted in the DRC report (106, 120 and 94 suicides per 100,000 inmate-years for 2014, 2015 and 2016, respectively), however, yield suicide numbers that are approximately 20 times larger than the actual numbers of suicides in these years (6, 6, and 5, respectively), and are more than 3 times larger than the number of suicides in the entire period 2010-2017 even though there were more than 700,000 inmates in the system during this period. We note that the DRC consistently reports ADP rates per 100,000; the units of the statistic are not given, but they should be inmate-years.

How can the ADP suicide rate yield numbers that are so high as to be incongruous with the data? The ADP suicide rate is calculated using a denominator of an inmate-year. An inmate-year consists of one inmate in the jail system for an entire year. Most inmates stay in the San Diego jail system much less than an entire year; in fact, the average length of stay for 2011-2017 is just 22 days [9]. So how do you get an inmate-year? Inmates with shorter lengths of stay are effectively strung together to make an inmate-year. Twelve inmates serving 30 days each would constitute one inmate-year. With an average length of stay of just 22 days, San Diego would require on average 365/22 = 16.6 inmates strung together to make up each inmate-year in the denominator of the ADP suicide rate. This methodology leads to the absurd conclusion that there can be multiple suicides within each inmate-year; the conclusion is particularly absurd when the unit is expressed as just an inmate, as it is done in the DRC report. This is also why the ADP suicide rates are approximately 17 times the at-risk suicide rates.

The ADP suicide rate is especially flawed when used to make comparisons across jail systems with different length of stay distributions. Comparing San Diego, with an average length of stay of 22 days, to Los Angeles, with an average length of stay of 56 days [9], is problematic. San Diego requires approximately 17 inmates strung together to make up each inmate-year; whereas Los Angeles requires only an average of 6.5 inmates to make up each inmate-year. This attribute of the ADP suicide rate inflates the San Diego rate two and one-half times as much as it inflates the Los Angeles rate. It is for these reasons that Crighton and Towl [6] (p.188) conclude "It is essential that

3

such comparisons not be made in unreflective and mechanistic ways such as using ADP rates comparing two samples with very different characteristics."

To estimate one inmate-year with a number of inmates with short lengths of stay requires the assumption that the risk of suicide in days 300-330 for an inmate serving a full year is the same as the risk of suicide in days 1-30 for an inmate with a short length of stay. Since most suicides occur within the first 30 days of incarceration [2], this assumption is clearly untenable.

### Are San Diego jail inmates 5 times more likely to die as an inmate in the California's State prison system and 8 times more likely to die by suicide than the average San Diego County resident?

These DRC statements [1 p.4] come from a comparison of the ADP suicide rates in the three-year period (2014-2016) in which San Diego jail system had an unusually high number of suicides. Further, the ADP suicide rate can be severely biased in comparisons of jail and prison populations, as discussed in Metzner [3] and O'Toole [4]. This bias is due to a significantly larger number of at-risk inmates in the jail versus the prison, even when they have the same ADP. This bias leads to much higher suicide rates in local jails than in State prisons when using the ADP methodology: in 2002, the national ADP suicide rate in local jails was over 3 times the rate in State prisons [2]. The specific ratio of jail and prison ADP suicide rates will depend on the ratio of the required number of inmates to make an inmate-year for the jail and prison systems. Since this ratio is dependent on the average length of stay in the jail and prison systems, it is an inappropriate measure to compare the risk of suicides in jails and prisons.

For similar reasons, the ADP is an inadequate statistic to compare jail and local populations. As discussed above, the inmates at risk in the San Diego jail system is approximately 17 times as large as the ADP. For the local population, the number of people at risk is the same as the ADP (assuming that the population is relatively stable). Using the at-risk suicide rate calculation, a San Diego jail inmate is about one-half as likely to die by suicide than the average San Diego resident [10, 11]. Thus, suicide rates are actually much lower in the San Diego jail than in the general population, a strikingly different conclusion than that reached by DRC.

As discussed in the BJS Special Report [2], the demographics of inmate populations do not reflect those of the resident population; inmates are predominately male and younger than in the general population, two characteristics that lead to higher suicides rates. To improve the comparison of suicide risks, the resident populations can be standardized by age, race and gender to match the proportions seen in jails. When resident suicide rates are standardized, a San Diego jail inmate is even less likely to die by suicide than the average San Diego resident.

### Why Should Suicide Risks be Standardized?

The demographics of inmate populations also differ across the California jail systems. San Diego has the highest percentage of white inmates (46%) of all the 10 largest jail systems in California for the period 2010-2016 (based on arrest data [12]). Los Angeles had the lowest percentage, with 21% white inmates. These racial discrepancies are important because white inmates are 6 times as likely to commit suicide as African American inmates and 3 times as likely to commit suicide as Hispanic inmates [2]. Discrepancies in racial distributions alone could contribute to a higher calculated suicide rate in San Diego. To fairly compare these ten counties, we standardize the rates (as recommended by the BJS [2]) to the same racial distribution. Specifically, we standardize each jail system's suicide rates to the average racial proportions of the ten counties.

4

### What years and counties should San Diego be compared to?

The primary comparison of jail inmate suicide rates presented in the DRC report [1 Figure on p. 3]
is for the period 2014-2016, comparing San Diego to five other "similarly sized California counties".
Why are these three years used rather than the 2010-2017 period discussed at the top of the page?
The set of years compared appears to be cherry-picked to support the desired conclusion. Page 4 of
the report contradictorily states: "suicide rates are most meaningful when viewed over a sustained
period of time." Metzner [3] recommends an assessment of the adequacy of a suicide prevention
program be assessed over at least a five-year period. Our analysis covers the period 2010-2017.
We include the largest 10 California county jail systems and show that San Diego's suicide rate is
similar to other California county jail systems and that it is not statistically significant from the
average.

### Causal Interpretations (Are the USA Winter Olympics Training Programs in Crisis?)

The DCR report compares the suicides rates of the San Diego jail system to (1) other California
county jail systems, (2) to the California prison system, (3) to the national jail suicide rate, and (4)
to the general San Diego population. All of these comparisons are based on the ADP suicide rate,
which has several serious flaws as discussed above. However, there are other differences in these
populations that make for unfair comparisons. To conclude that there is a crisis in the suicide
prevention policies would require a fair (apples-to-apples) comparison and a demonstration of a
correlation between suicide prevention policies and suicide rates. The suicide prevention policies
of the different jail systems are not discussed or compared; thus, concluding that the cause of the
differences in suicide rates is due to policy is pure speculation.

To illustrate the flaws in the logic of concluding that there is a suicide prevention policy problem
based solely on a discrepancy in suicide rates, we revisit the 2018 Winter Olympics. With a total of
39 medals, Norway dominated the 2018 Winter Olympics, surpassing the USA's total of 23 medals.
Calculating a per-capita medal rate increases the discrepancy in the medal-win rates for the two
countries. Yet, no one is calling the USA Winter Olympic Training Program a failure or "in crisis".
Why not? If we use the same logic used in the DRC report, we should conclude that the lower win
rate in the USA must be the result of a failed training program.

Most winter sports enthusiasts recognize that there are discrepancies between the two countries
(such as genetics and cultural differences that encourage more winter Olympics athletes), which are
more likely to account for the differences in medal wins.

Similarly, when comparing San Diego Jail inmates to inmates in other California counties, the
California prison system, the national jail system or to San Diego County residents, one should
recognize that cultural, demographic, and length-of-stay differences between these populations
may explain the differences in suicide rates. To attribute the differences in suicide rates to policies
requires a rigorous effectiveness analysis that correlates suicide rates to policies.

### A Crisis by Any Measure or a Propagation of Statistical Errors?

The statistics cited in the DRC report originated in a series of *CityBeat* articles published by Kelly
Davis. These statistics were then replicated in the Grand Jury Report [9] and in the DRC report [1].
Kelly Davis began her critique of San Diego's jail system using suicide numbers and then compared
the ADP suicide rate to other counties. San Diego Sheriff's Department spokesperson Jan Caldwell
pointed out the flaw in comparing ADP suicide rates in 2013 [10], yet Kelly Davis insisted upon

using the flawed ADP calculation in her articles because "San Diego County fares much better" using the at-risk rate calculation [11]. It is unfortunate that the ADP risk measure was originally chosen on the basis of how it makes San Diego look in comparison to other counties rather than on its inherent attributes and biases. The fact that the error has been replicated by other authors demonstrates a crisis in statistical understanding.

A rigorous statistical analysis of the effectiveness of the San Diego Jail system suicide prevention policy would have the following components:

1. The at-risk suicide rate calculation should be used instead of the ADP calculation. Comparing the average daily population (ADP) suicide rates across jails with differing numbers of inmates at risk is not a fair comparison; one should expect higher numbers of suicides in jails with larger numbers of inmates at risk.

2. The set of California counties and the set of years compared should not be cherry-picked to support the desired conclusion.

3. Comparisons across jail systems with diverse inmate populations should account for that diversity when it affects the suicide rates; specifically, because Caucasians, African Americans and Hispanics have drastically different suicide rates, the racial distribution of each jail system should be accounted for in the comparison.

4. The imprecision in estimating suicide rates using small numbers of suicides should be acknowledged; a statistical comparison that clearly demonstrates the errors in estimation should accompany any comparison of rates.

5. Inferring that the cause of a difference in suicide rates is due to the suicide prevention policy requires at a minimum a demonstration of the correlation of suicide prevention policies and lower suicide rates.

Our analysis estimates the suicide rates (per 100,000 inmates at risk) of the ten largest California county jail systems, standardized to the average racial distribution. We also estimate the 95% confidence intervals for the suicide rates (see Figure 2). Our statistical analysis shows that San Diego does not have the largest suicide rate and that its rate is not statistically different than the average rate. The only county that is statistically significantly different than the average is Orange County, which has a lower rate than the average.

6



Figure 2: A comparison of the suicide rates (standardized inmates at risk calculation) of the ten largest California counties for 2010-2017. Error bars represent the 95% confidence intervals for the suicide rate estimates. Only Orange county has a suicide rate that is statistically significantly different than the average.

Because the DRC report uses inappropriate statistics and does not conduct a statistical comparison of the rates and a more rigorous analysis (see Figure 2) finds that San Diego has a suicide rate similar to other California county jail systems, one cannot conclude that there is "a crisis by any measure" in San Diego County jail system.

# REFERENCES

1. Disability Rights California. 2018. Suicides at San Diego County Jail: A system failing people with mental illness.
2. U.S. Department of Justice. 2005. Suicide and Homicide in State Prisons and Local Jails. Bureau of Justice Statistics Special Report. August 2005, NCJ 210036.
3. Metzner JL. 2002. Class action litigation In correctional psychiatry. J Am Acad Psychiatry Law 30:19–29.
4. O'Toole M. 2001. Jails and prisons: the numbers say they are more different than generally assumed. Am Jails Magazine. XI: 27-31.
5. Liebling A. 1992. *Suicides in Prison.* Routledge, London UK.
6. Crighton D and Towl G. 2003. *Psychology in Prisons.* Second Edition. Blackwell Publishing Malden MA.
7. Daniel A. 2006. Preventing suicide in prison: a collaborative responsibility of administrative, custodial and clinical staff. J Am Acad Psychiatry Law 34 (2): 165-175.
8. Brown JM and Campbell EA. 2010. *The Cambridge Handbook of Forensic Psychology.* Cambridge University Press, Cambridge UK.
9. Board of State and Community Corrections California, Jail Population Trends. "Average Daily Population, Rated Capacity, and Bookings" https://public.tableau.com/profile/kstevens#!/vizhome/ACJROctober2013/LengthofStay
10. Southern California Patch. 2017. 431 suicides in San Diego County in 2016: report. San Diego Patch. Sept 7, 2017. https://patch.com/california/san-diego/431-suicides-san-diego-county-2016
11. US Census Bureau. 2018. Annual estimates of the resident population: April 1, 2010 to July 1, 2016. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (accessed March 11, 2018).
12. California Department of Justice, OpenJustice, "Arrests Data" http://openjustice.doj.ca.gov/arrests/overview.html (accessed December 1, 2017).
13. San Diego County Grand Jury 2016/2017, *Amended Grand Jury Report, Examining the Issue of Suicides in San Diego Jails,* at 1, (May 4, 2017), https://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2016-2017/SuicidesinSanDiegoJails.pdf
14. Davis K and Maass D. 2013. Suicide in the cell: inmates kill themselves at a high rate after San Diego County Sheriff's Department refuses to revamp policies. *San Diego CityBeat* April 24, 2013.
15. Davis K. 2014. An interview with the sheriff's chief medical officer. *San Diego CityBeat* July 16, 2014.

EXHIBIT C




# San Diego County Sheriff's Department

Post Office Box 939062    •    San Diego, California 92193-9062

## *William D. Gore, Sheriff*

April 24, 2018

Aaron J. Fischer
Rebecca Cervenak
Kim Swain
Disability Rights California
Bay Area Regional Office
1130 Broadway, Suite #500
Oakland, CA 94621

Re: County of San Diego's Final Response to Disability Rights California's March 2018 Investigation Report: *"SUICIDES AT SAN DIEGO COUNTY JAIL; A System Failing People With Mental Illness"*

Dear Mr. Fischer, Ms. Cervenak, and Ms. Swain:

The County of San Diego and the San Diego County Sheriff's Department appreciate the opportunity to respond to the 2018 Disability Rights California (DRC) Investigation Report, *"SUICIDES AT SAN DIEGO COUNTY JAIL: A System Failing People with Mental Illness."* The report followed the opening of an investigation by DRC into conditions at San Diego County Jails in 2015. During its investigation, DRC visited several San Diego County Sheriff's Department detention facilities and conducted interviews with jail inmates, jail staff and Sheriff's Department leadership. The report focused on suicide prevention and treatment of mentally ill inmates[1] in the detention facilities. Additionally, the report focuses on community response to the growing mental health crisis and a perceived lack of sufficient external, independent oversight with respect to suicide prevention in the jails by the San Diego County Citizens' Law Enforcement Review Board (CLERB).

It has long been and continues to be the goal of the County of San Diego and the Sheriff's Department to provide to those suffering from mental illness the best possible housing, treatment and care. The report recognizes *"the great advantage of committed mental health staff and a number of strong leaders within the Sheriff's Department"* (DRC report, page 2). In promoting the County of San Diego and the Sheriff's Department's position of openness and transparency, we recognize the benefit in utilizing independent review of our policies, procedures and operations.

---

[1] When DRC first contacted the San Diego County Sheriff's Department in 2015, the investigation appeared to focus on issues relating to accommodations for inmates with disabilities. But as DRC's staff attorney has stated, the focus of the investigation changed sometime during DRC's nearly two-year long period of contact with the Sheriff's Department.

*Keeping the Peace Since 1850*

Response to Disability Rights California
Page 2 of 18

Notwithstanding the DRC and Department's differences of opinion, the Department welcomes
the feedback regarding the jail system and will continue to develop and improve our processes
and procedures. As mutually agreed, DRC has allowed the Sheriff's Department the opportunity
to provide feedback of perceived inaccuracies contained within the report. This document serves
as our response to the provided DRC report.

Following review of the report, the Sheriff's Department has significant concerns relating to
several recommendations, findings and characterizations of the mental health and oversight
provided to individuals that are both in the community and incarcerated in San Diego. In
essence, the report focuses on the following matters: the suicide rate of San Diego detention
facilities, a perceived inadequacy in both community and detention facility inpatient psychiatric
services, and a lack of oversight by CLERB with respect to suicide prevention.

The cornerstone of the report is the assertion that San Diego County jails have a suicide rate
"many times higher" than is found in similarly sized county jail systems. To support this claim,
DRC cites to a series of *San Diego CityBeat* articles from 2013-2014 that made the same
assertion. The Sheriff's Department looked into these claims when the *CityBeat* articles were first
published, and found them to be alarmist and misleading. However, because these misleading
claims have since resurfaced in legal briefs filed by plaintiffs' attorneys seeking money
judgments against the County, as well as in DRC's report, the County retained former San Diego
State University Statistics Professor, Dr. Colleen Kelly to review the 2010-2017 jail suicide data
from the ten largest California counties and create an appropriate, accurate comparison of the
suicide rates. (The Kelly report is attached to this letter).

One of Dr. Kelly's key findings is that the DRC report, like the *CityBeat* articles before it, took a
fundamentally flawed approach in comparing suicide data from different jail systems. DRC's
report failed to take into account the significant diversity of jail systems, each having different
size, demographics and most importantly different lengths of stay. To cite one key difference,
San Diego had the highest percentage of white inmates of the ten largest jail systems in
California (2010-2016). This is important because statistics show that white inmates are six times
as likely to commit suicide compared to African American inmates and three times as likely to
commit suicide compared to Hispanic inmates (Kelly Report, page 4.) To fairly compare these
ten counties, the *Bureau of Justice Statistics* recommends standardizing each jail system's suicide
rates to the average racial proportions of those ten counties.

DRC's report further compounded its flawed methodology by utilizing what is commonly
referred to as the Average Daily Population (ADP) method to calculate suicide rates. This
practice has historically been used when other data was unavailable. In fact, the *Bureau of
Justice Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails* found
that the methodology using ADP is less accurate than the approach using "inmates at risk" to
calculate a suicide rate. (Kelly Report, page 3.) Consequently, Dr. Kelly used the more accurate
"inmates at risk" approach.

Response to Disability Rights California
Page 3 of 18

## QUANTIFYING SUICIDE RISK
Inmates at Risk



The ADP method is calculated as the number of suicides per year divided by the ADP and multiplied by 100,000. The key flaw in this calculation is the use of the ADP denominator. The ADP represents how many inmates were, on average, within a jail on a daily basis. The number of inmates passing through San Diego County's detention facilities far exceeds the ADP. This is due to the transitory nature of a local detention facility. San Diego historically has a higher number of admissions (specific individuals booked into a detention facility) than similar sized systems in California. It can be concluded the more bookings in a system, the more inmates can be considered at-risk for suicide. The ADP suicide rate is also flawed when making comparisons across jail systems with different length of stay distributions. For comparison, San Diego reflected an average length of stay of 22 days versus Los Angeles' 56 days (2011-2017) for that same time period. The net result is more individuals moving through the jail system and subsequently at-risk for suicide.[2]

---

[2] Another major concern of the report is the timeframe chosen by DRC to compare inmate suicide deaths with other large California county jail systems. For this particular parameter DRC opted to use 2014-2016 numbers, the peak of the cycle relating to inmate suicide deaths. The very next year, 2017, San Diego's jail system had only one suicide. DRC's exclusion of the 2017 statistics from the selected timeframe further calls its methodology and conclusions into question.

Response to Disability Rights California
Page 4 of 18

## SUICIDE RISK BASED ON INMATE TURNOVER
BSCC, 2011-2016



Using a proper statistical model, Dr. Kelly's independent analysis shows that San Diego County jails do not have a higher suicide rate than all other large county jail systems. In fact, the suicide rate in San Diego County jails is very similar to the rates found in the jail systems of most other large California counties. (Kelly Report, page 2). Dr. Kelly's report also refutes DRC's claim that San Diego County jails have an annual rate of 107 suicides for every 100,000 inmates. In creating an "apples to apples" comparison and using the most appropriate rate calculation method recommended by the Federal Bureau of Justice Statistics Special Report, Dr. Kelly was able to show that DRC's claim is drastically inaccurate. The data gathered and analysis conducted by Dr. Kelly demonstrate that for the past several years on average fewer than 4 suicides per 100,000 inmates at risk have occurred in San Diego County jails[3].

---

[3] Dr. Kelly notes that the ADP suicide rates quoted in the DRC report "yield suicide numbers that are approximately 20 times larger than the actual number of suicides in those year and are more than three times larger than the number of suicides in the entire period 2010-2017 even though there were more than 700,000 inmates in the system during this period." (Kelly Report, page 3.)

Response to Disability Rights California
Page 5 of 18



## INMATES AT RISK SUICIDE RATES
Standardized to the average racial distribution, 2010-2017

In the DRC's response to the Kelly report, which throughly refutes the alarmist notion that the San Diego County jails have a much higher than normal rate of suicides among California jails, DRC does not take issue with Dr. Kelly's analysis, nor do they argue that the "at risk" calculation is any way flawed. Instead, DRC asserts that San Diego County's higher population of "at risk" inmates (relative to other jail systems within California) "only adds urgency to the need for action." We agree that San Diego County's higher population of "at risk" inmates requires that suicide prevention be considered a top priority. The programs that have been implemented by the Sheriff's Department towards reduction of suicides have been highly successful, as evidenced by the reduction of suicides in the jails in 2017, to a single incident. What DRC, however, fails to acknowledge is that the Kelly report undermines and disproves the false premise that the suicide rate in the San Diego County jails constitutes a "crisis" that requires the oversight of DRC and their monitors.

None of this is intended to suggest that the Sheriff's Department's suicide prevention practices cannot be improved. The Sheriff's Department takes suicide prevention very seriously and has invested (and will continue to invest) significant resources to recruit and train jail staff, implement effective programs, and create an infrastructure conducive to preventing jail suicides. For example, in 2015, the Department implemented the Inmate Safety Program, in order to further reduce the number of inmate suicides.

