GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email:       ggrunfeld@rbgg.com
             vswearingen@rbgg.com
             pkaul@rbgg.com
             eanderson@rbgg.com
             hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone:  (510) 806-7366
Facsimile:  (510) 694-6314
Email:       ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**REPLY DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:  Hon. Anthony J. Battaglia<br><br>Date:    August 11, 2022<br>Time:    2:00 p.m.<br>Ctrm.:   4A |

[3923282.3]

1  (*counsel continued from preceding page*)

2  CHRISTOPHER M. YOUNG – 163319
   ISABELLA NEAL – 328323
3  OLIVER KIEFER – 332830
   DLA PIPER LLP (US)
4  401 B Street, Suite 1700
   San Diego, California 92101-4297
5  Telephone: (619) 699-2700
   Facsimile: (619) 699-2701
6  Email:      christopher.young@dlapiper.com
               isabella.neal@dlapiper.com
7              oliver.kiefer@dlapiper.com

8  BARDIS VAKILI – 247783
   JONATHAN MARKOVITZ – 301767
9  ACLU FOUNDATION OF SAN DIEGO &
   IMPERIAL COUNTIES
10 2760 Fifth Avenue, Suite 300
   San Diego, California 92103-6330
11 Telephone: (619) 232-2121
   Email:      bvakili@aclu-sdic.org
12             jmarkovitz@aclu-sdic.org

13 Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3923282.]

I, Van Swearingen, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this reply declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification ("Plaintiffs' Motion").

**I.    Two More People Have Died at the San Diego Jail and Hundreds of Incarcerated People Have Been on Hunger Strike Since Plaintiffs Filed Their Motion**

2.      Two additional people have died at the Jail in May 2022, since Plaintiffs' Motions were filed on May 2, 2022.  Attached as **Exhibit A** is a true and correct copy of the San Diego County Sheriff's Department's May 6, 2022 and May 12, 2022 public announcements stating that on May 5, 2022, Leonel Villaseñor died in a holding cell at San Diego Central Jail, the day after he was booked into the Jail.  Villaseñor was 31 years old.  The Sheriff's Department's May 6, 2022 announcement states that on May 5, 2022, deputies discovered an incarcerated person "alone in the cell and unresponsive," and that "[n]aloxone was administered to the incarcerated person by deputies and medical staff."  The announcement states that the person did not survive.  The May 12, 2022 announcement identifies Leonel Villaseñor as the person who died.  The administration of naloxone strongly suggests that Villaseñor died from a drug overdose.  Plaintiffs' Motion requests remedies to address preventable drug overdoses in the Jail.

3.      Attached as **Exhibit B** is a true and correct copy of the San Diego County Sheriff's Department's May 25, 2022 public announcement stating that on May 25, 2022, a 64-year-old man died at the San Diego Central Jail.  The Sheriff's Department has not yet released the identity of the person who died.  There have now been 10 reported deaths at the Jail this year.

4.      Plaintiffs' counsel have met with and spoken to dozens of incarcerated

people at the Jail in the five weeks since Plaintiffs' Motions were filed, both in person and over the telephone. Through those conversations, we have learned that in May 2022, hundreds of incarcerated people at the Jail were participating in a hunger strike to protest conditions at the Jail. Based upon these conversations, I understand that individuals in a unit at George Bailey Detention Facility began the hunger strike on or around May 4, 2022 to protest, among other things, the following conditions: (1) reduced social visits from loved ones; (2) the Jail's failure to provide video visits; (3) the Jail's failure to respond to grievances; (4) the Jail's practice of keeping individuals in administrative segregation past designated timelines; (5) lack of cleanliness in the Jail, including clogged dayroom toilets and trash; and (6) inadequate laundry exchanges. Incarcerated people in other units at George Bailey joined the hunger strike in solidarity, as did incarcerated people at East Mesa Reentry Facility. I am informed that individuals at East Mesa faced retaliation for their participation in the hunger strike, including the Jail canceling yard, failing to deliver commissary to incarcerated people, taking away the cleaning cart, and keeping the lights on 24 hours a day. I am informed that the hunger strike lasted for at least several days.

**II.     Since Plaintiffs Filed Their Motion, CLERB Has Reported on Further Problematic Actions by Custody Staff and Recommended Multiple Changes to Jail Policy**

5.      Attached as **Exhibit C** is a true and correct copy of the San Diego County Citizens' Law Enforcement Review Board's ("CLERB") agenda for its May 2022 meeting. The agenda includes CLERB's findings in the death of Luis Ahyule Gomez, who died at Vista Detention Facility on March 14, 2021. *Id.* at 5. CLERB found that on the day of Gomez's death, "Gomez's cellmate expressed concerns about the physical well-being of Gomez to Deputy 1 directly on two separate occasions, once during hard count and once through a call box." *Id.* Despite these notifications to deputies about Gomez's declining health, along with another notification from a different incarcerated person, the deputy "failed to take action to

1   summon medical aid." *Id.* CLERB identified "a lapse of approximately 48 minutes

2   from when Deputy 1 had the opportunity to identify a medical emergency to when

3   another deputy discovered Gomez unresponsive." *Id.* CLERB also found that the

4   same deputy failed to properly conduct a safety check of Gomez because he "failed

5   to obtain a response from Gomez that proved he was alive, awake, conscious, and

6   responsive." *Id.* at 5-6. The agenda also noted that several CLERB policy recom-

7   mendations to the Sheriff's Department remained "pending responses" from the

8   Sheriff's Department, including recommendations to use body scanners on incar-

9   cerated people transferred between facilities; to ensure sufficiently frequent safety

10  checks during the booking process; and to prioritize the use of cells with operable

11  cameras. *Id.* at 2.

12        6.      Attached as **Exhibit D** is a true and correct copy of CLERB's May 5,

13  2022 policy recommendation that the Sheriff's Department make naloxone "readily

14  available" to people incarcerated in the Jail. CLERB also recommended that the

15  Sheriff's Department educate incarcerated people on spotting overdoses and

16  properly administering naloxone. The recommendation observes that people in the

17  Jail are "two times more likely to die" from overdose deaths than people

18  incarcerated in other California county jails.

19        7.      Attached as **Exhibit E** is a true and correct copy of CLERB's May 5,

20  2022 policy recommendation that the Sheriff's Department develop policies and

21  procedures for use of a dog trained to detect fentanyl. CLERB noted that the

22  Sheriff's Department had deployed a dog trained to detect fentanyl, but had "no

23  documented policy or procedures" for the use of the canine. CLERB recommended

24  that the Sheriff's Department develop such policies, to include having the dog sniff

25  visitors and staff at the Jail along with incarcerated people.

26        8.      Attached as **Exhibit F** is a true and correct copy of the Sheriff's

27  Department's June 2, 2022 report on Suspected Overdose Incidents with Naloxone

28  Deployment. The report states that five people had naloxone administered to them

1   for a suspected overdose in the seven days leading up to June 2, 2022.  All five

2   people were at San Diego Central Jail.  The report indicates that as of June 2, 2022,

3   there have been 90 total suspected overdoses at the Jail this year.  The report was

4   publicly posted on the Sheriff's Department's website at the following link:

5   https://www.sdsheriff.gov/home/showpublisheddocument/5338/6378983881656029

6   45.

7        9.      Attached as **Exhibit G** is a true and correct copy of an August 21, 2020

8   memorandum from the San Diego County Health and Human Services Agency to

9   local health providers titled "Fentanyl Overdose Deaths Related to Illicit Drug Use."

10  The memorandum states that "[w]idespread access to naloxone is essential to

11  prevent fentanyl-related deaths." *Id.* at 1.  The memorandum also states that

12  "Medication Assisted Treatment (MAT), such as methadone and buprenorphine, is

13  the most effective treatment for opioid use disorder and is recommended to reduce

14  the risk of overdose." *Id.*  The memorandum is available online at:

15  https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/cahan/commu

16  nications_documents/08-21-2020.pdf.

17  **III.    Defendants Have Repeatedly Rejected Plaintiffs' Requests for Experts to
         Inspect the Jail Facilities**

18

19       10.     Months ago, Plaintiffs asked County Defendants for authorization for

20  Plaintiffs' subject-matter experts to inspect the Jail facilities and review additional

21  documents.  On February 23, 2022, in connection with County Defendants' request

22  for a 45-day extension to respond to the Second Amended Complaint, I spoke with

23  Matthew O'Sullivan, County Counsel for County Defendants.  I told Mr. O'Sullivan

24  that we would agree to County Defendants' request for additional time if Plaintiffs

25  were permitted to tour and inspect the Jail facilities with their experts.  The County

26  rejected this proposal.  A true and correct copy of an email exchange between

27  myself and Mr. O'Sullivan memorializing this conversation is attached hereto as

28  **Exhibit H**.

11.     County Defendants have also not substantively responded to Plaintiffs' repeated requests to have neutral subject-matter experts inspect the Jail facilities. Attached as **Exhibit I** is a true and correct copy of a March 15, 2022 letter from Plaintiffs' counsel to County Counsel for County Defendants, Fernando Kish, Ronald Lenert, and Matthew O'Sullivan.  Plaintiffs proposed "the use of neutral, mutually agreed-upon subject matter experts to assist the parties in the identification of systemic issues and effective remedies that are tailored to San Diego County's system." *Id.* at 3.  Plaintiffs proposed the retention of experts with subject matter expertise in several specific areas, a timeline for the retention of experts, and a process for the production of expert reports and recommendations.  *Id.* at 4.

12.     On March 28, 2022, County Counsel advised Plaintiffs' counsel of the association of private counsel for County Defendants.  On March 31, 2022, I sent an email to County Defendants' private counsel, Susan Coleman, informing her that County Counsel had not responded to Plaintiffs' proposal for neutral experts.  On April 4, 2022, Ms. Coleman wrote back and stated, "In response to your proposal about joint experts we may be willing to consider this.  Do you have some specific proposals?  We will need to confer about this in more detail."  On April 5, 2022, I wrote back, "Let's discuss and we can thereafter put together a comprehensive plan."  A true and correct copy of this email exchange is attached hereto as **Exhibit J**.

13.     Plaintiffs and County Defendants discussed these proposals on April 21, 2022.  Attached as **Exhibit K** is a true and correct copy of my email to Ms. Coleman memorializing that conversation and next steps.  I wrote, "We understand that you will … [l]et us know County's position on joint experts."  *Id.* at 9.  To date, County Defendants have not informed me or any other Plaintiffs' counsel that they are amenable to neutral, joint experts.

**IV. Plaintiffs Have Exhausted Their Administrative Remedies and Defendants' Declarations Often Omit Mention of Important Documents in the Jail's Own Records**

14. My firm, Rosen Bien Galvan & Grunfeld LLP, and attorneys with our co-counsel at DLA Piper LLP have been in regular contact with the eight class representatives in this case about grievances they submitted at the Jail. We have also spoken with other incarcerated people, including those who have submitted declarations in support of Plaintiffs' Motion and Reply briefing, about their experiences filing grievances at the Jail. Attorneys and staff in my office worked closely with class representatives on submitting grievances on the issues in this litigation, including the claims at issue in Plaintiffs' Motion. Attorneys and staff in my office and the DLA Piper San Diego office have been in regular contact with class representatives to monitor when the class representatives filed grievances, if and when the Jail responded to the grievances, if and when the class representatives appealed any response to that grievance and whether the Jail responded to that appeal, and whether the class representatives received copies of their submitted grievances from Jail staff. Based on these conversations, I am aware that each of the current class representatives submitted grievances about the issues in this litigation.

15. Defendants' declaration from E. Mendoza, a sergeant assigned to handle CPRA requests (Mendoza Declaration, Dkt. 153-9), states that Mendoza has searched the grievance database, but that his search did not identify grievances filed by class representatives and other incarcerated people.[1] Non-exhaustive examples follow. The Mendoza Declaration states that Christopher Norwood "only filed one grievance while at the county jail, regarding lockdown of the facility operations and COVID-19 protocols." *Id.* at ¶ 45. This is not true. Attached as **Exhibit L** is a true

---

[1] Mr. Mendoza states that his job responsibilities include handling "CPRA Requests," but not tracking grievances. *Id.* at ¶ 1.

and correct copy of the grievance that Mr. Norwood submitted on September 22, 2021, complaining of inadequate treatment for his heroin addiction, the failure to provide him with suboxone, inadequate policies for mental health care, cell-side mental health encounters, and inadequate policies to protect the safety of incarcerated people. The grievance is also contained in Mr. Norwood's medical records from the Jail, which the Sheriff's Department released to our firm. Mr. Norwood reported to attorneys at my firm that after he appealed the initial response to that grievance, he received no further response.

16.     The Mendoza Declaration states that Gustavo Sepulveda has not filed any grievances while in county custody, including about the homicide in the cell next to Mr. Sepulveda's. Dkt. 153-9 ¶ 48. That is not true. Mr. Sepulveda has filed several grievances while at the Jail, two of which are attached hereto as **Exhibit M**. One concerns the problems with the intercom system contributing to the homicide in the cell next to Mr. Sepulveda's and the other concerns a more recent assault in Mr. Sepulveda's cell in which deputies also did not respond to intercom calls. Mr. Sepulveda reported that he has not received a response to either grievance.

17.     Contrary to the Mendoza Declaration, Ernest Archuleta submitted a grievance regarding the issues in this case on December 15, 2021. A true and correct copy of that grievance is attached hereto as **Exhibit N**. The grievance complains of a number of disability-related issues at the Jail, including "an inadequate system for prisoners to grieve ADA issues" and "inaccessible spaces for programs." Mr. Archuleta reported to our co-counsel at DLA Piper that he did not receive a response to that grievance.

18.     As another example, the Mendoza Declaration claims that James Clark has filed only one grievance while in custody, about playing cards. Dkt. 153-09 ¶ 19. Yet attached as **Exhibit O** is a true and correct of a grievance that Mr. Clark submitted on February 24, 2022 about medical care issues. Mr. Clark has also reported to our firm that he filed a grievance on or around March 21, 2022 com-

1  plaining of inadequate mental health care, safety and security issues, and disability

2  access at the Jail.  Mr. Clark reported that he did not receive a copy of this grievance

3  back from the Jail after submitting it.  Mr. Clark reported to co-counsel at DLA

4  Piper that he has not received a response to that grievance from the Jail.

5       19.    The Mendoza Declaration claims that Josue Lopez has only submitted

6  three grievances, about the TTY device and a meal.  Dkt. 153-09 ¶ 34; *but see id.* at

7  ¶ 38 (later referring to Mr. Lopez filing "many" grievances).  Mendoza does not

8  mention and does not appear to have found other grievances Mr. Lopez has filed,

9  including about issues in this case.  For example, attached as **Exhibit P** is a true and

10  correct copy of a grievance Mr. Lopez submitted on April 24, 2020.  Mendoza also

11  does not mention that Mr. Lopez's grievance filed on April 28, 2021, attached

12  hereto as **Exhibit Q**, complained about other conditions at the Jail beyond the TTY

13  device, including a lack of safety and security at the Jail, inadequate mental health

14  care, and an officer's threat on February 14, 2021 that Lopez and others should not

15  submit a grievance.

16       20.    The Mendoza Declaration claims that Christopher Nelson has "never

17  filed grievances about lack of ADA/disability access" and other issues, but

18  Mr. Nelson reported to our firm that he filed a grievance on or around October 16,

19  2021 on issues including ADA access at the Jail and inadequate mental health care.

20  Mr. Nelson reported to our firm that he has not received a response to the grievance.

21       21.    The Mendoza Declaration similarly claims that Nikki Yach has only

22  filed one grievance while incarcerated, about her diet.  Contrary to Mendoza's

23  claim, Ms. Yach's medical records alone include other grievances, one of which,

24  about Jail staff misgendering her, is attached hereto as **Exhibit R**.

25       22.    The Mendoza Declaration contains other inconsistencies and assertions

26  unsupported by the record.  For example, in paragraph 13, Mendoza claims that

27  Dylan Lacroix "has submitted 3 grievances" during his incarceration at the Jail.  Yet

28  later in the declaration, Mendoza claims that Mr. Lacroix has submitted only two

grievances.  Dkt. 153-09 ¶¶ 13, 29.  Mendoza also claims that Gary Bartlett "has only been in Administrative Segregation since April 7, 2022," in an apparent attempt to dispute Mr. Bartlett's statement in his declaration that he has been in administrative segregation for over three months.  Dkt. 153-09 ¶ 5.  However, attached as **Exhibit S** is a true and correct copy of excerpts from Mr. Bartlett's medical records indicating that Mr. Bartlett was seen for ad seg rounds from November 26, 2021 through March 23, 2022, the last date of the medical records provided to Plaintiffs' counsel by the Sheriff's Department.

23.    The declarations by Dr. Montgomery about individual incarcerated people appear designed to discredit those individuals.  But at least some of Dr. Montgomery's claims are not supported by the record.  For example, David Smith's declaration explained that he was not able to meet with a clinician confi-dentially on July 27, 2021, and stated that the mental health clinician's progress note indicated "she would only be able to discuss all treatment options 'when in a private setting.'"  Dkt. 122-07 ¶ 5.  The Montgomery Declaration on David Smith claims this is not true.  Dkt. 151-20 ¶ 3.  Dr. Montgomery appears not to have read the Jail's full progress note from that date, July 27, 2021.  Although the full progress note was inadvertently not included with Mr. Smith's declaration, it is in his Jail medical records and attached hereto as **Exhibit T**.  In that progress note, contrary to Dr. Montgomery's declaration, the clinician wrote about treatment options in light of Mr. Smith's "high stress situation," and wrote that she would "discuss this in more detail with the pt when able to meet in a private setting."  That promised private meeting did not happen for over two weeks and was delayed from its scheduled date, as reflected in the true and correct copy of an excerpt from Mr. Smith's medical records attached hereto as **Exhibit U**.

24.    Attached as **Exhibit V** is the progress note from Christopher Norwood's July 3, 2021 meeting with a mental health clinician.  The full progress note was inadvertently not included with Exhibit A to Mr. Norwood's declaration,

Dkt. 122-4.  In that progress note, the mental health clinician quoted Mr. Norwood as saying, "I am 100 days sober, and I want to keep it that way.  Do you know if they prescribe Suboxone here?  That would help me stay away from heroin."  The note includes no indication of a response from the Jail.

## V.    The *Armstrong* Jail Plan Covers Only A Small Percentage of Incarcerated People at the Jail with Disabilities

25.    My firm, Rosen Bien Galvan & Grunfeld LLP, is counsel of record, along with the Prison Law Office and Disability Rights Education and Defense Fund, for the Plaintiffs in *Armstrong v. Newsom*, Case No. 4:94-cv-02307-CW (N.D. Cal.).  *Armstrong* is a long-running class action case under the Americans with Disabilities Act ("ADA") against the California Department of Corrections and Rehabilitation ("CDCR").  Attached as **Exhibit W** is a true and correct copy of the *Armstrong* Court's August 28, 2012 Order Distributing and Enforcing the Amended County Jail Order and Plan.  The August 28, 2012 Order sets forth remedies CDCR must undertake to address violations of the ADA.  *Id.* at 2.  The Order and a county jail plan CDCR was ordered to prepare cover only the "accommodation of disabled parolees and out-to-court prisoners housed in county jails."  *Id.*  As part of the county jail plan, CDCR must provide notifications to county jails when parolees with disabilities and incarcerated people out-to-court from CDCR with disabilities are held in those county jails.  *Id.* at 2-3.  CDCR provides the county jails with information about the person's "last-known disabilities and the accommodations in housing or programming" the person had when last released from CDCR.  *Id.*  The *Armstrong* Order and county jail plan do not provide for *Armstrong* notifications for other people incarcerated in county jails who have disabilities; it applies only to parolees from CDCR and those out to court from CDCR.  *See id.*

26.    Attached as **Exhibit X** is a true and correct copy of the Sheriff's Department's daily realigned population report from June 6, 2022.  The report shows that only a small proportion of incarcerated people—53 people—were in Jail

custody for charges of violating parole under Penal Code 3056 as of June 6, 2022. This report is available on the Sheriff's Department's public website at https://apps.sdsheriff.net/documents/ab109/ab109_counts.pdf. Not all of those people have disabilities. The *Armstrong* email notification applies to a very small portion of incarcerated people with disabilities at the Jail.

## VI.    The Jail Has Been Seeking NCCHC Accreditation Since at Least 2016

27.    Attached hereto as **Exhibit Y** is a true and correct copy of an October 13, 2019 article in the *San Diego Union-Tribune* titled "Sheriff has a ways to go to meet 'gold standard' of jail accreditation." The article states that the Sheriff's Department began seeking accreditation by the National Commission on Correctional Health Care "three years ago"—in 2016. The article is available at: https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-13/sheriffs-quest-for-jail-accreditation-to-take-time-money-and-culture-shift.

## VII.   NaphCare, the Jail's New Medical Contractor, Recently Settled A False Claims Act Lawsuit

28.    Attached as **Exhibit Z** is a true and correct copy of a June 25, 2021 news release by the United States Department of Justice. The news release states that in 2021, NaphCare, the new medical contractor at the Jail, "agreed to pay $694,593 to resolve allegations that the company violated the False Claims Act by knowingly submitting false claims to the Federal Bureau of Prisons (BOP) in connection with health care services provided to BOP inmates."

29.    Attached as **Exhibit AA** is a true and correct copy of an April 5, 2017 article from the *Reno Gazette Journal* titled "Death follows Washoe County Sheriff's decision to award a $5.9 million no-bid contract to NaphCare." The article states that a "spike in deaths" in the Washoe County, Nevada jail occurred after NaphCare assumed responsibility for health care at the Jail. The article also states that "[a]n audit of the jail's healthcare services performed in late January found significant problems with the delivery of health care, particularly mental health care

1   under NaphCare's contract."  The article is available online at:

2   https://www.rgj.com/story/news/2017/04/05/death-follows-washoe-county-sheriffs-

3   decision-award-59-million-no-bid-contract-naphcare/99126014/.

4          30.     Attached as **Exhibit BB** is a true and correct copy of a March 24, 2020

5   article from WBUR, a news radio station in Boston, titled "Pain and Profits: Sheriffs

6   Hand Off Inmate Care to Private Health Companies."  The article quotes a former

7   NaphCare physician assistant saying that "NaphCare's driving force was money,"

8   and states that the physician assistant said that "urgent blood tests were sometimes

9   overruled due to cost."  The article is available online at:

10  https://www.wbur.org/news/2020/03/24/jail-health-companies-profit-sheriffs-watch.

11  **VIII.  Class Representative Anthony Edwards Remains Incarcerated at the Jail**

12         31.     Attached as **Exhibit CC** is a true and correct copy of the June 7, 2022

13  Sheriff's Department's Who Is In Jail Inmate Detail for Anthony Edwards, a class

14  representative in this case.  This report from the Sheriff's Department's own website

15  indicates that Mr. Edwards is incarcerated as of June 7, 2022 and has not been

16  sentenced.

17         I declare under penalty of perjury under the laws of the United States of

18  America that the foregoing is true and correct, and that this declaration is executed

19  at San Francisco, California this 7th day of June, 2022.

20

21  _____

22  Van Swearingen

23

24

25

26

27

28

# TABLE OF CONTENTS

EXHIBITS TO THE REPLY DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| A | San Diego County Sheriff's Department May 6, 2022 News Release – In-Custody Death at San Diego Central Jail & May 12, 2022 Release – Update on In-Custody Death at San Diego Central Jail | 1 |
| B | Sheriff's Department May 25, 2022 News Release – In-Custody Death at San Diego Central Jail | 4 |
| C | Agenda for San Diego County Citizens' Law Enforcement Review Board ("CLERB") for May 10, 2022 Meeting | 7 |
| D | CLERB Policy Recommendation: Provide Inmate Access to Naloxone (Narcan) to Inmates at San Diego County Detention Facilities | 22 |
| E | CLERB Policy Recommendation: Create Fentanyl Canine Policy and Procedures | 24 |
| F | San Diego County Sheriff's Department – Suspected Jail Overdose Incidents with Naloxone Deployment, June 2, 2022 | 26 |
| G | August 21, 2020 Memorandum from San Diego County Health and Human Services Agency, "Fentanyl Overdose Deaths Related to Illicit Drug Deaths" | 28 |
| H | February 24, 2022 Emails, V. Swearingen – M. O'Sullivan Re: Experts | 33 |
| I | March 15, 2022 Letter from V. Swearingen to County Counsel | 38 |
| J | April 4-5, 2022 Emails, V. Swearingen – S. Coleman Re: Neutral Experts | 45 |
| K | April 21, 2022 Email, V. Swearingen – S. Coleman Re: Neutral Experts | 50 |

[4101057.1]

# TABLE OF CONTENTS

EXHIBITS TO THE REPLY DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| L | Christopher Norwood Grievance, September 22, 2021 | 59 |
| M | Gustavo Sepulveda Grievances, March 12, 2022 & May 23, 2022 | 63 |
| N | Ernest Archuleta Grievance, December 15, 2021 | 68 |
| O | James Clark Grievance, February 24, 2022 | 85 |
| P | Josue Lopez Grievance, April 24, 2020 | 87 |
| Q | Josue Lopez Grievance, April 28, 2021 | 89 |
| R | Nikki Yach Grievance, March 10, 2022 | 92 |
| S | Gary Bartlett, Medical Record Excerpts | 94 |
| T | David F. Smith III, Medical Record Excerpts | 104 |
| U | David F. Smith III, Medical Record Excerpts | 113 |
| V | Christopher Norwood, Medical Record Excerpts | 115 |
| W | Order Distributing and Enforcing the Amended County Jail Order and Plan, *Armstrong v. Newsom*, Case No. 4:94-cv-02307-CW (N.D. Cal.), filed Aug. 28, 2012 | 127 |
| X | San Diego County Sheriff's Department: June 6, 2022 Realigned Population Report | 132 |
| Y | Sheriff has a ways to go to meet 'gold standard' of jail accreditation, *San Diego Union-Tribune*, Oct. 13, 2019 | 134 |
| Z | June 25, 2021 – Prison Health Care Provider NaphCare Agrees to Settle False Claims Act Allegations, United States Department of Justice | 144 |

[4101057.1]

# TABLE OF CONTENTS

EXHIBITS TO THE REPLY DECLARATION OF VAN SWEARINGEN IN
SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION
AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| AA | Death follows Washoe County Sheriff's decision to award a $5.9 million no-bid contract to NaphCare, *Reno Gazette Journal*, April 5, 2017 | 147 |
| BB | Pain and Profits: Sheriffs Hand Off Inmate Care To Private Health Companies, *WBUR News*, March 24, 2020 | 157 |
| CC | Anthony Edwards, San Diego County Sheriff's Department Who is in Jail Report, June 7, 2022 | 181 |

[4101057.1]

# EXHIBIT A

## Most Recent News Releases

# In-Custody Death – San Diego Central Jail

*Thirty-one-year-old incarcerated man found dead in cell.*

**Post Date:**                    05/06/2022 8:56 AM

The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.

On May 5, 2022, just before 6:00 p.m., deputies were walking by a holding cell located on the second floor and discovered a 31-year-old incarcerated person slumped over the partition wall next to the toilet. The incarcerated person was alone in the cell and unresponsive. The Fire Department was notified and responded. Naloxone was administered to the incarcerated person by deputies and medical staff. CPR was performed by deputies, medical staff, and Paramedics. Unfortunately, the incarcerated person did not survive. The incarcerated person was pronounced deceased at 6:28 p.m.

The Homicide Unit responded to investigate the incident. As a matter of practice, the Sheriff's Homicide Unit investigates all deaths of persons in custody at the time of their passing. The cause and manner of death are still under investigation. The Medical Examiner's Office has been notified of the death. An autopsy has been scheduled for May 6th, 2022.

The Citizens Law Enforcement Review Board was notified of the death and responded to the San Diego Central Jail.

Media Contact: Chris Steffen, Lieutenant
Chris.Steffen@sdsheriff.org
Sheriff's Homicide Unit (858) 285-6330

*Return to full list >>*

### SUBSCRIBE

Subscribe to receive updates.

| Email ⌄ |

| Email Address |

| SUBMIT |

## Most Recent News Releases

# UPDATE: In-Custody Death – San Diego Central Jail

### *Release of name.*

**Post Date:**                    05/12/2022 11:30 AM

On May 4, 2022, 31-year-old Leonel Villasenor was arrested by the San Diego Police Department.  Villasenor was booked into custody for 166(c)(1) PC - Violation of a protection order and 484 PC - theft.

The Medical Examiner's Office conducted an autopsy of Villasenor on May 6, 2022.  The cause and manner of death are pending laboratory results and further evaluation.

Villasenor's family has been notified of his death.  Villasenor was a resident in the City of San Diego.

To read our previous news release from May 6, click here.

Media Contact: Chris Steffen, Lieutenant
Chris.Steffen@sdsheriff.org
Sheriff's Homicide Unit (858) 285-6330

*Return to full list >>*

### SUBSCRIBE

Subscribe to receive updates.

| Email ⌄ |

| Email Address |

| SUBMIT |

# EXHIBIT B

Case 3:20-cv-00406-AJB-DDL Document 162-2 Filed 06/07/23 PageID.5660 Page
22 of 201

# Most Recent News Releases

# In-Custody Death - San Diego Central Jail

### *64-year-old man found dead in his cell.*

**Post Date:**                05/25/2022 1:00 PM

*The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.*

On Wednesday, May 25, an individual in Sheriff's custody died.  Every death is a tragedy and our condolences go out to the family and all of those affected by this death.  A Sheriff's family liaison officer has been assigned to notify family members of his passing.  We are unable to identify the individual to the media until that notification occurs.

Just after midnight, deputies at the San Diego Central Jail were conducting security checks on the 7th floor.  They located an unresponsive 64-year-old man who was housed alone in his cell.  Deputies entered the cell and immediately began life saving measures.  Deputies, as well as medical staff, provided CPR until paramedics arrived.  Despite their best efforts, the man was pronounced deceased just before 1:00 a.m.

The Sheriff's Homicide Unit responded to investigate the incident. As a matter of practice, the Sheriff's Homicide Unit investigates all deaths of persons in custody at the time of their passing. The cause and manner of death are still under investigation. The Medical Examiner's Office has been notified of the death.  Their autopsy is preliminarily scheduled for May 26.

The Citizens Law Enforcement Review Board was notified of the death and an investigator responded to the scene at the San Diego Central Jail.

Further information will be released as it becomes available.

Media Contact: Lieutenant Kevin Ralph
Kevin.Ralph@sdsheriff.org
Sheriff's Homicide Unit (858) 285-6330

*Return to full list >>*

## SUBSCRIBE

Subscribe to receive updates.

| Email |

| Email Address |

| SUBMIT |

# EXHIBIT C



**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
*Chair*
EILEEN DELANEY
*Vice Chair*
ROBERT SPRIGGS JR.
*Secretary*
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III

# County of San Diego

## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776    FAX: (619) 238-6775
**www.sdcounty.ca.gov/clerb**

### MEETING AGENDA
### Tuesday, May 10, 2022, 5:30 p.m.
**Remote Meeting Zoom Platform**
https://us06web.zoom.us/j/85217957238?pwd=N01KZFdRV1YyTEh1ekdYRUtwaIoxZz09

Phone: +1 669 900 6833
Webinar ID: 852 1795 7238
Passcode: 956031

Pursuant to Government Code Section 54954.2 the Citizens' Law Enforcement Review Board will conduct a meeting at the above time and place for the purpose of transacting or discussing business as identified on this agenda. Complainants, subject officers, representatives, or any member of the public wishing to address the Board should submit a "Request to Speak" form prior to the commencement of the meeting.

### DISABLED ACCESS TO MEETING
A request for a disability-related modification or accommodation, including auxiliary aids or services, may be made by a person with a disability who requires a modification or accommodation in order to participate in the public meeting. Any such request must be made to CLERB at (619) 238-6776 at least 24 hours before the meeting.

### WRITINGS DISTRIBUTED TO THE BOARD
Pursuant to Government Code Section 54957.5, written materials distributed to CLERB in connection with this agenda less than 72 hours before the meeting will be available to the public at the CLERB office located at 555 W Beech Street, Ste. 220, San Diego, CA.

1. **ROLL CALL**

2. **PUBLIC COMMENTS**

This is an opportunity for members of the public to address the Board on any subject matter that is within the Board's jurisdiction but not an item on today's open session agenda. **Each speaker shall complete and submit an online "Request to Speak" form.** Each speaker will be limited to three minutes. This meeting will be held remotely via the Zoom Platform. Click the below link to access the meeting using the **Google Chrome web browser**:  https://us06web.zoom.us/j/85217957238?pwd=N01KZFdRV1YyTEh1ekdYRUtwaIoxZz09    Contact CLERB at clerb@sdcounty.ca.gov or 619-238-6776 if you have questions.

3. **MINUTES APPROVAL** (Attachment A)

4. **PRESENTATION/TRAINING**

   a) The San Diego County Medical Examiner's Office Role in In-Custody Deaths by Chief Medical Examiner Steven C. Campman, M.D.

5. **EXECUTIVE OFFICER'S REPORT**

8

a) Overview of Activities of CLERB Executive Officer and Staff

b) Workload Report – Open Complaints/Investigations Report (Attachment B)

c) Case Progress and Status Report (Attachment C)

d) Executive Officer Correspondence to Full CLERB (Attachment D)

e) Policy Recommendation Pending Responses

    i.   20-113 / Alvarez (Death) – SDSD
- It is recommended that the San Diego Sheriff's Department (SDSD) revise its Detention Policies and Procedures Section I. 64, entitled, "Safety Checks: Inmates, Housing, and Holding Areas," to mandate proof of life verification through visual checks every 60 minutes during the booking process.
- It is recommended that the San Diego Central Jail (SDCJ) only utilize cells with operable cameras unless all cells with operable cameras are in use.

    ii.   21-004 / Moreno (Death) – SDSD
- It is recommended that the San Diego Sheriff's Department (SDSD) identify who answers the "Arresting Officer Questions" on the Receiving Screening Questionnaire during the Booking process.

    iii.   21-014 / Calhoun (Death) – SDSD
- It is recommended that SDSD modify P&P Section 6.43 – Vehicle Pursuit, to mandate that deputies shall not initiate or participate in a pursuit in which the only known offense at the time of the initiation or subsequent participation is a non-violent crime, to include a stolen vehicle.
- It is recommended that SDSD modify P&P Section 6.43 – Vehicle Pursuit, to indicate that when initiating a pursuit, a deputy must not only consider all public safety factors applicable to the particular facts and circumstances, but "shall" (as opposed to the current standard of "may") consider the applicable public safety factors listed in the P&P.

    iv.   21-038 / Whitlock (Death) – SDSD
- It is recommended that the San Diego Sheriff Department update its Detention Services Bureau (DSB) P&P Section I.50 Body Scanners and X-Rays, as it pertains to Subsection III C and require that body scans be completed to include inmates transferred between facilities.

    v.   21-060 / Meadows – SDSD
- It is recommended that the San Diego Sheriff's Department (SDSD) create a policy that mandates conducting all Detentions Investigative Unit (DIU) interviews in a private area, out of view from other inmates.

    vi.   21-078 / Blakeney – SDSD
- It is recommended that the San Diego Sheriff's Department (SDSD) change SDSD P&P Section 6.131 titled "Body Worn Camera," to direct that deputies <u>shall</u> begin recording prior to initiating any law enforcement related contact.

    vii.   CLERB Staff Response to Death Scenes – Probation
- Allow a CLERB staff member with extensive death investigation experience to be present at the initial death scene and any related incident scene and, without compromising or obstructing the law enforcement investigation, receive a briefing, participate in a scene walk-thru, and have any questions about the circumstances surrounding the events leading up to, and including the death, answered.

    viii.   Expansion of Family Liaison Program – SDSD
- It is recommended that the SDSD update P&P Section 6.134 entitled, "Family Liaison Protocol," to mandate that the Family Liaison, or designee, meet with the family at the conclusion of the

9

investigation into a shooting, use of force resulting in significant injury or death, or an in-custody death. The purpose of the meeting will be to advise the family of the investigative outcome, answer questions, and provide information when appropriate. As currently stated in the P&P, when information cannot be released, the family will be provided with an explanation, follow-up, or referrals to appropriate agencies.

ix.   Reduction of Racially Disparate Policing Practices – SDSD

- Reduce discretionary stops or contacts, traffic or otherwise, pertaining to low-level offenses that do not compromise actual public safety. Many of these stops are pretextual in nature and oftentimes used to make an initial contact with the primary goal of locating weapons, drugs, warrants, suspended licenses, etc.
  - Eliminate stopping or contacting people solely for lower-level traffic offenses, such as:
    - Expired registration,
    - Equipment violations, and
    - No seatbelt in use.
  - Eliminate contacting people solely for quality-of-life issues not jeopardizing public safety, such as loitering or jaywalking.
- Add to Subsection B of Field Operation Manual Policy 1, "Use of Discretion," that discretionary decisions should be evaluated for whether they will result in racially disparate treatment or outcomes.
- Provide justification for a stop or contact on body worn camera (BWC).
- Proactively review BWC footage for the sole purpose of analyzing deputy interactions with people of color in comparison to interactions with white people.
- Institute pre-employment screening for existing implicit and explicit bias.

x.   Use of Technology to Monitor Health and Safety of Inmates – SDSD

- Research, and publicly report the results of its research efforts, i.e., associated costs, technology considered, reasons for not implementing, if applicable, etc., the use of technological devices to identify and subsequently aid inmates who may be in medical distress.
- Incorporate into policy the use of technological devices to identify and subsequently aid inmates who may be in medical distress.

xi.   Use of Technology to Monitor Health and Safety of Inmates – Probation

- Research, and publicly report the results of its research efforts, i.e., associated costs, technology considered, reasons for not implementing, if applicable, etc., the use of technological devices to identify and subsequently aid inmates who may be in medical distress.
- Incorporate into policy the use of technological devices to identify and subsequently aid inmates who may be in medical distress.

f)  Policy Recommendation Response

i.   None

g)  Sustained Finding Pending Responses

i.   None

h)  Sustained Finding Response

i.   20-104 / Chon (Death) – SDSD (Attachment E)

ii.   21-014 / Moreno (Death) – SDSD (Attachment F)

iii.   21-089 / Rau – SDSD (Attachment G)

# 6.  BOARD CHAIR'S REPORT

10

## 7. NEW BUSINESS

a) Continuance of Teleconferencing Meeting Option Pursuant to Government Code Section 54953(e)

b) Recognition of James Sandler, Retiring Outside CLERB Counsel

c) De-Brief CLERB Town Hall: CLERB Independent In-Custody Death Data Report by Analytica Consulting

d) Policy Recommendation to SDSD: Provide Inmate Access to Naloxone (Narcan) (Attachment H)

e) Policy Recommendation to SDSD: Create Fentanyl Dog Policy and Procedures (Attachment I)

f) Countywide Protocol for the Investigation of Officer-Involved Shootings (Attachment J)

## 8. UNFINISHED BUSINESS

a) Vote to Continue or Terminate Investigation of CLERB Case #20-050/Bils (Death) Pursuant to CLERB Rules and Regulations Section 5.8

b) Update: Authority for the Executive Officer to Work with County Staff to Pursue Legislation and/or to Add a Policy to the County Legislative Program in Support of Increased Transparency in Civilian Oversight of Peace Officers and Custodial Officers

c) Update: Authority for the Executive Officer to Work with County Staff to Request that the County Board of Supervisors Expand CLERB's Jurisdiction to Include Personnel Involved in Providing Medical Care in County Detention Facilities

d) Update: San Diegans for Justice CLERB Report Subcommittee

## 9. BOARD MEMBER COMMENTS

## 10. SHERIFF/PROBATION LIAISON QUERY

## 11. CLOSED SESSION

a) PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE
**Discussion & Consideration of Complaints & Reports:** Pursuant to Government Code Section 54957 to hear complaints or charges brought against Sheriff or Probation employees by a citizen (unless the employee requests a public session). Notice pursuant to Government Code Section 54957 for deliberations regarding consideration of subject officer discipline recommendation (if applicable).

| DEFINITION OF FINDINGS | |
|---|---|
| Action Justified | The evidence shows that the alleged act or conduct did occur but was lawful, justified and proper. |
| Not Sustained | There was insufficient evidence to either prove or disprove the allegation. |
| Sustained | The evidence supports the allegation and the act or conduct was not justified. |
| Unfounded | The evidence shows that the alleged act or conduct did not occur. |
| Summary Dismissal | The Review Board lacks jurisdiction or the complaint clearly lacks merit. |

**NOTICE: THE CITIZENS LAW ENFORCEMENT REVIEW BOARD (CLERB) MAY TAKE ANY ACTION WITH RESPECT TO THE ITEMS INCLUDED ON THIS AGENDA. RECOMMENDATIONS MADE BY STAFF DO NOT LIMIT ACTIONS THAT THE CLERB MAY TAKE. MEMBERS OF THE PUBLIC SHOULD NOT RELY UPON THE RECOMMENDATIONS IN THE AGENDA AS DETERMINATIVE OF THE ACTION THE CLERB MAY TAKE ON A PARTICULAR MATTER.**

## CASES FOR SUMMARY HEARING (7)

### 21-028/GOMEZ

1. Death Investigation/In-Custody Medical – Luis Ahyule Gomez, while an inmate at Vista Detention Facility, was found unresponsive in his cell on 03-14-21.

   Recommended Finding: Not Sustained
   Rationale: The evidence supported that Gomez was properly classified and placed into Protective Custody upon his entry into the SDSD jail system after his arrest for attempted rape. After his medical intake screening and subsequent interactions with SDSD medical personnel, to include psychiatric staff, Gomez never expressed concerns about his physical well-being to any member of SDSD, sworn or personnel. On 03-14-21, Gomez's cellmate expressed concerns about the physical well-being of Gomez to Deputy 1 directly on two separate occasions, once during hard count and once through a call box. Inmate Jimenez also expressed concerns about Gomez's well-being through the call box to the Tower Deputy who then passed the information to Deputy 1. Furthermore, another inmate expressed concerns about Gomez's well-being to Deputy 1. There was a preponderance of evidence that showed Deputy 1 was notified multiple times of concerns for Gomez's well-being but failed to take action to summon medical aid. Based on SDSD records, interviews, and policy, a preponderance of evidence showed Deputy 1 did not conduct hard count (day) or COVID-19 temperature check in accordance with policy. Deputy 1's actions were not justified (*see allegations 2&3*). The evidence suggested there was a lapse of approximately 48 minutes from when Deputy 1 had the opportunity to identify a medical emergency to when another deputy discovered Gomez unresponsive. The evidence suggested Gomez was alive during hard count, but in and out of consciousness. There was insufficient evidence to determine if the improper hard count or temperature check would have prevented Gomez's death by summoning medical aid sooner.

2. Misconduct/Procedure – Deputy 1 failed to conduct a hard count (day).

   Recommended Finding: Sustained
   Rationale: Deputy 1 failed to conduct a hard count (day). According to SDSD DSB P&P section I.43 entitled "Inmate Count Procedure" applies, "All inmates at each detention facility shall be accounted for. Sworn staff will physically conduct counts of inmates. All counts require sworn staff to verify each inmate's well-being through "verbal or physical acknowledgement" from the inmate. I.43 defines verbal or physical acknowledgement as "a response from the inmate to sworn staff that proves the inmate is alive, awake, conscious, and responsive. Verbal acknowledgement includes the use of spoken words, while physical acknowledgement includes actions of the body (i.e., hand gestures, head nod, etc.), in confirmation that the inmate notices and is responding to sworn staff." In addition, sworn staff will look for any obvious signs of medical or physical distress (e.g., asthma attack, chest pain, etc.), trauma (e.g., bleeding, ligature marks, etc.) and/or criminal activity (e.g., drug usage, fighting, etc.)." Video surveillance showed Deputy 1 stopped at Gomez's cell at 10:03AM. (Please note the video surveillance was time stamped one hour behind the actual time due to daylight savings). Deputy 1 appeared to converse with someone inside the cell until approximately 10:05AM. In a letter received, from Gomez's cellmate, he stated he saw [Deputy 1] handing out lunches, "As [Deputy 1] opens #22 tray slot, I notify him that my celly's man-down and unconscious, I also let the deputy know this is Mr. Gomez's second time passing out. As I do so I point out to Mr. Gomez's abdomen and voice to [Deputy 1] that Mr. Gomez is still breathing as his shirt is partially lifted and the up and down motion of his stomach is visible. [Deputy 1] verbally addresses Mr. Gomez several times unsuccessfully. He then closes the tray slot and continues the feeding". In a statement with Homicide Detectives, Deputy 1 recalled calling out to Gomez and asking him to come to the door. Deputy 1 continued to call Gomez and ask him to come to the door, but Gomez did not verbally respond or come to the door. Video surveillance showed Deputy 1 returned to cell 22 at 10:07AM and opened the cell door at approximately 10:09AM. In an interview with Homicide Detectives, Deputy 1 had no recollection of returning to cell 22 a second time. Deputy 1 indicated it was difficult to hear in the module, but he did notice Gomez's stomach was moving so he believed he was breathing. Confidential information provided by Deputy 1 and a Departmental Information Source were considered in arriving at the recommended finding. Deputy 1 exercised his option to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. Based on SDSD records, interviews and policy, a

12

preponderance of evidence showed Deputy 1 failed to obtain a response from Gomez that proved he was alive, awake, conscious, and responsive. The evidence supports the allegation, and the act or conduct was not justified.

3. Misconduct/Procedure – Deputy 1 failed to conduct a temperature check.

Recommended Finding: Sustained
Rationale: Deputy 1 failed to conduct a temperature check. According to SDSD media releases, due to stepped up COVID-19 measures in the jail, temperature checks were conducted in conjunction with hard count. In a Medical Services Division Training Unit Bulletin published in December 2020, "All inmates will be checked by Sworn Staff at Hard Count on Day & Night Shift. Sworn staff will document temperature of every inmate on floor count sheets in all housing units and deliver a copy of floor count sheets to medical for review". Furthermore, a CLERB liaison provided two different training bulletin PowerPoints which were posted on the Detentions Training Unit SharePoint website. The PowerPoints stated all inmates will be checked during hard count and logged in JIMS. SDSD records showed Gomez's temperature was scribbled out on the floor count sheet. Furthermore, in an interview with Homicide Detectives, Deputy 1 indicated Gomez never came to the door or responded during hard count. As per SDSD P&P 2.1 entitled Rules of Conduct for Members of SDSD, "All employees shall conform to Federal, State, and Local laws, as well as to the policies of this Department. It shall be the responsibility of all employees to familiarize themselves and comply with all such policies, orders, directives, rules and regulations of this Department." Furthermore, SDSD P&P 2.3 entitled Violation of Rules, "Employees shall not commit or omit any acts which constitute a violation of any of the rules, regulations, directives, orders or policies of this Department, whether stated in these Rules of Conduct or elsewhere." Additionally, SDSD P&P 10.6 Continuing Professional Training-Sworn, states it is the responsibility of all employees to remain current, and each command will ensure line-uptraining includes policy and procedure changes Confidential information provided by Deputy 1 and a Departmental Information Source were considered in arriving at the recommended finding. Deputy 1 exercised his option to decline participation in an interview pursuant to a long-standing agreement between CLERB and the Deputy Sheriff's Association. Based on SDSD records, interviews and policy, a preponderance of evidence showed Deputy 1 failed to conduct a temperature check on Gomez in accordance with policy and his actions were not justified.

## 21-032/HAVINS

1. Illegal Search and Seizure – The San Diego Sheriff's Department (SDSD) ordered the complainant from his home.

Recommended Finding: Action Justified
Rationale: The complainant stated, "I heard a voice over a loudspeaker coming from down my dirt Rd. It sounded like the message over the loudspeaker said, occupants, this is the San Diego County Sheriff's with a search warrant, come out with nothing in your hands." On 02-09-21, deputies arrived at the complainant's residence to serve and execute a search warrant, issued by the court on 02-02-21. According to deputies reports, the complainant was believed to be in possession of firearms, had a history of "resisting law enforcement, citing a sovereign citizen ideology." The Special Enforcement Detail (SED) team was requested to help serve the search warrant. SDSD P&P Section 6.38 titled Special Enforcement Detail states in part, "SED will be contacted to serve a warrant when execution of a warrant by conventional law enforcement techniques would expose Deputies to extreme and unnecessary danger. Situations requiring SED include any of the following: Suspects are known or suspected of being armed." Body Worn Camera (BWC) evidence, which included audio, showed that when SED deputies arrived, they issued the first of several announcements over a loud speaker. There were numerous announcements throughout the approximate three hour attempt to serve the search warrant and have the complainant exit his R.V. SDSD P&P Section 6.116 titled Search Warrant Service, states in part, "All Sheriff's Department employees shall execute search warrants according to established rules of law and shall not willfully violate the constitutional rights of citizens." The evidence showed that the actions of SDSD sworn personnel were carried out according to policy and were lawful, justified and proper.

2. Illegal Search and Seizure – Deputy 2 "detonated explosives" at the complainant's front door.

Recommended Finding: Action Justified
Rationale: The complainant stated, "I was in the shower when I heard an explosion outside of my RV motorhome. The explosion shook my motor home. The explosion was right outside my door. It was at that point that I realized that I was under attack. I was not safe to step out of my door." BWC video showed that approximately fifteen minutes after deputies arrived on scene, a Sheriff's siren went off briefly, followed by announcements issued over a loud speaker. The complainant did not respond. In an attempt to have the complainant exit his R.V., SED deployed a Light and Sound Diversionary Device (Flashbang) in order to prompt the complainant to exit his R.V. According to an Officer's Report, "the flashbang landed and deflagrated about 10 yards away from the RV... The complainant did not respond at all." SDSD P&P Section 6.38 Special Enforcement Detail, states in part, "Tactical assistance at critical incidents is provided when patrol personnel are not adequately equipped or trained to apprehend an armed barricaded suspect." The evidence showed that the alleged act or conduct did occur and was lawful, justified and proper.

3. Misconduct/Procedure – Deputy 9 "shot" at the complainant's R.V. (Recreational Vehicle).

Recommended Finding: Action Justified
Rationale: The complainant stated, "The San Diego County Sheriff's Department 'utilized' a 12-Gage shotgun to shoot holes through my R.V. Every shot from the 12 Gage shotgun that tore through my RV was terrifying." Review of BWC video showed the complainant's R.V. had a pole affixed to the top of the R.V. with a camera attached at the top. Deputy 11 documented in his Officer's Report, "To disable the security camera, Deputy 9 utilized his Less Lethal Shotgun and fired about 7 beanbag rounds at the camera separating it from its base." The Peace Officers Legal Sourcebook Section 2 titled, Search and Seizure Persons, states in part, "During a lawful detention, officers are authorized to take such steps as [are] reasonably necessary to protect their personal safety." The evidence showed Deputy 9 was in compliance with policy and his actions were lawful, justified and proper.

4. Illegal Search and Seizure – SDSD failed to provide "knock and notice" to the complainant.

Recommended Finding: Unfounded
Rationale: The complainant stated, "The entire time they had me trapped in my motorhome, shooting holes through my home, throwing grenades at my front door, never once did any officer think to 'knock' on my front door and let me know that they will stop shooting so I can safely exit without being shot to death." California Penal Code (PC)§1531, the knock and announce rule requires police to announce their presence and purpose before executing a search warrant and they must wait a reasonable amount of time before forcing their way in. There were numerous announcements throughout the approximate three hour attempt, to serve a search warrant and have the complainant exit his R.V. With every announcement the SDSD identified themselves and stated the purpose of their presence. SDSD P&P Section 6.116 titled Search Warrant Service, states in part, "All Sheriff's Department employees shall execute search warrants according to established rules of law and shall not willfully violate the constitutional rights of citizens." Evidence refuted the complainant's allegation and showed the alleged conduct did not occur.

5. Misconduct/Procedure – SDSD failed to use de-escalation tactics.

Recommended Finding: Unfounded
Rationale: The complainant stated, "Not once did they try to de-escalate the situation, or reach out to me in a non-violent manner." SDSD records and BWC evidence provided that de-escalation tactics were initiated and carried out by the Crisis Negotiation Team (CNT). According to the CNT policy, Section N.3, in part, "The Crisis Negotiations Team may be utilized in incidents that do not involve the taking of hostages. Incidents such as barricaded suspects, where the verbal skills of influence and persuasion would be appropriate are situations where the Crisis Negotiations Team might be called. The criteria for activating Crisis Negotiators will be based upon the following: The suspect is believed to be a threat to the lives and safety of himself/herself or others, the suspect is believed or known to be armed, the suspect refuses or appears to be unwilling to respond to deputies at the scene. Deputy 6 documented the following in his Arrest Report,

14

"Deputies from the SED and CNT attempted to establish a line of communication with the complainant for over three hours, they made numerous phone calls and left messages for the complainant on his phones, however, he would not respond. Additionally, CNT deputies went to the complainant's parents' home and obtained recorded messages to be delivered to the complainant if needed. The evidence showed that the alleged conduct did not occur.

6. Misconduct/Procedure – A SDSD deputy "slammed" into the complainant's R.V.

Recommended Finding: Unfounded
Rationale: The complainant stated, "I heard the sound of a diesel engine outside and as it got closer I thought the only thing that that diesel could be would be a tow truck, then slam it hit the front of my RV, and hit it hard, shaking everything. The diesel sound that I was hoping was a tow truck was one of two tanks that were on my dirt Rd. That's what smash the front of my RV." The evidence refuted the complainant's allegation that deputies "slammed" into his R.V. Records and BWC evidence documented one of the two SED vehicles on scene moved slowly, approached the complainant's R.V. until they touched. The alleged conduct did not occur.

7. Illegal Search and Seizure – Deputy 11 "broke" the windows in the complainant's R.V.

Recommended Finding: Action Justified
Rationale: The complainant stated, "The San Diego County Sheriff's we're just getting ready to escalate their attack to another level, a more deadly level of attack. My hopes of them letting me exit from under their attack was rocked by two more explosions, one at my front door, and one at the opposite side, followed immediately by an explosion at the front door of my RV that broke the windows out at the front cab part of the Motorhome." PC§ 1531 Forced Entry, states in part, "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance." The alleged conduct did occur and was lawful, justified and proper.

8. Excessive Force – Deputy 11 "threw" a chemical agent into the complainant's R.V.

Recommended Finding: Action Justified
Rationale: The complainant stated, "After the explosive blew out the windows an officer threw a grenade filled with 'Orthochlorobenzylmolononitrile' or 'CS' for short. The Grenade exploded 4 feet from my head and filled my home with the deadly chemical agent." SDSD P&P Section 6.66 titled Chemical Agents, states in part, "Non-lethal chemical agents may be used to accomplish any of the following objectives: To apprehend suspects who refuse to submit to arrest." Additionally, SDSD P&P Section 2.50 Use of Lethal/less Lethal Weapons, states in part, "Employees shall not use or handle lethal or less lethal weapons (including chemical agents) in a careless or imprudent manner. Employees shall use these weapons in accordance with law and established Departmental procedures." According to his report, and evidenced on BWC video, Deputy 11 utilized a bang pole with an indoor less-lethal chemical agent attached at the end. He introduced the bang pole into the driver side window of the R.V., and deployed the chemical agent. The complainant exited the R.V. and was taken into custody without incident. The evidence showed Deputy 11 was in compliance with policy and his actions were lawful, justified and proper.

9. Excessive Force – SDSD deputies "pointed" their machine guns at the complainant's head.

Recommended Finding: Action Justified
Rationale: The complainant stated, "I opened the front door, then I walked out with my hands in the air, and was met by the tip of a machine gun pushed to the side of my face, behind the first man with his machine gun, there were at least 12 more men with machine guns, all pointed at my head." The evidence showed when the complainant walked out of his R.V. with his hands in the air, four deputies approached him and took him into custody, and handcuffed him without incident. One of the four deputies had a rifle in his hand, however, it was pointed up, not at the complainant. BWC evidence did not show any deputy with their rifle "pushed" to the side of the complainant's face. Other SED deputies had their rifles pointed at the complainant until he was apprehended, however, they were not in direct contact with the complainant. Deputies utilized

15

their Department approved weaponry to effect an arrest in accordance with applicable policies. The evidence showed the alleged act or conduct did occur and was lawful, justified and proper.

10.   Illegal Search and Seizure – SDSD deputies handcuffed and searched the complainant.

Recommended Finding: Action Justified
Rationale: The complainant stated, "I asked the man who grabbed my arms and put me into handcuffs 'where is the search warrant?' He told me 'we don't have one.' I said, 'what do you mean you don't have one?' 'We don't have one he said.' I told him 'I don't consent to any searches or seizures." SDSD P&P Section 2.51 Arrest, Search and Seizure, states, "Employees shall not make any arrest, search or seizure, nor conduct any investigation or official Department business, in a manner which they know or ought to know is not in accordance with law and established Department policies and procedures." BWC evidence, showed Deputy 6 provided a copy of the search warrant to the complainant. The complainant stated that he did not consent to any search, however, the search of his person and property was conducted under authority of the search warrant. The evidence showed the alleged act or conduct did occur and was lawful, justified and proper.

11.   Illegal Search and Seizure – Deputies 4, 5, 6, 12 and 13 searched and seized items from the complainant's home.

Recommended Finding: Action Justified
Rationale: The complainant stated, "The entire time, beginning from when I came out, they were searching my home and removing my belongings from my home. They put me in the back of a cop car and kept searching my property." California Penal Code PC§ 1524 Search Warrants, states in part, "A search warrant may be issued upon any of the following grounds: When the property or things to be seized consist of an item or constitute evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony." PC§ 1523, Search Warrants, authorizes law enforcement to search a person, a residence, a vehicle, a place of business, or any other specified area suspected of containing evidence of illegal activity. Once police find the evidence they are seeking, the search warrant allows officers to seize that evidence. The following property was seized during the search; eight firearms, approximately 6100 rounds of firearm ammunition, and several items deemed illegal. Deputies 4, 5, 6, 12 and 13 searched and seized items from the complainant's home and their actions were lawful, justified and proper.

12.   Illegal Search and Seizure – Deputies 1, 3, 6, 7, 8 searched then seized items from the complainant's vehicles.

Recommended Finding: Action Justified
Rationale: See Rationale #11. Deputies 1, 3, 6, 7, 8 searched then seized items from the complainant's vehicles and their actions were lawful, justified and proper.

13.   Illegal Search and Seizure – Deputy 10 searched then seized items from the complainant's vehicles.

Recommended Finding: Summary Dismissal
Rationale: At the time of this incident, Deputy 10 was an active employee of the Sheriff's Department; however, SDSD CLERB Liaison notified CLERB that Deputy 10 retired from service on 03-25-21. CLERB's Rules and Regulations Section 5.8, Termination, Resignation or Retirement of Subject Officer, dictates, "CLERB shall have the discretion to continue or terminate an investigation, if, after a complaint is filed and before the Review Board completes its investigation, the subject officer terminates employment with the Sheriff's Department or the Probation Department." As such, the allegation is summarily dismissed.

14.   Misconduct/Procedure – SDSD "destroyed" the complainant's property.

Recommended Finding: Action Justified
Rationale: The complainant stated, "They destroyed most of what I own. They used battering rams and crow bars to break into storage containers and cabinets. They threw my mattress' into my bonfire pit." SDSD P&P Section 2.51 Arrest, Search and Seizure, states, "Employees shall not make any arrest, search or seizure, nor conduct any investigation or official Department business, in a manner which they know or ought to know is not in accordance with law and established Department policies and procedures." The evidence, to include

16

BWC video, showed deputies utilized bolt cutters, a crow bar and a battering ram to break open metal boxes, a compartment on the underside of an old military vehicle, and other locked containers scattered around the property. Mattresses were removed from the R.V., and power tools were used to remove boards for access to compartments underneath. Under California state law, police officers have immunity under Government Code Section GC§ 821.6 for property damage sustained during the execution of a search warrant. The alleged act or conduct did occur and was lawful, justified and proper.

15. Misconduct/Procedure – Deputy 6 was misinformed/in error regarding the complainant's probation status.

Recommended Finding: Unfounded
Rationale: The complainant stated, "When I was being transported by officer 6, he asked me again if I was on probation. I told him that I was not. He tried to tell me that I was, the fact is that I was released from probation on 01-21-21, which was an early termination of probation due to AB1950, which means that at the time of their assault on me, I was not on probation and not a fourth waiver." Assembly Bill (AB) 1950 was signed into law, by the California Governor, in September 2020 and went into effect on 01-01-21. The law was passed as a way to address the lengthy probation terms as well as the fact that many probationers were subjected to lengthy and unjust prison sentences after violating probation. Deputy 6 confirmed that on 06-26-18, the complainant was sentenced to probation for three years, with an expiration of 06-25-21. On the day of the search warrant execution, Deputy 6 confirmed with the complainant's probation officer that he was currently on probation. The complainant's belief that he was not on probation at the time the search warrant was issued, and then executed, does not negate the search warrant, as his "probation status," was only one of several reasons attested to by Deputy 6, as probable cause for the search warrant. The evidence showed that the alleged act or conduct did not occur.

16. Misconduct/Procedure – SDSD responded to a "noise complaint."

Recommended Finding: Action Justified
Rationale: The complainant stated, "I can't understand why the Sheriff's would respond to a noise complaint in such a deadly manner. It is totally obvious that I was / am a victim of 'swatting.' It is so scary that the San Diego County Sheriff's escalated this situation in such a deadly manner." "Swatting," as defined by the FBI: "making a hoax call to 9-1-1 to draw a response from law enforcement, usually a SWAT team. PC§ 148.5 makes it illegal to make a false police report of a crime. "Every person who reports to any peace officer that a felony or misdemeanor has been committed, knowing the report to be false, is guilty of a misdemeanor." There was no evidence to support the alleged "swatting," or that the call placed by the reporting party to SDSD was based on false information. The BWC video evidence along with SDSD reports showed the actions of deputies were handled per policy and were lawful, justified and proper.

17. Illegal Search and Seizure – SDSD towed the complainant's vehicles.

Recommended Finding: Unfounded
Rationale: The complainant stated, "they towed three of my automobiles off of my private property and impounded them in an attempt to further damage me. The sheriff's actions are un-excusable!" There was no evidence that deputies had the complainant's vehicles towed. When questioned, the complainant was unable to verify who towed his vehicles. CLERB Sheriff liaison confirmed that no vehicles were towed or impounded by SDSD. The evidence showed that the alleged act did not occur.

---

## 21-057/ANDERSON

1. Death Investigation/Officer-Involved Shooting – Deputies 1 & 2 shot and killed Eric Scott Anderson on 06-18-21.

Recommended Finding: Action Justified
Rationale: There was no complaint of misconduct, and this case was reviewed in accordance with CLERB Rules & Regulations 4.3, Complaint Not Required: Jurisdiction with Respect to Specified Incidents. According

to San Diego Sheriff's Department (SDSD) records and Body Worn Camera (BWC) evidence, Deputies 1 & 2 received a radio call of a suspicious person sleeping under a tree in a vacant lot in Encinitas on 06-18-21. Deputies 1 & 2 lawfully detained Anderson while conducting a field investigation in efforts to identify him. Anderson was initially cooperative but became unsettled and began to stand and subsequently ignored commands to sit down. Anderson pulled out an object wrapped in a cloth and pointed it toward deputies, then fled down a hill toward a heavily travelled interstate. Deputies 1 & 2 lawfully pursued Anderson on foot and closed in on him at which point Anderson stopped and abruptly turned toward Deputy 2. Anderson had his left arm extended out toward Deputy 2 who clearly saw a black semi-automatic handgun pointed at him. In fear for their lives coupled with the safety and concern of those who lived in the nearby community, both deputies fired their service weapons and struck Anderson who fell to the ground. Deputies 1 & 2 rendered emergency aid and Anderson was transported to a hospital where he never regained consciousness and death was pronounced. An autopsy was performed and documented three gunshot wounds of the body. The cause of death was listed as perforating gunshot wound of torso and the manner of death was homicide; at the hands of another. Anderson's toxicology results confirmed the presence of amphetamines and cannabinoids. According to all known factors, the use of deadly force was reasonable and justified based upon SDSD P&P 8.1, Use of Firearms/Deadly Force in that deputies shall use deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person. Anderson created a deadly force situation by pointing a handgun at the deputies. The use of less than lethal force option in this situation was not reasonably safe or feasible. Anderson's firearm was loaded and capable of shooting but malfunctioned. Deputies 1 & 2 reasonably believed that Anderson posed an imminent threat. Both deputies responded with deadly force in efforts to stop the threat and acted in accordance with department policy. The evidence showed the actions that occurred were lawful, justified and proper.

## 21-063/ESTRADA

1. Death Investigation/Drug Related - Ronaldino Estrada was found unresponsive in his cell while he was housed at the Vista Detention Facility (VDF) on 07-05-21.

Recommended Finding: Not Sustained
Rationale: Ronaldino Estrada was a 24-year-old single Hispanic male, who resided in Escondido with his family. Family reported that Estrada had a heart condition, was not known to use narcotics, but he was known to drink heavily and possibly smoke marijuana. Estrada had recent charges for driving under the influence, which led to him to acquire a court ordered ankle monitor through The Secure Continuous Remote Alcohol Monitoring (SCRAM) Program. SCRAM reported Estrada was active on the program from 05-11-21 to 07-02-21, where the system detected two alcohol consumptions. On 07-02-21, Estrada attended his court date where the Judge remanded him into custody of the San Diego Sheriff's Department, and he was booked into the Vista Detention Facility with a release date of 07-07-21. Per SDSD documentation, Estrada was fit to complete the booking process, noted he had hypertensions and denied any history of drug and/or alcohol use.  Estrada was prescribed Lisinopril (Per WebMD, Lisinopril is used to treat high blood pressure and heart failure), was classified as low-level 2 and housed in Lower West Module 4, cell 26. According to SDSD documentation and jail surveillance video, on 07-05-21 Deputy 1 assisted jail medical staff with the distribution of medication. Deputy 1 opened Estrada's cell door and stated he saw two inmates lying in their bunks who appeared to be asleep. Deputy 1 reported he called out to Estrada, but he would not respond so the cell mate attempted to wake him as well. Deputy 1 entered the cell, extracted the cell mate, checked for a pulse (which he reported was faint) and called for assistance. Deputy 2 and an additional deputy arrived on scene. Deputy 2 stated he checked for a pulse as well but did not feel anything and instructed another deputy to contact medical via radio. SDSD documentation showed that four doses of naloxone were administered by sworn and medical staff. Deputies moved Estrada from the top bunk to the floor where medical staff initiated chest compressions. Additional sworn and medical staff arrived on scene and resuscitative efforts were continued such as oxygen, AED (automated external defibrillator), and compressions. Oceanside Fire Department arrived on scene, began life-saving measures and transported Estrada to Tri-City Emergency Department. Per SDSD documentation and Tri-City medical records, Estrada

arrived at Tri-City Emergency Department at 11:13 am and was pronounced deceased at 11:20 am. Based on the autopsy finding, the cause of death was acute fentanyl intoxication with a contributing factor of hypertensive and atherosclerotic cardiovascular disease, and the manner of death was determined an accident. Deputies 1, 2 and an additional deputy also provided confidential information during the course of CLERB's investigation that was considered in arriving at the recommended finding. Deputies took immediate and appropriate action as they recognized and responded to Estrada's emergency medical needs in accordance with policy. Inmate counts and hourly security checks were completed in compliance with policy as evidenced by SDSD documentation and jail surveillance video. Detectives searched Estrada's cell and interviewed other inmates in the module but did not find anything of evidentiary value. Although SDSD has implemented numerous measures to deter drugs from entering its detention facilities, there is no doubt that Estrada while as an inmate in the custody and under the care of the SDSD, either acquired or possessed and subsequently consumed fentanyl, which resulted in his death. According to the SDSD News Release, "Stopping Drug Smuggling in County Jails", dated 04-19-21, the SDSD is active in their attempts to intercept drugs into the facilities. Some efforts being made are the use of body scanners at all intake facilities and GBDF, inmate screening and flagging of potential smugglers. Also, the mail processing center has special equipment for drug detection, drug detection K-9's, and a "no questions asked" drug drop box. SDSD also provides drug education and awareness in the facilities. Additionally, in accordance with DSB P&P I.41, Inmate Cell Searches and DSB P&P L.2 Sanitation and Hygiene Inspections, cell searches and inspections were performed in an effort to provide a safe and secure environment free of contraband. Despite all interdiction efforts, fentanyl, in part, contributed to Estrada's death, and, therefore, this death was preventable. As the investigation failed to determine how the fentanyl contributing to Estrada's death entered the detention facility, there was insufficient evidence to either prove or disprove misconduct on the part of SDSD sworn personnel.

---

## 21-092/JAMES

1. Use of Force Resulting in Great Bodily Injury – Deputies 1 and 2 used force to apprehend Taj Emory James.

Recommended Finding: Action Justified
Rationale: On 08-12-21, deputies were dispatched to "shots fired" at the Albertsons Grocery Store in Fallbrook. Witnesses reported they saw a suspect, later identified as Taj Emory James, with a gun in the parking lot and heard gunshots. According to SDSD documentation and Body Worn Camera (BWC), Deputy 1 was the first to respond on scene and spotted James in front of Albertsons. Deputy 1 pointed his gun at James and commanded him to put his hands up and drop to his knees. James did not comply, lifted his shirt (gun was visible) and began to slowly walk away. Deputy 1 stated he saw the gun, called for assistance and continued to give commands, but James did not comply. James wandered around, which caused his pants to fall, and he ultimately kicked off his shoes and pants away from him. (The gun was later located inside of his pant pocket.) James walked out of the parking lot towards the street, which prompted a foot pursuit. Deputy 1 chased him with an electrical control device (Taser) in hand. James turned around and attempted to punch the deputy in the face. Deputy 1 reported he grabbed James by his shirt and pulled him to the ground and applied pressure with his forearm against James' left temple area and forced his right temple against his chest. Deputy 1's BWC fell to the ground because of the struggle with James. SDSD documentation and BWC footage showed Deputy 2 arrived shortly after to assist. Deputy 2 reported James did not comply with her commands, so she attempted to gain control of his arm, but he resisted. Deputy 2's BWC was also dislodged due to the struggle. Deputy 2 reported she punched James approximately five times on the upper back and ribs and also applied downward pressure to James' upper back with her knees as she attempted to gain control of his right arm. The deputies were finally able to gain control of James, handcuffed him and lodged their BWC's back onto their person. Addendum F, Use of Force Guidelines states that deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident. Pursuant to Use of Force Guidelines, Deputy 1 utilized de-escalation techniques as he communicated with James, used verbal persuasion, advisements, and warnings. Deputy 1 commanded James several times and warned James he may be shot if he did not comply. James displayed verbal noncompliance, actively resisted, and used assaultive behavior towards Deputy 1. Deputy 2 arrived on scene and witnessed a struggle between Deputy

1 and James; it was her duty to gain safety/control of the situation. Deputy 2 also gave verbal commands, but James did not comply. Deputy 2 used hand techniques and punched James. Per Use of Force Guidelines, control compliance techniques and hand techniques are considered less lethal and may be used to gain control of a subject that is actively resisting and/or assaultive. Deputies 1 and 2 were confronted with a non-compliant, aggressive and armed suspect, but yet chose not to use deadly force. Deputies 1 and 2 used an adequate and reasonable amount of force towards James to apprehend him. This investigation found that the force was used towards James was lawful, justified and proper. There were no violations of policies and procedures found during this incident.

---

### 22-040/HUNTER

1. Excessive Force – An unidentified deputy re-injured the complainant's shoulder.

   Recommended Finding: Summary Dismissal
   Rationale: The complainant stated, "I claim misconduct, excessive force. Possible false reporting, also, by San Diego Sheriff's Department, SDSD Employees, VDF Intake personnel..." After his arrest on 07-13-21, the complainant said he informed officers of his recent shoulder surgery, which employees acknowledged. The complainant said SDSD employees at VDF ignored this information and handcuffed him behind his back (multiple times) which caused him excruciating pain then, and continues, so he has requested a compassionate release to receive urgently needed medical care. On 04-07-22, the complainant withdrew his complaint per CLERB Rules & Regulations 5.7: A complaint may be withdrawn from further consideration at any time by a written notice of withdrawal signed and dated by the complainant. The effect of such withdrawal will normally be to terminate any further investigation of the complaint of misconduct, unless the Executive Officer or a CLERB member recommends that the investigation continue and CLERB, in its discretion, concurs.

2. Misconduct/Procedure - Unidentified deputies handcuffed the injured complainant.

   Recommended Finding: Summary Dismissal
   Rationale: See Rationale #1.

---

### 22-047/DAHDOUH

1. Misconduct/Procedure – Deputy 1 used his official position and engaged in a personal relationship with the complainant.

   Recommended Finding: Summary Dismissal
   Rationale: The complainant reported she engaged in a consensual and personal relationship with Deputy 1. The complainant reported she and Deputy 1 were intimate and after the fact she "did not feel comfortable trusting a public official to use her body then just leave." The complainant also expressed concern that Deputy 1 did not return her phone calls and he "did not express care or concern for her." The complainant further reported she did not understand why Deputy 1 told her he "preferred to be independent" and stated, "If someone works for a law enforcement agency, they should treat members of the public with respect and consideration." Deputy 1 is no longer employed with the San Diego Sheriff's Department as of 03-24-22; therefore, CLERB lacks jurisdiction to investigate this complaint. Pursuant to CLERB Rules & Regulations, Section 4: Authority, Jurisdiction, Duties and Responsibilities of CLERB, subsection 4.1 states that CLERB shall have authority to receive, review, investigate and report on complaints filed against peace officers employed by the County in the Sheriff's Department. Furthermore, CLERB does not have jurisdiction to investigate deputies while off-duty in accordance with subsection 4.2 "Misconduct" which is defined to mean and include any alleged or illegal acts, omissions, or decisions directly affecting the person arising out of the performance of the peace officer's or custodial officer's official duties. Given that the complainant reported actions that allegedly took place outside of the scope of Deputy 1's official duties as a sworn officer, CLERB lacks jurisdiction in this matter.

20

*End of Report*

# EXHIBIT D

22

**CITIZENS' LAW ENFORCEMENT REVIEW BOARD**
**POLICY RECOMMENDATION**

**PROVIDE INMATE ACCESS TO NALOXONE (NARCAN) TO INMATES AT**
**SAN DIEGO COUNTY DETENTION FACILITIES**

**BACKGROUND:**

From 2006 through 2020, 185 people died in San Diego County's jails. The rate of deaths in San Diego County's jails raised concerns about underlying systemic issues within the San Diego Sheriff's Department's (SDSD) policies, procedures, and practices.

The California State Auditor (CSA) conducted an audit of the SDSD to determine the reasons for in-custody deaths; concluded that the SDSD failed to adequately prevent and respond to deaths of individuals in its custody; and made several recommendations pertaining to intake screenings, medical and mental health care, safety checks, and responses to medical emergencies.

A CLERB-commissioned study by Analytica Consulting in which overdose/accidental death rates of San Diego County Adult Detention Facilities inmates were compared to those from 11 other California counties revealed that San Diego County inmates have the highest overdose/accidental death rates. An inmate in San Diego is two times more likely to die in this manner than what is expected based on county mortality rates. San Diego County was the only county with a statistically significant excess number of overdose/accidental deaths. A review of drug-related causes of death for inmates over the past two years indicated that fentanyl, a synthetic opioid, contributed to most of those deaths.

Naloxone is a medication used for the emergency treatment of known or suspected opioid overdose, to include a known or suspected fentanyl overdose. The National Commission on Correctional Health Care (NCCHC) supports increased access to naloxone in correctional facilities, and promotion of naloxone use in said facilities. The NCCHC recommends that naloxone be "readily available" to all people in a facility, to include inmates. The NCCHC further recommends that inmates receive education on "opioid overdose and its signs, correct technique for administration of naloxone and, essential procedures, including performance of cardiopulmonary resuscitation."

CLERB believes that all efforts to reduce the likelihood of in-custody deaths must be taken, to include those that would appear fiscally cost prohibitive or delay facility operations. CLERB believes the value of human life outweighs any cost and is greater than any resulting operational delays.

**POLICY RECOMMENDATIONS:**

Pursuant to Section 340.9(g) of the San Diego County Administrative Code, the Citizens' Law Enforcement Review Board (CLERB) shall have the authority to review and make recommendations on policies and procedures of the San Diego County Sheriff's Department and San Diego County Probation Department.  As such, CLERB makes the following policy recommendations to the SDSD:

1.  Make naloxone "readily available" to San Diego County Detention Facility inmates.

2.  Educate inmates on opioid overdose and its signs, correct technique for administration of naloxone and, essential procedures, including performance of cardiopulmonary resuscitation.

| Submitted by: | Date: | Reviewed by: | Date: |
|---|---|---|---|
| | 05-05-22 | | 05-05-22 |
| Paul R. Parker III, Executive Officer | | Lynn Setzler, Supervising Special Investigator | |

23

# EXHIBIT E

**CITIZENS' LAW ENFORCEMENT REVIEW BOARD**
**POLICY RECOMMENDATION**

**CREATE FENTANYL CANINE POLICY AND PROCEDURES**

**BACKGROUND:**

From 2006 through 2020, 185 people died in San Diego County's jails. The rate of deaths in San Diego County's jails raised concerns about underlying systemic issues within the San Diego Sheriff's Department's (SDSD) policies, procedures, and practices. The California State Auditor (CSA) conducted an audit of the SDSD to determine the reasons for in-custody deaths; concluded that the SDSD failed to adequately prevent and respond to deaths of individuals in its custody; and made several recommendations pertaining to intake screenings, medical and mental health care, safety checks, and responses to medical emergencies.

A CLERB-commissioned study by Analytica Consulting in which overdose/accidental death rates of San Diego County Adult Detention Facilities inmates were compared to those from 11 other California counties revealed that San Diego County inmates have the highest overdose/accidental death rates. An inmate in San Diego is two times more likely to die in this manner than what is expected based on county mortality rates. San Diego County was the only county with a statistically significant excess number of overdose/accidental deaths. A review of drug-related causes of death for inmates over the past two years indicated that fentanyl, a synthetic opioid, contributed to most of those deaths.

As part of its drug interdiction efforts, the SDSD has trained and deployed a canine for the purpose of detecting fentanyl. As there are no documented policy or procedures (P&P) for the use of this specialized canine, CLERB recommends that SDSD update Detentions Services Bureau Policy I.87, entitled, "Detention Canine Program," and its Detentions Canine Manual to include said P&P. The P&P should indicate that the fentanyl canine will be used for searches of contraband in all areas; to conduct sniffs of all persons entering a facility to include visitors, inmates, and staff; and to conduct sniffs of persons already inside of a facility, to include visitors, inmates, and staff.

CLERB believes that all efforts to reduce the likelihood of in-custody deaths must be taken, to include those that would appear fiscally cost prohibitive or delay facility operations. CLERB is hopeful that the SDSD will pursue and obtain or be provided funding to fully train and deploy as many fentanyl canines as required to prevent fentanyl from being smuggled into the detention facilities and to identify persons and the methods used to do so. CLERB believes the value of human life outweighs any cost and is greater than any resulting operational delays.

**POLICY RECOMMENDATIONS:**

Pursuant to Section 340.9(g) of the San Diego County Administrative Code, the Citizens' Law Enforcement Review Board (CLERB) shall have the authority to review and make recommendations on policies and procedures of the San Diego County Sheriff's Department and San Diego County Probation Department.  As such, CLERB makes the following policy recommendations to the SDSD:

1. Update Detentions Services Bureau Policy I.87, entitled, "Detention Canine Program," and its Detentions Canine Manual to include said P&P. The P&P should indicate that the fentanyl canine will be used for searches of contraband in all areas; to conduct sniffs of all persons entering a facility to include visitors, inmates, and staff; and to conduct sniffs of persons already inside of a facility, to include visitors, inmates, and staff.

| Submitted by: | Date: | Reviewed by: | Date: |
|---|---|---|---|
| *[signature]* | | *[signature]* | |
| | 05-05-22 | | 05-05-22 |
| Paul R. Parker III, Executive Officer | | Lynn Setzler, Supervising Special Investigator | |

25

# EXHIBIT F

26

Case 3:20-cv-00406-AJB-DDL    Document 185-3    Filed 06/02/23    PageID.6662    Page 27 of 201

**SAN DIEGO COUNTY**
**Sheriff's Department**

# Suspected Jail Overdose Incidents with Naloxone Deployment*

CY 2022
Data as of:
06/02/2022



**Suspected Overdoses in the Last 7 Days**
By Facility

| Suspected Overdoses in the Last 7 Days |
| :---: |
| 5 |

5

SDCJ



**Suspected Overdoses Year-to-Date**
By Facility

| Total Suspected Overdoses Year-to-Date |
| :---: |
| 90 |

47  21  12  9  1
SDCJ  VDF  GBDF  LCDRF  EMRF

\* These figures reflect the number of incarcerated persons that had Naloxone administered to them as a result of a suspected overdose incident. Per policy, Naloxone should be administered to *any* individual who presents signs of opioid overdose or when opioid overdose is suspected. Medical follow-up on suspected overdoses is completed on an individual basis and is notated in the individual's medical records. This informaon is not tr acked at the aggregate level. Data for all suspected overdoses with Naloxone deployment is included in this report, regardless of the medical diagnosis and prognosis of the individual suspected overdose.

■ Data from all San Diego County detenon f acilies is included in this r eport: San Diego Central Jail (SDCJ), George Bailey Detenon F acility (GBDF), East Mesa Re-Entry Facility (EMRF), Vista Detenon F acility (VDF), Las Colinas Detenon and R e-Entry Facility (LCDRF), & South Bay Detenon F acility (SBDF). Incidents that occurred during transit are logged under the originang f acility.

■ Source: Detenon Ser vices Bureau. Includes only incidents from reports that were approved and submied as of report date. Totals are provisional and subject to change due to data reconciliaon and as addional in formaon bec omes available.

# EXHIBIT G

28

To:    CAHAN San Diego Participants
Date:   August 21, 2020
From:   Health and Human Services Agency

**Fentanyl Overdose Deaths Related to Illicit Drug Use**

This health advisory informs providers about a recent increase in fatal cases of fentanyl overdose in San Diego County.  It also contains recommendations for local healthcare providers and resource links.

---

**Key Points:**

- Fentanyl overdose deaths are increasing in San Diego County, with confirmed and suspect cases this year nearly triple the number at the same point in 2019.
- Nationwide, a rise in drug overdose deaths was observed prior to the Coronavirus Disease 2019 (COVID-19) outbreak.
- Current local trends in fentanyl overdose deaths may be compounded by stressors related to the COVID-19 pandemic, including restricted access to care, disruptions in usual drug supply routes, and economic stressors leading to increased drug misuse.
- Respiratory support and naloxone are the best treatments for fentanyl-related overdoses, and larger than usual doses of naloxone may be required.
- Widespread access to naloxone is essential to prevent fentanyl-related deaths.
- Medication Assisted Treatment (MAT), such as methadone and buprenorphine, is the most effective treatment for opioid use disorder and is recommended to reduce the risk of overdose.

---

**Situation**

The National Center for Health Statistics reports that prior to the COVID-19 pandemic, national overdose death rates were on the rise.  Similarly, California saw a 16% increase in reported drug overdose deaths from January 2018 to January 2019.

Locally, the rise in overdose deaths reported in 2018 has increased into the present.  In 2019, there were 152 fentanyl-related overdose deaths in San Diego County.  Through the first week of August, 233 fentanyl-related deaths have been noted this year, of which 119 have been confirmed and 114 are pending confirmation.  The deaths this year are nearly three times the 79 deaths due to fentanyl toxicity at the same time last year.  During the first week of August, the San Diego County Medical Examiner's Office noted 24 deaths likely due accidental fentanyl overdoses, alone or with another drug.

CAHAN San Diego Alerts are intended for the use of public health, medical and laboratory professionals in San Diego County. This alert has been approved for reproduction and distribution to interested professionals. An online CAHAN San Diego application is available at http://www.cahansandiego.com for appropriate and interested individuals.

29

There is an ongoing national and local trend of illicit opioid and non-opioid drugs and counterfeit pills being laced with illegally manufactured fentanyl and related chemical compounds, resulting in increased morbidity and mortality.  Some users may be unaware of the risk of fentanyl contamination of illicit drugs.  San Diego County healthcare providers can take actions to protect and prevent overdoses among their patients and/or clients.

The effects of COVID-19 across the globe and acute impacts at the individual level are likely contributing to the recent increase in fentanyl overdose deaths.  An increase in social isolation, economic strain due to job loss or reduced work, and reduced access to substance use disorder (SUD) treatment are important factors.  Some individuals may be disconnected from their usual drug sources and may therefore have increased exposure to fentanyl within new drug supplies.  Individuals turning to SUD treatment programs may be having difficulty accessing services due to reductions in capacity at some programs because of the need for infection control practices (i.e., social distancing).

Due to the potency of fentanyl and fentanyl analogs (50 to 1000 times that of morphine), these substances have a greater risk of fatal overdose than other opioids.  The most effective treatment for opioid overdoses is respiratory support and naloxone, an opioid receptor antagonist.  Larger and multiple  doses of naloxone (than usual 2-10 mg) may be needed to reverse the opioid effects from fentanyl and repeated dosing including continuous infusions may be required.  Healthcare providers, first responders, and illicit drug users should be aware that fentanyl-related overdoses are on the rise, and of the dangers of fentanyl overdose.

**Background**

Fentanyl is a synthetic, short-acting, highly potent opioid analgesic that carries a high risk of overdose.  Illicit drugs, including heroin and cocaine, can be laced with fentanyl, which may result in users of illicit drugs being exposed to fentanyl without their knowledge.

Fentanyl and its analogs result in the same central nervous system depression as heroin.  Overdose symptoms of opioids, such as fentanyl, include lethargy, respiratory depression, pinpoint pupils, change in consciousness, seizure, slowed or erratic heart rate, nausea or vomiting, muscle spasm, clammy skin, change in skin color, and/or coma.  The classic triad of altered mental status, pinpoint pupils, and depressed respirations suggests an opioid overdose. However, mixed overdoses may present with dilated pupils.  The key concerns are whether there is adequate ventilation and whether the respiratory depression requires naloxone for reversal.

Recent cases of fentanyl-related overdoses (and deaths) have increasingly been linked to illegally manufactured fentanyl and fentanyl analogs.  Nationally and locally, fentanyl has been seized by law enforcement in both powder and pill formulations, which may be marked as other substances.

**Harm Reduction and Medication-Assisted Treatment**

Harm reduction strategies are effective for individuals who have just experienced a non-fatal overdose or are at risk for overdose.  These strategies include but are not limited to taking a non-judgmental approach and a focus on meeting the patient "where they are at."  Low barrier access to treatment such as medication-assisted treatment (MAT) is also a harm-reduction strategy.  MAT is the use of FDA-approved medications, in combination with counseling and behavioral therapies, to effectively treat substance use disorders.  Among individuals with opioid use disorders the use of MAT reduces drug use,

CAHAN San Diego Alerts are intended for the use of public health, medical and laboratory professionals in San Diego County. This alert has been approved for reproduction and distribution to interested professionals. An online CAHAN San Diego application is available at http://www.cahansandiego.com for appropriate and interested individuals.

disease rates, and overdose deaths.  More information about MAT from the Substance Abuse and Mental Health Services Administration (SAMHSA) is available here.

Methadone and buprenorphine are the most effective treatment options for overdose prevention.  Although methadone can be continued in the acute care environment, ongoing outpatient treatment is restricted to licensed opioid treatment programs.  Buprenorphine, however, can be prescribed or dispensed by qualified prescribers in multiple settings, including outpatient clinics, some prehospital systems, and other general medical settings.  Examples of an algorithm for starting buprenorphine immediately after an overdose can be found here.

In addition to substance use disorders being broadly stigmatized, there is also stigma associated with the use of medications to treat substance use disorders.  Working with patients, families, and even treatment team members to provide psychoeducation around dispelling common myths about MAT may be helpful to engage patients in treatment.  Additionally, education about naloxone is critical for patients, family members or other social supports for people at risk for or recently experiencing a non-fatal overdose.

**Recommendations**

- **Suspect fentanyl toxicity in overdose cases**, particularly in patients presenting with symptoms consistent with opioid overdose.  Note that patients exposed to fentanyl-related compounds may be unaware of their exposure.
- **Consider multiple and higher doses of naloxone may be needed to counteract fentanyl-related overdoses** due to its high potency.
- **Be aware that, in rare cases, fentanyl can cause rigidity** of the thoracoabdominal musculature, known as "wooden chest syndrome," that may not respond to naloxone and may require treatment with small doses of succinylcholine and ventilatory support.
- **Remind ordering physicians to check with their laboratories** to determine whether fentanyl and/or its analogs are detected in the institution's urine opioid screens.
- **Educate patients who may be using illicit drugs** about the increase in counterfeit pills and illicit drugs laced with fentanyl and the associated risk of overdose.
- **Offer naloxone to at-risk patients and their family members, friends, and peers** and educate them about how to access and use it.  Emergency departments can serve as points of intervention for persons who experience overdose., Post-overdose protocols are recommended that include naloxone prescription and patient referral to case management services or peer navigators. Risk factors for opioid overdose include:
    - Use of street-purchased drugs,
    - History of overdose or substance use disorder,
    - Prescription for an opioid dose ≥ 50 morphine milligram equivalents (MME)/day, and
    - Concurrent use of benzodiazepines with opioids.
- **Refer patients with substance use disorders for treatment by calling 2-1-1 or, through the County Behavioral Health Services,** by calling the Access and Crisis line at 1-888-724-7240.  Patients with opioid use disorder should be referred to evidenced-based treatments, including MAT when possible.
- **Initiate and continue** MAT in all healthcare environments**,** whenever it is possible to connect the client to ongoing treatment.

CAHAN San Diego Alerts are intended for the use of public health, medical and laboratory professionals in San Diego County. This alert has been approved for reproduction and distribution to interested professionals. An online CAHAN San Diego application is available at http://www.cahansandiego.com for appropriate and interested individuals.

**Resources**

<u>Federal</u>

      CDC Health Advisory 413:  <u>Rising Numbers of Deaths Involving Fentanyl and Fentanyl Analogs, Including Carfentanil, and Increasing Usage and Mixing with Non-opioids</u>

      CDC Opioid Overdose webpage:  <u>Understanding the Epidemic</u>

      SAMHSA <u>Opioid Overdose Prevention Toolkit</u>

<u>Local</u>

      California Poison Control, San Diego Division <u>webpage</u> (phone number 1-800-222-1222)

      San Diego County Behavioral Health Services <u>Provider Directory</u>

      San Diego County Medication Assisted Treatment <u>Patient Referral Directory</u>

      San Diego County Prescription Drug Abuse Task Force <u>webpage</u>

Thank you for your participation.

**CAHAN San Diego**
County of San Diego Health & Human Services Agency
E-mail: <u>cahan@sdcounty.ca.gov</u>
Secure Website: <u>https://member.everbridge.net/892807736722952/login</u>
Public-Access Website: <u>http://www.cahansandiego.com</u>



*2020 data are cases as of August 7,2020.
The confirmed case count is 119 and those pending confirmation number 114.
**Source:** San Diego County Medical Examiner's Office

CAHAN San Diego Alerts are intended for the use of public health, medical and laboratory professionals in San Diego County. This alert has been approved for reproduction and distribution to interested professionals. An online CAHAN San Diego application is available at http://www.cahansandiego.com for appropriate and interested individuals.

# EXHIBIT H

33

| From: | Van Swearingen |
| To: | O'Sullivan, Matthew |
| Cc: | Lenert, Ronald |
| Subject: | RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747] |
| Date: | Friday, February 25, 2022 10:12:58 AM |

Hi Matthew,

Thanks for your email last night.  Yes—on Wednesday I informed you that while we want to accommodate the County's scheduling needs, Plaintiffs are eager to get this case underway and acknowledge that the County already has two months under the schedule fixed by the Court.  I proposed agreeing to the County's request for additional time on the condition that Plaintiffs have an opportunity within the next two months to have three on-site tours with an attorney and an expert.

We are disappointed that the County and Sheriff's Department are unwilling to permit our proposed site-inspections.  Nevertheless, we want to start this relationship on good footing and try to accommodate scheduling requests.  Accordingly, we are amendable to a 30-day extension which would provide the County with a quarter of a year to respond to the SAC.

Separately, we hope that we can work cooperatively on discovery issues and protective order in the near term.

Regards,
Van

**From:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Sent:** Thursday, February 24, 2022 8:15 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]

[EXTERNAL] Notice: This message comes from an external sender.

Hi Van-

I hope this email finds you well!  I'm writing to get back to you on the proposal you called me about yesterday.  From what I understood, you stated that Plaintiffs would be amenable to our requested extension of the responsive pleading deadline, but only if the County agreed to provide three separate days for which a lawyer from your team and an expert could conduct site visits of all of the facilities at issue in the lawsuit before the opening of discovery in this matter.

I do not have authority/authorization to agree to what you have proposed.  Just so I am clear for the purposes of our motion, this means that you all oppose our intended motion requesting an additional 45 days to file a responsive pleading.  Is that understanding correct?

Thanks!

Matthew

**Matthew Patrick O'Sullivan**
SENIOR DEPUTY COUNTY COUNSEL
OFFICE OF THE COUNTY COUNSEL - COUNTY OF SAN DIEGO
1600 Pacific Highway, Room 355
San Diego, California 92101
direct: 619-840-7347
CONFIDENTIALITY NOTICE:  This email message, including any attachments, is for the sole use of the intended
recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product
doctrine or other applicable privileges or confidentiality laws or regulations.  If you are not an intended recipient,
you may not review, use, copy, disclose or distribute this message or any of the information contained in this
message to anyone.  If you are not the intended recipient, please contact the sender by reply email and destroy all
copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-
client or any other privilege.

---

**From:** O'Sullivan, Matthew
**Sent:** Tuesday, February 22, 2022 5:21 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Lenert, Ronald < Ronald.Lenert@sdcounty.ca.gov>
**Subject:** RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]

Very kind, thank you Van!

**Matthew Patrick O'Sullivan**
SENIOR DEPUTY COUNTY COUNSEL
OFFICE OF THE COUNTY COUNSEL - COUNTY OF SAN DIEGO
1600 Pacific Highway, Room 355
San Diego, California 92101
direct: 619-840-7347
CONFIDENTIALITY NOTICE:  This email message, including any attachments, is for the sole use of the intended
recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product
doctrine or other applicable privileges or confidentiality laws or regulations.  If you are not an intended recipient,
you may not review, use, copy, disclose or distribute this message or any of the information contained in this
message to anyone.  If you are not the intended recipient, please contact the sender by reply email and destroy all
copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-
client or any other privilege.

---

**From:** Van Swearingen <VSwearingen@rbgg.com>
**Sent:** Tuesday, February 22, 2022 4:47 PM
**To:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Cc:** Lenert, Ronald < Ronald.Lenert@sdcounty.ca.gov>
**Subject:** [External] RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]

Hi Matthew,
Thanks for your email below.  Just wanted to let you know that I will inform you tomorrow of our
position on the County's request for an extension.  Regards,
Van

---

**From:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>

**Sent:** Friday, February 18, 2022 1:49 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]

[EXTERNAL] Notice: This message comes from an external sender.

Hi Van-

It was great getting to connect today.  I realized that I didn't leave you my preferred number (with COVID, it's best to reach me on my County cell vs. my office number).  That number is 619-840-7347.

We look forward to hearing your all's stance regarding the County's intended request for extension of the pleading deadline once you get the chance to speak to your cocounsel.

Warm regards (and happy weekend!),
Matthew


**Matthew Patrick O'Sullivan**
SENIOR DEPUTY COUNTY COUNSEL
OFFICE OF THE COUNTY COUNSEL - COUNTY OF SAN DIEGO
1600 Pacific Highway, Room 355
San Diego, California 92101
direct: 619-840-7347
CONFIDENTIALITY NOTICE:  This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product doctrine or other applicable privileges or confidentiality laws or regulations.  If you are not an intended recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in this message to anyone.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

---

**From:** Van Swearingen <VSwearingen@rbgg.com>
**Sent:** Friday, February 18, 2022 9:56 AM
**To:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** [External] RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]

Hi Matthew,
Yes – I can talk at 12:30 or 2:00-3:00 today.  415-433-6830.  Regards,
Van

---

**From:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Sent:** Friday, February 18, 2022 9:45 AM
**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** Dunsmore -- Request for a Call

[EXTERNAL] Notice: This message comes from an external sender.

Hi Van-

Do you have time today for us to connect regarding *Dunsmore*?  I want to run something by you relating to the County's responsive pleading deadline.  If so, please let me know your preferred number.

Let me know.

Thanks,
Matthew

**Matthew Patrick O'Sullivan**
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101
direct: 619-840-7347
**CONFIDENTIALITY NOTICE:**  This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product doctrine or other applicable privileges or confidentiality laws or regulations.  If you are not an intended recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in this message to anyone.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

# EXHIBIT I



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Van Swearingen
Email:  vswearingen@rbgg.com

March 15, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>
Fernando Kish
Ronald Lenert
Matthew O'Sullivan
Office of the County Counsel
County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2437
Fernando.Kish@sdcounty.ca.gov
Ronald.Lenert@sdcounty.ca.gov
Matthew.O'Sullivan@sdcounty.ca.gov

      Re:    *Dunsmore v. San Diego County Sheriff's Department, et al.*
                S.D. Cal. Case No. 3:20-CV-00406-AJB-WVG
                <u>Our File No. 1730-1</u>

Dear Messrs. Kish, Lenert, and O'Sullivan:

      As you have now seen in our class action complaint on behalf of Daryl Dunsmore and seven other individuals, we allege that the County of San Diego and the San Diego County Sheriff's Department violate the civil rights of people incarcerated at the San Diego County Jail by failing to provide reasonable accommodations to prisoners with disabilities, failing to operate an adequate mental health, medical, and dental care system, failing to ensure adequate safety and security for people in custody, subjecting individuals to unsanitary and inhumane conditions of confinement, and denying people access to legal counsel and the courts.  The County, the Sheriff's Department, and the Probation Department further violate the rights of people with mental health and other disabilities and/or people who are Black and/or Latinx, through policies and practices that illegally and wrongly result in the over-incarceration of these groups.  The conditions in the Jail cause very real harm to the more than 4,000 people regularly incarcerated in the Jail.

      We greatly appreciated the opportunity to meet in person with Mr. Kish and Mr. O'Sullivan on March 10, 2022.  From that conversation, we observed two important

[3875815.3]

39

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 2

objectives that the parties share – first, to proactively address serious problems within the County's carceral system, and second, to focus resources on practical solutions, including by narrowing the issues in dispute and avoiding costly, protracted litigation as much as possible.

The other defendants named in this action – each of which provide services subject to contract with the County – are also responsible and liable for certain aspects of the unlawful and unconstitutional systemic deficiencies set forth above and in our complaint. However, the County is ultimately responsible for *all* policies, practices, and conditions that illegally harm Plaintiffs and the putative class and subclass. *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) (state prison defendants cannot shirk their obligations to plaintiffs under federal law by contracting with a third party). We are therefore sending the following proposal to you prior to sharing it with other defendants.

Plaintiffs' counsel have extensive experience litigating class action cases addressing unlawful and unconstitutional conditions of confinement in jails and prisons. These experiences demonstrate that there are meaningful opportunities for the parties in such cases to proceed in ways that are most cost-effective and solutions-oriented while protecting the rights and interests of all parties.

To be clear, Plaintiffs' intention is to seek and secure an adequate and durable remedy – in the form of injunctive relief – for the legal and constitutional violations set forth in the complaint, with meaningful federal court oversight of implementation. In similar cases, this has been achieved through court orders and/or court-approved settlements.

We provide below a two-pronged proposal, with an eye towards the shared goals we discussed, addressing (1) class certification and (2) neutral, mutually agreed-upon expert assessments. The proposal would require a mutual good faith effort towards an expeditious and efficient resolution of this matter. If the County is amenable to such a proposal, we suggest that we together share it with the other defendants. Coordination across all parties will undoubtedly result in greater efficiencies and cost-savings.

## I.    Class Certification

In every significant jail system class action case filed in California's federal courts in recent years, class certification has been granted. The appropriateness of class certification in a matter such as this one is beyond reasonable dispute, as made clear by the Ninth Circuit in *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014). That case, now cited by numerous federal courts in California, makes clear that class certification is appropriate where, as here, plaintiffs seek to challenge systemic policies and practices that allegedly expose incarcerated people to a substantial risk of harm. *See, e.g.*,

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 3

*Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015); *Gray v. Cnty. of Riverside*, No. EDCV 13-00444-VAP, 2014 WL 5304915 (C.D. Cal. Sept. 2, 2014); *Jewett v. California Forensic Med. Grp., Inc.*, No. 213CV0882MCEACP, 2017 WL 931886 (E.D. Cal. Mar. 9, 2017), report and recommendation adopted sub nom. *Jewett v. California Forensic Med. Grp., Inc.*, 2017 WL 1356054 (E.D. Cal. Apr. 5, 2017).

More recently, California counties have avoided costly and time-consuming discovery and motion practice on class certification either by stipulating to class certification, *see, e.g., Mays v. County of Sacramento*, E.D. Cal. Case No. 2:18-cv-02081-TLN-KJN (Joint Motion for Class Certification granted 12/28/18); *Babu v. County of Alameda*, N.D. Cal. Case No. 5:18-cv-07677-NC (Joint Motion for Class Certification granted 1/21/20), or by submitting a statement of non-opposition to certification, *see, e.g., Murray v. County of Santa Barbara*, C.D. Cal. Case No 2:17-cv-08805-GW-JPR (Unopposed Motion for Class Certification granted 5/31/18).

In each of these cases, the County realized substantial cost-savings on a procedural matter that was not in reasonable dispute.

Class certification brings an additional benefit for the County, protecting it from additional suits for systemwide injunctive relief. Resolution of a case of this sort through a class proceeding facilitates efficiency and finality both in terms of adjudication of complex legal issues and any resulting legal remedies. With the extensive attention that the San Diego County Jail has received, including from the State Auditor, in the media, from non-profit and governmental organizations like Disability Rights California the United States Department of Justice, and through numerous individual lawsuits, the County faces substantial risk of additional legal proceedings. There is substantial value to all parties to narrow and resolve the matters raised in the *Dunsmore* case through a single, class-wide adjudicatory process.

As part of the this proposal, we ask that the County agree to class certification in the form of a stipulated order that would be filed with the Court no later than April 29, 2022. Counsel for Plaintiffs will be working on a motion for class certification during the pendency of this proposal. In the event that the County does not agree in principle with this proposal by April 1, 2022, Plaintiffs' counsel will accelerate their work on this motion.

## II.    Retention of Neutral Mutually Agreeable Experts

Given the parties' shared goals, we propose the use of neutral, mutually agreed-upon subject matter experts to assist the parties in the identification of systemic issues and effective remedies that are tailored to San Diego County's system.

A case like this one entails substantial fact discovery and expert input. A coordinated, streamlined process for information-sharing and expert involvement will put

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 4

the parties in the best position to identify and implement adequate solutions to the problems raised, with the parties realizing cost-savings and efficiencies wherever feasible.

For these and other reasons, several California counties have used, or are using, neutral experts in this sort of process, including (for example) Sacramento, Santa Clara, Santa Barbara, Monterey, Fresno, Riverside, San Bernardino, and Alameda. Where the parties have engaged in good faith negotiations, the outcome has been the achievement of – or significant progress towards – constitutional and legal compliance.

The most successful procedure, in our experience, is for the County to retain mutually agreed-upon experts with subject matter expertise on the relevant case issues, which in this case will include: (a) mental health care and suicide prevention, (b) medical care, (c) dental care, (d) eye care, (e) environmental sanitation, health, and safety conditions, (f) custodial operations, (g) compliance with the Americans with Disabilities Act ("ADA"), and (h) county carceral and alternatives-to-incarceration practices impacting people with mental health or other disabilities and/or people who are Black and/or Latinx.

Through this process, the County (and other defendants, as appropriate) would work with us and these experts on the following terms:

> ➢ By June 1, 2022, the County will retain mutually agreeable experts for the purpose of preparing reports and recommendations regarding the above subject matters. Plaintiffs' counsel will provide recommendations as to available experts for the parties to discuss and will consider your proposed experts.

> ➢ The experts will have access to all people incarcerated at the Jail, records, and staff as needed to prepare their reports and recommendations.

> ➢ Within 100 days of the appointment of the experts, they would issue reports proposing recommendations and remediation for conditions found to be below the minimum federal and state standards.

> ➢ The expert reports and recommendations will be public and admissible in any litigation that may occur, including in the event that (a) the parties negotiate a class-wide remedial plan and settlement, or (b) negotiations are not successful in whole or in part.

Assuming the parties are able to proceed in good faith with negotiations for a class-wide settlement, these neutral expert reports and recommendations would provide a distinctively useful guide to negotiations and the drafting of a remedial plan, to be filed with the federal court, that satisfies constitutional and legal requirements.

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 5

The expert reports and recommendations may assist in narrowing certain issues – where the mutually agreed-upon experts appropriately find that a systemic component is working well and is constitutionally or statutorily adequate, such an issue need not be the subject of litigation or a remedial plan – and will identify discrete issues that require remedial steps in this County.

Assuming the parties successfully negotiate a resolution through this structured process, it must ultimately result in a class settlement agreement filed with and approved by the court and over which the court retains continuing jurisdiction. The agreement would require that the County, where necessary to comply with state and federal law, revise policies and procedures, implement remedial plans, institute a system for quality assurance, and permit external monitoring of implementation and compliance. Furthermore, the County would agree not to oppose payment of reasonable attorneys' fees on the same terms as if Plaintiffs' counsel had fully litigated the case through a trial resulting in injunctive relief orders. The reasonableness of attorneys' fees would of course be a subject of negotiation and if necessary, dispute resolution processes.

## III.    Addressing Critical Issues

As discussed during our recent conversation, in a case of this nature and scope, it will be necessary to address certain issues on an expedited basis. There are issues in this case that require prompt attention. Specifically, there are systemic issues putting our clients and putative class members at extraordinary risk of serious harm right now; such issues cannot wait. Likewise, there are certain remedial actions that, if implemented in the near term, would lay a meaningful foundation for addressing other issues in the case in an efficient, cost-effective, and results-oriented way.

We will provide further detail on the critical issues that we consider essential for the County and other defendants to address without delay. The County's position on the proposal in this correspondence will assist in our presenting those issues and a procedure for addressing them.

We request that the County consider our proposals regarding (1) class certification and (2) the use of neutral, mutually agreeable subject matter experts, and provide us with its position as soon as possible, and no later than **April 1, 2022**. Agreeing to these proposals will not only save the County substantial resources and attorneys' fees, but also support a streamlined framework for identifying and resolving deficiencies at the Jail. Doing so will benefit incarcerated people, those who work at the Jail, and the County as a whole. If the County declines our proposals, we will accelerate our efforts to move for class certification as well as ask the Court for early discovery including the opportunity to inspect the Jail with our own experts.

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 6


    We are of course available to meet and confer about these proposals.  Thank you for your attention, courtesy, and continued efforts.

                                        Sincerely,

                                        ROSEN BIEN
                                        GALVAN & GRUNFELD LLP

                            By:    *Van Swearingen*


                                        LAW OFFICE OF AARON J.
                                        FISCHER

                            By:    *Aaron J. Fischer*


                                        DLA PIPER LLP US

                            By:    *Christopher M. Young*


                                        ACLU FOUNDATION OF SAN
                                        DIEGO & IMPERIAL
                                        COUNTIES

                            By:    *Bardis Vakili*

[3875815.3]

44

# EXHIBIT J

## Van Swearingen

| | |
|---|---|
| **From:** | Van Swearingen |
| **Sent:** | Tuesday, April 5, 2022 5:05 PM |
| **To:** | Coleman, Susan E.; Gay C. Grunfeld; Priyah Kaul; Eric Monek Anderson; Aaron Fischer; Christopher Young; Isabella Neal; Oliver Kiefer; Bardis Vakili; Jonathan Markovitz |
| **Cc:** | Mehra, Terri |
| **Subject:** | RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747] |
| **Attachments:** | [Dkt 081] Second Amended Complaint for Declaratory and Injunctive Relief, 02-09-2022, 1730-01.PDF; VS-SDC Probation Dept, Re Litigation Hold, 02-17-2022, 1730-01.PDF |

Hi Susan,
Thanks for your email (and congrats on finishing the trial). Please see the below interlineated responses, and let us know whether you are available to discuss on Wednesday afternoon or Thursday.
Van

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Monday, April 4, 2022 4:39 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

[EXTERNAL MESSAGE NOTICE]

Van – circling back now that I'm done with trial.  There are several issues we should address:

1) Your class certification proposal – for the County to stipulate to certification – is rather bare.  Do you have a more detailed proposal?  (ie. specific sub-classes, etc.)

As reflected on pp. 186-192 of the attached SAC, the class would be defined as  "all adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities."  There would be a subclass of "all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and [m], and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities."  The claims and issues would be the ones identified in the SAC.  Plaintiffs' counsel for the named plaintiffs would be class counsel for the class and subclass.

2) In terms of a protective order and site inspections, we feel this should wait for the discovery period absent some compelling reason.

The extraordinarily high death rate at the jail requires remedial actions before discovery would ordinarily open.   We are preparing motions to address issues that expose incarcerated people to substantial risk of harm, including death.  Negotiating a mutually satisfactory protective order at this time will provide all parties ample time to work collaboratively, and will minimize the likelihood of a rushed process and/or a need to present disputes to the Court.

3) With regard to document retention, we should confer about the specifics of what this should include other than the obvious such as the named plaintiffs' files, for example.

We are reattaching the preservation notice letter, and look forward to discussing.

4) In response to your proposal about joint experts, we may be willing to consider this. Do you have some specific proposals? We will need to confer about this in more detail.

Let's discuss and we can thereafter put together a comprehensive plan.

5) As far as specific issues with detainees/inmates, these have all been conveyed to the appropriate persons for handling. Without attorney-client agreements or official class representation, providing you the responsive info is problematic in terms of HIPAA and privacy rights.

Understood.

I look forward to working out this issues with you.

Best,

Susan

**Susan E. Coleman | Partner**
501 West Broadway, Suite 1600 | San Diego, CA  92101
d - 619.814.5803 | t - 619.814.5800 | f - 619.814.6799
scoleman@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Coleman, Susan E.
**Sent:** Thursday, March 31, 2022 9:26 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

Van – Nice to meet you as well.  As soon as my trial is done, we can work on the protective order and site inspection issues and respond to any specific issues that have not already been addressed.

Specifically, I was looking to extend the class certification/joint expert proposals.

Susan

47

**From:** Van Swearingen [mailto:VSwearingen@rbgg.com]
**Sent:** Thursday, March 31, 2022 12:50 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul
<pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>;
Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer
<oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz
<JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>; O'Sullivan, Matthew
<Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

[EXTERNAL]

Hello Susan,

It is nice to meet you over email and we look forward to meeting you in person.  We understand that you have been tied up with other matters, but need some help with respect to any specific request you are making for more time.  As background, we have made the following requests to County since appearing.

On January 26, we sent the County a litigation hold letter, requesting County defendants to suspend any and all document purging policies with respect to all hard copy and electronically stored information.  Counsel disputed the obligation and we sent a responsive email with case law explaining defendants' preservation obligations and consequences of spoliation.

On February 23, we asked the County for expert on-site inspections in connection with their request for more time.  Counsel indicated that the County would not authorize the requested inspections despite plaintiffs giving County defendants an extra 30 days to respond to the SAC.

On March 11 and 17, we sent letters to the County about our notifications regarding urgent and/or serious issues that require prompt attention from Jail staff (e.g., an individual experiencing a medical emergency or mental health crisis, or at acute risk of suicide).

On March 15, we asked the County to respond to our proposals for class certification and joint experts by April 1.  Counsel already indicated that the County will need a few additional weeks to respond to the proposals, and we responded that we will continue our work on class certification.

On March 18, we asked the County to negotiate a protective order, and counsel responded that the County would not do so at this time.

Given the above, please let us know if you are seeking a specific extension.  As you are likely aware, our case raises urgent issues that imperil the lives of people in custody every day and we are eager to address these matters promptly.  Thank you, and best regards,
Van

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Thursday, March 31, 2022 10:55 AM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul
<pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>;
Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer
<oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz

<JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** Dunsmore et al. v County of San Diego et al

[EXTERNAL MESSAGE NOTICE]

Counsel  - as you likely saw, I filed a notice of appearance in this case and will be lead counsel.  However, I have been in trial in LA Superior Court before Judge Green since 3/07.  I hope to be done soon but in the meantime would appreciate a 30 day extension on any outstanding letters/requests.

Thanks for your cooperation,

Susan

**Susan E. Coleman | Partner**
501 West Broadway, Suite 1600 | San Diego, CA  92101
d - 619.814.5803 | t - 619.814.5800 | f - 619.814.6799
scoleman@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

49

# EXHIBIT K

50

| From: | Van Swearingen |
|---|---|
| To: | Coleman, Susan E.; Gay C. Grunfeld; Priyah Kaul; Eric Monek Anderson; Aaron Fischer; Christopher Young; Isabella Neal; Oliver Kiefer; Bardis Vakili; Jonathan Markovitz |
| Cc: | Mehra, Terri |
| Subject: | RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747] |
| Date: | Thursday, April 21, 2022 4:28:24 PM |
| Attachments: | image001.jpg |
| | Dunsmore draft protective order IWOV-DMS.FID75747.msg |
| | [Dkt 0431] Order Granting Motion to Certify Class and Denying Motion to Strike, 1-29-15, 1187-6 pleadings.PDF |
| | Parsons Class Cert Order 3-6-13.docx.pdf |
| | Gray Class Cert.pdf |
| | RE Dunsmore v. State of California et al. Case No. 20-cv-406-AJB-WVG - litigation hold letter IWOV-DMS.FID75747.msg |

Hi Susan,

Thanks for speaking earlier today.  During the call I sent you our January 26 litigation hold and March 15 class cert/joint expert letters.  This email provides additional information that you requested:

- Draft protective order (in the attached email thread)
- Class cert orders in contested litigation in Hernandez, Parsons, and Gray

I am also attaching the email thread we had with County Counsel re evidence preservation in connection with our January 26 letter.

We understand that you will:

- Review and propose any redlines to the protective order so that we can finalize
- Let us know County's position on joint experts
- Let us know County's position on class certification

Please let us know if we can provide any other information helpful to the County's decisions as to the proposals in our March 15 letter.
Van

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Wednesday, April 20, 2022 2:11 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

| [EXTERNAL MESSAGE NOTICE] |
|---|

Van - How about tomorrow between 10 – 11:30 am?  Let me know the specific time and number.  I'll see if anyone from county counsel's office wants to be on the line too.

Susan

**From:** Van Swearingen [mailto:VSwearingen@rbgg.com]
**Sent:** Wednesday, April 20, 2022 2:06 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Coleman, Susan E. <SColeman@bwslaw.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

[EXTERNAL]

Hi Susan,
Circling back to see if you are available to talk today.  If not, please let us know your availability tomorrow 9:00 - 12:30 or 3:00 – 6:00.  Thanks,
Van

**From:** Van Swearingen
**Sent:** Tuesday, April 19, 2022 6:38 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Coleman, Susan E. <SColeman@bwslaw.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

Hi Susan,
Please let us know if you are available to talk tomorrow between 10:00-1:30 or 3:30 to 6:00.  Thanks,
Van

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Thursday, April 14, 2022 3:15 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

Dear Susan,

Hope the marathon goes well. Please give us a call when you are back.

Best, Gay

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Wednesday, April 13, 2022 2:43 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

[EXTERNAL MESSAGE NOTICE]

I'll be running the Boston marathon that day.  How about Wed. 4/20?

---

**From:** Gay C. Grunfeld [mailto:GGrunfeld@rbgg.com]
**Sent:** Wednesday, April 13, 2022 2:26 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

[EXTERNAL]

Dear Susan,

Van is on vacation this week.  Could we talk on Monday, April 18 at 11 a.m. or

53

2:30 p.m.? If one of those times/dates work for you, I can circulate a Zoom.

Thanks and warm regards, Gay

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, April 12, 2022 10:39 AM
**To:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

> [EXTERNAL MESSAGE NOTICE]

Van – would you like to talk Wed. or Thursday?  Happy to discuss these issues anytime.

Best,

Susan

---

**From:** Van Swearingen [mailto:VSwearingen@rbgg.com]
**Sent:** Tuesday, April 5, 2022 5:05 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

**[EXTERNAL]**

---

Hi Susan,

Thanks for your email (and congrats on finishing the trial). Please see the below interlineated responses, and let us know whether you are available to discuss on Wednesday afternoon or Thursday.
Van

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Monday, April 4, 2022 4:39 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

[EXTERNAL MESSAGE NOTICE]

Van – circling back now that I'm done with trial.  There are several issues we should address:

1. Your class certification proposal – for the County to stipulate to certification – is rather bare.  Do you have a more detailed proposal?  (ie. specific sub-classes, etc.)

As reflected in pp. 186-192 of the attached SAC, the class would be defined as  "all adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities."  There would be a subclass of "all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and [m], and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities."  The claims and issues would be the ones identified in the SAC.  Plaintiffs' counsel for the named plaintiffs would be class counsel for the class and subclass.

2. In terms of a protective order and site inspections, we feel this should wait for the discovery period absent some compelling reason.

The extraordinarily high death rate at the jail requires remedial actions before discovery would ordinarily open.   We are preparing motions to address issues that expose incarcerated people to substantial risk of harm, including death. Negotiating a mutually satisfactory protective order at this time will provide all parties ample time to work collaboratively, and will minimize the likelihood of a rushed process and/or a need to present disputes to the Court.

3. With regard to document retention, we should confer about the specifics of what this should include other than the obvious such as the named plaintiffs' files, for example.

We are reattaching the preservation notice letter, and look forward to discussing.

4. In response to your proposal about joint experts, we may be willing to consider this.  Do you have some specific proposals?  We will need to confer about this in more detail.

Let's discuss and we can thereafter put together a comprehensive plan.

5. As far as specific issues with detainees/inmates, these have all been conveyed to the

appropriate persons for handling. Without attorney-client agreements or official class
representation, providing you the responsive info is problematic in terms of HIPAA and
privacy rights.

Understood.

I look forward to working out this issues with you.

Best,

Susan

**Susan E. Coleman | Partner**
501 West Broadway, Suite 1600 | San Diego, CA  92101
d - 619.814.5803 | t - 619.814.5800 | f - 619.814.6799
scoleman@bwslaw.com | vCard | bwslaw.com



The information contained in this e-mail message is intended only for the
CONFIDENTIAL use of the designated addressee named above. The information
transmitted is subject to the attorney-client privilege and/or represents confidential
attorney work product. Recipients should not file copies of this email with publicly
accessible records. If you are not the designated addressee named above or the
authorized agent responsible for delivering it to the designated addressee, you
received this document through inadvertent error and any further review,
dissemination, distribution or copying of this communication by you or anyone else is
strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE
NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT
800.333.4297. Thank you.

---

**From:** Coleman, Susan E.
**Sent:** Thursday, March 31, 2022 9:26 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah
Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer
<ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal
<isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili
<BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>;
O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

Van – Nice to meet you as well.  As soon as my trial is done, we can work on the protective order and
site inspection issues and respond to any specific issues that have not already been addressed.

Specifically, I was looking to extend the class certification/joint expert proposals.

Susan

**From:** Van Swearingen [mailto:VSwearingen@rbgg.com]
**Sent:** Thursday, March 31, 2022 12:50 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

[EXTERNAL]

Hello Susan,

It is nice to meet you over email and we look forward to meeting you in person. We understand that you have been tied up with other matters, but need some help with respect to any specific request you are making for more time. As background, we have made the following requests to County since appearing.

On January 26, we sent the County a litigation hold letter, requesting County defendants to suspend any and all document purging policies with respect to all hard copy and electronically stored information. Counsel disputed the obligation and we sent a responsive email with case law explaining defendants' preservation obligations and consequences of spoliation.

On February 23, we asked the County for expert on-site inspections in connection with their request for more time. Counsel indicated that the County would not authorize the requested inspections despite plaintiffs giving County defendants an extra 30 days to respond to the SAC.

On March 11 and 17, we sent letters to the County about our notifications regarding urgent and/or serious issues that require prompt attention from Jail staff (e.g., an individual experiencing a medical emergency or mental health crisis, or at acute risk of suicide).

On March 15, we asked the County to respond to our proposals for class certification and joint experts by April 1. Counsel already indicated that the County will need a few additional weeks to respond to the proposals, and we responded that we will continue our work on class certification.

On March 18, we asked the County to negotiate a protective order, and counsel responded that the County would not do so at this time.

Given the above, please let us know if you are seeking a specific extension. As you are likely aware,

our case raises urgent issues that imperil the lives of people in custody every day and we are eager
to address these matters promptly.  Thank you, and best regards,
Van

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Thursday, March 31, 2022 10:55 AM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah
Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer
<ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal
<isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili
<BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>;
O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** Dunsmore et al. v County of San Diego et al

[EXTERNAL MESSAGE NOTICE]

Counsel  - as you likely saw, I filed a notice of appearance in this case and will be lead counsel.
However, I have been in trial in LA Superior Court before Judge Green since 3/07.  I hope to be done
soon but in the meantime would appreciate a 30 day extension on any outstanding letters/requests.

Thanks for your cooperation,

Susan

**Susan E. Coleman | Partner**
501 West Broadway, Suite 1600 | San Diego, CA  92101
d - 619.814.5803 | t - 619.814.5800 | f - 619.814.6799
scoleman@bwslaw.com | vCard | bwslaw.com



The information contained in this e-mail message is intended only for the
CONFIDENTIAL use of the designated addressee named above. The information
transmitted is subject to the attorney-client privilege and/or represents confidential
attorney work product. Recipients should not file copies of this email with publicly
accessible records. If you are not the designated addressee named above or the
authorized agent responsible for delivering it to the designated addressee, you
received this document through inadvertent error and any further review,
dissemination, distribution or copying of this communication by you or anyone else is
strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE
NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT
800.333.4297. Thank you.

# EXHIBIT L



## San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
### *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☐ SDCJ    ☒ GBDF    ☐ EMRF    ☐ LCDRF    ☐ SBDF    ☐ VDF    ☐ FAC8

From: Norwood, Christopher          21122487          4/A - 111
De:   Name (Last, First, Middle)          Booking Number      Housing Unit
      *Nombre (Apellido, Primero, Segundo)*   *Número de ficha*   *Unidad de alojamiento*

Grievance is about: ☒ Jail Procedures  ☒ Jail Conditions  ☒ Medical  ☐ PREA  ☒ Other  MENTAL HEALTH
*La queja es acerca:*  *Procedimientos de*  *Condiciones de*  *Médico*          *Otro*    CARE
                      *la Cárcel*          *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:*  Feb 2021 - present

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

The medical care at the jail is inadequate and places me and all prisoners
at a substantial risk of serious harm. The jail's dangerous policies and practices
include, but are not limited to, an insufficient number of medical and custody staff
available to assist with care, an inadequate system for prisoners to request care,
delays in providing timely access to care, inadequate identification of and
provision of care to prisoners with chronic illness, failures to timely refer
prisoners to outside providers, failure to continue medications for prisoners
who were taking taking medications before being arrested, (OVER)

_____          9/22/21
Inmate Signature / *Firma de Preso*          Date /*Fecha*

---

THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: _____  _____  9/23/21  1300
            Signature of receiving staff member   ARJIS #   Date    Time

Entered in JIMS: Tech Care  9/24/21
                Date       Time          JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐   The inmate's health or safety is unfairly impacted by a condition of confinement
☐   A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
  ☐   It is an appeal of discipline—JIMS Incident # _____  JIMS Appeal Hearing # _____
  ☐   It is a complaint against staff—JIMS Incident # _____  (Refer to Detentions P&P Section N.1)
  ☐   It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:
_____
_____

inadequate training and oversight of medical staff, inadequate withdrawal procedures, inadequate maintenance of medical records, and inadequate medication administration.

For example, I have been addicted to heroin for approximately 15 years. I have entered the jail several times while withdrawing from opiates. The jail's opiate withdrawal protocol is inadequate. The jail only offered me vistiril which did not prevent me from suffering from nausea, diarrhea, vomiting, and backaches while withdrawing. Nurses only provide medication while I am in withdrawal, but never ask about my physical and mental condition. I have never received addiction counseling or any substance abuse education while in withdrawal at the jail. The jail also has not provided suboxone to me even though I had a prescription for it in the community, and need it because I suffer from heroin addiction.

I overdosed on fentanyl at the jail in July and my ribs were broken when staff did chest compressions to revive me. Medical staff has provided me a brace but the pain has been unbearable. I had to go man down at one point because I could not handle the pain. It was uncomfortable to sleep and it took me a few minutes just to sit up. The pain medication I was receiving — extra strength aspirin and Motrin — is inadequate. Please provide adequate pain medication or otherwise address my pain issues.

Please fix all of the problems I listed above so that I am no longer at a substantial risk of harm.

The mental health care system at the Jail places me and all inmates with mental illness at a substantial risk of serious harm. The dangerous policies and practices that place me and all inmates at risk include, but are not limited to, inadequate policies and practices for identifying, treating, tracking and supervising inmates with mental illness, inadequate suicide prevention measures, substantial delays in providing appropriate medication, inadequate monitoring and evaluation of inmates receiving psychotropic medication, inadequate staffing, inadequate oversight of mental health

(NEXT PAGE)

staff, and inadequate maintenance of mental health care records.

For example, I have depression and anxiety. I put in a sick call request to see a mental health clinician before my July overdose, but did not see someone until three weeks later — after my overdose. I have only had short videoconference appointments with a psychologist who prescribes medication, and a mental health clinician comes by my cell to check on me briefly. I have not received therapy for my mental health and addiction issues despite asking. Over a month ago, I was told I was scheduled to see the addiction specialist, but I have not heard anything since and have not seen that specialist.

Please fix all of the problems listed above so that I am no longer at a substantial risk of serious harm.

There are still other conditions at the jail that place my and other prisoners' safety and survival at risk, including but not limited to: insufficient staff to safely monitor all prisoners, insufficient welfare checks, overuse of isolation cells, overcrowded facilities that make it impossible to safely house all prisoners, and inadequate training of officers.

For example, when I was booked to jail in Feb 2021, I told deputies that I could not be housed or out of cell with two individuals who are my enemies. Still, deputies left my cell door unlocked at the same time my enemies were in the dayroom, and I had to shut the cell door myself. When I was transferred to George Bailey, I was placed in protective custody, which only has reduced program opportunities. It is now not safe for me to go back to general population. All I wanted was protection from those two individuals, I want full access to program opportunities.

Please fix the conditions listed above so that I am no longer at a substantial risk of harm.

NORWOOD, CHRISTOPHER SCOTT  100113045 (21122487)

# EXHIBIT M



## San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
### *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☒ SDCJ     ☐ GBDF     ☐ EMRF     ☐ LCDRF     ☐ SBDF     ☐ VDF     ☐ FAC8

**From:** Zuniga Vega, Gustavo A.          211065940          26-4
*De:*     Name (Last, First, Middle)          Booking Number          Housing Unit
          *Nombre (Apellido, Primero, Segundo)*     *Número de ficha*     *Unidad de alojamiento*

**Grievance is about:**  ☒ Jail Procedures  ☐ Jail Conditions  ☐ Medical  ☐ PREA  ☐ Other _____
*La queja es acerca:*    *Procedimientos de*  *Condiciones de*   *Médico*            *Otro*
                         *la Cárcel*          *la Cárcel*

**Date and Time of Incident / *Fecha y hora del incidente:*** 3-12-22   13:00

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

At approx 13:00 on 3/12/22 I heard a physical altercation
taking place in cell 5 of B-Mod on the 7th floor of SDCJ. I
Pressed the button on my call box to notify the deputies of the
altercation and never recieved any acknowledgement. Inmate Baker
ended up dying from the injuries he recieved in the altercation
that the call box monitor ignored.
I am grieving the fact that the call Box is not being answered.

_____          3-12-22
**Inmate Signature / *Firma de Preso***          Date / *Fecha*

---

**THIS BOX IS FOR OFFICIAL USE ONLY**
*Esta caja es para el uso oficial solamente.*

**Received by:** GAona          0433          3/14/22          0841
              Signature of receiving staff member     ARJIS #     Date     Time

**Entered in JIMS:** _____     _____          _____
                     Date          Time          JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
  ☐ The inmate's health or safety is unfairly impacted by a condition of confinement
  ☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
  ☐ It is an appeal of discipline—JIMS Incident # _____     JIMS Appeal Hearing # _____
  ☐ It is a complaint against staff—JIMS Incident # _____     (Refer to Detentions P&P Section N.1)
  ☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
**Response to Inmate Request:**

---

## INSTRUCTIONS FOR THE USE OF THIS FORM

### GRIEVANCES

A written grievance can be submitted in one of two ways. You may place your grievance in the locked grievance box located in your housing module. In this case, you will receive the second page of the form within a couple of days, signed by a staff member. Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in. The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form. The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance. Be sure to keep this copy, because it is your receipt for your grievance. Your grievance will be answered within seven (7) days of the time you submit it to a staff member. Each time you appeal your grievance to a higher level of command, there will be another ten day response time. If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A.  When you believe a condition exists that constitutes a health or safety hazard.
B.  Unfair or unequal treatment of inmates by staff.
C.  Denial of privileges or rights.
D.  Disciplinary action imposed.
E.  PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

### QUEJAS

Una queja hecha por escrito, puede ser sometida de una o dos maneras. Puede poner su queja en la caja con candado que está en su unidad de alojamiento. En este caso, recibirá la segunda página del formulario dentro de un par de dias, firmada por un miembro de personal. O puede darle su queja a un oficiál u otro miembro de personal, siempre y cuando esté usted en un lugar permitido. El oficiál o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma. La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja. Asegurese de quedarse con la copia, porque es su recibo de su queja. Su queja será contestada dentro de siete (7) dias de cuando fue recibida por el miembro de personal. Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) dias de espera. Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A.  Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B.  Trato injusto o desigual a los presos por los empleados de la cárcel.
C.  El negar privilegios o derechos.
D.  Acción disciplinaria impuesta.
E.  PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK

65



# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☑ SDCJ    ☐ GBDF    ☐ EMRF    ☐ LCDRF    ☐ SBDF    ☐ VDF    ☐ FAC8

**From:** Sepulveda Gustavo Ariel          2106540          7B-6
**De:**   Name (Last, First, Middle)        Booking Number   Housing Unit
          *Nombre (Apellido, Primero, Segundo)*   *Número de ficha*   *Unidad de alojamiento*

Grievance is about:   ☑ Jail Procedures   ☐ Jail Conditions   ☐ Medical   ☐ PREA   ☐ Other
*La queja es acerca:*   *Procedimientos de*   *Condiciones de*   *Médico*              *Otro*
                        *la Cárcel*          *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* 5-23-2022  approx 9:20 am

Describe the reason for your grievance in your own words. Please be specific.  (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras.  Por favor sea específico. (Use hojas adicionales si es necesario)*

At approx 9:20 am on 5-23-2022 I heard the sounds of a physical altercation an a panicked voice screaming "Stop, Stop, why are you hitting me?" coming from cell #4 in B-Mod on the 7th floor of SDCJ. I immediately pushe the call button in my cell to try and get help for the person being attacked in cell #4 (Rudolph Gutierrez, BN 23720104). My calls for help through the intercom were never answered. Gutierrez also pushed his intercom button for help, to no avail. I am grieving the fact that calls for help placed on the in-cell intercom system are routinely going unanswered, just like in the Derek Baker incident a few months ago.

_____          5-23-2022
**Inmate Signature /** *Firma de Preso*          Date / *Fecha*

### THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

**Received by:** RT                          5/6/13    5/24/22  0730
                 Signature of receiving staff member   ARJIS #   Date      Time

**Entered in JIMS:** _____  _____  _____
                     Date              Time              JIMS Grievance Number

If one of the following **two** conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐ The inmate's health or safety is unfairly impacted by a condition of confinement
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
  ☐ It is an appeal of discipline—JIMS Incident # _____  JIMS Appeal Hearing # _____
  ☐ It is a complaint against staff—JIMS Incident # _____  (Refer to Detentions P&P Section N.1)
  ☐ It is an inmate request—respond in writing below.  (No entry in JIMS, copy of response to booking jacket)
**Response to Inmate Request:**

J-22 (Rev 1/15)    **Original goes to booking jacket**    **Copy goes to inmate after being signed by staff member**

## INSTRUCTIONS FOR THE USE OF THIS FORM

GRIEVANCES

A written grievance can be submitted in one of two ways. You may place your grievance in the locked grievance box located in your housing module. In this case, you will receive the second page of the form within a couple of days, signed by a staff member. Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in. The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form. The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance. Be sure to keep this copy, because it is your receipt for your grievance. Your grievance will be answered within seven (7) days of the time you submit it to a staff member. Each time you appeal your grievance to a higher level of command, there will be another ten day response time. If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A. When you believe a condition exists that constitutes a health or safety hazard.
B. Unfair or unequal treatment of inmates by staff.
C. Denial of privileges or rights.
D. Disciplinary action imposed.
E. PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

QUEJAS

Una queja hecha por escrito, puede ser sometida de una o dos maneras. Puede poner su queja en la caja con candado que está en su unidad de alojamiento. En este caso, recibirá la segunda página del formulario dentro de un par de días, firmada por un miembro de personal. O puede darle su queja a un oficiál u otro miembro de personal, siempre y cuando esté usted en un lugar permitido. El oficiál o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma. La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja. Asegurese de quedarse con la copia, porque es su recibo de su queja. Su queja será contestada dentro de siete (7) días de cuando fue recibida por el miembro de personal. Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) dias de espera. Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A. Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B. Trato injusto o desigual a los presos por los empleados de la cárcel.
C. El negar privilegios o derechos.
D. Acción disciplinaria impuesta.
E. PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK

# EXHIBIT N



# San Diego County
# SHERIFF'S DEPARTMENT

*PAGES 1 OF 8*

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☒ SDCJ   ☐ GBDF   ☐ EMRF   ☐ LCDRF   ☐ SBDF   ☐ VDF   ☐ FAC8

From: <u>ARCHULETA, ERNEST</u>   <u>19741878</u>   <u>7B-08</u>
*De:*   Name (Last, First, Middle)   Booking Number   Housing Unit
   *Nombre (Apellido, Primero, Segundo)*   *Número de ficha*   *Unidad de alojamiento*

Grievance is about: ☒ Jail Procedures   ☒ Jail Conditions   ☐ Medical   ☐ PREA   ☒ Other <u>MENTAL HEALTH</u> "ADA"
*La queja es acerca:*   *Procedimientos de*   *Condiciones de*   *Médico*   *Otro* <u>DENTAL</u>
   *la Cárcel*   *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:*   <u>ON GOING</u>

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

THE CONDITIONS IN THIS JAIL PLACE ME AND OTHER PRISONERS WITH DISABILITIES AT
A SUBSTANTIAL RISK OF HARM. THE DANGEROUS POLICIES AND PRACTICES THAT
PLACE ME AND OTHER PRISONERS AT A SUBSTANTIAL RISK OF SERIOUS HARM INCLUDE,
BUT ARE NOT LIMITED TO, INSUFFICIENT CUSTODY STAFF TO HELP ASSIST PEOPLE
WITH DISABILITIES, INADEQUATE SUPERVISION OF INDIVIDUALS DISABILITY-
RELATED NEEDS, AN INADEQUATE SYSTEM TO TRACK INDIVIDUALS DISABILITIES
AND THEIR NECESSARY ACCOMMODATIONS, AN INADEQUATE SYSTEM FOR PRISONERS
TO GRIEVE ADA ISSUES, INADEQUATE STAFFING, SCREENING, AND INTAKE PROCEDURES.

<u>Ernest Archuleta</u>   <u>12-15-2021 ONGOING ( CONT. PAGE 2)</u>
Inmate Signature / *Firma de Preso*   Date / *Fecha*

---

### THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: <u>J. FRANCIS</u>   <u>0457</u>   <u>12/18/21</u>   <u>0240</u>
   Signature of receiving staff member   ARJIS #   Date   Time

Entered in JIMS: <u>12/18/21</u>   <u>0245</u>   <u>214001452</u>
   Date   Time   JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
   ☐ The inmate's health or safety is unfairly impacted by a condition of confinement
   ☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
   ☐ It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
   ☐ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
   ☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request: <u>FORWARDED TO MEDICAL</u>

---

J-22 (Rev 1/15)   **Original goes to booking jacket**   **Copy goes to inmate after being signed by staff member**

## INSTRUCTIONS FOR THE USE OF THIS FORM

GRIEVANCES

A written grievance can be submitted in one of two ways. You may place your grievance in the locked grievance box located in your housing module. In this case, you will receive the second page of the form within a couple of days, signed by a staff member. Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in. The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form. The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance. Be sure to keep this copy, because it is your receipt for your grievance. Your grievance will be answered within seven (7) days of the time you submit it to a staff member. Each time you appeal your grievance to a higher level of command, there will be another ten day response time. If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A. When you believe a condition exists that constitutes a health or safety hazard.
B. Unfair or unequal treatment of inmates by staff.
C. Denial of privileges or rights.
D. Disciplinary action imposed.
E. PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

QUEJAS

Una queja hecha por escrito, puede ser sometida de una o dos maneras. Puede poner su queja en la caja con candado que está en su unidad de alojamiento. En este caso, recibirá la segunda página del formulario dentro de un par de dias, firmada por un miembro de personal. O puede darle su queja a un oficial u otro miembro de personal, siempre y cuando esté usted en un lugar permitido. El oficial o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma. La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja. Asegúrese de quedarse con la copia, porque es su recibo de su queja. Su queja será contestada dentro de siete (7) dias de cuando fue recibida por el miembro de personal. Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) dias de espera. Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A. Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B. Trato injusto o desigual a los presos por los empleados de la cárcel.
C. El negar privilegios o derechos.
D. Acción disciplinaria impuesta.
E. PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK



*PAGES 2 OF 8*

# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☒ SDCJ   ☐ GBDF   ☐ EMRF   ☐ LCDRF   ☐ SBDF   ☐ VDF   ☐ FAC8

From: _See Page 1_
*De:*    Name (Last, First, Middle)          Booking Number          Housing Unit
         *Nombre (Apellido, Primero, Segundo)*    *Número de ficha*        *Unidad de alojamiento*
                                                                           "ADA"

Grievance is about:  ☒ Jail Procedures  ☒ Jail Conditions  ☐ Medical    ☐ PREA  ☒ Other _Mental Health_
*La queja es acerca:*  *Procedimientos de*  *Condiciones de*  *Médico*           *Otro* _Dental_
                       *la Cárcel*          *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* _ON-GOING_

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

INACCESSIBLE SPACES FOR PROGRAMS, INSUFFICIENT MEDICAL AND CUSTODY STAFF TRAINING ON HOW TO INTERACT WITH PEOPLE WHO HAVE DISABILITIES, INSUFFICIENT SUPPLY OF ADA-ACCESSIBLE ACCOMMODATIONS (SUCH AS VP TABLETS FUNCTIONING TELECOMMUNICATION DEVICES FOR THE DEAF ("TDD") PHONES, CONFIDENTIAL ROOMS FOR ATTORNEY AND FAMILY PHONE CALLS ETC.). THE MEDICAL CARE AT THE JAIL IS INADEQUATE AND PLACES ME AND ALL PRISONERS AT A SUBSTANTIAL RISK OF SERIOUS HARM. THE JAIL'S DANGEROUS POLICIES AND PRACTICES INCLUDE, BUT ARE NOT LIMITED TO, AN INSUFFICIENT NUMBER OF MEDICAL AND CUSTODY STAFF

ON-GOING    (CONT. PAGE 3)

_____
Inmate Signature / *Firma de Preso*          Date / *Fecha*

---

### THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: _J. FRANCIS_   _C457_   _12/18/21_   _0240_
             Signature of receiving staff member   ARJIS#   Date   Time

Entered in JIMS: _12/18_   _0245_   _214001452_
                 Date      Time    JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐ The inmate's health or safety is unfairly impacted by a condition of confinement.
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance.
   ☐ It is an appeal of discipline—JIMS Incident # _____  JIMS Appeal Hearing # _____
   ☐ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
   ☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:

---

# INSTRUCTIONS FOR THE USE OF THIS FORM

GRIEVANCES

A written grievance can be submitted in one of two ways.  You may place your grievance in the locked grievance box located in your housing module.  In this case, you will receive the second page of the form within a couple of days, signed by a staff member.  Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in.  The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form. The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance.  Be sure to keep this copy, because it is your receipt for your grievance.  Your grievance will be answered within seven (7) days of the time you submit it to a staff member.  Each time you appeal your grievance to a higher level of command, there will be another ten day response time.  If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A. When you believe a condition exists that constitutes a health or safety hazard.
B. Unfair or unequal treatment of inmates by staff.
C. Denial of privileges or rights.
D. Disciplinary action imposed.
E. PREA (Prison Rape Elimination Act.)

# INSTRUCCIONES PARA EL USO DE ESTA FORMA

QUEJAS

Una queja hecha por escrito, puede ser sometida de una o dos maneras.  Puede poner su queja en la caja con candado que está en su unidad de alojamiento.  En este caso, recibirá la segunda página del formulario dentro de un par de días, firmada por un miembro de personal.  O puede darle su queja a un oficial u otro miembro de personal,  siempre y cuando esté usted en un lugar permitido.  El oficial o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma.  La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja.  Asegúrese de quedarse con la copia, porque es su recibo de su queja.  Su queja será contestada dentro de siete (7) días de cuando fue recibida por el miembro de personal.  Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) dias de espera.  Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A. Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B. Trato injusto o desigual a los presos por los empleados de la cárcel.
C. El negar privilegios o derechos.
D. Acción disciplinaria impuesta.
E. PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK



PAGES 3 OF 8

# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☐ SDCJ   ☑ GBDF   ☐ EMRF   ☐ LCDRF   ☐ SBDF   ☐ VDF   ☐ FAC8

From: *SEE PAGE 1*

*De:*   Name (Last, First, Middle)        Booking Number       Housing Unit
        *Nombre (Apellido, Primero, Segundo)*   *Número de ficha*   Unidad de alojamiento
                                                                    *ADA*

Grievance is about: ☑ Jail Procedures  ☑ Jail Conditions  ☐ Medical  ☐ PREA  ☑ Other *MENTAL HEALTH*
*La queja es acerca:*  *Procedimientos de*  *Condiciones de*  *Médico*          *Otro DENTAL*
                        *la Cárcel*          *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:*   *ON GOING*

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

*AVAILABLE TO ASSIST WITH CARE, AN INADEQUATE SYSTEM FOR PRISONERS TO REQUEST*
*CARE, DELAYS IN PROVIDING TIMELY ACCESS TO CARE, INADEQUATE IDENTIFICATION*
*OF AND PROVISION OF CARE TO PRISONERS WITH CHRONIC ILLNESS, FAILURES TO*
*TIMELY REFER PRISONERS TO OUTSIDE PROVIDERS, FAILURE TO CONTINUE MEDICA-*
*TIONS FOR PRISONERS WHO WERE TAKING MEDICATIONS BEFORE BEING ARRESTED,*
*INADEQUATE STAFFING, TRAINING AND OVERSIGHT OF MEDICAL STAFF, INADEQUATE*
*WITHDRAWAL PROCEDURES, INADEQUATE MAINTENANCE OF RECORDS, AND*
*INADEQUATE MEDICATION ADMINISTRATION.*

*ON-GOING    ( CONT. PAGE 4 ).*

Inmate Signature / *Firma de Preso*        Date / *Fecha*

### THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: *J. FRANCIS*        *C6897*  *12/18/21*  *0240*
            Signature of receiving staff member   ARJIS #   Date   Time

Entered in JIMS: *12/18/21*  *0248*  *2140001452*
                 Date        Time     JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐ The inmate's health or safety is unfairly impacted by a condition of confinement.
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance.
☐ It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
☐ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:

J-22 (Rev 1/15)   **Original goes to booking jacket**   **Copy goes to inmate after being signed by staff member**

## INSTRUCTIONS FOR THE USE OF THIS FORM

GRIEVANCES

A written grievance can be submitted in one of two ways.  You may place your grievance in the locked grievance box located in your housing module.  In this case, you will receive the second page of the form within a couple of days, signed by a staff member.  Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in.  The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form.  The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance.  Be sure to keep this copy, because it is your receipt for your grievance.  Your grievance will be answered within seven (7) days of the time you submit it to a staff member.  Each time you appeal your grievance to a higher level of command, there will be another ten day response time.  If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A.  When you believe a condition exists that constitutes a health or safety hazard.
B.  Unfair or unequal treatment of inmates by staff.
C.  Denial of privileges or rights.
D.  Disciplinary action imposed.
E.  PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

QUEJAS

Una queja hecha por escrito, puede ser sometida de una o dos maneras.  Puede poner su queja en la caja con candado que está en su unidad de alojamiento.  En este caso, recibirá la segunda página del formulario dentro de un par de dias, firmada por un miembro de personal.  O puede darle su queja a un oficial u otro miembro de personal, siempre y cuando esté usted en un lugar permitido.  El oficial o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma.  La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja.  Asegurese de quedarse con la copia, porque es su recibo de su queja.  Su queja será contestada dentro de siete (7) dias de cuando fue recibida por el miembro de personal.  Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) dias de espera.  Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A.  Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B.  Trato injusto o desigual a los presos por los empleados de la cárcel.
C.  El negar privilegios o derechos.
D.  Acción disciplinaria impuesta.
E.  PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK



# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

*PAGES 4 OF 8*

☒ **SDCJ**    ☐ **GBDF**    ☐ **EMRF**    ☐ **LCDRF**    ☐ **SBDF**    ☐ **VDF**    ☐ **FAC8**

**From:** _SEE PAGE 1_
*De:*    Name (Last, First, Middle)                     Booking Number            Housing Unit
         *Nombre (Apellido, Primero, Segundo)*          *Número de ficha*         *Unidad de alojamiento*

Grievance is about:   ☒ Jail Procedures   ☒ Jail Conditions   ☐ Medical   ☐ PREA   ☐ Other *MENTAL HEALTH*
*La queja es acerca:*  *Procedimientos de*   *Condiciones de*    *Médico*              *Otro* *DENTAL*
                       *la Cárcel*          *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* __ON-GOING__

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea especifico. (Use hojas adicionales si es necesario)*

_The Mental Health Care System at the Jail places me and all inmates_
_with Mental Illness at a substantial risk of serious harm. The dangerous_
_policies and practices that place me and all inmates at risk include, but_
_are not limited to, inadequate policies and practices for identifying,_
_treating, tracking, and tracking and supervising inmates with Mental_
_illness, inadequate suicide prevention measures, substantial delays_
_in providing appropriate medication, inadequate monitoring an_
_evaluation of inmates receiving psychotropic medication,_

_ON-GOING_     ( CONT. PAGE 5 )

_____        _____
**Inmate Signature / *Firma de Preso***        **Date / *Fecha***

---

### THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

**Received by:** _J. FRANCIS_     _C457_  _12/18/21_  _C240_
              Signature of receiving staff member    ARJIS #    Date    Time

**Entered in JIMS:** _12/18/21_  _C245_   _214001452_
                  Date      Time       JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐  The inmate's health or safety is unfairly impacted by a condition of confinement
☐  A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐  This submission is not a grievance:
   ☐  It is an appeal of discipline—JIMS Incident # _____  JIMS Appeal Hearing # _____
   ☐  It is a complaint against staff—JIMS Incident # _____  (Refer to Detentions P&P Section N.1)
   ☐  It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:

---

J-22 (Rev 1/15)    **Original goes to booking jacket**    **Copy goes to inmate after being signed by staff member**

## INSTRUCTIONS FOR THE USE OF THIS FORM

<u>GRIEVANCES</u>

A written grievance can be submitted in one of two ways. You may place your grievance in the locked grievance box located in your housing module. In this case, you will receive the second page of the form within a couple of days, signed by a staff member. Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in. The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form. The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance. Be sure to keep this copy, because it is your receipt for your grievance. Your grievance will be answered within seven (7) days of the time you submit it to a staff member. Each time you appeal your grievance to a higher level of command, there will be another ten day response time. If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A. When you believe a condition exists that constitutes a health or safety hazard.
B. Unfair or unequal treatment of inmates by staff.
C. Denial of privileges or rights.
D. Disciplinary action imposed.
E. PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

<u>QUEJAS</u>

Una queja hecha por escrito, puede ser sometida de una o dos maneras. Puede poner su queja en la caja con candado que está en su unidad de alojamiento. En este caso, recibirá la segunda página del formulario dentro de un par de días, firmada por un miembro de personal. O puede darle su queja a un oficial u otro miembro de personal, siempre y cuando esté usted en un lugar permitido. El oficial o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma. La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja. Asegurese de quedarse con la copia, porque es su recibo de su queja. Su queja será contestada dentro de siete (7) días de cuando fue recibida por el miembro de personal. Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) días de espera. Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A. Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B. Trato injusto o desigual a los presos por los empleados de la cárcel.
C. El negar privilegios o derechos.
D. Acción disciplinaria impuesta.
E. PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK

*PAGES 5 OF 8*



# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☒ SDCJ   ☐ GBDF   ☐ EMRF   ☐ LCDRF   ☐ SBDF   ☐ VDF   ☐ FAC8

From: *SEE PAGE 1*
De:   Name (Last, First, Middle)            Booking Number        Housing Unit
      *Nombre (Apellido, Primero, Segundo)*   *Número de ficha*     *Unidad de alojamiento*

Grievance is about:   ☒ Jail Procedures   ☒ Jail Conditions   ☐ Medical   ☐ PREA   ☐ Other *ADA MENTAL HEALTH*
*La queja es acerca:*   *Procedimientos de*   *Condiciones de*   *Médico*        *Otro* *DENTAL*
                        *la Cárcel*           *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* *ON-GOING*

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

*INADEQUATE STAFFING, INADEQUATE TRAINING AND OVERSIGHT OF MENTAL HEALTH STAFF, AND INADEQUATE MAINTENANCE OF MENTAL HEALTH CARE RECORDS. THE DENTAL CARE AT THE JAIL IS INADEQUATE AND PLACES ME AND ALL PRISONERS AT A SUBSTANTIAL RISK OF SERIOUS HARM. THE JAIL'S DANGEROUS POLICIES AND PRACTICES INCLUDE, BUT ARE NOT LIMITED TO, INADEQUATE POLICIES AND PRACTICES FOR IDENTIFYING, TREATING, AND TRACKING PRISONERS IN NEED OF DENTAL CARE; AN INADEQUATE SYSTEM FOR PRISONERS TO REQUEST DENTAL CARE; DELAYS IN PROVIDING TIMELY ACCESS TO DENTAL CARE;*

*ON-GOING    ( CONT. PAGE 6)*

Inmate Signature / *Firma de Preso*            Date / *Fecha*

---

### THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: *J. FRANCIS*        *0457*    *12/18*    *0510*
             Signature of receiving staff member   ARJIS #    Date    Time

Entered in JIMS: *12/18*   *0245*   *214001152*
                 Date      Time     JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐   The inmate's health or safety is unfairly impacted by a condition of confinement
☐   A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
   ☐   It is an appeal of discipline—JIMS Incident # _____   JIMS Appeal Hearing # _____
   ☐   It is a complaint against staff—JIMS Incident # _____   (Refer to Detentions P&P Section N.1)
   ☐   It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:

---

## INSTRUCTIONS FOR THE USE OF THIS FORM

GRIEVANCES

A written grievance can be submitted in one of two ways. You may place your grievance in the locked grievance box located in your housing module. In this case, you will receive the second page of the form within a couple of days, signed by a staff member. Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in. The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form. The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance. Be sure to keep this copy, because it is your receipt for your grievance. Your grievance will be answered within seven (7) days of the time you submit it to a staff member. Each time you appeal your grievance to a higher level of command, there will be another ten day response time. If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A.  When you believe a condition exists that constitutes a health or safety hazard.
B.  Unfair or unequal treatment of inmates by staff.
C.  Denial of privileges or rights.
D.  Disciplinary action imposed.
E.  PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

QUEJAS

Una queja hecha por escrito, puede ser sometida de una o dos maneras. Puede poner su queja en la caja con candado que está en su unidad de alojamiento. En este caso, recibirá la segunda página del formulario dentro de un par de días, firmada por un miembro de personal. O puede darle su queja a un oficial u otro miembro de personal, siempre y cuando esté usted en un lugar permitido. El oficial o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma. La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja. Asegúrese de quedarse con la copia, porque es su recibo de su queja. Su queja será contestada dentro de siete (7) días de cuando fue recibida por el miembro de personal. Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) días de espera. Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A.  Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B.  Trato injusto o desigual a los presos por los empleados de la cárcel.
C.  El negar privilegios o derechos.
D.  Acción disciplinaria impuesta.
E.  PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK



# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☒ SDCJ    ☐ GBDF    ☐ EMRF    ☐ LCDRF    ☐ SBDF    ☐ VDF    ☐ FAC8

From: *SEE PAGE 1*
*De:*
     Name (Last, First, Middle)        Booking Number      Housing Unit
     *Nombre (Apellido, Primero, Segundo)*    *Número de ficha*    *Unidad de alojamiento*

Grievance is about: ☒ Jail Procedures   ☒ Jail Conditions   ☐ Medical   ☐ PREA ☒ Other *ADA MENTAL HEALTH*
*La queja es acerca:*   *Procedimientos de*   *Condiciones de*   *Médico*      *Otro* *DENTAL*
     *la Cárcel*      *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:*   *ON GOING*

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

*FAILURES TO TIMELY REFER PRISONERS TO OUTSIDE PROVIDERS; FAILURES TO PROVIDE ADEQUATE TREATMENT, INCLUDING DENTAL RESTORATIVE THERE ARE STILL OTHER CONDITIONS AT THE JAIL THAT PLACE ME AND OTHER PRISONERS SAFELY AND SURVIVAL AT RISK, INCLUDING BUT NOT LIMITED TO; INSUFFICIENT STAFF TO SAFELY MONITER ALL PRISONERS, INSUFFI-CIENT WELFARE CHECKS, OVERUSE OF ISOLATION CELLS, OVERCROWDED FACILITIES THAT MAKE IT IMPOSSIBLE TO SAFELY HOUSE ALL PRISONERS, AND INADEQUATE TRAINING OF OFFICERS.*

_____    *ON-GOING*    (CONT. PAGE 7)
Inmate Signature / *Firma de Preso*       Date / *Fecha*

---

**THIS BOX IS FOR OFFICIAL USE ONLY**
*Esta caja es para el uso oficial solamente.*

Received by: *J. FRANCIS*    *C457*   *12/18*   *C24E*
     Signature of receiving staff member    ARJIS #    Date    Time

Entered in JIMS: *12/18*   *C24SS*   *214001452*
     Date      Time      JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
   ☐ The inmate's health or safety is unfairly impacted by a condition of confinement
   ☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
   ☐ It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
   ☐ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
   ☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:

---

## INSTRUCTIONS FOR THE USE OF THIS FORM

GRIEVANCES

A written grievance can be submitted in one of two ways.  You may place your grievance in the locked grievance box located in your housing module.  In this case, you will receive the second page of the form within a couple of days, signed by a staff member.  Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in.  The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form.  The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance.  Be sure to keep this copy, because it is your receipt for your grievance.  Your grievance will be answered within seven (7) days of the time you submit it to a staff member.  Each time you appeal your grievance to a higher level of command, there will be another ten day response time.  If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A.   When you believe a condition exists that constitutes a health or safety hazard.
B.   Unfair or unequal treatment of inmates by staff.
C.   Denial of privileges or rights.
D.   Disciplinary action imposed.
E.   PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

QUEJAS

Una queja hecha por escrito, puede ser sometida de una o dos maneras.  Puede poner su queja en la caja con candado que está en su unidad de alojamiento.  En este caso, recibirá la segunda página del formulario dentro de un par de días, firmada por un miembro de personal.  O puede darle su queja a un oficial u otro miembro de personal,  siempre y cuando esté usted en un lugar permitido.  El oficial o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma.  La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja.  Asegurese de quedarse con la copia, porque es su recibo de su queja.  Su queja será contestada dentro de siete (7) días de cuando fue recibida por el miembro de personal.  Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) días de espera.  Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A.   Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B.   Trato injusto o desigual a los presos por los empleados de la cárcel.
C.   El negar privilegios o derechos.
D.   Acción disciplinaria impuesta.
E.   PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK



*PAGES 7 OF 8*



# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
### *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☒ **SDCJ**    ☐ **GBDF**    ☐ **EMRF**    ☐ **LCDRF**    ☐ **SBDF**    ☐ **VDF**    ☐ **FAC8**

From: _See Page 1_
*De:*    Name (Last, First, Middle)                   Booking Number         Housing Unit
        *Nombre (Apellido, Primero, Segundo)*         *Número de ficha*      *Unidad de alojamiento*
                                                                             *ADA'S*

Grievance is about:  ☒ Jail Procedures  ☒ Jail Conditions  ☐ Medical   ☐ PREA  ☒ Other _Mental Health_
*La queja es acerca:*   *Procedimientos de*   *Condiciones de*   *Médico*          Otro _Dental_
                        *la Cárcel*          *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* _On-Going_

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

_The Jail violates my rights to counsel and to access to the courts._
_The Jail's wrongful policies and practices include, but are not limited_
_to, inadequate policies and procedures for professional visits with_
_attorneys, inadequate policies and procedures for confidential calls_
_with attorneys, inadequate policies and procedures for and interference_
_with legal mail, inadequate legal resources including access to a_
_law library and legal reference materials, improper seizure of_
_legal documents, interference with communication_

_____        _On-Going_  ( Cont. Page 8 )
Inmate Signature / *Firma de Preso*        Date / *Fecha*

---

**THIS BOX IS FOR OFFICIAL USE ONLY**
*Esta caja es para el uso oficial solamente.*

Received by: _J. Francis_        _C457_   _12/18_   _0240_
           Signature of receiving staff member   ARJIS #    Date      Time

Entered in JIMS:  _12/18_    _C245_    _2140 C1452_
                Date        Time       JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
  ☐  The inmate's health or safety is unfairly impacted by a condition of confinement.
  ☐  A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐  This submission is not a grievance.
  ☐  It is an appeal of discipline—JIMS Incident # _____  JIMS Appeal Hearing # _____
  ☐  It is a complaint against staff—JIMS Incident # _____  (Refer to Detentions P&P Section N.1)
  ☐  It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:

---

J-22 (Rev 1/15)    **Original goes to booking jacket**    **Copy goes to inmate after being signed by staff member**

81

## INSTRUCTIONS FOR THE USE OF THIS FORM

GRIEVANCES

A written grievance can be submitted in one of two ways.  You may place your grievance in the locked grievance box located in your housing module.  In this case, you will receive the second page of the form within a couple of days, signed by a staff member.  Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in.  The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form.  The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance.  Be sure to keep this copy, because it is your receipt for your grievance.  Your grievance will be answered within seven (7) days of the time you submit it to a staff member.  Each time you appeal your grievance to a higher level of command, there will be another ten day response time.  If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A.  When you believe a condition exists that constitutes a health or safety hazard.
B.  Unfair or unequal treatment of inmates by staff.
C.  Denial of privileges or rights.
D.  Disciplinary action imposed.
E.  PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

QUEJAS

Una queja hecha por escrito, puede ser sometida de una o dos maneras.  Puede poner su queja en la caja con candado que está en su unidad de alojamiento.  En este caso, recibirá la segunda página del formulario dentro de un par de dias, firmada por un miembro de personal.  O puede darle su queja a un oficial u otro miembro de personal,  siempre y cuando esté usted en un lugar permitido.  El oficial o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma.  La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja.  Asegurese de quedarse con la copia, porque es su recibo de su queja.  Su queja será contestada dentro de siete (7) dias de cuando fue recibida por el miembro de personal.  Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) dias de espera.  Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A.  Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B.  Trato injusto o desigual a los presos por los empleados de la cárcel.
C.  El negar privilegios o derechos.
D.  Acción disciplinaria impuesta.
E.  PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK



# San Diego County
# SHERIFF'S DEPARTMENT

PAGE ECF 8

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
### *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☐ SDCJ   ☐ GBDF   ☐ EMRF   ☐ LCDRF   ☐ SBDF   ☐ VDF   ☐ FAC8

From: *See Page 1*
De:   Name (Last, First, Middle)                        Booking Number        Housing Unit
      *Nombre (Apellido, Primero, Segundo)*             *Número de ficha*      *Unidad de alojamiento*
                                                                               ADA

Grievance is about:   ☒ Jail Procedures   ☒ Jail Conditions   ☐ Medical   ☐ PREA   ☒ Other Mental Health
*La queja es acerca:*  *Procedimientos de  Condiciones de*     *Médico*                    *Otro* Dental
                       *la Cárcel          la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:*   ON-GOING

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

WITH COURTS, AND FAILURES TO PROVIDE ADEQUATE ASSISTANCE AND
RESOURCES TO PRISONERS PROCEEDING PRO PER. THE JAIL ALSO FAILS TO
PROVIDE ADEQUATE COMMUNITY-BASED ALTERNATIVES TO INCARCERATION,
FAILS TO PROVIDE ADEQUATE ASSISTANCE PROGRAMS FOR PRISONER'S RE-ENTRY
INTO THE COMMUNITY, AND FAILS TO PROVIDE ADEQUATE PROGRAMS TO
PREVENT REINCARCERATION. PLEASE FIX THE CONDITIONS LISTED ABOVE
SO THAT I AM NO LONGER AT A SUBSTANTIAL RISK OF HARM.

_____          ON-GOING
Inmate Signature / *Firma de Preso*        Date / *Fecha*

---

**THIS BOX IS FOR OFFICIAL USE ONLY**
*Esta caja es para el uso oficial solamente.*

Received by:   J. FRANCIS              C457        12/18        0240
               Signature of receiving staff member   ARJIS #    Date    Time

Entered in JIMS:   2/18        0245        2110011152
                   Date        Time        JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
   ☐ The inmate's health or safety is unfairly impacted by a condition of confinement
   ☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
   ☐ It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
   ☐ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
   ☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:

_____

## INSTRUCTIONS FOR THE USE OF THIS FORM

<u>GRIEVANCES</u>

A written grievance can be submitted in one of two ways.  You may place your grievance in the locked grievance box located in your housing module.  In this case, you will receive the second page of the form within a couple of days, signed by a staff member.  Or, you can hand your grievance directly to a deputy or other staff member, as long as you are in an area that you have permission to be in.  The deputy or staff member who accepts your grievance will sign the grievance and give you back the second page of the form.  The page you receive will contain your own explanation of your grievance and the signature of the person who accepted your grievance.  Be sure to keep this copy, because it is your receipt for your grievance.  Your grievance will be answered within seven (7) days of the time you submit it to a staff member.  Each time you appeal your grievance to a higher level of command, there will be another ten day response time.  If you appeal a grievance to the level of the facility commander, his or her decision will be final.

Inmates can file a grievance for any reason or condition including, but not limited to:

A.  When you believe a condition exists that constitutes a health or safety hazard.
B.  Unfair or unequal treatment of inmates by staff.
C.  Denial of privileges or rights.
D.  Disciplinary action imposed.
E.  PREA (Prison Rape Elimination Act.)

## INSTRUCCIONES PARA EL USO DE ESTA FORMA

<u>QUEJAS</u>

Una queja hecha por escrito, puede ser sometida de una o dos maneras.  Puede poner su queja en la caja con candado que está en su unidad de alojamiento.  En este caso, recibirá la segunda página del formulario dentro de un par de días, firmada por un miembro de personal.  O puede darle su queja a un oficial u otro miembro de personal, siempre y cuando esté usted en un lugar permitido.  El oficial o miembro de personal que acepte su queja la firmará y le dará la segunda página de la forma.  La página que reciba incluirá su propia explicación de su queja firmada por la persona que recibió su queja.  Asegurese de quedarse con la copia, porque es su recibo de su queja.  Su queja será contestada dentro de siete (7) dias de cuando fue recibida por el miembro de personal.  Cada vez que apele su queja a un nivel mas alto de mandato, seran otros dies (10) dias de espera.  Si apela su queja a el nivel de comandante de la cárcel, la decisión de el o ella será final.

Presos pueden quejarse por cualquier razón o condición incluyendo, pero no limitado a:

A.  Si cree que existe una condición que puede dañar la salud o poner en peligro la vida de usted u otros presos.
B.  Trato injusto o desigual a los presos por los empleados de la cárcel.
C.  El negar privilegios o derechos.
D.  Acción disciplinaria impuesta.
E.  PREA (Prison Rape Elimination Act)

J-22 (Rev 1/15) BACK

# EXHIBIT O
# REDACTED

**San Diego County**
# SHERIFF'S DEPARTMENT

FEB 28 2022

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
*QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☒ SDCJ  ☐ GBDF  ☐ EMRF  ☐ LCDRF  ☐ SBDF  ☐ VDF  ☐ FAC8

| From: | Clark James H | 21137849 | 8-C |
|---|---|---|---|
| *De:* | Name (Last, First, Middle) | Booking Number | Housing Unit |
| | *Nombre (Apellido, Primero, Segundo)* | *Número de ficha* | *Unidad de alojamiento* |

Grievance is about:  ☐ Jail Procedures  ☐ Jail Conditions  ☒ Medical  ☐ PREA  ☐ Other
*La queja es acerca:*  *Procedimientos de*  *Condiciones de*  *Médico*  *Otro*
*la Cárcel*  *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* ON 2-22-22

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

I'm a a.d.a , diabetic inmate In need of Medical
services, I inmate clark continue to put IN Medical
requests for my ████████████ since october 2021
all I got is request stating I'm scheduled for
sick call. I put IN sick call request for my
T3, T4 panel blood check, and to check my A+C
No response on that request I have 10 sick
call requests stating scheduled for sick call. R.N.

Inmate Signature / *Firma de Preso*          2-24-22
                                              Date / *Fecha*

---

**THIS BOX IS FOR OFFICIAL USE ONLY**
*Esta caja es para el uso oficial solamente.*

| Received by: | AM | 5051 | 02/24/22 | 2256 |
|---|---|---|---|---|
| | Signature of receiving staff member | ARJIS # | Date | Time |

Entered in JIMS: _____ _____ _____
                        Date            Time            JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☒ The inmate's health or safety is unfairly impacted by a condition of confinement
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☒ This submission is not a grievance:
☐ It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
☒ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request: GIVEN TO MEDICAL Both drams are done
on weds. please do not refuse when called.

---

80

# EXHIBIT P

**\* Medical \***

# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☐ SDCJ  ☑ GBDF  ☐ EMRF  ☐ LCDRF  ☐ SBDF  ☐ VDF  ☐ FAC8

From: Lopez, Josue                    19763409              2/B/104
De:   Name (Last, First, Middle)      Booking Number         Housing Unit
      *Nombre (Apellido, Primero, Segundo)*  *Número de ficha*  *Unidad de alojamiento*

Grievance is about:  ☐ Jail Procedures  ☐ Jail Conditions  ☑ Medical  ☐ PREA  ☐ Other _____
*La queja es acerca:*  *Procedimientos de*  *Condiciones de*   *Médico*
                       *la Cárcel*          *la Cárcel*        *Otro*

Date and Time of Incident / *Fecha y hora del incidente:* ~~04/00/00~~ 4/24/20 10:20pm

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

Please, my medicines have been running out and it always takes
them about 2-3 days to arrive. Can you please, keep better track
of all my meds and order them in advance? Not when they are almost
over, because it puts my health, my kidney rejection, and it creates
a big risk. Please. This has happened many times in the past.
My kidney transplant really needs my meds. Please.
This is not an inmate request. Thank you.
            Mycophenolate is missing - given late
                                    on 4/24/20
                                    TW

Inmate Signature / *Firma de Preso*          4/24/20  10:30pm
                                             / Date / *Fecha*

---

### THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: _____
             Signature of receiving staff member   ARJIS #    APR 25 REC'D  Date   Time

Entered in JIMS: _____  _____  _____
                 Date               Time               JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐ The inmate's health or safety is unfairly impacted by a condition of confinement
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☒ This submission is not a grievance:
☐ It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
☐ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)

Response to Inmate Request:

Sir, we try our best to order your meds before they ran out.
Sometimes, ~~when we order~~ due to processing time, delivery is delayed

J-22 (Rev 1/15)    **Original goes to booking jacket**    **Copy goes to inmate after being signed by staff member**

# EXHIBIT Q



# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☐ SDCJ    ☒ GBDF    ☐ EMRF    ☐ LCDRF    ☐ SBDF    ☐ VDF    ☐ FAC8

**From:** Lopez, Josue
*De:* Name (Last, First, Middle)       1976 3409       M/085/102
*Nombre (Apellido, Primero, Segundo)*   Booking Number   Housing Unit
                                        *Número de ficha*   *Unidad de alojamiento*

**Grievance is about:** ☒ Jail Procedures  ☒ Jail Conditions  ☒ Medical  ☐ PREA  ☒ Other ADA conditions
*La queja es acerca:*  Procedimientos de  Condiciones de  Médico    *Otro*
                       la Cárcel          la Cárcel

Date and Time of Incident / *Fecha y hora del incidente:*  October 2019 — Present

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

The conditions in the jail place me and other inmates at a substantial risk of harm. I am deaf and my primary method of communication is American Sign Language. The jail consistent refuses to accomodate my hearing disability. The dangerous policies and practices that place me and other inmates at a substantial risk of serious harm include, but are not limite to, insuficient custody staff to help assist people with disabilities, inadequate supervisio of individual's disability-related needs, an inadequate system for inmates to grieve ADA issues, inadequate screening and intake procedures, insuficient medical and custody staff training on how to interact with people who have disabilities; insuficient supply of

*Josue Lopez*                           4/28/21  7:45pm
Inmate Signature / *Firma de Preso*     Date / *Fecha*

---

**THIS BOX IS FOR OFFICIAL USE ONLY**
*Esta caja es para el uso oficial solamente.*

Received by: _____  _____  4/28/21  _____
             Signature of receiving staff member  ARJIS #   Date     Time

Entered in JIMS: _____  _____  _____
                 Date       Time       JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐ The inmate's health or safety is unfairly impacted by a condition of confinement
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance.
  ☐ It is an appeal of discipline—JIMS Incident # _____  JIMS Appeal Hearing # _____
  ☐ It is a complaint against staff—JIMS Incident # _____  (Refer to Detentions P&P Section N.1)
  ☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)

Response to Inmate Request:
Forwarded to Medical / ADA Case Manager.

---

J-22 (Rev 1/15)    **Original goes to booking jacket**    **Copy goes to inmate after being signed by staff member**

ADA- accessible accomodations (such as video tablets, functioning Telecommunication Device for the Deaf, TTY phones, confidential rooms for attorney and family phone calls, video visits, social visits, etc.). For example, I can only use the TTY machine to communicate with my wife, loved ones and personal attorney. Sometimes the TTY has a poor signal and takes a lot of time to work. Many deputies at the jail become frustrated with me when I ask to use the TTY phone. They either deny me access to it, rush me when I am using it, or say they are "too busy" or short staffed to escort me to the TTY phone and supervise me. Some deputies also do not know I am deaf. A lot of them often rely on other inmates to write down responses for me to read. This places me at a substantial risk of harm because some of my confidential information could be released to these inmates during their conversations with staff. I also cannot trust that other inmates will write own accurate information. The jail does not provide a sign language interpreter during interactions with nursing and medical staff. I have to rely on lip reading and written notes to understand complex medical issues. Please, fix the conditions listed above so that am no longer at a substantial risk of harm. Please also allow me to access the TTY phone when requested, or provide me with a video phone tablet so I can communicate with my amily and personal attorney.

n addition, the medical care at the jail is inadequate and places me and all other inmates at substantial risk of harm. The jail's dangerous policies and practices include, but are not mited to, an inadequate system for inmates to request care, delays in providing timely access o care, inadequate identification of and provision of care to inmates with chronic illness, ailure to continue medications for inmates who were taking medications before being rrested, inadequate staff training, inadequate maintenance of medical records, and inadequa medication administration. For example, I was arrested on October 8, 2019, and did not eceived my medication to treat my kidney transplant for about 4 or 5 days. I take the ollowing medications: cyclosporine, mycophenolate and prednisone. Please, fix these issues o that I am no longer at a substantial risk of serious harm.

There are still other conditions at the jail that place my and other inmate's safety and survival at risk, including but not limited to: insufficient staff to safely monitor all inmates, overcrowded facilities that make it impossible to safely house all inmates and inadequate training of officers. For example, on February 14, 2021, when I and others asked for grievance forms, a deputy told us, "Whoever you want to write up, don't do it", and tried to threat that something bad would happen if we file grievances. Please fix the safety issues listed above so that I and others are no longer at a substantial risk of serious harm. Please, do not retaliate against me for filling this grievance.

# EXHIBIT R



**San Diego County**
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☒ SDCJ   ☐ GBDF   ☐ EMRF   ☐ LCDRF   ☐ SBDF   ☐ VDF   ☐ FAC8

From: YACH ERICH LOUIS    21150778    4 D 10
*De:*    Name (Last, First, Middle)    Booking Number    Housing Unit
    *Nombre (Apellido, Primero, Segundo)*    *Número de ficha*    *Unidad de alojamiento*

Grievance is about:  ☐ Jail Procedures  ☐ Jail Conditions  ☒ Medical  ☐ PREA  ☐ Other
*La queja es acerca:*  *Procedimientos de*  *Condiciones de*  *Médico*  *Otro*
    *la Cárcel*    *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* 3/10/22 9 am

Describe the reason for your grievance in your own words. Please be specific.  (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras.  Por favor sea especifico. (Use hojas adicionales si es necesario)*

THE NURSE THIS MORNING (WONT GIVE ME HIS NAME) RE-
FUSED TO GIVE MY MEDICATION. THIS NURSE MISGENDERS
ME EVERYTIME WE HAVE CONTACT (It has been over 4x NOW)
Culling me MR YACH. I ask EVERY TIME TO CALL ME YACH
ONLY. NOT MR. THE COP WANTED TO SEE MY WRISTBAND
AND CAUSE I WAS UPSET DUE TO BEING MISGENDERED
Told THE NURSE HE DIDNT SEE IT AND TOLD HIM TO WALK
AWAY. I GOT DISRESPECTED AND DIDNT RECIEVE MY MEDS

_____    3/10/22
Inmate Signature / *Firma de Preso*    Date / *Fecha*

---

### THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: DV    0075    3/12/22    1000
    Signature of receiving staff member    ARJIS #    Date    Time

Entered in JIMS: 3/12/22    1736    M000U533
    Date    Time    JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐   The inmate's health or safety is unfairly impacted by a condition of confinement
☐   A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
☐   It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
☐   It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
☐   It is an inmate request—respond in writing below.  (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request: THANK YOU FOR LETTING US KNOW; I WILL TALK TO THIS NURSE
PERSONALLY, & NOTIFY OTHER STAFF MEMBERS TO IDENTIFY YOU AS YOU STATED - "YACH
ONLY. PER POLICY, STAFF have to ConFirm identity in order to give medications."

J-22 (Rev A03), EORIGINALgoes to booking jacket (21150778 COPY goes to inmate after being signed by staff member

# EXHIBIT S
# REDACTED

94

Cynthia Joyal RN POSTED ON 3/23/2022 10:38:17 PM PDT                                     Type: RN NOTE

Ad Seg Check: pt seen awake and alert, standing at door, speaking with deputy, room clean,  breathing even and unlabored, no complaints endorsed

Addendum:

---

Samantha Macanlalay RN POSTED ON 3/22/2022 10:04:52 PM PDT                               Type: RN NOTE

Ad- Seg Wellness check: Seen during HUR, pt alert, breathing even and unlabored, no current complains.

Addendum:

---

Jennifer Manalo RN POSTED ON 3/18/2022 10:17:00 PM PDT                                   Type: RN NOTE

Saw pt in his cell, standing by his cell door,  observed breathing even and unlabored, no acute medical distress, cell is kept, CTO

Addendum:

---

Cynthia Joyal RN POSTED ON 3/16/2022 7:23:54 PM PDT                                      Type: RN NOTE

Ad Seg Check: pt seen awake and alert, walking in cell and speaking to neighboring cellmate, breathing even and unlabored, no complaints endorsed

Addendum:

---

Darshel Ontkean NP POSTED ON 3/15/2022 9:46:32 AM PDT                                    Type: NP NOTE

changed ████████ and mv to pm

Addendum:

---

Maria Atadero RN POSTED ON 3/14/2022 8:37:57 PM PDT                                      Type: REMOVE FROM QUEUE

Pt seen in ad seg round exercising. Pt verbalized "He's ok". Room appears neat and organized.
 AOx3. Respiration even & unlabored, no acute distress noted.

Addendum:

---

Dennis Quintos LVN POSTED ON 3/13/2022 10:03:56 AM PDT                                   Type: LVN NOTE

refused all AM meds; sh 2919

Addendum:

---

Manuel Ambrosio LVN POSTED ON 3/12/2022 12:42:35 PM PST                                  Type: LVN NOTE

████████████ given to med nurse for administration and instructions.

Addendum:

---

SOAP NOTE BY: Darshel Ontkean NP POSTED ON 3/12/2022 11:53:21 AM PST                      Type: NP NOTE

**Subjective**

HPI: Pt co ██████████████████ Denies fall/trauma, n/v/d, abd pain, fc, cough, sob,cp, flu sx or other acute c/o.

## Objective

| BP: / | Temp: | Pulse: | Resp: | Wt: | Sa02: | BS: | Pain: |
|-------|-------|--------|-------|-----|-------|-----|-------|

OBJECTIVE

Vitals: [As shown in top section of 'objective' box]

██████████████
█████████████████████████████████████████████
████████████████████
██████████████████████████
███████

## Assessment

████████

## Plan

████████

Notify staff if symptoms fail to improve, worsen or new symptoms develop

mdsc pm.

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|-----------|---------------|----------|-------|------|--------------|
| ██████████████ | ██ | █ | ████████████████ | | █████████████ |
| | | | | | █████████████ |
| | | | | | ███████████ |
| | | | | | █████████████ |
| | | | | | ███ |

Addendum:

---

Dennis Quintos LVN POSTED ON 3/12/2022 10:07:54 AM PST                    Type: LVN NOTE

refused all AM meds; sh 0266

Addendum:

---

Paul Mata RN POSTED ON 3/11/2022 8:14:17 PM PST                    Type: RN NOTE

ADSEG/ WELFARE CHECK: Pt awake – laying on bunk - in no acute medical distress. Pt appears well adjusted to ADSEG housing.

Addendum:

---

Dennis Quintos LVN POSTED ON 3/10/2022 9:39:08 AM PST                    Type: LVN NOTE

refused all AM meds; sh 3890

Addendum:

---

Silva Suaking RN POSTED ON 3/9/2022 10:27:57 PM PST          Type: RN EMERGENCY NOTE

Pt seen during AD-SEG rounds. Pt standing by the cell door, alert and verbally responsive. Breathing even and unlabored. NAD. No complaints at this time. With minimal trash noted inside the cell.

Addendum:

---

Dennis Quintos LVN POSTED ON 3/9/2022 9:38:53 AM PST          Type: LVN NOTE

refused all AM meds; sh 3392

Addendum:

---

Ara Garabedian RN POSTED ON 3/7/2022 8:32:40 PM PST          Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored.

Addendum:

---

Silva Suaking RN POSTED ON 3/4/2022 10:29:27 PM PST          Type: RN EMERGENCY NOTE

Pt seen during AD-SEG rounds. Pt standing by the cell door when approached.  Breathing even and unlabored. NAD. No c/o at this time. Took all ▉ meds. With some empty food tray on his table.

Addendum:

---

Kevin Yting RN POSTED ON 3/2/2022 9:57:31 PM PST          Type: RN NOTE

Pt observed in cell. Noted to be breathing with cell moderately kempt. No distress noted at this time.

Addendum:

---

Paul Mata RN POSTED ON 2/28/2022 9:02:56 PM PST          Type: RN NOTE

ADSEG/ WELFARE CHECK: Pt awake – laying on bunk - in no acute medical distress. Pt appears well adjusted to ADSEG housing.

Addendum:

---

Paul Mata RN POSTED ON 2/25/2022 10:52:55 PM PST          Type: RN NOTE

ADSEG/ WELFARE CHECK: Pt awake – laying on bunk - in no acute medical distress. Pt appears well adjusted to ADSEG housing.

Addendum:

---

Jessica Flores Registered Nurse POSTED ON 2/23/2022 10:36:57 PM PST          Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored. Cell neat with little to no debris noted.

Addendum:

---

Hang Nguyen LVN POSTED ON 2/23/2022 1:54:30 PM PST          Type: LVN NOTE

MDCC , order changed to ▉

---

BARTLETT, GARY RUSSELL JR 100064738 (21125464)          97

Nas Rafi MD POSTED ON 2/23/2022 1:38:33 PM PST                                                                    Type: MD NOTE

███████ changed to ███ per pt request.

Addendum:

---

Manuel Ambrosio LVN POSTED ON 2/23/2022 9:31:31 AM PST                                                            Type: LVN NOTE

Patient refused fluticasone nasal inhaler , refusal witnessed by deputy # 3515.

Addendum:

---

Ara Garabedian RN POSTED ON 2/21/2022 10:47:03 PM PST                                                             Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored.

Addendum:

---

Manuel Ambrosio LVN POSTED ON 2/20/2022 9:55:23 AM PST                                                            Type: LVN NOTE

Patient refused ██████████████ multivitamin, and flonase inhaler , refusal witnessed by deputy # 0829.

Addendum:

---

Manuel Ambrosio LVN POSTED ON 2/19/2022 9:45:05 AM PST                                                            Type: LVN NOTE

Patient refused ██████████████ , daily vitamin and fluticasone nasal inhaler , refusal witnessed by deputy # 3255.

Addendum:

---

Silva Suaking RN POSTED ON 2/18/2022 11:27:43 PM PST                                                              Type: RN EMERGENCY NOTE

Pt seen during ADSEG rounds standing by the cell door, alert and verbally responsive. Breathing even and unlabored. NAD. Took███ meds. Cell well kept at this time.

Addendum:

---

Reginald Moralde RN POSTED ON 2/16/2022 11:15:42 PM PST                                                           Type: RN NOTE

Pt. seen in housing for ad-seg rounds, observed awake at this time, no acute distress, breathing observed with even and unlabored respirations. Cell well kept at this time.

Addendum:

---

Manuel Ambrosio LVN POSTED ON 2/16/2022 10:17:13 AM PST                                                           Type: LVN NOTE

Patient refused fluticasone nasal inhaler , refusal witnessed by deputy # 3515.

Addendum:

---

Manuel Ambrosio LVN POSTED ON 2/15/2022 9:45:20 AM PST                                                            Type: LVN NOTE

Patient refused ██████████████ , and fluticasone nasal inhalation , refusal witnessed by deputy # 0577.

Addendum:

---

Ara Garabedian RN POSTED ON 2/15/2022 3:29:20 AM PST                                      Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen asleep at this time. No acute distress noted. Breathing observed even and unlabored.

Addendum:

---

Samantha Macanlalay RN POSTED ON 2/12/2022 12:01:00 AM PST                                Type: RN NOTE

Ad- Seg Wellness check: Seen during HUR, pt alert, breathing even and unlabored, no current complains.

Addendum:

---

Manuel Ambrosio LVN POSTED ON 2/11/2022 9:41:49 AM PST                                    Type: LVN NOTE

Patient refused  fluticasone propionate nasal inhalation , refusal witnessed by deputy # 3619.

Addendum:

---

Manuel Ambrosio LVN POSTED ON 2/10/2022 9:37:29 AM PST                                    Type: LVN NOTE

Patient refused fluticasone nasal inhalation  , refusal witnessed by deputy # 4286.

Addendum:

---

Erma Baluca RN POSTED ON 2/9/2022 10:34:10 PM PST                                         Type: RN NOTE

AdSeg rounds completed, noted awake and shaving. No s/s of acute distress, respirations even and unlabored. Cell noted organized with minimal trash.

Addendum:

---

Samantha Macanlalay RN POSTED ON 2/7/2022 8:13:51 PM PST                                  Type: RN NOTE

Ad- Seg Wellness check: Seen during HUR, pt alert, breathing even and unlabored, no current complains.

Addendum:

---

Ara Garabedian RN POSTED ON 2/4/2022 8:53:23 PM PST                                       Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored.

Addendum:

---

Cynthia Joyal RN POSTED ON 2/2/2022 7:44:41 PM PST                                        Type: RN NOTE

Ad Seg Check: pt seen awake and alert, breathing even and unlabored, no complaints endorsed

Addendum:

---

Paul Mata RN POSTED ON 1/31/2022 8:37:04 PM PST                                           Type: RN NOTE

ADSEG/ WELFARE CHECK: Pt awake – laying on bunk - in no acute medical distress. Pt appears well adjusted to current housing. Will CTO.

Addendum:

---

Samantha Macanlalay RN POSTED ON 1/28/2022 11:25:18 PM PST                                Type: RN NOTE

BARTLETT, GARY RUSSELL JR 100064738 (21125464)                                            99

Ad-Seg wellness per RN seen awake and alert, breathing even and unlabored. compliant with meds. no complaints

Addendum:

---

Jennifer Manalo RN POSTED ON 1/26/2022 8:52:34 PM PST                                          Type: RN NOTE

Adseg completed. Saw pt in his cell, standing by his cell door breathing even and unlabored. No acute medical distress. Pt cell has debris. No complaints

Addendum:

---

Jennifer Manalo RN POSTED ON 1/26/2022 8:49:59 PM PST                                          Type: RN NOTE

Adseg completed. Saw pt in his cell, standing by his cell door breathing even and unlabored. No acute medical distress. Pt cell has debris. No complaints

Addendum:

---

Cynthia Joyal RN POSTED ON 1/24/2022 8:55:14 PM PST                                            Type: RN NOTE

Ad Seg Check pt seen awake and alert, breathing even and unlabored, no complaints endorsed

Addendum:

---

Joseph Molina MD POSTED ON 1/24/2022 12:06:15 PM PST                                           Type: MD NOTE

CC

████████████████████ refilled

Addendum:

---

Ara Garabedian RN POSTED ON 1/21/2022 8:20:01 PM PST                                           Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored.

Addendum:

---

Ara Garabedian RN POSTED ON 1/20/2022 1:05:15 AM PST                                           Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored.

Addendum:

---

Ara Garabedian RN POSTED ON 1/18/2022 10:29:45 PM PST                                          Type: RN NOTE

pt c/o of anixenty, states started earlier today has gotten worse, VSS, no acute distress n oted at this time. pt has psych appt scheduled for f/u. made note to have meeds reviewed. pt understands to use calming techquies to help with anixiety. denies any SI at this time.

Addendum:

---

Maria Atadero RN POSTED ON 1/17/2022 10:15:03 PM PST                                           Type: REMOVE FROM QUEUE

Pt seen in ad seg round. Pt verbalized "He's ok". Room appears neat and organized.
AOx3. Respiration even & unlabored, no acute distress noted.

Addendum:

---

Paul Mata RN POSTED ON 1/14/2022 7:30:06 PM PST                                    Type: RN NOTE

ADSEG/ WELFARE CHECK: Pt awake – laying on bed, RR even and unlabored - in no acute medical distress. Pt appears well adjusted to ADSEG housing.

Addendum:

---

Jann Tayag RN POSTED ON 1/12/2022 7:58:19 PM PST                                    Type: RN NOTE

Administrative segregation wellness check rounds completed. Patient does not appear to be in any apparent distress. Cell well kempt with minimal to no trash observed.

Addendum:

---

Cynthia Joyal RN POSTED ON 1/10/2022 7:36:26 PM PST                                 Type: RN NOTE

Ad- Seg Wellness check pt alert and standing at the door,  breathing even and unlabored, no current complaints.

Addendum:

---

Jaime Preechar RN POSTED ON 1/7/2022 11:17:16 PM PST                                Type: RN NOTE

Pt seen for ad seg rounds. Pt answered "I'm freezing " when asked if he's doing okay. No other voiced concerns. Room appears clean and organized. NAD.

Addendum:

---

Samantha Macanlalay RN POSTED ON 1/5/2022 7:36:31 PM PST                            Type: RN NOTE

Ad- Seg Wellness check. Seen during HUR, pt alert, breathing even and unlabored, no current complains.

Addendum:

---

Samantha Macanlalay RN POSTED ON 1/3/2022 8:35:14 PM PST                            Type: RN NOTE

Ad- Seg Wellness check. Seen during HUR, pt alert, breathing even and unlabored, no current complains.

Addendum:

---

Samantha Macanlalay RN POSTED ON 12/31/2021 11:53:43 PM PST                         Type: RN NOTE

Ad- Seg Wellness check. Seen during HUR, pt alert, breathing even and unlabored, no current complains.

Addendum:

---

Ara Garabedian RN POSTED ON 12/30/2021 1:56:26 AM PST                               Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored.

Addendum:

---

Samantha Macanlalay RN POSTED ON 12/27/2021 8:41:32 PM PST                          Type: RN NOTE

Ad- Seg Wellness check: Seen during HUR pt- alert, breathing even and unlabored, no current complaints.

Addendum:

---

Samantha Macanlalay RN POSTED ON 12/22/2021 7:31:43 PM PST                              Type: RN NOTE

Ad- Seg Wellness check: Seen during HUR, pt alert, breathing even and unlabored, no current complains.

Addendum:

---

Reginald Moralde RN POSTED ON 12/21/2021 1:25:04 AM PST                                 Type: RN NOTE

Pt. seen in housing for ad-seg rounds, Pt. appears awake at this time, breathing observed and unlabored, no acute distress noted.

Addendum:

---

Ara Garabedian RN POSTED ON 12/17/2021 10:13:25 PM PST                                  Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored.

Addendum:

---

Pooja Mittal RN POSTED ON 12/16/2021 2:42:33 PM PST                                     Type: RN NOTE

Pt seen at cellside with dep 3169 regarding referal from psych NP of ringing of the R ear. Pt reported that he has had it for "years" and that it is "off and on". Pt stated, "it stops for a few days at a time and then come back." Pt denies it interfering with hearing and reports understanding stimuli. No other needs expressed during visit. Pt is breathing even and unlabored. No acute signs of distress. Able to answer questions with adequate eye contact. No further actions needed at this time as pt reports this is chronic and mild. Pt encouraged to notify staff should he require any further medical attention or if s/s worsen. Pt was receptive and verbalized understanding.

Addendum:

---

Silva Suaking RN POSTED ON 12/15/2021 9:06:53 PM PST                                    Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake, standing by the door. Breathing even and unlabored. NAD. With minimal trash noted.

Addendum:

---

Jessica Flores Registered Nurse POSTED ON 12/13/2021 11:22:51 PM PST                    Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored. Cell neat with little to no debris noted.

Addendum:

---

Jennifer Manalo RN POSTED ON 12/10/2021 10:49:34 PM PST                                 Type: RN NOTE

Pt seen in housing for Ad-seg rounds, Pt. is awake, standing by the cell door. AO x4, No acute medical distress noted. Breathing observed even and unlabored. Cell has debris.

Addendum:

---

Silva Suaking RN POSTED ON 12/8/2021 11:56:45 PM PST                                    Type: RN NOTE

Ad- Seg Wellness check: Pt seen during HUR, awake, standing by the door. Breathing even and unlabored. Denies any discomfort.

---

BARTLETT, GARY RUSSELL JR 100064738 (21125464)                                          102

Addendum:

Samantha Macanlalay RN POSTED ON 12/7/2021 12:05:33 AM PST                                      Type: RN NOTE

Ad- Seg Wellness check: Seen during HUR, pt alert, breathing even and unlabored, no current complains.

Addendum:

Jessica Flores Registered Nurse POSTED ON 12/3/2021 11:49:37 PM PST                              Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored. Cell neat with little to no debris noted.

Addendum:

Erma Baluca RN POSTED ON 12/1/2021 9:04:53 PM PST                                                Type: RN NOTE

Adseg rounds completed: awake in bed, cell noted clean and organized. No medical/psych concern at this time.

Addendum:

Jessica Flores Registered Nurse POSTED ON 11/29/2021 7:54:37 PM PST                              Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored. Cell neat with little to no debris noted.

Addendum:

Ara Garabedian RN POSTED ON 11/26/2021 9:40:18 PM PST                                            Type: RN NOTE

Pt seen in housing for Ad-seg rounds. Pt seen awake at this time. No acute distress noted. Breathing observed even and unlabored

Addendum:

Kevin Yting RN POSTED ON 11/25/2021 12:27:45 AM PST                                              Type: RN NOTE

Pt observed in cell. Moderately groomed. No immediate distress noted. Cell noted to have minimal debris. Continue to monitor. Informed pt that if there are any medical or psychiatric concerns to sign up for sick call for follow up.

Addendum:

Kevin Yting RN POSTED ON 11/24/2021 9:22:10 PM PST                                               Type: RN NOTE

Welfare check completed. No distress noted.

Addendum:

Joseph Carroll NP POSTED ON 10/13/2021 10:15:01 AM PDT                                           Type: NP NOTE

███████ ordered per pt request

follow up ███ pm

Addendum:

Ara Garabedian RN POSTED ON 10/6/2021 10:48:26 PM PDT                                            Type: RN NOTE

pt signed ROI, and pt states ██████████████████████

BARTLETT, GARY RUSSELL JR 100064738 (21125464)                                          103

# EXHIBIT T
# REDACTED

104



George Bailey
4464 Alta Rd., Suite 5300
San Diego, CA 92158
619-6612789

## QMHP PROGRESS NOTE - Completed by: Megan Baker MHC on 7/27/2021 12:36:57 PM PDT

| | | |
|---|---|---|
| **Patient:** SMITH, DAVID FRANCIS III | **#:** 400484468 (21119612) | **Lang:** 4 |
| **DOB:** ▮▮▮ (Age=36) | **Sex:** M | **Race:** W |
| **Housing:** GBDF-M-OBS-102-04 | **Court Date:** 9/14/2021 8:30:00 AM | **Type:** |
| **Status:** ACTIVE | **Booking Date:** 6/2/2021 12:04:04 PM PDT | **Proj. Rel:** |

Date of Encounter: 7/27/2021

## Clinic Reason

| | | |
|---|---|---|
| ☐ Wellness Check | ☐ I/P Request | ☑ ISP Follow-Up |
| ☐ RCC Needs | ☐ Counseling/Therapy | ☐ Referral |
| ☐ Mental Health Restriction Removal/Add | ☐ Other | |

Explain:

Pt has one ISP placement at booking due to severity of charges/first time in jail. Pt was last seen for ISP follow up on 07/22/21.

## Encounter Setting

| | | |
|---|---|---|
| ☐ Confidential | ☐ Semi-Confidential | ☑ Non-Confidential |

Pt seen at MOB cell due to lack of deputy assistance

## Housing Assignment

| | | |
|---|---|---|
| ☐ Mainline | ☐ Mainline Protective Custody | ☐ Segregation/Confinement |
| ☐ Psychiatric | ☑ Medical | |

Emotional Response to Incarceration:

Pt was booked into jail on 06/02/21 with the following charges: ▮▮▮▮▮ ▮▮▮▮▮ Pt's next scheduled court date is 09/14/21. This is the pt's first incarceration.

SMITH, DAVID FRANCIS III 400484468 (21119612)                    105

Pt reports a hx of PTSD prior to jail and states that the jail environment and stress of his legal situation have caused some of these symptoms to increase.

**Presenting Symptoms**

| ☑ Depression | ☑ Anxiety | ☐ Mania |
|---|---|---|
| ☐ Psychosis | ☑ Trauma | ☐ Drug/Alcohol Cravings/Urges |
| ☐ Adjustment Issues | ☑ Sleep Disturbance | ☐ Somatic |
| ☐ Other | ☐ None/Denied | ☐ Refused |

Describe:

Pt is currently prescribed ▇▇▇▇▇▇▇ and has been compliant with his medication. Pt is reporting nightmares about 1-2 times a week stating that he had nightmares prior to jail, but reports them to have increased since coming to jail. Pt is reporting a stable routine of reading, going to rec, watching TV, and socializing with others. Pt reports stable eating patterns and appears to making improvement adjusting to his environment as he is housed in a small MOB dorm with only a few others inmates.

_____

**MENTAL STATUS EXAM**

_____

**Appearance:**

- ⦿ Well-Groomed
- ○ Moderately Groomed
- ○ Disheveled/Unkempt

**Speech/Hearing:**

SMITH, DAVID FRANCIS III 400484468 (21119612)                    106

☑ Normal  ☐ Slow  ☐ Poverty of Speech
☐ Impairment  ☐ Pressured  ☐ Quiet
☐ Hard of Hearing  ☐ Deaf  ☐ Slurred
☐ Aphasic  ☐ Mute  ☐ Other

**Eye Contact:**

☑ Good  ☐ Avoids Eye Contact  ☐ Poor
☐ Staring  ☐ No Eye Contact

**Behavior:**

☑ Calm  ☐ Apprehensive  ☐ Agitated
☐ Motor Impairment  ☐ Tearful  ☐ Withdrawn

**Attitude:**

☑ Cooperative  ☐ Guarded  ☐ Non-disclosing
☐ Hostile/Belligerent  ☐ Uncooperative

**Interactions:**

☐ Spontaneous  ☐ Distant  ☐ Non-Cooperative/Evasive
☐ Threatening  ☑ Relevant  ☐ Irrelevant
☐ Only in Response to Questions  ☐ Other

**Mood:**

☑ Neutral  ☐ Frightened  ☐ Happy
☐ Threatening  ☐ Depressed  ☐ Sad
☐ Anxious  ☐ Irritable  ☐ Angry
☐ Other

SMITH, DAVID FRANCIS III 400484468 (21119612)    107

**Affect:**

| ☑ Appropriate/Full Range | ☐ Blunted | ☐ Agitated |
| ☐ Labile | ☐ Anxious | ☐ Depressed |
| ☐ Flat | ☐ Angry | ☐ Constricted |
| ☐ Expansive | ☐ Inappropriate | ☐ Other |

**Thought Content:**

| ☑ Appropriate to Situation | ☐ Grandiose | ☐ Paranoid |
| ☐ Impoverished | | |

**Thought Process:**

| ☑ Normal/Goal Directed | ☐ Incoherent | ☐ Flight of Ideas |
| ☐ Illogical | ☐ Disorganized | ☐ Circumstantial |
| ☐ Disassociation | ☐ Rambling | ☐ Concrete |
| ☐ Slow/Hesitant | ☐ Blocking | ☐ Loose Associations |
| ☐ Tangential | ☐ Abstract | |

**Delusions:**

| ☑ None | ☐ Ideas of Reference | ☐ Mood Congruent |
| ☐ Grandiose | ☐ Somatic | ☐ Persecutory |
| ☐ Guilt | ☐ Poor Organized | ☐ Nihilistic |
| ☐ Insertion | ☐ Systemized | ☐ Mood Incongruent |
| ☐ Paranoid | ☐ Bizarre | ☐ Religious |
| ☐ Hypochondriacal | ☐ Broadcasting | ☐ Other |

does not present with delusional thought content

**Perceptual Symptoms:**

| ☑ Normal | ☐ Tactile | ☐ Olfactory |
| ☐ Auditory | ☐ Visual | ☐ Other |

Describe:

none reported, no RIS

## Orientation:

- [x] Month
- [x] Situations
- [x] Year
- [x] Place
- [x] Person
- [ ] None

_____

## RISK ASSESSMENT

_____

## Suicidal Ideation:

- [x] Denied
- [ ] Intent
- [ ] Passive
- [ ] Refused
- [ ] Active

Describe:

## Homicidal Ideation:

- [x] Denied
- [ ] Intent
- [ ] Passive
- [ ] Refused
- [ ] Active

Describe:

## Recent experience of significant loss:

- [x] Relationship
- [x] Home
- [x] Job
- [ ] Recent Death of Family Member/Close
- [x] Finances
- [ ] None/Denied

SMITH, DAVID FRANCIS III 400484468 (21119612)                                      109

Friend

☐ Other                                    ☐ Refused

Describe:

Pt has been in the Marines for 18 years and endorsed worry about being discharged from the military due to his legal situation. ████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████

**Family or Close Friend Attempted or Completed Suicide:**

☐ Mother                    ☐ Father                    ☐ Sibling

☐ Grandparent              ☐ Aunt/Uncle                ☐ Spouse

☐ Friend                   ☐ Other                     ☑ None/Denied

☐ Refused

Details:

**Feeling as though there is nothing to look forward to in the immediate future (helplessness/hopelessness)**

☑ Hopeful                  ☐ Hopeless                  ☐ Helpless

☐ Realistic                ☐ Unrealistic

Describe:

Pt continues to endorse hope about the outcome of his case ███████████████

**Coping Skills:**

☑ Read                     ☑ TV                        ☑ Religion

☑ Write                    ☐ Play Games                ☑ Talk with Others

☑ Puzzles                  ☐ Exercise                  ☐ Other

reading the Bible, socializing with others in his dorm

Provisional Diagnosis:

PTSD by history

**Intervention Provided**

SMITH, DAVID FRANCIS III 400484468 (21119612)

110

- ☐ Depression Coping Skills
- ☐ Self-Harm Safety Skills Planning
- ☐ No Intervention Indicated
- ☐ Anxiety Coping Skills
- ☐ Distress Tolerance Skills
- ☑ Other
- ☐ Sleep Hygiene Skills
- ☐ Discharge Planning/Resources

spoke with pt again about adjustment to jail related issues. Pt is focused on obtaining therapy for his past trauma while in jail, however pt is currently in a high stress situation facing serious charges which make trauma therapy not appropriate for the pt at this time. MHC will discuss this in more detail with the pt when able to meet in a private setting. Focus of treatment at this time is stabilizing the pt's current symptoms and assisting him adjusting to the jail environment and cope with his current legal situation as addressing past trauma at this time can become triggering for the pt.

---

**RETURN TO CLINIC**

---

- ☐ Therapy/Counseling:
  - ☐ 1 week
  - ☐ Other
  - ☐ 2 weeks
  - ☐ 3-6 weeks

- ☐ Wellness Check
  - ☐ 1 week
  - ☐ Other
  - ☐ 2 weeks
  - ☐ 3-6 weeks

- ☑ ISP Follow-Up:
  - ☐ 1 week
  - ☐ Other
  - ☑ 2 weeks
  - ☐ 3-6 weeks

- ☐ No Appointment Indicated

**Referral:**

SMITH, DAVID FRANCIS III 400484468 (21119612)                    111

☐ Psych SC:

☐ Priority                    ☐ Routine

Details:

☐ MD SC:

☐ Priority                    ☐ Routine

Details:

# EXHIBIT U
# REDACTED

113

| Name | Scheduled Date | Reason | Completed Date |
|------|----------------|--------|----------------|
| QMHP | 7/14/2021 | MHC CLINIC - ISP fu/wellness check;lds 7/7 | 7/22/2021 |
| Medical Chart Review | 7/26/2021 | pt still complaining of back pain interfereing with sleep.with ███████████ active in EMAR. with instructions for extra mattress | 7/25/2021 |
| Medical Chart Review | 7/25/2021 | Req to renew ████ | 7/25/2021 |
| QMHP | 7/29/2021 | ISP follow up. LDS 07/22/21. | 7/27/2021 |
| Medical Doctor Sick Call | 7/29/2021 | 7/28/21 J212 "severe lower back pain interfered with sleep. Lumbar issues documented in my military medical records". | 7/29/2021 |
| QMHP | 8/10/2021 | ISP follow up. Meet with pt in private setting. LDS 07/27/21. | 8/12/2021 |
| Registered Nurse Sick Call | 8/16/2021 | J212 "Occipital nerve pain, L sciatic nerve pain, lumbar pain, L foot pain w/ sendals." Cancelled by lorelie.manaig on 8/14/2021 Reason: Seen by MD with meds noted. | 8/14/2021 |
| Psychiatry Sick Call | 8/15/2021 | LDS 7/18/21 f/u 4 weeks; inc ███████████ , 8/18 MED F/U | |
| Dental Sick Call | 3/29/2022 | Dental Sick Call scheduled from Receiving Screening | |

# EXHIBIT V
# REDACTED

115

George Bailey
446 Alta Rd., Suite 5300
San Diego, CA 92158
619-6612789

## BH ASSESSMENT - Completed by: Brandon Bridgeman MHC on 7/3/2021 5:37:40 PM PDT

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | NORWOOD, CHRISTOPHER SCOTT | **#:** | 100113045 (21122487) | **Lang:** | 4 |
| **DOB:** | ▮▮▮ (Age=34) | **Sex:** M | | **Race:** | W |
| **Housing:** | GBDF-4-A-111-B | **Court Date:** | | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** 6/22/2021 10:33:37 AM PDT | | **Proj. Rel:** 8/29/2021 12:00:00 AM | |

View this Patient's Charges in eJIMS:

[ View ]

Current Flags/Conditions:

Psychotic Disorders, Protective Custody, No SBDF, MEDICAL TRANSFER RESTRICTIONS, Inmate Safety Program, Asthma

Date of Assessment 7/3/2021 Assessing Staff Bridgeman

## Clinic Reason:

- ☑ Wellness Check
- ☑ I/P Request
- ☐ Counseling/Therapy
- ☐ RCC Needs
- ☐ Assess for Psychiatric Treatment
- ☐ Mental Health Restriction Removal/Add
- ☐ Mental Health Clearance
- ☐ Community Referral
- ☐ Other

Explain:

## Encounter Setting:

| ☐ Confidential | ☑ Semi-Confidential | ☐ Non-Confidential |
|---|---|---|

I/P was seen at the medication window with a deputy present.

Emotional Response to Incarceration:

I/P was booked on 6/22/21 for charges: ███████████████████████ ████████. I/P has a scheduled court date of 8/5/21.

ASSESSMENT: I/P presented as well groomed, fully oriented, cooperative, having a linear and logical thought process, and having a full range in affect. I/P reported that he was feeling, "alright." I/P stated, "it was wierd I heard things in the mornings that weren't really there. It really freaked me out because I never heard things like that before. I have a history of taking psychiatric medications like wellbutrin and zoloft. ███████████ ████████████████████████████████████████ My drugs of coice were heroin and crystal meth. I am 100 days sober, and I want to keep it that way. Do you know if they prescribe Suboxone here? That would help me stay away from heroin."

## Psychosis (Current and/or Past Symptoms)

- ☐ None Evident
- ☐ Command AH
- ☑ Non-Command
- ☐ Delusions
- ☐ Hallucinations
- ☐ Negative Symptoms/Affective Flattening/Directionless
- ☐ Disorganized/Incoherent Speech
- ☐ Disorganized/Catatonic Behavior
- ☐ Other

Other Comments:

I/P reported that he heard unrecognizable "voices" in the mornings, but denied any current AH or VH.

## Mood-Depressive Symptoms (Current and/or Past Symptoms)

- ☐ None Evident
- ☑ Depressed or Irritable Mood
- ☑ Decreased Interest or Pleasure
- ☐ Feelings of Worthlessness/Guilt
- ☑ Appetite Changes
- ☐ Motor Agitation/Retardation
- ☑ Insomnia/Hypersomnia
- ☑ Low Ability to Concentrate
- ☑ Fatigue/Loss of Energy
- ☑ Sleep Disturbance
- ☐ Crying Spells
- ☐ Feelings of Hopelessness
- ☐ Feelings of Helplessness
- ☐ Other

Other Comments:

I/P reported, "depression was a thing in my past. I'm not really struggling with that right now."

NORWOOD, CHRISTOPHER SCOTT  100113045 (21122487)          117

☐ Recent Self-Injurious Behavior    ☐ SI within Last 6 Months    ☐ Suicide Planning

**Anxiety (Current and/or Past Symptoms)**

☐ None

☐ Repetitive Behaviors

☑ Irritability

☑ Excessive Anxiety/Worry

☐ Recurrent Distressing Dreams

☐ Derealization/Depersonalization

☑ Avoidance of Certain Situations

☑ Restlessness/Feeling on Edge

☑ Recurrent/Persistent Thoughts

☑ Fear of Losing Control

☐ Feeling as if Trauma were Reoccurring

☐ Muscle Tension

☑ Racing Thoughts

☐ Difficulty Concentrating

☐ Hyper-Reactive Mood

☐ Generalized Paranoid Ideation

☐ Increased Impulsivity

☐ Hypersexual

☑ Other

Describe:

I/P reported, "the hearing voices things is kind of freaking me out. I have struggled with anxiety in the past. I'm not really worried about my court. I'm probably going to bail out in a couple of months."

**Somatic (Current and/or Past Symptoms)**

☑ None Evident

☐ Dizzy, Unsteady, Lightheaded

☐ Palpitations/Pounding Heart

☐ Shortness of Breath/Smothering Sensation

☐ Chest Pain/Discomfort

☐ Numbness or Tingling

☐ Sweating

☐ Nausea or Stomach Distress

☐ Chills or Hot Flashes

☐ Trembling/Shaking

☐ Choking Sensation

☐ Other

Describe:

CURRENT MEDICATIONS:

████████████████████████████

## MENTAL HEALTH HISTORY

### Past and/or Active Community Treatment:

Hospitalizations?

☑ Yes

☐ No

████████████████████████ I/P also reported currently being seen by Dr. Michlin in San Diego, CA. MHC completed an ROI with I/P and scanned a copy of the ROI into I/P's chart.

### Community/Wrap-Around Services:

☐ Telecare/ACT - Parole

☐ Telecare/ACT - AB109/PCRS

☐ RCC

☐ Other

Explain:

## FAMILY MENTAL HEALTH HISTORY

### Hx of Suicide:

☐ Mother          ☐ Father          ☐ Sister
☐ Brother         ☑ None Reported

### Hx of Severe Mental Illness:

☑ Mother          ☑ Father          ☐ Sister
☑ Brother         ☐ None Reported

I/P reported, ████████████████████████████████████
██████████              _____

Previously attempted suicide?

☐ Yes

☑ No

### When/Within:

☐ 1-5 years          ☐ 6-10 years          ☐ 11+ years

If active suicidal thinking is present, please indicate below the action taken.

## SUBSTANCE ABUSE HISTORY

● Reviewed

○ Revised

☑ Amphetamines          ☐ THC          ☐ ETOH

☑ Opiates          ☐ Cocaine          ☐ None Reported

☐ Other

Describe:

## Frequency:

● Daily

○ 2-3 times weekly

○ 1 weekly

○ Monthly

○ None

## Route:

☑ Smoke          ☐ Snort          ☑ Inject

☐ Eat          ☐ None

Describe:

I/P reported daily use of heroin and "crystal meth," and reported being sober for over 100 days.

## LEGAL HISTORY

☐ None          ☑ Prison          ☐ Current Probation

☐ Sexual Offense History          ☑ Jail          ☐ Juvenile Hall

☐ Current Parole

Explain (Legal History):

## MENTAL STATUS EXAM

## Age appears to be:

☐ Older Than Stated Age          ☑ Stated Age          ☐ Younger Than Stated Age

## Appearance:

☑ Well-Groomed          ☐ Moderately Groomed          ☐ Disheveled/Unkempt

NORWOOD, CHRISTOPHER SCOTT  100113045 (21122487)          120

**Speech/Hearing:**

- ☑ Normal
- ☐ Slow
- ☐ Poverty of Speech
- ☐ Impairment
- ☐ Pressured
- ☐ Quiet
- ☐ Hard of Hearing
- ☐ Deaf
- ☐ Slurred
- ☐ Aphasic
- ☐ Mute
- ☐ Other

**Motor Activity:**

- ☑ Normal
- ☐ Agitated
- ☐ Restless
- ☐ Tremor/Tic
- ☐ Psychomotor Slowing
- ☐ Other

**Eye Contact:**

- ☑ Good
- ☐ Staring
- ☐ Poor
- ☐ No Eye Contact
- ☐ Avoids Eye Contact

**Attitude:**

- ☑ Cooperative
- ☐ Hostile/belligerent
- ☐ Guarded
- ☐ Uncooperative
- ☐ Non-disclosing

**Behavior:**

- ☑ Calm
- ☐ Motor Impairment
- ☐ Apprehensive
- ☐ Tearful
- ☐ Agitated
- ☐ Withdrawn

**Interactions:**

- ☑ Spontaneous
- ☐ Threatening
- ☐ Only in Response to Questions
- ☐ Distant
- ☑ Relevant
- ☐ Other
- ☐ Non-Cooperative/Evasive
- ☐ Irrelevant

**Mood:**

- ☑ Neutral
- ☐ Frightened
- ☐ Happy
- ☐ Depressed
- ☐ Sad
- ☐ Anxious
- ☐ Irritable
- ☐ Angry
- ☐ Other

**Affect:**

- ☑ Appropriate/Full Range
- ☐ Blunted
- ☐ Agitated
- ☐ Labile
- ☐ Anxious
- ☐ Depressed
- ☐ Flat
- ☐ Angry
- ☐ Constricted
- ☐ Expansive
- ☐ Inappropriate
- ☐ Other

**Suicidal Thinking:**

☑ Denied   ☐ Passive   ☐ Active

☐ Intent

Describe:

## Homicidal Thinking:

☑ Denied   ☐ Passive   ☐ Active

☐ Intent

Describe:

## THOUGHT PROCESS

### Thought Process:

| | | |
|---|---|---|
| ☑ Normal/Goal Directed | ☐ Circumstantial | ☐ Blocking |
| ☐ Incoherent | ☐ Dissacociation | ☐ Loose Associations |
| ☐ Flight of Ideas | ☐ Rambling | ☐ Tangential |
| ☐ Illogical | ☐ Concrete | ☐ Abstract |
| ☐ Disorganized | ☐ Slow/Hesitant | |

## THOUGHT CONTENT

| | | |
|---|---|---|
| ☑ Appropriate to Situation | ☐ Grandiose | ☐ Paranoid |
| ☐ Impoverished | | |

### Delusions:

| | | |
|---|---|---|
| ☑ None | ☐ Poorly Organized | ☐ Paranoid |
| ☐ Ideas of Reference | ☐ Nihilistic | ☐ Bizarre |
| ☐ Mood Congruent | ☐ Guilt | ☐ Religious |
| ☐ Grandiose | ☐ Insertion | ☐ Hypochondriacal |
| ☐ Somatic | ☐ Systemized | ☐ Broadcasting |
| ☐ Persecutory | ☐ Mood Incongruent | ☐ Other |

### Perceptual Symptoms:

| | | |
|---|---|---|
| ☐ Normal | ☐ Olfactory | ☐ Visual |
| ☐ Tactile | ☑ Auditory | ☐ Other |

Describe (Thought Content, Other, Delusions, Hallucinations):

I/P reported "hearing things that weren't there," but denied any current AH sxs. I/P did not appear to RIS.

## INTELLECTUAL FUNCTIONING

### Level of Consciousness:

NORWOOD, CHRISTOPHER SCOTT  100113045 (21122487)                    122

- ⦿ Alert
- ◯ Confused
- ◯ Drowsy
- ◯ Stupor
- ◯ Coma
- ◯ Other

**Concentration:**

- ⦿ Good
- ◯ Poor
- ◯ Slightly Impaired

**Short-Term Memory:**

Intact?
- ☑ Yes
- ☐ No

Poor?
- ☐ Yes
- ☑ No

Slightly Impaired?
- ☑ Yes
- ☐ No

**Long-Term Memory:**

Intact?
- ☑ Yes
- ☐ No

Poor?
- ☐ Yes
- ☑ No

Slightly Impaired?
- ☐ Yes
- ☑ No

**Orientation:**

| ☑ Month | ☑ Person | ☑ Place |
| --- | --- | --- |

☑ Fear          ☑ Situations          ☐ None

Describe (Level of Consciousness, Concentration, Short-Term Memory, Long-Term Memory, Orientation):

I/P reported his short-term memory being "cloudy."

## Judgement:

○ Intact
● Good
○ Impaired
○ Poor

## Impulse Control:

○ Good
● Fair
○ Poor

## Insight:

○ Good
● Adequate
○ Partial
○ Poor

## Estimated Intelligence:

○ Above Average
● Average
○ Borderline
○ Mentally Retarded

## Future Orientation:

☑ Hopeful          ☐ Hopeless          ☑ Realistic
☐ Unrealistic

I/P reported that he is looking forward to bail out of jail. I/P also reported wanting to get some reading material while in jail.

## Coping Skills:

☑ Read          ☑ Write          ☑ Talk with Others
☑ TV            ☐ Play Games     ☐ Puzzles
☐ Religion

NORWOOD, CHRISTOPHER SCOTT  100113045 (21122487)                    124

I/P reported that he enjoy reading and watching TV. I/P also reported that he has been reaching out to family and friends while in jail.

**Concerns for Safety while Incarcerated:**

☐ Other Inmates          ☐ Staff          ☑ None Reported

Comments:

**Trauma History:**

**Have you experienced or witnessed any of the following in a way you feel has seriously impacted your outlook in life? No details needed now:**

☐ Parental Domestic Violence

☐ Absent Caregiver from Birth to Age 5

☐ Childhood Physical or Sexual Abuse

☐ Life-threatening Event or Assault

☐ Violent Death/Homicide of Family/Close Friend

☐ In-custody or Military Sexual Trauma

☐ War (Refugees) or Combat

☑ None Reported

Comments:

**CONCLUSIONS:**

**Motivation for Treatment:**

○ Excellent

● Good

○ Fair

○ Poor

Provisional Diagnosis:

F39 Mood D/O unspecified

**TREATMENT PLAN:**

**Target Symptoms/Behaviors:**

☐ Sleep Disturbance

☐ Loss of Interest

☐ Guilt

- ☐ Low Energy
- ☐ Appetite Changes
- ☐ Crying Spells
- ☐ Feelings of Hopelessness
- ☐ Feelings of Helplessness
- ☐ Recent Self-Injurious Behavior
- ☑ Anxiety/Panic
- ☐ Intrusive Negative Thoughts
- ☐ Racing Thoughts
- ☐ Concentration Difficulty
- ☐ Social Avoidance
- ☐ Nightmares
- ☐ No Treatment Indicated
- ☑ Other

Other:

I/P reported hearing voices, evaluation with psych scheduled.

**Intervention:**

- ☑ Anxiety Coping Skills
- ☐ Depression Coping Skills
- ☐ Sleep Hygiene Skills
- ☐ Self-Harm Safety Skills/Planning
- ☐ No Intervention Indicated

Details:

MHC discussed what I/P currently uses to "get out of his head." I/P reported that he mainly enjoys reading, and requested that MHC bring him the third book in the Games of Thrones series.

**Return to Clinic:**

| | | |
|---|---|---|
| ☐ Therapy/Counseling | | |
| ☐ 1 Week | ☐ 2 Weeks | ☐ 3-6 Weeks |
| ☑ Wellness Check | | |
| ☐ 1 Week | ☑ 2 Weeks | ☐ 3-6 Weeks |
| ☐ Assess for Psychiatric Treatment | | |
| ☐ 1 Week | ☐ 2 Weeks | ☐ 3-6 Weeks |
| ☐ Other | | |

NORWOOD, CHRISTOPHER SCOTT  100113045 (21122487)

# EXHIBIT W

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., on behalf of themselves and as representatives of the class, | No. C 94-2307 CW |
| Plaintiffs, | ORDER DISTRIBUTING AND ENFORCING THE AMENDED COUNTY JAIL ORDER AND PLAN |
| v. | |
| EDMUND G. BROWN, JR., Governor of the State of California; CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; MICHAEL MINOR, Acting Director of the Division of Juvenile Justice; MATTHEW CATE, Secretary of the California Department of Corrections and Rehabilitation; JENNIFER SHAFFER, the Executive Officer of the Board of Parole Hearings; DIANA TOCHE, Acting Director of the Division of Correctional Health Care Services; CHRIS MEYER, Director of the Division of Facility Planning, Construction and Management; KATHLEEN DICKINSON, Acting Director of Adult Institutions; and ROBERT AMBROSELLI, Acting Director of Division of Adult Parole Operations, | |
| Defendants. | |

Attached to this Order is the <u>Armstrong v. Brown</u> County Jail

Plan.  <u>Armstrong</u> is a class action under the Americans with

Disabilities Act (ADA) and the Rehabilitation Act (RA) against the

California Department of Corrections and Rehabilitation (CDCR) and

other State defendants, brought by prisoners and parolees with

mobility, sight, hearing, learning, developmental or kidney

disabilities that substantially limit one or more of their major

128

life activities.  On January 13, 2012 and again on April 11, 2012, as a remedy for violations of the ADA and RA, the Court ordered that CDCR develop, disseminate, and implement a plan for accommodation of disabled parolees and out-to-court prisoners housed in county jails.

Defendants' appeal of the April 11, 2012 order is currently pending before the Ninth Circuit Court of Appeals.  Defendants take the position that the counties are solely liable for providing disabled non-life parolees with accommodations legally mandated by the ADA and RA and that the State has no joint responsibility for this.  This Court has denied Defendants' request to stay the April 11, 2012 order during the appeal and has ordered that, while their appeal is pending, Defendants are required to comply with the County Jail Plan that they developed in conjunction with Plaintiffs' counsel.  The Ninth Circuit Court of Appeals has denied a stay of this Court's April 11, 2012 order.

Attached to this Order is the County Jail Plan, which supersedes the draft plans that were distributed to the counties on February 27, 2012 and July 12, 2012.

The County Jail Plan's requirements include the following, among others:

(1)  On or before September 1, 2012, CDCR will send an email notification to each county's legal counsel or designee identifying each parolee with a disability, including those subject to California Penal Code section 3056, being held in that county's jail facilities on that date.  Beginning on September 1, 2012, CDCR will send email notifications once per day to each county's legal counsel or designee identifying each parolee with a

disability booked in that county's jail facilities over the past
24 hours.  The notifications must include each parolee's name,
CDCR identification number, and last release date from prison.
The notification must also include a plain-language description of
each parolee's last-known disabilities and the accommodations in
housing or programming the parolee received as of the date he or
she was released from prison.

(2)  On or before September 15, 2012, CDCR will send an email
notification to each county's legal counsel or designee
identifying each CDCR out-to-court prisoner with a disability
being held in that county's facilities on that date.  Beginning on
September 15, 2012, CDCR will send email notifications once per
day to each county's legal counsel or designee identifying each
CDCR out-to-court prisoner with a disability sent to that county's
facilities in the past 24 hours.  The notification will include
each CDCR out-to-court prisoner's name and CDCR identification
number.  The notification will also include a plain-language
description of the out-to-court prisoner's last-known disabilities
and the accommodations in housing or programming the prisoner
received as of the date he or she was transferred from a prison.

(3)  Beginning on September 15, 2012, CDCR shall provide CDCR
grievance forms and stamped envelopes addressed to CDCR to all
parolees and out-to-court prisoners with disabilities housed in
county jails.  The parolees and out-to-court prisoners can send
the grievance forms to CDCR through the standard mail.  CDCR
personnel will encourage parolees and out-to-court prisoners also
to use the county jail's grievance process to request disability
accommodations.  Whenever CDCR personnel receive a completed

grievance form from a parolee or out-to-court prisoner in county

jail, they shall forward the grievance form to the county's legal

counsel or designee as soon as possible and no later than three

business days after receipt.  CDCR shall respond to the grievances

within the timeframes set forth in the County Jail Plan and may

contact counties to request information for a response.

(4)  Beginning no later than September 15, 2012, if CDCR

personnel become aware that an out-to-court prisoner or parolee

with a disability faces an urgent or emergency situation (for

example, if there is an allegation of a condition that is a threat

to the individual's health or safety or that would prevent his or

her participation or effective communication in a parole

revocation proceeding), CDCR will notify the county's designee or

legal counsel immediately.

CDCR will implement all remaining provisions of the County

Jail Plan by September 15, 2012.  This includes, but is not

limited to, the requirements that CDCR must review and respond to

grievances it receives from class members, promptly share

grievances with county officials, review grievances to identify

patterns of denials of disability accommodations, and investigate

any such patterns identified.

Any questions about the information received from CDCR may be

directed to the following email address:

Armstrongteam@cdcr.ca.gov.

IT IS SO ORDERED.

Dated: 8/28/2012

CLAUDIA WILKEN
United States District Judge

131

# EXHIBIT X

132

| Type | Total In Custody |
|------|------------------|
| Imprisoned County Jail (1170 PC) | 554 |
| Post-Release Community Supervision | 155 |
| Parole Violators (3056 PC) | 53 |
| | 133 |
| **TOTALS** | **762** |

# EXHIBIT Y



☰     The San Diego Union-Tribune     **SPONSOR A STUDENT DONATE**     🔍

# Sheriff has a ways to go to meet 'gold standard' of jail accreditation



At the San Diego Central Jail in downtown, Sheriff deputies monitor inmates who are housed in the Psychiatric Security Unit. (Nelvin C. Cepeda / San Diego Union-Tribune)

Sheriff Bill Gore began seeking national accreditation three years ago to improve jail operations, including medical and mental health care

BY JEFF MCDONALD, KELLY DAVIS

OCT. 13, 2019 5 AM PT



135

San Diego Sheriff Bill Gore has pinned his plan to reduce inmate deaths and raise the level of medical and mental health care inside his jails on winning accreditation from a national organization that promotes best practices for taking care of people behind bars.

He is hoping that implementing National Commission on Correctional Health Care recommendations will turn around a trend that includes at least 13 deaths so far this year and more than 140 in the last decade.

The national commission is "the gold standard" in jail operations, said Cmdr. Erika Frierson, who helps oversee the county's seven jails, in an interview earlier this year.

"NCCHC (accreditation) will increase how efficient we are in providing all of the health benefits that we provide to our inmates," she said. "So there are some benefits. It's not just bragging rights."

The county paid $100,000 to the national commission, which sent four consultants to the county's four largest jails to study what medical staff were doing well and suggest ways they could do better.

The San Diego Union-Tribune obtained a copy of the 2017 "technical assistance report" through a public records request. Included are 139 pages of findings and dozens of recommendations Gore and his command staff need to implement before the jails can be accredited.

It will not be easy for the department to win accreditation by 2020, the timeline officials outlined in an interview earlier this year.

Frank Clamser, assistant sheriff of the Detention Services Bureau, said in an August letter that some facilities will require construction and remodeling to meet accreditation standards, and the department will need to hire more medical and mental health staff.

136

"There are still many NCCHC standards to be met," Clamser wrote. "Some will be completed in the near future and some will require more time due to the complexity and the changes necessary or the resources needed to implement."

According to the 2017 report, the department lagged in providing basic medical and mental health care. Critics say those lapses contribute to the jail system's high mortality rate and to the multimillion-dollar lawsuits that have followed.

Some of the consultants' findings include:

- A limited use of suicide monitoring

- Inmates on psychiatric medications at booking frequently did not have their medication continued in a timely manner

- Correctional staff was not formally trained to recognize inmate drug and alcohol issues

- Nurses triaged inmate requests, setting their priority for care, without seeing the inmates

- Mentally ill inmates were kept in isolation, with little evidence of monitoring for "mental condition, hygiene, orientation or how they were adjusting."

The study noted that at least three of the four jails had significant backlogs of requests for medical care.

"A (continuous quality improvement) process should be implemented to examine timeliness of care," the report stated, "as understaffing or poorly organized systems may result in an inability to deliver appropriate and timely care."

According to the commission, all sheriff's departments seeking accreditation must meet all applicable "essential standards" and 85 percent of the "important" medical and

137

mental health care standards.

### Jail Accreditation Technical Report

Oct. 4, 2019

San Diego Central Jail met 12 of the 38 essential standards applicable to the jail and six of 25 important standards. Vista Detention Facility met 13 of 39 essential standards and six of 26 important standards.

George Bailey Detention Facility met 11 of 39 essential standards and six of 25 important standards. And Las Colinas Detention and Reentry Facility, the county's women's jail, met 12 of 40 essential standards and seven of 26 important standards, the report said.

At the central jail, where 73 inmates have died since 2009, the report said the staff needed to do a better job looking into and communicating what caused an inmate's death so they can prevent similar incidents in the future, the consultants said.

"The administrative and clinical mortality reviews were completed, but not in a timely manner, nor were psychological autopsies for the cases of suicide," the report found. "The treating and the health staff reported not being informed of any results of death reviews in their facilities."

Clamser said in his letter that the department has addressed many of the report's recommendations, such as overhauling its electronic health records system, adding mental health staff, creating private spaces so inmates feel more comfortable talking to mental health clinicians and implementing a new medication distribution system.

## More than 140 jail deaths

138

Last month, the Union-Tribune published the results of a six-month investigation into deaths inside San Diego County jails.

Among other things, the "Dying Behind Bars" series disclosed mortality and suicide rates that have been the highest among California's largest counties for years. It also exposed lapses in the quality of medical and mental health care that inmates receive in county jail.

The report documented at least 140 deaths in San Diego County jails since 2009 — 82 percent of which came before the inmates went to trial.

---

**DYING BEHIND BARS**  ›

‹                                                                                              ›

Sheriff Gore declined to be interviewed for the series, but his staff said even one death in custody is too many. The department is constantly working to improve the way it treats the people it locks up, they said.

"Operating safe and secure jail facilities is the cornerstone of our Detention Services mission and we recognize how critical the element of medical and mental health care is to the pursuit of our goals," Clamser wrote in a statement.

139

The accreditation panel said San Diego County has much to do to curb the number of suicides in its jails. The experts said that, even when the department initiated a new program aimed at protecting vulnerable inmates, deputies did not always follow the new rules.

"Suicide prevention in the facility is inadequate, despite the relatively recent implementation of the Inmate Safety Program," the consultants reported. "There was much confusion across facilities, and including at the Central Jail, about the requirements of the program and how to implement it."

The report also noted the San Diego Central Jail suicide rate was nearly double the national average from 2015 to 2016; the rate at George Bailey was nearly five times the national average, and the rate at the Vista jail was more than five times the national average.

Las Colinas reported no suicides over those two years, but the report said deputies there were not aware that they should have been monitoring the high-risk inmates every 15 minutes.

"Staff members were under the impression that an inmate who is at high risk of suicide is monitored only every 48 hours, while those who are identified as low risk are monitored every 24 hours," researchers wrote.

In April 2018, more than a year after the NCCHC consultants issued their report, the department contracted with Lindsay Hayes, an expert in suicide prevention in jails and prison. Hayes subsequently identified the same lapses in care.

"The (San Diego County Sheriff's Department's) various suicide prevention policies provide limited guidance regarding the observation of suicidal inmates," Hayes wrote. "...There is no option in any SDCSD policy for constant and continuous observation of inmates at the highest risk for suicide."

The department said in an August statement it has "been diligently working to address each of (Hayes') recommendations."

Ross Mirkarimi, a former San Francisco sheriff who also served two terms on the Board of Supervisors, reviewed the consultants' 2017 report on San Diego County jails.

He said Gore should use the report to argue for boosting his budget and to raise awareness of his department's challenges.

"The NCCHC report is Sheriff Gore's best friend, but it's a perishable resource," Mirkarimi said. "It provides him great advice without recrimination, as long as its recommendations are sincerely implemented, or at least attempted by the evidence of the bully pulpit."

Mirkarimi said there is a national crisis arising from criminalizing mental illness rather than treating it — and a rash of wrongful and preventable in-custody deaths is a result.

"Many sheriffs acknowledge that their jails have become the substitute for mental health hospitals, and yet this refrain is in danger of becoming cliche as local and state governments struggle on how to triage or manage an often unsympathetic population," he said.

## 'By the wayside'

To win commission accreditation, the department must prove it can deliver health care services in a timely manner, but San Diego County inmates said recently that even the most basic requests become mired in bureaucracy.

They said the booking process can take up to two days — something the consultant's report also noted — which means someone going into jail is not able to see a doctor or nurse for two days or more, even in dire circumstances.

It can take two weeks or more to get a Tylenol or Motrin, inmates said.

"People who can't speak for themselves fall by the wayside," inmate Lonzo Liggons said in a jailhouse interview in July. Liggons said it took 73 days for the staff at George Bailey to provide his prescription medication for a serious mental illness.

Steven Lake, who is serving time at the East Mesa Detention Facility on vehicle theft and other charges, said jail staff would not give him the medicine he needs to prevent flare-ups from gout, which causes his foot to swell so badly he cannot walk.

"They said 'If you don't have a heart attack or a seizure, you are not going to medical'," he said. "They have so many people cry wolf."

Once he got a prednisone shot, the acute attack dissipated within hours, Lake said.

"There's something broken here," he said. "If you ask me, it's lack of care."

Michael Wilson, one of more than a dozen inmates whose cases were profiled in the "Dying Behind Bars" series, died in San Diego Central Jail earlier this year after he was denied the heart medication he needed to stay alive, according to his family.

The consultant's report came on the heels of the Sheriff's Department's decision to terminate early a five-year, $21-million contract with its psychiatric care provider, CPMG. The department blamed the contractor for multiple inmate deaths and argued that it failed to conduct performance evaluations of its psychiatrists.

According to NCCHC standards, a formal peer-review process is the department's responsibility.

"There is no formal peer review process in place at this facility, for either providers (physicians, psychiatrist, psychologist, dentist, etc.), who are contracted employees, or

142

for nurses," the report noted for each jail.

Sheriffs like Gore who rely on contractors to provide mental or medical services behind bars can write specific conditions into their agreements to make sure providers meet department guidelines, said Maria Schiff of the Pew Charitable Trusts.

Last year she co-authored "Jails: Inadvertent Health Care Providers," a report identifying the health care challenges jails are confronting in the United States.

"Counties have various mechanisms to enforce these things," Schiff said. "Some use financial penalties and some use carrots, rewarding those who meet the criteria or withholding payment when they do not."

Jeff McDonald

🐦 Twitter     ✉ Email     f Facebook

Kelly Davis

🐦 Twitter     ✉ Email

Show Comments

143

# EXHIBIT Z

Case 3:20-cv-00406-AJB-DDL   Document 162-8   Filed 06/07/22   PageID.5800   Page
162 of 201



🇺🇸 An official website of the United States government
  Here's how you know

THE UNITED STATES
**DEPARTMENT** *of* **JUSTICE**
STICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                    Friday, June 25, 2021

## Prison Health Care Provider Naphcare Agrees to Settle False Claims Act Allegations

NaphCare Inc., headquartered in Birmingham, Alabama, has agreed to pay $694,593 to resolve allegations that the company violated the False Claims Act by knowingly submitting false claims to the Federal Bureau of Prisons (BOP) in connection with health care services provided to BOP inmates.

"Companies that do business with the government have an obligation to ensure that they charge only for the services they provide," said Acting Assistant Attorney General Brian M. Boynton of the Justice Department's Civil Division. "We will hold accountable those who knowingly fail to comply with this obligation and seek taxpayer funds to which they are not entitled."

NaphCare subcontracts with physicians to provide health care services to inmates who reside at BOP facilities located throughout the United States. The United States alleged that NaphCare submitted inflated claims for evaluation and management services provided by several physicians at BOP's Terre Haute, Indiana, facility between January 2014 and June 2020. Specifically, the United States alleged that, when certain physicians did not indicate the type of service performed on onsite visit sheets, NaphCare charged the government for higher-level services than were provided. The settlement also resolves allegations that, for two other physicians at BOP's facility in Victorville, California, NaphCare similarly submitted claims that included higher-level services than those that were actually performed.

"This settlement is the result of the OIG's innovative data analytics and other efforts to identify health care claims anomalies to protect taxpayer dollars," said Special Agent in Charge Kenneth R. Dieffenbach of the Justice Department's Office of the Inspector General, Fraud Detection Office. "Government contractors have a responsibility to ensure that all claims presented to the government are accurate."

The resolution obtained in this matter was the result of a coordinated effort between the Civil Division's Commercial Litigation Branch, Fraud Section, and the Department of Justice Office of Inspector General. This matter was handled by Trial Attorney Jonathan Gold.

*The claims resolved by the settlement are allegations only and there has been no determination of liability.*

---

**Attachment(s):**
Download Naphcare Settlement Agreement.pdf

**Topic(s):**
False Claims Act
Health Care Fraud

**Component(s):**
Civil Division

**Press Release Number:**

6/3/22, 5:26 PM    Case 3:20-cv-00406-AJB-DDL    Prison Health Care Provider NaphCare Agrees 2-Settle False Claims Act Allegations  PageID.5801    Department of Juage

Case    3:20-cv-00406-AJB-DDL    Document 162-8    Filed 06/07/22    PageID.5801    Page
163 of 201

21-597

*Updated July 6, 2021*

# EXHIBIT AA

# reno gazette journal

NEWS

# Death follows Washoe County Sheriff's decision to award a $5.9 million no-bid contract to NaphCare

**Anjeanette Damon** adamon@rgj.com
Published 8:41 a.m. PT April 5, 2017 | **Updated 12:27 p.m. PT April 6, 2017**

To Keely Darmody, nothing was more terrifying than the prospect of jail.

The fear was a real one for Darmody. The biggest battle of the 25-year-old's life was the drug addiction she developed as a means of coping with bipolar disorder. And with drug addiction often comes a jail cell.

In August, Darmody was arrested in Sparks for possessing drug paraphernalia. Freed on the condition that she stay clean, she failed a drug test and was sent back to Washoe County Jail.

Five days later, Darmody was dead.

"It just was like her worst-ever nightmare to be in jail, and then to have to die alone on a jail cell floor... nobody should have to die that way," her mother, Melinda Darmody, said.

Deputies found Darmody unresponsive on the cell floor with a garbage can full of vomit at her side. She had spent the last three days of her life vomiting until she was so dehydrated she died.

Although she was going through withdrawals, which caused the excessive vomiting, autopsy reports showed Darmody also had a high level of methamphetamine in her system. The medical examiner could not rule out the possibility that she had consumed drugs while in jail -- something that jail command staff said they couldn't explain.

Darmody is one of 13 inmates to die in the Washoe County Jail in the last two years. That's more than the total number of inmates who died in the eight years before Sheriff Chuck Allen took office on Jan. 1, 2015, a Reno Gazette-Journal investigation found.

148

The death rate in the Washoe County jail is five times higher than the national death rate in local jails.

The spike in deaths coincided not only with a new sheriff, but with the hiring of a new medical and mental health care provider. Alabama-based NaphCare Inc. was handed the $5.9 million-a-year contract six months after Allen took office. No competitive bid took place.

Of the 13 deaths since Jan. 1, 2015, 10 have occurred under NaphCare's contract, which was recommended by Allen and approved by the Washoe County Commission. Two deaths were ruled accidental by the medical examiner: Darmody's and a man who died when a baggie of meth ruptured in his digestive tract.

Four inmates committed suicide, including one who drank so much water he died — in the infirmary. Three inmates died after struggling with deputies who had pinned them to the floor on their bellies. And one 29-year-old man died of natural causes, a brain tumor.

NaphCare's general counsel, Brad Cain, said the company takes inmate care seriously, but pointed out the "extreme challenges" posed by the inmate population, including "high rates of chronic complex illnesses, drug and alcohol abuse and mental illness."

"Unfortunately, even with top-notch health care personnel, appropriate policies and procedures and advancements in technology, and vigilant prevention efforts, not every inmate death is preventable," Cain said in a lengthy written statement. "Every inmate death is a tragic loss, and we work hard every day to save lives and maintain and improve the health of our inmates."

Cain would not comment on any of the individual deaths or care provided to specific inmates.

When Allen took office in January 2015, one of his first moves was to oust the jail's medical contractor, Armor Correctional Care, which was paid $5.8 million for the first year of its contract.

"When I became sheriff, I was hearing some concerns from the command staff of the detention facility regarding the performance and the overall ability (of Armor) to provide quality health care on a consistent basis," Allen said.

Four people died in the 13 months Armor had the contract, including two natural deaths and two suicides. The jail's command staff wasn't satisfied with the administrator Armor put in

charge, and the company couldn't keep up with demands at the jail, sheriff's Capt. Heidi Howe said.

But rather than undertake a time-consuming competitive bid process, Allen simply relied on the recommendation of his detention command staff, who liked NaphCare. Howe and a former detention captain had visited the Clark County Detention Center and were impressed by how the facility was run and the fact NaphCare had been the provider there for nearly a decade.

That longevity is what Allen cited as the reason he selected the company. Because NaphCare already had a contract with another government within the state, he didn't have to undertake a competitive bid process. With the Washoe County Commission's unanimous vote, Allen simply joined the Clark County contract.

But while NaphCare has held onto the contract for a long time in Clark County, its record hasn't been spotless.

Lawsuits pending against the company when it was given the Washoe contract included a wrongful death claim for an inmate who was stabbed to death with a pencil by another inmate who was supposed to be under care for a mental illness.

Another man died after a struggle with deputies. His surviving family's lawsuit claimed NaphCare didn't provide him his medication, which led to a seizure, which deputies interpreted as a fight.

Another woman sued after suffering through painful withdrawals from methadone, claiming neither the jail nor NaphCare provided her with her prescribed methadone.

After years of legal wrangling, NaphCare was eventually dropped from those lawsuits.

Several lawsuits remain open in Las Vegas, however.

One man was arrested in Las Vegas when police mistakenly thought he was driving a stolen car. When he went to jail, NaphCare didn't provide him with his heart medication until he had chest pains, his lawsuit claims.

Another lawsuit claims NaphCare ignored a Las Vegas inmate's complaints of severe pain in her abdomen until she required emergency surgery. Her lawyer, Cal Potter, said she went septic from the abscess in her digestive track and almost died.

"I call her my miracle client," Potter said of the woman's comeback from near death.

Potter also represents the family of a man who suffered from a flesh-eating bacteria while at the Clark County Detention Center and eventually died. The lawsuit claims NaphCare ignored his condition despite his "excruciating pain, swelling and weakness."

A third man represented by Potter claims in a lawsuit that NaphCare personnel declined to treat the broken jaw he suffered after being jumped by other inmates. The man had been arrested for a string of burglaries he didn't commit.

When inmates are in jail, they don't have the freedom to seek medical attention anywhere but from the jail infirmary. Jails have the constitutional responsibility to provide adequate medical attention. Failure to do so constitutes cruel and unusual punishment.

"The biggest problem, not only with NaphCare, but with these other contractors is they try to do as least as possible under their contract," Potter said. "You see a lot of situations where they use physician assistants instead of a doctor or (licensed practical nurses) instead of a registered nurse."

Shortly after bringing NaphCare on at the Washoe Jail, Allen said he began noticing problems as well.

"Well, to be honest with you, I have some concerns, and talking with my staff and the corporate (NaphCare) staff who came in made it very clear that we are looking at going to a new vendor in the near future," Allen said.

The deaths at the Washoe County jail happening under NaphCare's contract also have left families asking how those deaths could happen for inmates who have 24-hour access to health care.

In Darmody's case, her mother notified court personnel supervising her case that Keely suffered seizures when she detoxed and asked that she be put under immediate medical supervision.

It didn't happen.

As a child, Keely Darmody competed in gymnastics and Irish dance and loved to enter horse show competitions. As she grew older, Keely also dealt with a drug addiction that resulted from her attempts to cope with bipolar disorder, her mother said.

"She was a fighter. She never gave up on anything, most of all herself," her mother Melinda Darmody said. "She never gave up trying to get clean and sober."

When Keely Darmody was 15, she became addicted to the pain pills she took after a tonsillectomy, her mom said.

Last year, Keely Darmody moved to Reno to be with her boyfriend, who had just gotten out of the military. But within months, she was arrested on drug possession charges. She was released for a time on the condition that she remain off drugs. When she failed a drug test, she went back to jail, a place that terrified her.

Melinda Darmody said she spoke with court personnel about her daughter's drug addiction and the medical care she needed while going through detox. Her daughter, who had always been thin, suffered seizures during the rigors of detox.

She said her daughter needed medical supervision.

But the jail staff doesn't put inmates in the infirmary until they exhibit a need. So, Keely Darmody was put in an intake unit that offers more supervision than the general population, Howe said.

"We don't have a medical unit that is large enough for everybody on detox protocol," Howe said.

When Darmody's condition deteriorated, she moved to the infirmary. Five days after she was booked, she was found unresponsive in her cell and died at the hospital.

It took the medical examiner's office four months to arrive at a cause of death: complications of dehydration due to drug withdrawal. Darmody had opiates and methamphetamine in her system.

Melinda Darmody knows very little about how her daughter died. She knows her daughter was suffering from dehydration, likely caused by the sweating and vomiting that accompanied detox. She said her daughter was taking anti-nausea medication when she died.

"We just don't know," Melinda Darmody said. "The investigator that we talked to from internal affairs for the jail said that it looked like she had gotten severely dehydrated and that caused her to have seizures."

But she wants to know why her request for medical supervision for her daughter went unheeded.

"We were told and reassured she would be under medical supervision the whole time," she said. "We were told not to worry."

152

She doesn't trust the jail's internal investigation.

"I'm sure the investigation will be to protect the jail and not to get at the truth," Melinda Darmody said.

She promised to fight for answers.

"I promised her as I kissed her goodbye for the last time that I would fight for her," Melinda Darmody said. "I won't let her death be for nothing, and I will do everything in my power to make sure this never happens to anyone else."

Allen said such a reaction from the family of inmates who have died is reasonable. But he said he has complete confidence in the professionalism and competence of his corrections staff at the jail.

He's not so happy with the medical contractor he brought on.

Within months of NaphCare taking over medical services at the Washoe County jail, Allen and his staff began to notice problems, he said.

NaphCare was having trouble filling contractually required positions and determined they didn't have enough authorized positions to deliver necessary care, Howe said.

When the old contractor left, many of the on-site medical professionals wanted to remain working at the jail. But Allen said NaphCare offered them a lower salary to remain employed.

Howe said much of the jail's medical staff left.

"We lost a lot of our institutional knowledge in the staff working here," she said. "We had addressed it immediately with Naphcare and they started increasing wages. They increased them some, but they don't give me a report on here's how they're much paying."

Under the contract, NaphCare is required to provide a medical doctor 40 hours a week and a full complement of nurses, physician assistants and mental health care personnel.

Asked if NaphCare has dropped below contractually obligated staffing levels, Cain said the company has provided 118.56 percent of the contractually required hours of service in the past two years.

"The hours provided may fluctuate for a certain position if the staff member is out on leave, vacation, etc. during a monthly period," Cain said. "However, when factoring in total hours provided, we have exceeded the contracted staffing hours requirement."

153

Howe didn't dispute the overall hours staffed by NaphCare probably meet the contractual obligations. But she said the contractor has deficiencies in specific areas, particularly mental health.

"I struggle with that (statement)," Howe said. "If you give me more hours with a (registered nurse), a (licensed practical nurse) or an (emergency medical technician), but don't give me enough mental health providers, that's a problem."

"Right now we have a full-time psychiatrist, we do," Howe added. "But we are supposed to have mental health care seven days a week and that's not happening."

Cain, in turn, blamed the jail for the personnel problems.

"NaphCare has encountered a number of challenges in meeting the healthcare needs of the inmates at Washoe," Cain said in a written statement. "These challenges begin with just getting our doctors and nurses through the jailhouse door due to the county's very strict security requirements."

Cain said 19 NaphCare employees had their security clearance revoked and another 12 took a job somewhere else because of the length of time it took the jail to perform background checks.

An audit of the jail's health care services performed in late January found significant problems with the delivery of health care, particularly mental health care under NaphCare's contract. Problems included exorbitant wait times to see a mental health professional, an over-reliance on temporary medical staff, inadequate training, a denial of certain prescription psychotropic drugs and inadequate initial health screenings.

Both Howe and Cain said they are analyzing the report, implementing some improvements and disputing some of the recommendations.

Cain touted the company's detoxification program as being "on the forefront in correctional health care" and conforms with national health care association standards.

"Any inmate identified as being at risk of withdrawal for a specific class of substance is enrolled in NaphCare's detoxification program, and the assessment and treatment protocols utilized by NaphCare personnel are nationally recognized and accepted as the appropriate standard of care for these issues," Cain said.

But Darmody's wasn't the first serious issue NaphCare had with a detoxing inmate at the Washoe County jail.

154

Richie West, who was arrested last year on suspicion of operating a pain pill ring from his father's car dealership, overdosed on the methadone the jail's doctor, Mark Hahn, had prescribed him. According to court documents, West received two doses of Narcan to revive him.

NaphCare terminated Hahn after the incident. Cain said he could not comment on personnel matters when asked about Hahn's departure from the jail.

Dr. John Dimuro is Nevada's chief medical officer, appointed by Gov. Brian Sandoval, and a board-certified pain specialist who has weaned patients off narcotics in private practice. He testified as an expert witness in West's case, recommending West be released from jail pending his trial so he could receive more effective medical care.

As Dimuro testified, West is a challenging patient because of his addiction to pain pills and the fact he had a gastric bypass, which prevents him from digesting normal doses of pain medication.

In an interview with the Reno Gazette-Journal, however, Dimuro said he is concerned that the jail doesn't employ a board-certified pain specialist.

"On a general scale, it worries me that non-pain physicians are doing the weaning," Dimuro said, noting it would be difficult to find a board-certified physician to work in a jail setting.

Patients undergoing detox are in a fragile medical state from the start, with a high risk of heart attack. That problem is worse when a patient is forced to go "cold turkey" and stop the narcotics without weaning off the drug slowly.

"The problem with cold turkey is the side effects make you more susceptible to morbidity and mortality," Dimuro said.

After the Reno Gazette-Journal began investigating the deaths at the Washoe County Jail, personnel there began to take action, including hiring the National Commission for Correctional Health Care to conduct a thorough review of the jail's medical services. Allen said he hopes to use that report to fashion a more detailed request for a new medical contractor.

This time he plans to put the contract out for competitive bid.

He noted NaphCare is welcome to submit a proposal to compete in that bid.

"We just want to get it right," Allen said. "When we go home at night, we want to sleep and not worry that there's going to be a medical discrepancy in the jail while we're gone."

# EXHIBIT BB

157



DONATE

## Their secrecy

# Pain And Profits: Sheriffs Hand Off Inmate Care To Private Health Companies

11:52

### DYING ON THE SHERIFF'S WATCH

*Part two of a series.*

**March 24, 2020**

By Beth Healy 🐦 and Christine Willmsen 🐦

*This article is more than 2 years old.*

t the Suffolk County House of Correction in Boston, where hundreds of people are serving short sentences, the sheriff tries

158

to keep inmate trips to hospitals or medical specialists under 80 per month. Escorting them off-site is considered a costly headache.

Suffolk's medical provider, a Birmingham, Ala., company called NaphCare Inc., is on board: It pays the sheriff's department a $100 penalty for each trip over the cap.

Rodrick Pendleton, a 51-year-old truck driver and preacher who became addicted to drugs, was under Suffolk County Sheriff Steven Tompkins' custody in June of 2015. He was in excruciating pain, fellow inmates in the medical unit said. Too weak to stand, he needed a chair to shower. He threw up in a pail for days, just feet from the NaphCare nurses.

"He was way beyond sick," an inmate told investigators in a recording obtained in a public records request. Pendleton looked like he was dying, the inmate said. "I was just thinking — why don't they just send him to the hospital?"



Cell number 7 at the Suffolk County jail, where Rodrick Pendleton suffered for days before dying due to a bowel obstruction. (Jesse Costa/WBUR)

A WBUR investigation found inmates in county jails suffering, and sometimes dying, under the care of companies with contracts that provide incentives to curb costs and hospital trips. These for-profit firms are increasingly taking over health care in jails here and across the country — part of a multi-billion-dollar industry with little public scrutiny.

Now more than ever, sheriffs' medical providers will come under staffing and financial strain amid this looming coronavirus crisis. Visits have been curtailed at jails across the state, and officials are debating whether to release some inmates from their cramped facilities. Sheriffs, meanwhile, are under pressure to show they can keep people safe.

_WBUR is a nonprofit news organization. Our coverage relies on your financial_

160

*support. If you value articles like the one you're reading right now, give today.*

Of the 13 sheriffs who run jails in this state, seven hire outside firms to provide medical care. Those contracts cost taxpayers about $42 million a year.

NaphCare staff finally sent Pendleton to the hospital. But not in time.

"When they paid attention, it was too late," said his sister, Janice Pendleton. The hospital was "right around the corner. I mean, I don't understand."

**Related audio**

> ### Recording From 2015 Pendleton Death Probe
> 02:31

*(Editor's Note: Above is an audio excerpt of an inmate being questioned in the internal investigation of Pendleton's death. WBUR obtained it from the Suffolk County Sheriff's Department. Portions were redacted by the department citing medical privacy. WBUR has shortened those pauses.)*

His autopsy would show he'd endured a bowel obstruction, a serious condition that frequently requires surgery. Pendleton was one of 127 Massachusetts jail inmates to die over the past decade of medical causes. The deaths often involved allegations or evidence of poor care.



Janice Pendleton with images of her brother, Rodrick Pendleton, and his children. (Robin Lubbock/WBUR)

## Jail Contracts Designed To Curb Costs

WBUR found that a bias toward avoiding hospital trips — even in emergencies — is often embedded not only in jail culture, but also in contracts with the private companies that sheriffs hire.

"These companies are inherently motivated to make money. That's why they're in the business," said Andrew Harris, professor of criminology and justice studies at the University of Massachusetts, Lowell. "There are going to be situations where care is going to be withheld, very often with negative consequences for the patients."

The same year Pendleton was sick, 2015, NaphCare won a renewal of its contract with the Suffolk sheriff. Just weeks later, NaphCare claimed it had

underbid, and wanted to renegotiate, according to records obtained by WBUR.

The sheriff's department told NaphCare it had to stick to its original bid.

**Suffolk County Jail**



Current sheriff: **Steven Tompkins**

Total deaths 2008-2018: **31**



Average inmate population (2018): **1,499**

Health care provider: **NaphCare**

Over the next three years, the sheriff's department charged NaphCare $2.4 million in penalty fees for inadequate staffing.

Rachelle Steinberg, a Suffolk assistant deputy superintendent, would not say whether the contract terms ever changed. As for the cap on off-site medical trips, Steinberg said they're designed to be higher than necessary for the

roughly 1,400 inmates in the sheriff's custody. She declined to comment on Pendleton.

"Our providers send people out on a regular basis to the hospitals and have the option to do so should that be medically necessary," she said.

In 2018, NaphCare paid $1,300 for exceeding the cap, the sheriff's department said, or the equivalent of 13 additional off-site trips.

"It's hard to imagine a more blatant and inappropriate disincentive to provide care than a financial penalty," said David Fathi, director of the ACLU's National Prison Project in Washington, D.C.

These terms can be found in contracts of all three companies that have dominated jail medical care in Massachusetts over the last 10 years.

The Bristol County jail had a cap of 20 off-site trips per month with Correctional Psychiatric Services (CPS) of Braintree. After that, $100 penalties were to kick in. In its contract renewed last year, the cap was raised to 45.

---

### Dying on the Sheriff's Watch

**Part One:** When Inmates Die Of Poor Medical Care, Jails Often Keep It Secret

**Part Two:** Pain And Profits: Sheriffs Hand Off Inmate Care To Private Health Companies

**Part Three:** Inside One Jail's Health Care Problems And 'Culture Of Impunity'

**Part Four:** Powerful Sheriffs Rarely Held To Account As Families Fight For The Truth

---

At the Essex County jail, a past contract offered NaphCare bonuses each month of $1,000 if it ordered no more than 15 emergency ambulance trips. A

separate $1,000 monthly bonus was offered for keeping off-site referrals under 30.

"NaphCare's driving force was money," said Eileen Taylor, a physician assistant for NaphCare at the Essex jail in 2016 and 2017. "It superseded everything else."

Taylor, who has a workers' compensation claim against NaphCare and is part of a group lawsuit against the company over pay, said things like urgent blood tests were sometimes overruled due to cost. Other orders, she said, would be reviewed and changed by centralized medical staff, over a thousand miles away.

And NaphCare was reluctant to send people to the hospital, Taylor said. The message was clear: "Don't send them out unless you absolutely, positively have to,'' she said.

NaphCare executives declined to be interviewed. In an email, spokeswoman Stephanie Coleman said the company "does not override site requests for health care services outside of the jail," but may confer with providers in the jail and recommend other treatments. She added that NaphCare sends patients to the hospital when necessary.

Officials at Essex, Worcester and Bristol all downplayed the caps and incentives, saying they had applied them rarely, or never.

165



A medical exam room in the Worcester County jail in West Boylston. (Jesse Costa/WBUR)

Essex County jail officials said they removed the bonus provisions when they hired Wellpath to replace NaphCare at the end of 2018. Incentives for reducing off-site visits, the Wellpath proposal said, "could create a negative perception of influencing clinical judgment."

In 2015, the company that's now Wellpath Holdings Inc. — the nation's largest corrections healthcare company — pledged to contain off-site medical spending to no more than $500,000 per year at the Worcester jail. If expenses were less than that, the company would split any money it didn't spend with the sheriff's office, 50-50.

"We sincerely believe that as your partner, we should have 'skin in the game,' " the proposal said.

166

Worcester County jail's share of the savings with Wellpath totaled $51,000 for 2016 and 2017, Superintendent David Tuttle said. Worcester scrapped the cost-savings deal in its latest contract, Tuttle said, because it could give a bad impression.

Wellpath's president, Kip Hallman, said contract terms are "almost always established by our clients." Jails want to save money on medical care, he said, similar to managed care used by employers and insurers.

**'I'm Not Going To Make It'**

NaphCare was in charge of caring for Kevin Chamberlain at the Essex County jail in March 2017.

The 66-year-old Vietnam veteran had been locked up for 43 days on a probation violation for driving under the influence with a suspended license. He stayed in the infirmary virtually all of the time.



Susan Chamberlain visits the grave of her late husband, Kevin Chamberlain, in Andover. (Jesse Costa/WBUR)

"He was screaming about being in pain," Taylor recalled.

Complaining in jail is par for the course, and it's part of why providing medical care is a challenge in that setting. Nurses have to distinguish between inmates who fake or exaggerate, and those who are truly sick or suffering.

"Maybe they'll con you 90% of the time. But you better watch out for the 10% of the time that they're not," Taylor said.

She recalled that Chamberlain could be cantankerous, but wasn't a person given to inflating his symptoms.



In this composite image, from left to right, Kevin Chamberlain embraces his brother, Joe Chamberlain. In the other image, Kevin is seen with his wife, Susan. (Courtesy Susan Chamberlain)

Chamberlain, known to friends and family as "Chopper," for his love of motorcycles, had a history of heart trouble and blood clots, as well as post-traumatic stress disorder, according to jail records and his wife, Susan.

"He'd call me at night, and he would cry," she said. He told her, "I'm not going to make it," she recalled. When she tried to visit him, she said jail staff told her she couldn't because, "He's not medically cleared."

On the night of March 28, 2017, jail records show, Chamberlain slept in "Risk Room 3," on a metal bed with a thin plastic mattress.

169



The infirmary at Essex County jail in Middleton. Pictured across from the nurse's station is "Risk Room 3," where Kevin Chamberlain was held. (Jesse Costa/WBUR)

The risk rooms are for patients who need close monitoring. His was directly across from the nurses' station, where staff could keep watch through the window of the locked door. Guards would report they made "all the appropriate checks during the midnight shift."

At 6:45 a.m., corrections officer Steven Snow was fixing his tie in the reflection of the window to Kevin's room — and noticed him not breathing, the records show. The guards unlocked the door and started CPR until an ambulance arrived. Chamberlain died soon after, at the hospital. His death certificate said he died of heart disease and the treatment of blood clots.

Investigation photographs of "Risk Room 3" after the death of Kevin Chamberlain. (Essex County jail)

Asked whether Chamberlain was ill enough that he should have been at the hospital, Essex County Sheriff Kevin Coppinger said, "That would've been a NaphCare decision.''

He added, "The reason we have the privatized health care here is to turn the care, the medical care, over to professionals, who do that for a career."

Coleman, the NaphCare spokeswoman, in a statement said Chamberlain received "the highest quality care possible, and we stand by the care delivered." She said he was "sent to the Emergency Room on multiple occasions" — but did not say when.

## Founder Of Jail Medical Giant Indicted

The juggernaut of the jail health care industry was started by a Worcester-area man — Jerry Boyle.

Wellpath, based in Nashville, Tenn., has $1.6 billion in annual revenue and responsibility for nearly 300,000 inmates in 33 states. It's one of two national jail medical giants that Boyle had a hand in creating.

Boyle had seen how bad health care could be in jail. He started as a prison guard and rose through the ranks to superintendent of Bridgewater State Hospital in the late 1980s to early 1990s. In those days and well into recent years, Bridgewater, an hour south of Boston, was a place where people with mental illness often suffered through poor health care, died or were forgotten entirely.

Boyle would parlay his 15 years of corrections experience into a second career in the private jail health care business — this time for profit.

He first led a company called Prison Health Services, which had the Suffolk jail contract in the early 2000s and later became part of Corizon Health.

171

Clients around the country followed him to his next company, Correct Care Solutions. Boyle attracted private equity backers, including Boston-based Audax Group, that saw prison medicine as ripe for cost savings and potential investment payoffs. Several mergers later, the company is now owned by the Miami investment firm H.I.G. Capital, and rebranded as Wellpath. (Wellpath is a financial underwriter for WBUR. It had no editorial involvement in this story.)



Jerry Boyle in 2014. (Courtesy Nashville Business Journal)

Boyle, 65, was indicted in October 2019 on charges of allegedly bribing a Norfolk, Va., sheriff with cash and gifts for contracts. That sheriff, Robert McCabe, was indicted too. He was one of Boyle's references when vying for business in Massachusetts: "As a client, I feel valued and this sets CCS apart from your competitors," McCabe said in a proposal document.

Both Boyle and McCabe have pleaded not guilty and resigned from their jobs. Boyle left the Wellpath board in October, the company said. The men are scheduled to face trial in May.

The charges marked the end of a long and lucrative run for Boyle, described by associates as an affable businessman who was good to employees. Wellpath executives said Boyle had no day-to-day role at the company after 2015. But his local ties and position as board chairman helped the company win contracts with the Worcester and Essex County jails, the state prison system and Bridgewater State Hospital, his former employer.

In a Nov. 9, 2018, letter to Boyle, Coppinger — the Essex sheriff — congratulated Wellpath on winning the contract. He hand-wrote in the margin, "Looking forward to working with you!"

Boyle was under investigation in Virginia by that time. Through his lawyer, Boyle declined to be interviewed.

172

## Companies Face Lawsuits Nationwide

Unlike elected sheriffs, contractors such as Wellpath aren't subject to public records laws. Most have used that as a reason, along with privacy concerns, to keep records secret, making it difficult for families to hold them accountable. Often, the only way to do so is to sue.

Beyond providing staffing, these companies also shoulder a large portion of the liability that can come with jail care when things go wrong.

"This is a litigious environment," Hallman, the Wellpath president, said. Sheriffs "see us as being a solution to that problem."

---

*Share your story or *[send our investigative team a tip](#)*. Plus, *[sign up](#)* to get WBUR investigations in your inbox. And listen to this series on *[your smart speaker](#)*.*

---

Legal complaints against medical companies and sheriffs range from allegations of neglect submitted in longhand by inmates on their own — and often dismissed by judges for lack of evidence — to those filed in state or federal court by lawyers alleging civil rights violations under the U.S. Constitution.

Wellpath and its predecessor company, Correct Care Solutions, have faced some 1,200 lawsuits from inmates or families in federal courts across the U.S. in the last five years.

Both Correct Care Solutions and NaphCare have boasted in marketing materials or bids that they've never lost a legal case. But behind the scenes, they have settled lawsuits totaling millions of dollars, according to court records and news reports.

173

In 2018, Wellpath paid a family $525,000 after a man died from a bleeding stomach ulcer at a jail in Norfolk, Va., where McCabe used to be sheriff. The company told WBUR it does not discuss patients or lawsuits.

And NaphCare, in just one example, paid a family $500,000 after a 28-year-old man had a seizure and died while restrained by guards and medical staff at the Montgomery County jail in Dayton, Ohio.

Here in the commonwealth, at the Suffolk County jail, NaphCare was sued by a man who alleged that a severe reaction to antibiotics put him in the hospital for weeks, skin peeling from his body. And at the Essex County jail, a man sued the company for failing to provide prompt care for his broken back. NaphCare settled both cases and required non-disclosure agreements.

## Waiting, And Dying

Kelly White's family members didn't have the resources to sue. They never felt they got the full story of what happened to her in the Bristol County jail.

A longtime heroin user, White had been picked up on a warrant in 2012, for owing the New Bedford court $200 in court fees.

Jail records show nurses ordered White twice in the same morning to be sent to the Bristol infirmary, overseen by Correctional Psychiatric Services Inc. (CPS).

But she never made it there the second time. White, 42, died in a maintenance hallway, waiting for a ride to the infirmary, one building away.



The hallway at the Bristol County jail where Kelly White fell unconscious waiting for a ride to the infirmary. (Jesse Costa/WBUR)

Case 3:20-cv-00406-AJB-DDL   Document 162-2   Filed 06/07/22   PageID.5830   Page 192 of 201

She was feeling sick and complaining of symptoms that are blacked out in the jail records. The sheriff's investigative records, citing a medical examiner's report, say she had a heart infection.

"Her cellmate told me she knew she was going to die,'' said Abigale Mulstay, White's sister. "How much pain do you have to be in to say to yourself, 'I'm dying' ?"

At the Bristol County jail, 31 people have died in the custody of Sheriff Thomas Hodgson and CPS over the past decade, WBUR found. That's the same number as at the larger Suffolk County jail, and more than at any other jail in the state.

Seventeen of the deaths were due to medical causes such as cardiac arrest, septic shock and cancer. The rest were suicides.

CPS is owned by Dr. Jorge Veliz, a psychiatrist and former medical director of Bridgewater State Hospital. He started CPS in 1994, later expanding from mental health into medical care.

**Bristol County Jail**



Current sheriff: **Thomas Hodgson**

175



Total deaths 2008-2018: **31**

Average inmate population (2018): **1,115**

Health care provider: **CPS**

Images on his company's website strike a decidedly corrections-oriented tone: closeups of barbed wire and handcuffs on a keyboard. Veliz has won contracts with four major jails in Massachusetts. He's also donated regularly to all of his client sheriffs' election campaigns — more than $7,000 since 2013, including to Hodgson.

The longtime sheriff of Bristol County is known for controversial measures tough on inmates, like charging medical co-pays and allegedly putting mentally ill inmates into segregation too often. He's facing a class-action lawsuit from those inmates and has recently been criticized for the overcrowding of ICE detainees.

In an interview, Hodgson said his jail, like others in the commonwealth, has become a kind of hospital, because so many inmates have medical issues and addictions. Still, he said, "It's never to our advantage to fall short of giving the proper care to anybody here."

Hodgson couldn't say why White wasn't sent to a hospital sooner. He deferred to CPS, saying, "They're the medical experts, not me."

CPS executives declined to discuss White's case. The company's chief operating officer, Beth Cheney, said, "The last thing we want is to have people die."

Case 3:20-cv-00406-AJB-DDL   Document 162-2   Filed 06/07/22   PageID.5883   Page 194 of 201

White had been at Bristol for just four days when she died on March 16, 2012.



A photo of Kelly White. (Courtesy of Abigale Mulstay)

The first several days in jail can be especially dangerous for new inmates withdrawing from drugs. They often suffer from nausea and dehydration, doctors say, and these symptoms can overshadow other health issues.

White was suffering not only because she was coming off drugs, but also from the heart infection, which, doctors say, could have been treated with IV antibiotics.

"She died a miserable death," White's sister, Mulstay, said. "It's a human life. They come with family and friends and history. They come with what-could-have-beens."

*This segment aired on March 25, 2020.*

WBUR's Morning Edition        Dying on the Sheriff's Watch

## Related:

- **Part One:** When Inmates Die Of Poor Medical Care, Jails Often Keep It Secret

- **Part Three:** Inside One Jail's Health Care Problems And 'Culture Of Impunity'

- **Reporters' Notebook And Series Credits:** How WBUR Told 'Dying On The Sheriff's Watch'

- **In Your Inbox:** Sign Up For Investigation Alerts

- **Ways To Listen:** On-Air, Online And On Your Smart Speaker

**Beth Healy** 🐦 Senior Investigative Reporter
Beth Healy is a senior investigative reporter for WBUR.

177



**Christine Willmsen** 🐦 Senior Investigative Editor-Reporter

Christine Willmsen is WBUR's senior investigative editor-reporter.

More...

# wbur

---

## Contact Us

(617) 353-0909

[info@wbur.org](mailto:info@wbur.org)

890 Commonwealth Ave.

Boston, MA 02215

[More ways to get in touch.](#)

## About WBUR

Who We Are

Inside WBUR

Careers

WBUR Staff

Community Advisory Board

Board Of Directors

178

CPB Transparency

Diversity, Equity And Inclusion

# Support WBUR

Make A Donation

Become A Member

Member Services

Donate Your Car

Join The Murrow Society

Become A Sponsor

Volunteer

# Follow

 Facebook

Twitter

Instagram

YouTube

LinkedIn

# Subscribe to our weekday newsletter
## Add WBUR to your morning routine

Your Email Address                    →

*It's Boston local news in one concise, fun and informative email*

© Copyright WBUR 2022

Policies & Statements

FCC Public File

WBUR EEO Reports

FCC Applications

Syndication

# EXHIBIT CC

181

# WHO IS IN JAIL - INMATE DETAIL

**Current as of:**

**06/07/2022 12:23:01**

The data contained in this web site should not be relied upon for any type of legal action.

## PERSONAL INFORMATION

**Booking Nbr:**
19741120
**Last Name:**
EDWARDS
**First Name:**
ANTHONY
**Middle Name:**
RAY

**Date of Birth:**
09/06/1973
**Sex:**
M
**Race/Ethnicity:**
H
**Age:**
48

**Hair:**
BAL
**Eyes:**
BRO
**Height:**
5' 10"
**Weight:**
215 lbs.

## HOUSING LOCATION

**Facility:**
George Bailey Detention Facility
**Address:**
446 Alta Road, Suite 5300

182

**Area/Housing Unit:**
M/OBS
**City:**
San Diego

## ARREST INFORMATION

**Arrest Agency:**
San Diego Sheriff Office

**Date Booked:**
07/02/2019

**Time Booked:**
20:09:01

## <u>BAIL INFORMATION</u>

**Inmate Bail Status:**
**Not Eligible For Release, Bailable Cases, But No Release;**

## RELEASE

**Sentenced?**
No

**Projected Release:**

## CASE / CHARGE INFORMATION

| Case # | Arr | Chg | Code Section | Code Description | *CL | Court | Court Date | Time | *ROC |
|--------|-----|-----|--------------|------------------|-----|-------|------------|------|------|
| CD288422 | 5 | 1 | 4573.6 PC | POSS CNTL SUB IN PRISON | F | <u>EC17</u> | 06/17/2022 | 09:00 | <u>FP</u> |

183

| SCE391238 | 4 | 1 | 530.5(A) PC | GET CREDIT/ETC OTHER'S ID | F | EC17 | 06/17/2022 | 09:00 | PHS |
| SCD277425 | 3 | 2 | 451(D) PC | ARSON:PROPERTY | F | EC17 | 06/17/2022 | 09:00 | SAR |
| SCE392534 | 1 | 1 | 459 PC | BURGLARY:FIRST DEGREE | F | EC17 | 06/17/2022 | 09:00 | PHS |

\* Note: CL - Charge Class (F - Felony, M - Misdemeanor, I - Infraction)

**ROC - Reason On Calendar**

184