GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:   ggrunfeld@rbgg.com
         vswearingen@rbgg.com
         pkaul@rbgg.com
         eanderson@rbgg.com
         hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email:   ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>　　　　　Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**REPLY DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:　Hon. Anthony J. Battaglia<br><br>Date:　August 11, 2022<br>Time:　2:00 p.m.<br>Ctrm.:　4A |

(*counsel continued from preceding page*)

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California  92101-4297
Telephone:  (619) 699-2700
Facsimile:   (619) 699-2701
Email:         christopher.young@dlapiper.com
                   isabella.neal@dlapiper.com
                   oliver.kiefer@dlapiper.com

BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
2760 Fifth Avenue, Suite 300
San Diego, California  92103-6330
Telephone:  (619) 232-2121
Email:         bvakili@aclu-sdic.org
                   jmarkovitz@aclu-sdic.org

Attorneys for Plaintiffs

I, James Austin, declare:

1. I make this reply declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification ("Plaintiffs' Motions"). My qualifications and a list of materials I have reviewed in this matter are set forth in my previous Declaration dated May 1, 2022 in support of Plaintiff's Motions. Dkt. 119-6.

2. In addition to the materials noted in my prior declaration, I have reviewed Defendants County of San Diego's and Correctional Healthcare Partners, Inc.'s Opposition to Plaintiffs' motions for preliminary injunction and provisional class certification, along with the declarations of J. Adamos, D. Blackwell, Susan E. Coleman, C. Darnell, F. Hunting, M. McArdle, and D. Williamson, and the exhibits thereto (including the report of Andrew Hildreth, Ph.D., attached as Exhibit G to the Coleman Declaration).

3. My opinions set forth below are based upon the documents and other evidence listed above and on my professional knowledge and my experiences working in correctional settings.

### I. The Jail Has an Extraordinarily High Death Rate

4. In my prior declaration, I explained that 18 deaths occurred in the San Diego County Jail system (the "Jail") during 2021, equivalent to a death rate among the 2021 Jail population of 454 per 100,000 incarcerated people. Austin Decl. ¶ 18. I also explained that this death rate is more than *three times* the most recent national jail death rate of 149 per 100,000 jail population, as reported by the Bureau of Justice Statistics, U.S. Department of Justice. *Id.*; *Mortality in Local Jails, 2000-2016 – Statistical Tables* (February 2020).

5. Defendants have hired a UK economist who self-identifies as an expert on the price of trucks and video cassettes, among other things. Report of Andrew Hildreth, Dkt. 153-1, Ex. G at ¶ 1. Mr. Hildreth does not claim any experience calculating jail death rates, nor any experience with respect to corrections issues.

He does not dispute my methodology for calculating the Jail's death rate. He does, however, dispute the State Auditor's methodology for calculating the Jail's death rate, stating that the State Auditor does not take into account the number of additional people who died in the process of arrest as well as certain characteristics of the population specific to the County of San Diego and the Jail. Report of Andrew Hildreth, Dkt. 153-1, Ex. G. As explained below, Mr. Hildreth's methodology does not comport with the methodology that correctional experts in the United States typically use to calculate Jail death rates, and instead appears designed to make the death rate specific to the Jail lower than it actually is.

### A. The U.S. Department of Justice Uses a Standardized Methodology to Calculate Jail Death Rates

6. The U.S. Department of Justice's Bureau of Justice Statistics ("BJS") methodology for computing mortality rates has been in place since at least the year 2000. *See* https://bjs.ojp.gov/content/pub/pdf/mlj0018st.pdf starting at page 25. It allows for a death rate to be computed that controls for the size of the daily jail population. This allows for comparisons to be made across jail systems and years. Developing a unique methodology for calculating the mortality rate for San Diego County's jail system (as was done by Dr. Hildreth) does not allow for such comparisons unless every other jail system in the country used the same approach (which is unlikely and impractical because those other systems would likely want to control for factors unique to their own jail population).

### B. The Methodology I Used to Calculate the Jail's Death Rate is Appropriate

7. Using the BJS methodology, I calculated a death rate for 2021 at the Jail to be 454 per 100,000 daily jail population based on the fact that 18 deaths occurred in 2021 and the average population in 2021 was 3,967. The most recent BJS national death rate for jails was 149 per 100,000 daily jail population for the year 2019. Austin Decl. ¶ 18. Thus, by using the BJS methodology, I can compare

the death rate in the Jail to the national average. This comparison shows that the death rate in the Jail in 2021 was nearly three times the national average.

### C. The Methodology the State Auditor Used to Calculate the Jail's Death Rate is Appropriate

8. Dr. Hildreth faults the State Auditor report on three issues – 1) it did not include Los Angeles County as a comparison site, 2) it did not account for the number of deaths that occurred in the arrest process, and 3) it did not use a mortality rate based on bookings.

9. With respect to the exclusion of Los Angeles County as a comparison site, it should be noted that the Los Angeles County jail system — which has been under a consent decree due to unconstitutional living conditions and has implemented a wide array of reforms to address those issues — is quite different than the Jail in terms of its volume of bookings and the daily population size. Further, the Los Angeles County jail system has a large "sub-station system," which deflects a large number of people arrested each year from the main jail system. As such, the Los Angeles County Jail system's uniqueness makes it difficult to compare to any other large jail system.

10. In terms of not taking into account the number of deaths that occurred during the arrest process, the data presented by Dr. Hildreth states that his analysis takes into account all such deaths between 2006 and 2020 that occurred upon arrest by the applicable Sheriff's Department. A large number of arrests in these counties, though, are made by non-sheriff law enforcement agencies. Therefore, in order to make a valid assessment of such deaths, Dr. Hildreth would need to include data for *all* arrests made by *all* law enforcement agencies in those counties.

11. Further, the argument that such arrest-based deaths somehow reduce the number of in-custody deaths is highly speculative and incomplete. One would need to know the causes of such deaths (e.g., killed by arresting officer versus

overdose while being arrested and transported to the jail for booking) in order to make any meaning of such analysis.

12. Although Dr. Hildreth claims that the State Auditor report does not take into account the number of bookings when calculating the death rate in the various California county jail systems, the State Auditor's report *does* do that. *See* Appendix A, Table A.2. I would agree that it is useful to examine a mortality rate based on both the average daily population ("ADP") and bookings. The State Auditor's report shows that whether based on the ADP or bookings, the Jail has consistently had one of the highest mortality rates in California since at least 2005.

13. BJS's 2019 national jail booking data shows a death rate of 11.7 per 100,000 bookings. The 2006-2020 San Diego rate is 14.4, which is higher than most other large jails in California. San Diego's rate has only gotten higher for 2021 and the first part of 2022. Dr. Hildreth could have calculated 2021 and partial 2022 rates based on the ADP and bookings but chose not to do so while knowing that these rates would be considerable higher than the pooled rates for 2006 – 2020.

**D. The Jail's Anticipated Death Rate in 2022 Will Likely Exceed the Jail's Extremely High Death Rate in 2021**

14. As of June 2, 2022, 10 incarcerated people have already died in the Jail so far this year. As of June 2, 2022, the Jail's current population is 4,017. Daily Population Report, San Diego County Sheriff's Department, https://apps.sdsheriff.net/Inmatepopulation/. At this pace, the number of deaths in 2022 will be 24 with a mortality rate of 597 per 100,000 jail population. This projected death rate is *four times* higher than the most recent (2019) national jail death rate of 149 per 100,000 jail population.

15. The Jail's extraordinarily high death rate continues to increase, which further exacerbates the risk of serious harm and death for incarcerated people within the Jail.

## II. Defendants' Plans Regarding Drug Contraband Screening Are Insufficient

16. Defendants admit that narcotics are a "huge problem" in county jails generally. Hunting Decl. ¶ 4. Defendants also admit that the amount of fentanyl, methamphetamine, heroin, and cocaine seized in the Jail facilities has risen over the past several years (since 2019). Hunting Decl. ¶ 6. Notably, this increase in narcotics has taken place during the Covid pandemic, when Jail facilities were largely closed off to visitors from March 2020 through the present. Assuming that visitors are a substantial contributor to the amount of drugs in any jail, one would expect the amount of drugs at the Jail to have decreased during the pandemic (assuming no changes in other sources of narcotics contraband). The increase in seized narcotics during this time suggests either a change in the level of searches for contraband or that more drugs are coming into the facility from other sources, such as staff, newly booked persons, or mail. In any event, despite substantial increases in narcotics seized at the Jail, in Jail overdoses, and in Jail overdose deaths in recent years, Defendants' Opposition papers do not indicate any action plan to immediately change what they are doing to interdict narcotics that are known to pose a risk of overdose (including death) to incarcerated people at the Jail.

17. Defendants make inconsistent representations regarding the number of body scanners currently at the Jail facilities. A December 2020 Sheriff's Department News Release states that there are "six high tech x-ray body scanners" at the Jail facilities, yet J. Adamos and C. Darnell declare in their declarations that the Jail system only has five body scanners, which are placed at booking facilities. Coleman Decl., Ex. G at 2 (ECF page 212); Adamos Decl., ¶ 10; Darnell Decl. ¶7. Regardless of which figure is accurate, Defendants admit that body scanners are not available at every Jail facility. Adamos Decl., ¶ 10; Darnell Decl. ¶7. Body scanners should be used at all Jail facilities, not just booking facilities.

18. Defendants' declarants, a Captain in the Detention Support Division and a Captain of the Central Jail, both state that there are five body scanners: "Two are at Las Colinas DRF, one at Vista DF, one at SD Central Jail, and one at George Bailey DF. These are the facilities that conduct intake/booking, *so scanners are not needed at the other facilities*." Adamos Decl., ¶ 10; Darnell Decl. ¶ 7 (emphasis added). This indicates that Defendants intend to scan only incoming incarcerated people and *not* staff, contractors, or visitors. If Defendants planned to scan all persons entering the Jail facilities, they would not limit body scanners to only those Jail facilities that conduct intake/booking – instead, they would strive to have at least one body scanner at each Jail facility and require all persons entering the secure areas of the facility to be scanned.

19. As discussed in my previous declaration, in order to effectively use body scanner resources to interdict narcotics contraband, *all* persons entering the Jail facilities (including staff, visitors, maintenance personnel, contractors and incarcerated people) should be scanned upon entry. The Sheriff's Department (the "SDSD") has itself identified staff as a source of narcotics contraband in the Jail. *See* Sheriff's Department admissions in Dkt. 119-3 at ¶ 36 & Ex. II; *id.* ¶ 41 & Ex. NN. Yet, it appears that Defendants do not intend to scan staff prior to entry into the Jail facilities. As a result, Defendants will miss potential sources of drug contraband in the Jail. Without working to interdict drug contraband from all sources, I anticipate that drugs will likely continue to be widely available in the Jail.

20. Plaintiffs' requested preliminary injunction would require the SDSD to develop a plan to revise Defendants' policies, procedures, practices and training for the interdiction of drug contraband being brought into the Jail and a plan to maintain fully-functioning body scanners located at *all* Jail facilities, ensure that *all* people who enter the facilities are properly scanned, and ensure all staff who operate scanners are properly trained.

21. Defendants' statements about how they use body scanners and how they train deputies on scanner use suggests areas for improvement. Staff assigned to the scanning systems should be specialists who are properly trained and consistently assigned to these units. There should also be regular simulation tests of their skills where staff who are purposely carrying drugs go through the scanning system to test and improve deputies' ability to properly evaluate body scan results. And, as stated above, people who regularly come into the Jail, such as staff, visitors, and contractors, should be scanned upon entry.

### III. Defendants' Plans Regarding the Jail's Intercom System Are Incomplete and Inadequate

22. Defendants' plans to address the issues with the Jail's intercom system are insufficient. Defendants state that on May 6, 2022, the Facility Commander at Central Jail sent a directive to staff to check the intercom buttons on the first and second floors of the Central Jail facility during each shift. Adamos Decl. ¶ 4. The Central Jail facility has eleven floors and is only one of six facilities within the Jail System. *See* https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/58/. Defendants do not explain why they will increase intercom functionality checks on two floors at a single facility, but not in all the other housing units where most incarcerated people are at risk of not being able to summon help using the intercoms. In order to ensure that incarcerated people have the ability to call for emergency help from Jail staff at all times, SDSD should revise their formal policies and procedures (rather than merely issuing inter-departmental correspondence) to require staff to regularly check the intercom functionality *in all housing units of each facility*.

23. In addition, Defendants vaguely state that a "renovation of the digital equipment used with the intercom system is planned" and that "I am informed and believe this will be done by the end of 2022." Darnell Decl. ¶6. Defendants provide

no details regarding the scope of the planned renovation, whether it will be at more than one facility, how it is expected to improve the system, whether plans could change, and whether it in fact has any concrete deadlines. Accordingly, there is not enough information for me to opine as to whether this plan will help ameliorate existing problems.

24. Defendants' declarant, J. Adamos, also states that if an incarcerated person is put into a holding area with an inoperable intercom, "it [sic] will be directly supervised or have 30-minute safety checks." Adamos Decl. ¶ 4. However, defendants do not provide any plans to ensure that broken intercom buttons are timely repaired. Adamos states that maintenance requests are submitted for inoperable intercoms but provides no information regarding the timeline for submitting the maintenance request, the timeline for repair, or how the intercom buttons are tested after they are repaired to ensure they are, in fact, functional. *Id.*

25. Defendants' declarants make inconsistent statements regarding the Jail's policies with respect to muting the intercom buttons. C. Darnell states that Central Jail "*prohibit[s]* any muting of the intercom system on the security side" and has "made [muting] more difficult to accomplish." Darnell Decl. ¶ 5 (emphasis added). J. Adamos, though, states that there is a way to temporarily disable calls from a particular cell for a period of 15 minutes and that the practice is used "*sparingly*." Adamos Decl. ¶ 6 (emphasis added). This discrepancy as to whether security staff is prohibited from muting intercom buttons (or may do so sparingly) suggests that the Jail does not have clear policies and procedures with respect to the muting of intercom buttons and/or that staff are not properly trained on the policies. If an intercom button is muted, staff should be conducting more frequent safety checks of that particular cell to ensure that the incarcerated person in the cell is not experiencing medical distress or another emergency.

26. Plaintiffs' requested reforms would instead require the SDSD to develop a plan to repair any non-functional elements of the intercom and

emergency button system, regularly test the system to ensure functionality and identify and remediate inoperable intercom components, ensure that when any elements of the intercom and emergency button system becomes inoperable, they are timely repaired (*i.e.,* within 2 calendar days), ensure that Jail staff are properly trained to respond and do respond to emergency calls within the Jail, and revise policies and procedures and training materials as necessary.

27. Since Plaintiffs' Motions were filed, the County's Citizens' Law Enforcement Review Board ("CLERB") has found that a deputy failed to respond to multiple emergency calls on behalf of Luis Gomez, who later died. CLERB Meeting Agenda, May 10, 2022, at 5. CLERB found that on the day of Gomez's death, "Gomez's cellmate expressed concerns about the physical well-being of Gomez to Deputy 1 directly on two separate occasions, once during hard count and once through a call box." *Id.* at 5. Another incarcerated person also notified officers about Gomez's declining health through the call box. *Id.* Despite these notifications, the deputy "failed to take action to summon medical aid." *Id.* CLERB identified "a lapse of approximately 48 minutes from when Deputy 1 had the opportunity to identify a medical emergency to when another deputy discovered Gomez unresponsive." *Id.* This tragic incident shows the need to reform policies, procedures, and training materials about deputy responses to emergency calls, and to do so across facilities.

28. I have also reviewed the Reply Declarations of Gustavo Sepulveda and Frank Ross, both of whom are incarcerated at Central Jail. Both persons describe incidents in late May 2022—post-dating the May 6, 2022 directive at Central Jail—in which deputies at Central Jail failed to respond to emergency calls for approximately 30 minutes or more. The declarations indicate that incarcerated people likely suffered more serious harm due to deputies' delayed response to requests for help through the intercom system.

### IV.  Defendants' Plans Regarding the Jail's Video Surveillance System are Vague, Untimely and Inadequate

29.   Defendants' plans to address the inadequacies of the video camera surveillance system in the Jail are vague and provide little information about what actually will be changed.  For instance, Defendants state that they "anticipate upgrading the cameras in the housing units, safety cells, and intake cells" without providing any further details as to how, where, or when the cameras will be upgraded.  Blackwell Decl. ¶7.  Defendants separately state that SDSD plans to upgrade the camera system in the next fiscal year (2023/2024).  McArdle Decl. ¶ 4. Defendants provide no specifics regarding the planned updates.  Defendants do not explain what the upgrade entails or why they are waiting until next fiscal year to perform the upgrade.

30.   Furthermore, Defendants' Opposition papers fail to address the glaring need for cameras in areas of the Jail where Defendants know fights occur but which are not properly monitored by cameras.  Defendants provide no plans whatsoever for ensuring that those areas of the Jail facilities are monitored by surveillance cameras.  In fact, Defendants' declarant, M. McArdle, suggests that Defendants will never provide camera coverage in those dangerous unmonitored areas because cameras "cannot be mounted in areas where incarcerated persons can access them or remove or vandalize them." McArdle Decl. ¶ 5.  People should not be housed in unmonitored units where corrections officials know that people are regularly harmed but nevertheless fail to take measures to prevent such harm.

31.   Given the serious risk of harm that the inadequate surveillance system poses to incarcerated people, Defendants need to develop a more detailed plan for upgrading and repairing the existing surveillance cameras and placing cameras in areas that are currently not properly monitored.  These reforms should take place immediately to protect people from further known risks of harm.  As discussed in my prior declaration, incarcerated people are at a serious risk of harm and even

death if staff cannot properly monitor areas in the Jail facilities due to lack of coverage or inoperable cameras.

32. Plaintiffs' requested reforms would instead require the SDSD to develop a plan to replace all outdated and non-functional elements of the video surveillance system at the Jail; develop a plan to ensure that when any video surveillance cameras at the Jail become non-functional in the future, they are timely identified and repaired; and ensure that individuals not be housed in units without adequate video surveillance coverage.

33. Defendants' plans with respect to the video surveillance system are inadequate, particularly as compared to Plaintiffs' requested reforms. Defendants have not provided any reason to wait 1-2 years to upgrade the current system. Moreover, since I have not yet been able to visit the facilities, I am unable to agree with the Defendants' assertion that there are certain locations where a fixed camera cannot be placed due to the concern that inmates will be able to reach them and damage them. Defendants did not provide detailed descriptions and photos of such locations in their response, nor did they provide specific explanations as to why any given area cannot be adequately monitored.

**V.    Defendants' Plans For Conducting and Reviewing Safety Checks are Inadequate**

34. In early 2022, in response to the State Audit Report, the SDSD stated that it would "reevaluate current policy and incorporate best practices" with respect to safety checks and formalize audits of safety checks into policy. Coleman Decl., Ex. H at 3-4. However, it does not appear that the SDSD has made effective changes to its safety check policies and procedures.

35. The SDSD has not increased the frequency of safety checks for incarcerated people held in isolation (i.e., cells with 2 hours or less daily out-of-cell time, including in Administrative Segregation, in Administrative Segregation Overflow, or on Lockdown (or "Bypass") status). *See* Darnell Decl. ¶ 13 (stating

1  that Defendants still only require one check per hour in those cells). Nor has the
2  SDSD changed its policy to require deputies conducting safety checks to confirm
3  that an incarcerated person is actually alive, without disrupting their sleep. *See*
4  Darnell Decl. ¶ 13 (stating that SDSD policy still only requires deputies to look for
5  "obvious signs of medical distress, trauma, or criminal activity").

6  36.  Defendants lack formalized, comprehensive policies for auditing the
7  quality and timeliness of safety checks, even though Defendants claimed in early
8  February 2022 that their alleged practices would be "clearly defined and formalized
9  into policy." Coleman Decl., Ex. H at 4. Four months later, Defendants' only
10 evidence that audits of safety checks are occurring are an email and "post orders"
11 for supervisorial staff at a single facility. Darnell Decl. ¶ 15 and Exs. A, B.
12 Darnell's declaration refers only to supervisors auditing deputy safety checks by
13 video at Central Jail. Darnell's declaration and the related communications to staff
14 at Central Jail do not specify the methodology for auditing the safety checks. An
15 effective audit cannot be accomplished by simply viewing video tapes of the
16 housing units on an unknown basis. The correct way to audit safety checks is to
17 randomly select days of the week and shifts and examine those video tapes to verify
18 checks are being made. Eventually, an electronic recording system should be
19 installed where security staff are required to "tag" each cell showing that they had
20 checked the cell.

21 37.  I have not seen any evidence that Defendants have a practice, policy,
22 or procedure of auditing deputy safety checks by video at any of the other five Jail
23 facilities, where the majority of incarcerated people are held. The practice at
24 Central Jail is also not formalized into any written policies or procedures, only post
25 orders for supervisors. To protect all incarcerated people, the audit process should
26 be formalized into written policy to ensure it is uniform and implemented at *all* Jail
27 facilities. Without a formal policy, the audit process may vary from facility-to-
28 facility and some facilities will likely maintain their current process – which, as

discussed in my prior declaration, is inadequate because it only requires a periodic review of the safety check logs rather than regular audits of the quality of safety checks to ensure that they were actually done in a timely and effective manner. In the absence of effective audits, staff will likely continue to perform inadequate safety checks, which will pose a significant risk of harm and death to incarcerated people at the Jail.

38. CLERB's finding in the death of Luis Gomez, released since Plaintiffs' Motions were filed, is further evidence that audits of safety checks are necessary at all facilities to ensure that deputies conduct effective safety checks. Mr. Gomez died on March 14, 2021 at Vista Detention Facility, a facility not addressed in Darnell's declaration. CLERB Meeting Agenda, May 10, 2022, at 5. CLERB found that a deputy committed misconduct by failing to conduct an adequate "hard count" that proved Gomez was "alive, awake, conscious, and responsive." *Id.*

39. The deputy's failure to confirm that Gomez was alive supports my opinion that the Sheriff's Department should implement regular audits by supervisors of the quality of safety checks (and other checks on the incarcerated person's welfare, like hard counts), to provide accountability and ensure that checks occur timely and effectively. As discussed above, Exs. A & B to the Darnell Declaration indicate that the Sheriff's Department has begun a process to audit safety checks at Central Jail. However, there is no indication that the audit process is occurring at any of the five other jails, or whether the safety check audit process will be formalized in facility- or system-wide policies and procedures. The failure to include any such documentation suggests that it is not.

40. Plaintiffs' requested reforms would require the SDSD to reform its policies and procedures to require custody staff to ascertain that each individual is still alive without disrupting the individual's sleep and to conduct safety checks at least once every 30 minutes at irregular and unpredictable intervals of all

incarcerated people held in isolation. In addition, Plaintiffs' requested reforms would require the SDSD to develop formal policies and procedures for supervisors to audit safety checks by custody staff to ensure those checks have actually occurred, with appropriate accountability and quality assurance measures taken to address deficiencies.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at Camden, South Carolina on June 6, 2022.

*James Austin*