GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:   ggrunfeld@rbgg.com
         vswearingen@rbgg.com
         pkaul@rbgg.com
         eanderson@rbgg.com
         hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email:   ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**REPLY DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:   Hon. Anthony J. Battaglia<br><br>Date:    August 11, 2022<br>Time:    2:00 p.m.<br>Ctrm.:   4A |

Case No. 3:20-cv-00406-AJB-WVG

REPLY DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

(*counsel continued from preceding page*)

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California 92101-4297
Telephone: (619) 699-2700
Facsimile: (619) 699-2701
Email: christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
2760 Fifth Avenue, Suite 300
San Diego, California 92103-6330
Telephone: (619) 232-2121
Email: bvakili@aclusandiego.org
jmarkovitz@aclusandiego.org

Attorneys for Plaintiffs

Case No. 3:20-cv-00406-AJB-WVG
REPLY DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, Pablo Stewart, M.D., declare:

1. I have been retained by Plaintiffs' counsel to provide expert opinion concerning the adequacy of policies, procedures, and practices regarding the San Diego County Jail. I make this Reply declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

2. My education, training, and experience are detailed in the Declaration I completed for this case approximately one month ago, which was filed May 2, 2022 (Docket No. 119-7) (hereinafter, "May 2 Stewart Decl.").

3. Since the time I completed my previous declaration, I understand that the Defendants in this case have filed an opposition to Plaintiffs' motions, accompanied by various declarations and documents. I have been asked to review these materials and provide any supplemental opinions on the issues discussed in my previous declaration about the San Diego County Jail system (the "Jail").

4. In addition to the documents I previously reviewed (as listed in the May 2, 2022 Stewart Declaration), I have reviewed the following additional materials:

(a) Declaration of Susan E. Coleman (Docket No. 153-01)
(b) Declaration of J. Adams (Docket No. 153-0-02)
(c) Declaration of D. Bennett (Docket No. 153-03)
(d) Declaration of K. Bibel (Docket No. 153-04)
(e) Declaration of D. Blackwell (Docket No. 153-05)
(f) Declaration of C. Darnell (Docket No. 153-06)
(g) Declaration of F. Hunting (Docket No. 153-07)
(h) Declaration of M. McArdle (Docket No. 153-08)
(i) Declaration of E. Mendoza (Docket No. 153-09)
(j) Declaration of J. Montgomery (Docket No. 153-10)
(k) Declaration of M. Quiroz (Docket No. 153-11)
(l) Declaration of O. Rodriguez (Docket No. 153-12)

   (m) Declaration of D. Williamson (Docket No. 153-13)

   (n) Records attached to Montgomery Under Seal Declarations re: Individual Mental Health Patients, and attached records (Docket Nos. 151-02, 151-05, 151-06, 151-12, 151-17, 151-18, 151-19, 151-20, 151-21)

   (o) Defendants' Opposition to Plaintiffs' Motions (Docket No. 153)

   (p) Declaration of Valerie Tozar

   (q) Declaration of Joseph Lewis

  5. After reviewing this additional information, my overall opinions in my May 2, 2022 declaration remain unchanged. In fact, the additional information I reviewed has reinforced my prior opinions.

  6. I am providing this declaration to address particular statements in the Defendants' declarations submitted with the County's opposition to Plaintiffs' motions. These statements are in many cases presented or cited by Defendants in ways that are incomplete and/or misleading, such that I feel that it is important for me to provide a response that can be considered by the Court.

  7. As I stated in my May 2, 2022 declaration, I understand that, as the case proceeds, I may have an opportunity to inspect the Jail facilities and review additional documents, records, and information. I expect to consider other issues as the case and relevant discovery move forward. Based upon the documents and information I have reviewed to date, I am able to offer the additional opinions contained in this declaration. I reserve the right to supplement or modify these opinions as more information becomes available.

  8. In summary, my additional opinions in response to the developments described above are as follows

(1) Defendants' declarants confirm that custody staff overrule clinicians on placement decisions for people with mental health needs in ways that put people at substantial risk of serious harm.

(2) Defendants' declarants confirm that the Jail's system fails to provide

confidentiality for clinical encounters and demonstrate a dangerous misconception about the standard of care in detention settings.

(3) Defendants' declarants fail to address serious concerns about the inadequate safety checks that put people at substantial risk of serious harm.

(4) Defendants have not committed to providing incarcerated people direct access to naloxone, while the County declarants do not provide any basis for denying such access.

(5) The health care services contractor transition to Naphcare does not address or mitigate my concerns about deficiencies with respect to treatment of people with mental health needs at the San Diego County Jail.

## I. Defendants' Declarants Confirm that Custody Staff Overrule Clinicians on Placement Decisions for People with Mental Health Needs in Ways that Put People at Substantial Risk of Serious Harm. (May 2, 2022 Stewart Declaration Finding #1)

9. In my May 2, 2022 declaration, I described a major concern about the widespread practice of custody staff overruling mental health clinicians on placement and other clinical decisions for people with mental health needs, in ways that put people at substantial risk of serious harm.

10. The declarations submitted by Defendants confirm this dangerous practice. Notably, they do not contradict the troubling first-hand observations of mental health staff members Jennifer Alonso, LCSW, and Christine Evans, M.D.

11. Jail Mental Health Director Melissa Quiroz responds to my opinions about custody overruling clinical judgment briefly and in a way that heightens my serious concerns. She writes: "In my experience, custody staff do take into account mental health clinicians' input and recommendations, though they sometimes disagree." Quiroz Decl. ¶ 6. She does *not* describe any process for what happens when there is such a disagreement. The clear implication is that "custody decides." This is just the sort of deficiency that puts people with mental health needs at

substantial risk of serious harm.

12.  Neither Quiroz's declaration, nor any of the other evidence submitted, addresses or even discusses my concerns about the Jail's policy deficiencies with respect to placement of people who would be placed at substantial risk of serious harm in Administrative Segregation housing. May 2, 2022 Stewart Decl. ¶¶ 34-50. The declaration of Lieutenant O. Rodriguez, which discusses Administrative Segregation placement procedures (Docket No. 153-12), makes *no* mention of the role of clinicians regarding such placements, even for people who may be at risk of psychological deterioration, self-harm, or suicide. The lack of clinical input in Administrative Segregation placement decisions makes this system dangerous and deficient, including as compared to other criminal detention systems.

13.  Neither Quiroz's declaration, nor any of the other evidence submitted, addresses or even discusses my concerns about the Jail's custodial blanket ban policy against Outpatient Step Down (OPSD) placement for people classified as "protective custody." May 2, 2022 Stewart Decl. ¶¶ 51-65. Patients who meet clinical criteria for OPSD placement should not be automatically excluded from that mental health program placement due to their having a "protective custody" classification.

14.  Quiroz's declaration also does not address my concerns about the custodial interference with clinical judgment regarding placement and conditions in the Enhanced Observation Housing (EOH) unit. May 2, 2022 Stewart Decl. ¶¶ 66-76. Without addressing the many examples presented in the Plaintiffs' staff and patient declarations about problems in this area, Quiroz states only: "[W]hen it comes to matters involving clinical judgments about psychiatric/mental health care, those are the sole province of the psychiatrist or mental health provider (within the scope of their licensure)." Quiroz Decl. ¶ 5. To support this statement, she relies on the assertion that, "[i]n February 2019 our safety policy program was updated, this allowed mental health staff rather than custody staff the authority to make placement

decisions into the safety program and when they will be released from it." *Id.* ¶ 6. That program update was three and a half years ago. The concerns documented by Evans and Alonso, the several in-custody deaths that have followed a custodial-driven placement without or in contravention of clinical input, and the testimony of several patients about their recent experiences all *post*-date that program update.

15. Medical Director Montgomery confirms the ongoing practice of universal denials of clothing, property, and privileges for *all* patients held in EOH, without consideration of individualized clinical input. *See, e.g.*, Montgomery Under Seal Decl. re: Roberts (Docket No. 151-18) ¶ 4 (confirming EOH clothing and property restrictions are categorial and not based on individualized assessment); Montgomery Under Seal Decl. re: Smith (Docket No. 151-20) ¶¶ 6-8 (confirming patient denied clothing and phone access during entire multi-day EOH placement).

16. Whatever the February 2019 "safety policy program update" did accomplish, it did *not* remedy the fundamental deficiency of custody interference with clinical judgment, which continues to put patients at substantial risk of serious harm.

**II. Defendants' Declarants Confirm that the Jail's System Fails to Provide Confidentiality for Clinical Encounters and Demonstrate a Dangerous Misconception about the Standard of Care in Detention Settings (May 2, 2022 Stewart Declaration Finding #2)**

17. In my May 2, 2022 declaration, I discussed the fact that confidential mental health contacts are the standard of care, both in the community and in detention settings, and that the failure to provide sufficient confidential treatment in San Diego County Jail places people at a substantial risk of serious harm by hindering their ability to request and receive adequate treatment. May 2 Stewart Decl. ¶¶ 77-84.

18. The declarations of Mental Health Director Melissa Quiroz (Docket No. 153-11) and Medical Director Jon Montgomery speak to this issue, and their descriptions of practices at the Jail do not in any way change my opinion.

19. Ms. Quiroz confirms that "mental health clinicians often do wellness checks at the cell front." Quiroz Decl. ¶ 11. She explains that a "Sheriff's deputy is **always present** with the mental health clinician on rounds, though the deputy is usually standing back, to the side, and out of view of the patient if possible. The deputies can potentially overhear the conversation but in my experience usually they are not interested, and they are present only to provide security." *Id.* ¶ 12 (emphasis added). Medical Director Jon Montgomery likewise states that, at the San Diego County Jail, "it is common practice to see patients at cell-side for convenience, efficiency, and timeliness." Montgomery Under Seal Decl. re: Baker (Docket No. 151-02) ¶ 3.

20. These descriptions reinforce – and if anything, increase – my concern that the San Diego County Jail system fails to provide for adequate confidentiality. Mental health clinical contacts are not meaningful or adequate unless provided in a private, confidential setting so that patients may communicate openly with their clinician. It makes absolutely no difference if deputies who are present and able to "overhear the conversation" are "usually . . . not interested," as Quiroz states. (Montgomery makes a similar statement, asserting that deputy presence for clinical encounters is not a problem because they "have received HIPAA training, and are not engaged or interested in hearing or learning the details of a medical encounter." Montgomery Under Seal Decl. re: Baker ¶ 3.) These statements demonstrate a fundamental and dangerous misconception about confidentiality, which is a central tenet of mental health standards of care, both in the community and in a jail detention setting.

21. Ms. Quiroz states that "[t]ypically, patients can obtain a confidential meeting if requested but it may take some time to coordinate. If the patient is interested in discussing something privately but it is not urgent, they can request to schedule for a confidential session." Quiroz Decl. ¶ 11. But she then confirms what mental health care staff and individual witnesses have stated, that "[s]ometimes

private (confidential) rooms to use for mental health sessions are in short supply or unavailable." *Id.* ¶ 13.  In short, Ms. Quiroz confirms that there is insufficient confidential treatment space in the Jail's system.

22.  Medical Director Montgomery states that if a patient "wishes for a confidential interview or otherwise desires privacy, then such a request is honored." Montgomery Under Seal Decl. re: Baker ¶ 3.  This statement is directly contradicted by patient declarations, Ms. Quiroz's declaration (see previous paragraph), and even the records attached to Montgomery's own declarations.  Patient and plaintiff Reanna Levy's case offers one example.  She has stated:

> The short non-confidential appointments made it extremely difficult for me to discuss my feelings truthfully. My father passed away in June 2020. His passing has deeply affected my mental health, but I was unable to speak about it openly because my meetings with clinicians were rushed and occurred cell-front. I did not want other incarcerated people, let alone custody staff, to hear me talk about my depression, family, and personal life. I also worried deputies would reveal my confidential information to others, which could place my personal safety at risk. Attached hereto as Exhibit A are true and correct copies of mental health progress notes from my Jail medical records indicating that sessions with mental health staff occurred cell front or with a deputy present.

Declaration of Reanna Levy ¶ 4, Docket No. 119-33.

23.  Medical Director Montgomery's response to Ms. Levy's declaration characterizes Ms. Levy's testimony as "inaccurate," stating that "[w]hile some of her wellness checks with a mental health clinician occurred cell-side, some sessions were held in an interview room."  Montgomery attaches two clinical notes in support of this statement.  One note, from March 2020, states that Ms. Levy was "seen in interview room *with deputy standing in room*."  Montgomery Under Seal Decl. re: Levy (Docket No. 151-12) Ex. A. (002).  The second note, from June 2020, documents that the "deputy sat in on session."  *Id.* Ex. A. (014).  The fact that, in Ms. Levy's nearly four years in custody at the Jail, these are the two clinical notes that apparently best support the County's assertion that the mental health care

system has provided adequate confidentiality for Ms. Levy is both remarkable and deeply troubling.

24. Montgomery concedes that other patients who expressed distress about the lack of confidentiality during mental health clinical encounters in fact did not receive care in confidential settings. *See, e.g.*, Montgomery Under Seal Decl. re: Jones (Docket No. 151-10) ¶¶ 4, 5, 8 (confirming 3 non-confidential clinical contacts, including one where patient "yelled, 'I don't want to be seen here,'" with request "to talk privately" denied by deputy, Montgomery noting that at the Jail "it is common practice to see patients at cell-side for convenience, efficiency and timeliness"); Montgomery Under Seal Decl. re: Clark (Docket No. 151-05) ¶ 6 (noting that clinical encounters were not confidential, but patient "never complained"); Montgomery Under Seal Decl. re: Roberts (Docket No. 151-18) ¶ 7 (confirming non-confidential clinical encounters and stating "deputies are typically nearby").

25. In the patient records submitted under seal by Defendants, some clinical notes reference "semi-confidential" mental health contacts. But in reviewing how such contacts are characterized (at cell-front, with a deputy in the room or otherwise present), it is apparent that all or nearly all of these contacts should be characterized as *non*-confidential. Under the mental health standards of care, there is no category of "semi-confidential" clinical contacts. A clinical encounter either is confidential or is not. It is clear that patients at San Diego County Jail nearly always are seen in non-confidential settings, which undermines the provision of care.

26. In all, the County's declarations confirm my opinion that the failure to provide confidentiality is the norm for clinical contacts at San Diego County Jail, and that this failure prevents the delivery of adequate care, particularly in settings where patients are most vulnerable (Administrative Segregation, EOH, *etc.*). May 2 Stewart Decl. ¶¶ 81-84.

REPLY DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

27. Defendants' opposition papers appear to rely heavily on security-related concerns to justify the lack of confidential mental health care. Based on my experience in and knowledge of detention settings across the country, there are many ways to provide adequate confidential mental health treatment while effectively addressing security risks that arise in the jail setting.

28. First, security measures should be based on *individualized* assessments of a patient's profile and recent behavior, *not* the sort of nearly universal practices undermining confidentiality that are currently in place at the San Diego County Jail.

29. Second, when an individual patient poses a security risk, the Jail may utilize settings that address that risk – for example, a non-contact booth where the patient and provider are separated by a transparent barrier. In some cases, a patient may be restrained, such as with a cuff around the ankle that prevents a patient from moving across the room during a session with a clinician. (I am aware that San Diego County Jail already uses these sorts of measures for attorney-client visits.) Many systems provide for auditory privacy by placing the patient and clinician in a room with a window, such that custody staff may visually monitor the clinical encounter without being able to hear the discussion.

30. In any event, the standard of care – including in a jail setting – is to provide for adequate confidentiality in clinical encounters, with individualized assessments to address security concerns on a case-by-case basis. Based on the information I reviewed, San Diego County Jail fails in this regard.

### III. Defendants' Declarants Fail to Address Serious Concerns about the Inadequate Safety Checks that Put People at Substantial Risk of Serious Harm. (May 2, 2022 Stewart Declaration Finding #3)

31. In my May 2, 2022 declaration, I describe how the failure to conduct safety checks in Administrative Segregation at least every 30 minutes at staggered intervals places people in great danger, especially those with mental illness, at risk of suicide, or with risk factors for drug/alcohol withdrawal or overdose. This reality is confirmed by the multiple in-custody suicides and other deaths that have occurred

in the Jail's Administrative Segregation units, and my concern is echoed by other experts and agencies. May 2 Stewart Decl. ¶¶ 85-94.

32. The County's declaration of Lieutenant D. Williamson (Docket No. 153-13) confirms that the County's policy and practice provides for safety checks in Administrative Segregation only hourly, just half as often as the thirty-minute checks that I and others have strongly urged.

33. Lt. Williamson instead describes "other precautions taken to help keep inmates safe." Williamson Decl. ¶ 5. These include "cameras in dayrooms and common areas," "two-way intercoms," "dayroom access on most of the units," meal distribution by other inmates, medication pass, twice-per-shift "soft counts" and once-per-shift "hard counts," and mail distribution. *Id.* ¶¶ 5-7. To be clear, based on my years of work in the detention setting, *none* of these "precautions" substitute for effective staggered-30-minute safety checks for people in the Jail's Administrative Segregation units. These units are defined by intense isolation and deprivation and, alarmingly, continue to be filled with people who have mental illness and significant risk factors for suicide and self-harm.

34. Defendants' brief and declarations do not sufficiently address my serious concern about the Jail's failure to perform adequate safety checks, a finding that has also been made by the California State Auditor, the Citizens' Law Enforcement Review Board (CLERB), and Disability Rights California. May 2 Stewart Decl. ¶¶ 95-105. Central Jail Facility Captain C. Darnell indicates in his declaration that some auditing processes for safety checks have been put in place at the Central Jail. (Docket No. 153-6, ¶¶ 15-16). However, there is no discussion of any auditing processes at any of the other facilities in the system, where thousands of other people are held (Las Colinas, Vista, George Bailey, etc.). While I would need further information to understand the adequacy of the audits being done at Central Jail, the ongoing absence of any auditing process at the majority of San Diego County Jail facilities confirms my distress that, without additional

intervention, safety check deficiencies will persist and continue to put people at substantial risk of serious harm, including death.

### IV. Defendants Have Not Committed to Providing Incarcerated People Direct Access to Naloxone, While the County Declarants Do Not Provide Any Basis for Denying Such Access. (May 2, 2022 Stewart Declaration Finding #4)

35. In my May 2, 2022 declaration, I expressed my opinion that a safe, effective, and life-saving measure at San Diego County Jail would be to place naloxone in areas where incarcerated people are held (such as intake holding areas and housing units), and to provide basic information to incarcerated people about its administration.

36. I am aware that, since I completed my previous declaration one month ago, at least one other incarcerated person has died from an apparent drug overdose at the Jail. I am also aware that since I completed my previous declaration, CLERB issued a recommendation consistent with my opinion. *See* CLERB *Policy recommendation: Provide Inmate Access to Naloxone (Narcan) to Inmates at San Diego County Detention Facilities*, May 5, 2022, available at https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/2022-documents/05-2022/Att.H-PR%20to%20SDSD%20-%20Provide%20Inmate%20Access%20to%20Naloxone.pdf.

37. I was thus encouraged to see that, according to Jail Medical Director Jon Montgomery, "[t]he Department is taking active steps to consider direct availability of Naloxone (Narcan) to patients in the housing units." Montgomery Decl. ¶ 6 (Docket No. 153-10). Montgomery does not provide any reason for why such a policy would not be appropriate or necessary. But the declarations filed by Defendants do not provide a commitment, plan, or timeline for rolling out such a policy. It is my opinion that this remedial measure will save lives and should not wait another day.

## V. The Health Care Services Contractor Transition to NaphCare Does Not Address or Mitigate My Concerns about Deficiencies with Respect to Treatment of People with Mental Health Needs at the San Diego County Jail.

38. I understand that the San Diego County Jail has recently transitioned to a new health care services contractor, NaphCare. Having reviewed the declarations and documents Defendants submitted about this new contract, this contractor transition does not address or mitigate my concerns about deficiencies with respect to treatment of people with mental health needs, including on each of the specific issues for which I have provided my opinion.

39. For example, Ms. Quiroz states that "[p]art of the [Naphcare] contract provides that the policies and procedures used by NaphCare will be merged with the Mental Health policies and procedures for the County Jails, with the goal of each jail qualifying for NCCHC accreditation." This contractual requirement does not in any way speak to the specific deficiencies identified in this and my previous declaration. In fact, I am very concerned that there is no apparent plan for the San Diego County Jail's existing mental health policies and procedures to be modified to address these deficiencies.

//
//
//
//
//
//
//
//
//
//
//
//

40. Based on my experience, when a new health care services contractor is hired by a detentions system, unless there is specific and concerted action to address explicitly identified, existing systemic deficiencies, those deficiencies will likely be replicated and perpetuated with the new health care services contractor. While I understand that new intake processes were enacted last month (Montgomery Decl. ¶ 3), the declarations and documents Defendants have submitted do not indicate any recently enacted – or even planned – changes to policy or practice that will remedy the deficiencies I have described.

41. It is thus apparent that the deficiencies with respect to (a) the improper and dangerous custodial interference with clinical judgment, (b) the denial of sufficient confidentiality necessary for the provision of adequate mental health care, and (c) the inadequate safety checks necessary to save lives are very likely to persist given the County's current course.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Honolulu, Hawaii this 6TH day of June, 2022.

_____
Pablo Stewart, M.D.