GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email:      ggrunfeld@rbgg.com
            vswearingen@rbgg.com
            pkaul@rbgg.com
            eanderson@rbgg.com
            hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone:  (510) 806-7366
Facsimile:  (510) 694-6314
Email:      ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**REPLY DECLARATION OF ROBERT L. COHEN, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:  Hon. Anthony J. Battaglia<br><br>Date:   August 11, 2022<br>Time:   2:00 p.m.<br>Ctrm.:  4A |

[3924911.8]

Case No. 3:20-cv-00406-AJB-WVG

REPLY DECLARATION OF ROBERT L. COHEN, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

(*counsel continued from preceding page*)

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California 92101-4297
Telephone: (619) 699-2700
Facsimile: (619) 699-2701
Email: christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
2760 Fifth Avenue, Suite 300
San Diego, California 92103-6330
Telephone: (619) 232-2121
Email: bvakili@aclu-sdic.org
jmarkovitz@aclu-sdic.org

Attorneys for Plaintiffs

I, Robert L. Cohen, M.D., declare:

1. I was retained by Plaintiffs' counsel to provide expert opinion concerning the adequacy of policies, procedures, and practices regarding treatment of opioid withdrawal and prevention of overdose deaths at the San Diego County Jail ("the Jail"). I make this reply declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification ("Plaintiffs' Motions").

2. My education, training, and experience are detailed in the declaration I completed approximately one month ago, which was filed on May 2, 2022.

3. Since I completed my previous declaration, I understand that Defendants have filed an opposition to Plaintiffs' Motions, accompanied by various supporting documents. I have been asked to review these materials and provide any supplemental opinions on the issues discussed in my previous declaration.

4. In addition to the documents I reviewed in connection with my previous declaration, I have reviewed the following additional materials:

   a. Defendants County of San Diego and Correctional Healthcare Partners, Inc.'s Opposition to Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification [Dkt. 153]

   b. Report of Andrew Hildreth, Ph.D. [Dkt 153-1, Ex. I]

   c. Declaration of Peter J. Freedland [Dkt. No. 155]

   d. Declaration of Jon Montgomery [Dkt 153-10]

   e. Declaration of K. Bibel [Dkt. 153-4]

   f. Declaration of James Austin [Dkt. 119-6]

   g. Declaration of Justin Christiansen

   h. Email from San Diego County Sheriff's Department entitled "New Intake Screening Processes," dated June 1, 2022

   i. San Diego County Sheriff's Department, "Most Recent News Releases: In-Custody Death – George Bailey Detention Facility," https://www.sdsheriff.gov/Home/Components/News/News/1190/514

   j. San Diego County Sheriff's Department, "Most Recent News Releases: Death Investigation – George Bailey Detention Facility," https://www.sdsheriff.gov/Home/Components/News/News/432/514

   k. NCCHC Foundation, *From the General Public to America's Jails: MAT Saves Lives*, https://www.ncchc.org/wp-content/uploads/From_the_General_Public_to_Americas_Jails_-_MAT_Saves_Lives-_Indivior.pdf

   l. Citizens' Law Enforcement Review Board, *Provide Inmate Access to Naloxone (Narcan) to Inmates at San Diego County Detention Facilities*, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/2022-documents/05-2022/Att.H-PR%20to%20SDSD%20-%20Provide%20Inmate%20Access%20to%20Naloxone.pdf

   m. Kelly Davis, *Civilian review board recommends jail inmates be given access to naloxone*, SAN DIEGO UNION-TRIBUNE, May 11, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-05-11/naloxone.

   n. Alanna Smith, *Supervised drug consumption sites for federal prison inmates to expand after success in Alberta's Drumheller Institution*, THE GLOBE AND MAIL, https://www.theglobeandmail.com/canada/alberta/article-at-least-two-additional-prisons-marked-for-overdose-prevention-sites/.

5. After reviewing these additional materials, I respond as follows to Defendants' pleadings.

**Defendants Have Not Presented Any Evidence that Changes My Opinion That the Risk of Drug Overdose Death In the Jail is High and Must Be Addressed**

6. Defendants appear to agree with my opinion that substance use and drug overdoses are significant problems that affect the population of the Jail.

[3924911.8] 2 Case No. 3:20-cv-00406-AJB-WVG

REPLY DECLARATION OF ROBERT L. COHEN, M.D. IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

Montgomery Decl. ¶¶ 5-6.  Instead of refuting this opinion, Defendants attempt to make a comparison argument.  Specifically, they argue that either the rate of overdoses in the Jail is "consistent with[] outside conditions" or the Jail "is doing a better job of controlling overdose."  Opp. at 17.  This argument is hard to follow or make sense of.  Defendants do not cite a single piece of evidence for this proposition, nor do they even attempt to explain how they reached this conclusion.  They do not provide any numbers or calculations, nor any methodology.  They also fail to explain what they mean by the Jail "doing a better job" and as compared to whom.  Later in the same paragraph, Defendants cite Andrew Hildreth's report, but Mr. Hildreth's analysis does not specifically address substance use, overdoses, or overdose deaths.

7.  Defendants also argue that in forming my opinions, I failed to take into account turnover in the population of the Jail, which has a significant downward impact on suicide rates.  Opp. at 17.  This appears to be an incorrect summary of their own evidence, as Mr. Hildreth's report states turnover contributes to a higher suicide rate in the Jail.  In any event, my declaration included only one refence to suicide when discussing the results of a study finding a marked reduction in rates of unnatural deaths, including suicide *as well as overdose deaths*, for persons receiving medication-assisted treatment ("MAT").  Cohen Decl. ¶ 18.  Based on my nearly forty years of experience as a correctional health administrator and expert—including serving 17 years on the board of the National Commission of Correctional Health Care ("NCCHC")—I am well aware that frequent turnover occurs in jail systems.  This was one of many factors I considered when forming my opinions in this case.

8.  I have not performed an independent statistical analysis of rates of overdose in the Jail, and was not retained for such purposes, but I have reviewed evidence on this topic, including an independent study of in-custody deaths completed in April 2022 by Analytica Consulting, which was conducted at the

request of the San Diego County Citizens' Law Enforcement Review Board ("CLERB").  The Analytica Consulting study states that inmates in the Jail are two times more likely to die of overdose/accidental deaths than what is expected based on county mortality rates.  Nothing in the evidence presented by Defendants changes my opinion that the risk of overdose deaths is high within the Jail.

9. I am aware that since I submitted my initial declaration in this case, there have been two more deaths at the Jail, including one at the George Bailey Detention Facility that appears likely to have been an opiate overdose.  Two individuals were found unresponsive in a cell.  One was revived with the use of Naloxone while the other died.

10. The information I have reviewed in this case suggests a causal relationship between the Jail's inadequate policies and procedures regarding treatment of those with substance use disorders and the extraordinarily high number of overdose deaths in the Jail over the last several years.  It is my opinion that the relief Plaintiffs seek—implementation of a comprehensive MAT program and expanded access to Naloxone for use by incarcerated people—would contribute to a significant reduction in the number of overdose deaths in the Jail.

**Defendants Appear to Agree that the Jail Needs a Comprehensive MAT Program But Remain Vague About Implementation of Such a Program**

11. Defendants appear to agree with my opinion that a comprehensive MAT program would help address the risk of overdose deaths in the Jail.  *See* Montgomery Decl. ¶ 11.

12. NCCHC released a white paper in December 2021, titled "From the General Public to America's Jails: MAT Saves Lives," which advocated for the use of MAT, including all three FDA-approved medications, in correctional settings.  The paper stated that if "[i]f policymakers and health care providers are truly interested in reducing recidivism, enhancing public safety, and promoting public health by way of reduced overdose, overdose deaths, and spread of infectious

disease, more deliberate movements need to be made in expanding [MAT] to people in jail and those being released." I agree with this statement.

13. I have reviewed the Declaration of Christopher Norwood and the portions of his medical records cited by Defendants. Opp. at 16. Defendants claim Mr. Norwood is unreliable because his medical records do not reflect that he was receiving Suboxone prior to his incarceration. Mr. Norwood's medical records demonstrate that physician staff at the facility believed that he used multiple substances and prescribed for him medical withdrawal from alcohol and benzodiazepines with a chlordiazepoxide taper regimen. They refused to treat his opiate use disorder with a medically-based opiate detox regimen using effective therapy with methadone or buprenorphine as he requested. Instead they offered treatment of the anticipated symptoms of opiate withdrawal—vomiting, nausea, diarrhea, abdominal pain—rather than prevent them with a medically sound opiate withdrawal protocol. Defendants also state that although Mr. Norwood was denied Suboxone, the Jail offered Vivitrol because it was determined to be an appropriate treatment. The medical records show that the Jail did not offer Vivitrol to Mr. Norwood until *after* he overdosed on fentanyl on July 17, 2021. If a comprehensive MAT program had been functioning at the Jail, and Mr. Norwood had been receiving treatment pursuant to such a program, Mr. Norwood would not have had the cravings which characterize opiate use disorder, and likely would not have experienced a potentially fatal opiate overdose.

14. Nothing in the evidence submitted by Defendants changes my opinion that the Jail currently lacks an adequate MAT program. Dr. Montgomery states that the Jail provides "limited methadone for exceptional cases, such as to pregnant women who were addicted to heroin" and "are in custody at Las Colinas." Montgomery Decl. ¶ 11. Dr. Freedland states that in the 20 months since Correctional Healthcare Partners, Inc. ("CHP") contracted to provide medical services in the Jail, they have only "maintained forty (40) to sixty (60) people on

MAT therapies." Freedland Decl. ¶ 10. The use of the term "maintained" confirms my reading of the Jail's policies regarding MAT, in that it is available only to people already receiving methadone treatment from a pre-approved outpatient clinic, or pregnant people. *See* Cohen Decl. ¶ 23. Moreover, given that the Jail's daily population is in the thousands, Defendants' admission that they provide MAT to so few people demonstrates that the Jail's policies and practices regarding MAT are woefully inadequate.

15. Defendants' opposition brief claims that a comprehensive MAT program "is being implemented within the next two weeks" under a new contract with Naphcare, Inc. In support of this claim, Defendants cite the declarations of Drs. Montgomery and Freedland. Neither of these declarations, however, lends support to this timeline. Instead, the evidence submitted by Defendants is vague as to when the Jail will implement an MAT program. Additionally, the scope of counseling and therapy and the eligibility criteria are not fully fleshed out. It is not clear that Defendants' alleged MAT program will indeed be available to all individuals for whom it is clinically appropriate at all facilities. Dr. Montgomery states that the Jail is "hoping to be active partners" with MAT providers to offer "continuing medications, counseling[,] and treatment" "in the near future." Montgomery Decl. ¶ 11. He also states that he is "not clear on the specific timeline." *Id*. Dr. Freedland appears to try to focus blame for the inadequacy of the Jail's MAT program on the County, stating that CHP has additional capacity to enroll individuals in MAT "at the County's discretion" and "subject to approval by the Sheriff's Department" and others. Freedland Decl. ¶ 10.

16. The assertion that Defendants are planning to implement a MAT program is consistent with my recommendation, but the details of such a program are critical to ensure its success, and the details are still missing. In particular, the timing of full program implementation is critically important because the longer the Jail fails to offer MAT, the more likely it will see preventable overdose deaths.

**Defendants Appear to Agree that the Jail Should Expand Access to Naloxone for Incarcerated People But Do Not Commit to Implementation**

17. Defendants appear to agree with my opinion that Naloxone is safe, effective, and should be available for use by incarcerated people in the Jail in order to reduce the number of preventable overdose deaths. *See* Montgomery Decl. ¶¶ 6, 12. I am aware that CLERB has also recommended that the Jail make Naloxone readily available to incarcerated people and educate incarcerated people on its use. Defendants, however, do not commit to making this potentially life-saving change in policy, or to doing so in any specific timeframe. Dr. Montgomery states in his declaration that the Sheriff's Department "is taking active steps to consider direct availability of Naloxone (Narcan) to patients in the housing units" and is "taking definitive steps toward putting Naloxone (Narcan) in the housing units, accessible directly to incarcerated persons." *Id*. It is not at all clear whether this change is being considered or implemented, and if the latter, when and how implementation will take place.

18. I have reviewed the Declaration of Justin Christiansen, which describes the events leading up to the death of Jerry Aleman. I have also reviewed the Sheriff's Department's June 10, 2021 news release regarding Mr. Aleman's death, which indicates Mr. Aleman had fentanyl in his system when he died. Mr. Aleman's death appears to present a textbook example of how making Naloxone available for use by incarcerated people could prevent overdose deaths in the Jail. The evidence I have reviewed indicates other incarcerated people were present at the time or immediately after Mr. Aleman collapsed, while deputies and medical staff were not, and that these incarcerated people wanted to and tried to come to Mr. Aleman's aid. Timely and proper administration of Naloxone by one of them might have saved Mr. Aleman's life.

**The Evidence Presented by Defendants About Changes They Have or Will Make to Prevent Overdoses Do Not Change My Opinion that the Relief Plaintiffs Seek is Necessary and Appropriate**

19. Dr. Montgomery states that Defendants' new process for "drug testing by urinalysis upon arrival" is a "success" based on just 48 hours' worth of evidence. Montgomery Decl. ¶ 7. During this brief period of time, the Jail apparently identified "at least 10 individuals" with drugs in their systems who did not disclose or were unaware of this fact. *Id*. This is an extremely limited dataset. Many other relevant questions about this 48-hour period remain unanswered, including: what drugs were identified through the tests and what treatment was provided or denied based on the urine toxicology results. One would need answers to these questions in order to properly evaluate this new process, and a much longer timeframe than two days. In addition, Dr. Montgomery claims the Jail obtains the results of these tests within 12 hours, *id*. ¶ 5, however, timing of test results is not addressed in the written policies. The Jail's policies should discuss the timeframe to receive results and the protocol that should be followed if elements of the testing system break down. The Jail's policies should make clear that if results are not returned within 12 hours, there should not be a delay in treatment of opioid or substance use withdrawal.

20. Dr. Montgomery also states that the Jail's new testing process will "provide knowledge of illicit substances," which in turn will "eliminate deaths from withdrawal and are expected to have some effect on reducing the number of overdoses." *Id*. ¶ 5. Even assuming the testing process is perfectly accurate in identifying individuals under the influence of illicit substances at intake, deaths from withdrawal will not be "eliminated" without careful management of individuals' withdrawal symptoms, which are often complex, particularly for those under the influence of opiates and alcohols.

21. Treating opiate withdrawal appropriately with physician-supervised buprenorphine or methadone is clinically appropriate, effective, and may prevent

deaths from opiate withdrawal. But after treatment of opiate withdrawal, cravings return, because opiate use disorder is a chronic relapsing condition. Incarcerated persons who have this disease and are not receiving MAT are at great risk for fatal overdose in a facility where drugs are readily available, like the Jail. In other words, treating withdrawal without initiating MAT will not meaningfully decrease the number of overdose deaths in the Jail.

22. No comprehensive MAT program for maintenance and induction of opioid use disorder has been established at the Jail. The declarations of Drs. Montgomery and Freedland indicate that this program is still aspirational. No published timetable for implementation exists. The "Medically Supervised Withdrawal and Treatment" policy (MSD.A.3), initiated on May 11, 2022, is an improvement over past practice because it allows for an advanced clinical provider to supervise buprenorphine tapered withdrawal for persons with opiate use disorder. *See* Montgomery Decl., Ex. A. But unfortunately, and dangerously, the protocol does not mention MAT except for the section on treatment of opioid use disorder in pregnancy, a policy already in effect.

23. MSD.A.3 appears to be the ***only*** new written policy submitted by Defendants related to the overdose problem in the Jail, even after "two solid years of effort" in planning with Naphcare to address policies and practices affecting patient health. *See* Montgomery Decl. ¶ 3. Based on my nearly forty years of experience as a correctional health administrator and expert, including at many large, metropolitan jails, it is critical for the Jail to have written policies and procedures that include clear and detailed instructions for implementation and address quality improvement processes. The Jail's vague, undefined proposals to address overdose deaths in the Jail fall short of the robust, written, and enforceable policies and procedures that in my experience are needed to affect meaningful change.

24. Defendants argue that I failed to investigate or take into account a "newly implemented health system" that "will provide more immediate services to

overdose victims." Opp. at 17. It is not clear what Defendants mean by this, especially given that the only new policy that Defendants appear to have drafted, MSD.A.3, was issued on May 11, 2022—after my declaration was filed in connection with Plaintiffs' Motion.

25. Overdose deaths in the Jail must be understood largely as attributable to the Jail. They occur because Jail officials allow significant quantities of drugs to enter the jail. They are jail attributable because many would be prevented if incarcerated persons had access to MAT. They are jail attributable because opiate overdose is treatable by Naloxone, and Naloxone is not readily available to treat an overdose.

### Defendants Misconstrue My Other Opinions

26. Defendants argue that I failed to "indicate any method of counteracting illicit drugs being smuggled into the Jail." Opp. at 17. I was not retained to provide an opinion on this issue, but rather, was retained to provide my opinion concerning the adequacy of policies, procedures, and practices regarding prevention of overdose deaths at the Jail through medical interventions. It is notable, however, that Defendants' "new plans" do not include any new efforts to reduce drug contraband brought into the Jail by correctional staff. Dr. James Austin provided a declaration on this topic, but Defendants appear not to engage with his suggestions, including to have body scanners used on all people entering the Jail facilities, including staff, visitors, and contractors.

27. Defendants point out that I have not had the opportunity to inspect the Jail or conduct interviews of staff or incarcerated people. Opp. at 17. I stated as much in my initial declaration to emphasize that I likely could identify additional steps the Jail should consider to reduce the high rate of overdose deaths if Defendants provided me with access to additional information. Cohen Decl. ¶¶ 8, 42. I was, however, able to confidently form opinions regarding certain elements of the medical care system at the Jail as it relates to drug overdoses. *Id*. ¶ 8. Those

opinions are based on my nearly forty years of experience as a correctional health administrator and expert, as well as relevant information I was provided regarding the Jail, including policies and procedures, statements from Jail officials, and declarations from incarcerated people. I would like to inspect the Jail and conduct interviews of staff and incarcerated people as part of this process; however, I am informed that Defendants have refused Plaintiffs' requests to allow retained experts or neutral experts to inspect the Jail.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at _New York, NY_ this _7_ day of June, 2022.

Robert L. Cohen, M.D.