GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:    ggrunfeld@rbgg.com
          vswearingen@rbgg.com
          pkaul@rbgg.com
          eanderson@rbgg.com
          hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email:    ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br>      v.<br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br>            Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**REPLY DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:   Hon. Anthony J. Battaglia<br>Date:    August 11, 2022<br>Time:    2:00 p.m.<br>Ctrm.:   4A |

[4100103.5]

(*counsel continued from preceding page*)

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California  92101-4297
Telephone:  (619) 699-2700
Facsimile:  (619) 699-2701
Email:  christopher.young@dlapiper.com
        isabella.neal@dlapiper.com
        oliver.kiefer@dlapiper.com

BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
2760 Fifth Avenue, Suite 300
San Diego, California  92103-6330
Telephone:  (619) 232-2121
Email:  bvakili@aclusandiego.org
        jmarkovitz@aclusandiego.org

Attorneys for Plaintiffs

[4100103.5]

Case No. 3:20-cv-00406-AJB-WVG
REPLY DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, Syroun Sanossian, declare:

1. I have been retained by Plaintiffs' counsel to provide expert opinion concerning the adequacy of policies, procedures, and practices regarding disability accommodations at the San Diego County Jail ("Jail"). I make this reply declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification ("Plaintiffs' Motions").

2. I have reviewed portions of Defendants County of San Diego, San Diego County Sheriff's Department, and Correctional Healthcare Partners, Inc.'s Opposition to Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification, and documents filed in support thereof, to the extent they relate to the issues on which I offered an opinion in my initial declaration. I have also reviewed the documents cited in the paragraphs below, a complete listing of which is attached hereto as **Exhibit A**. I respond as follows to Defendants' pleadings.

**I. Defendants' Pleadings Do Not Address My Opinions About Deficiencies with the Sheriff's Department's Policies and Procedures**

3. In my original declaration, I described in detail how the Sheriff's Department's policies and procedures relevant to people with mobility disabilities were deficient. I explained how the applicable policies and procedures are "excessively vague," lack clear standards and timelines, and fail to give appropriate guidance to staff. Dkt. 119-09, Declaration of Syroun Sanossian in Support of Plaintiffs' motions for Preliminary Injunction and Provisional Class Certification ("Sanossian Decl."), ¶¶ 11-31. I opined on the Sheriff's Department's deficient policies and procedures for transporting individuals with disabilities, *id.* ¶ 16, identifying and accommodating people with disabilities, *id.* ¶¶ 17-20, ADA grievances, *id.* ¶¶ 21-23, incarcerated people's assistive devices, *id.* ¶¶ 24-28, elevators for transporting people with mobility disabilities, *id.* ¶¶ 29-30, and tracking individuals with disabilities. *Id.* ¶ 31.

4. Defendants' pleadings do not appear to respond to my assessment of

these policies and procedures, whether as to my overall opinions, or as to any individual policy or procedure. Defendants did not have an expert on the ADA, disability access, or a Certified Access Specialist ("CASp") respond to my opinions. The Sheriff's Department's asbestos and lead coordinator responsible for maintenance and construction projects submitted a declaration in response to mine, but he did not discuss any of the Jail's disability-related policies and procedures. Declaration of Darren Bennett ("Bennett Decl."), Dkt. 153-3. The only policy-related discussion I am aware of in Defendants' pleadings is Mr. Bennett's statement that a person's security classification limits their "free movement" and the accommodations available to them. *Id.* ¶ 2. I am not aware of any exception to the ADA based on an individual's security classification. In my experience, the form that an accommodation takes may vary based on the person's particular classification (for example, celled versus dorm housing), but classification is not a basis to deny accommodations under the ADA.

## II. Defendants' Pleadings Appear to Agree That San Diego Central Jail is Inaccessible to People with Mobility Disabilities

5.   As explained in my original declaration, the ADA requires all facilities built after January 26, 1991 to fully comply with new construction standards under the ADA. The Sheriff's Department agrees that San Diego Central Jail was built in 1998, meaning it is a post-ADA facility and must be fully compliant. Bennett Decl. ¶ 2.

6.   Defendants' pleadings do not change my opinion that the housing units at Central Jail appear inaccessible to people with mobility disabilities. Sanossian Decl. ¶ 42. At the time of the Central Jail's construction in 1998, the Sheriff's Department was required to ensure that 5% of the cells were accessible to people with mobility disabilities, under the Uniform Federal Accessibility Standards ("UFAS"). Mr. Bennett's declaration cites the 2010 ADA guidelines applicable to correctional facilities, *id.* ¶ 5, but those guidelines were not applicable when Central

1  Jail was actually built more than a decade prior and Mr. Bennett says only 2% of
2  cells were required to provide mobility access, when the 2010 ADA Standards in
3  fact require a 3% ratio.  The 5% UFAS standard was the applicable benchmark.  I
4  have carefully reviewed the various figures cited in Mr. Bennett's declaration,
5  which seem confusing, incomplete and contradictory, and make it hard to determine
6  how many accessible features are available at the Central Jail.  Defendants also do
7  not provide enough information about the Jail population to understand the
8  percentage of accessible cells required.  However, it is at least clear to me that the
9  Jail does not have sufficient accessible space for the present population of
10 wheelchair users.  Mr. Bennett claims that 25 of 250 cells at Central Jail have
11 "mobility features," in one module *id.* ¶ 7, but then provides a different number for
12 wheelchair-accessible cells, stating that each module has 40 beds and "only one
13 wheelchair accessible cell/bed in each of the modules."  *Id.* at ¶ 8.  Mr. Bennett
14 never defines what he means by "mobility features," but it does not appear co-
15 extensive with being fully wheelchair accessible.  In addition, Mr. Bennett's
16 reference to a wheelchair-accessible "bed" indicates that people in wheelchairs are
17 housed in cells with other people.  If these cells are of the standard size that I have
18 seen in other jails, housing people who use wheelchairs with one or even two other
19 cellmates is per se inaccessible, as there would be insufficient space for wheelchairs
20 to turn in such a cell or to maneuver in required clear floor space at a bed or toilet
21 for transfer.

22      7.     It remains my opinion that individuals who use wheelchairs are housed
23 in cells at Central Jail that are not wheelchair-accessible, given that only one bed out
24 of 40 in a module is claimed to be wheelchair-accessible—and I would need to
25 inspect the cell to determine if that assertion is correct.  I would also like to know
26 how many wheelchair users are housed in a module.  Plaintiffs Christopher Nelson
27 and Ernest Archuleta both reported being housed inaccessibly, which Mr. Bennett's
28 declaration does not contest.  None of Defendants' pleadings respond to Mr.

1. Nelson's statement he was housed in a cell with a stool in front of his desk, or Mr. Archuleta's statement that the one wheelchair-accessible cell in his unit was left unused while he was housed in an inaccessible cell.

8. Consistent with my original declaration, Mr. Bennett's declaration admits that numerous other features in celled housing areas at Central Jail are inaccessible to people with mobility disabilities. He states that the only toilet transfer grab bar in the single ADA cell in Unit 7B was removed due to "safety" concerns. Bennett Decl. ¶ 10. The Sheriff's Department apparently has not replaced that grab bar, or provided the second required bar (side and rear bars required) even though ligature-proof toilet grab bars have been widely available for about a decade. Mr. Bennett concedes that the telephones in Unit 5A and Unit 8C are "not currently accessible," and describes vague plans to "come up with a workable solution." *Id.* ¶¶ 11, 13. Mr. Bennett states that all of the shower seats at Central Jail were removed decades ago, and that the Jail instead provides a plastic shower chair. *Id.* ¶ 3. In many jails, I have seen plastic lawn chairs in use as shower seats. Whether that is the case in this facility is unknown. There are several models of plastic shower chairs available, some of which are sturdier, have one grab bar to assist with transfer, and are more reliable than others. I would need to review specification sheets from the manufacturer for the model of chair that the Jail is using and review the physical circumstances in which it is used to assess whether it is a sufficient accommodation. Dion Scott Buckelew's declaration indicates that the shower chair is too flimsy and has contributed to falls in the shower. Chad Tucker's declaration describes him falling several times at a different facility, South Bay Detention Facility, apparently without the benefit of any shower chair. Mr. Tucker also describes falling in the shower where no grab bars were provided. Providing these simple, low-cost assistive devices can reduce accidents and injury in showers, which is of benefit to both the Jail staff and housed individuals.

9. Consistent with my original declaration, Mr. Bennett describes how

Unit 8C is inaccessible, even though individuals in wheelchairs are clustered there. His declaration states that 12 individuals in wheelchairs are in the unit. *Id.* ¶ 12. Despite this high concentration of individuals with mobility disabilities, Mr. Bennett concedes that only one seat in the dayroom table was removed, ostensibly to provide access to people in wheelchairs, that the phones in the unit are all inaccessible, and that there is only one toilet and shower claimed to be accessible in the unit. *Id.* ¶¶ 12-13. Mr. Bennett claims that the EOH and PSU cells at Central Jail have grab bars and a shower chair, but as stated above, an inspection is necessary to assess the appropriateness of the shower chair and a CASp assessment is necessary to verify grab bar compliance. A significant factor for both elements is their load bearing ability. Mr. Bennett fails to address the concern that incarcerated people in these cells are not allowed to have their assistive devices or even protheses with them inside these cells and that no alternative accommodation is provided.

10. My original declaration also described problems with the elevators at Central Jail, including the lack of a clear policy for how to accommodate individuals when the elevators are not available. Sanossian Decl. ¶¶ 29, 41. I am aware that two of Defendants' declarants say they are personally unaware of individuals being forced to take the stairs or claim that it would "never" happen, Darnell Decl. ¶ 3, Bennett Decl. ¶ 9, but neither addresses the lack of a clear policy on accessible alternative accommodations, such as the use of emergency evacuation chairs when the elevator is not working. The declarations do not provide any description of a process for alternative accommodations or records to show that incarcerated people have been transferred into the staff elevator when necessary. The County provided a contract for Balfour Beatty Contract 559290, which describes the San Diego Central Jail Elevator Modernization and Other Misc. Tasks Project under which Balfour Beatty is the general contractor, with Lerch Bates Inc. and Elevator Consulting Group as the subcontractors for the elevator modernization portion of the project. The contract does not appear to be a long-term maintenance contract. The language

1  of the contract requires the contractor to "use competent personnel, acceptable to
2  County, employed and supervised by the Contractor…"  This approach may run
3  afoul of CalOSHA, which requires a Certified Competent Conveyance Mechanic
4  ("CCCM") to provide monthly maintenance and annual inspections for purposes of
5  permitting.  If the County in fact has a monthly or annual inspection contract, it has
6  not been provided to me.

7  11.  Defendants indicate that plans exist to cluster incarcerated people in
8  wheelchairs at the Rock Mountain Detention Facility in several months.  Bennett
9  Decl. ¶¶ 7,12.  This is not a justification for failing to have accessible facilities at
10 Central Jail, given the ongoing danger and irreparable harm to people housed there.
11 I am also concerned about the ongoing segregation of individuals with mobility
12 disabilities, now planned to occur at Rock Mountain.  Given that Rock Mountain
13 was built in the 1970s, prior to the regulations contained in the UFAS or ADA, it is
14 impossible to assume that any elements in that facility are accessible.  Yet, the
15 CASp report (site accessibility evaluation) for this facility only claims to have
16 identify 301 barriers to access.  Considering my experience over decades of
17 inspections at similar facilities, I would have expected the report to identify
18 exponentially more physical barriers to access, given the age of Rock Mountain.  In
19 addition, in reviewing the existing CASp report (site accessibility evaluation), I
20 found that photos in the report illustrated many significant barriers that were not
21 recorded in the report.  I am very skeptical that such a report will result in full
22 compliance, or where technical infeasibility exists, compliance to the maximum
23 extent feasible, as required under the ADA.  *See* Sanossian Decl. ¶ 9.  Clustering is
24 itself concerning, as dispersion of individuals with disabilities is required by
25 California Building Code 11B-232.2.1.2 within classification levels at each facility.
26 Clustering is likely to reduce the ability of incarcerated people with mobility
27 disabilities to participate in Jail programming.
28  12.  My declaration also explained how the medical observation bed

("MOB") unit at George Bailey Detention Facility appeared inaccessible to individuals in wheelchairs, who may be housed there if they use CPAP machines. Sanossian Decl. ¶ 52. The Bennett Declaration addresses only the MOB unit at Central Jail, Bennett Decl. ¶ 15, even though my declaration refers to the MOB unit at George Bailey. The Montgomery Declaration on Dion Buckelew, Dkt. 151-4, does not address any of Mr. Buckelew's statements about accessibility at the MOB unit at George Bailey Detention Facility, contest Mr. Buckelew's current need for a wheelchair, or contest Mr. Buckelew's statements about specific elements of Units 5A and 8C at Central Jail being inaccessible to people with mobility disabilities.

13. Defendants' pleadings also do not address the fact that individuals who use wheelchairs are denied access to Vista Detention Facility and the programs there. *See* Sanossian Decl. ¶¶ 12, 30, 49. The Montgomery Declaration on Nikki Yach appears consistent with Ms. Yach's own declaration, which states that she was forced to choose between the use of her wheelchair or moving to Vista for safety reasons after experiencing and reporting assault. *See* Yach Decl. ¶ 4. The Declaration of Valery Tozer recounts a similar experience, as they were informed that they could not be housed at Vista with their back brace, and had to give up that assistive device required post-surgery to transfer to Vista for safety reasons. I have also reviewed the Declaration of Frank Ross, which indicates that Mr. Ross, who is a veteran, was denied his request to be housed in the veterans' programming unit at Vista because he uses an oxygen tank. That is discriminatory.

**III.  Defendants' Pleadings Do Not Change My Opinion That the Policies and Procedures Place Incarcerated People with Mobility Disabilities at Risk of Irreparable Harm**

14. Defendants claim that my declaration did not identify any immediate and ongoing "irreparable harm" that cannot wait for the discovery process to identify and address. When individuals with disabilities are forced to crawl up stairways to visit with their families and legal counsel, when wheelchairs are taken from an incarcerated individuals and given to others, leaving them stranded without

mobility assist devices, when individuals are unable to eat, write or read because their assistive spoons, pencils or prescription glasses are confiscated or not provided in the first place, when individuals leave the facility to attend a court hearing only to return and find their leg prothesis missing and never receive a replacement while at the facility, when individuals sustain injuries due to a lack of access that cause or worsen existing disabilities and are refused treatment or surgery, when individuals who have experienced assault are returned to the same housing module where the assault occurred and placed in a cell that has visible blood stains on walls and controls, people are experiencing irreparable harm on a daily basis.

15.     Defendants' pleadings do not rebut the examples of irreparable harm discussed in my original declaration. Dr. Montgomery, the Chief Medical Officer at the Jail, submitted declarations based on his partial review of the Jail medical records of several incarcerated individuals. The Montgomery declarations appear intended to discredit the declarations of those incarcerated people, but the statements in the Montgomery declarations omit important facts and do not change my opinions. For example, the Montgomery Declaration on Anthony Edwards notes that Mr. Edwards reported he was not able to attend an eye appointment in October 2021 because the Jail failed to provide him a cane in time. In response, Dr. Montgomery only states that the Jail *ordered* Mr. Edwards a cane prior to his appointment, not that Mr. Edwards *received* that cane prior to the appointment. The Montgomery Declaration on Ernest Archuleta does not contest that Mr. Archuleta was forced to choose between crutches and a wheelchair for the majority of his incarceration at the Jail but appears to justify this because Mr. Archuleta in August 2019 is reported to have said he did not want crutches. It is reasonable and expected that the needs and accommodations necessary for a disabled person will change over time, especially if their condition is deteriorating while in the Jail.

16.     My original declaration also described harm from Defendants' inadequate policies and procedures, including the confiscation of assistive devices

and one man's prosthetic leg, and the failure to replace assistive devices. For example, my declaration noted that James Clark did not receive a new wheelchair for multiple days after complaining via sick call requests, after filing a written grievance, and that he fell several times while waiting. Dr. Montgomery's declaration on Mr. Clark states only that Mr. Clark received a new wheelchair after filing a grievance, omitting that Mr. Clark filed sick call requests days before the grievance, fell while waiting for a new wheelchair, and that Mr. Clark met with Plaintiffs' counsel immediately prior to receiving a new wheelchair. The Montgomery declaration on Mr. Clark also does not dispute Mr. Clark's or other declarants' descriptions of accessibility problems and resulting harms in Unit 8C. *See* Sanossian Decl. ¶¶ 46-48. Primarily, Dr. Montgomery appears to blame the incarcerated people because Dr. Montgomery did not find grievances about discrete accessibility problems at the Jail, *see, e.g.*, Dkt. 151-15, ¶ 8, but as I opined in my original declaration, the Jail lacks a specific or clear ADA grievance process. I am also informed that Jail staff regularly fail to respond to grievances filed by incarcerated people, and appear to fail to track grievances.

17. Dr. Montgomery's declaration on Darryl Dunsmore does not dispute Mr. Dunsmore's multiple reports about having his assistive devices confiscated during his incarcerations at the Jail. Sanossian Decl. ¶ 56. Dr. Montgomery's declaration on Mr. Dunsmore ignores the confiscation of assistive devices including his wheelchair during his 2018-2019 incarceration, does not address the confiscation of his cane during his 2019-2021 incarceration, and appears to misunderstand the waxing and waning nature of his disability. Nor does Dr. Montgomery contest the delay in providing Mr. Dunsmore an adequate ADA spoon in 2020, other than to point to an apparent absence of recorded complaints. As with Mr. Edwards, he appears to conflate the Jail ordering a device with Mr. Dunsmore having timely received it. Finally, Dr. Montgomery's declaration on Daniel Webb appears to blame Mr. Webb for not providing documentation that his prosthetic was stolen by

Jail staff, but based on my experience and common sense, I would not expect Jail staff to document their own ADA violation.

### IV. Defendants' Pleadings Do Not Change My Opinion That the Remedies Plaintiffs Seek are Necessary and Reasonable

18. My original declaration set forth several specific, immediate remedies that the Sheriff's Department can undertake to prevent irreparable harm to individuals with disabilities at the Jail. Sanossian Decl. ¶¶ 61-70. Defendants' pleadings do not fully address any of these remedies. Instead, Defendants' pleadings only say that they are "immediately" removing a seat to provide one extra dayroom seat for people with wheelchairs in Unit 8C where 12 individuals using wheelchairs are housed. This is an insufficient remedy considering the number of people using wheelchairs in 8C and the fact that removing a fixed seat often does not result in compliant toe/knee clearance at tables. It is possible that the tables installed at the time of construction were never compliant and cannot be altered to comply. If the tables cannot be altered to comply, the provision of a new table with compliant toe/knee clearance would be considered an immediate remedy, and could be done quickly and inexpensively. Installing grab bars, providing medical-grade shower seats, and removing 5% of all fixed stools blocking wheelchair clear floor space at telephones are an immediate remedy that can and should be implemented to significantly improve access at this facility.

19. One other proposed remedy that Defendants do address is the recommendation to ensure access to programs when the elevators at the Jail are not functioning or not available. Sanossian Decl. ¶ 61. Defendants claim that the request is for "the County to reconfigure the space in this multi-story building so that all 'programs, services, and activities' are on the same floor as the inmates being housed." That is incorrect. I am not aware of any remedies that Plaintiffs seek that require reconfiguring space on a building-wide basis. My declaration simply explains that programs should be moved to the same floor as incarcerated

people in wheelchairs *when elevators are inoperable*, to ensure that these people can maintain access to programs, or another solution should be devised and put into practice so that people can participate in programs on a consistent basis. Plaintiffs have the right to professional and social visits, dining areas, exercise, toileting, showers, and sleeping areas that are accessible to them considering their various types of disabilities. These rights may be protected in a multi-story structure as readily as they could be in a single-story structure. The provision of vertical access (elevators) or relocation (when vertical access is not available for short-term maintenance) is commonplace in post-ADA facilities. Evacuation wheelchairs are a solution for use when elevators are undergoing short-term maintenance and for use in an actual emergency, such as a fire, when all elevators will be out of use. This is an immediate change that could have a significant impact for individuals with disabilities.

**V.     The Sheriff's Department Has Not Allowed the Access I Need to Fully Evaluate and Monitor Defendants' Compliance**

20.    Defendants claim that my statements demonstrate a lack of personal knowledge of any of the conditions claimed by Plaintiffs. Over the past two decades, I have worked with many cities and counties to improve access in their facilities that house incarcerated individuals with disabilities. As I explained in my original declaration, to fully assess the Sheriff's Department's compliance with the ADA and Unruh Act, I would need to review additional information, observe staff trainings and physically inspect the Jail facilities. If allowed access to these facilities, I could make recommendations on which particular assets and features should be renovated in the short term to alleviate the potential for imminent and recurring harm, as well as the timing and urgency of these renovations. I can also provide input on how to provide programmatic accessibility, which may reduce the amount of physical barrier remediation necessary within this detention system. Access to San Diego Central Jail and Rock Mountain Detention Facility is

particularly important, given Defendants' ongoing clustering of individuals with mobility disabilities at Central Jail, and an apparent future plan to segregate these individuals at Rock Mountain instead. I have expertise performing plan review to ensure compliance in the design phase and in monitoring construction for this type of alterations process in a facility of this age. Ongoing efforts to improve access must be closely monitored to achieve compliance.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Sacramento, California this 6th day of June, 2022.

_/s/ Syroun Sanossian_
Syroun Sanossian

# EXHIBIT A

# Index of Documents
# Reviewed by Syroun Sanossian
# Reply Declaration

| No. | Document Name | Document Date |
|---|---|---|
| 1. | County of San Diego-Balfour Beatty Elevator Modernization and Other Misc. Tasks Project, November 16, 2018 | November 29, 2018 |
| 2. | ADA Excerpt from County Defendants Opposition to Motions for Preliminary Injunction and Provisional Class Certification | Filed May 31, 2022 |
| 3. | [Dkt 151-1] UNDER SEAL Declaration of J. Montgomery re Inmate Ernest Archuleta | Filed May 31, 2022 |
| 4. | [Dkt 151-4] UNDER SEAL Declaration of J. Montgomery re Inmate Scott Buckelew | Filed May 31, 2022 |
| 5. | [Dkt 151-5] UNDER SEAL Declaration of J. Montgomery re Inmate James Clark | Filed May 31, 2022 |
| 6. | [Dkt 151-7] UNDER SEAL Declaration of J. Montgomery re Inmate Darryl Lee Dunsmore | Filed May 31, 2022 |
| 7. | [Dkt 151-8] UNDER SEAL Declaration of J. Montgomery re Inmate Anthony Ray Edwards | Filed May 31, 2022 |
| 8. | [Dkt 151-15] UNDER SEAL Declaration of J. Montgomery re Inmate Christopher Nelson | Filed May 31, 2022 |
| 9. | [Dkt 151-21] UNDER SEAL Declaration of J. Montgomery re Inmate Daniel Webb | Filed May 31, 2022 |
| 10. | [Dkt 151-22] UNDER SEAL Declaration of J. Montgomery re Inmate Nikki Yach | Filed May 31, 2022 |
| 11. | [Dkt 153-3] Declaration of D. Bennett ISO County Defendants' Opposition to PI and Prov Class Cert Motions | Filed May 31, 2022 |
| 12. | [Dkt 153-6] Declaration of C. Darnell ISO County Defendants' Opposition to PI and Prov Class Cert Motions | Filed May 31, 2022 |
| 13. | [Dkt 153-10] Declaration of J. Montgomery ISO County Defendants' Opposition to PI and Prov Class Cert Motions | Filed May 31, 2022 |
| 14. | Declaration of Frank Ross | June 2, 2022 |
| 15. | Declaration of Chad Tucker | June 3, 2022 |
| 16. | Declaration of Valery Tozer | June 5, 2022 |