1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   DARRYL DUNSMORE, ERNEST          )
    ARCHULETA, ANTHONY EDWARDS, REANNA)
4   LEVY, JOSUE LOPEZ, CHRISTOPHER   )
    NELSON, CHRISTOPHER NORWOOD, and )
5   LAURA ZOERNER, on behalf of      )
    themselves and all others        )
6   similarly situated,              )
                                     )  No. 20-CV-00406-AJB-WVG
7             Plaintiffs,            )
                                     )
8   v.                               )  August 11, 2022
                                     )
9   SAN DIEGO COUNTY SHERIFF'S       )
    DEPARTMENT; COUNTY OF SAN DIEGO; )
10  CORRECTIONAL HEALTCARE PARTNERS, )
    INC.; LIBERTY HEALTHCARE, INC.;  )
11  MID-AMERICA HEALTH, INC.; LOGAN  )
    HAAK, M.D., INC.; SAN DIEGO COUNTY)
12  PROBATION DEPARTMENT, and DOES 1 )
    to 20 inclusive,,                )
13                                   )  Courtroom 4A
              Defendants.            )
14  _____)  San Diego, California

15

16              TRANSCRIPT OF PROCEEDINGS
                   (Motion Hearing)

17

18     BEFORE THE HONORABLE ANTHONY J. BATTAGLIA, DISTRICT JUDGE

19

20

21

22  COURT REPORTER:         AMANDA M. LeGORE
                            RDR, CRR, CRC, FCRR, CACSR
23                          U.S. District Court
                            333 West Broadway, Suite 420
24                          San Diego, CA 92101
                            amanda_legore@casd.uscourts.gov
25

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:        VAN SWEARINGEN
                                 GAY GRUNFELD
 3                               Rosen Bien Galvan & Grunfeld LLP
                                 101 Mission Street, Sixth Floor
 4                               San Francisco, CA  94105-1738
                                 (415)433-6830
 5                               vswearingen@rbgg.com
                                 ggrunfeld@rbgg.com
 6
                                 AARON FISCHER
 7                               Law Offices of Aaron Fischer
                                 2001 Addison Street, Suite 300
 8                               Berkeley, CA  94704
                                 (510)806-7366
 9                               info@aaronfischerlaw.com

10                               CHRISTOPHER YOUNG
                                 DLA Piper, LLP (USA)
11                               401 B Street, Suite 1700
                                 San Diego, CA  92101
12                               (619)699-2700
                                 christopher.young@dlapiper.com
13

14                               BARDIS VAKILI
                                 ACLU Foundation of San Diego &
15                               Imperial Counties
                                 PO Box 87131
16                               San Diego, CA  92138
                                 (619)232-2121
17                               bvakili@aclu-sdic.org

18
      FOR DEFENDANT COUNTY OF
19    SAN DIEGO:                 SUSAN COLEMAN
                                 Burke Williams & Sorenson LLP
20                               501 W. Broadway, Suite 1600
                                 San Diego, CA  92101
21                               (619)814-5800
                                 scoleman@bwslaw.com
22
      FOR DEFENDANT LIBERTY
23    HEALTHCARE:                MARILYN MORIARTY
                                 Lewis Brisbois
24                               550 W. C Street, Suite 1700
                                 San Diego, CA  92101
25                               (619)699-4958
                                 marilyn.moriarty@lewisbrisbois.com
```

1  FOR DEFENDANT
   CORRECTIONAL HEALTHCARE
2  PARTNERS:                    LARA GARNER
                                Gordon Rees Scully Mansukhani
3                               101 W. Broadway, Suite 2000
                                San Diego, CA  92101
4                               (619)230-7733
                                lsgarner@grsm.com
5

6

7

8                                    -0-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Thursday, August 11, 2022; 2:02 p.m.)

2

3                    P R O C E E D I N G S

4

5          THE CLERK:  Calling matter 11, 20-CV-0406, Dunsmore

6   versus State of California, et al., for a motion hearing.

7          Counsel, please state your appearances, starting with

8   the plaintiffs.

9          ATTORNEY SWEARINGEN:  Good afternoon, your Honor.

10  Van Swearingen for plaintiffs.  I'm joined by other counsel for

11  my firm, as well as co-counsel.  Each of whom will individually

12  identify themselves.

13         THE COURT:  Okay.  Thank you.

14         ATTORNEY GRUNFELD:  Good morning, your Honor.  Gay

15  Grunfeld for plaintiffs and the putative class.

16         ATTORNEY FISCHER.  Good morning, your Honor.  Aaron

17  Fischer for plaintiffs.

18         THE COURT:  Thank you.

19         ATTORNEY VAKILI:  Good afternoon, your Honor.  Bartis

20  Vakili for the plaintiffs.

21         ATTORNEY YOUNG:  And good afternoon, your Honor.

22  Nice to see you.  Chris Young for the plaintiffs.

23         THE COURT:  Okay.  Thank you.

24         And for the defense?

25         ATTORNEY COLEMAN:  Good afternoon, your Honor.  Susan

1    Coleman for the County of San Diego.

2            THE COURT:  Great.  Thank you.

3            ATTORNEY MORIARTY:  Marilyn Moriarty of Lewis,

4    Brisbois, Bisgaard & Smith, on behalf of Liberty Healthcare,

5    Incorporation.

6            THE COURT:  Thank you.

7            And next?

8            ATTORNEY GARNER:  Good afternoon, your Honor.  Lara

9    Garner for Correctional Healthcare Partners.

10           THE COURT:  Great.  Thanks, Ms. Garner.

11           All right.  Anyone we missed?

12           Apparently not.

13           Okay.  Well, this is the hearing date set on the

14   plaintiffs' motion for preliminary injunction and provisional

15   class certification.

16           I'll let you add what you feel you may need to, to

17   the record.  But I'll give you -- I have a question and then a

18   comment by way of attending, that I'll share.

19           The question for plaintiffs is -- is this.  You know,

20   it's a little hard to tell from your pleadings if you're

21   seeking preliminary injunction -- injunction on each of the

22   claims and the various 15 causes of action, or not.  The facts

23   are relatively untethered.

24           So, sir, what would -- what would the answer be?

25           ATTORNEY SWEARINGEN:  Your Honor, we're seeking a

1 | narrow preliminary injunction only on the items identified at

2 | pages 5 through 8 of our proposed order.  That's docket number

3 | 119-3 at ECF 32.  That's when the proposed order begins.  And

4 | we're only seeking preliminary injunctive relief on these

5 | items.  I'll list them out for you in just a moment.

6 | THE COURT:  Sure.

7 | ATTORNEY SWEARINGEN:  We are not seeking relief on

8 | all of the claims in our second amended complaint.

9 | What we are seeking, your Honor, are narrow

10 | injunctive remedies to ensure, one, that the intercoms at the

11 | jail are working, so that people who need emergency help or

12 | safety help are not neglected but, instead, can effectively

13 | summon help.

14 | Two, we're asking for the video cameras to be fixed,

15 | the ones that are broken.  And for our plan to -- for

16 | defendants to -- coming up, to fix the ones that do end up

17 | breaking.  That -- at the jail itself, as well as the

18 | Undersheriff Martinez has historically described them as old,

19 | antiquated and -- and not capable of addressing all areas of

20 | the jail where people are known to fight.

21 | Three, we're asking for confidentiality --

22 | confidentiality and mental health evaluations, such that

23 | deputies and other incarcerated people are not present when

24 | people who are in their gravest, darkest moments need to tell

25 | mental health clinicians the problems and treatment needs that

1    they require.

2         Four, we are asking for safety checks to be conducted

3    on a timely and adequate basis and for there to be reasonable

4    audits.

5         Five, we are asking to ensure that mental health

6    clinicians have the ability to provide input as to people's

7    housing decisions, so that custody staff don't place people in

8    what one former clinician called conditions worse than kennels,

9    out of convenience.  But, instead, place them based upon their

10   treatment needs.

11        Sixth, we are asking that the drug -- that the county

12   take precautions to limit the amount of drugs that come into

13   the facility and to initiate medication and assisted treatment,

14   as well as Narcan, on individual persons.  Or at least make it

15   available to people so that -- that the number of overdoses at

16   the jail is reduced.

17        And, finally, we ask for certain remedies for people

18   with mobility disabilities, so that people do not need to be

19   forced up the stairs.  If they cannot walk to see their

20   attorneys, have reasonable accommodations so they don't slip

21   and fall in the shower or require their cellmate to help them

22   attend -- attend a toilet -- toileting activities.

23        That's it.  Happy to answer any questions you have.

24   But we're only asking for relief on those six or seven items.

25   They make up three pages of the proposed order, double-spaced

1    and heavily indented.

2            THE COURT REPORTER:  Could you state your name for

3    me.

4            ATTORNEY SWEARINGEN:  Van Swearingen.

5            THE COURT REPORTER:  Thank you.

6            THE COURT:  Okay.  Well, thank you.

7            And any of the other plaintiffs who want to weigh in

8    on this -- that this is the totality of the request?  Although

9    having heard the list, it sounds like almost everything anyway.

10           ATTORNEY SWEARINGEN:  It -- this is just the

11   beginning of a process, your Honor.  And, really, the -- the

12   remedies we seek are very tailored towards the -- the deaths

13   that we've seen at the jail.

14           If you'll permit me, I can talk a little bit about

15   those.

16           THE COURT:  Well, maybe you should.  Because one of

17   my problems with this, setting aside much of the issues, goes

18   to the likelihood of success and the fact that I don't see that

19   you connect the dots to the allegations for each claim with the

20   events or circumstances.  I know this is not a motion to

21   dismiss.  But a lot of -- if it were, I would be talking about

22   the conclusory language that's used.  And, at this stage, with

23   an injunction, injunctive relief, it's -- it's a fairly heavy

24   burden of likelihood of success that I don't see well

25   established here.

1          So if you want to speak about specifics, that might

2    be helpful.

3          ATTORNEY SWEARINGEN:   Okay, your Honor.   To begin

4    with -- to begin with, as you may well know, seven people have

5    died at the jail since we filed our reply brief.   That's

6    seven -- I'm sorry.   Seven individuals have died since we filed

7    the instant motion on May 2nd.   That's seven deaths in three

8    months.   There are 15 deaths since the California state auditor

9    issued its unprecedented report on the California county jail

10   system.   Finding that until systemic deficiencies are remedied,

11   the weaknesses in the sheriff's policies and procedures will

12   continue to jeopardize the health and lives of individuals in

13   its custody.   15 people have died this year.   Last year, 18

14   people died.   That's three times the national average of jail

15   death rates.   The highest death rate in all of California.

16   Currently, we're on track for 24 deaths at the jail this year.

17         I think the evidence has -- has quite well connected

18   the dots, your Honor.   If we could take any one of those

19   issues -- take the -- the intercoms, for example.

20         The Ninth Circuit, in *Hoptowit versus Ray*, said that

21   the jail must have an effective way for the inmates to summon

22   help during safety and medical emergencies.

23         The evidence is replete with examples of people who

24   have died while trying to communicate with jail staff through

25   the intercom system.   This includes Derek Baker.   You can look

1   at the declaration of Gustavo Sepulveda, who states that the

2   person next door to him was violently being attacked.  And he

3   kept on pressing the intercom button to try and summon help.

4   Nobody came.  The deputy later told him that the intercom

5   button was broken.

6          You can look to the declarations of Daniel LaCroix,

7   and Michael Keavney, who talk about the death of Robert

8   Moniger, his -- their cellmate who, over the course of days,

9   was dying.  They repeatedly pressed the intercom button to

10   summon help.  Nobody came.  Shortly thereafter, he died.

11          You can look to the declaration of Justin

12   Christiansen, who talks about Justin -- Jeremy [sic] Aleman,

13   who died 45 minutes after multiple people in the housing unit

14   were pressing the intercom button to save Jeremy Aleman's life.

15   Indeed, other people in the cell rushed to his help, performed

16   CPR on him.  But staff still did not come for 45 minutes.

17          Similarly, with Luis Gomez, his cellmate pressed the

18   intercom button to summon help for his cellmate, who was in

19   medical distress.  And waited 48 minutes before jail staff

20   came.

21          Similarly, Richard Boulanger, the Citizens Law Review

22   Oversight Board, reported that he was hanging by his neck; by a

23   cellmate who had pressed the intercom four to five times for

24   help.  But the intercom had been muted.

25          And these are just examples of death, your Honor.

1    Other individuals, declarants -- such as Laura Zoerner --

2    talked about trying to summon help because she was having heart

3    palpitations.  When that didn't work, she began banging her

4    head on the cell walls until her head began bleeding.

5          You can look at the declaration of plaintiff Darryl

6    Dunsmore, who talks about choking and pressing the intercom

7    button.  And no one coming for 30 minutes, during the time that

8    he was choking.

9          So that's just one of our issues, your Honor, in

10   which we can tender the evidence showing that people have died

11   and people have suffered from the jail's failure.

12         Under *Hoptoit versus Ray*, the Ninth Circuit decision

13   cited in our papers, showing that the jail must provide

14   effective ways for individuals, who are incarcerated with the

15   system, to summon help.

16         I can give you and run through examples of each of

17   the types of deaths and/or harms associated with each of the

18   remedies we seek, as well as the notice that the county has

19   been provided by various experts; including its own expert

20   consultants, oversight agencies, other experts, the news media,

21   citizens, as well as community groups.  Consistently, time and

22   time again, we've seen even the -- the sheriff's department's

23   own documents or spokespersons saying there's a problem here;

24   it has gone unaddressed.

25         And under *Farmer v. Brennan*, that is the definition

1  of deliberate indifference.  That is an acknowledgment that

2  there is a problem but not willing to address the serious

3  risk -- I'm sorry, the substantial risk of serious harm.

4          THE COURT:  Okay.  Well, thank you for that response.

5          Defendants have anything they want to say in relation

6  to the scope of the -- the narrowed scope of the relief or this

7  evidentiary basis?

8          Ms. Coleman?

9          ATTORNEY COLEMAN:  Yes, your Honor.  Thank you.

10          First of all, a lot of plaintiffs' motion and the

11  points that Mr. Swearingen made today are based on historical

12  examples that span back years.

13          So when the audit was critical, changes were made in

14  the jail system.  With the CLERB review, changes were made

15  after each of these incidents.

16          He cited to an example of an intercom where Inmate

17  Baker died while he was attacked, and the intercom didn't work

18  to alert authorities.  They have changed it so now you can no

19  longer mute the audio for the intercom system.

20          They also have instituted audits -- weekly audits of

21  the intercom.  Not just at the central jail but at all of the

22  facilities, to make sure the intercoms are properly working.

23  They're working on upgrades to that system, as well as the

24  video system.

25          With regard to the -- oh, and before I move to the

1    remedial change requested, plaintiffs' counsel also mentioned

2    the death rate.

3          First of all, not all of those deaths are due to

4    drugs.  Some of those deaths are natural causes.  For example,

5    Lacy, Jerrell died of thromboembolism.  It was deemed a natural

6    cause.

7          There are other people -- there was someone who

8    was -- had cancer of the throat.  And he was on hospice care.

9    He died.  He had a DNR.  So there's -- a lot of these deaths

10   are not due to drugs.

11         But fentanyl has been a problem since 2017, and

12   increasing in both the community and the -- and the jail

13   system.  It can be brought in in microscopic amounts, and it's

14   hard to detect.

15         So they have the scanners working at all of the

16   intake facilities.  Everyone who comes in on intake is scanned.

17   Any abnormality, then they address it.  They also do urinalysis

18   to determine if someone has drugs on board.

19         They have K-9 units.  There are a lot of different

20   things they're doing to try to interdict drugs from coming into

21   the prison.

22         And plaintiff -- plaintiffs have not suggested any

23   remedy, other than the county should come up with something to

24   try to stop the drugs coming in.

25         Well, that's not entirely true.  They say that the --

1    the visitors and the staff should all be -- go through the

2    scanner as well.  The Department of Corrections has had

3    lawsuits trying to put visitors through the scanner, with the

4    repeated X-ray, the radiology exposure, and the privacy

5    implications.  I'm sure that the ACLU would be back here with a

6    lawsuit based on that.

7            And your -- the Court is well aware that with staff,

8    there are other issues that come into play if the scanner is

9    used, such as the union and different issues that would come

10   into effect.

11           But in terms of visitors, all of the visits are

12   noncontact right now.  So that's not how the drugs are coming

13   in.

14           It's most likely the people who are coming in on --

15   on the two-day, five-day incarceration.  They get arrested just

16   to bring in the drugs.

17           (Nonverbal vocal response by audience.)

18           ATTORNEY COLEMAN.  And we're trying as hard as we can

19   to stop it.

20           Narcan has been put into all of the holding cells,

21   all of the day rooms, all of the units.  It's on the walls for

22   everyone to access, if they -- if they have an emergency.

23   Staff and medical also have Narcan on their belts and

24   available.  So it's very widely disseminated and used.

25           In terms of the remedial relief they seek, the

1   intercoms, they are working.  They're fixed when there's a

2   problem.  People are not put into cells where there's not a

3   working intercom.  They no longer can be muted.  And they are

4   working on upgrading the intercom system, as well.

5          The video.  The video is working, but they're also

6   doing -- I went into more detail about it in our opposition

7   brief, about the improvements that are coming in the video.

8   And then that's going to be helpful in a number of ways, as

9   well as deputies having body-worn camera.  And so that's going

10  to help not only in the safety inspections and being able to

11  audit those but also in any -- in any incident that occurs.

12         Video cannot be put in some corners, underneath the

13  stairs, for example, because the incarcerated persons tear down

14  video cameras when they are able to access them.

15         So there's video as much as can be, and then you have

16  the observation booth officers watching from above.

17         Confidentiality and mental health visits.  It is

18  provided.  Upon request, it is accommodated.  It cannot always

19  be confidential because of the safety risk.  It has to be

20  balanced, the safety risk to the other needs.  And so there's a

21  deputy present but not listening, not weighing in.

22         In terms of safety checks, they are done.  They are

23  logged.  They are now audited regularly.  And with the video

24  improvement, one thing they'll be able to do is have the chips

25  that they can scan when they do the safety checks, as well as

1    being able to see them on the body-worn camera; as far as what

2    is seen by the deputy when he looks into the cell.

3         Plaintiffs would like the safety checks to be done at

4    nighttime, when people are sleeping, without waking up the

5    people.  Unfortunately, there's no way to tell if they're alive

6    or dead sometimes without waking them up and having them move a

7    foot, or something like that.  So sometimes that has to be done

8    in order to make sure that they're okay.

9         Mental health clinicians.  They do have input on

10   housing.  But as the Court knows, sometimes safety

11   considerations or disciplinary considerations are also a factor

12   in determining where they're housed.  The mental health

13   clinicians, though, do go to every unit and visit them.  And

14   they now have interdisciplinary teams that are going to the

15   units as well.

16        And in terms of drugs, the MAT program -- medical

17   assistance treatment -- has been initiated with the rollout of

18   NavCARE into the facilities.  And so now you can have

19   methadone, Suboxone, and all of the things that plaintiffs were

20   seeking with the MAT program, as well as Narcan being widely

21   available.

22        In terms of ADA, no one is forced up the stairs.  I

23   tried hard to find any record of that, or any record of that

24   other than, you know, the plaintiffs saying that that occurred.

25   The staff were very adamant that they have never had an

1    incident where there were two elevators out of use.   But if

2    there were, they would put them on the staff elevators.

3           There are two elevators in the central jail for

4    inmates.   And they can divert them to a staff elevator, if

5    needed.   So no one would be forced up the stairs.   You could

6    reschedule a visit.   You could put them on another elevator.

7    You could have the visit take place on a different floor.

8    That's not something that occurs.

9           The new facility, Rock Mountain, is -- is hopefully

10   going to open this fall.   And that is completely ADA compliant.

11   So people will be moved into that that have ADA issues.   And

12   then the other facilities will be gradually upgraded as well to

13   current modern ADA compliance as needed.

14          Does the Court have any other questions?

15          THE COURT:   No.   No, thank you.

16          Anyone else on the defense side want to comment?   Or

17   did Ms. Coleman cover it for you.

18          ATTORNEY COLEMAN:   Maybe I could add one thing.

19   Sorry, your Honor.

20          THE COURT:   Sure.

21          ATTORNEY COLEMAN:   In terms of the -- I know there

22   were a lot of declarations from plaintiff and -- plaintiffs and

23   other incarcerated persons.   And we did our best to determine

24   if those facts were accurate, and provide information to the

25   Court in the opposition.   We didn't have a chance to do that

1   with the information submitted in the reply brief.  But it's

2   our position that it's premature to issue a preliminary

3   injunction.  Especially given the very recent changes that have

4   happened and the things that are -- that are going on in the

5   county jails.

6        I was -- I have been very impressed with staff's

7   efforts to make things safe and clean for inmates and what

8   they've been doing there.  And it compares favorably, for

9   example, to Orange County jails and some of the state

10   Department of Corrections that I've -- that I've visited.  I've

11   gone to all of the county jails.

12        So I think it's premature, without doing some

13   discovery, to determine what is actually the case, instead of

14   coming forward with declarations that couldn't be disputed at

15   this stage because of the timing of the briefing.  But we can

16   certainly do more discovery and revisit this issue.

17        The -- in terms of the preliminary injunction that

18   they seek, having the county come up with its own proposal is

19   not the type of targeted, least restrictive, narrowly drawn

20   measure contemplated by the PLRA.

21        There's -- what is going to stop drugs from coming

22   into the prison entire -- or the jails entirely?  I'm not aware

23   of any jail or prison that's been able to do that.  But we're

24   doing our best, despite the minute amount that fentanyl could

25   come in and be virtually undetected.

1          THE COURT:  Yeah.  It's deadly in just a matter of a

2    couple of grains.

3          Okay.  Thank you.

4          Ms. Moriarty, did you have something to add?

5          ATTORNEY MORIARTY:  Yes, your Honor, briefly

6          Liberty Healthcare Corporation had the mental health

7    care contract from 2017 until the end of May.  And so it's our

8    position that we shouldn't be involved or there shouldn't be

9    any order affecting Liberty Healthcare.

10          THE COURT:  Okay.  Thank you.  And Ms. Gardener --

11    Garner?

12          ATTORNEY GARNER:  Yes, your Honor.

13          Correctional Healthcare Partners is in the same

14    position.  They are no longer under contract.

15          Additionally, the particular request -- the relief

16    that plaintiff is seeking has no bearing on my client, who

17    provided doctors within the facility, not -- not mental health

18    care services, has no ability to address issues with regard to

19    video cameras or intercoms, et cetera.

20          THE COURT:  Okay.  Well, thank you.

21          And then, Mr. Swearingen, I don't know if you want to

22    respond at all?

23          There you are.

24          Or any of your colleagues want to have anything to

25    say in reply?  You may.

1          ATTORNEY SWEARINGEN:  I do, your Honor.

2          I think it's very important to dig into the actual

3   evidence that is in this case.  We've submitted declarations by

4   numerous experts, including nationally recognized experts and

5   medical healthcare, mental healthcare, safety and security, and

6   disability access.  Each of them has connected the dots to the

7   problems that are at issue and the remedies that we seek.

8   We've also submitted over 30 declarations of incarcerated

9   people that support the relief that is requested.

10          If you will permit me, your Honor, I would like to go

11  issue by issue that --

12          THE COURT:  No.  No.  That was what briefing was for.

13  We're not going to spend all afternoon on this.  I asked you to

14  highlight, and you did.  But we're not going to go issue by

15  issue and declaration by declaration.

16          I read it all.  If there's something you want to

17  respond to, specifically to what Ms. Coleman has said or the

18  other counsel who don't appear to have -- who appear to be out

19  of the loop at this point, let's address that.

20          ATTORNEY SWEARINGEN:  Thank you, your Honor.

21          As to Liberty Health -- Liberty and Correctional

22  Healthcare Partners, if indeed there are no employees of either

23  organization at the jail, we agree that preliminary injunctive

24  relief should not be sought again them.  Right now, that is not

25  in the record.

1          THE COURT:  Okay.

2          ATTORNEY SWEARINGEN:  What's also not in the record

3     are many of the bald and blanket assertions Ms. Coleman said

4     about the state of the jail.

5          In contrast, there is substantial evidence for each

6     of the six or seven issues that we've been discussing today,

7     about how those issues are deficient.

8          Historically, the jail has issued lip service as to

9     many, many issues, and said, "We're in compliance.  We're doing

10    our best.  We're going to do the right thing," when in fact

11    they haven't.

12         For example, in response to the expert report by

13    Lindsey Hayes, a nationally recognized suicide expert, who --

14    who was commissioned by the County of San Diego to evaluate the

15    jail, he recommended that the jail ensure that mental health

16    clinician contacts are confidential.  The jail said, in

17    response, "Changes were made to eliminate cell site encounters

18    except in situations where doing so could jeopardize the safety

19    of an inmate and staff."  And what we've seen is every single

20    encounter -- 99 percent of them, according to the declaration

21    of Ms. Alonzo, a former mental health clinician at the jail,

22    are not confidential.

23         If we go back to --

24         THE COURT:  But you have to admit, security issues

25    have to be considered in these evaluation settings.

1              ATTORNEY SWEARINGEN:  Absolutely, your Honor.  And

2    just as Pablo Stewart, the -- the plaintiffs' expert for mental

3    health, who has decades of experience in correctional mental

4    health says, individualized assessments of security needs are

5    needed.

6              So not just going through blanket-wise and assuming

7    every single person is a security threat but, instead, looking

8    at their history within the jail to determine if they are a

9    security threat.  And if there is a security threat, there are

10   ways the jails can go about conducting mental health

11   evaluations to mitigate the concern.  Not that deputies are

12   going to hear private details, but so that patients have the

13   comfort to talk about their mental health needs.  They can do

14   so by, you know, putting a -- a cuff around the ankle of

15   someone in a room.

16             You can do so by having a deputy look through a

17   window to see if there are any security concerns.  You can do

18   so by separating the mental health clinician and the patient by

19   a transparent barrier.

20             But going back to -- to some of the bigger issues of

21   this case, drugs, your Honor, if you look at the F. Hunting

22   declaration submitted by defendants in their opposition briefs,

23   that's one of the senior crime analysts in the detentions

24   investigation unit.  He says over the past five years -- and he

25   has charts and graphs showing that there has been an explosion

of drugs in the jail.  He says that fentanyl is on a
significant rise.  And what he says about fentanyl is really
useful.  He ends his declaration by saying, "Fentanyl is
especially problematic because it is so deadly."  Yet what has
the jail done in response?  There is nothing.  Not one thing in
defendants' opposition papers that show that they have done
anything different than we have asked for.  The body cam -- the
body scanners, CLERB, and -- and I believe the grand jury have
said that they're antiquated.  They're not used everywhere.
They're not used on staff.  F. Huntings declaration shows that
staff are one of the major effectors of introduction of drugs
into the jail.

If we go to -- to -- to Ms. Coleman's statement on
MAT, she says that there is a full medication-assisted therapy
program at the jail.  Of course, medication is just a therapy,
or the therapies that are used to treat people with opioid use
disorders.

In contrast to what Ms. Coleman says, the
declarations by Mr. Montgomery and other declarants the
defendants have put forward say there is no wide-scale MAT
program at the jail.  And, indeed, since the year 2020, there
have only been 40 to 60 patients treated with
medication-assisted therapy out of the likely 100,000 people
who have gone through the jail system.

The defendants, declarants, state that a MAT program

1   is in the works.  But if you look at the declaration of -- of

2   Robert Cohen, who has 40 years of correctional medicine

3   experience, 17 years sitting on the board of the National

4   Commission on Correctional Healthcare as the representative for

5   the American Public Health Association, he says that what's

6   important are the details.  The details are critical to a

7   program's success.

8          And the defendants' MAT program -- M-A-T program --

9   right now lacks any kind of indication or evidence as to

10   eligibility requirements, whether it be accessible to any or

11   all people with opioid use disorder, what types of drugs will

12   be provided, who will be providing them, whether the jail or

13   sheriff's department will have custody, operations over the

14   drugs, or whether outside providers will be responsible for

15   them, whether there are any therapeutic inventions involved.

16          Those are all according to Dr. Cohen.  Again,

17   somebody with 40 years of medical corrections experience,

18   saying that those details are necessary to understand the plan.

19   And when Ms. Coleman comes up and says that there's a MAT

20   program in the jail, that is -- that -- that is partially true.

21          It's accessible right now -- according to the jail's

22   only -- only policies and procedures on it -- to incarcerated

23   female people at Las Colinas, and certain other individuals who

24   already have community prescriptions, many of whom are not

25   receiving it.  We have declarations in the record of people who

1  say that they were on community medications for

2  medication-assisted therapy and are not receiving it.

3          That includes Christopher Norwood, who submitted a

4  declaration saying that he informed the jail of his community

5  prescription on Suboxone, did not receive it.  He ended up

6  overdosing at the jail on fentanyl.  And only the day after,

7  the day after he was hospitalized for fentanyl overdose, did

8  the jail offer him medication.

9          We can go through -- through -- through many other --

10  of -- of plaintiffs' requested remedies.  And each one will

11  show the -- the broadscale changes that Ms. Coleman announced

12  are not in the record.  And the reason why we are in court is

13  because the record matters; because the evidence matters.

14          And we've shown both through -- through evidence from

15  our own correctional experts; as well as documents from

16  Disability Rights California; from Lindsey Hayes and other

17  experts who were hired by the counties to do assessment; by --

18  the CLERB, the county agency responsible for reviewing deaths

19  at the jail, and others.  Showing that the jail's policies and

20  procedures place people at risk of harm.

21          Ms. Coleman says that the jail death rate is not that

22  bad.  But in April of this year, the county hired analytical --

23  Analytica Consulting to perform an analysis of the deaths.  I

24  believe that's the third document attached to my request for

25  judicial notice in the opening brief.  And it shows an

1   apples-to-apples comparison of San Diego jail -- jail deaths,

2   establishing that San Diego has the highest mortality rate of

3   any death -- of any jail in California and the -- the overdose

4   rate at the jail is twice that of the next highest in

5   California.

6         The jail death rate is out of control.  We're

7   surrounded by people in this courtroom, many of whom have lost

8   loved ones at the jail from preventable deaths because the jail

9   and the sheriff's department have not taken the actions that

10  are requested in our preliminary injunction, and that are put

11  forward and recommended by experts.  Nationally recognized

12  experts, again, in correctional healthcare, safety and

13  security, mental health care, and disability access.

14        THE COURT:  Okay.  Well, thank you.

15        I mean, clearly, the record is important, as you say.

16  And rather than repeating it further, I'll take the matter

17  under submission and rule accordingly.

18        ATTORNEY SWEARINGEN:  If I could state one thing,

19  your Honor, about the record, briefly.  I apologize.

20        But we would like to file a request for judicial

21  notice, establishing that Plaintiff Laura Zoerner has been

22  reincarcerated at the jail, as well as the fact that five

23  people have died at the jail since the time of our reply brief.

24        THE COURT:  Of drugs?

25        ATTORNEY SWEARINGEN:  Three of them, we believe, are

1    from drugs.  Three of those people, in the sheriff's own press

2    relief, say were administered Narcan; or other people in --

3    next to them were administered Narcan.  Highly suggesting that

4    they died of overdose deaths.  Because Narcan, of course, is

5    used to revive people who are suffering from overdoses.

6         THE COURT:  Well, what's the defense's position on

7    that?  I mean, I can take judicial notice of documents

8    Ms. Zoerner is back in custody.  But the facts in that report

9    may not be subject to judicial notice if they're subject to

10   debate.

11        ATTORNEY SWEARINGEN:  They're all sheriff's

12   department press releases, your Honor.

13        THE COURT:  That's not the point.

14        Ms. Coleman, what's the position on the judicial

15   notice request?

16        ATTORNEY COLE:  No objection as to Ms. Zoerner.

17        But absent autopsy or medical examiner's cause of

18   death, the fact that Narcan was administered doesn't mean much

19   if they come across someone who's unconscious.  They do it as

20   a -- you know, in case drugs were involved.  But, you know,

21   often drugs are not involved but they try to do Narcan anyway.

22        THE COURT:  Okay.  Well, I'll grant as to

23   Ms. Zoerner's -- Ms. Zoerner's reincarceration and deny

24   otherwise.  Take the matter under submission.

25        Was there anything you wanted to add, Ms. Coleman?

28

1          ATTORNEY COLEMAN:  If I might respond to a couple of

2    things, your Honor.  I'll try to keep it brief.

3          With regard to the death rate that Mr. Swearingen

4    mentioned, it doesn't take into account the turnover in the

5    jails that the most risk -- for example, suicide is in the

6    first six days of incarceration, and there's a lot more

7    turnover in San Diego counties than some of the other jails.

8          The -- there's a bunch of studies going around about

9    the death rate, so I'm not sure if Analytica is the one.  But

10   there were -- there was one that did not take into account L.A.

11   County, which has a higher death rate.

12         The experts that he cited, they used old information,

13   such as the -- the state audit.  That didn't take into account

14   the improvements and the -- the new system.  They didn't tour

15   the facilities.

16         He mentioned that Liberty and CHP, there's no

17   evidence that they're no longer at the jails.  I would submit

18   to the contrary.  That we submitted the NavCARE declaration and

19   the declaration of Captain Bibel, I believe, who said that was

20   the new system.  And Dr. Montgomery's declaration also explains

21   all of the other care providers who were doing piecemeal, you

22   know, dental, vision, psych., medical were out.

23         And the NavCARE was the comprehensive provider.  So

24   if there is going to be any injunctive relief at some point,

25   perhaps plaintiffs would like to add NavCARE in.  But the CHP

1    and Liberty, and all of the other providers should be out.

2              THE COURT:  Okay.

3              ATTORNEY COLEMAN:  And just finally on the drug

4    issue.  Things have changed.  There were only the MAT program

5    for females in place.  But with NavCARE coming in, there is now

6    MAT programs for drug withdrawal treatment and -- and that is

7    available now.  Things have been done to try to stop drugs from

8    coming in.

9              And Hunting's declaration points out the drugs that

10   are seized.  So the seizure of drugs has gone up.  That's what

11   those statistics tell us.

12             In terms of the individual assessment of security

13   needed to do private mental health assessment or meetings with

14   the inmates, that's not appropriate for preliminary injunction

15   if it requires an individual assessment of each inmate.

16             Certainly, if there is -- if the person feels he

17   needs -- he or she needs a confidential visit, as opposed to a

18   check in:  "How are you doing?"  You know, "Do you need to talk

19   further?"  Then that is accommodated.  But, otherwise, there's

20   no reason not to have the deputy there for safety and security.

21             THE COURT:  Okay.  Thank you.  Thank you, all.

22             The matter is under submission.  I'll rule

23   accordingly on all of the grounds raised.  All of the various

24   issues with regard to mootness, standing, you name it.  We will

25   cover it in a final order.

1          Thank you all very much.

2          THE ATTORNEYS:  Thank you, your Honor.  Thank you,

3    your Honor.

4          (Conclusion of proceedings at 2:40 p.m.)

5

6

7

8

9                              --oOo--

10

11   I certify, by signing below, that the foregoing is a correct

12   stenographic transcript of the oral proceedings had in the

13   above-entitled matter this 15th day of August, 2022.  A

14   transcript without an original signature or conformed signature

15   is not certified.  I further certify that the transcript fees

16   and format comply with those prescribed by the Court and the

17   Judicial Conference of the United States.

18          /S/ Amanda M. LeGore

19        _____

20        AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

21

22

23

24

25