GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email:      ggrunfeld@rbgg.com
            vswearingen@rbgg.com
            pkaul@rbgg.com
            eanderson@rbgg.com
            hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF AARON J. FISCHER
1400 Shattuck Avenue, Suite 12 – #344
Berkeley, California  94709-1474
Telephone:  (510) 806-7366
Facsimile:  (510) 694-6314
Email:      ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION FOR LIMITED EXPEDITED DISCOVERY**<br><br>Judge:      Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date:  None Set<br><br>**NO HEARING<br>DATE PER DKT. 211** |

[4144678.1]

1    (*counsel continued from preceding page*)

2    CHRISTOPHER M. YOUNG – 163319
     ISABELLA NEAL – 328323
3    OLIVER KIEFER – 332830
     DLA PIPER LLP (US)
4    401 B Street, Suite 1700
     San Diego, California  92101-4297
5    Telephone:   (619) 699-2700
     Facsimile:    (619) 699-2701
6    Email:        christopher.young@dlapiper.com
                   isabella.neal@dlapiper.com
7                  oliver.kiefer@dlapiper.com

8    Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION FOR LIMITED
EXPEDITED DISCOVERY

I, Van Swearingen, declare:

1.       I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Motion for Limited Expedited Discovery.

2.       Attached hereto as **Exhibit A** is a Proposed Order Granting Plaintiffs' Motion for Limited Expedited Discovery.

3.       Prior to filing this motion, on August 26 and September 6, 2022, Plaintiffs' counsel conferred with counsel for County Defendants.  County Defendants indicated that they would not agree to expedited discovery and will oppose this motion, however, the parties reached tentative agreement on many specifics related to the discovery Plaintiffs seek.  Attached hereto as **Exhibit B** is true and correct copy of correspondence between counsel for the parties that describes their positions on the requested discovery, including areas of agreement and remaining disagreements.

4.       Plaintiffs filed a motion for a preliminary injunction and provisional class certification on May 2, 2022.  *See* Dkt. 119.  On August 11, 2022, the Court held a hearing on the motion.  Attached hereto as **Exhibit C** is a true and correct copy of the official transcript of the hearing.

5.       This year to date, sixteen people have died in custody at the Jail.  Eight of those deaths occurred after Plaintiffs filed their preliminary injunction motion on May 2, 2022.  Attached hereto as **Exhibit D** are true and correct copies of the Sheriff's Department's announcements of the six deaths that occurred since the filing of the reply on June 7, 2022.  *See also* Dkt. 162-2, ¶¶ 2-3, Ex. A-B (announcing deaths of two other individuals who died after filing of preliminary injunction motion).

6.       An individual died in custody the day after the Court issued its order on

the preliminary injunction on August 15, 2022.  Based on a conversation with the decedent's family member, I understand that the individual who died had a history of mental illness and had attempted self-harm and suicide while in custody.

7. On February 23, 2022, County Defendants' counsel rejected Plaintiffs' request for expert Jail inspections.  Attached hereto as **Exhibit E** are true and correct copies of the correspondence between counsel for the parties.

8. On March 15, 2022, Plaintiffs' counsel asked County Defendants to agree to (1) class certification, and/or (2) the use of joint experts as an efficient process to identify and remedy deficiencies.  County Defendants would not agree to either proposal.  Attached hereto as **Exhibit F** is a true and correct copy of Plaintiffs' counsel's letter to County Defendants outlining the proposals.  Attached hereto as **Exhibit G** is a true and correct copy of correspondence between counsel for the parties regarding the proposals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 7th day of September, 2022.

*/s/ Van Swearingen*
Van Swearingen

DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION FOR LIMITED
EXPEDITED DISCOVERY

## TABLE OF CONTENTS
### DECLARATION OF VAN SWEARINGEN IN SUPPORT OF
### MOTION FOR LIMITED EXPEDITED DISCOVERY

| DESCRIPTION | EXHIBIT | PAGE NO. |
|---|---|---|
| Order Granting Plaintiffs' Motion for Limited Expedited Discovery | A | 1 |
| Email Regarding September 6, 2022 Meet and Confer | B | 6 |
| Official Transcript of the August 11, 2022 Hearing on Motions for Preliminary Injunction and Provisional Class Certification | C | 10 |
| Sheriff's Department's Death Announcements Since June 7, 2022 | D | 41 |
| February 2022 Emails Between Counsel for the Parties Regarding Plaintiffs' Requests For Inspections | E | 48 |
| Plaintiffs' March 15, 2022 Proposal Regarding Class Certification and/or Use of Joint Experts | F | 53 |
| March 2022 Emails Between Counsel for the Parties Regarding Plaintiffs' March 15, 2022 Proposal | G | 60 |

[4137051.2]

# EXHIBIT A

1

2

3

4

5

6

7

8

9

10              UNITED STATES DISTRICT COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00406-AJB-DDL |
| | **ORDER GRANTING PLAINTIFFS' MOTION FOR LIMITED EXPEDITED DISCOVERY** |
| Plaintiffs, | |
| v. | Judge:    Hon. Anthony J. Battaglia |
| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, | Magistrate: Hon. David D. Leshner |
| | Trial Date: None Set |
| Defendants. | |

[4144743.1]

This matter is before the Court on Plaintiffs' Motion for Limited Expedited Discovery. The Court having considered the parties' briefing, the arguments of counsel, and the entire record in this case, and good cause existing therefore, **GRANTS** the motion.

**WHEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Defendants San Diego County Sheriff's Department and County of San Diego ("County Defendants") shall permit four of Plaintiffs' experts—James Austin, Pablo Stewart, M.D., Robert Cohen, M.D., and Syroun Sanossian—to conduct on-site inspections of five of the Jail's facilities. Specifically, James Austin, Pablo Stewart, M.D., and Robert Cohen, M.D. shall be permitted to inspect the Central, George Bailey, Vista, and Las Colinas facilities. Syroun Sanossian shall be permitted to inspect the Central and Rock Mountain facilities. Each expert inspection shall be limited to one day per expert per facility. The inspections shall occur within 45 days of service of notices. The parties shall timely meet and confer to select dates and times, and coordinate all other logistics, for the inspections.

2.      Plaintiffs are permitted to serve on County Defendants requests to obtain documents related to the following issues raised in the preliminary injunction motion, Dkt. 119:

(i)      All policies, procedures, practices, staff directives, training materials, investigative materials, and third-party contracts regarding drug overdoses and overdose deaths, including the functionality of body scanners, the interdiction of drug contraband, and treatments for substance use disorder or overdoses in the Jails (including MAT and Narcan accessibility);

(ii)      All policies, procedures, practices, staff directives, training materials, investigative materials, logs, audits, and staff disciplinary records regarding the scope and adequacy of safety checks and audits thereof, as well as the timeliness of safety checks in cells with two hours or less

1   of daily out-of-cell time;

2   (iii)   All policies, procedures, practices, staff directives, training materials,

3           investigative materials, logs, audits, and staff disciplinary records

4           regarding the locations, functionality, testing, and repair/replacement of

5           the audio intercom and video surveillance systems, and related staff

6           responses to emergencies;

7   (iv)    All policies, procedures, practices, staff directives, training materials,

8           and investigative materials, classification records regarding the

9           consideration given to mental health staff's clinically-based

10          recommendations for incarcerated people with mental health needs,

11          including but not limited to placement of such individuals in enhanced

12          observation housing or protective custody;

13  (v)     All policies, procedures, practices, staff directives, training materials,

14          and investigative materials regarding the provision of mental health

15          care in confidential settings; and

16  (vi)    All policies, procedures, practices, staff directives, training materials,

17          investigative materials, classification records, staff disciplinary records,

18          and physical and design plans regarding the accessibility of facilities,

19          housing, programs, services, activities, and assistive devices for

20          incarcerated people with mobility disabilities.

21      County Defendants shall respond to Plaintiffs' requests for the production of

22  documents within 30 days service of document requests.

23      3.      Plaintiffs are permitted to conduct depositions, pursuant to Federal

24  Rule of Civil Procedure 30(b)(6), of persons most knowledgeable about the six

25  issues identified in the previous paragraph.  County Defendants shall designate one

26  or more persons as needed to provide complete and meaningful testimony as to each

27  of the six issues.  The depositions shall occur within 60 days of service of notices.

28      4.      Nothing in this Order limits Plaintiffs' ability to propound broader

1  requests in the normal course of discovery.

2

3  **IT IS SO ORDERED.**

4

5  DATED: _____, 2022        _____

6                                     David D. Leshner
                                       U.S. Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

| | |
|---|---|
| **From:** | Van Swearingen |
| **To:** | Coleman, Susan E. |
| **Cc:** | Priyah Kaul |
| **Subject:** | San Diego County Jail litigation: M&C re early discovery issues [IMAN-DMS.FID55015] |
| **Date:** | Tuesday, September 6, 2022 7:22:02 PM |

Hi Susan,

Per our conversation, below is our understanding of the parties' respective positions on discovery issues as discussed during today's meet and confer calls. To be clear, we understand that the County still intends to object to Plaintiffs' motion for expedited discovery, but that if the Court grants the motion, you would take the positions outlined below with respect to the specifics of this discovery.

<u>Inspections</u>

- Plaintiffs propose that four of their experts be permitted to inspect five of seven facilities: that their medical, mental health, and safety/security expert inspect the Central, George Bailey, Vista, and Las Colinas facilities, and that their ADA expert inspect the Central and Rock Mountain facilities. Plaintiffs anticipate having no more than two people from Plaintiffs' counsel present for each expert's inspection of each facility. Each inspection would be limited to one day (9am – 5pm) per expert per facility. Plaintiffs will agree to having multiple experts at a particular facility on the same day if County Defendants prefer, as long as each expert has staff to escort them to any relevant parts of the facility. County Defendants are generally amenable to this proposal except that you will get feedback from your client about whether there are certain times of day or areas where access may be restricted (e.g. during shift change). We are willing to further meet and confer regarding this issue.
- The parties agree that Plaintiffs' experts may ask questions of staff in the course of the inspections. Counsel for both parties (and counsel for Naphcare) may be present when staff are questioned. Plaintiffs do not intend for these to be formal or lengthy staff interviews.
- We discussed Plaintiffs' proposal that their experts be permitted to interview incarcerated people during the inspections without opposing counsel being present and County Defendants' objections to this proposal. After further discussing this issue internally, we will agree not to initiate conversations with incarcerated people during the inspections. Would this satisfy County Defendants?
- The parties agree that photos may be taken during the inspections. County Defendants propose that either their client take the photos and provide them to Plaintiffs' counsel or that they be permitted to inspect the photos before Plaintiffs leave the facility. County Defendants have expressed concerns about dissemination of photos of incarcerated people or photos that raise security issues, like photos of control panels. After further discussing this issue internally, we propose that Plaintiffs take pictures during the inspection but that County Defendants will have an opportunity to review the photos taken after the inspection. Plaintiffs will further agree to blur any faces if the photos are filed on the docket or otherwise made publicly available through litigation, and will consider any concerns raised by County Defendants about security or privacy issues arising out of specific photos. If the parties cannot resolve a dispute regarding any photo(s), the issue can be raised with Judge Leshner through in camera proceedings.
- The parties agree that in advance of each inspection, County Defendants will provide Plaintiffs with a map of the facility, identifying areas (including housing units) and their population types, as well as an organizational chart of high-level (supervisory) staff. County Defendants will make best efforts to produce these documents 20 days before each inspection, but in no event will they produce the documents less than 10 days before each inspection.
- We propose inviting Judge Leshner to attend one of the inspections. Let us know your thoughts on this.

<u>PMK Depositions</u>

- Plaintiffs propose that they be permitted to take Rule 30(b)(6) depositions of persons most knowledgeable about the six topics listed below. We are willing to agree that information sought regarding the below topics will be limited to the last two years. County Defendants are generally amenable to producing witnesses for these depositions but anticipate that they may designate multiple people to testify as to each topic, which may affect timing of the depositions. You will work on identifying the people who would testify, after which we are willing to further meet and confer about logistics.
    1. All policies, procedures, practices, staff directives, training materials, investigative materials, and third-party contracts regarding drug overdoses and overdose deaths, including the functionality of body scanners, the interdiction of drug contraband, and treatments for substance use disorder or overdoses in the Jails (including MAT and Narcan accessibility).
    2. All policies, procedures, practices, staff directives, training materials, investigative materials, logs, audits, and staff disciplinary records regarding the scope and adequacy of safety checks and audits thereof, as well as the timeliness of safety checks in cells with two hours or less of daily out-of-cell time.
    3. All policies, procedures, practices, staff directives, training materials, investigative materials, logs, audits, and staff disciplinary records regarding the locations, functionality, testing, and repair/replacement of the audio intercom and video surveillance systems, and related staff responses to emergencies.
    4. All policies, procedures, practices, staff directives, training materials, and investigative materials, classification records regarding the consideration given to mental health staff's clinically-based recommendations for incarcerated people with mental health needs, including but not limited to placement of such individuals in enhanced observation housing or protective custody.
    5. All policies, procedures, practices, staff directives, training materials, and investigative materials regarding the provision of mental health care in confidential settings.
    6. All policies, procedures, practices, staff directives, training materials, investigative materials, classification records, staff disciplinary records, and physical and design plans regarding the accessibility of facilities, housing, programs, services, activities, and assistive devices for incarcerated people with mobility disabilities.
- County Defendants have concerns about disclosure of information about disciplinary and personnel records. Plaintiffs ask County Defendants to identify what records or portions thereof, if any, they are willing to produce.

<u>Document Requests</u>

- Plaintiffs seek to serve document requests to obtain documents, going back no further than two years, related to the six issues raised in our PI motion. The above-listed PMK topics provide more detail about what we intend to seek as to each issue.
- We are willing to discuss limiting custodians if County Defendants provide relevant organizational charts.
- Plaintiffs are also willing to identify for County Defendants documents they already received through CPRA requests, and agree that those documents already produced unredacted and in full need not be re-produced.

<u>Timing</u>

We initially proposed that the above discovery should be completed within 30 days of service of notices, to which you responded that County Defendants would need more time. After further

discussing this issue internally, we will agree to allow 60 days from a Court order to complete the discovery, with overlapping windows to complete each type of discovery requested.  Specifically, we propose the production of documents within 30 days, inspections within 45 days, and PMK depositions within 60 days.  Please let us know your position on this proposed timing.

<u>Other Discovery Issues</u>
- The parties agree that there is good cause for the Court to enter a protective order and are finalizing the language of a proposed stipulated protective order between Plaintiffs and County Defendants that will be filed with the Court.
- You are also confirming the steps your client has taken with respect to document preservation.

<u>ENEs</u>
- We proposed starting with separate ENEs addressing three discrete issues on which we may be able to make progress: class certification, ADA claims, and mental health claims.  These ENEs would take place after we had obtained at least some of the discovery discussed above.  If we do not make progress on the first three ENEs, we can re-evaluate whether additional ENEs would be productive.  You are willing to go forward with ENEs but do not seem to agree with this structure.  Let us know if you have a counter-proposal.

In addition to following-up on outstanding issues, please let us know if you have a different understanding of any of the above.  Thanks.
Van

Van Swearingen
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830
VSwearingen@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

# EXHIBIT C

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   DARRYL DUNSMORE, ERNEST          )
    ARCHULETA, ANTHONY EDWARDS, REANNA)
4   LEVY, JOSUE LOPEZ, CHRISTOPHER   )
    NELSON, CHRISTOPHER NORWOOD, and )
5   LAURA ZOERNER, on behalf of      )
    themselves and all others        )
6   similarly situated,              )
                                     )  No. 20-CV-00406-AJB-WVG
7            Plaintiffs,             )
                                     )
8   v.                               )  August 11, 2022
                                     )
9   SAN DIEGO COUNTY SHERIFF'S       )
    DEPARTMENT; COUNTY OF SAN DIEGO; )
10  CORRECTIONAL HEALTCARE PARTNERS, )
    INC.; LIBERTY HEALTHCARE, INC.;  )
11  MID-AMERICA HEALTH, INC.; LOGAN  )
    HAAK, M.D., INC.; SAN DIEGO COUNTY)
12  PROBATION DEPARTMENT, and DOES 1 )
    to 20 inclusive,,                )
13                                   )  Courtroom 4A
             Defendants.             )
14  _____)  San Diego, California

15

16            TRANSCRIPT OF PROCEEDINGS
                 (Motion Hearing)

17

18    BEFORE THE HONORABLE ANTHONY J. BATTAGLIA, DISTRICT JUDGE

19

20

21

22  COURT REPORTER:        AMANDA M. LeGORE
                           RDR, CRR, CRC, FCRR, CACSR
23                         U.S. District Court
                           333 West Broadway, Suite 420
24                         San Diego, CA 92101
                           amanda_legore@casd.uscourts.gov
25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:        VAN SWEARINGEN
                                GAY GRUNFELD
 3                              Rosen Bien Galvan & Grunfeld LLP
                                101 Mission Street, Sixth Floor
 4                              San Francisco, CA  94105-1738
                                (415)433-6830
 5                              vswearingen@rbgg.com
                                ggrunfeld@rbgg.com
 6
                                AARON FISCHER
 7                              Law Offices of Aaron Fischer
                                2001 Addison Street, Suite 300
 8                              Berkeley, CA  94704
                                (510)806-7366
 9                              info@aaronfischerlaw.com

10                              CHRISTOPHER YOUNG
                                DLA Piper, LLP (USA)
11                              401 B Street, Suite 1700
                                San Diego, CA  92101
12                              (619)699-2700
                                christopher.young@dlapiper.com
13
14                              BARDIS VAKILI
                                ACLU Foundation of San Diego &
15                              Imperial Counties
                                PO Box 87131
16                              San Diego, CA  92138
                                (619)232-2121
17                              bvakili@aclu-sdic.org

18
     FOR DEFENDANT COUNTY OF
19   SAN DIEGO:                 SUSAN COLEMAN
                                Burke Williams & Sorenson LLP
20                              501 W. Broadway, Suite 1600
                                San Diego, CA  92101
21                              (619)814-5800
                                scoleman@bwslaw.com
22
     FOR DEFENDANT LIBERTY
23   HEALTHCARE:                MARILYN MORIARTY
                                Lewis Brisbois
24                              550 W. C Street, Suite 1700
                                San Diego, CA  92101
25                              (619)699-4958
                                marilyn.moriarty@lewisbrisbois.com
```

```
1   FOR DEFENDANT
    CORRECTIONAL HEALTHCARE
2   PARTNERS:               LARA GARNER
                            Gordon Rees Scully Mansukhani
3                           101 W. Broadway, Suite 2000
                            San Diego, CA  92101
4                           (619)230-7733
                            lsgarner@grsm.com
5

6

7

8                               -0-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Thursday, August 11, 2022; 2:02 p.m.)

2

3                    P R O C E E D I N G S

4

5          THE CLERK:  Calling matter 11, 20-CV-0406, Dunsmore

6   versus State of California, et al., for a motion hearing.

7          Counsel, please state your appearances, starting with

8   the plaintiffs.

9          ATTORNEY SWEARINGEN:  Good afternoon, your Honor.

10  Van Swearingen for plaintiffs.  I'm joined by other counsel for

11  my firm, as well as co-counsel.  Each of whom will individually

12  identify themselves.

13         THE COURT:  Okay.  Thank you.

14         ATTORNEY GRUNFELD:  Good morning, your Honor.  Gay

15  Grunfeld for plaintiffs and the putative class.

16         ATTORNEY FISCHER.  Good morning, your Honor.  Aaron

17  Fischer for plaintiffs.

18         THE COURT:  Thank you.

19         ATTORNEY VAKILI:  Good afternoon, your Honor.  Bartis

20  Vakili for the plaintiffs.

21         ATTORNEY YOUNG:  And good afternoon, your Honor.

22  Nice to see you.  Chris Young for the plaintiffs.

23         THE COURT:  Okay.  Thank you.

24         And for the defense?

25         ATTORNEY COLEMAN:  Good afternoon, your Honor.  Susan

1    Coleman for the County of San Diego.

2            THE COURT:  Great.  Thank you.

3            ATTORNEY MORIARTY:  Marilyn Moriarty of Lewis,

4    Brisbois, Bisgaard & Smith, on behalf of Liberty Healthcare,

5    Incorporation.

6            THE COURT:  Thank you.

7            And next?

8            ATTORNEY GARNER:  Good afternoon, your Honor.  Lara

9    Garner for Correctional Healthcare Partners.

10           THE COURT:  Great.  Thanks, Ms. Garner.

11           All right.  Anyone we missed?

12           Apparently not.

13           Okay.  Well, this is the hearing date set on the

14   plaintiffs' motion for preliminary injunction and provisional

15   class certification.

16           I'll let you add what you feel you may need to, to

17   the record.  But I'll give you -- I have a question and then a

18   comment by way of attending, that I'll share.

19           The question for plaintiffs is -- is this.  You know,

20   it's a little hard to tell from your pleadings if you're

21   seeking preliminary injunction -- injunction on each of the

22   claims and the various 15 causes of action, or not.  The facts

23   are relatively untethered.

24           So, sir, what would -- what would the answer be?

25           ATTORNEY SWEARINGEN:  Your Honor, we're seeking a

1    narrow preliminary injunction only on the items identified at

2    pages 5 through 8 of our proposed order.  That's docket number

3    119-3 at ECF 32.  That's when the proposed order begins.  And

4    we're only seeking preliminary injunctive relief on these

5    items.  I'll list them out for you in just a moment.

6                THE COURT:  Sure.

7                ATTORNEY SWEARINGEN:  We are not seeking relief on

8    all of the claims in our second amended complaint.

9                What we are seeking, your Honor, are narrow

10   injunctive remedies to ensure, one, that the intercoms at the

11   jail are working, so that people who need emergency help or

12   safety help are not neglected but, instead, can effectively

13   summon help.

14               Two, we're asking for the video cameras to be fixed,

15   the ones that are broken.  And for our plan to -- for

16   defendants to -- coming up, to fix the ones that do end up

17   breaking.  That -- at the jail itself, as well as the

18   Undersheriff Martinez has historically described them as old,

19   antiquated and -- and not capable of addressing all areas of

20   the jail where people are known to fight.

21               Three, we're asking for confidentiality --

22   confidentiality and mental health evaluations, such that

23   deputies and other incarcerated people are not present when

24   people who are in their gravest, darkest moments need to tell

25   mental health clinicians the problems and treatment needs that

1  they require.

2          Four, we are asking for safety checks to be conducted

3  on a timely and adequate basis and for there to be reasonable

4  audits.

5          Five, we are asking to ensure that mental health

6  clinicians have the ability to provide input as to people's

7  housing decisions, so that custody staff don't place people in

8  what one former clinician called conditions worse than kennels,

9  out of convenience.  But, instead, place them based upon their

10  treatment needs.

11          Sixth, we are asking that the drug -- that the county

12  take precautions to limit the amount of drugs that come into

13  the facility and to initiate medication and assisted treatment,

14  as well as Narcan, on individual persons.  Or at least make it

15  available to people so that -- that the number of overdoses at

16  the jail is reduced.

17          And, finally, we ask for certain remedies for people

18  with mobility disabilities, so that people do not need to be

19  forced up the stairs.  If they cannot walk to see their

20  attorneys, have reasonable accommodations so they don't slip

21  and fall in the shower or require their cellmate to help them

22  attend -- attend a toilet -- toileting activities.

23          That's it.  Happy to answer any questions you have.

24  But we're only asking for relief on those six or seven items.

25  They make up three pages of the proposed order, double-spaced

 1  and heavily indented.

 2              THE COURT REPORTER:  Could you state your name for

 3  me.

 4              ATTORNEY SWEARINGEN:  Van Swearingen.

 5              THE COURT REPORTER:  Thank you.

 6              THE COURT:  Okay.  Well, thank you.

 7          And any of the other plaintiffs who want to weigh in

 8  on this -- that this is the totality of the request?  Although

 9  having heard the list, it sounds like almost everything anyway.

10              ATTORNEY SWEARINGEN:  It -- this is just the

11  beginning of a process, your Honor.  And, really, the -- the

12  remedies we seek are very tailored towards the -- the deaths

13  that we've seen at the jail.

14          If you'll permit me, I can talk a little bit about

15  those.

16              THE COURT:  Well, maybe you should.  Because one of

17  my problems with this, setting aside much of the issues, goes

18  to the likelihood of success and the fact that I don't see that

19  you connect the dots to the allegations for each claim with the

20  events or circumstances.  I know this is not a motion to

21  dismiss.  But a lot of -- if it were, I would be talking about

22  the conclusory language that's used.  And, at this stage, with

23  an injunction, injunctive relief, it's -- it's a fairly heavy

24  burden of likelihood of success that I don't see well

25  established here.

1      So if you want to speak about specifics, that might

2  be helpful.

3      ATTORNEY SWEARINGEN:   Okay, your Honor.   To begin

4  with -- to begin with, as you may well know, seven people have

5  died at the jail since we filed our reply brief.   That's

6  seven -- I'm sorry.   Seven individuals have died since we filed

7  the instant motion on May 2nd.   That's seven deaths in three

8  months.   There are 15 deaths since the California state auditor

9  issued its unprecedented report on the California county jail

10  system.   Finding that until systemic deficiencies are remedied,

11  the weaknesses in the sheriff's policies and procedures will

12  continue to jeopardize the health and lives of individuals in

13  its custody.   15 people have died this year.   Last year, 18

14  people died.   That's three times the national average of jail

15  death rates.   The highest death rate in all of California.

16  Currently, we're on track for 24 deaths at the jail this year.

17      I think the evidence has -- has quite well connected

18  the dots, your Honor.   If we could take any one of those

19  issues -- take the -- the intercoms, for example.

20      The Ninth Circuit, in *Hoptowit versus Ray*, said that

21  the jail must have an effective way for the inmates to summon

22  help during safety and medical emergencies.

23      The evidence is replete with examples of people who

24  have died while trying to communicate with jail staff through

25  the intercom system.   This includes Derek Baker.   You can look

1   at the declaration of Gustavo Sepulveda, who states that the

2   person next door to him was violently being attacked.  And he

3   kept on pressing the intercom button to try and summon help.

4   Nobody came.  The deputy later told him that the intercom

5   button was broken.

6        You can look to the declarations of Daniel LaCroix,

7   and Michael Keavney, who talk about the death of Robert

8   Moniger, his -- their cellmate who, over the course of days,

9   was dying.  They repeatedly pressed the intercom button to

10  summon help.  Nobody came.  Shortly thereafter, he died.

11       You can look to the declaration of Justin

12  Christiansen, who talks about Justin -- Jeremy [sic] Aleman,

13  who died 45 minutes after multiple people in the housing unit

14  were pressing the intercom button to save Jeremy Aleman's life.

15  Indeed, other people in the cell rushed to his help, performed

16  CPR on him.  But staff still did not come for 45 minutes.

17       Similarly, with Luis Gomez, his cellmate pressed the

18  intercom button to summon help for his cellmate, who was in

19  medical distress.  And waited 48 minutes before jail staff

20  came.

21       Similarly, Richard Boulanger, the Citizens Law Review

22  Oversight Board, reported that he was hanging by his neck; by a

23  cellmate who had pressed the intercom four to five times for

24  help.  But the intercom had been muted.

25       And these are just examples of death, your Honor.

1    Other individuals, declarants -- such as Laura Zoerner --

2    talked about trying to summon help because she was having heart

3    palpitations.  When that didn't work, she began banging her

4    head on the cell walls until her head began bleeding.

5         You can look at the declaration of plaintiff Darryl

6    Dunsmore, who talks about choking and pressing the intercom

7    button.  And no one coming for 30 minutes, during the time that

8    he was choking.

9         So that's just one of our issues, your Honor, in

10   which we can tender the evidence showing that people have died

11   and people have suffered from the jail's failure.

12        Under *Hoptoit versus Ray*, the Ninth Circuit decision

13   cited in our papers, showing that the jail must provide

14   effective ways for individuals, who are incarcerated with the

15   system, to summon help.

16        I can give you and run through examples of each of

17   the types of deaths and/or harms associated with each of the

18   remedies we seek, as well as the notice that the county has

19   been provided by various experts; including its own expert

20   consultants, oversight agencies, other experts, the news media,

21   citizens, as well as community groups.  Consistently, time and

22   time again, we've seen even the -- the sheriff's department's

23   own documents or spokespersons saying there's a problem here;

24   it has gone unaddressed.

25        And under *Farmer v. Brennan*, that is the definition

1   of deliberate indifference.  That is an acknowledgment that

2   there is a problem but not willing to address the serious

3   risk -- I'm sorry, the substantial risk of serious harm.

4           THE COURT:  Okay.  Well, thank you for that response.

5           Defendants have anything they want to say in relation

6   to the scope of the -- the narrowed scope of the relief or this

7   evidentiary basis?

8           Ms. Coleman?

9           ATTORNEY COLEMAN:  Yes, your Honor.  Thank you.

10          First of all, a lot of plaintiffs' motion and the

11  points that Mr. Swearingen made today are based on historical

12  examples that span back years.

13          So when the audit was critical, changes were made in

14  the jail system.  With the CLERB review, changes were made

15  after each of these incidents.

16          He cited to an example of an intercom where Inmate

17  Baker died while he was attacked, and the intercom didn't work

18  to alert authorities.  They have changed it so now you can no

19  longer mute the audio for the intercom system.

20          They also have instituted audits -- weekly audits of

21  the intercom.  Not just at the central jail but at all of the

22  facilities, to make sure the intercoms are properly working.

23  They're working on upgrades to that system, as well as the

24  video system.

25          With regard to the -- oh, and before I move to the

1    remedial change requested, plaintiffs' counsel also mentioned

2    the death rate.

3            First of all, not all of those deaths are due to

4    drugs.  Some of those deaths are natural causes.  For example,

5    Lacy, Jerrell died of thromboembolism.  It was deemed a natural

6    cause.

7            There are other people -- there was someone who

8    was -- had cancer of the throat.  And he was on hospice care.

9    He died.  He had a DNR.  So there's -- a lot of these deaths

10   are not due to drugs.

11           But fentanyl has been a problem since 2017, and

12   increasing in both the community and the -- and the jail

13   system.  It can be brought in in microscopic amounts, and it's

14   hard to detect.

15           So they have the scanners working at all of the

16   intake facilities.  Everyone who comes in on intake is scanned.

17   Any abnormality, then they address it.  They also do urinalysis

18   to determine if someone has drugs on board.

19           They have K-9 units.  There are a lot of different

20   things they're doing to try to interdict drugs from coming into

21   the prison.

22           And plaintiff -- plaintiffs have not suggested any

23   remedy, other than the county should come up with something to

24   try to stop the drugs coming in.

25           Well, that's not entirely true.  They say that the --

14

1    the visitors and the staff should all be -- go through the

2    scanner as well.  The Department of Corrections has had

3    lawsuits trying to put visitors through the scanner, with the

4    repeated X-ray, the radiology exposure, and the privacy

5    implications.  I'm sure that the ACLU would be back here with a

6    lawsuit based on that.

7          And your -- the Court is well aware that with staff,

8    there are other issues that come into play if the scanner is

9    used, such as the union and different issues that would come

10   into effect.

11         But in terms of visitors, all of the visits are

12   noncontact right now.  So that's not how the drugs are coming

13   in.

14         It's most likely the people who are coming in on --

15   on the two-day, five-day incarceration.  They get arrested just

16   to bring in the drugs.

17         (Nonverbal vocal response by audience.)

18         ATTORNEY COLEMAN.  And we're trying as hard as we can

19   to stop it.

20         Narcan has been put into all of the holding cells,

21   all of the day rooms, all of the units.  It's on the walls for

22   everyone to access, if they -- if they have an emergency.

23   Staff and medical also have Narcan on their belts and

24   available.  So it's very widely disseminated and used.

25         In terms of the remedial relief they seek, the

1   intercoms, they are working.  They're fixed when there's a

2   problem.  People are not put into cells where there's not a

3   working intercom.  They no longer can be muted.  And they are

4   working on upgrading the intercom system, as well.

5           The video.  The video is working, but they're also

6   doing -- I went into more detail about it in our opposition

7   brief, about the improvements that are coming in the video.

8   And then that's going to be helpful in a number of ways, as

9   well as deputies having body-worn camera.  And so that's going

10  to help not only in the safety inspections and being able to

11  audit those but also in any -- in any incident that occurs.

12          Video cannot be put in some corners, underneath the

13  stairs, for example, because the incarcerated persons tear down

14  video cameras when they are able to access them.

15          So there's video as much as can be, and then you have

16  the observation booth officers watching from above.

17          Confidentiality and mental health visits.  It is

18  provided.  Upon request, it is accommodated.  It cannot always

19  be confidential because of the safety risk.  It has to be

20  balanced, the safety risk to the other needs.  And so there's a

21  deputy present but not listening, not weighing in.

22          In terms of safety checks, they are done.  They are

23  logged.  They are now audited regularly.  And with the video

24  improvement, one thing they'll be able to do is have the chips

25  that they can scan when they do the safety checks, as well as

1    being able to see them on the body-worn camera; as far as what

2    is seen by the deputy when he looks into the cell.

3           Plaintiffs would like the safety checks to be done at

4    nighttime, when people are sleeping, without waking up the

5    people.  Unfortunately, there's no way to tell if they're alive

6    or dead sometimes without waking them up and having them move a

7    foot, or something like that.  So sometimes that has to be done

8    in order to make sure that they're okay.

9           Mental health clinicians.  They do have input on

10   housing.  But as the Court knows, sometimes safety

11   considerations or disciplinary considerations are also a factor

12   in determining where they're housed.  The mental health

13   clinicians, though, do go to every unit and visit them.  And

14   they now have interdisciplinary teams that are going to the

15   units as well.

16          And in terms of drugs, the MAT program -- medical

17   assistance treatment -- has been initiated with the rollout of

18   NavCARE into the facilities.  And so now you can have

19   methadone, Suboxone, and all of the things that plaintiffs were

20   seeking with the MAT program, as well as Narcan being widely

21   available.

22          In terms of ADA, no one is forced up the stairs.  I

23   tried hard to find any record of that, or any record of that

24   other than, you know, the plaintiffs saying that that occurred.

25   The staff were very adamant that they have never had an

1   incident where there were two elevators out of use.  But if

2   there were, they would put them on the staff elevators.

3            There are two elevators in the central jail for

4   inmates.  And they can divert them to a staff elevator, if

5   needed.  So no one would be forced up the stairs.  You could

6   reschedule a visit.  You could put them on another elevator.

7   You could have the visit take place on a different floor.

8   That's not something that occurs.

9            The new facility, Rock Mountain, is -- is hopefully

10  going to open this fall.  And that is completely ADA compliant.

11  So people will be moved into that that have ADA issues.  And

12  then the other facilities will be gradually upgraded as well to

13  current modern ADA compliance as needed.

14            Does the Court have any other questions?

15            THE COURT:  No.  No, thank you.

16            Anyone else on the defense side want to comment?  Or

17  did Ms. Coleman cover it for you.

18            ATTORNEY COLEMAN:  Maybe I could add one thing.

19  Sorry, your Honor.

20            THE COURT:  Sure.

21            ATTORNEY COLEMAN:  In terms of the -- I know there

22  were a lot of declarations from plaintiff and -- plaintiffs and

23  other incarcerated persons.  And we did our best to determine

24  if those facts were accurate, and provide information to the

25  Court in the opposition.  We didn't have a chance to do that

18

1    with the information submitted in the reply brief.  But it's

2    our position that it's premature to issue a preliminary

3    injunction.  Especially given the very recent changes that have

4    happened and the things that are -- that are going on in the

5    county jails.

6            I was -- I have been very impressed with staff's

7    efforts to make things safe and clean for inmates and what

8    they've been doing there.  And it compares favorably, for

9    example, to Orange County jails and some of the state

10   Department of Corrections that I've -- that I've visited.  I've

11   gone to all of the county jails.

12           So I think it's premature, without doing some

13   discovery, to determine what is actually the case, instead of

14   coming forward with declarations that couldn't be disputed at

15   this stage because of the timing of the briefing.  But we can

16   certainly do more discovery and revisit this issue.

17           The -- in terms of the preliminary injunction that

18   they seek, having the county come up with its own proposal is

19   not the type of targeted, least restrictive, narrowly drawn

20   measure contemplated by the PLRA.

21           There's -- what is going to stop drugs from coming

22   into the prison entire -- or the jails entirely?  I'm not aware

23   of any jail or prison that's been able to do that.  But we're

24   doing our best, despite the minute amount that fentanyl could

25   come in and be virtually undetected.

1          THE COURT:  Yeah.  It's deadly in just a matter of a

2     couple of grains.

3          Okay.  Thank you.

4          Ms. Moriarty, did you have something to add?

5          ATTORNEY MORIARTY:  Yes, your Honor, briefly

6          Liberty Healthcare Corporation had the mental health

7     care contract from 2017 until the end of May.  And so it's our

8     position that we shouldn't be involved or there shouldn't be

9     any order affecting Liberty Healthcare.

10          THE COURT:  Okay.  Thank you.  And Ms. Gardener --

11     Garner?

12          ATTORNEY GARNER:  Yes, your Honor.

13          Correctional Healthcare Partners is in the same

14     position.  They are no longer under contract.

15          Additionally, the particular request -- the relief

16     that plaintiff is seeking has no bearing on my client, who

17     provided doctors within the facility, not -- not mental health

18     care services, has no ability to address issues with regard to

19     video cameras or intercoms, et cetera.

20          THE COURT:  Okay.  Well, thank you.

21          And then, Mr. Swearingen, I don't know if you want to

22     respond at all?

23          There you are.

24          Or any of your colleagues want to have anything to

25     say in reply?  You may.

1          ATTORNEY SWEARINGEN:  I do, your Honor.

2          I think it's very important to dig into the actual

3    evidence that is in this case.  We've submitted declarations by

4    numerous experts, including nationally recognized experts and

5    medical healthcare, mental healthcare, safety and security, and

6    disability access.  Each of them has connected the dots to the

7    problems that are at issue and the remedies that we seek.

8    We've also submitted over 30 declarations of incarcerated

9    people that support the relief that is requested.

10         If you will permit me, your Honor, I would like to go

11   issue by issue that --

12         THE COURT:  No.  No.  That was what briefing was for.

13   We're not going to spend all afternoon on this.  I asked you to

14   highlight, and you did.  But we're not going to go issue by

15   issue and declaration by declaration.

16         I read it all.  If there's something you want to

17   respond to, specifically to what Ms. Coleman has said or the

18   other counsel who don't appear to have -- who appear to be out

19   of the loop at this point, let's address that.

20         ATTORNEY SWEARINGEN:  Thank you, your Honor.

21         As to Liberty Health -- Liberty and Correctional

22   Healthcare Partners, if indeed there are no employees of either

23   organization at the jail, we agree that preliminary injunctive

24   relief should not be sought again them.  Right now, that is not

25   in the record.

1          THE COURT:  Okay.

2          ATTORNEY SWEARINGEN:  What's also not in the record

3  are many of the bald and blanket assertions Ms. Coleman said

4  about the state of the jail.

5          In contrast, there is substantial evidence for each

6  of the six or seven issues that we've been discussing today,

7  about how those issues are deficient.

8          Historically, the jail has issued lip service as to

9  many, many issues, and said, "We're in compliance.  We're doing

10  our best.  We're going to do the right thing," when in fact

11  they haven't.

12          For example, in response to the expert report by

13  Lindsey Hayes, a nationally recognized suicide expert, who --

14  who was commissioned by the County of San Diego to evaluate the

15  jail, he recommended that the jail ensure that mental health

16  clinician contacts are confidential.  The jail said, in

17  response, "Changes were made to eliminate cell site encounters

18  except in situations where doing so could jeopardize the safety

19  of an inmate and staff."  And what we've seen is every single

20  encounter -- 99 percent of them, according to the declaration

21  of Ms. Alonzo, a former mental health clinician at the jail,

22  are not confidential.

23          If we go back to --

24          THE COURT:  But you have to admit, security issues

25  have to be considered in these evaluation settings.

22

1          ATTORNEY SWEARINGEN:  Absolutely, your Honor.  And

2    just as Pablo Stewart, the -- the plaintiffs' expert for mental

3    health, who has decades of experience in correctional mental

4    health says, individualized assessments of security needs are

5    needed.

6          So not just going through blanket-wise and assuming

7    every single person is a security threat but, instead, looking

8    at their history within the jail to determine if they are a

9    security threat.  And if there is a security threat, there are

10   ways the jails can go about conducting mental health

11   evaluations to mitigate the concern.  Not that deputies are

12   going to hear private details, but so that patients have the

13   comfort to talk about their mental health needs.  They can do

14   so by, you know, putting a -- a cuff around the ankle of

15   someone in a room.

16         You can do so by having a deputy look through a

17   window to see if there are any security concerns.  You can do

18   so by separating the mental health clinician and the patient by

19   a transparent barrier.

20         But going back to -- to some of the bigger issues of

21   this case, drugs, your Honor, if you look at the F. Hunting

22   declaration submitted by defendants in their opposition briefs,

23   that's one of the senior crime analysts in the detentions

24   investigation unit.  He says over the past five years -- and he

25   has charts and graphs showing that there has been an explosion

1  of drugs in the jail.  He says that fentanyl is on a

2  significant rise.  And what he says about fentanyl is really

3  useful.  He ends his declaration by saying, "Fentanyl is

4  especially problematic because it is so deadly."  Yet what has

5  the jail done in response?  There is nothing.  Not one thing in

6  defendants' opposition papers that show that they have done

7  anything different than we have asked for.  The body cam -- the

8  body scanners, CLERB, and -- and I believe the grand jury have

9  said that they're antiquated.  They're not used everywhere.

10  They're not used on staff.  F. Huntings declaration shows that

11  staff are one of the major effectors of introduction of drugs

12  into the jail.

13        If we go to -- to -- to Ms. Coleman's statement on

14  MAT, she says that there is a full medication-assisted therapy

15  program at the jail.  Of course, medication is just a therapy,

16  or the therapies that are used to treat people with opioid use

17  disorders.

18        In contrast to what Ms. Coleman says, the

19  declarations by Mr. Montgomery and other declarants the

20  defendants have put forward say there is no wide-scale MAT

21  program at the jail.  And, indeed, since the year 2020, there

22  have only been 40 to 60 patients treated with

23  medication-assisted therapy out of the likely 100,000 people

24  who have gone through the jail system.

25        The defendants, declarants, state that a MAT program

1    is in the works.  But if you look at the declaration of -- of

2    Robert Cohen, who has 40 years of correctional medicine

3    experience, 17 years sitting on the board of the National

4    Commission on Correctional Healthcare as the representative for

5    the American Public Health Association, he says that what's

6    important are the details.  The details are critical to a

7    program's success.

8         And the defendants' MAT program -- M-A-T program --

9    right now lacks any kind of indication or evidence as to

10   eligibility requirements, whether it be accessible to any or

11   all people with opioid use disorder, what types of drugs will

12   be provided, who will be providing them, whether the jail or

13   sheriff's department will have custody, operations over the

14   drugs, or whether outside providers will be responsible for

15   them, whether there are any therapeutic inventions involved.

16        Those are all according to Dr. Cohen.  Again,

17   somebody with 40 years of medical corrections experience,

18   saying that those details are necessary to understand the plan.

19   And when Ms. Coleman comes up and says that there's a MAT

20   program in the jail, that is -- that -- that is partially true.

21        It's accessible right now -- according to the jail's

22   only -- only policies and procedures on it -- to incarcerated

23   female people at Las Colinas, and certain other individuals who

24   already have community prescriptions, many of whom are not

25   receiving it.  We have declarations in the record of people who

1    say that they were on community medications for

2    medication-assisted therapy and are not receiving it.

3         That includes Christopher Norwood, who submitted a

4    declaration saying that he informed the jail of his community

5    prescription on Suboxone, did not receive it.  He ended up

6    overdosing at the jail on fentanyl.  And only the day after,

7    the day after he was hospitalized for fentanyl overdose, did

8    the jail offer him medication.

9         We can go through -- through -- through many other --

10   of -- of plaintiffs' requested remedies.  And each one will

11   show the -- the broadscale changes that Ms. Coleman announced

12   are not in the record.  And the reason why we are in court is

13   because the record matters; because the evidence matters.

14        And we've shown both through -- through evidence from

15   our own correctional experts; as well as documents from

16   Disability Rights California; from Lindsey Hayes and other

17   experts who were hired by the counties to do assessment; by --

18   the CLERB, the county agency responsible for reviewing deaths

19   at the jail, and others.  Showing that the jail's policies and

20   procedures place people at risk of harm.

21        Ms. Coleman says that the jail death rate is not that

22   bad.  But in April of this year, the county hired analytical --

23   Analytica Consulting to perform an analysis of the deaths.  I

24   believe that's the third document attached to my request for

25   judicial notice in the opening brief.  And it shows an

1    apples-to-apples comparison of San Diego jail -- jail deaths,

2    establishing that San Diego has the highest mortality rate of

3    any death -- of any jail in California and the -- the overdose

4    rate at the jail is twice that of the next highest in

5    California.

6            The jail death rate is out of control.  We're

7    surrounded by people in this courtroom, many of whom have lost

8    loved ones at the jail from preventable deaths because the jail

9    and the sheriff's department have not taken the actions that

10   are requested in our preliminary injunction, and that are put

11   forward and recommended by experts.  Nationally recognized

12   experts, again, in correctional healthcare, safety and

13   security, mental health care, and disability access.

14           THE COURT:  Okay.  Well, thank you.

15           I mean, clearly, the record is important, as you say.

16   And rather than repeating it further, I'll take the matter

17   under submission and rule accordingly.

18           ATTORNEY SWEARINGEN:  If I could state one thing,

19   your Honor, about the record, briefly.  I apologize.

20           But we would like to file a request for judicial

21   notice, establishing that Plaintiff Laura Zoerner has been

22   reincarcerated at the jail, as well as the fact that five

23   people have died at the jail since the time of our reply brief.

24           THE COURT:  Of drugs?

25           ATTORNEY SWEARINGEN:  Three of them, we believe, are

 1    from drugs.  Three of those people, in the sheriff's own press

 2    relief, say were administered Narcan; or other people in --

 3    next to them were administered Narcan.  Highly suggesting that

 4    they died of overdose deaths.  Because Narcan, of course, is

 5    used to revive people who are suffering from overdoses.

 6           THE COURT:  Well, what's the defense's position on

 7    that?  I mean, I can take judicial notice of documents

 8    Ms. Zoerner is back in custody.  But the facts in that report

 9    may not be subject to judicial notice if they're subject to

10    debate.

11           ATTORNEY SWEARINGEN:  They're all sheriff's

12    department press releases, your Honor.

13           THE COURT:  That's not the point.

14           Ms. Coleman, what's the position on the judicial

15    notice request?

16           ATTORNEY COLE:  No objection as to Ms. Zoerner.

17           But absent autopsy or medical examiner's cause of

18    death, the fact that Narcan was administered doesn't mean much

19    if they come across someone who's unconscious.  They do it as

20    a -- you know, in case drugs were involved.  But, you know,

21    often drugs are not involved but they try to do Narcan anyway.

22           THE COURT:  Okay.  Well, I'll grant as to

23    Ms. Zoerner's -- Ms. Zoerner's reincarceration and deny

24    otherwise.  Take the matter under submission.

25           Was there anything you wanted to add, Ms. Coleman?

1          ATTORNEY COLEMAN:  If I might respond to a couple of

2     things, your Honor.  I'll try to keep it brief.

3          With regard to the death rate that Mr. Swearingen

4     mentioned, it doesn't take into account the turnover in the

5     jails that the most risk -- for example, suicide is in the

6     first six days of incarceration, and there's a lot more

7     turnover in San Diego counties than some of the other jails.

8          The -- there's a bunch of studies going around about

9     the death rate, so I'm not sure if Analytica is the one.  But

10    there were -- there was one that did not take into account L.A.

11    County, which has a higher death rate.

12          The experts that he cited, they used old information,

13    such as the -- the state audit.  That didn't take into account

14    the improvements and the -- the new system.  They didn't tour

15    the facilities.

16          He mentioned that Liberty and CHP, there's no

17    evidence that they're no longer at the jails.  I would submit

18    to the contrary.  That we submitted the NavCARE declaration and

19    the declaration of Captain Bibel, I believe, who said that was

20    the new system.  And Dr. Montgomery's declaration also explains

21    all of the other care providers who were doing piecemeal, you

22    know, dental, vision, psych., medical were out.

23          And the NavCARE was the comprehensive provider.  So

24    if there is going to be any injunctive relief at some point,

25    perhaps plaintiffs would like to add NavCARE in.  But the CHP

1    and Liberty, and all of the other providers should be out.

2              THE COURT:  Okay.

3              ATTORNEY COLEMAN:  And just finally on the drug

4    issue.  Things have changed.  There were only the MAT program

5    for females in place.  But with NavCARE coming in, there is now

6    MAT programs for drug withdrawal treatment and -- and that is

7    available now.  Things have been done to try to stop drugs from

8    coming in.

9              And Hunting's declaration points out the drugs that

10   are seized.  So the seizure of drugs has gone up.  That's what

11   those statistics tell us.

12             In terms of the individual assessment of security

13   needed to do private mental health assessment or meetings with

14   the inmates, that's not appropriate for preliminary injunction

15   if it requires an individual assessment of each inmate.

16             Certainly, if there is -- if the person feels he

17   needs -- he or she needs a confidential visit, as opposed to a

18   check in:  "How are you doing?"  You know, "Do you need to talk

19   further?"  Then that is accommodated.  But, otherwise, there's

20   no reason not to have the deputy there for safety and security.

21             THE COURT:  Okay.  Thank you.  Thank you, all.

22             The matter is under submission.  I'll rule

23   accordingly on all of the grounds raised.  All of the various

24   issues with regard to mootness, standing, you name it.  We will

25   cover it in a final order.

30

1          Thank you all very much.

2          THE ATTORNEYS:  Thank you, your Honor.  Thank you,

3    your Honor.

4          (Conclusion of proceedings at 2:40 p.m.)

5

6

7

8

9                         --oOo--

10

11   I certify, by signing below, that the foregoing is a correct

12   stenographic transcript of the oral proceedings had in the

13   above-entitled matter this 15th day of August, 2022.  A

14   transcript without an original signature or conformed signature

15   is not certified.  I further certify that the transcript fees

16   and format comply with those prescribed by the Court and the

17   Judicial Conference of the United States.

18          /S/ Amanda M. LeGore
19        _____

20       AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

21

22

23

24

25

Ex. C - 40

# EXHIBIT D

# News List

# In-Custody Death – Las Colinas Detention and Reentry Facility

**Post Date:**            07/02/2022 4:30 PM

On July 2, 2022, 40-year-old Erica Wahlberg died at a local hospital while in Sheriff's custody.  Every death is a tragedy and the San Diego County Sheriff's Department is sympathetic to Miss Wahlberg's family and loved ones.  A Sheriff's Family Liaison Officer has been assigned and the family has been notified of her passing.

**The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.**

On June 27, 2022 around 2:45 p.m., Erica Wahlberg was arrested by Sheriff's Deputies for an outstanding drug warrant.  Just before 9:00 p.m., Miss Wahlberg was transferred from the Vista Detention Facility to the Las Colinas Detention and Reentry Facility (LCDRF).  Just before 9:30 p.m., Miss Wahlberg arrived at LCDRF.  Although the Vista Detention Facility accepts female arrestees, those unable or ineligible to make bail are transferred to LCDRF for housing.

On June 28, 2022 just before 4:00 a.m., Miss Wahlberg was in the process of being housed when she started showing signs of medical distress and was sent to a local hospital for treatment.  On July 2, 2022 just after 5:00 a.m., Miss Wahlberg was pronounced deceased.

The Sheriff's Homicide Unit responded to investigate the incident.  As a matter of practice, the Sheriff's Homicide Unit investigates all deaths of persons in custody at the time of their passing.  The cause and manner of death are still under investigation.  The Medical Examiner's Office has been notified of the death.  An autopsy is preliminarily scheduled for July 3, 2022.

The Citizens' Law Enforcement Review Board (CLERB) was notified of the death.  Further information will be released as it becomes available.

Media Contact: Chris Steffen, Lieutenant
Chris.Steffen@sdsheriff.org
Sheriff's Homicide Unit (858) 285-6330

*Return to full list >>*

## SUBSCRIBE

Subscribe to receive updates.

| Email ▼ |
| --- |

Ex. D - 42

# News List

# Death Investigation - LCRDF

**Post Date:**                07/13/2022 2:07 PM

On July 13, 25-year-old Vianna Granillo who was recently released from San Diego County Sheriff's Department custody, died at a local hospital. Every death is a tragedy and the Sheriff's Department is sympathetic to Miss Granillo's family and loved ones.  A family liaison officer has been assigned and the family has been notified of her passing.

*The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.*

### Details of the Incident

On Friday, July 8, just before 10:00 a.m. Vianna Granillo was arrested by Sheriff's Deputies for 166(c)(1) PC – Violation of a court order. Miss Granillo was transferred from the Vista Detention Facility arriving at the Las Colinas Detention and Reentry Facility (LCDRF) just before 5:30 p.m.

On Tuesday, July 12, just after 2:00 a.m. deputies were conducting a safety check and found Miss Granillo unresponsive in her cell. Several doses of Naloxone were administered by deputies and medical staff. Life saving measures were also initiated. Paramedics arrived and transported Miss Granillo to a hospital for further treatment.

Despite ongoing care and treatment from the hospital, Miss Granillo's health continued to decline. On Wednesday, July 13, just before 3:00 a.m., Miss Granillo was pronounced deceased.

Due to Miss Granillo recently being in the custody of the Sheriff's Department, the Homicide Unit responded to investigate the incident. The cause and manner of death are still under investigation. The Medical Examiner's Office has been notified of the death.  An autopsy is preliminarily scheduled for Thursday, July 14.

The Citizens' Law Enforcement Review Board (CLERB) was notified of the death. Further information will be released as it becomes available.

Media Contact: Lieutenant Chris Steffen
Chris.Steffen@SDSheriff.org
Sheriff's Homicide Unit (858) 285-6330

*Return to full list >>*

**SUBSCRIBE**

Subscribe to receive updates.

News List

# Death Investigation - Hospital Guard Unit

**Post Date:** 07/22/2022 2:04 PM

On July 21st, an individual who was recently compassionately released from San Diego County Sheriff's Department custody, died at a hospital. Every death is a tragedy and the Sheriff's Department is sympathetic to those affected by this death. We are unable to identify the individual to the media until notification to the family has occurred.

*The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.*

## Details of the Incident

On January 25, 2021, the 64-year-old incarcerated man was arrested and booked by the San Diego Police Department. From late January 2021, thru March of 2021, the man was in and out of the hospital for several medical concerns. On June 23, 2021, the man was again admitted to a hospital for additional medical issues where he stayed for more than a year. On July 21, 2022, the man was compassionately released, transferred to a different part of the hospital where his health continued to decline. That same night just after 7:00 p.m., the man was pronounced deceased by hospital staff.

There are several reasons individuals are released from Sheriff's custody while being treated at a hospital. When a death occurs after a release from our custody, and we are made aware of the death, we will report it and investigate it as an in-custody death, under most circumstances. The reasons for release from custody include, but are not limited to; charges are not filed by the District Attorney, the charging agency declines to extradite on a warrant or file a case, or a compassionate release is authorized by the court.

The Sheriff's Department may seek a compassionate release of an individual who is in grave condition. This is done to facilitate family visitation and family decision making in medical decisions. Additionally, releasing the individual from custody, when they are not a threat to the public, hospital staff or others, allows deputies to return to other duties. The county continues in its responsibility to pay medical expenses, even upon release of the individual, and no reduction in care occurs.

The Medical Examiner's Office has been notified of the death. An autopsy will be scheduled soon.

A Sheriff's family liaison officer has been assigned to notify family members of the man's passing. The Citizens' Law Enforcement Review Board was notified of the death. Further information will be released as it becomes available.

Media Contact: Chris Steffen, Lieutenant

Chris.Steffen@sdsheriff.org

Sheriff's Homicide Unit (858) 285-6330

Ex. D - 44

# News List

# Death Investigation

**Post Date:**          07/22/2022 4:34 PM

*The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.*

Today, July 22, an individual in San Diego County Sheriff's Department custody died. Every death is a tragedy, and our condolences go to the family and all of those affected by this death. A Sheriff's family liaison officer has been assigned to notify family members of his passing. We are unable to identify the individual to the media until that notification occurs.

### Details of the Incident

On July 22, deputies were notified of a 35-year-old incarcerated man found unresponsive on a bunk in a housing quad at George Bailey Detention Facility. Deputies and medical staff immediately responded and provided medical aid. Several doses of Naloxone were administered to the man. Paramedics arrived and provided additional life saving measures. Despite the efforts of emergency responders, the man did not survive, and he was pronounced deceased at 10:25 a.m.

The Homicide Unit responded to investigate the incident. As a matter of practice, the Sheriff's Homicide Unit investigates all deaths of persons in custody at the time of their passing.

The cause and manner of death are still under investigation. The Medical Examiner's Office has been notified of the death. An autopsy will soon be scheduled.

The Citizens' Law Enforcement Review Board was notified of the death. Further information will be released as it becomes available.

Media Contact: Chris Steffen, Lieutenant
Chris.Steffen@sdsheriff.org
Sheriff's Homicide Unit (858) 285-6330

*Return to full list >>*

### SUBSCRIBE

Subscribe to receive updates.

| Email ▼ |

| Email Address |

Ex. D - 45

# News List
# Death Investigation

**Post Date:**          07/27/2022 3:30 PM

Today, July 27, 23-year-old James Bousman died while in San Diego County Sheriff's Department custody. Every death is a tragedy, and our condolences go to the family and all of those affected by this death.  A family liaison officer has been assigned and the family has been notified of Mr. Bousman's passing.

*The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.*

### Details of the Incident

On March 9, 2022, James Bousman was arrested by the Oceanside Police Department and booked into the Vista Detention Facility for a felony warrant pursuant to 3455(a) PC – Post Release Community Supervision Revocation, 69 PC – Obstruct/Resist a Peace Officer with Force and 243(c)(2) PC – Battery Against a Peace Officer Resulting in Injury. Oceanside Police Department later booked Mr. Bousman for additional charges of 245(a)(4) PC – Assault with Force and 594(a)(b)(1) PC – Vandalism.  Mr. Bousman was sentenced on the felony warrant and was awaiting further court proceedings on the remaining charges.

On July 26, 2022, just before midnight and 30-minutes after a previous check, deputies conducted a safety check and located Mr. Bousman unresponsive inside his cell. Mr. Bousman was the only occupant of the cell. Deputies provided life saving measures and administered Naloxone until relieved by the Fire Department and Paramedics. Mr. Bousman was transported to a hospital where his condition continued to decline. On July 27, 2022, just after 11:00 a.m. Mr. Bousman was pronounced deceased.

The Homicide Unit responded to investigate the incident. As a matter of practice, the Sheriff's Homicide Unit investigates all deaths of persons in custody at the time of their passing.

The cause and manner of death are still under investigation. The <u>Medical Examiner's Office</u> has been notified of the death. An autopsy will soon be scheduled.

The <u>Citizens' Law Enforcement Review Board</u> was notified of the death.

Media Contact: Chris Steffen, Lieutenant
<u>Chris.Steffen@sdsheriff.org</u>
Sheriff's Homicide Unit (858) 285-6330

*Return to full list >>*

**SUBSCRIBE**

Ex. D - 46

## News List

# Death Investigation

**Post Date:**              08/17/2022 12:30 PM

On August 16, 2022, an individual in the San Diego County Sheriff's Department custody died. Every death is a tragedy, and our condolences go to the family and all of those affected by this death. A Sheriff's family liaison officer has been assigned to notify family members of his passing. We are unable to identify the individual to the media until that notification occurs.

*The following information is fragmentary and has not been completely verified. It is based, in part, on hearsay and is intended for early information use rather than being a formal investigative report.*

### Details of the Incident

On August 16, 2022, just after 7:00 p.m., deputies were conducting a security check and found a 54-year-old incarcerated man in medical distress. Deputies immediately performed medical aid and called 9-1-1.

Paramedics arrived and provided additional life saving measures. Despite the efforts of deputies, jail medical staff and paramedics, the man did not survive. The man was alone in his cell.

The Homicide Unit responded to investigate the incident. As a matter of practice, the Sheriff's Homicide Unit investigates all deaths of persons in custody at the time of their passing.

The Medical Examiner's Office has been notified of the incident. An autopsy is scheduled for August 18, 2022.

The Citizens' Law Enforcement Review Board was notified of the death.

Further information will be released as it becomes available.

Media Contact: Chris Steffen, Lieutenant
Chris.Steffen@sdsheriff.org
Sheriff's Homicide Unit (858) 285-6330

*Return to full list >>*

**SUBSCRIBE**

Subscribe to receive updates.

Email

Email Address

SUBMIT

Ex. D - 47

# EXHIBIT E

| | |
|---|---|
| **From:** | Van Swearingen |
| **To:** | O"Sullivan, Matthew |
| **Cc:** | Lenert, Ronald |
| **Subject:** | RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747] |
| **Date:** | Friday, February 25, 2022 10:12:58 AM |

Hi Matthew,

Thanks for your email last night.  Yes—on Wednesday I informed you that while we want to accommodate the County's scheduling needs, Plaintiffs are eager to get this case underway and acknowledge that the County already has two months under the schedule fixed by the Court.  I proposed agreeing to the County's request for additional time on the condition that Plaintiffs have an opportunity within the next two months to have three on-site tours with an attorney and an expert.

We are disappointed that the County and Sheriff's Department are unwilling to permit our proposed site-inspections.  Nevertheless, we want to start this relationship on good footing and try to accommodate scheduling requests.  Accordingly, we are amendable to a 30-day extension which would provide the County with a quarter of a year to respond to the SAC.

Separately, we hope that we can work cooperatively on discovery issues and protective order in the near term.

Regards,
Van

---

**From:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Sent:** Thursday, February 24, 2022 8:15 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]

[EXTERNAL] Notice: This message comes from an external sender.

Hi Van-

I hope this email finds you well!  I'm writing to get back to you on the proposal you called me about yesterday.  From what I understood, you stated that Plaintiffs would be amenable to our requested extension of the responsive pleading deadline, but only if the County agreed to provide three separate days for which a lawyer from your team and an expert could conduct site visits of all of the facilities at issue in the lawsuit before the opening of discovery in this matter.

I do not have authority/authorization to agree to what you have proposed.  Just so I am clear for the purposes of our motion, this means that you all oppose our intended motion requesting an additional 45 days to file a responsive pleading.  Is that understanding correct?

Thanks!

Matthew

**Matthew Patrick O'Sullivan**
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101
direct: 619-840-7347
**CONFIDENTIALITY NOTICE:**  This email message, including any attachments, is for the sole use of the
intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work
product doctrine or other applicable privileges or confidentiality laws or regulations.  If you are not an intended
recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in
this message to anyone.  If you are not the intended recipient, please contact the sender by reply email and destroy
all copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-
client or any other privilege.

---

**From:** O'Sullivan, Matthew
**Sent:** Tuesday, February 22, 2022 5:21 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]


Very kind, thank you Van!


**Matthew Patrick O'Sullivan**
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101
direct: 619-840-7347
**CONFIDENTIALITY NOTICE:**  This email message, including any attachments, is for the sole use of the
intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work
product doctrine or other applicable privileges or confidentiality laws or regulations.  If you are not an intended
recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in
this message to anyone.  If you are not the intended recipient, please contact the sender by reply email and destroy
all copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-
client or any other privilege.

---

**From:** Van Swearingen <VSwearingen@rbgg.com>
**Sent:** Tuesday, February 22, 2022 4:47 PM
**To:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** [External] RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]


Hi Matthew,
Thanks for your email below.  Just wanted to let you know that I will inform you tomorrow of our
position on the County's request for an extension.  Regards,
Van

---

**From:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Sent:** Friday, February 18, 2022 1:49 PM

**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]

[EXTERNAL] Notice: This message comes from an external sender.

Hi Van-

It was great getting to connect today.  I realized that I didn't leave you my preferred number (with
COVID, it's best to reach me on my County cell vs. my office number).  That number is 619-840-
7347.

We look forward to hearing your all's stance regarding the County's intended request for extension
of the pleading deadline once you get the chance to speak to your cocounsel.

Warm regards (and happy weekend!),
Matthew

**Matthew Patrick O'Sullivan**
SENIOR DEPUTY COUNTY COUNSEL
OFFICE OF THE COUNTY COUNSEL - COUNTY OF SAN DIEGO
1600 Pacific Highway, Room 355
San Diego, California 92101
direct: 619-840-7347
CONFIDENTIALITY NOTICE:  This email message, including any attachments, is for the sole use of the
intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work
product doctrine or other applicable privileges or confidentiality laws or regulations.  If you are not an intended
recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in
this message to anyone.  If you are not the intended recipient, please contact the sender by reply email and destroy
all copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-
client or any other privilege.

**From:** Van Swearingen <VSwearingen@rbgg.com>
**Sent:** Friday, February 18, 2022 9:56 AM
**To:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** [External] RE: Dunsmore -- Request for a Call [IWOV-DMS.FID75747]

Hi Matthew,
Yes – I can talk at 12:30 or 2:00-3:00 today.  415-433-6830.  Regards,
Van

**From:** O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Sent:** Friday, February 18, 2022 9:45 AM
**To:** Van Swearingen <VSwearingen@rbgg.com>
**Cc:** Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>
**Subject:** Dunsmore -- Request for a Call

[EXTERNAL] Notice: This message comes from an external sender.

Hi Van-

Do you have time today for us to connect regarding *Dunsmore*?  I want to run something by you relating to the County's responsive pleading deadline.  If so, please let me know your preferred number.

Let me know.

Thanks,
Matthew

**Matthew Patrick O'Sullivan**
SENIOR DEPUTY COUNTY COUNSEL
OFFICE OF THE COUNTY COUNSEL - COUNTY OF SAN DIEGO
1600 Pacific Highway, Room 355
San Diego, California 92101
direct: 619-840-7347

**CONFIDENTIALITY NOTICE:**  This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain information protected by the attorney-client privilege, the attorney work product doctrine or other applicable privileges or confidentiality laws or regulations.  If you are not an intended recipient, you may not review, use, copy, disclose or distribute this message or any of the information contained in this message to anyone.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this message and any attachments.  Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

# EXHIBIT F

**R B** **ROSEN BIEN**
**G G** **GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Van Swearingen
Email:  vswearingen@rbgg.com

March 15, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>
Fernando Kish
Ronald Lenert
Matthew O'Sullivan
Office of the County Counsel
County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2437
Fernando.Kish@sdcounty.ca.gov
Ronald.Lenert@sdcounty.ca.gov
Matthew.O'Sullivan@sdcounty.ca.gov

Re:    *Dunsmore v. San Diego County Sheriff's Department, et al.*
S.D. Cal. Case No. 3:20-CV-00406-AJB-WVG
<u>Our File No. 1730-1</u>

Dear Messrs. Kish, Lenert, and O'Sullivan:

As you have now seen in our class action complaint on behalf of Daryl Dunsmore
and seven other individuals, we allege that the County of San Diego and the San Diego
County Sheriff's Department violate the civil rights of people incarcerated at the San
Diego County Jail by failing to provide reasonable accommodations to prisoners with
disabilities, failing to operate an adequate mental health, medical, and dental care system,
failing to ensure adequate safety and security for people in custody, subjecting
individuals to unsanitary and inhumane conditions of confinement, and denying people
access to legal counsel and the courts.  The County, the Sheriff's Department, and the
Probation Department further violate the rights of people with mental health and other
disabilities and/or people who are Black and/or Latinx, through policies and practices that
illegally and wrongly result in the over-incarceration of these groups.  The conditions in
the Jail cause very real harm to the more than 4,000 people regularly incarcerated in the
Jail.

We greatly appreciated the opportunity to meet in person with Mr. Kish and Mr.
O'Sullivan on March 10, 2022.  From that conversation, we observed two important

[3875815.3]

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 2

objectives that the parties share – first, to proactively address serious problems within the County's carceral system, and second, to focus resources on practical solutions, including by narrowing the issues in dispute and avoiding costly, protracted litigation as much as possible.

The other defendants named in this action – each of which provide services subject to contract with the County – are also responsible and liable for certain aspects of the unlawful and unconstitutional systemic deficiencies set forth above and in our complaint. However, the County is ultimately responsible for *all* policies, practices, and conditions that illegally harm Plaintiffs and the putative class and subclass. *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) (state prison defendants cannot shirk their obligations to plaintiffs under federal law by contracting with a third party). We are therefore sending the following proposal to you prior to sharing it with other defendants.

Plaintiffs' counsel have extensive experience litigating class action cases addressing unlawful and unconstitutional conditions of confinement in jails and prisons. These experiences demonstrate that there are meaningful opportunities for the parties in such cases to proceed in ways that are most cost-effective and solutions-oriented while protecting the rights and interests of all parties.

To be clear, Plaintiffs' intention is to seek and secure an adequate and durable remedy – in the form of injunctive relief – for the legal and constitutional violations set forth in the complaint, with meaningful federal court oversight of implementation. In similar cases, this has been achieved through court orders and/or court-approved settlements.

We provide below a two-pronged proposal, with an eye towards the shared goals we discussed, addressing (1) class certification and (2) neutral, mutually agreed-upon expert assessments. The proposal would require a mutual good faith effort towards an expeditious and efficient resolution of this matter. If the County is amenable to such a proposal, we suggest that we together share it with the other defendants. Coordination across all parties will undoubtedly result in greater efficiencies and cost-savings.

**I.    Class Certification**

In every significant jail system class action case filed in California's federal courts in recent years, class certification has been granted. The appropriateness of class certification in a matter such as this one is beyond reasonable dispute, as made clear by the Ninth Circuit in *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014). That case, now cited by numerous federal courts in California, makes clear that class certification is appropriate where, as here, plaintiffs seek to challenge systemic policies and practices that allegedly expose incarcerated people to a substantial risk of harm. *See, e.g.,*

[3875815.3]

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 3

*Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015); *Gray v. Cnty. of Riverside*, No. EDCV 13-00444-VAP, 2014 WL 5304915 (C.D. Cal. Sept. 2, 2014); *Jewett v. California Forensic Med. Grp., Inc.*, No. 213CV0882MCEACP, 2017 WL 931886 (E.D. Cal. Mar. 9, 2017), report and recommendation adopted sub nom. *Jewett v. California Forensic Med. Grp., Inc.*, 2017 WL 1356054 (E.D. Cal. Apr. 5, 2017).

More recently, California counties have avoided costly and time-consuming discovery and motion practice on class certification either by stipulating to class certification, *see, e.g., Mays v. County of Sacramento*, E.D. Cal. Case No. 2:18-cv-02081-TLN-KJN (Joint Motion for Class Certification granted 12/28/18); *Babu v. County of Alameda*, N.D. Cal. Case No. 5:18-cv-07677-NC (Joint Motion for Class Certification granted 1/21/20), or by submitting a statement of non-opposition to certification, *see, e.g., Murray v. County of Santa Barbara*, C.D. Cal. Case No 2:17-cv-08805-GW-JPR (Unopposed Motion for Class Certification granted 5/31/18).

In each of these cases, the County realized substantial cost-savings on a procedural matter that was not in reasonable dispute.

Class certification brings an additional benefit for the County, protecting it from additional suits for systemwide injunctive relief. Resolution of a case of this sort through a class proceeding facilitates efficiency and finality both in terms of adjudication of complex legal issues and any resulting legal remedies. With the extensive attention that the San Diego County Jail has received, including from the State Auditor, in the media, from non-profit and governmental organizations like Disability Rights California the United States Department of Justice, and through numerous individual lawsuits, the County faces substantial risk of additional legal proceedings. There is substantial value to all parties to narrow and resolve the matters raised in the *Dunsmore* case through a single, class-wide adjudicatory process.

As part of the this proposal, we ask that the County agree to class certification in the form of a stipulated order that would be filed with the Court no later than April 29, 2022. Counsel for Plaintiffs will be working on a motion for class certification during the pendency of this proposal. In the event that the County does not agree in principle with this proposal by April 1, 2022, Plaintiffs' counsel will accelerate their work on this motion.

## II.    Retention of Neutral Mutually Agreeable Experts

Given the parties' shared goals, we propose the use of neutral, mutually agreed-upon subject matter experts to assist the parties in the identification of systemic issues and effective remedies that are tailored to San Diego County's system.

A case like this one entails substantial fact discovery and expert input. A coordinated, streamlined process for information-sharing and expert involvement will put

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 4

the parties in the best position to identify and implement adequate solutions to the problems raised, with the parties realizing cost-savings and efficiencies wherever feasible.

For these and other reasons, several California counties have used, or are using, neutral experts in this sort of process, including (for example) Sacramento, Santa Clara, Santa Barbara, Monterey, Fresno, Riverside, San Bernardino, and Alameda. Where the parties have engaged in good faith negotiations, the outcome has been the achievement of – or significant progress towards – constitutional and legal compliance.

The most successful procedure, in our experience, is for the County to retain mutually agreed-upon experts with subject matter expertise on the relevant case issues, which in this case will include: (a) mental health care and suicide prevention, (b) medical care, (c) dental care, (d) eye care, (e) environmental sanitation, health, and safety conditions, (f) custodial operations, (g) compliance with the Americans with Disabilities Act ("ADA"), and (h) county carceral and alternatives-to-incarceration practices impacting people with mental health or other disabilities and/or people who are Black and/or Latinx.

Through this process, the County (and other defendants, as appropriate) would work with us and these experts on the following terms:

➢ By June 1, 2022, the County will retain mutually agreeable experts for the purpose of preparing reports and recommendations regarding the above subject matters. Plaintiffs' counsel will provide recommendations as to available experts for the parties to discuss and will consider your proposed experts.

➢ The experts will have access to all people incarcerated at the Jail, records, and staff as needed to prepare their reports and recommendations.

➢ Within 100 days of the appointment of the experts, they would issue reports proposing recommendations and remediation for conditions found to be below the minimum federal and state standards.

➢ The expert reports and recommendations will be public and admissible in any litigation that may occur, including in the event that (a) the parties negotiate a class-wide remedial plan and settlement, or (b) negotiations are not successful in whole or in part.

Assuming the parties are able to proceed in good faith with negotiations for a class-wide settlement, these neutral expert reports and recommendations would provide a distinctively useful guide to negotiations and the drafting of a remedial plan, to be filed with the federal court, that satisfies constitutional and legal requirements.

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 5

The expert reports and recommendations may assist in narrowing certain issues – where the mutually agreed-upon experts appropriately find that a systemic component is working well and is constitutionally or statutorily adequate, such an issue need not be the subject of litigation or a remedial plan – and will identify discrete issues that require remedial steps in this County.

Assuming the parties successfully negotiate a resolution through this structured process, it must ultimately result in a class settlement agreement filed with and approved by the court and over which the court retains continuing jurisdiction.  The agreement would require that the County, where necessary to comply with state and federal law, revise policies and procedures, implement remedial plans, institute a system for quality assurance, and permit external monitoring of implementation and compliance.  Furthermore, the County would agree not to oppose payment of reasonable attorneys' fees on the same terms as if Plaintiffs' counsel had fully litigated the case through a trial resulting in injunctive relief orders.  The reasonableness of attorneys' fees would of course be a subject of negotiation and if necessary, dispute resolution processes.

## III.    Addressing Critical Issues

As discussed during our recent conversation, in a case of this nature and scope, it will be necessary to address certain issues on an expedited basis.  There are issues in this case that require prompt attention.  Specifically, there are systemic issues putting our clients and putative class members at extraordinary risk of serious harm right now; such issues cannot wait.  Likewise, there are certain remedial actions that, if implemented in the near term, would lay a meaningful foundation for addressing other issues in the case in an efficient, cost-effective, and results-oriented way.

We will provide further detail on the critical issues that we consider essential for the County and other defendants to address without delay.  The County's position on the proposal in this correspondence will assist in our presenting those issues and a procedure for addressing them.

We request that the County consider our proposals regarding (1) class certification and (2) the use of neutral, mutually agreeable subject matter experts, and provide us with its position as soon as possible, and no later than **April 1, 2022**.  Agreeing to these proposals will not only save the County substantial resources and attorneys' fees, but also support a streamlined framework for identifying and resolving deficiencies at the Jail.  Doing so will benefit incarcerated people, those who work at the Jail, and the County as a whole.  If the County declines our proposals, we will accelerate our efforts to move for class certification as well as ask the Court for early discovery including the opportunity to inspect the Jail with our own experts.

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 6


        We are of course available to meet and confer about these proposals.  Thank you
for your attention, courtesy, and continued efforts.

                                    Sincerely,

                                    ROSEN BIEN
                                    GALVAN & GRUNFELD LLP

                          By:    *Van Swearingen*


                                    LAW OFFICE OF AARON J.
                                    FISCHER

                          By:    *Aaron J. Fischer*


                                    DLA PIPER LLP US

                          By:    *Christopher M. Young*


                                    ACLU FOUNDATION OF SAN
                                    DIEGO & IMPERIAL
                                    COUNTIES

                          By:    *Bardis Vakili*

# EXHIBIT G

# Van Swearingen

| | |
|---|---|
| **From:** | Van Swearingen |
| **Sent:** | Tuesday, April 5, 2022 5:05 PM |
| **To:** | Coleman, Susan E.; Gay C. Grunfeld; Priyah Kaul; Eric Monek Anderson; Aaron Fischer; Christopher Young; Isabella Neal; Oliver Kiefer; Bardis Vakili; Jonathan Markovitz |
| **Cc:** | Mehra, Terri |
| **Subject:** | RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747] |
| **Attachments:** | [Dkt 081] Second Amended Complaint for Declaratory and Injunctive Relief, 02-09-2022, 1730-01.PDF; VS-SDC Probation Dept, Re Litigation Hold, 02-17-2022, 1730-01.PDF |

Hi Susan,

Thanks for your email (and congrats on finishing the trial). Please see the below interlineated responses, and let us know whether you are available to discuss on Wednesday afternoon or Thursday.

Van

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Monday, April 4, 2022 4:39 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

**[EXTERNAL MESSAGE NOTICE]**

Van – circling back now that I'm done with trial.  There are several issues we should address:

1) Your class certification proposal – for the County to stipulate to certification – is rather bare.  Do you have a more detailed proposal?  (ie. specific sub-classes, etc.)

As reflected in pp. 186-192 of the attached SAC, the class would be defined as  "all adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities."  There would be a subclass of "all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and [m], and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities."  The claims and issues would be the ones identified in the SAC.  Plaintiffs' counsel for the named plaintiffs would be class counsel for the class and subclass.

2) In terms of a protective order and site inspections, we feel this should wait for the discovery period absent some compelling reason.

The extraordinarily high death rate at the jail requires remedial actions before discovery would ordinarily open.   We are preparing motions to address issues that expose incarcerated people to substantial risk of harm, including death.  Negotiating a mutually satisfactory protective order at this time will provide all parties ample time to work collaboratively, and will minimize the likelihood of a rushed process and/or a need to present disputes to the Court.

3) With regard to document retention, we should confer about the specifics of what this should include other than the obvious such as the named plaintiffs' files, for example.

We are reattaching the preservation notice letter, and look forward to discussing.

4) In response to your proposal about joint experts, we may be willing to consider this. Do you have some specific proposals? We will need to confer about this in more detail.

Let's discuss and we can thereafter put together a comprehensive plan.

5) As far as specific issues with detainees/inmates, these have all been conveyed to the appropriate persons for handling. Without attorney-client agreements or official class representation, providing you the responsive info is problematic in terms of HIPAA and privacy rights.

Understood.

I look forward to working out this issues with you.

Best,

Susan

**Susan E. Coleman | Partner**
501 West Broadway, Suite 1600 | San Diego, CA 92101
d - 619.814.5803 | t - 619.814.5800 | f - 619.814.6799
scoleman@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

---

**From:** Coleman, Susan E.
**Sent:** Thursday, March 31, 2022 9:26 PM
**To:** Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

Van – Nice to meet you as well. As soon as my trial is done, we can work on the protective order and site inspection issues and respond to any specific issues that have not already been addressed.

Specifically, I was looking to extend the class certification/joint expert proposals.

Susan

**From:** Van Swearingen [mailto:VSwearingen@rbgg.com]
**Sent:** Thursday, March 31, 2022 12:50 PM
**To:** Coleman, Susan E. <SColeman@bwslaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz <JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** RE: Dunsmore et al. v County of San Diego et al [IWOV-DMS.FID75747]

[EXTERNAL]

Hello Susan,

It is nice to meet you over email and we look forward to meeting you in person.  We understand that you have been tied up with other matters, but need some help with respect to any specific request you are making for more time.  As background, we have made the following requests to County since appearing.

On January 26, we sent the County a litigation hold letter, requesting County defendants to suspend any and all document purging policies with respect to all hard copy and electronically stored information.  Counsel disputed the obligation and we sent a responsive email with case law explaining defendants' preservation obligations and consequences of spoliation.

On February 23, we asked the County for expert on-site inspections in connection with their request for more time.  Counsel indicated that the County would not authorize the requested inspections despite plaintiffs giving County defendants an extra 30 days to respond to the SAC.

On March 11 and 17, we sent letters to the County about our notifications regarding urgent and/or serious issues that require prompt attention from Jail staff (e.g., an individual experiencing a medical emergency or mental health crisis, or at acute risk of suicide).

On March 15, we asked the County to respond to our proposals for class certification and joint experts by April 1.  Counsel already indicated that the County will need a few additional weeks to respond to the proposals, and we responded that we will continue our work on class certification.

On March 18, we asked the County to negotiate a protective order, and counsel responded that the County would not do so at this time.

Given the above, please let us know if you are seeking a specific extension.  As you are likely aware, our case raises urgent issues that imperil the lives of people in custody every day and we are eager to address these matters promptly.  Thank you, and best regards,
Van

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Thursday, March 31, 2022 10:55 AM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Christopher Young <christopher.young@dlapiper.com>; Isabella Neal <isabella.neal@dlapiper.com>; Oliver Kiefer <oliver.kiefer@dlapiper.com>; Bardis Vakili <BVakili@aclusandiego.org>; Jonathan Markovitz

<JMarkovitz@aclusandiego.org>
**Cc:** Mehra, Terri <TMehra@bwslaw.com>; Lenert, Ronald <Ronald.Lenert@sdcounty.ca.gov>; O'Sullivan, Matthew <Matthew.O'Sullivan@sdcounty.ca.gov>
**Subject:** Dunsmore et al. v County of San Diego et al

[EXTERNAL MESSAGE NOTICE]

Counsel  - as you likely saw, I filed a notice of appearance in this case and will be lead counsel.  However, I have been in trial in LA Superior Court before Judge Green since 3/07.  I hope to be done soon but in the meantime would appreciate a 30 day extension on any outstanding letters/requests.

Thanks for your cooperation,

Susan

**Susan E. Coleman | Partner**
501 West Broadway, Suite 1600 | San Diego, CA  92101
d - 619.814.5803 | t - 619.814.5800 | f - 619.814.6799
scoleman@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.