GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California  92101-4297
Telephone:  (619) 699-2700
Facsimile:  (619) 699-2701
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>                Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**THIRD AMENDED CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(1)  **Failure to Provide Adequate Medical Care:**  Violations of 8th and 14th Amendments of U.S. Constitution, and Article 1, Sections 7 and 17 of California Constitution<br><br>(2)  **Failure to Provide Adequate Mental Health Care:** Violations of 8th and 14th Amendments of U.S. Constitution, and Article 1, Sections 7 and 17 of California Constitution |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(3) **Failure to Provide Reasonable Accommodations to Incarcerated People with Disabilities:** Violations of Americans with Disabilities Act, Rehabilitation Act, and California Government Code § 11135

(4) **Failure to Ensure Adequate Environmental Health and Safety Conditions:** Violations of 8th and 14th Amendments of U.S. Constitution, and Article 1, Sections 7 and 17 of California Constitution

(5) **Failure to Ensure the Safety and Security of Incarcerated People:** Violations of 8th and 14th Amendments of U.S. Constitution, and Article 1, Sections 7 and 17 of California Constitution

(6) **Failure to Provide Adequate Dental Care:** Violations of 8th and 14th Amendments of U.S. Constitution, and Article 1, Sections 7 and 17 of California Constitution

(7) **Overincarceration of People with Disabilities:** Violations of Americans with Disabilities Act, Rehabilitation Act, and California Government Code § 11135

(8) **Denial of Access to Counsel and the Courts:** Violations of 6th and 14th Amendments of U.S. Constitution, and Article 1, Sections 7 and 15 of California Constitution

(9) **Discriminatory Racial Impact:** Violation of California Government Code § 11135

# TABLE OF CONTENTS

**Page**

TABLE OF ACRONYMS ..................................................................................... 9

NATURE OF ACTION ..................................................................................... 10

JURISDICTION ................................................................................................ 19

VENUE ............................................................................................................. 19

PARTIES .......................................................................................................... 19

FACTUAL ALLEGATIONS ............................................................................ 26

I.    JAIL DEFENDANTS FAIL TO PROVIDE ADEQUATE MEDICAL
      CARE TO INCARCERATED PEOPLE ................................................ 26

      A.    Jail Defendants Systematically Fail to Maintain Sufficient
            Numbers of Health Care Professionals, Resulting in Deficient
            Care .............................................................................................. 28

      B.    The Sheriff's Department's Custody Staff Interfere With and
            Undermine the Delivery of Care by Health Care Professionals in
            the Jail .......................................................................................... 30

      C.    The Sheriff's Department's Inadequate Screening and Intake
            Process Fails to Identify and Treat Medical Care Problems of
            Newly Arriving Incarcerated People ............................................ 32

      D.    The Sheriff's Department Fails to Provide Adequate Medical
            Care, Including Medication Assisted Treatment, for Incarcerated
            People With Substance Use Disorders .......................................... 35

      E.    The Sheriff's Department Fails to Provide Adequate Medical
            Care for Incarcerated People Entering the Jail Under the
            Influence of Alcohol and Drugs ................................................... 39

      F.    The Sheriff's Department Fails to Continue Medically Necessary
            Medications and Treatments for Incarcerated People Upon Their
            Arrival at the Jail, Resulting in Long Delays and Patient Harm ......... 43

      G.    The Sheriff's Department Does Not Provide Incarcerated People
            with a Reliable and Timely Way to Alert Health Care Staff of
            Their Medical Needs ..................................................................... 47

      H.    The Sheriff's Department Fails to Maintain Adequate, Accurate,
            and Complete Medical Records, Which Compromises the
            Delivery of Care ............................................................................ 52

      I.    Jail Defendants Lack Sufficient Contracts with Community
            Providers to Provide Adequate Medical Care to Incarcerated
            People ............................................................................................ 53

THIRD AMENDED CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

J.   The Sheriff's Department Fails to Provide Constitutionally Required Confidentiality in the Delivery of Medical Care .................. 54

K.   The Sheriff's Department Fails to Provide Adequate Diagnostic Care to Incarcerated People, Including Failing to Appropriately Refer Incarcerated People to Outside Specialists When Necessary ................................................................................. 55

L.   The Sheriff's Department Fails to Timely Provide Incarcerated People with Medically Required Eyeglasses ......................... 58

M.   The Sheriff's Department Fails to Provide Necessary or Adequate Follow-Up Medical Treatment to Incarcerated People ........ 59

N.   The Sheriff's Department Fails to Provide Adequate Discharge Planning Services and Medication for Incarcerated People Being Released from the Jail ...................................................... 61

O.   The Sheriff's Department Fails to Maintain Adequate Quality Assurance/Quality Improvement Processes to Ensure Appropriate and Timely Medical Care ....................................... 62

II.   JAIL DEFENDANTS FAIL TO PROVIDE MINIMALLY ADEQUATE MENTAL HEALTH CARE TO INCARCERATED PEOPLE ............................................................................... 63

A.   The Sheriff's Department Fails to Adequately Identify and Track Incarcerated People in Need of Mental Health Care ........................... 67

B.   Jail Defendants Fail to Maintain Sufficient Numbers of Qualified Mental Health Professionals to Meet the Current Need for Mental Health Treatment at the Jail ........................................ 69

C.   Sheriff's Department Custody Staff Improperly Control Clinical Mental Health Care Decisions, Which Undermines Delivery of Care by Mental Health Professionals ....................................... 73

D.   Jail Defendants Fail to Continue Incarcerated People's Mental Health Medications They Were Taking Prior to Detention ................. 76

E.   The Sheriff's Department Fails to Provide Incarcerated People with Timely Access to Mental Health Care ........................................... 77

F.   The Sheriff's Department Lacks an Adequate System for Providing Mental Health Treatment to Incarcerated People with Ongoing Mental Illness ........................................................ 81

G.   The Sheriff's Department Fails to Provide Confidential Mental Health Care in Adequate Physical Spaces ........................... 86

H.   The Sheriff's Department Houses Incarcerated People at Risk of Suicide in Punitive Isolation Units That Put Them at Unnecessary and Undue Serious Risk of Further Decompensation and Harm ..................................................... 90

I.   The Sheriff's Department Lacks Adequate Policies and Procedures to Identify, Treat, Track, and Supervise Incarcerated People at Risk for Suicide ................................................................ 97

     1.   The Sheriff's Department Fails to Adequately Identify Incarcerated People at Risk for Suicide ..................................... 98

     2.   The Sheriff's Department Fails to Adequately Monitor Incarcerated People at Risk for Suicide ................................... 100

     3.   The Sheriff's Department Fails to Provide Adequate Follow-up Care for Incarcerated People Released from Suicide Precautions ................................................................ 101

J.   The Sheriff's Department Fails to Provide Adequate Care to Incarcerated People with Acute Mental Health Needs ...................... 102

K.   The Sheriff's Department Discriminates Against and Unfairly Punishes Incarcerated People with Mental Illness in its Housing Placements ............................................................................. 107

L.   The Sheriff's Department Fails to Provide Incarcerated People with Adequate Mental Health Discharge Planning and Resources .... 111

III.  JAIL DEFENDANTS DISCRIMINATE AGAINST, FAIL TO ACCOMMODATE, AND VIOLATE THE CONSTITUTIONAL AND STATUTORY RIGHTS OF INCARCERATED PEOPLE WITH DISABILITIES ........................................................................ 112

A.   The Sheriff's Department Lacks Adequate Policies and Practices to Identify and Track Incarcerated People with Disabilities ............. 112

B.   The Sheriff's Department Fails to Accommodate Incarcerated People with Hearing and Speech Disabilities ..................................... 116

C.   The Sheriff's Department Fails to Accommodate Incarcerated People With Substance Use Disorders ............................................... 120

D.   The Sheriff's Department Routinely Fails to Provide Assistive Devices to Incarcerated People with Disabilities ............................. 120

E.   The Sheriff's Department Fails to Provide Equal Access to Programs and Services, Including Safe and Accessible Facilities, to Incarcerated People with Disabilities ............................................... 125

F.   The Sheriff's Department Lacks an Effective Procedure for Incarcerated People to Request Reasonable Disability Accommodations ................................................................. 131

G.   People with Disabilities Are Subjected to Dangerous Conditions in the Jail Specifically Because Jail Defendants Fail to Reasonably Accommodate Their Disability-Related Needs ............. 136

IV.  JAIL DEFENDANTS FAIL TO ENSURE ADEQUATE ENVIRONMENTAL CONDITIONS, WHICH PLACES

INCARCERATED PEOPLE AT UNDUE RISK OF HARM TO
THEIR HEALTH AND SAFETY ........................................................... 139

A.   The Jail Is Filthy and Ripe for the Spread of Disease ........................ 139

B.   The Sheriff's Department Fails to Remedy Dangerous Electrical
and Plumbing Hazards ...................................................................... 145

C.   The Sheriff's Department Fails to Ensure that Incarcerated
People Have Access to Clean Clothes and Linens ............................ 146

V.   JAIL DEFENDANTS FAIL TO ADEQUATELY ENSURE THAT
THE JAIL FACILITIES ARE SAFE AND SECURE FOR
INCARCERATED PEOPLE, PUTTING THEM AT UNDUE RISK
OF VIOLENCE AND PHYSICAL HARM ...................................... 146

A.   The Sheriff's Department Fails to Adequately Classify and
Assign People to Appropriate Housing Locations, Putting Them
at Grave Risk of  Violence and Physical Injury................................. 147

B.   The Sheriff's Department Has Failed to Protect People from
Fentanyl and Other Dangerous Contraband in the Jail ...................... 151

C.   The Sheriff's Department Fails to Maintain Functioning Video
Cameras, Emergency Intercoms, and Elevators, Which Places
Incarcerated People's Physical Safety at Risk ................................... 155

D.   The Sheriff's Department Fails to Provide Timely and Adequate
Safety Checks and Fails to Respond to People in Distress ................ 160

E.   The Sheriff's Department Fails to Prevent and Address
Misconduct by Custody Staff That Harms Incarcerated People......... 164

F.   The County Has Failed to Ensure Adequate Independent
Oversight of the Jail ......................................................................... 166

VI.   JAIL DEFENDANTS FAIL TO PROVIDE ADEQUATE DENTAL
CARE TO INCARCERATED PEOPLE ......................................... 168

VII.   ALL DEFENDANTS OVERINCARCERATE PEOPLE IN THE JAIL,
PARTICULARLY PEOPLE WITH DISABILITIES, BY DENYING
THEM ACCESS TO COMMUNITY-BASED SERVICES FOR
WHICH THEY ARE ELIGIBLE AND CAN SUCCESSFULLY
PARTICIPATE................................................................................. 172

A.   The County and Sheriff's Department's Incarceration Practices
Disproportionately Harm People with Disabilities, the Homeless,
and People of Color........................................................................... 173

B.   All Defendants Fail to Provide Adequate Capacity and Timely
Access to Alternatives to Incarceration Programs in the County,
Resulting in Non-Compliance with the ADA's Integration
Mandate and the Perpetuation of Disability-Based
Discrimination.................................................................................. 179

C.    All Defendants' Reentry Programming is Inadequate and Sets People Up for an Avoidable Cycle of Repeated Incarcerations ......... 182

D.    By Policy and Practice, Black and Latinx Arrestees are Disproportionately Incarcerated in the Jail ................................. 188

VIII.  JAIL DEFENDANTS INTERFERE WITH INCARCERATED PERSONS' ACCESS TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO THE COURTS ......................................................................... 192

A.    The Sheriff's Department Fails to Ensure That Incarcerated People Can Adequately Communicate Confidentially With Their Attorneys ........................................................................... 192

B.    The Sheriff's Department Improperly Interferes with Incarcerated Persons' Access to the Courts ....................................... 197

CLASS ACTION ALLEGATIONS ........................................................ 198

Incarcerated People Class ............................................................ 198

Numerosity:  Fed. R. Civ. P. 23(a)(1) ............................... 199

Commonality:  Fed. R. Civ. P. 23(a)(2) ............................. 200

Typicality:  Fed. R. Civ. P. 23(a)(3) ................................. 201

Adequacy:  Fed. R. Civ. P. 23(a)(4) .................................. 201

Fed. R. Civ. P. 23(b)(1)(A) and (B) .................................. 201

Incarcerated People with Disabilities Subclass ............................ 202

Numerosity:  Fed. R. Civ. P. 23(a)(1) ............................... 202

Commonality:  Fed. R. Civ. P. 23(a)(2) ............................. 203

Typicality:  Fed. R. Civ. P. 23(a)(3) ................................. 204

Adequacy:  Fed. R. Civ. P. 23(a)(4) .................................. 204

Fed. R. Civ. P. 23(b)(1)(A) and (B) .................................. 204

Fed. R. Civ. P. 23(b)(2) ....................................................... 204

FIRST CLAIM FOR RELIEF: FAILURE TO PROVIDE ADEQUATE MEDICAL CARE  By All Plaintiffs and the Incarcerated People Class Against Defendants SHERIFF'S DEPARTMENT and COUNTY ............. 205

SECOND CLAIM FOR RELIEF: FAILURE TO PROVIDE ADEQUATE MENTAL HEALTH CARE  By All Plaintiffs and the Incarcerated People Class Against Defendants SHERIFF'S DEPARTMENT and COUNTY ........................................................................... 207

THIRD CLAIM FOR RELIEF: FAILURE TO PROVIDE REASONABLE

ACCOMMODATIONS TO INCARCERATED PEOPLE WITH
DISABILITIES  By Plaintiffs DUNSMORE, ANDRADE,
ARCHULETA, CLARK, EDWARDS, LANDERS, LOPEZ,
NELSON, NORWOOD, SEPULVEDA, TAYLOR, ZOERNER, and
the Incarcerated People with Disabilities Subclass Against Defendants
SHERIFF'S DEPARTMENT and COUNTY ................................................. 209

FOURTH CLAIM FOR RELIEF:  FAILURE TO ENSURE ADEQUATE
ENVIRONMENTAL CONDITIONS TO PROTECT AGAINST
UNDUE HEALTH AND SAFETY RISKS  By All Plaintiffs and the
Incarcerated People Class Against Defendants SHERIFF'S
DEPARTMENT and COUNTY ..................................................................... 215

FIFTH CLAIM FOR RELIEF:  FAILURE TO ENSURE THE SAFETY
AND SECURITY OF INCARCERATED PEOPLE  By All Plaintiffs
and the Incarcerated People Class Against Defendants SHERIFF'S
DEPARTMENT and COUNTY ..................................................................... 217

SIXTH CLAIM FOR RELIEF:  FAILURE TO PROVIDE ADEQUATE
DENTAL CARE  By All Plaintiffs and the Incarcerated People Class
Against Defendants SHERIFF'S DEPARTMENT and COUNTY ............. 218

SEVENTH CLAIM FOR RELIEF: OVERINCARCERATION OF PEOPLE
WITH DISABILITIES  By Plaintiffs DUNSMORE, ANDRADE,
ARCHULETA, CLARK, EDWARDS, LANDERS, LOPEZ,
NELSON, NORWOOD, SEPULVEDA, TAYLOR, ZOERNER, and
the Incarcerated People with Disabilities Subclass Against
All Defendants ............................................................................................. 220

EIGHTH CLAIM FOR RELIEF: DENIAL OF ACCESS TO COUNSEL
AND THE COURTS  By All Plaintiffs and the Incarcerated People
Class Against Defendants SHERIFF'S DEPARTMENT and COUNTY .... 222

NINTH CLAIM FOR RELIEF: DISCRIMINATORY RACIAL IMPACT  By
All Plaintiffs and the Incarcerated People Class Against All Defendants .... 223

PRAYER FOR RELIEF ........................................................................................ 225

1

## TABLE OF ACRONYMS

| Acronym | Definition |
|---------|------------|
| ADA | Americans with Disabilities Act |
| ASL | American Sign Language |
| BSCC | Board of State and Community Corrections |
| CDCR | California Department of Corrections and Rehabilitation |
| CLERB | Citizens Law Enforcement Review Board |
| COMPAS | Correctional Offender Management Profiling for Alternative Sanctions |
| CPAC | County Parole and Alternative Custody |
| CQI | Continuous Quality Improvement |
| DOPS | Detention Outpatient Psychiatric Services |
| DRC | Disability Rights California |
| EOH | Enhanced Observation Housing |
| ISP | Inmate Safety Program |
| MAT | Medication Assisted Treatment |
| MSD | Medical Services Division |
| NCCHC | National Commission on Correctional Health Care |
| OPSD | Outpatient Stepdown Unit |
| OUD | Opioid Use Disorder |
| PRCS | Post Release Community Supervision |
| PRRS | Pretrial Release Risk Scale |
| PSU | Psychiatric Stabilization Unit |
| QA/QC | Quality Assurance/Quality Control |
| SOR | Supervised Own Recognizance |
| TTY | Telecommunications Device for the Deaf |
| VRI | Video Remote Interpreting |
| VRS | Video Relay Service |

# NATURE OF ACTION

1.    San Diego County residents are unnecessarily suffering and dying in the County's jail facilities ("the Jail") due to extraordinarily dangerous and deadly conditions, policies, and practices that have been allowed to persist for many years. While the death rate in the Jail has for years exceeded the rates nationally and in other large California jails, it reached chilling heights in 2021 when 18 people died, amounting to a death rate of 458 incarcerated people per 100,000.  The Jail's death rate in 2021 was almost triple the national rate of 167 deaths per 100,000 people, according to 2019 data from the Bureau of Justice Statistics.  2022 has been even worse:  as of November 18, 2022, 20 people have already died in custody, rapidly approaching four times the national in-custody death rate.  New York City's Rikers Island—which has received widespread national media attention and has a larger average daily population than the San Diego County Jail—has had *fewer* deaths than the San Diego County Jail both last year and this year.

2.    The crisis at the Jail is not new.  Since 2009, the Jail has averaged more than one death per month, for a total of at least 193 in-custody deaths since 2009. The California State Auditor's February 3, 2022 report ("State Audit Report") found that for years, "the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody."[1]  Observing that "systemic deficiencies" in Jail policies and practices for "intake screenings, medical and mental health care, safety checks, and responses to emergencies likely contributed to these deaths,"[2] the State Auditor warned that until meaningful changes are made, "the weaknesses in [the Sheriff's Department's] policies and practices will continue to jeopardize the health and lives of the individuals in its custody."[3]

---

[1] California State Auditor, "San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody," Feb. 3, 2022, at iii.

[2] State Audit Report at 53.

[3] *Id*. at 4.

3.      Deaths at the Jail irreparably harm incarcerated people and their families and loved ones, and impose staggering costs on San Diego County taxpayers.  Rather than remedy systemic failures that harm the people incarcerated at the Jail, Defendants San Diego County Sheriff's Department ("Sheriff's Department") and the County of San Diego ("County" or "San Diego County") (collectively, "Jail Defendants") pay millions of dollars to resolve their wrongdoing through individual settlements.[4]  Since 2017, Jail Defendants have paid over $27 million to resolve cases involving deaths and serious injuries at the Jail.  Jail Defendants paid nearly $3 million to the family of Heron Moriarty, who died by suicide even after Moriarty's wife called the Jail 30 times stating that he was suicidal.  Custody staff overruled medical staff's recommendation to place Moriarty under close suicide observation.  Jail Defendants paid $1 million to Ivan Ortiz's family after Ortiz committed suicide with a plastic bag erroneously provided to him.  Ortiz was left unmonitored even though he had tried to hang himself earlier in the day and told Jail staff that he was hearing voices telling him to kill himself.  Jail Defendants paid over $3 million to the family of Paul Silva, who was in a mental health crisis when he was killed by Sheriff's Department deputies during a cell extraction.  In October 2022, Jail Defendants agreed to pay over $4 million to Tanya Suarez, who clawed out her own eyeballs during a drug-induced psychosis, because custody staff failed to intervene and instead took a cell phone video while Suarez blinded herself.  Numerous lawsuits against Jail Defendants remain pending.

4.      This civil rights class action lawsuit seeks to remedy the dangerous,

---

[4] *See* Kelly Davis, Jeff McDonald, *San Diego County pays $1M to family in inmate death, pushing year's payouts past $14M*, SAN DIEGO UNION-TRIBUNE, June 12, 2021.  https://www.sandiegouniontribune.com/news/watchdog/story/2021-06-12/san-diego-county-pays-1m-to-family-in-inmate-death-pushing-payouts-past-14m-in-just-over-a-year; Kelly Davis, Jeff McDonald, *San Diego County agrees to pay almost $3 million to family of Vista jail suicide victim*, SAN DIEGO UNION-TRIBUNE, Oct. 7, 2021.  https://www.sandiegouniontribune.com/news/watchdog/story/2021-10-07/san-diego-county-pays-almost-3-million-to-family-of-man-who-killed-himself-in-vista-jail.

1  discriminatory, and unconstitutional conditions in the Jail.  Plaintiffs Darryl

2  Dunsmore, Andree Andrade, Ernest Archuleta, James Clark, Anthony Edwards, Lisa

3  Landers, Reanna Levy, Josue Lopez, Christopher Nelson, Christopher Norwood,

4  Jesse Olivares, Gustavo Sepulveda, Michael Taylor, and Laura Zoerner (collectively

5  "Plaintiffs") bring this action against all Defendants on behalf of themselves and the

6  approximately 4,000 incarcerated people who are similarly situated on any given

7  day.

8         5.     First, Plaintiffs seek declaratory and injunctive relief under the United

9  States and California constitutions for Jail Defendants' deliberate indifference to

10  their obligation to provide incarcerated people with minimally adequate medical

11  care.  Jail Defendants' flawed policies and practices combine to create a medical

12  care system that falls far short of constitutional standards.  For example, the Jail

13  suffers from chronic and dangerous understaffing of medical professionals.  An

14  October 2021 letter from the union representing Jail health care workers to the

15  Citizens Law Enforcement Review Board ("CLERB") explained that understaffing

16  created "dangerous and inhumane" conditions for incarcerated people and medical

17  staff alike.  As of June 2022, 199 medical staff positions remained vacant.[5]

18  Moreover, people at the Jail are not adequately screened for medical needs and do

19  not timely receive essential medication or treatment, resulting in unnecessary and

20  prolonged pain, suffering, worsening of their conditions, and sometimes even death.

21  In 2019, the *San Diego Union-Tribune* found that "[r]eports show multiple inmates

22  dying from treatable conditions like diabetes, pneumonia and stomach ulcers."[6]  At

---

[5] *See* Jeff McDonald, Kelly Davis, *Persistent medical staffing shortages in San Diego jails are causing lapses in care, driving down morale*, SAN DIEGO UNION-TRIBUNE, Sept. 4, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-09-04/jail-staff-shortages.

[6] *See* Jeff McDonald, Kelly Davis, Lauryn Schroder, *Rate of jail inmate deaths in San Diego County far exceeds other California counties*, SAN DIEGO UNION-TRIBUNE, Sept. 10, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-

least three incarcerated people have died from COVID-19 since December 2020, and the Jail's inadequate COVID-19 response is the subject of a separate lawsuit pending in state court.

6.     Second, Plaintiffs seek declaratory and injunctive relief under the United States and California constitutions against Jail Defendants' deliberate indifference to their failure to provide incarcerated people with minimally adequate mental health care.  Jail Defendants' failures to assess and address suicide risks have led to an inordinate number of suicides in the Jail.  From 2011 to 2020, 39 people committed suicide in the Jail, for a suicide rate of approximately 74 deaths by suicide per 100,000 people, which is more than 1.5 times the national average. Exhaustive reports from outside experts—Lindsay Hayes's *Report on Suicide Prevention Practices Within The San Diego County Jail System* ("Hayes Report")[7] and Disability Rights California's *Suicides in San Diego County Jail: A System Failing People with Mental Illness* ("DRC Report")[8]—have repeatedly criticized the Jail's suicide prevention policies and practices.  Nonetheless, the Jail maintains many of these same deadly policies and practices, in particular the dangerous misuse of isolation.  The Sheriff's Department fails to maintain appropriate time limits on stays in "safety cells" and enhanced observation cells, where incarcerated people are stripped of their clothes and denied access to programs and social contact.  The Jail's mental health program is woefully inadequate and understaffed, meaning that the vast majority of mental health encounters are brief, non-confidential wellness checks that provide little or no therapeutic benefit.  To make matters worse, conditions in the Jail's mental health units are filthy and barbaric, as demonstrated

---

behind-bars-san-diego-county-jail-deaths.

[7] Hayes, Lindsey M., *Report on Suicide Prevention Practices Within The San Diego County Jail System*, June 22, 2018.

[8] Disability Rights California, *Suicides in San Diego County Jail: A System Failing People with Mental Illness*, April 2018, available at https://www.disabilityrightsca.org/system/files/file-attachments/SDsuicideReport.pdf.

by the below photographs.[9]



7.     Third, under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Rehabilitation Act"), and California Government Code Section 11135, Plaintiffs seek declaratory and injunctive relief to remedy Jail Defendants' systemic and willful discrimination against incarcerated people in the Jail with disabilities, and failure to provide reasonable accommodations to incarcerated people with disabilities in programs, services, and activities.  Jail Defendants fail to identify and track incarcerated people with disabilities and the accommodations those people require, and fail to house incarcerated people with mobility disabilities in accessible housing.  Jail staff often deny incarcerated people needed assistive devices—in some cases even confiscating these devices—and fail to provide effective communication assistance to incarcerated people with disabilities, such as sign language interpretation for people with hearing disabilities. Jail Defendants' systemic failure to accommodate incarcerated people with

---

[9] The photos are from two cells in a mental health unit at San Diego Central Jail, taken in January 2022.

1  disabilities results in their widespread exclusion from programs, services, and
2  activities other incarcerated people enjoy, including health care services, attorney
3  representation, meals, exercise, religious services, sleeping, and educational and
4  vocational programs.  Moreover, the lack of accommodations makes incarcerated
5  people with disabilities reliant on other incarcerated individuals, placing them in
6  vulnerable situations and exposing them to exploitation and violence.  Jail
7  Defendants also fail to accommodate people with substance use disorder.

8       8.     Fourth, Plaintiffs seek declaratory and injunctive relief under the
9  United States and California constitutions to remedy Jail Defendants' deliberate
10 indifference to their failure to prevent the presence of environmental health hazards
11 and other unreasonably dangerous conditions in the Jail.  Filthy conditions and
12 environmental hazards, ranging from vermin to mold to overflowing sewage, expose
13 those incarcerated to infection and illness.

14      9.     Fifth, Plaintiffs seek declaratory and injunctive relief under the United
15 States and California constitutions to remedy Jail Defendants' deliberate
16 indifference to their failure to ensure the safety and security of incarcerated people
17 in the Jail.  Custody staff do not timely or adequately respond to calls for emergency
18 aid.  The Sheriff's Department's faulty classification process places individuals
19 charged with routine, low-level offenses in cells with violent individuals, as
20 evidenced by the 2021 deaths of Robert Salyers and Dominique McCoy, who were
21 killed by their cellmates.  Kristina Frost, a transgender woman, was attacked in 2020
22 after deputies housed her in a holding cell with men, in callous disregard of her
23 gender identity.  Plaintiffs also face an unreasonable risk of death or serious harm
24 from drug contraband in the Jail, which the Sheriff's Department fails to detect and
25 prevent.  In 2021, the Jail reported 204 suspected opiate overdoses, despite visitation
26 being severely restricted.  As of November 11, 2022, the Jail has reported 180
27 overdoses in 2022, and is on track to surpass the number of overdoses in 2021.  As a
28 result of inadequate training and a lack of functioning video coverage in the Jail,

when incarcerated people are in danger, custody staff fail to timely render aid. Emergency call buttons in cells often do not work or are ignored.  In several recent deaths at the Jail, custody staff failed to timely and adequately monitor individuals known to be a danger to themselves.  Jail Defendants have also failed to ensure that the Jail population does not exceed the capacity of the staff and system to provide minimally adequate care (including given severe staffing shortages), placing incarcerated people at substantial risk of serious harm.

10. Sixth, Plaintiffs seek declaratory and injunctive relief under the United States and California constitutions to remedy Jail Defendants' deliberate indifference to their failure to provide incarcerated people with adequate dental care. Dental care is frequently untimely and insufficient to the point of causing unnecessary pain and harm.  By policy and practice, treatment for dental problems is almost exclusively limited to tooth extractions, forcing incarcerated people to choose between living with tooth decay and pain (often treated only with Tylenol), or losing their teeth permanently.  Basic dental treatments like permanent fillings are almost nonexistent in the Jail.  Jail Defendants fail to provide routine dental cleaning, evaluations, or preventive care—even to individuals who have been in Jail custody for years.

11. Seventh, Jail Defendants' and Defendant San Diego County Probation Department's ("Probation Department") failed policies and practices have led to the disproportionate mass incarceration of people with mental health disabilities in San Diego County.  As one County Supervisor has acknowledged, "Mass incarceration disproportionately impacts the poor, homeless, mentally ill and people of color and does not make us safer."[10]  The Jail is the County's largest mental health services

---

[10] Supervisor Terra Lawson-Remer, "Agenda Item: A Data-Driven Approach to Protecting Public Safety, Improving and Expanding Rehabilitative Treatment and Services, and Advancing Equity Through Alternatives to Incarceration: Building on Lessons Learned During the COVID-19 Pandemic," Oct. 19, 2021, at 1, https://bosagenda.sandiegocounty.gov/cob/cosd/cob/doc?id=0901127e80db3aaf.

provider because All Defendants do not provide sufficient community-based mental health services.  The effects of even a short incarceration in the Jail are destabilizing to a person's health, residence, livelihood, and family.  All Defendants have failed to implement adequate alternatives-to-incarceration programs, adequate reentry programs, and other evidence-based policies to stop mass incarceration.  All Defendants' alternatives-to-incarceration programs—such as home detention—are available to far too few individuals who could participate consistent with public safety.  These failures create a cycle of reincarceration for people with serious medical or mental health needs who can be served safely in the community.  Even during the COVID-19 pandemic, the Sheriff's Department continues to jail people for minor charges, including disturbing the peace and evading trolley fares, some of which do not even meet the Jail's booking acceptance criteria.[11]  A zero bail policy for certain misdemeanors and felonies in the County has been rescinded, increasing the number of people subject to incarceration.  All Defendants' failed policies violate the ADA's integration mandate and other protections against discrimination by denying people with disabilities the community-based diversion, treatment, and reentry services for which they would otherwise be eligible.  All Defendants must significantly expand alternatives to incarceration and other programs to shift the pipeline away from the Jail and towards adequate community-based services, programming, and resources that can prevent unnecessary detention.

12.     Eighth, Plaintiffs seek injunctive relief under the United States and California constitutions to remedy the Sheriff's Department's interference with Plaintiffs' right to effective assistance of counsel and right to access the courts.  The Sheriff's Department, by its policies and practices, confiscates incarcerated people's

---

[11] Jeff McDonald, Kelly Davis, *From the Inside: San Diego County jail inmates describe filthy conditions, few COVID-19 protections*, SAN DIEGO UNION-TRIBUNE, Jan. 23, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-01-23/from-the-inside-in-request-for-injunction-san-diego-county-jail-inmates-describe-filthy-conditions-few-covid-19-protections.

1  legal materials, including legal materials in pending cases in which those

2  incarcerated people are proceeding without legal representation.  The Sheriff's

3  Department also unreasonably and unjustifiably denies incarcerated people access to

4  confidential communications with their attorneys.  Despite a policy that incarcerated

5  people have unlimited access to telephone calls with their attorneys, Sheriff's

6  Department staff frequently fail to notify incarcerated people about professional call

7  requests from their attorneys, effectively interfering with necessary attorney-client

8  communications.  In late 2021, the *San Diego Union-Tribune* obtained internal

9  emails showing that Sheriff's deputies recorded and listened to privileged telephone

10  calls between attorneys and their incarcerated clients.[12]

11         13.    Ninth, the unnecessary and dangerous detention practices in San Diego

12  County disproportionately harm Black and Latinx people.  For example, in August

13  2022, 21% of people incarcerated at the Jail were Black, whereas only just over 5%

14  of County residents are Black, and 42% of people incarcerated at the Jail were

15  Latinx, whereas only 35% of County residents are Latinx.[13]  Even once arrested,

16  Black and Latinx arrestees are incarcerated at higher rates than White arrestees and,

17  upon information and belief, are more likely to be incarcerated at the Jail for longer.

18  Upon information and belief, the disproportionate incarceration of Black and Latinx

19  arrestees results from All Defendants' policies for administering alternatives to

20  incarceration programs for pretrial detainees—including their use of a racially

21  biased risk assessment tool—and All Defendants' policies for administering early

---

[12] Jeff McDonald, *Sheriff's deputies recorded jail conversations between inmates and their lawyers*, SAN DIEGO UNION-TRIBUNE, Nov. 6, 2021. https://www.sandiegouniontribune.com/news/watchdog/story/2021-11-06/sheriffs-deputies-recorded-lawyer-jail-conversations.

[13] San Diego County Sheriff's Department, Jail Population Statistics. August 2022, https://www.sdsheriff.gov/home/showpublisheddocument/5703/637985910990770000; *see also* San Diego County, California QuickFacts, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/sandiegocountycalifornia,CA/POP815219 (accessed Nov. 16, 2022).

1  release and reentry programs.

## JURISDICTION

2

3    14.    This Court has jurisdiction over the claims brought under federal law

4  pursuant to 28 U.S.C. §§ 1331 and 1343.

5    15.    This Court has jurisdiction over the claims brought under California

6  law pursuant to 28 U.S.C. § 1367.

7    16.    Plaintiffs seek declaratory and injunctive relief under 28 U.S.C.

8  §§ 1343, 2201, and 2202, 42 U.S.C. §12101 *et seq.*, 29 U.S.C. § 794a, 42 U.S.C.

9  §§ 1983 and 12117(a), Fed. R. Civ. P. 65, California Government Code § 11135,

10  and Article 1, Sections 7, 15, and 17 of the California Constitution.

## VENUE

11

12    17.    Venue is properly in this Court, pursuant to Title 28 U.S.C.

13  § 1391(b)(1), in that Plaintiffs' claims for relief arose in this District and one or all

14  of the Defendants reside in this District.

## PARTIES

15

16    18.    Plaintiff DARRYL DUNSMORE has been incarcerated at the Jail

17  twice recently while seeking re-sentencing, and on several prior occasions as well.

18  Most recently, DUNSMORE was incarcerated at the Jail from August 16, 2018 to

19  September 19, 2018, and then again from December 13, 2019 to April 21, 2021.

20  DUNSMORE was incarcerated at the Jail when this action was initiated on

21  March 20, 2020 and when the First Amended Complaint was filed on July 23, 2020.

22  DUNSMORE is currently incarcerated at California Health Care Facility, a

23  California Department of Corrections and Rehabilitation ("CDCR") facility in

24  Stockton, California.  DUNSMORE has two pending habeas petitions and an active

25  appeal of a petition under SB 775, and anticipates returning to the Jail in the near

26  future for resentencing or other proceedings under one or more of his pending

27  petitions.  DUNSMORE will also be incarcerated at the Jail if he is transported from

28  CDCR out to court to serve as a witness.  If DUNSMORE is released from CDCR

on state parole or under Post Release Community Supervision ("PRCS"), he is subject to being referred to the Jail as San Diego is his county of commitment. DUNSMORE is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

19.    Plaintiff ANDREE ANDRADE was incarcerated at the Jail, where he served a local sentence, from June 7, 2022 to October 31, 2022. ANDRADE has been incarcerated in the Jail on several prior occasions, including from May 2013 to March 2014 and again in September 2021. ANDRADE is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

20.    Plaintiff ERNEST ARCHULETA was incarcerated at the Jail from July 6, 2019 until approximately April 2022. ARCHULETA is currently incarcerated at a CDCR facility. While in CDCR custody, ARCHULETA will be housed at the Jail while out-to-court for any proceedings related to his underlying conviction or to serve as a witness in a case in San Diego County. If ARCHULETA is released from CDCR on state parole or under PRCS, he is subject to being referred to the Jail as San Diego is his county of commitment. ARCHULETA is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

21.    Plaintiff JAMES CLARK has been incarcerated at the Jail 19 times since August 2017, often for as little as a week or two. Most recently, CLARK was incarcerated at the Jail from September 29, 2021 until approximately August 3, 2022. CLARK is now incarcerated in CDCR and is scheduled for release in January 2023. If released on state parole or PRCS, CLARK is subject to being referred to the Jail as San Diego is his county of commitment. CLARK is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

22.    Plaintiff ANTHONY EDWARDS has been incarcerated at the Jail

eight times since 2011. Most recently, EDWARDS was incarcerated at the Jail from July 2, 2019 to approximately August 10, 2022. EDWARDS is currently incarcerated at a CDCR facility. While in CDCR, EDWARDS will be housed at the Jail while out-to-court for any proceedings related to his underlying conviction or to serve as a witness in a case in San Diego County. If EDWARDS is released from CDCR on state parole or under PRCS, he is subject to being referred to the Jail as San Diego is his county of commitment. EDWARDS is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

23.    Plaintiff LISA LANDERS has been incarcerated at the Jail since June 20, 2022. LANDERS is currently incarcerated pending trial. LANDERS has been incarcerated at the Jail approximately seven times since 2006. LANDERS is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

24.    Plaintiff REANNA LEVY has been incarcerated at the Jail eight times since 2006. Most recently, LEVY was incarcerated at the Jail from June 27, 2018 until February 3, 2022. LEVY is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

25.    Plaintiff JOSUE LOPEZ was incarcerated at the Jail from October 18, 2019 to May 12, 2021, while awaiting trial. LOPEZ has been released on bail, is still awaiting trial, and may be incarcerated at the Jail again depending on factors related to his bail and criminal case. LOPEZ is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

26.    Plaintiff CHRISTOPHER NELSON was incarcerated at the Jail from March 2, 2021 to approximately May 2022. NELSON was detained awaiting trial until September 2021 and then incarcerated before his eventual transfer to CDCR on or around May 2022. While in CDCR custody, NELSON will be housed at the Jail

if he is out-to-court for any proceedings related to his underlying conviction or to serve as a witness in a case in San Diego County.  If NELSON is released from CDCR on state parole or under PRCS, he is subject to being referred to the Jail as San Diego is his county of commitment.  NELSON is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

27.    Plaintiff CHRISTOPHER NORWOOD has been incarcerated at the Jail 15 times since 2005.  Most recently, NORWOOD was incarcerated at the Jail from June 22, 2021 to February 9, 2022.  NORWOOD was first detained at the Jail for several months awaiting trial and then after being sentenced and while awaiting transfer to CDCR, where he is currently incarcerated.  While in CDCR custody, NORWOOD will be housed at the Jail if he is out-to-court from any proceedings related to his underlying conviction or to serve as a witness in a case in San Diego County.  If NORWOOD is released from CDCR on state parole or under PRCS, he is subject to being referred to the Jail as San Diego is his county of commitment. NORWOOD is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

28.    Plaintiff JESSE OLIVARES has been incarcerated at the Jail since October 28, 2021.  OLIVARES is currently detained pretrial.  OLIVARES was incarcerated at the Jail twice earlier in 2021, both times for approximately two months.

29.    Plaintiff GUSTAVO SEPULVEDA has been incarcerated at the San Diego County Jail since October 3, 2017, with the exception of a period from on or around August 12, 2020 to February 25, 2021, when he was committed to Atascadero State Hospital.  SEPULVEDA has been sentenced, although he was detained pretrial for the majority of his incarceration at the jail.  SEPULVEDA has been incarcerated at the Jail six other times since 2006.  SEPULVEDA is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and

California Government Code § 12926(l).

30.     Plaintiff MICHAEL TAYLOR has been incarcerated at the Jail since March 29, 2022, and was previously incarcerated at the Jail on multiple occasions, including in 2014 and 2017.  TAYLOR is currently detained pretrial.  TAYLOR is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

31.     Plaintiff LAURA ZOERNER has been incarcerated in the Jail 22 times since 2010, including six times in 2021.  Most recently, ZOERNER was incarcerated at the Jail from June 2022 to September 2022.  ZOERNER also goes by "Laura Grubbs," as "Grubbs" is her maiden name.  ZOERNER is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(l).

32.     Defendant SAN DIEGO COUNTY SHERIFF'S DEPARTMENT ("SHERIFF'S DEPARTMENT") is a public entity, duly organized and existing under the laws of the State of California.  The SHERIFF'S DEPARTMENT is responsible for the day-to-day operations of the Jail, including promulgating policies and procedures for the operation of all Jail facilities, the implementation thereof, and the training and supervision of all persons working in the Jail.  The SHERIFF'S DEPARTMENT has contracted with NaphCare, Inc. ("NaphCare") to provide certain medical, mental health, and dental care services in the Jail, but by law retains the ultimate authority over and responsibility for the health care, treatment, disability accommodations, and safekeeping of incarcerated people in the Jail.  The SHERIFF'S DEPARTMENT employs 50 or more persons.

33.     Defendant COUNTY OF SAN DIEGO (the "COUNTY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, Defendant COUNTY operates and manages the Jail, is responsible for setting the SHERIFF'S DEPARTMENT's budget, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies,

procedures, practices, and customs of the SHERIFF'S DEPARTMENT and its respective employees and/or agents.  The COUNTY authorized and approved the contracts between Defendant SHERIFF'S DEPARTMENT and third-party contractors to provide certain medical, mental health, and dental care to incarcerated people in the Jail.  The COUNTY by law retains the ultimate authority over and responsibility for the health care, treatment, disability accommodations, and safekeeping of Plaintiffs and the class they seek to represent.  The COUNTY employs 50 or more persons.

34.    Together, Defendants COUNTY and SHERIFF'S DEPARTMENT (collectively, "JAIL DEFENDANTS") are responsible for operation of all San Diego County Jail facilities.  As of November 15, 2022, 3,909 people were incarcerated in the Jail.  The Jail is comprised of six facilities in current operation: San Diego Central Jail ("Central"), George Bailey Detention Facility ("George Bailey"), Vista Detention Facility ("Vista"), Las Colinas Detention and Reentry Facility ("Las Colinas"), South Bay Detention Facility ("South Bay"), and East Mesa Reentry Facility ("East Mesa").  A seventh facility, Facility 8 Detention Facility ("Facility 8"), was part of the Jail system until recently but currently houses no incarcerated people.  JAIL DEFENDANTS plan to open a new facility, Rock Mountain Detention Facility ("Rock Mountain"), although its opening is years behind schedule and it is not currently used to house incarcerated people.[14]  Central, Vista, and Las Colinas are booking facilities for newly-arriving incarcerated people. Central, George Bailey, South Bay, and East Mesa are male-only facilities.  Las Colinas is usually a female-only facility, although it has housed males during the COVID-19 pandemic.  Male and female incarcerated people may be booked at Vista, but females are then transferred to Las Colinas.  Although there are several

---

[14] *See* San Diego County Grand Jury, "San Diego County Detention Facilities: Inspection Report and Inmate Mental Health," May 28, 2019, https://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2018-2019/DetentionFacilitiesReport.pdf.

1  facilities, the SHERIFF'S DEPARTMENT has stated it operates the Jail system

2  "collectively as one system" and transfers people "fluidly within the system."

3      35.    Defendant SAN DIEGO COUNTY PROBATION DEPARTMENT

4  ("PROBATION DEPARTMENT") is a public entity, duly organized and existing

5  under the laws of the State of California.  Defendant PROBATION

6  DEPARTMENT, through its division for Adult Reintegration and Community

7  Supervision Services, is responsible for supervising many individuals before and

8  after their release from the Jail and providing them with services to assist their

9  reentry into the community.  The PROBATION DEPARTMENT is responsible for

10 preparing presentence reports and recommendations on the sentence options and

11 community interventions available to incarcerated people.  The PROBATION

12 DEPARTMENT is also responsible for certain pre-trial diversion programming,

13 including a pre-trial mental health diversion program.  The PROBATION

14 DEPARTMENT employs 50 or more persons.

15     36.    Plaintiffs are ignorant of the true names and capacities of Defendants

16 sued in this complaint as DOES 1 through 20, inclusive, and therefore sue these

17 Defendants by such fictitious names.  Plaintiffs will amend this complaint to allege

18 their true names and capacities when ascertained.  Plaintiffs are informed and

19 believe and thereon allege that each of the fictitiously named Defendants is

20 personally responsible in some manner for the occurrences alleged in this complaint.

21     37.    At all times mentioned in this complaint, each Defendant was the agent

22 of the others, was acting within the course and scope of this agency, and all acts

23 alleged to have been committed by any one of them was committed on behalf of

24 every other Defendant.  Throughout the complaint, allegations of a Defendant's

25 failure to train includes that the Defendant failed to adequately supervise.

26

27

28

# FACTUAL ALLEGATIONS

## I.   JAIL DEFENDANTS FAIL TO PROVIDE ADEQUATE MEDICAL CARE TO INCARCERATED PEOPLE

38.   Incarcerated people in the Jail are dependent on the COUNTY and SHERIFF'S DEPARTMENT (the JAIL DEFENDANTS) for medical care.  By policy and practice, the JAIL DEFENDANTS fail to provide adequate medical care to incarcerated people in the Jail, and are deliberately indifferent to the fact that their failure to provide adequate medical care subjects incarcerated people to a substantial risk of unnecessary suffering, serious injury, clinical deterioration, and/or death. JAIL DEFENDANTS are aware of the severe, system-wide medical care deficiencies that have caused and continue to cause significant harm to the incarcerated people in their custody, and have failed to adequately train and supervise their staff to prevent such harm.  In 2017, the National Commission on Correctional Health Care ("NCCHC") found in an exhaustive 139-page report ("NCCHC Report")[15] that the Jail failed to meet nearly all of the standards for adequate medical care, including on Access to Care, Initial Health Assessment, and Intoxication and Withdrawal.  In reviewing Jail deaths, the 2022 State Audit Report raised concerns about the Jail's "ability to provide adequate safety and medical care to those it incarcerates."[16]

39.   The SHERIFF'S DEPARTMENT operates a Medical Services Division ("MSD") that is responsible for providing health care services to all incarcerated people at the Jail.  MSD health care staff include registered nurses, nurse practitioners, and a nursing supervisor.  The MSD's Division Operations Manual sets forth policies and procedures for medical care at the Jails.  The MSD has also issued Standard Nursing Procedures, which specify treatment procedures

---

[15] National Commission on Correctional Health Care (NCCHC) Resources, Inc., "Technical Assistance Report: San Diego Sheriff's Department," January 2017.
[16] State Audit Report at 15.

that nurses should follow for certain conditions.  Within the MSD, the Managed Care Group is responsible for the review of all outpatient referrals and for managing inpatient hospitalizations.

40.    JAIL DEFENDANTS have contracted with the Alabama company NaphCare, Inc. ("NaphCare") to provide some health care staffing and health care services at the Jail.  For example, of the 103.35 health care positions allocated to Central, the COUNTY provides 89 and NaphCare provides 14.35 full-time equivalent staff.  NaphCare may provide staffing and services at the Jail through at least May 31, 2027, although JAIL DEFENDANTS may terminate or suspend NaphCare's work under the contract at any time.  JAIL DEFENDANTS may audit or inspect NaphCare at any time.  NaphCare replaced prior contractors providing services at the Jail and did not take over any COUNTY medical staff positions.  The JAIL DEFENDANTS bear ultimate responsibility for medical care provided at the Jail.  The SHERIFF'S DEPARTMENT has final authority over space needs for the provision of health care.  By contract, the SHERIFF'S DEPARTMENT's medical officials and the COUNTY Public Health Officer have final say "in any disputes [with NaphCare] concerning appropriate health care standards and/or provision of care."  The SHERIFF'S DEPARTMENT must approve any change in contracted provider staffing levels and schedules, and can reject any individual NaphCare staff member.  NaphCare staff must follow the SHERIFF'S DEPARTMENT's and COUNTY's respective policies and procedures.  NaphCare is responsible for collaborating with the SHERIFF'S DEPARTMENT to develop an "Operations Manual" for medical care at the Jail facilities, although the SHERIFF'S DEPARTMENT has final approval over policies and procedures.

41.    Pursuant to the contract, NaphCare may subcontract with other private providers, although the COUNTY must approve most subcontracts.  NaphCare has subcontracted with Correctional Healthcare Partners, Inc. to provide physicians and other medical staff at the Jail.

**A.**   **Jail Defendants Systematically Fail to Maintain Sufficient Numbers of Health Care Professionals, Resulting in Deficient Care**

42.   JAIL DEFENDANTS maintain insufficient numbers of health care professionals to provide minimally adequate care to the approximately 4,000 incarcerated people in the Jail.  As of June 2022, almost 200 of the approximately 500 allocated health care positions in the SHERIFF'S DEPARTMENT were vacant,[17] a rate of almost 40%.  There are not sufficient health care staff to timely respond to incarcerated people's requests for medical care, to adequately screen, monitor, and provide follow-up care to incarcerated people who have serious and chronic illnesses, or to treat incarcerated people when medical emergencies occur.

43.   JAIL DEFENDANTS have long been aware that the Jail's medical staffing is deficient and jeopardizes patient safety.  The NCCHC Report found that medical understaffing may be contributing to untimely medical care at the Jail.[18] After the NCCHC Report, the SHERIFF'S DEPARTMENT publicly acknowledged that it needed to hire more medical staff to provide adequate care and comply with NCCHC standards.[19]  In July 2021, the SHERIFF'S DEPARTMENT had 233 medical staff vacancies and only 287 medical staff.  Over a year later, little has changed.  The SHERIFF'S DEPARTMENT has failed to hire and retain sufficient medical staff and contractors, as the SHERIFF'S DEPARTMENT has admitted through its Undersheriff.[20]

---

[17] Jeff McDonald, Kelly Davis, *Persistent medical staffing shortages in San Diego jails are causing lapses in care, driving down morale*, SAN DIEGO UNION-TRIBUNE, Sept. 4, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-09-04/jail-staff-shortages.

[18] NCCHC Report at 40.

[19] Jeff McDonald, Kelly Davis, *Sheriff has a ways to go to meet 'gold standard' of jail accreditation*, SAN DIEGO UNION-TRIBUNE, Oct. 13, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-13/sheriffs-quest-for-jail-accreditation-to-take-time-money-and-culture-shift.

[20] "Debate: Who Should be Sheriff?", *Times of San Diego*, Oct. 22, 2021, at 6:52, https://www.youtube.com/watch?v=idmGH03C0Sg.

44.     Understaffing of health care professionals translates to dangerous conditions and inadequate medical care for incarcerated people.  In December 2020, understaffing prompted nursing staff at Vista to write a desperate plea to Jail command staff for "any kind of help we can get."  The nurses' letter explained that during certain shifts, Vista had only two registered nurses available—one permanently stationed at intake—for the 600 people incarcerated at the facility.  As a result, the nurses wrote, "this environment for patient care is not even close to standard," and "[p]atients are being neglected and not being given the care that they need and deserve."  The nurses implored command staff to "understand that people's lives are put at risk" by the dangerous understaffing at the Jail.

45.     Due to understaffing, the SHERIFF'S DEPARTMENT improperly allows untrained nurses to perform mental health evaluation gatekeeping functions.  Many nurses are uncomfortable being asked to serve this role.  An October 2021 letter from the Service Employees International Union ("SEIU") Local 221, which represents Jail health care workers, to the Citizens Law Enforcement Review Board ("CLERB") explained that understaffing created "dangerous and inhumane" conditions for incarcerated people and medical staff alike.

46.     The Central Psychiatric Stabilization Unit ("PSU")—the inpatient mental health unit for male incarcerated people with the most serious mental health needs—is supposed to have three registered nurses per shift to provide medical care to those housed in the PSU.  However, the unit rarely has three nurses available and on many occasions zero nurses are available to provide care.  Upon information and belief, on Christmas Day 2021, there was an extreme shortage of nurses on duty for the entire Central facility; a single supervising nurse came in to cover.  In January 2022, the PSU went approximately 12 hours with no nursing staff, leaving the unit with only deputies.  Upon information and belief, there have been several periods during the 2022 calendar year during which health care staffing levels have been dangerously low—in some cases at *zero*—in the PSU, even though it has remained

1  filled with patients with acute treatment needs.

2      47.    Because of its failure to hire and retain sufficient medical staff, the

3  SHERIFF'S DEPARTMENT relies on a system of mandatory overtime, which

4  causes medical staff burnout, results in high turnover, and places incarcerated

5  people at further risk of harm.  The SHERIFF'S DEPARTMENT's medical

6  employees have been on mandatory overtime because of chronic staffing deficits.

7  Medical staff often call in sick due to burnout, which leaves incarcerated people

8  with even fewer medical professionals available to provide care.  Mandatory

9  overtime and other workplace stressors are so severe that medical staff often quit.

10  Even when the SHERIFF'S DEPARTMENT hires new medical staff, it is unable to

11  retain new employees due to these impossible working conditions.

12      48.    The failure to maintain sufficient medical staff causes disruptions and

13  delays in the care of incarcerated people's serious medical needs.  For example, due

14  to staffing shortages, Plaintiff LOPEZ often did not receive his daily medications—

15  which he was required to take in the morning—until the afternoon or evening, if at

16  all.  LOPEZ's medications ensure that his body does not reject a kidney transplant

17  he received before being incarcerated.

18      49.    Many of the systematic and dangerous practices in the Jail outlined in

19  this complaint—including the failure to adequately continue essential medications

20  and treatments, the failure to provide adequate treatment and observation for

21  incarcerated people in withdrawal, the failure to provide adequate discharge

22  planning, the failure to conduct adequate intake screenings, and many others—stem

23  from JAIL DEFENDANTS' failure to maintain sufficient numbers of health care

24  staff and contractors in the Jail.

25  **B.    The Sheriff's Department's Custody Staff Interfere With and
       Undermine the Delivery of Care by Health Care Professionals in
26     the Jail**

27      50.    By policy and practice, the SHERIFF'S DEPARTMENT fails to ensure

28  that clinical medical decisions about medical care for incarcerated people are made

by medical professionals, rather than sworn custody staff.  Although the
SHERIFF'S DEPARTMENT's written policies purport to leave authority for
medical decisions with medical professionals, sworn command staff oversee all
health care professionals and contractors within the SHERIFF'S DEPARTMENT,
as reflected in the SHERIFF'S DEPARTMENT's organizational chart.[21]  In
practice, custody staff often make decisions determining what medical care is
provided to individual patients, as well as about policies, practices, and procedures
for medical care in the Jail.  For example, custody staff rejected and precluded the
implementation of recommendations made by the SHERIFF'S DEPARTMENT's
chief medical officer concerning quarantine protocols for incarcerated people during
the COVID-19 pandemic.  Medical professionals are implicitly and expressly
informed that if command staff and/or custody staff give orders about the medical
care of an incarcerated person, the medical staff must follow those orders.  The
October 12, 2021 letter written by the SEIU, the union representing JAIL
DEFENDANTS' health care staff, complains of the Jail's "lack of adherence to
general practice protocols such as direction of health care service providers by
licensed medical professionals rather than law enforcement."

51.     The SHERIFF'S DEPARTMENT's policy and practice of allowing
custody staff with no medical licensing, credentials, or training to make medical
decisions places incarcerated people in the Jail at substantial risk of serious harm.
Custody staff at times deny incarcerated people clinically necessary treatments for
their serious medical needs.

52.     The SHERIFF'S DEPARTMENT's policy and practice of interference
with medical professionals and clinical judgment sidelines medical staff and has a
chilling effect that dissuades medical professionals from contradicting custody staff,

---

[21] San Diego County Sheriff's Department, Organizational Chart,
https://www.sdsheriff.gov/home/showpublisheddocument/5402 (accessed Oct. 27,
2022).

1    even when medically necessary.  Medical professionals at the Jail who have

2    repeatedly been overruled by custody staff are implicitly trained not to advocate for

3    better treatment of incarcerated people because they know that their advocacy is

4    futile.  Custody interference harms morale and contributes to JAIL DEFENDANTS'

5    failure to hire sufficient medical staff for the Jail.  In a September 2022 article, a

6    former medical staff member discussed poor working conditions "largely due to

7    sworn staff overriding" medical staff.[22]

8    **C.    The Sheriff's Department's Inadequate Screening and Intake Process Fails to Identify and Treat Medical Care Problems of Newly Arriving Incarcerated People**

9

10    53.    By policy and practice, the SHERIFF'S DEPARTMENT fails to

11    adequately identify and treat the medical issues of newly arriving incarcerated

12    people during the screening and intake process and fails to adequately train or

13    supervise intake staff to do the same.  These policies and practices place

14    incarcerated people at risk of serious harm or death.  The 2022 State Audit Report

15    studied 30 recent in-custody deaths and found that at least eight individuals "had

16    serious medical or mental health needs that health staff did not identify or

17    communicate to detention staff at intake."  Several of those people died within days

18    of entering the Jail.  In one instance, the intake nurse identified possible symptoms

19    of drug withdrawal in an arriving person, but failed to communicate the conclusion

20    to other staff, and the individual died a day later from complications of overdose—

21    without ever receiving medical care.[23]

22    54.    For example, when Plaintiff TAYLOR was booked into Jail custody in

23    2017, he was recovering from surgery for a compound fracture in his hand.  While

24    in the community, TAYLOR was scheduled to have a follow-up procedure to

25

26    _____

     [22] Jeff McDonald, Kelly Davis, *Persistent medical staffing shortages in San Diego jails are causing lapses in care, driving down morale*, SAN DIEGO UNION-TRIBUNE,

27    Sept. 4, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-09-04/jail-staff-shortages.

28    [23] State Audit Report at 20.

remove metal pieces from the surgery; however, the Jail refused to take him to the follow-up appointment or to provide other necessary care.  Additionally, Plaintiff TAYLOR had a large and visible hernia on his groin when he was booked into the Jail.  The hernia was very painful.  Unless TAYLOR used a hand to hold the herniated tissue, the hernia would dangle painfully away from his body.  The hernia continued to increase in size while TAYLOR was incarcerated, eventually becoming so large and painful that he was sometimes unable to defecate.  Despite TAYLOR's requests for medical treatment, the SHERIFF'S DEPARTMENT did not refer TAYLOR for surgery for the hernia.  Medical staff provided TAYLOR only with Motrin and Tylenol.  TAYLOR received surgery only after he was transferred to prison nearly six months later.

55.    When Plaintiff LANDERS arrived at the Jail, she informed medical staff that she had gout and neuropathy, and that she had been taking medications for each.  LANDERS was taking gabapentin to treat pain from her neuropathy.  For three weeks, Jail staff gave LANDERS only medication like acetaminophen, which was insufficient to treat her pain—and, as described below, denied LANDERS assistive devices to help with her mobility disability.  LANDERS did not receive gabapentin for three weeks, and did not receive any medication for gout until after that.  Records indicate that LANDERS was not ordered those medications and was not referred to the medical unit until after she met with Plaintiffs' counsel and counsel contacted JAIL DEFENDANTS and advocated for urgent action.  Even after the Jail ordered medication to treat her gout, the medication was listed as "not available" for several days, prolonging LANDERS's discomfort.

56.    The Jail fails to timely conduct intake screening of newly arriving incarcerated people.  The NCCHC Report found that the Jail was not compliant with NCCHC standards on medical intake and screening.  According to NCCHC, the Jail booking process often takes 8 hours after arrival, and can sometimes take 30 hours, which delays access to care for incarcerated people with medical needs far beyond

1 modern jail standards.[24]  Intake screening remains untimely.

2       57.     The SHERIFF'S DEPARTMENT lacks adequate policies and practices
3 to ensure that intake medical screening is confidential.  A 2018 report by the
4 COUNTY's own suicide prevention expert consultant, Lindsay Hayes, found that
5 intake screening areas at all three booking Jail facilities lacked sound
6 confidentiality, which compromises a patient's ability to respond candidly to
7 medical and mental health intake questions and prevents medical staff from
8 adequately identifying the person's serious medical needs.[25]  Upon information and
9 belief, the SHERIFF'S DEPARTMENT has failed to ensure that all intake booking
10 areas at the Jail facilities are confidential.

11       58.     The SHERIFF'S DEPARTMENT lacks adequate policies and practices
12 for reviewing arriving incarcerated people's medical history.  The SHERIFF'S
13 DEPARTMENT fails to ensure continuity of medical care for the many incarcerated
14 people receiving care through other COUNTY agencies or community providers.
15 The SHERIFF'S DEPARTMENT does not adequately train or supervise intake staff
16 to review an incarcerated person's prior medical records.  As a result, Jail intake
17 staff fail to conduct adequate reviews of prior booking information, which contrib-
18 utes to the SHERIFF'S DEPARTMENT's failure to identify current medical needs
19 and to treat them.

20       59.     The SHERIFF'S DEPARTMENT's policies and practices undermine
21 continuity of care when patients transfer between Jail facilities.  For example, when
22 an incarcerated person has a health care request pending at one facility and is
23 transferred to another, health care staff and contractors at the transferring facility
24 frequently shred and discard the person's pending health care request, rather than
25 transmit the request to the receiving facility.  Health care staff and contractors at the

26

27 ────────────────────
[24] NCCHC Report at 18.
28 [25] Hayes Report at 19-20.

transferring facility do not adequately communicate with staff and contractors at the receiving facility about the person's pending health care requests and needs. As a result, the SHERIFF'S DEPARTMENT fail to timely treat the serious and chronic medical needs of people transferred between the Jail facilities.

### D. The Sheriff's Department Fails to Provide Adequate Medical Care, Including Medication Assisted Treatment, for Incarcerated People With Substance Use Disorders

60.    By policy and practice, the SHERIFF'S DEPARTMENT fails to provide adequate medical treatment for incarcerated people with substance use disorders and to continue medically necessary treatments for people who were receiving care for substance use disorders prior to being booked into the Jail.  The SHERIFF'S DEPARTMENT lacks adequate policies and practices for the tracking and treatment of people with substance use disorders.  Upon information and belief, the SHERIFF'S DEPARTMENT does not adequately train its staff how to evaluate and treat incarcerated people with substance use disorders.

61.    Medication assisted treatment ("MAT") is a clinical course of treatment for opioid use disorder ("OUD").  MAT combines the provision of FDA-approved medications with counseling and therapy.  As noted by one of the health care companies bidding to provide services in the Jail in 2021, "three forms of FDA-approved medication (methadone, buprenorphine, and naltrexone) should ideally be available so that the best course of treatment can be determined for each individual." Buprenorphine is known by the brand name Suboxone, which is a combination medication that also includes the opioid blocker Naloxone to blunt intoxication and prevent cravings.[26]  Naltrexone is known by the brand name Vivitrol.  These MAT medications must be taken regularly to prevent individuals with OUD from experiencing cravings for opioids.  Counseling and therapy, including in individual

---

[26] *See* Peter Grinspoon, *5 myths about using Suboxone to treat opiate addiction*, *Harvard Health Publishing,* HARVARD HEALTH PUBLISHING: HARVARD MEDICAL SCHOOL, Oct. 7, 2021 https://www.health.harvard.edu/blog/5-myths-about-using-suboxone-to-treat-opiate-addiction-2018032014496 (accessed Jan. 23, 2022).

and group settings, are essential components of MAT that increase the patient's likelihood of avoiding relapse.  MAT saves lives by preventing accidental overdoses and can also reduce recidivism.  A National Institute of Health-funded study released in January 2022 found that in two Massachusetts jails, providing Suboxone to incarcerated people led to a 32% reduction in probation violations, reincarcerations, and court charges for those incarcerated people receiving Suboxone, as compared to incarcerated people who did not receive Suboxone.[27]  Yet the SHERIFF'S DEPARTMENT fails to provide timely access to Suboxone and other OUD treatments when such treatment is clinically necessary.

62.    One Supervisor for the COUNTY admitted in 2021 that in practice, the Jail facilities "presently don't do medication for addiction treatment, so if you come in and have substance use issues, you don't get the services and treatment you need to actually help you medically withdraw and then get on a program of sustained drug treatment when you come out."[28]  On information and belief, the SHERIFF'S DEPARTMENT has begun to provide MAT to a small fraction of incarcerated people with opioid use disorder—primarily those with active MAT prescriptions in state prison or immediately prior to their incarceration.  But the SHERIFF'S DEPARTMENT still fails to provide MAT to the vast majority of patients with opioid use disorder.  The Jail's failure to implement a comprehensive MAT program places incarcerated people at risk of serious harm and also constitutes discrimination in violation of the ADA.

63.    For example, Plaintiff SEPULVEDA became addicted to fentanyl

---

[27] National Institutes of Health, *Offering buprenorphine medication to people with opioid use disorder in jail may reduce rearrest and reconviction*, Jan. 18, 2022, https://www.nih.gov/news-events/news-releases/offering-buprenorphine-medication-people-opioid-use-disorder-jail-may-reduce-rearrest-reconviction.

[28] Gary Warth, Teri Figueroa, *A completely broken behavioral health system*, SAN DIEGO UNION-TRIBUNE, Oct. 3, 2021, https://www.sandiegouniontribune.com/news/public-safety/story/2021-10-03/steven-john-olson.

1   while in the Jail.  Beginning in March 2022, SEPULVEDA filed multiple sick call

2   requests and grievances requesting MAT and substance use counseling to help with

3   his addiction.  SEPULVEDA has not been started on MAT or seen a substance use

4   counselor.  In fact, Jail medical staff informed SEPULVEDA that the Jail does not

5   provide any counseling for substance use.  SEPULVEDA fears that he may die

6   without medical assistance to treat his addiction.  After SEPULVEDA asked for

7   help for his addiction in late March 2022, medical staff responded that the Jail does

8   not initiate MAT, and that he could obtain an outpatient referral once he is out of

9   Jail.  In response to a court order requiring the SHERIFF'S DEPARTMENT to

10  provide SEPULVEDA with medical treatment, spurred by his need for MAT, Jail

11  medical staff documented that he "is a candidate for MAT once we have the

12  program established and running," but "the Program is not available right now."

13        64.    The need to provide MAT in the Jail is clear.  Survey results indicate

14  that approximately 83% of men and 60% of female incarcerated people booked into

15  the Jail test positive for at least one illicit substance upon booking.[29]  Without

16  adequate treatment for substance use disorders, including MAT, incarcerated people

17  are more likely to relapse—a problem exacerbated by the ready availability of

18  fentanyl and other drugs inside the Jail.  In 2021, there were at least 204 suspected

19  overdoses in the Jail,[30] at least four of them fatal.  From 2019-2021, at least 15

20  people died in the Jail from drug overdoses.  In 2022, the SHERIFF'S

21  DEPARTMENT has reported using Narcan in connection with six deaths,

22  suggesting each was a fatal overdose.  Already in 2022, there have been 180

23

24

25

26  [29] SANDAG, *Report on 2021 Adult Arrestee Drug Use in the San Diego Region*,
    July 2022 at 4,
    https://www.sandag.org/uploads/publicationid/publicationid_4790_29577.pdf.

27  [30] *See* San Diego County Sheriff's Department, Suspected Overdose Incidents with
    Naloxone Deployment (Dec. 30, 2021),

28  https://www.sdsheriff.gov/home/showpublisheddocument/4611.

suspected overdoses, on pace to exceed last year's total.[31]

65.    When Jail staff or contractors offer medication for substance use disorders, it is untimely, reactive, and not paired with addiction counseling or therapy.  For example, Plaintiff NORWOOD has been addicted to heroin for over a decade and diagnosed with opioid dependence.  In the community, an addiction specialist prescribed Suboxone to NORWOOD about ten years ago and NORWOOD has had Suboxone prescriptions regularly since that time.  Suboxone helps NORWOOD manage his cravings for opioids, avoid using heroin, and live a normal, functioning life.  When NORWOOD is managing his addiction well in the community, he takes Suboxone daily.  When NORWOOD arrived at the Jail on June 22, 2021, he was clean and had last used heroin three months prior.

66.    On July 3, 2021, NORWOOD asked a health care staff member about receiving Suboxone to help manage his cravings.  NORWOOD was informed that the Jail would not provide him Suboxone.  Without Suboxone or any other medication for his opioid dependence, or any substance use counseling, NORWOOD experienced cravings.  On July 17, 2021, NORWOOD had a fentanyl overdose at the Jail.  NORWOOD lost consciousness and was rushed to the hospital. Only after NORWOOD's overdose did Jail medical staff offer NORWOOD Vivitrol—not Suboxone, which NORWOOD finds works better for him—for his opioid dependence.  In August 2021, NORWOOD asked to see an addiction specialist and a nurse told him that he was scheduled for the specialist. NORWOOD never saw an addiction specialist during his incarceration and the SHERIFF'S DEPARTMENT failed to provide him with substance use counseling or group treatment to help him manage his disorder.  NORWOOD is now receiving MAT while incarcerated at CDCR.

---

[31] *See* San Diego County Sheriff's Department, Suspected Overdose Incidents with Naloxone Deployment (Nov. 11, 2022), https://www.sdsheriff.gov/home/showpublisheddocument/5928.

E.   **The Sheriff's Department Fails to Provide Adequate Medical Care for Incarcerated People Entering the Jail Under the Influence of Alcohol and Drugs**

67.   By policy and practice, the SHERIFF'S DEPARTMENT fails to provide adequate withdrawal treatment for incarcerated people who enter the Jail under the influence of alcohol, opiates, benzodiazepines, and other substances. The SHERIFF'S DEPARTMENT's policies, practices, and procedures for monitoring and treating incarcerated people in withdrawal are inadequate. The SHERIFF'S DEPARTMENT does not adequately train staff, including custody staff, how to evaluate, treat, and monitor incarcerated people in withdrawal. The SHERIFF'S DEPARTMENT is well aware that newly booked persons require adequate withdrawal protocols: a survey indicated that in 2021, approximately 83% of men and 60% of women arriving at the Jail tested positive for at least one substance.[32]

68.   The SHERIFF'S DEPARTMENT's practices and training for implementing alcohol and opiate withdrawal protocols are inadequate. Although the SHERIFF'S DEPARTMENT has a written protocol for alcohol withdrawal, on information and belief, incarcerated people in withdrawal from alcohol do not always receive these medications when clinically indicated. Similarly, although the SHERIFF'S DEPARTMENT's written protocol provides that incarcerated people in withdrawal from opiates should receive "comfort" medications such as Imodium or Zofran, in practice, many incarcerated people in opiate withdrawal do not receive those medications. Nor does the Jail's protocol include medications that are more effective in preventing opiate withdrawal, such as methadone. These systemic practices and failures to adequately train and supervise staff and contractors place incarcerated people at risk of serious harm or death.

69.   The SHERIFF'S DEPARTMENT also lacks adequate policies and

---

[32] SANDAG, *Report on 2021 Adult Arrestee Drug Use in the San Diego Region*, July 2022 at 4, https://www.sandag.org/uploads/publicationid/publicationid_4790_29577.pdf.

practices for observing incarcerated people in withdrawal.  The NCCHC Report found that nurse stations at the Jail do not enable medical staff to visually monitor incarcerated people in withdrawal.[33]  NCCHC also found that custody staff are not informed when incarcerated people are in withdrawal.  Today, although the booking Jail facilities have designated areas for incarcerated people actively under the influence of substances, incarcerated people who are withdrawing from alcohol and drugs are regularly scattered throughout various housing units in the Jail facilities, preventing adequate monitoring and timely interventions.  The Jail lacks adequate observation cells where custody and medical staff can regularly observe incarcerated people in alcohol or opiate withdrawal.  This makes it more difficult for medical staff to track and monitor incarcerated people in withdrawal.  In practice, medical staff fail to regularly monitor incarcerated people in alcohol withdrawal, and instead often perform monitoring checks at most once per shift.  This is far below modern standards.  Moreover, by policy and practice, a person can be kept in a sobering cell for more than 24 hours before they are even evaluated by a physician.

70.    These inadequate withdrawal practices and inadequate training place incarcerated people at risk of serious harm or even death.  For example, Elisa Serna died at Las Colinas in November 2019 after she did not receive prompt and adequate withdrawal treatment.  Serna informed Jail medical staff during booking that she had used heroin, Xanax, and alcohol in the hours before her arrest, but she received only nausea medication and was instructed to drink water, according to a lawsuit filed by Serna's family.  After booking, Serna suffered for days from severe dehydration and other medical issues without adequate medical attention for her withdrawal symptoms.  While in this state of crisis, Serna collapsed in her cell and hit her head.  She died alone after a deputy and nurse witnessed Serna fall but failed

---

[33] NCCHC Report at 26, 60.

to provide medical care.[34]  A doctor falsely accused Serna of "faking" her illness. Serna died due to the very problems with the Jail's practices and training for treating withdrawal of which the SHERIFF'S DEPARTMENT has long been aware.

71.     The SHERIFF'S DEPARTMENT's failure to provide adequate medical care to people entering the Jail under the influence of alcohol and drugs is longstanding.  In 2015, a jury awarded $3 million to the family of Daniel Sisson, who died at Vista after having an asthma attack precipitated by heroin withdrawal. Sisson's family had alleged that Jail staff failed to adequately monitor Sisson while he was in withdrawal.[35]  CLERB found that in 2017, Jail staff failed to timely place Bruce Stucki on an alcohol withdrawal protocol, even though Stucki had been arrested for public intoxication and was known to have alcohol dependence.  Two days after booking, Jail staff found Stucki "hallucinating in his cell" and finally gave him medication to ease the symptoms of alcohol withdrawal.  Jail staff's intervention came far too late, and Stucki died several hours later.[36]  In 2018, James Athos and Alan Christopher Washam each died from perforated ulcers—which can occur upon the sudden cessation of opiate use—while in heroin withdrawal.

72.     In 2021, Omar Moreno Arroyo died at Central while under the influence of methamphetamine after Jail staff failed to adequately monitor him or provide him any medical care.  Moreno Arroyo's widow had originally called police because Moreno Arroyo was acting bizarrely and was in a mental health crisis. Moreno Arroyo was arrested for drug-related charges, which would not have met

---

[34] Jeff McDonald, Kelly Davis, *Nurse charged with involuntary manslaughter in 2019 jail death,*" SAN DIEGO UNION-TRIBUNE, Nov. 4, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-11-04/nurse-charged-with-involuntary-manslaughter-in-2019-jail-death.

[35] Kristina Davis, *County asks judge to overturn $3m verdict*: *San Diego Union-Tribune*, Jan. 3, 2015, https://www.sandiegouniontribune.com/sdut-county-judgment-sisson-verdict-jail-death-2015jan03-story.html.

[36] Citizens' Law Enforcement Review Board, August 2018 Findings at 1-2, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/0818%20findings.pdf.

the Jail's booking acceptance criteria; however, SHERIFF'S DEPARTMENT staff changed Moreno Arroyo's arresting charges so that they could book and incarcerate him.  According to a lawsuit by Moreno Arroyo's widow, despite his obvious substance use and medical distress—as evidenced by the documented basis for his detention—he was left in a holding cell and not placed under medical observation. Staff also failed to provide Moreno Arroyo any medical attention for his unusually high heart rate, even though his widow had informed deputies that he had a heart condition and gave them Moreno Arroyo's medication.  While in the holding cell, intoxicated and unmonitored, Moreno Arroyo choked on his COVID-19 mask and died.[37]

73.     The availability of illicit and dangerous drugs in the Jail, like fentanyl, compounds the failures of the SHERIFF'S DEPARTMENT's withdrawal practices and training.  Upon information and belief, where the Jail fails to provide withdrawal treatment, incarcerated people in withdrawal seek out contraband and drugs in the Jail to relieve their symptoms.  For example, Saxon Rodriguez—who was homeless and had mental illness—died of a fentanyl overdose in July 2021 just days after arriving at Central.  In a news article, Rodriguez's sister stated that Rodriguez was likely withdrawing and that he did not receive adequate medical care.[38]  That same month, Ronaldino Estrada died of a fentanyl overdose at Vista, just three days after arriving at the Jail.[39]

---

[37] Kelly Davis, Jeff McDonald, *Widow of deceased inmate files wrongful-death lawsuit against San Diego sheriff*, SAN DIEGO UNION-TRIBUNE, Nov. 19, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-11-19/widow-of-deceased-inmate-files-wrongful-death-lawsuit-against-san-diego-sheriff.

[38] Gary Warth, *San Diego march against police brutality remembers those killed*, SAN DIEGO UNION-TRIBUNE, Oct. 23, 2021, https://www.sandiegouniontribune.com/news/public-safety/story/2021-10-23/san-diego-march-against-police-brutality-remembers-those-killed.

[39] David Hernandez, *Autopsy report: Vista inmate died of fentanyl intoxication*, SAN DIEGO UNION-TRIBUNE, Dec. 7, 2021, https://www.sandiegouniontribune.com/news/public-safety/story/2021-12-07/authorities-vista-inmate-died-of-fentanyl-intoxication.

**F.     The Sheriff's Department Fails to Continue Medically Necessary Medications and Treatments for Incarcerated People Upon Their Arrival at the Jail, Resulting in Long Delays and Patient Harm**

74.     The SHERIFF'S DEPARTMENT's policies and practices for continuing medically necessary treatments for incarcerated people who arrive at the Jail are inadequate.  The SHERIFF's DEPARTMENT fails to continue medically necessary treatments for incarcerated people who were taking certain medications and receiving care for chronic or serious conditions immediately prior to being booked into the Jail.  Upon information and belief, the SHERIFF'S DEPARTMENT does not adequately train medical staff how to evaluate and treat incarcerated people who were undergoing care for chronic or serious conditions immediately prior to being booked into the Jail.

75.     Jail staff routinely fail to provide medications that incarcerated people have been using to treat conditions outside of the Jail, even when the incarcerated people themselves, doctors, family members, or other persons bring their medications and/or valid prescriptions to the Jail.  The NCCHC Report found that the SHERIFF'S DEPARTMENT fails to timely provide essential medications to incarcerated people.[40]  The NCCHC Report also found that during lockdowns at the Jail, nurses are unable to provide medications to incarcerated people, and that the SHERIFF'S DEPARTMENT lacks procedures to determine which medications are essential during those lockdowns.[41]

76.     The failure to ensure adequate continuity of care, treatment, and medication places incarcerated people at substantial risk of serious harm.  For example, Michael Wilson died in February 2019 after Jail staff and contractors failed to provide him with medically necessary treatment for his chronic heart condition.  According to a lawsuit filed by Wilson's family, he had hypertrophic

---

[40] NCCHC Report at 16, 50, 116.

[41] *Id.* at 16.

cardiomyopathy and regularly took medications that kept him alive.  Wilson was booked into Central to serve a two-week sentence for a minor offense.  The judge in Wilson's case even ordered Jail staff to ensure that Wilson received treatment and attention for his serious medical issues.  However, staff failed to ensure that Wilson received his heart medications, and instead gave him cough syrup.  Within a few days of arriving at Central, Wilson collapsed and died.[42]

77.    Plaintiff LOPEZ received a kidney transplant in November 2001 and since then has taken medication daily to ensure that his body does not reject the transplant.  After LOPEZ arrived at Vista in October 2019, Jail staff failed to provide LOPEZ with his medications for at least four days.  Even after LOPEZ eventually began receiving his medication, medical staff were often untimely in providing it.  The Jail did not maintain adequate stock of LOPEZ's medications and delayed in ordering refills, which meant that LOPEZ sometimes went three days without taking his daily medications.  This failure contributed to a decline in LOPEZ's health in April 2020.  He lost 15-20 pounds, had a low sodium count, was physically weak and constantly thirsty, and had to be seen several times in the hospital by a kidney specialist.  As a result of the Jail's consistent failures to provide LOPEZ with his essential medications, the judge in LOPEZ's criminal case issued a court order requiring the Jail to keep a stockpile of LOPEZ's medications on site to ensure they did not run out.

78.    Similarly, Plaintiff ARCHULETA has hypertension and takes medication to maintain his blood pressure at a healthy level.  On numerous occasions, the Jail failed to continue ARCHULETA's blood pressure medication for several days, apparently because they forgot to reorder the medication and did not have an adequate backup supply on hand.  In May 2021, for example, the Jail ran out of ARCHULETA's medication and did not reorder it until ARCHULETA filed a

---

[42] *Estate of Wilson v. County of San Diego*, 20-cv-00457-BAS-DEB (S.D. Cal.), Dkt. 1.

grievance asking about the medication.

79.    Plaintiff DUNSMORE has been diagnosed with diabetes.  Immediately prior to being incarcerated at the Jail in December 2019, DUNSMORE was receiving four shots of insulin daily to treat his diabetes.  However, shortly after DUNSMORE was booked into custody, Jail medical providers terminated DUNSMORE's daily insulin shots and instead provided DUNSMORE with insulin shots only after his blood sugar was measured over 250 mg/dL.  This clinically dangerous change of treatment caused DUNSMORE to develop symptoms indicating mismanagement of diabetes: he became fatigued, lethargic, and thirsty, and was frequently urinating.  This diabetes management regimen is completely inconsistent with modern standards of care, including in detention settings.[43]

80.    For over two years, the SHERIFF'S DEPARTMENT failed to provide Plaintiff EDWARDS with a CPAP machine, which he uses to breathe at night due to his severe sleep apnea. EDWARDS informed staff of this when he arrived at the Jail in July 2019, but the SHERIFF'S DEPARTMENT refused to provide him with a CPAP machine.  EDWARDS filed sick call slips and urgent grievances for months. The SHERIFF'S DEPARTMENT initially responded by stating that they first needed to monitor his oxygen in the medical unit before referring him out for a sleep study.  Because the medical unit was full and had a waitlist, EDWARDS waited two months before being admitted to the medical unit for oxygen monitoring.  After monitoring his oxygen, the SHERIFF'S DEPARTMENT failed to refer EDWARDS to a formal sleep study or provide a CPAP machine.  EDWARDS continued to file grievances, noting in a February 2020 grievance that "I'm having bad episodes, when I sleep I stop breathing.  I wake up clenching my heart …  Need CPAP." When the Jail finally referred EDWARDS to a sleep study at Sleep Data

---

[43] American Diabetes Association, *Position Statement: Diabetes Management in Detention Facilities*, Diabetes Care 37 (Suppl. 1) (Oct. 2021), https://diabetes.org/sites/default/files/2021-11/ADA-position-statement-diabetes-management-detention-settings-2021.pdf.

Diagnostics, an outside provider, on August 28, 2020, the study confirmed that he has sleep apnea and stated that a CPAP machine "is the most effective therapy for obstructive sleep apnea." Even then, the SHERIFF'S DEPARTMENT did not give EDWARDS a CPAP machine until late July 2021—two years after he was booked. During those two years, EDWARDS was unable to get a full night's sleep, leading to migraines, dizziness, and confusion. He often woke up gasping for air; sometimes his cellmates would have to wake him when he stopped breathing. EDWARDS also had pains and a racing heart, which he describes as feeling like "mini-heart attacks." EDWARDS now has short-term memory loss and has trouble sleeping and thinking properly. Upon information and belief, the SHERIFF'S DEPARTMENT continues to deny incarcerated people at the Jail access to CPAP machines when clinically necessary, for reasons that include waitlists for housing units with electrical access to operate a CPAP machine. Incarcerated people face unnecessary pain and risks of grave harm as a result.

81.    As a further example, Plaintiff NELSON, who suffered a serious spinal injury in a vehicle accident shortly before his arrest, had been prescribed pain medication by doctors at an outside hospital. Jail medical staff and contractors abruptly discontinued that prescribed medication and instead gave NELSON varying dosages of less effective medications that left him in excruciating pain during his first weeks in the Jail and put him in danger of withdrawal complications.

82.    Even where Jail staff do continue community-prescribed medications or treatments, the SHERIFF'S DEPARTMENT lacks adequate policies and practices to prevent gaps in medication and treatment. For example, a person who was incarcerated at Central in or around September 2021 uses catheters for a medical condition. However, the SHERIFF'S DEPARTMENT initially refused to provide that incarcerated person with more than one catheter at a time, forcing him to reuse the catheters when replacements were not available, which caused infections. When the SHERIFF'S DEPARTMENT eventually gave the incarcerated

1   person two catheters at a time, they failed to give him clean medical gloves to use

2   when changing the catheters.  That practice continued to put the incarcerated person

3   at risk of infection—especially given the filthy conditions in his cell, which was

4   piled high with trash that the SHERIFF'S DEPARTMENT failed to remove.

5        83.    Although JAIL DEFENDANTS have contracted with NaphCare to

6   furnish medication for incarcerated people in the Jail, JAIL DEFENDANTS are

7   ultimately legally and constitutionally responsible for ensuring that incarcerated

8   people timely receive medications and other essential treatments.  JAIL

9   DEFENDANTS' contract with NaphCare requires NaphCare to collaborate on

10  program design, and states that the SHERIFF'S DEPARTMENT is responsible for

11  medication inventory.  The SHERIFF'S DEPARTMENT fails to maintain adequate

12  supplies of essential medications so that incarcerated people have timely access to

13  medications in the event that there are delays obtaining medication.  Frequently,

14  health care staff fail to take remedial actions when medications are delayed.  Nurses

15  who deliver medications mark records as "no medications available" for days at a

16  time, but fail to take steps to obtain those medications for their patients.

17       **G.    The Sheriff's Department Does Not Provide Incarcerated People
             with a Reliable and Timely Way to Alert Health Care Staff of**
18           **Their Medical Needs**

19       84.    By policy and practice, the SHERIFF'S DEPARTMENT fails to

20  provide a timely and reliable way for incarcerated people to alert health care staff

21  and contractors of their need for evaluation of medical problems.  The SHERIFF'S

22  DEPARTMENT has failed to implement appropriate triage procedures to ensure

23  that emergent and urgent medical needs receive timely care, and that non-emergency

24  medical needs are attended to before they develop into emergencies.  Upon

25  information and belief, the SHERIFF'S DEPARTMENT fails to adequately train

26  staff how to timely and adequately respond to incarcerated people's requests for

27  medical evaluation.

28       85.    To request medical care, incarcerated people at the Jail submit a form

called a "sick call request."  Once medical staff receive the request form, medical staff assign the request a triage level without assessing the patient's symptoms in person.  NCCHC found that many incarcerated people wait over a week to see a nurse or physician after submitting a sick call request, and that some wait well over two weeks before being seen—timelines that fail to comply with the relevant standards of care in a jail system.[44]  NCCHC found George Bailey had a backlog of over 300 sick call requests that had not yet been addressed in person and meant that "patients' serious health care needs are being delayed."[45]  NCCHC also found Las Colinas had a backlog of over 150 sick call requests.  There, incarcerated people waited an average of 4-8 days to see medical staff even for requests triaged as Level 1 – the most urgent requests that require same-day or next-day evaluation.[46] These delays in responding to sick call requests persist.  The 2022 State Audit Report found that the SHERIFF'S DEPARTMENT often failed to follow up on requests for medical or mental health services "even though these individuals often had serious needs that, when unmet, may have contributed to their deaths."[47]  In multiple cases, individuals reported serious symptoms of medical crisis several times over a period of weeks, but did not receive physician attention for those symptoms before dying.[48]

86.     Jail medical staff's failure to timely respond to health care requests is caused, at least in part, by the SHERIFF'S DEPARTMENT's failure to create an effective tracking and scheduling system for health care appointments.  In practice, no standardized protocols are used to determine when incarcerated people should receive a face-to-face appointment with a nurse or other medical staff member.

---

[44] NCCHC Report at 21.
[45] Id. at 55.
[46] Id. at 73, 88.
[47] State Audit Report at 21.
[48] Id. at 21-22.

1   Consequently, health care providers arbitrarily determine whether the content of a
2   sick call request form, often written by an incarcerated person who may not be able
3   to adequately express themselves in writing, warrants an examination.  The
4   SHERIFF'S DEPARTMENT does not adequately train health care providers how to
5   review, process, and respond to health care request forms submitted by incarcerated
6   people.  Medical staff's failure to timely respond to health care requests—or in some
7   cases to fail to respond at all to health care requests—jeopardizes the health and
8   safety of incarcerated people.

9         87.   For example, Plaintiff EDWARDS submitted several sick call requests
10  in late 2020 and early 2021 about his sleep apnea and need for a CPAP machine, but
11  Jail staff failed to respond to many of his sick call requests and at other times told
12  EDWARDS he was scheduled for a future appointment, which was not actually
13  made available to him for almost five months.  Without a CPAP machine to treat his
14  sleep apnea, EDWARDS suffered for two years from heart pains, fitful sleep, and
15  frequent terrifying episodes where he was unable to breathe.

16        88.   Plaintiff LANDERS has been diagnosed with gout and neuropathy.  On
17  June 30, 2022, LANDERS filed a sick call request complaining about severe pain in
18  her legs.  Jail staff finally saw LANDERS on July 8, 2022, only after Plaintiffs'
19  counsel sent an urgent message to the JAIL DEFENDANTS on LANDERS's
20  behalf.  Jail records indicate that staff did not mark LANDERS's sick call request as
21  "received" until July 14, 2022, which suggests that LANDERS would not have
22  received care for several weeks absent counsel's intervention.  In the interim,
23  LANDERS suffered from severe pain in her ankles and legs that limited her
24  mobility and ability to perform daily functions like using the toilet and shower.  Jail
25  staff have also run out of the medication LANDERS takes to treat her back pain,
26  forcing her to file new sick call requests simply to stay on her existing medication.

27        89.   As another example, Plaintiff ANDRADE, who suffered multiple head
28  injuries while in the Jail both from falling out of his upper bunk and from being

assaulted by other incarcerated people, did not receive prompt care for the aftereffects of those injuries.  In particular, after his second concussion, ANDRADE began feeling extreme nausea and dizziness that prevented him from standing up or walking, occasionally making it impossible for him to see.  ANDRADE repeatedly submitted requests to see a doctor; however, he was not evaluated for three weeks.  Finally, medical staff diagnosed Plaintiff ANDRADE with vertigo and prescribed him medication.  However, Jail staff repeatedly prescribed him medication lasting one week or less, requiring ANDRADE to repeatedly request renewals.

90.    In emergent situations, incarcerated people sometimes request health care from the nurses who pass out medication.  However, rather than promptly contacting the sick call nurses or physicians on duty, medication pass nurses often dismiss the person's request and instruct them to fill out a sick call request, which delays their access to care.  For example, in 2021, one person began to develop an infection in a wound he had suffered in an attack from another incarcerated person.  For days, nurses distributing medication ignored the person's pleas that they further examine the wound, as it was inflamed and oozing pus.  Once the man finally received medical attention, he was immediately transferred to an outside for hospital for multiple surgeries to remove MRSA in the wound.

91.    In other emergency situations, incarcerated people sometimes request health care from custody staff when medical staff are not immediately available.  Rather than immediately contact health care staff to determine whether emergency care is required, custody staff often dismiss the person's request and instruct them to fill out a sick call request.  For example, in a lawsuit over COVID-19 conditions at the Jail, Thomas Foster reported that he received no response to his sick call request reporting symptoms of COVID-19.  Foster had a headache and lost his sense of taste and smell.  Foster asked staff for Tylenol, but was told he had to submit a sick call request form.  Foster submitted a sick call request, but he never received a response and never received any Tylenol or other medication to treat him.

92.     In January 2022, CLERB found that Anthony Chon died after two deputies failed to adequately respond to his requests for medical assistance. Chon, who was housed in a special mental health unit at the Jail, complained to one deputy of trouble breathing. The deputy told Chon he would seek medical help for him, but in fact passed that duty on to another deputy. The second deputy chose not to call for medical attention, but instead brought Chon to the recreation area for fresh air[49] because the deputy decided that Chon had anxiety about his confinement. Minutes after arriving at the recreation area, Chon collapsed, and he died that day of a pulmonary embolism.[50]

93.     To take another example, Plaintiff ZOERNER began to experience heart palpitations, common in persons with alcohol dependence, in June 2021. Medical staff at Tri-City Hospital treated ZOERNER by replenishing her magnesium levels and instructed her to request assistance from Jail staff if she experienced heart palpitations once back at the Jail. When ZOERNER returned to the Jail and had a heart palpitation episode, she pushed the emergency call button located in her cell, but custody staff did not respond. ZOERNER was scared and overwhelmed by the heart palpitations, and began to bang on the walls of the cell. She continued to push the emergency call button, but received no response. ZOERNER thereafter began to bang her head against the cell window, drawing blood. Only once ZOERNER began to self-harm did staff respond and then transport her to the hospital to address the heart palpitations.

94.     Custody staff at times respond callously to requests for emergency assistance. In one instance in 2021, after a man who is HIV positive was deprived of his medication, he had to yell to custody staff that he needed HIV medication.

---

[49] The recreation area at Central is not outdoors, but does have vents that allow in fresh air.

[50] Citizens' Law Enforcement Review Board, January 2022 Findings at 1-2, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2022/0122%20Findings.pdf.

1    The deputy laughed at the man and said aloud to the entire housing unit "That guy is

2    yelling that he has AIDS."

3    **H.     The Sheriff's Department Fails to Maintain Adequate, Accurate, and Complete Medical Records, Which Compromises the Delivery of Care**

4

5    95.     By policy and practice, the SHERIFF'S DEPARTMENT fails to

6    maintain adequate, accurate, and complete medical records.  The SHERIFF'S

7    DEPARTMENT's policies and practices for maintaining adequate medical records

8    are inadequate.  Upon information and belief, the SHERIFF'S DEPARTMENT fails

9    to adequately train staff how to maintain adequate medical records.  As a result of

10   the failure to maintain adequate medical records, incarcerated people suffer from a

11   substantial risk of misdiagnosis, dangerous mistakes, and unnecessary delays in

12   care.

13   96.     For example, Plaintiff ANDRADE suffered multiple concussions while

14   in the Jail, both from falling out of his upper bunk and from being assaulted.  After

15   an initial fall from his bunk in June 2022, he was sent to the hospital and informed

16   by medical staff at the hospital that he sustained a concussion.  His discharge

17   instructions also include a highlighted section for "concussion" under "injury

18   specific instructions."  However, ANDRADE's progress notes as maintained by the

19   SHERIFF'S DEPARTMENT make no reference to the concussion.  Similarly, only

20   days after his first hospital visit, ANDRADE was assaulted and again taken to the

21   hospital, where hospital staff noted that his chief complaint was "concussion/head

22   pain" and again provided him with specific discharge instructions for "concussion."

23   Again, ANDRADE's progress notes as maintained by the SHERIFF'S

24   DEPARTMENT make no reference to the possible concussion, essential medical

25   history information for providing care moving forward.

26   97.     The NCCHC Report found numerous deficiencies in this area that

27   indicated a substandard system of care.  NCCHC found that Jail medical staff failed

28   to document when or whether medical staff screened an incarcerated person arriving

from a different Jail facility.[51]  NCCHC found that the SHERIFF'S DEPARTMENT lacked logs and tracking processes to ensure that incarcerated people referred to mental health evaluations were actually seen by the mental health team.[52]  NCCHC also found that Jail medical staff failed to document in medical records any medical checks of incarcerated people in administrative segregation units.[53]

### I.   Jail Defendants Lack Sufficient Contracts with Community Providers to Provide Adequate Medical Care to Incarcerated People

98.   JAIL DEFENDANTS fail to maintain sufficient contracts with community medical providers to allow Jail medical providers to refer incarcerated people with chronic and emergent medical needs to those community providers when the Jail medical units are full or do not have the resources to provide necessary treatment.  Frequently, the Jail has more individuals requiring placement in medical housing units than beds available.  Medical housing units are designed for incarcerated people who require significant daily monitoring, medication, and/or therapy, or assistance with activities of daily living (*e.g.*, skilled nursing), such as people with open wounds that require regular cleaning and changing, those who have returned from an outside hospital, or who use medical devices like a CPAP machine.  However, due to insufficient medical housing beds, incarcerated people are placed on waitlists for medical housing beds.  By policy, SHERIFF'S DEPARTMENT custody or command staff can place a person classified for administrative segregation in a medical observation unit.  This policy removes medical staff from decisions about placement in medical units and limits access to the medical unit for people with serious medical needs.  These practices place incarcerated people at risk of serious harm.

99.   For example, in or around January 2022, a man at Central with sleep

---

[51] NCCHC at 19.

[52] *Id*. at 20.

[53] *Id*. at 22.

apnea and who requires a CPAP machine was denied access to a machine because the medical observation unit was full.  Incarcerated people with CPAP machines must be housed in the medical observation unit, but the person was told the unit was full.  At that time, at least two people in the Central medical observation unit were housed there not for medical reasons, but rather based on custody staff's decision to house them in the medical unit—where they are single-celled—due to behavioral issues or because their case was high-profile.  This custody-driven practice directly and further undermines the delivery of medical care to those who need it.

100.   Because JAIL DEFENDANTS lack adequate medical beds within the Jail, the SHERIFF'S DEPARTMENT sometimes uses administrative segregation cells as "medical overflow."  For example, one incarcerated person who had surgery at Tri-City Hospital in 2021 was returned to Vista's medical unit for two weeks, and then—before healing—was transferred to a "medical overflow" administrative segregation cell.  In segregation, the person was subject to punitive conditions with very little out-of-cell time, and did not receive adequate medical attention.  Later, the person had to return to the hospital for additional surgeries when his wound became reinfected while he languished in the "medical overflow" administrative segregation cell.

**J.    The Sheriff's Department Fails to Provide Constitutionally Required Confidentiality in the Delivery of Medical Care**

101.   The SHERIFF'S DEPARTMENT fails to provide medical care in confidential settings.  The SHERIFF'S DEPARTMENT's policies and practices for medical encounters between incarcerated patients and medical staff are inadequate.  The SHERIFF'S DEPARTMENT fails to train medical care staff how to conduct confidential meetings with incarcerated patients.  The NCCHC Report found that encounters between Jail medical staff and incarcerated people were frequently not

confidential.[54]  During medical encounters, custody staff were nearby, which, as NCCHC explained, "compromises privacy and may prevent a provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis."[55]  Years later, Jail medical staff and contractors still hold the vast majority of medical appointments in non-confidential settings.  For example, Plaintiff LEVY's medical encounters with physicians, nurses, and mental health clinicians almost always occurred through the food slot in her cell.  During these encounters, a deputy stood directly outside the cell.  Deputies have even chimed in with comments on the conversations between incarcerated people and medical staff.

102.   As a further example, Plaintiff TAYLOR reported seeing blood in his stool in May 2022 and regularly seeing blood in his urine beginning in September 2022.  After TAYLOR submitted a sick call request on this issue, Jail staff scheduled him only for a non-confidential visit, which occurred at the gate to the dayroom, while deputies and other incarcerated people were standing nearby.  The nurse conducting the appointment asked TAYLOR to pull down his pants so she could examine him in full view of the other people gathered there.  Because TAYLOR was embarrassed and uncomfortable with the lack of privacy, he declined to expose himself for the examination.

103.   Other incarcerated people report that nurses and nurse practitioners come to the front gate of their dorms for medical visits, in full view of other incarcerated people and with no auditory privacy.

**K.     The Sheriff's Department Fails to Provide Adequate Diagnostic Care to Incarcerated People, Including Failing to Appropriately Refer Incarcerated People to Outside Specialists When Necessary**

104.   By policy and practice, the SHERIFF'S DEPARTMENT fails to order diagnostic testing when medically necessary, creating an unreasonable risk of harm

---

[54] NCCHC Report at 8-9, 42.

[55] *Id.* at 43.

to incarcerated people.  The SHERIFF'S DEPARTMENT fails to adequately train staff as to when, and under what circumstances, to order diagnostic testing.  As described above, Jail staff waited over a year to order a sleep study for Plaintiff EDWARDS, which confirmed his sleep apnea diagnosis and need for a CPAP machine.  Jail medical staff and contractors also fail to refer incarcerated people to medical specialists or to an outside medical center when medically necessary.  The SHERIFF'S DEPARTMENT's policies and practices for referring incarcerated people to specialists or outside providers are inadequate.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train medical staff and contractors regarding when it is appropriate to refer incarcerated people to medical specialists or outside medical centers.

105.   Another incarcerated person experienced substantial delays in referral to outside specialists to address back problems, causing him to endure severe pain for months.  In fall 2021, the person filed a sick call request informing medical that he was experiencing back and leg pain similar to pain he had in 2019 before a prior back surgery.  A nurse practitioner told the person that he should "just deal with" the pain, in a non-confidential appointment.  SHERIFF'S DEPARTMENT medical staff referred the person for an MRI and orthopedist appointment, but the MRI was constantly rescheduled and delayed for almost three months.  The incarcerated person developed urinary incontinence, which he believed resulted from his back issues, and frequently went "man down" due to unbearable pain.  In April 2022, the incarcerated person met with an orthopedic surgeon, who told him "I can only imagine how much pain you're in" and scheduled surgery on an urgent basis.

106.   Plaintiff LEVY—who has a history of pituitary brain tumors and had surgery for such a tumor while incarcerated at the Jail in 2015—began to experience familiar symptoms of pituitary gland growth in late 2019.  LEVY had severe headaches and was dizzy, and her menstruation cycle was irregular.  Lab results showed elevated prolactin levels, which are indicative of tumor growth.  When

1   LEVY asked Jail medical staff about seeing an endocrinologist, she was told

2   "You're not dying, not an emergency."  Throughout 2020, LEVY wrote sick call

3   requests and grievances asking to see a specialist for her ongoing headaches.  Staff

4   repeatedly told LEVY that she was scheduled, but LEVY did not see an

5   endocrinologist during 2020.  In February 2021, after long delays, Jail medical staff

6   referred LEVY for an MRI, which revealed a pituitary tumor and led to an "urgent"

7   follow-up referral to the endocrinologist.  Even then, LEVY did not see an

8   endocrinologist until June 2021—a full four months later.

9       107.   Prior to his incarceration, Plaintiff ARCHULETA had been referred for

10  neck surgery by Dr. David J. Smith of the San Diego Comprehensive Pain

11  Management Center.  The day ARCHULETA arrived at the Jail in July 2019,

12  wearing a neck brace, he informed medical staff that he had a spinal injury that

13  requires neck surgery.  However, the SHERIFF'S DEPARTMENT failed to obtain

14  any records related to Dr. Smith's care of ARCHULETA, even after he submitted

15  another sick call request form in late July 2019 reminding them of his neck issues.

16  Without surgery, ARCHULETA has trouble turning his head to the left and cannot

17  sit upright for extended periods of time.  In August 2019, medical scans taken by the

18  Jail noted "severe degenerative disc disease" in ARCHULETA'S cervical spine.

19  Yet the SHERIFF'S DEPARTMENT never referred ARCHULETA for surgery or

20  outside treatment, nor provided ARCHULETA physical therapy.  As another

21  example, Plaintiff CLARK was diagnosed with hydroceles, inflammation in his

22  scrotum, via an ultrasound while in the Jail in November 2021.  CLARK did not

23  receive adequate treatment for the inflammation at the Jail.  CLARK did not see a

24  urologist until approximately late March 2022.  That urologist recommended that

25  CLARK have surgery to drain fluid from his scrotum.  In or around May or June

26  2022, CLARK went for a pre-surgery appointment, and assumed that his surgery

27  was proceeding as scheduled.  However, in early July 2022, Jail staff informed

28  CLARK that he would not receive the surgery until out of the Jail.  CLARK

experienced severe pain from the inflammation, which made it difficult for him to sleep, use the bathroom, and move around his housing unit.

108.    As another example, Plaintiff ANDRADE was told by a nurse at the hospital during his incarceration that he had a nodule on his lungs.  However, the SHERIFF'S DEPARTMENT did not provide him any additional diagnostic care or treatment for the nodule.  When ANDRADE asked medical staff about follow-up care, he was told that the SHERIFF'S DEPARTMENT was "like an insurance company," because they would not provide any care unless a medical need was "emergent."

**L.    The Sheriff's Department Fails to Timely Provide Incarcerated People with Medically Required Eyeglasses**

109.    By policy and practice, the SHERIFF'S DEPARTMENT fails to timely provide eyeglasses to incarcerated people who require them.  The SHERIFF'S DEPARTMENT fails to train staff and contractors how to timely evaluate incarcerated people for vision needs and provide eyeglasses to those incarcerated people who require eyeglasses to see and access activities in the Jail.  The SHERIFF'S DEPARTMENT currently lacks a comprehensive vision services program at the Jail.

110.    For example, Plaintiff TAYLOR, who has a vision disability and has a small amount of usable or residual vision, notified the Jail during booking that he needed glasses, as his were broken during arrest.  Without his glasses, TAYLOR suffers from severe headaches and eye fatigue.  In addition, TAYLOR's low vision makes it difficult for him to read or write without straining his eyes.  Defendants continually failed to provide TAYLOR with prescription glasses or even non-prescription reading glasses, despite repeated orders from the court, where TAYLOR is a pro per litigant, ordering that he be provided glasses.  Although a nurse conducted a visual exam for TAYLOR in April 2022, TAYLOR was not seen by an optometrist to prescribe glasses until September 2022, nearly six months after

TAYLOR was booked.  TAYLOR received non-prescription reading glasses in September 2022, but, as of November 14, 2022, still has not received prescription glasses.  In addition to suffering from severe headaches, the lack of glasses makes it difficult and dangerous for TAYLOR to interact with other incarcerated people, as he is unable to see people's facial expressions.  Out of fear of inadvertently angering someone whose facial expression he cannot read, TAYLOR avoids interacting with other incarcerated people, mostly staying in his cell.

111.   As further recent examples, in 2021, one person waited at least three months to receive eyeglasses after being evaluated for them, and another requested an evaluation for eyeglasses on four occasions without seeing the ophthalmologist or receiving an eye examination.

## M.   The Sheriff's Department Fails to Provide Necessary or Adequate Follow-Up Medical Treatment to Incarcerated People

112.   By policy and practice, the SHERIFF'S DEPARTMENT fails to provide adequate follow-up treatment to incarcerated people when they return to the Jail after receiving care from outside medical specialists.  The SHERIFF'S DEPARTMENT's policies and practices for treatment of incarcerated people receiving care from outside specialists are inadequate.  The SHERIFF'S DEPARTMENT fails to adequately train staff how to provide follow-up care to incarcerated people.  For example, Plaintiff LOPEZ received treatment at an outside hospital in April 2020 for a serious kidney condition and symptoms including weight loss and dehydration.  A kidney specialist informed LOPEZ that to maintain his health he should drink <u>more than</u> two liters of water per day.  However, when LOPEZ returned to the Jail, medical staff failed to follow the specialist's instruction and limited LOPEZ to <u>no more than</u> two liters of water per day.  LOPEZ was at risk of again becoming severely dehydrated—which had contributed to LOPEZ's kidney treatment needs in the first place.

113.   Although a specialist at the University of California – San Diego

Hospital ("UCSD") diagnosed Plaintiff NELSON with a torn rotator cuff, Jail medical staff failed to provide NELSON with any follow-up treatment, putting him at risk for long-term damage. The specialist prescribed a physical therapy regimen that Plaintiff NELSON was not able to complete because the exercises require the use of bands and other tools that the Jail forbade him to have. While at the Jail, NELSON had trouble sleeping and trouble cleaning himself after toileting due to his untreated rotator cuff injury. The injury also affected his ability to safely transfer from his wheelchair and placed him at risk of falling in everyday situations, such as using the bathroom. Follow-up treatment for NELSON's rotator cuff injury was also necessary, as NELSON relies on his arms for mobility because he uses a wheelchair due to disabilities affecting his lower body.

114. Separately, an ophthalmologist recommended that EDWARDS receive cataract surgery for glaucoma and deteriorating vision, but the Jail later refused to cover any such surgery. There was a two-month delay between medical staff becoming aware of EDWARDS's need for surgery and informing him that surgery would not be offered. EDWARDS was then scheduled to see an eye specialist, but was not able to attend because the SHERIFF'S DEPARTMENT refused to provide him a cane or other mobility assistance for him to attend the appointment due to his severe back pain. Upon information and belief, the SHERIFF'S DEPARTMENT has a policy and practice of declining to refer incarcerated people for surgeries for serious medical needs when incarcerated people may soon transfer out of the Jail. EDWARDS experienced severe eye pain while in Jail. Now in CDCR, EDWARDS has been referred for eye surgery.

115. Another incarcerated person had back surgery in May 2022. This person was discharged with instructions for daily physical therapy appointments for the next week, yet Jail staff failed to provide him with any physical therapy.

1

2

**N.    The Sheriff's Department Fails to Provide Adequate Discharge Planning Services and Medication for Incarcerated People Being Released from the Jail**

3    116.   By policy and practice, the SHERIFF'S DEPARTMENT fails to ensure

4   adequate patient discharge planning.  The SHERIFF'S DEPARTMENT's policies

5   and practices for the provision of continuing medical care services upon an

6   incarcerated person's release are inadequate.  Upon information and belief, the

7   SHERIFF'S DEPARTMENT fails to adequately train staff how to prepare for

8   release of incarcerated people with serious medical concerns so that such individuals

9   can continue their medical care without dangerous interruption.  The NCCHC

10  Report found that the SHERIFF'S DEPARTMENT had inadequate discharge

11  planning processes.[56]  According to the NCCHC Report, Jail medical staff do not

12  document discharge plans for incarcerated people.[57]  Medical records indicate that

13  Jail medical staff and contractors continue to fail to document discharge plans for

14  incarcerated people being released from the Jail.  For example, although Plaintiff

15  LEVY has been incarcerated at the Jail eight times, and had a pituitary brain tumor

16  on one occasion, her medical records contain no apparent documentation of any Jail

17  discharge planning, instructions, or community linkages for LEVY.

18    117.   Jail medical providers routinely release incarcerated people with

19  serious medical conditions from the Jail without providing them with linkages to

20  services to prevent dangerous disruptions in their medical care.  Jail medical staff do

21  not schedule follow-up appointments in the community, nor are incarcerated people

22  provided with sufficient referrals or linkages about where they may receive medical

23  care services or medications.  Upon information and belief, the SHERIFF'S

24  DEPARTMENT fails to help people sign up for Medi-Cal coverage.

25    118.   For those incarcerated people who are prescribed medications at the

26

27  ────────────────

[56] NCCHC Report at 69.

28  [57] *Id*. at 57.

Jail, SHERIFF'S DEPARTMENT policy provides that incarcerated people receive only a 10-day supply of medication, and only for certain limited medications, defined vaguely as "critical medications."  For many medications, a 10-day supply is insufficient.  Incarcerated people released from the Jail are often unable to secure medical care in the community and a refill of essential medications within 10 days. For comparison, CDCR provides everyone released from prison with a 60-day medication supply.[58]  Other California jail systems provide at least a 30-day supply, with linkages to community providers to facilitate continuity of care.

**O.    The Sheriff's Department Fails to Maintain Adequate Quality Assurance/Quality Improvement Processes to Ensure Appropriate and Timely Medical Care**

119.   The SHERIFF'S DEPARTMENT fails to engage in meaningful Quality Assurance/Quality Control ("QA/QC") processes.  The NCCHC Report found that the SHERIFF'S DEPARTMENT lacked a formal peer review process for medical staff, and that the SHERIFF'S DEPARTMENT's lacked a continuous quality improvement ("CQI") process for reviewing untimely medical care.[59]  The SHERIFF'S DEPARTMENT's quarterly CQI program lacked documentation of the effectiveness of any plans undertaken as a result of the CQI program, including any notes or minutes from reviewing Jail suicide prevention policies.[60]  The DRC Report also found that the SHERIFF'S DEPARTMENT lacked a "functioning or effective quality improvement program."[61]  Upon information and belief, the SHERIFF'S DEPARTMENT's quality improvement policies and practices remain inadequate.

120.   The SHERIFF'S DEPARTMENT lacks adequate policies and practices for reviewing deaths in the Jail, informing staff of the results, and implementing

---

[58] *See* CDCR Healthcare Department Operations Manual 3.5.28(d)(1)(2)(B) (https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-ch03-art5.28.pdf).
[59] NCCHC Report at 5.
[60] *Id*. at 8.
[61] DRC Report, Appendix A at 24.

improvements to Jail processes as a result.  NCCHC found that medical staff were "not being informed of any results of death reviews in their facilities."[62]  Even now, the SHERIFF'S DEPARTMENT still fails to share substantively important information about deaths with health care staff.

121.   The DRC Report's experts found the Jail's death review process to be inadequate in several respects, including its failure to direct how any findings and corrective action plans will be acted upon and how proposed corrective actions will be enforced.  What this means in practice is that the SHERIFF'S DEPARTMENT fails to learn from past mistakes and fails to implement essential changes to prevent similar mistakes and resultant harms in the future.

122.   The SHERIFF'S DEPARTMENT's failure to engage in meaningful QA/QC processes further undermines its ability to adequately train custody and medical staff how to provide appropriate and timely medical care to incarcerated people.

## II.   JAIL DEFENDANTS FAIL TO PROVIDE MINIMALLY ADEQUATE MENTAL HEALTH CARE TO INCARCERATED PEOPLE

123.   JAIL DEFENDANTS are and have been failing to meet their constitutional obligation to provide adequate mental health care to the people incarcerated at the Jail.  Although JAIL DEFENDANTS contract with NaphCare to provide certain mental health staff and services to incarcerated people at the Jail, JAIL DEFENDANTS are ultimately responsible for all mental health care in the Jail.  NaphCare must provide mental health care pursuant to SHERIFF'S DEPARTMENT policies and procedures, over which the SHERIFF'S DEPARTMENT maintains final approval.  The mental health care provided in the Jail is woefully inadequate and subjects incarcerated people to a substantial risk of deteriorating psychiatric conditions, extreme anguish and suffering, and in some

---

[62] NCCHC Report at 9, 76.

cases, even death.  In fall 2021, one of the COUNTY's elected supervisors admitted that in the Jail, "arrestees with mental illness typically receive inadequate mental health services while incarcerated."[63]  By policy and practice, the mental health care system in the Jail falls far short of the minimum elements of a constitutional mental health system.

124.   The mental health care system in the Jail includes two inpatient PSUs, one at Las Colinas for women (32 beds) and one at Central for men (30 beds).  There are also outpatient "stepdown" ("OPSD") units for incarcerated people who have been discharged from more acute mental health treatment environments, such as having been subject to a 5150 hold.  Separate from the PSU, the SHERIFF'S DEPARTMENT operates an Inmate Safety Program ("ISP") for incarcerated people staff identified as being at risk of suicide.

125.   Inadequacies with the mental health care system, including its suicide prevention practices, are well-documented.  The NCCHC Report found that the SHERIFF'S DEPARTMENT failed to comply with nearly all of NCCHC's essential standards for an adequate correctional mental health care system.  NCCHC also found that JAIL DEFENDANTS lacked sufficient mental health staff for the incarcerated people at the Jail.  For example, at Central, mental health professionals "primarily respond to crises and try to provide two, four-hour 'mental health clinics' each per week, but these are often interrupted or not held due to facility needs or other issues, including lack of staff or lock-downs on individual housing modules."[64]  NCCHC found that the SHERIFF'S DEPARTMENT lacked adequate procedures for monitoring of incarcerated people at risk of suicide, which

---

[63] Supervisor Terra Lawson-Remer, "Agenda Item: A Data-Driven Approach to Protecting Public Safety, Improving and Expanding Rehabilitative Treatment and Services, and Advancing Equity Through Alternatives to Incarceration: Building on Lessons Learned During the COVID-19 Pandemic," Oct. 19, 2021, at 9. https://bosagenda.sandiegocounty.gov/cob/cosd/cob/doc?id=0901127e80db3aaf.

[64] NCCHC Report at 33.

"represents a high risk to the safety of inmates who are suicidal, and a risk to the facility."[65]  Overall, NCCHC found that "[s]uicide prevention is inadequate" at each Jail facility it visited.[66]  In addition, NCCHC also observed the lack of confidentiality when mental health staff met with incarcerated people.[67]  All of these problems persist to this day.

126.   In April 2018, after a multi-year investigation of Jail policies and conditions, the non-profit Disability Rights California released a report on suicides in the Jail.  DRC retained two experts on correctional mental health care and suicide prevention practices, Dr. Karen Higgins and Dr. Robert D. Canning (collectively, "DRC Experts"), to assess individual suicides of incarcerated people and the Jail's suicide prevention practices.  The DRC Report and DRC Experts found that the Jail's suicide rate exceeded national averages and those of other large jails in California.[68]  From 2011-2020, the suicide rate in the Jail was approximately 74 per 100,000 incarcerated people,[69] sixty percent higher than the national average (just under 46 per 100,000 incarcerated people) over the most recent decade with statistics available.[70]  The Jail's suicide rate over that period was almost five times the suicide rate in Orange County (approximately 15 per 100,000 incarcerated people), and higher than suicide rates at all other large California jails.[71]  The Jail had the same number of suicides as Los Angeles County, even though the Los

---

[65] *Id.* at 34.

[66] *Id.* at 33, 66, 100, 134.

[67] *Id.* at 35.

[68] DRC Report at 3.

[69] California Department of Justice, https://openjustice.doj.ca.gov/data (Death in Custody & Arrest-Related Deaths).

[70] *See* "Suicide in Local Jails and State and Federal Prisons, 2000–2019 – Statistical Tables," Bureau of Justice Statistics, Office of Justice Programs, U.S. Dept. of Justice, October 2021 at 2. https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sljsfp0019st.pdf.

[71] California Department of Justice, https://openjustice.doj.ca.gov/data (Death in Custody & Arrest-Related Deaths).  .

1   Angeles County jails house more than three times as many people.  Many of the

2   problems with the SHERIFF'S DEPARTMENT's policies, practices, and

3   procedures criticized by the DRC Report—inappropriate overuse of isolation, the

4   failure to conduct constant observation of individuals at risk for suicide, and mental

5   health encounters consisting of brief wellness checks—continue today.

6   Remarkably, the SHERIFF'S DEPARTMENT's response to the DRC Report and its

7   recommendations for systemic improvements was a statistician's report challenging

8   DRC's statistical method (the same method used by the United States Department of

9   Justice) for calculating the Jail's historical suicide rates.

10         127.   An internal SHERIFF'S DEPARTMENT document indicates that the

11   SHERIFF'S DEPARTMENT has not implemented 8 of the 18 DRC Report

12   recommendations, such as preparing a written treatment plan for each patient

13   requiring mental health services.

14         128.   In the wake of the DRC Report, JAIL DEFENDANTS solicited a

15   report from Lindsay Hayes, a national expert on suicide prevention in jails.  The

16   Hayes Report also identified widespread deficiencies in the SHERIFF'S

17   DEPARTMENT's mental health and suicide prevention policies, practices, and

18   procedures.  For example, Hayes criticized the Jail's lack of confidential intake

19   screening spaces, undue restrictions on programs and property for individuals on

20   suicide precautions, and failure to impose time limits on stays in hyper-isolation

21   cells.[72]  Despite Hayes's criticism, these practices persist.

22         129.   Today, the SHERIFF'S DEPARTMENT's policies and practices for

23   mental health care remain woefully inadequate.  The SHERIFF'S DEPARTMENT

24   has failed to implement many of the recommendations in the NCCHC Report, DRC

25   Report, and Hayes Report, including several that the 2022 State Audit Report found

26

27

---

28   [72] Hayes Report at 68-76.

are "essential for ensuring the welfare and safety of incarcerated individuals …."[73] The SHERIFF'S DEPARTMENT has failed to adequately train and supervise staff and contractors on the policies revised in response to the reports.  These failures have tragic consequences.  Since 2010, over 40 people have committed suicide while incarcerated in the Jail.  Upon information and belief, many of these suicides—and other attempted suicides—were preventable.  JAIL DEFENDANTS are well aware of severe system-wide deficiencies that have caused and continue to cause significant harm to the incarcerated people in their custody, yet they have failed to take reasonable measures to abate this impermissible risk of harm.

### A.   The Sheriff's Department Fails to Adequately Identify and Track Incarcerated People in Need of Mental Health Care

130.   By policy and practice, the SHERIFF'S DEPARTMENT fails to adequately identify, track, and treat incarcerated people's mental health needs.  The SHERIFF'S DEPARTMENT's policies and practices for mental health screening and tracking are inadequate.  The SHERIFF'S DEPARTMENT fails to adequately train its intake nurses, who are not mental health professionals, how to identify incarcerated people with mental health needs.

131.   The Jail's intake screening process is inadequate to identify incarcerated people in need of mental health care.  Intake nurses are not properly trained to consistently identify an incarcerated person's prior mental health history, and frequently fail to do so.  Jail intake staff frequently do not review past incarceration records or county behavioral health records in connection with booking, which means that intake staff lack important information about arriving incarcerated people's prior mental health history.  In October 2022, a COUNTY public health official admitted that behavioral health electronic health records are currently not shared with the SHERIFF'S DEPARTMENT.  As a result, people in need of mental

---

[73] State Audit Report at 38-39.

1  health care at admission are either denied care, or their care is delayed.  These

2  deficiencies cause unnecessary suffering or even death.  For example, the DRC

3  Report found that one individual who arrived at the Jail "with symptoms of florid

4  psychosis and mania" committed suicide after he was housed in a punitive

5  administrative segregation unit—that is, in solitary confinement—rather than a

6  mental health unit or safe observation cell.[74]

7      132.   Even when the Jail's initial screening process does identify an

8  incarcerated person in need of mental health care, the SHERIFF'S DEPARTMENT

9  fails to provide a timely comprehensive mental health assessment.  The Jail's

10  screening policies fail to provide for timely *assessment* and—just as important—fail

11  to facilitate delivery of clinically necessary *treatment*.

12      133.   A mental health professional from the SHERIFF'S DEPARTMENT

13  speaks with an incarcerated person at intake only if the intake nurse determines the

14  person may need to be placed on suicide precautions.  The mental health

15  professional—called the "gatekeeper"—conducts an initial suicide risk assessment,

16  not a comprehensive mental health assessment.  That assessment, by policy and

17  practice, serves only to evaluate for placement on suicide precautions, not for

18  clinically necessary mental health treatment.  Often, no mental health staff—or even

19  medical staff—are available to serve as the gatekeeper.

20      134.   By policy and practice, the SHERIFF'S DEPARTMENT has no system

21  for triaging new arrivals with emergent or urgent mental health care needs.  Instead,

22  under Medical Services Division policy E.5.1, anyone who "screen[s] positive to

23  [sic] mental health concerns will be scheduled by intake nursing staff for '30-day []'

24  clinic type for further assessment."  The NCCHC Report observed that the

25  SHERIFF'S DEPARTMENT fails to conduct a comprehensive mental health intake

26

27

28  [74] DRC Report at 13.

within 14 days of booking.[75]  In fact, by policy, when intake staff determine at intake that an incarcerated person should be referred for further mental health evaluation, follow-up is only required within *30 days*, without any expedited timeline where clinically indicated.  That 30-day wait is far too long to initially evaluate someone, especially given that entering the Jail is a traumatic event that can exacerbate existing mental health symptoms.  For example, the 2022 State Audit Report found one instance in which an intake nurse referred an arriving incarcerated person for mental health services, and the person urgently requested mental health services the next day.  That request was denied because a referral was in process. Two days later, the person died by suicide, having never seen a mental health professional.[76]

135.   As another example, Plaintiff SEPULVEDA has been diagnosed with schizophrenia and PTSD, among other disorders.  SEPULVEDA's competency has been at issue in his underlying criminal case, and he was committed to Atascadero State Hospital from on or around August 12, 2020 until February 25, 2021.  Despite SEPULVEDA's mental health history, he was not screened by a mental health clinician when he returned to the Jail.

136.   Plaintiff TAYLOR reported suicidal ideation during booking and has been prescribed psychotropic medication.  Although the gatekeeper determined that TAYLOR was not suicidal during the intake evaluation, the gatekeeper referred TAYLOR for a psychiatric visit within 72 hours.  However, TAYLOR's initial psychiatric evaluation did not occur for over three weeks.

**B.    Jail Defendants Fail to Maintain Sufficient Numbers of Qualified Mental Health Professionals to Meet the Current Need for Mental Health Treatment at the Jail**

137.   JAIL DEFENDANTS' policies and practices for mental health care

---

[75] NCCHC Report at 20, 53, 87, 121.

[76] State Audit Report at 23.

staffing are inadequate.  JAIL DEFENDANTS fail to maintain sufficient numbers of mental health care professionals to provide minimally adequate care to the approximately 4,000 incarcerated people in the Jail.  According to the SHERIFF'S DEPARTMENT, it has long been the largest mental health care provider in San Diego County.[77]  In May 2021, the SHERIFF'S DEPARTMENT estimated that at least a third of incarcerated people had mental health needs.[78]

138.   JAIL DEFENDANTS have failed to maintain sufficient numbers of mental health staff and contractors to adequately provide mental health care to the many incarcerated people in need.  As of September 2022, the Jail had only 21 mental health clinicians, despite having 45 positions.  Because of insufficient staffing, SHERIFF'S DEPARTMENT mental health staff have long been required to work mandatory overtime hours.[79]  Mandatory overtime reduces the quality of mental health care provided to incarcerated people and increases staff burnout because mental health staff are overworked.  On information and belief, at least eight mental health clinicians quit in 2021 alone.

139.   JAIL DEFENDANTS are well aware that they have failed to hire, train, supervise, and retain adequate mental health staff.  The NCCHC Report found that JAIL DEFENDANTS maintained insufficient mental health staff to provide adequate care to people incarcerated at the Jail.  For example, at George Bailey, only three clinicians were managing "suicide watches, evaluations, programs,

---

[77] Jeff McDonald, Kelly Davis, *In California, jails are now the mental health centers of last resort*, SAN DIEGO UNION-TRIBUNE, Sept. 9, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/in-california-jails-are-now-the-mental-health-centers-of-last-resort.

[78] Catherine Garcia, Tom Jones, Jay Yoo, Armando Flores, Rafael Avitabile, *BREAKDOWN – Part II: Law Enforcement and Mental Illness Collide*, NBC San Diego (May 7, 2021), https://www.nbcsandiego.com/news/local/breakdown-part-ii-law-enforcement-and-mental-illness-collide/2595525/.

[79] *See* Jeff McDonald, Kelly Davis, *Persistent medical staffing shortages in San Diego jails are causing lapses in care, driving down morale*, SAN DIEGO UNION-TRIBUNE, Sept. 4, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-09-04/jail-staff-shortages

requests for care, [and] crisis intervention," and had additional responsibilities for approximately 1,500 incarcerated people.[80]  Clinicians often had to cancel individual counseling sessions and instead focus on tasks like "wellness checks, segregation monitoring and crisis management."[81]  The report further found that some incarcerated people "go for weeks without being seen following a referral or scheduled appointment."[82]  San Diego County's June 2017 Grand Jury report similarly noted that "[o]nly three counselors serve 1,500+ inmates."[83]  The DRC Report found that insufficient mental health staffing contributed to care consisting largely of "brief, non-confidential 'check-ins' with mental health staff, often through a cell door."[84]  DRC recommended that JAIL DEFENDANTS "substantially increase mental health staffing."[85]  They have failed to do so.  In October 2021, the Undersheriff (and now newly elected Sheriff) publicly acknowledged that the SHERIFF'S DEPARTMENT lacks sufficient mental health staff.[86]

140.   JAIL DEFENDANTS have failed to take necessary action to address the insufficient numbers of qualified mental health professionals at the Jail—whether by hiring additional mental health staff, retaining existing staff, contracting with third-party providers, diverting incarcerated people with mental illness to community providers, or supporting mental health-based alternatives to incarceration.  JAIL DEFENDANTS' failure to maintain adequate mental health care staffing or to contract with community mental health care providers denies

---

[80] NCCHC Report at 61.

[81] *Id.* at 66, 68.

[82] NCCHC Report at 135.

[83] San Diego County Grand Jury, "Adult Detention Facilities," June 1, 2017 at 4, https://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2016-2017/AdultDetentionFacilitiesReport.pdf.

[84] DRC Report at 23.

[85] *Id.* at 27.

[86] "Debate: Who Should be Sheriff?", *Times of San Diego*, Oct. 22, 2021, at 6:52, https://www.youtube.com/watch?v=idmGH03C0Sg.

incarcerated people timely access to adequate mental health care.  Mental health care throughout much of the Jail still suffers from the same defects that DRC criticized in 2018:  non-confidential check-ins that are too brief and inadequate to provide meaningful benefit, lack of individualized treatment plans, a near-complete absence of structured treatment programming, and more.

141.   The SHERIFF'S DEPARTMENT fails to retain the mental health staff that have been hired, disrupting continuity of care.  For example, Plaintiff EDWARDS has been diagnosed with depression and was prescribed Prozac and Remeron.  EDWARDS sought counseling several times, but due to significant turnover among the clinicians, EDWARDS often spent sessions recounting basic facts and background details to the new clinician.  Because these sessions, some which occurred cell-side, are typically only a few minutes long and often involve a new mental health staff member, EDWARDS did not make progress in managing his depression at the Jail.  Plaintiff ARCHULETA experienced a deterioration in his mental health after the psychologist that met with him for wellness checks and counseling left the job in or around July 2021.  After that, ARCHULETA was not able to consistently see a mental health staff member, despite reporting that counseling helps him manage his mental health symptoms.

142.   In the wake of the DRC, Hayes, and NCCHC reports, the SHERIFF'S DEPARTMENT designated the OPSD units, ostensibly to address gaps in the delivery of care.  But the resources, programming, and structure of those units have been so deficient as to be a failure.  In the OPSD units, clinicians carry unreasonable caseloads of more than 100 incarcerated people with mental health needs.  JAIL DEFENDANTS' failure to maintain adequate numbers of mental health staff places incarcerated people at risk of serious harm or death.  For example, Rafael Hernandez, who had psychosis, was initially found incompetent to stand trial and placed in the Jail competency restoration program.  After he was found competent in July 2021, although still experiencing psychosis, Hernandez was moved to one of

the OPSD units at Central for further treatment.  There, Hernandez stayed for months and did not improve, as mental health staff lack the resources to see Hernandez and other incarcerated people with serious mental health needs frequently enough to provide adequate care.  On October 13, 2021, having been at the Jail for almost a year, Hernandez hanged himself in his cell and died several days later.  The SHERIFF'S DEPARTMENT's OPSD units are failing, set mental health staff up to fail, and put patients at extraordinary risk.

### C. Sheriff's Department Custody Staff Improperly Control Clinical Mental Health Care Decisions, Which Undermines Delivery of Care by Mental Health Professionals

143.   The SHERIFF'S DEPARTMENT fails to ensure that clinical decisions about mental health care for incarcerated people are made by mental health professionals, rather than custody staff.  The SHERIFF'S DEPARTMENT's organizational chart reflects that sworn custody staff oversee the entire medical division, including mental health staff and contractors.[87]  This structure allows custody staff to overrule healthcare providers and is out of step with modern practice.  In practice, custody staff implicitly and expressly inform mental health staff and contractors that they must follow custody orders regarding mental health decisions.  Although custody staff are not equipped to identify behaviors and other signs showing mental illness, they often overrule mental health providers or otherwise make decisions affecting the mental health care provided at the Jail in an effort to control incarcerated people they deem problematic.

144.   Custody staff have expressly dictated when and how mental health clinicians treat incarcerated people—even recommending "forced meds" for patients.  The practice of custody staff making decisions about mental health care was criticized in an October 12, 2021, letter from the SEIU, the union representing

---

[87] San Diego County Sheriff's Department, Organizational Chart, https://www.sdsheriff.gov/home/showpublisheddocument/3985/637650542546670000 (accessed Nov. 16, 2022).

SHERIFF'S DEPARTMENT mental health staff at the Jail.  The letter warns about the SHERIFF'S DEPARTMENT's "lack of adherence to general practice protocols such as direction of health care service providers by licensed medical professionals rather than law enforcement."  Having custody staff make decisions about mental health care places incarcerated people at risk of serious harm, with custody operations and administrative convenience trumping the clinical judgment of a mental health professional in ways that are dangerous.

145.   In other instances, custody staff exercise their authority to deny mental health care to incarcerated people.  For example, when limited group programming was available in the Jail prior to the pandemic, custody staff routinely refused to escort incarcerated people to group counseling, and sometimes would falsely report to mental health staff that a patient refused to attend when the deputy did not want to escort the person.  Other times, custody staff refused to unlock a closet where reading material was kept, which prevented clinicians from distributing them to their patients.  Custody staff have bullied and belittled mental health staff who advocate for patients' wellbeing by calling them "inmate lovers."

146.   Custody staff also dictate the treatment that patients receive in the ISP, the SHERIFF'S DEPARTMENT's suicide precaution program.  Custody staff frequently assert final authority over whether to place or keep people in a safety cell or enhanced observation housing ("EOH") cell, and frequently override the recommendation of mental health staff.

147.   Custody staff improperly exercise control over the timing of incarcerated people's removal from suicide precaution protocols and placements.  For example, on May 30, 2021, Lester Marroquin committed suicide at Central after custody staff decided to move Marroquin, who had a mental illness and had repeatedly attempted suicide, from the highest level of suicide observation directly into an administrative segregation cell—on a Sunday, with little planning for Marroquin's discharge.  Although Marroquin was moved from a safety cell, custody

staff still forced Marroquin to wear a safety smock rather than his normal clothing in the segregation cell.  This action directly contradicts suicide expert Lindsay Hayes's recommendation to the SHERIFF'S DEPARTMENT in 2018.  Hayes recommended that the SHERIFF'S DEPARTMENT only use safety smocks for incarcerated people "at high risk for suicide by hanging."[88]  Marroquin's prior suicide attempts were by water intoxication, not hanging.  Hayes also stated that the SHERIFF'S DEPARTMENT should "return full clothing to the inmate prior to their discharge from suicide precautions."[89]  In all, the custody-driven management of Marroquin during his mental health crisis was incoherent and clinically deficient.  Shortly after Marroquin was moved from the safety cell to the segregation cell, he died by suicide.

148.   Custody staff also determine whether to house incarcerated people in the PSU, which provides the most intensive level of mental health care in the Jail. The DRC Report found that custody staff "unilaterally place patients in the PSU's 'observation units,' which amount to a solitary confinement setting without access to the PSU's treatment programming"—even when mental health staff make contrary clinical recommendations.[90]  DRC discovered that incarcerated people in those observation cells were decompensating and "smearing food, feces, and urine on the walls and floor."[91]  Although the SHERIFF'S DEPARTMENT has revised its written policies and procedures since the DRC report, in practice, custody staff continue to dictate placements for people with acute mental health needs, often negating clinical judgment.

---

[88] Hayes Report at 43.

[89] *Id.* at 44.

[90] DRC Report at 20-21.

[91] *Id.* at 20.

**D.    Jail Defendants Fail to Continue Incarcerated People's Mental Health Medications They Were Taking Prior to Detention**

149.   By policy and practice, JAIL DEFENDANTS fail to ensure that incarcerated people arriving at the Jail with active prescriptions for mental health medications are able to timely continue on those medications.  The SHERIFF'S DEPARTMENT fails to adequately train staff to identify incarcerated people's active mental health medications and ensure that they are continued in a timely manner.  NCCHC found that incarcerated people who enter the Jail with active prescriptions for psychotropic medication "frequently" fail to receive their medication in a timely manner.[92]  This continues to happen.

150.   Once mental health medications are prescribed by mental health staff, the SHERIFF'S DEPARTMENT fails to ensure that patients receive those medications in a timely manner.  Often, incarcerated people prescribed psychotropic medications in the Jail for their mental health needs wait up to a week or longer for those medications to arrive.  Incarcerated people decompensate during those delays, leading to safety cell or EOH placements, as well as avoidable suicide attempts and incidents of serious self-harm.

151.   For example, Plaintiff OLIVARES has serious mental health needs and was prescribed and taking Prozac in the Jail in September 2021, shortly before his most recent incarceration in October 2021.  When Olivares was booked in October 2021, staff did not provide OLIVARES with Prozac for almost a week after he was booked—even though the SHERIFF'S DEPARTMENT's own records documented that OLIVARES had been taking Prozac.  In the interim, OLIVARES attempted suicide.  Moreover, a psychiatrist only spoke to OLIVARES after OLIVARES called for the psychiatrist on his rounds while meeting with other people.  On other occasions, when OLIVARES was transferred between facilities, the SHERIFF'S

---

[92] NCCHC Report at 35.

1   DEPARTMENT failed to continue his mental health medications.

2   152.   Another person, who reported during intake screening that he took

3   multiple medications to treat a history of psychotic disorders, was not provided with

4   his prescribed medications for 72 hours, despite calls to the Jail from both his family

5   and his pharmacist.  While he was waiting to receive his medications, this person

6   began experiencing chest pains and a persistent headache, and he was taken to the

7   emergency room.

8   **E.      The Sheriff's Department Fails to Provide Incarcerated People**
   **with Timely Access to Mental Health Care**

9

10   153.   The SHERIFF'S DEPARTMENT lacks adequate policies and practices

11   to timely respond to incarcerated people's requests for mental health care.  The

12   SHERIFF'S DEPARTMENT fails to adequately train their staff, and to provide

13   adequate resources, to timely address and respond to incarcerated people's requests

14   for mental health care.  Incarcerated people may request mental health care by

15   submitting a sick call request form.  However, the SHERIFF'S DEPARTMENT

16   lacks an adequate triage system to address mental health care requests.  The triage

17   process begins with a psych office assistant scanning and assigning all mental health

18   care requests to mental health clinicians.  If the clinician assigned to a given request

19   is unavailable, out sick, or on vacation, the SHERIFF'S DEPARTMENT lacks an

20   adequate system to ensure that another clinician addresses the person's mental

21   health needs.  Any "backup" occurs, if at all, on an *ad hoc* basis.  Nor does the triage

22   process include any system or procedure for prioritizing sick call requests based on

23   whether they are emergent, urgent, or routine.  Staff members are trained only to

24   look for suicide risk language, without attention paid to patient needs for treatment

25   to prevent decompensation.

26   154.   This inadequate triage system, in combination with the chronic under-

27   staffing of mental health professionals, results in many mental health care requests

28   going largely unaddressed unless and until incarcerated people threaten self-harm.

The DRC Report found that:  "Only when [incarcerated people] reach the point of engaging in acts of self-harm or having an acute breakdown do they receive an enhanced level of care.  Such a system is cruel and counterproductive[.]"[93] Otherwise, incarcerated people "remain in harsh, non-therapeutic settings without adequate treatment until their condition deteriorates."[94]  NCCHC similarly found that the mental health system at the Jail reflects a "disproportionate focus on those with psychotic disorders" and neglect of "other, less severely mentally ill inmates."[95]

155.   These inadequate systems harm patients.  In early February 2022, the mental health clinic backlog was approximately 300 patients at Central, causing delays upwards of 25 days for patients to be seen.  At George Bailey, the mental health clinic backlog reached nearly 500 patients.  In November 2021, one incarcerated person at Central submitted numerous urgent requests for mental health care because he was struggling with the upcoming anniversary of a tragic death in his family.  The SHERIFF'S DEPARTMENT failed to send a mental health clinician to see the person or to provide any treatment.  Only when the person's family reported that he was feeling suicidal—at least five days after the person submitted his first sick call request—was a mental health staff member dispatched to talk to him.

156.   As another example, Plaintiff TAYLOR, who is prescribed psychotropic medication and had reported suicidal ideation at the time he was booked, submitted a request on July 19, 2022 asking to see psych "immediately!" because he increasingly felt despair about his future and again was contemplating suicide.  TAYLOR submitted another request on July 28, 2022, reporting "extreme anxiety and depression."  However, TAYLOR was not seen by a psychiatric nurse

---

[93] DRC Report at 17.

[94] *Id.* at 17.

[95] NCCHC Report at 35, 67, 101.

until July 29, 2022—ten days after his initial, urgent request.

157.   Upon information and belief, Plaintiff NELSON similarly did not receive responses to multiple sick call requests, and was forced by the SHERIFF'S DEPARTMENT's lack of response to ultimately yell at and beg for deputies to allow him to see mental health staff.  Shortly after arriving at the Jail on March 2, 2021, NELSON filed two sick call request slips asking for mental health care for his depression and anxiety.  In his second sick call slip NELSON wrote that he urgently needed to see a psychiatrist.  NELSON received no response to those requests, and fell into a deep depression.  Having not received any response in almost seven weeks and in a desperate attempt to get mental health care, on or around April 20, 2021, NELSON begged each custody staff member passing his cell for more than one and a half days to allow him to see a mental health provider, which caused him significant anxiety because he feared physical harm from his cellmates and neighbors for disturbing the housing unit.  Shortly thereafter, on April 22, 2021, NELSON was finally seen for an initial evaluation, although he was not seen by a psychiatrist until May 10, 2021.

158.   Plaintiff ARCHULETA requested mental health care shortly after he was incarcerated in July 2019.  Although ARCHULETA saw a mental health clinician in August 2019, he was not seen by a psychiatrist until December 2019.  One mental health staff member apologized to ARCHULETA about the delays in care and explained that the SHERIFF'S DEPARTMENT was severely understaffed.

159.   Initially, after returning to the Jail from a state hospital, Plaintiff SEPULVEDA had been seeing a psychologist about every two weeks until July 2021.  When that psychologist apparently left the SHERIFF'S DEPARTMENT, SEPULVEDA went almost two months without seeing a clinician.  Recently, one of SEPULVEDA's scheduled mental health visits was pushed back a month from the scheduled date, forcing him to go over two months between visits.  SEPULVEDA regularly waits over a month between visits with mental health staff.  These

1  interruptions place SEPULVEDA at serious risk of harm, given his serious mental

2  illness and ongoing struggles with addiction.

3      160.   By policy and practice, there is poor coordination of care for

4  incarcerated people with mental health needs.  Neither medical nor custody staff

5  appropriately or timely refer to mental health staff incarcerated people who exhibit

6  symptoms of mental illness during encounters with medical and custody staff.  As a

7  result, many incarcerated people who exhibit symptoms of mental illness never

8  receive treatment.  The SHERIFF'S DEPARTMENT fails to adequately train

9  medical and custody staff to recognize signs and symptoms of mental illness, and to

10 refer to mental health staff incarcerated people exhibiting such signs and symptoms.

11     161.   Upon information and belief, the SHERIFF'S DEPARTMENT does

12 not maintain any central list, electronic or otherwise, of incarcerated people with

13 mental illness and the treatment they require.  The SHERIFF'S DEPARTMENT

14 does not maintain adequate information about incarcerated people's mental health

15 needs in their custody and/or medical files.  To the extent that the SHERIFF'S

16 DEPARTMENT maintains information about an incarcerated person's mental health

17 needs in any form, custody, medical, and mental health staff are not provided with

18 access to the information in a manner that would timely and effectively inform them

19 of a patient's mental health concerns and treatment needs.

20     162.   For example, the SHERIFF'S DEPARTMENT's recordkeeping and

21 tracking of Plaintiff OLIVARES's care is inadequate.  Although OLIVARES

22 attempted suicide when he was booked into the Jail in late October 2021, the

23 psychiatrist who saw OLIVARES for his initial evaluation on November 18, 2021

24 appeared to have no documentation of that prior suicide attempt.  Despite

25 OLIVARES's suicide attempt and documented mental health needs, he did not see a

26 mental health clinician for about two months in spring 2022.  One appointment

27 scheduled for March 6 was apparently pushed back to May 1.  Staff appear to have

28 contradicted their own note that OLIVARES was supposed to have "on-going ISP

1   follow ups throughout his entire incarceration," in the wake of his suicide attempt.

2        163.  The SHERIFF'S DEPARTMENT lacks adequate policies and

3   procedures for providing timely mental health care to incarcerated people who are

4   transferred between Jail facilities with sick call requests pending.  The SHERIFF'S

5   DEPARTMENT maintains no policy, procedure, or consistent practice for the

6   transfer of those sick call requests from one Jail facility to another.  On an *ad hoc*

7   basis, some clinicians at the transferring facility try to email clinicians at the

8   receiving facility, but this is not policy or even a widespread practice.  Upon

9   information and belief, most clinicians at the transferring facility do not look at a

10   pending slip or become involved if an incarcerated person is transferred.

11   **F.**    **The Sheriff's Department Lacks an Adequate System for Providing**
**Mental Health Treatment to Incarcerated People with Ongoing**
12   **Mental Illness**

13        164.  The SHERIFF'S DEPARTMENT lacks a coherent system for

14   identifying the mental health care needs of incarcerated people and implementing

15   appropriate treatment plans and programming for each individual.  Although the

16   DRC Report recommended that Jail staff prepare and follow a written,

17   individualized treatment plan for each incarcerated person requiring mental health

18   care,[96] the SHERIFF'S DEPARTMENT continues to fail to maintain adequate

19   treatment plans for mentally ill patients.  As such, the SHERIFF'S

20   DEPARTMENT's policies and practices for providing mental health care to

21   incarcerated people are inadequate.  The SHERIFF'S DEPARTMENT fails to

22   adequately train mental health staff how to monitor incarcerated people with mental

23   illness and the treatment they require.  These inadequate policies and procedures

24   place incarcerated people at substantial risk of serious harm.

25        165.  In October 2018, clinical leadership gave a presentation to command

26   staff proposing that the SHERIFF'S DEPARTMENT implement a level of care

27

28   _____
[96] DRC Report at 27.

system for mental health care (and other medical care) at the Jail.  A level of care system is necessary to assess an incarcerated person's treatment needs and then provide clinical interventions that match those treatment needs.  Specifically, clinical leadership proposed assigning each person at the Jail a mental health needs score, along with a system of subcodes to indicate important mental health/disability factors, such as a developmental disability or history of traumatic brain injury.  Under the proposed system, each person would receive care based on their mental health need score.  However, the SHERIFF'S DEPARTMENT chose not to implement a level of care system due to concerns about mental health understaffing and the SHERIFF'S DEPARTMENT's lack of commitment to providing clinically necessary care.

166.   On occasion, Jail mental health staff or contractors complete a "BH Assessment" form to assess the mental health needs of incarcerated people who have reported mental health symptoms while at the Jail.  However, staff completing the BH Assessment fail to appropriately assess patients' mental health needs and prescribe an adequate course of treatment.  For example, a SHERIFF'S DEPARTMENT mental health clinician prepared a BH Assessment form of Plaintiff NORWOOD on July 3, 2021, after NORWOOD requested mental health attention.  NORWOOD was never given a copy of the BH Assessment, nor were its contents ever disclosed to him.  The mental health clinician noted that NORWOOD had a past history of inpatient mental health care, active symptoms of psychosis such as hallucinations, and a history of depression and anxiety, and noted NORWOOD's mental health acuity level as "moderate."  Nevertheless, the mental health clinician wrote that NORWOOD needed only infrequent "wellness checks."  At the Jail, wellness checks are generally brief, cell-side encounters that last anywhere from one to five minutes, and provide no therapeutic benefit.  It would have been obvious to any reasonable clinician from NORWOOD's stated history that he required more frequent, intensive mental health treatment.  Before NORWOOD's next "wellness

1  check" was scheduled, and in part because he was having trouble coping with his

2  mental illness, NORWOOD overdosed on fentanyl at the Jail on July 17, 2021.

3      167.   These non-therapeutic "wellness checks" are often the extent of the

4  SHERIFF'S DEPARTMENT's mental health "programming" for most incarcerated

5  people with mental health needs, leaving patients without the care that they need.

6  Therapy or counseling in an individual or group setting is rarely offered or provided

7  to incarcerated people, regardless of whether they were receiving therapy or

8  counseling as a part of their treatment for mental illness outside of the Jail.  The

9  SHERIFF'S DEPARTMENT has been deliberately indifferent to these inadequate

10  practices for years.  As the DRC Report documented, many incarcerated people with

11  mental health needs "expressed to us an interest in group or individual out-of-cell

12  therapeutic activities."[97]  One patient asked to discontinue his medication and try

13  counseling, but instead "mental health staff increased his medication dosage and

14  ignored his request for counseling."[98]  Plaintiff LANDERS has been diagnosed with

15  bipolar disorder and anxiety, but for almost two months, did not see a clinician for

16  therapy, and instead received only medication as treatment.

17      168.   During his last incarceration, Plaintiff CLARK reported that he had

18  suicidal thoughts.  CLARK had attempted suicide while on the streets prior to his

19  incarceration.  A mental health clinician met with CLARK on October 26, 2021,

20  almost a month after he was booked.  CLARK asked for ongoing follow-up from the

21  clinician and psychiatrist, which the clinician noted.  However, CLARK had only

22  infrequent, brief "wellness checks" with the clinician, often in non-confidential

23  settings.  His next visit was not until November 24, a month after his first meeting.

24  After that, CLARK was not able to meet with a clinician—a different clinician than

25  his initial visit—until March 2022.  CLARK's mental health remained poor during

26

27  _____

[97] *Id.* at 23.

28  [98] *Id.*

this delay.

169.   The SHERIFF'S DEPARTMENT operates a crisis-reactive system, without structured mental health programming for the vast majority of patients with mental health treatment needs.  The SHERIFF'S DEPARTMENT's Detention Outpatient Psychiatric Services ("DOPS") policy confirms this failure—to wit, the *only* "modes of treatment" set forth in policy are (1) "Pharmacotherapy" (*i.e.*, medication), (2) "Crisis intervention," and (3) "Release from outpatient service." The SHERIFF'S DEPARTMENT denies patients the structured, clinically driven programming that other jail systems provide and that many patients need, putting them at risk of avoidable psychological decompensation and harm.  On information and belief, the SHERIFF'S DEPARTMENT is aware that such programming is provided by other jail facilities, but choose to implement its substandard DOPS policy.

170.   The SHERIFF'S DEPARTMENT's policies and procedures for communication between mental health staff and custody staff about the treatment needs of incarcerated people with mental illness are inadequate.  These inadequate policies and procedures lead to inadequate mental health care and place incarcerated people at substantial risk of serious harm.

171.   For example, in 2015, Ruben Nunez died by suicide at Central after mental health providers and custody staff failed to adequately communicate about Nunez's mental health needs.  While in a state psychiatric hospital, Nunez had been diagnosed with psychogenic polydipsia, which caused him to drink water uncontrollably.  According to a lawsuit filed by Nunez's family, although Jail mental health officials knew about Nunez's condition when he transferred to the Jail from the state psychiatric hospital, his condition was not adequately communicated to mental health and custody staff at Central.  There, staff failed to prevent him from having unlimited access to water.  Nunez died of water intoxication five days after

booking.[99]  In 2021, a remarkably similar suicide occurred, demonstrating the SHERIFF'S DEPARTMENT's deliberate indifference to the problems with its policies, procedures, practices, and training:  Lester Marroquin drowned himself in his toilet even though Jail staff knew that Marroquin had attempted suicide in a similar manner on previous occasions.[100]  Marroquin was at least the *third* person in a decade to die from water intoxication in the Jail.  In 2011, 34-year-old Abraham Clark ingested enough water to kill himself.[101]

172.   As a result of the SHERIFF'S DEPARTMENT's failure to track and monitor incarcerated people and the mental health treatment they require, incarcerated people experience disruptions in prescribed treatment and are exposed to a substantial risk of serious harm.  For example, in or around January 2022, a patient with serious mental illness was moved from the outpatient stepdown unit at Central to a COVID-19 quarantine unit.  When the person returned to the outpatient stepdown unit, he was wearing another person's wristband and had not received his psychiatric medication for at least five days while in quarantine.  Evidently, no staff noticed that the person was wearing the wrong wristband and needed his medication.  As a result, the person had decompensated by the time he returned to the stepdown unit, and was kicking his cell and screaming.

173.   Plaintiff ZOERNER has been diagnosed with depression, bipolar disorder, and PTSD, and for several years has taken Prozac and Lamictal to treat those conditions.  In mid-June 2021, Jail staff added Tramadol to ZOERNER's existing medications, although Tramadol is contraindicated with Prozac and

---

[99] Kelly Davis, *Jail death from excess water drinking raises questions*, SAN DIEGO UNION-TRIBUNE, May 23, 2016, https://www.sandiegouniontribune.com/news/watchdog/sdut-nunez-water-death-2016may23-story.html.

[100] Kelly Davis, *Another San Diego County inmate dies from drinking too much water*, SAN DIEGO UNION-TRIBUNE, Dec. 10, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-12-10/another-san-diego-county-inmate-dies-from-drinking-too-much-water.

[101] *Id.*

Lamictal.  ZOERNER was kept on that new regimen for multiple days until she went to the hospital for a dental procedure on June 15, 2021.  Medical records indicate that Jail staff recognized that this medication regimen may have contributed to a psychotic episode.  After ZOERNER returned from the hospital on June 20, 2021, Jail staff suddenly stopped providing ZOERNER with Prozac and Lamictal because of their contraindication with Tramadol.  In other words, rather than prescribing ZOERNER a pain medication that she could take with her existing psychiatric medications, medical staff discontinued those psychiatric medications altogether.  ZOERNER decompensated, began to bang on the walls of her cell and cry, and banged her head against the cell window until she began bleeding.

### G.     The Sheriff's Department Fails to Provide Confidential Mental Health Care in Adequate Physical Spaces

174.   The SHERIFF'S DEPARTMENT fails to provide mental health care in confidential settings.  This practice undermines the delivery of mental health care because an incarcerated person's candid discussion of their mental health needs in earshot of custody staff or other incarcerated people places their safety at risk.  A person could be victimized by custody staff or other incarcerated people for personal information they are overheard sharing with a mental health professional, or unwilling to share information necessary to their treatment for fear others will overhear.  The SHERIFF'S DEPARTMENT is deliberately indifferent to the harms of non-confidential mental health encounters, for which outside experts have repeatedly criticized the Jail.  Even in Jail facilities that include spaces for confidential visits with mental health staff, custody staff frequently refuse to escort incarcerated people to those clinical spaces.

175.   The NCCHC Report found that mental health staff often spoke to patients through the cell window, which means the person's cellmate and other

1   nearby incarcerated people or custody staff can overhear the conversation.[102]

2   NCCHC recommended that the SHERIFF'S DEPARTMENT provide confidential

3   spaces for mental health staff to meet with incarcerated people.  The Hayes Report

4   similarly documented frequent non-confidential interviews, even for people on

5   suicide precautions.[103]  The DRC Report criticized the SHERIFF'S

6   DEPARTMENT's practice of non-confidential mental health encounters because it

7   precludes incarcerated people from disclosing "sensitive information about their

8   mental health history or current situation"—information that is necessary to provide

9   adequate mental health treatment.[104]  The DRC Experts recommended that the

10  SHERIFF'S DEPARTMENT ensure mental health treatment occurs in confidential

11  spaces.[105]

12      176.   Despite these recommendations, the majority of mental health

13  encounters in the Jail continue to be at the cell or dorm door, and the vast majority

14  of mental health encounters are non-confidential.  Incarcerated people with mental

15  illness must speak to mental health staff in view of and within hearing range of other

16  incarcerated people and custody staff.  This practice forces incarcerated people to

17  choose between being candid about their mental health needs and risking their safety

18  within the Jail.  Even the clinical treatment room in the PSU—housing incarcerated

19  people with the most serious mental health needs—lacks auditory privacy, which

20  means that custody staff can overhear conversations between mental health staff and

21  incarcerated people.  Some concerned mental health staff have resorted to asking

22  clients to whisper or to write notes as a workaround for confidential communication.

23  Many incarcerated people describe being unable to speak about their serious mental

24  health needs, and having their conditions deteriorate, due to lack of confidentiality.

25

26  _____

[102] *See* NCCHC Report at 35, 68.

27  [103] Hayes Report at 39, 57.

[104] DRC Report at 23.

28  [105] DRC Report, Appendix A at 10.

177.   For example, Plaintiff OLIVARES, who attempted suicide in the Jail and who has serious mental health needs, often has non-confidential mental health visits.  At George Bailey, OLIVARES is called to see the mental health clinician in a space that usually has a long line of people behind him.  Other incarcerated people in line can hear what OLIVARES is saying, and the clinician often rushes the visit in order to address other patients waiting in the line.  Although OLIVARES has repeatedly requested to have confidential mental health visits at George Bailey, by default he is scheduled for non-confidential appointments.

178.   As another example, Plaintiff LEVY has been diagnosed with depression and takes Wellbutrin.  LEVY desired therapy in the Jail, but she was not able to meet with a mental health clinician in a confidential setting.  Appointments with the clinician took place at LEVY's cell.  The clinician stood outside the cell, LEVY was inside, and a deputy stood directly outside the cell with the clinician.  LEVY worried that custody staff would share her confidential information and so she did not feel comfortable discussing her mental health issues in detail.  Upon information and belief, custody staff share information about the nature of patients' medical issues, mental health diagnoses, and criminal charges with other persons in the same housing unit.  Nor was there time for LEVY to discuss her issues in-depth with clinicians, as most encounters last five minutes at most due in part to deputies' insistence on rushing the meetings.  LEVY's father died in late 2021 while she was incarcerated.  Yet because of the non-confidential environment, LEVY was unable to fully discuss her father's death and its effect on her.

179.   Plaintiff NORWOOD requested mental health care in late June 2021 because he was experiencing anxiety, hearing voices, and also had not received any medical treatment for opioid dependence.  Several days later, a mental health clinician came to NORWOOD's cell to ask about his symptoms, but the two spoke through the cell window and a deputy was right outside the cell with the clinician.  Both the deputy and other incarcerated people nearby could hear the conversation.

In that setting, NORWOOD did not feel comfortable explaining how he was feeling and could not adequately process his anxiety.  NORWOOD did not see a mental health professional in a confidential setting until well over a month after he arrived at the Jail.  By that time, NORWOOD had overdosed on fentanyl, in part because he was having trouble coping with his mental illness.

180.   As another example, Plaintiff TAYLOR, who is prescribed psychotropic medication and reported suicidal ideation at the time he was booked, frequently receives mental health clinician visits cell-side and/or in other non-confidential circumstances, including for the evaluation immediately following his report of suicidal ideation.  Because of the lack of confidentiality, and the ability for deputies and other incarcerated people to overhear his conversations, TAYLOR does not feel able to openly discuss his mental health concerns with clinicians.

181.   The SHERIFF'S DEPARTMENT has also retaliated against incarcerated people who request confidential visits with a mental health clinician. In September 2022, Plaintiff ANDRADE, who had previously reported experiencing suicidal thoughts while in the Jail, was visited by a mental health clinician in a non-confidential space, where other incarcerated people and custody staff could overhear the conversation.  After stating that he was "tired of living," ANDRADE requested to continue the conversation in a confidential setting with the clinician.  Custody staff refused to allow ANDRADE to meet confidentially with a mental health clinician, instead asserting that custody staff were required to listen to ANDRADE's conversations with mental health staff to determine if ANDRADE was suicidal. After Plaintiff ANDRADE again requested to have a confidential conversation with mental health staff, a deputy handcuffed him, forced him to walk into a room with several other deputies and a mental health clinician, and demanded to know if ANDRADE was suicidal.  The deputies and mental health clinician effectively threatened that if ANDRADE were suicidal, he would be returned to the EOH cell where he had previously been deprived of sleep.

**H.     The Sheriff's Department Houses Incarcerated People at Risk of Suicide in Punitive Isolation Units That Put Them at Unnecessary and Undue Serious Risk of Further Decompensation and Harm**

182.    The SHERIFF'S DEPARTMENT routinely houses incarcerated people at risk of suicide in conditions that exacerbate symptoms of their mental illness, deteriorate their mental health, violate notions of minimally adequate mental health care and basic human dignity, and are incompatible with civilized standards of humanity and decency.  The SHERIFF'S DEPARTMENT's policies and practices for housing incarcerated people who are suicidal are constitutionally inadequate. This overuse of isolation harms incarcerated people and violates the federal and state Constitutions.  Voluminous psychiatric literature has documented the adverse mental health effects of isolation, particularly on people with mental health disabilities.  As suicide expert Lindsay Hayes wrote in his report on the Jail, isolation "escalates the inmate's sense of isolation[.]"[106]  Isolation can exacerbate, and in some cases cause, physical and/or psychiatric disabilities, including gastrointestinal disorders, insomnia, eyesight deterioration, heart palpitations, migraines, and profound fatigue.  Even those who endure the effects of isolation better than others are subjected to intolerable conditions, as they are forced to endure the hallucinations and screaming of other incarcerated people suffering the debilitating effects of isolation.

183.    Nonetheless, the SHERIFF'S DEPARTMENT's Inmate Safety Program ("ISP") relies exclusively on harsh isolation settings to house patients in crisis.  The ISP has two types of restrictive cells.  For a person who is "actively self-harming or actively assaultive," a safety cell is recommended.  Safety cells are small, windowless cells with no furniture and rubberized walls.  Rather than a toilet, incarcerated people must defecate or urinate through a grate in the center of the floor.  The Jail's safety cells are frequently covered in feces, blood, urine, and/or

---

[106] Hayes Report at 34.

1    other bodily fluids.  The second type of restrictive cells, EOH cells, are recom-

2    mended for a person "with suicide risk but [who] is not actively self-harming or

3    actively assaultive."  Although EOH cells include a toilet, they are often as filthy as

4    safety cells.  People in crisis have been placed in a cell that still has someone else's

5    feces smeared on the walls.[107]  In both safety cells and EOH cells, incarcerated

6    people are typically stripped naked and forced to wear a safety smock regardless of

7    whether such a smock is clinically appropriate.  Patients in safety cells and EOH

8    cells are on near-total lockdown, deprived of access to their property, and denied

9    programs, showers, phone calls, family visits, social interaction, and recreation.

10   Patients at this acute risk of suicide should receive therapy and access to human

11   interaction.  The SHERIFF'S DEPARTMENT provides the opposite:  extreme

12   isolation in degrading conditions, which is counterproductive and punishes

13   incarcerated people for feeling suicidal.

14       184.   The sheer number of people placed in these conditions in San Diego

15   County, combined with the level of deprivation in the safety cell and EOH settings,

16   is unparalleled in other county jail systems.  JAIL DEFENDANTS are deliberately

17   indifferent to these dangerous conditions, which they have been warned about

18   repeatedly by suicide prevention experts.

19       185.   Suicide expert Lindsay Hayes criticized the isolation conditions in

20   safety cells and EOH cells, which he called "overly restrictive and seemingly

21   punitive" and "harsher than for those [incarcerated people] on segregation status."[108]

22   As Hayes found, isolation "not only escalates the inmate's sense of alienation, but

23   also further serves to remove the individual from proper staff supervision."[109]  Given

24   conditions in safety cells, "it is hard to imagine how any individual would not feel

25   that their expressed suicidal ideation was being responded to in a punitive, non-

---

[107] *See* Hayes Report at 36.

[108] *Id.* at 40, 39.

[109] *Id.* at 34.

therapeutic manner."[110]  Hayes noted "the real possibility that [EOH] measures were contributing to an inmate's debilitating mental illness."[111]  Hayes also observed that visits with mental health staff were non-confidential and cell-side, even in safety cells and EOH cells.  As Hayes wrote, this practice makes it impossible to adequately assess whether and why a person is suicidal, and many incarcerated people will deny suicidal ideation just to get out of isolation:

> Take, for example, the scenario of a clinician interviewing an inmate on suicide precaution.  The inmate has been in the cell for a day or two, clothed only in a safety smock.  The clinician approaches the inmate cell-side, within easy hearing distance from both other inmates and non-healthcare professionals, and asks: "Are you suicidal?"  Given the circumstances he or she finds themselves in, the likelihood of an inmate answering affirmatively to that question, the result of which will be their continued placement under these conditions, is highly questionable.[112]

186.   Hayes recommended that the SHERIFF'S DEPARTMENT house incarcerated people at risk of suicide, if possible, in "the general population, mental health unit, or medical infirmary, located in close proximity to staff."[113]  When placements in safety cells or EOH cells become necessary, Hayes recommended the SHERIFF'S DEPARTMENT ensure incarcerated people maintain routine privileges like showers, family visits, access to recreation, and their normal clothing, rather than being stripped naked and forced to wear a safety smock.[114]

187.   The DRC Report included similar findings.  Incarcerated people in EOH "complained about extremely limited time outside their cell and excessive isolation."[115]  DRC noted that mental health staff were aware of the problems with EOH cells:  one mental health chart included a psychiatrist's observation that EOH

---

[110] *Id.* at 38.

[111] *Id.* at 42.

[112] *Id.* at 40.

[113] *Id.* at 34-35.

[114] *Id.* at 34.

[115] DRC Report at 22.

"isolation is inhumane and likely to compromise [the person] psychologically."[116] In several instances, incarcerated people in EOH did not even receive a safety smock or blanket.[117] DRC "found extremely disturbing the levels of deprivation and isolation for so many individuals [in EOH], without access to any therapeutic or recreational activities."[118] As DRC documented, isolation conditions expose incarcerated people to a substantial risk of serious harm or death. DRC found that at least six suicides only over a three-year period occurred in solitary confinement housing, and several others occurred in units with isolation conditions.[119] DRC also observed the shocking overuse of safety cells, including that incarcerated people were placed in safety cells more than 6,700 times in one year alone.[120]

188.   The SHERIFF'S DEPARTMENT has failed to remedy the isolation conditions in safety cells and EOH cells, resulting in the continued risk of serious harm to incarcerated people with serious mental health needs. According to the SHERIFF'S DEPARTMENT, as of December 26, 2021, people were placed in EOH cells 2,846 times in 2021, and hundreds more were placed in safety cells. By policy and practice, custody staff regularly order such placements and overrule mental health staff's clinical judgment. Although the SHERIFF'S DEPARTMENT's written policies now state that incarcerated people in EOH cells may access telephone calls and certain other programs, in practice, people incarcerated in EOH are still regularly denied out-of-cell time to use telephones, to take a shower, or to interact with other individuals. By policy and practice, the SHERIFF'S DEPARTMENT continues to deny incarcerated people in EOH access to their own property, recreation time, and family visits. People in safety cells and EOH cells are

---

[116] *Id.*

[117] *Id.* at 21.

[118] *Id.* at 22.

[119] *Id.* at 3.

[120] *Id.* at 19.

also still stripped naked and forced to wear safety smocks.  Even if mental health clinicians determine it is clinically beneficial for a patient in EOH to have their clothing or personal property, or call family, clinicians have no authority to allow such privileges.  Isolation conditions in the Jail continue to expose people to a substantial risk of serious harm.

189.   For example, Lester Marroquin died by suicide on May 30, 2021 after he was repeatedly isolated in the Jail's safety cells.  On May 25 or May 26, Marroquin had spoken to his mother and "expressed that he was upset because he had not been allowed phone calls to call her and that speaking to her helped him," according to a report.  Marroquin was not allowed to speak to his mother again, including while housed in the safety cell.[121]

190.   Plaintiff OLIVARES tried to commit suicide by strangling himself with a chain when he was arrested because he was so distraught about being in the Jail again.  After booking, OLIVARES was placed in a safety cell for about 16 hours, with no clothes and only a green safety smock.  Deputies came to check on OLIVARES when an alarm sounded, which he estimated was once every 30 minutes.  OLIVARES was moved to an EOH cell after the safety cell, where deputies similarly checked on him about every 30 minutes.  OLIVARES was in the EOH cell for about three days.

191.   Plaintiff ANDRADE reported that he was experiencing suicidal thoughts while incarcerated at the Jail.  ANDRADE was housed in EOH for nearly 36 hours over two nights, where his clothes were taken and he was forced to wear a safety smock.  Throughout the first twelve hours that he was in EOH, custody staff woke him up every fifteen minutes, preventing him from sleeping.  One custody officer said to ANDRADE, "if you're going to make us work, then I'm going to

---

[121] Kelly Davis, *Another San Diego County inmate dies from drinking too much water*, SAN DIEGO UNION-TRIBUNE, Dec. 10, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-12-10/another-san-diego-county-inmate-dies-from-drinking-too-much-water.

keep waking you up." Plaintiff ANDRADE understood that custody staff were depriving him of sleep to punish him for reporting that he was suicidal. As a result of these experiences, ANDRADE is less likely to report suicidal thoughts to Jail staff.

192. The isolating and degrading conditions in safety cells and EOH cells have dissuaded Plaintiff ZOERNER from reporting suicidal or homicidal ideation, even when she has such feelings. In June and July 2021, ZOERNER was housed in safety and EOH cells—alternating between the two—for at least five consecutive days. Jail staff took all of ZOERNER's property and clothes, and forced her to wear a safety smock, which she describes as "humiliating." The cell was very cold and ZOERNER slept on a thin mattress on the ground. ZOERNER became reluctant to report suicidal thoughts to Jail staff for fear that she would be further humiliated and receive no help.

193. The SHERIFF'S DEPARTMENT lacks adequate policies and practices for limiting the use of isolating safety cells and EOH cells. Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train and supervise staff and contractors on policies and procedures to limit the use of isolation. The Jail's current practices contradict recommendations from experts to impose limits on the amount of time an incarcerated person can spend in both safety cells and EOH cells. For safety cells, the Hayes Report found that the SHERIFF'S DEPARTMENT was housing incarcerated people in safety cells for up to three days at a time.[122] Hayes recommended that the Jail limit time in a safety cell to no more than six hours.[123] For EOH cells, the DRC Experts recommended that the SHERIFF'S DEPARTMENT limit stays to a maximum of 48 hours and refer a patient in EOH to the PSU if their condition does not stabilize after 48 hours in EOH.[124]

---

[122] Hayes Report at 38.

[123] *Id.* at 43.

[124] DRC Report, Appendix A at 12.

194.   Despite these recommendations, the SHERIFF'S DEPARTMENT's policies and procedures still include no set limit on how long a person can spend in a safety cell or EOH cell.  In fact, the SHERIFF'S DEPARTMENT does not track the average amount of time that incarcerated people spend in safety cells or EOH cells. One incarcerated person was kept in a safety cell for several days in a row, even when not actively self-harming.  Instead, custody staff placed him in the safety cell as a form of "behavior management."  It is not unusual for a person to spend a week or more in the harsh EOH setting where no structured treatment is provided.

195.   The SHERIFF'S DEPARTMENT lacks adequate policies and procedures to timely remove people from isolation safety and EOH cells once cleared by mental health staff.  Custody staff regularly prolong such placements even after clinicians determine a person is no longer at heightened risk of suicide. For example, in or around November 2021, at least eight people clinically cleared from EOH at Central were kept in EOH for days after their clearance date—two of them for five more days.  This is a regular occurrence.  On another occasion, after mental health staff at Central cleared a patient from EOH, custody staff delayed the person's transfer and placed him in a safety cell without conferring with mental health staff.  Housing incarcerated people in the restrictive EOH environment, in the absence of any clinical justification for their continued stay in EOH, is dangerous and punitive.

196.   People have even been placed in safety cells without any clinical justification, out of retaliation, and/or lack of space in the Jail.  For example, in January 2022, OLIVARES was put in a safety cell in Vista after he went on a hunger strike, even though he was not suicidal.  OLIVARES was thereafter moved to Central Jail and designated for placement in EOH, but he was placed in a safety cell allegedly because there was "no cell available in EOH housing when patient came," according to his medical records.

197.   The SHERIFF'S DEPARTMENT's failure to provide socialization and

1   programs to incarcerated people in safety cells and EOH also constitutes discrimina-

2   tion against people with disabilities, in violation of the ADA.  On information and

3   belief, the majority of individuals in the ISP have mental illness, intellectual

4   disabilities, and/or other ADA-qualifying disabilities.  By denying programs to

5   people in ISP, the SHERIFF'S DEPARTMENT denies incarcerated people with

6   disabilities equal access to programs and services at the Jail.

7          198.   For example, Plaintiff DUNSMORE is a person with a disability.  The

8   SHERIFF'S DEPARTMENT placed DUNSMORE in an EOH cell in 2018 after he

9   decompensated following custody staff's confiscation of DUNSMORE's eating and

10  writing assistive devices.  Jail staff forced DUNSMORE to strip naked and did not

11  allow him to have any of his clothes in the EOH cell.  DUNSMORE had access to

12  only a thin mattress and a toilet.  DUNSMORE did not have access to his

13  wheelchair and the cell lacked grab bars, which made it very difficult for

14  DUNSMORE to use the toilet.  He often made a mess in the cell and was forced to

15  sleep among his own feces and other trash in the filthy cell.  Jail staff failed to

16  provide DUNSMORE with the modified spoon and modified straw he uses to eat for

17  several days.  Rather than eat with his bare hands like an animal, DUNSMORE

18  refused the food brought to him in the EOH cell.  DUNSMORE requires regular

19  exercise and movement to ward off the debilitating symptoms of his arthritic

20  condition, but lacked any opportunity for exercise or yard while in EOH.  Lying

21  down for long periods in the EOH cell, without anything else to do, exacerbated

22  DUNSMORE's arthritic condition.  During this time in the EOH cell, DUNSMORE

23  had no opportunity for socialization and was not allowed to use the telephone or

24  access reading materials.

25      **I.   The Sheriff's Department Lacks Adequate Policies and Procedures
        to Identify, Treat, Track, and Supervise Incarcerated People at**
26      **Risk for Suicide**

27         199.   The SHERIFF'S DEPARTMENT lacks adequate policies, procedures,

28  and practices for screening, supervising, and treating incarcerated people at risk for

suicide.  The SHERIFF'S DEPARTMENT fails to properly train custody, medical, and mental health staff how to screen, supervise, and treat incarcerated people at risk for suicide.  As a result, the SHERIFF'S DEPARTMENT fails to adequately identify, supervise, and treat incarcerated people who are at risk for suicide.

### 1. The Sheriff's Department Fails to Adequately Identify Incarcerated People at Risk for Suicide

200.   Intake evaluations at the Jail are conducted by nurses rather than mental health professionals.  A mental health "gatekeeper" is called only for a suicide risk assessment if the intake nurse determines a risk assessment is necessary.  However, intake nurses are not adequately trained to identify suicidal persons, nor are they adequately trained to identify when a patient should be referred for a risk assess-ment.  As found by the DRC Experts, intake nurses often fail to refer incarcerated people in drug or alcohol withdrawal to a suicide risk assessment, even though people in withdrawal are at greater risk of suicide.[125]  Together, these systematic failures expose incarcerated people to a substantial risk of serious harm.

201.   For example, in 2020, Joseph Morton, who later died by suicide in the Jail, informed an intake nurse that he "wished he could go to sleep and never wake up," and the arresting deputies also informed her that Morton had made suicidal statements.[126]  However, the intake nurse did not flag Morton as a high suicide risk.  Morton was placed in an EOH cell only after he self-reported suicidal ideation to a deputy.[127]

202.   By policy and practice, the SHERIFF'S DEPARTMENT lacks an adequate suicide risk assessment tool, and fails to properly train their staff to

---

[125] DRC Report, Appendix A at 7.

[126] Jeff McDonald, Kelly Davis, *Family of Vista jail suicide victim files lawsuit against San Diego County,* SAN DIEGO UNION-TRIBUNE, Aug. 11, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-08-11/family-of-vista-jail-suicide-victim-files-lawsuit-against-san-diego-county.

[127] *Id.*

adequately assess suicide risk.  The SHERIFF'S DEPARTMENT's risk assessment tool lacks any scoring mechanism or objective means for assessing a patient's suicide risk based on the answers to the questions in the risk assessment tool. Instead, the staff member completing the risk assessment tool must make a subjective decision about the person's suicide risk.  Compounding the problem, the tool's suicide risk levels are circular and ill-defined.  The SHERIFF'S DEPARTMENT's policies and procedures define "acute low risk" as "the patient is currently deemed at low imminent risk of suicide," whereas "acute high risk" is defined as "the patient is currently deemed at imminent high risk for suicide."  In practice, staff regularly fail to ask all of the questions on the risk assessment tool, further hampering accurate risk assessment.

203.   The NCCHC Report observed that:  "It appears that the clinicians do not maintain an awareness of suicide risk over time, instead judging or evaluating each incident as being isolated from the individual's history within the facility and within the community."[128]  The DRC Report also concluded that mental health staff failed to adequately document suicide risk factors, suggesting also that the mental health staff are inadequately trained.[129]

204.   These problems persist.  For example, although the intake nurse failed to flag Joseph Morton as a suicide risk at Vista in 2020, Morton eventually was placed in an EOH cell after he self-reported suicidal ideation.  A mental health staff member then visited Morton to conduct an evaluation.  That clinician assessed Morton and determined that his statements about needing withdrawal medication meant he had changed his mind about suicide.  Morton was moved into a single cell for COVID-19 precautions.  Another psychologist who visited Morton wrote that he had been lying about being suicidal to get access to a phone, even though all

---

[128] NCCHC Report at 34.

[129] DRC Report, Appendix A at 9, 10.

1   mainline housing units have phone access and people in EOH cells generally do not

2   have that access.  Morton remained in quarantine without adequate suicide

3   precautions until May 17, when he committed suicide.[130]

### 2.      The Sheriff's Department Fails to Adequately Monitor Incarcerated People at Risk for Suicide

6   205.   The SHERIFF'S DEPARTMENT lacks adequate policies and

7   procedures for the observation of incarcerated people at risk of suicide.  The Hayes

8   Report recommended that the SHERIFF'S DEPARTMENT revise its policies to

9   provide for constant observation of incarcerated people at the highest level of

10  suicide risk.[131]  The NCCHC Report also criticized the complete absence of constant

11  observation of incarcerated people who were actively self-harming.[132]  The DRC

12  Experts likewise recommended that the SHERIFF'S DEPARTMENT provide for

13  constant observation of incarcerated people when necessary.[133]  The DRC Report

14  recounted video of a person in EOH preparing for over 14 minutes to jump from his

15  cell desk, until the person finally jumped and landed on his head.[134]  Constant

16  observation would have allowed for earlier intervention and would help to prevent

17  such serious suicide attempts.

18  206.   The SHERIFF'S DEPARTMENT still lacks any policy or practice

19  providing for the constant observation of incarcerated people who are actively

20  suicidal, either threatening to or engaging in the act of suicide.  The SHERIFF'S

21  DEPARTMENT also fails to adequately train and supervise custody staff on suicide

22  prevention, observation, and intervention.  These inadequate policies and practices

---

[130] Jeff McDonald, Kelly Davis, *Family of Vista jail suicide victim files lawsuit against San Diego County,* SAN DIEGO UNION-TRIBUNE, Aug. 8, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-08-11/family-of-vista-jail-suicide-victim-files-lawsuit-against-san-diego-county.

[131] Hayes Report at 45, 54, 73.

[132] NCCHC Report at 33, 67.

[133] DRC Report, Appendix A at 17-18.

[134] *Id.* at 15.

place incarcerated people at risk of serious harm or death.

### 3. The Sheriff's Department Fails to Provide Adequate Follow-up Care for Incarcerated People Released from Suicide Precautions

207.   The SHERIFF'S DEPARTMENT lacks adequate policies and practices for providing follow-up mental health care once patients are discharged from the ISP.  The SHERIFF'S DEPARTMENT fails to adequately train staff to provide follow-up mental health care to patients discharged from the ISP.  The Hayes Report found that the ISP follow-up protocol was "confusing and unnecessarily cumbersome."[135]  Hayes also found that Jail staff consistently failed to document adequate treatment plans for incarcerated people released from the ISP.  An adequate treatment plan would describe "signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur."[136]  These failures place incarcerated people at substantial risk of serious harm.

208.   For example, DRC found that one person's treatment record included no information about his heightened risk for suicide, even though custody staff knew the individual had attempted suicide three weeks earlier and had been in the ISP after that suicide attempt.  The person was anxious about his upcoming extradition, and died by suicide the day before the extradition was scheduled.[137]  Plaintiff OLIVARES was supposed to have regular ISP follow-up care, but Jail staff repeatedly rescheduled one of his appointments—ultimately pushing it back nearly two months from March 6 to May 1, 2022.

209.   To ensure adequate follow-up care, the DRC Experts recommended that the SHERIFF'S DEPARTMENT ensure all incarcerated people released from the ISP to other housing units in the Jail are seen by a mental health professional

---

[135] Hayes Report at 52.

[136] Id. at 52-53.

[137] DRC Report at 13.

within one day.[138]  The SHERIFF'S DEPARTMENT's policies and practices remain deficient and follow-up care remains untimely.  The 2022 State Audit Report found that under the SHERIFF'S DEPARTMENT's current policies, a person previously housed in a safety cell or EOH cell might eventually receive follow-up appointments only once every 90 days.[139]  Upon information and belief, custody staff are unavailable or unwilling to transport incarcerated people to follow-up visits with mental health professionals, or even to assist mental health staff with opening doors or food flaps to enable cell-side follow-up encounters with incarcerated people released from ISP.  This practice contributes to the dangerous delays in provision of any mental health care to those incarcerated people being released from ISP.

### J.   The Sheriff's Department Fails to Provide Adequate Care to Incarcerated People with Acute Mental Health Needs

210.   Upon information and belief, the SHERIFF'S DEPARTMENT fails to provide adequate mental health treatment to incarcerated people with acute mental health needs.  The SHERIFF'S DEPARTMENT fails to adequately train staff to provide mental health treatment to incarcerated people with acute treatment needs.  The PSUs at Central and Las Colinas are intended to provide an inpatient level of care to incarcerated people requiring the most intensive mental health care.  However, the PSUs lack sufficient space for the number of incarcerated people requiring that level of mental health care.  Incarcerated people with serious mental illness have to wait days for a referral to the PSU, and then join a lengthy waitlist for admission.  The problem is so acute that one psychologist in the PSU at Central would regularly sneak in and move her patient's name up the list (written on a whiteboard), in an attempt to ensure that her patients actually received PSU-level care.  The system's deficiencies force clinicians into a terrible Hobson's choice –

---

[138] *Id.*, Appendix A at 11.

[139] State Audit Report at 22.

engage in unethical manipulation of the system or see their patients go without the treatment they need.

211.   While waiting for referral or admission to the PSU, patients requiring more intensive mental health care are sometimes placed in other housing units used as "overflow."  For example, Plaintiff LEVY reported that her housing unit at Las Colinas, 4A, is used as "overflow" when the PSU lacks capacity for incarcerated people referred to the PSU.  Unit 4A is a high-security unit with restrictions on privileges, which means that patients referred to the PSU—deemed to require the most intensive mental health care available in the Jail system—are instead subject to punitive housing conditions while waiting to get care.  Other times, incarcerated people in mental health crisis are locked down in their existing housing unit— depriving them of access to programs and services—while they await a psychiatric evaluation for potential admission to the PSU.

212.   Upon information and belief, JAIL DEFENDANTS have failed to execute any contracts with community mental health providers to allow the Jail to refer incarcerated people with emergent medical and mental health needs to those community providers when the Jail's PSUs and medical units are full or, as is often the case, dangerously understaffed.

213.   JAIL DEFENDANTS' failure to maintain sufficient mental health staff creates pronounced problems in the PSU, as well as in the Jail's mental health stepdown units, where many other patients requiring high levels of mental health care are housed.  Although PSU patients often require daily one-on-one treatment, there are not enough assigned PSU mental health staff or contractors to provide daily treatment.  The Women's PSU at Las Colinas has been regularly understaffed, with patient-to-staff ratios nearly twice the community standard. Staff turnover is rampant at the PSU:  a new clinician assigned to the PSU in 2021 quit after only two months, and it took the Jail another two months to hire a replacement.

214.   Making matters worse, the SHERIFF'S DEPARTMENT lacks

adequate policies and practices for providing mental health care in the PSUs during lockdowns, which are frequent.  The NCCHC Report found that mental health care was often interrupted by lockdowns.[140]  The SHERIFF'S DEPARTMENT has failed to implement adequate policies and procedures to remedy the problem:  lockdowns remain frequent in the Jail—including in the PSUs—which prevents patients with the highest need for mental health care from receiving treatment.

215.   The SHERIFF'S DEPARTMENT also fails to house patients with serious mental illness in appropriate, therapeutic settings.  In violation of the ADA and Rehabilitation Act, the SHERIFF'S DEPARTMENT has a policy and practice of placing people with mental health disabilities in isolation rather than individually determining the most integrated environment in which a person can be safely housed.  For example, the PSU contains four observation cells that custody staff often use to punish incarcerated people for perceived behavioral issues, rather than because such placement is clinically indicated.  These observation cells are often dirty isolation environments in which a person is stripped naked and given a safety smock to wear.  The below photo shows a man deprived of his clothes in the PSU, using a roll of toilet paper to rest his head on the floor.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[140] NCCHC Report at 33.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18      216.   On other occasions, after mental health staff clear a person from the

19   observation cells, custody staff delay the person's move from the observation cells

20   back to the rest of the PSU for as long as a week, which causes those incarcerated

21   people to further decompensate.

22      217.   Cells in the mental health OPSD, which house individuals with serious

23   mental illness but do not provide a structured mental health treatment program, are

24   barbaric and filthy.  The below photographs from Central in November 2021

25   demonstrate how these cells are frequently covered in trash and not fit for human

26   habitation, let alone for incarcerated people with grave mental health needs.

27

28



218.    The SHERIFF'S DEPARTMENT fails to provide adequate training and supervision to custody staff assigned in the PSU.  This leads to systematic violations of policy and to other practices that place incarcerated people at risk of serious harm or death.  For example, in 2019, Ivan Ortiz died by suicide in a PSU observation cell after a deputy, in violation of policy, left a plastic bag in Ortiz's cell.[141]  Ortiz used the plastic bag to suffocate himself to death.  On other occasions, custody staff prevent clinicians in the PSU from providing care to incarcerated people, including by refusing to escort incarcerated people to mental health encounters, or by refusing to unlock the closet that contains reading material for the clinician to provide to incarcerated people.

219.    The SHERIFF'S DEPARTMENT lacks adequate policies and procedures for providing follow-up care to patients discharged from the PSU.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to properly train staff how to provide adequate follow-up care to incarcerated people discharged from the PSU.  In practice, mental health staff fail to prepare adequate discharge plans for incarcerated people released from the PSU back to other housing units.  This

---

[141] Jeff McDonald, Kelly Davis, *San Diego County pays $1M to family in inmate death, pushing year's payouts past $14M*, SAN DIEGO UNION-TRIBUNE, June 12, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-06-12/san-diego-county-pays-1m-to-family-in-inmate-death-pushing-payouts-past-14m-in-just-over-a-year.

practice places incarcerated people at significant risk of serious harm.

**K.    The Sheriff's Department Discriminates Against and Unfairly Punishes Incarcerated People with Mental Illness in its Housing Placements**

220.    Pursuant to the ADA and the Rehabilitation Act, patients with serious psychiatric disabilities and intellectual disabilities must be housed in the most integrated and least restrictive setting appropriate to their needs.  By policy and practice, the SHERIFF'S DEPARTMENT discriminates against incarcerated people with mental health disabilities and intellectual disabilities by placing them in isolation units solely because of their disabilities.  The SHERIFF'S DEPARTMENT fails to adequately train staff how to appropriately house incarcerated people with mental health disabilities.  Instead, the SHERIFF'S DEPARTMENT frequently houses people with mental health disabilities in isolation units known as "administrative segregation."  These administrative segregation cells are generally intended for incarcerated people who have violated Jail rules, been violent toward incarcerated people or staff, or failed to conform to the "minimum standards" of other Jail housing units.  The SHERIFF'S DEPARTMENT's Jail Population Management Unit also retains discretion to place people in segregation.

221.    In segregation, people are held in lockdown conditions, and by policy receive only 60 minutes of out-of-cell time every 24 hours; even this minimal out-of-cell time is often not provided.  Incarcerated people in segregation have even less freedom to interact with other incarcerated people and have extremely limited access to programs and services at the Jail.  Access to mental health care in administrative segregation is limited, as visits with mental health staff and contractors are usually brief and conducted through the food slot in the door.  For incarcerated people with acute and/or chronic mental illness, the appropriate standard of care includes, and they should be provided with, psychosocial rehabilitation services, which include structured out-of-cell programming that addresses their symptoms of mental illness, reduces their isolation, and promotes

adherence with treatment and medications.  Segregation provides the opposite, and incarcerated people with serious mental illness are denied access to programs and services because they are placed in administrative segregation cells.

222.   Experts have criticized the SHERIFF'S DEPARTMENT for using segregation to house people with mental illness, thereby placing them at risk of serious harm.  The NCCHC Report found that the SHERIFF'S DEPARTMENT housed incarcerated people in segregation units solely because they have a mental illness, rather than for disciplinary infractions.[142]  The DRC Report found that at least six incarcerated people killed themselves at the Jail between 2014-2016 while in segregation units.[143]  The DRC Report further found that one person committed suicide after spending six consecutive weeks in administrative segregation, and four months overall.[144]  The person's medical record indicated that staff failed to notice the significant mental health issues the person developed while in segregation. Another person with mental illness committed suicide in administrative segregation after waiting days to see mental health staff and being denied out-of-cell time.[145] DRC urged the SHERIFF'S DEPARTMENT to "take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances."[146]  Expert Lindsay Hayes also noted "the strong association between inmate suicide and segregation housing" and urged the SHERIFF'S DEPARTMENT to ensure that mental health staff timely evaluate whether segregation is contraindicated by a person's mental health needs.[147]

---

[142] NCCHC Report at 68, 136.

[143] DRC Report at 3.

[144] *Id.* at 14.

[145] *Id.* at 15.

[146] *Id.* at 27.

[147] Hayes Report at 18, 57.

223.   Clinical leadership at the Jail themselves recommended, and attempted to direct, that patients with significant mental health needs not be placed in isolation housing.  The SHERIFF'S DEPARTMENT rejected these recommendations and continues to house people with serious mental illness in administrative segregation. For example, at George Bailey, unit 5C is an administrative segregation unit that frequently houses incarcerated people with mental illness.  On average in 2021, nearly half of the administrative segregation cells on the fifth and sixth floor at Central were occupied by incarcerated people with serious mental health needs.  The SHERIFF'S DEPARTMENT routinely places incarcerated people in administrative segregation for reasons related to their mental illness, such as "erratic behavior" or "causing tension in the module."  One person with serious mental illness at Central was kept in administrative segregation for at least six months during 2021, not due to any disciplinary infraction but rather due to his mental health-related behaviors. He repeatedly asked to be let out of segregation because the isolation was causing him to decompensate.  In January 2022, a patient who had been without his psychiatric medication for at least five days was placed in administrative segregation as punishment for behavior based on his mental health disability.

224.   Custody staff frequently make housing decisions for patients with mental illness without consulting with, or overruling the recommendation of, mental health staff.  The SHERIFF'S DEPARTMENT also lacks adequate policies and practices to ensure the safety of incarcerated people once they are placed in administrative segregation.  After a person is transferred to administrative segregation, the SHERIFF'S DEPARTMENT's written policy provides that custody staff must notify health care staff, who are supposed to review the person's health record.  However, mental health staff cannot recommend that a person be removed from administrative segregation even if such placement is clinically contraindicated—and many people are housed in isolation even when clinicians conclude such placement is contraindicated.

225.   These policies and practices place incarcerated people at risk of serious harm.  For example, Matthew Mark Godfrey, a man with serious mental illness, died in filthy conditions in administrative segregation in November 2019.  Godfrey died in 6E, the same unit as Lester Marroquin, who died by suicide in May 2021.  The harmful effects of isolation on Godfrey's mental health were manifest from the condition in which he died.  Godfrey was wearing five pairs of underwear and three pairs of socks.  He was found with torn clothing around his neck and a rope in his pants.  Although Jail medical staff initially reported Godfrey's death as a suicide, the medical examiner determined he died from a heart condition.  According to the medical examiner's report, Godfrey's cell "was dirty and unkempt with paper waste and food debris strewn along the walls and floor."  In 2022, custody staff moved Lonnie Rupard—who had serious mental health needs—to a segregation unit, even though Mr. Rupard's clinician did not think administrative segregation was a clinically appropriate housing placement for him.  However, Mr. Rupard's clinician had no power to advocate for another housing option.  The placement in administrative segregation also meant that Mr. Rupard's existing clinician could no longer see him.  In March 2022, Mr. Rupard died in administrative segregation, with feces all over his cell and the toilet, and food trays and other trash all over his cell.

226.   The SHERIFF'S DEPARTMENT lacks adequate policies and procedures to ensure that incarcerated people designated as protective custody receive the mental health care they need.  Specifically, the SHERIFF'S DEPARTMENT categorically excludes people designated as protective custody from housing in the outpatient stepdown ("OPSD") unit, which is designed to cluster people with mental illness and protect them from victimization by others.  If custody staff designate a person with mental illness as protective custody, that designation prevails and the person is excluded from OPSD, even if OPSD placement is clinically recommended.  This places patients at a substantial risk of serious harm.  For example, in March 2022, Derek Baker—who was found

1   clinically appropriate for OPSD but excluded due to his protective custody status—

2   was killed by his protective custody cellmate.  Mental health staff have raised

3   concerns about this policy, including before Derek Baker's death, but the

4   SHERIFF'S DEPARTMENT has refused to change its policy and continues to place

5   people at risk of grave harm.

6   **L.    The Sheriff's Department Fails to Provide Incarcerated People with Adequate Mental Health Discharge Planning and Resources**

7

8       227.   The SHERIFF'S DEPARTMENT's policies and practices for the

9   provision of continuing mental health care services upon an incarcerated person's

10  release are inadequate.  The SHERIFF'S DEPARTMENT fails to adequately train

11  staff how to appropriately release incarcerated people with serious mental health

12  needs so that such individuals can continue their mental health care in the

13  community.

14      228.   The SHERIFF'S DEPARTMENT does not provide adequate discharge

15  planning to incarcerated people with mental health needs.  For example, the

16  SHERIFF'S DEPARTMENT routinely releases incarcerated people with serious

17  mental illness from the Jail (including from the PSU) in the middle of the night, with

18  no discharge plan, no linkage to mental health services, and no one to pick them up.

19  The SHERIFF'S DEPARTMENT does not sufficiently or adequately schedule

20  follow-up appointments in the community, nor are incarcerated people provided

21  with sufficient referrals or information about where they may receive access to

22  Medi-Cal, mental health care services, or medications.  For example, Plaintiff

23  ANDRADE, who reported feeling suicidal while incarcerated at the Jail in August

24  2022, did not receive any discharge planning, including seeing a psychiatrist, prior

25  to his release in October 2022.  The Jail's discharge planners have little contact with

26  mental health staff, and the SHERIFF'S DEPARTMENT lacks any formal

27  procedure for ensuring that incarcerated people are connected with mental health

28  services in the community.

229.   The SHERIFF'S DEPARTMENT does not provide incarcerated people with an adequate supply of their necessary mental health medications.  For those incarcerated people who are prescribed medications at the Jail, SHERIFF'S DEPARTMENT policy provides that incarcerated people only receive a 10-day supply of medication upon release, and only for certain medications, defined vaguely as "critical medications."  However, in practice, Jail staff provide incarcerated people with only 7 days of most medications.  This is insufficient, as incarcerated people released from the Jail are often unable to secure medical care in the community and a refill of essential medications within 7 days.  As a point of comparison, CDCR people releasing from prison with a 60-day supply of medication.  Other California county jail systems provide medication supplies of 30 days or more upon release.

## III.   JAIL DEFENDANTS DISCRIMINATE AGAINST, FAIL TO ACCOMMODATE, AND VIOLATE THE CONSTITUTIONAL AND STATUTORY RIGHTS OF INCARCERATED PEOPLE WITH DISABILITIES

230.   JAIL DEFENDANTS incarcerate significant numbers of individuals with disabilities, as that term is defined in the ADA, and Rehabilitation Act, and California law.  By policy and practice, JAIL DEFENDANTS routinely fail to provide incarcerated people with disabilities reasonable accommodations and to ensure meaningful and equal access to all of the programs and services offered by the Jail.  These actions and inactions significantly increase the risk of substantial harm to incarcerated people with disabilities.  Moreover, JAIL DEFENDANTS' refusal to accommodate incarcerated people with disabilities results in the provision of inadequate medical, mental health, and dental care.

### A.   The Sheriff's Department Lacks Adequate Policies and Practices to Identify and Track Incarcerated People with Disabilities

231.   Under the ADA and the Rehabilitation Act, the SHERIFF'S DEPARTMENT must create and maintain a system to identify and track individuals

1  with disabilities and the accommodations they require.  However, by policy and
2  practice, the SHERIFF'S DEPARTMENT fails to adequately identify individuals
3  with disabilities and the reasonable accommodations they require.  During the intake
4  process, Jail staff gather information about newly arriving people, and use this
5  information to make a number of determinations, including for classification,
6  housing, and treatment decisions.  The staff responsible for intake are not adequately
7  trained by the SHERIFF'S DEPARTMENT about how to identify and track people
8  with disabilities, and therefore frequently fail to identify people with disabilities or
9  the accommodations they need to access programs and services in the Jail.  The Jail
10  intake questions are inadequate to document if a person has a disability and requires
11  accommodations.

12      232.   As a result of these inadequate policies and procedures, the SHERIFF'S
13  DEPARTMENT fails to identify newly arriving people's disabilities and needed
14  accommodations during the intake process, which results in the denial of
15  accommodations mandated by the ADA and the Rehabilitation Act and places
16  people with disabilities at risk of discrimination, injury, and/or exploitation.

17      233.   For example, Plaintiff LOPEZ is Deaf and uses American Sign
18  Language ("ASL") as his primary form of communication.  LOPEZ requires an
19  ASL interpreter to communicate effectively with persons who do not know ASL.
20  During the booking process, LOPEZ informed the intake nurse by written notes that
21  he is Deaf and uses ASL; however, LOPEZ's medical records indicate that as of
22  June 2020—eight months after he was arrested and booked—the Jail did not have a
23  record that LOPEZ is Deaf and uses ASL to communicate.  The Jail intake form
24  completed upon LOPEZ's arrival contains an incorrectly checked "No" in response
25  to the question of whether LOPEZ has hearing limitations.  Jail custody and medical
26  staff lacked critical information in LOPEZ's medical records and in the Jail's
27  tracking systems about the accommodations necessary for him to access programs
28  and services at the Jail.  For several months, when a new nurse was assigned to work

with LOPEZ, the staff member often failed to communicate effectively with LOPEZ because they apparently did not know that LOPEZ is Deaf.

234.   Upon information and belief, the SHERIFF'S DEPARTMENT does not maintain an effective central tracking system, electronic or otherwise, of incarcerated people with disabilities and the accommodations they require.  The SHERIFF'S DEPARTMENT does not maintain adequate information about incarcerated people's disabilities and related accommodations in custody and/or medical files.  Upon information and belief, to the extent that the SHERIFF'S DEPARTMENT maintains information about a person's disabilities in any form, custody, medical, and clerical staff are not provided access to the information in a manner that would timely and effectively inform them of the person's disabilities and appropriate accommodations.  The SHERIFF'S DEPARTMENT does not adequately train staff to maintain records or information about incarcerated people's disabilities and related accommodations.

235.   The lack of an adequate disability and accommodation tracking system results in substantial injuries to incarcerated people with disabilities.  Without an adequate tracking system, custody, medical, and mental health staff and contractors have no easily accessible means to determine whether a person has a disability, and what, if any, accommodations that person requires.  Consequently, the SHERIFF'S DEPARTMENT fails to provide people with accommodations and/or take away accommodations that have already been provided without justification.

236.   For example, Plaintiff DUNSMORE has ankylosing spondylitis, a severe and advanced form of arthritis that, over time, can cause spinal deformities. DUNSMORE started to have back pain decades ago and has already had sections of his spine fused together.  Due to his condition, DUNSMORE also experiences inflammation, pain, and stiffness in his hands and feet.  He is slowly losing feeling in both of his hands, and he struggles to grip items.  He uses a modified spoon with a foam handle to eat and a modified pencil with a foam handle to write.  Without

1   those devices, DUNSMORE struggles to eat and write.  DUNSMORE also cannot

2   tip his head back to drink because his spine is fused, so he uses a straw to drink.

3   DUNSMORE receives injections that have enabled him to be more mobile than

4   untreated patients with his condition.  Regular physical activity helps DUNSMORE

5   stay mobile when his condition allows.  Even so, DUNSMORE's disability-related

6   limitations wax and wane.  On some days, he is more easily able to move around

7   than other days.  Sometimes, his condition flares up so significantly that the pain

8   places DUNSMORE in a state of paralysis.  Because his condition fluctuates,

9   DUNSMORE often needs a wheelchair, cane, or walker to move around.  When

10  DUNSMORE arrived at the Jail on August 16, 2018 from CDCR, DUNSMORE had

11  all of his assistive devices:  a wheelchair, cane, walker, modified spoon, modified

12  pencil, and straw.  On September 10, 2018, Jail staff confiscated DUNSMORE's

13  wheelchair and modified spoon because a deputy watched a video of DUNSMORE

14  ambulating unassisted in the recreation area at a moment when he was capable of

15  doing so.  Because the Jail lacks an adequate system for tracking DUNSMORE's

16  disability and his required accommodations, Jail staff did not understand the nature

17  of DUNSMORE's disability and how his mobility fluctuates.  The SHERIFF'S

18  DEPARTMENT's confiscation of DUNSMORE's devices caused his psychological

19  state to decompensate to the point where he told Jail staff that he was suicidal.

20  DUNSMORE was placed in a dirty EOH cell for several days without any of his

21  assistive devices or property.  Thereafter, DUNSMORE changed his behavior to try

22  to hide the nature of his disability out of concern that staff would call him a liar and

23  again confiscate his assistive devices if they saw him at a time when he was capable

24  of unassisted movement.

25      237.   When Plaintiff DUNSMORE returned to the Jail again in December

26  2019 for resentencing, he came with all of the assistive devices he uses in CDCR,

27  including his modified spoon, straw, wheelchair, and cane.  Even though

28  DUNSMORE has been prescribed these devices in CDCR on a permanent basis,

1  staff immediately confiscated DUNSMORE's modified spoon, straw, and cane.

2  Because DUNSMORE had been incarcerated at the Jail on previous occasions,

3  including in 2018, the SHERIFF'S DEPARTMENT had knowledge of

4  DUNSMORE's disability and need for accommodations.  DUNSMORE did not

5  receive his cane for the entirety of his stay at the Jail, from December 2019 to April

6  2021.  DUNSMORE also requires assistance changing his shirts, but the

7  SHERIFF'S DEPARTMENT frequently refused to provide DUNSMORE with help

8  during his incarceration at the Jail, so he often wore the same dirty shirt for months

9  at a time.

10      238.   One person at George Bailey, who has lower back pain and nerve

11  damage resulting from his long career in the military, has a prescription for a

12  wheelchair for use when traveling long distances or standing for a long time, such as

13  when going to court.  In or around October 2021, custody staff forced this person to

14  walk from the Jail to the bus transporting people to court, rather than providing him

15  his wheelchair, despite his requests.  Custody staff did not believe that the person

16  had a chrono (authorizing documentation) for a wheelchair.  When he returned from

17  court, deputies again refused to provide him a wheelchair, and he had to walk to the

18  bus again.  Walking caused the person a significant amount of pain.  One deputy

19  told the person, "You were in the military, you can handle the pain."

20      239.   Similarly, Plaintiff ARCHULETA was denied use of his wheelchair

21  while waiting in the court holding area at Central.  A deputy took away the

22  wheelchair and tried to force ARCHULETA to walk to the hearing.  However,

23  ARCHULETA cannot walk long distances, and his court hearing had to be

24  postponed because he was unable to walk to the hearing and his disability was not

25  accommodated.

26  **B.    The Sheriff's Department Fails to Accommodate Incarcerated People with Hearing and Speech Disabilities**

27

28      240.   Incarcerated people with hearing, speech, and other communication

disabilities have difficulty effectively communicating with Jail staff and require accommodations to ensure effective communication with staff as well as equal access to programs and services offered by the Jail.  By policy and practice, the SHERIFF'S DEPARTMENT fails to provide such accommodations and fail to adequately train staff how and when to provide such accommodations.  The SHERIFF'S DEPARTMENT regularly fails to provide incarcerated people with hearing and speech disabilities with sign language interpreters, hearing aids, or other auxiliary aids.

241.   The SHERIFF'S DEPARTMENT does not provide incarcerated people with hearing and speech disabilities with sign language interpreters, hearing aids, or other auxiliary aids during the booking and intake process, which harms these incarcerated people by preventing them from communicating specific concerns, including emergency medical issues, and understanding the Jail's policies and practices.  For example, Plaintiff LOPEZ, who is Deaf and uses ASL to communicate, was booked into Vista on or around October 8, 2019.  LOPEZ was not provided a sign language interpreter during the booking process; instead, he was forced to communicate with medical staff via written notes, a method of communication that is less effective for him.  During the intake process, a deputy was dispatched to sign with LOPEZ, but the deputy lacked the skill and qualifications to effectively communicate with Deaf individuals.  Later, LOPEZ attended an initial mental health appointment during which custody staff handcuffed him to a bar in the room, which made it impossible for him to use his hands to sign effectively with the in-person interpreter about his mental health.

242.   The SHERIFF'S DEPARTMENT fails to provide equal access to telephone services to incarcerated people who are Deaf or hard of hearing. Incarcerated people without disabilities generally have access to standard telephones when they are in the common area of their housing unit.  By policy and practice, an incarcerated person may make unlimited telephone calls, unless restrictions are

1   necessary to preserve safety and security.  In contrast, the SHERIFF'S

2   DEPARTMENT fails to provide anything close to the same level of access to

3   functioning Video Relay Service ("VRS") or Video Remote Interpreting ("VRI"), or

4   even to the now-outmoded Telecommunications Device for the Deaf ("TTY")

5   phones, to incarcerated people who are hard of hearing.  The SHERIFF'S

6   DEPARTMENT's policies and practices for equal access to telephone services are

7   inadequate, and the SHERIFF'S DEPARTMENT fails to adequately train staff how

8   to provide equal access to telephone services.

9        243.   For example, Plaintiff LOPEZ could not keep in regular contact with

10   his wife or attorney because Vista did not have any VRS and its TTY machine was

11   not in working order.  A few days after arriving at Vista, LOPEZ tried to use the

12   TTY, but it was broken.  When LOPEZ asked deputies about the TTY, none of them

13   knew how to operate it—and they ignored LOPEZ's repeated requests to fix the

14   TTY machine.  Because of the lack of communication options, LOPEZ was forced

15   to ask other incarcerated people to make phone calls on his behalf and to relay

16   important messages.

17        244.   LOPEZ later transferred to George Bailey, which also had an

18   antiquated TTY that staff did not know how to make operable.  When the Jail

19   suspended social visits for long periods during LOPEZ's incarceration, he had to

20   rely on the TTY to communicate with his family.  But the TTY at George Bailey did

21   not work properly; there was usually a poor signal that stopped all communication,

22   and even when the signal worked, words often became garbled when two people

23   spoke at the same time, messing up the translation.  Because of these problems,

24   LOPEZ's conversations over the TTY took much longer than normal voice phone

25   calls, but Jail staff would regularly rush LOPEZ to end his calls and prevent him

26   from finishing conversations with his loved ones or attorneys.  Deputies also

27   frequently refused LOPEZ's requests to use the TTY.  LOPEZ estimates that staff

28   refused him access to the TTY at least 100 times during his incarceration.  In some

1    cases, he waited as long as three days after requesting to use the TTY.

2       245.   The SHERIFF'S DEPARTMENT fails to provide incarcerated people

3    with hearing and/or speech disabilities with sign language interpreters, hearing aids,

4    or other auxiliary aids to permit participation in programs and services at the Jail,

5    including but not limited to appointments with medical staff.  For example, Jail staff

6    did not provide Plaintiff LOPEZ a sign language interpreter during numerous

7    interactions with nursing and medical staff, despite his multiple requests.  LOPEZ

8    never received an interpreter for routine medical contacts inside the Jail.  Instead,

9    LOPEZ had to rely on handwritten notes to understand complex medical issues and

10   his provider's advice.  For the majority of these appointments, LOPEZ did not

11   understand what medical staff tried to communicate.  Sometimes, medical staff did

12   not write any information for LOPEZ, and he could not read their lips because staff

13   wore masks for most interactions.  If a new nurse was assigned to work with

14   LOPEZ, they often failed to communicate effectively because they did not know,

15   and apparently had no way of knowing due to the Jail's deficient disability

16   identification and tracking processes, that LOPEZ is Deaf.  Custody staff at the Jail

17   had other incarcerated people write down staff's questions and responses for

18   LOPEZ to read.  Custody staff often told another incarcerated person what to

19   communicate to LOPEZ and then left before LOPEZ had an opportunity to respond,

20   which prevented LOPEZ from asking follow-up questions.  This practice also placed

21   LOPEZ at a substantial risk of serious harm because other incarcerated people

22   learned confidential information about him, and he could not trust that other

23   incarcerated people would write down information accurately.  LOPEZ was

24   constantly fearful that having other incarcerated people involved in his

25   communications with deputies put him at extreme risk of being harmed.  LOPEZ

26   could not control whether incarcerated people would communicate sensitive and

27   confidential information about him to other incarcerated persons at the Jail.  In

28   internal documents, SHERIFF'S DEPARTMENT staff recognized the same danger.

1   A SHERIFF'S DEPARTMENT sergeant wrote to supervisors at the Jail that "using

2   other inmates to try and communicate with [a Deaf person] could lead to issues

3   down the road," because it "could pose a danger to him if deputies are using other

4   inmates to rely conversations they (other inmates) should not be privy to."

5        246.   The SHERIFF'S DEPARTMENT does not provide equal access to

6   television to incarcerated people who have hearing disabilities or are Deaf.  Upon

7   information and belief, most non-disciplinary housing units have televisions

8   installed for incarcerated people to watch, but in many instances, the SHERIFF'S

9   DEPARTMENT has either not installed televisions capable of displaying closed

10  captioning or failed to ensure the televisions are set to display closed captioning.

11       **C.     The Sheriff's Department Fails to Accommodate Incarcerated
          People With Substance Use Disorders**

12

13       247.   As explained above, the SHERIFF'S DEPARTMENT by policy and

14  practice fails to continue or provide medically necessary treatments and

15  accommodations, including MAT, for incarcerated people with substance use

16  disorders prior to being booked into the Jail.  The SHERIFF'S DEPARTMENT

17  lacks adequate policies and practices for the tracking and treatment of people with

18  substance use disorders.  Upon information and belief, the SHERIFF'S

19  DEPARTMENT does not adequately train or supervise their staff how to evaluate

20  and treat incarcerated people with substance use disorders.

21       **D.     The Sheriff's Department Routinely Fails to Provide Assistive
          Devices to Incarcerated People with Disabilities**

22

23       248.   By policy and practice, the SHERIFF'S DEPARTMENT fails to ensure

24  that incarcerated people with disabilities who require assistive devices as

25  accommodations are provided with and allowed to retain those devices, including,

26  but not limited to, wheelchairs, walkers, eyeglasses, magnifiers, screen readers,

27  crutches, canes, braces, tapping canes, hearing aids, and pocket talkers.  The

28  SHERIFF'S DEPARTMENT fails to consider incarcerated people's specific needs

1    and abilities in assigning assistive devices, to the detriment of those people's overall
2    health and safety.  The SHERIFF'S DEPARTMENT also fails to adequately train
3    staff how to timely and appropriately provide assistive devices to people with
4    disabilities.

5         249.   For example, Plaintiff NELSON has osteonecrosis in his hips and
6    knees, which means his bones are deteriorating, and has had multiple hip
7    replacements.  In addition, he sustained a serious spinal injury immediately before
8    being booked into the Jail.  As a result, NELSON requires use of a wheelchair to get
9    around; he cannot stand or walk without experiencing significant pain.  Jail staff
10   initially provided NELSON with a wheelchair that had such small wheels that
11   NELSON could not push himself around using his arms.  Instead, NELSON had to
12   use his legs to kick the floor in order to propel the wheelchair—even though it is
13   painful to do so and his legs have little strength.  To avoid pain, NELSON would
14   rely on other incarcerated people to push him around in his wheelchair.  Eventually,
15   after about four months, Jail staff finally provided NELSON a replacement wheel-
16   chair.  Before the replacement wheelchair was provided, NELSON was required to
17   rest his forearms directly on the rubber wheels that come in contact with the floor,
18   an unsanitary practice.  Over time, this became painful for NELSON and the friction
19   from the rubber wheels reopened and sometimes caused sores on his arms.

20        250.   Plaintiff CLARK has mobility disabilities and uses a wheelchair to
21   travel long distances.  In or around March 2022, the seat of CLARK's wheelchair
22   broke, which caused him to fall when trying to sit in the chair.  CLARK filed two
23   sick call requests to get the wheelchair repaired.  He fell out of his broken
24   wheelchair and hurt himself while waiting for it to get repaired.  CLARK had to
25   borrow a wheelchair from a dormmate to meet with Plaintiffs' counsel.

26        251.   Plaintiff LANDERS has a history of gout and neuropathy, which cause
27   pain in her ankles and knees, and can make it very painful for her to walk.  In the
28   community, LANDERS used a cane and walker.  LANDERS was not permitted to

1  bring either device when she was arrested.  A doctor in the community had

2  recommended in February 2022 that LANDERS receive a wheelchair on a

3  permanent basis.  The SHERIFF'S DEPARTMENT received that medical

4  documentation June 21, 2022 but did not provide LANDERS a wheelchair or any

5  assistive device at that time.  LANDERS persisted through multiple sick call

6  requests for mobility assistive devices.  Jail staff refused to provide her with a

7  wheelchair.  LANDERS did not receive a walker until on or around July 8, 2022,

8  after she met with Plaintiffs' counsel and Plaintiffs' counsel specifically requested

9  that she receive the accommodation.  Without assistive devices, LANDERS suffered

10  from severe pain that limited her from activities of daily living, and she struggled to

11  shower and use the toilet.

12      252.   The SHERIFF'S DEPARTMENT's policy on incarcerated people with

13  disabilities includes no definition of auxiliary aids and services, although the ADA

14  regulations require that public entities give primary consideration to a person with

15  disabilities' preferred auxiliary aids and services.  28 C.F.R. § 35.160.  In addition,

16  the SHERIFF'S DEPARTMENT's medical operations manual does not define "aids

17  to impairment," but instead only includes a short, non-exhaustive list of potential

18  aids.  Staff using these policies, especially those who are not well-trained and not

19  familiar with the range of assistive devices a person with disabilities might require,

20  improperly decline to provide incarcerated people with their requested assistive

21  devices.

22      253.   For example, Plaintiff DUNSMORE uses a modified spoon with a

23  foam handle to eat because his arthritic condition has caused his grip to weaken.

24  DUNSMORE has dysphagia, which makes it difficult to swallow foods on his own

25  and requires a ground medical diet.  When DUNSMORE arrived at the Jail in

26  December 2019, Jail staff failed to place him on a medical diet.  DUNSMORE was

27  forced to use his modified spoon to cut the food into small enough pieces for him to

28  eat, causing his modified spoon to break in February 2020.  After more than a

1   month, in response to his request for a new spoon, Jail staff gave DUNSMORE a

2   tiny pediatric spoon, which was ineffective and made it more difficult for him to eat.

3       254.  By policy and practice, the SHERIFF'S DEPARTMENT improperly

4   applies a "medical necessity" standard to determine whether to provide assistive

5   devices to incarcerated people.  Specifically, the SHERIFF'S DEPARTMENT's

6   policy on incarcerated people with disabilities, M.39, states that accommodations

7   instructions are added to a person's medical record when "the recommended

8   instructions are necessary for the safety and/or welfare of a disabled inmate."  That

9   medical necessity standard is narrower than the ADA's reasonable accommodation

10  requirement that a public entity provide assistive devices or other accommodations

11  as necessary to ensure meaningful access to programs, services, and activities,

12  provided that doing so is reasonable.  Because of the SHERIFF'S DEPARTMENT's

13  improper standard, people with disabilities do not receive needed assistive devices

14  and cannot access the programs and services offered at the Jail.

15      255.  For example, the SHERIFF'S DEPARTMENT repeatedly took away

16  an extra mattress that had been provided to Plaintiff NELSON, who has a mobility

17  disability related to a leg condition and spinal injury.  (NELSON has been

18  prescribed one on a permanent basis by CDCR.)  NELSON's request for the extra

19  mattress was reasonable, especially because his pain and discomfort was far more

20  acute at the Jail than when he was incarcerated in CDCR due to the spinal injury he

21  suffered immediately before booking.  When NELSON arrived at the Jail on

22  March 2, 2021, the SHERIFF'S DEPARTMENT received an email notification

23  from CDCR that he requires an extra mattress.  NELSON initially received the extra

24  mattress, but it was taken from his cell four or five times during his first two months

25  at the Jail by custody staff conducting searches.  Each time the extra mattress was

26  taken away, NELSON had to plead for its return with deputies who often ignored

27  him.  During the times that he was without an extra mattress, NELSON suffered

28  from substantial pain and discomfort without his reasonable accommodation.

256.   Plaintiff ARCHULETA has severe osteoarthritis in his left knee, and his left leg is shorter than his right leg.  ARCHULETA also has degenerative disc disease.  As a result, he uses a wheelchair to travel long distances.  Crutches help him to ambulate and build strength in his legs.  In September 2019, ARCHULETA requested "crutches for therapy" in a sick call request that noted his mobility disability.  In response, Jail staff told ARCHULETA that he had to choose between crutches and a wheelchair, and could not have both.  This prevented him from using crutches to help build up his leg strength.

257.   By policy and practice, the SHERIFF'S DEPARTMENT frequently denies incarcerated people assistive devices or take them away when they have been issued.  For example, custody staff at Central apparently confiscated and threw away the prosthetic leg of one individual while he was out to court.  Without that prosthetic, the person was unable to ambulate on his own and was forced to use a wheelchair.  Custody staff confiscated the person's prosthetic even though the SHERIFF'S DEPARTMENT had documentation from a prior incarceration that he required one in order to walk.  Using a wheelchair reduces this person's ability to build strength in his other leg and also reduces his access to programs and services at the Jail, as many elements of housing units at the Jail are inaccessible to people in wheelchairs.

258.   The SHERIFF'S DEPARTMENT's written policies permit staff to remove devices based on "safety and security" concerns.  Inadequacies in the policies lead to the unjustified removal of assistive devices.  The policies include no provision requiring staff to document a specific safety or security concern arising from a person's assistive device.  Nor do the policies require staff to attempt to provide the person with an alternative accommodation that does not implicate the same safety concerns.

**E.    The Sheriff's Department Fails to Provide Equal Access to Programs and Services, Including Safe and Accessible Facilities, to Incarcerated People with Disabilities**

259.   The SHERIFF'S DEPARTMENT fails to ensure that incarcerated people with disabilities have equal access to all programs and services offered at the Jail.  The SHERIFF'S DEPARTMENT fails to ensure that people with disabilities are housed in units and assigned to beds that are accessible and safe.  Physical accessibility deficiencies throughout the Jail facilities prevent people with disabilities from safely accessing programs and services.  The SHERIFF'S DEPARTMENT fails to adequately train staff to house people with disabilities in accessible and safe housing.

260.   Each of the Jail facilities contains multiple housing units.  The housing units differ in their design, and importantly, in their accessibility to people with disabilities.  Some housing units consist of celled housing, where the unit is divided into a number of cells with doors, in which one, two, or three incarcerated people are housed.  Other housing units are dorm housing units, where many beds, including bunk beds, are placed into an open area shared by the people in that unit.

261.   The SHERIFF'S DEPARTMENT controls housing unit assignments. In housing units with celled housing, the SHERIFF'S DEPARTMENT assigns people to a particular cell.  By policy and practice, custody staff make decisions about where to house a particular person without taking into account the person's disability-related abilities and needs.  Due to the SHERIFF'S DEPARTMENT's failure to identify and track people with disabilities, custody staff decide where to house a person without essential information regarding the person's needs; this practice significantly increases the risk that the person will be assigned to a housing unit that is not accessible, because, for example, it lacks adequate toilets or grab bars in the shower, or lacks space for a wheelchair.

262.   For example, Plaintiff NELSON was repeatedly housed in inaccessible units.  NELSON uses a wheelchair due to his mobility disability.  Jail custody staff

1    initially assigned NELSON to a cell on the fifth floor at Central that was
2    inaccessible to him.  A stool was bolted in front of the desk in the cell, which meant
3    that NELSON's wheelchair could not fit in front of the desk.  To use the desk,
4    NELSON would have to make the difficult transfer from his wheelchair to the stool,
5    which put him at risk of falling to the floor, just to use the desk.  NELSON fell and
6    hurt his wrist in his cell in July 2021.  This was a double occupancy cell in unit 5A
7    housing three people.  The Board of State and Community Corrections ("BSCC")
8    has repeatedly criticized the Jail for housing three incarcerated people in cells rated
9    only for double occupancy.[148]  In NELSON's small cell, his wheelchair took up a
10   significant amount of space, which caused his cellmates to frequently become angry
11   with him.  Although the SHERIFF'S DEPARTMENT used the cell as an "ADA
12   cell," it was not the actual ADA cell in the housing unit, and the desk was too short
13   for NELSON to pull his wheelchair close and use the desk.

14        263.   While housed in unit 5A, NELSON also could not access the four
15   telephones in the dayroom because stools were placed in front of each telephone.
16   NELSON could not fit his wheelchair close enough to use the telephones because
17   the cords connecting the phone to the receiver were too short.  The seats at tables in
18   the dayroom are also bolted down and include no accessible space for a person in a
19   wheelchair to approach and sit at a table.  To access these programs and services,
20   NELSON had to transfer from his wheelchair to the bolted seats, which is difficult,
21   painful, and places him at risk of falling.  At least one individual in a wheelchair at
22   Central has fallen and seriously injured himself while attempting to transfer from his
23   wheelchair to the telephone stool.

24        264.   The shower in housing unit 5A lacks a shower chair for people with
25   mobility disabilities.  When NELSON was housed in that unit, he had to stand in the

26   ───────────────
27   [148] *See* Board of State and Community Corrections, *2018-2020 Biennial Inspection – San Diego County Jails*, Dec. 7, 2020, at 37, 84; Board of State and Community Corrections, *2016-2018 Biennial Inspection – San Diego County Jails*, Sept. 24, 2018, at 5-6.
28

shower, which is painful for him because of his medical conditions and mobility limitations, and he was at risk of falling. The grab bar in the 5A shower is often slippery and filthy, and does not provide support to people with mobility disabilities like NELSON.

265.   On or around October 12, 2021, custody staff again moved NELSON, this time to housing unit 8C at Central. Housing unit 8C is a medical dorm that houses a significant number of people with disabilities. In October 2021, around 15 people in wheelchairs were housed in unit 8C. Although the dayroom tables in 8C have some spaces for people with wheelchairs to sit while they eat, there are far too few spaces to accommodate all of the incarcerated people in 8C who use wheel-chairs. That meant that NELSON and other people in wheelchairs could not all eat at the dayroom tables. Instead, people must place their trays on benches in the dayroom and lean forward to eat from them. Eating in such a fashion was painful for NELSON. Plaintiff CLARK was also housed in 8C, and often had to eat food from his lap because of the lack of accessible spaces. Upon information and belief, many housing units throughout the Jail are similarly inaccessible to people in wheelchairs.

266.   In unit 8C, where Plaintiff CLARK was housed, only one of the two showers has a plastic portable shower chair available. Because many wheelchair users in 8C need to use that shower, CLARK was at times unable to shower. The telephones in the unit have stools bolted in front of them, which means CLARK had to transfer from his wheelchair to the stool to use the phone. CLARK missed phone calls because could not reach the phone due to the accessibility barrier created by the unmovable stools.

267.   The SHERIFF'S DEPARTMENT houses many people with mobility disabilities at Central, which consists of 11 floors with a total of 17 levels including

the mezzanines and basement.[149]  Some programs at Central, including recreation, social visits, and attorney visits, are on mezzanine floors separate from the housing units and are accessible only via stairs or the elevator.  However, the elevators are often broken and not functioning.  Although custody staff can use an elevator that they have designated for "staff elevator use" to transport an incarcerated person with a mobility disability to the recreation area, a social visit, or an attorney visit, custody staff frequently refuse to transport people in the staff elevator.  These practices prevent people with mobility disabilities from accessing programs and services at the Jail, including but not limited to recreation, social visits, and professional visits.

268.   For example, Plaintiff NELSON relied on elevators to access programs on other floors in Central, including social visits, professional visits, and recreation. NELSON often had to wait to access programs because the non-staff elevator was broken.  On one occasion, NELSON missed an important professional visit with a detective because the elevator was broken and deputies would not take NELSON in the staff elevator (the detective never returned).  Even when the elevators were working and NELSON could access the recreation area, the limited exercise equipment available—a rowing machine, dip bars, and a stationary bike—were not accessible to NELSON due to his mobility disability.  The SHERIFF'S DEPARTMENT does not offer accessible equipment that NELSON could use. Without exercise, NELSON was at risk of worsening pain and disability.

269.   Plaintiff ARCHULETA was forced to walk up the stairs to attend a visit, rather than use the elevators.  When walking back down the stairs, ARCHULETA lost his balance, fell, and struck his head.  Similarly, in or around October 2021, a person who uses a walker at the Jail was denied access to the staff elevator to accommodate his disability.  Instead, Jail staff required that this person

---

[149] San Diego County Sheriff's Department, San Diego Central Jail, https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/58/.

1  walk upstairs, with his walker folded up, to attend a professional visit at Central.

2  The man was at risk of falling while taking the stairs without the assistance of his

3  walker, and arrived at the professional visit exhausted and out of breath.

4      270.   Other Jail facilities remain inaccessible as well.  For example, Plaintiff

5  SEPULVEDA has mobility disabilities, due to a motorcycle collision that caused

6  severe damage to his leg and foot.  SEPULVEDA has used a wheelchair in the past,

7  and in the Jail uses a cane to ambulate.  When he was housed at George Bailey, in or

8  around January 2020, SEPULVEDA had to use a shower that lacked grab bars, and

9  he slipped and fell in the shower.  Sometime before then, SEPULVEDA was housed

10 at Vista and nearly fell while using a shower that also lacked grab bars.

11     271.   The SHERIFF'S DEPARTMENT lacks adequate policies and practices

12 for ensuring that people who require lower bunk bed assignments actually receive

13 lower bunk bed assignments and are able to sleep in lower bunks.  The SHERIFF'S

14 DEPARTMENT fails to train staff to ensure that people who require lower bunk bed

15 assignments receive lower bunk beds.  As a result, people who require lower bunk

16 assignments as accommodations for their disabilities are at times forced to sleep on

17 upper bunks, which places them in danger.

18     272.   For example, Plaintiff ANDRADE has limited mobility in his shoulders

19 and back, caused by a torn rotator cuff in his right shoulder, fractured vertebrae, and

20 two ruptured disks in his spine.  Those injures cause severe pain in his back and

21 shoulder.  As a result, ANDRADE cannot raise his right arm more than a foot away

22 from his body.  That mobility disability made it difficult and dangerous for

23 ANDRADE to climb into any upper or middle-tier bunk bed.  ANDRADE informed

24 Jail staff about these limitations and requested accommodation for his mobility

25 disability, including assignment to a lower bunk.  ANDRADE also signed a release

26 to allow the SHERIFF'S DEPARTMENT to access his medical records from a prior

27 incarceration with CDCR, where he was prescribed a permanent lower bunk due to

28 his mobility disability.  Despite these requests, the SHERIFF'S DEPARTMENT

failed to provide ANDRADE with a lower bunk assignment and/or failed to enforce ANDRADE's lower bunk assignment.  ANDRADE was forced to sleep on the upper or middle bunks.  Because of his mobility disability, ANDRADE twice fell while trying to climb down from an upper bunk.  The first time he fell while trying to climb down from an upper bunk, in June 2022, ANDRADE was taken to the hospital and diagnosed with a concussion.  The second time he fell while trying to climb down from an upper bunk, in September 2022, ANDRADE suffered an injury to his foot, including severe pain making it nearly impossible for him to walk.  ANDRADE suspects that he may have broken his heel, however, despite his repeated requests for treatment, the SHERIFF'S DEPARTMENT merely provided ANDRADE with some ice and a cane.  ANDRADE did not receive an x-ray or any other medical care.  Even after ANDRADE was prescribed a cane, the SHERIFF'S DEPARTMENT did not enforce his lower bunk assignment, and he was forced to climb into the middle bunk.  ANDRADE was also not provided with a shower chair, making it difficult and dangerous for him to bathe.

273.   Frankie Greer had a catastrophic brain injury after Jail staff failed to ensure that he was placed in a lower bunk, according to a lawsuit that Greer filed.  Greer had been diagnosed with a seizure disorder, about which he informed staff when arriving at Central.  Greer requested a lower bunk because he worried that his seizure disorder would cause him to fall off an upper bunk, and intake staff noted this in paperwork.  However, this written note was not incorporated into the electronic records system, and Greer was assigned to a top bunk.  A deputy refused Greer's request to move to a lower bunk despite Greer explaining that he had previously fallen off a top bunk.  The next day, Greer had a seizure, fell off his top bunk, and hit his head on the concrete floor.  Greer fell into a coma and suffered facial fractures and a brain injury.[150]

---

[150] *See Greer v. County of San Diego*, 2020 WL 1864640, at *1 (S.D. Cal. Apr. 14, 2020).

274. Another person, an elderly wheelchair user with mobility disabilities and a lower bunk assignment in CDCR, fell from his bunk at Central in 2021. This man was forced to sleep on the top bunk because his cellmates refused to yield the lower bunks, and a deputy refused to intervene. Shortly after taking the top bunk, the person fell off of that bunk and injured his leg.

**F.     The Sheriff's Department Lacks an Effective Procedure for Incarcerated People to Request Reasonable Disability Accommodations**

275. The SHERIFF'S DEPARTMENT neither provides an effective or functional grievance system for incarcerated people with disabilities as required by the ADA and the Rehabilitation Act nor provides people with adequate notice of how to request reasonable accommodations for their disabilities. Upon information and belief, people with disabilities are not informed of any specific process for complaining about disability discrimination or requesting disability accommodations. Instead, people with disabilities must use the Jail's general grievance procedure, which lacks any field for an incarcerated person to note that the grievance concerns disability accommodations. Nor does the SHERIFF'S DEPARTMENT's policy for people with disabilities state that the grievance process can be used to appeal the denial of an accommodation.

276. The SHERIFF'S DEPARTMENT lacks adequate policies and procedures for responding to grievances, including ADA-related grievances, and fails to maintain adequate, complete, and accurate records of grievances submitted by incarcerated people. The SHERIFF'S DEPARTMENT fails to timely and adequately respond to grievances. The SHERIFF'S DEPARTMENT also fails to adequately train staff and contractors how to receive, track, and respond to grievances.

277. Although the SHERIFF'S DEPARTMENT's written policies provide that people can physically hand grievances to a staff member and receive a receipt, in practice staff often refuse to accept grievance forms directly. Instead, Jail staff

instruct people to place grievance forms into a specific box in the person's housing unit, with no mechanism for a person to retain documentation that the grievance was submitted (as is done in jail systems with effective disability accommodation systems).  At times, Jail staff more overtly interfere with the grievance process.  For example, on February 13, 2021, Plaintiff LOPEZ—who has a hearing disability— and other incarcerated people in his unit asked for grievance forms.  A deputy warned LOPEZ and others, saying "whoever you want to write up, don't."  In 2021, when Plaintiff NELSON attempted to file a grievance, the deputy told him that he needed "to let the Sergeant sign this" before accepting and processing the grievance. However, the SHERIFF'S DEPARTMENT's policies include no such requirement. On November 7, 2022, Plaintiff TAYLOR submitted a grievance by placing the form in the designated box in his housing unit.  Shortly thereafter, TAYLOR witnessed a deputy take the grievance out of the box and throw it into a trash can. In separate COVID-19 litigation against the SHERIFF'S DEPARTMENT, an incarcerated person testified that there were no grievance forms available in his housing unit and deputies would refuse to provide grievance forms when he and other people asked for them.

278.   Jail staff regularly fail to adequately and timely respond to grievances, including ADA-related grievances.  By SHERIFF'S DEPARTMENT written policy, Jail staff must respond to a person's written grievance within 7 days.  However, staff often do not respond at all to grievances.  On occasions when Jail staff do respond to grievances, their responses are often not adequate, comprehensive, or timely, and may be arbitrary and counterproductive.

279.   For example, Jail staff regularly argue that grievances filed on the Jail's grievance forms are not in fact grievances, which means that the grievances are neither logged in the Jail's information system nor responded to.  On April 24, 2020, Plaintiff LOPEZ submitted a grievance about Jail staff's consistent failure to timely provide him with his daily kidney medications.  LOPEZ complained about prior

1  failures to timely provide him with his daily kidney medication, explained that Jail

2  staff's failures put his health at risk, and asked Jail staff to ensure that he timely

3  received his kidney medication.  LOPEZ expressly stated that: "This is not an

4  inmate request" in order for his grievance to be treated as a grievance.  In response,

5  a Jail staff member checked a box for "This submission is not a grievance," but

6  failed to specify how the submission should be categorized, and failed to clearly

7  sign their name.  Many other proper grievances submitted by Plaintiffs and others

8  are similarly marked "This submission is not a grievance" and then marked as

9  "inmate requests."  Upon information and belief, the SHERIFF'S DEPARTMENT

10  has no written policy instructing when a grievance is treated as an "inmate request,"

11  thereby enabling Jail staff to treat any grievance as an "inmate request" when they

12  wish to remove it from the existing grievance process.  The SHERIFF'S

13  DEPARTMENT's failure to adequately and timely respond to grievances, including

14  ADA-related grievances, prolongs people's suffering and time without necessary

15  accommodations.

16       280.   For example, Plaintiff DUNSMORE submitted several grievances

17  about his need for ADA accommodations while in the Jail, including when Jail staff

18  confiscated his assistive devices in August 2018.  However, for most of the

19  grievances DUNSMORE filed, Jail staff never responded in writing and failed to

20  provide DUNSMORE with the accommodations he requested.  In 2019,

21  DUNSMORE brought with him to the Jail writing utensils with long handles, which

22  allow him to grip the utensils and write given the arthritic condition in his hands.

23  Those writing utensils were confiscated when DUNSMORE arrived at the Jail.

24  When DUNSMORE requested a replacement, Jail staff failed to provide

25  DUNSMORE with any replacement for almost a year.  Even then, the SHERIFF'S

26  DEPARTMENT gave DUNSMORE a device that was unfamiliar to him and failed

27  to provide instructions on how to use it.  Before DUNSMORE could receive any

28  such instructions, a deputy searching DUNSMORE's cell confiscated the device as

1    "contraband."

2    281.   As another example, the SHERIFF'S DEPARTMENT failed to process

3    three grievances that Miguel Lucas submitted about another person's misclassifica-

4    tion.[151]  The other person was incorrectly housed, and assaulted Lucas after Jail staff

5    failed to respond to any of his three grievances.  Later, the SHERIFF'S

6    DEPARTMENT admitted that they failed to process Lucas's grievances.

7    282.   Multiple court orders in the Southern District reflect that the

8    SHERIFF'S DEPARTMENT consistently fails to respond to grievances.  In

9    *Goolsby v. County of San Diego*, 2020 WL 1673036, at *6-7 (S.D. Cal. Apr. 26,

10   2020), the Court found "no evidence in the record" that Jail staff responded to an

11   incarcerated person's grievance, and the person stated under oath that Jail staff

12   never responded to his grievance.  *See also Williams v. Gore*, 2017 WL 1354695, at

13   *6 (S.D. Cal. March 24, 2017) (this Court noting that plaintiff stated in sworn

14   testimony that he had not received responses to six separate grievances).

15   283.   Even when Jail staff do respond to grievances, the process fails to result

16   in appropriate resolution.  Plaintiff EDWARDS submitted several grievances about

17   his severe sleep apnea and need for a CPAP machine.  The SHERIFF'S

18   DEPARTMENT's responses failed to address EDWARDS' primary complaint,

19   which was that he had been without a CPAP machine for several months and that

20   his symptoms—including having trouble breathing and headaches—were getting

21   worse.  Jail staff responded to one of the grievances approximately a month after

22   EDWARDS submitted it and well past the SHERIFF'S DEPARTMENT's one-week

23   deadline to respond.  EDWARDS did not receive a CPAP machine for almost two

24   years and suffered while he waited.

25   284.   The SHERIFF'S DEPARTMENT has long been on notice of its

26

27   [151] *See* Kelly Davis, *Two families unite after one jail inmate bites, disfigures another*, SAN DIEGO UNION-TRIBUNE, Oct. 7, 2019,

28   https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-17/two-families-unite-over-inmates.

deficient procedures for tracking and responding to grievances, including ADA grievances.  In 2017, NCCHC found that the SHERIFF'S DEPARTMENT's records did not include "any indication" that grievances received an appropriate response.[152] In separate cases in 2016 and 2018, CLERB found that custody staff failed to respond to grievances.[153]

285.   The systematic unavailability of the grievance process, including for ADA-related grievances, means that grievances are not a functional means for people with disabilities to request and receive accommodations for their disabilities.

286.   The SHERIFF'S DEPARTMENT also lacks adequate policies and procedures instructing medical staff and custody staff how to respond if people request accommodations through means other than the grievance process.  The SHERIFF'S DEPARTMENT fails to adequately train staff how to provide accommodations through means other than the grievance process.  For example, the SHERIFF'S DEPARTMENT's policy sets forth no procedure—other than "notifying" health care staff—if custody staff are unable to accommodate a person's disability in their housing unit.  This means that people with disabilities may not receive an accommodation if custody staff are unable to provide it in the first instance.  Further, the SHERIFF'S DEPARTMENT's policy states that accommodation requests will be "acted upon" within 72 hours, but that appears to mean only that the Jail will provide a response within 72 hours—not that the SHERIFF'S DEPARTMENT will actually provide a reasonable accommodation within 72 hours or any other set time frame.  The experiences of Plaintiffs and others affirmatively demonstrate that the delays in providing requested

---

[152] NCCHC Report at 35.

[153] Citizens' Law Enforcement Review Board, September 2016 Findings at 7-9, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2016/0916findings.pdf; Citizens' Law Enforcement Review Board, February 2018 Findings at 9-10, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/0218%20findings.pdf.

1    accommodations can last weeks or months.

2    **G.    People with Disabilities Are Subjected to Dangerous Conditions in**
       **the Jail Specifically Because Jail Defendants Fail to Reasonably**
3      **Accommodate Their Disability-Related Needs**

4         287.   By policy and practice, the SHERIFF'S DEPARTMENT fails to

5    provide people with hearing and speech disabilities with sign language interpreters,

6    hearing aids, or other auxiliary aids for interactions with medical and mental health

7    care staff, despite the grave importance of the interactions.  The SHERIFF'S

8    DEPARTMENT fails to adequately train staff to provide people with hearing and

9    speech disabilities with sign language interpreters, hearing aids, or other auxiliary

10   aids for these interactions.  The SHERIFF'S DEPARTMENT fails to provide such

11   accommodations despite having knowledge that individuals with disabilities cannot

12   effectively communicate with staff without the accommodations and that the failure

13   to communicate effectively places them at an increased risk that medical or mental

14   health issues will not be diagnosed or will be misdiagnosed.

15        288.   For example, Plaintiff LOPEZ is Deaf and uses ASL to communicate.

16   However, Jail staff failed to provide LOPEZ with a sign language interpreter during

17   interactions with nursing and medical staff, despite his requests.  The SHERIFF'S

18   DEPARTMENT never provided LOPEZ with an interpreter for routine medical

19   contacts inside the facility.  Instead, he had to rely on written notes to understand

20   complex medical issues and advice that the provider was trying to discuss.  For the

21   majority of these appointments, LOPEZ did not understand what medical staff tried

22   to communicate to him.  Sometimes, health care staff did not write any information

23   down for LOPEZ.  He could not read their lips because the majority of interactions

24   occurred while staff wore masks.

25        289.   The SHERIFF'S DEPARTMENT endangers incarcerated people with

26   hearing disabilities by failing to institute any system for quickly identifying people

27   with hearing disabilities.  Incarcerated people with communication disabilities, like

28   Plaintiff LOPEZ, are not capable of understanding without accommodations and

assistive devices, and therefore are less likely to comply with alarms and oral orders from Jail staff.  If a fight breaks out in a housing unit, custody staff may order all incarcerated people to get down on the ground or to line up against a wall.  For any number of reasons, custody staff may also order a specific person to cease or engage in certain behavior.  Without a visual identification system (*e.g.*, vests) or other mechanism by which staff can quickly identify people with communication disabilities, there is an increased risk that staff will not recognize that a person has a hearing disability and will interpret such person's actions as a failure to comply with an order, rather than as a failure to hear and/or understand the order.  As a result, people with hearing disabilities are at increased risk that staff will initiate disciplinary proceedings and/or use force for failure to comply with an order that they have not heard.  Pursuant to Jail policy, the use of force for failure to comply with an order can include the use of cell extraction, non-lethal firearms, and lethal firearms.  Plaintiff LOPEZ specifically asked deputies if the Jail had a way to identify incarcerated people with communication disabilities, such as vests or wristbands, but deputies failed to identify any such accommodations or provide any solution.

290.   Upon information and belief, the SHERIFF'S DEPARTMENT lacks any policy, practice, or system for notifying people with disabilities of emergencies, including alarms, fires, and earthquakes, and evacuating them.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff how to notify people with disabilities of emergencies and how to evacuate them.  Upon information and belief, the Jail facilities do not have visual or tactile alarm systems installed to alert people with disabilities.  Because the SHERIFF'S DEPARTMENT lacks a system for identifying people with disabilities, including those with hearing disabilities, or notifying people with disabilities of an emergency, these people may not be aware of an emergency, or may need assistance during the emergency, and are therefore at increased risk of injury or death should one occur.

291.   Upon information and belief, the SHERIFF'S DEPARTMENT lacks any policies or practices to ensure that people with difficulty walking, including people in wheelchairs, are safely evacuated from the Jail in the event of an emergency.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff how to ensure that people with mobility disabilities are safely evacuated from the Jail in an emergency.  Upon information and belief, the evacuation routes in the Jail, to the extent they exist, are not accessible to people in wheelchairs.  As a result, people with mobility disabilities are at increased risk of injury or death if an emergency, like a fire or earthquake, were to occur.

292.   The SHERIFF'S DEPARTMENT endangers incarcerated people with mobility disabilities by failing to institute any system for staff to visually identify people with mobility disabilities.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff how to visually identify people with mobility disabilities.  Upon information and belief, in response to alarms or other incidents in the Jail, custody staff frequently order people to lay down on the ground, face down.  Upon information and belief, custody staff are authorized to initiate disciplinary proceedings and/or use force against people who fail to prone out when ordered to do so even when it is physically impossible for them to do so.

293.   Some people with mobility disabilities, like Plaintiffs NELSON, CLARK, LANDERS, and DUNSMORE, are incapable of complying with an order to lay prone because of their mobility disabilities.  Without a system by which staff can identify people with such mobility disabilities, there is an increased risk that custody staff will not recognize that a person has a mobility disability and will interpret such a person's failure to prone out as a failure to comply with an order, rather than an inability to comply with the order.  As a result, people with mobility disabilities are at increased risk that staff will initiate disciplinary proceedings and/or use force for failure to comply with an order to prone out with which they cannot comply because of their disability.

294.   People with disabilities that are not accommodated are susceptible to exploitation.  For example, in exchange for help getting to the toilet or shower, obtaining meals, or communicating with Jail staff, people with disabilities may be required to pay their peers or provide a service, potentially leading to increased risk of violence or even sexual assault.

## IV.   JAIL DEFENDANTS FAIL TO ENSURE ADEQUATE ENVIRONMENTAL CONDITIONS, WHICH PLACES INCARCERATED PEOPLE AT UNDUE RISK OF HARM TO THEIR HEALTH AND SAFETY

295.   By policy and practice, JAIL DEFENDANTS subject incarcerated people to a substantial risk of serious harm or death by maintaining unsanitary Jail facilities and depriving individuals of the ability to support basic personal hygiene. Upon information and belief, the SHERIFF'S DEPARTMENT fails to properly train staff how to maintain sanitary facilities and ensure that individuals are not exposed to environmentally unsafe conditions.  The COUNTY has failed to exercise meaningful oversight over environmental health conditions and practices at the Jail.

### A.   The Jail Is Filthy and Ripe for the Spread of Disease

296.   Overcrowded and unsanitary conditions at the Jail create a substantial risk of transmission of infectious diseases (including COVID-19), bacterial infections, and other serious conditions including scabies and lice.  The SHERIFF'S DEPARTMENT routinely fails to remove and dispose of trash from housing units, creating a substantial risk of food-borne illness.  The below photographs from 2022 at Central show that common areas and cells are riddled with piles of trash, including days-old rotting food:

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25
26



27      297.   The SHERIFF'S DEPARTMENT fails to timely clean human waste

28   and bodily fluids from cells in which people reside.  Jail staff place people in cells

that have other peoples' feces smeared along the walls and windows, and staff permit filthy cells to remain dirty for long periods of time.  The below photo shows a patient with mental health disabilities sleeping under his bunk in a cell covered in graffiti written in feces.



298.   The SHERIFF'S DEPARTMENT fails to take adequate measures to eradicate vermin and insects from Jail facilities, including housing units where rats can be heard running across the ceilings at night.  Ceiling tiles in Vista's medical unit are stained with rodent urine.  The below photos show a cockroach crawling down one of the Jail's walls as well as a dead rat found in a sink in one of Vista's medical examination rooms.

/ / /



299.   Poor ventilation and the accumulation of dirt and mold facilitate the transmission of infectious disease and cause or exacerbate serious respiratory conditions, including asthma.  The SHERIFF'S DEPARTMENT regularly fails to clean air flow vents, which allows spores and other particulates to spread throughout living facilities.  The below photos depict a dirty air vent in an administrative area of the Jail as well as black mold covering a ceiling tile.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /





300.   One person housed in a cell with another person's feces on the walls and who observed black mold growing on hand rails in the showers said that the Jail was the "filthiest place I've ever been."  Multiple other incarcerated people have complained about black mold in showers at the Jail.  In describing the filthy conditions in the Jail, one staff person reported that "not even dogs in kennels are

kept like this." The SHERIFF'S DEPARTMENT's failure to keep the Jail clean places incarcerated people at serious risk of harm. For example, multiple people at the Jail have developed serious, preventable infections that required hospitalization. Another person returned from surgery that involved the removal of infected tissue and was placed in a cell that reportedly was infested with flies and ants and had a moldy toilet. A few weeks later, the person again developed infections in the same wound and had to be transported to an outside hospital for additional surgeries.

301.   Another incarcerated person with incontinence reported that his cell had three feet of trash piled inside of it. Despite the filth in his cell, Jail staff refused to give the person gloves to wear when inserting catheters. On multiple occasions at the Jail, this person developed bacterial infections. When another incarcerated person arrived at the Jail, his cell was littered with trash from the people who were housed there before him.

302.   In May 2022, Plaintiff OLIVARES went on a hunger strike related to inadequate phone access, broken toilets, clogged showers, and deaths at the Jail. Deputies belittled OLIVARES and retaliated against him for engaging in the hunger strike. One told him the hunger strike was "fake" and that no one would acknowledge him; another threatened to put him in an EOH cell. OLIVARES was eventually placed into a cell in the medical unit that smelled like urine and had a soiled diaper on the floor. While he was housed in that cell, a deputy threw OLIVARES's breakfast tray into the cell, causing the food to roll across the dirty floor.

303.   In the medical unit where Plaintiff LANDERS is now housed, the bathroom has no cleaner or soap to wash her hands. LANDERS has to rely on others to clean because of her mobility issues, but trustees infrequently clean the unit. In addition, LANDERS has incontinence episodes due to her disability, and sometimes has to request extra toilet paper. Custody staff often delay in providing toilet paper, causing LANDERS to remain soiled for long periods of time.

304.   Overcrowding exacerbates the likelihood that people will fall ill at the Jail from poor environmental conditions.  In a separate lawsuit about a lack of COVID-19 protections, numerous incarcerated people testified in January 2022 about their inability to socially distance in full housing units where people can reach out and touch the person sleeping next to them.[154]  One person submitted a declaration explaining that custody staff sometimes refuse to provide cleaning supplies to an entire housing unit as discipline because one of the residents "act[ed] up."[155]

**B.     The Sheriff's Department Fails to Remedy Dangerous Electrical and Plumbing Hazards**

305.   The SHERIFF'S DEPARTMENT does not timely remedy known plumbing and electrical hazards at the Jail.  For example, Plaintiff NELSON was repeatedly shocked when he rested his arm on the metal table connected to the telephones in his housing unit.  If someone else was talking on another phone and hung it up, a shock would go through the phone and the metal table and shock other phone users. The shocks caused blister-like sores to form on NELSON's arm, which became infected.

306.   Another person incarcerated at George Bailey filed a declaration in the COVID-19 lawsuit stating that his housing unit had only one working toilet for 32 people.  The person further testified that the urinal had been out of service for months, the showers were "so backed up [that] when you would stand in them, the water went up your ankles," and there "were also little worms that would crawl up out of the sink drains."[156]

---

[154] Jeff McDonald, Kelly Davis, *From the Inside: San Diego County jail inmates describe filthy conditions, few COVID-19 protections*, SAN DIEGO UNION-TRIBUNE, Jan. 23, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-01-23/from-the-inside-in-request-for-injunction-san-diego-county-jail-inmates-describe-filthy-conditions-few-covid-19-protections.

[155] *Id.*

[156] *Id.*

**C.   The Sheriff's Department Fails to Ensure that Incarcerated People Have Access to Clean Clothes and Linens**

307.   The SHERIFF'S DEPARTMENT's inadequate laundry and linen exchange practices mean that people are forced to endure filth and unhygienic conditions that contribute to dangerous skin conditions and other illness.  People who soil their linens are often not provided clean linens for days.  For example, one person regularly defecated and/or urinated on himself due to his disabilities and medical issues.  Despite his increased need for regular showers and clean clothes, custody staff often denied him access to the shower or to clean clothes, forcing him to sit in his soiled clothes for hours or days at a time.

**V.   JAIL DEFENDANTS FAIL TO ADEQUATELY ENSURE THAT THE JAIL FACILITIES ARE SAFE AND SECURE FOR INCARCERATED PEOPLE, PUTTING THEM AT UNDUE RISK OF VIOLENCE AND PHYSICAL HARM**

308.   Incarcerated people at the Jail face a substantial risk of serious harm or death from the SHERIFF'S DEPARTMENT inadequate policies and practices for the classification of incarcerated people; failure to monitor the safety of incarcerated people in the Jail; failure to protect people from dangerous drugs in the Jail; and failure to maintain clean, functioning, and adequate Jail facilities.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to properly train staff how to protect people against serious harm or death.  The COUNTY has failed to exercise meaningful oversight of the Jail and to ensure adequate, independent review of all deaths and alleged misconduct in the Jail.

309.   Another obstacle to providing safety and security is the disturbing number of SHERIFF'S DEPARTMENT deputies openly hostile to many of the groups incarcerated in the Jail.  Responses to a union survey about the Sheriff's election included numerous anti-Black Lives Matter comments (one calling Black Lives Matter a "domestic terror" group) and homophobic comments (worrying that the Sheriff's Department will promote the LGBTQ "lifestyle").

**A.    The Sheriff's Department Fails to Adequately Classify and Assign People to Appropriate Housing Locations, Putting Them at Grave Risk of  Violence and Physical Injury**

310.   The SHERIFF'S DEPARTMENT fails to adequately evaluate people for placement in housing locations where they will be safe from injury and violence. By policy and practice, the SHERIFF'S DEPARTMENT uses a faulty classification process to assign people to certain Jail facility locations and housing units.  This classification process is based on a number of factors including one's criminal charges, gang affiliation, race, and history of violence.  The SHERIFF'S DEPARTMENT's classification procedures have proven inappropriate and ineffective, however, and people who are incompatible for various reasons, including a history of assaultive behaviors, are housed together in the Jail.  People with disabilities are at increased risk of being the victims of violence from others because of their perceived or actual inability to defend themselves.  The SHERIFF'S DEPARTMENT fails to adequately train classification staff how to properly classify and house people to keep them reasonably safe.

311.   Last year, two people were apparently murdered by their cellmates just days after entering the Jail.  On August 18, 2021, Richard Lee Salyers was booked into Central on suspicion of contempt of court.  The SHERIFF'S DEPARTMENT housed Salyers in a quarantine cell with Steven Young, who had at least one recent conviction for a violent crime.  On August 22, 2021, just a few days after the two were each booked into the Jail, Young allegedly strangled Salyers to death.[157]  The cell in which the alleged murder occurred was covered in urine and feces.

312.   Another homicide arising from apparently poor classification decisions happened just a few months later.  On December 23, 2021, Dominique McCoy, a 38-year-old resident of San Diego, was booked into the Jail on an allegedly faulty

---

[157] David Hernandez, *Authorities ID man strangled in jail cell in downtown San Diego*, SAN DIEGO UNION-TRIBUNE, Aug. 26, 2021, https://www.sandiegouniontribune.com/news/public-safety/story/2021-08-26/authorities-id-san-diego-central-jail-inmate-strangled.

warrant.  The SHERIFF'S DEPARTMENT housed McCoy with John Medina, who had been booked into Jail on violent charges.  On December 29, 2021, Medina is alleged to have murdered McCoy.[158]  The deaths of Salyers and McCoy are in addition to at least six other incarcerated people who have been killed in the Jail by other incarcerated people in the past decade.  Two more homicides have occurred in the Jail in 2022.[159]

313.   In 2019, the *San Diego Union-Tribune* reported on 70-year-old Russell Hartsaw, who was gay, had mental illness, and had previously been designated "Keep Separate All"—meant to protect him from other incarcerated people—when housed at the Jail.  The SHERIFF'S DEPARTMENT housed Hartsaw with an incarcerated gang member nicknamed "Evil."  Hartsaw's cellmate killed him within one day.[160]

314.   The SHERIFF'S DEPARTMENT's misclassification of incarcerated people has also led to other serious injuries.  For example, the SHERIFF'S DEPARTMENT housed a transgender woman with men, who violently attacked her.  According to a lawsuit filed by Kristina Frost, who is transgender, she was arrested and booked into Central in November 2020.  Frost repeatedly informed custody staff of her gender and asked not to be housed with men.  However, Jail staff classified Frost incorrectly and placed her in a minimally monitored cell with three men.  Frost was repeatedly attacked by one of her male cellmates and suffered

---

[158] Jeff McDonald, *Sheriff's Department faces new lawsuit over 2021 death of wrongly arrested man*, SAN DIEGO UNION-TRIBUNE, Nov. 7, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-11-07/sheriffs-department-faces-new-lawsuit-over-2021-death-of-wrongly-arrested-man.

[159] Jeff McDonald, Kelly Davis, *Fight among detainees at Otay Mesa jail results in 19th death this year, marking grim record*, SAN DIEGO UNION-TRIBUNE, Oct. 6, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-10-06/fight-among-detainees-at-otay-mesa-jail-results-in-19th-death-this-year-marking-grim-record.

[160] Jeff McDonald, Kelly Davis, *Longtime inmate who felt safer behind bars was killed in jail*, SAN DIEGO UNION-TRIBUNE, Sept. 23, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-23/longtime-convict-falls-through-the-cracks.

serious injuries.  According to Frost's lawsuit, custody staff failed to adequately monitor the cell and also did not intervene quickly when Frost was attacked.[161] CLERB sustained several misconduct findings against custody staff and noted systemic deficiencies in the SHERIFF'S DEPARTMENT's policies:  "The assault and injury were the result of a systemic failure on the part of (the Sheriff's Department) exemplified by insufficient policies and procedures, a lack of sensible and appropriate communication among numerous staff members and no apparent forethought by several employees as to the ramifications of placing a transgender female in a cell with three cisgender men."[162]

315.   In 2019, Miguel Lucas was attacked by another person in his housing unit and had part of his face bitten off after the SHERIFF'S DEPARTMENT failed to adequately classify the other person.  The other person had a serious mental illness and, as a deputy told Lucas, should have been housed in a different unit.[163]

316.   CLERB has also found on multiple occasions that the SHERIFF'S DEPARTMENT misclassified people and placed them at undue risk of violence. People may be classified for protective custody based on characteristics that make them more vulnerable to violence.  In 2018, CLERB found that a person who should have been placed in protective custody was inappropriately placed in general population mainline housing.  The person alleged that staff placed him in mainline due to a grudge against him, and in mainline, he was attacked by his cellmate.[164]  In

[161] Meryl Kornfeld, *A transgender woman was put in a jail cell with men and assaulted by one of them, lawsuit says*, THE WASHINGTON POST, Nov. 13, 2021, https://www.washingtonpost.com/nation/2021/11/13/transgender-woman-lawsuit-jail/.

[162] Citizens' Law Enforcement Review Board, July 2022 Findings at 1-7, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/2022-documents/07-2022/07-12-22/071222-Findings.pdf.

[163] *See* Kelly Davis, *Two families unite after one jail inmate bites, disfigures another*, SAN DIEGO UNION-TRIBUNE, Oct. 7, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-17/two-families-unite-over-inmates.

[164] Citizens' Law Enforcement Review Board, January 2018 Findings at 3,

1   2019, CLERB found that Jail staff improperly placed someone classified as

2   protective custody in the law library with other people from the general mainline

3   population, which put the person's safety at undue risk.[165]

4       317.   Plaintiff OLIVARES has witnessed the mixing of people in protective

5   custody and in general population in the same cell.  For example, in early 2021,

6   OLIVARES observed people in the same quarantine cell wearing classification

7   wristbands indicating they were in protective custody and other people wearing

8   wristbands indicating they were in general population.  This practice places

9   incarcerated people at substantial risk of serious harm.

10      318.   Overcrowding in Jail facilities increases the risk of violence among

11  incarcerated people who have been misclassified by placing them in closer quarters.

12  Tensions are extremely high due to reduced out-of-cell time and the lack of

13  programs and services during frequent facility-wide lockdowns, which are

14  commonplace even absent COVID-19 surges.  Even during the pandemic, multiple

15  Jail facilities have held numbers of incarcerated people that exceed their rated

16  capacities, as the SHERIFF'S DEPARTMENT continues to lock up people for low-

17  level crimes.  For example, on December 2, 2021, when the SHERIFF'S

18  DEPARTMENT announced a COVID-19 outbreak at the Jail, Central held 973

19  incarcerated people (exceeding its rated capacity of 944) and George Bailey held

20  1,469 incarcerated people (exceeding its rated capacity of 1,380).[166]  The following

21  week, George Bailey held over 1,500 incarcerated people.

22

23

24  https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/0118%20findings.pdf.
[165] Citizens' Law Enforcement Review Board, December 2019 Findings at 7,

25  https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2019/1219%20findings.pdf.

26  [166] Jeff McDonald, Kelly Davis, *San Diego sheriff orders lockdown inside all jails amid surge in COVID-19 infections*, SAN DIEGO UNION-TRIBUNE, Dec. 2, 2021,

27  https://www.sandiegouniontribune.com/news/watchdog/story/2021-12-02/san-diego-sheriff-orders-lockdown-inside-all-jails-amid-surge-in-covid-19-infections.

28

**B.** **The Sheriff's Department Has Failed to Protect People from Fentanyl and Other Dangerous Contraband in the Jail**

319.   Faced with a deadly overdose crisis in the Jail, the SHERIFF'S DEPARTMENT has failed to adequately protect incarcerated people from access to dangerous drugs like fentanyl, a synthetic opioid.  The SHERIFF'S DEPARTMENT's policies and practices for detecting and preventing contraband from entering the Jail are inadequate.  The SHERIFF'S DEPARTMENT fails to adequately train staff how to detect and prevent contraband from entering the Jail and fails to employ body-worn cameras and sufficient audiovisual surveillance to reduce contraband in the Jail.  The SHERIFF'S DEPARTMENT is deliberately indifferent to the unconstitutional risk of harm incarcerated people face as a result of deadly contraband in the Jail.

320.   According to the *San Diego Union-Tribune*, "[i]llegal drug use has exploded in San Diego County jails."[167]  In 2018, there were 11 drug overdoses in the Jail.[168]  According to the SHERIFF'S DEPARTMENT's data, 204 incarcerated people are suspected to have overdosed on opioids in the Jail during 2021 and required the administration of Naloxone, a spray used to reverse opioid overdoses.[169]  That total does not include overdoses from other deadly, dangerous drugs, such as methamphetamine.  From 2019-2021, at least 15 people have died from drug overdoses in the Jail.  Many more have been hospitalized, including Plaintiff NORWOOD who was hospitalized in July 2021 after a fentanyl overdose at George Bailey.  NORWOOD was one of several people to overdose that day—the second

---

[167] Jeff McDonald, Kelly Davis, *Number of drug overdoses in San Diego County jails jumps sharply*, SAN DIEGO UNION-TRIBUNE, June 1, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-06-01/number-of-drug-overdoses-in-san-diego-county-jails-jumps-sharply.

[168] *Id.*

[169] San Diego County Sheriff's Department, Suspected Overdose Incidents with Naloxone Deployment (Dec. 30, 2021), https://www.sdsheriff.gov/home/showpublisheddocument/4611.

1    mass overdose at George Bailey in a two-month period.[170]   In 2022, the Sheriff's

2    Department has reported using Narcan in connection with six deaths, suggesting

3    each was a fatal overdose.[171]   Already in 2022, there have been 180 suspected

4    overdoses, on pace to exceed last year's total.[172]   An April 2022 report

5    commissioned by CLERB found that the risk of overdose deaths is higher in San

6    Diego County's Jail than any other jail in the state's 12 most populous counties.[173]

7         321.   Despite this extreme and unacceptable risk of harm and death, the

8    SHERIFF'S DEPARTMENT has failed to take effective action.   The SHERIFF'S

9    DEPARTMENT's policies and procedures for screening arriving people and Jail

10   staff for contraband are inadequate.   The SHERIFF'S DEPARTMENT fails to equip

11   all facilities with body scanners, properly maintain existing body scanners, properly

12   train staff on their use, or require scanning of everyone entering the Jail.   The

13   SHERIFF'S DEPARTMENT has acknowledged that drugs enter the Jail facilities

14   through staff, visitors, mail, and hidden in the body cavities of individuals entering

15   custody.   Yet the SHERIFF'S DEPARTMENT does not conduct body scans of staff,

16   contractors, or visitors.   Nor has the SHERIFF'S DEPARTMENT taken action to

17   address deficiencies in its body scanners, which are only stationed at four of the six

18

19   _____

20   [170] *See* City News Service, *Seven Otay Mesa jail inmates hospitalized for drug overdose*, SAN DIEGO-UNION TRIBUNE, July 18, 2021, https://www.sandiegouniontribune.com/news/public-safety/story/2021-07-18/seven-otay-mesa-jail-inmates-hospitalized-for-drug-overdose; Alex Riggins, *8 inmates at a San Diego County jail hospitalized after overdosing on fentanyl*, LOS ANGELES TIMES, May 19, 2021, https://www.latimes.com/california/story/2021-05-19/8-inmates-at-otay-mesa-jail-hospitalized-after-overdosing-on-fentanyl-naxolone.

21

22

23   [171] In a change from past practice, the Sheriff's Department has stopped issuing updates on deaths at the Jail with toxicology results, which means the public lacks

24   information about the cause of deaths at the Jail.

25   [172] *See* San Diego County Sheriff's Department, Suspected Overdose Incidents with Naloxone Deployment (Nov. 11, 2022),

26   https://www.sdsheriff.gov/home/showpublisheddocument/5928.

27   [173] Analytica Consulting, "San Diego County:  In-Custody Death Study," April 2022, available at:  https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/in-custody-death-study/Att.G-CLERB%20In-Custody%20Death%20Study.pdf, at v,

28   10.

Jail facilities.  The SHERIFF'S DEPARTMENT admitted that its drug detection system had "limitations" in 2019.[174]  That year, Joseph Castiglione died after a body scan failed to detect a baggie in his intestine.[175]  Nevertheless, the Undersheriff (and now the newly elected Sheriff) stated late last year that the SHERIFF'S DEPARTMENT's body scanners remain inadequate to detect contraband carried by incarcerated people and Jail staff alike.[176]  The SHERIFF'S DEPARTMENT has also failed to take other measures adequate to stop, or even reduce, the flow of drugs, or to train staff on the existing measures.  These failures continue to contribute to deaths at the Jail.  Omar Moreno Arroyo died in 2021 after, CLERB found, "the operator of the body scanner never identified or inquired with Moreno about anomalies on his body scan."[177]

322.   The SHERIFF'S DEPARTMENT has also failed to adequately train custody staff to timely and properly prevent and respond to deadly overdoses in the Jail.  For example, in July 2021, CLERB found that a deputy failed to conduct appropriate safety checks on someone who then died from an overdose.[178]  CLERB found that two deputies failed to administer life-saving measures to someone dying of a fentanyl overdose in 2020.  The SHERIFF'S DEPARTMENT initially lied

---

[174] Jeff McDonald, Kelly Davis, Lauren Schroeder, *Rate of jail inmate deaths in San Diego County far exceeds other large California counties*, SAN DIEGO UNION-TRIBUNE, Sept. 19, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

[175] Citizens' Law Enforcement Review Board, September 2019 Findings at 9, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2019/0919%20findings.pdf.

[176] "Debate: Who Should be Sheriff?", *Times of San Diego*, Oct. 22, 2021, at 34:50, https://www.youtube.com/watch?v=idmGH03C0Sg.

[177] Citizens' Law Enforcement Review Board, March 2022 Findings at 1-4, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/2022-documents/03-2022/0322%20Findings%20-%20Final.pdf.

[178] Jeff McDonald, Kelly Davis, *Investigators said San Diego deputy neglected to check inmate found dead in 2020*, SAN DIEGO UNION-TRIBUNE, July 12, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-07-12/investigators-said-san-diego-deputy-neglected-to-check-inmate-found-dead-in-2020.

1  about the circumstances of the death, stating that deputies "immediately performed

2  life-saving measures." That was later shown to be false.[179]

3      323.  These policies and practices place incarcerated people at risk of serious

4  harm. For example, Plaintiff SEPULVEDA has been denied treatment for his

5  opioid addiction and is worried about overdosing given the rampant availability of

6  contraband drugs in the Jail. When SEPULVEDA expressed fear about overdosing

7  and asked to have Naloxone—an opioid overdose reversal medication that deputies

8  are supposed to carry in the Jail and that is now supposed to be available in housing

9  unit common areas—in his cell, staff callously wrote back that "[t]here should be no

10  opiate overdose as you are not prescribed any [opiates]."

11      324.  The SHERIFF'S DEPARTMENT is currently ill-equipped to handle

12  the overdose crisis. In July 2021, in the midst of the ongoing overdose crisis, the

13  SHERIFF'S DEPARTMENT published a video in which it claimed that a deputy

14  had overdosed when handling fentanyl while making an arrest, even though the

15  deputy did not ingest any fentanyl. Numerous experts pointed out that a person

16  cannot overdose from fentanyl through skin contact or exposure, and that

17  overdosing can occur only through actually ingesting the drug. Later, it was

18  revealed that the deputy who allegedly overdosed never took a toxicology test.[180]

19  This episode engenders little confidence in the SHERIFF'S DEPARTMENT's

20  training, policies, and practices concerning the prevention of overdoses in the Jail.

21

22

23

---

24  [179] Jeff McDonald, Kelly Davis, *Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds*, SAN DIEGO
UNION-TRIBUNE, Dec. 6, 2021,
25  https://www.sandiegouniontribune.com/news/watchdog/story/2021-12-06/two-san-
diego-sheriffs-deputies-failed-to-provide-medical-aid-to-inmate-before-he-died-
26  review-board-finds.

27  [180] Isabella Grullón Paz, *Video of Officer's Collapse After Handling Power Draws Skepticism*, NEW YORK TIMES, Aug. 31, 2021,
28  https://www.nytimes.com/2021/08/07/us/san-diego-police-overdose-fentanyl.html.

C.  **The Sheriff's Department Fails to Maintain Functioning Video Cameras, Emergency Intercoms, and Elevators, Which Places Incarcerated People's Physical Safety at Risk**

325.   The SHERIFF'S DEPARTMENT's policies and practices for maintaining safe and functioning Jail facilities are inadequate.  By policy and practice, the SHERIFF'S DEPARTMENT fails to maintain functional video cameras, intercoms, and elevators in areas of the Jail where emergencies occur and incarcerated people's physical safety is often placed at risk.  The SHERIFF'S DEPARTMENT fails to adequately train staff to respond to emergencies and maintain safe facilities, including by maintaining working video cameras, intercoms, and elevators.  As a result, important safety features at the Jail are often broken, inoperable, or nonexistent, making it impossible to respond to emergency situations and rendering the Jail even more dangerous for incarcerated people.

326.   Video camera coverage in detention facilities helps keep people safe by enabling custody staff to monitor all areas of the Jail, and quickly respond to dangerous situations such as fights and rapes.  Video footage also helps provide staff with a clear record of incidents in the Jail, which better enables the SHERIFF'S DEPARTMENT to improve policies and practices in response, to provide training when necessary, and to hold staff and incarcerated people accountable for misconduct.  For this reason, video surveillance—both via stationary cameras and through body-worn cameras that pick up sound and capture tight spaces—has become commonplace in jails and prisons across the country.

327.   The SHERIFF'S DEPARTMENT lacks adequate policies and practices for providing comprehensive video coverage in the Jail.  Many of the video cameras in the Jail are not functioning.  In December 2021, the SHERIFF'S DEPARTMENT admitted that the Jail lacks operable cameras:  "Our inability to tell the entire story or to be completely transparent when incidents in the jail occur, is unacceptable…. The cameras throughout the jail system are aging and are not always reliable."

(emphasis added).[181]  In multiple cases, inadequate video coverage has prevented CLERB from adequately investigating deaths at the Jail, including Lazaro Alvarez's overdose death at George Bailey in November 2020 and Joseph Morton's death by suicide at Vista in May 2020.  In Morton's case, for example, CLERB stated that inoperable video cameras prevented it from assessing whether custody staff performed timely safety checks before Morton was found hanging in his cell.[182]  The 2022 State Audit Report found that a "key, recurring recommendation that the Sheriff's Department has not implemented for nearly a decade relates to updating equipment for monitoring the safety of incarcerated individuals."[183]

328.   Certain spaces in the Jail are not covered at all by video cameras. People in the Jail are aware of these unmonitored spaces and use them to administer "discipline" against others.  Plaintiff ANDRADE has heard custody staff acknowledge these unmonitored spaces and suggest that incarcerated people "work out" their disputes through violent means in these locations, which are referred to as "the pocket."  Plaintiff OLIVARES has also seen incarcerated people disciplined in the pocket on multiple occasions.  George Bailey is known as "the Thunderdome" because so many fights occur there.

329.   One person at Vista reported that after members of a gang discovered his charges, they took him to an area in his dorm housing module in the South building to administer discipline because they knew that specific area was out of camera view.  They then beat him, causing serious injuries.  No custody staff

---

[181] Jeff McDonald, Kelly Davis, *Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds*, SAN DIEGO UNION-TRIBUNE, Dec. 6, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-12-06/two-san-diego-sheriffs-deputies-failed-to-provide-medical-aid-to-inmate-before-he-died-review-board-finds.

[182] Jeff McDonald, Kelly Davis, *Broken cameras, lack of evidence limit inquiry into Vista jail suicide, review board finds*, SAN DIEGO UNION-TRIBUNE, Aug. 9, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-08-09/lack-of-evidence-limits-investigation-into-vista-jail-suicide-last-year.

[183] State Audit Report at 40.

members intervened.  Another person reported that in 5C at Central, incarcerated people are aware of a cell that lacks camera coverage.  That person was attacked in 5C by approximately 5 or 6 people he identified as gang members because they believed that his charges involved another member.  No custody staff intervened and the person was only protected from further harm when his cellmate intervened.  Upon information and belief, custody staff do not regularly wear body-worn cameras in the Jail.

330.   Jail cells are equipped with one or more emergency intercom call buttons, used to summon help from custody staff.  The call buttons are supposed to connect to the deputy control tower in the unit.  When staff are not physically nearby, an intercom may be the only way to alert staff of an emergency.  However, these call buttons often do not work or staff simply ignore them.  The SHERIFF'S DEPARTMENT's policies and procedures for maintaining functioning emergency call buttons are inadequate.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff how to maintain functioning emergency call buttons in Jail cells and how to respond to them.  These inadequate policies, procedures, and training create an unreasonable risk that incarcerated people will suffer at length before receiving assistance.

331.   For example, on March 12, 2022, Plaintiff SEPULVEDA was housed in cell 4 in unit 7B at Central Jail.  Derek Baker and his cellmate Patrick lived adjacent to SEPULVEDA in cell 5.  On March 12, SEPULVEDA heard an altercation in cell 5.  SEPULVEDA believed he heard a person in the cell say "man down, man down" into the intercom box.  SEPULVEDA then heard grunting and thudding sounds from cell 5, and thought it sounded like a person's body being hit against the ground or wall.  The sound continued for several minutes.  Eventually, Patrick told an incarcerated person in the dayroom that he had killed his cellmate, and that no one answered when he pushed the emergency button.  Baker later died from his injuries.  Staff in 7B have also failed to respond to the emergency button in

1  SEPULVEDA's cell when he has pressed it.

2  332.  Two months after Mr. Baker was killed, SEPULVEDA heard another
3  altercation in the cell next to him.  SEPULVEDA pushed the call button in his cell,
4  but deputies did not respond.  SEPULVEDA later learned that the incarcerated
5  person being attacked in the cell next to him also pushed the call button, but
6  received no response.  Deputies did not enter the housing unit to intervene until
7  about 40 minutes later, which, on information and belief, contributed to the
8  seriousness of that person's injuries.

9  333.  Plaintiff TAYLOR was attacked in his cell by other incarcerated people
10 on or around October 26, 2022.  The SHERIFF'S DEPARTMENT had failed to
11 place TAYLOR in protective custody and instead classified as general population,
12 even though it should have known that he was a target for violence.  TAYLOR
13 repeatedly pressed the call button during the attack, which lasted about four or five
14 minutes, but no deputy responded.  After about ten calls, a deputy finally responded
15 by informing TAYLOR that custody staff was too busy to come to his aid.
16 TAYLOR received the same response on two more calls.  TAYLOR suffered
17 serious injuries from the attack, including facial bruising and abrasions, soreness in
18 his head and kidneys, and a loose tooth.  No one from the SHERIFF'S
19 DEPARTMENT took photos of TAYLOR's injuries or the attack scene, or offered
20 TAYLOR medical assistance.  Instead, staff took TAYLOR to the yard and left him
21 there for about three hours, before placing him in administrative segregation for a
22 week and then finally moving him to protective custody.

23 334.  Plaintiff DUNSMORE was housed in a medical observation unit during
24 his 2019-2021 incarceration at the Jail.  DUNSMORE's cell had three emergency
25 call buttons to summon help from custody staff.  One call button was next to the
26 bed, one by the toilet, and one on the wall near a speaker.  However, only the call
27 button by the toilet worked, as DUNSMORE discovered when at one point he
28 started to choke and was unable to breathe.  DUNSMORE pushed the call buttons

1   by his bed and the wall, but received no response from custody staff.  Only once

2   DUNSMORE pushed the call button by the toilet did staff respond to render aid.

3       335.   Even when the emergency call buttons do work, custody staff do not

4   respond—whether because they are not in the control tower to receive the call,

5   because there is insufficient staff coverage, or because staff choose to ignore calls

6   for help.  DRC found that monitoring panels in the control towers "were at times set

7   to mute."[184]  CLERB found that custody staff failed to respond to a dying person's

8   cell for at least 10 minutes, even though that person's cellmate pushed the

9   emergency call button in their cell at least four times.  In 2021, one person pushed

10  the emergency call button in his cell at Vista while he was being physically attacked

11  by his cellmate.  Custody staff failed to respond to the call button and did not assist

12  the person until meal time, by which point he had been bloodied and injured by his

13  cellmate.  Custody staff told the man that no deputy was available in the control

14  tower when he pushed the button.

15      336.   At Central Jail, Robert Moniger died in 2021 after he and two cellmates

16  used the intercom repeatedly over the course of days without staff response.  Upon

17  information and belief, Moniger began to have trouble breathing and complained of

18  a pounding headache after he used up all of the medication in his two inhalers.  In

19  distress, Moniger pushed the call button to request assistance from deputies, but

20  received no response.  Moniger's cellmates also pushed the intercom button to call

21  for help from custody staff, but did not receive any response.  His cellmates

22  eventually got a deputy to come by, but by this time, Moniger could not walk.

23  Custody staff placed Moniger in a wheelchair and took him to a side cell, but did not

24  provide him with any medical attention.  Upon information and belief, Moniger died

25  the next morning without receiving any medical care.

26      337.   The SHERIFF'S DEPARTMENT's policies and practices for

27

28  ───────────────
[184] DRC Report, Appendix A at 16.

maintaining the elevators at the Jail are inadequate.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff how to maintain elevators at the Jail.  Central is a tower facility with 11 floors accessible only via stairs or the elevator.  The lack of functioning elevators places incarcerated people at substantial risk of harm in the event that they are injured, and custody and medical staff cannot timely respond to render aid.

**D.    The Sheriff's Department Fails to Provide Timely and Adequate Safety Checks and Fails to Respond to People in Distress**

338.   By policy and practice, the SHERIFF'S DEPARTMENT fails to conduct timely safety checks and to adequately respond to incarcerated people in distress.  The SHERIFF'S DEPARTMENT does not adequately train custody staff how to prevent and appropriately respond to violence between people or other emergency situations.  As a result of a lack of adequate training, staff: (1) do not timely respond to violent incidents at the Jail; (2) allow security lapses that endanger incarcerated people; (3) fail to appropriately intervene when assaults and security breaches occur; and (4) fail to appropriately monitor the wellbeing of incarcerated people.

339.   By policy and practice, custody staff at the Jail fail to conduct timely and adequate safety checks.  SHERIFF'S DEPARTMENT policies fail to require that safety checks involve staff observation sufficient to ensure that the observed person is alive, such as seeing the rising and falling of the person's chest when breathing.  The SHERIFF'S DEPARTMENT has long known about these problems.

340.   For example, CLERB has repeatedly found that custody staff fail to conduct timely and adequate safety checks, including where a deputy failed to perform a safety check on a person who committed suicide and lied about conducting a head count of incarcerated persons in an apparent effort to cover up the lapse.  One person had committed suicide, and the deputy could have responded to

render aid earlier had he done his job.[185]  In 2019, CLERB found that deputies failed to obtain a verbal or physical acknowledgment of life from a person later found dead.[186]  In 2020, another deputy failed to confirm signs of life from all three people in a cell.  When the cell was opened in the morning for medication distribution, Blake Wilson was discovered in the cell, dead from an overdose.[187]  The DRC Experts documented a similar incident in which two deputies completed welfare checks of 40 cells in just 17 seconds—far too quickly to meaningfully assess the welfare of all people in each cell.  One of the deputies did not look into any cells after the first.[188]  The 2022 State Audit Report documented "multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride," and that when staff checked more closely, "some of these individuals showed signs of having been dead for several hours."[189]  The State Auditor recommended the SHERIFF'S DEPARTMENT revise its policies to ensure that staff "check that an individual is still alive without disrupting the individual's sleep."  On information and belief, the SHERIFF'S DEPARTMENT has failed to implement this recommendation in policy and practice.

341.   The State Audit Report stated that the SHERIFF'S DEPARTMENT lacks any formal policy for confirming that custody staff actually complete checks, such as a policy of auditing safety checks.[190]  On information and belief, the

---

[185] Citizens' Law Enforcement Review Board, June 2017 Findings at 3, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2017/0617findings.pdf

[186] Citizens' Law Enforcement Review Board, February 2019 Findings at 3-4, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2019/0219%20findings.pdf.

[187] Citizens' Law Enforcement Review Board, July 2021 Findings at 2, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2021/0721Findings.pdf.

[188] DRC Report, Appendix A at 16.

[189] State Audit Report at 2.

[190] *Id.* at 26.

1  SHERIFF'S DEPARTMENT has failed to implement safety check audit systems at

2  all Jail facilities.

3      342.   The SHERIFF'S DEPARTMENT also fails to conduct safety checks at

4  sufficient frequency in administrative segregation units, which are notoriously harsh

5  and isolating, and may exacerbate mental illness and suicidal ideation.  As a result,

6  it is standard in detention facilities to conduct safety checks in administrative

7  segregation units every 30 minutes.  However, by policy, the SHERIFF'S

8  DEPARTMENT conducts safety checks in those units only every hour, which

9  places incarcerated people in those units at substantial risk of serious harm.  Several

10  people have committed suicide in the Jail's administrative segregation units in

11  recent years.

12      343.   By policy and practice, custody staff fail to adequately respond and

13  intervene to provide lifesaving measures when incarcerated people are in distress.

14  The SHERIFF'S DEPARTMENT fails to adequately train custody staff to intervene

15  and provide aid when people are in distress.  For example, Plaintiff ANDRADE was

16  assaulted by other incarcerated people while in the protective custody housing unit

17  at George Bailey in June 2022.  An alarm went off during the course of the assault,

18  alerting custody staff to the incident.  However, deputies were delayed in

19  responding, allowing the attackers to continually beat ANDRADE until he passed

20  out.  ANDRADE suffered a broken nose and a concussion in the extended attack.

21      344.   In May 2019, Tanya Suarez—a 23-year-old student at San Diego State

22  University—was booked into Las Colinas.  Suarez was under the influence of

23  methamphetamine and was experiencing psychotic delusions.  Although Suarez was

24  placed in a safety cell, custody staff restrained her, cut her acrylic nails after she

25  attempted to gouge out one of her eyes, and placed her naked into a safety cell.

26  According to Suarez's civil lawsuit, surveillance video from the Jail shows that on

27  rounds, a deputy went to the window of Suarez's safety cell.  That deputy used her

28  personal cell phone to record video of Suarez, who was naked and gesturing toward

her eyes.  That deputy walked away without intervening.  A few minutes later, another deputy came to the cell window and saw that Suarez was attempting to remove her right eyeball.  The deputy did not intervene, even after watching Suarez in fact remove her right eyeball.  Then, the deputy walked away and returned with other deputies a full two minutes later, by which time Suarez had removed her other eye.  If deputies been properly trained to intervene, staff could have stopped Suarez from harming herself.  Instead, Suarez is now permanently blind.[191]  JAIL DEFENDANTS recently agreed to pay Suarez $4.35 million to settle her lawsuit.

345.   In November 2019 at Las Colinas, another deputy walked away after Elisa Serna—who was in withdrawal and having seizures—fell and struck her head. Even though Serna was unresponsive, the deputy left her on the floor of her cell. Serna was later discovered dead in the same position.[192]

346.   These problems persist.  In December 2021, CLERB found that two deputies failed to render emergency aid to Lazaro Alvarez, who suffered a heart attack from fentanyl and methamphetamine intoxication at the Jail in November 2020.  Although deputies responded to Alvarez, one deputy started and then quickly stopped chest compressions, and a second deputy provided no aid.  Nor was the first deputy carrying Naloxone.  CLERB's findings contradict the SHERIFF'S DEPARTMENT's initial report, which was that deputies "immediately" performed life-saving measures.[193]  In January 2022, CLERB found that deputies failed to

---

[191] *Suarez v. County of San Diego, et al.*, No. 20-CV-00456-WQH-DEB (S.D. Cal.), Dkt. 32-1.

[192] Jeff McDonald, Kelly Davis, *Woman left alone to die after striking her head in jail, independent review finds*, SAN DIEGO UNION-TRIBUNE, Feb. 7, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-02-07/woman-left-alone-to-die-after-striking-her-head-while-collapsing-in-jail-independent-review-finds.

[193] *See* Jeff McDonald, Kelly Davis, *Two San Diego County sheriff's deputies failed to provide medical aid to inmate before he died, review board finds*, SAN DIEGO UNION-TRIBUNE, Dec. 6, 2021. https://www.sandiegouniontribune.com/news/watchdog/story/2021-12-06/two-san-diego-sheriffs-deputies-failed-to-provide-medical-aid-to-inmate-before-he-died-review-board-finds.

1  summon medical attention for Anthony Chon, who complained of shortness of

2  breath at the Jail in October 2020.  Instead of obtaining medical help, a deputy

3  brought Chon to the recreation area, where he collapsed and died of a pulmonary

4  embolism.[194]  The State Auditor found that in almost a third of the deaths it

5  reviewed, "issues with the response time of sworn staff or medical staff may have

6  resulted in unnecessary delays in performing lifesaving measures."[195]

7  **E.    The Sheriff's Department Fails to Prevent and Address
        Misconduct by Custody Staff That Harms Incarcerated People**

8

9      347.   By policy and practice, the SHERIFF'S DEPARTMENT fails to

10  prevent and address misconduct against incarcerated people by custody staff.  The

11  SHERIFF'S DEPARTMENT does not adequately train custody staff how to prevent

12  and address misconduct in its ranks.  As a result, custody staff regularly commit

13  misconduct that directly harms incarcerated people.

14      348.   This misconduct can take the form of lockdowns or other tactics that

15  deprive incarcerated people of programs and privileges.  For example, custody staff

16  punish people, including people with mental health disabilities, without following

17  any formal discipline system, by refusing to provide meals, refusing to let them out

18  for showers, refusing to take them out to court, or denying professional visits.  In

19  practice, this is often performed pursuant to an unofficial but widely used system

20  called "bypass," under which a person is essentially placed on individualized

21  lockdown, and denied access to out-of-cell time.  The person's cellmate is removed

22  and the person's cell door is not opened for access to programs or dayroom.  The

23  bypass system is not memorialized in any written policy but is a longtime practice

24  administered by some custody staff.  A person can be placed on bypass for months.

25

26  [194] Jeff McDonald, Kelly Davis, *Citizens' review board probe finds misconduct by two deputies in San Diego jail death*, SAN DIEGO UNION-TRIBUNE, Jan. 9, 2022,
27  https://www.sandiegouniontribune.com/news/watchdog/story/2022-01-09/citizens-review-board-probe-finds-misconduct-by-two-deputies-in-san-diego-jail-death.
28  [195] State Audit Report at 26-27.

349.   Staff misconduct takes the form of violence against incarcerated people.  For example, Oscar Leal died at the Jail after custody staff used restraints on Leal, in a death ruled a homicide by the medical examiner.[196]  That same year, Earl McNeil died at Central after a deputy covered McNeil's mouth with a shirt, even though he was already restrained in a WRAP device, with a spit sock over his head.  This compromised McNeil's respiratory functions and contributed to his death.[197]  CLERB found that the deputy used excessive force.  CLERB also found that a deputy used excessive force when he used a flashlight to strike an incarcerated person in the head while that person was restrained by five other deputies.  Upon information and belief, the custody staff involved were not disciplined.

350.   Custody staff discriminate against incarcerated people with mental illness by emotionally, verbally, and/or physically abusing them.  In 2021, in a mental health unit, a custody staff member slammed the food tray slot on a man's hands and trapped his hands in the slot for a significant period of time.  Another person with mental health needs reported that a deputy tried to slam his arm in the food tray slot.  When the person wrote a grievance, the deputy falsely wrote him up for a disciplinary infraction.  A deputy told one incarcerated veteran with PTSD that he would have to "get over" his PTSD like everybody else on the outside.

351.   Custody staff also create situations that increase the likelihood that they will use force against incarcerated people.  For example, custody staff sometimes "pop" the cell doors of people who are violent and actively psychotic when they are speaking with mental health staff.  In January 2022, a deputy opened the cell door of

---

[196] Jeff McDonald, Kelly Davis, Lauren Schroeder, *Rate of jail inmate deaths in San Diego County far exceeds other large California counties*, SAN DIEGO UNION-TRIBUNE, Sept. 9, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

[197] Greg Moran, *Review Board Investigation Concludes Deputy Violated Policy in Earl McNeil Death*. SAN DIEGO UNION-TRIBUNE. Oct. 4, 2019. https://www.sandiegouniontribune.com/news/courts/story/2019-10-04/review-board-concludes-deputy-violated-policy-in-earl-mcneil-death.

a person who was acting aggressively and erratically during a mental health episode, and the deputy ended up using a Taser against that person and leaving him bloodied. Custody staff's actions and inactions increase the likelihood that they will have to intervene and use force against people with mental health disabilities.

352.   The SHERIFF'S DEPARTMENT has been repeatedly informed about the above and other consequences of its failure to adequately train, supervise, and discipline custody staff, including through lawsuits, grievances, and CLERB findings, but are deliberately indifferent and have failed to take effective action to prevent and address misconduct, including through holding custody staff accountable via progressive discipline.  For example, former SHERIFF'S DEPARTMENT staff reported in an October 2022 article about a culture of retaliation that chills staff from coming forward to report on problems within the Jail.  One former sergeant's supervisor "told her not to complain if anyone said negative things to her."  Another former staff member described "a culture within the department that makes people scared to report," because they would be viewed as a "snitch" or "rat," and others would not want to work with them.[198]

## F.  The County Has Failed to Ensure Adequate Independent Oversight of the Jail

353.   Despite the well-documented deaths and conditions in the Jail, JAIL DEFENDANTS have failed for years to take effective action to address the inadequate policies, procedures, practices, and lack of training and supervision that make the Jail so dangerous.  These failures stem at least in part from the COUNTY's failure to ensure meaningful, independent oversight of the SHERIFF'S DEPARTMENT and its staff.

354.   CLERB is the outside agency that the COUNTY has tasked with

---

[198] Claire Trageser, *Police discrimination cases are now public records, but few released by San Diego County departments*, KPBS, Oct. 19, 2022, https://www.kpbs.org/news/local/2022/10/19/police-discrimination-cases-are-now-public-records-but-few-released-by-san-diego-county-departments.

1   investigating allegations of misconduct by custody staff and all deaths in the Jail.

2   However, the COUNTY has failed to provide CLERB with adequate resources and

3   authority to do its job.  A judge of this Court has already found that although the

4   County "has established a board to investigate the widely known problem of in-

5   custody deaths, it has also failed to enable the board to carry out its stated

6   responsibilities."[199]  The COUNTY has systematically understaffed CLERB and

7   prevented it from carrying out its responsibilities.  The 2022 State Audit Report

8   found that CLERB's investigations have not been "independent, thorough, or

9   timely,"[200]  and that in the last 15 years, CLERB has failed to investigate 57 in-

10  custody deaths.[201]  On information and belief, CLERB has never inspected the Jail

11  in its nearly three decades in existence.

12        355.   Despite what may be its best efforts to investigate deaths, CLERB lacks

13  authority to investigate the conduct of Jail medical staff and lacks the ability to

14  review a deceased person's entire medical records.  CLERB cannot interview any

15  Jail medical staff, and custody staff can choose to refuse to meet with CLERB.

16  CLERB's leadership has specifically identified addressing this efficiency in order to

17  facilitate meaningful oversight; to date, JAIL DEFENDANTS have refused to

18  implement the change.  CLERB investigators rely primarily on evidence from the

19  SHERIFF'S DEPARTMENT.  By the time it receives any such evidence, witnesses

20  may be unavailable.  To date the COUNTY has failed to implement critically

21  needed improvements to ensure CLERB's effectiveness.[202]  These restrictions on

22  CLERB's authority and power prevent the agency from meaningfully investigating

23

24  [199] *Estate of Silva v. City of San Diego*, No. 3:18-CV-2282-L-MSB, 2020 WL
        6946011, at *20 (S.D. Cal. Nov. 25, 2020).

25  [200] State Audit Report at 4.

26  [201] *Id.* at 46.

27  [202] Jeff McDonald, Kelly Davis, *Citizens review board leader wants to change the
        way it investigates deaths in custody*, SAN DIEGO UNION-TRIBUNE, Oct. 10, 2021,
28      https://www.sandiegouniontribune.com/news/watchdog/story/2021-10-10/citizens-
        review-board-leader-wants-to-change-the-way-it-investigates-deaths-in-custody.

1  misconduct at the Jail and deprive CLERB of the ability to formulate meaningful

2  findings and recommendations to hold the SHERIFF'S DEPARTMENT

3  accountable.  Indeed, the State Audit Report found that CLERB's reports to the

4  Board of Supervisors "do not include any significant discussion or analysis that

5  might point to deficiencies in the Sheriff's Department policies or practices."[203]  The

6  need for effective, independent oversight is clear, as the State Audit Report also

7  found that the SHERIFF'S DEPARTMENT's internal investigations and reports on

8  deaths "have been insufficient and have lacked transparency."[204]

9  **VI.   JAIL DEFENDANTS FAIL TO PROVIDE ADEQUATE DENTAL
        CARE TO INCARCERATED PEOPLE**

10

11     356.   The SHERIFF'S DEPARTMENT has a policy and practice of failing to

12  provide adequate dental care to people incarcerated in the Jail.  Together, JAIL

13  DEFENDANTS are deliberately indifferent to the dental care needs of incarcerated

14  people, and place them at a substantial risk of unnecessary suffering, serious injury,

15  and clinical deterioration.  People incarcerated in the Jail are entirely dependent on

16  the SHERIFF'S DEPARTMENT for all dental care.

17     357.   SHERIFF'S DEPARTMENT staff are responsible for "oral hygiene

18  instruction and preventive oral education at intake" and for dental screenings.

19  Pursuant to the contract with JAIL DEFENDANTS, NaphCare provides some dental

20  care and staffing in the Jail.

21     358.   JAIL DEFENDANTS maintain insufficient numbers of dental

22  professionals to provide minimally adequate care to the approximately 4,000

23  incarcerated people in the Jail.  There are insufficient dental staff to timely respond

24  to requests for dental evaluations and treatment; to adequately screen, monitor, and

25  provide follow-up care to people with serious dental conditions; and to treat people

26

27  _____
[203] State Audit Report at 51.

28  [204] *Id.* at 33.

on an emergency basis.  The SHERIFF'S DEPARTMENT fails to adequately train and supervise their staff to ensure that dental care is provided on a timely basis.  The SHERIFF'S DEPARTMENT fails to schedule a sufficient number of dental clinics to timely serve all people requiring dental care.  If a person at Central, for example, is not scheduled for a given dental clinic, they will have to wait at least two weeks until another dental clinic is held at the Jail.  NCCHC found that people may wait as long as two months for dental care from the time an appointment is made.[205]  Upon information and belief, people continue to have to wait as long as two months from scheduling an appointment to receive dental care.  In addition, per SHERIFF'S DEPARTMENT policy, people requesting dental care are often first seen or triaged by undefined "health staff"—not a dentist—who are not capable of evaluating a person's dental needs.

359.   For example, Plaintiff ZOERNER began to notice severe pain in her mouth shortly after she was booked into Las Colinas in early May 2021. ZOERNER had been homeless and drinking heavily due to her alcoholism, and she did not notice the mouth pain until she was incarcerated and sober.  The pain became so excruciating that ZOERNER could not sleep.  Beginning on or around May 20, 2021 ZOERNER submitted several sick call requests and grievances with crying faces to describe the severe pain.  ZOERNER was scheduled to see the dentist on May 25, 2021 but the appointment was rescheduled without explanation. On June 7, 2021, ZOERNER told a nurse that "I'm tired of [you] telling me that I'm scheduled for Dental but it didn't happen.  Tylenol or Motrin doesn't help for the pain."  Only then was ZOERNER designated "must see" for dental sick call.  On June 8, 2021, the dentist diagnosed ZOERNER with an abscessed tooth and removed it.  However, the multi-week delay in treating the abscess likely contributed to the development of osteomyelitis, or inflammation of the jaw.

---

[205] NCCHC Report at 20.

ZOERNER's pain soon returned and the area where her tooth was extracted became swollen.  The pain and neglect ZOERNER experienced affected her mental health and she became depressed.  On or around June 12, 2021, ZOERNER began to feel as if she would rather die than live with such excruciating pain, and felt that she would only get attention for her serious medical and dental needs by taking extreme actions.  ZOERNER went "man down" in the dayroom in order to obtain dental care, but was told that the dentist was out.  ZOERNER then reported feeling suicidal and was transferred to a safety cell and then an EOH cell.  Days later, ZOERNER was finally seen by a dentist, who ordered that she immediately be transported to Tri-City Hospital for an operation to address the osteomyelitis in her jaw.

360.   The SHERIFF'S DEPARTMENT fails to provide minimally adequate dental treatment to incarcerated people.  Dental care and treatment available for people incarcerated in the Jail is almost exclusively limited to extracting teeth, even if a much less invasive procedure is medically appropriate.  Rarely are other treatments provided, despite incarcerated people's requests for services such as fillings and root canals, rather than extraction.  The NCCHC Report found that the dentist "rarely" provides fillings."[206]  Upon information and belief, the SHERIFF'S DEPARTMENT's dental care regimen continues to consist almost exclusively of extractions.  Nor does the SHERIFF'S DEPARTMENT's dental services policy provide any description of the routine dental care provided; instead, it focuses almost exclusively on emergency care.  Incarcerated people face the terrible dilemma of keeping a tooth and suffering pain, or ending the pain and losing a tooth that otherwise could be saved.  Extractions of teeth that could be salvaged are so common that many incarcerated people with dental pain will not visit the dentist because they know they will lose their teeth, regardless of the underlying problem.

361.   For example, Plaintiff NORWOOD began to experience significant

---

[206] *Id.* at 20.

tooth pain in or around October 12, 2021.  NORWOOD submitted two to three sick call requests, and was told he was "scheduled" to see the dentist, but he did not see the dentist for over a month.  When NORWOOD finally saw the dentist, in late November 2021, the dentist informed him that he needed a root canal—but that the only treatment the Jail dentist could provide was to pull his teeth.  Though he initially declined this procedure, within two weeks the pain in NORWOOD's tooth became unbearable and he again requested to see the dentist in or around early December 2021.  After waiting another full month, NORWOOD was finally able to see the dentist and have his tooth pulled in early January.  NORWOOD likely could have kept his tooth had the SHERIFF'S DEPARTMENT provided him with adequate dental care.  NORWOOD was unable to identify the dentist because the dentist, like many medical staff members, had his name badge turned around so that incarcerated people could not identify him.

362.   In November 2020, Plaintiff EDWARDS saw the dentist at the Jail for pain in his right molar.  The only treatment the dentist offered was an extraction, and EDWARDS had the tooth removed a few days later.  In or around September 2021, EDWARDS developed severe pain in his lower left molar, and decided not to seek care from the dentist because he does not want to lose another tooth to extraction.  As a result, EDWARDS had to manage the pain in his lower left molar while in the Jail.  When transferred to CDCR, EDWARDS received prompt care for his left molar.

363.   The SHERIFF'S DEPARTMENT's policies and procedures for preventive dental care are inadequate.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff how to provide preventive dental care to incarcerated people.  As a result, incarcerated people at the Jail do not receive preventive dental services.  The NCCHC Report found that incarcerated people are not informed about oral hygiene, preventive oral education, or dental services during

the booking process.[207]  NCCHC recommended that the SHERIFF'S DEPARTMENT ensure that people incarcerated in the Jail on a long-term basis receive dental care by affirmatively scheduling those people for a dental evaluation.[208]  Upon information and belief, the SHERIFF'S DEPARTMENT does not affirmatively schedule people for timely preventive dental care or regular examinations.  The SHERIFF'S DEPARTMENT does not tell people that they can request preventive care.  Nor, upon information and belief, does the SHERIFF'S DEPARTMENT approve preventive dental services for people who do request preventive dental care.

364.   For example, Plaintiff LEVY was incarcerated at the Jail for more than three years, but did not receive any preventive dental care or regular cleanings. Plaintiff EDWARDS was incarcerated at the Jail for over two and a half years, but never received a regular dental examination, dental cleaning, or treatment options other than extraction.  EDWARDS requested a dental cleaning, but Jail staff failed to timely respond to his request and EDWARDS remains waiting for a dental cleaning.  Plaintiff ARCHULETA was at the Jail for over two and a half years, and was never offered a cleaning or routine dental examination.

365.   The SHERIFF'S DEPARTMENT's policies, procedures, and practices place incarcerated people at risk of serious harm, as serious dental problems may go unnoticed and cause incarcerated people to suffer severe pain, loss of their teeth, or long-term damage to their dental health.

**VII.   ALL DEFENDANTS OVERINCARCERATE PEOPLE IN THE JAIL, PARTICULARLY PEOPLE WITH DISABILITIES, BY DENYING THEM ACCESS TO COMMUNITY-BASED SERVICES FOR WHICH THEY ARE ELIGIBLE AND CAN SUCCESSFULLY PARTICIPATE**

366.   As alleged above, the unconstitutional and discriminatory conditions in

---

[207] *Id.* at 20.

[208] *Id.* at 54.

the Jail harm or threaten to harm thousands of incarcerated people each year.  Yet the COUNTY, SHERIFF'S DEPARTMENT, and PROBATION DEPARTMENT (collectively, "ALL DEFENDANTS") have created a cycle of reincarceration and overincarceration that exacerbates the problems in the Jail and exposes more people than necessary to the harms within the Jail walls.  ALL DEFENDANTS fail to provide adequate alternatives to incarceration and adequate re-entry programming and assistance for people who are incarcerated in the Jail.  This failure contributes to many people being repeatedly reincarcerated in the Jail.  Plaintiffs CLARK, NORWOOD, and ZOERNER each have been incarcerated at the Jail more than 10 times over the last decade.  Each incarceration disrupts a person's access to services, employment, and stable housing.  In particular, the COUNTY and SHERIFF'S DEPARTMENT overincarcerate people with disabilities, often on minor charges that are disability-related.  This practice violates the ADA's integration mandate and deepens the crisis of inadequate treatment and dangerous conditions inside the Jail facilities.

### A. The County and Sheriff's Department's Incarceration Practices Disproportionately Harm People with Disabilities, the Homeless, and People of Color

367.   The ADA and the Rehabilitation Act prohibit all forms of discrimination against people with disabilities.  The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act includes similar protections.  *See* 29 U.S.C. § 794(a).  Implementing regulations for both the ADA and the Rehabilitation Act prohibit public entities from utilizing "methods of administration" that "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or that "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's

program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b(3).
Implementing regulations further require the Jail to administer services, programs,
and activities in the most integrated setting appropriate to the needs of qualified
individuals with disabilities.  28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d); *see also*
45 C.F.R. 84.4(b)(2).

368.   In enacting the ADA, Congress found that "historically, society has
tended to isolate and segregate individuals with disabilities, and, despite some
improvements, such forms of discrimination against individuals with disabilities
continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2).
"[I]ndividuals with disabilities continually encounter various forms of
discrimination, including …, segregation, and relegation to lesser services,
programs, activities, benefits, jobs or other opportunities[.]"  42 U.S.C.
§ 12101(a)(5).  According to Congress, "the Nation's proper goals regarding
individuals with disabilities are to assure equality of opportunity, full participation,
independent living, and economic self-sufficiency for such individuals." 42 U.S.C.
§ 12101(a)(7).

369.   The COUNTY and SHERIFF'S DEPARTMENT's failure to provide
people with disabilities adequate community-based alternatives to incarceration
results in discrimination that violates the ADA, Rehabilitation Act, and California
law, as these failed policies and practices lead to the repeated incarceration in the
Jail of people with disabilities, including mental health disabilities.

370.   Providing community-based alternatives to incarceration in the Jail is
appropriate and necessary.  In 2019, the SHERIFF'S DEPARTMENT admitted that
the Jail is the largest mental health service provider in San Diego County.[209]  DRC
observed that the 62 PSU beds at Central and Las Colinas make the Jail the

---

[209] Jeff McDonald, Kelly Davis, *In California, jails are now the mental health centers of last resort*, SAN DIEGO UNION-TRIBUNE, Sept. 20, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/in-california-jails-are-now-the-mental-health-centers-of-last-resort.

County's largest provider of inpatient psychiatric services.[210]  In October 2021, County Supervisor Terra Lawson-Remer stated that the Jail is currently used "as a first line response to issues like homelessness, poverty, substance use, and mental health."[211]  The COUNTY is well aware that its overincarceration of low-income persons with disabilities in need of community services creates its own cycle of additional incarcerations.  In an October 2021 legislative proposal, Supervisor Lawson-Remer acknowledged that even a day or two in jail "can result in more, not less, future contact with the criminal justice system."[212]  According to Supervisor Lawson-Remer, the COUNTY suffers from an "unknown" gap in substance use services.[213]

371.   Supervisor Lawson-Remer's proposal, which was approved by the Board of Supervisors, also acknowledged that "[m]ass incarceration disproportionately impacts the poor, homeless, mentally ill and people of color and does not make us safer."[214]  This is especially true in San Diego County where almost 34% of incarcerated people in the Jail receive psychotropic medication.[215]  22% of people incarcerated at the Jail are Black, whereas only 5% of County residents are Black.  Moreover, the State Audit Report found that between 2018-2020, Black individuals in the Jail died at a disproportionately high rate.[216]  41% of people incarcerated at the Jail are Latinx, whereas only 34% of County residents are

---

[210] DRC Report at 19.

[211] Supervisor Terra Lawson-Remer, "Agenda Item: A Data-Driven Approach to Protecting Public Safety, Improving and Expanding Rehabilitative Treatment and Services, and Advancing Equity Through Alternatives to Incarceration: Building on Lessons Learned During the COVID-19 Pandemic," Oct. 19, 2021, at 3. https://bosagenda.sandiegocounty.gov/cob/cosd/cob/doc?id=0901127e80db3aaf.

[212] *Id.* at 2.

[213] *Id.*

[214] *Id.* at 1.

[215] San Diego County Sheriff's Department, Jail Population Statistics: September 2022. https://www.sdsheriff.gov/home/showpublisheddocument/5827.

[216] State Audit Report at 17.

1  Latinx.[217]  Supervisor Lawson-Remer recently stated that overincarceration is
2  "completely inappropriate; it is ineffective; it doesn't help individuals have a second
3  chance and build a better future."[218]  Yet the COUNTY and SHERIFF'S
4  DEPARTMENT continue to overincarcerate individuals with mental health
5  disabilities, people experiencing homelessness, and people of color rather than fund
6  and make available alternatives to incarceration.  Even during the COVID-19
7  pandemic, the COUNTY and SHERIFF'S DEPARTMENT—which is responsible
8  for a significant portion of arrests in the COUNTY—are incarcerating people for
9  minor, non-violent charges such as disturbing the peace and illegal lodging.[219]

10       372.   The COUNTY's overreliance on incarceration, especially of people
11  with mental health disabilities, has received widespread criticism.  In 2016, the San
12  Diego County Grand Jury recommended that the COUNTY increase spending on
13  community-based mental health services.[220]  The DRC Report criticized the
14  COUNTY's "dangerous, costly, and counter-productive over-incarceration of
15  people with mental health-related disabilities."[221]  The DRC Report recommended
16  that the COUNTY and SHERIFF'S DEPARTMENT (1) ensure that the County's

17
18  [217] San Diego County Sheriff's Department, Jail Population Statistics: September
19  2022. https://www.sdsheriff.gov/home/showpublisheddocument/5827; *see also* San
    Diego County, California QuickFacts, United States Census Bureau,
20  https://www.census.gov/quickfacts/fact/table/sandiegocountycalifornia,CA/POP815
    219.
21  [218] Kelly Davis, *County Supervisors OK study to keep some with mental illness, drug
    problems out of jail*, SAN DIEGO UNION-TRIBUNE, Oct. 19, 2021,
22  https://www.sandiegouniontribune.com/local/story/2021-10-18/county-supervisor-
    stop-using-jails-to-house-people-with-mental-illness-drug-problems.
23  [219] Jeff McDonald, Kelly Davis, *From the Inside: San Diego County jail inmates
    describe filthy conditions, few COVID-19 protections*, SAN DIEGO UNION-TRIBUNE,
24  Jan. 23, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-
    01-23/from-the-inside-in-request-for-injunction-san-diego-county-jail-inmates-
25  describe-filthy-conditions-few-covid-19-protections.
26  [220] "The Mental Health Services Act in San Diego County: Unspent Funds, Ongoing
    Needs," San Diego County Grand Jury 2015/2016, June 9, 2016,
27  https://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2015-
    2016/MHSAinSanDiegoCountyReport.pdf.
28  [221] DRC Report at 9.

1  mental health system supports people with mental illness and prevents them from

2  entering the criminal justice system; (2) when people with mental illness come into

3  contact with law enforcement, ensure that those people are diverted away from the

4  Jail and toward mental health services; and (3) ensure continuity of care and access

5  to services once people with mental illness are released from Jail, if incarceration is

6  necessary, so that they can successfully reenter their communities.[222]  These recom-

7  mendations have not been implemented, and the SHERIFF'S DEPARTMENT's

8  internal documents indicate that "no action [is] needed" on these recommendations.

9  The *San Diego Union-Tribune* recently reported on Steven Olson, one County

10  resident with mental illness who was booked into the Jail 188 times over the course

11  of his life.[223]  Last year, Olson died in a confrontation with police, having cycled in

12  and out of the Jail—his condition only deteriorating—for years.

13      373.   The SHERIFF'S DEPARTMENT's policies and practices contribute to

14  overincarceration.  During the pandemic, the state courts issued a "zero bail" order

15  in an attempt to limit new incarcerations, but the SHERIFF'S DEPARTMENT

16  "emphatically" protested against that policy.  The SHERIFF'S DEPARTMENT has

17  issued booking acceptance criteria stating which offenses preclude booking and

18  incarceration.  Upon information and belief, the SHERIFF'S DEPARTMENT has

19  discretion to change its booking acceptance criteria, and thus exercises influence

20  over how many people are incarcerated in the Jail.  Further, according to the

21  Undersheriff (and now newly elected Sheriff), SHERIFF'S DEPARTMENT

22  deputies and other arresting officers have been "creative" and have booked arrestees

23  for "other charges that are not the primary offense" in order to ensure that are

24  incarcerated at the Jail.  As outlined above, SHERIFF'S DEPARTMENT deputies

25

26  ―――――――――――――
[222] *Id.*

27  [223] Gary Warth, Teri Figueroa, *A completely broken behavioral health system*, SAN DIEGO UNION-TRIBUNE, Oct. 3, 2021,

28  https://www.sandiegouniontribune.com/news/public-safety/story/2021-10-03/steven-john-olson.

booked Omar Moreno Arroyo into Jail on a manufactured "drunk in public" charge, because his other charges were not bookable.  Arroyo—who was in a mental health crisis—died in the Jail.

374.   The deaths and injuries to people with mental illness described throughout this Complaint show how the Jail is not equipped to safely house people with serious mental illness.  Yet the COUNTY's failure to provide sufficient available community-based services means that the Jail is often where people with mental illness end up, to their severe detriment.  For example, in June 2020, Spiros Fonseca, a 26-year-old man, attempted to seek evaluation at a mental health facility operated by the COUNTY.  However, upon information and belief, the facility refused to treat Fonseca because he was under the influence of a substance.  Two days later, Fonseca was arrested and "expressed to officers that he was being followed."[224]  Fonseca was booked into the Jail and not provided any mental health treatment, nor placed under observation.  Just two days after his incarceration, and four days after he sought community mental health services but was denied, Fonseca hanged himself in the Jail.

375.   As another example, in 2019, Reginald Harmon, who has serious mental health issues, and who had been in and out of jails and psychiatric hospitals, attacked another incarcerated person in his housing unit at Central.  The victim's mother, a licensed mental health clinician, said that Harmon "should never, ever have gone to jail … He should have gone to a mental health provider."[225]  Yet the COUNTY and SHERIFF'S DEPARTMENT incarcerated him at the Jail and failed to even house him in a unit with access to a higher level of mental health services.

---

[224] Citizens' Law Enforcement Review Board, February 2021 Findings at 11, https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/findings/2021/0221%20Findings%20.pdf.

[225] Kelly Davis, *Two families unite after one jail inmate bites, disfigures another*, SAN DIEGO UNION-TRIBUNE, Oct. 7, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-17/two-families-unite-over-inmates.

376.   The COUNTY and SHERIFF'S DEPARTMENT repeatedly and unnecessarily expose people like Olson, Fonseca, Harmon, and Plaintiffs to the Jail's constitutionally inadequate medical and mental health care systems, to disability discrimination in the Jail, and to an environment that is much more deadly than other jails around the country.

**B.   All Defendants Fail to Provide Adequate Capacity and Timely Access to Alternatives to Incarceration Programs in the County, Resulting in Non-Compliance with the ADA's Integration Mandate and the Perpetuation of Disability-Based Discrimination**

377.   The COUNTY, SHERIFF'S DEPARTMENT, and the PROBATION DEPARTMENT fail to provide adequate alternatives to incarceration to prevent the unnecessary incarceration of people with disabilities, including mental health disabilities.  For pre-trial detainees, the COUNTY and SHERIFF'S DEPARTMENT fail to provide adequate alternatives to pre-trial custody in the Jail.  For persons serving sentences in the Jail, ALL DEFENDANTS fail to provide adequate out-of-custody programs through which they can serve their sentences, due to lack of capacity and other systemic deficiencies.  The COUNTY's Community Corrections Partnership Plan has recognized the need to expand and "[e]nhance prevention, diversion and alternatives to custody" to limit the use of Jail for only the most serious offenders.[226]  Although the COUNTY, SHERIFF'S DEPARTMENT, and PROBATION DEPARTMENT currently maintain some alternatives to incarceration programs, they are insufficient in size, scope, and funding, and must be expanded so that people with disabilities who can be effectively and appropriately diverted from the Jail are able to participate.  The current deficiencies in these programs, including insufficient capacity, mean that ALL DEFENDANTS are essentially rationing services, particularly those designed to benefit people with

---

[226] FY 2021/2022 Community Corrections Partnership Plan, County of San Diego, https://www.sandiegocounty.gov/content/dam/sdc/probation/CCPdocs/FY_2021-22_Community_Corrections_Partnership_Plan.pdf ("FY2021/2022 Plan").

1    mental health and other disabilities, leading to repeated incarcerations.

2        378.   For example, the SHERIFF'S DEPARTMENT maintains a program

3    known as County Parole and Alternative Custody ("CPAC").  CPAC includes a

4    "Home Detention" program available to pretrial detainees.  Under Home Detention,

5    a person may reside at their home with a GPS monitor in lieu of confinement at the

6    Jail.  When a judge orders a person to be screened for eligibility in Home Detention,

7    the SHERIFF'S DEPARTMENT conducts the eligibility screening and decides

8    whether a person will participate in the program.  Upon information and belief, the

9    SHERIFF'S DEPARTMENT uses discriminatory eligibility criteria that

10   unnecessarily limit the people who may receive Home Detention.  For example, a

11   "minimum qualification" for participation is a landline telephone, which disqualifies

12   people who are poor, people who only have cell phones, individuals without stable

13   housing, and many others.  The SHERIFF'S DEPARTMENT also relies on the

14   Pretrial Release Risk Scale ("PRRS"), a score generated by a predictive screening

15   algorithm, in considering Home Detention eligibility.  The SHERIFF'S

16   DEPARTMENT regularly rejects individuals with low PRRS scores from

17   participating in Home Detention, and in so doing, provides little or no explanation to

18   the person or their attorney as to what factor or factors resulted in exclusion.

19       379.   Upon information and belief, the SHERIFF'S DEPARTMENT can and

20   should accept more people in the Home Detention program.  The COUNTY has the

21   authority to expand eligibility for Home Detention.  The Home Detention program

22   is authorized by California Penal Code § 1203.018.  Under Penal Code

23   § 1203.018(d), a "board of supervisors, after consulting with the sheriff and district

24   attorney, may prescribe reasonable rules and regulations under which an electronic

25   monitoring program … may operate."  The SHERIFF'S DEPARTMENT's rules

26   unreasonably exclude too many people from Home Detention, and instead steer

27   them toward the Jail.  Even during the COVID-19 pandemic, use of home detention

28   has *decreased*, rather than used increasingly to limit incarceration at the Jail.

380.   The SHERIFF'S DEPARTMENT's pretrial services unit conducts assessments of new arrestees and can recommend release on Supervised Own Recognizance ("SOR") release.  However, in 2021, only 1,389 individuals were released on SOR, whether pursuant to a court order or granted by the pretrial services unit.  By comparison, 48,283 individuals were booked into the Jail in calendar year 2021.[227]

381.   Other COUNTY alternatives to incarceration programs lack sufficient funding and capacity to provide meaningful access to those who would be eligible and benefit from such programs, in particular as to people with mental health disabilities.  For example, the COUNTY has a pre-trial mental health diversion program, but it is available to at most 30 participants at any given time.[228]  The COUNTY provides Crisis Stabilization Units, which are available for law enforcement drop-offs as a "safe alternative to a jail or hospitalization."[229]  However, the limited number of Crisis Stabilization Unit placements are severely inadequate.  If these programs and services were provided with sufficient capacity and reach, many people incarcerated at the Jail who have serious mental health needs would be able to access them and avoid damaging and dangerous periods of incarceration.

382.   Programs to divert people with substance use issues from Jail are also insufficient.  The COUNTY and PROBATION DEPARTMENT provide a Drug Court program that offers substance use disorder treatment for people who have committed a non-violent, drug-related crime.  However, upon information and belief, Drug Court has the capacity to serve only a small percentage of the people who qualify.  A disproportionate number of people with substance use disorder

---

[227] San Diego County Sheriff's Department, Jail Population Data, https://www.sdsheriff.gov/resources/jail-population-data (accessed Jan. 26, 2022).
[228] "District Attorney Announces Funding for New Mental Health Diversion Program," *Office of the District Attorney, County of San Diego*, July 7, 2020.
[229] FY2021/2022 Plan at 18.

1  needs have mental health disabilities[230] and are not provided the opportunity to

2  participate in the program due to lack of capacity, discriminatory eligibility criteria,

3  and other systemic deficiencies, causing them to end up incarcerated in the Jail.

4  Similarly, the COUNTY's Serial Inebriate Program for people facing misdemeanor

5  drug and disorderly conduct offenses is limited to only 15-20 participants[231]—a tiny

6  fraction of those pre-trial detainees booked at the Jail on misdemeanor drug and

7  disorderly conduct charges.

8      383.  For people serving sentences, the COUNTY's alternative-to-

9  incarceration programs are extremely limited.  The PROBATION DEPARTMENT

10  has discontinued the Residential Reentry Center program, which allowed

11  incarcerated people to work or attend school while serving their sentence.  In 2021,

12  only 20 people in the SHERIFF'S DEPARTMENT's custody were allowed to

13  participate in the Fire Camp program.

14      384.  ALL DEFENDANTS' insufficient alternatives to incarceration

15  contribute to the unnecessary and harmful incarceration of people with disabilities in

16  the Jail when the provision of adequate community-based services would allow

17  them to receive such services for which they qualify instead of face damaging and

18  dangerous periods of incarceration at the Jail.

19  **C.   All Defendants' Reentry Programming is Inadequate and Sets
       People Up for an Avoidable Cycle of Repeated Incarcerations**

20

21      385.  The COUNTY, SHERIFF'S DEPARTMENT, and the PROBATION

22  DEPARTMENT do not provide adequate reentry programming or planning for

23

24  [230] *See* "Key Substance Use and Mental Health Indicators in the United States:
   Results from the 2020 National Survey on Drug Use and Health," U.S. Dep't of

25  Health & Human Services, Substance Abuse and Mental Health Services
   Administration (Oct. 2021), Figure 36 (indicating that 15% of adults with substance

26  use disorder have co-occurring serious mental illness, where 5.6% of all adults in
   the United States have serious mental illness).

27  [231] *Id.* at 20; How the Serial Inebriate Program works. S.I.P.: The Serial Inebriate
   Program, http://apps.sandiego.gov/directories/sip/howsipworks.htm (accessed

28  Feb. 7, 2022).

people being released from the Jail.  The COUNTY recognizes the importance of providing "evidence-based reentry services striving to reduce recidivism and increase public safety in collaboration with criminal justice partners and community agencies."  Yet ALL DEFENDANTS fail to provide such services with sufficient capacity and reach to serve people with mental health and other disabilities who would be eligible for such services, setting up such individuals for further and repeated incarcerations.

386.   ALL DEFENDANTS do not provide incarcerated people with adequate resources to ensure that they have access to employment, housing, medical care, and other basic needs once released from the Jail.  As detailed above, the SHERIFF'S DEPARTMENT does not provide incarcerated people with serious medical and mental health needs with adequate discharge resources.  ALL DEFENDANTS' reentry programs are inadequate to prevent repeated and unnecessary reincarceration, particularly regarding people with disabilities.  In 2021, for example, at least 83 people were booked 10 or more times in a single year's time.

387.   The SHERIFF'S DEPARTMENT's Reentry Services Division is responsible for providing reentry services to people incarcerated at the Jail.  The Reentry Services Division is intended to provide vocational, education, wellness, and behavioral assistance to incarcerated people.[232]  However, people often do not have access to these programs due to insufficient capacity, inadequate staffing, discriminatory eligibility criteria, and other systemic deficiencies, and do not receive reentry assistance until after they have left the Jail.  The number of people who participated in all Reentry Services Division programs in 2021—just 372 individuals—is strikingly small compared with the over 48,000 people booked at the Jail.  Only 57 unique individuals participated in education programming, only 80 in vocational programs, only 105 in wellness programs, and only 125 in behavioral

---

[232] FY2021/2022 Plan at 10-11.

programs.  The vast majority of people at the Jail in 2021 did not have access to any of those programs to assist their reentry into the community.  The SHERIFF'S DEPARTMENT can refer people to Project In-Reach, a program of Neighborhood House Association that provides services to help incarcerated people with substance use and mental health needs in preparation for their re-entry.  However, there were only 135 Project In-Reach participants in 2021.

388.   For individuals who are most frequently incarcerated at the Jail—averaging 10 or more bookings per year for three years—the "Sheriff's – Supporting Individual Transitions" program is intended to connect these individuals to providers.  However, the 2021-2022 Community Corrections Partnership Plan includes little detail about whether the program is effective.  The Plan states that "811 total annual contacts were made with S-SIT participants," but offers no information about the actual number of participants actually connected with services and whether the program has succeeded in diverting any participants from repeated incarceration in the Jail.[233]

389.   The COUNTY's and PROBATION DEPARTMENT's programs to provide services to people reentering the community from Jail are similarly limited. Their Behavioral Health Court program is available after Jail release to people with serious mental illness who are probation-eligible.  In Behavioral Health Court, participants receive intensive mental health treatment, treatment for substance use issues, and assistance finding resources for housing and employment.[234]  However, space is limited to only 60 people, when well over 1,000 people in the Jail at any given time have mental health treatment needs.[235]

390.   Other COUNTY services—such as Center Star Assertive Community

---

[233] *Id.* at 11.

[234] *Id.* at 18.

[235] "San Diego Behavioral Health Court," Telecare, https://www.telecarecorp.com/san-diego-collaborative-mental-health-court (accessed Jan. 23, 2022).

Treatment, which provides comprehensive mental health services for people in contact with the justice system who have mental illness, and Reentry Court, which "engages" people with substance use disorders and possible co-occurring mental health conditions who have violated terms of probation[236]—also lack sufficient capacity to provide adequate services to all people who need and would benefit from them.  The number of people in Jail with substance use disorders and serious mental health needs demonstrates that the COUNTY's and the PROBATION DEPARTMENT's current programs are not meeting the overwhelming demand for such services.  Likewise, the PROBATION DEPARTMENT's mandatory super-vision program, which is meant to provide reentry assistance before and after release for people subject to the PROBATION DEPARTMENT's supervision, fails to provide adequate services, particularly for people with mental health disabilities and related needs.  As a result, people with mental health disabilities face unnecessary reincarceration, and are also at risk for unnecessary psychiatric institutionalization, a further violation of the ADA's integration mandate.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) (requiring that people with disabilities receive services in the least restrictive and most integrated setting appropriate, and finding that denial of services that put people "at risk" or unnecessary institutionalization violates the ADA).

391.   In other instances, people are not linked with services because SHERIFF'S DEPARTMENT sworn staff are not properly trained on them.  The COUNTY's Sobering Center "provides a safe alternative to custody to individuals who are inebriated in public," and law enforcement may transport them to the center.[237]  However, given the high number of people who end up in the Jail on book-and-release charges of being under the influence—and sometimes die there, as

---

[236] FY2021/2022 Plan at 18, 19.

[237] *Id.* at 20.

1  in the case of Omar Moreno Arroyo—the Sobering Center is underutilized as an

2  alternative to incarceration.

3      392.   ALL DEFENDANTS' failure to provide and fund adequate reentry

4  programs causes people to repeatedly become incarcerated at the Jail, and may also

5  place people at risk for unnecessary psychiatric institutionalization, as they do not

6  have access to the services they need to thrive upon release into the community.

7  ALL DEFENDANTS must invest in strengthening and expanding their reentry

8  programs to prevent avoidable incarceration and institutionalization of people with

9  disabilities.

10     393.   Incarcerated people who would benefit from alternatives to incarcera-

11 tion and reentry programs are instead steered into the Jail, which cannot adequately

12 address their needs.  For example, Plaintiff NORWOOD has been incarcerated at the

13 Jail 15 times in the last decade and a half, including several times on low-level drug

14 charges related to his addiction.  At the Jail, NORWOOD did not have access to

15 Narcotics Anonymous or other substance use education programs, although he

16 wished the Jail would make them available.  Instead, he relied on a sobriety book

17 from outside the Jail and worked on his own to try to stay clean and sober.

18 NORWOOD also did not receive adequate treatment for his opioid use disorder,

19 such as MAT, or adequate mental health care to treat his serious mental health

20 needs.  He would like to participate in alternatives to incarceration and reentry

21 programs, in part because he feels that being incarcerated made his addiction worse.

22     394.   Plaintiff ZOERNER has been incarcerated in the Jail 20 times since

23 2010.  ZOERNER has alcoholism and has often been incarcerated at the Jail on

24 charges related to her addiction, including public intoxication.  She is frequently

25 homeless and was homeless prior to her most recent incarceration.  ZOERNER has

26 been diagnosed with bipolar disorder, manic depression, and severe PTSD.  She also

27 has a learning disability.  ZOERNER did not have access to substance use education

28 programs while incarcerated at Las Colinas.  Nor did she receive adequate treatment

1  for her serious mental health needs.  ZOERNER would like to participate in

2  alternatives to incarceration.

3      395.   Although Plaintiff CLARK, who is Black, has been incarcerated at the

4  Jail at times multiple occasions per year, he has not received adequate reentry

5  programming to prevent his further incarceration, or been provided alternatives to

6  incarceration at the Jail.  CLARK would like to participate in alternatives to

7  incarceration.

8      396.   Plaintiff SEPULVEDA, who is Latinx, has been housed in the Jail on

9  several prior occasions for alcohol-related charges, but the SHERIFF'S

10  DEPARTMENT and COUNTY did not provide SEPULVEDA with adequate

11  treatment for his addiction, or adequate reentry programming.

12      397.   Plaintiff LANDERS, who is Black, has not been provided adequate

13  reentry programming or alternatives to incarceration.  The SHERIFF'S

14  DEPARTMENT's and COUNTY's failure to provide LANDERS with adequate

15  reentry programming and alternatives to incarceration has contributed to her

16  repeated reincarceration at the Jail.

17      398.   Plaintiff LEVY has been incarcerated at the Jail eight times since 2014.

18  She has not been offered alternatives to incarceration while awaiting trial, although

19  she would have liked to participate in Home Detention or other alternatives.  During

20  her most recent incarceration, LEVY requested reentry programming but the

21  SHERIFF'S DEPARTMENT did not offer her any such programming and released

22  her without notice on February 3, 3022.

23      399.   For many individuals who come in contact with the criminal justice

24  system, including individuals with serious mental health needs and other people

25  with disabilities, incarceration should be a last resort.  Instead, ALL

26  DEFENDANTS' failure to provide reasonable alternatives ensures that the Jail is

27  the first and only option for many people.  ALL DEFENDANTS can and should

28  provide adequate alternatives to incarceration and adequate reentry programming to

stop the cycle of reincarceration and overincarceration in the Jail, and prevent the unnecessary institutionalization of people with disabilities.

**D.    By Policy and Practice, Black and Latinx Arrestees are Disproportionately Incarcerated in the Jail**

400.   California Government Code Section 11135 bans discrimination in state-funded programs.  The COUNTY, SHERIFF'S DEPARTMENT, and the PROBATION DEPARTMENT administer state-funded programs that cause Black and Latinx individuals to be disproportionately incarcerated in the Jail as compared to White individuals.

401.   Upon information and belief, the SHERIFF'S DEPARTMENT uses state funds to over-police Black and Latinx communities, including by targeting patrolling activities in Black communities to detain and arrest individuals suspected of gang-related activities.  This results in Black and Latinx individuals being stopped and arrested at disproportionately high rates.  For example, in 2020, 16% of all arrestees in the San Diego region were Black despite the fact that only 5% of County residents were Black.  Analyzing data provided by the SHERIFF'S DEPARTMENT, the Center for Policing Equity observed in a report that Black people, who make up 5% of the population of San Diego County, made up 11% of all people stopped in non-traffic stops by law enforcement between 2018-Q3 and 2020-Q2.[238]  Taking into account the influence of neighborhood crime rates, poverty, and share of Black residents, that report found that Black people were stopped by law enforcement 3.5 times as often as White people.  The Center for Policing Equity's report also found that once stopped, Latinx people were arrested 1.2 times as often as White people.  A 2022 study similarly found that in 2019, Black residents of San Diego County were 2.2 times more likely than White

---

[238] *See* Center for Policing Equity, Summary of Findings for San Diego County, CA 2021, *available at:*  https://justicenavigator.org/report/sandiego-county-ca-2021/summary.

1  residents to be stopped by the SHERIFF'S DEPARTMENT.[239]

2      402.   Upon information and belief, ALL DEFENDANTS use state funds on

3  policies and practices that overincarcerate Black and Latinx people in the Jail.

4  Black and Latinx *arrestees* are disproportionately more likely to be booked into the

5  Jail and, upon information and belief, to stay incarcerated at the Jail, than White

6  arrestees.  Although Black individuals constituted 16% of arrestees in the region,

7  Black individuals accounted for 22% of people incarcerated at the Jail in the most

8  recent month where statistics are available.  Likewise, although Latinx individuals

9  constituted 35% of arrestees in 2020 in the San Diego region, Latinx individuals

10  accounted for 41% of incarcerated people in September 2022.  By contrast, White

11  arrestees are disproportionately likely to avoid pretrial incarceration and, upon

12  information and belief, to be released earlier.  White individuals constituted 41% of

13  arrestees in 2020, but accounted for only 31% of people in the Jail in the most recent

14  month where statistics are available—even though 46% of the County's population

15  is White.[240]

16      403.   Upon information and belief, the disproportionate incarceration of

17  Black and Latinx individuals is also caused by ALL DEFENDANTS'

18  disproportionate and discriminatory administration of state-funded pretrial

19  alternatives to incarceration programs, reentry programming, and alternatives to

20  incarceration programs for sentenced individuals.  For example, the Drug Court and

21

22

23  [239] *See* Catalyst California and ACLU of Southern California, Reimagining Public
Safety in California, October 2022, available at:  https://catalyst-
ca.cdn.prismic.io/catalyst-ca/126c30a8-852c-416a-b8a7-
24  55a90c77a04e_APCA+ACLU+REIMAGINING+COMMUNITY+SAFETY+2022_
5.pdf.

25  [240] Arrest and County population statistics are found in SANDAG's report,
SANDAG, *Arrests 2019 and 2020: Law Enforcement Response to Crime in the San*
26  *Diego Region*," November 2021 at 11,
https://www.sandag.org/uploads/publicationid/publicationid_4807_31020.pdf.  Jail
27  population data is from the Sheriff's Department.  *See* San Diego County Sheriff's
Department, Jail Population Statistics: September 2022,
28  https://www.sdsheriff.gov/home/showpublisheddocument/5827.

1   Reentry Court programs leading to termination of probation and, in some cases,

2   dismissal of the drug charges, disproportionately benefit White individuals.

3   Although Black individuals constituted 16% of arrestees in the region, Black

4   individuals accounted for only 7% of people participating in the Drug Court

5   program and 8% of people participating in the Reentry Count program in 2020.

6   Likewise, although Latinx individuals constituted 35% of arrestees in 2020 in the

7   San Diego region, Latinx individuals accounted for only 26% of Drug Court

8   participants and 20% of Reentry Court participants.  By contrast, White arrestees are

9   disproportionately likely to be admitted to these alternatives.  White individuals

10  constituted 41% of arrestees in 2020, but accounted for 53% of participants in Drug

11  Court and 59% of participants in Reentry Court.

12      404.   Upon information and belief, ALL DEFENDANTS' respective policies

13  for administering these state-funded alternatives to incarceration programs

14  programs—including their use of risk assessment tools and eligibility criteria—

15  contribute to the overincarceration of Black and Latinx individuals in the Jail

16  relative to comparable White individuals.

17      405.   For example, both the SHERIFF'S DEPARTMENT and the

18  PROBATION DEPARTMENT employ a risk assessment tool that is known to have

19  racial bias.  For all arrestees, the SHERIFF'S DEPARTMENT's Pretrial Unit

20  prepares a pretrial report, and presents to the court "a tailored individualized

21  recommendation regarding release options."  As part of that pretrial report, the

22  SHERIFF'S DEPARTMENT conducts a pre-trial risk assessment using the

23  Correctional Offender Management Profiling for Alternative Sanctions

24  ("COMPAS") PRRS-II tool developed by Northpointe (now known as Equivant).

25  Although the SHERIFF'S DEPARTMENT is validating a new tool, the California

26  Pretrial Assessment ("CAPA"), CAPA is based on COMPAS's tool.[241]  Studies have

27

28  [241] San Diego County Sheriff's Department, Equivant, *Rebooting Pretrial Services*

found racial biases in the COMPAS tool[242] and cast doubt on whether COMPAS is at all effective in predicting a person's risk of recidivism.[243]  A 2016 study found that the tool was more likely to wrongly flag Black defendants as high risk than to do so for White defendants.  In 2018, another study found that COMPAS was no more accurate at predicting recidivism than a random group of volunteers.  In internal SHERIFF'S DEPARTMENT emails, employees have shared these studies about bias in Northpointe's assessment tools—with one employee noting that "using past data to inform future decisions can continue the bias that may exist in the previous data."  Although the SHERIFF'S DEPARTMENT Pretrial Unit has stated that it intends to remove bias from the CAPA, the disproportionate incarceration of Black and Latinx arrestees suggests that is not the case.

406.   Upon information and belief, the COMPAS risk assessment tool is used for other programs that affect whether a person is incarcerated in the Jail, including as part of the eligibility criteria for home detention through the SHERIFF'S DEPARTMENT's CPAC program.  The SHERIFF'S DEPARTMENT alone determines who participates in CPAC.  Upon information and belief, other eligibility criteria that prohibit eligibility for CPAC, such as being a documented prison gang member or having a residence that does not meet the SHERIFF'S DEPARTMENT's minimum qualifications, also contribute to the disproportionate pretrial incarceration of Black and Latinx arrestees.  During the COVID-19 pandemic, the SHERIFF'S DEPARTMENT made no modifications to CPAC eligibility criteria to increase participation in CPAC, even though the lieutenant in

---

*in San Diego County*, at 8, https://www.equivant.com/wp-content/uploads/NAPSA-2019_slide-details_FINAL_QA-1.pdf.

[242] Julia Angwin, et al. "Machine Bias," *ProPublica*, May 23, 2016, https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing.

[243] Ed Yong, *A Popular Algorithm is No Better at Predicting Crimes Than Random People*, THE ATLANTIC, Jan. 17, 2018, https://www.theatlantic.com/technology/archive/2018/01/equivant-compas-algorithm/550646/.

charge of CPAC had raised concerns about the purpose of some eligibility criteria which tended to limit the number of program participants.

407.   ALL DEFENDANTS' reentry programs and alternatives to custody programs for sentenced individuals also rely on the COMPAS tool and other eligibility criteria that result in disparate incarceration rates by race and ethnicity. For example, the PROBATION DEPARTMENT relies on the COMPAS tool to determine the level of supervision and community interventions available to a person under the PROBATION DEPARTMENT'S supervision.  Upon information and belief, the results of the risk assessment contribute to whether a person is considered for early release from the Jail.  Upon information and belief, these policies and eligibility criteria contribute to the disproportionate incarceration of Black and Latinx individuals, and keep them in the Jail longer than comparable White individuals.

## VIII.   JAIL DEFENDANTS INTERFERE WITH INCARCERATED PERSONS' ACCESS TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO THE COURTS

408.   JAIL DEFENDANTS interfere with and impede people incarcerated in the Jail from exercising their right to effective assistance of counsel under the United States and California constitutions.  JAIL DEFENDANTS also interfere with incarcerated people's due process rights under the United States and California constitutions to access the civil courts and their legal representatives.

### A.   The Sheriff's Department Fails to Ensure That Incarcerated People Can Adequately Communicate Confidentially With Their Attorneys

409.   The SHERIFF'S DEPARTMENT's policies and procedures for confidential communications between incarcerated people and their attorneys are inadequate.  The SHERIFF'S DEPARTMENT fails to adequately train custody staff on its policies and procedures for allowing confidential communications between incarcerated people and their attorneys.  Although the SHERIFF'S DEPARTMENT purports to offer multiple means for people and their attorneys to communicate

1  confidentially, the SHERIFF'S DEPARTMENT's practices systematically impede

2  and interfere with such communication.

3       410.   The SHERIFF'S DEPARTMENT fails to provide adequate access to

4  telephone communications between incarcerated people and their attorneys.  The

5  SHERIFF'S DEPARTMENT's policies and procedures state that people have

6  "unlimited" telephone access to communicate with their attorneys, and require Jail

7  personnel to ensure that incarcerated people have access to "confidential

8  consultation with attorneys."  Procedurally, to speak confidentially with an

9  incarcerated client over the telephone, an attorney must call the front desk of the Jail

10 facility where the person is incarcerated and request a "callback" from the client.

11 Then, the front desk clerk communicates the callback request to custody staff in the

12 person's housing unit.  However, on information and belief, it is rare for people to

13 actually speak over the phone confidentially to their attorney.

14      411.   Frequently, custody staff fail to communicate callback requests to

15 incarcerated people.  For example, Plaintiff NELSON's criminal defense attorney

16 placed approximately one dozen callback requests, none of which were

17 communicated to NELSON.  Other attorneys placed callbacks for NELSON, and he

18 also was not notified about those calls.  Likewise, Plaintiff EDWARDS was not

19 notified of approximately six callback requests placed by an attorney over the course

20 of several weeks, and he only knew the attorney was calling him once he received

21 physical mail from the attorney.

22      412.   On multiple occasions, Plaintiff OLIVARES has not received attorney

23 callbacks that were placed by his attorney.  Once, at George Bailey, he was woken

24 by deputies calling OLIVARES' name on the intercom.  After confirming with the

25 deputy the name and contact information of the attorney who called him,

26 OLIVARES gathered the legal papers from his cell, then pressed the intercom

27 button to signal to the deputy that he was ready for the callback.  However, the

28 deputy refused to release him from his cell for the confidential attorney call, saying

1  that the callback request had actually been for a different incarcerated person.  When

2  OLIVARES called that attorney during his dayroom time later that day, he learned

3  that the attorney had indeed placed a callback request for him that day.

4      413.   On other occasions, custody staff communicate callback requests to

5  incarcerated people only after normal business hours, when the attorney's office is

6  closed, and then custody staff refuse to honor the callback request the next day.

7  Because an attorney cannot schedule a confidential call, and may not be available if

8  and when the deputy informs the incarcerated client about the request, the

9  SHERIFF'S DEPARTMENT's practice substantially reduces the likelihood that the

10  client and their attorney can speak confidentially.  Attorneys repeatedly place calls

11  for their incarcerated clients that are never returned.  This practice prevents people

12  from obtaining effective assistance of counsel in their criminal cases and prevents

13  them from vindicating their civil rights in court.

14      414.   When calls between an attorney and incarcerated person do occur, the

15  SHERIFF'S DEPARTMENT often fails to protect the confidential attorney-client

16  relationship.  For example, Plaintiff LOPEZ, who is deaf and uses ASL to

17  communicate, experienced significant challenges setting up confidential calls with

18  his criminal defense attorney.  Sometimes, deputies stayed in the same room while

19  LOPEZ spoke over video with his attorney and a sign language interpreter.  Even at

20  court hearings, when LOPEZ needed short but important confidential appointments

21  with his attorney, SHERIFF'S DEPARTMENT deputies remained in the same room

22  while LOPEZ talked over video with his attorney.  Deputies refused LOPEZ's

23  attorney's request that they leave the room.  Deputies also kept LOPEZ handcuffed

24  during many of the calls, which prevented him from signing and communicating

25  effectively to the interpreter.

26      415.   Because there is no reliable means for people to confer with their

27  attorneys by phone, attorneys are forced to instead travel to and from the widely

28  dispersed Jail facilities.  In-person professional visits are not even a guaranteed

1    means to meet with a client.  Due to limited physical space at the Jail, the

2    professional visit rooms are first-come, first-serve, and are not exclusive to

3    attorneys.  This means an attorney may spend several hours of their day traveling

4    and waiting just to have a brief discussion with their incarcerated client, which

5    reduces the time that the attorney can spend on other substantive aspects of the

6    client's case.  For example, counsel in this case have traveled to visit with clients at

7    George Bailey, but were informed that the backup in the visiting area was so long

8    that counsel would have to come back another day.  In COVID-19 outbreak

9    conditions, the policy is even more unreasonable.  It forces criminal defense

10   attorneys and civil attorneys to choose between visiting their clients in-person in the

11   Jail—which have been subject to regular COVID-19 outbreaks—or potentially

12   failing to connect with their clients about important case developments.  The

13   combined effect of providing illusory callbacks and denying in-person visits results

14   in situations in which incarcerated people cannot communicate with their attorneys

15   for extended periods or at critical junctures of their cases.

16          416.   The SHERIFF'S DEPARTMENT has also compromised the attorney-

17   client relationship during professional visits by recording confidential calls, which

18   prevents the effective assistance of counsel.  For example, in fall 2021, deputies

19   from the SHERIFF'S DEPARTMENT recorded at least 37 phone calls between

20   incarcerated people and their attorneys.  At the time, professional visits between

21   incarcerated people and their attorneys took place in the Jail's social visiting areas,

22   via telephone.[244]  While social visits are ordinarily recorded, Jail staff stated to

23   attorneys that the recording function had been turned off—even though that was not

24   true in many cases.  This was not an isolated incident.  In the *San Diego Union-*

25   *Tribune*'s article on the incident, one attorney noted that he has stopped meeting

---

[244] Jeff McDonald, *Sheriff's deputies recorded jail conversations between inmates and their lawyers*, SAN DIEGO UNION-TRIBUNE, Nov. 6, 2021, https://www.sandiegouniontribune.com/news/watchdog/story/2021-11-06/sheriffs-deputies-recorded-lawyer-jail-conversations.

1   with clients in the social visiting areas for fear of the conversations being taped,

2   which "has affected at least 20 clients, delaying proceedings while they remain in

3   custody."[245]   As that attorney noted: "If you have clients who are accused of a

4   serious crime, how do you effectively represent them if you can't see them and can't

5   talk to them?"  This practice improperly prevents people from accessing and

6   speaking to their attorneys.

7          417.   Custody staff also purposefully prevent incarcerated people from

8   attending professional visits.  In September 2021, a custody staff member retaliated

9   against Plaintiff NELSON by attempting to prevent him from attending a

10   professional visit.  Earlier in the day, NELSON had opened the tray slot in his cell to

11   let in fresh air, as his three-person, approximately 8x10 cell was humid and smelly.

12   A deputy ordered NELSON to close the tray slot, and NELSON thereafter

13   complained to the deputy.  Later, when NELSON's attorney appeared for a

14   professional visit, the deputy falsely told the attorney that NELSON did not want to

15   visit and asked what the attorney wanted to talk about with NELSON.  Only after

16   the attorney demanded to see NELSON for a privileged discussion did the deputy

17   relent and allow NELSON to attend the professional visit.

18          418.   In or around November 2021, counsel in this case received legal mail

19   from a person at the Jail.  However, the envelope arrived empty and opened,

20   suggesting that the SHERIFF'S DEPARTMENT had opened and removed the mail

21   before it was sent to counsel in this case.  When counsel later met with the

22   incarcerated person, he reported that when he mailed the envelope, it contained

23   documents intended for counsel.

24          419.   Plaintiff TAYLOR has also received legal mail that had been opened.

25   When TAYLOR raised the issue with SHERIFF'S DEPARTMENT staff, they

26   responded that his attorney must have mailed the letter open.

27

28   [245] *Id.*

420.   The SHERIFF'S DEPARTMENT's inadequate and unlawful policies and practices for attorney-client contact prevent incarcerated people and their attorneys from meeting or speaking confidentially.  As a result of these inadequate policies and procedures, incarcerated people are unable to enjoy effective assistance of counsel in their criminal cases and prevented from vindicating their civil rights in court.  Upon information and belief, these policies and procedures restricting confidential attorney-client communications are not justified by any legitimate penological interest, and in part due to the SHERIFF'S DEPARTMENT's failure to train and supervise its staff.

## B.   The Sheriff's Department Improperly Interferes with Incarcerated Persons' Access to the Courts

421.   The SHERIFF'S DEPARTMENT's policies and procedures with respect to incarcerated persons' legal materials are inadequate.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train staff in how to protect incarcerated people's legal materials and their right of access to the courts.

422.   Jail staff unlawfully interfere with incarcerated people's legal materials. For example, when DUNSMORE arrived at the Jail for resentencing in December 2019, he brought a significant amount of his legal materials with him.  However, the Jail immediately confiscated DUNSMORE's legal papers, including complaints against the Jail from DUNSMORE's previous incarceration in 2018.  DUNSMORE did not receive any legal papers back for 2-3 weeks, after repeatedly asking.  Even then, staff only let him have a small portion of his legal papers.  DUNSMORE did not receive the rest of his legal papers back until at least 90 days after he arrived at the Jail.  When DUNSMORE received the papers back, he discovered that some of his legal papers were missing.  Among the material lost and not returned was a box with discovery material crucial to DUNSMORE's continuing court challenges to his underlying conviction, complaints to CLERB, and grievances about DUNSMORE's treatment at the Jail in 2018.

423.   The SHERIFF'S DEPARTMENT lacks adequate policies and procedures for providing legal materials to *pro se* litigants.  Upon information and belief, the SHERIFF'S DEPARTMENT fails to adequately train Jail staff to provide pro se litigants with the assistance they should receive in the Jail.  For example, Plaintiff DUNSMORE was recognized as a pro per litigant by the California Court of Appeal's Fourth Appellate District and was also proceeding pro se on his federal habeas petitions while at the Jail.  However, the SHERIFF'S DEPARTMENT did not provide DUNSMORE with pro per privileges, including access to the law library for several hours each week, access to copying and printing services, and legal materials like pleading paper and legal-size envelopes.  DUNSMORE had no access to a computer for legal research for his active cases.  This lack of access prevented DUNSMORE from developing an adequate record in court, contributed to the dismissal of several of his civil claims, and caused him to incur filing fee debts. Another incarcerated person representing himself pro se in state court habeas matters reported repeatedly failing to receive his legal mail, contributing to procedural default and his inability to pursue his case.

424.   As noted above, Plaintiff TAYLOR has been denied prescription glasses for months, which made it extremely difficult for him to litigate his case pro per without developing severe headaches from reading mail and legal documents. Because he had no glasses, TAYLOR was repeatedly forced to request extensions from the court.  TAYLOR ultimately was forced to abandon his pro per status because the Jail did not timely provide him glasses.

## CLASS ACTION ALLEGATIONS

**Incarcerated People Class**

425.   Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all others similarly situated.  Plaintiffs bring the claims articulated herein on behalf of all adults who are now, or will be in the future, incarcerated in any of the San Diego

County Jail facilities ("Incarcerated People Class").  All incarcerated people are at risk of substantial harm due to the following policies and practices:

        a.     Denial of minimally adequate medical care;

        b.     Denial of minimally adequate mental health care;

        c.     Imposition of filthy, unhealthy, and dangerous conditions of confinement;

        d.     Denial of protection from injury and violence in the Jail;

        e.     Denial of minimally adequate dental care;

        f.     Denial of access to counsel and the courts; and

        g.     Disproportionate incarceration based upon race, ethnicity, and/or national origin.

<u>Numerosity:  Fed. R. Civ. P. 23(a)(1)</u>

426.   The proposed class as defined is sufficiently numerous that joinder of all members of the class is impracticable and unfeasible.  Currently, there are approximately 4,000 incarcerated people in the Jail, as well as thousands of individuals in the community on probation, mandatory supervision, and home confinement, who are subject to being returned to the Jail at any time on an alleged violation or revocation of their supervision.  Due to Jail Defendants' policies and practices, all incarcerated people receive or are at substantial risk of receiving inadequate medical, dental, and mental health care.  Due to Jail Defendants' policies and practices, all incarcerated people are at risk of injury in the Jail.  Due to Jail Defendants' policies and practices, all incarcerated people are at substantial risk of being denied access to their attorneys or the courts.

427.   Although the proposed class is transitory and people will cycle into and out of the jails, the thousands of members of the proposed class at any given time will be readily identifiable using records maintained in the ordinary course of business by All Defendants.

1

<u>Commonality:  Fed. R. Civ. P. 23(a)(2)</u>

2    428.   There are questions of law and fact common to the Incarcerated People

3  Class, including, but not limited to:

4         a.    Whether Jail Defendants' failure to provide minimally adequate

5  medical care to incarcerated people violates the Due Process Clause of the

6  Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth

7  Amendment to the United States Constitution, and Article 1, Sections 7 and 17 of

8  the California Constitution;

9         b.    Whether Jail Defendants' failure to provide minimally adequate

10  mental health care to incarcerated people violates the Due Process Clause of the

11  Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth

12  Amendment to the United States Constitution, and Article 1, Sections 7 and 17 of

13  the California Constitution;

14        c.    Whether the imposition of filthy, unhealthy, and dangerous

15  conditions of confinement violates the Due Process Clause of the Fourteenth

16  Amendment and the Cruel and Unusual Punishment Clause of the Eighth

17  Amendment to the United States Constitution, and Article 1, Sections 7 and 17 of

18  the California Constitution;

19        d.    Whether Jail Defendants' failure to protect incarcerated people

20  from violence and injury violates the Due Process Clause of the Fourteenth

21  Amendment and the Cruel and Unusual Punishment Clause of the Eighth

22  Amendment to the United States Constitution, and Article 1, Sections 7 and 17 of

23  the California Constitution;

24        e.    Whether Jail Defendants' failure to provide minimally adequate

25  dental care to incarcerated people violates the Due Process Clause of the Fourteenth

26  Amendment and the Cruel and Unusual Punishment Clause of the Eighth

27  Amendment to the United States Constitution, and Article 1, Sections 7 and 17 of

28  the California Constitution;

1    f.    Whether Jail Defendants' failure to ensure incarcerated people

2  have access to counsel and the courts violates the Due Process Clause of the

3  Fourteenth Amendment and the Sixth Amendment right to counsel, and Article 1,

4  Sections 7 and 15 of the California Constitution; and

5    g.    Whether disproportionate incarceration of people based on their

6  race, ethnicity, and/or national origins violates California Government Code Section

7  11135.

8  Typicality:  Fed. R. Civ. P. 23(a)(3)

9    429.   The claims of the named Plaintiffs are typical of the claims of the

10  members of the proposed class.  Plaintiffs and all other members of the class have

11  sustained similar injuries arising out of and caused by All Defendants' common

12  course of conduct and policies in violation of the law as alleged herein.

13  Adequacy:  Fed. R. Civ. P. 23(a)(4)

14    430.   Plaintiffs are members of the class and will fairly and adequately

15  represent and protect the interests of the putative class members because they have

16  no disabling conflict(s) of interest that would be antagonistic to those of the other

17  class members.  Plaintiffs, as well as plaintiff class members, seek to enjoin the

18  unlawful acts and omissions of All Defendants.  Plaintiffs have retained counsel

19  who are competent and experienced in complex class action litigation and litigation

20  on behalf of incarcerated people.

21  Fed. R. Civ. P. 23(b)(1)(A) and (B)

22    431.   Since the number of class members is approximately 4,000 on any

23  given day, separate actions by individuals could result in inconsistent and varying

24  decisions, which in turn would result in conflicting and incompatible standards of

25  conduct for All Defendants.  Plaintiffs challenge All Defendants' policies and

26  practices that apply generally to the class, so that final injunctive relief or

27  corresponding declaratory relief is appropriate respecting the class as a whole.

28

Fed. R. Civ. P. 23(b)(2)

432.   This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because All Defendants have acted and failed to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class and will apply to all members of the class.

**Incarcerated People with Disabilities Subclass**

433.   All Plaintiffs (all of whom are people with disabilities) bring this action on their own behalf and, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (l), and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities ("Incarcerated People with Disabilities Subclass").  All incarcerated people with disabilities at the Jail are at risk of harm as a result of the following policies and practices of the Defendants:

  a.   Denial of reasonable accommodations and equal access to programs, services, and activities;

  b.   Discrimination on the basis of their disabilities;

  c.   Denial of adequate alternatives to incarceration in Jail custody; and

  d.   Denial of adequate programs and services to prevent reincarceration.

Numerosity:  Fed. R. Civ. P. 23(a)(1)

434.   The proposed subclass as defined is sufficiently numerous that joinder of all members of the subclass is impracticable and unfeasible.  The exact number of members of the Incarcerated People with Disabilities Subclass is unknown.  According to data from the Sheriff's Department, around 33.7% of incarcerated people at the Jail in September 2022 were taking psychotropic medications for

mental health disabilities.  This figure likely undercounts the number of incarcerated

people with mental health disabilities, and does not include incarcerated people with

other disabilities, such as mobility disabilities, hearing disabilities, vision

disabilities, and intellectual/developmental disabilities.  At least 33.7%, and likely

more, of the incarcerated people in the Jail are qualified individuals with disabilities

as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California

Government Code § 12926(j) and (l).

435.   Although the proposed Incarcerated People with Disabilities Subclass

is transitory and will include people with disabilities who cycle into and out of the

jails, the members of the proposed subclass at any given time will be readily

identifiable using records maintained in the ordinary course of business by All

Defendants.

<u>Commonality:  Fed. R. Civ. P. 23(a)(2)</u>

436.   There are questions of law and fact common to the Incarcerated People

with Disabilities Subclass, including, but not limited to:

a.   Whether Jail Defendants' failure to reasonably accommodate

incarcerated people with disabilities violates the Americans with Disabilities Act

and Section 504 of the Rehabilitation Act;

b.   Whether Jail Defendants' discrimination against incarcerated

people with disabilities violates the Americans with Disabilities Act and Section 504

of the Rehabilitation Act.

c.   Whether Jail Defendants' failure to ensure that incarcerated

people are able to access all programs and services at the Jail and communicate

effectively during classification, disciplinary hearings, and all programs and services

violates the Americans with Disabilities Act and Section 504 of the Rehabilitation

Act; and

d.   Whether All Defendants' failure to house people with disabilities

in the most integrated environment and provide adequate alternatives to

incarceration and reentry programming violates the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

437.   All Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

Typicality:  Fed. R. Civ. P. 23(a)(3)

438.   The claims of the named Plaintiffs are typical of the claims of the members of the proposed subclass.  Plaintiffs and all other members of the subclass have sustained similar injuries arising out of and caused by All Defendants' common course of conduct and policies in violation of the law as alleged herein.

Adequacy:  Fed. R. Civ. P. 23(a)(4)

439.   Plaintiffs are members of the subclass and will fairly and adequately represent and protect the interests of the putative subclass members because they have no disabling conflict(s) of interest that would be antagonistic to those of the other subclass members.  Plaintiffs, as well as Incarcerated People with Disabilities Subclass members, seek to enjoin the unlawful acts and omissions of All Defendants.  Plaintiffs have retained counsel who are competent and experienced in complex class action litigation and litigation on behalf of incarcerated people.

Fed. R. Civ. P. 23(b)(1)(A) and (B)

440.   Since the subclass consists of at least 34% of the population in the Jail, separate actions by individuals could result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for All Defendants.

Fed. R. Civ. P. 23(b)(2)

441.   This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because All Defendants have acted and refused to act on grounds that apply generally to the subclass, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the subclass and will apply to all members of the class and subclass.

**FIRST CLAIM FOR RELIEF:**
**FAILURE TO PROVIDE ADEQUATE MEDICAL CARE**

**By All Plaintiffs and the Incarcerated People Class Against Defendants
SHERIFF'S DEPARTMENT and COUNTY**

442.   PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 441 above.

443.   JAIL DEFENDANTS' failure to provide adequate medical care to PLAINTIFFS and the Incarcerated People Class they represent violates both the U.S. and California Constitutions.

444.   The Eighth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 17 of the California Constitution prohibit officials from being deliberately indifferent to policies and practices that expose sentenced incarcerated persons to a substantial risk of serious harm.  The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies and practices that are objectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

445.   By their policies, practices, and failures to train staff described specifically and without limitation in paragraphs 38 through 122 above, JAIL DEFENDANTS subject PLAINTIFFS and the Incarcerated People Class they represent to a substantial risk of serious harm and injury from inadequate medical care at the Jail.  JAIL DEFENDANTS' systemic policies and practices pertaining to medical care include, but are not limited to:

      a.     Failing to maintain sufficient numbers of adequately trained healthcare professionals;

      b.     Permitting custody staff to interfere with and undermine healthcare professionals at the Jail;

      c.     Conducting inadequate screening and intake procedures, which fail to identify medical care issues of incarcerated people upon booking;

1          d.       Refusing to provide adequate care, including MAT, for

2    incarcerated people with substance use disorders;

3          e.       Refusing to provide adequate care for incarcerated people

4    withdrawing from alcohol and drugs;

5          f.       Not continuing medically necessary medications for people upon

6    arrival at the Jail;

7          g.       Not providing a reliable and timely way for incarcerated people

8    to alert healthcare staff of their medical needs;

9          h.       Failing to maintain adequate, accurate, and complete medical

10   records;

11         i.       Lacking sufficient contracts with community providers to

12   provide medical care to incarcerated people;

13         j.       Providing medical care to incarcerated people in non-

14   confidential spaces in the Jail;

15         k.       Refusing to appropriately refer incarcerated people to outside

16   specialists when necessary;

17         l.       Failing to timely provide incarcerated people with medically

18   required eyeglasses;

19         m.       Failing to provide adequate follow-up medical treatment to

20   incarcerated people;

21         n.       Failing to provide adequate discharge instructions and

22   medication for incarcerated people released from the Jail;

23         o.       Failing to maintain adequate quality assurance and quality

24   improvement processes to ensure appropriate and timely medical care; and

25         p.       Other constitutionally inadequate policies and procedures, to be

26   proven at trial.

27         446.    JAIL DEFENDANTS have been and are aware that these objectively

28   unreasonable policies, practices, and failures to train staff, as described herein,

compose an inadequate system of medical care that exposes PLAINTIFFS and the Incarcerated People Class to a substantial risk of serious harm, and JAIL DEFENDANTS have condoned or been deliberately indifferent to that risk.  These policies and practices have and continue to be implemented by JAIL DEFENDANTS and their agents or employees in their official capacities.

447.   All people incarcerated in the Jail, including PLAINTIFFS and the Incarcerated People Class, are injured by their exposure to the substantial risk of serious harm created by JAIL DEFENDANTS' systemic policies and practices.  As such, JAIL DEFENDANTS' policies and practices are the proximate cause of PLAINTIFFS' and the Incarcerated People Class's ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and by the California Constitution, Article 1, Sections 7 and 17.

WHEREFORE, PLAINTIFFS and the Class they seek to represent request relief as outlined below.

## SECOND CLAIM FOR RELIEF:
## FAILURE TO PROVIDE ADEQUATE MENTAL HEALTH CARE

**By All Plaintiffs and the Incarcerated People Class Against Defendants SHERIFF'S DEPARTMENT and COUNTY**

448.   PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 447 above.

449.   JAIL DEFENDANTS' failure to provide adequate mental health care to PLAINTIFFS and the Incarcerated People Class they represent violates both the U.S. and California Constitutions.

450.   The Eighth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 17 of the California Constitution prohibit officials from being deliberately indifferent to policies and practices that expose sentenced incarcerated persons to a substantial risk of serious harm.  The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies and

practices that are objectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

451.   By their policies, practices, and failures to train staff described above, specifically and without limitation in paragraphs 123 through 229 above, JAIL DEFENDANTS subject PLAINTIFFS and the Incarcerated People Class they represent to a substantial risk of serious harm and injury from inadequate mental health care at the Jail.  JAIL DEFENDANTS' systemic policies and practices pertaining to mental health care include, but are not limited to:

a.   Failing to identify and track incarcerated people in need of mental health care;

b.   Failing to maintain sufficient numbers of mental health professionals;

c.   Permitting custody staff to interfere with mental health care decisions;

d.   Failing to continue mental health medications;

e.   Failing to provide timely access to mental health care;

f.   Failing to maintain a system for treatment of incarcerated people with ongoing mental health conditions;

g.   Conducting mental health appointments in non-confidential spaces;

h.   Housing incarcerated people at risk of suicide in punitive isolation units;

i.   Lacking adequate policies and procedures to track, treat, and supervise incarcerated people at risk of suicide;

j.   Failing to provide adequate mental health care to incarcerated people with acute mental health needs;

k.   Housing incarcerated people with mental illness in units that are inappropriate for their treatment needs;

l.      Failing to provide adequate mental health discharge planning and resources; and

m.      Other constitutionally inadequate policies and procedures, to be proven at trial.

452.   JAIL DEFENDANTS have been and are aware that these objectively unreasonable policies, practices, and failures to train staff, as described herein, compose an inadequate system of mental health care that exposes PLAINTIFFS and the Incarcerated People Class to a substantial risk of serious harm, and JAIL DEFENDANTS have condoned or been deliberately indifferent to that risk.  These policies and practices have and continue to be implemented by JAIL DEFENDANTS and their agents or employees in their official capacities.

453.   All people incarcerated in the Jail, including PLAINTIFFS and the Incarcerated People Class, are injured by their exposure to the substantial risk of serious harm created by JAIL DEFENDANTS' systemic policies and practices.  As such, JAIL DEFENDANTS' policies and practices are the proximate cause of PLAINTIFFS' and the Incarcerated People Class's ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and by the California Constitution, Article 1, Sections 7 and 17.

WHEREFORE, PLAINTIFFS and the Class they represent request relief as outlined below.

### THIRD CLAIM FOR RELIEF:
### FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS TO INCARCERATED PEOPLE WITH DISABILITIES

**By Plaintiffs DUNSMORE, ANDRADE, ARCHULETA, CLARK, EDWARDS, LANDERS, LOPEZ, NELSON, NORWOOD, SEPULVEDA, TAYLOR, ZOERNER, and the Incarcerated People with Disabilities Subclass Against Defendants SHERIFF'S DEPARTMENT and COUNTY**

454.   PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 453 above.

455.   JAIL DEFENDANTS' failure to provide reasonable accommodations

to the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent violates both federal law, including the ADA and the Rehabilitation Act, and state law, including California Government Code § 11135.

456.   The ADA prohibits public entities, including JAIL DEFENDANTS, from denying "a qualified individual with a disability … the benefits of the services, programs, or activities of [the] public entity" because of the individual's disability and from discriminating against people with disabilities based on their disability.  42 U.S.C. § 12132.  Similarly, the Rehabilitation Act requires all state and local governments receiving federal funds, including JAIL DEFENDANTS, to reasonably accommodate inmates with disabilities in their facilities, program activities, and services, and to provide a grievance procedure.  29 U.S.C. § 794.

457.   Under the ADA's anti-interference provision, a public entity cannot "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, of any right granted or protected by this chapter."  42 U.S.C. § 12203(b).  The anti-interference clause prohibits conduct that has a chilling effect on a person's exercise of their ADA rights.  Nor can a public entity retaliate against an individual for exercising their ADA rights.  42 U.S.C. § 12203(a).

458.   JAIL DEFENDANTS are legally responsible for not only their own violations of the ADA, but also those violations of the ADA committed by any contractor in the course of performing their duties under their contractual arrangements with JAIL DEFENDANTS to provide medical, mental health, and dental care services to incarcerated people.  *See* 28 C.F.R. § 35.130(b)(1).

459.   The ADA defines "a qualified individual with a disability" as a person who has a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending,

speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(1)(A), (2)(A).  The ADA Amendments Act of 2008 expanded the definition of "major life activities" to also include:  "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  Any "qualified individual with a disability" under the ADA is considered an "individual with a disability" for purposes of the provision of services under the Rehabilitation Act.  29 U.S.C. § 705(20).  The above-named PLAINTIFFS are qualified individuals with disabilities as defined in the ADA, the ADA Amendments Act of 2008, and the Rehabilitation Act, as they have disabilities that substantially limit one or more major life activities.

460.   The programs, services, and activities that JAIL DEFENDANTS provide to incarcerated people include, but are not limited to, sleeping; eating; showering; toileting; communicating with those outside the Jail by mail and telephone; exercising; entertainment; safety and security; the Jail's administrative, disciplinary, and classification proceedings; medical, mental health, and dental services; the library; educational, vocational, substance use, and anger management classes; and discharge services.  These programs, services, and activities are covered by the ADA and the Rehabilitation Act.

461.   Under Title II of the ADA and the Rehabilitation Act, JAIL DEFENDANTS must provide the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass reasonable accommodations and modifications so that they can avail themselves of and participate in all programs and activities offered by the Jail.

462.   By failing to reasonably accommodate, discriminating against, and interfering with the ADA rights of the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass as described above, including and

without limitation in paragraphs 230 through 294 above, JAIL DEFENDANTS
violate the ADA and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794,
including by:

a.    failing to "ensure that qualified inmates or detainees with
disabilities shall not, because a facility is inaccessible to or unusable by individuals
with disabilities, be excluded from participation in, or be denied the benefits of, the
services, programs, or activities of a public entity, or be subjected to discrimination
by any public entity."  28 C.F.R. § 35.152(b)(1);

b.    failing to "ensure that inmates or detainees with disabilities are
housed in the most integrated setting appropriate to the needs of the individuals."
28 C.F.R. § 35.152(b)(2);

c.    failing to "implement reasonable policies, including physical
modifications to additional cells in accordance with the 2010 [accessibility]
Standards, so as to ensure that each inmate with a disability is housed in a cell with
the accessible elements necessary to afford the inmate access to safe, appropriate
housing."  28 C.F.R. § 35.152(b)(3);

d.    failing or refusing to provide the above-named PLAINTIFFS and
the Incarcerated People with Disabilities Subclass with reasonable accommodations
and other services related to their disabilities, *see generally* 28 C.F.R. § 35.130(a);

e.    failing or refusing to provide equally effective communication,
*see generally* 28 C.F.R. § 35.160(a);

f.    denying the above-named PLAINTIFFS and the Incarcerated
People with Disabilities Subclass they represent "the opportunity to participate in or
benefit from [an] aid, benefit, or service" provided by JAIL DEFENDANTS, 28
C.F.R. § 35.130(b)(1)(i);

g.    using criteria or methods of administration that have the effect of
subjecting Incarcerated People with Disabilities to discrimination on the basis of
disability, 28 C.F.R. § 35.130(b)(3);

h.      failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability …," 28 C.F.R. § 35.130(b)(7);

i.      failing to make available information to the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass about their rights under the ADA while detained in the Jail, 28 C.F.R. § 35.106;

j.      failing to "adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by … [the ADA]," 28 C.F.R. § 35.107(b);

k.      interfering with the above-named PLAINTIFFS' and the Incarcerated People with Disabilities Subclass's use of the grievance process to assert their ADA rights, 42 U.S.C. § 12203(b);

l.      failing to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the [ADA]," 28 C.F.R. § 35.133(a); and

m.      failing to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," 28 C.F.R. § 35.160(b)(1).

463.   As a result of JAIL DEFENDANTS' policy and practice of failing to provide reasonable accommodations to, discriminating against, and interfering with the ADA rights of incarcerated people with disabilities, as well as failing to provide a grievance procedure, the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent do not have equal access to Jail activities, programs, and services for which they are otherwise qualified.

464.   Moreover, under Government Code § 11135, a person may not be denied, on account of "mental disability, physical disability, [or] medical condition," "full and equal access to the benefits of, or be unlawfully subjected to discrimination

under, any program or activity that is … funded directly by the state, or receives any financial assistance from the state." JAIL DEFENDANTS receive financial assistance from the State of California as part of Realignment Legislation, Government Code §§ 30025, 30026, and 30029, and through other statutes and funding mechanisms. The above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent are all persons with disabilities within the meaning of Government Code § 11135.

465.   As described above, JAIL DEFENDANTS deny the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent full access to the benefits of the Jail's programs and activities that receive financial assistance from the State of California and unlawfully subject the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent to discrimination within the meaning of Government Code §11135(a) on the basis of their disabilities.

466.   From at least August 2021 to October 2022, through grievances submitted to the Jail, the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent demanded that JAIL DEFENDANTS stop their unlawful discriminatory conduct described above, but JAIL DEFENDANTS refused and still refuse to refrain from that conduct.

467.   JAIL DEFENDANTS' unlawful and discriminatory conduct, described above, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent in that the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass are repeatedly subjected to discrimination, risk of injury, and denial of full and equal access to the benefits, programs, and services provided by the Jail.

468.   The above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent have no adequate remedy at law for the injuries

1   they described above in that they are continually subjected to discrimination on the

2   basis of their disabilities, are at increased risk for danger and injury on the basis of

3   their disabilities, and are denied full and equal access to programs, services, and

4   activities offered at the Jail.

5        WHEREFORE, the above-named PLAINTIFFS and the Incarcerated People

6   with Disabilities Subclass they represent request relief as outlined below.

7                         **FOURTH CLAIM FOR RELIEF:**
    **FAILURE TO ENSURE ADEQUATE ENVIRONMENTAL CONDITIONS**
8      **TO PROTECT AGAINST UNDUE HEALTH AND SAFETY RISKS**

9   **By All Plaintiffs and the Incarcerated People Class Against Defendants**
                 **SHERIFF'S DEPARTMENT and COUNTY**

10

11       469.   PLAINTIFFS re-allege and incorporate by reference herein all

12   allegations previously made in paragraphs 1 through 468 above.

13       470.   JAIL DEFENDANTS' failure to ensure adequate environmental health

14   conditions to PLAINTIFFS and the Incarcerated People Class they represent

15   violates both the U.S. and California Constitutions.

16       471.   The Eighth Amendment of the U.S. Constitution and the parallel

17   provision in Article 1, Section 17 of the California Constitution prohibit officials

18   from being deliberately indifferent to policies and practices that expose sentenced

19   incarcerated persons to a substantial risk of serious harm.  The Fourteenth

20   Amendment of the U.S. Constitution and the parallel provision in Article 1, Section

21   7 of the California Constitution prohibit officials from employing policies and

22   practices that are objectively unreasonable because they expose pretrial detainees to

23   a substantial risk of serious harm.

24       472.   By their policies, practices, and failures to train staff described above,

25   specifically and without limitation in paragraphs 295 through 307 above, JAIL

26   DEFENDANTS subject PLAINTIFFS and the Incarcerated People Class they

27   represent to a substantial risk of serious harm and injury from inadequate

28   environmental health and safety conditions at the Jail.  JAIL DEFENDANTS'

1  systemic policies and practices pertaining to environmental health and safety

2  include, but are not limited to:

3         a.     Allowing the Jail to become filthy such that it foments the spread

4  of disease;

5         b.     Refusing to remedy dangerous electrical and plumbing hazards;

6         c.     Failing to provide incarcerated people with clean clothes and

7  linens; and

8         d.     Other constitutionally inadequate policies and procedures, to be

9  proven at trial.

10     473.   JAIL DEFENDANTS have been and are aware that these objectively

11  unreasonable policies, practices, and failures to train staff, as described herein,

12  compose a system that exposes PLAINTIFFS and the Incarcerated People Class to a

13  substantial risk of serious harm, and JAIL DEFENDANTS have condoned or been

14  deliberately indifferent to that risk.  These policies and practices have and continue

15  to be implemented by JAIL DEFENDANTS and their agents or employees in their

16  official capacities.

17     474.   All people incarcerated in the Jail, including PLAINTIFFS and the

18  Incarcerated People Class, are injured by their exposure to the substantial risk of

19  serious harm created by JAIL DEFENDANTS' systemic policies and practices.  As

20  such, JAIL DEFENDANTS' policies and practices are the proximate cause of

21  PLAINTIFFS' and the Incarcerated People Class's ongoing deprivation of rights

22  secured by the United States Constitution under the Eighth and Fourteenth

23  Amendments and by the California Constitution, Article 1, Sections 7 and 17.

24         WHEREFORE, PLAINTIFFS and the Class they represent request relief as

25  outlined below.

26

27

28

**FIFTH CLAIM FOR RELIEF:**
**FAILURE TO ENSURE THE SAFETY AND SECURITY OF**
**INCARCERATED PEOPLE**

**By All Plaintiffs and the Incarcerated People Class Against Defendants**
**SHERIFF'S DEPARTMENT and COUNTY**

475.   PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 474 above.

476.   JAIL DEFENDANTS' failure to ensure the safety and security of PLAINTIFFS and the Incarcerated People Class they represent violates both the U.S. and California Constitutions.

477.   The Eighth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 17 of the California Constitution prohibit officials from being deliberately indifferent to policies and practices that expose sentenced incarcerated persons to a substantial risk of serious harm.  The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies and practices that are objectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

478.   By their policies, practices, and failures to train staff described above, specifically and without limitation in paragraphs 308 through 355 above, JAIL DEFENDANTS subject PLAINTIFFS and the Incarcerated People Class they represent to a substantial risk of serious harm and injury from inadequate safety and security measures at the Jail.  JAIL DEFENDANTS' systemic policies and practices pertaining to safety and security include, but are not limited to:

a.      Inappropriately classifying and assigning people to housing locations where they are at an unreasonable risk of violence and injury;

b.      Failing to implement adequate systems for interdicting fentanyl and other contraband;

c.      Failing to maintain functioning safety features in the Jail;

1    d. Delaying responses to emergency calls placed by incarcerated

2 people in distress;

3    e. Failing to prevent and address misconduct by custody staff;

4    f. Failing to ensure adequate independent oversight of the Jail; and

5    g. Other constitutionally inadequate policies and procedures, to be

6 proven at trial.

7   479. JAIL DEFENDANTS have been and are aware that these objectively

8 unreasonable policies, practices, and failures to train staff, as described herein,

9 compose an inadequate safety and security system that exposes PLAINTIFFS and

10 the Incarcerated People Class to a substantial risk of serious harm, and JAIL

11 DEFENDANTS have condoned or been deliberately indifferent to that risk.  These

12 policies and practices have and continue to be implemented by JAIL

13 DEFENDANTS and their agents or employees in their official capacities.

14   480. All people incarcerated in the Jail, including PLAINTIFFS and the

15 Incarcerated People Class, are injured by their exposure to the substantial risk of

16 serious harm created by JAIL DEFENDANTS' systemic policies and practices.  As

17 such, JAIL DEFENDANTS' policies and practices are the proximate cause of

18 PLAINTIFFS' and the Incarcerated People Class's ongoing deprivation of rights

19 secured by the United States Constitution under the Eighth and Fourteenth

20 Amendments and by the California Constitution, Article 1, Sections 7 and 17.

21   WHEREFORE, PLAINTIFFS and the Class they represent request relief as

22 outlined below.

**SIXTH CLAIM FOR RELIEF:**
**FAILURE TO PROVIDE ADEQUATE DENTAL CARE**

**By All Plaintiffs and the Incarcerated People Class Against Defendants**
**SHERIFF'S DEPARTMENT and COUNTY**

26   481. PLAINTIFFS re-allege and incorporate by reference herein all

27 allegations previously made in paragraphs 1 through 480 above.

28   482. JAIL DEFENDANTS' failure to provide adequate dental care to

1  PLAINTIFFS and the Incarcerated People Class they represent violates both the

2  U.S. and California Constitutions.

3      483.   The Eighth Amendment of the U.S. Constitution and the parallel

4  provision in Article 1, Section 17 of the California Constitution prohibit officials

5  from being deliberately indifferent to policies and practices that expose sentenced

6  incarcerated persons to a substantial risk of serious harm.  The Fourteenth

7  Amendment of the U.S. Constitution and the parallel provision in Article 1, Section

8  7 of the California Constitution prohibit officials from employing policies and

9  practices that are objectively unreasonable because they expose pretrial detainees to

10  a substantial risk of serious harm.

11      484.   By their policies, practices, and failures to train staff described above,

12  specifically and without limitation in paragraphs 356 through 365 above, JAIL

13  DEFENDANTS subject PLAINTIFFS and the Incarcerated People Class they

14  represent to a substantial risk of serious harm and injury from inadequate dental care

15  at the Jail.  JAIL DEFENDANTS' systemic policies and practices pertaining to

16  dental care include, but are not limited to:

17          a.    Providing tooth extractions as the only option for dental care;

18          b.    Failing to provide non-emergent dental care, such as regular

19  cleanings and check-ups;

20          c.    Refusing to refer patients to external providers for needed dental

21  care; and

22          d.    Other constitutionally inadequate policies and procedures, to be

23  proven at trial.

24      485.   JAIL DEFENDANTS have been and are aware that these objectively

25  unreasonable policies, practices, and failures to train staff, as described herein,

26  compose an inadequate system of dental care that exposes PLAINTIFFS and the

27  Incarcerated People Class to a substantial risk of serious harm, and JAIL

28  DEFENDANTS have condoned or been deliberately indifferent to that risk.  These

1  policies and practices have and continue to be implemented by JAIL

2  DEFENDANTS and their agents or employees in their official capacities.

3      486.   All people incarcerated in the Jail, including PLAINTIFFS and the

4  Incarcerated People Class, are injured by their exposure to the substantial risk of

5  serious harm created by JAIL DEFENDANTS' systemic policies and practices.  As

6  such, JAIL DEFENDANTS' policies and practices are the proximate cause of

7  PLAINTIFFS' and the Incarcerated People Class's ongoing deprivation of rights

8  secured by the United States Constitution under the Eighth and Fourteenth

9  Amendments and by the California Constitution, Article 1, Sections 7 and 17.

10      WHEREFORE, PLAINTIFFS and the Class they represent request relief as

11  outlined below.

12  **SEVENTH CLAIM FOR RELIEF:**
**OVERINCARCERATION OF PEOPLE WITH DISABILITIES**

13  **By Plaintiffs DUNSMORE, ANDRADE, ARCHULETA, CLARK, EDWARDS,**
14  **LANDERS, LOPEZ, NELSON, NORWOOD, SEPULVEDA, TAYLOR,**
**ZOERNER, and the Incarcerated People with Disabilities Subclass Against**
15  **All Defendants**

16      487.   PLAINTIFFS re-allege and incorporate by reference herein all

17  allegations previously made in paragraphs 1 through 486 above, including

18  specifically and without limitation in paragraphs through 366 through 399 above.

19      488.   The SHERIFF'S DEPARTMENT's, COUNTY's, and PROBATION

20  DEPARTMENT's overincarceration of people with disabilities violates federal law,

21  in particular, the ADA.

22      489.   The ADA requires that people with disabilities receive services in the

23  least restrictive and most integrated setting appropriate and prohibits public entities

24  from unnecessarily institutionalizing people with disabilities.  *See Olmstead*, 527

25  U.S. at 581.

26      490.   The above-mentioned PLAINTIFFS and the Incarcerated People with

27  Disabilities Subclass are qualified individuals with disabilities within the meaning of

28  Title II of the ADA.

491.   The SHERIFF'S DEPARTMENT, COUNTY, and PROBATION DEPARTMENT are public entities subject to Title II, 42 U.S.C. § 12131(1).

492.   The SHERIFF'S DEPARTMENT, COUNTY, and PROBATION DEPARTMENT violate the ADA, and its implementing regulations, including by utilizing methods of administering their programs in ways that deny the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass access to services and programs for which they would be eligible, resulting in avoidable incarcerations, 28 C.F.R. § 35.130(b)(3), and placing them at unnecessary risk of institutionalization in violation of the ADA's Integration Mandate and *Olmstead*, 28 C.F.R. § 35.130(d).

493.   The lack of adequate capacity and reach regarding diversion and reentry services for people with mental health and other disabilities leads to the rationing of services that is arbitrary and/or discriminates against people based on the severity of their disability, in violation of the ADA and other relevant disability law.

494.   Providing the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass with the alternatives to incarceration programs and reentry programs they need and for which they would be eligible would not fundamentally alter the SHERIFF'S DEPARTMENT's, COUNTY's, and PROBATION DEPARTMENT's programs, services, or activities.

495.   The above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass have suffered and will suffer injury as a proximate result of the SHERIFF'S DEPARTMENT's, COUNTY's, and PROBATION DEPARTMENT's violation of their rights under the ADA.

WHEREFORE, the above-named PLAINTIFFS and the Incarcerated People with Disabilities Subclass they represent request relief as outlined below.

**EIGHTH CLAIM FOR RELIEF:**
**DENIAL OF ACCESS TO COUNSEL AND THE COURTS**

**By All Plaintiffs and the Incarcerated People Class Against Defendants**
**SHERIFF'S DEPARTMENT and COUNTY**

496.   PLAINTIFFS re-allege and incorporate by reference herein all allegations previously made in paragraphs 1 through 495 above.

497.   JAIL DEFENDANTS' denial of access to counsel and the courts to PLAINTIFFS and the Incarcerated People Class they represent violates both the U.S. and California Constitutions.

498.   The Sixth Amendment to the U.S. Constitution and the parallel provision in Article 1, Section 15 of the California Constitution guarantee assistance of counsel to people charged with criminal offenses and prohibits jail officials from interfering with incarcerated persons' confidential communications with counsel. The Fourteenth Amendment to the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit jail officials from denying incarcerated people access to courts, including for prosecution of civil rights actions.

499.   By their policies, practices, and failures to train staff described above, specifically and without limitation in paragraphs 408 through 424 above, JAIL DEFENDANTS deprive PLAINTIFFS and the Incarcerated People Class of their rights to adequate representation by an attorney and to access the courts and counsel to prosecute their claims and defenses.  JAIL DEFENDANTS' systemic policies and practices pertaining to access to courts and counsel include, but are not limited to:

a.      Failing to communicate incoming requests for confidential callbacks from attorneys to incarcerated people;

b.      Failing to provide adequate confidential spaces for attorney-client meetings, including by providing limited in-person professional meeting rooms and recording confidential calls;

c.      Preventing incarcerated people from attending professional visits

1  with their attorneys;

2         d.    Opening and tampering with mail between incarcerated people

3  and their attorneys;

4         e.    Failing to alert incarcerated people representing themselves pro

5  se or pro per to the types of assistance they can receive;

6         f.    Confiscating incarcerated people's legal papers; and

7         g.    Other constitutionally inadequate policies and procedures, to be

8  proven at trial.

9      500.  These policies and practices have and continue to be implemented by

10  JAIL DEFENDANTS and their agents or employees in their official capacities, and

11  are the proximate cause of PLAINTIFFS' and the Incarcerated People Class's

12  ongoing deprivation of rights secured by the United States Constitution under the

13  Sixth and Fourteenth Amendments and by Article 1, Sections 7 and 15 of the

14  California Constitution.

15      WHEREFORE, PLAINTIFFS and the Class they represent request relief as

16  outlined below.

17  ### NINTH CLAIM FOR RELIEF:
## DISCRIMINATORY RACIAL IMPACT

18
### By All Plaintiffs and the Incarcerated People Class Against All Defendants
19

20      501.  PLAINTIFFS re-allege and incorporate by reference herein all

21  allegations previously made in paragraphs 1 through 500 above, including

22  specifically and without limitation in paragraphs 400 through 407 above.

23      502.  Under Government Code § 11135, a person may not be denied, on

24  account of their race, color, national origin, or ethnic group identification, "full and

25  equal access to the benefits of, or be unlawfully subjected to discrimination under,

26  any program or activity that is … funded directly by the state, or receives any

27  financial assistance from the state."

28      503.  A violation of Section 11135 is enforceable by a civil action for

1   equitable relief.  Cal. Gov. Code § 11139.

2       504.   The COUNTY, SHERIFF DEPARTMENT, and PROBATION

3   DEPARTMENT administer State-funded programs that cause Black and Latinx

4   persons to be disproportionately incarcerated in the Jail and are thus subject to

5   Section 11135 and its implementing regulations.

6       505.   In carrying out their policing programs, alternatives to pre-trial custody

7   programs, early release programs, and re-entry programs, the COUNTY,

8   SHERIFF'S DEPARTMENT, and PROBATION DEPARTMENT violate Section

9   11135 by causing a disproportionate adverse effect on the basis of race, color,

10   national origin, or ethnic group identification.  As a result of the COUNTY's,

11   SHERIFF'S DEPARTMENT's, and PROBATION DEPARTMENT's policing

12   practices, disproportionate numbers of Black and Latinx persons are arrested.

13   Further, COUNTY's, SHERIFF'S DEPARTMENT's, and PROBATION

14   DEPARTMENT's discriminatory implementation of their alternatives to pre-trial

15   custody programs, early release programs, and re-entry programs result in

16   disproportionate numbers of Black and Latinx arrestees remaining in Jail.

17       506.   In carrying out their policing programs, alternatives to pre-trial custody

18   programs, early release programs, and re-entry programs, the COUNTY,

19   SHERIFF'S DEPARTMENT, and PROBATION DEPARTMENT violate 2 Cal.

20   Code Regs. § 11154(i) because they use criteria or methods of administration that

21   have the purpose or effect of subjecting a person to discrimination on the basis of

22   race, color, national origin, or ethnic group identification.  For example,

23   DEFENDANTS use racially-biased risk assessment tools as part of their

24   determination of eligibility for alternatives to pre-trial custody programs, early

25   release programs, and re-entry programs.

26       507.   PLAINTIFFS and the Incarcerated People Class have suffered and will

27   suffer injury as a proximate result of the COUNTY's, SHERIFF'S

28   DEPARTMENT's, and PROBATION DEPARTMENT's violation of their rights

under § 11135.

WHEREFORE, PLAINTIFFS and the Incarcerated People Class they represent request relief as outlined below.

## PRAYER FOR RELIEF

Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiffs are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the Constitution and laws of the United States and the State of California.

WHEREFORE, Plaintiffs DUNSMORE, ANDRADE, ARCHULETA, CLARK, EDWARDS, LANDERS, LEVY, LOPEZ, NELSON, NORWOOD, OLIVARES, SEPULVEDA, TAYLOR, and ZOERNER, on behalf of themselves, the proposed Incarcerated People Class, the proposed Incarcerated People with Disabilities Subclass, and all others similarly situated, pray for judgment and the following specific relief against Defendants SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 through 20 as follows:

1.      An order certifying that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23;

2.      A declaratory judgment that the conditions, acts, omissions, policies, and practices described above are in violation of the rights of Plaintiffs and the class and subclass they represent under the ADA, the Rehabilitation Act, the Eighth and Fourteenth Amendments to the United States Constitution, California Government Code § 11135, and Article 1, Sections 7, 15, and 17 of the California Constitution;

3.      An order requiring Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise to

(1) provide minimally adequate health care to incarcerated people; (2) provide minimally adequate mental health care to incarcerated people; (3) cease discriminating against, interfering with the ADA rights of, and failing to provide accommodations to incarcerated people with disabilities and violating their due process rights; (4) ensure adequate environmental health and safety conditions consistent with modern public health standards; (5) provide minimally adequate protections against violence and other serious harm; (6) provide minimally adequate dental care to incarcerated people; (7) cease violating the Sixth Amendment and due process rights of incarcerated people; (8) provide alternatives-to-custody and reentry services to people with disabilities in the most integrated, least restrictive environment; and (9) cease their policies and practices that disproportionately and discriminatorily overincarcerate Black and Latinx people.

4.      An order enjoining Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

5.      An order requiring Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise to develop and implement, as soon as practical, a plan to eliminate the substantial risk of harm, discrimination, and statutory violations that Plaintiffs and members of the class and subclass they represent suffer due to the unlawful acts, omissions, conditions and practices described in this Complaint.  Defendants' plan shall include at a minimum the following:

a.      Medical Care:  Ensure adequate medical care to treat the serious medical needs of the Jail population.

b.      Access to Care:  Ensure timely access to appropriately trained providers and staff to adequately treat incarcerated people's serious medical needs.

c.      Medical Staffing:  Ensure adequate numbers of staff by discipline to ensure the timely and appropriate treatment of the Jail population's

1   serious medical needs.

2          d.      Emergency Care:  Ensure timely access to appropriate

3   emergency care of incarcerated people's emergent medical needs.

4          e.      Medical Autonomy:  Ensure that medical and mental health care

5   professionals make clinical decisions about incarcerated people's serious medical

6   and mental health needs without interference from custody staff.

7          f.      Chronic Care:  Ensure appropriate and timely monitoring and

8   care of incarcerated people's chronic conditions.

9          g.      Medical Records:  Ensure appropriate and complete medical

10  records are maintained as necessary to ensure adequate treatment of incarcerated

11  people's serious medical needs.

12         h.      Specialists and Outside Treatment:  Ensure appropriate and

13  timely access to specialists and outside treatment and hospitalization for

14  incarcerated people who cannot be adequately treated at the Jail.

15         i.      Medical Training:  Ensure that all staff are adequately trained to

16  carry out their duties to provide adequate medical care to the Jail population.

17         j.      Mental Health Care:  Ensure timely access to necessary

18  treatment by qualified staff for serious mental illness, including appropriate

19  medication practices; appropriate therapies; access to hospitalization and inpatient

20  care; appropriate suicide prevention practices and policies; appropriate use of

21  seclusion and restraints; appropriate disciplinary policies and practices regarding the

22  mentally ill; and appropriate training of corrections and mental health staff to

23  recognize and treat incarcerated people's mental illness.

24         k.      Mental Health Staffing:  Ensure adequate numbers of staff by

25  discipline to ensure the timely and appropriate treatment of the Jail population's

26  serious mental health needs.

27         l.      Mental Health Training:  Ensure that all staff are adequately

28  trained to carry out their duties to provide adequate mental health care to the Jail

population.

m. **Quality Assurance:**  Ensure a system that regularly assesses the performance of health care and custodial staff regarding the provision of health services at the Jail against a set of established and appropriate criteria, so that errors and deficiencies in the Jail's health care system are identified and corrected timely.

n. **Environmental Health and Safety:** Ensure adequate environmental health and safety conditions consistent with modern public health standards, including appropriate physical plant conditions; policies and procedures for sanitation and environmental health; prevention of infectious disease transmission; and regular cleaning, maintenance, and remediation of dangerous conditions.

o. **Dental care:**  Ensure timely access to dental care to treat the serious dental needs of the Jail population.

p. **Population Management:**  Implement appropriate population management so that the number of incarcerated people is kept at a level that can be safely managed.

q. **Physical Plant:**  Remedy all physical plant problems that endanger the safety and security of the Jail population.

r. **Protection from Harm:**  Take all steps to ensure that incarcerated people are safe from harm from fellow incarcerated people.

s. **Training:**  Ensure that custody staff are adequately trained to carry out their duties to ensure the safety and security of the Jail population.

t. **Classification and Housing:**  Appropriately classify and house incarcerated people to ensure their safety and security.

u. **Accommodations for Incarcerated People with Disabilities:** Ensure that the members of the Incarcerated People with Disabilities Subclass are not denied the benefits of, or participation in, programs, services, and activities at the Jail and that incarcerated people with disabilities are timely identified and

tracked; have their disabilities accommodated; are not discriminated against or have their rights interfered with; are provided with an effective grievance procedure; are provided with all needed assistive devices and other accommodations; receive accessible transportation to the Jail and to outside appointments; and receive effective communication in all medical, mental health, and due process settings and encounters.

v.     Alternatives to Incarceration for People with Disabilities:  Ensure that community-based alternatives to incarceration programs are funded, created, and expanded in size and scope to reduce incarceration of people with disabilities in the Jail; and ensure that reentry programs are funded, created, and expanded to reduce the reincarceration of people with disabilities in the Jail.

w.     Alternatives to Incarceration for All Incarcerated People:  Ensure that community-based alternatives to incarceration programs and re-entry programs are made available to people of all races on an equitable basis; study the disparate impacts of eligibility criteria for community-based alternatives to incarceration programs and re-entry programs, and amend eligibility criteria to prevent such disparate impact; train staff to ensure that community-based alternatives to incarceration programs and re-entry programs are administered in a manner that does not have a disproportionate impact on Black and Latinx individuals.

x.     Access to Attorneys and Courts:  Ensure that all incarcerated people have adequate access to confidential communication with their criminal defense attorneys and their civil attorneys; and that all incarcerated people's legal property and materials are not interfered with by Jail staff.

6.     An award to Plaintiffs, pursuant to 29 U.S.C. § 794a, 42 U.S.C. §§ 1988, 12205, and California Code of Civil Procedure § 1021.5, of the costs of this suit and reasonable attorneys' fees and litigation expenses;

7.     An order retaining jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that

1    Defendants will continue to comply in the future absent continuing jurisdiction; and

2          8.      An award to Plaintiffs of such other and further relief as the Court

3    deems just and proper.

4

5    DATED:  November 18, 2022            Respectfully submitted,

6                                        ROSEN BIEN GALVAN & GRUNFELD LLP

7
                                         By:  */s/ Van Swearingen*
8                                             Gay C. Grunfeld
9                                             Van Swearingen
                                              Priyah Kaul
10                                            Eric Monek Anderson
11                                            Hannah Chartoff

12                                       LAW OFFICE OF AARON J. FISCHER
13                                            Aaron J. Fischer

14                                       DLA PIPER LLP (US)
15                                            Christopher M. Young
16                                            Isabella Neal
                                              Oliver Kiefer
17
18                                       Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27

28