1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   DARRYL DUNSMORE, AD6237,        )
    California Health Care Facility, )
4   Stockton 19777041, PO Box 32200, )
    Stockton, CA  95213; JOSUE LOPEZ; )
5   CHRISTOPHER NELSON; ET AL.        )
                                      )  No. 20-CV-0406-AJB-DDL
6            Plaintiffs,              )
                                      )
7   v.                               )  January 9, 2023
                                      )
8   COUNTY OF SAN DIEGO, ET AL.,     )
                                      )
9            Defendants.             )
    _____)  San Diego, California

10

11         TRANSCRIPT OF DIGITALLY RECORDED PROCEEDINGS

12                    (Discovery Hearing)

13

14      BEFORE THE HONORABLE DAVID D. LESHNER, MAGISTRATE JUDGE

15

16

17

18

19

20  COURT REPORTER:          AMANDA M. LeGORE
                             RDR, CRR, CRC, FCRR, CACSR
21                           U.S. District Court
                             333 West Broadway, Suite 420
22                           San Diego, CA 92101
                             amanda_legore@casd.uscourts.gov
23

24

25

```
 1   APPEARANCES:

 2   FOR PLAINTIFFS:          GAY GRUNFELD
                              Rosen Bien Galvan & Grunfeld LLP
 3                            101 Mission Street, Sixth Floor
                              San Francisco, CA  94105-1738
 4                            (415)433-6830
                              ggrunfeld@rbgg.com
 5
                              CHRISTOPHER YOUNG
 6                            DLA Piper, LLP
                              401 B Street, Suite 1700
 7                            San Diego, CA  92101
                              (619)699-2700
 8                            christopher.young@dlapiper.com

 9

10

11
     FOR DEFENDANT COUNTY
12   OF SAN DIEGO:            SUSAN COLEMAN
                              ELIZABETH PAPPY
13                            Burke Williams & Sorenson LLP
                              501 W. Broadway, Suite 1600
14                            San Diego, CA  92101
                              (619)814-5800
15                            scoleman@bwslaw.com
                              epappy@bwslaw.com
16

17

18

19

20

21

22

23

24

25
```

```
1              (Monday, January 9, 2022; 9:04 a.m.)

2

3                    P R O C E E D I N G S

4

5         THE CLERK:  Please be seated and come to order.

6    Calling matter one, 20-CV-0406, Dunsmore versus State of

7    California, et al.

8         THE COURT:  Okay.  Good morning.

9         Could we start with appearances from counsel.

10        ATTORNEY GRUNFELD:  Yes, your Honor.  Good morning.

11   I'm Gay Grunfeld with Rosen, Bien, Galvan & Grunfeld for

12   plaintiffs and the putative class.  And --

13        ATTORNEY YOUNG:  I'm Christopher Young, your Honor,

14   of DLA Piper in San Diego.  Also for plaintiffs and the

15   putative class.

16        THE COURT:  Good morning to you guys.

17        ATTORNEY COLEMAN:  Good morning, your Honor.  Susan

18   Coleman from Burke, Williams & Sorenson, for the defense.

19        ATTORNEY PAPPY:  And good morning, your Honor.

20   Elizabeth Pappy, also from Burke Williams, for the defense.

21        THE COURT:  Great.  Good morning to both of you.

22        There are a number of issues that I would like to

23   address with you all this morning.  But I do think it makes

24   sense to begin with the plaintiffs' motion for expedited

25   discovery.
```

1          I trust that everyone received the email from my

2     chambers, with my thoughts, to help focus the hearing a little

3     bit.

4          And I did receive an email from Ms. Grunfeld --

5          Am I pronouncing that correctly, ma'am?

6          ATTORNEY GRUNFELD:  Grunfeld.

7          THE COURT:  Grunfeld.  I'm sorry about that.

8          From Ms. Grunfeld, that appears to adopt some of but

9     not all of my tentative.

10         So I -- candidly, Ms. Grunfeld, I appreciate it.  I

11    had a little bit of trouble sifting through exactly what you're

12    agreeing to and what you think, you know, I should not stick

13    with on the tentative.

14         So let me begin with this, if I could.

15         And, Ms. Coleman, Ms. Pappy, if I could ask this to

16    you all first.  With respect to my tentative thoughts in the

17    email, what is your general position with that?

18         And maybe -- we'll dig into the plaintiffs', you

19    know, revisions in a moment.  But I would like to know, from

20    the defense, what -- what is your perspective?

21         ATTORNEY PAPPY:  Sure.  I -- we generally agree with

22    the Court's perspective, that we're looking -- we should look

23    at current things.  This is expedited discovery.  So what's

24    happening today is really all that's relevant today.  It

25    doesn't mean it won't become relevant in the normal course of

1    discovery.

2         The 30(b)(6), the only issue that I had was, really,

3    I -- I am going to request, when we get to the discussion, a

4    little more detail about what the persons most knowledgeable

5    are going to testify to.  But, generally, we agree with it.

6         THE COURT:  Okay.  So I think, Ms. Grunfeld, it

7    probably makes sense for you or Mr. Young to walk me through so

8    I understand, you know, what you agree with, what you don't,

9    and why.  And probably beginning with the definitions because

10   that was something that I had struck out.  And I think you had

11   put in at least one definition back in there for -- actually,

12   I'm not sure that you did.

13        Yeah.  Why don't you fill me in a little bit because

14   I have worked my way through this over the weekend but I want

15   to make sure I understand exactly what the plaintiffs' position

16   is and what you're trying to accomplish.

17        And do you generally agree that -- at the outset that

18   what you are looking at is the current conditions at Rock

19   Mountain and at each of the facilities?

20        ATTORNEY GRUNFELD:  Yes, your Honor.  Of course, we

21   are interested in the current conditions.  And we've defined

22   that as -- we defined that here in the request for production

23   to be in effect and not superseded and/or issued on or after

24   January 1, 2021.  That's on page 3 of our replies to RFPs.

25        Your Honor, if I may, before we delve into the actual

1    requests, I wanted to say, first of all, how much I appreciated

2    receiving the tentative with your thoughts.  That's very

3    helpful in preparing.  And as far as the proposed order that I

4    emailed, I would say that the vast majority of what I did with

5    these requests is consistent with what the Court indicated in

6    the tentative.

7         Of course I would like to preserve plaintiffs' view

8    and concern that we believe all 33 requests were justified.

9    And we'd like to really understand and get at what is going on

10   in this jail system with respect to the Americans with

11   Disabilities Act and other aspects of their compliance with

12   accommodating people with disabilities.  However, we have taken

13   the order, and we have revised it in a way that I think is very

14   consistent with the Court's tentative.  And it seems like the

15   Court would like to discuss the scope first, and then I would

16   like to talk about five additional requests.  The Court -- we

17   had 33.  The Court said eight.  I would really like to get to

18   13 requests for production, if we could discuss that.

19        So scope first?

20        THE COURT:  I think that makes sense.  I would like

21   to understand what you have currently here.  And if you wish to

22   tell me that I'm wrong, I have no problem with that.  And -- as

23   to why you should have more RFPs.  And I'm certainly happy to

24   hear from the defense as to why I'm wrong, and it should be

25   further limited for purposes of expedited discovery.

1          So with that being said, you know -- and, first,

2    Ms. Coleman, Ms. Pappy, thank you for including the requests

3    with your opposition.  And, Ms. Grunfeld, I appreciate you,

4    again, submitting the red-line version.

5          Let me ask this.  On -- from the defense perspective,

6    it is not ordinarily my practice to dig into requests for

7    production and definitions.  So this is unusual for me.  But

8    given the nature of the discovery that's being sought, I don't

9    see a better way to do it.  And I welcome you to tell me, hey,

10   this is not efficient.  You know, back off a little bit.  And

11   I'm not going to take offense to that.  But given how much

12   we're into the details of what's being requested, I do think

13   it's important to go through these one at a time.

14         From the defense perspective, do you have any

15   objections to -- let's just start with the definitions in the

16   requests for production.

17         ATTORNEY PAPPY:  Sure.  First of all, your Honor,

18   just so you know, I have the documents.  I (indiscernible) down

19   here with a laptop.  And so here's my computer I am using for

20   the day.

21         THE COURT:  Do you have an extra copy, Ms. --

22         UNIDENTIFIED SPEAKER:  Absolutely.

23         ATTORNEY PAPPY:  It's okay.  I actually -- I'm fine

24   with it.  But I just don't want you to think I'm looking at

25   Facebook while we're here.

1          THE COURT:  I'm pretty sure you're not tweeting
2    anything this morning.  So all good.  Don't worry about it.
3          ATTORNEY PAPPY:  No.  I wouldn't know how to do it.
4    So we're safe.  Yeah.
5          THE COURT:  That's fine, fair enough.
6          ATTORNEY PAPPY:  Your Honor, the only two -- I
7    appreciate that the plaintiffs went back and tried, in their
8    view, to amend the requests.
9          Most of them, I'm fine with.  I have a few tweaks.
10   But definition specifically is current.  And then the
11   definition of documents.  With regard to "current," they're
12   asking for what an -- and I get the sense that the Court is
13   going to give them current conditions.  We actually don't have
14   an objection to that.  Because, look, if there's -- if there's
15   something that's missing, that needs to be put into the -- into
16   the prison, I get that.  That is what the plaintiffs are
17   defining as an emergency.
18         But "current" should not -- for their benefit and our
19   benefit -- say January 1st, 2021.  What if the policy was
20   implemented in 2016 and it's still in effect?  They just want
21   what the current policy is, is what I think I understand them
22   to be saying.
23         So I don't think that that 2021 limitation benefits
24   them.  In addition to the fact I don't want any
25   misunderstandings.  Because it's my interpretation of what your

1   order is, that you're saying, "Hey, plaintiffs should be able

2   to see what's in effect today. Let's see if what is in effect

3   today requires a preliminary injunction for immediate change

4   because it's an urgent situation."

5          So the 2021 doesn't -- I don't understand why it's

6   there.  I think it creates confusion and potential problems,

7   fights down the road about the 2021.  But I also don't think it

8   benefits plaintiffs because it seems to exclude policies that

9   are in effect today that may have been implemented ten years

10  ago.

11         THE COURT:  Well, so that the two issues from the

12  defense perspective, with respect to the definitions, are the

13  term "document," which I do see was narrowed to some degree.

14         ATTORNEY COLEMAN:  Yeah.  Yeah.

15         THE COURT:  And the definition of "current."

16         ATTORNEY PAPPY:  Yeah.

17         THE COURT:  Which is a new definition.

18         So let me turn to -- go ahead, Ms. Coleman.

19         ATTORNEY COLEMAN:  Sorry.  Sorry to tag-team.

20         THE COURT:  It's all right.

21         ATTORNEY COLEMAN:  Just on the definition of

22  "document," we don't believe "grievances" should be in there

23  because we're really looking at the current conditions, current

24  policies.  So grievances, grievance responses, we can get into

25  that further down the road.  But it shouldn't be in this

1    expedited discovery process.

2         THE COURT:  I understand your position, and I do want

3    to talk to the parties about that.  I think it will make the

4    most sense in the context of the individual RFPs.  But I did

5    see that as well, and I do have questions for the plaintiffs'

6    counsel about that.

7         So for plaintiffs' counsel, let's start with the

8    definition of "current."  Because I noted that as well and

9    wasn't quite sure where January 1, 2021, comes from.  It was my

10   intent to authorize discovery for whatever categories I

11   ultimately do.

12        As to the current policies and procedures, which

13   presumably you would evaluate to frame a motion for a

14   preliminary injunction before Judge Battaglia and you would

15   want to look at the current policies.  So what is it -- why the

16   January 1st, 2021, as just opposed to what's in effect right

17   now?

18        ATTORNEY GRUNFELD:  Well, and it's -- first of all,

19   it's not -- it's not exclusive.  It's and/or.  So if something

20   is in effect right now, we would like it.

21        And -- or if something happened after January 1,

22   2021 -- for example, let's take grievances.  They should be

23   logging all ADA grievances and grievance responses.  Those were

24   not -- you know, those aren't in effect.  I think this goes to

25   the fact that we are not just looking for policies and

1     procedures.  We have most of those, your Honor.  And they're

2     very vague.  And our expert has critiqued them as not

3     consistent with the ADA.  And, also, what we're looking at here

4     is we want to see what are the practices on the ground?  What's

5     actually happening with respect to disabilities in these jails?

6          So if someone submitted a grievance or someone issued

7     a memo saying, gee, the elevators at Central are always broken,

8     can we get a contract to address this?  And if that was after

9     January 1, 2021, it's not a policy and procedure in effect but

10    it is highly relevant to any future preliminary injunction

11    motion.

12          THE COURT:  I see.  So -- I understand the

13    distinction you're drawing and why -- why you're drawing that.

14    And that -- let's, I think, move forward.  Both that and the

15    definition of "document," though, I think will be best

16    addressed in the context of the individual RFPs.

17          Ms. -- Ms. Coleman, Ms. Pappy --

18          Am I pronouncing your name correctly, Ms. Pappy?

19          ATTORNEY PAPPY:  You are.

20          THE COURT:  Okay.  Anything that you would like to be

21    heard on with respect to the instructions?

22          ATTORNEY PAPPY:  Do you mean the definition of

23    "document"?

24          THE COURT:  No.  I mean that there are instructions.

25    That there are 14 instructions that are on pages 3 through 6 of

1   the draft RFPs.

2          Is there anything that you wish to be heard on with

3   respect to those ma'am?

4          ATTORNEY PAPPY:  Well, yes.

5          And the one issue in terms of those instructions is

6   the way they're incorporated into the specific requests.  For

7   example, it asks for drafts of policies.

8          We're looking at the policy.  The policy as it

9   exists, not the way it was drafted yesterday, ten days ago, or

10  ten years ago.  Just the current policy.

11         So, unfortunately, in these respect -- in these

12  instructions, it's essentially trying to make an even broader

13  category than I think what your Honor intended.

14         THE COURT:  You're looking at number 5?

15         ATTORNEY PAPPY:  Yes.

16         ATTORNEY COLEMAN:  Yes, your Honor.

17         THE COURT:  Okay.  Anything else that we should

18  discuss about the instructions before we get into the RFPs?

19         ATTORNEY PAPPY:  Not that I'm aware of right now,

20  your Honor.

21         THE COURT:  Okay.  All right.  Then let's -- let's go

22  through the RFPs.  And I think it probably makes sense to --

23  let's go through the ones that I flagged as tentatively

24  permissible.  Those were numbers 2, 4, 7, 13, 21, 23, 31, and

25  33.

1           And then I will certainly allow the parties to tell

2    me their position as to whether I should authorize more or

3    fewer.

4           So let's begin with number 2 for -- I guess starting

5    with plaintiffs' counsel.  So my -- I'll tell you that the

6    reason why I framed the RFPs as I did is because I -- in my

7    view, getting at the current policies and procedures, the

8    current conditions at the jails is what the plaintiffs are

9    really after.

10          In terms of -- for purposes of expedited discovery

11   only.  You may be seeking broader discovery later in the case.

12   But in terms of expedited discovery, I was trying to provide,

13   you know, an -- what I believe to be an appropriately tailored

14   focus.  And that's why the -- the draft -- or my tentative

15   would be for this one all current policies and procedures.

16          We can talk about the definition of relating to, if

17   anyone would like.  Again, I would not ordinarily dig into

18   that.  You have a definition of "relating to" that includes the

19   words "relating to" in the definition and a whole bunch of

20   other stuff, you know, and any -- I get it.  And if we need to

21   talk about it, we can.

22          But from this one, why -- why change it from current

23   policies and procedures to all policies and procedures and

24   documents?  Which -- as you've defined "documents," is a little

25   bit more narrowly tailored than it was in what you provided

1  earlier.  But it is still any log, audit report, any record,

2  note, assessment, analysis, repair receipt.  I mean, this is

3  still pretty broad.

4         ATTORNEY GRUNFELD:  Thank you, your Honor.  First of

5  all, in our rush to get this to you, we forgot to put "current"

6  in here.  So we understand that that needs to be in there.

7         And we understand that the Court is seeking to narrow

8  these requests.  And, for example, you do not want ESI

9  between -- you know, electronic communications between

10 officials at this jail about the policies and procedures.  And

11 that's a huge limitation that we understand is occurring here.

12 But current policies and procedures is simply too narrow to get

13 at the practices.

14        What is happening with all of these aspects of the

15 Americans with Disabilities Act?  What are they doing when

16 people cannot get a cane?  Or they are placed in the middle

17 tier of a three-bunk bed instead of on the lower bunk?  And how

18 are they addressing the broken elevators?

19        These issues, which we have extensively outlined both

20 in our complaint, the third amended complaint, and in our

21 motion for preliminary injunction will not be addressed by the

22 policies and procedures.  We need to see what, if any,

23 documents exist.  And these are not going to be onerous.  I

24 mean, if -- they're supposed to be complying with the ADA

25 already.  They've known about it for 25 to 30 years.  And they

1    should have internal memoranda.  They should have repair

2    receipts.  They should have these documents ready.

3           In the normal course of business, they should be

4    auditing and analyzing what they're doing in these jails with

5    people with disabilities.

6           They do receive grievances.  They have the J-I-M-S

7    system, JIMS, where they respond to grievances in writing.

8    That should be a computer search just to find disability

9    grievances.  So logs, audits, lists of people with

10   disabilities, they should be tracking each person upon intake

11   and whether they have a disability or not.

12          So those are the kinds of documents that will tell us

13   whether, in practice, they are not complying -- which is our

14   contention -- or they are complying.

15          So that's why current policies and procedures -- we

16   have some of their policies and procedures, your Honor.

17   They're just very vague.  Like, you know, give them an assitive

18   device.  Well, that doesn't answer whether it's happening.  So

19   that's why we've expanded the definition of "documents," and

20   asked for current documents.

21          And, of course, as you point out, if there's

22   something that's too broad or too onerous, they can file an

23   objection.  They can serve an objection, saying this would take

24   too much time; it's not proportionate.  That's a different

25   issue from what we're talking about today, which is whether we

 1   may serve discovery early and on an expedited basis.

 2          THE COURT:  I -- I don't see it quite that way, the

 3   last part of what you said.  And here's why.

 4          Ordinarily, I would absolutely agree with you.  And I

 5   want the parties to meet and confer about discovery requests

 6   and responses.  And hopefully figure out or narrow it before it

 7   comes back to me.  But you want -- and I guess for the third

 8   time, that's why I would ordinarily not be digging through your

 9   discovery requests.

10          But given that we're talking about expedited

11   discovery and, you know, issues that the plaintiffs

12   understandably believe should be dealt with now, I really want

13   to try to avoid a situation where I authorize this discovery

14   and then you propound it.  And Ms. Coleman and Ms. Pappy come

15   back with a bunch of objections, and we have a further motion

16   to compel.

17          It is my -- my hope to come up with a reasonably

18   tailored set of discovery that -- to -- as to which -- whether

19   you agree with it or disagree with it, that's what I want the

20   defendants to produce, and they have something to produce.  So

21   that you get the documents, and you're not engaged in a -- you

22   know, in a back and forth, and are back in front of me on

23   what's no longer expedited discovery in a month or so.  So --

24   but I understand why you want the additional documents.

25          Let me ask it from the defense's perspective -- and

 1  I -- I haven't seen the current policies and procedures.  So

 2  I'm taking Ms. Grunfeld at her word, that they are just general

 3  but they don't get at what's actually happening in the jails

 4  with respect to providing, like, the cane for somebody who

 5  needs one.

 6       What -- what is the defense position with respect to

 7  providing information about, you know, specific types of

 8  documents?  Let's start with grievances and responses for ADA

 9  issues.

10       The -- is it the JIMS system that was mentioned?  I

11  don't know about that.  I don't know how onerous it is to

12  search through that, to provide it?  Obviously, there are

13  privacy concerns that are involved that would need to be

14  fleshed out.  But just talk to me generally about -- at least

15  grievances and responses for some period of time.

16       ATTORNEY PAPPY:  Of course, your Honor.  So the words

17  "policies, procedures, and practices" get conflated a lot.

18  There's no ADA requirement that any public accommodation,

19  including a prison, keep something called practice documents.

20  There's no such thing.

21       THE COURT:  Right.

22       ATTORNEY PAPPY:  There are policies.  And we say we

23  want all disabled people to have equal access and compliance

24  with federal law and state law.

25       Then we have a procedure.  The way that we're going,

1    in theory.  (Indiscernible) procedure.  The way that we are

2    going to make sure that a hearing-impaired individual is going

3    to have access to telephones use.  We've got one housing

4    unit -- and I'm obviously rattling this off in my head.  It may

5    not be true.  But with one housing unit, we're going to make

6    sure -- because the TTY telephones are in there -- so you've

7    got a written procedure.

8              Then you've got -- which I think is what counsel is

9    talking about -- okay.  You've got that procedure.

10             What happens in reality?

11             THE COURT:  Right.

12             ATTORNEY PAPPY:  A grievance is not -- it may -- but

13   it's a grievance from a detainee that's going to say, "You

14   didn't give me TTY time today."

15             THE COURT:  Right.

16             ATTORNEY PAPPY:  How is that grievance, per se, going

17   to get them to the -- the expedited point that they want?  They

18   are trying to expedite discovery to find out do we need to file

19   a preliminary -- preliminary injunction?  Which is why, in

20   my -- the defense's opposition to the expedited motion, it

21   would make the most sense to me -- and I can -- I could be

22   wrong.  There's always a chance of that.  That you have the

23   policies and procedures.  And -- and I would even agree, if

24   there's anything about -- I don't know what it would be.  But

25   in practice, you need to do it this way.  If there's a

1   procedure, I guess contextually there could be a document that

2   said, "This is what the procedure said but, really, this is the

3   way we do it in practice."

4           I have a problem with narrowly defining that.  I have

5   a feeling they're not going to get anything.  But that's why we

6   have the 30(b)(6), is who is the person most knowledgeable

7   about the policy, the procedure, and the implementation.  That

8   is how you avoid, from the defense's perspective, overbroad --

9   at this point -- document requests.  And you get them a

10  streamlined discovery that -- I hate to concede anything.  But,

11  you know, that they have a right to at this point.

12          THE COURT:  Well --

13          ATTORNEY COLEMAN:  And if I might add, your Honor,

14  the JIMS system -- which is J-I-M-S, for the court reporter,

15  the acronym -- you only get in what you -- you only get out

16  what you put in, in terms of a database search.

17          So if you put in ADA but the grievant doesn't use

18  that word in the grievance, then, you know, you're not going to

19  find the relevant grievance for that.  And I know we could

20  confer about search terms.

21          THE COURT:  Is it a Boolean search?  Such that you

22  put in "cane" or "hearing" or -- in the --

23          ATTORNEY COLEMAN:  Yeah, we could -- we could search

24  terms.  I mean, in the database.  I'm not sure what Boolean is,

25  Judge.

1           THE COURT:  I -- I think it just means search; you

2   can do search terms.

3           ATTORNEY COLEMAN:  Well, we can search different

4   terms and see what we come up with.  But it's not going to, you

5   know, take "ADA," and then extrapolate from there to "hearing."

6   We would have to put in "hearing," for example.

7           THE COURT:  Can I ask you a further question about

8   that?

9           ATTORNEY COLEMAN:  Sure.

10          THE COURT:  With respect to the County's ability to

11  search in the JIMS system, can that be done on a

12  facility-by-facility basis, if you know?

13          ATTORNEY COLEMAN:  I believe so.

14          And there are some tracking documents with regard to

15  ADA persons that track, you know, using the -- the Department

16  of Corrections Armstrong class action categories for

17  disability -- mobility disabilities, for example.  So there are

18  some tracking sheets that use that.

19          Perhaps, you know, we could very narrowly define,

20  like, the tracking sheets.  Or there are, for example, green

21  sheets that are done internally at -- at the jails to implement

22  the procedures.

23          So you have the policies online.  But at the facility

24  for that unit, you have green sheets that are, you know,

25  internal to the -- to the staff.  So that may offer some

1    additional input.  I would like to add, too, that plaintiffs

2    have been doing a lot of CPR requests over the last more than a

3    year, and they have obtained a lot of grievances and responses

4    thereto.  And since they're only representing certain

5    plaintiffs at this point, they would be redacted if we -- if we

6    were to provide grievances.

7            THE COURT:  Sure.  You know -- and I understand, and

8    I saw that in the parties' papers.

9            But I -- I have to say that in the fact that

10   documents might be available through a public records

11   request -- I mean, I -- I see that as -- as a second

12   independent mechanism for the plaintiffs to get these

13   documents.

14           And I don't, at this point -- understanding that

15   there may be some duplication of effort involved --

16   Ms. Coleman, see that as a reason to -- to limit what I would

17   otherwise be authorizing here.

18           And I agree with Ms. Pappy.  We're talking about

19   policies, procedures, and then practices.  We're all on the

20   same page with that.  And what we're really talking about,

21   here, is to what extent should the plaintiffs be allowed to

22   obtain evidence relating to -- to practices.

23           And that -- so turning to -- to the plaintiffs --

24   well, actually, before I get that, let me get a better sense of

25   what this would entail.

1              If we're talking about grievances -- Ms. Coleman,

2    Ms. Pappy -- we've got the JIMS system.  And let's say -- let's

3    say you type in "cane" as your search term.  That's going to --

4    what's that going to pull up, actually?  Is it going to pull up

5    the actual grievance and then all of the follow-up?  Or what --

6    what are you going to need to do to figure out -- because I

7    think the plaintiffs want to know not just what's the grievance

8    but what happened to it.  What type of effort does that entail?

9    Because I'm trying to determine the proportionality of all of

10   this.

11             ATTORNEY PAPPY:  Sure.

12             Well, so the JIMS system is all of the medical

13   records of -- of all detainees.  And what it's going to get you

14   is any person that's ever come through the system -- assuming

15   it can -- that's not too broad of a term, it's going to get you

16   every person who ever came through the system.  And then I

17   would assume that it -- that's going to be a gargantuan number.

18   Detainees tend to have health issues.

19             We would then have to narrow it down to find truly

20   disabled people.  Because did that person have a sprained ankle

21   for a week?  Or, you know, what -- do they qualify as disabled?

22   So then we would have to figure out, all right, who is maybe on

23   an assistive device list?  You know, narrow it down further.

24             Then maybe figure out, okay, if it's an assistive

25   device, is it a mobility assistive device?  Okay?  Or is it a

1    hearing assistive device?

2              So we -- if it is certainly something, if you are

3    inclined to want to go down the JIMS system, what I would

4    actually suggest is a little bit of meet and confer.  I don't

5    know if the plaintiffs would want it today.  But to find out

6    what we can and can't search and how we can and can't narrow

7    things down because it's every detainee in the system.

8              THE COURT:  So the JIMS system is not specifically

9    related to grievances?  It is more of a general medical

10   information?

11             ATTORNEY PAPPY:  Yes.  And a grievance could be

12   related to:  "You didn't give me my cane."  "My wheelchair is

13   broken."

14             So it's -- you would have to narrow it down from out

15   here to down here, is my understanding of that system.  And how

16   long it would take us to do that, I don't know.

17             THE COURT:  And is there a separate system, of which

18   you're aware, for searching grievances only?  Because I can see

19   your point about sifting through it -- medical records for

20   detainees.  But there's not -- there's not a central way to

21   search for grievances and responses to grievances, as far as

22   you're aware?

23             ATTORNEY PAPPY:  I would not -- as I stand here

24   today, I'm not sure.

25             I suspect that it would just be a detainee file,

1  which is different than JIMS.  A detainee file to find

2  grievances.  And what you're going to come up with is:  "My

3  laundry wasn't done on time."  "I wasn't given an extra bag for

4  laundry."

5        So you're going to have a gargantuan pile of

6  grievances.  And then you're going to have to narrow it down,

7  hopefully electronically.  Maybe by marrying it to a list of

8  detainees who have disabilities.  Cull out the people who do

9  not have disabilities, and then go through the grievances of

10  the people with dis -- the grievances that are left, and

11  compare the two.  And see if they have any ADA-related

12  grievances.

13        ATTORNEY COLEMAN:  And a lot of the grievances are

14  handwritten, so it depends on how stuff is entered into the

15  system, what you're going to get out.  And you could get people

16  who are hit with a cane, for example.

17        THE COURT:  Sure.

18        ATTORNEY COLEMAN:  You know.

19        ATTORNEY GRUNFELD:  Your Honor, I think we're perhaps

20  over -- overlaboring this.

21        I wanted to point out a couple of things, if I might.

22  First of all, the definition of policies and procedures

23  includes -- I want to make sure everyone understands, and I

24  assume this is okay.

25        First of all, it's going to be modified by current.

1    We all agree on that.  But it includes handbooks, advice,

2    directives, training materials, forms, instructions, and

3    guidelines that come from -- comprise established standards.

4    So that is acceptable.  That's what we wrote.  That's going to

5    be more than just the standalone policies and procedures.  Then

6    we want to add in documents.

7            Now, documents have been defined here as log, audit,

8    report, memoranda, records, notes, assessment, analysis, lists,

9    grievance responses only.  So that's already hugely narrowed

10   from what we've been talking about.  And I was noticing that

11   as -- as my opponents were discussing grievances.

12           What's important, at this point, is what is the

13   County saying to someone who did not get a cane or was placed

14   in a middle bunk; as opposed to, you know, what the person has

15   said.  We want that in the long run, but for now, we've

16   narrowed it to the responses, if they can be obtained in -- in

17   a reasonable manner, of course.

18           Repair receipts, that would go to the elevators.  We

19   know we received -- in the public records, we received some

20   logs of intercom repairs.  We want to see something similar for

21   those elevators at Central, which we believe are causing people

22   to have falls and not be able to access program services and

23   activities.

24           And then the final word is a "summary."  So that

25   would be some kind of summary or memoranda, if these exist,

1  saying, "Gee, we're getting a lot of grievances about the lack
2  of grab bars on the toilet in such-and-such a unit.  Maybe we
3  should move people out of there."
4          Those are the kinds of documents.  And, again,
5  everything is narrowed by current and/or after January 1, 2021;
6  for now, of course.  That is telling us what is actually
7  happening within this large jail system with respect to people
8  with disabilities.
9          ATTORNEY COLEMAN:  Your Honor, I'm unable to find a
10  "policies and procedures" definition.  If plaintiff's counsel
11  could point it out.
12          ATTORNEY GRUNFELD:  It's on page 3, line 7 through
13  10.
14          ATTORNEY PAPPY:  Yeah, I see it.
15          THE COURT:  Yeah.  But, no.  And I hear that your
16  policies and procedures are limited to documents that comprise
17  established standards, which is limiting.
18          But, let me ask you this.  What is the relevance of
19  every time a -- an elevator in the Central jail has been
20  repaired from January 1, 2021, to the present, as opposed to
21  what -- how it's functioning right now?  Which is what it would
22  be -- what would be relevant, I believe, for purposes of
23  seeking any injunctive relief.
24          ATTORNEY GRUNFELD:  In our injunction, your Honor,
25  our clients testified under oath that there had been occasions

1   in the past year or two when they could not get to program

2   services and activities because those elevators were broken.

3   And if there is a chronic problem with the elevators, just

4   because it's working today does not mean it's going to be

5   working tomorrow.  And public entities are required to have a

6   certain kind of maintenance contract and to be keeping this

7   active.

8           So, again, limited back -- if it's broken ten times

9   in the last year, that seems relevant to establishing the

10  credibility of this problem.  They had someone testify.

11  Mr. Bennett said that he was never aware that the elevators had

12  been broken at Central.

13          Well, is he there 24 hours a day, standing at the

14  elevator?  Of course not.

15          There are documents that could tell us if defendants

16  have become aware in the last two years of elevator breakdowns

17  in the jail.  It is not dispositive that the elevator is broken

18  today.  But it shows that the elevators have a problem, and

19  let's see what they're doing about it.  And what is their

20  workaround?  Someone testified that they would let the

21  incarcerated people use the staff elevator.  Is there any

22  evidence for that?

23          Our clients were not allowed that, the ones that we

24  submitted declarations for.  But maybe there is a memo saying,

25  "In all situations, please let them use the staff elevator."

1    If that exists, that would be relevant.

2          THE COURT:  What's the plaintiffs' position about --

3    for purposes of expedited discovery, about focusing on a

4    particular facility?

5          ATTORNEY GRUNFELD:  Well, your Honor, we -- we didn't

6    focus on one.  We had five we wanted to inspect.  And --

7          THE COURT:  I know.  And I'm not -- this may be two

8    totally different things, where we're talking about -- I mean,

9    in your inspection of Rock Mountain, there's nobody there yet.

10   So that's going to be looking at the grab bars; to pull

11   something from the defendants' brief.  But if you're looking at

12   practices and sort of how these policies have been utilized in

13   practice, one thing I am considering is rather than -- it does

14   sound like this is not -- this is not going to be -- if I'm

15   inclined to do this, it is not going to be easy for the County,

16   from what I can tell.

17         And I'm going to ask you all to meet and confer on

18   this because I -- I think there's a more efficient way to

19   handle this, with you all talking, than with me asking all of

20   these questions and trying to learn this for the first time.

21   But one thing that I'm considering is whether it makes sense

22   to -- to take a particular facility.  You seem to be -- I mean,

23   I'm not limiting you, for purposes of later.

24         But the Central jail, for example, this is a facility

25   that -- where your clients are saying the elevator is always

1   broken.  You know, perhaps it makes sense to focus on that.

2   Again, for purposes of expedited discovery.

3          And I -- let me -- I'll let you think on that.  I'm

4   not trying to put you on the spot with that.  But I've been

5   asking you a number of questions.

6          Ms. Pappy, what did you want to tell me about

7   anything that we have just been talking about?  Or,

8   Ms. Grunfeld, the same.

9          ATTORNEY PAPPY:  Yes.  And I will comment on your

10  last comment.

11         The only point that I want to make is in -- we --

12  from my perspective -- got a little bit off of grievances and

13  on to elevators.  The policies and procedures in place for the

14  elevators today -- we don't actually have an objection to that.

15  Documents.  That, I guess, would show do you have a maintenance

16  contract?  Do you have a regular maintenance contract?  What do

17  you do when the elevators are down?  Documents that show that

18  kind of thing.  They -- they have a procedure where if the

19  elevators who are -- that are apparently deplorable -- and

20  they've replaced one whole elevator.  They can only do it in

21  slow progression because of money and because it's an elevator.

22  And the other one is being replaced by spring.  This has been

23  long in the works because it's very expensive.

24         But I'm not -- I'm not insensitive to the elevator

25  thing but we lost sight of -- you don't need historical -- lots

of historical records about the elevators, at this point, to
determine are you maintaining them?  What is the policy in
place for maintaining them?  What do you do if they go down?
What do you do if they all go down?  Those are policies and
procedures that when you then take a 30(b)(6) deposition of a
person most knowledgeable about what do you do in these
situations; how do you implement these if you have a disabled
detainee?  I will actually tell you that the deputies have the
ability to reroute an elevator to themselves.  They can bypass
everybody else and make the elevator come to them and get a
detainee -- detainee to where they need to go.  They can also
reroute staff elevators using -- it's a key you turn in hand
because you use a key.

        But the way you figure that out is by these general
document collection requests narrowed; as we agreed to with the
30(b)(6) deposition.

        The grievances, which is where we started the
conversation, is really a completely different ball of wax that
I agree we probably need to meet and confer about parameters.
No doubt, eventually, they're going to legit -- legitimately
ask for them and get them.  My trouble with the grievances, at
this stage, is what exactly are those grievances going to tell
you that you are not going to be able to determine by looking
at the policies and procedures; and either saying these are
terrible or, you know, these are great?  But what are you guys

1    doing, in practice, in asking those 30(b)(6) questions?

2        With regard to focusing on one facility, I tend to

3    like nice, neat packages.  If you couldn't tell from my papers,

4    I -- the defense agrees to the nice new packages because I want

5    to make this efficient for everyone.  And -- and policies and

6    procedures may be the same between all facilities.  I'm not

7    entirely sure.  But in terms of inspections, picking them off

8    one at a time --

9        THE COURT:  Well, I don't think the plaintiffs are

10   losing sight of, you know, this; to use your phrase, Ms. Pappy.

11   Because I understand why they are asking about repair logs

12   for -- for example, the elevators at Central, and why they

13   would want that information to -- to test whether there is --

14   you know, whether the -- the practices with respect to

15   maintaining those elevators are really consistent with the

16   policies and procedures.  Because that policies and procedures

17   can say one thing.  But if day-to-day in a facility is an

18   entirely different matter, I -- that, I get.  And I am inclined

19   to -- well, I am inclined to agree with the plaintiffs that

20   some additional information is relevant.

21       I will tell you, Ms. Grunfeld, I'm not inclined to

22   agree that the entirety of the definition of documents is

23   appropriate at this stage.  I mean, I -- I hear you on the

24   grievance responses and on the repair receipts.  But on every

25   note or log entry, I just -- I -- I fear that that opens this

 1    up beyond what the plaintiffs truly need to evaluate a request

 2    for a preliminary injunction, and will actually slow this

 3    process down.  But I -- I understand why you're asking for it,

 4    and I want to think through that a little bit more.

 5            Let's do this because I -- I appreciate hearing

 6    everyone's views on this particular RFP number 2.  There are a

 7    number of others but I think those are -- are less -- if we're

 8    talking about -- for example, I was inclined to authorize for

 9    requests for production number 4, which is policies and

10    procedures relating to assistive devices.

11            Is that correct, Ms. Grunfeld?

12            ATTORNEY GRUNFELD:  Yes, your Honor.  As -- as

13    rewritten.  The rewritten version is number 4, yes.  It's now

14    at the top of page 8, lines 2 through 6 of the document I

15    submitted Friday evening.

16            And that, again, would have to be modified with the

17    word "current," which we missed in our review.

18            ATTORNEY PAPPY:  Your Honor, may I ask a question

19    about that?

20            THE COURT:  Sure.

21            ATTORNEY PAPPY:  The one saying I would naturally

22    include -- because I think it's broad enough -- but there's

23    nothing in here about hearing aids.  I'm assuming -- these are

24    two disabilities identified:  Mobility and hearing.  And I'm

25    assuming that they would want to know about hearing aids.

1          THE COURT:  Is that a deliberate omission,

2     Ms. Grunfeld?  Or was that just an inadvertent omission?

3          ATTORNEY GRUNFELD:  I think it was probably -- it --

4     inadvertent.  And we, of course, want all of that.  So, yes.

5     Being it says "assistive devices, including but not limited

6     to."  So --

7          THE COURT:  Right.  But I mean, honestly, from the

8     defense perspective, the "not limited to" is just lawyer talk.

9     Right?

10         I mean, they can't search for -- it's going to be

11    limited to what you actually are asking for.  And if you want

12    hearing, I appreciate that, Ms. Pappy.  That, really, what

13    we're talking about is mobility and hearing.

14         And I am going to ask you all to meet and confer.

15    And then we'll -- I'll take the bench again, after you all have

16    an opportunity to do that.

17         Because I really do think figuring out -- if we're

18    talking about mobility and hearing -- and how -- how do we

19    narrow this down for the purpose of expedited discovery?  I'm

20    not suggesting necessarily that you are -- discovery is limited

21    to the -- the disabilities that are identified in the

22    complaint.  But I believe Ms. Pappy is correct.  That the --

23    the vast majority, if not all of them -- the disabilities

24    suffered by the named plaintiffs -- are related to mobility and

25    hearing.

1          That to -- to limit this number 4, as you propose to

2     do it, but to add hearing devices in there would be -- would be

3     appropriate.  Again, the issue is with respect -- in my view,

4     is with respect to the definition of documents.  What does that

5     really include for -- for the plaintiffs?

6          ATTORNEY GRUNFELD:  And, your Honor, I need to say

7     that we are seeking relief under the ADA for all people in this

8     jail who have all disabilities, not just hearing and mobility.

9     And mental illness, substance use disorder, cognitive problems,

10    blindness.  There are many, many disabilities.  They're all

11    covered by the ADA.  And so I just want to be clear that we are

12    willing to limit the disabilities for purposes of the expedited

13    discovery, but not in general.

14         THE COURT:  And I don't think anyone's taking a

15    position you're waiving your rights for later.  For example,

16    the issue about individuals with substance abuse problems is

17    a -- is going to be a -- in my view, a very, you know,

18    different issue to tackle.  And I do want to hear from the

19    parties as to how we tackle it over the course of this case.

20    But, understood, you're not waiving this for later,

21    Ms. Grunfeld.  I don't think anyone's taking that position.

22         For number seven, documents relating to identifying

23    and tracking incarcerated persons with disabilities, did you

24    want to be heard on that, Ms. Grunfeld?

25         ATTORNEY GRUNFELD:  Yes.  Well --

1          THE COURT:  I think that was my number seven.  It

2     doesn't have a number next to it.  But --

3          ATTORNEY GRUNFELD:  Okay.  Well, actually, your

4     Honor -- so if we look at the actual requests, as I mentioned

5     earlier, the Court -- the Court took our 33 and changed it to

6     8.  And there's five more that we think are really important.

7     And old numbers -- and we, of course, love all of ours.  But

8     old number 7 is not one that we wanted to discuss today.

9          We wanted to discuss old number 1, which is still --

10    which I have kept in here because I think it's so important but

11    that the Court's tentative disallowed.  And so I think, if it

12    would be okay with the Court, I would just like to highlight

13    the five that we would really love to keep.

14         THE COURT:  Okay.  That's fine.  Let's do this, then.

15    Just so we are all on the same page -- because, obviously, I

16    think I got a little bit turned around with some of the

17    redlining.

18         Number -- request number 2 is -- actually has the

19    number next to it.  That's on -- I'm looking at what -- your

20    red-line, Ms. Grunfeld.  That's page 7, line 11.  Request for

21    production number 4 is actually on that same page 7, line 24.

22    It does not have a -- a number next to it.  It relates to

23    testing and repair of elevators at the jail.

24         ATTORNEY GRUNFELD:  That's number 3.  And the Court

25    allowed that one, as I understood it.

1          THE COURT:  This is where I'm getting a little bit

2     turned around.

3          ATTORNEY GRUNFELD:  Yes.

4          THE COURT:  Because I'm looking at -- because the

5     defense submitted these, I'm looking at requests for production

6     number 4, which is ECF number 245-1 on the ECF pages, page 11.

7          That request for production, number 4, asks for

8     policies and procedures relating to the functionality, testing,

9     maintenance, and repair of elevators at the jail.  It was my

10    intent to allow that one, which I see now is --

11         ATTORNEY GRUNFELD:  And that's new number 3 in the

12    red-line.

13         THE COURT:  I don't have a number -- oh, I see.

14    Because number line is on line 16 --

15         ATTORNEY GRUNFELD:  Yes.  I'm sorry.

16         THE COURT:  No, that's okay.  I appreciate that.  I

17    just need -- then -- okay.  So old number 4 is new number 3.

18    All right.  Got it.  And with that in mind, I -- I can go

19    through the -- the rest of the ones as to which I was inclined

20    to grant.

21         You wanted to be heard on the other ones,

22    Ms. Grunfeld, and I want to provide you that opportunity; for

23    the ones that I struck.

24         So go ahead, ma'am.

25         ATTORNEY GRUNFELD:  Thank you.

1          So request number 1, which the Court struck, this

2    mostly mirrors our PMK topic.  Seeks policies and procedures

3    regarding effective communication, reasonable accommodation,

4    and assistive devices.  It's basically the core -- core

5    request.

6          So I didn't understand -- I mean, I understand the

7    limit to current, but I don't understand -- or I didn't really

8    understand why the Court struck that one.

9          THE COURT:  Sure.  Because it seemed to me to be a

10   catchall.  You had very -- you had targeted requests for

11   current policies and procedures.  And I looked at number 1, and

12   it seemed to me that this one was just overly broad.  And you

13   were -- is there anything in the other requests for production

14   that I authorized that would not give you the policies and

15   procedures that you are looking for?

16         ATTORNEY GRUNFELD:  Well, I feel -- I feel like --

17   rather than see it as a catchall, I saw this as a basic -- like

18   give us what you've got on effective communication, reasonable

19   accommodations, and incarcerated people with disabilities.  So,

20   yeah, I didn't think the other ones covered that.

21         Nor do I see that they would really object to this

22   one.  It should be pretty easy to pull together.

23         THE COURT:  Well, why not hear from Ms. Coleman and

24   Ms. Pappy on this one.  So this one is limited to policies and

25   procedures.  It does not ask for documents relating to

1   practices.  And this is request for production number one.

2           What's your position on this one, Ms. Pappy?

3           ATTORNEY PAPPY:  Yes.  Thank you, your Honor.

4           I -- to me, it's duplicative.  They've got -- number

5   1 is a catchall.  Number 2, I -- I think, covers the same

6   stuff, relating to physical accessibility of facilities,

7   housing, programs, services, activities, and assistive devices

8   for incarcerated persons with mobility disabilities.

9           If they want to add hearing disabilities because

10  they're concerned that that's not covered, that's fine, but it

11  seems just duplicate.

12          THE COURT:  Ms. Grunfeld, if I'm inclined to limit

13  this -- for purposes of expediting discovery -- only to

14  mobility and hearing disabilities, do you agree that requests

15  for production number 2 would provide you with all of the

16  current policies and procedures that are in place, assuming

17  that we added hearing disabilities to number 2?

18          ATTORNEY GRUNFELD:  No, your Honor.

19          THE COURT:  Okay.  Why not?

20          ATTORNEY GRUNFELD:  Because -- because the first one

21  asks for the provision of housing, program services, and

22  activities.

23          And the second one is limited by physical

24  accessibility.

25          THE COURT:  Got it.  Okay.  I appreciate that.

1          All right.  Understood your point as to number one,

2     Ms. Grunfeld.

3          Which are the other four that you wanted to be heard

4     on?

5          ATTORNEY GRUNFELD:  Number six, which is old number

6     20.

7          THE COURT:  And why don't you just take me to your

8     red-line, and make sure that I'm there.

9          ATTORNEY GRUNFELD:  Yes.  Yes.

10         THE COURT:  So I see we're going to page 9, lines 25

11    through 28.  Is that correct?

12         ATTORNEY GRUNFELD:  Yes, your Honor.

13         And that seeks all physical, structural, and design

14    plans relating to the Rock Mountain jail facility.

15         And we have modified it in the red-line to make sure

16    that we can see the as-built plans.  And the punch list for

17    construction in process or completed, we've consulted with our

18    expert.  That's what she says she needs to assess this

19    facility.  I think we all agree that it's very important to get

20    an outside assessment of the facility.

21         Of course, those plans can be placed under a

22    protective order, if that is a concern, if that's appropriate.

23    But this is apparently ongoing construction in response to a

24    2019 CASp report.

25         So this will make our expert's job much more

1   efficient.  This is a large facility.

2          THE COURT:  Well, that's my concern, honestly, is

3   that -- it's not so much the construction plan.  But if you

4   want a punch list for every single item in this facility,

5   whether it has anything to do with ADA or not, that seems to me

6   to be entirely different.  And maybe I'm not reading it the way

7   you are.  But I'm looking -- this is a punch list that could be

8   related to, you know, the rec yard.  Or, you know, something

9   in, you know, food service areas, that's got nothing to do with

10  your client.

11         So am I misreading number nine and making it unduly

12  broad?

13         ATTORNEY GRUNFELD:  We can -- I -- I see your point,

14  your Honor.  We can narrow this to relating to the physical

15  accessibility or ADA accessibility of Rock Mountain jail

16  facility.

17         My understanding is the construction -- construction

18  that is underway there now, at this moment, is to bring it into

19  compliance with the ADA.

20         So if there's other construction going on for some

21  other reason, obviously, we don't need to see those documents.

22         THE COURT:  Well, but --

23         ATTORNEY GRUNFELD:  So that's the assumption

24  underlying this request, is that it's ADA renovations that are

25  underway.  And that is why our expert would like to see the

1   as-built plans and the construction documents.

2               THE COURT:  I understand you, and I appreciate that.

3               Respectfully, I didn't read this RFP at all.  You're

4   asking for the punch list for construction in process or

5   completed.  Basically every punch list ever drafted for Rock

6   Mountain.  That's why I struck it.  Because I -- it just seemed

7   to me to seek information that would be voluminous and not

8   relevant to the case.

9               ATTORNEY GRUNFELD:  Well, we could limit it to ADA

10  accessibility -- or disability --

11              THE COURT:  Okay.  Ms. Pappy, do you wish to be heard

12  on this one?

13              ATTORNEY PAPPY:  Yeah, I can make this super easy.

14  I --

15              THE COURT:  Great.

16              ATTORNEY PAPPY:  I have handled several of these

17  cases.  And it is my standard practice, document production

18  requests or not -- to provide plans.  The experts can do their

19  work very efficiently by providing plans.

20              There are no as-builts for Rock Mountain because it's

21  not done, and we don't do as-builts until it is done.  I don't

22  know what construction monitoring documents are.  As also a

23  construction attorney, I've never used -- I've never heard that

24  term used.  But normally what experts -- CASp experts are

25  looking for are plans and elevations, which are engineering

1    plans.  And I am happy to provide both of those.  It makes

2    everybody's job easier:  My expert and theirs.

3              But the rest of this stuff, I don't understand it.  I

4    don't understand what a punch list has to do with the issue.

5    The issue is when we go there, is there a grab bar or is there

6    not?

7              THE COURT:  I -- I tend to agree with Ms. Pappy.

8    That, you know, let's -- the point of a punch list -- I mean,

9    colloquially, you identify issues and you fix it before, you

10   know, your home renovation or your jail construction is done.

11             So if the punch list identifies something that needs

12   to be done for ADA purposes and it's done, I don't understand

13   the relevance of that in the proportionality analysis,

14   Ms. Grunfeld.  Because your expert is going to go -- they're

15   going to see what is there in the facility as it currently

16   stands.  It would seem to me that providing the -- the design

17   plans for Rock Mountain would be what your expert needs.

18             I guess -- I am assuming it's relevant to the

19   preliminary injunction motion because your expert wants to look

20   at the plans and that will inform the expert's inspection,

21   which would then be part of any motion.  But all of the

22   underlying documents and punch lists are -- it's just not

23   readily apparent to me, ma'am.  And if I'm missing something,

24   please do tell me.

25             ATTORNEY GRUNFELD:  Thank you, your Honor.

1        Well, what I'm hearing is that the work is not done.

2    And yet we're also being told that people with mobility

3    disabilities are going to be housed in this place and this is

4    going to resolve some of the ADA concerns we have.

5        So if the ADA construction is not done, that means

6    there are punch lists or there are plans to do construction.

7    And if that is not completed, then the place will not comply

8    with the ADA.  So if it's already done, then, sure, we can just

9    look around and see; and either agree or we don't agree.  But

10   it's in progress.  So how are we going to know if it's

11   completed or not; if it's done according to the ADA and the

12   CDC, before people move in there?

13        THE COURT:  Sure.  And part of this is going to

14   require communication between counsel.  It's going to be part

15   of a 30(b)(6) deposition on this issue, perhaps.

16        But I -- this -- as -- I'll take another look at this

17   after the hearing, Ms. Grunfeld.  I'm not inclined to order the

18   County to produce, you know, every construction monitoring

19   document and every punch list.

20        And I understand the parties disagree as to whether

21   this is going to be the one and only inspection of Rock

22   Mountain.  And I'm not making a finding on that right now.  It

23   may be that there's good cause for a second inspection down the

24   road, depending on what your expert sees.

25        But I do think just -- I understand what you want.

 1   And I appreciate, Ms. Pappy, that -- getting to the chase, that
 2   you don't object to producing the design plans.  But I will --
 3   I will give that some additional thought.
 4           So what's next, Ms. Grunfeld?
 5           ATTORNEY GRUNFELD:  Let's skip to number 11, which
 6   was old 30, which is also about Rock Mountain.
 7           And I'll just -- if you could give me one moment,
 8   I'll find that.  It's -- this is about the plans to house
 9   incarcerated people in wheelchairs at Rock Mountain.  So this
10   is on page 11, lines 12 to 15.
11           In other words, are they going to cluster people with
12   disabilities who are full-time wheelchair riders at this
13   facility?  And, if so, how many people are they going to put
14   there?  How are they going to do it?  And which aspect of the
15   facility will they be living in?  And how many of the cells and
16   sanitary facilities, and the like, are being renovated?
17           So this one is related to this other one on page 9.
18           THE COURT:  I see.
19           ATTORNEY GRUNFELD:  And so it's just really critical
20   that we understand what they're doing with respect to these
21   facilities.  This facility in particular.
22           THE COURT:  Ms. Coleman, Ms. Pappy, let me ask you.
23           If I were to agree to this, it would say, you know,
24   documents relating to plans to house incarcerated persons who
25   use wheelchairs at the Rock Mountain facility, period.

 1           I just -- unless you're going to convince me

 2    otherwise, construction monitoring documents and punch lists, I

 3    just don't see as relevant.  But I understand where

 4    Ms. Grunfeld is coming from with respect -- if there are plans

 5    about housing folks in wheelchairs there, they would want to

 6    see those in evaluating their ADA claim.  At least with respect

 7    to Rock Mountain.  So what's your position, ma'am?

 8           ATTORNEY PAPPY:  I wholeheartedly agree.  And it's

 9    shocking.  But the only thing I was concerned about --

10           THE COURT:  It's not shocking.  It's just being

11    reasonable.

12           ATTORNEY PAPPY:  Well, you've removed the

13    construction monitoring documents because they don't know what

14    those are, and punch lists.  But the only concern I have about

15    all documents -- capital D -- is I don't know if there is a

16    current plan, like we have Mr. Smith and Ms. Jones -- I don't

17    want people's names disclosed.  But this seems like a policies

18    and procedures.  What is your planned policy for how these

19    folks are going to be housed?  Are they going to be clustered

20    in this?  I don't have a problem with that.

21           So as long as we understand that I'm not giving

22    over -- I'm not required to give over any documents of people,

23    individual named people; fine.

24           THE COURT:  But you don't know right now if there are

25    any -- documents exist, do you?

1          ATTORNEY PAPPY:  I don't know if -- it's spring it's

2    supposed to open.  And so have they started making a list of

3    people?  I don't know.

4          So if we can just -- make that clear.

5          THE COURT:  I think for purposes of expedited

6    discovery, I would agree with you.  Again, this is not to

7    preclude Ms. Grunfeld from seeking these documents about

8    individuals later in the case.

9          But, Ms. Grunfeld, do you want to be heard on that

10   one?

11         ATTORNEY GRUNFELD:  Your Honor, I'm not looking for

12   documents about individuals.  I'm looking for, okay, we're

13   putting people in wheelchairs in this unit.  And what are we

14   going to do about the fact that this particular facility will

15   not have any classrooms or will not have any substance abuse

16   programs?  How are we going to address that?  What will we do

17   about the path of travel between the clustered area for the

18   people in wheelchairs, and perhaps the chapel?  Those kinds of

19   things.  What are -- what is the plan here?

20         And so I think if -- if this is what they're planning

21   to do to resolve some of their ADA issues, there -- there is

22   likely to be a document about it.

23         THE COURT:  What I hear Ms. Pappy saying, she's not

24   objecting to that.  But she doesn't -- I -- understandably

25   doesn't, at this point, want to dive into plans with respect to

1  individual detainees who are going to Rock Mountain.

2            ATTORNEY GRUNFELD:  That's fine, your Honor.

3            THE COURT:  Okay.

4            ATTORNEY GRUNFELD:  There's only two more that we

5  were hoping to keep in.

6            THE COURT:  Let's go.

7            ATTORNEY GRUNFELD:  Number eight, on page 10, lines 7

8  through 12.

9            The Court had stricken that one.  And we took out

10  "communications," but we would still like documents relating to

11  the accessibility of programs, activities, and services

12  relating to telephones, tablets, elevators, yard, exercise

13  equipment, religious services, substance abuse, education, and

14  job training.

15            These program services and activities are highly

16  critical to our clients.  They're a way -- they help them get

17  out earlier.  They help them survive.  They help them interact

18  with their family and their lawyers.  And so we would like to

19  see information about how those things are being made

20  accessible to our clients.

21            In the *Hernández* case, we discovered that sign

22  language -- there were no sign language interpreters, for

23  example.  There was no program for that.  We also discovered

24  that the classroom for substance abuse was on the second floor,

25  and there was no way to get people in wheelchairs up there.

1         If that kind of thing is occurring in this jail

2    system, we would like to see documentation regarding those

3    issues, one way or the other.

4         THE COURT:  Ms. Pappy?

5         ATTORNEY PAPPY:  I'm -- I got a little confused.

6    First, we're talking about new number eight at line 7 on page

7    10.  Correct?

8         THE COURT:  Yes.

9         ATTORNEY PAPPY:  I don't have a problem with this

10   because it seems duplicative.  I just -- it includes all

11   programs and services offered.  And it's just a more detailed

12   description of -- from my perspective, of what number 2 already

13   says, with the addition of hearing-impaired people.

14        So I didn't --

15        ATTORNEY COLEMAN:  Except that it opens the can of

16   worms with respect to grievances, your Honor.

17        ATTORNEY PAPPY:  Right.  I don't -- we don't agree

18   that grievances are a part of this.  But I interpreted it as

19   they are, again, looking for policies and procedures relating

20   to accessibility of programs, activities, services, et cetera,

21   et cetera, accessed by mobility disabled and hearing-impaired

22   individuals.  Right?

23        THE COURT:  Right.  But I -- as I read this one, this

24   is getting -- to take us back to the big three, this is not so

25   much focused on policies and procedures as it is practices.

1    Where it's getting into the details of how the -- the County is

2    facilitating this.

3            Am I reading that correctly, Ms. Grunfeld?

4            ATTORNEY GRUNFELD:  Yes, your Honor.  And, again, we

5    have not ask asked for grievances.  We've asked for grievance

6    responses.  We are interested in what's actually happening.

7            THE COURT:  Sure.

8            ATTORNEY GRUNFELD:  Not what they say they are going

9    to do.  What they are actually doing.

10            How do they get people with disabilities into these

11    programs?  They don't exist at all of the jails.  They only

12    exist at some of the jails.

13            THE COURT:  All right.  Understood.

14            Which one -- which one did you want to be heard on,

15    in addition, Ms. Grunfeld?

16            ATTORNEY GRUNFELD:  The last one, your Honor, is new

17    number ten, on page 10.  And it used to be 26.  And it's page

18    10, lines 25 through 27.  And this is documents related to

19    disability accommodations -- well, actually, this is -- I'm so

20    sorry.

21            This is the one about audits, reports, and

22    assessments.  So that is --

23            THE COURT:  As you framed it, it's actually broader

24    now.

25            ATTORNEY GRUNFELD:  Yes.

1          THE COURT:  And that was -- this is my concern with

2     this one.

3          This is -- even if you limit it to January 2021, it

4     is any document relating to any accommodation offered by any of

5     the jails for any disability.

6          And I -- if you want to be heard on that, I'm more

7     than happy, Ms. Grunfeld.  The breadth of this is of concern to

8     me.

9          And what I -- what I'm thinking -- as I think is

10    obviousness -- is for purposes of expedited discovery, when it

11    talks about -- we're talking about practices, what's actually

12    happening -- obviously, Rock Mountain is not relevant because

13    there's nobody there yet.

14         But it would be to limit this for purposes of

15    expedited discovery to the Central jail.  To limit it to

16    disabilities involving mobility and hearing.  And -- as well as

17    to limit it to -- and with those limitations, to ask the County

18    to look for grievance responses; to ask the County to look for

19    elevator repair receipts.  Because I think that is more

20    narrowly tailored.  And I think would minimize the burden.

21         But what I would like you all to do -- because I --

22    this back and forth is not the most efficient way to deal with

23    it.  I don't know that you all ever had a chance to talk in

24    person about this.  I would be more than happy to give you time

25    to do that right now, if you would like.  And if you all can

1    agree on this, fine.  You know generally what I'm thinking.

2    But, also, I'll allow you an opportunity -- particularly for

3    Ms. Coleman and Ms. Pappy -- to give that some thought.

4    Because I -- I am taking your comments as -- about the burden.

5    And I think I am mitigating that appropriately.  But if you

6    disagree, I want to know.  If this is still extraordinarily

7    burdensome and you want to tell me why, I'm happy to hear from

8    you on that.

9            But I do think it would be helpful for -- if there's

10   going to be any, you know, agreement on this, to let you all

11   talk about it.  And then we can -- you know, I am probably

12   going take this under submission and issue a final ruling with

13   the text of the RFPs and the other documents.  So --

14           ATTORNEY PAPPY:  Can I ask a question?

15           THE COURT:  Sure.

16           ATTORNEY PAPPY:  I want to make sure what we're going

17   outside to talk about.

18           You want us to talk about grievances?  Or are those

19   off the table?

20           THE COURT:  No, grievances are not off the table.

21           What I'm considering doing, Ms. Pappy, is for when --

22   policies and procedures, I think everyone is on the same page

23   on.  It's not too burdensome, and they're entitled to that.

24   What we're talking about are practices.

25           And I -- I am inclined to agree with the County that

1   all practices for all of the jails -- even from 2021 to the

2   present, is going to be extraordinarily burdensome, from what

3   you've described to me of the JIMS system and with the repair

4   receipts for elevators.

5           And what I am talking about doing is limiting

6   documents relating to practices to the Central jail for the

7   time period requested by the plaintiffs and limiting it to

8   mobility and hearing disabilities.

9           To really provide the County with something that it

10  can hopefully provide to the plaintiffs in a -- in a shorter

11  period of time.  And what would be really helpful to me,

12  frankly, is I'm happy to do my best to rewrite the RFPs.  But

13  it would be -- it would --

14          UNIDENTIFIED SPEAKER:  That would be great, your

15  Honor.

16          THE COURT:  And I'll probably do something that

17  nobody likes, and it's going to have mistakes in it.

18          UNIDENTIFIED SPEAKER:  Can we file objections?

19          THE COURT:  Right.  So -- yeah, and, no, we're going

20  to figure this out.  And we're going to get rolling on this

21  case, to the extent we can; understanding there's a motion to

22  dismiss pending.  But that's something I would like you all to

23  talk about.

24          It can be for five minutes, it can be for ten

25  minutes.  And if there's something you all want to put on the

 1   record about that, fine.  I know you've got other issues we

 2   want to reach with respect to the -- how the inspections are

 3   going to work and how the -- the 30(b)(6) deposition is going

 4   to be conducted.  I actually think we could move through that

 5   relatively quickly, given what we've discussed today.  And then

 6   I really do want to hear your thoughts on how we should move

 7   forward with this case.

 8            I obviously -- there's a lot happening with the

 9   motions that are under submission, and I want to save time for

10   that.

11            I've blocked out until 11:00 a.m., so I think that

12   will give us time to deal with this, and I appreciate you all

13   putting the time and thought into this.

14            So if you think it's going to be a waste of time to

15   talk outside, tell me.  That would be disappointing to me.  If

16   I were to hear that, I don't think it would be good.  But tell

17   me if you think that's -- we're all in agreement, you don't

18   need to talk, fine.

19            What do you want to do, Ms. Grunfeld?

20            ATTORNEY GRUNFELD:  We're happy to talk outside.

21            ATTORNEY PAPPY:  Yeah, absolutely.  I think it will

22   be get us organized when we come back in, if nothing else.

23            THE COURT:  Okay.  Why don't we do that.  I'm going

24   to -- tell you what.  It's 10:16.  Why don't we come back in at

25   10:30.  Tell me where you are.  And then I'm going to talk

 1   about the 30(b)(6) deposition.

 2         I want to talk about the inspections and how that

 3   will work, in particular in light of -- if I'm going to be

 4   limiting the documents to -- for practices to men's Central

 5   jail -- I don't know if that changes your thinking,

 6   Ms. Grunfeld, as to the order in which you want to do the

 7   inspections.

 8         I do want to talk through with you all -- if we're

 9   going to do the inspections -- how that would work at the

10   facilities where detainees are being held.

11         I hear defendants' concerns about doing informal

12   interviews.  I'm going to give you a chance to be heard on

13   that.  I'm not on board with that, at this point, but I want to

14   hear what you have to say, Ms. Grunfeld.

15         And then I wanted to talk about, more generally, how

16   we're going to move forward with the ADA issues, and -- and

17   others.

18         So with that being said, let's come back at 10:30, if

19   we could, and we'll keep moving.

20         ATTORNEY GRUNFELD:  Thank you, your Honor.

21         (Recess taken.)

22         (Resuming at 10:32 a.m.)

23         THE COURT:  All right.  So, Ms. Grunfeld, have you

24   guys figured everything out?

25         ATTORNEY GRUNFELD:  Unfortunately not, your Honor.

1            THE COURT:  Okay.

2            ATTORNEY GRUNFELD:  We tried, though.

3            THE COURT:  All right.  Fair enough.

4            Then what --

5            UNIDENTIFIED SPEAKER:  The main thing we're still

6    disagreeing, your Honor -- I'm sorry to interrupt.

7            THE COURT:  That's okay.

8            ATTORNEY GRUNFELD:  Is the definition of documents

9    and it being overly broad.  And we suggest that maybe if they

10   want to pick a document or two out of there for certain things,

11   perhaps we could meet and confer about that.

12           But the way that it's currently phrased is extremely

13   broad.

14           THE COURT:  Okay.  Then, Ms. Grunfeld, just so I can

15   make sure I've got this correct, tell me, again, the five RFPs

16   for which you are -- that you are asking me to add back in

17   using your numbering in -- in the red-line document.

18           ATTORNEY GRUNFELD:  Thank you, your Honor.  Number

19   one, number six, number eight, number ten, and number 11.

20           THE COURT:  All right.  Look, I'm going to go through

21   and -- and decide which of these I'm going to authorize and

22   rewrite them.  I don't know that that's going to ultimately be

23   the most efficient way to do this.  It may not be what either

24   party ends up agreeing with.  But that's not a problem for me.

25           I will tell you that you can expect that if I'm doing

1   that, it will be limited to -- limited in a manner that I

2   described.

3           And does anybody want to be heard generally on that?

4   When I say "limited manner I describe," limited to the Central

5   jail and Rock Mountain; limited to mobility and hearing; and

6   then -- well, limited in the manner that Ms. Grunfeld explained

7   for practices from January 1, 2021, to the present.  So

8   essentially two years' worth of documents.

9           ATTORNEY GRUNFELD:  And, your Honor, I would submit

10  that our definition of "documents," seen in that light, all of

11  those limit -- limitations, all of that funneling should not be

12  onerous.  They should be complying with the ADA, and there

13  should be documentation of what they're doing when their

14  facilities are not sufficient to meet the needs of our clients.

15          And I would particularly refer the Court to

16  Mr. Bennett's declaration in opposition to summary judgment,

17  where he made assertions about the ADA modules at Central jail.

18  And those assertions are surely not based on personal knowledge

19  but, rather, on documentation.  Because no one person can be

20  standing or sitting in a jail all day long.   Instead, these are

21  facilities.  They're institutions.  They're run with logs,

22  documents, memoranda, directives.  Policies and practices are

23  implemented.  Grievances are filed.  People respond to

24  grievances.  That is the kind of documentation that we need to

25  determine if Mr. Bennett's assertions of how the jail is

1   accommodating our clients in realtime, currently, are in fact

2   occurring.  It is not merely a matter of what the physical

3   toilet looks like.  We do want to see that, and we want to see

4   the showers, and we want to see the cells, and we want to count

5   them.  But we also want to know what is happening day-to-day

6   with respect to our client's needs.

7           We made some very serious allegations in our

8   preliminary injunction motion of unmet needs, denials of

9   disability accommodations.  And those are -- I think, with the

10  limitations within the past two years, there should be

11  documents.  And if there are not documents, the response to the

12  document request is "no documents exist."

13          THE COURT:  I assume you disagree with much of that,

14  Ms. Coleman; Ms. Pappy?

15          ATTORNEY PAPPY:  Yes and no.

16          THE COURT:  Okay.  Go ahead.  Tell me what you don't

17  disagree with.  And then let's move on to the other issues.

18          ATTORNEY PAPPY:  Yes, absolutely.

19          What I -- what this -- what this hearing is about is

20  what do they need to determine, for preliminary injunction on

21  an expedited basis, should I file an injunction?  And what

22  should I file it on?  So what are the conditions today?

23          And I'm going to look at 7 -- number 7 and 8

24  specifically and with regard to the overbroad definition of

25  documents.

1          You know, all documents relating to the accessibility

2     of housing units utilized by incarcerated persons with

3     disabilities, including but not limited to accessibility of

4     beds, desks, toilets, et cetera.

5          When you do a physical inspection, you will see, is

6     it right?  Is it wrong?  Is it somewhere in between?  And so

7     the notion that the County should -- I don't even know how to

8     interpret this.  But if you use the word "documents, audits,

9     memos, notes," other -- to me -- superfluous pieces of paper

10    that do not say this bed is the right width from this desk.

11    This desk has -- or it does not have a chair impeding forward

12    access to that desk.

13         That's what -- my objection to the word "document"

14    throughout.  We've addressed it in a lot of our conversation

15    earlier.  But that really is sort of where we agree and

16    disagree as policies and procedures; what's going on today, no

17    objection.

18         But all of this backup documentation to figure out

19    Mr. -- with -- whether Mr. Bennett was lying or not, you're

20    going to figure it out because you're going to be standing

21    there looking at it.

22         THE COURT:  Okay.  Got it.

23         All right.  Let's talk about the 30(b)(6) and the

24    inspections.

25         So probably makes sense to -- we're talking about the

1    inspections.  What -- what guidance do you need from me,

2    Ms. Grunfeld and Ms. Coleman and Ms. Pappy, on how -- how this

3    should shake out?  Is it -- with the inspections, is it the

4    date?  The timing?  What are the ground rules?  What -- what

5    are the areas of disagreement right now with respect to the

6    inspections?

7            ATTORNEY GRUNFELD:  Well, your Honor, I did red line

8    the requests for inspection significantly.

9            And all we did want, that the Court had not agreed

10   to, was something telling us how many people with disabilities

11   are housed in a particular facility on a particular day.

12           Again, the Court is limiting this to Central, at this

13   time.  So I don't know what the reaction of the defense would

14   be to this -- this narrowed version of the inspection and the

15   document requests.

16           I did send a letter about Rock Mountain, asking to

17   see certain parts of it; asking that my expert can bring her

18   CASp -- second CASp, to make it go more quickly; asking about

19   equipment she could bring.  And I got an email back saying your

20   letter is inappropriate and will be ignored.

21           So I'm happy to pass up my letter and the response to

22   it.  But it's -- it's unclear to me what we're going to be

23   allowed to see and do on the inspections.  But I -- I hope we

24   can get past that.  And we do have a date for Rock Mountain.

25           THE COURT:  All right.  So some of what we're talking

 1   about right now -- you know, roster of incarcerated people --

 2   doesn't apply to Rock Mountain.

 3             ATTORNEY GRUNFELD:  Correct, yes.

 4             THE COURT:  It's going to apply to --

 5             ATTORNEY GRUNFELD:  Of course.  Yeah.

 6             THE COURT:  -- Central and the other ones.

 7             So understanding that, let me -- let me turn to the

 8   defense.

 9             With respect to the instructions -- and in the

10   red-lined copy, or the red-lined document I should say, "A"

11   seeks for a map of a facility to be inspected, including

12   identifying housing units.

13             Do you object to that Ms. Pappy and Ms. Coleman?

14             ATTORNEY PAPPY:  Do not.  If -- if we have a map,

15   they can have one.  We usually have floor plans.

16             THE COURT:  A roster --

17             ATTORNEY GRUNFELD:  Is floor plans -- should we add

18   that?  Or is that going to be what you give?  In other words,

19   map and/or floor plans?  Should we change it?

20             THE COURT:  I assume map --

21             ATTORNEY PAPPY:  I will -- I will represent to the

22   Court that I will use the word "map" exclusively.

23             THE COURT:  Okoay.  And do you have a floor plan --

24   and, again, to the extent that was not raised -- I realize

25   there's a protective order.  To the extent there are any

61

```
 1  particular security concerns, you can bring those to my
 2  attention.  If there's something that you believe in good faith
 3  must be redacted for security concerns -- and that can't even
 4  be shown to plaintiffs' counsel -- you can raise that with me.
 5  That may or may not be a concern.  I don't want to create
 6  issues where there are none.  But --
 7           ATTORNEY PAPPY:  Sure.  Thank you.
 8           THE COURT:  All right.
 9           ATTORNEY PAPPY:  Do you want me to just go through
10  these?
11           THE COURT:  Well, I have a question.
12           ATTORNEY PAPPY:  Okay.
13           THE COURT:  I assume you're objecting to "B,"
14  every -- roster of everyone incarcerated at the facility?
15           ATTORNEY PAPPY:  Yes.
16           THE COURT:  So, Ms. Grunfeld --
17           ATTORNEY GRUNFELD:  I said it with disabilities, your
18  Honor.
19           THE COURT:  No, I understand that.
20           ATTORNEY GRUNFELD:  Including their housing
21  assignments.  And they can take the names off, if they want.
22  But we have to know -- if the facility has three ADA beds and
23  30 people in wheelchairs, they should know that, and we would
24  like to know that so we can understand whether it's
25  accommodating our clients.
```

1           And if -- and for those people, what are they doing

2    as a workaround?  It's not as simple as here's the one ADA cell

3    and it's perfect or not perfect.  It's how do people move

4    around and live in these facilities, compliant with the ADA?

5           So, of course, the names can be redacted if that's

6    requested.  But there should be a tracking system to

7    understand.  And, again, this is going to be limited to hearing

8    and mobility.

9           THE COURT:  No, I understand.

10          "And for each incarcerated person with one of those

11   disabilities, include all information about their disability

12   and any accommodations that are being provided."

13          Let me ask this.  Is -- is a Rule 34 request for

14   inspection the right way to go about this one?  And that's a

15   question.  I'm not telling you you're wrong.  I really -- this

16   seems to be more of an interrogatory.  But if you think

17   that's -- it's a permissible request for inspection -- you

18   know, sort of subtopic -- I'm happy to hear from you on that.

19          ATTORNEY GRUNFELD:  Well, your Honor, again, I'm

20   hoping, when I go into the facility to learn how many people

21   with these disabilities are housed in that particular unit, you

22   know, if the Court wanted to narrow that second part of it,

23   that would be understandable in this situation.

24          But does this person use a cane, crutches?  For

25   example, in a -- the County has been criticized for putting

1    three people in two-people cells.  The Bureau of Standards and

2    Correctional Services has issued audits on that.  If you're in

3    a wheelchair or you have a walker and you're in with two other

4    guys in a cell, that's a problem.

5            So it's going to make it harder to comply because

6    there's no room for those things to move around in the cell,

7    and it's also problematic for the other cellees.

8            So perhaps we could take "B," and just do the first

9    half of it.  But it -- it would be very helpful, upon entering

10   the facility -- an interrogatory would not tell us what we're

11   seeing there because it would be 30 to 40 days old.

12           THE COURT:  No, I understand.

13           ATTORNEY GRUNFELD:  So we're trying to make the

14   inspections as meaningful as possible.  And, again, I'm saying

15   "inspection," because I understand the Court to be saying we're

16   going to go to Central only at this time.

17           So -- as far as occupied, I mean, there will be no

18   roster at Rock Mountain.

19           THE COURT:  Right.  And I -- I have not made the

20   determination as to inspections of other facilities.  Now,

21   whether you decide that's not going to be worth it for you

22   because you need all of the other documents in order to perform

23   a meaningful inspection is a related question.

24           But I wanted to hear from you all as to whether you

25   still want to go forward with your plan for inspections of

 1    the -- of the occupied facilities as well.

 2           But before we get to that, Ms. Grunfeld -- from the

 3    defense, what's your position on item 8?

 4           ATTORNEY PAPPY:  Yes, your Honor.  I agree with the

 5    Court's sense that it is not a proper inclusion in -- in an

 6    inspection request.  And the inspection request is look at the

 7    physical -- whatever it is you're looking at.  I -- I do not

 8    want people's names disclosed.

 9           THE COURT:  Sure.

10           ATTORNEY PAPPY:  I -- they don't need this before

11    they do the inspection.  It's not going to change how many ADA

12    beds exist or don't exist.

13           But I do actually understand the notion that they

14    want to know how many mobility disabled individuals are housed

15    in that.

16           THE COURT:  Right.

17           ATTORNEY PAPPY:  And that's a pretty unintrusive just

18    tell us how many people and what their mobility devices

19    request.  I don't have a problem with that, but not in the

20    context of this inspection.

21           THE COURT:  But if I'm Ms. Grunfeld, I want to know

22    if there are two people with mobility issues that are housed in

23    this particular cell.  And during inspection, I'm walking out

24    and there's this particular cell.  And it's three-tier bunk

25    bed, for example.  What -- you know, not giving out the names.

1    But why shouldn't the plaintiffs have that information, to say

2    to Judge Battaglia, "Hey, look, you've got people with mobility

3    issues that are in a three-tier bunk?"  That's where I

4    understand where the plaintiffs are coming from.

5            ATTORNEY PAPPY:  Understood.  And what I should have

6    also said is the way the information is listed, it includes

7    their housing assignment.

8            THE COURT:  Okay.

9            ATTORNEY PAPPY:  And there's nobody in three bunks

10   anywhere in the facility.  But, yeah.

11           THE COURT:  Okay.

12           ATTORNEY COLEMAN:  But, your Honor, there's a

13   difference between providing lists of ADA people on a certain

14   date and where they're housed, to doing it on the day of the

15   inspection.  And then they want to go look and peer into those

16   cells and see, you know, what the actual situation is of that

17   date; which changes daily.  And there's a lot of turnover in

18   the facility.

19           So, you know, I don't know --

20           THE COURT:  I get it, Ms. Coleman.  And you're right

21   that this information may need to be updated the day of.  And

22   it's one of the reasons why I really do think this might make

23   sense to begin with Central and -- and go from there.

24           But I hear what you're saying.  It is -- it is a

25   fluid facility, in terms of who's being housed and where

1   they're being housed.

2           ATTORNEY PAPPY:  You know, one very important thing I

3   forgot to say is one thing that the plaintiffs need to

4   understand is the County is not going to let -- not Ms. Coleman

5   and I -- is not going to let them into an area where there are

6   detainees.  These are open.  The detainees have freedom of

7   movement there.  And so they're -- for security reasons, they

8   can't just walk into a housing module; they call them.  They

9   can't just walk -- it's a pie shape.  They can't just walk into

10  a module where there are detainees.

11          There are some that are not used, and they can see

12  those.  And so at least as to Central, I believe with regard to

13  the old facility, the GEO facility, we actually had to do it on

14  different days.  But we can't allow -- they can't allow all of

15  us in there for security reasons.

16          So I just don't want the Court left with the image

17  that there's going -- we're going to walk by these closed jail

18  cell doors and be staring at people in their cells.

19          THE COURT:  I understand that.  And I don't have

20  enough information, right now, to come up with anything

21  reasonable in terms of how exactly this is going to happen.

22          ATTORNEY PAPPY:  Sure.

23          THE COURT:  Because it's based on security terms that

24  I don't know about.  Maybe the counsel do or not.

25          If there are issues with the inspection and

```
 1    Ms. Grunfeld believes that they have been denied access to a

 2    portion of the Central jail, and they really should have --

 3    it's important to their preliminary injunction motion, and you

 4    should have let them in, we can address that separately.  But

 5    at least in terms of --

 6              ATTORNEY PAPPY:  Yes.

 7              THE COURT:  -- that type of security concern, I don't

 8    think I'm in a position to address it prior to the inspection.

 9              Ms. Grunfeld, if you want to be heard on that, I

10    would be happy to.

11              ATTORNEY GRUNFELD:  I would, your Honor.

12              First of all, I would invite the Court to come with

13    us to Central jail.  It's not far from here.  And I was very

14    fortunate to clerk for Jack Weinstein, who did institutional

15    reform litigation.  And he liked to go on field trips and see

16    what it is he's being asked to look at.  So I hope the Court

17    would consider going with us.

18              As far as seeing areas where there are detained

19    individuals, I have done this many, many times.  It's perfectly

20    safe.  And I don't understand how they're going to assess the

21    ADA compliance of the jail if we don't see where the people are

22    living.  I -- I -- I've never heard of that.

23              I mean, of course, we -- we don't spend hours there.

24    But we need to be able to walk around with our expert and look

25    at the cells that are actually being used for our clients.
```

68

1          UNIDENTIFIED SPEAKER:  I'm hearing this and

2   understanding this for the first time at this moment.

3          THE COURT:  And then this is not -- you know, sitting

4   here this morning, this is not going to be the best place to

5   ultimately resolve this issue, I believe, Ms. Grunfeld.

6          At the outset, I'm not inclined to join you for the

7   initial inspection, but I won't foreclose that in the future,

8   if the parties believe that would be helpful.

9          But I -- I would say that -- understanding your

10  concerns and your understanding of the defense concerns, I am

11  hopeful that the initial inspection of -- or the inspection of

12  the Central jail would be productive.  But if you believe that

13  it's not -- I think this isn't going to be a situation where,

14  you know, I'm going to get on the phone and order the jail to

15  do something that there are security concerns.

16          I'll need to hear from you all about it and resolve

17  it.  And to the extent we need to have, you know, a formal

18  hearing on it, we can do that.  I'm hopeful -- I'm hopeful you

19  won't.  And I don't want to create a problem where one doesn't

20  exist right yet, Ms. Grunfeld.  But I am sensitive to some of

21  the security concerns, and I would want to have a better

22  understanding of that before I make any ruling.  I'm not going

23  to do it on the fly today.  I understand nobody's asking me to.

24          I hear where you're coming from.  You want to see

25  where things are.  I understand what the defense is saying

1    about the need for institutional security.

2              We'll leave it at that for now, understanding that,

3    you know, what the defense is going to be doing is providing

4    plaintiffs -- counsel and your expert -- with access in the

5    spirit of allowing your expert to truly evaluate ADA issues at

6    the Central facility.  And not utilizing security to try to

7    hamstring the inspection.  I don't get a sense that is what

8    Ms. Pappy and Ms. Coleman are talking about.  But we'll have to

9    see what happens at the inspection and then go from there, if

10   there are disagreements between the parties.

11             So with -- with that being said, it sounds to me,

12   Ms. Pappy, that for item 1B, you -- the County does not object

13   to a roster that's redacted by name.  Understanding that it may

14   not be 100 percent accurate the day that the inspection takes

15   place?

16             ATTORNEY PAPPY:  Yes.  Correct, your Honor.

17             Do we -- your Honor, I don't -- I mean, is this a

18   document production request?  Or is it a --

19             THE COURT:  Well, that's why I asked.  It sounds like

20   it is going to be --

21             Do you want these documents -- at least the roster --

22   20 days before the inspection, Ms. Grunfeld?

23             ATTORNEY GRUNFELD:  We said at least ten days and,

24   you know, I mean --

25             THE COURT:  What I'm hearing Ms. Coleman saying,

1    given that this is a pretrial facility, that people could be in

2    one area one day, and another area another day.

3              Is that what you -- do you -- did you --

4              ATTORNEY GRUNFELD:  Well, we could take it the day

5    of, sure.

6              ATTORNEY PAPPY:  I don't know if I can generate it

7    the day of.

8              THE COURT:  Right.  I think that with that one,

9    within a reasonable period of time closer to the inspection

10   date.  I don't know that you want it 20 days beforehand,

11   Ms. Grunfeld.

12             ATTORNEY GRUNFELD:  Thank you, your Honor.

13             THE COURT:  And then I -- I have to tell you,

14   Ms. Grunfeld, as I'm looking at the remainder of yours and

15   their -- as -- using your number, it's C through G.  I mean,

16   these read to me like additional requests for production, which

17   I think they are.

18             And I -- it would strike me these are either

19   duplicative of or go beyond the scope of what I'm prepared to

20   authorize for expedited discovery.  And that with the exception

21   of the map, floor plan of the facility -- which is A -- and a

22   roster of the people with the disabilities -- which is B --

23   that other document requests should be in the RFPs.

24             Do you disagree with that?

25             ATTORNEY GRUNFELD:  I believe that these would be

1    highly relevant.  But I understand the Court's limitation.

2              I would direct the Court to -- unfortunately, there

3    are no page numbers.  F, new F.  We're looking for information

4    about where the programs are offered, when we go there.

5              So if they have a -- some kind of -- in other words,

6    we had a list of all of the program services and activities

7    that are offered in the system.  But we would like something to

8    help guide us, to see where at Central -- again, we're talking

9    about Central now.  Where these programs are.

10             THE COURT:  Okay.

11             ATTORNEY GRUNFELD:  So that one, I think, is

12   critical.

13             THE COURT:  How do you -- Ms. Pappy and Ms. Coleman,

14   how do you see this happening?

15             Because -- you don't -- this -- this may be answered

16   by the fact that perhaps someone is going to be in charge of

17   this group and is going to be, you know -- I mean, the phrase

18   tour management is in here.  That sounds a bit euphemistic for

19   what this is.  But in all seriousness, like, this is what it

20   is.  And so leading the group and explaining where they --

21   where they are.  Not necessarily answering questions to be

22   deposed informally but at least -- I hear what Ms. Grunfeld is

23   saying.

24             And you don't want plaintiffs' counsel and their

25   experts sort of just wandering ad hoc around the Central jail

1    either.  This seems to me that there's some middle ground here

2    to provide some structure to the inspection for the benefit of

3    both parties.

4          So how do you see this happening?  And I want to hear

5    from Ms. Grunfeld about that as well.

6          ATTORNEY PAPPY:  Yes, absolutely.

7          So the way that I normally -- I guess, if I'm in

8    charge -- conduct these is we are -- we are always led by

9    somebody from the facility, a corrections officer.  And start

10   at intake.  Literally, the person drives into the facility.

11   And at Central, it's an under -- a covered -- covered area.

12   And then walk them through.

13         And I'm using my hands, going this way, because

14   that's the way it works at Central.  And then they go to

15   holding, and then they go to booking, and then they get

16   handprinted.  And then walk up -- walk them the way that the

17   detainee would go through the system to then get to holding, to

18   then get to housing.

19         Now, what I would envision and what I -- you know,

20   what Ms. Grunfeld put in that letter was, to me, a tag on -- an

21   inappropriate tag onto the request itself.

22         But if Ms. Grunfeld or the expert says -- because

23   Ms. Coleman will actually be accompanying -- where do they hold

24   the religious services?

25         Ms. Coleman is going to answer the question.

```
 1                Where are the --

 2                ATTORNEY COLEMAN:  In the chapel.

 3                ATTORNEY PAPPY:  Yeah.  Where are the substance

 4      abuse?  The AA meetings?

 5                They're held over there.

 6                That information free flow but through counsel.

 7                And if Susan has to ask the -- the corrections

 8      officer that we're with, fine.  I mean, that -- that's informal

 9      to me.  But that's the way I've done them always.  That's the

10      way I plan to do it this time.

11                THE COURT:  What do you think, Ms. Grunfeld?  Would

12      that address your concerns about knowing sort of what you're

13      seeing and where it is in relation to other things, to have

14      those communications go through Ms. Coleman?  Understanding

15      that people are going to need to act in good faith and answer

16      the questions to the best that they can, if they're

17      appropriate.  And it sounds like -- this sounds about right to

18      me, but I want to hear from you; if there's anything else that

19      we should be talking about today on that.

20                ATTORNEY GRUNFELD:  Sure, your Honor.  But, again, if

21      there is a document that says this is the religious room or

22      this is the classroom and they have it there, I would like to

23      see it, as opposed to just oral.  But perhaps I'll be getting

24      it in the document production.

25                THE COURT:  Well, you are going to be getting the
```

1    floor plan and the map of the facility that Ms. Pappy has

2    agreed to give you.

3            I -- understood.  I think for right now I'll leave it

4    at this.  That sounds like a reasonable procedure.  I am sure

5    Ms. Coleman is going to work with you, to the extent she can

6    provide information.  She's going to ask the officer who's

7    accompanying to provide it.

8            And that way there's not an issue if someone's going

9    to be -- you know, that there's not going to be a declaration,

10   later, about officer so-and-so told me whatever.  Which might

11   inhibit the free flow of information that I think you need for

12   purposes of your preliminary injunction motion and a full

13   inspection.  So I think that sounds like a reasonable

14   procedure, just with those very rough guideposts.

15           Obviously, if something comes up and there is

16   something that you just cannot agree on during the inspection,

17   you can reach out to my chambers.  That is going to be -- I

18   hope that will be used only if necessary because I'm -- I don't

19   want to be in a position of ruling on the fly about security

20   concerns.  And I'm probably not going to.

21           My default will be that if there's an issue of

22   security, we're going to talk it through first.  And if that

23   requires a second inspection because I disagree with the

24   defense, then so be it.  But to the extent there's something

25   that we can -- need to talk about, okay.  But I think this

75

1    procedure will hopefully eliminate the need for that.

2           ATTORNEY COLEMAN:  Thank you, your Honor.

3           And, yeah, the first inspection is Rock Mountain, and

4    we've agreed on a date of February 10th for that.

5           So, you know, that will be the -- the starting point.

6    And then we'll figure out a date for CJ after the production of

7    documents.

8           THE COURT:  Since Rock Mountain is not occupied, is

9    there -- as far as you're aware, are there any issues with

10   respect to plaintiffs' access to the facility?  I mean --

11          ATTORNEY COLEMAN:  No.  Except that I should add we

12   believe the access should be limited to areas that detainees

13   would occupy.

14          So, for example, they don't need to see the staff

15   locker rooms or the place where body-worn cameras are going to

16   be maintained and charged and -- and backed up; or control

17   panel rooms, for example.

18          So, really, the areas the detainees would access, I

19   believe, should be the focus.

20          THE COURT:  Is that correct, Ms. Grunfeld?

21          ATTORNEY GRUNFELD:  Yes, your Honor.

22          And I sent a letter, which I would be happy to share

23   with the Court, describing exactly where our expert would like

24   to go.  And it did not say body-worn camera rooms, or anything

25   like that.

1          THE COURT:  I figured you were being reasonable.

2          ATTORNEY COLEMAN:  And the reason we objected to the

3   letter that the plaintiffs' counsel raised earlier is because

4   she again -- even though the Court had indicated and we had

5   indicated, weren't going to allow interviews of staffing and

6   detainees or observing medical visits, for example -- they --

7   they added that fact into the process of the letter.

8          ATTORNEY GRUNFELD:  I respectfully disagree, your

9   Honor.

10          THE COURT:  I get it.  I -- honestly, this -- this

11   sounds to me like a situation where a phone call would have

12   resolved the issue.  And I understand the need to memorialize

13   things and be appropriate in your documentation.  But, I mean,

14   like -- look.  I -- I hope you all are talking.  I really do.

15   I have just nothing more than this sense that communication

16   could be better.  And I hope I'm wrong.  I'm wrong about a lot

17   of stuff.  But hopefully I'm wrong about that too.

18          But, honestly, I mean, the way we are going to get

19   through these inspections is by -- is by talking it through.

20   And I get the need for letters and emails, but I -- I just hope

21   you all can talk through this stuff in a reasonable way, and

22   raise whatever disputes you need with me, where you need it.

23          But, I mean, I am going to be looking at everyone to

24   handle a challenging case in which there are serious issues;

25   some of which are, you know, in the news.  And some of which

1    are emotionally charged.  I fully get that.  And accommodate

2    each other with every possible professional courtesy, to which

3    you both are entitled -- or all are entitled.

4              So with that being said, February 10th is Rock

5    Mountain.  I don't think there's more we need to talk about

6    with respect to Rock Mountain.  It's not occupied.

7              When -- when are you planning for -- like, would the

8    next one be Central?  And, if so, when do you think that would

9    be?  Do we need to set a date?  Or is that something you all

10   want to talk about --

11             UNIDENTIFIED SPEAKER:  No.  I think the parties can

12   confer about that, your Honor.  But they had asked for it to be

13   15 days after the document production.

14             So I -- you know, that may be a little close to the

15   document production, if they want to absorb all of that.

16             But -- and the timing of the PMK is pretty close, as

17   well.  So I thought maybe we could confer about that.

18             THE COURT:  What's your proposed order, Ms. Grunfeld?

19             And do you -- I think what would be make sense is for

20   the parties to meet and confer and then agree on a proposed

21   schedule for this.  And then you can -- I would invite you to

22   submit a joint report, so that when I do issue, you know, the

23   order with the allowed, you know, PMK topic and document

24   requests and inspection guidelines, that can I incorporate what

25   you -- what you agreed on.

1          ATTORNEY GRUNFELD:  Thank you, your Honor.  I did

2     submit a proposed order.  I said that inspections shall

3     commence on dates to be mutually agreed upon, within 45 to 60

4     days of electronic service of the request.  With the exception

5     of Rock Mountain, which is already set for February 10.

6          THE COURT:  And then you still want responsive

7     documents produced ten days prior to the Rock Mountain

8     inspection?

9          ATTORNEY GRUNFELD:  Actually, your Honor, we asked

10    that responses and documents to the document requests would be

11    30 days after service of the request.  That was in the proposed

12    order.

13         THE COURT:  I'm reading from the proposed order.

14         I meant responsive documents related to Rock Mountain

15    shall be produced ten days prior to the inspection.

16         I'm looking at page 2, lines 18 and 19.

17         ATTORNEY GRUNFELD:  Yes.  Yes.  Thank you, your

18    Honor.  Yes.

19         THE COURT:  Okay.  What about that timing, from the

20    defense perspective; Ms. Coleman, Ms. Pappy?

21         ATTORNEY PAPPY:  When you're talking about production

22    of documents on page 2 -- hang on.

23         THE COURT:  Sure.

24         ATTORNEY PAPPY:  All right.  Are you talking about

25    the production of documents in the inspection request or in the

 1    document production request?

 2              THE COURT:  I think we're talking -- that's a fair

 3    question.  Responses to the requests for production would be

 4    due within 30 days of the service of the requests, or frankly,

 5    issuance of the order that has them attached.

 6              ATTORNEY PAPPY:  Yes.

 7              THE COURT:  Responsive documents related particularly

 8    to Rock Mountain, I don't know that they're going to be --

 9    other than the floor plan --

10              ATTORNEY PAPPY:  Yeah.

11              THE COURT:  -- or the map, that would be within ten

12    days or sooner, if you could do it.

13              With respect to Central, it would be the map, slash,

14    floor plan, as well as the list of incarcerated persons with

15    disabilities --

16              ATTORNEY PAPPY:  Okay.

17              THE COURT:  -- redacted.

18              ATTORNEY PAPPY:  So that doesn't --

19              THE COURT:  That would be the ten days.

20              ATTORNEY PAPPY:  Yeah.  That works as to Rock

21    Mountain because there's no list of incarcerated people.

22              And then -- you know, we'll just start working on how

23    we're going to come up with that incarcerated people list for

24    Central, so we're ready to go when that inspection is

25    scheduled.

1          THE COURT:  So here's what I would ask you all to do.

2     I would ask you all to meet and confer and just -- with

3     respect -- I would like for you all to provide me with the

4     language that I should use on page 2, the paragraph beginning

5     on line 12, about -- about the timing.

6          And I want input from the defense on the timing for

7     the production.  I understand that Rock Mountain is set for

8     February 10th.  It would be good to have in that filing when --

9     a date for the inspection of Central, as well.  And I would

10    plan to issue the order with the attachments following receipt

11    of that information.

12          ATTORNEY GRUNFELD:  Okay.  Okay, your Honor.

13          So it seems to me that I should send the revised --

14    the Word versions of the revised document requests.

15          THE COURT:  Yes, please.

16          ATTORNEY GRUNFELD:  And then the other thing is, of

17    course, I understand that typically document requests -- one

18    responds, and then there's a few days until the documents are

19    produced.  But this is expedited discovery, which is why we

20    said 30 days from service.  Because we have electronic service

21    in the case.

22          Is the Court -- I'm not sure what the Court's asking

23    us to meet and confer about.

24          THE COURT:  Sure.

25          ATTORNEY GRUNFELD:  I mean, they would probably not

 1   agree to that.  But -- 30 days.  So -- is that the question?

 2             THE COURT:  No.  That's what I'm asking you to talk

 3   about.

 4             So with respect to the timing that is in that

 5   paragraph on page 2 of your proposed order, what I want to know

 6   is from both parties -- I would like you all -- you've got to

 7   be able to figure this out between yourselves, understanding

 8   you've got the February 10th date for the inspection of Rock

 9   Mountain.  What -- what should be the schedule for -- by what

10   date are the defendants going to produce documents in response

11   to the requests for production?  On what date are the

12   defendants going to produce the floor plan for Rock Mountain?

13   I mean, on what date are they going to produce the floor plan

14   and the roster for Central?

15             That's something where I really want you all to talk

16   about that and figure that out and tell me.  And I will

17   incorporate that into the proposed order.

18             And, yes, Ms. Grunfeld, I would like you to please

19   submit the requests for production and the -- the inspection --

20   well --

21             ATTORNEY GRUNFELD:  There were three.

22             THE COURT:  I would like you to submit all three

23   into -- to my chambers.  E-file, email address, copy defense

24   counsel.

25             ATTORNEY GRUNFELD:  Of course.

1          THE COURT:  And we will issue an order that will

2     probably be a single order with everything in it.

3          ATTORNEY GRUNFELD:  Okay.  So, your Honor, the date

4     for Central will depend presumably on the experts.  So does the

5     Court want that information today?  Or --

6          THE COURT:  No, I would like you to talk to Ms. Pappy

7     and Ms. Coleman about it and -- and figure that out with them.

8     I would like you all to come up with a schedule.

9          And it could be that you tell me, hey, look, the --

10    the February 10th inspection of Rock Mountain should be pushed

11    a little bit later, based on the timing for the production of

12    documents.

13         But given you know what I'm likely to order with

14    respect to documents, I think you will be able to come up with

15    a realistic schedule that will work for everybody.

16         ATTORNEY GRUNFELD:  Thank you, your Honor.

17         THE COURT:  Sure.

18         And then I asked the question, Ms. Grunfeld, for you,

19    is what should we do after you inspect men's Central and Rock

20    Mountain?

21         I mean, I frankly thought that the defense request

22    to -- or proposal to have you all meet and confer about, you

23    know, ADA issues that your expert identifies, makes a lot of

24    sense, so that the defense can then look at them.  And maybe

25    they're going to agree with you on some or all of them; I don't

83

1    know.  But what should be the next step?  And should that

2    include inspections of the other facilities that you are

3    requesting?  Or do you want to take a pause after Rock Mountain

4    and Central?  Or do you not know yet?

5          ATTORNEY GRUNFELD:  Your Honor, first of all, I think

6    it's great that we're starting to address some of these issues.

7    And so let's look at Rock Mountain.  Let's look at Central.

8          If the Court wants us to come in for an ENE sometime

9    after those inspections, we would be happy to do so, and we're

10   happy to meet and confer beforehand.

11         But what we would like to see is a court-supervised

12   process for remediating ADA violations and not just physical

13   structures, which are important.  But also how the practices --

14   how are they accommodating our clients?

15         So, generally, we are open to an ENE.  We're open to

16   meet and confer.  And, yes, we would like to continue

17   inspecting throughout this period.  But I think it may be too

18   soon to set those up right now; the other four jails.

19         THE COURT:  Sure.  And -- and your language, "the

20   Court supervise" -- I mean, if it is an ENE, it is in the

21   nature of a settlement discussion where I am participating and

22   trying to help the parties reach an agreement.  As opposed to a

23   preliminary injunction, which is above my pay grade and would

24   be before Judge Battaglia; and that type of consent decree or

25   preliminary injunction.

84

1          I would be happy to work with you all on, you know,

2     settlement issues, to the extent we can -- I think, to the

3     extent we can pick sets of issues and work through them

4     together, I think that is going to be the way to proceed with

5     this case.

6          And so I would like you all to -- as part of your

7     meet-and-confer process, to discuss, you know, how -- how

8     should this happen?

9          I think the defense request was -- was a sensible one

10    for -- for -- before I jump into an ENE, to have -- what are

11    the disputed issues?  Because there may -- hopefully, you'll be

12    able to narrow some.  If there's an ADA issue that can be

13    corrected, it's going to be corrected.  You know, we don't need

14    to talk about it.  But tell me.  Tell me what you think we

15    should do.

16         And I think -- some of the other issues you all raise

17    about class certification and come -- you know, mutually

18    agreed-upon experts, I think that is -- the class certification

19    is going to be before Judge Battaglia.  I don't think that's

20    something we can address in an ENE.  But the underlying issues

21    themselves, we can.

22         And I -- I would like you all to talk about this

23    because I don't want to put you on the spot yet.  But it would

24    seem to me that the net -- in connection -- well, you -- on a

25    parallel track to the ADA violations, the issues that should be

1    addressed by the parties are the issues with respect to the

2    provision of medical, dental, and mental health care.  I mean,

3    I've heard a lot about -- is it NaphCare?

4              I mean, I don't know anything about it.  But this --

5    and you want more information, too.  Right, Ms. Grunfeld?

6    Because if there is truly going to -- has changed the way that

7    these services are provided in the jail, such that they are --

8    some of the issues that existed before no longer exist, then

9    let's get through the evidentiary support for that, that I

10   think you've been looking for.  And let's figure out,

11   discovery-wise, how that can go forward.  Because I also think

12   those are claims that are not as affected by the pending

13   motions to dismiss, as I -- as I read the defense motion.

14             ATTORNEY GRUNFELD:  That's right, your Honor.  The --

15   the first, second, and third causes of action are not subject

16   to motion to dismiss.  The third being ADA.

17             THE COURT:  Right.

18             ATTORNEY GRUNFELD:  Other than stating that it's a

19   shotgun pleading, which we respectfully disagree with.

20             THE COURT:  All right.  Is there anything -- well,

21   understanding that -- and, again, I -- I think you know sort of

22   my tentative thinking as to how we can work together to try to

23   resolve some of these issues and really figure out which issues

24   can't be resolved.  And you're going to need to pursue those

25   through summary judgment or trial.

1          What is a reasonable time period for you all to

2   submit a joint status report to me that would be limited to

3   the -- the issues on page 2 of the proposed order?  So your

4   timing for the document production and inspections involving

5   Rock Mountain and Central?

6          And I would also like to hear from you all on -- the

7   second big issue would be how should we start addressing the

8   other issues in the case?  Is it -- do you all -- do the

9   parties agree that we should focus on medical care, mental --

10  and mental healthcare?  Which, as I see it, involves -- you

11  know, screen -- the urinalysis screening that's happening at

12  the facilities now.  Track opioids and -- I want to know from

13  you all how -- how should we do this?

14         Because I really do feel like breaking this down into

15  component pieces is the way to go.  But I also don't want to

16  break it down into so many pieces that it ends up being less

17  efficient.  And I really could use your help on that.  And if

18  you could talk about it, we could figure -- I would like to see

19  what you have to say.

20         How long do you think that would -- how long do you

21  need for either or both of those issues, to give me something

22  in writing?

23         ATTORNEY GRUNFELD:  Your Honor, if we could focus on

24  the expedited discovery motion in one statement, we could get

25  it to you tomorrow.

1          THE COURT:  Okay.

2          ATTORNEY GRUNFELD:  Perhaps the other one we could do

3   next week.

4          THE COURT:  That's fine.  I mean, tomorrow is -- I

5   mean, if -- if that works for the defense.

6          Why don't we say by -- by Wednesday, if you all can

7   meet and confer on that.

8          Would that be okay, Ms. Pappy?

9          ATTORNEY PAPPY:  How about Friday?

10         I -- I am -- I have something all day tomorrow and

11  something all day Wednesday where I will be out of the office.

12  So I have no ability to look.

13         Thursday?

14         THE COURT:  Thursday would be fine.

15         ATTORNEY PAPPY:  Okay.

16         THE COURT:  And that would be only on the timing

17  issues for the --

18         ATTORNEY PAPPY:  Yes.

19         THE COURT:  -- proposed order.

20         And then if you all could -- I don't want to jam you

21  up unnecessarily.  I realize that the ADA is going to take a

22  lot of time and attention.  And if you need more time to really

23  figure out how you want to address the other issues in the

24  case, I'm fine with that.  I just want to have that in mind as

25  we're dealing with the ADA issues.

```
 1            ATTORNEY PAPPY:  I -- your Honor, I am -- I am going

 2   to volunteer myself.  I had some ideas of how to do it.  Full

 3   of great ideas.

 4            And I can send maybe a draft proposal by -- not this

 5   Friday, next Friday, to counsel, of how to deal with the

 6   medical.

 7            What's a good discovery plan for that?  And then

 8   policies and procedures that they're actually addressing here.

 9   So I have some thoughts about that.  So why don't I take a stab

10   at something?

11            THE COURT:  Look, my only requirement is that it not

12   be entirely in written correspondence.

13            ATTORNEY PAPPY:  Oh, no.  I'll draft a statement.

14   And we can work on, you know, this -- if -- in this many days,

15   we'll exchange information on -- something like that?

16            ATTORNEY COLEMAN:  No, but he wants us to talk.

17            ATTORNEY PAPPY:  Oh, yeah.  Okay.  Okay.

18            THE COURT:  A battle of the written proposals is just

19   not --

20            ATTORNEY PAPPY:  I've got it.

21            ATTORNEY COLEMAN:  And if the Court wants something

22   that we're going to actually agree on, it may be longer for the

23   breakdown of issues beyond the ADA inspections.  But we can

24   definitely get something to you in writing this week on the --

25            ATTORNEY PAPPY:  Timing.
```

1          ATTORNEY COLEMAN:  -- timing on the written

2    inspection -- of the facility inspections, the PMKs, and the

3    RFPs related to them.

4          THE COURT:  Okay.  Thursday will work for --

5          ATTORNEY PAPPY:  Okay.

6          THE COURT:  -- the ADA issues.

7          And then two weeks -- would two weeks be enough time

8    to talk about the other issues?

9          ATTORNEY GRUNFELD:  Sure.  Sure, your Honor.  We

10    already tried that, and we submitted something on December

11    28th.  So I'm not sure --

12          THE COURT:  Yeah, I saw that.  And that's when I was

13    referring to -- I'm being more -- I'm being more focused now, I

14    should say, Ms. Grunfeld.  I get -- here's what I don't want to

15    have.

16          When -- when I say "joint filing," I -- somebody's

17    position -- somebody else's position -- I want to know where

18    you can -- which issues you want to tackle.

19          I -- hearing about the class certification and -- is

20    fine.  It's interesting to me.  I -- I am glad to know it.  But

21    it doesn't help me figure out with you all how we're going to

22    move the case forward.

23          I get the defense isn't going to agree, right now, to

24    a mutually agreed-upon expert.  It's premature for that.  You

25    know, okay.

```
 1            All -- I guess my thought for the joint filing is

 2    more focused.  It's a -- what -- similar to how we're dealing

 3    with the ADA issues.  What other issues in this case should we

 4    tackle next?

 5            And it seems to me initially that, you know, your

 6    causes of action 1 and 2, Ms. Grunfeld, would be amenable to

 7    that approach.  Particular to the changes the County has made

 8    in this NaphCare.

 9            And it could be that the joint statement is a couple

10    of paragraphs.  These are the issues we want -- and maybe you

11    want to talk it through with me.  I'm happy to hold a status

12    conference on that, if that's going to be more efficient than,

13    you know, spending a lot of time doing the status report.  But

14    just looking ahead, beyond ADA, how -- how do we want to move

15    forward with the case.

16            ATTORNEY GRUNFELD:  Thank you, your Honor.

17            THE COURT:  Sure.

18            I've kept you past 11:00, but I really do appreciate

19    it.  And I don't want to cut this short.  If there's something

20    else that I neglected to talk about that you think we should,

21    as -- as of right now --

22            Go ahead, Ms. Grunfeld.

23            ATTORNEY GRUNFELD:  Your Honor, the Court has not yet

24    signed the protective order.  I did bring a hard copy, if the

25    Court would consider that.
```

1              THE COURT:  We're going to enter it as soon as

2    possible.  I did see it.  And we're working through it.  And so

3    thank you for that reminder.  It is definitely on our radar.

4              ATTORNEY GRUNFELD:  Okay.  I think that would be very

5    helpful.

6              THE COURT:  Sure.

7              ATTORNEY GRUNFELD:  So thank you.

8              THE COURT:  Okay.  No problem.

9              ATTORNEY PAPPY:  Just one question.

10             THE COURT:  Sure.

11             ATTORNEY PAPPY:  The -- the -- the PMK description,

12   how is the Court going to address that?  Are you going to

13   tailor that to your rulings about policies and procedures?

14             THE COURT:  I am.

15             ATTORNEY PAPPY:  Okay.  Thank you.

16             THE COURT:  I think you can reasonably expect that

17   the general principles that I've described with respect to the

18   RFPs are going to apply to the 30(b)(6) deposition, for this

19   stage.

20             ATTORNEY PAPPY:  Great.  Thank you.

21             THE COURT:  Sure.

22             ATTORNEY COLEMAN:  And it may be because of timing of

23   witnesses and -- the PMK maybe ten people and not just one

24   person.  That it -- it can't happen within 15 days of the last

25   benchmark, like the RFP, as plaintiff proposed.  So we would

1   appreciate a little flexibility.

2           We'll certainly work to get those done together.

3           ATTORNEY PAPPY:  Thank you.

4           ATTORNEY COLEMAN:  We hear you.

5           THE COURT:  So I'm going to give you something

6   nobody's happy with, and that's not going to be realistic.  And

7   you're going to figure out something that works for everybody.

8   And I am sure that if that is what happens, that if there are

9   more designees than either party reasonably anticipates, that

10  you're going to work together to figure out how to get the

11  depositions done in a reasonable way.  So I appreciate that.

12          ATTORNEY PAPPY:  Yes.  Thank you.

13          THE COURT:  You bet.

14          ATTORNEY GRUNFELD:  Thank you, your Honor.

15          ATTORNEY YOUNG:  Thank you, your Honor.

16          THE CLERK:  That concludes the matter.  We're now in

17  recess.

18          (Conclusion of proceedings.)

19

20

21

22

23

24

25

1

2

3

4                                      --oOo--

5    I certify, by signing below, that the foregoing is a correct

6    stenographic transcript, to the best of my ability, of the

7    digital recording of the audio proceedings had in the

8    above-entitled matter this 11th day of January, 2023.  A

9    transcript without an original signature or conformed signature

10   is not certified.  I further certify that the transcript fees

11   and format comply with those prescribed by the Court and the

12   Judicial Conference of the United States.

13

            /S/ Amanda M. LeGore
14          _____

15        AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

16

17

18

19

20

21

22

23

24

25