Pages 1 - 44

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

| | | |
|---|---|---|
| DARRYL DUNSMORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. 20-CV-00406-AJB-DDL |
| | ) | |
| STATE OF CALIFORNIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Diego, California
Monday, April 3, 2023

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        ROSEN BIEN GALVAN & GRUNFELD, LLP
                        101 Mission Street, Sixth Floor
                        San Francisco, California 94105
                **BY: RICHARD VAN SWEARINGEN, ESQ.
                        PRIYAH KAUL, ESQ.**


For Defendants:
                        BURKE WILLIAMS & SORENSEN LLP
                        60 South Market Street, Suite 1000
                        San Jose, California 95113
                **BY: ELIZABETH MARIE PAPPY, ESQ.**




Transcribed By:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                Official Court Reporter

1 | **<u>Monday - April 3, 2023</u>**                                    **<u>12:00 p.m.</u>**

2 | **<u>P R O C E E D I N G S</u>**

3 | **---oOo---**

4 | **THE COURT:**  All right.  Good afternoon.

5 | We are here in Dunsmore versus San Diego County Sheriff's

6 | Department, et al., Case Number 20-CV-406, for a discovery

7 | conference.

8 | May I have appearances from counsel, beginning with the

9 | plaintiffs.

10 | **MR. SWEARINGEN:**  Van Swearingen for plaintiffs.

11 | **THE COURT:**  All right.  Great.  Good afternoon.

12 | **MS. KAUL:**  Good afternoon, Your Honor.  Priyah Kaul

13 | for the plaintiffs.

14 | **THE COURT:**  Good afternoon.

15 | **MS. PAPPY:**  Good afternoon, Your Honor.

16 | Elizabeth Pappy appearing on behalf of defendant.

17 | **THE COURT:**  All right.  And good afternoon to you as

18 | well.

19 | I hope you're all doing well, and I appreciate the -- the

20 | updates on where you stand on these issues, and I want -- what

21 | I'd like to do is spend the initial portion of our time

22 | together talking about the second set of requests for

23 | production.

24 | And then I'd also like to speak with you-all about where

25 | things stand with the ADA discovery -- I think a lot of that

1    has already happened -- and what you-all think is going to be

2    the best path forward for teeing up some of those issues for a

3    possible ENE in the near future.

4        But why don't we start with the second set of requests for

5    production, and I see the parties were able to narrow their

6    disputes.  It looks like, as I understand it, RFP Numbers 11,

7    13, 14, 18, and 24 are the ones at issue.  I have a couple of

8    questions at the outset.

9        So I can understand the scope of the dispute, Ms. Pappy,

10   are you able to tell me how many deaths there were in the

11   San Diego County jails from January 1st, 2021, to the present?

12       **MS. PAPPY:**  In fact, Mr. Swearingen told me.  I think

13   it was about 44.

14       **THE COURT:**  Okay.  And then your proposal, Ms. Pappy,

15   is to limit this to deaths that are determined to be suicide,

16   overdose, or inmate-on-inmate violence.

17       How many deaths would that be?

18       **MS. PAPPY:**  I -- I don't know.  I got a list of

19   people, but I don't know if it says, "Cause of Death."  Let me

20   see if I can pull that up.

21       **THE COURT:**  And I realize your argument doesn't turn

22   on that, but it does bear consideration by me for the

23   proportionality analysis.

24       So I'd like to know that, if you -- if you could figure

25   that out, and if you're not able to do it right away -- I don't

4

1   want to put you on the spot, you know?

2          MS. PAPPY:  I'll -- I'll look for it while you move on

3   because I know you're -- you're busy.  So let me look for it

4   because I just got the list.

5          THE COURT:  I'm not busy.  I'm just waiting for the

6   San Diego game --

7          MS. PAPPY:  You are?

8          THE COURT:  -- today and seeing if they can win the

9   national championship.

10         MS. PAPPY:  Go Aztecs.  As a UCSD grad, go Aztecs.

11         THE COURT:  All right.  There you go.

12      All right.  Then let me ask -- let me ask this.  Before we

13  get into the individual RFPs, is there really a disagreement

14  between the parties as to HIPAA and whether or not -- assuming

15  I order some sort of production that this can be done pursuant

16  to some combination of the existing protective order, a

17  designation for attorney eyes only, plus the relevant expert,

18  or -- or redactions?

19      I mean, that part of the dispute seems to me one that the

20  parties should be able to figure out, again, if -- if we're

21  ordering records to be produced for any inmate deaths.

22      Mr. Swearingen, what's the plaintiff's position on that?

23  I think you said, "Hey, look, a protective order is good

24  enough."  What about the defendant's concern for, you know,

25  HIPAA and third parties?

 1          Would designation of these materials -- would these

 2   reports need to be reviewed by anyone other than counsel and

 3   your -- and your expert?  I think it was Dr. Cohen or --

 4          **MR. SWEARINGEN:**  Thank you, Your Honor, for that.

 5          I'll address confidentiality first, more generally, with

 6   respect to HIPAA, where there's the disagreement and then

 7   address who at our law firm would be reviewing the records in

 8   addition to any experts.

 9          First, Subsection (e)(ii)(B) of 45 CFR Section 164.512,

10   the section identified in our joint statement, specifically

11   provides that a covered entity can disclose protected health

12   records where it receives satisfactory assurance from the

13   parties seeking the information that reasonable efforts have

14   been made by such a party to secure a qualified protective

15   order that meets the HIPAA requirements.

16          Here, there's no dispute that there's a protective in

17   order -- protective order in place that does, in fact, qualify

18   as a protective order under HIPAA.  That's Docket 255.

19          **THE COURT:**  Uh-huh.

20          **MR. SWEARINGEN:**  Now, in our joint statement, I

21   identified two cases showing preclass discovery,

22   HIPAA-protected data, that can be disclosed pursuant to

23   discovery.

24          I have several of the court cases from within this

25   district, including *Coleman v. Brown*, a case in which my firm

1    is plaintiff's counsel -- and that's 2013 Westlaw 5348218 --

2    where plaintiff sought mental health in the Central file

3    records, the custody records, of nonclass members who are

4    incarcerated or formerly incarcerated, because those records

5    were relevant to the case, and there was a protective order in

6    place.  And, there, the Court ordered the records to be

7    disclosed.

8         I can go through a handful of other cases.  There are many

9    cases within this district in which the Court looks to that

10   specific HIPAA provision that I identified, (e)(ii)(B), and

11   says that there's a protective order in place; therefore, it

12   can be disclosed.

13        I have a feeling that the County -- it's a permissible

14   statute.  I have a feeling the County, even if it -- if it

15   recognizes the validity of that statute, still will not produce

16   the records without a court order.

17        So I just want to flag that.

18            **THE COURT:**  Okay.

19            **MR. SWEARINGEN:**  As far as attorneys' eyes only --

20   give me one second, if you would, Your Honor.

21        The -- the HIPAA protections identified in -- in that

22   section I flagged do not require an attorneys' eyes only

23   provision.  Our protective order that's in place specifically

24   references that HIPAA-protected data is -- is sought through

25   discovery in this case, it will be protected under the -- the

1    protective order, and that the term "confidential information"

2    includes personally identifiable materials.

3         There's no reason to elevate it to the attorneys' eyes

4    only designation in the protective order, and the reason why

5    that would be problematic is because it would preclude, for

6    example, our paralegals from looking at that information.  It

7    would preclude us from using that information with deposition

8    witnesses, if there came an opportunity in the case.

9         Of course, under the confidential designation, the

10   materials cannot be used outside of this case.  It is still

11   limited to only those people who are either designated in the

12   protective order or who have signed the Addendum A.

13        And it's important that there's an Addendum A to the

14   protective order because that Addendum A says that only people

15   who sign that document can also have access to it, and that

16   would be plaintiff's experts and any paralegals at our firm.

17        The -- the appendix that they would sign, showing that

18   they have read the protective order, are willing to be bound by

19   the protective order, requires them to be bound by the

20   jurisdiction of the Court and is made under penalty of perjury.

21   So there really can be no concern about elevating this to

22   attorneys' eyes only.

23        The third reason is that, if we were to do so, plaintiffs

24   would be unable to submit documentation under seal to the Court

25   about these deaths in connection with the dispositive motion.

1   That -- the -- that would significantly burden us.

2        And, again, going back to the statutory language of HIPAA,

3   there's simply no requirement in HIPAA that records that are

4   turned over pursuant to a qualified protective order or

5   pursuant to a court order needs to be designated attorneys'

6   eyes only.  The burden is on defendants to show that there is,

7   and there is no such requirement.

8        **THE COURT:**  What provision of the protective order

9   would preclude a party from submitting to the Court information

10  that is designated as highly confidential, attorneys' eyes

11  only?  Maybe I missed that provision.

12       **MR. SWEARINGEN:**  Your Honor, let me just -- I have it

13  printed out right here.  I believe it's on Page 5.

14       So Page 5, Paragraph 7 of the order says, "The information

15  that's designated as confidential for counsel only must not be

16  disclosed by the receiving party to anyone other than those

17  persons designated within this order and must be handled in the

18  manner set forth below."

19       And when you look at the designation for counsel only,

20  it's only counsel and counsel's experts.  In contrast, when you

21  look for the designation of confidential information, it

22  includes court personnel.

23       **THE COURT:**  Yeah.

24       Honestly, I wish I would have caught that.  I would have

25  scratched that out.  That distinction between confidential for

1   counsel only and confidential as -- vis-a-vis the Court and the

2   court personnel's ability to view materials -- I -- I haven't

3   seen that in another case.

4       And, candidly, I think I probably just missed it because

5   I -- the Court is not precluded from viewing information, or

6   should not be.  So that's something we can talk about, but I --

7   I understand what you're -- what you're talking about,

8   Mr. Swearingen.

9       Was that intentional by the parties to restrict the

10   Court's ability to view materials?

11         MS. PAPPY:  Not mine, no.

12         MR. SWEARINGEN:  No, Your Honor.  We actually did not

13   think that an attorneys' eyes only designation was necessary,

14   and the protective order --

15         THE COURT:  Yeah.

16         MR. SWEARINGEN:  -- that we submitted to the opposing

17   party did not include such a designation.

18         THE COURT:  Right.

19       Okay.  No.  I understand.

20       Ms. Pappy, what's your -- well, I guess, first off, if

21   you -- before we get to the specific requests, what's your

22   position on the CFR provision that Mr. Swearingen is citing

23   in -- does that provide authorization for the County to produce

24   the medical records of these third-party inmates?

25         MS. PAPPY:  No.  It takes me -- it takes the

1    authorization to produce the records -- the patients requesting

2    them -- the person -- or the deceased's family that is

3    requesting them.

4         And I -- I believe -- to my detriment, but I believe that

5    the Court has the authority to issue an order under HIPAA.  But

6    I do not believe that third-party records are covered by that

7    if there's a protective order.

8         My -- I will give the Court an example, HIV.  One of these

9    individuals has an HIV-positive blood test, and none of their

10   family members know about it.  Nobody knows about it, and this

11   is extremely private information to this person that they may

12   never want their mother to know.

13        That is what I'm worried about, and the County has a legal

14   obligation to protect that privacy right.  It -- it highly

15   likely has nothing to do with the case, but I do understand the

16   balancing act of, you know, how are we going to go through all

17   of these detainees' medical records and -- and potentially

18   delete little things like that, which was why I had said,

19   "Let's do these attorneys' eyes only."

20        I assumed that the Court would have the authority to look

21   at them, but I also offered to amend the protective order to do

22   that, and -- and only experts because, if there is such

23   information, I would expect that an expert would be able to,

24   you know, push that aside and not disclose that in materials

25   that -- that would be filed in the court or indicate somehow

1    that it wasn't relevant.

2        But that's my concern about all of this, is -- I don't

3    disagree that they might be able to get this information.

4            **THE COURT:**  Uh-huh.

5            **MS. PAPPY:**  But we do have to remember, however, that

6    this is expedited discovery, and it is not the whole kit and

7    caboodle at this point.

8            **THE COURT:**  No.  I hear you on that, and this is

9    discovery that is geared toward the plaintiff's desire to

10    consider moving for another preliminary injunction.  I got you

11    on that.

12        But let me ask you this -- Mr. Swearingen, I know you had

13    your hand up for a second, but let me just follow up with a

14    question to Ms. Pappy.

15        Regardless of whether the County could just do it under

16    the CFR provision or whether I order it, if I do order it, you

17    agree that that would be sufficient for purposes of HIPAA; is

18    that right, Ms. Pappy?

19            **MS. PAPPY:**  I do.  I do.

20            **THE COURT:**  Okay.  So let's move beyond that issue,

21    then.  Why -- I'm not trying to jump the gun on how the County

22    chooses to designate the materials that it produces in

23    discovery, but just to -- we can head off another dispute.

24        Having heard what Mr. Swearingen said about his reasons

25    why he thinks that, if the -- if any material is produced, it

1    can be produced as confidential under the protective order,

2    which would be limited to plaintiff's firm, essential

3    personnel, you know, paralegals and the experts, would that

4    sat- -- if it's produced pursuant to a court order directing

5    that it be produced, would the confidential designation be

6    sufficient, Ms. Pappy, or do you continue to believe it would

7    have to be attorneys' eyes only?

8         **MS. PAPPY:**  My only concern is that this information

9    leaks out.  I have no concern about Mr. Swearingen or anybody

10   in his firm, none of them.  My concern is just this is

11   third-party information.  It is extremely sensitive --

12        **THE COURT:**  Yeah.

13        **MS. PAPPY:**  -- and -- and it deserves a heightened

14   level of protection.

15        If there is a court order ordering it under

16   "Confidential," I am not going to appeal it.  How's that?

17        **THE COURT:**  No.  No.  I get you, and I -- that's fair

18   enough, and that's not what I'm even looking for.  I really --

19   I hear what you're saying about this.  This information is

20   different, and I -- but I'm also trying to figure out how it

21   can be, you know -- how we can have a workaround here.

22        Mr. Swearingen, let me ask you this.  Understanding all of

23   that, if this information were to be -- any of it were to be

24   produced to the plaintiffs, is there anything -- any extra

25   layer of protection that it should deserve above and beyond the

1    confidential designation?

2        And I'm not talking about AEO, but is there -- is there

3    some limitation whereby the plaintiffs would agree that it

4    would be, for example, shared only with the paralegal who is

5    assigned to this case?  I mean, I'm just -- I'm thinking out

6    loud here.

7        Is it -- what would be appropriate, Mr. Swearingen, to

8    address Ms. Pappy's concerns, which are not rooted in any

9    distrust of you or Ms. Kaul but an understandable concern, that

10   information not be -- should not -- well, cannot be leaked out?

11   How would -- how should we address that?

12       **MR. SWEARINGEN:**  Thank you, Your Honor.

13       I think it's addressed in Appendix A to the stipulated and

14   entered protective order, which requires every single person

15   who has access to the information to sign it.  Again, that's

16   limited to the people who were designated that can even be

17   receiving confidential information in the case in the first

18   place.

19       And then those people are bound to be subject to the

20   protective order, bound to be subject to the Court's

21   jurisdiction, and agree, under penalty of perjury, not to use

22   this information outside this litigation or share it otherwise.

23       I'll just say that our -- our firm is class counsel in

24   numerous California jail cases -- or class counsel in two

25   statewide prison cases.  We have literally hundreds of

1    thousands of incarcerated-person protected health information

2    in our records.

3        This is something that we do all the time, and the

4    Appendix A, the acknowledgment of and agreement to be bound by

5    the protective order, is the comfort that we need.  If there's

6    ever any concern about who at our firm has had access to the

7    information, it will be found in our logs of those people who

8    have signed the case.

9        I can represent to you now that I anticipate that the only

10   people who will have access to this information are the

11   attorneys on the case, the paralegals on the case, any other

12   clerical people at our firm who may access that, which -- at

13   this point in time, I can't identify anybody -- and plaintiff's

14   experts.  That's it.

15           **THE COURT:**  Okay.  All right.  With that in mind,

16   let's move on to the requests themselves.

17       Mr. Swearingen, I'm going to start with you.  I have to

18   tell you that we're talking about 44, I think you said, deaths

19   in the jail, and you want every -- essentially every piece of

20   paper relating to every one of those 44 deaths.

21       I'm still hard-pressed to see how that is the narrowly

22   tailored discovery that you-all agree to propound and respond

23   to, again, in the form of expedited discovery.  Is that really

24   what you need?

25           **MR. SWEARINGEN:**  Good question, Your Honor.

1        First, I'll address the tailoring.  The state auditor's

2   report, which we featured heavily in our third amended

3   complaint -- it's on the first page of the complaint -- of

4   course, found deficiencies with how the Sheriff's Department

5   provides care for and protects individuals, which likely

6   contributes to in-custody deaths.  That's a direct quote.

7        It also says that the weaknesses in the

8   Sheriff's Department policies and practices will continue to

9   jeopardize the hells [sic] -- the health and lives of the

10  individuals in its custody.

11       The state auditor's report looked at deaths from 2006 to

12  2020, 15 years of data.  We tailored our request to only two

13  years of data -- a little bit more, actually -- since

14  January 1st, 2021.

15       The third amended complaint talks about how other

16  oversight entities have raised the alarm about the crisis of

17  deaths in the jail, and that includes Disability Rights

18  California, the Citizens' Law Enforcement Review Board, or

19  CLERB.

20       And even after we filed our complaint, Analytica, a

21  consultant retained by the County, released a report in

22  April 2022, in which it noted that Cal- -- that San Diego has

23  the highest number of excess deaths among California's 12

24  largest jail systems.

25       So, again, there's no doubt that there's a crisis in the

1    jail of deaths, of in-custody deaths, and we tailored our

2    request to only about the past two years.

3          Now, I'd like to say why defendants' proposal for focusing

4    on overdoses, suicides, and inmate violence is simply

5    unworkable.  The reason why is because all deaths relate to

6    urgent situations.  Plaintiffs allege that it is difficult to

7    access care at the jail, and the care that is provided is

8    inadequate.

9          Our first and second causes of action states the

10   defendants are deliberately indifferent to jail policies and

11   practices regarding the medical and mental health.  And if I

12   can say, our -- the expert that we have intended to use for the

13   review of this, Dr. Bobby Cohen, has said all jail deaths are

14   relevant.

15         Defendants' own expert -- several years ago, they hired

16   Dr. Homer Venters, a correction expert who focuses, in part,

17   his work on whether custody deaths are what are called

18   jail-attributable deaths.  And what he means is whether or not

19   the person would still be alive if they were not incarcerated.

20         Dr. Venters, defendants' own previous expert, noted the

21   jail-attributable deaths can include deaths from preexisting

22   and acute medical conditions.

23         Now, our third amended complaint references probably at

24   least ten people who would have died from what defendants would

25   call, quote/unquote, "natural causes" but are still what their

 1   expert, Dr. Venters, would call -- are jail-attributable.

 2       And I'd like to give you just a couple examples that

 3   really, really highlight why natural cause deaths are still

 4   incredibly relevant to whether or not people who are

 5   incarcerated at the jail receive the urgent care that they

 6   need.

 7       Lonnie Rupard died in March 2022 last year, about one year

 8   ago.  When he died, the Sheriff's Department issued a news

 9   release stating that he had died, and they said, quote, "Rupard

10   was alone in the cell, and there was no obvious signs of

11   trauma.  No evidence of foul play was discovered."

12       Well, in just this past month, the Medical Examiner

13   released the results of his autopsy.  They found that he died

14   of natural causes, of pneumonia, malnutrition, and dehydration,

15   with the COVID-19 viral infection, pulmonary, and ulcer listed

16   as contributing conditions.

17       But the Medical Examiner also concluded that Rupard's

18   death was a homicide due to ineffective care from jail staff.

19   He had lost 60 pounds in the three months that he was

20   incarcerated.  He was 105 pounds at death.  The jail, according

21   to the Medical Examiner, failed to tend to his medical and

22   mental health needs.

23       Rupard's death shows two things.  First, if the definition

24   of "death" is confined to overdose, suicide, and violence, the

25   Sheriff's Department is not going to produce records related to

deaths like Lonnie Rupard's.

Second, it also shows that sometimes it takes up to a year for the Medical Examiner to release information about deaths, meaning the defendants would hold nearly half of the requested records on the grounds that the causes of death have not been determined.

That's just one death.  I can list many others, including Elisa Serna, Robert Moniger, Anthony Chon, Daniel Sisson, James Athos, Alan Washam, and Matthew Godfrey, among even more others who are identified in our third amended complaint, who -- we say these people died of what would probably be considered natural causes, but there was a problem with them not getting the care that they urgently needed in the jail from custody and medical staff.

That's why these are relevant, that's why these are tailored to the past two years, and that's why these are urgently needed now.

**THE COURT:**  And we are talking about discovery that is specifically focused on a preliminary injunction motion, not -- you know, expedited discovery, not general merits-based discovery; is that correct, Mr. Swearingen?

**MR. SWEARINGEN:**  That's correct, Your Honor.

We would like to -- we plan to review these records with our experts to better understand the causes of these deaths, whether they are not, in Dr. Venters's words,

 1   jail-attributable, and to show, likely through a preliminary

 2   injunction, that there is a crisis of deaths at the jail that

 3   is attributable to defendants' actions and omissions.

 4           **THE COURT:**  But -- okay.

 5       How do you -- but you don't do that in a vacuum --

 6   right? -- because -- I mean, one of the things I've heard about

 7   repeatedly is that the -- the jails have implemented a new,

 8   more consolidated health care system for providing care to

 9   detainees.  And, you know, going forward, things are -- things

10   are different.

11       So why is it that the death of everybody in custody before

12   this new health care system was implemented is relevant for

13   either a preliminary injunction or a determination on the

14   merits?  Because, as I understand it, what you're really

15   looking at is, you know, injunctive relief going forward.

16           So could you address that, Mr. Swearingen?

17           **MR. SWEARINGEN:**  Yes, Your Honor.

18       First, your question presupposes, I think -- and I just

19   want to clarify -- that there will be a beneficial -- or change

20   in the direction of the health care at the jail.  I don't think

21   that there's any evidence in the record that shows that.

22       So I just want to make that clear.

23           **THE COURT:**  Okay.

24           **MR. SWEARINGEN:**  Second, NaphCare came on as the new

25   private provider of health care at the jail last summer.

1    Before then, it was a different provider of health care.

2        As we allege in our third amended complaint, the jail

3    maintained -- that is, the Sheriff's Department and the County

4    maintained control over many, many health care decisions, even

5    though the health care is provided by the private contractor.

6        The jail, for example, decides who gets access to the

7    jail.  The jail -- I'm sorry -- decides who gets access to the

8    medical provider.

9        If somebody like Daniel [sic] Moniger, who died at the

10   jail from COVID, is in his cell, and he and his two cellmates,

11   Michael Keavney and Dylan LaCroix, are both, over the course of

12   days, trying to get access, trying to flag down medical and

13   mental health care and jail staff to get health care for this

14   individual, it's ultimately on the jail.

15       It's not on NaphCare.  NaphCare may have something to do

16   with it, but it's ultimately the jail's responsibility to

17   ensure that everybody incarcerated in the facility gets access

18   to quality medical and mental health care.

19       And in the instance of Moniger, who died after, for three

20   or four days, trying to summon jail staff help, he wasn't able

21   to get help, in part, because custody staff would not let

22   him -- would not grant him access to the private care provider

23   at the jail.

24           **THE COURT:**  Okay.  Ms. Pappy, I appreciate your

25   allowing me to ask a number of questions of Mr. Swearingen.

1    You don't happen to have the numbers yet, do you?

2        **MS. PAPPY:**  I -- well, I have the list, and it doesn't

3    say "Causes."

4        **THE COURT:**  Okay.

5        **MS. PAPPY:**  I'm sure I can ask for a different report

6    that shows me that, but I don't have that.

7        **THE COURT:**  Okay.  No.  I understand.

8    So out of the 44, you're just not sure right now how many

9    would be included in your -- the way you'd proposed to narrow

10   this?

11       **MS. PAPPY:**  No.

12       **THE COURT:**  Let me ask this, then.

13   For every one of those 44 deaths during this two-plus-year

14   time period, was there a -- a Medical Examiner report done?

15       **MS. PAPPY:**  I -- I don't know yet.  The medical

16   reports are being gathered in response to their request because

17   those are public records.

18   So they're -- we're gathering them.  They either exist --

19   they may not be done yet because the Medical Examiner's Office

20   is really, really behind, and nobody I've talked to yet has

21   been able to tell me whether there would ever be an instance

22   where they would create one.

23   So as far as I know thus far, either one exists or it is

24   coming simply because it isn't done yet.

25       **THE COURT:**  Mr. Swearingen, let's say that I agree

1   with you that, you know, deaths that might otherwise be

2   determined -- determined to be natural causes are also

3   jail-attributable, in the way that you describe it.

4       Why would you -- why do you need every -- at this point at

5   least, everything that you've asked for in RFP 11, as opposed

6   to the Medical Examiner report for each of those deaths?

7           **MR. SWEARINGEN:**  Because most Medical Examiner

8   reports -- most autopsy reports and toxicology reports do not

9   do a full review of the medical records, the custody records

10  that surround them.  They instead look more medically at the

11  cause of death.

12      So, for example, for Elisa Serna, she died of dehydration

13  and other causes.  What's not listed in Ms. Serna's

14  Medical Examiner report is the fact that she was undergoing

15  withdrawal.  Withdrawal is another category that is not covered

16  by defendants' proposal of overdoses, suicides, and inmate

17  violence.

18      Ms. Serna was undergoing withdrawal.  She died of

19  dehydration, or at least, in part, of dehydration.  The

20  Medical Examiner report was released.

21      And separate from that -- if you were to look at the

22  Medical Examiner report, you might think that, "Okay.  Well,

23  she died of natural causes or," if you want to think about

24  withdrawals, "maybe nonnatural causes."  Withdrawal is not

25  natural causes.

1       But subsequent to that, two people at the jail were

2   charged with her death, both a doctor and a nurse, because

3   Elisa Serna -- about an hour before she died, she fell and hit

4   her head.  Jail staff watched her do this, and they watched her

5   as she urinated on herself over the course of an hour and just

6   slowly died all by herself on the floor after those two

7   individuals just walked away.

8       This is another example of a natural death in which

9   there's a jail-attributable cause.  Ms. Serna would not have

10   died from dehydration had jail staff -- the doctor and the

11   custody staff were present and who saw her laying on the floor

12   here promptly reacted and give -- given her life-saving

13   services.

14       **THE COURT:**  Okay.

15       **MS. PAPPY:**  When did Ms. Serna die?  She's not on the

16   list.

17       **MR. SWEARINGEN:**  I don't have that in front of me.

18   I'm sorry.

19       **MS. PAPPY:**  Was it more than -- was it before 2021?

20       **MR. SWEARINGEN:**  I do not have that at my fingertips.

21       **MS. PAPPY:**  Okay.

22       **MR. SWEARINGEN:**  She was someone referenced in -- in

23   our third amended complaint of a recent death.

24       **THE COURT:**  Ms. Pappy, let's say that I agree with

25   Mr. Swearingen that the natural cause deaths might be

1  jail-attributable and should be produced at this point, or

2  documentation about it should be produced at this point.

3      I was asking Mr. Swearingen about Medical Examiner

4  reports, and is there any other report -- I'm not talking about

5  CIRB, but is there any other report that is prepared by the

6  jail regarding an inmate's death that would be prepared in the

7  ordinary course, regardless of the cause of death?

8          **MS. PAPPY:**  No.

9          **THE COURT:**  Okay.

10         **MS. PAPPY:**  They --

11         **MR. SWEARINGEN:**  I think that's inaccurate,

12 Your Honor, and if I could -- if I could have a word on this --

13         **THE COURT:**  You may after I finish speaking with

14 Ms. Pappy.

15         **MS. PAPPY:**  They -- they do not do a cause of death.

16 I mean, there's medical records leading up thereto that say

17 everything that's -- that happened and treatment that they

18 gave, but there's no independent report.

19         **THE COURT:**  All right.  What did you want to say about

20 that, Mr. Swearingen?

21         **MR. SWEARINGEN:**  Sure.

22     Well, this goes to the dispute about Request Number 13 and

23 14.  Defendants' joint statement contends that the document --

24 that the requests seek the same information, and that's simply

25 not true.

1    In addition to the CIRB documents that Your Honor

2    referenced, that are within the scope of Request 13, Request 14

3    has many other in-custody death reviews that are not covered by

4    CIRB death reviews.

5    That includes thorough investigations of every in-custody

6    death that is conducted by the Sheriff's Homicide Unit.  This

7    investigation is separate from, and in addition to, the CIRB

8    reviews.  That can be found on the Sheriff's website.

9    In addition to -- to those reviews, the CIRB reviews and

10   the Sheriff's Homicide Unit reviews, Title 15 requires an

11   initial review of all deaths to be conducted within 30 days,

12   involving not only custody staff but also the health

13   administrator, the responsible physician, and other health care

14   and supervision staff who are relevant to the incident.

15        **THE COURT:**  What's the citation for that?

16        **MR. SWEARINGEN:**  Title 15 -- that's California Code of

17   Regulations, Title 15, Section 1046.

18   Further, Captain Bibel submitted a declaration already in

19   this case, at Docket 153-4, stating that NaphCare will have its

20   own peer review, mortality review, quality assurance, and other

21   competency review programs.

22   So in our experience dealing with private contractors to

23   jail facilities, it -- it is always the case that the private

24   contractor will conduct their own medical reviews of the -- of

25   the death as well as part of their own quality assurance

 1    program.

 2             THE COURT:  Okay.  Ms. Pappy, are you aware of the --

 3    whether or not the San Diego Sheriff's Department Homicide Unit

 4    conducts a review every time that there is an in-custody death?

 5             MS. PAPPY:  I don't know.

 6             THE COURT:  Okay.

 7             MS. PAPPY:  If -- yeah.  When you're ready for me, I

 8    would like to comment on two or three things, yes.

 9             THE COURT:  Yes.  Sure, and the next question will be

10    whether those would be in your possession, but what -- one more

11    question, and then I'll hear from you, of course.

12        The J-I-M-S -- the JIMS system -- would that contain --

13    what information would that contain?

14             MS. PAPPY:  My understanding is that JIMS would

15    contain the medical records.  All of their treatment records

16    are kept in JIMS.

17             THE COURT:  Okay.  All right.  Go ahead, Ms. Pappy.

18    You wanted to respond, please.

19             MS. PAPPY:  Sure.  Sure.

20        I want to go -- I'm going to go backwards.  So the CIRB is

21    obviously an issue that we'd like separately briefed, but just

22    to be clear about CIRB, CIRB doesn't create reports.  It -- or

23    information.

24        It creates -- it draws from what's already in the record,

25    if you will, evidence.  That's the medical files and things

 1   that have been created by third parties.  So it doesn't

 2   independently investigate or create things.

 3        With regard to 14, I want to point out, you know, the

 4   homicide file -- and he indicated -- Counsel indicated a -- I

 5   wrote it down as a -- I think it was a 1046.  You know, if --

 6   therein lies the problem with the breadth of these requests.

 7   If they had narrowed them -- or I think he said NaphCare

 8   creates the report.

 9        If he had narrowed these requests to those two items, the

10   homicide investigation file -- because it's my understanding

11   that those are discoverable -- and then any report that

12   NaphCare created, you know, with the same objection I have to

13   the breadth of it, that's a different question than the breadth

14   of -- of Number 14.

15        In that situation, I don't have a problem with those

16   requests other than the threshold, all deaths, you know, not

17   taking out anything relating to natural causes.

18             **THE COURT:**  Understood.

19        Are you in a position to address the California Code of

20   Regulations Section 1046 provision that Mr. Swearingen cited?

21             **MS. PAPPY:**  I'm -- yeah.  I'm not.  He's never shared

22   that with me before.

23        But -- but, again, if this is something that is -- it is

24   not an otherwise privileged document, you know, I don't know

25   how it wouldn't be discoverable, but it's never been

```
1    specifically identified to me in a meet-and-confer.  I'd have

2    to look at what it was.

3         And I see the -- I wrote down a reference to

4    Captain Bible's -- Bibel's -- excuse me.

5              THE COURT:  Why didn't you-all talk about this?  I

6    mean, I -- it's -- I'm a little bit surprised because you-all

7    have worked well together, and that's been very helpful and

8    appreciated by me.

9         But, Mr. Swearingen -- I mean, I -- it does surprise me,

10   if I'm hearing Title 15 of the California Code of Regulations,

11   and Ms. Pappy is hearing it, for the first time -- is this not

12   something that you-all discussed to try to be as targeted as

13   you can?

14             MR. SWEARINGEN:  Your Honor, I think it would be fair

15   to say that we -- we had at least two, if not more,

16   meet-and-confers.

17             THE COURT:  Yeah.

18             MR. SWEARINGEN:  They lasted for quite a bit of time.

19   They were very substantive, and we were able to reach agreement

20   on some of the --

21             THE COURT:  Yeah.

22             MR. SWEARINGEN:  -- the items, and we were unable to

23   reach agreement on others.  We did not have the time to go into

24   every single individual request of what's included there.

25        And in part -- and I think as -- I'll just say, from my
```

1    position, I don't think that opposing counsel had the universe

2    of documents that the Sheriff's Department and the County

3    collects at hand, and I think that opposing counsel still does

4    not have the scope of that documentation at hand in preparation

5    for this IDC.

6            THE COURT:  Look, I -- you-all have -- I know that you

7    met, and you narrowed the disputes, and I do appreciate that.

8    That's better for everybody to figure this out together because

9    you don't know what you're going to get from me.

10           I'm going to give it my best shot, but it's based on a

11   knowledge base that is not as extensive as either party's.

12   That's just the reality of it.  So -- but I understand that.

13           Let me go on to -- well, I don't -- we're not going to

14   talk about the CIRB reports further at this point,

15   Mr. Swearingen.  There's a serious privilege analysis that

16   needs to be done with respect to those reports.

17           And I will tell you that at this point, in the context of

18   expedited discovery, I'm not inclined to authorize that, where

19   I think that the information can be found in -- in other

20   sources.

21           MR. SWEARINGEN:  Can I say one thing on defendants'

22   proposal regarding the CIRB documents, Your Honor?

23           THE COURT:  Yes.

24           MR. SWEARINGEN:  Defendants proposed providing written

25   responses and objections along with the timely privilege log.

```
 1    We're not opposed to that.  I would just like to highlight what
 2    should be in the privilege log.
 3         The reason why I want to spend just a second on this is
 4    because in a separate case, Greer v. the County, your
 5    colleague, Magistrate Daniel Butcher, granted Mr. Greer's
 6    motion to compel CIRB documents.  He found them not work
 7    product, not attorney-client-privileged.
 8         And the reason why I wanted to bring this up now is
 9    because 17 months passed in litigating whether or not the CIRB
10    documents were privileged.
11         Twice, the County and the Sheriff's Department was ordered
12    to provide a privilege log that included information such as
13    the date the document was prepared, the identity of all
14    individuals listed as receiving a copy, the identity of any
15    other individuals to whom the document was disseminated and
16    their relationship to the County and whether the document
17    includes attachments.  And multiple times, they did not and
18    refused to provide that information in the privilege log.
19         I would ask the Court order, in connection with the
20    privilege log the County has said that it is willing to produce
21    for the CIRB documents, that it includes the documents that the
22    Court requested in the Greer v. County case.
23              MS. PAPPY:  May I?
24              THE COURT:  No, you don't need to.
25         Mr. Swearingen, that's -- respectfully, you know, to --
```

1    I'm familiar with *Greer* and my colleague's ruling in that.  But

2    to launch in the middle of this, with respect to what you are

3    asking me to order on the fly, with respect to a privilege log,

4    I'm not going to do during this discovery conference.

5        All right.  Let's move on to Number 18.  What's the

6    objection to this, Ms. Pappy?  Getting -- getting beyond HIPAA

7    and the -- your three proposed categories, this does seem to be

8    rather narrowly tailored to the 24-hour period preceding the

9    death of each individual.

10        **MS. PAPPY:**  I -- I'm looking at what my objection is.

11   I think my objection is just the breadth as -- including every

12   death.

13        **THE COURT:**  Okay.

14        **MS. PAPPY:**  It's -- it's -- you know, whatever you

15   decide is the scope of people's records -- that it will be

16   provided for these people in response to 18 as well.

17        **THE COURT:**  Okay.  Got it.

18        And then finally, with respect to Number 24, I understand

19   your position as to why it shouldn't go back to June 1st, 2018,

20   but I also saw the plaintiff's position that there was a review

21   that was conducted and an implementation.

22        And I'm looking specifically at Page -- well, ECF Page 3

23   of the joint statement, that Lindsay Hayes has issued a report

24   and that the Sheriff's Department reported that this report --

25   or this review was conducted, and modifications were submitted

1   for implementation.  I think that's why, as I understand

2   Mr. Swearingen's point, it goes back beyond 2021.

3      Mr. Swearingen, do you have this review that was conducted

4   by Lindsay Hayes?

5       **MR. SWEARINGEN:**  We do, Your Honor, and it's in the

6   record.

7       **THE COURT:**  Okay.  You've got that.

8      And then do you -- do you have whatever procedures or

9   whatever modifications were submitted for implementation by the

10   Sheriff's Department, or do you not have that yet?

11       **MR. SWEARINGEN:**  No.  The Sheriff's Department only

12   made the representation that a comprehensive physical plan

13   review was conducted and that the -- the proposed changes were

14   slated for implementation.

15      And that's why, of course, this is the only request that

16   dates back to before 2021, is because if we were to receive

17   documents only from 2021 and beyond, it would be incomplete.

18   It would be pretty much useless, whatever documents we got, to

19   see whether or not the Sheriff's Department implemented the

20   recommendations of its own expert, Lindsay Hayes.

21       **MS. PAPPY:**  May I comment on that briefly?

22       **THE COURT:**  Of course.

23       **MS. PAPPY:**  My comment is that's not -- the request

24   is -- doesn't contain any of that.  And if that's the request,

25   I probably don't have any objection to it, but the -- but the

1    request itself needs to be rephrased.

2         **THE COURT:**  All right.  All right.  For the benefit of

3    all parties, and because I have a hard stop at 1:00 p.m. to

4    handle another matter, and I want to hear about ADA, let me

5    give you my tentative thoughts on all of these that will guide

6    the parties, I hope.

7         As to Number 11, my -- my tentative view is that the

8    documents to be produced should not be limited to the three

9    categories that the defendants have proposed.  I do think --

10   again, this is all tentative, but that the information provided

11   by the plaintiffs regarding jail-attributable deaths would

12   properly be disclosed.  And that would include, then, all 44.

13        That being said, there has got to be a way to narrow the

14   scope of the documents to be produced.  And whether that is to

15   include the Medical Examiner report and any SDSO Homicide Unit

16   review and potentially the -- the JIMS information, that is

17   something that I'm going to direct the parties to try to figure

18   out together.  And if you can't, we're going to come up with a

19   procedure where you're going to tell me, and I'm going to rule.

20        With respect to Number 13, the tentative is to deny that

21   request.  I think it is duplicative of the other -- of

22   Number 11 and, for purposes of expedited discovery, implicates

23   a privilege analysis that is not necessary at this stage of our

24   proceedings, where we're talking about expedited discovery to

25   seek a preliminary injunction.

1      With respect to Number 14, the tentative is to deny that

2  as duplicative of Number 11 because I'm incorporating into

3  Number 11 some of the categories of documents and directing the

4  parties to meet and confer about those categories of documents

5  that Mr. Swearingen identified, including the Homicide Unit

6  review and the reports that are prepared pursuant to -- I

7  didn't mention Title 15 of the California Code of Regulations,

8  Section 1046 -- to see if there can be an agreement between the

9  parties on how to narrow Number 11.

10     With respect to Number 18, the tentative would be to -- to

11 grant that, limit it to the requested 24-hour period.  And,

12 again, it would include all 44.

13     And I don't know how burdensome that is, Ms. Pappy.

14 That's something that, if there's a dispute, you're going to

15 have to tell me.

16         **MS. PAPPY:**  Will do.

17         **THE COURT:**  And then with respect to Number 24, the

18 tentative would be to include, from 2018 to January 1st, 2021,

19 reports that were generated by the Sheriff's Department

20 regarding its review and implementation of measures that were

21 recommended by the Lindsay Hayes report.

22     And then from January 1st, 2021, to the present, I think

23 that -- well, that takes care of -- I think that takes care of

24 Ms. Pappy's overbreadth concern.

25     I really want you-all to avoid additional motion practice

 1  and focus on getting these documents so that the plaintiffs can

 2  get them as quickly as possible.  What I would direct is as

 3  follows:

 4      I direct the parties to continue to meet and confer,

 5  keeping in mind my -- my tentative thoughts on these RFPs.

 6  And, again, they're tentative thoughts only.  If you are unable

 7  to agree on them, I will provide the parties with an

 8  opportunity to each file simultaneous briefs on the specific

 9  RFPs at issue.  And, again, we're limiting it to 11, 13, 14,

10  18, and 24.

11      How much -- how much time do you think you need to talk to

12  Ms. Pappy and be specific about what you're looking for,

13  Mr. Swearingen, and figure out if you guys can agree or not?

14          **MR. SWEARINGEN:**  I -- I anticipate that that can be

15  concluded by the end of the week.

16          **MS. PAPPY:**  I agree with that.

17          **THE COURT:**  Okay.  And then we're not going to do a

18  motion in opposition.  I'm going to -- because this dispute is

19  so crystallized, to the extent there's any dispute that's

20  remaining after you meet and confer, the intent would be to

21  have the parties file simultaneous briefs on any RFPs, among

22  these five, that you haven't agreed on, and I'll rule on it.

23      So how much -- I want to be realistic with you-all.  How

24  much time do you need, assuming you can't figure it out?  I

25  think you will, but if you can't, how much time do you need?

1          **MR. SWEARINGEN:**  I would anticipate that we'd be able

2   to accomplish that by the following Thursday.

3          **MS. PAPPY:**  That's (Inaudible) as well.

4          **THE COURT:**  What do you think, Ms. Pappy?

5          **MS. PAPPY:**  That's fine.

6          **THE COURT:**  All right.  Do you need more than ten

7   pages, Mr. Swearingen?

8          **MR. SWEARINGEN:**  No, Your Honor.

9          **THE COURT:**  Ms. Pappy, do you need more than ten

10  pages?

11          **MS. PAPPY:**  I do not.

12          **THE COURT:**  All right.  So the parties will meet and

13  confer, and by April 13th, you will file any motion to -- to

14  compel with a simultaneous, you know, defense brief before the

15  close of business.

16          **MS. PAPPY:**  I have one question, Your Honor.

17          **THE COURT:**  You bet.

18          **MS. PAPPY:**  You included in our meet-and-confer

19  Number 13, which is CIRB.  Do you want us to meet and confer

20  about that?

21          **THE COURT:**  I mean -- yes.  I'm including all five

22  disputed --

23          **MS. PAPPY:**  Okay.

24          **THE COURT:**  -- but I can tell you that my tentative is

25  going to be that that is not appropriate in the context of

```
 1   expedited discovery, which this is.
 2           MS. PAPPY:  All right.  Thank you.
 3           THE COURT:  That may be an issue later in the case,
 4   and there may be, as you note, Mr. Swearingen, some privilege
 5   issues that I need to resolve in light of Greer and some other
 6   cases that have dealt with -- is it -- is it CIRB or SIRB?
 7   What's the -- what's the right acronym?
 8           MS. PAPPY:  CIRB is what the County calls it.
 9           THE COURT:  CIRB.
10      All right.  CIRB reports.  Sorry.
11      So I know you're not -- you're probably not going to agree
12   on that, but you-all, Mr. Swearingen and Ms. Kaul, understand
13   my tentative as to the CIRB reports, at least in the current
14   procedural posture of the case.
15      I would also request that if -- I don't think anybody
16   intended for AEO material to be not subject to judicial review
17   or judicial consideration, which, arguably, the protective
18   order, as drafted, provides, as Mr. Swearingen pointed out.
19      So I would invite the parties to file a joint motion to
20   amend the protective order.  I'm not sure if that language is
21   taken from the -- from the Court's model order, in which case
22   you can just file a joint motion that makes it clear that --
23   yeah.  That's weird.
24                         (Laughter.)
25           THE COURT:  -- that, you know, material can be
```

```
 1    reviewed by the Court.
 2         And as I think about it -- you know what?  Scratch that
 3    for now.  I -- that's -- you've already got enough on your
 4    plate.  I'm going to take another look at that, and I want
 5    to -- if I need anything more from you, I will issue a minute
 6    order on that one.
 7              MS. PAPPY:  All right.  Thank you.
 8              THE COURT:  You've got enough going on.
 9              MR. SWEARINGEN:  Your Honor, while we're still on
10    RFP Set 2, previously, the January 6th -- I'm sorry.
11         The February 6th joint statement from the parties --
12              THE COURT:  Uh-huh.
13              MR. SWEARINGEN:  -- said that we would, you know, go
14    through this process, serve the document requests, and that the
15    County and Sheriff's Department would be obligated to respond
16    by March 31st, four days ago.
17              THE COURT:  Yep.
18              MR. SWEARINGEN:  I just wanted to get a clarification
19    from you on timing of this new RFP set.
20              THE COURT:  What do you mean?
21              MR. SWEARINGEN:  Well, there's certain RFPs that have
22    already been agreed to.  Can we -- can we set a deadline at
23    least for those, or should -- should plaintiffs wait for the
24    totality of the RFP set to be finalized and potentially a
25    motion to compel to be addressed before production begins?
```

```
 1            THE COURT:  I assume that's a question you want to

 2   just ask Ms. Pappy.  I doubt she's holding onto documents that

 3   she's agreed to produce, pending a motion to compel.

 4            MS. PAPPY:  Again --

 5            THE COURT:  Ms. Pappy, what's your position?

 6            MS. PAPPY:  Well, I would suggest that we'll do a

 7   written response with the ones that we agreed to or the County

 8   is already collecting -- I think I have some of them in my

 9   possession -- and -- I don't know -- a production date,

10   Mr. Swearingen, of -- I don't want to kill my staff -- next

11   Thursday.

12            MR. SWEARINGEN:  We're amenable to that.

13       Thank you.

14            MS. PAPPY:  Okay.

15            THE COURT:  All right.  I have to go in four minutes,

16   but I really do want to ask you-all.  How -- give me the --

17   give me the 30,000-foot overview of where things stand with the

18   ADA discovery.

19       You've inspected the two jail facilities, and you've taken

20   the 30(b)(6) deposition, Mr. Swearingen?

21            MR. SWEARINGEN:  That's correct.

22            THE COURT:  All right.  When can we get together and

23   try to resolve any issues with respect to ADA?

24            MR. SWEARINGEN:  So, Your Honor --

25            MS. PAPPY:  I -- I would love to get together sooner
```

1   rather than later about the physical barriers.  Each of our

2   experts has inspected, and there's no reason why we can't try

3   to get an ENE together to address physical barrier issues.

4       **THE COURT:**  Okay.  What did you want to say,

5   Mr. Swearingen?

6       **MR. SWEARINGEN:**  Your Honor, plaintiffs -- or counsel

7   are presently preparing a preliminary injunction motion on the

8   ADA issues, finding -- you know, after findings from our expert

9   that show that there is no ADA-accessible cell in Central Jail,

10  that there are widespread accessibility problems within

11  Central Jail, and that Rock Mountain is not a solution.

12      Rock Mountain is not complete, and defendants' person most

13  knowledgeable does not know when it will be open.  And in the

14  meantime, people are being injured and being subject to a

15  substantial risk of serious injury that should be addressed as

16  soon as possible.

17      **THE COURT:**  So you've talked through all this with

18  Ms. Pappy?

19      **MS. PAPPY:**  No.

20      **MR. SWEARINGEN:**  We have informed opposing counsel

21  that we are preparing a preliminary injunction motion.

22      **MS. PAPPY:**  Counsel did not inform me that it was

23  going to include the (Inaudible) barrier site.  I've long been

24  on the record in saying I'd really like to go to an ENE and try

25  to agree to things that are physical barriers because there can

1    be no dispute about whether they're a barrier or not.

2         **MR. SWEARINGEN:**  It goes well beyond barriers.  It

3    includes -- it includes accessibility features, and it includes

4    housing assignments.  It includes bedding assignments.  It

5    includes the jail's ability to identify and track incarcerated

6    individuals who have disabilities.

7         So it goes beyond just the pure structural features of

8    Rock Mountain.

9         **THE COURT:**  So what you filed on February 6th talked

10   about defendants' proposal for a meet-and-confer to narrow the

11   disputed issues as to physical barriers without the Court's

12   assistance, and it says, "Plaintiffs are considering

13   defendants' proposal, which will be designated subject to

14   mediation privilege and protections."

15        So that was two months ago.  So have you considered the

16   defendants' proposal, and if -- are you rejecting it, or

17   what -- I'm very surprised by this response, Mr. Swearingen.

18        **MR. SWEARINGEN:**  I'm sorry.  Could you repeat which

19   proposal you're talking about?

20        **THE COURT:**  You've talked -- the defendants' -- I'm

21   talking about the parties' February 6th joint status report

22   before me on how to address ADA discovery.

23        And it says, "The parties discussed the defendants'

24   proposal for a meet-and-confer between the parties in an

25   attempt to narrow the disputed issues as to physical barriers

1    without court assistance.  Plaintiffs are considering

2    defendants' proposal, which will be designated subject to

3    mediation privilege and protections."

4        So I guess -- did that not happen?  Was there -- there was

5    no meet-and-confer about disputed issues as to physical

6    barriers?

7            MR. SWEARINGEN:  The parties have not met and

8    conferred about the disputed physical barriers because

9    Rock Mountain presently has no architectural features that are

10   ADA-compliant.  There's not -- it's a work-in-progress with no

11   anticipated date.

12       You know, previously, defendants reported to the Court

13   that it would be open last fall, and they said it would be

14   winter/spring.  It -- you know, the state of the facility is

15   such that it's unclear to plaintiffs when it will open, what

16   architectural features it will actually include, and what

17   population that has disabilities will actually be included

18   there.

19       We've been unable to get any concrete information about

20   any of those issues.  And in the meantime, people are stuck in

21   Central Jail without accessible features, subject to

22   irreparable harm.

23            MS. PAPPY:  May I?

24            THE COURT:  Yes.

25            MS. PAPPY:  It's 1:00 o'clock.

1       **THE COURT:**  It is.

2       **MS. PAPPY:**  Your Honor, first of all, there are

3   numerous architectural features that are in ADA compliance in

4   Rock Mountain, as their expert measured, noted, took

5   photographs of.

6       In addition to the fact that Central Jail -- it's not open

7   yet.  It's supposed to open to -- to wheelchair mobility folks

8   in the summer, and that's been stated in depositions and on the

9   record.

10      However, Central Jail, where these folks are presently

11  sitting -- why aren't we talking about that?  Why aren't we

12  meeting and conferring about what we can do to make folks more

13  comfortable, more -- make things more accessible at Central

14  while we're waiting for Rock Mountain?

15      And none of that has happened.  That has been inspected by

16  both experts as well.

17      **THE COURT:**  Okay.  I hear you.  I appreciate the

18  update from everyone.  I will take that under consideration,

19  and I will give some thought to how best to move forward on the

20  ADA issues.

21      I will issue a minute order with my -- the date that I've

22  provided you for the parties to meet and confer and then file

23  any motion to compel and, you know, simultaneous response

24  thereto.

25      In the meantime, thanks very much for the status reports.

1    I really do appreciate you-all keeping me apprised on what's
2    happening with the case.
3        I continue to believe that, you know, there should be an
4    opportunity to work together to address some of these issues,
5    maybe not every single issue that's raised in the third amended
6    complaint but at least some of them.
7        And I really do want to work with all parties to see if we
8    can make some progress on narrowing the issues in dispute and
9    coming up with this stuff that the County needs to do, to
10   figure that out together short of a full-on motion practice.
11   But that being said, I understand where things are.  I do
12   appreciate it.
13       Mr. Swearingen, Ms. Kaul, Ms. Pappy, thank you-all very
14   much for the information today.  I'm already late.  So I need
15   to -- to ride off to my next hearing, but I hope you-all enjoy
16   the rest of your day, and thank you for your time this
17   afternoon.
18           **MS. PAPPY:**  Thank you for your time.
19           **MR. SWEARINGEN:**  Thank you, Your Honor.
20           **THE COURT:**  You bet.
21       Have a good day, everyone.
22                  (Proceedings adjourned.)
23
24
25

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4          I certify that the foregoing is a true and correct

5    transcript, to the best of my ability, of the above pages of

6    the official electronic sound recording provided to me by the

7    U.S. District Court, Southern District of California, of the

8    proceedings taken on the date and time previously stated in the

9    above matter.

10         I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties to the action in

12   which this hearing was taken, and further that I am not

13   financially nor otherwise interested in the outcome of the

14   action.

15

16   DATE:  Wednesday, April 5, 2023

17

18

19

20         _____/S/ James C. Pence-Aviles_____

21         James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                        U.S. Court Reporter
22

23

24

25