GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge: Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Date: June 29, 2023<br>Time: 2:00 p.m.<br>Crtrm: 4A<br><br>Trial Date: None Set |

[4245777.7]

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................... 1

I.   DEFENDANTS HAVE LONG BEEN ON NOTICE OF—AND IGNORED—THEIR OBLIGATIONS TO ACCOMMODATE INCARCERATED PEOPLE WITH DISABILITIES. ........................................ 1

II.  DEFENDANTS FAIL TO ENSURE THAT PEOPLE WITH HEARING DISABILITIES ARE PROVIDED EFFECTIVE COMMUNICATION, EVEN DURING MEDICAL ENCOUNTERS. ........... 3

III. DEFENDANTS HOUSE PEOPLE WITH MOBILITY DISABILITIES IN FACILITIES WHERE THEY CANNOT SAFELY ACCESS BEDS, TOILETS, OR SHOWERS. ..................................................... 5

   A.   Defendants House People with Mobility Disabilities in Inaccessible Triple Bunk Beds, Including on Upper and Middle Bunks. ............................................................................... 7

   B.   Defendants Fail to Provide People with Mobility Disabilities Accessible Toilets. ......................................................... 8

   C.   Defendants Fail to Provide People with Mobility Disabilities Accessible Showers. ...................................................... 9

ARGUMENT .................................................................................................... 10

I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ............... 11

   A.   The ADA and Related Statutes Apply to the Jail. ............................... 11

   B.   Plaintiffs Meet All Criteria for Relief Under the ADA and Related Statutes. ............................................................... 12

   C.   Defendants Violate the ADA by Depriving Deaf People of SLI ......... 12

   D.   Defendants Violate the ADA by Depriving People with Mobility Disabilities of Safe, Accessible Facilities for Sleeping, Toileting, and Showering. .................................................................... 15

        1.   The Jail's Current Sleeping, Toileting, and Showering Facilities Are Not Accessible. ...................................... 17

        2.   Rock Mountain Is Not a Solution. ............................................. 18

II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION. .......................................................... 20

III. THE BALANCE OF THE EQUITIES TIPS IN PLAINTIFFS' FAVOR. .................................................................................................... 21

[4245777.7]                                    i                    Case No. 3:20-cv-00406-AJB-DDL

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

IV.  A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST...........21

V.   THE COURT SHOULD WAIVE THE RULE 65(C) SECURITY BOND.........................................................................................21

VI.  THE REQUESTED RELIEF IS CONSISTENT WITH THE PLRA. ...........21

VII. THE COURT SHOULD PROVISIONALLY CERTIFY THE SUBCLASS OF INCARCERATED PEOPLE WITH DISABILITIES.........22

    A.  The Proposed Subclass Is Sufficiently Numerous................................23

    B.  The Proposed Subclass Has Common Questions. ................................23

    C.  Plaintiffs' Claims Are Typical of the Proposed Subclass.....................24

    D.  Plaintiffs and Counsel Are Adequate Representatives. ........................24

    E.  Defendants' Generally Applicable Conduct Requires Relief...............25

CONCLUSION.................................................................................................25

[4245777.7]

ii

Case No. 3:20-cv-00406-AJB-DDL

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*A.B. v. Haw. State Dep't of Educ.*,
    30 F.4th 828 (9th Cir. 2022)..................................................................23

*Armstrong v. Brown*,
    732 F.3d 955 (9th Cir. 2013)....................................................................2

*Armstrong v. Brown*,
    939 F. Supp. 2d 1012 (N.D. Cal. 2013) ...............................................13

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001)......................................................22, 23, 24

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010)...............................................12, 17, 22

*Barnes v. Healy*,
    980 F.2d 572 (9th Cir. 1992)...................................................................20

*C.B. v. Moreno Valley Unified Sch. Dist.*,
    554 F. Supp. 3d 973 (C.D. Cal. 2021)...................................................11

*Cohen v. City of Culver City*,
    754 F.3d 690 (9th Cir. 2014)...................................................................12

*Duffy v. Riveland*,
    98 F.3d 447 (9th Cir. 1996)....................................................................13

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,
    630 F.3d 1153 (9th Cir. 2011)..................................................................21

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998).................................................................24

*Harris v. Bd. of Supervisors, L.A. Cty.*,
    366 F.3d 754 (9th Cir. 2004)....................................................................21

*Hernandez v. Cty. of Monterey*,
    110 F. Supp. 3d 929 (N.D. Cal. 2015) ...............................11, 13, 17, 21

*Hernandez v. Cty. of Monterey*,
    305 F.R.D. 132 (N.D. Cal. 2015) ..........................................................24

*In re Cooper Cos. Sec. Litig.*,
    254 F.R.D. 628 (C.D. Cal. 2009) ..........................................................23

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003)...................................................................21

*Just Film, Inc. v. Buono,*
    847 F.3d 1108 (9th Cir. 2017)............................................................24

*Kirola v. City & Cty. of San Francisco,*
    860 F.3d 1164 (9th Cir. 2017)......................................................15, 16

*Lopez v. Heckler,*
    713 F.2d 1432 (9th Cir. 1983)............................................................21

*Madrid v. Gomez,*
    889 F. Supp. 1146 (N.D. Cal. 1995) ..................................................20

*Martinez v. Cuomo,*
    459 F. Supp. 3d 517 (S.D.N.Y. 2020) ...............................................13

*Meyer v. Portfolio Recovery Assoc., LLC,*
    707 F.3d 1036 (9th Cir. 2012)............................................................22

*Owino v. CoreCivic, Inc.,*
    60 F.4th 437 (9th Cir. 2022)..............................................................23

*Pa. Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998) ..........................................................................12

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014)..............................................................25

*Pierce v. Cty. of Orange,*
    526 F.3d 1190 (9th Cir. 2008)......................................................17, 20

*Pierce v. Cty. of Orange,*
    761 F. Supp. 2d 915 (C.D. Cal. 2011)...............................................22

*Pierce v. Dist. of Columbia,*
    128 F. Supp. 3d 250 (D.D.C. 2015) ...............................................3, 14

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs,*
    251 F.3d 814 (9th Cir. 2001)..............................................................20

*Thor v. Superior Ct.,*
    5 Cal. 4th 725 (1993) .........................................................................20

*Vos v. City of Newport Beach,*
    892 F.3d 1024 (9th Cir. 2018)............................................................11

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ..........................................................................25

*Willits v. City of Los Angeles,*
    925 F. Supp. 2d 1089 (C.D. Cal. 2013)..............................................16

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ..............................................................................11

[4245777.7]        iv        Case No. 3:20-cv-00406-AJB-DDL

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

## STATUTES

18 U.S.C. § 3626................................................................................................22

29 U.S.C. § 794.................................................................................................11

42 U.S.C. § 12132.............................................................................................11

42 U.S.C. § 12134.............................................................................................15

Cal. Gov't Code § 11135 ..............................................................................1, 11

Cal. Pen. Code § 4016.5 ...................................................................................11

## RULES

Fed. R. Civ. P. 23..................................................................................23, 24, 25

Fed. R. Civ. P. 30..........................................................................................3, 4

Fed. R. Civ. P. 65................................................................................................1

## REGULATIONS

28 C.F.R. § 35.104............................................................................................12

28 C.F.R. § 35.150............................................................................................16

28 C.F.R. § 35.151......................................................................................15, 16

28 C.F.R. § 35.152..............................................................................10, 11, 16

28 C.F.R. § 35.160......................................................................................12, 14

28 C.F.R. § 36.104............................................................................................13

28 C.F.R. Pt. 36, App. A at 44 (§ 36.303).......................................................13

## OTHER AUTHORITIES

1991 ADAAG § 4.16.3.......................................................................................17

1991 ADAAG § 4.17.6.......................................................................................18

1991 ADAAG § 4.21.3.......................................................................................18

1991 ADAAG § 4.21.4.......................................................................................18

1991 ADAAG § 4.26..........................................................................................18

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1

2010 ADAS § 403.5.1 ................................................................................. 16

2010 ADAS § 505.4 ..................................................................................... 16

2010 ADAS § 602.5 ..................................................................................... 16

2010 ADAS § 604.4 ..................................................................................... 17

2010 ADAS § 604.5 ..................................................................................... 18

2010 ADAS § 608.3 ..................................................................................... 18

2010 ADAS § 608.4 ..................................................................................... 18

2010 ADAS § 609.2 ..................................................................................... 16

2010 ADAS § 609.3 .......................................................................... 9, 16, 18

2010 ADAS § 903.5 ..................................................................................... 17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# INTRODUCTION

The County of San Diego and San Diego County Sheriff's Department ("Defendants") repeatedly and daily violate the Americans with Disabilities Act ("ADA") and related federal and state antidiscrimination laws.[1] Defendants fail to provide even the most basic accommodations for people with disabilities who are incarcerated at the San Diego County Jail (the "Jail"). Defendants do not provide sign language interpretation ("SLI") and therefore subject deaf people to medical procedures without informed consent. Without SLI, deaf people in mental health crises are unable to communicate their suicidal ideation to mental health clinicians and endure other harm. Defendants deny wheelchair riders safe beds and force them to sleep on the top bunk of triple bunk beds. Without ADA-compliant grab bars, people with mobility disabilities slip and struggle to access toilets and showers.

To protect people with disabilities from these harms and indignities and end this unlawful discrimination, Plaintiffs and the Incarcerated People with Disabilities Subclass bring these Motions pursuant to their Third Claim for Relief, Dkt. No. 231 at ¶¶ 209-15, and Federal Rule of Civil Procedure 65(a), asking this Court to enter an injunction addressing two glaring ADA violations: (1) the failure to provide SLI to people with hearing disabilities; and (2) the failure to ensure people with mobility disabilities have safe and accessible places to sleep, toilet, and shower.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

**I.    Defendants Have Long Been on Notice of—and Ignored—Their Obligations to Accommodate Incarcerated People with Disabilities.**

For the last decade, Defendants have received daily notifications from the

---

[1] The federal Rehabilitation Act and state Government Code Section 11135 require public entities receiving public funding to comply with the ADA. Except where otherwise indicated, this brief refers to all three statutes collectively as the "ADA."

[2] Defendants fail to comply with disability discrimination law in multiple aspects of their jail system. Here, Plaintiffs focus on two issues for which they were granted expedited discovery and which are causing significant harm.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

California Department of Corrections and Rehabilitation ("CDCR"), alerting them of the ADA accommodations required for parolees in the Jail's custody. *See Armstrong v. Brown*, 732 F.3d 955, 962 (9th Cir. 2013) (requiring CDCR to notify county jail officials of every disabled parolee housed in the Jail); *see also* Declaration of Gay Crosthwait Grunfeld, filed herewith ("Grunfeld Decl.") ¶¶ 3-6. Since at least 2015, Defendants have also received letters and reports from the *Armstrong* Plaintiffs' counsel, further alerting them to the ADA needs of CDCR parolees. *See, e.g., id.* ¶¶ 7-8 & Ex. B.

In March 2020, Plaintiff Darryl Dunsmore filed this action *pro se*, alleging that Defendants violated the ADA, among other things. Dkt. 1 at p. 4. In February 2022, Mr. Dunsmore was joined by additional plaintiffs and, now represented by counsel, filed a class action complaint, alleging that Defendants systemically fail to accommodate people with disabilities. Dkt. 81 at ¶¶ 222-50; Dkt. 231 at ¶¶ 240-74.

In May 2022, Plaintiffs moved for a preliminary injunction to require structural and policy changes making the Jail accessible to incarcerated people with mobility disabilities, among other things. Dkt. 119-1 at 26-28. As described in that motion, Defendants' ADA program is deficient, lacking sufficient staff training and an adequate grievance procedure. *Id.* at 27.

The Court denied Plaintiffs' May 2022 motion, noting that "[d]iscovery will no doubt edify the merits of Plaintiffs' claims beyond what currently exists." Dkt. 203 at 10. After Plaintiffs moved for expedited discovery on ADA issues, *see* Dkt. 243, the Court allowed narrow discovery with respect to hearing and mobility disabilities at two Jail facilities. Grunfeld Decl. ¶ 14. Pursuant to the Court's order, Plaintiffs and their expert inspected the Central Jail and the under-construction Rock Mountain Detention Facility, and Defendants produced documents and witnesses for deposition under Federal Rule of Civil Procedure 30(b)(6). *Id.* ¶¶ 15-16, 25-27.

1    **II.    Defendants Fail to Ensure That People with Hearing Disabilities Are Provided Effective Communication, Even During Medical Encounters.**

2

3    People with hearing disabilities rely on different kinds of accommodations to

4    communicate effectively.  Because American Sign Language "is not derived from

5    English …, the vast majority of deaf people … lack the ability to communicate

6    effectively in English, whether by writing notes or reading lips." *Pierce v. Dist. of*

7    *Columbia*, 128 F. Supp. 3d 250, 275 (D.D.C. 2015) (Jackson, J.).  For these

8    individuals, sign language may be their only means of communication.  Other deaf

9    people may rely on hearing aids or other assistive listening devices to communicate.

10   Declaration of Syroun Sanossian, filed herewith ("Sanossian Decl.") ¶¶ 22-24.  To

11   ensure that staff achieve effective communication with deaf incarcerated people,

12   many jails and prisons in California, such as CDCR and Orange County Jail, have

13   detailed policies explaining how to communicate with people with hearing

14   disabilities in various circumstances. *See, e.g.*, Grunfeld Decl. at Ex. Q-167–169,

15   Ex. R-249–252, and T-281, -283–284.

16   In contrast, Defendants' policies related to effective communication with

17   incarcerated people who have hearing disabilities are rudimentary and deficient.

18   The policies provide no guidance on when SLI is required.  To the contrary, the

19   Jail's policy does not explicitly use the term "sign language" and vaguely states:

20   > The County of San Diego has contract providers for interpreting services in place for any County-affiliated
21   > agency.  For non-emergency interpreting service requests, you will find a list of approved service providers at:
22   > https://insiteext.sdcounty.ca.gov/csg/pc/Lists/dpc_cw/Allitemsg.aspx.
23
24   > For emergency interpreting services (such as an arrest or interview), call (619) 398-2488.  Press "5" to obtain the After Hours Emergency Line.[3]
25

26   Defendants' Rule 30(b)(6) deponent was unable to identify any specific instance in

27

28   ───────────────

[3] Grunfeld Decl. at Ex. H-60–61 ; *see also id.* Ex. N-97:4-23 (no other SLI policy).

which SLI was provided to an incarcerated person during a medical, dental, or mental health visit at the Jail, nor of an instance when SLI was provided during a classification interview. *Id.* at Ex. N-93:25–94:19. The Rule 30(b)(6) deponent had never used the phone number for "emergency interpreting services," nor did he know to whom it connected. *Id.* at Ex. N-97:24–98:7.

Defendants' policies also fail to require Jail staff to either evaluate or document the primary means of communication for each person, *e.g.*, sign language, written notes, speaking loudly, or use of hearing aids. Rather, Defendants use the blanket term "hearing deficit/deaf" for all persons with any hearing disability, without further documenting how each person communicates or what accommodations they require. *See id.* at Ex. M-77:13–78:3; *id.* at Ex. N-99:18–102:6; *id.* at Ex. Z-423, -426. As a result, in *each new interaction* Jail staff must use trial-and-error to communicate with a person with hearing disabilities. *See id.* at Ex. M-78:18–79:3; *id.* at Ex. N-91:9–92:25. As Plaintiff Josue Lopez, who is deaf, reported, whenever "a new nurse was assigned to [him], they often failed to communicate effectively … because they did not know, and apparently had no way of knowing, that [he is] deaf." *Id.* at Ex. X-367 ¶ 12; *see also id.* ¶ 13.

In practice, deaf people do not receive SLI in medical encounters and, as a result, do not understand what is happening. Plaintiff Lopez was "never provided … with an interpreter for routine medical contacts inside" the Jail. *Id.* ¶ 12. Cristian Esquivel, another deaf person who "can only read and write a little bit," was not provided SLI for a dental appointment in which the dentist extracted one of his teeth. Esquivel Decl. ¶¶ 3, 7. Mr. Esquivel "did not understand what the dentist, the Jail staff, or anyone else was saying" or "what was on the papers" he was provided, and, as a result, he "did not know that they were going to take out [his] tooth before they did it." *Id.* ¶ 7.

Defendants' policies also force deaf people to suffer mental health crises without being able to communicate effectively with clinicians. Mental health clini-

1  cians at the Jail did not provide Mr. Esquivel with SLI when trying to communicate

2  with him, but instead used written notes, including when he was being housed in a

3  cell for people who are actively suicidal.  Second Esquivel Decl. ¶¶ 5-8; Grunfeld

4  Decl. at Ex. U-299.  Mr. Esquivel cannot effectively communicate through writing

5  and instead was forced to gesture the method of suicide he was contemplating.  *Id.*

6  As he explained in a declaration translated by an SLI:  "If someone asks me to write

7  a note, it wouldn't work, because I do not know how to read or write that much."

8  Second Esquivel Decl. ¶ 7.  While suicidal, Mr. Esquivel "was not able to

9  communicate to anyone how [he] was really feeling."  *Id.* ¶ 8.  Defendants' failure

10  to provide SLI to deaf individuals who need it places them at ongoing risk of serious

11  harm and even death.  Sanossian Decl. ¶ 29.

12  **III.   Defendants House People with Mobility Disabilities in Facilities Where They Cannot Safely Access Beds, Toilets, or Showers.**

13

14       By policy and practice, Defendants house male wheelchair users in the

15  Central Jail facility,[4] specifically, in cells throughout the Jail and in a dormitory

16  unit, 8C, where people in wheelchairs are clustered.  Grunfeld Decl. at Ex. L-71; *id.*

17  at Ex. N-103:2–106:5; Decl. of Darren Scott Bennett, Dkt. 153-3, at ¶ 7.

18  Defendants' policy indicates that people with mobility disabilities who use canes

19  and crutches may be housed in other Jail facilities, including George Bailey

20  Detention Facility.  Grunfeld Decl. at Ex. L-71.

21       The Jail has far more incarcerated people with mobility disabilities than it

22  does cells identified as "accessible."  Despite the fact that, at most, only one cell in

23  each housing unit at Central Jail is identified as "accessible," Defendants housed

24

25  _____

26  [4] Las Colinas Detention Facility, the Jail's facility for people who Defendants identify as female, is also intended to house people in wheelchairs.  Plaintiffs have not yet inspected that facility.  *See* Grunfeld Decl. ¶ 14; *id.* at Ex. L-71.  Defendants

27  have forced trans people to choose between retaining their wheelchairs, and thus being housed at Central Jail, or being housed at Vista Detention Facility in transgender-designated housing but without access to a wheelchair.  *See, e.g.*, Dkt.

28  162-12 (Declaration of Valery Tozer).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

five people in wheelchairs in unit 5C, eight people in wheelchairs in unit 7A, two people in wheelchairs in unit 7B, and three people in wheelchairs in unit 7D. *Id.* at Ex. Z-426–427. Additionally, people with mobility disabilities who need wheel-chairs are routinely forced out of Central Jail and housed in other Jail facilities where wheelchairs are not allowed. *See id.* at Ex. L-71. For example, Nierobi Kuykendall, who has a mobility disability requiring him to be in a wheelchair, was forcibly removed from his wheelchair and transferred to George Bailey where he was denied wheelchair use. Kuykendall Decl. ¶¶ 6-7. After he arrived at George Bailey, a doctor evaluated Mr. Kuykendall's disability and questioned whether it was appropriate for him to be housed there due to its lack of accessible features, but Mr. Kuykendall has nonetheless been housed there ever since. *Id.* ¶ 8 & Ex. B; *see also* Littlejohn Decl. ¶¶ 6-7 (wheelchair confiscated, transferred to George Bailey).

As explained in more detail below, *none* of the Central Jail housing cells that are identified as "accessible" by Defendants—nor the Central Jail dormitory where people with mobility disabilities are clustered—have safe and accessible beds, toilets, and showers. Sanossian Decl. ¶ 10 & Ex. C. The other Jail facilities where Defendants house people with mobility disabilities similarly lack ADA-compliant features. Yet Defendants have no written plan to remedy the Jail's lack of accessible housing. Grunfeld Decl. at Ex. N-124:9-16; *id.* at Ex. DD-461.

As a result, people with mobility disabilities are at constant risk of falling and frequently sustain injuries. People fall when trying to climb in or out of bed, trying to lower or lift themselves from the toilet, and trying to shower. *See, e.g.*, Andrade Decl. ¶ 5; Fuentes Decl. ¶ 5; Kingery Decl. ¶ 6; Kuykendall Decl. ¶¶ 5, 8; Martin Decl. ¶ 4; Medrano ¶ 6; Rosier Decl. ¶ 8. As Captain Bibel acknowledged: "[I]f I received a notification for everyone that slipped and fall, I would never get off the phone." Grunfeld Decl. at Ex. N-121:3-12.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

**A.    Defendants House People with Mobility Disabilities in Inaccessible Triple Bunk Beds, Including on Upper and Middle Bunks.**

Despite Defendants' misrepresentations to the Court that "[t]here's nobody in three bunks anywhere in the facility," Jan. 9, 2023 Hearing Tr., Dkt. 256, at 65:9-10, the Jail's various facilities, including the dormitory at Central Jail where Defendants cluster people with mobility disabilities, contain many triple-decker bunk beds.  *See* Grunfeld Decl. at Ex. N-103:25–106:5, -112:12-22.  The California Board of State and Community Corrections ("BSCC") has explained to the Sheriff's Department that "triple bunks … are not supported by the current infrastructure of" the Jail and told them to "transition[] away from triple bunks."  *Id.* at Ex. S-273.

Yet Defendants routinely force people with mobility disabilities to sleep in triple bunk beds that are difficult and dangerous for them to access, causing them to risk serious injury including by falling on the hard concrete floor.  None of the beds in a triple bunk is accessible to a person with mobility disabilities—including the lower bed.  Sanossian Decl. ¶ 10 & Ex. C-255, -259.  The lower bed is too close to the ground, such that a person in a wheelchair cannot safely lift themselves from the seat of the wheelchair to the bed and back.  *Id.* at Ex. C-259.  In addition, the space between bunks is too narrow for someone with mobility disabilities to twist and squeeze into.  For example, Mr. Kuykendall, who requires a wheelchair and back brace, cannot contort himself into either the lower or middle beds in a triple bunk.  Kuykendall Decl. ¶ 5.  He therefore is forced to either sleep on the floor or attempt climbing onto the top bunk, risking a serious fall.  *Id.*; *see also* Kingery Decl. ¶ 6; Non-Party Request to Present Claim, Dkt. 280 (Apr. 19, 2023) at 1-2.

Defendants also frequently assign people with mobility disabilities to the top or middle bunk, even when the person is unable to climb into those higher beds without the risk of falling.  *See, e.g.*, Andrade Decl. ¶¶ 3-5, 9; Childs Decl. ¶¶ 3-5; Martin Decl. ¶ 3.  Jail policy explicitly permits custody staff to assign people who require a lower bunk to be housed on the *middle* bunk of a triple bed.  Grunfeld

Decl. at Ex. E-51.  And Defendants' own Central Jail rosters show multiple people with mobility disabilities assigned to top and middle bunks, including a wheelchair user and a person with a walker—both of whom were assigned to top bunks.  *Id*. at Ex. Z-424–425.

Even when people with mobility disabilities do receive lower bunk assignments, those bed assignments are not enforced by Defendants.  By policy, a lower bunk assignment is merely a "recommendation[]."  *Id.* at Ex. E-51; *id.* at Ex. J-65.  Matthew Ybarra, who was incarcerated at Central Jail and uses a wheelchair following a stroke, has witnessed deputies "wheel[ing] a mobility-impaired person into the unit and leav[ing] them in 8C [a dormitory] to figure out where to bunk." Ybarra Decl. ¶ 8; *see also* Butler Decl. ¶ 4; Littlejohn Decl. ¶ 4.  Incarcerated people with mobility disabilities—who are likely to be vulnerable given their physical limitations—are thus in the untenable position of relying on other incarcerated people just to get a bed they can safely access, Littlejohn Decl. ¶ 4, or trying to climb into the top bunk to avoid conflict, Butler Decl. ¶ 4; *see also* Ybarra Decl. ¶ 8.

Numerous incarcerated people with disabilities have fallen as a result of being forced to try to climb into an inaccessible bed, including Plaintiff Andrade, who suffered a concussion.  Andrade Decl. ¶ 5; *see also, e.g.*, Fuentes Decl. ¶ 5; Kuykendall Decl. ¶ 5; Martin Decl. ¶ 4; Medrano ¶ 6.  Not only are these injuries harming Plaintiffs and other people incarcerated in the San Diego County Jail, they are costing the County millions in outside medical bills and settlement payouts.  The County recently paid almost $8 million to Frankie Greer, who was assigned to a top bunk despite having a seizure disorder, and subsequently suffered a serious brain injury after falling from the top bunk.  Grunfeld Decl. at Ex. AA-430–433.

### B.  Defendants Fail to Provide People with Mobility Disabilities Accessible Toilets.

Defendants house people with mobility disabilities in units and cells lacking ADA-compliant grab bars near the toilets, making it difficult and dangerous for

people to lower or raise themselves while using the toilet. Dorm 8C in Central Jail, which is used to house people in wheelchairs, *see id.* at Ex. N-103:25–106:5, lacks toilets with grab bars that are compliant with ADA requirements. Sanossian Decl. at Ex. C-268, -273 (citing 2010 ADAS § 609.3); *see also* Clark Decl. ¶¶ 2, 4; Ybarra Decl. ¶ 11. The toilet grab bars have an incorrectly-placed infill plate, which cuts off the gripping surface of the grab bar. Sanossian Decl. at Ex. C-273. Cells at Central Jail—including those identified as "accessible"—lack grab bars completely. *Id.* at Ex. C-264; *see also* Butler Decl. ¶ 4; Fuentes Decl. ¶ 4; Littlejohn Decl. ¶ 5; Medrano Decl. ¶ 4; Rosier Decl. ¶ 4; Grunfeld Decl. at Ex. B-19, -30. Housing units in other Jail facilities, including George Bailey, Vista, and Las Colinas, also lack toilet grab bars. *See* Andrade Decl. ¶ 8; Butler Decl. ¶ 6; Kuykendall Decl. ¶ 7; Landers Decl. ¶ 4.

As a result of Defendants' failure to provide ADA-compliant grab bars, multiple incarcerated people, including Plaintiffs Andrade, Clark, and Landers, have fallen or fear falling when trying to use the toilet. Andrade Decl. ¶ 8; Butler Decl. ¶ 4; Clark Decl. ¶ 4; Fuentes Decl. ¶ 4; Landers Decl. ¶ 4; Littlejohn Decl. ¶ 5.

### C.    Defendants Fail to Provide People with Mobility Disabilities Accessible Showers.

Defendants routinely house people with mobility disabilities in units and cells lacking ADA-compliant shower grab bars and shower seats, which are necessary to provide stability and safety for people who cannot stand unassisted for long periods of time while showering.

At Central Jail, some showers used by people with mobility disabilities lack *any* place to sit, and the showers are too narrow for people in wheelchairs to safely access. Sanossian Decl. at Ex. C-255, -265–269; Littlejohn Decl. ¶ 5; Rosier ¶ 7. The shower grab bars are not ADA-compliant, similar to the toilet grab bars described above, and do not actually make the shower accessible. Sanossian Decl. at Ex. C-265–269. Such faulty grab bars often become slippery, making them

1   dangerous for a person with mobility disabilities to rely on for stability.  *See*

2   Medrano Decl. ¶ 7; Nelson Decl. ¶ 11.

3        The few shower chairs that do exist at Central Jail are portable plastic chairs.[5]

4   Sanossian Decl. at Ex. C-267, -269; *see* Clark Decl. ¶ 6.  Such portable chairs have

5   an inherent "safety risk" due to their capacity to move when a wheelchair user tries

6   to transfer their weight onto the chair.  Sanossian Decl. at Ex. C-267; Medrano Decl.

7   ¶ 7.  Deputies often ignore requests from incarcerated people for help moving chairs

8   into the shower, *see* Nelson Decl. ¶ 11, and there is no policy requiring staff to assist

9   with the placement of shower chairs.  *See* Grunfeld Decl. at Ex. F.

10       Housing units at the Jail's other facilities, including George Bailey and Vista,

11  also lack shower chairs and grab bars.  Andrade Decl. ¶ 7; Butler Decl. ¶¶ 5-6;

12  Kuykendall Decl. ¶¶ 7-8; Kingery Decl. ¶ 6; Martin Decl. ¶ 4.  At least some of the

13  showers in Vista contain a 10- or 11-inch curb, which is difficult and dangerous for

14  people with disabilities to step over when accessing the shower.  Butler Decl. ¶ 6.

15       As a result of Defendants' failure to provide ADA-compliant grab bars or

16  shower chairs, multiple incarcerated people, including Plaintiffs Andrade and

17  Landers, have fallen or fear falling when trying to shower.  Andrade Decl. ¶ 7;

18  Landers Decl. ¶ 4; Kingery Decl. ¶ 6; Kuykendall ¶ 8; Littlejohn Decl. ¶ 5; Martin

19  Decl. ¶ 4; Rosier Decl. ¶ 7.  Some people with mobility disabilities are forced to

20  abstain from showering, like Plaintiff Clark, for fear that they will fall while doing

21  so.  Clark Decl. ¶ 6; *see also* Butler Decl. ¶ 6.

22                              **ARGUMENT**

23       Courts should grant preliminary injunctions when:  plaintiffs are likely to

24  succeed on the merits of their claim; plaintiffs will suffer irreparable harm absent

25  the injunction; the balance of the equities tips in plaintiffs' favor; and an injunction

---

[5] Fixed shower seats may exist in medical housing units.  However, medical housing
is appropriate only for incarcerated people who are "actually receiving medical care
or treatment," 28 C.F.R. § 35.152(b)(2)(ii); it is not a general solution for people
with mobility disabilities.

1  would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

2  20 (2008). Preliminary injunctions are appropriate to remedy violations of the ADA

3  in jails. *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 934 (N.D. Cal. 2015).

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

**A.    The ADA and Related Statutes Apply to the Jail.**

6  Title II of the ADA provides that "no qualified individual shall, by reason of

7  such disability, be excluded from participation in or be denied the benefits of the

8  services, programs or activities of a public entity, or be subjected to discrimination

9  by any such entity." 42 U.S.C. § 12132. The U.S. Department of Justice ("DOJ")

10 regulations implementing the ADA in jails provide that public entities "shall ensure"

11 that incarcerated people with disabilities are "not, because a facility is inaccessible

12 to or unusable by individuals with disabilities, … denied the benefits of, the

13 services, programs, or activities, of a public entity." 28 C.F.R. § 35.152(b)(1).

14 Similarly, Section 504 of the Rehabilitation Act prohibits discrimination on the basis

15 of disability in, among other things, any "operation[]" of a state or local agency. 29

16 U.S.C. § 794. The ADA and Rehabilitation Act "provide identical remedies,

17 procedures and rights." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th

18 Cir. 2018) (internal quotation marks omitted).

19 California state law also requires entities receiving state funding to comply

20 with the ADA and its implementing regulations. California Government Code

21 Section 11135, which prohibits discrimination on the basis of disability, requires

22 that entities receiving state funding "meet the protections and prohibitions contained

23 in section 202 of the federal Americans with Disabilities Act of 1990 [Title II], and

24 the federal rules and regulations adopted in implementation thereof." Cal. Gov't

25 Code § 11135(b); *see also C.B. v. Moreno Valley Unified Sch. Dist.*, 554 F. Supp. 3d

26 973, 992 (C.D. Cal. 2021). Defendants receive state funding. *See* Cal. Penal Code

27 § 4016.5 (state reimbursement of costs to detain sentenced prisoners locally).

28 Long-standing precedent holds that the programs, services, and activities at

1  issue here—sleeping quarters, toilets, showers, communication with medical and

2  mental health care providers, and communication regarding due process encounters

3  in prison or jail—are covered by the ADA.  *See Pa. Dep't of Corr. v. Yeskey*, 524

4  U.S. 206, 210 (1998); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir.

5  2010) ("use of toileting and bathing facilities" is a "benefit" under ADA).

6    **B.    Plaintiffs Meet All Criteria for Relief Under the ADA and Related**
**Statutes.**

7

8    "To prevail under Title II, [a] plaintiff must show that:  (1) he is a qualified

9  individual with a disability; (2) he was either excluded from participation in or

10  denied the benefits of a public entity's services, programs, or activities, or was

11  otherwise discriminated against by the public entity; and (3) this exclusion, denial,

12  or discrimination was by reason of his disability."  *Cohen v. City of Culver City*, 754

13  F.3d 690, 695 (9th Cir. 2014).

14    Each requirement is met here.  First, Plaintiffs and the subclass they seek to

15  represent, including the other declarants herein, are qualified individuals with

16  disabilities:  Plaintiff Lopez has a hearing disability, and Plaintiffs Dunsmore,

17  Andrade, Archuleta, Clark, Landers, and Nelson have mobility disabilities.  *See*

18  Andrade Decl. ¶ 3; Clark Decl. ¶ 3; Landers Decl. ¶ 3; Grunfeld Decl. at Ex. V-338

19  ¶ 5, Ex. W-354 ¶ 4, Ex. X-364 ¶ 3, and Ex. Y-410 ¶ 4.  Second, Plaintiffs are denied

20  access to the Jail's programs, services, and activities by Defendants' policy and

21  practice of (a) failing to provide sign language interpretation and (b) failing to

22  provide safe sleeping, toileting, and showering facilities.  Third, the exclusion and

23  discrimination Plaintiffs experience at the Jail is a result of their disabilities.

24    **C.    Defendants Violate the ADA by Depriving Deaf People of SLI.**

25    The ADA and its implementing regulations mandate that public entities like

26  the Jail ensure that their communications with people with disabilities are

27  "effective," including by providing "auxiliary aids and services," *e.g.*, SLI, to

28  facilitate communication.  28 C.F.R. § 35.160(a)-(b); *see also id.* § 35.104(1)

1  (enumerating types of auxiliary aids).  The type of auxiliary aid required may

2  depend on context, and "interpreters should be used when the matter involves more

3  complexity, such as … in conversations about medical procedures and treatment

4  decisions."  28 C.F.R. Pt. 36, App. A at 44 (§ 36.303).  Interpreters must be able to

5  interpret "effectively, accurately, [and] *impartially*," 28 C.F.R. § 36.104 (emphasis

6  added), in other words, not a cellmate or custody officer, *see* Sanossian Decl. ¶ 28.

7      Federal courts routinely hold that prisons and jails violate the ADA when they

8  fail to provide SLI to incarcerated people with hearing disabilities who use sign

9  language to communicate.  For example, in *Armstrong*, the court concluded that

10  CDCR violates the ADA by "consistently and systemically" denying SLI to deaf

11  prisoners, including at medical and mental health appointments and classification

12  hearings, and, as a result "deaf signers are unable to understand or comprehend

13  significant due process proceedings and medical care provided to them."  Grunfeld

14  Decl. at Ex. T-278; *see also Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1015-22

15  (N.D. Cal. 2013).  CDCR "harm[ed] deaf prisoners" who use SLI "by forcing them

16  to rely on inadequate and ineffective forms of communication, such as reading lips

17  and written notes."  939 F. Supp. 2d at 1021.  In *Hernandez*, the court preliminarily

18  enjoined Monterey County Jail to provide SLI to any incarcerated person "for whom

19  sign language is their only or primary method of communication," for "the intake

20  process, classification hearings, disciplinary hearings, all medical, mental health and

21  dental treatment, … and any other interactions with staff that implicate … due

22  process."  110 F. Supp. 3d at 960; *see also Duffy v. Riveland*, 98 F.3d 447, 455-56

23  (9th Cir. 1996) (reversing summary judgment on ADA claims based on prison's

24  failure to provide SLI in disciplinary proceedings); *Martinez v. Cuomo*, 459 F. Supp.

25  3d 517, 524-26 (S.D.N.Y. 2020) (preliminary injunction requiring government to

26  provide SLI in press briefings).

27      Moreover, the ADA requires an individualized assessment of the specific

28  accommodation that a person with hearing disabilities requires to effectively

communicate.  *Pierce v. Dist. of Columbia*, 128 F. Supp. 3d at 272; *see also* 28 C.F.R. § 35.160(b) ("In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities.").  In *Pierce v. District of Columbia*, for example, the parties vigorously disputed whether the deaf plaintiff had been able to communicate with jail staff.  128 F. Supp. 3d at 275-77.  Regardless of that factual dispute, then-District Judge Jackson concluded that the jail had "violated Section 504 and Title II *as a matter of law* when it failed to evaluate [the deaf plaintiff's] need for accommodation at the time he was taken into custody." *Id.* at 267 (emphasis added).  In other words, jail officials may not "rely[] solely on the assumptions of [staff] regarding [an incarcerated] individual's needs." *Id.* at 272.

Defendants' policies and practices regarding the accommodation of people with hearing disabilities violate the ADA.  Defendants have no written policy requiring SLI at booking, in medical and mental health encounters, or during classification and disciplinary proceedings.  Grunfeld Decl. at Ex. N-96:1–97:23.  By practice, Defendants fail to provide SLI during these critical encounters.  Indeed, Captain Bibel was not aware of a single instance in which an incarcerated person was provided SLI during a dental, medical, or mental health appointment or during a classification interview.  *Id.* at Ex. N-93:25–94:15.  And Defendants have no way to track a person's preferred method of communication, *i.e.*, whether sign language is the primary way a deaf person communicates.  *Id.* at Ex. N-99:18–100:13.  Rather, Defendants generally default to written notes when communicating with deaf people in their custody.  *See id.* at Ex. M-80:16-23, -81:9-11; *id.* at Ex. N-91:9–92:25.  Yet, as noted above, ASL is a distinct language from English, and "the vast majority of deaf people … lack the ability to communicate effectively in English." *Pierce v. Dist. of Columbia*, 128 F. Supp. 3d at 275; Sanossian Decl. ¶¶ 23-24.

Incarcerated people with hearing disabilities, and deaf signers in particular, are harmed by Defendants' failures to accommodate their communication needs.

1   Mr. Esquivel, for example, cannot communicate effectively via written notes, yet,

2   while he was suicidal, mental health staff exclusively used written notes to

3   communicate with him.  Grunfeld Decl. at Ex. U-299, -311.  Mr. Esquivel's

4   inability to write should have been obvious to staff—as the clinician's notes indicate

5   that Mr. Esquivel resorted to gestures in an attempt to communicate his thoughts of

6   "hanging" himself, *id*. at Ex. U-299—yet no SLI was provided.  Both Plaintiff

7   Lopez and Mr. Esquivel were denied SLI during medical appointments, resulting in

8   sub-standard health care, including the extraction of Mr. Esquivel's tooth without

9   his informed consent.  Esquivel Decl. ¶ 7; Grunfeld Decl. at Ex. X-367 ¶ 12.

10          Defendants' policies and practices regarding SLI are legally insufficient; out

11  of step with those of other jails and prisons in California, including Orange County,

12  Santa Barbara County, and CDCR, *see* Grunfeld Decl. at Ex. Q-167–169, Ex. R-

13  249–252, and T-281, -28–284; and lead to discrimination and other harms to deaf

14  incarcerated people.

**D.    Defendants Violate the ADA by Depriving People with Mobility Disabilities of Safe, Accessible Facilities for Sleeping, Toileting, and Showering.**

17          "Title II's implementing regulations mandate that 'each facility constructed'

18  after January 26, 1992, be 'readily accessible to and usable by individuals with

19  disabilities.'"  *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1176 (9th Cir.

20  2017) (quoting 28 C.F.R. § 35.151(a)(1)).  To ensure compliance with that mandate,

21  the ADA instructs DOJ "to adopt its own *binding* access regulations," including

22  detailed requirements for various architectural features, which have gone through

23  multiple iterations.  *Id.* at 1177 (citing 42 U.S.C. § 12134(b)) (emphasis in original).

24  For example, the current DOJ access regulations include specifications for the

25  minimum width of walking paths, the appropriate height of handrails, and the size

26  and spacing of toilet grab bars, among many others.  *See* 2010 ADA Standards for

27

28

1   Accessible Design §§ 403.5.1, 505.4, 602.5, 609.2-3 (Sept. 15, 2010).[6]  Public

2   entities not in compliance with the ADA are required to develop a "transition plan"

3   to "[i]dentify physical obstacles" and outline the "methods," "schedule," and

4   "official responsible" for correcting those ADA violations.  28 C.F.R. § 35.150(d).

5   For construction or alterations built after January 26, 1992, "undue financial

6   burden" is not a defense to noncompliance with ADA regulations.  *Willits v. City of*

7   *Los Angeles*, 925 F. Supp. 2d 1089, 1094 (C.D. Cal. 2013).

8        For purposes of these Motions, two versions of the DOJ access regulations are

9   relevant.  First are the 1991 ADA Accessibility Guidelines ("ADAAG"), which the

10  DOJ adopted on July 26, 1991, and constitute the minimum standards for any

11  building constructed or altered from January 26, 1992 until March 15, 2012.  *Kirola*,

12  860 F.3d at 1177 (citing 28 C.F.R. § 35.151(c)(2)).  Second are the 2010 ADA

13  Standards for Accessible Design ("ADAS"), which the DOJ adopted on Septem-

14  ber 15, 2010, and which constitute the minimum standards for "new constructions or

15  alterations commenced after March 15, 2012."  *Id.* (citing 28 C.F.R. § 35.151(c)(3)).

16  Central Jail, which was built in 1998, Dkt. 153-3 at ¶ 2, is generally governed by the

17  1991 ADAAG, though any renovations—including any currently underway, *see*

18  Grunfeld Decl. at Ex. N-120:12-24—must comply with the 2010 ADAS.  Title II

19  requires jails to "implement reasonable policies, including physical modifications to

20  additional cells in accordance with the 2010 Standards, so as to ensure that each

21  [person] with a disability is housed in a cell with the accessible elements necessary

22  to afford … access to safe, appropriate housing."  28 C.F.R. § 35.152(b)(3).

23       As multiple courts have held, "[b]ecause of the unique nature of correctional

24  facilities, in which jail staff control nearly all aspects of [incarcerated people's]

25  daily lives, most everything provided to [them] is a public service, program or

26  activity, including sleeping …, showering, [and] toileting," that is covered by the

27  ───────────────

28  [6] The current version of the DOJ access regulations can be viewed in full at
    https://www.ada.gov/law-and-regs/design-standards/2010-stds.

ADA.  *Hernandez*, 110 F. Supp. 3d at 935-36; *see also Armstrong*, 622 F.3d at 1068; *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1196 (9th Cir. 2008).

### 1.     The Jail's Current Sleeping, Toileting, and Showering Facilities Are Not Accessible.

Defendants regularly house people with mobility disabilities in non-ADA-compliant cells.  Captain Bibel testified that the Jail has had too many people who use wheelchairs for all of them to be housed in cells identified as "accessible."  Grunfeld Decl. at Ex. N-107:22–108:1.  Defendants produced in discovery two rosters of people with mobility disabilities at Central Jail; *both* show more than one wheelchair user in each housing unit, when each unit contains only one cell identified as "accessible."  *Id.* at Ex. Z-423–428.  In addition, Defendants house people with mobility disabilities at George Bailey and other Jail facilities where it is undisputed that *no* units are "accessible."  *See, e.g.*, Kuykendall Decl. ¶¶ 6-7.

Even those housing units at Central Jail that Defendants identify as "accessible" are not ADA-compliant.  Plaintiffs' qualified expert has concluded that these cells do not comply with the DOJ's accessibility standards:

***Inaccessible Bed Spaces.***  The ADA Standards require that any seat a person with a mobility disability might be required to sit on be at approximately the same height as a standard wheelchair, to enable them to safely transfer into and out of a wheelchair.  *See, e.g.*, 2010 ADAS §§ 604.4 (toilet seat), 903.5 (bench seat); 1991 ADAAG § 4.16.3 (toilet seat).  In addition, the BSCC has explained that "use of triple bunks … are not supported by the current infrastructure of" the Jail.  Grunfeld Decl. at Ex. S-273.  Defendants nevertheless routinely house people with mobility disabilities on upper or middle bunks of three-tier beds, and their policies expressly state that middle bunks should be considered "lower" bunks.  *Id.* at Ex. E-51; *id.* at Ex. Z-42–428.  None of those bunks is accessible for people with mobility disabilities, and housing people there is an "egregious, dangerous practice."  Sanossian Decl. ¶ 19.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

***Inaccessible Toilets.***  Toilet grab bars are required by both the 1991 ADAAG and the 2010 ADAS.  1991 ADAAG § 4.17.6; 2010 ADAS § 604.5.  The ADA Standards also include specifications for the gripping space of the grab bar.  *See* 1991 ADAAG § 4.26; 2010 ADAS § 609.3.  Defendants fail to provide ADA-compliant grab bars in numerous locations throughout their facilities, including those cells Defendants deem "accessible."  *See* Sanossian Decl. at Ex. C-263, -269.  The few toilet grab bars that do exist do not comply with the 2010 ADAS, because the gripping space is obstructed.  *Id.* at Ex. C-273.

***Inaccessible Showers.***  Shower grab bars and shower chairs are required by both the 1991 ADAAG and the 2010 ADAS.  1991 ADAAG §§ 4.21.3, 4.21.4; 2010 ADAS §§ 608.3, 608.4.  As noted above, the standards include specifications for the gripping space of grab bars.  *See* 1991 ADAAG § 4.26; 2010 ADAS § 609.3.  In addition, both standards set the required dimensions for a shower space to be accessible.  None of the showers used by people with mobility disabilities comply with those legal requirements.  *See* Sanossian Decl. at Ex. C-265–269.

Defendants have no written transition plan to remedy these violations.  Grunfeld Decl. at Ex. N-124:9-16; *id.* at Ex. DD-461.  And, as a result of their failure to do so, there is an ongoing, substantial, and unacceptable risk of serious harm to incarcerated people with mobility disabilities.  Numerous incarcerated people, including Plaintiffs, have suffered physical injury and/or fear physical injury when completing basic life tasks.  Incarcerated people with disabilities fall trying to get in and out of bed.  *See supra* at p. 8.  They fall trying to access the toilet.  *See supra* at p. 9.  And they fall trying to use the shower.  *See supra* at p. 10.

## 2.    Rock Mountain Is Not a Solution.

Defendants suggest that their failure to comply with federal and state disability law violations will be solved with the opening of the Rock Mountain Detention Facility ("Rock Mountain").  Defendants have explained that their "goal is to house all wheelchair users at Rock Mountain once the facility opens."  Dkt.

153-3 at ¶ 7; *see also* Aug. 11, 2022 Hearing Tr., Dkt. 204, at 17:9-13.  But when asked about the plan to house people with disabilities at Rock Mountain, Defendants' Rule 30(b)(6) deponent stated that he "didn't know" about that plan "until now."  Grunfeld Decl. at Ex. M-84:2-8.  Prior to the day of his deposition, he had "assume[d] that Rock Mountain wouldn't be any different than any other facility," regarding the housing of people with disabilities.  *Id.*

Rock Mountain is not the solution for people with mobility disabilities who are currently incarcerated and harmed in the Jail.  Rock Mountain is presently only a construction site, and what has been built at the site is not compliant with the ADA.  Sanossian Decl. ¶ 7 & Ex. B.  Among other problems, the grab bars for both toilets and showers suffer the same problem as those at Central Jail:  they cannot be "fully grip[ped]," creating a risk that someone using the grab bar will slip and fall.  *Id.* at Ex. B-14–15.  The beds are installed at the wrong height, so a person in a wheelchair cannot safely transfer into them.  *Id.* at Ex. B-16–17.  In addition, it does not appear that Rock Mountain will contain enough housing that is identified as "accessible"—let alone that actually complies with the ADA—for all people in wheelchairs in the Jail's custody.  *Id.* at Ex. B-23–25.  Finally, Rock Mountain is not intended to be a booking facility, *id.* at Ex. B-11, meaning that people with mobility disabilities will still be housed at Central Jail for booking.

Even if Rock Mountain were to eventually become an ADA-compliant booking facility with sufficient accessible housing, the Court should not trust Defendants' representations regarding when it will open.  Defendants have been making premature representations for years—and their timeline has continually been extended.  *See, e.g.*, Grunfeld Decl. at Ex. BB-440 (in 2019, "Rock Mountain … is projected to open soon"); Dkt. 153-3 at ¶ 12 (as of May 2022, "opening this Fall"); Dkt. 204 at 17:9-10 (as of August 2022, "hopefully going to open this fall"); Dec. 7, 2022 Hearing Tr. at 9:17-18, 20:10 ("going to be done and operational in the first quarter of 2023"); Dkt. 256 at 46:1-2 (as of January 2023, "supposed to open" in

"spring").  Just last month, Defendants' Rule 30(b)(6) deponent testified that he "ha[d] no idea" when Rock Mountain would be operational.  Grunfeld Decl. at Ex. M-82:17–83:3.  Defendants' representations that Rock Mountain will open imminently cannot be considered credible.  *See, e.g.*, *Pierce v. Cty. of Orange*, 526 F.3d at 1223 (conclusion that County would "move toward full compliance" with the ADA was "unwarranted given the County's track record").

In any event, as a matter of law, promises of future changes are not sufficient bases to deny a preliminary injunction.  *See Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992) ("Voluntary cessation of an illegal course of conduct does not render moot a challenge to that course of conduct unless (1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."); *see also Madrid v. Gomez*, 889 F. Supp. 1146, 1281-82 (N.D. Cal. 1995).  Plaintiffs need and are entitled under the law to safe, accessible housing now.

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION.

The Ninth Circuit has "held that where a defendant has violated a civil rights statute, [the court] will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation."  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001).  Irreparable injury may be presumed here because Defendants' failures to provide SLI and safe, accessible sleeping, toileting, and showering facilities are violations of antidiscrimination law.

Moreover, Plaintiffs and incarcerated people with disabilities have suffered loss of dignity and physical injuries as a result of Defendants' policies and practices, and they are at ongoing risk of future harm.  Mr. Esquivel, for example, was subjected to a serious medical procedure without his informed consent—in other words, he suffered a battery, *see Thor v. Superior Ct.*, 5 Cal. 4th 725, 735 (1993).  Esquivel Decl. ¶ 7.  Several people with disabilities have fallen trying to complete

1  basic life tasks, including Plaintiff Andrade, who sustained a concussion.  Andrade

2  Decl. ¶ 5; *see also supra* at pp. 8-10.  The risk of serious harm remains ever-present

3  for Plaintiffs and other incarcerated persons with disabilities.

### III.  THE BALANCE OF THE EQUITIES TIPS IN PLAINTIFFS' FAVOR.

5          "[F]aced with [] a conflict between financial concerns and preventable human

6  suffering, [courts] have little difficulty concluding that the balance of hardships tips

7  decidedly in plaintiffs' favor."  *Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d

8  754, 766 (9th Cir. 2004) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir.

9  1983)).  The actual and substantial risk of serious harm to incarcerated people with

10  disabilities as a result of Defendants' conduct weighs heavily in Plaintiffs' favor.

### IV.  A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

12          A preliminary injunction enjoining Defendants' ADA violations would serve

13  "the public's interest in enforcement of the ADA and in elimination of

14  discrimination on the basis of disability."  *Hernandez*, 110 F. Supp. 3d at 958 (citing

15  *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011)).

16  The public interest is further served by protecting people from the risk of physical

17  injury while they are in custody, reducing the cost of state-funded medical care and

18  the number of individual lawsuits based on injuries, and enhancing public

19  confidence that the entity charged with enforcing criminal justice itself complies

20  with the law.

### V.  THE COURT SHOULD WAIVE THE RULE 65(C) SECURITY BOND.

22          "Rule 65(c) invests the district court with discretion as to the amount of

23  security required, *if any*."  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)

24  (internal quotation marks and citation omitted).  Courts routinely exercise this

25  discretion to require no security in cases brought by indigent or incarcerated people.

26  *See, e.g.*, *Hernandez*, 110 F. Supp. 3d at 958-59.  The Court should do so here.

### VI.  THE REQUESTED RELIEF IS CONSISTENT WITH THE PLRA.

28          The Prison Litigation Reform Act ("PLRA") authorizes preliminary

injunctive relief to address conditions of confinement in criminal detention facilities. *See* 18 U.S.C. § 3626(a)(2). Such relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct that harm." *Id.*; *see also Armstrong v. Davis*, 275 F.3d 849, 872 (9th Cir. 2001). The Ninth Circuit has explained that, "in a prison litigation case," the most appropriate process "for devising a suitable remedial plan" is to "allow[] defendants to develop policies and procedures to meet" the legal requirements of the ADA. *Armstrong*, 622 F.3d at 1071; *see also Pierce v. Cty. of Orange*, 761 F. Supp. 2d 915, 954 (C.D. Cal. 2011) ("[T]he least intrusive means to compel the County to remedy the physical barriers … is to allow the County to draft a proposed plan that will address and correct each and every physical barrier identified in this Order.").

Here, Plaintiffs ask the Court to require Defendants to produce and implement a plan for timely: (1) requiring the evaluation and documentation of the primary method of communication for people with hearing disabilities and providing SLI at booking, medical, dental, and mental health encounters, classification, and disciplinary proceedings; and (2) ensuring that people with mobility disabilities are housed in ADA-compliant units/cells and remedying the lack of 2010 ADAS-compliant sleeping, toileting, and showering facilities, including specific, staged deadlines for renovations. Plaintiffs' Proposed Order, Grunfeld Decl. Ex. A, is consistent with the PLRA. The proposed order requires Defendants to devise their own remedial plans—consistent with Ninth Circuit guidance.

## VII.   THE COURT SHOULD PROVISIONALLY CERTIFY THE SUBCLASS OF INCARCERATED PEOPLE WITH DISABILITIES.

When issuing a preliminary injunction on a class-wide basis, courts may provisionally certify a class. *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). Plaintiffs seek provisional certification of the Incarcerated People with Disabilities Subclass, as defined in the Third Amended

Complaint.  Dkt. 231 ¶ 433.  Provisional class certification is appropriate because Plaintiffs meet the requirements of Federal Rule of Civil Procedure 23.

## A.    The Proposed Subclass Is Sufficiently Numerous.

A class may be certified if "the class is so numerous that joinder of all members in impracticable."  Fed. R. Civ. P. 23(a)(1); *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 835-36 (9th Cir. 2022).  "[N]umerosity is presumed where the plaintiff class contains forty or more members."  *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009).

The Proposed Subclass is so numerous that joinder would be impractical.  In 2022, the Jail booked 50,705 individuals.[7]  The Bureau of Justice Statistics estimates that 10 percent of people confined in criminal detention facilities have a hearing disability and 12 percent have an ambulatory disability, Grunfeld Decl. at Ex. CC-450, meaning that the Jail may annually house as many as 5,070 people with hearing disabilities and 6,084 with ambulatory disabilities.  Indeed, Captain Bibel stated that over 1,000 people at the Jail each year either use a wheelchair, cane, or crutches, or otherwise have a recognized mobility disability, *see id.* at Ex. O, though that is likely an underestimation in light of the Bureau of Justice Statistics report.

## B.    The Proposed Subclass Has Common Questions.

Rule 23(a)(2) requires there to be "questions of law or fact common to the class."  "Commonality is necessarily established where there is a class-wide policy to which all class members are subjected."  *Owino v. CoreCivic, Inc.*, 60 F.4th 437, 444 (9th Cir. 2022).  Where such system-wide practices exist, "individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality."  *Armstrong*, 275 F.3d at 868.

Plaintiffs and all members of the Proposed Subclass challenge such system-wide practices and as such share a common core of facts:  they are or will be

---

[7] *See* San Diego County Sheriff's Department, "Jail Data / Reports," available at https://www.sdsheriff.gov/resources/jail-population-data.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

1  detained in the Jail and thus are subject to Defendants' systemic policies and

2  practices that fail to provide adequate disability accommodations.  A central

3  question common to all Proposed Subclass members is whether Defendants'

4  systemic failures to provide those accommodations violates the ADA.

### C.    Plaintiffs' Claims Are Typical of the Proposed Subclass.

6      Rule 23(a)(3) requires that "the claims … of the representative parties [be]

7  typical of the claims … of the class."  Typicality is "satisfied when each class

8  member's claim arises from the same course of events, and each class member

9  makes similar legal arguments to prove the defendant's liability." *Armstrong*, 275

10  F.3d at 868 (internal citation and quotation marks omitted).  When "plaintiffs all

11  suffer a refusal or failure to afford them accommodations as required by statue, and

12  are objects of discriminatory treatment on account of their disabilities," Rule

13  23(a)(3) is satisfied.  *Id.* at 869.  "[M]inor differences in the nature of the specific

14  injuries suffered by the various class members … are insufficient to defeat

15  typicality." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017).

16      Plaintiffs' claims are typical of the Proposed Subclass because both Plaintiffs

17  and the putative class members are subject to the same unlawful course of conduct

18  by Defendants:  the failure to provide disability accommodations.

### D.    Plaintiffs and Counsel Are Adequate Representatives.

20      Rule 23(a)(4) requires that "the representative parties will fairly and

21  adequately protect the interests of the class."  This factors requires that (1) proposed

22  representative plaintiffs have no conflicts of interest with the proposed class and

23  (2) plaintiffs be represented by qualified or competent counsel. *Hanlon v. Chrysler*

24  *Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

25      Plaintiffs are not aware of any conflicts among the putative class

26  representatives and the Proposed Subclass. *See Hernandez v. Cty. of Monterey*, 305

27  F.R.D. 132, 160 (N.D. Cal. 2015) ("Class representatives have less risk of conflict

28  with unnamed class members when they seek only declaratory and injunctive

1   relief."). Plaintiffs' counsel have extensive experience litigating complex class

2   actions, including those related to conditions of confinement in jails and prisons, and

3   have committed substantial resources to this litigation. Grunfeld Decl. ¶¶ 44-58.

4   **E.    Defendants' Generally Applicable Conduct Requires Relief.**

5       Class certification is appropriate when "the party opposing the class has acted

6   or refused to act on grounds that apply generally to the class, so that final injunctive

7   relief or corresponding declaratory relief is appropriate respecting the class as a

8   whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the 'indivisible

9   nature of the injunctive or declaratory remedy warranted—the notion that the

10  conduct is such that it can be enjoined or declared unlawful only as to all of the class

11  members or as to none of them.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

12  360 (2011) (citation omitted). "[T]he primary role of this provision has always been

13  the certification of civil rights class actions." *Parsons v. Ryan*, 754 F.3d 657, 686

14  (9th Cir. 2014). Because all the Proposed Subclass members are subject to

15  Defendants' conduct and seek systemic injunctive relief, Rule 23(b)(2) is satisfied.

16  **CONCLUSION**

17      For the foregoing reasons, Plaintiffs respectfully request that the Court grant

18  these Motions.

19

20  DATED:  April 25, 2023            Respectfully submitted,

21                                   ROSEN BIEN GALVAN & GRUNFELD LLP

22
                                     By: */s/ Gay Crosthwait Grunfeld*
23                                       Gay Crosthwait Grunfeld

24                                   Attorneys for Plaintiffs

25

26

27

28