1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  PRIYAH KAUL – 307956
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   ROSEN BIEN
4  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
5  San Francisco, California  94105-1738
   Telephone:  (415) 433-6830
6  Facsimile:   (415) 433-7104
   ggrunfeld@rbgg.com
7  vswearingen@rbgg.com
   pkaul@rbgg.com
8  eanderson@rbgg.com
   hchartoff@rbgg.com
9
   AARON J. FISCHER – 247391
10 LAW OFFICE OF
   AARON J. FISCHER
11 1400 Shattuck Square Suite 12 - #344
   Berkeley, California  94709
12 Telephone:  (510) 806-7366
   Facsimile:   (510) 694-6314
13 ajf@aaronfischerlaw.com

14 Attorneys for Plaintiffs

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA  92121-2133
Telephone:  (858) 677-1400
Facsimile:  (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

15               UNITED STATES DISTRICT COURT

16             SOUTHERN DISTRICT OF CALIFORNIA

17 DARRYL DUNSMORE, ANDREE
   ANDRADE, ERNEST ARCHULETA,
18 JAMES CLARK, ANTHONY EDWARDS,
   LISA LANDERS, REANNA LEVY,
19 JOSUE LOPEZ, CHRISTOPHER
   NELSON, CHRISTOPHER NORWOOD,
20 JESSE OLIVARES, GUSTAVO
   SEPULVEDA, MICHAEL TAYLOR, and
21 LAURA ZOERNER, on behalf of
   themselves and all others similarly situated,

22               Plaintiffs,

23        v.

24 SAN DIEGO COUNTY SHERIFF'S
   DEPARTMENT, COUNTY OF SAN
25 DIEGO, SAN DIEGO COUNTY
   PROBATION DEPARTMENT, and DOES
26 1 to 20, inclusive,

                Defendants.
27

28

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF GAY
CROSTHWAIT GRUNFELD IN
SUPPORT OF PLAINTIFFS'
MOTIONS FOR PRELIMINARY
INJUNCTION AND
PROVISIONAL CLASS
CERTIFICATION**

Judge:       Hon. Anthony J. Battaglia
Magistrate: Hon. David D. Leshner

Date:    June 29, 2023
Time:    2:00 p.m.
Crtrm:   4A

Trial Date: None Set

**[REDACTED]**

[4259279.3]

I, Gay Crosthwait Grunfeld, declare:

1.    I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

2.    Attached hereto as **Exhibit A** is a true and correct copy of Plaintiffs' proposed Order Granting Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

## I.    Defendant San Diego County Sheriff's Department Has Repeatedly Been Informed of ADA Violations in San Diego County Jails.

3.    In my capacity as Plaintiffs' counsel in the long running Americans with Disabilities Act ("ADA") lawsuit against the California Department of Corrections and Rehabilitation ("CDCR") entitled *Armstrong v. Newsom* (N.D. Cal. No. 4:94-cv-02307-CW), I have been monitoring CDCR's compliance with the *Armstrong* County Jail Plan since its inception in 2012.  Under that remedial plan, CDCR is required to inform counties on a daily basis of the disability needs of people with disabilities who are incarcerated in county jails by CDCR.  CDCR is also required to respond to letters from my law firm regarding the accommodation needs of CDCR parolees with disabilities who are incarcerated at county jails.

4.    On a regular basis, I receive copies of emails from CDCR to San Diego County Jail personnel, informing them of the disability needs of recently incarcerated people, including those who have hearing and mobility disabilities. These and similar emails serve as notice to Defendants of the ADA needs of persons incarcerated in their jails.

5.    For example, on June 13, 2019, December 24, 2022, and February 28, 2023, CDCR wrote emails to Sheriff's Department personnel, copying me, notifying them of individuals in their custody who have been evaluated by medical staff in

CDCR and determined to be deaf or hard-of-hearing.  An email dated June 13, 2019 describes an individual who is deaf and also unable to speak.  The email indicates that this individual requires a sign language interpreter to communicate.

6.     Similarly, on January 13, 2023 and February 3, 2023,, CDCR wrote emails to Sheriff's Department personnel, copying me, notifying them of individuals in their custody who have been evaluated by medical staff in CDCR and determined to have a mobility disability that requires them to use a wheelchair.  The February 3, 2023 email describes an individual who "requires wheelchair and wheelchair accessible housing at all times."

7.     From time to time, attorneys under my supervision visit San Diego County Jail (the "Jail") to interview our clients in the *Armstrong* case, incarcerated people with disabilities, when they are incarcerated there on alleged parole violations or on out-to-court status.  We also write letters to CDCR describing issues faced by our *Armstrong* clients with disabilities in the Jail, and we provide copies of these letters to Sheriff's Department and County personnel.

8.     Attached hereto as **Exhibit B** are true and correct copies of letters without their enclosures dated February 23, 2018, July 11, 2018, September 3, 2019, and July 28, 2021, from attorneys under my supervision to CDCR and copying Sheriff's Department and County personnel, notifying CDCR, the County, and the Sheriff's Department of individuals housed in the Jail who have been denied accommodations for their disabilities.  For example, the letter dated July 11, 2018, describes an individual who "uses a wheelchair and … arrived at the jail in a wheelchair but it was taken by jail staff on arrival," causing him to fall twice, as well as an individual who uses a wheelchair but was not housed in a wheelchair accessible cell.  *See id.* at B-24.  The letter dated September 3, 2019, reports that Ernest Archuleta (now a Plaintiff in this case) fell  and injured himself while walking down the stairs to his housing unit, which lacked a shower chair and  toilet grab bars.  The letter dated July 28, 2021, reports that James Clark (now a Plaintiff

DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION—**REDACTED**

1  in this case) had been denied a cane and was "struggl[ing] to get in and out of bed,

2  and is at risk of falling." *Id.* at B-35.

3      9.   The Jail's significant ADA violations became even more clear to me

4  when I learned of a deaf signer named Josue Lopez (now a Plaintiff in this case).

5  Mr. Lopez was confined to the Jail for approximately 19 months and consistently

6  denied sign language interpretation for medical appointments in the Jail, as well as

7  for interactions with Jail staff.  Although a sign language interpreter was present for

8  his initial mental health appointment, Mr. Lopez was handcuffed to a bar during the

9  interaction, so he was not able to use both his hands to effectively communicate.

10  Our firm  assisted Mr. Lopez in filing a grievance over, *inter alia*, the Jail's denials

11  of sign language interpretation, a true and correct copy of which is attached hereto

12  as **Exhibit C**.  I have never seen a response to this April 28, 2021 grievance.

13      10.   In addition, I learned of Plaintiff Darryl Dunsmore's pending lawsuit

14  for, *inter alia*, denial of accommodations for his mobility disability, while

15  incarcerated at the Jail.  I filed a notice of appearance in this case on December 13,

16  2021.

17  **II.   Discovery Provided Pursuant to Judge Leshner's Order for Expedited**
**Discovery of the Jail's Current ADA Policies and Practices Confirms**

18  **That the County Is Woefully Deficient in Its Compliance With the ADA**
**and Related Statutes**

19

20      11.   Since my appearance in this case, my colleagues and I have reached out

21  to Defendants' counsel repeatedly to work with Defendants toward ADA

22  compliance at the Jail, without resorting to motion practice.  For example, attached

23  hereto as **Exhibit D** are true and correct copies of letters dated March 15, 2022 from

24  my partner Van Swearingen and April 4, 2023 from me to Defendant's counsel.

25  Defendants' counsel have not agreed to Plaintiffs' proposals.

26      12.   On May 2, 2022, Plaintiffs filed Motions for Preliminary Injunction

27  and Provisional Class Certification ("2022 PI Motion"), which included a

28  declaration from our ADA expert Syroun Sanossian, as well as declarations from

DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION—**REDACTED**

eleven incarcerated people describing failures to provide effective communication and accommodate mobility disabilities.

13.     In the order denying the 2022 PI Motion, the Court suggested that further discovery would be helpful.  On December 14, 2022, we moved for expedited discovery on ADA issues.

14.     On January 17, 2023, Judge Leshner issued an order permitting expedited ADA discovery with respect to the County's approach to mobility and hearing disabilities at two of its facilities, Central Jail, located at 1173 Front Street, San Diego, California, and Rock Mountain Detention Facility, located at 446 Alta Road, San Diego, California.  *See* Dkt. No. 258.  The Court's order included requests for production of documents that the Court approved and that Defendants were required to respond to by February 27, 2023.

15.     On February 10, 2023, as authorized by the Court's order, a colleague and I and Plaintiffs' experts, Syroun Sanossian and Io Seng Ng of SZS Consulting, inspected the Rock Mountain facility.  The facility is unoccupied and incomplete, lacking a kitchen, sinks, and other features for operation.  During the course of the approximately eight hours I spent on site, I saw only one construction worker.  I heard no sounds nor saw any signs of active construction work.  We were accompanied during our tour by Defendants' counsel, Susan Coleman; Defendants' expert, Paul Joelson; and Defendants' Building Superintendent, Scott Bennett.

16.     On February 27, 2023, Defendants produced documents, Bates stamped SD-00081 through SD-000431.  Included in those documents were copies of policies and procedures that purport to address people with disabilities in the Jail.  These documents are available on the County website or through Public Record Act requests, but only in redacted form.  I have been informed and believe that the documents called "policies and procedures" apply throughout Defendants' system, whereas the documents called "green sheets" apply only to a particular jail facility.  Defendants later produced a few additional documents, Bates stamped SD000432-

DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION—**REDACTED**

000470, in response to the ADA document requests.

17. Attached hereto as **Exhibit E** is a true and correct copy of Defendants' Detention Services Bureau Manual of Policies and Procedures Section I.22 ("Lower Bunk / Lower Tier Assignment").

18. Attached hereto as **Exhibit F** is a true and correct copy of Defendants' Detention Services Bureau Manual of Policies and Procedures Section M.39 ("Disabled Incarcerated Persons").

19. Attached hereto as **Exhibit G** is a true and correct copy of Defendants' Detention Services Bureau Manual of Policies and Procedures Section M.39.C.1 (San Diego Central Jail Green Sheet regarding "Disabled Inmates – Usage of Lower Bunks Lower Tier").

20. Attached hereto as **Exhibit H** is a true and correct copy of Defendants' Detention Services Bureau Manual of Policies and Procedures Section P.11 ("Incarcerated Persons Who Are Deaf or Hard of Hearing").

21. Attached hereto as **Exhibit I** is a true and correct copy of Defendants' Detention Services Bureau Manual of Policies and Procedures Section P.11.C.1 (San Diego Central Jail Green Sheet regarding "Incarcerated Persons Who Are Deaf or Hard of Hearing").

22. Attached hereto as **Exhibit J** is a true and correct copy of Defendants' Medical Services Division Operations Manual Section MSD.F.1.2 ("Lower Bunk/Lower Tier").

23. Attached hereto as **Exhibit K** is a true and correct copy of Defendants' Medical Services Division Operations Manual Section MSD.P.7 ("Prostheses, Orthoses, and Other Aids to Impairment").

24. Attached hereto as **Exhibit L** is a true and correct copy of Defendants' Medical Services Division Nursing Guidelines Section NSG.C.12 ("COVID-19 Interim Emergency Classification Matrix for Medical and Psychiatric Housing").

25. On March 13, 2023, as authorized by the Court's order, a colleague and

I and Plaintiffs' experts, Syroun Sanossian and Io Seng Ng of SZS Consulting, inspected Defendants' Central Jail facility. The facility is occupied and has been designated as San Diego's facility to house all male incarcerated people with wheelchairs. We were accompanied during our tour by Defendants' counsel, Susan Coleman; Defendants' expert, Paul Joelson; Defendants' Building Superintendent, Scott Bennett; and Defendants' person-most-knowledgeable for ADA issues, Captain Kyle Bibel, the Commander of Central Jail.

26.    On March 14, 2023, Plaintiffs took the depositions of Sergeant Matthew Jensen and Lieutenant Derek Williamson, both assigned to the Detention Support Division of the Sheriff's Department. Attached hereto as **Exhibit M** is a true and correct copy of excerpts from the deposition of Sergeant Jensen, who was designated as Defendants' Rule 30(b)(6) witness on Rock Mountain.

27.    On March 15, 2023, Plaintiffs took the deposition of Captain Kyle Bibel, the commander of Central Jail. Attached hereto as **Exhibit N** is a true and correct copy of excerpts of the deposition of Captain Bibel, who was designated as Defendants' Rule 30(b)(6) witness on Central Jail with respect to current policies, procedures, and practices regarding the accessibility of facilities, housing, programs, services, activities, effective communication, reasonable accommodations, and assistive devices for incarcerated persons with disabilities.

28.    In his deposition, Captain Bibel referenced a presentation he had given on ADA issues at the Jail. **Exhibit O** is a true and correct copy of that presentation, which was given on July 8, 2022 to the San Diego County Committee for Persons with Disabilities. This video is not able to be filed electronically and is the subject of Plaintiffs' Application for Leave to Allow Non-Electronic Filing of Exhibits, filed concurrently with Plaintiffs' Motions.

**III.    Defendants Are Failing to Comply with the ADA as Demonstrated by Numerous Documents.**

29.    Attached hereto as **Exhibit P** is a true and correct copy of the Santa

1  Clara County Mobility Disability Remedial Plan, which was entered into by consent

2  decree on November 6, 2018.

3      30.    Attached hereto as **Exhibit Q** is a true and correct copy of the

4  Remedial Plan for the Orange County Jail Regarding the Treatment of People with

5  Disabilities, Restrictive Housing, and the Treatment of People who Identify as

6  Lesbian, Gay, Bisexual, Transexual, Queer or Intersex (LGBTQI), dated

7  November 21, 2019.

8      31.     Attached hereto as **Exhibit R** is a true and correct copy of the Santa

9  Barbara County Jail Remedial Plan, dated July 17, 2020.

10     32.    Attached hereto as **Exhibit S** is a true and correct copy of an excerpt

11 from the California Board of State and Community Corrections' June 8, 2022 report

12 on the 2020-2022 Biennial Inspection of San Diego County Type II Jail Facilities.

13 Among the items of noncompliance with Title 24 minimum standards identified in

14 the report is the Jail's continued use of triple bunks, which, the BSCC explained

15 "are not supported by the current infrastructure" of the Jail.  *See id.* at S-273.  The

16 inspections found that:

17       "Double occupancy cells and dormitories in the facilities listed above
         are equipped with triple bunks.  On the dates of inspection, many of
18       these cells were occupied by three inmates.  The square footage of floor
         space along with fixtures to include toilets, washbasins, and showers
19       does not support the number of occupants."

20 *Id.* at S-272.

21     33.    Attached hereto as **Exhibit T** is a true and correct copy of the

22 Injunction in *Armstrong v. Newsom*, dated January 18, 2007, requiring the provision

23 of sign language interpreters at each prison designated to house prisoners whose

24 hearing disabilities impact their placement.

25     34.    Attached hereto as **Exhibit U** is a true and correct copy of excerpts

26 from the medical records of Cristian Esquivel, 22749556, who has been currently

27 incarcerated in the Jail since November 29, 2022.  Mr. Esquivel is deaf and

28 communicates through a sign language interpreter.

DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION—**REDACTED**

35.     Attached hereto as **Exhibit V** is a true and correct copy of the declaration of Plaintiff Darryl Dunsmore (without exhibits), filed in support of Plaintiffs' 2022 PI Motion.

36.     Attached hereto as **Exhibit W** is a true and correct copy of the declaration of Plaintiff Ernest Archuleta (without exhibits), filed in support of Plaintiffs' 2022 PI Motion.

37.     Attached hereto as **Exhibit X** is a true and correct copy of the declaration of Plaintiff Josue Lopez, filed in support of Plaintiffs' 2022 PI Motion.

38.     Attached hereto as **Exhibit Y** is a true and correct copy of the declaration of Plaintiff Christopher Nelson (without exhibits), filed in support of Plaintiffs' 2022 PI Motion.

39.     Attached hereto as **Exhibit Z** is a true and correct copy of redacted disability rosters showing where ADA individuals are housed in the Jail.  The first roster was produced by Defendants with redactions in response to Plaintiffs' Requests for Production of Documents, Set One, on February 27, 2023.  An updated redacted roster was produced in an email from Defendants' counsel Elizabeth Pappy to my colleague Eric Monek Anderson on March 10, 2023.

40.     Attached hereto as **Exhibit AA** is a true and correct copy of a March 4, 2023 article in the *San Diego Union-Tribune.*  The article states that San Diego County settled a lawsuit brought by Frankie Greer for $7.5 million.  Mr. Greer, who has a medically diagnosed seizure disorder, suffered a serious brain injury when he fell out of the top bunk in the Jail while experiencing a seizure.

41.     Attached hereto as **Exhibit BB** is a true and correct copy of the San Diego County Civil Grand Jury report "San Diego County Detention Facilities: Inspection Report and Inmate Mental Health," dated May 28, 2019.  The Grand Jury notes that "Rock Mountain, also at Otay Mesa, is projected to open soon, but the completion date continues to be delayed.  The Sheriff's plan is for Rock Mountain to replace South Bay Detention Facility."  *See id.* at BB-440.

42.     Attached hereto as **Exhibit CC** is a true and correct copy of the U.S. Department of Justice Bureau of Justice Statistics report "Survey of Prison Inmates, 2016: Disabilities Reported by Prisoners," dated March 2021.

43.     Attached hereto as **Exhibit DD** is a true and correct copy of an excerpt of the San Diego County Sheriff's Department's response to a California Public Records Act Request submitted by my law firm, which we received on May 10, 2021.  In response to Request 2 for "writings related to your county's Sheriff's Department's ADA transition plan(s), required by 28 C.F.R. § 35.150(d)," the Sheriff's Department responded:  "The Sheriff's Department does not have any documents responsive to this request for a transition plan."  *See id.* at DD-461.

## IV.     Class Counsel Meet the Requirements of Rule 23(a)(4), (g)(1), and (g)(4).

44.     The attorneys from three private law firms working on this case on behalf of the named plaintiffs and the putative subclass bring to bear an extraordinary amount of experience and expertise in the rights of incarcerated persons, the ADA, and class action litigation.

### A.     Rosen Bien Galvan & Grunfeld LLP

45.     From its formation in 1990, Rosen Bien Galvan & Grunfeld LLP ("RBGG") has been a nationally recognized leader in civil rights, employment, consumer, and antitrust class action litigation.  The firm has specialized in large class action lawsuits seeking to improve conditions in correctional systems.  The firm was co-counsel in *Plata v. Brown*, 563 U.S. 493 (2011), the landmark case that required population reduction in California's overcrowded prison system.  The firm is currently lead or co-lead class counsel in the following class actions:  *Coleman v. Newsom* (E.D. Cal. No. 2:90-CV-00520-KJM-DB), an Eighth Amendment and ADA class action lawsuit against CDCR on behalf of a class of more than 25,000 incarcerated people with serious mental illness; *Armstrong v. Newsom* (N.D. Cal. No. C 94-2307 CW), an ADA Rehabilitation Act and due process class action against CDCR on behalf of more than 10,000 incarcerated people and parolees with

1   mobility, hearing, vision, learning, kidney, and developmental disabilities;

2   *Hernandez v. County of Monterey* (N.D. Cal. No. 5:13-cv-2354-BLF-NMC), a class

3   action on behalf of all persons incarcerated in the Monterey County Jail and a

4   certified subclass of all qualified individuals with a disability who are incarcerated

5   in the Monterey County Jail; *Hedrick v. Grant* (E.D. Cal. No. 2:76-CV-00162-GEB-

6   EFB), a class action on behalf of all persons incarcerated at the Yuba County Jail;

7   *Cole v. County of Santa Clara* (N.D. Cal. No. 5:16-cv-06594-LHK), a class action

8   on behalf of all persons with mobility disabilities incarcerated at the Santa Clara

9   County Jail; *Babu v. County of Alameda* (N.D. Cal. No. 5:18-cv-07677-NC), a class

10   action on behalf of all adults and a subclass of all qualified individuals with a

11   psychiatric disability who are incarcerated in the Santa Rita Jail; and the putative

12   class action *Stiner v. Brookdale Senior Living, Inc.* (N.D. Cal. No. 4:17-cv-03962-

13   HSG (LB)), seeking relief under the ADA and other statutes on behalf of senior

14   citizens living in assisted living facilities.

15       46.    Best Lawyers in America placed RBGG in the first tier nationally in

16   Appellate Practice, and for San Francisco in Commercial Litigation, Employment

17   Law-Individuals, and Civil Rights for 2022.  All of the firm's partners are AV-rated

18   by Martindale-Hubbell and have been named SuperLawyers or SuperLawyers

19   Rising Stars.  Seven of the firm's senior counsel or associates were named Rising

20   Stars by SuperLawyers in 2022.

21       47.    I am the managing partner of RBGG.  I graduated from Columbia Law

22   School in 1984 as a Harlan Fiske Stone Scholar and Articles Editor of the *Columbia*

23   *Law Review*, after which I clerked for the Honorable Jack B. Weinstein of the

24   United States District Court for the Eastern District of New York.  I became a

25   member of the State Bar of California in 1985.  I am also admitted to the Southern,

26   Eastern, and Northern Districts of California; the Ninth Circuit Court of Appeals;

27   and the Supreme Court of the United States.

28       48.    In addition to my role as one of the lead counsel in *Armstrong* and

DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION—**REDACTED**

*Hedrick*, described *supra* at ¶ 45, I have been appointed class counsel in a number of cases, including *Ramirez et al. v. Ghilotti Bros., Inc.* (N.D. Cal. No. 3:12-cv-04590-CRB), a class action on behalf of workers denied pay for all hours worked and meal and rest breaks; *L.H. v. Brown* (E.D. Cal. No. CIV. S-06-2042 LKK/GGH), a due process and ADA class action on behalf of juvenile parolees; *Smith v. Shorenstein Hays-Nederlander Theatres LLC* (San Francisco Superior Court Case No. CGC-16-554905), a class action on behalf of security guards denied minimum wage and overtime; *Quinby v. ULTA, Salon, Cosmetics & Fragrance, Inc.* (N.D. Cal. Case No. C-15-4099-WHO), a misclassification class action; and *Moore v. Department of State Hospitals* (Los Angeles Superior Court Case No. 19STCV16858), a class action on behalf of patients civilly committed to the Department of State Hospitals ("DSH") who performed work for DSH and whom DSH paid less than minimum wage. I have repeatedly been named to the *Daily Journal*'s Top 100 Lawyers in California, including in 2022, and I have received CLAY Awards and other recognition for my work.

49.    My partner and co-lead counsel Van Swearingen graduated from the University of California, Berkeley School of Law in 2008 as Executive Editor of the *California Law Review*. He was admitted to the California Bar in 2008. He received CLAY Awards in 2016 and 2022, and was named one of *Lawdragon*'s 500 Leading Plaintiff Employment and Civil Rights Lawyers for 2020-2021.

50.    In addition to Mr. Swearingen and me, the RBGG team includes three associates, each of whom has broad legal experience and expertise in the litigation of class action lawsuits. RBGG has the capacity thoroughly and vigorously to prosecute the claims in this case and properly represent the plaintiff class and intends to commit all necessary resources to do so.

**B.    Law Office of Aaron J. Fischer**

51.    The Law Office of Aaron J. Fischer engages in class action and other complex litigation regarding public entity systems. The firm's areas of practice

include disability rights, civil and constitutional rights, and complex investigations and systems counseling.  The firm is willing and able to devote the resources necessary to litigate this case.

52.    Aaron Fischer is the principal at the Law Office of Aaron J. Fischer. He graduated from Columbia Law School and clerked for the Honorable Jack B. Weinstein of the United States District Court for the Eastern District of New York, and for the Honorable Kimba M. Wood of the United States District Court for the Southern District of New York.  He became a member of the State Bar of California in 2006.  He is admitted the Southern, Central, Eastern, and Northern Districts of California, and the Ninth Circuit and Eleventh Circuit Courts of Appeals.  He previously served as Litigation Counsel for Disability Rights California, where he worked on and litigated several complex criminal system- and disability-related matters.  Prior to joining Disability Rights California, he was an attorney at RBGG. In 2014, he received the Jack Berman Award of Achievement for Distinguished Service to the Profession and the Public from the California State Bar Association (now the California Lawyers Association).  He has repeatedly been named a Northern California Rising Star by SuperLawyers.

53.    Mr. Fischer is currently lead class counsel representing approximately 800 people incarcerated in Santa Barbara County Jail, in *Murray v. County of Santa Barbara* (C.D. Cal. No. 2:17-cv-08805-GW-JPR), a case challenging systemic deficiencies as to mental health and medical care, conditions of confinement (including solitary confinement), environmental health and safety conditions, and the treatment of people with disabilities.  The class was certified, and a comprehensive settlement was approved by the court in 2021; remedial plan implementation and monitoring are ongoing.  Mr. Fischer is also co-lead class counsel representing more than 3,000 people incarcerated in Sacramento County Jail, in *Mays v. County of Sacramento* (E.D. Cal. No. Case 2:18-cv-02081-TLN-KJN), a case challenging systemic deficiencies in the provision of mental health and

1   medical care, conditions of confinement, and the treatment of people with

2   disabilities.  The class was certified, and a comprehensive settlement was approved

3   by the court in 2020; remedial plan implementation and monitoring are ongoing.

4   Other cases in which Mr. Fischer has served on the class counsel team include:

5   *Coleman v. Newsom* and *Armstrong v. Newsom*, both described *supra* at ¶ 45;

6   *Valdivia v. Brown* (E.D. Cal. No. S-94-671 LKK/GGH), on behalf of parolees

7   regarding their constitutional due process rights in parole revocation proceedings;

8   *Hecker v. Brown* (E.D. Cal. No. 2:05-cv-2441 LKK JFM P), on behalf of

9   incarcerated people with a mental health disability; *Hernandez v. County of*

10  *Monterey*, described *supra* at ¶ 45; and *Johnson v. County of Los Angeles* (C.D. Cal.

11  No. 2:08-cv-03515-DDP-SH), on behalf of people with mobility disabilities

12  incarcerated in the Los Angeles County Jail system seeking improved accessibility,

13  reasonable accommodations, and equitable treatment.

14      **C.    DLA Piper**

15      54.    DLA Piper LLP (US) ("DLA Piper") is a global law firm with lawyers

16  located in more than 40 countries throughout the Americas, Europe, the Middle

17  East, Africa, and Asia.  DLA Piper's clients range from multinational, *Global 1000*,

18  and *Fortune 500* enterprises, to emerging companies, to individuals.  They include

19  more than half of the *Fortune 250* and nearly half of the *FTSE 350* or their

20  subsidiaries.  DLA Piper has repeatedly been recognized for its dedication to pro

21  bono work.  Most recently, DLA Piper received the 2022 John Minor Wisdom

22  Public Service and Professionalism Award from the American Bar Association

23  Litigation Section's Access to Justice Committee.

24      55.    DLA Piper features one of the premier class action practices in the

25  United States, having handled class action lawsuits in virtually every U.S. juris-

26  diction.  Well over 100 lawyers at the firm litigate class action lawsuits, of virtually

27  every variety.  DLA Piper's class action group is regularly recognized by respected

28  legal industry websites and publications.  As one example, DLA Piper was recently

1   named a Powerhouse firm for class action litigation by BTI Consulting Group.

2       56.    Christopher Young graduated from the University of California,

3   Berkeley School of Law in 1992, and was admitted to the California Bar in 1992.

4   He has been practicing with DLA Piper and its predecessor firms in San Diego for

5   30 years, since 1992.  He was an associate with Gray Cary Ames & Frye and Gray

6   Cary Ware & Freidenrich from 1992 to 2000, and a partner with Gray Cary

7   Ware & Freidenrich from 2000 to 2005, when that firm merged to form DLA Piper.

8   He has been a partner with DLA Piper since 2005.  He is licensed to practice law in

9   the State of California and is admitted to all California state courts; the Southern,

10  Central, Eastern, and Northern Districts of California; and the Ninth Circuit Court of

11  Appeals.  Mr. Young has been repeatedly recognized for his accomplishments by

12  respected legal industry publications.  Each year since 2020, Chambers USA listed

13  him in Band One, as one of the three top-ranked litigation attorneys in San Diego,

14  commenting that he regularly takes on significant class actions and is noted for his

15  proficiency in product liability matters.  Mr. Young was also  named  "Lawyer of

16  the Year" by The Best Lawyers in America in the category of Class Actions and

17  Mass Tort Defense Litigation for San Diego for both 2020 and 2023.

18      57.    Mr. Young has devoted the bulk of his practice to class action litigation

19  for the past 30 years.  He has acted as lead counsel in dozens of class actions in

20  courts throughout California and the United States.  He has litigated class actions

21  involving putative classes ranging from several hundred to 14 million individuals,

22  and ranging from local to nationwide in scope.  Of particular relevance here,

23  Mr. Young recently served as co-lead counsel with RBGG in *Sabata et al. v.*

24  *Nebraska Department of Correctional Services et al*. (D. Neb. No. 4:17-cv-3107-

25  RFR-MDN).  Mr. Young worked to prosecute the *Sabata* case for several years, and

26  along with my law firm, received the Good Apple Award from Nebraska Appleseed

27  for his work on that case.  *See* https://webcache.googleusercontent.com/search

28  ?q=cache:-GK7otoZIMwJ:https://neappleseed.org/blog/37216+&cd=2&hl=en&ct

[4259279.3]                                          15                           Case No. 3:20-cv-00406-AJB-DDL

=clnk&gl=us.  That litigation centered around conditions for incarcerated persons in the Nebraska state prison system and involved many issues similar to those raised by this action.

58.    In addition to Mr. Young, the DLA Piper team working on the instant matter includes six associate attorneys, all of whom have broad legal experience and expertise in the litigation of class action lawsuits.  DLA Piper is willing and able to devote the necessary resources to the representation of the plaintiff class in this matter through the conclusion of the litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 24th day of April, 2023.

*/s/ Gay Crosthwait Grunfeld*
Gay Crosthwait Grunfeld

[4259279.3]                                        Case No. 3:20-cv-00406-AJB-DDL
DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION—**REDACTED**

# TABLE OF CONTENTS

EXHIBITS TO THE DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---------|-------------|----------|
| A | Proposed Order Granting Motions for Preliminary Injunction and Provisional Class Certification | 1 |
| B | Letters from Plaintiffs to the San Diego County Sheriff's Department and the California Department of Corrections and Rehabilitation re: individuals in the Jail denied disability accommodations | 17 |
| C | Jail grievance filed by Josue Lopez on April 28, 2021 | 37 |
| D | Letters dated March 15, 2022 and April 4, 2023 from Plaintiffs to Defendants | 40 |
| E | SDSD Detention Services Bureau Manual of Policies and Procedures Section I.22 | 50 |
| F | SDSD Detention Services Bureau Manual of Policies and Procedures Section M.39 | 53 |
| G | SDSD Detention Services Bureau, San Diego Central Jail Green Sheet Section M.39.C.1 | 57 |
| H | SDSD Detention Services Bureau Manual of Policies and Procedures Section P.11 | 59 |
| I | SDSD Detention Services Bureau, San Diego Central Jail Green Sheet Section P.11.C.1 | 62 |
| J | SDSD Medical Services Division Operations Manual Section MSD.F.1.2 | 64 |
| K | SDSD Medical Services Division Operations Manual Section MSD.P.7 | 67 |
| L | SDSD Medical Services Division Nursing Guidelines Section NSG.C.12 | 70 |
| M | Excerpts of Deposition of Sergeant Matthew Jensen, taken March 14, 2023 | 75 |
| N | Excerpts of Deposition of Captain Kyle Bibel, taken March 15, 2023 | 86 |
| O | July 8, 2022 Presentation by Kyle Bibel to the San Diego County Committee for Persons with Disabilities | 127 |
| P | Santa Clara County Mobility Disability Remedial Plan | 128 |
| Q | Orange County Jail Remedial Plan | 159 |
| R | Santa Barbara County Jail Remedial Plan | 208 |
| S | Excerpts of 2022 Board of State and Community Corrections San Diego County Sheriff Adult Jails Inspection Report | 269 |
| T | Injunction in *Armstrong v. Newsom*, dated January 18, 2007 | 275 |

# TABLE OF CONTENTS

EXHIBITS TO THE DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---------|-------------|----------|
| U | Excerpts from the medical records of Cristian Esquivel | 287 |
| V | Declaration of Darryl Lee Dunsmore filed in support of Plaintiffs' 2022 Motions for Preliminary Injunction and Provisional Class Certification (without exhibits) | 334 |
| W | Declaration of Ernest Archuleta filed Iin support of Plaintiffs' 2022 Motions for Preliminary Injunction and Provisional Class Certification (without exhibits) | 351 |
| X | Declaration of Josue Lopez filed in support of Plaintiffs' 2022 Motions for Preliminary Injunction and Provisional Class Certification | 361 |
| Y | Declaration of Christopher Nelson filed in support of Plaintiffs' 2022 Motions for Preliminary Injunction and Provisional Class Certification (without exhibits) | 407 |
| Z | Rosters of People With Mobility and Hearing Disabilities at San Diego Central Jail (redacted) | 422 |
| AA | March 4, 2023 article in the *San Diego Union-Tribune* re: settlement with Frankie Greer | 429 |
| BB | San Diego County Civil Grand Jury Report dated May 28, 2019 | 437 |
| CC | U.S. Department of Justice Bureau of Justice Statistics report "Survey of Prison Inmates, 2016: Disabilities Reported by Prisoners," dated March 2021 | 449 |
| DD | Excerpts from San Diego County Sheriff's Department May 10, 2021 response to a California Public Records Act request | 460 |

[4275951.2]

# EXHIBIT A

1

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10  DARRYL DUNSMORE, ANDREE          Case No. 3:20-cv-00406-AJB-DDL
    ANDRADE, ERNEST ARCHULETA,
11  JAMES CLARK, ANTHONY EDWARDS,    **ORDER GRANTING**
    LISA LANDERS, REANNA LEVY,       **PLAINTIFFS' MOTIONS FOR**
12  JOSUE LOPEZ, CHRISTOPHER         **PRELIMINARY INJUNCTION**
    NELSON, CHRISTOPHER NORWOOD,     **AND PROVISIONAL CLASS**
13  JESSE OLIVARES, GUSTAVO          **CERTIFICATION**
    SEPULVEDA, MICHAEL TAYLOR, and
14  LAURA ZOERNER, on behalf of      Judge:      Hon. Anthony J. Battaglia
    themselves and all others similarly situated,   Magistrate:Hon. David D. Leshner
15
            Plaintiffs,             Trial Date: None Set
16
        v.
17  SAN DIEGO COUNTY SHERIFF'S
    DEPARTMENT, COUNTY OF SAN
18  DIEGO, SAN DIEGO COUNTY
    PROBATION DEPARTMENT, and DOES
19  1 to 20, inclusive,
20          Defendants.

21

22

23

24

25

26

27

28

[4254029.5]

**EX. A-2**

On April 25, 2023, Plaintiffs filed Motions for Preliminary Injunction and Provisional Class Certification ("the Motions") seeking to stop Defendants' policies and practices of (1) depriving incarcerated people with disabilities of effective communication through sign language interpretation; and (2) housing incarcerated people with mobility disabilities in inaccessible locations, where they cannot safely access sleeping, toileting, and showering facilities, in violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and California Government Code Section 11135. The Motions came before the Court for hearing. The Court, having considered the parties' pleadings, the arguments of counsel, and the entire record, GRANTS Plaintiffs' Motions and makes the following findings:

In March 2020, Plaintiff Darryl Dunsmore filed this action *pro se*, alleging that Defendants violated the ADA at the San Diego County Jail ("the Jail") by denying him access to an accessible shower and his medical appliances, among other things. Dkt. 1 at p. 4.

In February 2022, Dunsmore was joined by additional plaintiffs and, now represented by counsel, filed a class action complaint alleging that Defendants violate the ADA and other statutes in multiple respects, including by failing to provide effective communication or safe and accessible facilities to people with disabilities. Dkt. 81 at ¶¶ 222-50; *see also* Dkt. 231 at ¶¶ 240-74.

In December 2022, Plaintiffs filed a motion for expedited discovery on ADA issues arising under their Third Claim for Relief. *See* Dkt. 243. After the Court granted that motion in part, Defendants produced documents and witnesses for deposition under Federal Rule of Civil Procedure 30(b)(6). In February and March 2023, pursuant to the Court's expedited discovery order, Plaintiffs and their expert inspected two of the Jail's seven facilities: the Central Jail and the under-construction and unoccupied Rock Mountain Detention Facility.

1    **I.    Plaintiffs Are Entitled to a Preliminary Injunction**

2        **A.    Disability Discrimination Law**

3        The ADA prohibits public entities, including Defendants, from denying "a

4    qualified individual with a disability … the benefits of the services, programs, or

5    activities of [the] public entity" because of the individual's disability and from

6    discriminating against people based on their disabilities.  42 U.S.C. § 12132.

7    Similarly, the Rehabilitation Act requires all state and local governments receiving

8    federal funds, including Defendants, to reasonably accommodate incarcerated

9    people with disabilities in their facilities, programs, activities, and services.  29

10   U.S.C. § 794.  California Government Code Section 11135 similarly prohibits

11   Defendants from denying "full and equal access to the benefits of … any program or

12   activity that … is funded directly by the state[] or receives any financial assistance

13   from the state" to any person on the basis of disability.  In particular, Section 11135

14   explicitly requires compliance with Title II of the ADA—at a minimum—such that

15   a violation of the ADA necessarily constitutes a violation of Section 11135.  Cal.

16   Gov't Code § 11135(b).

17       Under federal and state law, detention facilities such as the Jail must:

18       •    "ensure that qualified inmates or detainees with disabilities shall not,

19            because a facility is inaccessible to or unusable by individuals with

20            disabilities, be excluded from participation in, or be denied the benefits

21            of, the services, programs, or activities of a public entity, or be

22            subjected to discrimination by any public entity," 28 C.F.R.

23            § 35.152(b)(1);

24       •    "implement reasonable policies, including physical modification to

25            additional cells in accordance with the 2010 [accessibility] Standards,

26            so as to ensure that each inmate with a disability is housed in a cell with

27            the accessible elements necessary to afford the inmate access to safe,

28            appropriate housing," *id.* § 35.152(b)(3);

[4254029.5]                                     2                    Case No. 3:20-cv-00406-AJB-DDL

**EX. A-4**

- ensure that communications with people with disabilities are "effective," including by providing "auxiliary aids and services," including sign language interpretation, *id.* § 35.160(a)(1), (b)(1); and,

- when providing auxiliary aids and services to facilitate effective communication, "give primary consideration to the requests of individuals with disabilities," *id.* § 35.160(b)(2).

The ADA defines "a qualified individual with a disability" as a person who has a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(1)(A), (2)(A). Any "qualified individual with a disability" under the ADA is considered an "individual with a disability" for purposes of the provision of services under the Rehabilitation Act. 29 U.S.C. § 705(20). Plaintiffs Dunsmore, Andrade, Archuleta, Clark, Landers, Lopez, and Nelson are qualified individuals with disabilities as defined in the ADA and Rehabilitation Act, as they have disabilities that substantially limit one or more major life activities.

The programs, services, and activities that Defendants provide to incarcerated people include, but are not limited to, sleeping; showering; toileting; safety and security; the Jail's administrative, disciplinary, and classification proceedings; and medical, mental health, and dental services. These programs, services, and activities are covered by the ADA, the Rehabilitation Act, and state law. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) ("use of toileting and bathing facilities" is a "benefit" under ADA).

**B.    Findings of Fact**

Defendants' ADA compliance is deficient. Defendants fail to ensure effective communication for people with hearing disabilities, in particular, by failing to

EX. A-5

provide sign language interpretation to people incarcerated at the Jail.  Defendants do not have any written policy requiring that people with hearing disabilities be evaluated to determine their primary method of communication.  As a result, Jail staff are not informed of the effective way to communicate with an individual with a hearing disability.  Defendants do not distinguish between people who are completely deaf and those who are hard of hearing.  They do not track whether people need sign language, hearing aids, written notes, pocket talkers, or other methods to communicate.  Instead, they have one catchall phrase: "hearing deficit/deaf."

Defendants do not have any written policy requiring sign language interpretation to be provided to people who communicate via sign language, nor is there a written policy identifying a person or unit within the Sheriffs' Department responsible for obtaining sign language interpretation.  As a result, deaf people who communicate via sign language are denied effective communication even for critical encounters with Jail staff and contractors, including at booking, medical and mental health appointments, and meetings and hearings implicating their due process rights, such as disciplinary and classification proceedings.  Plaintiffs have provided evidence documenting the harm of Defendants' conduct—including a declaration from a deaf incarcerated person whose tooth was removed without his understanding of what was happening, and therefore without his informed consent, and who was unable to communicate effectively with mental health clinicians while suicidal.  Defendants' failure to provide sign language interpretation places deaf signers for whom sign language is their primary means of communication at ongoing and serious risk of harm and even death.

Defendants have denied incarcerated people with mobility disabilities access to safe facilities to complete basic activities of daily life, such as sleeping, toileting, and showering.  Documents produced by the Jail purporting to show all incarcerated people with mobility disabilities reveal that Defendants lack sufficient accessible

**EX. A-6**

housing.  Defendants house more people with mobility disabilities at Central Jail than there are so-called "accessible" spaces.  Defendants do not in fact have a single accessible cell, toilet, or shower suitable for use by people with serious mobility disabilities at Central Jail.  Defendants house people with mobility disabilities in unsafe bed spaces, including the middle and top bunks of a three-tiered bunkbed. Even when people with disabilities are housed in the bottom of a triple bunk, that bed is below the height of a wheelchair seat, which makes transferring down to that low bed dangerous.  Many toilets lack grab bars entirely, and even those toilets that nominally contain grab bars (at Central Jail) lack sufficient space for people in wheelchairs to transfer on and off of the toilet.  The grab bars used are also inadequate.  The showers throughout the Jail lack fixed shower seats and have inadequate grab bars.  In addition, the showers are too narrow for a person to safely maneuver in or lack a level entry into the shower.  Nor do Defendants have any written plan to remedy these issues.

Multiple incarcerated people with mobility disabilities report that they have been transferred out of Central Jail (including being forcibly removed from wheelchairs) or denied transfers to Central Jail, the only allegedly "accessible" housing for incarcerated people identified as male, and instead are housed in other Jail facilities, which lack any shower chairs or grab bars in the shower or toilet.  As a result, incarcerated people have fallen and injured themselves when trying to complete fundamental life activities such as climbing in and out of bed, toileting, or showering.

All people with mobility disabilities in the Jail are at risk of serious injury as a result of Defendants' lack of safe, accessible housing.  Defendants claim that they will place people with mobility disabilities at Rock Mountain Detention Facility and that it will be fully accessible.  However, that facility is a currently under construction.  Renovations have been underway for years, with no deadline for completion.  And an inspection by Plaintiffs' experts revealed that Rock Mountain

EX. A-7

1  contains no ADA-compliant, safe housing for people with mobility disabilities.

2  Even if Defendants conduct renovations of Rock Mountain that satisfy state and

3  federal disability law, that alone will not solve the problem.  That facility is not

4  intended for booking and will not provide sufficient safe housing for all

5  classifications of incarcerated people with mobility disabilities.

6      **C.    Conclusions of Law**

7          Defendants' failures in policy and practice, as outlined above and detailed in

8  Plaintiffs' Motion, violate the ADA, the Rehabilitation Act, and California

9  Government Code Section 11135 because they discriminate against incarcerated

10  people with disabilities, deny them meaningful access to programs, services, and

11  activities, and injure them, both in their dignity and through actual or likely physical

12  harm.

13          Defendants fail to reasonably accommodate and have discriminated against

14  the above-named Plaintiffs and the Incarcerated People with Disabilities Subclass in

15  at least two ways.  First, Defendants fail to provide sign language interpretation to

16  people with hearing disabilities, and thereby deny those people effective

17  communication.  *See Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 960

18  (N.D. Cal. 2015) (granting preliminary injunction to require sign language

19  interpretation in jail); *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1015-22 (N.D.

20  Cal. 2013); *Duffy v. Riveland*, 98 F.3d 447, 455-56 (9th Cir. 1996); *Pierce v. Dist. of*

21  *Columbia*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015) (Jackson, J.).  On their face,

22  Defendants' policies are insufficient because they do not require sign language

23  interpretation at any time, including during critical encounters such as booking,

24  medical and mental health interactions, classification, or disciplinary proceedings.

25  Moreover, Defendants fail to evaluate, document, or track incarcerated people with

26  disabilities' primary method of communication.  Defendants do not determine

27  whether an individual requires sign language interpretation, as opposed to

28  communicating via written notes or with hearing aids or pocket talkers.

1  Incarcerated people with hearing disabilities are suffering irreparable harm because

2  of Defendants' failure to accommodate them, including but not limited to being

3  denied effective communication with mental health clinicians while experiencing

4  suicidal ideation, and being subjected to medical procedures without their informed

5  consent.

6      Second, Defendants fail to accommodate Plaintiffs and incarcerated people

7  with mobility disabilities by housing them in inaccessible and unsafe locations,

8  where they cannot safely access sleeping, toileting, and showering facilities.  The

9  Jail, including the Central Jail facility built in 1998, must comply with applicable

10 standards, including those articulated by the Department of Justice.  *See* 28 C.F.R.

11 § 35.152(b)(3); *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1176-77 (9th

12 Cir. 2017).  Federal regulations make clear that the Jail is required to make

13 "physical modification[s] … in accordance with the 2010 [accessibility] Standards"

14 to "ensure that each inmate with a disability is housed in a cell with the accessible

15 elements necessary to afford the inmate access to safe, appropriate housing."  28

16 C.F.R. § 35.152(b)(3).  Housing for incarcerated people with mobility disabilities

17 must include grab bars in the toilet, ADAS §§ 604.5, 609.3; grab bars in the shower,

18 *id.* §§ 608.3, 609.3; a shower seat, *id.* § 608.4; and sufficient space to maneuver

19 from a wheelchair safely into a bed.  Yet the Jail lacks sufficient accessible housing

20 for people with mobility disabilities—including showers with adequate grab bars

21 and shower chairs, toilets with adequate grab bars, and bunks with sufficient space

22 and at an appropriate height for people with mobility disabilities to safely transition

23 from wheelchair to bed.  Nor do Defendants have any transition plan, with the

24 detailed requirements described in 28 C.F.R. § 35.150(d), to remedy the lack of

25 accessible housing.  Defendants' own documents confirm that people with mobility

26 disabilities are housed inaccessibly, including by assignment to top- and middle- tier

27 bunkbeds.  Moreover, Defendants have, on multiple occasions, transferred people

28 with mobility disabilities out of Central Jail and instead have housed them at other

1   Jail facilities where showers and toilets lack *any* grab bars or shower chairs, making

2   them even more dangerous than those at Central Jail.  As a result, incarcerated

3   people with disabilities have suffered harm, including falling while getting in and

4   out of bed, transferring to and from the toilet, and in the shower.

5        As a result of Defendants' failures to provide reasonable accommodation as

6   described above, Plaintiffs and incarcerated people with disabilities are irreparably

7   harmed.  *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814,

8   827 (9th Cir. 2001) ("We have held that where a defendant has violated a civil rights

9   statute, we will presume that the plaintiff has suffered irreparable injury from the

10  fact of the defendant's violation.").  Incarcerated people with hearing disabilities

11  have been denied effective communication with mental health clinicians while

12  experiencing suicidal ideation and been subjected to medical procedures without

13  their informed consent.  These and other harms are likely to occur when deaf

14  individuals who use sign language as their primary means of communication are

15  denied sign language interpretation during medical, mental health, and other

16  important encounters.  Incarcerated people with mobility disabilities have fallen

17  getting in and out of bed, transferring to and from the toilet, and in the shower.

18  These and other serious injuries are likely to occur when people with mobility

19  disabilities are denied access to safe and accessible beds, showers, and toilets.

20       In light of the physical injuries and irreparable harm outlined above, the

21  balance of equities tips toward the Plaintiffs.  Defendants have identified no

22  interests that outweigh the harm and deprivation established by Plaintiffs in their

23  Motions, including being subjected to invasive medical procedures without

24  informed consent; denial of effective communication with nurses and mental health

25  clinicians, even in the midst of suicidal thoughts; and physical injuries resulting

26  from falls while trying to complete basic hygiene tasks.  "[F]aced with such a

27  conflict between financial concerns and preventable human suffering, [courts] have

28  little difficulty concluding that the balance of hardships tips decidedly in plaintiffs'

**EX. A-10**

1   favor." *Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d 754, 766 (9th Cir. 2004)

2   (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).  In addition, the

3   public interest would be served by remedying Defendants' violations of disability

4   discrimination law.  *Hernandez*, 110 F. Supp. 3d at 958; *Enyart v. Nat'l Conf. of Bar*

5   *Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) (public has an "interest in

6   enforcement of the ADA and in elimination of discrimination on the basis of

7   disability").  Protecting incarcerated people from physical injury and the denial of

8   equal access through effective communication to Jail services such as medical and

9   mental health care is in the public interest.

10         As described in the declaration of Plaintiffs' accessibility expert, some of

11  Defendants' most egregious ADA and statutory violations can be promptly and

12  effectively remedied.  Defendants can convert or replace their triple bunk beds with

13  double bunk beds to make them safer to access; install adequate grab bars near

14  toilets; install adequate grab bars and chairs in showers; or take other steps at a

15  relatively low cost and in the near future.  Defendants can also reassign people with

16  mobility disabilities to bottom bunks in double bunk beds on lower tiers.

17  Defendants can create a plan for renovations and revise any existing plans for

18  ongoing renovations at their facilities.  Defendants can also revise their deficient

19  policies to ensure no person with a serious mobility disability is placed in middle

20  and upper bunks.

21         In addition, Defendants can obtain an effective sign language interpretation

22  contract or hire an interpreter and train their staff on obtaining sign language

23  interpretation.  Defendants can revise their policy P.11 to require sign language

24  interpretation during critical medical and mental health encounters and at

25  classification and disciplinary hearings.

26  **II.    Rule 23 Factors Are Met**

27         Plaintiffs have moved to provisionally certify an Incarcerated People with

28  Disabilities Subclass.  *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036

(9th Cir. 2012).  The Incarcerated People with Disabilities Subclass is defined as all
qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12102,
29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and
who are now, or will be in the future, incarcerated in the Jail.

The Court finds that the Subclass is so numerous that joinder of all members
is impracticable.  The Subclass consists of thousands of current and future
individuals with disabilities incarcerated at the Jail.  Fed. R. Civ. P. 23(a)(1).  *See*
Bureau of Justice Statistics, Disabilities Reported by Prisoners, https://bjs.ojp.gov
/content/pub/pdf/drpspi16st.pdf.

There are questions of law and fact common to the Subclass.  Fed. R. Civ. P.
23(a)(2).  For purposes of preliminary relief, questions of law and fact common to
the Subclass include:  (1) Do Defendants, through their disability-related policies
and practices or lack thereof, deny qualified people with hearing disabilities access
to programs, services, and activities at the Jail, through failure to provide sign
language interpretation?  (2) Do Defendants, through their disability-related policies
and practices or lack thereof, deny qualified people with mobility disabilities access
to programs, services, and activities at the Jail, such as safe sleeping, toileting, and
showering facilities?

The proposed class representatives have claims sufficiently typical of the
class and subclass they seek to represent.  Fed. R. Civ. P. 23(a)(3).  The claims and
defenses of Plaintiffs Dunsmore, Andrade, Archuleta, Clark, Landers, Lopez, and
Nelson (collectively "the putative subclass representatives") are typical of the claims
and defenses of the Subclass.  All of the putative subclass representative either have
been or are currently incarcerated in the Jail.  They suffer the same injuries under
the ADA, Rehabilitation Act, and California Government Code Section 11135 as the
Subclass.  The putative subclass representatives and the members of the Subclass
are all subject to the same policies, procedures, and practices of Defendants that
deny them access to Jail programs, services, and activities and discriminate against

1  them because of their disabilities.

2      The putative subclass representatives will fairly and adequately protect the

3  interests of the class.  Fed. R. Civ. P. 23(a)(4).  The putative subclass representa-

4  tives, who seek only preliminary injunctive relief at this stage, have no conflict with

5  the subclass they seek to represent and are knowledgeable and involved in the

6  lawsuit.  Plaintiffs' counsel—Gay Grunfeld and Van Swearingen of Rosen Bien

7  Galvan & Grunfeld LLP, Aaron Fischer of Law Office of Aaron J. Fischer, and

8  Christopher Young of DLA Piper LLP—have sufficient experience litigating

9  complex actions, including in cases related to conditions of confinement in jails and

10 prisons, and will be adequate representatives of the subclass.

11     Defendants' discriminatory actions and omissions apply generally to the

12 Subclass, so that preliminary injunctive relief is appropriate respecting the Subclass

13 as a whole.  Fed. R. Civ. P. 23(b)(2).

14     In order to remedy the ongoing harm to Plaintiffs and the Incarcerated People

15 with Disabilities Subclass, to ensure that Defendants meet their obligations under

16 the ADA, Rehabilitation Act, and California Government Code Section 11135, and

17 based on the entire record in this action, the Court hereby ORDERS the following

18 relief:

19     1.     Within thirty days of this Order, Defendants shall develop and submit

20 to the Court and to Plaintiffs a plan to remedy the above violations of state and

21 federal law, which shall include, at a minimum, the following elements:

22          a.     For incarcerated people with hearing disabilities:

23               i.     Defendants must provide sign language interpretation for

24 all incarcerated people with hearing disabilities who use sign language interpretation

25 as their primary means of communication for all medical and mental health

26 encounters, booking, classification proceedings, and disciplinary proceedings.

27               ii.     During booking, Defendants must evaluate every person to

28 determine whether they have a hearing or speaking disability and, if so, what each

person's primary method of communication includes, *e.g.*, sign language, written notes, hearing aids, or pocket talkers. In determining a person's primary method of communication, Defendants must give deference to the preference of the incarcerated person. Defendants must then document that method of communication and require that their staff and contractors use that method when interacting with the incarcerated person during all medical and mental health encounters, booking, classification proceedings, and disciplinary proceedings.

b.      For incarcerated people with mobility disabilities:

i.      Defendants must stop placing incarcerated people with mobility disabilities in inaccessible housing, including: any bed in a triple bunk, any top bed in a double bunk, toilets without 2010 ADAS-compliant grab bars, or showers without 2010 ADAS-compliant grab bars and shower chairs. Defendants' plan to remedy the lack of accessible housing for people with mobility disability should identify each element in each housing unit that they propose renovating and any other changes they propose, as well as the maximum number of incarcerated people with disabilities that can be safely housed in each unit. This portion of Defendants' plan should also include staged deadlines for completion of renovations, with at least some accessible housing becoming available as soon as possible and no later than 90 days from the date of this Order. All renovations and changes required to make accessible housing available to all incarcerated people with mobility disabilities shall be completed within one year of the date of this Order.

ii.      Defendants' plan must include accessible and safe housing for people with mobility disabilities throughout their incarceration, including accessible housing that is available immediately upon booking.

iii.      Defendants' plan must require that during booking, and at the request of any incarcerated person, Defendants will evaluate every person to determine whether they have a mobility disability and, if so, what accommodations

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION
AND PROVISIONAL CLASS CERTIFICATION

EX. A-14

1   each person requires.  Defendants must then document those accommodations and

2   ensure that the incarcerated person is housed accessibly with their accommodations.

3        2.      Within fifteen days of Plaintiffs' receipt of Defendants' proposed plan,

4   Plaintiffs shall file objections (if any) to the proposed plan with the Court.  The

5   Court thereafter shall enter an Order adopting the plan, as revised (if at all) by the

6   Court, in consideration of Plaintiffs' objections.

7        3.      After the Court issues the Order adopting the plan, Plaintiffs will, upon

8   reasonable notice, be entitled to monitor Defendants' compliance with this Order

9   and the Order adopting the plan.  Plaintiffs shall be allowed to inspect with ADA

10   experts any renovations completed by Defendants at the Jail, with one week's

11   notice, to ascertain whether Defendants have adequately modified their housing for

12   people with mobility disabilities.

13        4.      After the Court issues the Order adopting the plan, Plaintiffs shall be

14   allowed access to records documenting that sign language interpretation is being

15   employed for incarcerated people with hearing disabilities.

16        5.      Within thirty days of this Order, and for the twelve months following

17   this Court's Order adopting Defendants' plan, Defendants must, on a monthly basis,

18   provide daily housing rosters from the preceding month to the Court and Plaintiffs,

19   reflecting the disability needs of every person incarcerated at the Jail with a mobility

20   or hearing disability, including information sufficient to describe their mobility

21   disability (if any), hearing disability (if any), effective communication needs (if

22   any), housing unit, bed assignment (top, middle, or lower bunk), and whether the

23   person's cell or housing unit has 2010 ADAS-compliant toilet grab bars, shower

24   grab bars, and shower seat.

25        6.      These remedies are all consistent with the Prison Litigation Reform

26   Act's requirement that the Court's orders be narrowly drawn, extend no further than

27   necessary to correct the violation of a federal right, and be the least intrusive means

28   necessary to correct the violation.  *See* 18 U.S.C. § 3626(a)(1)(A).  Anything short

[4254029.5]               13        Case No. 3:20-cv-00406-AJB-DDL
ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION
AND PROVISIONAL CLASS CERTIFICATION       **EX. A-15**

of these remedies will not put an end to Defendants' ongoing violations of the rights of Plaintiffs.

7.    The Court provisionally certifies the Subclass and appoints the putative subclass representatives as provisional class representatives for the Subclass.  The Court appoints Plaintiffs' counsel—Gay Grunfeld and Van Swearingen of Rosen Bien Galvan & Grunfeld LLP, Aaron Fischer of Law Office of Aaron J. Fischer, and Christopher Young of DLA Piper LLP—as provisional class counsel.  Fed. R. Civ. P. 23(g)(1) and (4).

8.    This Order shall apply to Defendants, their agents, contractors, employees, successors in office, and all persons with knowledge of it.  No person who has noticed of this injunction shall fail to comply with it, nor shall any person subvert the injunction by any sham, indirection, or other artifice.

9.    The bond requirement is waived.

10.    The Court shall retain jurisdiction to enforce the terms of this Order.

IT IS SO ORDERED.

DATED: _____, 2023

_____
Honorable Anthony J. Battaglia
United States District Judge

ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION
AND PROVISIONAL CLASS CERTIFICATION

EX. A-16

# EXHIBIT B

## [REDACTED]

Ex. B-17

**RBGG**

**ROSEN BIEN
GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Krista Stone-Manista
Email: kstone-manista@rbgg.com

February 23, 2018

<u>VIA ELECTRONIC MAIL ONLY</u>

> **PRIVILEGED AND
> CONFIDENTIAL**
> _____
> **SUBJECT TO
> PROTECTIVE ORDER**

Russa Boyd
Nicholas Meyer
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA 94283
*Russa.Boyd@cdcr.ca.gov*
*Nicholas.Meyer@cdcr.ca.gov*

      Re:    *Armstrong v. Brown:* Plaintiffs' Report re Class Member Interviews at San
               Diego County Jails (Q1 2018)
               <u>Our File No. 0581-09</u>

Dear All:

      This letter reports on Plaintiffs' January 29, 2018 class member interviews at the
San Diego County Jails. On that date, I interviewed four class members housed at the
San Diego Central Jail ("Central Jail") and three class members housed at the George F.
Bailey Detention Facility ("Bailey Detention Facility"). On February 1, 2018, I sent a
Paragraph 5 Request to CDCR Office of Legal Affairs regarding three of the class
members whom I interviewed. *See* **Exhibit A**. I received a response to that letter from
CDCR on February 22, 2018. *See* **Exhibit B**.

      My interviews with class members and review of available records revealed the
following issues.

      //

      //

[3227898.1]

**Ex. B-18**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
February 23, 2018
Page 2

## I.    Denials of Accommodations at the San Diego County Jails

### A.    Inadequate Bathroom Facilities for Disabled Individuals

Several class members housed at the Central Jail reported that the bathrooms in their housing areas lacked adequate accessibility features, such as grab bars in the showers and near the toilets, to ensure their safety in the bathrooms. ███████████
██████, who is paraplegic and DPW (a full-time wheelchair user), reported that there were no grab bars for his use in the shower area of his housing unit.

Several class members also reported that there is only one shower chair available for use in Units 7/A and B, which at the time of my visit, housed multiple individuals with serious mobility impairments including two individuals who were using wheelchairs. San Diego County should ensure that it has adequate restroom and shower accommodations to meet the needs of all individuals with mobility impairments.

### B.    Unsafe Custody Escort Practices for Individuals with Mobility Impairments

Class member ████████████████, who is DNM (mobility impaired) and uses a cane, reported that when he is transported to court, he is chained at the waist with a large group of other individuals. As a result, he is unable to use his cane for stability as he requires. He reported that he has tripped several times and nearly fallen during these group escorts.

San Diego County should ensure that its escort practices are safe for individuals with mobility impairments and that individuals who require assistive devices are able to use those devices while being escorted by deputies.

### C.    Denial of Shoes as a Disability Accommodation

Class member ███████████████, reported that he had been denied access to orthopedic shoes upon his arrival to the Jail. He requires specialty shoes for stability and to minimize his risk of falling due to post-stroke muscular weakness on his left side. Plaintiffs have advocated for ██████████ regarding this issue several times prior to my February 1, 2018 advocacy letter on his behalf, most recently in February 2016, and he has submitted multiple 2275-CJs on this issue, most recently in July 2016. He has received the shoes as a reasonable accommodation following advocacy on several occasions in the past. Although San Diego's response to my February 1 letter stated that his doctor had deemed the shoes not medically indicated at this time pending receipt of

**Ex. B-19**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
February 23, 2018
Page 3

"outside records," it is concerning that ███████ has been repeatedly (and apparently
currently) denied an accommodation that the Jail has found warranted on several prior
occasions.

San Diego County must have initial screening and medical evaluation procedures
sufficient to identify and provide previously-granted accommodations without
intervention from Plaintiffs' counsel.

## II.     Division of Adult Parole Operations ("DAPO") Issues

### A.     Parole and Release Planning Concerns

Several class members reported significant difficulties in the community due to
DAPO's failure to provide necessary services while on parole.

███████████████, is DPV (vision impaired) and received mental health
care at the EOP level of care while in CDCR.  Despite his significant physical and
psychological disabilities, Mr. Martinez reported that his parole agent had not responded
to requests for assistance with finding housing after his release from the San Diego
County Jail.  He expects to be released on June 23, 2018.  He reported that he has reached
out to a program called HealthRight 360, which is also listed on the directory of STOP
subcontractors that CDCR provided to us, but had not received any response as of the
time of my interview with him.  Please provide information regarding plans for ███
███████ continuation on parole following his release from the Jail, including about
plans to ensure his safe housing, whether at HealthRight 360 or another accessible
program.

Please also ensure that ███████████ receives assistance in completing any
necessary applications for benefits prior to his release.  He reported that his SSI
application had not been fully processed prior to his release from CDCR or prior to his
re-incarceration at the Jail and that he would need assistance to complete the process due
to his vision disability.

███████████████, is DPM (mobility impaired).  He paroled from
CDCR on October 8, 2017, and expects to be homeless after his anticipated release from
San Diego County Jail in early March.  He reported that his incarceration in the Jail was
directly related to his homelessness, as it arose from a parole violation that occurred
because he does not have a stable and accessible place to consistently charge his ankle
monitor.  Although he reported that he has received several parole violations related to
this same issue, it does not appear that efforts have been made to find a suitable program

**Ex. B-20**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
February 23, 2018
Page 4

or other housing arrangements for him that would help prevent future such violations.
Please provide information regarding plans for ██████████' continuation on parole
following his release from the Jail, including about plans to ensure his safe housing.

████████████████, is DNM (mobility impaired), has an upper mobility
impairment, and is also blind in one eye, although not classified by CDCR as DPV.
Similarly to ████████, he paroled to homelessness, which he reported was in part due
to CDCR's failure to ensure that his benefits applications were completed before his
release.  He has had multiple parole violations related to his continued homelessness and
inability to consistently charge his ankle monitor.  He reported that he has not received
any housing assistance from DAPO.  He would like to participate in educational
programs as well as programs to address his substance abuse issues, but expects to parole
from the Jail to homelessness and is not aware of any arrangements for placement in any
such programs.  Please provide information regarding plans for ████████
continuation on parole following his release from the Jail, including about plans to ensure
his safe housing and to facilitate access to suitable programs.

//

//

//

//

//

//

//

//

//

//

//

[3227898.1]

**Ex. B-21**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
February 23, 2018
Page 5


       I appreciate the cooperation and courtesy of jail staff during my visit.  We look
forward to your response to this report.


                              Sincerely,

                              ROSEN BIEN
                              GALVAN & GRUNFELD LLP

                              */s/ Krista Stone-Manista*

                  By:  Krista Stone-Manista

KSM:ncw
Enclosures (Exhibit A-B)
cc:

| | |
|---|---|
| Ed Swanson | Laurene Payne |
| Patricia Lee | Ceasar Aguilar |
| Tamiya Davis | Rita Lowe |
| Joanne Chen | CCHCS Accountability |
| Alma Underwood | Desiree Collum |
| Davies Sasere | Anastasia Bartle |
| Amenthia Tisdale | Lynda Robinson |
| Sharon Garske | Ngoc Vo |
| Bryan Kao | Trennie Rios |
| Erick Rhoan | Erin Anderson |
| Danielle O'Bannon | OLA Armstrong |
| Janet Chen | Lois Welch |
| John Carbone | Matt Espenshade |
| Pam Cantelmi | Corene Kendrick |
| Steve Blum | Rita Lomio |
| Bruce Beland | Prison Law Office |
| John Dovey | William Pettingill, San Diego County Counsel |
| Vincent Cullen | Sanford Toyen, San Diego County Sheriff Legal Advisor |
| Donald Meier | Nancy Booth, San Diego County Sheriff's Office |
| Judy Burleson | Liza Macatula, San Diego County Sheriff's Office |
| Kelli Abernathy | |

[3227898.1]

**Ex. B-22**



50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email:  pgoldbold@rbgg.com

July 11, 2018

<u>VIA ELECTRONIC MAIL ONLY</u>

> **PRIVILEGED AND CONFIDENTIAL**
>
> **SUBJECT TO PROTECTIVE ORDERS**

Russa Boyd
Nicholas Meyer
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA 94283
*Russa.Boyd@cdcr.ca.gov*
*Nicholas.Meyer@cdcr.ca.gov*

      *Armstrong v. Brown:* Plaintiffs' Report re Class Member Interviews at San Diego County Jails
      <u>Our File No. 0581-09</u>

Dear All:

      This letter reports on Plaintiffs' June 28, 2018 class member interviews at the San Diego County Central Jail. On that date, I interviewed six class members housed at the San Diego Central Jail ("Central Jail").

      My interviews with class members and review of available records revealed the following issues.

//

//

//

[3276806.1]

**Ex. B-23**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
July 11, 2018
Page 2

## I.    Failure to Provide Accommodations

    *1.*    ██████████████████████

    ██████████ reported that his condition had changed since he was listed as DNM in prison a few years ago. He stated that he now requires a wheelchair following his hip replacement and ongoing problems related to his surgery. He reported that one leg is shorter than the other and he is very unsteady. He stated that he uses a wheelchair and that he arrived at the jail in a wheelchair but it was taken by jail staff on arrival. He was reportedly told that, because the wheelchair had a pole for an IV attachment, he could not use it in jail. He was not given an alternative wheelchair. Instead, staff provided him with a walker. He stated that it is difficult for him to get around with the walker, he has great difficulty walking, he is unsteady, and he is in fear of falling. He reported that he has fallen twice since his hip replacement.

    ██████████ also reported that he requires glasses to read, fill out forms, and see the TV. He was told that the jail would not provide him with glasses.

    Staff should evaluate ██████████ for a wheelchair and glasses and provide required accommodations. CDCR should determine whether additional information should be included in DECS to reflect his reported change in DPP status and required accommodations including his need for a wheelchair and glasses.

    *2.    **Mr. Clark, AG3655 (DLT)***

    Mr. Clark reported that he does not have his required orthopedic shoes. DECS confirms that he requires shoes. The shoes he has in jail are slip on sandals and they reportedly slide off his feet making him unsteady and placing him at risk of falling. Mr. Clark should be evaluated for orthopedic shoes.

    He stated that he did not want to complain about his situation because he does not want to be difficult nor retaliated against.

    3.    ██████████████████████

    ██████████ reported that he was not housed in a wheelchair accessible cell at the jail, despite having a wheelchair as a result of his prosthetic leg. He stated that he is not able to wear his leg all day so, when he is not wearing his leg, he is in a wheelchair. He

**Ex. B-24**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
July 11, 2018
Page 3

stated that, because he is not in a wheelchair accessible cell, space is tight with his wheelchair in his cell.  As a wheelchair user, ██████ should be housed in a wheelchair accessible cell.

    *4.* ███████████

    ██████ reported that he does not have his required accommodations including leg brace, back brace, glasses or compression stockings.  He stated that the jail will allow him to have those items, but they refuse to provide them stating they are not covered by medical services at the jail.  His glasses, compression stockings, and orthopedic shoes are listed in DECS.  CDCR should ensure these accommodations are provided.

    ██████ reported that he is being accommodated on a low bunk and low tier.  However, he stated that the bunk is so low that he has trouble getting out of bed.  He reported that his cellie is helping him get up and that he sometimes gives him food in exchange for his help.  ██████ did not want to complain about this arrangement, did not he want to get his cellie in trouble or be required to move.  Nevertheless, he should not have to provide food in exchange for assistance getting out of bed as a result of his disability.  He should be seen by medical staff to determine whether there is an accommodation, such as a walker or grab bars, that could assist him in his current placement.

    ██████ reported that he is diabetic and that his evening snacks, which he stated are necessary to keep his blood sugar levels stable, have not been provided on multiple occasions.  He reported that the inmate medical assistant was assisting him with this problem.  Please ensure that ██████ receives all required meals/snacks.

    Lastly, ██████ reports that he is hearing voices and he requires psych meds.  He stated that he has completed sick call requests but, despite that, has not received any medication.  ██████ should be seen be the psych department and evaluated for medication.

## II.    Delays in Providing Accommodations

    *1.* ██████████████

    ██████ reported that his prosthetic leg was taken from him when he arrived at the jail and it took one month to get his leg back.  He stated that he was first told he may

**Ex. B-25**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
July 11, 2018
Page 4

not have his leg because it is metal and can be used as a weapon.  He stated that he was given crutches to use instead, which were also metal.

      2.   ***Mr. Clark, AG3655 (DLT)***

      Mr. Clark reported that he met with his notice agent after arrival and, following that visit where he reported he needed a cane, it took one week for him to receive a cane.

      The required accommodations should have been provided by jail staff without the reported delays.

## III.    Transition to Community Problems

      Multiple class members reported problems on parole because staff failed to consider and accommodate their disabilities.



      *1.*   ██████████████████████

      ████████ reported that his prior agent accommodated his disability for years and helped him comply with is parole requirements.  He reported that his problems started when he was assigned a new agent.  According to ████████, he does not really understand what he has done wrong or why he is in custody.  He stated that he did not understand the new agent or the strict new rules imposed by the agent.  As a result of his disability, he had difficulty remembering these rules and knowing what to do.  ██████ is identified as DD1 but stated that he suffered significant head trauma while in custody previously when he fell off a top bunk.  It appeared that ████████ requires prompting and accommodations such as multiple reminders to understand and follow rules.  He reported that his new parole agent did not provide those accommodations.  He may require a higher level of DDP code.

      *2.*   ████████████████████

      ████████ reported that while on parole he did not believe that parole staff were accommodating his mental health needs and that they did not understand how his mental health issues impacted his ability to comply with parole requirements.

      *//*

**Ex. B-26**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
July 11, 2018
Page 5

3.    ██████████████████████

██████ reported that the director of his STOP housing, Debbie Freedman, failed
to accommodate the disability and mental health needs of multiple people living in his
home.  He stated that she kicked him out of the STOP program with no notice and
nowhere to go.  He reported that she did this to multiple people and he stated that there
were many complaints against her and her program.  He stated that his mental health
deteriorated and he quickly returned to custody after being kicked out of his housing and
forced in to homelessness. He does not dispute that she is permitted to kick him out, he
stated that he had a disagreement with her over the way she talked to people in the house,
but he claims that he should have been given notice, time to pack his things, and
assistance finding somewhere else to go.  CDCR should investigate ██████ allegation
that the STOP program he was placed in is failing to accommodate disabilities including
mental health needs and is "kicking out" parolees with no notice, forcing people in to
homelessness.

//

//

//

//

//

//

//

//

//

//

//

[3276806.1]

**Ex. B-27**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
Nicholas Meyer
July 11, 2018
Page 6


        Thank you for the courtesy and professionalism of CDCR staffing during these
interviews.  Please contact me if you have any questions regarding this report.


                                        Sincerely,

                                        ROSEN BIEN
                                        GALVAN & GRUNFELD LLP

                                        */s/ Penny Godbold*

                                        Penny Godbold
                                By:     Of Counsel


PMG:ncw
cc:

| | | |
|---|---|---|
| Ed Swanson | CCHCS Accountability | Lois Welch |
| Joanne Chen | Joseph Williams | Matt Espenshade |
| Patricia Ferguson | Alma Underwood | Cathy Jefferson |
| Tamiya Davis | Davies Sasere | Steven Faris |
| Erin Anderson | Amenthia Tisdale | Desiree Collum |
| Sharon Garske | Rachelle Velasquez | Anastasia Bartle |
| Erick Rhoan | John Carbone | Lynda Robinson |
| Annakarina Fennell | OLA Armstrong | Ngoc Vo |
| Jay Russell | Rita Lomio | Dawn Malone-Stevens |
| Adriano Hrvatin | Margot Mendelson | William Pettingill, County Counsel Office |
| Pam Cantelmi | Tommy Nosewicz | Sanford Toyen, Legal Advisor Sheriff's Department |
| Steven Blum | Camille Woods | |
| Bruce Beland | Molly Petchenick | |
| John Dovey | Prison Law Office | |
| Vincent Cullen | Trennie Rios | |
| Donald Meier | Samantha Chastain | |
| Kelli Abernathy | | |
| Laurene Payne | | |
| Ceasar Aguila | | |

**Ex. B-28**



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jenny S. Yelin
Email:  jyelin@rbgg.com

September 3, 2019

VIA ELECTRONIC MAIL ONLY

> PRIVILEGED AND
> CONFIDENTIAL
>
> SUBJECT TO
> PROTECTIVE ORDERS

Russa Boyd
Nicholas Meyer
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA  94283
*Russa.Boyd@cdcr.ca.gov*
*Nicholas.Meyer@cdcr.ca.gov*

      Re:    *Armstrong v. Newsom*: Plaintiffs' Report on Notice Agent "Ride-Along"
            and Class Member Interviews at San Diego County Jails (Q3 2019)
            Our File No. 0581-09

Dear Russa and Nicholas:

On August 26, 2019, I accompanied Nicholas Meyer, John Carbone, Parole
Administrator II, and Unit Supervisor Frank York in observation of Notice Agent
Mercedes Lucero, PAI, as she completed service of the Notice of Rights/Notice of
Charges ("NOR") for one *Armstrong* class member who was out to court in San Diego
County's Central Jail ("the Jail"), ███████████████████.  I also conducted
interviews of ███████ and four additional *Armstrong* class members at the Jail.  The
following are my observations from the tour.

## I.    Observation of Notice Serves

Agent Lucero's presentation to ███████ during the notice serve was somewhat
confusing.  She never explained to him the distinction between a parole violation and
being out to court, or explained that some of the language in the forms she was going
over with him—in Section II of the Form 2271, for example—would be irrelevant to him,
given that he was not on parole.  This was particularly problematic for ███████, who
apparently is EOP and has a TABE score of 1.7, and therefore requires effective

[3429319.3]

**Ex. B-29**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
September 3, 2019
Page 2

communication.  At one point during the serve, when Agent Lucero mentioned the
"notice of charges," ██████████ became visibly unnerved, and asked if he had more
charges.  Agent Lucero told him that he did not, but she did not explain to him clearly
that the forms are usually used for individuals in the jail for parole violations, and that
because he was out to court, this language did not apply to him.

Agent Lucero had ██████████ read Section II out loud, but she did not ask him to
confirm his understanding of it, by explaining it in his own words.  Given his TABE
score, she should have done so.

## II.    Denial of Disability Accommodations in Jail

██████████ reported that although the Jail allowed him to have his wheelchair and
cane, he was not allowed to have his walker, CPAP machine, back brace, or knee brace,
even though all of those are DME he requires, according to DECS. He also said that he
was denied the pain medication he takes in CDCR, Gabapentin, and that the ibuprofen the
Jail provided him was not sufficient to manage his pain.  ██████████ housing unit at the
Jail did not have an ADA accessible shower bench or chair, and his cell's toilet does not
have grab bars.

**Ernest Archuleta, F38052, DPM**, reported that the Jail allowed him to have
either a wheelchair or cane, but not both.  He chose a wheelchair, but would like to also
have crutches so he can strengthen his leg muscles. Very problematically, on his last
visit, jail staff required him to walk upstairs to the visiting area, despite the "no stairs"
restriction in DECS.  On the way back down to his housing unit, Mr. Archuleta fell and
badly injured himself.  Mr. Archuleta's housing unit also does not have a shower bench
or chair, and Mr. Archuleta has had to shower in his wheelchair.  The toilet in his cell
does not have grab bars.

██████████████████, has not had access to his orthotic shoes in the
Jail, even though he required them in CDCR per DECS.

Also, although other documents note that ██████████ is DPV, and indeed he is
blind in his left eye, the June 28, 2019 notification to San Diego County did not include
his DPV code.  This is problematic, as the County did not have the necessary information
to accommodate all of his disabilities.

██████████████████, requires incontinence supplies, per DECS.
Although the Jail does provide him with supplies, they only give him supplies two times
daily, during pill calls, and the supplies are not sufficient.  He has had to resort to
washing out used supplies to re-use.  The Jail should provide him with extra supplies.

**Ex. B-30**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
September 3, 2019
Page 3


### III.    Discrimination While on Parole

The documents produced by Russa Boyd on August 28, 2019 regarding █████ ███████ current parole revocation term indicate that ████████ parole violations resulting in his revocation included failing to charge his GPS device and absconding parole supervision.  According to ████████, he had only recently moved into his sober living house (indeed the 1502-B PCD confirms that **he only signed his conditions of parole two days prior to his alleged absconding incident**), and was not familiar with the area.  ████████ had recently been incarcerated, and went from the sober living house to a store where his electric wheelchair had been in storage to retrieve his wheelchair.  After obtaining it, he got lost trying to return to the housing placement, and he then realized that his wheelchair was running out of battery.  He made two attempts to charge the wheelchair, but it did not hold a charge, and he therefore had to spend the night on the streets.  He did not have his property on his person, and therefore did not have the contact information for the housing placement, and likely did not have the charger for his GPS unit.

In the morning, he went to a medical supply store to swap the non-functional electronic wheelchair for a non-electric chair.  According to the documents you provided, he reported to the parole office on the subsequent day.  He was arrested there.

We are very concerned that DAPO chose to pursue revocation of ████████ parole given that his failures to return to his housing placement and charge his GPS device were at least in part due to his difficulty obtaining a functional wheelchair, his very recent release from jail, and his placement in a transitional housing location with which he was not familiar.  DAPO should have considered a less severe sanction given the circumstances, especially since, according to his CDCR 1244, he had no prior violations on parole.

Similarly, we have concerns regarding the current parole revocation for ████ ████, given the documents you produced and my interview with him.  The documents indicate that Mr. Mosby was released from custody on July 30, 2019, after a 7 day flash incarceration.  He was transient and was instructed to report to his parole office the following week.  ████████, a wheelchair user, reported to me that it is extremely difficult to get to the parole office from where he stays when transient, in "The Mesa"— he has to take a bus to a trolley to another bus to another trolley, and the journey takes him **close to four hours**.  He has asked his parole agent to see him in the field, a request that is noted in the documents you provided, but the agent has refused, because DAPO policy requires homeless and transient individuals to report to the office weekly.  On the

[3429319.3]

**Ex. B-31**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
September 3, 2019
Page 4

date he was supposed to report, ███████ was apparently in the hospital receiving IV
drug treatment for a UTI.

     The Form 1500 notes that DAPO has "encouraged" ███████ to "utilize the
paratransit service when regular bus and light rail services do not meet his transportation
needs," but this is not a reasonable suggestion for a homeless person—how would
███████ arrange for a paratransit pick up?  The ten-page paratransit application for San
Diego County begins with a request for the applicant's home and mailing addresses. ███████
███████ has neither.  *See*
https://www.rideonmts.com/resource/1560349979000/MTSApplicationPDFs/MTS
ApplicationPDFs/docs/PartA-EnglishRegular-PrintMay2019.pdf.

     Given the circumstances, DAPO should consider having ███████ agent
arrange to meet with him at a public place closer to where he stays.  Requiring him to
travel four hours by public transportation weekly is not a reasonable accommodation of
his disability.  Alternatively, DAPO should consider transferring ███████ parole to
the Hemet, California area, where his family lives, and where he apparently has family
support to assist him in obtaining an apartment.

     Moreover, ███████ reported that he asked his parole agent and the unit
supervisor for a Form 1824 and Form 1858 to request accommodations regarding the
transportation issues discussed above, and to complain about his parole agent's refusal to
discuss an accommodation with him.  Apparently, the supervisor told ███████ that the
office did not have a Form 1858, and very problematically, told him that he could not file
an 1824 until after first filling out a Form 22 inmate request.  This is incorrect
information, and a violation of the ARP.  *See* ARP Parole Field Operations, "Processing
of 1824's ("A parolee with a disability may request an accommodation to access CDCR
authorized programs, services, and activities, or grieve alleged discrimination through the
use of the [] Form 1824.  DAPO staff shall ensure the 1824 is readily available to all
parolees").  Please add this allegation to the non-compliance accountability log, and
investigate it.

/ / /

/ / /

/ / /

/ / /

[3429319.3]

**Ex. B-32**

**PRIVILEGED AND CONFIDENTIAL**
Russa Boyd
September 3, 2019
Page 5


     I appreciate the cooperation and courtesy of Notice Agent Lucero and the other participants on the tour.  Please investigate the issues identified herein and provide Plaintiffs with the results of your investigation.

                                      Sincerely,

                                        ROSEN BIEN
                                        GALVAN & GRUNFELD LLP

                                        */s/ Jenny S. Yelin*

                         By:   Jenny S. Yelin

JSY:aa

cc:  Ed Swanson

| | | |
|---|---|---|
| Alexander Powell | Laurene Payne | Lois Welch |
| Patricia Ferguson | Ceasar Aguila | Steven Faris |
| Tamiya Davis | CCHCS Accountability | Alma Underwood |
| Amber Lopez | Cindy Flores | Amenthia Tisdale |
| Erin Anderson | Joseph Williams | Rachelle Velasquez |
| OLA Armstrong | Cathy Jefferson | Robert Wahl |
| Sharon Garske | Vincent Cullen | John Carbone |
| Joanna B. Hood | Desiree Collum | Asvi Phuong |
| Annakarina Fennell | Lynda Robinson | Rita Lomio |
| Damon McClain | Barb Pires | Margot Mendelson |
| Bruce Beland | Ngoc Vo | Tommy Nosewicz |
| Robert Gaultney | Samantha Chastain | Camille Woods |
| Saundra Alvarez | Olga Dobrynina | Juliette Mueller |
| Tabitha Bradford | Dawn Malone-Stevens | Shira Tevah |
| John Dovey | Bryan McCloughan | Prison Law Office |
| Donald Meier | Alexandrea Tonis | Sanford Toyen, Sheriff's Office |
| Robin Hart | Gently Armedo | William Pettingill, County Counsel |
| | Matt Espenshade | |

                                                     **Ex. B-33**



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

July 28, 2021

<u>VIA ELECTRONIC MAIL ONLY</u>

<table>
<tr><td>PRIVILEGED AND<br>CONFIDENTIAL</td></tr>
<tr><td>SUBJECT TO<br>PROTECTIVE ORDERS</td></tr>
</table>

Tamiya Davis
Nicholas Meyer
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA 94283
*Tamiya.Davis@cdcr.ca.gov*
*Nicholas.Meyer@cdcr.ca.gov*

  Re: *Armstrong v. Newsom* Request Under Paragraph 5 of the April 11, 2012
    Order: **James Harold Clark, AG3655 (DPM)**
    <u>Our File No. 0581-09</u>

Dear Counsel:

  Plaintiffs write pursuant to Paragraph 5 of the *Armstrong* Court's April 11, 2012
Order, as implemented by the June 21, 2012 County Jail Plan for Addressing *Armstrong*
Class Members Housed in County Jails, as Ordered by the Federal District Court (the
"County Jail Plan"), which requires a mechanism for "promptly addressing concerns
raised by Plaintiffs' counsel regarding individual class members housed in county jails."

  Below is a Paragraph 5 Request for an *Armstrong* class member housed by CDCR
at San Diego County Jail: **James Harold Clark, AG3655 (DPM)**

  //

  //

  //

[3766612.1]

**Ex. B-34**

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
Nicholas Meyer
July 28, 2021
Page 2

| | |
|---:|:---|
| **Class Member Name** | James Harold Clark |
| **CDCR No.** | AG3655 |
| **County Jail** | San Diego County – Central Jail |
| **CDCR E-Notification** | July 9, 2021 |
| **Description of Disability** | Mr. Clark is designated as having a DPM mobility code, and the CDCR prescribed him a walker, cane, therapeutic shoes with orthotics, foot orthoses, wrist support brace, compression stockings and eyeglasses.  Mr. Clark receives mental health care in the CDCR at the CCCMS level of care.  His housing restrictions include ground floor, no stairs, bottom bunk, and special cuffing. |
| **Need for Accommodation** | Mr. Clark  reports that he is being denied access at the Jail to the assistive devices prescribed to him by the CDCR, which he needs to be able to ambulate safely and with less pain.  Mr. Clark reports that he needs a cane and without this device he struggles to get in and out of bed, and is at risk of falling.  Mr. Clark also reports that he is denied access to a walker, which he needs to travel greater distances at the Jail, including accessing the ADA shower facilities and when he must pick up his own food.  Mr. Clark reports that during a recent previous stay at the Jail, he was denied access to a walker but provided a wheelchair to use around the Jail.  Mr. Clark reports that he is only provided a loaner wheelchair when he is transported to court, and it is removed when he is returned to the Jail.<br><br>**Please provide Mr. Clark with a cane, and either a walker or wheelchair that he can keep with him and use to ambulate the Jail safely.  Please also evaluate Mr. Clark for eyeglasses due to failing eyesight that is preventing him from reading and seeing at distances.** |

//

//

//

**Ex. B-35**

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
Nicholas Meyer
July 28, 2021
Page 3


      Pursuant to the *Armstrong* County Jail Plan, please investigate these issues and provide a response to us within 15 working days.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:  Penny Godbold
      Of Counsel

PMG:ncw

cc:  Alexander Powell      Tammy Foss      Jay Powell
     Patricia Ferguson      John Dovey      Gently Armedo
     Gannon Johnson      Robin Hart      Vimal Singh
     Amber Lopez      CCHCS Accountability      Joshua (Jay) Leon Guerrero
     Robin Stringer      Joseph Williams      Lacey Watson
     OLA Armstrong      Amy Padilla      Lois Welch
     Chor Thao      Jason Anderson      Steven Faris
     Adriano Hrvatin      Joseph Edwards      Mark Cruise
     Trace Maiorino      Lynda Robinson      Amenthia Tisdale
     Anthony Tartaglio      Barb Pires      Rachelle Velasquez
     Namrata Kotwani      Courtney Andrade      Robert Wahl
     Andrea Moon      Miguel Solis      John Carbone
     Sean Lodholz      Olga Dobrynina      Asvi Phuong
     Bruce Beland      Dawn Malone-Stevens      Prison Law Office
     Robert Gaultney      Alexandrea Tonis      Michael Baranic, Sheriff's Office Legal
     Saundra Alvarez      Jimmy Ly      Will Brown, Sheriff's Office
     Tabitha Bradford

[3766612.1]

**Ex. B-36**

# EXHIBIT C

Ex. C-37



# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☐ SDCJ    ☑ GBDF    ☐ EMRF    ☐ LCDRF    ☐ SBDF    ☐ VDF    ☐ FAC8

From: *Lopez, Josue*
De:    Name (Last, First, Middle)
       *Nombre (Apellido, Primero, Segundo)*

Booking Number: *19763409*
*Número de ficha*

Housing Unit: *M/085/102*
*Unidad de alojamiento*

Grievance is about:    ☑ Jail Procedures    ☑ Jail Conditions    ☑ Medical    ☐ PREA    ☑ Other *ADA conditions*
*La queja es acerca:*    *Procedimientos de*    *Condiciones de*    *Médico*                              *Otro*
                         *la Cárcel*            *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* *October 2019 — Present*

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

The conditions in the jail place me and other inmates at a substantial risk of harm. I am
deaf and my primary method of communication is American Sign Language. The jail consistent
refuses to accomodate my hearing disability. The dangerous policies and practices that
place me and other inmates at a substantial risk of serious harm include, but are not limit.
to, insufficient custody staff to help assist people with disabilities, inadequate supervision
of individual's disability-related needs, an inadequate system for inmates to grieve ADA
issues, inadequate screening and intake procedures, insufficient medical and custody staff
training on how to interact with people who have disabilities; insufficient supply of

Inmate Signature / *Firma de Preso*: *Josue Lopez*    Date / *Fecha*: 4/28/21  7:45pm

---

**THIS BOX IS FOR OFFICIAL USE ONLY**
*Esta caja es para el uso oficial solamente.*

Received by: _____    _____    4/28/21    _____
             Signature of receiving staff member    ARJIS #    Date    Time

Entered in JIMS:
             _____    _____    _____
             Date    Time    JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐ The inmate's health or safety is unfairly impacted by a condition of confinement
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.

☐ This submission is not a grievance:
   ☐ It is an appeal of discipline—JIMS Incident # _____    JIMS Appeal Hearing # _____
   ☐ It is a complaint against staff—JIMS Incident # _____    (Refer to Detentions P&P Section N.1)
   ☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)

Response to Inmate Request: FORWARDED TO MEDICAL / ADA CASE MANAGER

J-22 (Rev 1/15)    **Original goes to booking jacket**    **Copy goes to inmate after being signed by staff member**

ADA- accessible accomodations (such as video tablets, functioning Telecommunication Device for the Deaf, TTY phones, confidential rooms for attorney and family phone calls video visits, social visits, etc.). For example, I can only use the TTY machine to communicate with my wife, loved ones and personal attorney. Sometimes the TTY has a poor signal and takes a lot of time to work. Many deputies at the jail become frustrated with me when I ask to use the TTY phone. They either deny me access to it, rush me when I am using it, or say they are "too busy" or short staffed to escort me to the TTY phone and supervise me. Some deputies also do not know I am deaf. A lot of them often rely on other inmates to write down responses for me to read. This places me at a substantial risk of harm because some of my confidential information could be released to these inmates during their conversations with staff. I also cannot trust that other inmates will write own accurate information. The jail does not provide a sign language interpreter during interactions with nursing and medical staff. I have to rely on lip reading and written notes to understand complex medical issues. Please, fix the conditions listed above so that am no longer at a substantial risk of harm. Please also allow me to access the TTY phone when requested, or provide me with a video phone tablet so I can communicate with my family and personal attorney.

n addition, the medical care at the jail is inadequate and places me and all other inmates at substantial risk of harm. The jail's dangerous policies and practices include, but are not mited to, an inadequate system for inmates to request care, delays in providing timely access o care, inadequate identification of and provision of care to inmates with chronic illness, ailure to continue medications for inmates who were taking medications before being rrested, inadequate staff training, inadequate maintenance of medical records, and inadequate medication administration. For example, I was arrested on October 8, 2019, and did not eceived my medication to treat my kidney transplant for about 4 or 5 days. I take the ollowing medications: cyclosporine, mycophenolate and prednisone. Please, fix these issues o that I am no longer at a substantial risk of serious harm.

There are still other conditions at the jail that place my and other inmate's safety and survival at risk, including but not limited to: insufficient staff to safely monitor all inmates, overcrowded facilities that make it impossible to safely house all inmates and inadequate training of officers. For example, on February 14, 2021, when I and others asked for grievance forms, a deputy told us, "Whoever you want to write up, don't do it" and tried to threat that something bad would happen if we file grievances. Please fix the safety issues listed above so that I and others are no longer at a substantial risk of serious harm. Please, do not retaliate against me for filling this grievance.

Ex. C-39

# EXHIBIT D



**ROSEN BIEN
GALVAN & GRUNFELD** LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Van Swearingen
Email: vswearingen@rbgg.com

March 15, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>
Fernando Kish
Ronald Lenert
Matthew O'Sullivan
Office of the County Counsel
County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2437
Fernando.Kish@sdcounty.ca.gov
Ronald.Lenert@sdcounty.ca.gov
Matthew.O'Sullivan@sdcounty.ca.gov

  Re: *Dunsmore v. San Diego County Sheriff's Department, et al.*
    S.D. Cal. Case No. 3:20-CV-00406-AJB-WVG
    <u>Our File No. 1730-1</u>

Dear Messrs. Kish, Lenert, and O'Sullivan:

  As you have now seen in our class action complaint on behalf of Daryl Dunsmore
and seven other individuals, we allege that the County of San Diego and the San Diego
County Sheriff's Department violate the civil rights of people incarcerated at the San
Diego County Jail by failing to provide reasonable accommodations to prisoners with
disabilities, failing to operate an adequate mental health, medical, and dental care system,
failing to ensure adequate safety and security for people in custody, subjecting
individuals to unsanitary and inhumane conditions of confinement, and denying people
access to legal counsel and the courts.  The County, the Sheriff's Department, and the
Probation Department further violate the rights of people with mental health and other
disabilities and/or people who are Black and/or Latinx, through policies and practices that
illegally and wrongly result in the over-incarceration of these groups.  The conditions in
the Jail cause very real harm to the more than 4,000 people regularly incarcerated in the
Jail.

  We greatly appreciated the opportunity to meet in person with Mr. Kish and Mr.
O'Sullivan on March 10, 2022.  From that conversation, we observed two important

[3875815.3]

**Ex. D-41**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 2

objectives that the parties share – first, to proactively address serious problems within the
County's carceral system, and second, to focus resources on practical solutions, including
by narrowing the issues in dispute and avoiding costly, protracted litigation as much as
possible.

The other defendants named in this action – each of which provide services
subject to contract with the County – are also responsible and liable for certain aspects of
the unlawful and unconstitutional systemic deficiencies set forth above and in our
complaint.  However, the County is ultimately responsible for *all* policies, practices, and
conditions that illegally harm Plaintiffs and the putative class and subclass.  *See
Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) (state prison
defendants cannot shirk their obligations to plaintiffs under federal law by contracting
with a third party).  We are therefore sending the following proposal to you prior to
sharing it with other defendants.

Plaintiffs' counsel have extensive experience litigating class action cases
addressing unlawful and unconstitutional conditions of confinement in jails and prisons.
These experiences demonstrate that there are meaningful opportunities for the parties in
such cases to proceed in ways that are most cost-effective and solutions-oriented while
protecting the rights and interests of all parties.

To be clear, Plaintiffs' intention is to seek and secure an adequate and durable
remedy – in the form of injunctive relief – for the legal and constitutional violations set
forth in the complaint, with meaningful federal court oversight of implementation.  In
similar cases, this has been achieved through court orders and/or court-approved
settlements.

We provide below a two-pronged proposal, with an eye towards the shared goals
we discussed, addressing (1) class certification and (2) neutral, mutually agreed-upon
expert assessments.  The proposal would require a mutual good faith effort towards an
expeditious and efficient resolution of this matter.  If the County is amenable to such a
proposal, we suggest that we together share it with the other defendants.  Coordination
across all parties will undoubtedly result in greater efficiencies and cost-savings.

**I.    Class Certification**

In every significant jail system class action case filed in California's federal courts
in recent years, class certification has been granted.  The appropriateness of class
certification in a matter such as this one is beyond reasonable dispute, as made clear by
the Ninth Circuit in *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014).  That case, now
cited by numerous federal courts in California, makes clear that class certification is
appropriate where, as here, plaintiffs seek to challenge systemic policies and practices
that allegedly expose incarcerated people to a substantial risk of harm.  *See, e.g.*,

[3875815.3]

**Ex. D-42**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 3

*Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015); *Gray v. Cnty. of Riverside*, No. EDCV 13-00444-VAP, 2014 WL 5304915 (C.D. Cal. Sept. 2, 2014); *Jewett v. California Forensic Med. Grp., Inc.*, No. 213CV0882MCEACP, 2017 WL 931886 (E.D. Cal. Mar. 9, 2017), report and recommendation adopted sub nom. *Jewett v. California Forensic Med. Grp., Inc.*, 2017 WL 1356054 (E.D. Cal. Apr. 5, 2017).

   More recently, California counties have avoided costly and time-consuming discovery and motion practice on class certification either by stipulating to class certification, *see, e.g., Mays v. County of Sacramento*, E.D. Cal. Case No. 2:18-cv-02081-TLN-KJN (Joint Motion for Class Certification granted 12/28/18); *Babu v. County of Alameda*, N.D. Cal. Case No. 5:18-cv-07677-NC (Joint Motion for Class Certification granted 1/21/20), or by submitting a statement of non-opposition to certification, *see, e.g., Murray v. County of Santa Barbara*, C.D. Cal. Case No 2:17-cv-08805-GW-JPR (Unopposed Motion for Class Certification granted 5/31/18).

   In each of these cases, the County realized substantial cost-savings on a procedural matter that was not in reasonable dispute.

   Class certification brings an additional benefit for the County, protecting it from additional suits for systemwide injunctive relief. Resolution of a case of this sort through a class proceeding facilitates efficiency and finality both in terms of adjudication of complex legal issues and any resulting legal remedies. With the extensive attention that the San Diego County Jail has received, including from the State Auditor, in the media, from non-profit and governmental organizations like Disability Rights California the United States Department of Justice, and through numerous individual lawsuits, the County faces substantial risk of additional legal proceedings. There is substantial value to all parties to narrow and resolve the matters raised in the *Dunsmore* case through a single, class-wide adjudicatory process.

   As part of the this proposal, we ask that the County agree to class certification in the form of a stipulated order that would be filed with the Court no later than April 29, 2022. Counsel for Plaintiffs will be working on a motion for class certification during the pendency of this proposal. In the event that the County does not agree in principle with this proposal by April 1, 2022, Plaintiffs' counsel will accelerate their work on this motion.

## II.   Retention of Neutral Mutually Agreeable Experts

   Given the parties' shared goals, we propose the use of neutral, mutually agreed-upon subject matter experts to assist the parties in the identification of systemic issues and effective remedies that are tailored to San Diego County's system.

   A case like this one entails substantial fact discovery and expert input. A coordinated, streamlined process for information-sharing and expert involvement will put

[3875815.3]

**Ex. D-43**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 4

the parties in the best position to identify and implement adequate solutions to the problems raised, with the parties realizing cost-savings and efficiencies wherever feasible.

For these and other reasons, several California counties have used, or are using, neutral experts in this sort of process, including (for example) Sacramento, Santa Clara, Santa Barbara, Monterey, Fresno, Riverside, San Bernardino, and Alameda.  Where the parties have engaged in good faith negotiations, the outcome has been the achievement of – or significant progress towards – constitutional and legal compliance.

The most successful procedure, in our experience, is for the County to retain mutually agreed-upon experts with subject matter expertise on the relevant case issues, which in this case will include:  (a) mental health care and suicide prevention, (b) medical care, (c) dental care, (d) eye care, (e) environmental sanitation, health, and safety conditions, (f) custodial operations, (g) compliance with the Americans with Disabilities Act ("ADA"), and (h) county carceral and alternatives-to-incarceration practices impacting people with mental health or other disabilities and/or people who are Black and/or Latinx.

Through this process, the County (and other defendants, as appropriate) would work with us and these experts on the following terms:

➢ By June 1, 2022, the County will retain mutually agreeable experts for the purpose of preparing reports and recommendations regarding the above subject matters.  Plaintiffs' counsel will  provide recommendations as to available experts for the parties to discuss and will consider your proposed experts.

➢ The experts will have access to all people incarcerated at the Jail, records, and staff as needed to prepare their reports and recommendations.

➢ Within 100 days of the appointment of the experts, they would issue reports proposing recommendations and remediation for conditions found to be below the minimum federal and state standards.

➢ The expert reports and recommendations will be public and admissible in any litigation that may occur, including in the event that (a) the parties negotiate a class-wide remedial plan and settlement, or (b) negotiations are not successful in whole or in part.

Assuming the parties are able to proceed in good faith with negotiations for a class-wide settlement, these neutral expert reports and recommendations would provide a distinctively useful guide to negotiations and the drafting of a remedial plan, to be filed with the federal court, that satisfies constitutional and legal requirements.

[3875815.3]

**Ex. D-44**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 5

The expert reports and recommendations may assist in narrowing certain issues – where the mutually agreed-upon experts appropriately find that a systemic component is working well and is constitutionally or statutorily adequate, such an issue need not be the subject of litigation or a remedial plan – and will identify discrete issues that require remedial steps in this County.

Assuming the parties successfully negotiate a resolution through this structured process, it must ultimately result in a class settlement agreement filed with and approved by the court and over which the court retains continuing jurisdiction. The agreement would require that the County, where necessary to comply with state and federal law, revise policies and procedures, implement remedial plans, institute a system for quality assurance, and permit external monitoring of implementation and compliance. Furthermore, the County would agree not to oppose payment of reasonable attorneys' fees on the same terms as if Plaintiffs' counsel had fully litigated the case through a trial resulting in injunctive relief orders. The reasonableness of attorneys' fees would of course be a subject of negotiation and if necessary, dispute resolution processes.

## III.    Addressing Critical Issues

As discussed during our recent conversation, in a case of this nature and scope, it will be necessary to address certain issues on an expedited basis. There are issues in this case that require prompt attention. Specifically, there are systemic issues putting our clients and putative class members at extraordinary risk of serious harm right now; such issues cannot wait. Likewise, there are certain remedial actions that, if implemented in the near term, would lay a meaningful foundation for addressing other issues in the case in an efficient, cost-effective, and results-oriented way.

We will provide further detail on the critical issues that we consider essential for the County and other defendants to address without delay. The County's position on the proposal in this correspondence will assist in our presenting those issues and a procedure for addressing them.

We request that the County consider our proposals regarding (1) class certification and (2) the use of neutral, mutually agreeable subject matter experts, and provide us with its position as soon as possible, and no later than **April 1, 2022**. Agreeing to these proposals will not only save the County substantial resources and attorneys' fees, but also support a streamlined framework for identifying and resolving deficiencies at the Jail. Doing so will benefit incarcerated people, those who work at the Jail, and the County as a whole. If the County declines our proposals, we will accelerate our efforts to move for class certification as well as ask the Court for early discovery including the opportunity to inspect the Jail with our own experts.

**Ex. D-45**

Fernando Kish, Ronald Lenert, and Matthew O'Sullivan
March 15, 2022
Page 6


        We are of course available to meet and confer about these proposals.  Thank you for your attention, courtesy, and continued efforts.

                                    Sincerely,

                                    ROSEN BIEN
                                    GALVAN & GRUNFELD LLP

                            By:     *Van Swearingen*


                                    LAW OFFICE OF AARON J.
                                    FISCHER

                            By:     *Aaron J. Fischer*


                                    DLA PIPER LLP US

                            By:     *Christopher M. Young*


                                    ACLU FOUNDATION OF SAN
                                    DIEGO & IMPERIAL
                                    COUNTIES

                            By:     *Bardis Vakili*


[3875815.3]

**Ex. D-46**

R B G G   **ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

P.O. Box 390
San Francisco, California 94104-0390
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email:  ggrunfeld@rbgg.com

April 4, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Elizabeth M. Pappy
Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000
San Jose, CA  95113-2336
epappy@bwslaw.com

Re:     *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
        S.D. Cal. No. 3:20-cv-00406-AJB-DDL
        ADA Preliminary Injunction and Early Neutral Evaluation
        <u>Our File No. 1730-01</u>

Dear Beth:

This letter seeks to respond to your representation to the Court during yesterday's informal discovery conference that you were unaware of Plaintiffs' intent to file a preliminary injunction motion under the Americans with Disabilities Act ("ADA") and related federal and state disability discrimination law.

Contrary to your representation, Defendants have been on notice of Plaintiffs' intent to move again for a preliminary injunction since we moved for expedited ADA discovery on December 14, 2022.  That motion stated that Plaintiffs were seeking discovery "in anticipation of a renewed motion for preliminary injunctive relief." Dkt 243-1 at 1.  Moreover, in our March 20, 2023 letter we stated:  "we are preparing a motion for preliminary injunction."  Your email of the same date acknowledged that Plaintiffs' "stated reason" for document requests was "emergency or need for an injunction."

Since the Court granted the motion for expedited discovery in January, we have repeatedly met and conferred with you about the scope of our discovery requests, the dates for the inspections and person-most-knowledgeable depositions, and the inadequacy of your response to our request for production of documents and PMK designations.  We have now spent four full days with you and your co-counsel, inspecting two jails and

[4264751.1]

**Ex. D-47**

Elizabeth M. Pappy
April 4, 2023
Page 2

taking three depositions.  During all of these interactions, we have repeatedly stressed the need for prompt and thorough discovery in support of our view that the County is failing to comply with the ADA and related statutes and must immediately take action to end the harm to our clients.  At no time during these interactions did you or your co-counsel acknowledge any ADA failings or offer to enter into negotiations to address our concerns with the County's ADA compliance.

Regarding the possibility of an early neutral evaluation on ADA issues, Plaintiffs have repeatedly attempted to engage and work with you towards ADA compliance.  For example, we reached out to Defendants over a year ago about possible neutral expert evaluations.  At that time, we proposed that Defendants "retain mutually agreed-upon experts with subject matter expertise on the relevant case issues," including "compliance with the Americans with Disabilities Act."  V. Swearingen Letter to F. Kish et al. (Mar. 15, 2022) at 4.  We tried again in a meeting with Susan Coleman on April 21, 2022.  Defendants failed to provide any substantive response, essentially rejecting our proposal.  We were rebuffed again shortly before the August 11, 2022 hearing on our motion for preliminary injunction.  In December 2022, we again encouraged Defendants to use mutually agreed-upon neutral experts with ADA subject matter expertise (Dkt. 249); again Defendants rejected our proposal.

We understand that Defendants have retained Paul Joelson and potentially others to evaluate their compliance with the ADA.  However, we have received no information regarding Defendants' position on ADA compliance.  You instructed Defendants' Rule 30(b)(6) witnesses not to answer questions about your experts' work, and you withheld all expert analysis from production, citing the work-product and attorney-client privileges.

Based on the serious and urgent nature of ADA violations established by discovery to date, Plaintiffs will be seeking a preliminary injunction focused on two of the most egregious areas of the County's noncompliance:  Defendants' failure to provide in-person sign language interpretation to deaf incarcerated people, and their lack of safe and accessible housing for people with mobility disabilities.

In order to avoid litigation on these important issues, please let us know no later than **April 10, 2023** if Defendants will agree to an ENE process that includes the simultaneous mutual exchange of expert reports, the filing of a joint statement identifying points of agreement to be included in a remedial plan and any points of disagreement, and the development of a plan to timely remedy, at minimum, all points of agreement that will result in a stipulated order to be submitted to the Court with Court oversight of the process.

[4264751.1]

**Ex. D-48**

Elizabeth M. Pappy
April 4, 2023
Page 3


    Please do not hesitate to call me if you have questions about our proposal or the
scope of the County's ongoing failures to comply with the ADA and related statutes.

    As always, we appreciate your courtesy and cooperation in this matter.

                                          Very truly yours,

                                          ROSEN BIEN
                                          GALVAN & GRUNFELD LLP

                                          */s/ Gay Crosthwait Grunfeld*

                                    By:   Gay Crosthwait Grunfeld

GCG:cg
cc:  Susan Coleman
     Co-counsel

[4264751.1]

**Ex. D-49**

# EXHIBIT E

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| DATE: | MAY 9, 2022 |
| NUMBER: | I.22 |
| SUBJECT: | LOWER BUNK / LOWER TIER ASSIGNMENT |
| RELATED SECTIONS: | I.21; M.9; M.39 |

PURPOSE:

To establish minimum standards for the assignment and review of incarcerated persons to lower bunk and/or lower tier housing.

POLICY:

Lower bunk and/or lower tier recommendations are determined by detention facility health staff due to physical impairments or mobility issues caused by a disability, medical condition or drug/alcohol withdrawal. Sworn staff will review and resolve any discrepancies in housing/bunk assignments due to the lower bunk and/or lower tier restriction.

PROCEDURE

I.  LOWER BUNK/LOWER TIER HOUSING ASSIGNMENT

   A.  Sheriff's health staff will ensure incarcerated persons with physical impairments or mobility issues are accommodated for their safety and appropriate bed assignment.

      1.  The recommendation for a lower bunk and/or lower tier will be determined by health staff and entered into the medical instructions.

      2.  The health staff's order for lower bunk and/or lower tier housing is considered a housing restriction to minimize the risk of injury to the incarcerated person.

      3.  Incarcerated persons without an instruction for lower bunk and/or lower tier may submit a Sick Call Request (J-212) form to request this type of bed assignment. A medical evaluation is required to determine the need to establish or reinstate an instruction for lower bunk and/or lower tier.

   B.  If the health staff recommendation for a lower bunk and/or lower tier housing restriction is established during the intake process, Jail Population Management Unit (JPMU) deputies will notate such housing restriction on the incarcerated person's face card. If the restriction is determined after the incarcerated person has been housed, health staff will notify the housing deputies of the restriction.

      1.  Housing deputies will be responsible for assigning these incarcerated persons in the Jail Information Management System (JIMS) to either a lower bunk ("LOWER BUNK"), lower tier ("LOWER TIER") or a lower bunk on the lower tier ("LOWER BUNK/LOWER TIER").

      2.  The bottom bunk on double-bunks and the bottom and middle bunks on triple-bunks will satisfy the lower bunk restriction.

**Ex. E-51**

C.     At the beginning of each shift, the watch commander or designee will review the "LOWER BUNK / LOWER TIER DISCREPANCIES" report in JIMS.

     1.     The watch commander or designee shall direct housing deputies to resolve any discrepancies.

     2.     Bunk and/or housing moves may be required to accommodate incarcerated persons with a lower bunk and/or lower tier designation.

     3.     In the event the number of incarcerated persons requiring a lower bunk and/or lower tier placement is greater than the beds available, JPMU deputies will be notified.

     4.     Housing deputies will log the report review and reconciliation in the JIMS Area Activity Log utilizing the "LOW BUNK/TIER REVIEW" drop-down. Any discrepancies that remain unresolved due to an incarcerated person not being present in the housing area (e.g., court, medical appointment, etc.) will be noted in the "Notes" section of the log entry and the watch commander shall be notified.

D.     Incarcerated persons shall accept bunk assignments as directed by staff. Incarcerated persons are not entitled to bunk location of choice and shall be subject to disciplinary action in accordance with Detention Services Bureau Policies and Procedures section O.1 for refusing a bunk assignment, including any lower bunk and/or lower tier restriction.

# EXHIBIT F

Ex. F-53

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| DATE: | MAY 27, 2022 |
| NUMBER: | M.39 |
| SUBJECT: | DISABLED INCARCERATED PERSONS |
| RELATED SECTIONS: | C.1, M.9, CCR TITLE 15, SEC, 1057, CA Penal Code 2656, Americans with Disabilities Act |

## PURPOSE

To establish uniform procedures to identify, evaluate and house disabled incarcerated persons in the safest manner possible while ensuring the accommodation of major life activities.

## POLICY

The department recognizes disabled incarcerated persons are entitled to the same rights, privileges, and services as other incarcerated persons of the same classification level per the Americans with Disabilities Act (ADA). An incarcerated person is covered by the ADA when the incarcerated person has a permanent, temporary, or intermittent condition that impacts a major life activity.

Qualified incarcerated persons with disabilities shall not be excluded from participation in, denied the benefits of, or subjected to discrimination in any detention facility's services, programs, work assignments or activities, based on a disability. Each incarcerated person identified as having a disability must be reasonably accommodated through some means.

## ADA DEFINITIONS

DISABILITY - An individual has a disability if there is a physical or mental impairment that substantially limits one or more major life activities. The ADA also recognizes individual s with a record of impairment, or individual s regarded as having an impairment, as meeting the definition of disabled. Generally, such individual s will not require special accommodations.

PHYSICAL IMPAIRMENT - Includes any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin and endocrine.

MENTAL IMPAIRMENT - Includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

MAJOR LIFE ACTIVITIES - Includes but not limited to such functions as caring for oneself, reading, communicating, performing manual tasks, walking, seeing, hearing, speaking, and thinking.

CARING FOR ONESELF - Personal care such as toileting, dressing, bathing and feeding.

COGNITIVE DISABILITY - A broad term to describe conditions affecting types of mental tasks such as problem solving, reading comprehension, attention, and/or remembering. A cognitive disability is not the same as a mental disorder.

M.39 DISABLED INCARCERATED PERSONS

SD 000322

**Ex. F-54**

MENTAL DISABILITY - An individual who has a past medical record of, or is regarded as, having one or more mental disorders as defined in the American Psychiatric Association's Diagnostic Manual.

BLIND - An individual whose visual acuity in their best eye has an acuity of 20/200 or worse and/or if their peripheral vision is less than 20 degrees.

DEAF - An individual who cannot readily understand spoken language through hearing alone and who may have a speech defect that renders them unintelligible to most normal hearing people.

REASONABLE ACCOMMODATION - Any modification or adjustment that is effective in enabling an individual to perform the major life activities. Any change in the facility, policies, procedures, or the manner in which tasks are completed that enables a qualified individual with a disability to participate in and receive the same benefits from a program or service. Reasonable accommodation does not require fundamental alteration of the nature of a program or activity.

<u>PROCEDURE</u>

I.    IDENTIFICATION AND SCREENING

    A.    The identification of an incarcerated person with a disability generally will occur during the receiving screening process.  However, the identification of an incarcerated person with a disability can occur at any point during an individual's incarceration (e.g., Jail Population Management Unit (JPMU) interview, outside agency, by the advisement of a family member, etc.).

    B.    Sheriff's health staff will evaluate and determine if an incarcerated person qualifies as 'disabled.'

    C.    All incarcerated persons who have been screened and determined to be disabled will be housed in a facility with the appropriate accommodations. Based on their disability, each incarcerated person covered under the ADA must be reasonably accommodated through some means, such as but not limited to modified housing for wheelchair access, grab bars in bathrooms, shower chairs, closed captioning on the television, interpreter services, telecommunications device for the deaf, assistive listening devices, magnification devices, large, printed materials, and braille materials. Health screening staff shall enter health instructions into the incarcerated person's health record. The shift charge nurse or designee will inform JPMU of the health instructions. They will also inform the Reentry Services Division (RSD) Manager or their designee via email with the names of those incarcerated persons who have an identified need for accommodations for adaptive or programming services.

    D.    A health recommendation (e.g., "lower bunk," "lower tier") shall be initiated and entered into the incarcerated person's health record upon determination that the recommended instructions are necessary for the safety and/or welfare of a disabled incarcerated person.

    E.    If sworn staff is unable to accommodate the aforementioned housing recommendations, health staff shall be notified.

    F.    Re-evaluation of functional performance will be conducted by the registered nurses/designee once a month for those incarcerated persons identified as having a

M.39 DISABLED INCARCERATED PERSONS

#22//18

SD 000323

**Ex. F-55**

temporary medical disability.  A possible reassignment of housing unit and/or facility may be recommended.

II.     ACCOMMODATIONS

Incarcerated persons requiring ADA accommodations will be assisted in receiving access to the following by either the Medical Services Division (MSD) or RSD staff:

A.     Medical services

B.     Psychiatric services

C.     Adaptive services to assist in participation in programs or services

D.     Adaptive services to report to health and/or sworn staff if they have been sexually assaulted.

III.    REQUEST FOR ACCOMMODATIONS

A.     A request for reasonable accommodation may be initiated by the incarcerated person, their family members, or an outside agency.

B.     A request for an assessment of accommodations will be forwarded to the MSD ADA case manager for review.  Assessments can be completed by either a registered nurse or by a physician. The findings and disposition will be documented in the incarcerated person's health record.

C.     Requests will be acted upon within 72 hours

IV.    ADA GRIEVANCE PROCEDURE

Grievances will be handled according to Detention Services Bureau Policies and Procedures section N.1 and forwarded to a MSD supervisor or designee. All ADA related grievances will be forwarded to the MSD ADA case manager for processing.

# EXHIBIT G

| | |
|---|---|
| **DATE:** | **October 1, 2020** |
| **NUMBER:** | **M.39.C.1** |
| **SUBJECT:** | **Disabled Inmates - Usage of Lower Bunks Lower Tier** |

PROCEDURE

During the second stage medical screening, the San Diego Central Jail (SDCJ) Medical Staff will note in the Jail Information Management System (JIMS) when an inmate has a medical condition necessitating assignment of a lower bunk or a restriction to the lower tier of the module.

At the beginning of each shift, the Housing Deputies will review the "LOWER BUNK" and "LOWER BUNK/LOWER TIER" lists.  Housing Deputies should make all attempts to resolve the discrepancies prior to the end of shift.  Once the list has been reviewed/resolved, an appropriate log entry will be made into JIMS under the "Lower Bunk/Tier Review" drop down.  If the list is unable to be resolved during the shift, the reason for the list remaining unresolved will be noted in the "Notes" section of the log entry (e.g. no lower bunks available, inmate at court).

In the event an inmate refuses his lower bunk/lower tier designation, the inmate must fill out and sign a J223 (Medical Refusal Form). The signed J223 will be forwarded to SDCJ Medical Staff.  The deputy handling the refusal will note in the inmate's history under "Interview with Jail Staff" the reason for the refusal and that a J223 Form was filled out by the inmate and forwarded to SDCJ Medical.

SD 000306

Ex. G-58

# EXHIBIT H

Ex. H-59

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| **DATE:** | MAY 4, 2022 |
| **NUMBER:** | P.11 |
| **SUBJECT:** | INCARCERATED PERSONS WHO ARE DEAF OR HARD OF HEARING |
| **RELATED SECTIONS:** | |
| **IN COMPLIANCE WITH:** | AMERICANS WITH DISABILITIES ACT OF 1990 |

PURPOSE

To provide assistance to incarcerated persons who have hearing impairments in accordance with the requirements of the Americans with Disabilities Act.

PROCEDURE

Each detention facility shall have their telephonic communication system equipped to provide access for incarcerated persons with varying degrees of hearing impairments. Equipment shall be provided to communicate on the public phone system and also the visiting phone.

I.     ASSISTING INCARCERATED PERSONS WITH COMMUNICATION ON TELEPHONIC COMMUNICATION SYSTEMS

A.     In each facility, a Telecommunications Device for the Deaf (T.D.D.) shall be made available to severely hearing impaired incarcerated persons to be utilized while making outside phone calls.

B.     Each facility shall issue a green sheet on the location and procedures for the use of the T.D.D.

C.     Each facility shall be equipped with "Hearing Aid Compatible" phones to allow incarcerated persons with personal hearing aids to effectively utilize the phone.

D.     All facilities' incarcerated person phones, including the social visiting phones, shall have the hearing enhancement device feature. These devices shall enhance the ability to hear by the activation of an amplification switch that has three settings: *Normal*, *Loud* and *Louder*. A decal or engraving with the universal symbol for the hearing impaired shall be visible on all phones designated for incarcerated persons.

II.     IDENTIFICATION OF HEARING IMPAIRED INCARCERATED PERSONS

The administrative lieutenant and the Supervising Correctional Counselor or designee at each facility shall identify all incarcerated persons with serious hearing impairments. This information is available in the Jail Information Management System (JIMS) via the *Inmates with active Medical Instructions: Hearing Deficit/Deaf* JIMS Web Report. These incarcerated persons shall be allowed to use the T.D.D.'s. or other communication systems that have hearing amplification devices.

III.    OBTAINING SIGN LANGUAGE INTERPRETING ASSISTANCE

The County of San Diego has contract providers for interpreting services in place for any County-affiliated agency.  For non-emergency interpreting service requests, you will find a list of approved service providers at:
https://insiteext.sdcounty.ca.gov/csg/pc/Lists/dpc_cw/Allitemsg.aspx.

For emergency interpreting services (such as an arrest or interview), call (619) 398-2488.  Press "5" to obtain the After Hours Emergency Line.

# EXHIBIT I

**SDSD Detention Services Bureau—San Diego Central Jail Green Sheet**

| | |
|---|---|
| **DATE:** | **February 21, 2023** |
| **NUMBER:** | **P.11.C.1** |
| **SUBJECT:** | **INCARCERATED PERSONS WHO ARE DEAF OR HARD OF HEARING** |

<u>PROCEDURE</u>

San Diego Central Jail (SDCJ) will be equipped with two different types of telecommunication devices to assist incarcerated persons who are deaf or hard of hearing. The two types of devices available are:

   1.) Telecommunication Device for the Deaf (T.D.D.)

   2.) Video Relay Service (V.R.S.) provided by Purple Communications

Any incarcerated persons who have been identified as being deaf or hard of hearing, regardless of classification, will be allowed to use the T.D.D. and the V.R.S. devices to remain in compliance with State Senate Bill 1008 – The Keep Families Connected Act.

1) The T.D.D. at SDCJ is located on the 6th Floor in the Mental Health Clinician's Interview Room.

2) The V.R.S. device is located on the 2nd Floor inside of Booking Window #8. The V.R.S. is hardwired and connects with an American Sign Language interpreter

3) Incarcerated persons brought from the housing floors to use the V.R.S. will be logged out to V.R.S. (Video Relay Service) in the Operation Status Board drop-down in the Jail Information Management System (JIMS).

**Ex. I-63**

# EXHIBIT J

| **SAN DIEGO COUNTY SHERIFF'S DEPARTMENT** **MEDICAL SERVICES DIVISION** | Operations Manual | | |
|---|---|---|---|
| SUBJECT: LOWER BUNK/ LOWER TIER | DATE: | 11/4/2022 | |
| CATEGORY: MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.F.1.2 | |
| DISSEMINATION: MEDICAL SERVICES DIVISION | PAGE: | 1 | |

RELATED SECTIONS: DSB I.22; DSB O.1
IN COMPLIANCE WITH: CCR, TITLE 15, SECTION 1208 &1210; NCCHC J-F-01

## PURPOSE

To ensure that patients with medical problems will be housed in the bunk and/or tier appropriate to the need assessed by health staff.

To clarify criteria for lower bunk and/or lower tier when entering patient flags in the health record.

To emphasize that a qualified health provider's order for lower bunk and/or lower tier housing is recommended to minimize the risk of injury to patient meeting criteria.

To ensure patient's with physical impairments or mobility issues be accommodated for their safety and appropriate bed assignment.

## PROCEDURE

I.  Criteria for placement as follows:
    A.  Patients having physical disabilities or limitations but ambulating without the use of crutches, walker or wheelchair, may be housed on an upper tier.
    B.  Patients requiring a cane for ambulation will be assessed on a case by case basis by health staff to determine their ability to safely use the stairs.
    C.  Patients with the following conditions must be placed in a lower bunk and on the lower tier:
        1.  Seizures
        2.  Active alcohol withdrawal treatment.  (*time limited)
        3.  Active heroin withdrawal treatment. (*time limited)
        4.  Pregnancy
        5.  Status post caesarian-section

II. Notification and Documentation:
    A.  Adding patient flag in the health record should include the following:
        1.  Enter reason for recommending lower bunk/lower tier in the comment field.
        2.  Add expiration date as needed for time limited conditions.
    B.  Notify the corresponding housing deputies of the restriction.

III. Compliance and monitoring:
    A.  Sworn staff will routinely monitor compliance of bed assignments.
    B.  Inmates shall accept bunk assignments as directed by staff and shall be subject to disciplinary action for refusing a bunk assignment (see DSB I.22 and DSB O.1).

**SAN DIEGO COUNTY SHERIFF'S DEPARTMENT**
**MEDICAL SERVICES DIVISION**                    Operations Manual

| SUBJECT: | LOWER BUNK/ LOWER TIER | DATE: | 11/4/2022 |
|---|---|---|---|
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.F.1.2 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 2 |

RELATED SECTIONS:    DSB I.22; DSB O.1
IN COMPLIANCE WITH:   CCR, TITLE 15, SECTION 1208 &1210; NCCHC J-F-01

Reviewed:  8/18/03, 8/9/04, 8/12/05, 7/31/06, 7/30/07, 7/10/08, 8/13/09, 1/10/22, 11/4/22
Revised:      7/01, 4/8/11, 12/21/11, 6/15/16, 11/2/2020, 12/09/2020

**Ex. J-66**

# EXHIBIT K

Ex. K-67

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | | Operations Manual |
|---|---|---|
| SUBJECT: | PROSTHESES, ORTHOSES AND OTHER AIDS TO IMPAIRMENT | DATE: 11/4/2022 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: MSD.P.7 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: 1 |

| RELATED SECTIONS: | MSD P&P: S.3 |
|---|---|
| IN COMPLIANCE WITH: | CCR Title 15, Section 1206, 1215, NCCHC J-F-01 |

## PURPOSE

To provide guidelines when a patient presents to booking with their personal prosthesis, orthotic or other aids to impairment.  To provide guidelines when a patient requests or a provider considers the ordering of a prosthesis, orthotic or other aids to impairment.  To provide guidelines for the housing of patients with clinically indicated prosthetic appliance.  To provide guidelines in the event a patient has violated this policy.  To define care abilities for those who are medically impaired.
Definitions:

- Prostheses are devices to replace missing body parts such as limbs, teeth, eyes, or heart valves.
- Orthoses are mechanical devices, such as braces, foot inserts, or hand splints, used to support or supplement weakened or abnormal joints or limbs.
- Aids to impairment include, but are not limited to eyeglasses, hearing aids, canes, crutches, and wheelchairs.

## POLICY

Patients shall be allowed to keep/wear prescribed prosthesis, orthotic or aids to impairment unless it has been determined that it poses a risk to safety or security.  Prostheses, orthoses or aids to impairment may be provided to patients upon request and if medically indicated.  If a patient has previously violated the policy and was non-compliant with the use of a prosthesis, orthotic or an aid to impairment, clinical indication for the appliance will be re-evaluated.

## PROCEDURE

I.    An Appliance and Prostheses Authorization form is to be completed by a provider to request for a patient's appliance in TechCare. Patients may submit a Sick Call Request (J212) to request evaluation for prosthesis or replacement.
    A.  Providers completing and submitting a prosthesis request will include the following information:
        1.  The end dates whenever possible and appropriate.
        2.  The follow-up appointment for reassessment of need for the appliance.
    B.  Referrals for appliances may require a review by the Sheriff's Chief Medical Officer, and approval by the Medical Services Administrator.
II.   The removal of an appliance may occur if:
    A.  There is a safety and security concern/violation.
    B.  The patient is found to be non-compliant with prescribed regimen.
III.  In the event an appliance is removed:
IV.   The appliance should be placed immediately in the patient's property.

**PROSTHESES, ORTHOSES AND OTHER AIDS TO IMPAIRMENT**

SD 000341
**Ex. K-68**

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | Operations Manual | |
|---|---|---|
| SUBJECT: PROSTHESES, ORTHOSES AND OTHER AIDS TO IMPAIRMENT | DATE: | 11/4/2022 |
| CATEGORY: MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | MSD.P.7 |
| DISSEMINATION: MEDICAL SERVICES DIVISION | PAGE: | 2 |

RELATED SECTIONS: MSD P&P: S.3
IN COMPLIANCE WITH: CCR Title 15, Section 1206, 1215, NCCHC J-F-01

    B. The medical services staff must be notified, and a note will be made in the patients the medical record.

IV.  Appealing the removal of an appliance:
    A. The patient may appeal such removal by writing an Inmate Request/Grievance, stating the need.
    B. This written appeal request will be routed to the appeal's officer in the detention facility via the watch commander's office who will decide whether or not the appeal may be granted.

V.  Housing Recommendations:
    A. Appropriate accommodation for patients with prosthesis, orthotic or aid to impairment will be provided as indicated.

Implemented:  10/90
Reviewed:  9/17/96, 9/19/97, 9/18/98, 8/11/99, 7/31/00, 8/18/03, 8/9/04, 8/12/05, 7/31/06, 7/31/07, 07/09/08, 2/24/11, 2/27/13, 9/6/19, 11/4/22
Revised:  3/17/92, 10/20/92, 6/4/93, 4/1/94, 5/24/95, 1/29/96, 8/10/01, 9/18/02, 1/24/05, 7/28/09, 2/14/12, 2/24/14, 3/30/17, 1/6/22

**PROSTHESES, ORTHOSES AND OTHER AIDS TO IMPAIRMENT**

SD 000342
**Ex. K-69**

# EXHIBIT L

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | NURSING GUIDELINES | |
|---|---|---|
| SUBJECT: COVID-19 INTERIM EMERGENCY CLASSIFICATION MATRIX FOR MEDICAL & PSYCHIATRIC HOUSING | NUMBER: | NSG.C.12 |
| DATE: 07/21/2021 | PAGE: | 1 |

**This guideline will serve as temporary document in response to the necessary movement of patients requiring quarantine during COVID- 19 pandemic.**

| DESCRIPTION | SDCJ | VDF | LCDRF | GBDF | EMRF | FAC 8 *Facility Closed | SBDF |
|---|---|---|---|---|---|---|---|
| **Medical Acuity & Capability** | High* | High* | High* | High* | Medium** | N/A | Low** |
| **Gender Population** | Men | Men Women | Women | Men | Men | N/A | Men |
| **Nursing Hours** | 24 | 24 | 24 | 24 | 12 | N/A | 10 |
| **MDSC** | YES (Daily) | YES (Daily) | YES (Daily) | YES (Daily) | 2x/week | N/A | Weekly |
| **Handicapped** | YES | - | YES | - | YES+ | - | - |
| **Work programs** | - | - | YES | - | YES | - | - |
| **Isolation - Respiratory** | YES | YES | YES | YES | - | - | - |
| **Intake Services** | YES | YES | YES | - | - | - | - |
| **Crutch, Cane, Cast, Sling** | YES | YES | YES | YES | YES | N/A | YES |
| **MOB** | YES | YES | YES | YES | - | - | - |
| **Acute/ Unstable Medical Conditions** | | | | | | | |
|   Asthma | YES | YES | YES | YES | YES | N/A | Stable |
|   Diabetic | YES | YES | YES | YES | YES (NIDDM) | N/A | YES (NIDDM) |
|   HIV | YES | YES | YES | YES | YES | N/A | YES |
|   HTN | YES | YES | YES | YES | YES | N/A | YES |
|   Seizure | YES | YES | YES | YES | YES | N/A | Stable |
|   Withdrawal (Heroin / Alcohol) | YES | YES | YES | NO | NO | N/A | NO |
|   Draining Wounds | YES | YES | YES | YES | YES | N/A | YES |
| **Specialty Clinics** | | | | | | | |
|   OB / Planned Parenthood | - | - | YES | - | - | N/A | - |
|   Dental Services | YES | YES | YES | YES | YES | N/A | - |
|   Methadone | YES | YES | YES | - | - | N/A | - |
|   Dialysis | YES | - | - | - | - | N/A | - |
| **Psychiatric Services** | | | | | | | |

**CLASSIFICATION MATRIX FOR MEDICAL & PSYCHIATRIC HOUSING**

SD 000331

**Ex. L-71**

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | NURSING GUIDELINES |
|---|---|

| SUBJECT: | COVID-19 INTERIM EMERGENCY CLASSIFICATION MATRIX FOR MEDICAL & PSYCHIATRIC HOUSING | NUMBER: | NSG.C.12 |
|---|---|---|---|
| DATE: | 07/21/2021 | PAGE: | 2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PSU | YES | - | YES | - | - | N/A | - |
| Outpatient Mental Health Services | YES | YES | YES | YES | YES | N/A | - |
| Mental Health Clinician | YES | YES | YES | YES | YES | N/A | YES |
| Penal Commits (1026,1370,2970) | YES | YES | YES | YES | - | N/A | - |
| PSA | YES | YES | YES | YES | YES w/ QMHP appt. 1 week post transfer | N/A | - |

| Instructions | | | | | | | |
|---|---|---|---|---|---|---|---|
| Medical Diets, Food Allergies | YES | YES | YES | YES | YES | N/A | YES |
| Lower Bunk/Lower Tier | YES | YES | YES | YES | YES | N/A | YES |
| TID Medications | YES | YES | YES | YES | YES | N/A | - |
| Narcotic Medications | YES | YES | YES | YES | - | N/A | - |

*High: Some capacity to manage high risk and complex acute and chronic medical/psychiatric conditions with 24hour nurse staffing.

**Medium: Full capacity to manage uncomplicated acute and stable chronic medical/psychiatric conditions with 12-hour nurse staffing.

***Low: Limited capacity to manage uncomplicated acute and stable medical/psychiatric conditions with 8 to 10hour nurse staffing.

* See facility green sheet for detailed ADA accommodation capacity.

PURPOSE

To establish guidelines for medical screening of inmates transferring to other facilities at the request of JPMU.

To ensure continuity of care for an inmate's existing medical conditions.

CLASSIFICATION MATRIX FOR MEDICAL & PSYCHIATRIC HOUSING

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | NURSING GUIDELINES | |
|---|---|---|
| SUBJECT: COVID-19 INTERIM EMERGENCY CLASSIFICATION MATRIX FOR MEDICAL & PSYCHIATRIC HOUSING | NUMBER: | NSG.C.12 |
| DATE: 07/21/2021 | PAGE: | 3 |

PRE-SCREENING TRANSFER

I.  For inmates transferring to SDCJ, LCDRF, VDF or GBDF, a pre-screening transfer is not necessary except for the following conditions:
   A. Patients currently housed in MOB, safety cell, enhanced observation housing unit and/or isolation cells are not to be transferred without prior coordination between JPMU and facility medical staff.
   B. Patients with transfer restrictions noted in JIMS INSTRUCTION i.e. dialysis, special meds, special cases and/or inmate on programs only available at the current facility. C. Patients with scheduled outpatient clinic appointments.

II.  For inmates transferring to SBDF and EMRF, a pre-screening transfer is to be completed based on the above matrix as follows:
   A. SBDF transfers will be pre-screened by the medical staff of the sending facility. If cleared for transfer, designate "Cleared for SBDF" in the JIMS medical instruction.
   B. EMRF transfers will be pre-screened by EMRF medical staff. If cleared for transfer, designate "Cleared for EMRF" in the JIMS medical instruction.

III.  Pre-screening transfer procedure:
   A. JPMU will send SBDF and EMRF potential transfer list to the above-referenced designated staff for review between 2000-0000 hours.
   B. Facility designated staff will return the potential transfer list to JPMU with individual transfer determination based on medical matrix by 0500 hours.

COMPLETED TRANSFER REVIEW

I.  A final transfer list will be available in JIMS Scheduling Report for each facility for medication administration and medical record transfer.

II.  A record review is to be completed by the receiving facility within 12 hours of transfer.

III.  Completed record review is to be documented by the receiving facility in JIMS along with the necessary changes caused by the transfer.

DEFINITIONS OF STABLE CONDITIONS

I.  Asthma
   A. Patient knowledgeable of disease processes, triggering events, and methods of self - treatment.
   B. Demonstrated self-treatment and self-carry of personal medications for given condition.
   C. No documented history of respiratory distress or nebulizer treatment/therapy during current incarceration.
   **CLASSIFICATION MATRIX FOR MEDICAL & PSYCHIATRIC HOUSING**

SD 000333
**Ex. L-73**

| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION | NURSING GUIDELINES | |
|---|---|---|
| SUBJECT: COVID-19 INTERIM EMERGENCY CLASSIFICATION MATRIX FOR MEDICAL & PSYCHIATRIC HOUSING | NUMBER: | NSG.C.12 |
| DATE: 07/21/2021 | PAGE: | 4 |

II.   HTN
    A. Blood pressure (BP) is maintained with current treatment and is not labile
    B. No chest pains in the last 6 months.
    C. BP measurement of 150/90 or below for three consecutive encounters.
    D. Asymptomatic
    E. Recommend individual assessment if patient has comorbidities (e.g. diabetes or chronic kidney disease).

III.   Outpatient Mental Health Services
Exclusionary factors to being transferred to EMRF include, but will not be limited to the following:
    A. Inmates with a History of PSA and/or history of inmate safety program (ISP) placement will be assessed on a case by case basis. Initial pre-screening evaluation for appropriate transfer to EMRF will be performed by a Qualified Mental Health Provider (QMHP). If QMHP determines inmate is appropriate for transfer, inmate will be transferred based on QHMP's determination. Once transferred, inmate is to be evaluated by a Qualified Mental Health Provider (QMHP) within 7 days.

IV.   Diabetics:
    A. Oral medications (biguanides, sulfonylureas, etc.); no insulin support.

    B. Recommend individual assessment if patient has comorbidities. Serum glucose needed for evaluation.

V.   Seizure
    A. Completion of any form of withdrawal protocol/SNP (if applicable).
    B. Medication Compliant
    C. No seizure within the last three months.

VI.   Specialty Clinic Appointments
    A. Inmates with specialty clinic appointments may be housed in SBDF and EMRF and, so long as the appointments do not require special preparations. NOTE: Does not include those patients needing to be NPO.

Implemented:   3/17/2020
Reviewed:       07/15/2021
Revised:         11/20/2020,07/21/2021

**CLASSIFICATION MATRIX FOR MEDICAL & PSYCHIATRIC HOUSING**

# EXHIBIT M

Sergeant Matthew Jensen

Dunsmore vs.
San Dirgo County Sheriff's Office

```
 1                UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

   DARRYL DUNSMORE, ANDREE ANDRADE,
 4 ERNEST ARCHULETA, JAMES CLARK,
   ANTHONY EDWARDS, LISA LANDERS,
 5 REANNA LEVY, JOSUE LOPEZ,       Case No.:
   CHRISTOPHER NELSON, CHRISTOPHER 3:20-cv-00406-AJB-DDL
 6 NORWOOD, JESSE OLIVARES, GUSTAVO
   SEPULVEDA, MICHAEL TAYLOR, and
 7 LAURA ZOERNER, on behalf of
   themselves and all others
 8 similarly situated,

 9                         Plaintiffs,

10          vs.

11 SAN DIEGO COUNTY SHERIFF'S
   DEPARTMENT, COUNTY OF SAN DIEGO,
12 SAN DIEGO COUNTY PROBATION
   DEPARTMENT, and DOES 1 to
13 inclusive,

14                        Defendants.
   _____
15

16

17                     DEPOSITION OF

18               SERGEANT MATTHEW JENSEN

19                 SAN DIEGO, CALIFORNIA

20                   MARCH 14, 2023

21

22

23

24 REPORTED BY:
   A. DESIREE TIPPER, CSR NO. 13806
25 JOB NO: 10116488
```

Ex. M-76

```
1      A    You click on the individual's name and you can

2  access the instructions from the individual's profile in

3  the JIMS system.

4      Q    What else is in their JIMS profile?

5          MS. PAPPY:  I'm going to object.  I'm going to

6  instruct him not to answer.

7          I'm giving you some leeway about this because it

8  relates to hard-of-hearing individuals and getting -- I'm

9  hoping we're going to get to their access to Purple, but

10 what else is in JIMS is not relevant to this deposition

11 as a PMK on Purple and Rock Mountain policies.

12 BY MR. ANDERSON:

13     Q    So this instructions hazard -- it says that they

14 are deaf or hard of hearing?

15     A    It just labels deaf, hard-of-hearing on the

16 hazard.

17     Q    Does it say whether they use the VRS?

18     A    No.

19     Q    Does it say whether they use the TTY?

20     A    No.  It just says "deaf" or "hard-of-hearing" on

21 there.

22     Q    Will it have a notification if they use a

23 hearing aid?

24     A    No.  Not as far as their hazards go.  If they're

25 hard of hearing, and then that's labeled on there, then
```

Ex. M-77

1    that would be on there.

2        Q    So it just says "deaf" or "hard-of-hearing"?

3        A    Yeah, that's correct.

4        Q    For a person does it say "deaf and hard of

5    hearing" or does it say just "deaf"?

6        A    I can't remember off the top of my head which

7    one, but I do remember seeing "deaf" or

8    "hard-of-hearing."  You only see it every so often.

9    There's not many people that come in with the hazard on

10   there from my experience within the jails.

11       Q    Are all people with that hazard housed at

12   Central?

13       A    Not necessarily.

14       Q    So how does -- a staff person goes to JIMS to

15   determine -- and if they see "deaf" or "hard-of-hearing,"

16   that person can use the VRS?

17       A    That person can use VRS, yes.

18       Q    How does the deputy know if that person knows

19   sign language or not?

20       A    The -- they'll go talk to the individual.

21   Usually if -- since I don't know sign language, you would

22   just write on paper, you know, "sign language?" or "Do

23   you need to use the Purple or TTY?"

24            And then the person would let you know.

25       Q    Are those notes kept?

Ex. M-78

Sergeant Matthew Jensen

```
 1      A     No.  It's like a communication between -- it's

 2   like a sticky note that's written back and forth between

 3   myself and the individuals there.

 4      Q     How many people at the jail right now use VRS?

 5      A     I don't know that number off the top of my head.

 6      Q     I think you mentioned a little bit, but how does

 7   the VRS technology work?

 8      A     So it's a screen.  You log into the Purple

 9   account from your account and the individual types in the

10   phone number that they're calling, and the VRS pops up

11   with their individual -- so long as their phone or their

12   computer, whatever they use it on, and then they just

13   talk to each other via sign language through the screen

14   and the camera.

15      Q     So people use it for social phone calls?

16      A     Yes, correct.

17      Q     What about attorney calls?

18      A     If they need it for an attorney call, they can

19   use it for an attorney call.  It's whoever they need to

20   communicate with on there.

21      Q     Do they communicate with medical staff at the

22   jail?

23      A     Not the VRS system.  Because they're in person.

24      Q     What about outside medical, if a person has an

25   appointment with a specialist?
```

Ex. M-79

Sergeant Matthew Jensen

Dunsmore vs.
San Dirgo County Sheriff's Office

```
 1      A    They -- usually if it's something specialized
 2   like that, they'll get taken to a specialty appointment.
 3      Q    Usually, but not always?
 4      A    If they have something specially -- like in what
 5   sense?  Like something that we can't provide?
 6      Q    A video visit with a specialist?
 7      A    If they want a video visit with a specialist,
 8   they can.  I mean, it's open to whoever has a VRS system.
 9      Q    So people use the VRS to call out?
10      A    Correct.
11      Q    For communications in the jail, they don't use
12   it?
13      A    No, not in the jail.
14      Q    Not -- okay.  So not with a deputy?
15      A    No.
16      Q    Typically you would write notes to communicate
17   with the person?
18      A    Right.  We would just ask what they need and
19   write it on paper.
20      Q    Same for medical staff?  Is that how they
21   communicate with the person?
22      A    Generally they'll write answers and questions on
23   there.
24      Q    Are there deaf people who don't know how to use
25   sign language in the jail?
```

www.aptusCR.com

Ex. M-80

 1      A    I'm not sure.

 2      Q    **So in practice when a person -- how does a**

 3  **person request to use VRS?**

 4      A    They'll just stop a deputy in the module and ask

 5  to use the VRS.

 6      Q    **When they're out of their cell?**

 7      A    Out of their cell, in their cell.  It doesn't

 8  matter what time of day or wherever they're at.

 9      Q    **If a person is deaf and can't speak, how do they**

10  **ask a deputy?**

11      A    They'll write it on paper.

12      Q    **And what -- does the deputy have to provide the**

13  **VRS at that point?**

14      A    We'll bring them when we have time.  So we make

15  sure that they get on the phone, but if you're in the

16  middle of security or safety check, then you have to make

17  sure that everyone else in the module is safe, and

18  there's no maintenance issues, no medical emergencies.

19          And then when they have time to, they'll escort

20  the individual out to the phone.

21      Q    **Is that written down somewhere?**

22      A    For removing them?

23      Q    **The practice of "you can wait" to take the**

24  **person?**

25      A    It's not necessarily written to wait, but you

Ex. M-81

1    right now.  And what they're going to consist of, it's

2    all going to depend on when the facility opens, what

3    layout the facility goes, who is housed there, just a ton

4    of factors.  It's not operational yet.  So there's no

5    green sheets on it yet.

6        **Q    You said they're in progress.  By in "progress,"**

7    **you mean they're being talked about?**

8        A    They're being talked about because there's

9    nowhere to go with it yet because the facility is not

10   operational.

11       **Q    Are there written drafts?**

12       A    It's in the process of getting worked on because

13   it's not operational.  So there's nothing to go off of.

14       **Q    Yes or no, are there written drafts?**

15       A    As far as I know, no, not written drafts for

16   Rock Mountain just because it's not operational yet.

17       **Q    Do you know when Rock Mountain will be**

18   **operational?**

19       A    I do not know.

20       **Q    Toward end of this year?**

21       A    I have no idea.  I wish I did, though.

22       **Q    Who would know?**

23       A    For Rock --

24       **Q    Sorry.  Who would know when Rock Mountain is**

25   **going to open?**

Sergeant Matthew Jensen

```
 1      A    Construction crew, County of San Diego.  I don't
 2   know on that one.  I mean, it's -- it's been in the works
 3   since 2016.
 4      Q    I'd like to introduce another exhibit.  This
 5   will be 7.
 6           (Exhibit 7 marked for identification.)
 7   BY MR. ANDERSON:
 8      Q    Sergeant Jensen, I can represent this is a
 9   declaration that the county sheriff's department filed in
10   this case by M. McArdle.  Do you know who M. McArdle is?
11      A    Yes.
12      Q    What's their role at the sheriff's department?
13      A    I just know that Matt is the one who does the
14   tech stuff.  So anything to do with tech.
15      Q    Yeah.  It says on paragraph 1 he's the
16   facilities superintendent.
17           Does that sound right?
18      A    If that's what he says.  I don't know his actual
19   title until right now.
20      Q    We can go to page 3.  So paragraph 9 says -- for
21   the first sentence, it says, "The intent for Rock
22   Mountain is to house all types of physically disabled
23   inmates at Rock Mountain rather than housing them in one
24   module at each floor at Central."
25           Are you aware of that plan?
```

Dunsmore vs.
Sergeant Matthew Jensen                          San Dirgo County Sheriff's Office

1      A    I am now.

2      Q    **You didn't know beforehand that Rock Mountain**

3   **was going to be where all types of physically disabled**

4   **inmates would be housed?**

5      A    All facilities have physically disabled people

6   in one or the other.  So I would assume that Rock

7   Mountain wouldn't be any different than any other

8   facility.  I didn't know this specific until now.

9      Q    **Yeah, this is saying they're going to be housed**

10  **at Rock Mountain instead of Central, right?**

11     A    Sounds like they're just not going to house

12  everybody at Central, to me.  So instead of housing them

13  in one module as Central, not necessarily not at Central.

14     Q    **Yeah, I won't ask you to interpret.  But are**

15  **you -- are you aware of any plan to house people with**

16  **disabilities at Rock Mountain?**

17     A    I am now, yes.

18     Q    **And there's no policies and procedures for Rock**

19  **Mountain?**

20     A    It's not operational.  So there's nothing for --

21  there's no green sheets for them yet.

22     Q    **Are any of the green sheets related to the**

23  **housing of people with disabilities at Rock Mountain?**

24     A    There's no green sheets for Rock Mountain yet.

25  It's not operational yet.  They just have the detention

Page 118

Ex. M-84

Sergeant Matthew Jensen

Dunsmore vs.
San Dirgo County Sheriff's Office

 1                  REPORTER'S CERTIFICATE

 2

 3              I, A. Desiree Tipper, a Certified Shorthand

 4   Reporter No. 13806 in the State of California, do hereby

 5   certify:

 6                  That the foregoing proceedings were taken

 7   before me at the time and place herein set forth; that

 8   any witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14              I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17                  IN WITNESS WHEREOF, I have hereunto

18   subscribed my name this 19th day of March, 2023.

19

20

21

22   _____

23                         A. Desiree Tipper
                           CSR No. 13806

24

25

Ex. M-85

# EXHIBIT N

Ex. N-86

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

   DARRYL DUNSMORE, ANDREE ANDRADE,
4  ERNEST ARCHULETA, JAMES CLARK,
   ANTHONY EDWARDS, LISA LANDERS,
5  REANNA LEVY, JOSUE LOPEZ,
   CHRISTOPHER NELSON, CHRISTOPHER
6  NORWOOD, JESSE OLIVARES, GUSTAVO
   SEPULVEDA, MICHAEL TAYLOR, and LAURA
7  ZOERNER, on behalf of themselves and
   all others similarly situated,        CASE NO.
8
              Plaintiffs,                3:20-cv-00406-
9                                        AJB-DDL
   vs.
10
   SAN DIEGO COUNTY SHERIFF'S
11 DEPARTMENT, COUNTY OF SAN DIEGO, SAN
   DIEGO COUNTY PROBATION DEPARTMENT,
12 and DOES 1 to 20, inclusive,

13            Defendants.
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
14

15

16          DEPOSITION OF KYLE BIBEL

17           San Diego, California

18            March 15, 2023

19

20

21
   Reported by:
22
   CLAIRE ANDREWS
23
   CLR, CSR No. 13509
24

25 JOB No. 10116489

Ex. N-87

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    Q.    Do you recall seeing it?

2    A.    No.

3    Q.    When did you first learn that you were going to

4    be designated a person most knowledgeable for this

5    deposition?

6    A.    Four to six weeks ago, approximately.

7    Q.    This is Exhibit 1, which we marked yesterday.

8          MR. ANDERSON:  Do you want --

9          MS. PAPPY:  No, that's okay.

10   BY MR. ANDERSON:

11   Q.    Captain Bibel, this is -- the Exhibit 1 is the

12   Notice of Deposition in this case.

13         Have you seen this before?

14   A.    I don't recall.

15   Q.    I'll have you turn to page 2.  It's the third

16   sheet, but it's got the 2 at the bottom.

17   A.    Page 2 you said?

18   Q.    Yeah.

19         And there -- near the middle, there's the bold

20   topic for examination.

21         Do you see that?

22         MS. PAPPY:  Down here.

23         THE WITNESS:  Okay.

24   BY MR. ANDERSON:

25   Q.    And that's -- under that, it says, "All current

Ex. N-88

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    policies, procedures, and practices regarding the

2    accessibility of facilities, housing program services,

3    activities, effective communication, reasonable

4    accommodations, and assistive devices for incarcerated

5    persons with disabilities."

6          THE REPORTER:  I'm sorry.  If you can read just

7    a little slower next time.  I got that.

8          MR. ANDERSON:  Understood.

9          THE REPORTER:  Thank you.

10         MR. ANDERSON:  You got that down?

11         THE REPORTER:  Yeah.

12         MR. ANDERSON:  Okay.  Thank you.

13   BY MR. ANDERSON:

14      Q.   Do you see that?

15      A.   I -- I see it.

16      Q.   And have you read that topic before?

17      A.   This specific topic?

18      Q.   Yeah.

19      A.   I don't recall seeing this form.

20      Q.   You have been designated to testify about this

21   topic as it relates to Central Jail; is that right?

22      A.   Correct.

23      Q.   With the exception only of the purple system

24   and the new phone system?

25         THE REPORTER:  Of the what system?

Ex. N-89

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

```
 1            MR. ANDERSON:  The purple system.

 2            THE REPORTER:  Purple system.

 3            MR. ANDERSON:  And the new phone system.

 4            THE WITNESS:  I know I'm the PMK for ADA

 5   specific to SDCJ --

 6            THE REPORTER:  I'm sorry.  The door.  I

 7   couldn't hear you.  Repeat that.

 8            THE WITNESS:  I'm the -- I know I'm the PMK as

 9   it relates to ADA for SDCJ.

10   BY MR. ANDERSON:

11       Q.   So you can cover this entire topic as it

12   relates to SDCJ?

13       A.   To the best of my ability, yes.

14       Q.   What did you do to make yourself the person

15   most knowledgeable in this category?

16            MS. PAPPY:  How did you accidentally manage to

17   do that?

18            THE WITNESS:  I don't know.  Other than I can

19   speculate.

20   BY MR. ANDERSON:

21       Q.   Well, I'm sorry.  I don't mean how you were

22   selected.

23            I mean, what did you do, once you were

24   designated, what actions did you take to make yourself

25   the person most knowledgeable?
```

Page 23

Ex. N-90

Kyle Bibel

1    Q.    Are you aware it was being used for booking

2    interviews in February 2023?

3    A.    I'm -- no, I'm not.

4    Q.    So reentry services are responsible for

5    scheduling all sign language interpretation in the jail?

6    A.    They're our conduit to coordinating those

7    interpreter requests.

8    Q.    So they're the conduit.

9          So, for example, a deputy is having an

10   interview with someone about potentially moving them to

11   AdSeg.  What would the deputy do to -- how do they

12   connect with reentry services?

13   A.    Well, I think the first thing the deputy would

14   do is try to effectively communicate with that person

15   through other means first.  And if that was

16   unsuccessful, they would attempt -- just depends on how

17   important that interpreter is in that moment.  Can it

18   wait?  If it can't wait, we could also -- again, in an

19   emergency situation, we have our communication center

20   that is specific to law enforcement that runs 24/7, and

21   we have access to counseling services -- excuse me --

22   interpreter services in that avenue for emergency

23   situations.

24   Q.    So, first -- so you said sometimes where it

25   might be important to you -- you'd have to kind of make

Ex. N-91

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    this decision of, is it important now to do sign

2    language interpretation, or can we wait?  Is that a fair

3    characterization of your testimony?  I want to make sure

4    I got it right.

5         A.    I don't recall saying that.

6              What I recall saying is is the deputy and the

7    inmate, the nurse and the inmate are going to do

8    everything possible to try to effectively communicate,

9    whether that's through handwriting, whether that's

10   through another person who may happen to speak sign

11   language, a cellmate.  The deputy and the nurse need to

12   determine how serious this is, can this wait until our

13   counselors come in so we can put this individual into

14   contact with an interpreter.

15        Q.    So they make that decision about how serious

16   something is before getting an interpreter?

17        A.    Or they call the interpreter if they're

18   available.

19        Q.    But the first option is generally to write

20   notes, try to communicate some other way, and then

21   decide if sign language interpretation is necessary?

22        A.    Yeah, and just to -- to gauge on -- on how much

23   communication can occur without an interpreter.  And if

24   an interpreter is needed, then we'll go.  We'll find one

25   and get it for the individual.

Ex. N-92

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1   for an interview at the jail?

2       A.   I'm sorry?

3       Q.   So do you ever have two sign language

4   interpreters for an interview at the jail?

5       A.   Again, I -- I don't know.

6       Q.   Reentry services would be the one --

7       A.   Correct.  Yes, sir.

8       Q.   Where do those interactions with the sign

9   language interpreter take place?

10      A.   Under which scenario?

11      Q.   Let's go through a medical appointment.

12           If sign language interpretation is provided,

13  where does that occur?

14      A.   It depends on what the medical appointment is

15  because we have all types of medical appointments.

16      Q.   Well, how about a dental appointment?

17      A.   So if it's a dental appointment, we actually

18  have a dentist office on our third floor, which is where

19  our -- the bulk of our medical staff work out of.

20      Q.   And that's where the sign language interpreter

21  would go to the third floor, be in the dental -- the

22  exam room with the person and the dentist?

23      A.   Potentially there.  They could go up to the

24  housing floor as well, if -- if -- if needed.

25      Q.   Are you aware of any time where a person was

Ex. N-93

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1  provided sign language interpretation during a dental
2  visit?
3      A.   I can't think of one.
4      Q.   Are you aware of any time where a person was
5  provided a sign language interpreter for a visit with
6  the doctor?
7      A.   I can't think of one, no.
8      Q.   Are you aware of any time where a person was
9  provided an in-person sign language interpreter for a
10 classification interview?
11     A.   No, I don't recall.
12     Q.   Are you aware of any time where a person was
13 provided a sign language interpreter for an appointment
14 with a mental health clinician?
15     A.   No, I can't think of one.
16     Q.   Are you aware of any times where a staff had
17 been disciplined for not providing sign language
18 interpretation to someone?
19     A.   No.
20     Q.   So this is Exhibit 6 that was marked yesterday.
21          MR. ANDERSON:  Do you want a copy?
22          MS. PAPPY:  No, that's okay.  I saw them
23 yesterday.
24          MR. ANDERSON:  Did you want a copy?
25 BY MR. ANDERSON:

Ex. N-94

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

```
1          Q.    So this is the detention services bureau policy

2     and procedure entitled "Incarcerated Persons Who are

3     Deaf or Hard of Hearing."

4          Have you seen this policy before?

5     A.    Yes.

6          Q.    You reviewed it as part of your preparation for

7     this deposition?

8     A.    Yes.

9          Q.    And does this policy and procedure, does it --

10    so detention services bureau policies and procedures,

11    does that apply to just sworn staff, or does this also

12    include medical staff?

13    A.    Both.

14         Q.    And also contractors working at the jail?

15    A.    Correct.

16         Q.    So anyone working at the jail, they have to

17    follow these policies and procedures?

18    A.    Yes.

19         Q.    Let's go to the second page.

20    A.    Okay.

21         Q.    And that's Subsection 3 there.  It's at the

22    very top titled, "Obtaining sign language interpreting

23    assistance."

24         Have you seen this provision before?

25    A.    Yes.
```

Ex. N-95

Kyle Bibel

1     Q.    Does this procedure include any requirement

2   that the jail provide in-person sign language

3   interpretation at booking?

4     A.    I'm sorry.  Repeat that, please.

5     Q.    Does this include any requirement that the

6   Central Jail provide sign language interpretation at

7   booking?

8     A.    No, and it wouldn't be in a white sheet.

9     Q.    Where would it be?

10    A.    So if anything specific to -- anything

11  facilities specific would be in a green sheet.

12    Q.    But there's no green sheet on providing sign

13  language interpretation in-person is there?

14    A.    If you have a green sheet, I'm -- I'm happy to

15  go over it with you.  I -- I don't know.  I'd have to

16  look at it with you.

17    Q.    You're the expert for Central Jail; is that

18  right?

19    A.    Correct.

20    Q.    Do you know of anyone --

21    A.    I'm sorry?

22    Q.    Do you know a green sheet on in-person sign

23  language interpretation?

24          MS. PAPPY:  Objection.  Asked and answered.

25          MS. GRUNFELD:  It wasn't answered.

Ex. N-96

Case 3:20-cv-00406-AJB-DDL    Document 281-2    Filed 04/25/23    PageID.8705    Page
115 of 473

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

```
 1            MS. PAPPY:  It was answered.  And only one
 2   attorney's taking this deposition.
 3   BY MR. ANDERSON:
 4       Q.   We haven't seen a green sheet in sign language
 5   interpretation.
 6            Do you know of any other place where a specific
 7   procedure on Central Jail sign language interpretation
 8   would be?
 9       A.   No.
10       Q.   So this is probably it?
11       A.   Well, this is the white sheet.
12       Q.   Do you have any reason to believable there is
13   any other policy on providing sign language
14   interpretation at Central Jail?
15       A.   No.
16       Q.   Does it require sign language interpretation
17   for any interaction with the jail?
18       A.   Say that again.  I'm sorry.
19       Q.   So for any particular -- I can -- so is there
20   any category listed here where sign language
21   interpretation is required?
22       A.   No, I don't see anything in here about sign --
23   specific to sign language and a requirement.
24       Q.   Yeah, this is the policy here -- the
25   subdivision on sign language interpreting assistance.
```

1           Have you ever clicked on that link?

2      A.   I don't recall.

3      Q.   Have you ever called the number for

4  interpreting services?

5      A.   No.

6      Q.   Do you know who that goes to?

7      A.   No.

8           MS. PAPPY:  It's been a little more than an

9  hour.  Why don't we take a break.  Five minutes.  Take a

10  break.

11          MR. ANDERSON:  I'll find a stopping point soon.

12          MS. PAPPY:  No, now is good because I need to

13  use the restroom.

14          MR. ANDERSON:  Okay.

15          MS. PAPPY:  I appreciate the courtesy.

16          MR. ANDERSON:  Go off the record.

17          (Recess.)

18          MR. ANDERSON:  Back on the record.

19  BY MR. ANDERSON:

20      Q.   The orientation video that's shown, what is in

21  that video?

22      A.   It's pretty all encompassing, from what the

23  different color wristbands that we issue out, what do

24  those mean; how to fill out or how to complete an inmate

25  request; medical appointments; commissary, how they can

Case 3:20-cv-00406-AJB-DDL    Document 281-2    Filed 04/25/23    PageID.8707    Page
117 of 473

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1  order things, like, on commissary.

2      Q.   Does it include any information about access to

3  sign language interpretation?

4      A.   That, I don't know.

5      Q.   When was the last time you reviewed this video?

6  I imagine you've maybe seen portions of it all day,

7  correct?

8      A.   I see portions of it all day.  It's a pretty

9  lengthy video too.  I believe it's 15, 20 minutes or so.

10     Q.   Does it have any information in it about access

11 to reasonable accommodations or assistive devices under

12 the ADA?

13     A.   I don't know how specific the video goes into

14 that topic.

15     Q.   Does it discuss it at all?

16     A.   I don't know.  I just -- I know that there's a

17 sign language -- there's an interpreter on the video.

18     Q.   Is there a place where it's trapped in a

19 person's file or on a jail database about the best way

20 to communicate with them?

21     A.   Best way to communicate with them?  I don't

22 think that we have something that specific.

23     Q.   For example, so if, you know, a deputy learns

24 this person is deaf and they communicate via sign

25 language, is that put somewhere so that the next person

Ex. N-99

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    knows?

2        A.    So in our jail information management system,

3    we have various, what we refer to as "flags," which is

4    common markers, and anything that specific would be

5    listed in -- in that area.

6        Q.    **How would it be listed?**

7        A.    I believe there is an actual hearing impaired

8    marker.

9        Q.    **Is there one for sign language interpretation?**

10       A.    I don't believe so.

11       Q.    **Or to know if someone uses a hearing aid?**

12       A.    I don't remember how many additional flags we

13   have.

14       Q.    **The one you remember is hearing deficit --**

15       A.    I believe it's called "hearing impaired."

16       Q.    **Hearing impaired?**

17             **Is that from a drop-down menu?**

18       A.    It's in a medical instruction in our -- what we

19   call "JIMS," jail information management system.

20       Q.    **So a deputy would go and see the person is --**

21   **says, "hearing impaired"?  That's the information they**

22   **would have?**

23       A.    Correct.

24       Q.    **Are you aware of any entries in JIMS saying the**

25   **person has a hearing aid?**

Ex. N-100

**Kyle Bibel**

**Dunsmore vs.
San Dirgo County Sheriff's Office**

1      A.   We make entries in JIMS for all types of

2   things.

3      Q.   **Any flag about a person having a hearing aid?**

4           **Is that a flag -- so is a flag from a**

5   **prepopulated list, or is it someone -- something that**

6   **someone can enter?**

7           THE REPORTER:  Are you saying a flag?

8           MR. ANDERSON:  A flag, yeah.  Sorry.  I have

9   a --

10          THE REPORTER:  That's okay.

11          MR. ANDERSON:  -- Midwestern --

12          THE WITNESS:  So our flags that are specific to

13   conditions that you just mentioned are entered by our

14   health staff.

15   BY MR. ANDERSON:

16     Q.   **Do you know if there is a flag for hearing aid?**

17     A.   No, I don't know.  I don't recall.

18     Q.   **What about for reads lips?**

19     A.   I'm not sure.

20     Q.   **Health staff would know?**

21     A.   I believe so.

22          THE REPORTER:  Was that a name you said?

23          MR. ANDERSON:  "Health staff."

24   BY MR. ANDERSON:

25     Q.   **Have you ever seen a flag in JIMS for reads**

```
 1    lips?

 2        A.    No.

 3        Q.    What about for hearing aid?

 4        A.    That, I cannot remember.  I'm confident I've

 5    not seen one for read lips.  Can't remember hearing

 6    device, though.

 7        Q.    What is a mobility disability?

 8        A.    I'd have to refer to the specific definition in

 9    our policy.  That's -- that's my -- my answer.  You have

10    the -- is this the policy in front of me?

11        Q.    It's not.

12        A.    It's in here?

13        Q.    Do you know what policy that would be in?

14        A.    The top of my head, I think it's referred to as

15    "disabled persons."

16        Q.    Is that M.39?

17        A.    Could be.  M would be our medical section.

18        Q.    If you can go to Exhibit 1, which is the notice

19    of deposition, it also includes a definition of mobility

20    disability in it.  So we can go to page 1.  Under Number

21    1 there, which is the last full definition at the

22    bottom, it says, "The terms 'mobility,' 'disability,'

23    and 'mobility disabilities' mean any mobility

24    impairment --

25            THE REPORTER:  Hold on.  Just a little slower.
```

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    Just start over, please.

2            MR. ANDERSON:  Any mobility impairment -- I'll

3    start over.

4            THE REPORTER:  Yeah.

5    BY MR. ANDERSON:

6        Q.    "The terms, quote, 'mobility disability,' end

7    quote, and quote, 'mobility disabilities,' end quote,

8    mean any mobility impairment that limits one or more

9    major life activities, including limiting the ability to

10   stand, walk, climb stairs or use one's upper

11   extremities."

12           Just in your experience working at the jail,

13   how do you know when someone has a mobility disability?

14       A.    In my experience, you can see it in our JIMS

15   system, that medical drop-down that I mentioned.

16       Q.    What does it say in the drop-down?

17       A.    Hearing impaired.

18       Q.    Sorry.

19           Specific to mobility, what would it say?

20       A.    Wheelchair, intermittent wheelchair, or cane.

21       Q.    Is there also an entry for ADA mobility?

22       A.    I think there is.

23       Q.    For walker?

24       A.    I believe we have one for walker as well.

25       Q.    Are there people with mobility disabilities at

Ex. N-103

```
 1   Central Jail?
 2       A.   Yes.
 3       Q.   Does your policy require them to be housed in
 4   any certain location?
 5       A.   I'd have to see the policy for a question that
 6   specific.
 7       Q.   Is there a policy that you know of for --
 8       A.   Well, we have a mobility disability policy.
 9       Q.   What's the name of that policy?  I'm not sure
10   I've seen it.
11       A.   I think it's disabled persons policy, if we're
12   talking about the same one.
13       Q.   I'm just asking, I think -- I understand it's
14   more broadly about disabilities.
15            But I'm asking about people with mobility
16   disabilities.  Is there any specific policy about where
17   they need to be housed?
18       A.   The closest one would be our medical matrix,
19   which I believe was in the discovery that was provided
20   to me.
21       Q.   Is that a policy that custody staff have to
22   follow as well?
23            THE REPORTER:  "Is that a policy that" -- what?
24            MR. ANDERSON:  "That custody staff have to
25   follow as well."
```

**Ex. N-104**

Kyle Bibel

**Dunsmore vs.
San Dirgo County Sheriff's Office**

```
 1              THE WITNESS:  Yes.
 2   BY MR. ANDERSON:
 3        Q.    So based on that matrix, where are people with
 4   wheelchairs housed in Central Jail?
 5        A.    Wheelchairs are on the eighth floor.
 6        Q.    Only the eighth floor?
 7        A.    I think they may have potential to be on other
 8   housing floors, but my recollection is the bulk of them
 9   are on the eighth floor.
10        Q.    Why is that?  Why are they on the eighth floor?
11        A.    Well, I don't -- I don't know what decision
12   went into -- this been for a while.  I can't tell you
13   the specific reason.  I can just tell you that they are
14   on -- the majority of them are on our eighth floor.
15        Q.    The majority of the wheelchair users are on the
16   eighth floor?
17        A.    Correct.
18        Q.    And you don't know why specifically?
19        A.    No, but I can tell you the difference between
20   eighth floor and the seventh floor, is the eighth floor
21   is more dormitory-style housing, which gives us more
22   ability to have lower bunks to accommodate them better.
23        Q.    But there are triple bunks on the eighth floor;
24   is that right?
25        A.    Yes.
```

**Ex. N-105**

Kyle Bibel

1    Q.   And most people -- so most people in

2   wheelchairs are on the eighth floor.

3          Are they in one specific unit, one specific

4   dorm on the eighth floor?

5    A.   They're predominantly in 8C and 8D.

6    Q.   Why are those two not in 8A and 8B?

7    A.   8A and 8B is where our worker -- facility

8   workers are housed.

9    Q.   Can people in wheelchairs be facility workers?

10    A.   I don't know whether that is part of the

11   factor.  What I do know is that in order to become a

12   worker, you have to have an additional health

13   assessment.  And it's our healthcare staff that

14   determine if they can -- in conjunction with the

15   security clearance become a worker.

16    Q.   Have you seen a person in a wheelchair in 8A?

17    A.   No.

18    Q.   What about in 8B?

19    A.   No.

20    Q.   And you've worked at Central Jail off and on

21   but for five years at the beginning of your career,

22   since then for about eight months?

23    A.   Correct.

24    Q.   And so I think you said that some people -- so

25   most people in wheelchairs are on the eighth floor.

Ex. N-106

1   of assisting those in a wheelchair who need a shower and

2   can only shower while sitting, and that is used to move

3   in.

4         But I don't know of anything specific to the

5   toilets though, but we do have grab bars.

6         **Q.   In all toilets?**

7         A.   Not on all toilets.

8         **Q.   Do you know how many wheelchair cells you have**

9   **per classification?**

10        A.   No.

11        **Q.   The seventh floor, is that protective custody**

12  **at Central Jail?**

13        A.   There is a protective custody element in one of

14  our modules in the seventh floor.

15        **Q.   When you say, "element," I wouldn't delve too**

16  **far.  I'm just trying to understand how people are**

17  **dispersed throughout the facility.**

18        A.   Yeah.  So we have a module, I cannot recall

19  which specific module on that floor that is protective

20  custody, but I don't believe every single module on that

21  floor is protective custody.

22        **Q.   Have you had any times where you have too many**

23  **people who use wheelchairs in a given classification --**

24  **if you have more than one person who uses a wheelchair**

25  **in a given module; does that happen?**

```
 1        A.    I'm sure it has.
 2        Q.    Currently is there anyone in a wheelchair?  Are
 3   there more than -- is there more than one person in a
 4   wheelchair in a given module at Central Jail?
 5        A.    What module are you referring to?
 6        Q.    In a cell module.
 7        A.    I don't know.  I don't have current numbers in
 8   front of me.
 9        Q.    Show you Exhibit 5.
10              MR. ANDERSON:  And this is the confidential
11   document yesterday --
12              MS. PAPPY:  Yeah, let's do the same thing.  If
13   he says something that is confidential, but I don't
14   think it's going to be.
15              MR. ANDERSON:  I agree.  I wanted to defer to
16   you.
17              MS. PAPPY:  Yeah, yeah.  Thank you for that.
18              So, Madam Court Reporter, what we did yesterday
19   was we designated the document as it's confidential and
20   it needs to be segregated from the rest, but not the
21   testimony, unless we tell you afterwards, after he's
22   done testifying about this document.
23   BY MR. ANDERSON:
24        Q.    I'll represent this is a roster obviously with
25   names and booking numbers redacted of people at Central
```

Ex. N-108

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

```
 1       A.    Yes.

 2       Q.    And 7A is a cell module at Central Jail?

 3       A.    Correct.

 4       Q.    And, like you said, there's one cell there

 5   that's designated for people in wheelchairs?

 6       A.    Correct.

 7       Q.    So going to the ADA flags on the right column,

 8   there's the person in Cell 2 who has a wheelchair; is

 9   that right?

10       A.    Yeah.

11       Q.    And Cell 3?

12       A.    (Nodding.)

13       Q.    And Cell 4?

14       A.    Correct.

15       Q.    And Cell 5 and Cell 6?

16       A.    Uh-huh.

17       Q.    And Cell 8; is that right?

18       A.    Yes.

19       Q.    And Cell 10?

20             And 10 is the one that is designated wheelchair

21   accessible?

22       A.    Correct.

23       Q.    So you have, by my count, six people who are

24   housed -- who have wheelchairs who are housed not in the

25   ADA designated cells; is that right?
```

Ex. N-109

1    A.    Correct.

2    **Q.    Do you know why that is?**

3    A.    Well, we have one cell.  We have more than one

4    person -- only three people total can go in that cell,

5    and only one that would require a lower bunk.

6    **Q.    So why would they not be moved to a different**

7    **unit if there's a wheelchair-accessible cell open?**

8    A.    Well, we would -- we have them in a -- we would

9    put them in a lower bunk or a lower tier.

10   **Q.    How often does it happen that you have more**

11   **wheelchair users in a given module than you have a**

12   **wheelchair bed available?**

13   A.    Honestly, I couldn't give you an answer.

14   Our -- our population is to transitory and it -- it

15   fluctuates minute by minute, day by day.  I don't know.

16   **Q.    Do you have any idea how long any of these**

17   **people have been housed in these cells?**

18   A.    No.

19   **Q.    And then going down a little bit to 7D.**

20   A.    Yeah.

21   **Q.    You see -- going over to Cell 8, and then the**

22   **far right column is a person in a wheelchair in Cell 8.**

23   A.    Uh-huh.

24   **Q.    A person in Cell 9 and a person in Cell 10.**

25          **So the people in Cell 8 and Cell 9 are not in**

Ex. N-110

1    the wheelchair-designated cell, are they?

2        A.    Correct.

3        Q.    Just the person in Cell 10 is?

4        A.    Yes.

5        Q.    Has there been any plans to try to add more

6    wheelchair-accessible cells?

7        A.    Yes.

8        Q.    What are those plans?

9        A.    Well, I've not seen blueprints, but I know in

10    discussions, we know we want to add more

11    wheelchair-accessible cells.

12        Q.    At Central Jail?

13        A.    Yes.

14        Q.    Any written plan to do that?

15        A.    I don't know if one currently exists, but there

16    will be one, ultimately.   I couldn't give you a time

17    frame on that because I'm not part of that.

18        Q.    You've had discussions about the plans, though?

19        A.    Oh, yeah.   Oh, yeah.

20        Q.    Do you know what specific are -- where those

21    cells will be added?

22        A.    No.

23        Q.    Any timeline on when those will happen?

24        A.    I couldn't -- I couldn't give you a timeline.

25        Q.    Who is responsible for that project?

Ex. N-111

1    walkers, or wheelchairs can be housed on the upper tier?

2       A.   What I can tell you is, I agree with Section A,

3    the way it reads.

4       Q.   Like, what do you mean, "the way it reads"?

5    Why do you phrase it --

6       A.   I don't understand what your question -- I -- I

7    understand what the policy says, but I'm not too clear

8    on what you're asking me.

9       Q.   We can step back for a moment.

10          So most of the cell units at the jail, Central

11   Jail, include bunks, right?

12      A.   Yes.

13      Q.   So on the fourth floor, is triple bunks?

14      A.   Yes.

15      Q.   The fifth floor, triple bunks?

16      A.   Yes.

17      Q.   The six floor, single bunks or double bunks?

18      A.   Correct.

19      Q.   Seventh floor, double bunks?

20      A.   Yes.

21      Q.   And then the eighth floor, triple bunks?

22      A.   Yes.

23      Q.   So I think you were describing earlier that

24   health staff make this decision about whether a person

25   should be assigned lower bunk or lower tier, right?

Ex. N-112

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1      A.    Yes.

2          Q.    And lower tier, that refers to how a unit has a

3      bottom floor, and then someone goes up the steps to a

4      second floor; is that right?

5      A.    Yes.

6          Q.    So this is the procedure that medical staff are

7      applying to determine whether someone should be

8      designated lower bunk or lower tier; is that right?

9      A.    Yes.

10         Q.    So do you see where it says, under 2,

11     notification and documentation, then A1?

12              It says, "Enter reason for recommending lower

13     bunk, lower tier in the comment field."

14              Do you know why it says "recommending" versus

15     requiring?

16     A.    So our nursing staff will be the ones

17     recommending, but it's our doctors that make the

18     ultimate decision.

19         Q.    So a nurse will enter into JIMS -- this says,

20     "Adding the patient flag in the health record."

21              And the nurse enters the patient flag, and a

22     doctor then reviews that?

23     A.    Yes.

24         Q.    How do you know?  Is that in the policy?

25     A.    I talk to our health staff all the time.

Ex. N-113

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    Q.    When it -- sorry.

2    A.    Providers -- it's our providers, i.e., our

3  doctors and our nurse practitioners, that make the

4  ultimate decision as to whether someone's going to have

5  a lower bunk or a lower tier flag added.

6    Q.    Have you ever talked to them about the factors

7  that they use to determine if someone should be in a

8  lower bunk or lower tier?

9    A.    Yes.

10    Q.    What are those factors that they've told you?

11    A.    Well, predominantly case by case.  Wheelchair

12  would be one.  I can't -- I am unsure if wheelchair by

13  itself, because we have two categories of wheelchair,

14  intermittent and wheelchair.  So I don't know if -- how

15  much of a factor that goes into that decision, but

16  ultimately, it's our doctors.

17    Q.    And so when a nurse -- is this procedure here

18  referring to what nurses must do or to all health staff?

19    A.    Well, it's all health staff.  No sworn staff

20  member, myself included, is going to intervene on this

21  policy and dictate whether somebody needs a lower bunk

22  or lower tier; so it's recommended to our doctors.

23    Q.    Okay.  I just don't see -- so the way I

24  understand this -- and you can tell me what I'm missing

25  in this procedure -- is it says, "Adding patient flag

Ex. N-114

Kyle Bibel

1    should include the following, and then notify the

2    corresponding housing deputies of the restriction."

3              I don't see any two-step process described

4    there where a nurse makes a recommendation and a doctor

5    then reviews that recommendation.

6              MS. PAPPY:  The question -- you're saying --

7    the question is, you don't see it?

8              MR. ANDERSON:  Yeah.

9              MS. PAPPY:  Hang on.  Objection.  Vague and

10   ambiguous.  The document speaks for itself.  Whether you

11   see it or not is speculation.

12             Go ahead.  Do you need the question read back?

13             THE WITNESS:  I don't -- I'm happy to answer --

14             MS. PAPPY:  Okay.

15             THE WITNESS:  -- your question, if you rephrase

16   it.

17   BY MR. ANDERSON:

18        Q.   This doesn't include any description of a

19   two-step process where a nurse enters a recommendation

20   and then a doctor reviews that, does it?

21             MS. PAPPY:  Objection.  Document speaks for

22   itself.

23   BY MR. ANDERSON:

24        Q.   You can answer.

25        A.   I don't see the word "doctor" in this document.

Ex. N-115

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    Q.    How do you know that when a nurse enters the

2    restriction that a doctor reviews it?

3    A.    Well, for one, active withdrawal of treatment.

4    Let me give you an example of active withdrawal of

5    treatment.  People are going to come into our custody

6    with various stages of withdrawal.  Nurses, by default,

7    are going to recommend lower bunk, lower tier, but that

8    is outside the purview of their expertise, and that is

9    why we have a doctor or nurse practitioner overseeing it

10   and making the final determination on time limited

11   that's going to be determined on a doctor, all of these

12   decisions ultimately get made.  The final say is going

13   to be on our doctors.

14   Q.    Is there any deadline once the nurse makes a

15   recommendation for a doctor to confirm or agree with it?

16   A.    I -- I don't know of a specific deadline.

17   Q.    Do you know how often -- how long it takes on

18   average?

19   A.    No.

20   Q.    You just know that a doctor reviews every

21   single recommended housing restriction put in by a

22   nurse?

23   A.    Yes.

24   Q.    And when a doctor says "yes" or "no," does that

25   create an entry in JIMS?

1    A.    Well, the only entry would be whether or not

2    that lower bunk, lower tier restriction is -- goes into

3    JIMS.

4    **Q.    So someone adds a patient flag in the health**

5    **record.    Would that be the nurse?**

6    A.    Yes.

7    **Q.    And then the doctor either goes in there and**

8    **deletes it or leaves it?**

9    A.    Yes, and they chart.    And that's all done

10    during -- through Tech Care.

11    **Q.    Which is the medical records system?**

12    A.    Correct.

13    **Q.    So this says that an incarcerated person -- I**

14    **can direct you to it rather than telling you what it**

15    **says.    3B, that quote, "Inmates shall accept bunk**

16    **assignments as directed by staff," and then it goes on**

17    **to say, "They could be subject to disciplinary action."**

18    **How often are incarcerated people disciplined**

19    **for not accepting their bunk assignment?**

20    A.    Well, we write rule violation reports daily.

21    Daily.    And this is -- kind of ties into that scenario I

22    was talking to you about earlier is where we'll tell

23    individuals where they need to house, and some don't

24    want to house there.    And we have -- we have to enforce

25    that to make room for the folks that truly need it.

1    Q.    So rule violation report would document if --

2    to try to go back to the example you gave earlier of a

3    person who's assigned a middle bunk in the computer, but

4    they're sleeping somewhere else, would they be written

5    up for that?

6         MS. PAPPY:    Objection.    Mischaracterizes his

7    earlier testimony.

8    BY MR. ANDERSON:

9    Q.    You can answer.

10   A.    Well, deputies have the responsibility and

11   ability to enforce rules in the facility.    And the rule

12   violation report is the method in which we hold inmates

13   accountable for violating rules.

14   Q.    Are you aware of any rule violation reports

15   people have received for not moving from a bunk?

16   A.    Over the course of my career, several.

17   Q.    Where in this policy does it require a

18   wheelchair user to be housed in a lower bunk?

19        MS. PAPPY:    Objection.    Document speaks for

20   itself.

21   BY MR. ANDERSON:

22   Q.    You can answer.

23   A.    Lower bunk?

24   Q.    Yes.

25   A.    I don't think I see the words "lower bunk" in

Ex. N-118

Kyle Bibel

**Dunsmore vs.**
**San Dirgo County Sheriff's Office**

1    here.

2        Q.    Under 1C, it says, "Patients with the following

3    conditions must be placed in a lower bunk, in a lower

4    tier"; is that right?

5        A.    Yup.

6        Q.    Wheelchair listed below there?

7        A.    No.

8        Q.    Crutches?

9        A.    No.

10       Q.    Cane?

11       A.    No.

12       Q.    Where in this policy does it require a person

13   using a wheelchair to be housed on a lower tier?

14           MS. PAPPY:   Objection.   The document speaks for

15   itself.

16           Go ahead.

17           THE WITNESS:   I don't see anything about lower

18   tier in the document.

19           MR. ANDERSON:   Introduce this as Exhibit

20   No. 11.

21           THE WITNESS:   I just wanted to clarify.

22           So to go back, you had asked about whether or

23   not there's a doctor in here.   It says right here in the

24   third sentence, "To emphasis that a qualified health

25   provider's order for lower bunk and/or lower tier

Ex. N-119

Kyle Bibel

```
 1        A.    Well, just the fact that I have only a limited
 2   amount of cells versus day room.  I cannot create a day
 3   room, like replicate 8C and 8D downstairs.  I -- I don't
 4   have that ability; so that is a -- that is a limitation.
 5        Q.    And what are some things you're trying to do in
 6   the interim given that you can't convert a housing cell
 7   module to a dorm?
 8        A.    Well, the first things we did was we recognized
 9   we could definitely make some small improvements to make
10   the mail and the grievances more accessible to folks
11   that are in a wheelchair, which we've done.
12              We're also in the process of doing some
13   retrofits down on the first and second floor to make
14   some of those cells ADA complaint, specifically for
15   wheelchairs.  And I'm sure we'll have more specific
16   plans here in the near future.
17        Q.    On the first and second floor, are those
18   retrofits in progress now?
19        A.    Yes.
20        Q.    There's construction happening?
21        A.    Well, I don't know if there's physically people
22   in the building right now doing construction, but
23   physical ordering of supplies and planning is in
24   progress.
25        Q.    And any plans to retrofit other units in the
```

Ex. N-120

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    mobility disabilities?

2        A.    I'm unaware of those situations.

3        Q.    **So you were aware of some people slipping and**

4    **falling.**

5              **How's that presented to you?**

6        A.    Well, again, it depends on the situation.  So

7    if I received a notification for everyone that slipped

8    and fall, I would never get off the phone.  It depends

9    on the severity of the slip and fall.  It depends on the

10   circumstances.  And really, the criteria is to what

11   injury this person received will prompt the phone call

12   to me.

13       Q.    **What information would you learn in that phone**

14   **call?**

15       A.    Well, I would hope to learn what happened.  I

16   mean, whether or not the inmate is okay.

17       Q.    **Are you only notified about serious injuries?**

18       A.    I have a specific protocol that I require of my

19   lieutenants on what I get notified on.  Serious injury

20   is -- is one of them.

21       Q.    **Will they get notified of lower than serious**

22   **injuries?**

23       A.    Who's "they"?

24       Q.    **The lieutenant.**

25              **And they choose to escalate only serious**

1        I'm just asking, so if a person in a

2   wheelchair, they have a -- you said that people in 8C

3   have detox or a medical condition that leads to them

4   being placed there.

5        Is there a medical condition that would -- say

6   all things being equal, this person is in a wheelchair,

7   they're going to be in 8C over 5C; is that the case?

8   A.    I don't -- it's not so simple because people

9   are not simple and people present in a very different

10  way, and a lot of factors go into determining whether or

11  not they're going to be on the fifth floor or the eighth

12  floor.

13        MR. ANDERSON:  Mark this as Exhibit 13.

14        (Exhibit 13 was marked for

15        identification.)

16  BY MR. ANDERSON:

17  Q.    Captain Bibel, this is a Medical Services

18  Division Nursing Guideline that was produced to us in

19  this litigation.  It's -- the subject is "COVID-19

20  interim emergency classification matrix for medical and

21  psychiatric housing."

22        Is this the --

23        THE REPORTER:  "For medical" --

24        MR. ANDERSON:  -- "and psychiatric housing."

25  BY MR. ANDERSON:

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    Q.    You referred earlier to a medical matrix for

2  housing people at Central Jail; is that right?

3    A.    Yes.

4    Q.    Is this the matrix you were talking about?

5    A.    Yes.

6    Q.    Is this only in effect because of COVID, or is

7  this a permanent matrix?

8    A.    It's -- this is our matrix.  I think we had to

9  make some modifications during our three years in COVID,

10  but this is our matrix.

11    Q.    So there's -- there was a matrix at some point,

12  and then it was modified for COVID.

13        And this is the current version of the matrix?

14    A.    Correct.

15    Q.    Going about five rows down under the

16  "Description" column, there's a reference to, quote,

17  "handicapped."

18        Do you see that?

19    A.    Yes.

20    Q.    What does that mean?

21    A.    What does what mean?  "Handicapped"?

22    Q.    Yeah.  What does -- what does that mean to you?

23    A.    What is the definition of "handicapped"?

24    Q.    How do you understand handicapped to affect

25  where someone is housed?

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1     A.    Yes.

2           THE REPORTER:  When it's a good time, if I

3     could use the restroom.

4           MR. ANDERSON:  I think now is good actually.

5           Let's go off the record.

6           (Recess.)

7           MR. ANDERSON:  Let's go back on the record.

8     BY MR. ANDERSON:

9     Q.    Captain Bibel, does the sheriff's department

10    have an ADA transition plan?

11    A.    I don't know.

12    Q.    Do you know what an ADA transition plan is?

13    A.    Not specifically, no.

14    Q.    "Yes" or "no," do you know generally what it

15    means?

16    A.    No.

17    Q.    Does the sheriff's department have ADA specific

18    staff who you work with?

19    A.    ADA specific staff?

20    Q.    Is there an ADA supervisor for the jail system?

21    A.    In the sheriff's department?

22    Q.    Yeah.

23    A.    Let me back up.  What -- what do you mean

24    staff?  Like --

25    Q.    Is there a person with the title "ADA

Ex. N-124

Kyle Bibel

Dunsmore vs.
San Dirgo County Sheriff's Office

1    supervisor" that you interacted with?

2        A.    No.

3        Q.    If you have a question about the ADA, do you go

4    to medical staff, or is there any ADA department at the

5    sheriff's department that you go to?

6        A.    If I had a question about ADA, I would consult

7    our health staff.

8        Q.    Are you aware of any ADA department within the

9    sheriff's department?

10       A.    Not currently, no.

11       Q.    So for people who are in the trustee program,

12   they had, it looks like, vending machines, is that

13   right, in their housing unit?

14       A.    Yes.

15       Q.    And one of them had a pool table; is that

16   right?

17       A.    Yes.

18       Q.    Do people who are trustees get paid for being

19   trustees?

20       A.    Yes.

21       Q.    How much?

22            MS. PAPPY:  Wait.  Hold on.

23            I'm going to object.  I'm going to instruct not

24   to answer.

25            What does this have to do with mobility --

Ex. N-125

**Kyle Bibel**

**Dunsmore vs.
San Dirgo County Sheriff's Office**

1          REPORTER'S CERTIFICATION

2

3      I, Claire Andrews, CLR, a Certified Shorthand

4  Reporter in and for the State of California, do hereby

5  certify:

6

7      That the foregoing witness was by me duly sworn;

8  that the deposition was then taken before me at the time

9  and place herein set forth; that the testimony and

10  proceedings were reported stenographically by me and

11  later transcribed into typewriting under my direction;

12  that the foregoing is a true record of the testimony and

13  proceedings taken at that time.

14

15      IN WITNESS WHEREOF, I have subscribed my name this

16  22nd day of March, 2023.

17

18

19  _____

20          Claire Andrews, CLR,

21          CSR No. 13509

22

23

24

25

**Ex. N-126**

SUBMITTED WITH
PLAINTIFFS' APPLICATION
FOR LEAVE TO ALLOW NON-
ELECTRONIC FILING

# EXHIBIT O

Ex. O-127

# EXHIBIT P

**Santa Clara County Mobility Disability Remedial Plan**

## I.    TERMINOLOGY AND DEFINITIONS

The terms and definitions set forth in the Consent Decree, to which this Remedial Plan is attached and into which this Remedial Plan is incorporated by reference, also control the terms and definitions set forth in this Remedial Plan.

## II.    INTAKE PROCESS

A.    In a reasonably confidential setting, the County shall inquire during intake whether an inmate has a Mobility Disability using an agreed-upon screening tool.                                           500

B.    The intake screening shall be conducted by a licensed registered nurse or, at the County's discretion, a Medical Provider.                                           501

C.    During the intake screening, the County shall begin the verification process of whether an inmate has a Mobility Disability, as outlined in Section III, if:

   1.    The inmate self-reports a Mobility Disability;                                           502

   2.    The inmate's Healthlink or ADA Tracking System record contains documentation of a Mobility Disability; or

   3.    The screening tool indicates that the inmate might have a Mobility Disability.

D.    If the intake process outlined in Section II.C, above, indicates that an inmate might have a Mobility Disability, the County shall utilize the agreed-upon screening tool to determine what type of reasonable modifications are necessary and available (e.g., changes to housing, lower bunk/lower tier) and shall provide such reasonable modifications while the inmate awaits verification pursuant to Section III.                                           503

E.    *Issuance and Retention of Mobility Devices at Intake*

   1.    The County will issue a Standard Mobility Device promptly, but in any case no later than the timelines contained in Section IV, to any inmate who is determined to possibly need a Mobility Device pursuant to Section II.D, subject to later verification pursuant to Section III, unless a Captain or Watch Commander determines and documents, based on a Safety-Security Assessment, that an inmate's possession of a Mobility Device constitutes an immediate risk of                                           504

Santa Clara County ADA Remedial Plan Page 1

**Ex. P-129**

bodily harm to inmates or staff, or threatens the security of the facility. If providing an alternative Mobility Device would mitigate the risk, the Captain or Watch Commander shall direct that the inmate be provided with the designated alternative.

2.  The County acknowledges its obligations to comply with California Penal Code section 2656 pertaining to retention of orthopedic and prosthetic appliances.                                                              505

3.  Subject to Sections II.E.1 & II.E.2, inmates will be permitted to keep their Personal Mobility Device(s) during the intake process until the County issues a Standard or Generic (if available) Mobility Device, unless a Captain or Watch Commander determines and documents, based on a Safety-Security Assessment, that the Mobility Device constitutes an immediate risk of bodily harm to inmates or staff, or threatens the security of the facility. If providing an alternative Mobility Device would mitigate the risk, the Captain or Watch Commander shall direct that the inmate be provided with the designated alternative.                                                    506

F.  If an inmate arrives at the Jail with a Personal Mobility Device that is exchanged for a County-owned Mobility Device, the County shall store the Personal Mobility Device at the Jail at no cost to the inmate for return upon release and/or transfer from the Jail to another facility. Alternatively, the inmate may arrange for pick-up of the Mobility Device. The County will not store a Personal Mobility Device for more than ninety (90) days after an inmate has been released or transferred.                                              507

G.  The County shall advise inmates of the results of the intake screening and notify the inmate of the right to request a physical examination by a Medical Provider to the extent the inmate disagrees with the results and/or reasonable modifications provided. The County shall further notify inmates of the right to request use of a Personal Mobility Device consistent with Section IV below.                                                                 508

H.  The results of the intake screening shall be documented and promptly inputted into the County's ADA Tracking System.                          509

I.  As part of the intake process, all inmates shall be informed of the process by which they can request a reasonable modification while in custody, including the types of issues that can be reviewed by the County Jails' ADA Unit on an expedited basis.                                                        510

---

Santa Clara County ADA Remedial Plan Page 2

Ex. P-130

III. **VERIFICATION OF AN INMATE'S MOBILITY DISABILITY AND NEED FOR REASONABLE MODIFICATIONS**

A.  The County's policy is to issue County owned Mobility Devices in all instances unless: (a) an inmate's Personal Mobility Device is the only reasonable modification for the inmate's Mobility Disability; or (b) the nature of the inmate's Personal Mobility Device would pose particular difficulty and/or harm to the inmate to remove, and/or removal is otherwise unnecessary due to the origin or nature of the device (i.e., a hospital-issued sling or brace).                                                                                   511

B.  An inmate may make a request to the ADA Unit to be able to continue to use his/her Personal Mobility Device. The ADA Unit and/or Medical Provider (where necessary) will evaluate the request based on an individualized assessment as outlined in Sections III.D and III.E.          512

C.  An inmate's Personal Mobility Device may be retained by the County for a short period of time sufficient to inspect the device for contraband. In most cases the inspection should occur promptly, but in rare cases the inspection may take longer, in which case it shall be completed within 14 days.          513

D.  *ADA Unit's Responsibilities*

1.  The County's ADA Unit shall review whether an inmate has a Mobility Disability and/or what reasonable modification(s) are necessary for the inmate within 7 calendar days under the following circumstances:                                                                                   514

    a.  An inmate is designated during the intake screening as possibly having a Mobility Disability and/or the need for a reasonable modification;

    b.  An inmate makes a request to the ADA Unit, including through an ADA Request or ADA-related grievance as outlined in Section XIII, for evaluation of a Mobility Disability and/or the need for a reasonable modification; or          515

    c.  The inmate is referred by staff to the ADA Unit for evaluation of a Mobility Disability and/or the need for a reasonable modification.          516

2.  The ADA Unit shall document a Mobility Disability and/or what reasonable modification(s) are necessary in the ADA Tracking System.          517

Santa Clara County ADA Remedial Plan Page 3

**Ex. P-131**

      a.    If the ADA Unit determines that an inmate requires a
Mobility Device, the County shall issue it consistent with
Section IV.D.1, and the ADA Unit will issue to the inmate
appropriate documentation authorizing possession of a
Mobility Device.

      b.    If the ADA Unit determines that an inmate requires a
reasonable modification related to their housing assignment
(e.g., ADA Accessible cell, grab bars, dining areas, showers,
path of travel, lower bunk, lower tier and/or a housing
reassignment in order to access work, educational or other
programs), the inmate shall receive the reasonable
modification within 24 hours.

3.    If the ADA Unit determines that an inmate's Mobility Disability
requires evaluation from a Medical Provider, the ADA Unit shall
offer an inmate a reasonable modification on a temporary basis
pending a medical appointment, which shall occur within 30 days.

4.    The Parties agree that not all Mobility Disabilities and/or reasonable
modifications will require an appointment with a Medical Provider
to verify the Mobility Disability and/or the need for a reasonable
modification. Further, an inmate's Mobility Disability and/or need
for a reasonable modification could change over time and will be
addressed based on an inmate's current status.

E.    *Medical Provider's Responsibilities*

1.    If the ADA Unit refers an inmate for evaluation pursuant to Section
III.D.3, or if an inmate or Medical Provider first identifies a Mobility
Disability at a medical encounter where the Medical Provider is able
to assess the Mobility Disability, the Medical Provider shall verify
whether the inmate has a Mobility Disability and/or determine what
reasonable modification(s) are necessary for the inmate unless such a
determination requires a specialist-medical appointment.

      a.    If the Medical Provider determines that an inmate requires a
Mobility Device, the County shall issue it consistent with
Section IV.D.1, and the County will issue to the inmate
appropriate documentation authorizing possession of a
Mobility Device

      b.    If the Medical Provider determines that an inmate requires a
reasonable modification related to their housing assignment

Ex. P-132

(e.g., ADA Accessible cell, grab bars, dining areas, showers, path of travel, lower bunk, lower tier and/or a housing reassignment in order to access work, educational or other programs), the inmate shall receive the reasonable modification within 24 hours.

c.    The County shall document **the Medical Provider's** determination in the ADA Tracking system and refer the inmate to the ADA Unit for follow-up.    525

d.    If the Medical Provider determines that an inmate requires a specialist-medical appointment, the Medical Provider shall promptly request that appointment, and shall consult with the ADA Unit in order to provide a reasonable modification, such as a Mobility Device and/or a housing change in accordance with Sections III.E.1.a and III.E.1.b on a temporary basis pending the outcome of the specialist-medical appointment.    526

2.    If an inmate or Medical Provider first identifies a Mobility Disability at a medical or mental health appointment where the Medical Provider cannot assess the Mobility Disability (e.g., because the appointment is not conducted by the appropriate Medical Provider and/or is scheduled for a different purpose), the Medical Provider shall refer the inmate to the ADA Unit, and the County shall document the referral in the ADA Tracking System. The ADA Unit shall then conduct a review consistent with Section III.    527

3.    Medical Providers evaluating an inmate's Mobility Disability and/or the need for a reasonable modification(s) may determine at an in-person evaluation that the inmate does not have a Mobility Disability and/or the inmate does not require a reasonable modification. If such a determination is made, the County shall document the rationale for the Medical Provider's finding in the ADA Tracking system.    528

IV.    **ISSUANCE, RETENTION, MAINTENANCE, AND DENIAL OF MOBILITY DEVICE(S)**

A.    The County's policies and procedures for the ordering, retention, maintenance, and denial/confiscation of Mobility Devices shall be reviewed and amended or drafted, as necessary to be consistent with this Remedial Plan.    529

B.    Supply and Maintenance of Standard Mobility Devices

Ex. P-133

1.    The County shall maintain a reasonable supply of Standard wheelchairs, walkers, canes, and crutches.    530

2.    The County shall inspect its supply of Standard Mobility Devices on a quarterly basis to ensure sufficient operational quantities are available.    531

C.    *Motorized Mobility Devices*

1.    Motorized Mobility Devices are generally not permitted in the Jails.    532

2.    The ADA Unit and Medical Provider(s), in coordination with the Assistant Sheriff, shall determine the most appropriate manner to accommodate an inmate who requires a motorized Mobility Device in the exceptional circumstance where a Medical Provider or the ADA Unit have determined, as outlined in Section III, that a motorized Mobility Device is the only reasonable modification that would meet the needs of the inmate with a Mobility Disability.    533

3.    The County shall consult with Plaintiffs' Counsel if the County determines that it will accommodate the inmate in need of motorized Mobility Device in some other manner than permitting the inmate to utilize the motorized Mobility Device in the Jail.    534

D.    *Timing for Issuance of Mobility Devices*

1.    An inmate with a Mobility Disability in need of a Standard Mobility Device shall be issued a Standard Mobility Device within four (4) hours, absent extenuating circumstances, following the ADA Unit or the Medical Provider's determination that an inmate needs a Mobility Device.    535

2.    Generic or Customized Mobility Devices may take time to order or design. If the required Generic Mobility Device is available on site, it shall be issued within four (4) hours, absent extenuating circumstances, following the ADA Unit or the Medical Provider's determination that an inmate needs a Mobility Device. For Customized Mobility Devices and Generic Mobility Devices not kept on site, Adult Custody Health Services shall either obtain the device or, if the device requires a special order, place the order for said device within three (3) business days of identification of need. The County shall inform the inmate of an estimated time that the Generic and/or Customized Mobility Device shall be provided. The County shall check on the status of the Generic or Customized    536

Santa Clara County ADA Remedial Plan Page 6

**Ex. P-134**

Mobility Devices every 30 days and shall provide the inmate with a temporary reasonable modification to the extent necessary.

E.   *Maintenance of Mobility Devices*

1.   **If an inmate's Mobility Device is operable but in need of** maintenance or repair, and the inmate notifies the ADA Unit, the ADA Unit shall assess and address the maintenance or repair need within seven (7) days.                                                       537

2.   **If an inmate's Standard Mobility Device becomes** inoperable and the inmate reports the problem to custody staff, the County shall provide a replacement within twenty-four (24) hours.                              538

3.   If an inmate advises the ADA Unit and/or a Medical Provider that a Generic or Customized Mobility Device is in need of maintenance, repair, or replacement, the County shall coordinate maintenance, repair, or replacement as necessary.  In the interim, the ADA Unit shall replace the Generic Mobility Device if such device is kept in stock on site or provide the inmate with a Standard Mobility Device on a temporary basis and evaluate the provision of other interim reasonable modification(s).                                            539

F.   *Safety-Security Assessments After Intake*

1.   The County shall permit an inmate to keep a Mobility Device unless a Captain or Watch Commander determines and documents, based on a Safety-Security Assessment, that a Mobility Device constitutes an immediate risk of bodily harm to inmates or staff, or threatens the security of the facility.                                             540

2.   If the Captain or Watch Commander makes such a determination, they shall document the decision, and reasons for it, as well as the date of decision, in writing, and shall promptly consult with a Medical Provider and the ADA Coordinator to determine if an appropriate alternative reasonable modification can be provided, in which case an alternative reasonable modification shall be provided. The Captain, Watch Commander, Medical Provider, or ADA Coordinator shall document the nature of any alternative reasonable modification(s) provided in the ADA Tracking System.            541

Ex. P-135

3.     If the County removes **an inmate's Mobility Device** following a Safety-Security Assessment, the County shall reevaluate the Safety-Security Assessment as follows:

     a.    The inmate must be reevaluated by the ADA Unit to determine if he or she can safely possess the Mobility Device a minimum of every seven (7) days if the device is removed during the intake process.       542

     b.    The inmate must be reevaluated by the ADA Unit to determine if he or she can safely possess the Mobility Device a minimum of every fourteen (14) days if the device is removed at any other time.       543

     c.    For each evaluation pursuant to Section IV.F.3.a and IV.F.3.b, the ADA Unit shall make a recommendation to the Captain of the facility or his or her superiors regarding whether the Mobility Device should continue to be removed from the inmate and shall document the rationale in the ADA Tracking System.       544

4.     Notwithstanding the provisions above, the County acknowledges its obligations to comply with California Penal Code section 2656 pertaining to retention of orthopedic and prosthetic appliances.       545

## V.   CLASSIFICATION AND HOUSING OF INMATES WITH MOBILITY-DISABILITIES

A.    The County shall review its Classification Policies and Procedures and revise, as necessary, to be consistent with this Remedial Plan.       546

B.    An inmate's need for a Mobility Device in a housing unit shall not be a basis for assignment to the infirmary, a medical unit, or a mental health housing unit.       547

C.    That an inmate has a Mobility Disability and/or requires reasonable modifications for that disability (including the provision of Mobility Devices) shall not be a factor in determining an inmate's security classification.       548

D.    Inmates identified as having a Mobility Disability shall be placed in housing that is consistent with their security classification and their accessibility needs. Not all inmates with a Mobility Disability require an ADA Accessible cell or unit, but may require reasonable modifications       549

---

Santa Clara County ADA Remedial Plan Page 8

**Ex. P-136**

related to housing such as, but not limited to, a lower bunk/lower tier assignment, or access to ADA Accessible shower facilities.

E.     This Remedial Plan recognizes that, while additional ADA Accessible housing is constructed pursuant to the Construction Remedial Plan (Section XI), ADA Accessible housing may not be immediately available for every inmate needing such housing consistent with their classification.  As ADA Accessible housing is completed and brought online under the Construction Remedial Plan, inmates in need of ADA Accessible housing shall be housed consistent with their needs.  In the interim, the Parties agree that inmates with Mobility Disabilities who require ADA Accessible housing shall be housed as follows:     **550**

1.     Male Inmates

   a.     Inmates determined to be a Level 1 classification shall be housed in Barracks 3 at the Elmwood Minimum Camp unless Barracks 3 is closed for repairs, construction, or other extenuating circumstances, in which case these inmates shall be housed in Special Housing.     **551**

   b.     Inmates who use wheelchairs, and who are determined to be Level 2, 3, or 4 security level inmates, shall be housed in Main Jail Unit 2B and/or Elmwood Unit M3.     **552**

   c.     Inmates who use Mobility Devices other than wheelchairs and who are determined to be Level 2, 3, or 4 security level inmates, shall be assessed on an individualized basis and housed as appropriate.     **553**

2.     Female Inmates

   a.     Inmates who can be appropriately housed in a dorm setting based on their security level shall be housed in W2.  The ADA Unit will promptly conduct an individualized assessment to determine if additional reasonable modification(s) are necessary and develop a plan to address those needs.     **554**

   b.     Inmates who require cell-style housing based on their security level shall be housed in W4.  The ADA Unit shall promptly conduct an individualized assessment to determine if additional reasonable modification(s) are necessary and develop a plan to address those needs.  The County shall     **555**

Santa Clara County ADA Remedial Plan Page 9

**Ex. P-137**

promptly consult with Plaintiffs' Counsel regarding the County's planned reasonable modifications for an inmate requiring cell-style housing who, the County has determined as outlined in Section III, requires full-time use of a wheelchair.

F.   If the housing units listed in Sections V.E.1 and/or V.E.2 are closed for repairs, construction, or other extenuating circumstances, the County shall promptly (1) notify Plaintiffs' Counsel of the closure(s), and (2) provide Plaintiffs' Counsel with a list of where inmates with Mobility Disabilities will be housed for the duration of the closure(s). During such closure(s), the ADA Unit shall promptly conduct an individualized assessment to determine if additional reasonable modifications are necessary for the affected inmates with Mobility Disabilities and develop a plan to address those needs.      556

## VI.   TRACKING INMATES WITH MOBILITY DISABILITIES ("ADA TRACKING SYSTEM")

A.   The County shall use an ADA Tracking System to document and share internally information regarding inmates with Mobility Disabilities.     557

B.   The ADA Tracking System shall identify and track all inmates with a Mobility Disability.     558

C.   The ADA Tracking System shall have the following functional capabilities:

   1.   Code the type of Mobility Disability and the reasonable modifications an inmate requires for the Mobility Disability (e.g., Mobility Devices, lower bunks, ground floor housing).     559

   2.   Track all programs, services, and reasonable modifications offered to an inmate with a Mobility Disability throughout his/her incarceration.

D.   The County shall designate staff that shall be responsible for using the ADA Tracking System. Designated Staff shall include Classification Staff, the ADA Coordinator and his or her staff, the Facility Watch Commander, Division Commander, Administrative Sergeant, Program Managers, and staff from Adult Custody Health Services ("Designated Staff").     560

E.   Designated Staff, both during the intake and booking process and during clinical encounters, shall be responsible for adding or modifying     561

Santa Clara County ADA Remedial Plan Page 10

Ex. P-138

information regarding the nature of an inmate's Mobility Disability and necessary reasonable modifications for that Mobility Disability.

F.      Designated Staff shall be able and expected to view information in the system to ensure that the County provides reasonable modifications to inmates with Mobility Disabilities.                                                562

G.      Designated Staff shall also be responsible for updating the system with information regarding the reasonable modifications provided during the inmate's incarceration and any subsequent returns to custody.          563

H.      Housing unit, education, and program office staff shall be provided with a report listing all inmates with a Mobility Disability in the relevant unit or program, as well as those inmates' needing reasonable modifications for a Mobility Disability.  The report shall be updated and provided in written form to such staff at least once per week.  Additionally, information from the report shall be communicated in writing to staff whenever an inmate with a Mobility Disability is assigned to the unit or program.          564

I.      All Designated Staff shall be trained to properly use the ADA Tracking System.  The training shall occur on site over the course of six months after implementation begins.                                                565

J.      The County shall develop and maintain appropriate policies outlining who can access and modify information in the ADA Tracking System.          566

VII.   **PROGRAMS AND SERVICES**

A.      The County's policies and procedures pertaining to programs and services shall be reviewed and amended or drafted, as necessary, to be consistent with this Remedial Plan.                                                567

B.      The County shall ensure that an inmate with a Mobility Disability has equal access to all inmate programs and services for which an inmate would be eligible but for that Mobility Disability—including, but not limited to educational, vocational, work, recreational, visiting, medical, mental health, substance abuse, self-improvement, and religious programs, as well as early release programs such as the Custody Alternative Supervision Program (CASP)—on a space available basis, consistent with the inmate's security classification.                                                568

C.      If an inmate's Mobility Disability interferes with his or her ability to participate in a program or service for which he or she is otherwise eligible, the ADA Coordinator shall first determine whether the individual inmate

**Ex. P-139**

can participate in the program or service if the County provided a
reasonable modification.  If a non-structural reasonable modification will
allow an inmate with a Mobility Disability to participate in a program, the
County shall provide the non-structural reasonable modification and shall
allow the inmate to participate in the program.

569

D.    If a non-structural reasonable modification would result in a fundamental
alteration of the program, the County must take actions that would not
result in such an alteration but would nevertheless ensure that the inmate
with a Mobility Disability receives the benefits or services offered by the
County's program.

570

E.    The County can refuse to provide a reasonable modification to an inmate
with a Mobility Disability who is otherwise qualified for a program or
service if:  (1) the inmate's participation in the program would pose a direct
threat to the health or safety of others, or (2) there is a reason for doing so
that is reasonably related to a legitimate penological interest(s), as
determined by the ADA Unit in coordination with the Assistant Sheriff.
Refusal to provide a reasonable modification pursuant to either of the
preceding exceptions shall be based on a Safety-Security Assessment.  If
providing an alternative Mobility Device would mitigate the risk, the
County shall provide the inmate with the designated alternative as
expeditiously as possible.

571

F.    If the County relies upon any of the above exceptions to deny an inmate
with a Mobility Disability the opportunity to participate in a program or
service, the ADA Unit must document the basis for the determination in the
ADA Tracking System.

572

G.    *Location of Programs and Services*

1.    The Parties have designated structural changes in the Construction
Remedial Plan outlined in Section XI in order to provide program
accessibility to inmates with Mobility Disabilities.

573

2.    In order to address program accessibility, the County agrees to
provide programming and services in the areas designated in the
Construction Plan (Section XI) as the portions of the Construction
Plan providing accessibility to programs and services are completed.

574

3.    As an alternative to providing programming and services in areas
designated in the Construction Plan, the County may continue to
utilize nonstructural methods to provide accessibility to programs
and services, including but not limited to acquisition or redesign of

575

Santa Clara County ADA Remedial Plan Page 12

**Ex. P-140**

equipment, assignment of aides to inmates with Mobility Disabilities or, at the County's election, the provision of services at alternate accessible sites.

4.  While the County is undertaking the construction described in Section XI of this Remedial Plan, the Parties agree that the County shall take the following interim measures to provide accessibility to programs and service for inmates with Mobility Disabilities:

    a.  The County may use inmates or Custody Staff to push inmates in wheelchairs to a program or service along paths of travel agreed upon by the Parties. Pending completion of physical modifications to the paths of travel, wheelchair pushers may be used as an interim measure. Wheelchair pushers used on an interim basis are subject to the training requirements and other provisions outlined in Section VII.G.7.

    b.  Assignment of aides to inmates with Mobility Disabilities.

5.  Where the County cannot provide programs or services at the locations designated in the Construction Plan and cannot find nonstructural measures to provide accessibility to programs and services, the County may refuse to provide the program or service to an inmate with a Mobility Disability only upon a showing that doing so would result in a fundamental alteration in the nature of the program, service, or activity, or would result in undue financial and administrative burdens.

6.  The County shall maintain ADA Accessible facilities in operable working condition. Isolated or temporary interruptions in access to these facilities due to maintenance or repairs are not prohibited if the County is exercising reasonable diligence in addressing the maintenance or repairs.

7.  Once paths of travel are made compliant with this Remedial Plan, wheelchair pushers may continue to be used for inmates who need assistance traveling long distances, unless otherwise requested by the inmates. Appropriately screened inmates and/or Custody Staff chosen to assist inmates who use wheelchairs shall receive initial and periodic training as to their job duties and performance criteria. The training shall cover how to safely and properly assist inmates with Mobility Disabilities. The ADA Unit shall evaluate wheelchair

576

577

578

579

580

Ex. P-141

pushers which shall include feedback from the inmates with
Mobility Disabilities. Inmates with Mobility Disabilities have the
right to refuse a wheelchair pusher, and in that circumstance, the
ADA Unit shall determine an appropriate alternative reasonable
modification.

H.    If an inmate with a Mobility Disability requires transportation in a
vehicle—e.g., to court or to a medical appointment at an outside facility—
the vehicle used to transport the inmate must be ADA Accessible.
Specifically, inmates who use wheelchairs on permanent bases and/or
inmates who have difficulty navigating steps without assistance must be
transported in vehicles equipped with a wheelchair lift and other safety
equipment mandated by the Department of Motor Vehicles and the
Department of Transportation. If the Department of Motor Vehicles and
Department of Transportation standards conflict, the applicable standard
that provides greater protections to individuals with a Mobility Disability
shall govern.

581

## VIII. POLICY REVIEW AND REVISION

A.    The County is reviewing and revising, as needed, all policies, procedures,
Post Orders, and forms, including those for Adult Custody Health Services,
and the Inmate Orientation book, to be consistent with the provisions in this
Remedial Plan. Plaintiffs' Counsel shall be provided the opportunity to
comment on these documents.

582

B.    *Policy Revision Process*

1.    Within 30 days of the execution of the Consent Decree, the Parties
shall meet and confer to designate the policies that require revision
to address key portions of this Remedial Plan

583

2.    The County shall provide Plaintiffs' Counsel with draft proposed
revisions to the agreed upon policies within 120 days of the
execution of the Consent Decree unless a longer timeframe is
mutually agreed upon by the Parties.

584

3.    The designated policies shall be finalized with one year of the
execution of the Consent Decree unless the Parties agree to a longer
time frame.

585

C.    The County shall train relevant Staff on new or revised policies and
procedures as detailed in Section X.

586

Santa Clara County ADA Remedial Plan Page 14

## IX.    ADA COORDINATOR

A.    The County has appointed a full-time ADA Coordinator, a lieutenant who
reports directly to the Assistant Sheriff. The ADA Coordinator shall
oversee all issues related to inmates with Mobility Disabilities, including,
but not limited to, classification; housing; inspection, maintenance,
provision, and removal of Mobility Devices; and responding to Mobility
Disability-related requests and inmate grievances pursuant to County
policy.                                                                                                  587

B.    The County shall not modify the job description of the ADA Coordinator
without consultation with Plaintiffs' Counsel.                                                588

C.    As soon as practical, but under no circumstances more than ninety (90)
days after an inmate has been identified as having a Mobility Disability, the
ADA Coordinator and/or her or his staff shall personally meet with each
new inmate housed in the Jail who is identified as having a Mobility
Disability. The meeting with the ADA Coordinator shall be for the purpose
of ensuring that the inmate is housed in a cell and unit that accommodates
his or her Mobility Disability; has the appropriate Mobility Device(s)            589
and/or other reasonable modifications; ensuring the inmate has equal access
to Jail programs for which she or he is eligible but for his or her Mobility
Disability; ensuring the inmate has access to grievance forms to raise
disability-related issues; and to advise the inmate of personnel who can
assist her or him with reasonable modification needs. For an inmate
identified as having a Mobility Disability who remains in the Jails for more
than six (6) months, the ADA Coordinator and/or her/his staff shall meet
with the inmate at least once every six (6) months until the inmate is
released from the Jail.

D.    The ADA Coordinator is charged with facilitating ADA Mobility-Disability
related training to Custody Staff and Adult Custody Health Services Staff,
and with monitoring programs and work assignments to ensure meaningful      590
access for all inmates with Mobility Disabilities. The ADA Coordinator
shall have sufficient staffing (the "ADA Unit") to assist him or her
regarding Mobility-Disability issues.

E.    During any period where the ADA Coordinator is unavailable for more
than thirty (30) days, a sergeant or higher-ranked individual shall fulfill the
duties of the ADA Coordinator position until the ADA Coordinator            591
becomes available or a replacement is appointed to the position.

Santa Clara County ADA Remedial Plan Page 15

**Ex. P-143**

F.   The ADA Coordinator shall attend and complete a certificate-course designed for ADA coordinators and obtain a certification and maintain said certification with updates and continuing education courses. Any replacement ADA Coordinator or interim ADA Coordinator shall obtain his or her ADA certification within twelve (12) months of starting in the position.

592

X.   **TRAINING**

A.   The County provided eight (8) hours of mutually agreed upon ADA training to all DOC Academy Cadets, Custody Staff, and Adult Custody Health Services Staff members in 2015 and 2016.

593

B.   *Training on New Policies and Procedures*

1.   Within six (6) months of the finalization of the revised policies and procedures (see Section VIII), the Parties shall select a mutually agreed upon trainer to train on the revised policies and procedures. Within the same six (6) month period, the selected trainer shall develop a curriculum for training Custody and Adult Custody Health Services Staff on the revised policies and procedures. The trainer shall then train Custody and Adult Custody Health Services Staff as outlined in Sections X.C.2 and X.D.2.

594

2.   Within nine (9) months of the trainer's preparedness to conduct the training, the trainer shall train 90 percent of Custody and Adult Custody Health Services Staff, and make reasonable efforts to train all Custody and Adult Custody Health Services Staff, on new policies and procedures or revised policies and procedures adopted pursuant to relevant topics in this Agreement. Critical Staff, such as the ADA Coordinator, ADA Unit, Intake Staff, and Medical Providers shall be prioritized for training during the first three months.

595

C.   *On-Going Training to Custody and Adult Custody Health Services Staff*

1.   The County shall provide eight hours of ADA training to all DOC Academy classes.

596

2.   After completion of the training in Section X.B, the County shall provide a biennial training by a mutually agreed upon trainer to train Custody and Adult Custody Health Services Staff.

597

---

Santa Clara County ADA Remedial Plan Page 16

**Ex. P-144**

D.    The County may engage a consultant to provide one 24-hour Train the Trainer (T4T) ADA training to prepare the County to take over the responsibility of providing ongoing ADA training and the responsibility of providing biennial refresher training.     598

E.    The appropriate length, format, and method of the training for Staff, including different types of Staff, will be developed in consultation with Plaintiffs' counsel. Plaintiffs' Counsel shall have the right to comment on all of the above-listed training modules in advance of their roll-out and to observe any of the aforementioned trainings upon request.     599

## XI.   FACILITY MODIFICATIONS AND ADJUSTMENTS

A.   *Facilities*

   1.   The County currently has two jail facilities:

      a.   Main Jail (presently, Main Jail North and South).

      b.   Elmwood (presently, Elmwood Correctional Center for Men and Correctional Center for Women).

   2.   The County intends to build a new jail ("New Jail"). However, if the County determines it will not build the New Jail, the parties will meet and confer within thirty (30) days of such determination to discuss any additional construction that may be necessary at the Jails to meet the needs of inmates with Mobility Disabilities.     600

   3.   The County shall not house inmates with Mobility Disabilities at Main Jail South or Elmwood W1.     601

   4.   The County shall maintain ADA Accessible features required by this Agreement in operable working condition. This requirement does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.     602

B.   *New Jail*

   1.   The New Jail shall be constructed in accordance with all applicable construction requirements under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and California Government Code Section 11135 ("Section 11135").     603

**Ex. P-145**

2.  The New Jail shall include at least three percent ADA Accessible cells or 20 ADA Accessible cells, whichever is greater. The New Jail will provide housing for Level 2 and 3 inmates at a minimum.     604

C.  *Main Jail North*

1.  Booking Area (Basement Level): The County shall make the following ADA Accessible:

    a.  One transaction counter for men;     605

    b.  One transaction counter for women;     606

    c.  One single occupancy holding cell for men;     607

    d.  One multiple occupancy holding cell for men;     608

    e.  One dress out area, including shower;     609

    f.  One television shelf in the general occupancy classification holding cell;     610

    g.  One mirror for inmate use; and     611

    h.  One pay telephone for inmate use.     612

    i.  The Parties agree that in lieu of making one holding cell for women ADA Accessible, the County shall use the dress out area in the bathroom/shower for women with Mobility Disabilities.     613

2.  Property Release Area: The County shall make the following ADA Accessible:

    a.  One transaction counter; and     614

    b.  One bench in holding room.     615

    c.  The Parties agree that in lieu of making the property release area restroom ADA Accessible, the County shall provide access, immediately upon request, to a restroom located in the lobby.     616

Ex. P-146

3.   Second Floor:

    a.   General Use Area and Medical Unit (2A):  The County shall make the following ADA Accessible:

       i.   One dental examination room;     617

       ii.   Remove access barriers and install a high-low table in one examination room on the unit;     618

       iii.   One medical waiting area cell with accessible restroom;     619

       iv.   The counter in one visiting cell; and     620

       v.   One telephone in the pro per interview room.     621

    b.   Special Housing (2B):  The County shall make the following ADA Accessible:

       i.   Eight cells;     622

       ii.   One shower (excluding a fixed bench) and one bathtub;     623

       iii.   One table in the dayroom and one table in the multipurpose room; and     624

       iv.   One piece of exercise equipment.     625

       v.   The Parties agree that in lieu of providing fixed benches in ADA Accessible showers, the County shall adopt a policy of providing a safe and secure shower chair which shall be readily accessible and provided immediately upon request to an inmate with a Mobility Disability.     626

    c.   Infirmary (2C):  The County shall make the following ADA Accessible:

       i.   Two dorms with a combined minimum of 8 beds;     627

       ii.   Eight cells;     628

Ex. P-147

    iii.    One shower (excluding a fixed bench) and one
bathtub;       629

    iv.    One table in the dayroom and one table in the
multipurpose room;       630

    v.    Call buttons; and       631

    vi.    One piece of exercise equipment.       632

    vii.    The Parties agree that in lieu of providing fixed
benches in ADA Accessible showers, the County shall
adopt a policy of providing a safe and secure shower
chair which shall be readily accessible and provided
immediately upon request.       633

4.    <u>Fourth and Fifth Floor Housing Units</u>: The County shall make the
following ADA Accessible:

    a.    Five cells on the 4$^{th}$ floor;       634

    b.    Five cells on the 5$^{th}$ floor;       635

    c.    The counter in one visiting room on the 4$^{th}$ floor;       636

    d.    The counter in one visiting room on the 5$^{th}$ floor;       637

    e.    One shower serving each of the designated housing units on
the 4$^{th}$ floor;       638

    f.    One shower serving each of the designated housing units on
the 5$^{th}$ floors;       639

    g.    One table in the dayroom serving each of the designated
housing units on the 4$^{th}$ and 5$^{th}$ floors;       640

    h.    One table in the multipurpose room serving each of the
designated housing units on the 4$^{th}$ and 5$^{th}$ floors;       641

    i.    One payphone and one mirror in the dayrooms serving each
of the designated housing units on the 4$^{th}$ and 5$^{th}$ floors; and       642

    j.    One piece of exercise equipment.       643

**Ex. P-148**

5.    <u>Eighth Floor (Mental Health/Special Management Housing)</u>:  The
County shall make the following ADA Accessible:

    a.    The door threshold of the Seclusion/Safety cell;                                          644

    b.    Four cells in 8A and one cell in 8B;                                                              645

    c.    One shower with flip-down shower bench serving each of the                      646
designated housing units;

    d.    One table in the dayroom serving each of the designated                            647
housing units;

    e.    One table in the multipurpose room serving each of the                              648
designated housing units;

    f.    One payphone and one mirror in the dayrooms serving each                        649
of the designated housing units; and

    g.    One piece of exercise equipment.                                                              650

    h.    The Parties agree that in lieu of providing additional ADA
Accessible cells on 8A, the County shall adopt a policy that
shall require that an inmate with a Mobility Disability, who
otherwise would be housed on 8A, be transferred to the                           651
County hospital if there is not appropriately accessible
housing for the inmate's needs on 8A.

    i.    The Parties also agree that in lieu of providing additional
ADA Accessible cells on 8B, the County shall adopt a policy
that shall require that an inmate with a Mobility Disability,
who otherwise would be housed on 8B, shall be housed in                        652
another appropriate accessible housing unit at the Jail and
shall be provided with services equivalent to what the inmate
would have received in 8B in that housing unit.

D.    *Elmwood Facility*

1.    <u>General</u>:

    a.    The County shall install ADA Accessible water fountains in                       653
housing areas, program areas, and along paths of travel
utilized by inmates with Mobility Disabilities.

Santa Clara County ADA Remedial Plan Page 21

**Ex. P-149**

b. <u>Paths of Travel</u>:  The County agrees to make the Paths of Travel used by inmates with Mobility Disabilities affixed as Attachment 1 ADA Accessible.                                                654

c. <u>Processing Area</u>:  The County shall make the following ADA Accessible:

    i.    One restroom; and                                                655

    ii.    Dress out area for male and female inmates.                                                656

    iii.    The Parties agree that in lieu of making the holding cells ADA Accessible, the County shall adopt a policy of placing an inmate with a Mobility Disability outside of the holding cells either on or next to the seating area and shall ensure that the inmate with a Mobility Disability is moved directly to housing, limiting the amount of time in the processing area.                                                657

    iv.    The Parties agree that in lieu of making the showers ADA Accessible, the County shall not use the showers unless needed for decontamination or biohazard cleanup in the rare circumstance where contamination or biohazard incident occurs in the immediate area, in which case the inmate shall be offered appropriate assistance.  An inmate with a Mobility Disability has the right to refuse assistance, in which case the inmate shall be transported to an alternative ADA shower for decontamination.                                                658

d. <u>Information Center</u>:  The County shall make the following ADA Accessible:

    i.    The counter; and                                                659

    ii.    One restroom.                                                660

    iii.    The Parties agree that the room for attorney visits located in the Information Center shall have a small table to allow sufficient clearance space for an inmate with a Mobility Disability.  The County agrees to provide a small table and maintain sufficient clearance space at all times.                                                661

Santa Clara County ADA Remedial Plan Page 22

**Ex. P-150**

    e.    <u>M1 – (Upper Floor)</u>:  The County shall make eight cells ADA    662
Accessible to house men and/or women.

    f.    <u>Medical Facility</u>:  The County shall make the following ADA
Accessible:

    i.    The restroom serving the waiting area.    663

    ii.    The Parties agree that in lieu of installing a bench in
the X-ray changing room, the County shall adopt a
policy of providing a chair for an inmate with a    664
Mobility Disability.  The County further commits to
ensuring all movable furniture shall not be placed in
paths of travel.

2.    <u>Elmwood Men's</u>

    a.    Operations Facilities:  The County shall make the following
ADA Accessible:

    i.    The counter located in the library;    665

    ii.    One restroom in the workshop area;    666

    iii.    One restroom near the classrooms;    667

    iv.    The threshold to classroom doors except that the
County is not required to modify the cross-slope of the    668
walkway that abuts the classrooms; and

    v.    Table or work bench where used by Mobility Impaired    669
inmates.

    b.    <u>Men's Minimum Security Housing (Level 1 Dorm-Style
Housing)</u>:  The County shall make the following ADA
Accessible:

    i.    Twenty-five beds spread across at least two different    670
housing units;

    ii.    The entryway/ramps to the housing units;    671

    iii.    One shower and restroom serving the designated    672
housing units; and

**Ex. P-151**

       iv.    One table in the designated housing units.    673

c.    **Men's Dining Hall for Minimum Security (Level 1) Inmates**: The County shall make the following ADA Accessible:

       i.    Five percent of the seating capacity; and    674

       ii.    One ADA-designated portable toilet that meets California Building Code 11B-603 outside the dining hall.    675

d.    **Men's Recreation Yard for Minimum Security (Level 1) Inmates**:  The County shall make the following ADA Accessible:

       i.    Handrails on the path to the volleyball court;    676

       ii.    Paved route from ADA housing unit(s) to the handball courts and basketball courts, or paved route from ADA housing unit(s) to and around the perimeter of the field; and    677

       iii.    One piece of exercise equipment.    678

e.    **Men's Medium Housing (Level II and III Inmates)**:  The County shall make the following ADA Accessible:

       i.    <u>Cell-Style Housing at M4 and/or M5</u>:

          (1)    Four cells in a minimum of two different cell-style housing units;    679

          (2)    One shower serving each of the designated housing units;    680

          (3)    One dayroom table serving each of the designated housing units;    681

          (4)    Cane detectable railing serving each of the designated housing units;    682

          (5)    Remove access barriers and install a high-low table in one examination room on the housing unit; and    683

(6)    One piece of exercise equipment.    684

(7)    The Parties agree that in lieu of providing additional ADA Accessible cells in M4 and/or M5, the County shall adopt a policy that shall require that an inmate with a Mobility Disability, who otherwise would be housed on M4 and/or M5, shall be housed in ADA Accessible dorm-style housing at the same security level or lower.    685

ii.    <u>Dorm-Style Housing Units in M3 and/or M8</u>

(1)    Twenty-five beds spread across at least two different housing units;    686

(2)    One restroom serving each of the designated housing units;    687

(3)    One shower serving each of the designated housing units;    688

(4)    One dayroom table serving each of the designated housing units;    689

(5)    Cane detectable railing serving each of the designated housing units;    690

(6)    Remove access barriers and install a high-low table in one examination room on the unit;    691

(7)    One piece of exercise equipment; and    692

(8)    One holding cell in M8.    693

3.    <u>Elmwood – Women's</u>

a.    <u>W-2 Dorm Style Housing for Minimum and Medium (Level 1 and 2 Inmates)</u>: The County shall make the following ADA Accessible:

i.    Eight beds in a minimum of two different housing units;    694

ii.    One restroom serving the housing units;    695

Santa Clara County ADA Remedial Plan Page 25

**Ex. P-153**

|       |                                                                                                                               |     |
|-------|-------------------------------------------------------------------------------------------------------------------------------|-----|
| iii.  | One shower serving the designated housing unit;                                                                               | 696 |
| iv.   | One table serving the designated housing unit;                                                                                | 697 |
| v.    | Cane detectable railings in designated housing unit; and                                                                      | 698 |
| vi.   | One piece of exercise equipment.                                                                                              | 699 |

b.   W-4 Cell-Style Housing Medium and Maximum Security Inmates (Level II, III, and IV Inmates):  The County shall make the following ADA Accessible:

|       |                                                                                                                               |     |
|-------|-------------------------------------------------------------------------------------------------------------------------------|-----|
| i.    | Four cells in two different housing units;                                                                                    | 700 |
| ii.   | One restroom serving the designated housing units;                                                                           | 701 |
| iii.  | One shower serving the designated units;                                                                                     | 702 |
| iv.   | One table serving the designated units;                                                                                     | 703 |
| v.    | Cane detectable railings in designated units;                                                                               | 704 |
| vi.   | Walkway and thresholds to the yards on the designated units;                                                                 | 705 |
| vii.  | Restroom in court holding cell;                                                                                             | 706 |
| viii. | Bench in visiting area; and                                                                                                 | 707 |
| ix.   | One piece of exercise equipment.                                                                                           | 708 |

c.   Level IV inmates shall not be housed in the W-1 dorm setting.                                                                   709

d.   Modular Classrooms:  The County shall make ADA Accessible any classrooms serving Elmwood Women's ADA Accessible housing, including the associated paths of travel.   710

## XII.  MONITORING PLAN

A.   The County shall develop a Monitoring Plan to ensure effective internal oversight and accountability procedures to comply with the non-construction related portions of this Agreement.  Plaintiffs' Counsel shall be provided the opportunity to comment on the Monitoring Plan.   711

Ex. P-154

B.      The County shall develop a construction schedule for the Construction          712
        Plan. Plaintiffs' Counsel shall be provided with an opportunity to comment
        on the plan.

## XIII. GRIEVANCE AND ADA REQUEST SYSTEM

A.      *ADA Requests*

1.      The County will provide and maintain a readily available mechanism          713
        for inmates to make a request for reasonable modifications
        independent of the grievance system ("ADA Request").

2.      The ADA Coordinator or a member of the ADA Unit shall review               714
        the ADA Request within seven (7) days of receipt of such a request
        and, where appropriate, provide the requested reasonable
        modification and/or begin the verification process as set forth in
        Section III.

B.      *Grievance System*

1.      The County shall provide and maintain an inmate grievance system           715
        that provides for prompt and equitable resolution of complaints by
        inmates with Mobility Disabilities who allege disability-related
        violations.

2.      The County grievance form shall continue to include a checkbox or          716
        similar means to identify that the request and/or grievance is ADA-
        related. The County shall train grievance staff to route "ADA"
        grievances appropriately even if the inmate who filed the grievance
        did not check the "ADA" checkbox.

3.      The ADA Coordinator or a member of the ADA Unit shall review               717
        all ADA-related complaints, assign an ADA-trained staff person to
        investigate the complaints, and/or interview the inmate to the extent
        his or her complaint or requested reasonable modification is unclear,
        and provide a substantive written response to the inmate. The total
        response time for all ADA-related grievances (but not appeals) shall
        be no more than 30 days from receipt.

4.      All ADA-related grievances and responses, including provision of          718
        interim reasonable modifications, shall be documented and tracked
        in the ADA Tracking System.

Santa Clara County ADA Remedial Plan Page 27

**Ex. P-155**

C.    *Expedited ADA Unit Review of Urgent ADA Requests and Grievances*

1.    The ADA Unit shall screen ADA Requests and ADA-related grievances for ADA-related issues that, if true, would subject the inmate to a substantial risk of injury or other harm, which include: (a) unauthorized removal of an inmate's Mobility Device by Custody Staff; and (b) failures to provide housing-related reasonable modifications following a determination that the inmate requires such reasonable modification.                                    719

2.    If the ADA Unit finds that the issue can be addressed through an interim modification, the ADA Unit shall provide such interim modification promptly, but in any case no later than seven (7) days from receipt of the ADA Request or Grievance.  If the risk to health or safety cannot be addressed through an interim accommodation, within seven days from receipt of the ADA Request or Grievance, the ADA Unit shall, as appropriate:  (1) confer with the Captain or his or her superior; and/or (2) arrange for a medical consultation with a Medical Provider for resolution of the ADA Request or Grievance.  The ADA Unit shall also provide written notification to the inmate of the action(s) taken within the same seven-day period.                                    720

Ex. P-156

# ATTACHMENT 1

Ex. P-157



SCC DRA_000284

Ex. P-158

# EXHIBIT Q

Exhibit B: Remedial Plan (DRC, County of Orange)

# REMEDIAL PLAN FOR THE ORANGE COUNTY JAIL REGARDING THE TREATMENT OF PEOPLE WITH DISABILITIES, RESTRICTIVE HOUSING, AND THE TREATMENT OF PEOPLE WHO IDENTIFY AS LESBIAN, GAY, BISEXUAL, TRANSEXUAL, QUEER OR INTERSEX (LGBTQI)

## TABLE OF CONTENTS

Page

**DEFINITIONS** .................................................................................................... 1

**TOPIC 1: RIGHTS OF PEOPLE WITH DISABILITIES** ............................................. 3

I.     POLICIES AND PROCEDURES ........................................................................ 3

II.    ADA TRACKING PROCEDURES ...................................................................... 3

III.   IDENTIFYING PEOPLE WITH DISABILITIES .................................................. 4

IV.    ORIENTATION ............................................................................................... 5

V.     EFFECTIVE COMMUNICATION .................................................................... 6

VI.    INTELLECTUAL AND DEVELOPMENTAL DISABILITIES ............................. 8

VII.   HEALTH CARE APPLIANCES, ASSISTIVE DEVICES, DURABLE MEDICAL EQUIPMENT ................................................................................. 10

VIII.  HOUSING PLACEMENTS .............................................................................. 12

IX.    ACCESS TO PROGRAMS, SERVICES, AND ACTIVITIES ............................. 14

X.     ACCESS TO WORKER OPPORTUNITIES ...................................................... 15

XI.    ACCESS TO COMMUNITY WORK PROGRAM .............................................. 16

XII.   DISABILITY-RELATED GRIEVANCE PROCESS ............................................ 17

XIII.  ALARMS/EMERGENCIES/ANNOUNCEMENTS ........................................... 20

XIV.   SEARCHES, RESTRAINTS, AND COUNTS .................................................... 20

XV.    TRANSPORTATION ....................................................................................... 21

XVI.   ADA TRAINING, ACCOUNTABILITY, AND QUALITY ASSURANCE ....... 21

**TOPIC 2: ELIMINATION OF HARMFUL RESTRICTIVE HOUSING AND DISCIPLINARY PRACTICES** ........................................................................ 23

I.     SYSTEMWIDE INCREASE OF MINIMUM OUT-OF-CELL TIME ................. 23

II.    CLOSURE OF DISCIPLINARY ISOLATION (DI) CELLS AND CENTRAL MEN'S SHELTERED LIVING CELLS TO END HOUSING

Ex. Q-160

Exhibit B: Remedial Plan (DRC, County of Orange)

OF PEOPLE IN AREAS OF EXTREME SENSORY DEPRIVATION AND LACK OF PROGRAMMING SPACE ........................................................ 26

III.    CREATION OF SPECIAL MANAGEMENT UNIT (SMU) STATUS .............. 26

IV.    PROHIBITION ON DISCIPLINE FOR BEHAVIORS THAT ARE RELATED TO MENTAL HEALTH OR OTHER DISABILITY, PROHIBITION ON SANCTIONS THAT POSE RISK OF SERIOUS HARM ........................................................................................................ 32

**TOPIC 3: RIGHTS AND TREATMENT OF PEOPLE WHO IDENTIFY AS LESBIAN, GAY, BISEXUAL, TRANSGENDER, QUEER OR INTERSEX (LGBTQI) ..................................................................... 35**

I.    LGBTQI NONDISCRIMINATION POLICY, STAFF ACCOUNTABILITY ............................................................................ 35

II.    TRANSGENDER AND INTERSEX INTAKE & CLASSIFICATION PROCEDURES ...................................................................................... 36

III.    LEAST RESTRICTIVE SETTING APPROPRIATE FOR LGBTQI POPULATION ....................................................................................... 37

IV.    LGBTQI HOUSING/CLASSIFICATION REVIEW PROCEDURES ................. 38

V.    LGBTQI ACCESS TO PROGRAMS, SERVICES, AND ACTIVITIES ............ 40

VI.    SEARCHES ............................................................................................ 42

VII.    MEDICAL AND MENTAL HEALTH CARE ....................................................... 43

VIII.    LGBTQI TRAINING FOR STAFF ................................................................ 44

Ex. Q-161

Exhibit B: Remedial Plan (DRC, County of Orange)

# REMEDIAL PLAN FOR THE ORANGE COUNTY JAIL REGARDING THE TREATMENT OF PEOPLE WITH DISABILITIES, RESTRICTIVE HOUSING, AND THE TREATMENT OF PEOPLE WHO IDENTIFY AS LESBIAN, GAY, BISEXUAL, TRANSEXUAL, QUEER, OR INTERSEX (LGBTQI)

## DEFINITIONS

A.  **"County"** refers to the Orange County Sheriff's Department and the Orange County Health Care Agency's Correctional Health Services.

B.  **"Disability"** means any physical, cognitive, developmental, intellectual, mental, or sensory impairment that substantially limits one or more major life activities.

C.  **"Effective Communication"** means that whatever is written or spoken must be as clear and understandable to the person with a disability as reasonably possible.

D.  **"Gender Identity"** refers to an individual's internal, personal sense of their own gender, which may or may not be associated with a person's assigned sex at birth.

E.  **"Gender Expression"** means gender-related traits that may or may not be consistent with those traits typically associated with a person's assigned sex at birth.

F.  **"Gender-Variant"** refers to having gender-related traits that are not typically associated with a person's assigned sex at birth.

G.  **"Intellectual/Developmental Disability"** is a disability characterized by significant limitations in intellectual functioning (such as learning, reasoning, and problem-solving) and in adaptive behavior (conceptual skills such as language, literacy, money, time, and self-direction; social and interpersonal skills; and practical skills such as personal care and schedules/routines). This includes people for whom the onset of the disability occurred before age 18 (developmental disabilities) and people for whom events later in life resulted in similar limitations (*e.g.*, traumatic head injury, stroke, or dementia).

H.  **"Intersex"** refers to people who are born with variations in chromosomes, genitals, or reproductive organs that do not align with typical definitions of female or male.

I.  **"LGBTQI"** is an abbreviation that refers to lesbian, gay, bisexual, transgender, queer, and intersex individuals.

[3843854.1]

Page **1**

**Ex. Q-162**

Exhibit B: Remedial Plan (DRC, County of Orange)

J.     **"Restrictive Housing"** refers to any type of housing that involves all three of the following elements: "(1) removal of an incarcerated person from the general population, whether voluntary or involuntary; (2) placement of an incarcerated person in a locked room or cell, whether alone or with another incarcerated person; and (3) the inability of the incarcerated person to leave the room or cell for the vast majority of the day, typically 22 hours or more."

K.     **"Serious Mental Illness"** means a mental disorder that may cause behavioral functioning which interferes substantially with the primary activities of daily living, and which may result in an inability to maintain stable adjustment and independent functioning without treatment, support, and rehabilitation.

L.     **"Sex"** can refer to "assigned sex at birth," which refers to the sex recorded on an individual's birth certificate at the time of birth.  **"Affirmed sex"** refers to the self-reported sex-based classification that aligns most closely with an individual's gender identity.  **"Gender marker"** or **"legal sex"** refers to an individual's gender designation on legal documents.

M.     **"Transgender"** or **"trans"** is an umbrella term for persons whose gender identity, gender expression or behavior does not conform to that typically associated with the sex to which they were assigned at birth. For example, a person who was assigned male at birth but is female may describe herself as a transgender woman, a trans woman, or a woman.  This terminology includes individuals who are nonbinary, genderqueer, or agender, among other identities.

**Ex. Q-163**

Exhibit B: Remedial Plan (DRC, County of Orange)

## <u>TOPIC 1: RIGHTS OF PEOPLE WITH DISABILITIES</u>

**I.    POLICIES AND PROCEDURES**

    A.    It shall be the policy of the County to provide equal access to the Jail's services, programs, and activities to incarcerated people with disabilities. No person with a disability, as defined in 42 U.S.C. § 12102 and under California law, shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. It shall be the policy of the County to provide reasonable accommodations or modifications where necessary to provide equal access to services, programs, or activities, consistent with the Americans with Disabilities Act ("ADA"), 28 C.F.R. § 35.130, and other applicable federal and state disability laws.

    B.    The County shall, within six (6) months of finalizing this Remedial Plan and in consultation with Counsel and the joint expert, complete revision of its policies, procedures, and practices to ensure compliance with the ADA, its implementing regulations, related federal and state disability laws, and to ensure compliance with the remedial provisions outlined herein. Implementation of revised policies, procedures, and practices will proceed expeditiously and consistent with the parties' agreement. The six-month implementation deadline will not apply to the County's development of a disability tracking system, addressed in Paragraph II.A.

**II.    ADA TRACKING PROCEDURES**

    A.    The County shall implement a centralized, real-time networked electronic system to identify and track all incarcerated people with disabilities and their specific accommodation needs (the "ADA Tracking System"). The County will make best efforts to implement the ADA Tracking System by January 1, 2023, and will provide notice of any delay to this timeline to allow the parties to confer and address the matter. Until the new ADA Tracking System is in place, the County shall continue to use its existing system for tracking incarcerated person's disabilities and their specific accommodation needs ("Existing ADA Tracking System").

    B.    The ADA Tracking System shall identify:

        1.    All types of disabilities, including but not limited to mental health, Intellectual/Developmental Disability, learning, speech, hearing, vision, mobility, dexterity, upper extremity, or other physical or sensory disabilities;

        2.    Disability-related health care needs;

Ex. Q-164

Exhibit B: Remedial Plan (DRC, County of Orange)

    3.      Barriers to communication, including but not limited to
Intellectual/Developmental Disability, learning, and hearing, speech,
or vision disabilities;

    4.      Accommodation needs, including but not limited to accommodations
related to housing, programming, classification, Effective
Communication, adaptive supports, and health care appliances,
assistive devices, and/or durable medical equipment
("HCA/AD/DME");

C.      The ADA Tracking System's information shall be readily accessible to and
used by all custody, medical, mental health, program, and other staff who
need such information to ensure appropriate accommodations, adaptive
supports and meaningful access for persons with disabilities.

D.      The ADA Tracking System shall not be called the "Special Needs List."

## III.   IDENTIFYING PEOPLE WITH DISABILITIES

A.      The County shall, throughout a person's time in custody, take steps to
identify and verify each person's disability and disability-related needs.

B.      During the medical intake screening conducted for every person booked
into the Jail, CHS staff shall take steps to identify and verify each person's
disability and disability-related needs, including based on:

    1.      The individual's self-identification or claim to have a disability;

    2.      Documentation of a disability in the individual's Jail health record
and/or County (OCHCA) records;

    3.      Staff observation/referral to ADA Unit regarding a person who may
have a disability; or

    4.      The request of a third party (such as a family member) for an
evaluation of the individual for an alleged disability.

C.      When conducting the medical intake screening, staff shall determine if the
individual has a disability affecting communication and, if yes, provide and
document the provision of Effective Communication during the medical
intake screening.

D.      CHS staff shall conduct medical intake screenings, including for
disabilities, in settings that allow for reasonable privacy and confidentiality.

E.      When conducting screening and intake, CHS shall utilize evidence-based
and Trauma-Informed practices that take into account that many
incarcerated people have experienced trauma.

F.      If the medical intake screening identifies that the person in custody requires
any accommodations (*e.g.*, housing, HCA/AD/DME), such

Ex. Q-165

accommodations shall be provided promptly to the incarcerated person. The need for such accommodations shall also be communicated to all relevant staff and documented in the ADA Tracking System/Existing ADA Tracking System.

G.   Medical staff shall immediately notify custody staff and the ADA Compliance Unit regarding a person's disabilities and disability-related needs.

H.   All disabilities and disability-related accommodation needs identified during the intake process shall be tracked in the ADA Tracking System/Existing ADA Tracking System.

I.   CHS shall develop a process for conducting disability-related evaluations for persons in custody after the medical intake screening. Such evaluations can occur at the request of the person in custody, staff who observe a potential need for accommodation, or third parties. Like the medical intake screening, such evaluation shall be conducted by a qualified health care professional to determine whether a person has a disability and, if yes, any reasonable accommodations necessary for the person to have equal access to programs, services, and activities offered at the Jail.

## IV.   ORIENTATION

A.   The County shall ensure that persons with disabilities are adequately informed of their rights under the ADA, including but not limited to:

1.   The right to reasonable accommodations;

2.   The process for requesting a reasonable accommodation;

3.   The grievance process, location of the forms, and process for getting assistance in completing grievance process;

4.   The role of the OCSD and CHS ADA Coordinators and methods to contact them;

5.   Instructions on how persons with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services; and

6.   The availability of and process for requesting access to auxiliary aids, including sign language interpreters, and other accommodations for people with disabilities affecting communication.

B.   Upon booking, persons with disabilities shall receive, in an accessible format (including in Spanish language), an orientation video regarding rules or expectations. Once they are housed, persons with disabilities shall receive, in an accessible format (including in Spanish language): the Jail

rules, the ADA information brochure and the ADA inmate qualifications/ acknowledgement of rights/programs form as part of the initial ADA interview process conducted by the ADA Compliance deputies.

C.   The County shall ensure that all information from the orientation process is communicated effectively to people with communication-related disabilities. The County shall ensure that any orientation videos are available with closed captioning, and in Spanish language.

D.   The County shall post an ADA Rights Notice that provides information about incarcerated persons' rights under the ADA, reasonable accommodations, and contact information for the ADA Coordinator. The Notice shall be prominently posted in all housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

E.   The County shall ensure that staff orient and provide individualized support for persons who are blind, low vision, deaf, hard of hearing, or who have developmental or intellectual disabilities when the County initially places such people in housing or transfers such people to a new housing unit. The orientation must be effectively communicated to ensure that the person with a disability can safely navigate the housing unit and understands how to request assistance, including from staff working in the housing unit. The nature and extent of the orientation will depend on individual need.

## V.   EFFECTIVE COMMUNICATION

A.   For people with disabilities affecting communication, the County shall assess each person's Effective Communication needs, and shall provide Effective Communication based on individual need.

B.   The County shall assess all people detained at the Jail for any period of time to determine if they have a disability that affects communication. A disability affects communication if it affects hearing, seeing, speaking, reading, writing, or understanding. Persons who have disabilities affecting communication include, but are not limited to, people who are blind or have low vision, who are deaf or hard of hearing, who have a speech, learning, Intellectual/Developmental Disability, who have traumatic brain injury, or who have a mental illness.

C.   In determining what accommodations are necessary to achieve Effective Communication, including what auxiliary aids and services may be necessary, the County shall give primary consideration to the preference of the person with Effective Communication needs.

D.   Effective auxiliary aids and services shall be provided when simple written or oral communication is not effective. Such aids may include, but are not

limited to, bilingual aides, qualified sign language interpreters, certified deaf interpreters, oral interpreters, readers, sound amplification devices, captioned television/video text displays, speech-to-text and real-time captioning, videophones and other telecommunication devices for deaf persons (TDDs), video relay services, video remote interpreting services, audiotaped texts, Braille materials, large print materials, screen readers, writing materials, written notes, and signage.

E.     The County shall ensure that staff provide Effective Communication such that persons with communication-related disabilities can participate as equally as possible in Jail programs, services, and activities for which they are qualified.

F.     The requirements in subsection (G) shall apply for Effective Communication in the following situations:

1.     Due Process Events

   a.     Classification processes;

   b.     Jail disciplinary hearing and related processes;

   c.     Service of notice (to appear and/or for new charges);

   d.     Release processes;

2.     Clinical Encounters

   a.     Obtaining medical history or description of ailment or injury;

   b.     Communicating diagnosis or prognosis;

   c.     Providing medical care (note: medical care does not include medication distribution);

   d.     Performing medical evaluations;

   e.     Providing mental health care;

   f.     Performing mental health evaluation;

   g.     Providing group and individual therapy, counseling and other therapeutic activities;

   h.     Providing patient's rights advocacy/assistance;

Ex. Q-168

Exhibit B: Remedial Plan (DRC, County of Orange)

i.      Obtaining informed consent or refusal for provision of treatment;

j.      Explaining information about: medications, medical or mental health procedures, treatment, or treatment options;

k.      Explaining discharge instructions;

l.      Providing clinical assistance during a medical/mental health round (note: this requirement does not apply to performing routine medical/mental health safety checks).

G.    In the situations described in subsection (F), above, Jail staff shall:

1.      Prior to the encounter, access the ADA Tracking System or Electronic Health Record system (as applicable) and identify if the person requires reasonable accommodation(s) for Effective Communication;

2.      Provide reasonable accommodation(s) to achieve Effective Communication; and

3.      Document the method used to achieve Effective Communication and how the staff person determined that the person understood the encounter, process, and/or proceeding.

H.    Lip reading generally should not be used by staff as a means of Effective Communication. If an incarcerated person's preferred/primary method of communication is lip reading, then staff shall accommodate by speaking slowly and loudly.

I.      The County shall establish a process for logging all instances where sign language interpreters are provided to persons in custody. The County shall also log all instances where a sign language interpreter was needed but was not provided.

## VI.    INTELLECTUAL AND DEVELOPMENTAL DISABILITIES

A.    OCSD and CHS shall develop and implement comprehensive and coordinated written policies and procedures on serving incarcerated people with Intellectual/Developmental Disabilities.

B.    CHS will develop and adopt a comprehensive screening process for trained clinical staff to identify Intellectual/Developmental Disabilities, including cognitive deficits, adaptive functioning deficits, and adaptive support needs.

Ex. Q-169

Exhibit B: Remedial Plan (DRC, County of Orange)

    1.    If a person is known to have or suspected of having an Intellectual/Developmental Disability, the County shall provide a secondary screening performed by a licensed clinical psychologist within seven (7) business days.

    2.    CHS will timely contact the appropriate Regional Center and request the person's current Individualized Program Plan (IPP), with the person's authorization. Once received, health care and custody staff will review the IPP to ensure that appropriate supports and services are provided.

    3.    Whenever possible, Jail staff will work with the Regional Center and any relevant County agencies to move a person with an identified Intellectual or Developmental Disability out of custody and into a setting with appropriate supports to meet the person's individual needs.

    4.    CHS and OCSD will timely provide relevant information and input about a person's Intellectual/Developmental Disabilities and related needs to OCSD Classification and ADA Compliance Unit staff, for appropriate consideration as to housing, work assignments, disciplinary measures, and other relevant matters.

C.    A multidisciplinary team that includes appropriate health care staff shall monitor and ensure appropriate care and support for people with an Intellectual/Developmental Disability. For each patient, the multidisciplinary team will develop an individualized plan that addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, and (3) programming, housing, and accommodation needs. The multidisciplinary team's plan will be reviewed quarterly.  If a member of the team becomes aware that a person with an Intellectual/Developmental Disability has a change in (1), (2) or (3) above, the team will promptly review and, if necessary, update the person's plan.

D.    Relevant staff, including housing deputies, the ADA Compliance Unit, and work supervisors/teachers, shall be trained and informed, as appropriate, as to: (a) incarcerated people with Intellectual/Developmental Disabilities, their individualized plan, and related accommodation and adaptive support needs; and (b) staff responsibilities to provide for such needs as well as to monitor for and address any safety, vulnerability, or victimization concerns.

E.    People identified as having an Intellectual/Developmental Disability shall be provided with accommodations and adaptive supports tailored to their needs, including (but not limited to) communications at the appropriate comprehension level, more time to complete directions, and specific behavioral and activities of daily living (ADL) supports.

**Ex. Q-170**

Exhibit B: Remedial Plan (DRC, County of Orange)

1.    Jail staff will be assigned, as appropriate, to assist with health appointments, classification or disciplinary proceedings, housing/facility transfers, and other events involving potentially complex communications.

2.    The ADA Compliance Unit shall track provision of supports for people with Intellectual/Developmental Disabilities on the ADA Inmate Activity Log.

F.    Incarcerated people with Intellectual/Developmental Disabilities, as well as learning disabilities, will have access to easy reading books, magazines, and electronic tablet programs consistent with their reading and cognitive abilities, such that they have equal access to such materials as compared with other incarcerated people at the Jail.

G.    CHS and OCSD staff will provide discharge planning tailored to the needs of people with Intellectual/Developmental Disabilities, including appropriate and effective linkages to housing assistance and community-based service providers.

## VII. HEALTH CARE APPLIANCES, ASSISTIVE DEVICES, DURABLE MEDICAL EQUIPMENT

A.    The County shall immediately provide HCA/AD/DME to persons for whom HCA/AD/DME are a reasonable accommodation. The County shall ensure an individualized assessment by qualified health care staff to determine whether HCA/AD/DME is warranted and to ensure equal and meaningful access to programs, services, and activities in the Jail.

B.    The County shall track and document the inspection and maintenance of HCA/AD/DME.  Such documentation shall include the following information for each device: whether the person has all assigned HCA/AD/DME; whether the person believes the assigned HCA/AD/DME is appropriate; whether the HCA/AD/DME is in good working order; and, if the HCA/AD/DME requires repair or replacement or is inappropriate for the person, a description of the actions taken (*e.g.*, to repair/replace HCA/AD/DME, evaluation for different HCA/AD/DME, *etc.*).

C.    The County shall ensure that all County-provided wheelchairs are in working order and have features consistent with individual needs.

D.    The County shall not charge people in custody for the provision, repair, or replacement of HCA/AD/DME.

E.    **Personal HCA/AD/DME.** The County shall allow people to retain personal HCA/AD/DME (including reading glasses, as allowed by current policy), unless there is an individualized determination that doing so would create an articulated safety or security risk.

[3843854.1]

Ex. Q-171

Exhibit B: Remedial Plan (DRC, County of Orange)

1.     Where Jail staff determine it is necessary to remove an individual's personal HCA/AD/DME for safety and security reasons, the County shall immediately provide an equivalent alternative Jail-issued device unless custody staff, with supervisory review, determine and document, based on an individualized assessment, that the device constitutes a risk of bodily harm or threatens the security of the facility.

2.     If such a determination is made, an ADA Coordinator or supervisory level designee shall document the decision and reasons for it, and shall consult with medical staff within 48 hours to determine an appropriate alternative device and/or accommodation.

3.     If an individual's personal HCA/AD/DME is in need of repair, the County shall either repair the HCA/AD/DME at the County's expense or provide the person with a replacement HCA/AD/DME at the County's expense while the person is incarcerated.

4.     Any HCA/AD/DME provided by the County to replace an individual's personal HCA/AD/DME shall be sufficient to provide the person with safe access to the Jail's programs, services, and activities.

5.     If the County repairs a personal HCA/AD/DME, the County shall provide the person with an interim HCA/AD/DME while the personal HCA/AD/DME is being repaired.

F.     **Prosthetics.** The County shall permit any person who has a prosthetic limb or similar device and needs such prosthesis full use of such prosthesis while in custody absent specifically identified security concerns.

1.     If a prosthetic limb or device is removed, a health care provider will examine the person as soon as possible, and not later than the next sick call after the removal, in order to address any negative impact on the health or safety of the person and to provide an alternative device and/or accommodation.

2.     If a person requires repair or maintenance of a prosthetic limb or similar device, the County shall take prompt steps to resolve the issue, including providing interim accommodations as indicated.

3.     If CHS determines a person requires a prosthetic limb or similar device but does not have one, the County will take prompt steps to provide appropriate assessment and timely provision of prostheses or similar device. The County will provide an alternative assistive device, based on clinical assessment and meaningful consideration of the individual's stated preference, as an interim accommodation to facilitate equal access to services.

Ex. Q-172

Exhibit B: Remedial Plan (DRC, County of Orange)

G. The County shall not automatically remove HCA/AD/DME when incarcerated people are placed in temporary holding, sobering, or observation cells, and shall remove HCA/AD/DME only based on individualized security factors and only for the minimum time necessary.

H. **HCA/AD/DME Upon Release.** The County shall take steps necessary to address a person's disability needs upon release. In no event will a person in need of HCA/AD/DME be released without access to HCA/AD/DME that is in good working order and appropriate for the person's needs.

　　1. The County will ensure that any personally owned HCA/AD/DME that has been removed is returned to the incarcerated person prior to release from custody.

　　2. Upon release, if an incarcerated person does not have personal HCA/AD/DME or came to the Jail with HCA/AD/DME that is not adequate for the person's needs, the County will permit the person to retain any HCA/AD/DME that the County provided to the person while in custody, or the County will provide a comparable device. Jail staff may alternatively coordinate with the incarcerated person, the person's family or friends, and/or other County agencies to secure HCA/AD/DME for the person prior to release.

　　3. The County shall document this process in a manner that (a) can be reviewed for quality assurance and (b) ensures individual tracking and an adequate inventory of HCA/AD/DME.

## VIII. HOUSING PLACEMENTS

A. The County shall house persons with disabilities in the most integrated setting appropriate, consistent with their individual security classification, in facilities that accommodate their disabilities and in which they have equivalent access to programs, services, and activities.

B. The County shall provide persons with disabilities at all classification levels with access to out-of-cell time, programs, services, activities that is equivalent to the access provided to persons without disabilities with comparable security and classification profiles.

C. The County shall maintain a housing assignment system that utilizes information in the ADA Tracking System/Existing ADA Tracking System for each person's disability needs, including, but not limited to:

　　1. The need for ground floor housing;

　　2. The need for a lower bunk;

　　3. The need for grab bars in the cell;

　　4. The need for a cell with sufficient clearance for a wheelchair;

Ex. Q-173

Exhibit B: Remedial Plan (DRC, County of Orange)

    5.      The need for accessible toilets;

    6.      The need for accessible showers;

    7.      The need for no stairs or other obstructions in the path of travel;

    8.      The need for level terrain; and

    9.      The need for mental-health related accommodations.

D.      Classification staff shall not place persons with disabilities in:

    1.      Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

    2.      Designated medical areas unless the person is currently receiving medical care or treatment that necessitates placement in a medical setting; or

    3.      Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

E.      Sheltered Living cells

    1.      The County agrees that the Sheltered Living cells behind the O Module at Central Men's Jail create operational difficulties, including with respect to the provision of adequate out-of-cell time, program access, and socialization for incarcerated persons with disabilities. OCSD will deactivate and no longer use these Sheltered Living cells for incarcerated persons with disabilities at the earliest date feasible given COVID-related housing demands (e.g., quarantine housing) and alternative accessible housing.  OCSD will begin to re-house individuals with disabilities from Sheltered Living as soon as other accessible housing units are available.

    2.      Until the Central Men's Jail Sheltered Living cells are deactivated, the County shall house a person with a disability in the Sheltered Living cells only if there is no other placement that is consistent with the person's classification/housing needs and meets the person's accessibility needs.

F.      The County shall assist incarcerated persons with disabilities (including in wheelchairs) to access the Central Men's Jail yard from the elevators and to navigate the ramp leading to the yard. Staff shall ensure incarcerated persons with mobility disabilities are provided access to an accessible restroom when on the Central Men's Jail yard.

Exhibit B: Remedial Plan (DRC, County of Orange)

G.  The County shall conduct periodic quality assurance audits to ensure that all people in custody who require accommodations in housing are placed in housing consistent with their needs.

H.  The County shall develop a process to expeditiously move people in custody with disability-related needs who are inappropriately housed in an inaccessible placement to an accessible placement.

## IX.  ACCESS TO PROGRAMS, SERVICES, AND ACTIVITIES

A.  The County shall ensure that all persons with disabilities, including those in ADA-accessible or other specialized housing, are informed of and have equal access to programs, services, and activities available to similarly situated persons without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

1.  Dayroom and out-of-cell time;

2.  Outdoor recreation and exercise equipment;

3.  Showers;

4.  Telephones;

5.  Reading materials;

6.  Reading and scribing documents;

7.  Religious services;

8.  Educational, vocational, reentry and substance abuse programs;

9.  Work Assignments, including the Community Work Program;

10.  Medical, mental health, and dental services and treatment;

11.  Public visiting; and

12.  Attorney visiting.

B.  The County shall provide appropriate assistance to persons with disabilities so that they can meaningfully participate in Jail programs, services, and activities for which they are qualified and medically cleared.

C.  The County shall assist persons with disabilities in reading or scribing documents (legal, medical, request forms, grievances, due process, *etc.*).

D.  The County shall provide equal access to library, recreational, and educational reading materials for persons with disabilities, including providing easy reading, large-print, and Braille books; a Braille writer audiobooks; accessible electronic tablet programming; and assistive technology, as necessary.

[3843854.1]

Page **14**

**Ex. Q-175**

Exhibit B: Remedial Plan (DRC, County of Orange)

E.      The County shall log and track out-of-cell time and program participation
        to ensure that people with disabilities receive meaningful and equitable
        access to such programs and activities. At minimum, the system shall
        collect information as to:

    1.      When the County offers out-of-cell opportunities (dayroom and
            outdoor); whether the incarcerated person with a disability accepts or
            refuses the opportunity; and, if an incarcerated person accepts the
            opportunity, the amount of time spent out of cell;

    2.      The ADA Compliance Unit shall interview incarcerated persons
            with disabilities on a monthly basis. If during the interview, the
            ADA Compliance Unit discovers that a person with a disability has
            refused offers for outdoor recreation three times in a row, or has
            refused offers for dayroom three times in a row, the ADA
            Compliance Unit shall inquire and document the reason(s) for the
            refusal. The ADA Compliance Unit shall inquire whether a disability
            accommodation, mental health referral or other action is needed to
            afford meaningful access, and shall document the action taken in the
            incarcerated person's ADA Inmate Activity Log.  During the
            monthly meeting, the ADA Compliance Unit will also provide the
            incarcerated person with a message slip to contact the ADA
            Compliance Unit regarding any disability issues. If at any time prior
            to the monthly interview, any member of the ADA Compliance Unit
            becomes aware that an incarcerated person with a disability may
            need a disability accommodation, mental health referral or other
            action to afford meaningful access to out-of-cell opportunities, the
            ADA Compliance Unit will meet promptly with the incarcerated
            person and document the action taken in the incarcerated person's
            ADA Inmate Activity Log.

    3.      The County shall conduct an annual review to determine whether the
            County offers structured programs and activities, including, but not
            limited to, religious, educational, vocational, reentry, and substance
            abuse programs, on an equal basis to people with disabilities and
            whether there are access/accommodation barriers to be addressed.

## X.    ACCESS TO WORKER OPPORTUNITIES

A.      The County shall ensure equitable work opportunities for incarcerated
        persons with disabilities. Incarcerated people with disabilities who can
        perform the essential functions of a position, with or without
        accommodations, shall be considered for and placed into work
        opportunities in the same manner as incarcerated people who do not have
        disabilities and who are similarly situated with respect to other factors

[3843854.1]

Ex. Q-176

Exhibit B: Remedial Plan (DRC, County of Orange)

unrelated to disability (*e.g.*, classification level, individualized security considerations).  To ensure equitable work opportunities for incarcerated people with disabilities, the County shall:

1.  Ensure clear job descriptions that include the essential functions and clear hiring criteria that do not inappropriately screen out people with disabilities;

2.  Ensure that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations, in order to ensure appropriate work assignments and reasonable accommodations on the job;

3.  Ensure that staff supervising incarcerated workers consider, with input from the incarcerated person, reasonable accommodations that would make it possible for the incarcerated person to perform the essential job functions and/or consider whether the incarcerated person could, with or without reasonable accommodations, perform the essential job functions of another position.

4.  Ensure equitable work opportunities for incarcerated persons with intellectual disabilities, with appropriate accommodations and supports (e.g., additional supervision and training, modified production expectations, expanded timeframes for completion of projects, etc.).

B.  Nothing in this section shall prohibit the County from excluding a person from a work opportunity who would be disqualified based on factors unrelated to the person's disability, including classification level and individualized security considerations that cannot be addressed through reasonable disability-related accommodations.

## XI.  ACCESS TO COMMUNITY WORK PROGRAM

A.  The County shall ensure equal access to the Community Work Program (CWP) for people with disabilities. People with disabilities who can perform the essential functions of a CWP position, with or without accommodations, shall be considered for and placed into CWP opportunities in the same manner as people who do not have disabilities and who are similarly situated with respect to other factors unrelated to disability (*e.g.*, classification level, individualized security considerations). To ensure equitable CWP opportunities for people with disabilities, the County shall:

1.  Ensure clear job descriptions that include the essential functions and clear hiring criteria that do not inappropriately screen out people with disabilities;

Ex. Q-177

Exhibit B: Remedial Plan (DRC, County of Orange)

> 2. Ensure that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations, in order to ensure appropriate CWP assignments and reasonable accommodations on the job;
>
> 3. Ensure that staff supervising CWP workers consider, with input from the incarcerated person, reasonable accommodations that would make it possible for the person to perform the essential job functions and/or consider whether the person could, with or without reasonable accommodations, perform the essential job functions of another CWP position.
>
> 4. Ensure equitable CWP opportunities for incarcerated persons with intellectual disabilities, with appropriate accommodations and supports (e.g., additional supervision and training, modified production expectations, expanded timeframes for completion of projects, etc.).

B. The County shall end its practice of medical staff not approving people with disabilities for participation in the CWP based on a person's disabilities absent meaningful consideration of essential job functions and reasonable accommodations.

C. The County shall provide reasonable accommodations to enable incarcerated persons with disabilities to participate in work opportunities, including the CWP.

D. Nothing in this section shall prohibit the County from excluding a person from the CWP who would be disqualified based on factors unrelated to the person's disability, including classification level and individualized security considerations that cannot be addressed through reasonable disability-related accommodations.

## XII. DISABILITY-RELATED GRIEVANCE PROCESS

A. The County shall ensure that grievance policies and procedures are readily available and accessible to all persons.

> 1. The County shall inform people of the disability grievance procedures, including, but not limited to, by posting notices throughout the Jail, ensuring the grievance procedures are explained in the orientation packet, and discussing the procedures with people with disabilities during the meeting with staff from the ADA Compliance Unit that occurs within seven days of a person being identified as having a disability.

[3843854.1]

Page **17**

Ex. Q-178

Exhibit B: Remedial Plan (DRC, County of Orange)

     2.    The County shall ensure that the disability grievance procedures are effectively communicated to persons with disabilities affecting communication.

B.    The County shall track all grievances that request disability accommodations and/or raise any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy.

C.    The County shall ensure that all persons, including people with disabilities, have meaningful access to the grievance process and to grievance forms.

     1.    The County shall ensure that grievance forms are readily available to people in custody, either by placing grievance forms in the housing units in areas accessible to people in custody or ensuring that staff provide grievance forms promptly upon request, irrespective of the type of grievance raised.

     2.    Jail staff can and should attempt to address grievances informally but may not, under any circumstances, refuse to provide a requested grievance form, destroy a grievance form, or otherwise obstruct or interfere with a person's ability to submit a grievance form.

     3.    Jail staff shall assist people in custody who require accommodations to submit a grievance or to appeal a grievance response (*e.g.*, people who are blind, have an Intellectual/Development Disability, have a learning disability, or who have physical disabilities that make it difficult or impossible for them to write, or are illiterate).

D.    Responses to Grievances

     1.    The Housing Sergeant who receives the grievance or appeal shall screen all ADA-related grievances and appeals within one day of receipt to determine whether the grievance presents an urgent issue regarding a person's safety or well-being. For grievances and appeals that present an urgent issue, the County shall either (a) immediately provide an interim accommodation that addresses the urgent issue pending a final response to the grievance or (b) resolve the grievance promptly with participation of health care staff, as appropriate. For grievances that raise significant and imminent health or safety risks, the County shall address the grievance immediately.

     2.    The Facility Administrative Sergeant, in consultation with the ADA Compliance Unit, shall investigate all non-urgent ADA-related grievances and appeals and provide a written response within fourteen days of receipt.

Ex. Q-179

Exhibit B: Remedial Plan (DRC, County of Orange)

3.    In limited circumstances where the County is unable to resolve the grievance within fourteen days (e.g., the incarcerated person must be referred to a specialist and the appointment will not occur within fourteen days or the grievance involves a personnel complaint), the County should still provide a response within fourteen days.  The response should communicate why the County cannot resolve to the grievance within the fourteen-day deadline and, if relevant, provide information regarding any subsequent events scheduled to resolve the grievance (e.g., a specialist appointment) and address, as appropriate, provision of interim accommodations pending resolution .

4.    If the grievance is a request for an accommodation, the response must articulate whether the County is granting the requested accommodation, providing an alternative accommodation, or is declining to provide any accommodation. If the County is not providing the requested accommodation, the response must explain the reasoning for the decision. If the County is providing an accommodation (either the requested accommodation or an alternative), the County must document that it has provided the granted accommodation.

5.    The County shall ensure that, in responding to an ADA-related grievance, the ADA Compliance Unit receives input from all sources, including OCSD and CHS staff, as necessary to respond to the grievance. Input from CHS staff may be required in circumstances where the grievance raises a question regarding whether the grievant has a disability or whether an accommodation requested by the grievant is reasonable. CHS staff may provide input based on a records review and/or in-person evaluation conducted for purpose of responding to the grievance, as circumstances warrant.

6.    When necessary, the ADA Compliance Unit shall interview people in custody regarding their requests for accommodations to gather information about or to clarify the nature of the request for accommodation.

7.    All grievance responses shall include an explanation of the process for appealing the grievance response.

8.    The County shall ensure that it effectively communicates all grievance and appeal responses to the grievant/appellant.

9.    When a person files a grievance or appeal of a grievance response, the County shall provide a copy of the grievance or appeal to the grievant.

Ex. Q-180

Exhibit B: Remedial Plan (DRC, County of Orange)

E.    The County shall ensure that incarcerated persons do not face any retaliation for requesting accommodations or submitting grievances.

## XIII.  ALARMS/EMERGENCIES/ANNOUNCEMENTS

A.    The County shall accommodate people with disabilities with respect to alarms and emergencies.

B.    Relevant policies related to accommodations for alarms and emergencies shall be communicated to persons with disabilities using Effective Communication.

C.    The County shall communicate effectively and appropriately with persons who have disabilities that may present barriers to communication during emergencies or alarms.

D.    In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, people who have disabilities to wear visible markers to identify their disability needs (e.g., identification vests). The County shall also maintain a list, posted in such a way to be readily available to Jail staff in each unit, of persons with disabilities that may require accommodations during an alarm or emergency.

E.    The County shall ensure that people who are deaf or hard of hearing receive effective communication during alarms and emergency announcements. Staff will prioritize these persons during alarms, emergency announcements and any evacuation.

F.    Staff shall ensure that they effectively communicate all verbal announcements to persons with disabilities that affect communication. For example, staff may need to communicate verbal announcements in writing or electronic means (*e.g.*, pager) to deaf incarcerated people.

G.    Staff shall ensure that they effectively communicate all written notices to persons with disabilities that affect communication. For example, staff may need to read a written notice to blind or low vision incarcerated people or provide such notices in large print.

## XIV.  SEARCHES, RESTRAINTS, AND COUNTS

A.    The County shall ensure that incarcerated people with disabilities, including those with prosthetic limbs, receive reasonable accommodations with respect to the following:

1.    All searches, including pat searches and searches without clothing;

2.    Application of restraint equipment; and

3.    During counts.

[3843854.1]

Ex. Q-181

Exhibit B: Remedial Plan (DRC, County of Orange)

    B.    Incarcerated persons with disabilities who cannot be restrained, searched, or counted using the standard methods/processes, including but not limited to persons with certain mobility or upper extremity disabilities, using HCA/AD/DME, using prosthetic limbs, and in need of Effective Communication accommodations, must be provided reasonable accommodations.

## XV. TRANSPORTATION

    A.    The County shall provide reasonable accommodations for persons with disabilities when they are in transit, including during transport to court, between Jail facilities, or to outside health care services.

    B.    Prescribed HCA/AD/DME, including canes, for persons with disabilities shall be available to the person at all times during the transport process.

    C.    The County shall use accessible vehicles to transport persons whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. For scheduled transportation (e.g., court appearances and non-emergency outside medical appointments), the County shall schedule the accessible transportation in advance. The County shall ensure that, to the greatest extent practicable, persons who require accessible transportation are not required to wait longer for transportation than people who do not require accessible transportation. The County shall ensure that transportation staff do not ask persons who require accessible transportation to accept inaccessible transportation.

    D.    Persons with mobility impairments shall, when necessary, be provided staff assistance getting on and off transport vehicles.

## XVI. ADA TRAINING, ACCOUNTABILITY, AND QUALITY ASSURANCE

    A.    The County shall ensure all custody, health care, and other Jail staff receive annual ADA training appropriate to their position.

        1.    The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA and other federal and state disability law.

        2.    The County shall provide to all staff appropriate training on Trauma-Informed Care, which will be included in the ADA training and Crisis Intervention training (CIT).

        3.    The ADA training shall include: formalized lesson plans and in-classroom or real-time virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or

Ex. Q-182

Exhibit B: Remedial Plan (DRC, County of Orange)

otherwise qualified ADA trainers. Self-directed study may be paired with real-time ADA training.

    4.    CHS and OCSD staff shall receive periodic training on the range of potential accommodation and adaptive support needs of people with Intellectual/Developmental Disabilities.

B.    ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

C.    The County shall, in consultation with Counsel and the joint expert, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

D.    The County shall develop an ADA accountability plan intended to timely log and investigate allegations, from any source, that staff have violated the ADA or Jail ADA-related policies and procedures. OCSD staff who OCSD finds have violated the ADA or Jail ADA-related policies and procedures shall be subject to OCSD's progressive discipline policy. CHS staff who the Health Care Agency finds to have violated the ADA or Jail ADA-related policies and procedures shall be subject to the Health Care Agency's discipline policy.

**Ex. Q-183**

Exhibit B: Remedial Plan (DRC, County of Orange)

## TOPIC 2: ELIMINATION OF HARMFUL RESTRICTIVE HOUSING AND DISCIPLINARY PRACTICES

**I.     SYSTEMWIDE INCREASE OF MINIMUM OUT-OF-CELL TIME**

   A.     It is the intent of OCSD and CHS to provide as much out-of-cell time and programming to the incarcerated population as possible, consistent with security, classification, and operational needs.

   B.     Absent exigent circumstances or exigent security concerns that are documented, the County shall offer each person in custody who is not housed in the Special Management Unit a minimum of twenty-four (24) hours out of their cell each week, as follows:

       1.     At least (3) hours per day in a dayroom or other common area, for a total of at least twenty-one (21) hours per week.

           a.     OCSD will offer additional dayroom time beyond three (3) hours per day as scheduling and classification needs allow. To do so, OCSD will ensure that dayrooms in celled housing units will be available and occupied for use by incarcerated people from 0600 through 2300 hours daily, except in cases of emergency and as necessary for particular events related to the safety and security of the institution (*e.g.*, counts, searches).  Once every incarcerated person in a celled housing unit has been offered use of the dayroom and, if they choose, used the dayroom for three hours in a day, OCSD shall offer another opportunity to use the dayroom to incarcerated people who already used the dayroom or were already offered but declined the opportunity to use the dayroom. OCSD shall make efforts to rotate these opportunities for additional dayroom among the incarcerated people in a housing unit or sector so that everyone in the unit or sector can have approximately equal additional dayroom time. If everyone in the unit or sector has had an opportunity for dayroom time and everyone refuses any subsequent offer of additional dayroom time, dayroom will be closed for two hours. Incarcerated persons will then be offered dayroom on a recurring two hour cycle for the remainder of the day. If a pattern develops that an incarcerated person is refusing an offer of dayroom time in an apparent attempt to obtain a specific dayroom time, the incarcerated person will be informed that the specific dayroom time will not be offered, and will be given the opportunity to accept the offered time.

Ex. Q-184

Exhibit B: Remedial Plan (DRC, County of Orange)

       b.      When people are provided dayroom time, OCSD staff will
ensure they have ready access to toilet facilities.  This may be
accomplished by staff opening their cell door promptly upon
request (and allow them to return to dayroom after using the
toilet/sink), or other appropriate procedure.

       c.      OCSD shall document if there are exigent circumstances, if a
person is at court, or if the person is at an off-site medical
appointment, so as to preclude the provision of minimum
dayroom time on a given day.

       d.      Scheduled programming in the dayroom may be included in
the three hours per day of dayroom time.

2.      At least three (3) hours per week outdoors for exercise and/or
recreation.

       a.      OCSD will offer additional outdoor exercise and/or recreation
time beyond three (3) hours per week as scheduling and
classification needs allow.  To do so, OCSD will ensure that
all outdoor recreation areas are in use by incarcerated people
from 0600 through 2300 hours daily, except in cases of
emergency and as necessary for particular events related to
the safety and security of the institution (*e.g.*, counts,
searches).  For the outdoor space adjacent to the Theo Lacy
Barracks (the "Green Sector"), where artificial lighting is
unavailable, OCSD will ensure that the Green Sector is in use
by incarcerated people during daylight hours, except in cases
of emergency and as necessary for particular events related to
the safety and security of the institution (*e.g.*, counts,
searches).  Once every incarcerated person has been offered
use of the outdoor recreation area and, if they choose, used
the outdoor recreation area for three hours per week, OCSD
shall offer additional opportunities to use the outdoor
recreation area to incarcerated people who already used the
outdoor recreation area or were already offered the
opportunity to use the outdoor recreation area.  OCSD shall
make efforts to rotate these opportunities for additional
outdoor recreation among the incarcerated people so that
everyone can have approximately equal additional outdoor
recreation time. If everyone in the unit or sector has had an
opportunity for outdoor recreation time and everyone refuses
any subsequent offer of additional outdoor recreation time,
outdoor recreation will be closed for two hours. Incarcerated

**Ex. Q-185**

Exhibit B: Remedial Plan (DRC, County of Orange)

persons will then be offered outdoor recreation on a recurring two hour cycle for the remainder of the day. If a pattern develops that an incarcerated person is refusing an offer of outdoor recreation time in an apparent attempt to obtain a specific outdoor recreation time, the incarcerated person will be informed that the specific outdoor recreation time will not be offered, and will be given the opportunity to accept the offered time.

    b.    OCSD shall document if exigent circumstances or inclement weather affecting the safety of the outdoor recreation area preclude the provision of the minimum outdoor time in a given week.

3.    OCSD will offer additional programming, including through electronic tablets, that will be available for use when people are confined to their cells, among other times. OCSD expects that the electronic tablet program will be rolled out by the first quarter of 2023, and that tablets will be provided. OCSD will take affirmative steps to ensure that electronic tablet programming is accessible to people with disabilities (*e.g.*, vision).

C.    Consistent with safety and security needs, the County shall take steps to maximize opportunities for people in celled housing units to interact with others during out-of-cell time.

D.    The County will make best efforts to accommodate individual needs regarding the time of day for out-of-cell time (*e.g.*, for people with disabilities impacting fatigue, on sleep medications, *etc.*).

E.    The County will make best efforts to ensure that all people are offered some opportunities for out-of-cell time during normal daylight hours each week.

F.    The County shall utilize an effective electronic system for documenting and tracking the amount of out-of-cell time that each person in custody is offered and receives with respect to each of the above categories.

G.    The County shall conduct electronic audits at least weekly to ensure that OCSD is offering the required out-of-cell time consistent with the provisions set forth herein. Supervisory staff will regularly review this data for quality assurance and take steps to address any deficiencies.

**Ex. Q-186**

H.   OCSD, in coordination with CHS, may place temporary restrictions on dayroom and outdoor recreation access, such as for issues related to infectious disease control.

I.   OCSD may place temporary restrictions on dayroom and outdoor recreation access for the count, the escort of CHS or other non-custodial personnel, and for any lockdown of a facility/housing unit for security reasons.

J.   In cases where a person refuses out-of-cell time repeatedly (*e.g.*, more than 3 times in one week) and the reason for such refusals may be related to their mental health, medical, or disability status, Jail staff will make a referral to CHS (urgent or higher) for assessment and appropriate clinical follow-up.

## II.   CLOSURE OF DISCIPLINARY ISOLATION (DI) CELLS AND CENTRAL MEN'S SHELTERED LIVING CELLS TO END HOUSING OF PEOPLE IN AREAS OF EXTREME SENSORY DEPRIVATION AND LACK OF PROGRAMMING SPACE

A.   It is the intent of OCSD to end the system of Disciplinary Isolation that has historically applied in Orange County's jails.  This commitment includes ending the use of the 72 "Disciplinary Isolation" (DI) cells, including 24 cells at the Intake and Release Center (IRC), 32 cells at Theo Lacy, 12 cells at Central Men's Jail, and 4 cells at Central Women's Jail.

B.   The DI cells at IRC were recently deactivated and will no longer be used for disciplinary or any other form of housing effective.  The DI cells at IRC are designated to be repurposed for meeting space available for people in custody (legal counsel meetings, mental health contacts, etc.).

C.   OCSD recently deactivated and will no longer use the DI cells at Theo Lacy, Central Men's Jail, and Central Women's Jail for disciplinary or any other form of housing.

D.   Notwithstanding the above, OCSD may use the above-referenced cells on a temporary basis for infection control or exigent security reasons.

## III.   CREATION OF SPECIAL MANAGEMENT UNIT (SMU) STATUS

A.   With the deactivation of the Disciplinary Isolation cells, OCSD shall revise its Disciplinary system to instead utilize a Special Management Unit (SMU).  The SMU will be in designated general modular housing unit(s) and serve as housing for people on a temporary housing status for prescribed periods of time, due to a disciplinary violation.  SMU will be utilized for only egregious and violent rule violations.

Exhibit B: Remedial Plan (DRC, County of Orange)

B.    OCSD and CHS will implement new procedures to limit the number and length of placements in the SMU, including as set forth below.

C.    OCSD shall utilize a disciplinary matrix of penalties that will include alternatives to SMU disciplinary housing status. The matrix shall set forth maximum penalties for each disciplinary violation. SMU disciplinary housing status shall be reserved for offenses involving violence, escape, possession of drugs or weapons, or posing a serious threat to the facility's safety and security or by encouraging others to engage in such misconduct.

D.    No SMU disciplinary term for a rule violation will exceed 30 days. Disciplinary SMU placements for violations that arise out of the same episode shall be served concurrently.

E.    CHS will be notified prior to the placement of any person in the SMU. A medical evaluation will be conducted within 72 hours prior to a person's placement in the SMU. A mental health evaluation will be conducted within 24 hours prior to a person's placement in the SMU.

F.    No person will be placed in the SMU prior to a disciplinary hearing, except in rare cases in which there is a current threat to safety and security of the facility that requires immediate SMU placement.

    1.    Such placement may occur only with approval of the Watch Commander. CHS will conduct a medical and mental health evaluation within eight hours of the placement.

    2.    Placement in the SMU pending a disciplinary hearing will not include the loss of any regular privileges.

G.    Upon placement in the SMU, OCSD will provide each individual, in writing and with effective communication accommodations as needed, notice as to the conditions, privileges, expectations, and incentive-based system that applies in the SMU. OCSD staff shall document that this information is communicated effectively to individuals with disabilities affecting communication.

H.    Conditions and Incentive-Based System in the SMU

    1.    A person placed in the SMU will be offered a minimum of two (2) hours per day of out-of-cell time, with opportunities for interaction with others (*e.g.*, shared dayroom time) consistent with safety and security needs.

Ex. Q-188

2.    When a person is placed in the SMU, certain privileges may initially be suspended, as determined at the disciplinary hearing.

3.    OCSD will develop an incentive-based system to facilitate reinstatement of privileges based on compliance with Jail regulations.  The incentive-based system will include consideration – at the Weekly Review (discussed below) – of early discharge from the SMU and/or reinstatement of privileges based on positive behavior, including:

    a.    Outdoor recreation

    b.    Dayroom time beyond the required two (2) hours per day

    c.    Public visiting

    d.    Access to commissary items

    e.    Access to newspapers, magazines and more than one book (the one book will be in addition to any religious materials, with a process for book exchange promptly upon request)

    f.    Access to personal telephone calls

    g.    Electronic tablets

    h.    Cards or games

    i.    Return of personal property items

4.    OCSD will develop clear rules that are effectively communicated to incarcerated persons held in the SMU that explain under what circumstances a person can achieve early release from the SMU and/or reinstatement of privileges.

5.    Any person placed in the SMU will not be denied exercise of religion.  OCSD will ensure that people in the SMU may participate in religious programming, absent a specific security concern that is documented.

6.    Access to showers will not be restricted in the SMU.  Additional showers will be provided upon reasonable request and in cases where personal hygiene and sanitation warrant, including where necessary to accommodate people with disabilities (e.g., extra showers for individuals with incontinence).  OCSD will ensure

Exhibit B: Remedial Plan (DRC, County of Orange)

adequate documentation as to the provision of showers to each person in the SMU.

7.     Any person placed in the SMU will have normal personal mail/correspondence privileges except in cases where the person has been found to have violated correspondence regulations, in which case correspondence may be suspended for no longer than seventy-two (72) hours without the review and approval of the Administrative Captain.

8.     Any person placed in the SMU will have access to the telephone on request to contact an attorney, the courts, or for personal emergencies.

9.     Access to legal counsel shall not be restricted as a disciplinary measure.

10.    Any person in the SMU will always be permitted one book from the Orange County Jail Library, which can be exchanged for another book promptly upon request.

I.     Regular Classification Review Process in SMU

1.     For each person held in the SMU, custody staff will conduct a review at least every seven (7) days (the "Weekly Review"), regardless of any assessed SMU term imposed, to evaluate the person's current circumstances and determine whether the person should be removed from the SMU and/or have some or all privileges reinstated.

2.     The Weekly Review will include a face-to-face interview in a private, out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with the SMU-detained person's individual case plan.

3.     As part of the Weekly Review, custody staff shall confer with mental health and medical staff about whether the SMU setting and/or denial of privileges/property is causing harm or risk of harm to the individual's well-being and if so, the appropriate steps to address the issue (including removal from SMU or reinstatement of privileges/property (in particular, phone contact/visits with family/loved ones or access to reading/writing/art materials) pursuant to the incentive-based system).  Mental health and medical staff input should be documented.

Ex. Q-190

209 of 473

4.      Completion of the Weekly Review process will be overseen by the Watch Commander or other Commander-level-or-higher staff.

5.      Absent extraordinary circumstances that include a person's persistent failure to comply with facility regulations in a manner that poses a specific threat to safety and security, no SMU placement will exceed thirty (30) days.

6.      If a person is held in the SMU for 28 days, the Administrative Captain will conduct a review (the "28-Day Review"), which shall include a face-to-face interview with the person in a private out-of-cell setting (consistent with individual security needs), consultation with mental health and medical staff, and consultation with custody staff in the housing unit.

7.      If a person is retained in the SMU following completion of a Weekly Review or 28-Day Review, OCSD will document and provide the person with written notice explaining (a) the reasons for retention in the SMU, and (b) clear expectations for how the person may earn reinstatement of privileges and progress to a less restrictive setting. This information will be effectively communicated to the individual consistent with any applicable communication- and/or disability accommodation-related needs.

8.      Appropriate SMU Review form(s) will be implemented consistent with the provisions set forth herein.

J.      Hygiene Items and Writing Supplies

1.      OCSD will ensure that persons placed in the SMU receive a welfare pack containing appropriate personal hygiene items and writing supplies.

2.      Staff will provide replacement items for all allowable hygiene items and writing supplies promptly upon request, except in cases where the individual is using a particular item improperly.

3.      OCSD will ensure complete and adequate documentation of initial and replacement provision of welfare pack items, including all requests and any refusals.

4.      Any person placed on SMU restrictions will be provided reasonable access (including promptly upon request) to nail clippers, with appropriate restrictions and supervision based on individualized safety concerns.

**Ex. Q-191**

K.    OCSD shall not restrict access to Inmate Request forms or Grievance forms in the SMU.

L.    CHS health care staff will conduct rounds in the SMU at least once per shift, and mental health staff will conduct rounds in the SMU at least once per week.

    1.    These contacts will include, at a minimum: (a) conversation with each person housed in the SMU; b) visual observation of the person's cell, including the cleanliness of clothing and bed linens; (c) inquiry into whether the person would like to request a confidential meeting with a mental health or medical provider.

    2.    If a person requests a confidential medical or mental health care contact or staff identify a mental health or medical need warranting follow-up, staff shall arrange for timely evaluation and treatment in an appropriate confidential setting.

M.    In recognition of the distinct risks of Restrictive Housing placement in detention, OCSD will not place people with the following risk factors in the SMU absent rare and extraordinary circumstances in which such placement is necessary to address current, specific safety concerns that are documented, with Watch Commander review and approval, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

    1.    People diagnosed with Serious Mental Illness or who have an Intellectual or Developmental Disability;

    2.    People with significant medical or daily nursing care needs, consistent with CHS's clinical input;

    3.    People who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy, consistent with CHS's clinical input.

N.    Safety checks to maintain the safety and health of the persons in SMU and the security of the facility shall be conducted for all individuals on SMU status at least every 30 minutes, at staggered intervals.  Completion of safety checks will be timely documented.

O.    Return of Personal Property Taken During SMU Status

    1.    Any personal property that is taken from an individual who is subject to SMU disciplinary status will be clearly logged and

Exhibit B: Remedial Plan (DRC, County of Orange)

documented, and the personal property will be held in a secure
location until returned.

2.    Return of personal property should be considered during the period
of discipline as part of the incentive-based system.

3.    OCSD will return all personal property that was taken during the
SMU disciplinary period promptly following the end of the SMU
disciplinary period (i.e., within 24 hours).  OCSD will document the
return of property.

## IV.    PROHIBITION ON DISCIPLINE FOR BEHAVIORS THAT ARE RELATED TO MENTAL HEALTH OR OTHER DISABILITY, PROHIBITION ON SANCTIONS THAT POSE RISK OF SERIOUS HARM

A.    OCSD and CHS policies and procedures shall require meaningful
consideration of the relationship of each person's behavior to any mental
health disability or Intellectual/Developmental Disability, the efficacy of
disciplinary measures versus alternative interventions, and the impact of
disciplinary measures on the health and well-being of incarcerated people
with disabilities.

B.    People alleged to have committed a rules violation shall be reviewed by a
qualified mental health professional if any of the following apply:

1.    The person is housed in, or is currently referred for placement in,
any designated Mental Health Unit.

2.    The Disciplinary Hearing Officer or other jail staff have reason to
believe the person's behavior was unusual, uncharacteristic, or a
possible manifestation of mental illness, including where referral for
CHS evaluation is warranted.

3.    The person is on the mental health caseload and may be subject to
(a) Special Management Unit (SMU) placement, or (b) loss of good
time/work time credit as a consequence of the disciplinary violation
as charged.

4.    If any of the above criteria is met, a mental health clinical staff
member who is *not* the treatment provider for the patient shall
complete a Rules Violation Mental Health Review form, indicating:

a.    Whether or not the reported behavior was related to mental
illness, adaptive functioning deficits, or other disability.

Ex. Q-193

   b. Whether the person's behavior is, or may be, connected to any of the following circumstances:

     i. An acute or otherwise significant psychiatric episode

     ii. An act of self-harm or attempted suicide

     iii. A cell extraction related to provision of medical/mental health treatment

     iv. Placement in clinical restraints or seclusion.

   c. Any other mitigating factors regarding the person's behavior, disability, and/or circumstances that should be considered.

   d. Whether particular disciplinary sanctions should be avoided in light of the person's mental health disability or intellectual disability, treatment plan, or adaptive support needs (*e.g.*, the potential adverse mental health impact of denial of phone contact/visits with family members).

   e. CHS staff will consider issues of brain development and psychosocial development for young adults (generally, anyone 24 years old or younger) as part of this evaluation, including as they relate to the appropriateness of discipline for the behavior and the potential adverse impacts of particular disciplinary sanctions.

C. Consideration of Mental Health Input and Other Disability Information in Disciplinary Process

  1. The Disciplinary Hearing Officer shall ensure that incarcerated people are not disciplined for conduct that is related to their mental health disability or Intellectual/Developmental Disability.

  2. The Disciplinary Hearing Officer shall consider the mental health clinician's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

  3. The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the person in view of their Serious Mental Illness, any other relevant disability, or adaptive support needs.

    4.    OCSD shall not subject any person to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

D.    Disability-Related Accommodations During the Disciplinary Process

    1.    OCSD and CHS shall provide reasonable accommodations (e.g., staff assistant) during the hearing process for people with mental health or intellectual disabilities.

    2.    OCSD and CHS shall take reasonable steps to ensure the provision of effective communication and necessary assistance to people with disabilities at all stages of the disciplinary process.

    3.    The Disciplinary Hearing Officer will check the ADA Tracking System and ensure provision of reasonable accommodations and effective communication during the disciplinary process.

E.    Supervision and Oversight of Disciplinary Processes

    1.    OCSD shall designate a supervisory-level Disciplinary Hearing Officer for each facility, to be responsible for ensuring consistency in disciplinary practices and procedures as set forth herein.

    2.    CHS shall designate a supervisory-level clinician for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures as set forth herein.

Exhibit B: Remedial Plan (DRC, County of Orange)

## TOPIC 3: RIGHTS AND TREATMENT OF PEOPLE WHO IDENTIFY AS LESBIAN, GAY, BISEXUAL, TRANSGENDER, QUEER OR INTERSEX (LGBTQI)

**I.      LGBTQI NONDISCRIMINATION POLICY, STAFF ACCOUNTABILITY**

A.      OCSD Policy 375 (Transgender Policy) prohibits staff from discriminating against incarcerated individuals on the basis of gender, including one's gender identity, gender expression, and sexual orientation. The County requires that staff "shall treat transgender persons in a manner that shows respect for the individual's gender identity and gender expression, which includes addressing them by their preferred name and using gender pronouns appropriate to the individual's gender self-identity and expression."

B.      The County shall develop and implement procedures to ensure accountability for its LGBTQI non-discrimination policy.

   1.      The County shall develop a procedure to track complaints involving LGBTQI-involved discrimination, including as to housing placement, property, privileges, or health/mental health care. Such tracking will be used for continuous quality improvement purposes.

   2.      The County shall develop an accountability plan intended to timely log and investigate allegations, from any source, that staff have violated the LGBTQI non-discrimination policies and procedures. Any staff member who the County finds to have violated such policies and procedures shall be subject to the relevant progressive discipline policy.

   3.      The County shall ensure that any staff, contractors, agents, and incarcerated individuals may submit complaints regarding any failures to comply with LGBTQI non-discrimination policies and procedures or components stated herein.

   4.      The County shall track and analyze for quality improvement purposes the final dispositions of LGBTQI-related complaints, including staff accountability/discipline outcomes.

C.      The County shall develop and implement procedures to protect against staff and contractors disclosing an individual's LGBTQI identity. The County shall limit disclosures to specific, limited circumstances, as for purposes of the individual's safety, such as transporting someone.

Ex. Q-196

Exhibit B: Remedial Plan (DRC, County of Orange)

D.     Staff shall use (1) an individual's pronoun (including the third-person singular, they/them) appropriately and/or (2) the individual's preferred name or last name.

E.     The County shall permit individuals (including people awaiting trial) to update their Jail ID names if they have obtained a legal name change and (in cases where there are pending charges) the criminal court has recognized the name change. The County shall permit individuals to seek legal name changes and to take appropriate steps to update legal documents.  During the period of monitoring of remedial plan implementation, the County will notify DRC of any incarcerated person who obtains a legal name change.

F.     The County shall permit transgender and intersex individuals (whether sentenced or unsentenced) to update the photo on their jail ID. The County shall permit transgender individuals to update their photos on their ID to minimize the negative impacts of how such photos can "out" them (*e.g.*, if their ID photo and their current gender expression are dissimilar) or cause psychological distress.

G.     A person's self-identification as LGBTQI at any point is sufficient to trigger the protections and procedures specific to LGBTQI individuals, as set forth herein. Documentation of a medical diagnosis or legal documentation of an individual's identity, including their gender marker or legal sex, is not required for staff to respect or confirm an individual's gender identity, except in cases where there is specific evidence that a person has falsely asserted a gender identity.

1.     The fact that a person has not completed a legal name change or has not obtained a government-issued identification that reflects their affirmed sex, gender identity, or name shall not constitute evidence to justify staff not respecting the individual's gender identity.

2.     The absence of completed County's Voluntary Gender Identity Disclosure and Search Preference Form shall not constitute evidence to justify staff not respecting the individual's known gender identity.

II.    **TRANSGENDER AND INTERSEX INTAKE & CLASSIFICATION PROCEDURES**

A.     During intake and classification, Jail staff shall:

1.     Offer each transgender or intersex individual the option to complete the OCSD Voluntary Gender Identity Disclosure and Search

[3843854.1]

Page **36**

**Ex. Q-197**

Preference Form, and continue to maintain documentation of an individual's gender identity, pronoun, honorific, and search preference.

2.      Explain that the individual will not be punished if they choose not to provide such information.

3.      Explain that staff, contractors, and volunteers shall use a person's stated pronoun and honorific, and that the failure to do so may be grieved and reported.

4.      Effectively communicate how gender identity impacts classification and housing placement determinations.

5.      Ask for information about the individual's preferred housing placement (*e.g.*, male-/female-designated unit, general population/protective custody).

6.      Ensure that the above inquiries and information are communicated in a private setting.

B.      The County shall revise the Voluntary Gender Identity Disclosure and Search Preference Form to specify the following:

1.      The purpose of the form is to ensure that the County adheres to its own policies concerning transgender and intersex individuals.

2.      An individual may update the form at any time by requesting a new form from custody/ classification staff, sending a message slip, or submitting a grievance, without fear of retaliation or discipline.

3.      The form may be accessed by custodial and classification staff only for purposes of ensuring compliance with Jail policies.

## III.    LEAST RESTRICTIVE SETTING APPROPRIATE FOR LGBTQI POPULATION

A.      The County recognizes that LGBTQI individuals and people whose appearance or manner does not conform to traditional gender expectations should not be placed in more restrictive custodial settings based solely on such identification or status, or because they receive gender dysphoria treatment.

B.      The County shall not house LGBTQI individuals in more restrictive housing than otherwise indicated because of their actual or perceived sexual

orientation, gender expression, gender identity, or intersex status. The County shall house LGBTQI people in the least restrictive housing allowed by their classification and security designation.

C.  The County will establish a voluntary GBTQI Program Sector unit once the use of the housing unit is no longer necessary for social distancing, isolation or quarantine of incarcerated persons due to COVID-19.  The unit will provide expanded out-of-cell time (*i.e.*, doors open during daytime hours), access to jobs in the sector, and enhanced programming activities. Attached as **Appendix 1** is the County's planned GBTQ+ Program Sector Pilot overview and programming schedule.

   1.  Once the GBTQI Program Sector unit has been fully operational for 90 days, the County will provide a status report on the program.  The Parties will then discuss whether the County will terminate the program or whether there are any appropriate program modifications, including efforts towards adequate inclusion of transgender individuals consistent with safety and other applicable considerations.

D.  The County shall continue its efforts to ensure that lesbian and transgender/intersex individuals housed in the Jail's women-designated housing units are placed in the least restrictive setting with programming access, as appropriate to their individual circumstances.

E.  The County shall not place LGBTQI individuals in LGBTQI-specific housing without the individual's consent to such housing.

## IV.    LGBTQI HOUSING/CLASSIFICATION REVIEW PROCEDURES

A.  The County shall house LGBTQI individuals in LGBTQI-designated housing only if an individual requests such housing. If an individual requests such housing, the County may deny such a request if the individual would present specific, articulable threats to the security or safety of other individuals in such a placement.

   1.  The County shall conduct individual housing/classification assessments for each transgender and intersex individual. The County shall give "serious consideration" to each individual's views of their own safety regarding the prospective housing placement (i.e., male vs. female housing for transgender and intersex individuals; LGBTQI-specific housing vs. non-LGBTQI housing) and classification (i.e., general population vs. protective custody).

Exhibit B: Remedial Plan (DRC, County of Orange)

2. Denial of a transgender or intersex individual's stated preference is permissible only where there is a determination that the individual's stated preference presents specific and articulable management or security concerns and that the County's alternative placement ensures the individual's health and safety."

3. The County shall document decisions described in subsection (2), above, and the Classification Sergeant will review and approve of the decision.

4. The County shall not consider an individual's status of transition, or inquire into the individual's genitalia when determining housing placement.

5. The County shall document all denials of a transgender or intersex individual's stated preference for housing including classification staff's and supervisor's rationale for the decision. Such denials shall be reviewed periodically for continuous quality improvement purposes.

6. If the County denies a transgender or intersex individual's preferred housing placement, the County shall inform the incarcerated individual of the right to file a grievance about the decision.

7. The County shall prohibit retaliation against LGBTQI individuals who grieve or appeal housing placement or classification decisions.

B. The County shall re-evaluate classification, placement, and programming assignments of each transgender or intersex individual at least twice a year, including as part of any regular classification reviews.

1. At each review, the County shall inquire as to the transgender or intersex individual's current preferences and shall re-assess the individual's classification, placement, and programming assignments, consistent with the process in Section IV.A, above.

C. If an individual self-identifies as LGBTQI at any time after intake and states a preference to be assigned to a different housing placement, the County shall conduct a classification review and evaluate the individual's housing preference within 24 hours of receipt of a classification review form.

D. If an individual requests housing reassignment based on LGBTQI status, the County shall develop and implement a safety plan for that individual pending review and any reassignment. The interim placement shall not be

Ex. Q-200

Exhibit B: Remedial Plan (DRC, County of Orange)

Special Management Unit, "Total Sep," or other restrictive housing or classification, unless the individual requests such a placement for their own safety, or unless serious, specific, and articulable security or management concerns require such placement.

E.    If Jail staff identify serious, specific, and articulable security or management concerns regarding an LGBTQI individual in their housing placement, staff shall document the basis for their concerns, and the housing determination shall be referred for a classification review, consistent with the above procedures.

## V.    LGBTQI ACCESS TO PROGRAMS, SERVICES, AND ACTIVITIES

A.    The County shall ensure that all LGBTQI persons are informed of and have equal access to programs, services, and activities available to similarly situated individuals, consistent with their health and security needs and classification level. Such programs, services, and activities include, but are not limited to:

1.    Dayroom and out-of-cell time;

2.    Outdoor recreation and exercise equipment;

3.    Showers;

4.    Telephones;

5.    Television;

6.    Reading materials;

7.    Religious programming;

8.    Educational, vocational, reentry and substance abuse programs;

9.    Work Assignments, including the Community Work Program;

10.    Self-help groups and similar programs;

11.    Medical, mental health, and dental services and treatment;

12.    Public visiting;

13.    Attorney visiting;

14.    Commissary.

**Ex. Q-201**

B.    The County shall offer regular in-custody programs and support groups specifically serving the needs of LGBTQI individuals (*e.g.*, APAIT).

    1.    The County shall make such LGBTQI-specific programming available to all LGBTQI individuals (*i.e.*, pretrial, pre-sentenced, and sentenced; general population and restrictive custody, etc.). consistent with individualized safety and security assessments.

    2.    The County shall identify and collaborate with LGBTQI community groups to deliver programming in the Jail facilities.

C.    The County, with input from DRC, shall identify and procure LGBTQI community resource information and disseminate such information to incarcerated LGBTQI individuals.

D.    The County shall identify, procure, and make accessible LGBTQI reading materials to LGBTQI individuals.

E.    Showers

    1.    Transgender and intersex individuals shall be given an opportunity to shower separately from others – *i.e.*, at a separate time and/or with appropriate physical separation.

    2.    Transgender and intersex individuals shall be permitted to use showers with privacy screens.

F.    Commissary

    1.    The County shall, in consultation with DRC, facilitate transgender and intersex individuals to access gender-affirming commissary items, hygiene products, and beauty products.

    2.    The County shall provide transgender and intersex individuals additional allowances of personal hygiene products (*i.e.*, razors) to alleviate the negative mental health impact of body hair for some individuals, consistent with jail safety and security.

G.    Clothing

    1.    The County shall provide gender-affirming clothing, including, but not limited to:

        a.    Undergarments, including bras, underwear, and boxer shorts depending on the individual's stated preference;

Exhibit B: Remedial Plan (DRC, County of Orange)

        b.      Footwear in all sizes;

        c.      Binders and chest compression garments, and other types of compression garments;

        d.      Religious items in accordance with their gender; and

        e.      Make-up, hair products, hair removal tools, and other gender affirming hygiene products.

    2.    The County shall apply grooming standards based on an individual's gender identity. For example, if the County permits non-transgender women to wear their hair at a certain ponytail length, transgender women shall be allowed to wear their hair similarly.

H.    Visitation

    1.    The County shall ensure that rules on contact and affection during visiting are the same for LGBTQI and non-LGBTQI individuals, including in-person visitation and approved contact visits.

## VI.  SEARCHES

A.    Policy

    1.    For incarcerated persons who are transgender or intersex, or whose appearance or manner does not conform to traditional gender expectations, the County shall allow the individual to identify the preferred gender of Jail staff who will perform pat and strip searches of them, including through the use of the Voluntary Gender Identity Disclosure and Search Preference Form.

        a.      The County shall conduct searches in accordance with the individual's search preference, except in exigent circumstances (*i.e.*, "temporary and unforeseen circumstances that require immediate action in order to address a threat to safety or institutional security") or when performed by medical practitioners in a hospital setting.

        b.      If an individual's search preference cannot be determined, the search shall be conducted in a manner consistent with their gender identity or expression.

Ex. Q-203

Exhibit B: Remedial Plan (DRC, County of Orange)

      c.    Temporary staffing issues (e.g., not enough staff on the unit of a specific gender) shall not meet the criteria for "exigent circumstances."

   2.    The County shall ensure that strip searches of transgender and intersex individuals occur with enhanced and appropriate privacy (*e.g.*, outside the view of others not participating in the search).

   3.    The County shall not conduct genital inspections (visual or pat) to determine a transgender or intersex person's anatomy, to otherwise harass or embarrass the individual, or for any other improper purpose.

   4.    The County shall not conduct searches to punish or retaliate against incarcerated people, including people who identify as LGBTQI.

## VII.  MEDICAL AND MENTAL HEALTH CARE

A.    The County's standards of care for transgender and gender-variant individuals shall reflect community-based standards of care, including relevant UCSF guidelines and World Professional Association for Transgender Health (WPATH) Standards of Care.

B.    The County's standards of care and practice shall ensure that documentation or evidence of prior gender-affirming care is *not* a prerequisite to receiving gender-affirming care while in Jail custody.

C.    The County shall ensure that medical and mental health staff have specific knowledge of and training on gender dysphoria, and the treatment thereof, including as to the WPATH Standards of Care.

D.    The County shall ensure that a qualified medical professional and a qualified mental health professional coordinate to evaluate, diagnose, and treat patients for gender dysphoria.

E.    The County shall give transgender and intersex patients uninterrupted access to clinically indicated hormone therapy based upon an individualized assessment of the patient's medical needs in accordance with community-based standards of care.

   1.    If a patient arrives at the jail on hormone therapy, the patient shall be supplied with a prescription for hormones as a bridge, and shall be scheduled for an assessment for continued gender dysphoria care as soon as possible. Hormone therapy shall not be interrupted absent a clinical evaluation and individualized assessment of need.

Ex. Q-204

2.    The County shall accept an individual's self-attestation concerning historical hormone use. Self-attestation permits individuals to access hormone therapy immediately until an assessment for gender dysphoria is completed.

F.    Sex reassignment surgery should be considered on a case-by-case basis and provided when determined to be medically necessary for a patient.

G.    The County shall prohibit psychotherapy such as "reparative" or "conversion" therapy or attempts to alter gender identity.

## VIII.  LGBTQI TRAINING FOR STAFF

A.    The County shall provide at least biennial live/real-time training to staff and contractors, including anyone who has contact with LGBTQI individuals in custody, on LGBTQI policy, procedures, and legal requirements, including as to the following topics and as appropriate to their position:

1.    The County's non-discrimination policy;

2.    The County's complaint and grievance process for reporting alleged incidents of abuse and harassment;

3.    The Prison Rape Elimination Act;

4.    How to communicate with LGBTQI individuals professionally, effectively, and consistent with this Agreement;

5.    The impact of discrimination against LGBTQI incarcerated people;

6.    Classification, housing, programming, education, work opportunities, and integration of LGBTQI individuals in the jails;

7.    Basic information about gender identity, sexual orientation, gender expression, and privacy rights.

B.    Training, including refresher training as appropriate to their position, will be provided to all staff at least biennially. The County shall maintain records of training history.

C.    The County shall provide DRC draft LGBTQI training materials (including any updates or revisions) and shall meaningfully consider any DRC input on the content and method of delivery of the training. DRC agrees to

[3843854.1]

Page **44**

Ex. Q-205

Exhibit B: Remedial Plan (DRC, County of Orange)

complete a prompt review (*e.g.*, within 30 days) of draft training materials
to accommodate the County's training and operational needs.

**Ex. Q-206**

# GBTQ+ Program Module J

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| **8:00 AM - 10:00 AM** | | **Individual Case Management** | **Pride Process Group** | **Reentry Planning** | **Substance Abuse Group** | **Bibliotherapy** | |
| | | One-on-one case management to assist inmates with discharge planning, provide resources, and facilitate access to post-custody treatment program. | A space allowing LGBTQIA+ identifying inmates to explore issues surrounding themselves and current events. | Individual discharge planning to support inmate reintegration to the community. | Group therapy to promoting recovery from drug and alcohol addiction. | A therapeutic approach that will support program curricula. Books selected will contain LGBTQIA+ theme. | |
| **1:00 PM - 3:00 PM** | | **APAIT** | **Employment Readiness** | **Health & Wellness** | **Healthy Relationships/ Communication** | **Self-Care** | |
| | | | Prepare inmate to enter the workforce upon release from custody. Identify barriers to employment, provide resources to education and training programs, and setting realistic career goals. | Increase awareness on health issues affecting the LGBTQ+ community. | Address issues related to domestic violence, anger management, and developing effective communication skills. | Improve physical and mental health. Enhance self-esteem and promote mindfulness. | |
| **5:30 PM - 8:00 PM** | | | **Attitudes for Success (College)** | **Money Matters (College)** | **HiSet/GED (College)** | | |
| | | | Provides students with classroom discussion and information about attitudes and behaviors that influence success in their personal, educational, and career development. | Designed to provide basic financial literacy and information on budgeting. | Provide preparation for HiSet or GED exam. | | |

Ex. Q-207

# EXHIBIT R

Ex. R-208

# EXHIBIT A

*Murray v. County of Santa Barbara*

**Remedial Plan**

**Ex. R-209**

# TABLE OF CONTENTS

I.      Definitions...................................................................................................1

II.     MEDICAL CARE .......................................................................................3

    A.   **County Monitoring of Private Medical Contract** ...................................3

    B.   **Policies and Procedures** .........................................................................4

    C.   **Health Care Records** ...............................................................................4

    D.   **Space for Health Care Service Delivery** ..................................................4

    E.   **Screening on Intake** .................................................................................5

    F.   **Access to Care** .........................................................................................6

    G.   **Chronic Care** ............................................................................................8

    H.   **Pharmacy Services** ...................................................................................9

    I.   **Transgender and Gender Nonconforming Health Care** ...........................10

    J.   **Drug/Alcohol Withdrawal** .......................................................................10

    K.   **Utilization Management** ...........................................................................10

    L.   **Review of Inmate Deaths** .........................................................................11

    M.   **Discharge Planning** ..................................................................................11

    N.   **Quality Management** ................................................................................11

III.    MENTAL HEALTH CARE .........................................................................12

    A.   **Policies and Procedures** ...........................................................................12

    B.   **Intake** ........................................................................................................13

    C.   **Patient Privacy and Confidentiality** .......................................................14

    D.   **Mental Health Services, Housing, and Access to Care** ...........................15

    E.   **Psychiatric Medication Practices** ............................................................18

    F.   **Mental Health and Disability Input in the Jail Disciplinary Process** .................18

    G.   **Seclusion and Restraint** ............................................................................20

    H.   **Discharge and Reentry Services** ...............................................................20

    I.   **Cross-Agency Coordination of Mental Health Treatment and Service Need** ...21

    J.   **Continuous Quality Improvement** ...........................................................21

IV.     SUICIDE PREVENTION.............................................................................23

**Ex. R-210**

|   |   | | |
|---|---|---|---|
| A. | **Overview** | | 23 |
| B. | **Screening for Suicide Risk** | | 23 |
| C. | **Housing of Prisoners on Suicide Precautions** | | 24 |
| D. | **Treatment and Conditions for Individual Prisoners on Suicide Precautions** | | 25 |
| E. | **Supervision/Monitoring of Suicidal Prisoners** | | 26 |
| F. | **Discharge from Suicide Precautions and Follow-Up** | | 26 |
| G. | **Emergency Response** | | 27 |
| H. | **Continuous Quality Improvement** | | 28 |

| V. | DISABILITY ACCOMMODATIONS AND ACCESS, AMERICANS WITH DISABILITIES ACT (ADA) | | 28 |
|---|---|---|---|
| | A. | **Policy** | 28 |
| | B. | **ADA Coordinator** | 29 |
| | C. | **ADA Notice to Prisoners** | 29 |
| | D. | **Staff Training** | 30 |
| | E. | **ADA Tracking System** | 30 |
| | F. | **Screening for Disability and Disability-Related Needs** | 31 |
| | G. | **Disability-Related Requests and Grievances** | 32 |
| | H. | **Housing Placements** | 33 |
| | I. | **Visitation** | 34 |
| | J. | **Access to Programs, Services, and Activities** | 34 |
| | K. | **Health Care Appliances, Assistive Devices, Durable Medical Equipment** | 35 |
| | L. | **Transportation** | 36 |
| | M. | **Effective Communication** | 37 |
| | N. | **Access for Individuals with Hearing Impairments** | 39 |
| | O. | **Prisoners with Intellectual/Developmental Disabilities** | 40 |
| | P. | **Physical Accessibility Requirements** | 41 |
| | Q. | **Alarms/Emergencies** | 41 |
| | R. | **Quality Assurance** | 42 |

| VI. | ENVIRONMENTAL HEALTH AND SAFETY | | 43 |
|---|---|---|---|
| | A. | **Environmental Health and Safety Monitor** | 43 |
| | B. | **Cleanliness and Sanitation of Jail Facilities** | 43 |

ii

**Ex. R-211**

C.  Laundry ................................................................................................ 44

D.  Food Service and Kitchen Operations ............................................... 45

E.  Work Order System and Preventative Maintenance ......................... 45

F.  Chemical Control and Biohazardous Materials ................................ 46

G.  Negative Pressure Monitoring and Recording .................................. 47

H.  Emergency Response and Fire/Life Safety ........................................ 47

I.  Environment of Care Monitor Inspections, Corrective Action, and Process for Prisoners to Raise Concerns ........................................... 47

VII.  CUSTODY OPERATIONS/SEGREGATION ............................................ 48

A.  General Principles ............................................................................... 48

B.  Classification Procedures ................................................................... 48

C.  Elimination of Dangerous or Improper Physical Plant Features ...... 49

D.  Minimum Out-of-Cell Time ............................................................... 50

E.  Disciplinary Procedures ..................................................................... 51

F.  Safeguards for Prisoners Placed in Segregation ............................... 52

G.  Grievances, Inmate Request Forms, Property/Privileges in Segregation .......... 53

H.  Other Custody Operations ................................................................. 54

VIII.  STAFFING FOR HEALTH CARE SERVICES ......................................... 54

IX.  TRAINING RELATED TO TREATMENT OF PRISONERS WITH SPECIAL NEEDS ................................................................................... 55

iii

**Ex. R-212**

## MURRAY V. COUNTY OF SANTA BARBARA

## REMEDIAL PLAN

## I.   DEFINITIONS

**"Disability"** means any physical, cognitive, developmental, intellectual, mental, or sensory impairment that substantially limits one or more major life activities.

**"Effective Communication"** means that any written or spoken communication must be as clear and understandable to people with disabilities as it is for people who do not have disabilities.

**"Emergent"** in the context of a medical care referral means a medical care referral or request that manifests itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in serious disability or death.  Emergent medical conditions include shortness of breath, uncontrolled bleeding, seizures, chest pain, and hypoglycemic shock. Emergent medical care conditions are treated as an emergency by the County. Within the context of mental health referral or request, "emergent" refers to acute symptoms in which the patient is in immediate danger to him(her) self or others. Emergent mental health conditions include a patient reporting suicidality or command hallucinations to harm self or others, or who is actively engaging in self-inflicted bodily harm.

**"Health Care Appliances, Assistive Devices, Durable Medical Equipment"** (HCA/AD/DME) refers to equipment necessary to meet or accommodate a person's medical or disability-related needs, and includes, but is not limited to, prosthetic and orthotic appliances, prosthetic appliances, eyeglasses, and other equipment used to to serve a medical purpose.

**"Individual Program Plan"** or **"IPP"** is a record of the decisions made by the planning team of a person with a developmental disability, including the person with a developmental disability, their family (when appropriate), regional center representative(s) and others.

**"Intellectual/Developmental Disability"** is a disability characterized by significant limitations in intellectual functioning (such as learning, reasoning, and problem-solving) and in adaptive behavior (conceptual skills such as language, literacy, money, time, and self-direction; social and interpersonal skills; and practical skills such as personal care and schedules/routines). This includes people for whom the onset of the disability occurred before age 18 (developmental

disabilities) and people for whom events later in life resulted in similar limitations (*e.g.*, traumatic head injury, stroke, or dementia).

"**Jail**" refers to the Santa Barbara County Jail, including its current and future jail facilities.

"**Mental health caseload**" means all prisoners in the jail with a current identified need for any mental health services.

References to "**medical services**," "**medical treatment**" and "**medical staff**" includes dental services, dental treatment and dental staff, as well as pharmacy services and pharmacy staff.

"**Provider**" means physician, dentist, physician's assistant, or nurse practitioner.

"**Qualified Health Professional**" means physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide health care to patients.

"**Qualified Mental Health Professional**" means psychiatrists, psychologists, master's level social workers, licensed professional counselors (including licensed MFTs), licensed nurses, or others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide mental health care to patients.

"**Qualified Sign Language Interpreter**" ("SLI") is an individual, available on-site or through a VRI service, who is adept at American Sign Language ("ASL") and has passed a test and qualified in one of the categories established by the National Association for the Deaf (NAD) or one of the categories established by the Registry of Interpreters for the Deaf (RID). For the purposes of this agreement, no incarcerated person or custody staff may serve as a SLI.

"**Routine**" means a medical care or mental health referral or request other than an emergent or urgent medical condition. Routine medical conditions include colds, flus, complaints of pain, skin conditions, and special requests. Routine mental health conditions include the need for a medication bridge, current mental health symptoms, current mental health treatment, refusal to answer medical intake questionnaire, reporting thoughts of hopelessness, worthlessness, or a history of mental illness, or a current or history of substance abuse, violent behavior, or victimization.

"**Segregation**" means the confinement in a locked room or cell, with or without a cellmate, with limited social contact as compared with the general population, in conditions characterized by substantial isolation, which includes 22 hours per day

**Ex. R-214**

or more in a cell.  If a housing unit or location meets the above definition, the unit will be considered a Segregation unit, regardless of name.

"**Serious Mental Illness**" ("SMI") means a mental illness that results in serious functional impairment which substantially interferes with or limits one or more major life activities.

"**Structured Out-of-Cell Time**": Out-of-cell time in the designated mental health units, during which services, programs, or activities that are (1) facilitated by staff or a contractor; and (2) approved by mental health staff, are offered.

"**TTYs**" or "**TDDs**" means devices that are used with a telephone to communicate with persons who are Deaf by typing and reading communications.

"**Unstructured Out-of-Cell Time**": Out-of-cell time that is not Structured Out-of-Cell Time.

"**Urgent**" means a medical or mental care referral or request that manifests itself by acute symptoms of sufficient severity that if services are not urgently received, the patient's situation could deteriorate to the point that emergent services are necessary.  Urgent medical conditions include hives, abscesses, allergic reactions, signs and symptoms of cardiac conditions, and hypo/hyperglycemia.

"**Video Remote Interpreting service**" or "**VRI service**" means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering clear, delay-free, full-motion video and audio over high-speed connection that delivers high-quality video images as provided in 28 C.F.R. § 35.160(d).

"**Videophone**" means a device with a video camera that can perform bi-directional video and audio transmissions between people in real-time.

"**Video-Relay Services**" or "**VRS**" is a video telecommunications relay service that enables persons with hearing-related disabilities who use Sign Language to communicate with voice telephone users through video equipment, such as a Videophone, rather than through typed text.

## II.   MEDICAL CARE

### A.   County Monitoring of Private Medical Contract

1. The County shall appoint a County employee or consultant with adequate expertise to provide ongoing monitoring and oversight of the private Jail health care provider contract.

Ex. R-215

2.    The County's Department of Public Health and Behavioral Wellness shall actively monitor the Jail health care contract with any private health care services provider.

B.   **Policies and Procedures**

1.    The County will develop and implement policies and procedures related to the delivery of medical care specific to the County's Jail system. The County will have ownership and control over the final policies that are created from this process.

C.   **Health Care Records**

1.    The County shall implement an integrated electronic health records system and provide ongoing IT support.

2.    The County shall implement policies and procedures to ensure that health care staff adequately document health care contacts and treatment intervention information, including:

   a)   Patient housing location, type of health care service, and setting where the services were delivered;

   b)   Time of the health care encounter and time the note is generated in the system.

3.    The County shall implement policies and procedures to ensure that the electronic health record system is modified, maintained, and improved as needed on an ongoing basis.

4.    The County shall implement and utilize Jail health care forms that the County owns.

D.   **Space for Health Care Service Delivery**

1.    The County shall ensure sufficient and suitable clinical treatment and office space to support health care service delivery.  Space for health care services shall provide a therapeutic setting with adequate patient privacy and confidentiality.

2.    The parties recognize that paragraph 1, above, will require a remodel, reconfiguration, or renovation of the Main Jail subject to the timeframe set forth in the Stipulated Judgment.  The County and the Sheriff's Office agree that, during the period of renovations at the Main Jail, they will, to the maximum extent possible given existing physical plant limitations, take reasonable steps to provide

**Ex. R-216**

sufficient and suitable clinical treatment and office space to support health care service delivery with adequate privacy and confidentiality.

E.   **Screening on Intake**

1.   The County shall develop and implement an Intake Screening Implementation Plan that specifies standards and timelines to ensure that arriving prisoners are promptly screened for urgent health care needs (within minutes of a prisoner's arrival when possible, and in all cases within two hours of arrival), with adequate confidentiality, timely follow-up, and disability accommodations. The standards and timelines shall include medical clearance on arrival at the Jail to determine whether the prisoner must be excluded from the Jail or housed in a special placement based on medical or mental health condition, initial health screening, and an initial health assessment within timeframes based on the individual's conditions and acuity.

2.   The Intake Screening Implementation Plan shall include the following:

a)   Standards and procedures to ensure Medication Continuity, either through outside verification or on-site physician medication order;

b)   Procedures to ensure adequate review of individual health care records maintained by the County or otherwise available as part of the intake process;

c)   Infectious disease screening and follow-up;

d)   Initial Health Assessment for all incoming prisoners with chronic illnesses;

e)   Psychological Evaluation for persons with signs of development disability;

f)   Psychological Evaluation for persons with signs and/or histories of mental illness;

g)   Clinical evaluation of persons in need of detoxification with clinical determinations for any use of sobering, safety or isolation cells;

      h)  Use of a suicide risk assessment tool, with Psychological Evaluation for those with positive findings on the suicide assessment.

    3.  Registered nurses shall perform the intake health screening, and shall receive annual training on intake policies and procedures.

**F.  Access to Care**

    1.  The County shall develop and implement a Health Care Implementation Plan to provide all necessary levels of care for prisoners with health care needs and to ensure that they receive timely treatment appropriate to the acuity of their conditions, consistent with established standards of care and clear timelines for routine, urgent and emergent cases.

    2.  All non-emergent health care requests or referrals shall be reviewed by the triage RN within 12 hours of receipt and assigned a triage level for a Provider appointment of urgent or routine.

    3.  For all health care requests or referrals, the following timelines and procedures shall apply:

        a)  Patients with emergent medical conditions shall be treated or sent out for emergency treatment immediately.

        b)  Patients with urgent medical conditions shall be seen by the Provider within 12 hours of review by the triage RN.  For urgent referrals that occur on the weekend when a Provider is not on-site, medical staff shall complete a phone consultation with the Provider within 12 hours of review by the triage RN, with any clinically indicated treatment or other follow-up provided.  The Provider will conduct a face-to-face appointment with the patient on the next business day.

        c)  Patients with routine medical concerns shall be seen by the Provider within five (5) days of review by the triage RN, or sooner if clinically indicated.

        d)  All health care requests or referrals that are received shall be seen by the RN or a Provider.  The County affirms that it does not utilize a written response only process for medical care requests and referrals.

**Ex. R-218**

    e)  The County shall inform patients of the above timelines for urgent and routine care by including that information in the inmate orientation manual and on the medical request forms.

4.   The RN or Provider shall:

    a)  conduct a brief face-to-face visit with the patient in a confidential, clinical setting;

    b)  take a full set of vital signs, if appropriate;

    c)  conduct a physical exam, if appropriate;

    d)  assign a triage level for a Provider appointment of emergent, urgent, or routine;

    e)  provide over-the-counter medications pursuant to protocols; and

    f)  consult with Providers regarding patient care pursuant to protocols, as appropriate.

5.   The County shall ensure timely access to appropriate medical care based on the community standard, including with respect to medication practices, treatment, clinical and administrative treatment space, access to specialty care and hospitalization, emergency response, chronic care, infirmary or intermediate level of care, follow-up medical attention for prisoners discharged from the hospital, and supervision of medical staff.

6.   The County shall staff and schedule dental clinics to ensure timely access to clinically indicated dental care.

    a)  A qualified or appropriately trained clinician shall triage dental care requests to identify emergent or urgent dental issues that require treatment of infection or pain.

    b)  Patients with emergent dental conditions shall be treated or sent out for emergency treatment immediately.

    c)  Patients with urgent dental conditions shall be seen by a dentist within one (1) week, or sooner if clinically indicated.

    d)  Patients with routine dental concerns shall be seen by a dentist within two (2) weeks, or sooner if clinically indicated.

7.   The County shall permit patients, including those who are illiterate, non-English speaking, or otherwise unable to submit written health

Ex. R-219

care requests, to verbally request care.  Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified medical professional for response consistent with the above provisions.

8.  The County shall not prohibit patients from reporting or inquiring about multiple medical needs in the same appointment.

9.  The County shall designate and provide sufficient custody escorts to facilitate timely delivery of health care.

G.  **Chronic Care**

1.  The County shall develop and implement a Chronic Disease Management Program for the management of chronic conditions, including but not limited to diabetes mellitus and other respiratory conditions, hypertension, HIV, and hepatitis C.

2.  The Chronic Disease Management Program shall include provision of written individual treatment plans, case tracking, adherence to community standards, and routine scheduled follow up with Qualified Health Professionals including specialists.

3.  The Chronic Disease Management Program shall include, at a minimum, the following protocols, which will be regularly evaluated through quality management processes:

    a)  A Comprehensive Asthma Protocol: The protocol shall ensure that patients with significant asthma histories are regularly evaluated by physicians. Medical staff shall use appropriate diagnostic tool(s) to assess a patient's ability to breathe.  The County will allow patients to keep prescribed rescue inhalers on their person, consistent with individualized clinical and security input.

    b)  A Comprehensive Hypertension Management Protocol: The protocol shall ensure that patients with hypertension receive complete initial exams, including but not limited to lab tests and EKG's per clinical input, and medication at the appropriate times and intervals.

    c)  A Comprehensive Diabetes Management Protocol: The protocol shall ensure regular testing of blood sugar and hemoglobin A1C levels for patients with diabetes, at clinically

**Ex. R-220**

appropriate intervals. Patients shall have access to the types of insulin and dosing frequency consistent with the treatment they were receiving prior to detention or most appropriate to their individual treatment goals and correctional setting, including multiple daily injection therapy using long-acting and rapid-acting insulins and insulin pump therapy, as clinically appropriate. The County will provide a diabetes-appropriate diet, compiled by a qualified registered dietician, to prisoners with diabetes.

4.    The County shall develop policies and procedures to ensure that labs ordered by clinicians are drawn in a timely manner, that the results are reviewed by nurses and clinicians in a timely manner, that the results are communicated to patients in a timely manner, and that the results are placed in the patient's health care record in a timely manner.

## H.   Pharmacy Services

1.    The County shall develop and implement policies to ensure continuity of medication at the time of Jail arrival and throughout the period of detention. Verified medications from the community shall be continued without interruption. Prisoners with unverified medications for serious conditions shall be evaluated promptly to ensure timely provision of necessary treatment.

2.    The County shall ensure that the Jail's formulary policies and procedures are sufficient to provide adequate individualized care to patients, including through ongoing staff training on the process of requesting non-formulary medications.

3.    The County shall revise its Keep on Person medication policies and procedures for common over-the-counter medications, including but not limited to rescue inhalers for asthma treatment.

4.    The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with applicable laws and through the following:

   a)    ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically indicated to deliver the medication sooner;

Ex. R-221

b) ensuring that medical staff who administer medications to patients document in the patient's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

5. The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times, including when out to court, in transit to or from any outside appointment, or being transferred between facilities. If administration time occurs when a patient is in court, in transit or at an outside appointment, medication will be administered as close as possible to the regular administration time.

6. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

I.  **Transgender and Gender Nonconforming Health Care**

1. The County shall treat transgender prisoners based upon an individualized assessment of the patient's health care and related needs, consistent with relevant legal requirements.

J.  **Drug/Alcohol Withdrawal**

1. The County shall develop and implement drug/alcohol withdrawal policies and procedures that include specific guidelines as to the frequency and documentation of patient assessment.

K.  **Utilization Management**

1. The County shall develop and implement a utilization management (UM) system that ensures that health decisions about patient care are made with sufficient input from Providers and meaningful consideration of patients' health history and needs.

2. The UM process shall ensure that Providers and patients are promptly informed about decisions made through the UM process, including with respect to specialist referral requests.

3. The UM process shall include an appeal process to enable patients and Providers to appeal a decision denying a referral request.

Ex. R-222

L. **Review of Inmate Deaths**

    1.    The County shall complete timely and adequate death reviews, within 30 days of any death, including a clinical mortality review in all cases and a psychological autopsy if death was by suicide or is otherwise indicated. The County shall also complete a multidisciplinary administrative review to assess custodial and emergency response actions.

    2.    The death review process shall include a root cause analysis, as appropriate, and the development of corrective action plans to identify and address systemic or individual issues.

M. **Discharge Planning**

    1.    The County shall implement an in-custody discharge/reentry planning program, described in a written policy, with emphasis on prisoners who suffer from chronic mental health and medical conditions, including addiction.

    2.    The reentry services program shall include the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

N. **Quality Management**

    1.    The County shall develop a Quality Management program to regularly assess and take necessary measures to ensure quality and efficiency of care.

    2.    The County shall establish a Continuous Quality Improvement (CQI) Unit to develop tracking mechanisms and to monitor the timeliness and effectiveness of care, to be reviewed at least quarterly and with corrective action plans employed where issues are identified.

    3.    The County shall track and document all completed, delayed, and canceled medical appointments, including reasons for delays and cancelations. Such documentation shall be reviewed as part of the quality management process.

    4.    The County shall track compliance with the Chronic Disease Management Program requirements for timely provision of appointments, procedures, and medications.

Ex. R-223

5.   The County shall incorporate a systematic review of prisoner grievances related to health care into its Quality Management program.

## III.  MENTAL HEALTH CARE

### A.   Policies and Procedures

1.   The County shall develop its own county- and site-specific policies and procedures related to its jail mental health care system. Jail mental health policies and procedures shall be reviewed at least annually and updated as necessary.

2.   The County shall develop policies and procedures regarding mental health care committees that clearly describe structure, membership, and minimum meeting frequencies.

3.   The County shall ensure that its policies and procedures are consistent with the provisions of this Remedial Plan and include the following:

   a)   A written document reflecting the spectrum of mental health care programming and services provided to prisoners;

   b)   Reasonable timeframes for completion of each type of mental health care-related task or service, consistent with community and professional standards;

   c)   An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff referrals for mental health care;

   d)   Clinical monitoring of inmates, including but not limited to those who are segregated or on suicide watch;

   e)   Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff positions who have the authority to place inmates in specialized mental health housing;

   f)   Relevant mental health-related training for all staff members who are working with inmates with mental illness.

4.   The County's health screening policy and procedure shall include criteria for the triage system for intake referrals and health service

Ex. R-224

requests. Referrals shall be designated as emergent, urgent, or routine based on clinical judgment.

5. The County shall ensure that there is a licensed mental health professional on-site at the Jail facilities who, working in collaboration with the health care services administrator, shall be responsible for supervising the clinical aspects of the following functions:

   a) Treatment programming that meets the needs of the inmate population and is consistent with individualized treatment plans.

   b) Supervision of mental health staff to ensure appropriate in-service training, development of treatment plans, and health care record documentation.

   c) Treatment programming provided by outside mental health agencies.

6. The County shall develop policies and procedures to ensure that all clinical interactions (other than rounds) be conducted in a private and confidential manner, absent a specific, current risk that necessitates the presence of custody staff. Custody and mental health staff shall be trained accordingly.

7. The County shall develop policies and procedures on the use of de-escalation techniques and early involvement by Qualified Mental Health Professionals in situations involving an inmate with SMI.

8. When utilizing trainees, such as psychiatric interns, the County shall have a memorandum of agreement with the provider that addresses supervision and other appropriate requirements.

B. **Intake**

1. The County shall ensure implementation of a screening tool to identify individuals with mental illness, at risk of self-injury, or vulnerable to predation secondary to a mental illness. The screening tool shall:

   a) Identify risk factors or medication that require a mental health referral.

   b) Recommend housing and referrals based on the individual's diagnosis, strengths, and weaknesses.

    c)  Refer inmates to mental health staff for any positive finding of mental illness, and triage all referrals as urgent, emergent, or routine.

    d)  Describe signs and symptoms of conditions which justify the assignment of a DSM[1] diagnosis.

2.    The County shall implement a follow-up review process for inmates who refuse the intake screening. Upon inmate refusal at intake, the intake nurse shall provide a detailed record of the inmate's presentation and an opinion regarding the inmate's condition, with appropriate referrals to psychiatry and mental health professionals.

3.    Refusal to give consent at intake will not be considered an indication of refusal of any treatment and evaluation at a later time.

4.    Inmates entering the facility on verified medications shall receive a referral to psychiatry at the time of intake, which will be prioritized as clinically indicated.

## C.  Patient Privacy and Confidentiality

1.    The County shall provide sufficient private interviewing spaces for all clinical contacts for evaluation and/or treatment (other than rounds).

2.    It shall be the policy of the County that mental health clinicians shall not conduct their clinical contacts for evaluation and/or treatment (other than rounds) at cell-front except pursuant to documented refusals or specific, documented security concerns.

3.    For each clinical contact for evaluation and/or treatment (other than rounds), mental health staff shall document whether the encounter was confidential, including whether it took place at cell-front. If a contact occurs at cell-front or is otherwise non-confidential (*i.e.*, due to patient refusal or specific, documented security concern), the reason(s) shall be clearly documented in the individual patient record and will be reviewed as part of the County's Continuous Quality Improvement review procedures.

---

[1] Diagnostic and Statistical Manual of Mental Disorders, Current Edition, American Psychiatric Association

**Ex. R-226**

Case 2:17-cv-08003-CBW-JPR   Document 751-1   Filed 07/14/20   Page 39 of 88   Page ID #:11047

4.    The County shall implement a confidential mental health service request system that does not require patients to share confidential health information with custody or other non-health care staff.

D.    **Mental Health Services, Housing, and Access to Care**

1.    Mental health staff shall respond to mental health referrals and requests within the following timelines:

a)    Four (4) hours for emergent cases, and sooner if clinically indicated, except that during the hours of 11:00 p.m. and 7:00 a.m., medical staff shall respond to emergent cases;

b)    Twenty-four (24) hours for urgent cases, and sooner if clinically indicated;

c)    One week for routine cases, and sooner if clinically indicated.

2.    The County shall implement a policy to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

3.    The County shall develop and designate specialized mental health units, with provision of the appropriate levels of programming and treatment for each mental health care service level.

a)    The County shall provide a sufficient number of beds at all necessary levels of clinical care and levels of security, to meet the needs of the Jail population of people with SMI.

b)    The County shall develop referral criteria and policies regarding management, treatment, and placement of inmates with SMI.

c)    Mental health staff shall recommend appropriate placement in and discharge from the specialized mental health units and programs for inmates with mental illness based on clinical judgment.

d)    The County shall develop policies and procedures to house and treat inmates with mental illness at the clinically appropriate level of care.

4.    Staff shall conduct regular multidisciplinary team meetings to discuss the treatment and management of each inmate with SMI who is incapable of functioning in a general population setting or who is

Ex. R-227

housed in a specialized mental health unit, to coordinate individual health, mental health, classification and discharge needs.

    a)  The County shall include the line officer, whenever possible, in the multidisciplinary treatment team meeting. The line officer shall provide day-to-day observations on an inmate's functioning and receive input from the professional staff in management approaches.

    b)  The multidisciplinary treatment team shall determine which privileges and property shall be available to inmates. The treating clinician shall provide input as to privileges and property for inmates on psychiatric observation or suicide watch.

    c)  Treatment staff shall provide all inmates on specialty units an enhanced individualized treatment plan documented on a medical record treatment plan form and completed within the first seven days of placement on that unit. These treatment plans shall be regularly reviewed and updated as needed by the multidisciplinary treatment team, with participation of the inmate.

5.    The County shall provide a minimum of 6 hours per week, of Structured Out-of-Cell Time for therapeutic group and/or individual programming, and twelve (12) hours per week of Unstructured Out-of-Cell time (including dayroom, outdoor/recreation time, and other self-directed activities) for people with mental illness housed in specialized mental health units. The County will also provide in-cell structured programming – *i.e.*, electronic tablets – to people in these units equivalent to that provided in the general population (at least four (4) hours per day, on at least three (3) separate days per week).

    a)  It is recognized that not all inmates can participate in and/or benefit from 6 hours per week of structured treatment programming.  For those individuals with mental health treatment needs housed in the specialized mental health units and for whom fewer hours of treatment services is clinically indicated, the treating clinician will present the case and recommended treatment program to the multidisciplinary treatment team for approval. Such a Modified Individualized Treatment Plan will include a description of the diagnosis,

Ex. R-228

problems, level of functioning, medication compliance, and
rationale for scheduling fewer hours of treatment services.

b) The Modified Individualized Treatment Plan will be reviewed
by the multidisciplinary treatment team at least monthly, with
consideration of an increase in treatment activities and referral
to a higher level of care as clinically indicated.

c) The County shall establish an additional, less intensive mental
health program for individuals with mental health treatment
needs who are stable.  Such a program shall provide a
minimum of four (4) hours per week of Structured Out-of-Cell
Time for therapeutic group and/or individual programming,
subject to the Modified Individual Treatment Plan provisions
described above.

6. The County shall not house inmates with SMI meeting criteria for
placement in specialized mental health units in a segregation or
isolation unit, except as outlined below.

a) In rare cases where such an inmate presents an immediate
danger or serious danger for which there is no reasonable
alternative, such an inmate may be housed separately for the
briefest period of time necessary to address the issue, and only
with written justification for the placement that is approved by
a jail commander or designee.

b) The County shall continue to provide supervision, treatment,
and out-of-cell time consistent with the inmate's Modified
Individualized Treatment Plan.

7. The County shall develop and provide comparable and separate
services and treatment programs for male and female inmates
meeting criteria for placement in specialized mental health units.

8. The County shall provide psychiatric appointments with inmates on
the mental health caseload housing at least every 90 days, or more
often if clinically indicated, and that provide counseling services
consistent with individual need that is documented in an
individualized treatment plan.

9. Mental health staff shall provide a behavioral management plan and
regularly scheduled counseling services to inmates with severe

**Ex. R-229**

personality disorders and/or frequent episodes of suicidal ideation or self-harm.

10. The County shall ensure that clinical contact record entries indicate the inmate's housing location, the type of service, the location where mental health staff delivered the service, the date and time of the encounter, and the date and time the record is generated.

E. **Psychiatric Medication Practices**

1. The County shall, in consultation with the subject matter expert and Plaintiffs, ensure that the Jail's policies and procedures are sufficient to provide adequate individualized care to patients, including with respect to (a) non-formulary medication requests, (b) patient refusals, and (c) prescriptive practices.

2. Any inmate requesting psychiatric evaluation or treatment shall receive a timely comprehensive mental health assessment to determine clinical need for medication or other treatment.

3. No verified or prescribed psychiatric medication will be terminated or significantly changed without in-person consultation with a psychiatrist, absent clinical justification that is documented. Mental health staff shall see patients who receive significant changes in prescriptions or initiation of new medications within 30 days, unless earlier requested by patient or clinically indicated, to assess efficacy, side effects, and other follow-up as appropriate.

4. The County shall implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times (e.g., sedating medications administered at bedtime).

F. **Mental Health and Disability Input in the Jail Disciplinary Process**

1. The County shall adopt policies and procedures that require meaningful consideration of the relationship of an inmate's behavior to a mental health or intellectual disability, the appropriateness of disciplinary measures versus clinical or other interventions, and the impact of disciplinary measures on the health and well-being of inmates with disabilities.

2. The County shall develop policies and procedures on the consideration of mental health input in the disciplinary process.

**Ex. R-230**

3. In cases where an inmate with SMI, with an intellectual disability, or who is exhibiting unusual or bizarre behavior may face a disciplinary sanction, including denial of property or privileges, placement in restrictive housing, or lockdown for any period of time, a Qualified Mental Health Professional shall complete a Mental Health/Disciplinary Recommendation Form and provide written findings as to:

    a) Whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other disability;

    b) Any other mitigating factors regarding the inmate's behavior, disability, and/or circumstances that should be considered, and whether certain sanctions should be avoided in light of the inmate's mental health or intellectual disability, treatment plan, or adaptive support needs.

4. Staff shall meaningfully consider the Qualified Mental Health Professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

5. Staff shall meaningfully consider the Qualified Mental Health Professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

6. If custody staff do not follow the mental health input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, staff shall explain in writing why it was not followed.

7. Inmates shall not be subjected to discipline in any manner that prevents the delivery of mental health treatment or adaptive support needs.

8. Inmates shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

9. The County shall provide reasonable accommodations during the disciplinary process for inmates with mental health or intellectual disabilities.

**Ex. R-231**

10. The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to inmates with disabilities at all stages of the disciplinary process.

11. The County shall designate a supervisory-level custody staff member who shall be responsible for ensuring consistency in disciplinary practices and procedures. The County shall track and monitor this process, including the frequency that the recommendation of the Qualified Mental Health Professional was followed.

## G.   Seclusion and Restraint

1. The County affirms that it will not utilize clinical restraints or clinical seclusion at the Jail, except as consistent with involuntary medication court orders for people adjudicated to be Incompetent to Stand Trial who participate in any implemented in-jail restoration of competency treatment services program.

## H.   Discharge and Reentry Services

1. Inmates on the mental health caseload shall receive discharge planning that is documented. Such planning will be enhanced, as defined by policy, for inmates with SMI and/or meeting criteria for placement in the specialized mental health units.

2. Discharge plans shall include assistance with application for public benefits and social services, outpatient referrals and appointments, medical insurance, housing, substance abuse treatment, parenting and family services, inpatient treatment, and other reentry services.

3. The County will ensure that inmates taking prescribed psychiatric medications have continuity of medications, and arranging follow-up appointments with providers.

4. The County shall track the elements of discharge planning for Continuous Quality Improvement purposes. Data shall include at least the following:

   a) The total number of inmates with SMI and/or meeting criteria for placement in the specialized mental health units who are eligible for discharge planning per month.

   b) The number of those inmates with SMI and/or meeting criteria for placement in the specialized mental health units who have

Ex. R-232

received referrals for outpatient appointments, discharge medications, 5150 referrals, and other aspects of reentry services completed by the mental health care staff.

I.    **Cross-Agency Coordination of Mental Health Treatment and Service Need**

1.    The County has begun to conduct monthly Medical Administration Committee meetings, with a portion of such meetings dedicated to discussion of the treatment of Jail inmates with mental illness, to include other relevant county agencies (e.g. Behavioral Wellness). The County agrees to continue such meetings, with additional cross-agency coordination as needed to address individual and systemic issues related to inmates with mental health treatment and service needs.

2.    The County shall develop a process to ensure timely referrals to and placements in inpatient care and other higher level mental health care outside the facility.

3.    The County shall make best efforts to expedite court referrals to the State Hospital system or other treatment facilities.

4.    The County shall track and monitor the number of referrals to mental health services and facilities outside of the jail, shall track and monitor the amount of time to provide services pursuant to those referrals, and shall identify and remedy causes of delay or other identified issues.

5.    The County shall implement a policy that ensures that inmates on the mental health caseload returning from outside facilities receive timely placement in appropriate housing, continuity of medication, and timely face-to-face clinical review to ensure continuity of care and reduce the risk of decompensation cycling.

J.    **Continuous Quality Improvement**

1.    The County has implemented a Continuous Quality Improvement meetings, which are modeled after J-A-06 Continuous Quality Improvement Program Standard[2] or a similar standard.

---

[2] Standards for Health Services in Jails 2008, Essential Standard J-A- 06 Continuous Quality Improvement Program, p.10. National Commission on Correctional Healthcare 2008

**Ex. R-233**

2.  The County shall develop quality indicators for purposes of monitoring a private mental health care contract. The County shall implement a detailed tracking system that parallels the scope of contractor work requirements to ensure that the contractor is meeting the requirements of the contract. For example, the County requires Service Level Agreements with clear mental health service-related performance indicators of the contracted health care provider, to be updated and reviewed annually or more often if warranted.

3.  The Quality Improvement process studies shall include (a) a clearly articulate hypothesis and methodology to determine if standards have been met; (b) data collection; (c) analysis of data to identify trends and patterns; (d) analysis to identify the underlying causes of problems; (e) development of remedies to address problems that are identified; (f) a written plan that identifies responsible staff and establishes a specific timeline for implementation of the remedy; (g) follow-up data collection; and (h) analysis to determine if the remedies were effective.

4.  The County shall conduct periodic quality improvement reviews of the intake process to ensure that staff are accurately recording intake information and making appropriate referrals.

5.  The County shall maintain lists of all inmates referred to a higher level of mental health care with sufficient information to complete periodic quality reviews.

6.  The County shall track the number of inmates on the mental health caseload, the number of inmates with SMI, the number of inmates awaiting court-ordered psychiatric facility placement, the number of inmates referred and found appropriate for inpatient (acute) and enhanced (sub-acute/residential) mental health treatment, and the number of inmates with SMI in restrictive housing units.

7.  The County shall develop a system to log inmate requests, including a log of inmates referred for placement on the mental health caseload from booking. These logs shall be available for auditors to complete randomized studies of the referral process via the CQI Committee or the assignment of a subject matter expert under a legal agreement.

**Ex. R-234**

8. The County shall conduct periodic quality reviews to assess whether:

   a) Health service requests are retrieved in a timely manner;

   b) Health service requests are triaged within the established timeframe;

   c) A proper level of triage is assigned, based on the nature of the request;

   d) Mental health staff appropriately resolved the request; and

   e) Mental health staff resolved the request in a timely fashion.

9. The County shall monitor the frequency of psychiatric follow-up appointments as a quality measure to ensure that inmates have adequate access to the prescriber.

10. Continuous Quality Improvement studies, data, and related materials will be made available to Plaintiffs and the subject matter expert during the period of implementation and monitoring.

## IV. SUICIDE PREVENTION

### A. Overview

1. The County shall develop and implement its own Suicide Prevention Policy, which shall set forth clear procedures consistent with the provisions set forth below.

### B. Screening for Suicide Risk

1. The County shall ensure that its intake assessment procedures timely identify acute and high-risk mental health conditions, including:

   a) Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;

   b) Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;

   c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

   d) Other relevant suicide risk factors, such as:

(1) Recent significant loss (job, relationship, death of family member/close friend);

(2) History of suicidal behavior by family member/close friend;

(3) Upcoming court appearances;

   e) Transporting officer's impressions about risk.

2.  Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a history related to suicide or self-harm.

3.  When a prisoner refuses to respond to assessment questions, staff shall complete the intake screening, including the mental health and suicide risk assessments, to the maximum extent possible.  For example, staff will still complete the records/history review, if applicable, as well as the assessment of the individual's presentation and behaviors, and shall make appropriate mental health referrals when indicated.

4.  Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral, immediately referred to mental health staff, and placed in a safe setting pending the mental health contact.

5.  Mental health clinicians shall complete and document a suicide risk assessment, with the use of suicide risk assessment tool, as close to placement on suicide watch as possible and upon discharge to a lower level of observation.

C.  **Housing of Prisoners on Suicide Precautions**

1.  The County's policy and procedures shall ensure that prisoners, including those identified as being at risk for suicide, are housed and treated in the least restrictive setting appropriate to their individual clinical and safety needs.

2.  Prisoners on psychiatric observation for suicide risk shall be housed and monitored in a setting appropriate for their clinical needs.

3.  No prisoner shall be housed in a safety cell for more than twenty-four (24) hours, unless there are exceptional circumstances documented by clinical and custody staff.  Within twelve (12) hours

Ex. R-236

---

of safety cell placement, the County shall refer the patient to behavioral health for inpatient placement evaluation.

4. The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in an acute care unit as soon as possible. A patient showing no improvement or continuing deterioration after 12 hours shall be transferred to an inpatient mental health facility or hospital for evaluation and treatment.  In all other cases, after 24 hours of being housed in a safety cell, the patient shall be transferred to an appropriate inpatient mental health setting or hospital, absent exceptional circumstances documented by clinical and custody staff.

**D. Treatment and Conditions for Individual Prisoners on Suicide Precautions**

1. The County shall provide at least one daily mental health professional contact, or more as clinically indicated, for any prisoner who is identified as a current suicide risk.  The clinical contact shall be conducted in a space with sound privacy unless there are current, specific safety concerns that are documented, with supervisory-level review and approval.

2. The Jail's qualified mental health professionals shall provide input with respect to the provision of property and privileges for prisoners on suicide precautions.  Custody staff may remove property/privileges, if necessary, prior to the mental health staff evaluation of a prisoner identified as at risk. Once the mental health evaluation occurs, the qualified mental health professional and custody staff shall determine, based on clinical judgment and on a case-by-case basis, the removal and/or return of property (e.g., clothing, books, footwear, eyeglasses) and privileges.  The removal of property/privileges shall be documented with clinical justification in the health record, and shall be reviewed on a regular basis to ensure restoration of property/privileges as soon as appropriate.

3. Safety cells shall be sanitized after every use and the sewer grate inspected to ensure cleanliness and appropriate conditions.

4. The County shall provide clinically-indicated therapeutic services, including psychiatric services, to prisoners on suicide precautions or otherwise identified as at elevated risk of suicide.  The County shall provide prisoners on suicide precautions or otherwise identified as at

**Ex. R-237**

elevated risk of suicide with appropriate individual counseling and medication review in a confidential setting.

E.  **Supervision/Monitoring of Suicidal Prisoners**

   1.  The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two levels of observation:

      a)  Close observation shall be used for prisoners who are not actively suicidal but require enhanced observation to ensure safety.  Staff shall observe the prisoner at staggered intervals not less than every 15 minutes and shall document the observation as it occurs.

      b)  Constant observation shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, and considered a high risk for suicide.  An assigned staff member shall observe the prisoner on a continuous, uninterrupted basis.  The observation should be documented at 15-minute intervals.  Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

   2.  For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances.  Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

   3.  Video monitoring of prisoners on suicide precaution shall not serve as a substitute for the clinically indicated level of observation.

F.  **Discharge from Suicide Precautions and Follow-Up**

   1.  A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions.  Such assessment shall be conducted in a space with sound privacy unless there are current, specific safety concerns that are documented.

   2.  Qualified mental health professionals shall provide, and update as clinically appropriate, individualized treatment plans for all prisoners discharged from suicide precautions.  The treatment plan shall describe signs, symptoms, and circumstances in which the risk

**Ex. R-238**

of suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, appropriate individualized treatment interventions, and actions the patient or staff can take if suicidal thoughts do occur.

3. Qualified mental health professionals shall provide clinical input regarding appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge from suicide precautions. Custody and classification staff shall consider such clinical input in determining post-discharge placement and conditions of confinement, and document the reasons when clinical input is not followed. Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

4. Prisoners discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts. A qualified mental health professional shall provide, at a minimum, clinical follow-up assessment and contacts within 24 hours of discharge, and again within one week of discharge, and more often as clinically indicated.

G. **Emergency Response**

1. The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custody and medical staff shall be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

2. The County shall ensure that all emergency response equipment at the jail is inspected monthly and after each use and is repaired and replaced as needed. The County shall ensure that the jail maintains a service log for all emergency response equipment.

3. It shall be the policy of the County that any staff who discovers a prisoner attempting suicide shall immediately respond and alert other staff to call for medical personnel. Trained staff shall immediately begin to administer standard first aid and/or CPR, as appropriate.

Ex. R-239

H. **Continuous Quality Improvement**

1. The County shall track all critical incidents which include prisoner suicides, attempted suicides, and incidents involving serious self-harm. The County shall review critical incidents and related data through its quality assurance and improvement processes.

2. For each serious suicide attempt (*e.g.*, requiring hospital admission), the County shall conduct a multidisciplinary (mental health, medical, and custody) review of: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) possible precipitating factors that may have caused the victim to commit suicide or make a serious suicide attempt. The review team shall generate written recommendations (as appropriate) for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

3. The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health and suicide risk assessments, crisis response, treatment plans/behavior management plans, and post-suicide watch clinical follow-up assessment and contacts.

V. **DISABILITY ACCOMMODATIONS AND ACCESS, AMERICANS WITH DISABILITIES ACT (ADA)**

A. **Policy**

1. It is the County's policy to provide access to its programs and services to incarcerated people with disabilities, with or without reasonable accommodations, consistent with legitimate penological interests. No person with a disability, as defined in 42 U.S.C. § 12102, shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. It is the County's policy to provide reasonable accommodations or modifications, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable law.

Ex. R-240

Case 2:17-cv-08003-CAS-JPR   Document 751-2   Filed 07/14/20   Page 40 of 284   Page ID
#:1215

B. **ADA Coordinator**

1. The County shall have a designated Americans with Disabilities Act (ADA) Coordinator whose position is dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies. The ADA Coordinator shall have sufficient authority to carry out such duties, and shall work with the executive management team regarding ADA compliance, training, and program needs.

2. The County intends for the ADA Coordinator to be based at the Main Jail. Any County jail facility that does not have the ADA Coordinator on site shall have a designated staff member on site at that facility who will have responsibility to monitor day-to-day ADA compliance and will report to the ADA Coordinator.

3. The County shall clearly enumerate the job duties and training requirements for the ADA Coordinator position.

4. The County will ensure that the name of and the method for people to contact the ADA Coordinator (or facility designee) are clearly posted in the intake area and in every jail housing unit. The County will also ensure that the name and contact information (address, phone, email) of the ADA Coordinator (or facility designee) are available to the public, including posting in each jail's main lobby and online.

C. **ADA Notice to Prisoners**

1. The County shall ensure that people with disabilities held at the Jail are adequately informed of their rights, including but not limited to:

   a) The right to receive reasonable accommodations;

   b) The process for requesting a reasonable accommodation;

   c) The role of the ADA Coordinator (and designee) and method to contact them;

   d) The grievance process, location of relevant forms, and process for getting assistance in completing request and grievance forms;

   e) Instructions on how to request and access health care services, including the provision of Effective Communication and other accommodations in accessing those services.

Ex. R-241

2.    Within 6 hours of processing and classification, the County will provide all incarcerated people a Custody Operations Orientation Handbook in an accessible format, containing a designated section with ADA-related policies, procedures, and other information.  The Orientation Handbook shall be made available in large print (at least 18-point font) in English and Spanish to accommodate people with visual impairments.

3.    The County will provide an accessible video that presents the contents of the Orientation Handbook, including the ADA-related policies, procedures and information.  The County will, as appropriate, provide an SLI to interpret the contents of the Orientation Handbook to persons who are deaf or hard of hearing who use American Sign Language as their primary means of communication.

D.  **Staff Training**

1.    The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position. The County shall provide training to all staff during the academy and at least bi-annually thereafter on:

    a)  Disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA;

    b)  Use of force when interacting with people with disabilities.

2.    Staff ADA training shall include formalized lesson plans and in-classroom or virtual training for all staff provided by qualified ADA instructors.

E.  **ADA Tracking System**

1.    The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive, standardized electronic system ("ADA Tracking System") to track people with disabilities and their accommodation and Effective Communication needs.

2.    The ADA Tracking System shall identify for each prisoner, as appropriate:

    a)  Any disabilities and related health conditions;

b) Disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

c) Accommodation needs, including as to housing, classification, transportation, Effective Communication, adaptive supports, and health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

d) Class membership in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307) (*i.e.*, people held in the Jail related to a parole revocation proceeding or term), with their applicable disability classification(s) and accommodation need(s).

3. The ADA Tracking System's prisoner disability information will be readily available to custody, medical, mental health, and other staff at the Jail to ensure appropriate accommodations and adequate program access for people with disabilities. Health care staff, the ADA Coordinator, and any ADA Coordinator-designee shall have the ability to input information into the ADA Tracking System in real time.

4. The County will print a prisoner's disability accommodation need(s) on the person's wristband.

5. Staff shall check the ADA Tracking System for each prisoner, and document that check, immediately prior to:

a) Intake screening;

b) Classification interview;

c) Assignment of housing;

d) Assignment of programs;

e) Medical and mental health encounters;

f) All due process proceedings, including but not limited to, resolving grievances and disciplinary infractions;

g) All trips to court or outside health care appointments.

F. **Screening for Disability and Disability-Related Needs**

1. The County shall take steps to identify and verify each person's disability and disability-related needs, including by screening them

for disabilities during medical intake and classification. The County shall ensure that all private health care and other service providers implement any policies and procedures needed to facilitate full implementation of these provisions.

2. The County, in consultation with subject matter experts and Plaintiffs' counsel, shall revise its ADA screening process to ensure consideration of:

a) The individual's self-identification or claim to have a disability;

b) Documentation of a disability in the individual's health, custody, and any other available records;

c) Staff observation that the individual may have a disability that affects placement, program access, or Effective Communication; and

d) The request of a third party (such as a family member) for an evaluation of the individual for a possible disability.

3. The County shall ensure that ADA screening results are promptly entered in the ADA Tracking System.

G. **Disability-Related Requests and Grievances**

1. The County shall revise its ADA Request Form to contain an explanation of how to appeal a denial of accommodations.

2. The County shall provide a grievance procedure for people with disabilities to appeal any denial of an accommodation, and to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy.

3. The County shall ensure that people who are Deaf or hard of hearing are interviewed and provided a qualified SLI as part of the grievance/appeal process.

4. To ensure that ADA accommodations requests and ADA grievances are promptly addressed, the County shall:

a) Respond to an individual's Request for Accommodations within 72 hours of receipt;

b) Respond to an ADA-related grievance within 72 hours of receipt;

**Ex. R-244**

c) Establish an expedited process for urgent ADA requests and grievances (*e.g.*, situations in which a person's safety or physical well-being is at risk); and

d) Allow each person to retain accommodation(s) they possess at the time of arrival at the Jail, or that they have been previously provided by the Jail, pending review of a grievance/appeal regarding the denial or removal of such accommodation(s), absent an individualized security concern that is documented.

5. The County shall ensure that grievance forms contain an "ADA" box to indicate that a particular grievance relates to a disability-related issue. The County will ensure that disability-related grievances are so identified by the reviewing supervisor, even if the individual who submitted the grievance does not check the "ADA" box.

6. The County will ensure that grievance forms are readily available and accessible to all prisoners at all times. Grievance forms shall be made available in large print (minimum 18-point font) to accommodate people with vision impairments.

7. The County shall provide to the person with a disability a written grievance response, including the resolution, the basis for a denial (if applicable), and the process for appeal.

8. The County shall take steps to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

9. The County shall implement a specific tracking system regarding the submission, processing, and responses for disability-related grievances and complaints, and regularly review such information for quality assurance purposes.

H. **Housing Placements**

1. The County shall implement a housing assignment system that includes an individualized assessment to be completed by health care staff, the results of which shall be documented in the ADA Tracking System, of each person's functional limitations and restrictions, including but not limited to:

a) The need for a lower bunk;

Ex. R-245

b) The need for grab bars in the cell and/or shower;

c) The need for accessible toilets;

d) The need for no stairs in the path of travel; and

e) The need for level terrain.

2. People with disabilities shall be housed in the Jail consistent with their individual security classification. Classification staff shall not place prisoners with disabilities in: (a) inappropriate security classifications because no ADA-accessible cells or beds are available; (b) designated medical areas unless the prisoner is currently receiving medical care requiring such placement; or (c) any location that does not offer the same or equivalent programs, services, or activities as facilities where they would be housed absent a disability.

I. **Visitation**

1. The County shall ensure that family/personal and professional visitation areas are accessible for people with disabilities and visitors.

2. The County shall perform an individualized assessment as needed and shall ensure that people with disabilities have full access to visitation at the Jail.

J. **Access to Programs, Services, and Activities**

1. The County shall ensure people with disabilities, including those housed in specialty health care units, have equal access to programs, services, and activities available to similarly situated people without disabilities, consistent with their health and security needs. The County shall ensure that staff provide appropriate assistance to people with disabilities as needed to ensure equal access to programs, services, and activities provided at the Jail.  Such programs, services, and activities include, but are not limited to:

a) Educational, vocational, reentry and substance abuse programs

b) Work Assignments

c) Dayroom and other out-of-cell time

d) Outdoor recreation (including accessible exercise equipment)

e) Structured programming (including in-cell activities)

Ex. R-246

f) Showers

g) Telephones and/or videophones

h) Reading materials (including easy reading, large print books and other materials accessible to people with a vision-related disability)

i) Religious services

j) Family/personal and professional visits

k) Medical, mental health, and dental services and treatment

2. The County's policy shall include the provision of assistance in reading or scribing legal documents, sick call requests, grievances, documents related to disciplinary procedures, and documents related to health care encounters.

3. The County shall ensure equitable work opportunities for people with disabilities, including by ensuring: (a) clear job duty statements, with essential functions and specific criteria, for each worker position; and (b) that health care and other relevant staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments, to ensure reasonable accommodations, and to prevent improper exclusions from work opportunities.

K. **Health Care Appliances, Assistive Devices, Durable Medical Equipment**

1. The County shall establish a written policy to ensure the timely provision of safe and operational HCA/AD/DME to people with a disability based on an individualized assessment by medical staff, with a process for timely repair and replacement of such devices as needed.

2. A person's request for a particular device or other accommodation shall be given primary consideration and shall be granted unless the request is unreasonable for specific, articulated reasons allowable under the ADA, or unless other effective accommodations are available.

3. The County shall allow people to retain personal HCAs/ADs/DME (including mobility devices, glasses, and hearing aids), unless there

**Ex. R-247**

is an individualized determination that doing so would create an articulated safety or security risk.

  a) Where Jail staff determine it is necessary to remove personal HCA/AD/DME for security reasons, the County shall provide an equivalent Jail-issued device unless custody staff, with ADA Coordinator approval, determine and document, based on an individualized assessment, that the device constitutes a risk of bodily harm or threatens the security of the facility.

  b) If such a determination is made, the ADA Coordinator shall document the decision and reasons for it and shall consult with medical staff to determine an appropriate alternative accommodation.

4. The County shall implement a written policy governing the release of people who need assistive devices.

  a) The County will ensure that any personal mobility device belonging to a person is returned prior to release.

  b) If a person does not have a personal mobility device, but is ambulatory with the assistance of a cane, crutch, or walker, the prisoner will be permitted to retain such device that was used while in custody upon release, or will be provided a comparable device, upon release.

  c) If a person who is due for release requires a wheelchair, but does not have a personal wheelchair, Jail staff shall coordinate with the prisoner, family or friends, and other County agencies as needed to secure a wheelchair or take other steps to address the individual's needs upon release. The County shall document this process in the ADA Tracking System for purposes of individual tracking and quality assurance.

L. **Transportation**

1. The County shall provide reasonable accommodations for people with disabilities when they are in transit, including during transport between facilities, to and from court, or to and from outside health care services.

2. Prescribed HCAs/ADs/DME for people with disabilities, shall be available to them at all times during the transport process, including in temporary holding cells.

Ex. R-248

3. The County shall maintain a sufficient number of accessible vehicles to ensure timely transport of people with disabilities that require special transportation.  The County intends for all transport vehicles to be accessible.

4. Staff will provide assistance to people with mobility or other disabilities where necessary to ensure safe access on and off of transport vehicles.

M. **Effective Communication**

1. The County shall develop and implement a Custody Operations policy to ensure that people with disabilities receive accommodations and services necessary to provide Effective Communication, consistent with the provisions set forth herein.

2. The County shall assess all people detained at the Jail for any period of time for Effective Communication needs and take steps to provide Effective Communication based on individual need.  The County shall ensure that Jail custody and health care policies and procedures contain sufficient guidance on the provision of Effective Communication.

3. The County shall ensure that appropriate staff assess individual Effective Communication needs at the beginning of the medical intake screening and at the beginning of the classification screening, to facilitate Effective Communication throughout those and all subsequent processes.

4. Enhanced procedures for the provision of Effective Communication, as described in the paragraph below, shall apply in the following situations:

   a) Due Process Events, including the following:

      i. Classification processes

      ii. Disciplinary hearing and related processes

      iii. Service of notice (to appear and/or for new charges)

      iv. Release processes

      v. Probation encounters/meetings in custody

   b) Clinical Encounters, including the following:

Ex. R-249

       i.   Determination of medical history or description of ailment or injury

      ii.  Diagnosis or prognosis

    iii.  Medical care and medical evaluations

    iv.  Provision of mental health evaluations, rounds, group and individual therapy, counseling and other therapeutic activities

     v.  Provision of the patient's rights, informed consent, or permission for treatment

    vi.  Explanation of medications, procedures, treatment, treatment options, or surgery

   vii. Discharge instructions

5.   In the situations described in the previous paragraph, Jail staff shall:

   a)  Identify each person's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

   b)  Provide effective reasonable accommodation(s) to overcome the communication barrier; and

   c)  Document the method used to achieve Effective Communication and how the staff person determined that the person understood the encounter, process, and/or proceeding.

6.   In determining what auxiliary aid or service to provide, the County shall give primary consideration to the request of the person with Effective Communication needs.  Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and telecommunication services for deaf persons, audiotaped texts, Braille materials, large print materials, writing materials, and signage.

7.   The County shall ensure that all outside education, program, and service providers at the Jail provide Effective Communication for people participating in such programs.

Ex. R-250

N. **Access for Individuals with Hearing Impairments**

1. The County shall develop and implement a policy for newly arrived and newly identified people with hearing disabilities to determine each person's preferred method of communication.

2. Qualified Sign Language Interpreters (SLIs), on-site or through a VRI service, will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the person's primary means of Effective Communication, unless the person waives the assistance of an interpreter and/or delay would pose an urgent safety or security risk

3. The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why an SLI was not used for a person with an identified need for SLI services (e.g., waived or delay would have posed urgent safety or security risk).

4. When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

5. The County shall maintain a contract or service agreement with interpreter services, including a VRI service, in order to provide such services for deaf or hard of hearing prisoners. The County will ensure that appropriate Jail staff have sufficient guidance regarding use of such services.

6. Lip reading will not be the sole method of Effective Communication used by staff, unless the person indicates that is their preferred method of communication.

7. In cases where the use of an SLI is not practicable, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

8. The County shall make videophones available for deaf and hard of hearing people. The videophones shall provide for calls that utilize Video Relay Services (VRS) at no cost to deaf and hard of hearing prisoners, or for calls directly to another videophone.

9. The County shall provide deaf/hard of hearing people with twice as much time for calls using telecommunication relay services, such as a videophone or TDD/TTY, to account for the fact that such

Ex. R-251

conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

10. People who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, and religious programs.

11. In housing units where an individual with a hearing-related disability resides, public announcements shall be communicated as consistent with individual Effective Communication needs. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or dry erase board, or by personal notification, as consistent with individual need. These procedures shall be communicated to people during the orientation process and shall be incorporated into relevant policies and post orders.

O. **Prisoners with Intellectual/Developmental Disabilities**

1. The County shall develop and implement a comprehensive written policy and procedure regarding people with Intellectual and/or Developmental Disabilities, including:

   a) Screening;

   b) Identification of their adaptive support needs and adaptive functioning deficits; and

   c) Monitoring, management, and accommodations for people with Intellectual or Developmental Disabilities.

2. If a person is known to have or suspected of having an Intellectual or Developmental Disability, the County shall contact the appropriate Regional Center within the next business day of the person's arrival at the Jail. The County shall request the prisoner's current IPP (Individualized Program Plan), with the individual's authorization. Once received, medical and custody staff shall review the IPP to ensure that all communications and services being provided are appropriate. If the person is not a Regional Center client, the County shall request that the Regional Center (or other appropriate agency) perform an evaluation. Whenever possible, Jail staff will work with the Regional Center and any relevant County

Ex. R-252

agencies to move a person with an identified Intellectual or Developmental Disability out of custody and into a setting with appropriate supports to meet the person's individual needs.

3. People identified as having an Intellectual or Developmental Disability will be provided with accommodations tailored to their needs, which may include but are not limited to communications at the appropriate comprehension level, more time to complete directions, and specific behavioral supports.

4. A multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for people with an Intellectual or Developmental Disability. The multidisciplinary team will develop an individualized plan for each person with an Intellectual or Developmental Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, and (3) programming, housing, and accommodation needs. The multidisciplinary team's plan will be regularly reviewed and updated as needed.

P. **Physical Accessibility Requirements**

1. The County shall implement an ADA transition plan to remedy Main Jail physical plant features that could result in access barriers for people with disabilities.

2. The above ADA transition plan will be implemented in the timeframe set forth in the Stipulated Judgment. The County and the Sheriff's Office agree that, during the period of implementation of the ADA transition plan at the Main Jail, they will take all reasonable steps to promote and ensure accessibility for people with disabilities to the maximum extent possible. This includes the use of interim measures to address existing access barriers in order to ensure safety and program access for people with disabilities.

3. The County shall ensure that the North Branch Jail provides adequate accessibility for people with disabilities, consistent with accessibility requirements under federal and state law.

Q. **Alarms/Emergencies**

1. The County shall implement written policies regarding the expectations of staff as to persons with disabilities during emergencies and alarms, including as to disabilities that may affect

their ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of people with mobility-related disabilities who are unable to prone out or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant policies, and communicated to people with disabilities using Effective Communication.

2.   In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (e.g., wristbands). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of people with disabilities that may require accommodations during an alarm or emergency.

3.   The County shall install visual alarms appropriate for people who are deaf or hard of hearing.

4.   All housing units shall post notices for emergency and fire exit routes.

R.   **Quality Assurance**

1.   The County shall develop and implement written policies and procedures regarding monitoring compliance with ADA requirements and Jail ADA policies, including (but not limited to) the following:

   a)   Requests for ADA accommodations;

   b)   ADA-related grievances;

   c)   ADA-related training;

   d)   Use of the ADA Tracking System.

2.   The County shall develop an ADA accountability plan that will ensure quality assurance, track violations of the ADA and the Jail's ADA policies, and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

## VI. ENVIRONMENTAL HEALTH AND SAFETY

### A. Environmental Health and Safety Monitor

1. The County shall designate an environmental health and safety monitor ("Environment of Care Monitor") responsible for ensuring compliance with this Remedial Plan and other environmental health and safety policies and procedures. The duties of the Environment of Care Monitor will be established in writing consistent with this remedial plan. The Environment of Care Monitor will have sufficient authority to carry out such duties.

### B. Cleanliness and Sanitation of Jail Facilities

1. The County shall establish a sanitation plan to ensure that all Jail facilities maintain appropriate cleanliness. The plan shall provide for any cleaning issues requiring an established cleaning schedule and written documentation of such cleaning, including, at a minimum:

   a) Daily access to supplies and equipment for prisoners to conduct cleaning and disinfection of housing units, including floors, toilets, sinks, and showers, with a cleaning chemical that sufficiently eliminates pathogens found in living and common areas;

   b) Weekly inspections of housing units, including floors, toilets, sinks, and showers by jail staff, with prompt steps to address identified cleaning and disinfection needs;

   c) Daily cleaning of intake, health care clinics, kitchen, laundry and other common areas, such as hallways and the tunnel;

   d) Weekly cleaning of visitation rooms and classrooms, and more frequently as needed;

   e) Biweekly (*i.e.*, every other week) power washing of shower areas;

   f) Weekly cleaning of cell bars, windows, and lights;

   g) Quarterly cleaning of fans and air vents, and more frequently as necessary to ensure that they are clean and free of mold, mildew, and/or accumulation of dirt and dust.

2. Upon intake, the County shall provide prisoners an orientation regarding the Jail's expectations and procedures for cleanliness,

Ex. R-255

elimination of clutter, and proper use of personal property containers.

3.  The County shall establish a procedure to maintain cleanliness in housing areas where a prisoner is unable or unwilling to adequately clean. Where prisoners are expected to participate in cleaning, staff shall ensure appropriate assistance to people with mental illness, intellectual and developmental disabilities, or other special needs.

4.  The County shall develop and implement a policy and procedure for effective cleaning, disinfection, distribution, and repair of mattresses. The policy shall provide a process for inspection and replacement of all frayed and cracked mattresses that cannot be disinfected sufficiently to eliminate harmful bacteria.

5.  The County shall ensure that newly arrived prisoners receive a clean and serviceable mattress.  Mattresses shall be cleaned and disinfected anytime they are assigned to a different prisoner or when there is a biohazardous or bloodborne incident involving the mattress.

6.  The County shall establish procedures so that a cell is cleaned prior to a prisoner's placement in that cell.

7.  The County has committed to ensuring that each prisoner is assigned and provided a bed, as set forth in the Custody Operations/Segregation Remedial Plan.  Until such remedial provision is fully implemented, where the County uses plastic beds, or "boats," the County shall ensure that they are cleaned and disinfected anytime they are assigned to a different prisoner or when there is a biohazardous or bloodborne incident involving the mattress or boat.

C.  **Laundry**

1.  Clothing and linen exchange shall occur for all prisoners at least weekly, and more frequently when circumstances warrant. Kitchen workers shall be provided a clean kitchen uniform daily.  Whenever a prisoner presents to jail staff clothing or linen that are soiled and/or reasonably requests a clothing/linen exchange, jail staff will ensure a prompt exchange, in all cases by the end of the shift.

2.  The County shall provide, document and maintain records of training provided to prisoner-workers and staff assigned laundry

Ex. R-256

duties on chemical safety, biohazardous and bloodborne contaminated clothing and linens, use of personal protective equipment, and Material Safety Data Sheets.

3.  Staff shall make reasonable efforts to ensure that all prisoners have clean linens at all times.  Staff will make a health care referral for any prisoner refusing to exchange linens if there is reason to believe such refusal relates to the person's mental health condition. Mental health staff shall assist in resolving the situation, as appropriate.

D.  **Food Service and Kitchen Operations**

1.  Prisoners assigned to kitchen duties shall be provided with clean outer clothing daily. If during a prisoner's work shift the clothing becomes soiled, it should be replaced promptly.

2.  The County shall perform a weekly inspection of kitchen operations, with a report submitted to the Environment of Care Monitor, and shall ensure actions are taken to correct any identified issues.

3.  The County shall develop and implement policies and procedures for food service and kitchen operation as required in Section 1246 of California Code of Regulations Title 15. The policy shall include provisions for tool control, roles and responsibilities of Jail staff and the food service Contractor, employee and prisoner-worker training in food safety, and temperature monitoring. The policy shall provide that prisoner-workers are medically screened prior to being assigned to work in the kitchen.

4.  The County shall provide prisoner-workers with training and education regarding kitchen operations.

5.  The County shall conduct periodic temperature monitoring of food and take steps to ensure that food prepared as hot is served hot to the greatest extent practicable.

E.  **Work Order System and Preventative Maintenance**

1.  The County shall train staff on the process of submitting work orders.

2.  The County shall utilize the work order reporting system to schedule preventative maintenance and repairs. The system shall provide for any cleaning or maintenance requiring an established schedule, including, at a minimum

Ex. R-257

    a) Regular maintenance of plumbing;

    b) Quarterly cleaning of fans and ventilation grills;

    c) Quarterly replacement of ventilation filters;

    d) Regular external contractor monitoring of negative pressure cells and gauges;

    e) Monthly fire extinguisher inspections; and

    f) Monthly fire and life safety inspections.

3. The County shall develop and implement an environmental inspection policy with procedures that include an assessment of maintenance issues for every housing unit, including for plumbing, electrical, ventilation, painting, cleanliness, lighting, and storage of personal belongings.

## F. Chemical Control and Biohazardous Materials

1. The County shall develop and implement chemical control policies and procedures for safe storage, dilution, and distribution of chemicals used at the Jail.

2. The County shall develop and implement a chemical safety training for all staff and prisoners assigned the responsibility of cleaning. The County or County's contract provider shall maintain documentation that demonstrates evidence of training for all staff and prisoner-workers involved in cleanup.

3. The County shall revise and ensure implementation of its Communicable Disease policy, including to ensure appropriate use and concentration of pyrethrum spray.

4. The County shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, including waste. The County shall ensure that Material Safety Data Sheets are accessible anywhere chemicals are stored, mixed, or diluted.

5. The County shall ensure that staff and prisoner-workers responsible for cleaning biohazardous materials or areas suspected of being contaminated by pests (*e.g.* lice or scabies) are outfitted with protective equipment and receive appropriate supervision.

Ex. R-258

G. **Negative Pressure Monitoring and Recording**

1. The magnehelic gauges located outside the housing area to any negative airflow cell shall be checked once per shift to ensure the cells remain in a negative airflow state. When non-conformities are identified, the cell shall not be used for people with circumstances requiring a negative airflow cell, and a work order shall be submitted for prompt repair.

2. The County shall provide and document training regarding acceptable gauge readings and the steps to take if the readings are outside the acceptable range for all staff assigned to housing areas with negative airflow cells.

3. Negative pressure cells and gauges shall be tested by an external contractor on a regular schedule as part of the Jail's preventive maintenance schedule.

H. **Emergency Response and Fire/Life Safety**

1. The County shall inspect fire extinguishers monthly and hold drills to ensure all jail staff are trained consistent with NCCHC standards on emergency response. Drill documentation shall include start and stop times, the number and location of any prisoners moved as part of the drill, any noted deficiencies, and any corrective actions taken.

I. **Environment of Care Monitor Inspections, Corrective Action, and Process for Prisoners to Raise Concerns**

1. The Environment of Care Monitor shall conduct bimonthly (*i.e.*, every other month) Environmental Health and Safety inspections in every housing unit. The inspections shall include a documented assessment of and (as needed) corrective action plans for:

   a) Cleanliness of floors, walls, ceilings, bed and bedding, toilet and lavatory, cells and dayrooms surfaces;

   b) Cleanliness and disinfection of common areas and furnishings, including showers, shower chairs, plastic chairs, wheelchairs, stretchers, beds/bunks and personal property containers.

   c) Cleanliness of fans, exhaust and return ventilation grills, and the need for any maintenance repairs such as painting, broken tiles, blocked lighting, and plumbing.

Ex. R-259

Case 3:20-cv-00406-AJB-DDL   Document 751-2   Filed 04/25/23   PageID.28669   Page 279 of 473
Case 2:17-cv-08003-ESW-JFR   Document 781-1   Filed 07/04/20   Page 72 of 86   Page ID
#: 1347

2. The County shall provide a system through which class members are able to raise sanitation matters of concern. The grievances shall be reviewed by the housing unit supervisors before each shift change. Where a maintenance issue is identified, a work order shall be submitted before the end of the following shift.

# VII. CUSTODY OPERATIONS/SEGREGATION

## A. General Principles

1. Prisoners shall be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff and other prisoners.

2. The County shall not place prisoners in more restrictive settings, including Segregation, based on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

3. The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for security reasons and/or the safety of the staff or other prisoners. The County shall maintain a system by which it documents in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence.

4. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for such placement.

## B. Classification Procedures

1. The County shall implement a validated Classification System consistent with the provisions of this remedial plan.

2. The Classification System shall be based on clear criteria and procedures for placing prisoners in and removing prisoners from Segregation units. Placement in and removal from Segregation units shall be documented for all prisoners.

3. The Classification System shall facilitate the following:

   a) *Housing placements based on the behavior and clinical needs of prisoners who are identified as having Serious Mental*

Ex. R-260

*Illness*. Mental health staff shall provide input regarding the classification and placement of people with Serious Mental Illness.

    b) *Screening to determine whether a prisoner should be separated from other prisoners for safety purposes.* Where a prisoner is found to require separation from other prisoners for safety, placement will be in the least restrictive setting appropriate, and will allow for out-of-cell and recreation time consistent with the provisions herein.

4. The Classification System shall include a Classification Review Process.

    a) The Classification Review Process shall include clear, written criteria by which prisoners in a Segregation Unit can secure placement in a less restrictive setting as well as restoration of property or privileges. This review will include a private, out-of-cell interview (unless individual security issues prevent such an interview and are documented). The review shall occur at least every 30 days or sooner if circumstances warrant.

    b) If a prisoner is retained in a Segregation unit following the Classification Review, the reasons for retention and the specific steps to be taken to achieve restoration of property/privileges and transfer to a less restrictive setting will be documented.

    c) Prisoners in Segregation units will be provided an oral and written statement of the reasons for the outcome of each review, including what steps are necessary to gain restoration of property/privileges and to be moved to a less restrictive setting.

5. The County shall perform Prison Rape Elimination Act (PREA) screenings in a private location.

## C. **Elimination of Dangerous or Improper Physical Plant Features**

1. The County shall conduct an assessment of all Segregation cells and develop a plan to address structural suicide hazards, such as tie-off points within the cells, to the maximum extent feasible.

2. The County shall ensure that prisoners with serious mental illness or otherwise at elevated risk of suicide will not be housed in a cell that

**Ex. R-261**

contains attachment points or other structural suicide hazards, as follows.

    a) The County shall maintain a list of Segregation cells containing structural suicide hazards.

    b) The County shall not place any person in a Segregation cell containing structural suicide hazards if the person has a diagnosed Serious Mental Illness.

    c) The County shall assess all cells used to hold prisoners awaiting intake screening or post-intake housing placement, including as intake "overflow," and shall ensure that they are suicide-resistant and do not contain structural blind spots, to the maximum extent feasible.

3. No later than January 1, 2021, the County shall discontinue its use of the Main Jail's "double door" or other extreme isolation cells, including Central 7 and Central 8.

4. No later than January 1, 2021, the County shall discontinue its use of Segregation housing units that lack access to a dayroom, including South 1-16, West 18-29, and East 11-22. The County may retrofit such units to ensure that they provide access to a dayroom and outdoor recreation areas and that they comply with contemporary correctional standards.

## D. Minimum Out-of-Cell Time

1. Absent exigent circumstances or exigent security concerns that are documented, the County shall offer each prisoner not subject to discipline (except in the Northwest unit), at a minimum, 18 hours out of their cell each week, and other structured programming, as follows:

    a) At least six (6) hours per week outdoors for exercise/recreation

    b) At least twelve (12) hours per week in a dayroom or other common area

    c) At least four (4) hours per day, on at least three (3) separate days per week, of in-cell structured programming – *i.e.*, programming on electronic tablets.

2. For those prisoners housed in the Northwest unit, absent exigent circumstances or exigent security concerns that are documented, the

Ex. R-262

County shall offer each prisoner not subject to discipline at a minimum, 15 hours out of their cell each week, and other structured programming, as follows:

   a) At least six (6) hours per week outdoors for exercise/recreation

   b) At least nine (9) hours per week in a dayroom or other common area

   c) At least four (4) hours every other day (*i.e.*, 3 or 4 times per week, on an alternating basis), of in-cell structured programming – *i.e.*, programming on electronic tablets.

3. The County shall provide prisoners out-of-cell time daily, at appropriate times of the day – *i.e.*, not during normal sleeping hours.

4. The County shall implement a system of documenting the amount of out-of-cell time each prisoner is offered for each of the above categories.

5. The County shall conduct monthly audits to ensure that required out-of-cell time with respect to each of the above categories is made available to the jail population. Supervisory staff shall regularly review this data for quality assurance, and take steps to address any deficiencies.

6. In cases where a prisoner refuses out-of-cell time repeatedly and the reason for such refusals may be related to their mental health condition, Jail staff shall make a mental health referral for assessment and appropriate clinical follow-up.

E. **Disciplinary Procedures**

1. A prisoner may be housed in Segregation for disciplinary purposes only after the prisoner has received notice of the charges against him/her, a supervisor has conducted a disciplinary hearing at which the prisoner is given an opportunity to rebut the charges, and the prisoner is adjudicated guilty of the alleged violation(s). Where there is a serious and immediate safety risk and no other housing unit is sufficient to protect the inmate from harm, staff may place a prisoner in Segregation for the shortest period of time necessary. In such cases, supervisory custody staff will promptly review the case and must approve in writing continued retention in Segregation.

Ex. R-263

2. Prisoners serving a disciplinary term in Segregation may be subject to a reduction in out-of-cell time, including in-cell confinement not to exceed twenty-two (22) hours per day.

3. The County shall implement a 30-day maximum term in Segregation for any single or set of disciplinary violations stemming from the same incident.

4. The County shall not use safety cells for punishment.

5. The County shall not use the denial or modification of food as punishment. The County shall not use the "prison loaf" as a disciplinary diet.

F. **Safeguards for Prisoners Placed in Segregation**

1. Prior to Segregation placement of any person with Serious Mental Illness, with an intellectual disability, or who is exhibiting unusual or bizarre behavior, the County shall ensure completion of the mental health review process detailed in Section VII of the Mental Health Remedial Plan.

2. The County shall conduct visual cell checks (to ensure that prisoners are safe and breathing) for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of safety checks shall be timely documented and audited regularly by supervisory staff for quality assurance purposes.

3. Health care staff shall conduct check-ins three times per week to assess and document the health status of all prisoners in Segregation, and shall make medical and mental health referrals as necessary.

4. A Qualified Mental Health Professional shall conduct check-ins at least three times per week to assess and document the mental health status of all prisoners in Segregation and shall make referrals as necessary. The check-in shall include the following:

   a) Conversation with each prisoner;

   b) Visual observation of the prisoner's cell, including the cleanliness of the prisoner's clothing and bed linens; and

   c) Inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider.

5. If a prisoner in Segregation requests a confidential health care contact or staff identify a mental health or medical need warranting

**Ex. R-264**

follow-up, staff shall arrange for evaluation and treatment of the prisoner in an appropriate confidential setting.

6.  If health care staff observe a prisoner's medical or mental health condition deteriorate in Segregation, they shall promptly confer with supervisory level custody staff to discuss the need for higher level of care or alternative placement to address the prisoner's condition. This conference will be documented in the prisoner's record.

    a)  The County shall not place the following prisoners in Segregation unless necessary to address current, specific safety concerns that are documented, with supervisory-level review and approval, and in such cases only for the minimum time necessary to identify an alternative appropriate placement: Prisoners with acute medical or mental health needs that require an inpatient level of care and/or daily nursing care;

    b)  Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

7.  The County shall avoid the release of prisoners from custody directly from Segregation to the maximum extent possible.

8.  If a prisoner has an expected release date in less than 60 days, the County shall take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. Should Segregation become necessary during this time period, the County shall provide individualized discharge planning to prepare the prisoner for release to the community, including in light of the prisoner's Jail housing placement and status.

G.  **Grievances, Inmate Request Forms, Property/Privileges in Segregation**

1.  The County shall provide grievance forms and inmate request forms in each housing unit for prisoners to readily access and use.

2.  Prisoners housed in Segregation units shall have equal access to grievance and inmate request forms and procedures as compared to general population prisoners.

3.  The County shall allow reasonable access to the following for all prisoners, including those in Segregation, absent a specific safety or security issue that is documented:

Ex. R-265

a) Personal phone calls on a daily basis during normal business hours.

b) Education, rehabilitation, and other materials (*e.g.*, books, magazines, radios, writing implements, art supplies, tablets) for in-cell activities.

H. **Other Custody Operations**

1. Capacity of Jail Facilities

   a) No later than January 1, 2021, the number of prisoners placed in a particular housing unit shall be limited to no more than the rated capacity.

   b) No later than January 1, 2021, the County shall assign a bed to all prisoners.

   c) The County shall establish procedures to ensure that no prisoner is placed in any cell or housing unit without a mattress and appropriate bedding, unless there are individualized clinical or security concerns that are documented.

   d) Female prisoners shall be separated by sight and sound from male prisoners.

## VIII. STAFFING FOR HEALTH CARE SERVICES

1. The County shall establish and maintain appropriate Qualified Health Professional staffing levels and sufficient custodial staff to provide timely escorts for inmates to health care appointments.

2. The County shall perform the following analyses:

   a) Comprehensive staffing analysis based on a needs assessment, to include medical and mental health care providers and clinical staff, office and technological support, Quality Assurance staff, supervisorial staff, and custody staff for escorts and transportation;

   b) Determination of the number of positions required in each discipline for health care needs at each facility, based on current populations;

   c) Timeline for implementation of the staffing analysis (including authorization, funding, and hiring).

Ex. R-266

    3.    The County shall regularly monitor and adjust, as needed, staffing in order to ensure timely access to care.

## IX. TRAINING RELATED TO TREATMENT OF PRISONERS WITH SPECIAL NEEDS

1.    The County shall develop and implement training, through various mediums including memorandums, briefings, online presentations, and/or classroom presentations, for Jail custody staff on the provisions described in this remedial plan, as well as general correctional health care issues, including crisis intervention techniques, recognizing different types of medical and mental health conditions and appropriate responses, developmental/intellectual disability, descalation and crisis intervention, suicide/self-harm prevention, cultural diversity, health care referral practices, and confidentiality standards.

2.    Jail custody staff training on implementation of remedial plan provisions shall be completed within 90 days of the effective date of this remedial plan.  Jail custody staff shall receive at least eight (8) hours of training on all other topics described above on a bi-annual basis. The County shall keep records documenting all such trainings and training participants.

3.    Jail custody staff assigned to specialized units that house people with serious mental illness shall receive four (4) additional hours of pre-service training, and on a bi-annual basis thereafter, on working with people with mental health needs, special medico-legal considerations, de-escalation and specialized management techniques, and the Jail's mental health treatment programs.

4.    The County shall ensure that the health care services provider develops and implements training for health care staff to ensure timely implementation of and ongoing adherence to the provisions described in this remedial plan. The County shall keep records documenting all such trainings and training participants.

5.    The County shall review and revise (as necessary) suicide prevention training for custody, health care, and other relevant staff, and ensure that it adequately covers the following topics:

        a)   avoiding obstacles (negative attitudes) to suicide prevention;

        b)   why facility environments are conducive to suicidal behavior;

Ex. R-267

    c)  identifying suicide risk;

    d)  predisposing factors to suicide;

    e)  high-risk suicide periods;

    f)  suicide risk warning signs and symptoms;

    g)  components of the County's jail suicide prevention program;

    h)  liability issues associated with prisoner suicide; and

    i)  crisis intervention.

6.    The County shall provide all custody staff with at least eight hours of initial training and at least two to four hours of annual training, through various mediums including memorandums, briefings, online presentations, and/or classroom presentations, regarding suicide prevention and the identification and approach to prisoners with mental illness.

7.    All health care staff shall receive at least two hours of training annually on suicide prevention and related mental health treatment and management issues. Annual training shall include a review of the current Jail suicide prevention policy and program.

8.    All custody and medical staff shall be trained in first aid and CPR.

**Ex. R-268**

# EXHIBIT S



# BSCC
## CALIFORNIA
BOARD OF STATE AND COMMUNITY CORRECTIONS

June 8, 2022


Anthony Ray, Sheriff
San Diego County Sheriff's Department
9621 Ridgehaven Ct.
San Diego, CA 92123


**2020-2022 BIENNIAL INSPECTION, PENAL CODE 6031, WELFARE & INSTITUTION CODE
209**
**SAN DIEGO COUNTY TYPE II JAIL FACILITIES**


Dear Interim Sheriff Ray:

The 2020-2022 biennial inspection of the San Diego Sheriff Department's adult jail system has
been completed.  A pre-inspection briefing was held on February 4, 2021, and the facilities were
inspected between November 3 and 11, 2021. The following facilities were inspected; please
note that Facility #8 (BSCC# 4410) was not inspected as it is currently unoccupied and
undergoing refurbishment.

| Inspection Date | Facility Name | BSCC # |
|---|---|---|
| November 3, 2021 | George Bailey Detention Facility (GBDF) | 4430 |
| November 4, 2021 | East Mesa Re-Entry Facility (EMRF) | 4435 |
| November 5, 2021 | San Diego Men's Central Jail (SDMC) | 4381 |
| November 5, 2021 | Vista Detention Facility (VDF) | 4440 |
| November 9, 2021 | Las Colinas Women's Detention Center (SCWD) | 4402 |
| November 10, 2021 | South Bay Detention Facility (SBDF) | 4420 |

Pursuant to Penal Code Section 6031, these inspections were performed to determine
compliance with the Minimum Standards for Local Detention Facilities as outlined in Titles 15
and 24, California Code of Regulations.   In addition, BSCC staff conducted compliance
monitoring pursuant to Welfare and Institutions Code Section 209(f) for the federal Juvenile
Justice and Delinquency Prevention Act (JJDPA) for the separation requirements of juveniles
from incarcerated adults.

The complete Board of State and Community Corrections (BSCC) inspection report is
enclosed and consists of the following:  this transmittal letter; a Title 15 Procedures checklist
for each facility, outlining applicable minimum standards for detention facilities; a Physical
Plant Evaluation, outlining applicable Title 24 minimum standards; and the Living Area Space
Evaluation (LASE), summarizing the physical plant configuration and outlining rated capacity.

Please refer to the Title 15 Procedures checklist for a summary of applicable minimum
standards, indication of compliance or noncompliance, and information used to determine
compliance.

Linda M. Penner, Chair
Kathleen T. Howard, Executive Director

WWW.BSCC.CA.GOV

Gavin Newsom
California Governor

Ex. S-270

Anthony Ray
Sheriff
Page 2

## LOCAL INSPECTIONS

In addition to the biennial inspection by the BSCC, inspections are also required annually by the County Health Officer and biennially by the State Fire Marshal or an authorized representative (Health and Safety Code Sections 101045 and 13146.1). Please consider our report in conjunction with the reports from the County Health Officer and the respective fire authorities for a comprehensive perspective of your facilities. Local inspection reports are forwarded to your office under separate cover; the dates of these inspections are included below.

Each of the local inspections was current and there were no issues of noncompliance.

| Facility Name | Fire and Life Safety | Medical/Mental Health | Environmental Health | Nutritional Health |
|---|---|---|---|---|
| San Diego Men's Central Jail | 8/30/2020 | 3/20/2020 | 11/19/2019 | 1/28/2020 |
| Las Colinas Women's Detention Facility | 2/16/2021 | 5/18/2020 | 4/13/2020 | 1/29/2020 |
| South Bay Detention Facility | 6/22/2020 | 5/18/2020 | 4/17/2020 | 1/31/2020 |
| George Bailey Detention Facility | 6/17/2019 | 5/19/2020 | 10/01/2019 | 1/30/2020 |
| East Mesa Re-Entry Facility | 11/20/2020 | 5/19/2020 | 11/20/2019 | 1/30/2020 |
| Vista Detention Facility | 3/29/2021 | 3/11/2020 | 3/13/2020 | 1/29/2020 |
| Facility #8 | 6/10/2020 | 5/19/2020 | 10/01/2019 | 1/30/2020 |

## BSCC INSPECTION

### Title 15, CCR Minimum Standards

The inspection consisted of a review of policies and procedures related specifically to applicable Title 15, CCR sections[1], a site visit to review operations, a physical plant evaluation, a review of relevant documentation, and interviews with administration staff, facility staff, inmates and collaborative partners. Please see the procedures checklists for detailed information.

The following items of noncompliance with Title 15, CCR were identified:

### Title 15, §1280 Facility Sanitation, Safety and Maintenance

- San Diego Men's Central Jail
- George Baily Detention Center
- East Mesa Detention Center

During the onsite inspection, BSCC staff observed plumbing, sewage, and hot water supply issues at the above noted facilities.

---

[1] BSCC reviews only those policy and procedures required by, and applicable to, Title 15, CCR. BSCC staff do not "approve" policies and procedures, nor do we review them for constitutional or legal issues. We recommend agencies seek review through their legal advisor, risk manager and other persons deemed appropriate.

4381 4402 4410 4420 4430 4435 4440 San Diego Type II LTR 20-22

Ex. S-271

Anthony Ray
Sheriff
Page 3

**Title 24, CCR Physical Plant**

There were no changes made to any of the facilities' physical plant, the rated capacity for each facility remains:

| | |
|---|---|
| San Diego Central Men's Jail | 946 |
| Las Colinas Women's Facility | 1216 |
| South Bay Detention Facility | 306 |
| George Bailey Detention Facility | 1380 |
| East Mesa Re-Entry Facility | 760 |
| Vista Detention Facility | 807 |
| Facility #8 | 200 |

Please see the Physical Plant Evaluation for each facility for detailed information. The following items of noncompliance with Title 24 minimum standards were identified:

**1231.2.2    Temporary Holding Cell or Room**
San Diego Men's Central Jail

These cells were observed to contain more than 16 inmates on the date of inspection.

**1231.2.7    Double Occupancy Cells**
San Diego Men's Central Jail
George Bailey Detention Center
South Bay Detention Center
Vista Detention Facility

**1231.2.8    Dormitories**
George Bailey Detention Center

**1231.3.1    Toilets and Urinals**
George Bailey Detention Center

**1231.3.2    Wash Basins**
George Bailey Detention Center

**1231.3.4    Showers**
George Bailey Detention Center

Double occupancy cells and dormitories in the facilities listed above are equipped with triple bunks. On the dates of inspection, many of these cells were occupied by three inmates. The square footage of floor space along with fixtures to include toilets, washbasins, and showers does not support the number of occupants.

**1231.2.22    Audio Monitoring**
San Diego Men's Central Jail

Audio/visual call systems were tested and were not operable on the date of inspection.

4381 4402 4410 4420 4430 4435 4440 San Diego Type II LTR 20-22

Ex. S-272

Anthony Ray
Sheriff
Page 4

**1231.3.5 Beds**
>           San Diego Men's Central Jail
>           Las Colinas Women's Facility

On the date of inspection, BSCC staff observed plastic "temporary beds or boats" being used and stored for use in the above facilities. These temporary beds do not conform to Title 24 standards.

<u>**Training**</u>
According to the most recent Standards and Training for Corrections audit, the San Diego County Sheriff's Department is in compliance with all relevant regulations and mandates and mitigating circumstances if applicable.

<u>**Juvenile Justice and Delinquency Prevention Act (JJDPA) Compliance Monitoring**</u>
We reviewed the San Diego Type II, Adult Jail Facilities, and found no violations of the JJDPA. Please refer to Title 15 Procedures checklist for detailed information.

**CORRECTIVE ACTION PLAN**

On November 16, 2021, BSCC staff held an Exit Briefing where staff from your department were provided with an Initial Inspection Report outlining items of noncompliance. During that briefing, BSCC staff provided an overview of the biennial inspection and the Enhanced Inspection Process, provided technical assistance, and best practice recommendations.

Your agency provided BSCC staff with a Corrective Action Plan (CAP) addressing these issues on December 14, 2021; all items of noncompliance have been corrected with the exception of the continued use of triple bunks that are not supported by the current infrastructure of your jail facilities including floor space, and the number of available toilets, washbasins and showers. The CAP received stated that with the completion of the Rock Mountain Detention Facility in Spring 2022, bed space will become available that will allow for renovations to existing facilities. This process will eventually result in an increase in available bed space. Throughout this process, we will evaluate options for transitioning away from triple bunks in areas lacking adequate fixtures or square footage to support their use. BSCC staff will continue to monitor your progress on the above referenced project.

--

Ex. S-273

Anthony Ray
Sheriff
Page 5

This concludes the 2020-2022 biennial inspection report. It was a pleasure working with your team and I am available to provide technical assistance when requested.  I look forward to continuing to work together.  Please do not hesitate to email me at Kim.Moule@bscc.ca.gov or call 916-322-8081 if you have any questions.

Sincerely,

Kimberly
Moule

Digitally signed by
Kimberly Moule
Date: 2022.06.16
17:24:43 –05'00'

KIMBERLY MOULE, CJM
Field Representative
Facilities Standards and Operations Division


Enclosures

cc:    Chair, Board of Supervisors, San Diego County *
       Presiding Judge, Superior Court, San Diego County *
       County Administrator, San Diego County *
       Grand Jury Foreperson, Superior Court, San Diego County *
       Anthony Ray, Interim Sheriff, San Diego County Sheriff's Office
       Theresa Adams-Hydar, Assistant Sheriff, San Diego County Sheriff's Office
       Christina Bavencoff, Commander, San Diego County Sheriff's
       Daniel Dennis, Sergeant, San Diego County Sheriff's Office

       *Copies of full inspection are available upon request or are available online at www.bscc.ca.gov.

4381 4402 4410 4420 4430 4435 4440 San Diego Type II LTR 20-22

**Ex. S-274**

# EXHIBIT T

Ex. T-275

ORIGINAL

| | |
|---|---|
| 1 | PRISON LAW OFFICE |
| | DONALD SPECTER – 83925 |
| 2 | SARA NORMAN – 189536 |
| | General Delivery |
| 3 | San Quentin, California 94964 |
| | Telephone: (415) 457-9144 |
| 4 | |
| | DISABILITY RIGHTS EDUCATION & |
| 5 | DEFENSE FUND, INC. |
| | LINDA KILB – 136101 |
| 6 | 2212 6th Street |
| | Berkeley, California 94710 |
| 7 | Telephone: (510) 644-2555 |
| 8 | JONES DAY |
| | CAROLINE N. MITCHELL – 143124 |
| 9 | 555 California Street, 25th Floor |
| | San Francisco, CA 94104 |
| 10 | Telephone: (415) 875-5712 |

BINGHAM McCUTCHEN, LLP
WARREN E. GEORGE – 53588
Three Embarcadero Center
San Francisco, California 94111-4066
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone (415) 433-6830

**R E C E I V E D**

JAN 1 7 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**FILED**

JAN 1 8 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

11  Attorneys for Plaintiffs

12           IN THE UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                   OAKLAND DIVISION

15  JOHN ARMSTRONG, et al.,                ) Case No. C 94-2307 CW
                                           )
16           Plaintiffs,                   )
                                           )
17  v.                                     )
                                           ) **INJUNCTION**
18  ARNOLD SCHWARZENEGGER, et al.,         )
                                           )     RECEIVED
19           Defendants.                   )
                                           )   JAN 2 2 2007
20                                         )
                                           )
21  _____)   Rosen, Bien & Galvan

22        On January 12, 2007, this matter came on regularly for hearing in Courtroom 2,

23  Fourth Floor, of this Court, the Honorable Claudia Wilken presiding. Donald Specter, Sara

24  Norman, Michael Bien, and Gay Grunfeld appeared on behalf of Plaintiffs John Armstrong

25  et al. Katherine Nelson appeared on behalf of Defendants Arnold Schwarzenegger,

26  Governor; James Tilton, Secretary of California Department of Corrections and

27  Rehabilitation ("CDCR"); Kingston W. Prunty, Jr., Undersecretary, CDCR; Scott Kernan,

28  Acting Director, Division of Adult Institutions; Marisela Montes, Chief Deputy Secretary,

1 Adult Programs; George A. Sifuentes, Deputy Director, Office of Facilities Management;

2 and Dr. Peter Farber-Szekrenyi, Director, Division of Correctional Health Care Services

3 ("Defendants").

4      Having considered the parties' pleadings and the arguments of counsel, and good

5 cause existing therefor,

6      **THE COURT HEREBY FINDS AND ORDERS:**

7      In a series of orders commencing in 1996 and culminating in 2002, this Court found

8 defendants' treatment of prisoners with disabilities violates the Americans with Disabilities

9 Act and Section 504 of the Rehabilitation Act. On January 3, 2001, defendants issued the

10 amended Armstrong Remedial Plan, which sets forth their own policies and procedures to

11 bring them into compliance with the ADA and Section 504. On March 21, 2001, this Court

12 issued a Permanent Injunction ordering defendants to comply with the ADA and Section

13 504 in eight specific areas previously litigated by the parties.

14      Commencing in 1999 and continuing to the present, plaintiffs' counsel have engaged

15 in extensive monitoring of CDCR institutions for compliance with the ADA, Section 504,

16 the Permanent Injunction, and the Armstrong Remedial Plan.

17      This monitoring effort has not yet brought defendants into compliance. While some

18 individual prisons have improved their compliance, it has become increasingly clear that

19 defendants are unable to meet their obligations. This inability to comply with the Court's

20 Orders and with federal law causes significant harm to the plaintiff class.

21      Through their Motion for Enforcement and Further Remedial Orders, Plaintiffs have

22 demonstrated that defendants continue to violate the rights of prisoners with disabilities

23 under the ADA and Rehabilitation Act in four significant areas.

24      **Inaccessible Housing**

25      Contrary to law, the Permanent Injunction, and the Armstrong Remedial Plan,

26 defendants are systemically failing to provide safe, accessible housing to prisoners with

27 mobility impairments, resulting in significant harm to the plaintiff class, including through

28 increased risk of injury. Defendants lack an adequate number of wheelchair accessible

1   placements, toilets and showers to accommodate the needs of prisoners with mobility

2   impairments who need to use a wheelchair either full-time or part-time. This shortage is

3   particularly acute for prisoners with special housing needs such as protective custody,

4   enhanced mental health care, administrative segregation, or high security levels.

5       Defendants also repeatedly fail to place prisoners with serious mobility and vision

6   impairments in safe housing. Defendants often force prisoners into upper bunks or upper

7   tiers of the prison despite restrictions from medical staff on such placements.

8       Defendants fail to transfer prisoners with severe disabilities to prisons designed to

9   accommodate them in a timely fashion. As a result, such prisoners are denied needed

10  accommodations too often and for too long.

11      Defendants have failed to repair and maintain accessible showers and toilets in many

12  prisons, especially California Institution for Men, San Quentin, and Kern Valley.

13  **Denial of sign language interpreters to prisoners who need them**

14      Contrary to law and the Armstrong Remedial Plan, defendants consistently and

15  systemically deny sign language interpreters to deaf prisoners. Within designated prisons,

16  the violations occur most frequently at deaf prisoner's medical and mental health

17  appointments. Plaintiffs have also presented pervasive evidence of violations with regard to

18  suicidal prisoners; in education, work, and other programming; and during classification

19  hearings, harming deaf signers by forcing them to rely on ineffective and inadequate forms

20  of communication such as lip reading and written notes. As such, deaf signers are unable to

21  understand or comprehend significant due process proceedings and medical care provided to

22  them.

23  **Confiscation of Medically Prescribed Assistive Devices**

24      Contrary to law and the Armstrong Remedial Plan, defendants routinely and

25  systemically remove assistive devices such as walking canes, hearing aids, tapping canes,

26  crutches, and wheelchairs from prisoners without any security justification and without

27  consulting medical staff. The problem is severe and longstanding. Removal of assistive

28  devices has been adopted as a policy at some institutions, while at others it is tolerated and

1  continues sporadically, making it difficult or impossible for prisoners to ambulate or hear in

2  prison and putting them at significant risk of injury.

3  **Late and Inadequate Disability Grievance Responses**

4  Contrary to law and the Armstrong Remedial Plan, defendants repeatedly and

5  systemically fail to respond promptly to class members' grievances requesting

6  accommodations.  Some institutions respond chronically late – as often as 70 to 90 percent

7  of the time – to disability grievances, thereby subjecting class members to extraordinarily

8  long waits for hearing aids and other accommodations.   Some institutions simply stop

9  processing grievances or lack any staff person (medical appeals analyst) to process

10  disability grievances or fail to retrieve the grievances from the box where prisoners are

11  instructed to leave them.  Through whichever failed mechanism, CDCR's inadequate

12  disability grievance system harms the plaintiff class by denying them their only means of

13  seeking accommodation for their disabilities.

14  **Inadequate Disability Tracking**

15  Underlying all of these violations is defendants' failure to adequately track prisoners'

16  disabilities and the accommodations they need.  As this Court held on May 30, 2006, "[t]he

17  current system for tracking prisoner … disabilities is unreliable, noncomprehensive, and

18  insufficient."  This Court further stated that "[u]se of a tracking system to prevent such

19  violations is required … by the underlying law."  Defendants' Armstrong and Clark

20  Automated Tracking System has failed to identify and track CDCR prisoners' disabilities

21  and the accommodations needed for those disabilities.  The lack of an adequate tracking

22  system has resulted in significant harm to the plaintiff class, including but not limited to

23  denial of safe, accessible housing, prompt transfers to designated institutions, and sign

24  language interpretation.

25  **IT IS HEREBY ORDERED** that defendants, their agents, employees and

26  successors in interest shall take the actions listed below, and use all means at their disposal

27  to comply with the provisions set forth below, including obtaining staffing and funding on

28  an emergency basis, if necessary.  If defendants believe that any provision in state law

1  makes compliance with any provision impossible, they shall immediately thereafter notify

2  the Court and set forth their position about whether such law should be waived pursuant to

3  18 U.S.C. Section 3626(a)(1)(B).

4       The parties shall meet and confer as often as necessary to fulfill the provisions of this

5  order and obtain as much agreement as possible on the means to achieve compliance

6  therewith.  The parties shall notify the Court in writing of any disputes about the

7  implementation of these provisions and suggest appropriate methods of resolution.

8       The Court shall schedule periodic status conferences at 60 day intervals to monitor

9  the progress of compliance with this and other prior orders.  Prior to such conferences, the

10 parties shall file statements in a form to be determined through agreement of the parties

11 describing defendants' progress on each issue, any perceived barriers to future compliance

12 and suggested methods of overcoming those barriers.

13 **A. ENHANCED STAFFING**

14      Within 45 days of the date of this Order, defendants shall increase the staff of the

15 CDCR Court Compliance Team so that it has at least one staff member at Correctional

16 Counselor II level or higher for each prison designated to house prisoners with disabilities

17 impacting placement (including designated reception centers and designated Security

18 Housing Unit and condemned housing) and at least one position at Correctional Counselor

19 II or higher position for every two non-designated prisons.

20      The Court Compliance Team shall have sufficient command authority within the

21 CDCR to direct compliance with the Armstrong Remedial Plan and the orders of this Court

22 at all CDCR institutions.

23      Within 45 days of the date of this Order, defendants shall appoint one full-time staff

24 member at the Associate Warden level or higher as the ADA Coordinator at each institution

25 designated to house prisoners with disabilities impacting placement (including designated

26 reception centers and designated Security Housing Unit and condemned housing), to work

27 only on ADA compliance matters, with a supervising correctional counselor as an assistant.

28 \\\

**EX. Y-280**

1

**B. TRACKING SYSTEM**

2     Defendants shall develop, implement, and begin to use a state-wide, computerized,

3 networked real-time tracking system to track prisoners with disabilities by May 30, 2007.

4 This system shall be integrated with the BPH tracking system previously ordered by the

5 Court. The tracking system shall include prisoners' disability designations and the

6 disability accommodations they require, including but not limited to lower bunks, ground

7 floor housing, assistive devices, and effective communication needs such as sign language

8 interpreters, large print, and scribes.

9     For prisoners whose disabilities impact placement (DPW, DPO, DPM, DPV, and

10 DPH), as well as for prisoners who are DNM with housing restrictions, the tracking system

11 shall include placement and classification factors, including but not limited to mental health

12 placement needs, protective custody, administrative segregation, Security Housing Unit,

13 security level, and developmental disability designation.

14     The tracking system shall be updated continuously as new information is received

15 about prisoners with disabilities.

16

**C. HOUSING**

17     Within 90 days of the date of this Order, defendants shall generate an inventory of

18 housing placements available to DPV, DPW, DPM, and DPO prisoners and DNM prisoners

19 with housing restrictions. The inventory must include classification factors for each

20 placement, including but not limited to mental health placement needs, protective custody,

21 administrative segregation, Security Housing Unit, security level, and developmental

22 disability designation. The inventory must also include information regarding the current

23 state of repair of accessible features for each placement.

24     The placement inventory shall be updated continuously as new information is

25 received regarding placement factors and maintenance.

26     Upon completion of the inventory, CDCR may no longer house DPW, DPO, and

27 DPM prisoners at any placements without adequate accessible housing, including working

28 accessible toilets and showers.

1   Starting immediately, defendants shall not house DPW, DPO, and DPM prisoners in

2   the CIM dayrooms or Kern Valley State Prison until those locations have adequate

3   accessible housing, including working accessible toilets and showers.

4   **D. ACCOUNTABILITY**

5   Within 120 days of the date of this Order, defendants, in cooperation with the Office

6   of the Inspector General and the Receiver in *Plata v. Schwarzenegger*, shall develop a

7   system for holding wardens and prison medical administrators accountable for compliance

8   with the Armstrong Remedial Plan and the orders of this Court.  This system shall track the

9   record of each institution and the conduct of individual staff members who are not

10  complying with these requirements.  Defendants shall refer individuals with repeated

11  instances of non-compliance to the Office of Internal Affairs for investigation and

12  discipline, if appropriate.

13  Within 60 days of the date of this Order, defendants, in consultation with plaintiffs'

14  counsel, shall develop and implement a system of positive incentives to encourage

15  individual employees and managers at the institutions to comply with the Armstrong

16  Remedial Plan and the Orders of this Court.

17  Within 60 days of the date of this Order, defendants shall amend post orders and duty

18  statements of correctional staff as appropriate to include the *Armstrong* requirements for

19  which they are responsible.

20  **E. TRAINING**

21  Within 60 days of the date of this Order, defendants, subject to the approval of

22  plaintiffs' counsel, shall select and retain outside experts to provide training of health care

23  staff and correctional counselors in effective communication issues.

24  Within 60 days of the date of this Order, the parties shall jointly agree on outside

25  experts and defendants shall retain them to provide training to all custody staff who work in

26  administrative segregation units, the Security Housing Unit, or Receiving and Release on

27  their obligations not to confiscate assistive devices and the reasons therefor.

28

1    Defendants' employees may jointly provide training with the outside experts. The

2    training of all appropriate staff shall be completed by September 1, 2007, and a regular

3    schedule of ongoing and refresher training shall be established.

4    **F. GRIEVANCES**

5    Within 30 days of the date of this Order, defendants shall ensure that the Appeals

6    Coordinator and Medical Appeals Analyst positions are filled at each institution.

7    Defendants shall take all actions necessary to ensure that these positions do not remain

8    vacant for more than one month.

9    Within 60 days of the date of this Order, defendants shall provide sufficient

10   additional staff time to timely process grievances whenever a prison's disability grievance

11   responses are late more than 30% of the time within the last six months. The additional

12   staffing shall remain in place until the grievance process is in substantial compliance. The

13   parties shall meet and confer as soon as possible to establish an appropriate methodology to

14   determine how to measure the timeliness of grievance responses and the definition of

15   substantial compliance in this area, with any disputes to be resolved by the Court.

16   **G. SIGN LANGUAGE INTERPRETERS**

17   Within 120 days of the date of this Order, defendants shall establish as permanent

18   civil service positions qualified sign language interpreters for each prison designated to

19   house prisoners whose hearing disabilities impact their placement (DPH). Defendants shall

20   employ, through whatever salary is necessary, sufficient qualified interpreters to serve the

21   needs of the DPH prisoners housed at each institution. Defendants may seek relief from this

22   provision at a particular institution when their video conferencing facilities are sufficient to

23   provide all necessary sign language services at that institution.

24   Within 30 days of the date of this Order, defendants shall conduct interviews of all

25   DPH inmates in reception centers by a correctional counselor in the presence of a qualified

26   sign language interpreter to determine the prisoner's preferred method of communication

27   and record that information in the state-wide tracking system as well as the prisoner's

28

1    central and medical files.  Defendants shall conduct such interviews with prisoners who are

2    newly designated DPH within 30 days of the designation.

3      **H.  MISCELLANEOUS**

4       Defendants shall comply with the policies and procedures contained in their

5    *Armstrong* Remedial Plan relevant to the issues outlined above, specifically Sections I (p.1),

6    II.A-D (pp. 1-4), II.E (pp. 4-7),  II.F (p. 7), IV.C-G (pp. 16-21),  IV.I.22 (pp. 34-35), and

7    IV.I.23 (pp. 36-41) of the Remedial Plan.

8       The Court finds that the relief ordered herein is narrowly drawn, extends no further

9    than necessary to correct the violation of federal rights, and is the least intrusive means

10    necessary to correct the violation of the federal rights.

11    **IT IS SO ORDERED.**

12

13    Dated: _____ **JAN 1 8 2007** _____     By: _____

14                                        THE HONORABLE CLAUDIA WILKEN
                                       UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ARMSTRONG, ET AL,

          Plaintiff,

  v.

DAVIS, ET AL et al,

          Defendant.
_____/

Case Number: CV94-02307 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on January 18, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Arlene Brynne Mayerson
Disability Rights Education and Defense Fund, Inc.
2212 Sixth Street
Berkeley, CA 94710

Benjamin C. Sybesma
California Correctional Peace Officers' Association
Legal Department
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605-1634

Caroline N. Mitchell
Jones Day
555 California Street
26th Floor
San Francisco, CA 94104

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA 94964

Elaine Feingold
Elaine B. Feingold Law Offices
1524 Scenic Avenue
Berkeley, CA 94708

**Ex. T-285**

Katherine Kylin Nelson
Office of the Attorney General
Correctional Law Section
1300 I Street, Suite125
P.O. Box 944255
Sacramento, CA 94244-2550

Michael William Bien
Rosen Bien & Galvan, LLP
155 Montgomery St.
8th Floor
San Francisco, CA 94104

Paul B. Mello
Hanson Bridgett Marcus Vlahos & Rudy LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

Ronald Yank
Carroll, Burdick & McDonough, LLP
Attorneys At Law
44 Montgomery St., Suite 400
San Francisco, CA, CA 94104

Warren E. George
Bingham McCutchen LLP
Three Embarcadero Ctr
San Francisco, CA 94111

Dated: January 18, 2007

                                Richard W. Wieking, Clerk
                                By: Sheilah Cahill, Deputy Clerk

**Ex. T-286**

# EXHIBIT U

## [REDACTED]

Ex. U-287



George Bailey
446 Alta Rd., Suite 5300
San Diego, CA 92158
619-6612789

2/22/2023 8:12:07 AM PST

# PSYCHIATRIC EVALUATION - Completed by: Jason Balingit Psych NP on 12/21/2022 10:15:07 AM PST

| | | |
|---|---|---|
| **Patient:**ESQUIVEL, CRISTAIN | **#:**400446006 (22749556) | **Class:**2 |
| **DOB** ▓▓▓ (Age=27) | **Sex:**M | **Race:**H |
| **Housing:**GBDF-1-A-103-38B | **Court Date:**3/16/2023 9:00:00 AM | **Type:** |
| **Status:**ACTIVE | **Booking Date:**11/29/2022 5:25:43 AM PST | **Proj. Rel:** |

Chief Complaint/Presenting Problem:

Psych Initial Note NP

ID: 27 y/o male pt booked on 11/29/22 for charges ▓▓▓▓▓▓▓▓▓▓▓▓

CC: "Not good."

Of note, patient is hard of hearing/deaf, and utilizes writing material to communicate. Patient agrees to proceed.

HISTORY OF PRESENT ILLNESS: Patient presents today calm, cooperative, appears fairly groomed dressed in jail attire, seen today for initial psychiatric evaluation. He reports his mood is, "not good." He reports having feeling of guilt. He reports his sleep is, "okay." Denise any appetite disturbance. Denies any thoughts of hurting himself or others. Denies any auditory hallucinations. He reports having visual hallucinations of shadows and ghosts. He reports having stressors with his visual hallucinations. He reports he attempts to cope by reading. He reports having some restlessness and racing thoughts at times. He denies any symptoms of mania. Denies any symptoms PTSD or OCD.

Psychiatric History:

Prior diagnosis/treatment: denies. History of mood disorder per techcare.

Prior Hospitalizations: History of hospitalization at CMH. Per CCBH, history of hospitalization at CMH, Grossmont hospital, Paradise Valley Hospital, and Bayview hospital.

Prior suicide attempts or Self-injurious Behavior: Denies. Per history, self-harming behavior history.

Substance Abuse History: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Family Psychiatric History: Denies

Trauma: Denies

Medical and Surgical History: Denies any history of TBI or history of seizures.

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-288**

Current medications: None

Allergies: Denies

Review of Systems: comprehensive review of system all negative unless noted above.

Social History:

Housing: Homeless

Work: Unemployed

Social Support: Family

MH hospitalization: no changes from hx review

Psychotherapy: Denies

Functional Assessment:

Family:  Mother, Grandmother

Significant Other: Denies

Education:

Diet/Appetite: good

Sleep: good

RISK ASSESSMENT: RISK ELEVATION FROM BASELINE: Minimal. BASELINE: Low.

-RISK FACTORS: Gender, Little access to social support, No direct access to significant other

-PROTECTIVE FACTORS: Little access to means, No organized plan, No current substance misuse, Not intoxicated, Future oriented and hopeful, Age, No past attempt, Intact thought process, No life threatening illness, not currently depressed.

DRUG ALLERGIES: Denies

## Suicide/Violence Assessment:

Current Suicidal Ideation and Behavior:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-289**

Past Suicidal Ideation/Attempts (dates and methods):

Prior suicide attempts or Self-injurious Behavior: Denies. Per history, self-harming behavior history

Current Violent/Assaultive Ideas/Behavior:

denies

Past Violent/Assaultive Behavior:

Past Psychiatric History and Treatment:

Psychiatric History:

Prior diagnosis/treatment:  denies.  History of mood disorder per techcare.

Prior Hospitalizations: History of hospitalization at CMH.  Per CCBH, history of hospitalization at CMH, Grossmont hospital, Paradise Valley Hospital, and Bayview hospital.

Prior suicide attempts or Self-injurious Behavior: Denies. Per history, self-harming behavior history.

Substance Abuse History: ███████████████

Family Psychiatric History: Denies

Trauma: Denies

Medical History:

Medical and Surgical History: Denies any history of TBI or history of seizures.

Current medications: None

Allergies: Denies

Review of Systems: comprehensive review of system all negative unless noted above.

Current Allergies

No Known Drug Allergy

Abuse History:

Trauma: Denies

Family Psychiatric History:

Family Psychiatric History: Denies

Legal History:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-290**

Developmental/Social History:

Social History:

Housing: Homeless

Work: Unemployed

Social Support: Family

MH hospitalization: no changes from hx review

Psychotherapy: Denies

Functional Assessment:

Family:  Mother, Grandmother

Significant Other: Denies

Education:

Diet/Appetite: good

Sleep: good

Substance Use History:

Substance Abuse History: ███████████████████

Strengths and Assets and/or Deficiences:

## Mental Status Examination:

## Orientation:

| Unimpaired | Person | Place |
|---|---|---|
| Time | Situation | |

Comments/Other:

## Memory:

| Unimpaired | Immediate Deficit | Short Term Deficit |
|---|---|---|
| Long Term Deficit | | |

Comments/Other:

## Appearance:

| Well Groomed | Mildly Unkempt | Disheveled |
|---|---|---|

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-291**

Comments/Other:

## Demeanor:

| Spontaneous | Cooperative | Mistrustful |
| Preoccupied | Demanding | Hostile |

Comments/Other:

## Psychomotor Activity:

| Normal | Increased | Decreased |

Comments/Other:

## Speech:

| Appropriate | Coherent | Incoherent |
| Rapid | Pressured | Loud |
| Soft | Perseveration | Word Salad |
| Mute | | |

Comments/Other:

## Mood:

| Euthymic | Depressed | Anxious |
| Angry | Irritable | Elated |

Comments/Other:

## Affect:

| Appropriate | Flat | Blunted |
| Expansive | Euphoric | Anxious |
| Labile | Irritable | Angry |

Comments/Other:

## Thought Process:

| Appropriate | Goal Directed | Tangential |
| Circumstantial | Flight of Ideas | Loosening of Associations |

Comments/Other:

## Thought Content:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-292**

Appropriateness abnormal as noted

Comments/Other:

## Delusions:

| | | |
|---|---|---|
| Persecution | Grandiose | |

Comments/Other:

## Hallucinations:

| | | |
|---|---|---|
| Auditory | Visual | Command |

Comments/Other:

He reports having visual hallucinations of shadows and ghosts. He

## Compulsions and Obsessions:

| | | |
|---|---|---|
| Obsessions | Compulsions | Phobias |
| Hopelessness | Worthlessness | Loneliness |
| Guilt | Self Deprecation | |

Comments/Other:

## Insight:

| | | |
|---|---|---|
| Good | Fair | Poor |

Comment:

## Judgment:

| | | |
|---|---|---|
| Good | Fair | Poor |

Comment:

Suicidal Ideation:

Yes

No

Comment:

Suicide Plan:

Yes

No

Comment:

ESQUIVEL, CRISTAIN   400446006 (22749556)

Ex. U-293

Homicidal Ideation

Yes

No

Comment:

Homicidal Plan:

Yes

No

Comment:

## Impression:

Axis I:

Axis II:

Axis III:

Axis IV:

Axis V:  GAF:

Recommendations:

A: ASSESSMENT

Patient presents to the clinic, calm, cooperative with psychotic symptoms and low mood.  Patient has difficulty coping with his current symptoms.  Educated patient on medication options.  Will start Zyprexa 10mg PO qHS to target his mood and cognitive symptoms. Discussed treatment plan and medication, and he agrees.  Educated on the risk benefits, and side effects of medication.  Signature pad unavailable.

F29 Psychosis NOS

F39 Mood D/o unspecified

F19.20 Combination Drug Use Disorder

================================================================

P: INTERVENTION & PLAN

ESQUIVEL, CRISTAIN   400446006 (22749556)

Ex. U-294

1. Provided active listening, psychoeducation, and supportive therapy with direction.

2. Discussed with patient various diagnostic, treatment and medication issues, options explored and explained. Treatment plan discussed with the patient; questions were answered. Patient expressed understanding and agrees with treatment recommendations.

3. Educated on meds: take meds as prescribed (names, dose, route, time, frequency, reason and to take routinely), potential length of time for a response, potential complications as a result of an abrupt cessation once a certain dose has been reached for certain meds, the need to continue routine meds even if pt. starts to feel better, and to report any questions/concerns.

– Start Zyprexa 10mg PO qHS

– Refused lab draw at this time.

Patient advised to discuss concerns with staff, should suicidal thoughts occur/worsen with medications, has any adverse reactions to medication, or sx precipitously worsen.

4. Health maintenance (as needed) managed by medical.

5. Follow-Up:  4-weeks

Pt. aware he can request Psych SC sooner if needed

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|
| OLANZapine Oral | 10 | 1 | 12/21/2022 8:00:00 PM | 1/19/2023 11:59:59 PM | Take 10 mg by mouth once in p.m. for 30 day(s). Dispense 30 tablet. 6 Refill(s) |

Discharge Needs:

**Select Flags:**

Developmental Disability/Intellectual Disability

Other Psychiatric Disorders

Delirium and Dementia and Amnestic and Other Cognitive Disorders

Substance Related Disorders

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-295**

Psychotic Disorders

Mood Disorders

Anxiety Disorders

Adjustment Disorders

Personality Disorders

**FOLLOW UP:**

6 months

3 months

2 months

1 month

Other

**Sick Call Completion**

○ Complete Scheduled Sick Call

Available Sick Calls:

○ Create and Complete Sick Call

Sick Call Types:

○ This visit does not require a sick call

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-296**

George Bailey
446 Alta Rd., Suite 5300
San Diego, CA 92158
619-6612789

2/22/2023 8:12:08 AM PST

## RN GATEKEEPER - Completed by: May Adraneda RN on 12/25/2022 4:26:52 PM PST

| | | |
|---|---|---|
| **Patient:** ESQUIVEL, CRISTAIN | **#:** 400446006 (22749556) | **Class:** 2 |
| **DOB:** ▮▮▮▮ (Age=27) | **Sex:** M | **Race:** H |
| **Housing:** GBDF-1-A-103-38B | **Court Date:** 3/16/2023 9:00:00 AM | **Type:** |
| **Status:** ACTIVE | **Booking Date:** 11/29/2022 5:25:43 AM PST | **Proj. Rel:** |

RN Gatekeeper Designee

### Date/Time of Evaluation:

Date: 12/25/2022 Time: 1620 PM

### Reason for Evaluation:

| | | |
|---|---|---|
| Charges | Sentence | Resistance during arrest |
| Verbalized SI/HI | Actively self-harming | Danger to self or others |
| per Policy Risk Factors | Columbia Suicide Severity Scale | Others |
| | Triggers | |

IP deaf, but able to communicate thru writing. Communicated that he wants to hurt himself by hanging .

Objective Findings Explain:

### Risk: High

### Plan (limited the plans):

ISP Placement not indicated-refer to Classification

Explain:

Placement in ISP – EOH

Explain:

Due to communicated SI

Placement in ISP - Safety Cell

Explain:

B and R-consult with Watch Commander for possible transport:

Explain:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-297**

George Bailey
446 Alta Rd., Suite 5300
San Diego, CA 92158
619-6612789

2/22/2023 8:12:09 AM PST

## ISP ASSESSMENT/FOLLOW-UP FOR MHC'S - Completed by: Leslee Buluran MHC on 12/26/2022 12:33:54 PM PST

| | | |
|---|---|---|
| Patient:ESQUIVEL, CRISTAIN | #:400446006 (22749556) | Class:2 |
| DOB: ███ (Age=27) | Sex:M | Race:H |
| Housing:GBDF-1-A-103-38B | Court Date:3/16/2023 9:00:00 AM | Type: |
| Status:ACTIVE | Booking Date:11/29/2022 5:25:43 AM PST | Proj. Rel: |

- ○ Gatekeeping Assessment
- ● 1st ISP Assessment
- ○ 2nd ISP Assessment
- ○ Additional ISP Assessment
- ○ ISP Follow Up

Date/Time of Assessment/Placement: 12/26/2022 1034

**Reason for Assessment/Placement:**

| Charges | Sentence | Resistance during arrest |
|---|---|---|
| Actively self harming | Verbalized SI/HI | Danger to self or others |
| Other | | |

Explain:

PT is 27 years old booked on 11/29/2022 and charged with ████████

PT gestured he is deaf and have limited verbal communications. PT gestured he is able to communicate in writing.

RESON: PT was placed in EOH by RN GK on 12/25/2022. PT communicated via writing that he want to hurt himself by hanging.

PSYCH Hx:

Per JIMs, ISP hx on prior booking 09/04/2022, PT endorsed SI via writing. Last PSU 02/16/2019, no JBCT hx.

Per Cerner/ CCBH, extensive MH hx and hospitalizations. dx hx unspecified mood [affective] d/o; deaf no speaking, not elsewhere classified; schizoaffective

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-298**

d/o, unspecified; ██████████; unspecified psychosis not due to a substance or known physiological condition; paranoid schizophrenia; ██████████; ██████████; schizoaffective d/o, depressive type; ██████████; major depressive d/o, recurrent, unspecified; schizophrenia. unspecified; ██████████; schizoaffective, bipolar type; ██████████. Co Adult Forensic Eval (12/2021), Co Emergency Psych Unit- EPU (2019, 2020- 5x, 08/2022), Co SD CO Psych Hospital Inpat (06/2019, 03/2020, 07/2020, 11/2020, 12/2020), Jane Westin Center (08/2020), Bayview Hospital (01/2019, 09/2019, 07/2020, 08/2020- x2, 10/2020, 11/2020, 08/2022.).

ASSESSMENT:

PT was moved to psych 2 room. Medical Deputy informed MHC that PT was deaf and has not verbally engaged with him. MHC introduced self and asked / gestured to PT is he able to hear and speak, PT moved his head from left to right and motioned "writing." Medical Deputy was able to move PT to medical examination room. MHC was able to provide PT with paper and a crayon. MHC again introduced self. MHC asked and wrote what happened. PT gestured hanging. MHC asked how long he have been feeling like hurting himself. PT wrote "today and yesterday." MHC asked if he still feels like hurting himself and PT nodded his head up and down. MHC asked/ wrote if he hurt himself in the past and PT nodded his head up and down and wrote "home." MHC asked/ wrote what he have done in the past to make himself feel better and PT moved his head from left to right. MHC asked/ wrote what we can do now to help him feel better and PT moved his head from left to right. MHC asked/wrote if he has any housing issues. PT moved his head from left to right.

CURRENT RISK DESIGNATION: High Risk.

PLAN: PT will be reassessed in 12-24 hours.

**Mental Status Exam:**

**Appearance**

- ○ Well Groomed
- ● Moderately Groomed
- ○ Disheveled/Unkempt

Explain:

PT was dressed in green safety attire.

**Level of Consciousness**

- ● Alert and Awake
- ○ Drowsy
- ○ Stupor
- ○ Coma

Explain:

PT was able to sit independently and engage with MHC.

ESQUIVEL, CRISTAIN    400446006 (22749556)

Ex. U-299

**Eye Contact**

- ◉ Good
- ○ Fair
- ○ Poor
- ○ None

Explain:

PT was able to maintain appropriate eye contact.

**Attitude**

| Cooperative | Guarded | Non-disclosing |
| --- | --- | --- |
| Hostile/belligerent | Uncooperative | |

Explain:

**Behavior**

| Calm | Apprehensive | Agitated |
| --- | --- | --- |
| Motor Impairment | Tearful | Withdrawn |

Explain:

**Speech**

| Clear | Slurred | Slow |
| --- | --- | --- |
| Pressured | Quiet | Rapid |
| Selective Mute | Aphasic | |

Explain:

PT did not say words. PT did make sound like noises as he responded via writing and gesturing.

**Conversation**

| Spontaneous | Only in response to questions | Relevant |
| --- | --- | --- |
| Irrelevant | Non-cooperative/Evasive | Threatening |
| Distant | | |

Explain:

**Orientation**

| Person | Place | Month |
| --- | --- | --- |
| Year | Situations | None |

Explain:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-300**

**Memory**

| Immediate Intact | Recent Intact | Remote Intact |
|---|---|---|
| Refused | | |

Explain:

**Affect**

| Appropriate | Inappropriate | Labile |
|---|---|---|
| Expansive | Constricted | Blunt |
| Angry | Flat | Congruent |
| Incongruent | | |

Explain:

**Thought Process**

| Intact | Concrete | Abstract |
|---|---|---|
| Thought Blocking | Circumstantial | Disorganized |
| Loose Association | Tangential | Flight of Idea |
| Slow/Hesitant | | |

Explain:

**Thought Content**

| Appropriate to situation | Grandiose | Obsessions |
|---|---|---|
| Compulsions | Paranoia | Delusions |
| Impoverished | | |

Explain:

**Impulse Control**

○ Good
● Fair
○ Poor

Explain:

PT did not engage in any self harming behaviors.

**Judgement**

○ Intact
● Concrete

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-301**

## Insight

- ○ Good Understanding
- **● Adequate**
- ○ Partial Recognition
- ○ Poor

Explain:

## Perceptual Symptoms

| Normal | Hallucinations Auditory | Hallucinations Visual |
|---|---|---|
| Hallucinations Olfactory | | |

Explain

PT denied any current perceptual symptoms.

Per BH Assessment and psych assessment dated 12/2022:

PT reported CAH and VH.

---

First time in jail?

    Yes

    No

View this Patient's Charges in eJIMS:

[ View ]

## Future orientation:

- ○ Hopeful
- ○ Hopeless
- ○ Realistic
- **● Unrealistic**

Explain

## Motivation for Treatment

ESQUIVEL, CRISTAIN   400446006 (22749556)

Ex. U-302

- ○ Excellent
- ● Good
- ○ Fair
- ○ Poor

Explain:

PT was able to engage with MHC and PT s compliant with psych medications.

## Depressive Symptoms

| Not Able to Assess | None/Denied | Sleep Disturbance |
| Eating Disturbance | Crying Spells | Feelings of Hopelessness |
| Feelings of Helplessness | | |

Explain:

PT reported and guestured he sleeps about 5 hours every day. PT reports he eats all of his meals.

## Support network:

| Significant Other | Parents | Family |
| Other | Refused | |

Explain

PT reported he has not spoken to his family and gestured towards his eat and mouth and he then motioned both of his hands and shoulder up.

## Suicidal Thinking

- ○ Denied/None
- ○ Passive
- ● Active
- ○ Intent
- ○ Refused

Explain

PT motioned "hanging."

## Homicidal Thinking

- ● Denied
- ○ Passive
- ○ Active
- ○ Intent
- ○ Refused

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-303**

PT denied any HI.

History of ISP placement:

Yes

No

**When/Within:**

○ 1-30 days

○ 30-90 days

● 3-6 months

○ 6+ months

Explain

PT was placed in ISP on 09/04/2022- PT endorced SI via writing.

Per prior ISP note dated on 09/04/2022:

EOH 02/16/2019; 06/06/2019; 09/04/2022

SC: 02/16/2019

History of in-custody suicide attempt:

Yes

No

**When/Within:**

○ 1-30 days

○ 30-90 days

○ 3-6 months

○ 6+ months

Explain

History of in-custody self-harm:

Yes

No

**When/Within:**

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-304**

- ○ 1-30 days
- ○ 30-90 days
- ○ 3-6 months
- ● 6+ months

Explain

SC: 02/16/2019

PT was attempted to hurt himself- no othher information noted.

## Most recent SI:

Previously Attempted Suicide

Yes

No

## When/Within:

- ● 1-5 years
- ○ 6-10 years
- ○ 11+ years

Explain

Per Cerner/ CCBH, hx of tying a zip tie around his neck.

Previous Self-Harm

Yes

No

## When/Within:

- ● 1-5 years
- ○ 6-10 years
- ○ 11+ years

Explain

PT has hx of banging his head and cutting.

Family/Close Friend Attempted or Completed Suicide:

Yes

No

## When/Within:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-305**

○ 1-5 years
○ 6-10 years
○ 11+ years

Explain

**Recent Losses:**

| | | |
|---|---|---|
| Family | Friend | Career |
| Finances | Home | None reported |

**When/Within:**

○ 1-5 years
○ 6-10 years
○ 11+ years

Explain

**History of Sexual Abuse:**

○ Yes
● No
○ Refused
○ None reported

| As a Child | As an Adult |
|---|---|

Explain

**History of Physical Abuse:**

○ Yes
● No
○ Refused
○ None reported

| As a Child | As an Adult |
|---|---|

Explain

**History of Emotional Abuse:**

○ Yes
● No
○ Refused

ESQUIVEL, CRISTAIN   400446006 (22749556)

○ None reported

| As a Child | As an Adult |
|------------|-------------|

Explain

**Concerns for Safety while incarcerated:**

| Other inmates | Staff | None reported |
|---------------|-------|---------------|

Explain

Combat Veteran:

Yes [  ]

No

**Symptoms of post-traumatic stress:**

○ Yes

● No

○ Refused

○ None reported

Explain:

_____

███████████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

█████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-307**

_____

**Current Withdrawal Symptoms:**

- ○ Yes
- ● No
- ○ On Withdrawal Protocol

Explain

**Current Suicide Risk Acuity:**

- ○ Low
- ● High

Explain:

CUrrent risk level is high. PT continues to have SI thoughts with plan to hang himself. PT was not able to ID coping strategies and reported no current conatct with support system.

**Provisional Diagnosis:**

Add Diagnosis Code  Remove Selected

**Plan:**

ISP placement not indicated, refer to classification

Cleared from ISP to JPMU

Remain in ISP with CTO in EOH

Remain in ISP with CTO in SC

Remain in ISP CTO with move to EOH

Remain in ISP CTO with move to SC

Additional provider to assess within 12 hours (Safety Cell)

Additional provider to assess within 12 to 24 hours (EOH)

Placement in ISP - EOH

Placement in ISP - Safety Cell

Consult with Psychiatry for Inpatient Admission

B and R-consult with Watch Commander for transport to an inpatient community facility

Medical Emergency Sendout

Explain:

**Refer to Psychiatric Sick Call in:**

ESQUIVEL, CRISTAIN  400446006 (22749556)

**Ex. U-308**

24 hr

72 hr

1 week

Explain:

## Refer to MD Sick Call in:

24 hr

72 hr

1 week

Explain:

## Discharge from ISP with Follow Up in:

24hrs

72hrs

1 week

2 weeks

4 weeks

6 weeks

12 weeks

Pre-Court Proceedings Assessment

Post-Court Proceedings Assessment

N/A (not clearing from ISP)

Court Proceedings Assessment Date:

Explain:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-309**

2/22/2023 8:12:12 AM PST

George Bailey
446 Alta Rd., Suite 5300
San Diego, CA 92158
619-6612789

**Progress Notes - ESQUIVEL, CRISTAIN 400446006 (22749556)**

---

Ana Marsters Mental Health Clinician POSTED ON 12/27/2022 8:44:29 AM PST                    Type: MENTAL HEALTH CLINICIAN

placed in EOH

Addendum:

---

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-310**

George Bailey
446 Alta Rd., Suite 5300
San Diego, CA 92158
619-6612789

2/22/2023 8:12:10 AM PST

## ISP ASSESSMENT/FOLLOW-UP FOR MHC'S - Completed by: Ana Marsters Mental Health Clinician on

12/27/2022 1:17:45 PM PST

| | | |
|---|---|---|
| **Patient:**ESQUIVEL, CRISTAIN | **#:**400446006 (22749556) | **Class:**2 |
| **DOB:** ▮ (Age=27) | **Sex:**M | **Race:**H |
| **Housing:**GBDF-1-A-103-38B | **Court Date:**3/16/2023 9:00:00 AM | **Type:** |
| **Status:**ACTIVE | **Booking Date:**11/29/2022 5:25:43 AM PST | **Proj. Rel:** |

○ Gatekeeping Assessment

○ 1st ISP Assessment

● 2nd ISP Assessment

○ Additional ISP Assessment

○ ISP Follow Up

Date/Time of Assessment/Placement: 12/27/2022 7:10 AM

## Reason for Assessment/Placement:

| Charges | Sentence | Resistance during arrest |
|---|---|---|
| Actively self harming | Verbalized SI/HI | Danger to self or others |
| Other | | |

Explain:

REASON FOR REFERRAL:  Pt communicated via writing to RN GK that he wanted to hurt himself via hanging.

Pt is a 27 year old male booked on 11/29/22 for ▮▮▮▮▮▮▮▮▮▮

ASSESSMENT:  Pt was evaluated cell side with deputy present.  Pt is deaf and was willing to communicate via writing.  Pt was provided with paper and a pencil to communicate with this MHC.  Pt sat up in his bed and smiled at this MHC.  Pt reported via writing that his mood was, "good" and denied current SI/HI. Pt also denied AH / CAH to harm himself.  Pt reports medication was, "good" reported stable sleeping and eating patterns (empty food trays observed in his cell) and has not been observed engaging in self harming bx.  Pt is prescribed Zyprexa and per chart has been compliant with medication with no reported side effects.  Pt will be given a LOW risk designation and will be evaluated by QMHP in 12-24 hours.

PSYCH HX

CCBH extensive hx of hospitalizations- CMH, Sharp GRossmnt, Paradise Valley, Bayvieiw. outpatient tx at Jane Westin, Telecare IHOT, CRF MAST, PERT x8.

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-311**

Per CCBH, patient is not being forthcoming with a noose tied around his neck...SIB - After banging his head and per PERT eval, cuts were observed on his arms

## Mental Status Exam:

## Appearance

○ Well Groomed

● Moderately Groomed

○ Disheveled/Unkempt

Explain:

dressed in green safety garment

## Level of Consciousness

● Alert and Awake

○ Drowsy

○ Stupor

○ Coma

Explain:

## Eye Contact

● Good

○ Fair

○ Poor

○ None

Explain:

## Attitude

| Cooperative | Guarded | Non-disclosing |
|---|---|---|
| Hostile/belligerent | Uncooperative | |

Explain:

## Behavior

| Calm | Apprehensive | Agitated |
|---|---|---|
| Motor Impairment | Tearful | Withdrawn |

Explain:

## Speech

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-312**

| | | |
|---|---|---|
| Clear | Slurred | Slow |
| Pressured | Quiet | Rapid |
| Selective Mute | Aphasic | |

Explain:

Pt is deaf and communicated via writing with a pencil

## Conversation

| | | |
|---|---|---|
| Spontaneous | Only in response to questions | Relevant |
| Irrelevant | Non-cooperative/Evasive | Threatening |
| Distant | | |

Explain:

Able to read and write answers effectively

## Orientation

| | | |
|---|---|---|
| Person | Place | Month |
| Year | Situations | None |

Explain:

## Memory

| | | |
|---|---|---|
| Immediate Intact | Recent Intact | Remote Intact |
| Refused | | |

Explain:

## Affect

| | | |
|---|---|---|
| Appropriate | Inappropriate | Labile |
| Expansive | Constricted | Blunt |
| Angry | Flat | Congruent |
| Incongruent | | |

Explain:

## Thought Process

| | | |
|---|---|---|
| Intact | Concrete | Abstract |
| Thought Blocking | Circumstantial | Disorganized |
| Loose Association | Tangential | Flight of Idea |
| Slow/Hesitant | | |

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-313**

## Thought Content

| | | |
|---|---|---|
| **Appropriate to situation** | Grandiose | Obsessions |
| Compulsions | Paranoia | Delusions |
| Impoverished | | |

Explain:

## Impulse Control

○ Good
● **Fair**
○ Poor

Explain:

**pt has not engaged in self harming or aggressive bx while under observation in ISP**

## Judgement

○ Intact
● **Concrete**

Explain:

## Insight

○ Good Understanding
● **Adequate**
○ Partial Recognition
○ Poor

Explain:

## Perceptual Symptoms

| | | |
|---|---|---|
| **Normal** | Hallucinations Auditory | Hallucinations Visual |
| Hallucinations Olfactory | | |

Explain

**denied**

First time in jail?

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-314**

Yes

No

View this Patient's Charges in eJIMS:

[ View ]

## Future orientation:

○ Hopeful
○ Hopeless
● Realistic
○ Unrealistic

Explain

## Motivation for Treatment

○ Excellent
● Good
○ Fair
○ Poor

Explain:

Able to communicate with this MHC via writing.  Per chart, pt has been compliant with medication

## Depressive Symptoms

| Not Able to Assess | None/Denied | Sleep Disturbance |
| Eating Disturbance | Crying Spells | Feelings of Hopelessness |
| Feelings of Helplessness | | |

Explain:

reports stable sleeping and eating patterns, denied current depression and anxiety sx

## Support network:

| Significant Other | Parents | Family |
| Other | Refused | |

Explain

## Suicidal Thinking

● Denied/None

ESQUIVEL, CRISTAIN   400446006 (22749556)

Ex. U-315

○ Passive
○ Active
○ Intent
○ Refused

Explain

## Homicidal Thinking

● Denied
○ Passive
○ Active
○ Intent
○ Refused

Explain

History of ISP placement:

| | |
|---|---|
| Yes | |
| No | |

## When/Within:

○ 1-30 days
○ 30-90 days
○ 3-6 months
● 6+ months

Explain

Per chart

PT was placed in ISP on 09/04/2022- PT endorsed SI via writing.

EOH 02/16/2019; 06/06/2019; 09/04/2022

SC: 02/16/2019

History of in-custody suicide attempt:

| | |
|---|---|
| Yes | |
| No | |

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-316**

**When/Within:**

- ○ 1-30 days
- ○ 30-90 days
- ○ 3-6 months
- ○ 6+ months

Explain

History of in-custody self-harm:

Yes

No

**When/Within:**

- ○ 1-30 days
- ○ 30-90 days
- ○ 3-6 months
- ● 6+ months

Explain

Per chart pt was placed in the SC on 2/16/2019 after attempting to hurt himself. No other information was provided

**Most recent SI:**

Previously Attempted Suicide

Yes

No

**When/Within:**

- ● 1-5 years
- ○ 6-10 years
- ○ 11+ years

Explain

Per CCBH, hx of tying a noose around his neck

Previous Self-Harm

Yes

No

**When/Within:**

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-317**

- ● 1-5 years
- ○ 6-10 years
- ○ 11+ years

Explain

Per chart, hx of banging his head and cutting (per Techcare, pt is on razor restriction)

Family/Close Friend Attempted or Completed Suicide:

　　Yes

　　No

## When/Within:

- ○ 1-5 years
- ○ 6-10 years
- ○ 11+ years

Explain

## Recent Losses:

| Family | Friend | Career |
|--------|--------|--------|
| Finances | Home | None reported |

## When/Within:

- ○ 1-5 years
- ○ 6-10 years
- ○ 11+ years

Explain

## History of Sexual Abuse:

- ○ Yes
- ○ No
- ○ Refused
- ● None reported

| As a Child | As an Adult |
|------------|-------------|

Explain

## History of Physical Abuse:

- ○ Yes

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-318**

○ No
○ Refused
● None reported

| As a Child | As an Adult |
|---|---|

Explain

**History of Emotional Abuse:**

○ Yes
○ No
○ Refused
● None reported

| As a Child | As an Adult |
|---|---|

Explain

**Concerns for Safety while incarcerated:**

| Other inmates | Staff | None reported |
|---|---|---|

Explain

Combat Veteran:

Yes

No

**Symptoms of post-traumatic stress:**

○ Yes
○ No
○ Refused
● None reported

Explain:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-319**

---

**Current Withdrawal Symptoms:**

○ Yes
● No
○ On Withdrawal Protocol

Explain

**Current Suicide Risk Acuity:**

● Low
○ High

Explain:

Pt denied current SI/HI, has been eating all meals, sleeping and has not been observed engaging in self harming bx.  Pt is med compliant.  Pt will be given a LOW risk designation and will be evaluated by another QMHP in 12-24 hours

**Provisional Diagnosis:**

Add Diagnosis Code Remove Selected

**Plan:**

ISP placement not indicated, refer to classification

Cleared from ISP to JPMU

Remain in ISP with CTO in EOH

Remain in ISP with CTO in SC

Remain in ISP CTO with move to EOH

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-320**

Remain in ISP-CTO with move to SC

Additional provider to assess within 12 hours (Safety Cell)

Additional provider to assess within 12 to 24 hours (EOH)

Placement in ISP - EOH

Placement in ISP - Safety Cell

Consult with Psychiatry for Inpatient Admission

B and R-consult with Watch Commander for transport to an inpatient community facility

Medical Emergency Sendout

Explain:

## Refer to Psychiatric Sick Call in:

24 hr

72 hr

1 week

Explain:

## Refer to MD Sick Call in:

24 hr

72 hr

1 week

Explain:

## Discharge from ISP with Follow Up in:

24hrs

72hrs

1 week

2 weeks

4 weeks

6 weeks

12 weeks

Pre-Court Proceedings Assessment

Post-Court Proceedings Assessment

N/A (not clearing from ISP)

Court Proceedings Assessment Date:

Explain:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-321**

George Bailey
446 Alta Rd., Suite 5300
San Diego, CA 92158
619-6612789

2/22/2023 8:12:10 AM PST

## ISP ASSESSMENT/FOLLOW-UP FOR MHC'S - Completed by: Ana Marsters Mental Health Clinician on

12/28/2022 7:29:41 AM PST

| | | |
|---|---|---|
| **Patient:**ESQUIVEL, CRISTAIN | **#:**400446006 (22749556) | **Class:**2 |
| **DOB** (Age=27) | **Sex:**M | **Race:**H |
| **Housing:**GBDF-1-A-103-38B | **Court Date:**3/16/2023 9:00:00 AM | **Type:** |
| **Status:**ACTIVE | **Booking Date:**11/29/2022 5:25:43 AM PST | **Proj. Rel:** |

○ Gatekeeping Assessment
○ 1st ISP Assessment
○ 2nd ISP Assessment
● Additional ISP Assessment
○ ISP Follow Up

Date/Time of Assessment/Placement: 12/28/2022 0700

## Reason for Assessment/Placement:

| Charges | Sentence | Resistance during arrest |
|---|---|---|
| Actively self harming | Verbalized SI/HI | Danger to self or others |
| Other | | |

Explain:

REASON FOR REFERRAL:  Pt communicated via writing to RN GK that he wanted to hurt himself via hanging.

Pt is a 27 year old male booked on 11/29/22 for ████████████████████████

ASSESSMENT:  Pt was evaluated cell side with deputy present.  Pt was observed to be sleeping when MHC arrived and empty food trays were observed at the foot of the bed.  This assessment was conducted via writing since pt is deaf.  Pt agreed to participate in the assessment.  Pt wrote that he is doing, "good it's fine" and denied AH, SI/HI.  Pt reports medication is good (wrote, "good" and gave a thumbs up) and denied depression and anxiety sx.  Pt reports he has been sleeping well, denied any thoughts of hurting himself while in ISP and has been eating all his meals.  Pt was asked if he was ready to return to housing and he nodded his head to indicate, 'yes."  Pt reports he is able to inform jail staff if he has any thoughts of hurting himself in the future.

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-322**

Pt is prescribed Zyprexa and per chart pt has been compliant with medication with no reported side effects.

PLAN: Pt will be given a LOW risk designation and cleared from ISP. Pt will continue to be followed by psychiatrist and will have ongoing follow up appointments with QMHP. RN and Deputy notified

PSYCH HX

CCBH extensive hx of hospitalizations- CMH, Sharp Grossmnt, Paradise Valley, Bayvieiw. Outpatient tx at Jane Westin, Telecare IHOT, CRF MAST, PERT x8. Per CCBH, pt has a hx being found with a noose tied around his neck ████████████████████████████. SIB- hx of banging his head and per PERT eval, cuts were observed on his arms

## Mental Status Exam:

## Appearance

- ○ Well Groomed
- ● Moderately Groomed
- ○ Disheveled/Unkempt

Explain:

dressed in green safety garment

## Level of Consciousness

- ● Alert and Awake
- ○ Drowsy
- ○ Stupor
- ○ Coma

Explain:

## Eye Contact

- ● Good
- ○ Fair
- ○ Poor
- ○ None

Explain:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-323**

**Attitude**

| Cooperative | Guarded | Non-disclosing |
| --- | --- | --- |
| Hostile/belligerent | Uncooperative | |

Explain:

## Behavior

| Calm | Apprehensive | Agitated |
| --- | --- | --- |
| Motor Impairment | Tearful | Withdrawn |

Explain:

## Speech

| Clear | Slurred | Slow |
| --- | --- | --- |
| Pressured | Quiet | Rapid |
| Selective Mute | Aphasic | |

Explain:

pt is deaf and communicated via writing

## Conversation

| Spontaneous | Only in response to questions | Relevant |
| --- | --- | --- |
| Irrelevant | Non-cooperative/Evasive | Threatening |
| Distant | | |

Explain:

Able to read and write answers effectively

## Orientation

| Person | Place | Month |
| --- | --- | --- |
| Year | Situations | None |

Explain:

## Memory

| Immediate Intact | Recent Intact | Remote Intact |
| --- | --- | --- |
| Refused | | |

Explain:

## Affect

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-324**

Appropriate    Inappropriate    Labile
Expansive    Constricted    Blunt
Angry    Flat    Congruent
Incongruent

Explain:

## Thought Process

Intact    Concrete    Abstract
Thought Blocking    Circumstantial    Disorganized
Loose Association    Tangential    Flight of Idea
Slow/Hesitant

Explain:

## Thought Content

Appropriate to situation    Grandiose    Obsessions
Compulsions    Paranoia    Delusions
Impoverished

Explain:

## Impulse Control

◯ Good
◉ Fair
◯ Poor

Explain:

Pt has not engaged in self harming or aggressive bx while under observation in ISP

## Judgement

◉ Intact
◯ Concrete

Explain:

## Insight

◯ Good Understanding
◉ Adequate
◯ Partial Recognition
◯ Poor

ESQUIVEL, CRISTAIN   400446006 (22749556)

Ex. U-325

Explain:

## Perceptual Symptoms

| Normal | Hallucinations Auditory | Hallucinations Visual |
|---|---|---|
| Hallucinations Olfactory | | |

Explain

Denied and not observed RIS

---

First time in jail?

　　　Yes

　　　No

View this Patient's Charges in eJIMS:

[ View ]

## Future orientation:

○ Hopeful
○ Hopeless
● Realistic
○ Unrealistic

Explain

Pt communicated that he is ready to take a shower, get clothes and return to housing.

## Motivation for Treatment

○ Excellent
● Good
○ Fair
○ Poor

Explain:

Pt has been cooperative during assessments and has been compliant with medication.  Pt is

## Depressive Symptoms

| Not Able to Assess | None/Denied | Sleep Disturbance |
|---|---|---|
| Eating Disturbance | Crying Spells | Feelings of Hopelessness |

ESQUIVEL, CRISTAIN   400446006 (22749556)

Ex. U-326

Feelings of Helplessness

Explain:

Denied anxiety and depression sx, report stable sleeping and eating patterns

## Support network:

| Significant Other | Parents | Family |
|---|---|---|
| Other | Refused | |

Explain

## Suicidal Thinking

- ● Denied/None
- ○ Passive
- ○ Active
- ○ Intent
- ○ Refused

Explain

## Homicidal Thinking

- ● Denied
- ○ Passive
- ○ Active
- ○ Intent
- ○ Refused

Explain

History of ISP placement:

Yes

No

## When/Within:

- ○ 1-30 days
- ● 30-90 days
- ○ 3-6 months
- ○ 6+ months

Explain

Per chart

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-327**

PT was placed in ISP on 09/04/2022- PT endorced SI via writing.

EOH 02/16/2019; 06/06/2019; 09/04/2022

SC: 02/16/2019

History of in-custody suicide attempt:

Yes ☐

| No |
|----|

## When/Within:

○ 1-30 days
○ 30-90 days
○ 3-6 months
○ 6+ months

Explain

History of in-custody self-harm:

| Yes |
|-----|

No

## When/Within:

○ 1-30 days
○ 30-90 days
○ 3-6 months
● 6+ months

Explain

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-328**

Per chart, pt was placed in the SO on 2/16/2018 after attempting to hurt himself. No other information was provided

## Most recent SI:

| Previously Attempted Suicide | |
|---|---|
| Yes | ☐ |
| No | |

## When/Within:

● 1-5 years
○ 6-10 years
○ 11+ years

| Explain |
|---|
| Per CCBH, hx of tying a noose around his neck |

| Previous Self-Harm | |
|---|---|
| Yes | ☐ |
| No | |

## When/Within:

● 1-5 years
○ 6-10 years
○ 11+ years

| Explain |
|---|
| Per chart, hx of banging his head and cutting (per Techcare, pt is on razor restriction) |

| Family/Close Friend Attempted or Completed Suicide: | |
|---|---|
| Yes | ☐ |
| No | |

## When/Within:

○ 1-5 years
○ 6-10 years
○ 11+ years

| Explain |
|---|

## Recent Losses:

| Family | Friend | Career |
|---|---|---|

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-329**

Finance     Home     None reported

**When/Within:**

○ 1-5 years

○ 6-10 years

○ 11+ years

Explain

**History of Sexual Abuse:**

○ Yes

○ No

○ Refused

● None reported

| As a Child | As an Adult |
|---|---|

Explain

**History of Physical Abuse:**

○ Yes

○ No

○ Refused

● None reported

| As a Child | As an Adult |
|---|---|

Explain

**History of Emotional Abuse:**

○ Yes

○ No

○ Refused

● None reported

| As a Child | As an Adult |
|---|---|

Explain

**Concerns for Safety while incarcerated:**

| Other inmates | Staff | None reported |
|---|---|---|

Explain

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-330**

Combat Veteran:

Yes [ ]

No

**Symptoms of post-traumatic stress:**

( ) Yes

( ) No

( ) Refused

(•) None reported

Explain:

---

**▮▮▮▮▮▮▮▮▮▮**

**▮▮▮▮▮▮**

**▮▮▮**

---

**Current Withdrawal Symptoms:**

( ) Yes

(•) No

( ) On Withdrawal Protocol

Explain

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-331**

**Current Suicide Risk Acuity:**

⦿ Low

◯ High

Explain:

Pt denied current SI/HI/SIB.  Pt has been observed sleeping and eating all meals and has not engaged in self harming or aggressive bx while under observation in ISP.  Pt has been compliant with medication and reports he is ready to return to housing.  Pt was able to safety plan and agreed to notify jail staff if he begins to have SI/HI.  Pt will be given a LOW risk designation and cleared from ISP

**Provisional Diagnosis:**

Add Diagnosis Code  Remove Selected

**Plan:**

ISP placement not indicated, refer to classification

Cleared from ISP to JPMU

Remain in ISP with CTO in EOH

Remain in ISP with CTO in SC

Remain in ISP CTO with move to EOH

Remain in ISP CTO with move to SC

Additional provider to assess within 12 hours (Safety Cell)

Additional provider to assess within 12 to 24 hours (EOH)

Placement in ISP - EOH

Placement in ISP - Safety Cell

Consult with Psychiatry for Inpatient Admission

B and R-consult with Watch Commander for transport to an inpatient community facility

Medical Emergency Sendout

Explain:

**Refer to Psychiatric Sick Call in:**

24 hr

72 hr

1 week

Explain:

**Refer to MD Sick Call in:**

24 hr

72 hr

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-332**

Explain:

**Discharge from ISP with Follow Up in:**

24hrs

72hrs

1 week

2 weeks

4 weeks

6 weeks

12 weeks

Pre-Court Proceedings Assessment

Post-Court Proceedings Assessment

N/A (not clearing from ISP)

Court Proceedings Assessment Date:

Explain:

ESQUIVEL, CRISTAIN   400446006 (22749556)

**Ex. U-333**

# EXHIBIT V

GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:    ggrunfeld@rbgg.com
          vswearingen@rbgg.com
          pkaul@rbgg.com
          eanderson@rbgg.com
          hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email:    ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-WVG<br><br>**DECLARATION OF DARRYL LEE DUNSMORE IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Judge:    Hon. Anthony J. Battaglia<br><br>Trial Date:   None Set |

[3903205.1]

1 | (*counsel continued from preceding page*)

2 | CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
3 | OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4 | 401 B Street, Suite 1700
San Diego, California 92101-4297
5 | Telephone: (619) 699-2700
Facsimile: (619) 699-2701
6 | Email: christopher.young@dlapiper.com
isabella.neal@dlapiper.com
7 | oliver.kiefer@dlapiper.com

8 | BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
9 | ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
10 | 2760 Fifth Avenue, Suite 300
San Diego, California 92103-6330
11 | Telephone: (619) 232-2121
Email: bvakili@aclusandiego.org
12 | jmarkovitz@aclusandiego.org

13 | Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3903205.1]

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF DARRYL LEE DUNSMORE IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

**Ex. V-336**

## DECLARATION OF DARRYL LEE DUNSMORE

I, Darryl Lee Dunsmore, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     I am 54 years old. I have been incarcerated at the San Diego County Jail ("the Jail") multiple times over the past decade. Most recently, I was housed at the San Diego Central Jail facility on the third floor in cell 20 from December 13, 2019 to April 21, 2021. My booking number was BK19777041. I am currently incarcerated in the California Department of Corrections and Rehabilitation ("CDCR") at California Health Care Facility ("CHCF") in Stockton, California.

3.     I have been incarcerated in the Jail at least four or five times since 2002. I have returned to the Jail on out to court proceedings related to my original criminal sentence. I have been housed at the following facilities in the Jail: Central Jail, George Bailey Detention Facility, and South Bay Detention Facility.

4.     It is my understanding that I could be sent back to the Jail if I need to be present in court related to the criminal charges that resulted in me being sent to prison. I have two pending habeas petitions and an active appeal of a petition under SB 775. I also recently filed another motion for resentencing under SB 483. I anticipate returning to the Jail in the near future for resentencing or proceedings related to these and other petitions. I could also be sent back to the Jail if it were necessary for me to testify in this case about the problems I experienced in the Jail. In addition, I will parole from prison at some point in the future. When I parole, I will be sent back to San Diego County, which is the county in which I was convicted and where I lived prior to my arrest. While on parole, I could be arrested and placed in the Jail simply for allegedly violating the terms and conditions of my parole, whether or not the alleged violation constitutes a violation of a criminal law. I am deeply concerned that, if I am sent back to the Jail, I will experience problems similar to the problems I have experienced in the past.

[3882338.1]

1

DD

**Ex. V-337**

1    5.    I have physical disabilities.  I have a rare and advanced form of arthritis
2  known as Ankylosing Spondylitis ("AS").  I started to have back pain decades ago,
3  which was an early sign of AS.  I have sections of my spine fused together.  I often
4  experience inflammation, pain, and stiffness in other areas of the body, including the
5  hands and feet.  I use a wheelchair in CDCR.  I also used a wheelchair while
6  incarcerated at the Jail.

7    6.    My AS greatly affects the use of my hands.  Over the years, I have
8  slowly lost feeling in both of my hands, making it difficult to grip items.  I require
9  modified utensils to help me write and eat.  These utensils – a pencil and spoon –
10  have foam handles attached to them to help me with my grip.  I also use a personal
11  straw to help me drink.  Because of my AS, I cannot tip my head back properly to
12  drink things, so I require a straw when drinking.  I have fastened shirts for myself
13  that zipper off at the front, because that is the easiest way for me to take on and off
14  my shirts.  I did not use zippers at the Jail, but I created these ties at the front.
15  Typically, at the Jail, I did not change my shirt frequently.  It was hard to get
16  assistance to change my shirts, so I kept one on me for multiple days or weeks at a
17  time.

18    7.    To treat my AS, I receive injections of an experimental drug known as
19  Enbrel.  I receive an injection of Enbrel once every week in my upper left thigh.
20  Enbrel has been effective in treating my AS and has allowed me to be more mobile
21  than other patients with the condition.  I also require regular physical activity to stay
22  somewhat mobile.  The longer I spend lying down, the more difficult it is for me to
23  move days later.

24    8.    My disability waxes and wanes.  There will be days where I am able to
25  move around more than others.  Sometimes, my AS flares up and I will be in such
26  significant pain that I am paralyzed by it.  In those hours or days of paralysis, I need
27  assistance eating and performing other activities of daily living.  Many outside
28  observers do not understand how my disability presents itself differently depending

Ex. V-338

1  on the day. It has been difficult for me to receive consistent and adequate
2  accommodations for my disability in the Jail due to this lack of understanding.

3      9.    I have mental health disabilities. I have depression and anxiety. In the
4  past, I have been diagnosed as bipolar and schizophrenic by outside clinicians. I
5  accessed mental health care services in the Jail.

6      10.    I also have an intellectual disability, that I believe may be associated
7  with my arthritis. I struggle to process information and have to re-read things to
8  fully comprehend them.

9      11.    I have a number of serious medical conditions besides those already
10  described. I am a type II diabetic. I also suffer from dysphagia, which means I
11  struggle to swallow things on my own. I use a Nestle Food Thickener to help me
12  swallow certain liquids. I also suffer from Gastro-esophageal Reflux Disease
13  ("GERD") and high blood pressure. I also have chronic immunosuppression
14  because of the Enbrel rejections I receive.

15      12.    In my experience, the Jail is an unsafe and unfair place for incarcerated
16  people with disabilities.

17      13.    On August 16, 2018, I booked into San Diego Central Jail. I came
18  from CDCR and was there for resentencing of my original conviction. I was housed
19  in a Medical Observation Bed ("MOB") because of my medical conditions. I
20  booked into the Jail with the following assistive devices for my disability: a
21  wheelchair, walker, a cane, a mobility vest, magnifying glass, and orthotic shoes. I
22  had my modified spoon, straw, and pencil in my possession too. I also used waffle
23  foams on my bed rail. The foams enabled me to grip the sides of the bed and sit
24  upright. There are days where I sometimes cannot lift myself up on the bed.
25  Attached hereto as **Exhibit A** is a true and correct copy from my medical file of an
26  intake note indicating some of the assistive devices with which I arrived at the Jail.

27      14.    During the first few weeks of my time at the Jail, I was managing in the
28  MOB unit. The MOB cells have a bed, a toilet, and a sink. There is also an

[3882338.1]

3

1  adjustable table you can move up or down depending on your height.  The sink and
2  toilets have railings to help assist you, as they are low to the ground.  There were
3  three emergency call buttons in the cell.  There was also a TV mounted up near the
4  ceiling, although I had to rely on deputies to turn it on and off.  When I requested to
5  turn it on, deputies rarely did.

6      15.    Because I was able to receive more assistance and attention for my
7  physical and medical conditions in the medical unit, my symptoms from AS
8  lessened.  I was able to be somewhat more mobile and exercise out on the yard.

9      16.    On September 12, 2018, the Jail suddenly confiscated my wheelchair
10  and special spoon.  The floor staff informed me that on September 4, 2018, the Jail
11  had captured a video of me exercising out on the yard and walking around.  They
12  told me I was lying about my disability.  Attached hereto as **Exhibit B** is a true and
13  correct copy of a medical progress note indicating medical staff had received a
14  verbal order from Dr. Berkman to discontinue my wheelchair and special utensils.
15  As I explained, I am somewhat more mobile in my legs than I am in the use of my
16  back and hands.  My ability to perform daily activities can vary.  I require exercise
17  to treat my AS.  It is a form of pain management, because the longer I am inactive,
18  the worse my symptoms get.  Since my diagnosis of AS, specialists have prescribed
19  me exercise to treat my disability.

20      17.    Staff discharged me from the MOB on September 12, 2018.  When
21  staff confiscated my assistive devices and informed me I would no longer receive
22  care in the MOB, I panicked.  I knew that I would not be able to function without
23  these accommodations for my disability.  I was distraught and angry.  I began to
24  decompensate at the thought of not being able to eat or move around properly
25  without my special spoon and wheelchair.  I told staff that I was suicidal upon
26  learning of my discharge.

27      18.    Staff transferred me to Enhanced Observation Housing ("EOH").  I
28  stayed in an EOH cell for five or six days.  EOH cells are solitary confinement cells

[3882338.1]                                    4

Ex. V-340

1   for incarcerated people at risk of self-harm or suicide. Clinical and custody staff are

2   supposed to conduct routine welfare checks every 15 minutes. The Jail denied me

3   my property and clothes. I covered myself with a safety garment. There was only a

4   toilet and a thin mattress in the cell.

5       19.     For multiple days, I slept on the floor on a thin mattress by the cell's

6   food port. I did not have my wheelchair and there were no grab bars installed by the

7   toilet, making it very hard to use the restroom. I often made a mess in the cell when

8   I tried to use it, sometimes urinating and defecating on the ground. Despite asking

9   for my ADA cutlery on multiple occasions, staff refused to give them to me.

10   Without my special utensils, I could not eat the food staff brought to me. Because I

11   did not want to eat with my hands like an animal, I refused the food brought to me

12   for those five or six days I was in the EOH. During that time, the room smelt like

13   urine and was filled with trash and dirtied toilet paper. Attached hereto as **Exhibit**

14   **C** is a true and correct copy of a September 16, 2018 clinical staff observation note

15   during my EOH stay. I pleaded with staff as they passed by that I needed to be

16   housed in an MOB cell and I needed my assistive devices. They were indifferent to

17   my pleas.

18       20.     Suddenly, the Jail discharged me from the EOH cell and transferred me

19   back to CDCR on or around September 19, 2018.

20       21.     My experience in the Jail in 2018 has affected the way I program in Jail

21   and prison significantly. While incarcerated, I have always had to fight to receive

22   help because no one has understood my disability. I feel like I have to hide my

23   mobility because I am afraid that Jail and prison staff will label me a liar and take

24   away my assistive devices. Because medical and custody personnel do not

25   understand my disability while incarcerated, I have to stay debilitated to prevent

26   myself from being even more debilitated without my assistive devices.

27

28

[3882338.1]

Ex. V-341

22.     On December 13, 2019, I again returned to the Jail for resentencing.  I resided there for over a year, until I transferred back to CDCR on April 21, 2021.  I was housed in an MOB cell.

23.     I arrived at the Jail with the following assistive devices I used in state prison: my spoon, straw, and writing utensil, wheelchair, cane, orthotic shoes, mobility vest, and magnifying glass to help me see.  Physicians within CDCR had prescribed me these assistive devices on a permanent basis.  Attached hereto as **Exhibit D** is a true and correct copy from my medical file of a CDCR form listing the assistive devices prescribed to me, updated on December 5, 2019, shortly before I arrived at the Jail.  I also arrived with a large amount of my legal property, which included paperwork related to my criminal and civil proceedings.  Upon my arrival, the Jail immediately confiscated many of my assistive devices, including my spoon and straw, cane, shoes, vest, and magnifying glass.  The Jail also confiscated my legal property and did not return it to me for several months.

24.     Given that I have been incarcerated at the Jail multiple times, staff should have been aware of my disability-related accommodations upon my arrival. I did not receive my cane during the entirety of my stay at the Jail from December 2019 until April 2021 and only received one when I returned to CDCR.  The Jail later returned my ADA-accessible straw and spoon to me.

25.     I also arrived back at the Jail with a grabber, which is a device the same length as a cane that has claws that open and close at the end.  I used the grabber in CDCR to help pick items up, as my disability makes it difficult to bend down.  The Jail confiscated my grabber upon arrival and never returned it to me.

26.     At the time of my incarceration in December 2019, I received four shots of insulin to treat my diabetes.  When I first arrived at the Jail, I received my four shots of insulin.  The Jail began to taper me off insulin, giving me only one shot a day for the next few days.  The Jail then discontinued my insulin altogether.  They would only give me insulin if my numbers were over 250 mg/dL.  Attached hereto

[3882338.1]

6

1 | as **Exhibit E** is a true and correct copy of a nursing note from my medical file in
2 | which I asked staff about the change in my levels of insulin. The Jail would not
3 | relent. As a result of this sudden change in my insulin levels, I became very thirsty,
4 | started urinating frequently, and experienced extreme fatigue.

5 |     27. The Jail also refused to continue my medical diet to help treat my
6 | dysphagia. While in CDCR custody and during my previous incarcerations at the
7 | Jail, I was on a medical diet. This diet consisted of ground food and thickened
8 | liquids. Attached hereto as **Exhibit F** is a true and correct copy of a December 4,
9 | 2018 medical classification document from my time in CDCR noting that I required
10 | a "chopped/ground" diet.

11 |     28. Because the food Jail staff gave to me was not considered a ground
12 | diet, I used my ADA spoon to try and cut up the food to make it easier to eat.
13 | Around early February 2020, I broke my ADA-accessible spoon while trying to
14 | grind and cut the meat included in my meal. I requested a new ADA spoon.
15 | Attached hereto as **Exhibit G** is a true and correct copy of an inmate request form I
16 | filed on February 8, 2020, noting that I had broken my ADA spoon and asking for a
17 | new one. While waiting for a new spoon, I had made a makeshift spoon by breaking
18 | the handle on my water pitcher and using a paper clip, homemade string, and tape to
19 | tie it all together. In March 2020, more than a month later, the Jail gave me a
20 | pediatric spoon to use, but it was too small for me to grip effectively. Attached
21 | hereto as **Exhibit H** is a true and correct copy of an MOB progress note in which
22 | RN Shiflet issued me a spoon on March 8, 2020. I requested a larger spoon on
23 | several occasions. Nursing staff could see that the pediatric spoon was useless.
24 | They took the spoon away and told me they would search for a better alternative.

25 |     29. In December 2020, almost a year after I had requested a replacement
26 | spoon, the Jail gave me back the very same pediatric spoon that did not work. I was
27 | shocked and frustrated that they gave me the same ineffective spoon. Attached
28 | hereto as **Exhibit I** is a true and correct copy of a December 31, 2020 document

[3882338.1]

7

1 | from my medical file reflecting my discussion with nursing staff in which I
2 | explained that the pediatric spoon was too small for me and I was unable to use it.
3 | During the rest of my incarceration, I continued to use my homemade spoon to eat.
4 | Using this makeshift spoon put me at risk because I had created it using contraband
5 | materials and staff could have issued me a disciplinary infraction for keeping
6 | contraband items.  However, I was desperate for a working utensil, and so I
7 | accepted the risk.

8 |   30.   I also had issues receiving accessible writing utensils.  Because of my
9 | AS, I struggle to grip a pencil normally, making writing very difficult.  When I
10 | arrived at the Jail in 2019, I brought with me writing utensils with long handles,
11 | which allowed me to grip the length of the pencil.  The Jail confiscated those
12 | utensils upon my arrival.  I asked for longer writing utensils so that I could fit my
13 | therapeutic foam handles on the length of the pencil.  Attached hereto as **Exhibit J**
14 | is a true and correct copy of a document from my medical file noting that I had filed
15 | a sick call slip on or around February 7, 2020 requesting a proper writing utensil
16 | because I could not use the small pencils.

17 |   31.   The Jail refused to give me longer writing utensils for over a year and
18 | continued to make me use small and short pencils I could not grip.  I ended up
19 | having to modify the Jail-issued pencils myself.  I used my Nestle Food Thickener
20 | as a paste and lengthened a pencil to use it.  About a year later, the Jail supplied me
21 | with a special writing device that I had never used before.  It was made up of a small
22 | plastic tube (where the pencil could go through) and a string that I could wrap
23 | around my hand to allow me to write.  I asked staff to help me learn how to use the
24 | device, but deputies and medical staff did not know how it worked either.  Before
25 | anyone could give me instructions about how to use it, a deputy confiscated the
26 | device during a cell search and threw it away.  I believe the deputy threw it out
27 | because he thought it was contraband.

28 |

[3882338.1]                  8

**Ex. V-344**

1        32.     During my incarceration at CHCF, I had a three tier locker to store my

2  clothing, property and legal property. Because I am a wheelchair user with AS, I

3  struggle to bend down and pick things up from the floor. The three tier locker

4  allowed me to store my property so that I did not have to bend down. Upon my

5  arrival to the Jail on December 13, 2019, I had to store my property on the ground

6  because the cell was not equipped with any storage or shelving. I requested

7  specialized shelving on or around February 10, 2020 in an inmate request form. I

8  explained that it was difficult to bend down and pick things up. A true and correct

9  copy of a document from my medical file noting this inmate request form is attached

10  hereto as **Exhibit K**. The Jail did put an extra table in my cell, but it could not store

11  all of my property and I had to place the rest on the ground.

12        33.     In early March 2020, after bending over in my wheelchair to pick some

13  of my property off the ground, I noticed a sharp pain in my groin area. After a few

14  days, a protrusion formed around my belly button and there was consistent pain in

15  the area. I first verbally reported the pain to medical staff who were passing by my

16  cell. On March 11, 2020, I reported that I had a hernia to medical staff in a sick call

17  slip. Medical staff had different opinions about whether or not I had a hernia.

18  When I first saw a doctor, on or around March 26, 2020, he diagnosed me with a

19  hernia. A few days later, on or around March 30, 2020, another doctor said that I

20  did not have a hernia. The doctor gave me an abdominal binder to help with my

21  pain. Attached hereto as **Exhibit L** are true and correct copies of progress notes

22  from my medical records noting these interactions with medical staff.

23        34.     I continued to experience pain in my groin and when peeing and a

24  protrusion from my belly. The protrusion seemed to swell when I started coughing.

25  On or around June 4, 2020, I put in a medical request stating that I continued to have

26  difficulty peeing and I thought my hernia was worsening. Medical staff gave me a

27  new abdominal binder but did not provide me with more treatment. Attached hereto

28

1  as **Exhibit M** are true and correct copies of medical progress notes from my file
2  confirming this.

3      35.    There were many issues with the emergency call button system at the
4  Jail, which put people incarcerated there at a serious risk of harm.  There are three
5  emergency call buttons in the Jail's medical isolation cells—one next to the bed, one
6  down by the toilet, and one on a cell wall near a speaker.

7      36.    During my 2019 incarceration, I discovered that the only functioning
8  call button was the one near the toilet, which the Jail had informed me was intended
9  for emergency use only.  At the time, I was cutting up my food to be able to eat it
10 more easily.  I started to choke on a large piece of food I had not cut properly.  I
11 could not breathe and I frantically pushed the call button by my bed and the one on
12 the wall.  I got no response.  I pushed the one by the toilet and staff finally
13 responded twenty or thirty minutes later.  Luckily, by the time staff arrived I had
14 stopped choking and managed to swallow the food.  A nurse came into my cell and I
15 explained the situation: that the call buttons did not work because no one responded
16 to me when I pressed them.  The nurse seemed upset with me.  She said, "if you
17 have that kind of problem, you'll just go to the rubber room."  The rubber room
18 refers to a safety cell that people go to when on suicide watch.  I believe the nurse
19 was upset that I pushed the emergency call button but, by the time she came to see
20 me, I was no longer choking.  I think she mentioned the rubber room as a threat,
21 saying that I should not push the call button unless it was a real emergency.  From
22 my experience at the Jail, if a person inconveniences staff enough, they will put you
23 in the rubber room as punishment.

24     37.    The Jail's entire call button system malfunctioned on multiple other
25 occasions.  My cell tended to get extremely cold, which exacerbated my AS
26 symptoms.  In order to stay warm, I covered up the vents in my cell.  There is a
27 sensor that should go off when I cover the vents for an extended period of time.  I
28 knew this from prior incarcerations at the Jail.  However, the sensor was faulty and

[3882338.1]                                    10

1  would go off at random intervals, even when the vent was not covered. I believe
2  this meant the Jail's entire alarm system had glitches.

3      38.    I also had problems showering in the medical observation unit. In my
4  cell, I had a single shower. I requested to use the shower in my cell on multiple
5  occasions, but deputies refused to let me shower alone. When the COVID-19
6  pandemic started, I became increasingly nervous about using a communal shower.
7  I am immuno-compromised, which means that I was and continue to be at risk of
8  becoming seriously ill or dying from COVID-19 or any other infection. I asked
9  deputies in my unit to turn the water on for the shower in my cell so that I could
10 shower safely, but they refused me. I was too scared to use communal showers for
11 fear of becoming sick and dying. Because I could not shower with other people, I
12 bird bathed in my cell. Bird bathing means to use the water from your cell's sink to
13 clean yourself. I cleaned myself this way for the sixteen or so months while I was in
14 custody at the Jail.

15     39.    The Jail consistently denied me proper access to legal research, its law
16 library, and the courts.

17     40.    I have been recognized as a pro per litigant by the California Court of
18 Appeal's Fourth Appellate District. I was also proceeding pro se on several federal
19 habeas petitions while in the Jail. When you are designated as pro per, you have
20 access in the Jail to the law library and a runner, who will deliver documents to the
21 court for you. There are also copy and print out services available, where I can use
22 pleading paper and legal-size envelopes. The Jail will not provide you with these
23 services unless you are pro per.

24     41.    I filed multiple cases in the Superior Court against the San Diego
25 Sheriff's Department for their failure to accommodate my disability and medical
26 conditions, as well as about my own criminal conviction. The Jail denied me pro
27 per privileges, including access to legal research, the law library, and other
28 resources. When I showed the Jail my court designations, they told me to speak

Ex. V-347

1  with the Office of Assigned Counsel ("OAC"). The OAC then referred me back to
2  the court to get pro per access, creating a never-ending cycle.

3      42.    The Jail also had a separate legal research process available where you
4  could request different materials that amount to a certain number of pages.
5  However, this process did not really allow me to perform case law research. I
6  would have to know exactly what case or material I was looking for; I was unable to
7  access a computer to do my own reading and research, which I could have done at
8  the Jail's law library.

9      43.    Because the Jail denied me this access, I was unable to develop an
10  accurate and sufficient record in court. I incurred multiple filing fees, and I believe
11  the lack of access to legal research and resources contributed to the dismissal of
12  several of my civil claims. Attached hereto as **Exhibit N** are true and correct copies
13  of request forms I filed stating the Jail was obstructing my access to the courts and
14  legal research.

15      44.    The Jail also confiscated multiple boxes of my legal property when I
16  first arrived in 2019. The Jail claimed that I had an excessive amount of paperwork,
17  but that was not true. I had paperwork that was able to fit within six or seven cubic
18  square feet and there remained plenty of room in my cell. When incarcerated
19  previously, I never had an issue with legal property.

20      45.    I continued to push to know where my legal property was by filing
21  multiple grievances. A female Sergeant Sipperly told me that she had stored my
22  paperwork in her office. I thought that was inappropriate and a confidentiality issue,
23  as many of my legal documents involved complaints I had made against the Jail
24  during my 2018 incarceration. After about two or three weeks, I received a small
25  portion of my legal property back. I did not receive the rest of my property until
26  about 90 days after I first arrived at the Jail. When I received the papers back, I
27  discovered that several documents had disappeared.

28

[3882338.1]                          12

46.     I lost many materials related to potential challenges for my criminal convictions and civil proceedings.  One of the boxes that disappeared involved crucial discovery related to my original conviction.  Several grievances I filed against the Jail and Sheriff's department, as well as complaints against the Citizen's Law Enforcement Review Board ("CLERB") went missing.

47.     I have had many problems using the grievance process at the Jail.  I estimate that I have filed over twenty to thirty grievances about the Jail's failure to accommodate my disability and medical needs, as well as allow me access to my pro per privileges.  The Jail did not respond to the majority of my grievances.  I believe many deputies simply threw my grievances away and did not process them.  Attached hereto as **Exhibit O** is a November 27, 2020 grievance I filed stating that the Jail was failing to provide a timely response or any response at all to my grievances.

48.     When staff do not understand people with disabilities, those people's lives are not only endangered, but their livelihood is disrupted, just as mine was when Jail staff continually refused me my assistive devices that allow me to live my life to the fullest.  I believe the Jail needs checks and balances to ensure people incarcerated there are treated humanely.  I also believe the Jail's grievance and legal access procedures need a significant overhaul.  A system that does not allow people to air their grievances properly disempowers individuals, stops them from rehabilitating and educating themselves, and keeps them subject to mental and physical abuse.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[3882338.1]

13

Ex. V-349

1      49.    I agreed to be a class representative in this case because I want to help

2 improve the medical, dental, and mental health care at the Jail, ensure that

3 incarcerated people with disabilities are accommodated and treated fairly, ensure

4 access to rehabilitative programs, and help make the Jail safe and secure for all

5 people. I have been cooperating fully with my counsel and am responding to all

6 requests for information to the best of my ability and recollection, and will continue

7 to do so in the future. My lawyers keep me updated on the progress of this case, and

8 I will review all materials provided to me and provide my input to the best of my

9 ability. When I have questions about the case, I will ask the attorneys for help to

10 understand everything to the best of my ability.

11      I declare under penalty of perjury under the laws of California and the United

12 States of America that the foregoing is true and correct, and that this declaration is

13 executed at Stockton, California this 30 day of Mar , 2022.

Darryl Lee Dunsmore

[3882338.1]

14

# EXHIBIT W

GAY CROSTHWAIT GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
2001 Addison Street, Suite 300
Berkeley, California 94704-1165
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
Email: ajf@aaronfischerlaw.com

(*additional counsel on following page*)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ERNEST ARCHULETA, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00406-AJB-WVG |
| Plaintiffs, | **DECLARATION OF ERNEST ARCHULETA IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** |
| v. | |
| SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, | Judge: Hon. Anthony J. Battaglia |
| | Trial Date: None Set |
| Defendants. | |

[3903205.1]

1 | (*counsel continued from preceding page*)

2 | CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
3 | OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4 | 401 B Street, Suite 1700
San Diego, California 92101-4297
5 | Telephone: (619) 699-2700
Facsimile: (619) 699-2701
6 | Email: christopher.young@dlapiper.com
isabella.neal@dlapiper.com
7 | oliver.kiefer@dlapiper.com

8 | BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
9 | ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
10 | 2760 Fifth Avenue, Suite 300
San Diego, California 92103-6330
11 | Telephone: (619) 232-2121
Email: bvakili@aclusandiego.org
12 | jmarkovitz@aclusandiego.org

13 | Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3903205.1]

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF ERNEST ARCHULETA IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

Ex. W-353

# DECLARATION OF ERNEST ARCHULETA

I, Ernest Archuleta, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    I have been incarcerated at the San Diego County Jail ('the Jail") since July 6, 2019.  I am housed at San Diego Central Jail in housing unit 7B, cell 8. My booking number is 19741878.  I am 63 years old.

3.    I have been sentenced to state prison in the custody of the California Department of Corrections and Rehabilitation ("CDCR").  It is my understanding that I could be sent back to the Jail if I ever need to be present in court related to the criminal charges that resulted in me being sent to CDCR, which I am attempting to challenge.  I could also be sent back to the Jail if it is necessary for me to testify in this case about the problems I experienced in the Jail.  In addition, I also will parole from CDCR at some point in the future.  When I parole, I will be sent back to San Diego County, which is the county in which I was convicted and where I lived prior to my arrest.  When I am on parole, I can be arrested and housed in the Jail simply for allegedly violating the terms and conditions of my parole, whether or not the alleged violation constitutes a violation of a criminal law.  I am concerned that, if I am sent back to the Jail, I will experience problems similar to the problems I have experienced in the past.

4.    I have physical disabilities.  I have degenerative disc disease and severe osteoarthritis in my left knee.  My left leg is also shorter than my right.  Because of these conditions, I need a wheelchair to travel longer distances.

5.    I experience chronic neck pain that affects my daily life; I am unable to turn my head to the left and I cannot sit upright for extended periods of time.  The level of pain consistently stays at an 8 out of 10.  I also have high blood pressure and take the medication Atenolol to control it.

Ex. W-354

6.      I have depression and access mental health care services in the Jail.   I take Trazadone and Remeron, which are both antidepressants.  I also take Benadryl for allergies.

7.      The Jail has failed to provide me with adequate medical care.  Before I entered the Jail, Dr. David J. Smith of the San Diego Comprehensive Pain Management Center had referred me for neck surgery.  I arrived at the Jail in July 2019 wearing a neck brace. It is shown in the photo on my wrist band.  About a month after arriving, I was placed alone in a cell on the medical floor due to vomiting and diarrhea.  I was there about a week and when I returned to my regular cell my neck brace was missing.  I requested it back but the doctors here ignored my requests. Not having the neck brace makes my neck pain worse.

8.      I informed medical staff during intake that I had a spinal injury requiring neck surgery.  During that encounter, I signed a Release of Information ("ROI") form so medical staff could obtain records from Dr. Smith.  Attached hereto as **Exhibit A** is a true and correct copy of notes from my encounter with medical staff during intake.  On July 30, 2019, I filed a sick call request after receiving no additional information about my surgery.  A true and correct copy of that sick call request and the response from Jail medical staff is attached hereto as **Exhibit B**.  The response from Jail nursing staff was an instruction that I sign another ROI to obtain my outside medical records, even though I had already done that when booked into the Jail.  To this day, the Jail has not provided me a referral to a neck surgeon or even obtained my outside records from my neck specialist. Attached hereto as **Exhibit C** is an August 12, 2019 CT Scan recognizing indicating I have "severe degenerative disc disease" in my spine.   Despite this evaluation, the Jail has not referred me for surgery or outside treatment, and I suffer neck pain that affects my ability to perform activities of daily life like dressing myself.  The Jail also has not provided me with physical therapy to manage my neck problems, despite my requests.

**Ex. W-355**

9.      I also have degenerative conditions affecting my knees.  Before I entered the Jail, a specialist recommended that I have a knee replacement.  Attached hereto as **Exhibit D** is an August 6, 2019 progress note from nursing staff confirming that I was "recommended for surgical repair" of my knee.  As was the case with my neck surgery, the Jail has failed to refer me to a surgeon to operate on my knee.  In my first month at the Jail and again later, a physician told me that the San Diego Sheriff's department would not pay for my knee replacement because I was awaiting transfer to CDCR custody.  As a result, I have constant pain in my knee and hip, affecting my ability to walk.

10.      On numerous occasions, the Jail has failed to refill my daily blood pressure medication, Atenolol, for several days. Several times, this cause my blood pressure to soar high and I became flushed and had to go the medical floor.   It is my understanding that the delays in receiving my medication happen because Jail medical staff forget to reorder the medication and do not have a backup supply available.  Attached hereto as **Exhibit E** is a true and correct copy of a June 3, 2020 encounter with medical staff, in which medical staff noted that nurses could not find a supply of my blood pressure medication in the medication room.  In May 2020, the Jail ran out of my medication for over a week.  They did not reorder it until I filed a sick call slip asking for my blood pressure medication.  Attached hereto as **Exhibit F** is a true and correct copy of the sick call slip I filed on May 28, 2020, asking for my meds.  Nursing staff responded and said they had reordered my medication that same day.  They did not offer me any backup supply of the medication.  Not having that medication gives me blurred vision and bad headaches, making it hard for me to engage in activities of daily living.  I worry that this will happen again.

11.      The Jail has discriminated against me based on my disabilities. For example, the severe osteoarthritis in my left knee and left hip means I must use a wheelchair for long-distance travel.  Early in my incarceration, around July or

**Ex. W-356**

August 2019, I started using crutches that I requested and received from Jail medical staff. I used them to build up strength in my legs, hoping that I would eventually be able to walk on my own. It was my own form of physical therapy because the Jail was not providing me with any. The Jail did not let me keep both my wheelchair and crutches; they confiscated my crutches while I went to yard. On September 5, 2019, I filed a sick call request asking for crutches. Attached hereto as **Exhibit G** is a true and correct copy of that sick call request slip and the Jail's response. In the response, Jail staff wrote that I had to choose between having crutches or a wheelchair, stating "if you would rather use crutches, we will … replace the wheelchair with a pair of crutches if the doctor deems such are indicated." I decided to keep a wheelchair because without it, I would be at risk of falling and seriously injuring myself. I now use my wheelchair for physical therapy; I stand behind my wheelchair and lean on it for support when trying to walk.

12. I have experienced other types of disability discrimination and retaliation and been denied equal access to jail programs. To review this declaration with my attorney, a deputy told me the elevator was broken so I was forced to climb a flight of stairs to get to an attorney visiting room. I was worried I would fall down the stairs, which has happened in the past. I was also worried this could be retaliation for being a named plaintiff. During the attorney visit, I observed other incarcerated wheelchair users who are not named plaintiffs in this case who came for attorney visits and used the elevator.

13. On another occasion, deputies did not allow me to use my wheelchair to travel to a presentencing hearing. I was waiting in the court holding area at Central. A deputy took away my wheelchair and then tried to force me to walk to the hearing. Because I cannot walk long distances on my own, the hearing had to be postponed, delaying my criminal case.

14. The Jail is not a safe place for people with disabilities like me. In August 2019, deputies forced me to walk up the stairs to attend a family visit, rather

**Ex. W-357**

than use the elevators in my wheelchair.  When trying to walk back down the stairs, I lost my balance, fell, and struck my head.  I was in pain for a couple of months after that.

15.     The Jail is not accessible to people with disabilities in other ways. The day room tables have no cut out spaces for wheel chair access. There are no grab bars on the toilet in my cell, making it harder to use the restroom. I am informed and believe that there are six of us currently on my floor who use wheelchairs and only one ADA cell.   But the wheelchair users are not currently placed in that cell.

16.     I have also had issues receiving adequate mental health care.  I sought mental health treatment shortly after being booked into the Jail in July 2019.  At that time, several close family members had recently died as well as several close friends.  A mental health clinician saw me in August 2019.  However, I was not able to speak with a psychiatrist until four months later on December 16, 2019. Attached hereto as **Exhibit H** is my initial encounter with a psychiatrist.  During the appointment, I expressed thoughts of harming myself.  At that point, I was really struggling to manage my depression; I was dealing with serious charges and recent deaths in my family and among my friends.  Two mental health staff members have apologized to me about the delays in my care, and explained that the Jail is severely understaffed.

17.     My mental health has declined since Dr. Smerud – the psychologist that I met with for wellness checks and counseling – retired in or around June or July, 2021.  Since then, I have not been able to consistently see a mental health staff member for counseling, which has best helped me managed my depression.

18.     When I have interacted with psychiatrists and mental health personnel, they usually visit me quickly, cell-side, where other incarcerated people can hear. Even more upsetting, typically a deputy is present for the entirety of the conversation.  A deputy will stand between me and my provider.  I do not trust custody staff with my personal information.  The lack of confidentiality makes it

[3867416.1]                                             5

1   very difficult to express my honest feelings with mental health staff, and to feel like

2   I am making progress in managing my depression.

3        19.    I have been at the Jail for over two and a half years, but I have never

4   been offered a dental cleaning or routine teeth examination.

5        20.    During my time at the Jail, I have never received an eye examination or

6   prescription eye glasses.  I need prescription eye glasses to read signs and navigate

7   around the Jail. Although I have asked for prescription eye glasses several times, the

8   only glasses made available to me are magnifying reading glasses that I purchased

9   in the canteen.

10        21.    In my time at the Jail, there have been many times that I needed help

11   but did not ask for it because there are too few deputies and they do not stop during

12   their rounds to listen to me.  Recently, I believe there has been only one deputy on

13   our floor with 170 incarcerated people.

14        22.    Since Covid-19 began, I have been locked down most of the time.  I get

15   out of my cell only about an hour or two per week.  Our "yard" is an enclosed space

16   without sunlight.  I have been allowed to go there only about once a month.  This

17   isolation and lack of exercise and fresh air have taken a toll on my mental health.

18        23.    I agreed to be a class representative in this case because I want to help

19   improve the medical, dental, and mental health care at the Jail, ensure that

20   incarcerated people with disabilities are accommodated and treated fairly, and help

21   make the Jail safe and secure for all incarcerated people.  I have been cooperating

22   fully with my counsel and am responding to all requests for information to the best

23   of my ability and recollection, and will continue to do so in the future.  My lawyers

24   keep me updated on the progress of this case, and I will review all materials

25   /////

26   /////

27   /////

28   /////

Ex. W-359

Case 3:20-cv-00406-AJB-WVG   Document 128-12   Filed 05/02/23   PageID.4896   Page 9 of 10
Case 3:20-cv-00406-AJB-WVG   Document 112-2   Filed 04/28/23   PageID.3968   Page 9 of 10
378 of 473

1   provided to me and provide my input to the best of my ability.  When I have

2   questions about the case, I will ask the attorneys for help to understand everything to

3   the best of my ability.

4        I declare under penalty of perjury under the laws of California and the United

5   States of America that the foregoing is true and correct, and that this declaration is

6   executed at San Diego, California this ___9th___ day of March, 2022.

7

8                                                                  _Ernest Archuleta_

9                                                                  Ernest Archuleta

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3867416.1]                                      7

Ex. W-360

# EXHIBIT X

Ex. X-361

1   GAY CROSTHWAIT GRUNFELD – 121944
    VAN SWEARINGEN – 259809
2   PRIYAH KAUL – 307956
    ERIC MONEK ANDERSON – 320934
3   HANNAH M. CHARTOFF – 324529
    ROSEN BIEN GALVAN & GRUNFELD LLP
4   101 Mission Street, Sixth Floor
    San Francisco, California 94105-1738
5   Telephone: (415) 433-6830
    Facsimile: (415) 433-7104
6   Email:      ggrunfeld@rbgg.com
                vswearingen@rbgg.com
7               pkaul@rbgg.com
                eanderson@rbgg.com
8               hchartoff@rbgg.com

9   AARON J. FISCHER – 247391
    LAW OFFICE OF
10  AARON J. FISCHER
    2001 Addison Street, Suite 300
11  Berkeley, California 94704-1165
    Telephone: (510) 806-7366
12  Facsimile: (510) 694-6314
    Email:      ajf@aaronfischerlaw.com

13  (*additional counsel on following page*)

14  Attorneys for Plaintiffs

15

16              UNITED STATES DISTRICT COURT

17             SOUTHERN DISTRICT OF CALIFORNIA

18  DARRYL DUNSMORE, ERNEST          | Case No. 3:20-cv-00406-AJB-WVG
    ARCHULETA, ANTHONY EDWARDS,      |
19  REANNA LEVY, JOSUE LOPEZ,        | **DECLARATION OF JOSUE**
    CHRISTOPHER NELSON,              | **LOPEZ IN SUPPORT OF**
20  CHRISTOPHER NORWOOD, and         | **PLAINTIFFS' MOTIONS FOR**
    LAURA ZOERNER, on behalf of      | **PRELIMINARY INJUNCTION**
21  themselves and all others similarly situated, | **AND PROVISIONAL CLASS**
                                     | **CERTIFICATION**
22              Plaintiffs,          |
                                     | Judge:     Hon. Anthony J. Battaglia
23         v.                        |
                                     | Trial Date: None Set
    SAN DIEGO COUNTY SHERIFF'S       |
24  DEPARTMENT, COUNTY OF SAN        |
    DIEGO, CORRECTIONAL              |
25  HEALTHCARE PARTNERS, INC.,       |
    LIBERTY HEALTHCARE, INC., MID-   |
26  AMERICA HEALTH, INC., LOGAN      |
    HAAK, M.D., INC., SAN DIEGO      |
27  COUNTY PROBATION DEPARTMENT,     |
    and DOES 1 to 20, inclusive,     |
28              Defendants.          |

[3903205.1]

Case No. 3:20-cv-00406-AJB-WVG
DECLARATION OF JOSUE LOPEZ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

Ex. X-362

1 | (*counsel continued from preceding page*)

2 | CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
3 | OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4 | 401 B Street, Suite 1700
San Diego, California 92101-4297
5 | Telephone: (619) 699-2700
Facsimile: (619) 699-2701
6 | Email: christopher.young@dlapiper.com
isabella.neal@dlapiper.com
7 | oliver.kiefer@dlapiper.com

8 | BARDIS VAKILI – 247783
JONATHAN MARKOVITZ – 301767
9 | ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
10 | 2760 Fifth Avenue, Suite 300
San Diego, California 92103-6330
11 | Telephone: (619) 232-2121
Email: bvakili@aclusandiego.org
12 | jmarkovitz@aclusandiego.org

13 | Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3903205.1]

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF JOSUE LOPEZ IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

**Ex. X-363**

DocuSign Envelope ID: 089AED53-F70A-4123-B99E-538CC7B0A3EA

## DECLARATION OF JOSUE LOPEZ

I, Josue Lopez, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     I was incarcerated in the San Diego County Jail (the "Jail") from October 8, 2019 until May 12, 2021.  During that time, I was awaiting trial.  I was released on bail on May 12, 2021.

3.     From my experiences, the Jail is a very unsafe and inaccessible place for incarcerated people with disabilities.  I am deaf and my primary method of communication is American Sign Language ("ASL").  I can rely on written notes in the absence of a sign language interpreter.  I am not fluent in lip-reading in English, but I am able to understand some information.  The Jail consistently refused to accommodate my hearing disability while I was incarcerated.

4.     I was booked into Vista Detention Facility ("Vista") on or around October 8, 2019.  Shortly after my arrival, I attended an initial mental health appointment during which custodial staff kept me handcuffed to a bar in the room which made it impossible for me to use my hands to sign effectively with the in-person interpreter about my mental health.

5.     At Vista, I could not keep in regular contact with my wife or attorney because the facility did not have any interpreting services or Video Relay services, and its Telecommunication Device for the Deaf ("TTY") machine was not in working order.  The Jail had a sign that said deaf people can access the TTY to communicate, but when I asked correctional staff about it, no one knew how to operate it.  I tried to use it a few days after arriving at the Jail, but it did not work. Several times I complained to staff about its non-working condition as well as the lack of access to communication devices, but they ignored my repeated requests for help fixing the machine.  Because of the lack of communication options, I

[3737812.7]

1

**Ex. X-364**

DocuSign Envelope ID: 089AED63-5704-44E3-B99F-538CC7B0A3FA

1  sometimes asked fellow incarcerated people to make phone calls for me in order to
2  relay important messages.

3       6.     I transferred to George Bailey Detention Center ("George Bailey") on
4  or around December 12, 2019.  During the first few months of my time at the
5  facility, the most effective point of contact I had with my wife was through short, in-
6  person visits.  But because the facilities were overcrowded, it was difficult to
7  schedule visits.  There was a TTY at George Bailey, but staff did not know how to
8  operate it.  When I tried to ask staff to use the TTY, they often refused to allow me
9  to use it.  Staff never once offered me access to the TTY.  There was also a thirty-
10  minute video conferencing method called Securus.  During my time in the Jail, these
11  video conferencing calls were expensive for me and my family.  It was around $100
12  a month to participate in frequent calls with my loved ones.  These calls also had
13  poor network connectivity, so it was hard to use this method.  When the COVID-19
14  pandemic began in March 2020, George Bailey suspended all in-person social
15  visiting.  They suspended in-person social visits from March 2020 until July 2020,
16  and then again in November 2020 until May 2021.  In December 2020, they
17  suspended all video visits as well.

18       7.     When the Jail suspended social visits, I had to rely on just the TTY to
19  communicate with my family.  The TTY is a special device, similar to a typewriter,
20  that allows speech-to-text communication.  The TTY was not effective for
21  communication; there was usually a poor signal which stopped all communication,
22  and even when the signal worked, words often became garbled when two people
23  spoke at the same time, messing up the translation.  My conversations over the TTY
24  took much longer than normal voice phone calls.

25       8.     Many deputies at George Bailey became visibly frustrated with me
26  when I asked to use the TTY.  Deputies frequently denied me access to the TTY
27  when I requested it.  They said they were "too busy" or "short-staffed" to take me to
28  use it.  They also delayed my request by stating they would help me "later" or they

Ex. X-365

"needed to ask the team" if I was allowed to use the TTY. When I finally did get to use the TTY, and it was slow to operate because of poor network connection, the deputies rushed me to end my call and did not allow me to finish my conversations with my loved ones or attorneys. To take one example, on March 16, 2021, I requested to use the TTY several times. I waited hours, and was not allowed to use the TTY to call my wife until 11:45 pm. I was unable to reach my wife because she was most likely asleep by the time I called her. I asked to use the TTY the next day and explained that I could not reach my wife due to the late hour that I called the night before. Staff originally accepted my request, but later came back and told me the TTY had been moved to a different area of the Jail, without my knowledge. Deputies did not escort me to the TTY's new location and I was unable to call my wife for a second time.

9.      I tried to raise the issues of TTY access with staff on several occasions. For example, on October 3, 2020, I spoke with Sergeant Cortes-Garcia about the issue and he said he would help resolve it. For a few days after my conversation with the Sergeant, it was easier to access the TTY when I requested it from staff. However, after those few days, custodial staff went back to refusing or delaying my access. Deputies continued to be dismissive or outright rude to me when I asked to use the TTY, denying me contact with my family, friends, and legal counsel. I estimate that staff refused me access to the TTY at least 100 times, maybe more. Wait times varied each day, but I estimate the average amount of time I waited to use the TTY was two to three hours. It was hard to predict how long I would have to wait. The longest time I had to wait to use the TTY was three days. That happened at least four or five times. People who did not have hearing disabilities never had to wait as long as I did when they requested to use the phone. Sometimes my hearing friends told me that they would overhear the deputies talking badly of me when they discussed the phone schedule. My neighbors would say that the deputies complained about how much I asked to use the TTY.

**Ex. X-366**

DocuSign Envelope ID: 089AED63-1720-44E3-B99F-538CC7B0A3FA

10.     There were also long delays to set up confidential videoconferencing calls with my defense attorney.  For a significant period of time, George Bailey only had two laptops to use for court and attorney-client meetings, making it very difficult to schedule a call with my attorney.

11.      Throughout my time at Vista and George Bailey, I had problems securing a video call with my attorney that was confidential.  Sometimes, deputies stood in the same room while I communicated with my attorney and a sign language interpreter over video.  This was especially bad during court appointments.  When I needed to have short but important confidential appointments with my attorney before a court hearing, deputies remained in the same room.  When my attorney asked if deputies could leave the room, they said they could not.  They also failed to accommodate my disability during many of these calls.  Some deputies kept me handcuffed, which prevented me from signing and communicating effectively to the interpreter.

12.     The Jail has also failed to accommodate my disability in other ways. The Jail did not provide a sign language interpreter during interactions with nursing and medical staff, despite my requests.  When I left the Jail to attend medical appointments at an outside hospital, I received an interpreter.  But the Jail never provided me with an interpreter for routine medical contacts inside the facility. Instead, I had to rely on written notes to understand the complex medical issues and advice that the provider was trying to discuss with me.  For the majority of these appointments, I did not understand what medical staff tried to communicated to me. Sometimes, the doctors did not write any information down for me.  I could not read their lips because the majority of interactions occurred while staff wore masks.  If a new nurse was assigned to me, they often failed to communicate effectively with me because they did not know, and apparently had no way of knowing, that I am deaf.

13.     Many of the deputies also did not know that I am deaf and rely on written notes and lip-reading in the absence of a sign language interpreter.  As a

Ex. X-367

1  result, many of the deputies tried to communicate with me while wearing their

2  masks.  Whenever staff did communicate with me via written notes, the notes would

3  be short and cryptic.  Staff always seemed rushed and acted like they did not want to

4  take the time to explain things to me.

5         14.    Custody staff usually involved other incarcerated people when there

6  was reason to communicate with me.  Custody staff would have other incarcerated

7  people write down staff's questions and responses for me to read.  Custody staff

8  often told another incarcerated person what to communicate to me and then the staff

9  member would leave before I had an opportunity to respond.  This process was

10  ineffective because I often had follow-up questions I wanted to ask the deputy.  This

11  practice also placed me at a substantial risk of harm because other incarcerated

12  people learned confidential information about me whenever I needed to

13  communicate with Jail staff.  I also could not trust that these people would write

14  down accurate information.  I was especially vulnerable to other people incarcerated

15  in the Jail because of the nature of my charges, and was constantly fearful that

16  having them participate in my communications with deputies put me at an extreme

17  risk of being harmed.  I had no ability to control whether the other incarcerated

18  people who learned my confidential information from Jail staff would pass that

19  information on to other incarcerated persons at the Jail.

20         15.    I have also experienced issues with the medical care treatment at the

21  Jail, which put my life at a substantial risk of harm.  Before I was arrested, I

22  received a kidney transplant in November 2001.  I take the following medications

23  every day to ensure that my body does not reject the transplant: cyclosporine,

24  mycophenolate and prednisone.  When I first arrived at Vista in October 2019, the

25  Jail failed to give me my medication for around four to five days.  I also had issues

26  with receiving my medication on a daily basis.  I was supposed to take my

27  medication in the mornings, but due to staffing shortages, I would sometimes

28  receive my meds in the afternoon or evening.  The Jail occasionally dealt with

DocuSign Envelope ID: 089AED53-5704-44B3-B99E-538CC7B0A3FA

**Ex. X-368**

DocuSign Envelope ID: 089AEDC3-570A-44B3-B99F-538CC7B0A3FA

1   inventory shortages; they did not have my medications in stock and there would be a

2   delay in ordering them.  This meant I sometimes went three days without taking my

3   medications.  Throughout the month of April 2020, I was in and out of the hospital

4   because I had lost around fifteen to twenty pounds and I had a low sodium count.

5   My body was shutting down and I was very sick.  I was physically weak and thirsty

6   all the time.  I believe the decline in my health, including my weight loss, was due in

7   part to the Jail's failure to provide me with my life-sustaining medications in a

8   timely manner.

9       16.     Medical staff at the Jail also ordered me to drink two liters of water per

10  day.  When I went to the outside hospital in April 2020, a kidney specialist at the

11  hospital told me that I needed to be drinking even more water.  When I returned to

12  the Jail and told medical that I needed to drink more water, they denied me access to

13  more water.  I do not know why they limited me to two liters and ignored the

14  specialist's advice.  I began to drink more water secretly, so that I could stay

15  hydrated.

16      17.     On June 9, 2020 and April 26, 2021, my defense attorney argued in

17  court about the Jail's failure to provide adequate medical care treatment for my

18  kidney transplant.  The court transcripts are attached hereto as **Exhibits A** and **B**.

19  The judge ordered that the Sheriff's Department address my medication issues by

20  ensuring they have a stockpile of medications on-site so that I receive them in a

21  timely manner.

22      18.     There were other conditions that placed my safety and survival at risk

23  in the Jail.  For example, on February 13, 2021, myself and others in my housing

24  unit asked for grievance forms.  A deputy threatened us that something bad would

25  happen if we filed grievances, saying, "whoever you want to write up, don't."

26  / / /

27  / / /

28  / / /

**Ex. X-369**

1        19.    I want to help improve conditions for people with disabilities and

2  severe medical conditions who are incarcerated within the San Diego County Jail

3  system.

4        I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct, and that this declaration is executed

6  at San Diego, California on _____ 10/19/2021 .

7

8

9                      Josue Lopez

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3737812.7]

7

Ex. X-370

# EXHIBIT A

1

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        IN AND FOR THE COUNTY OF SAN DIEGO

3    DEPARTMENT 25      BEFORE HON. HARRY M. ELIAS, JUDGE

4    _____
                                     )
5    THE PEOPLE,                     )  CERTIFIED TRANSCRIPT
                                     )
6              PLAINTIFF,            )  CASE NO.  CN405969
        VS.                          )
7                                    )
     JOSUE LOPEZ,                    )
8                                    )
              DEFENDANT.             )
9    _____)

10              REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                      JUNE 9, 2020

12                  PAGES 1 THROUGH 11

13

14   APPEARANCES:

15
     FOR THE PLAINTIFF:    SUMMER STEPHAN
16                         DISTRICT ATTORNEY
                           BY:  JENNIFER REISCHL
17                         DEPUTY DISTRICT ATTORNEY
                           325 S. MELROSE DRIVE, SUITE 5000
18                         VISTA, CALIFORNIA 92081

19
     FOR THE DEFENDANT:    HERBERT WESTON & TANYA WESTON
20                         BY:  HERBERT WESTON
                           378 VISTA VILLAGE DRIVE
21                         VISTA, CALIFORNIA 92083

22

23

24

25

26

27
                  DULCEMARIA DUARTE, CSR 13968
28                  OFFICIAL COURT REPORTER

Ex. X-372

2

```
1    VISTA, CALIFORNIA; TUESDAY, JUNE 9, 2020; 11:02 A.M.
2    (THE FOLLOWING HEARING WAS REPORTED VIA VIDEO CONFERENCE PER
3    EMERGENCY RULE OF COURT 3(A).)
4                          - oOo -
5         THE COURT:  Okay.  This is CN405969.  The People
6    vs. Josue Lopez.  Mr. Lopez is appearing by way of video
7    remote as are both counsel to a semi-closed courtroom
8    pursuant to California Emergency Rule of Court 3 and 5.
9    There's no member of the public present.  The public can
10   listen in on YouTube.  Mr. Lopez is being assisted by a
11   certified American Sign Language interpreter.
12        THE INTERPRETER:  Certified American Sign Language
13   interpreter, Nancie Alcock.  Qualified by 16 years in the
14   court, oath on file.
15        THE CLERK:  The interpreter's identification has
16   been verified by the Court.
17        THE COURT:  She has an oath on file and certified.
18   Mr. Weston, would you like to state your appearance, please.
19        MR. WESTON:  Yes.  Herbert Weston appearing on
20   behalf of Mr. Lopez.  I'm appearing by video from my office.
21        THE COURT:  And Ms. Reischl on behalf of the
22   People.
23        MS. REISCHL:  Yes, Your Honor.  Jennifer Reischl
24   appearing on behalf of the People.
25        THE COURT:  And Mr. Lopez, are you able to see the
26   American Sign Language interpreter and understand what we're
27   doing?
28        THE DEFENDANT:  Yes, I can, Your Honor.
```

**Ex. X-373**

3

1          THE COURT:  Thank you.  I believe we're here for
2     purposes of a prelim; is that correct?
3          MR. WESTON:  Well, I'm here to make a record about
4     my client being denied his constitutional right to have
5     effective representation and to address the issue of the
6     prelim.  I think they're both sort of together.
7          THE COURT:  Okay.  Why don't you fill me in,
8     Mr. Weston.
9          MR. WESTON:  Okay.  Your Honor, my client has been
10    in custody since the beginning of this case and I
11    understand -- just so that the record is clear, I understand
12    that he is not entitled to zero bail because of the charges.
13    However, back in February I went in to see my client prior
14    to the coronavirus.  We had a prelim date set.  I was having
15    good contact with my client.  I went in in March.  I believe
16    it was March the 20th.  At that point in time the jails had
17    shut down.  They weren't allowing any visits in.  The
18    problem for my client is that meant that he could not
19    communicate at all with his -- with his attorney.  We were
20    back in court on April the 23rd in front of Your Honor to
21    discuss the problems that I was having regarding, first of
22    all, his health, and I'm going to get into that in a moment,
23    but also my concern is that I cannot and I'm being prevented
24    from effectively representing my client.
25          I mean, I understand that it's a difficult
26    situation and I understand about the coronavirus.  With all
27    my other clients we've been able to sort of jerry-rig a --
28    the ability to communicate either by phone or by video.  The

**Ex. X-374**

1    jail has now set up video conferencing in some jails, but

2    they limit the people who are able to appear in those

3    videos.  So on April the 23rd I expressed my concern to this

4    Court regarding, first of all, my inability to effectively

5    represent him and secondly, his health conditions.  The

6    Court then said well -- that at this point in time the --

7    there -- he continue to be in custody, but if there were

8    continued issues to bring it back to the Court to address

9    those issues.  I've been contacting -- or trying to get

10   Mr. Lopez on the triage calendar for that specific purpose

11   to address those issues.

12          Since April the 23rd I have had no contact with my

13   client.  Today is the first time that I've been able to see

14   my client.  I've attempted probably every day to get a video

15   conference with him.  One of the problems is for awhile he

16   was in a facility that didn't have video conferencing.  Then

17   he got into a facility that has video conferencing, but they

18   won't video conference people from his particular cell.

19   They just -- for security or for medical reasons or for

20   whatever reasons, they don't really explain to me.  I can't

21   set up a video conference.  Obviously my client is disabled

22   in that he cannot hear.  He shouldn't be denied his

23   constitutional rights to effective counsel just because he

24   has a disability.  And the fact of the matter is how can we

25   go months?  It's now June the 9th.  I haven't talked to him

26   since February the 12th in person, though I did on April the

27   23rd.

28          We had the same type of a conference; we just had

**Ex. X-375**

1    for a period of time so I can at least explain to him what's
2    going on.  I do find it amazing that my client is able to
3    talk to his -- his -- his family sometimes but not to me,
4    and I don't understand why that is.  You know, I've been
5    told a few times that it's because the jail phones for
6    attorneys is not there.  I haven't the slightest idea what
7    they're doing with that, but I think that this Court is
8    mandated to do something to prevent this continuing on and
9    on and we have a prelim date set, and I'm not able to do a
10   prelim because I can't effectively represent him because we
11   haven't been able to talk about his case, just mere
12   communications.
13          I -- he also has a medical condition.  That's one
14   of the other issues that we addressed the last time.  He has
15   a -- a -- he has a kidney transplant, meaning that he has a
16   transplanted kidney.  He is at high risk.  The Court was
17   concerned about the medical conditions and we addressed
18   those the last time.  He has been getting treatment, but
19   again, he tells me that he has this medicine that he has to
20   take every day.  Unfortunately, sometimes the medicine
21   doesn't get to the jail.  So he wasn't been able to take his
22   medicine yesterday for the pills that keep him alive.
23          THE COURT:  Who has the responsibility of getting
24   the medication to the jail?
25          MR. WESTON:  The jail does.  They won't take --
26   they will not take any -- any private things.  We've asked
27   that the jail -- that he could bring his stuff -- that they
28   won't accept anything but their medicine.  He's been

**Ex. X-376**

6

1   hospitalized since April the 23rd twice in that he has a low
2   sodium count and he's lost -- my understanding is he's lost
3   somewhere between 15 and 20 pounds because his body is
4   shutting down and he's not functioning.  And so I'm asking
5   the Court for a lot -- for all of those different particular
6   reasons to make sure that -- that he's, you know, medically
7   protected, and I know that -- that the jail tries to do the
8   best they can, but with a high risk individual, they're just
9   overwhelmed trying to make sure the coronavirus doesn't get
10  there and they're overwhelmed because my client has extreme
11  medical needs and even though this case is very, very, very
12  serious, it doesn't mean he should die because he's in
13  custody.

14          I -- the Court does have to make sure that -- that
15  the public is safe.  I'm asking the Court to consider to
16  releasing him on zero bail and putting him under house
17  arrest because of these conditions.  At least I could then
18  go visit him with a signed interpreter.  I mean, I have --
19  the problem is even if I were to decide, and my daughter
20  would probably object to me saying this, even if I decide to
21  go visit him, which they don't allow right now, they don't
22  allow us to go in because they're worried we would bring in
23  the disease into the jail, but even if we somehow got that,
24  I would have to have a signed interpreter put their health
25  at risk when they're not supposed to be having that type of
26  a contact.

27          So I -- you know, I understand that back in April
28  we said, you know, let's try to do the best we can, but the

**Ex. X-377**

7

1    best we can is basically -- it's denying him his right to
2    have an effective attorney because as many times as I tried
3    and attempted to have that communication, it hasn't happened
4    and I don't think that that should happen in this day in age
5    when we could put him under house arrest and make sure he
6    isn't able to leave his house.  From my experience with the
7    electronic bracelet, whatever way we set it up, they're
8    pretty accurate.  They get almost immediate notice if you
9    were to leave that particular area and it's a GPS thing and
10   they would follow him.

11          And so I'm asking the Court to allow him to be
12   released so at some point in time he be able to communicate
13   and have effective communication.  Even if he's out of
14   custody we can do Zoom meetings like we're doing right now,
15   which the jail doesn't allow.  They're just incapable of
16   doing that and I can't blame the jail for that because I
17   don't know -- we were able to come up with this or have this
18   idea of what we needed to do.

19          THE COURT:  Okay.  Ms. Reischl?

20          MS. REISCHL:  Yes, Your Honor.  I'm opposed to any
21   reduction in bail.  I understand Mr. Weston's concerns, but
22   this is a very serious case with life talk allegations, and
23   I know Your Honor heard the bail arguments on April 23rd and
24   left bail at a million dollars.  And I believe this Court is
25   already familiar with the facts of this case, but the
26   defendant is a public safety -- a major public safety
27   concern.  In this case he had intercourse multiple times
28   with a victim who was five years old.  There was oral

**Ex. X-378**

1    copulation.  He apologized on video when confronted about

2    the charges.  There's also a potential additional 1108

3    victim, and when his phone was searched there was child porn

4    found on his phone.  So this is a very serious case.  I do

5    not think a reduction in bail is the solution here.  I don't

6    know what relief the Court can offer, but I think the

7    solution needs to be finding a way he can communication with

8    his attorney while remaining in custody.  If the Court wants

9    any additional facts about the fact --

10            THE COURT:  I want to know what you can do to

11   facilitate to -- yeah, you work with the Chief law

12   enforcement in the County of San Diego.  Your -- your Chief

13   Officer can probably direct or have directly with the

14   sheriff -- the sheriff an ability to make this work.  So

15   what can you do to make it work because otherwise you've got

16   an appeal right at the outset before you've even gotten a

17   prelim?

18            MS. REISCHL:  Does the Court have suggestions?  So

19   I don't know what the Court would suggest, but --

20            THE COURT:  I'm asking you what you can do.  I'm

21   not suggesting anything yet.

22            MS. REISCHL:  I don't know what we can do to make

23   the sheriff's department do anything.

24            THE COURT:  How about ask --

25            MS. REISCHL:  Yeah, we can ask --

26            THE COURT:  Has anybody asked -- has anybody

27   asked --

28            MS. REISCHL:  In past issues I've seen defense file

**Ex. X-379**

9

1    writs to the sheriff.  He's adept and that's what I've seen

2    when there is a complaint about the conditions or the

3    treatment and they've done the writ procedure.

4            THE COURT:  So I was -- I'm just making sure --

5            MS. REISCHL:  Yes, it's certainly something we can

6    look into.

7            THE COURT:  So now let me talk because you talked

8    over me three times.  I'm just making sure you're indicating

9    you will do nothing affirmative until the defendant seeks a

10   writ; is that correct?

11           MS. REISCHL:  No, Your Honor.  I'm happy to --

12           THE COURT:  So --

13           MS. REISCHL:  -- make inquires.

14           THE COURT:  So who's asked -- who from the DA's

15   office has asked the sheriff to do something?

16           MS. REISCHL:  I don't believe they have,

17   Your Honor.

18           THE COURT:  What do we have on the 11th -- here's

19   what I'm going to do:  I'm setting the matter for the 11th

20   at 1:30.  I don't know if it will go at 1:30.  An OSC

21   regarding contempt for failure to pre-provide his

22   medication, failure to receive medication when they've run

23   out -- I want someone from the sheriff's department on the

24   line so we can address Mr. Weston's ability to communicate.

25   I'll also reserve the rest of that afternoon for Mr. Weston

26   to continue with his communications with the client to avoid

27   a continuance of the prelim.  The People are to grease the

28   skids.  If it has to go all the way up to the DA, fine.  Do

**Ex. X-380**

1    something.  If I'm in a position come the 11th that nothing

2    has been done, I will take the only action I feel I can take

3    to preserve the constitutional integrity of this case.

4    Anybody have any doubts as to what we're talking about?

5              MR. WESTON:  No, Your Honor.

6              MS. REISCHL:  No.

7              THE COURT:  Okay.  All you guys have got work to do

8    the 11th at 1:30.

9              MR. WESTON:  Thank you, Your Honor.

10             THE COURT:  Ms. Reischl, you'll notify the sheriff

11   he's adept of the OSC?

12             MS. REISCHL:  Yes.

13             THE COURT:  Thank you.

14             MR. WESTON:  Thank you, Your Honor.

15             (The proceedings adjourned at 11:16 a.m.)

16

17

18

19

20

21

22

23

24

25

26

27

28

**Ex. X-381**

```
1    STATE OF CALIFORNIA)
2                       :  SS.
     COUNTY OF SAN DIEGO)
3
4
5
6         I, DULCEMARIA DUARTE, Official Reporter for the
7    Superior Court of the State of California, in and for the
8    County of San Diego, do hereby certify:
9         That as such reporter, I reported in machine
10   shorthand the proceedings held in the foregoing case;
11        That my notes were transcribed into computer format
12   under my direction, and the proceedings held on June 9,
13   2020, contained within Pages 1 through 11 are a true and
14   correct transcription.
15        Dated this 16th day of April, 2021.
16
17
18        Dulcemaria Duarte, CSR 13968
19        OFFICIAL COURT REPORTER
20
21
22
23
24
25
26
27
28
```

**Ex. X-382**

# EXHIBIT B

1

Superior Court of the State of California

For the County of San Diego

Department 25    Hon. Harry M. Elias, Judge

| | |
|---|---|
| The People, | ) Certified Transcript |
| Plaintiff, | ) Case No. CN405969 |
| v. | ) |
| JOSUE LOPEZ, | ) |
| Defendant. | ) OSC Hearing |

Reporter's Transcript

June 11, 2020

Pages 1 through 26

Appearances:

    For Plaintiff:    Summer Stephan
                    District Attorney
                    By: Justine L. Santiago
                    Deputy District Attorney
                    325 South Melrose Drive, Suite 5000
                    Vista, California  92081-6691

    For Defendant:    Weston Criminal Lawyers
                    By: Herbert Weston
                    378 Vista Village Drive
                    Vista, California 92083

Stephanie Whitehead, RDR, CRR, CSR# 10093
Official Court Reporter

Ex. X-384

1          Vista, California; Thursday, June 11, 2020; 3:42 p.m.

2                            -o0o-

3

4          THE COURT:    All right.  So this is CN405969.  The

5 People v. Josue Lopez.

6             Mr. Lopez is appearing by way of video remote to a

7 semi-closed courtroom pursuant to California Emergency Rule

8 of Court 3 and 5.  It's semi-closed in that the public are

9 not physically present; they are able to listen in by way of

10 YouTube.

11             Mr. Lopez is being assisted by a certified American

12 sign language interpreter who is?

13          THE INTERPRETER:    Certified American Sign Language

14 Interpreter Nancy Alcock.  Oath on file.

15          THE CLERK:    The interpreter's identification has

16 been verified by the Court.

17          THE COURT:    We're here at a hearing set by the

18 Court because we were in court two days ago.  One, I want to

19 thank Mr. Toyen for responding so quickly and being

20 available.

21            Present currently on the stream are Sanford Toyen,

22 the legal adviser to the Sheriff, Herb Weston, counsel for

23 Mr. Lopez, and Justine Santiago, counsel for the People.  I

24 know there are other people available.  We'll get to that in

25 a minute.

26           Mr. Toyen, let me give you a brief run-up to where

27 we're at and why I asked you to be present today.  I'm going

28 to give you a brief overview, and then I am going to let

**Ex. X-385**

1  Mr. Weston give you more detail.  There are two issues of

2  some concern as it relates to me, which is why I asked for

3  this hearing.

4         The more important one to me is the fact that

5  Mr. Weston advised me Mr. Lopez has certain medical issues,

6  in particular he's a kidney transplant recipient.  And,

7  therefore, as I understand most transplant patients require

8  significant medications, antirejection medications, other

9  medications so their transplant remains successful.  That's

10  my primary concern.

11        The second, though, was Mr. Weston has indicated to

12  me an inability to be able to communicate with his client in

13  terms of preparation for the preliminary hearing.  I mean,

14  we hear that on a number of occasions, but I think it's sort

15  of borne out here in the sense that it's clear Mr. Lopez

16  needs an American Sign Language interpreter.  So, one, we

17  have to accommodate the interpreter's schedule to make that

18  work, and obviously the schedule of the facility, and the

19  ability so that Mr. Lopez can see the interpreter while

20  Mr. Weston is trying to communicate with her.

21        We've been able to accommodate that twice here in

22  court in that we've set up in a separate room a laptop so

23  that Mr. Weston can Microsoft Teams into the laptop, as can

24  the jail facility, and then Ms. Alcock has been here on both

25  occasions so she can serve as the link between Mr. Weston

26  and his client for those communications.

27         continue or to do that other than when we're in

28  the courtroom setting to make that work.  And in light of

1    the fact that this is a multi-count life-top case, that's

2    sort of the third branch, if you will, in terms of the weigh

3    down on this issue.

4         So, Mr. Weston, I would ask for you, if you could,

5    to advise Mr. Toyen in more detail as it relates to, first,

6    the medication issue and then, second, the ability to

7    communicate with your client issue.

8         MR. WESTON:   Yes, your Honor.  During the pendency

9    of this particular case, since I got on, there's always been

10   a concern regarding the medical condition of my client.  And

11   I know that the Sheriff tries as best as they can -- I'm not

12   trying to think that they don't try at all on behalf of

13   Mr. Lopez.  However, I do get called quite a few times

14   regarding the fact that there's some medicine that he has

15   been on that he would miss on kind of a regular basis.  It

16   seems like it's a special medicine.

17        They have problems with either getting it or having

18   it in enough of a supply that he can't get his daily dose.

19   Like the other day, when he went to court he told me that he

20   had missed, I believe, a day or two where they had missed it

21   out.  Today they were -- they're supposed to give it in the

22   morning, and they gave it to him in the afternoon, right

23   about 1:30 today.

24        There's a concern about that.  It has been better,

25   his medical care, since they transferred him from a regular

26   jail cell to the medical facility.  It's better care there

27   because -- and not because the other -- (technical

28   difficulties with live stream) -- are not watching, but this

Ex. X-387

1   is an individual who needs extra care because of his medical

2   condition and that it would be severe health issues.

3          He has been going to the hospital. He has a

4   lower -- and I thought it was salt, but I might not have

5   gotten to remember the exact one, but a lower reading which

6   causes a big concern. Also the fact that he's been losing

7   weight because of the medical conditions that he has, that

8   that in fact has prevented him -- and when he was going to

9   the hospital they were trying to control that medical

10   condition, and, therefore, he was going back and forth to

11   the hospital.

12          My understanding that he's been back and forth to

13   the hospital a few times since our last court date on April

14   the 23rd where we went through and I addressed or was

15   concerned about the fact that there's this medical condition

16   that he has that doesn't seem to be being taken care of.

17          So I have a concern regarding his medical

18   condition. I do get a call from his relatives. That's how

19   I hear it because, of course, he can't communicate with me.

20   He does communicate with his relatives. The other problem

21   is just that, the lack of communication.

22          When he was -- when the coronavirus wasn't present

23   I could take my American Sign interpreter and go down and

24   visit him, which we did. But since that time we've been --

25   and again, I don't want to say this as if they're picking on

26   me in particular, but they basically have shut down the jail

27   from having visits that we are able to go. And --

28          MR. TOYEN:   Mr. Weston?

Ex. X-388

1    MR. WESTON:  Yes.

2    MR. TOYEN:  I'm sorry.  I don't want to interrupt

3  you, but I think we might be able to shortcut some of this.

4  I don't mean to dispute your experience, but I can tell you

5  that, you know, I've got the acting lieutenant of the Bailey

6  facility here as well as THE sergeant who's in charge of

7  supplementary services.  And if you can come down to the

8  Bailey with your interpreter, you're not going to be --

9  you're not -- you'll be able to have your contact visit.

10    MR. WESTON:  Well, I mean --

11    MR. TOYEN:  I can tell you that right now.

12    MR. WESTON:  Well, I mean, the difficulty of that

13  is I have to make a decision that my -- that I'm putting

14  my -- I know the room that we go to.  That room is not --

15  does not socially distance the three individuals who are

16  going to be in that room.  I've been in that room numerous

17  times.  I mean, they're physically not being able to do

18  that.  Also the fact that during this time period we're not

19  supposed to be doing that type of contact.  Whether I do it

20  is something that I decide, but I can't decide for my

21  interpreter.  The fact of the matter is --

22    MR. TOYEN:  So are you -- is your claim that the

23  room isn't big enough?  Because I thought it had to do with

24  you not -- a claim that you didn't have -- that you weren't

25  being allowed down at the facility to have a contact visit

26  with a sign language interpreter.

27    MR. WESTON:  Well, when we went to the jail to try

28  to accomplish that, we were told that there are no contact

Ex. X-389

1  visits.  There's no visits -- visiting.  Now, I mean, all's
2  I can do is -- they tell me that the jail was shut down for
3  visits of that type.  There is a way that we can do
4  through -- at least now or started to do -- (technical
5  difficulties with live stream) -- there was -- the Securus
6  has allowed us to do video visits with certain people at
7  George Bailey.  They do it at George Bailey and they do it
8  at Vista.  They don't do it at South Bay and downtown.
9          When my client got to George Bailey, I tried to
10 avail myself of the video visits that way, and I kept
11 getting denied of the video visits; that he wasn't available
12 for -- to visit.  The procedure is I go in at midnight,
13 because there's a two-day span which I can ask for a visit.
14 On midnight, about three times a week, I go onto the Securus
15 website and I try to book a visit with my client within
16 those two days because that's the only two days that they
17 will allow me to have.
18          And every time -- I did -- was able to get two
19 times or, I believe, one time on this particular client that
20 I was able to get a visit, but then it wasn't -- he wasn't
21 brought there to be visited.  It isn't that we're not
22 trying.
23          MR. TOYEN:   This was at midnight?
24          MR. WESTON:   No, no, no.  This is where I have to
25 go on Securus.  You have to go on the form and demand a
26 time.  So you go on the form, they give you two days to
27 request a visit.  So if I'm on midnight, I've got that day
28 and the next day.  And those are the only two days that I

Ex. X-390

1   can make a visit for.  If there's no visiting available then

2   they tell me, "no visits available."  There's never a visit

3   within the first day.  Sometimes, for some people, there's a

4   visit on the next day.

5           On Mr. Lopez's matter, there was never a visit.

6   I've been on that website numerous times trying to get to

7   see him because I know I have to organize a visit.  And I'm

8   able to then, after I make an appointment, try to have an

9   interpreter ready to go so that I can then see him at least

10   through the phone, even though the phone screen, at least

11   from my experience, is not that -- at least it appears for

12   me, not that big.  But we might have some problems.  But

13   that's the problem is that every time I've attempted to try

14   to see my client, I've been told that we can't do that.

15           MR. TOYEN:   You're talking -- well, I just want to

16   make clear because there's a lot of things you're

17   throwing -- you're kind off putting up here.

18           Is the issue with in-person visit or the video

19   visits?

20           MR. WESTON:   I was told you can't do an in-person

21   visit.  Period.

22           MR. TOYEN:   You can.  You can.  We may not allow

23   that for -- we may not allow that for everybody, but, you

24   know, you clearly -- your client clearly has a situation

25   that's different, and we need to accommodate that and we

26   will.  You can come down for an in-person visit if that's

27   what you want.

28           THE COURT:   And Mr. Toyen, do you believe that were

1     that to occur you have a locale or a location where the

2     visit can occur where both his client, Mr. Weston, and the

3     interpreter could be sufficiently distant in terms of

4     meeting the Department of Public Health's requirements?

5          MR. TOYEN:   Yes. So let me about put that -- I've

6     got the administrative lieutenant there -- here. She can

7     confirm that.

8          MS. FARRIS:   Hi, this is Lieutenant Jill Farris,

9     and we are happy to accommodate any visit any time you need.

10    So we switched our professional visits to the social visit

11    room so that there would be the glass. And if using an

12    interpreter, Mr. Lopez would be on one side of the glass,

13    you could be on the other side of the glass, and the

14    interpreter could be on that side of the glass, and that way

15    you'd be spread out if you need to be. And the

16    interpretations can happen through the glass.

17         We can also do in-person contact visits like you

18    did back in February when you were down here. So we can do

19    it that way. If you're not comfortable doing an in-person,

20    then we could do it through the glass in the social visit

21    room as well. I'm happy to accommodate whatever makes

22    everyone feel comfortable. We really don't have a lot of

23    visits happening, so the space is really not an issue down

24    here.

25         THE COURT:   So Mr. Weston, let me ask you: Between

26    the option of trying to do it on Securus with a video setup

27    or doing an in-person in a larger room that would allow all

28    three parties to be present socially distanced, consistent

**Ex. X-392**

1  with the requirements of the Department of Public Health,

2  which would you prefer to do?

3            MR. WESTON:   Well, first I'd have to figure out

4  what my interpreter would want.  I mean, it's not just me.

5  If it was just me, I'd probably go down to the room and do

6  it, but it's not just me.  So I'd have to make a

7  determination of what he -- he feels comfortable in doing

8  when I take him with me because there's three of us, me, him

9  and my --

10            THE COURT:   So you haven't inquired of that person

11  yet?

12            MR. WESTON:   Well, I did inquire.  When I asked him

13  if he would feel comfortable going down to a jail, and he

14  said no, I mean, I did inquire that way.  There isn't

15  that -- but I would tell the Court that was a couple weeks

16  ago.  I mean, there seems to be a more opening of our

17  society.  So I don't know what his -- what his experience

18  has been.  And I do notice that -- and I will tell the Court

19  since we last talked on, I believe, three days ago, they

20  have opened up Microsoft Teams to be able to do some visits

21  at the -- at the George Bailey facility similar to what we

22  have here.

23            We are having some difficulty though in the George

24  Bailey facility because it's not a confidential

25  communication, being that the -- my understanding is that

26  George Bailey's Microsoft system isn't tied down to a table.

27  So, like, I've done visits now at South Bay.  They put

28  the -- they turn the computer on.  It's either tied down and

1   then all of the Sheriffs go out of the room, and so I feel

2   comfortable that my client has a confidential communication

3   with me.

4            We tried that at George Bailey, and it appears --

5   and I don't know if it's just one room -- that in that

6   particular facility, the Microsoft Teams or the computer

7   that they have to leave a Sheriff within the room after --

8   even after they turn it off as opposed to whereas you can --

9   they can leave the room in other facilities.

10           I'm okay with Microsoft Teams because that's safe.

11  I just want to make sure it's a confidential communication

12  between me and my client and being able to have a room where

13  he's not there with a Sheriff.  Because I think if a

14  Sheriff's in the room, that that violates -- it's no longer

15  confidential.

16           THE COURT:   So Mr. Toyen, what can you tell me

17  about what, if anything, you know about the accessibility of

18  a Microsoft Teams interview or client contact similar to the

19  process we have here; one, if that can be done, and two, the

20  ability to keep it confidential so that the deputy need not

21  be in the room at the time they're communicating?

22           MR. TOYEN:   I'd have to -- I'd defer to Justine on

23  that because she's, you know, at the facility.  I don't know

24  is that -- it sounds to me like that's primarily for social

25  visits.

26           Justine, am I -- am I close?

27           MS. SANTIAGO:   And I think -- are you trying to get

28  information from Jill or myself?

Ex. X-394

1  MR. TOYEN:   Oh, sorry.

2  THE COURT:   You mean, Lieutenant Farris?

3  MR. TOYEN:   Yes, Lieutenant Farris.

4  MS. SANTIAGO:   Thank you.

5  MS. FARRIS:   Yes.  So it's my understanding there

6  are computers throughout the facility that we're doing

7  attorney-client meetings.  If the deputies are leaving the

8  door propped open or they're standing in there because

9  there's computer equipment and they don't want to leave the

10  inmate with the computer equipment unmonitored, then that is

11  an issue I can address on my end.  Obviously, our inmate can

12  be patted down, searched, before he goes in the room, after

13  he leaves the room so if there's an issue of computer

14  tampering we can address that.

15  THE COURT:   Right.

16  MS. FARRIS:   So if that's what you're seeing here

17  at Bailey, is that the deputy is staying in the room, it may

18  be to monitor the computer equipment, and I can fix that.

19  That's no problem.  I can ask the deputies to secure the

20  door so there is no deputy monitoring your -- your meeting

21  with your client.

22  THE COURT:   So what I'm hearing -- and any one of

23  you feel free to correct me if I'm wrong.  What I'm hearing

24  is the Sheriff can accommodate a Microsoft Teams client --

25  attorney-client interview, maintain confidentiality, and

26  with the use of Microsoft Teams, have it also accessible to

27  a sign language interpreter so that Mr. Weston can

28  communicate with his client.

**Ex. X-395**

13

1       MS. FARRIS:   Mr. Weston would have to provide

2  the -- I don't have a sign language interpreter at George

3  Bailey.

4       THE COURT:   No, no, no.  That's him.

5       MS. FARRIS:   Okay.

6       THE COURT:   It's basically a three-party meeting.

7  The sign-language interpreter is to facilitate Mr. Weston's

8  ability to communicate with Mr. Lopez, Mr. Lopez's ability

9  to communicate back.  And when that meeting is ongoing,

10  Mr. Lopez will be in the room by himself, the deputy would

11  have had the ability to pat him down before, if they feel

12  appropriate, handcuff him to the chair so he at least can't

13  damage the computer, and then when it's done, he goes back

14  to his -- his room or his cell or his mod, and Mr. Weston

15  goes on with his.

16       Mr. Weston, will that meet your ability to have a

17  confidential client interview?

18       MR. WESTON:   It would, your Honor.  I do tell the

19  Court that it appears that the way we're doing that -- and

20  again, I apologize.  We just started it yesterday the 11th.

21  I had eight interviews with my clients that I've been doing

22  over -- that I haven't been communicating with except over

23  the phone.  So I've done eight of those.

24       Now, one of the issues is for Mr. Lopez's idea is

25  the slots are regulated by the public defender because I

26  believe they're the ones that set it up.

27       THE COURT:   I would think, based on what I'm

28  hearing, that if you had a direct communication with

**Ex. X-396**

1  Lieutenant Farris or any designee of hers, they could

2  facilitate that to expedite your ability to communicate with

3  your client.

4           MR. WESTON:   Thank you.  That was my other thing

5  that the slots are limited to 20 minutes.  So I was hoping

6  that I would be able to communicate with someone directly so

7  that we can set that up to have -- because of the sign

8  interpreter it takes longer, I believe, to communicate, as

9  opposed to the other times if they only give you 20-minute

10  slots which is okay; we just make more of them.  But if

11  they're available for us to make those arrangements or I

12  have someone to make the arrangements I'm happy to do it

13  that way.

14           THE COURT:   All right.  So let me now then go to

15  the --

16           MR. TOYEN:   Lieutenant, is that something we can

17  do?

18           MS. FARRIS:   Yes, I will get a hold of Ridgehaven.

19  They simply provide us with the schedule and make sure that

20  we -- after I know a good time for you and for the

21  interpreter and then we'll get that time slot saved for you.

22           MR. WESTON:   And if you could -- I'm happy to give

23  you my e-mail address so we can communicate e-mail or

24  however --

25           MS. FARRIS:   Absolutely, yeah.  Absolutely.

26           THE COURT:   All right.  So let me go back.

27  Mr. Toyen, I wonder if you could then go back and address

28  what you know or how you think we can help facilitate the

Ex. X-397

1   continued medical care and/or providing of medication to

2   Mr. Lopez.  It sounds like there's already been an

3   improvement because he's been moved to a medical room or a

4   medical ward, if you will.

5           MR. TOYEN:   Yeah, and we -- Dr. Montgomery is here

6   just to back me up.  We did a -- we looked at his medication

7   that he's supposed to be receiving, and I think -- I'm

8   probably going to mangle this.  But Prednisone, cyclosporin,

9   and mycophenolate.  It shows that he's regularly receiving

10   those.  Those are -- those are the kidney medications.  We

11   discovered, though, that, you know, because we've gone to a

12   new provider, pharmaceutical provider that basically just

13   does everything outside and ships it to us, my understanding

14   is in, you know, prepackaged dosages --

15           THE COURT:   Right.  Like being in a nursing care

16   home.

17           MR. TOYEN:   Very similar to that is my

18   understanding.  And we discovered that we didn't -- there

19   have been gaps where, you know, the shipment has taken

20   longer to arrive than we thought it was going to be -- than

21   we thought it was going to take.  And that, I think,

22   accounts for the vast majority of the times when he didn't

23   appear to be getting his medicine -- his medication.

24           Now that we know that that's the issue, we're

25   working you know to make sure that happens including, you

26   know, keeping a stocked supply of certain medications

27   available.  So if a shipment is late, you know, we've got a

28   replacement stockpile.

Ex. X-398

1    THE COURT:    So Mr. Weston, Prednisone,

2  cyclosporin -- I forget the name of the third one.  Are

3  those the three you're aware of, or are there more, or

4  something else you think that has not or is not being

5  provided?

6    MR. WESTON:    I believe that those are the ones that

7  my client was being -- was talking about.  The kidney

8  medication was the ones that they were concerned.  And I

9  believe what -- what he just described was exactly what my

10  client was saying.  They were telling him well, we're out of

11  it.  We'll get it to you as soon as we get another supply of

12  it, which is a concern is that they shouldn't run out of it

13  because it's real important.

14    I understand we're all human.  I'm not trying to

15  say there's some nefarious thing here.  I'm just worried

16  about the effect of lack of medication my client is --

17    THE COURT:    If I hear Mr. Toyen correctly, the

18  Sheriff's trying to remedy the situation by creating sort of

19  a stockpile so that they will have some available --

20    MR. TOYEN:    That's my understanding.

21    THE COURT:    -- of regular.

22    MR. TOYEN:    Dr. Montgomery, if you want to jump in.

23    DR. MONTGOMERY:    Yes.  Thank you, Mr. Toyen.  Your

24  Honor, Jon Montgomery, Medical Officer.  Thank you for

25  allowing me to join you today.

26    Just to clarify, Mr. Lopez is currently on three

27  separate medications, that's Prednisone, cyclosporine and

28  mycophenolate.  These medications are associated with the

1  chronic immunosuppression needed for the maintenance of his

2  transplant.

3          The issue has been with, as Mr. Toyen mentioned, we

4  have relatively recently moved to an outsourced

5  pharmaceutical service, and the two main medications, the

6  cyclosporin and mycophenolate, have been essentially just in

7  time, if you will, shipped in, as you were alluding to,

8  similar to a group home construct, in 30-day pill packages.

9  And they've been ordered for months at a time.

10          However, because of the logistical considerations,

11  sometimes it takes upwards of about three to five days for

12  some of the medications to arrive.  And it does appear that

13  there has been several instances, unfortunately, that we

14  have run out by a day or so.  Again, our primary reason for

15  being is for the appropriate medical care and treatment of

16  our patients.

17          So yes, we are taking direct action.  We are

18  getting a stockpile of medications which is called our stock

19  or profile medications for all three of those.  The intent

20  is if and when the patient-specific medications for whatever

21  reason are not readily available, we would shift over to the

22  stock medications to provide the buffer until the resupply

23  from Diamond comes into play.

24          THE COURT:   All right.  So it sounds to me like the

25  Sheriff is making, one, the inability to deliver it is not

26  either intentional on their part or even a result of their

27  lack of effort; it's the inability of the pharmaceutical

28  company or the pharmaceutical provider to ship with a

Ex. X-400

1  consistent enough basis so it's always there on time.

2              I think any of us who have ever switched from one

3  health plan to another health plan or one Rx provider --

4  prescription provider to another runs into some of this.

5  But it sounds to me like they're making every effort in

6  creating the stockpile that if there's any further delay, it

7  will not affect him receiving his meds.

8              So then I guess my next then question is we

9  currently have a preliminary hearing date set for June 17.

10  And I want to hear from you, Mr. Weston.  Are you

11  comfortable proceeding then, or would you like additional

12  time so you can work out these Microsoft Teams meetings to

13  communicate with your client, or what would you like?

14              MR. WESTON:   No, your Honor.  It's always been our

15  intent to not have a prelim on the 17th.  This is the type

16  of case that we need to do a live prelim on, and so it's

17  never been our intention to go forward unless we had the

18  ability to do a live prelim.  Either way, I wouldn't be

19  ready to perform a prelim because of the lack of

20  preparation.

21              But I want to make sure that the record is clear

22  that our intention was, even before I couldn't communicate

23  with my client, that I don't believe having a video prelim

24  is proper in this type of case.  Especially with the

25  communication problems, being in another room is -- for him

26  would just be terrible in trying to figure out how to

27  communicate during a prelim.

28              So I'm going to waive time and set the matter over

Ex. X-401

1  to a time when we're at least going to have -- or have a

2  potential of having a live hearing, which I think is

3  sometime July or August.

4          THE COURT:    The longer we go the likelihood is

5  greater than we'll have something live in court.  If I had a

6  firm date when I knew we'd start, I'd tell you.

7          MR. WESTON:    No, I understand that, your Honor.

8          THE COURT:    But I don't know yet.

9          So Mr. Lopez, what I'd like to ask you is under the

10  law you have a right to a speedy preliminary hearing, under

11  the new emergency rules, within 30 days of when you are

12  arraigned and no later than 60 days from when you are

13  arraigned.

14          If you wish, you may give up your right to a speedy

15  preliminary hearing and agree to one at a later date.

16          Mr. Weston is trying to accommodate or find a date

17  when everyone could actually appear here in court.  But I

18  want to be very candid with you:  I can't guarantee that the

19  date we set would necessarily accomplish that.

20          Are you willing at this time, sir, to waive time to

21  a new date picked by Mr. Weston?

22          THE DEFENDANT:    Yes.  Yes, that would be fine.

23          THE COURT:    Thank you.

24          THE DEFENDANT:    Thank you, your Honor.

25          THE COURT:    Mr. Weston, you're in charge.

26          MR. WESTON:    Yes, your Honor.  I would suggest

27  maybe we can do the 26th of August which is like a

28  Wednesday.  That gives us enough time -- again, it might not

Ex. X-402

1  be a solid date, but I think that might be enough.

2          THE COURT:   All right.  Ms. Santiago, is that date

3  okay with the People?

4          MS. SANTIAGO:   Yes, your Honor, thank you.

5          THE COURT:   All right.  We'll set the matter for

6  preliminary hearing on August 26, 8:45 a.m. in Department 5

7  or whatever courtroom 5 sends it to.  As we get closer it

8  that August date, we'll know more as to whether we're having

9  live hearings or not.  Again, I want to thank Mr. Toyen on

10 behalf of the Sheriff's Department, Lieutenant Farris and

11 Dr. Montgomery for participating in this and helping us try

12 to reach some ability to assist both in Mr. Lopez's health

13 and also his ability to communicate with his client.

14         MR. WESTON:   Your Honor, I was wondering if -- I

15 don't want to give Lieutenant Farris's e-mail or contact --

16         THE COURT:   No, no.  We can go offline and I'll let

17 Ms. Santiago or Mr. Toyen, either one, be the link so that

18 you and Lieutenant Farris can be in touch.

19         MR. WESTON:   Okay.

20         MR. TOYEN:   I will act as the clearinghouse.  I

21 will send all the e-mails to Ms. Santiago.

22         THE COURT:   Thank you very much, Mr. Toyen.

23         MR. WESTON:   Okay.  That would be perfect.

24         THE COURT:   Thank you everybody.

25         MR. WESTON:   Your Honor, maybe we could set a

26 back-up readiness date with the idea that maybe that

27 would -- we can have a better idea whether or not the courts

28 are going to be open or not.

**Ex. X-403**

1   THE COURT:   Okay.

2   MR. WESTON:   And we could do a 977 waiver because

3   then that way least if we don't need Mr. Lopez and we're

4   only going to set new dates that we can take care of it.

5   THE COURT:   Do you want to take a 977 waiver from

6   Mr. Lopez at this time?

7   MR. WESTON:   Yes, your Honor.  May I go forward?

8   THE COURT:   Yes.

9   MR. WESTON:   Okay.  Mr. Lopez, we're going to be

10  setting an intervening court date.  We're asking that you

11  waive your right to come to court just to set new dates in

12  case the courts aren't open yet.

13  Is that okay for you to be -- basically allow me to

14  appear for you for the purposes of just setting dates?  Is

15  that all right?

16  THE DEFENDANT:   Yes, yes.  That would be fine.

17  Yes, that would be fine.

18  THE COURT:   All right.  Again, thank you everybody.

19  I appreciate the time you put in and waiting to hear this so

20  late in the afternoon so I could clear up the appropriate

21  room and get everybody involved.

22  MR. TOYEN:   You're welcome, your Honor.  Your

23  Honor, just on a personal matter would you be able to either

24  call me or contact me on Teams after you're done with your

25  calendar for the day?

26  THE COURT:   Yeah.

27  MR. TOYEN:   This has nothing to do with this case.

28  THE COURT:   Yeah.  Sure.  Why don't you stay -- can

**Ex. X-404**

22

1  he stay there and we lose everybody else?

2  THE BAILIFF:   I can do that.

3  THE CLERK:   What's the readiness date?

4  THE COURT:   Herb, what date do you want for that

5  readiness?

6  MR. WESTON:   Right.  I was just going to say, can

7  we have July 23rd?  That's a Thursday.  Is that okay,

8  Ms. Santiago?

9  MS. SANTIAGO:   That's fine.  Thank you.

10  THE COURT:   Okay.  Good.  Thanks.

11  MR. WESTON:   Thank you, your Honor.  Thank you,

12  everyone.

13  THE COURT:   Everybody bail out except Mr. Toyen.

14  (Proceedings concluded at 4:15 p.m.)

15  -- oOo --

16

17

18

19

20

21

22

23

24

25

26

27

28

Ex. X-405

23

```
 1  │  State of California)
    │                          : SS.
 2  │  County of San Diego)
 3  │
 4  │
 5  │          I, Stephanie Whitehead, RDR, CRR, CSR #10093, an
 6  │  Official Court Reporter for the Superior Court of the State
 7  │  of California, in and for the County of San Diego, do hereby
 8  │  certify and declare:
 9  │
10  │          I reported the proceedings held in the foregoing
11  │  case by creating notes utilizing my stenographic machine;
12  │
13  │          That my notes were transcribed with proprietary
14  │  computer and formatted under my direction;
15  │
16  │          And the preceding hearing heard on June 11, 2020,
17  │  contained within pages 1 through 23, is a true and accurate
18  │  transcription.
19  │
20  │          Dated this 26th day of April 2021.
21  │
22  │
23  │
24  │          _____
25  │          Stephanie Whitehead, RDR, CRR, CSR #10093
    │          Official Court Reporter
26  │
27  │
28  │
```

Ex. X-406

# EXHIBIT Y

1  GAY CROSTHWAIT GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  PRIYAH KAUL – 307956
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   ROSEN BIEN GALVAN & GRUNFELD LLP
4  101 Mission Street, Sixth Floor
   San Francisco, California 94105-1738
5  Telephone: (415) 433-6830
   Facsimile: (415) 433-7104
6  Email:     ggrunfeld@rbgg.com
              vswearingen@rbgg.com
7              pkaul@rbgg.com
              eanderson@rbgg.com
8              hchartoff@rbgg.com

9  AARON J. FISCHER – 247391
   LAW OFFICE OF
10 AARON J. FISCHER
   2001 Addison Street, Suite 300
11 Berkeley, California 94704-1165
   Telephone: (510) 806-7366
12 Facsimile: (510) 694-6314
   Email:     ajf@aaronfischerlaw.com

13 (additional counsel on following page)

14 Attorneys for Plaintiffs

15

16              UNITED STATES DISTRICT COURT

17             SOUTHERN DISTRICT OF CALIFORNIA

18 DARRYL DUNSMORE, ERNEST            Case No. 3:20-cv-00406-AJB-WVG
   ARCHULETA, ANTHONY EDWARDS,
19 REANNA LEVY, JOSUE LOPEZ,          **DECLARATION OF**
   CHRISTOPHER NELSON,                **CHRISTOPHER NELSON IN**
20 CHRISTOPHER NORWOOD, and           **SUPPORT OF PLAINTIFFS'**
   LAURA ZOERNER, on behalf of        **MOTIONS FOR PRELIMINARY**
21 themselves and all others similarly situated, **INJUNCTION AND**
                                      **PROVISIONAL CLASS**
22              Plaintiffs,           **CERTIFICATION**

23       v.                          Judge:    Hon. Anthony J. Battaglia
   SAN DIEGO COUNTY SHERIFF'S
24 DEPARTMENT, COUNTY OF SAN          Trial Date: None Set
   DIEGO, CORRECTIONAL
25 HEALTHCARE PARTNERS, INC.,
   LIBERTY HEALTHCARE, INC., MID-
26 AMERICA HEALTH, INC., LOGAN
   HAAK, M.D., INC., SAN DIEGO
27 COUNTY PROBATION DEPARTMENT,
   and DOES 1 to 20, inclusive,
28              Defendants.

[3903205.1]

1  (*counsel continued from preceding page*)

2  CHRISTOPHER M. YOUNG – 163319
   ISABELLA NEAL – 328323
3  OLIVER KIEFER – 332830
   DLA PIPER LLP (US)
4  401 B Street, Suite 1700
   San Diego, California  92101-4297
5  Telephone:   (619) 699-2700
   Facsimile:   (619) 699-2701
6  Email:       christopher.young@dlapiper.com
               isabella.neal@dlapiper.com
7              oliver.kiefer@dlapiper.com

8  BARDIS VAKILI – 247783
   JONATHAN MARKOVITZ – 301767
9  ACLU FOUNDATION OF SAN DIEGO &
   IMPERIAL COUNTIES
10 2760 Fifth Avenue, Suite 300
   San Diego, California  92103-6330
11 Telephone:   (619) 232-2121
   Email:       bvakili@aclusandiego.org
12              jmarkovitz@aclusandiego.org

13 Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3903205.1]

Case No. 3:20-cv-00406-AJB-WVG

DECLARATION OF CHRISTOPHER NELSON IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

**Ex. Y-409**

# DECLARATION OF CHRISTOPHER NELSON

I, Christopher Nelson, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      I have been incarcerated at the San Diego County Jail ("Jail") since approximately March 2, 2021.  I am currently housed in module 8C, which is a medical dorm.  I was previously housed in module 5A.  My booking number is 21107181.  I am 45 years old.

3.      I have been incarcerated in the Jail approximately five times since 2012.  I was detained at the Jail awaiting trial on the charges brought against me until September 2021.  I am currently waiting to transfer to the custody of the California Department of Corrections and Rehabilitation ("CDCR").  It is my understanding that I could be sent back to the Jail if I ever need to be present in court related to my criminal case.  I could also be sent back to the Jail if it is necessary for me to testify in this case about the problems I experienced in the Jail.  In addition, I also will parole from prison at some point in the future.  When I parole, I will be sent back to San Diego County, the county in which I was convicted and where I lived prior to my arrest.  When I am on parole, I can be arrested and returned to the Jail for allegedly violating the terms and conditions of my parole, whether or not the alleged violation constitutes a violation of a criminal law.  I am concerned that, if I am sent back to the Jail in the future, I will experience problems similar to the problems I have been experiencing for months.

4.      I have stage four osteonecrosis in my hips and knees, which means my bones are deteriorating.  Attached hereto as **Exhibit A** is a true and correct copy of excerpts from my Jail medical records showing that my osteonecrosis diagnosis dates back as far as 2017.  I have previously been prescribed bilateral knee braces.  I use a wheelchair at the Jail.  I used to use a

[3871883.1]

1

DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-410**

wheelchair for long-distance travel only, but after suffering a spinal injury prior to my incarceration, I now use a wheelchair for even short distances. When I first came to the Jail in 2021, I could not climb stairs. I now have the ability to walk up stairs with the support of a handrail, and I cannot sleep on a top bunk.

5.    During a prior incarceration in CDCR, I had two hip replacement surgeries. Before this most recent incarceration at the Jail, I took 10 milligrams of the pain medication Norco three times per day to alleviate severe pain associated with my arthritis and hip surgeries. Attached hereto as **Exhibit B** is a true and correct copy of an initial Jail booking screening form confirming that I took this amount of pain medication for the two years prior to my incarceration. On the night of my arrest, on or about March 1, 2021, I was in a car crash and seriously injured my spine, which worsened my already poor mobility. I was transported to Scripps Hospital before booking into the Jail. Because of my medical conditions and recent injury, I could not and still cannot stand or walk without experiencing significant pain.

6.    I have mental health disabilities. I was diagnosed with clinical depression and anxiety in 2012, and access mental health care services in the Jail. During my most recent CDCR incarceration, I was prescribed Zoloft and Abilify. Currently at the Jail, I have prescriptions for Wellbutrin and Remron.

7.    In my experience, the Jail is an unsafe and unfair place for incarcerated people with disabilities. During my first four to five months at the Jail, the wheelchair the Jail gave me had very small wheels and lacked arm rests. Because the chair had no arm rests and I was unable to grip the wheels, I was forced to use my feet to push myself in the wheelchair. I have little strength in my legs due to my hip condition and spinal injury, making it very painful to use them. To avoid further pain, I often relied on other incarcerated people to push me in my wheelchair. I felt very unsafe when I had to rely on other

[3871883.1]

2

DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-411**

incarcerated people to push me in my wheelchair. It is hard to trust people while in Jail and I am already vulnerable because of my physical disabilities and medical conditions. I received a replacement wheelchair with arm rests on or around July 2021 – four months after I first arrived at the Jail.

8.     The Jail has also failed to house me in cells that are accessible to me. For the first several months of my incarceration, the Jail assigned me to Cell 9 in module 5A on the fifth floor at Central Jail. The cell was about 10 feet by 8 feet, and I shared it with two other incarcerated people. My wheelchair took up a lot of space in the small cell and my cellmates frequently got angry with me, complaining that it was in their way. A stool was bolted in front of the desk in that cell. This meant my wheelchair could not fit in front of the desk. Having access to a desk is important to me so that I can cope with the stresses of incarceration by writing letters to my family. To use the desk, I had to transfer from my wheelchair to the stool. Making the transfer was difficult for me and put me at risk of falling. In July 2021, I fell while trying to transfer and I hurt my wrist. Attached hereto as **Exhibit C** is a true and correct copy of a medical evaluation a nurse conducted on my injured wrist.

9.     Because of my physical disabilities, it was difficult for me to clean my cell. I had to rely on my cellmates to do my portion of the cleaning, which created constant disagreements. It felt like I was walking on egg shells with my cellmates and I was afraid they might hurt me. The Jail does not have a program that hires other incarcerated people to assist people with disabilities with tasks such as cleaning, carrying property, meals, or laundry. I know CDCR has such a program and I have benefitted from it while in state custody.

10.    I could not access the four telephones in module 5A from my wheelchair because the telephone cord running between the phone and its receiver was too short for me to bring the receiver to my ear while sitting in

[3871883.1]

3

DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-412**

my wheelchair. Stools were also bolted to the ground in front of all telephones in 5A, which prevented me from being close to the telephone in my wheelchair. The seats for the tables in the dayroom, where people would eat their meals and socialize, were also bolted down. There was no cut out space for a person in a wheelchair to roll up to a table and participate in those activities. To use the telephones and dayroom tables, I had to transfer from my wheelchair to the bolted seats, which is difficult and painful, and placed me at risk of falling.

11. The shower in module 5A had no shower chair or stool for people with mobility disabilities, like myself, to use. When I was first booked into the Jail, I overheard another wheelchair user ask for a shower chair, but deputies ignored him. Without a stool or shower chair, I had no choice but to stand in the shower. I had to take very fast showers before the pain in my hips set in. There was a grab bar in the shower but it was very slippery, and often filthy with soap, water and anything others had washed off. It did not provide enough support for me while I stood.

12. On or around October 12, 2021, I moved to module 8C, where I currently live. 8C is a medical dorm. Many other people with mobility disabilities live in 8C. Although I am better able to move around in my cell in 8C, it is still difficult to use the dayroom tables during meals and recreation. There are often ten to fifteen other people in my dorm who use wheelchairs, and there is not enough cut out space for everyone with wheelchairs to eat at the tables. Due to the lack of space, many wheelchair users have to roll up and place their trays on stools that other people have sit on in the dayroom, and then lean down to eat from those stools. Having to eat like this is especially difficult for people like me who are in wheelchairs and also have upper extremity disabilities. Because of the lack of table space, I often take

4
DECLARATION OF CHRISTOPHER NELSON

Ex. Y-413

my food back to my cell, and place my tray on a bunk and eat there. As a result, I have less time to socialize with other people in my module.

13. Custody staff also do not accommodate me and my mobility disability. I require an extra mattress for my disability and medical conditions, including my spinal injury. I have a chrono from CDCR for the extra mattress. Attached hereto as **Exhibit D** is a true and correct copy of an April 2021 notification the ADA coordinator at the Jail received from CDCR indicating I had a double mattress in their custody. When I booked into the Jail in March 2021, staff initially gave me my extra mattress. But during the first two months of my incarceration, deputies conducted cell searches and took my extra mattress away on four or five separate occasions. Each time, I had to advocate to get my mattress back, pleading with deputies who often ignored me. Attached hereto as **Exhibit E** is a true and correct copy of a grievance form I filed on April 1, 2021 requesting, among other items, my extra mattress. I finally received the extra mattress on or around April 16, 2021. During the times that I am without an extra mattress, including those two weeks in April, I experience severe pain and discomfort that interferes with my sleep.

14. Deputies sometimes take away my wheelchair and use it to transport other incarcerated people who may need a temporary wheelchair. I estimate this has occurred approximately 5 or 6 imes. When I am without my wheelchair, it is hard for me to get anywhere in my housing unit.

15. On several occasions, I have gone to court in connection with my criminal case. Each time, Jail staff has begun my transfer to court at around 4:00 a.m. Each trip involves several long waiting periods during which time I am stuck in my wheelchair for 3 to 4 hours at a time, without the ability to lay down. This exacerbates the stiffness and pain from my injuries. Instead of directly transferring me for the 5-10 minute court hearing, I have to endure a

[3871883.1]
5
DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-414**

total of about 6-12 hours stuck in my wheelchair in holding cells every time I go to court.

16.     I cannot safely access the exercise equipment at the Jail. The Jail only provides dip bars, a rowing machine, and stationary bike (now removed), all of which I cannot use because of my mobility issues. Lack of exercise makes my physical condition and pain worse. I would use equipment like yoga mats, exercise balls, or light weights if they were available. The Jail does not provide any physical therapy, and I have gained approximately 45 pounds as a result of the inability to exercise.

17.     Because of my mobility disability, I rely on the elevator to access programs on other floors, including social visits, professional visits, and the recreation area. The non-staff elevator in the Jail frequently breaks down and I often have to wait until the staff elevator is available. On one occasion, the elevator was broken so custody staff could not take me for a professional visit with a detective with whom I had wished to speak. The detective also made multiple calls that were not communicated to me. I learned about the detective's attempt to communicate with me when I obtained discovery in connection with my criminal case.

18.     The Jail's failure to fix electrical problems have caused problems for me. For example, the phones did not work properly for several months. In the housing units at Central Jail, the telephones are surrounded in a metal case. If someone else was talking on another phone and hung it up, an electrical shock would go through the phone and the metal case, shocking the bare arms of other phone users who rested their arms on the metal case. I have been repeatedly shocked when I rested my arm on the metal case connected to the telephones. These shocks caused blister-like sores to form on my arm, which became infected. Attached hereto as **Exhibit F** is a true

[3871883.1]

6

DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-415**

and correct copy of a nursing note from my file confirming the sores on my arms.

19.     I have had difficulties receiving mental health care while incarcerated at the Jail.  I experience depression and anxiety.  I did not receive an initial psychiatric evaluation until almost two months after my arrival at the Jail.  I also did not receive my psychiatric medication in a timely manner.  Shortly after being booked into the Jail, my mental health worsened and I began to experience high levels of anxiety and depression.  I submitted two sick call slips asking for mental health care in my first weeks at the Jail.  In my second sick call slip, I wrote that I never received a response or attention from clinical staff.  I began to feel very dejected.  I thought I would never get help for my mental health.  I fell into a deep depression.  I felt like staff would only respond to me if I took drastic measures to show how badly I was feeling.  On or around April 20, 2021, I started to yell out to each deputy passing by my cell, begging them to let me see mental health staff.  This went on for about one and a half days.  Finally, I received an initial mental health evaluation on April 22, 2021.  Attached hereto as **Exhibit G** is a true and correct copy of that evaluation conducted by mental health counselor.  I did not see a psychiatrist until May 10, 2021, more than three months after arriving at the Jail.  After that May 10, 2021 meeting, the Jail started me on Wellbutrin.   Attached hereto as **Exhibit H** is a true and correct copy of my initial psychiatric evaluation on May 10, 2021.

20.     I have had problems receiving adequate medical care to treat my medical conditions, including my spinal injury.  Before my arrest, I was in a car crash and taken to the emergency room at Scripps Hospital.  Scripps medical staff discovered that I had a severely injured vertebrae, and contusions of the shoulder and hand.  The treating physician prescribed me Norco to manage my pain.  Attached hereto as **Exhibit I** are excerpts of my

[3871883.1]

7

DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-416**

treating records from Scripps showing this instruction.  When I arrived at the Jail, instead of gradually adjusting my pain medications, medical staff discontinued my Norco prescription entirely and instead provided me 50 milligrams of Tramadol two times a day for the first five days of my incarceration.  The Tramedol did not effectively manage my pain.  The Jail then discontinued my Tramadol and prescribed me 400 milligrams of Gabapentin to take two times a day for 90 days.  At CDCR and in the community I had 1200 milligrams of Gabapentin three times a day.  The Jail's provision of Gabapentin was much less, and did not adequately address the pain I felt from my injuries.  In mid-April 2021, the Jail took the Gabapentin entirely away and prescribed me 50 milligrams of Pregabalin to take once per day.  Attached hereto as **Exhibit J** is a true and correct copy of excerpts from my Jail medication administration record confirming these dosages.  These abrupt changes in my pain regimen, prescribing me drastically less pain medication over a short period of time, gave me profound withdrawals and left me in excruciating pain.  It was agony trying to heal from a serious spinal injury without proper pain management.  Attached hereto as **Exhibit K** are true and correct copies of two sick call slip requests I filed about my need for better pain management in the months after my accident.

21.     I was booked into the Jail with a shoulder injury and told booking staff about the shoulder injury, which was exacerbated from the automobile crash that occurred immediately prior to my incarceration.  After booking, I submitted numerous requests for care for my shoulder, but the Jail frequently did not respond to my requests.  After several months, the Jail gave me one cortisol shot but it relieved the pain in my shoulder for only several days.  After that, I submitted more sick call requests, but Jail staff did not respond.  During this time, it was very difficult for me to get in and out of my wheelchair.  It was not until October 2021 until I was finally referred to a

8

DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-417**

specialist at the University of California – San Diego Hospital who confirmed that I had a torn rotator cuff.  Jail medical staff have failed to provide me with any follow-up treatment.  The specialist prescribed a physical therapy regimen that I cannot complete because Jail staff do not allow me to use rubber bands and other accessories that the exercises require.  My torn rotator cuff also makes daily activities very difficult; I have trouble sleeping and wiping myself after using the bathroom.  Denying me treatment for this injury does not take into account that I have a wheelchair, and rely on my arms and upper body for mobility.  I now struggle to safely transfer from my wheelchair and I am at risk of falling in daily situations, like using the bathroom or showering.  I fear that the Jail's failure to treat this shoulder injury will result in long-term damage.

22.     I have severe persistent respiratory distress (SPRD) and asthma, which has continued to bother me during my incarceration.  Prior to my incarceration at the Jail, I have gone to the emergency room for issues related to my respiratory illnesses on numerous occasions.  Outside the Jail, I regularly received nebulizer treatments.  At the Jail, I have frequently had respiratory difficulties and have submitted multiple sick call requests about them.  Attached as **Exhibit L** is an encounter note from September 2021 in which medical staff noted my history of asthma and that I had been wheezing for several days.  The Jail has told me it is impossible for them to provide me nebulizer treatment in my cell.  I regularly require nebulizer treatments and have to ask custody staff to get emergency treatment in the medical unit for breathing problems.  Custody staff in turn regularly tell me that they will inform medical, but in actuality, they frequently either fail to do so or fail to ensure that I am actually sent to medical for a nebulizer treatment.  Whether I actually make it to the medical floor and receive nebulizer treatments depends

on the temperament and identity of the deputy working in my housing unit at that time.

23.     The Jail has also prevented me from speaking with my attorneys confidentially.  Typically, custody staff are supposed to inform an incarcerated person if their attorney has requested a professional call back.  These phone calls should not be monitored by custody staff.  In theory, once someone learns about a professional call back request placed for them, they are allowed to leave their cell and make a return call to their attorneys.  My attorney in my criminal case informed me that they placed over a dozen professional callback requests.  However, custody staff never notified me that my criminal attorney placed any of these call requests for me.  My attorneys in this case have informed me and I understand that they placed eight call back requests for me on October 21, October 25, October 28, November 15, November 17, November 22, November 29, and December 7, 2021.  I never received notice of any of those calls.

24.     Further, in September 2021, a deputy attempted to prevent me from speaking with my attorney during a professional visit.  I previously had issues with this deputy because, earlier that day, I had opened my tray slot in my cell to let in fresh air.  At the time, the vents in my three-person cell were not working and it was becoming difficult to breathe in such a tight space.  It was incredibly humid and smelly.  The deputy ordered me to close the tray slot, and I complained to him about it.  We got into a verbal argument.  I understand that this deputy falsely told my attorney that I did not want to visit with my attorney and that the deputy asked my attorney why he wanted to speak with me.  My attorney also informed me that only after he demanded to see me was I allowed out of my cell to attend my professional visit.  I believe this deputy delayed my visit with my attorney in retaliation for his disagreement with me opening my cell's tray slot.

**Ex. Y-419**

25.     I have had many problems using the grievance process at the Jail.  For example, on October 16, 2021, I filed a grievance about issues in the Jail related to ADA accommodations, mental health and medical care, and safety and security issues.  The Jail never responded to my grievance.  I usually do not receive any responses to my grievances.  Similarly, when my grievances have been about a lack of medical or mental health care, the Jail typically does not respond.

26.     In my experience, deputies are often reluctant to take grievances.  One told me that they "need to let the sergeant sign this" before being able to accept and process a grievance.  Nowhere on the grievance form does it say that a sergeant has to sign off on a grievance before the Jail can process it.  A true and correct copy of a blank grievance form is attached hereto as **Exhibit M**.  One deputy told me that he does not sign grievances.

27.     During medical appointments, custody staff are always present and overhear my conversations about my medical issues.  Sometimes when I talk to a medical professional, custody staff will chime in with their opinions and observations.  In addition, custody staff sometimes openly discuss my medical issues in front of other incarcerated people.  Custody staff will openly complain in front of other people in my housing unit about my medical and disability needs, and their obligation to accommodate them.

28.     I agreed to be a class representative in this case because I want to help improve the medical, dental, and mental health care at the Jail, ensure that incarcerated people with disabilities are accommodated and treated fairly, and help make the Jail safe and secure for all incarcerated people.  I have been cooperating fully with my counsel and am responding to all requests for information to the best of my ability and recollection, and will continue to do so in the future.  My lawyers keep me updated on the progress of this case, and I will review all materials provided to me and provide my input to the

[3871883.1]

11

DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-420**

1    best of my ability.  When I have questions about the case, I will ask the

2    attorneys for help to understand everything to the best of my ability.

3

4    I declare under penalty of perjury under the laws of California and the United

5    States of America that the foregoing is true and correct, and that this declaration is

6    executed at the San Diego County Central Jail in California this 9th day of March,

7    2022.

8    _____

9    Christopher Nelson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CHRISTOPHER NELSON

**Ex. Y-421**

# EXHIBIT Z
## [FILED UNDER SEAL]

Ex. Z-422

# EXHIBIT AA

Content:

none
none

The San Diego Union-Tribune

WATCHDOG

# San Diego County will pay almost $8 million to man gravely injured in sheriff's custody



In February 2018, Frankie Greer had a seizure and fell from the top of three jail bunks, suffering a serious brain injury. (Courtesy of Julia Yoo)

But the settlement with Frankie Greer does not resolve a broader dispute over the release of internal sheriff's records.

BY KELLY DAVIS, JEFF MCDONALD

MARCH 4, 2023 4:30 AM PT



**Ex. AA-430**

Case 3:20-cv-00406-AJB-DDL     Document 281-2     Filed 04/25/23     PageID.9033     Page
443 of 473

The federal lawsuit that sparked a public fight over the San Diego sheriff's refusal to release internal reports on jail deaths and other incidents has settled, with the county agreeing to pay almost $8 million to a man who was gravely injured in the Central Jail five years ago.

The $7.75 million settlement with Frankie Greer — an Army veteran who was a musician and mechanical engineer before his injury — is the latest multimillion-dollar payout to a person who was injured or died while in the sheriff's custody.

The Board of Supervisors has now approved almost $50 million in payments for in-custody deaths and injuries in the past five years, according to a review by The San Diego Union-Tribune.

Lawyers for San Diego County also are defending lawsuits filed by families of several other people who did not survive the local jail system.

County supervisors approved the payout to Greer on Tuesday, one day before the federal court denied a motion to dismiss the case ahead of trial.

**Ex. AA-431**

"The conduct of the Sheriff's Department which led to this tragedy was the product of systemic failures in training and supervision for many years," said Eugene Iredale, one of the attorneys who represented Greer.

"While the department is now led by a new sheriff, its policies and practices appear to be business as usual, and require substantial and sustained change," he said.

**Ex. AA-432**

Greer was arrested in 2018 and placed on a top bunk after he was booked into jail, despite having a medically diagnosed seizure disorder.

Deputies seized his medication and did not provide a suitable alternative, the lawsuit alleged. Later, he tumbled from his bed while experiencing a seizure and suffered a serious brain injury.

Both Sheriff Kelly Martinez and Board of Supervisors chair Nora Vargas declined to comment on the Greer settlement.

While the agreement closes the Greer litigation, it leaves unresolved an ongoing dispute over internal Sheriff's Department records that plaintiffs' lawyers, civilian overseers and others say should be released to the public.

When she was running for sheriff last year, Martinez pledged to release reports from the Critical Incident Review Board, an internal department panel that examines cases of deputy misconduct and error.

But Martinez reversed her position after she took office, and she decided against releasing the full findings. Instead, she began releasing brief summaries of critical incidents, usually just a few paragraphs along the lines of a department press release.

The sheriff also declined to publish any summaries from findings issued prior to last year.

The decision has not escaped the notice of families whose loved ones have died in San Diego County jails or of the Citizens' Law Enforcement Review Board, which provides independent oversight of the Sheriff's and Probation departments.

The citizens' panel has urged the sheriff to publish the board's findings as a way of promoting transparency across the department — one of Martinez's key promises

during her campaign.

The California State Auditor also recommended that the department release critical-incident reports — one of many suggestions auditors put forward as a way to help reduce the number of in-custody deaths.

State auditors found that 185 men and women died in Sheriff's Department custody between 2006 and 2020. They said the mortality rate was so dire that only new legislation could resolve the systemic problems in San Diego County jails.

A then-record 18 people died in sheriff's custody in 2021 and another 20 last year. So far this year, two people have died in local jails.

But Sheriff's Department lawyers — as well as litigators who defend the county in civil lawsuits like the Greer case — say information contained in the Critical Incident Review Board findings is exempt from public inspection.

"CIRB reports have always been treated as protected attorney-client communications and maintained in my office in the legal affairs section of the office of the sheriff," Robert Faigin, the sheriff's legal director, wrote in court papers.

"In my role on the CIRB board, I provide legal advice, in my official capacity, as the chief legal adviser for the Sheriff's Department, with the expectation that the communications are made in confidence and shall remain so," Faigin told the court.

But Greer's legal team filed a sworn declaration from longtime CIRB member and former sheriff's Cmdr. David Myers that contradicted Faigin.

"I was never given instructions on how to maintain any material I received as part of the CIRB meetings," wrote Myers, who also ran for sheriff last year but finished third in the June primary election.

Ex. AA-434

"I was never given warnings not to share the documents or to keep them confidential or secret," he said. "I was never told the documents were privileged."

Myers also questioned why Faigin was on the board because he advised the sheriff — not the department — and whether it was appropriate that the attorney appointed himself board chair.

"Given that what was best for the sheriff is not necessarily best for department as a whole, I believed Mr. Faigin's appointment as chair of the board presented a critical conflict of interest to CIRB's overall purpose," Myers wrote.

He also said CIRB documentation was not routinely secured; he found older CIRB records loose in an office he moved into around 2014.

"Anyone on the floor could have accessed the office because it was not locked, including janitorial and night staff," the former sheriff's commander said.

Martinez declined to comment on the Myers testimony.

"The sheriff has no response to the declaration as that will be decided by the courts," Lt. Amber Baggs, the department spokesperson, said two days after the Greer settlement was approved by the Board of Supervisors.

Faigin left the Sheriff's Department last year and now serves as executive director of the Office of Independent Review in Orange County.

San Diego County lost its effort to keep internal Sheriff's Department reports out of the Greer lawsuit.

Judge Jinsook Ohta allowed the Greer critical-incident report and numerous others into the court case, although they were sealed at the county's request.

**Ex. AA-435**

Julia Yoo, Iredale's law partner who also represented Greer, said the settlement will not deter her from continuing to press the Sheriff's Department to release the Critical Incident Review Board findings as a matter of routine.

"While Mr. Greer's case has resolved, we represent many impacted families and victims of civil-rights violations who deserve to know the truth," she said.

"We will obtain these documents on their behalf in those ongoing cases."



### Kelly Davis

 Twitter      ✉ Email



### Jeff McDonald

 Twitter      ✉ Email      f Facebook

**Ex. AA-436**

# EXHIBIT BB

# *San Diego County Detention Facilities*
## *Inspection Report and Inmate Mental Health*

### *EXECUTIVE SUMMARY*

The 2018/2019 San Diego County Grand Jury (Grand Jury) inspected the San Diego County (County) detention facilities as mandated by California Penal Code 919(b). In general, the Grand Jury found that the facilities were clean and, from our observation, the staff appeared to be following established procedures. The Grand Jury saw no evidence of inmate mistreatment. Inmates had access to medical, dental, and mental health care at most locations. At some locations, access to care was only available based on the schedule of provider visits to that facility.

This year the Grand Jury focused on mental health issues in jails including the issue of suicides. Both adult and juvenile facilities were inspected. The Grand Jury was impressed by the programs for rehabilitation and reentry for inmates returning to society. The Grand Jury recommends that further efforts be made to identify that part of the inmate population that would benefit from mental health treatment rather than incarceration.

The Grand Jury also identified improvements that could be made to some of the older, outdated facilities.

### *BACKGROUND*

All California Grand Juries are required to investigate the condition and management of their county's detention facilities. The recent County endorsement of *Stepping Up*, a national initiative to reduce the number of people with mental illnesses in jail, has made the mental health of inmates a particular concern.

### *METHODOLOGY*

The Grand Jury reviewed:

- California Code of Regulations Title 15, "Minimum Standards for Local Detention Facilities"
- Board of State and Community Corrections (BSCC) inspection reports for each facility
- The San Diego County Sheriff's Department Detention Services Manual of Policies and Procedures
- Detention Facility Fact Sheets provided for each detention facility
- Reports from national and local community mental health resources and relevant media accounts

As required by law, the Grand Jury visited and inspected all seven County-operated adult detention centers:

- East Mesa Detention and Reentry Facility (EMDF)

1

**Ex. BB-438**

- Facility 8 Detention Facility (F8DF)
- George Bailey Detention Facility (GBDF)
- Las Colinas Detention and Reentry Facility (LCDF)
- South Bay Detention Facility (SBDF)
- San Diego Central Jail (SDCJ)
- Vista Detention Facility (VDF)

The Grand Jury visited and inspected all three juvenile facilities:
- Kearny Mesa Juvenile Hall
- East Mesa Juvenile Detention Facility
- Urban Camp

The Grand Jury interviewed:
- Individual Sheriff's personnel and community mental health authorities on specific correctional issues under investigation. Note: During inspections, we addressed questions to officers and staff regarding the operations of that facility. [1]

## *DISCUSSION*

### *Declining Inmate Numbers*

The Grand Jury's inspections of the County detention facilities included escorted walk-throughs of the adult jails operated by the Sheriff's Department, as well as juvenile facilities operated by the Probation Department. Both adult and juvenile facilities have been affected by passage of California Assembly Bill 109, (AB 109) the "California Public Safety Realignment Initiative," which became effective in 2011.

AB 109 diverted certain categories of felons to serve their sentences in county jails instead of state prisons, which means that inmates traditionally sentenced to state prison for most non-violent or non-sexual felonies are now housed in County jails. With the exception of the Central Jail, all of the adult institutions the Grand Jury visited are currently under their maximum capacity and the number of inmates is steadily decreasing. The reasons for this decline include the following voter-approved changes to California law:

- **Proposition 36** made many non-violent drug offenders eligible for probation rather than incarceration.
- **Proposition 47** provides for the reclassification of many previously filed felonies, which are now being charged as misdemeanors.
- **Proposition 57** changed juvenile policies to emphasize rehabilitation over placement at Juvenile Hall.

---

[1] California Penal Code section 929 mandates that reports of the Civil Grand Jury not contain the name of any person or facts leading to the identity of any person who provides information to the Grand Jury.

2

**Ex. BB-439**

***Inmate Housing***

The San Diego County Sheriff's Department uses a classification system to house inmates.[2] Classifications take into account such factors as age, gender, health, gang affiliation, criminal sophistication, the need for protective custody, and many other factors. This system results in inmates being assigned one of six different levels of security risk.

San Diego Central Jail (built in 1998), Vista Detention Facility (built in 1978) and South Bay Detention Facility (built in 1982) are outdated jails originally intended for booking and housing misdemeanor offenders and inmates awaiting court proceedings. Felons doing sentences of one year or longer were sent to state prisons. Inmates were rarely incarcerated at county jails for more than one year. However, due to the mandates of AB 109, inmates with longer sentences are now housed in facilities never designed nor intended for long-term occupancy.

Several County detention centers are located in Otay Mesa, adjacent to the U.S./Mexico border. These include the George Bailey Detention Center, Facility 8 and the East Mesa Reentry Facility. Another nearly identical adult facility, Rock Mountain, also at Otay Mesa, is projected to open soon, but the completion date continues to be delayed. The Sheriff's plan is for Rock Mountain to replace South Bay Detention Facility.

Facility 8 and George Bailey Detention Centers are nearly identical in design. However, George Bailey houses over 1,000 inmates of various types and classifications, and Facility 8 accepts only low- and medium- risk inmates, housing only 183 inmates at the time of Grand Jury inspection. Outside yards for recreation are available at these facilities. Inmates with mental health or serious medical issues are not sent to Facility 8.

Most female inmates are housed at the Las Colinas Detention Facility. This is the newest County detention facility and is modeled after a college campus. Some females are booked into the Vista Detention Facility and, if detained, transported later to Las Colinas. Mental health services are available at Las Colinas and 32 beds are dedicated for "return to competency" treatment.

***Mental Health Concerns***

All California counties are required, by law, to provide psychiatric services during incarceration, and after parole from state prisons. Failure to provide needed mental health care has been ruled as constituting "cruel and unusual punishment."[3]

The Lanterman-Petris-Short Act (LPS), codified in the California Welfare and Institutions Code, allows for individuals to be placed, involuntarily, in a locked psychiatric unit if they are found *gravely disabled* or a danger to themselves or others. Sections 5150 and 5250 describe 72-hour and 14-day holds, respectively, that can be placed on individuals after assessment by a peace

---

[2] San Diego Sheriff's Department Detention Services Bureau Manual of Policies and Procedures (2018) (https://www.sdsheriff.net/documents/dsb-201503.pdf)
[3] Supreme Court of the United States, *Brown v. LaPlata, et al*, (2011) 563 U.S. 493

3

**Ex. BB-440**

officer, registered nurse, medical doctor, or certain other categories of people. Inmates subject to this kind of hold may also be housed in the San Diego Central Jail Psychiatric Stabilization Unit (PSU). Inmates with less serious psychiatric problems may be housed in other detention facilities. Inmates with mental health needs are dispersed throughout the correctional system, depending on specific housing determinations. For example, a relatively stable inmate with depression may have a classification which only allows housing in a particular facility.

San Diego Central Jail (SDCJ) is the largest mental health facility in the County. The sixth floor houses a PSU, with 180 beds dedicated to inmates with serious mental health needs. Thirty of those beds are reserved for "return to competency" treatment. Many inmates found mentally incompetent to stand trial are housed in the San Diego Central Jail. These inmates would normally be transported to state hospitals, but those institutions have limited availability and long waiting lists for admission.

About 30% of the County's approximately 6,000 inmates are on prescribed psychotropic medication. In 2017, Sheriff Bill Gore publicly stated, "*On any given day about 2,000 county inmates are on some kind of psychotropic drug.*"[4] A relatively small percentage of those medicated are housed in psychiatric units. Other inmates have some access to treatment when requested, such as appointments when professionals are available. Realizing the need for change, on November 15, 2016, the San Diego County Board of Supervisors adopted a resolution to support the *Stepping Up* initiative, a nationwide effort to provide mental health services in lieu of incarceration.[5]

Booking procedures at Central, Vista (VDF) and Las Colinas (LCDF) jails screen for mental health issues. Arrestees suffering psychiatric emergencies are transported to the County Psychiatric Hospital, just as those with serious medical conditions are transferred to local emergency rooms. Treatment programs for inmates with mental health issues are increasingly necessary in California as their percentage of the jail population has increased. [6]

Concurrent conditions of drug use and mental health issues, or "dual diagnosis," present a difficulty for mental health professionals. Methamphetamine addiction, in particular, contributes to the number of inmates with psychiatric problems. Withdrawal from drugs can be fatal and requires qualified medical personnel on staff.[7] The Grand Jury learned that psychiatric professionals are in such high demand that the County has a problem recruiting and retaining

---

[4] Alvarez, J. A. (July 19, 2017). *CountyNewsCenter.* Retrieved from CountyNewsCenter.com.

[5] Rise Haneberg,et al, "*Reducing the Number of People with Mental Ilnesses in Jail*" January 2017 (https://stepuptogether.org/wp-content/uploads/2017/01/Reducing-the-Number-of-People-with-Mental-Illnesses-in-Jail_Six-Questions.pdf )

[6] Stanford Justice Advocacy Project (2018) *The Prevalence and Severity of Mental illness among California Prisoners on the Rise (*https://law.stanford.edu/publications/the-prevalence-and-severity-of-mental-illness-among-california-prisoners-on-the-rise/)

[7] Federal Bureau of Prisons (2018)  *Detoxification of Chemically Dependent Inmates* (https://www.bop.gov/resources/pdfs/detoxification.pdf)

4

Ex. BB-441

sufficient staff. Witnesses testified that the shortage of psychiatric professionals is a growing nationwide problem.

A situation arises for inmates who have served their sentences but still remain gravely disabled and/or are a danger to themselves or others or were never restored to competency. These individuals may be found "non-restorable," and a judge can order that they remain incarcerated. Because they no longer serve criminal sentences, different rules apply for their housing and hours, and their status requiring incarceration is also regularly reviewed by the court pursuant to California Penal Code 1370(c)(1). [8]

The County of Los Angeles faced a similar challenge caring for the mental health of a large number of inmates. Following a public outcry, the Los Angeles County Board of Supervisors recently voted to tear down its aging Men's Central Jail holding over 4,000 inmates in favor of a Mental Health Treatment Center able to house over 3,800 patients, including inmates. The final design may not consist of one facility, but instead construction of several localized sites using those funds. The Los Angeles Department of Mental Health will staff the facility with a limited number of deputies providing security.[9]

A number of programs are being introduced in San Diego County to intervene before mental illness results in incarceration. A Behavioral Health Court is available for diversion into counseling and psychiatric services, while offenders are placed on probation for various offenses. A new California law, codified in Penal Code sections 1001.35 and 1001.36, opens up pre-trial diversion for certain mentally ill defendants.[10] The Sheriff also uses Programming for Reentry, Support and Stability (PROGRESS), for inmates already incarcerated who can be rehabilitated better in treatment programs than in jail. Inmates with mental health issues spend a longer time in jail than other inmates. The *Stepping Up* Initiative hopes to alleviate that situation.[11] Reduced inmate population raises the question of how best to utilize facilities operating well below rated capacity. Major changes may be necessary to accommodate the increasing need for psychiatric care.

### The Reality of Suicide

Suicide is a leading cause of death among inmates in local jails in the United States.[12] San Diego County jails have been criticized many times over the past decade for their high suicide rates.[13] Disability Rights California (DRC), a non-profit agency that advocates for people with disabilities,

---

[8] California Penal Code section 1370 et seq.

[9] Lau, M., Los Angeles Times (February 13, 2019) *County Oks Central Jail Tear Down* (https://www.pressreader.com/)

[10] Wahn, A.K., (2018) *California's New Mental Health Diversion Law* (http://www.aleidalaw.com/californias-new-mental-health-diversion-law-criminal-offenders-receive-treatment/)

[11] Rise Haneberg, et al, pg. 7,"*Reducing the Number of People with Mental Ilnesses in Jail*" January 2017 (Ibid)

[12] Gallagher, M. (2018). *Suicide in Prisons and Jails: A Growing Concern. O'Neill Institute for National and Global Health Law.* (http://oneill.law.georgetown.edu/suicide-in-prisons-and-jails-a-growing-concern/ )

[13] Hacket, A. (June 11, 2018) Pacific Standard  *"Is San Diego County Failing Its Most Vulnerable Inmate Population"* (https://psmag.com/social-justice/is-san-diego-county-failing-its-most-vulnerable-inmate-population)

5

Ex. BB-442

conducted an investigation of suicides in San Diego County jails and published a critical report in April of 2018. San Diego County jails have seen more than 120 deaths since 2007, including 30 suicides.[14] After a San Diego *City Beat* investigation[15] determined the average mortality rate in local jails over six years was the highest among California's 10 largest lockups, the Sheriffs' department put new measures in place to better identify and monitor suicidal inmates.[16]

Four suicides occurred at San Diego County jails in 2018. On October 8, 2018 an inmate killed himself the same day he was booked into San Diego Central Jail. The Sheriff's Department reported he used food to suffocate himself while he was being housed in a unit designed for suicidal inmates.[17] On March 28, 2018 an inmate killed himself at South Bay Detention Facility (SBDF), using cloth from bedding strung through a vent cover in the inmate's cell.

The design defect with vent covers in the cells at SBDF, i.e., the ability to use them to support a ligature, was known prior to the March suicide, and a program to replace/modify the vent covers had begun but was stopped due to budgetary concerns. To date the Sherriff's Department has not remedied the problem. The explanation provided to this Grand Jury was that the vent repair project was placed on hold due to the cost and a delay in renovation of Rock Mountain, which is expected to replace SBDF.[18]

The aforementioned Rock Mountain Facility is a County detention facility, previously leased to a private detention company, but currently unoccupied and undergoing renovations. The Sheriff's Department has reported that Rock Mountain will be opening soon, but the date has been delayed.

### Other Issues

The Grand Jury was advised that the body scanner at the Central Jail used to screen for concealed drugs and weapons needs updated software. The software is available, but the County is prevented from acquiring it due to the terms of their maintenance contract for the body scanner.[19]  The Grand Jury recommends the Sheriff's Department find a way to update the scanners.

The designs of the Vista and South Bay detention facilities include little or no outside area where the sky is visible. At SDCJ the roof was previously used for inmate recreation, but now the recreation area is an enclosed concrete room with large windows high above the floor. The Grand Jury recommends inmates should not be housed in these older facilities for more than

---

[14] Id. (Hacket, 2018)

[15] City Beat (March 27, 2013) *How Many Inmate Deaths is Too Many (Part One of Five Parts)* (http://sdcitybeat.com/news-and-opinion/news/many-inmate-deaths-many/)

[16] San Diego Union Tribune (September 16, 2018) *Recent Inmate Death was Third Jail Suicide this Year.* (https://www.sandiegouniontribune.com/news/public-safety/sd-me-jefferson-suicide-20180913-story.html)

[17] Id. (San Diego Union Tribune)

[18] California Penal Code section 929 requires that reports of the Civil Grand Jury not contain the name of any person or facts leading to the identity of any person who provides information to the Grand Jury.

[19] Id.

6

**Ex. BB-443**

one year at a time due to lack of adequate natural sunlight and/or outdoor recreation. This deficiency has been noted in prior San Diego County Grand Jury Reports (2017/2018, filed May 29, 2018) and has yet to be adequately addressed. Older facilities could be used for booking, holding inmates incarcerated for shorter terms and for housing during specific rehabilitation programs.

### Rehabilitation and Reentry

The Grand Jury wishes to commend the various efforts at rehabilitation and reentry that it observed during its visits. The San Diego County Sheriff's Detention Services unit has instituted rehabilitation and reentry programming throughout the system. The East Mesa Reentry Center located at Otay Mesa is designated to serve inmates willing to participate in rehabilitative programs. These programs offer inmates incentives such as personal privileges, less restrictive housing, opportunities to work outdoors, and shortened sentences for good conduct. The reentry programs include drug rehabilitation and mental health counseling programs, academic classes, work within the facilities for a small wage, and vocational training for placement outside. At the Vista Detention Center, it is noted that The Veterans Moving Forward Program continues to be recognized for its rehabilitative value.

The Central Production Plant, which handles most of the food preparation for both adult and juvenile detention facilities, is also located in Otay Mesa. The Central Production Plant contains food preparation and storage operations for thousands of inmate meals per week, a working print shop able to satisfy many of the County's printing needs, laundry facilities, wood shops and bicycle repair. Some inmates work at Central Production, and inmates also do maintenance and janitorial work at other detention facilities, under supervision by Sheriff's officers or civilian staff.

Reentry programs are also available for Las Colinas inmates, with incentives to progress into much less restrictive housing, and ultimately, placements after release from jail. Many inmates are given the liberty to walk unescorted outdoors between buildings to get to the mess hall, to classrooms, or to vocational training areas. In general, the reentry programs available at both Las Colinas and East Mesa Reentry facility should reduce recidivism, particularly if the general economy has jobs for inmates upon release.

### Family Visitation

Family visitation is an important tool of rehabilitation, especially for juveniles. Four County detention facilities (3 adult and 1 juvenile) with a combined total of approximately 3,000 inmates are located in Otay Mesa. In addition, a state and federal prison, as well as immigration detention facilities are located in Otay Mesa.

Visitation for families of inmates to Otay Mesa is difficult. The closest Metropolitan Transit System (MTS) bus line terminates 5.4 miles away. The nearest trolley station is over 10 miles away. Downtown San Diego is over 20 miles away.

7

Ex. BB-444

The Grand Jury suggests that the County, in coordination with the San Diego Sheriffs' and Probation Department, explore options for providing transportation alternatives for family visitation to the Otay Mesa detention facilities. Options for them to study could include utilizing the County's iCommute program, small County buses, ride share transportation etc. Given the proximity of state and federal facilities, it may be beneficial to coordinate efforts with state and federal authorities.

***Juvenile Facilities and Services***
The juvenile facilities (Juvenile Hall, East Mesa Juvenile Detention Facility and Urban Camp) are operated by the San Diego County Probation Department (Probation). Juveniles are required to attend classes regularly and much of their day revolves around schooling, recreation and meals. The East Mesa Juvenile facility is only for boys. There were 112 juveniles housed there at the time of inspection by the Grand Jury. Forty boys were housed there for long terms, resulting from serious offenses, or were there awaiting court proceedings. Most juveniles are in custody for a much shorter time than adults. At the Kearny Mesa Juvenile Detention Center, the average stay in custody is only 18 to 21 days. The population of juveniles at that facility was 83 boys and 42 girls, with separate housing units for each. There is a third separate program at the Kearny Mesa location called Urban Camp.

In order to intervene before minors become involved in the justice system, San Diego County has begun to use the *Youth in Custody Practice Model* (YICPM) developed by Georgetown University. [20] Informed by research on "what works" in serving youth in custody, as well as professional standards and the field's preeminent thinking on best practices, the Youth in Custody Practice Model (YICPM) initiative is designed to assist state and county juvenile correctional agencies and facility providers to implement a comprehensive and effective service delivery approach.[21] The Crossover Youth Practice Model (CYPM) is also being used for youth coming out of foster care. As a result of these efforts and others, the juvenile system in San Diego County has undergone a transformation resulting in a significant reduction in the juvenile population in detention. The juvenile facilities were operating with approximately half the population the facilities were designed to hold.

## FINDINGS
**Finding 01:** A preventable suicide risk exists at South Bay Detention Facility.

**Finding 02:** The San Diego County Sheriff's Department provides mental health treatment to an increasing number of inmates, some of whom could be better rehabilitated in other facilities.

**Finding 03:** The older facilities were not designed for inmates serving long sentences and are outdated for current use.

---

[20] Georgetown University, McCourt School of Public Policy, Center for Juvenile Justice Reform, 2019 (https://cjjr.georgetown.edu/our-work/yicpm/)
[21] *Youth in Custody Practice Model*, id.

8

**Ex. BB-445**

**Finding 04:** Several detention facilities, both adult and juvenile, are located at Otay Mesa, an isolated area which is difficult for families of inmates to visit.

## *RECOMMENDATIONS*

**The 2018/2019 San Diego County Grand Jury recommends that the San Diego County Sheriff's Department:**

**19-20:**       **As soon as possible replace or modify the vent covers at South Bay Detention Facility (using 24-hour emergency purchasing procedures) to prevent further loss of life.**

**19-21:**       **Study and consider the decision made by the Los Angeles County Board of Supervisors to centralize mental health treatment of inmates.**

**19-22:**       **Study and consider transportation options for family visitation to the Otay Mesa detention facilities.**

**The 2018/2019 San Diego County Grand Jury recommends that the San Diego County Probation Department:**

**19-23:**       **Study and consider transportation options for family visitation to the Otay Mesa detention facilities.**

## *REQUIREMENTS AND INSTRUCTIONS*

The California Penal Code §933(c) requires any public agency which the Grand Jury has reviewed, and about which it has issued a final report, to comment to the Presiding Judge of the Superior Court on the findings and recommendations pertaining to matters under the control of the agency. Such comment shall be made *no later than 90 days* after the Grand Jury publishes its report (filed with the Clerk of the Court); except that in the case of a report containing findings and recommendations pertaining to a department or agency headed by an underline{elected} County official (e.g. District Attorney, Sheriff, etc.), such comment shall be made *within 60 days* to the Presiding Judge with an information copy sent to the Board of Supervisors.

Furthermore, California Penal Code §933.05(a), (b), (c), details, as follows, the manner in which such comment(s) are to be made:
   (a) As to each grand jury finding, the responding person or entity shall indicate one of the following:
           (1) The respondent agrees with the finding
           (2) The respondent disagrees wholly or partially with the finding, in which case the response shall specify the portion of the finding that is disputed and shall include an explanation of the reasons therefor.
   (b) As to each grand jury recommendation, the responding person or entity shall report one of the following actions:

9

**Ex. BB-446**

(1) The recommendation has been implemented, with a summary regarding the implemented action.

(2) The recommendation has not yet been implemented, but will be implemented in the future, with a time frame for implementation.

(3) The recommendation requires further analysis, with an explanation and the scope and parameters of an analysis or study, and a time frame for the matter to be prepared for discussion by the officer or head of the agency or department being investigated or reviewed, including the governing body of the public agency when applicable. This time frame shall not exceed six months from the date of publication of the grand jury report.

(4) The recommendation will not be implemented because it is not warranted or is not reasonable, with an explanation therefor.

(c) If a finding or recommendation of the grand jury addresses budgetary or personnel matters of a county agency or department headed by an elected officer, both the agency or department head and the Board of Supervisors shall respond if requested by the grand jury, but the response of the Board of Supervisors shall address only those budgetary or personnel matters over which it has some decision making authority. The response of the elected agency or department head shall address all aspects of the findings or recommendations affecting his or her agency or department.

Comments to the Presiding Judge of the Superior Court in compliance with the Penal Code §933.05 are required from the:

| Responding Agency | Recommendations | Date |
|---|---|---|
| San Diego County Sheriff's Dept. | 19-20 through 19-22 | 7/29/19 |
| San Diego County Probation Dept. | 19-23 | 8/14/19 |

### *Works Cited*

Alvarez, J. A. (2017, July 18). *CountyNewsCenter.* Retrieved from CountyNewsCenter.com.

Board of State Community Corrections. (2018).

Center for Juvenile Justice Reform. (2019). Retrieved from Youth in CustodyPpractice Model.

Federal Bureau of Prisons. (2014 (updated 2018)). *Detoxification of Chemically Dependent Inmates.*

10

**Ex. BB-447**

Gallagher, M. (2018). Suicide in Prisons and Jails: A Growing Concern. *O'Neill Institute for National and Global Health Law*.

Hacket, A. (2018, June 11). *Is San Diego County Failing Its Most Vulnerable Inmate Population*. Retrieved from Pacific Standard.

Lau, M. (February 13, 2019). County OKs Central Jail tear-down. *Los Angeles Times*.

National Alliance on Mental Illness. (2019). *Jailing People with mental Illness.*

Rise Haneberg, D. F. (2017). *Reducing the Number of People with Mental Illnesses in Jail.*

San Diego Sheriffs Department Detention Services Bureau Manual of Policies and Procedures. (2018).

Stanford Justice Advocacy Project. (2018). *The Prevalence and Severity of Mental Illness Among California Prisoners On the Rise.*

Supreme Court of the United States, Brown v. La Plata, et al.,563 U.S. 493. (2011). Brown v. La Plata, et al.,563 U.S. 493.

Wahn, A. K. (2018, September). *California's New Mental Health Diversion Law: Criminal Offenders Receive Treatment Instead of Prosecution*. Retrieved from Law and Beyond Blog.

11

**Ex. BB-448**

# EXHIBIT CC

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*



March 2021, NCJ 252642

*Survey of Prison Inmates, 2016*
# Disabilities Reported by Prisoners

Laura M. Maruschak, *BJS Statistician*
Jennifer Bronson, Ph.D., and Mariel Alper, Ph.D., *former BJS Statisticians*

Nearly 2 in 5 (38%) state and federal prisoners had at least one disability in 2016 (**figure 1, table 1**). Statistics in this report are based on self-reported data collected through face-to-face interviews with a national sample of state and federal prisoners age 18 or older in the 2016 Survey of Prison Inmates (SPI). (See *Methodology*.) Disability types included hearing, vision, cognitive, ambulatory, self-care, and independent living.[1]

The most commonly reported type of disability among both state and federal prisoners was cognitive disability (23%), followed by ambulatory (12%) and vision (11%) disabilities.[2] Among all prisoners, 24% reported that a doctor, psychologist, or teacher had told them at some point in their life that they had an attention deficit disorder. Nearly a quarter of all prisoners reported participating in special education classes (24%).

---

[1] "Independent living" refers to the ability to navigate daily activities without assistance. Each disability type measured is unique. See *Definitions of disability types*.

[2] "Cognitive disability" describes a variety of medical conditions affecting different mental tasks, such as problem-solving, reading comprehension, attention, and remembering. A cognitive disability is not the same as a mental disorder.



**FIGURE 1**
**Prevalence of disabilities among all state and federal prisoners, 2016**

Note: Prisoners could report more than one disability. See table 1 for percentages and standard errors.
[a] Includes hearing, vision, cognitive, ambulatory, self-care, and independent living.
[b] Includes prisoners who reported they had ever been told by a doctor, psychologist, or teacher that they had an attention deficit disorder, sometimes called ADD or ADHD.
[c] Includes prisoners who reported they had ever been told by a doctor, psychologist, or teacher that they had a learning disability, such as dyslexia or dyscalculia.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

*Bureau of Justice Statistics • Statistical Tables*

## Highlights

- Nearly 4 in 10 state prisoners (40%) and 3 in 10 federal prisoners (29%) reported having a disability.

- Female state (50%) and federal (40%) prisoners were more likely than male state (39%) and federal (28%) prisoners to report having a disability.

- Among both state and federal prisoners, white prisoners were more likely than black and Hispanic prisoners to report having any disability.

- About a quarter of state prisoners reported a cognitive disability (24%), and about a tenth reported an ambulatory (12%), a vision (12%), or a hearing (10%) disability.

- Among federal prisoners, 14% reported a cognitive disability, 10% reported an ambulatory disability, and 9% reported a vision disability.

- Twenty-six percent of state prisoners and 13% of federal prisoners reported ever being told that they had an attention deficit disorder.



Ex. CC-450

# Other key findings

- In both state and federal prisons, female prisoners were more likely than male prisoners to report a cognitive, ambulatory, or independent-living disability **(tables 2 and 3)**.

- Forty-four percent of white state prisoners reported a disability, compared to 37% of Hispanic and 33% of black state prisoners.

- Black and Hispanic state prisoners were less likely than white state prisoners to report a hearing, cognitive, ambulatory, or independent-living disability.

- Black federal prisoners were less likely than white federal prisoners to report a hearing, vision, cognitive, ambulatory, or independent-living disability, and equally likely to report a self-care disability.

- More than half of state (57%) and federal (51%) prisoners ages 55 to 64 reported having a disability, and 7 in 10 state (70%) and federal (68%) prisoners age 65 or older reported a disability.

- State and federal prisoners (38%) were about two and a half times more likely to report a disability than adults in the U.S. general population (15%) **(table 4)**.

- Twenty-five percent of state prisoners and 14% of federal prisoners reported having ever attended special education classes **(table 5)**.

- State prisoners (15%) were nearly twice as likely as federal prisoners (8%) to report that a doctor, psychologist, or teacher had ever told them that they had a learning disability, such as dyslexia or dyscalculia.

## List of tables

**TABLE 1.** Prevalence of disabilities among all state and federal prisoners, 2016

**TABLE 2.** Disabilities among state prisoners, by demographic characteristics, 2016

**TABLE 3.** Disabilities among federal prisoners, by demographic characteristics, 2016

**TABLE 4.** Disabilities among all state and federal prisoners and the U.S. general population age 18 or older, by age, 2016

**TABLE 5.** State and federal prisoners who were ever told they had an attention deficit disorder, ever attended special education classes, or were ever told they had a learning disability, 2016

**TABLE 6.** Prevalence of disabilities among all state and federal prisoners, by selected disabilities, 2011-2012 and 2016

## List of figures

**FIGURE 1.** Prevalence of disabilities among all state and federal prisoners, 2016

## List of appendix tables

**APPENDIX TABLE 1.** Estimated number of state and federal prisoners, by demographic characteristics, 2016

**APPENDIX TABLE 2.** Standard errors for table 2: Disabilities among state prisoners, by demographic characteristics, 2016

**APPENDIX TABLE 3.** Standard errors for table 3: Disabilities among federal prisoners, by demographic characteristics, 2016

Ex. CC-451

**TABLE 1**

**Prevalence of disabilities among all state and federal prisoners**, 2016

| Disability | All state and federal prisoners | |
| --- | --- | --- |
| | Percent | Standard error |
| Any disability[a] | 38.4% | 0.65% |
|   Cognitive | 22.8 | 0.44 |
|   Ambulatory | 11.5 | 0.42 |
|   Vision | 11.4 | 0.39 |
| Told had an attention deficit disorder[b] | 24.4% | 0.51% |
| Ever attended special education classes | 23.8% | 0.47% |
| Told had a learning disability[c] | 14.1% | 0.36% |

Note: Prisoners could report more than one disability. See appendix table 1 for prisoner estimates.

[a]Includes hearing, vision, cognitive, ambulatory, self-care, and independent living.

[b]Includes prisoners who reported they had ever been told by a doctor, psychologist, or teacher that they had an attention deficit disorder, sometimes referred to as ADD or ADHD.

[c]Includes prisoners who reported they had ever been told by a doctor, psychologist, or teacher that they had a learning disability, such as dyslexia or dyscalculia.

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**TABLE 2**

**Disabilities among state prisoners**, by demographic characteristics, 2016

| Characteristic | Any | Hearing | Vision | Cognitive | Ambulatory | Self-care | Independent living |
| --- | --- | --- | --- | --- | --- | --- | --- |
|   All state prisoners | 39.7% | 10.0% | 11.7% | 24.0% | 11.8% | 2.5% | 6.2% |
| **Sex** | | | | | | | |
|   Male* | 38.9% | 10.0% | 11.7% | 23.0% | 11.6% | 2.5% | 6.1% |
|   Female | 49.8 † | 8.9 | 12.1 | 36.8 † | 14.2 † | 2.4 | 8.0 † |
| **Race/ethnicity** | | | | | | | |
|   White[a]* | 44.4% | 13.3% | 11.3% | 27.1% | 12.6% | 2.4% | 7.1% |
|   Black[a] | 33.4 † | 5.6 † | 11.1 | 19.6 † | 10.0 † | 1.8 † | 4.8 † |
|   Hispanic | 36.9 † | 9.3 † | 12.1 | 21.9 † | 10.6 † | 2.6 | 5.6 † |
|   American Indian/ Alaskan Native[a] | 49.2 | 17.0 | 18.4 † | 29.4 | 16.4 | 3.8 | 8.9 |
|   Asian/Native Hawaiian/ Other Pacific Islander[a] | 35.4 † | 7.7 † | 7.7 | 23.9 | 8.0 | 2.3 ! | 2.1 † ! |
|   Two or more races[a] | 48.7 † | 14.1 | 13.6 † | 31.6 † | 16.5 † | 4.1 † | 9.3 † |
| **Age** | | | | | | | |
|   18-24 | 34.6% | 4.2% † | 9.4% | 25.5% † | 2.9% † | 0.7% ! | 3.6% |
|   25-34* | 32.1 | 5.4 | 7.7 | 22.8 | 4.8 | 0.8 | 3.7 |
|   35-44 | 36.0 † | 8.2 † | 9.5 † | 23.4 | 9.4 † | 1.9 † | 5.3 † |
|   45-54 | 46.7 † | 13.3 † | 16.7 † | 25.1 † | 17.3 † | 3.5 † | 7.9 † |
|   55-64 | 57.1 † | 21.5 † | 20.2 † | 25.3 | 30.0 † | 6.5 † | 12.4 † |
|   65 or older | 69.7 † | 35.4 † | 24.0 † | 26.8 | 45.8 † | 11.8 † | 19.8 † |

Note: Prisoners could report more than one disability. See appendix table 1 for prisoner estimates. See appendix table 2 for standard errors.

*Comparison group.

†Difference with comparison group is significant at the 95% confidence level.

! Interpret with caution. Estimate is based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.

[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Ex. CC-452

## TABLE 3
### Disabilities among federal prisoners, by demographic characteristics, 2016

| Characteristic | Any | Hearing | Vision | Cognitive | Ambulatory | Self-care | Independent living |
|---|---|---|---|---|---|---|---|
| All federal prisoners | 28.8% | 6.4% | 9.4% | 13.7% | 9.5% | 1.7% | 4.2% |
| **Sex** | | | | | | | |
| Male* | 28.1% | 6.4% | 9.3% | 12.8% | 9.2% | 1.6% | 4.0% |
| Female | 40.2 † | 6.5 | 10.4 | 26.9 † | 14.3 † | 2.6 | 6.8 † |
| **Race/ethnicity** | | | | | | | |
| White[a]* | 36.8% | 9.5% | 8.8% | 19.4% | 12.2% | 1.7% | 5.9% |
| Black[a] | 22.0 † | 3.7 † | 6.2 † | 10.4 † | 7.3 † | 1.3 | 3.4 † |
| Hispanic | 26.8 † | 5.2 † | 12.0 † | 11.3 † | 8.9 | 1.6 | 3.1 † |
| American Indian/ Alaskan Native[a] | 47.0 | 20.7 | 6.2 ! | 29.2 | 13.2 | 6.9 ! | 15.3 |
| Asian/Native Hawaiian/ Other Pacific Islander[a] | 39.0 | 10.1 ! | 8.6 ! | 19.0 | 7.7 ! | 2.2 ! | 2.3 ! |
| Two or more races[a] | 40.8 | 11.4 | 12.5 | 19.9 | 13.8 | 3.5 | 7.3 |
| **Age** | | | | | | | |
| 18-24 | 26.7% | 3.3% ! | 5.5% | 17.5% | 2.5% ! | 0.5% ! | 5.1% ! |
| 25-34* | 22.7 | 3.4 | 7.4 | 13.6 | 3.5 | 1.0 | 2.5 |
| 35-44 | 22.5 | 3.6 | 6.8 | 12.0 | 6.3 † | 1.1 | 2.7 |
| 45-54 | 33.9 † | 8.1 † | 12.3 † | 14.0 | 14.0 † | 2.1 | 4.5 † |
| 55-64 | 50.5 † | 17.9 † | 16.9 † | 16.2 | 25.2 † | 4.6 † | 11.8 † |
| 65 or older | 67.8 † | 28.9 † | 21.9 † | 18.0 | 41.0 † | 6.9 † | 13.1 † |

Note: Prisoners could report more than one disability. See appendix table 1 for prisoner estimates. See appendix table 3 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
! Interpret with caution. Estimate is based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## TABLE 4
### Disabilities among all state and federal prisoners and the U.S. general population age 18 or older, by age, 2016

| | Any disability[a] | | | |
|---|---|---|---|---|
| | All state and federal prisoners | | Adult U.S. general population* | |
| | Percent | Standard error | Percent | Standard error |
| **All** | 38.4% † | 0.65% | 15.4% | 0.01% |
| **Age** | | | | |
| 18-34 | 31.8% † | 0.73% | 6.3% | 0.01% |
| 18-24 | 34.1 | 1.49 | 6.2 | ... |
| 25-34 | 31.1 | 0.72 | 6.5 | ... |
| 35-64 | 41.5% † | 0.73% | 13.1% | 0.01% |
| 35-44 | 34.0 | 0.85 | 7.8 | ... |
| 45-54 | 44.9 | 1.11 | 12.5 | ... |
| 55-64 | 56.4 | 1.49 | 19.0 | ... |
| 65 or older | 69.5% † | 2.45% | 35.2% | 0.01% |
| 65-74 | 67.6 † | 2.56 | 25.3 | 0.01 |
| 75 or older | 81.7 † | 4.90 | 49.5 | 0.01 |

Note: More than one disability could be reported.
...Not available.
*Comparison group.
†Difference with the comparison group is significant at the 95% confidence level.
[a]Includes hearing, vision, cognitive, ambulatory, self-care, and independent living.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016; and U.S. Census Bureau, American Community Survey, 2016.

Ex. CC-453

**TABLE 5**

**State and federal prisoners who were ever told they had an attention deficit disorder, ever attended special education classes, or were ever told they had a learning disability, 2016**

| Indicator of other disabilities | State prisoners | | Federal prisoners* | |
|---|---|---|---|---|
| | Percent | Standard error | Percent | Standard error |
| Told had an attention deficit disorder[a] | 26.1% † | 0.55% | 12.7% | 1.13% |
| Ever attended special education classes | 25.2 † | 0.51 | 13.8 | 1.21 |
| Told had a learning disability[b] | 15.0 † | 0.40 | 7.7 | 0.68 |

Note: Prisoners could report multiple learning disabilities. See appendix table 1 for prisoner estimates.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
[a]Includes prisoners who reported they had ever been told by a doctor, psychologist, or teacher that they had an attention deficit disorder, sometimes called ADD or ADHD.
[b]Includes prisoners who reported they had ever been told by a doctor, psychologist, or teacher that they had a learning disability, such as dyslexia or dyscalculia.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## Definitions of disability types

Six questions were included on the 2016 Survey of Prison Inmates to measure any disability. These questions were modeled after those on the American Community Survey, conducted by the U.S. Census Bureau.

**Hearing**—Are you deaf or do you have serious difficulty hearing?

**Vision**—Are you blind or do you have serious difficulty seeing even when wearing glasses?

**Cognitive**—Because of a physical, mental, or emotional problem, do you have serious difficulty concentrating, remembering, or making decisions?

**Ambulatory**—Do you have serious difficulty walking or climbing stairs?

**Self-care**—Do you have difficulty dressing or bathing?

**Independent living**—Because of a physical, mental, or emotional problem, do you have difficulty doing activities on your own, such as going to meal time, going outside, working in or outside of this facility, going to classes, or attending programs?

Other disabilities and disorders examined in this report include learning disabilities, such as dyslexia or dyscalculia, attention deficit disorder (ADD) or attention deficit hyperactivity disorder (ADHD), and participation in special education classes.

**Attention deficit disorder (ADD or ADHD)**—Has a doctor, psychologist, or teacher ever told you that you have an attention deficit disorder, sometimes called ADD or ADHD?

**Special education**—Have you ever been enrolled in special education classes, sometimes called SPED?

**Learning disability**—Has a doctor, psychologist, or teacher ever told you that you have a learning disability, such as dyslexia or dyscalculia?

Ex. CC-454

# Change in disabilities among all state and federal prisoners, 2011-2012 and 2016

The 2016 Survey of Prison Inmates (SPI) had a different sampling frame from the 2011-12 National Inmate Survey (NIS), the previous survey that collected data on disabilities from prisoners.[3] To produce comparable data, BJS made two adjustments. First, because the 2011-12 NIS did not include prisoners in community-based correctional facilities, those prisoners were removed from the 2016 SPI sample before analysis. Second, because the federal population in the 2011-12 NIS was not designed to be self-representing but as part of a representative sample for all prisoners, the comparisons made between the years were for all prisoners, without separating out state and federal prisoners.

After these adjustments, a comparison between the years showed an increase in the prevalence of prisoners reporting any disability between 2011-12 (32%) and 2016 (38%) **(table 6)**. The 2016 survey showed increased reporting of hearing, vision, and cognitive disabilities.

---

[3]Mode effects may impact the differences observed between 2011-12 and 2016 percentages, as audio computer-assisted self-interviewing was used to collect NIS data, while SPI data were collected through face-to-face interviews using computer-assisted personal interviewing. For detailed methodology for this data collection, see *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12* (NCJ 241399, BJS, May 2013).

**TABLE 6**

**Prevalence of disabilities among all state and federal prisoners, by selected disabilities, 2011-2012 and 2016**

| Disability | 2011-2012* | | 2016[a] | |
|---|---|---|---|---|
| | Percent | Standard error | Percent | Standard error |
| Any | 31.6% | 1.40% | 38.4% † | 0.65% |
| Hearing | 6.2 | 0.61 | 9.5 † | 0.32 |
| Vision | 7.1 | 0.69 | 11.5 † | 0.39 |
| Cognitive | 19.5 | 1.13 | 22.8 † | 0.45 |
| Ambulatory | 10.1 | 0.76 | 11.6 | 0.43 |
| Self-care | 2.1 | 0.29 | 2.4 | 0.18 |
| Independent living | 7.5 | 0.71 | 6.0 † | 0.26 |

Note: Prisoners could report more than one disability. Based on the adjusted 2016 data, there was an estimated total of 1,403,600 state and federal prisoners in 2016. There was an estimated total of 1,441,800 state and federal prisoners in 2011-2012.

*Comparison group.

†Difference with comparison group is significant at the 95% confidence level.

[a]To allow for comparison to 2011-2012, estimates for 2016 exclude those held in community-based correctional facilities.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011-2012; and Survey of Prison Inmates, 2016.

Ex. CC-455

# Methodology

Findings are based on self-reported data collected through face-to-face interviews with a national sample of state and federal prisoners in the 2016 Survey of Prison Inmates (SPI), produced by the Bureau of Justice Statistics. The 2016 SPI included confinement and community-based facilities but excluded special facilities such as those operated by or holding prisoners exclusively for the U.S. military, U.S. Immigration and Customs Enforcement, the U.S. Marshals Service, and correctional authorities in Indian country. Facilities in every state and the Federal Bureau of Prisons were eligible. The 2016 SPI was a stratified two-stage sample design in which prisons were selected in the first stage and prisoners within sampled facilities were selected in the second stage. The SPI sample was selected from a universe of 2,001 unique prisons (1,808 state and 193 federal). A total of 364 prisons (306 state and 58 federal) participated in the 2016 SPI out of 385 selected (324 state and 61 federal). The first-stage response rate (i.e., the response rate among selected prisons) was 98.4% (98.1% among state prisons and 100% among federal prisons).[4]

A total of 24,848 prisoners (20,064 state and 4,784 federal) participated in the 2016 SPI, based on a sample of 37,058 prisoners (30,348 state and 6,710 federal).[5] The second-stage response rate (i.e., the response rate among selected prisoners) was 70.0% (69.3% among state prisoners and 72.8% among federal prisoners).[6]

## Standard errors and tests of significance

When national estimates are derived from a sample, as with the SPI, caution must be used when comparing one estimate to another or when comparing estimates over time. Although one estimate may be larger than another, estimates based on a sample rather than a complete enumeration of the population have some degree of sampling error. The sampling error of an

estimate depends on several factors, including the size of the estimate, the number of completed interviews, and the intracluster correlation of the outcome within prisons. When the sampling error around an estimate is taken into account, estimates that appear different may not be statistically different.

One measure of the sampling error associated with an estimate is the standard error. The standard error may vary from one estimate to the next. Standard errors in this report were estimated using Taylor Series Linearization (TSL) to account for the complex design of the 2016 SPI and the 2011-12 National Inmate Survey. The TSL method directly estimates variances through a linearized function by combining variance estimates from stratum and primary sampling units used to sample prisoners.

Readers may use the estimates and standard errors of the estimates provided in this report to generate a 95% confidence interval around the estimates as a measure of the margin of error. Typically, multiplying the standard error by 1.96 and then adding or subtracting the result from the estimate produces the confidence interval. This interval expresses the range of values within which the true population parameter is expected to fall 95% of the time if the same sampling method is used to select different samples.

For small samples and estimates close to 0%, the use of the standard error to construct the 95% confidence interval may not be reliable. Therefore, caution should be used when interpreting the estimates. Caution should also be used if constructing a 95% confidence interval, which would include zero in these cases, because the estimate may not be distinguishable from zero.

The standard errors have been used to compare selected groups of prisoners that have been defined by demographic characteristics. They have also been used to compare estimates of state and federal prisoners between 2011-12 and 2016. Differences in the estimates for subgroups in tables 2, 3, 4, 5, and 6 in this report have been tested and notated for significance at the 95% level of confidence. Readers should reference the tables for testing on specific findings. Unless otherwise noted, findings described in this report as higher, lower, or different passed a test at the 0.5 level of statistical significance (95% confidence level).

---

[4]A total of 15 prisons (12 state and 3 federal) that were sampled were deemed ineligible for the 2016 SPI. For more information, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS, July 2019).

[5]There were 10,661 sampled prisoners who were eligible for the survey but did not participate. Another 1,549 sampled prisoners were deemed ineligible for the survey. For more information, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS, July 2019).

[6]For more detailed information on the 2016 SPI, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS, July 2019).

Ex. CC-456

**APPENDIX TABLE 1**
**Estimated number of state and federal prisoners, by demographic characteristics, 2016**

| Characteristic | State prisoners | Federal prisoners |
|---|---|---|
| All prisoners | 1,248,300 | 173,400 |
| **Sex** | | |
| Male | 1,159,100 | 162,700 |
| Female | 89,200 | 10,700 |
| **Race/ethnicity** | | |
| White* | 391,800 | 35,900 |
| Black* | 415,500 | 55,000 |
| Hispanic | 254,700 | 63,500 |
| American Indian/ Alaskan Native* | 17,600 | 2,800 |
| Asian/Native Hawaiian/ Other Pacific Islander* | 11,400 | 2,600 |
| Two or more races* | 138,600 | 11,200 |
| **Age** | | |
| 18-24 | 128,500 | 8,200 |
| 25-34 | 400,800 | 48,900 |
| 35-44 | 328,800 | 59,700 |
| 45-54 | 231,000 | 37,300 |
| 55-64 | 120,900 | 14,400 |
| 65 or older | 38,400 | 4,900 |

Note: Numbers are rounded to the nearest 100. Details may not sum to totals due to rounding and missing data. Counts are weighted to totals from the 2015 National Prisoner Statistics Program. See *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS, July 2019).

*Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Ex. CC-457

## APPENDIX TABLE 2
**Standard errors for table 2: Disabilities among state prisoners, by demographic characteristics, 2016**

| Characteristic | Any | Hearing | Vision | Cognitive | Ambulatory | Self-care | Independent living |
|---|---|---|---|---|---|---|---|
| All state prisoners | 0.72% | 0.35% | 0.43% | 0.49% | 0.47% | 0.20% | 0.29% |
| **Sex** | | | | | | | |
| Male | 0.76% | 0.37% | 0.46% | 0.51% | 0.50% | 0.21% | 0.31% |
| Female | 1.38 | 0.61 | 0.65 | 1.03 | 0.85 | 0.34 | 0.55 |
| **Race/ethnicity** | | | | | | | |
| White | 0.96% | 0.64% | 0.69% | 0.74% | 0.63% | 0.27% | 0.45% |
| Black | 0.93 | 0.35 | 0.49 | 0.68 | 0.56 | 0.20 | 0.32 |
| Hispanic | 1.31 | 0.60 | 0.86 | 0.86 | 0.79 | 0.36 | 0.49 |
| American Indian/ Alaskan Native | 3.84 | 2.76 | 3.11 | 3.68 | 3.05 | 1.53 | 2.10 |
| Asian/Native Hawaiian/ Other Pacific Islander | 4.50 | 2.10 | 2.63 | 4.27 | 2.33 | 1.25 | 1.03 |
| Two or more races | 1.43 | 1.07 | 0.92 | 1.26 | 0.98 | 0.54 | 0.78 |
| **Age** | | | | | | | |
| 18-24 | 1.57% | 0.52% | 0.91% | 1.39% | 0.46% | 0.23% | 0.52% |
| 25-34 | 0.79 | 0.40 | 0.43 | 0.65 | 0.36 | 0.15 | 0.31 |
| 35-44 | 0.98 | 0.53 | 0.52 | 0.81 | 0.54 | 0.22 | 0.38 |
| 45-54 | 1.23 | 0.67 | 0.85 | 0.91 | 0.79 | 0.34 | 0.56 |
| 55-64 | 1.61 | 1.26 | 1.51 | 1.30 | 1.43 | 0.69 | 0.98 |
| 65 or older | 2.72 | 2.26 | 2.02 | 2.10 | 3.05 | 1.83 | 1.96 |

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 3
**Standard errors for table 3: Disabilities among federal prisoners, by demographic characteristics, 2016**

| Characteristic | Any | Hearing | Vision | Cognitive | Ambulatory | Self-care | Independent living |
|---|---|---|---|---|---|---|---|
| All federal prisoners | 1.10% | 0.53% | 0.69% | 0.81% | 0.68% | 0.25% | 0.39% |
| **Sex** | | | | | | | |
| Male | 1.15% | 0.56% | 0.72% | 0.84% | 0.71% | 0.26% | 0.40% |
| Female | 2.43 | 0.64 | 1.59 | 1.91 | 1.66 | 0.47 | 1.19 |
| **Race/ethnicity** | | | | | | | |
| White | 1.72% | 1.13% | 0.92% | 1.57% | 1.46% | 0.41% | 0.83% |
| Black | 1.24 | 0.46 | 0.90 | 0.78 | 0.91 | 0.35 | 0.56 |
| Hispanic | 1.80 | 0.68 | 1.17 | 1.31 | 0.83 | 0.41 | 0.52 |
| American Indian/ Alaskan Native | 7.63 | 5.90 | 3.00 | 6.07 | 3.27 | 2.95 | 7.29 |
| Asian/Native Hawaiian/ Other Pacific Islander | 6.20 | 3.37 | 4.03 | 5.04 | 3.16 | 1.52 | 1.86 |
| Two or more races | 3.50 | 2.59 | 2.20 | 2.46 | 2.20 | 0.94 | 1.37 |
| **Age** | | | | | | | |
| 18-24 | 3.81% | 2.08% | 1.67% | 2.74% | 1.07% | 0.49% | 2.32% |
| 25-34 | 1.41 | 0.53 | 0.73 | 1.20 | 0.48 | 0.30 | 0.50 |
| 35-44 | 1.34 | 0.54 | 0.98 | 0.91 | 0.66 | 0.24 | 0.46 |
| 45-54 | 2.20 | 1.23 | 1.40 | 1.74 | 1.31 | 0.52 | 0.69 |
| 55-64 | 3.41 | 2.32 | 2.80 | 2.02 | 2.77 | 1.23 | 1.94 |
| 65 or older | 3.57 | 3.33 | 4.13 | 3.25 | 5.19 | 2.45 | 3.23 |

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Ex. CC-458



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Doris J. James is the acting director.

This report was written by Laura M. Maruschak, Jennifer Bronson, and Mariel Alper. Zhen Zeng, Tracy L. Snell, and Stephanie Mueller verified the report. Lauren G. Beatty was the BJS project manager for the 2016 Survey of Prison Inmates and provided statistical and methodological input and review.

Eric Hendrixson and Jill Thomas edited the report. Carrie Epps-Carey produced the report.

March 2021, NCJ 252642



NCJ 252642

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.gov**

Ex. CC-459

# EXHIBIT DD

CALIFORNIA PUBLIC RECORDS ACT (CPRA) DOCUMENT REQUEST
Reference #S000396-040221
RE: Ms. Ellie Heywood CPRA for
Americans with Disabilities Act Information

Dear Ms. Heywood,

The San Diego County Sheriff's Department is in receipt of your CPRA request dated and received on April 2, 2021. The Sheriff's Department responds to your requests as follows:

**Request 1:** Any studies, reports, audits, or analyses related to the Jail's compliance with state and federal disability laws, such as Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as amended 29 U.S.C. § 794, and/or similar state disability rights laws. [Include in your response any materials older than January 1, 2016.]

**Response 1:** The Sheriff's Department identifies the following documents responsive to your request.

- National Commission On Correctional Health Care (NCCHC) Technical Assistance Report
- Dr. Colleen Kelly's Review and Critique of the Disability Rights California's Report
- Lindsay Hayes' Report

These documents are provided on the Sheriff's public website:
https://www.sdsheriff.gov/bureaus/detention-services-bureau/preventing-jail-suicides

_____

**Request 2:** Any and all writings related to your county's Sheriff's Department's ADA transition plan(s), required by 28 C.F.R. § 35.150(d), or, if your county and/or the Sheriff's Department did not produce a transition plan specific to the Sheriff's Department, any and all writings related to your county's ADA transition plan.

**Response 2:** The Sheriff's Department does not have any documents responsive to this request for a transition plan. Construction or renovations made for the Sheriff's Department's detention facilities are conducted in accordance with California's Building Standards Codes (Physical Access Regulations) as found in Title 24 of the California Code of Regulations (https://www.dor.ca.gov/Home/Title24), and are designed to comply with the requirements of the Americans with Disabilities Act (ADA) and State statutes.

_____

**Request 3:** Any and all writings related to the hiring or appointment of a person, to a position in your county's government, responsible for overseeing your county's Sheriff's

**Ex. DD-461**