GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Date:      June 29, 2023<br>Time:     2:00 p.m.<br>Crtrm.:   4A<br><br>Judge:     Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

[4295794.4]

1    I, Gay Crosthwait Grunfeld, declare:

2    1.    I am an attorney duly admitted to practice before this Court.  I am a

3 partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

4 Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a

5 witness, I could competently so testify.  I make this reply declaration in support of

6 Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification

7 ("Plaintiffs' Motions").

8    **Defendants' Remedial Efforts Directly Respond to Plaintiffs' Litigation Efforts**

9    2.    On May 2, 2022, Plaintiffs filed Motions for Preliminary Injunction

10 and Provisional Class Certification, including regarding the Sheriff's Department's

11 and the County's non-compliance with the Americans with Disabilities Act and

12 related federal and state laws ("ADA").  Dkt. 119-1 at 16-18.  After the Court

13 denied the motions, stating that "[d]iscovery will no doubt edify the merits of

14 Plaintiffs' claims," Dkt. 203 at 10, Plaintiffs reached out to Defendants to request

15 expedited discovery on the issues raised in that original motion for preliminary

16 injunction, including the ADA.  Attached as **Exhibit A** is a true and correct copy of

17 an August 19, 2022 email exchange between my colleague Van Swearingen and

18 Defendants' counsel, in which Plaintiffs sought to meet and confer about such

19 expedited discovery.  Plaintiffs then moved for expedited discovery on September 7,

20 2022.  Dkt. 212.  Plaintiffs then sought in November 2022 to obtain expedited

21 discovery on ADA issues only.  Attached hereto as **Exhibit B** is a November 21,

22 2022 email from Priyah Kaul, an associate in my firm, to Defendants' counsel,

23 seeking expedited discovery on ADA issues.

24    3.    The Declaration of Commander Christina Bavencoff states that she

25 began trying to address ADA issues at the Jail in September 2022, but omits any

26 reference to this case or Plaintiffs' motions for preliminary injunction on ADA

27 issues and expedited ADA discovery.  Dkt. 311-16 ("Bavencoff Decl."), ¶ 4.

28 Below, Plaintiffs replicate the relevant timeline in Commander Bavencoff's

declaration, but add the relevant events from this litigation up to the filing of Plaintiffs' Motions to show how Plaintiffs' actions in this case are the main driver of Defendants' recent attempts at ADA compliance:

| Date | *Dunsmore* Litigation | Bavencoff Timeline |
|---|---|---|
| 02-09-2022 | Plaintiffs' class action complaint (including ADA claim for relief) filed.  Dkt. 81. | |
| 05-02-2022 | First preliminary injunction motion (including ADA issues at Central Jail) filed.  Dkt. 119. | |
| 08-11-2022 | Hearing on first preliminary injunction motion (including ADA issues at Central Jail). | |
| 08-19-2022 | Plaintiffs email Defendants regarding expedited discovery, including "inspect[ion of] certain jail facilities." *See* **Exhibit A**. | |
| 09-06-2022 | | SDSD began working with Purple to expand our ASL services to all our facilities. |
| 09-07-2022 | Plaintiffs' motion for expedited discovery filed. | |
| 11-21-2022 | Plaintiffs email Defendants regarding ADA-specific expedited discovery, including facility inspections.  *See* **Exhibit B**. | |
| 11-30-2022 | | SDCJ had their inspection by our team (Paul). |
| 12-7-2022 | Discovery Conference regarding ADA-specific expedited discovery. | |
| 12-14-2022 | Plaintiffs' motion for ADA-specific expedited discovery filed.  Dkt. 243. | |

REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| Date | *Dunsmore* Litigation | Bavencoff Timeline |
|---|---|---|
| 12-28-2022 | The parties' Joint Statement reports that "The parties have reached a tentative agreement that Plaintiffs' disability access expert and Plaintiffs' counsel will inspect the Rock Mountain facility on a mutually agreed-upon date in February." Dkt. 249 at 1. | |
| 01-09-2023 | Hearing regarding motion for ADA-specific discovery, including discussion of triple bunk beds, during which Defendants' counsel represented that "there's nobody in three bunks anywhere in the facility." Dkt. 256 at 65:9-10.<br><br>The Court indicated it was "inclined to grant" some expedited discovery. *Id.* at 36:19-20. | SDSD received the list of proposed corrective actions for SDCJ. |
| 01-10-2023 | | VDF and LC had their inspection by our team (Paul). |
| 01-11-2023 | | SBDF, GBDF, EMRF, RMDF had their inspections by our team (Paul). |
| 01-12-2023 | The parties' Joint Statement sets the dates for Plaintiffs and their ADA experts to inspect Central Jail and Rock Mountain. Dkt. 257. | |
| 01-17-2023 | Court orders ADA-specific document production, facility inspections, and Rule 30(b)(6) depositions. Dkt. 258. | SDSD had their first meeting with Facilities Project Manager Scott Bennett and Support Services Director Chris Thibodeaux to review the findings for SDCJ and discuss a plan to correct infrastructure. |

REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| Date | *Dunsmore* Litigation | Bavencoff Timeline |
|---|---|---|
| 01-20-2023 | | Created an excel tracking sheet to track ADA modifications.<br><br>Began reviewing SDCJ Green Sheets to identify and update needed changes.<br><br>Bennett physically walked SDCJ. |
| 01-22-2023 | | Received RMDF list of proposed corrective actions from Paul.<br><br>Began assembling binders and archive materials. |
| 01-23-2023 | | Bennett began drafting requests for quotes for materials for SDCJ.<br><br>Sought clarification of acceptable modifications for RMDF. |
| 01-27-2023 | | Jensen sent out a statewide email re ADA Units and their policies, and structure. |
| 01-30-2023 | | Plumbers toured SDCJ to reference the combination units.<br><br>Bennett toured RMDF again. |
| 01-31-2023 | | Bennett walked RMDF with Paul. |
| 02-01-2023 | | Draft of proposed changes to RMDF sent to Paul. |
| 02-06-2023 | The parties' Joint Statement reports that "Defendants are considering Plaintiffs' proposal for an early exchange of [ADA] expert reports, provided the exchange is within the confines of a Court-supervised mediation process." Dkt. 266 at 2. | Received an updated corrections list from RMDF from Paul.<br><br>First draft of proposed green sheet changes for SDCJ submitted. |
| 02-10-2023 | Plaintiffs' inspection of Rock Mountain with the parties' experts and Defendants' counsel. | |
| 02-15-2023 | | Commander Cinnamo generated CARs to create the positions for the ADA Unit. |

| Date | *Dunsmore* Litigation | Bavencoff Timeline |
|---|---|---|
| 02-17-2023 | | Infrastructure changes commenced at SDCJ floors 4-8: Lowering of Naloxone boxes, grievance and medical boxes were lowered to comply with ADA regulations. Also, stools were removed from phones/tables. |
| 02-18-2023 | | Received sample documents from Julian Martinez regarding ADA language. |
| 02-21-2023 | | SDCJ green sheets amended: M.9.C.1, I.50.C.1, P.11.C.1, I.51.C.5, I.51.C.3. |
| 02-24-2023 | | RMDF plans still developing.<br><br>SDCJ Floors 5 and 6 have now been completed as of 2/24/23. This includes mailboxes, Narcan boxes, and removing one stool from a phone and a table.<br><br>Continuing to develop materials and lead times for the 1st & 2nd floors ADA compliant cells. |
| 03-06-2023 | | SDCJ Infrastructure changes completed for floors 4-8. Ref: Lowering of Naloxone boxes, grievance and medical boxes were lowered to comply with ADA regulations. Also, stools were removed from phones/tables. |

REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| Date | *Dunsmore* Litigation | Bavencoff Timeline |
|------|----------------------|--------------------|
| 03-07-2023 | | Additional Green sheet modifications submitted for SDCJ: G.3.C.1, H.3C.1, P.9.C.1.<br><br>For tracking purposes: Purple accounts for VDF, SBDF, and GBDF. The facilities are still working out logistics on getting WIFI installed at their respective facilities and working on acquiring the proper equipment for the IP's to use. As soon as those two things are set up, the accounts are ready and waiting for them. |
| 03-10-2023 | | 2 ADA Toilets for 1st and 2nd floors ordered 03-8th. Approximately 60 days for delivery and another 30 or so to install.<br><br>Bennett received the grade slope challenges from Paul at Rock. |
| 03-13-2023 | Plaintiffs' inspection of Central Jail with the parties' experts and Defendants' counsel. | |
| 03-14-2023 | Rule 30(b)(6) depositions on ADA policies and procedures for Rock Mountain and video relay services. | |
| 03-15-2023 | Rule 30(b)(6) deposition on Central Jail policies, procedures, and practices regarding incarcerated persons with disabilities, including testimony confirming existence of triple bunks, Dkt. 281-2 at Ex. N-105. | |
| 04-04-2023 | | RMDF and GBDF plans amended to exclude all triple bunks during renovations. Also, EMDF has 24 triple bunks in B dorm. Bennett was advised to purchase 32 double bunks and replace all triple bunks there so there would be no triple bunks left at that facility. |

[4295794.4]

7

Case No. 3:20-cv-00406-AJB-DDL

REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| Date | *Dunsmore* Litigation | Bavencoff Timeline |
|------|----------------------|--------------------|
| 04-20-2023 | Rule 30(b)(6) deposition on the provision and documentation of sign language interpretation at Central Jail.<br><br>Rule 30(b)(6) deposition on changes and alterations at Central Jail to rectify physical barriers and improve disability access since February 2022. | |
| 04-25-2023 | Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification regarding sign language interpretation and accessible beds, toilets, and showers filed. | |

**Plaintiffs Informed Defendants of Their Intent to Seek Injunctive Relief**

4.     Defendants have known that Plaintiffs intended to seek a second preliminary injunction as to ADA issues since as early as September 7, 2022, when Plaintiffs moved for expedited discovery to support a "potential future motion for injunctive relief." Dkt. 212-1 at 10. On December 21, 2022, Defendants acknowledged in their opposition to Plaintiffs' motion for ADA-specific expedited discovery that "Plaintiffs assert that current conditions at the detention facilities may warrant swift injunctive relief and the expedited discovery will elicit evidence as to whether a second attempt at an injunction is appropriate." Dkt. 245 at 4.

5.     The Declaration of Susan Coleman states that Plaintiffs provided Defendants "[n]o information about the basis or the timing" of Plaintiffs' Motions before they were filed. Dkt. 311-15 ("Coleman Decl.") at ¶ 4. However, attached to my initial declaration in support of Plaintiffs' Motions was a letter I sent to Ms. Coleman and other counsel for Defendants on April 4, 2023—three weeks before filing the Motions—stating that Plaintiffs would be seeking a preliminary injunction on "Defendants' failure to provide in-person sign language interpretation to deaf

incarcerated people, and their lack of safe and accessible housing for people with mobility disabilities." Dkt. 281-2 ("Grunfeld Decl."), at Ex. D-48. Plaintiffs requested a response by April 10, 2023 to avoid litigation. *Id.* Defendants read and responded to the letter. *See* Coleman Decl., Dkt. 311-15, at Ex. B-006–007. Defendants' pleadings omit reference to that letter. Plaintiffs also sent Defendants an April 11, 2023 letter reiterating Plaintiffs' willingness to engage in an ENE process, a true and correct copy of which is attached hereto as **Exhibit C**. *See also* Grunfeld Decl., Dkt. 281-2, at Ex. D-41–46 (March 15, 2022 letter to Defendants proposing to resolve issues in the case, including ADA compliance, without resort to motion practice).

**Defense Counsel Repeatedly Informed the Court that Rock Mountain Would Imminently Be ADA-Compliant and Used to House People with Disabilities**

6.      At the August 11, 2022 hearing on Plaintiffs' first preliminary injunction motion, defense counsel informed the court that "The new facility, Rock Mountain, is—is hopefully going to open this fall. And that is completely ADA compliant. So people will be moved into that that have ADA issues. And then the other facilities will be gradually upgraded as well to current modern ADA compliance as needed." Dkt. 204 at 17:9-13. Later the same month, on August 31, 2022, defense counsel informed Judge Leshner at a Discovery Conference that "There have been a lot of changes that have been made by the County, including the Rock Mountain facility that's going to be open this fall, which is entirely ADA compliant." Aug. 31, 2022 Hearing Tr. at 17:6-9. Defense counsel also stated that Defendants "have a new facility that's coming online that's ADA compliant." *Id.* at 18:6-7.

7.      At the December 7, 2022 Discovery Conference before Judge Leshner defense counsel stated that "the Rock Mountain facility is—is going to be done and operational in the first quarter of 2023. And that is in the process of being completely ADA compliant." Dec. 7, 2022 Hearing Tr. at 9:17-19. Based on representations by defense counsel, Judge Leshner stated that "If [Rock Mountain]

is going to be the ADA compliant facility—and if it's what it sounds like, it may—it may resolve many of the issues as to which the plaintiffs are seeking expedited discovery." *Id.* at 16:15-18.

8.    Defendants' Opposition does not identify when Rock Mountain will be fully ADA-compliant, nor when people with mobility disabilities will be housed at that facility.  The Sheriff's Department Project Manager Darren Scott Bennett submitted a declaration in opposition stating that once Rock Mountain is completed, it will be opened in phases, but "[n]o mobility impaired individuals can be rehoused at Rock Mountain until appropriate sworn and medical staffing becomes available." Dkt. 312 at ¶ 9.

### Plaintiffs' 30(b)(6) Depositions and Other Evidence Confirm the Need for Court Oversight of the Jail's ADA Efforts

9.    On April 25, 2023, after filing Plaintiffs' Motions, I sent Defendants' counsel an email, a true and correct copy of which is attached hereto as **Exhibit D**, reiterating Plaintiffs' willingness to discuss a resolution to the ADA deficiencies at the Jail.  I attached the proposed order in support of Plaintiffs' Motions and emphasized the need for a "stipulated order or court-overseen process."  Ex. D-14, *infra*.  In the correspondence preceding that email, Defendants' counsel Elizabeth Pappy stated, regarding the ADA experts, "We don't have a report."  Ex. D-16, *infra*.  However, the opposition Declaration of Paul Joelson (Defendants' ADA expert) refers to a report on Central Jail (completed December 16, 2022) and a report on Rock Mountain (completed February 3, 2023), neither of which has been provided to Plaintiffs.  Dkt. 311-18 at ¶¶ 18j, 18o.

10.    On March 14, 2023, Plaintiffs took the deposition of Defendants' Rule 30(b)(6) witness on policies and procedures for Rock Mountain Detention Facility and video relay services.  Defendants designated Sergeant Matthew Jensen of the Sheriff's Department.  Attached hereto as **Exhibit E** is a true and correct copy of excerpts from the transcript of the 30(b)(6) deposition of Sergeant Jensen.

11.     On March 15, 2023, Plaintiffs took the deposition of Defendants'
Rule 30(b)(6) witness on Central Jail with respect to current policies, procedures,
and practices regarding the accessibility of facilities, housing, programs, services,
activities, effective communication, reasonable accommodations, and assistive
devices for incarcerated persons with disabilities and Central Jail.  As stated in my
initial declaration, Defendants designated Captain Kyle Bibel as the person most
knowledgeable for this topic.  In his opposition declaration, Captain Bibel states that
his testimony about falls at the Jail was "an exaggeration," and he was "not being
literal," but rather "was being sarcastic or flippant."  Dkt. 311-19 at ¶ 13.  As far as I
am aware, Captain Bibel made no corrections to his deposition transcript, despite
having the opportunity to do so.  Captain Bibel's declaration acknowledges that he
was not aware of any specific instance of sign language interpretation being
provided at the Jail as of his deposition.  *Id.* at ¶ 4.  Although Captain Bibel testified
that the Jail orientation video includes sign language interpretation, *see* Grunfeld
Decl. at Ex. N-99, Defendants refused Plaintiffs' request for a copy of the Jail
orientation video.  Commander Bavencoff's declaration indicates that the Sheriff's
Department needs to "[r]efilm and deploy the facility orientation video with closed
captioning and/or ASL incorporated."  Bavencoff Decl., Dkt. 311-16, at ¶ 5.

12.     On April 20, 2023, Plaintiffs took the deposition of Defendants'
Rule 30(b)(6) witness on changes and alterations at Central Jail to rectify physical
barriers and improve disability access for incarcerated persons with mobility
disabilities since this lawsuit was amended in February 2022.  Defendants
designated Darren Scott Bennett, Project Manager in the Facilities Division of the
Sheriff's Department.  Attached hereto as **Exhibit F** is a true and correct copy of
excerpts from the transcript of the 30(b)(6) deposition of Mr. Bennett.  In his
deposition, Mr. Bennett testified that he has received no ADA training.  Ex. F-27,
*infra*.  Mr. Bennett also testified that he had heard about ADA complaints "back as
far as 2008," but had not "started a process of being more compliant with ADA

1    rules" until 2022. Ex. F-29–31, *infra*. Mr. Bennett testified that a funding request

2    for improvements to Central Jail will not be ready to submit until **March 2024**.

3    Ex. F-58–59, *infra*.

4        13.    On April 20, 2023, Plaintiffs took the deposition of Defendants'

5    Rule 30(b)(6) witness on the provision and documentation of sign language

6    interpretation to incarcerated persons at San Diego Central Jail. Defendants

7    designated Michael Barragan, a Supervising Correctional Counselor within the

8    Reentry Services Division of the Sheriff's Department. Attached hereto as

9    **Exhibit G** is a true and correct copy of excerpts of the 30(b)(6) deposition of

10    Mr. Barragan. In his deposition, Mr. Barragan testified, as the person most

11    knowledgeable, that he had never seen any request for sign language interpretation.

12    Ex. G-75, *infra*. He also testified that the division allegedly responsible for sign

13    language interpretation services has never received an emergency request for sign

14    language services. Ex. G-77, *infra*. Mr. Barragan also had never seen any record of

15    sign language interpretation being provided at the Jail. Ex. G-80, *infra*.

16        14.    Throughout the course of this case, Plaintiffs' counsel has been sending

17    Defendants' counsel emails advocating for the urgent needs of incarcerated people

18    at the Jail. The opposition Declaration of Susan Coleman states "nor do I recall

19    Plaintiffs' counsel in this matter ever asking for help (from any of the defense

20    counsel in this matter) in ensuring appropriate ADA accommodations for any

21    incarcerated person with mobility or hearing issues." Coleman Decl., Dkt. 311-15,

22    at ¶ 2. However, attached as **Exhibit H** are true and correct copies of advocacy

23    emails Plaintiffs' counsel has sent to Defendants' counsel about ADA issues, dating

24    back to July 1, 2022.

25        15.    In particular, on February 10, 2023, Plaintiffs' counsel emailed

26    Defendants' counsel about Mr. Kuykendall's need for accommodation, including a

27    wheelchair and to be housed on the lower bed of a double bunk. Ex. H-87, *infra*.

28    Mr. Kuykendall was then housed at George Bailey Detention Facility, *id.*, where he

REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

remained until Plaintiffs filed these Motions.  Mr. Kuykendall was transferred to Central Jail within 48 hours of Plaintiffs' filing these Motions; however, he was not immediately provided a wheelchair.  Kuykendall Reply Decl. ¶ 4.  Plaintiffs' counsel again emailed Defendants' counsel about Mr. Kuykendall's need for a wheelchair at noon on May 5, 2023.  Ex. H-88, *infra*.  Mr. Kuykendall was provided a wheelchair approximately 1.5 hours later.  Kuykendall Reply Decl. ¶ 4 & Ex. A.

16.    My initial declaration attached letters dating back to 2018 from my firm to the California Department of Corrections and Rehabilitation ("CDCR") regarding the disability needs of people incarcerated in county jails by CDCR.  *See* Grunfeld Decl., Dkt. 281-2, at ¶¶ 3-6 & Ex. B.  Our office copied San Diego County Counsel and the Sheriff's Department's legal counsel on those letters.  *See id.* at Ex. B-18–36.

17.    Plaintiffs' Motions attached the Declaration of Kevin Martin. Dkt. 281-15.  Defendants' responsive pleadings refer to a Kevin Martin with the booking number 22752829 and middle name "Dean," stating that Mr. Martin's sick call slips never referred to "any complaints of back pain or mobility issues."  Defs.' Opp., Dkt. 311, at 6; *see also, e.g.*, Dkt. 311-11 ("Montgomery Decl. re: Martin") at Ex. A-002.  Defendants appear to refer to a different Kevin Martin than the one who submitted a declaration in support of Plaintiffs' Motions.  The Kevin Martin who was in the Jail for 18 months and submitted a declaration in support of Plaintiffs' Motions had the booking number 21129360 and middle name "Michael."  *See, e.g.*, Ex. I-90, *infra*.  Our office submitted a medical records request to the Sheriff's Department for Mr. Kevin Michael Martin's medical records on February 13, 2023. Attached as **Exhibit I** is a true and correct copy of excerpts of those medical records, comprising over a dozen sick call slips and grievances that Mr. Martin filed regarding severe pain due to a pinched sciatic nerve, and his related mobility disability.  For example, on August 1, 2022, Mr. Martin wrote:  "I need a lower bunk do [*sic*] to back problems.  I also need a cane or some type of assistance to

help me walk." Ex. I-99, *infra*. On December 16, 2022, Mr. Martin wrote: "I need a back brace and cane. I cannot stand straight up [f]or longer than 30 sec-1 min without SEVERE pain!!! Unable to stand to shower or anything else! PLEASE HELP!" Ex. I-101, *infra*.

18.     As stated in my initial declaration, I am Plaintiffs' counsel in the long-running ADA lawsuit against CDCR, entitled *Armstrong v. Newsom*. *See* Grunfeld Decl., Dkt. 218-2, at ¶ 3. In the course of *Armstrong*, the instant case, and other cases, attorneys working under my direction have obtained sign language interpreting services to meet with clients, including incarcerated clients. In my experience, the agency providing the sign language interpreter then submits an invoice to my firm, which I review. For example, attached as **Exhibit J** is a true and correct copy of an invoice for sign language interpreting services used to interview a person incarcerated at the Jail. CDCR also regularly produces logs and other types of documentation demonstrating the provision of ASL to deaf signers who need it. I have reviewed Defendants' opposition pleadings and been unable to find any such invoices, receipts, or logs showing the provision of sign language at any time to any person in the Jail. None were produced in response to Plaintiffs' First Request for Production either. *See* Grunfeld Decl., Dkt. 281-2, at ¶¶ 14, 16.

19.     Defendants' brief states that, of the named Plaintiffs, only Lisa Landers remains in the Jail. Defs.' Opp., Dkt. 311, at 15. This is inaccurate and inconsistent with Defendants' own pleadings, as the opposition Declaration of Matthew Jensen confirms that James Clark and Laura Zoerner (Grubbs) are in Jail custody. Dkt. 311-17 at ¶¶ 3c, 4. The Jensen Declaration refers to an "Anthony Fuentes," *id.* at ¶ 3e, but Plaintiffs submitted a declaration from *Alberto Fuentes* with Plaintiffs' Motions. *See* Dkt. 281-10.

**Dr. Montgomery's Declarations Lack Foundation and Are Based on Hearsay**

20.     The County submitted several declarations from Jon Montgomery, Medical Director for the Detention Services Bureau, Medical Services Division, of

REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

the San Diego County Sheriff's Department ("the Montgomery Declarations"), for the purposes of "evaluat[ing] the veracity" of Plaintiffs' claims, Defs.' Opp., Dkt. 311, at 6. *See* Dkts. 311-1, 311-2, 311-3, 311-4, 311-5, 311-6, 311-7, 311-8, 311-9, 311-10, 311-11, 311-12, 311-13, 311-14. Each of the Montgomery Declarations responds to one of the declarations filed in support of Plaintiffs' Motions and is based on Dr. Montgomery's "not … thorough review" of the incarcerated person's medical file. *See, e.g.*, Dkt. 311-1 at ¶ 2. Dr. Montgomery does not state that he personally examined any of Plaintiffs' declarants.

21.    In several of Dr. Montgomery's declarations, he asserts that Plaintiffs and the other incarcerated people who submitted declarations regarding their mobility disabilities were seen "ambulating without assistive devices." *E.g.*, Dkt. 311-8 at ¶¶ 6-7; *see also* Dkt. 311-9 at ¶¶ 7, 10, 12, 14. Those assertions lack foundation. Many of medical records relied on by Dr. Montgomery for those statements do not contain direct observations of the declarants, but are rather based on hearsay. For example, Dr. Montgomery cites multiple notes in Plaintiff Landers' medical records which report observations made by people other than the note-writer. *E.g.*, Dkt. 311-9 at Ex. B-006 (RN noting that "per NP" the patient was "ambulatory with steady gait"); *id.* at Ex. B-007 (nurse noting that two other people "witnessed" her "not using the walker"); *id.* at Ex. C-009 (NP noting that "x2 RNs have informed NP that Pt is ambulating well"). In contrast, elsewhere in Plaintiff Landers' medical records, medical staff document the "objective" observations that she has a "limp," *id.* at Ex. B-006, and was "using her walker" to ambulate, *id.* at Ex. C-009, as well as the assessment that she has "[d]ifficulty w ambulation," *id.* Dr. Montgomery similarly cites notes in Mr. Kuykendall's medical records which are hearsay. *E.g.*, Dkt. 311-8 at Ex. F-013 (stating that writer was "notified by deputy … that patient was found doing push ups"). In contrast, elsewhere in Mr. Kuykendall's medical records, medical staff document the "objective" observation that Mr. Kuykendall has an "unsteady" "antalgic gait" and was "holding

onto wall" to ambulate.  *Id.* at Ex. A-002.

22.    Dr. Montgomery's declaration regarding Mr. Rosier states that although Mr. Rosier "fainted while in the restroom," "this fall was not due to lack of grab bars."  Dkt. 311-13 at ¶ 6.  This assertion lacks foundation.  Mr. Rosier's medical records do not make any reference to grab bars or otherwise state that the presence of a grab bar might have allowed Mr. Rosier to catch himself and prevent his fall.  *See id.* at Ex. A-019–020.

23.    Dr. Montgomery's declaration regarding Plaintiff Andrade, which confirms that he has fallen from the top bunk multiple times, Dkt. 311-1 at ¶¶ 4, 7, nonetheless claims that he is "an unreliable historian," *id.* at ¶ 11.
Dr. Montgomery's attempt to attack Plaintiff Andrade's credibility is based solely on the fact that he apparently misstated the name of the blood thinner medication he received.  *See id.*  Such a misstatement is not a sufficient basis to question Plaintiff Andrade's credibility.  Dr. Montgomery's declaration also unnecessarily asserts that Plaintiff Andrade has used illicit substances in the past, which is not relevant to these Motions.

24.    Dr. Montgomery's declaration regarding Mr. Littlejohn states that Mr. Littlejohn was assessed for a wheelchair on October 26, 2022, but determined that one was "no[t] medical[ly] indicat[ed]" because there were "no ambulation issues" in the evaluation.  Dkt. 311-10 at ¶ 5.  Mr. Littlejohn's medical records, however, confirm that a full evaluation was not completed.  Health care staff noted that only a "[l]imited exam" was completed "due to safety."  *Id.* at Ex. A-003.  The Jail's determination that Mr. Littlejohn did not require a wheelchair was therefore not properly supported.

**Mr. Bennett's Declaration Is Inaccurate Regarding the Central Jail Inspection**

25.    The Declaration of Scott Bennett states that during the March 13, 2023 Central Jail inspection, "there was never any request to see additional areas or any denial of a request to see any additional areas."  Bennett Decl., Dkt. 312, at ¶ 16.

1  However, I was on the inspection and was informed by counsel for Defendants that
2  we could not inspect certain housing areas.  Mr. Bennett was not privy to my
3  conversations with Defendants' counsel, who asked me to direct all questions to her,
4  not Defendants' staff.

5      I declare under penalty of perjury under the laws of the United States of
6  America that the foregoing is true and correct to the best of my knowledge, and that
7  this declaration is executed at San Francisco, California this 26th day of May, 2023.

8

9

10                                              */s/ Gay Crosthwait Grunfeld*
11                                              Gay Crosthwait Grunfeld

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[4295794.4]

17

Case No. 3:20-cv-00406-AJB-DDL

REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

# TABLE OF CONTENTS
## EXHIBITS TO THE REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---------|-------------|----------|
| A | Email correspondence between Van Swearingen and Susan Coleman, Re: early/expedited discovery re PI Issues (Aug. 19, 2022) | 1 |
| B | Email from Priyah Kaul to Susan Coleman, Re: Meet and Confer re Expedited Discovery (Nov. 21, 2022) | 3 |
| C | Letter from Gay C. Grunfeld to Elizabeth M. Pappy, Re: Early Neutral Evaluation on ADA Non-Compliance (April 11, 2023) | 7 |
| D | Email from Gay C. Grunfeld to Defendants' counsel, Re: Letter Regarding ADA Preliminary Injunction and ENE (April 25, 2023) | 13 |
| E | Excerpts from transcript of 30(b)(6) Deposition of Sergeant Matthew Jensen (March 14, 2023) | 18 |
| F | Excerpts from transcript of 30(b)(6) Deposition of Darren Scott Bennett (April 20, 2023) | 25 |
| G | Excerpts from 30(b)(6) Deposition of Michael Barragan (April 20, 2023) | 66 |
| H | Advocacy emails from Plaintiffs' counsel to Defendants' counsel | 83 |
| I | Excerpts from medical records of Kevin Martin | 89 |
| J | Invoice for sign language interpretation services | 104 |

[4299054.1]

# EXHIBIT A

| | |
|---|---|
| **From:** | Coleman, Susan E. |
| **To:** | Van Swearingen |
| **Subject:** | Re: Dunsmore et al. v County of San Diego et al: early/expedited discovery re PI issues [IMAN-DMS.FID55015] |
| **Date:** | Friday, August 19, 2022 12:45:38 PM |

[EXTERNAL MESSAGE NOTICE]

I will be back in the country Tuesday.  When is good thereafter to talk?

Sent from my iPhone


> On Aug 19, 2022, at 7:20 PM, Van Swearingen <VSwearingen@rbgg.com>
> wrote:


[EXTERNAL]

Hi Susan,
We would like to meet and confer with you about early and expedited discovery as to issues in Plaintiffs' preliminary injunction motion.  I left you a voicemail just a few minutes ago.  We seek early/expedited discovery as to 1) permitting four experts identified in our PI papers to inspect certain jail facilities, 2) document requests specific to the PI issues and remedial actions that you identified at the oral argument, and 3) PMK witnesses limited to the topics in the PI motion.  Please let me know your availability for a telephone call.  I am available all of this afternoon, and have good availability Monday as well.  Thank you,
Van

Van Swearingen
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830
VSwearingen@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

Ex. A-2

# EXHIBIT B

Ex. B-3

| From: | Priyah Kaul |
|---|---|
| To: | Coleman, Susan E. |
| Cc: | Van Swearingen; Aaron Fischer; Christopher Young; matthew.o"sullivan@sdcounty.ca.gov; Fernando.Kish@sdcounty.ca.gov |
| Subject: | Dunsmore et al. v. San Diego County Sheriff's Department et al., Case No. 20-cv-406 -- Meet and Confer re Expedited Discovery |
| Date: | Monday, November 21, 2022 1:21:21 PM |
| Attachments: | DRAFT 2022-11-21 Pls 1st Set RFP 1730-01.docx |
| | DRAFT 2022-11-21 Pls First Request for Inspection 1730-01.docx |
| | DRAFT 2022-11-21 Notice of PMK Deposition 1730-01.docx |

Susan,

With the Third Amended Complaint now on file, Plaintiffs will renew our request for expedited discovery.  At this time we will be seeking inspections, documents, and PMK deposition(s) related to the accessibility of facilities, housing, programs, services, activities, effective communication, reasonable accommodations, and assistive devices for people with disabilities incarcerated in the Jail.

We would like to meet and confer with you regarding this issue.  To facilitate our discussion, attached are drafts of the discovery we intend to serve by way of the expedited discovery process. Please note that we are still refining these drafts and are sending them to give you a general sense of the volume and scope of our requests.  Below, we have taken the notes that were circulated following our last meet and confer regarding expedited discovery, and updated them to reflect Plaintiffs' initial positions regarding the discovery we are now seeking.  We reserve all rights to edit the discovery requests prior to service and to amend our positions as set forth below.

Please let us know your availability for a telephone call on November 28 or 29.  Thanks.

***

Inspections
- Plaintiffs propose that their disabilities expert, Syroun Synosian, be permitted to inspect five facilities: Central, Vista, Las Colinas, George Bailey, and Rock Mountain.
- We anticipate having no more than two people from Plaintiffs' counsel present for the expert's inspection of each facility.
- The inspections would be limited to a half-day per facility (8:30am-12:30pm or 1:30pm-5:30pm).
- The parties previously agreed that Plaintiffs' experts could ask questions of staff in the course of the inspections.  Counsel for both parties may be present when staff are questioned.  We do not intend for these to be formal or lengthy staff interviews.
- The parties previously agreed that photos could be taken during the inspections.  We propose that Plaintiffs take pictures during the inspection but that Defendants have an opportunity to review the photos taken after the inspection.  Plaintiffs will further agree to blur any faces if the photos are filed on the docket or otherwise made publicly available through litigation, and will consider any concerns raised by Defendants about security or privacy issues arising out of specific photos.  If the parties cannot resolve a dispute regarding any photo(s), the issue can be raised with Judge Leshner through in camera proceedings.
- The parties previously agreed that in advance of each inspection, Defendants would provide Plaintiffs with a map of the facility, identifying areas (including housing units) and their population types, as well as an organizational chart of high-level (supervisory) staff.  We propose that Defendants make best efforts to produce these documents, as well as the others identified in the draft request, 20 days before each inspection, but in no event produce the documents less than 10 days before each inspection.

**Ex. B-4**

- We propose inviting Judge Leshner to attend one of the inspections.

PMK Depositions
- Plaintiffs propose that they be permitted to take Rule 30(b)(6) depositions of persons most knowledgeable regarding all policies, procedures, practices, staff directives, training materials, investigative materials, classification records, staff disciplinary records, and physical and design plans regarding the accessibility of facilities, housing, programs, services, activities, effective communication, reasonable accommodations, and assistive devices for incarcerated people with disabilities.
- Defendants previously expressed concerns about disclosure of information about disciplinary and personnel records. If Defendants still have this concern, Plaintiffs ask Defendants to identify what authority they believe exempts such records from disclosure.

Document Requests
- Plaintiffs seek to serve document requests to obtain documents regarding all policies, procedures, practices, staff directives, training materials, investigative materials, classification records, staff disciplinary records, and physical and design plans regarding the accessibility of facilities, housing, programs, services, activities, effective communication, reasonable accommodations, and assistive devices for incarcerated people with disabilities.
- We are willing to discuss limiting custodians if Defendants provide relevant organizational charts.
- Plaintiffs are also willing to identify documents they already received through CPRA requests, and agree that those documents already produced unredacted and in full need not be re-produced.

Timing
We propose to allow Defendants 60 days from a Court order to complete the discovery, with overlapping windows to complete each type of discovery requested. Specifically, we propose the production of documents within 30 days, inspections within 45 days, and PMK deposition(s) within 60 days.

Other Discovery Issues
- The parties previously agreed that there is good cause for the Court to enter a protective order and are finalizing the language of a proposed stipulated protective order between Plaintiffs and Defendants that will be filed with the Court.
- You previously stated that you were confirming the steps your client has taken with respect to document preservation.


Priyah Kaul
Associate Attorney




ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
pkaul@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly

Ex. B-5

prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at pkaul@rbgg.com.

**Ex. B-6**

# EXHIBIT C



ROSEN BIEN
GALVAN & GRUNFELD LLP

April 11, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Elizabeth M. Pappy
Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000
San Jose, CA  95113-2336
epappy@bwslaw.com

> Re:    *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
> S.D. Cal. No. 3:20-cv-00406-AJB-DDL
> Early Neutral Evaluation on ADA Non-Compliance
> <u>Our File No. 1730-01</u>

Dear Beth:

I write to respond to your email of April 4, 2023, a copy of which is enclosed.

The allegations that we are attempting to "litigate this case through letters" or "increase fees" or have "never attempted to engage and work … towards ADA compliance" are all inaccurate, as our prior correspondence and pleadings show.

Plaintiffs will participate in an ENE regarding Defendants' failure to comply with the ADA and related statutes.

As we informed you in December 2022 and more recently, for an ENE to be successful, there needs to be Court supervision of remedial efforts, and a stipulation that Defendants do not currently comply with regard to physical barriers and the provision of SLI.  We asked you to respond by April 11 if Defendants will agree to an ENE process that includes the simultaneous mutual exchange of expert reports, the filing of a joint statement identifying points of agreement to be included in a remedial plan and any points of disagreement, and the development of a plan to timely remedy, at minimum, all points of agreement that will result in a stipulated order to be submitted to the Court with Court oversight of the process.  You did not respond to this proposal to avoid motion practice.  We therefore understand that Defendants are not amenable to this proposal.

**Ex. C-8**

The concept of having our "experts … talk about what they found at the facilities, directly, and without attorney interference …" is unlikely to be productive in addressing multiple barriers at two large facilities in a timely manner.  Your expert took measurements during both inspections and presumably wrote down his findings.  It would be helpful to see those. It would also be useful to learn if your expert has concluded that both facilities are fully compliant with governing ADA standards.

Also, for your information, "readily achievable" is not applicable as a defense in a Title II action such as this.

As for your assertion that the lack of SLI services "is false and lacking factual basis," please provide us any documentation of provision of SLI to incarcerated persons within the past five years.  If promptly provided, we will be happy to look at that documentation prior to seeking injunctive relief on that issue.

As always, we appreciate your courtesy and cooperation in this matter.

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:   Gay Crosthwait Grunfeld

GCG:cn
Enclosure
cc:    Susan Coleman
       Co-counsel

**Ex. C-9**

**From:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Sent:** Tuesday, April 4, 2023 6:03 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Eric Monek Anderson <EMonekAnderson@rbgg.com>; Coleman, Susan E.
<SColeman@bwslaw.com>
**Subject:** RE: Dunsmore v. San Diego County Sheriff's Dept., et al.: Letter Regarding ADA Preliminary
Injunction and ENE [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

I never made any such representation.  Quite to the contrary, I stated several times at the hearing
and have written in some of our communications, my awareness of your intention to file for a
preliminary injunction.  You were unfortunately given false information because you obviously were
not at the hearing.

Why does your firm persist in trying to rewrite the facts in an attempt to litigate this case through
letters?  To increase fees?

Plaintiffs have never attempted to engage and work with me towards ADA Compliance.  You have
blamed, accused, disparaged, complained, assumed this case is a one way street, and refused to
engage in any discussions about physical barrier compliance.  You consistently tell me you don't
understand what I'm proposing.  I understand that you may be used to dealing with a different kind
of attorney but I do exactly what I say and say exactly what I mean.

I will repeat again.  I would like our experts to talk about what they found at the facilities directly,
and without attorney interference, under mediation privileged protection.  Their instructions will be
to agree on what barriers exist to the extent they can, come up with proposed fixes (understanding
that they cannot agree without our input), and coming up with a list of things they cannot agree
upon.  We would then try ourselves (attorneys to attorneys) to narrow the list of disputed items and
failing that, attend an ENE.

You are now raising the new issue of an alleged lack of ASL services, which is false and lacking factual
basis, and lack of accessible housing without reference to whether you are talking about physical
barriers or something else.  I have no problem adding these two discrete issues to an ENE if it will
help you avoid an injunction application.  As with everything, I suggest we have the experts get the
discussion scheduled ASAP so we can get going on the conversation and go to an ENE in short order.

We don't have a report.  All they need is a list to guide them.  Since you are the plaintiff, it would be
useful to simply have a list from your expert to get them going.  Please try to make this less
complicated and more streamlined to get to the conclusion rather than putting up these formalistic
road blocks to resolution.  I find that the lawyers are more of an impediment when dealing with
physical barriers.  Experts have the expertise, experience and creativity to solve barrier issues, or at
least narrow the scope and leave it to us to resolve the disputed "readily achievable" items.

Thank you.

**Ex. C-10**

| Elizabeth M. Pappy | Partner |
|---|

Pronouns: she, her, hers
60 South Market Street, Suite 1000 | San Jose, CA 95113
d - 408.606.6305 | t - 408.606.6300 | f - 408.606.6333
epappy@bwslaw.com | vCard | bwslaw.com

Burke, Williams & Sorensen, LLP


The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Eric Monek Anderson [mailto:EMonekAnderson@rbgg.com]
**Sent:** Tuesday, April 4, 2023 1:32 PM
**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>; Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Young, Christopher <Christopher.Young@us.dlapiper.com>
**Subject:** Dunsmore v. San Diego County Sheriff's Dept., et al.: Letter Regarding ADA Preliminary Injunction and ENE [IMAN-DMS.FID55015]

**[EXTERNAL]**

Beth,

Please see the attached letter from Gay.

Regards,
Eric

**Eric Monek Anderson** (he/him)
Associate Attorney



**Rosen Bien Galvan & Grunfeld LLP**
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104

**Ex. C-11**

eanderson@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at eanderson@rbgg.com.

**Ex. C-12**

# EXHIBIT D

| | |
|---|---|
| **From:** | Gay C. Grunfeld |
| **To:** | Coleman, Susan E.; Pappy, Elizabeth M. |
| **Cc:** | Eric Monek Anderson; San Diego County Jail Team - RBGG Only; Young, Christopher; Aaron Fischer |
| **Subject:** | RE: Dunsmore v. San Diego County Sheriff"s Dept., et al.: Letter Regarding ADA Preliminary Injunction and ENE [IMAN-DMS.FID55015] |
| **Date:** | Tuesday, April 25, 2023 6:06:42 PM |
| **Attachments:** | 2023-04-24 Proposed Order Granting Pls Motion for Preliminary Injunction 1730-01.docx |

Dear Susan and Beth,

Plaintiffs today filed motions for a preliminary injunction and provisional class certification seeking to remedy Defendants' denials of sign language interpretation and inaccessible housing of incarcerated people with mobility disabilities. The motions are scheduled for hearing on Thursday, June 29 at 2:00 p.m.

We remain open to discussing a resolution that includes Defendants agreeing to remedial action in a stipulated order or court-overseen process, as previously requested. Pages 11-14 of the attached proposed order describe the changes needed to Defendants' policies and practices and could guide our discussion.

Thank you for your ongoing courtesy and cooperation in this matter, Gay

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Coleman, Susan E. <SColeman@bwslaw.com>
**Sent:** Tuesday, April 11, 2023 11:15 AM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Cc:** Eric Monek Anderson <EMonekAnderson@rbgg.com>
**Subject:** RE: Dunsmore v. San Diego County Sheriff's Dept., et al.: Letter Regarding ADA Preliminary Injunction and ENE [IMAN-DMS.FID55015]

<div style="border:1px solid #c99; background:#fbeec0; padding:4px;">[EXTERNAL MESSAGE NOTICE]</div>

Counsel – this is incorrect. We suggested exchanging lists of items to repair – rather than full blown

**Ex. D-14**

expert reports -in an effort to streamline the process.

As for the ASL, it's my understanding we are having another PMK on the topic.  You asked leading and not open-ended questions at your deposition, yielding little information and not exploring the use of ASL at the facilities.

Best,

Susan

---

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Tuesday, April 11, 2023 10:21 AM
**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Cc:** Eric Monek Anderson <EMonekAnderson@rbgg.com>; Coleman, Susan E. <SColeman@bwslaw.com>
**Subject:** RE: Dunsmore v. San Diego County Sheriff's Dept., et al.: Letter Regarding ADA Preliminary Injunction and ENE [IMAN-DMS.FID55015]

[EXTERNAL]

---

Please see attached.

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Sent:** Tuesday, April 4, 2023 6:03 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Eric Monek Anderson <EMonekAnderson@rbgg.com>; Coleman, Susan E. <SColeman@bwslaw.com>
**Subject:** RE: Dunsmore v. San Diego County Sheriff's Dept., et al.: Letter Regarding ADA Preliminary Injunction and ENE [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

I never made any such representation.  Quite to the contrary, I stated several times at the hearing and have written in some of our communications, my awareness of your intention to file for a preliminary injunction.  You were unfortunately given false information because you obviously were

**Ex. D-15**

not at the hearing.

Why does your firm persist in trying to rewrite the facts in an attempt to litigate this case through letters? To increase fees?

Plaintiffs have never attempted to engage and work with me towards ADA Compliance. You have blamed, accused, disparaged, complained, assumed this case is a one way street, and refused to engage in any discussions about physical barrier compliance. You consistently tell me you don't understand what I'm proposing. I understand that you may be used to dealing with a different kind of attorney but I do exactly what I say and say exactly what I mean.

I will repeat again. I would like our experts to talk about what they found at the facilities directly, and without attorney interference, under mediation privileged protection. Their instructions will be to agree on what barriers exist to the extent they can, come up with proposed fixes (understanding that they cannot agree without our input), and coming up with a list of things they cannot agree upon. We would then try ourselves (attorneys to attorneys) to narrow the list of disputed items and failing that, attend an ENE.

You are now raising the new issue of an alleged lack of ASL services, which is false and lacking factual basis, and lack of accessible housing without reference to whether you are talking about physical barriers or something else. I have no problem adding these two discrete issues to an ENE if it will help you avoid an injunction application. As with everything, I suggest we have the experts get the discussion scheduled ASAP so we can get going on the conversation and go to an ENE in short order.

We don't have a report. All they need is a list to guide them. Since you are the plaintiff, it would be useful to simply have a list from your expert to get them going. Please try to make this less complicated and more streamlined to get to the conclusion rather than putting up these formalistic road blocks to resolution. I find that the lawyers are more of an impediment when dealing with physical barriers. Experts have the expertise, experience and creativity to solve barrier issues, or at least narrow the scope and leave it to us to resolve the disputed "readily achievable" items.

Thank you.

**Elizabeth M. Pappy | Partner**
Pronouns: she, her, hers
60 South Market Street, Suite 1000 | San Jose, CA  95113
d - 408.606.6305 | t - 408.606.6300 | f - 408.606.6333
epappy@bwslaw.com | vCard | bwslaw.com

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated

**Ex. D-16**

addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

---

**From:** Eric Monek Anderson [mailto:EMonekAnderson@rbgg.com]
**Sent:** Tuesday, April 4, 2023 1:32 PM
**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>; Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Aaron Fischer <ajf@aaronfischerlaw.com>; Young, Christopher <Christopher.Young@us.dlapiper.com>
**Subject:** Dunsmore v. San Diego County Sheriff's Dept., et al.: Letter Regarding ADA Preliminary Injunction and ENE [IMAN-DMS.FID55015]

---

**[EXTERNAL]**

---

Beth,

Please see the attached letter from Gay.

Regards,
Eric

**Eric Monek Anderson** (he/him)
Associate Attorney



**Rosen Bien Galvan & Grunfeld LLP**
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
T: (415) 433-6830  •  F: (415) 433-7104
eanderson@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at eanderson@rbgg.com.

**Ex. D-17**

# EXHIBIT E

Deposition of

# Sergeant Matthew Jensen

March 14, 2023

Dunsmore

vs.

San Dirgo County Sheriff's Office



www.aptusCR.com | 866.999.8310

Ex. E-19

Sergeant Matthew Jensen

1      A     Yes, correct.

2      Q     Is that --

3            MS. PAPPY:  Slow down.

4            THE WITNESS:  Sorry.  Red Bull.  Sorry.

5    BY MR. ANDERSON:

6      Q     And is that Purple Communications?  Is that the

7    name of the company?

8      A     Yes, Purple Communications, LLC, is the full

9    title, I think.

10     Q     Do they provide that person into a contract with

11   the county?

12     A     No.  It's free of charge to anybody who wants to

13   create a Purple system, and we're just one of their

14   free-of-charge clienteles like anybody else would be.

15     Q     So how did you go about working with Purple?

16     A     Purple has been at San Diego Central Jail since

17   2016.  And then I've looked further into the Purple

18   system in my position, just trying to get into other

19   facilities and speaking with Purple and seeing what

20   upgrades or new technology they offer these days.

21     Q     Are you -- so is it only at Central Jail?

22     A     Yes, just at Central Jail.

23     Q     When you say you've been looking into getting

24   a -- I don't want to misstate what you said, but you said

25   you were looking into getting another device; is that

Sergeant Matthew Jensen

1  right?

2      A    We're trying to look into other accounts for the

3  rest of the facilities.

4      Q    What stage is that at?

5      A    We've gotten accounts created through Purple for

6  four facilities, but we're working currently on

7  infrastructure for Wi-Fi to get the system to work on the

8  computers needed to work on.

9      Q    Do you have an estimate?

10     A    I don't have an estimate.

11     Q    Before the end of this year?

12     A    We're hoping by December, but that's about the

13  only estimate I got.  We're still just working on the

14  Wi-Fi right now, infrastructure.

15     Q    And you also mentioned working -- with

16  discussions with Purple about upgrading; is that right?

17     A    Just seeing what upgrades they have, if there's

18  any to offer on their end.

19     Q    Have you implemented any upgrades?

20     A    No, not upgrade.  There's nothing really new, if

21  you will.  It's more a -- if the computer is old, you

22  would get a new computer that's, you know, 2023 as

23  opposed to 2020 or whatever, with software updates.

24     Q    Who provided the terminal?

25     A    The terminal, we provide ourselves.

Ex. E-21

1    Q    It's not like a private room?

2    A    Correct.

3    Q    So that's the only station in the jail?

4    A    Yes.  For Purple.

5    Q    There's no station in an attorney visit room?

6    A    There's attorney visit rooms.  So they're

7    elsewhere, but they're not right there.

8    Q    There's no Purple in an attorney visit room?

9    A    No.  There's no Purple in an attorney visit

10   room.  Because generally that's for in person, when your

11   lawyer comes to speak to you or your public defender or

12   whoever.

13   Q    So the Purple system includes computer, you

14   said, that the sheriff's department provides?

15   A    Yes, that's correct.

16   Q    And you discussed that you're implementing

17   Wi-Fi, adding some Wi-Fi at the other facilities.  So

18   does it have to be a hard-wired Wi-Fi connection?

19   A    The way -- when I talked to Purple is we have

20   the old hard-wire way of Purple at Central Jail where

21   it's hard-wired in there, but with their app and

22   everything else, it's more friendly with -- what's the

23   word I'm looking for? -- like a touchscreen-type device.

24   So they were talking like a Surface Pro, an iPad will

25   work, but they said Surface Pros are better.  So there's

Ex. E-22

1   really not a hard line to put in a Surface Pro.  So you

2   would have to get the Wi-Fi to get the device to work

3   properly.

4        **Q    I see.  So it would be a tablet.  A person --**

5        A    Essentially.  A tablet, correct.

6        **Q    And is that the plan for the other facilities?**

7        A    Yes.  The plan is to get the Wi-Fi

8   infrastructure in place and then get something similar to

9   a Surface Pro to be able to utilize the Purple

10  technology.

11       **Q    Would that allow people to use Purple elsewhere**

12  **in the jail?**

13       A    So long as it hits the Wi-Fi area.  I mean, it's

14  concrete steel.

15       **Q    A large facility.**

16       A    A large facility makes it a little harder with

17  some Wi-Fi areas.

18       **Q    Is it possible to use the Purple, the computer**

19  **there, for any purpose other than VRS?**

20       A    No.

21       **Q    No one else makes a video call?**

22       A    No.  They just lock down just to use the Purple

23  device or Purple technology.

24       **Q    Have there been any problems with the internet**

25  **connection at the VRS -- with the current Purple at**

Ex. E-23

Dunsmore vs.
**Sergeant Matthew Jensen**                                      **San Dirgo County Sheriff's Office**

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, A. Desiree Tipper, a Certified Shorthand

 4   Reporter No. 13806 in the State of California, do hereby

 5   certify:

 6              That the foregoing proceedings were taken

 7   before me at the time and place herein set forth; that

 8   any witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14              I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17              IN WITNESS WHEREOF, I have hereunto

18   subscribed my name this 19th day of March, 2023.

19

20

21

22
             _____
23                          A. Desiree Tipper
                            CSR No. 13806
24

25
```

**Page 128**

Ex. E-24

# EXHIBIT F

Deposition of

# Darren Scott Bennett

PMK for San Diego Sheriff's Department

April 20, 2023

Dunsmore

vs.

San Diego County Sheriff's Office



www.aptusCR.com | 866.999.8310

**Ex. F-26**

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1  discuss and make contracts with companies.

2      Q    I see.  If -- so if the sheriff's department's

3  contracting with someone to help with maintenance?

4      A    Yes.

5      Q    So are you a COR?

6      A    Yes.

7      Q    A COR.  That's C-O-R?

8      A    Uh-huh -- yes.

9      Q    Thank you.  Have you had any training on the

10  ADA?

11          MS. COLEMAN:  Objection.  Vague.  You mean

12  formal training?

13  BY MR. MONEK ANDERSON:

14      Q    You can answer.

15      A    No.

16      Q    So when did you learn about the lawsuit that

17  we're here for?

18      A    March of '22.

19      Q    And do you understand the allegations that have

20  been made by the plaintiffs in this lawsuit?

21      A    Yes.

22      Q    In your own words, what are the allegations?

23          MS. COLEMAN:  Objection.  Relevance.  Overly

24  broad.

25          THE WITNESS:  ADA compliance -- certain, I

Page 14

Ex. F-27

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1   BY MR. MONEK ANDERSON:

2       Q    And you understand that you're designated as

3   the person most knowledgeable for this topic, here,

4   Number 2?

5       A    Yes.

6       Q    So what did you do to make yourself the person

7   most knowledgeable in this category?

8       A    I've been here for a long time.  I've been in

9   charge of specifically Central Jail since before it

10  opened.

11      Q    So that would have been in your role with the

12  county?

13      A    Yes.

14      Q    When you say in charge of Central Jail, what do

15  you mean by that?

16      A    As far as maintenance and relevance of

17  maintenance goes.

18      Q    So from when it was built, you've been in

19  charge of maintenance?

20      A    Before it was built.

21      Q    Before it was built.  Well, there was no

22  maintenance to it before it was built.  That's why I

23  asked --

24      A    As it was being built, I was there.

25          MS. COLEMAN:  Let him finish the question

**Ex. F-28**

1    Q    When?

2    A    Yesterday.

3    Q    For about how long?

4         MS. COLEMAN:  I'm going to instruct the witness

5    not to answer.  That's an attorney work product

6    privilege.

7    BY MR. MONEK ANDERSON:

8    Q    Is there any reason whatsoever that you cannot

9    give truthful testimony today on the topic?

10   A    No.

11   Q    So what changes has the sheriff's department

12   made to Central Jail since February 2022 to improve

13   disability access?

14   A    We've --

15   Q    Do you have a document in front of you that

16   you're looking at?

17   A    Yes.

18   Q    Have you provided that?  Thank you.

19   A    Since 2022, we've started a process of being

20   more compliant with ADA rules in regards to when it was

21   built, meaning removing stools in front of tables and

22   chairs and phones.  We've lowered any devices, including

23   mailboxes, Narcan boxes to an acceptable ADA height.

24   Q    And why did you start in 2022 this process of

25   becoming more ADA compliant?

Ex. F-29

**Darren Scott Bennett**

1    A    I was instructed to.

2    **Q    By who?**

3    A    The captain.

4    **Q    Which captain?**

5    A    Bibel.

6    **Q    Is that Kyle Bibel?**

7    A    Yes, sir.

8    **Q    B-i-b-e-l?**

9    A    Uh-huh.  Yes.

10    **Q    Do you remember when he instructed you?**

11    A    Not specifically.

12    **Q    What did he specifically say?**

13         MS. COLEMAN:  May call for speculation.

14    BY MR. MONEK ANDERSON:

15    **Q    You can answer.**

16    A    That we needed to look at ways to improve

17    accessibility.

18    **Q    Did he tell you why?**

19    A    I was aware there were other previous

20    complaints. I didn't need to ask specifically why.

21    **Q    What were the other previous complaints you're**

22    **aware of?**

23    A    Just that there were other ADA complaints of

24    aspects of ADA compliance in the jail.

25    **Q    When you say "other," you mean other than this**

Ex. F-30

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1    lawsuit?

2        A    Yes.

3        Q    Do you remember any of those specific

4    complaints that you're aware of?

5        A    No.

6        Q    When did you hear about those complaints?

7        A    Probably go back as far as 2008.

8        Q    So you said you removed stools and chairs and

9    lowered mailboxes and Narcan boxes.

10            Have you made any other changes?

11       A    We've removed the -- the stools in front of the

12   phones.

13       Q    So this list here on the document we are

14   looking at, it says, "Work completed since November 2022

15   in all housing units and dayrooms."

16            Those four bullet points, those are the four

17   things that have been completed?

18       A    So far, yes.

19            MS. COLEMAN:  Well, I'm going to object that it

20   may misstate the document in that there's a bullet point

21   above that.

22            MR. MONEK ANDERSON:  I'll get to that one.

23   Thank you.

24   BY MR. MONEK ANDERSON:

25       Q    And then above that, there's a underlined

Ex. F-31

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

```
 1      A    Yes.

 2      Q    -- about maintenance issues?

 3      A    Yes.

 4           MS. COLEMAN:  Just wait for him.

 5   BY MR. MONEK ANDERSON:

 6      Q    So you removed the stools in front of

 7   telephones; is that right?

 8      A    I'm sorry.  Repeat.

 9      Q    You removed stools in front of telephones?

10      A    Yes.

11      Q    When did you do that?

12      A    It started in February of this year.

13      Q    Do you remember what -- what day in February it

14   started?

15      A    No.

16      Q    Why did were you remove stools in front of the

17   telephones?

18      A    To make them more ADA accessible.

19      Q    How does removing the stool make it more

20   accessible?

21      A    It allows a more front approach.

22      Q    By a person in a wheelchair?

23      A    Yes.

24      Q    Did you personally remove stools?

25      A    No.
```

Ex. F-32

1           How long did it take to remove the stools?  How

2   many days?

3       A    Approximately three weeks.  I'm sorry.  That

4   was for the whole process of what we were doing, not

5   just the stools.

6       Q    So there were multiple alterations happening at

7   once, and that -- those entire alterations took three

8   weeks?  Is that what you're saying?

9       A    Yes.  They would go into one module and

10  complete the tasks assigned for that module.

11      Q    Were any contractors involved?

12      A    No.

13      Q    It was just general services?

14      A    Yes.

15      Q    Did it cost anything?

16      A    Materials of saw blades.

17      Q    Saw blades?

18      A    Yes.

19      Q    What's your estimate of how much those cost?

20           MS. COLEMAN:  Objection.  Relevance.  May call

21  for speculation.

22           THE WITNESS:  $150.

23  BY MR. MONEK ANDERSON:

24      Q    This document says that you removed stools at

25  tables; is that right?

Ex. F-33

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1  ordered.

2      Q    And when were they ordered?

3      A    February of this year.

4      Q    So for two of them.  Are there three cells that

5  are being -- are those the combo units that are being

6  replaced -- or added?  Sorry.

7      A    Yes.

8      Q    So there's Intake Holding 2.

9           What are the other two?

10     A    It would be Medical Screen 1.

11     Q    And what floor is that on?

12     A    Second floor.  And the other one is Intake

13  Booking 5 on the first floor.

14     Q    Are you making the same changes in Medical

15  Screening 1 as in Intake Holding 2?

16     A    Yes.  There may be need to be more work in

17  those -- or individual ones, based on their current

18  design layout.  What those are specifically at this

19  point, off the top of my head, I don't know.

20     Q    For each of those, you're adding combo units.

21          And are you removing -- or are you replacing --

22          (Reporter clarification.)

23  BY MR. MONEK ANDERSON:

24     Q    Are you replacing grab bars in each of them?

25     A    Yes.

Ex. F-34

1    Q    And creating a 60-inch circle?

2    A    Yes.

3    Q    Are you moving a privacy wall in each of them?

4    A    Yes.

5    Q    And redoing plumbing?

6    A    Yes.

7    Q    Do you know when the combo units that you

8    ordered will arrive?

9    A    May 1st.

10    Q    Can you begin work then once you receive them?

11    A    Once I receive them, I will be able to direct

12    my plumbers to order materials for the installation of

13    it.

14    Q    Is there a written plan for altering the

15    holding cells?

16    A    No.

17    Q    Why not?

18    A    I don't know.

19    Q    So when you provide direction to general

20    services, it's verbal?

21    A    Yes.

22    Q    Would you ever write an email to them

23    describing what changes to make?

24    A    No.

25    Q    Is there a budget for the holding cell

**Darren Scott Bennett**

1    Q    Can you repeat that last phrase.  Purchasing

2    card rules?

3    A    Yes.

4    Q    And how do those limit the amount of money you

5    can spend?

6    A    Policies and procedures of --

7        (Reporter clarification.)

8        THE WITNESS:  Credit card use.

9    BY MR. MONEK ANDERSON:

10    Q    Do you know when you'll be able to order that

11    third toilet?

12    A    Sometime in May.

13    Q    Are you getting permits for this work?

14    A    No.

15    Q    Why not?

16    A    I'm not required.

17    Q    It's not a building alteration?

18    A    No.  The county doesn't pull permits, unless

19    it's done by a contractor.

20    Q    So if you're doing the work yourselves, you

21    don't pull permits?

22    A    General services is the permit provider, so

23    essentially, they are doing their own work.

24    Q    Self-permitting?

25    A    Correct.

Ex. F-36

**Darren Scott Bennett**

1    Q    But if a contractor does the work, do they get

2    a permit?

3          MS. COLEMAN:  Lack of foundation.

4          THE WITNESS:  They have the general services

5    inspector review and approve the work, not a permit.

6    BY MR. MONEK ANDERSON:

7    Q    Okay.  So the general services -- from county

8    general services will approve the work?

9    A    Yes.

10   Q    Is Intake Holding 2 currently being used?

11   A    Yes.

12   Q    Medical Screen 1 --

13   A    Yes.

14   Q    -- also being used?

15   A    Sorry.

16   Q    And Intake Booking 5 also being used?

17   A    Yes.

18         MR. MONEK ANDERSON:  How about we take a break?

19   Can we go off the record?

20         MS. COLEMAN:  Sure.

21         (Recess was taken.)

22   BY MR. MONEK ANDERSON:

23   Q    Mr. Bennett, did you prepare those notes that

24   are in front of you?

25   A    Yes.

Ex. F-37

Dunsmore vs.
San Diego County Sheriff's Office

1    Q    Did you look at any documents to prepare these

2    notes?

3    A    No.

4    Q    You did it from memory?

5    A    Yes.

6    Q    So the second bullet under "Work Planned but

7    not Completed," which we were just looking at says:

8    "Lowering mirrors to appropriate height."

9    A    Yes.

10   Q    Is that being done in those same three cells or

11   different cells?

12   A    Different cells.

13   Q    What cells is that being done in?

14   A    The current housing cells.

15   Q    I see.  So cells where people are living?

16   A    Yes.

17   Q    And is that being done in all housing cells?

18   A    No.

19   Q    Which cells?

20   A    The facilities designed ADA compliant cells.

21   Q    And are those typically a corner unit in a cell

22   module?

23   A    Yes.

24   Q    How many designed accessible cells are there

25   total?

Ex. F-38

**Darren Scott Bennett**

**Dunsmore vs.
San Diego County Sheriff's Office**

1    A    No.

2    Q    Do you have an idea when you might order new

3    benches?

4    A    No.

5    Q    What -- any steps you need to go through before

6    you order new benches?

7    A    I have to get quotes.

8    Q    Have you gotten quotes?

9    A    I've done research.

10    Q    But you haven't gotten quotes?

11    A    No.

12    Q    How many benches do you need to get?

13    A    Ten, estimate.

14    Q    So what do people in wheelchairs use now if

15    they can't do a side approach?

16    MS. COLEMAN:  Lack of foundation.  Calls for

17    speculation.

18    THE WITNESS:  I don't know.

19    BY MR. MONEK ANDERSON:

20    Q    Do you work at the Central Jail?  Is your

21    office there?

22    A    No.  My office is not there.  Yes, I work

23    there.

24    Q    How often are you there?

25    A    Almost every day.

**Ex. F-39**

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1    BY MR. MONEK ANDERSON:

2        Q    Is the way that they're mounted wrong different

3    by cell?

4            MS. COLEMAN:   Vague compound.

5    BY MR. MONEK ANDERSON:

6        Q    You can answer.

7        A    Can you rephrase it?

8        Q    Sure.  You gave me a bunch of ways that they're

9    not compliant, which suggests that you know which ones

10   are compliant or which ones are not.  So I'm just asking

11   is there a specific cell where there's a grab bar that's

12   too short?

13       A    When you say short, what do you mean by short?

14       Q    You said "too short."  What do you mean by "too

15   short"?

16       A    My "too short" means they're too close to the

17   wall and not far enough out from the toilet.

18       Q    So what are you going to do to make them

19   compliant?

20       A    Remove them from the wall --

21           (Reporter clarification.)

22           THE WITNESS:  The handrail from the wall and

23   reinstall them, if possible, or buy a new one.

24   BY MR. MONEK ANDERSON:

25       Q    Have you decided if you're going to remove it

Ex. F-40

1    or buy a new one yet?

2        A    No.

3        Q    Will that just depend as you go cell by cell?

4        A    Yes.  And if it's too short or if it gets

5    damaged being removed.

6        Q    Are you getting permits for any of the work --

7        A    No.

8        Q    -- in these cells general services will

9    inspect?

10       A    Yes.

11       Q    Does general services review the plans before

12   they're implemented?

13            MS. COLEMAN:  Objection.  Vague.  Assumes there

14   are plans.

15            THE WITNESS:  There are no plans.

16   BY MR. MONEK ANDERSON:

17       Q    So there's no written plans yet for this work

18   for Floors 1 through 3 here?

19       A    There are no plans.

20       Q    Will there be plans?

21       A    For what?

22       Q    For the work that's listed here.

23       A    All of it or some of it?  What work?

24       Q    All of it.

25       A    No.

Ex. F-41

1    Q    For some of it?

2    A    Yes.

3    Q    What will there be plans for?

4    A    The longer term repairs in progress on plans --

5    Q    Sorry to interrupt.  I'm talking about this set

6    here that we're still on.

7    A    That's why I'm asking specifically what are you

8    talking about.  All of this?  You said "yes."  So I'm

9    doing all of it.  Yes, plans will be made for some of it

10   on all of this stuff.

11   Q    Let's just break that -- this -- okay --

12   A    I'm trying to be specific in the question that

13   you're asking.

14   Q    Okay.  So for this one, these tasks being done

15   on Floors 1 through 3, common materials on order?

16   A    Correct.

17   Q    On those four bullets below, are there plans?

18   A    No.

19   Q    Will there be plans?

20   A    No.

21   Q    Why not?

22   A    Because I don't need them.

23   Q    Why don't you need them?

24   A    Because I know what the 2010 regulations call

25   for.

**Darren Scott Bennett**

Dunsmore vs.
**San Diego County Sheriff's Office**

```
 1      Q      Are you going to be there doing the work?

 2      A      I will be instructing the work to be done.

 3      Q      How will you provide that instruction?

 4      A      Verbally.

 5      Q      And -- so the general services, who are you

 6   going to instruct to do the work?

 7      A      The crafts.

 8      Q      The crafts?  Who's that?

 9      A      Plumbers, masons, electricians, if needed.

10      Q      And are all those general services staff?

11      A      Yes.

12      Q      So there's -- you're just going to tell them

13   this is the standard, do this?  How are you going to

14   instruct them?

15            MS. COLEMAN:  Compound.

16            THE WITNESS:  Specifically.

17   BY MR. MONEK ANDERSON:

18      Q      You're not going to write it down for them?

19      A      No.

20      Q      Wouldn't that make it easier for them to see?

21   "Here's a plan.  These are the specifications I need to

22   meet."

23            MS. COLEMAN:  Calls for speculation.  Compound.

24   BY MR. MONEK ANDERSON:

25      Q      You can answer.
```

Page 70

Ex. F-43

**Darren Scott Bennett**

```
 1      A    Engineer of record, really, is Randall Lamb.

 2      Q    Is that R-a-n- --

 3      A    -- d-a-l-l.

 4      Q    Last name --

 5      A    L-a-m-b.

 6      Q    -- L-a-m-b.

 7           MS. COLEMAN:  She has to type both of you when

 8  you guys do that.

 9           THE WITNESS:  Sorry.

10           MS. COLEMAN:  She's probably going to kick you.

11           THE WITNESS:  She can.  I might enjoy it.  Wake

12  me up.

13           MS. COLEMAN:  We have coffee, if you want.

14  BY MR. MONEK ANDERSON:

15      Q    The first bullet here says, "Rework all module

16  showers to comply with current code of 36 inches by 36

17  inches, appropriate shower seat and grab bar height."

18           So you're going to redo all the showers at

19  Central Jail in the housing units?

20           MS. COLEMAN:  Objection.  Vague as to "all."

21           THE WITNESS:  That's the plan.

22  BY MR. MONEK ANDERSON:

23      Q    That's --

24      A    The goal.

25      Q    The goal.
```

**Ex. F-44**

**Darren Scott Bennett**

 1      A      Sorry.  The goal.

 2      Q      And what is the current code of 36 inches by

 3   36 inches?  Where does that come from?

 4      A      It's my reference from a consultant that I

 5   discuss with sometimes.

 6      Q      Who's that consultant?

 7      A      Paul.  Sorry.  I don't know his last name.

 8             MS. COLEMAN:  Joelson.

 9             THE WITNESS:  Joelson.

10   BY MR. MONEK ANDERSON:

11      Q      Paul Joelson?

12             MS. COLEMAN:  J-o-e-l-s-o-n.

13   BY MR. MONEK ANDERSON:

14      Q      Is he a consultant on this other work as well?

15             MS. COLEMAN:  Objection.  Vague as to "other."

16   BY MR. MONEK ANDERSON:

17      Q      On the work being done on Floors 1 through 3.

18      A      Yes.

19      Q      How often do you talk with him?

20      A      Rarely.

21      Q      And what is "appropriate shower seat" mean?

22      A      One that will comply with the current

23   regulations.

24      Q      Is there currently a shower seat in the

25   showers?

**Ex. F-45**

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

```
 1   this deposition?

 2            MS. COLEMAN:  Objection.  Vague.

 3            Do you mean to prepare for this deposition?

 4            MR. MONEK ANDERSON:  Yeah.

 5            THE WITNESS:  No.

 6   BY MR. MONEK ANDERSON:

 7       Q    So you knew this, off the top of your head,

 8   this last bullet when you were making your notes?

 9       A    Yes.

10       Q    So what is a collapsible desk/table?

11       A    I can't tell you that.

12       Q    Paul told you and you heard --

13       A    It's his recommendation.

14            MS. COLEMAN:  You --

15            THE WITNESS:  Sorry.

16   BY MR. MONEK ANDERSON:

17       Q    I'm just trying to understand.

18            Has he described to you what that would

19   involve?

20       A    No.

21       Q    And this says grab bars also.  So you'll be

22   adding grab bars to ADA housing cells?

23            MS. COLEMAN:  Vague.  Assumes facts.

24            THE WITNESS:  That's the plan --

25
```

Ex. F-46

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1   BY MR. MONEK ANDERSON:

2       Q    Do they currently --

3       A    It needs to be developed.

4       Q    Do you have a timeline for developing the plan?

5       A    No.

6       Q    Are you responsible for developing the plan?

7       A    Define "responsible."

8       Q    Well, will you be the one developing the plan?

9       A    No.

10      Q    Who will be?

11      A    The architect and CASP.

12      Q    Is the architect currently developing the plan?

13      A    No.

14      Q    Do you need to hire a CASP first?

15      A    The engineer of record will hire that and give

16   direction.

17      Q    And the engineer of record, Russell Lamb, he

18   will hire the CASP?

19      A    Randall Lamb will hire the architect and CASP.

20      Q    I thought Randall Lamb was the architect, but

21   he's the engineer of record?

22      A    He's -- yes.

23      Q    Is he an outside contractor?

24      A    Yes.

25      Q    Do you have a goal for when you will have a

Ex. F-47

1    written plan ready?

2        A    Before funding becomes available.

3        Q    Do you know when funding will become available?

4        A    No.

5        Q    Any estimate?

6        A    Within three years.

7        Q    So the fourth bullet here says, "Detriple bunk

8    all living area cells throughout CJ."

9            Does "CJ" refer to Central Jail?

10       A    Yes.

11       Q    Are there triple bunks at Central Jail?

12       A    Yes.

13       Q    In what housing units?

14       A    I'll give you floors, not housing units.

15   Fourth floor has some.  Fifth floor has some.  And

16   eighth floor has some.

17       Q    And when you say "has some," does that mean all

18   housing modules on the fourth floor have triple bunks?

19       A    No.

20       Q    Which ones do?

21       A    I don't know, off the top of my head.

22       Q    And on the eighth floor, all the dorms have

23   triple bunks, don't they?

24       A    Yes.

25       Q    Do you know how many triple bunks there are

Ex. F-48

1    total throughout Central Jail?

2        A    I do not.

3        Q    Have you been part of any conversations about

4    how detriple bunking will occur?

5        A    I'm not sure what you mean how it will occur.

6        Q    Well, have you been -- how are you going to

7    remove the triple bunks?

8        A    Cut -- close the module down.  Cut the bunks

9    out and reinstall a single bunk.

10        Q    So there'll be --

11        A    In --

12        Q    Sorry about that.

13        A    -- the lower floors.  The eighth floor will be

14    installed double bunks.

15        Q    So in the lower floors, currently, there are

16    three bunks in a cell, say, on the fourth floor?

17        A    Some of them.

18        Q    Let's take a cell where there is three bunks.

19    You're going to remove those three bunks, close down the

20    module.  You're going to cut out the top two?

21        A    Yes.

22        Q    And leave the lower one?

23        A    Yes.

24        Q    And are you going to add a bunk on top there?

25             MS. COLEMAN:  Objection.  Vague.

Ex. F-49

```
 1              THE WITNESS:  That would be the plan.
 2   BY MR. MONEK ANDERSON:
 3        Q    To make them double bunks?
 4        A    Yes.
 5        Q    Why couldn't you just remove the top bunk from
 6   the triple bunk?
 7        A    Because it's a unit.  They come manufactured as
 8   a unit that was put on top of the single bunk that's a
 9   built-in.  So it's alter -- a double bunk will be
10   altering a manufacturer's design.
11        Q    Okay.  So there's -- a single bunk was built
12   into the cell, and then, essentially, a double bunk was
13   added on top?
14        A    Yes.
15        Q    That's why -- I see.  I just want to understand
16   that you're not removing all three bunks.  You're just
17   moving the top two.
18        A    Yes.
19        Q    Okay.  And in the dorm modules, you're going to
20   replace them.  So those are also triple bunks, right?
21        A    Yes.  Some of them.
22        Q    Well, I thought earlier you said all -- all the
23   dormitories on the eighth floor have triple bunks; is
24   that right?
25        A    They all have a triple bunk.  They have some
```

Ex. F-50

1  BY MR. MONEK ANDERSON:

2      Q    Do you go on inspections when BFCC tours the

3  facility?

4      A    I try to.

5      Q    So you mentioned there might be double bunks

6  or single bunks, depending on rated capacity; is that

7  correct -- after -- after you do the detriple bunking?

8      A    Yes.

9      Q    And you don't know yet which bunks will be

10  double and which will be single?

11      A    Correct.

12      Q    That will be in the written plan?

13      A    Yes.

14      Q    Have you had conversations with the consultant

15  about how you're going to detriple bunk at Central Jail?

16      A    No.

17      Q    So how do you know what they'll do is remove

18  the top two?

19      A    Because that's the way I'll give the direction.

20      Q    You'll give the direction?

21      A    I'll give the direction on how to -- I should

22  specify.  The decision to do that will come from

23  command.

24      Q    So the written plan of process of the architect

25  and the CASP will have to do the written plan; is that

**Ex. F-51**

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1    right -- prepare a written plan?

2       A    Per the direction that I'm given.

3       Q    **And will that have to be approved by anyone --**

4            MS. COLEMAN:  Objection.  Vague.

5    BY MR. MONEK ANDERSON:

6       Q    **-- in the sheriff's department?**

7       A    In the sheriff's department?  The decision will

8    come from the sheriff and filter down to me.

9       Q    **Has the sheriff requested funding for these**

10   **projects?**

11           MS. COLEMAN:  The last portion?

12           MR. MONEK ANDERSON:  Yeah, the last portion.

13           MS. COLEMAN:  May call for speculation.

14   BY MR. MONEK ANDERSON:

15      Q    **You can answer.**

16      A    When you say "sheriff," do you mean as a whole

17   or the sheriff?

18      Q    **The sheriff's department.  You're the person**

19   **most --**

20      A    The department?

21      Q    **Yeah.**

22      A    And I'm part of that department?  Yes.

23      Q    **Who -- who made the request?**

24      A    For the funding?

25      Q    **Yeah.**

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

```
 1      A     Me.

 2      Q     And in what format was that request made?

 3      A     You mean written?

 4      Q     Yeah.

 5      A     I gave them -- there's -- there's a plan that

 6   this is being added to.  That plan is somewhat

 7   developed.

 8      Q     What's -- what's the written plan that is

 9   somewhat developed?

10      A     It's an overhaul maintenance of the entire

11   facility, TI, tenant improvement.

12      Q     What does TI stand for?

13      A     TI, tenant improvement.

14      Q     Tenant improvement?  And did any of -- only the

15   repairs listed in the last set of the bullets here,

16   those are the only ones in the tenant improvement plan?

17            MS. COLEMAN:  Misstates his testimony.

18            THE WITNESS:  Those will go into the plan.

19   Will it be the only plan?  It's -- because it's being

20   developed, not necessarily.

21   BY MR. MONEK ANDERSON:

22      Q     Is the set of tasks being done on Floors 1

23   through 3, this four set of bullets here, is that in the

24   tenant improvement plan?

25      A     No.
```

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1    Q    Why do these last set of repairs need to be in

2    that plan?

3    A    The cost is the driver.

4    Q    You said you submitted a request for funding?

5    A    Yes.

6    Q    What how much funding did you request?

7    A    For the entire project or for that?  Okay.  I

8    requested funding for a plan to be developed in the

9    amount of around 40 million.

10    Q    When you say you requested money for a plan to

11    be developed, can you break that down for me?  I don't

12    understand.  Does that -- does that cover just the

13    development of the plan or does that cover this work?

14          MS. COLEMAN:  Objection.  Vague.  Compound.

15          THE WITNESS:  It has some of this work in it,

16    but it has not been developed yet, so there's no funding

17    that's necessarily attached to this.  I asked for 40

18    million for the rest of the plan that's already being

19    developed.

20    BY MR. MONEK ANDERSON:

21    Q    For the -- does any of the 40 million cover any

22    of these projects?

23    A    Yes.

24    Q    What else is being included in that $40 million

25    request?

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

```
 1            MS. COLEMAN:  Asked and answered.  He said
 2    overhaul of the entire facility.
 3    BY MR. MONEK ANDERSON:
 4        Q    What are some other overhauls of the entire
 5    facility?
 6        A    Security, counters, cabinets.
 7        Q    Cabinets, you said?
 8        A    Uh-huh.
 9        Q    When did you submit that request for 40
10    million?
11        A    Would have been approximately March of '22 --
12    no.  Sorry.  February of '22.
13        Q    And at that time did you have plans to rework
14    the shower modules?  Was that included in the
15    $40 million request?
16        A    That was not.
17        Q    What about detriple bunking?
18        A    That was.
19        Q    What's the status of your request?  Is it with
20    the sheriff or does go to the county?  Can you explain
21    to me.
22        A    It's with Management Services Bureau's
23    department to request funding for projects to the board
24    of supervisors.
25        Q    Is Management Services Bureau, is that a county
```

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1    agency?

2        A    That's part of the sheriff's facilities.

3        **Q    And they will be the ones to develop a proposal**

4    **for the board of supervisors?**

5        A    The proposal has been set.  It may be upfunded.

6        **Q    What is upfunded?**

7        A    Meaning more than 40 million.

8        **Q    Has it been sent to the board of supervisors?**

9        A    No.

10       **Q    Do you know when it will be?**

11       A    No.

12       **Q    What's holding it up?**

13           MS. COLEMAN:  Calls for speculation.  Lacks

14    foundation.

15           THE WITNESS:  It's not my call to tell what --

16    to know what is holding it up.  You're only allowed so

17    much funding per year, and that changes.

18    BY MR. MONEK ANDERSON:

19       **Q    So this last set of bunks -- sorry -- bullets**

20    **regarding bunks.  So it says, "Dorm modules," dash.**

21    **Then below it looks like a sub bullet that says,**

22    **"Realign bunks for ADA access clearance, eighth floor."**

23           **What does that mean?**

24       A    It means there's currently not enough space in

25    between for approach -- accessible approach.

Ex. F-56

Dunsmore vs.
San Diego County Sheriff's Office

1      A    Yes.

2      Q    But you knew then that you needed to realign

3   access?

4      A    I knew then that it would have to be -- the

5   bunks would have to be removed and reinstalled.

6      Q    And how did you know that?

7      A    Because I know the 2010 regulations.

8      Q    So was it your idea to remove the triple bunks?

9      A    No.

10     Q    Whose idea?

11     A    Command.

12     Q    Do you remember who in command?

13     A    Changeover comes from many different people.

14     Q    When do you think you got that direction?

15     A    Approximately 2018, 2019.

16     Q    And then it ended up in the March 2022 request

17  for funding?

18     A    Yes.

19     Q    So you're going to take down modules at Central

20  Jail when doing renovations; is that right?

21         MS. COLEMAN:  Take out of operation?

22         MR. MONEK ANDERSON:  He can answer.

23         THE WITNESS:  It's probably going to be the

24  whole floor.

25

Page 96

Ex. F-57

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1          THE WITNESS:  Twenty-five total -- on floors

2    four through eight.

3    BY MR. MONEK ANDERSON:

4        Q    And are all 25 of those lower-tier showers

5    being altered?

6        A    I don't know that yet.

7        Q    Has it been determined?

8        A    It has not.

9        Q    Right now, the -- your $40 million request is

10   with the Management Services Bureau?

11       A    Yes.

12       Q    The next step is for it to go to the board of

13   supervisors; is that right?  Or what's the process?

14       A    Management Services Bureau of the sheriff's

15   will request funding from PSG, which is Public Safety

16   Group.  They choose what to fund and what not to fund,

17   based on their goal, which then goes to the board for

18   approval.

19       Q    Is the other Public Safety Group, is that a

20   county department?

21       A    It's a group.

22       Q    Does it include the sheriff?

23       A    It does.

24       Q    Do you know who else it includes?

25       A    DA, probation, anything to with public safety.

Ex. F-58

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1    That's their group, the group managers.

2        Q    Is there a sheriff's representative on the

3    Public Safety Group?

4        A    Yes.

5        Q    Who's that the representative?

6        A    I don't know.

7        Q    And you said that the proposal could be

8    upfunded; is that right?

9        A    A request -- at the time of the March, it was

10   requested 40.  When it goes again, it will be more that

11   40.

12       Q    So you're going to resubmit it?

13       A    Once it's ready to go again -- there's certain

14   times of the year you submit.  When it's ready to go

15   again, it will be -- it will be for more -- more than

16   the 40 million.

17       Q    And when will you -- when it will be ready to

18   go again?

19       A    Next March.

20       Q    March 2024?

21       A    Ish.  Yeah.

22       Q    So it's annual cycle of --

23       A    Yes.  It's the final quarter filing.  That will

24   be a capital improvement.

25       Q    Do you know what the amount will be next March?

Ex. F-59

**Darren Scott Bennett**

**Dunsmore vs.
San Diego County Sheriff's Office**

```
 1      A    I do not.

 2      Q    Will it be 10 million more?

 3           MS. COLEMAN:  Calls for speculation.

 4           THE WITNESS:  I don't know.

 5   BY MR. MONEK ANDERSON:

 6      Q    Have you started working on adding to that

 7   proposal?

 8      A    Yes.

 9      Q    Does that include all of these bullets here

10   under the last set, longer term repairs?

11      A    Yes.

12      Q    You said "yes"?  But you don't have a figure

13   yet?

14      A    No.

15      Q    So then once you resubmit it in March 2024, it

16   will go to the Public Safety Group?

17      A    MSB submits it to the Public Safety Group, yes.

18      Q    And MSB can decide whether or not to submit it

19   to the Public Safety Group?

20      A    They could.

21      Q    And if they do submit it, is there a time frame

22   when the Public Safety Group needs to decide on it?

23      A    They have meetings throughout the year that

24   focus towards this final meeting.

25      Q    What -- this final meeting, when does this
```

**Ex. F-60**

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1   final meeting occur?

2       A    When it's due in March or the final quarter for

3   the capital improvement for the following year's

4   funding.

5       Q    I thought you submit it to them in March?

6       A    I submit to MSB.

7       Q    Yeah.

8       A    MSB submits it to Public Safety Group.  Public

9   Safety Group and MSB have meetings all year long about

10  budget forecasts.  Those forecasts are finalized in that

11  final meeting around March.

12      Q    Okay.

13      A    It's then decided.

14      Q    So they decide on it in March 2024?

15      A    Ish.

16      Q    Well, the one that you submitted in March 2022,

17  it wasn't decided on then, was it?

18      A    It was denied.

19      Q    Denied.  Do you know why?

20      A    No funding.

21      Q    Did you resubmit one in March 2023?

22      A    No.

23      Q    Why not?

24      A    Because they already have it.

25      Q    Well, it's denied.  Does it then sit with them?

**Darren Scott Bennett**

```
 1      A    Yes.

 2      Q    So that they can deny it, but then reconsider

 3   the proposal the next year?

 4      A    Yes.

 5      Q    Why were these not included?  Did you not have

 6   time to amend for March 2023?

 7           MS. COLEMAN:  Objection.  Vague.  Compound.

 8           THE WITNESS:  Was told not to.

 9   BY MR. MONEK ANDERSON:

10      Q    By who?

11      A    My boss.

12      Q    But your boss gave the okay for March 2024?

13      A    It's implied.

14      Q    How was it implied?

15      A    Funding will be more available, based on

16   current needs.

17      Q    Did he tell you that?

18           MS. COLEMAN:  Objection.  Assumes it's a male.

19           THE WITNESS:  Yes.

20   BY MR. MONEK ANDERSON:

21      Q    And do you remember what specifically he said?

22   Did he say funding is going to be more available?

23      A    The plan was to complete Rock Mountain, then

24   George Bailey, then Central.

25      Q    Is that still the plan?
```

**Page 104**

**Ex. F-62**

**Darren Scott Bennett**

Dunsmore vs.
San Diego County Sheriff's Office

```
 1      A     Yes.
 2      Q     So these alterations at Central could happen
 3   after George Bailey?
 4            MS. COLEMAN:  Objection.  Vague as to "these."
 5            THE WITNESS:  I can't speculate that.
 6   BY MR. MONEK ANDERSON:
 7      Q     But you just said that Rock Mountain will go
 8   first.
 9      A     Uh-huh.
10      Q     And then George Bailey?
11      A     Uh-huh.
12      Q     And then Central Jail?
13      A     Uh-huh.
14      Q     Is that still the plan?
15      A     Yes.
16      Q     Is Rock Mountain done?
17      A     No.
18            MS. COLEMAN:  Counsel, we're getting into areas
19   beyond CJ.
20            MR. MONEK ANDERSON:  He brought it up, so I'm
21   just asking him about it.  And it definitely relates to
22   when Central started.  It has to come after Rock
23   Mountain.
24            MS. COLEMAN:  But I think he's referring to
25   allocation of funding, not the actual.
```

Ex. F-63

Darren Scott Bennett

Dunsmore vs.
San Diego County Sheriff's Office

1  BY MR. MONEK ANDERSON:

2      Q    Are you referring to the allocation of funding?

3      A    Yes.

4      Q    What do you mean?  So is there funding

5  allocated for George Bailey?

6      A    Yes.  But not all of it.

7      Q    Is there's not funding for Central?

8      A    There is some.

9      Q    How much?

10     A    Approximately 5 million towards security that

11  was approved.

12     Q    When was that approved?

13     A    Two years ago.

14     Q    So March 2021?

15     A    Yes.

16     Q    That was approved by the board of supervisors?

17     A    Yes.

18     A    Well, I'm sorry that's not true.  It's approved

19  by the Public Safety Group.  The actual funding -- the

20  funding is being encumbered.  It's that five and a half

21  million-ish to develop the plans to move forward with

22  it.  It doesn't go to the board until the final dollar

23  amount is approved to go to a contractor.

24     Q    So --

25          MS. COLEMAN:  I'm not going to let you continue

Ex. F-64

 1 | I, MARTHA OJEDA-JIMENEZ, CSR No. 13574, Certified

 2 | Shorthand Reporter for the State of California, do

 3 | hereby certify:

 4 |      That the witness in the foregoing deposition was by

 5 | me first duly sworn to testify to the truth, the whole

 6 | truth and nothing but the truth in the foregoing cause;

 7 | that the deposition was taken by me in stenographic

 8 | machine shorthand and thereafter transcribed by me,

 9 | under my direction.

10 |      I further certify that I am not of counsel or

11 | attorney for either or any of the parties to said cause

12 | of action, nor in any way interested in the outcome of

13 | the cause of action.  I declare under penalty of perjury

14 | under the laws of California that the foregoing contains

15 | a true and correct record of the testimony of the

16 | witness.

17 |      The tampering, dismantling, unsealing or unbinding

18 | of the original transcript will render the Reporter's

19 | certificate null and void.

20 |

21 | Dated:  This 20th day of April, 2023, at San Diego,

22 | California.

23 |

24 | _____

25 |           MARTHA OJEDA-JIMENEZ, CSR No. 13574

Ex. F-65

# EXHIBIT G

Deposition of

# Michael Barragan

April 20, 2023

Dunsmore

vs.

San Diego County Sheriff's Office



www.aptusCR.com | 866.999.8310

**Ex. G-67**

Michael Barragan

Dunsmore vs.
San Diego County Sheriff's Office

1    requirement that -- that is followed?

2           MS. COLEMAN:  Well, compound as to practice and

3    requirement, but he is here as a PMK.

4           THE WITNESS:  Well, in regards to practice,

5    there is policy right now, in regards to practice now.

6    In regards to it being a requirement for the individual

7    to be required and mandated to receive the service, I'm

8    not too sure about specific policy on that.

9    BY MR. MONEK ANDERSON:

10      Q    So you mentioned you have contract

11   interpreters?

12      A    Correct.

13      Q    Do you have any staff interpreters?

14      A    From my knowledge at this point, we have --

15   you're referring to sign language interpreters?

16      Q    Yes.

17      A    Not that I know of.

18      Q    Have you been present for a sign language

19   interpretation at Central Jail?

20      A    I have not.

21      Q    When was the last time that a person a Central

22   Jail was provided sign language interpretation?

23           MS. COLEMAN:  May call for speculation.

24           THE WITNESS:  Yeah.  I mean, I wouldn't be able

25   to come up with that.

Ex. G-68

Michael Barragan

Dunsmore vs.
San Diego County Sheriff's Office

1    Q    So it depends on the need whether it's in

2    person or virtual?  Is that a fair characterization of

3    what you said?

4    A    Correct.

5    Q    Who makes that determination of whether this

6    need is okay for video versus in person?

7    A    The individual in custody.

8    Q    If they ask, "I want in person," they get it?

9    A    Correct.

10    Q    What if they don't ask but you know it's

11    necessary?

12    A    Then we would refer to medical to make those

13    judgments.  That's outside my scope.  Medical will

14    further screen and make the proper referral.

15    Q    You said reentry meets with someone after

16    medical sends you an email?

17    A    Correct.

18    Q    What are you talking with them at that meeting

19    about?

20    A    We're just ensuring that they know how to

21    access medical services, counseling services, and if

22    there's any need to access medical, counseling, psych

23    services or any other accommodations that they may need,

24    in regards to their ADA need.  And if there is, we'll go

25    ahead and process that and document it.

Michael Barragan

Dunsmore vs.
San Diego County Sheriff's Office

1     Q     Have you had such a meeting with someone who

2     uses sign language interpretation before?

3     A     I personally have not.

4     Q     Is an interpreter provided for that meeting

5     with Reentry Services?

6     A     Are you referring to the meeting after the

7     email was sent from medical?

8     Q     Yes.

9     A     No.  At that point, no.  Because the need --

10    well, the -- they're there to further screen the need.

11    If at that point there is a need, then we'll coordinate.

12    Q     So your further -- further screening, that

13    means are you reviewing what medical determined?

14    A     Correct.  If -- in regards to the American Sign

15    Language, if there is a need earlier in the intake

16    process, that will be sent up to me prior to that

17    counseling meeting.

18    Q     And have you received one of those during the

19    intake process?

20    A     No.

21    Q     How would -- how do you know it would be sent

22    up to you?

23    A     That's been the common practice.  In regards to

24    our policy.  The supervising correctional counselor's

25    outlined as the point of contact in regards to

Ex. G-70

Michael Barragan

1   coordinating those services.

2       **Q    Is it in policy the supervising correctional**

3   **counselor is outlined as the point of contact?**

4       A    Is one of the point of contacts, correct.

5       **Q    Do you know what policy that is?**

6       A    No.  I would need to see the policy.  I don't

7   want to misquote it.

8       **Q    So then this further screening that reentry**

9   **does, how do you determine what accommodations the**

10  **person needs?**

11      A    Well, based on what the individual shares,

12  we'll make the appropriate accommodations, based on what

13  they share.  If we get information from an outside

14  agency or a family member, as well, regarding the

15  individual, you know, those stuff -- those things will

16  be taken into consideration as well.

17      **Q    Take a person who is deaf and may use sign**

18  **language interpretation, if medical will say we think**

19  **this person needs, how does that get communicated to**

20  **you?**

21      A    It would be e-mailed to me or a phone call

22  right within the facility.  They will let me know that

23  sign language interpretation is needed.  And at that

24  point if it's -- if it's in person and there's a point

25  of contact I need to reach out, then I'll go ahead and

**Ex. G-71**

Michael Barragan

Dunsmore vs.
San Diego County Sheriff's Office

1  reach out to them.  If other means are -- can be

2  adjusted to meet those needs, for example, the -- if

3  virtual can be a solution, then that would be pursued at

4  that point.

5      Q    Have you used virtual interpretation?

6      A    I personally have not used it.

7      Q    Do you know from talking with people at Central

8  if they have used that for in-person?

9      A    They have used the virtual -- a relay service,

10 yeah, in the facility.

11     Q    So if medical tells you the person needs sign

12 language interpretation, is an interpreter provided for

13 that meeting with Reentry Services?

14     A    If medical identifies the need, we would go

15 down and meet with the individual to see if there's

16 other -- other ways of effectively communicating with

17 the individual, whether that be writing, pointing to

18 something or having his cellmate assist in certain

19 things, we would explore that.  If we go down and meet

20 with the individual, and it's expressed by the

21 individual in need for sign language interpretation for

22 specific services, then we'll go ahead and coordinate.

23     Q    You'd first check to see if they use writing?

24     A    We would go down and verify.

25     Q    How do you verify?  Is there a set of questions

Michael Barragan

1    you go through?

2        A    Well, like we shared, there's a specific

3    outline that we kind of follow, in regards to can you

4    access medical.  Do you know how to access counseling?

5    Is there specific needs or modifications that we can

6    assist you with?  At that point if there is something

7    addressed that we can work towards, if it being a sign

8    language interpreter or access to specific

9    interpretation to access services, then we would

10   coordinate.

11       **Q    And if medical says this person needs sign**

12   **language interpretation, you go down and have this**

13   **meeting?  You'd communicate with the person in writing**

14   **to start?  Is that -- just how would you work through**

15   **your outline with that person if they can't speak?**

16       A    If medical identifies that the individual needs

17   sign language interpretation for a specific matter, then

18   at that point we would coordinate services for the

19   individual.  Now, if it's not a urgent matter, then we

20   would go down and meet with the individual to see how we

21   can address.

22       **Q    What's an urgent matter?**

23       A    That would have to be identified by medical or

24   sworn.

25       **Q    And do you know if reentry has ever set up an**

Ex. G-73

1    interpreter for a meeting with the correctional

2    counselor?

3        A    From my knowledge, no.

4        Q    And from talking with people to prepare for

5    this deposition?

6        A    Correct.  No.

7        Q    In what circumstances would you have a cellmate

8    assist with communicating with someone?  How does that

9    work?

10       A    If the individual needs a cellmate to assist

11   with writing a request, maybe, navigating certain things

12   within the facility.

13       Q    And specific to a person who uses sign

14   language, a deaf person.

15       A    Then they would get staff's attention, maybe.

16   But like I said, at that point classification has

17   screened, medical has screened, and counseling should --

18   we'll be aware.

19       Q    Right.  You just mentioned that a cellmate

20   would assist.  So in what circumstances does that

21   happen?

22       A    So if an individual has issues writing, a

23   cellmate could assist with that.  Cellmate could assist

24   with getting a deputy's attention, writing a request to

25   counseling.

Ex. G-74

**Michael Barragan**

**Dunsmore vs.
San Diego County Sheriff's Office**

```
1        A     I believe so, a policy.

2        Q     Do you know what policy?

3        A     Unfortunately, I can't quote that right now.

4        Q     We'll look at one policy.

5        A     Okay.

6        Q     But if you remember, let me know.

7              It sounds like staff have a lot of options.

8    They can call medical.  They can call reentry.  They

9    call reentry coordinators; is that right?

10       A     That's right.  But once again, the supervising

11   correctional counselor will be the avenue to go ahead

12   and coordinate those services.  It will be directed

13   right back to the supervising correctional counselor to

14   ensure those services are provided and documented.

15       Q     And is that request directed to you in writing?

16       A     Yes.

17       Q     And in an email?

18       A     It can be an email.

19       Q     How else, if not an email?

20       A     Primarily email, yeah.

21       Q     Have you received an email -- such an email

22   requesting sign language interpretation?

23       A     Sign language interpretation, no.

24       Q     Have you seen one?

25       A     No.
```

**Ex. G-75**

Michael Barragan

Dunsmore vs.
San Diego County Sheriff's Office

1    Q    And how's the request from medical transferred

2    to Reentry Services?

3    A    It could be via email or phone call.

4    Q    Have you seen any of those?

5    A    I have not.

6    Q    Did you receive any training on sign language

7    interpretation?

8    A    I have not received any training, in regards to

9    sign language interpretation, no.

10   Q    How do you know this is the practice?

11        MS. COLEMAN:   Asked and answered.

12        THE WITNESS:   How do I know it's the practice?

13   BY MR. MONEK ANDERSON:

14   Q    Yeah.  How do you know that you're the person

15   who's supposed to call the point of contact?

16   A    Well, like we shared earlier, there's specific

17   policy.  There's specific training that's provided by my

18   chain of command in regards to these processes.  It's

19   relayed that way.

20   Q    What specific training were you provided?

21   A    So meeting with my reentry coordinator,

22   reviewing processes with our reentry coordinator during,

23   you know, specific staff meetings.

24   Q    And they talked about the process for reaching

25   out to the contract providers?

Ex. G-76

Michael Barragan

Dunsmore vs.
San Diego County Sheriff's Office

1    A    That would be sworn or mental health to go

2    ahead and identify that.

3    **Q    Have you seen any written guidance?**

4    A    Not that is pertaining to counseling or reentry

5    services within the facility, no, I haven't.

6    **Q    So if someone -- have you received an emergency**

7    **request?**

8    A    I have not received emergency request.

9    **Q    Has Reentry Services received an emergency**

10   **request?**

11   A    Reentry Services has not received, from my

12   understanding, a emergency request.

13        MR. MONEK ANDERSON:  Let's take a break.  We

14   can go off the record.

15        (Recess was taken.)

16   BY MR. MONEK ANDERSON:

17   **Q    It sounds like you found the policy that you**

18   **were discussing earlier; is that right?**

19   A    Yes.

20   **Q    What's the name of that policy?**

21   A    The policy is P.11, and it's specific to deaf

22   and hearing deficit individuals in the facility.

23        MR. MONEK ANDERSON:  Okay.  Let's mark this

24   one --

25        I think we're on 21; is that right?

Michael Barragan

Dunsmore vs.
San Diego County Sheriff's Office

1    Q    So once medical puts that in there and then you

2    also put something in a Correctional Counseling Note?

3    A    So for all ADA individuals, a correctional

4    counselor will meet with them.  This indicator just

5    notifies us that they would have access to our

6    telecommunication texting device in the facility.  They

7    could utilize that video relay service as well.  And we

8    would be mindful of those accommodations.

9    Q    Does this policy anywhere say that you are the

10   one -- supervising correctional counselor is the person

11   to reach out about sign language interpretation?

12            MS. COLEMAN:  Document speaks for itself.

13            THE WITNESS:  Yeah.  I believe so.  It's

14   referring to supervising correctional counselor as the

15   designee to identify these individuals and provide

16   appropriate services.

17   BY MR. MONEK ANDERSON:

18   Q    Where does it say provide appropriate services?

19   I don't see it.  I'm just asking.

20   A    I'm just inferring that appropriate services

21   would be offered by the supervising correctional

22   counselor, and the process is identified on the second

23   page.

24   Q    Do all people who are -- have a hearing deficit

25   or are deaf use sign language interpretation?

Michael Barragan

1   BY MR. MONEK ANDERSON:

2       **Q      Yeah.**

3       A      Then at that point, you know, we would -- I

4   wouldn't say it's a requirement.  If it is -- if the

5   service is needed, then it will be coordinated to

6   facilitate -- assist facilitating in that meeting,

7   similarly to the example you mentioned earlier regarding

8   the dentist appointment.

9       **Q      Is it required anywhere in policy that it's**

10  **provided for a disciplinary hearing?**

11      A      In regards to requirements for disciplinary

12  hearing, I'm not familiar if it is required or not.

13      **Q      Are you aware from talking with people to**

14  **prepare for this deposition of a sign language**

15  **interpreter being provided for a disciplinary hearing?**

16      A      From my conversations, no, I have been not --

17  I'm not aware of that being used for that.

18      **Q      Did they give you examples of when an**

19  **interpreter is provided?  What types of interactions?**

20      A      There has been examples of in the past for a

21  medical appointment.  As you mentioned, there has been

22  examples during the intake process using the video relay

23  service system.

24      **Q      Are you aware of any changes to this policy?**

25      A      No.  Whatever is there, that's what I'm aware

**Ex. G-79**

Dunsmore vs.
San Diego County Sheriff's Office

Michael Barragan

1    A    It being verbalized through our leadership and

2  being informed that -- the need of it being documented.

3    **Q    Did you review any records in Offender 360**

4  **before this deposition?**

5    A    I did not, no.

6    **Q    You didn't check to see if people were logged**

7  **in?**

8    A    I check that frequently from my counselors if

9  they're documenting and logging in case notes, so yeah.

10   **Q    Have you seen case notes that someone used**

11  **providing sign language interpretation?**

12   A    I haven't seen a specific case note to that.

13  But as mentioned, counselors are putting case notes for

14  all those specific interactions and services.

15   **Q    How long -- you were at Central Jail for how**

16  **long before moving to East Mesa?**

17   A    I was two years at Central Jail prior to moving

18  to East Mesa.

19   **Q    Do you see invoices for sign language**

20  **interpretation?**

21   A    I do not see invoices.  That would have to be

22  under our financial services.

23   **Q    Have you -- you've never seen an invoice for**

24  **interpretive services?**

25   A    I specifically have not seen an invoice.  As

**Ex. G-80**

Michael Barragan

1    A    Met with staff in the facility.

2    Q    **And they told you it's provided?**

3    A    Correct.  And seen the devices that are

4    utilized as well in the facility.

5    Q    **Did they tell you when it was last provided at**

6    **the jail?**

7    A    No.

8    Q    **So just -- it's provided, but no specifics?**

9    A    Correct.

10    MR. MONEK ANDERSON:  Let's take a short break.

11    Go off the record.  I'm almost done.

12    (Recess was taken.)

13    BY MR. MONEK ANDERSON:

14    Q    **So is there anywhere, other than Offender 360,**

15    **where it's documented when sign language interpretation**

16    **is provided?**

17    A    From my understanding, it will just be Offender

18    360, and some of those notes, I believe -- yeah, they'll

19    be in Offender 360 from a correctional counselor.

20    Q    **Do you know why the sign language**

21    **interpretation is provided through Reentry Services?**

22    A    We'll just be the avenue to go ahead and

23    coordinate those individuals coming into the facility

24    and ensure that they are clear to come in.

25    Q    **The avenue for the -- by people, you mean the**

**Ex. G-81**

Michael Barragan

Dunsmore vs.
San Diego County Sheriff's Office

1    I, MARTHA OJEDA-JIMENEZ, CSR No. 13574, Certified

2    Shorthand Reporter for the State of California, do

3    hereby certify:

4        That the witness in the foregoing deposition was by

5    me first duly sworn to testify to the truth, the whole

6    truth and nothing but the truth in the foregoing cause;

7    that the deposition was taken by me in stenographic

8    machine shorthand and thereafter transcribed by me,

9    under my direction.

10       I further certify that I am not of counsel or

11   attorney for either or any of the parties to said cause

12   of action, nor in any way interested in the outcome of

13   the cause of action.  I declare under penalty of perjury

14   under the laws of California that the foregoing contains

15   a true and correct record of the testimony of the

16   witness.

17       The tampering, dismantling, unsealing or unbinding

18   of the original transcript will render the Reporter's

19   certificate null and void.

20

21   Dated:  This 20th day of April, 2023, at San Diego,

22   California.

23

24   _____

25                MARTHA OJEDA-JIMENEZ, CSR No. 13574

Ex. G-82

# EXHIBIT H

| From: | Van Swearingen |
|---|---|
| To: | Coleman, Susan E.; Kish, Fernando; Ronald Lenert; O"Sullivan, Matthew |
| Cc: | Kedra Chan |
| Bcc: | 1730_01_Darryl Dunsmore et al_Darryl Dunsmore et al_v_San Diego Jail_Emails_1730_01_ |
| Subject: | Dunsmore: Serious/urgent issues - Ybarra, Peterson, Shoemaker [IMAN-DMS.FID55015] |
| Date: | Friday, July 1, 2022 3:12:00 PM |

Dear counsel,

We understand that **Matthew Ybarra (22708744**) had a stroke in 2021 that resulted in partial paralysis. He presently uses a wheelchair, but it does not have a leg rest. As a result, one of his legs drags on the ground when he uses the wheelchair. Please provide him with a wheelchair with a leg rest so that he doesn't drag and potentially harm his foot. In approximately late March or early April, he requested physical therapy. He finally received a PT appointment approximately ten days ago. The provider said that he should have PT once per week, but he has not had PT since that one and only time. Please ensure that Mr. Ybarra is provided PT as indicated by his provider. Over the past two to three weeks, Mr. Ybarra has also had difficult receiving the full regimen of his HIV medication, as the Jail runs out of medication. Please ensure that Mr. Ybarra's medication is provided to him as prescribed and that there are no interruptions in the administration of his medication.

We understand that **Jonathan Peterson (22719408)** had a recommendation for hip surgery from his San Ysidro Health physician prior to being booked. After submitting numerous requests. Mr. Peterson finally saw a doctor yesterday – however, he is not aware that the doctor referred him to an orthopedic specialist for surgery consultation. Please obtain Mr. Peterson's full medical records and have him seen by an orthopedic specialist. In addition, Mr. Peterson has a tooth abscess that causes him a lot of pain. He has submitted numerous requests to see the dentist, but still has not seen a dentist. Please have him seen by a dentist immediately.

We understand that **Thomas Shoemaker (22720725)** was in a car accident in May--shortly before booking--in which some teeth were shattered, some were knocked out, and some were loosened. He has submitted numerous requests to see a dentist but still has not been seen. Please have Mr. Shoemaker seen by a dentist immediately. He also experiences considerable pain from injuries to his toe, hip, and back. Please have a doctor see Mr. Shoemaker about pain management and an evaluation for back surgery.

Thank you,
Van


Van Swearingen
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830
VSwearingen@rbgg.com

**Ex. H-84**

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

**Ex. H-85**

| | |
|---|---|
| **From:** | Eric Monek Anderson |
| **To:** | scoleman@bwslaw.com; fernando.kish@sdcounty.ca.gov; matthew.o"sullivan@sdcounty.ca.gov |
| **Cc:** | Van Swearingen; Kedra Chan |
| **Subject:** | Dunsmore: Serious/urgent issues [IMAN-DMS.FID55015] |
| **Date:** | Friday, July 8, 2022 3:40:54 PM |
| **Attachments:** | image001.jpg |

Counsel,

We understand that Lisa Landers (Bk. 22725436) had her cane and walker taken from her when she was incarcerated on June 20, 2022. Ms. Landers suffers from gout and neuropathy that make it incredibly painful for her to walk without the assistance of a walker or a wheelchair. She has submitted several sick call requests, yet did not meet with any medical providers for more than two weeks. The medical staff at Las Colinas have still not provided Ms. Landers with a walker or wheelchair so that she can move, shower, and use the toilet without severe pain. Please ensure Ms. Landers sees medical staff and is provided a walker or wheelchair immediately. Please also ensure that Ms. Landers receives records release forms so that the Jail can obtain her current medications from her civilian providers.

Thank you.

**Eric Monek Anderson** (he/him)
Associate Attorney



**Rosen Bien Galvan & Grunfeld LLP**
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
eanderson@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at eanderson@rbgg.com.

**Ex. H-86**

| From: | Van Swearingen |
|---|---|
| To: | Kish, Fernando; Inman, Steven; Coleman, Susan E.; Pappy, Elizabeth M. |
| Cc: | Kedra Chan |
| Bcc: | 1730_01_ Darryl Dunsmore et al _Darryl Dunsmore et al _v _San Diego Jail_ _Emails _1730_01_ |
| Subject: | Dunsmore: serious/urgent issue re Nierobi Kuykendall (No. 22726980) [IMAN-DMS.FID55015] |
| Date: | Friday, February 10, 2023 2:16:24 PM |

Dear Counsel,

Nierobi Kuykendall (No. 22726980) suffers from injuries on his upper and lower spine and experiences back and leg pain that impairs his mobility. Mr. Kuykendall requires a wheelchair and a cane to ambulate. We understand his wheelchair was taken away when he was moved from Central Jail to George Bailey. In addition, Mr. Kuykendall is unable to access the lower- or medium-bunk beds in a triple-tier bunk without severe pain, as his spinal issues make it difficult to twist or bend in the way required to get into those beds. He would not experience such pain if he were housed on the lower bunk of a two-tier bed. Accordingly, please ensure Mr. Kuykendall is housed in a location where he has access to a wheelchair and is assigned a bed that does not cause or exacerbate his pain.

Thank you,
Van

Van Swearingen
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830
VSwearingen@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

**Ex. H-87**

| | |
|---|---|
| **From:** | Van Swearingen |
| **To:** | Coleman, Susan E.; Pappy, Elizabeth M.; Kish, Fernando; Inman, Steven |
| **Cc:** | Kedra Chan |
| **Bcc:** | 1730_01_Darryl Dunsmore et al_Darryl Dunsmore et al_v_San Diego Jail_Emails_1730_01_ |
| **Subject:** | Dunsmore: serious/urgent issue re Nierobi Kuykendall (No. 22726980) [IMAN-DMS.FID55015] |
| **Date:** | Friday, May 5, 2023 12:00:47 PM |

Dear Counsel,

Nierobi Kuykendall (No. 22726980) suffers from injuries on his upper and lower spine and experiences back and leg pain that impairs his mobility; he requires a wheelchair and cane to ambulate.  We previously emailed you about Mr. Kuykendall on February 10, 2023, requesting that he be housed in a location where he has access to a wheelchair and is assigned a bed that does not cause or exacerbate his pain.  We understand that Mr. Kuykendall was moved back from George Bailey to Central last week, but that he still does not have access to a wheelchair.  Please ensure that Mr. Kuykendall is provided with a wheelchair.

Thank you,

Van Swearingen
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830
VSwearingen@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

**Ex. H-88**

# EXHIBIT I

# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION 1**   Complete this information to request medical attention.

Print Name: _Kevin Martin_ Bkg #: _21129360_   Housing Unit: _2-C_ DOB: ____-84

I am requesting:
- [X] Medical Services
- [ ] Mental Health Services
- [ ] Dental Services
- [X] GBDF
- [ ] SDCJ
- [ ] VDF
- [ ] EMRF
- [ ] LCDRF
- [ ] SBDF
- [ ] FAC 8
- [ ] Other

Reason for request for health services: _Extreme problems with sciatic Nerve_

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: _____   Date: _11-18-21_

**SECTION 2**   Date Request Received: _NOV 19 ENT'D_   Date Seen: _____

1. [ ] SEEN IN HUR   [ ] Chart reviewed
2. [ ] NOT SEEN DUE TO: [ ] Court [ ] Visit [ ] Released [ ] No Show/Refused [ ] Other____ [ ] Rescheduled_____
3. [ ] Non-medical problem referred to: _____
4. [ ] Seen previously for same non-medical request, (tennis shoes, blankets, etc.). No further evaluation.
5. [ ] NO FURTHER COMPLAINTS. Patient advised to submit another Sick Call Request Slip if problem recurs.

**"S"ubjective** Chief Complaint: _Extreme Problems with my Sciatic Nerve_

**"O"bjective:** _____

**"A"ssessment Nursing Diagnosis:** _____

**"P"lan:** [ ] Rx GIVEN as per SNP_____
[X] SCHEDULED FOR SICK CALL WITH:   [ ] MD [X] RN [ ] NP [ ] DDS
[ ] Psych/Mental Health Specialist
[ ] Other_____
[ ] PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____   ID#_____

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
SICK CALL REQUEST
Page 1 of 1

[X] GBDF [ ] EMRF [ ] LCDRF [ ] SBDF [ ] SDCJ [ ] VDF [ ] FAC8
Patient's Name: _Martin, Kevin_
D.O.B: _____

KEVIN MICHAEL 4004B0156 (21129360) 6 0   | |-| 9 -2 1

Form J212 Rev 12/19

Booking Number

EX: I-90

# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

---

**SECTION 1**   Complete this information to request medical attention.

Print Name: _Kevin Martin_    Bkg #: _21129360_    Housing Unit: _2C_   DOB: ▇ _04_

I am requesting
- ☒ Medical Services
- ☐ Mental Health Services
- ☐ Dental Services

- ☒ GBDF
- ☐ SDCJ
- ☐ VDF

- ☐ EMRF
- ☐ LCDRF
- ☐ SBDF

- ☐ FAC 8
- ☐ Other

Reason for request for health services: _Siatic Nerve is pinched in Extreme Pain. Please Help_

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: _Kevin_    Date: _11-27-21_

---

**SECTION 2**    Date Request Received: _NOV 27 ENT'D AwA_    Date Seen: _____

1. ☐ SEEN IN HUR        ☐ Chart reviewed
2. ☐ NOT SEEN DUE TO: ☐ Court ☐ Visit ☐ Released ☐ No Show/Refused ☐ Other_____ ☐ Rescheduled_____
3. ☐ Non-medical problem referred to: _____
4. ☐ Seen previously for same <u>non-medical</u> request, (tennis shoes, blankets, etc.). No further evaluation.
5. ☐ NO FURTHER COMPLAINTS. Patient advised to submit another Sick Call Request Slip if problem recurs.

"**S**"ubjective
Chief Complaint: _____

"**O**"bjective: _____

"**A**"ssessment Nursing Diagnosis: _____

"**P**"lan: ☐ Rx GIVEN as per SNP_____
☑ SCHEDULED FOR SICK CALL WITH:    ☐ MD ☑ RN ☐ NP ☐ DDS
☐ Psych/Mental Health Specialist
☐ Other_____
☐ PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____    ID# _____

---

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
**SICK CALL REQUEST**
Page 1 of 1

☑ GBDF ☐ EMRF ☐ LCDRF ☐ SBDF ☐ SDCJ ☐ VDF ☐ FAC8
Patient's Name: _____

MARTIN, KEVIN MICHAEL  400130156 (21129360)

D.O.B.

Ex. T-91

Form I312  Rev. 12/19

# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION 1**  Complete this information to request medical attention.

Print Name: _Kevin Martin_  Bkg #: _2112936 0_  Housing Unit: _2-C_  DOB: ___

I am requesting:
- [X] Medical Services
- [X] Mental Health Services
- [ ] Dental Services

- [X] GBDF
- [ ] SDCJ
- [ ] VDF

- [ ] EMRF
- [ ] LCDRF
- [ ] SBDF

- [ ] FAC 8
- [ ] Other

Reason for request for health services: _Extreme Back pain!!_

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: _____  Date: _1-30-22_

**SECTION 2**  Date Request Received: _JAN 31 REC'D_  Date Seen: _____

1. [ ] SEEN IN HUR     [ ] Chart reviewed
2. [ ] NOT SEEN DUE TO: [ ] Court [ ] Visit [ ] Released [ ] No Show/Refused [ ] Other____ [ ] Rescheduled____
3. [ ] Non-medical problem referred to: ____
4. [ ] Seen previously for same _non-medical_ request, (tennis shoes, blankets, etc.). No further evaluation.
5. [ ] NO FURTHER COMPLAINTS. Patient advised to submit another Sick Call Request Slip if problem recurs.

**"S"ubjective**
Chief Complaint: _____

**"O"bjective:** _____

**"A"ssessment Nursing Diagnosis:** _____

**"P"lan:** [ ] Rx GIVEN as per SNP ____
[ ] SCHEDULED FOR SICK CALL WITH: [ ] MD [ ] RN [ ] NP [ ] DDS
[ ] Psych/Mental Health Specialist
[ ] Other____

[ ] PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____  ID#_____

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
SICK CALL REQUEST
Page 1 of 1

[ ] GBDF [ ] EMRF [ ] LCDRF [ ] SBDF [ ] SDCJ [ ] VDF [ ] FAC8
Patient's Name: _Martin, Kevin_
D.O.B.: _____
Date (MM/DD/YY): _01-31-22_

MARTIN, KEVIN MICHAEL 4002301561 (2112936 0)  60

**San Diego County**
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION 1**   Complete this information to request medical attention.

**Print Name:** Kevin Martin   **Bkg #:** 21129360   **Housing Unit:** 2-C   **DOB:** ██-84

**I am requesting**
- [X] Medical Services
- [ ] Mental Health Services
- [ ] Dental Services

- [X] GBDF
- [ ] SDCJ
- [ ] VDF

- [ ] EMRF
- [ ] LCDRF
- [ ] SBDF

- [ ] FAC 8
- [ ] Other

**Reason for request for health services:** Psyatic Pain - Right leg numb
Pain is so bad I cant sleep.

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

**Signed:** _(signature)_   **Date:** 2-12-22

**SECTION 2**   **Date Request Received:** FEB 1 3 REC'D   **Date Seen:** _____

1. [ ] SEEN IN HUR   [ ] Chart reviewed
2. [ ] NOT SEEN DUE TO: [ ] Court [ ] Visit [ ] Released [ ] No Show/Refused [ ] Other_____ [ ] Rescheduled_____
3. [ ] Non-medical problem referred to: _____
4. [ ] Seen previously for same <u>non-medical</u> request, (tennis shoes, blankets, etc.).  No further evaluation.
5. [ ] NO FURTHER COMPLAINTS.  Patient advised to submit another Sick Call Request Slip if problem recurs.

**"S"ubjective**
**Chief Complaint:** _____

**"O"bjective:** _____

**"A"ssessment Nursing Diagnosis:** _____

**"P"lan:** [ ] Rx GIVEN as per SNP_____
[X] SCHEDULED FOR SICK CALL WITH: [ ] MD [X] RN [ ] NP [ ] DDS
[ ] Psych/Mental Health Specialist
[ ] Other_____
[ ] PATIENT EDUCATION AND ADDITIONAL INFO: _____

**SIGNATURE:** _____   **ID#**_____

[X] GBDF [ ] EMRF [ ] LCDRF [ ] SBDF [ ] SDCJ [ ] VDF [ ] FAC8

**Patient's Name:** Martin, Kevin
**D.O.B:** 01 - 06 - 1984

KEVIN MICHAEL  4001 30156 (21129360)   2 1 1 2 9 3 6 0   0 2 - 1 3 - 2 2
Date (MM-DD-YY)

Booking Number

# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION I**   Complete this information to request medical attention.

Print Name: _Kevin Martin_ Bkg #: _21129360_  Housing/Unit: _2-C_ DOB: _-84_

I am requesting
- ☒ Medical Services
- ☐ Mental Health Services
- ☐ Dental Services

- ☒ GBDF
- ☐ SDCJ
- ☐ VDF

- ☐ EMRF
- ☐ LCDRF
- ☐ SBDF

- ☐ FAC 8
- ☐ Other

Reason for request for health services: _Please renew my Motrin_
_I have extreme pain in leg and Back_

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: _K_____   Date: _2·22·22_

FEB 24 2022

**SECTION 2**   Date Request Received: _____   Date Seen: _____

1. ☐ SEEN IN HUR   ☐ Chart reviewed
2. ☐ NOT SEEN DUE TO: ☐ Court ☐ Visit ☐ Released ☐ No Show/Refused ☐ Other____ ☐ Rescheduled____
3. ☐ Non-medical problem referred to: _____
4. ☐ Seen previously for same non-medical request, (tennis shoes, blankets, etc.). No further evaluation.
5. ☐ NO FURTHER COMPLAINTS. Patient advised to submit another Sick Call Request Slip if problem recurs.

**"S"ubjective**
Chief Complaint: _____

**"O"bjective:** _____

**"A"ssessment Nursing Diagnosis:** _____

**"P"lan:** ☐ Rx GIVEN as per SNP _____
☐ SCHEDULED FOR SICK CALL WITH:   ☐ MD ☐ RN ☐ NP ☐ DDS
☐ Psych/Mental Health Specialist
☒ Other _hycc_

☐ PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____   ID# _____

---

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
SICK CALL REQUEST
Page 1 of 1

☒ GBDF ☐ EMRF ☐ LCDRF ☐ SBDF ☐ SDCJ ☐ VDF ☐ FAC8

Patient's Name: _Martin, Kevin_

D.O.B.:

KEVIN MICHAEL   21129360   02-24-22

Ex. 1-94

# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION 1**  Complete this information to request medical attention.

Print Name: Kevin Martin  Bkg #: 21129360  Housing Unit: 2-C  DOB: ___-8~

I am requesting
- ☑ Medical Services
- ☐ Mental Health Services
- ☐ Dental Services

- ☑ GBDF
- ☐ SDCJ
- ☐ VDF

- ☐ EMRF
- ☐ LCDRF
- ☐ SBDF

- ☐ FAC 8
- ☐ Other

Reason for request for health services: Bills I still need the pretizone for pinched norve.

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: _____  Date: 2-25-22

FEB 26 REC'D

**SECTION 2**  Date Request Received: _____  Date Seen: _____

1. ☐ SEEN IN HUR    ☐ Chart reviewed
2. ☐ NOT SEEN DUE TO: ☐ Court ☐ Visit ☐ Released ☐ No Show/Refused ☐ Other_____ ☐ Rescheduled_____
3. ☐ Non-medical problem referred to: _____
4. ☐ Seen previously for same non-medical request, (tennis shoes, blankets, etc.).  No further evaluation.
5. ☐ NO FURTHER COMPLAINTS.  Patient advised to submit another Sick Call Request Slip if problem recurs.

"**S**"ubjective
Chief Complaint: _____

"**O**"bjective: _____

"**A**"ssessment Nursing Diagnosis: _____

"**P**"lan: ☐ Rx GIVEN as per SNP_____
☐ SCHEDULED FOR SICK CALL WITH: ☐ MD ☐ RN ☐ NP ☐ DDS
☐ Psych/Mental Health Specialist
☑ Other  MDCC
☐ PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____  ID# _____

☐ GBDF ☐ EMRF ☐ LCDRF ☐ SBDF ☐ SDCJ ☐ VDF ☐ FAC8

Patient's Name: Martin, Kevin
D.O.B. 1-6-198~

MARTIN, KEVIN MICHAEL  400130156 (211293602)

Ex. I-95



# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION 1   Complete this information to request medical attention.**

Print Name: KEVIN Martin    Bkg #: 21129360    Housing Unit: 2 C DOB: [redacted] 84

I am requesting
- [X] Medical Services
- [ ] Mental Health Services
- [ ] Dental Services

- [X] GBDF
- [ ] SDCJ
- [ ] VDF

- [ ] EMRF
- [ ] LCDRF
- [ ] SBDF

- [ ] FAC 8
- [ ] Other

Reason for request for health services: Extreme Pain!!! Pinched nerve in my Back Right Leg numb

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: _____    Date: 2-28-22

---

**SECTION 2**    Date Request Received: _____    Date Seen: _____

MAR 0.3 REC'D

1. [ ] SEEN IN HUR    [ ] Chart reviewed
2. [ ] NOT SEEN DUE TO: [ ] Court [ ] Visit [ ] Released [ ] No Show/Refused [ ] Other_____ [ ] Rescheduled_____
3. [ ] Non-medical problem referred to: _____
4. [ ] Seen previously for same **non-medical** request, (tennis shoes, blankets, etc.). No further evaluation.
5. [ ] NO FURTHER COMPLAINTS.  Patient advised to submit another Sick Call Request Slip if problem recurs.

**"S"ubjective**
Chief Complaint: _____

**"O"bjective**: _____

**"A"ssessment Nursing Diagnosis**: _____

**"P"lan**: [ ] Rx GIVEN as per SNP_____
[X] SCHEDULED FOR SICK CALL WITH:    [ ] MD [X] RN [ ] NP [ ] DDS
[ ] Psych/Mental Health Specialist
[ ] Other_____
[ ] PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____    ID# _____

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
SICK CALL REQUEST
Page 1 of 1

[ ] GBDF [ ] EMRF [ ] LCDRF [ ] SBDF [ ] SDCJ [X] VDF [ ] FAC8
Patient's Name: Martin, K
D.O.B. _____

KEVIN MICHAEL 40/180156 (21129360)

03 - 0 3 - 22

FEX. 196



# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION 1**  Complete this information to request medical attention.

Print Name: **Kevin Martin** Bkg #: **21129360** Housing Unit: **2-C** DOB: **-84**

I am requesting
- [X] Medical Services
- [ ] Mental Health Services
- [ ] Dental Services

- [X] GBDF
- [ ] SDCJ
- [ ] VDF

- [ ] EMRF
- [ ] LCDRF
- [ ] SBDF

- [ ] FAC 8
- [ ] Other

Reason for request for health services: **I'm in Constant Pain due to pinched nerve.**

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: _____  Date: **3-19-22**

**SECTION 2**    Date Request Received: _____ **MAR 20 REC'D**    Date Seen: _____

1. [ ] SEEN IN HUR       [ ] Chart reviewed
2. [ ] NOT SEEN DUE TO: [ ] Court [ ] Visit [ ] Released [ ] No Show/Refused [ ] Other_____ [ ] Rescheduled_____
3. [ ] Non-medical problem referred to: _____
4. [ ] Seen previously for same non-medical request, (tennis shoes, blankets, etc.).  No further evaluation.
5. [ ] NO FURTHER COMPLAINTS.  Patient advised to submit another Sick Call Request Slip if problem recurs.

**"S"ubjective**
Chief Complaint: _____

**"O"bjective:** _____

**"A"ssessment Nursing Diagnosis:** _____

**"P"lan:** [ ] Rx GIVEN as per SNP_____
[ ] SCHEDULED FOR SICK CALL WITH:    [ ] MD [X] RN [ ] NP [ ] DDS
[ ] Psych/Mental Health Specialist
[ ] Other_____ **pin ch**
[ ] PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____  ID#_____

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
SICK CALL REQUEST
Page 1 of 1

[ ] GBDF [ ] EMRF [ ] LCDRF [ ] SBDF [ ] SDCJ [ ] VDF [ ] FAC8
Patient's Name: _____
D.O.B: _____

MARTIN KEVIN MICHAEL 400130156 (21129360)

Ex. I-97

# San Diego County
# SHERIFF'S DEPARTMENT

## INMATE GRIEVANCE/APPEAL OF DISCIPLINE
## *QUEJA/APELACION DE LA DISCIPLINA DE PRESO*

☐ SDCJ  ☒ GBDF  ☐ EMRF  ☐ LCDRF  ☐ SBDF  ☐ VDF  ☐ FAC8

From: MARTIN, KEVIN, MICHAEL          21129360          2c/109
*De:*  Name (Last, First, Middle)       Booking Number    Housing Unit
     *Nombre (Apellido, Primero, Segundo)*  *Número de ficha*  *Unidad de alojamiento*

Grievance is about:  ☐ Jail Procedures  ☐ Jail Conditions  ☒ Medical  ☐ PREA  ☐ Other
*La queja es acerca:*  *Procedimientos de*  *Condiciones de*  *Médico*              *Otro*
                    *la Cárcel*         *la Cárcel*

Date and Time of Incident / *Fecha y hora del incidente:* _____

Describe the reason for your grievance in your own words. Please be specific. (Use additional sheets if necessary)
*Describa la razón de su queja en sus propias palabras. Por favor sea específico. (Use hojas adicionales si es necesario)*

I HAVE AN EXTREMELY PAINFUL CONDITION, A PINCHED SCIATIC NERVE.
THERE HAS BEEN A PENDING REFERRAL TO A PAIN SPECIALIST FOR SEVERAL
WEEKS BUT NO APPOINTMENT HAS BEEN SET. I HAVE NOT BEEN GIVEN ANY
MEDICATION STRONGER THAN IBUPROFIN WHICH IS INEFFECTIVE.
APPELANT MAINTAINS THAT THE ACTIONS AND INACTIONS OF SDSD CONSTITUTE
AN ONGOING MATERIAL ADVERSE EFFECT ON HIM AND HE SEEKS RELIEF
FOR SUCH.

Inmate Signature / *Firma de Preso*          3/19/22
                                          Date / *Fecha*
                                                       MAR 20 REC'D

THIS BOX IS FOR OFFICIAL USE ONLY
*Esta caja es para el uso oficial solamente.*

Received by: _____    CMY    3/19/22    200ᵛ
           Signature of receiving staff member  ARJIS #    Date    Time

Entered in JIMS: _____    _____    _____
                Date            Time            JIMS Grievance Number

If one of the following two conditions is alleged by the inmate, this grievance must be answered within 4 days:
☐ The inmate's health or safety is unfairly impacted by a condition of confinement
☐ A condition of confinement has prevented the inmate's effective communication/participation in a legal hearing.
☒ This submission is not a grievance:
☐ It is an appeal of discipline—JIMS Incident # _____ JIMS Appeal Hearing # _____
☐ It is a complaint against staff—JIMS Incident # _____ (Refer to Detentions P&P Section N.1)
☐ It is an inmate request—respond in writing below. (No entry in JIMS, copy of response to booking jacket)
Response to Inmate Request:
RNSC  Schul^

# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION 1**  Complete this information to request medical attention.

Print Name: KEVIN Martin  Bkg #: 21129360  Housing Unit: 7B  DOB: ___-84

I am requesting
- ☒ Medical Services
- ☐ Mental Health Services
- ☐ Dental Services

- ☐ GBDF
- ☒ SDCJ
- ☐ VDF

- ☐ EMRF
- ☐ LCDRF
- ☐ SBDF

- ☐ FAC 8
- ☐ Other

Reason for request for health services: I NEED A Lower Bunk Do to Back Problems. I also need a cane of Some type of Assistance to help me walk.

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services; its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: _Kevin M___  Date: 8-1-22

---

**SECTION 2**  Date Request Received: 8/8  Date Seen: _____

1. ☐ SEEN IN HUR  ☐ Chart reviewed
2. ☐ NOT SEEN DUE TO: ☐ Court ☐ Visit ☐ Released ☒ No Show/Refused ☐ Other  ☐ Rescheduled
3. ☐ Non-medical problem referred to: _____
4. ☐ Seen previously for same non-medical request, (tennis shoes, blankets, etc.).  No further evaluation.
5. ☐ NO FURTHER COMPLAINTS. Patient advised to submit another Sick Call Request Slip if problem recurs.

"S"ubjective
Chief Complaint: _____

"O"bjective: _____

"A"ssessment Nursing Diagnosis: _____

"P"lan: ☐ Rx GIVEN as per SNP
☒ SCHEDULED FOR SICK CALL WITH: ☐ MD ☒ RN ☐ NP ☐ DDS
☐ Psych/Mental Health Specialist
☐ Other _____
☐ PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____  ID# _____

---

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
MEDICAL SERVICES DIVISION
SICK CALL REQUEST
Page 1 of 1

☐ GBDF ☐ EMRF ☐ LCDRF ☐ SBDF ☐ SDCJ ☐ VDF ☐ FAC8

Patient's Name: _____

D.O.B: ☐☐ ☐☐ ☐☐

Date (MM-DD-YY): ___-___-___

Form J212 Rev 12/19

MARTIN, KEVIN MICHAEL  400130156 (21129360)

Booking Number

Ex. I-99



# San Diego County
# SHERIFF'S DEPARTMENT

## SICK CALL REQUEST

**SECTION 1**   Complete this information to request medical attention.

Print Name: Kevin Martin

Booking #: 21129360   Housing Unit: E-5-26   DOB: ▉▉-84

I am requesting
- [x] Medical Services
- [ ] Mental Health Services
- [ ] Dental Services
- [ ] GBDF
- [ ] SDCJ
- [x] VDF
- [ ] EMRF
- [ ] LCDRF
- [ ] SBDF
- [ ] FAC 8
- [ ] Other

**Reason for request for health services:** SEVERE Back Pain!!!
I cant stand for more than 30 seconds

I authorize and request the San Diego County Sheriff's Medical and Mental Health Services, its physicians, psychiatrists, dentists contracted agents, and medical personnel to administer and perform any and all medical and dental examinations, treatments, and diagnostic procedures deemed advisable or necessary.

Signed: Kevin M   Date: 12-12-22

---

**SECTION 2**         Date Request Received: _____         Date Seen: _____

1. [ ] SEEN IN HUR      [ ] Chart reviewed
2. [ ] NOT SEEN DUE TO: [ ] Court [ ] Visit [ ] Released [ ] No Show/Refused [ ] Other [ ] Rescheduled _____
3. [ ] Non-medical problem referred to: _____
4. [ ] Seen previously for same <u>non-medical</u> request, (tennis shoes, blankets, etc.) No further evaluation.
5. [ ] NO FURTHER COMPLAINTS.  Patient advised to submit another Sick Call Request Slip if problem recurs.

"**S**"ubjective
Chief Complaint: Face to Face completed

"**O**"bjective: MDSC & Ice pack given.

"**A**"ssessment Nursing Diagnosis: _____

"**P**"lan: [ ] Rx GIVEN as per SNP _____
[ ] SCHEDULED FOR SICK CALL WITH:   [ ] MD [ ] RN [ ] NP [ ] DDS
[ ] Psych/Mental Health Specialist
[ ] Other _____
[ ] PATIENT EDUCATION AND ADDITIONAL INFO: _____

SIGNATURE: _____   ID# _____

---

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT        [ ] GBDF/EMDF   [ ] LCDF   [ ] SBDF   [ ] SDCJ   [ ] VDF
MEDICAL SERVICES DIVISION
Sick Call Request          Patient's Name: _____
Page 1 of 1

D.O.B. _____

MARTIN, KEVIN MICHAEL  400130156 (21129360)
Form J212 Rev 12/2008          Booking Number          Date (M/D/Y)

EX. 1-100



ATTN. MEDICAL

**San Diego County**
# SHERIFF'S DEPARTMENT
**INMATE REQUEST** *(PETICION DEL RECLUSO)*



RECEIVED
DEC 17 2022

**SECTION I**   **Complete the following information:** *(Llene la siguiente informacion)*

**Facility:** *(Carcel)*   ☐ SDCJ   ☐ FAC8   ☐ EMRF   ☐ GBDF   ☐ LCDRF   ☐ SBDF   ☒ VDF

**Name:** *(Nombre)*   KEVIN MARTIN

**Booking #:** *(Número)*   21129360   **Date of Birth:** *(Fecha de Nacimiento)*   ████ -84   **Housing Unit:** *(Unidad)*   E-2-

**SECTION II**   **Refer to instructions on the back of this form.**
*Refiere se a las instrucciones al revez de este formulario.*

**I have a Request for the following:**
*(Tengo una petición a lo siguiente):*

I need a Backbrace & cane.
I cannot stand straight up or longer than
30 sec - 1 min without SEVERE pain!!!
Unable to stand to shower or anything
Else! PLEASE HELP!

**Signature:** *(Firma)*   [signature]   **Date and Time:** *(Fecha y hora)*   12-16-22

**SECTION III**   **RESPONSE BY DETENTION FACILITY STAFF ONLY**

**Forwarded to:** _____   **Date:** _____   **Time:** _____

You are scheduled to see the
Doctor.

MN395

**Completed by:** MARTIN, KEVIN MICHAEL  400130156 (21129360)   **Date:** _____

J-21 (REV 01/15) FRONT   **Ex. I-101**



**San Diego County**
**SHERIFF'S DEPARTMENT**
**INMATE REQUEST** *(PETICION DEL RECLUSO)*

---

**SECTION I**    **Complete the following information:** *(Llene la siguiente informacion)*

**Facility:** ☐ SDCJ ☐ FAC8 ☐ EMRF ☐ GBDF ☐ LCDRF ☐ SBDF ☑ VDF
*(Carcel)*

**Name:** KEVIN MARTIN
*(Nombre)*

**Booking #:** 21129360    **Date of Birth:** ███-84    **Housing Unit:** 7-A
*(Número)*           *(Fecha de Nacimiento)*        *(Unidad)*

---

**SECTION II**    **Refer to instructions on the back of this form.**
*Refiere se a las instrucciones al revez de este formulario.*

**I have a Request for the following:**
*(Tengo una petición a lo siguiente):* I slipped in the shower and Hurt my Back, I cannot stand straight up or longer than 30 sec - 1 min. I cannot sit in a chair or it feels like my right leg is ripping out of its socket. The only time its not in EXTREME pain is when Im lying on my Back! Please Help!

**Signature:** Kev M    **Date and Time:** 12-23-22
*(Firma)*            *(Fecha y hora)*

---

**SECTION III**        **RESPONSE BY DETENTION FACILITY STAFF ONLY**

**Forwarded to:** _____ **Date:** _____ **Time:** _____

You were seen about this in clinic. 12/28

**Completed by:** _CK 07W_    **Date:** 1.1.23

MARTIN, KEVIN MICHAEL  400130156 (21129360)

J-21 (REV 01/15) FRONT                    Ex. I-102

I have put in multiple request as well as told
the nurses & have heard no response and no
Dr. or staff. This issue has been going on
for over a month.

## San Diego County
## SHERIFF'S DEPARTMENT
## HEALTH CARE REQUEST

Received By: _____

**Name (Nombre)** Kevin Martin

**Today's Date (Fecha)** 1-16-23

**Date of Birth (Fecha de Nacimiento)** ▪-84

**Booking Number (Numero de Recluso)** 21129360

**Housing Unit (Unidad de Habitacion)** 7.A #9

**Complaint (Queja/Enfermedad)**

Severe lower back pain! (R) foot is numb along the outside half.
I can't stand straight up without unbearable pain. I have lost control
of my bladder a few times. Its a bulging disc or slipped disc
most likely. only time theres any relief is when I'm laying flat
on my back

**Patient Signature (Firma del paciente)** [signature]

**Please do not write below**  **CLINIC USE ONLY**  **Por favor no escriba debajo**

| Face to Face Date | Face to Face Time | Nurse Initial/ARJIS |
|---|---|---|
| | | |

**Notes** Seen in clinic 1/24

| Vital Signs: | Temp | Pulse | Resp | O2 Sat | B/P |
|---|---|---|---|---|---|
| | | | | | |

**Action Taken**
- ☐ Seen for face to face
- ☐ Seen previously for same non-medical request
- ☐ No further complaints. Patient advised to submit another Health Care Request if complaint occurs.
- ☐ See progress notes in TechCare
- ☐ Not seen due to:
  - ☐ Court
  - ☐ Visit
  - ☐ Released
  - ☐ No show/Refused
  - ☐ Other: _____

**Triage**
- ☐ Refer to Provider – Sick Call
- ☐ Refer to Behavioral Health- QMHP Sick Call
- ☐ Refer to Dental
- ☐ Refer to OB/GYN
- ☐ Refer to Counseling
- ☐ Refer to Medical Records
- ☐ Nursing Protocol Initiated
- ☐ Other: _____

| Nurse Initial/ARJIS | Date Completed | Time Completed |
|---|---|---|
| CV 87W | 1 25 23 | 0909 |

**MEDICAL ADMIN USE ONLY**

MARTIN, KEVIN MICHAEL .400130156 (21129360)

Health Care Request Bilingual

# EXHIBIT J



| Date | Invoice # |
|------|-----------|
| 5/11/2022 | 71729 |

1545 Hotel Circle South., Suite 300
San Diego, CA 92108

| Bill To |
|---------|
| Rosen Bien Galvan and Grunfeld
ATTN: Accounts Payable
101 Mission Street, Sixth Floor
San Francisco, CA 94105 |

| Service Location |
|------------------|
| San Diego County Jail
1173 Front Street
San Diego, CA 92101 |

| Job # | Requestor | PO Number | Deaf Client | Client ID # | Terms |
|-------|-----------|-----------|-------------|-------------|-------|
| 27548 | Nathalie █████ | | G ████ | | Net 30 |

| Service Date | Description | Rate | Quantity | Amount |
|--------------|-------------|------|----------|--------|
| 5/2/2022 | Sign Language Interpreting Services Provided For Legal Consultation. Interpreter: Wayne.<br><br>Services From 2:00 PM - 3:00 PM.<br>Legal Weekday Day Rate (2-Hour Minimum Charge Per Interpreter) | 100.00 | 2 | 200.00 |

REMIT TO: 1545 Hotel Circle South., San Diego, CA 92108

** Reference The Invoice Number When Submitting Your Payment. **

Phone: (619) 398-2489 or (619) 535-7631    Fax: (619) 398-2490
Email: billing@dcsofsd.org

deafcommunityservices.org    DCS Tax ID #33-0006089

| Total | $200.00 |
|-------|---------|
| Payments/Credits | $0.00 |
| Balance Due | $200.00 |

Ex. J-105