| | |
|---|---|
| GAY C. GRUNFELD – 121944<br>VAN SWEARINGEN – 259809<br>PRIYAH KAUL – 307956<br>ERIC MONEK ANDERSON – 320934<br>HANNAH M. CHARTOFF – 324529<br>ROSEN BIEN<br>GALVAN & GRUNFELD LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, California 94105-1738<br>Telephone: (415) 433-6830<br>Facsimile: (415) 433-7104<br>ggrunfeld@rbgg.com<br>vswearingen@rbgg.com<br>pkaul@rbgg.com<br>eanderson@rbgg.com<br>hchartoff@rbgg.com | CHRISTOPHER M. YOUNG – 163319<br>ISABELLA NEAL – 328323<br>OLIVER KIEFER – 332830<br>DLA PIPER LLP (US)<br>4365 Executive Drive, Suite 1100<br>San Diego, California 92121-2133<br>Telephone: (858) 677-1400<br>Facsimile: (858) 677-1401<br>christopher.young@dlapiper.com<br>isabella.neal@dlapiper.com<br>oliver.kiefer@dlapiper.com |

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**REPLY DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Date: June 29, 2023<br>Time: 2:00 p.m.<br>Crtrm.: 4A<br><br>Judge: Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

[4299727.2]

Case No. 3:20-cv-00406-AJB-DDL

DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF
MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION

I, Syroun Sanossian, declare:

1. I have been retained by Plaintiffs' counsel to provide expert opinion concerning the adequacy of policies, procedures, and practices regarding disability accommodations at the San Diego County Jail ("Jail"). I make this reply declaration in support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

2. I have reviewed portions of the Opposition to Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification, and documents filed in support thereof, to the extent they relate to the issues on which I offered an opinion in my initial declaration (Dkt. 281-3). A complete listing of the documents I have reviewed for this declaration is attached hereto as **Exhibit A**.

3. This reply declaration focuses on the problems at issue in Plaintiffs' Motions: (1) unsafe housing for people with mobility disabilities at Central Jail, specifically regarding beds, toilets, and showers; and (2) Defendants' failure to provide effective communication for people who use sign language. Defendants comment on other issues under the Americans with Disabilities Act ("ADA") and state disability law unrelated to Plaintiffs' Motions, which are not pertinent here and which I will address at a later time.

I. **CENTRAL JAIL IS UNSAFE FOR PEOPLE WITH MOBILITY DISABILITIES**

4. My initial declaration and report on Central Jail, based on a March 13, 2023 partial inspection of the facility, identified barriers to access for people with disabilities throughout Central Jail. *See* Dkt. 281-3 at ¶¶ 9-13 & Ex. C. Central Jail is the critical facility to remedy because it is where Defendants house all male incarcerated people who use wheelchairs, as well as many other people with mobility disabilities. In brief, I found that the showers in the celled housing units and in the few units of dormitory housing at Central Jail are not compliant with the ADA, place incarcerated people at risk of falling at the entry point, and are too small

for wheelchair use. I also found that the cells designated as "accessible" for people with mobility disabilities lack a required 60-inch turning space in the center of the room and transfer space at the beds, lack sufficient space for a person to transfer safely to the toilet, and the toilets have no grab bars. These cells often include triple bunks that are extremely dangerous for people with mobility disabilities. In the dormitory where the Sheriff's Department clusters people with mobility disabilities, the only beds I observed on the bottom floor were again triple bunks.

5. By policy, the Sheriff's Department houses people with mobility disabilities on either the lower or middle bunk, even though neither is level with a wheelchair seat. The difference in surface height makes transfer to the bunk very dangerous for the many people who use wheelchairs with limited upper body strength and poor torso control.

6. Defendants' accessibility expert, Paul Joelson, does not appear to meaningfully contest any of these conclusions in his declaration. Mr. Joelson's declaration refers to a December 16, 2022 certified access specialist (CASp) report detailing Central Jail access barriers, *see* ¶ 18o, but he attached no such report and I understand the report has not been provided to Plaintiffs or the Court. Curiously, Mr. Joelson's declaration spends very little time discussing barriers at Central Jail and spends much more time on Rock Mountain, even though Central Jail is the facility currently housing people with disabilities and is therefore the most urgent priority. Below, I address Mr. Joelson's responses (or lack thereof) to my key findings about the dangerous showering, toileting, and sleeping facilities at Central.[1] *See* Joelson Decl. at 26, ¶¶ 1-5.

7. **Showers.** In my initial declaration, I described that the showers at Central Jail (1) have trip hazards at entry thresholds or steep ramps at entry; (2) are

---

[1] Confusingly, Mr. Joelson's declaration restarts paragraph numbers multiple times throughout the document. As such, for clarity, I refer to the page number and the paragraph number to disambiguate the various paragraphs with the same number.

too small; (3) are in deep alcoves that make turning to face the shower impossible; (4) lack fixed fold-down shower seats for people with mobility disabilities to use; and (5) lack accessible controls. Sanossian Decl. ¶ 10 & Ex. C at 265-268.

8. Mr. Joelson's declaration acknowledges that the showers at Central Jail have the incorrect dimensions. *See* Joelson Decl. at 27, ¶ 2. Mr. Joelson does not respond to my other critiques of the showers, except to claim that fixed shower seats cannot be installed due to anti-ligature standards. However, fixed shower seats with anti-ligature protections are readily available—and the Sheriff's Department has installed such seats at Rock Mountain.

9. Scott Bennett – the Sheriff's Department's facilities manager, who is not a CASp, architect, or engineer – also submitted a declaration about my findings. Dkt. 312 ("Bennett Decl."). Mr. Bennett appears to claim that a portable shower chair with wheels is an acceptable replacement for a fixed shower seat. *See id.* at ¶ 8 & Ex. G. This is wrong and dangerous because transferring to a portable chair with wheels in the wet conditions of a shower, as shown in Mr. Bennett's photo, presents multiple safety risks. Non-fixed seats pose a safety risk during transfer under any conditions, but wheels mean the seat is intended to move, which is especially problematic on a wet floor.

10. As I explained in my declaration and report, the Sheriff's Department must construct accessible showers at Central Jail. In the short term, the Sheriff's Department can install temporary accessible showers. Mr. Joelson's declaration claims that staff are "investigating" this solution, but provides no timeline or guarantee of implementation. *See* Joelson Decl. at 27, ¶ 2.

11. **Toilets**. In my initial declaration and report, I described how the toilets in the designated as accessible cells at Central Jail were designed and constructed with no maneuvering clearance to position a wheelchair at the toilet to allow safe transfer and no grab bars, which places incarcerated people at risk of falling when trying to use the toilet. Sanossian Decl. ¶ 10 & Ex. C. at 260-264. My report also

details how the toilets in the dorms were not designed and constructed to comply. Sanossian Decl., Ex. C at 269. Mr. Joelson concedes that the cells are "too small" and does not contest my findings about the lack of grab bars in these cells. Joelson Decl. at 27, ¶¶ 1, 4. As to the grab bars provided in the dorms, they violate ADA Standard 609 by unnecessarily blocking 25% of the grip for the grab bar.

12. Mr. Joelson claims that people with mobility disabilities in cells "have been assigned to dormitories instead." *Id.* at 27, ¶ 4. Mr. Joelson provides no documentation to support this vague claim. Nor, to my understanding, have Defendants provided any updated roster showing that all people in wheelchairs are housed in dormitories. The March 2023 roster I reviewed for my first declaration showed at least 48 people with mobility disabilities in celled housing units. In my experience in the jail and prison setting, incarcerated people have housing restrictions for reasons of classification, security level, medical needs, or other factors, as Mr. Joelson acknowledges. *See id.* at 27, ¶ 1. For example, a person in protective custody cannot be housed in a general population housing unit. Indeed, declarations of incarcerated people at the Jail, such as those from Victor Medrano and Nierobi Kuykendall, indicate that the Sheriff's Department continues to house people with mobility disabilities in celled housing.

13. **Beds**. In my initial declaration, I noted that the Sheriff's Department houses people with mobility disabilities throughout its facility—in both dorms and cells—in triple bunks. Transferring from a wheelchair into either the low bunk or the middle bunk in a triple bunk is dangerous because neither is at wheelchair seat height. I also found that the cells designated as accessible for people with mobility disabilities lack sufficient transfer space for a person in a wheelchair to rest adjacent to the bed or toilet to transfer safely. Sanossian Decl. & Ex. C at 258-260.

14. Mr. Joelson does not contest these findings. In response, Mr. Joelson asserts that the Sheriff's Department has added five single bunks to a single dormitory. Joelson Decl. at 27, ¶ 3. This is a small step in the right direction after

years of the Sheriff's Department knowing that it needed to remove the triple bunks. I emphasize the word "small," as a document attached to Mr. Bennett's declaration indicates that there are 76 triple bunks throughout Central Jail. Bennett Decl., Ex. C. Adding five single beds does not assuage my concerns that people with mobility disabilities are housed in dangerous triple bunks, including the top bunk. The photos attached as Exhibit E to Mr. Bennett's declaration show the single beds installed aligned in the same narrow rows as the triple bunks, which blocks required parallel approach. When a person using a wheelchair approaches a bed, they align parallel with the bed to safely transfer. These single beds were installed with what appears to be a minimal clear space between beds, as confirmed in the drawings Mr. Bennett attaches as Exhibit I. A 60-inch turning radius is required, but not provided.

15. For some unspecified barriers, Mr. Joelson concedes that barriers exist but claims that the work is not "technically feasible" because work is "disruptive, costly" and is not guaranteed to be done correctly. *See* Joelson Decl. ¶ 17. It is concerning that the Sheriff's Department appears reluctant to undertake more significant work because it does not have confidence in its contractors. The 2010 ADA Standards require the Sheriff's Department to bring Central Jail into compliance, and that includes moving walls if necessary. This is a commonplace alteration. Mr. Joelson's description of technical infeasibility is also wrong because cost is not a factor in that analysis.[2]

16. Mr. Joelson does not appear to have read any of the declarations from incarcerated people submitted with or described in Plaintiffs' Motions, which show that the current conditions at Central Jail are dangerous for people with mobility disabilities. In his declaration, Victor Medrano describes being unable to transfer

---

[2] The Americans with Disabilities Act; Title II Technical Assistance Manual Covering State and Local Government Programs and Services; II-6.3100 General principles 4) Exemption from application of standards in alterations (§4.1.6(1)(j)).

from his wheelchair safely to the low bed and expresses fear that he will fall again, as has happened in the past. Dr. Montgomery declares that when Mr. Medrano was escorted in a wheelchair back to his cell, the deputy "instructed [Mr. Medrano] to grab on to the desk and wheelchair in order to transfer to the bed." This statement is appalling, as it assumes that Mr. Medrano, a person with a disability, can somehow launch himself into his bed from afar.

## II. DEFENDANTS INCLUDE NO CONCRETE PLANS TO ADDRESS THE UNSAFE ELEMENTS AT CENTRAL JAIL

17. In my declaration and report, I described the need to remediate the barriers at Central Jail. Very generally, Mr. Joelson claims that his reports "are being incorporated among other resources to develop a scope of work for the future rehabilitation of building systems, in general, and removal of architectural barriers specifically." Joelson Decl. at ¶ 18o. That sentence says almost nothing. Mr. Joelson offers no timeline for when the Sheriff's Department might develop the scope of work, let alone when that work might be funded or completed, or what it might entail.

18. Mr. Bennett's declaration attaches various plans that largely lack set timelines, fail to propose remedies to many of the barriers identified herein, and remain, with few exceptions, unfunded. For example, Mr. Bennett attaches a September 16, 2022 architectural plan for a single floor (the eighth floor) at Central Jail, which was not provided to Plaintiffs or to me prior to our Central Jail inspection. Mr. Bennett refers to new plans for the eighth floor submitted on May 14, 2023, after I submitted my initial declaration and report and Plaintiffs filed the Motions. *See* Bennett Decl. ¶ 7 & Exs. A & B. Mr. Bennett's declaration also attaches a Central Jail "modernization plan" dated October 24, 2022, which was not provided to Plaintiffs or to me prior to our Central Jail inspection. Mr. Bennett concedes that the changes are awaiting funding. *See* Bennett Decl. ¶ 8 & Ex. C. That unfunded plan lists 60 separate tasks, two of which are accessibility-related.

19. The May 14, 2023 plan actually indicates that the Sheriff's Department intends to *replace* double bunks with triple bunks. See Bennett Decl., Ex. B at 17 ("Remove 3 double(2) bunks and replace with 3 triple(3) bunks"), 19 ("Remove 3 double bunks and replace with 3 triple bunks"). None of the plans attached to Mr. Bennett's declaration refer to remediating the inaccessible toilets in cells, even though my declaration pointed out short-term solutions such as adding portable wheelchair-accessible toilets in the dayrooms. See Sanossian Decl. ¶ 13. In the long term, the Sheriff's Department must alter the cells to provide the required maneuvering clearance. Adding grab bars to cells that Mr. Joelson admits are too small does not present a significant improvement in accessibility, and is a poor use of public funds.

20. Mr. Bennett's declaration is also internally inconsistent. Mr. Bennett claims in his declaration that direction to remove triple bunks came in February 2022. Bennett Decl. ¶ 7. Elsewhere, Mr. Bennett claims that another, apparently-unfulfilled plan to remove triple bunks "was first drafted in approximately 2018." *Id.* ¶ 11. Either way, the Sheriff's Department did not even bring in five temporary single bunks to one dorm until May 11, 2023, after my initial declaration and report. As described above, those beds appear to be bolted down so close together that they do not allow for an accessible route to the bed or a parallel approach for transfer onto the bed. Sixty inches are required between beds in an alcove or space defined by three sides, as here. It is also unclear what the bed surface height is for the new "single ADA beds." As I have previously explained, bed height is key for safe transfer into a bed.

21. Exhibit D and Exhibit H are drawings and a brief description of alterations planned for the showers at Central Jail. However, the rudimentary drawings in Exhibit D show the changes will not remedy the deficiencies, as nothing is being altered to remove the trip hazard at the entrance, or the saloon door which is not accessible. Mr. Bennett proposes to "rework[] all existing module showers to

comply with current code of 36" x 36" appropriate shower seat and grab bar height (planned but unfunded)." *Id.* at Ex. H.  These small showers that Mr. Bennett proposes are prohibited from use in jails under California Building Code because they are considered standing showers for those who have mobility disabilities but do not use wheelchairs.  Also, the small footprint is not adequate for most people who use mobility assist devices because the maneuvering clearance is not adequate and these showers have controls installed on the opposite wall from the shower seat outside of accessible reach range, rather than at the side of the seat on the back wall.

22.  Mr. Bennett is the person responsible for implementing the (incomplete and unfunded) plans to address ADA compliance, but he also has been involved with Central Jail since before it was built and is doing much of the work without permits.  He has been the facilities point person for an inaccessible facility for decades, which leaves me little confidence that he can now carry out alterations that comply.

### III. ROCK MOUNTAIN IS NOT A SOLUTION

23.  In my initial declaration, I described my February 10, 2023 inspection of Rock Mountain Detention Facility, which is undergoing rehabilitation.  *See* Sanossian Decl. ¶¶ 6-8 & Ex. B.  I found, among other things, that Rock Mountain lacked many ADA features and that the ADA features that had been installed were often installed incorrectly.  *Id.* at ¶ 7.

24.  As an introductory matter, the Sheriff's Department's plan for housing people with mobility disabilities at Rock Mountain is unclear.  In May 2022, in response to my prior declaration, Mr. Bennett—the person apparently in charge of facilities throughout the system—claimed that "[t]he goal is to house all wheelchair users at Rock Mountain once the facility opens."  Dkt. 153-3, ¶ 7.  Mr. Bennett included no documentation supporting that claim.  Another Sheriff's Department official declared that Rock Mountain would house "all types of physically disabled inmates" and open by the end of 2022.  Dkt. 153-8 ¶¶ 9-10.  Now, Mr. Bennett is

declaring that Rock Mountain will only partially be open in July 2023 and incarcerated people with mobility disabilities will *not* be housed at Rock Mountain "until appropriate sworn and medical staffing becomes available," with no timeline for when that might occur. Bennett Decl. ¶¶ 24, 26. The shifting story about where the Sheriff's Department will house people with mobility disabilities leaves me with little confidence the Sheriff's Department has analyzed its population of people with mobility disabilities and assessed the types and numbers of accessible beds that are required throughout its system.

25. In his declaration, Mr. Joelson states that he inspected Rock Mountain four times and authored a report on the facility on February 3, 2023. Joelson Decl. ¶¶ 18i, 18j. The Sheriff's Department did not provide that report to Plaintiffs, me, or the Court. Regardless, Mr. Joelson's declaration indicates that he agrees that many barriers identified at Rock Mountain exist, including that alterations are required at intake, in holding cells, and showers. *See, e.g.*, *id.* at ¶¶ 20, 24a, 24k, 24q-r, 24t. I disagree with many of Mr. Joelson's other conclusions, but do not list them here as we agree on the essence of the matter: Rock Mountain requires significant alterations to comply with the ADA and state disability law.

26. Mr. Bennett's declaration attaches purported Rock Mountain plans dated July 2022 and September 2022 that contain markups for planned alterations, neither of which was provided to Plaintiffs or to me before my inspection. *See* Bennett Decl., Exs. L, M. That is unfortunate, as I could have used these plans to identify additional areas to inspect. These documents also raise concerns, as they are a confusing mishmash of plans and drawings. For example, one comment simply says "redo grab bars," which provides far too little information to accomplish any grab bar changes that actually comply.

IV. **THE SHERIFF'S DEPARTMENT LACKS ADEQUATE POLICIES AND PRACTICES FOR EFFECTIVE COMMUNICATION**

27. In my initial declaration, I described the requirement under the ADA to

provide effective communication for people with hearing disabilities—specifically people who use sign language. Sanossian Decl. ¶¶ 21-36. In his declaration, Defendants' expert Julian Martinez claims that the Sheriff's Department is revising its policies consistent with the Orange County policy I cited in my declaration. *See* Sanossian Decl. ¶¶ 33, 36. However, the proposed revisions to M.39 do not resolve the Sheriff's Department's failures. As I stated in my first declaration in this case, Dkt. 119-9 at ¶¶ 17-18, the Sheriff's Department is using a hodgepodge of definitions, some from the ADA and some from an unknown source. These definitions must comply with California law, including Government Code 12926. Other issues I observed on initial review are the improper use of the medical necessity standard, a statement that temporary disabilities do not need to be accommodated, and a statement that suggests that effective communication and sign language interpretation are only needed for due process encounters. There may well be other areas that require further revision.

28. Revising policy is only one step to ensuring that the people in the Jail who actually need sign language interpretation receive it. The Sheriff's Department must train staff on the policy, track when sign language is provided, and hold staff accountable when they fall short. *See* Sanossian Decl. ¶ 33. The Sheriff's Department already has a policy about sign language interpretation, P.11, but has failed to provide such sign language to the deaf incarcerated people in its care. Mr. Martinez's declaration is unable to point to any examples of the Sheriff's Department providing a qualified sign language interpreter for a medical appointment or a due process hearing in any of the Jail's six facilities. *See* Martinez Decl. ¶ 29.

29. As I explained in my first declaration, if a person uses sign language, communicating through written notes is not an effective way to determine a person's primary method of communication. *See* Sanossian Decl. ¶ 24. I wrote in my first declaration about Cristian Esquivel, a deaf person incarcerated at the Jail for whom

the Sheriff's Department failed to provide sign language interpretation before pulling his tooth. *See id.* at ¶ 31. Defendants' chief medical officer declared, after reviewing some of Mr. Esquivel's medical records, that Mr. Esquivel has "used writing" in a "rudimentary" way. *See* Dkt. 311-5 ¶ 3. That official does not represent that he has ever evaluated Mr. Esquivel himself or that he is qualified to assess Mr. Esquivel's communication. Regardless, my point stands: communicating via written notes with a person who uses ASL and has limited literacy skills is not an appropriate method to determine that person's method of communication. In fact, the exhibits to the official's declaration show that other incarcerated people wrote requests for Mr. Esquivel, as the handwriting on the requests varies, and one explicitly states so. *See id.*, Ex. A at Esquivel 31. Under the ADA, staff are required to give primary consideration to the choice of aid or service requested by the person who has the communication disability[3] – not simply use the most convenient method for staff.

30.     Defendants' opposition also confuses methods of communication for people who are deaf. As I explained in my first declaration, video remote interpretation ("VRI") is an available option to provide sign language interpretation via a remote interpreter, in certain circumstances. Defendants' opposition refers to TDD/TTY devices. Such devices are not used for in-Jail communication; they are (a largely outdated) method for a deaf person to speak with someone outside the Jail. Similarly, video relay services ("VRS") are also a method for a deaf person to speak, via remote interpreter, with a person *outside* the Jail. VRS is provided free by the Federal Communications Commission and cannot be used for in-person communication. Neither VRS nor TTY can provide effective communication for due process or medical encounters *within* the Jail.

---

[3] US Department of Justice Civil Rights Division, ADA Requirements: Effective Communication; Who Decides Which Aid or Service is Needed?

31. Regardless, Defendants' vague plan for future changes appears to rely solely on "mobile ASL services." *See* Dkt. 311 at 4. However, these mobile services are dependent on consistent access to the Internet and adequate bandwidth to ensure a constant stream of communication, which I understand is not currently the case in the vast majority of Jail facilities. One way the Sheriff's Department could ensure access to sign language interpretation is by hiring a staff sign language interpreter or an adequate number of interpreters to suit the needs of the incarcerated individuals being housed. This would remove scheduling challenges and other complications that using a service presents.

## V. THE SHERIFF'S DEPARTMENT'S POLICIES FOR HOUSING PEOPLE WITH MOBILITY DISABILITIES REMAIN DEFICIENT

32. In my initial declaration, I described how rosters of people with mobility disabilities at Central Jail and declarations showed that people with mobility disabilities are housed on top and middle bunks. *See* Sanossian Decl. ¶ 15 & Ex. C at 259. I described how deficiencies in the Sheriff's Department's policies may be contributing to people with mobility disabilities being placed in unsafe bunks. *Id.* at ¶¶ 16-18 & Ex. C at 259.

33. Mr. Martinez's declaration attempts to address the policies, but he does not appear to have reviewed the rosters showing the outcomes at the Jail or declarations of incarcerated people with mobility disabilities describing being housed in top bunks and the harm resulting therefrom. *See* Martinez Decl. ¶ 7. Instead, Mr. Martinez reached his conclusions about practices at the Jail based on a single "demonstration of the housing assignment process" occurring after my initial declaration. *See id.* ¶ 24. Regarding the policies, Mr. Martinez does not respond to my point that is inappropriate for a middle bunk to qualify as a lower bunk, as the Sheriff's Department's policies state. Nor does Mr. Martinez dispute that the Sheriff's Department's policies repeatedly use "recommend" language to refer to a

medical evaluator's determination whether a person should be housed on a low bunk or lower floor.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Palo Alto, California this 26th day of May, 2023.

_____
Syroun Sanossian

# Exhibit A

# INDEX OF DOCUMENTS
# REVIEWED BY SYROUN SANOSSIAN
# REPLY DECLARATION

| NO. | DOCUMENT NAME |
|---|---|
| 1. | Excerpts from County of San Diego's Opposition (Dkt. 311) |
| 2. | Declaration of Paul Joelson (Dkt. 311-18) |
| 3. | Declaration of Julian Martinez (Dkt. 311-20) |
| 4. | Declaration of Darren Scott Bennett (Dkt. 312) |
| 5. | Excerpts from 30(b)(6) Deposition of Darren Scott Bennett (April 20, 2023) |
| 6. | Declaration of Dr. Montgomery re: Declarations of C. Esquivel (Dkt. 311-5) |
| 7. | Declaration of Dr. Montgomery re: Declaration of V. Medrano (Dkt. 311-12) |
| 8. | Exhibit F to the Declaration of Commander Christina Bavencoff (Dkt. 311-16) |
| 9. | Reply Declaration of Cristian Esquivel in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification |
| 10. | Declaration of Francisco Rios in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification |
| 11. | Reply Declaration of James Clark in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification |
| 13. | Reply Declaration of Randall Rosier in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification |
| 14. | Reply Declaration of Victor Medrano in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification |
| 15. | Reply Declaration of Nierobi Kuykendall in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification |
| 16. | Declaration of Sean Montgomery in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification |