GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF JENNIFER ALONSO IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Hearing: June 29, 2023<br>Time: 2:00 p.m.<br>Courtroom: 4A<br><br>Judge: Hon. Anthony J. Battaglia |

I, Jennifer Alonso, LCSW, hereby declare as follows:

1. I am a Licensed Clinical Social Worker and a resident of San Diego County, California. I spent three years (April 2019-April 2022) working as a mental health clinician at the San Diego County Jail (the "Jail").

2. The statements made in this declaration are made of my own personal knowledge. If called as a witness, I could and would testify competently to the facts set forth in this declaration. I make this declaration in Support of Plaintiffs' Motions for Preliminary Injunction and Provisional Class Certification.

3. In my previous declaration in this case [Dkt. No. 119-11], I describe my observations as to several dangerous and harmful practices that my patients at the San Diego County Jail (the "Jail") have faced, including: the common practice of custody staff overruling mental health clinicians about the placement of patients in dangerous solitary confinement-type housing; blanket exclusions from mental health housing for some patients despite their need; the custody-driven use of harsh suicide observation cells; the failure to provide adequate mental health treatment, including due to the lack of clinically necessary confidentiality; and custody failures to conduct safety checks to ensure the well-being of detainees.

4. I have been asked to provide observations about my experiences with patients in the Jail who have hearing-related disabilities.

5. Based on my experience, I have found that people who have both serious mental health needs and hearing-related disabilities are denied adequate treatment at the Jail – both in all the general ways that I have described in my previous declaration and in ways specific to their hearing-related disability needs. The consequent harms and risks of harm to these patients are severe.

I. **My Professional Background**

6. I have dedicated my professional career to providing clinical care to patients with mental illness.

7. I became a Licensed Master Social Worker ("LMSW") in 2007 for the

States of Illinois and New York. I was licensed as a Licensed Clinical Social Worker ("LCSW") for the State of California in 2014.

8. I have worked as a social worker and mental health clinician since 2008, in positions treating patients in the community, in inpatient psychiatric facilities, and in the jail setting.

9. From January 2016 to April 2019, prior to working as a Jail clinician for the San Diego County Sheriff's Department, I was a social worker at the California Department of State Hospitals facility in Atascadero. There, I worked directly with a highly complex forensic patient population. In this position, I completed clinical assessments and participated in multidisciplinary clinical meetings to develop individualized treatment plans, behavioral plans, and discharge plans for my patients. I provided individual therapy and led psychotherapeutic groups and sex offender treatment (Cognitive Behavioral Interventions) programming.

10. Starting in April 2019, I was hired by the San Diego Sheriff's Department as a full-time Detentions Licensed Mental Health Clinician working at the Jail. The Sheriff's Department hired me primarily to develop and provide care in the Jail's Outpatient Step Down ("OPSD") unit. Many patients in OPSD experience hallucinations, delusions, and other symptoms of mental illness. My job responsibilities included: (a) Performing mental health screenings; (b) Responding to psychiatric crises within the facility; (c) Clinically evaluating and assessing patients' psychiatric condition during wellness checks, clinical encounters and suicide assessments; and (d) Developing and implementing the Jail system's OPSD Unit, which houses people with chronic mental illness who are unable to house safely with higher functioning people in Jail custody.

11. After observing my patients decompensate, suffer in what can only be described as filthy, inhumane conditions, and in some cases, die by suicide, I voluntarily left the San Diego Sheriff's Department on April 23, 2022. My patients

were subjected to terrible conditions and put at risk of great harm every day, and I felt powerless to give them the care they need and deserve.

12. I am presently employed at Sharp Hospital (Mesa Vista), providing clinical services to patients receiving psychiatric and substance use treatment in an inpatient setting. I also work on a part-time basis for The Counseling Team International, providing individual counseling services to public employees.

## II. Jail Mental Health Staff Receive No Training or Guidance as to Accommodating Patients with Hearing-Related Disabilities during Mental Health Contacts.

13. In my time working at as a mental health clinician at the Jail, I received no training or guidance as to whether or how to accommodate my patients with hearing-related disabilities. We as mental health clinicians were left to navigate such situations on our own.

14. I also never received any training on how mental health staff should identify or check for a patient's effective communication needs. While the electronic health record system prompted us to check certain boxes regarding hearing issues, those boxes were confusing, with multiple, vague, and overlapping options like "Impairment," "Hard of Hearing," "Deaf," and "Quiet." Without training, we as staff members were inconsistent in how we filled out this portion of the patient's health record. There was nothing in the electronic health record system that prompted us to accommodate these disabilities.

15. While I recall there being some information regarding a language-line that could be used for communicating with incarcerated individuals who spoke languages other than English, I was never provided information about when and how to obtain a Sign Language Interpreter for patients who were hearing impaired and used Sign Language to communicate.

16. The only times I ever recall seeing a Sign Language Interpreter used for communications with patients at the Jail was when an agency or person from outside the Sheriff's Department was involved, such as Public Defender attorneys or

psychological evaluators conducting court-ordered competency evaluations. I always considered it strange and troubling that while those individuals utilized a Sign Language Interpreter to communicate with my patients, my clinician colleagues and I were never able to do so.

### III. Without Training or Guidance on Accommodating Patients with Hearing-Related Disabilities, Mental Health Staff Could Not Provide Adequate Care to Our Patients.

17. I served as a clinician for multiple patients at the Jail with hearing-related disabilities, some of whom communicated effectively only through Sign Language. Despite my best efforts, I was not able to provide adequate care or necessary clinical interventions with these patients.

18. I took several steps on my own to try to meet the needs of my mental health patients with hearing-related disabilities. I spoke with other clinicians at the Jail about whether and how we could get a certified Sign Language Interpreter. I was told again and again that requests to obtain a qualified Sign Language Interpreter never went anywhere. One colleague told me: "That just doesn't happen here."

19. Staff in the Psychiatric Services Unit, where many of the most acute patients are housed, told me that they could not get Sign Language interpretation for patients, or often even Spanish language interpreters, forcing them to find Jail administrative staff to help with Spanish translation. I also regularly had to rely on deputies to assist with Spanish translation in the housing units where I saw patients, including because there was no way to access or use the language line during a cell-front clinical contact (which is where nearly all my clinical contacts occurred because the Jail did not provide me an alternative space to see my patients outside of their cell). We knew that relying on uncertified custody and administrative staff was not sufficient, but it was the best we could do to serve our patients.

### IV. My Patients at the Jail Who Communicate Through Sign Language Would Get Extremely Inadequate Care Due in Part to the Denial of Appropriate Sign Language Interpretation.

20. While a treating clinician at the Jail, I had multiple patients on my

caseload who are Deaf and, I eventually learned, use Sign Language to communicate. My ability to provide care to them was greatly hindered by not only the general deficiencies in the Jail's mental health system (which I describe in my previous declaration), but also by the lack of qualified Sign Language Interpretation services for us. Without being able to effectively communicate with these patients, it was impossible to do a complete or adequate assessment of their mental health condition and needs.

21.  Because nearly all of my clinical contacts with my patients at the Jail were at cell-front, my first challenge was getting a Deaf patient's attention from my position outside the cell door. I would often kick the door to create a vibration that might get the attention of my patient inside the cell. This was not always successful, causing some of my clinical contacts with Deaf patients to end before they even began.

22.  In some cases, I tried to communicate with hearing impaired patients through written notes. I would write short notes like "How are you feeling?" and hold them up to the cell window. My patients did not consistently have paper to write back to me, and would usually just make a basic hand-gesture, like a "thumbs up" or "thumbs down."

23.  Some patients do not read or write well, making written notes a further ineffective method for us to communicate. I found that written notes were, in nearly all cases, an inferior and insufficient way to have a meaningful clinical exchange, and for me to understand what was going on in my patient's mind.

24.  At times, I would try to speak slowly hoping that my patient could read my lips through the cell window or foot port. In such cases, I could never be sure whether they understood what I was saying, and their responses were again almost always limited to general hand gestures, like a "thumbs up" or "thumbs down." I found that lip reading was, in nearly all cases, an inferior and insufficient way to have a meaningful clinical exchange, and for me to understand what was going on in

my patient's mind.

25. I had patients, including some with very serious mental health symptoms and needs, who I knew could communicate effectively through Sign Language. One way I knew this was through my communications with their family members or court-appointed clinicians who used Sign Language for their competency evaluations.

26. On a handful of occasions, I relied on a Jail deputy I knew who had learned some Sign Language from a girlfriend whose brother was Deaf. I would ask him to help me communicate with my Deaf patients through the cell window. I knew that this was not a full or real solution, but I was desperate for a way to help my patients. This deputy was not a certified Sign Language Interpreter and had limited signing skills. Still, the deputy and I would see how my patients would light up and engage more when there was *someone* who could communicate with them, even a little, through Sign Language. This deputy is no longer working at the Jail.

27. These experiences made me wish that I could obtain qualified Sign Language Interpreters for my clinical contacts with patients who preferred to communicate that way. I knew that, without Sign Language Interpretation, I could not fully assess whether my patient was suicidal, in distress, or at risk of decompensation, and I could not provide the kind of treatment interventions that were needed.

**V.    The County's Reported Plan to Use iPads with Sign Language Interpretation Capability Will Not Address the Problems I Observed in Caring for My Patients.**

28. I am informed the County reports that this month, it used an iPad once to provide American Sign Language (ASL) translation services at intake at Central Jail, and hopes to make the technology available in other facilities at some time in the future. These reported developments and plans unfortunately will *not* address the problems I faced as a clinician at the Jail in providing effective communication and

adequate care to my patients who need Sign Language Interpretation.

29. First, I understand the County reports that its first "successful use of the new iPad device" for ASL, on May 12, 2023, was for the classification and booking process. [Bavencoff Decl., Dkt. No. 311-16, at 8.] These are *custody*-related intake processes, and are entirely separate from mental health screening, evaluation and treatment. Unless and until Sign Language Interpretation is provided in our *clinical* contacts with patients, staff will continue to struggle to provide adequate mental health care to this patient population.

30. Second, as I have described in this and my prior declaration, clinical contacts are almost always conducted at cell-front – that is, through a small window on the cell door or through a small food port opening. This is due to lack of available space, custody and clinical staff shortages, and frequent custody staff refusals to move patients from their cells to a confidential setting even when clinical staff specifically request it. Even if the iPads are someday able to function in the Jail housing units, mental health staff will not be able to use them effectively for cell-front clinical encounters. The idea of mental health clinicians like me having to hold an iPad with a Sign Language Interpreter on it up to the small cell window, while also reviewing and taking clinical notes, is simply not feasible.

31. Based on my experience working at the Jail, in order to provide adequate care to patients who use Sign Language to communicate, Sign Language interpretation must be made available for all substantive clinical contacts in an out-of-cell, confidential setting.

32. In my current position providing clinical services in a community mental health facility, it is unthinkable that we would not take steps to accommodate patients with disability-related communication needs, including the provision of Sign Language Interpretation in an appropriate setting for treatment delivery. The same principle should absolutely apply to patients with mental health treatment

needs at the San Diego County Jail.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on May 23, 2023 at San Diego, California.

By: _____
Jennifer Alonso, LCSW