1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  PRIYAH KAUL – 307956
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   ROSEN BIEN
4  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
5  San Francisco, California 94105-1738
   Telephone: (415) 433-6830
6  Facsimile: (415) 433-7104
   ggrunfeld@rbgg.com
7  vswearingen@rbgg.com
   pkaul@rbgg.com
8  eanderson@rbgg.com
   hchartoff@rbgg.com
9
   AARON J. FISCHER – 247391
10 LAW OFFICE OF
   AARON J. FISCHER
11 1400 Shattuck Square Suite 12 - #344
   Berkeley, California 94709
12 Telephone: (510) 806-7366
   Facsimile: (510) 694-6314
13 ajf@aaronfischerlaw.com

14 Attorneys for Plaintiffs and the
   Certified Subclass

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

15

16              UNITED STATES DISTRICT COURT

17             SOUTHERN DISTRICT OF CALIFORNIA

18 DARRYL DUNSMORE, ANDREE
   ANDRADE, ERNEST ARCHULETA,
19 JAMES CLARK, ANTHONY EDWARDS,
   LISA LANDERS, REANNA LEVY,
20 JOSUE LOPEZ, CHRISTOPHER
   NELSON, CHRISTOPHER NORWOOD,
21 JESSE OLIVARES, GUSTAVO
   SEPULVEDA, MICHAEL TAYLOR, and
22 LAURA ZOERNER, on behalf of
   themselves and all others similarly situated,
23
                 Plaintiffs,
24
        v.
25 SAN DIEGO COUNTY SHERIFF'S
   DEPARTMENT, COUNTY OF SAN
26 DIEGO, SAN DIEGO COUNTY
   PROBATION DEPARTMENT, and DOES
27 1 to 20, inclusive,
                 Defendants.
28

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF CIRB DOCUMENTS [RFP NO. 81]**

Mag. Judge: Hon. David D. Leshner

**NO HEARING DATE PER DKT. 404**

[4369065.2]

I, Van Swearingen, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Motion to Compel Production of CIRB Documents.

2.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the San Diego County Sheriff's Department Policy and Procedure Manual, which is available on the Sheriff's Department's website.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the San Diego County Sheriff's Department's publication "Progress Report: Update on State Jail Audit," published January 25, 2023 to the Sheriff's Department's website.

4.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the testimony of Michael Baranic, Sheriff's Legal Adviser, in the case *Morton, et al. v. County of San Diego, et al.*, No. 21-cv-01428-MMA-DDL (S.D. Cal.).  The transcript is published at Dkt. 79.

5.      Attached hereto as **Exhibit D** is a true and correct copy of excerpts from Plaintiffs' Third Set of Requests for Production.

6.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts from Defendants' Responses to Plaintiffs' Third Set of Requests for Production, served August 14, 2023.

7.      After Defendants served their written responses to Plaintiffs' Third Set of Requests for Production, Plaintiffs initiated meet and confer discussions about Defendants' responses, including to Request No. 81.  The first call occurred on August 21, 2023 and Defendants stated they would provide a privilege log for the documents withheld in response to Request No. 81.  Attached hereto as **Exhibit F** is a true and correct copy of an August 29, 2023 email from Defendants' counsel after that call confirming, with regard to RFP No. 81, "I did tell you we would be

1  providing a privilege log. I am informed by my colleagues Priyah Kaul and Hannah

2  Chartoff that on a subsequent September 22, 2023 meet and confer call, Defendants'

3  counsel again stated that they would provide a privilege log for the withheld CIRB

4  documents. To date, Defendants have not served any privilege log identifying the

5  withheld CIRB documents or the bases for withholding.

6      8.    Attached hereto as **Exhibit G** is a true and correct copy of excerpts

7  from the California State Auditor's February 3, 2022 report, titled "San Diego

8  County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to

9  the Deaths of Individuals in Its Custody," and excerpts from the Sheriff's

10 Department's response thereto.

11     9.    Attached hereto as **Exhibit H** is Judge David D. Leshner's August 30,

12 2023 order in *Serna, et al. v. County of San Diego*, Case No. 20-cv-2096-LAB-DDL

13 (S.D. Cal.) compelling production of CIRB documents. Judge Leshner's order is

14 published at Dkt. 220.

15     10.   Attached hereto as **Exhibit I** is Judge Larry A. Burns's September 20,

16 2023 order in *Serna, et al. v. County of San Diego*, Case No. 20-cv-2096-LAB-DDL

17 (S.D. Cal.) denying the County of San Diego's *ex parte* motion to stay the order

18 attached hereto as Exhibit H. Judge Burns's order is published at Dkt. 236.

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

11.    Attached hereto as **Exhibit J** is a true and correct copy of excerpts from the transcript of a February 8, 2023 hearing before Judge Jinsook Ohta in *Greer v. County of San Diego, et al.*, Case No. 19-cv-00378-JO-DEB (S.D. Cal.).  The transcript is published at Dkt. 341.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 9th day of October, 2023.

*/s/ Van Swearingen*
Van Swearingen

# TABLE OF CONTENTS

EXHIBITS TO THE DECLARATION OF VAN SWEARINGEN IN SUPPORT
OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF CIRB
DOCUMENTS [RFP NO. 81]

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| A | Excerpts from the San Diego County Sheriff's Department Policy and Procedure Manual | 1 |
| B | San Diego County Sheriff's Department, "Progress Report: Update on State Jail Audit" (January 25, 2023) | 8 |
| C | Excerpts from the Transcript of the Testimony of Michael Baranic in *Morton et al. v. County of San Diego, et al.,* No. 21-cv-01428-MMA-DDL (S.D. Cal.), Dkt. 79 | 20 |
| D | Excerpts from Plaintiffs' Third Set of Requests for Production | 29 |
| E | Excerpts from Defendants' Responses to Plaintiffs' Third Set of Requests for Production | 37 |
| F | Email from Defendants' Counsel to Plaintiffs' Counsel (August 29, 2023) | 42 |
| G | Excerpts from California State Auditor's Report, "San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody" (February 3, 2022) | 49 |
| H | Order by Judge David D. Leshner in *Serna et al. v. County of San Diego,* Case No. 20-cv-2096-LAB-DDL (S.D. Cal.), Dkt. 220 | 59 |
| I | Order by Judge Larry A. Burns in *Serna et al. v. County of San Diego,* Case No. 20-cv-2096-LAB-DDL (S.D. Cal.) (September 20, 2023), Dkt. 236 | 88 |
| J | Excerpts from February 8, 2023 Hearing Transcript in *Greer v. County of San Diego, et al.,* Case No. 19-cv-00378-JO-DEB (S.D. Cal.), Dkt. 341 | 94 |

# Exhibit A



# *San Diego County Sheriff's Department*

## Policy and Procedure Manual

Last updated 5/16/23

EX A-2

**San Diego County Sheriff's Department – Procedure Section**

> **4.23 DEPARTMENT
> COMMITTEES AND
> REVIEW BOARDS**

### Definitions

- Committee:  A committee is a group of people delegated to perform a particular task or on-going function.

  Standing Committee:  A committee that has on-going responsibilities and functions.

  Ad Hoc Committee:  A committee formed for a specific purpose, case, or situation.

- Review Board:  A review board is an organized body of investigators who review specific incidents and report their findings to a higher authority.

### Responsibility

Each committee/review board shall have an assigned task and scope of responsibility.

### Membership

Each committee/review board shall have a defined membership and a chairperson appointed by the Sheriff or Undersheriff. When indicated, a committee or review board may add other Department staff to its membership. A committee chair may select temporary committee members to establish membership rules for the formation of the committee.

### Decision Making Authority

- Each committee shall have a reviewing officer with final decision-making authority.

- Each review board shall report its findings to the Office of the Sheriff, which shall have final decision-making authority.

### Record of Proceedings

- Each committee chairperson shall keep a record of their proceedings on file.

- Reports generated by review boards shall be kept on file in the Office of the Sheriff, Legal Affairs.

The Committees and Review Boards of the Sheriff's Department are as follows:

### Uniform and Safety Equipment Committee

Responsibility:

Consider any changes in the uniform, dress standards, safety equipment and personal equipment worn or used by Department personnel and making recommendations to the Sheriff relative thereto.

**San Diego County Sheriff's Department – Procedure Section**

Maintaining and publishing, semiannually, a roster of authorized uniform dealers and their addresses and publishing, without delay, the names and addresses of any dealers added to or deleted from the list.

Supplying authorized dealers with copies of the Department's uniform, safety and personal equipment specifications and Department directives pertaining to the same.

Originating and maintaining correspondence concerning uniform, safety and personal equipment matters.

Membership:

Chairperson - Assistant Sheriff, Human Resource Services Bureau, or designee.

Commander, Law Enforcement Support Command, or designee.

Three (3) members from the Law Enforcement Services Bureau, one of the rank of Captain or above, one Sergeant, and one Deputy Sheriff.

Three (3) members from the Court Services Bureau, one of the rank of Captain or above, one Sergeant, and one Deputy Sheriff or Detention/Courts Deputy Sheriff;

Three (3) members from the Detentions Services Bureau, one of the rank of Captain or above, one Sergeant-Detentions, and one Deputy Sheriff Detentions/Courts.

One Community Service Officer.

One (1) representative from the Deputy Sheriff's Association; and,

Others as approved by the chairperson.

Reviewing Officer:

The Undersheriff is the reviewing officer on all matters within the jurisdiction of the Uniform and Safety Equipment Committee.

**Strategic Planning Committee**

Responsibility:

The Office of the Sheriff's Strategic Planning Manager shall be responsible for advising the Sheriff and Undersheriff on all matters of major Department concern; including:

Charting the Department's future strategy.

Reviewing and revising priorities and goals of the Department.

Directing a management planning system to devise long-range plans to enhance Department effectiveness.

Establishing task forces on an ad-hoc basis to formulate specific long-range plans.

Assigning Department command staff as task force leaders.

Membership:

## San Diego County Sheriff's Department – Procedure Section

Strategic Planning Manager/Senior Policy Advisor

Others as approved by the Strategic Planning Manager
Reviewing Officer:

The Undersheriff is the reviewing officer on all matters within the jurisdiction of the Long-Range Strategic Planning Ad-Hoc Committee.

### Critical Incident Review Board (CIRB)

Responsibility:

The purpose of this board is to consult with department legal counsel when an incident occurs which may give rise to litigation.  The focus of the CIRB will be to assess the department's civil exposure because of a given incident.  The CIRB will carefully review those incidents from multiple perspectives, including training, tactics, policies, and procedures with the goal of identifying problem areas and recommending remedial actions so that potential liability can be avoided in the future.

The Lieutenant of the Division of Inspectional Services (DIS) shall ensure that a copy of all related reports, as well as audio and video recordings are placed in a shared drive for CIRB board members within 30 days of the completion of an investigation, and no later than seven (7) days prior to the date of the Critical Incident Review Board convening.

Membership:

The Critical Incident Review Board shall consist of voting and non-voting members.

Voting members:

- A Commander from Law Enforcement or another designated commander
- A Commander from Court Services or another designated commander
- A Commander from Detention Services or another designated commander

Non-voting members:

- The Director of Legal Affairs, or another designated legal advisor
- Commander from Human Resources, who shall serve as the chair of the meetings

The following people will attend a Pre-CIRB: the Director of Legal Affairs, the HRSB Commander, the three (3) commanders representing each bureau, the DIS Lieutenant, and the applicable DIS Sergeants for the cases being presented.

The following people will attend a CIRB: the attendees of a Pre-CIRB, plus a representative from the Facility or Unit Commander from the employee's chain of command, Weapons Training Unit, In-Service Training Unit and Detention Training Unit.

Other representatives may be requested to attend a CIRB at the discretion of the chair.

**San Diego County Sheriff's Department – Procedure Section**

**The Critical Incident Review Board shall convene as follows:**

Preliminary Critical Incident Review Board (Pre-CIRB)

Within one month (30 days) of the occurrence of a critical incident for a preliminary assessment.

Final Critical Incident Review Board (Final CIRB):

Within sixty (60) days of a District Attorney's review letter involving a critical incident; and within thirty (30) days of the completion of the investigation of a critical incident.

When requested by the Sheriff, Undersheriff, Assistant Sheriff, or a board member.

**The following incidents are deemed critical incidents and shall be reviewed by the CIRB:**

In custody death;
Use of deadly force by a department employee;
Pursuits resulting in any injury requiring hospital admittance or major property damage;
Death or serious injury resulting from action of a member of this Department;

Note: Serious injury means a serious impairment of physical condition, including but not limited to: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement.

Law Enforcement related injuries requiring hospital admittance;
Discharge of a firearm by sworn personnel;
Any other incident involving the discharge of a firearm, major property damage, or major vehicle damage by a member of this Department or other critical incident which, in the judgment of the Sheriff, Undersheriff, Assistant Sheriff, or board member warrants review.

Presentation:

Pre-CIRB

At the beginning of the Pre-CIRB the DIS Sergeants will present facts and circumstances to the members of the CIRB.

Final CIRB

At the beginning of the CIRB, the investigators involved in the investigation of the critical incident will present facts and circumstances to the members of the CIRB.

At the conclusion of the presentation each board member will have an opportunity to question the investigator regarding the specific facts and circumstances surrounding the critical incident.

Additional Investigation:

If after a presentation, additional investigation is determined to be necessary, the CIRB will continue the proceedings and return the case to the DIS Lieutenant for further follow up. The Division of Inspectional Services is responsible for working with the investigators involved in the case to ensure that all follow up investigations are completed appropriately and timely.

**San Diego County Sheriff's Department – Procedure Section**

The matter shall be reset for hearing before the CIRB within 30 days of being returned for follow up.

Policy Violations:

After hearing from all necessary parties, the three voting Commanders will vote to make a determination as to whether or not a policy violation may exist.

If a majority of the voting members determine that a policy violation may have occurred, the case will be forwarded to Internal Affairs, assigned an Internal Affairs case number and investigated. After the case is investigated by Internal Affairs, the case will be forwarded to the command for review consistent with the Department's policies and procedures.

If, during the Critical Incident Review Board, the majority of the voting members determine that no policy violations have occurred, the CIRB case will be forwarded to the DIS Lieutenant for the generation of a report, consistent with the Board's findings, at the conclusion of the CIRB.

Training:

The CIRB is also tasked with making recommendations for training based upon the analysis of critical incidents. If the Board identifies significant training issues, the Board will direct those issues to the Training Lieutenant. The Training Lieutenant will be required to prepare a written report to the DIS Lieutenant within thirty (30) days outlining the actions taken based upon the Boards direction.

Policies:

If the CIRB identifies policy issues of concern while reviewing a critical incident, the Board will direct its concerns to the Standards and Compliance Manager of the Division of Inspectional Services. The Standards and Compliance Manager will ensure that the proposed policy recommendations are prepared and present them for approval to SOPC within thirty (30) days of the CIRB.

Distribution of Reports:

Within seven (7) days of the CIRB, the Facility or Unit Commander, from the employee's chain of command, will meet with the employee and provide them with any feedback generated as a result of the CIRB presentation.

Within forty-five (45) days of a Pre-CIRB or Final CIRB, the DIS Lieutenant will prepare a report summarizing the actions and conclusions of the board. The CIRB report shall contain specific findings regarding whether the review board found any policy violations, and training or policy issues, as well as what actions were taken by the department. A copy of the CIRB Confidential Report and other related reports shall be filed in the Legal Affairs Section, Office of the Sheriff.

Within forty-five (45) days of a Pre-CIRB or Final CIRB, the DIS will prepare a public report detailing the facts reviewed by the CIRB Board at a CIRB meeting. The public report will be posted on the Sheriff's internet website.

# Exhibit B



SAN DIEGO COUNTY
SHERIFF'S DEPARTMENT

# PROGRESS REPORT

## UPDATE ON STATE JAIL AUDIT



2023

EX B-9

# Committed to Improving

## A Progress Report One-Year After the State Audit on County Jails

On February 3, 2022, the California State Auditor released their report to the Governor and legislative leaders titled: "*San Diego County Sheriff's Department: It has failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*" (Audit Report)[1]. The report provided findings over the last 15-years on data, protocol, and prevention procedures related to in-custody deaths of incarcerated individuals in the care of the San Diego County Sheriff's Department (Sheriff's Department).

During the extensive 6-month audit, representatives from the State Auditor's Office were provided access to Sheriff's Department records of in-custody deaths, policies, procedures, facility maintenance, and staff. The Department was cooperative and transparent during the audit review process. Upon the release of the Audit Report, and its accompanying recommendations, the Sheriff's Department issued a detailed response to each recommendation providing further information and context as it aligned to the bigger effort of improving the custodial setting in county jails[2].

Over the course of the past year, the Sheriff's Department remained steadfast in its commitment to improving conditions in county jails. The Sheriff's Department is undergoing changes to improve its healthcare service delivery model by renovating aging facilities, increasing staff, and implementing new programs and initiatives. The goal of these changes is to improve overall health care and treatment for those in our custody, improve rehabilitation opportunities, and reduce recidivism.

> *"Accountability, transparency, and the genuine commitment to doing better are the drivers to creating a new level of care to individuals in custody while supporting the needs of our detentions team."*
> *Sheriff Kelly Martinez*

---

[1] California State Auditor Report on San Diego County Jails **https://www.bsa.ca.gov/reports/2021-109/index.html**
[2] Sheriff's Department Response to State Audit of County Jails
**https://www.sdsheriff.gov/home/showpublisheddocument/4717/637794797354130000**

EX B-10

## Holding Ourselves Accountable and Transparent

Throughout our history and especially in the past year, the Sheriff's Department has made a concerted effort to keep representatives from the San Diego State Legislative Delegation apprised of areas of interest, while maintaining lines of communication with the San Diego County Board of Supervisors (Board) and our communities. The Board has received updates on the progress of implementing new programming and initiatives across the jail system to prevent further deaths, in addition to hosting a formal Board Meeting presentation focused on the progress being made in San Diego County jails. Board support of the Sheriff's Department initiatives and investment in improving jail infrastructure and services, while bolstering staffing needs, demonstrates the collective sense of urgency and attention to improving the safety and security for those in our custody.

Community dialogue has also taken place as the Sheriff's Department met with community advocates, racial justice groups, as well as the San Diego County Human Relations Commission. These mutually beneficial exchanges facilitated opportunities for not only the Sheriff's Department to educate and share our initiatives and actions which are underway to improve conditions, but to have meaningful dialogue with community members, especially those who advocate for families that had loved ones die while in custody.

While the State Auditor indicated "*no single entity has sufficient oversight authority over the Sheriff's Department to require it to make meaningful changes… we believe that the Legislature should direct the Sheriff's Department to implement the changes we detail below,*" the Sheriff's Department respectfully disagrees with this statement. Sheriff Martinez has and continues to keep the efforts of improving jails at the forefront of her priorities. She believes the only way to develop and maintain the public's trust and confidence in this process is to promote transparency through open and honest communication.



EX B-11

## Progress Report on State Audit Recommendations

The following section provides an update on the progress the Sheriff's Department has been implementing as it relates to the recommendations provided in the State Audit. The Audit focused on many recommendations directed towards the State Legislature, the San Diego Sheriff's Department, the Board of State and Community Corrections, and the San Diego County Citizens' Law Enforcement Review Board. For the purpose of this progress report, the Sheriff's Department will speak to recommendations directly impacting its operations and the status of either the completion, the progress, and/or if other action has been taken.

Several policy changes provided in the following section have been standard practices of the Sheriff's Department, however, in early 2023, they will be codified into policy to align with the Department's goal of earning accreditation from the National Commission on Correctional Health Care (NCCHC).

## RECOMMENDATIONS

*Legislature—All Sheriff's Departments and the California Department of Justice*

**To ensure that all sheriff's departments accurately report deaths that occur from incidents or conditions in county jails, the Legislature should amend state law to require sheriff's departments to report to the attorney general individuals who are released from custody after being transported directly to a hospital or similar medical facility and subsequently die in the facility. It should also amend state law to require sheriff's departments to provide the attorney general with all facts concerning the death, such as the cause and manner. The California Department of Justice should annually publish this information on its website.**

Since 2021, the San Diego County Sheriff's Department has been reporting to the California Department of Justice, if the Sheriff's Department became aware of any individual who was released from custody at a medical facility and subsequently died there. Additionally, in 2022, the Governor signed Assembly Bill 2761, which mandates sheriff's departments shall report the following information on their public internet websites (Penal Code section 10008(a)):

- The full name of the agency with custodial responsibility at the time of death;
- The county in which the death occurred;
- The facility in which the death occurred, and the location within that facility where the death occurred;
- The race, gender, and age of the decedent;
- The date on which the death occurred;
- The custodial status of the decedent, including, but not limited to, whether the person was awaiting arraignment, awaiting trial, or incarcerated; and
- The manner and means of death

The San Diego County Sheriff's Department on its own initiative has been providing similar data over the past two years in its public website www.sdsheriff.gov "Open Data Portal" and will be expanding its reports to include the additions listed in the new statute, which went into effect on January 1, 2023.

*Legislature—San Diego Sheriff's Department*

**To ensure that the San Diego Sheriff's Department identifies individuals' medical and mental health needs at intake, the Legislature should require it to revise its policies to better align with best practices, as follows:**

- **Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them.**

  The Department is actively moving toward providing 24-hour mental health care in the facilities, including the availability of mental health professionals during the intake process at the receiving facilities. This includes hiring additional mental health staff and contracting for services with our current provider, NaphCare. We have implemented in-depth mental health care screening for every individual during the booking process. This includes utilizing Qualified Mental Health Professionals and tools like the Columbia Suicide Severity Rating Scale (C-SSRS) to better evaluate suicide risk and refer individuals to the appropriate mental health resources sooner. This is documented in our electronic healthcare record keeping system for referral and tracking.

  We have looked at the viability of implementing a mental health acuity level rating scale[3] to assist in the housing process, however, they are very system-specific and through our research we have learned simply mirroring another county is not feasible. The San Diego Sheriff's Department classifies and houses our incarcerated population based on several criteria including but not limited to current charges, criminal sophistication, ability to maintain in main line housing, documented safety risks and past behavior/actions while incarcerated. Making the shift to housing individuals by acuity level would create a need for acuity-based housing for each classification level, to include those who need to be kept separate for security reasons, those in protective custody, and other unanticipated housing issues. With this model, there is also a larger potential for the use of administrative separation housing for those who cannot remain in the general incarcerated person population, something we would like to steer away from as it limits access to programming opportunities and rehabilitative services.

- **Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.**

  Unlike many other counties, San Diego does not have a coordinated county health system or shared electronic health care records system.  As a result, we cannot meet this recommendation as written. However, in May 2022, by way of our contract with NaphCare, jail medical staff continued using TechCare for all health care records. We were also able to gain access to SureScript, a system allowing

---

[3] A mental health acuity rating scale is an assessment tool used to identify the amount of mental health resources needed for an incarcerated person at the time of assessment, e.g., acute, moderately severe, severe, moderate, mild, minimum.

**5**

staff to verify prescription medication history to assist with identifying previously diagnosed medical and mental health treatment, facilitate dispensing medications sooner, and decrease the timeline to provide follow-up care. Medical and mental health staff also gained access to StatCare, a 24/7 telemedicine provider, available for use when a provider is not on-site, and a consultation is needed. This system is used to supplement provider staffing and reduce wait times for addressing medical and mental health requests.

In April 2021, Qualified Mental Health Providers (QMHP), such as mental health clinicians, psychologists, psychiatrists, and psychiatric technicians, were granted "read-only" access to Cerner Community Behavioral Health (CCBH), a system currently utilized by San Diego County Mental Health. This breakthrough allowed QMHP's to review records at any point in the patient's custody, including during intake, to assist with determining treatment while in custody and appropriate housing. Additionally, the Sheriff's Department and County of San Diego Health and Human Services Agency (HHSA) are currently working collaboratively to create an interface between Cerner and TechCare to improve health information accessibility to our providers. The sharing of information with our community partners will facilitate a bilateral continuity of behavioral health care between agencies to positively impact patient care and promote the coordination of community care.

In June 2022, the Department also implemented voluntary drug and alcohol screening at intake. This process supplements questions from medical staff at intake and is used to confirm if someone is under the influence of drugs or alcohol. The results along with Clinical Institute Withdrawal Assessment Alcohol Scale (CIWA) and Clinical Opiate Withdrawal Scale (COWS) scoring allow for better treatment and management of withdrawal symptoms starting at intake and following an individual through their participation in the medication-based detoxification program for opioid and alcohol withdrawal.

**To ensure that the Sheriff's Department provides the necessary medical and mental health care to individuals incarcerated in its facilities, the Legislature should require it to do the following:**

- **Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.**

  In August 2022, the Department began the practice of requiring nurses to schedule an individual for an appointment with a provider upon receipt of two requests from an incarcerated individual regarding any condition. This is both a NaphCare protocol and National Commission on Correctional Health Care standard and will be adopted into the official department policies and procedures in early 2023.

- **Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request.**

  The nursing staff is currently doing face-to-face assessments within 24-hours of receipt of a request for medical services at the facilities. This process was implemented on December 15, 2022, and the practice follows National Commission on Correctional Health Care standards. This practice will be adopted into department policies and procedures in early 2023."

**6**

- **Revise its policy to require more frequent psychological follow-up after release from the inmate safety program, including at least monthly check-ins.**

  The Department will be updating its policy in early 2023 which will integrate new language that will state: "*patients will be reassessed within 24-hours of being discharged from suicide watch by a qualified mental health professional or appropriately trained qualified health care professional on days where no qualified mental health professional is onsite.*" This effort came about in late 2022 as part of the onboarding process with NaphCare. Therefore, the policies will require that Qualified Mental Health Providers follow-up with an individual within 24-hours of discharge from the Detentions Safety Program and will require at least monthly check-ins until the end of their incarceration.

- **Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.**

  Patients have the right to refuse medical and mental health care while in Sheriff's custody. Every effort is made to accurately document care refusals by incarcerated persons and varies depending on the situation at-hand, for instance:

  Medication Refusals - In the event a patient refuses prescribed medication, the nurse will counsel them on the potential impact and try to convince them to take the prescribed medication. If the patient declines, they will be asked to sign the refusal form, which will be witnessed by the nurse. If the patient refuses to sign, the nurse will sign the form and the accompanying sworn staff member will sign as a witness. A copy of the form will be placed into the health records system (TechCare) for reference.

  Medical Appointment Refusal - The patient will be counseled by medical staff, which may include a provider or nurse, regarding the potential effects on their health of missing the appointment and try to convince them to attend. If the patient still refuses the appointment, the patient will be given an opportunity to sign the medical refusal form. In the event the patient refuses to sign the refusal form, the nurse will sign the form. A copy of the form will be placed into the health records system (TechCare) for reference.

  Mental Health Refusal - If the patient refuses to meet with the Mental Health Clinician (MHC) at first attempt, the MHC will sign the refusal and have the patient sign the refusal as well. If the patient is unwilling to sign the refusal the MHC will sign the form as well as the accompanying sworn staff member, who will sign as a witness. A copy of the form will be placed into the health records system (TechCare) for reference. Additionally, the MHC will mark the scheduled appointment as "complete" and document as "refused" in their electronic health record and reschedule for a second attempt. Subsequent refusals may require additional follow-up.

  Psychiatry Appointment Refusal - If the patient refuses to meet with a psychiatrist, the rescheduling process is handled by Naphcare, and may include in-person or tele-psychiatry appointments.

**7**

**To ensure that sworn staff properly perform safety checks, the Legislature should require the Sheriff's Department to do the following:**

- **Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.**

  Safety checks shall be conducted at least once within every 60-minutes. Efforts are made to not disturb a sleeping incarcerated person and still comply with the requirements of looking at the individual for any obvious signs of medical distress, trauma, or criminal activity. However, sleep patterns of the entire incarcerated population vary throughout the day, and it is not feasible to have a policy requirement that incorporates not waking an individual. Checking for obvious signs of medical distress or trauma may require waking the individual as some sleep in such a manner that it is difficult to meet the policy requirements without doing so.

  Hard count is conducted twice per day (1000-1200 and 2100-2300 hours). This count involves verbal or physical acknowledgment to the deputy from each incarcerated person. Another mechanism is through the visual verification of the incarcerated person's identity by comparing the person's wristband photo to the person's face to the Jail Information Management System record.

  There are four soft counts (0400-0500, 0600-0700, 1700-1800, and 1830-1930). The soft counts coincide with mealtimes and the start or end of shift. All soft counts require verbal or physical acknowledgment from each incarcerated person and count of the number of incarcerated persons in the module/area/unit.  The incarcerate person needs to respond during these counts and disturbing sleep may be necessary.

- **Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff members perform.**

  Current policy requires a sworn supervisor to review safety checks of one complete shift from each team on an ongoing monthly basis. The Jail Information Management System (JIMS) Area Activity Logs and corresponding video footage shall be utilized for the review of safety checks. Sergeants already review the JIMS Logs twice per shift and the Lieutenant once per shift. Video footage may vary on quality and availability depending on facility. As the body-worn camera program expands across all detention facilities, the Sheriff's Department has been able to supplement facility CCTV footage and can capture audio interaction between deputies conducting checks with incarcerated persons. The completed reviews are documented and reviewed via chain of command by the facility commander for which the review was conducted. Once reviewed and approved, records of the reviews are electronically retained at each facility for two years. Facilities are not limited on the number of reviews

**8**

that can be conducted. Supplemental reviews may be conducted by whichever means the facility commander finds appropriate.

**To ensure that department staff promptly respond to unresponsive individuals, the Legislature should require the Sheriff's Department to revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow. The Legislature should also require that the Sheriff's Department provide sworn staff with additional training for starting CPR immediately and how to properly alert medical staff.**

Since April 2016, Detentions Policy required sworn staff to immediately call for a medical response, activation of 9-1-1 emergency medical services, and initiate CPR, as needed. In December 2022, the policy section reading, "*Absent rigor mortis or post-mortem lividity, all inmates with a potential for resuscitation shall be provided basic life saving measures*," was removed to address the State Audit's concern regarding sworn staff failing to initiate CPR given what they believed were exceptions as listed above. This change was also addressed in the Detentions Training Unit's CPR/First Aid Class, which includes how to properly communicate via radio for 9-1-1 and medical staff notification of an emergency, as well as initiate CPR and utilize the Automated External Defibrillator (AED) as appropriate. To emphasize the importance of implementing these changes, Command Staff regularly attends the required CPR First Aid Training classes to reinforce these changes to staff in training and is supplemented by ongoing collaborative training involving sworn and medical staff in emergency response at each facility.

**To ensure that the Sheriff's Department properly assesses the reasons for each in-custody death and makes prompt changes as necessary in response, the Legislature should require it to revise its policy to specify the following:**

- **Staff will provide a written report of each 30-day medical review to its management.**

Department policy states: "*A medical review of every in-custody patient's death shall be conducted within 30 days*." The Department facilitates several reviews, including a review by the In-Custody Death Advocate and Department Investigation Coordinator within a week of an incident. This review encompasses a synopsis of the incident, response by involved employees, and an update to the investigation. This review is completed prior to the Critical Incident Review Board's (CIRB) presentation. CIRB presentations consists of affected facility command, Division of Inspectional Services, Homicide, and Department Command Staff. The preliminary review addresses initial areas of the appropriateness of clinical care; assesses whether changes to policies, procedures, or practices are warranted; and identifies issues that require further study. Due to the early nature of these reviews, neither of these reviews have access to the Medical Examiner's reports as those are unavailable at the time of the reviews.

It should be noted that due to workload, the Medical Examiner's Official Cause of Death may take months to determine, which could affect the 30-day review report completed by the Chief Medical

**9**

Officer. Therefore, the Sheriff's Department finds its two reviewing mechanisms to be effective and necessary to identify policy violations, changes that need to be made, or deficiencies in training.

In-custody death response and prevention measures are highly scrutinized at all levels during the reviews and can include items related to response, training, and current policies and practices. Recommendations can be made by anyone in the chain of command including facility and Department Command staff, as well the In-Custody Death Advocate and Department Investigation Coordinator, the CIRB Board, and the Chief Medical Officer. Recommended improvements are tracked by the Division of Inspectional Services to ensure implementation.

- **When warranted, the report should specify recommendations for changes to prevent further deaths.**

  In-custody death response and prevention measures are highly scrutinized at all levels during the reviews and can include items related to response, training, appropriateness of care, and current policies and practices. Recommendations can be made by anyone in the chain of command including facility and Department Command Staff, as well the In-Custody Death Advocate and Department Investigation Coordinator, CIRB Board, and the Chief Medical Officer. Recommended improvements are tracked by the Division of Inspectional Services to ensure implementation.

- **The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and identify issues that require further study.**

  In-custody death response and prevention measures are highly scrutinized at all levels during the reviews and can include items related to response, training, appropriateness of care, and current policies and practices. Recommendations can be made by anyone in the chain of command including facility and Department Command Staff, as well the In-Custody Death Advocate and Department Investigation Coordinator, CIRB Board, and the Chief Medical Officer. Recommended improvements are tracked by the Division of Inspectional Services to ensure implementation.

**To improve oversight of in-custody deaths and encourage meaningful action to prevent future deaths, the Legislature should require the Sheriff's Department to revise its policy to require that the Critical Incident Review Board review natural deaths.**

On March 29, 2022, Sheriff's Policies and Procedures Section 4.23 was amended to require the Critical Incident Review Board review all in-custody deaths.

**To increase the transparency of the Sheriff's Department's reviews of in-custody deaths, the Legislature should require the Sheriff's Department to either make public the facts it discusses and recommendations it decides upon in the relevant Critical Incident Review Board meetings or to establish a separate public process for internally reviewing deaths and making necessary changes.**

Upon completion of the Critical Incident Review of an in-custody death, the Sheriff's Department will publish a brief synopsis of the facts it discussed of the incident, any recommendations or action items,

policy revisions resulting from the incident review, and the dates those items were accomplished. Currently, the Sheriff's Department is completing and posting these reviews for in-custody deaths that occurred beginning and after January 1, 2022.

**To ensure that the Sheriff's Department provides complete and prompt assistance to CLERB's investigations, the Legislature should require the Sheriff's Department to do the following:**

- **Revise its policy to include CLERB in its immediate death notification process.**

  On February 14, 2022, the Sheriff's Department signed a Memorandum of Understanding[4] to include a CLERB investigator in the death notification process.

- **Revise its policy to allow a CLERB investigator to be present at the initial death scene.**

  On February 14, 2022, the Sheriff's Department signed a Memorandum of Understanding to allow a CLERB investigator to have limited access to death scenes.

- **Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.**

  The Sheriff's Department has a well-established record of cooperating with and supporting CLERB's investigations. We are responsive to CLERB subpoenas, sworn employees are required to respond to CLERB queries via electronic Sheriff's Employee Response Forms (eSERFs), and have the option to speak with CLERB investigators during in-person interviews.

## Conclusion

The San Diego Sheriff's Department has leveraged the State Audit as an opportunity to reimagine the way services can be offered and delivered to those in its care and custody. Going beyond the audit recommendations, the Sheriff's Department has elevated its forward-thinking strategy by partnering with local and state entities to enhance its service delivery, address staffing shortfalls, bolstering medical and mental health care, creating new programming and processes, while using technology to our advantage.

---

[4] **SDSD and Citizen Law Enforcement Review Board MOU**

# Exhibit C

Pages 1 - 129

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

```
MARILYN MORTON, et al.,        )
                               )
          Plaintiffs,          )
                               )
  VS.                          )        NO. 21-CV-01428-MMA-DDL
                               )
COUNTY OF SAN DIEGO, et al.,   )
                               )
          Defendants.          )
_____)
```

San Diego, California
Monday, April 24, 2023

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

Liberty Player Recording 2:02 p.m. - 4:05 p.m. and
4:11 p.m. - 4:52 p.m. = 164 minutes

**APPEARANCES:**

For Plaintiffs:
                    PHG LAW GROUP
                    501 West Broadway, Suite 1480
                    San Diego, California 92101
               **BY:  DANIELLE RENEE PENA, ESQ.**


For Defendants County of San Diego, Samantha Macanlalay, and
Hosanna Alto:
                    COLLINS AND COLLINS LLP
                    2011 Palomar Airport Road, Suite 207
                    Carlsbad, California 92011
               **BY:  RADA FELDMAN, ESQ.**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Transcribed by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                    Official Court Reporter

**APPEARANCES:   (CONTINUED)**

For Defendants Bijan Rahmani, Matthew Berlin, and Liberty
Healthcare:

                          BRADLEY, GMELICH & WELLERSTEIN LLP
                          700 North Brand Boulevard, Tenth Floor
                          Glendale, California 91203
                  BY:  **MARK L. KIEFER, ESQ.**

BARANIC - CROSS / PENA

1   BY MS. PENA:

2   **Q.**   The PowerPoint, the spreadsheet, and the memo.

3   **A.**   So the PowerPoint is prepared by the DIS sergeant, based

4   upon the documents that we asked them to gather up.

5        So when I took over, when Rob Faigin retired and I became

6   the Director of Legal Affairs, I met with the Division of

7   Inspectional Services.  And they said, "On these types of

8   cases, Rob asked for us to pull these documents and this

9   evidence.  Are there any other" -- I'm sorry.

10  **Q.**   Who's Rob?

11  **A.**   Rob Faigin.

12  **Q.**   Got it.  Sorry.

13  **A.**   My apologies.

14  **Q.**   That's okay.  I'm following you now.

15       Go ahead.

16  **A.**   Well, I'll go back to "Mr. Faigin."

17       They said that, "Mr. Faigin asked for us to gather up this

18  evidence as part of the CIRB process," and that's what they

19  would base the PowerPoint on.  They asked whether there was

20  anything additional or different that I would like to see, and

21  I had that discussion with them.

22  **Q.**   Do you --

23  **A.**   So the PowerPoint is based on documents that Rob, as my

24  predecessor -- Mr. Faigin as my predecessor, and that I've

25  asked them to gather up because they're documents that are

BARANIC - CROSS / PENA

 1   important to myself and to Mr. Faigin as far as being able to

 2   offer an opinion on liability in these cases.

 3   **Q.**   Is that something -- those documents that you asked for,

 4   Mr. Faigin and yourself -- is that done every time there is a

 5   preliminary CIRB, or is that done -- what I mean by that is are

 6   you specifically saying, "Hey, in the Morton case, I want you

 7   to pull this document and this document and this document," or

 8   is there an understanding -- a general understanding of what

 9   documents should be included in the investigation?

10         **MS. FELDMAN:**  Objection.  Vague and ambiguous as to

11   "investigation."

12         **THE COURT:**  I will sustain it on the grounds that it's

13   compound.

14      Make sure to ask a question, Ms. Pena, that isn't

15   compound.

16         **MS. PENA:**  Sure.  Sure.

17   BY MS. PENA:

18   **Q.**   My question -- what I'm trying to see is if every

19   individual CIRB investigation -- prior to that preliminary

20   investigation, there is a Legal Affairs attorney involved that

21   says, "Hey, DIS, I want you to get this document and this

22   document and this document for the Morton case."

23         **MS. FELDMAN:**  Objection.  Compound.  Vague and

24   ambiguous as to "investigation."

25         **THE COURT:**  Overruled.

EX C-24

BARANIC - CROSS / PENA

1    You may answer that, sir.

2    **THE WITNESS:**  That's why I think there might be some

3    misunderstanding, is the Division of Inspectional Services does

4    not conduct any investigation.  So the investigation is

5    conducted by the unit that has subject matter expertise over

6    the incident.

7    So in the case of an in-custody death, the Homicide Unit

8    is the one that does the investigation.  So the Division of

9    Inspectional Services does not conduct an investigation.

10   **BY MS. PENA:**

11   **Q.**   Homicide investigations are typically not confidential --

12   right? -- because they include third-party statements and rules

13   of law policy or --

14   **A.**   I don't -- I don't believe that's accurate.

15   **Q.**   What do you believe?  Do you believe that all homicide

16   are -- investigations are confidential?

17   **A.**   That's not what I said.  You said that all homicide

18   investigations are not confidential.  I don't believe that's

19   accurate.  I believe there's different rules of evidence that

20   apply.  I believe the Public Records Act applies to that,

21   particularly based on the status of the investigation.

22   So I don't think that's a fair assessment that con- --

23   that homicide investigations are not confidential.

24   **Q.**   At a certain point -- maybe not while the investigation is

25   ongoing, sure.  But at some point, those statements that are

**BARANIC - REDIRECT / FELDMAN**

1    So those types of cases, generally, would not be referred

2    to for a full CIRB, but an in-custody death and a

3    deputy-involved shooting generally go to a full CIRB.

4    **Q.**   And --

5    **A.**   If there is a situation -- excuse me.  If there is a

6    situation where it's a pre-CIRB, say, a use-of-force case, we

7    might --

8    **Q.**   Let's talk about in-custody jail suicide to make it

9    simpler.

10   **A.**   Okay.

11        **MS. PENA:**  Just -- objection.  Just -- in the interest

12   of fairness, I think the witness should be --

13        **MS. FELDMAN:**  Sure.

14        **MS. PENA:**  -- able to finish his -- his answer.

15        **THE COURT:**  Go ahead, Mr. Baranic.

16        **THE WITNESS:**  You derailed my train of thought, but I

17   think I was going with that -- there are occasions where

18   something that would be a pre-CIRB -- and we might not have all

19   the information available.  So we ask for it to come back as a

20   full CIRB, and a full CIRB generally involves a presentation by

21   the actual investigator or the affected facility.

22        So whereas the pre-CIRB is a presentation by the DIS

23   sergeant, the full CIRB is generally the investigative team

24   that would be doing the presentation or the affected facility

25   or command.  So if it was a station-level use of force, it

BARANIC - REDIRECT / FELDMAN

 1    might be representatives from the Poway station that present

 2    the full CIRB.

 3         And that way, we have the actual affected command doing

 4    the presentation, as opposed to the DIS sergeant doing the

 5    pre-CIRB.  So --

 6    **BY MS. FELDMAN:**

 7    **Q.**    And for an in-custody death/suicide, is there a homicide

 8    investigation that's done?

 9    **A.**    Yes.

10    **Q.**    And who conducts that?

11    **A.**    The Sheriff's Homicide Unit.

12    **Q.**    And is that separate from the CIRB review process?

13    **A.**    It is.

14    **Q.**    And those -- okay.  And does the CIRB review process

15    itself conduct a separate investigation?

16    **A.**    No.  The CIRB doesn't conduct any investigation.  We

17    receive the information.  I look at the information, and then I

18    offer advice and guidance to the other board members as far as,

19    you know, what our liability is on this case, what we did

20    right, what we did wrong, what we can do differently in order

21    to avoid future liability or to mitigate our risk in the

22    future.

23         But CIRB does not do any investigation.

24    **Q.**    And I don't know if you have it still in front of you, but

25    Plaintiffs' Exhibit 1 was portions of the website that was

1   line.  We have individual presentations, and then we convene in

2   closed session, and that's where the voting takes place.

3       So none of the individuals that are invited to the

4   presentation session are present for any of the voting that

5   takes place.

6       **THE COURT:**  I see, and thank you.

7       So with respect to the presentation session, does the

8   Chief Legal Advisor attend that, as a matter of course?

9       **THE WITNESS:**  Oh, yeah.  And they're -- it would be

10  the Chief Legal Advisor or, in their absence, their designee.

11  So when Rob Faigin was with us, there were occasions where he'd

12  be out of town, teaching at a conference, and he would

13  designate me as Acting Chief Legal Advisor.  And I would sit in

14  his place for the presentation session and then the closed

15  session as well.

16      But the Chief Legal Advisor is involved in both sessions.

17      **THE COURT:**  You were asked a number of questions about

18  the PowerPoint that is utilized during the presentation

19  session.

20      Who prepares that PowerPoint?

21      **THE WITNESS:**  That would be the Divisional --

22  Division of Inspectional Services sergeant that's responsible

23  for the case.  So they're really the facilitator for the CIRB.

24  So Mr. Faigin and now I have identified those documents that

25  are important to us, as far as what we're looking for in the

# Exhibit D

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone:  (510) 806-7366
Facsimile:  (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:  (858) 677-1400
Facsimile:  (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT**<br><br>Judge:      Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set |

PROPOUNDING PARTY:  PLAINTIFFS

RESPONDING PARTY:    DEFENDANTS SAN DIEGO COUNTY SHERIFF'S
DEPARTMENT, COUNTY OF SAN DIEGO, SAN
DIEGO COUNTY PROBATION DEPARTMENT

SET NO.:                         THREE

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure

Rule 34, Plaintiffs Darryl Dunsmore, Andree Andrade, Ernest Archuleta, James

Clark, Anthony Edwards, Lisa Landers, Reanna Levy, Josue Lopez, Christopher

Nelson, Christopher Norwood, Jesse Olivares, Gustavo Sepulveda, Michael Taylor,

and Laura Zoerner ("Plaintiffs"), on behalf of themselves and all persons similarly

situated, by their attorneys, hereby demand that Defendants San Diego County

Sheriff's Department, County of San Diego, and San Diego County Probation

Department respond under oath to the following document requests, and produce

and permit inspection or copying of the original documents and materials described

below at Rosen Bien Galvan & Grunfeld LLP, 30 days after service of this demand.

**INSTRUCTIONS**

1.      In responding to this Request for Production of Documents, you are

requested to furnish all documents which are in your possession, custody, or control,

including information in the possession of your attorneys, or other persons directly

or indirectly employed or retained by you, or connected with you or your attorneys,

or anyone else acting on your behalf or otherwise subject to your control.

2.      In responding to this Request for Production of Documents, if any

responsive document is maintained electronically, the document shall be produced

on disc in native format and with metadata intact.  You are also requested to furnish

print-outs of documents which may not currently exist in "hard copy" paper form

but which exist in electronic form as electronic mail or as a document or file

generated by word processing, data base, or spreadsheet software, and which are

stored electronically on a "floppy" disc, a compact disc, a zip drive, a personal computer hard drive, a network server, a back-up tape or disc, text message, or any other electronic medium.

3.    If an electronically-generated document does not currently exist as a "hard copy" and if it has been deleted from the hard drives of personal computers, you are requested to retrieve it from any other electronic medium (e.g., a network server or a backup tape disc) from which it is retrievable.

4.    If you cannot respond to any document request in full, respond to the fullest extent possible, explain why you cannot respond to the remainder, and describe the nature of the documents which you cannot furnish.

5.    If you object to part of a request and refuse to answer that part, state your objection and respond to the remaining portion of that request.  If you object to the scope or time period of a request and refuse to respond for that scope or time period, state your objection and respond to the request for the scope or time period you believe is appropriate.

6.    With respect to any requested document that you refuse to produce in response to these Requests for Production on the basis of any asserted privilege, please state:

        a.    the full identity of the document including:

                i.    the nature of the document (e.g., letter, memorandum, etc.);

                ii.    date of the document;

                iii.    its title (if any);

                iv.    its authors, addressees, recipients, or parties;

                v.    the identity of any other individuals to whom the document was disseminated and their relationship to Defendants;

                vi.    whether the document includes any attachments and, if so,

1        a description of the attachments; and

2       vii. its present location and identity of its custodian;

3    b. whether your objection or refusal is directed to the entire

4      document or part thereof;

5    c. if your objection or refusal goes to part of the document, specify

6      the specific part(s) of the document to which your objection or

7      refusal is directed; and

8    d. the specific factual basis which gives rise to the objection or

9      refusal and the specific legal ground on which the objection or

10     refusal is based.

11   7. If any of the following requested documents cannot be located or

12 produced after exercising due diligence to secure the information, please so state

13 and respond to the extent possible, specifying your inability to respond fully, and

14 stating whatever information you have relating to the non-produced documents.  If

15 your response is qualified in any particular manner, please set forth the details of

16 such qualification.

17          **DEFINITIONS**

18   Unless otherwise indicated, the following definitions and terms shall apply to

19 these requests for production:

20   1. The terms "ANY" and "ALL," as used herein, shall include "each" and

21 "every" and are not to be construed to limit a request.

22   2. The term "ADA" means the Americans with Disabilities Act, 42 U.S.C.

23 §§ 12101 *et seq.* as well as related federal and state laws that require

24 accommodation of disabilities and prohibit discrimination on the basis of disability.

25   3. The term "COMMUNICATIONS" means any transmittal of

26 information from one person or entity to another by any means, including letters,

27 correspondence, notes, memoranda, records,  reports, papers, facsimiles, electronic

28 mail (whether to, from, copied or blind copied), electronic mail generated from a

[4302533.7]        3     Case No. 3:20-cv-00406-AJB-DDL
PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

EX D-38

1  of violence by or against INCARCERATED PEOPLE at the JAIL from January 1,

2  2021 to present.

3  **REQUEST FOR PRODUCTION NO. 76:**

4      Rosters of INCARCERATED PEOPLE with mobility DISABILITIES in Las

5  Colinas and Central Jails for the month preceding YOUR response showing the

6  area, housing unit, cell and bed placement, and accommodation need for each

7  person, in a format similar to SD 000467.

8  **REQUEST FOR PRODUCTION NO. 77:**

9      ALL invoices for Sign Language Interpretation services provided in the JAIL

10  from January 1, 2021 to the present.

11  **REQUEST FOR PRODUCTION NO. 78:**

12      ALL DOCUMENTS RELATING TO workload, productivity, or daily

13  services provided by CONTRACTORS at the JAIL from January 1, 2021 to the

14  present.

15  **REQUEST FOR PRODUCTION NO. 79:**

16      ALL use of force logs for each facility in the JAIL from January 1, 2021 to

17  the present.

18  **REQUEST FOR PRODUCTION NO. 80:**

19      ALL DOCUMENTS AND COMMUNICATIONS RELATING TO

20  complaints RELATING TO excessive force, including but not limited to use of

21  force AND claims of physical harm by JAIL staff, from INCARCERATED

22  PERSONS between January 1, 2021 and the present.

23  **REQUEST FOR PRODUCTION NO. 81:**

24      ALL reports generated by the Critical Incident Review Board RELATING

25  TO in-custody DEATHS at the JAIL from January 1, 2021 to the present.

26  **REQUEST FOR PRODUCTION NO. 82:**

27      ALL DOCUMENTS RELATING TO use of tactical teams at the JAIL from

28  January 1, 2021 to the present, including but not limited to documentation of

1 | debriefs after use of force or weapons by the JAIL's tactical teams.

2 | **REQUEST FOR PRODUCTION NO. 83:**

3 |     DOCUMENTS sufficient to show the percentages of INCARCERATED

4 | PERSONS at the JAIL annually who are detained for less than one week, for less

5 | than one month, for less than six months, for over a year, and for over two years,

6 | from January 1, 2021 to the present.

7 |

8 | DATED:  June 15, 2023        ROSEN BIEN GALVAN & GRUNFELD LLP

9 |

10 |     By:  */s/ Van Swearingen*

11 |       Van Swearingen

12 |     Attorneys for Plaintiffs

1

*Dunsmore et al. v. San Diego County Sheriff's Dept., et al.*
20-cv-00406 AJB DDL

2

3

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

4

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Francisco, State of California. My business address is 101 Mission Street, Sixth Floor, San Francisco, CA 94105-1738.

5

6

On June 15, 2023, I served a true copy of the following documents described as:

7

8

**PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT**

9

10

on the interested parties in this action as follows:

11

**SEE ATTACHED SERVICE LIST**

12

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent in PDF from e-mail address kchan@rbgg.com to the persons at the e-mail addresses listed in the attached Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the e-mail transmission was unsuccessful.

13

14

15

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

16

Executed on June 15, 2023, at San Francisco, California.

17

18

19

Kedra Chan

20

21

23

24

25

26

27

28

[4311028.1]

# Exhibit E

Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA 92101-8474
Tel: 619.814.5800    Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
Tel: 408.606.6300    Fax: 408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION DEPARTMENT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, et.al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, et.al.,<br><br>　　　　Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DEFENDANTS' RESPONSES TO REQUESTS FOR PRODUCTION, (SET THREE)** |

PROPOUNDING PARTY:  PLAINTIFFS

RESPONDING PARTY:    Defendants SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT

SET NO.:             THREE (3)

　　　Defendant San Diego County Sheriff's Department, County of San Diego, and San Diego County Probation Department, hereby respond to Plaintiffs' Request

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

1

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' RESPONSES TO REQUESTS
FOR PRODUCTION, SET THREE

EX E-38

1  complaints RELATING TO excessive force, including but not limited to use of

2  force AND claims of physical harm by JAIL staff, from INCARCERATED

3  PERSONS between January 1, 2021 and the present.

4  **RESPONSE TO REQUEST FOR PRODUCTION NO. 80:**

5      Objection.  The request seeks documents subject to the attorney client

6  privilege and work product protections.  The request also seeks documents subject

7  to the privacy rights of jail staff and Peace Officers Bill of Rights.  The requested

8  records also may include documents subject to the privacy rights and HIPPA rights

9  of third party Incarcerated Persons who have not been asked for and have not

10  provided authorization of their records.  The use of the phrase "excessive force" is

11  vague and ambiguous and unintelligible in the context of the request, and calls for a

12  legal conclusion given there is no definition of excessive force provided and it

13  unknown what is meant. The request as phrased must be narrowed through meet and

14  confer efforts.

15  **REQUEST FOR PRODUCTION NO. 81:**

16      ALL reports generated by the Critical Incident Review Board RELATING

17  TO in-custody DEATHS at the JAIL from January 1, 2021 to the present.

18  **RESPONSE TO REQUEST FOR PRODUCTION NO. 81:**

19      Objection.  The reports are subject to attorney client and work product

20  privileges, and the official information privilege.  *Sanchez v. City of Santa Ana*, 936

21  F.2d 1027, 1033 (9th Cir. 1990); *Kelly v. City of San Jose*, 114 F.R.D. 653, 669

22  (N.D. Cal. 1987), and accordingly will not be produced.

23  **REQUEST FOR PRODUCTION NO. 82:**

24      ALL DOCUMENTS RELATING TO use of tactical teams at the JAIL from

25  January 1, 2021 to the present, including but not limited to documentation of

26  debriefs after use of force or weapons by the JAIL's tactical teams.

27  **RESPONSE TO REQUEST FOR PRODUCTION NO. 82:**

28      Objection.  The request is overly broad and unduly burdensome in that it

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

26

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' RESPONSES TO REQUESTS
FOR PRODUCTION, SET THREE

EX E-39

1   seeks documents which are not related to any subject matter pled in the TAC and

2   thus not reasonably calculated to lead to the discovery of admissible evidence. The

3   request is also vague and ambiguous as to the meaning of the phrase "tactical

4   teams".  It is unknown what is meant by "tactical teams," as a definition is not

5   provided, and there is no claim relating to "tactical teams" to enable responding

6   party to relate to the request and the phrase to a claim made in the TAC. The request

7   as phrased must be narrowed through meet and confer efforts.

8   **REQUEST FOR PRODUCTION NO. 83:**

9        DOCUMENTS sufficient to show the percentages of INCARCERATED

10  PERSONS at the JAIL annually who are detained for less than one week, for less

11  than one month, for less than six months, for over a year, and for over two years,

12  from January 1, 2021 to the present.

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 83:**

14       Objection.  The request is compound, overly broad and unduly burdensome.

15  The request seeks thousands of pages of documents subject to the privacy rights of

16  Incarcerated Persons in the form of their custody files for which authorization has

17  not been requested and has not been provided. Alternately, the request requires the

18  compilation of statistics regarding the duration of incarcerated persons in a format

19  that is not already maintained by the County. The request as phrased must be

20  narrowed through meet and confer efforts.

21  Dated:  August 14, 2023                    BURKE, WILLIAMS & SORENSEN, LLP

22

23                                             By: */s/ Susan E. Coleman*
                                                   Susan E. Coleman
24                                                 Elizabeth M. Pappy

25                                             Attorneys for Defendants
                                               COUNTY OF SAN DIEGO, SAN DIEGO
26                                             COUNTY SHERIFF'S DEPARTMENT
                                               and SAN DIEGO COUNTY PROBATION
27                                             DEPARTMENT

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

27                 Case No. 3:20-cv-00406-AJB-DDL
                   DEFENDANTS' RESPONSES TO REQUESTS
                   FOR PRODUCTION, SET THREE

EX E-40

1

## PROOF OF SERVICE

2

### *Dunsmore v. San Diego County Sheriff's Department*
### Case No. 3:20-cv-00406-AJB-DDL

3

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

4

5

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of .  My business address is 444 South Flower Street, Suite 2400, Los Angeles, CA 90071-2953.

6

7

On August 14, 2023, I served true copies of the following document(s) described as **DEFENDANTS' RESPONSES TO REQUESTS FOR PRODUCTION, (SET THREE)** on the interested parties in this action as follows:

8

### SEE ATTACHED SERVICE LIST

9

10

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address tmehra@bwslaw.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

11

12

13

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

14

Executed on August 14, 2023, at Los Angeles, California.

15

16

17

Terri Mehra

18

19

20

21

22

23

24

25

26

27

28

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

1

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' RESPONSES TO REQUESTS
FOR PRODUCTION, SET THREE

EX E-41

# Exhibit F

| From: | Pappy, Elizabeth M. |
|---|---|
| To: | Hannah Chartoff |
| Cc: | Coleman, Susan E.; Gay C. Grunfeld; Van Swearingen; Priyah Kaul; Young, Christopher; Aaron Fischer |
| Subject: | RE: Dunsmore v. San Diego County Sheriff"s Department - Request to Meet and Confer re Defs" Written Discovery Responses [IMAN-DMS.FID55015] |
| Date: | Tuesday, August 29, 2023 9:31:07 AM |

[EXTERNAL MESSAGE NOTICE]

I'm not clear how the July 19th letter applies to the issues but you can clarify that in our next meeting.  I'm free this Friday but for our 3:00 p.m. ENE so pick a time that works for you for about 1 hour.

The letter is helpful.  Thank you.  As to No. 80, we will apply the Penal Code section 832.7(b)(1)(A)(ii)-(iii) definition and see if anything comes up.

See my responses below as to the remainder.

Thank you.


**Elizabeth M. Pappy | Partner**
Pronouns: she, her, hers
60 South Market Street, Suite 1000 | San Jose, CA  95113
d - 408.606.6305 | t - 408.606.6300 | f - 408.606.6333
epappy@bwslaw.com | vCard | bwslaw.com
Burke, Williams & Sorensen, LLP


The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Hannah Chartoff <HChartoff@rbgg.com>
**Sent:** Thursday, August 24, 2023 12:08 PM
**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>; Coleman, Susan E. <SColeman@bwslaw.com>; Kish, Fernando <Fernando.Kish@sdcounty.ca.gov>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Young, Christopher <Christopher.Young@us.dlapiper.com>; Aaron Fischer <ajf@aaronfischerlaw.com>

**Subject:** RE: Dunsmore v. San Diego County Sheriff's Department - Request to Meet and Confer re Defs' Written Discovery Responses [IMAN-DMS.FID55015]

[EXTERNAL]

Hi Beth,

Thanks for meeting and conferring on Tuesday.  A list of issues for our next conversation is below.  Note that this list contains issues about both document requests and interrogatories, in light of your indication by email on August 23 that you will not meet and confer separately about the interrogatories but rather only in connection with the document requests.  We hope to continue the discussions of both types of discovery, especially with regard to assertions of privacy, as soon as possible.  Please note that, once we complete all discussions, Plaintiffs will request that certain responses be amended.  In addition, we've attached a formal letter memorializing the definitions requested on Tuesday.

Please us know if you are available tomorrow (August 25) at 4:00 p.m. for a follow-up discussion on these topics:

**Requests for Production**

1.     RFP Nos. 25, 26 and 30 –  Thank you for confirming on Tuesday that Defendants will produce policies, procedures, and green sheets.  Defendants' response states that such documents related to Rock Mountain have already been produced; however, at the time of the earlier request, Defendants asserted there were no such policies and procedures because the facility was not open.  We understand that Rock Mountain is now open.  Please confirm that all Rock Mountain policies and procedures will be produced as well.  Produced already.

2.     RFP No. 28 – Defendants' responses request a definition of "memoranda."  This can be limited to memoranda related to the eight general topics of the TAC and defined as correspondence from Command Staff at the Sheriff's department to all Detention Services Bureau staff, supervisors, and/or managers, or to all staff, supervisors, and/or managers of a particular division, as well as captain's directives like the one produced at SD056140 (see also the attached letter providing this definition).  I will see if there are any responsive documents given this definition and hopefully get back to you Friday.

3.     RFP No. 29 – Please let us know whether Defendants will produce post orders as described in DSB Policy I.29 (see also the attached letter providing this definition).  To the extent they exist, yes.

4.     Search terms for ESI in response to RFP Nos. 31, 32, 33, 37, 38, 47, 48, 51, 59, 61, 63, 72, 74, 75 – We have previously provided search terms and will now specify by RFP number.  We hope to have those to you shortly.

5.     Privilege Log regarding RFP Nos. 37, 43, 45, 48, 54, 55, 56, 58, 59, 60, 61, 63, 65, 80, 81 – To the extent that Defendants plan to withhold documents on the basis of privilege (as

indicated in response to those RFPs), please confirm that Defendants will produce a log describing each document withheld.  The only items that were not created as part of this litigation between our clients and us (which will not be included in a privilege log) are the CIRB records which I advised you would be in the same form as *Morton*.  We are working on that log.

6.    RFP No. 41 – Consistent with our discussion on August 22, please confirm whether there are quality improvement / quality assurance reports or meetings conducted, and whether Defendants will produce documents related to those meetings/reports. Plaintiffs do not seek through this request any separate medical records for a specific incarcerated person. Will do.

7.    RFP No. 43 – Please provide authority for the proposition that disciplinary actions taken against medical staff and contractors are protected from disclosure.  Every employee has a right to privacy under the California Constitution in their employment records.

8.    RFP No. 45 – Consistent with our discussion on Tuesday, please let us know whether Defendants maintain any documents tracking court orders for medical care.  They do not. However, they are in process of conducting whatever searches they are able to perform given that there is no tracking system.  An order regarding a particular IP will come in and it is simply placed in the IP's file and whatever the order is complied with if not already done. Many times IP's complain they haven't seen a doctor but never made a request or notified anyone they needed care, or were already scheduled for one by the time they complained to the Court.

9.    RFP No. 52 – This response is incomplete.  Will Defendants also provide a blank suicide assessment form?  I don't recall talking about this one and don't know that there is a "blank suicide assessment form".  We can talk about this Friday.

10.    RFP No. 53 – Defendants' HIPAA and privacy objections are particularly ill advised here where CDCR is sending Defendants daily emails about the disabilities of incarcerated people and copying multiple third parties.  Please let us know whether Defendants will reconsider this position.  I'm not sure I understand the use of the phrase "ill advised".  Ill advised by whom?  I don't recall talking about this one either but we received 5000 emails which are being reviewed.  You are going to have to educate me on this one because a communication between CDCR, who is also subject to HIPPA and obligated under the California Constitution, sending something to SDSD does not waive or affect the right to privacy or HIPPA rights.

11.    RFP No. 56 – As noted in the attached letter, this request refers to transition plans under 28 C.F.R. § 35.150(d).  Consistent with our discussion on Tuesday, please confirm that no responsive documents exist.  Confirmed.

12.    ADA Compliance prior to SAC, in relation to RFP Nos. 59, 60, 63 – Consistent with our discussion on Tuesday, please confirm that Defendants are searching for and will produce any documents related to ADA compliance efforts that pre-date the filing of the TAC and are not specific to (a) sleeping/toileting/showering accommodations for people with mobility disabilities at Central Jail or (b) hearing disabilities.  If no such documents exist, please

confirm.  Please note that Plaintiffs do not waive their objections to either Defendants' general assertion of privilege related to ADA remediation efforts since the filing of the complaint or Defendants' refusal to produce documents related to the June 21, 2023 stipulation, but will pursue those issues separately.  What is SAC?  Defendants are not searching for documents responsive to No. 59, 60 or 61 as stated in the objections.  What I did agree to look for and what will be produced are documents generated by the ADA Unit upon its formation which was officially June or July 1st (can't recall which).  The written responses may need amendment but we did not talk about and I did not agree to search for documents predating the Third Amended Complaint.  Why would that even be discoverable?  The question in the case isn't what existed prior to the complaint being filed but rather current conditions for which you seek an injunction.  We should go over this one again.

13.    RFP No. 75 – Defendants' response indicates that there were "3,477 incidents" relevant to this request.  Please let us know whether Defendants will produce investigative reports, incident reports, and corrective action plans relating to each of those incidents, as well as any tracking documents from which the figure 3,477 was calculated for purposes of responding to this request.  Please re-read the response.  It will take hundreds of hours to pull each record and review to determine if it is responsive.  All 3,477 are not responsive but there is no way to know without an individual review.  The response requests a narrowing of the category.  Hopefully you can provide that Friday so I can go back to the client with some idea of exactly what you are looking for to reduce the number of incidents.  I can provide you details on how the 3477 was determined and you can narrow from there.

14.    RFP No. 78 – Please let us know whether Defendants maintain records documenting the number and type of services health care contractors provide at the Jail for purposes of billing (e.g., number of patients seen during dental clinic).  We produced the contracts so please take a look at those and let me know what they say on Friday.  I will also ask.

15.    RFP No. 80 – As noted in the attached letter, this request relates to incidents of use of force resulting in death or in great bodily injury and incidents of unreasonable or excessive force, consistent with Penal Code Section 832.7(b)(1)(A)(ii)-(iii), which are public under that statute.  To the extent there have been claims of excessive force and/or physical harm by Jail staff resulting in death or great bodily injury in the past two years, please confirm that Defendants will produce those records.  As I stated above, we will relook at the request applying the penal code statute you have cited.

16.    RFP No. 81 – Consistent with our conversation on August 22, Plaintiffs understand that we are at an impasse on this issue, and no additional meet and confer is necessary prior to IDC.  Correct but I did tell you we would be providing a privilege log.

17.    RFP No. 82 – As noted in the attached letter, this request relates to tactical teams described in DSB Policy I.70.  Please let us know whether Defendants will produce documents in response to this request.  I will take the information you provided back to the client.

18.    RFP No. 83 – Documents already produced (e.g., SD056176 at page 11) indicate that length

of stay statistics are tracked in some format. Please let us know where this information is maintained. The information was produced. An amended response will be provided once we finalize meet and confer on all other issues.

**Interrogatories**

19.     Please provide authority for your claim that members of the certified subclass must opt in to be represented by plaintiffs' counsel. I'm not aware of any such claim.

20.     With respect to Defendants' objections based on the privacy rights of the pre-certified class (ROGs 1-6, 8-10), please see our attached July 19 letter setting forth our position as to why we believe we are entitled to the requested information. Can you provide us with Defendants' position in response and any legal authority for Defendants' position? The information requested in Nos. 1-6 and 8-10 do not request the identification of the settlement class.

21.     Defendants have objected on HIPAA grounds to ROGs 1-6. Plaintiffs disagree that HIPAA applies to all of these requests, at least some of which do not seek "protected health information" as defined by HIPAA. See 45 C.F.R. § 160.103. Even if HIPAA applies, it does not preclude Defendants from providing the requested information subject to the protective order. See 45 C.F.R. § 164.512(e)(1)(ii)(B). Based on our discussion on Tuesday, we understood Defendants' position on the RFPs to be that Defendants would not respond to certain requests on HIPAA grounds, with the possible exception of producing certain documents redacting all personally-identifiable information except the last three digits of incarcerated persons' booking numbers. Is that position the same as to these ROGs? If so, can you provide us with the legal authority on which you rely? This argument is unclear. Certain lists requested were produced with all but the last three digits of booking numbers and in some cases, JIMS numbers were produced. A protective order does not overcome privacy rights and you have never given me any legal authority to support that claim.

22.     Defendants have objected to ROG 6 in part on the ground that the lawsuit has not been certified as a class action "except for limited settlement of the Central Jail ADA issues for mobility impaired persons." To be clear, the certified subclass was defined as "all qualified individuals with a hearing and/or mobility disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in the Jail." Will you agree to provide a response to ROG 6 for members of the certified subclass? If not, can you please provide Defendants' position and legal authority? As to all other incarcerated persons with disabilities, Plaintiffs again refer you to our July 19 letter for our position. The request is not limited in any way to individuals under the settlement. You may not serve discovery about a settlement. The issue is "settled". The Settlement Order provides your rights to information, including the rosters to be produced monthly starting end of this month/start of next. What else is it you think you are entitled to get?

As usual, you skirt around an issue without getting to the point. You are entitled to get, and we have no objection to providing, contact information for individuals that are part of the

settlement class.  You just served a request (No. 86 for that information) and a timely response will be provided.  There is no legal authority that supports the notion that you have the right to unfettered access to information other than identification of people who haven't even been given notice of the class.  I invite you to provide it to me.

The items listed above are not dispositive of all issues related to these responses.  We will provide additional information as soon as possible.

Thank you,
Hannah

**Hannah Chartoff**
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830
hchartoff@rbgg.com | she/her | rbgg.com

---

**From:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Sent:** Wednesday, August 16, 2023 6:22 PM
**To:** Hannah Chartoff <HChartoff@rbgg.com>; Coleman, Susan E. <SColeman@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Kish, Fernando <Fernando.Kish@sdcounty.ca.gov>
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Kedra Chan <KChan@rbgg.com>; Young, Christopher <Christopher.Young@us.dlapiper.com>; Aaron Fischer <ajf@aaronfischerlaw.com>
**Subject:** RE: Dunsmore v. San Diego County Sheriff's Department - Request to Meet and Confer re Defs' Written Discovery Responses [IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

That works for me.

---

**From:** Hannah Chartoff <HChartoff@rbgg.com>
**Sent:** Wednesday, August 16, 2023 5:39 PM
**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>; Coleman, Susan E. <SColeman@bwslaw.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>; Kish, Fernando <Fernando.Kish@sdcounty.ca.gov>
**Cc:** Gay C. Grunfeld <GGrunfeld@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Kedra Chan <KChan@rbgg.com>; Young, Christopher <Christopher.Young@us.dlapiper.com>; Aaron Fischer <ajf@aaronfischerlaw.com>
**Subject:** RE: Dunsmore v. San Diego County Sheriff's Department - Request to Meet and Confer re Defs' Written Discovery Responses [IMAN-DMS.FID55015]

[EXTERNAL]

---

# Exhibit G



# *San Diego County Sheriff's Department*

It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody

*February 2022*

**REPORT 2021-109**





**CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814



**916.445.0255** | TTY **916.445.0033**



For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* 

*For questions regarding the contents of this report, please contact our* Public Affairs Office *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternative format reports available upon request | Permission is granted to reproduce reports



**Michael S. Tilden** *Acting State Auditor*

February 3, 2022
*2021-109*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the San Diego County Sheriff's Department (Sheriff's Department) to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps it took to address these deaths. The following report details our conclusion that the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody.

From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

Furthermore, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action. In addition, the Citizens' Law Enforcement Review Board (CLERB)—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. CLERB also failed to investigate nearly one-third of the deaths of incarcerated individuals in the past 15 years, which means that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

In light of the ongoing risk to inmate safety, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

iv | California State Auditor Report 2021-109
February 2022

## Selected Abbreviations Used in This Report

| | |
|---|---|
| ADP | average daily population |
| BSCC | Board of State and Community Corrections |
| CDCR | California Department of Corrections and Rehabilitation |
| CLERB | Citizens' Law Enforcement Review Board |
| POBR | Public Safety Officers Procedural Bill of Rights |

# Contents

Summary                                                                                    1

Introduction                                                                               7

Chapter 1
The San Diego County Sheriff's Department Did Not Take Sufficient
Steps to Prevent the High Number of Deaths in Its Jails                                    13

Chapter 2
Neither the Sheriff's Department nor CLERB Has Taken Adequate
Action in Response to the Deaths of Incarcerated Individuals                               33

Conclusions and Recommendations                                                            53

Appendix A
In-Custody Deaths in California's 15 Largest Counties                                      59

Appendix B
Scope and Methodology                                                                      61

Responses to the Audit
Board of State and Community Corrections                                                   65

   California State Auditor's Comments on the Response From
   the Board of State and Community Corrections                                            71

Citizens' Law Enforcement Review Board                                                     75

   California State Auditor's Comments on the Response From
   the Citizens' Law Enforcement Review Board                                              79

California Department of Justice                                                           81

San Diego County Sheriff's Department                                                      83

   California State Auditor's Comments on the Response From
   the San Diego County Sheriff's Department                                               115

have reservations about formalizing these reports in a written format without some form of protection against using these documents as evidence in litigation. He stated that without such protection, staff members would be reluctant to point out any form of mistake or error, leading to lost learning opportunities. Regardless of the department's position, we believe the reviews should be formalized for internal use to help the department better track its identification of deficiencies and recommendations for improvements to its clinical care. Other counties we reviewed have policies for documenting these 30-day reviews.

In addition to the 30-day medical review, in-custody deaths—except natural deaths—are also subject to review by the Critical Incident Review Board, which is the Sheriff's Department's internal review committee. The board consists of three voting members—commanders from the Law Enforcement, Court Services, and Detention Services bureaus—and two nonvoting members—the chief legal advisor and a commander from the human resources bureau. The stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals.

Moreover, the board is an entity within the Sheriff's Department, so it is not independent. The Sheriff's Department's investigators present to the board the facts and circumstances related to an in-custody death. According to department policy, the board then carefully reviews the incident from multiple perspectives, including training, tactics, policies, and procedures. Its ultimate goal is identifying problem areas and recommending remedial actions—such as posting a training bulletin or changing a policy—so that potential liability can be avoided in the future. According to policy, if the board votes to determine that any policy violations exist, it will forward the case to Internal Affairs.

*After the Critical Incident Review Board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with policies and practices.*

However, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Of the 18 cases we reviewed for which the department held a Critical Incident Review Board meeting, the board reported taking action related to 13. However, only six resulted in substantive actions, such as changes to policy and procedures or training, related to preventing inmate deaths. The remaining seven resulted predominantly in minor administrative actions or recommendations for training that would not have far-reaching effects on the welfare of individuals in custody.

Moreover, even though the board discussed critical issues in some meetings, it ultimately concluded them without making recommendations for addressing these issues. For example, in

six of the 18 cases, the board indicated that the events surrounding the deaths in question could merit changes to policy and procedures; however, it did not recommend any related actions. According to the assistant sheriff of detentions, the Sheriff's Department may make immediate changes to policies following a death if it identifies a need, so additional recommendations from the board are sometimes unnecessary. However, the minutes of the Critical Incident Review Board meetings do not always discuss these types of policy changes. We question why the review board did not discuss the need for changes in some instances or discuss whether any changes made address the problems identified.

Further, the Critical Incident Review Board generally does not review natural deaths. Instead, it primarily reviews suicides, homicides, and accidental in-custody deaths. According to the Sheriff's Department's chief legal advisor, the board does not review natural deaths in part because the risk of legal liability in those incidents is low. He further stated that because the Medical Examiner's Office has made a determination that an individual's death was from natural causes, it rules out other human factors. However, we found in our review of 30 case files that the Medical Examiner's Office typically reviews events preceding individuals' deaths and their medical records, but it does not make conclusions about the appropriateness of care provided by the Sheriff's Department. We find the Sheriff's Department's decision not to hold critical incident reviews for natural deaths concerning given that these deaths accounted for nearly 50 percent of all deaths in the department's facilities in the period of our review. Further, as we note in Chapter 1, we identified significant deficiencies in the Sheriff's Department's handling of care leading to all types of deaths, including natural deaths. By not requiring the Critical Incident Review Board to review these cases, the department is not doing everything it can to protect incarcerated individuals.

Finally, the Critical Incident Review Board is not transparent. It does not make its reports and investigations public. The board's reports are classified as attorney-client privileged, meaning that they are confidential and cannot be disclosed without the Sheriff's Department's consent. The purpose of attorney-client privilege is to ensure that clients can fully disclose information to their lawyer without fear that it will be revealed to others, enabling them to receive competent legal advice. Although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.

*By keeping the findings and recommendations of the Critical Incident Review Board confidential, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.*

Although the Sheriff's Department's homicide unit is rarely involved in developing policy recommendations, it typically presents facts about in-custody deaths to the Critical Incident Review Board. The homicide unit investigates deaths that occur in custody by, in part, inspecting the scene of the incident, interviewing any witnesses and detention staff, and reviewing video surveillance and reports written by sworn staff. Even though the information that the homicide unit presents to the Critical Incident Review Board is a key component of the Sheriff's Department's review of in-custody deaths, the Critical Incident Review Board ultimately decides whether to take further action.

The Sheriff's Department's internal affairs unit may also investigate detention staff—including health staff—for alleged misconduct related to an in-custody death. The internal affairs unit receives complaints that are initiated by a member of the community or by the Sheriff's Department. The Critical Incident Review Board can also initiate an internal affairs investigation if it votes that a policy violation may have occurred.

However, the Sheriff's Department has performed very few such investigations. Specifically, it reported to us that it conducted only four internal affairs investigations related to the 30 cases we reviewed, even though we identified a number of potential violations or concerns in some of the other 26 cases that could justify further investigation. Further, internal affairs indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.

*The Sheriff's Department's internal affairs unit indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.*

Thus, the Sheriff's Department does not complete internal affairs investigations frequently enough for it to provide significant value. Although internal affairs indicates that its investigations are generally complaint-driven, the small number of investigations related to death cases—coupled with the lack of meaningful changes arising from the 30-day medical review and the Critical Incident Review Board meeting—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

### The Sheriff's Department Has Not Implemented Key Recommendations From External Entities Related to Incarcerated Individuals' Welfare and Safety

The Sheriff's Department has not implemented a number of key recommendations from external entities that are essential for ensuring the welfare and safety of incarcerated individuals, as Table 3 shows. We reviewed recommendations from 2006 through 2020 that the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention

addressed to the Legislature and/or the BSCC, not to the Sheriff's Department as the audited entity.

### ii. The Critical Incident Review Board's Roles of Preventing Future Litigation and Improving the Health and Welfare of Incarcerated Individuals are Not Mutually Exclusive

(16)

The auditors stated there should be more transparency regarding the process and findings of the Sheriff's CIRB Board. The CIRB reviews occur within the confines of the attorney-client relationship and are not reported out publicly. Every governmental entity, even those such as the State Legislature or a Board of Supervisors, both of which are subject to the *Brown Act's* open meeting requirements, are afforded the opportunity to engage in candid conversations with its counsel within the confines of the attorney-client relationship.

Notwithstanding the auditors' particular concern regarding the existence of the attorney-client privilege, the CIRB's role of preventing future litigation compliments rather than undercuts the Department's goal of improving the health and welfare of incarcerated individuals entrusted to the care and custody of the Sheriff. As items of concern are identified during a critical incident, such as an in-custody death, the CIRB review is focused with an eye towards what changes have already been implemented by the chain of command to remedy any deficiencies before the matter made it to the CIRB for review, as well as any changes the chain of command may not have already identified and/or implemented to minimize the risk of a recurrence. If the CIRB identifies any best practices or changes not previously identified and implemented by the chain of command prior to its review, the CIRB is empowered to make such recommendations.

As it relates specifically to in custody deaths, the CIRB concentrates not only on the death itself, but also considers the handling of the inmate from the time the inmate was originally booked. The Board looks to determine whether any warning signs existed, whether appropriate and timely safety checks occurred, and whether there were any risk reduction lessons that could be derived from the incident.

While the focus of the CIRB may be risk management, the mechanism by which risk management is ultimately accomplished is clearly through the promotion of best practices and policies that improve the health and welfare of incarcerated individuals and holding staff accountable.

While the Auditor was "particularly concerned" that the Sheriff's Department does not publicly report out its CIRB discussions, all Sheriff's Department policies, procedures, training, and education materials are published on the Sheriff's Department's website. Any changes to Sheriff's policies, procedures, training, or education, whether recommended by the CIRB or implemented by management prior to or without the need for a CIRB review, are published and available for the public to access on the Sheriff's Department's website. In addition to the

# Exhibit H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF ELISA SERNA, et al.

Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

Case No.: 20-cv-2096-LAB-DDL

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

**[Dkt. No. 141]**

# I.

## INTRODUCTION

Elisa Serna died while in custody at Las Colinas Detention Facility. In this civil rights action arising from Serna's death, Plaintiffs move to compel production of: (1) 35 reports of the San Diego Sheriff's Department's Critical Incident Review Board (the "CIRB") pertaining to inmates who died in Sheriff's Department custody for the time period November 1, 2015 to December 1, 2019; (2) a CIRB Report tracking spreadsheet; (3) the Internal Affairs investigation file relating to Serna's death; and (4) and an unredacted copy of an email chain involving defendant Friederike Von Lintig, M.D.

/ / /

/ / /

The County of San Diego ("County") argues the 35 CIRB Reports and the spreadsheet are protected from disclosure by the attorney-client privilege, the work product doctrine, the official information privilege, the deliberative process privilege, the law enforcement investigatory privilege and privacy rights. The County similarly invokes the official information privilege and privacy rights to resist disclosure of the Internal Affairs file. Finally, the County and defendants Coast Correctional Medical Group ("CCMG"), Von Lintig and Mark O'Brien (collectively, the "CCMG Defendants") oppose production of the emails involving Von Lintig because they contain confidential medical information of third parties.

The Court has considered the arguments of counsel made in multiple rounds of briefing and at oral argument on August 8, 2023, and has conducted an *in camera* review of the disputed documents. After careful consideration, and on the record before it, the Court finds the County has not met its burden to establish the privileges it invokes apply to the CIRB Reports in their entirety, the CIRB spreadsheet or the Internal Affairs file. Further, the Court finds the privacy concerns raised by the County and the CCMG Defendants are adequately addressed by the operative Protective Order and limited redactions of personal information as described in this Order. The Court further concludes that 33 of the 35 CIRB Reports and the Internal Affairs file are relevant to Plaintiffs' claims and proportional to the needs of the case.

## II.

## FACTUAL BACKGROUND

### A. Serna's Death

As alleged in Plaintiffs' Second Amended Complaint, Serna was admitted to the Las Colinas Detention Facility on November 6, 2019. Dkt. No. 34 at ¶ 22. She reported she was addicted to heroin and alcohol and that she had used heroin, alcohol and Xanax two hours before her booking. *Id.* at ¶¶ 23, 25. Serna went to the Las Colinas medical ward on November 6 and 7, where she was given Zofran and "advised to increase her fluid intake." *Id.* at ¶ 26. Serna vomited for multiple consecutive days and had symptoms

EX H-61
20-cv-2096-LAB-DDL

indicating dehydration, but she was not placed on withdrawal protocol and was "told to drink some more water." *Id.* at ¶¶ 30-34.

On November 10, Serna was transferred to a Medical Observation Bed, where she was given medication for her withdrawal. *Id.* at ¶¶ 37-39. On November 11, beginning at 1:15 a.m., multiple medical personnel at Las Colinas observed Serna as she continued exhibiting symptoms of withdrawal and dehydration. *Id.* at ¶¶ 41-80. Plaintiffs allege medical personnel failed to treat Serna as she repeatedly suffered seizures, lost consciousness and fell to the ground. *Id.* at ¶ 75.

On November 11, at approximately 7:00 p.m., two jail personnel "watched as [Serna] suffered a seizure, struck her head and fell unconscious onto the floor of her cell." *Id.* at ¶ 78. The personnel left the cell without providing any medical treatment. *Id.* at ¶ 80. Serna died on the cell floor shortly thereafter. *Id.* at ¶¶ 81-82.

Plaintiffs assert causes of action under 42 U.S.C. § 1983 against several individual defendants, as well as a cause of action under § 1983 against the County and CCMG pursuant to *Monell v. Dep't of Soc. Serv. of the City of N.Y.*, 436 U.S. 658 (1978). Plaintiffs also assert causes of action under California law for wrongful death, negligence and a survival claim.

## B. **Critical Incident Review Board**

San Diego Sheriff's Department Policy and Procedure Manual Section 4.23 ("Section 4.23") describes the CIRB's purpose and procedures:

> The purpose of [the CIRB] is to consult with department legal counsel when an incident occurs which may give rise to litigation. The focus of the CIRB will be to assess the department's civil exposure as a result of a given incident. The CIRB will carefully review those incidents from multiple perspectives, including training, tactics, policies, and procedures with the ultimate goal of identifying problem areas and recommending actions so that potential liability can be avoided in the future.

/ / /

/ / /

Dkt. No. 153-2 at 11.[1]  Section 4.23 requires the CIRB to review all "critical incidents," which include "[i]n custody deaths, other than natural causes."  *Id.* at 12.

The CIRB consists of three voting members and two non-voting members.  *Id*. at 11. The three voting members include Sheriff's Department Commanders from the Law Enforcement, Court Services, and Detention Services Divisions.  *Id*.  The two non-voting members are the Sheriff's Department Chief Legal Advisor and a Commander from Human Resources.  *Id*.

Following an in-custody death, the Sheriff's Department's Homicide Unit conducts an investigation.  Baranic Trans. at 28:7-9.  In preparation for the CIRB meeting, Sheriff's Department personnel prepare a PowerPoint presentation summarizing the incident and the investigation.  Baranic Trans. at 26:23-27:2; 108:20-23.

The CIRB's review consists of both a "presentation session" and a "closed session." Dkt. No. 153-2 at 5; Baranic Trans. at 16:19-17:4.  At the presentation session, "the investigators involved in the investigation of the critical incident will present facts and circumstances to the members of the CIRB."  Dkt. No. 153-2 at 12.  CIRB members may question the investigators "regarding the specific facts and circumstances surrounding the critical incident."  *Id*.  Baranic testified the presentation session "is where the information is presented to the board members, and we have the opportunity to ask questions of either the affected command or subject matter experts."  Baranic Trans. at 16:25-17:3.[2]

---

[1]    The Court draws the facts regarding the CIRB process from the declaration of Sheriff's Department Director of Legal Affairs and Chief Legal Advisor Michael Baranic, which includes Section 4.23.  Dkt No. 153-2.  The Court also draws from Baranic's testimony on April 24, 2023, in *Morton v. Cnty. of San Diego, et al.*, 21-cv-1428-MMA-DDL, Dkt. No. 79 ("Baranic Trans."), regarding the CIRB process and functions.

[2]    *Greer v. Cnty. of San Diego*, 634 F. Supp. 3d 911 (S.D. Cal. 2022), describes the CIRB meeting as occurring in three stages, with a second stage involving a discussion between the CIRB members and Sheriff's Department subject matter experts.  *Id*. at 915. The record in this case does not include information about that second stage, but that does not affect the Court's analysis.

EX H-63
20-cv-2096-LAB-DDL

Following the presentation session, the CIRB meets in closed session. Only the five CIRB members and a Division of Inspectional Services Lieutenant acting as the "scribe" are present at the closed session. *Id.* at 78:14. As stated in Section 4.23, "[a]fter hearing from all necessary parties, the three Commanders will vote to make a determination as to whether or not a policy violation may exist." Dkt. No. 153-2 at 12. If a majority of the three voting Commanders determine a policy violation may have occurred, the case is referred to Internal Affairs for further investigation. *Id.* If the majority does not find a potential policy violation, "the CIRB case will be forwarded to the Standards and Compliance Manager of the Division of Inspectional Services for the generation of a report, consistent with the Board's findings, at the conclusion of the CIRB." *Id.* at 13.

Section 4.23 identifies two post-CIRB meeting requirements. First, for critical incidents involving a Sheriff's Department employee, the employee's Facility or Unit Commander must brief the employee "as to the results of the CIRB" review within seven days of the CIRB meeting. *Id.* Second, within 45 days of the CIRB review, the Department of Inspectional Services must "prepare a report summarizing the actions and conclusions of the board." *Id.* The report "shall contain specific findings with regard to whether the review board found any policy violations, and training or policy issues, as well as what actions were taken by the department." *Id.* The Lieutenant who served as the "scribe" prepares the CIRB Report. Baranic Trans. at 78:14. Baranic testified the CIRB Report may contain action items. *Id.* at 112:4-13. Under Section 4.23, the CIRB may also make "recommendations for training based on the analysis of critical incidents" as well as "proposed policy recommendations" if it identifies "policy issues of concern while reviewing a critical incident." Dkt. No. 153-2 at 13. In addition to these requirements, Baranic testified that, in the days following the CIRB review, he "tend[s] to have a standing meeting with the Sheriff and Undersheriff, and I will brief them on the CIRBs." Baranic Trans. at 112:1-3.

In February 2022, the California State Auditor issued a report regarding inmate deaths in San Diego County Jails. *See* https://www.auditor.ca.gov/pdfs/reports/2021-

109.pdf (last accessed August 29, 2023). The report included a response from the San Diego County Sheriff's Department that includes the following regarding the CIRB:

> As items of concern are identified during a critical incident, such as an in-custody death, the CIRB reviews focus with an eye toward what changes have already been implemented by the chain of command to remedy any deficiencies before the matter admitted to the CIRB for review, as well as any changes the chain of command may not have already identified and/or implemented to minimize the risk of a reoccurrence.

> If the CIRB identifies any best practices or changes not previously identified and implemented by the change [sic] of command prior to this review, the CIRB is empowered to make such recommendations.

*Id.* at 103. Baranic testified this is "a purpose of CIRB but not the primary purpose of CIRB." Baranic Trans. at 76:1-2.

## III.

## DISCUSSION

### A.    CIRB Reports and Spreadsheet (RFP Nos. 12 and 13)

Plaintiffs seek disclosure of 35 CIRB Reports pertaining to in-custody deaths at San Diego County jails from November 1, 2015 to December 1, 2019, and a spreadsheet listing the same CIRB Reports. The County asserts the attorney-client privilege, work product doctrine, official information privilege, deliberative process privilege, law enforcement investigatory privilege and third-party privacy concerns exempt the CIRB Reports from disclosure. The County further asserts the CIRB Reports are neither relevant nor proportional to the needs of the case irrespective of any privilege. The Court addresses each contention in turn.

#### 1.    Attorney-Client Privilege

##### a.    General principles

Federal law applies to assertions of privilege in this federal civil rights action. *See United States v. Zolin*, 491 U.S. 554, 562 (1989). "The attorney-client privilege is the

EX H-65
20-cv-2096-LAB-DDL

oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id*. "However, since the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose" and "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).[3]

The privilege "protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021). The elements of the privilege are:

> (1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived.

*Martin*, 278 F.3d at 999. "The burden is on the party asserting the privilege to establish all the elements of the privilege." *Id*. at 999-1000.

There is no dispute the County may invoke the attorney-client privilege for confidential communications between Sheriff's Department counsel and Sheriff's Department personnel so long as the County establishes that the communications meet the foregoing elements for privileged communications. *See In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) ("In civil suits between private litigants and government agencies, the attorney-client privilege protects most confidential communications between government

---

[3] All citations are omitted unless otherwise noted.

1    counsel and their clients that are made for the purpose of obtaining or providing legal
2    assistance."). This is because "[a]ccess to legal advice by officials responsible for
3    formulating, implementing and monitoring governmental policy is fundamental to
4    promot[ing] broader public interests in the observance of law and administration of
5    justice." *Id*. at 419.

### b.  **Prior rulings**

7    At the outset, the Court acknowledges that multiple judges in this District (including
8    the undersigned) have considered attorney-client privilege assertions as to CIRB Reports.
9    In *Bush v. Cnty. of San Diego*, No. 15-cv-686-L-JMA, Dkt. No. 22 (S.D. Cal. Nov. 24,
10   2015), the court declined to compel production of a CIRB Report based on a declaration
11   from then-Sheriff's Department Chief Legal Advisor Robert Faigin stating the Report "is
12   a confidential communication involving the County's employees and Faigin, in his
13   capacity as a legal advisor, and was prepared for the purpose of obtaining legal advice
14   related to the subject incident." *Id*. at 8. Similarly, in *Estate of Ruben Nunez v. Cnty. of
15   San Diego*, No. 16-cv-1412-BEN-MDD, Dkt. No. 186 (S.D. Cal. Sept. 11, 2017), the court
16   declined to compel production of a CIRB Report based on a declaration from Faigin stating
17   that "the purpose of the [CIRB] meeting was to obtain legal advice in advance of potential
18   litigation." *Id*. at 3.

19   More recently, the *Greer* court applied the "primary purpose" test adopted by the
20   Ninth Circuit in *In re Grand Jury* to CIRB investigations. *Greer*, 634 F. Supp. 3d. at 919-
21   21. The *Greer* court conducted a detailed analysis of Section 4.23 and concluded "the
22   objective evidence before the Court establishes the CIRB's primary purpose is
23   investigative and remedial (activities generally not protected by the attorney-client
24   privilege), and the County has not carried its burden of establishing the primary purpose of
25   the twelve CIRB investigations at issue was obtaining legal advice." *Id.* at 921. The
26   District Judge affirmed that ruling and thereafter conducted an *in camera* review of the
27   CIRB Reports at issue. Following the *in camera* review, the District Judge affirmed the
28   prior ruling that the CIRB Reports were not privileged. *See* Dkt. No. 61-1 at 59 (transcript

of February 8, 2023 hearing in *Greer* in which the District Judge concluded "the CIRB memoranda reports and documents are not privileged because their primary purpose is to determine training issues and recommend remedial measures in response to serious incidents that occur within the County jails, as opposed to giving or seeking legal advice from or by the chief legal officer").

Finally, in *Morton*, this Court concluded that the County had not carried its burden to establish that the primary purpose of all the communications at the subject CIRB meeting was to seek or provide legal advice so as to render the entire CIRB Report privileged but that limited portions of the CIRB Report were properly redacted prior to the Report's disclosure to the plaintiffs. *Morton v. Cnty. of San Diego*, 21-cv-1428-MMA-DDL, 2023 WL 4243239, at *6 (S.D. Cal. June 27, 2023).

### c. <u>Application to the Present Dispute</u>

Against this backdrop, the Court turns to the CIRB Reports at issue in this case. To justify its assertion of the attorney-client privilege as to the entirety of all 35 CIRB Reports, the County bears the burden to establish that each Report memorializes confidential communications between attorney and client that were "made for the purpose of giving legal advice." *In re Grand Jury*, 23 F.4th at 1091; *see also Chrimar Sys. Inc. v. Cisco Sys. Inc.*, No. 13-CV-01300-JSW(MEJ), 2016 WL 1595785, at *3 (N.D. Cal. Apr. 21, 2016) (attorney-client privilege extends to document that "memorializes and reflects legal advice rendered in a privileged conversation"). Given that the County asserts the privilege as to the entirety of each Report, the County must show that every communication memorialized in that Report was "made for the purpose of giving [or seeking] legal advice." *In re Grand Jury*, 23 F.4th at 1091. The County has not met its burden.

The County points out the stated purpose of the CIRB is to "consult with department legal counsel when an incident occurs which may give rise to litigation" and "assess the department's civil exposure as a result of a given incident." Dkt. No. 153-2 at 11. Baranic declares the CIRB's "primary purpose is risk management" with a "focus on potential litigation." *Id.* at 3-4. At the evidentiary hearing, Baranic similarly testified the "sole

purpose" of the CIRB is to examine critical incidents "from a liability standpoint." Baranic Trans. at 83:24-25. He further testified that he CIRB Report is generated "to memorialize the discussions and [] any legal advice that was given during the CIRB process." *Id.* at 90:8-9.

"Where the communication was made for dual-purposes, courts must determine 'whether the primary purpose of the communication is to give or receive legal advice, as opposed to business . . . advice.'" *Greer,* 634 F. Supp. 3d at 917-18 (citing *In re Grand Jury*, 23 F.4th at 1091). In determining whether the CIRB Reports memorialize communications "made for the purpose of giving legal advice," *In re Grand Jury*, 23 F.4th at 1091, the Court begins with the provisions of Section 4.23 that govern the CIRB process. As noted above, at the presentation session, "the investigators involved in the investigation of the critical incident will present facts and circumstances to the members of the CIRB." Dkt. No. 153-2 at 12. Thereafter, the five CIRB members meet in closed session where "the three Commanders will vote to make a determination as to whether or not a policy violation may exist." *Id.* In addition, the CIRB may make training recommendations and "proposed policy recommendations." *Id.* at 13. Finally, Section 4.23 requires the preparation of a CIRB Report that "shall contain specific findings with regard to whether the review board found any policy violations, and training or policy issues, as well as what actions were taken by the department." *Id.*

The requirements established by Section 4.23 – that the CIRB vote on the existence of policy violations, make findings as to any policy violations and "training or policy issues" and describe actions taken – exist independent of any legal advice that may be provided by the Chief Legal Advisor, who serves as a non-voting CIRB member. Stated another way, the CIRB could fulfill its duties under Section 4.23 to vote on policy violations and address training or policy issues absent any legal advice from the Chief Legal Advisor. *See Fisher*, 425 U.S. at 403 (privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege"); *Wisk Aero LLC v. Archer Aviation, Inc.*, No. 21-cv-2450-WHO (DMR), 2023

WL 2699971, at *4 (N.D. Cal. March 29, 2023) ("no privilege can attach to any communication as to which a business purpose would have served as a sufficient cause, *i.e.*, any communication that would have been made because of a business purpose, even if there had been no perceived additional interest in securing legal advice").  That legal advice from the Chief Legal Advisor is not necessary for the CIRB to fulfill these duties significantly undermines the County's position that the Reports *in toto* are privileged, and weighs against a finding that the primary purpose of the CIRB meetings is to "give or receive legal advice."  *In re Grand Jury*, 23 F.4th at 1091.

The Court's *in camera* review of the 35 CIRB Reports further supports the conclusion that the primary purpose of the communications at the CIRB meetings was not to seek or receive legal advice such that the attorney-client privilege protects the entirety of each Report from disclosure.  *See United States v. Chevron Corp.*, No. C 94-1885 SBA, 1996 WL 444597, at *2 (N.D. Cal. May 30, 1996) ("The court may conduct an *in camera* review of withheld documents to allow the client to demonstrate to the court that the attorney-client privilege applies to segregable portions of the withheld documents.").  Certain of the CIRB Reports contain questions and statements by then-Chief Legal Advisor Robert Faigin. [4]  *See*, *e.g.*, CSD-2461-2479.  However, it is not apparent from the CIRB Reports themselves that these questions or statements constitute legal advice, and the County has not asserted that specific portions of the CIRB Reports contain legal advice. [5]  To be sure, the privilege applies to confidential "communications relating to" the seeking of legal advice, *Martin*, 278 F.3d at 999, which may include communications made by the client and communications made by the attorney that do not constitute legal advice *per se*.

---

[4]    Faigin was the Chief Legal Advisor in November 2020 and attended the CIRB meeting in that capacity.  Baranic assumed the Chief Legal Advisor role thereafter.

[5]    Baranic asserts Faigin "regularly provided legal advice at the CIRB meetings" and provides "general examples" of the types of legal communications, but he does not reference portions of the CIRB Reports that contain legal advice.  Dkt. No. 153-2 at ¶ 9.

1  But the absence of readily identifiable legal advice contained in the CIRB Reports is
2  nevertheless relevant to the Court's assessment of whether the primary purpose of the
3  communications was to give or receive legal advice.

4       The Court credits Baranic's testimony that, from his perspective as the Chief Legal
5  Advisor, his role in the CIRB is to provide legal advice. But the issue presented is whether
6  the *primary* purpose of the communications at the CIRB meetings was to provide legal
7  advice such that the 35 CIRB Reports are protected in their entirety by the attorney-client
8  privilege. *In re Grand Jury*, 23 F.4th at 1091. As the Second Circuit explained, "[t]he
9  predominant purpose of a communication cannot be ascertained by quantification or
10 classification of one passage or another," but "should be assessed dynamically and in light
11 of the advice being sought or rendered, as well as the relationship between advice that can
12 be rendered only by consulting the legal authorities and advice that can be given by a non-
13 lawyer." *In re Cnty. of Erie*, 473 F.3d at 420-21. Here, the rendering of legal advice is not
14 necessary for the CIRB to fulfill the requirements of Section 4.23, and the CIRB Reports
15 do not, on their face, contain legal advice provided by the Chief Legal Advisor. On this
16 record, the County has not carried its burden to establish that the primary purpose of the
17 communications at the CIRB meetings was to seek or provide legal advice. As such, the
18 Court concludes the attorney-client privilege does not apply to the entirety of each CIRB
19 Report at issue.

20      "[R]edaction is available for documents which contain legal advice that is incidental
21 to the nonlegal advice that is the predominant purpose of the communication." *Id.* at 421;
22 *see also Chevron Corp.*, 1996 WL 444597, at *2 ("[D]espite the overall nature of the
23 document, the client may assert the attorney-client privilege over isolated sentences or
24 paragraphs within a document."). The County has not asserted that any portions of the
25 CIRB Reports contain segregable, confidential attorney-client communications that should
26 be redacted if the Court were to conclude the attorney-client privilege does not apply to the
27 / / /
28 / / /

12

Reports in their entirety. As set forth below, the Court will provide the County with an opportunity to propose redactions to the CIRB Reports consistent with this Order.[6]

The Court has also reviewed the CIRB spreadsheet (Bates-stamped CSD-2650-2651) documenting each of the 35 CIRB proceedings at issue. There is no indication the spreadsheet itself is an attorney-client communication or memorializes any such communication, and the Court concludes the County has not met its burden to establish that the attorney-client privilege log applies to the CIRB spreadsheet.

## 2. **Work Product Doctrine**

### a. **General Principles**

"The work-product doctrine is a qualified privilege that protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119 (9th Cir. 2020). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case, and protects both material prepared by agents for the attorney as well as those prepared by the attorney himself." *Id.* The doctrine "upholds the fairness of the adversarial process by allowing litigators to creatively develop legal theories and strategies – without their adversaries invoking the discovery process to pry into the litigators' minds and free-ride off them." *In re Grand Jury*, 23 F.4th at 1093; *see also* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . .").

"In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the 'because of' test is used." *United States v.*

---

[6]   On August 25, 2023, the Court directed the County to submit for *in camera* review "its proposed redactions to the CIRB Reports at issue" if the Court were to conclude that the Reports are not protected from disclosure in their entirety. Dkt. No. 215. Thereafter, the Court granted the County's request to provide its proposed redactions after issuance of this Order. Dkt. No. 218.

*Richey*, 632 F.3d 559, 567–68 (9th Cir. 2011).  "In applying the 'because of' standard, courts must consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation."  *Id*.  "The party asserting work product protection has the burden to demonstrate it applies to the information in question."  *Greer*, 634 F. Supp. 3d at 918.

### b.    Application to the Present Dispute

The work product doctrine applies if the County establishes that each of the 35 CIRB Reports "would not have been created in substantially similar form but for the prospect of litigation."  *Richey*, 632 F.3d at 568.  Here, however, Section 4.23 requires the CIRB to review all "critical incidents," which include "[i]n custody deaths, other than natural causes."  Dkt. No. 153-2 at 12.  Section 4.23 applies to all "critical incidents" regardless of whether the County has received notice of litigation arising from the incident at issue. Baranic Trans. at 22:25-23:15.  The Court therefore concludes the County has not met this burden because Section 4.23 mandates the CIRB review process for all critical incidents whether or not litigation is anticipated.  *See Kelly v. City of San Jose*, 114 F.R.D. 653, 659 (N.D. Cal. 1987) ("Since police departments are under an affirmative duty, in the normal course of serving their public function, to generate the kind of information at issue here, the policies that inspire the work product doctrine are wholly inapplicable."); *Martin v. Evans*, No. C 08-4067 JW MEJ, 2012 WL 1894219, at *5 (N.D. Cal. May 23, 2012) (overruling work-product objection to production of prison internal affairs reports where prison "fails to demonstrate how the reports were generated primarily for use in litigation or collected outside the regular course of business"); *Greer*, 634 F. Supp. 3d at 921-22 (finding County did not establish work product doctrine applied to CIRB reports).

### 3.    Official Information Privilege

"Federal common law recognizes a qualified privilege for official information." *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1033 (9th Cir.1990).  "In determining what level of protection should be afforded by this privilege, courts conduct a case by case

balancing analysis, in which the interests of the party seeking discovery are weighed against the interests of the governmental entity asserting the privilege." *Soto v. City of Concord*, 162 F.R.D. 603, 613 (N.D. Cal. 1995). This balancing approach is "moderately pre-weighted in favor of disclosure." *Id.* The County bears the burden of establishing the official information privilege applies. *Shiflett by and through Davenport v. City of San Leandro*, No. 21-cv-7802-LB, 2023 WL 4551077, at *2 (N. D. Cal. July 13, 2023).

The party asserting the privilege must make a "substantial threshold showing." *Soto*, 162 F.R.D. at 613. "[T]o fulfill the threshold requirement, the party asserting the privilege must submit a declaration or affidavit from a responsible official with personal knowledge of the matters to be attested to in the affidavit." *Id.* The affidavit must include:

> (1) an affirmation that the agency generated or collected the material in issue and has maintained its confidentiality; (2) a statement that the official has personally reviewed the material in question; (3) a specific identification of the governmental or privacy interests that would be threatened by disclosure of the material to plaintiff and/or his lawyer; (4) a description of how disclosure subject to a carefully crafted protective order would create a substantial risk of harm to significant governmental or privacy interests, and (5) a projection of how much harm would be done to the threatened interests if disclosure were made.

*Id.* "If the nondisclosing party does not meet this initial burden, the court will order disclosure of the documents; if the party meets this burden, the court generally conducts an *in camera* review of the material and balances each party's interests." *Rogers v. Giurbino*, 288 F.R.D. 469, 481 (S.D. Cal. 2012) (overruling privilege claim where defendant did not submit appropriate declaration).

The County asserts that Baranic's declaration makes the requisite "substantial threshold showing." Dkt. No. 153 at 16. Baranic states he has reviewed all the CIRB Reports at issue. Dkt. No. 153-2 at ¶ 5. Although he does not specifically state the CIRB Reports are maintained in confidence, that is a reasonable inference from his repeated references to the confidential nature of the CIRB Reports (*id.* at ¶¶ 10, 15), and he previously testified that he maintains the Reports in his office. Baranic Trans. at 41:21-25.

However, Baranic does not sufficiently address the third, fourth or fifth factors. Baranic focuses on the County's position that the CIRB Reports are subject to the attorney-client privilege, but that is a separate inquiry from "the governmental or privacy interests that would be threatened by disclosure of the material to plaintiff and/or his lawyer." *Soto*, 162 F.R.D. at 613. Nor does Baranic address how disclosure of the CIRB Reports subject to the existing Protective Order "would create a substantial risk of harm to significant governmental or privacy interests" or "how much harm would be done to the threatened interests if disclosure were made." *Id.* This is insufficient to satisfy the County's burden to make a substantial threshold showing the official information privilege applies.

Even assuming the requisite showing were made, the County does not address the non-exhaustive factors used in balancing the parties' respective interests.[7] *See Shiflett*, 2023 WL 4551077, at **2-3 (citing *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. 1973)). The Court has reviewed the 35 CIRB Reports and spreadsheet *in camera* and concludes these factors weigh in favor of disclosure under the Protective Order. There is no showing that disclosure will discourage citizens from giving the government information, the party seeking the information is not an actual or potential defendant in a criminal proceeding, there is no indication that the 34 CIRB Reports unrelated to Serna's

---

[7] Those factors include: "(1) The extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) The impact upon persons who have given information of having their identities disclosed; (3) The degree to which government self-evaluation and consequent program improvement will be chilled by disclosure; (4) Whether the information sought is factual data or evaluative summary; (5) Whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) Whether the police investigation has been completed; (7) Whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) Whether the plaintiff's suit is non-frivolous and brought in good faith; (9) Whether the information sought is available through other discovery or from other sources; [and] (10) The importance of the information sought to the plaintiff's case." *Kelly*, 114 F.R.D. at 663.

1   death entail ongoing disciplinary proceedings, Plaintiffs' suit is non-frivolous, there is no

2   showing that this information is available to Plaintiffs from other sources and the

3   information regarding other deaths is relevant to Plaintiffs' *Monell* claims.  Other factors

4   arguably weigh against disclosure, including the potential for disclosure of identities of

5   individuals who died in the jails and the potential that "government self-evaluation and

6   consequent program improvement will be chilled by disclosure." *Kelly*, 114 F.R.D. at 663.

7   However, the absence of evidence from the County precludes a finding of any chilling

8   effect beyond the generalized assertions that courts have found insufficient to deny

9   disclosure under the official information privilege.  *Shiflett*, 2023 WL 4551077, at *3

10  (collecting cases).   And the operative Protective Order assuages any concern that

11  information about nonparties would be disclosed outside of the litigation. The Court

12  concludes the balancing analysis weighs in favor of disclosure of the CIRB Reports and

13  spreadsheet to Plaintiffs under the Protective Order.

14      **4.   Deliberative process privilege**

15      Federal law "shields from public disclosure confidential interagency memoranda on

16  matters of law or policy." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1116

17  (9th Cir. 1988).  This deliberative process privilege applies to documents that "reflect

18  advisory opinions recommendations and deliberations comprising part of a process by

19  which government decisions and policies are formulated." *F.T.C. v. Warner Commc'ns

20  Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (hereafter "*Warner*").  The document "must be

21  predecisional – i.e., it must have been generated before the adoption of a policy or

22  decision," and it "must be deliberative in nature, containing opinions, recommendation, or

23  advice about . . . policies [or decisions]." *Id.*  In assessing whether the document is

24  deliberative in nature, the inquiry is "whether the requested information independently

25  reflects the deliberative process itself" because "purely factual material that does not reflect

26  deliberative processes is not protected," and "[o]nly those portions of a predecisional

27  document that reflect the give and take of the deliberative process may be withheld."

28  *Shiflett*, 2023 WL 4551077, at *4.

"The deliberative process privilege is a qualified one," and "[a] litigant may obtain deliberative materials if his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner*, 742 F.2d at 1161. "Among the factors to be considered in making this determination are: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.* The Court may also consider "(5) the interest of the litigant, and ultimately society, in accurate judicial fact finding, (6) the seriousness of the litigation and the issues involved, (7) the presence of issues concerning alleged governmental misconduct, and (8) the federal interest in the enforcement of federal law." *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1122 (N.D. Cal. 2003). The County bears the burden of establishing the deliberative process privilege applies to the 35 CIRB Reports and the CIRB spreadsheet. *Shiflett*, 2023 WL 4551077, at *2.

The County has not met its burden for multiple reasons.[8] First, the County's position that the deliberative process privilege applies to the entirety of every CIRB Report is not well-taken. "Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld." *Shiflett*, 2023 WL 4551077, at *4. It is true that factual materials may be exempt from disclosure under certain circumstances. *Nat'l Wildlife Fed'n*, 861 F.2d at 1119 ("whenever the unveiling of factual materials would be

---

[8] There is authority for the proposition that "the deliberative process privilege generally does not apply in civil rights lawsuits to protect from disclosure internal affairs documents, investigations, and records of witness/police officer statements, as these routinely generated communications are not designed to contribute to the formulation of important public policy." *Shiflett*, 2023 WL 4551077, at *5. However, in the absence of controlling Ninth Circuit authority addressing this issue, the Court assumes the privilege applies. *See Llera v. Las Vegas Metro. Police Dep't*, 564 F. Supp. 3d 914, 918–19 (D. Nev. 2021) ("Because the deliberative process privilege is a privilege that the government can utilize to protect some deliberative material and the Court has not located any controlling authority stating that the privilege cannot be used in civil rights cases, the Court does not agree that it is inapplicable here.").

EX H-77
20-cv-2096-LAB-DDL

1   tantamount to the publication of the evaluation and analysis of the multitudinous facts

2   conducted by the agency, the deliberative process privilege applies").  However, the

3   County simply asserts that "both the conclusions and the factual portions of the CIRB

4   Reports are protected by the deliberative process privilege," Dkt. No. 153 at 15, and does

5   not explain how the factual materials contained in the CIRB Reports and spreadsheets are

6   "tantamount to the publication of the evaluation and analysis of the multitudinous facts

7   conducted by the agency." *Id*.[9]

8       Second, even looking beyond the County's failure to justify the wholesale

9   application of the privilege to the 35 CIRB Reports and the CIRB spreadsheet, and even

10  assuming the privilege applies to all these documents, the County does not offer any

11  argument or analysis as to whether Plaintiffs' "need for the materials and the need for

12  accurate fact-finding override the government's interest in non-disclosure." *Warner*, 742

13  F.2d at 1161.  The County does not acknowledge the *Warner* factors, and its two-sentence

14  argument pertains solely to the fourth factor: "if discoverable, the CIRB is necessarily

15  going to be less forthcoming and thus less productive, and less productive means less

16  positive change." Dkt. No. 153 at 15.  This generalized statement is insufficient to meet

17  the County's burden.

18      Third, although the County's failure to meet its burden is dispositive, the Court has

19  independently considered the *Warner* factors and concludes they support disclosure of the

20  CIRB Reports and spreadsheet.  The CIRB Reports are relevant to Plaintiffs' *Monell* claim,

21  as explained further below, and there is no indication that Plaintiffs can obtain information

22  regarding other incidents relevant to the existence (or not) of a municipal policy that

23

24  _____

25  [9]    Baranic testified that "policy changes don't come out of CIRB," and "[t]here's a

26  procedure to change department policy, which accounts for 99 percent of the changes that

27  occur."  Baranic Trans. at 83:11-17.  This arguably weighs finding the deliberative process

    privilege applies to the CIRB Reports, but the parties did not address this portion of

28  Baranic's testimony in their briefing, and the Court will not consider it in determining

    whether the County has met its burden to establish the privilege applies here.

19

Plaintiffs must establish to prevail on that claim. As a party to this action, the County "is not an uninvolved entity that is being asked to disclose a typically confidential document for little reason." *Llera*, 564 F. Supp. 3d at 920. And although disclosure of the CIRB Reports could potentially affect the willingness of CIRB participants to speak freely, there is no evidence in the record that disclosure of CIRB Reports pursuant to the protective order in this case would have such a chilling effect. *See id.* (holding deliberative process privilege did not prevent disclosure of Critical Incident Review Team report in federal civil rights case and concluding that fourth *Warner* factor did not support application of privilege, and noting "it is also entirely possible that if officers knew their reports would be public, they might be more thorough, accurate, deliberative, and candid . . ."). As such, Plaintiffs' need for the CIRB Reports and spreadsheet "override[s] the [County's] interest in non-disclosure," *Warner*, 742 F.2d at 1161, and production pursuant to the Protective Order "will sufficiently protect [the County's] interests." *Al Otro Lado, Inc. v. Wolf*, No. 3:17-CV-2366-BAS-KSC, 2020 WL 6449152, at *5 (S.D. Cal. Nov. 2, 2020) (overruling deliberative process privilege objection to production of documents).

## 5. Law enforcement investigatory privilege

"Although the Ninth Circuit has not expressly recognized the law enforcement privilege, several courts within this Circuit have acknowledged and applied it." *Lien v. City of San Diego*, No. 21-cv-224-MMA-WVG, 2022 WL 134896, at *2 (S.D. Cal. Jan. 14, 2022). The privilege "is based on the harm to law enforcement efforts that might arise from public disclosure of investigatory files." *Id.*

A party asserting the privilege must meet the following requirements:

(1) there must be a formal claim of privilege by the head of the department having control over the requested information, (2) assertion of the privilege must be based on actual personal consideration by that official, and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege.

*Roman v. Wolf*, No. EDCV20-768-TJH(PVC), 2020 WL 6588399, at *2 (C.D. Cal. July 16, 2020). Thus, in *Lien*, the District Court found the privilege applied to internal

documents maintained by the San Diego Police Department relating to "an ongoing, pending criminal prosecution" and "ongoing active criminal investigations" and affirmed the production of those documents to the civil action plaintiffs with redactions to information identifying those individuals. *Lien*, 2022 WL 134896, at **3-4.

The County again relies on Baranic's declaration to make the required showing and argues the CIRB Reports "consist of confidential communications between the Department and its attorneys following critical incidents and the potential resulting exposure." Dkt. No. 153 at 17. But this is a repetition of the County's attorney-client privilege argument, and Baranic does not explain how disclosure of the CIRB Reports and spreadsheet subject to the existing Protective Order could cause "harm to law enforcement efforts" such as pending investigations or prosecutions. *Lien*, 2022 WL 134896, at *2. Nor does Baranic explain how redactions to specific portions of the CIRB Reports would be insufficient to protect the integrity of any unspecified investigations or prosecutions. *See id.* at **4-5 (upholding redactions to names of individuals subject to ongoing investigation and prosecution). For all these reasons, the County has not met its burden to establish the law enforcement investigatory privilege applies to the CIRB Reports and spreadsheet.

### 6. **Privacy considerations**

The CIRB Reports contain information regarding Sheriff's Department employees as well as confidential medical information regarding the individuals who died in Sheriff's Department custody. The County asserts privacy rights on behalf of both groups.

"Federal courts recognize a constitutionally-based right of privacy that can be raised in response to discovery requests." *Carr v. Cnty. of San Diego*, No. 19-cv-1139-JLS-MDD, 2020 WL 7074881, at *4 (S.D. Cal. Dec. 3, 2020). "Resolution of a privacy objection . . . requires a balancing of the need for the information sought against the privacy right asserted." *Soto*, 162 F.R.D. at 616. "However, these privacy interests must be balanced against the great weight afforded to federal law in civil rights cases against police departments." *Id.* "[P]rivacy objections can be appropriately addressed by: (1) redacting any personal identifying information from the documents produced; and (2) producing

1   documents under a protective order to minimize any invasion into the individual's privacy
2   rights." *Stuart v. Cnty. of Riverside*, No. 522CV701SPGMAR, 2023 WL 4826231, at *2
3   (C.D. Cal. June 15, 2023).

4        As explained below, the CIRB Reports contain information that is relevant to
5   Plaintiffs' *Monell* claim, and there is no showing this information is available to Plaintiffs
6   through other means.  Production of the CIRB Reports subject to the existing Protective
7   Order will adequately protect the privacy interests of Sheriff's Department employees.  To
8   the extent the CIRB Reports contain personal identifiable information  regarding Sheriff's
9   Department employees (other than their names and titles) such as marital status, spouse
10  names, children's names, driver's license numbers, Social Security numbers and home
11  addresses, the County may redact that information.   *Stuart*, 2023 WL 4826231, at **3-4.

12       As to the privacy rights of individuals who died in Sheriff's Department custody, the
13  County correctly points out the Health Insurance Portability and Accountability Act
14  ("HIPAA") protects personal health information for 50 years after death.   45 C.F.R.
15  § 160.103.  HIPAA also provides that protected health information may be disclosed "[i]n
16  response to an order of a court or administrative tribunal, provided that the covered entity
17  discloses only the protected health information expressly authorized by such order."  45
18  C.F.R. § 164.512(e)(1)(i).  The existing Protective Order adequately protects these privacy
19  concerns and any similar concerns falling under the California Confidentiality of Medical
20  Information Act.  *See A.H. v. Cnty. of Los Angeles*, No. CV 22-03671-SB (ASX), 2023
21  WL 3035349, at *4 (C.D. Cal. Jan. 19, 2023) ("Given the protective order in place, Court
22  is likewise unpersuaded by Plaintiffs' assertion that HIPAA bars disclosure of these
23  records."); *Marsh v. Cnty. of San Diego*, No. CIV. 05CV1568 JLS AJB, 2007 WL
24  3023478, at *3 (S.D. Cal. Oct. 15, 2007).

25       **7.    Relevance and proportionality**

26       The Federal Rules of Civil Procedure permit a broad scope of discovery: "Parties
27  may obtain discovery regarding any nonprivileged matter that is relevant to any party's
28  claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).

"Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "The party seeking to compel discovery has the burden of establishing that its request satisfies the relevance requirement of Rule 26." *FlowRider Surf, Ltd. v. Pacific Surf Designs, Inc.*, No. 15-cv-1879-BEN-BLM, 2016 WL 6522807, at *2 (S.D. Cal. Nov. 3, 2016).

Plaintiffs assert the CIRB Reports are relevant to their *Monell* claim against the County. To successfully establish *Monell* liability, a plaintiff must show: "(1) [the plaintiff] was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). A municipal policy may be established by showing: (1) "a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official government policy"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (internal quotations omitted).

Plaintiffs allege the County had "a custom and practice" of, *inter alia*, "assuming a patient was seeking 'secondary gain' and denying patients medical care," "not properly screening inmates for medical care or treatment," "failing to communicate the medical needs of inmates between the medical staff and deputies," and "not properly checking on the welfare of inmates, even those inmates known to have serious medical needs." Dkt. No. 34 at ¶¶ 279-282. On the present record, Plaintiffs have adequately shown that information regarding other in-custody deaths contained in the CIRB Reports is "relevant

1  to a claim or defense" for purposes of the Fed. R. Civ. P. 26(b) analysis.  *See Henry v. Cnty.*

2  *of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *as amended*, 137 F.3d 1372 (9th Cir. 1998)

3  ("post-event evidence is not only admissible for purposes of proving the existence of a

4  municipal defendant's policy or custom, but is highly probative with respect to that

5  inquiry").

6        The County's reliance on *Gordon v. Cnty. of Orange*, 6 F.4th 961 (9th Cir. 2021), is

7  misplaced for purposes of this motion to compel.  *Gordon* held the District Court properly

8  granted summary judgment on the plaintiff's *Monell* claim because "a single incident of

9  unconstitutional activity is not sufficient to impose liability under *Monell*" and "the record

10  lacks evidence of any other event involving similar conduct or constitutional violations."

11  *Id.* at 974.  *Gordon* may be instructive should the County bring a future summary judgment

12  motion and argue, as it does here, that Plaintiffs cannot establish liability for an

13  unconstitutional custom or practice because the other incidents documented in the CIRB

14  Reports are factually dissimilar to Serna's death.  But the fact that the CIRB Reports, in

15  the County's view, undermine Plaintiffs' *Monell* claim does not render the Reports

16  irrelevant for purposes of Rule 26(b).  To the contrary, evidence is relevant if "it has any

17  tendency to make a fact *more or less* probable than it would be without the evidence" and

18  "the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added).

19        Having reviewed the 35 CIRB Reports *in camera*, all but two Reports contain

20  information pertaining to other inmate deaths that is relevant and proportional to the needs

21  of the case under Rule 26(b) regardless of whether that information ultimately supports

22  Plaintiffs' *Monell* claim or the County's defense thereto.  However, the Court concludes

23  that two of the CIRB Reports pertaining to inmates killed by other inmates are not relevant

24  to Plaintiffs' *Monell* claim.  These documents, bearing Bates Nos. CSD-2593-2602 and

25  CSD-2622-2630, shall not be produced.

26  **B.**    **Internal Affairs File (RFP No. 2)**

27        Plaintiffs move to compel production of the Sheriff's Department's Internal Affairs

28  file pertaining to Serna's death.  The County contends the file is subject to the official

information privilege and submits the declaration of Lieutenant Ruben Medina in support of its privilege assertion. Dkt. No. 153-1 at 4-7.

As noted above, the party asserting the official information privilege must properly invoke the privilege by making a "substantial threshold showing." *Kelly*, 114 F.R.D. at 669. Medina's declaration fulfills the first two requirements in that he avers Internal Affairs files are confidential and he has personally reviewed the Internal Affairs documents relating to Serna's death. Dkt. No. 153-1 at 5, ¶ 2.

The remainder of Medina's declaration, however, proffers only generalized concerns regarding disclosure of information in Internal Affairs files. He states, "[d]isclosure of certain information about law enforcement personnel can jeopardize their safety and the safety of their families, and subject them to harassment or intimidation." Dkt. No. 153-1 at 6, ¶ 3. Medina further declares "constructive and even negative criticism is sometimes necessary in evaluating the performance of one's subordinates" and that maintaining the confidentiality of Internal Affairs files "enhances critical and candid assessments and is vital to deputies, their superiors and the public." *Id.* at ¶ 5. Further, he asserts general concerns regarding dissemination of Internal Affairs files, such as "discourag[ing] individuals from providing information" and "disrupt[ing] the vital day to day operations of the department." *Id.* at ¶ 6.

These generalized concerns, untethered to the facts of this case, do not make the requisite substantial threshold showing to satisfy the third, fourth or fifth factors. As to the third factor – identification of the specific privacy interests that would be threatened with disclosure in this case – Medina provides broad statements about the risks of disclosure generally. But to satisfy this factor, the County "must specifically describe how disclosure of the requested documents in that particular case . . . would be harmful." *Soto*, 162 F.R.D. at 614. Medina does not address the fourth factor in that he does not attempt to explain how disclosure pursuant to the Protective Order would create a substantial risk of harm to significant governmental or privacy interests. *See Simon v. City of Los Angeles*, No. 222CV01775SSSGJSX, 2023 WL 3402628, at *7 (C.D. Cal. Apr. 21, 2023) (granting

motion to compel production of LAPD Internal Affairs records where declaration offered in support of official information privilege invocation "only generally asserts speculative harm that may result if officers' private information is disclosed and has failed to explain why disclosure of responsive documents in this case would be detrimental if done pursuant to a carefully crafted protective order, such as the one already issued in this action"). Finally, Medina does not project the degree of harm that would be caused by disclosure to Plaintiffs of the Internal Affairs file relating to Serna's death.

Even if Medina's declaration were sufficient to make the requisite substantial threshold showing to assert the privilege, the County does not address the Court's obligation to balance the parties' respective interests in determining whether the privilege should bar disclosure under the facts of this case. *Shiflett*, 2023 WL 4551077, at **2-3. The Court has reviewed the Internal Affairs file and concludes the relevant factors weigh in favor of disclosure under the Protective Order. *Kelly*, 114 F.R.D. at 663. As an initial matter, the investigation into Serna's death is relevant to Plaintiffs' claims. *Simon*, 2023 WL 3402628, at *7. The County's contention that the Internal Affairs records will be inadmissible at trial does not carry the day, as "[i]nformation within th[e] scope of discovery need not be admissible to be discoverable." Fed. R. Civ. P. 26(b)(1). Some of the information contained within the Internal Affairs file may be duplicative of materials already provided to Plaintiffs, but that possibility does not warrant denying Plaintiffs access to the file. The County's assertion that Plaintiffs have not shown a "compelling need for any Internal Affairs records" (Dkt. No. 153 at 20-21) misses the mark because "compelling need" is not the legal standard. The Internal Affairs file is relevant to Plaintiffs' claims, and its production is proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

Through Medina, the County requests an opportunity to redact personal information from the Internal Affairs file if the Court orders its production. Dkt. No. 153-1 at ¶ 10. The file does not appear to contain any personal information, only work addresses and phone numbers. Nevertheless, like the CIRB Reports, to the extent the Internal Affairs file contains contain employees' personal identifiable information (other than names and titles)

such as marital status, spouse names, children's names, driver license numbers, social security numbers and home addresses, the County may redact that information.   *Stuart*, 2023 WL 4826231, at **3-4; *Simon*, 2023 WL 3402628, at *8 (compelling production of Internal Affairs records with redactions to personal information that defendant "reasonably determines is required to protect the privacy and security of law enforcement officers and third-parties, such as address, social security number, date of birth, medical information, and the like").

## C.   Von Lintig Emails

The County produced to Plaintiff nine pages of email messages to and from Von Lintig (CSD-316-324).   One email written by Von Lintig dated November 17, 2019, includes a discussion of medical treatment provided to six inmates, not including Serna (CSD-320-323).   The County redacted the description of the medical treatment provided but not the six names.

Plaintiffs assert the type of treatment provided is relevant but that they do not need the six inmate names.   At the August 8 hearing, counsel for CCMG and Von Lintig agreed redaction of the six names would satisfy their HIPAA and third-party privacy concerns.

To resolve this issue, Plaintiffs shall destroy all copies of CSD-316-324 in their position on or before September 6, 2023.   Within one week of receiving confirmation from Plaintiffs that the documents have been destroyed, the County shall re-produce CSD-316-324 with the six inmate names redacted but with all other information unredacted, including the description of medical treatment.

**V.**

**CONCLUSION**

For all the foregoing reasons, Plaintiffs' motion to compel is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      By not later than **September 6, 2023**, the County must submit for *in camera* review any proposed redactions to the CIRB Reports and the CIRB spreadsheet identified

/ / /

27

in its privilege log (excluding the CIRB Reports with Bates Nos. CSD-2593-2602 and CSD-2622-2630). The County must highlight the proposed redacted text for each Report.

2. By not later than **September 6, 2023**, the County must produce to Plaintiffs the Internal Affairs file relating to Serna's death.

3. By not later than **September 6, 2023**, Plaintiffs must destroy all copies of CSD-316-324 in their position. Within one week of receiving confirmation from Plaintiffs that the documents have been destroyed, the County shall re-produce CSD-316-324 with the six inmate names redacted but with all other information, including the description of medical treatment, unredacted.

**IT IS SO ORDERED.**

Dated: August 30, 2023

_____
Hon. David D. Leshner
United States Magistrate Judge

EX H-87
20-cv-2096-LAB-DDL

# Exhibit I

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF ELISA SERNA by and through its administrator DOUGLAS GILLILAND, et al., | Case No.: 20-cv-2096-LAB-DDL |
| Plaintiffs, | **ORDER:** |
| v. | **(1) DENYING EX PARTE MOTION FOR LIMITED STAY OF AUGUST 30, 2023 DISCOVERY ORDER, [Dkt. 223];** |
| COUNTY OF SAN DIEGO, et al., | |
| Defendants. | **(2) SETTING DEADLINE TO PROPOSE REDACTIONS; and** |
| | **(3) STAYING AUGUST 30, 2023 DISCOVERY ORDER** |

On September 6, 2023, Defendant County of San Diego (the "County") filed an *ex parte* motion to stay portions of Magistrate Judge David D. Leshner's August 30, 2023 Discovery Order, (Dkt. 220), pending review by the undersigned district judge. (Dkt. 223). The County specifically requests the Court stay the Discovery Order to the extent it compels the production of 33 Critical Incident Review Board ("CIRB") Reports and a CIRB Spreadsheet. (*Id.* at 1).

1    The Discovery Order found the CIRB documents weren't protected in their
2    entirety by the various evidentiary privileges asserted by the County. (Dkt. 220
3    at 2). Judge Leshner did, however, find that certain statements might be protected
4    by the attorney-client privilege and ordered the County to "submit for *in camera*
5    review any proposed redactions to the CIRB Reports and the CIRB spreadsheet"
6    identifying specific, privileged statements. (*Id.* at 13, 27–28). The County timely
7    submitted its proposed redactions, (Dkt. 232 at 3), and, on September 13, 2023,
8    filed its objections to and motion for reconsideration of the Discovery Order under
9    Federal Rule of Civil Procedure 72(a) ("Rule 72 Motion"), (Dkt. 231). A hearing on
10   that motion is set for October 17, 2023 at 11:30 a.m. (*Id.*). On September 14,
11   2023, Judge Leshner issued an Order Regarding Redactions to CIRB Documents,
12   rejecting the County's "sweeping [proposed] redactions" and ordering the County
13   to produce unredacted versions of the CIRB documents following the resolution
14   of the Rule 72 Motion. (Dkt. 232).

15   Rule 72(a) permits non-dispositive pretrial matters, such as discovery
16   motions, to be decided by a magistrate judge. Fed. R. Civ. P. 72(a). Such rulings
17   are subject to reconsideration by the district judge if a party files a timely objection.
18   *Id.* When reviewing a magistrate judge's ruling on a non-dispositive matter, the
19   district judge may modify or set aside any part of an order which is "found to be
20   clearly erroneous or contrary to law." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(A).

21   In addition to filing a Rule 72 objection or motion for reconsideration, a party
22   may also request a stay of the challenged order. *See, e.g.*, *Esparza v.*
23   *Bridgestone/Firestone, Inc.*, 200 F.R.D. 654, 656–57 (D. Colo. 2001); *Litton*
24   *Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 124 F.R.D. 75, 79 (S.D.N.Y.
25   1989). When considering whether to stay a magistrate judge's order, many courts,
26   including courts in this District, apply the same four-factor test used to determine
27   whether to stay a district court order pending appellate review: "(1) whether the
28   movant has made a showing of likelihood of success on the merits; (2) whether

the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest." *E.g.*, *Alvarez v. Larose*, No. 20-cv-782-DMS-AHG, 2020 WL 5632659, at *2 (S.D. Cal. Sept. 21, 2020); *see also In re Republic of Ecuador*, No. 10-MC-80087 CRB (NC), 2012 WL 13187177, at *2 (N.D. Cal. Mar. 30, 2012) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)) (applying the four-factor test because the motion to stay the effect of the magistrate judge's order pending resolution of Rule 72 objections "is akin to a motion for stay pending appeal"). The first two factors "are the most critical" and "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *Nken*, 556 U.S. at 434 (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)).

The County argues it is "substantially likely to prevail on the merits" because "the Discovery Order is clearly erroneous and contrary to law." (Dkt. 223-1 at 6). According to the County, the Discovery Order misapplies the "primary purpose" test articulated in *In re Grand Jury*, 23 F.4th 1088 (9th Cir. 2021), and fails to apply the holdings in *Bush v. County of San Diego*, No. 15-cv-686-L-JMA (S.D. Cal. Nov. 24, 2015), ECF No. 22, and *Estate of Nunez v. County of San Diego*, 16-cv-1412-BEN-MDD (S.D. Cal. Sept. 11, 2017), ECF No. 186. *Bush* and *Nunez* found the purpose of the CIRB was for the County to obtain legal advice, but both were decided before *In re Grand Jury* and, therefore, don't shed light on the application of the primary purpose test to the CIRB documents at issue here.

More recently, several judges in this District applying the primary purpose test have found CIRB documents aren't subject to the attorney-client privilege in their entirety. *See, e.g.*, *Greer v. County of San Diego*, 634 F. Supp. 3d 911, 919–21 (S.D. Cal. 2022) (concluding "the objective evidence before the Court establishes the CIRB's primary purpose is investigative and remedial (activities generally not protected by the attorney-client privilege), and the County has not

carried its burden of establishing the primary purpose of the twelve CIRB investigations at issue was obtaining legal advice"); Hearing Tr. at 56:17–23, *Greer*, No. 19-cv-378-JO-DEB (S.D. Cal. Feb. 23, 2023), ECF No. 341 (transcript of February 8, 2023 hearing in which the District Judge concluded "the CIRB memoranda reports and documents are not privileged because their primary purpose is to determine training issues and recommend remedial measures in response to serious incidents that occur within the County jails, as opposed to giving or seeking confidential legal advice from or by the chief legal officer"); *Morton v. County. of San Diego*, No. 21-cv-1428-MMA-DDL, 2023 WL 4243239, at *6 (S.D. Cal. June 27, 2023) (concluding the County didn't carry its burden to establish that the primary purpose of all communications at the subject CIRB meeting was to seek or provide legal advice but that limited portions of a CIRB Report were properly redacted prior to disclosure to the plaintiffs); *Morton*, No. 21-cv-1428-MMA-DDL, slip. op. at 13, 15 (S.D. Cal. Sept. 6, 2023) (overruling objections to discovery order; concluding the magistrate judge's finding weren't clearly erroneous; and ordering compliance with discovery order compelling production of CIRB documents).

Considering these recent decisions concluding CIRB documents produced by the County aren't privileged in their entirety, the Court finds the County hasn't made a "better than negligible" showing of a likelihood of success on the merits of its Rule 72 Motion. *Nken*, 556 U.S. at 434. The County's *ex parte* motion to stay portions of the Discovery Order is **DENIED**. (Dkt. 223).

Without a stay, Judge Leshner's Order Regarding Redactions to CIRB Documents requires the County to produce unredacted versions of the CIRB documents once the Court resolves the pending Rule 72 Motion. (Dkt. 232). The Court will afford the County one more opportunity to identify specific statements that might be protected by the attorney-client privilege. No later than **September 27, 2023**, the County may submit to Judge Leshner for *in camera*

EX I-92
20-cv-2096-LAB-DDL

review proposed redactions to the 33 CIRB Reports at issue identifying *specific* statements that might be privileged. (Dkt. 220 at 13, 27–28). Proposed redactions should be highlighted in each report. To allow the County time to review the CIRB Reports, the Discovery Order is **STAYED** until Judge Leshner has issued an order on the County's newly proposed redactions.

      **IT IS SO ORDERED**.

Dated:  September 20, 2023

_Larry A. Burns_

**Hon. Larry Alan Burns**
United States District Judge

EX I-93
20-cv-2096-LAB-DDL

# Exhibit J

```
 1              UNITED STATES DISTRICT COURT        CERTIFIED COPY

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3                    BEFORE THE HONORABLE
              JINSOOK OHTA, DISTRICT JUDGE PRESIDING
 4    _____

 5    Frankie Greer,                  ) CASE NO:  19-cv-00378-DEB
                                      )
 6    Plaintiff,                      ) DATE:  February 8, 2023
                                      )
 7                                    ) Final Pretrial Conference/
                                      ) Motion Hearing
 8    v.                              )
                                      ) Date: 2/8/2023
 9    COUNTY OF SAN DIEGO,            )
      WILLIAM GORE, in his individual) Pages 1 through 63
10    capacity, ALFRED JOSHUA, in    )
      his individual capacity,       )
11    BARBARA LEE, in her individual )
      capacity, and DOES 1-100.      )
12                                    )
      Defendants.                     )
13                                    )
      _____

14
                REPORTER'S TRANSCRIPT OF PROCEEDINGS
15

16

17

18

19

20

21
      _____
22    REPORTED BY:          Abigail R. Torres, CSR, RPR/RMR, FCRR
                            United States District Court
23                          Southern District of California
                            333 West Broadway, Suite 420
24                          San Diego, California 92101

25          --appearances continued on the following page--
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:        IREDALE & YOO, APC
                               105 West F Street, 4th Floor
 3                             San Diego, California 92101
                               BY:  JULIA YOO, ESQ.
 4
     FOR THE DEFENDANT:        MCDOUGAL, LOVE, ECKIS, BOEHMER & FOLEY
 5                             8100 La Mesa Boulevard, Suite 200
                               La Mesa, California 91942
 6                             BY:  CARRIE L. MITCHELL, ESQ.
                               BY:  STEVEN E. BOEHMER, ESQ.
 7                                  -oOo-
                               COUNTY OF SAN DIEGO
 8                             OFFICE OF COUNTY COUNSEL
                               1600 Pacific Highway, Room 355
 9                             San Diego, California 92101
                               BY:  MELISSA HOLMES, ESQ.
10                             BY:  DAVID BRODIE, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:20-cv-00406-AJB-DDL   Document 412-2   Filed 10/09/23   PageID.16383
Page 102 of 105
Case 3:19-cv-00378-JO-DEB   Document 341   Filed 02/23/23   PageID.7820   Page 55 of 63

55

1  to meet and confer before the -- and then get the Court's

2  permission before filing motions with the Court, after that,

3  the Court decided to impose a good-faith meet-and-confer

4  obligation on all cases.

5       And so those are what will control.  And so the Court

6  is going to allow this motion -- or the motion that it just

7  heard on the merits.  And, finally, with regard to the -- with

8  regard to the privilege issue as to the CIRB documents, so

9  there were objections to the magistrate judge's ruling that the

10  CIRB documents were not privileged and that Defendants had not

11  met their burden of establishing they were privileged.  The

12  Court found that -- the Court overruled those objections to the

13  magistrate judge's ruling and agreed with that ruling.

14       However, in order to give the Defendants a chance to

15  excise or redact any specific portions that might constitute

16  attorney-client privilege information, the Court allowed a

17  procedure by which the parties can meet and confer and see if

18  they could stipulate to very specific portions.

19       Plaintiff's counsel did stipulate to some specific

20  portions.  However, Defendants' counsel maintained their

21  blanket objection to the entirety of the CIRB memo, as

22  attorney-client privilege information.  Upon in-camera review

23  of those same materials, the Court finds additional

24  confirmation of its original ruling overruling your objections

25  to the magistrate judge's ruling.

1          The Court agrees -- the Court agreed with

2     Judge Butcher before, but after seeing the documents, the Court

3     is confirmed in its agreement with Judge Butcher that those

4     CIRB memoranda were dual purpose documents.  And when a

5     communication is made for dual purpose, the Court must

6     determine whether the primary purpose of the communication is

7     to give or receive legal advice as opposed to business advice.

8          If the communication gives or receives both legal

9     advice and business advice, the communication is protected by

10    the attorney-client privilege only where the primary purpose of

11    the communication is to give or receive the legal advice.  And

12    a dual-purpose communication can only have a single primary

13    purpose.  The Court is drawing this from the *In Re Grand Jury*

14    case from the Ninth Circuit, 2021.

15          Here, after reviewing -- actually reviewing the CIRB

16    memoranda in camera, the Court, again, finds further

17    confirmation to agree with Judge Butcher that the CIRB

18    memoranda reports and documents are not privileged because

19    their primary purpose is to determine training issues and

20    recommend remedial measures in response to serious incidents

21    that occur within the County jails, as opposed to giving or

22    seeking confidential legal advice from or by the chief legal

23    officer.

24          The CIRB members conduct these routine and mandatory

25    meetings in response to serious incidents arising to identify

Case 3:20-cv-00406-AJB-DDL    Document 412-2    Filed 10/09/23    PageID.16385
Page 104 of 105
Case 3:19-cv-00378-JO-DEB    Document 341    Filed 02/23/23    PageID.7822    Page 57 of 63

57

1   policy issues and recommend training for the employees involved

2   in the incident, as well as other follow-up -- follow-up

3   actions needed to be taken.

4           The meeting minutes and reports reflect this purpose.

5   They consist of the factual information underlying the critical

6   incidents discussion amongst CIRB members regarding policy

7   violations and issues and recommendations on remedial action

8   and training.

9           Because the primary purpose of these documents is for

10  investigative and remedial purposes in order to increase

11  accountability and public trust, these CIRB materials do not

12  serve the primary purpose of seeking or giving confidential

13  legal advice.  And the Court makes that factual finding.  It

14  does appear from the documents that obtaining legal advice is a

15  tertiary and incidental goal of these CIRB memoranda, and there

16  are specific incidents where there is legal advice given.

17          And, again, Plaintiff stipulated to some of them.  And

18  the Court ordered that the documents be produced minus those

19  portions that Plaintiff agreed were attorney-client -- actually

20  attorney-client privileged information.

21          But, again, because the Court finds that the primary

22  purpose was not for the giving or seeking of legal advice, the

23  Court finds that the presence of these small snippets of legal

24  advice does not render the primary purpose of these meetings or

25  the memoranda created after these meetings to be primarily for

1    attorney-client privilege purposes.

2            The Court also, again, finds no reason to change its

3    ruling with regard to its agreement with Judge Butcher's

4    original order on why this does not constitute work-product

5    protection, so I won't repeat those reasons. I'm just going to

6    say for the reasons he stated, the Court agrees that this is

7    not work-product information.

8            Its own in camera review of this information does not

9    show that these documents were created in anticipation of

10   litigation. These documents were created because you had to

11   hold these meetings in response to serious incidents. And

12   these memos are written to memorialize the meetings, discuss

13   follow-up events, and make sure that they were circulated to

14   the correct party.

15           So this constitutes the Court's ruling on the

16   attorney-client issue. The Court is of a mind to keep --

17   however, given the sensitive nature of this information, the

18   Court is of a mind to keep the sealing and "attorneys' eyes

19   only" procedure in place up until trial, and then we can

20   discuss, at that point, how we want to handle it.

21           Any objections from Plaintiff to keeping the Court's

22   sealing order and -- sealing/protective order with regard to

23   these -- with regard to these files in place?

24           MS. YOO: Yes, Your Honor. There is a primary issue

25   which is that our experts have reserved the right to supplement