GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Subclass

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF SYROUN SANOSSIAN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' ADA PLAN**

Judge: Hon. Anthony J. Battaglia
Magistrate: Hon. David D. Leshner

Trial Date: None Set

[4376009.6]

I, Syroun Sanossian, declare:

1.     I have been retained by Plaintiffs' counsel to provide expert opinion concerning the adequacy of policies, procedures, and practices regarding disability accommodations at the San Diego County Jail ("Jail").  I make this declaration in support of Plaintiffs' Objections to Defendants' ADA Plan.

2.     I have submitted prior declarations in this case in support of Plaintiffs' first and second motions for preliminary injunction and provisional class certification.  Those declarations are available at Dkt. 119-9 and Dkt. 162-6 (first motions for preliminary injunction) and Dkt. 281-3 and 320-2 (second motions for preliminary injunction).  I also inspected San Diego Central Jail and Rock Mountain Detention Facility, and prepared reports identifying numerous accessibility barriers at both facilities.  *See* Dkt. 281-3, Exs. B, C.

3.     As set forth in those declarations, I am a Certified Access Specialist (CASp) with extensive experience inspecting, performing plan review, construction monitoring, and evaluating government facilities, including California county jails, for compliance with the Americans with Disabilities Act and similar state law ("ADA").  *See* Dkt. 119-9, ¶¶ 1-2.  My resumé is included in Exhibit A to my first declaration and incorporated herein by reference.  *See* Dkt. 119-9, Ex. A.

4.     I reviewed Defendants' proposed ADA plan served August 21, 2023 and offered critiques about the proposed plan's outline for construction at Central Jail to address ADA barriers.  I understand these critiques were shared with Defendants.  I have now reviewed Defendants' ADA Plan ("Plan") filed with the Court on October 5, 2023.  It is my opinion that if the ADA Plan is implemented as written, Defendants will fail to comply with the ADA and will fail to remedy the problems identified in my declarations.

5.     In the ADA Plan filed with the Court, Defendants do not appear to have addressed my concerns on the particularly vague or conflicting information provided to describe the planned alterations, or potentially noncompliant elements.  For

1  instance, the 15 new beds already installed in 8C and 8D for those with mobility

2  disabilities appear to have been bolted to the floor based on dimensions for

3  maneuvering clearance that do not comply with the ADA. *See* ADA Plan at 5-6. As

4  noted in my report, where the configuration of rows of beds creates a space

5  constrained by 3 sides, defined as an alcove, a minimum 60-inch turnaround space is

6  required adjacent to each accessible bed to allow people using wheelchairs to turn,

7  park at an angle when needed, or otherwise maneuver into place to allow for safe

8  transfer. Instead, the ADA Plan refers to dimensions of 36" by 48"—but that only

9  provides an accessible route, not maneuvering clearance. These two elements are

10  connected, but each is required as a separate space. Non-compliance should not be

11  the starting point for this alterations process. This is an example of how my

12  assistance in reviewing construction documents prior to alterations could both

13  improve compliance and cut costs.

14      6.     In addition, the ADA Plan indicates that Defendants have not

15  completed alterations to provide required 60-inch turnaround space to toileting areas

16  in 8C and 8D, which house individuals who use wheelchairs. *See* ADA Plan at 5-6.

17  That turnaround space is necessary for a person using a wheelchair to approach the

18  toilet and safely transfer onto the toilet. The danger posed by this lack of

19  maneuvering space is significant. Plaintiffs report falling while trying to transfer

20  because the existing maneuvering clearance available is 30 percent smaller than the

21  *minimum* requirement.

22      7.     The ADA Plan also indicates that Defendants will house people with

23  mobility disabilities who do not use wheelchairs on upper bunks. ADA Plan at 15.

24  I have serious concerns about that plan. Just because a person does not use a

25  wheelchair does not mean that they can safely use an upper bunk. For example,

26  people who use walkers or canes due to serious upper body impairments are

27  unlikely to be able to climb on and off an upper bunk safely. A person with limited

28  strength in their arms due to a stroke, other medical condition, or who may use a

cane or crutches, is unlikely to be able to use an upper bunk safely.

8.      I have reviewed the portion of the ADA Plan stating that Defendants will not implement in policy and train their staff on new ADA policies until July 1, 2024, despite finalizing the new ADA processes by January 1, 2024.  In my experience working with government entities, a process will only be implemented as intended after it is memorialized in policy and staff are trained.  The training process is an important part of the policy development process, as it allows staff to provide vital feedback on the feasibility of new policies and practices.  Holding the training so late in this process may force further delays in implementation in a complex and fast-moving jail setting.  This means that incarcerated people with mobility and hearing disabilities will not have the benefit of these new processes until at least July 1, 2024.  For example, Defendants state that they are implementing new sign language communication devices at each facility by January 1, 2024.  *See* ADA Plan at 3.  Defendants should train staff *before* implementing those new devices for the reasons described above; not train staff six months later, as Defendants currently plan to do.  *Id.* at 4.  In my experience, the implementation of high-tech systems—such as those Defendants plan to implement to provide sign language interpretation—is challenging in many ways, including user proficiency.  The addition of Internet service alone is going to require a significant effort in troubleshooting before technology dependent on that system can be brought up and running.  Our clients have experienced struggles when implementing similar technologies.  It is unclear whether Defendants have had time to adequately think through this process considering the late date for staff training and what appears to be immediate implementation of these high-tech solutions.  Given these potential pitfalls, the Plan could ensure access to sign language interpretation by including clear provisions for *in-person* sign language interpretation, which it currently lacks.

9.      Defendants' ADA Plan proposes to provide only American Sign Language interpretation to incarcerated people who use sign language.  However,

many people who use sign language use *other* sign languages, and do not know ASL. For example, Mexican Sign Language is the predominant sign language used by individuals in Mexico. It is likely if not certain that given San Diego's border location, deaf individuals in the Jail may use Mexican Sign Language, also known as LSM. In addition, some deaf individuals require use of a Certified Deaf Interpreter due to their unique communication needs, such as having minimal communication skills.[1] By limiting the ADA Plan to ASL, Defendants will not be prepared to provide effective communication to all people who use sign language that enter Defendants' care.

10.     In addition, the Sheriff's Department's proposed timeline for revising their ADA policies is not consistent with my experience helping to draft and update policies on the ADA and state accessibility laws, including for government entities. In general, revised ADA policies can be implemented within a matter of months, or even days, when warranted. This is true even accounting for several layers of approval processes within a government agency. In fact, clients that we have worked with have acted quickly when confronted with the need for sign language interpretation when they realized they had no policy or procedure in place. They immediately contacted a provider and brought interpreters into their facilities within days of having recognized the need even before the policy was finalized.

11.     I have reviewed the policies attached to the ADA Plan and continue to have concerns about these policies, even as apparently revised by the Sheriff's Department. For example, I previously criticized the use of the term "recommend" in Policy I.22, regarding housing individuals on lower bunks, because it did not require the Sheriff's Department to house people with mobility disabilities on lower bunks even after medical staff determined that was appropriate. *See* Dkt. 281-3, ¶¶ 15-16. Yet the revised version of I.22 still includes the word "recommend." *See*

---

[1] https://www.courts.ca.gov/partners/documents/2011SRL4aDeaf.pdf.

1  ADA Plan, Ex. B, I.22 at I.A.1 (referring to medical staff "recommendation for a
2  lower bunk").  Other language in the policy states that health staff's decision is a
3  "requirement."  This inconsistent language disregards expertise in medical staff,
4  resulting in ambiguity for housing unit staff that could lead to the failure to house
5  people with mobility disabilities appropriately on lower bunks.

6       12.    Next, revised policy M.39 includes a definition of disability that is too
7  restrictive and in violation of California law.  The policy defines disability as "a
8  physical or mental impairment that substantially limits one or more major life
9  activities."  ADA Plan, Ex. B, M.39 at p. 1.  However, the definition of disability
10 under California law, which applies to the Sheriff's Department and the Jail, is more
11 broad and does not require that a disability "substantially" limit a major life activity,
12 as I have repeatedly stated in declarations.  Dkt. 119-9 at ¶¶ 17-18; Dkt. 320-2 at
13 ¶ 27.  The Sheriff's Department's policies must comply with this definition.

14 / / /
15 / / /
16 / / /
17 / / /
18 / / /
19 / / /
20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

13.    Policy M.9.C.1, attached to the ADA Plan, is a "green sheet" that I understand applies only to San Diego Central Jail.  The policy provides very vaguely that "[i]ncarcerated persons that have any mobility limitations and/or need assistance, shall be assisted through the fingerprinting, booking, search, and classification process by sworn staff."  ADA Plan, Ex. B at M.9.C.1.  However, the policy and procedure provide no detail for staff about how to assist incarcerated people with mobility disabilities, or what specific accommodations they should be provided for each of these separate tasks.  For example, how should staff "assist" an incarcerated person who uses a wheelchair and who cannot stand up to be searched?  Defendants also do not refer to any training that might provide staff with more detail or instruction on how to implement this highly generalized directive.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Palo Alto, California this 20th day of October, 2023.

Syroun Sanossian