1                   UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4  DUNSMORE,                      )  Case No. 20CV0406-AJB-DDL
                                  )
5           Plaintiff,            )  San Diego, California
                                  )
6  vs.                            )  Monday,
                                  )  November 6, 2023
7  STATE OF CALIFORNIA, et al.,   )  1:30 p.m.
                                  )
8           Defendants.           )
   _____)
9

10               TRANSCRIPT OF DISCOVERY CONFERENCE
                BEFORE THE HONORABLE DAVID D. LESHNER
11                UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:            HANNAH M. CHARTOFF, ESQ.
                                  RICHARD VAN SWEARINGEN, ESQ.
14                                PRIVAH KAUL, ESQ.
                                  Rosen Bien Galvan &
15                                  Grunfeld, LLP
                                  101 Mission Street
16                                Sixth Floor
                                  San Francisco, California
17                                  94105
                                  (415) 433-6830
18
   For the Defendants:           ELIZABETH MARIE PAPPY, ESQ.
19                                Burke Williams & Sorensen, LLP
                                  60 South Market Street
20                                Suite 1000
                                  San Jose, California 95113
21                                (408) 606-6300

22  Transcript Ordered by:

23

24

   Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.



ii

1  Transcriber:                    Dee Gregory
                                   Echo Reporting, Inc.
2                                  9711 Cactus Street, Suite B
                                   Lakeside, California 92040
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    SAN DIEGO, CALIFORNIA MONDAY, NOVEMBER 6, 2023 1:30 P.M.

2                          --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Calling matter 20CV0406, Dunsmore versus

5    the State of California, et al.

6            And please be sure that everyone is speaking into

7    the mics.

8            THE COURT:  Good afternoon, everyone.

9            Could I have appearances from counsel, beginning

10    with Plaintiffs.

11            MS. CHARTOFF:  Hannah Chartoff from Rosen, Bien,

12    Galvan and Grunfeld, your Honor.

13            THE COURT:  Thank you.

14            MR. SWEARINGEN:  Van Swearingen for Plaintiffs.

15            MS. KAUL:  Priyah Kaul for the Plaintiffs.

16            THE COURT:  Thank you.

17            MS. PAPPY:  Elizabeth Pappy for Defendants.

18            THE COURT:  Okay.  Thank you all.

19            Is Mr. Fischer joining by Zoom?

20            MR. SWEARINGEN:  He is available if we go into the

21    ENE territory today, but he's not necessary to the discovery

22    portion of today's conference.

23            THE COURT:  Okay.  I appreciate that.  And I

24    think -- well, even before some of the travel issues came up

25    for everyone, in reviewing what was submitted to me, I think

2

1 our time is going to be best spent dealing with the discovery

2 issues.  There are frankly more than I had realized, and I

3 have a number of things that I want to discuss with you all.

4          Let's start with this.  I was copied on some email

5 correspondence that was, frankly, surprising and

6 disappointment, both with respect to the Plaintiffs'

7 submission of their portion of the joint status report by

8 email that did not have input from the Defendants -- I was

9 also provided copies of emails regarding disputes over whether

10 discovery responses would be due on October 31st or November

11 7th or whether that also included responsive documents.

12          I don't want to spend our time this afternoon

13 talking about that unless it is necessary.  I'm just going to

14 note this.  I read everything that you all submit to me.  And

15 to the extent that things are being provided to me, a portion

16 of a status report that does not have the Defendants' input --

17 I really hope that we haven't lost some of the positive

18 momentum that you all had working together in quite admirable

19 fashion on the ADA stipulation and the class certification

20 motion, because frankly, the emails that I've seen going back

21 and forth -- which were just provided to me for whatever

22 reason -- are surprising, given the counsel that I'm dealing

23 with in this case.

24          Candidly, other cases, I wouldn't be at all

25 surprised to see them.  I am here, and I'm going to leave it

3

1 at that, and hope that everyone gets some grace in an email on

2 a Friday afternoon, and maybe there was a decision it would be

3 a good idea to submit by email to me a joint report that I had

4 specifically requested come from both parties.

5          Let's move forward, and let's move forward in a way

6 that is constructive.

7          I have a number of questions for you all about

8 issues in the case, having reviewed the joint status report

9 that is docket number 436.

10          And here's what I would like to do.  I'm going to

11 address the issues in the report.  I want to talk first about

12 the status of written discovery, and I want to understand what

13 written discovery has been propounded and when it is going to

14 be responded to.

15          I want to talk second about the parties' joint

16 motion regarding protected health information because I did

17 not sign off on that, given that I had some questions for you

18 all about it.

19          I want to talk third about the Rule 30(b)(6)

20 depositions and how we're going to go about resolving issues

21 with those.

22          I want to talk fourth about issues relating to the

23 jail inspections and identifying disputes and how we're going

24 to resolve those.

25          And, fifth, I want to talk to you about the

4

1 pretrial schedule, because before you leave here today, I

2 intend to give you tentative dates through trial in this case

3 so that you can move forward.

4       And if we have any time left, we can talk about

5 settlement.  But candidly, as much as I would love to sit down

6 with you informally off the record and talk settlement, this

7 case needs some work from all of us on discovery issues first.

8       So with that being said, let me begin with the

9 Plaintiffs with respect to your discovery.

10       I understand that the Plaintiffs have served five

11 sets of requests for production; is that correct?

12       MS. CHARTOFF:  Yes, your Honor, including the early

13 discovery.

14       THE COURT:  Right.  So the discovery that is

15 outstanding -- well, my understanding is the third, fourth and

16 fifth set of requests for production; is that correct?

17       MS. CHARTOFF:  Yes.  I think there may be a couple

18 of documents that are trickling in from requests -- set two of

19 the requests for production.  Those are as they become

20 available, as medical examiner reports, for example, become

21 available.  I think there are a couple, but we have no

22 concerns about those being produced as they are available.

23       THE COURT:  All right.  So I understand that there

24 was a third set of requests for production served by the

25 Plaintiffs on June 15th.  That was request numbers 25 to 83;

5

1 is that correct?

2          MS. CHARTOFF:  Yes, your Honor.

3          THE COURT:  And I understand there is a fourth set

4 of requests for production served on August 16th, numbers 84

5 to 87; is that correct?

6          MS. CHARTOFF:  Correct, yes, your Honor.

7          THE COURT:  And then I understand that there is a

8 fifth set of requests for production that you all provided to

9 me -- thank you very much -- set five that was served on

10 September 1st.  I don't think I've seen that before, but I do

11 see the parties providing me with a courtesy copy.  And that

12 is request numbers 88 to 247; is that correct?

13          MS. CHARTOFF:  Correct, your Honor.

14          THE COURT:  Okay.  Have the Defendants responded to

15 either the third, fourth or fifth sets of requests for

16 production?

17          MS. CHARTOFF:  Yes, to three and four.  Not yet to

18 five.

19          THE COURT:  All right.  Do I understand correctly

20 that the Plaintiffs served the first set of interrogatories on

21 June 15th?

22          MS. CHARTOFF:  Yes, your Honor.

23          THE COURT:  All right.  And how many

24 interrogatories were in that set, Ms. Chartoff?

25          MS. CHARTOFF:  Ten, your Honor.

6

1        THE COURT:  And then there was a second set that
2 was served?

3        MS. CHARTOFF:  Yes.

4        THE COURT:  And when was that?

5        MS. CHARTOFF:  Also on September 1st.

6        THE COURT:  And how many are in that set?

7        MS. CHARTOFF:  11 through 25.

8        THE COURT:  Have the Plaintiffs served requests for
9 admission?

10       MS. CHARTOFF:  Yes.  Only in June I believe, and
11 those have been responded to.  And there are no -- you have
12 not seen that in your joint status report, because there are
13 no outstanding issues as to those.

14       THE COURT:  I do see a second set of RFAs that were
15 served on September 1st as well.  And this is not a memory
16 test for you.

17       MS. CHARTOFF:  Yes.

18       THE COURT:  That's okay.  I just want to get my
19 arms around this.

20       MS. CHARTOFF:  No, that's -- apologies, yes.  RFAs
21 are due, and then those would still be -- those have not yet
22 been responded to.

23       THE COURT:  Okay.  Ms. Pappy, is all that correct?

24       MS. PAPPY:  Yes, your Honor.

25       THE COURT:  All right.  Let's turn to the discovery

7

1 that the Defendants have propounded, and then I want to talk

2 about the actual document production.

3        I understand from the briefing that the Defendants

4 propounded a first set of requests for production on September

5 1st; is that correct, Ms. Pappy?

6        MS. PAPPY:  Yes, your Honor.

7        THE COURT:  And how many requests were in that --

8 again, not a memory test.  I'm just trying to get my arms

9 around this.

10        MS. PAPPY:  Twenty-five.

11        THE COURT:  Did you propound interrogatories?

12        MS. PAPPY:  Yes.  When I originally propounded

13 them, I mistakenly didn't pay attention to the Court's order

14 and I propounded a set of 25 on each Plaintiff.

15        Counsel asked me -- well, I offered to re-issue

16 them as one set of 25 with the preface "For each Plaintiff,

17 state."  So I did that.  So 25, and then -- let me see,

18 requests for admissions, two.  And they were only to three

19 Plaintiffs.

20        THE COURT:  Have you received responses to any of

21 the written discovery that you've propounded as of yet?

22        MS. PAPPY:  Yes, the 31st.  On the 31st.  Actually,

23 your Honor, I take that back.  They responded to the requests

24 for admission and the requests for production of documents on

25 the 31st.  I don't remember when the response to the special

8

1  interrogatories is due because they asked that I re-serve them

2  as one set of 25, so I think those responses are due sometime

3  next week.

4          THE COURT:  Okay.  Staying with you, Ms. Pappy,

5  have the Defendants responded to the third, fourth or fifth

6  sets of requests for production to date?

7          MS. PAPPY:  Written responses to three and four,

8  yes.  Our written responses to five are due tomorrow.

9          And in terms of production of documents, I think

10  almost everything has been responded to.  There are some

11  overbroad issues that we're still grappling with, I think as

12  you see in here.

13          THE COURT:  And from the Defendants' perspective,

14  do the documents produced include substantially all of the ESI

15  that you are contemplating producing, or is that a current

16  issue between the parties?

17          MS. PAPPY:  That's a good question.  When the

18  Plaintiffs asked us to do ESI searches, they didn't ask us to

19  produce ESI.  The ESI searches, probation and the County --

20  and their search was last week -- all the documents were

21  segregated, but they didn't run a hit list, which is what

22  Plaintiffs requested from me.

23          So they finished their hit list last week.

24  Sheriff's completed 90 percent of their hit list last Friday.

25  I was supposed to get a final run of the ESI hits today.  We

9

1 are -- I'm working with Plaintiffs to provide them more detail

2 they've asked for on the hit list.

3        Now, separate and apart from that, when they ask me

4 a document production request, we search everything.  So that

5 universe of documents plus anywhere and everywhere else that

6 documents are stored, because what they gave me was custodian

7 email addresses and then they said search these -- segregate

8 these, put a litigation hold on them -- we did that -- and

9 search these email addresses.

10       So the hit lists are those people's emails.

11       The system -- people do not and are not supposed to

12 store anything on their hard drives.  The rest of the

13 information is in GMS, Tech Care -- I'm trying to think of the

14 rest of the names.  Those are the two that pop into my mind.

15 PCMS which is Probation.  And those things have litigation

16 holds on them.

17       Hit lists were not performed on those non-email

18 systems.

19       THE COURT:  As I was preparing for today's hearing,

20 I was looking at the docket and the prior orders that I

21 issued, and it appeared to me that I initially ordered that

22 the parties resolve any -- or raise any disputes regarding ESI

23 and search terms by late June and then I subsequently granted

24 the parties' request to continue that deadline I think to July

25 10th.

1       Was there a later request to continue that deadline
2  that you're aware of, Ms. Pappy?

3       MS. PAPPY:  There was not.  And I wasn't aware that
4  there was a dispute until I got the status conference
5  statement.  I've been working with them.  The response has
6  been slow on my side of it, getting those hit lists.

7       THE COURT:  Okay.  All right.  Let me turn to the
8  Plaintiffs then.

9       With respect to issues regarding search terms and
10 custodians, is my recollection correct that the initial
11 deadline for the parties to raise any disputes on those two
12 areas was -- I think it was June 26th, and subsequently
13 extended to July 10th?

14      MS. CHARTOFF:  That's correct, your Honor.

15      THE COURT:  Was there a subsequent extension of
16 that?

17      MS. CHARTOFF:  No, your Honor.

18      THE COURT:  So with respect to the portion of the
19 joint status report where there's a page or so -- on pages one
20 and two at docket number 436.  And let me refer to ECF page
21 numbers for the record.  It's ECF page numbers three and four.

22      Is there anything for me to resolve on that, given
23 that that date has passed?

24      MS. CHARTOFF:  Yes, your Honor, there is.  We
25 approached -- you know, we sent our search terms to Ms. Pappy

11

1  in June to Defendants and said:  These are our search terms.

2  Please provide us a hit report, and we will -- so that we can

3  see if there's anything to narrow here.

4        And we followed up and said:  Please provide a hit

5  report.

6        And Ms. Pappy represented that all of the documents

7  had been collected, and we agreed that that would be the

8  universe of documents that for those searches would be

9  conducted from as it relates to ESI.

10       And when we pressed and tried to make progress on

11 narrowing the search terms, the response from Defendants was:

12 None of your document requests are -- our deadline to respond

13 to them hasn't arisen yet, so there's nothing for us to talk

14 about here.

15       So we waited and continued to press and told

16 Defendants -- I mean we understand the Court's order to mean

17 we need to resolve what the universe of documents that will be

18 reviewed is.  And our understanding from Defendants was:

19 We've identified that universe with the custodians and the

20 search terms that you've provided and further narrowing can be

21 done once we've responded to your document requests.

22       So we brought this up again in August:  Why haven't

23 you conducted ESI searches for these -- for this material?

24       And that's where we are right now.  And we have

25 asked for hit reports for unique hits of these documents and

12

1 have been asking for that information and haven't received

2 complete information, as Ms. Pappy just said.  It's something

3 that Defendants are still working on gathering.

4          THE COURT:  The reason why I had a deadline for the

5 parties to raise any disputes over search terms and custodians

6 was so that we could resolve any disputes over the summer, and

7 we're now four months later and approaching -- well, we're

8 past the date for substantial completion of document

9 production, and we are approaching the fact discovery cutoff

10 that I'm going to set at the end of this hearing.

11          So what disputes remain between the parties with

12 respect to the production of ESI, Ms. Chartoff?

13          MS. CHARTOFF:  We have not agreed -- Defendants

14 have not agreed to search all and manually review all of the

15 documents that are currently in that universe of documents

16 that was originally provided by the search terms that we

17 provided in June and the custodians.

18          And Plaintiffs have repeatedly offered to narrow

19 those search terms to create a smaller universe of documents

20 for Defendants to review each document manually.  But we can't

21 do that until we have concrete information about how many

22 documents are in that joint repository, which custodians those

23 documents are from and which of the search terms are

24 generating the most unique hits.

25          And we've had this discussion several times now

13

1 with Ms. Pappy and we still haven't gotten that complete

2 information.  And it's very difficult for us.  And without

3 knowing the complete number of documents in this saved search

4 that I understand the Defendants have put together, I don't

5 know how we can offer any more narrow search terms.

6            THE COURT:  Was there ever a discovery conference

7 requested of me on this issue?  Because I have to tell you

8 that I know that it may have been noted in a prior status

9 report, but we're in a position now where I think Ms. Pappy

10 believes their production is substantially complete.  The

11 Plaintiffs are saying that you don't believe that it is.  And

12 we are well beyond the time period where I had expected this

13 to be raised.

14            Was it ever raised with me in a prior discovery

15 conference, Ms. Chartoff?

16            MS. CHARTOFF:  It wasn't, your Honor, but the

17 reason for that is because we have been waiting on this more

18 detailed information from Plaintiffs -- or, sorry, excuse

19 me -- from Defendants.

20            And the message that we have gotten when we have

21 repeatedly discussed this with Defendants is:  We are working

22 on it and it's not appropriate for you to raise the issue

23 before the responses for these document requests are even due.

24            And I will say, your Honor, I have been surprised

25 at the delay that it has taken Defendants to provide some of

14

1 this basic -- what seems to me from other cases, basic data

2 points like the total number of documents in the search, like

3 the number of unique hits.  That's information that I would

4 expect to be provided within a couple of hours by an

5 e-discovery vendor.

6           And my understanding is that whatever system

7 Defendants are using, they aren't in a position to provide

8 that information.

9           THE COURT:  Ms. Pappy, from your position, is there

10 a dispute between the parties regarding the production of ESI?

11 I guess specifically emails is really what we're talking

12 about.

13           MS. PAPPY:  No.

14           THE COURT:  I appreciate a direct answer to a

15 direct question.

16           MS. PAPPY:  No.

17           THE COURT:  So what's the status of it?  So you

18 have a hit report, and you plan to -- do you plan to share

19 that with the Plaintiffs?

20           MS. PAPPY:  We already gave it to them.

21           THE COURT:  All right.  So what's the next step,

22 from your perspective?

23           MS. PAPPY:  Well, what I'm hearing today is brand

24 new.  And I don't -- I'm going to take your comments to heart

25 at the beginning, and I'm not going to go into whether I agree

15

1 with them or not.

2        I gave this hit report to them, the first one,

3 which concededly, my clients are behind.  I'm not going to sit

4 here and tell anybody they weren't.  But no, it wasn't raised

5 to the Court.  And I gave them that hit list last week, so --

6 and said, "Hey, listen, this is" -- remember, the hit list is

7 emails.  They gave us people's names, the client -- so the

8 Sheriff's Department has its own email system and then County

9 and Probation have another.  And so there's two hit lists.

10        They gave me a list of people.  They gave me a list

11 of search terms, 86 search terms.  Both entities ran the hit

12 list -- with speed or not speed, I am not commenting on -- and

13 generated hit lists from those custodians' emails.

14        THE COURT:  How many custodians' emails were there?

15        MS. PAPPY:  I don't --

16        THE COURT:  Approximately.

17        MS. PAPPY:  Thirty? 30 --

18        MS. CHARTOFF:  I think there maybe have been 50.

19        MS. PAPPY:  A hundred and fifty?

20        MS. CHARTOFF:  No, no.  Maybe it has been 50.

21        MS. PAPPY:  Fifty custodians.

22        THE COURT:  So approximately 50 custodians and

23 approximately 86 search terms?

24        MS. PAPPY:  And 86 search terms.

25        THE COURT:  Okay.

16

1          MS. PAPPY:  That took a while since I started it,

2   and that's all I'll say on that.  And I finally got the search

3   terms.  I provided -- or the hit lists.  And some of the hit

4   lists show up with 500 documents and some of them show up with

5   150,000 documents.  And that was provided to counsel.

6          I had thought that they were going to get back to

7   me with:  Okay, try to narrow by -- and in fact we talked

8   about it last week -- can you give me three search terms to

9   combine together?  Give me like the highlights, five of them

10  that you want me to re-run.  Let's see if we can narrow it

11  down.

12         They asked me for hits by custodian, which I just

13  haven't had time to get them before coming here today.  But

14  that was my next step, was they had asked for that hits by

15  custodian so they could see if one custodian had more

16  information than another one, maybe we focus on production of

17  that person's documents.

18         The first time I heard that they wanted us to

19  review some, I don't know, some half-million, million

20  documents, was Friday in the joint status report.  And

21  obviously the County doesn't agree to do that.

22         There seems to be a misunderstanding, which I have

23  had conversations repeatedly about, that this is not like a

24  business where the whole computer system is centralized and

25  you can -- like at my law firm, you might -- well, actually

17

1 probably wouldn't in my law firm -- run one whole systemwide

2 search.  And I thought they understood that because they gave

3 me email addresses.

4         The GMS system which you hear all about is not

5 electrically or network-system connected to emails.  So if

6 they're saying that they want to limit document productions to

7 just those emails -- I hate to skewer myself -- but they're

8 not going to capture all the responsive documents.

9         They need us to search GMS, they need us to search

10 Offender 360, they need us in Probation to search PCMS.  To

11 collect all electronically stored information, all of those

12 systems have to be searched as well.

13         So I'm a little unclear about what it is that they

14 want.  When they serve me a document production request, I

15 don't limit the search to the custodians.  We do a systemwide

16 search of every system that exists where these documents may

17 be stored.

18         THE COURT:  So which understanding is -- the

19 obligation of the responding party is to look at a requests

20 for production and determine where to find responsive

21 documents.  And search terms and custodians are designed to

22 allow the parties, ideally, to work collaboratively to narrow

23 that universe.

24         So you're saying, Ms. Pappy, that when we're

25 talking about electronically stored information, it's not just

18

1 limited to emails but it includes -- responsive documents may

2 be found on the GMS system and this PCMS system?

3 　　　　　MS. PAPPY:　PCMS is Probation.　GMS you've got Tech

4 Care, which is where the medical information is kept.　I don't

5 know if GMS contains custodian files, but wherever those

6 custodian files -- which are a lot of what has been requested.

7 　　　　　And so I had sort of viewed them as separate --

8 this bucket of ESI custodian emails for their ESI search, but

9 we don't just limit the search to any of that.　We don't even

10 limit it to the custodians.　We search everything.

11 　　　　　And that's one of the things that I have been

12 providing them.　I don't want to get ahead, but just for

13 example, on number 28, we searched the word "memo and."　I

14 picked out a bunch of things and I sent them the search --

15 what it came up with and said:　Okay.　Now can you narrow this

16 down a little?

17 　　　　　And they came back and said, "Yeah.　How about

18 captains directives."　I haven't had time to run that.

19 　　　　　But that's how we've been doing it, so I hope that

20 doesn't confuse or belabor the point.　But that's where the

21 County and the Sheriff's Department and Probation have been

22 coming from and the way we've been conducting searches.

23 　　　　　THE COURT:　So am I understanding correctly that

24 the Defendants have been searching through different databases

25 of electronically stored information for documents that are

19

1 responsive to the -- I guess we're now up to 247 RFPs?

2          MS. PAPPY:  Absolutely.  Every time.  We search all

3 the databases.

4          THE COURT:  So --

5          MS. PAPPY:  And we -- let me rephrase that.  We

6 don't search it if we know there's not going to be anything in

7 it.  So I'm trying to -- policies and procedures is a bad

8 example, but something that might be stored in GMS that is not

9 going to be stored in Tech Care, we aren't going to search

10 Tech Care for it.

11          THE COURT:  Understood.

12          So what is the dispute, Ms. Chartoff?

13          MS. CHARTOFF:  I have factual disputes with many of

14 the things that Ms. Pappy just said, unfortunately.

15          So, first of all, I do not think we have seen a

16 single email that has been produced in response to RFP Set

17 Three or RFP Set Four.

18          And on the substance of what we are asking for, I

19 think there are many places where we have received very, very

20 little information.  So as an example -- and I think the

21 representation that we only recently provided some of this new

22 information or new direction to Defendants is inaccurate, in

23 my view.

24          So to take number 28, the Sheriff's memoranda, for

25 example, we had requested memoranda from the Sheriff's

20

1 Department in June and were told that term is too broad, when

2 we got the response in August.

3          On August 24th, I sent a letter saying:  Please now

4 search for documents, including captains directives and

5 indicating a specific document that we had received from one

6 of the expedited discovery requests that was titled "Captains

7 Directive" and said "Please search for documents that are

8 captains directives," and then only within the last couple of

9 days did Ms. Pappy agree to, and Defendants agreed, to search

10 for captains directives.

11          So from our perspective, the complete search that

12 Defendants are talking about as being currently conducted has

13 not been happening.  There has not been a complete search at

14 all.

15          I'll also say that in our view, ESI and email

16 correspondence is particularly important in this case.  And I

17 don't want to say that we are not interested in documents from

18 GMS and medical records, because we certainly are interested

19 in that information as well.

20          But as we've been meeting and conferring about some

21 of our more targeted requests that do not call for ESI, there

22 are circumstances where we're finding that Defendants don't

23 keep records on certain issues, or formal records on certain

24 issues that we would expect them to be keeping records on.  Or

25 they don't track information on certain points that we would

21

1 expect them -- we would expect that they would track.

2          So an example of that is the deployment of tactical

3 teams.  We asked for all logs relating to the deployment of

4 tactical teams within the jail and were told that -- that's

5 request number 82.  And we were told that there are no written

6 records.  There is no tracking that's created for each time a

7 tactical team is being used.

8          So there is no way for us to search for that

9 without application of search terms and agreement to review a

10 large quantity of documents.

11          A similar example is disciplinary reports regarding

12 improper or inadequate healthcare.  That was request for

13 production number 43.  Defendants have told us, "We do not

14 have some kind of unified tracking mechanism."  So doing a

15 search term type search where an attorney or reviewer of some

16 kind would then go through all documents hit on by a certain

17 set of search terms is necessary to generate that information.

18          And I have other similar examples.  Court orders

19 for medical care, for example.  Defendants have recently

20 produced all of the court orders pertaining to medical care in

21 jail they received, but I understand that there is no

22 centralized tracking mechanism when such orders come in.

23          So without, again, applying some kind of global ESI

24 search, it's not clear that we would get the follow-up

25 documents to that.

22

1            And I'll also note that from other documents that
2  we have received, including for the documents in response to
3  some of our PRA requests that we made before this litigation
4  began, I understand that there actually are -- there is a lot
5  of conversation about the care of incarcerated people or the
6  housing and those kinds of decisions that are communicated
7  through email.  And I've seen emails that talk about a
8  specific incarcerated person by name and booking number in an
9  email and then some information that follows up.
10            It's very hard to tell in many of the PRA
11  documents.  A lot is redacted.  But there are various
12  indications that that information is going to be very
13  important for us, particularly when Defendants don't track
14  that information on some higher level.
15            So we are still waiting for Defendants to agree to
16  review by hand every single document that hits on this
17  universe of search terms that, again, we are willing to narrow
18  if we even know the total number of documents that are
19  currently hit on.
20            And I think, again, we still don't have the
21  complete hit list.  Ms. Pappy yesterday very kindly emailed me
22  the most updated one, but she still said it's only 90 percent
23  complete, from the Sheriff's Department, which is particularly
24  concerning because I understood that all of those documents
25  had already been gathered as of July.

23

1          And although these hits are returned, I think the

2 de-duplicated information is really what we're still missing

3 here.

4          A hit report without the de-duplication is somewhat

5 useful, but if we get those unique hits, only the number of

6 documents that are turned on by a specific search term, then

7 we actually can do the iterative process and go back and forth

8 and figure out how to narrow this apparently very large

9 collection of documents to something that Defendants and their

10 attorneys can review every single document and determine

11 responsiveness.

12          And finally, my last note is, my understanding is

13 that we have not gotten any documents responsive to Request

14 for Production Set Five and it's -- at this point, absent

15 Defendants' response -- which as you know, your Honor, we

16 disagree that the deadline for responses was tomorrow.  But

17 absent that information, it's not even clear to us if

18 Defendants are agreeing to produce anything in response to

19 that.

20          So I don't think it's a fair statement that things

21 are well and good and on the way to complete production in

22 response to all of our document requests.

23          THE COURT:  I understand both parties' positions.

24 Here's what I'm inclined to do, and I would welcome input from

25 both of you before I make a final decision.

24

1          We'll talk later about the fact discovery cutoff.
2 But with respect specifically to written discovery, here is
3 what I am inclined to do.

4          The deadline for all parties to serve responses to
5 written discovery will be this Friday, November 10th.  That
6 includes any outstanding discovery that has been served to the
7 Defendants and any outstanding discovery that has been served
8 to the Plaintiffs.

9          The parties will have one week to meet and confer
10 regarding any outstanding discovery issues and will file a
11 joint status report with respect to any outstanding discovery
12 issues by November 17th.

13          I will hold a hearing to address those written
14 discovery disputes on November 21st at 4:00 p.m.  To the
15 extent we need to carry over, I will carry over to the
16 following day.  And I plan to resolve all discovery disputes
17 during that conference.  And the deadline for all parties to
18 produce all responsive documents will be December 22nd.

19          And I realize that the holidays are in the middle
20 of that, but we are where we are.  I thought this would be
21 resolved earlier, and I'm not suggesting anyone has been
22 acting in bad faith.  But it just -- it needs to get done,
23 because I'm going to set other dates for you all, and you both
24 need to have each other's documents so that you can take
25 depositions and provide them to your experts and go forth with

25

1 the case.

2      Do you wish to be heard on that, Ms. Chartoff?

3      MS. CHARTOFF:  Yes, your Honor.

4      In principle, I think this schedule makes sense to

5 us.  The one thing I'll say is, on this -- I think on the

6 issue of ESI discovery and number of documents approaching how

7 to identify this universe of documents that Defendants are

8 going to review to ensure that there are responsive documents

9 to all of our discovery requests, in the ESI.  If we can get

10 from Defendants de-duped information about the number of

11 documents that are currently in this saved collection of

12 documents in a timely manner -- and by that I mean within a

13 day from asking -- from providing revised search terms, to

14 get, yes, this is how many documents are hit on by those

15 search terms, I don't know that we can finish meeting and

16 conferring within a week to identify that review universe.

17      And that's because in my experience this is always

18 an iterative process.  It's much more an art than a science.

19 And we're going to provide revised search terms.  Maybe

20 they'll narrow it to some documents.  Maybe they won't be as

21 effective as we intend them to be.  And if it's taking

22 Defendants a week to even get a complete hit report, which at

23 this point -- at this point, I think it's been taking several

24 months.  But now I trust Defendants that they're focused on

25 this more now -- then I don't think that we'll be able to

26

1 complete that review within a week -- or complete that meet

2 and confer, I should say, within a week.

3          THE COURT:  I agree with you that this can and

4 should be an iterative process, as you are working together to

5 figure out proportionality issues.  Ultimately, it's the

6 responding party's decision to make as to what documents they

7 believe are responsive to requests for production and are

8 proportional.

9          And if there are documents that the County says,

10 "Those aren't proportional.  We're not going to produce them,"

11 this would not preclude you from seeking relief from me.  It's

12 going to be yet another series of motions that I very much

13 hope to work with you to avoid and, more important, hope that

14 you can all work together to avoid.

15          But ultimately I hear what you're saying, Ms.

16 Chartoff.

17          Let me hear from Ms. Pappy.

18          MS. PAPPY:  The County -- well, my clients are fine

19 with that deadline because I think proportionality is one of

20 the huge issues here.  And this notion that the County is

21 obligated to review what is probably a million documents is

22 going to be a sticking point.

23          So hopefully your deadline will cause your people

24 to get real, my clients included.  I'm fine with the deadline.

25          THE COURT:  Well, and you agree, Ms. Pappy, that it

27

1 would be the propounding party's burden to establish relevance

2 and if there's a claim of proportionality and undue burden,

3 that would be on the responding party?

4            MS. PAPPY:  Yes, absolutely.  I have -- and I have

5 been sending hit lists regarding -- not the hit list, but I've

6 been sending hit lists to demonstrate that we're trying to

7 work with them to reduce the scope.

8            THE COURT:  I'm still not exactly sure what

9 happened that prevented the parties from dealing with this

10 issue months ago.

11           It does sound to me, Ms. Pappy, like there was a

12 delay by the County in providing you with a hit list.  I don't

13 have that information before me yet.

14           I certainly hope it's not necessary for me to dig

15 in and determine that issue, because I am going to be working

16 very hard at allocating costs as appropriate under Rule 37 if

17 there is a motion to compel, because this issue, for whatever

18 reason, has carried on, in my respectful view, for far too

19 long.  And I do think that it is -- you all need an answer

20 from me on this if it comes to that, but more important, from

21 the County in terms of producing the documents that it

22 believes are responsive.

23           And there is a difference, as I see it, between the

24 obligations of the parties to work together to determine what

25 the appropriate search parameters are, which you're doing

28

1  right now through this iterative process by providing hit

2  reports as opposed to after documents are produced and there

3  is case law for the proposition that the party receiving the

4  documents needs to show that there's some sort of deficiency

5  in the production.

6          I do want in this case to understand that if it

7  becomes necessary, exactly what searches the County ran and if

8  there's an issue of proportionality and the County is taking

9  the position that this tranche of documents should not be

10 reviewed, I'm going to be looking at the County to tell me

11 exactly how many documents there are.

12         And hopefully that's not going to be an issue, but

13 I'm going to leave it to you all to figure that out.

14         MS. PAPPY:  Can I make a request?

15         THE COURT:  You may.

16         MS. PAPPY:  And we do have -- I've been keeping

17 records of the proportionality issue, so the County is

18 prepared to respond to that.

19         THE COURT:  Okay.

20         MS. PAPPY:  But with regard to these PRA requests,

21 one of the, from my perspective, issues that I have had in

22 trying to focus my client in on what to look for -- Ms.

23 Chartoff references PRA requests, and there has been little to

24 no willingness to send me documents even when I ask, "Well, we

25 saw this in a PRA request.  Can you send it to me so I can

29

1 send it to my client," which is an organization of thousands

2 of people "and say 'They found it.  Why can't you?'"

3          It would be nice if I could call one voice and say

4 "You have praecipe and search for this," but that is not the

5 situation that I'm in.  That is not the way the County is set

6 up.

7          All I would ask is that going forward under these

8 very strict deadlines there's a little more forthcomingness

9 about -- like here's an example.  Go tell your client.

10 Certainly, I would expect to see that in a motion to compel

11 anyways.

12          MS. CHARTOFF:  I disagree that we haven't been

13 cooperative to this point, but we continue -- we certainly

14 intend to continue being cooperative.  And all of the

15 documents that we have received through PRA requests will be

16 produced anyway as part of our production, so you are soon to

17 have all of them.  Defendants are soon to have all of the

18 documents that we have produced.

19          Again, I really think that what we are talking

20 about here is email correspondence, and that shouldn't be

21 difficult to find or identify.  It really is a matter of

22 narrowing the universe to which documents are going to be

23 reviewed.  And from our perspective, I think, again, we want

24 to be collaborative and cooperative to narrow the set of

25 documents.  But if Defendants can't provide us unique hits and

30

1 de-duped information about how many documents they're even

2 talking about, it's very difficult for us to make -- move

3 forward.

4          THE COURT:  I appreciate your collective focus on

5 relentlessly looking forward and figuring this out now,

6 because I am setting tight deadlines and I'm doing so after

7 giving this quite some thought over the weekend and again this

8 morning as to how I can help you move this forward.

9          Is there an issue with the County providing

10 information regarding unique hits, Ms. Pappy?  Because I

11 understand from Ms. Chartoff why that is something that's

12 important for Plaintiffs.

13          MS. PAPPY:  No, absolutely not.  I told her no

14 problem last Wednesday when we talked and it's now the next

15 Monday.

16          THE COURT:  All right.  You have your answer, Ms.

17 Chartoff.

18          MS. CHARTOFF:  Great.  We look forward to receiving

19 them because --

20          THE COURT:  Yes.

21          MS. CHARTOFF:  -- we haven't received them yet.

22          THE COURT:  You will.

23          All right.  I think this was clear in our

24 conversation during the last status conference, but to be

25 extra clear, there will be no further written discovery in the

31

1 form of requests for production, requests for production

2 admission, or interrogatories served by either party absent

3 leave of Court and showing of good cause.  We need to figure

4 out the discovery that you call have right now.

5        And I don't think that anybody has plans to serve

6 additional discovery at this point, but just to be clear, not

7 before we talk about it first and exactly why a party believes

8 they need it.

9        The next -- before we move on, anything further

10 that we should discuss on that issue, Ms. Chartoff?

11        MS. CHARTOFF:  No, your Honor.

12        THE COURT:  And, I'm sorry, "Chartoff."  I think I

13 pronounced it "Chartoff."  I apologize.

14        MS. CHARTOFF:  Yes.  Thank you.

15        THE COURT:  Ms. Pappy, how about from you?

16        MS. PAPPY:  No.

17        THE COURT:  Okay.  Let's talk about the joint

18 motion.  And I wasn't trying to ghost you on this one, but I

19 kept looking at it and I thought it would benefit from a

20 conversation between us about it, because -- I think I

21 understand the reason why probably the County wants an order

22 that this information be produced.  But the form of the order

23 is a little bit different to me in that, as I read this, I'm

24 ordering the County to produce this information subject to the

25 protective order, but not really because they get to keep

32

1 their other objections.  So it's a sort of, kind of, not

2 really type order, which is not what I'm used to issuing.

3          So what do you really need from me to move this

4 forward, especially given the deadlines that I've set, Ms.

5 Pappy?

6          MS. PAPPY:  I need something that says that nobody

7 can sue my clients for violating their privacy rights by

8 disclosing this information.

9          THE COURT:  And do you believe that --

10          MS. PAPPY:  Can you give me that?

11          THE COURT:  Do you believe that you require that

12 assurance when you are producing information subject to a

13 protective order?

14          MS. PAPPY:  I am concerned about it.  If the Court

15 were to order me to produce the documents attorneys' eyes only

16 or confidential, I would comply.

17          THE COURT:  But what am I ordering you to produce?

18          MS. PAPPY:  I don't know.  I mean, let me give you

19 an example.  One of the issues is -- proportionality is part

20 of it -- but medical records for every person who has been in

21 the jail for the last, at this point, three years.  If I

22 recall, we have an agreement to shorten that to two years, so

23 back to January 1st of 2022.

24          We haven't quite agreed on it, but assuming we

25 agree to January 1st of 2022 to the present, then your order

33

1 would say -- I think it might be 87 or 88, one of those

2 requests for all of the people in the subclass, the order

3 would reference that specific document production request.

4           If you're uncomfortable ruling on it today, what I

5 would suggest is that as part of our joint status statement on

6 the 17th, we specifically identify requests that it would

7 relate to.

8           Would that make the Court more comfortable?

9           THE COURT:  Partially.  But even asking me to

10 direct that you shall produce information responsive to these

11 requests -- I guess I have them now so I can look at what they

12 are -- it just strikes me that the parties agree that under

13 the relevant CFR provision, the protective order in this case

14 constitutes a qualified protective order.  And everyone

15 further agrees that the protective order is adequate to

16 protect from public disclosure the private information of

17 incarcerated people.

18           And I understand your desire to make sure that that

19 is crystal clear, Ms. Pappy.  And to that extent, I would

20 certainly consider signing off on a stipulation between the

21 parties, even though I'm not sure it's truly necessary.

22           Where I start to have hesitation is in ordering the

23 County to produce documents where I don't really know exactly

24 what they are and then secondarily ordering them to produce

25 the documents but still allowing the County to maintain its

34

1 objections, because then I -- that's my concern.

2          If you believe a stipulation would be important,

3 would a stipulation that the protective order in this case

4 constitutes a qualified protective order under the relevant

5 CFR provision do the trick for you?

6          MS. PAPPY:  Yes.

7          THE COURT:  I think that might be something where

8 I'm not then ordering you to produce unspecified documents

9 subject to additional objections.  That may be the way to go

10 about this.

11          Ms. Chartoff, what's your position on this?

12          MS. CHARTOFF:  We don't have any objection to a

13 stipulation that the protective order is a qualified

14 protective order.  I mean the only other thing that I would

15 note that is different now is now we are class counsel.  So I

16 don't know if that changes Ms. Pappy's position on any of this

17 and whether the production of our clients' medical records to

18 us is different in that case.

19          But we wouldn't object to a stipulation.

20          MS. PAPPY:  I would request a stipulation because

21 they don't have the specific authority of 4,000 people.

22          THE COURT:  Here's what I'm going to do.  I'm going

23 to respectfully deny the joint motion that's docket number 415

24 without prejudice to the parties resubmitting a more narrowly

25 tailored stipulation.

35

1          And, Ms. Pappy, I think -- I'm looking at page two

2 of docket number 415, and it sounds like what we are talking

3 about is the information that is contained on lines 16 to 27

4 of page two, which would be in a stipulation and would not be

5 then tied to the unspecified documents and unspecified

6 objections and I think would satisfy you and would satisfy my

7 desire to have an order that at least I can understand it.

8          MS. PAPPY:  That's fine.  And I think I understand

9 you to say that the language from lines 16 to 27 is

10 acceptable -- would be acceptable were we to submit it?

11          THE COURT:  It does appear to be narrowly tailored

12 and acceptable.

13          MS. PAPPY:  Okay.

14          THE COURT:  And I don't think Ms. Chartoff is going

15 to have a problem with that from what she's saying, so --

16          MS. PAPPY:  Then we'll resubmit it.

17          THE COURT:  -- if you wish to resubmit that, I

18 would be happy to consider it the new.

19          Let's talk now -- any further issues on the joint

20 motion, Ms. Chartoff?

21          MS. CHARTOFF:  No, your Honor.

22          THE COURT:  Ms. Pappy?

23          MS. PAPPY:  No, your Honor.

24          THE COURT:  All right.  Let's talk about the Rule

25 30(b)(6) depositions.  Let me grab the notice of deposition.

36

1          Thank you for sending this, and thank you to

2  whoever on your staffs prepared the binders that you provided

3  to me.  I really do appreciate it.  And I know that you all

4  hauling them down from Northern California was not easy, so

5  thank you.

6          All right.  Ms. Pappy, what do you want to talk

7  about first, Rule 30(b)(6) or the jail inspections?

8          MS. PAPPY:  30(b)(6) since I turned to that page.

9  Okay?

10          THE COURT:  All right.  As you understand it, Ms.

11  Pappy, what are the issues, if any, that I should resolve with

12  respect to the 30(b)(6) depositions that the Plaintiffs wish

13  to take?

14          MS. PAPPY:  Sure.  I want you to gently convince

15  Plaintiffs that my set of categories as I rewrote them -- I

16  provided this to them.  It's been -- I provided it to them

17  back in July.  As part of meet and confer, I just sent them a

18  sort of summary.

19          What I did with the categories -- because they were

20  too broad for me to be able to identify the correct person,

21  and I asked that they narrow them.  Let me give you an example

22  to just the first issue.

23          Policies, procedures and practices relating to

24  healthcare at the jail.

25          Policies, procedures and practices relating to

37

1 hiring and vacancy levels of healthcare staff.

2          That is subsumed within category number one as the

3 Plaintiffs wrote it.

4          If you look through the entire list of categories,

5 nowhere in any of them -- but let's just look at one -- is the

6 word "document" or "communications."

7          So my problem with the way that they wrote it is

8 twofold, and this applies to most of the categories, is that

9 there were disputes that I'm happy to say were resolved after

10 the last 30(b)(6) deposition about the breadth of these

11 categories.  They're written, from my perspective, more like

12 document production requests than a category of deposition.

13          I'd rather that they have the 26 categories that I

14 wrote out than the 11 that they have, because it leads to too

15 many possibilities for arguments.

16          The person for healthcare at the jail and the

17 person for hiring relating to healthcare are two different

18 people.

19          I also have a sheet that is my work product -- and

20 I'm happy to share it with the Court -- where we've identified

21 the persons most knowledgeable.  And generally speaking, I

22 don't have any problem having two or three people be the

23 person most knowledgeable for one category.  But the way those

24 are written -- I'm going to go out on a ledge here -- it's

25 going to lead to fights.

38

1           And then you take the "document" definition and
2  "communications," which Ms. Grunfeld told me -- I said:  How
3  do I interpret those as it relates to these issues you've
4  identified to know who to identify?  Does the person have to
5  know every document that might relate to this topic, every
6  communication that might exist related to this?
7           And the answer was basically yes.  And that's not a
8  proper way to write a 30(b)(6) notice.  I didn't object to it
9  the first time around.  It led to objections.  And so this
10 time, I'm putting my foot down that I need to make sure that I
11 get the right people, we don't have disputes.
12          And on this list with the names, I have 15
13 different people listed for those 26 categories as I wrote
14 them.
15          The only other issue then, your Honor, from my
16 perspective, is the amount of time.  We had offered I think 50
17 hours or 55, somewhere around there.  That was -- there was a
18 sense from Plaintiffs that that was going to be acceptable,
19 and now that has increased to 93 hours.
20          I have asked for -- can you look at the categories
21 as I've written them, tell me which ones you think are going
22 to take longer.  Let's try to go back and forth and come up
23 with some rational thing.  Ninety-three hours is 12 days, 13
24 days of deposition?  And I don't consider that to be
25 reasonable.

39

1          THE COURT:  Just so we're clear for the record,

2  because the 30(b)(6) notice is not in the docket, we're

3  talking about the July 20, 2023 30(b)(6) notice that has 14

4  topics; is that correct, Ms. Pappy?

5          MS. PAPPY:  Yes, that's correct.

6          THE COURT:  The 30(b)(6) deposition that you

7  referenced occurring earlier, Ms. Pappy, is that the

8  definition regarding policies and procedures for reasonable

9  accommodations for incarcerated persons with disabilities that

10  I wrote --

11          MS. PAPPY:  I think --

12          THE COURT:  -- or that was in my order which is

13  docket number 258?

14          MS. PAPPY:  Yeah, the issue.  Yes, the issues that

15  you wrote, not the definitions.  The definitions were in

16  addition to those, and that's where we have problems.

17          THE COURT:  Are you addressing this, Ms. Chartoff?

18          MS. CHARTOFF:  Mr. Swearingen is.

19          THE COURT:  Okay.  Great.

20          Well, Mr. Swearingen I would appreciate hearing

21  from you, because I will tell you that, as I read through

22  this, I had some of the same concerns that Ms. Pappy is

23  raising.  And that is that this reads like a request for

24  production, including definition of "communications" and

25  definition of "documents" that I wouldn't ordinarily expect to

40

1 see in a 30(b)(6) notice.  They're not in the 30(b)(6) topic

2 that I authorized for the expedited discovery at docket number

3 258.

4          I would prefer that the parties be able to work

5 this out among themselves, but if you can't, I'm not going to

6 wait and let it fester either, and I will rule on this if

7 necessary.

8          What do you think is the best path forward?

9          MR. SWEARINGEN:  Thank you, your Honor.

10          THE COURT:  Sure.

11          MR. SWEARINGEN:  I think the best path forward is

12 for the parties meet and confer on the rewritten categories

13 that Ms. Pappy provided.

14          THE COURT:  Can I see those?

15          MR. SWEARINGEN:  Say again?

16          THE COURT:  I don't have them now, do I?

17          MR. SWEARINGEN:  No, you don't.

18          THE COURT:  Are they on these nifty yellow sheets

19 of paper?

20          MS. PAPPY:  It was the only draft paper I had.

21          THE COURT:  Do you mind if I take a look, Mr.

22 Swearingen?

23          MR. SWEARINGEN:  No.  No, I have a copy as well.

24          THE COURT:  Okay.  Good.

25          MS. PAPPY:  Go ahead.

41

1              THE COURT:  Ms. Pappy, to orient me, can you tell

2    me whether or not those are the 15 categories that you

3    provided to us or the 26 categories that you provided to us on

4    Thursday?

5              MS. PAPPY:  They are the same ones I provided in

6    July, but not in this format when I red-lined the notice.  And

7    they're the same format that Ms. Chartoff asked me for, which

8    I sent to her.

9              THE COURT:  So there's 26 topics, but they are --

10             MR. SWEARINGEN:  Yes, those are --

11             MS. PAPPY:  My --

12             THE COURT:  -- I think put into subparts.

13             MS. PAPPY:  My version, right.

14             THE COURT:  Yes, okay.

15             Go ahead, Mr. Swearingen.

16             MR. SWEARINGEN:  Thank you.  So we received an

17   earlier iteration of that document that had 15 categories of

18   documents.  And we went through those 15 categories and

19   estimated that based on the 15 categories that Ms. Pappy

20   identified, our best estimate for the length of time for the

21   deposition would be 93 hours.

22             We have not had an opportunity to do that yet with

23   the 26 categories that you have in front of you, because we

24   received those on Thursday.  We are happy to do so.

25             We note that some of those categories have been

42

1  rewritten.  For example, instead of having policies and

2  procedures and practices related to ADA issues, instead it's

3  been rewritten to "green sheets," without the provision of

4  inquiry on practices, for example.

5          So we would need to meet and confer and make sure

6  that we agree on the language so that the witnesses can be

7  adequately prepared.

8          THE COURT:  Didn't you already have a 30(b)(6)

9  deposition on policies, practices and procedures relating to

10 ADA issues or is your category now more broad?

11         MR. SWEARINGEN:  The category is broader because

12 the expedited discovery that was issued -- or that was allowed

13 earlier this year was only as it relates to people with

14 mobility disabilities in Central Jail and the provision of

15 SLI.

16         MS. PAPPY:  Yeah, I don't want to shoot myself in

17 the foot, but we don't -- I don't have a dispute with the

18 appropriateness of these categories.

19         THE COURT:  Okay.  No, I appreciate that.

20         Go ahead, Mr. Swearingen.

21         And you're correct.  I looked at it again.  Thank

22 you for refreshing my memory.

23         MR. SWEARINGEN:  I think that we will end up having

24 a dispute about the number of hours.  I think that we can meet

25 and confer about what is appropriate, but we may end up having

43

1  a dispute, given the difference that we have.

2          I would disagree with Ms. Pappy's contention that

3  my colleague, Ms. Grunfeld, said that each deponent is

4  responsible for knowing what is in every single document and

5  every single contention.

6          What we did when we served these deposition notices

7  was used the same format that we used across all written

8  discovery and using the defined terms.  And as my colleague,

9  Ms. Grunfeld, explained to Ms. Pappy, the definitions of

10 "communications" and "document" may be at issue that to the

11 extent that only if -- if somebody doesn't understand what a

12 document is or a communication is, these are the definitions

13 that we would use for that.

14         Ms. Grunfeld did not represent that the deponent

15 would need to know the content of every single document that

16 could possibly be at issue with respect to a given topic.

17         THE COURT:  Okay.  So is it the Plaintiffs' request

18 to conduct the 93 hours of 30(b)(6) depositions and then take

19 nine additional depositions?

20         MR. SWEARINGEN:  Yes, your Honor.

21         THE COURT:  Who?

22         MR. SWEARINGEN:  At this point, we do not have

23 sufficient information, and we have not made that

24 determination yet.  Part of that determination will be made

25 upon having the opportunity to review documents in this case.

44

1          THE COURT:  So your proposal would result in there

2    being over 150 hours of depositions being taken by the

3    Plaintiffs.

4          MR. SWEARINGEN:  Possibly.

5          THE COURT:  I would consider everything with an

6    open mind and subject to the specific reasons that are

7    proffered.  I will tell you, just to the extent, it's helpful,

8    Mr. Swearingen, I would have to be convinced based on specific

9    facts provided by the Plaintiffs that 156 hours of deposition

10   testimony would truly be proportional to the needs of the

11   case.

12         Again, I'm not saying it's not, because I don't

13   have the specifics in front of me, but that is weeks' worth of

14   depositions in this case.  And I understand there are a number

15   of issues and the case is a large one, but I would urge you

16   all, at least initially, to work hard at the topics that Ms.

17   Pappy provided, because even aside from the definition of

18   "documents" and "communications" that may not really be an

19   issue -- and I understand you're saying, Mr. Swearingen, that

20   you wouldn't expect the designee to know of every

21   communication ever written on a single topic -- they are

22   broad.

23         So what do you think we should do with respect to

24   timing?  Because I can tell you that I'm inclined to set a

25   fact discovery cutoff of February 16th in this case, to give

45

1 you approximately two months to conclude your inspections and

2 take depositions.

3          MS. PAPPY:  Did you say 15 or 16?  I'm sorry.

4          THE COURT:  16.

5          MS. PAPPY:  Thank you.

6          THE COURT:  So I want to work with you all so there

7 are not any last-minute disputes over the 30(b)(6) topics.

8 But I also realize that going through the written discovery

9 and the documents is going to be time consuming.  I want to be

10 realistic.

11          What are your thoughts with respect to how much

12 time the parties would need to meet and confer in a meaningful

13 fashion and then seek resolution if any outstanding issues

14 remain, Mr. Swearingen?

15          MR. SWEARINGEN:  Is your question, your Honor,

16 directed at the 30(b)(6) deposition issue?

17          THE COURT:  It is.

18          MR. SWEARINGEN:  I think that we can resolve this

19 within two weeks.  I think that the first step, like I said,

20 would be to take the categories that Ms. Pappy identified for

21 us to identify if we have any problems with them and to put

22 our best estimates of the time for each of the deponents and

23 to also understand from the Defendants' perspective which

24 witnesses will be designated for each topic, so that we have a

25 better understanding of how many new individuals there will be

46

1  and whether or not the -- the background information that seek

2  and then the depositions will take extra time.

3         And just to conclude, I think that this process can

4  wrap up in two weeks.

5         THE COURT:  What do you think, Ms. Pappy?

6         MS. PAPPY:  That's fair.  I mean I have the people

7  designated already, and there's a lot of crossover, so

8  hopefully that will help Plaintiffs narrow that time frame

9  they need for the depositions.

10         THE COURT:  Do you have any problem with telling

11  Plaintiffs' counsel at the outset, "These are the people we

12  intend to designate for the particular topics?"

13         MS. PAPPY:  Oh, I can do it.  Let me get home and I

14  will tell them.

15         THE COURT:  I want to save you all further status

16  reports and further briefing where I can.

17         Why don't we do this.  Why don't you plan to tell

18  me at the hearing on November 21st whether there are any

19  disputes, and you can provide me with simply a copy of

20  whatever is in dispute.  If it's going to be the 26 categories

21  that Ms. Pappy suggested, I would ask you to file it just so

22  there's a record of it in case anyone wants to look at it

23  later, but you don't need to brief it for me.  We can just

24  talk it through.

25         And if I can provide with a ruling on the topics on

47

1 November 21st, I will endeavor to do that.  If I think there's

2 an issue that really does require briefing, we can talk about

3 it, but I don't want you to have to do that where I don't

4 think it's necessary.

5          MR. SWEARINGEN:  Thank you, your Honor.  Should it

6 take the form of joint status report?  And if we're in

7 agreement and hopefully there are no disputes, we can just say

8 there are no disputes as to the 30(b)(6) deposition issues.

9          THE COURT:  It can simply say "Yippee."  Okay?

10          MR. SWEARINGEN:  Got it.

11          MS. PAPPY:  So if there's no dispute, you don't

12 want a joint status.

13          THE COURT:  No.  Again, I'm trying to be mindful of

14 the fact that you've got lots of stuff going on, so if you

15 don't have a dispute, you can even email my chambers, "No

16 dispute."  And you can confirm it on the record on the 21st.

17          But if there is a dispute, just file the categories

18 and just tell me what's at issue.  I'll take a look at it

19 before the hearing, and you'll tell me what your decisions

20 are.

21          MS. PAPPY:  Thank you.

22          THE COURT:  Sure.

23          MR. SWEARINGEN:  Before moving on, your Honor, can

24 we go back to that February 16th date, or should we discuss

25 that at a later time in today's conference?

48

1          THE COURT:  Why don't we discuss that at a later

2   time because I want to talk about the inspections as well,

3   which is part of fact discovery, although I know it relates to

4   your experts, but it's still I think properly considered fact

5   discovery.  And I'll be happy -- I'll give you the dates that

6   that I am thinking of setting, including that one, and then

7   I'll be happy to hear from you as well.

8          MR. SWEARINGEN:  Thank you.

9          THE COURT:  Sure.

10          Let's talk about the jail inspections.  I

11   understand that they have been -- were noticed initially, were

12   taken off calendar by the Plaintiffs, were noticed a second

13   time and then taken off calendar because there were some

14   disputes between the parties.

15          I don't think there's a dispute that the Plaintiffs

16   should be allowed to go into each of the facilities, but the

17   specifics of that I understand from our last conversation are

18   disputed.

19          Why don't you tell me this -- is this your issue,

20   Mr. Swearingen?

21          MR. SWEARINGEN:  It is, your Honor.

22          THE COURT:  Okay.  Great.  What do you understand

23   to be the specific issues between the parties with respect to

24   the jail inspections that I should be prepared to resolve?

25          MR. SWEARINGEN:  First, the documents that are --

49

1 the documents included in our inspection notices, whether or

2 not Defendants will be required to produce those documents in

3 advance of the inspections.

4          THE COURT:  Okay.  Let's go -- what's the next one?

5          MR. SWEARINGEN:  The second issue is whether or not

6 Plaintiffs' experts will be allowed to speak with staff, not

7 in a deposition manner, but instead to better orient

8 themselves around the facility, to ask questions like:  "When

9 is yard time?"  "This person is in the safety cell.  Why is

10 this person in the safety cell?"  "What are the safety checks

11 and welfare check requirements for somebody in this type of

12 housing?"  To ask those types of questions to staff.  That's

13 one issue.

14          Another issue is whether or not Plaintiffs' counsel

15 and experts will be allowed to speak with incarcerated people.

16          Another issue, whether or not Plaintiffs' counsel

17 and their experts will be allowed to observe intake, the

18 delivery of medical care, and other normal processes and

19 activities and operations of the jail, including, for example,

20 people participating in therapeutic programs.

21          Another issue relates to -- and a very

22 consequential issue -- relates to the number of Plaintiffs'

23 counsel and experts who will be allowed to attend any given

24 inspection.

25          I have lots to say, your Honor, on each of these,

50

1 but I'm just trying to summarize these at a high level right

2 now.

3          THE COURT:  I appreciate that.

4          MR. SWEARINGEN:  Back in July we were told that

5 Plaintiffs' counsel and their experts would only have one shot

6 at each institution, meaning they must all get on the same

7 schedule so that all inspections of Central Jail or George

8 Bailey happened on a given day.  There will be no re-do's.

9 There will be no second chances.

10          After Defendants served their untimely objections,

11 we learned that they would not permit more than six people on

12 a given tour due to understaffing.

13          So a question for Plaintiffs as we prepare for

14 these and we try to work with experts who have their own very,

15 very demanding schedules, is what days are going to work for

16 everybody and what are the maximum amount of people who can

17 attend any given inspection?  And are we going to need to have

18 more than one inspection at a facility?

19          Attendant to this conversation are issues that may

20 pertain to the ENE.  I don't know if it's appropriate right

21 now to say on the record what those issues are with respect to

22 experts visiting facilities, but given the representations by

23 Defendants in the joint status report that this should be done

24 as expediently as possible, including with Plaintiffs' ADA

25 expert, those experts regarding issues for discussion on the

51

1 ENE, one of those experts should have their own tours in

2 advance and get them working on inspections at an early

3 opportunity that do not preclude Plaintiffs' other experts

4 from inspecting the facilities.

5           And finally, your Honor, I think that the photos

6 are a big issue.  Defendants have said that only Ms.

7 Sanossian, Plaintiffs' ADA expert, is permitted to take photos

8 and that she must turn them over to the Sheriff's Department,

9 and the Sheriff's Department will have discretion to delete

10 whatever photos they want out of security concerns and give

11 them back to us.

12          During the last set of inspections, Ms. Sanossian

13 was permitted -- well, allowed them to take the photos back.

14 At Central she was not.  She gave the photos over.  It turned

15 out that I think well over 100 photos were either collected or

16 missing from the share thumb drive that was returned back to

17 us with no explanation of why those were deleted.

18          In addition, it's not clear why only Ms. Sanossian

19 is permitted to take photos and why other experts are not.

20          THE COURT:  All right.  So the high-level issues

21 that I wrote down are:

22          Production of documents responsive to inspection

23 requests.

24          Whether Plaintiffs' experts should be allowed to

25 speak with staff members, whether Plaintiffs' experts should

52

1 be allowed to speak with detainees.

2          Fourth, whether Plaintiffs' experts should be

3 allowed to observe intake, medical care and therapeutic

4 programs.

5          Fifth issue, the number of counsel and experts who

6 would be allowed to attend, including whether the inspection

7 of each facility should all be on one day.

8          And finally, the procedure for taking photographs

9 and whether photographs should be limited to the Plaintiffs'

10 ADA expert or should include other experts.

11          So I have six categories, Ms. Pappy.  Does that

12 sound right to you?

13          MS. PAPPY:  I have six as well.

14          THE COURT:  All right.  So with that in mind, are

15 there any -- are any of these categories where you believe the

16 parties can work out on their own without my involvement?

17          MS. PAPPY:  Well, I don't quite understand the

18 production of documents.  So with each of these facility

19 inspections, there are eight more requests for production of

20 documents.  So six times another eight requests for production

21 of documents.

22          THE COURT:  Okay.

23          MS. PAPPY:  And like, for example, the map and

24 floor plans.  I've already advised counsel that I don't have a

25 problem with that, that for each of the last two inspections

53

1 we gave them and don't have a problem giving them.

2          Organizational chart, you ruled previously that

3 that didn't need to be produced.  We're not willing to give

4 that.  I don't understand why that's relevant.

5          So the document thing, I really don't quite

6 understand why it's an issue.  Some of it is like the complete

7 roster of incarcerated people.  Why do you need that for the

8 inspection unless you intend to talk to people?

9          So if you're not going to let them have that

10 ability to talk to people, then why do they need that roster

11 for the inspection?  I mean they're certainly going to get

12 class lists as a part of class certification.

13          So I don't quite get that one.

14          They ask for documents, rosters or tracking systems

15 which are duplicate of document production requests.  I don't

16 understand why they need that for an inspection.  An

17 inspection is a visual inspection.  You walk by, you look, you

18 take photos if you're the ADA expert.  The doctor wants to

19 observe the medical area, see if it's properly outfitted with

20 what it needs.

21          So some of these documents I simply don't

22 understand why they're necessary, and I would think that we

23 should have been able to resolve the document issues.  They

24 are -- like I said, we've never really talked about them in

25 great detail.

54

1          We talked about the organization chart because you
2   had previously ruled on that, and I already told them they
3   could have the maps and floor plans.  The rest sort of went by
4   the wayside, I think is a fair way to say it, because we got
5   caught up in who you can interview and who you can't.
6          THE COURT:  Sure.  Does anyone have a hard copy of
7   one of the requests for inspections that I can take a look at?
8          MS. CHARTOFF:  Yes, your Honor.
9          THE COURT:  Thanks, Ms. Chartoff.
10         Ms. Pappy, are there identical document requests
11  for each of the facilities?
12         MS. PAPPY:  I don't know.  I'm not sure off the top
13  of my head.
14         THE COURT:  I should ask you that, Ms. Chartoff.
15         MS. PAPPY:  If they can just tell me which one
16  they're giving you, I can pull that up.
17         MS. CHARTOFF:  George Bailey.
18         MS. PAPPY:  These requests are identical to the
19  ones I saw in the East Mesa, so I think they're generally the
20  same.
21         THE COURT:  Did you all provide rosters of
22  detainees with respect to the prior inspection, Ms. Pappy?
23         MS. PAPPY:  No.
24         THE COURT:  I am going to direct that the parties
25  continue to meet and confer on the issue of the document

55

1 production.  There's no dispute that the Defendants will

2 provide the map and floor plans of each facility prior to the

3 inspection, which is document request number 1A.

4          It is not at all clear to me why an organizational

5 chart for supervisory staff or a roster of the incarcerated

6 persons at each facility would be relevant to the inspection.

7 And I haven't looked at every request for production.

8          1D asks for logs, rosters and tracking systems of

9 different types.  Is that contained in requests for

10 production?

11          MR. SWEARINGEN:  The logs, rosters of people on

12 medical, mental health, sick call, for example, on a given day

13 before the tour, no, your Honor.  And if I could explain why

14 that's so helpful for the experts.

15          Rule 34 allows for the inspection of facilities as

16 well as well as the operations.  We think that this issue as

17 to what the experts can observe and who they can talk to needs

18 to be briefed, as we said in our joint status report.

19          The reason why the experts can benefit from having

20 those documents is because the mental health expert, who has

21 tons of experience in correctional health medicine, can go up

22 to those people who are on the mental health sick call list

23 and better understand, you know, what are your issues, have

24 you been seen today, have you repeatedly rescheduled for

25 visits.  They can go to the person on the medical sick call

56

1 list and better ascertain whether that person's hernia has

2 been addressed.  They can see the open wound on somebody's leg

3 and understand whether or not it gets regular re-wrapping.

4        Those lists in proximation to our inspection tours

5 are different from the general full sheets of Excel

6 spreadsheets that we've asked with respect to sick call lists

7 to better understand how frequently people receive treatment

8 as a result of sick call requests and how much time passes

9 between the request and the response time and the actual

10 evaluation by a medical staff member.

11        So they are different in that way, and that's how

12 they can help assist the experts who are on site.

13        THE COURT:  So they would assist the experts in

14 connection with speaking to detained individuals and in that

15 sense would be inextricably intertwined with the issue as to

16 whether Plaintiffs' counsel and experts should be allowed to

17 speak with people in the first instance.

18        MR. SWEARINGEN:  I agree with that, your Honor.

19        THE COURT:  I see.  That's helpful.  Thank you, Mr.

20 Swearingen.

21        What about categories E, F and G.  Those don't seem

22 to be related to the Plaintiffs' request to speak with

23 individuals.  Are those covered by requests for production?

24 And regardless whether they are, why are those essential to

25 the Plaintiffs' ability to inspect the facilities?

57

1          MR. SWEARINGEN:  I'm sorry, your Honor.  I'm

2 turning to that right now.

3          THE COURT:  Sure.  Take your time.

4          MR. SWEARINGEN:  E refers to documents sufficient

5 to show which programs, services and activities are offered to

6 incarcerated people.  That allows our experts to plan in

7 advance which sets of program they would like to observe

8 during the inspection.

9          For example, the mental health expert would want to

10 see the rehabilitative programs and the therapeutic programs

11 offered to people with mental illness.  The ADA expert may

12 want to see rehabilitative programs.  The safety and security

13 person may want to observe different programs still.

14          With respect to request F, this is documentation of

15 temporary or permanent modifications made to physical

16 structures.  This will help our ADA experts better understand

17 what physical alterations have been made at the jail and where

18 to focus their attention.  Request number --

19          THE COURT:  And you're saying it's not covered by

20 requests for production?

21          And, look, I'm not trying to put you on the spot,

22 Mr. Swearingen.  So here's what I would just say.  You see

23 where my concerns are, I think.

24          MR. SWEARINGEN:  Sure.

25          THE COURT:  I think that you all can make some

58

1 meaningful progress on this.  It sounds like there may be

2 disputes between the parties and I recall Mr. Fischer asking

3 for briefing on the issue in particular of speaking with

4 detained individuals, and I can't recall -- he was talking

5 also about speaking with staff members but that was an issue

6 that he said there's case law supporting the Plaintiffs'

7 position.  I would like to see it, coming up with an

8 appropriate order for the inspections.

9          Ms. Pappy, when we were on the last hearing, it

10 seemed to me like there might be agreement between the parties

11 that structuring the inspections with the ADA expert Ms.

12 Sanossian -- it's Ms. Sanossian, correct? -- separately from

13 some of the other experts who are looking at mental healthcare

14 and other medical care might just make sense logistically.

15          Do I recall that correctly?

16          MS. PAPPY:  You do.  But before I forget, F is

17 request for production number 54.  I'm very familiar with it.

18          THE COURT:  That's what you guys are going to talk

19 about.

20          MS. PAPPY:  I'm very familiar with it.

21          THE COURT:  Okay.

22          MS. PAPPY:  So this weekend, I contacted my client

23 and encouraged them that it made a whole heck of a lot of

24 sense to me to do the ADA inspections separately so that --

25 not all the facilities need to be -- we've already done Rock

59

1  Mountain, we've already done Central.  And why, County -- why

2  don't we agree to the ADA ones because the quicker we get

3  those done, the quicker we can start talking about settlement.

4          The County has also made -- the Sheriff's

5  Department, I guess, has made decisions not to house people

6  with wheelchairs simply because they would have to knock down

7  facilities and rebuild them and they don't have the money at a

8  couple of the facilities.

9          So those ADA inspections will be narrow in scope.

10 But the client agreed and said:  Yeah, we're good with that

11 because we do want to get that issue resolved.  We want to get

12 those ADA ones.

13         Ms. Sanossian and her assistant were able to take

14 photographs last time.  I'm not going to -- until you want me

15 to comment about the photograph issue -- but they -- you know,

16 same rules as last time, same Bat channel, same Bat time.

17         I say let's get these ADA ones out of the way, and

18 we can probably do them in, I would say, three or four days.

19 There's only about three or four facilities where there will

20 be full top to bottom, maybe only three top-to-bottom

21 inspections.

22         And the other ones -- like, for example, Vista,

23 they have made a policy decision not to house anyone in a

24 wheelchair there because that's being rebuilt and they cannot

25 afford right now to do the work that's necessary.  They're not

60

1 even going to intake anyone there.

2          But there are other disabilities that have to be
3 addressed by Ms. Sanossian.  So she needs to go there and
4 address the other disabilities.

5          Let's get all of those done forthwith.  I think Ms.
6 Sanossian is in Northern California.

7          Now, as to the rest of these experts, setting aside
8 the interviews, not having the ADA married to the rest of
9 them, the six people is still a problem.  The County wanted
10 three.  The people I deal with pushed it to six, because of
11 safety and security and this notion of people wandering around
12 and looking and talking to people.

13          But medical, dental, mental health, those folks are
14 pretty finite in areas they need to see.  So put them in the
15 morning.

16          Put the health and safety people -- I think there's
17 one about cleanliness.  Put her in the afternoon with general
18 overall safety person, because that would seem to be a more
19 comprehensive need to go everywhere in the facility.

20          Those are my thoughts.

21          THE COURT:  Ms. Chartoff, I asked if I could borrow
22 this.  Could I keep it?

23          MS. CHARTOFF:  Yes, sure.

24          THE COURT:  Thank you.  I'm going to write on it.

25          Who is Robert Cohen?

61

1          MR. SWEARINGEN:  Robert Cohen is Plaintiffs'
2 medical expert.

3          THE COURT:  How about Mr. Stewart (phonetic)?

4          MR. SWEARINGEN:  Plaintiffs' mental health expert.

5          THE COURT:  Mr. Austin?

6          MR. SWEARINGEN:  Safety and security expert.

7          THE COURT:  Mr. Schulman (phonetic)?

8          MR. SWEARINGEN:  Dental expert.

9          THE COURT:  Is Ms. Sanossian -- it's Ms. Sanossian
10 and SZS Engineering.  But does that mean really just Ms.
11 Sanossian?

12          MR. SWEARINGEN:  And her assistant, your Honor.

13          THE COURT:  So there's two people total for that
14 one?

15          MR. SWEARINGEN:  Yes, your Honor.

16          THE COURT:  And Debbie (phonetic) Graham?

17          MR. SWEARINGEN:  Environmental issues expert.

18          THE COURT:  Do you think that there is benefit in
19 the parties meeting and conferring with respect to a schedule,
20 to a framework for the inspections, Mr. Swearingen?  If so,
21 how much time should that take because I also -- if this is
22 going to be something where you think the parties are going to
23 need to brief an issue of whether the Plaintiffs' experts can
24 talk to detainees, for example, I don't want to leave that
25 lingering, especially given that you're going to have to

62

1 conclude these inspection, under my tentative schedule, by

2 mid-February.

3          MR. SWEARINGEN:  I think that given that the

4 parties are meeting and conferring about several issues at

5 once, I think it would be beneficial to have three weeks to

6 discuss this.

7          I would also like to have the opportunity to

8 respond to a couple points raised by Ms. Pappy.

9          THE COURT:  Sure.  Go ahead.

10          MR. SWEARINGEN:  One is the idea that the ADA will

11 be narrow in scope because the County and Sheriff's Department

12 have determined that certain wheelchair users will be confined

13 only to certain institutions.

14          I just want to point out that disability issues go

15 beyond the mere usage of a wheelchair.  So if somebody has,

16 for example, an upper extremity disability, they may be housed

17 in a facility where people with wheelchairs are not housed but

18 still require grab bars for toilets, for example.

19          THE COURT:  Sure.

20          MR. SWEARINGEN:  People with vision disabilities

21 still need emergency exit procedures, or hearing disabilities,

22 for example, to see the lights that show the exit corridor.

23          So it's not just whether or not someone is in a

24 wheelchair that determines whether or not an ADA experts

25 inspection is necessary or not.  So I would push back against

63

1 the contention that ADA inspections will be more limited in

2 scope.

3          That said, I do very much agree with the

4 opportunity to have our ADA expert and other experts go in at

5 an early opportunity, so long as it will not prejudice our

6 other experts' ability to inspect the facilities.

7          I don't disagree with the suggestion that our

8 mental health, medical and dental experts go in on the same

9 day, but I would push back against the idea that they should

10 be limited to just a morning or an afternoon.

11          This is an incredibly expensive endeavor, lining up

12 experts known for their skills who are in high demand.  They

13 should be given the full opportunity to conduct their

14 inspections without being limited to just a portion of the

15 jail or a portion of the day because of Defendants'

16 acknowledged understaffing.

17          We have conducted tours with many more people than

18 six in the past without any security concerns whatsoever,

19 including inspections that had federal judges on the

20 inspections.

21          I'm not going to tell the County how many is the

22 right number for their security concerns, but because of their

23 understaffing, we should not be prejudiced by the amount of

24 time that we have to conduct those inspections.

25          That said, I do think that we can meet and confer

64

1 in between two and three weeks, and I do think it's

2 appropriate to brief some of the issues as it relates to what

3 those experts can observe.  I do believe the case law weighs

4 in Plaintiffs' favor.  The idea that Plaintiffs' counsel --

5 and given Friday's order granting the class classification

6 motion, Plaintiffs' counsel are now counsel for all people

7 detained in the jail.

8          The idea Plaintiffs' counsel would not be allowed

9 to talk to their own clients is somewhat absurd to us in part

10 because Plaintiffs should have a voice in this.  Plaintiffs

11 should be able to participate in this litigation.  Plaintiffs

12 have every ability to say no and not to provide informed

13 consent if they do not want their medical consultation to be

14 watched by others.

15          They don't need to be protected from prying eyes.

16 They are -- the class members are the ones who we represent.

17 It would never be the case that -- I can't imagine the Court

18 would ever make it so that defense counsel couldn't talk with

19 their clients during the inspections.

20          As Defendants noted in the joint status report,

21 they say that we have the opportunity -- "we" being

22 Plaintiffs' counsel -- have the opportunity afterwards to go

23 to a professional visit and talk with the people that we met

24 during the inspections.

25          That does not help with judicial economy or

65

1 efficiency.  We have told Defendants over and over that there

2 very, very long waits for pro visits.  Sometimes we have

3 waited as long as two hours to be able to see a client or one

4 hour to be let out from a client visit.

5          Having the opportunity to talk with the client for

6 not a great length of time -- we're not deposing them -- but

7 to better understand why they're seeking medical care, what

8 the delays are, and have our experts then be able to follow up

9 during those longer visits, is the more appropriate way to go,

10 in our opinion.

11          THE COURT:  I understand that the issue is not

12 whether Plaintiffs' counsel and the experts can have access to

13 the class members at all, but the circumstance under which the

14 access should occur.

15          So to use your example in the criminal case, you're

16 absolutely right, defense counsel have access to their

17 clients.  But they don't go into the client cells to meet with

18 them.  They schedule an appointment and they go to a waiting

19 room.

20          And so, look, I hear what you're hear saying, Mr.

21 Swearingen.  And I think this is something where I would want

22 to hear from the parties in writing about the appropriate way

23 to go about this.  It just strikes me that with a little

24 bit -- well, maybe a little bit -- maybe with a certain degree

25 of willingness to engage in a serious back-and-forth, that

66

1 there may be a way to accommodate these concerns, because I

2 also hear you to be saying, Mr. Swearingen, that you're not

3 asking for an in-depth interview of an individual who is

4 undergoing mental health treatment by your mental health

5 expert, but maybe a few questions and then setting up

6 something for a formal visit later.

7            I also would note that to the extent that the

8 Plaintiffs are concerned about having access to the class

9 representatives and waiting months to schedule a formal visit,

10 may not be necessary if there is a court order directing that

11 individuals be made available within a very specified time

12 frame.

13            So I think this is one where you all would benefit

14 from talking to each other.  There may still be an impasse as

15 to certain issues as to speaking with employees and speaking

16 with detainees, but I'm not convinced that it's an

17 insurmountable problem that requires me to tell you what to

18 do.

19            If there's a two-step process, that might be

20 something the parties can figure out.  And even if you can't,

21 it may inform the way that you all brief the issue for me.

22            So here's what I would like to do.  I don't want to

23 kick this can down the road for an inordinate period of time,

24 but I do want the parties to see what you can figure out in

25 the inspections with the benefit of hearing each other today.

67

1          I do want to discuss that with you all on the 21st.

2  And if there are issues that require briefing, you can brief

3  it and we'll hold a further hearing on it in early December.

4  Let's see if we can avoid that though, or at least narrow the

5  scope of it.

6          What were you saying, Ms. Pappy?

7          MS. PAPPY:  Yes, I would at least like to respond

8  to the arguments that have been made.

9          This isn't just about staffing at the facility.

10  This is about proportionality.

11          THE COURT:  Right.

12          MS. PAPPY:  And I want to make that loud and clear,

13  that yeah, having six people at one time may be a safety issue

14  and understaffing, but this is having somebody who is a

15  medical doctor walk through the kitchen, walk through a

16  housing unit to see beds.  This is about proportionality and

17  wasting time and wasting money on things that don't need to be

18  done.

19          I understand that the Plaintiffs' firm is involved

20  in numerous consent decree cases.  But this is not a consent

21  decree case.  This is a hotly contested case.  And we have

22  successfully resolved issues, and I expect that we will

23  continue to be able to resolve issues.  But as counsel was

24  first explaining this process, this very friendly and informal

25  and we're all just going to get along process of interviewing

68

1 incarcerated people, the first thing that popped into my head

2 was my client's due process right to cross-examine these

3 people.

4          So I've got an expert up on the stand that I'm

5 going to be faced with at trial that says "Well, as the

6 defense attorneys were standing there and all the custody

7 staff were standing there, I asked this gentleperson whether

8 there were delays in his medical care, and he said "Yes, of

9 course there were."

10          How do I defend against that at trial?  It is an

11 entirely different ballgame when you have what your Honor has

12 suggested which is -- I'm not even sure they're going to

13 require a court order -- but the County's willingness to or

14 order availability times that counsel can come in and talk to

15 various class members with their experts there or on the phone

16 or on Zoom.

17          All these niceties of this would be easier, this is

18 about a hotly contested case and my client's due process

19 rights with these informal interviews would be a big problem

20 and something that I couldn't overcome at trial with this

21 expert and the way the jury is going to view the fact that I

22 and all of the defense employees are standing around listening

23 to this conversation.  Do I get to cross-examine the person?

24 I don't want to.  I think it would be inappropriate.

25          But that is a major concern, and then this notion

69

1 about proportionality and why these extremely expensive

2 experts all need to spend hours at this facility looking at a

3 medical observation room.

4          THE COURT:  Okay.  Understood.  And I do think that

5 this is where your collective reasonable minds can work

6 together to figure some of these issues out, particularly the

7 latter issue that you raised, Ms. Pappy, because there's got

8 to be a way for you all to structure the inspections where --

9 you were talking about Ms. Sanossian and her assistant going

10 on a separate set of inspections, doing their thing the way

11 they did it at Central and Rock Mountain.  And then I haven't

12 heard Mr. Swearingen say that the dental expert wants to

13 inspect the housing units.

14          Probably -- I don't know.  Probably not.  But this

15 is something where I think you all can figure it out.  And

16 obviously if I am looking at this and it doesn't seem to make

17 sense to me on a contested motion, then I'll resolve it

18 accordingly.

19          The order that I issued on the expedited discovery

20 request did not allow counsel to conduct interviews, formal or

21 informal, with detained individuals.  I don't have it in front

22 of me, but it said something to the effect of defense counsel

23 shall facilitate providing information to Plaintiffs' counsel.

24          And what I am thinking that might include here

25 would be the names of individuals who are receiving services

70

1 such that Plaintiffs' counsel would be able to speak with them
2 in a private and more structured setting.  Frankly, I don't
3 know how it would work.  How do we know whether an expert --
4 if an expert approaches somebody who is receiving mental
5 healthcare, how does one obtain -- I'd have to think through
6 how does one obtain -- make sure that the consent to speak
7 with that expert is informed.

8          There's just issues that are popping into my head
9 that I would hope the parties can talk about, and if we need
10 to resolve it with the benefit of some briefing, I want to be
11 thoughtful about it, because it's important.  I understand why
12 it's important to the Plaintiffs and I don't want to issue a
13 ruling on that without really thinking it through.

14          So that's an issue that if the parties haven't been
15 able to come to an agreement and there are specific areas of
16 dispute, when we talk on the 21st, I will probably ask for
17 briefing from the parties so that I can come up with an order
18 regarding the inspections that makes sense.

19          MS. PAPPY:  So just on the 21st, we need to provide
20 a status of our meet and confer.

21          THE COURT:  You can.  And you can tell me where you
22 are.  I don't need you to file something in advance.  I'm
23 familiar with the issue.  I've taken Ms. Chartoff's inspection
24 request and I've been taking notes on it, so I'll have that
25 with me.

71

1        You can let me know what are the areas of agreement
2 that will probably be best memorialized in a stipulation
3 regarding the inspection so that there's no ambiguity and what
4 are any areas of disagreement where the parties belief that
5 you need to brief the issue for me to resolve, and I'll do
6 that.

7        MS. PAPPY:  Do you want us here in person that day?
8        THE COURT:  Well, I happen to believe that we
9 accomplish more in person sitting here together than we do
10 otherwise, so I think yes unless you think that the parties
11 are going to really make a bunch of progress and we won't have
12 to spend several hours together drilling down.

13        And, by the way, I'm not saying that just because
14 you all have to travel and I'm trying to coerce you all into
15 agreeing on issues.  I mean that sincerely.  I do think that
16 we accomplish more in person when we can talk through these
17 issues together.  But I also realize that we get to that
18 Thanksgiving holiday and I want to be respectful to you and
19 your families and trying to spend some time with them.

20        So what do you want to do, Ms. Pappy?
21        MS. PAPPY:  I just want to make a plane
22 reservation, so I'm going to make a refundable plane
23 reservation now and --

24        THE COURT:  And hope for no fog.
25        MS. PAPPY:  And hope there's no fog at 4:00 o'clock

*Echo Reporting, Inc.*

72

1 in the afternoon, yes.

2          THE COURT:  What do you want to do, Mr. Swearingen?

3          MR. SWEARINGEN:  I recall you saying earlier this

4 afternoon that you anticipated that starting at 4:00 p.m. and

5 carrying over to the following day if necessary.

6          THE COURT:  If you can't finish.  I have a criminal

7 calendar.  I'm trying to find time for you, and I have a

8 criminal calendar at 2:00 that should be done by 4:00 which is

9 why we could start at 4:00 and go to 5:30 or so and then we

10 could resume the next day if necessary.

11          If you think -- do this.  Talk to one another.  Let

12 me know what you want to do.  You've earned that from me, that

13 I will trust you.  If you tell me we can accomplish as much on

14 Zoom as we can in person, let me know and I will give that

15 serious consideration again.  I really do think it's important

16 for you all to be able to not disrupt your holiday plans with

17 your families, and I have no interest in doing that.  But I

18 really also want to help you resolve these issues in a timely

19 way, especially if I'm going to be setting the deadlines that

20 I'm thinking about.

21          MR. SWEARINGEN:  Can I ask one follow-up to that?

22          THE COURT:  Sure.

23          MR. SWEARINGEN:  What time do you think that 4:00

24 p.m. hearing would conclude if the parties were in person and

25 dedicated to working through the issues?

73

1          THE COURT:  Well, let's see.  Let me see if I have

2  anything -- you want to tell me your concern, Mr. Swearingen?

3  You don't have to.

4          MR. SWEARINGEN:  I just wanted to know whether it

5  would be necessary to stay the night that night.

6          THE COURT:  I have --

7          MS. PAPPY:  Your Honor, can I make a pitch for

8  Zoom?  We are never going to get out of here on Wednesday.  If

9  we have to reschedule flights, we will not get one to get home

10 on Wednesday before Thanksgiving.

11         So I will stay with you on Zoom all night long if

12 that's what it takes.  But I'm going to make a pitch for Zoom

13 because if anybody has to change a flight, we're not getting

14 out of here on Wednesday.  If you want to invite us all over

15 to your place --

16         THE COURT:  That's fine.  No problem.  You would be

17 welcome.

18         Look, sort of looping back to where we started.

19         The honest problem I see sometimes with Zoom is it

20 can just be easy talking to a screen to dig in.  And if I have

21 a commitment from you all to talk to one another and to really

22 approach this with an open mind and trying to figure this

23 stuff out, understanding that you're going to zealously

24 represent your clients -- I'm not asking anyone to make

25 unwarranted concessions -- we can do it by Zoom if that would

74

1 be better for you all otherwise.

2          But I really want to make this productive, and I

3 would hope that we could do so if we do it by Zoom.

4          What's your preference, Mr. Swearingen, if you have

5 one?

6          MR. SWEARINGEN:  I'm open.  Any one works.

7          I think Ms. Pappy makes good arguments about -- the

8 concern I would have is coming back on Wednesday.

9          THE COURT:  Okay.  Let me give that some thought.

10          Let me -- before we move on, we've got a number of

11 items on our plate for November 21st.  If I could start

12 earlier, say around 3:00 o'clock, would that be better for you

13 all?

14          Ms. Pappy?

15          MS. PAPPY:  I'm free.  So I have hearings in the

16 morning, but I'm free all afternoon.  Even if it was last

17 minute, I can just keep it open.

18      (Court conferring with Clerk.)

19          THE COURT:  Go ahead.

20          MR. SWEARINGEN:  I just realized my colleague

21 planned to be on the East Coast already during that time, so

22 Zoom may be preferable.  We are amenable to starting anytime

23 that afternoon.

24          THE COURT:  Yeah, I'd even do it in the morning,

25 but I'm already scheduled to do some naturalization

75

1 ceremonies, and I'm not going to reschedule that.

2          So I probably can start earlier than 4:00 p.m.  Let

3 me work it out with my CRD and if that's the case and it would

4 be better for you all, I certainly don't want you to be stuck

5 in San Diego over Thanksgiving.

6          So we'll do the hearing by Zoom and just hopefully

7 make a bunch of progress.

8          Let me provide you with the other dates that I am

9 inclined to set.

10          And, Mr. Swearingen, you asked to be heard on

11 these, and I certainly will give you the opportunity to do so.

12          If there's a December 22nd deadline for both

13 parties to complete their document productions, I would intend

14 to set a fact discovery cutoff of February 16, 2024 and the

15 following dates would all be 2024.

16          A deadline to exchange expert reports and

17 disclosures of March 15th.

18          A deadline to exchange rebuttal expert reports and

19 disclosures of April 5th.

20          An expert discovery cutoff of May 3rd.

21          And a pretrial motion filing deadline of May 31st.

22 That would include Daubert motions as well as any motions for

23 summary judgment.

24          I would set a series of dates in September for the

25 parties to complete their meeting and conferring regarding the

76

1 pretrial order and set you for a pretrial conference before

2 Judge Battaglia on October 10th.

3          Go ahead, Mr. Swearingen.

4          MR. SWEARINGEN:  Thank you, your Honor.

5          THE COURT:  Sure.

6          MR. SWEARINGEN:  I think that the pretrial

7 conference date is a good one to put on the calendar.  I think

8 it may make sense to have fact discovery cutoff at the end of

9 February, on the 29th instead of the 16th, so that the parties

10 have more time, in part, to review documents.  I know that

11 Plaintiffs would benefit from having more time to review more

12 documents before depositions begin.

13          In addition, I think that -- I know, for example,

14 Mr. Stewart -- Dr. Stewart, our mental health expert is only

15 available to tour the facility in early February, and I just

16 want to make sure that those inspections take place, given

17 that I anticipate that depositions and inspections will be

18 pretty clustered together in February.

19          THE COURT:  So he's not available in the months of

20 November, December, or January?

21          MR. SWEARINGEN:  Not to my understanding, no, your

22 Honor.

23          THE COURT:  That a pretty tough schedule to work

24 around.

25          MR. SWEARINGEN:  It was a very tough schedule to

77

1 get everybody on board for November 1 through 9.

2          THE COURT:  Okay.  So your request would be to set

3 the fact discovery cutoff toward the end of February?

4          MR. SWEARINGEN:  That's right, your Honor.  And I

5 think that the parties may benefit from a little bit more time

6 between the -- I think that Plaintiffs would appreciate one to

7 two months between the end of fact discovery and the drafting

8 of the expert reports and maybe a little bit more time between

9 the exchange of reports and the rebuttal report, maybe one

10 more week.

11          THE COURT:  The issue is that moving those dates

12 out would also require me, I think, to move the pretrial

13 motion filing deadline out that's currently set for May 31st.

14 And that would then affect -- if the Defendants move for

15 summary judgment, for example, if the parties file Daubert

16 motions, it would compress the time for Judge Battaglia to

17 resolve those motions before the pretrial conference so that's

18 what I'm going to have to work through.

19          MR. SWEARINGEN:  If I could respond --

20          THE COURT:  Sure.

21          MR. SWEARINGEN:  -- and ask whether or not the

22 motions really need to be pegged off of the expert reports.

23          Do the pretrial motions depend on the expert

24 testimony?

25          THE COURT:  I'm pretty sure a Daubert motion would.

*Echo Reporting, Inc.*

78

1              MR. SWEARINGEN:  I would agree as to a Daubert

2 motion for sure.  But would summary judgment?

3              THE COURT:  It depends on the issues that you raise

4 on summary judgment and Defendants raise on summary judgment.

5              I would be reluctant to require any party to file

6 all pretrial motions, including motions for summary judgment,

7 while discovery is still ongoing.  That's what I'll have to

8 think through.

9              I appreciate your point, Mr. Swearingen.  I'll give

10 that some additional thought.

11             Is there anything else you would like to raise with

12 respect to the dates I'm considering setting?

13             MR. SWEARINGEN:  No, your Honor.

14             THE COURT:  Okay.  Thank you.

15             How about you, Ms. Pappy?

16             MS. PAPPY:  No comments.

17             THE COURT:  All right.  Let me give this some

18 thought, and if I have additional -- if there's a need for us

19 to talk further about the pretrial schedule, we can do so

20 either on November 21st or an earlier date if I think it's

21 time sensitive.

22             But otherwise, you have a sense of my thinking in

23 terms of how to help you all continue moving forward with the

24 case.  And none of this is to the exclusion of our continued

25 efforts to talk about settlement.

79

1        I would hope to be to do that with you on an

2 ongoing basis to ideally help you resolve the case if we can;

3 if we can't, at least to resolve it as to certain issues the

4 way that you all did with respect to the ADA issues.

5        So I realize that can be challenging when you've

6 got a bunch of deadlines to comply with, but it's also I think

7 unavoidable because I do need to help you continue moving the

8 case forward.

9        But I'll give that some thought, and then we can

10 talk about how best to move forward.

11        Let me ask you this.  It's 3:30.  That clock on the

12 wall really confused me for a second.

13        So I'm happy to talk through some ENE issues if you

14 would like to do so.  I don't know what time you all are

15 trying to catch flights back to San Jose and San Francisco.

16 And we started a little bit later.  So if you've made plane

17 reservations, I don't want you changing anything, but I'm

18 available if you want to start talking through some issues.

19        Or if this is a time where you all want to talk to

20 one another while you're here, that's fine with me as well.

21        What would you like to do?  And if you want to take

22 a minute to think about it and to talk to each other about

23 what you want to do and whether you would rather stop for

24 today or continue on, I will defer to you all on how we can

25 best work together on settlement.

80

1          MR. SWEARINGEN:  I'll start, your Honor, if I may.

2          THE COURT:  Sure.

3          MR. SWEARINGEN: Plaintiffs are ready and very

4 amenable to talking through settlement issues with the Court

5 and opposing counsel.  I think what would benefit those

6 discussions is being able to patch my colleagues, Mr. Fischer

7 and/or Ms. Grunfeld, into the discussion.

8          THE COURT:  Sure.  If we do that, that would be

9 just fine.  We'll probably go to one of the rooms on the fifth

10 floor and you could patch them in no problem.

11          Do you have any travel issues, because we are

12 getting a little bit late in the day.

13          MR. SWEARINGEN:  The earliest flights on our end

14 are at 6:30 today.

15          THE COURT:  Okay.  So you would need to leave

16 here --

17          MR. SWEARINGEN:  By 5:15 at the latest -- 5:00

18 o'clock or 5:15.

19          THE COURT:  5:15 is bold, Mr. Swearingen, but okay.

20          How about you, Ms. Pappy?

21          MS. PAPPY:  I could not get out until tomorrow.

22 But one thing that -- if the Court wants to talk about these

23 issues continuing today, I'm happy -- I'm not going anywhere.

24 So I'm happy to talk about them.

25          The one issue that I continue to harp on and

81

1 everybody is currently harping on is, I want those ADA

2 inspections scheduled ASAP.  There's nothing stopping us from

3 doing those, because I don't think anybody needs to be

4 interviewed.  But getting those on schedule and getting an ENE

5 scheduled relating to those ADA issues as soon thereafter as

6 they can, as soon as their expert can formulate her reports,

7 because those are to me easy pickings.  We have a model of a

8 settlement agreement with regard to those issues.

9          It's not all the ADA issues.  I understand there

10 are programmatic issues and other things.  But the physical

11 barrier issues, those are just so easy.  I want them out of

12 the way.

13          THE COURT:  Okay.  Why don't we do this.  You said

14 6:30, Mr. Swearingen?

15          MR. SWEARINGEN:  6:35 to be precise, your Honor.

16          THE COURT:  That is very precise.  You really

17 should be out of here by 4:45 or so because traffic to the

18 airport can be a bit of a pain.  But you're here.  Let's use

19 the time that we have.

20          What I'd like to do is meet you all up on the fifth

21 floor and let's just spend an hour talking through together

22 the structure of what we're going to do.  I'd like to talk

23 through Ms. Pappy's suggestion for how do we resolve the ADA

24 issues.  I asked for you all to provide me with topics for

25 discussion regarding overdoses in medical care and dental care

82

1 and you provided that, so I appreciate that and I want to at

2 least talk through that as well, because I do think even with

3 respect to settlement, we focused on ADA issues appropriately

4 earlier but maybe there is a way to proceed on multiple tracks

5 with respect to settlement, and I would like to explore that

6 with you all as well.

7          Sound good?

8          MR. SWEARINGEN:  Thank you, your Honor.

9          MS. PAPPY:  Yes.

10          THE COURT:  No problem.  Anything further that we

11 should discuss on the record, Mr. Swearingen?

12          MR. SWEARINGEN:  No, your Honor.

13          THE COURT:  Ms. Chartoff?

14          MS. CHARTOFF:  No, your Honor.

15          THE COURT:  Ms. Kaul, anything you'd like to be

16 heard on?

17          MS. KAUL:  No, your Honor.

18          THE COURT:  Ms. Pappy, how about you?

19          MS. PAPPY:  No, your Honor.

20          THE COURT:  Okay.  Great.

21          If you all -- take your time to gather your things.

22 Meet me up on the fifth floor, and let's just talk together as

23 a group and we can go into separate rooms if we need to, and

24 start talking through the best way to deal with some of the

25 settlement issues.

83

1          Thanks.

2       (Proceedings concluded.)

3

4

5

6

7          I certify that the foregoing is a correct

8  transcript from the electronic sound recording of the

9  proceedings in the above-entitled matter.

10

11 /s/Dee Gregory                    11/16/2023
   Transcriber                       Date
12
   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
13

14 /s/L.L. Francisco
   L.L. Francisco, President
15 Echo Reporting, Inc.

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*