GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>      Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**PLAINTIFFS' MOTION TO COMPEL INSPECTIONS**<br><br>Judge:    Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner<br><br>Trial Date: None Set<br><br>**NO HEARING DATE<br>PER DKT 454** |

# INTRODUCTION

Plaintiffs' inspections, which are a routine aspect of discovery in jail and prison conditions cases, are critical to Plaintiffs' claims, as they allow Plaintiffs' experts and counsel to observe the Jail's facilities and ordinary operations. In order to present their case at trial, Plaintiffs' experts must be permitted to inspect most of the Jail's facilities. Plaintiffs request that the Court enter an Order directing Defendants to permit the inspections on the terms set forth below.

## I. PROCEDURAL HISTORY

On July 7, 2023, Plaintiffs served requests for their mental health expert to inspect three Jail facilities and for their ADA expert to inspect one Jail facility in mid-August 2023. Declaration of Gay Grunfeld ("Grunfeld Decl."), ¶ 2. After Defendants raised numerous issues with the protocols for the inspections, Plaintiffs took the inspections off calendar. *Id.* ¶ 2, Ex. A.

On September 1, 2023, Plaintiffs served notices indicating that their experts and attorneys would inspect all Jail facilities as well as the Jail Information Management System (JIMS) and tablets made available to incarcerated people, to take place November 1-9, 2023. *Id.* ¶ 3, Exs. B-I. Defendants waived their objections by serving untimely objections on October 10, 2023. *Id.* ¶ 5, Exs. J-Q. Defendants acknowledged that they "missed the deadline" to respond. *Id.* ¶ 5, Ex. R. Five days later, Defendants informed Plaintiffs that the Sheriff's Department would not allow all experts and counsel to inspect the facilities at the same time. *Id.* ¶ 6. Defendants' counsel said that Plaintiffs' experts could "make whatever arrangements they want but they may not be let in." *Id.* ¶ 6, Ex. S. Due to these and other untimely objections, on October 20, 2023, Plaintiffs were forced to cancel the inspections that had taken substantial resources to plan. *Id.* ¶ 6.

## II. LEGAL STANDARD

The scope of discovery under Rule 34, including inspections under Rule 34(a)(2), is liberally construed. Wright & Miller et al., Fed. Prac. & Proc. § 2202

1  (3d ed. 2020); *Coleman v. Schwarzenegger*, 2007 WL 3231706, at *2 (E.D. Cal.
2  Oct. 30, 2007).  A motion to compel discovery is appropriate when a party fails to
3  permit an inspection as requested under Rule 34.  Fed. R. Civ. P. 37(a)(3)(B)(iv).
4  The party seeking to compel discovery bears the burden of establishing that the
5  requested discovery is relevant to a claim or defense, while the party opposing
6  discovery has the burden to show that the discovery should be prohibited, as well as
7  the burden of clarifying, explaining, and supporting its objections.  *Viasat, Inc. v.*
8  *Certain Underwriters at Lloyd's, London (Syndicates 2623 & 623)*, 2023 WL
9  2583280, at *1 (S.D. Cal. Mar. 17, 2023).

**III.  REQUEST #2: SPEAKING WITH STAFF ABOUT ORIENTATION ISSUES AND OPERATIONS AT THE JAIL**

12  Plaintiffs requested that Plaintiffs' experts and counsel may speak with Jail
13  staff and ask routine questions concerning the operations of the facility and the
14  practical orientation issues regarding the inspection.  *See* Grunfeld Decl. ¶ 3, Exs.
15  B-G.  Defendants provided no cognizable objection, instead stating that any
16  individual who speaks to anyone in the facility not through defense counsel will be
17  "removed from the facility."  *Id*. ¶ 5, Exs. J-O.
18  The weight of case law and modern practice in jail conditions federal class
19  actions strongly favors Plaintiffs' request.  A federal court in this district recently
20  ruled, in a putative class action regarding conditions of confinement, that the
21  detainees' expert must be permitted to "interview" detention facility staff during a
22  site inspection to determine *even whether* a preliminary injunction motion would be
23  appropriate.  *Alvarez v. LaRose*, No. 3:20-cv-00782-DMS-AHG, 2020 WL
24  5594908, at *12 (S.D. Cal. Sept. 18, 2020).  Defendants contend that the *Alvarez*
25  decision is inapplicable because that case involved COVID-19 and thus "called for
26  immediate action" given its life-and-death nature.  Grunfeld Decl. ¶ 2, Ex. A.  This
27  distinction fails.  Respectfully, one Otay Mesa detainee died due to complications
28  from the COVID-19 virus.  *See* DHS Office of the Inspector General, Violations of

ICE Detention Standards at Otay Mesa Detention Center at 5, Sept. 14, 2021. There have been more than 225 in-custody deaths in San Diego County Jail since 2006, including more than 50 since 2021. Moreover, this case is far more developed than the *Alvarez* case was at the time of that court's ruling.

Plaintiffs ask that knowledgeable staff be available to "answer any routine questions regarding the general operations of the jail to assist [P]laintiffs' experts with understanding their observations during the inspection." Grunfeld Decl. ¶ 2, Ex. A. This framework closely tracks what another magistrate judge ordered in the face of a similar discovery dispute. *Id*. ¶ 20, Ex. X (*Bock v. County of Sutter*, E.D. Cal. Case No. 2:11-cv-00536, Dkt. 82 at 4, May 13, 2023 ["Defendant County of Sutter shall make a person(s) available to answer any routine questions regarding the general operations of the jail to assist plaintiffs' experts with understanding their observations during the inspection."]). The *Bock* case was an individual wrongful death case; *Dunsmore* is a certified class action seeking injunctive relief to remedy alleged deficiencies in *current* practices and conditions and is thus a significantly *more* compelling circumstance for efficient information-gathering to evaluate the jail facilities, as requested by Plaintiffs. *See also United States v. Erie Cnty.*, 2010 WL 986505, at *3 (W.D.N.Y. Mar. 17, 2010) ("Reasonable access to employees is necessary for the consultants to form an understanding and opinion about the suicide practices and protocols at the [detention center]").

Numerous courts have issued similar rulings and allowed detention facility inspections to include communications with facility staff. As the *Erie County* court noted, "there is no danger of prejudice or element of surprise to Defendants because [the county's] attorneys are permitted to accompany the consultants and advise County employees as they see fit."[1] *Id*. Defendants claim that post-settlement cases

---

[1] *See also Coleman*, 2007 WL 3231706, at *1 ("questions by the experts directed to prison employees and to class members concerning those matters identified in plaintiffs' inspection request are properly included as part of an inspection of 'any

are irrelevant as they are not contested litigation; yet all of the cases Plaintiffs cite involve contested disputes about the scope of permissible inspections.

Defendants contend that the Court's January 17, 2023 order regarding the ADA-physical plant accessibility expedited discovery inspections should govern the upcoming inspections. *See* Dkt. No. 258 at 6. The distinctions between those inspections and the upcoming ones are evident and consequential. The ADA inspections were early and expedited, for the purpose of moving for a preliminary injunction and prior to class certification. There, the ADA expert was primarily measuring technical compliance with ADA accessibility requirements, with little reference to operational issues like intake procedures, medical and mental health evaluation, and treatment delivery. And Defendants' refusal to allow Plaintiffs' counsel to speak to incarcerated people prevented the full inspection of Central Jail. Grunfeld Decl. ¶ 9. As explained by Plaintiffs' mental health care expert, Dr. Pablo Stewart, who has served as a litigation expert and as a neutral court-appointed monitor in numerous prison and jail cases, it is both customary and essential for jail operations experts to get answers directly from knowledgeable staff on questions regarding routine operations and procedures, to ensure an accurate understanding of what is being observed. Decl. of Pablo Stewart, M.D. ("Stewart Decl.") ¶¶ 17-18. Defendants' legal counsel is no substitute for Jail staff. *Id.* ¶ 18.

## IV.   REQUEST #3: OBSERVING JAIL PROCESSES

Plaintiffs requested that, with patient permission, Plaintiffs' experts and counsel observe booking and intake screening, as well as the delivery of medical,

---

operation' on the prison facilities to be inspected"); *K.L. v. Edgar*, 945 F. Supp. 167, 168-169 (N.D. Ill. 1996) (allowing plaintiffs' experts to interview staff in a mental hospital in the presence of defense counsel); *Lizotte v. New York City Health & Hosps. Corp.*, 1990 WL 267421, at *1 (S.D.N.Y. Mar. 13, 1990) (allowing plaintiffs' experts to ask staff about "the operations of the emergency room, the nature of the functions carried out by the employees, the type of care being provided, and the policies and procedures followed there"); *New York State Ass'n for Retarded Child. Inc. v. Carey*, 706 F.2d 956, 960–61 (2d Cir. 1983) (finding no error in court's order that plaintiffs' experts could interview staff during inspection).

1  dental, and/or mental health care treatment programming, and medication
2  administration.  *See* Grunfeld Decl. ¶ 3, Exs. B-G.  Defendants provided no
3  cognizable objection, instead stating that observations "will not be permitted" and
4  anyone who violates this rule will be "removed from the facility." *Id.* ¶ 5, Exs. J-O.

5        For a proper inspection of a jail facility, jail operations cannot be suspended
6  or substantially altered during the time of the inspection.  The relevant rule is
7  unambiguous.  Rule 34 permits Plaintiffs to inspect not only the physical layout of a
8  facility, but also the "operation on it." Fed. R. Civ. P. 34(a)(2); *see also Martin v.*
9  *Reynolds Metals Corp.*, 297 F.2d 49, 56-57 (9th Cir. 1961) (noting that "[t]he word
10 'inspection' has a broader meaning th[a]n just looking").

11       The *Bock* court, ruling on a similar jail inspection dispute, specifically
12 directed the County to "continue normal operations of the jail as much as is reason-
13 ably possible during the inspection, allowing plaintiffs' counsel and experts to
14 observe jail operations in the ordinary course of business." Grunfeld Decl. ¶ 20,
15 Ex. X (*Bock*, at 4); *see also Dang by & through Dang v. Eslinger*, 2015 WL
16 13655675, at *4 (M.D. Fla. Jan. 20, 2015) (judge noting that he "has taken walking
17 tours of a large county jail and the largest of all the federal prisons and is unaware of
18 his presence … disrupting operations," and finding privacy concerns could be
19 addressed by "conceal[ing]" faces of photographed incarcerated people).

20       Dr. Stewart has conducted well over two hundred inspections of detention
21 facilities, and customarily observes where and how treatment is provided.  Stewart
22 Decl. ¶¶ 13, 15-16.  Observation of normal operations related to mental health care,
23 such as intake screening, evaluation, mental health staff-patient contacts provide
24 substantial, relevant, and probative information regarding the adequacy of mental
25 health care in a carceral system. *Id.* ¶ 16.  Plaintiffs' counsel also are highly
26 experienced in conducting such inspections with minimal intrusion into jail
27 operations and addressing reasonable security concerns.  Grunfeld Decl. ¶ 8.
28 Plaintiffs' experts and counsel, who have been appointed class counsel by the Court,

will take substantial care to protect patient privacy, including by seeking patient consent (obviating HIPAA or privacy concerns) before observing treatment activities, and minimizing the impact on facility operations. *Id.*

## V. REQUEST #4: SPEAKING WITH INCARCERATED PEOPLE

Plaintiffs requested that Plaintiffs' experts and counsel be permitted to conduct short interviews with class and subclass members. *See* Grunfeld Decl. ¶ 3, Exs. B-G. Defendants provided no cognizable objection, instead stating that any individual who speaks to anyone in the facility not through defense counsel will be "removed from the facility." *Id.* ¶ 5, Exs. J-O.

Federal courts have repeatedly allowed for such interviews in detention facility inspections. *See, e.g., Alvarez*, 2020 WL 5594908, at *10-11 (S.D. Cal. Sept. 18, 2020) (ruling, over Defendants' objections, that the petitioners' experts could interview the detainees "who are willing to speak to Petitioners' expert in confidence"); *Ruiz v. Johnson*, 154 F. Supp. 2d 975, 993 (S.D. Tex. 2001) (describing practices, including interviews, of several experts); *K.L. v. Edgar*, 945 F. Supp. 167, 168-169 (N.D. Ill. 1996) (permitting plaintiffs' experts to confidentially interview patients in a mental hospital during their inspection).[2]

Confidential interviews with incarcerated people during facility inspections are part of the standard methodology for experts in this field. Stewart Decl. ¶¶ 19-20. Courts have found information gathered through such processes to be useful to the fair resolution of complex legal and constitutional claims. *See, e.g.*, *Braggs v. Dunn*, 317 F.R.D. 634, 651 (M.D. Ala. 2016) (noting helpfulness of information from expert witness based on observations during interviews with incarcerated people during inspections).

---

[2] The *Alvarez* court required that Plaintiffs' counsel confer with the Federal Defenders to determine whether they consent to interviews of their incarcerated clients during the inspection, noting "attorney-client privilege issues." Such a concern is not applicable here, as (unlike in *Alvarez*) a class has been certified and Plaintiffs' counsel themselves represent all incarcerated people at the jail. *See* Dkt. 435.

Preventing Plaintiffs' experts from communicating with class members during inspections undermines fair and efficient adjudication in jail conditions cases due to the restrictive nature of incarceration. Stewart Decl. ¶¶ 19-22. Class members who have and wish to share their experiences about treatment or conditions at the Jail can do so efficiently during inspections, with individual security concerns addressed as needed. *Id*. By contrast, and particularly in the context of the Jail's system, the professional visiting process is extremely limiting due to lack of visiting rooms, staffing, and other factors. Grunfeld Decl. ¶ 19, Ex. W.

## VI.  DOCUMENTS REQUESTED

Plaintiffs seek the production of documents in connection with their inspections of the Jail facilities. Defendants' untimely objections lack merit.

### A.  Organizational Charts

Defendants object to producing organizational charts for their facilities on relevance grounds. *Id*. ¶ 5, Exs. J-O. Organizational charts are relevant for Plaintiffs' experts to understand who is responsible for processes observed during the inspection.

### B.  Rosters of Incarcerated People

Defendants object to producing rosters of all incarcerated people at each facility on privacy grounds and based on a refusal to create documents in response to a document request. *Id*. ¶ 5, Exs. J-O. Defendants also object on privacy grounds to producing logs and rosters of class members who have experienced particular conditions in the Jail: (i) those on sick call lists for the six months prior to the inspection; (ii) those who have received antibiotic prescriptions for dental care; and (iii) those with disabilities, and disability accommodations required, requested, and provided for the six months prior to the inspection. *Id*. Defendants' privacy assertion carries no weight given that Plaintiffs' counsel have been appointed counsel for the certified class and a HIPAA-compliant protective order governs this

1  case, *see* Dkt. 443. The requests are not overly burdensome, as evidenced by
2  Defendants agreeing to produce a class list. Defendants maintain rosters of all
3  incarcerated people as a matter of course; no documents need be created. Notably,
4  the Court already ordered the production of similar logs and rosters relevant to the
5  ADA inspections in expedited discovery, *see* Dkt. 258 at 6. And Defendants are
6  producing rosters under the ADA Order. *See* Dkt. 409. Plaintiffs' inspection
7  notices seek logs and rosters tailored to the specific experts who will be conducting
8  the remaining inspections.

### C. Documentation Related to Jail Operations

Defendants object on privacy grounds to producing documents regarding specific Jail operations: (i) lists of programs, services, and activities offered to class members with disabilities and those on medical, mental health, and dental caseloads; and (ii) documentation of modifications to physical structure, programs, services, or activities to provide disability accommodations. Grunfeld Decl. ¶ 5, Exs. J-O. As explained, privacy objections are meritless in light of class certification and the parties' HIPAA-compliant protective order in this case. Further, these documents are important for Plaintiffs' counsel to understand Jail conditions, the Jail's ordinary operations, and the class members with whom they should prioritize speaking.

## VII. INSPECTION OF JIMS AND ELECTRONIC TABLETS

Plaintiffs additionally seek to inspect and observe use of JIMS and the electronic tablets used by class members. *Id.* ¶ 3, Exs. H-I. Defendants refused an inspection of JIMS and tablets and stated that any inspection "may be limited to Defendants' provision of screen shots of the functionality of [JIMS or tablets] without any Incarcerated Person information included. There will no interview of any employee or Incarcerated Person as part of any such process." *Id.* ¶ 5, Exs. P-Q.

### A. JIMS

JIMS is a critical tool used by Jail staff to communicate, track, and administer medical and mental health care in the Jail. Defendants themselves have described

JIMS as a dynamic, interactive electronic system that uses pop-ups, links, and drop-down menus, among other functions, to support the administration of medical and mental health care in the Jail. For example, one of Defendants' witnesses testified that in order to identify if an incarcerated person is deaf or hard of hearing using JIMS, they must navigate to an "operation status board with [] individuals' names," "click on the[] name," which "pops up [] with … a snapshot of hazards and instructions and some other click-downs." *Id.* ¶ 21, Ex. Y (M. Jensen Dep. 75:5-76:2.) JIMS is used to create the ADA rosters being produced to Plaintiffs under the ADA Order. *Id.* ¶ 14.

Plaintiffs seek to inspect and observe the use of JIMS to understand, for example, the scope of information captured in the database; its search parameters; its relational and report-generating capabilities; the types of windows, notifications, pop-ups, drop-down menus, and prompts in the system, and the order in which they appear; and how medical and custody staff coordinate care. Inspecting a system like JIMS is standard practice in prison and jail litigation. *Id.* ¶¶ 10-14. Defendants' proposal to limit inspection of JIMS to screenshots fails to account for the layers of functionality that cannot be determined from documents only.

Defendants refused to permit inspection of JIMS without asserting any cognizable grounds for their objection. Inspecting and observing staff performing basic functions in JIMS poses little if any burden to Defendants, as Plaintiffs will limit the inspection to no more than four hours at a mutually-agreeable date and time. Plaintiffs seek only one employee who uses the system to demonstrate its basic functions. Defendants also may show records of a class member or test case.

### B. Electronic Tablets

Plaintiffs also seek to inspect electronic tablets made available for use by class members. Defendants are seeking to contract with a provider to offer phone and video services, as well as application-based resources for email communication, entertainment, educational and legal research, and reentry services created content.

*Id.* ¶¶ 15-16, Exs. U-V. Defendants indicate they may use tablets to provide sign language interpretation to deaf class members. *See* Dkt. 409. The accessibility, usability, and functionality of these devices is directly relevant to Plaintiffs' claims. Tablet functionality depends on Internet access and other factors specific to the setting in which they are used. For this reason, Defendants' proposal that Plaintiffs' counsel inspect a tablet in a non-Jail setting is not an adequate substitute for the requested inspection. Plaintiffs' counsel should be permitted to observe their clients using the tablets in the Jail setting where the devices are intended to be used. This inspection and observation would be completed in less than four hours at mutually-agreeable date and time, and thus, impose no meaningful burden on Defendants.

## VIII. TIMING AND LOGISTICS OF INSPECTIONS

Plaintiffs seek to inspect the Central, George Bailey, and Las Colinas facilities with their medical, mental health, and dental experts between February 5-8, 2024, from 9:00 a.m. to 5:00 p.m. Plaintiffs propose inspecting the Central, George Bailey, Las Colinas, Vista, South Bay, and East Mesa facilities at mutually agreeable dates in January 2024 with their ADA, safety and security, and environmental experts, from 9:00 a.m. to 5:00 p.m.[3] Plaintiffs are doing everything possible to coordinate with their experts and ensure that this proposal works, but there may need to be an additional inspection time frame. Grunfeld Decl. ¶ 6. No more than six individuals from Plaintiffs' side, including experts and attorneys, will be present for any inspection.

## CONCLUSION

Plaintiffs respectfully request an order ensuring that Plaintiffs' experts are able to complete a productive and efficient inspection that is not disrupted by improper interference or non-cooperation that could require additional inspections and costs.

---

[3] For some of the facilities, Plaintiffs are not requesting that all experts be allowed to enter.

1
2  DATED: November 30, 2023    Respectfully submitted,
3
                               ROSEN BIEN GALVAN & GRUNFELD LLP
4
5                              By: */s/ Van Swearingen*
                                   Van Swearingen
6
7                              Attorneys for Plaintiffs and the Certified Class
                               and Subclasses
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28