1                    UNITED STATES DISTRICT COURT

2                FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   DARRYL DUNSMORE, ERNEST            )
    ARCHULETA, ANTHONY EDWARDS, REANNA)
4   LEVY, JOSUE LOPEZ, CHRISTOPHER     )
    NELSON, CHRISTOPHER NORWOOD, and   )
5   LAURA ZOERNER, on behalf of        )
    themselves and all others          )
6   similarly situated,                )
                                       )   No. 20-CV-00406-AJB-DDL
7             Plaintiffs,              )
                                       )
8   v.                                 )   December 20, 2023
                                       )
9   SAN DIEGO COUNTY SHERIFF'S         )
    DEPARTMENT; COUNTY OF SAN DIEGO;   )
10  CORRECTIONAL HEALTHCARE PARTNERS,  )
    INC.; LIBERTY HEALTHCARE, INC.;    )
11  MID-AMERICA HEALTH, INC.; LOGAN    )
    HAAK, M.D., INC.; SAN DIEGO COUNTY )
12  PROBATION DEPARTMENT, and DOES 1   )
    to 20 inclusive,                   )
13                                     )
              Defendants.              )
14  _____ )   San Diego, California

15

    TRANSCRIPT OF DIGITALLY RECORDED VIDEOCONFERENCED PROCEEDINGS
16                    (Discovery Conference)

17

18     BEFORE THE HONORABLE DAVID D. LESHNER, MAGISTRATE JUDGE

19

20

21

22

23  COURT REPORTER:          AMANDA M. LeGORE
                             RDR, CRR, CRC, FCRR, CACSR
24                           U.S. District Court
                             333 West Broadway, Suite 420
25                           San Diego, CA 92101
                             amanda_legore@casd.uscourts.gov

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:       RICHARD VAN SWEARINGEN
                               Rosen Bien Galvan & Grunfeld LLP
 3                             101 Mission Street, Sixth Floor
                               San Francisco, CA  94105-1738
 4                             (415)433-6830
                               vswearingen@rbgg.com
 5

 6                             PRIYAH KAUL
                               (Appearing Via Zoom)
 7                             Rosen Bien Galvan & Grunfeld LLP
                               101 Mission Street, Sixth Floor
 8                             San Francisco, CA  94105-1738
                               (415)433-6830
 9                             pkaul@rbgg.com

10

11

12   FOR DEFENDANT COUNTY OF
     SAN DIEGO:                ELIZABETH PAPPY
13                             Burke Williams & Sorenson LLP
                               501 W. Broadway, Suite 1600
14                             San Diego, CA  92101
                               (619)814-5800
15                             epappy@@bwslaw.com

16

17   FOR NAPHCARE:             C. SMITH
                               (Appearing Via Zoom)
18

19

20                                   -0-

21

22

23

24

25
```

3

1          (Wednesday, December 20, 2023; 9:04 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE CLERK:  Please be seated and come to order.

6   Calling number one, 20-CV-406, Dunsmore versus State of

7   California, et al.

8          Counsel can state their appearance.

9          ATTORNEY SWEARINGEN:  Van Swearingen for plaintiffs.

10         THE COURT:  Good morning, Mr. Swearingen.

11         ATTORNEY PAPPY:  Elizabeth Pappy for the defendant.

12         THE COURT:  Good morning.

13         You okay?

14         ATTORNEY PAPPY:  I'm (indiscernible).

15         THE COURT:  Oh, sorry.  That's no fun.

16         ATTORNEY PAPPY:  No.

17         THE COURT:  And I think we have two counsel appearing

18   by Zoom.

19         Why don't you go ahead and state your appearances:

20   Ms. Kaul and Mr. Smith.

21         ATTORNEY KAUL:  Priyah Kaul for the plaintiffs on the

22   matter.

23         ATTORNEY SMITH:  Good morning, your Honor.  Craig

24   Smith for third-party NaphCare.

25         THE COURT:  Okay.  Good morning to you as well.

1          All right, everyone.  We've got a number of matters

2  to address.  And I think it makes sense to go through the

3  issues in the order that they were raised in.

4          My tentative rulings -- that's Docket Number 471.

5  And also given that we've got a third party here, we can

6  address the NaphCare subpoena first.  So why don't we do that.

7          And, Ms. Kaul, why don't you -- you start, please.

8          I did have a question for the plaintiffs with respect

9  to that subpoena.  It looked as though it was issued in August,

10  with a compliance date in September.

11          And I would like to understand why we're here, over

12  three months later, toward the end of fact discovery, with now

13  a request by the parties for additional time that seems to be

14  caused -- perhaps, at least in part -- by the fact that this

15  issue may not have been timely raised.  I would like to

16  understand a little bit more.

17          So go ahead, Ms. Kaul.

18          ATTORNEY SMITH:  Your Honor, may I please interject

19  (indiscernible)?  I just need to advise the Court of one thing.

20          Yesterday, when I was conferring on this case with my

21  supervising partner, we have another case that is

22  (indiscernible) in the Southern District.  And he made a

23  comment (indiscernible) I'm admitted to the Southern District.

24  And we kind of laughed (indiscernible).  That I've been

25  admitted -- you know, five years ago I got admission for all of

1   the districts (indiscernible).  I checked on Pacer, and I

2   didn't see that I had been admitted.  And I immediately paid

3   the fee.  And I'm sending down a (indiscernible) in good

4   standing.  And, to my dismay, I didn't have admission to the

5   Southern District.  I am appearing third party.  Although, I

6   need to advise the Court of this because my admission is

7   currently pending, and I want to make sure the Court is fully

8   aware of that status.

9               THE COURT:  Ms. Kaul, do you wish to be heard on

10  that?

11              ATTORNEY KAUL:  I think our papers -- honestly, there

12  is a lot of feedback coming on my side.

13              I don't know if Mr. Smith hears it.  But it's hard to

14  decipher everything that he's saying because it's echoing

15  through the Court's system.  But -- but I think, you know --

16  and actually my own voice is -- there is an echo coming through

17  in the courtroom that's giving feedback on my side.

18              THE COURT:  Okay.  I can hear you loud and clear,

19  Ms. Kaul.

20              Mr. Swearingen, are you able to hear Mr. Smith and

21  Ms. Kaul?

22              ATTORNEY SWEARINGEN:  I am.

23              THE COURT:  We're not getting the same feedback that

24  you are, Ms. Kaul.

25              Although -- let me -- Melissa, is there anything we

```
 1   can do about --

 2             ATTORNEY KAUL:  I wonder if Mr. Smith is?  Or is it

 3   coming just on my end?

 4             THE COURT:  Mr. Smith, could you try muting yourself?

 5             ATTORNEY SMITH:  I will mute myself.

 6             THE COURT:  Ms. Kaul, go ahead and speak, and see if

 7   you still get the same feedback when Mr. Smith is muted.

 8             ATTORNEY KAUL:  Okay.  You know, even my own voice is

 9   echoing back.  But I can go ahead and proceed.

10             I think that -- I think for purposes -- you know,

11   (indiscernible) purposes for which we need to appear today,

12   (indiscernible) we're okay with meeting.  You know,

13   notwithstanding, whatever (indiscernible).

14             THE COURT:  I tend to agree, Counsel.  I -- this

15   issue, I do not want to put off any further.

16             Mr. Smith, I accept your representation that this was

17   an oversight on your part, that you are correcting.  And let's

18   do plan to proceed this morning.

19             And I want to make sure that everyone can hear what's

20   being said.  So, Mr. Smith and Ms. Kaul, in particular, your

21   voices are coming through loud and clear in the courtroom.

22             But if you are unable to hear something that someone

23   is saying, just raise your hand or speak up, and we'll be happy

24   to -- to slow down for you or repeat something that's said.

25             Hopefully it won't be an issue.
```

1           So thank you for raising that, Mr. Smith.

2           I agree with Ms. Kaul that we can and should go

3    forward today.  And to the extent you appear again in this

4    court, I'll expect that your application for admission to the

5    Southern District has been granted.

6           And if it's not, we'll -- we'll figure out a

7    different course.

8           So with that, Ms. Kaul, go ahead, ma'am.

9           ATTORNEY KAUL:  Thank you, your Honor.

10          The -- you know, I -- just to sort of go back and

11   retrace back the history of our -- our interactions with

12   counsel over the last couple of months in September, when we

13   received the written responses of the initial production from

14   NaphCare on October 2nd, we, you know, fairly immediately came

15   back to Mr. Smith, raising questions about the completeness and

16   adequacy of the production and responses and trying to clarify,

17   you know, what we viewed as additional documents that needed to

18   be produced; as well as, you know, other formats in which we

19   (indiscernible) receive the documents, issues like that.

20          We continued that meet and confer to resolve those

21   outstanding questions.  And I think Mr. Smith would agree that

22   (indiscernible) generally cooperative, and (indiscernible)

23   resolve the (indiscernible) issues.

24          And throughout that -- those discussions, I think

25   with -- other than with respect to (indiscernible) records,

1    which we set aside, there was no real (indiscernible) between

2    the parties.

3            We expressed the (indiscernible) -- documents that we

4    believe should have been included.  I -- and the

5    representations from counsel, you know, repeatedly were that

6    they were going to cooperate.  That they told them to produce

7    responsive documents.  That they would be looking for them.

8            We kept the depositions on calendars.  Several were

9    deposed, you know, because we believed that -- that production

10   would be (indiscernible) and we would be able to proceed with

11   that.  And we (indiscernible) cooperative nonparty

12   (indiscernible) unnecessarily.  And at that time there were

13   (indiscernible).  I think things changed in the last couple of

14   weeks, in -- in at least one way.  We received supplemental

15   productions in November, as well as a week ago.

16   (Indiscernible) December 13th.  And hoped those

17   (indiscernible).  That we had maybe reached a tipping point.

18   They were not full production of all of the documents that we

19   sought.  And, you know, with, of course, the discovery

20   deadlines approaching quickly, it became clear to us

21   (indiscernible) really a deadline (indiscernible).

22           And -- and -- and, you know, I had a conversation

23   (indiscernible), I think the day that we -- maybe a couple of

24   days before we did send the email to initiate the IEC.  We both

25   agree that (indiscernible) would be pushing on some issues.

1   But I think -- you know, the first that I really noticed that

2   there might be an issue as to (indiscernible) to scope.

3   Otherwise, (indiscernible) really about, you know, timing.  So

4   setting a deadline to (indiscernible), because we haven't been

5   able to do so, despite our numerous requests for supplemental

6   productions to be complete.

7           And then I think there was the issue of the

8   unredacted (indiscernible).  Again, in the last

9   (indiscernible).

10          THE COURT:  Look, I -- I appreciate the explanation,

11  Ms. Kaul.

12          And I do appreciate the fact that you are trying to

13  work cooperatively with Mr. Smith and not raise issues that

14  don't need to be raised with me.

15          So -- but then I realize there's some tension with

16  the requirement to at least give me a heads-up on issues

17  because I don't want to find ourselves where we do now.

18          And it's -- it seems to me that -- I mean, obviously,

19  the better course and the proper course would have been to

20  alert me that the 30-day deadline to raise disputes was coming

21  up and that you jointly were requesting an extension of time.

22  Had you done so, I might have simply granted it.  But

23  understanding the issue that I see in your email, I might have

24  convened a status conference with you all.

25          Because, for example, while there is an issue with

1    respect to -- I understand -- patient privacy that maybe we can

2    talk through right now, I also understand that there is an

3    issue with assertions of privilege by NaphCare as to certain

4    documents that the plaintiffs believe are encompassed within

5    their subpoena.

6              And that's something, had I realized -- you know, in

7    a timely manner -- was a dispute between the parties, I may

8    well have brought you in and set a briefing schedule on that.

9    Because privilege issues, I want to be, you know, thoughtful

10   about and really work through with the parties.

11             So we're in a tough spot right now, given that I

12   understand you were trying to work cooperatively.  But we have

13   issues that need to be addressed, and you do have deadlines

14   coming up for fact discovery that we're going to need to take

15   into account.  So, look, let's see what progress we can make

16   right now.  And I want to understand where things are.

17             I have looked at the subpoena.  And, for the record,

18   there have been no -- you know, no motion to quash or -- was

19   filed by NaphCare regarding the scope of the document requests.

20   There are, I think, 88 of them.  So that's not before me.  It

21   has never been raised before me by NaphCare.

22             So I think what we're looking at right now,

23   Mr. Smith, is I want to understand what -- what are the

24   specific documents that are disputed?

25             I -- I hear there are two.  One is that there is a

1    dispute about producing unredacted documents, with the

2    redactions -- without redactions to names and booking numbers.

3    And the second is there may be a privilege objection to certain

4    internal NaphCare documents.

5            Are those the two disputed issues, Mr. Smith?

6            ATTORNEY SMITH:  Yes.  The Court has that correct.

7    Those are the two disputed issues.

8            We claimed the privilege from the beginning with

9    respect that the in-custody death reviews, NaphCare is not a

10   part of any county in-custody death reviews.  They do their

11   (indiscernible) internal meeting with counsel, if there is an

12   in-custody death; and they discuss it.  That is an

13   attorney-client privilege communication.

14           We raised with plaintiffs' counsel that we would --

15   intend to file a motion to quash.  But if we work together and

16   preserve our objections, we'll forgo that.

17           We submitted a privilege log with our responses with

18   respect to the in-custody death reviews.  And then the second

19   issue with respect to redactions is patient information.

20           The documents that were produced have patient

21   information names, booking numbers, that date back to

22   (indiscernible) contract when NaphCare first started with the

23   County about a year and a half ago.  There's a concern that

24   those individuals are a part of the class.

25           And that if we just unredacted the -- the documents

1   and gave them this information, we may be subject to

2   third-party privacy litigation from inmates that -- that are no

3   longer in custody or a part of the class, and have to get

4   permission for release of their medical information.

5   Especially concern (indiscernible) with mental health records.

6            And that's really where NaphCare's position has been.

7   We understand there has been class certification since we first

8   raised that issue.  And it may be that if the Court orders that

9   (indiscernible) redactions be lifted, that that provides some

10  (indiscernible) for NaphCare and alleviates NaphCare's concern

11  about the (indiscernible) privacy right.  But that's -- those

12  are the two primary issues.

13           The rest of the issues we're working through the

14  majority of the requests.  Some of the documents aren't

15  (indiscernible) we've (indiscernible) plaintiffs' counsel

16  informed them (indiscernible) some of the categories we would

17  actually have to pull individual medical records to -- you

18  know, compilation of data.  They informed us that they do not

19  request individual medical records of each inmate.

20           So we're not capable of populating some of the data.

21  And we have further supplemental documents to produce to

22  plaintiffs' counsel, and then we'll be ready to (indiscernible)

23  depositions.

24           The two big issues (indiscernible) the ones that

25  we're (indiscernible) here today with respect to

1   attorney-client privilege communications regarding -- I
2   wouldn't even really call them formal (indiscernible) reviews.
3   It's meetings (indiscernible) death in custody of the sheriff's
4   department.
5           THE COURT:  Okay.  Let's address those issues in
6   reverse order.
7           The first issue, with respect to redaction of
8   information -- specifically inmate names and dates of birth --
9   my question first to you, Mr. Smith, is why is it not
10  sufficient to produce the documents pursuant to the protective
11  order?  And why does it matter whether individuals are class
12  members or not class members?  I don't understand the legal
13  distinction there.
14          ATTORNEY SMITH:  Well, that -- the documents that we
15  produce (indiscernible) retain their medical information.
16          So unredacted, you'll get their name, booking number,
17  and also, you know, medical information regarding them, all on
18  the same page.  And we don't have permission from, you know,
19  the individuals to produce their medical records.
20          I -- we're -- we're a little bit concerned that that
21  protective order might not be enough if there's third-party
22  claims coming back to us that we produced this -- this
23  unredacted information and their medical information.
24          And maybe we're (indiscernible) about that.  And so
25  we appreciate the Court's time.

1          THE COURT:  I'm not exactly sure what guidance you're

2     expecting me to give.  It sounds like what you're asking is for

3     me to issue an order that you produce the information.

4          ATTORNEY SMITH:  I mean, if the Court believes it's

5     discoverable and then -- (indiscernible) position's incorrect,

6     and that's your order, we would comply with it.

7          THE COURT:  Well -- well, there's not even a motion

8     before me right now.  I mean -- and this is, again, the problem

9     that we are facing with respect to this coming up three months

10    after responses were -- were due.

11         I -- you know, there was never -- there was never a

12    motion to quash filed by NaphCare.  And you have -- I did

13    receive the parties' joint application to have the protective

14    order apply to NaphCare, which I believed would, you know,

15    cover any issues with respect to confidentiality or third-party

16    privacy, given that NaphCare would be able to designate

17    documents that it produced pursuant to the protective order, as

18    has been done by the County in this case.  So I'm --

19         ATTORNEY KAUL:  Can I make a suggestion, your Honor?

20    Or a proposal?

21         THE COURT:  You may.

22         ATTORNEY KAUL:  Okay.  We had entered or submitted a

23    joint motion with the defendants, with the County, you might

24    recall --

25         THE COURT:  I do.

1          ATTORNEY KAUL:  -- stating that the -- asking,

2     basically, for the Court to confirm that the protective order

3     (indiscernible) protective order under HIPAA.  And the language

4     of your order is Docket Number 4430.  Then stated that you

5     ordered the defendants to produce (indiscernible) information

6     pursuant to the protective order.

7          It was (indiscernible) -- and so, you know, I wonder

8     if something similar, that applied to NaphCare specifically,

9     might allow us to just get through what we need to supply

10    documents and get them what they're looking for as well.

11         THE COURT:  I would also want to -- make sure that I

12    understand that the documents that are at issue are responsive

13    to one or more of the categories of documents that are sought

14    in the subpoena.  So if the parties wish to submit a joint

15    motion in that regard, then I certainly would be willing to

16    consider it.

17         And you're right.  We did discuss that in the context

18    of production by the County.  So perhaps that's a path that you

19    and Mr. Smith wish to explore.

20         I'm not going to give you an advisory opinion beyond

21    that, Ms. Kaul.  I think -- but if you all want to file a joint

22    motion, I will -- I will consider it.

23         And if that does not answer NaphCare's concerns --

24    I'm not going to preclude any party from filing, you know, a

25    further motion on the subpoena.

16

1        If you all think there's an appropriate motion to

2   file, whether it's a motion to quash or a motion to compel, I'm

3   not precluding anyone from filing anything.  But I will -- if I

4   do receive a motion, I am going to look very carefully to see

5   whether it timely raised the disputes at issue.  And I will

6   then issue a further briefing schedule on the motion.

7   Understanding -- I think, as you do -- my concerns with respect

8   to this -- the -- the timing for this issue being raised.

9        And I -- I'm a little bit at a loss, frankly, with

10  respect to the -- the -- the objection on privilege.  If that

11  was something that was -- that was immediately apparent to

12  NaphCare, Mr. Smith, why was there not a motion to quash filed

13  with respect to documents as to which you believed the

14  privilege applied?

15       ATTORNEY SMITH:  Well, your Honor, I have conferred

16  with plaintiffs' counsel and informed them that we would be

17  raising that objection, and found it sufficient that

18  (indiscernible) they allowed us (indiscernible) log with

19  respect to the responses that we did back in October, and

20  raised the -- raised the issue.

21       And (indiscernible) the Court -- it was our

22  understanding they weren't going to be seeking attorney-client

23  communication.

24       THE COURT:  Then let me put the question to you,

25  Ms. Kaul.

17

```
 1           When did you receive the privilege log?
 2           ATTORNEY KAUL:  The -- the privilege log, which we
 3    asked -- subsequent -- for more a more detailed one.  But the
 4    initial privilege log was produced, was with the October 2nd
 5    written response.
 6           THE COURT:  Well, and that then -- again, I don't
 7    mean to just run this into the ground.  But you had a privilege
 8    log.  You knew that NaphCare was taking the position that the
 9    documents are privileged.  But no motion to compel or request
10    to -- for a discovery conference was filed with me, you know,
11    for over two months.
12           And that's -- frankly, I -- it's one things where the
13    parties are negotiating over redactions.  But it's another
14    where there's an assertion of privilege that's being made.  I
15    do not understand why, respectfully, that was not raised by
16    either party with me.
17           I mean, I just -- it is not something that one
18    typically negotiates away, if there's an assertion of
19    attorney-client privilege.
20           What's your request, Ms. Kaul?
21           What would you like me to do with respect to the
22    privilege claim?
23           ATTORNEY KAUL:  You know, I believe we would want, at
24    a minimum, an opportunity to brief this.
25           We had also requested a more detailed privilege log,
```

18

1    in part so that we can understand this assertion of privilege.

2    (Indiscernible) pointed out in a subsequent meet-and-confers,

3    for example, that NaphCare's contract (indiscernible) refers to

4    NaphCare performing morbidity and mortality rates that happens

5    pursuant to contracts.  And we would say that the idea that

6    those are (indiscernible) counsel is not one we agree with.

7           And so there were additional things that came to

8    light subsequently that were sort of the basis of continued

9    meet-and-confer efforts.  So we would like to (indiscernible)

10   the issue, if your Honor is amenable to having us do that.  Or

11   at least state (indiscernible), you know, I think with that

12   detailed privilege log, would be something that we would ask

13   the Court to direct (indiscernible) to provide.

14          THE COURT:  So you're moving to -- for an order

15   finding that the documents are not privileged and ordering

16   NaphCare to provide a more detailed privilege log?

17          Because I -- I'm not prepared to issue that order on

18   the privilege log today because I've never seen the privilege

19   log.  And I wouldn't even know what I'm ordering NaphCare to

20   do.

21          Mr. Smith, what -- what relief are you seeking from

22   me today, if any?

23          ATTORNEY SMITH:  No particular (indiscernible) your

24   Honor, (indiscernible) today.  We would like an opportunity to

25   oppose any motion to compel, if one was to be brought.

19

1          THE COURT:  Okay.  I'm going to give some further

2     consideration to how I want to handle this issue.  I -- you

3     know, I think we're going to be in this situation again.  But I

4     just want to note, again for the benefit of all parties, that

5     although I appreciate efforts to work out issues together, it

6     is still not at all clear to me why this issue was not raised

7     promptly after NaphCare filed or served its objections to the

8     subpoena, including objections on privilege grounds and why it

9     was, you know, not for over two months that this issue was

10    raised before me.  I'm going to give some thought to how we're

11    going to proceed with this issue.  But it's 9:30, and we've got

12    a number of other issues to address in the case.  So I will --

13    I will issue an order with respect to next steps on this issue.

14          ATTORNEY KAUL:  Understood, your Honor.

15          I think there was just one other thing I wanted to

16    bring up with respect to NaphCare, if I can.

17          THE COURT:  Go ahead.

18          ATTORNEY KAUL:  I think -- you know, I think the two

19    issues that were discussed were -- were the two key ones.  But

20    we also were coming to your Honor in part to seek a deadline.

21    You know, it -- we've heard -- we've heard over and over again,

22    through the meet-and-confer, that additional documents are

23    coming.  You know, Mr. Smith just represented now that -- that

24    we would get a supplemental.  And we waited and (indiscernible)

25    the reason that we are here, as you noted, two months after

1    the -- the responses first came in.

2              I think that would be helpful, possibly, for both

3    sides.  We just have to get it by (indiscernible) date to get

4    this supplemental production completely done.

5              THE COURT:  Okay.  I understand.  And you did raise

6    that earlier.  Thank you for the reminder.

7              Mr. Smith, there was no motion to quash the subpoena

8    filed.  I'm considering, right now, issues of privilege with

9    respect to internal NaphCare documents; as well as an issue as

10   to whether documents that everyone agrees have been or will be

11   produced should be redacted at all.

12             Is there an issue as -- or -- are there additional

13   documents beyond what we just discussed that NaphCare intends

14   to produce but has not yet?

15             ATTORNEY SMITH:  Yes.  Not a substantial amount.  But

16   we are working through the supplemental meet-and-confer that

17   plaintiffs' counsel (indiscernible).  They received their first

18   production for which we've -- we believe was (indiscernible)

19   complete.  And they called (indiscernible) again and identified

20   areas where they think there are additional documents that are

21   responsive.  And we're working with them to provide those and

22   cooperate (indiscernible) we submitted one supplemental

23   production, and now we have another one that's (indiscernible)

24   as well.

25             THE COURT:  Okay.  I got it.  I will add that to the

1    list of issues that I am going to address in the order that I

2    issue because it -- these are all interrelated.

3                  Let me ask you this, Mr. Smith.

4                  With respect to the documents as to which NaphCare is

5    asserting the privilege, what's the volume?

6                  ATTORNEY SMITH:  I don't have a particular page

7    number.  It's hard to determine because -- whether or not it's

8    each in-custody death that happened since we took over the --

9    the contract in June of 2022.  So I -- I don't know that the

10   volume is simply that large.  But our (indiscernible) that

11   they're all privileged.  So --

12                 THE COURT:  I mean, is that -- I don't mean to be too

13   particular.  But is that a long way of saying you don't know?

14                 ATTORNEY SMITH:  It's a lot -- yes.  I don't know the

15   exact number of documents that relate to these in-custody death

16   (indiscernible).

17                 THE COURT:  That's okay.  I just -- if you don't

18   know, you don't know.

19                 Are we talking hundreds of pages of documents?

20                 I mean, when I look at your privilege log, and I

21   order you to produce them for in camera review, am I going to

22   be getting one binder?  Two binders?  What is this looking

23   like?

24                 ATTORNEY SMITH:  I -- I -- I apologize to the Court.

25   I am hopeful it will be a binder or two.

1      THE COURT:  Okay.  That is the information that I

2  need, right now, to make a determination as to how best to

3  proceed.

4      Thank you, Counsel.  I appreciate you both appearing.

5      ATTORNEY KAUL:  Thank you, your Honor.

6      THE COURT:  You're welcome -- both welcome to stay

7  on, of course.  It's a public hearing.  But you are excused if

8  you have other matters to attend.

9      Mr. Smith, thank you.  Ms. Kaul, thank you.  I hope

10  you both have a great holiday.

11      ATTORNEY KAUL:  You as well.

12      THE COURT:  All right.  Is the rest up to you

13  Mr. Swearingen?

14      ATTORNEY SWEARINGEN:  It is, your Honor.

15      THE COURT:  Okay.  And, Ms. Pappy, thank you for your

16  patience as well while we handled that issue.

17      All right.  The second issue addressed in my order --

18      Thank you, (indiscernible).

19      Is the plaintiffs' motion to compel inspections,

20  which is Docket Number 458.

21      The defendants oppose that.  I reviewed both the

22  motion and the opposition, including the declaration of

23  Dr. Stewart.  I also reviewed the cases that the parties are

24  relying upon.

25      And, Ms. Pappy, I -- you may want to be heard first

1    on this, given that the tentative is to -- to grant the motion

2    in part.

3         For what it's worth, in looking at the cases that

4    everyone cited, it did appear to me that the weight of the more

5    recent authority is on the plaintiffs' side in terms of

6    allowing the inspections to take place and to observe the

7    jails, in quotes, in operation, which would mean observe the

8    processes.  But to try to do so in a way, of course, that

9    maintains the -- the security and the safety of everyone

10   involved.

11        There (indiscernible) authority in the Fourth Circuit

12   case that you cited, Ms. Pappy.  And the distinction that I

13   would draw between what the plaintiffs are seeking to do here

14   and what was at issue in the *Belcher* case was -- as I recall

15   the facts of that case, it was -- there were allegations of

16   racial discrimination in a store, and the district court

17   potentially granted the plaintiffs' request to go in and just

18   root around for racial discrimination in the store.  I mean, I

19   think that was the effect of it, from what I understood the

20   (indiscernible) Circuit opinion to say.

21        That's not what I read the plaintiffs to be seeking

22   to do here.  It does appear to be obviously more focused and

23   more tailored to specific issues.  And I do think, based on the

24   cases that I reviewed -- and my review of Rule 34 -- that it is

25   appropriate.

1          So with all of that in mind, Ms. Pappy, let me ask

2     you this.  Do you have any specific thoughts with respect to

3     the parameters that are laid out on page 2 of Docket 471?

4          ATTORNEY PAPPY:  Your Honor, the only -- I -- I do

5     have a lot, believe it or not.

6          I mean, I -- everything except -- really, except the

7     interviewing of the inmates is everything that the defense has

8     been willing to do.  I understand that you're allowing direct

9     questions by experts to employees.  But if we feel they're

10    inappropriate, we can interject -- Ms. Coleman and I can

11    interject.  And I think that's pretty consistent with your

12    prior order.  I am proud of my papers on the interviewing the

13    incarcerated persons.  And you felt the other way.  So I don't

14    feel like sitting here and arguing with you is going to change

15    your mind on that.

16         But, otherwise, you know, while I certainly disagree

17    with that, I'm fine with the order.  I think it was a fair

18    compromise.

19         THE COURT:  Well, let me ask you this, Ms. Pappy,

20    because this ruling is tentative.  And I -- I read your papers.

21    And every -- both sides' papers were thoughtful, and I

22    appreciate the briefing.  What I'm trying to understand,

23    Ms. Pappy, is I -- I am being told by Dr. Stewart that this is

24    the norm in his inspections.  And that doesn't, of course,

25    carry the day.  But as I take it from there, for another step,

1    that he has, in other instances, you know, conducted these

2    informal -- what's called -- interviews of detainees or inmates

3    with their consent, and he's using it to gather information.

4    And these individuals are all class members, at this point.

5         Understanding that Dr. Stewart could gain this same

6    information, theoretically, if he were to schedule visits with

7    everybody at the jail, which would be private, what am I

8    missing in terms of the County's objection?

9         And I may still not change my tentative, but I want

10   to at least make sure that I am appreciative of everything that

11   the County is raising that is a potential problem with that.

12        ATTORNEY PAPPY:  Well, sure, your Honor.  I think

13   that the main distinction and -- is that Dr. Stewart -- what --

14   what he doesn't say is that -- I want to say 100 percent of his

15   cases where he's interviewed people is consent decrees.  It's

16   not contested litigation.  And I don't think any of these cases

17   have ever gone to trial.

18        But, I mean, look.  I'm not going to sit here and

19   tell you that I don't have the opportunity to -- because I will

20   have the opportunity to get everything that these people said

21   to Dr. Stewart when he is deposed.  He has to disclose it.  And

22   I will be able to cross-examine him on it.

23        So I think I would be hard-pressed to -- it just

24   makes it a little harder for the plaintiffs.  And that's not my

25   intent here.  I'm concerned about perception.  I am concerned

1    about due process and my right to cross-examine.

2           But I will also say that Ms. Coleman and I are both

3    very good trial lawyers, and we'll handle it.

4           THE COURT:  Okay.  I appreciate that, Ms. Pappy.

5           Mr. Swearingen, the -- do you wish to be heard on any

6    of the, I guess, eight paragraphs that are in my tentative

7    ruling on the plaintiffs' request to compel inspections?

8           ATTORNEY SWEARINGEN:  I do, your Honor.

9           THE COURT:  Okay.  Go ahead.

10          ATTORNEY SWEARINGEN:  If I can first just briefly

11   respond to Ms. Pappy's statement about interviewing individual

12   class members during the inspections?

13          THE COURT:  Sure.  So let's just -- we're talking

14   about paragraph 6?

15          ATTORNEY SWEARINGEN:  That's correct.

16          THE COURT:  Sure.  Go ahead.

17          ATTORNEY SWEARINGEN:  Ms. Pappy said it's -- the

18   distinction is that this is contested litigation.  All of those

19   other cases are consent decrees or post-litigation cases.

20          I just want to point out in both *Coleman* and the *U.S.*

21   *v. Erie County* case, the Court addressed that.  In the *U.S. v.*

22   *Erie County*, the Court specifically said the defendants argue

23   that *Coleman* is distinguishable because the decision came into

24   compliance -- in the compliance phase of that litigation.  This

25   argument is unpersuasive, however, because the phase of

1    litigation is not material to the Court's construction of what

2    Rule 34 allows.

3              Our primary concern, your Honor, with the Court's

4    tentative is the limitation on medical, mental health, and

5    dental experts being allowed to inspect George Bailey, Central

6    and Las Colinas for only four hours.  And that's the primary

7    issue that I would like to address.

8              THE COURT:  Sure.  Go ahead.

9              ATTORNEY SWEARINGEN:  Not even in really small jails

10   is it customary to have a four-hour limit.  It is customary to

11   have day-long inspections.

12             I think it would be helpful to walk through what

13   happens in an inspection.

14             With these particular types of experts; the medical,

15   mental health, and dental experts, the inspection usually

16   starts in the intake.  Intake is -- is a process that all three

17   experts would want to observe.  Generally, intake takes about

18   ten to 30 minutes.  Often there's not somebody being -- being

19   booked at that very moment.

20             Custodies have to usually alert plaintiffs' counsel

21   and experts during the tour when somebody is coming in.  If the

22   intake isn't in process, necessarily, the experts and the

23   entire group would have to go to the (indiscernible) area to

24   see that, would have to travel through the facility.  Or

25   sometimes wait because custody staff may be in contact with

1    patrol who's bringing somebody in, and say, "Okay, somebody is
2    going to be here in about 10 minutes."  So, you know, probably
3    15 to 30 minutes, very conservatively, of the inspection right
4    there.
5            After intake, people -- the group will go to booking.
6            And I say "the group" because defendants have made
7    clear that each expert will not be able to inspect the facility
8    on their own inspection tour.  Instead, they must be together
9    as a group.
10           Booking cells are next.  Booking cells are where
11   people are usually under the influence of -- of -- of drugs or
12   alcohol or often under the influence.
13           Sometimes have been in accidents, and they require
14   medical care.  There are usually logs outside the booking cell
15   that talk about different checks that have been made.  Those
16   will be evaluated.
17           In many jails, close to the booking cells are
18   sobering observation cells, where people are going through
19   withdrawal.  Tend to be fishbowl-type rooms.  Those will be
20   inspected.  May talk to -- the experts may talk to individuals
21   in those cells.  Again, the logs pertaining to those cells will
22   be reviewed.
23           Also in that area is -- is sometimes safety cells.
24   The same type of review would -- would -- would take place
25   there.

1          The medical expert would want to see the medical

2    observation unit, the medical clinic.

3          The dental expert would want to see the dental

4    clinic.

5          The mental health expert would want to see the

6    psychiatric stabilization unit, the enhanced observation

7    unit -- I'm sorry, enhanced observation housing, the outpatient

8    sit-down unit.

9          Each expert will want to see some housing units; not

10   all housing units.  I think what would be appropriate is two

11   housing units each:  For administrative segregation, for

12   maximum custody, for medium and low custody, as well as dorms

13   where people are in general population and mingling.

14         Every single one of these different rooms or

15   different sets of housing units, it will be necessary for the

16   experts to ask basic orientation questions.  Who's in this

17   facility -- who's in this particular housing unit?

18         THE COURT:  Can I ask you a question, Mr. Swearingen?

19         Are you talking about, for example, your dental

20   expert is going to want to investigate the maximum custody

21   housing unit?  And why?

22         ATTORNEY SWEARINGEN:  Based on the -- the -- the

23   rosters that we're asking for.

24         If there are people who have urgent needs, who are in

25   maximum custody, then, yes, the dental expert may want to talk

1    to them about the dental care that they're receiving.

2              THE COURT:  Okay.  That -- but that would be very

3    focused, based on the roster.

4              Is the roster that you're getting going to indicate

5    which individuals have dental needs and which individuals have

6    psychiatric needs, or which individuals have other medical

7    needs?

8              ATTORNEY SWEARINGEN:  We have requested rosters to

9    show which ones are receiving those types of care.

10             THE COURT:  So you're really going to be -- going --

11   your dental expert would be wanting to go to a -- let's just

12   say, a dorm or the maximum custody unit, looking for a specific

13   individual who's identified on the roster?

14             ATTORNEY SWEARINGEN:  Yes, your Honor.

15             THE COURT:  What -- outside of the desire to

16   interview individuals who are identified on the roster, would

17   the medical, dental, or mental health experts have any need to

18   investigate the housing?

19             ATTORNEY SWEARINGEN:  The -- the -- the housing will

20   show several things.  For example, for -- for the mental health

21   expert, they'll show the safety check rounds for administrative

22   segregation or -- or the enhanced observation units.

23             THE COURT:  Okay.

24             ATTORNEY SWEARINGEN:  They'll also be able to look

25   and see what kind of property somebody has in the safety cell.

1    Are they wrapped up in a blanket, where they can't move their

2    arms and legs?  What is the condition of that cell?  Is it just

3    a great hole in the center of it, with no other attributes

4    besides padded walls?  Or is there some other attribute to the

5    cell?

6              And it's important to better understand this from the

7    mental health expert, to see the conditions in which suicidal

8    or potentially a suicidal individual is placed.

9              THE COURT:  Is the same true for the medical and

10   dental experts?

11             ATTORNEY SWEARINGEN:  Medical experts, yes, your

12   Honor.  The medical expert will see, for example, in -- whether

13   it be in the medical observation unit or whether it be in

14   regular housing units -- the frequency of welfare checks by the

15   nurses who go on their regular rounds in that facility.  Also

16   be able to determine whether or not somebody who, for example,

17   has an open leg (phonetic) in their cell, whether they are

18   receiving the bandaging they need; whether that bandaging is

19   actually in the cell and has been recommended by jail's medical

20   staff to be self-applied or whether that should have been put

21   on by a nurse.

22             THE COURT:  I'm a little bit -- okay.  I appreciate

23   the explanation.  This is really helpful, Mr. Swearingen.

24             I hear what you're saying, as to the mental health

25   expert.

1              Is it -- are you saying that the medical expert is

2      going to want to stay inside, for example, at a maximum custody

3      unit and wait and see how often a nurse comes around?

4              ATTORNEY SWEARINGEN:  Not to wait, your Honor, but to

5      check the logs that are in that housing unit.

6              There should be paper or electronic logs in that

7      housing unit.

8              THE COURT:  I see.

9              ATTORNEY SWEARINGEN:  They'll want to better

10     understand medication administration, whether or not pills are

11     left to take on their own or whether they're

12     self-administration; whether they're -- whether medication

13     nurses are requiring people to take medication in front of

14     them, to ensure that there's no cheating.

15             THE COURT: All right.  Thank you.  I interrupted you

16     to ask you some of those questions.  So if you were in the

17     middle of --

18             ATTORNEY SWEARINGEN:  Sure thing.

19             THE COURT:  -- your comments, Mr. Swearingen, go

20     ahead.

21             ATTORNEY SWEARINGEN:  Sure thing.

22             The experts will want to see some of the programming.

23     For example, the mental health expert will want to see a group

24     therapy program that is taking place during that day; if there

25     is one.

1          What -- we'll ask custody staff, if they haven't set

2     the date, to let us know if such programming is taking place.

3     And, if so, we would like to observe it.  Usually those types

4     of programs take approximately one hour.  We wouldn't want to

5     observe -- or, I'm sorry, experts would not want to observe the

6     entirety of the program, very likely.  But I think it's --

7     it's -- it's appropriate to expect 15 to 20 minutes.

8          THE COURT:  Okay.

9          ATTORNEY SWEARINGEN:  I would like to say, these are

10    really big jails.  These experts -- again, three experts have

11    only requested to see and inspect three facilities:  George

12    Bailey, Las Colinas, and Central jail.

13         Unlike the other three experts, the ADA, safety and

14    security, and environmental experts who are inspecting six

15    facilities, these three experts are inspecting these three

16    jails that are very, very large.

17         Central jail has eight different floors in which

18    people are housed.  If the elevators aren't working, then the

19    entire group of -- of probably 10, 12 people are going to have

20    to take the stairs.  Are going to have to take different

21    elevators at different times.  That will eat into the time.

22         George Bailey and Las Colinas are more flatter jails,

23    but very, very, very large jails.  They're likely to have

24    multiple sally ports.  Sally ports are safety areas, kind of

25    like big garages, where somebody has to come -- where the tour

1    will necessarily go through different security stages.  They'll

2    be entering vestibules.  Sometimes vestibules can't accommodate

3    a group of 10 or 12 people.  So only six people will be able to

4    go at a time.  One door needs to close, then another door needs

5    to open, and then they pass through.  This takes time.

6            It is simply not realistic for three experts, for

7    constitutional claims of facilities this size, to inspect the

8    jails in four hours.

9            THE COURT:  So your request is for eight hours?

10           ATTORNEY SWEARINGEN:  We do, your Honor.

11           THE COURT:  Okay.  Got it.

12           Ms. Pappy, do you wish to be heard on that?

13           I am going to give some additional thought as to the

14   appropriate -- well, actually, before I go to you, Ms. Pappy --

15           Mr. Swearingen, why don't we continue on.

16           Are there any other issues from my tentative order

17   that you wish to address, sir?

18           ATTORNEY SWEARINGEN:  Only just -- if there's any

19   clarity needed, I thought the tentative was pretty clear on a

20   lot of issues.  But whether there's any clarity needed on when

21   and where and how plaintiffs' experts can communicate with

22   incarcerated people -- in our experience, and including my

23   colleague Mr. Fischer's experience when he worked for

24   Disability Rights California and they inspected the San Diego

25   jails, they would go up to people in housing units.  If people

1    were socializing, they would ask them questions.

2           If they were in dorm settings, they would walk

3    between the beds in the dorm settings and ask questions.  If

4    they were in celled housings, they would go along the cells.

5    And open the doors.  Or if there was a safety consideration,

6    usually custody staff are pretty knowledgeable about who's

7    dangerous and who shouldn't be spoken to face-to-face.

8           They'll, instead, you know, crack the door or open

9    the slot, so the person can communicate in the slot, with --

10   with a semblance of confidentiality and distance, so the

11   security staff cannot hear those conversations.

12          I just want to clarify whether or not plaintiffs'

13   experts will be allowed to do that.

14          THE COURT:  Well, I guess -- boy, that's a -- that's

15   a big question; I mean, yes or no.  And is there -- is there

16   information in the record before me to indicate exactly how

17   this is going to happen?  Because I did not see that in the

18   parties' filings.

19          If I missed it, you can certainly clarify.  But I'm

20   not comfortable right now, without having -- you know -- a

21   floor plan of the jails, to -- to document or issue a detailed

22   order as to exactly how this is going to occur.

23          In my view of the other -- or of the case law that

24   you all cited, the orders were broader in that they just

25   granted a request for there to be private communications.

1          I -- I think it would make most sense, Mr. Swearingen

2     and Ms. Pappy, to leave it as is.  Which would really allow

3     both sides the flexibility to handle situations as they come

4     up.

5          I am loath to try to micromanage this process when

6     I -- I don't have that information -- I don't believe -- in the

7     record before me, and it's going to depend.  Like you said,

8     Mr. Swearingen, Dr. Stewart wants to go talk to inmate or

9     detainee A, and is told that inmate or detainee A is -- is a

10    safety risk to you, sir.  And then that's going to have to

11    change on the fly.

12         So I -- if there's a specific thing that you think we

13    should discuss, I'm happy to do it, Mr. Swearingen.  Otherwise,

14    just like with the ADA inspections, I would intend to leave it

15    to everyone's professionalism and good faith to make this work

16    in an appropriate manner.

17         And, obviously, if there is a big issue, you know,

18    you can contact my chambers, understanding some of the

19    difficulties in getting a ruling on the spot when I'm listening

20    to your descriptions of it.  But I think that's probably the

21    best way to proceed, Mr. Swearingen.  But I appreciate you

22    raising the issue.

23         Let me turn to you, Ms. Pappy.

24         Do you wish to be heard on the issue of four versus

25    eight hours, or some other time period for the medical, mental

1   health, and dental experts?  And what are your thoughts on

2   additional details from me in any order, if I do stick with the

3   tentative and allow plaintiffs' experts and counsel to speak

4   privately with detainees?

5           ATTORNEY PAPPY:  Well, I'll start with the last

6   first.

7           I think it is inviting problems if you get more

8   specific as to Item Number 6, which is speak -- speaking with

9   incarcerated people.  I think it should flow naturally.

10          And I suspect we -- we had no problems at the last

11  inspections.  I suspect we're not going to have them this time.

12          And certainly, I guess, if -- you know, we're to

13  stand in front of an incarcerated person and refuse to let

14  counsel and their expert talk to them, you would hear about it.

15  But that kind of thing is not going to happen.  So I would ask

16  that it remain flexible, to allow the day-to-day operations to

17  happen as plaintiffs want to see them happen.  And the

18  day-to-day interactions happen as plaintiffs' counsel wants to

19  see them happen.

20          So that's all I'll say about that, is that I think it

21  should remain open, as your Honor has set it forth.  The

22  arguments sort of assume that we are somehow going to

23  interfere, and that was not borne out in the first inspections.

24          THE COURT:  For what it's worth, I didn't hear

25  Mr. Swearingen to be saying that.  I think he was just asking

1   if there are going to be more ground rules.  And I think,

2   Mr. Swearingen, for all of the reasons that I indicated, and

3   stated by Ms. Pappy and relying on you all to kind of work

4   cooperatively together, I'm not going to issue -- assuming I

5   stick with the tentative, I'm not going to issue further

6   detailed guidance.  I don't feel like I'm capable of doing it

7   in a meaningful way right now, and I think me trying to lay

8   down additional ground rules is going to invite more problems.

9           ATTORNEY SWEARINGEN:  (Indiscernible) your Honor.

10          THE COURT:  Okay.  Thank you.

11          Ms. Pappy, I didn't mean to cut you off on the issue

12  of timing --

13          ATTORNEY PAPPY:  No.  No.

14          THE COURT:  -- or the length of the inspections?

15          ATTORNEY PAPPY:  So number one about the timing, four

16  hours is plenty of time.  You knew I was going to say that.

17          We keep hearing:  "This is customary."  "This is the

18  way we keep doing it."  "This is the way we always do."  "This

19  is the way they always do it with neutral experts in consent

20  decrees."  This is not the way they do it in hotly contested

21  litigation.

22          We are talking about -- I mean, really -- for all

23  intents and purposes -- it's two physical locations.  It's

24  mental health care; you know, safety cells.  They are located

25  in the same area.  Elevators don't break down.  We have access

1    to staff elevators.  There's never been an instance in the

2    recent history of the jails where there's been no elevator

3    available.  And we have priority, as we did last time, when we

4    went on the inspections, unless there was some emergency in the

5    jail; in which case we would all be evacuated.

6            The notion that, because it's customary, we should be

7    able to do this is unrealistic.  This is litigation.  This is a

8    disruption to operations.  We have to make sure that there are

9    enough people -- there will only be one attorney for us.  But

10   there have to be enough people to protect the plaintiffs'

11   attorneys and their experts and to walk us through the jails.

12   It's extremely disruptive to operations on a day-to-day basis

13   and the way security staff have to deal with people passing

14   through the jails.

15           To custody levels -- I really don't understand.  I

16   mean, if a list says that yesterday somebody had a dental issue

17   and it was Beth Pappy, it would sure make sense that you would

18   interview that person privately, in a meeting scheduled.

19           And you would ask for that person's specific medical

20   records, so that you could have the specific medical records in

21   front of you, if I was the dentist; and be able to talk to that

22   person at length about, well, what did they do for you?  How

23   quickly did they see you?  I see that they saw you on this

24   dates.  So I think that that suggestion is actually counter to

25   the suggestion that they need more than four hours.

1          If you've got people with those sort of -- I'll call

2     them urgent medical issues -- having their identification aids

3     the plaintiffs in being able to specifically go in and talk to

4     those people at a separate time.

5          My understanding of the purpose of these inspections

6     is to see day-to-day operations.  We're not going to stand

7     around.  And nor do I think it's appropriate and there's no

8     legal authority to suggests that we're going to wait for a

9     drunk person to come in.

10          THE COURT:  Wait for a what person?

11          ATTORNEY PAPPY:  A drunk person to come in.

12          THE COURT:  Oh, I see.

13          ATTORNEY PAPPY:  That we're going to wait for

14     somebody addicted to drugs.  The jail cannot stand there and

15     hold somebody in a sally port.  And by the way, only one of

16     these prisons that we're talking about does booking.  Okay?  So

17     we're not talking about Las Colinas, and we're not talking

18     about George Bailey, in terms of booking process.

19          So Central, they're going to say -- I've been there.

20     The intake area is very small.  It doesn't take very long.  You

21     walk around, and there's bookings.  So it's a very small area

22     that we have to stand in.  And hopefully there will be

23     people -- there will be people booked, so they can see what

24     they want to see.  But, I mean, are we supposed to sit in the

25     sally port, with arrestees, and make them sit in the cars

41

1   while -- while we wait to -- wait for the experts to come

2   downstairs?  I mean, we have to be reasonable about this.

3              Before we first get there, at the beginning of four

4   hours, there's nobody there.  But we alert somebody in intake

5   and say, if we get somebody in, can you let us know?  We'll

6   come down.  That is absolutely something we're willing to do.

7   But the notion that we're going to stand and waste time to wait

8   for these people -- I don't think that's being suggested.

9              THE COURT:  I agree.  It's not being suggested.

10             ATTORNEY PAPPY:  But four hours is a lot of time.

11  M.O.B. is not very big.  It's a small -- I mean, small in

12  comparison to the eight floors of the jail.

13             The low custody versus -- I mean minimum security

14  versus maximum security, what's the difference with the health

15  issues?

16             Dorms versus minimum security versus maximum

17  security, what's the difference with the house issues?  Again,

18  if -- if there is somebody on a roster that they specifically

19  want to talk to, I don't -- I don't see that being a problem.

20  But the notion that they're going to go in there and we should

21  be permitted to spend an hour and a half with that person,

22  that's not what this inspection is about.  At least that was my

23  understanding.

24             It was to be able to talk to people, ask them a few

25  questions, maybe note who they are, and say, "Gee, you know,

1   Mr. Swearingen, I want to follow up with this individual

2   leader."

3            We're not going to schedule group therapy so that the

4   plaintiffs can stand there and watch.  We have to get the

5   authority of each and every one of those people.  Again, it

6   offends me to absolutely no end that these people should have

7   themselves watched as lab rats while they are in group therapy.

8   These are incarcerated people.  And I can -- I can imagine that

9   those kind of people, more than most, do not want to share

10  their mental health care problems with a group of people

11  standing there, staring at them.

12           That aside, four hours is plenty to get through all

13  of this.  If it isn't, why don't we come back?  Because what's

14  going to happen with eight hours is they're going to fill those

15  eight hours.  And from the defense perspective, not

16  productively.  And we suggest that the four hours is a

17  reasonable compromise.  And that if they need to come back, you

18  know, and say, "Hey, we need another hour" -- quite frankly, if

19  they need another hour, we would say, "Fine, just stay.

20  Don't -- don't leave the facility."

21           Again, I -- I'm troubled by the need for eight hours

22  because it somewhat suggests that Ms. Coleman, who's probably

23  going to be the one there, is going to say, "I'm sorry.  Your

24  time is up," even though you really wanted to talk to this one

25  other person and visit this one other person; you're out.  We

1    would never do that.  Because if we came back to you, I don't

2    think you would look too kindly on that response.

3             THE COURT:  Go ahead, Mr. Swearingen.

4             ATTORNEY SWEARINGEN:  Thank you, your Honor.  Several

5    points.

6             First, (indiscernible) previously indicated from the

7    *Erie* decision, Rule 34 does not distinguish between the phase

8    of litigation.

9             So whether this is hotly contested litigation

10   (indiscernible), Rule 34 should be construed broadly as the

11   Ninth Circuit has suggested.

12            Second, defendants -- let me rephrase that.

13            Plaintiffs' experts have no intention of waiting

14   around.  We -- we do not -- they don't want to waste anyone's

15   time.

16            Plaintiffs' experts routinely get permission from

17   individuals in group settings, in group therapeutic settings,

18   to observe processes.  I've been there before, myself, in group

19   settings, where patients have no problem whatsoever letting

20   myself and experts and defense counsel observe their group

21   therapy.  Their group therapy takes place in the housing unit,

22   in the socialization room, with dozens of other people,

23            THE COURT:  What if someone says no?  What if one --

24   one participant says, "I'm not comfortable with that," do you

25   move on?

1          ATTORNEY SWEARINGEN:  We do.

2          THE COURT:  Go ahead.  That's what I wanted to know.

3          ATTORNEY SWEARINGEN:  Ms. Pappy suggests that if four

4    hours isn't enough, plaintiffs' experts can simply come back.

5          Plaintiffs can -- worked with the experts twice to

6    reschedule tours.  It has been a weeks-long process, both

7    times.  All of the experts have busy schedules.  They're

8    (indiscernible) out of state.  It would create a logistical

9    burden and cost thousands and thousands of dollars to

10   reschedule inspections for just a couple more hours.

11         THE COURT:  Just to be clear, we're not doing that,

12   where this is going to be the one time in this case that there

13   will be inspections of each of these facilities.

14         So I -- I hear you loud and clear, Mr. Swearingen,

15   and I agree with you.  And I think that's probably what

16   Ms. Pappy and her clients would prefer as well.

17         So I think we are all on the same page that this

18   needs to happen once.  And what I need to try to do is craft an

19   order that will allow the plaintiffs to obtain the information

20   they are entitled to seek under Rule 34.  And ensure that the

21   defendants are -- are able to continue to operate their

22   facilities to protect the safety of everyone involved.  So I --

23   I hear you.  We agree.  I think everyone agrees on that aspect,

24   in a large sense.

25         Go ahead.

1          ATTORNEY SWEARINGEN:  And if I can continue.

2          If the Court is at all inclined to provide fewer

3    hours of medical, mental health, and dental experts than the

4    ADA environmental safety and security experts, I would suggest

5    that the Court consider evaluating which areas of the jail

6    those experts -- the medical, mental health, and dental

7    experts -- want to -- to -- and require to see as part of their

8    inspections.  Those would include all of the housing units and

9    areas that I indicated.  We would be happy to provide the Court

10   with a list, as long as the defendants provide us with the

11   floor plans that they promised would be produced during the

12   week of October (indiscernible) October 30th hearing.  That's

13   what they said.  Last week, they again said they would be

14   promptly produced.

15         We're still waiting for the floor plans.  But we

16   would be happy to give a list of the areas that our experts

17   would like to see.

18         And if in the Court's order it said plaintiffs'

19   experts are allowed no fewer than four hours, no more than

20   eight hours to see these areas, that would ensure that the

21   defendants did not later challenge our expert reports on the

22   grounds that they were not allowed to inspect certain

23   facilities and, therefore, they can offer no opinions on those

24   facilities.

25         THE COURT:  Okay.  All right.  Fair enough.

1          I will give some additional thought to the -- the

2    time limitation that -- as currently exists in paragraph 1.

3    And I will issue a further written order on that.

4          I am -- at -- all of these eight paragraphs will be

5    contained in the written order, for the reasons we discussed,

6    Ms. Pappy.  I understand the defendants object to paragraph 6.

7    I'm going to keep that in there for the -- and based on your

8    suggestions, I am -- I am not going to add additional details

9    or try to create additional rules for those communications.  I

10   don't think that's going to be productive, and I think it may

11   be counterproductive.

12         Before we move on to the topic of the privilege log,

13   I do want to make sure that everyone is on the same page with

14   respect to the documents that are going to be produced by the

15   County prior to the inspections.

16         I'm looking at Ms. Grunfeld's declaration, which is

17   Docket 458-2, ECF page number 29; which is the inspection

18   request for George Bailey.

19         And I will be candid with you all.  But I have not

20   looked at each of the inspection requests, side by side, to

21   make sure that the document categories line up.

22         I'm assuming that they do.  Is that correct,

23   Mr. Swearingen?

24         ATTORNEY SWEARINGEN:  I believe so, your Honor.  I

25   don't have the documents in front of me.

1          THE COURT:  Okay.  Well, let's -- let's just talk

2    through what the plaintiffs are seeking, and if there are

3    objections.

4          Ms. Pappy, I just don't want there to be any

5    disputes, as you all get closer to the inspection dates, so

6    that you can proceed efficiently.

7          Category 1 seeks -- well, it's all Category 1.  So

8    1A, the map and floor plans.  I thought those were undisputed.

9          Is that correct, Ms. Pappy?

10          ATTORNEY PAPPY:  Yes.  And plaintiffs' counsels have

11    had -- plaintiffs' counsel has had Central since, like,

12    February, or something.

13          THE COURT:  All right.

14          ATTORNEY PAPPY:  No problem --

15          THE COURT:  So 1A, map and floor plans, not disputed.

16          ATTORNEY PAPPY:  Right.

17          THE COURT:  And I don't anticipate -- well, I may

18    include this in the written order.

19          So, B, an organizational chart identifying

20    supervisory staff.

21          Mr. Swearingen, I did not order that before.  I just

22    don't see it as relevant.

23          ATTORNEY SWEARINGEN:  (Indiscernible due to

24    overlapping speakers) your Honor.

25          THE COURT:  Okay.  Then that -- it will not include

1    an organizational chart.

2            Ms. Pappy, what is the County's position on providing

3    a roster of incarcerated individuals prior to each facility

4    inspection?

5            And I would note that the plaintiffs' request is a

6    little bit more specific or maybe you think a lot more

7    specific, in that it requests for each of the individuals,

8    provide personal identifying information.  And then anyone

9    who's on the medical care caseload, mental health caseload,

10    dental health caseload.  And identify everyone with a

11    disability.

12            I have to tell you that I don't know how the County

13    maintains that information.  It strikes me, just off the top,

14    that if the County does not have the ability to simply print

15    that out, that requiring the County to go through on the roster

16    and identifying everybody with a disability and then describe

17    the type of disability and any information about any

18    accommodations that are provided to that individual -- it just

19    seems like a rather large undertaking.

20            But, Ms. Pappy, could you please tell me the County's

21    position with respect to Category 1C?

22            ATTORNEY PAPPY:  Yeah, sure.

23            So we can provide them rosters.  I can't -- just

24    because -- I don't know that I can run it that day and get it

25    to them.  But a couple of days before, we can give them a

49

1  roster of people in the facility they're inspecting.

2  (Indiscernible) George Bailey.

3                    THE COURT:  Right.

4                    ATTORNEY PAPPY:  And I think -- I'm pretty sure we

5  can also provide on that -- either on that list or on a

6  separate list, disabilities; people with disabilities.  Because

7  it's a particular flag.  It might not tell you what disability,

8  but it will tell you that they have a disability.  We may even

9  be able to provide what the disability is.

10                    And if we can, I'm happy to do that.  So I just need

11  to find out from the client, is it -- can I do this two days

12  before?  Can you run it the day before?  How can you do this?

13  It will contain housing information.  It will say where they're

14  housed in the facility.

15                    The rest of this stuff is not something that I can

16  put into that report or just generate another report.  You will

17  hear more about that when we get to the document dispute.

18                    THE COURT:  Okay.  With respect to the -- there's

19  a -- that request for identifying individuals on a medical care

20  caseload, a mental health caseload, and a dental care caseload,

21  are those categories of information that are meaningful in

22  terms of the County's ability to electronically segregate and

23  provide information.

24                    ATTORNEY PAPPY:  No.  You can't -- can't say, "Give

25  me a list of everybody who's received -- receiving medical

50

 1   care."  There isn't a functionality to enable it to -- to do

 2   that.  There also isn't one for mental health care.  There also

 3   isn't one for dental care.

 4          What we're producing, as a part of the documents

 5   that -- when we get to all of the document requests, is sick

 6   call requests.  And those are both for mental health, medical

 7   health, and dental health.  So that the plaintiffs can see a

 8   history -- a recent history -- six months to a year -- who's

 9   been going to the dentist a lot.  And they'll actually have

10   those before -- before the inspections.

11          THE COURT:  Okay.

12          ATTORNEY PAPPY:  Now, I can't promise that the people

13   on those lists won't be transferred to a different facility by

14   the day of the inspection.  But the plaintiffs' counsel could

15   certainly compare the two lists, so you can see who's been

16   going to the doctor a lot.

17          THE COURT:  Okay.

18          ATTORNEY PAPPY:  I have -- I know that I have seen

19   doctor -- there are two dentists, and they have a list of the

20   people that they have seen recently.  And so people's names are

21   on that.

22          But, like, there's no way to generate a list of all

23   people receiving medical care.  Because I'm not even sure how

24   you would define that.  You mean, today?  Yesterday?  Does it

25   mean they had an appointment today?  Had an appointment

1    yesterday?  They have one coming up?  They had an appointment

2    six months ago?

3            I mean, technically, I guess, if you are in jail, at

4    some point you're going to need to see medical; so that's

5    potentially 4,000 people.  But there is no functionality.

6            THE COURT:  Okay.  Mr. Swearingen, with that

7    additional information, it sounds like -- provided by

8    Ms. Pappy, it sounds like there's no objection to providing a

9    roster.  And that -- it sounds like it's not going to be a

10   problem to identify, on that roster, individuals with

11   disabilities.  And it may even be possible to provide the type

12   of disability.

13           I -- I'm not going to issue an order directing the

14   County to do that, if I issue one based on what Ms. Pappy is

15   saying:  To the extent it is reasonably practicable, the County

16   will provide the type of disability.  But it doesn't sound like

17   the County's in a position to also identify on that roster, you

18   know, who's on the medical caseload, dental caseload, and

19   mental health caseload.

20           With all of that being said, does the information

21   that Ms. Pappy is agreeing to provide suffice for the

22   plaintiffs?  And, if not, you're happy to tell -- well, I'm

23   happy to hear from you as to why not or what else I should

24   order the County to do.

25           ATTORNEY SWEARINGEN:  We appreciate Ms. Pappy's offer

1    to provide the information that you just discussed.

2           We do believe that TechCare does have the capability

3    of generating lists to show, for example, the (indiscernible)

4    sick call, (indiscernible) sick call.

5           Ms. Pappy, last week, represented to us in an email

6    that TechCare can state which people who are incarcerated are

7    on certain medications.  A medication list would be indicative,

8    for example, of people with medical care issues or mental

9    health issues.

10           THE COURT:  Could I interrupt you for one second,

11    please.

12           So that sounds like something separate, though.

13           If there's a TechCare system over here and then the

14    County's generating a roster, what your document requests would

15    be asking the County to do is match those up and add that

16    information to the roster.

17           If I'm incorrect, tell me.  But it sounds like that

18    would be the -- the required step.

19           And I'm not inclined to require the County to import

20    TechCare into this roster, if it's not something where the

21    systems are already integrated.

22           So if I missed that, go ahead, Mr. Swearingen.

23           ATTORNEY SWEARINGEN:  I'm not sure the degree to

24    which they're integrated, your Honor.  I think that, if need

25    be, separate reports would be sufficient.

1        Those separate reports from TechCare would indicate

2   the person's name, the person's housing unit, and that would be

3   sufficient, along with the other information --

4        THE COURT:  Ms. Pappy, do you have any information

5   about this TechCare that you can share with me, and what may be

6   feasible to --

7        ATTORNEY PAPPY:   (Indiscernible) mm-hm, I do.

8        THE COURT:  Go ahead.

9        ATTORNEY PAPPY:  So this report was sent to me by

10  plaintiffs' counsel last week, saying, "No, you can produce

11  logs because we get this document from NaphCare."  These

12  documents were never shared with us until this week.

13       I gave this document to my client, who is my

14  interface in medical, who knows all about -- about medical

15  records and what we can do.  And he advised me that this report

16  is inaccurate, that they don't use it, and that they've asked

17  NaphCare -- like, you can generate it if you want but don't

18  give it to us.

19       TechCare is a new software created by NaphCare.  Some

20  functionality is terrific.  But these overall generalized

21  reports are extremely inaccurate.  And so the County won't rely

22  on them because they -- they don't -- they don't help.  And

23  they don't want any of their data screwed up by these reports.

24       There is no way to -- to run a medical caseload,

25  mental health care, or dental case.  If -- they will have this

1    medication roster as part of the document production.

2            Again, if the plaintiffs want to do this matching,

3    based on the roster I give them, feel free.  But I don't think

4    that's incumbent on the County to try to create, try to mix and

5    match a -- a spreadsheet.

6            These are Excel spreadsheets that my client gives me.

7    They're not these TechCare reports.

8            THE COURT:  What rosters are you planning to produce

9    to the plaintiffs in addition to the medication roster?

10           ATTORNEY PAPPY:  Sure.  It's sick call logs, so that

11   they can see -- they can see who -- who's going to the doctor;

12   who's going to the doctor a lot.  And you can see the reason

13   for it.  Mental health care and dental care caseload.  I was

14   hoping I had Wi-Fi, so I could look in the system because I

15   looked at all of these last week ad nauseum.

16           There's another one that shows -- I told you the

17   dentist appointments.

18           There's another one that shows hospitalizations.

19           There's another one that shows -- well, there's one

20   that shows hospitalizations for -- I'm not going to say

21   "overdoses."  But if they send anybody who uses Narcan that --

22   that they use Narcan on to the hospital; because they don't

23   know if it's an overdose until the hospital tests the person.

24   So that report.

25           Anybody who is ever sent out for a specialty

1    appointment, on -- on a roster.

2            Chronic care folks, we have a -- a report for chronic

3    care that shows chronic care people.  It's not specific to

4    facility, but it shows what facility they're in.

5            THE COURT:  And are all of those reports going to be

6    produced to the plaintiffs?

7            ATTORNEY PAPPY:  Yes, as a part of -- again, you'll

8    hear it ad nauseum in the document -- documents.

9            THE COURT:  Well, we'll see if it's ad nauseum or

10   not.

11           ATTORNEY PAPPY:  (Laughing.)

12           THE COURT:  But fair enough.

13           Let me ask you one question, and then I'll provide

14   you an opportunity to be heard, Mr. Swearingen.

15           If -- I need to figure out what information is going

16   to be provided to you.  But how far in advance of each

17   inspection do you want it?  Understanding that the jails are

18   fluid, as we all know.  And they may be accurate on Monday but

19   not accurate on Wednesday.  But also understanding you probably

20   want some time to prepare for each inspection.

21           So with that in mind, what would be your request for

22   how many days in advance of each inspection you would like to

23   have the roster?

24           ATTORNEY SWEARINGEN:  100 days.

25           THE COURT:  Does that sound doable to you, Ms. Pappy?

1          ATTORNEY PAPPY:  Oh, sure.  As long as I know how

2    many days before, we'll have it run.

3          THE COURT:  Was there something else you wish to be

4    heard on, Mr. Swearingen?

5          ATTORNEY SWEARINGEN:  Yes, your Honor.

6          THE COURT:  Yeah, go ahead.

7          ATTORNEY SWEARINGEN:  The rosters Ms. Pappy discussed

8    will likely be produced on the last day of production.  The

9    Court ordered December 22nd.  Those will certainly be stale and

10   rather useless by the time the inspections take place in

11   January and February.

12         I think -- don't think that the Court has gotten a

13   full picture of TechCare.  The -- the County's budget report

14   states, quote:

15              "In September 2019 -- this is before NaphCare

16              became the provider of the jail in the summer of

17              2022."

18         THE COURT:  Right.

19              "September of 2019, the department implemented and

20              deployed the electronic healthcare (indiscernible)

21              system, TechCare.  After over two years of

22              development and collaboration with the vendor,

23              this new system assists sheriff's staff in timely

24              gathering of an inmate's health history to ensure

25              appropriate access of care and treatment.

57

1              "In addition, the capabilities of a standalone
2          electronic healthcare record assists providers in
3          identifying trends and issues to prevent
4          complications and prevent -- and potential chronic
5          diseases.
6              "TechCare substantially increases operational
7          efficiencies."
8              This is 2023.  Electronic medical records have been
9    around for two-plus decades in correctional facilities.  They
10   are very, very capable platforms.
11             I would like to read just a few other representations
12   that have been made which TechCare.  This is NaphCare's RFP,
13   request for -- I'm sorry, P -- not coming to mind right now --
14   proposal.  Request for proposal to the County.  Quote:
15             "NaphCare uses TechCare to manage all patient
16         healthcare records from the point of intake to
17         release, which creates a standardized process of
18         care with documentation provided every step of the
19         way."
20             This is what TechCare says about itself:
21             "TechCare allows on-demand and scheduled reporting
22         of any data captured, with displayed results in
23         seconds, not hours."
24             NaphCare's vice president of information systems
25   says:

1              "TechCare's advantage is that because of its

2              unique niche, it can focus solely on timely care

3              that meets inmate needs, while exceeding quality

4              standards specific for correctional environments.

5              Protocols, processes, alerts, dashboards native to

6              the products are all centered on these national

7              standards for correctional institutions and the

8              built-in reporting tools can show compliance and

9              lack thereof with a single click."

10        I believe that TechCare has much more capabilities

11   than are being represented here.

12              THE COURT:  Understood.  And --

13              ATTORNEY PAPPY:  May I respond, your Honor?

14              THE COURT:  Oh, sure.

15              ATTORNEY PAPPY:  I'm not surprised that TechCare and

16   NaphCare have produced media blurbs that say that their systems

17   are fantastic.  I think that we all understand that the power

18   of the press or the power of advertising is not always

19   accurate.

20              If plaintiffs believe that my folks are not telling

21   the truth -- because that is exactly what they are saying -- I

22   am more than happy to have my medical person, who knows whether

23   these reports are accurate or not, come to court and meet with

24   your Honor under penalty of perjury and talk about what is

25   possible and what is not.

1          THE COURT:  Right.

2          ATTORNEY PAPPY:  More than happy --

3          THE COURT:  I think -- I appreciate that.

4          But I think as we're going back, what -- what we are

5   really focused on is Category 1C, which is asking about

6   identifying everyone who's on the mental care caseload, the

7   mental health caseload, and the dental care caseload.  And it

8   sounds like that there isn't that caseload of information to be

9   produced.

10         To the extent it is, then it would be produced, but

11  there's no -- there's no separate listing of caseload.

12  There -- so regardless of the specific functionality of

13  TechCare and whether that's -- that -- those statements are

14  accurate or not, I'm really looking very carefully at Category

15  1C.  And I think I have the information that I need for 1C.

16         I -- I'm not sure what additional information --

17  well, I'm not sure what additional information the plaintiffs

18  are really seeking in Category 1D, Mr. Swearingen.  The logs,

19  rosters, or other tracking systems.  Any kind used -- it --

20  what do I need to resolve on 1D?  I don't want to just go

21  through it and talk it through.  That's not going to be a good

22  use of our time.  What's the dispute?

23         ATTORNEY SWEARINGEN:  Agreed, your Honor.

24         We -- plaintiffs would withdraw or release 1D.  And

25  so -- and, actually, most of all other inspection requested

1  documents except for one other category if we can get the

2  information in 1C.  1C -- again, I do believe that that

3  information is readily available.  I don't know whether or not

4  it's merged into the JIMS system and there's integration.  But

5  I do believe that the caseload -- who's on the (indiscernible)

6  caseload, who's on the (indiscernible) caseload, who's on the

7  medical care caseload can be obtained through TechCare.  And if

8  we were to get that, then we wouldn't need any other requests

9  and we would forgo them, but for the last request; for

10 documents sufficient to show which program services and

11 activities are being offered to -- to people.

12        THE COURT:  Okay.  And, Ms. Pappy, do you have a

13 problem with giving the plaintiffs the programming that's going

14 to be available in each facility on that given day, so that

15 they can decide, yes, we would like to go see this session or

16 that session?

17        ATTORNEY PAPPY:  Sure.  If it's limited to

18 programming happening that day, it can absolutely provide that.

19        THE COURT:  Well, I think that's all -- for the

20 inspection, that's all that would be relevant, I think.

21        ATTORNEY PAPPY:  That's what I think.

22        THE COURT:  Is that correct, Mr. Swearingen?

23        ATTORNEY SWEARINGEN:  That's correct.

24 (Indiscernible) RFP for programming in general.  We just want a

25 program that's going to be happening --

1            THE COURT:  Okay.  Okay.  With that in mind, is there
2    anything else that I should know before -- or as I think
3    through the order that I'll issue on the motion for
4    inspections?
5            Mr. Swearingen?
6            ATTORNEY SWEARINGEN:  No, your Honor.
7            THE COURT:  Ms. Pappy?
8            ATTORNEY PAPPY:  No, your Honor.  Thank you.
9            THE COURT:  Sure.
10           All right.  Let's go to the privilege log.  And so
11   here's my question.
12           We all agree that -- or the parties agree that
13   communications between -- let's say -- Ms. Pappy and the County
14   are privileged and need not be included on a privilege log.
15           Are we -- are we fighting over anything else?  I --
16   that's what I really could not quite discern from the briefing.
17   Is there something that I need to resolve or not?
18           And maybe the answer for you, Mr. Swearingen, is you
19   don't know.
20           But go ahead.  Why don't you take the first crack at
21   that, and then I'm going to turn to Ms. Pappy for her response.
22           ATTORNEY SWEARINGEN:  It's a mixed response, your
23   Honor.
24           THE COURT:  Okay.  Go ahead.
25           ATTORNEY SWEARINGEN:  We do know some stuff that

```
 1    should be on the privileged log.  We don't know the entirety --
 2              THE COURT:  What's the some stuff that you believe
 3    should be on a privilege log that does not include direct
 4    conversations between Ms. Pappy and her client?
 5              ATTORNEY SWEARINGEN:  The notes that are requested in
 6    doc -- requests for production Number 65, those request the
 7    notes that are kept by Commander Christina Bavencoff regarding
 8    services provided to incarcerated people at the jail, any
 9    changes to the services that (indiscernible) has requested.
10              Second -- Bavencoff declaration said that.
11              THE COURT:  Okay.  That's not on the disputed RFP
12    list.  Right?
13              ATTORNEY PAPPY:  No, it's not.
14              THE COURT:  Okay.  That's why I --
15              ATTORNEY SWEARINGEN:  Because it's a separate issue.
16              THE COURT:  That's fine.  Okay.  Let me get to
17    that --
18              ATTORNEY SWEARINGEN:  It's already been briefed on
19    the privilege log issue.
20              THE COURT:  No problem.
21              ATTORNEY SWEARINGEN:  If I could read several things
22    from the Bavencoff declaration.
23              THE COURT:  Could I get there first?  I could
24    actually look at it too?  Hang on real quick.
25              ATTORNEY SWEARINGEN:  Yes, your Honor.
```

 1          THE COURT:  What is the ECF number?

 2          ATTORNEY SWEARINGEN:  It is 311-16.

 3          THE COURT:  Give me just a second.

 4          (Pause, referring.)

 5          THE COURT:  311.  I'm sorry.  Mr. -- I'm in the 450s,

 6  in the document.  What are you reading from?

 7          ATTORNEY SWEARINGEN:  Docket 311-16.

 8          THE COURT:  Was this included in the briefing that

 9  was submitted to me?

10          ATTORNEY PAPPY:  No.

11          ATTORNEY SWEARINGEN:  Uhm, I do not know, your Honor.

12  I'm sorry for not knowing.

13          THE COURT:  I don't -- I was looking at your

14  declaration, which was 456-2.

15          I'll -- I'll give you a chance to be heard.  But I --

16          (Pause, handed document.)

17          THE COURT:  Okay.  Fantastic.  Court personnel have

18  it, so there you go.

19          Go ahead, Mr. Swearingen.

20          ATTORNEY SWEARINGEN:  Among other things, Commander

21  Bavencoff says, in paragraph 7:

22          "I have examined various county service providers

23          and incarcerated persons they encounter; obtained

24          a description of the way services are currently

25          being provided; and after research, noted where I

1          would like changes or have already requested

2          changes.  I (indiscernible) descriptions with

3          notes to keep track of research conducted to date

4          and desired changes."

5          Paragraph 2, Commander Bavencoff states:

6          "I also began reviewing all policies,"

7          specifically -- I'm sorry -- "specific to

8          accessibility matters, and tasked with my staff

9          with creating a tracking sheet, to keep track of

10         policy issues and changes, infrastructure issues

11         and (indiscernible) and all other accessible work

12         we are doing."

13         In paragraph 4, it talks about a time limit she's

14   created.

15         Paragraph 5, she talks about a list of short-term,

16   long-term projects.

17         The County has taken the position that these are

18   privileged documents.  The County's also taken the position

19   that documents more than six months old aren't relevant because

20   those are old and don't represent what's actually happening at

21   the jail.  But evidence of actual changes that are happening

22   internally to the department, in which outside counsel is not

23   copied on, are also privileged.  But, nevertheless, not

24   including those on a privileged log.

25         Today, plaintiffs are not challenging whether those

1   are privileged or not.  We're simply asking that they be

2   included on a privilege log because they're internal documents

3   to the County, documenting observations and what's happening at

4   the jail; policy changes that are taking place.  They're being

5   claimed as privileged, yet we have no way to even ascertain

6   whether they're privileged because they're not showing up on a

7   log.

8            THE COURT:  Okay.  I got it.

9            So, Ms. Pappy, if -- if the parties agree that your

10  communications with the County subsequent to the filing of this

11  litigation are privileged and need not be included on the

12  privilege log.  Got it.

13           The question that I'm trying to figure out, then, is

14  what additional documents are there, not involving direct

15  communications with you and your firm, as to which the County

16  is asserting the privilege and further asserting -- for today's

17  purposes -- that the documents need not be included on a

18  privilege log?

19           Because I will tell you that I am somewhat

20  sympathetic to Mr. Swearingen's position.  You know, he -- you

21  don't know what you don't know.  And maybe you could shed some

22  light on that.

23           ATTORNEY PAPPY:  Sure.  Well, first of all, I don't

24  know what the six-month argument is.  I'm not -- I'm not aware

25  of that.  We didn't assert it --

1            THE COURT:  Let's leave that to the side.  Let's talk

2    about --

3            ATTORNEY PAPPY:  And so I want to start with the last

4    thing that counsel said.  He says that he needs these documents

5    because the County is hiding changes and policy changes, and

6    they're doing things and they're not telling us.  So we have an

7    ADA plan in place, and we have to make disclosures.  And they

8    (indiscernible).  They can see what we've changed and what we

9    haven't changed.

10           The fact -- let's say that -- that I've got -- a

11   toilet has been replaced.  And, you know, there's nothing --

12   they have the document, showing that we bought -- or will have,

13   if they don't have it as part of a plan now -- if Ms. Nosean

14   (phonetic) was there and saw the old toilet.  And when she goes

15   back and sees it as part of their -- their rights under the ADA

16   plan, they'll see that there's another toilet there.

17           They have -- they -- well, they've requested -- but I

18   think -- they've requested -- we've actually provided them --

19   and I think they went out yesterday -- all of the policies that

20   have been changed.  They've been produced in two places because

21   they had a very broad document production request asking for

22   all policies, no matter what it was.  So those have been

23   produced.

24           And we also did some of the ADA plan production, that

25   wasn't specific to an RFP, of all of the policy changes.  So

1    this notion that there's some information hiding that hasn't

2    been produced is not accurate.

3              What are the documents that I assert are privileged?

4              THE COURT:  And they're not included on a privilege

5    log?

6              ATTORNEY PAPPY:  They are not included on the

7    privilege log.

8              Not only are my communications with the client

9    privileged, but the client's communications.  Commander

10   Bavencoff was my direct contact.  Now Commander Ralph.  She is

11   my direct contact.

12             And through the lead-up, you will recall that we were

13   trying to get the plaintiffs into settlement discussions in

14   January.  They chose not to engage with us.  And, instead,

15   chose to file a motion for preliminary injunction.

16             In preparation for that and -- Commander Bavencoff

17   and I would meet.  And she would create these notes from the

18   things I'm telling about:  Hey, you need to do this, you need

19   to do this, you need to do that.

20             The unit -- I think I can fairly say that -- not --

21   I'm not going to disclose that.  We discussed it.  But a -- a

22   lovely consequence of those back-and-forths was the creation of

23   the unit and its formation on June 1st.  It is no different

24   when I'm talking to Commander Bavencoff about those things, and

25   she's taking notes and she is then carrying out my instructions

1    by communicating what different people do.

2          What I am concerned about is that they are asking for

3    those communications that Commander Bavencoff is communicating

4    to other people, saying Beth Pappy said this.  Yes, I'm

5    oversimplifying it.  But it's what Beth Pappy said to do to

6    prepare ourselves for injunction, to try -- try to strategize

7    the case or set it up for settlement.

8          Those communications are what are privileged and what

9    I do not believe belongs in a privilege log.  Just as my

10   communications with Commander Bavencoff are what -- her notes

11   are what were the result of my communications with her.

12   Anything that wasn't privileged is attached to her declaration

13   or included in her declaration.

14         As of June 1st, I took the position -- and still --

15   still take it as, "You guys are off on your own."  You know.

16   I'm not going to -- nothing is, from henceforth, privileged.

17   Because you now have a unit that is not attorney supervised, if

18   you will, doing what they need to do; whether it's for

19   settlement or not.  And I don't believe it's appropriately

20   cloaked in privilege.

21         THE COURT:  So the universe of documents that we are

22   talking about, as to which the County is asserting the

23   privilege and further asserting that they need not be included

24   on a privilege log, include your direct communications with

25   Commander Bavencoff?

1              ATTORNEY PAPPY:  Yes.

2              THE COURT:  Which everyone agrees need not be

3    included on the privilege log.

4              ATTORNEY PAPPY:  Yes.

5              THE COURT:  They also include, perhaps, Commander

6    Bavencoff's notes of her communications with you.

7              Mr. Swearingen, do you agree that those -- that

8    Commander Bavencoff's notes of her communications with

9    Ms. Pappy would be privileged?

10             ATTORNEY SWEARINGEN:  Yes.

11             THE COURT:  Do you believe they should be on a

12   privilege log?

13             ATTORNEY SWEARINGEN:  No.

14             THE COURT:  Okay.  So we're all in agreement with

15   steps one and two.

16             Step three are Commander Bavencoff's communications

17   with other sheriff's department personnel, you know,

18   implementing the issues discussed in Ms. Pappy's communications

19   with Commander Bavencoff.

20             Is that right, Ms. Pappy?

21             ATTORNEY PAPPY:  Yes, your Honor.

22             THE COURT:  What is -- and these all pertain to the

23   creation of an ADA unit.  Is that right?

24             ATTORNEY PAPPY:  No.  They don't all relate to the

25   creation of the ADA unit.  That was one -- they're doing a lot

1   of things at one time.

2           It all -- it all either relates to the ADA unit and

3   our ultimate settlement and the -- and the injunction motion.

4   We were working on trying to settle it from, I would say, about

5   January.

6           THE COURT:  So this -- okay.  So this --

7           ATTORNEY PAPPY:  (Indiscernible).

8           THE COURT:  No, I get you.  But this dispute, the

9   disputed documents all pertain to the ADA portion of the case

10  and the ultimate resolution of it?

11          ATTORNEY PAPPY:  Yes.

12          THE COURT:  (Pause.)  Got it.

13          Mr. Swearingen, understanding the universe of

14  documents at issue -- which I now understand better than I did

15  before we began this discussion -- and everyone is in agreement

16  that communications with Ms. Pappy need not -- are privileged

17  and need not be on a privilege log.  Everyone further agrees

18  Commander Bavencoff's notes of those communications are

19  privileged and need not be on a privilege log.

20          The question is when Commander Bavencoff is engaged

21  in further discussions on those same topics and issues raised

22  by Ms. Pappy or discussed with Ms. Pappy, with other county

23  employees, that are all related to the ADA issues that are part

24  of the parties' settlement discussions and that resulted in the

25  stipulation on the ADA issues that was entered by Judge

1    Battaglia I believe back in June -- are these still documents
2    that you think belong on a privileged log to be produced to
3    plaintiffs?
4            ATTORNEY SWEARINGEN:  Yes, your Honor.  I -- it's not
5    clear to me that -- I don't know when these notes were drafted,
6    when these intra-departmental communications -- not including
7    Ms. Pappy or anyone else from outside counsel -- took place.
8    Settlement discussions were a limited time.  They did not
9    include the period in which we are moving to -- to -- to --
10   moving to enforce -- or seeking a preliminary injunction.
11   Excuse me.
12           So we don't know the scope of when the documents
13   were -- were generated.  We don't know what the documents are
14   about.
15           Ms. -- Commander Bavencoff's declaration says, at
16   paragraph 7:
17               "I obtained a description of the way that services
18               are currently being provided to incarcerated
19               people."
20           When was that list?  What is that?  How does that
21   relate to Ms. Pappy's communications and directions?  It's not
22   clear to me.
23           And if we extend this principle to the entirety of
24   the case, Ms. Pappy could simply instruct departmental
25   personnel, fix anything that's at issue in the third amended

1    complaint.  And all of the departmental machinations and

2    observations -- she could say, "See what's going on in this

3    unit."  And they could write up charts.  They could, you know,

4    have statistics.  And all of that information may be privileged

5    or may not be privileged.  But it would be outside of our

6    ability to even evaluate that because it wouldn't take place on

7    a privilege log.

8              THE COURT:  What's this universe of documents that

9    we're talking about, Ms. Pappy?

10             ATTORNEY PAPPY:  Email communications, I would say,

11   to -- I want to say to Scott Bennett (phonetic), the head of

12   facilities.  You know, email communications back and forth.

13   Some of which would be directly privileged because they have me

14   on them saying something like -- I'm making it up.  "You know,

15   gee, plaintiffs have raised X in the preliminary injunction."

16   And I think we do have a date.  It would be the date of

17   Commander Bavencoff's declarations.  We do know when these

18   communications are from.  They're from before then.

19             You know, "Can we will knock down this wall?  Are we

20   going to do something structural?  Can we knock down this

21   wall?"

22             "Plaintiffs are suing us.  No, we can't."

23             Those are the kinds of communications I had with the

24   client and the kind of communications that Commander Bavencoff

25   was working with.  That's -- that's a simple one.

1          She was communicating with them about policy changes.

2     About, look, if we -- if we -- well, if we can't structurally

3     change this, what about inserting a policy?  What if we do

4     this, and make this offer to them, that we'll change this

5     policy?  They were -- I would say -- largely emails.

6          THE COURT:  What -- I know you have not counted

7     pages.  But what -- we're talking about a finite time period,

8     it sounds like.  But may be a lot of emails, I don't know.  Do

9     you have any sense of the volume?  Because here's why I'm

10    asking.

11         I -- I hear where Mr. Swearingen is coming from.

12    That, you know, everyone agrees as to categories, one and two,

13    that we discussed earlier, that they are privileged and need

14    not be logged.

15         But there are additional internal county

16    communications that perhaps belong on a privileged log, perhaps

17    not.  How does he know it?  How do I know it?

18         And the two ways to go about it are the County could

19    simply say, one, "Look, fine.  We'll produce a privilege log

20    for those email communications between Commander Bavencoff

21    and" -- I forget the gentleman's name.

22         ATTORNEY PAPPY:  (Indiscernible.)

23         THE COURT:  Right.  Communications with you need not

24    be logged.  Everyone agrees.

25         The second would be that the county could provide me

1  with the email communications, and I could look at them in

2  camera and decide whether they belong on a privilege log or

3  not.

4            ATTORNEY PAPPY:  Hundreds.

5            THE COURT:  Hundreds?

6            ATTORNEY PAPPY:  January through whenever we entered

7  into that agreement.  Which was, like, right around the time

8  the ADA unit was formed.

9            THE COURT:  And do you agree that these email

10  communications are responsive to a specific request for

11  production?

12            Because I -- we've got other RFPs to discuss.  But as

13  I noted at the outset, this is not one of them as to which

14  there is a dispute.  So did the County agree to produce

15  responsive nonprivileged documents with respect to the RFP that

16  would call for all of these communications?

17            ATTORNEY PAPPY:  No, I don't think they are

18  responsive.  I mean, it -- we're talking about requests for

19  production number 65.  And request for production number 65 is

20  limited to the notes kept by Commander Bavencoff regarding

21  services provided to incarcerated people at the jail and any

22  changes to those services.

23            THE COURT:  I have the courtesy copy that

24  Ms. Chartoff brought from the Bay Area for me, which I am still

25  very grateful for.  So when I (indiscernible).

75

```
 1              ATTORNEY SWEARINGEN:  That's fantastic.
 2              THE COURT:  So please tell them thank you for doing
 3   that, again, Mr. Swearingen.  It's very helpful.
 4              Where are we in that -- in these documents
 5   (indiscernible).
 6              ATTORNEY PAPPY:  Well, he is -- well, you know, if
 7   you have the moving papers in front of you, I can actually give
 8   you the -- page 22 of 90.  Or in that binder, it's our request
 9   for production of documents number three, and it's number 19.
10              THE COURT:  Hang on.
11              ATTORNEY PAPPY:  I mean -- I'm sorry.  Page 19.
12              And while you're looking for that, I will note that,
13   look, if you want -- (laughing) I don't want to argue about
14   this much longer.  If you want me to list the notes on a
15   privilege log, I'll do it.  I'll (indiscernible) --
16              THE COURT:  Okay.  But (indiscernible).  I do have it
17   here.  And I see it's defendants' response to request for
18   production number 65.
19              The request itself is all notes kept by Commander
20   Bavencoff regarding services provided to incarcerated people
21   from jail and any changes to those services that she has
22   requested.
23              Okay.  And that was already in the -- you know, what
24   I just saw --
25              ATTORNEY PAPPY:  Yes.
```

1          THE COURT:  -- that Ms. Khan brought me.

2          And this says, "No such documents will be produced."

3    That's the County's response.

4          ATTORNEY PAPPY:  Yes.

5          THE COURT:  So, Mr. Swearingen, are those

6    post-litigation inception communications between County

7    employees about what they are going to do to try to, I guess,

8    further the (indiscernible) settlement discussions, are those

9    responsive for requests for production, other than number 65?

10          ATTORNEY SWEARINGEN:  They may be responsive to many

11    RFPs that ask for policies and procedures, to the extent the

12    policies and procedures have been changed during the

13    litigation.  And may be responsive to other lists or summaries

14    that have been created since litigation was initiated; since

15    the third amended complaint was filed but before the RFPs were

16    served.

17          THE COURT:  All right.  And the reason I'm asking,

18    Counsel, is I don't want to issue a legal ruling in a vacuum.

19    It -- the initial question is whether these communications are

20    responsive to a specific request for production or not.  If

21    they're not responsive, they're not logged, no matter what.  If

22    they are -- and that's what I'm trying to understand.

23          This RFP number 65 is specific.  It seeks the notes

24    kept by Commander Bavencoff.  It doesn't ask for all of the

25    follow-up -- the further communications.  So --

1          ATTORNEY PAPPY:  You're correct.  And that's how I

2    interpreted it.

3          THE COURT:  At this point, Counsel, I --

4    respectfully, I -- I don't know that there's a dispute for me

5    to resolve.  I mean, I -- tell me -- and you're welcome to tell

6    me that I'm wrong.  But if these -- I don't know what RFP

7    these -- all these post (indiscernible) communications are

8    responsive to.  And I'm not going to order documents be put on

9    a privilege log unless I know that they would be responsive to

10   a request for production.

11         I would be happy to hear from you both.

12         ATTORNEY SWEARINGEN:  And that's where -- where I

13   begin, your Honor.  With -- we know some stuff that should be

14   on a privilege log, but we don't know the other stuff that

15   should be on a privilege log.

16         So the some stuff would be that responsive to request

17   65 in particular, which asks for specific documents.  The notes

18   and any changes.

19         It appears that they are responsive documents because

20   the claim of privilege is being asserted.  And all we're asking

21   is that those be included in the privilege log.

22         THE COURT:  But if the notes that we're talking

23   about -- I think we -- bless you.  I think we agreed are -- are

24   notes of communications between Commander Bavencoff and

25   Ms. Pappy, I thought we all agreed that those would not be

1  included on a privilege log because they are direct

2  communications with counsel.

3        ATTORNEY SWEARINGEN:  Agreed as to those.

4        But as to --

5        THE COURT:  All right.

6        ATTORNEY SWEARINGEN:  -- any other communications

7  that are strictly inter-- I'm sorry -- intra-departmental -- so

8  between Mr. Bennett and Commander Bavencoff or notes that she

9  created herself -- it's not clear to me that the notes that she

10 describes in her declaration, at Docket number 311-16, are

11 notes that were sent in an email.

12       THE COURT:  I understand.

13       Counsel, here's what we are going to do with respect

14 to this one.

15       The request for production number 65 seeks the notes

16 that are kept by Commander Bavencoff.

17       Ms. Pappy, if there are any such notes that are

18 responsive to requests for production number 65, I'm directing

19 the County to include all of those notes in a supplemental

20 privilege log.

21       That -- and those would include notes between --

22 notes of direct communications between Commander Bavencoff and

23 your firm.  And I understand that we agreed earlier that those

24 wouldn't be logged.  But I want to dispel any uncertainty with

25 respect to this, so that Mr. Swearingen knows the notes that

79

1    are being -- that are at issue.  And I would --

2            ATTORNEY PAPPY:  That's fine.  I agree.  I have the

3    notes in my possession.

4            THE COURT:  And I'm not aware -- requests for

5    production number 65 did not call for the production of any

6    other communications, any further internal county

7    communications.  That issue is not properly before me at this

8    point, based on the record I have.  So that will be my ruling

9    on the motion for -- to compel production of a privilege log.

10   It's going to be granted in part, and I will include that in my

11   written order.

12           ATTORNEY PAPPY:  Thank you.

13           THE COURT:  Sure.

14           Let's move to the parties' joint list of disputes

15   regarding written discovery, Docket number 466.

16           I have reviewed every one of the requests for

17   production, the one interrogatory at issue, and then the

18   County's discovery issue.

19           And as I stated in my tentative ruling,

20   Mr. Swearingen, as a general matter, it appears to me that the

21   requests for production are very, very broad.  And that the

22   County's proposal for the information that they seek is, you

23   know -- is reasonable.

24           I am not inclined to rewrite the request for

25   production to narrow their scope to the four categories of

1    information that I see throughout the chart, including all

2    policies and procedures; including green sheets; all training

3    materials; all logs, lists, or summaries; and the outcomes; and

4    reports of any audits.

5         I -- each of the RFPs, as I read it -- with some

6    limited exceptions that I do want to discuss with you -- does

7    appear to be much broader than that.

8         And I'm not inclined -- I mean, I am inclined to rule

9    on the RFPs as propounded.  And they are -- I'm happy to give

10   you specific examples.

11        And I -- we can go through, you know, every -- all

12   memoranda -- the requests for production number 28:  "All

13   memoranda issued by you relating to the jail from January 1,

14   2021, to the present."

15        I mean, just the first one, that would include any

16   memoranda on any topic, even topics have -- having no relation

17   to the -- the issues in this litigation.

18        Am I reading that incorrectly, Mr. Swearingen?

19        ATTORNEY SWEARINGEN:  No, you're not.

20        THE COURT:  And that's -- that's the fundamental

21   issue that I have, is I spent a lot of time going through each

22   of these RFPs.  Is that a memoranda relating to a softball game

23   at a 4th of July picnic -- I mean, that really would fall

24   within the scope of RFP 28.  And I'm not trying to make light

25   of it.  I'm really not.  It's just -- they -- they are very,

1  very broad.

2          I do think that the -- their request -- their 199

3  through 202 -- Ms. Pappy -- that did appear to seek information

4  regarding specific incidents of inmates that may be relevant.

5  I mean, I don't know the -- the specifics.  But those were --

6  those were focused.  And I would like to discuss that with you

7  all.

8          Let's start with that.  Then I'll be happy to hear

9  from the parties.  I -- on -- I'll give you, you know, ten

10  minutes per side.

11          And, by the way, do you want to take a short break?

12  We've been going for almost two hours.  Does anybody want to

13  take, like, a five-minute break?

14          ATTORNEY PAPPY:  (Indiscernible.)

15          THE COURT:  You're fine?

16          Mr. Swearingen?

17          ATTORNEY SWEARINGEN:  I'm fine to continue if the

18  rest -- if the Court and --

19          THE COURT:  Ms. Exler?  Ms. Khan?  Does anybody --

20          Okay.  Let's go.

21          ATTORNEY PAPPY:  Judge, could I be so bold as to go

22  first?

23          THE COURT:  You may be so bold.

24          Is that okay with you, Mr. Swearingen?  On 199?

25          ATTORNEY PAPPY:  You know --

1          ATTORNEY SWEARINGEN:  As to those, yes.

2          THE COURT:  Okay.  Go ahead.

3          ATTORNEY PAPPY:  And 200 and 201.

4          THE COURT:  Sure.  Go ahead, because I don't know

5   what those are.

6          ATTORNEY PAPPY:  Well, those are the video.  Video

7   body-worn camera.  Give us -- I will asked plaintiffs for dates

8   and approximate times of incidents, so that -- because if we

9   have the body-worn footage or video camera from those dates and

10  times, no problem.

11         But I couldn't get that from them.  And that's really

12  all I need.

13         THE COURT:  Okay.

14         ATTORNEY PAPPY:  And that was the only objection.  Is

15  just give me dates and times.

16         Because 11, Mr. Rodriguez, has been in and out of

17  incarceration for a while.  We're all familiar with him.  And I

18  actually do have some documents with -- from -- about him and

19  some body-worn camera stuff that we got.  It's just unrelated

20  to these requests.  It may be what they're looking for, but I

21  don't know.  But I have booking numbers.  I have names.  If

22  they can just get me dates and times, we can go into archives,

23  understanding that body-worn cameras only started two months

24  ago.

25         THE COURT:  Okay.  That's a fair request.

1          It looks like the plaintiffs' chart says that the
2    incident involving Mr. Rodriguez in RFP 199 happened on May
3    1st.
4          Is that correct, Mr. Swearingen?
5          ATTORNEY SWEARINGEN:  Yes, your Honor.
6          THE COURT:  All right.
7          ATTORNEY PAPPY:  And there was no body-worn camera.
8          THE COURT:  Well, it seeks that -- I -- I'm the one
9    that inadvertently narrowed it.  It does seek documents
10   relating to that incident.  So that would include if there's an
11   incident report, or, you know, statements that were taken.
12         ATTORNEY PAPPY:  Yeah.
13         Okay.  And that's great.  I mean, that had not been
14   provided before.  But no problem.  We'll look for
15   Mr. Rodriguez, if it's not what I already have; which it might
16   be.
17         THE COURT:  Do you have dates for the others,
18   Mr. Swearingen?  On the specific incidents that you're --
19         ATTORNEY SWEARINGEN:  I don't your Honor.  No.
20         THE COURT:  All right.  Are you able to make any
21   proffer regarding the relevance of incidents for a --
22   particular individuals?
23         ATTORNEY SWEARINGEN:  Yes.
24         THE COURT:  Okay.  Go ahead.  And maybe that will
25   help.  Why don't we start with -- sounds like 199 is not in

1  dispute.  You gave the date.

2          What about number 200, for Mr. Cunningham.

3          ATTORNEY SWEARINGEN:  Sure.  For both Mr. Cunningham

4  and Mr. Fuller, these were requests that were served to try to

5  identify only a subset of incidents.  A very, very -- a very,

6  very narrow set of incidents in relation to the entirety of

7  this case, in order to get some idea of the jails' response to

8  incidents of violence involving incarcerated people.

9          THE COURT:  Okay.

10         ATTORNEY SWEARINGEN:  Both Mr. Fuller and

11 Mr. Cunningham have alleged that they were assaulted by staff.

12 One of the two has serious mental illness and was, at one time,

13 receiving treatment at Patton State Hospital.

14         THE COURT:  So am I understanding correctly,

15 Mr. Swearingen, that the relevant incidents -- from your

16 perspective -- are incidents involving allegations -- or

17 alleged assaults by staff members against Mr. Cunningham and

18 Mr. Fuller?

19         ATTORNEY SWEARINGEN:  That's correct.

20         And similar to Mr. Rodriguez, who's at issue in 199

21 and Docket 344, he's the person who has requested intervention

22 numerous times in this case.  And the Court has (indiscernible)

23 that.  But he has said, among other things, that he's received

24 retaliatory searches for his submission of an ADA grievance.

25 He has been retaliated by having his legal work class -- his

1    legal work taken away.  Being -- being placed on lockdown.  By

2    being forced to clean up the urine of a cellmate.  And these

3    are just three individuals who we've received complaints about,

4    or we're knowledgeable about their complaints about

5    (indiscernible) staff.  And we're trying to get more

6    information about them.

7              THE COURT:  And I think that -- understanding that, I

8    agree.  It's just --

9              Ms. Pappy, you know the incident that we're

10   talking -- well, you know the nature of the allegations.

11             ATTORNEY PAPPY:  I don't.  I didn't even question

12   relevance.

13             THE COURT:  You now know.

14             ATTORNEY PAPPY:  Yeah.  Yeah, I do.

15             THE COURT:  I'm saying you know now.  This is what

16   Mr. Swearingen is looking for.  And do you have any objection

17   to providing responsive documents for 200 and 201?

18             ATTORNEY PAPPY:  They just need to give me dates.  Or

19   even a date range.

20             THE COURT:  Well, do you -- do you have a date range,

21   Mr. Swearingen?  If you don't, you don't.

22             ATTORNEY SWEARINGEN:  For Mr. Rodriguez, yes.  For

23   number 199, we provided that already.

24             THE COURT:  Right.

25             ATTORNEY SWEARINGEN:  You identified it by reading

1    the document.

2         THE COURT:  No.  Right.  I'm talking about for

3    Mr. Cunningham and Mr. Fuller.

4         ATTORNEY SWEARINGEN:  We don't have dates for those

5    two individuals but those are individuals who presumably, if

6    there was an incident to violence, there would be a report on

7    it.  In many jails, it's called an incident report.  And that

8    incident report will say, "On this date" -- you know, it could

9    be that, hypothetically speaking -- I'm not representing that

10   this is what happened.  But sometimes incarcerated people, you

11   know, gas a custody officer.  You know, that is, squirt urine

12   on the officer.  And sometimes that provokes a -- an excessive

13   force response.  I do not know what happened here.

14        THE COURT:  Yeah

15        ATTORNEY SWEARINGEN:  But if there was an incidence

16   of violence, presumably that would be recorded in the report,

17   like an incident report.  An incident report would have the

18   date, would have all of the facts, this is what happened.

19        THE COURT:  Do you have any -- based on your

20   understanding of the facts, Mr. Swearingen, did either

21   Mr. Cunningham or Mr. Fuller file a -- I don't know the correct

22   term -- a grievance or a complaint from these incidents?

23        ATTORNEY SWEARINGEN:  I do not know the answer to

24   that question.  That would be another location that this

25   information could be found in.

1          THE COURT:  All right.  So, look, Ms. Pappy, with

2    respect to 199, 200, and 201, the County's obligation is to

3    perform a diligent search and a reasonable inquiry.  You know

4    the specific date of the incident requested for Mr. Rodriguez,

5    which is June 1st.

6          Mr. Swearingen does not have the specific dates for

7    the alleged incidents involving Mr. Cunningham and Mr. Fuller.

8    But I -- I am directing the County to undertake a diligent

9    search for -- if there are any incident reports involving

10   allegations of physical assaults by staff members on these

11   gentlemen.  That's what Mr. Swearingen is looking for.

12         ATTORNEY PAPPY:  Well, can I clarify?

13         First of all, do we even know a year?  Any idea?

14         THE COURT:  It sounds like the answer is no.  I asked

15   Mr. Swearingen for a date, and the answer is no.

16         I don't even know when these gentlemen were in County

17   custody.  So we're -- and I don't know how the County tracks

18   its documents or incident reports.

19         ATTORNEY PAPPY:  So here's the problem.  If they are

20   being less than truthful, I think -- and I don't even have a

21   date.  Like I don't even know a year.  I mean, was it ten years

22   ago?  Was it five years ago?

23         Counsel knows about it, so I'm assuming they've

24   talked to these people.  They must have told them, at least,

25   this happened last year or this happened recently.  We'll look.

1   But I don't -- body-worn footage only started a couple of

2   months ago.  So if these are old, they're not going to have

3   anything.  But we'll look -- we'll look by booking number and

4   see what we come up with on these two guys.  If there's any

5   incident report or a grievance report.

6           THE COURT:  Is the County, to your knowledge,

7   Ms. Pappy, able to search by booking number for a particular

8   individual and then --

9           ATTORNEY PAPPY:  Yes.

10          THE COURT:  -- populate incident reports --

11          ATTORNEY PAPPY:  Yes.

12          THE COURT:  -- related to that individual?

13          ATTORNEY PAPPY:  Yes.

14          I think we've produced some -- we -- we have -- if

15  these two are on an incident report, that incident report was

16  produced to plaintiffs already.  But we'll do an independent

17  search, if we can find anything.

18          But if there's no -- if I can't find anything

19  because, you know, the County didn't file an incident report --

20  and it should have happened if the plaintiffs are going to

21  claim that -- I can't search video without -- if I can't tie

22  the two.  So I'll communicate with counsel about that.

23          THE COURT:  Then the answer would be, after a

24  diligent search and a reasonable inquiry, there's -- can't give

25  any responsive documents.

```
1              ATTORNEY PAPPY:  Sure.

2              THE COURT:  What's the County's position with respect

3    to number 202?

4              And that is -- it's incident reports -- other

5    documents relating to incidents for the plaintiffs.

6              I think there's -- are there 12 named plaintiffs,

7    Mr. Swearingen?  14.  Excuse me.

8              ATTORNEY PAPPY:  Two (indiscernible) two.  I don't

9    know -- I mean, what's an incident?  Are they talking about

10   excessive force?  Are they talking about who dropped their food

11   on the floor?  I don't know.

12             THE COURT:  What are you looking for, Mr. Swearingen?

13             ATTORNEY SWEARINGEN:  We've clarified that the word

14   "incident" means "incident report."

15             THE COURT:  Okay.

16             ATTORNEY SWEARINGEN:  We've already clarified that

17   (indiscernible) her.

18             THE COURT:  All right.  Ms. Pappy, do you have any

19   objection to producing incident reports for those 14

20   individuals?

21             ATTORNEY PAPPY:  Reports?  No, if they exist.

22   Unfortunately, I never heard that this was limited.

23             But I thought they wanted the video.

24             THE COURT:  Well, there may not be any video.

25             ATTORNEY PAPPY:  Yeah.  But just -- (indiscernible).
```

1          THE COURT:  (Indiscernible) -- look, if one of these

2    incidents occurred in the last month, and it's on -- if there's

3    body cam video --

4          ATTORNEY PAPPY:  Right.

5          THE COURT:  -- then you're going to produce it?  But

6    if there's not, then there's not.

7          ATTORNEY PAPPY:  So IRs.  Yes.  IRs and any -- any

8    video.  Whether it's video cameras or body-worn, I will look

9    for.

10          THE COURT:  All right.  Those were the four that I

11    wished to discuss.

12          And, Mr. Swearingen, I appreciate you letting

13    Ms. Pappy go first.

14          I would provide you an opportunity to be heard as to

15    the remaining requests for production.

16          If you want to give me specific examples, you're

17    welcome to do so.  And if you want a couple of minutes to --

18    I'm going to give you ten minutes, and Ms. Pappy ten minutes as

19    well.

20          If you want a couple of minutes right now to sort of

21    organize how you wish to present that to me, I'm happy to give

22    it to you because I know there's a lot of RFPs at issue.  But

23    if you're ready to go, that's okay, too.

24          ATTORNEY SWEARINGEN:  I'm ready to go, your Honor.

25          THE COURT:  Go ahead, sir.

1            ATTORNEY SWEARINGEN:  First, as to the tentative,

2    your Honor.

3            The tentative says that -- at document -- docket

4    entry 471, plaintiffs move to compel further responses.  I just

5    want to clarify that we have not moved to compel.

6            The joint list was produced in response to the

7    Court's November 22nd order, Docket 454, asking the parties to

8    jointly communicate to the Court disputed written discovery

9    RFPs, rogs, and RFAs.  We have not yet moved to compel, and the

10   production date has not yet passed.  The production date for

11   these documents is December 22nd.  So I just wanted to clarify

12   that we haven't moved to compel, and that we would reserve our

13   rights to do so.

14           THE COURT:  I'm not quite understanding your -- the

15   distinction you're drawing, Mr. Swearingen.  The -- you know

16   what the defendants are agreeing to do.  And I told you that I

17   am going to resolve every discovery dispute today.  And I

18   intend to do that, to allow you to meet the other deadlines

19   that have been set in the case.

20           I'm not precluding you from -- if you think the

21   defendants, for example -- if I -- well, what -- what is --

22   what's the distinction that you're trying to draw?

23           And I'm not trying to pick at you, but I really do

24   just want to understand.

25           ATTORNEY SWEARINGEN:  Just, procedurally, we

1   haven't -- we haven't moved.  We haven't filed an oral or a

2   written motion to compel documents responsive to RFP set 5.

3           The vast majority of the disputes that are in that

4   list that was submitted are on RFP set 5.

5           THE COURT:  Okay.

6           ATTORNEY SWEARINGEN:  And I want to reserve our

7   right.  We have not yet seen the productions.  I want to

8   reserve plaintiffs' right to move to compel if those

9   productions are insufficient.

10          THE COURT:  I see what you're saying.  And what I am

11  going to do today is to resolve the scope of those forthcoming

12  productions, understanding -- as I believe you were saying,

13  Mr. Swearingen -- that if there's something that I determine

14  you're entitled to and you don't get it, that I'm not

15  precluding you from seeking further relief to -- to obtain

16  those documents.

17          Is that what you're getting at?

18          ATTORNEY SWEARINGEN:  Yes, your Honor.

19          THE COURT:  Oh, okay.  Then that's fine.  I just

20  didn't understand that.

21          ATTORNEY SWEARINGEN:  Okay.

22          THE COURT:  I wasn't ever intending to say that you

23  can't -- if I say the County has got to do something and they

24  don't do it, that you're precluded from coming back and asking

25  for it.

1          ATTORNEY SWEARINGEN:  Thank you.

2          THE COURT:  Okay.  Go ahead.

3          ATTORNEY SWEARINGEN:  The Court's order states that

4   the majority of the RFPs on the joint list of disputed items

5   are overbroad and not proportional to the needs of the case.

6   Several times, throughout this litigation at discovery

7   hearings, the defense counsel has mentioned the word

8   "proportionality," but never endeavored to identify what those

9   factors are or how they -- they factor into this case.

10          Proportionality, as is discussed in Judge Battaglia's

11   discovery manual, requires consideration of the importance of

12   the issues at stake in the action, the amount in controversy,

13   the parties' relative access to relevant information, the

14   parties' resources, the importance of the discovery in

15   resolving the issues, and whether the burden or the expense of

16   the discovery outweighs the benefit; the likelihood.

17          I would like to go into each of those factors.

18   Because Judge Battaglia's discovery manual says that a party

19   may not refuse discovery simply by making a boilerplate

20   objection that the discovery is not proportional.  That is the

21   only thing that we've received in this case to date.

22          If we take the first proportionality factor, that is

23   the importance of the issues at stake in the action.  Judge

24   Battaglia's discovery manual says that in considering the

25   importance of the issues at stake in the action, that first

1    factor ranks ahead of the strength of other factors, including

2    the amount in controversy.

3            And this premise -- this is Judge Battaglia's order

4    that I'm quoting from.

5            "This premise dates back to the 1983 amendments

6            where the rules drafters note that this is

7            measured in, quote, philosophic, social, or

8            institutional terms.  This recognized that, quote,

9            many cases in public policy spheres" -- it goes on

10           to say, "may have importance beyond the

11           monetary -- monetary amount involved."

12           This case is one of extreme public policy importance.

13   There is, to my knowledge, no other jail case in America that

14   is as extensive as this one.  In California, I'm not aware of

15   any conditions of confinement case that's ever been litigated

16   as big as this one in San Diego County jail.

17           As to the specific jail system, concerns have been

18   expressed and damning findings have been made in recent

19   years -- in very recent years by the state auditor, the

20   Attorney General, state legislators, CLERB, the County Board of

21   Supervisors, the San Diego County Grand Jury.

22           People who work at the sheriff's department, people

23   who are incarcerated in the sheriff's jails, the County's own

24   medical examiners who perform autopsies on people who die in

25   the jail, many families of people who are incarcerated,

1    community groups, and the editorial board of the San Diego

2    *Union Tribune*, that has repeatedly called for reforms after

3    publishing reports on death behind (indiscernible).

4              This case involves constitutional and statutory

5    claims that are essential to a safe and fair community.

6              County is -- over the past two decades has spent tens

7    of millions of dollars in payments to -- to families for

8    wrongful death claims.

9              The second proportionality factor is the amount in

10   controversy.  Judge Battaglia's discovery manual notes that one

11   of the factors that goes to proportionality and justifies the

12   scope of discovery is the party's resources.

13             This year the County Board of Supervisors unanimously

14   adopted a new $8.17 billion budget.  Of that, the sheriff's

15   department is over half.  The sheriff's department, alone, is

16   $4.7 billion on an annual basis.

17             Number three is the party's relative access to

18   relevant information.  Judge Battaglia's discovery manual talks

19   about informational asymmetries.

20             Other than the public reports by oversight agencies,

21   the only source of information as to what happens in the jail

22   is the defendants themselves.

23             The fourth factor is the parties' resources.  Again,

24   the County and the sheriff's department have billion-dollar

25   budgets.  And the sheriff's department, alone, takes up over

1    half of the entire County's budget.

2              Fifth, the importance of the discovery in resolving

3    the issues.

4              I acknowledge your Honor's concerns as to the

5    overbreadth -- the apparent overbreadth of some of the -- the

6    RFPs, based on the way they are drafted.  Including as to the

7    RFP 28, that the Court previously discussed.

8              But I, too, have gone through all of these.  I was

9    one of the people who drafted these.  And I'm -- and I'm

10   confident that all of these relate to issues that are very

11   important to deciding the factual record of the third amended

12   complaint.

13             I'll go through several examples of defendants'

14   responses.  But I will say that, to date, defendants have

15   produced very, very little responsive information that is

16   actually going to help the Court and the parties ascertain

17   whether or not the allegations in the third amended

18   complaint -- the complaint that has survived two rounds of

19   motions to dismiss -- are valid and -- and have (indiscernible)

20   or not.

21             The final factor is whether the burden or expense of

22   the proposed discovery outweighs the likely benefit.  The

23   defendants have never identified a single instance where the

24   burden or expense outweighs the likely benefit.

25             They haven't put dollar amounts to it.  They haven't

1    said this will take this many hours, for the vast majority of

2    them.  I should -- I should make clear -- I should go back and

3    say that in several instances, they -- they substantiated that

4    this will take a certain amount of hours.  But for the vast

5    majority, they have not done so.  And that is the sixth factor.

6             I think that the proportionality can be viewed as in

7    terms of both the number of discovery requests and the specific

8    requests themselves.

9             As to number, a couple comparative points.  In

10   Monterey County -- well, first, in this case, 247 requests for

11   productions have been propounded and served by plaintiffs.

12            In Monterey County, a jail case that settled

13   approximately ten years ago, the defendants in that case

14   responded to 466 RFPs.

15            Discovery in that case stopped due to a productive

16   settlement discussion that began right around the same stage as

17   where we are in this litigation.  It was a month after a

18   preliminary injunction motion was granted and class

19   certification was approved.  By this time, defendants had

20   produced documents ranging in the six -- in the six figures.

21            This case, in contrast to Monterey County jail,

22   involves a much larger system.  Monterey County jail has one

23   jail facility.  This system has seven.

24            It involved many, many more people.  Monterey County

25   jail incarcerates, on average, approximately 900 people on any

1  given day.  This jail over 4,000.  And the claims in the

2  Monterey County jail case were much narrower than the claims

3  here.  There were approximately four similar claims to what we

4  have here.  This case has nine claims.

5         Another comparison can be made to *Johnson versus L.A.*

6  *County*.  That subject matter, too, was much more limited.  It

7  was a large system.  It was actually larger than San Diego, as

8  you can imagine.  But that case was limited to a single ADA

9  case on behalf of people with mobility disabilities.  In that

10  case, plaintiffs propounded and defendants responded to at

11  least 113 RFPs.

12         So, again, I think that we're just focusing on the

13  number of RFPs that have been issued to -- served to date in

14  this case.  They are much, much smaller than comparative cases.

15         THE COURT:  Can I ask you a question, Mr. Swearingen?

16         ATTORNEY SWEARINGEN:  Yes.

17         THE COURT:  I don't think that anything in my

18  tentative suggested that you should be limited or that there

19  are too many RFPs, generally.  In fact, at the case management

20  conference, I agreed to the plaintiffs' request not to limit

21  RFPs.  So I -- that's not the issue before me.  And that's --

22         ATTORNEY SWEARINGEN:  (Indiscernible.)

23         THE COURT:  -- as I see it.  I don't see that as the

24  problem.  The issue I'm having is really the substance of each

25  of the RFPs.

1       So just so we're all clear, I -- you know, I didn't
2   set limits, at your request.
3       ATTORNEY SWEARINGEN:  I very much appreciate that
4   clarification.
5       I didn't know if the Court's tentative was to express
6   concern as to the proportionality as to the number of RFPs or
7   to the substance of the specific RFPs.  I'll turn to the
8   specific substance of the RFPs now.
9       THE COURT:  Yeah.  That, I think, is going to be --
10  like I said, I didn't just say there's so many here, I'm not
11  looking at them.  As I said, I reviewed every RFP in your joint
12  list.  And I -- I mean, number 28 was one of a number of
13  examples where I just -- some of them seemed to be moot.  But
14  I -- the vast majority, I just -- we can -- I'm happy to talk
15  about them in the context that you -- and after -- that you
16  wish, after I give Ms. Pappy a chance to respond.
17      So go ahead, Mr. Swearingen.
18      ATTORNEY SWEARINGEN:  Sure.
19      As to the specific RFPs, plaintiffs have narrowed,
20  through meet and confer, our requests in two major ways.
21      First, we have limited the overwhelming vast majority
22  of requests to responsive documents from January 2021 to the
23  present.
24      Second, we have narrowed our requests to four types
25  of information.  One, policies and procedures.  Two, training

1    materials.  Three, evidence of practice.  And, four, audits and

2    quality assurance or quality improvement documents.  I would

3    like to go through each of those briefly.

4            As to the first one, policies and procedures, there

5    is no dispute.  Defendants have already said they're going to

6    produce all of the policies and procedures.  That can be

7    checked off.

8            As to the second, training materials, we're simply

9    asking for what training materials are presented to staff.  And

10   whether or not all of the staff, some of staff, or no staff

11   received that training.

12           The third one is -- the third category is probably

13   the meatiest, if you will.  That's evidence of practice.  As I

14   related earlier, there is a lot in TechCare that can be

15   generated that's responsive to a lot of these reports.  Other

16   sources that are commonly created are documents in the -- are

17   documents that are commonly or ordinarily created in the course

18   of -- in the normal course of business.  These are logs, lists,

19   summaries, reports, and memos on specific items.

20           The last issue is -- or the fourth way that we would

21   narrow this, the last category of documents that we seek, are

22   quality assurance, quality control documents.  These are audits

23   and peer reviews.  That type of documentation.

24           Interrogatory 23 asks for a list of all of the

25   quality assurance and quality control documents that -- that

1    defendants have.  They have said we -- we served -- we gave you

2    these documents at Bate range -- let's just say 140 to 200.

3    Those are the extent of our quality assurance processes.  So if

4    that truly is the total extent of their audits, quality

5    control, and quality assurance documents, then -- then that

6    universe is -- is a small universe of information.

7            But without the information that we've requested in

8    these RFPs, as I said earlier, plaintiffs will not be able to

9    develop a factual record to present to the Court for the

10   parties to evaluate that will meaningfully assist the

11   resolution of the claims in this action.  I would like to go

12   through some of the -- the specific RFPs, and show you some of

13   those deficiencies.

14           I'll start with RFP 182.  I'll take little breaks, so

15   that people can go to those, if necessary; or I'll just read

16   them.

17           THE COURT:  I'm there.  Go ahead.

18           ATTORNEY SWEARINGEN:  182 calls for all documents,

19   including but not limited to logs, audits, and training

20   materials relating to (indiscernible) response, including

21   response times to emergency intercom use by incarcerated

22   people.

23           Third amended complaint has several examples of

24   people trying to use the intercoms and not receiving prompt

25   responses by staff.  The third amended complaint alleges that

1   people have died, whether being beaten to death by their

2   cells -- by being beaten to death by their cellmates in cells

3   adjacent to where somebody has pressed the intercom button and

4   saying, "There is a problem.  Please come.  There's an

5   emergency."  The third amended complaint has also discussed how

6   nonfunctioning intercom buttons or the lack of the jail's

7   prompt response has led to people, for days, trying to receive

8   and request emergency help and not getting it from medical or

9   custody staff.

10          Defendants' responded to RFP 182 by saying all

11  policies, procedures, and green sheets have been or will be

12  produced.  And these are the responsive documents in total.

13          Now, we know that to not be true.  How do we know

14  that to not be true?  Because Captain Adamos (phonetic) filed a

15  declaration at docket 153-2 that discusses a facility

16  commander's directive about checking intercom buttons, as well

17  as a first and second floor daily intercom check.

18          Captain Adamos states that this information will be

19  entered into JIMS to indicate that the intercom check has been

20  completed, and any discrepancies identified in the notes.

21          That -- one of the policies and procedures that

22  defendants have -- have -- have filed in this case is San Diego

23  County -- it was attached to the Adamos declaration.  It was

24  the green sheet, 1.61.C.2.  States that, at the start of each

25  shift, control deputies will create a 10-dot -- a 10-8 briefed

1    log entry.  The deputy will note in the description field a

2    volume check and an intercom check conducted.  If any issues

3    are found, they will note the nature of the issue and when the

4    sergeant was notified.  Sergeants assigned to the movement or

5    security will visually inspect each touch screen once per shift

6    to ensure (indiscernible) function.  This will be documented in

7    the note section of JIMS, in the supervisory log review entry.

8    The maintenance and central jail administrative notification

9    will be required for any intercom not found in working order.

10            These are logs and lists that we're talking about.

11   In many instances, plaintiffs don't have the precise language

12   of the name of the document the defendants have in their

13   possession.  That is why the document requests are drafted in a

14   way that I believe the Court perceives them to be broadly

15   worded, in many instances.

16            For many months, plaintiffs requested post orders,

17   for example.  Post orders are the job description of what

18   different custody staff need to do at any given station.  Over

19   and over, defense counsel told us, "We don't know what you mean

20   by post orders.  The -- the -- the jail doesn't have post

21   orders."

22            We debated this for a month.  We said there should be

23   post orders.  There should be documents called post orders.

24   Maybe something else of a similar nature.

25            Defendants said, "No, no such thing exists."  And

1    finally, after months and months of going back and forth,

2    defendants produced voluminous documents that make up a

3    substantial portion of all of the documents we've received in

4    RFP set 3 that are clearly titled "post orders."

5              We know that post orders exist because "post order"

6    is a term, like "safety check," that exists in a lot of jails.

7    But we don't know the names of a facility commander's

8    directive; or a first and second floor daily intercom check; or

9    a supervisory log review entry of intercom checks; or a 10-8

10   brief log entry.  That's why we drafted our requests to

11   encompass logs, lists, summaries, and reports that are normally

12   kept.

13             When we met and conferred with -- we met and

14   conferred with the defendants for the first time on RFP set 5

15   on November 16th.  These documents requests were issued on

16   September 1st.  Defendants responses were not served on us, I

17   believe, until the -- November 10th.  Is that right?

18             THE COURT:  That was pursuant to my order, yes.

19             ATTORNEY SWEARINGEN:  Pursuant to your order.

20             We did not meet and confer until November 16th.  At

21   that time, defense counsel said she's not going to search for

22   every -- for the types of documents that we were discussing on

23   that call unless plaintiffs' counsel specifically agrees that

24   there's a narrow, narrow set of documents that satisfies this

25   discovery request.  And only if plaintiffs' counsel agrees that

1    that will be the totality of documents that are -- that -- that

2    are produced in this litigation, will defense counsel even

3    agree to -- to search for and discuss the types of documents

4    that are in their possession.

5         As a result, we're left with plaintiffs' and

6    defendants' positions in a joint dispute of written discovery

7    that appears at docket entry 466.

8         As I said, we're looking for a narrow set of

9    documents.  Just these four sets of documents:  Policies and

10   procedures; evidence of what the training is and whether or not

11   no staff, all staff, or just some staff have been trained on

12   it; and what really those documents, the evidence of the

13   practice is.

14        Let me focus the Court and counsel's attention to RFP

15   33.  This is from RFP set 3.  I'm going to go back to RFP set 5

16   documents.  But this is an important one because this has been

17   an issue for a long time in this case.  And I think that all of

18   the parties and the Court understands the importance of

19   medication assisted therapy.  This is what's commonly referred

20   to as M.A.T., M-A-T.

21        RFP 33 requests all documents and communications

22   relating to identifying, responding to, housing, treating,

23   monitoring, and/or tracking incarcerated persons in the

24   sheriff's department's medication assisted treatment, M.A.T.

25   program, from January 1, 2021, to the present.

1          Defendants' responded that they produced the policies

2    and procedures, green sheets only.  The statement in their

3    chart says that they have produced or agreed to produce lists

4    or logs containing information about withdrawal, but nothing

5    has been produced yet

6          Lists or information about withdrawal tell us nothing

7    about the number of people who have -- who have opioid use

8    disorder; the number of people who have opioid use disorder who

9    are receiving that; the number of people who -- who have opioid

10   use disorder who received M.A.T. from the community or if it's

11   originating from the jail itself.  The jail has previously

12   said, "This number of people are on M.A.T."

13         But if we only receive logs or lists related to

14   withdrawal, we're not going to get all of those people or any

15   idea of how many people are incarcerated with substance -- with

16   specifically opioid use disorder who are at risk of overdosing

17   in the jail facilities because they haven't received M.A.T..

18         THE COURT:  Your -- your RFP, as framed, would

19   require the County to produce every single communication

20   between any county employee having anything to do with -- with

21   M.A.T.

22         ATTORNEY SWEARINGEN:  You're right, your Honor.

23         THE COURT:  And that is the fundamental problem that

24   we are having, Mr. Swearingen.  Is I don't disagree with you on

25   the importance of the case and the amount at stake.  It's not a

1    monetary amount.  It's declaratory injunctive relief that is

2    important.  I think everybody agrees on that.

3         It is -- but what I'm struggling with, sir, is that

4    the -- you know, even, you know, considering the

5    proportionality factors, and factor five in particular is

6    looking at the discovery requests, they are -- I just --

7    exceptionally broad.  And that is -- and they're -- and they're

8    exceptionally broad, even though I did not place limits on the

9    plaintiffs -- the number of RFPs the plaintiffs could serve.

10   And that's where -- that's where I am struggling.

11        And so that -- you raised number 33.  That's one of

12   the ones that I highlighted in my notes, going through the

13   RFPs.  Was that I -- I mean, here, we actually have the -- the

14   search term generated 1.9 million results.  I mean, I don't

15   know if those de-duped.  We don't need to talk about that.  But

16   that -- that's the challenge, Mr. Swearingen.

17        ATTORNEY SWEARINGEN:  And the challenge for us -- I

18   appreciate that, your Honor.  That makes sense to me.  I

19   appreciate the Court's concern about the way that they are

20   drafted.

21        Plaintiffs anticipated, through meet and confer, that

22   we would be able to discuss what types of documents that we're

23   looking for, what kinds of documents exist.

24        Those meet-and-confers have not been productive.

25   They effectively stopped on November 17th, when -- when

1    Ms. Pappy informed us that she will not search for any

2    documents -- will not identify whether any documents exist,

3    unless plaintiffs agree to a very, very narrow subset in

4    advance.  And that that subset will satisfy defendants'

5    production obligations.

6            And then we went right into -- to spending all of the

7    time drafting the joint list of disputes.  We've met and

8    conferred a little bit since then.  There have been phone

9    calls, email, and letter communications.  But I -- I -- I do

10   believe that the plaintiffs' narrowing to documents from

11   January 2021 and these four categories -- one of which I think

12   that there's no dispute.  And the other three, I think they're

13   readily apparent.  Again, the number three, the evidence of

14   practice is going to be challenging at times because plaintiffs

15   don't know the names of the specific documents.  And the

16   defendants have been unwilling to produce documents unless we

17   identify -- or unwilling to -- to identify what documents are

18   in their possession unless we first identify what those

19   documents are.

20           THE COURT:  I understand what you mean with respect

21   to policies and procedures, including green sheets.  And it

22   sounds like that's not in dispute.  I think I understand what

23   you mean with respect to training materials, just generally.

24           As we're looking at RFP 33, at "documents pertaining

25   to medication-assisted treatment generally; all logs, lists, or

1   summaries outside of an individual person's records, that

2   document the process," what does that mean?

3            ATTORNEY SWEARINGEN:   It means is the jail monitoring

4   how many people are on its medication-assisted therapy list?

5   Is there a way to generate that from TechCare, which I believe

6   there should be.   How does the jail keep track of those people

7   who receive medication-assisted therapy?

8            Again, as we've already discussed in this meeting,

9   counsel's already said that TechCare can generate lists or --

10  I'm not sure if it was TechCare or a different system.   But

11  there's a system that the defendants operate that can generate

12  which lists -- I'm sorry -- which medications people are

13  receiving.

14           I don't have it in front of me.   I do believe that

15  there is a document that we received in this case that shows

16  how many people are on medication-assisted therapy.

17           The -- I -- I believe this information is tracked,

18  and that's the -- the -- the most consequential information

19  that we're trying to understand here, is the question everybody

20  wants to know.   It's what Supervisor Fletcher wanted to know.

21  What percentage of people who require medication-assisted

22  therapy are receiving it?

23           THE COURT:   You were going through RFP 33,

24  Mr. Swearingen.   Were there additional RFPs you wish to

25  address?

1           ATTORNEY SWEARINGEN:  There are, your Honor.

2           THE COURT:  I had said ten minutes.  And I'm not --

3    I'm going to give you more time, Mr. Swearingen.  But we still

4    need to address your request for additional RFPs, and we still

5    need to address your -- the parties' joint motion to continue.

6           Before you proceed, I want to turn to Ms. Pappy with

7    a question.

8           Do you --

9           ATTORNEY PAPPY:  You're going to ask me a question?

10          THE COURT:  Yes.  I'm going to ask you a question,

11   yes.

12          ATTORNEY PAPPY:  I thought you wanted me to ask you a

13   question.

14          THE COURT:  No.  Not at this point.  Thank you,

15   though.

16          ATTORNEY PAPPY:  Okay.

17          THE COURT:  Are the -- the -- the plaintiffs --

18   excuse me.  The defendants' responses to the plaintiffs' fifth

19   set of requests for production, those were not included in the

20   binders that Ms. Chartoff gave me because they hadn't been

21   provided yet.  They are with the declaration of Ms. Grunfeld.

22   Correct?

23          Or, no.  Excuse me.  They were -- they were an

24   exhibit to the joint report.  Excuse me.  That's what I meant

25   to say.

1          ATTORNEY PAPPY:  (Indiscernible.)

2          ATTORNEY SWEARINGEN:  I missed the beginning of your

3    question, your Honor.  I'm sorry.

4          THE COURT:  That's okay.  The November 10th responses

5    to your fifth set of requests for production -- I think that's

6    numbers 88 through 240 something, those were attached to

7    Ms. Grunfeld -- to the parties' joint report.  Correct?

8          ATTORNEY SWEARINGEN:  Correct, your Honor.

9          THE COURT:  That's what I -- that's what I

10   (indiscernible).

11         Ms. Pappy, let me ask you this.  Have discussions

12   between the parties as to the County's willingness to

13   produce -- what documents the County is willing to produce,

14   have they broken down?  Are you at an impasse?

15         ATTORNEY PAPPY:  (Indiscernible.)

16         THE COURT:  Okay.  All right.  Here's what we're

17   going to do.

18         I need about a two-minute break to think through how

19   we're going to best proceed with this hearing because I do want

20   to get to your additional RFPs.  Here's what I want you to do.

21   Actually, we're going to take a little bit of a longer break.

22   I'm going to give you ten minutes, and here is what I want you

23   to do.  I'm going to turn to the request for the additional

24   RFPs.  And I -- here's how I read these, Mr. Swearingen.

25         I read RFP number 1 -- or proposed -- proposed new

1    RFP number 1 -- and this is Docket 467-1 -- as seeking every

2    single policy and procedure relating to anything having to do

3    with patrol activities that could have some bearing on who is

4    arrested and who is booked, and could have no bearing on that

5    whatsoever.  It could relate to break times.  It could relate

6    to anything.

7             Does R -- proposed RFP number 5, which seeks -- does

8    that seek every single 9-1-1 call made to the sheriff's

9    department from January 1, 2022, to the present?

10             ATTORNEY SWEARINGEN:  It does, your Honor.

11             May I speak to that?

12             THE COURT:  Not yet.  You will.  Yeah, eventually,

13    yes.

14             Here's what I would like you all to do.

15             I haven't -- I haven't heard the County's response to

16    these because I told them they could respond in writing or

17    orally.

18             Have you spoken with Ms. Pappy about these requests?

19             ATTORNEY SWEARINGEN:  No, your Honor.

20             THE COURT:  All right.  Here's what I'm going to have

21    you all do.

22             The -- my concerns, just out of the box on these, are

23    similar to my concerns with the other ones.  It is difficult

24    for me to ascertain if I'm seeking leave -- given that you're

25    seeking leave to propound these, how every 9-1-1 call made to

1  the San Diego County Sheriff's Department for a two-year period

2  is proportional to the needs of the case; or even seeks

3  evidence that's relevant to a claim or a defense.

4        I understand that you are saying that your expert

5  needs statistical data to perform his or her analysis.  And I

6  think you mentioned in your papers that this type -- the type

7  of statistical data upon which your expert is going to rely is

8  that commonly maintained by law enforcement agencies.

9        And I'm looking at page 4 of docket 467-1, which

10  cites to your declaration.

11        I'm going to give you ten minutes to talk to

12  Ms. Pappy about these five proposed RFPs.  And if there is some

13  potential compromise that you all can reach on them, I'm going

14  to come back at 11:45.  I'm going to give you an opportunity to

15  be heard on the other RFPs at issue, Mr. Swearingen.  But I

16  want to see if you all can make some progress.  And I want to

17  speak with the court staff about how we're going to proceed

18  with this hearing this morning.  Okay?

19        Is that okay with you, Mr. -- Mr. Swearingen?

20        ATTORNEY SWEARINGEN:  It is, your Honor.

21        THE COURT:  Ms. Pappy, is that okay with you?

22        ATTORNEY PAPPY:  Yes.

23        Can I use part of my ten minutes to use the

24  facilities?

25        THE COURT:  You may as well, Mr. Swearingen.  Yes, of

1    course.

2           All right.  Thank you, Counsel.

3              (Recess taken.)

4              (Resuming.)

5           THE CLERK:  (Indiscernible.)

6           THE COURT:  Hi.

7           ATTORNEY PAPPY:  Hi.

8           THE COURT:  I don't want to jump around too much.

9           I know we were talking about the, you know, current

10   RFPs.  Then I asked you all to talk about, you know, the

11   proposed RFPs.  And let me tell you what my thinking is, and

12   then we can decide how we best want to use our time together.

13          Mr. Swearingen, you are correct that there hasn't

14   been a formal motion to compel further responses filed.  And

15   you did spend, you know, time compiling the chart that I asked

16   you to, which limited you to -- I think it was a couple of

17   sentences on each RFP.

18          I'm not going to prevent you from filing a -- a

19   motion to compel, as I mentioned earlier, and I think -- what I

20   think probably makes sense is this.  And I -- and then I'll be

21   happy to hear from you both.

22          The schedule is what it is.  The County is producing

23   their documents by December 22nd.  That's correct, Ms. Pappy?

24          ATTORNEY PAPPY:  Yes.

25          THE COURT:  I'm going to think through a briefing

1   schedule on a motion to compel once you get those documents,

2   Mr. Swearingen.

3               I'm not going to change any other dates.  And you

4   know my tentative thinking is that the County's positions

5   appear to be well taken, and the County is going to produce

6   what it does.  And I'm going to give you an opportunity to move

7   to compel.

8               And I'm going to give you an opportunity to move to

9   compel on both the -- whether the County has produced what they

10  said they were going to produce -- and hopefully that's not

11  going to be an issue.  But I'm going to give you an opportunity

12  to move to compel if you think that the -- the County should

13  have produced a category of documents beyond what they did.

14              So you're going to have that -- that chance.  And I'm

15  still going to let you make whatever points you want to make,

16  if you think it's appropriate as to the other RFPs,

17  Mr. Swearingen.  But I'm telling you that now because it may

18  counsel in favor of regrouping with your colleagues and

19  deciding, you know, how you wish to proceed; which RFPs you

20  wish to move to compel on formally.  And then you can proceed

21  as you deem appropriate.

22              With respect to the additional RFPs that you are

23  seeking leave to propound, I'm not sure of the exact definition

24  of scrivener's error.  It sounds kind of Dickensian in a way.

25  But the bottom line is you meant to include him, and you forgot

1    to.  And -- and that happens.  I -- and they are -- I

2    understand that the general nature of the information that you

3    are seeking is relevant to the plaintiffs' ninth claim -- ninth

4    cause of action.  So I -- I am inclined to allow the plaintiffs

5    to propound, you know, RFPs specific to that cause of action.

6            The question really, Mr. Swearingen, is whether you

7    want to propound those specific RFPs or whether you want to

8    rethink it in light of my tentative rulings on the other RFPs

9    at issue and what we were just talking about with respect to do

10   you truly want me to evaluate whether the plaintiffs are

11   entitled to every single 9-1-1 call for a two-year period.

12           I mean, I'll look at it.  And I'll look at it with an

13   open mind and a fresh set of eyes if you do.

14           But it would strike me -- and what I wanted you to

15   talk to Ms. Pappy about was whether there could be some meeting

16   of the minds as to what information do the plaintiffs need for

17   your experts to perform their analysis?  And is there a way the

18   parties can work together to figure that out and design

19   appropriate RFPs that can allow you to proceed?  And if you

20   can't, I'll rule on it.  No problem.  But that's what I wanted

21   you all to talk about.

22           So with -- with all of that in mind, how do you think

23   we should proceed, Mr. Swearingen?

24           ATTORNEY SWEARINGEN:  Can I address the limited set

25   of five additional RFPs, first?

1              THE COURT:  Sure.  Sure.

2              ATTORNEY SWEARINGEN:  Ms. Pappy and I just met and

3    conferred.  (Indiscernible) communications broke down over

4    whether or not -- we didn't get into the granularity of each

5    request because there was a disagreement on whether or not

6    they're relevant to the complaint.

7              The -- the -- the three datasets -- I've talked to

8    our expert -- he says that he routinely obtains these through

9    FOIA, often without charge.  If he is ever charged for time

10   spent -- for actually IT time spent -- usually he meets with

11   the IT person, it take two to three hours at most to get any of

12   these datasets.  They're publicly available.  They're --

13   they're obtained either through FOIA or through the state law

14   equivalent, like the California Records Act.  He has entire

15   datasets like this for 15 years for cities that include San

16   José.  Each of these three specific requests, he asked me to

17   request.

18             THE COURT:  Okay.

19             ATTORNEY SWEARINGEN:  I was -- I should have

20   corrected myself.  I was wrong, earlier, that we didn't do any

21   meet-and-confer on these issues.  I believe that I did ask the

22   County to provide a set of variables or set -- you know,

23   columns of information that were kept in these, to see if we

24   can limit the datasets, if that would be helpful.  But there

25   was no -- but I -- we haven't received that list.

1        So as to those three datasets, my understanding is

2    that they're -- you have to get to the right IT person within

3    the department to know how to export it to an Excel -- an Excel

4    data sheet.  But it can be done very, very quickly, in two to

5    three hours.

6        And, again, my expert, who has dozens and dozens of

7    these types of files, says he's never paid more than 3- to 400

8    dollars in administrative time through a FOIA or comparable

9    request.

10        THE COURT:  Okay.  And you're talking about proposed

11    RFPs 3, 4, and 5, Mr. Swearingen?

12        ATTORNEY SWEARINGEN:  Yes, your Honor.

13        THE COURT:  So -- okay.  And you're saying that the

14    talks broke down in court today because of a disagreement as to

15    whether or not this -- this information is relevant to the

16    ninth cause of action?

17        ATTORNEY SWEARINGEN:  Yes, your Honor.

18        THE COURT:  Well, given that Ms. Pappy has not had an

19    opportunity to be heard yet, let me hear from her.  And then

20    we'll come back, and we'll -- we'll figure this out.

21        Ms. Pappy, why don't you talk to me about the

22    proposed additional RFPs that's Docket 67-1.

23        ATTORNEY PAPPY:  Well, I don't understand why we're

24    arguing about it.  I mean, even if you did that, you accept the

25    issue that it was a mistake, you're going to allow them to be

 1   served or respond to them, I would certainly hope that counsel

 2   would narrow them.  I'm sort of curious as to why a FOIA

 3   request hasn't been made if it only takes two or three hours

 4   and $300.

 5          But what I would suggest is, since you have -- you

 6   know, seem inclined to allow them to serve them, serve them,

 7   and we'll respond.

 8          I would hope that plaintiffs' counsel would take into

 9   account some of the things you've said about overbreadth.  And

10   I'm happy to talk about overbreadth.  We didn't have any

11   meet-and-confer, other than "Will you agree to these?" and I

12   said "no."

13          So serve them and we'll respond, or give me a date to

14   respond by and we'll respond.

15          THE COURT:  When Ms. Pappy takes -- let's say you --

16   let's say I grant the motion, Mr. Swearingen, and direct you to

17   propound them tomorrow and Ms. Pappy gives them to her client,

18   I'm not an IT person.  (Indiscernible) -- understanding that,

19   when the sheriff's department IT person sees the phrase "All

20   electronic data relating to officer-initiated field contacts,

21   searches, arrests, use of force, and criminal charges for two

22   years," I read that to seek literally every electronic record

23   virtually in the custody of the sheriff's department, other

24   than HR.

25          You -- you meant to say, it's not just field contacts

1    but it also includes any piece of electronic data related to

2    searches.  It includes every piece of electronic data relating

3    to arrests.  It includes every piece of electronic data

4    relating to use of force.  And it includes every piece of

5    electronic data maintained by the sheriff's department relating

6    to criminal charges.

7            I -- again, I'm not advocating for the County.  But

8    I'm just -- I am trying to help you all move forward.  That

9    seems, to me, to be an extraordinarily massive dataset.  And I

10   just want to make sure that that's -- that's what you are

11   saying your expert needs.

12           ATTORNEY SWEARINGEN:  These requests, I worked with

13   my expert --

14           THE COURT:  Um-hmm.

15           ATTORNEY SWEARINGEN:  -- to draft and formulate.

16   This goes back to the entire difficulty of the RFP sets in

17   getting responsive information from defendants.

18           I don't know -- and he doesn't know -- the exact name

19   of the datasets that -- that San Diego County maintains.  My

20   expert says that there are just a handful of different

21   companies that maintain these datasets, across the country.

22           THE COURT:  Stop real quick.

23           So you're not talking about going into the County's

24   records and producing every electronic piece of paper that

25   relates to every criminal charge between January 1, '22, and

1   the present?

2           ATTORNEY SWEARINGEN:  No, your Honor.

3           THE COURT:  But you understand that's how it's

4   drafted?

5           ATTORNEY SWEARINGEN:  It's drafted that way because I

6   don't know the name of the dataset.

7           THE COURT:  And that is what I was really hoping you

8   all would talk about in the last 15 minutes.

9           ATTORNEY SWEARINGEN:  I was, too.

10          THE COURT:  Okay.  Here's what we're going to do.

11  I've got -- I am going to grant the County's request for leave

12  to serve the RFPs.  They will be served --

13          ATTORNEY PAPPY:  You mean the plaintiffs' request?

14          THE COURT:  I'm sorry.  Yes.  The plaintiffs'

15  request.  Thank you, Ms. Pappy.

16          I am going to grant the request, and they should be

17  served by tomorrow, Mr. Swearingen.  Serve them by Friday, if

18  you're going to be doing some traveling to get back home.

19          I'll issue an order with when they need to -- when

20  the County needs to respond.  It's probably going to be on a

21  more expedited schedule.

22          But, again, where I don't want to end up is where I

23  fear we may be with all of the RFPs, which is they're --

24  they're -- I was actually going to use the phrase "super

25  broad," which is -- sounds more like (inaudible) my teenage son

1   would say.  But they are very, very broad.  And -- and then I'm

2   left in the same position in a couple of months.  Because I

3   don't think that's what you want.

4          And this is where I would urge you to speak with

5   Ms. Pappy about what datasets the County maintains, and to see

6   if you can -- if there's a specific dataset that she says, yes,

7   this is how we maintain them, you can request that specific

8   dataset; which may be easy to provide.

9          And, again, because it sounds like you're not

10  actually asking for every single recorded 9-1-1 call.  Which

11  is -- when I asked you that, you said, "Yes, that's what I

12  want."  Maybe you and I were talking past each other in a way

13  that I didn't mean to.

14         ATTORNEY SWEARINGEN:  We're asking for every single

15  log of the 9-1-1 calls.  I don't know what they're -- what

16  they're specifically called.

17         But, your Honor, this goes to the heart of this -- of

18  all the items that are on the joint disputed lists that you've

19  received.  And that is, plaintiffs cannot get information from

20  defendants about what documents that they maintain.

21         And unless we are so exact in our description -- and

22  we don't have -- again, when I went through this intercom, the

23  five different types of data the jail regularly maintains as to

24  safety checks, unless -- I'm sorry, intercom checks.  Unless I

25  have those specific names, defense counsel has been unwilling

1   to discuss what those are, what those responsive documents are.

2   And, as a result, it makes -- it makes the meeting and

3   conferring nonexistent.

4          We have, for all of the RFPs that are in the joint

5   list of disputed items, we've spent a tremendous amount of time

6   drafting another letter that said, "Look, we're asking for

7   the -- what we think that -- or we anticipate that these are

8   the specific types of documents that would exist from -- for

9   example, for M.A.T.  The eligibility requirements.  The number

10  of people who are actually opioid use -- who have opioid use

11  disorder.  The number of people who are receiving M.A.T. in the

12  county, from -- from county programs.

13         The amount of people who are -- the number of people

14  who are receiving M.A.T. from county-initiated programs or from

15  jail-initiated programs.  We've gone through that granularity

16  and in another meet-and-confer letter.

17         I don't expect it will be responded to because,

18  often, our meet-and-confer letters are not responded to.  But,

19  as a result, defendants -- if -- if the Court grant -- if the

20  Court finds that the majority of plaintiffs' RFPs are overbroad

21  the way that they're drafted and requires us to move to compel,

22  we'll be in the exact same position, months from now, when

23  we're doing that.  Because defendants have said in their joint

24  statement, over and over, for many, many requests:  You're only

25  going to get policies and procedures; or you're only going to

1    get policies and procedures and this limited dataset that we

2    think we're willing to give you.  Oftentimes, as I just showed

3    with the M-A-T, M.A.T. programs, is not responsive to our

4    request.  That's the fundamental concern that plaintiffs have.

5            THE COURT:  And the fundamental concern that I'm

6    having, Mr. Swearingen, is the breadth of the RFPs as drafted.

7    And I did not limit you in the number of RFPs that you could

8    serve, for that reason.

9            But as we're talking about number 33, every single

10   communication relating to treating anyone with medication

11   assisted treatment -- that's how they are framed.  And I -- the

12   record before me does not reflect intransigence by the County.

13           It -- right now, what is before me are a set of very,

14   very broad RFPs.  And you're right, Mr. Swearingen, we may be

15   in the same place.  It's not going to be months down the road

16   because I'm not going to continue the pretrial dates at this

17   point.  They're going to remain in place.  And I am going to

18   rule on the RFPs that come before me in a motion to compel.

19           But I -- I -- you know, you have said a number of

20   times that this is -- you know, to the effect of this is all

21   the County's fault.  And respectfully, sir, I'm not casting

22   blame on the plaintiffs' side, and I'm not casting blame on the

23   County's side because that is not what I'm seeing.

24           You disagree with the documents the County has

25   offered to provide.  I understand that.  I respect the

1   plaintiffs' position.  But I -- I don't see this as coming from

2   a -- you know, any sort of bad faith by the County.

3           Ms. Pappy, do you wish to be heard on the -- on the

4   RFPs?  On either the joint list?  I gave Mr. Swearingen time.

5   I'm happy to hear from you, too.  Or the -- we've already

6   discussed the motion for leave to serve the additional RFPs.

7           ATTORNEY PAPPY:  Your Honor, I do because there's a

8   long -- long argument, and made a lot of accusations.

9           I wrote myself a note this morning on my paper that

10  says, "Move forward," exclamation point, exclamation point.

11  Because I promised myself I wasn't going to come in here and

12  accuse plaintiffs' counsel of, you know, what I think they're

13  guilty of.

14          I want to move forward.  I disagree with everything

15  that was said about what I allegedly did and didn't do.  Who

16  cares?  We're here and we're now, and we have these disputes

17  that I want to try to resolve.  So I'm going to try very hard

18  to focus on important things that were said.

19          Okay.  The County, to date, has -- actually, as of

20  Sunday -- because I sent them myself -- about 118,000 pages of

21  documents, responsive to all kinds of requests.

22          THE COURT:  I'm sorry.  You said the County has

23  produced 118,000 pages?

24          ATTORNEY PAPPY:  Yeah, 118,000 pages --

25          THE COURT:  Okay.

1          ATTORNEY PAPPY:  -- of documents as of this past

2    Sunday.

3          In terms of putting dollar amounts and amounts of

4    time each and every step of the way, I asked my clients, "Okay.

5    So if the judge ordered you to do this, how long would it

6    take?"  If the Court requires a motion to compel, I will be

7    ready and prepared.  I have a million-dollar-a-month quote from

8    one of the data-hosting services.  A million dollars a month.

9          And I have -- and we are prepared, and I will put

10   those declarations into evidence in response to a motion to

11   compel, which is the information that was provided to

12   plaintiffs' counsel.

13         The number of requests for production of documents

14   isn't indicative of the fact if they're proper or the

15   complications in the case.  If there had been 401 specific

16   requests for production of documents, I wouldn't have blinked

17   an eye about them.  I mean, I'm not happen about 247, but it's

18   a complicated case, with a lot of issues.  If they had been

19   narrow, it would -- wouldn't have been a problem.  Quite

20   frankly, I do redraft these things to be specific to what I

21   think that they want.

22         I want to point out to the Court and make sure

23   there's a record of the fact that there has not been a single

24   drug overdose death in the jail in 2023.  And it is December

25   20th.  And the County and the sheriff are extremely proud of

1    that, given the efforts that they've put forth.

2            Policies and procedures.  Every single policy and

3    procedure that is -- that exists -- that existed before, that

4    has changed because of this case or just changed, has been

5    produced.  I hit send on Sunday.

6            Trainings.  Every single training that we have has

7    been produced, except for what I'm in the process of producing

8    in response to 5.

9            Audits and quality control.  Everything that we have

10   that has been requested -- that I didn't go back to for some

11   other reason -- has been produced.

12           Evidence of practice is, I agree with counsel, where

13   we are tripped up.  Because you get the phrase "All documents,

14   all communications."

15           And proportionality -- I promised I'm going to move

16   forward.  Proportionality is something that I have talked about

17   a lot with plaintiffs' counsel.

18           And one of the errors that I see in the way that this

19   case has been litigated -- which we are now stuck with -- is

20   counsel, on the one hand, tells us that their entire firm --

21   and I have no doubt are extremely (indiscernible) these cases.

22   They filed them throughout the state of California.  And, no,

23   they don't know what County of San Diego's particular

24   terminology is, but they know their stuff.

25           And if there really was an issue of we don't know

1    what this stuff is called, wouldn't proportionality have called

2    for take PMK depos very early, before you serve any document

3    production requests; of persons most knowledgeable about what

4    documents might exist or could be generated or leading to

5    medical issues, mental health issues.  You know, it might be

6    six or seven categories.  It might be, probably -- given my

7    knowledge of the folks now, it might be six people.  But that

8    would have given them more directed discovery requests using

9    our terminology.

10          Post orders is one example that was given.  When I

11    asked my client, "Do you guys have post orders?"  Nobody uses

12    that terminology.  So they said, "No."  I went back to

13    Ms. Chartoff, and she was kind enough to say, "Hey, here's a

14    policy that says 'post orders.'"

15          Great.  Let me give this off to my client.  Because

16    this should give them some direction.  They don't -- they said,

17    "Oh, yeah.  No, no.  We know what we're talking about."  We

18    produced them.

19          Number 182 was something that counsel talked about

20    and specifically said, "Well, we don't know what their

21    terminology is.  We didn't know what we should ask for."  And

22    yet, at the same time, Counsel read off very precise language

23    of documents that we purportedly have and are not producing.

24          The information in JIMS can sometimes be rendered

25    into reports.  Sometimes it can't.  That is something that

1   counsel will find out in the PMK depositions, the PMK

2   depositions that they have coming up.  Because Lieutenant

3   Blackwell -- the be all, end all of JIMS -- can speak to these

4   issues.

5          The notion that because we only produce policies,

6   procedures, and green sheets in response to 182 is because

7   that's all we have in response to 182.  I don't care what all

8   this -- nice things that you can see in JIMS.  You can't

9   necessarily print it out.

10         Now, if Lieutenant Blackwell says in his deposition,

11  "Oh, sure.  I can run you that report," I mean, I'm going to be

12  a little bummed if he says that.  But you better believe we're

13  going to produce the thing.

14         But, you know, the other thing is that these requests

15  are so broad that the other thing that counsel is getting --

16  because I just looked through them -- are logs and invoices of

17  intercom repair that have an immense amount of detail about

18  what the complaint was, when the call was made, and when it was

19  responded to repair it.  I don't think that's responsive to

20  this one.

21         It is responsive to one of the other ones that is

22  incredibly duplicative and overbroad.  And so -- and they're

23  getting.  I understand that counsel doesn't have it yet.  But,

24  you know, requests for production of documents number 5 was

25  just served and responded to.

1          We can fight about whether it was late or not, but it

2    wasn't due by agreement until November.  And we're in December.

3    So all of those documents are coming.  And to sit here and say

4    that we are intentionally hiding documents makes me crazy.  All

5    right?  (Laughing.)

6          So the -- number 33.  I want to talk about that one

7    because that was specifically highlighted by the Court.

8          Number 33, the M.A.T.  That is one that I -- I want

9    to talk about the medical records because I think it's

10   significant.

11         Medical records are not -- cannot be searched --

12   (indiscernible) find information in them.  You can't search

13   them.  You have to look at them.  You have to pull the document

14   up.  When I say "hand search," I mean you have to look at it.

15   And I have repeatedly made the pitch to plaintiffs' counsel,

16   "How can we back into this information?  How can we -- how can

17   I give you lists to back into it?"  So that then we can look

18   at -- at maybe what's on the list and can say, "Yeah, okay.

19   Can you give me, this, this, this, and this?"

20         But each time that I am faced with that, making those

21   offers, what I get in response is, yeah, you can do that, but

22   we still want all of the medical records.

23         And I still take the position that they're not

24   entitled to those or not.  Unless you order me otherwise, I

25   refuse to do it.

1              THE COURT:  I'm sorry.  The medical records for?

2              ATTORNEY PAPPY:  Everybody in the prison.  Everybody

3    that they want.  Everybody in M.A.T.  Everybody for everything.

4    They have -- in one way or another, in 247 or '57 requests,

5    they have asked for the entire medical file of every person

6    incarcerated at the prison.  In some instances -- instances,

7    from when the prison started.  I understand that they've

8    revised that position for this submission to the Court to

9    January 1st of 2021.

10             And I started this conversation with counsel -- I

11   remember because I was in trial in Southern California, and I

12   was in Lake Arrowhead for the weekend.  And I was talking to

13   counsel, in a very productive conversation.  And we were

14   talking about this sort of backing into it concept, as to how

15   can we do this so that I can get you what your experts need

16   without producing -- and -- and Ms. Chartoff was terrific about

17   it.  She said, "You're right.  I'm not sure I want 4,000-plus

18   medical records."

19             And so on December 7th -- that was the September of

20   2023.  On December 7th they sent me a list.  And I'm showing

21   you this.  This included the TechCare report that, you know,

22   allegedly shows that we're hiding information.

23             On this list are 500 -- a request for 570 medical

24   records.  For my people -- and you will see it in a

25   declaration -- to be able to upload or download -- whatever you

 1   want -- the medical records -- even if I knew these people's

 2   names, of 570 people -- for 4,000 people, the client told me it

 3   would take 52 weeks, two people working full time, every single

 4   day, to do it; based on -- on sample runs of -- of downloading.

 5          I used my math, which I promise is not that great.

 6   For 570, it's going to take nine to ten weeks to run these 570

 7   medical reports.

 8          And what this report will tell me -- or what this

 9   email tells me is ten records of people identified as having an

10   opioid use disorder.  I don't -- I'm just supposed to look

11   through 4,000 medical records and find somebody who has an

12   opioid disorder.

13          This is where I said, "What about using these lists?"

14   I even suggested a discovery referee.  Let me give you the

15   lists, and then let's have a pow-wow about it.  It might help

16   to have a discovery referee.  I think it's an expense -- money

17   well spent, so that we are not in here, hopefully fighting

18   about these requests for production of documents; to maybe find

19   some -- some commonality and say, hey, maybe it's only a

20   hundred.  Okay.  We can do that.  We may not be able to get it

21   to you for a couple of months.  We may have to hire a

22   contractor to do it.  But let's have that conversation.  We

23   just never get there.  It stops up here, and we just never get

24   down there.  This is the frustration and the problem that I'm

25   facing.

1        M.A.T.  In response to special interrogatory -- and

2   this is number one.  I wrote it down.  Yeah, special

3   interrogatory number 1.  I have a list of people on M.A.T.

4   protocols that is being produced, and it has something like 7-

5   or 800 people on it.  They're not currently in it.  They may

6   have been in it over -- over time.  And so that will come to

7   them.

8        And, again, that provides to me a function and an

9   ability for them to look at that list.  And their doctor to

10  say, "All right.  You know, give me" -- like these ten seem to

11  be an (indiscernible) time or they -- you know, they're the

12  most recent.  Give me this stuff.  To start a conversation.

13       Let's talk about number 28, the memoranda.  The

14  memoranda originally came up with 349,000 hits through EXI

15  searches.  That's where memoranda would be stored, is they

16  would be sent -- generated out to staff.  And what they were

17  really talking about was captain's directives.  Because

18  captain's directives are -- it's not a policy change but it's

19  something -- hey, folks, be aware of this.  Look out for this.

20  Please do it this way.  Something like that.  They ran

21  captain's directives.  It reduced the hit count to

22  approximately 3500.  We're producing those.  You can have them.

23  I don't care if it's about the company picnic.  You can have

24  every captain's directive.  I don't care what it's about.  You

25  won.  You can have it.  This is the way that I have been trying

1    to -- to approach this.  And it frustrates me to have to come

2    before the Court and use this time.

3            I wholeheartedly agree with Mr. Swearingen that we

4    are just -- whether it's our personalities or not -- that's a

5    knock on us -- but we are unable to get past these overbreadth

6    issues.  And my strong suggestion is a -- a discovery referee.

7    And barring that, if the Court just wants the productions --

8    which they're coming -- oh, and by the way, the ESI hit list

9    pared down by us and them -- but more by us -- they're going to

10   get 580,000 pages of documents that my staff is currently

11   trying to figure out how the heck to get to them.

12           And that the pared-down ESI search term list -- they

13   want it, they can have it.  But these are the things that we

14   are trying to do.  And I do appreciate the Court's recognition

15   that the defense is trying.  It's just that I don't know where

16   we go from here so that we're not back here.  It may just be

17   motions to compel, and the Court makes a yea or nay.  And I am

18   quite honestly at the point where whatever decision you make I

19   am willing to live with, because we just go round and round and

20   round like circles on hamster wheels.  And with that, I will

21   stop talking.

22           THE COURT:  All right.  I will issue an order based

23   on everything that I've heard today.  I will try my best to get

24   that to you all tomorrow, setting forth a further schedule.

25           I am going to deny, without prejudice, Docket number

1    469, which is the joint motion to extend the deadlines.

2           I am certainly not precluding the parties from filing

3    something else based on the volume of discovery and, really,

4    with a -- the -- their -- your collective ability to tell me

5    whether you believe that you will, in the exercise of due

6    diligence, be able to meet the current dates.  But I'm denying

7    469 without prejudice based on the record currently before me.

8           ATTORNEY PAPPY:  And, your Honor, just for the

9    record, we would support, you know -- because the plaintiffs

10   are going to get this giant document dump on Friday -- by

11   Friday, by midnight.  And if they deem -- I mean, it's a lot of

12   stuff.  And so I just want to make clear that we would support

13   their -- their right and ability to make sure that they've

14   prepared themselves for those depositions.  But I know you're

15   overruling it for now.

16          THE COURT:  All right.  Fair enough.

17          Before -- before -- well, go ahead, Mr. Swearingen.

18          ATTORNEY SWEARINGEN:  May I be heard on the joint

19   motion?

20          THE COURT:  Yes.  But before you do that, I realize

21   that we talked all about the plaintiffs' discovery, and we did

22   not talk about the discovery that the defendants propounded.

23          Do I understand correctly, Mr. Swearingen, that

24   the -- the plaintiffs read the discovery limitation on the --

25   to apply that -- basically to mean that the plaintiffs only

1    need to respond on behalf of one plaintiff and not on behalf of

2    the other plaintiffs?

3              ATTORNEY SWEARINGEN:  For -- for -- we understood --

4    for the interrogatories, your Honor?

5              THE COURT:  Yeah.

6              ATTORNEY SWEARINGEN:  For interrogatories, we

7    understood that -- that each side could propound 25.

8              THE COURT:  Right.  And I did not, in the order,

9    distinguish between unique and nonunique interrogatories.

10   That's correct.

11             But let me ask you this.  Do you think that Ms. Pappy

12   and the County are entitled to have the information -- let's

13   say, just response to Interrogatory number 1:

14             "Describe the deficiencies that you claim would

15             render medical care inadequate."

16             Is Ms. Pappy not entitled to know if there's

17   different information that each plaintiff has that supports

18   their allegations?  Maybe it's all the same.  Maybe it's a set

19   of responses on behalf of all of the plaintiffs.  But why isn't

20   she entitled to that information, other than the limitation

21   that -- that I impose?  That's really all you're relying on?  I

22   want to make sure I get it.

23             ATTORNEY SWEARINGEN:  I believe that she has that.  I

24   believe that through the document requests we've produced, I

25   believe, thousands of documents in response, for each of our

1    plaintiffs.

2            THE COURT:  Okay.

3            ATTORNEY SWEARINGEN:  The way that the rog responses

4    are styled, I don't think it will be that different from one

5    plaintiff to the next.

6            THE COURT:  Right.  Perhaps it won't be.  And I -- I

7    understand that I did not, in my order, distinguish between

8    unique and nonunique interrogatories.

9            But, you know -- you know, document -- well, I

10   just -- I'm not sure why that's a fight.  I'm really not.  I'm

11   not sure why, if there was -- if everyone's got the same

12   information, why it wasn't just a joint response on behalf of

13   the plaintiffs.

14           If you're relying on your interpretation of my order,

15   okay, I'll issue a clarification.  I mean, it wasn't to keep

16   Ms. Pappy from getting discovery that -- you know, unique facts

17   in the possession of each of the plaintiffs.  I think that

18   would be unfair to the County.  That wasn't my intent.  But if

19   that's truly how you read it, okay.

20           ATTORNEY SWEARINGEN:  That is how we read it, your

21   Honor.  There were 25 per side.  And that would have ended up,

22   I think, with approximately 360, or so, interrogatories, if you

23   multiply it whatever 25 times 14 people is.

24           THE COURT:  I understand.

25           ATTORNEY SWEARINGEN:  But at the core, each of

1   plaintiffs' claims is that they -- is not an -- is not that,

2   you know, I broke my leg, and I didn't receive treatment.  It's

3   that I'm exposed to a system that exposes me to substantial

4   risk of serious harm.

5          And so -- and that's -- that's what -- what the Ninth

6   Circuit case in *Parsons* teaches us.  It's not the individual's

7   single, you know, incident that's consequential in the

8   deliberate indifference analysis.  Instead, it's the exposure

9   to a system that places them at risk.

10          THE COURT:  So what you're telling me is that the

11  interrogatories would be the same -- the interrogatory response

12  would be the same as to all of the class representative

13  plaintiffs?

14          ATTORNEY SWEARINGEN:  I believe they would, but for

15  the idiosyncratic information that's in their medical records;

16  as well as any information that has already been produced or

17  will be produced by December 22nd, from the plaintiffs

18  themselves.

19          THE COURT:  All right.  All right.  Okay.  You wanted

20  to be heard on the joint motion?

21          ATTORNEY SWEARINGEN:  I do, your Honor.  Thank you.

22          THE COURT:  Go ahead.

23          ATTORNEY SWEARINGEN:  If I could have just a second

24  to collect my thoughts.

25          THE COURT:  Sure.

1            ATTORNEY PAPPY:  Which motion is that we're

2      talking --

3            THE COURT:  This is your joint motion to extend the

4      deposition dates.  It's Docket 469, I believe, is what

5      Mr. Swearingen is referring to.

6            ATTORNEY PAPPY:  Thank you.

7            THE COURT:  Sure.

8            ATTORNEY SWEARINGEN:  On the joint motion, your

9      Honor, it's -- given the parties' meet-and-confer regarding

10     inspections, the inspections certainly cannot be completed

11     before fact discovery cutoff on February 16th.

12            Plaintiffs have requested that the three experts for

13     ADA, environmental conditions, and safety and security, inspect

14     the jail facilities on January 15th through January 20th.  That

15     is the only week that works before February 16th for at least

16     one of those experts, if not more.

17            It has taken -- as I've said repeatedly throughout

18     this case -- a lot of time to coordinate everyone's schedules

19     so they're on the same page, with the same dates.

20            The defendants have informed us that neither

21     January -- that January 15th is a holiday and January 20th is a

22     weekend, and that they would prefer not to accommodate

23     inspections on those dates for -- for reasons for both staff

24     and counsel.

25            We've agreed in principle -- through meet and

1  confer -- to delay those two inspections; the ones that would

2  have occurred on January 15th and the other one on January 20th

3  to a later date.  But those dates cannot be before February

4  16th.

5        THE COURT:  Okay.

6        ATTORNEY SWEARINGEN:  As to other issues in the joint

7  motion to extend the deadlines, the fact discovery cutoff and

8  the expert deadlines, I want to make clear on the record right

9  now that the amount of records that we have coming in is going

10 to take an enormous amount of time for us to sift through.  We

11 will not be prepared to -- to -- we will not have reviewed even

12 a sizable chunk of those documents before the 30(b)(6)

13 depositions are set to take place in mid to late January.

14       It -- the schedule is very, very compressed.  Expert

15 reports are a big part of this case.  And it will be very

16 difficult for our experts, given their existing schedules, to

17 inspect the facilities, receive any documents that we've

18 reviewed to put into their report, and complete those reports

19 by March 15th.  That just cannot happen.  I'm very, very

20 concerned about that.

21       THE COURT:  Okay.  Do you believe that the Rule

22 30(b)(6) depositions have to happen before the inspections?

23       ATTORNEY SWEARINGEN:  No, your Honor.  They're

24 presently scheduled to be between two sets of inspections.

25       THE COURT:  Okay.  Got it.

1          ATTORNEY PAPPY:  If I may weigh in on this?

2          THE COURT:  Sure.

3          ATTORNEY PAPPY:  You know, I don't -- we may have our

4    disagreements about other things.  But I do -- this -- it is an

5    extremely compressed schedule, and we are dealing with a lot of

6    factors.

7          And, I -- I mean, I think the Court takes

8    Mr. Swearingen and myself at face value when we say that the

9    parties are working together to get these inspections and these

10   depositions taking place, and neither of us is trying to drag

11   this out.

12         I understand the Court's desire to keep our feet to

13   the fire and make sure that this case moves along.  But from

14   the defense position, I just don't -- we don't see that -- that

15   the requested extensions are not moving it along.  I mean, it's

16   two months.  There is a lot of work to be done.  And I know

17   that we're going to be back.  I don't even think it's a

18   question.  But we'll be back.  And, I mean, I don't know if

19   maybe plaintiffs' counsel does want to wait to see what he has,

20   in case he wants more time.

21         But, you know, I hate to keep coming back to court

22   and -- and I don't -- there are -- there are, you know, six --

23   six full days of deposition.  Plus the plaintiffs have

24   noticed -- I don't know -- maybe six depositions that are going

25   to be seven hours.  We still need to get our deposition notices

1    out, and all of that has to happen by February 16th.  So --

2            THE COURT:  Okay.

3            ATTORNEY PAPPY:  -- there's a difference between

4    torturing and keeping our feet to the fire.

5            THE COURT:  And, to be honest, I don't like the

6    phrase "keeping your feet to the fire," Ms. Pappy.  That's

7    not -- that's not my intent.  It really is to help the case

8    move forward.

9            And what I understand now, that I did not understand

10   when I initially spoke about the joint motion, was the -- the

11   volume of electronic records and other materials that will be

12   produced on December 22nd.  I assumed it would be quite a bit.

13           You've referenced hundred -- you know, 118,000 pages,

14   and then 500-and-some-thousand pages of electronic records.

15           So what I will do is this.  I'm going to give 469

16   some further thought --

17           ATTORNEY PAPPY:  Thank you.

18           THE COURT:  -- based on the information that you all

19   have provided.

20           And I will say this.  You know, we made, I thought,

21   really good progress earlier this year, when you all were

22   working on the ADA issues and the settlement.  And it was --

23   everyone was zealously representing their respective clients.

24   But, at the same time, you got it done.  You also got it done

25   with respect to the class certification issue.  And, you know,

1    kudos to everyone.  And in particular to the -- the County for

2    agreeing to something that they just -- they could have fought

3    about, just to drag things out; and they didn't.  And I think

4    that was -- you know, just showed good judgment.

5              I don't know what's happened in the last -- you know,

6    in the -- at some point between June and now, that leads us

7    here, to where there seems to be an inability to really talk

8    through things.  And I'm not going to sit up here and scold you

9    two.  I don't know the particular dynamics of what's going on.

10             It does seem to me that the three and a half hours we

11   have just spent together probably could have been avoided with

12   a different type of communication between the parties.

13             And, again, I'm only talking to you because you two

14   are the ones sitting here today.  I don't anything else about

15   who's involved in the communications or what's driving

16   anything.

17             I'm going to give some thought to the -- to the

18   dates.  And, in particular, to the mandatory settlement

19   conference.  Because it seems to me that you're not in a

20   position -- much as I think that in this case taking off the

21   issues, one by one, and talking about medication-assisted

22   therapy, frankly, would help you with your discovery and other

23   issues.  Because there may be not nearly as many fights as you

24   think there are.  But, at this point, it's just not feasible.

25   And that is a disappointment to me.

```
 1              But I'm going to take you out from underneath that
 2    burden of preparing for an MSC in January, regardless.  Unless
 3    you think we should keep it on.  And I just -- which is a
 4    bummer, honestly.  It really is.  Because I thought that we
 5    were in a position to really start making progress on the other
 6    issues in the case after the ADA.  And without getting into
 7    specifics on the record, I get that some of these other issues
 8    are tough, and that is to be expected.
 9              But to be sitting here, spending three and a half
10    hours -- and all of the prep time for everybody for this
11    hearing -- resolving a bunch of disputes that possibly could
12    have been avoided, is -- is what it is.  But I'm hopeful we can
13    move forward in 2024, as you all work through some of the
14    remaining discovery issues to really figure out what issues
15    need go before Judge Battaglia on summary judgment, what don't.
16    And then whatever comes out of that -- or trial, if there's
17    trial in this case, are the issues that the parties truly
18    cannot resolve between themselves and that obviously are not
19    subject to resolution on summary judgment.  So I'm looking
20    forward to working with you on that.  I really am, both the
21    discovery and settlement.  And I hope to -- you know, to be
22    able to -- to do so with you all in a productive and
23    constructive manner, in 2024.
24              (Pause, conferring.)
25              THE COURT:  Let's talk.  I'm not sure yet.
```

145

```
 1              (Speaking to law clerk.)

 2              THE COURT:  So with that in mind, the ball is in my

 3    court to issue an order on the present motions.

 4              I know you all both traveled to be here.  I hope you

 5    have a safe trip home, and enjoy some time over the holidays

 6    with your families.

 7              Go ahead, Mr. Swearingen.

 8              ATTORNEY SWEARINGEN:  I know we're wrapping up here,

 9    and I appreciate the Court's considered thoughts on all of the

10    issues before today.

11              One issue I do want to raise, that is very

12    consequential to our ability to move forward in this case, is

13    getting the class list in this case.  The ones -- that -- that

14    is requested in the first set of rogs propounded by plaintiffs.

15              THE COURT:  Ah.  Is that in your joint report that I

16    skipped over?

17              ATTORNEY SWEARINGEN:  It is in there, your Honor.

18              ATTORNEY PAPPY:  We already produced it earlier this

19    week.

20              ATTORNEY SWEARINGEN:  The --

21              ATTORNEY PAPPY:  I hit "send."

22              ATTORNEY SWEARINGEN:  The class lists that we

23    requested, your Honor.

24              THE COURT:  What page is that in your joint report?

25              ATTORNEY SWEARINGEN:  I'm sorry, your Honor.  I don't
```

1    have that before me.

2            THE COURT:  I have plaintiffs' interrogatories.  And

3    the only interrogatory at issue was interrogatory number 24,

4    asking to identify audits.

5            ATTORNEY SWEARINGEN:  I'm sorry.  I misspoke.  It is

6    not in the joint disputes because we understood defendants,

7    over and over, said they would produce it.  It was not in

8    dispute.  We only included ones that --

9            THE COURT:  Okay.  So you don't think you have the

10   class list yet.  Is that correct?

11           ATTORNEY SWEARINGEN:  We -- if I could speak to this

12   issue, your Honor.

13           The interrogatories specifically requested the class

14   list current as of the date of production.  The reason why the

15   class list is so important to be current as of the date of

16   production is we intend to write to our -- to the class members

17   at the jail, through legal mail, to start corresponding with

18   them.

19           Defendants, on Sunday, produced two class lists, both

20   from November.  They were already more than two-plus weeks old.

21   And as we know, that jail population is being fluid and flux.

22   That would necessarily mean a large portion of those class

23   members would already be released.  And we -- you know, we

24   would be wasting resources and not connecting with the right

25   people.  That's why we asked for a class list to be current as

1    of the date of production.  We're still waiting for that.  And

2    those responses to our legal mail are going to help us, as

3    counsel, and help our experts.

4            So it's very, very important -- especially with the

5    looming expert deadlines -- even if they get pushed back, for

6    us to get those class lists so that we can communicate with our

7    clients.

8            THE COURT:  So you've gotten a class list, but you

9    want a more recent class list?

10           ATTORNEY SWEARINGEN:  Correct.

11           THE COURT:  Did you send out the notices to the class

12   list that Ms. Pappy sent you on Sunday?  Or did you decide to

13   just raise it today?

14           Have you spoken to Ms. Pappy about this?

15           ATTORNEY SWEARINGEN:  Yes, we have.

16           THE COURT:  And what's the answer?

17           ATTORNEY SWEARINGEN:  We've said over and over we

18   want the -- (indiscernible).

19           THE COURT:  No, I mean, since Sunday, have you spoken

20   with Ms. Pappy about this?

21           ATTORNEY SWEARINGEN:  I believe we've written, yes.

22           THE COURT:  You've written?

23           ATTORNEY SWEARINGEN:  Yes.

24           THE COURT:  Okay.  And what's been the response?

25           ATTORNEY SWEARINGEN:  I'll let Ms. Pappy answer that.

1          We're not -- we haven't received the new class list.

2     We want the class list as of today, so that we can communicate

3     with people who are currently incarcerated.

4          THE COURT:  Go ahead.

5          And this, again --

6          ATTORNEY SWEARINGEN:  We have emailed, your Honor,

7     over and over -- (indiscernible).

8          THE COURT:  Let me finish.  Let me finish, please.

9          You know, none of this is in the five motions that I

10    have before me, so this is another issue that is raised that

11    we'll deal with right now.

12         Ms. Pappy, what's the subject -- what's the status of

13    the class list?

14         ATTORNEY PAPPY:  Sure.  So the class lits have been

15    produced.  And every month they get -- so two class lists.

16    There's the January 21st class list, the people that were in

17    the class.  And then everybody disabled -- mobility and

18    hearing -- that come in after that.  So that class list gets

19    produced essentially every month, pursuant to the ADA plan.

20         The plaintiffs complained because the names were

21    redacted.  But we've unredacted them, accordingly, because

22    of --

23         THE COURT:  Um-hmm.

24         ATTORNEY PAPPY:  -- class cert, and orders, and

25    whatever.  Those have been produced.

1          So we produced a November 30th class list.  And then

2     in what I'm producing tomorrow, there are more class lists

3     because it's just a list of everybody incarcerated.

4          THE COURT:  Um-hmm.

5          ATTORNEY PAPPY:  Like, for example, they've asked for

6     an interrogatory request for everybody that gets reentry

7     services.  Everybody in the whole jail gets reentry services.

8     So it's going to be a list, and it's going to be dated a couple

9     of days ago.

10          I would actually like some comment from the judge on

11     this because I keep getting this:  "You have to give me on the

12     day of production.  You have to give me" -- what day of

13     production?  Is it today?  Is it tomorrow?  Is it next week?

14     Because the minute I give it to you, it's stale the next day.

15          THE COURT:  Okay.  So here's what we're going to do.

16          You have your production on Friday.  Correct?

17          ATTORNEY PAPPY:  Yes.

18          THE COURT:  Is it -- how long does it take to run the

19     class list that Mr. Swearingen is talking about?

20          ATTORNEY PAPPY:  Oh, I can have them run it -- I can

21     have them run a new one.  We just ran one on Monday.  We

22     request run a new one on Friday.

23          THE COURT:  Is that going to satisfy you,

24     Mr. Swearingen?

25          ATTORNEY SWEARINGEN:  It would.  We would prefer it

1    to come Monday through Thursday.  But that (indiscernible) --

2              THE COURT:  No, that's fine.  Actually, that's a fair

3    request.  But Monday is Christmas, so let's not do that.

4              So when are you going to be back --

5              ATTORNEY PAPPY:  Oh, I can get it done tomorrow.  I

6    can get it done -- I don't know what people's schedules are,

7    the lady who runs them for me.  But can I get it -- as long as

8    she's in the office, I can get it by Friday.

9              ATTORNEY SWEARINGEN:  If we could do it this

10   Thursday, your Honor, instead of Friday.

11             ATTORNEY PAPPY:  I don't know who, where.  And I

12   don't want to promise something that then they're going to

13   write me an email.

14             THE COURT:  No, we're not going to do that.  Here's

15   what we're going to do.

16             Ms. Pappy, what I am directing the County to do is

17   within the next two weeks --

18             ATTORNEY PAPPY:  Okay.

19             THE COURT:  -- you are to run a class list, and you

20   are to provide it to Mr. Swearingen on the date it was run, so

21   that it is current.  And it should be Monday through Thursday.

22             That was your preference.  Right, Mr. Swearingen?

23             ATTORNEY SWEARINGEN:  (Nods head.)

24             THE COURT:  All right.  So Monday through Thursday.

25   And the reason I'm giving you two weeks, Ms. Pappy, is because

1  if there's one person who runs it and you said -- she, I think,

2  is out during the holidays, then I don't want to put you in a

3  spot where you can't, you know, meet a certain deadline.  And

4  you're also doing a bunch of production by Friday.

5          So I don't know what this individual's schedule is

6  next week.  But I'll give you two weeks, and that will give you

7  time to produce it the same day to Mr. Swearingen.

8          ATTORNEY PAPPY:  Thank you.

9          THE COURT:  Sure.  Does that answer your question,

10  Mr. Swearingen?

11          ATTORNEY SWEARINGEN:  Yes, your Honor.  Thank you.

12          ATTORNEY PAPPY:  I want to be clear.  I want to be

13  clear.  Are you officially taking off January 9th?

14          Have you official --

15          THE COURT:  I'm officially going to take off January

16  9th because I don't think we're in a position to make progress.

17          ATTORNEY PAPPY:  (Indiscernible) that too.

18          THE COURT:  Do you agree that we should table the

19  MSC, Mr. Swearingen?

20          ATTORNEY SWEARINGEN:  Based on defendants' response

21  to our -- to our initiating document, yes.  Based -- based on

22  defendant's response to our settlement proposal, yes.

23          THE COURT:  Yeah.  Okay.  All right.

24          Well, that's disappointing, but it is what it is.

25  And I think that we need to resolve some legal issues first.

152

1    So let's do that.  And then you will have your class list,

2    Mr. Swearingen.

3                ATTORNEY SWEARINGEN:  (Indiscernible), your Honor.

4                THE COURT:  No problem.  All right.

5                ATTORNEY PAPPY:  Thank you for the Court's time

6    today.  We appreciate it.

7                THE COURT:  No problem.  Take care.  Have a good

8    holiday.

9                ATTORNEY PAPPY:  You too.

10               (Conclusion of proceedings at 12:41 p.m.)

11

12                           --oOo--

13   I certify, by signing below, that the foregoing is a correct
     stenographic transcript, to the best of my ability, of the
14   digital recording of the audio proceedings had in the
     above-entitled matter this 26th day of December, 2023.  A
15   transcript without an original signature or conformed signature
     is not certified.  I further certify that the transcript fees
16   and format comply with those prescribed by the Court and the
     Judicial Conference of the United States.

17

                 /S/ Amanda M. LeGore
18               _____

19           AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

20

21

22

23

24

25