GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 3:20-cv-00406-AJB-DDL <br><br> **DECLARATION OF HANNAH CHARTOFF IN SUPPORT OF PLAINTIFFS' *EX PARTE* REQUEST FOR LEAVE TO FILE LIMITED REPLY BRIEF ADDRESSING FALSE STATEMENT IN DEFENDANTS' OPPOSITION** <br><br> Magistrate: Hon. David D. Leshner <br><br> Date: February 6, 2024 <br> Time: 9:00 a.m. <br> Crtrm.: TBD |

[4429558.2]

Case No. 3:20-cv-00406-AJB-DDL

DECLARATION OF HANNAH CHARTOFF ISO PLFS' *EX PARTE* REQUEST FOR LEAVE TO FILE LIMITED
REPLY BRIEF ADDRESSING FALSE STATEMENT IN DEFS' OPPOSITION

I, Hannah M. Chartoff, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs and the Certified Class and Subclasses.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' *Ex Parte* Request for Leave to File Limited Reply Brief Addressing False Statement in Defendants' Opposition as well as Plaintiffs' Limited Reply Brief Addressing False Statement in Defendants' Opposition.

2.      Attached hereto as **Exhibit A** is a true and correct copy of Defendants' Opposition to Plaintiffs' Motion to Compel ("Opposition") filed in this Court on January 24, 2024, as Dkt. No. 504.

3.      On receiving the Opposition, I reviewed documents produced by Defendants on January 23, 2024.  This document production, which was sent to our firm by email from Diana Favela, a paralegal at Burke, Williams & Sorensen LLP, reported to be responsive to request for production number 123, but contained only one audit report:  the February 2022 State Auditor report that is cited throughout Plaintiffs' Third Amended Complaint.

4.      Attached hereto as **Exhibit B** is a true and correct copy of email exchanges dated January 26-29, 2024 between counsel for Plaintiffs and counsel for Defendants regarding the Opposition misstatement.  On January 29, 2024, as part of that correspondence, Plaintiffs' counsel advised Defendants' counsel of their intent to file the instant motion, absent Defendants' filing of a corrected opposition brief.

5.      Attached hereto as **Exhibit C** is a true and correct copy of an excerpt from the transcript of an informal discovery conference held in this Court on January 9, 2023.

6.      Attached hereto as **Exhibit D** is a true and correct copy of an excerpt from the disability access report of SZS Engineering Access, Inc. following an

1  inspection of San Diego Central Jail on March 13, 2023.  The report is filed publicly

2  at Dkt. 281-3.

3      7.    Attached hereto as **Exhibit E** is a true and correct copy of an excerpt

4  from the transcript of a discovery conference before this Court on December 20,

5  2023.

6      8.    Attached hereto as **Exhibit F** are true and correct copies of San Diego

7  County Sheriffs' Department Critical Incident Review Board In Custody Death

8  Information Releases posted on the Sheriff's public website at

9  https://www.sdsheriff.gov/resources/transparency-reports, dated February 4, 2023,

10  and April 17, 2023.

11      9.    Attached hereto as **Exhibit G** is a true and correct of an excerpt from

12  the transcript of an informal discovery conference before this Court on August 31,

13  2022.

14      10.    Attached hereto as **Exhibit H** is a true and correct copy of a news

15  release by the San Diego County Sheriff's Department entitled "State of San Diego

16  County Jails," dated July 5, 2023.

17      11.    On January 30, 2024, Defendants produced some additional audit

18  reports, which I have reviewed.  That production does not include some of the audit

19  documents referenced as being produced in Defendants' Opposition at pp. 7-9, *e.g.*,

20  the "Grand Jury Inspections" and "Board of State and Community Corrections Pre-

21  Opening Inspection of House 1 at the Rock Mountain Detention Facility."

22      I declare under penalty of perjury under the laws of the United States of

23  America that the foregoing is true and correct, and that this declaration is executed

24  at San Francisco, California this 1st day of February, 2024.

25

26

27  _____

28  Hannah M. Chartoff

# TABLE OF CONTENTS

EXHIBITS TO THE DECLARATION OF HANNAH M. CHARTOFF ISO
PLAINTIFFS' *EX PARTE* REQUEST FOR LEAVE TO FILE LIMITED REPLY
BRIEF ADDRESSING FALSE STATEMENT IN DEFENDANTS'
OPPOSITION

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| A. | Defendants' Opposition to Plaintiffs' Motion to Compel, Filed January 24, 2024 | 1 |
| B. | January 26-29, 2024 Email Correspondence Between Plaintiffs' Counsel and Defendants' Counsel | 23 |
| C. | Excerpts from Transcript of January 9, 2023 Discovery Hearing | 30 |
| D. | Excerpts from SZS Engineering Access report entitled "CASp Assessment San Diego County Central Jail," dated April 24, 2023 | 34 |
| E. | Excerpts from Transcript of December 20, 2023 Discovery Hearing | 43 |
| F. | San Diego County Sheriff's Department CIRB In-Custody Death Information Releases | 48 |
| G. | Excerpts from Transcript of August 31, 2023 Discovery Hearing | 53 |
| H. | San Diego County Sheriff's Department news release entitled "State of San Diego County Jails," posted July 5, 2023 | 57 |

# EXHIBIT A

1   Susan E. Coleman (SBN 171832)
    E-mail: scoleman@bwslaw.com
2   BURKE, WILLIAMS & SORENSEN, LLP
    501 West Broadway, Suite 1600,
3   San Diego, CA 92101-8474
    Tel: 619.814.5800 Fax: 619.814.6799
4
    Elizabeth M. Pappy (SBN 157069)
5   E-mail: epappy@bwslaw.com
    BURKE, WILLIAMS & SORENSEN, LLP
6   60 South Market Street, Ste. 1000
    San Jose, CA 95113-2336
7   Tel: 408.606.6300 Fax: 408.606.6333

8   Attorneys for Defendants
    COUNTY OF SAN DIEGO, SAN DIEGO
9   COUNTY SHERIFF'S DEPARTMENT and
    SAN DIEGO COUNTY PROBATION
10  DEPARTMENT

11              UNITED STATES DISTRICT COURT

12             SOUTHERN DISTRICT OF CALIFORNIA

13

14  DARRYL DUNSMORE, ANDREE          Case No. 3:20-cv-00406-AJB-DDL
    ANDRADE, ERNEST ARCHULETA,
15  JAMES CLARK, ANTHONY             **DEFENDANTS' OPPOSITION TO**
    EDWARDS, LISA LANDERS,           **PLAINTIFFS' MOTION TO**
16  REANNA LEVY, JOSUE LOPEZ,        **COMPEL**
    CHRISTOPHER NELSON,
17  CHRISTOPHER NORWOOD, JESSE       Judge: Anthony J. Battaglia
    OLIVARES, GUSTAVO
18  SEPULVEDA, MICHAEL TAYLOR,       Magistrate Judge David D. Leshner
    and LAURA ZOERNER, on behalf of
19  themselves and all others similarly
    situated,                        **Date:    February 1, 2024**
20                                   **Time:    1:00 p.m.**
                  Plaintiffs,        **Judge:   Magistrate David Leshner**
21
          v.
22
    SAN DIEGO COUNTY SHERIFF'S
23  DEPARTMENT, COUNTY OF SAN
    DIEGO, SAN DIEGO COUNTY
24  PROBATION DEPARTMENT, and
    DOES 1 to 20, inclusive,
25
                  Defendants.
26

27

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

                          1

## **INTRODUCTION**

Plaintiffs assert they are exempt from all legal constraints on discovery because this case is important. Every case is important to every litigant in equal measure and the legal limits on discovery are not dictated by whether a party believes their case is important. Document discovery in this matter has been difficult and unwieldy. Meet and confer has been a one way street as to those items still at issue. The motion to compel should be denied in its entirety because the requests at issue are overbroad and burdensome, all responsive documents have been produced where appropriate, and Plaintiffs have failed to meet and confer in good faith to narrow the scope of the requests.

There is no dispute that, "[b]oth broadly written and expansively construed, Rule 26(b)(1) allows the discovery of "[r]elevant information," even if inadmissible at trial, "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED.R.CIV.P. 26(b)(1).  (*U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 236 (S.D. Cal. 2015))  However, the right to discovery is not without limitation.  'Even if evidence is discoverable and relevant under Rules 34 and 26, the Rules contain some express constraints, boundaries both "ultimate and necessary," *Hickman v. Taylor*, 329 U.S. 495, 506, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947), on discovery's otherwise sprawling reach.' (Id, at 237)

Plaintiffs discovery and moving papers ignore the express constraints on discovery and forge ahead with the notion that because they asked, they are entitled to the documents. The examples provided in the moving papers as to how productions are allegedly deficient highlight the lack of any evidence that full and complete responses have been provided, and ignore the overbreadth of the requests and Plaintiffs' failures in meet and confer. The motion should be denied in its entirety.

## **RELEVANT FACTS.**

Plaintiffs served 6 sets for Requests for Production of Documents with 252 categories of documents, and 12 Requests for Inspection containing 68 Requests for

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO  MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-3

Production of Documents. In total, Plaintiffs have propounded 320 document requests.

Plaintiffs served Request for Production of Documents, Set Three, on June 15, 2023. The request contains 58 separate requests for documents. Request for Production of Documents, Set Four, was served by Plaintiffs on August 16, 2023 and contains 4 separate requests for documents. Request for Production of Documents, Set Five, was served by Plaintiffs on September 1, 2023 and contains 159 separate requests for documents. Request for Production of Documents, Set Six, was served by Plaintiffs on December 21, 2023, and contains 5 separate requests for production of documents.

Defendants provided written responses and objections, and responsive documents to the extent agreed to, in response to each of the requests. (Dkt.489-3, p.226 [RFPOD#3] and p.280 [RFPOD#5].

Meet and confer was difficult, extremely contentious at times, and largely driven by Plaintiffs inability or refusal to compromise. (See, Pappy Declaration in Opposition to Motion to Compel). The meet and confer efforts illustrated by Plaintiffs' submissions demonstrate the efforts of Defendants attempting to cooperate (e.g., Dkt. 489-3, p.137), and convince Plaintiffs to pare down the requests (e.g., Dkt. 489-3, p. 132), all to no avail.

The first docket reference above is an exchange between counsel working out the ESI protocols in an amicable manner with clarification by Defendants that they were not agreeing to produce the results of the ESI search but rather to preserve it, which was done as confirmed in the email exchange between June and July of 2023. Four months later, Plaintiffs wrote an out of the blue letter about ESI discovery efforts being "rebuffed" and Defendants "failing" to provide information. (DKT 489-3, p.133 of 462) This sort of behavior was standard fare for Plaintiffs while meeting and conferring, and all of a sudden sending a letter written as if the parties were not talking. An email from defense counsel dated two weeks before the "rebuffed" letter,

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

3

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-4

evidences an ongoing discussion between counsel regarding the hit list provided by Defendants following a back and forth with Plaintiffs' counsel about the ESI process---not being rebuffed or Defendants refusing to do anything. (DKT. 489-3, p.156) The one sided narrative by Plaintiffs about meet and confer stems from the viewpoint that it is their way or the highway and if a document was requested, it is legally required to be produced regardless of cost, burden, relevance, and/or proportionality. Throughout meet and confer as to every discovery issue, Defendants offered suggestions to narrow requests in order to come to a final, compromise solution. In almost every instance, Plaintiffs refused any attempt to narrow the requests and demanded that such offers to compromise where a "step in the right direction" but that every document requested was to be produced. This approach was flatly rejected by Defendants and led to substantial motion practice as the Court as experienced.

## ARGUMENT

## THE MOTION TO COMPEL SHOULD BE DENIED BECAUSE THE REQUESTS ARE OVERBROAD AND NOT PROPORTIONAL TO THE NEEDS OF THE CASE.

Plaintiffs approach this motion with the same viewpoint as has existed since the requests were served, throughout meet and confer, and a Court hearing where the Court made clear to no avail that the requests were extremely overbroad. "[P]er Rule 26(b)(2)(C), on its own initiative or at a party's request, for example, a court may limit discovery for any one of three reasons: "the discovery sought is unreasonably cumulative or duplicative"; it is "obtainable from some other source that is more convenient, less burdensome, or less expensive"; or "the burden or expense of the proposed discovery outweighs the likely benefit." FED.R.CIV.P. 26(b)(2)(C)(i)—(iii); [Citations omitted]" (*U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, *supra,* 305 F.R.D. at 237) "'Rule 26(b) has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition." *Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir.2010).' (Id, at 237)

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

4

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-5

1    Plaintiffs were obligated by Rule 26 to determine how to most efficiently go

2    about seeking documents necessary to their case in chief at trial.  They failed to do so

3    and should not be rewarded in violation of Rule 26 and the prohibition against fishing

4    expeditions. Throughout discovery, Plaintiffs have spoken out of both sides of their

5    mouth claiming on the one hand that they don't know the names of documents or

6    correct terminology of Defendants' records necessitating that document requests be

7    broad.  On the other hand, Plaintiffs claim to "know" that certain documents exist and

8    are being hidden by Defendants. An example came up in the December 20th hearing

9    where Plaintiffs read a lengthy press release about a Naphcare report that was reported

10   to be available as part of the Naphcare contract. The reading of the news article into

11   the record was intended as conclusive proof that the report and information in it is

12   being hidden by Defendants. Plaintiffs have no evidence that the reports were ever

13   used, are accurate, are used by the County whether generated by Naphcare or not

14   because they have not deposed a single witness to determine the facts. Plaintiffs get

15   their information about what documents Defendants allegedly have and are able to

16   generate from news articles and what they claim to have received in other cases for

17   other County's. A 30(b)(6) deposition would have been a more prudent use of time

18   and resources given the anticipated volume of documents and nature of Defendants'

19   operations.

20   Rather than rely on news articles and experiences in different Consent Decree

21   cases, Rule 26 dictated that Plaintiffs notice a simply 30(b)(6) deposition asking for

22   the persons most qualified to testify about what types of documents are maintained to

23   understand lingo, locations, and other detail information to enable them to narrowly

24   craft requests for what they want and, more importantly, need to litigate the case.  The

25   fact that Plaintiffs chose the most arcane, unwieldy and cost prohibitive method is not

26   a justification to grant the motion.

27   A party may obtain discovery concerning any nonprivileged matter that is

28   relevant to any party's claim or defense and is proportional to the needs of the case.

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO  MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-6**

FED. R. CIV. P. 26(b)(1). "When determining if the proportionality requirement has been met, courts are to consider six factors, namely, the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Id. Relevant information need not be admissible to be discoverable. *Id*." (*Terpin v. A T & T Inc.*, No. CV 18-6975-ODW (KSX), 2022 WL 3013153, at *3 (C.D. Cal. June 13, 2022)) Plaintiffs fail to meet the proportionality test.

## I.     Audits and quality assurance documents.

Plaintiffs assert that audit and quality assurance documents have not been produced in response to RFP #'s 32, 33, 98, 99, 104, 106, 109-111, 118, 121, 125-129, 138, 143-148, 150, 153, 155, 157-159, 161, 162, 164-167, 171, 172, 179, 180, 182, 184, 193, 195, 211, 220, 221, 225, 230, 232 and 236. The claim is meritless.

Plaintiffs use the words/phrases "inspection", "audit", and "quality assurance" synonymously in the 252 requests served. For example, RFP#41 seeks all "DOCUMENTS" relating to "auditing" of health care including quality improvement and audits. Request No. 115 seeks all "DOCUMENTS" including audits relating to any and every quality assurance/quality control process in the jails. Request No. 123 seeks all "DOCUMENTS" relating to inspections conducted by any entity other than you relating to any facility, practice at a facility or healthcare. Defendants produced every audit, inspection and quality assurance document it could locate whether prepared internally or by other parties in response to Nos. 41, 115 and 123. There is nothing more to produce.

The fact that the documents produced are also responsive to numerous other requests is indicative of the abusive nature of the discovery. Plaintiffs threw together requests that seek duplicate documents and instead of focusing on, for example, all inspections, audit and quality control processes regardless of topic, they included general requests seeking all such documents and separate requests seeking

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

6

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-7

the same documents over and over again.

The reference to Commander Ralph's deposition testimony about DIS reports is directly on point to the discovery abuses of Plaintiffs, and an excellent example of the issues created by the overbroad requests, the thoughtless manner in which the requests were drafted, and the continuing refusal to compromise based upon the overbreadth. The Court will recall that Defendants agreed to amend the response to Special Interrogatory No. 24 as part of meet and confer efforts with Plaintiffs. Special Interrogatory No. 24 and the recently amended (and served) response are as follows:

**INTERROGATORY NO. 1:**

Identify all audits relating to custody operations and HEALTH CARE services at the JAIL, from January 1, 2020 to the present.

**AMENDED RESPONSE TO INTERROGATORY NO. 24:**

. . .

• Board of State and Community Corrections Pre-Opening Inspection of House 1 at the Rock Mountain Detention Facility

• Board of State and Community Corrections – Comprehensive Inspection

    o    9/6/23 George Bailey Detention Facility

    o    9/7/23 San Diego Central Jail

    o    9/8/23 Vista Detention Facility

    o    9/11/23 Las Colinas Detention and Reentry Facility

    o    9/13/23 East Mesa Reentry Facility

    o    9/13/23 South Bay Detention Facility

• Title 15 Nutritional Evaluations: In Process

• Title 15 Medical / Mental Health Inspection – Completed by National Commission on Correctional Health

    o    1/10/23 East Mesa Reentry Facility

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-8**

1        o    1/10/23 George Bailey Detention Facility

2        o    1/19/23 San Diego Central Jail

3        o    2/2/23 Vista Detention Facility

4        o    3/23/23 Las Colinas Detention and Reentry Facility

5        o    12/13/23 South Bay Detention Facility

6    •    Title 15 Environmental Health Evaluation – Completed by County of

7 San Diego Department of Environmental Health

8        o    2/28/23 South Bay Detention Facility

9        o    3/20/23 Las Colinas Detention and Reentry Facility

10        o    3/23/23 East Mesa Reentry Facility

11        o    11/7/23 Mobile Food Inspection Report

12        o    11/7/23 George Bailey Detention Facility

13        o    11/7/23 Central Production Center

14        o    11/14/23 Vista Detention Facility

15        o    11/15/23 San Diego Central Jail

16    •    Grand Jury Inspections

17        o    9/20/23 Opening Introduction/Orientation (LCDRF)

18        o    9/22/23 Las Colinas Detention and Reentry Facility (Presentation

19 from Sheriff's Transportation Unit)

20        o    10/6/23 San Diego Central Jail

21        o    10/20/23 East Mesa Reentry Facility and Central Processing

22 Center

23        o    11/3/23 George Bailey Detention Facility and Rock Mountain

24 Detention Facility

25        o    11/8/23 South Bay Detention Facility (Presentations from K-9,

26 DIU and CPAC)

27        o    11/17/23 Vista Detention Facility

28    •    https://justicenavigator.org/report/sandiego-county-ca-2021/summary

**Ex. A-9**

- Auditor of State of California; San Diego County Sheriff's Department, February 2022, Report 2021-109

Each and every audit report identified in the request was produced on January 23, 2024 and Ms. Pappy notified Plaintiffs' counsel that they would be grouped together as responsive to RFP No. 123[1]. Which other requests they may be responsive to is indecipherable and thus Defendants produced them as responsive to No. 123, which broadly requests audits and inspections. The reports include the Board of State and Community Corrections inspection reports, referenced by Commander Bavencoff in her deposition.

The document requests as prepared make it burdensome, if not impossible, to segregate all the responsive documents into the dozens of duplicative requests. By way of example only, one of the inspection reports referenced by Commander Bavencoff and identified in response to Special Interrogatory No. 24, was prepared by the Board of State and Community Corrections and addresses safety checks, number of personnel, professional training, and Corrections Officer Core Course (COCC), among other topics. Which of the 155 requests which include the word "audit" is the single report responsive to? COCC training covers booking and intake, transport, record keeping, supervising inmates, communication with inmates, inmate hygiene, and handling emergencies, among a litany of other training topics. The Board of State and Community Corrections audit report could cover each and every request for audits relating to health care, communication of any kind with an Incarcerated Person including as it relates to health and mental health needs, hygiene, etc. It could relate to safety and security in terms of supervision of inmates and emergencies.

Drafting streamlined categories in the form of one or two requests for

---

[1] All audits, inspections and quality assurance process reports specific to health care were previously produced in response to RFP#41.

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san jose

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-10**

production that sought "all audits conducted internally and/or by third parties for any aspect of jail operations and services", and maybe another for "health/mental health services" would have sufficed. Ensuring complete production could easily have been accomplished through a 30(b)(6) deposition of someone knowledgeable about internal and external auditing, inspections and quality control. The speculation and supposition contained in the moving papers about a "full-time auditor" for mental health issues is irrelevant and does not support the granting of the motion. It certainly begs the question of why this speculation and supposition was never raised in meet and confer as "proof" that audit reports are missing but it never was. There is no evidence submitted in support of the motion that any such information was provided to Defendants asking if any such audits had been completed. The reference to ¶36 of the Swearingen declaration is a copy of a quality control report (of the type Plaintiffs claim was not produced) but nothing about meeting and conferring to inquire whether the audit was done, in process, etc. Again, this case involves a potential universe of hundreds of thousands of documents and hundreds of detentions and medical personnel and it is incumbent upon Plaintiffs to participate in meet and confer in good faith to get the information they believe the need and not to play a game of "gotcha".

Plaintiffs have not identified any instance where they provided an email or other document which suggested the existence of more documentation during meet and confer and Defendants refused to follow up. To the contrary, in every instance where Defendants were presented with such information, follow up was made and explanations provided to Plaintiffs as to why there were no documents or additional documents were produced.

The motion should be denied based upon a claim that audits and quality assurance documents were withheld.

## II.    Training materials.

Plaintiffs contend that no training materials were provided. The claim is

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

10

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-11

1   meritless. All training materials were provided no matter the form.  Because Plaintiffs

2   never conducted a simply 30(b)(6) deposition to determine what types of training

3   materials there may be and what format those training materials may take, Plaintiffs

4   have no idea what training materials do or do not exist. What plaintiffs fail to

5   recognize and never bothered to investigate, is whether there are traditional "training

6   materials", whether those training materials take the form of green sheets, policies

7   and/or procedures, or whether there are non-policy documents on a particular subject

8   versus "on the job" training.  And yet, Plaintiffs assert that all training documents

9   were not produced.  Based upon what evidence?

10          The only alleged evidence of a lack of "training materials" is a reference to a

11  training bulletin (which is curiously a responsive document) which relates to OPSD

12  Incarcerated Persons. (Dkt. 489-1, p.9:24-28) Plaintiffs complain that the training

13  bulletin is not reflected in the mental health housing policy. Are Plaintiffs

14  complaining that the policy is deficient? This has nothing to with whether a training

15  document exists or was produced.

16          The "failure to produce training materials" section of the brief identifies 28

17  requests (32, 33, 98, 99, 100, 110, 118, 121, 143, 144, 145, 146, 166, 175, 181, 198,

18  211, 217-221, 230, 232-234, 240 and 246 ) that make no reference to "training", and

19  another 23 requests (111, 114, 129, 138, 147, 148, 150, 155-159, 161, 162, 164, 165,

20  167, 171, 180, 182, 184, 225, 236) which include the word "training". Why is the

21  word "training" included in some and not others?  Why would Defendants believe

22  that the ones without the word "training" include "training" documents when others

23  specifically include the word? This is yet another example of the overbreadth and

24  thoughtless nature of the requests.

25          Where there were "training materials" in Defendants' possession, which mostly

26  consist of green sheets, policies and procedures, they were produced.  All policies,

27  procedures and green sheets were produced in response to RFP #25 which requested

28  all polices, and RFP#25 is specifically referenced in the appropriate written responses

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

11

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO  MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-12

to Request for Production of Documents, Set Five, where trainings were requested and the request was not otherwise objected to by Defendants. (*See,* 114, 129, 138, 147 [which refers to RFP#25 and #41], 148, 155-158, 164, 165, 180, 182, 184, 225 and 236 [which references policies already having been produced but not #25 specifically]). Plaintiffs have a belief based upon no evidence of what a "training" document is supposed to look like. This is not the basis to compel a further production of that which does not exist.

The Court should deny each and every request for further training documents in response to Request Nos. 32, 33, 98-100, 110, 111, 114, 118, 121, 129, 138, 143-148, 150, 155-159, 161, 162, 164-167, 171, 175, 180, 182, 184, 198, 211, 217-221, 225, 230, 232-234, 236, 240 and 246.

## III. Plaintiffs' attempt to recast overbroad requests as seeking "practices" must be disregarded.

Apparently recognizing the significant overbreadth of the requests identified in Section III of the Moving Mpa's, Plaintiffs attempt recast 52 overbroad requests as seeking "practices". A review of each of the 52 demonstrates that the word "practice" is nowhere to be found in any of the requests and the requests have nothing to do with "practices". This newly hatched theory is simply a way around otherwise inappropriate requests.

Had the requests been phrased as Plaintiffs attempt to suggest to the Court, this motion may not have been necessary. For example, RFP #97 states, "All DOCUMENTS showing the time between a person arriv[ing] at the JAIL and the time the person receives intake screening." The word "practice" is not in the request and yet Plaintiffs attempt to mislead the Court by suggesting that the request seeks practices in general about timing of intake. The request does not seek "practice".

"DOCUMENTS", as plaintiffs define it, includes every custody file and every medical record of every person ever incarcerated at any San Diego County jail facility for 3 years which will amount to 12,000+ individuals given that the average daily

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

12

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-13

population is 4000 and the level of turnover. The request is not limited to documents showing practice in any manner. Each one would include arrival dates and processing times (but not arrival times).

RFP #141 states, "ALL logs RELATING TO INCARCERATED PERSONS placed in the Outpatient Step Down Unit from January 1, 2021 to the present." There is no reference to practices, and logs of individuals in Step Down do not demonstrate "practices". It provides names. The inclusion of No. 141 in the motion is inconsistent with the fact that Defendants produced logs with names of individuals in Step Down which is all that was requested. This motion is simply more evidence of the haphazard and thoughtless manner in which the requests were drafted without any thought as to what was necessary to prove Plaintiffs' case at trial and proportional to the issues. Including No. 141 in the motion is evidence of bad faith. "Logs relating to OSDU" individuals provides Plaintiffs with nothing more than potential witnesses—not practices.

If the requests had been limited to documents sufficient to show practice, it is unlikely there would be a dispute. That is not what the requests ask literally or impliedly as Plaintiffs assert. Further response to the requests identified in Section III (32, 49, 82, 97, 99, 100, 105, 106, 109-111, 113, 114, 119, 121, 125-130, 138, 141, 146-148, 150, 152, 155-159, 161, 162, 164, 165, 167, 172, 175, 176, 179, 180, 182, 179, 193, 195, 221, 231, & 232-236), should be denied.

## IV. Medical records and custody files.

The Court issued Dkt. 495 [Order] on January 19, 2024 regarding selection and production of medical and custody files. Defendants are complying with the Court's order. The Joint Status Report to be filed with the Court on January 31st, 2024 will provide the current status and Defendants' position.

## V. Contractor productivity reports (RFP#78).

Defendants agreed in meet and confer to produce productivity reports and inadvertently failed to produce the document. On January 11, 2024, in meet and

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

13

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-14

1   confer, Plaintiffs' counsel advised that the document had yet to be produced and upon
2   investigation, Defendants counsel realized that the document was in her possession
3   but had been overlooked in prior productions. It was produced on January 23, 2024.

**VI.    Staffing Plan (RFP#191).**

5           Defendants previously agreed to produce staffing plans to the extent they exist.
6   As of the time of filing this opposition, Defendants are conducting a search and should
7   be able to produce any responsive documents by the time of the hearing on February
8   1ˢᵗ or advise of no responsive documents.

**VII.   Text messaging or instant messages.**

10          The use of text messages or instant messages is not a standard method of
11  communication between correctional staff inside facilities. Correctional officers
12  communicate via radios/walkie talkies for instant communications and safety.  The
13  issue of communications by text or instant messaging arose during meet and confer
14  with Plaintiffs as to Correctional Officers *only* in 2023. The conversation during meet
15  and confer is specifically referenced in Dkt.489-3, p.209 and carrying over to p.208,
16  confirming that the discussion was limited to Teams chat and text messaging between
17  custody staff---not health care staff. Defendants never provided conflicting
18  information as Plaintiffs claim. As usual, Plaintiffs take one piece of a conversation
19  about Correctional Officers not using texts or instant messaging to communicate
20  during emergencies and turn it into a broad based and meritless accusation of lying or
21  hiding information.  The email exchange attached to Mr. Swearingen's declaration
22  proves otherwise.

23          Weeks after first discussing the matter, Plaintiffs sent an email on January 9,
24  2024 to "meet and confer" about text messages between unidentified types of staff
25  communicating about "medical care".  Defendants responded the same day, with the
26  same  information previously provided that Correctional Officers do not communicate
27  via text. In their usual manner of hiding information that may suggest there may be
28  responsive documents, Plaintiffs' counsel then forwarded a document authored by Dr.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

14

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO  MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-15**

Jon Montgomery regarding Naphcare medical staff communicating by text and/or instant messaging with jail medical staff. According to the moving papers, a conversation that started with Plaintiffs demanding non-existent texts between Correctional Officer staff about emergencies, is now another way for Plaintiffs to claim that Defendants are providing "conflicting information". As with every single other instance where Plaintiffs play these games of hiding information that may help in finding additional responsive documents, they initially withheld the Dr. Montgomery note, provided it, Ms. Pappy then agreed to investigate and now Defendants are providing "conflicting information". Ms. Pappy sent an email to Plaintiffs' counsel on January 16, 2024 following up on the text and instant messaging issue *confirming* that Defendants were looking into it. (Pappy Decl., Ex. A) The email was omitted from Plaintiffs papers.

As to the three specifically referenced document production requests, RFP #136 seeks communications with any contractor of Defendants regarding "policies and procedures". An objection was interposed and Defendants refused to produce. RFP#137 duplicates No. 34 in that it seeks communications with Naphcare as the health care provider and Defendants refused to produce.

RFP#34 sought communications with Naphcare and Defendants objected based upon overbreadth and burden and agreed to produce only information that involved non-HIPPA protected information. The parties subsequently entered into an agreement, and an order was issued regarding HIPPA and Defendants produced email communications.

Plaintiffs' withholding of information that would help the Defendants, an organization that employs hundreds of people and generates/stores hundreds of thousands of documents, find specific information Plaintiffs seek has been a consistent practice throughout discovery and meet and confer. Plaintiffs are more interested in disparaging Defendants than obtaining the relief for their clients they claim to want. Had Plaintiffs approached any aspect of discovery with any sense of

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

15

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-16**

the cooperation dictated by Rule 26, none of the disputes before the Court would exist.

**VIII. ESI.**

Plaintiffs assert that productions of ESI are incomplete because every document requested was not produced. There is no explanation provided about what information is allegedly missing. Plaintiffs reference the search including the word "Thunderdome". The search conducted using the term resulted in only 15 documents making it is obvious that employees do not routinely use the term "Thunderdome" in written communication. Plaintiffs' assertions in the moving papers presume that there must be certain words in written communications without a single example of a document containing the term to prove otherwise.

Because of the overbreadth of the 86 ESI terms and 76 person custodian list first proposed by Plaintiffs, the searches resulted in millions of hits. (Dkt.489-3, p121, and p127) Plaintiffs' position is that all of those documents should have been reviewed and produced. Defendants produced 586,729 pages of emails resulting from the significantly pared down custodian list and ESI search term list. (Dkt.489-3, p.213 and p.221) Defendants attempted to focus in on the most likely candidates for various of the overbroad search terms such as management medical staff who would almost always be copied on communications containing certain search terms, command staff for facilities who would almost always be copied on communications containing certain search terms, etc.

Plaintiffs' lengthy "explanation" of what occurred during meet and confer entirely misses the point. Plaintiffs fixated on minutia that did nothing to reduce the number of hits with the single goal of requiring production of all documents regardless of number, cost and time. As previously reported to the Court by Defendants in a Joint status report (Dkt.450), Plaintiffs' lists generated 7,000,000 (for 58 custodians) and Defendants' estimated it would take 20 years to review the results to determine responsiveness and produce. The Court rejected Plaintiffs' position and repeatedly pointed out that ESI disputes were untimely because of the July 2023 deadline as

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san jose

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-17**

1   noted in this Court's order dated November 22, 2023 (Dkt.454).

2          The Court provided a procedure for addressing the disputes in the November

3   22ⁿᵈ order (Dkt.454) and Defendants fully complied with the order. As the Court noted

4   in the order, Plaintiffs were required to be specific and explain why specific

5   custodians and specific search terms were necessary and would "plausibly yield

6   responsive ESI", citing to *Emerson v. Iron Mountain Info. Mgmt. Servs., Inc.,* No.

7   20CV08607YGRAGT, 2021 WL 8085488, at *1 (N.D. Cal. Sept. 2, 2021) On

8   November 29, 2023, Plaintiffs sent a revised ESI Search Term list that <u>omitted the</u>

9   <u>Thunderdome/pocket search term in its entirety</u>. (Dkt.489-3, p.197-Search Term 35)

10  Defendants *added it back in* as part of the proposed search terms on December 4, 2023

11  (Dkt.489-3, p.203, Search Term 35). It remained in Defendants' final version on

12  December 7, 2023.  (Dkt.489-3, p.215) After removing it altogether and Defendants

13  putting it back in, Plaintiffs may not now complain about the search.

14         The moving papers offer no specificity about search terms other than "pocket"

15  and make only a passing reference to unidentified custodians. As to "pocket", the

16  explanation provided as to why this particular word is important is nonsensical.

17  Plaintiffs want to know about fights which occur in areas of the facilities that are not

18  covered by cameras which cause staff to refer to George Bailey as the

19  "Thunderdome". Plaintiffs' original search term was "pocket OR Thunderdome".

20  (Dkt.489-3, p.124) There was never any narrowing language limiting it to George

21  Bailey.  There was no limiting language including the word "fight". The first hit list

22  provided to Plaintiffs resulted in 10,705 hits on the words "pocket OR Thunderdome".

23  After removing 28 custodians with Plaintiffs' agreement, the number of hits reduced

24  to 2894.  Removing the word "pocket" and adding "jail", the search results came up

25  with 33 hits and they were all produced. A common word like "pocket" in an

26  organization that has uniform standards, concerns itself with "pocket" contents of

27  visitors and Incarcerated Persons and employees, is not a narrowly tailored ESI search

28  term targeted to the alleged issue.  The alleged issue is fighting that occurs in these so

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

17

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO  MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-18**

1  called "pocket areas". Why didn't the search term start out with "pocket" and include

2  "fight"?

3      Search term 43 in the November 29th version of Plaintiffs' desired search term

4  list relates to "bypass". The original search of all terms and all custodians resulted in

5  22,341 hits. Plaintiffs never offered a narrowed search term. Defendants accordingly

6  deleted it from the final list/search.

7      Plaintiffs' assert that because they pared down to half the number of ESI terms,

8  and limited the custodians misses the mark as to the genesis of the dispute. Only after

9  being forced by the Court to pare down the requests were Plaintiffs willing to make

10  any concessions. The notion that a reduction of terms from 43 to 86 and an alleged

11  refusal to provide a "unique" hit list justifies the Court compelling further searches

12  and production lacks any causal connection. The total number of hits with all terms

13  and all custodians was 7,679,096. The total produced based upon the significantly

14  pared down list Defendants used was 586,000. There is no explanation by Plaintiffs

15  how the "unique hit list" or their reduction of search terms was of any help at all.

16  Under no circumstances was 586,000 pages of emails proportionate to any issue in

17  this case. The claimed need for even more emails must be weighed against Plaintiffs

18  40 hours of depositions of 30(b)(6) witnesses that have yet to take place and the

19  additional 63 hours of individual witness depositions, most of which have not taken

20  place. The Court must look at the overall discovery in the case in deciding

21  proportionality in discovery and Plaintiffs' ability to obtain information from other

22  sources that would be less burdensome and more productive. The fact that Plaintiffs

23  have chosen one method over another does not dictate the Court's ability to put

24  limitations on discovery. The Plaintiffs almost complete unwillingness to compromise

25  even with Court intervention is good evidence of where the problem lay.

26      The motion requesting additional ESI searches should be denied.

27  **IX.**   **"Data" responsive to Special Interrogatory No. 25.**

28      Special Interrogatory No. 25 seeks information that would require thousands of

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

18

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-19**

hours over months and months to compile the information requested. There are approximately 4000 Incarcerated Persons housed at the jails every day. There is turnover every day. The interrogatory was intentionally not highlighted to the Court in the moving papers.  It provides:

**INTERROGATORY NO. 2:**

For each INCARCERATED PERSON at the Jail since January 1, 2022, provide their: (a) booking number; (b) name; (c) date of birth; (d) gender; (e) race/ethnicity; (f) booking date and time; (g) primary offense/charge; (h) if multiple offenses or charges are listed, up to 5 other charges or offenses; (i) current bail amount (total or by charge); (j) current classification record (initial or reclassification); (k) current housing unit and bed assignment; (l) all special management flags (e.g., protective custody, gang, juvenile, etc.); (m) whether the person is currently on lockdown status; (n) if currently on lockdown status, when the lockdown began; (o) if sentenced, sentence length; (p) if sentenced, current release date; (q) risk level determined by pretrial risk assessment; (r) mental health care level; and (s) medical care level.

Plaintiffs have never offered any explanation as to why they need any of the information and Defendants were not served with an "Allen declaration" which supposedly supports the claim that Plaintiffs "get the information all the time". This oft repeated phrase by Plaintiffs is not supported by any evidence and has no relevance to whether the information is discoverable in this case or whether the interrogatory is proper.  It is not.

In an attempt to provide as much of the information as could be coalesced into a responsive format, versus preparing an interrogatory response that would take months if not years to answer, Defendants produced spreadsheets Bates Numbered SD 723737-724114 which contain much of the information requested including JIMS numbers, booking numbers, name, date of birth, gender, ethnicity, booking date, release date (anticipated), facility location, facility location (housing location floor

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

19

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO  MOTION TO
COMPEL FURTHER RESPONSES TO RFP

**Ex. A-20**

and cell), Penal code section violation, description of violation. There are 27390 entries on one of the spreadsheets. Another of the spreadsheets was run for November 3, 2024, the date of class certification and it shows booking numbers, JIMS numbers, arrest type, number of charges, types of charges by Penal code, description of charges, severity (Felony or Misdemeanor), and bail information.

Defendants interposed objections to the interrogatory as follows:

**AMENDED RESPONSE TO INTERROGATORY NO. 2:**

Objection. The requested information in the form of an interrogatory is made in bad faith, burdensome, oppressive and overbroad. The Department is unable to extract the data as requested. Some of the data is not tracked at all or is transient in nature and does not exist historically. In addition, the information being requested is irrelevant to any issue raised in the Third Amended Complaint and requested for no apparent reason other than harassment. Without waiving said objections and subject thereto, responding parties have provided several spreadsheets identifying certain of the information requested in the overbroad interrogatory for class members in both the certified subclass and the subsequent broader class and the information will not be repeated herein to the extent it is contained in the spreadsheets and responding party will not search the records of 4000+ individuals for the remaining information because of the overbreadth, burdensome and harassing nature of the interrogatory.

Plaintiffs ignore the spreadsheets provided and attempt mislead the Court about what was provided. The written response is sufficient and the documents produced are sufficient to provide the information requested given the overbroad and harassing nature of the request.

///

///

///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

20

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' OPPOSITION TO MOTION TO
COMPEL FURTHER RESPONSES TO RFP

Ex. A-21

# X.    <u>CONCLUSION</u>

Based upon the foregoing, Defendants request that the Motion to Compel be denied in its entirety.

Dated:  January 24, 2024                                BURKE, WILLIAMS & SORENSEN, LLP


                                                        By:    _*/s/ Elizabeth M. Pappy*_
                                                            Susan E. Coleman
                                                            Elizabeth M. Pappy
                                                            Attorneys for Defendants
                                                            COUNTY OF SAN DIEGO, SAN
                                                            DIEGO COUNTY SHERIFF'S
                                                            DEPARTMENT and SAN DIEGO
                                                            COUNTY PROBATION
                                                            DEPARTMENT

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN JOSE

21                          Case No. 3:20-cv-00406-AJB-DDL
                            DEFENDANTS' OPPOSITION TO MOTION TO
                            COMPEL FURTHER RESPONSES TO REP

Ex. A-22

# EXHIBIT B

| From: | Pappy, Elizabeth M. |
|---|---|
| To: | Gay C. Grunfeld |
| Cc: | Coleman, Susan E.; Hannah Chartoff; Eric Monek Anderson; Priyah Kaul; Van Swearingen; Ben Holston; Inman, Steven |
| Subject: | RE: Dunsmore v. County of San Diego: Defs" January 24 Opposition Brief Mis-Statement [IMAN-DMS.FID55015] |
| Date: | Monday, January 29, 2024 8:50:57 PM |

**[EXTERNAL MESSAGE NOTICE]**

You are not permitted to file a reply.  If you violate court rules in doing so, please attach my email explanation I sent late Friday.  I hope this furthers the merits of your case.

**Elizabeth M. Pappy | Partner**
Pronouns: she, her, hers
60 South Market Street, Suite 1000 | San Jose, CA  95113
d - 408.606.6305 | t - 408.606.6300 | f - 408.606.6333
epappy@bwslaw.com | vCard | bwslaw.com
Burke, Williams & Sorensen, LLP



The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the designated addressee named above. The information transmitted is subject to the attorney-client privilege and/or represents confidential attorney work product. Recipients should not file copies of this email with publicly accessible records. If you are not the designated addressee named above or the authorized agent responsible for delivering it to the designated addressee, you received this document through inadvertent error and any further review, dissemination, distribution or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

---

**From:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Sent:** Monday, January 29, 2024 6:27 PM
**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Cc:** Coleman, Susan E. <SColeman@bwslaw.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric Monek Anderson <EMonekAnderson@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Ben Holston <BHolston@rbgg.com>; Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Subject:** RE: Dunsmore v. County of San Diego: Defs' January 24 Opposition Brief Mis-Statement [IMAN-DMS.FID55015]

**[EXTERNAL]**

---

Dear Counsel,

It appears that Defendants are declining our request to file an amended opposition brief.  If that remains the case as of January 31, we will seek the Court's leave to file a reply limited to the false statement in the Opposition.

**Ex. B-24**

Best, Gay

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

---

**From:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Sent:** Friday, January 26, 2024 7:46 PM
**To:** Gay C. Grunfeld <GGrunfeld@rbgg.com>
**Cc:** Coleman, Susan E. <SColeman@bwslaw.com>; Hannah Chartoff <HChartoff@rbgg.com>; Eric
Monek Anderson <EMonekAnderson@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Van Swearingen
<VSwearingen@rbgg.com>; Ben Holston <BHolston@rbgg.com>
**Subject:** Re: Dunsmore v. County of San Diego: Defs' January 24 Opposition Brief Mis-Statement
[IMAN-DMS.FID55015]

> [EXTERNAL MESSAGE NOTICE]

You can tell the court on Thursday that we have been producing documents all week and that my
paralegal didn't have time when I thought she did.

And maybe you can explain to me why you are spending a Friday night billing for this?

Sent from my iPhone

On Jan 26, 2024, at 5:38 PM, Gay C. Grunfeld <GGrunfeld@rbgg.com> wrote:

> [EXTERNAL]

---

Counsel,

Defendants' opposition brief filed January 24, attached here, states
that "[e]ach and every audit report identified in the [interrogatory]
was produced on January 23, 2024..."  Id. at 9.  Below Ms. Pappy
states that "the audit reports are in line for stamping..." by which we
understand you mean they have not been produced.

**Ex. B-25**

Please file a revised opposition correcting the mis-statement.

Thank you, Gay

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** Coleman, Susan E. <<u>SColeman@bwslaw.com</u>>
**Sent:** Friday, January 26, 2024 5:25 PM
**To:** Gay C. Grunfeld <<u>GGrunfeld@rbgg.com</u>>; Pappy, Elizabeth M.
<<u>EPappy@bwslaw.com</u>>; Hannah Chartoff <<u>HChartoff@rbgg.com</u>>
**Cc:** Eric Monek Anderson <<u>EMonekAnderson@rbgg.com</u>>; Priyah Kaul
<<u>pkaul@rbgg.com</u>>; Van Swearingen <<u>VSwearingen@rbgg.com</u>>; Ben Holston
<<u>BHolston@rbgg.com</u>>
**Subject:** RE: Dunsmore v. County of San Diego: Defs' January 23, 2024 Production
[IMAN-DMS.FID55015]

<div style="border:1px solid #000; background:#fde6a8; padding:4px;">[EXTERNAL MESSAGE NOTICE]</div>

We are not done producing documents today, counsel.

**Susan E. Coleman | Partner**
444 South Flower Street, Suite 2400 | Los Angeles, CA  90071-2953
d - 213.236.2831 | t - 213.236.0600 | f - 213.236.2700
<u>scoleman@bwslaw.com</u> | <u>vCard</u> | <u>bwslaw.com</u>



The information contained in this e-mail message is intended only for the CONFIDENTIAL use of
the designated addressee named above. The information transmitted is subject to the attorney-
client privilege and/or represents confidential attorney work product. Recipients should not file
copies of this email with publicly accessible records. If you are not the designated addressee
named above or the authorized agent responsible for delivering it to the designated addressee, you
received this document through inadvertent error and any further review, dissemination, distribution
or copying of this communication by you or anyone else is strictly prohibited. IF YOU RECEIVED
THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONING
THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Gay C. Grunfeld <<u>GGrunfeld@rbgg.com</u>>
**Sent:** Friday, January 26, 2024 5:24 PM

**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>; Hannah Chartoff
<HChartoff@rbgg.com>; Coleman, Susan E. <SColeman@bwslaw.com>
**Cc:** Eric Monek Anderson <EMonekAnderson@rbgg.com>; Priyah Kaul
<pkaul@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Ben Holston
<BHolston@rbgg.com>
**Subject:** RE: Dunsmore v. County of San Diego: Defs' January 23, 2024 Production
[IMAN-DMS.FID55015]

[EXTERNAL]

Beth,

Will you be revising and re-filing your opposition brief to reflect that
the documents have not yet been produced?

Thanks, Gay

Gay Crosthwait Grunfeld
Managing Partner
She/her
**ROSEN BIEN GALVAN & GRUNFELD LLP**
**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile

**From:** Pappy, Elizabeth M. <EPappy@bwslaw.com>
**Sent:** Friday, January 26, 2024 5:15 PM
**To:** Hannah Chartoff <HChartoff@rbgg.com>; Coleman, Susan E.
<SColeman@bwslaw.com>
**Cc:** Eric Monek Anderson <EMonekAnderson@rbgg.com>; Priyah Kaul
<pkaul@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld
<GGrunfeld@rbgg.com>; Ben Holston <BHolston@rbgg.com>
**Subject:** RE: Dunsmore v. County of San Diego: Defs' January 23, 2024 Production
[IMAN-DMS.FID55015]

[EXTERNAL MESSAGE NOTICE]

The audit reports are in line for stamping after the medical records and contracts (173-
176).

Elizabeth M. Pappy | Partner
Pronouns: she, her, hers

60 South Market Street, Suite 1000 | San Jose, CA  95113
d - 408.606.6305 | t - 408.606.6300 | f - 408.606.6333
epappy@bwslaw.com | vCard | bwslaw.com
<image001.jpg>

The information contained in this e-mail message is intended only for the CONFIDENTIAL use of the
designated addressee named above. The information transmitted is subject to the attorney-client privilege
and/or represents confidential attorney work product. Recipients should not file copies of this email with
publicly accessible records. If you are not the designated addressee named above or the authorized agent
responsible for delivering it to the designated addressee, you received this document through inadvertent
error and any further review, dissemination, distribution or copying of this communication by you or anyone
else is strictly prohibited. IF YOU RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US
IMMEDIATELY BY TELEPHONING THE SENDER NAMED ABOVE AT 800.333.4297. Thank you.

**From:** Hannah Chartoff <HChartoff@rbgg.com>
**Sent:** Friday, January 26, 2024 5:14 PM
**To:** Pappy, Elizabeth M. <EPappy@bwslaw.com>; Coleman, Susan E.
<SColeman@bwslaw.com>
**Cc:** Eric Monek Anderson <EMonekAnderson@rbgg.com>; Priyah Kaul
<pkaul@rbgg.com>; Van Swearingen <VSwearingen@rbgg.com>; Gay C. Grunfeld
<GGrunfeld@rbgg.com>; Ben Holston <BHolston@rbgg.com>
**Subject:** Dunsmore v. County of San Diego: Defs' January 23, 2024 Production [IMAN-
DMS.FID55015]

[EXTERNAL]

Hi Beth,

We are writing to follow up on the production dated January 23, 2024, which according
to Defendants' Opposition to Plaintiffs' Motion to Compel should contain "[e]ach and
every audit report identified in" Defendants' amended response to Interrogatory No.
24.  *See* Opposition, Dkt. 504 at 9.  The Opposition lists about 30 audits.  *Id.* at 7-9.

However, the January 23, 2024 production contains only two documents: (1) a
spreadsheet regarding contractors, that we understand is responsive to a different
request; and (2) the 2022 state auditor report with the Sheriff's Departments
response.  Were the other audit reports produced on a different date?  Please confirm
that the production is complete, or let us know when Defendants will produce
additional responsive documents.

Thank you, and have a good weekend,
Hannah


**Hannah Chartoff**
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor

San Francisco, CA 94105
(415) 433-6830
hchartoff@rbgg.com | she/her | rbgg.com

<[Dkt 504] Defs' Opposition to Pls' Motion to Compel, 01-24-2024, 1730-
1(4426639.1).pdf>

**Ex. B-29**

# EXHIBIT C

1                   UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    DARRYL DUNSMORE, AD6237,          )
     California Health Care Facility,  )
4    Stockton 19777041, PO Box 32200,  )
     Stockton, CA  95213; JOSUE LOPEZ; )
5    CHRISTOPHER NELSON; ET AL.        )
                                       )  No. 20-CV-0406-AJB-DDL
6             Plaintiffs,              )
                                       )
7    v.                                )  January 9, 2023
                                       )
8    COUNTY OF SAN DIEGO, ET AL.,      )
                                       )
9             Defendants.              )
     _____)  San Diego, California
10

11            TRANSCRIPT OF DIGITALLY RECORDED PROCEEDINGS

12                      (Discovery Hearing)

13

14      BEFORE THE HONORABLE DAVID D. LESHNER, MAGISTRATE JUDGE

15

16

17

18

19

20   COURT REPORTER:          AMANDA M. LeGORE
                              RDR, CRR, CRC, FCRR, CACSR
21                            U.S. District Court
                              333 West Broadway, Suite 420
22                            San Diego, CA 92101
                              amanda_legore@casd.uscourts.gov
23

24

25

1    But why shouldn't the plaintiffs have that information, to say

2    to Judge Battaglia, "Hey, look, you've got people with mobility

3    issues that are in a three-tier bunk?"  That's where I

4    understand where the plaintiffs are coming from.

5             ATTORNEY PAPPY:  Understood.  And what I should have

6    also said is the way the information is listed, it includes

7    their housing assignment.

8             THE COURT:  Okay.

9             ATTORNEY PAPPY:  And there's nobody in three bunks

10   anywhere in the facility.  But, yeah.

11            THE COURT:  Okay.

12            ATTORNEY COLEMAN:  But, your Honor, there's a

13   difference between providing lists of ADA people on a certain

14   date and where they're housed, to doing it on the day of the

15   inspection.  And then they want to go look and peer into those

16   cells and see, you know, what the actual situation is of that

17   date; which changes daily.  And there's a lot of turnover in

18   the facility.

19            So, you know, I don't know --

20            THE COURT:  I get it, Ms. Coleman.  And you're right

21   that this information may need to be updated the day of.  And

22   it's one of the reasons why I really do think this might make

23   sense to begin with Central and -- and go from there.

24            But I hear what you're saying.  It is -- it is a

25   fluid facility, in terms of who's being housed and where

**Ex. C-32**

1

2

3

4                                --oOo--

5    I certify, by signing below, that the foregoing is a correct

6    stenographic transcript, to the best of my ability, of the

7    digital recording of the audio proceedings had in the

8    above-entitled matter this 11th day of January, 2023.  A

9    transcript without an original signature or conformed signature

10   is not certified.  I further certify that the transcript fees

11   and format comply with those prescribed by the Court and the

12   Judicial Conference of the United States.

13

              /S/ Amanda M. LeGore
14           _____

15        AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

16

17

18

19

20

21

22

23

24

25

Ex. C-33

# EXHIBIT D

# ROSEN BIEN GALVAN & GRUNFELD LLP



# CASp ASSESSMENT SAN DIEGO COUNTY CENTRAL JAIL





**April 24, 2023**

**Ex. D-35**



# Table of Contents

**Background and Findings**      **2**

**Applicable Standards**      **4**

**Overview**      **4**

   1. **Celled Housing Units: Floors 4, 5, 6, and 7** ....................................5

   2. **Dorm Housing Units: Floor 8** .........................................................14

   3. **Dayrooms and Visiting Areas in Housing Units** ..........................16

**Overview of Additional Areas Inspected**      **17**

   1. **Accessible Route** ............................................................................17

   2. **Intake Area** .....................................................................................17

   3. **Second Floor: Holding and Release Areas** .................................21

   4. **Floor 3: Medical Floor** ....................................................................22

   5. **Communication Features Accessible for People with Hearing Disabilities** ........................................................................23

**Methodology**      **23**

**Barrier Severity Ratings (BSR)**      **24**

**Report Format – Definitions**      **26**

**Barrier Records**      **29**

**Reference Drawings**      **359**

**Ex. D-36**

**SZS**
ENGINEERING

## Background and Findings

Findings contained in this report are the result of a site inspection of the San Diego County Central Jail on March 13, 2023. The site visit was performed over an approximately 6-hour time period by two Certified Access Specialists (CASp) representing SZS Engineering Access Inc. The inspection assessed Central Jail's compliance with the Americans With Disabilities Act ("ADA"). Defendants San Diego County and the San Diego County Sheriff's Department ("Defendants"), through counsel, escorted the CASp specialists to areas identified for inspection during the site visit. They were accompanied by their expert, Paul Joelson.

Our inspection found:

(1)    None of the assessed cells designated as accessible are in fact accessible to people with mobility disabilities. The cells lack sufficient space for a wheelchair user to turn inside the room or safely transfer in and out of bed, lack grab bars for people to safely transfer to the toilet, lack compliant lavatories, and lack sufficient space for people to transfer to the toilet.

(2)    Showers throughout the facility are not accessible to people with mobility disabilities. Showers in celled housing units on floors 4-7 are at the end of a long and narrow alcove that can trap wheelchairs at the end with no way to turn around. Showers in dormitories on floor 8 have no level wheelchair space at the entry to transfer to a seat (if provided) and no required maneuvering clearance for wheelchairs. All showers lack fixed shower seats with a backrest, accessible grab bars, controls, and shower spray units.

(3)    Defendants house people with mobility disabilities in triple bunks in several units at Central Jail. The bed surfaces are either far below wheelchair seat height, or far above. None of the bunks on these beds are not accessible to people with mobility disabilities because transferring means that a person must support their entire upper body while essentially balancing on their hands and swinging their lower body in the direction of the surface to which they must transfer. Doing this uphill or downhill is not possible for most people and with those for whom it is possible, it poses a safety risk.

**SZS**
ENGINEERING

Department also produced redacted rosters identifying the incarcerated people with mobility disabilities and hearing disabilities at Central Jail, as of two different dates in the weeks before our inspection.

Below, we provide a narrative summary of the major issues with each element of the facility that we inspected, beginning with the housing units. **We found that none of the housing units—including critical features like toilets, beds, drinking fountains and showers—were accessible to people with mobility disabilities**.

### 1. Celled Housing Units: Floors 4, 5, 6, and 7

Floors 4, 5, 6, and 7 at Central Jail each include several celled housing modules. For example, we observed five housing unit modules on Floor 4: 4A, 4B, 4C, 4D, and 4E.[3] Each housing module with cells consists of a group of cells on the main floor, and another group of cells up the stairs on the mezzanine (in Jail terminology, called the "upper tier"). The floor plan documents indicate that each module has one cell designated as accessible for a person with a mobility disability on the main level only, which calculates to 5 cells identified as accessible on each of 4 floors (4-7).

**Our inspection found that these designated as accessible cells do not comply with the ADA, and that the showering facilities for people with mobility disabilities are also not compliant with the ADA. These non-compliant beds, toileting, and showering facilities place incarcerated people with mobility disabilities at risk.**



The housing cells identified as accessible for those who require mobility features in units on floors 4-7 were located in the corner of each unit. Cell 4A10 was one such corner unit. First of all, after assessing many jail facilities, I have never encountered a facility in which the operators claimed that a cell used by incarcerated individuals requiring mobility features was ADA compliant while including a triple bunk

---

[3] The roster provided to us also shows a person in a wheelchair housed in 4F. However, Defendants did not show us 4F on the inspection and the floor plan documents do not include any indication about where on the fourth floor 4F is located.

Ex. D-38

bed (see photo). Neither the low nor the middle bed height is at the same level as a wheelchair seat, which makes transfer virtually impossible at the least and dangerous at best.

Specifically, the low bunk bed in triple bunk beds was 10-1/2 inches off the floor. By contrast, the low bunk beds in the double-celled modules on the seventh floor were 16-1/2 inches high, which is a more suitable height for transfer. Wheelchair seats generally vary in height from 17 to 19 inches high. Under the ADA, Defendants must provide toilets and dressing benches at a seat height range of 17 to 19 inches.[4] Transfer should occur from one surface to another surface of the same or similar height for safety reasons. The low triple bunk beds at 10-1/2 inches off the ground are much too low, as they require a person to transfer down from a wheelchair into the bunk. Although we did not measure the middle or top bunk on the triple bunks, it is obvious that both were far higher than 19 inches off the ground. To transfer to a middle bunk, a person in a wheelchair must somehow climb up to reach the bed surface, which is not safe.

Central Jail includes triple bunks in the cells on both the fourth and the fifth floors (as well as the eighth-floor dormitories, as discussed below).[5]

The roster provided March 10, 2023, right before the inspection, showed that two people with mobility disabilities were assigned to top bunks. The roster also showed that at least ten people who use wheelchairs were assigned to the middle bunk in a triple bunk, which as discussed, is very dangerous for those people (and also dangerous for people with less serious mobility disabilities, who are also housed on middle bunks). Jail policy expressly states that a middle bunk on a triple bunk is considered a lower bunk, for purposes of housing people with mobility disabilities. That policy is dangerous and misplaced for the reasons stated above.

In the designated as accessible cell, although the floor plan shows a 60-inch turning circle in this cell, the desk obstructs almost half of the turning circle space—which makes that turning space unusable, with only 27-to-

---

[4] See both 1991 ADAAG 4.16.3 and 2010 ADA 604.4 governing toilet seat height and 2010 ADAS 903.5 governing bench seat height.

[5] The cells on the seventh floor included double bunks and the designated as accessible cell on the sixth floor included a single bunk.

**SZS**
ENGINEERING

28-1/2-inches left for maneuvering. The view panels in the door are also not compliant for incarcerated individuals who use wheelchairs, as they are too high for them to see from their cells into the dayroom while seated in a wheelchair.



The floor plan provided for use in the assessment process shows 4A10, the cell identified as accessible, as having almost a pie-shaped footprint. The same is true for all other cells identified as accessible in the floor plans provided. The cell design lacks the required space to provide mobility features. This configuration drastically limits the space inside the cell, which forces the fixed desk into the clear floor space required for a wheelchair to rest adjacent to the triple bunk bed to safely transfer. In addition, the triple bunk bed blocks clear floor space needed for a wheelchair to fit under the desk to use it (see photo). The lack of required maneuvering space in the room makes both the bed and desk unsafe to use. In fact, an incarcerated individual using a wheelchair is forced to pull under the desk at a sharp angle to fit their wheelchair between the desk and bed.

**Even more problematic, the toilet in the cell is placed in a small alcove between the triple bunk beds and outer wall, without space for a wheelchair to pull up to the side and allow safe transfer onto the toilet.** The flush control is mounted on the wall above the toilet, far above compliant height under the California Building Code ("CBC")[6], and the clear floor space needed to reach the flush control is blocked by the toilet and triple bunk bed. Other ADA violations include a lavatory without required knee clearance, a mirror not low enough for an incarcerated individual using a wheelchair to see themselves, and a toilet in a small alcove that was 30% smaller[7] than required under the ADA.

---

[6] Although this case was brought under the ADA and related state statutes, buildings in California must also comply with accessibility requirements in the CBC.

[7] Per the 1991 ADAAG Figure 24 Clear Floor Space at Water Closets, applicable to Central Jail at the time of construction, a minimum of 60 inches in width is required at an

**SZS**
ENGINEERING

upper level (known in the Jail system as the "upper tier").[9] The bunks are arranged along the edges of the dormitory, with a dayroom area in the center of the dormitory. According to the roster provided and as we observed on the inspection, the vast majority of people with mobility disabilities on this floor were clustered into 8C.

In the 8C dormitory housing unit, we observed several individuals using wheelchairs in the dayroom, in addition to several other empty wheelchairs stored under the stairway. The same non-compliant lavatories, drinking fountains, toilet, and showers identified in the celled housing units were also identified in these locations, as well as the same issues with triple bunk beds. The use of triple bunk beds is particularly egregious in 8C, given the clustering of people with mobility disabilities in that unit. The roster provided March 10, 2023 shows 24 people with mobility disabilities in that unit, including 13 who use wheelchairs. ***Seven*** of those people who use wheelchairs were indicated as housed on the middle bunk, which as described above means they have to undertake a dangerous transfer up into or down out of the middle bunk at least twice a day. In addition, only two triple bunk beds were in locations where maneuvering space for a wheelchair was available. The others were oriented in the unit with the bunk bed end facing open space, and a narrow passing space between bunk beds that was not wide enough for a wheelchair to travel through.

In contrast to the 24 people with mobility disabilities in 8C, the roster shows only one person with a mobility disability in 8B and none in 8A. Units 8A and 8B are reserved for incarcerated individuals who take part in work programs. On our inspection, those units appeared to have many beds open and unused, even though such work programs are ordinarily highly sought as they offer participants benefits such as pay. Units A and B had vending machines and large monitors where individuals were playing video games. These physical amenities were not observed in any other area in the Jail, and the contrast with 8C was stark. Excluding incarcerated individuals with disabilities from participation in work programs that afford otherwise unavailable benefits to participants is discriminatory.

---

[9] The Jail construction plans refer to the second level of each housing unit as the "mezzanine."

**SZS ENGINEERING**

# County of San Diego

| | |
|---|---|
| Field Date: 3/13/2023 | Report Date: 4/3/2023    Barrier #: 37F |



Facility: Central Jail

Location: Floor 4 - Housing 4A Cell A10

Official Responsible: San Diego County

Facility Function: Public    Dwg: 4 of 11

Barrier Area: Counters and Tables    Remediation: Required

Barrier Type: Desks - Clear Floor Space

Barrier Description: Clear floor space of min. 30" by 48" not provided

Code References: ADAAG 4.32.2 & 4.2.4.1 | CBC 11B-902.2 and 2010 ADAS 902.2

As Built Description: 27-1/2" between desk and triple bunk bed. Wheelchair cannot pull under desk to use.

Proposed Solution: Alter cell to comply

As-Built Meas: 1    Quantity: JOB    Cost Estimate: $0.00    BSR: 1 - High Severity

X Coordinate: N/A    Y Coordinate: N/A    Z Coordinate: N/A

Implementation:    Priority _____    Phase _____    Date _____    Status Open

Notes:

---

Field Date: 3/13/2023    Report Date: 4/3/2023    Barrier #: 37G



Facility: Central Jail

Location: Floor 4 - Housing 4A Cell A10

Official Responsible: San Diego County

Facility Function: Public    Dwg: 4 of 11

Barrier Area: Restrooms    Remediation: Required

Barrier Type: WC - Toilet with Lavatory

Barrier Description: Clear space in front of closet not min. 60" wide x 56" deep

Code References: ADAAG 4.17.3* Figure 30 (a) | CBC 11B-604.3.1 and 2010 ADAS 604.3.1

As Built Description: 40-1/2" wide between outer wall and end of triple bunk beds

Proposed Solution: Alter cell to comply

As-Built Meas: 1    Quantity: JOB    Cost Estimate: $0.00    BSR: 3 - Low Severity

X Coordinate: N/A    Y Coordinate: N/A    Z Coordinate: N/A

Implementation:    Priority _____    Phase _____    Date _____    Status Open

Notes:

CASp Inspection

Ex. D-42

# EXHIBIT E

1              UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   DARRYL DUNSMORE, ERNEST          )
    ARCHULETA, ANTHONY EDWARDS, REANNA)
4   LEVY, JOSUE LOPEZ, CHRISTOPHER    )
    NELSON, CHRISTOPHER NORWOOD, and  )
5   LAURA ZOERNER, on behalf of       )
    themselves and all others         )
6   similarly situated,               )
                                      )   No. 20-CV-00406-AJB-DDL
7            Plaintiffs,              )
                                      )
8   v.                                )   December 20, 2023
                                      )
9   SAN DIEGO COUNTY SHERIFF'S        )
    DEPARTMENT; COUNTY OF SAN DIEGO;  )
10  CORRECTIONAL HEALTHCARE PARTNERS, )
    INC.; LIBERTY HEALTHCARE, INC.;   )
11  MID-AMERICA HEALTH, INC.; LOGAN   )
    HAAK, M.D., INC.; SAN DIEGO COUNTY)
12  PROBATION DEPARTMENT, and DOES 1  )
    to 20 inclusive,                  )
13                                    )
             Defendants.              )
14  _____    )   San Diego, California


15

    TRANSCRIPT OF DIGITALLY RECORDED VIDEOCONFERENCED PROCEEDINGS
16                   (Discovery Conference)

17

18      BEFORE THE HONORABLE DAVID D. LESHNER, MAGISTRATE JUDGE

19

20

21

22

23  COURT REPORTER:        AMANDA M. LeGORE
                           RDR, CRR, CRC, FCRR, CACSR
24                         U.S. District Court
                           333 West Broadway, Suite 420
25                         San Diego, CA 92101
                           amanda_legore@casd.uscourts.gov

**Ex. E-44**

1          ATTORNEY PAPPY:  -- of documents as of this past

2     Sunday.

3          In terms of putting dollar amounts and amounts of

4     time each and every step of the way, I asked my clients, "Okay.

5     So if the judge ordered you to do this, how long would it

6     take?"  If the Court requires a motion to compel, I will be

7     ready and prepared.  I have a million-dollar-a-month quote from

8     one of the data-hosting services.  A million dollars a month.

9          And I have -- and we are prepared, and I will put

10    those declarations into evidence in response to a motion to

11    compel, which is the information that was provided to

12    plaintiffs' counsel.

13         The number of requests for production of documents

14    isn't indicative of the fact if they're proper or the

15    complications in the case.  If there had been 401 specific

16    requests for production of documents, I wouldn't have blinked

17    an eye about them.  I mean, I'm not happen about 247, but it's

18    a complicated case, with a lot of issues.  If they had been

19    narrow, it would -- wouldn't have been a problem.  Quite

20    frankly, I do redraft these things to be specific to what I

21    think that they want.

22         I want to point out to the Court and make sure

23    there's a record of the fact that there has not been a single

24    drug overdose death in the jail in 2023.  And it is December

25    20th.  And the County and the sheriff are extremely proud of

127

1    that, given the efforts that they've put forth.

2            Policies and procedures.  Every single policy and

3    procedure that is -- that exists -- that existed before, that

4    has changed because of this case or just changed, has been

5    produced.  I hit send on Sunday.

6            Trainings.  Every single training that we have has

7    been produced, except for what I'm in the process of producing

8    in response to 5.

9            Audits and quality control.  Everything that we have

10   that has been requested -- that I didn't go back to for some

11   other reason -- has been produced.

12           Evidence of practice is, I agree with counsel, where

13   we are tripped up.  Because you get the phrase "All documents,

14   all communications."

15           And proportionality -- I promised I'm going to move

16   forward.  Proportionality is something that I have talked about

17   a lot with plaintiffs' counsel.

18           And one of the errors that I see in the way that this

19   case has been litigated -- which we are now stuck with -- is

20   counsel, on the one hand, tells us that their entire firm --

21   and I have no doubt are extremely (indiscernible) these cases.

22   They filed them throughout the state of California.  And, no,

23   they don't know what County of San Diego's particular

24   terminology is, but they know their stuff.

25           And if there really was an issue of we don't know

152

1   So let's do that.  And then you will have your class list,

2   Mr. Swearingen.

3              ATTORNEY SWEARINGEN:  (Indiscernible), your Honor.

4              THE COURT:  No problem.  All right.

5              ATTORNEY PAPPY:  Thank you for the Court's time

6   today.  We appreciate it.

7              THE COURT:  No problem.  Take care.  Have a good

8   holiday.

9              ATTORNEY PAPPY:  You too.

10             (Conclusion of proceedings at 12:41 p.m.)

11

12                          --oOo--

13  I certify, by signing below, that the foregoing is a correct
    stenographic transcript, to the best of my ability, of the
14  digital recording of the audio proceedings had in the
    above-entitled matter this 26th day of December, 2023.  A
15  transcript without an original signature or conformed signature
    is not certified.  I further certify that the transcript fees
16  and format comply with those prescribed by the Court and the
    Judicial Conference of the United States.

17             /S/ Amanda M. LeGore

18             _____

19       AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

20

21

22

23

24

25

Ex. E-47

# EXHIBIT F



# SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
## Critical Incident Review Board
## In-Custody Death Information Release

DATE OF INCIDENT: February 4, 2023

TIME: 10:30 a.m.
LOCATION: Tri-City Medical Center (Vista Detention Facility)

The Sheriff's Homicide Unit conducts a thorough investigation of every in-custody death. In addition to the investigation conducted by the Sheriff's Homicide Unit, the Sheriff's Critical Incident Review Board (CIRB) conducts a review of in-custody deaths. The CIRB is comprised of department leadership and the Sheriff's Legal Advisor and performs a critical review of each incident. The focus of the CIRB is to assess the department's civil exposure because of a given incident. The review may identify potential misconduct, criminal negligence or behavior, policy violations, training deficiencies, or other areas where we can improve and make our facilities safer for staff and those in our custody. This release synopsizes the reviewed incident and any resultant actions taken to improve our operations.

On February 1, 2023, at about 9:55 a.m., while conducting a safety check of the Lower West housing unit at the Vista Detention Facility, a Sheriff's deputy found Incarcerated Person Ryan Thuresson unresponsive inside a cell. Thuresson was the sole occupant of the cell. Deputies initiated cardiopulmonary resuscitation (CPR), administered Naloxone, and summoned medical staff. Sheriff's medical personnel arrived at about 9:59 a.m. to assist with lifesaving measures, including applying an Automated External Defibrillator (AED) and administering additional doses of Naloxone.

At about 10:10 a.m., Vista Fire Department (VFD) personnel arrived and took over lifesaving measures, including applying a Lund University Cardiopulmonary Assist System (LUCAS) CPR machine. VFD paramedics were able to restore Thuresson's pulse and transported him to the Tri-City Medical Center. Members of Thuresson's family were contacted prior to his passing to provide input on his care and treatment. Despite the efforts of emergency responders and hospital staff, a doctor pronounced Mr. Thuresson deceased on February 4, 2023, at approximately 10:37 a.m.

As is the protocol for all in-custody deaths, the San Diego Sheriff's Homicide Unit investigated this incident and documented the scene. Evidence seized from the scene is pending laboratory analysis.

Ex. F-49

The San Diego County Medical Examiner's Office conducted an independent investigation and post-mortem. The cause of death was determined to be "combined fentanyl and fluorofentanyl toxicity" and the manner was "accident." (ME Case #2023-00429)

The CIRB conducted a preliminary review of this incident on March 15, 2023, with no action items or policy recommendations at that time.

**Ex. F-50**



# SAN DIEGO COUNTY SHERIFF'S DEPARTMENT
## Critical Incident Review Board
## In-Custody Death Information Release

DATE OF INCIDENT: April 17, 2023

TIME: 7:28 p.m.
LOCATION: Vista Detention Facility

The Sheriff's Homicide Unit conducts a thorough investigation of every in-custody death. In addition to the investigation conducted by the Sheriff's Homicide Unit, the Sheriff's Critical Incident Review Board (CIRB) conducts a review of in-custody deaths. The CIRB is comprised of department leadership and the Sheriff's Legal Advisor and performs a critical review of each incident. The focus of the CIRB is to assess the department's civil exposure because of a given incident. The review may identify potential misconduct, criminal negligence or behavior, policy violations, training deficiencies, or other areas where we can improve and make our facilities safer for staff and those in our custody. This release synopsizes the reviewed incident and any resultant actions taken to improve our operations.

On April 17, 2023, at about 6:59 p.m., a Sheriff's deputy conducting a safety check of the East housing unit at the Vista Detention Facility found Incarcerated Person Eddie Faulkner unresponsive inside a cell. Faulkner was the sole occupant of the cell. Deputies and a nearby nurse initiated cardiopulmonary resuscitation (CPR), administered Naloxone, summoned additional medical staff, and requested an emergency response by calling 911. Additional Sheriff's medical personnel arrived at about 7:05 p.m. to assist with lifesaving measures, including applying an Automated External Defibrillator (AED) and administering additional doses of Naloxone.

At about 7:12 p.m., Vista Fire Department (VFD) personnel arrived and took over lifesaving measures, including applying a Lund University Cardiopulmonary Assist System (LUCAS) CPR machine. Despite the efforts of emergency responders, a doctor pronounced Faulkner deceased at 7:28 p.m.

As is the protocol for all in-custody deaths, the San Diego Sheriff's Homicide Unit investigated this incident and documented the scene.

The San Diego County Medical Examiner's Office conducted an independent investigation and post-mortem. The cause of death was determined to be "acute fentanyl, trazodone, and gabapentin intoxication" with "hypertensive and atherosclerotic cardiovascular disease" contributing, and the manner was "accident." (ME Case #2023-01276)

Ex. F-51

The CIRB conducted a preliminary review of this incident on June 14, 2023, with no action items or policy recommendations at that time.

**Ex. F-52**

# EXHIBIT G

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4  DUNSMORE, et al.,              )  Case No. 20CV0406-AJB-DDL
                                  )
5            Plaintiffs,          )  San Diego, California
                                  )
6  vs.                            )  Wednesday,
                                  )  August 31, 2022
7  STATE OF CALIFORNIA, et al.,   )  2:00 p.m.
                                  )
8            Defendants.          )
                                  )
9  _____)

10                TRANSCRIPT OF DISCOVERY CONFERENCE
                BEFORE THE HONORABLE DAVID D. LESHNER
11                 UNITED STATES MAGISTRATE JUDGE

12
   APPEARANCES:
13
   For the Plaintiffs:          PRIYAH KAUL, ESQ.
14                              RICHARD VAN SWEARINGEN, ESQ.
                                Rosen Bien Galvan &
15                                Grunfeld, LLP
                                101 Mission Street
16                              Sixth Floor
                                San Francisco, California
17                                94105
                                (415) 433-6830
18

19  For the County of San Diego:  SUSAN E. COLEMAN, ESQ.
                                Burke, Williams & Sorensen, LLP
20                              444 South Flower Street
                                Suite 2400
21                              Los Angeles, California 90071
                                (213) 236-0600
22

23

24
   Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

17

1 before, have all been replaced with Mass Care, an entirely

2 different company that's not currently sued by Plaintiffs but

3 is the company going to work for the -- for the comprehensive

4 medical, vision, dental, psych, everything for the County

5 incarcerated persons.

6         There have been a lot of changes that have been

7 made by the County, including the Rock Mountain facility

8 that's going to be open this fall, which is entirely ADA

9 compliant.

10         In terms of the death rate, they characterized in a

11 lot of their pleadings and here today as extraordinary and

12 higher than other counties.  The statistics they compiled

13 didn't include L.A. County.  L.A. County has a higher death

14 rate.  Not all of the deaths that they had this year or last

15 year were preventable.  There were some for cancer, natural

16 causes, COVID.  They are not, for example, all from drug

17 overdoses or something.

18         In terms of the injunction they proposed, it really

19 wasn't a proposal.  They asked for the County to come up with

20 plans to fix things like not having drugs come into the prison

21 anymore, for the County to come up with a plan within 30 days.

22 The County is already doing scanning, drug dogs, you know, a

23 lot of measures, and they're interdicting a lot of drugs.

24 But, you know, with Fentanyl, it's smaller and smaller

25 quantities.  So, it's -- it's difficult.  It's an issue, but

33

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Jordan Keilty                    9/28/2022
     Transcriber                         Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8    /s/L.L. Francisco
     L.L. Francisco, President
9    Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

**Ex. G-56**

# EXHIBIT H

**News List**

## State of San Diego County Jails

**Post Date:**      07/05/2023 5:30 PM





We recognize the significance of sharing information with the people we serve. Today, Sheriff Kelly Martinez and members of the Sheriff's Detention Services Bureau held a news conference to report on the State of our Jails. Sheriff Martinez provided a thorough update on construction projects, technological advancements, healthcare services, accessibility, reentry services and keeping drugs out of our jails.

### Rock Mountain Detention Facility



The Sheriff's Department will soon be opening the Rock Mountain Detention Facility in Otay Mesa. The facility was built in 1998 and operated by a private company for federal agencies, which was not subject to California Board of State and Community Corrections (BSCC) standards and inspections. When the facility was turned over to the Sheriff's Department, Rock Mountain had to undergo further renovations to meet requirements set forth by BSCC and the Americans with Disabilities Act (ADA). The Rock Mountain renovation project cost $48 million.

Rock Mountain is located at the same complex as our George Bailey Detention and East Mesa Reentry Facilities. The first housing unit is set to open this month. Additional work on the rest of the housing units is expected to be completed in 2024.

### ADA Compliance

Ex. H-58

1/30/24, 11:55 AM    Case 3:20-cv-00406-AJB-DDL   State of San Diego County Jails | News | Document 516-2   Filed 02/01/24   PageID.20731

Page 63 of 70



We have taken significant steps to increase access for persons with disabilities in our county jails. To make our facilities compliant with the Americans with Disabilities Act (ADA), we have started making changes such as:

- Modifications to jail showers, toilets, and beds to comply with the ADA.
- Provide more information during the booking process about jail accommodations for individuals with mobility disabilities.
- Provide sign language interpretation, either in person or remote, for individuals in our custody who use sign language as their primary means of communication.
- Created the ADA Unit to update policies and procedures regarding individuals with disabilities in our custody, as well as oversee renovation projects for ADA compliance.

## Keeping Drugs Out Of Jails



The Sheriff's Department continues to find effective ways to prevent drugs from getting into our jails.

Specially trained deputies make up the Sheriff's Narcotics and Contraband Interdiction Unit. They are stationed in the booking areas of our jails. By using basic and more sophisticated investigative techniques, these deputies can uncover drugs before they get inside our detention facilities.

**Ex. H-59**



We have purchased new body scanners to screen people coming into our custody. These scanners are more accurate in identifying drugs hidden on or in the bodies of people being booked.



Naloxone has been placed inside all our detention facilities and is available to individuals who are in our custody. This harm reduction measure has saved lives and reversed the effects of overdoses in jail.

**Medical and Mental Health Care**



We continue to make progress in enhancing the healthcare services we provide to ensure the safety of people in our custody.

Everyone who is booked into our jails undergoes a medical evaluation, including a voluntary urine screening. This helps us identify any substances people have in their system when they come into our facilities. The information guides the treatment plan they will receive from Sheriff's Medical Services.



We have expanded the Medication-Assisted Treatment (MAT) Program. We can better help people in our facilities through treatment programs that work with medication and counseling to reduce addiction. When someone is released, they are provided resources for continuing care in the community.



Ex. H-61

Case 3:20-cv-00406-AJB-DDL   Document 516-2   Filed 02/01/24   PageID.20734
Page 66 of 70

We know a large portion of our jail population needs mental health services. We provide those mental health assessments at intake so we can provide the appropriate treatment plan as soon as possible.

Individuals who are unable to take care of themselves undergo Wellness Checks from a multi-disciplinary group of our staff that includes sworn staff, medical and mental health providers, as well as correctional counselors. This group visits these individuals weekly in their cells, to assess if the person is eating, bathing, sleeping and generally taking care of themselves. We can identify concerns and risks earlier and get people the help they need.

We continue to improve the electronic health record system which makes medical and mental health information easier to access and available to providers.

## Jail Construction Projects



There are several projects underway to renovate and improve many of our detention facilities:

- A nearly $12 million elevator project at the San Diego Central Jail.
- A $2.5 million intercom project is in the planning stages at the Vista Detention Facility, as well as upgrades in wireless connections for body-worn cameras. A planning study is also in the works for the construction of a new facility.
- A $1.5 million renovation of our Central Production Center at the East Mesa Reentry Facility is currently in the design stage. This remodel includes all the preparation areas where meals are cooked for people in our custody.
- Work is underway on renovating the George Bailey Detention Facility. Housing units will be remodeled from top to bottom. During construction, incarcerated individuals at George Bailey will be transferred to the newly renovated Rock Mountain Detention Facility next door.

## Jail Technological Improvements



Great strides continue to be made in rolling out body worn cameras at our county jails.

Ex. H-62

1/30/24, 11:55 AM
Case 3:20-cv-00406-AJB-DDL    Document 516-2    Filed 02/01/24    PageID.20735    Page 67 of 70
State of Department - In the News - About - San Diego County Sheriff

All deputies at the Las Colinas Detention and Reentry Facility in Santee have been equipped and trained to use body cameras. We are in the process of doing the same at the San Diego Central Jail. From there, we will bring body-worn cameras to the Vista Detention Facility later this year once the electrical and network infrastructure has been updated.

The Sheriff's Department is also looking into implementing radio-frequency identification (RFID) wristbands in our county jails. An RFID system will significantly improve the health and safety of individuals in our custody by providing real-time access to essential information about each person. This will give our jail staff immediate access to critical medical information such as allergies, chronic conditions and other known issues.

### Reentry Services



Sheriff's Reentry Services provides opportunity, education and job training to people in our jails.



With more than three dozen reentry programs ranging from gardening to construction trades to culinary arts, individuals are given a second chance to prepare for their return to our communities.

Our nationally recognized Veterans Moving Forward program for former military servicemembers has been so successful it is being used as a model for implementation by other counties in their jails

The Sheriff's Department partners with more than 40 agencies to connect individuals with various resources for a successful transition back into society.

Ex. H-63



For media resources such as b-roll and photos for broadcast or publication, scan the QR Code above or click here.

Media Contact:
mediarelations@sdsheriff.org
Media Relations Office (858) 974-2259
San Diego County Sheriff's Department



# Estado de las Cárceles del Condado de San Diego

*Actualización sobre nueva instalación, proyectos de mejora.*

Reconocemos la importancia de compartir información con las personas a las que servimos. Hoy, la Alguacil Kelly Martínez y los miembros de la Oficina de Servicios de Detención del Alguacil realizaron una conferencia de prensa para informar sobre el estado de nuestras cárceles. La Alguacil Martínez proporcionó una actualización completa sobre proyectos de construcción, avances tecnológicos, servicios de atención médica, accesibilidad, servicios de reingreso y cómo mantener las drogas fuera de nuestras cárceles.

# Centro de Detención Rock Mountain

El Departamento del Alguacil pronto abrirá el Centro de Detención Rock Mountain en Otay Mesa. La instalación fue construida en 1998 y operada por una empresa privada para agencias federales, que no estaba sujeta a las normas e inspecciones de la Junta de Correccionales Comunitarias y Estatales de California (BSCC). Cuando la instalación fue entregada al Departamento del Alguacil, Rock Mountain tuvo que someterse a más renovaciones para cumplir con los requisitos establecidos por BSCC y la Ley de Estadounidenses con Discapacidades (ADA). El proyecto de renovación de Rock Mountain costó $ 48 millones.

Rock Mountain está ubicado en el mismo complejo que nuestras Instalaciones de Detención de George Bailey y Reingreso de East Mesa. La primera unidad de vivienda está programada para abrir este mes. Se espera que el trabajo adicional en el resto de las unidades de vivienda se complete en 2024.

## Cumplimiento de ADA

Hemos tomado medidas significativas para aumentar el acceso de las personas con discapacidades en las cárceles de nuestro condado. Para que nuestras instalaciones cumplan con la Ley de Estadounidenses con Discapacidades (ADA), hemos comenzado a realizar cambios como:

• Modificaciones a las duchas, inodoros y camas de la cárcel para cumplir con la ADA.
• Proporcione más información durante el proceso de reserva sobre alojamiento en la cárcel para personas con discapacidades de movilidad.
• Proporcionar interpretación de lenguaje de señas, ya sea en persona oa distancia, para las personas bajo nuestra custodia que usan el lenguaje de señas como su principal medio de comunicación.
• Crear la Unidad de ADA para actualizar las políticas y los procedimientos relacionados con las personas con discapacidades bajo nuestra custodia, así como supervisar los proyectos de renovación para el cumplimiento de ADA.

**Ex. H-64**

## Mantener las Drogas Fuera de las Cárceles

El Departamento del Alguacil sigue buscando formas eficaces de evitar que las drogas entren en nuestras cárceles.

Oficiales especialmente capacitados conforman la Unidad de Interdicción de Narcóticos y Contrabando del Alguacil. Están estacionados en las áreas de reserva de nuestras cárceles. Mediante el uso de técnicas de investigación básicas y más sofisticadas, estos oficiales pueden descubrir drogas antes de que ingresen a nuestros centros de detención.

Hemos comprado nuevos escáneres corporales para examinar a las personas que están bajo nuestra custodia. Estos escáneres son más precisos para identificar drogas escondidas en los cuerpos de las personas fichadas.

La naloxona se ha colocado dentro de todos nuestros centros de detención y está disponible para las personas que están bajo nuestra custodia. Esta medida de reducción de daños ha salvado vidas y revertido los efectos de las sobredosis en la cárcel.

## Atención Médica y de Salud Mental

Seguimos avanzando en la mejora de los servicios de atención médica que brindamos para garantizar la seguridad de las personas bajo nuestra custodia.

Todos los que ingresan en nuestras cárceles se someten a una evaluación médica, incluido un examen de orina voluntario. Esto nos ayuda a identificar cualquier sustancia que las personas tengan en su sistema cuando ingresan a nuestras instalaciones. La información guía el plan de tratamiento que recibirán de los Servicios Médicos del Alguacil.

Hemos ampliado el Programa de Tratamiento Asistido por Medicamentos (MAT). Podemos ayudar mejor a las personas en nuestras instalaciones a través de programas de tratamiento que funcionan con medicamentos y asesoramiento para reducir la adicción. Cuando alguien es dado de alta, se le proporcionan recursos para la atención continua en la comunidad.

Sabemos que una gran parte de nuestra población carcelaria necesita servicios de salud mental. Proporcionamos esas evaluaciones de salud mental en la admisión para que podamos proporcionar el plan de tratamiento adecuado lo antes posible.

Las personas que no pueden cuidar de sí mismas se someten a controles de bienestar de un grupo multidisciplinario de nuestro personal que incluye personal jurado, proveedores médicos y de salud mental, así como consejeros correccionales. Este grupo visita semanalmente a estas personas en sus celdas, para evaluar si la persona está comiendo, bañándose, durmiendo y cuidándose en general. Podemos identificar las preocupaciones y los riesgos antes y brindarles a las personas la ayuda que necesitan.

Continuamos mejorando el sistema de registro de salud electrónico que hace que la información médica y de salud mental sea más fácil de acceder y esté disponible para los proveedores.

## Proyectos de Construcción de Cárceles

Hay varios proyectos en marcha para renovar y mejorar muchas de nuestras instalaciones de detención:

• Un proyecto de ascensor de casi $12 millones en la Cárcel Central de San Diego.
• Un proyecto de intercomunicación de $2.5 millones está en las etapas de planificación en el Centro de Detención de Vista, así como actualizaciones en las conexiones inalámbricas para cámaras corporales. También se está trabajando en un estudio de planificación para la construcción de una nueva instalación.
• Una renovación de $1.5 millones de nuestro Centro de Producción Central en la Instalación de Reingreso de East Mesa se encuentra actualmente en la etapa de diseño. Esta remodelación incluye todas las áreas de preparación donde se cocinan las comidas para las personas bajo nuestra custodia.
• Se está trabajando en la renovación del Centro de Detención George Bailey. Las unidades de vivienda serán remodeladas de arriba a abajo. Durante la construcción, las personas encarceladas en George Bailey serán transferidas al recientemente renovado Centro de Detención de Rock Mountain, al lado.

## Mejoras Tecnológicas en las Cárceles

Se siguen logrando grandes avances en el despliegue de cámaras corporales en las cárceles de nuestro condado.

Todos los oficiales del Centro de Detención y Reingreso de Las Colinas en Santee han sido equipados y capacitados para usar cámaras corporales. Estamos en el proceso de hacer lo mismo en la Cárcel Central de San Diego. A partir de ahí, traeremos cámaras corporales al Centro de Detención de Vista a finales de este año una vez que se haya actualizado la infraestructura eléctrica y de red.

El Departamento del Alguacil también está estudiando la implementación de pulseras de identificación por radiofrecuencia (RFID) en las cárceles de nuestro condado. Un sistema RFID mejorará significativamente la salud y la seguridad de las personas bajo nuestra custodia al proporcionar acceso en tiempo real a información esencial sobre cada persona. Esto le dará a nuestro personal de las cárceles acceso inmediato a información médica crítica, como alergias, condiciones crónicas y otros problemas conocidos.

## Servicios de Reingreso

**Ex. H-68**

Los Servicios de Reingreso del Alguacil brindan oportunidades, educación y capacitación laboral a las personas en nuestras cárceles.

Con más de tres docenas de programas de reingreso que van desde la jardinería hasta los oficios de la construcción y las artes culinarias, las personas tienen una segunda oportunidad de prepararse para su regreso a nuestras comunidades.

Nuestro programa Veterans Moving Forward, reconocido a nivel nacional para ex miembros del servicio militar, ha tenido tanto éxito que otros condados lo utilizan como modelo para su implementación en sus cárceles.

El Departamento del Alguacil se asocia con más de 40 agencias para conectar a las personas con diversos recursos para una transición exitosa de regreso a la sociedad.

Para recursos de medios como material de archivo o fotos para transmisión o publicación, haga clic aquí.

Para Más Información:
mediarelations@sdsheriff.org
Media Relations Office (858) 974-2259
San Diego County Sheriff's Department

*Return to full list >>*

**SUBSCRIBE**

Subscribe to receive updates.

Email

Email Address

SUBMIT

Ex. H-66