Response to Disability Rights California
Page 6 of 18

DRC's report also makes several factually erroneous claims related to suicide attempts, the
Inmate Safety Program, and inmate lawsuits. To wit:

-   DRC's report claims that there were 73 suicide attempts and serious acts of self-harm
    from January to September 2017 in San Diego County jails. The number of suicide
    attempts during that period was 10. Implementation of the Inmate Safety Program has
    reduced the number of suicide attempts and self-harming gestures inside the detention
    facilities. In the full year of 2017, 15 suicide attempts were recorded. In making its
    misleading claim, it appears that DRC has combined *self-harming gestures* and *suicide
    attempts*. While *self-harming gestures* are important to recognize and address, they
    should not and must not be confused with actual *suicide attempts*. Moreover, not all
    incidents of *self-harming gestures* that are reported involve attempts at serious self-harm.

    For example inmates will tell staff, in response to notification of a pending transfer, "I'm
    going to kill myself if you transfer me," in an attempt to avoid transfer. While these
    incidents appear to be more an attempt to manipulate the system, our recording practices
    are such that they may document these incidents as suicide attempts.

-   On page 28 of its report, the DRC suggests that the County has paid "millions of dollars"
    due to medical and suicide-related lawsuits since 2010.  This is misleading.  The Office
    of County Counsel reports that the County has paid less than $100,000 due to lawsuits
    involving suicides in County jail since 2010.

-   Other dubious claims are made by DRC that are couched as characterizations rather than
    statements of fact, but nonetheless seem as though they are intended to be inflammatory
    rather than analytical. For example, DRC characterizes Enhanced Observation Housing
    (EOH) units as having "extreme conditions" and Inmate Safety Cells as "extraordinarily
    harsh settings." The Safety Cells are designed to keep suicidal inmates safe and prevent
    them from being able to harm themselves; they also provide for standardized assessments
    by qualified mental health providers.

    DRC acknowledges that, per policy, safety cells are for inmates who are unable to
    function in the regular or socialized housing areas due to behavior which jeopardizes
    their safety. Yet DRC cites, in support of their characterization of the safety cells as being
    "extraordinarily harsh," the fact there are no windows, toilets or sinks. The reason those
    fixtures are not included in safety cells is that suicidal inmates could use them to harm
    themselves.

    Similarly, the Enhanced Observation Housing unit cells are not intended to be harsh or
    inhumane. These cells were designed for suicide prevention. It logically follows that the
    lethal methods inmates typically use (hanging or jumping) to commit suicide must be
    removed from this environment. Again, the purpose of these cells is for assessment by
    mental health staff in a safe environment.

-   There are a number of mental health-related examples in DRC's report that are either
    factually inaccurate and/or misleading as to the conditions inside the detention facilities.

Response to Disability Rights California
Page 7 of 18

Some of these incidents are the subject of litigation, and therefore, will not be the subject of specific comment. However, the Sheriff's Department can state that no inmate described in DRC's report who had verbalized suicidal thoughts or behavior was ignored or not evaluated for the Inmate Safety Program. Moreover, the inmates did receive a suicide assessment from a Psychiatrist who had the authority to exercise independent clinical judgement.

Finally, the Sheriff's Department disagrees with DRC's implication that our Citizen's Law Enforcement Review Board (CLERB) does not provide "meaningful, independent oversight" to the Sheriff's Department. In 2017, CLERB invested significant resources in personnel and streamlining operations to meet its mission of being an independent oversight for the Sheriff's Department. The authority and duty to monitor inmate treatment, suicide prevention, and jail operations should be performed by CLERB, the well-established, experienced existing independent oversight agency, as opposed to creating a new independent oversight entity.

The San Diego Sheriff's Department fully supports the funding and staffing of CLERB to ensure it is able to carry out its investigations as authorized by its Rules and Regulations with subsequent reporting to the Board of Supervisors and regular community outreach, which is consistent with its current complaint and death investigation practices. CLERB's inspections result in independent oversight of jail operations, the public identification of problems with conditions and operations, early detection of potential issues inside jail facilities, and better-informed policy decisions.

## DETAILED RESPONSES TO DRC RECOMMENDATIONS 1-18

As noted above, the San Diego County Sheriff's Department facilitated and fully cooperated with DRC's inspection of several of our detention facilities. Despite DRC's criticisms of its jail system, San Diego detention facilities are in full compliance with California Code of Regulations, Title 15 Standards for Local Detention Facilities, as evidenced by inspections from the Board of State and Community Corrections. The Sheriff's Department continues to strive to improve operations, practices and policies.

Responses below are offered in the interest of recognizing and responding to DRC's observations, analysis and recommendations. Responses to Recommendations 1-5 were obtained from the County's Health and Human Services Agency, a partner with the Sheriff's Department in providing continuity of care for our inmate/patients. The response to Recommendation 18 was provided by CLERB, our independent oversight entity.

**Recommendation 1.**          **Fully implement the County's three-year Mental Health Services Act (MHSA) Plan, with adequate transparency as to spending and program outcomes.**

Response to Disability Rights California
Page 8 of 18

RESPONSE:

The County's comprehensive three-year MHSA Plan for fiscal year 2017-2018 through fiscal
year 2019-2020 was approved by the County of San Diego Board of Supervisors on October 10,
2017. The Board will receive annual updates that include spending and program outcomes.

All posted reports can be found on the County of San Diego MHSA website
at:   http://www.sandiego.camhsa.org/archive.aspx

**Recommendation 2.**            **Focus investment on community-based services and treatment
programming that help individuals with mental health needs to
thrive and to avoid incarceration and entanglement with the
criminal justice system.**

RESPONSE:

The County agrees that community-based services that help those with mental health needs avoid
incarceration are important. The County is working to continue previous efforts in this area. The
County will continue to invest in community-based services and treatment programming that
help individuals with mental health needs thrive and avoid incarceration and entanglement with
the criminal justice system.  Some examples of such efforts include the following:

- The County expanded the number of Psychiatric Emergency Response Teams (PERT)
  from twelve (12) prior to MHSA to fifty (50) teams today, with 50 % of individuals
  served having been stabilized and avoiding hospitalization or jail encounters.

- The County has continued development of Assertive Community Treatment/Full Service
  Partnership Programs (ACT/FSP) that served approximately 1000 individuals prior to
  2016 with an array of housing supports. This past year, the County's Behavioral Health
  Services department introduced a new program for individuals in the justice system with
  serious mental illness who are transitioning from custody and in need of wraparound
  services to include treatment, housing, and stability in the community.  This is in addition
  to another program already serving this population, Center Star ACT.  Overall about 14%
  of ACT clients had contact with the justice system one year prior to entering the ACT
  program, and 56% of these clients avoided contact with the justice system following
  treatment.

- The County implemented the Behavioral Health Collaborative Court in 2009, which
  offers comprehensive ACT treatment as an alternative to custody for individuals with
  serious mental illness including those with a dual diagnosis.

- The County expanded long term capacity for individuals who are gravely disabled, of
  whom, 60% had contact with the criminal justice system in their past. This expansion
  increased the number of beds from 75 beds in 2014 to over 250 anticipated by this
  summer. This expansion does not involve MHSA funding.

Response to Disability Rights California
Page 9 of 18

- Beginning in 2010, the County has ensured that all of our outpatient mental health clinics have urgent care/walk in hours to help facilitate court referrals.

- In 2010, the County launched one of its largest community education and prevention campaigns, "It's Up to Us," enhancing community and family awareness of mental health issues while de-stigmatizing mental illness and helping individuals access needed care and resources. An increase in calls to our Access and Crisis line has been attributed to the campaign's success as the campaign works to bring attention to available programs and resources, with the hope that connecting someone to care earlier will lead to positive outcomes and prevent negative outcomes such as justice system involvement.

- The county implemented the In-Reach program, which was designed to facilitate appropriate prevention and early intervention services and aftercare linkages with a focus on African American and Latino individuals disproportionately represented in the jail system who may not have been connected to community-based care in the past.

- The County implemented the Courage to Call program which serves returning service men/women and veterans through peer navigation and early intervention, including services to help them connect to resources and avoid unnecessary contacts with the criminal justice system.

- The County implemented the In-Home Outreach Team (IHOT), which is a centralized program offering three mobile teams to provide in-home outreach to adults with serious mental illness who are reluctant or resistant to receiving mental health services. IHOT also provides support and education to family members and caretakers of IHOT participants. Teams serve the six regions of the County of San Diego. Eligible individuals may have a co-occurring substance abuse diagnosis, in addition to a diagnosis of a serious mental illness.

All of the programs offered by the County's Behavioral Health Services (BHS) department are listed on their website at: http://sandiego.networkofcare.org/mh/services/content.aspx?id=6572

| **Recommendation 3.** | **Develop capacity for community-based competency restoration programs for individuals found Incompetent to Stand Trial (IST), so they can receive treatment in the least restrictive setting appropriate and do not languish unnecessarily in jail.** |
|---|---|

RESPONSE:

The County is aware that this issue is being examined at the state level and we will continue to research and monitor any developments.

Response to Disability Rights California
Page 10 of 18

**Recommendation 4.**        **Strengthen reentry programming for individuals with
                            disabilities to ensure continuity of care, including with respect
                            to medication and other treatment, and access to job
                            opportunities, housing, food, and other basic needs for
                            successful reintegration into the community.**

RESPONSE:

The Sheriff's Re-Entry Services Division has taken numerous steps to strengthen re-entry
programming for individuals with mental health needs. The Sheriff's Department works with two
contracted agencies that provide discharge planning services to our inmates with behavioral
health disorders. Their focus is on severely mentally ill individuals. The contractors evaluate the
individual, work with any family/community connections they have and prepare a discharge
plan. While in custody, they will visit the inmate at least twice a month, establishing a
relationship and preparing them for release.

Upon release, contract staff pick up the inmate, collect their discharge medications, and bring the
individual either to a program if they were able to secure a bed in a residential treatment
program, or to their home if they are returning home to family. Case managers and clinicians
continue to work with the individual for 3 months post release to make sure that any problems
that arise are addressed. The program structure for the discharge planners follows a successful
contract already in place with our mainline inmates who have substance abuse issues. We
anticipate expanding these services in the near future to include department staff working
alongside these providers.

The Sheriff's Department also works collaboratively with community providers, criminal justice
partners and community members to develop and implement reentry programs designed to
provide ongoing support and stability to former inmates by cultivating positive and meaningful
opportunities. Community engagement and coordination offers individuals in our custody an
opportunity to build relationships with community based organizations prior to release. The goal
is to enhance reentry services offered within our jail facilities while creating relationships and
linkages to ongoing support upon reentry. Services provided include psych-social treatment,
vocational training and employment connection, health and wellness, college education
opportunities and creative arts. The direct links to services and ongoing support include
employment, housing, system of care coordination, psycho-social interventions and general life
skills.

**Recommendation 5.**        **Ensure that the County's mental health programs are subject
                            to rigorous data collection and self-critical analysis of progress
                            and where additional resources may be needed.**

RESPONSE:

The County's behavioral health programs are already subject to rigorous data collection and self-
critical analysis of progress to determine where additional resources may be needed. The

Response to Disability Rights California
Page 11 of 18

County's behavioral health programs utilize a wide variety of outcome tools to regularly track
the clients' change in symptoms and functioning as well as progress towards recovery. The
County's Behavioral Health Services (BHS) department works closely with the University of
California – San Diego Research Centers to develop procedures that evaluate client outcomes on
a quarterly, annual, and triennial basis.  System-wide and program level reports are produced that
specifically include client outcomes tracked via the outcome measures and other indicators (e.g.,
housing).

Additionally, all mental health programs are required to adhere to cultural competence standards
which include assessments at the program and staff levels, as well as the completion of client
satisfaction surveys that are administered twice a year.  All data from these measures are
analyzed and reported on as well.

BHS routinely develops and distributes "dashboards" (detailed, at-a-glance summaries) and
reports to support the goals of providing safe, client centered, effective, timely, efficient, and
equitable services. Data and reports are utilized for system and program monitoring in alignment
with BHS' goal of continuous improvement and outcome driven guiding principles.  Annual
System of Care reports can be viewed at the following links:

*Children, Youth & Families System of Care*:
https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/bhs/TRL/TRL%20Section%20
6/CYFBHS%20SOC%20Report%202015-16_Final.pdf

*Adult and Older Adult System of Care*:

https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/bhs/TRL/TRL%20Section%20
6/AOABHS%20Annual%20Report%20FY%202015-16_FINAL.pdf

**Recommendation 6.**         **Develop a plan for timely implementation of the DRC Experts'
46 recommendations to address deficiencies in San Diego
County Jails suicide prevention policies, practices, and
training.**

RESPONSE:

Although the Sheriff's Department agrees with some of the recommendations of the DRC
experts, it disagrees with many of them and believes their analysis was incomplete. DRC Experts
Dr. Karen Higgins and Dr. Robert D. Canning were provided reports from our department at a
time when many of our processes were changing. Moreover, their experience regarding mental
health care for inmates lies primarily with the California Department of Corrections and
Rehabilitation and the prison system, not city and county jail systems. Further, Dr. Higgins and

Response to Disability Rights California
Page 12 of 18

Dr. Canning did not visit any of our jails or conduct interviews with any of the mental health staff, inmates, or leadership at any point in time. Thus, many of the recommendations were derived from second hand reports of what actually occurs inside the jails.

**Recommendation 7.**   **Strengthen the County's internal review process and quality improvement program to ensure the implementation of necessary changes to enhance suicide prevention and inmate safety.**

RESPONSE:

Continuous Quality Improvement (CQI) is already being done with respect to suicide prevention and inmate safety. A CQI process exists to identify problems and implement effective solutions, including suicide prevention. All in custody deaths are reviewed at monthly facility Patient Care Coordination Committee (PCCC) meetings. Suicide attempts are reviewed to address areas of improvement related to suicide prevention. The Sheriff's Department Critical Incident Review Board reviews in-custody deaths. We also began performing psychological autopsies on suicide deaths at the end of 2016.

**Recommendation 8.**   **Substantially increase mental health staffing and related resources to ensure that individuals with mental illness in the jail receive clinically indicated treatment.**

RESPONSE:

The County agrees that increasing mental health staffing and related resources are important ways to ensure that mentally ill inmates receive appropriate treatment. The Sheriff's Department has substantially increased its mental health staffing. This includes 14 Full Time Equivalent (FTE) Sheriff's Detentions Licensed Mental Health Clinicians (a 133% increase in Mental Health clinician staffing in the past 3 years) as well as 6 full time licensed psychologists and the equivalent of 7 FTE board certified psychiatrists who are employed through our mental health provider. In addition, the County of San Diego approved an additional $3 million annually for the recruitment of an additional 16 FTE Sheriff's Detentions Licensed Mental Health Clinicians to be able to staff the intake facilities 24 hours per day.

The Sheriff's Department recognizes the importance of mental health services and has over the past three years consistently increased its annual mental health budget to over $14 million annually. The increase in staffing provides individuals with mental illness access to more psycho-social and therapeutic programs through both outpatient and inpatient services while in custody.

Response to Disability Rights California
Page 13 of 18

**Recommendation 9.**          **Ensure that the inpatient Psychiatric Security Units (PSU) are
fully and appropriately utilized, and that all patients in the
PSU receive meaningful, clinically driven treatment.**

RESPONSE:

The Sheriff's Department believes that the Psychiatric Security Units are fully and appropriately
utilized. The PSU is utilized for those acutely in need of psychiatric stabilization in order to

provide them with care including the administration of psychiatric medications, recreation
therapy, milieu therapy, and implemented multi-disciplinarily treatment plans for each patient.
Ensuring the PSU is fully and appropriately utilized is an ongoing priority for our clinical staff
due to increasing needs.

A multidisciplinary team representing custody, classification, medical, mental health, and
counseling regularly meet to discuss placement and treatment options.  Each patient's treatment
plan is reviewed and modified on a weekly basis. The PSU is for those inmates who meet the
requirements of the Welfare and Institutions code Section 5150 (Danger to Self, Others, or
Gravely Disabled) as well as Sections 5250 and 5270, (Temporary or Permanent
Conservatorship). This process is governed in collaboration with the mental health clinical team
and the Courts.

**Recommendation 10.**          **Greatly reduce the use of "Safety Cells" for individuals with
mental health needs. Inmates placed in safety cells as a result
of behaviors related to mental health symptoms should not be
housed there for greater than 6 hours. At that point if there is
no less restrictive housing appropriate, they should be
considered placement in inpatient care including the PSU.**

RESPONSE:

The Sheriff's Department is implementing strategies to reduce the number of safety cell
placements and better utilize the enhanced observation housing cells for individuals who express
suicidal ideation or behaviors.  The Sheriff's Department is in the process of implementing and
creating a Suicide Prevention Focused Response Team that will evaluate safety cell placements
of individuals with mental health issues. The team will develop evidence-based and best
practices for the handling and treatment of individuals placed into a safety cell. The safety cell
length of stay will be based on the clinical assessment of the inmate by the mental health
provider and the Team will develop practices that benefit the inmates with mental health
conditions.

This Team will also evaluate our current policy in order to recommend other placement and
housing options, including the PSU.  The PSU is again for those inmates who meet the
requirements of Welfare and Institutions code Section 5150 (Danger to Self, Others, or Gravely

Response to Disability Rights California
Page 14 of 18

Disabled) as well as Sections 5250 and 5270, (Temporary or Permanent Conservatorship). This process is governed in collaboration with the mental health clinical team and the Courts.

**Recommendation 11.**          **Revise Policies and Practices for the Enhanced Observation Housing (EOH) units to make them less harsh and inhumane, with a greater focus on delivery of treatment designed to reduce the risk of suicide and mental health decompensation.**

RESPONSE:

The Sheriff's Department disagrees with the characterization of the enhanced observation units as harsh or inhumane. These cells were designed for suicide prevention so the lethal methods that inmates typically use (hanging or jumping) were removed from this environment. The purpose of these cells is for structured assessments by mental health staff in a safe environment.

The Suicide Prevention Focused Response Team that the Sheriff's Department will be creating will evaluate the current policy and make whatever changes are necessary to improve practices. The addition of mental health clinician staff will provide the department with more resources for the treatment of patients placed in EOH.

**Recommendation 12.**          **Revise Policies to allow individuals in EOH to have access to social visits, increased out of cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs.**

RESPONSE:

The Sheriff's Department does not believe the EOH policies need to be revised at this time. The purpose of the enhanced observation housing units is to create a safe environment for an assessment by mental health staff. These units are not intended for long term housing. Further, articles such as clothes or other personal property may be used by inmates who are suicidal to attempt to harm themselves. Again, the Suicide Prevention Focused Response Team that the Sheriff's Department will be creating will evaluate and determine whether certain living restrictions can be modified. The department wants to be careful not to create a housing option that would encourage other inmates to manipulate the system for personal gain. We are strongly committed to suicide prevention and our efforts will be towards that end with respect to the use of these cells.

**Recommendation 13.**          **Implement a consolidated mental health treatment program that offers a spectrum of levels of care. The program should include the creation of an intermediate level of mental health care for individuals who need enhanced treatment**

Response to Disability Rights California
Page 15 of 18

> programming. The Intensive Outpatient Program at
> Sacramento County Jail offers one useful model.

RESPONSE:

The Sheriff's Department has already implemented a mental health treatment program that offers
different levels of care. Sheriff's mental health care has progressed from mental health services
that focused heavily on medication management and discharge planning to include more
comprehensive services which include an "intermediate" level of care for non-medication related
mental health issues. We have established a dedicated Step Down Unit. We are providing
intermediate services in 6 of our jails, with plans to offer them in the 7th later in 2018. Expansion
of our Licensed Mental Health Clinician staff has allowed us to expand the outreach of our
services. Additionally, discharge planning efforts are now more extensive with the utilization of
county contracts with Training Center and Project In Reach.

**Recommendation 14.**           **Provide a written individualized treatment plan for each
person requiring mental health services in the jail, as required
by Title 15, Section 1210 of the California Code of Regulations.
Ensure that clinically indicated treatment prescribed in the
treatment plan is provided.**

RESPONSE:

The Sheriff's Department already provides treatment planning for inmates with mental health
needs. The Sheriff's Detention facilities have passed each Title 15 Health and Hygiene inspection
and have satisfied this requirement annually. Treatment planning is embedded in our mental
health staff documentation for our Licensed Mental Health Clinicians as it is a required section
in all of our templates (mental health needs assessment, suicide risk assessment). The
multidisciplinary groups at each facility serve as a forum where high risk inmate treatment plans
are discussed. Multidisciplinary groups started at Vista Detention Facility in 2009 and gradually
transitioned to the other detention facilities between 2011-2013.

**Recommendation 15.**           **Reduce the use of solitary confinement segregation housing,
and take affirmative steps to eliminate solitary confinement
placements for individuals with mental illness at risk of harm
in such a setting, absent exceptional and exigent circumstances.**

RESPONSE:

The Sheriff's Department acknowledges that the use of solitary confinement is an issue currently
being discussed nationally across many types of correctional facilities. The Sheriff's Department
has been proactive in reducing the number of administrative segregated housing placements.
Multidisciplinary groups meet weekly (at the Vista Detention Facility) or biweekly (at San Diego

Response to Disability Rights California
Page 16 of 18

Central Jail, George Baily Detention Facility and Las Colinas Detention and Reentry Facility) to focus on trying to ensure care and minimize decompensation for those in segregated housing.

Licensed Mental Health Clinicians conduct and document weekly administrative segregation wellness checks to monitor and intervene in case of decompensation. The Clinicians also communicate weekly with the Jail Population Management Unit to share their impressions and concerns about inmates in segregated housing who have mental health needs. Additionally, system wide segregation emails are sent to the Clinicians informing them of restrictive housing placement for assessment within 24 hours. The Sheriff's Department will continue to focus on this issue going forward.

**Recommendation 16.**        **Track and Analyze data on all segregation housing placements and lockdowns, including lengths of stay and outcomes for inmates, particularly those with mental illness. Take corrective action to eliminate unnecessary segregation placements and lockdowns as part of ongoing quality improvement efforts.**

RESPONSE:

The Sheriff's Department agrees that tracking and analyzing data with segregation is helpful to reduce unnecessary segregation placements and is currently working to that end. The Sheriff's Department processes noted in Recommendation 15 are part of a collaborative effort to eliminate unnecessary segregation placements and lockdowns. Tracking and analyzing data on segregated housing is not currently done but we appreciate the feedback and will explore in the future. The Department is currently in the initial stages of procuring a new Jail Information Management System. The procurement process offers the ability to customize the new system in a manner that may allow for additional tracking of pertinent administrative segregation information.

**Recommendation 17.**        **Reduce the harsh isolation conditions in segregation and other restrictive housing units. Provide individuals in such units a minimum of four hours per day of out of cell time, along with access to treatment, recreation, and other activities necessary to ensure their health and well-being.**

RESPONSE:

The Sheriff's Department acknowledges that segregation can have adverse effects on inmates in prolonged isolation. The Sheriff's Department has taken proactive efforts to improve isolation conditions in restrictive housing units. In efforts to improve conditions in segregated housing, we have undertaken group dayroom projects, whereby the Jail Population Management Unit (JPMU) in collaboration with mental health and line staff attempt to pair up segregated inmates for lengthier and shared dayroom times to encourage socialization. This will be a continuous improvement process as in many national detention facilities.

Response to Disability Rights California
Page 17 of 18

**Recommendation 18.**     **The County should establish a professional independent oversight entity that has the authority and duty to monitor the treatment of inmates with mental health needs, suicide prevention, and other aspects of jail operations affecting inmates with disabilities, with periodic reporting to the Board of Supervisors and regular outreach to the public.**

RESPONSE:

The County already has a professional, independent oversight entity in the Citizens Law Enforcement Review Board (CLERB). Pursuant to San Diego County Code of Administrative Ordinances Section 340, when CLERB was established in 1991 the purpose and intent of the

Board of Supervisors (BOS) was for CLERB to advise the BOS, the Sheriff, and Chief Probation Officer on matters related to the handling of citizen complaints which charge peace officers and custodial officers employed by the County's Sheriff's Department or Probation Department with misconduct arising out of the performance of their duties. CLERB was also established to receive and investigate specific citizen complaints and investigate deaths arising out of or in connection with the activities of peace officers and custodial officers employed by the County's Sheriff's Department or Probation Department.

CLERB's Rules and Regulations (R&R), which were adopted in 1992, detail other duties and responsibilities for which CLERB has authority. CLERB R&R Section 4.7 (d) indicates that CLERB shall have authority to:

> Annually inspect county adult detention facilities and annually file a report of such visitations together with pertinent recommendations with the BOS, the Presiding Judge of the Superior Court, the Sheriff, the Board of Corrections, and Attorney General. Inspections shall be concerned with the conditions of inmate employment, ***detention, care, custody, training, and treatment*** on the basis of, but not limited to, the minimum standards established by the Board of Corrections. (Emphasis added.)

In the past, CLERB's focus has been limited to the investigation of complaints of misconduct and deaths arising out of or in connection with the activities of peace officers and custodial officers and making policy and procedure recommendations. Presumably due to staffing and/or funding issues, CLERB has never inspected the county's adult detention facilities. However, when receiving complaints about general conditions or operations not pertaining to the actions of peace officers, CLERB advises the Sheriff's Department of the nature of these complaints.

With the hiring of a new Executive Officer in June 2017 and the addition of a newly funded Investigator position as of March 16, 2018, several internal practices have been implemented to ensure that CLERB conducts timely investigations into complaints of misconduct and deaths. With its additional staffing, CLERB will be able to annually inspect county adult detention facilities for the purpose of documenting the conditions of detention, care, custody, training, and treatment as authorized by CLERB Rules and Regulations Section 4.7 (d). These inspections will

Response to Disability Rights California
Page 18 of 18

result in meaningful and sufficient monitoring of treatment of inmates with mental health needs,
suicide prevention practices, and other aspects of jail operations affecting inmates with
disabilities.

## CONCLUSION

The Sheriff's Office and the County of San Diego appreciate DRC's insight and experience on
the issues associated with those suffering mental illness in our detention facilities. The Sheriff's
Department and the County of San Diego maintain a commitment to providing all inmates safe,
secure housing in conjunction with the highest standard of medical and mental health services in
all San Diego County jails.

Sincerely,

William D. Gore, Sheriff

WDG:eds

Attachment: [Expert Report by Colleen Kelly, Ph.D.]

EXHIBIT D

**William D. Gore, Sheriff**                                    (858) 974-2259

### San Diego County Sheriff's Department – Media Relations

Lt. Karen Stubkjaer, Media Relations Director                    www.SDSheriff.net

April 24, 2018

# Taking a Proactive Approach to Treating the Mentally-Ill in Jail

The San Diego County Sheriff's Department has always sought to provide high quality medical and mental health services to inmates and recognizes the challenges associated with providing care within our detention facilities.  Across the nation and within San Diego, there are a growing number of inmates experiencing mental health issues.  As a result, the Sheriff's Department has doubled its budget for inmate mental health services to $14 million annually, and we recently received approval for an additional $3 million per year to recruit and hire more mental health professionals to staff our detention facilities.

In 2017, the Department made significant changes to our mental health program.  The Department contracted with Liberty Healthcare Corporation to facilitate the hiring of psychologists, psychiatric nurse practitioners and psychiatrists.  Liberty Healthcare is a national mental health leader in establishing many innovative programs for mentally ill inmates.  The Department has also hired additional mental health clinicians to provide timely and efficient mental health services to inmates.  The Department reviewed and revised processes in 2017 including mental healthcare policies and procedures, psychotropic medication management, suicide prevention, and mental health training curriculums that were specifically developed for deputies and professional staff.  The revised mental health training provides staff with essential skills that are useful when interacting with mentally ill inmates.

Furthermore, the Sheriff's Department as part of our suicide prevention efforts has made significant investments in specialized housing units, structured clinical assessments, quality assurance mechanisms, and a follow up program for those identified as "at risk" for suicide.  Following these efforts, the Sheriff's Department experienced but one suicide within our jails in 2017, representing an 80% drop in the number of completed suicides compared with the previous year.

Nevertheless, San Diego County's jails have, in recent years, been the subject of the false and misleading claim (originally in a series of articles in San Diego CityBeat, which have been repeated in reports issued by at least one advocacy group ) that our jail system has one of the highest suicide rates in the nation. We have always strongly suspected that the extrapolated figures that were the cornerstone of these articles and reports did not paint an accurate picture of the true "suicide rate" within the jails.  Because we believed that the public deserved the benefit of an independent statistical analysis on this issue, the County retained a highly skilled and respected statistician, Dr. Colleen Kelly, to conduct an independent review of inmate suicide statistics (See Dr. Kelly's Expert Report from 2010-2017).  We trusted that Dr. Kelly would conduct a thorough and proper analysis of our jail suicide data, and we were prepared to accept the results of such an analysis, even if it turned out to be unfavorable to us.

    



As we suspected, the analysis demonstrated that the approach taken in the CityBeat articles was significantly flawed and misleading. Dr. Kelly concluded that when "at risk" population figures are correctly used to compare counties, the suicide rate in San Diego County detention facilities was comparable to other county detention facilities throughout the state. "At risk" figures take into account racial and gender discrepancies between the various detention systems as well as the varying number of inmates cycling through a jail system, and when used, San Diego County detention facilities are actually as safe as other comparably sized county jails.

That being said, simply being comparable to other counties is not good enough. We are continuously looking for best practices in our delivery of mental health services to inmates. Towards that end, the Department is consulting with Lindsay M. Hayes, a nationally recognized expert in the area of jail suicide prevention, to evaluate our programs. We expect that our consultations with a respected independent reviewer such as Mr. Hayes to scrutinize our practices (which includes on-site visits and deep analysis of our current system) will lead to further improvements and quality of care provided to inmates.

Additionally, the Sheriff's Department is in the process of obtaining national accreditation of our detention facilities with the National Commission on Correctional Healthcare (NCCHC). This organization has become the recognized leader in publishing medical and mental health standards for detention facilities, prisons, and juvenile facilities across the country. Obtaining accreditation will further validate the quality of care the Sheriff's Department provides.

Within the past few years the Sheriff's Department, by adhering to model policies and practices set forth by the NCCHC, has improved many of our practices related to mental health and suicide prevention. Examples include the implementation of security checks every 15 minutes of those in the Inmate Safety Program and the implementation of Enhanced Observation Housing for "at risk" inmates. Additionally, in the event of a completed suicide a detailed analysis is completed of all available information from multiple sources and records, to include relatives and friends as well as attending health care personnel (also known as "psychological autopsy".)

The Sheriff's Department expects the recommendations and observations by our consultants, as well as the improvements to practices as we gain accreditation, will contribute to the positive changes we have already made to our mental health services delivery system. The Department will continue to strive for improvement and provide the best possible medical and mental health services for inmates within our detention facilities.

To read more about this topic and to review Dr. Kelly's entire Expert Report, go to http://sdsheriff.net/response.

### 



EXHIBIT E

In April of 2018, the San Diego Office of County Counsel requested Lindsay Hayes to independently assess suicide prevention practices within the Sheriff's Jail system, as well as, to offer any appropriate recommendations for the revision of suicide prevention policies and procedures.  Mr. Hayes is nationally regarded as an expert in the field of suicide prevention within jails, prisons and juvenile facilities, and has been appointed as a Federal Court Monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction.  Mr. Hayes conducted an on-site assessment at four Sheriff's jail facilities from April 23 thru April 28, 2018.

In June of 2018, the Sheriff's Department received Mr. Hayes report entitled "Report on Suicide Prevention Practices within the San Diego County Jail System." The report focused on eight (8) critical components of a suicide prevention policy which include staff training, identification/screening, communication, housing, levels of supervision/management, intervention, reporting, and follow-up/mortality-morbidity review.   Based on his on-site assessment, as well as a review of various San Diego County Sheriff's Department policies and procedures related to suicide prevention, Mr. Hayes' produced a report containing 32 actionable recommendations.

Since receiving Mr. Hayes' report, the Sheriff's Department has been diligently working to address each of the recommendations.  The following is a list of the recommendations contained within the Hayes report, as well as a synopsis as to what the Sheriff's Department has done to implement the recommendations, and the current status of those recommendations that have yet to be completed.  The italicized and bolded language below is taken from the "Summary of Recommendations" from the Lindsay Hayes report.

## Mr. Lindsay Hayes' full report begins on page 15.

### *Staff Training*

***1) It is strongly recommended that the ISP policy be revised to include a more robust description of the requirements for both pre-service and annual suicide prevention training, to include the duration of each workshop and an overview of the required topics.***

Detentions Policy and Procedure was updated to require "Suicide Detection and Prevention" training annually.  This is accomplished in an 8 hour initial training as well as a 2 hour refresher course.  In addition, professional staff members receive training on "Suicide Detection and Prevention" as part of their orientation.

***2) It is strongly recommended that the joint efforts of the Medical Services Division (MSD) and Detention In-Service Training unit (DTU) to consolidate this writer's 10-hour Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison***

*Facilities into an 8-hour classroom training for all current SDCSD deputies be expanded to include all new employees (i.e., medical and mental health personnel) working within the San Diego County Jail System.*

This recommendation was implemented through a collaborative effort between the Detentions Training Unit, Sheriff's mental health staff, and contracted mental health staff to create a curriculum of training utilizing the Lindsay Hayes program guide. This course is required for all Sheriff's Detention assigned staff.

*3) It is strongly recommended that the MSD and DTU jointly collaborate on the development of a 2-hour annual suicide prevention curriculum based upon this writer's Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities. At a minimum, the curriculum should include a review of: 1) avoiding obstacles (negative attitudes) to prevention, 2) predisposing risk factors, 3) warning signs and symptoms, 4) identifying suicidal inmates despite the denial of risk, and 5) review of any changes to the ISP policy. The annual training should also include general discussion of any recent suicides and/or serious suicide attempts in the San Diego County Jail System.*

This recommendation was implemented. A two hour curriculum was separated into four 30 minute parts and will be required briefing training to meet the refresher training recommendation.

*4) It is strongly recommended that the annual suicide prevention training be required for all custody, medical, and mental health personnel (including LHC contracted psychologists and psychiatrists). Suicide prevention is all about collaboration, and requiring custody, medical, and mental health personnel to sit together in a classroom environment is not only symbolically appropriate, but instills the philosophy that all professionals, regardless of credentials, have an equal responsibility for inmate suicide prevention and can learn from one another's backgrounds, insights, and experiences.*

This recommendation was implemented. All staff listed above are required to attend the course that was collaboratively designed utilizing the Lindsay Hayes curriculum.

### Intake Screening/Assessment

*5) It is strongly recommended that Detention Services Bureau (DSB) and MSD officials look at options to better ensure reasonable sound privacy in the booking areas of the three intake facilities when multiple nurses are conducting intake screening at the same time. As demonstrated in the SDCJ, if the inmate is secured within the nursing booth and the door is closed with the officer stationed outside, reasonable privacy and confidentiality can occur while ensuring staff safety.*

This recommendation has been partially implemented. The only remaining booking facility that does not allow for private interview space at booking is the Vista Detention Facility (VDF). The project is currently on the capital improvement list.

*6) It is strongly recommended that the current suicide risk inquiry contained in the "Medical Intake Questions" form embedded in the JIMS be revised to include the following:*

- *Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?*

- *Has a family member/close friend ever attempted or committed suicide?*

- *Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?*

This recommendation has been implemented. The questions listed above were added to the Jail Information Management System and are asked during the booking process by nursing staff.

*7) It is strongly recommended that MSD officials reconsider the utility of the Columbia-Suicide Severity Rating Scale (C-SSRS) during the intake screening process. Although the C-SSRS has become a popular screening form in some jail facilities throughout the country, its effectiveness remains questionable. It is this writer's opinion that the structure of the questions creates awkwardness between the screener and inmate, and more importantly, questions that limit responses to the "past month" are potentially very dangerous (e.g., the suicidal ideation of an inmate that was experienced more than a month ago would not be captured during the screening process). Intake screening questions by nursing staff should be open-ended and not time-sensitive; it is responsibility of a mental health clinician during a subsequent assessment to determine the degree of relevancy of prior suicide risk to current risk. With addition of the three questions offered above, the current intake screening form would be more than adequate without the necessity of the C-SSRS.*

This recommendation has been completed. The Sheriff's Department has reconsidered the utility of the Columbia-Suicide Severity Rating Scale (C-SSRS) during the intake process and determined that it will continue to utilize the C-SSRS, in addition to the questions added in the previous recommendation. The C-SSRS has been normed for the correctional environment and is a tool to drive further assessment by a qualified mental health provider. Further, the C-SSRS is part of the County of San Diego suicide prevention strategic plan and utilized by other justice partners.

*8) Although this writer would defer to MSD officials as to whether to designate either a charge nurse or mental health clinician to be the ISP gatekeeper, it is strongly recommended that, if the charge nurse is a gatekeeper, they should always immediately notify an on-site mental health clinician when an inmate has been identified as potentially suicidal. The clinician, in turn, should respond and conduct the suicide risk assessment and determine the appropriateness of suicide precautions. Unless exigent circumstances exist and/or mental health personnel are not on-site, the determination of placing a potentially suicidal inmate in either a safety cell and/or the EOH unit should be made by the mental health clinician.*

Detentions Policy and Procedure has been updated to reflect the recommendation related to the roles of a qualified mental health provider. The service hours of the mental health clinicians have been expanded for greater coverage and plans to have mental health staff available 24/7 at the intake facilities (San Diego Central Jail, Vista Detention Facility and Las Colinas Detention and Reentry Facility) are in the works and will be accomplished through the hiring of new staff as well as through expanded hours of contract staff.

*9) It is strongly recommended that DSB and MSD officials revise the "automatic triggers" criteria contained within the ISP policy to require only criteria No. 3 ("The inmate states he/she is suicidal and or made suicidal statements to sworn staff, medical, family, etc.) to result in placement on suicide precautions. Although the other four criteria could be potential suicide risk factors, they should be considered criteria for a mental health referral, and not necessarily automatic placement on suicide precautions.*

This recommendation is not necessary. The "automatic triggers" referred to in the recommendation report were not triggers for placement on suicide precautions. They were triggers to require an assessment for the need for placement on suicide precautions. These triggers give both sworn and medical staff a tool in determining if a referral for assessment is needed, and are consistent with the recommendation.

*10) Consistent with the SDCSD philosophy that a previous suicide attempt documented in JIMS could be a factor for current suicide risk, an inmate's previous placement on suicide precautions within the San Diego County Jail System is equally important. As such, regardless of the inmate's behavior or answers given during intake screening, a mental health referral should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during an inmate's prior confinement within the San Diego County Jail System. As such, it is strongly recommended that determination of whether the inmate was "on suicide precautions during prior confinement in a SDCSD facility?" should be independently verified through review of the JIMS by nursing staff. An "alert" screen on JIMS and protocol should be created according to the following procedures:*

- *Any inmate placed on suicide precautions should be tagged on the JIMS "alert" screen by mental health staff (e.g., "ISP June 2018");*

- *Nursing staff conducting intake screening should always review the inmate's "alert" screen to verify whether they were previously confined in a SDCSD facility and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and*

- *Regardless of the inmate's behavior or answers given during intake screening, further assessment by mental health staff should always be initiated based on documentation reflecting suicidal behavior/ placement on suicide precautions during the inmate's prior SDCSD confinement.*

Changes to Detentions Policy and Procedure are in process to reflect the recommendation regarding a mental health referral for a previous suicide attempt during an inmate's prior confinement in the San Diego County Jail system.    Alert flags in the Jail Information Management System advise nursing staff of previous in custody suicide attempts, and Psychiatric Stabilization Unit housing, which will alert nursing staff to schedule an urgent Qualified Mental Health Provider assessment.  These flags, in addition to a newly created flag for those previously housed within the Inmate Safety Program will be within the Electronic Health Record system once operational in mid-September.   These flags will alert both nursing and mental health providers of the patient's prior and current mental health status.

*11) It is strongly recommended that MSD officials initiate a continuous quality assurance plan to periodically audit the intake screening process to ensure that nursing staff are accurately completing the "Medical Intake Questions" form, and not using abbreviated inquiry, as well as soliciting responses to the four arresting officer questions.*

This recommendation has been implemented.  Nursing audits by supervising nurses have been adjusted to include periodic audits of the intake screening process at intake facilities.  The results of these audits are reported at  quarterly quality assurance meetings.

*12) It is strongly recommended that MSD officials develop a mental health triage and referral protocol. Although there is no standard of care that consistently specifies time frames to respond to mental health referrals, one suggested schedule would be as follows: Emergent - immediate or within 1 hour; Urgent - within 24 hours; and Routine - within 72 hours.   In addition, mental health leadership should develop a mental health triage policy that defines response levels, sets timetables for each level, and defines the acuity of behavior(s) that dictates a specific response level. Of course, any inmate expressing current suicidal ideation*

*and/or current suicidal/self-injurious behavior should result in an <u>Emergent</u> mental health referral.*

An acuity referral system for mental health treatment and Inmate Safety Program already exist in policy and will be built into the Electronic Health Record system.  Mental Health staff will continue operating under the current protocols as we continue to evaluate and enhance our mental health services.

*13) Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, it is strongly recommended that medical personnel review the medical section of JIMS to determine whether existing medical and/or mental health needs contraindicate the placement or require accommodation. In addition, a "best practice" would be that any inmate assigned to such a special management housing unit receive a brief assessment for suicide risk by nursing staff upon admission to such placement. The following are recommended questions for the brief assessment:*

- *Are you currently having thoughts of harming yourself?*

- *Have you previously tried to harm yourself because of a segregation placement?*

- *Is the inmate speaking incoherently; expressing bizarre thoughts; unable to sit still or pay attention; or is disoriented to time, place, or person?*

*Affirmative responses to any of these questions should result in an Emergent mental health referral.*

Business processes are being developed, and policies are being updated, to provide for real time notification to Qualified Mental Health Providers so assessments can be accomplished in a timely manner.

<u>Communication</u>

*14) It is strongly recommended that the MSD establish a weekly mental health team meeting at each facility that includes MSD mental health clinicians and LHC psychologists and psychiatrists. The primary purpose of the weekly meeting is to identify and manage the treatment needs of suicidal and/or seriously mentally ill patients.*

This recommendation will not be implemented.  The NCCHC recommendation relating to mental and medical health patient care meetings between staff is that they are to occur once per month.  The San Diego County Sheriff's Department exceeds this standard by holding bi-

weekly Multi-Disciplinary Group (MDG) meetings at the San Diego Central Jail, George Bailey Detention Facility, Vista Detention Facility, and Las Colinas Detention and Reentry Facility. In addition, each of these facilities also have monthly Patient Care Coordinating Committee meetings, daily Psychiatric Stabilization Unit meetings (SDCJ, LCDRF), and weekly outpatient stepdown unit meetings (SDCJ,LCDRF). Additionally, ad hoc meetings can be called when urgent inmate care issues arise.

### *Housing*

*15) As this writer inspected a vast array of differing physical environments for the housing of suicidal inmates in the four jail facilities (i.e., safety cells, EOH single cells and dormitories, MOB, and PSU observation cells, etc.), it is strongly recommended that DSB officials conduct a comprehensive physical plant review of all jail cells utilized for the housing of suicidal inmates to ensure that they are reasonably suicide-resistant. This writer's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities," included as Appendix A of this report, can be utilized as a guideline for such an inspection.*

A comprehensive physical plant review of all specialty and segregated housing was conducted. Construction plans for modifications to these housing areas were submitted to General Services for implementation.

*16) Due to the limited positive attributes of safety cell use, it is strongly recommended that, if utilized, the maximum length of stay in a safety cell be limited to no more than six (6) hours. In addition, use of a safety cell should not be the first option available, rather it should only be utilized in exigent circumstances in which the inmate is out of control and at immediate, continuing risk to self and others. Current SDCSD policies should be appropriately revised.*

Revisions were made to the Inmate Safety Cell policy to ensure safety cells are not the first option of placement for those identified as having a suicide risk. The placement criteria was changed in the policy to use safety cells only for inmates who are actively self-harming or actively assaultive. The policy now requires a Qualified Mental Health Provider assessment for retention in a safety cell to be conducted every 4 hours.

*17) It is strongly recommended that MSB officials instruct their clinical staff on the appropriate use of safety smocks, i.e., they should not be utilized as a default, and not to be used as a tool in a behavior management plan (i.e., to punish and/or attempt to change perceived manipulative behavior). Rather, safety smocks should only be utilized when a clinician believes that the inmate is at high risk for suicide by hanging. Should an inmate be placed in a safety smock, the goal should be to return full clothing to the inmate prior to their discharge from suicide precautions. Finally, custody personnel should never place an inmate*

*in a safety smock unless it had been previously approved by medical and/or mental health personnel. Current SDCSD policies should be appropriately revised.*

This recommendation has not yet been implemented.  The Sheriff's Department has changed the criteria for admission into a safety cell.  As a result of these changes, there are fewer placements into a safety cell, and inmates are spending significantly less time.  The Department is seeking additional clarification from Mr. Hayes as it relates to the changes and this recommendation.

*18) It is strongly recommended that possessions and privileges provided to inmates on suicide precautions should be individualized and commensurate with their level of risk. As such, current SDCSD policies should be appropriately revised, as follows:*

- *All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk as determined on a case-by-case basis by mental health clinicians and documented in JIMS;*

- *If a mental health clinician determines that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock and safety blanket;*

- *A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended (i.e., attempting to tamper with/destroy, utilize to obstruct visibility into the cell, etc.);*

- *All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction;*

- *All inmates on suicide precautions shall be allowed to attend court hearings unless exigent circumstances exist in which the inmate is out of control and at immediate, continuing risk to self and others, and*

- *Inmates on suicide precautions shall not automatically be locked down.  They should be allowed dayroom and/or out-of-cell access commensurate with their security level and clinical judgment of mental health clinicians.*

This recommendation has been implemented in part.  Inmates placed in safety cells are not allowed privileges since the only inmates placed in safety cells are those who are actively self-harming or actively assaultive.  Inmates placed in Enhanced Observation Housing (EOH) are

allowed dayroom time, television time, and social phone calls.  Additionally, inmates in EOH have access to reading materials such as books and periodicals.  Inmates who are designated as low risk in EOH may attend court.  This recommendation is still being reviewed for its efficacy in our system.

**19) Although SDCSD Policy J.4: Enhanced Observation Housing (EOH), Definition and Use requires that "EOH units shall be clean and disinfected using facility approved disinfectants or bleach solution after every use or as needed,"  this writer's inspection of cells in several facilities found them to be quite dirty and unsanitary. As such, it is strongly recommended that DSB officials reinforce the above directive and that shift supervisors at each facility ensure that cells utilized to house suicidal inmates are reasonably clean and sanitary.**

Enhanced Observation Housing policy was updated to add a daily cleaning as well as after each use.  Facility supervisor and management staff are required to check for compliance.

**Levels of Supervision/Management**

**20) It is strongly recommended that all DSB and MSD suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:**

- **Close Observation is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific plan) and/or has a recent prior history of self-destructive behavior and would be considered a low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10-15 minutes, and should be documented as it occurs.**

- **Constant Observation is reserved for the inmate who is actively suicidal, either by threatening (with a plan) or engaging in self-injury, and considered a high risk for suicide.  This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals.**

This recommendation has been implemented in part.  Close observation is conducted for those inmates in Enhanced Observation Housing and in Safety Cells.  Constant Observation can be utilized for those inmates in the Psychiatric Stabilization Units when warranted.

*21) It is strongly recommended that, with the adaption of the two-level observation system as offered above, reference to the ill-defined "high" and "low" suicide risk categories are no longer necessary and should be deleted from all SDCSD policies.*

Levels of observation are currently outlined in policy.  After internal discussion and review of this recommendation, SDSD has opted to keep both "high and low" risk indicators.

*22) It is strongly recommended that the narrative of "twice every 30 minutes" currently contained within some SDCSD policies be replaced with "staggered intervals that do not exceed 10-15 minutes."*

This recommendation was implemented to include language in Detention Policy and Procedure regarding staggered safety checks not to exceed 15 minutes.

*23) It is strongly recommended that SDCSD policies should be revised to eliminate the necessity of "a minimum of two assessments by mental health provider with time interval between assessments and for clearance based on high/low risk designation after first assessment." In other words, consistent with the standard of care, an inmate identified as potentially suicidal (or placed on suicide precautions after hours by non-mental health personnel) should be immediately referred to a mental health clinician for completion of a suicide risk assessment. The assessment should be completed immediately if mental health personnel are on-site or during the next business day morning if they are off-site at the time of the referral. Should the clinician's initial suicide risk assessment find that the inmate is not suicidal and does not require either initiation/continuation of suicide precautions, the inmate should be released to appropriate rehousing. Should the clinician's suicide risk assessment find that the inmate is suicidal, the inmate should be placed on suicide precautions and seen on a daily basis by a mental health clinician until a determination is made that they are no longer suicidal. Daily assessments of suicide risk should be documented in SOAP-formatted progress notes. When the clinician determines that an inmate is no longer suicidal and can be discharged from suicide precautions, documentation of such clinical judgment should occur in a suicide risk assessment form. In addition, the MSD document entitled "ISP Clarifications, March 29, 2018" (which speaks to "two consecutive low risk assessments by two different providers," as well as assessments occurring between 4 and 6 hours of each other) should also be deleted from SDCSD policies as it will no longer be relevant.*

This recommendation was implemented in part.  Policy and Procedure revisions were made to require an assessment to be completed immediately if mental health personnel are on-site or during the next business day morning if they are off-site at the time of the referral. As it relates to a second assessment, the second assessment will occur within 12-24 hours but no more than 24 hour intervals between assessments.

*24) It is strongly recommended that the MSD utilize only one version of the suicide risk assessment forms currently being utilized by MSD mental health clinicians and LHC psychologists (i.e., LMHC ISP Risk Assessment Form, Psychologist EOH Evaluation, Psychologist ISP Evaluation, etc.). The Psychologist ISP Evaluation template that this writer reviewed at GBDF appears to be the most comprehensive. As recommended above, the selected suicide risk assessment form template should be utilized as justification for an inmate's initial placement on suicide precautions, as well as justification for an inmate's discharge from suicide precautions.*

The Chief Mental Health Clinicians developed a standardized suicide risk assessment template which will be embedded into the Electronic Health Record system.  Training was provided to all QMHP's and contracted mental health staff.

*25) It is strongly recommended that, consistent with NCCHC and other national correctional standards, all clinicians develop treatment plans for inmates discharged from suicide precautions that describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur. A treatment plan should be contained in the discharging suicide risk assessment.*

The Chief Mental Health Clinicians developed a standardized treatment plan template which will be embedded into the Electronic Health Record system.  Training was provided to all QMHP's and contracted mental health staff.

 *26) It is strongly recommended that reasonable efforts should be made, particularly when considering the discharge of an inmate from suicide precautions, to avoid a cell-side encounters; rather, suicide risk assessments should be made in a private and confidential setting. Should an inmate refuse a private interview, the reason(s) for the refusal should be documented in JIMS.*

This recommendation has been implemented in part Policy and procedure changes were made to eliminate cell-side encounters except in situations where doing so could jeopardize the safety of the inmate or staff.   There is a pending construction project at the Vista Detention Facility that will provide additional confidential setting options in the booking area.

*27) It is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on the mental health caseload and receive regularly scheduled follow-up assessments by clinicians until their release from custody.  As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), it is recommended that the follow-*

*up schedule be simplified and revised as follows:  follow-up within 24 hours, again within 72
hours, again within 1 week, and then periodically as determined by the clinician until release
from custody.*

This recommendation has been implemented.  All inmates placed into and subsequently
released from the Inmate Safety Program are maintained on a Qualified Mental Health
Provider's caseload and are followed up with as clinically indicated.

*28) Given the strong association between inmate suicide and segregation housing and
consistent with national correctional standards, it is strongly recommended that DSB officials
give strong consideration to increasing deputy rounds of such housing units from 60-minute
to 30-minute intervals.*

This recommendation has been implemented.  The Sheriff Department has given strong
consideration to increasing deputy rounds of restricted housing units from 60 minutes to 30
minute intervals.  However, given the challenges regarding the physical layout of jail facilities,
the numbers of inmates, and care necessary to properly conduct these checks, the Department
has determined that it would not be feasible at this time to make this change.  This
recommendation requires the potential of cohorting inmates in administrative segregation, and
disciplinary isolation areas of facilities to make implementation feasible.  The Department
continues to assess the feasibility of this recommendation.

*29) It is strongly recommended that both mental health and nursing personnel be instructed
to refrain from utilizing terms such "contracting for safety" or "vouching for his safety" with
patients when assessing suicide risk. SDCSD policy should also be revised accordingly to
prohibit its use.It is strongly recommended that both the SCSD and JPS suicide prevention
policies be revised to include two levels of observation that specify descriptions of behavior
warranting each level of observation. A proposed revision is offered as follows:*

This recommendation was implemented by a directive to contract mental health staff and
Sheriff's mental health clinicians to eliminate the use of "contracted for safety" or "vouching for
his safety" practices and verbiage from their clinical notes.

*Intervention*

*None*

*Reporting*

*None*

*Follow-Up/Mortality-Morbidity Review*

*30) It is strongly recommended that either the Critical Incident Review Board (CIRB) or the Suicide Prevention and Focused Response Team (SPFRT) be responsible for conducting mortality reviews of any inmate suicide, as well as morbidity reviews of any serious suicide attempts (defined as necessitating medical treatment outside the facility). Such reviews should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When recommendations are accepted for implementation, a corrective action plan should be created that identifies each recommendation, followed by identified responsible staff, status(s) and deadline(s) for implementation. Every effort should be made to complete mortality-morbidity review process within 30 days of the incident. As such, should the mortality-morbidity review process become the responsibility of the CIRB, review of the suicide should be moved from the current 14-day deadline to a more reasonable 30-day deadline. Both the DSB's Policy M.7: Inmate Deaths and MSD's Policy Death of an Inmate On-Site should be revised to reflect the above 6-step review process. To assist either of the CIRB or SPRFT in these processes, this writer's "Mortality-Morbidity Review of Inmate Suicides/Serious Suicide Attempts Checklist" is offered for consideration in Appendix B.*

<span style="color:red">MSD's Policy titled "Death of an Inmate On-Site" has been revised to require a mortality review within 30 days as recommended for cases involving suicide and serious suicide attempts.</span>

*31) It is strongly recommended MSD's clinical review of an inmate suicide that is currently entitled "psychological autopsy" be renamed as either a "suicide report" or "clinical suicide report." In the alternative, should MSD officials decide to commit to a psychological autopsy process, consistent with NCCHC standards, the review should include the MSD chief mental health clinician's prompt examination of the suicide site (including cell contents), as well as interviews with relevant staff, inmates, and family members of the decedent (when appropriate). Every effort should be made to complete the psychological autopsy within 30 days of the incident for presentation at the mortality review meeting.*

<span style="color:red">The Chief Mental Health Clinicians will be collaborating with the Sheriff's Homicide Unit in conducting and completing a "suicide death report" within 30 days. In the event that the 30 day timeline cannot be adhered to, at a minimum, an administrative mortality review will be conducted.</span>

*32) It is strongly recommended that SDCSD officials consider slightly revising the SPFRT responsibility to "track and review all self-harm incidents, attempt suicides and suicides."*

*Although it would be reasonable to "track" all incidences of self-harm and attempted suicides, given the large size of the San Diego County Jail system, it would be unreasonable to expect that the SPRFT could adequately "review" all incidents of self-harm and attempted suicide. As such, the following revision is offered: "Track all incidents of self-harm and attempted suicide; Review all serious suicide attempts (defined as incidents of self-harm and/or attempted suicide that result in medical treatment outside of the jail facility) and suicides."*

<span style="color:red">The Detention Services Bureau Policy and Procedure was revised to reflect the recommendation.</span>

While it is impossible to prevent all suicides, the Sheriff's Department is committed to reducing suicide risk and self-harm incidents in our jail system.  It is important to note that the Sheriff's Department has always been compliant with meeting State standards related to the operation of our detention facilities and that we remain steadfast in our pursuit of implementing best practices for a safe and humane environment.  The assessment by Lindsay Hayes and his ensuing report, as well as the changes made by the Department based on his recommendations, are examples of the Department's ongoing commitment to continuously improve how we manage our jails and work to enhance the safety of our inmate population.

EXHIBIT F

In January, 2017, the San Diego County Sheriff's Department contracted with the National Commission on Correctional Health Care (NCCHC) to conduct a technical review of our jails' medical and mental health delivery to compare our current model to their national standards.  This review culminated in a report to the Sheriff's Department identifying several areas of improvement needing to be addressed to meet the NCCHC standards.  We used this report, as well as the NCCHC "Standards for Health Services in Jails" book, to develop an implementation plan to start the process of moving toward gaining accreditation from NCCHC.  NCCHC updated and revised their standards in 2018 and we adapted our implementation plan to the new standards.  We have worked to steadily enhance our medical and mental health service delivery.  Below are the descriptions of the standards and where we are in the implementation process, as of October 14, 2019.

NCCHC STANDARDS

SECTION A – GOVERNANCE AND ADMINISTRATION

1. **J-A-01   Access to Care –**

   ***Inmates have access to care for their serious medical, dental, and mental health needs.***

   The Sheriff's Department has always provided access to medical and mental health care.  Policy and procedure changes, including the triaging of medical sick call requests and scheduling follow-up appointments, were made to ensure the compliance indicators for this standard are being met. We currently meet all compliance indicators for this standard.

2. **J-A-02   Responsible Health Authority –**

   ***The responsible health authority (RHA) ensures that the facility maintains a coordinated system for health care delivery.***

   After further consultation with NCCHC, we have designated the Chief Medical Officer (CMO) as the Responsible Health Authority (RHA) and the individual facility Supervising Registered Nurses (SRN) act as his designee.  The policy has been updated to meet the compliance indicators for this standard.

3. **J-A-03   Medical Autonomy –**

   **Health care decisions are made by qualified health care professionals for clinical purposes.**

   The Sheriff's Department met all the compliance indicators for this standard.  No further recommendations were provided.

4. **J-A-04   Administrative Meetings and Reports –**

   **The facility's health and correctional administrators coordinate the health care delivery system through joint monitoring, planning, and problem resolution.**

Each facility conducts a Patient Care Coordinating Committee (PCCC) meeting monthly where statistics are shared and problems solved. In addition, bi-weekly Multi-Disciplinary Group (MDG) meetings are held to share information about patient needs, care, and follow up. Policy and procedure for the standardization of these meetings was written and is in place. We currently meet all compliance indicators for this standard.

5. **J-A-05   Policies and Procedures –**

**The responsible health authority (RHA) ensures that health care policies and procedures are developed, documented, and readily available to the staff.**

The Medical Services Division is undergoing a complete policy and procedure review process to ensure all required NCCHC standards are covered. The requirement that the policies be site specific will follow the review. The Chief Medical Officer is responsible to review all policy and procedure. This process is ongoing.

6. J-**A-06   Continuous Quality Improvement Program –**

**A continuous quality improvement (CQI) program monitors and improves health care delivered in the facility.**

The Sheriff's Department has a Quality Improvement Committee that meets quarterly. The committee chairperson is developing a process to comply with all compliance indictors. Policy revisions are being drafted. This process is ongoing.

7. **J-A-07   Privacy of Care –**

**Health care encounters and exchanges of information remain private.**

The Sheriff's Department meets many of the compliance indicators for this standard. A capital improvement project is slated for the Vista Detention Facility to add private interview space at intake. All other facilities allow for private interview space currently.

8. **J-A-08   Health Records –**
**A confidential health record is created and maintained** using a standardized format.

The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

9. **J-A-09   Procedure in the Event of an Inmate Death –**

**The responsible health authority conducts a thorough review of all deaths in custody in an effort to improve care and prevent future deaths.**

The Sheriff's Department conducts several levels of review following an inmate death. There is a mortality review completed by the Chief Medical Officer, an administrative review at the Patient Care Coordinating Committee meeting, a review by the Critical Incident Review Board, and a clinical suicide report following a completed suicide. Policy was put in place and we currently meet all compliance indicators for this standard.

10. **J-A-10   Grievance Process for Heath Care Complaints –**

**The facility protects a patient's right to disagree with or question the health care system.**

The Sheriff's Department maintains a robust grievance process that is documented in Policy and Procedure. This policy meets all the compliance indicators to meet the NCCHC standard.

SECTION B – HEALTH PROMOTION, SAFETY, AND DISEASE PREVENTION

11. **J-B-01   Health Lifestyle Promotion –**

**Health care policies, procedures, and practices emphasize health promotion, wellness, and recovery.**

The Sheriff's Department meets the compliance indicators for this standard.

12. **J-B-02   Infectious Disease Prevention and Control –**

**There is a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease.**

The Sheriff's Department employs an Infection Control Nurse (ICN) who works under the direction of our Managed Care Unit. The ICN is a member of the quality assurance committee and participates in all issues related to infection control. The ICN is currently finalizing the Department's Infection Control Plan that will be reviewed by the Chief Medical Officer. This process is ongoing.

13. **J-B-03   Clinical Preventive Services –**

**Inmates are provided with clinical preventive services as medically indicated.**

The Sheriff's Department meets many of the compliance indicators for this standard. The completion of this process is dependent on the development of the preventative services program by the Chief Medical Officer, policy and procedure changes and the application of resources.

14. **J-B-04   Medical Surveillance of Inmate Workers –**

**The health and safety of the inmate worker populations are protected.**

Occupational injury or exposure of inmate workers was added to the monthly Patient Coordination Care Committee agenda.  Documentation of injuries is being entered into the health record. The Quality Assurance committee will review and discuss steps in prevention and education for the inmate worker program.  The Sheriff's Department is revamping its inmate worker orientation and training to include education on the prevention of illness and injury due to the health hazards they may experience while performing their duties. This committee is currently in the process of completing the training and education for the inmate worker population.  This process is ongoing.

15. **J-B-05   Suicide Prevention and Intervention –**

**Suicides are prevented when possible by implementing prevention efforts and intervention.**

The Sheriff's Department has been diligently working toward improving our prevention and intervention efforts.  The department has created and implemented curriculum on suicide detection and prevention which is required training for all sworn, professional and contracted staff to attend.  The department revised policies to reflect national standards and added specific questions in our receiving screening to flag inmates with the potential for suicidal ideations or in need of acute mental health treatment. The department is compliant with the indicators in this standard.

16. **J-B-06   Contraception –**

**Contraception is made available as clinically indicated**.

A procedure has been developed for continuing birth control and providing emergency contraceptives at our female facilities.  Policy for this standard has been drafted and once completed will satisfy full compliance with this standard.

17. **J-B-07   Communication on Patient's Health Needs –**

**Communication occurs between the facility administration and treating health staff regarding inmates' significant health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff.**

The Sheriff's Department met all the compliance indicators for this standard.   No further recommendations were provided.

18. **J-B-08   Patient Safety –**

**Facility staff implement systems to reduce risk and prevent harm to patients.**

The Sheriff's Department's Medical Services Division went through a complete change in medication dispensing in the effort to prevent adverse clinical events.  The division started a

Process Improvement Team to discuss improving systems and maintaining a safe environment for patients.

19. **J-B-09   Staff Safety –**

**Facility staff implement measures to ensure a safe environment.**

The Sheriff's Department has always been dedicated to providing a safe and healthy environment for its staff.  The department continually evaluates methods to improve staff safety.  A recent example of this is improving radio communication coverage for medical and mental health staff.  This aids in their overall awareness of facility operations as well as improves communication and response in the event of an emergency. The department meets all compliance indicators for this standard.

SECTION C – PERSONNEL AND TRAINING

20. **J-C-01   Credentials –**

**The facility's qualified health care professionals are legally eligible to perform their clinical duties.**

The Sheriff's Department met all the compliance indicators for this standard.   No further recommendations were provided.

21. **J-C-02   Clinical Performance Enhancement –**

**Individuals delivering patient care are reviewed through a clinical performance enhancement process.**

A peer review process was implemented in 2018 for Sheriff's nursing staff.  Our Chief Medical Officer is in the process of implementing a peer review process for both our Medical and Psychiatric contract providers.  This process is ongoing.

22. **J-C-03   Professional Development –**

**The facility's qualified health care professionals maintain current clinical knowledge and skills.**

The Sheriff's Department met all the compliance indicators for this standard.   No further recommendations were provided.

23. **J-C-04   Health Training for correctional Officers –**

**Correctional officers are trained to recognize the need to refer an inmate to a qualified health care professional.**

Training for sworn staff was developed and incorporated in the Detention Services Bureau annual training plan.  Health related training for all sworn staff that works with inmates is required every two years.  The department meets all compliance indicators for this standard.

24. **J-C-05   Medication Administration Training –**

**Personnel who administer or deliver prescription medication are appropriately trained.**

New nursing staff members receive an orientation to medication administration during their new employee orientation. They are taught how to navigate the electronic health record for this function and are introduced to policies surrounding medication administration. The orientation to medication administration continues at the facility level. The department meets all compliance indicators for this standard.

25. **J-C-06   Inmate Workers –**

**Health services are provided by health staff and not inmate workers.**

The Sheriff's Department met all the compliance indicators for this standard.  No further recommendations were provided.

26. **J-C-07   Staffing –**

**The responsible health authority (RHA) ensures sufficient numbers and types of health staff to care for the inmate population.**

The Sheriff's Department conducted a staffing study and workload analysis which was submitted for approval.

27. **J-C-08   Health Care Liaison –**

**Health care services continue to be coordinated via a health care liaison when qualified health care professionals are not available for an extended period of time.**

The Sheriff's Department maintains full time staffing of health care professionals, therefore this standard is not applicable.

28. **J-C-09   Orientation for Health Staff –**

**Health staff are properly acclimated to work in the correctional environment and understand their roles and responsibilities.**

All new health staff receives a basic orientation from the Medical Services Training Unit prior to their assignment in a detention facility related to the overall Medical Services Division, safety & security and electronic health record.  In depth training continues at the facility level covering all functional areas based on job classification.  The department meets all compliance indicators for this standard.

SECTION D – ANCILLARY HEALTH CARE SERVICES

29. **J-D-01   Pharmaceutical Operations –**

**Pharmaceutical operations meet the needs of the facility and conform to legal requirements.**

The Sheriff's Department's contract supplier of medication complies with the NCCHC standards for the administration of medications.  Medications are packaged as patient specific in unit dose which assists with inventory and control and minimizes potential for errors.  The department is continuing to review our processes to meet all compliance indicators for this standard.

30. **J-D-02   Medication Services-**

*Medications are provided in a timely, safe, and sufficient manner.*

The Medical Services Division policy is currently being revised which identifies expected timeframes from ordering to administration of medication.  Contingency plans are also in place for time sensitive medication ordering.  Notifications are currently being made to the prescriber of any impending expiration of orders. The department already had established policies regarding all prescription medications administered or delivered as well as procedures to ensure continuity of medication services.  This process is ongoing.

31. **J-D-03   Clinic Space, Equipment, and Supplies-**

*Sufficient and suitable space, supplies, and equipment are available for the facility's medical, dental, and mental health services.*

The Sheriff's Department met all compliance indicators for this standard.  No further recommendations were provided.

32. **J-D-04   On-Site Diagnostic Services-**

*The facility provides the necessary on-site diagnostic services for patient care.*

The Medical Services Division requires documentation that contracted on-site diagnostic services are certified and licensed to provide that service.  The division created procedure and calibration manuals for all equipment to include protocols for the calibration of testing devices to ensure accuracy.  The Sheriff's Department maintains a supply of diagnostic supplies such as, multiple-test dipstick urinalysis, finger-stick blood glucose tests, peak flow meters and

pregnancy test kits.  Policy for this standard is currently being drafted and once completed will satisfy full compliance with this standard.

33. **J-D-05     Medical Diets-**
**Medical diets are provided that enhance patients' health.**

The Sheriff's Department met all compliance indicators for this standard.   No further recommendations were provided.

34. **J-D-06     Patient Escort-**

***The facility staff ensure that patients can meet scheduled health care appointments***.

The Sheriff's Department met all compliance indicators for this standard.   No further recommendations were provided.

35. **J-D-07     Emergency Services and Response Plan –**

***Planning for emergency health care ensures that all staff are prepared to effectively respond during emergencies.***

The Sheriff's Department met all compliance indicators for this standard.   No further recommendations were provided.

36. **J-D-08     Hospital and Specialty Care –**

***Hospitalization and specialty care are available to patients who need these services***.

The Sheriff's Department met all compliance indictors for this standard.   No further recommendations were provided.

SECTION E- PATIENT CARE AND TREATMENT

37. **J-E-01     Information on Health Services-**

***Upon arrival at the facility, inmates are informed of the availability of health care services and how to access them.***

The Sheriff's Department shows an inmate orientation video once a day to ensure inmates are informed of the facilities health care services and how to access these services.  Signage and inmate handbooks are being finalized to allow for additional information on resources and how to access them. This process is ongoing.

38. **J-E-02    Receiving Screening-**

*Screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met.*

The Sheriff's Department has always utilized a comprehensive medical and mental health intake screening process.  The implementation of the new electronic health record now allows for more efficient screening which complies with this standard.

39. **J-E-03    Transfer Screening-**

*Inmates who are transferred within the same correctional system continue to receive appropriate health services.*

Medical staff reviews each transferred inmate's health record or summary to ensure continuity of care and medications.  The electronic health record assists with tracking and allows compliance with this standard.

40. **J-E-04    Initial Health Assessment-**

 *Inmates receive initial health assessments.*

This standard will require expanded contractual staffing to ensure a full clinical follow up can be completed on each inmate within 14 days of their initial booking.  This process is ongoing.

41. **J-E-05    Mental Health Screening and Evaluation-**

*Mental health screening is performed to ensure that urgent mental health needs are met.*

A comprehensive mental health screening is conducted during receiving screening. Inmates identified with mental health needs are referred to a qualified mental health professional for further evaluation.  Patients who require acute mental health services beyond  those  available on-site are transferred to an appropriate facility.  This process is ongoing.

42. **J-E-06    Oral Care-**

 *Inmates' dental needs are addressed.*

Oral care is currently provided by a licensed dentist to inmates when clinically indicated.  The department is working toward screening every inmate within 14 days of admission as well as an oral examination within 12 months of admission into custody.  Both of these standards require the addition of contractual staffing/hours.  This process is ongoing.

43. **J-E-07    Nonemergency Health care Requests and Services-**

*Inmates' nonemergent health care needs are met.*

All inmates, regardless of housing assignment are given the opportunity to submit oral and written health care requests on a daily basis. Nurses are responsible for reviewing inmate requests.   They triage and schedule follow up appointments based on acuity level.  The department is working toward a process to allow a face-to-face encounter for the health care request within 24 hours of receipt by medical staff. This will be implemented as we continue to increase our staffing levels.  This process is ongoing.

44. **J-E-08    Nursing Assessment Protocols and Procedures-**

*Nursing assessment protocols and procedures are appropriate to the level of competency and preparation of the nursing personnel and comply with the relevant state practice acts.*

Nursing assessment protocols and procedures were revised to comply with this standard. Protocols and procedures are being reviewed annually based on the level of care provided in the facilities.  All protocols and procedures are accessible to all nursing staff.  Training is tracked for compliance and there is retraining when protocols or procedures are revised.  All compliance indicators for the standard have been met.

45. **J-E-09    Continuity, Coordination, and Quality of Care During Incarceration-**

*Patient medical, dental, and mental health care is coordinated and monitored from admission to discharge.*

With the implementation of the electronic health record, monitoring of patient care is more comprehensive. The Quality Assurance Committee will oversee a multi-disciplinary approach to patient care.  The new electronic health record  assists with compliance and tracking.   Primary Care nursing will enhance the timeliness of care and familiarize staff of patient needs in  the housing units. This process is ongoing.

46. **J-E-10    Discharge Planning-**

*Discharge planning is provided for inmates with serious health needs whose release is imminent.*

The Sheriff's Department currently provides discharge prescriptions for those inmates who are prescribed psychotropic medications.   The new electronic health record will assist with compliance and tracking of those with serious health needs and prepare staff to educate and supply the necessary resources and prescriptions upon their release.  Protocols and policies need to be revised for compliance.  This process is ongoing.

SECTION F- SPECIAL NEEDS AND SERVICES

47. **J-F-01    Patients With Chronic Disease and Other Special Needs-**

*Patients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence- based standards.*

The Sheriff's Department currently has clinical protocols in place for the identification and management of chronic diseases or other special needs.  The Chief Medical Officer (CMO) is in the process of developing a program according to the standard.

48. **J-F-02    Infirmary-Level Care-**

*Infirmary-level care, when provided, is appropriate to meet the health care needs of patients.*

Infirmary-level care is care provided to patients with an illness or diagnosis that requires daily monitoring, medication and/or therapy, or assistance with activities of daily living at a level needing  nursing intervention.  The Medical Services Division is working toward developing an acuity scale and an admission and discharge procedure in the electronic health record.  Protocols and policies need to be revised for compliance.

49. **J-F-03    Mental Health Services-**

*Mental health services are available for all inmates who require them.*

The department ensures that a comprehensive mental health screening is conducted upon admission into custody.  Those in need of mental health services are referred to a qualified mental health provider for an assessment.  Inmates in need of mental health services are addressed on-site or referred to an appropriate alternative facility.  The department currently has 7 day QMHP coverage at our four main facilities and is working to recruit clinicians to provide 24 hour coverage.  The department is currently recruiting for a Chief Mental Health Officer and has  requested approval to increase the number of our current authorized positions.

50. **J-F-04    Medically Supervised Withdrawal and Treatment-**

*Inmates who are intoxicated or undergoing withdrawal are appropriately managed and treated.*

The Sheriff's Department currently has protocols in place for managing inmates under the influence of or undergoing withdrawal from alcohol and other substances.  The department has acquired an evidence-based assessment tool in treating inmates undergoing withdrawal which will be  implemented in the near future.  The department is currently receiving training on how to effectively implement a Medication Assistance Treatment (MAT) program in our facilities.

51. **J-F-05    Counseling and Care of the Pregnant Inmate-**

*Pregnant inmates are given comprehensive counseling and care in accordance with national standards and their expresses desires regarding their pregnancy.*

The Sheriff's Department met all compliance indicators for this standard.  No further recommendations were provided.

52. **J-F-06    Response to Sexual Abuse-**

*Facility staff ensure that victims of sexual abuse receive appropriate intervention.*

The Sheriff's Department met all compliance indicators for this standard. No further recommendations were provided.

53. **J-F-07  Care for the Terminally Ill-**

*The facility addresses the needs of terminally ill inmates, including protecting their rights regarding end of life decisions.*

The Medical Services Division made updates to nursing protocols to provide guidance and instruct procedures to follow when a terminally ill inmate is identified.  The department is compliant with this standard.

SECTION G- MEDICAL LEGAL ISSUES

54. **J-G-01  Restraint and Seclusion-**

*The responsible health authority ensures that when restraints are used for clinical or custody reasons, the inmate is not harmed by the intervention.*

Medical Services Division policy and procedures were updated for compliance with this standard.

55. **J-G-02    Segregated Inmates-**

*Any practice of segregation should not adversely affect an inmate's health.*

Detentions and Medical policy and procedures are being updated to reflect practices and compliance with this standard.

56. **J-G-03    Emergency Psychotropic Medication-**

*Health staff follow policies developed for the emergency use of forces psychotropic medications as governed by the laws applicable in the jurisdiction.*

The Sheriff' Department's policy and procedures are currently in compliance with the laws of the state.  Protocols on medications administered and policies to comply with this standard are under revision.

57. **J-G-04    Therapeutic Relationship, Forensic Information, and Disciplinary Actions-**

*Health staff protect the integrity of the therapeutic partnership with their patients.*

The Sheriff's department was already in compliance with this standard. No further recommendations were provided.

58. **J-G-05    Informed Consent and Right to Refuse**

*Inmates have the right to make informed decisions regarding health care, including the right to refuse care.*

The Sheriff's department was already in compliance with this standard.  No further recommendations were provided.

59. **J-G-06    Medical and Other Research**

*Biomedical, behavioral, or other research using inmates as subjects is consistent with established ethical, medical, legal, and regulatory standards for human research.*

Medical Services Division policy and procedures were updated for compliance with this standard.

EXHIBIT G



San Diego County Sheriff's Department- Media Relations Office

# NEWS RELEASE

Lieutenant Ricardo Lopez
Media Relations Director

December 10, 2020

The Sheriff's Department has a comprehensive approach to keep illegal drugs from entering county jails.  Our innovative strategy combines investments in equipment and technology, utilizing specialized resources and integrating investigative methods to provide a safe environment for those in our custody and staff.

70 to 80 percent of people in our custody are using drugs at the time of arrest or have committed a crime associated with their drug use (SANDAG 2019 Crime Justice Bulletin).

Drugs can pose the threat of harmful exposure and potential overdose. One example is fentanyl.  A speck the size of a few grains of salt or just one touch of this drug can kill you.  It can be absorbed through the skin or inhaled when it becomes airborne.



The misuse and abuse of opioids is widespread in the nation and our county. In its latest report card, the Prescription Drug Task Force recorded 275 overdose deaths in 2019. 151 of those deaths were because of fentanyl.

It should be noted the Sheriff's Department has always been at the forefront of the opioid crisis. In 2014, we helped pass a California law giving deputies and officers permission to administer a nasal spray that would counter the effects of an overdose.  Our deputies were also the first in the Western United States to carry this nasal spray called Naloxone for overdose emergencies. So far this year, detention deputies and medical staff have saved 66 people from overdosing in our jails. Fentanyl is so potent deputies have at times administered up to seven sprays of Naloxone before a person regains consciousness.  The dangers of fentanyl are real.  Some deputies and medical staff have been rushed to the hospital after being exposed while administering the antidote.

Sheriff's Detectives follow all available leads to trace the drug from an overdose victim to his or her supplier. It's part of a protocol implemented in 2017 to hold those accountable for the manufacturing and supply of dangerous drugs.



www.sdsheriff.net/newsroom

mediarelations@sdsheriff.org
(858) 974-2259


STAY CONNECTED @SDSheriff



# San Diego County Sheriff's Department - Media Relations Office

These processes and systems were recognized by the American Jail Association (AJA) in April of this year with the national Innovation Award. Here's a snapshot of our multi-faceted approach that has resulted in a remarkable number of drug seizures.

| Point of Entry | |
|---|---|
| Six high tech x-ray body scanners | "No Questions Asked" Drug drop boxes |
| Overdose awareness video at booking | Warnings on dangers of smuggling drugs in body at intake |
| Inmate screening and flagging of potential smugglers | Random searches of visitors who may be bringing in drugs |
| **Interception** | |
| Creation of Mail Processing Center with special equipment and deputies trained in detecting drug-soaked letters, cards, and other contraband. | |
| TruNarc – mobile testing device that identifies drug with the push of a button | Downdraft Tables – pulls dangerous fumes and particles from suspicious mail into a filter |
| Six drug sniffing K-9s | Anonymous Tip Line |
| Surprise searches of cells and housing modules | Drug awareness training for deputies and staff. Policy & Procedure updates |
| Using Intelligence Led-Policing (ILP) strategy to identify patterns, links and trends. Prosecution of smuggling cases | Substance abuse programs in jails in collaboration with community partners so person can stay sober upon release |



This expansive approach resulted in a 45% drop in drugs being mailed into county jails.

So far this year (January to November 2020), the Sheriff's Detention and Investigations Unit (DIU) have seized more than 3,300 grams of heroin, meth, cocaine, fentanyl powder and pills being smuggled into the jails. That's a 34-percent increase in seizure compared to the same time period last year. Mail Processing Deputies also intercepted 228 drug-laced strips hidden in letters and cards. These seizures resulted in 88 people being arrested in the community and additional charges being filed for those already in custody.



 www.sdsheriff.net/newsroom
mediarelations@sdsheriff.org
(858) 974-2259



**STAY CONNECTED** @SDSheriff

EXHIBIT H



The California State Auditor (CSA) conducted an examination of the San Diego County Sheriff's Department's detention facilities and the care being provided to individuals in our custody. The evaluation reviewed in-custody deaths at San Diego County Sheriff's Department jails over the last 15 years.

Of the in-custody deaths that occurred, almost 50 percent were a result of natural causes and about 45 percent were a result of accidental deaths, to include suicides and overdoses. During calendar years 2020 and 2021, Sheriff's Department employees in the jails responded to 314 incidents of suspected opioid overdose and deployed 848 doses of NARCAN (an opioid antagonist) saving hundreds of lives.

We appreciate the CSA taking the time to review our current policies and making recommendations for ways we can improve the care provided to individuals housed in our facilities.

The CSA has made several recommendations for ways we can improve the services we currently provide.  Their recommendations are in the following areas:

- **Intake Screening**
- **Medical & Mental Health Follow-Up**
- **Safety Checks**
- **Sworn Discovery of Medical Emergency**
- **In-Custody Death Follow-Up**
- **Critical Incident Review Board**
- **Citizen's Law Enforcement Review Board Integration**


## Intake Screening

CSA Recommendations:

*Revise its intake screening policy to require mental health professionals to perform its mental health evaluations.  These evaluations should include a mental health acuity rating scale to better inform individuals' housing assignments and service needs while in custody.  The Sheriff's Department should communicate the acuity rating as it assigns to individuals to all detentions staff overseeing them.*

The Sheriff's Department concurs with the auditor's assessment that Qualified Mental Health Providers (QMHP) are the more appropriate staff to conduct the mental health screening portion of the intake process. We thank the San Diego County Board of Supervisors for approving the funding for additional staffing. We're currently in the process of recruiting and hiring licensed mental health clinicians to fill these positions.

Additional staffing will allow us to provide a comprehensive screening process utilizing the electronic health record, in accordance with National Commission for Correctional Health Care (NCCHC) standards. Some identified QMHP staffing duties would be to conduct the Behavioral Health (BH) screening, complete a risk/needs assessment, to include substance use disorder (SUD). The assessment would determine a behavioral health acuity rating, schedule psychiatric appointments, schedule follow up QMHP appointments, assess for the need of placement into our Inmate Safety Program (ISP) and obtain Release of Information authorizations.

QMHPs and nursing staff working in collaboration at the initial intake assessment and throughout a patient's incarceration promotes a comprehensive whole person model of care.

***Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.***

Currently, San Diego County does not have an interconnected health information exchange. However, our health staff does have access to the Health and Human Services Agency- Cerner Community Behavioral Health (CCBH) as of April 2021. QMHPs can review records at any point in the patient's stay. The planned integration of a QMHP into the intake process for behavioral health screening will fulfill this recommendation.

In addition to having access to review community behavioral health records, the Sheriff's Detention Services Bureau contributes to this community database by recording and entering mental health care provided while the patient is in our custody as part of the county's continuum of care.

Our staff also has access to the Health and Human Services Agency – San Diego Immunization Registry (SDIR) to verify a patient's vaccination status. SDIR is limited to vaccinations given in San Diego County.


**<u>Medical & Mental Health Follow-Up</u>**

<u>CSA Recommendations:</u>

***Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.***

The Sheriff's Department concurs with the auditors' assessment that a revision is necessary to address the process for medical/mental health referral after two requests. The Sheriff's Medical Services Division intends to implement this recommendation. When a patient presents for health care services more than two times with the same complaint and has not seen a provider, they will receive an appointment to do so.

***Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request. Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.***

The Sheriff's Department concurs a timely medical response to patient concerns is extremely important. We are committed to the health and well-being of our patients, and are developing safeguards to ensure a timely, efficient re-engagement of both medical and mental health services.

We're currently focused on a more nursing centric model. For health staff, we are in the process of embedding nursing staff at the ward level, assigning nursing staff to most housing units in support for the Primary Care nursing model. Nurses will be there to perform face-to-face assessments of their assigned patients (on the floors and during sick call) and involved in counseling and advocacy efforts for every refusal.

***Revise its policy to require more frequent psychological follow up after release from the inmate safety program to at least monthly check-ins.***

The Sheriff's Department will reevaluate our policies reference psychological follow-ups. We currently adhere to the recommendations set forth by Dr. Lindsay Hayes, a nationally recognized expert in the field of suicide prevention within custodial settings. The Sheriff's Department's current planned expansion and hiring of additional mental health professionals will allow for more frequent encounters with patients in our care.


## Safety Checks

CSA Recommendations:

***Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.***

The Sheriff's Department will reevaluate current policy and incorporate best practices. We are exploring technologies to assist with monitoring a "proof of life" for individuals in custody with minimal sleep disruption. Our planned integration of Body Worn Cameras (BWC) into the custodial setting will greatly assist in showing the point of view each deputy has during the safety checks.

*Develop and implement a policy requiring that designated supervising sworn staff conduct audits of of at least two randomly selected safety checks from each prior shift.  These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately.  In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks.  The policy should also require each facility to maintain a record of the safety check audits that staff perform.*

Line supervisors conduct electronic log reviews every shift.  This review includes ensuring the timeliness of safety checks in accordance with established Policy & Procedures.  Our current practice requires supervisors conduct video audits of random safety checks.  These practices will be clearly defined and formalized into policy.

## Sworn Discovery of Medical Emergency

CSA Recommendation:

*Revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow.*

Sworn staff members do not require approval from medical services to start CPR.  Per DSB Policy and Procedure section M.6, "Any life-threatening medical emergency shall trigger a 911 request for a paramedic emergency response team. Sworn and health staff shall initiate emergency response and basic lifesaving measures until relieved by the paramedic emergency response team."

## In-Custody Death Follow-Up

*CSA Recommendations:*

*Staff will provide a written report of each 30-day medical review to its management.*

The Sheriff's Department concurs with this recommendation.

*When warranted, the report should specify recommendations for changes to prevent future deaths.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case.

*The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case. There are other processes currently in place to look for policy, training, or accountability issues following critical incidents.

**Critical Incident Review Board**

*CSA Recommendations:*

**Revise its policy to require that the Critical Incident Review Board review natural deaths.**

In July 2021, the Division of Inspectional Services (DIS), Sheriff's Legal Affairs, and CIRB board members evaluated potential updates to policy and procedures section 4.23 – Department Committees and Review Boards. This assessment included reviewing in-custody deaths deemed natural by the Medical Examiner's Office, as the auditors recommend. This, along with other changes are anticipated to be in a pilot phase beginning February 2022. Historically, if a natural death is deemed to have potential issues of any nature it may be presented to CIRB at the discretion of the board members. Also, the Chief Medical Officer and appropriate medical staff conduct a mortality/morbidity review of each in-custody death for their determination of any changes that are needed related to medical care for incarcerated individuals.

**Require the Sheriff's Department to make public the facts it discusses and recommendations it decides upon in the Critical Incident Review Board meetings to establish a separate public process for reviewing deaths and making necessary changes.**

CIRB presentations allow the Sheriff's legal advisor and the various commands the ability to review critical incidents to identify issues that should be addressed in various areas, including, but not limited to, training, policies, procedures, staffing, and equipment. The confidential environment provided by the CIRB is essential to the free exchange of ideas and concerns. Effectiveness and thoroughness would likely be diminished if the attorney-client privilege is removed, or information is required to be disclosed during pending, or anticipated litigation. Much of the information presented in CIRBs is intended for individuals who have a vast familiarity and understanding of law enforcement or detention operations, department policies, and state and federal laws, and may contain confidential information including criminal history, medical history, and peace officer personnel records.

**Citizen's Law Enforcement Review Board Integration**

CSA Recommendations:

**Revise its policy to include CLERB in its immediate death notification process.**

**Revise its policy to allow a CLERB investigator to be present at the initial death scene.**

We agree with this recommendation and this new procedure will be implemented this month, February 2022.  CLERB officers will be notified and respond to death scenes related to in-custody-deaths and officer-involved shootings.

***Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.***

The CLERB has subpoena powers for in person sworn staff interviews.   In 2003, the CLERB discontinued issuing Sheriff's Department sworn staff interview subpoenas and opted for written responses due to Public Safety Officers Procedural Bill of Rights (POBAR) conflicts where ultimately the interviews did not benefit the CLERB's investigations.  The CLERB continues to have subpoena powers.   This recommendation should be re-directed to the CLERB for its review to change its current practice and exercise its authority to issue subpoenas to Sheriff's sworn staff.

In conclusion, we welcome this audit and the recommendations set forth by the California State Auditor.  We will consider every recommendation and implement appropriate changes to provide the best care for individuals in our custody.

Here's a link to the full JLAC report.



EXHIBIT I

**Report of Andrew Hildreth, Ph.D.**

*Darryl Dunsmore, on behalf of himself and all others similarly situated*
*v.*
*San Diego County Sheriff's Department*

**In the United States District Court**
**Southern District of California**
**Case No. 3:20-cv-00406-AJB-WVG**

**Resolution Economics**
**Los Angeles, CA**
**May 30, 2021**

**I, ANDREW HILDRETH, state:**

I have been retained to provide expert testimony in this matter.  All opinions expressed herein are based on the information and knowledge as of the date of this report.  I reserve the right to alter these opinions in the light of new information that may have relevance at some future date.

## I.    Qualifications

1.    I am a Partner at Resolution Economics LLC, a firm whose activities include conducting labor studies, performing economic and statistical analyses, and providing complex data analysis in connection with litigation and non-litigation issues.  I have been retained as an expert or in a consulting capacity in numerous class-action matters on a variety of issues including labor and employment, pharmaceutical drugs, credit card charges, the price of trucks or even the price of video cassettes.  I was the expert in *Duran v. US Bank* and *Felzcer v. Apple Inc* in terms of labor and employment.

2.    As a former academic in the economics and econometrics field I have led scientific studies that have collected data on the activities of groups of workers, individuals, and companies through the use of scientific surveys, time-and-motion studies, and other forensic data studies.  In addition, I am frequently asked to review and comment upon surveys and other studies conducted by other experts.  I have also been asked to perform similar studies outside of the litigation context.

3.    Finally, my work has often called for analysis of survey and labor market data in the context of studying economics issues, as well as in connection with conducting statistical analyses of various other economic and social phenomena.  I hold a Ph.D. from the University of Cambridge, England and a B.A. degree in economics from the City of London Polytechnic.  I

have been qualified as an expert witness in both Federal and State Courts.  My resume is attached to this report as Attachment A.  My hourly rate is $850 per hour, which is the rate I customarily charge for both consulting work and expert testimony.

## II.      Data And Documents Relied Upon

4.      The San Diego Sheriff's Department has provided me with legal filings, reports, and other documents.  In addition, I reviewed relevant literature and relied on other secondary materials, including publicly available data and information relevant to my analyses.  All of the materials that I relied upon for my analysis and opinions are listed in Attachment B.

## III.     Introduction And Summary Of Findings

5.      Plaintiffs' motion relies on a variety of sources to support its assertion that the number of deaths in the San Diego County prison system are unusually high.  However, the analyses underlying these claims are simplistic and flawed, failing to appropriately consider the variation that exists between San Diego County and other counties in California. In particular, some counties have a more stable population whereas San Diego County has more turnover, and the suicide rate is highest in the first 6 days of incarceration.

6.      In connection with these claims, I have been asked to conduct a variety of analyses relating to the jail systems of San Diego and other California counties.  In summary, my findings are as follows:

   a.  The California State Auditor's report on the San Diego County jail system referred to by the plaintiffs cites the many differences between San Diego County and the counties it refers to as "comparators" in its analyses.  However, because the report fails to take the initial differences between the counties into account, other factors, such as variation in the prevalence of gang violence or pre-existing health conditions among the jail population, may explain the difference in deaths occurring in San Diego County.

    b. The California State Auditor's report uses a misleading methodology in its comparison of death rates across selected California counties. The California State Auditor assumes that death rates are constant across an inmate's entire time in the jail and fails to account for the fact that the risk of inmate death may be highest soon after booking. Most importantly, when using the ADP (Average Daily Population) method, the turnover of the population in San Diego when compared to counties with lower turnover artificially inflates the death rate.

Below I discuss my methodology and results in further detail.

## IV.    Class and Subclass Definition

7.    As I understand it, Plaintiffs move to certify a class and subclass as follows: "The Incarcerated People Class is defined as all adults who are now, or will be in the future, incarcerated in the Jail. The Incarcerated People with Disabilities Subclass is defined as all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in the Jail."

## V.    The State Audit Report Does Not Compare San Diego County to Comparable Counties

8.    The State Auditor Report claims that 185 inmates died between 2006 and 2020 in the San Diego County Sheriff's Department Jail System. Upon further inspection of the raw data, I find that between 2006 and 2020, an additional 38 people died in the process of arrest that are not accounted for in the State Auditor's analysis.[1] If someone dies in the process of arrest, it follows that they cannot therefore die in custody. If there are higher rates of death in the process of arrest, then the probability of inmates dying in custody may be lower. Figure 1 below shows the

---

[1] The data on inmate deaths comes from the California Department of Justice: https://openjustice.doj.ca.gov/data-stories/deathincustody. The data includes one record per death and records information associated with the death including agency name (i.e. "San Diego County Sheriff's Department"), county, race, gender, age, custody status, custody offense, date, custodial responsibility, location, facility, manner of death, and means of death.

4

number of people who died during the process of arrest in Sheriff's Departments across California.[2] Figure 2 shows the deaths in the process of arrest as a percentage of all deaths from 2006 to 2020.  As shown in Figure 2, only 17% of all deaths in the San Diego County Sheriff's department occurred in the process of arrest.  Conversely, almost half (48.9%) of all deaths in the Riverside County Sheriff's department occurred in the process of arrest.  With such a high proportion of deaths occurring before people even make it into custody, Riverside County makes a questionable comparator to San Diego County.

Figure 1: Deaths in the Process of Arrests by County from 2006-2020



---

[2] The analysis is restricted to where the "agency_full_name" variable is one of the following Sheriff Departments: "Alameda County Sheriff's Department", "Los Angeles County Sheriff's Department", "Orange County Sheriff's Department", "Santa Clara County Sheriff's Department", "Sacramento County Sheriff's Department", "San Bernardino County Sheriff's Department", "Fresno County Sheriff's Department", "Riverside County Sheriff's Department", "Tulare County Sheriff's Department", "Kern County Sheriff's Department", "San Francisco County Sheriff's Department", "Contra Costa County Sheriff's Department", "Ventura County Sheriff's Department", "San Joaquin County Sheriff's Department", "San Diego County Sheriff's Department".



Figure 2: Percentage of Dead Inmates Who Died in Process of Arrest vs Other Types of Death from 2006 to 2020 by County

9.      Los Angeles County is not selected as a comparator for San Diego County in the California State Auditor's report, despite the fact that San Diego County and Los Angeles County are more similar to each other than San Diego County is to any of the counties selected as comparators in many ways.

10.     For instance, San Diego County contains the second-largest city in California, while Los Angeles County contains the largest.  By contrast, the largest city in Alameda County is the eighth-largest in California; the largest city in Orange County is the tenth-largest in California; and the largest city in Riverside County is the twelfth-largest in California.  San Diego County has a larger population than any of the three counties selected as comparators – in fact, it has the second-largest population of any county in the state.  Furthermore, the California State Auditor

6

selected Alameda County as a comparator, despite the fact that the two counties are over 350 miles away from each other.

11.     If San Diego County is compared to Los Angeles County, it is clear that the rate of inmate deaths per 100,000 bookings is 33% lower in San Diego County than in Los Angeles County.  The California State Auditor's own report shows 21.36 deaths per 100,000 inmates booked in Los Angeles County, but only 14.40 deaths per 100,000 inmates booked in San Diego County.[3]

12.     The State Audit Report claims that "more individuals died of natural and accidental causes in the custody of the San Diego Sheriff's Department than in the custody of each of the comparable counties" and that "Natural deaths can include deaths from pre-existing medical conditions and deaths resulting from inadequate care."[4] However, the report does not account or control for these factors.  It may be that San Diego County inmates have more pre-existing conditions than that of other counties, and therefore more risk of dying a natural death.  As I do not have access to inmates' medical data, I use age as a proxy, as people who are older are more likely to die of natural causes.  I use t-tests to evaluate if the average age of inmates who died natural deaths is statistically significant between San Diego and other comparator counties.  The results are presented in Table 1, which illustrates that the average age between San Diego inmates and Alameda and Kern County inmates are statistically significant at the 5% level.  Furthermore, the average age between San Diego inmates and Fresno, Los Angeles, and San Joaquin inmates are statistically significant at the 10% level.  All significant results indicate that the people who died of natural deaths in San Diego County Sheriff's Department are older than the inmates who died of natural deaths in the sheriff departments of other counties.

---

[3] California State Auditor Report, Appendix A
[4] California State Auditor Report p.15-16

Consequently, if one is to compare natural deaths across counties, age should be taken into consideration.

| Table 1: T-Tests on Age of Inmates Who Died of Natural Deaths San Diego vs Comparator Counties | | | | | |
|---|---|---|---|---|---|
| Comparison County | N San Diego Natural Deaths | N Comparison County Natural Deaths | Average Age San Diego | Average Age Comparison County | T-value |
| Alameda | 88 | 52 | 53.47 | 46.85 | -2.93 |
| Contra Costa | 88 | 19 | 53.47 | 52.16 | -0.63 |
| Fresno | 88 | 48 | 53.47 | 49.00 | -1.71 |
| Kern | 88 | 36 | 53.47 | 48.22 | -1.96 |
| Los Angeles | 88 | 253 | 53.47 | 50.77 | -1.64 |
| Orange | 88 | 77 | 53.47 | 50.21 | -1.50 |
| Riverside | 88 | 54 | 53.47 | 54.24 | 0.33 |
| Sacramento | 88 | 29 | 53.47 | 54.24 | 0.27 |
| Santa Clara | 88 | 49 | 53.47 | 53.08 | -0.16 |
| San Francisco | 88 | 23 | 53.47 | 50.91 | -0.80 |
| San Joaquin | 88 | 14 | 53.47 | 46.21 | -1.87 |
| Tulare | 88 | 16 | 53.47 | 51.56 | -0.52 |
| Ventura | 88 | 21 | 53.47 | 56.67 | 0.99 |

Note: The orange rows (Alameda and Kern) indicate statistical significance at the 5% level and the blue rows (Fresno, Los Angeles, and San Joaquin) indicate statistical significance at the 10% level. The data comes from the California Department of Justice Deaths in Custody Dataset: https://openjustice.doj.ca.gov/data-stories/deathincustody

T-Value: This is the number of standard deviations associated with the difference in age between San Diego and the comparator county. A result that is less than or equal to -1.96 standard deviations suggests that the average age of San Diego County inmates (who died a natural death) is statistically significantly older than that of the comparator county. A measure that is greater than or equal to +1.96 standard deviations suggests that the average age of inmates in San Diego County (who died a natural death) is statistically significantly younger than that of the comparator county. A measure that is between -1.96 and +1.96 suggests the average age between San Diego County inmates and the comparator county is statistically neutral.

## VI.    The California State Auditor's Report Uses Misleading Metrics Which Overstate the Disparity in Death Rates Between San Diego County and Other Counties in California

13.    In examining in-custody deaths in San Diego County jails, the California State Auditor's report uses a number of misleading metrics.  In both Figure 4 and Table 1 of their report, the

California State Auditor compares total deaths between the different Sheriff's departments, without accounting for differences in population size between counties. This is misleading, as San Diego County has a larger population than Orange, Riverside or Alameda County, which are used by the California State Auditor as comparators.

14. The California State Auditor uses the Average Daily Population (ADP) of the counties it examines to calculate a death rate per 1,000 inmates. This metric fails to account for the fact that San Diego County jails hold their inmates for a shorter period of time than almost any other county in California. Because inmates are at their highest risk of death in the period shortly after their arrival in jail, what appears to be an unusually high rate of deaths in San Diego prisons is driven, in part, by the fact that individuals are released or transferred more quickly in San Diego than in other counties. Plaintiffs' own supporting documents note that, of the 17 inmates of San Diego County jails who committed suicide between 2014 and 2016, 11 were in custody for 10 days or less.[5]

15. The very data used by plaintiffs in their motion shows that San Diego County inmates spend less time in jail than inmates in any of the comparator counties. Table 2 shows the average number of days in jail for each inmate booked, calculated using the values presented in Appendix A of the California State Auditor's report. As this table shows, San Diego inmates spend less time in jail, on average, than inmates in any of the three comparator counties used in the California State Auditor's report. Without adjusting for the turnover of the population, this results in an artificially high rate. It should be self-evident that if one person is in a cell for 365 days, versus 52 people in the same cell over 365 days (average 1 week each), the risk of suicide substantially increases in the cell with 52 times the turnover rate.

---

[5] *Dunsmore [119] NOTICE of Motions and Motions for Preliminary Injunction and Provisional Class Certification by Plaintiffs*, pg. 318

| County | Average Daily Population | Average Inmate-Days Per Year | Average Total Bookings | Average Days Per Inmate Booked |
|---|---|---|---|---|
| **Table 2:** Average Days Per Inmate Booked By County | | | | |
| Los Angeles | 17,044 | 6,225,321 | 131,377 | 47.39 |
| **Orange** | **5,877** | **2,146,574** | **59,263** | **36.22** |
| Santa Clara | 3,732 | 1,363,113 | 45,467 | 29.98 |
| Sacramento | 4,008 | 1,463,922 | 48,885 | 29.95 |
| San Bernardino | 5,490 | 2,005,223 | 68,480 | 29.28 |
| Fresno | 2,752 | 1,005,168 | 36,775 | 27.33 |
| **Riverside** | **3,668** | **1,339,737** | **54,025** | **24.80** |
| Tulare | 1,510 | 551,528 | 22,263 | 24.77 |
| Kern | 2,266 | 827,657 | 34,672 | 23.87 |
| **Alameda** | **3,325** | **1,214,456** | **51,842** | **23.43** |
| San Francisco | 1,492 | 544,953 | 23,568 | 23.12 |
| **San Diego** | **5,162** | **1,885,421** | **85,631** | **22.02** |
| Contra Costa | 1,446 | 528,152 | 24,687 | 21.39 |
| Ventura | 1,537 | 561,389 | 28,332 | 19.81 |
| San Joaquin | 1,367 | 499,297 | 26,193 | 19.06 |

## VII.    The Lowest-Risk Inmates in San Diego County May be Placed into a Separate Program Which is Not Part of the Jail System, and Therefore Do Not Appear in The Metrics Used By Plaintiffs

16.     In addition to the jail system run by the San Diego Sheriff's Department, the County of San Diego also operates a work-release program which permits some individuals to avoid being held in the jail system while residing in a different facility and continuing to work.[6] This type of program is uncommon in California – only Ventura County operates a similar work-release system.

---

[6] https://www.sandiegocounty.gov/content/sdc/probation/adult_information_detained.html

17.    It is plausible that, because the inmates in this program are uniformly capable of working,

the program holds a lower-risk group of prisoners who would otherwise be placed in the San

Diego Sheriff's Department jail system.  In other counties where no work-release program exists,

the equivalent group of inmates are potentially placed in the jails run by the local Sherriff's

department, rather than being segmented out for work-release.

18.    No deaths are associated with this program, which is relatively small (with an average

daily population of 269, the work-release program holds about 5.2% as many inmates as the San

Diego County Sheriff's Department).

## VIII.  Conclusion

19.    Plaintiffs rely on the California State Auditor's report, which uses inappropriate and

misleading methodology in its analysis of deaths in San Diego County.  The Auditor's report

makes simple comparisons between San Diego County and their arbitrarily selected comparator

counties without properly controlling for the differences between these jurisdictions.  The

Auditor's report neither mentions nor investigates the large differences in average time spent in

custody between counties.  In their motion, plaintiffs make unsophisticated assertions about

deaths in the San Diego County Jail system without properly investigating the differing

compositions of jail populations across the state of California. Because of this, plaintiffs'

assertions cannot be taken at face value and must be interpreted with caution.


Executed this 30th day of May, 2022 in London, United Kingdom


Andrew Hildreth, Ph.D.

11

**Attachment A**

# ANDREW K. G. HILDRETH, Ph.D C.V.

**Education:**

B.A. (First Class Honours), Economics, City of London Polytechnic.
Ph.D, Economics, University of Cambridge.

**Professional History:**

| | |
|---|---|
| 2021 to present | *Equity Partner* Resolution Economics LLC, 1925 Century Park East 15th Floor Los Angeles, CA 90067, USA and *CEO* Observare Ltd, 2 London Wall Buildings, London Wall, London EC2M 5PP, UK |
| 2019 to 2021 | *Equity Partner/Senior Managing Director,* Ankura LLC, 55 Bishopsgate, 2nd Floor, London, EC2N 3AS, UK. |
| 2018 - 2019 | *Equity Partner/Managing Director,* Berkeley Research Group LLC, 6 New Street Square, 15th Floor, London, EC4A 3BF, UK.  2200 Powell Street #1200, Emeryville, CA 94608, USA. |
| 2013 to present | *Fellow,* Royal Statistical Society. |
| 2013 - 2018 | *Equity Partner/Managing Director,* Alvarez & Marsal GFD LLP, One Finsbury Circus, London EC2M 7EB, UK.  Alvarez & Marsal GFD LLC, 600 Madison Avenue, New York, NY 10022, USA |
| 2009 -2013 | *Director,* AlixPartners LLP, 20 North Audley Street, London, UK. |
| 2007 -2009 | *Vice President,* CRA International, 99 Bishopsgate London, UK. |
| 2001 -2007 | *Consultant to the Firm,* Econ One Research Inc., 601 W.Fifth Street, Los Angeles, CA, USA. |
| 1999 -2007 | *Director of Research,* California Census Research Data Center, University of California-Berkeley, CA, USA. |
| | *Associate Professor,* Department of Economics, University of California-Berkeley, Berkeley, CA, USA. |
| | *Professorial Researcher,* Survey Research Center, University of California-Berkeley, Berkeley, CA, USA. |
| 2003 | *CNRS-Berkeley Overseas Fellowship,* CREST-INSEE, Malakoff Cedex, France. |
| 2003 | *J. Fish & Lillian Smith Chair in Free Market Economics,* Department of Economics, Brigham Young University, Provo, UT, USA. |
| 1998 -1999 | *Visiting Professor,* Department of Economics and Center for Labor Economics, University of California-Berkeley, CA, USA. |
| 1994 -1999 | *Lecturer,* Department of Economics, University of Essex, UK. |
| 1994 | *Visiting Professor,* Graduate School for Industrial Administration, Carnegie-Mellon University, Pittsburgh, PA, USA. |
| 1993 | *Visiting Lecturer,* Department of Economics, University of Melbourne, Economics and Commerce Building, Victoria, Australia. |
| 1992 -1994 | *Senior Research Officer,* Department of Economics & ESRC Research Centre for Micro-Social Change, University of Essex, UK. |
| 1990 -1992 | *Research Fellow,* Institute of Economics and Statistics, University of Oxford, UK. |

**CASE WORK (cases as expert or expert witness role):**

*Anti-trust*

*Lee Eddins D/B/A Video Empire; et al.,v. Sumner Redstone; Viacom Inc.; Blockbuster Inc.; Paramount Home Video, Inc.; Buena Vista Home Entertainment, Inc.; Columbia Tri-Star Home Video, Inc.; Universal Studios Home Video, Inc.; and Twentieth Century Fox Home Entertainment, Inc. v. Blockbuster Video.* (Class Action on discriminatory pricing by movie studios in favor of Blockbuster. Estimates of extent of damages to non-Blockbuster video stores). Plaintiff. Testimony given.

*Department of Justice v. Atofina (US).* (Anti-trust pricing by Atofina in terms of non-competitive practices and pricing of PVC hardeners). Defence.

*American Express v. Visa, MasterCard, et al.* (Restrictive practices private litigation). Representing plaintiffs seeking damages for defendants restrictive practices in the US credit card market. Private litigation following on from Department of Justice legal action against Visa and MasterCard restrictive rules. Plaintiff. See here:
http://www.nytimes.com/2008/06/26/business/26credit.html

Dominant position market analysis of the nuclear reprocessing industry (in Europe) following the sale of Sellafield SLC for client. Report submitted to the European Commission via Eversheds LLC.

Assessment of 'Cover Bidding' practices for client in response to United Kingdom Office for Fair Trading (OFT) Letter of Intent on the construction industry. Results reported to client via Linklaters LLP.

Consulting expertise to large UK bank to answer regulatory concerns on market abuse in the unauthorized overdraft charges (UOC), credit card credit limits, and PPI (Payment Protection Insurance) markets. Reports filed with the Competition Commission.
http://www.competitioncommission.org.uk/inquiries/ref2010/ppi_remittal/pdf/review_of_accent
_final_with_addendum_21_oct_2010.pdf

Consulting expertise to Lloyds Bank in constructing their PPI calculator for remittance back to customers filing PPI claims.  Calculator required to meet stringent Financial Services Authority (FSA) and Financial Ombudsman Services (FOS) limits on precision.  Use of sampling and estimation.

Consulting expertise to British Telecommunications concerning survey evidence for market definition in the Wholesale Calls market in relation to an OFCOM Statement of Objections concerning accusations of a margin squeeze by Thus and Gamma.
http://stakeholders.ofcom.org.uk/enforcement/competition-bulletins/opencases/
all-open-cases/cw_988/

*National Grid Electricity Transmission v. ABB, Siemens, Alstom & others* (follow-on damages claim by National Grid following a cartel finding in the GIS switchgear market by the European Commission.) UK High Court. Defence.
http://www.monckton.com/docs/library/NGETvABBandOthers.pdf

*U.S. Department of Justice v. various banks and individual traders*.  Highly classified work concerning allegations of foreign exchange manipulation by various parties.
http://www.bloomberg.com/news/articles/2015-05-20/six-banks-pay-5-8-billion-five-plead-guilty-to-market-rigging

*UKTC v. DAF, Iveco, Daimler, MAN, Volvo*.  Follow-on action from the European Commission on a ruling concerning price and product characteristic fixing in the medium and heavy trucks market.  Market definition and damage estimates.  English High Court.  Claimant.

### Litigation

*Obayashi Corporation v. Los Angeles Metropolitan Transit Authority (LAMTA)*. (Estimates of cost over-run and productivity in the mining and construction of the LA Metro Line tunnel). Defence.

*Various v. Pittsburgh Corning Corporation*. (Representing the Insurance companies in estimates of the extent and cost of damages for future litigants in asbestos related claims). Defence.

*Various v. Halliburton (DII)*. (Representing the Insurance companies in assessment of the bankruptcy filing of DII in response to asbestos litigants. 'Event analysis' on the value of the bankruptcy declaration to the company as a means of settling all pending and future asbestos claims). Defence.

*GFT v. Bank of New York* (Representing GFT – a foreign exchange trading platform and fund – in a breach of contract case for a Joint Venture). Work involved econometric models predicting the growth of assets under management. Plaintiff.

*The Official Committee of Unsecured Creditors of Mervyn's Holdings LLC et al v. SCSF Mervyn's Offshore Inc. & Mervyn's (US) LLC*. Statistical sampling of documents according to key words to produce an estimate of the documents covered by the key word search.

*Vossloh Aktiengesellschaft v. Alpha Trains (UK)*. Breach of contract on leasing, guarantee, and maintenance of locomotives across European rail networks. Statistical evidence on the rate of failure for locomotives above the mandated threshold from the maintenance contract. UK High Court.  Defence.

*MBIA Insurance Corp v. Various banks (e.g. Countrywide)*. Modelling the causation and the damages elements to claims by MBIA that the banks had misled the insurance company as to the degree of defaults for the residential mortgages in the Residential Mortgage Backed Securities (RMBS). Plaintiff. Current. MBIA claim that the dilution of underwriting standards caused the

15

increased defaults. See: http://www.bloomberg.com/news/2012-01-03/mbiawins-judgment-ruling-against-countrywide.html

*Regents of the University of California v. Edwards, Wagstaff (in their official capacity as representatives of the County of Sacramento).* Sampling medical claims and estimating the liability for and the dollars owed on medical treatment at County of Sacramento hospitals. Defence.

*Dover et al., v. British Airways, PLC (UK).* Representing the airline against allegations of non-competitive fuel surcharge pricing on redemption (air mile) passenger tickets. Defence. http://uk.reuters.com/article/2013/11/08/uk-britishairways-lawsuit-idUKBRE9A711V20131108

*TMST, Inc., Thornburg Mortgage Inc. et al v. JPMorgan, Citigroup, Credit Suisse, RBS, UBS.* The work involves estimating the effects of underwriting and economic conditions on the mortgage market from 2000 until 2014. Work will be undertaken through the statistical estimation on both mortgage files and macroeconomic data. Defence: UBS.

*Claimants v. Serco Group Plc.* Securities class action under section 90A of the FSMA (Financial Services and Markets Act) 2000. Estimating the value of the information disclosure to institutional shareholders. Event study and data verification work. English High Court. Claimants.

*Claimants v. G4S Plc.* Securities class action under section 90A of the FSMA (Financial Services and Markets Act) 2000. Estimating the value of the information disclosure to institutional shareholders. Event study and data verification work. English High Court. Claimants.

*Claimants v. RSA Insurance.* Securities class action under section 90A of the FSMA (Financial Services and Markets Act) 2000. Estimating the value of the information disclosure to institutional shareholders. Event study and data verification work. Expert report filed. English High Court. Claimants.

*Claimants v. Tesco Plc.* Securities class action under section 90A of the FSMA (Financial Services and Markets Act) 2000. Estimating the value of the information disclosure to institutional shareholders. Event study and data verification work. English High Court. Claimants.

*Dialight v. Sanmina.* Breach of contract and loss of business from failure to provide product as required. Estimating the value of lost market share and business revenue. Event study. Plaintiff. Expert report and deposition.

*Claimants v. Kansai Electric Power Co., Inc.* (Japanese: 関西電力株式会社). Securities class action under the FIEA (Financial Instruments and Exchange Act, 2006, Japan), estimating the damages suffered by shareholders from Kansai executives bribery and corruption. Event study and LIFO/FIFO/WA damage models. Specific FIEA damage models. Expert report filed. Osaka District Court, Osaka, Japan.

16

***COVID***

*John Doe and Jane Doe as parent(s) of Child Doe and on behalf of those similarly situated, Plaintiffs v. Perkiomen Valley School District, Jason Saylor, Matthew Dorr, Rowan Keenan, Don Fountain, Kim Mares, Reena Kolar, Sarah Evans-Brockett, Laura White and Tammy Campli, all elected officials sued in their capacity as members of the Board of School Directors of the Perkiomen Valley School District*, Defendants. United States District Court, Eastern District of Pennsylvania.  Lawsuit regarding the wearing of masks and vaccinations to enter school premises and attend class.  Expert report on COVID incidence rates.  Defence.

***International Arbitration***

*Alceni International Limited v. Daniel Wellington A.B.* International Arbitration: Sweden. Allegations concerning grey market import of watches and undercutting authorized outlets in the US for sales and promotions.  Claimant.

*VW-VES (HK) Limited v. The Government of the Hong Kong Special Administrative Region.* Hong Kong (HKIAD).  Allegations concerning the cost overrun in the construction of a sludge treatment facility.  Design of a sampling scheme to cope with an understanding of the degree of cost and operational problems from a complex complaints online system.  TAE (Tribunal Appointed Expert).

***Intellectual Property***

*Louisiana Wholesale Drug Company, Rochester Drug Co-Operative Inc, and Meijer Distribution Inc. v. Abbotts Laboratories and Laboratories Fournier* (Intellectual Property): infringement of patent protection legislation in the development and distribution of Tricor drug for cholesterol. Plaintiffs (generic drug manufacturers).

*NHS v. Reckitt Benckiser.*  U.K. High Court litigation concerning the abuse of dominance re Gaviscon and the supply of a generic alternative.

***Employment (incl. Executive Compensation)***

*Nostrum v. Albertsons.* (Overtime legislation litigation). Representing the defence – Albertsons – in the assessment of whether or not they were negligent in allowing for a sufficient overtime payment for missed lunch breaks on the part of in-store pharmacists. Defence.

*Duran v. US Bank.* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Sampling and limits to the estimation of damages in class action using inferential statistics.  Defence. http://www.wagehourlitigation.com/state-claims/willthe-california-court-of-appeal-follow-dukes-and-reject-trial-by-formula-in-class-action-trials/ California Supreme Court: Duran v. U.S. Bank Nat. Assn., 59 Cal.4th 1 (2014). Opinion: http://www.courts.ca.gov/opinions/documents/S200923.PDF

*Dudash v. Lowes* (Overtime legislation litigation). Representing plaintiffs (class action) in an overtime dispute over hours of work. Class certification expert. Plaintiff.

*Shin v. First Republic Bank* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Estimation of damages. Defence.

*Credit Suisse Securities (USA) LLC v. Belanger, Eggesbo.* (Trader compensation and non-solicitation). Representing Credit Suisse First Boston (CSFB) in a matter regarding UBS poaching a property securities trading team). Estimation of loss for CSFB. Plaintiff.

*Carpenter v. Boeing* (Discrimination case regarding pay and promotion. Analysis of wages and positions within Boeing in Wichita, Kansas.). Report submitted. Defence.

*Dukes v. Walmart* (Discrimination case regarding pay. Analysis of wages across positions and stores within Walmart). Report submitted. Defence.

*Green v. Penske* (Overtime legislation litigation). Representing defendants (class action) in an unpaid vacation (days) hours dispute. Estimation of damages. Defence.

*Burakoff v. US Bank* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Estimation of damages. Defence.

*Vadura v. Paddy Murphy's Inc.* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Estimation of damages. Defence.

*Trahan v. US Bank* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Defence.

*Naranjo v. Spectrum* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Defence.

*Mathis v. Quicken Loans Inc.,* (Overtime legislation litigation). Representing defendants (class action) in a Federal overtime dispute on hours worked. Defence.

*Felczer v. Apple Inc.* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Defence.
http://blogs.wsj.com/digits/2014/07/22/apple-facing-another-class-action-suit-by-employees/
https://www.theguardian.com/technology/2014/jul/23/apple-lawsuit-employment-practices-california

*Abdulhaqq v Urban Outfitters.* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Defence.

*Shields et al. v. Security Paving Company, Inc.* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Defence.

*Kenemixay et al. v. Aldo U.S. Inc*.  (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Defence.

*Brinkel v. Westamerica Bank.*  (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Defense.

*Utne et al. v. Home Depot USA, Inc.,* (Overtime legislation litigation). Representing defendants (class action) in an overtime dispute over out of hours work. Defense.

*Jewett, et al., v. Oracle America, Inc.,* (Sex discrimination litigation).  Representing defendants (class action) in a pay and promotion discrimination dispute.  Defence.

Assessment and monitoring of training in *Southern California Edison* Linesmen on behalf of the company. Report submitted.

### *Wrongful death/injury*

*Various (Individual cases: Bermudez, Chavez, Hall, M., Sparks, Thompson, Williams) v. Alaska Airlines.* (Estimates of value of life for air crash victims in Alaska Airlines Flight 261 crash at Pacifica, California, 2000). Defence.

*Tallboys v. Garuda Airlines* (Mediation – expert report). (Estimates of value of life for air crash victims in Garuda Airlines crash in Indonesia, 2007). International Arbitration, Singapore. Defence.

*Faith Zaman and Thomas W. Derbyshire, v. Amedeo Holdings, Inc., PH Partners, Inc., Palace Holdings Inc., Kava Holdings, Inc., and Cedar Swamp Holdings, Inc.* (Estimates of loss of career earnings from wrongful lawsuits regarding professional conduct). Plaintiffs.

### *Other work*

*National Association for the Advancement of Colored People v. U.S. Bureau of the Census.* Constitutional case concerning the Census resources for the Decennial Census and the potential to miss sub sections of the population and undercounting their numbers.  United States District Court (Maryland).  Plaintiffs.

Assessment of 'fair rents' (pricing) for the New York Rent Stabilization Authority.

### **European enterprise panels project (European Commission)**

### *Authored reports*

"Enterprise Panels and the European Commission's White Paper", Luxembourg - Office for Official Publications of the European Communities, (1994).

"UK Manufacturing Performance and the Single Market". Confidential Report to EUROSTAT, Directorate D and Directorate General XV, for the 1996 Study on the European Internal Market.

**Australian Bureau of Statistics**

Service Industries and Science and Technology Section, PO Box 10, Belconnen, Canberra, ACT 2616, Australia. Work carried out: Sampling and design of the questionnaire.

**PUBLICATIONS:**

**Journals**

"Wage Bargaining, Inventories, and Union Legislation." With M. G. Coles. *Review of Economic Studies,* 67, (2000), pp. 273–294.

"Employers, Workers, and Unions: Analysis of a Matched Firm-Worker Panel with Endogenous Sampling and Survey Response." With S. E. Pudney. *Journal of Applied Econometrics.*

"Rent-Sharing and Wages: Evidence From Company and Establishment Panels." With A.J. Oswald. *Journal of Labor Economics,* 15, (1997), pp. 318–337.

"Environmental Regulation and the Cost of Job Displacement." *Industrial and Labor Relations Review.*

"The Measurement of Medicaid Coverage in the SIPP: Evidence from California, 1990-1996." With D. Card and L Shore-Sheppard. *Journal of Economic and Business Statistics,* 22, (2004), pp. 410–420.

"Estimating the 'True' Cost of Job Loss: Evidence using Matched Data from California 1991–2000." With T. von Wachter and E. Weber. *American Economic Review Papers and Proceedings.*

"The Hiring Practices of Firms: Estimates from Linked Cross-Section Employer-Worker Survey Data." With S. E. Pudney. *Journal of Industrial Economics,* (forthcoming).

"What has Happened to the Union Wage Differential in Great Britain in the 1990's?" *Oxford Bulletin of Economics and Statistics,* 61, (1999), pp. 5–31.

"A New Voice or a Waste of Time? Returns to Using Computers for Communication in the Workplace." *British Journal of Industrial Relations,* 39, (2001), pp. 257–284.

"Rent-Sharing and Wages: Product Demand or Technology Driven Premia?" *Economics of Innovation and New Technology,* 5, (1998), pp. 199–226.

20

"Wages, Work, and Unemployment: Work History Evidence on Allocating Time between Labour Market States." With D.T. Mortensen, S.P. Millard, and M.P. Taylor. *Applied Economics,* 30, (1998), pp. 1531-1547.

"Labor Demand and the Structure of Adjustment Costs in Japan." With Fumio Ohtake. *Journal of Japanese and International Economies,* 12, (1998), pp. 131–150.

"Union Wage Differentials for Covered Members and Nonmembers in Great Britain". *Journal of Labor Research,* 21, (2000), pp.133–145.

"Understanding the Labour Market: Matching Workers and Employers Using Respondent Level Data from Government Surveys." With S. E. Pudney. *Labour Market Trends,* 106, Number 12, (1998), pp. 643–656.

"The Ambiguity of Verdoorn's Law: A Case of the British Regions." *Journal of Post-Keynesian Economics,* 11, (1988–1989), pp. 279–294.

**Chapters in books**

"Aspetti econometrici nell' analisi di studi 'cross-section' con dati su lavoratori e datori di lavoro." With S. E. Pudney. *Micro and Macrodata of Firms,* Biffandini, S. (ed), Springer-Verlag, Germany, (1999), pp. 509–540.

"Econometric Issues in the Analysis of Linked Worker-Employer Cross-Section Surveys." With S. E. Pudney. *The Creation and Analysis of Employer and Employee Matched Data,* Haltiwanger, J. C., Lane, Spletzer, J., J., Theeuwes, J., and Troske, K., eds, North-Holland, Amsterdam, (1999).

**Book reviews**

*Job Creation and Destruction,* by Davis, S. J., Haltiwanger, J. C., and Schuh, S., (Camb, MIT, 1996) in *Industrial and Labor Relations Review,* 51, 1997, pp. 143–145.

**INVITED LECTURES AND KEYNOTE SPEECHES**

January 1993: Measurement and Analysis of Vacancies: An International Comparison. University of Limburg, Netherlands.

February 1993: Australian Labour Market Workshop. Fremantle, Australia. Keynote Paper: "Design, Implementation, and Uses of the European Establishment Panel Survey.

June 1993: International Conference on Establishment Surveys. Buffalo, New York, USA. Invited Paper: "Economists Use of Establishment Data."

December 1994: Microeconomics of Human Resource Management: Multinational Studies of Firm Practices. Ministere de l' Economie, Paris, France. Invited Paper: "Unions and Employment: Evidence from US and UK Company Panels."

May 1995: The Effects of Advanced Technologies and Innovation on Firm Performance and Employment. U.S. Department of Commerce, Washington, DC, USA. Invited Paper: "Rent-Sharing and Wages: Product Demand or Technology Driven Premia?"

June 1996: International Conference on Comparative Analysis of Enterprise Data, Statistics Finland, Helsinki, Finland. Invited Paper: "Approaches to International Comparisons."

December 1997: International Conference on Comparative Analysis of Enterprise Data, Department of Mathematics & Statistics, University of Bergamo, Italy. Invited Paper: "Econometric Issues in the Analysis of Linked Worker-Employer Cross-Section Surveys."

May 1998: International Symposium on Employer-Employee Matched Data, Department of Commerce & Bureau of the Census, Washington, DC, USA. Invited Paper: "Econometric Issues in the Analysis of Linked Worker-Employer Cross-Section Surveys."

August 2001: 53rd Session of the International Statistical Institute (ISI), Seoul, Korea. Invited Paper: "Econometric Issues in the Analysis of Linked Worker-Employer Longitudinal Surveys."

October 2003: Committee on National Statistics (CNSTAT) Workshop: Access to Research Data: Assessing Risks and Opportunities. National Academy of Science, Washington DC. Commissioned Paper: "The Census Research Data Center Network: Problems, Possibilities and Precedents."

September 2005: Department of Trade and Industry (DTI)/Policy Studies Institute (PSI) Conference: Making Linked Employer-Employee Data Relevant to Policy Analysis. The British Academy, London. Commissioned Paper: "On the Importance of Measurement Error in Estimating Displacement and the Cost of Job Loss: Lessons using Matched Employer-Employee Data."

## PRESENTATIONS

Royal Economic Society Meeting, University of Kent, 1995.
Econometric Society Summer Meeting, University of Iowa, Iowa City, 1996.
Econometric Society Summer Meeting, California Institute of Technology, Pasadena, 1997.
Econometric Society World Congress, University of Washington, Seattle, 2000.

**Attachment B: Data and Documents Reviewed and Relied Upon**

## I.    Court Documents

Notice of Motions and Motions for Preliminary Injunction and Provisional Class Certification

## II.    Data

DeathInCustody_2005-2020_20210524.xlsx

"San Diego County Sheriff 's Department It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody," Auditor of the State of California, February 2022

United States Census, County Population Totals: 2020-2021

## III.    Online Cites

"Arrests, 2011-2020" California Department of Justice, https://openjustice.doj.ca.gov/data-stories/arrests, retrieved on May 10, 2022.

"DOJ CJSC Arrests/Arrests Dispositions Context", https://data-openjustice.doj.ca.gov/sites/default/files/dataset/2021-06/Arrests%20Context_062921.pdf, retrieved on May 12, 2022.

"East Mesa Reentry Facility" San Diego County Sheriff's Department, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/102/126, retrieved on May 12, 2022

"George Bailey Detention Facility" San Diego County Sheriff's Department, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/90/126, retrieved on May 12, 2022

"Death In Custody, 2011-2020" California Department of Justice, https://openjustice.doj.ca.gov/data-stories/deathincustody, retrieved on May 10, 2022

"Las Colinas Detention and Reentry Facility" San Diego County Sheriff's Department, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/105/126, retrieved on May 12, 2022

"San Diego Central Jail" San Diego County Sheriff's Department, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/58/126, retrieved on May 12, 2022

"San Diego County Sheriff's Department Public Information Plan 2020" San Diego
County Sheriff's Department
https://www.sdsheriff.gov/home/showpublisheddocument/4641/63777580842447
0000, retrieved on May 12, 2022

"South Bay Detention Facility" San Diego County Sheriff's Department,
https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory
/56/126, retrieved on May 12, 2022

"Vista Detention Facility" San Diego County Sheriff's Department,
https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory
/60/126, retrieved on May 12, 2022

"Work Furlough and Residential Re-Entry Center" San Diego County Probation
Department,
https://www.sandiegocounty.gov/content/sdc/probation/adult_information_detain
ed.html, retrieved on May 12, 2022

EXHIBIT J

APPEAL,CLOSED,1983PSLC,IFP,REOPEN

# U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:20-cv-01443-MMA-MSB

Keavney v. O'Brian et al

Assigned to: Judge Michael M. Anello

Referred to: Magistrate Judge Michael S. Berg

Case in other court: USCA, 21-56088

Cause: 42:1983pr Prisoner Civil Rights

Date Filed: 07/27/2020

Date Terminated: 06/10/2021

Jury Demand: Plaintiff

Nature of Suit: 550 Prisoner: Civil Rights

Jurisdiction: Federal Question

**Plaintiff**

**Michael Richard Keavney**

represented by **Michael Richard Keavney**
17104761
San Diego County Jail
1173 Front Street
San Diego, CA 92101
PRO SE

V.

**Defendant**

**Dr. O'Brian**
*Doctor (SDCJ)*
*TERMINATED: 05/05/2021*

**Defendant**

**Dr. John Doe**
*Doctor*

**Defendant**

**Dr. Cynthia Pucviance**
*Doctor/Physician Assistant*
*TERMINATED: 05/05/2021*

**Defendant**

**Dr. John Doe**
*Dept in Charge of Transportation*
*TERMINATED: 05/05/2021*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/21/2021 | 18 | ORDER of USCA as to 13 Notice of Appeal to the 9th Circuit filed by Michael Richard Keavney. A review of the USDC's docket reflects that the USDC has certified that this appeal is not taken in good faith and has revoked appellant's in forma pauperis status. The USCA may dismiss a case at any time, if the court determines the case is frivolous. Within 35 days after the date of this order, appellant must: (1) file a motion to dismiss this appeal, see Fed. R. App. P. 42(b), or (2) file a statement explaining why the appeal is not frivolous and should go forward. If appellant files a statement that the appeal should go forward, |

| | | appellant also must: (1) file in the USCA a motion to proceed in forma pauperis, OR (2) pay to the USDC $505.00 for the filing and docketing fees for this appeal AND file in the USCA proof that the $505.00 was paid. If appellant does not respond to this order, the Clerk will dismiss this appeal for failure to prosecute, without further notice. If appellant files a motion to dismiss the appeal, the Clerk will dismiss this appeal, pursuant to Federal Rule of Appellate Procedure 42(b). If appellant submits any response to this order other than a motion to dismiss the appeal, the USCA may dismiss this appeal as frivolous, without further notice. If the court dismisses the appeal as frivolous, this appeal may be counted as a strike under 28 U.S.C. § 1915(g). The briefing schedule for this appeal is stayed. (akr) (Entered: 10/21/2021) |
|---|---|---|
| 10/08/2021 | 17 | ORDER Responding to 16 Referral Notice. After review of the record herein, the Court concludes that Plaintiff's appeal lacks any arguable basis in law or fact, and thus is considered as not being taken "in good faith" pursuant to 28 U.S.C. § 1915(a)(3). Accordingly, the Court hereby REVOKES Plaintiff's IFP status. The Clerk of the Court is directed to notify the Ninth Circuit Court of Appeals of this Order. Signed by Judge Michael M. Anello on 10/8/2021. (USCA Case Number 21-56088. Order electronically transmitted to the US Court of Appeals. All non-registered users served via U.S. Mail Service.) (akr) (Entered: 10/08/2021) |
| 10/06/2021 | 16 | REFERRAL NOTICE from USCA as to 13 Notice of Appeal to the 9th Circuit filed by Michael Richard Keavney. This matter is referred to the USDC for the limited purpose of determining whether in forma pauperis status should continue for this appeal or whether the appeal is frivolous or taken in bad faith. If the USDC elects to revoke in forma pauperis status, the USDC is requested to notify the USCA and the parties of such determination within 21 days of the date of this referral. If the USDC does not revoke in forma pauperis status, such status will continue automatically for this appeal pursuant to FRAP 24(a). This referral shall not affect the briefing schedule previously established by the USCA. (akr) (Entered: 10/06/2021) |
| 10/05/2021 | 15 | USCA Time Schedule Order as to 13 Notice of Appeal to the 9th Circuit filed by Michael Richard Keavney. (akr) (Entered: 10/05/2021) |
| 10/05/2021 | 14 | USCA Case Number 21-56088 for 13 Notice of Appeal to the 9th Circuit filed by Michael Richard Keavney. (akr) (Entered: 10/05/2021) |
| 10/01/2021 | 13 | NOTICE OF APPEAL to the 9th Circuit by Michael Richard Keavney as to 12 Clerk's Judgment. IFP Status. (The document was received by the Clerk of the US Court of Appeals on 10/1/2021 and was forwarded to the Clerk of the US District Court for processing. Notice of Appeal electronically transmitted to the US Court of Appeals.) (akr) (Entered: 10/01/2021) |
| 08/30/2021 | 12 | CLERK'S JUDGMENT. IT IS SO ORDERED AND ADJUDGED that the Court dismisses this action without prejudice based upon Plaintiff's failure to prosecute by amending his First Amended Complaint to identify a Defendant by name so as to permit service of the Summons and First Amended Complaint as required by Court's May 5, 2021 Order. (All non-registered users served via U.S. Mail Service) (tcf) (Entered: 08/30/2021) |
| 08/30/2021 | 11 | ORDER DISMISSING CIVIL ACTION for Failure to Prosecute in Compliance with Court Order Requiring Amendment. Signed by Judge Michael M. Anello on 8/30/2021. (All non-registered users served via U.S. Mail Service) (tcf) (Entered: 08/30/2021) |
| 05/05/2021 | 10 | ORDER DISMISSING First Amended Complaint. The Court DISMISSES this action in its entirety and GRANTS Plaintiff sixty (60) days leave to amend. If Plaintiff fails to file a Second Amended Complaint within the time provided, the Court will enter a final Order dismissing this civil action based on Plaintiff's failure to prosecute in compliance with a court order requiring amendment. Signed by Judge Michael M. Anello on 5/5/2021. (All |

| | | non-registered users served via U.S. Mail Service. First Amended Complaint, Blank 1983 Complaint form and instructions, and AO 88B form mailed to Plaintiff.) (tcf) (Entered: 05/05/2021) |
|---|---|---|
| 01/25/2021 | 9 | AMENDED COMPLAINT with Jury Demand against John Doe(Doctor), John Doe(Dept in Charge of Transportation), filed by Michael Richard Keavney. (jms) (Main Document 9 replaced on 4/8/2021 to include missing pages) (jms). (Entered: 01/27/2021) |
| 12/11/2020 | 8 | ORDER Granting Motion to Proceed In Forma Pauperis Pursuant to 28 U.S.C. § 1915(a) [Doc No. 2 ]; Denying as Moot Motions to Proceed In Forma Pauperis [Doc. Nos. 5 , 7 ]; Dismissing Civil Action for Failing to State a Claim Pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A; Denying Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No 3 ]. The Court DISMISSES Plaintiff's Complaint for failing to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b), and GRANTS him forty-five (45) days leave from the date of this Order in which to file an Amended Complaint which cures all the deficiencies of pleading noted. Signed by Judge Michael M. Anello on 12/11/2020. (Order electronically transmitted to Secretary of CDCR) (All non-registered users served via U.S. Mail Service) (tcf) (Entered: 12/11/2020) |
| 10/29/2020 | 7 | MOTION for Leave to Proceed in forma pauperis by Michael Richard Keavney. Nunc Pro Tunc 10/28/2020 (jms) (Entered: 10/29/2020) |
| 10/29/2020 | 6 | Notice of Document Discrepancies and Order Thereon by Judge Michael M. Anello Accepting Document: Motion to Proceed IFP, from Plaintiff Michael Richard Keavney. Non-compliance with local rule(s), OTHER: IFP Motion already pending [ECF No. 5]; Complaint submitted for screening pursuant to 28 U.S.C. § 1915(e) and § 1915A. Nunc Pro Tunc 10/28/2020. Signed by the Chambers of Judge Michael M. Anello on 10/29/2020.(All non-registered users served via U.S. Mail Service)(jms) (Entered: 10/29/2020) |
| 10/13/2020 | 5 | MOTION for Leave to Proceed in forma pauperis by Michael Richard Keavney. (jms) (Entered: 10/14/2020) |
| 09/28/2020 | 4 | ORDER Dismissing Civil Action for Failing to Prepay Filing Fee Required by 28 U.S.C. § 1914(a) or File a Motion to Proceed in Forma Pauperis. Signed by Judge Michael M. Anello on 9/28/2020.(All non-registered users served via U.S. Mail Service)(sxa) (Entered: 09/28/2020) |
| 07/27/2020 | 3 | MOTION for Temporary Restraining Order by Michael Richard Keavney. (jms) (Entered: 07/28/2020) |
| 07/27/2020 | 2 | MOTION for Leave to Proceed in forma pauperis by Michael Richard Keavney. (jms) (Entered: 07/28/2020) |
| 07/27/2020 | 1 | COMPLAINT With Jury Demand Against O'Brian, John Doe (Doctor), Cynthia Pucviance, John Doe (Dept in Charge of Transportation), filed by Michael Richard Keavney. ($400.00 Filing Fee, Fee Not Paid, IFP Filed) (Attachments: # 1 Civil Cover Sheet)<br><br>The new case number is 3:20-cv-1443-MMA-MSB. Judge Michael M. Anello and Magistrate Judge Michael S. Berg are assigned to the case.[*Case in Screening per 28 USC 1915*] (jms)(jrd) (Entered: 07/28/2020) |

---

**PACER Service Center**

**Transaction Receipt**

| 05/25/2022 16:18:28 | | | |
|---|---|---|---|
| **PACER Login:** | tmm4SEC3 | **Client Code:** | 08747-0001 |
| **Description:** | Docket Report | **Search Criteria:** | 3:20-cv-01443-MMA-MSB |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

EXHIBIT K

**General Docket**
**United States Court of Appeals for the Ninth Circuit**

| Court of Appeals Docket #: 21-56088 | | | **Docketed:** 10/05/2021 |
|---|---|---|---|

**Nature of Suit:** 3550 Prisoner-Civil Rights
Michael Keavney v. O'Brian, et al
**Appeal From:** U.S. District Court for Southern California, San Diego
**Fee Status:** IFP

**Case Type Information:**
   **1)** prisoner
   **2)** state
   **3)** civil rights

**Originating Court Information:**
   **District:** 0974-3 : 3:20-cv-01443-MMA-MSB
   **Trial Judge:** Michael M. Anello, Senior District Judge
   **Date Filed:** 07/27/2020

| **Date Order/Judgment:** | **Date Order/Judgment EOD:** | **Date NOA Filed:** | **Date Rec'd COA:** |
|---|---|---|---|
| 08/30/2021 | 08/30/2021 | 10/01/2021 | 10/01/2021 |

**Prior Cases:**
   None

**Current Cases:**
   None

---

| MICHAEL RICHARD KEAVNEY (17104761) | Michael Richard Keavney |
|---|---|
|       Plaintiff - Appellant, | [NTC Pro Se] |
| | SDCJ - SAN DIEGO CENTRAL JAIL |
| | 1173 Front St. |
| | San Diego, CA 92101 |
|   v. | |
| | |
| O'BRIAN, Doctor (SDCJ) | |
|       Defendant - Appellee, | |
| | |
| JOHN DOE, Doctor | |
|       Defendant - Appellee, | |
| | |
| CYNTHIA PUCVIANCE, Doctor/Physician Assistant | |
|       Defendant - Appellee, | |
| | |
| JOHN DOE, Dept in Charge of Transportation | |
|       Defendant - Appellee, | |

MICHAEL RICHARD KEAVNEY,

       Plaintiff - Appellant,

  v.

O'BRIAN, Doctor (SDCJ); JOHN DOE, Doctor; CYNTHIA PUCVIANCE, Doctor/Physician Assistant; JOHN DOE, Dept in Charge of Transportation,

       Defendants - Appellees.

| | | |
|---|---|---|
| 10/05/2021 | ☐ 1<br>60 pg, 949.5 KB | DOCKETED CAUSE AND ENTERED APPEARANCE OF PRO SE APPELLANT AND NO APPEARANCE FOR APPELLEES. SEND MQ: No. The schedule is set as follows: Appellant Michael Richard Keavney opening brief due 11/30/2021. [12248255] (JPD) [Entered: 10/05/2021 03:09 PM] |
| 10/06/2021 | ☐ 2<br>2 pg, 126.2 KB | Filed referral notice (Deputy Clerk:CKP): Referring to the district court for determination whether in forma pauperis status should continue for this appeal. [12249318] (CKP) [Entered: 10/06/2021 12:17 PM] |
| 10/11/2021 | ☐ 3<br>2 pg, 188.48 KB | Received copy of District Court order filed on 10/08/2021. Responding to referal notice [12253115] (NAC) [Entered: 10/11/2021 03:52 PM] |
| 10/18/2021 | ☐ 4<br>1 pg, 28.51 KB | **Streamlined request by Appellant Michael Richard Keavney to extend time to file the brief is approved. Streamline requests allow for only 30 day extensions. Amended briefing schedule: Appellant Michael Richard Keavney opening brief due 12/30/2021.** [12260626] (DLM) [Entered: 10/18/2021 04:47 PM] |
| 10/21/2021 | ☐ 5<br>14 pg, 282.38 KB | Filed clerk order (Deputy Clerk: DA): A review of the district court's docket reflects that the district court has certified that this appeal is not taken in good faith and has revoked appellant's in forma pauperis status. See 28 U.S.C. § 1915(a). This court may dismiss a case at any time, if the court determines the case is frivolous. See 28 U.S.C. § 1915(e)(2). Within 35 days after the date of this order, appellant must: (1) file a motion to dismiss this appeal, see Fed. R. App. P. 42(b), or (2) file a statement explaining why the appeal is not frivolous and should go forward. If appellant files a statement that the appeal should go forward, appellant also must: (1) file in this court a motion to proceed in forma pauperis, OR (2) pay to the district court $505.00 for the filing and docketing fees for this appeal AND file in this court proof that the $505.00 was paid. If appellant does not respond to this order, the Clerk will dismiss this appeal for failure to prosecute, without further notice. See 9th Cir. R. 42-1. If appellant files a motion to dismiss the appeal, the Clerk will dismiss this appeal, pursuant to Federal Rule of Appellate Procedure 42(b). If appellant submits any response to this order other than a motion to dismiss the appeal, the court may dismiss this appeal as frivolous, without further notice. If the court dismisses the appeal as frivolous, this appeal may be counted as a strike under 28 U.S.C. § 1915(g). The briefing schedule for this appeal is stayed. The Clerk shall serve on appellant: (1) a form motion to voluntarily dismiss the appeal, (2) a form statement that the appeal should go forward, and (3) a Form 4 financial affidavit. Appellant may use the enclosed forms for any motion to dismiss the appeal, statement that the appeal should go forward, and/or motion to proceed in forma pauperis. [12264608] (CKP) [Entered: 10/21/2021 01:39 PM] |
| 10/21/2021 | ☐ 6<br>8 pg, 853.8 KB | Filed Appellant Michael Richard Keavney motion to appoint pro bono counsel. Deficiencies: None. [12264768] (NAC) [Entered: 10/21/2021 02:50 PM] |
| 11/01/2021 | ☐ 7 🔒<br>0 pg, 0 KB | Filed Appellant Michael Richard Keavney motion to proceed In Forma Pauperis. Deficiencies: None. [12274602] (NAC) [Entered: 11/01/2021 02:38 PM] |
| 11/01/2021 | ☐ 8<br>1 pg, 329.9 KB | Received Appellant Michael Richard Keavney request for copy of Court forms. [12275165] (NAC) [Entered: 11/02/2021 07:31 AM] |
| 11/03/2021 | ☐ 9 | Sent: Appellant Michael Richard Keavney copy of Court forms, per request. [8] [12277013] (ER) [Entered: 11/03/2021 11:27 AM] |
| 11/18/2021 | ☐ 10<br>13 pg, 696.59 KB | Filed Appellant Michael Richard Keavney response to order to show cause. [12292249] (NAC) [Entered: 11/18/2021 03:14 PM] |
| 11/18/2021 | ☐ 11<br>13 pg, 468.09 KB | Filed Appellant Michael Richard Keavney motion to proceed In Forma Pauperis. Deficiencies: None. [12292254] (NAC) [Entered: 11/18/2021 03:15 PM] |
| 11/18/2021 | ☐ 12<br>2 pg, 111.55 KB | Received Appellant Michael Richard Keavney request for docket sheet and copy of FRAP Rules. [12292262] (NAC) [Entered: 11/18/2021 03:17 PM] |
| 11/18/2021 | ☐ 13 | Sent Appellant a copy of the docket sheet and the FRAP and Ninth Circuit rules in response o the Form 29 request received on 11/18/2021. [12292578] (JR) [Entered: 11/18/2021 05:14 PM] |
| 12/20/2021 | ☐ 14<br>2 pg, 60.72 KB | Filed Appellant Michael Richard Keavney motion to extend time to file appellant opening brief. Deficiencies: None [12320885] (NAC) [Entered: 12/20/2021 02:53 PM] |
| 02/22/2022 | ☐ 15<br>1 pg, 98.01 KB | Received Appellant Michael Richard Keavney request for case status & docket. [12377224] (NAC) [Entered: 02/23/2022 07:23 AM] |
| 02/23/2022 | ☐ 16 | Sent Appellant a copy of the docket sheet in response to the letter received on 02/22/2022. [12377328] (JR) [Entered: 02/23/2022 08:51 AM] |

Clear All

◉ **Documents and Docket Summary**
○ Documents Only

☑ **Include Page Numbers**

**Selected Pages:** 0        **Selected Size:** 0 KB
**Totals reflect accessible documents only and do not include unauthorized restricted documents.**

View Selected

---

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| U.S. Court of Appeals for the 9th Circuit - 05/25/2022 16:20:36 | | |
| **PACER Login:** | tmm4SEC3 | **Client Code:** | 08747-0001 |
| **Description:** | Docket Report (filtered) | **Search Criteria:** | 21-56088 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |