Pages 1 - 178

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

DARRYL DUNSMORE, et al.,          )
                                  )
            Plaintiffs,           )
                                  )
   VS.                            )          NO. 20-CV-00406-AJB-DDL
                                  )
STATE OF CALIFORNIA, et al.,      )
                                  )
            Defendants.           )
_____    )

                          San Diego, California
                          Tuesday, February 6, 2024

            <u>**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**</u>
                         <u>**OF PROCEEDINGS**</u>

 Zoom Recording 9:13 a.m. - 1:43 p.m. = 4 hours and 30 minutes

**<u>APPEARANCES:</u>**

For Plaintiffs:
                    DLA PIPER LLP (US)
                    4365 Executive Drive, Suite 1100
                    San Diego, California 92121
            BY:     **CHRISTOPHER M. YOUNG, ESQ.**
                    **ISABELLA MARIA NEAL, ESQ.**
                    **OLIVER M. KIEFER, ESQ.**

                    ROSEN BIEN GALVAN & GRUNFELD, LLP
                    101 Mission Street, Sixth Floor
                    San Francisco, California 94105
            BY:     **GAY CROSTHWAIT GRUNFELD, ESQ.**
                    **RICHARD VAN SWEARINGEN, ESQ.**
                    **PRIYAH KAUL, ESQ.**
                    **ERIC D. MONEK ANDERSON, ESQ.**
                    **HANNAH M. CHARTOFF, ESQ.**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Transcribed by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                 Official Court Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiffs:
                        LAW OFFICE OF AARON J. FISCHER
                        1400 Shattuck Avenue, Suite 12, Number 344
                        Berkeley, California 94709
                BY:  **AARON J. FISCHER, ESQ.**


For Defendants:
                        BURKE, WILLIAMS & SORENSEN LLP
                        60 South Market Street, Suite 1000
                        San Jose, California 95113
                BY:  **ELIZABETH MARIE PAPPY, ESQ.**

                        BURKE, WILLIAMS & SORENSEN LLP
                        444 South Flower Street, Suite 2400
                        Los Angeles, California 90071-2953
                BY:  **SUSAN E. COLEMAN, ESQ.**

                        OFFICE OF COUNTY COUNSEL
                        1600 Pacific Highway, Room 355
                        San Diego, California 92101
                BY:  **STEVEN PAUL INMAN, II, ESQ.**

For Third Party NaphCare of San Diego, LLC:
                        MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
                        801 South Figueroa Street, 15th Floor
                        Los Angeles, California 90017-3012
                BY:  **G. CRAIG SMITH, ESQ.**

| | |
|---|---|
| 1 | **Tuesday - February 6, 2024**                                    **9:13 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---0O0---** |
| 4 | **THE CLERK:**  The Honorable David D. Leshner now |
| 5 | presiding. |
| 6 | **THE COURT:**  Good morning, everyone. |
| 7 | **ALL:**  Good morning, Your Honor. |
| 8 | **THE CLERK:**  Please be seated and come to order. |
| 9 | Calling Matter 1, 20-CV-406, Dunsmore versus State of |
| 10 | California, et al. |
| 11 | **THE COURT:**  Melissa, can you make sure that everyone |
| 12 | who's on the Zoom is muted, please. |
| 13 | **THE CLERK:**  Everyone's connected by Zoom. |
| 14 | **THE COURT:**  Okay.  Since we're recording here, I want |
| 15 | to make sure we've got a clean recording. |
| 16 | Okay.  Thanks. |
| 17 | All right.  Good morning, everyone. |
| 18 | May I have appearances from counsel, beginning with the |
| 19 | plaintiffs. |
| 20 | **MS. GRUNFELD:**  Good morning, Your Honor.  Gay Grunfeld |
| 21 | for the plaintiff certified class and subclasses. |
| 22 | **THE COURT:**  Thank you. |
| 23 | **MR. SWEARINGEN:**  Good morning, Your Honor. |
| 24 | Van Swearingen for the plaintiffs. |
| 25 | **THE COURT:**  Thank you. |

1          **MR. YOUNG:**  Good morning, Your Honor.

2    Christopher Young for plaintiffs.

3          **THE COURT:**  Thank you.

4          **MS. KAUL:**  Good morning, Your Honor.  Priyah Kaul for

5    the plaintiffs.

6          **THE COURT:**  Thank you.

7          **MR. ANDERSON:**  Good morning, Your Honor.

8    Eric Anderson for the plaintiffs.

9          **THE COURT:**  Thank you.

10          **MR. FISCHER:**  Aaron Fischer for plaintiffs.

11      Good morning, Judge.

12          **THE COURT:**  Thank you.  Good morning.

13          **MS. CHARTOFF:**  Good morning, Your Honor.

14    Helen Chartoff for the plaintiffs.

15          **THE COURT:**  Thank you, Ms. Chartoff.

16          **MS. NEAL:**  Good morning, Your Honor.  Isabella Neal

17    for the plaintiffs.

18          **THE COURT:**  Good morning.

19          **MR. KIEFER:**  Good morning, Your Honor.  Oliver Kiefer

20    for plaintiffs.

21          **THE COURT:**  Good morning.

22      Thank you-all.

23          **MS. PAPPY:**  Good morning, Your Honor.  Elizabeth Pappy

24    on behalf of defendants.

25          **THE COURT:**  Thank you.

1          **MS. COLEMAN:**  Good morning, Your Honor.  Susan Coleman

2     for defendants.

3          **THE COURT:**  Thank you.

4          **MR. INMAN:**  Good morning, Your Honor.  Steven Inman,

5     from County Counsel, for defendants.

6          **THE COURT:**  Thank you.

7     All right.  First, thank you-all for your patience as we

8     dealt with some technical issues.  Also, thank you to those of

9     you who traveled here today.  I realize that the conditions

10    were not ideal, and I'm glad to see that everyone made it

11    safely.

12    I know that there is an inspection of the jail that is

13    going to be starting as soon as we are finished.  So what I

14    would like to do is begin by -- I'm informed that there is

15    counsel of record who's not here, Salayha Ghoury.

16    Who's that?

17         **MS. PAPPY:**  Oh.  Ms. Ghoury is no longer with my firm.

18         **THE COURT:**  Okay.  Fair enough.  Thank you.

19    So what I'd like to do is begin by addressing the matter

20    that led to me requesting you-all be here today, and then I'll

21    proceed to the remaining matters with those counsel who are

22    going to be here for the rest of the proceedings.

23    I did not likely -- lightly request that you-all appear

24    this morning.  I realize that you are busy professionals.  You

25    have many other obligations that you are attending to, personal

1   and professional, including, as I mentioned, other obligations

2   in this case that are scheduled to -- well, that are being

3   delayed for purposes of this proceeding.

4       But as I thought about what has happened in this case over

5   the past several months, I was convinced that the circumstances

6   of this case do require everyone to be here.

7       This isn't just about the ex parte motion for leave to

8   file a reply alleging a false statement.  It really is the

9   culmination of a number of events, over the course of the past

10  few months, that has led me to really question the willingness

11  and the ability of counsel in this case to move the case

12  forward in a constructive and productive manner, in a way that

13  demonstrates the civility and the professionalism that,

14  honestly, sitting here today, I see throughout this room.

15      You-all are familiar with our local civil rules, Rule 83.3

16  and Rule 2.1, which talk about the way in which counsel are

17  required to deal with one another, the expectation that lawyers

18  resolve disputes promptly, fairly, and reasonably but resort to

19  the Court for judicial relief only if necessary.

20      And we expect lawyers to not impugn the integrity of its

21  proceedings or its members, not to impugn -- or to treat

22  adverse witnesses, litigants, and opposing counsel with

23  courtesy, fairness, and respect and particularly, in a case

24  such as this, where you have a wide range of lawyers with --

25  some with vast professional experience and some with less, to

1    encourage other lawyers to conform to the standards that are

2    set forth in the Code of Conduct and, ultimately, with the goal

3    being that, at the end of the case, the lawyers may part

4    amicably.

5         The matters that are before me today, that we are going to

6    spend a substantial amount of time resolving, unfortunately

7    reflect an apparent unwillingness to engage in meaningful

8    efforts to, among other things, meet and confer with one

9    another.

10        Those efforts are not measured in terms of the length of

11   the letters and the emails that are sent back and forth but, in

12   my view, are measured by the willingness of the parties to

13   engage in an open and honest dialogue before raising issues

14   with the Court.

15        On December 11th, in reviewing the parties' joint

16   statement that was submitted prior to the December 20th

17   hearing, I looked, with some surprise, at Footnote Number 1,

18   which was a back-and-forth describing counsel's complaint, from

19   the plaintiffs' side, that the defendants have returned their

20   portion two hours after the close of business and that the

21   defendants' portion was too long and requesting that everything

22   beyond the first two sentences be stricken.

23        On December 20th, Mr. Swearingen, Ms. Pappy, and I spent

24   about three and a half hours together trying to make progress

25   through requests for production, including, at one point, me

 1    leaving the bench for about 15 minutes so that Ms. Pappy and

 2    Mr. Swearingen could try to talk to one another about the

 3    additional requests for production related to Cause of Action

 4    Number 9.

 5        No progress was made during that conversation, and it

 6    really is a microcosm of something that I think is happening in

 7    a larger sense that, really, is a problem in this case that I

 8    see, which is the inability to listen to each other and to

 9    engage in constructive dialogue.

10        And I realize that I only see the tip of the iceberg when

11    it comes to your interactions with one another, and I

12    appreciate that.  I've got a lot of emails that were submitted

13    to me today in the number of pages that were provided by the

14    parties, but I realize that is a fraction of what you-all

15    correspond with each other on, but I was struck by that

16    inability to make any progress when you were together.

17        And our progress on December 20th, despite the length of

18    time we spent together, left me hopeful.  And I -- as I was

19    reviewing the -- the transcript of that hearing and preparing

20    for today, you know, we finished about -- you know, by

21    essentially saying that we hope that 2024 would be both

22    constructive and productive because 2023 was -- for a period of

23    time, you-all really did make progress.  And it was, and still

24    is, a pleasure to work with you on this case, the current

25    circumstances notwithstanding.

1          You-all made true efforts to figure out the ADA

2    stipulation in a manner that didn't leave anyone totally happy

3    but really was a testament to what you were able to do

4    together.

5          On the class certification issues, you know, frankly,

6    kudos to the County for stipulating to that because that could

7    have built in more delay into this case, months of briefing to

8    get to a result that may well have been the same if there had

9    been a contested motion.

10          And I'm not sure exactly what has happened, but I was --

11    "disappointed," I think, is a mild word -- to see the first

12    three pages of the plaintiffs' motion to compel basically

13    throwing defense counsel under the bus, plaintiffs being

14    stymied in efforts to meet and confer, conflicting statements

15    by the County, which really leads only to the inference that

16    the County is up to something no good and specifically counsel

17    for the County.

18          I then see the opposition filed on January 24th, and what

19    I see is the first line, that the plaintiffs believe they are,

20    quote, "exempt from all legal restraints on discovery," end

21    quote.

22          I mean, none of that helps me resolve your disputes.  None

23    of that makes you-all look any better.  And frankly, to anybody

24    else reading that, it is not indicative of the level of

25    professionalism, civility, and, frankly, zealous representation

1    of your respective clients that I have been privileged to

2    witness over the entire time that I've been working with you on

3    this case.

4        We spent a substantial amount of time on December 20th

5    talking about the new requests for production that the

6    plaintiffs wanted to serve because they were inadvertently left

7    out of the requests.

8        And I provided an opportunity for the parties to meet and

9    confer, the whole point being talk to each other, figure out

10   the specific data sets that the County maintains to allow the

11   plaintiff to propound RFPs that will be targeted and that will

12   not be the subject of dispute.

13       Maybe you did that, but I'm going to be listening really

14   carefully to what meet-and-confer efforts happened before the

15   plaintiffs propounded the new RFPs because I'm now told that

16   there's not an agreement on it.

17       I'm told that the parties cannot agree on the medical and

18   custody records, and I realize that I'm the one who denied the

19   motion to give you additional time.  But, frankly, I denied

20   that motion because I did not have good reason to believe that

21   you-all would be able to figure this out on your own and that

22   further efforts would only create more delay.

23       And finally -- well, second-to-last, I'm told that there's

24   an inability of the parties to agree on dates for inspections

25   of the jail, and my first reaction to that was, "Really?"

 1        Really, that's how we're spending our time in this case,

 2   not figuring out the truly serious issues that are involved in

 3   this case, which everyone agrees are important to the County,

 4   to the people who are incarcerated, to the citizens of our

 5   community?

 6        We are going to be bickering about whose expert's

 7   available when, who's flying in from South Carolina when, and

 8   we can't figure that out?  That, to me, tells me something is

 9   really off.

10        And then, of course, there is this ex parte motion for

11   leave to file a reply, which ultimately comes down to a fight

12   about a statement by Ms. Pappy that documents have been

13   produced or documents will be produced because she thought they

14   were going to be produced at the time she wrote it.  And,

15   ultimately, it leads to a filing with the intentionally

16   inflammatory caption regarding false statements.

17        So we're going to talk a lot later today about meeting and

18   conferring, and I'm going to be drilling in with you-all about

19   specifically the meet-and-confer efforts that have occurred

20   both with respect to the motion to compel on the discovery to

21   the defendants as well as the motion to compel with respect to

22   NaphCare.

23        While I have you-all here, here's what I want from

24   you-all.  I actually am looking to you for guidance.  Where do

25   things go from here, and how do we get this case back on track?

 1   And I would actually, you know, appreciate hearing from some of

 2   you who have been on all of the emails and all of the

 3   correspondence but I haven't been hearing from as much

 4   recently.

 5        Mr. Fischer, Mr. Young, you're on all of these emails back

 6   and forth, but you are not sending and receiving them -- or

 7   sending them directly.  I'd like to hear from you-all.  What do

 8   we do?

 9        Go ahead, Mr. Fischer.  If you're willing to tell me, I'm

10   really willing to listen, and I'm not asking you to throw

11   anybody under the bus.  I really want to know, how do we get

12   this back on track?

13        You're welcome to stand there or stand at the lectern, if

14   you wish.

15        **MR. FISCHER:**  I'll stand here, if that's okay.  You

16   caught me a little off guard, but I appreciate the opportunity.

17        I -- I think that the key approach is what you already

18   said, which is the case is not about us.  It's not about any of

19   us.  It's about really serious issues that affect people at the

20   jail, the staff, the community, and so forth.

21        So I would -- you've put me on the spot.  So I don't have

22   a quick answer --

23        **THE COURT:**  I did.

24        **MR. FISCHER:**  -- but I think that the more that we can

25   focus on those issues -- and maybe even having some check-ins,

1    if Your -- Your Honor would allow, with -- on particular

2    issues, not as disputed motions but as status conferences.

3    They can be briefed.  They can be by Zoom.

4         But I think some of that -- my impression is that when

5    the -- you're -- I'll just say I think you're right to keep

6    schedules tight because I think, if things get extended, things

7    sometimes get more complicated than they should, and it gets

8    stuck on issues that we shouldn't be stuck on.  So maybe having

9    periodic static -- status conferences on a particular issue, so

10   we can nip things in the bud, might be productive.

11        I know it's imposing on your time, but that might be one

12   suggestion.  The more structure that we can -- that we can work

13   off of, the better.  I am hopeful, very hopeful, that this week

14   will be very productive on the inspections because we have a

15   structure now.

16        I know that was a long process, but we have a structure.

17   We have some guidance from the Court.  It doesn't always have

18   to be an order.  Your words are very -- taken very seriously by

19   counsel.

20        So even if you just talk through issues with us -- but I'm

21   confident that, with the structure that we have in place this

22   week, we're going to have a productive few days of inspections.

23   And it's going to be helpful for the case just to develop the

24   facts and get to what's important.

25        So those are my general thoughts.  I'd be glad to

1    (Inaudible) further, and I appreciate the opportunity.

2        **THE COURT:**  I know I put you on the spot, and I

3    appreciate that.

4        So take some time.  If you have additional thoughts, I

5    really would be happy to hear them.

6        **MR. FISCHER:**  Thanks for calling me up.

7        **THE COURT:**  You didn't really mean that --

8                    (Laughter.)

9        **THE COURT:**  -- but I got you.

10        **MR. YOUNG:**  And, Your Honor, let me echo what

11    Mr. Fischer said.  I do appreciate both this hearing and the

12    opportunity to speak at it because I do have a couple of things

13    I'd like to say, and I appreciate the opportunity to do so.

14        As I said, thank you to Your Honor for calling this

15    hearing.  It's not easy.  People had to come in from all over,

16    myself closer than others but still not close, and I think it's

17    frankly overdue in some respects.

18        I'm a partner with the DLA Piper firm here in San Diego,

19    as Your Honor knows.  I've practiced in this district for my

20    entire career, over 30 years now.  I'm very familiar with the

21    civil rules -- the local civil rules and take those very

22    seriously.

23        And it -- as Your Honor has noted, both myself and

24    Mr. Fischer have been on many of the emails, probably most, if

25    not all, but haven't been as directly involved.  I've been

1   directly involved with some of the back-and-forth on the issues

2   but not as much.

3       And I have frankly been disappointed, since last year, to

4   see the tone.  Things really took a turn about six or eight

5   months ago, maybe longer -- in fact, longer, probably close to

6   a year ago.  And I have been uncertain as to sort of how to

7   turn that around.

8       And, certainly, I will offer to both sides, if there's

9   anything I can do -- obviously, I'm on the plaintiffs' side,

10  and I'll zealously represent the class.  But, you know, as

11  someone who hasn't been as involved, I'm happy to get more

12  involved, to the extent that will help.

13      One thing I -- sort of building up something I just

14  thought of that -- building up something that Mr. Fischer said,

15  I do think some of it is due to the sort of scattered nature of

16  late-night emails, when there are many, many issues going on,

17  you know, emails sort of flying back and forth on sort of

18  Issue 1, Issue 2, maybe other ones on Issues 1 and 3, and then

19  there's one on Issue 2.

20      And so I think that regularizing meet-and-confer and the

21  exchange of information a little bit, sort of having more

22  comprehensive communications, sort of, "Here's the list of

23  currently outstanding issues, 1 through 12.  Here's where we

24  are on all of them" -- that could be done between counsel.

25      I also -- and this is the part that builds on something

```
 1   Mr. Fischer said.  Whether or not there are regular discovery
 2   status hearings, I do think those are a good idea, but I think
 3   interspersed much more frequently than those should frankly be
 4   just a report to the Court listing that sort of Issues 1
 5   through 12 or whatever it is that I just mentioned with, you
 6   know, a truly joint statement of, you know, no more than a
 7   couple sentences on each one on sort of what the -- well, maybe
 8   a paragraph -- on sort of what the progress has been on each
 9   issue since the last report to the Court.
10        And maybe there can be a monthly, you know, at the
11   discretion of the Court, Zoom hearing where the Court takes
12   Issues 1 through 12, looks at the previous three weekly reports
13   and says, "Okay.  This is where we're at.  You're making
14   progress.  This is where you need to do more."
15        Maybe that -- and now I'm thinking out loud, but perhaps
16   that would assure both parties that they're getting access to
17   the Court when needed, the Court's aware of what's going on in
18   a -- you know, in an objective fashion rather than sort of one
19   party coming in -- you know, one side coming in and discussing
20   all the bad things the other side has done and the other side
21   replying in kind.
22        So that's just an idea.  I may have more as I think on it,
23   and I'm happy to report further to the Court.
24        Thank you, Your Honor.
25           THE COURT:  Thank you.
```

 1          Ms. Pappy, one of the suggestions, in your opposition to

 2    the motion to compel, is that this case merits a discovery

 3    referee or, you know, a special master for purposes of

 4    discovery.

 5          Do you think that would be advisable?

 6          **MS. PAPPY:**  Yes.  Unfortunately, I think that it

 7    would.

 8          I mean, one of the things that I -- I would say, in

 9    response to Your Honor's question, is we need to stop attacking

10    each other.  We need to stop making this personal between the

11    attorneys, and that includes myself.

12          And for my part in that, I apologize to the Court and to

13    opposing counsel because, really, this is about the plaintiffs

14    and their claims.  And, yes, I'm a zealous advocate for my

15    client, but I need to stop doing it, and I commit to this Court

16    that I will.

17          I think that a discovery referee and the informity --

18    informal nature of that and the ability to call them up and

19    say, "Hey, can we talk to you tomorrow?  I feel like I'm" --

20    you know, "The other side is doing this, and I need some help.

21    Defense counsel is doing this.  We need some help."  I think

22    that quick availability will help us move along quicker without

23    burdening the Court.

24          So the very long answer is yes.

25          **THE COURT:**  Ms. Grunfeld, do you wish to be heard on

1    that?

2          **MS. GRUNFELD:**  Yes, Your Honor.  Thank you.

3      I share my colleagues' appreciation for today's

4    opportunity.  I too am familiar with the local rules and will

5    strive to ever do better at the goal of civility and

6    professionalism, which is what I and my team attempt to

7    practice at that level at all times.

8      I apologize for my voice.  I'm coming in from Texas, and I

9    may have picked a little something up.

10      As far as the discovery referee and the conference ideas,

11   I'm all for whatever will expedite and make things better.  My

12   concern with the discovery referee is, frankly, costs.  It is

13   very challenging to pursue an ambitious case like this.  We all

14   agree that it's a very important case.  People are literally at

15   risk of dying.  We've had our third death this year, just

16   Sunday, at Central Jail.

17      On the other hand, if we could do some kind of situation

18   where the County were to pay for the discovery referee, that

19   would be strongly preferable to the plaintiffs, who are

20   indigent, of course.

21      So those are my thoughts, Your Honor, and the experts are

22   here.  We're very pleased to get the opportunity to have them

23   tour Central today, and I'm happy to answer any questions.

24          **THE COURT:**  Sure.

25      My question -- I'm not interested in revisiting the past

1  with you.  You understand what I've seen over the past few

2  months that, to me, has been a marked departure from what was

3  happening in terms of the progress that you made earlier this

4  year.

5      And my question to you is:  How do we turn this around?

6  What do we -- we do?  And I mean "we" with a capital W.

7          MS. GRUNFELD:  Yes, Your Honor.

8      And, again, a discovery referee may be helpful.  My

9  concern is the cost.  I would be happy to brief whether that's

10  something that a defendant could pay for in this situation,

11  also the check-ins.

12      And I do appreciate the apology that was just made.  That

13  means a lot.  And I also apologize for anything I've said

14  that's incivil or inappropriate, either in writing or here in

15  this court or in conferences.

16          THE COURT:  Do you think that there has been

17  meaningful communication between the parties regarding the

18  outstanding discovery?  Because one thing that Mr. Young said

19  that resonates with me, you know, is just the sheer volume of

20  emails going back and forth.  And there appears to be a huge

21  volume going to Ms. Pappy, for example.

22      And I'm not saying that any of them are sent in bad faith,

23  but what can be done to -- in that regard that may well help

24  turn down the temperature in this case?

25          MS. GRUNFELD:  My style and preference is letters that

1  summarize a number of issues.  I agree with you.  I have never

2  seen so many emails.  It is very difficult to keep up with them

3  and later to find what was said and represented in those

4  emails.

5      So I've created folders, and I'm taking steps -- and we

6  all are -- to trace where we are with the various issues, but

7  it is -- I'm not saying no emails, but I'm suggesting that

8  summary letters of the positions that are exchanged from time

9  to time is a useful technique that was -- has been done in many

10 other cases that I've been involved in.

11     **THE COURT:**  You may not be sticking around for the

12 motion to compel.  I understand you will probably be attending

13 the inspection; is that correct, Ms. Grunfeld?

14     **MS. GRUNFELD:**  I was going to go to the inspection

15 while Ms. Kaul argues the NaphCare, and then she will be

16 attending.

17     **THE COURT:**  Okay.  Then maybe you will be here for

18 part of this.

19     But one thing that concerns me is, given the number of

20 disputed requests for production between the plaintiffs and the

21 defendants, as well as between the plaintiffs and NaphCare, do

22 you believe that there has been a genuine effort by the

23 parties, on a request-by-request basis, to talk through the

24 issues?

25     **MS. GRUNFELD:**  I do not believe there has been an

 1    exchange.  I do believe that we have tried our best, but I

 2    don't think there has been the kind of meet-and-confer and

 3    exchange of ideas that I think would benefit all of us.

 4          **THE COURT:**  One solution that has been utilized in

 5    other cases, that I frankly have never had to utilize before,

 6    is a requirement that meet-and-confers occur in person or by

 7    Zoom and that they be transcribed and that, for every discovery

 8    conference, the Court is provided with a transcript of the

 9    meet-and-confer to ensure that requests are addressed on a

10    request-by-request basis.

11          Because I have to tell you, Ms. Grunfeld, I looked very

12    carefully at each of the RFPs at issue here, and I have serious

13    concerns as to whether each of them was the subject of a

14    meet-and-confer as I ordered.  And I would like to know how we

15    can do better with that in the future.

16          **MS. GRUNFELD:**  Thank you, Your Honor.

17          There were long phone calls, and I was part of some of

18    them, and other counsel here were part of others.  We took

19    notes, and we did try to carry out, as best we could, the

20    Court's order.

21          Clearly, if the meet-and-confers were recorded, then the

22    Court would understand perhaps better what was happening.

23          **THE COURT:**  Do you think that's a good idea?

24          **MS. GRUNFELD:**  Maybe.  It's a little -- little hard to

25    say.  Sometimes, that might intimidate a free discussion,

1   but -- but on the other hand, given where we're at, it could be

2   useful.

3          **THE COURT:**  What do you think, Ms. Pappy?

4   Ms. Coleman?

5          **MS. PAPPY:**  I don't -- I don't think it's a

6   (Inaudible) use of time.  I think that a discovery referee is

7   quicker.  It's cheaper.

8      I think that email -- I don't like the idea of writing

9   letters.  It's -- it's -- you can't talk.  You can't have a

10  free exchange of information and, "Well, what about this, and

11  what about this compromise?"  And, understandably, we have not

12  been great about that when we talk to each other, but that's

13  why I see the discovery referee as the most economical way.

14     I understand the plaintiffs are suggesting that they do

15  not have the money, but wouldn't it be cheaper than flying down

16  here for in-person hearings and constantly appearing before

17  Your Honor via Zoom at all of our hourly rates, to pay some

18  money to a discovery referee to have them at the other end of a

19  phone call 24 hours (Inaudible) help us resolve some of these

20  things?

21     I -- that's my thinking, is I want the most -- the

22  quickest, most efficient way without having -- I'm sure you

23  enjoy reading our briefs, but multiple briefs coming back to

24  the Court.  I just see the discovery referee as the best, most

25  efficient way to accomplish what really plaintiffs want to

1  accomplish, get the information.

2       THE COURT:  What about Ms. Grunfeld's suggestion that

3  it should be the County who pays for the discovery referee?

4       MS. PAPPY:  I don't agree with that.  I mean, I think

5  that if you're willing to send multiple attorneys down to

6  hearings down here in San Diego from Northern California, then

7  why not put that money to a discovery referee?  They are

8  well-funded to this litigation.  They have numerous experts.

9       And, quite frankly, I don't think the expert is going

10 to -- or the discovery referee is going to cost that much

11 because I'm hoping that it helps us move discovery along and we

12 stop having disputes.  I may be wrong about that.

13      THE COURT:  Then, Ms. Grunfeld, with respect to the

14 suggestion that we have more regular status conferences, I

15 actually have a binder now of the number of discovery

16 conferences that we've held already and the orders that I've

17 issued.

18      What, if anything, would be helpful to the parties with

19 respect to my involvement in discovery beyond that which is

20 already taking place?

21      MS. GRUNFELD:  I like the idea of more frequent

22 meetings, as Mr. Young suggested, and perhaps helping us

23 through a few places where we're stuck, which -- many may be

24 resolved today, by the way -- I mean, hopefully.  But that

25 would be -- we'd be very open to that.  And, of course, either

1   with that or the meet-and-confers, Zoom is -- is a good

2   mechanism.  We don't have to fly down here.

3        I take a little issue with the concept that we're

4   well-funded and -- et cetera.  But frequent meetings, I think,

5   could be good.  Transcribing the meet-and-confers or recording

6   them could be good.

7            **THE COURT:**  Mr. Fischer, having had a chance to

8   collect your thoughts, anything -- oh.  Go ahead first,

9   Ms. Coleman.

10                      (Laughter.)

11          **MS. COLEMAN:**  Well, Your Honor, I don't know if the

12  Court was suggesting that you get more involved in this case

13  than you've already been.  You've already offered us a lot of

14  your time, and we do appreciate it.

15       I think we could do better, and we just -- you know,

16  hopefully, this is a wake-up call to everyone that we need to

17  read over our emails before we send them or -- you know, to

18  make sure they are a civil tone and that we hopefully can

19  compromise on some things.  There hasn't been a lot of

20  compromise and -- you know, on some of these discovery issues.

21       And I'm not going to lay blame on what -- who's doing that

22  and/or who's not, but there hasn't been a lot of compromise

23  lately, and maybe we just need to talk more or switch up some

24  of the players that are involved in the discovery or, you know,

25  do what we can.

 1          **THE COURT:**  Thank you.

 2      Mr. Fischer, having had a chance to collect your thoughts,

 3  anything else you'd like to add?

 4          **MS. COLEMAN:**  Sure, please.

 5          **MR. FISCHER:**  I'm trying to summon up some other

 6  similar cases that I've worked on with other complex jail

 7  conditions/matters, multi-agencies, and outside counsel and so

 8  forth.  I mean, every case is different, of course.  This one,

 9  I think, is, in some ways, particularly complex, and it's -- it

10  is heavily contested, which is -- which is fine.  That's the

11  process.

12      I -- I'll (Inaudible) that I don't know that a discovery

13  referee is going to be helpful.  I think you know the issues

14  very well.  Getting that person up to speed, learning the

15  parties -- I mean, I guess we can make another copy.  There's

16  voluminous binders, but there's a lot that a discovery referee

17  would have to get up to speed, and we're already on a very

18  tight schedule to get through this case.

19      I do think that recording, in some form or fashion, our

20  meet-and-confers is useful.  I think it will have a salutary

21  effect.  Whether that comes to you or not, I think that would

22  be useful.

23      I am strongly in favor of reducing the amount of emails.

24  And if defense counsel doesn't want to have letters, I do think

25  some type of a reporting to the Court in writing -- one -- you

1    know, one document that sort of includes everything -- that

2    tends to cut out the -- I'm reluctant to use the word, but the

3    snark and kind of these personal attacks.  It does exist.  I've

4    been -- I've been a target of -- of it.  It doesn't feel good,

5    and it's distracting.

6         So I do think some -- some structure guided by you as to

7    how we are going to herd the cats at the different disputes,

8    whether it's through summary letters that each counsel needs

9    to -- or required to engage in this part of the meet-and-confer

10   or a report to the Court -- I think that is the strongest way

11   to -- we are all professionals.  Defense counsel has a ton of

12   experience and is professional and knows what they're doing.

13        So it's not -- there's not a lack of capacity here.  I

14   really don't think that's the case, and --

15             **THE COURT:**  It's clearly not the case.

16             **MR. FISCHER:**  -- same thing for my -- my co-counsel,

17   to be sure.

18             **THE COURT:**  Clearly.

19             **MR. FISCHER:**  So I -- but I do think that capping the

20   emails, stopping the emails, some type of summary -- I'm not

21   sure -- a written summary of disputes, I think, would be very

22   helpful.  And I'm open to different ways, depending on the

23   level of involvement that the -- that the Court wants for this

24   case.

25        So -- but that's -- that's my further thinking, and thank

1    you, Judge.

2         **THE COURT:**  No.  I appreciate that, and I appreciate

3    all of the suggestions.  I really do.

4         I -- part of this involves the fact that I'm thinking

5    through, you know, suggestions for more regular status

6    conferences and hearings.  I -- I am willing to give you as

7    much time as this case needs, understanding that the case is

8    really important, and the other cases that I have before me are

9    very important to those litigants for -- for other reasons.

10        And I would say only this.  I will think through that

11   suggestion to give you-all more time.  However, it has got to

12   be a two-way street.  It has got to be a situation where, when

13   we get together, there is -- that is preceded by an honest and

14   open dialogue about issues in the case and where we are not

15   spending time arguing about things that should be resolved

16   between counsel because we're here today.

17        And I do intend to rule on every dispute that's before

18   me -- before me, and I really have -- I question very much

19   whether many of these issues could have been resolved by a

20   point-by-point, "This RFP asks for this.  What do you have?

21   What can you produce?  What will you not?"

22        And maybe you're going to tell me that's all happened, but

23   I strongly suspect otherwise, based on my review of everything

24   before me.  And, ultimately, you're asking me to make a call,

25   and I'm going to do my absolute best to do it, but it almost

1    never is as satisfying to the parties as figuring it out among

2    yourselves.

3         And I would note only this as well.  You talk about the

4    experience of counsel, Mr. Fischer, and you're a hundred

5    percent right.  I mean, I look at counsel for the County and

6    counsel for the plaintiffs, and you-all have vast experience.

7    And I was, you know, as I said, privileged to be a part of that

8    through the negotiations regarding the ADA stipulations and the

9    negotiations regarding class certification.

10        And you also have very talented attorneys on your --

11   particularly on the plaintiffs' side with less experience who

12   are copied on, you know, these unnecessary emails, who are

13   perhaps themselves tasked with sending truly unnecessary emails

14   that don't further the cause for anybody.

15        And one of my chambers' rules, you know, encourages

16   attorneys with less than ten years' experience who want to

17   argue to get the opportunity to do so.  And I'm not suggesting

18   that anyone in this room, particularly on the plaintiffs' side,

19   needs more experience because you're not.

20        But the idea is to, you know, foster the growth of

21   attorneys, you know, in our court.  And that's not only through

22   arguing in court, which is what I can control, you know,

23   providing those opportunities for oral argument.  But it also

24   comes from the more experienced lawyers and the way that they

25   litigate the cases and the way that they handle cases and the

1    way that they are treating one another on emails or in these

2    meet-and-confer conversations that -- I think every one of us,

3    as a new lawyer, had those experiences.  But positive and,

4    unfortunately, sometimes negative -- they really do shape the

5    way that we practice law later in our careers.

6        And I -- this case really does present a terrific

7    opportunity for everyone to do that and to do so in a way that

8    preserves everyone's ability to zealously advocate for their

9    clients while also demonstrating for the community and maybe

10   for some of the less experienced lawyers, you know, what it

11   really means to have, you know, the honor and dignity of

12   practicing law.

13       I'm going to give some further thought to how we can best

14   go forward.

15       Yeah.  Go ahead, Mr. Fischer.

16       **MR. FISCHER:**  I just -- I just want to state for -- on

17   the record that, certainly, co-counsel -- my co-counsel in the

18   second row -- they have -- I just wanted you to know because

19   you also don't see it, and I don't think defense counsel also

20   sees it.

21       But they are deep in the weeds.  They know this case so

22   well.  They articulate disputes, talk about the -- both

23   sides -- how they can find their way to compromise.  Just so --

24   I think you're -- you're intuitive, but their capacity to

25   analyze a very complex set of issues is extremely impressive,

 1   and they have been -- to the extent that we've made progress on

 2   a lot of issues, I give them a lot of the credit.

 3        So I just want to state that.

 4             **THE COURT:**  You should.

 5             **MR. FISCHER:**  Okay.

 6             **THE COURT:**  I have read a number of Ms. Chartoff's

 7   emails that have come before me, and I will tell you this.

 8   Every single one of those emails is polite.  It is

 9   professional, and it is to the point in terms of raising issues

10   for further discussion.

11        And so I absolutely agree with you --

12             **MR. FISCHER:**  I understand.

13             **THE COURT:**  -- Mr. Fischer.  We are on the same page,

14   and thank you for raising that.

15             **MR. FISCHER:**  Thank you.

16        I'll sit down.

17             **THE COURT:**  Sure.

18        Does anybody else wish to be heard before we turn to the

19   other matters that are before me this morning?

20             **MS. PAPPY:**  No, Your Honor.

21             **MS. GRUNFELD:**  Yes, Your Honor.

22             **THE COURT:**  Sure.  Go ahead.

23             **MS. GRUNFELD:**  Just -- just, again, thank you for

24   having us today.

25        May the people involved in the inspection be excused?

1          **THE COURT:**  Yes.  Absolutely.

2          **MS. GRUNFELD:**  Thank you very much.

3          **THE COURT:**  Thank you, Ms. Grunfeld.

4      And to those of you who are leaving for the inspection,

5   thank you for being here.  I very much appreciate it.

6          **MS. GRUNFELD:**  Thank you, Your Honor.

7          **MR. YOUNG:**  Your Honor, to be clear, if --

8   hypothetically, when we're neither involved in the inspections

9   nor in these specific issues to be heard, would those folks be

10  excused as well?

11         **THE COURT:**  Yes.

12         **MR. YOUNG:**  Thank you, Your Honor.

13         **THE COURT:**  Thank you, Mr. Young.

14         **MR. YOUNG:**  It actually was a hypothetical.

15         **THE COURT:**  No.  I understand.

16         **UNIDENTIFIED SPEAKER:**  Hypothetically.

17                      (Laughter.)

18         **THE COURT:**  You okay, Ms. Kaul?

19         **MS. KAUL:**  I'm going to do my best.

20         **THE COURT:**  All right.  If you need to step out to get

21  some water or anything, please feel free.

22         **MS. KAUL:**  I appreciate that.

23      Thank you, Your Honor.

24         **THE COURT:**  All right, Counsel.  We've got about an

25  hour before we're going to have Mr. Smith on for the NaphCare

1    motion to compel, and here's the order in which I am planning

2    to handle these issues with you.  I have 11 items on my to-do

3    list with you, and they are as follows:

4        The first item, we have already covered.

5        The second will be plaintiffs' ex parte motion to file a

6    reply brief.

7        The third issue, which is a series of issues, will be the

8    plaintiffs' motion to compel.

9        Issue Number 4 will be the motion to seal.

10        Issue Number 5 will be the dispute regarding Requests for

11    Production Numbers 250 to 252.

12        Issue 6 will be the jail inspection dates.

13        Issue 7, or whenever we get to the 11:00 o'clock, will be

14    plaintiffs' motion to compel regarding the NaphCare subpoena.

15        Issue Number 8 will be defendants' motion to stay

16    regarding the production of CIRB reports.

17        Issue Number 9 will be the completeness of the CIRB

18    reports with respect to the order that I issued and the

19    additional reports that I received following that order.

20        Issue Number 10 will be the status of plaintiffs'

21    responses to defendants' interrogatories.

22        And Issue 11 will be regarding the mandatory -- or excuse

23    me -- the case scheduling order that I issued at the end of

24    December and whether it makes sense to schedule a further

25    settlement conference to get those back on track.

1    So with respect to the ex parte application to file a

2    reply regarding an alleged false statement, Docket Number 516,

3    Ms. Pappy, my question to you is this:  Have all of the audit

4    reports identified in the plaintiffs' -- or excuse me --

5    defendants' amended response to Interrogatory Number 24 been

6    produced as of today's date?

7         **MS. PAPPY:**  Yes, Your Honor.  They were -- all -- the

8    rest of them were produced on January 30th.

9         **THE COURT:**  Should those reports have been produced on

10   December 22nd?  That was the deadline for production of what I

11   thought was going to be production of everything.

12        **MS. PAPPY:**  They should have been.

13        **THE COURT:**  Okay.  Mr. Swearingen, Ms. Kaul, do you

14   wish to be heard on this?

15        **MR. SWEARINGEN:**  No, Your Honor.

16        **THE COURT:**  I'm denying the ex parte application to

17   file a reply brief.  I -- it is moot for all of the reasons

18   that we have discussed.

19    Turning now to the plaintiffs' motion to compel further

20   responses to request for productions -- requests for production

21   and interrogatories, which is Docket Number 489, I am going to

22   provide you with a tentative ruling.  That will include a

23   number of questions to Ms. Pappy.

24    And then what I would do, Mr. Swearingen, Ms. Kaul, is

25   provide you an opportunity to, of course, be heard and address

1  any issues that you wish me to consider.  And I will either --

2  well, I will probably then take the matter under submission and

3  issue a written order that may simply confirm my tentative; or

4  if I decide to change any aspects of my tentative, we'll do

5  that as well.

6     Beginning with my tentative ruling, Federal Rule of Civil

7  Procedure 26 provides that the parties may obtain discovery

8  regarding any non-privileged matter that is relevant to any

9  party's claim or defense and proportionate to the needs of the

10  case, considering the importance of the issues at stake in the

11  action, the amount in controversy, the parties' relative access

12  to relevant information, the parties' resources, the importance

13  of the discovery in resolving the issues, and whether the

14  burden or expense of the proposed discovery outweighs its

15  likely benefit.

16     Courts have interpreted this rule as imposing a duty of

17  good faith and a reasonable inquiry on all attorneys involved

18  in litigation who rely on discovery responses executed by

19  another attorney.  In particular, Rule 34 requires the

20  requesting party to describe the items to be produced with

21  reasonable particularity.

22     And the test for reasonable particularity is whether the

23  request places a party upon reasonable notice of what is called

24  for and what is not.  It requires the parties to tailor their

25  requests to the needs of the case, and where they fail to do

1    so, Rule 26 provides that the Court must limit the discovery.

2        We talked through a number of these issues on

3    December 20th, and my order following that discovery

4    conference, at Docket Number 478, gave plaintiffs leave to file

5    a motion to compel as to Interrogatory Number 24 and/or any of

6    the requests for production identified in the parties' joint

7    list.

8        I will discuss this further, but it appears to me that the

9    plaintiffs' motion includes multiple requests for production,

10   Numbers 82 and 231, that were not included in the joint list,

11   and Interrogatory Number 25, which was also not included in the

12   joint list.  And I want to hear from the parties as to whether

13   or not they have waived their right to seek relief as to those

14   discovery requests.

15       In addition, Mr. Swearingen's declaration, Exhibit A,

16   contains multiple requests for production that are not

17   mentioned in the motion.  I will discuss those separately after

18   we go through all of the ones that are mentioned in the motion.

19       As I noted, on December 20th, we held an approximately

20   three-and-a-half-hour discovery hearing regarding the requests

21   for production in dispute.  During the course of that hearing,

22   I expressed my view that the requests were exceptionally broad.

23       And plaintiffs' counsel stated that, although the requests

24   were broad as drafted, they anticipated, through

25   meet-and-confers, that the parties would be able to discuss

1   "what types of documents we're looking for and what kinds of

2   documents exist."  That's from the December 20th transcript at

3   Pages 106 to 107.

4        Among other things, the requests that we talked about

5   included Request Number 28, which sought every memorandum

6   relating to the jail from January 1st, 2021, to the present.  I

7   understand that Request Number 28 is no longer at issue, as are

8   a number of other requests that were raised in the

9   December 11th list of discovery in dispute.

10       However, it is unfortunately indicative of the very broad

11  nature of the requests that were propounded by the plaintiffs,

12  which -- many -- well, many of which demand all documents,

13  including, but not limited to, logs, audits, training

14  materials, and summaries relating to, which itself is defined

15  very broadly, a host of different topics.

16       This approach is not consistent with the principles

17  articulated above -- earlier and does not comply with the

18  plaintiffs' obligations, under Rule 26, to reasonably and

19  thoughtfully tailor their discovery.  It rather shifts the

20  burden to their opponents to figure out what documents the

21  plaintiffs require and builds delay into what has already been

22  a lengthy course of discovery.

23       I appreciate the plaintiffs may not have known what types

24  of documents the defendants maintain or their precise names,

25  but the defendants do point out that a Rule 30(b)(6) deposition

1   on those issues would have saved time and resources.

2       As they did at the December 20th hearing, the plaintiffs,

3   in their current motion, state they substantially limited

4   discovery requests at issue to four categories of documents:

5   Policies and procedures, training, evidence of practice, and

6   quality assurance or audits.

7       This proposal does not answer the question of why the

8   requests were actually drafted more broadly than these four

9   categories of documents by utilizing the phrase "including, but

10  not limited to," which made the requests vastly more broad.

11      However, I have reviewed each of the disputed requests

12  that are contained in the chart attached to Mr. Swearingen's

13  declaration and the plaintiffs' proposed narrowing of those

14  requests and the defendants' responses, and I am prepared to

15  give you tentative rulings on all of them.  I'm going to

16  utilize the same four categories that the parties did in their

17  briefs with respect to the RFPs.

18      First, with respect to policies and procedures, Ms. Pappy,

19  you represented, at the December 20th hearing, that all

20  policies and procedures at issue would be produced.  Have they

21  all been produced?

22          **MS. PAPPY:**  Yes, Your Honor.  Whether they're at issue

23  or not, we sent every single policy the county detention has,

24  medical and operations.

25          **THE COURT:**  You also represented that all training

1    materials would be produced; is that correct?

2        **MS. PAPPY:**  Yes, I did make that representation.

3        **THE COURT:**  And were they?

4        **MS. PAPPY:**  Yes, they were.

5        **THE COURT:**  And what did that include, generally

6    speaking?

7        **MS. PAPPY:**  I would say that the vast majority of them

8    are policies, procedures, and green sheets.  And then some of

9    them are what one would consider traditional training

10   materials, like a bulletin that says, "Training Bulletin" or

11   a -- I think there might have been some -- I don't know what

12   the class is, but presentations.  I don't think there were many

13   of those.

14      Most of their trainings in the Sheriff's Department are

15   green sheets, policies, and procedures.

16       **THE COURT:**  You also represented, at the December 20th

17   hearing, that all audits and quality assurance documents would

18   be produced.  Have they been?

19       **MS. PAPPY:**  Yes.

20       **THE COURT:**  And that, you already represented,

21   includes the audits that are at issue in the amended response

22   to Interrogatory 24?

23       **MS. PAPPY:**  Yes.

24       **THE COURT:**  All right.  And, Mr. Swearingen, I will

25   give you an opportunity to be heard on all of this.  I want to

 1    make sure I understand where things are.

 2        And I want to go through every request for production with

 3    the understanding that, from the defendants' perspective,

 4    policies and procedures, training materials, and audits and

 5    quality assurance documents have been produced.  The most

 6    difficult category of documents is evidence of practice.

 7        And I understand, from the defendants' brief, that the

 8    word "practice" does not appear in the requests for production.

 9    However, I understand that that is what the plaintiffs are

10    generally getting at when they are seeking, for example, lists

11    and logs.

12        And where I am denying a request for production is based

13    on my considered determination that the request is overbroad

14    and that the scope of the documents sought is not proportional

15    to the needs of the case.

16        But with respect to that, my first question for you,

17    Mr. Swearingen, is -- I've got -- I don't know how many

18    specific RFPs are at issue, but there are a lot.  Did the

19    parties comply with my December 22nd order at Page 4 to meet

20    and confer in person or over Zoom about each of these RFPs and

21    the interrogatory?

22            **MR. SWEARINGEN:**  We -- I -- we met and conferred, I

23    believe, over Zoom.  I don't believe that I participated in

24    those meet-and-confers, but I believe it did happen.  I believe

25    that it was a truncated event.

1        **THE COURT:**  My December 22nd order, Docket Number 478,

2    at Page 4, states, "Subsequent to December 22nd, 2023, the

3    parties shall promptly meet and confer in person or via Zoom

4    regarding defendants' document production.  If the parties

5    cannot resolve these issues through good-faith meet-and-confer

6    efforts, plaintiffs may file a motion to compel as to

7    Interrogatory Number 24 and/or any of the requests for

8    production identified in the parties' joint list by not later

9    than January 17th."

10   The clear expectation was that the parties would go

11   through each of the disputed requests and decide whether

12   there's a dispute, if they can be narrowed, and what any

13   agreement would be.

14   Do I understand you to be saying, Mr. Swearingen, that

15   although there was some sort of a meet-and-confer, it did not

16   go through each of the requests at issue?

17        **MR. SWEARINGEN:**  I believe that to be the case,

18   Your Honor.  I believe that the issues -- I apologize,

19   Your Honor, but I don't believe that I was on the

20   meet-and-confer.

21   So I -- I'm unable, at this time, to represent what

22   occurred on that meet-and-confer call.

23        **THE COURT:**  No.  I appreciate your honest answer, but

24   if the -- but if the -- if the parties did not comply with the

25   order that I issued and go through each of the requests, you're

1    now asking me to do that.

2        And just to give you an example, your Request for

3    Production Number 32 seeks all documents and communications

4    relating to, identifying, responding to housing, treating,

5    monitoring, and/or tracking incarcerated persons covered by

6    Sheriff's Department alcohol and opiate withdrawal protocols

7    from January 1st, 2021, to the present.  "All documents and

8    communications" includes literally every piece of paper on that

9    topic, which is vast.

10       And then I'm told plaintiffs seek training materials,

11   audits, and documents reflecting evidence of practice, in

12   particular other documents produced reference continuous

13   quality improvement studies regarding detox charting.

14       And so, as I am reading that, I am thinking to myself,

15   well, during the meet-and-confer, was there a question posed by

16   plaintiffs' counsel to Ms. Pappy as to whether or not the

17   County maintained continuous quality improvement studies, or is

18   this just something that the plaintiffs think they should have,

19   and they'd never asked -- specifically asked about it?

20       **MR. SWEARINGEN:**  It's a good question, Your Honor.

21       Again, as I sit here, I'm sorry.  I don't recall being on

22   the meet-and-confer.  So I can't answer the question

23   specifically.

24       What I can say, Your Honor, is historically -- and this

25   goes to the first part of today's hearing -- there's been a

1   difficulty in information-sharing, and the parties have

2   previously gone through every single RFP one by one.

3        And since then, it is plaintiffs' perspective that -- that

4   little or no more information would be shared by defendants

5   regarding the specific requests for evidence of practice.

6        **THE COURT:**  But -- but understanding that, the phrase

7   "evidence of practice" is, in and of itself, very, very broad.

8   It could relate to virtually -- you know, it's just not subject

9   to being limited in a meaningful way.  And that is precisely

10  what I would have expected between September 1st, when the last

11  RFPs were propounded, and today, you know, five months ago,

12  that that would have happened.

13       So I understand you don't know what happened during the

14  meet-and-confer, if you weren't there, Mr. -- sorry --

15  Mr. Swearingen, but this just throws it in my lap to say,

16  "Well, you figure it out now."  And how is that possibly a -- a

17  constructive endeavor?

18       I'm going to try, and I'm going to do my absolute best,

19  but -- and I'm not complaining to you, like, "Look at all the

20  work you're making me do" because it's -- my job is to resolve

21  disputes where you can't resolve them.  But that is exactly why

22  there is a meet-and-confer requirement.

23       **MR. SWEARINGEN:**  I hear your concern, Your Honor.  I

24  think it's very valid.  I think the process has been

25  inefficient.  I think that -- as you think about some of the

1    suggestions that were made earlier this morning, my primary

2    concern is information-sharing.

3        In most instances, in the pre- -- in the meet-and-confers

4    that I've been involved with, with the RFPs, unless plaintiffs

5    are able to identify a specific document by name, many times,

6    defendants are unwilling to identify what types of documents

7    are kept in the normal practice that relates to logs or lists

8    that occur as part of the jail's treatment and processing of

9    individuals who are incarcerated within it.

10       There's no meaningful -- there's been very little

11   meaningful discussion about where that rubber meets -- meets

12   the road.  So as a result, we are in this position, Your Honor,

13   where plaintiffs don't know and have not been able to further

14   narrow.

15       You know, if, for example -- there's a dispute, for

16   example, about safety logs.  Every jail that I have seen

17   records from, and that I'm aware of from my practice, maintains

18   safety logs -- safety check logs.  Defendants have claimed that

19   those don't exist.

20       If we were to have a meaningful discussion about those

21   safety logs, which I can only presume do exist, we'd be more

22   capable of actually narrowing.  You know, if we have them from

23   all seven facilities, maybe this time period would work and

24   satisfy their -- their request and make it not so broad.

25       But we have not had that level of discussion for just

1  about any RFP at issue.

2       **THE COURT:**  Ms. Pappy, do you know if the County

3  maintains quality improvement studies regarding detox charting?

4       **MS. PAPPY:**  Your Honor, anything that we have about

5  quality improvement from medical was produced, anything and

6  everything, not limited to any specific topics.  So if we have

7  it, we produced it.

8       One comment is I believe that Mr. Swearingen is just

9  confused about our meet-and-confer.  There was no

10 meet-and-confer about this -- the documents that are included

11 in the motion after that hearing.

12      The meet-and-confer we had was about 250, 251, and 252,

13 which are in Request for Production of Documents Number 6.

14      **THE COURT:**  This is a serious concern to me as to

15 whether or not there was compliance with the order that I

16 issued on December 22nd and the -- whether or not the parties

17 met and conferred, which was specifically intended to allow you

18 to reduce the number of RFPs and interrogatories -- or the

19 interrogatory in dispute, and instead has produced --

20 apparently has resulted in no meet-and-confer and however many

21 RFPs are in dispute.

22      Who participated in that meet-and-confer, as directed by

23 my order, Mr. Swearingen?  Do you know?

24      **MR. SWEARINGEN:**  I believe -- I believe that I saw an

25 email from my colleague, Hannah Chartoff, setting up that

```
 1    email -- setting up that meet-and-confer.  I was out of the
 2    office due to personal reasons for a couple weeks, off and on.
 3              THE COURT:  Okay.
 4              MR. SWEARINGEN:  So I can't tell you, Your Honor --
 5              THE COURT:  No.  I appreciate that.
 6              MR. SWEARINGEN:  -- but I do believe that -- that I
 7    saw a meet-and-confer set up.  I don't know if it was
 8    actually -- if the participants actually participated in the
 9    meet-and-confer.
10              THE COURT:  Okay.  Thank you.
11         And, Ms. Kaul, I -- if you don't know, either, I
12    understand.  I'm not trying to put you on the spot, but I do
13    want to make sure that I have all of the information that's
14    available to me before I make a decision.
15              MS. KAUL:  I don't have any addition- -- additional
16    information about that, Your Honor.
17              THE COURT:  Okay.  Thank you, Ms. Kaul.
18         Ms. Pappy, was there a meet-and-confer subsequent to
19    December 22nd regarding the RFPs and the defendants' document
20    production, as I ordered on December 22nd?
21              MS. PAPPY:  Your Honor --
22              THE COURT:  On December 20th.  Excuse me.
23              MS. PAPPY:  Apologies.
24         There was a meet- -- there was a meet-and-confer with
25    Mr. Swearingen on the 11th about 250, and then there was a
```

1   meet-and-confer with Ms. Chartoff later that afternoon, but --

2   I want to tell you exactly what this was about.  So if you'll

3   give me a moment, I want to pull up the email so I can recite

4   (Inaudible) what the topic was.

5        **THE COURT:**  And while you're looking, just so the

6   record is clear, I think I erroneously referred to my order

7   date as December 20th.  That was the date of our hearing.  The

8   order which I am referring to is dated December 22nd.  It's

9   Docket Number 478 on Page 4, as I mentioned earlier.

10        **MS. PAPPY:**  I found the email.  I can read you the

11   topics that plaintiff -- that Ms. Chartoff actually sent to me.

12        **THE COURT:**  Go ahead.

13        **MS. PAPPY:**  No metadata produced with regard to the

14   ESI, no medical -- custody or medical records, no text messages

15   or instant messages -- "message ESI" is how Ms. Chartoff

16   describes it.  The ESI production does not include all of the

17   plaintiffs' search terms.

18        **THE COURT:**  What's the date of that email?  Because I

19   believe I saw it in the papers.

20        **MS. PAPPY:**  The 9th of January.  It was sent to me,

21   and then I responded at 12:46 p.m., and then I -- quality

22   training materials, audits, quality assurance, and practices

23   with regard to some of the items in here, in the papers.  I can

24   read them off to the Court; or, if it's in the papers, maybe

25   you have the email.

1      It does not include staffing plans as to two of the items

2  in the motion.  Contractor productivity reports -- that is not

3  included in the motion.  It was just -- it's something that I

4  had overlooked, so it's not (Inaudible) in the motion, and then

5  designation of documents as confidential that plaintiff doesn't

6  think should be confidential.

7          THE COURT:  Okay.  Is that in the motion papers?  I

8  can't remember exactly where.

9      Go ahead, Mr. Swearingen.

10         MR. SWEARINGEN:  Your Honor, it's Exhibit RR, Page 735

11  to the Swearingen declaration.

12         THE COURT:  Thank you.

13     So I appreciate that there was an email sent on

14  January 9th, consistent with the discussion at the (Inaudible)

15  hearing about the limited effectiveness of long emails.  And my

16  order had required the parties to meet and confer, in person or

17  by Zoom, if you could talk through these issues.

18     Did that ever happen, Ms. Pappy?

19         MS. PAPPY:  It did as to these issues.

20     And in our defense, the most efficient way that

21  Ms. Chartoff and I find to work through all of the issues is

22  she will send me an email bullet-pointing them, and then I will

23  respond to them and give her sort of our position, and then we

24  talk so that we can -- or she'll say, "Hey, can you follow up

25  on this?"

1    So in that respect, Ms. Chartoff and I have actually been

2    pretty successful in at least preparing for the

3    meet-and-confer.  We may not agree at the meet-and-confer,

4    but -- but -- so please don't make us stop doing that.  It

5    makes it very organized to have our positions in one space.

6    Email allows us to do that.

7         THE COURT:  No.  I -- I understand, but, for

8    example -- I mean, I keep coming back to the first request

9    that's disputed, Number 32.  That asks me to order the County

10   to produce continuous quality improvement studies regarding

11   detox charting.

12        That's really specific, and I would expect that to have

13   arisen because the County was specifically asked to provide

14   those studies and specifically said, "No," as opposed to not

15   being asked or being asked and saying, "I don't" -- "we don't

16   have them."

17        It's -- it is asking me to rule in a vacuum, and that is

18   precisely the difficulty with both the very broad nature of the

19   requests, in a general matter, as well as what appears to be a

20   meet-and-confer that did not accomplish what I was directing

21   the parties to do.

22        MS. PAPPY:  We did not address 32 directly or 33.  The

23   first one on the list is 47.

24        THE COURT:  So is the first time that you saw a

25   mention of continuous quality improvement studies when you

1    received the motion on January 17th?

2         MS. PAPPY:  Well, I wouldn't -- I don't think that's

3    quite a fair characterization because I'm sure, at some point

4    in -- in the past, plaintiffs had brought this up.  And I can't

5    remember off the top of my head, but in terms of your order and

6    specifically what you ordered us to do, it was not raised in

7    the meet-and-confer.

8         I recognize this, and I think, as I put in the opposition,

9    one of the frustrations was trying to pluck out something that

10   may be responsive to 15 different requests.  We just produced

11   all of them.

12        THE COURT:  Isn't --

13        MS. PAPPY:  I suppose I could amend the written

14   response.

15        THE COURT:  We're doing things on the record today,

16   and there will be a transcript of all of this.

17        It does appear to me, unfortunately, that, notwithstanding

18   the good faith of Ms. Chartoff, who sent the email at issue,

19   and the subsequent meet-and-confer regarding general categories

20   or general issues with respect to the County's production --

21   that there was not a meaningful meet-and-confer regarding the

22   requests for production that are now the subject of the motion

23   to compel.

24        With that in mind, I am going to give you my tentatives on

25   every request for production, with a number of questions to

1   Ms. Pappy, keeping in mind that, unfortunately, a number of

2   these issues perhaps could have been resolved through a

3   meaningful meet-and-confer.  But they're before me now, and I

4   intend to resolve them.

5        Request for Production Number 32.  If I say "denied," it

6   is a shorthand way of saying the motion to compel is denied.

7   It is denied and -- in particular in light of Ms. Pappy's

8   representation that all quality improvement documents have been

9   produced.

10       Request Number -- and these are all the -- I should

11  clarify.  These are all of the requests that are categorized as

12  practice because I have a representation from Ms. Pappy that

13  quality control and audit documents, training documents, and

14  policy and practice documents have been produced.

15       Request for Production Number 49.  Ms. Pappy, it seeks,

16  according to plaintiffs, documents related to the psychiatric

17  stabilization unit.

18       Are there any logs from the psychiatric stabilization

19  unit?

20            **MS. PAPPY:**  Yes.  (Inaudible) looking for logs of

21  people, and we've provided logs.  We did not provide them as

22  far back as they wanted them.

23            **THE COURT:**  How far back did you provide logs?

24            **MS. PAPPY:**  Three months, six months.

25            **THE COURT:**  Is there any reason why you didn't go back

further?

MS. PAPPY:  We just picked a reasonable amount of going back.  I don't have a problem going back a little farther, but the -- but my concern has always been the January 1st, 2021, because we're talking about current issues.

THE COURT:  Right, but I understand that the plaintiffs are alleging a policy and practice of the County.

MS. PAPPY:  Understood.

THE COURT:  I --

MS. PAPPY:  Whatever you want to order is fine with me.

THE COURT:  Okay.  Given -- given that the claims, under Section 1983, do allege a policy and practice, I do find it appropriate generally that the requests go back to January 1st, 2021.  You will hear that from me throughout this.

I am directing the County, in response to Request for Production Number 49, to provide psychiatric stabilization unit logs from January 1st, 2021, to the present.

The next request for production regarding practice is Number 82.  It was not raised in the parties' prior joint chart and is not properly before me.  That is waived.

Request for Production Number 97.  Ms. Pappy, this seeks documents showing a time between a person's arrival at the jail and intake screening.

Does the County maintain logs showing that time period?

1          **MS. PAPPY:**  They do not.

2          **THE COURT:**  That request is denied.

3      Request Number 99 is denied.

4      Request Number 100.  Ms. Pappy, does the County maintain

5  logs regarding continuing health care treatments for

6  incarcerated people upon their arrival at the jail?

7          **MS. PAPPY:**  As phrased, no.

8          **THE COURT:**  What do you mean by that?

9          **MS. PAPPY:**  It states "logs, audits, lists, and

10 summaries related to continuing health care treatments."  They

11 have sick call logs.  They have logs for people who were sent

12 out to a specialist.  They have logs for people sent to ER,

13 which really is just an emergency situation, probably doesn't

14 cover this.  They have medication logs.

15      To me, all of those are subsumed within this request, and

16 all of those have been produced.  The other most responsive

17 thing would be all of the medical records for the entire

18 history of the --

19          **THE COURT:**  Do you need some water, Ms. Kaul?  We can

20 grab you some.  I feel bad for you.

21          **MS. KAUL:**  I'm okay.

22      Thank you, Your Honor.

23          **THE COURT:**  Okay.  But we will talk about sick call

24 logs and specialist logs and medication logs in connection with

25 some of the other requests.

1        But while we're talking about it now, Ms. Pappy, were --

2   were all of those logs produced?

3        **MS. PAPPY:**  Yes, they were.

4        **THE COURT:**  For what time period?

5        **MS. PAPPY:**  A limited time period.

6        **THE COURT:**  Okay.  I'm going to direct the County to

7   produce -- I'm going to call them sick call logs, specialist

8   logs, and medication logs.

9        Does that all make sense to you?

10       **MS. PAPPY:**  Yes, it does.

11       **THE COURT:**  From -- for the relevant time period that

12  we discussed earlier, January 1st, 2021, to the present.

13       And, Mr. Swearingen, I'm not ignoring you.  I just -- I

14  want to get through this, and I'll hear anything you have to

15  say, sir.

16       Request Number 105.  The County produced a spreadsheet of

17  canceled and refused sick calls for the period June to

18  August 2023.

19       Ms. Pappy, I am directing the County to produce those for

20  the relevant time period.

21       Does that make sense?

22       **MS. PAPPY:**  Yes, Your Honor.

23       **THE COURT:**  Request Number 106 is denied.

24       Request Number 109.  We already talked about specialty

25  care referrals.  This also includes emergency transport,

1   specialty care appointments, and I think that is it.

2        The County is directed to produce spreadsheets for the

3   time period beginning January 1st, 2021.

4        Does that make sense, Ms. Pappy?

5            **MS. PAPPY:**  Yes.

6            **THE COURT:**  Request Numbers 110 and 111 are denied.

7        With respect to 113, Ms. Pappy, does the County maintain a

8   log or -- or a list reflecting when individuals received

9   eyeglasses, or does that require the County to go and get every

10  individual medical file?

11           **MS. PAPPY:**  No, they don't have lists.  Yes, it would

12  require a view of medical files.

13           **THE COURT:**  Number 113 is denied.

14       114 is denied.

15       Ms. Pappy, for 119, does the County maintain a log or a

16  list that would show the waiting time between when a person is

17  prescribed medication and when the person receives the

18  medication?

19           **MS. PAPPY:**  No.  It would require the medication list

20  and then going through the medical records.

21           **THE COURT:**  Number 119 is denied.

22       121 is denied as moot because it is the same information

23  that we discussed with respect to RFP 109.

24       Number 125.  Ms. Pappy, does the County maintain a log or

25  a list of individuals receiving chronic care with the

1    conditions described in the RFP?

2            MS. PAPPY:  It does not maintain it.  It can create

3    it.

4            THE COURT:  What does that mean?

5            MS. PAPPY:  If there is somebody in JIMS that has --

6    "chronic care," I don't know how to define.  I mean, the best

7    way that we tried to back into that was sick call logs for, I

8    think, a year back to show who goes to the doctor all the time.

9        But specific to diabetes, hypertension, hepatitis, AIDS,

10   TB, cancer, some of these are -- are -- have a flag in JIMS

11   that they can just identify, "Ah, this person has a flag" and

12   print out a list of names.

13       OB/GYN -- it's not going to show up.  It would just be a

14   woman unless they're pregnant.  I think pregnancy will show up

15   as a flag.

16       And then mental health -- it won't necessarily be a flag

17   unless it's, you know, suicide or something really serious.

18   So, I mean, mental health, to me, could be anything from

19   anxiety and depression.

20       So -- so the general answer is no.

21           THE COURT:  The middle column for 125 states that

22   defendants produced a spreadsheet of people with chronic

23   conditions as well as a list of pending psychiatry sick calls.

24           MS. PAPPY:  Yes.

25           THE COURT:  Do -- do those spreadsheets include the

1  entire period that we've been discussing?

2       **MS. PAPPY:**  I doubt it.

3       **THE COURT:**  I'm directing the County to produce those

4  spreadsheets for the relevant time period that we've been

5  discussing, starting on January 1st, 2021, and the --

6  Request Number 125 is otherwise denied.

7       Request Number 126 is denied.

8       Request Number 127.  Ms. Pappy, does the County maintain

9  logs reflecting the discharge of people from outside hospitals

10  to the jail?

11       **MS. PAPPY:**  No.  This one asks for documents relating

12  to the process and criteria, and that's a policy and a

13  procedure.  I'm not sure they're asking for logs.  Oh, no.

14  You're right.  They are.

15       No, there's no such log.  It's just a policy and procedure

16  question.

17       **THE COURT:**  Request Number 127 is denied.

18       Request Number 128.  Ms. Pappy, does the County keep logs

19  of delays in admissions of incarcerated persons into specialty

20  clinics or other health care providers?

21       **MS. PAPPY:**  They don't keep statistics about delays,

22  but what we produced was a chart showing the timing of the

23  scheduling appointment, when the appointment is.

24       So I guess you could -- somebody could -- it could be open

25  to debate whether that's a delay or not.

1        **THE COURT:**  Okay.  But it shows the date the

2   appointment was scheduled and the date the person was actually

3   seen?

4        **MS. PAPPY:**  Correct, or the scheduled appointment.  It

5   may be a future appointment for them.

6        **THE COURT:**  From what relevant time period is that

7   spreadsheet?

8        **MS. PAPPY:**  I'm going to say limited.

9        **THE COURT:**  I'm going to direct the County, in

10  response to Number 128, to provide that information for the

11  relevant time period.

12      Does that make sense, Ms. Pappy?

13       **MS. PAPPY:**  Yes.

14       **THE COURT:**  The request is otherwise denied beyond

15  that.

16      Request Number 129 seeks -- well, let me ask this:  Does

17  the County keep logs of cancellations of health care

18  appointments?

19       **MS. PAPPY:**  They -- the sick call logs have

20  cancellations listed on them.  But to the extent that you've

21  ordered me to produce -- you can just order it, again, with

22  regard to this.  But the sick call logs show when somebody

23  cancels it.

24       **THE COURT:**  That information, you're saying, is

25  already on the sick call logs that --

1    **MS. PAPPY:** Yes.

2    **THE COURT:** -- were being produced for the relevant

3 time period?

4    **MS. PAPPY:** Yes.

5    **THE COURT:** Then I'm going to deny, with respect to

6 Number 129, as moot.

7    Request Number 130. Does the County keep logs of

8 treatment orders?

9    **MS. PAPPY:** They do not.

10    **THE COURT:** That request is denied.

11    Number 138. Does the County keep logs of medications

12 provided to individuals at the time of their discharge?

13    **MS. PAPPY:** They do not.

14    **THE COURT:** That request is denied.

15    Request Number 141. Given what the -- that the County has

16 produced this spreadsheet showing the individuals in the

17 Outpatient Step Down Unit from January -- well, from 2021 to

18 the present, my tentative is to deny that request.

19    But, Ms. Pappy, did this spreadsheet go back to

20 January 1st, 2021?

21    **MS. PAPPY:** It did not.

22    **THE COURT:** All right. Then I am going to grant the

23 motion to compel insofar as I'm directing the County to provide

24 that spreadsheet for the relevant time period.

25    Request Number 146. Does the County keep logs of delayed

1  admissions to outside hospitals or other facilities for mental

2  health care?

3       **MS. PAPPY:**  Not specifically to delays, but as with

4  med- -- outside medical appointments, it would be the same log

5  showing when the referral was made and when they're scheduled

6  to go.

7       **THE COURT:**  In light of that information that's

8  available in -- on the other -- on the -- I'm sorry.  What log

9  were you referring to, Ms. Pappy?

10      **MS. PAPPY:**  The other log was, I think, just generic

11  to medical appointments.

12      **THE COURT:**  And that's the same log that would show

13  when appointments were canceled?

14      **MS. PAPPY:**  No.  No.  There are -- there was -- there

15  was a previous request about specialty clinics, 128.  And I

16  would -- I would compare 146 to 128.  Because these are outside

17  referrals, the cancellations would be on internal sick call

18  lists.

19      **THE COURT:**  All right.

20      **MS. PAPPY:**  When I was talking about cancellations,

21  those are internal sick calls, going to see the doctor in the

22  jail.

23      **THE COURT:**  And how would -- how would one determine,

24  with respect to 140- -- excuse me -- 146 --

25      **MS. PAPPY:**  Yeah.

1    **THE COURT:** -- whether there's a delayed admission of

2    someone into an outside hospital or psychiatric care facility?

3    **MS. PAPPY:** You would have to look at -- well,

4    "delayed" is subject to interpretation.

5    **THE COURT:** Understood --

6    **MS. PAPPY:** You'd have to look at --

7    **THE COURT:** -- but just the dates -- the dates of

8    that.

9    **MS. PAPPY:** Oh, yeah. You would have to look -- you

10   would have to look at the medical records to determine when the

11   recommendation was made or when the referral was made -- was

12   made. It would probably line up with the date in the log that

13   we did give them. That's a -- and a referral date, and then it

14   would show when they were supposed to go.

15   I specifically remember one instance where the hospital

16   wouldn't take him, and so there was a "supposed to go" and then

17   an "actually went" date.

18   **THE COURT:** Okay.

19   **MS. PAPPY:** Same log -- same concept with the log.

20   **THE COURT:** And this is the log that you've already

21   been directed to produce going back to January 1st, 2021? Is

22   it the same log?

23   **MS. PAPPY:** You're going to -- it is not. You're

24   going to order me to --

25   **THE COURT:** But what is this log? I want to be very

```
 1  precise -- as precise as I can in terms of what I'm directing
 2  you to do.
 3          MS. PAPPY:  Mental disorders -- I would just say
 4  "outside providers."  I think that that captures all that -- if
 5  they have outside hospitals, forensic facilities, or other
 6  psychiatric facilities.
 7          THE COURT:  All right.  I am going to order the County
 8  to produce the log regarding appointments and other information
 9  that you just referenced, Ms. Pappy, concerning outside
10  providers, including -- so that includes, but is not limited
11  to, mental health care providers?
12          MS. PAPPY:  I would take out the word "appointments."
13  These are actually transfers for admission to mental health
14  care facilities.
15          THE COURT:  You are correct.  I appreciate that.
16      So -- but, otherwise, it includes -- is what you're going
17  to produce limited to mental health care facilities, or does it
18  include all outside providers?
19          MS. PAPPY:  The one responsive to 146 will be a
20  separate log.  It is not combined with a log for referrals to
21  outside specialty medical care providers.
22          THE COURT:  That's the one we discussed previously.
23          MS. PAPPY:  Correct.
24          THE COURT:  All right.  Then the outside provider logs
25  shall be provided by the County for the relevant time period.
```

1           Does that make sense, Ms. Pappy?

2           **MS. PAPPY:**  Yes, it does.

3           **THE COURT:**  For Request Number 147, Ms. Pappy, I

4    understand that the County produced a report of pending mental

5    health sick calls on a single date.

6           Do you happen to know the date in question?

7           **MS. PAPPY:**  I do not have 147 in my binder.

8           **THE COURT:**  It says, "All documents including, but not

9    limited to, logs, audits, lists, training materials, and

10   summaries relating to the identification, tracking, and/or

11   treatment of incarcerated persons' mental health care needs."

12          **MS. PAPPY:**  "Mental health care needs."

13          **THE COURT:**  And what I --

14          **MS. PAPPY:**  Sick -- it would be sick call lists with

15   regard to mental health care needs, which were produced.  There

16   is no log that says someone is going to be seen for X.

17          **THE COURT:**  Is that the same sick call list that we

18   discussed earlier in this hearing?

19          **MS. PAPPY:**  I don't know if it's the same document,

20   but I include it within sick call lists for medical -- there's

21   medical and mental.

22          **THE COURT:**  And we are clear that the County is

23   producing this sick call list for medical and mental for the

24   relevant time period?

25          **MS. PAPPY:**  Yes.

1      I want to make sure that the prior one for medical care --

2   yeah.  I'd -- I'd hate to shoot myself in the foot, but I think

3   you should, to be clear, limited-grant 147 because the previous

4   one talks about health care staff.  147 is specific to mental

5   health.

6          **THE COURT:**  It is specific to mental health.  You're

7   right, but I want to make sure that -- and I will grant it for

8   that, but I want to make sure I understand what the County is

9   producing.

10      And I understand that there are two separate lists -- two

11  separate sick care lists.  One is for --

12         **MS. PAPPY:**  Yeah.

13         **THE COURT:**  -- medical, and one is for mental health;

14  is that correct?

15         **MS. PAPPY:**  Yes.

16         **THE COURT:**  And to be clear, I am directing the County

17  to produce both for the relevant time period.

18         **MS. PAPPY:**  Yes.

19         **THE COURT:**  Does that make sense?

20         **MS. PAPPY:**  If I may, Counsel, you don't happen to

21  have an extra copy of Page 11 and 12, do you?

22         **MR. SWEARINGEN:**  11 and 12 of what?

23         **MS. PAPPY:**  Of your Exhibit A.  I have every other

24  page but not this one.

25         **MR. SWEARINGEN:**  (Inaudible).

1    **MS. PAPPY:**  Go ahead.

2       It's okay.  I'll meddle in --

3       **THE COURT:**  Here, I'll make you a copy.

4       You mean -- well, are you -- which page number -- page

5    numbers are you using, ECF page numbers or the page numbers in

6    the bottom middle?

7       **MS. PAPPY:**  In the bottom.

8       **THE COURT:**  Because I'm only -- okay.

9       So why don't we do this.  Can you please show this to --

10   can you please show this to Mr. Swearingen, make sure he's okay

11   with us making a copy of this for Ms. Pappy, Melissa?  Thanks.

12      Do you mind, Melissa?

13      **MS. PAPPY:**  You don't -- you don't need to make a copy

14   of it.  I just -- if I can just have the request in front of

15   me, I can take notes.  Don't -- I wouldn't (Inaudible) on the

16   time.

17      **THE COURT:**  Oh, but I kind of need to, yeah.

18      **MS. PAPPY:**  You do?  Oh.

19      **THE COURT:**  There's that.

20      **MS. PAPPY:**  Yeah.

21      And there's you.

22                              (Laughter.)

23      **THE COURT:**  All right.  Thanks.

24      Thank you, Melissa.

25      **THE CLERK:**  You're welcome.

1        **MS. PAPPY:**  I have a lot of pages but not that one.

2        **THE COURT:**  No problem.

3     All right.  That was 147.

4     I can't -- 148 is denied.

5     150.  Ms. Pappy, does the County maintain logs showing the

6  time between a referral for mental health care evaluations or

7  care and the time a person received that evaluation or care?

8        **MS. PAPPY:**  They do not.

9        **THE COURT:**  That request is denied.

10    152 is denied.

11    155 is denied.

12    156.  Ms. Pappy, did the County produce documents showing

13  mental health programming that is available at the jails?

14       **MS. PAPPY:**  Your Honor, if it's in the policies and

15  procedures, yes.  This -- these requests were given to the

16  clients, and I don't believe that there is anything like a

17  separate list.  All -- the medical policies and procedures

18  include all of what services are provided -- mental health

19  services are provided to incarcerated persons.

20       I'm happy to, again, take a limited grant, but I'll go

21  back and confirm that there's nothing separate and apart.  I

22  think I've done that once, but I'm happy to do it again

23  because, off the top of my head, I'm not -- I'm not confident

24  about this one.  We didn't spend lot of time talking about this

25  specifically.

1      **THE COURT:**  And I will -- with respect to Request for

2  Production Number 156, I will grant the motion insofar as I am

3  directing the County to ascertain whether there are any

4  documents showing mental health programming available at the

5  jails beyond what's in the policies and procedures.

6      And I want to be clear that I'm not ordering the County to

7  produce every single piece of paper with respect to every

8  single mental health program that's been provided over the past

9  three years necessarily.  I want to understand what the

10  universe is, and to the extent you can locate documents, they

11  should be produced.

12      If there is an issue with respect to undue burden, given

13  that I don't know the scope of the documents that might be

14  responsive, you can raise that with me.

15      **MS. PAPPY:**  Thank you.

16      **THE COURT:**  This is not talking about individuals --

17  going through individual files.  This is talking about what is

18  available.

19      **MS. PAPPY:**  Understood.

20      Thank you.

21      **THE COURT:**  With respect to Request Number 157, does

22  the County utilize a level of care system, Ms. Pappy?  I don't

23  know what that is.

24      **MS. PAPPY:**  I don't know what that is.  It provides

25  care, as outlined in the mental -- medical -- medical policies

 1    and procedures.  That includes mental health.

 2              THE COURT:  Mr. Swearingen, I am going to -- again,

 3    I'm going to give you time to address all of these, but do you

 4    know what a level of care system is?

 5              MR. SWEARINGEN:  Yes, Your Honor.  It's -- it's

 6    assigning people with different levels of mental health needs,

 7    different priorities in levels of care.

 8         So, for example, somebody with extreme schizophrenia may

 9    have -- or somebody with a suicidal risk may have a higher

10    level of care than somebody who has mild depression.

11              MS. PAPPY:  To the extent there is any such process,

12    it would be in policies and procedures.  Otherwise, it would be

13    in the person's medical records as to what level they were

14    classified as.

15              THE COURT:  There are not separate general logs or

16    lists pertaining to that?

17              MS. PAPPY:  No.

18              THE COURT:  I'm denying Number 157 based on that

19    information.

20         158 is denied.

21         159.  I'm told, Ms. Pappy, that the defendants produced

22    logs showing -- I believe that's -- "EOH" is Enhanced

23    Observation Housing.

24         Is that correct, Mr. Swearingen?

25              MR. SWEARINGEN:  It is, Your Honor.

1      **THE COURT:**  I'm told that the defendants produced

2   monthly logs for Enhanced Observation Housing and safety cell

3   actions for a limited time period.

4      I am directing the defendants to provide those logs for

5   the relevant time period that we have discussed today.

6      Does that make sense, Ms. Pappy?

7      **MS. PAPPY:**  Yes, Your Honor.

8      **THE COURT:**  With respect to Request for Production

9   Number 161, does the County maintain logs for follow-up care

10  for individuals who are discharged from the Inmate Safety

11  Program?

12     **MS. PAPPY:**  They do not.

13     **THE COURT:**  That request is denied.

14     162 is denied.

15     164.  Ms. Pappy, does the County keep logs showing

16  individuals with mental health disorders or intellectual

17  disabilities who are held in administrative segregation?

18     **MS. PAPPY:**  They do.

19     **THE COURT:**  Have those been produced?

20     **MS. PAPPY:**  They have.

21     **THE COURT:**  For the relevant time period?

22     **MS. PAPPY:**  No.

23     **THE COURT:**  I'm directing the County to produce those

24  logs for the relevant time period.

25     Does that make sense, Ms. Pappy?

1      **MS. PAPPY:**  Yes.

2      **THE COURT:**  With respect to 165, does the County

3  maintain logs related to the provision of mental health care

4  for individuals in administrative segregation or other

5  isolation housing?

6      **MS. PAPPY:**  They provide -- they -- they maintain logs

7  of people in ad seg, and those were produced for a limited time

8  period.

9      **THE COURT:**  What would one need to do to determine

10  whether the individuals on the log for administrative

11  segregation are also receiving mental health care or were in

12  need of mental health care?

13      **MS. PAPPY:**  You'd have to review their medical

14  records.  If it was a mental health situation such that it was

15  in JIMS, you could look in the JIMS.

16      **THE COURT:**  But you'd have to look it up by each

17  person?

18      **MS. PAPPY:**  You'd have to look it up by person.

19      **THE COURT:**  Has the County produced logs showing the

20  identities of the individuals in administrative segregation for

21  the relevant time period?

22      **MS. PAPPY:**  A limited time period.

23      **THE COURT:**  I'm directing the County to produce the

24  administrative segregation log for the relevant time period.

25      Does that make sense, Ms. Pappy?

1          **MS. PAPPY:**  Yes.

2          **THE COURT:**  Number 167, documents relating to programs

3    and services for incarcerated persons with disabilities.

4          I understand that there is a policy and a list of programs

5    as of November 2023, but the plaintiffs are seeking, you know,

6    a log or a document that would be used to track participation

7    in those programs.

8          Does the County maintain that data, you know, on a -- in a

9    list or a log, or would it require going to individual inmates'

10   files?

11         **MS. PAPPY:**  I -- I actually don't know because we

12   never talked about participation.  We just produced the

13   policies, which is what the request was.  I can -- I'm

14   certainly happy to follow up on whether there's participation

15   logs.

16         **THE COURT:**  I'm going to direct the County to produce

17   participation logs related to programs and services for

18   incarcerated people with disabilities, to the extent any such

19   logs exist.

20         Again, I am compelled to note that this, for example, is

21   something that should have been the -- the subject of a very

22   direct conversation as to what exists and what doesn't, and we

23   wouldn't even be talking about it.

24         Number 172.  I don't recall if we discussed this on

25   December 20th.  That's a request for production that asks for

1  every single document in the possession of the County relating

2  to laundry, clothes, and linens.  It is -- it is actually

3  overbroad, even as narrowed, and it is denied.

4      Ms. Pappy, for Number 175, does the County maintain lists

5  or logs regarding trash collection and removal from housing

6  units at the jail?

7          **MS. PAPPY:**  They do not.  What -- what they have is

8  janitorial contracts that show the frequency with which they

9  pick up the trash.  So we produced those.

10          **THE COURT:**  Number 175 is denied with that

11  information.

12      For Number 176, it appears that the defendants produced

13  invoices for cell decontamination services.  I am directing the

14  County to produce those invoices for the relevant time period.

15      Does that make sense, Ms. Pappy?

16          **MS. PAPPY:**  Yes.

17          **THE COURT:**  Number 179.  Again, I am compelled to

18  point out that a request for every single document relating to

19  contraband narcotics is vastly overbroad.  It is denied.

20      180.  Does -- Ms. Pappy, does the County maintain logs

21  regarding safety checks?

22          **MS. PAPPY:**  They do.

23          **THE COURT:**  Have those been produced?

24          **MS. PAPPY:**  I am not sure.

25      What request were you looking at?

1    **THE COURT:**  I'm looking at 180.

2    **MS. PAPPY:**  I'm not sure whether they have or not.  I

3   know that audits of safety checks have been produced.

4    **THE COURT:**  To the extent the County maintains logs of

5   safety checks, I am directing the County to produce those for

6   the relevant time period.

7    Does that make sense, Ms. Pappy?

8    **MS. PAPPY:**  Yes.

9    **THE COURT:**  Number 182.  Does the County maintain logs

10   regarding response times to emergency intercom use?

11    **MS. PAPPY:**  They do not.

12    **THE COURT:**  That request is denied.

13   Number 193 seeks every single document related to the use

14   of body scanners at the jail, including, but not limited to,

15   documents relating to body-scanning software, maintenance and

16   repair of body scanners, contracts related to body -- body

17   scanners, policies and procedures related to the use of body

18   scanners, and internal and/or third-party reports regarding the

19   efficacy and/or utility of body scanners.

20    As framed, that request is, again, respectfully, vastly

21   overbroad, and it is denied.

22    Number 195 is also vastly overbroad, and it is denied.

23    221.  Ms. Pappy, does the County maintain logs of

24   individuals who are prescribed antibiotic medications for

25   dental pain?

 1          **MS. PAPPY:**  They are not specific to antibiotics.

 2   They are those medication logs that we talked about earlier.

 3          **THE COURT:**  And --

 4          **MS. PAPPY:**  Whoever is given a medication has to be

 5   logged.

 6          **THE COURT:**  That includes dental?

 7          **MS. PAPPY:**  Anything -- yes, everything.

 8          **THE COURT:**  With that additional information,

 9   Request Number 221 is denied because the information is already

10   being provided.

11       Number 230- -- I don't think 231 is at issue.  I don't see

12   it in the -- in the chart, but I thought I saw it in the

13   motion.  So, to the -- to the extent it is at issue, I don't

14   have any information regarding it, and it is denied.

15       Number 230- -- Number 232.  Ms. Pappy, does the County

16   maintain spreadsheets of attorney callback requests prior to

17   August 2023?

18          **MS. PAPPY:**  They -- we produced -- what you see in

19   the -- in the documents produced -- spreadsheets showing

20   facility notifications --

21          **THE COURT:**  Right.

22          **MS. PAPPY:**  -- including -- that's what we have, and

23   we went back to August 31st of 2023.

24          **THE COURT:**  I'm directing the County to produce that

25   information going back -- for the relevant time period.

```
 1        Does that make sense, Ms. Pappy?
 2            MS. PAPPY:  Yes.
 3            THE COURT:  Number 233 appears to relate to wait times
 4    for professional visits, including the time it takes to release
 5    visitors from the waiting room.  That is denied.
 6        234.  Ms. Pappy, does the -- does the County have a list
 7    showing law library hours of availability?
 8            MS. PAPPY:  Whatever we have was -- is in the policies
 9    and procedures and green sheets.
10            THE COURT:  So the --
11            MS. PAPPY:  If it --
12            THE COURT:  Sorry.  I interrupted you.
13        Go ahead.
14            MS. PAPPY:  No.  No.  As it -- green sheets are
15    specific to a facility.  So for every single one of those
16    facilities, the policies, procedures, and green sheets would
17    include this information, and those were all produced for every
18    facility.
19            THE COURT:  It includes the hours and availability?
20            MS. PAPPY:  I don't know.
21            THE COURT:  Okay.
22            MS. PAPPY:  I don't -- off the top of my head, I don't
23    know.
24            THE COURT:  I am directing the -- with respect to
25    Number 234, I am directing the County to provide documents
```

1    sufficient to show the law library hours of availability.

2        Does that --

3            **MS. PAPPY:**  If they are not in the policies and

4    procedures and green sheets?

5            **THE COURT:**  To the extent they don't -- they haven't

6    been produced, that's correct.

7            **MS. PAPPY:**  Thank you.

8            **THE COURT:**  Does that make sense, Ms. Pappy?

9        **MS. PAPPY:**  Yes.

10           **THE COURT:**  Number 235 is denied.

11       All documents -- Number 236 is all documents relating to

12   legal mail.

13       Ms. Pappy, is there a -- is there a policy governing legal

14   mail, or is it more generally incarcerated person mail?

15           **MS. PAPPY:**  I'm not sure if it's specific to legal

16   mail, but it's -- it's -- all mail, no matter who it's from, is

17   included in policies and procedures.

18           **THE COURT:**  Is there a separate set of procedures or

19   policies that applies to legal mail?

20           **MS. PAPPY:**  I don't know.  If -- remember, we produced

21   every policy, not just limited ones.  If -- if there is one,

22   it's in the plaintiffs' possession.

23       What number is this, Your Honor?

24           **THE COURT:**  That's Number 236.

25           **MS. PAPPY:**  Okay.

 1           **THE COURT:**  And that request is denied based on the

 2    information provided by Ms. Pappy.

 3           Before I hear from Mr. Swearingen, the following requests

 4    were identified in the chart that is Exhibit A to

 5    Mr. Swearingen's declaration but were not specifically

 6    addressed in the motion.

 7           Those are Numbers 101, 102, 103, 135, 136, 137, 139, 168,

 8    173, 174, 185, 187, 188, 192, 194, 196, 197, 199, 200, 201,

 9    202, 203, 204, 205, 206, 207, 222, 223, 238, 239, 241, 242,

10    243, 244, 245, and 247.

11           It is not clear if these requests are truly in dispute or

12    were simply not removed from the earlier joint discovery chart

13    from December 2023.

14           To the extent the plaintiffs are seeking to move to compel

15    production of additional documents responsive to these

16    requests, they -- plaintiffs have not met their burden, as the

17    moving party, to demonstrate these requests seek documents that

18    are relevant to a claim or defense.

19           Given that they are not at all addressed in the motion,

20    and to the extent that the motion does pertain to these

21    requests, it is denied.

22           It is 11:00 o'clock now, and I know that Mr. Smith is

23    going to be on at about 11:00.

24           Mr. Swearingen, let me ask you this.  I know that that's a

25    lot to digest, and I'm going to give you some time to digest

```
 1    that.  If you would like, I can turn to the motion involving

 2    NaphCare; or, if you'd like to be heard on this motion while

 3    it's all fresh in your mind, I'll give you the chance to be

 4    heard, sir.

 5        It's your choice.

 6            MR. SWEARINGEN:  Given that Mr. Smith is here, I would

 7    appreciate the time to collect my thoughts and respond

 8    afterwards.

 9            THE COURT:  Yeah.  Sure thing.

10            MR. SWEARINGEN:  Thank you.

11            MS. PAPPY:  Your Honor, may I step out of the

12    courtroom for five minutes?

13            THE COURT:  Sure.

14        Mr. Smith, we've been going for a couple of hours.  So

15    give us just a moment, and we'll turn to your matter.

16            MR. SMITH:  I've got all day for this.  So take your

17    time, please.

18        Thank you for accommodating me as well.

19            THE COURT:  Anybody who wants to take a short break,

20    feel -- we've been going for two hours.  Feel free to do so.

21        Ms. Kaul, are you sure you don't want some water or

22    anything?

23            MS. KAUL:  I'm okay.

24        Thank you.

25            THE COURT:  I'd offer you one of these chocolate
```

```
 1  things that are on the bench, but I don't know that they taste

 2  very good, how long they've been there.  So --

 3          MS. KAUL:  I've been popping cough drops.

 4          THE COURT:  Okay.

 5          MS. KAUL:  I can do with that.

 6                    (Recess taken.)

 7          THE COURT:  All right.  Mr. Smith, can you hear us?

 8          MR. SMITH:  I can hear and see you.

 9          THE COURT:  Great.

10      Good morning to you.

11          MR. SMITH:  Good morning.

12          THE COURT:  Before you state your appearance, have you

13  filed a notice of appearance in this case?

14          MR. SMITH:  I filed an opposition with my pleading on

15  it.  We represent --

16          THE COURT:  I know.

17          MR. SMITH:  (Inaudible).  So I don't know who I would

18  be appearing on behalf of other than --

19          THE COURT:  Okay.  But you did receive your pro hac

20  vice?

21          MR. SMITH:  Oh.  Yes.  I'm in California.  I am

22  admitted to the Southern District.

23          THE COURT:  I meant -- I'm sorry -- your admission to

24  this district.  That's what I meant to say.

25          MR. SMITH:  Yes, that's --
```

```
 1            THE COURT:  We did discuss -- that's fine.

 2            MR. SMITH:  That's correct.  I am admitted.  I've got

 3     the certificate.  Everything's squared away.

 4            THE COURT:  But you -- if you -- are you receiving ECF

 5     notices in this case?

 6            MR. SMITH:  At this point, I am, since the filing of

 7     the opposition.

 8            THE COURT:  All right.  If that's -- as long as you're

 9     receiving ECF notices, I -- and you -- you have your admission,

10     I think we're -- we're squared away.

11         All right.  Then what we are going to do, Counsel, is I am

12     going to stop there with respect to the plaintiffs' motion to

13     compel.  There are a number of other issues that are raised in

14     the motion that I do want to -- I need to address with you-all.

15         But Mr. Smith is here on behalf of NaphCare, and we are

16     turning now to the plaintiffs' motion to compel with respect to

17     NaphCare, which is Docket Number 488.

18         And, Mr. Smith, we have -- plaintiffs' counsel already

19     stated their appearances.  Why don't you go ahead and state

20     your appearance for the record, please.

21            MR. SMITH:  Good morning.  Craig Smith on behalf of

22     Third Party NaphCare.

23            THE COURT:  Thank you, Mr. Smith.

24         Ms. Kaul, let me start with you, if I could.  My order

25     dated December 22nd, 2023, at Page 2, directed the parties to
```

 1    meet and confer, in person or over Zoom, regarding NaphCare's

 2    document production and any assertion of privilege, and then it

 3    provided the plaintiffs an opportunity to file a motion to

 4    compel with respect to any issues.

 5        My understanding, at the December 20th hearing, was that

 6    NaphCare really wasn't objecting to the subpoena -- or the

 7    documents sought in the subpoena, really, with the exception of

 8    the attorney-client privilege objection.

 9        So I must tell you, I was surprised to see the number of

10    requests that are at issue.  And I'm not saying -- that is what

11    it is, but it really called into question for me whether there

12    was a meaningful meet-and-confer between the plaintiffs and

13    NaphCare, as required by my order.

14        So the question out of the box, Ms. Kaul, is:  Was there a

15    meet-and-confer with respect to each of these RFPs?

16        **MS. KAUL:**  So there was a meet-and-confer by Zoom,

17    pursuant to the Court's order, and I -- I checked my calendar

18    while -- during the first portion of this hearing, and it

19    occurred -- it was on the -- January 10th, so following the

20    most -- the last (Inaudible) production of documents from

21    NaphCare --

22        **THE COURT:**  Right.

23        **MS. KAUL:**  -- which occurred on the 4th or 5th.  We

24    did not, at that -- during that meet-and-confer, discuss these

25    on an RFP-by-RFP basis.  That previously had occurred in

1  conversations with Mr. Smith in terms of going through each of

2  our requests, explaining (Inaudible) the types of documents we

3  believed exist -- exist, but that did not occur during the

4  January meet-and-confer.

5      I just jumped ahead a bit.  I take the Court's point about

6  the number of RFPs involved, you know, in our motion to compel.

7  I think, in part, what's happening there, Your Honor, is, at

8  previous meet-and-confers, we've tackled what we see is the

9  deficiency in different ways, including by identifying dozens

10  of types of documents.

11      You'll see, in my November emails, where I outlined

12  documents referenced in the County's contract with NaphCare

13  that we believed should have been produced.  It wasn't on an

14  RFP-by-RFP basis, but a number of those documents are

15  responsive to multiple RFPs.

16      So the motion -- you know, we raised every single RFP

17  where we saw that there were deficiencies but understanding

18  that certain documents will be responsive to multiple

19  defendants.

20          **THE COURT:**  Understood.

21      My concern with the RFPs, as framed, is the same concern

22  that I have expressed on -- with respect to the RFPs to the

23  County on December 20th and then during my -- during this

24  hearing, and that is that they are very broad.

25      But what you're telling me, Ms. Kaul, is that you did

1    provide NaphCare's counsel with a list saying, "Hey, these are

2    the specific types of documents we're looking for"; is that

3    right?

4         MS. KAUL:  At our -- during our first meet-and-confer

5    phone call in September -- and this was -- Mr. Swearingen was

6    on that call as well -- we went through on an RFP-by-RFP basis,

7    and -- and this was -- this was the nature of the discussion

8    where, you know, Mr. Smith expressed some uncertainty and, I

9    think, an interest in speaking to his client about what

10   documents we were looking for.

11        I believe that that conversation happened in good faith,

12   and we provided as much specificity as we could.  I will say

13   that I think that we have been -- we've learned more even in

14   the course of time since September, in part, because of the

15   defendants' production.  So, for example, on December 21st, we

16   received a production that included the corrective action

17   notice that was attached to my declaration.

18        That is the kind of document we wouldn't have known to ask

19   for, but it's one that, when we saw it, we -- we would have

20   expected it would have been one of the first things to come to

21   mind for a NaphCare custodian who was asked about, you know,

22   who was -- who was -- who sought out a request.  And so,

23   certainly, the extent of the deficiency, I think, has been

24   crystallized since September.

25        But to answer your question, yes, the first phone call

1  that we had about -- about the request went on a

2  request-by-request basis and tried to identify what we believed

3  (Inaudible) off what we believed existed.

4        **THE COURT:**  I guess I'm puzzled and -- Ms. Kaul,

5  because I'm looking at Page 9 of NaphCare's opposition,

6  specifically Line 18, and Mr. Smith says that these corrective

7  action notices were never raised in your meet-and-confers.  And

8  I understand that maybe the plaintiffs didn't know about these

9  corrective actions when you served the subpoena.

10        But at any point, did you tell Mr. Smith, in a

11  meet-and-confer, before you filed your motion, "Hey, you need

12  to produce these" or "We think these corrective action notices

13  are responsive to the subpoena"?

14        **MS. KAUL:**  Yes, Your Honor.

15        So that production -- that document was produced to us on

16  December 21st.

17        **THE COURT:**  Right.

18        **MS. KAUL:**  I found that -- that document in my own

19  keyword search for that production somewhere around

20  Christmastime, and I sent that document to Mr. Smith on

21  January 4th, and this is Exhibit K to my declaration.  The

22  attachment isn't included, but you can see that there are

23  documents attached here.

24        And I highlighted that these were the types of documents

25  that we were surprised were not produced, we expected to be

1   produced.  And this was also where I outlined, in detail,

2   again, all of the RFPs that -- that ended up being in our

3   motion to compel and, again, tried to articulate, in different

4   ways, the kinds of documents we were looking for.

5        But, yes, the corrective action notice, as well as the

6   cover email showing that it was transmitted to NaphCare, was

7   provided to NaphCare's counsel on January 4th.  And if I

8   recall, I think we had a phone conversation around that time

9   about that document as well.

10          THE COURT:  Is that correct, Mr. Smith?

11          MR. SMITH:  That is correct, and I'm -- that might be

12   an incorrect statement in the motion, but I think what I was

13   trying to express was the corrective action notices were not

14   specifically requested as part of the request for production of

15   documents.

16        The request for production of documents, on their face,

17   wouldn't cause NaphCare to believe that they were asking for

18   corrective action notices or documents related thereto, and it

19   wasn't part of our ongoing meet-and-confer discussion.

20        It wasn't until this informal discovery conference was

21   about to take place and moving towards motion to compel that

22   plaintiffs' counsel indicated, "Well, look, this is why we

23   think that there are deficiencies in your responses because, in

24   defendants' production, we found a few documents that relate to

25   NaphCare, including a corrective action notice that we would

1   have expected to be part of your production."

2       I'd like to note that it is a very small amount of records

3   that they obtained from defendants, that they would have

4   (Inaudible) our production, and a corrective action notice --

5   I'm not sure where that squarely fits into what requests for

6   production of documents that they're indicating.

7       I'd like to note, too, that we did submit objections with

8   our responses to their requests for production of documents.

9   And so, at the discovery conference, I was not trying to

10  indicate that we don't have any objections.

11      Rather, the indication was -- is that we have been working

12  to comply, and we have complied, and we have a declaration from

13  the general counsel as to the reasonable and diligent search

14  that was conducted and the compliance pursuant to the

15  stipulation of the parties.

16          **THE COURT:**  I appreciate that, and it is apparent that

17  a number of documents have been produced.  And I don't look

18  solely at the, you know, 31,000 pages and conclude that that

19  must be sufficient because, of course, it depends on the nature

20  of the requests and the nature of the case.

21      But it did strike me, Mr. Smith, that -- you said, in your

22  brief, correction action -- corrective action notices, meeting

23  minutes, and email exchanges were never raised by plaintiffs in

24  meet-and-confer discussions.  And I'm not trying to get too

25  stuck on a single sentence, but I read that meaning that

1  corrective -- corrective action notices were never raised, and

2  it sounds like they were raised by Ms. Kaul.  And you've had a

3  number of discussions over a period of months.

4      So if that was a slip on -- on your part, I understand

5  that, but it does sound like there was a -- a meaningful

6  meet-and-confer.

7          **MR. SMITH:**  Yes.

8          **THE COURT:**  Is that -- go ahead, Mr. Smith.

9          **MR. SMITH:**  Well, I apologize because of the way that

10  that was worded.  I didn't mean to mislead the Court.  It -- it

11  can be, you know, determined to be as a slip.

12      But the meaning I was trying to bring to it was -- is that

13  the multiple meet-and-confer discussions that we had prior to

14  the Court's order -- these issues weren't raised until then.

15  You know, it became a new issue that plaintiffs had and now are

16  saying that these are the type of documents they expect to see.

17      So I didn't (Inaudible) that statement.

18          **THE COURT:**  I understand.  I -- I understand, and I'm

19  not suggesting that you were trying to do anything wrong,

20  Mr. Smith.  I appreciate the clarification.

21      Let me ask this:  Have all policies and procedures

22  promulgated by NaphCare been produced?

23          **MR. SMITH:**  Yes.

24          **THE COURT:**  Has NaphCare produced all internal and

25  external audits and other quality assurance documents

1    pertaining to medical care and mental health care at the

2    San Diego County jails?

3          **MR. SMITH:**  Yes.  And, unfortunately, there aren't

4    any.  I mean, they may -- they should be doing them, but the

5    issue is -- is that we don't have audits to produce.

6         So what has been produced is -- is what exists as -- as to

7    the extent you can refer to them as audits.

8          **THE COURT:**  But whether they should have been

9    generated or not is perhaps an issue for a different time, but

10   you're telling me that there -- there are no audits to produce;

11   is that correct, Mr. Smith?

12         **MR. SMITH:**  That's correct.

13         **THE COURT:**  Are there any quality assurance documents

14   generated by NaphCare pertaining to its provision of medical

15   care or mental health care services at the jails?

16         **MR. SMITH:**  As for quality assurance documents, I'm

17   not sure exactly the definition you're -- you're giving me with

18   respect to that, but there are no meeting minutes.  To the

19   extent there were quality assurance meetings with the County,

20   the County would have taken minutes, but we don't have -- so we

21   don't have documents that reflect that.

22         **THE COURT:**  No.  I understood, from your brief, that

23   you don't have any meeting minutes to produce.  I'm speaking

24   more generally as to quality assurance documents, and I don't

25   have a specific definition for you.  I've been using that

1  definition with the County, and everyone seems to have

2  understood it.

3      So I'm talking about sort of the common definition of --

4  you know, are there any such documents that NaphCare maintains?

5  Have you -- have you asked them if they have those documents, I

6  should say?

7      **MR. SMITH:**  Yes, and I'm willing to follow up with

8  that specific -- specific request.  I -- there wasn't an RFP,

9  that I'm aware of, that asks specifically for quality assurance

10  documents.

11      So I don't want to get that wrong, but I don't believe

12  they have any responsive records.

13      **THE COURT:**  Okay.  Ms. Kaul, here's what I'm thinking:

14      I can go through each of these RFPs, as I did for the RFPs

15  that the defendants propounded to the County, and I'll be

16  looking at the scope of the RFPs and giving you rulings.  I've

17  told you I'm prepared to do it.  You understand my -- my views

18  on the breadth of the RFPs.

19      Alternatively, do you think there would be value in you

20  providing Mr. Smith with a specific list of the documents that

21  you are seeking?  And when I say "list," I want to be careful.

22      I'm not talking about, respectfully, every email, text,

23  Teams message in the phrasing that appears throughout the --

24  your chart, but corrective action notices, quality assurance

25  documents, something -- something that is meaning- --

1  meaningful and has given NaphCare the ability to say, "These

2  are the discrete types of documents that we are looking for."

3       And maybe the answer is going to be that some or all of

4  those documents are not in NaphCare's possession, custody, or

5  control.  But at least it would provide the plaintiffs and

6  NaphCare with the ability to have that discussion that I know

7  you tried to have, it sounds like, in good faith, back and

8  forth in September rather than me giving you rulings right now.

9       I'll leave it up to you.  Which would you prefer?

10      MS. KAUL:  I'm open to Your Honor's suggestion of us

11  essentially continuing to meet and confer on these.

12      I do want to express a concern about --

13      THE COURT:  Sure.

14      MS. KAUL:  -- that, which is -- I think the -- the --

15  the declaration that was submitted or -- along with the

16  opposition described -- it's the reason that I didn't know

17  about the process that NaphCare undertook, which they say

18  demonstrates their diligence.

19      And they -- they said, essentially, they searched files

20  maintained by legal.  They reached out to HR, accreditation

21  compliance, IT, software implementation.  None of those people

22  are on the ground in the jail.  None of them are providers.

23  None of them are in charge of policies and procedures.

24      As far as I can tell, those are -- those are

25  administrative tasks and then -- and then participated in --

 1  individuals from legal participated in meetings with the

 2  house -- help services administrator for the jail.  As far as I

 3  can tell, that is the only person who is actually interacting

 4  with the County and the Sheriff's Department about what's

 5  happening substantively in the jail.

 6      And so I am -- I am concerned about that -- the extent of

 7  that search.  And, you know, if -- if that is the extent of the

 8  discussion that's happening on NaphCare's side, it is no wonder

 9  that -- frankly, Mr. Smith -- you know, these meet-and-confer

10  efforts have been not very substantive.  There hasn't been an

11  understanding of what the company actually has.

12      And so I -- I worry that we are going to be in a cycle of

13  that, even if we provide more specifics.  And -- and so I'm

14  open to doing this.

15      And the other thing I would say is, you know, we can --

16  the opposition also says that even now, in our motion, we

17  haven't identified, with specificity, what the discrepancies

18  are.  These charts -- in addition to the previous

19  meet-and-confers, the chart that was attached to Exhibit A to

20  my declaration was (Inaudible) attempt to encapsulate that.

21      So I feel that we've -- we've -- we may be late to the --

22  to the game, but we've tried to really climb the distance to

23  bridge that gap and the communication of what we're looking

24  for.  I don't want us to be up against the gun -- another

25  concern I have is, obviously, the deadlines in this case.  I

1  don't want us to be pushing up against those.  We have a

2  deposition to get done as well.

3      With those concerns stated, I am -- I am open to one more

4  effort to get this done, but I think it would -- one thing that

5  could be helpful is the tight deadlines, again, from Your Honor

6  about -- about that, the opportunity to come back if we are

7  still in the same place unfortunately.

8      And then -- I don't know what the solution is but -- but

9  some kind of -- you know, I think it would -- what I would even

10  propose is that, depending on how the meet-and-confer process

11  goes from hereon out -- that NaphCare provides a supplemental

12  declaration of some sort that allows the Court to understand,

13  with specificity, what the search was.

14      **THE COURT:**  I would propose to go a step further than

15  that because, in connection with the motion to compel the

16  morbidity reviews, there is the declaration from NaphCare's

17  general counsel, Mr. -- Mr. Barkley.

18      I'm going to set that for an evidentiary hearing and

19  provide the plaintiffs with an opportunity to cross-examine

20  Mr. Barkley because I think that will provide a better record.

21  We'll talk about that in a moment.

22      And what is Ms. Tejura's title, Mr. Smith?

23      **MR. SMITH:**  Say that again.

24      **THE COURT:**  What is Ms. Tejura's title?  The declarant

25  is Seetal Tejura, Docket Number 503-10.

 1          **MR. SMITH:**  I'm still not understanding.  What is --

 2   what is what?

 3          **THE COURT:**  What is her job title?

 4          **MR. SMITH:**  Oh.  Seetal?

 5          **THE COURT:**  Uh-huh.

 6          **MR. SMITH:**  She's a -- she's --

 7          **THE COURT:**  "Ms. Tejura" to me, but --

 8          **MR. SMITH:**  Yeah.  Yeah.

 9      Okay.  I'm sorry.  That's her last name.  Yes, that's

10   correct.  She's the chief legal officer.

11          **THE COURT:**  All right.  Well, she said that in a

12   declaration about their -- NaphCare's efforts to comply with

13   the subpoena.

14      So I would --

15          **MR. SMITH:**  Sure.

16          **THE COURT:**  If -- if there is a disagreement over

17   the -- the scope of NaphCare's search, I would provide the

18   plaintiffs with an opportunity to -- to cross-examine

19   Ms. Tejura about the content of her declaration at the same

20   evidentiary hearing where I'll be hearing from Mr. Barkley

21   regarding the death reviews.  So -- because I do understand

22   Ms. Kaul's point.

23      Let me ask you some questions, Mr. Smith.  Ms. Tejura's

24   declaration states that a paralegal reached out to people in

25   certain departments within NaphCare.  Were those individuals

1    located in San Diego, or were they located in Birming- --

2    Birmingham, Alabama, or somewhere else?

3            MR. SMITH:  The people that were reached out to are in

4    San Diego.  The paralegal -- I'm not sure exactly where her

5    location is, but she is part of the internal NaphCare company.

6    She's not a paralegal from our office.

7            THE COURT:  But the people who were contacted to

8    gather responsive documents were the people on the ground, so

9    to speak, at the San Diego facilities?

10           MR. SMITH:  That -- that's correct, and mainly the

11   health services administrators from San Diego -- the San Diego

12   facility.

13           THE COURT:  All right.  Let me ask you some more

14   questions, Mr. Smith, and then --

15           MR. SMITH:  Yes.

16           THE COURT:  -- I'll make a determination regarding how

17   best to proceed.

18       As I mentioned, I am prepared to go through these RFPs on

19   a request-by-request basis.  I do have tentative rulings for

20   each of them.

21       Let me ask this:  For Request Number 23, I see that

22   NaphCare has produced policies and procedures and blank forms

23   and unspecified TechCare reports.

24       What TechCare reports were produced?

25           MR. SMITH:  One second.

1    This --

2        **THE COURT:** Do you want me to (Inaudible)?

3        **MR. SMITH:** This -- I -- I mean, the TechCares

4    reports -- I think we had to do screenshots in order to get

5    them the information.  It may relate to the protocols.  I'm

6    looking at the list of documents.

7        **THE COURT:** Well, hang on, Mr. Smith.

8    Ms. Kaul, do you know what TechCare reports were produced?

9        **MS. KAUL:** I do, Your Honor.

10    The TechCare reports are charts that are presumably

11    generated on TechCare that -- in this instance, with respect to

12    RFP 23, I believe there was a line item showing, for a

13    particular month, the number of patients who were pregnant or

14    flagged as pregnant or something like that.

15    So it's just not, you know, a month -- there were a series

16    of monthly columns for, and I don't know -- I apologize.  We

17    don't know what time period was covered, but it was a portion

18    of 2022 to 2023 and then a line item for a number of patients

19    who fell into various categories, including one for pregnancy.

20        **THE COURT:** Okay.  That's helpful.  Thank you.

21    Turning to Number 68, Mr. Smith, which seeks studies and

22    analyses regarding adequacy of staffing, are there any

23    responsive documents?

24        **MR. SMITH:** No.  There -- there are not -- the

25    contract was produced that lists the employees.  That's

1    arguably responsive because it includes what employees, you

2    know, would be staffed, but there's not any other responsive

3    document.

4         MS. KAUL:  Your Honor, the corrective action notice

5    refers to staffing as well.  Even that -- it just exemplifies

6    the -- I just -- I think it just exemplifies the inadequacy of

7    the (Inaudible) of production, but I've made my point on that.

8         THE COURT:  No.  I understand.  I appreciate that,

9    Ms. Kaul.

10        Mr. Smith, for Number -- go ahead, Mr. Smith.

11        MR. SMITH:  I -- I just -- I mean -- and we don't --

12   we are -- not "we," but NaphCare is unable to locate any other

13   responsive documents.  And, you know, they did a diligent

14   search into that.

15        So I don't know what else can be done, but I can -- I can

16   look into it, but let's proceed.

17        THE COURT:  Okay.  Number 70.  Mr. Smith, did NaphCare

18   object to producing the licensing credentials of employees at

19   the jail?

20        MR. SMITH:  There was an objection.  That was not one

21   of the -- I'm looking at meet-and-confer correspondence with

22   plaintiffs' counsel that I think they had an issue with.  I

23   think we produced these employee -- the employee information.

24   You know, I'll turn to Ms. Kaul and see if that's actually an

25   issue.  It wasn't on my list.

 1          **THE COURT:**  Well, candidly, I'd prefer that you turn

 2   to Ms. Kaul at a different time and place to --

 3          **MR. SMITH:**  Okay.

 4          **THE COURT:**  -- have that conversation.

 5      So --

 6          **MR. SMITH:**  I'm sorry, Your Honor.

 7          **THE COURT:**  That's okay.  No, no, no.  I'm not looking

 8   for an apology.  I want to make good use of your time and ours,

 9   given the number of issues we have to address.

10          **MR. SMITH:**  Okay.

11          **THE COURT:**  Let me -- one more question for you,

12   Mr. Smith.

13      One of the issues between -- one of the -- one of the

14   issues I see is that the parties did reach some agreements,

15   which I commend you for doing, and that the -- NaphCare was to

16   provide the plaintiffs with a list of trainings, and the

17   plaintiffs were to go through that document and pick the

18   specific documents they want.

19      I'm told that it was a 396-page PDF file that had columns

20   spilling over from one page to the next, which is challenging

21   to read, which I would understand.

22      Was there an objection to giving the plaintiffs that PDF

23   in native form?

24          **MR. SMITH:**  There's -- no, there's not an objection.

25   I -- I'm not sure what type of native form it would be, but we

1    could -- we could --

2              THE COURT:  How about PDF?

3              MR. SMITH:  The PDF is what they had.

4              THE COURT:  You gave them the PDF file?

5              MR. SMITH:  So --

6              THE COURT:  Okay.  Ms. Kaul, go ahead.

7              MR. SMITH:  No.  I gave them -- I gave them a list --

8    we gave them a list of all of the training, which -- it clearly

9    indicates that there's a lot of training.  It's a voluminous

10   amount of training.

11             THE COURT:  Okay.

12             MR. SMITH:  And then my understanding was -- is that

13   they were going to identify which training records they wanted,

14   and we would produce training records that were relevant to

15   avoid the burden.  We are not in objection to providing them a

16   more user-friendly list -- and that hasn't been a big topic of

17   our meet-and-confer until recently -- as to the training

18   information.

19        But from the PDF, you can identify different training that

20   they feel they need or would be relevant, and we're willing to

21   provide them with the training (Inaudible).

22             THE COURT:  Go ahead, Ms. Kaul.

23             MS. KAUL:  A PDF was produced to us.  It was very

24   difficult to understand.  We requested a number of times

25   whether an Excel document could be produced because it's

sortable, and it allows us to remove duplicates and really

narrow down to the trainings that are -- are also provided.

I never received an answer about whether that could or

could not be produced.  So I said, "Alternatively, could we

just get a list, even in an email form, about the trainings

that are provided?"  That wasn't provided, either.

If we have to use the PDF, frankly, that was produced and

take the time to go through it, it's burdensome, in our view.

But if that's where we are, that's where we are.  I think the

difficulty was just understanding, because that's really the

last resort, but I don't think -- I do think this is one on

which we can figure this out if -- if we work together on it.

THE COURT:  Here's what we are going to do:

My tentative ruling, on the RFPs at issue and the motion

to compel, was to deny the motion as to each of them based on

overbreadth grounds.  I can go through and give you specific

examples.

But even looking at the documents that are allegedly

missing, for every one of these RFPs, it was -- I was not able

to find good cause to order the production of, generally

speaking, text messages, Teams chats, and so forth on very,

very broad topics.

Some of the topics, in addition, such as every single

document relating to the contract negotiations, which was

Request for Production Number 2, are, respectfully, very, very

1    broad.

2         The one -- I should have backed up.  The two requests as

3    to which I was going to -- my tentative is to conduct further

4    proceedings are Request Numbers 80- -- 85 and 77, which I

5    believe are the requests pertaining to deaths in -- no.  Excuse

6    me.  77 and -- I was wrong -- 28, which pertain to in-custody

7    deaths.  And I -- I don't have sufficient information before me

8    to give you a ruling on that.

9         Here is how we are going to proceed:

10        Ms. Kaul, you understand, from being here for the last

11   couple of hours, my concerns with respect to the RFPs.  I have,

12   you know, listened to the efforts that you have made and that

13   are described as well in your declaration to meet and confer

14   and drill down on the specific documents that the plaintiffs

15   are seeking.

16        And with -- you know, understanding my view that any Teams

17   message, in any way, relating to these very broad categories of

18   documents, I am not going to be inclined to order NaphCare to

19   produce.

20        I would provide you with an opportunity to engage with

21   Mr. Smith and give him, as targeted as you can, a list of the

22   types of documents that you are seeking.  And we've been

23   talking a lot about the correction -- corrective action

24   notices, for example.  That would be just -- just one.

25        And to the extent you-all can agree, wonderful.  If you

 1 | cannot, I'm going to set this motion for a further evidentiary
 2 | hearing on the -- the death reviews.
 3 |     Mr. Smith, we're going to pick a date today for that
 4 | evidentiary hearing.  Two weeks before that hearing, NaphCare
 5 | will lodge, for my in-camera review, the documents that are
 6 | contained in its privilege log.  That is Docket 488-4.
 7 |     And given that the -- or that NaphCare is relying on the
 8 | declaration of Justin Barkley to establish that the documents
 9 | pertaining to these death reviews are privileged, I would
10 | provide the plaintiffs with an opportunity to cross-examine
11 | Mr. Barkley, if they wish.
12 |     Is that something you would wish to do, Ms. Kaul?
13 |         **MS. KAUL:**  I think we would, Your Honor.
14 |         **THE COURT:**  I would not limit the examination solely
15 | to cross-examination.  To the extent, Mr. Smith, that you would
16 | wish to elicit additional direct examination testimony from
17 | Mr. Barkley, I would allow you to do that.
18 |     But Mr. Barkley should be present at the evidentiary
19 | hearing and be prepared to testify, given that it is, of
20 | course, NaphCare's burden to establish that the requirements
21 | for the privilege have all been met.  And between Mr. Barkley's
22 | testimony and my review of the in-camera documents, I will be
23 | able to, I believe, make a principled ruling.
24 |     The parties, I'm sure, are aware of my ruling with respect
25 | to the CIRB reports.  I am not suggesting that ruling controls,

1  but I would suggest that, Mr. Smith, you review that, to the

2  extent you have not, given that it may provide some -- some

3  guidance on the issues that will be significant to this

4  determination.

5      Let's pick a date for the evidentiary hearing.

6      The earliest I can do it, Counsel, is going to be

7  Wednesday, March 6th.  I can give you the morning on that date.

8          **MR. SMITH:**  That works for NaphCare.

9          **MS. KAUL:**  Your Honor, I am out of the country that

10  week, but --

11         **THE COURT:**  I know this is your issue that you've been

12  working on, Ms. Kaul.  So let me see what we can do.

13         **MS. KAUL:**  I appreciate that.  I was going to offer

14  coverage, but it's the ideal --

15         **THE COURT:**  No.  I understand.

16      Hey, Melissa, can we move, for the last week in

17  February -- are you available the week before then?

18         **MS. KAUL:**  It's those two weeks (Inaudible).

19         **THE COURT:**  Okay.  Okay.  No.  I understand.

20      You'll be back the following week, Ms. Kaul?

21         **MS. KAUL:**  Yes, Your Honor.

22         **THE COURT:**  Melissa, can we, on March 12th, close our

23  criminal calendar and move everything to -- well, actually, I

24  can give you -- I can give you March 12th, if that would work

25  for you.

1          **MS. KAUL:**  That's okay with -- with me, Your Honor.

2          **THE COURT:**  How about you, Mr. Smith?

3          **MR. SMITH:**  That works for my -- my calendar.

4     Thank you.

5          **THE COURT:**  Sure.

6     March 12th at 9:00 a.m.  We will hold an evidentiary

7     hearing on the attorney-client privilege issue.

8          Melissa, is that okay with you?

9          **THE CLERK:**  Yes.

10         **THE COURT:**  Great.

11    By not later than February 27th, NaphCare shall lodge

12    copies of the documents on its privilege log for my in-camera

13    review.  Mr. Barkley will be expected to be here in person to

14    testify at the hearing.  I will also hear further argument on

15    the motion to compel, if necessary.

16    How long do you think it would take for you to give

17    Mr. Smith a list of the specific documents you're seeking,

18    Ms. Kaul, to really figure if there's going to be a dispute or

19    not?

20         **MS. KAUL:**  With inspections this week, I think by the

21    end of the week.

22         **THE COURT:**  No.  I understand.  I'm not trying to rush

23    you.

24    So --

25         **MR. SWEARINGEN:**  Next week.

 1          THE COURT:  Mr. Swearingen is maybe suggesting next
 2   week?
 3          MS. KAUL:  I'll try to do it this week, but -- but,
 4   yes, next week would be helpful.
 5          THE COURT:  Why don't you do it within a week.
 6          MS. KAUL:  Okay.  Thank you, Your Honor.
 7          THE COURT:  Sure.
 8       Ms. Kaul, you'll provide Mr. Smith with a list of the
 9   specific types of documents that you're seeking, and hopefully
10   I've given you as much of my thinking as is helpful to you
11   about what I would be inclined to agree is appropriate and what
12   is not.
13       So corrective action notices, yes; general Teams messages,
14   no.  But I'm not precluding you from including whatever you
15   deem appropriate on the list.  You'll provide that to Mr. Smith
16   by 2/13.
17       And then, Mr. Smith, you'll take that to your client, and
18   you'll respond to Ms. Kaul by February 20th with respect to
19   whether NaphCare is willing to produce -- or any or all of
20   those documents for the time period requested.
21       And then I will ask you to -- so you're gone the end of
22   February; right, Ms. Kaul?
23          MS. KAUL:  That's correct.
24          THE COURT:  All right.  If there's going to be a joint
25   report filed with me the week of the -- the last week in

```
 1    February, is that something that somebody else can handle on

 2    behalf of plaintiffs?

 3              MS. KAUL:  Yes.  I can figure that out.

 4              THE COURT:  I would like to see the fruits of the

 5    parties' labors by February 27th in terms of a joint status

 6    report, just whether there are agreements or disagreements, and

 7    attach for me the documents that are requested and what's been

 8    agreed to.  And let's not -- I don't need argument.

 9              MS. KAUL:  Understood.

10              THE COURT:  And if I look at that and determine that

11    it's going to be necessary to have witness testimony regarding

12    that issue, I'll issue an order.

13         So Ms. Tejura does not need to otherwise plan to be here,

14    but I will issue an order if I'm going to need testimony from

15    her regarding those search efforts.

16         Any questions, Mr. Smith?

17              MR. SMITH:  No, Your Honor.

18         Thank you for the reasonable approach.  We'll work with

19    plaintiffs' counsel and hope to minimize as much issues as

20    possible for the Court, and I've really got to thank you for

21    accommodating my travel this morning.  I really appreciate it.

22              THE COURT:  No problem.

23         Ms. Kaul, what else can we do to make this issue proceed

24    as smoothly as possible?  Do you have any thoughts?

25              MS. KAUL:  I think we have our marching orders.
```

1    And for what it's worth, I think, taking Your Honor's

2  comments this morning -- I mean, the tone of the

3  meet-and-confer with NaphCare has been, I think, not an issue.

4  It's more about substance.

5    **THE COURT:**  No.  I appreciate that, and that's clear

6  from your declaration and from Mr. Smith's comments.

7    And, look, Mr. Smith, this -- I take what you're saying at

8  face value, that people in San Diego and the people on the

9  ground have been consulted on this.  That really is what I

10  expect.

11    If people are otherwise in Birmingham, okay.  Fine, but I

12  really am going to want to hear as to what efforts were made to

13  determine whether these categories of documents exist.  And if

14  there is a contention regarding burden, that will be on

15  NaphCare to justify as to why certain documents are just too

16  expansive to be produced.

17    I have a feeling that you'll be able to figure this out

18  with Ms. Kaul.  At least I hope you can narrow the issues in

19  dispute.  And then if you are not able to, we will address it

20  on March 12th at the conclusion of the evidentiary hearing on

21  the privilege issue.

22    **MR. SMITH:**  Yes.

23  Thank you, Your Honor.

24    **THE COURT:**  Thank you, Mr. Smith.

25  Anything further we should discuss on the NaphCare issue,

1    Ms. Kaul?

2              **MS. KAUL:**  I don't think so, Your Honor.

3         Thank you.

4              **THE COURT:**  Okay.  Thank you, Mr. Smith.  You're

5    welcome to stay on, but you do not have to, if you'd prefer to

6    do something else.

7              **MR. SMITH:**  Okay.

8              **MS. KAUL:**  And, Your Honor, may I be excused?

9              **THE COURT:**  Sure.

10             **MS. KAUL:**  Thank you.

11             **THE COURT:**  Have a good day.  I hope you feel better.

12             **MS. KAUL:**  Thank you.  I appreciate that.

13             **THE COURT:**  Now, Mr. Swearingen, turning back to you

14   to address my tentative rulings on the requests for production.

15             **MR. SWEARINGEN:**  Yes, Your Honor.

16        I'd like to go through them, for the ones that you'd like

17   to discuss, just in numerical order, if I may.

18             **THE COURT:**  Sure.

19             **MR. SWEARINGEN:**  But before I go, I'd like to say two

20   things, the first of which is there was a colloquy between the

21   Court and defense counsel regarding whether or not responsive

22   lists or logs exist in certain instances.

23        Would the Court order defendants to amend their responses

24   to indicate where no responsive documents regarding evidence of

25   practice exists, or is the record sufficient in Your Honor's

eyes?

**THE COURT:**  I believe the record is sufficient in my

eyes, in part, because, Mr. Swearingen, I -- the phrase

"evidence of practice" is amorphous, and I'm not comfortable

requiring Ms. Pappy to say that every -- there are no possible

documents regarding evidence of practice.

I've made my views clear on relevance and proportionality,

and I do believe that the current record that we have, as to

what is available and maintained by the County, should suffice.

**MR. SWEARINGEN:**  Thank you, Your Honor.

The second preliminary point that I'd like to raise is

that you denied a number of plaintiffs' requests on the basis

that they did not appear in plaintiffs' moving papers in the

motion to compel.  And I just wanted to highlight Page 1 of

plaintiffs' motion to compel at Lines 11 through 14.

Given that we were capped at page -- at 15 pages, we

included Exhibit A to my declaration, which is the list of

disputed items.  And in so doing, we stated specifically,

quote, "This memorandum broadly describes the category" --

"categories of missing documents, and the request-by-request

summary of documents outstanding is attached as Exhibit A to

the declaration of Van Swearingen filed herewith."

Some of the requests that I will be going through

numerically do pertain to those that you identified as not

being specifically identified -- identified in the motion to

compel.  I think, for some instances, that was probably just a

simple oversight on our part, whereas we did include it in

Exhibit A to my declaration.

In other instances, it may not have fallen neatly into

those categories.  For example, one of the requests that I'll

ask the Court to consider ordering defendants to produce

documents for is a request for blank exemplars.  It's not

really clear if blank exemplars are policies and procedures,

evidence of practice, audits, or trainings, but they are

relevant.

And all of the requests that include -- that are included

in Exhibit A to my declaration are ones that were included in

the joint status report to the Court as disputed items back in

December and ones where I included, in my follow-up letter

following the joint status report to defendants on

December 18th, identifying the continued disputed items that

were in the joint status report and explaining plaintiffs'

expectation of what types of responsive documents would exist.

**THE COURT:**  Okay.

**MR. SWEARINGEN:**  With that, and unless the Court has

any questions, I'm prepared to go through the Court's order --

tentative order as to the specific RFPs.

**THE COURT:**  That would be fine, Mr. Swearingen.

To the -- well -- and to the extent there is a request for

production you believe is at issue that is not referenced in

the motion, I would note that your motion included the types of

documents that -- or the list -- you listed the RFPs that I

understood were truly at issue, and you did that with your

headers for each category.

I didn't see anything in your motion explaining to me why

any other RFP that is not stated in the motion is relevant or

seeks relevant information.  I'll hear you out on it, if you

want to go through it, and -- but I did want to note that that

was my understanding, that if it was in the motion, that's what

you were seeking to move on.

Go ahead.  Why don't you walk me through them, and I'll

make the call.

**MR. SWEARINGEN:**  Thank you, Your Honor.

**THE COURT:**  Sure.

**MR. SWEARINGEN:**  RFP 32 was denied, and I'd like to --

the Court to consider the request for just whether or not there

are logs of welfare checks of people who are on withdrawal

protocols.  Typically, people who are on withdrawal protocols

are in severe medical distress.

Most jails have a welfare check of those individuals

every, say, four hours.  They conduct welfare checks of things

like vital signs, weight, blood pressure, heart rate,

et cetera.  And we would appreciate the narrow inquiry into

whether or not there are logs of welfare checks of people who

are on withdrawal protocols.

 1        **THE COURT:**  Can I ask you a question first?

 2        **MR. SWEARINGEN:**  Yes, Your Honor.

 3        **THE COURT:**  Why didn't you put that in an RFP asking

 4   for logs of welfare checks?  I mean, we've had this discussion,

 5   but I specifically agreed with Ms. Pappy's request not to limit

 6   the number of RFPs that the plaintiffs could serve.

 7        So if you didn't, and there's nothing to talk about, I

 8   just -- I would welcome you to help me understand.

 9        **MR. SWEARINGEN:**  I think, for this RFP and for all

10   RFP's, Your Honor, we generally crafted them in, I think, what

11   Your Honor would describe as an overly broad way, in part, to

12   capture ESI, to ensure that the ESI search terms would be broad

13   enough to consider all documents -- "all documents" would

14   include things like emails and texts -- and that the

15   meet-and-confer process would have been more productive and

16   would have involved an exchange of information and an

17   opportunity for plaintiffs' counsel to narrow in and identify

18   documents like this.

19        That, unfortunately, didn't happen, and we are here where

20   we are.

21        **THE COURT:**  Okay.  Ms. Pappy, can I ask you a

22   question?

23        **MS. PAPPY:**  Yes.

24        **THE COURT:**  Does the County maintain logs of welfare

25   checks for individuals who are in withdrawal protocol?

1        **MS. PAPPY:**  They do not.  They requested a list of

2   people in MAT -- MAT protocols, and that was just provided, its

3   withdrawal protocol.  It is a list of people.

4        **THE COURT:**  So to the extent there is a list involving

5   individuals who are in withdrawal protocols, it would be

6   contained in the list of medication-assisted-therapy

7   individuals?

8        **MS. PAPPY:**  Yes.

9        **THE COURT:**  Go ahead, Mr. -- there's your answer,

10  Mr. Swearingen.

11      Go ahead.

12       **MR. SWEARINGEN:**  Thank you, Your Honor.

13       **THE COURT:**  Sure.

14       **MR. SWEARINGEN:**  For Number 3, that is the list of MAT

15  participants.

16       **THE COURT:**  Number what?

17       **MR. SWEARINGEN:**  We would -- for RFP 33.

18       **THE COURT:**  Oh.  33.

19       **MR. SWEARINGEN:**  This segues into the list of RF- --

20  of M-A-T -- MAT participants.

21       **THE COURT:**  Okay.

22       **MR. SWEARINGEN:**  We would respectfully ask the Court

23  to order production of documents, to extend to the full time

24  period since January 1st, 2021.

25       **THE COURT:**  Do you object, Ms. Pappy?

1          **MS. PAPPY:**  No.

2          **THE COURT:**  Okay.  The County will provide the

3     spreadsheets of MAT, M-A-T, participants for the time period

4     January 1st, 2021, to the present.

5          Go ahead, Mr. Swearingen.

6          **MR. SWEARINGEN:**  With respect to RFP 82, we would

7     respectfully request the production of all watch commander

8     logs.  An example of the watch commander log is identified at

9     Exhibit JJ to my declaration.

10         **THE COURT:**  Could I interrupt?  I'm sorry.  I will let

11    you continue.

12         Ms. Pappy, you told me, at the hearing on December 20th,

13    that all watch commander logs had been produced.

14         **MS. PAPPY:**  Watch commander logs?

15         **THE COURT:**  I believe that's what my notes indicated.

16    If that's not correct, just tell me.

17         **MS. PAPPY:**  Well, I don't remember watch commander

18    logs.

19         I want to point out that this isn't included in the

20    motion.  You've ordered that it was waived.  It wasn't

21    something that was on the joint list, and I'd ask you not to --

22    not to change that ruling.

23         But I also communicated to Counsel via an email months ago

24    that they don't keep -- they have whatever is in policies and

25    procedures, but they don't keep logs relating to tactical teams

```
 1    or any such --
 2            THE COURT:  I was wrong.  You mentioned captain's
 3    directives, and I was -- I was thinking -- I got that mixed up
 4    (Inaudible).
 5            MS. PAPPY:  They all sound the same.
 6            THE COURT:  That was my -- my mistake.
 7            MS. PAPPY:  Yeah.
 8       We don't -- they don't keep logs of -- of when tactical
 9    teams are deployed.  A tactical team being deployed would
10    appear in an incident report, and I've never been provided a --
11    these dates or names that we could do any sort of logical
12    search.  And Counsel was notified of that months ago.
13            THE COURT:  All right.  Based on all of that, I'd
14    respectfully deny the motion to compel a further response to
15    Request Number 82.
16            MR. SWEARINGEN:  Mr. -- sorry, Your Honor.  May I
17    respond?
18            THE COURT:  Sure.
19            MR. SWEARINGEN:  I do agree with Ms. Pappy that this
20    was not included on the disputed items, in part, because of the
21    representation from opposing counsel that there are no logs
22    regarding tactical teams.
23       But the watch commander logs do discuss the deployment of
24    tactical teams, and the watch commander logs -- logs are highly
25    relevant not only to tactical teams generally but what occurs
```

1   during -- during a day that's notable as it relates to

2   incarcerated persons' safety and health.

3        So, for example, watch commander logs include things like

4   use of tactical teams, imposition of restricted movement and

5   lockdown, intercoms not working, medical emergencies, use of

6   force incidents.  And these -- these costs apply to other RFPs

7   that are at issue.

8        And that's why I'm asking the Court to consider not the

9   granting of all documents related to tactical teams but instead

10  the narrow request for all watch commander logs because they

11  are such a rich source of information.

12       **THE COURT:**  Why are they -- why is there not a request

13  for production seeking watch commander logs?

14       **MR. SWEARINGEN:**  Because we did not know what they

15  were called.  I haven't seen something called a watch commander

16  log in -- you know, in Monterey County Jail, for example.

17       **THE COURT:**  When did you find out about watch

18  commander logs in this case?

19       **MR. SWEARINGEN:**  Since the December 22nd production.

20       **THE COURT:**  What are watch commander logs, Ms. Pappy?

21       **MS. PAPPY:**  I have absolutely no idea.  I've never

22  discussed it.  I don't know.  I don't know how burdensome it

23  is, I don't know what they are, I don't know what information

24  they include, nothing.

25       **THE COURT:**  Did you -- when you received the

```
 1   production on December 22nd, and you saw that it referenced or

 2   contained a watch commander log, that -- this is exactly why I

 3   directed the parties to meet and confer to determine what are

 4   the alleged deficiencies and what you could agree on or agree

 5   to disagree on.

 6       Was this raised with the defense counsel, Mr. Swearingen,

 7   specifically watch commander logs?

 8           MR. SWEARINGEN:  I do not know, Your Honor.  I do know

 9   that there was a gigantic amount of volume of data that was

10   produced on December 20th and December 22nd, leading into the

11   holiday week, in which many of the attorneys at our firm were

12   on vacation.  And I believe some of the staff at DLA Piper who

13   ingested the data into our system was also on -- on holiday or

14   vacation.

15       I think that it wasn't until early January.  So we had

16   about two weeks to go through every single document and create

17   an index of the types of documents that existed.  We had

18   numerous people working on this project, and I think that the

19   watch commander logs came out -- or came to our attention

20   shortly before and -- as we were drafting this motion to

21   compel.

22           THE COURT:  When they came to your attention, did you

23   ever reach out to Ms. Pappy?

24           MR. SWEARINGEN:  I'm not -- I'm not aware of a

25   specific conversation about the watch commander logs.
```

1          **THE COURT:**  Do you see why that is of concern to me?

2          **MR. SWEARINGEN:**  I do, Your Honor.

3      I also understand that meet-and-confers have been very

4  difficult.  I appreciate both parties' representations about

5  how it will change going forward.  But we were truly, I think,

6  at a nadir in our meet-and-confer perspectives and, with

7  respect to -- to other ongoing meet-and-confers, their refusal

8  to meet and confer.

9      And I think that those could -- could have been in our

10  minds, but there were a lot of responsive documents,

11  Your Honor, for us to ingest.  And I'm not sure, during that

12  time, we could have met and conferred about each.

13          **THE COURT:**  Well, I will say only this.  The record

14  before me does not reflect intransigence by counsel for the

15  County with respect to meeting and conferring.

16      It does reflect frustration, and perhaps that frustration

17  is borne out by, or caused by, the fact that these RFPs are so

18  broad and the difficulty attendant to responding to RFPs that

19  are so broad and the fact that, when RFPs are so broad, the

20  party who is propounding the RFPs then has the opportunity,

21  during a meet-and-confer, to redefine what they want, including

22  any manner they wish.  And that is challenging, to say the

23  least, for the party who is responding.

24      That being said, Ms. Pappy, will you attempt to ascertain

25  the existence of watch commander logs and what they are?  I

1    don't know what they are.

2        MS. PAPPY:  If you are inclined to order the County to

3    do that, I will absolutely follow your order.  I am extremely

4    frustrated by this.  I think it was waived.  But whatever

5    Your Honor orders, I will respect.

6        THE COURT:  I am not ordering you to produce them.  I

7    am ordering you to find out what they are --

8        MS. PAPPY:  I will do so.

9        THE COURT:  -- and what is -- what is the scope of

10   these watch commander logs because I do agree with you.  It is

11   not raised in the motion.  It is -- I've already made a finding

12   that this is waived, and I'm not changing that finding.  I am

13   directing you to simply inquire as to what they are and what is

14   their volume.

15       MS. PAPPY:  I will do so.

16       THE COURT:  Thank you.

17       But, Mr. Swearingen, I take you at your word that we're

18   not going to be talking about new categories of documents,

19   honestly, for the first time in court going forward because

20   this is truly not -- in some ways, not fair to Ms. Pappy.  But

21   I'm directing her to look at documents for the first time,

22   sitting in court.

23       And it's something that, really, I am confident, will be

24   discussed by the parties on an item-by-item basis, to the

25   extent there's any future discovery like this in the case,

 1   which there may not be.

 2        So go ahead, Mr. Swearingen.

 3        **MR. SWEARINGEN:**  Thank you, Your Honor.

 4        RFP 101 was to help to statistics, and I would point out

 5   that Policy and Procedure A62 -- they said statistics may be

 6   kept for certain information, including, but not limited to,

 7   things like the number of sick call visits by physicians,

 8   nursing staff, dentists, mental health staff, health

 9   screenings, food service worker screening, laboratory tests

10   performed, prescriptions, and the list goes on and on.

11        And we did not meet and confer about this, Your Honor, but

12   I would request that the -- a limited number of health

13   statistics -- a limited number of statistics be produced in

14   response to RFP 101, consistent with the types of statistics

15   that may be collected pursuant to Policy A62.

16        **THE COURT:**  It was not the subject of the parties'

17   meet-and-confer.  I am denying that request.

18        Go ahead, Mr. Swearingen.

19        **MR. SWEARINGEN:**  Numbers -- RFP Numbers 102 and 103

20   are grievances and responses to grievances.  These are highly

21   relevant to the issues in plaintiffs' third amended complaint,

22   and we would ask for production of those.

23        **THE COURT:**  Every grievance submitted by every

24   incarcerated person for a one-year period?

25        **MR. SWEARINGEN:**  Yes, Your Honor.

```
 1            THE COURT:  And this was not referenced in your
 2    motion, was it?
 3            MR. SWEARINGEN:  Other than Page 1, Lines 11 through
 4    14, no, Your Honor.
 5            THE COURT:  How many requests are you going through,
 6    Mr. Swearingen?
 7            MR. SWEARINGEN:  I was guess -- I would estimate maybe
 8    three dozen.
 9            THE COURT:  All right.  I ask because we have got a
10    hard stop at 1:30 to allow me to get back for an early neutral
11    evaluation in another case that begins at 2:00, and we'll need
12    to -- I want to finish this issue, Mr. Swearingen, and then see
13    how much time we've got left.
14        So with that being said, (Inaudible), these were not
15    addressed in the motion.  They're included in the chart.  I
16    don't have the RFPs in front of me because I did not prepare
17    for these.
18        What is the defendants' position with respect to producing
19    inmate grievances, both in terms of relevance as well as
20    proportionality?
21            MS. PAPPY:  Well, if you look on the chart, under
22    "Documents Produced," we did produce them and sick call
23    requests, and then -- and plaintiffs represent that in the --
24    in their Exhibit A.
25        So I don't -- I don't know how to respond.  I don't know
```

```
 1   what the issue is.  It was never raised.
 2        THE COURT:  Was this ever raised by the plaintiffs,
 3   Mr. Swearingen?
 4        MR. SWEARINGEN:  And I will use, in my one example, my
 5   December 18th letter to defendants.
 6        THE COURT:  No.  I mean either in person or via Zoom,
 7   as I ordered.
 8        MR. SWEARINGEN:  I believe probably on the
 9   November 16th meet-and-confer.
10        THE COURT:  Do you know, Ms. Pappy?
11        MS. PAPPY:  Are you talking about the January 11th
12   conference that Ms. Chartoff and I had?
13        THE COURT:  I don't know --
14        MS. PAPPY:  Okay.
15        THE COURT:  -- which meet-and-confers you had.  I
16   ordered you-all to meet and confer --
17        MS. PAPPY:  Yeah.
18        THE COURT:  -- regarding this following the production
19   on December 22nd.
20     Was this ever raised?
21        MS. PAPPY:  I don't -- I'm sorry.  I don't remember,
22   and I was -- because -- and I didn't focus on it in the motion
23   because it's not in the motion.  I don't know what the issue
24   is.
25        THE COURT:  It's not in the motion.  It is -- there's
```

1   no evidence that it is -- was properly raised between the

2   parties through a meet-and-confer.  It is overbroad, and it is

3   respectfully denied as to both.

4       And I would note that certain grievances were produced.  I

5   don't have a -- any specificity as to what grievances were

6   produced and what additional grievances should have been

7   produced other than the request to produce every grievance in

8   the jail, regardless of subject matter, for a one-year period.

9       So I will respectfully deny the motion -- any motion to

10  compel as to 102 and 103.

11      Go ahead, Mr. Swearingen.

12      **MR. SWEARINGEN:**  On RFP 105, as the Court went through

13  this, I did not -- I did not capture in my notes whether or not

14  the Court ordered production of the canceled and refused sick

15  calls that have been produced for June and August 2023 for the

16  relevant time period.

17      **THE COURT:**  I was using the phrase "relevant time

18  period" to refer to January 1st, 2021, through December 31st,

19  2023.

20      And you understand that as well, Ms. Pappy?

21      **MS. PAPPY:**  Yes.

22      **THE COURT:**  So I think the answer to your question is

23  they will all be produced for that time period.

24      **MR. SWEARINGEN:**  Understood.

25      And I just didn't know if it would be produced for that

1  specific RFP 105.  That was what was missing from my notes.

2      **THE COURT:**  Oh, I understand.  Yes.  Well, hang on.

3      Yes, but the -- there's not a specific spreadsheet showing

4  only canceled and refused sick calls.  It's a -- it's a broader

5  sick call spreadsheet, I understood Ms. Pappy to be saying,

6  that includes notations where sick calls were canceled.  I

7  don't recall what Ms. Pappy said with respect to any refused

8  sick calls.

9      But, Ms. Pappy, why don't you go ahead and correct me if I

10 said anything that was incorrect.

11     **MS. PAPPY:**  No, not incorrect.  I do -- I remember

12 seeing "refused" on some of the columns.  So I know they're in

13 there, in the same chart.

14     **THE COURT:**  Okay.  With that clarification,

15 Mr. Swearingen, I think we're good on 105.

16     **MR. SWEARINGEN:**  Thank you, Your Honor.

17     Regarding RFP 113, defense counsel, earlier this morning,

18 discussed how this request would require individual hand review

19 of medical records.  And I recall that Dr. Hawk provided

20 services for eyeglasses prior to NaphCare coming in in 2022.

21     And I understand, from NaphCare's contract with the

22 County, that they are responsible for producing contractor

23 activity reports.

24     And in our interview with a dentist from Mid-America, they

25 talked about the contractor productivity reports, what they

produced for the County prior to their contract being replaced
by NaphCare.  And they discussed how those basic metrics that
were included regarding patient care -- that were filled out on
a regular basis.

    And the question would be whether there are similar
contractor productivity reports regarding eyeglasses that were
maintained either by Dr. Hawk or by NaphCare that would be
responsive to this particular RFP.

            **THE COURT:**  When did you interview Dr. Hawk?

            **MR. SWEARINGEN:**  We did not interview Dr. Hawk.  We
interviewed Mid-America.

            **THE COURT:**  When did you interview Mid-America?

            **MR. SWEARINGEN:**  Prior to dismissing them.

            **THE COURT:**  When was that?

            **MR. SWEARINGEN:**  I would think back in 2022.

            **THE COURT:**  Is there a reason why you didn't ask for
contractor productivity reports in your request for production?

            **MR. SWEARINGEN:**  We didn't know -- there's no good
answer, Your Honor.

            **THE COURT:**  I would respectfully stand on my ruling on
113.

            **MR. SWEARINGEN:**  For 114, I just wanted to clarify
because I did not capture this in my notes, and I don't want to
waive this argument going forward.  I just want to -- to see
whether or not the denial of 114 was on the basis that no lists

1    or logs exist regarding discharge planning.

2         THE COURT:  It was based on my determination that it

3    was overbroad and not proportional to the needs of the case in

4    that the missing documents, in particular, are generally

5    described as evidence of practice, summaries, and training.

6         You have a representation from Ms. Pappy that training

7    documents have been provided, and the phrase "evidence of

8    practice" does not shed any meaningful light for me on the

9    documents that are requested, and it was denied on that basis.

10        MR. SWEARINGEN:  Would Your Honor consider inquiring

11   whether or not lists or logs exist with respect to discharge

12   planning?

13        THE COURT:  Do you know, Ms. Pappy?

14        MS. PAPPY:  You did ask me, and I said they don't.

15        THE COURT:  I don't recall asking you.  So I

16   appreciate the reminder.

17        MS. PAPPY:  Okay.

18        THE COURT:  With that in mind, Mr. Swearingen, that

19   there are no such lists or logs, I would respectfully stand on

20   my ruling on 114.

21        MR. SWEARINGEN:  Thank you both.

22        THE COURT:  Sure.

23        MR. SWEARINGEN:  RFP 135.  Plaintiffs seek only any

24   memoranda drafted analyzing CLERB policy proposals.

25        MS. PAPPY:  I'm sorry.  What number is this?

1         **MR. SWEARINGEN:** 135.

2         **THE COURT:** Mr. Swearingen, this is one that

3 absolutely should have been briefed for me in terms of what

4 CLERB documents exist and whether there are any privilege

5 issues that -- that arise from this.

6     Why was this not addressed in the moving papers? This

7 just appears on a chart. This is a -- this is a real issue.

8         **MR. SWEARINGEN:** I think, ultimately, because there

9 are over, I believe, a hundred disputed items, and we focused

10 our energies on -- in the motion on certain categories of

11 information. And this didn't neatly fit into one of these

12 categories of information.

13         **THE COURT:** So why didn't you ask me for extra pages,

14 if you really felt like you have important RFPs that don't fit

15 into one of your four categories and you need more pages?

16         **MR. SWEARINGEN:** I think that -- that plaintiffs'

17 counsel is working on a lot of tasks in realtime, and in

18 hindsight, we should have done so.

19         **THE COURT:** What's CLERB policy proposals? I mean,

20 the Citizens' Law Enforcement Review Board is not limited to

21 conditions in the jail, is it?

22         **MR. SWEARINGEN:** We would ask for CLERB proposals

23 related to issues in the third amended complaint, including,

24 but not limited to, the ability to investigate medical care at

25 the jail, contraband at the jail, body scanner use at the jail,

1   and deaths at the jail.

2        THE COURT:  That's not what the RFP asks for.  It was

3   never the subject of a meet-and-confer between the parties.

4      And on that basis, I'm not going to compel the County to

5   respond to 135, even as narrowed here in court by the

6   plaintiffs.

7        MR. SWEARINGEN:  For RFP 137, Your Honor, we've

8   discussed corrective action notices today.  We would

9   respectfully request the defendants produce only the corrective

10   action notices and communications about those notices in

11   response to RFP 137.

12        THE COURT:  Was this topic of corrective action

13   notices ever discussed with defense counsel?

14        MR. SWEARINGEN:  We did not receive corrective action

15   notices until, I believe, the December 22nd production.  And

16   I -- I -- again, I cannot represent what was discussed at

17   the -- I believe the January 11th meet-and-confer.

18        THE COURT:  Are the corrective action notices specific

19   to NaphCare, or do they refer to any contractor?

20        MR. SWEARINGEN:  I do not know the answer to the

21   question.  I -- I get the sense that the jail has corrective

22   action notices and would have issued corrective action notices,

23   were they warranted, in the past to Drs. [sic] Hawk and

24   Mid-America, for example, when they were providers.

25        THE COURT:  Do you (Inaudible), Ms. Pappy?

 1          **MS. PAPPY:**  No.  I do have input or a response to this

 2     request, if you would like to hear it.

 3          **THE COURT:**  I would like to hear it.

 4          **MS. PAPPY:**  This -- I -- this issue is limited to --

 5     by their own chart.  Defendants have produced some email ESI.

 6     Plaintiffs seek all forms of communication but not limited --

 7     but not limited to text messages and instant message.  It has

 8     nothing to do with notices of corrective action.

 9          Emails -- email communications with MAT care were

10     produced, which is where they got these notices of corrective

11     action.  I think they also got them from NaphCare.

12          So I don't -- I'm -- again, because there was no

13     meet-and-confer specific to just notices of corrective action,

14     I -- I don't know what they're missing.  I don't know what

15     additional they're asking for.  And on that basis, I would ask

16     that it be denied because of the representation to the Court

17     that this is about ESI.

18          **MR. SWEARINGEN:**  May I respond, Your Honor?

19          **THE COURT:**  Go ahead, Mr. Swearingen.

20          **MR. SWEARINGEN:**  I believe the corrective --

21     corrective action notices came to our attention through ESI,

22     and that's the reason why this statement is written the way

23     that it is.

24          **THE COURT:**  Ms. Pappy, your position is well-taken.

25     I'm going to ask you to do the same thing that I asked you to

1    do with respect to the watch commander log and ascertain what

2    is the volume of those documents.

3         I don't have any idea.  They were not raised with you.

4    They should have been raised with you.  They should have been

5    the subject of a meet-and-confer.  It should not be fleshed out

6    for the first time on the fly before me at this hearing, when

7    we have -- when we have had the ample opportunity to do so at

8    any point between December 22nd.

9         And I will also say, in the present, this was filed on

10   January 17th.  Nothing has prevented the parties, in

11   particular, Mr. Swearingen, if this is something you want, from

12   picking up the phone and asking Ms. Pappy to look into

13   corrective action notices.  And if she said, "No, I'm not going

14   to do it," you tell me that, and that would be certainly a

15   (Inaudible).

16        But I am mindful, Ms. Pappy, that this was never asked of

17   you in the past.

18        **MS. PAPPY:**  Your Honor, I just want to make sure I'm

19   clear on what the order is.

20        Look for, capital N, notices of correction -- corrective

21   action.

22        **THE COURT:**  Whether it's notices of correct -- notice

23   of corrective action or corrective action notice.  I don't know

24   the actual title of the document.

25        **MS. PAPPY:**  I know what you're talking about.

```
 1          THE COURT:  It's similar to watch commander logs.  I

 2   don't know exactly what they are --

 3          MS. PAPPY:  Yes.

 4          THE COURT:  -- or how vast that is or how easy it is

 5   to retrieve.  I would like you to look into that.

 6          MS. PAPPY:  I will.

 7          THE COURT:  And I am not making any determination how

 8   I am ruling on this because this is something that is

 9   frankly -- it's not even -- you would agree that the corrective

10   action notices are nowhere in your motion; is that correct,

11   Mr. Swearingen?

12          MR. SWEARINGEN:  I believe that's correct.  There may

13   be a representation to them in one of the exhibits, but I --

14   but to the best of my knowledge, the answer is no.

15          THE COURT:  Go ahead, Mr. Swearingen.

16          MR. SWEARINGEN:  For 139, if you look at the middle

17   column, it states the defendants produced PA -- PSU, EOH, and

18   safety cell rosters from two facilities from a single day.  We

19   would ask whether the Court would order production of documents

20   for the same relevant time period.

21          THE COURT:  I think we did, did I not, Ms. Pappy?

22   Psychiatric Stabilization Unit?  Enhanced -- Enhanced

23   Observation Housing?

24          MS. PAPPY:  I thought -- EOH, definitely, and --

25          THE COURT:  What -- the PSU may have been in -- that
```

1  was Number 49.  I don't know if we talked about that.

2         MS. PAPPY:  You -- you did, safety cells and EOH, and

3  you asked -- you ordered -- limited-grant to produce back to

4  1/1/2021.

5         THE COURT:  And that would be for safe -- spreadsheet

6  log (Inaudible) placement of safety cells and Extended

7  Observation -- or Enhanced Observation Housing.  Excuse me.  I

8  did not specifically reference Psychiatric Stabilization Unit.

9  Again, it does not appear that this was actually covered in the

10 parties' meet-and-confer efforts.

11        But, Ms. Pappy, for Number 49 --

12        MS. PAPPY:  Yes.

13        THE COURT:  -- I will respectfully direct the County

14 to include Psychiatric Stabilization Unit logs, in addition to

15 the safety cell and EOH logs, for the relevant time period.

16        MS. PAPPY:  Yes.

17     And then are you going to deny their request?  I can't --

18 I can't remember what it was now.

19        THE COURT:  139?

20        MS. PAPPY:  Yes.

21     Thank you.

22        THE COURT:  Yes.  It is denied as moot.

23     Go ahead, Mr. Swearingen.

24        MR. SWEARINGEN:  With respect to RFP 146, there was a

25 discussion between the Court and Ms. Pappy earlier today, and I

1   believe the colloquy ended by discussing the -- a list with

2   respect to outside providers would be produced.

3        And I would anticipate that the responsive documents to

4   RFP 146 would be in a different list.  This is individuals who

5   are awaiting transfer to the Department of State hospitals or

6   other psychiatric facilities.

7        There's a long backlog in beds -- for available bed spaces

8   in DSH, and this particular request is asking for lists with

9   respect to those awaiting transfer to DSH and other hospitals,

10  not to outside specialty care providers.

11            THE COURT:  So for the long term, you mean?

12            MR. SWEARINGEN:  Yes, Your Honor.

13            THE COURT:  Okay.  Well, that makes sense.

14       MS. PAPPY:  And this is -- that -- we talked about the

15  distinction between medical specialties and then transfer to

16  outside facilities.  You covered this, and you ordered the

17  County to produce going back to 1/1/2021 for those transfers.

18            THE COURT:  And we're talking about, just for clarity,

19  actual transfers for perhaps an extended period of time, not

20  just to outside providers for psychiatric appointments?

21       MS. PAPPY:  No.  No.  I think I clarified earlier that

22  they are -- they are leaving the jail, and they are going to

23  a -- that's where they're going to live.

24            THE COURT:  Does that satisfy you, Mr. Swearingen,

25  that clarification?

1      **MR. SWEARINGEN:** If that list includes people who are

2   going to the state hospital, then yes.

3      **THE COURT:** It's going to, more generally, include

4   transfers. So I don't know what is going to be on the list,

5   but it's responsive to your concern, and I would stand on my

6   ruling on 136.

7      Go ahead, Mr. Swearingen.

8      **MR. SWEARINGEN:** For RFP 167, the middle column

9   indicates the defendants produced policies regarding programs

10  and a list of programs as revised November 2023. We would ask

11  for the list of programs for the relevant time period.

12     **THE COURT:** Didn't -- didn't I discuss this,

13  Ms. Pappy?

14     **MS. PAPPY:** We did, and you ordered me to produce --

15  you ordered the County to produce participant logs, to the

16  extent that they exist.

17     **THE COURT:** Does that satisfy you, Mr. Swearingen?

18     **MR. SWEARINGEN:** I believe -- I appreciate that --

19  that order, but we would also appreciate a list of the programs

20  that are available at the jails for the relevant time period.

21     **MS. PAPPY:** And that's -- well, when we talk about the

22  relevant time period, there is no time period in 167, and the

23  program list was provided as revised in November of 2023. So I

24  don't know what the relevant time period is.

25     **THE COURT:** Does that -- so that list is a set list as

1   of November 2023 (Inaudible) programs?

2        **MS. PAPPY:**  What they asked, yes.

3        **THE COURT:**  All right.  Here's what I would ask you to

4   do, Ms. Pappy:  Provide a list of the programs that is

5   effective in November of 2022 and a list of programs that is

6   effective as of November 2021.

7        **MS. PAPPY:**  I will do so.

8        **THE COURT:**  Thank you.

9      I will amend my order to include those.

10     Does that satisfy you on 167, Mr. Swearingen?

11       **MR. SWEARINGEN:**  Yes, Your Honor.

12       **THE COURT:**  Okay.  What's your next one?

13       **MR. SWEARINGEN:**  RFP 172.  Your Honor denied this as

14   overbroad, and we would ask whether the Court would consider

15   ordering only lists of laundry exchange dates at the jails.

16       **THE COURT:**  What does that mean?

17       **MR. SWEARINGEN:**  Every week, people incarcerated at

18   the jail should receive fresh linens and clothes.  I have,

19   Your Honor, spoken to an individual who was in (Inaudible)

20   clothes, had medical issues requiring him to change a catheter,

21   and he had told me that he didn't receive regular clothes.

22     And we would ask that the Court consider ordering only

23   lists or logs of laundry exchange, if those documents exist.

24       **THE COURT:**  I'm not going to do that, Mr. Swearingen.

25   This particular request for production is so broad.  Every

 1  single document in the possession of the County relating to

 2  laundry, clothes, and linens that -- even as narrowed to every

 3  document pertaining to laundry exchanges over the course of a

 4  three-year period, I respectfully find is -- it does not fall

 5  within the scope of Rule 26.

 6      Go ahead.

 7          MR. SWEARINGEN:  For RFP 174, plaintiffs seek

 8  production of the spreadsheets that were produced for the

 9  longer -- what we are calling the relevant period, going back

10  to January 1st, 2021.

11      THE COURT:  This document was not included as one of

12  your documents relating to practices; is that correct?  I don't

13  see it anywhere in your motion.

14          MR. SWEARINGEN:  It's -- it's -- again, it may have

15  been an oversight that it did not make it into a section

16  heading.  But I would, again, reference Page 1, Lines 11

17  through 14 of the motion.

18      THE COURT:  Ms. Pappy, did you produce a spreadsheet

19  showing past inspection visits from June 2023 to the present?

20          MS. PAPPY:  Yes.

21      THE COURT:  All right.  I am going to direct the

22  County to produce spreadsheets showing past inspection visits

23  for the relevant time period, which we have defined as

24  January 1st, 2023, to the present, for RFP Number 174, noting,

25  again, that this is not truly raised in the motion and appears

1    only in the chart.

2        I am informed that I misspoke.  The relevant time period

3    begins January 1st, 2021.  I may have given you the wrong year,

4    but we're talking about the same time period.  I just want to

5    make sure we're all clear on that.

6            **MS. PAPPY:**  I wrote down the wrong thing.  I wrote

7    down "2021."  So I don't know what you said.

8            **THE COURT:**  Well, neither do I.

9        So we're all on the same page.

10           **MS. PAPPY:**  2021.

11           **THE COURT:**  We all agree on the relevant time period.

12       Okay.  Go ahead, Mr. Swearingen.

13           **MR. SWEARINGEN:**  Thank you, Your Honor.

14           **THE COURT:**  Sure.

15           **MR. SWEARINGEN:**  RFP 179.  We would ask the Court to

16   consider ordering logs or lists regarding contraband collected

17   at the jail for the relevant time period.

18           **THE COURT:**  Do you know if such a log exists,

19   Ms. Pappy?

20           **MS. PAPPY:**  I have absolutely no idea.  I don't know.

21   Our meet-and-confer is focused on training and "What do you do?

22   Drug interdiction.  How do you stop it from coming in?"

23           **THE COURT:**  I am going to ask you to look at this one,

24   Ms. Pappy.

25       The RFP itself is, frankly, overbroad.  I -- every single

1    piece of paper relating to contraband narcotics, staff,

2    inmates, anyone -- to the extent it is now requesting to be

3    narrowed, that should have happened weeks ago and not putting

4    us here.

5        However, Ms. Pappy, without ordering you to produce it, I

6    would ask you to determine whether there are any logs showing

7    contraband narcotic seizures.

8            **MS. PAPPY:**  I will do so.

9            **THE COURT:**  Go ahead, Mr. Swearingen.

10           **MR. SWEARINGEN:**  RFP 185.  Plaintiff seeks blank

11   examples of forms that are used for classification, including

12   defendants' decision tree regarding classification.  This has

13   been requested by our security expert, who regularly performs

14   classification reviews on jails.

15           **THE COURT:**  Is that Mr. Austin?

16           **MR. SWEARINGEN:**  It is, Your Honor.

17           **THE COURT:**  Well, I don't have any more information,

18   Ms. Pappy, because it wasn't raised in the moving papers.

19           **MS. PAPPY:**  I don't -- to the extent that

20   classification documents are in-custody files, we've produced

21   custody files.  I don't -- I really can't say anything more

22   than that because this was never specifically discussed.

23           **THE COURT:**  It was not.  I -- and it was not raised in

24   the motion.  If it was simply seeking blank forms, I would ask

25   you to look into that, Ms. Pappy.

1          **MS. PAPPY:**  Yes, Your Honor.

2          **THE COURT:**  Go ahead, Mr. Swearingen.

3          **MR. SWEARINGEN:**  RFP 187 seeks incident reports

4     related to assaults at the jail from January 1st, 2021.

5     Incident reports are documents.  They're regularly created in

6     the normal course of business that, in other cases, show very,

7     very relevant information with respect to alarming incidents of

8     violence, deaths, suicides, et cetera, at the jail.

9          We would request those be produced since January 1st,

10    2021.

11         **THE COURT:**  It's not in your motion.  This absolutely

12    should be something that was the subject of explanation as to

13    its relevance.  It is every single document relating to any

14    assaults, the use of weapons in that insult -- assaults.

15         I -- all documents, including, but not limited to, logs,

16    audits, lists, and summaries, showing the number of assaults,

17    dates of assaults, use of any weapons in assaults, involvement

18    of employees or incarcerated persons in assaults, the nature of

19    injuries sustained in assaults, and cause of injuries sustained

20    in assaults for every assault involving an incarcerated person

21    for a three-year period.

22         It is compound, it is overbroad, and it is respectfully

23    denied.  And it is also not in your motion, with no explanation

24    as to how it might reasonably be narrowly tailored, and

25    apparently it is not the subject of any meaningful

1  meet-and-confer discussion between the parties.

2      Go ahead, Mr. Swearingen.

3      **MR. SWEARINGEN:**  RFP 191 -- and this seeks staffing

4  plans.  Defendants produced daily deployment spreadsheets but

5  only for Central Jail.  They also did not produce the total

6  number of allocated positions and the number of vacant

7  positions.

8      **THE COURT:**  That's information you can gather at a

9  Rule 30(b)(6) deposition, is it not?

10     **MR. SWEARINGEN:**  Daily deployments, no, Your Honor.

11  Those are documents, again, that are spreadsheets that were

12  produced for Central Jail but no other facility.  I would

13  anticipate that we can get the number --

14     **THE COURT:**  You're asking for staffing plans.  You're

15  saying that a daily deployment is the same as a staffing plan?

16     **MR. SWEARINGEN:**  It -- it is responsive to the call

17  for documents in 191, which show the number of hours required

18  for each position and defendants' staffing plan or plan for

19  staffing those positions.

20     **THE COURT:**  For every facility for three years?

21     **MS. PAPPY:**  If I may.

22     **THE COURT:**  You may.

23     **MS. PAPPY:**  We did not ever specifically discuss these

24  number of allocated positions, but my client produced all

25  staffing plans, everything that it had, any -- any staffing

1  plan, in response to 191.

2      And I would ask that it be denied.

3      **THE COURT:**  I'm denying your request to compel a

4  further response to RFP Number 191, given Ms. Pappy's

5  representation that the staffing plans have been produced.

6      Go ahead, Mr. Swearingen.

7      **MR. SWEARINGEN:**  RFP 197 seeks grievances and

8  complaints filed by the Deputy Sheriffs' Association regarding

9  overtime, supervisory practices, staffing, retaliation, and

10  safety concerns.

11      **THE COURT:**  Well, it seeks that with respect to every

12  matter of jail employment, and then you have narrowed it

13  somewhat.

14      Again, was this the subject of a meet-and-confer,

15  Ms. Pappy?

16      **MS. PAPPY:**  No.

17      **THE COURT:**  There was no meet-and-confer.  It's not

18  raised in the motion to explain to me why this is relevant.  It

19  simply appears in a chart.  As drafted, it is overbroad and not

20  proportional to the needs of the case.

21      I am respectfully denying the motion to compel any further

22  response to 197.

23      **MR. SWEARINGEN:**  For RFP 219, plaintiffs' third

24  amended complaint talks at length about areas of the jail that

25  are unsafe and prone to inmate violence due to the lack of

safety cameras.  And plaintiffs would ask the Court,

respectfully, to consider ordering production of schematics

showing where cameras are located within each facility.

**THE COURT:**  That's not what the RFP asks for.  You

agree with that; right?  And, actually, that's not what you

were even saying is missing.

The RFP Number -- RFP 219 asks for every document and

communication that refers to any location in the jail that

incarcerated persons may access but is not monitored by video

cameras, including, but not limited to, the area described as,

quote/unquote, "the pocket."

And your -- the missing documents, according to your

chart, are documents relating to the pocket, including

trainings or analyses of how to avoid incidents of violence in

the pocket.

What you're asking me to produce -- or the County to

produce isn't mentioned in the RFP or any allegedly missing

documents, is it?

**MR. SWEARINGEN:**  I'm trying to get the most narrowed

responsive document possible, Your Honor.

**THE COURT:**  I'm understanding that -- oh.  Go ahead.

I interrupted you.  Go ahead.

**MR. SWEARINGEN:**  No.  I'm finished now.

**THE COURT:**  No.  Go ahead.

**MR. SWEARINGEN:**  Again, understanding that I wasn't

1   part of the meet-and-confer on January 11th.

2        **MS. PAPPY:**  It wasn't discussed.  I would also suggest

3   that a 30(b)(6), which we have somebody on security, is

4   probably the best way to get this information.

5        We've produced policies about video systems, and -- and we

6   produced ESI on the subject.  I don't -- we tried to search ESI

7   regarding "the pocket," and anything that showed up was

8   produced.  Nothing specific was ever asked about it.  So I

9   just -- I don't know what there is.  I don't know what I should

10  go look for.

11       I just -- I have, really, nothing more to say.

12       **THE COURT:**  We're going to talk about ESI, well,

13  hopefully today.  But I think "the pocket" was a disputed ESI

14  search term.

15       So leaving ESI aside --

16       **MS. PAPPY:**  Yeah.

17       **THE COURT:**  -- the locations of the video cameras at

18  every one at the facilities is not requested in this RFP.

19       **MS. PAPPY:**  Correct.

20       **THE COURT:**  And it's also not requested in the

21  allegedly missing documents.  So it's being raised for the

22  first time today with all of us.  I don't know the relevance of

23  every location of every camera in the jails.

24       What's your position?

25       **MS. PAPPY:**  They should be -- you should deny it, and

 1   they should ask these questions in a 30(b)(6).

 2        **THE COURT:**  What is the relevance of the plaintiff in

 3   understanding the location of every security camera in every

 4   San Diego County Jail facility, Mr. Swearingen?

 5        **MR. SWEARINGEN:**  It really should be narrowed to the

 6   housing units.  And the relevance is because, in housing units

 7   that don't have video cameras -- because there's a lot of

 8   violence in the jail to begin with --

 9        **THE COURT:**  Uh-huh.  Right.

10        **MR. SWEARINGEN:**  -- and violence often occurs in

11   places where incarcerated people know that area is not

12   monitored either by eyesight or by video camera.

13        And knowing where -- having that list of where video

14   cameras exist in housing units and don't exist would be helpful

15   to our safety and security expert's analysis of the safety of

16   those housing units.

17        **MS. PAPPY:**  That same expert has done an in-person

18   inspection.  So he knows where all of them are located.  I

19   don't know that there is a list of where they are specifically

20   located.  I have no idea.

21        **THE COURT:**  I understand your point, Ms. Pappy.

22        And whether there's a list or not, given that the safety

23   and security expert has performed an inspection of the

24   facilities, I'm going to deny what is functionally a new

25   request for production, given that it's not contained in

1   RFP 219 and also is not contained in the -- the -- the

2   allegedly missing documents.

3       Go ahead, Mr. Swearingen.

4       **MR. SWEARINGEN:**  RFP 223.  Dental sick call lists for

5   a log from 2023 was produced.  Plaintiffs would respectfully

6   ask that the dental sick call logs be produced for the relevant

7   time period, if that hasn't already been ordered and I missed

8   it.

9       **THE COURT:**  I think we already ordered it, but I

10  appreciate you raising it again, Mr. Swearingen.  Maybe we

11  discussed specifically medical, mental health, and I don't know

12  that we specifically discussed dental sick call logs.

13      I would direct the County to include dental sick call

14  logs, if that is, in fact, a separate log from medical, for the

15  relevant time period.

16      Does that make sense, Ms. Pappy?

17      **MS. PAPPY:**  Yes, and it is a separate log that was

18  produced just for 2023.

19      **THE COURT:**  All right.  Well, I appreciate that

20  clarification, Mr. Swearingen, and you will have that document

21  for the relevant time period.

22      **MR. SWEARINGEN:**  Thank you, Your Honor.

23      **THE COURT:**  Sure.

24      **MR. SWEARINGEN:**  RFP 233 seeks documents tracking the

25  wait time for professional visits.  Our third amended complaint

has a Sixth Amendment claim for access to counsel.  Numerous
plaintiffs' attorneys and myself have waited extremely long
times to see incarcerated people during professional visits.

I understand that the time that attorneys seeking
professional visits into the jail is logged into the JIMS
system.  I don't know whether or not the time the person whom
we seek to speed with -- speak with is also logged into the
JIMS system.

But I do know that, in contrast to the professional visits
that we have to wait through extremely long times to visit our
clients, Public Defenders in this county can request scheduled
Microsoft Team meetings with their clients and don't have to
wait any period of time whatsoever.

And we would respectfully ask the Court to consider asking
whether or not the tracking of waiting times for professional
visits is kept by the County.

**THE COURT:**  I'll ask.

I mean, I would also note that you also had requested to
know how long it takes to release visitors from the waiting
room after a request has been made.  Was it including the time
it takes to release visitors from the professional visiting
room after a request has been made, meaning after the attorney
has met with his or her client?

**MR. SWEARINGEN:**  That's correct, Your Honor.
Afterwards, usually, the normal course of conduct is for the

attorney to press a button and ask the person down at reception

to be let out, and we have experienced exceedingly long times

to be let out in order to see the next person on our list who

we wish to communicate with.

    And sometimes we have even been trapped in the vestibule,

the security doors between the professional visiting room and

the hallway they're letting us out -- it's a small room, maybe

a little bit bigger than the size of this desk -- for over half

an hour.  So it requests that time, too.

    **THE COURT:**  Ms. Pappy, do you know whether the County

maintains logs documenting wait times for professional visits?

    **MS. PAPPY:**  They do not.  What we maintain is what we

produced.  We limited it to August 31st of 2023, and Your Honor

has already ordered us to go back to January 1st of 2021.  I

would ask that that be the only order with regard to this

request.

    **THE COURT:**  It's what you have, and I stand on my

order in that regard.

    All right.  Next, Mr. Swearingen?

    **MR. SWEARINGEN:**  RFP 238.  Plaintiffs seek production

of SANDAG, County, Probation Department, and Sheriff's

Department reports evaluating access to alternatives.

    **THE COURT:**  Again, this is a serious RFP.  It doesn't

appear in a motion.  There's no explanation as to the relevance

of it, proportionality.  It is -- the County has not had a

meaningful opportunity to respond to it.

And that's another part of this that is very challenging,
Mr. Swearingen, is the County is reading your memorandum and
responding to the arguments in it.  It is decidedly not fair to
expect the County to read through the memorandum, respond to
the arguments in the memorandum, and then go pick through the
charts, figure out what's in the chart that's not in the
memorandum, and then respond to the arguments in the chart.

I mean, it -- I didn't even look at this one because I
didn't see it anywhere in your motion.  And it's not all about
me, but I want to give these consideration and really think
through them.

And now I'm -- you're talking about Probation
Department/Sheriff's Department reports evaluating access to
alternatives to incarceration, reentry programming,
proposals -- proposals for expansion.  The expansion of the
jails?

        **MR. SWEARINGEN:**  The expansion of the alternative
programs.

        **THE COURT:**  Okay.  And analyses of cost savings that
can be achieved by routing people into services instead of
jail.

Are there specific reports that you're aware of that
you're asking the -- the County to look for?

        **MR. SWEARINGEN:**  We understand that the County

1   generally has been investigating these issues.  I do not know

2   the names of the reports or the dates of the reports,

3   Your Honor.

4          **THE COURT:**  And that was the purpose of speaking to

5   Ms. Pappy about it at a time where this could have actually

6   been fruitful.

7          **MR. SWEARINGEN:**  Your Honor, could I say a little bit

8   more about that, about the meeting and conferring on RFP Set 5,

9   because we've been denied numerous requests on the basis of not

10  meeting and conferring?

11         But RFP Set 5 -- Set 5 was served on September 1st, 2023.

12  Pursuant to the parties' agreement, defendants had two months

13  to respond.  We did not get their response until November.

14  Shortly thereafter, the Court ordered the parties to meet and

15  confer.

16         Within two days of the Court's ordering the parties to

17  meet and confer before our November 17th joint status report,

18  we repeatedly requested from defendants times to meet and

19  confer, and defendants said that they would not meet and confer

20  with us until the day before the JSR.  That JSR, on

21  November 17th, was the disputed items list.

22         We did not have -- so we were basically stonewalled to

23  meeting and conferring from November -- from September 1st

24  until November 16th, the day before the joint disputed list.

25  Thereafter, we had an in-person hearing on that.

On December 18th, I sent a long letter to defense counsel asking them to meet and confer.  I repeatedly asked them to meet and confer on the December 18th letter.  That's one of my exhibits to the declaration.  They said, "No.  You'll have to wait until after the production."

Again, the production came over the holiday, and we did not meaningfully get to it, if you will, until early January, at which time, we had a lot of attorneys reviewing documents extremely quickly because there were hundreds of thousands of documents.

It was very hard for us to put together a list of what was produced and to create this chart in realtime and also draft the motion to compel because the deadline for doing so was so short.

At the same time, I tried to meet and confer numerous times on RFP Set 6.  I have -- I have the emails with me.  I will be happy to show them to you.  And Counsel repeatedly refused to meet and confer.

I held a phone call meet-and-confer.  Defense counsel never appeared on that phone call, and we've taken, collectively, defendants' refusal to meet and confer and generate throughout this process as an understanding that they're not going to meaningfully confer -- meet and confer about these issues.

There is documentation in my declaration showing that,

1  subsequent to our November 16th meet-and-confer, defendants'

2  counsel said that they are not going to search for anything

3  unless plaintiffs agree in advance to a more limited set of

4  documents.  The defendants mandated, and unless we did so, no

5  documents would be searched for.

6       So respectfully, Your Honor, many of the requests at

7  issue -- I understand Your Honor's rationale for denying them.

8  I'm not going to argue with that rationale, but I would

9  respectfully ask the opportunity to seek leave to file an

10  RFP Set 7 for a much more narrowed set of documents, one that

11  we anticipate that exists, whether we have names of those

12  specific documents or whether we're much more precise in our

13  language, because we are where we are, because many of the

14  requests that you are presently denying are highly relevant to

15  defendant -- to plaintiffs' claims.

16       And without these documents, there will be no evidentiary

17  record for which the Court -- to have a full and fair hearing

18  on whether or not plaintiffs' claims are meritorious or not.

19       **THE COURT:**  Ms. Pappy, do you wish to respond?

20       **MS. PAPPY:**  I do.

21       Focusing on the question at hand, if you look at

22  Request for Production 238, it bears absolutely no resemblance

23  to the, quote/unquote, "limited requests" and -- under "Missing

24  Document."

25       The missing document category is actually broader than the

1    original RFP.  There was never any specific conversation about

2    this in any of our requests for production, never any attempt

3    to say, "Hey, can you get us this information or that

4    information?" such that I could go look and see what it was.

5        And I take exception to the things that were said about

6    meet-and-confer.  But that said, the time is now.  The time was

7    now to bring you things to the Court.  They've had since

8    January 17th, when they filed this, to call me to say, "Hey, we

9    never talked about 238."

10       Your directives were clear.  There has to be an end to

11   this.  The notion that they should be given leave to serve yet

12   another request for production, given what has transpired thus

13   far, is -- is highly objectionable and extremely prejudicial to

14   the defendants.

15       **THE COURT:**  Mr. Swearingen, I -- I have to agree with

16   Ms. Pappy with respect to -- even if -- even if there were

17   difficulties in meeting and conferring, that was not a reason

18   to not comply with my order on December 22nd, at any point

19   between then and now, to try to raise these issues with defense

20   counsel.

21       And I realize that there were problems, and I'm not making

22   any finding about anybody doing anything wrong at this point,

23   but Ms. Pappy is correct.  The -- if the plaintiffs wanted to

24   have these reports, at any point, even after the filing of the

25   motion, there could be an effort to meet and confer and get

1   together and say, "We're raising it now."

2        The first time it's actually being discussed is in court

3   on a motion to compel, where the request, as Ms. Pappy points

4   out, is actually -- looks to be narrower than the purported

5   missing documents.

6        So -- and it's -- the -- the requests are not simply being

7   denied for failure to meet and confer.  They're being denied

8   for the reasons stated on the record, including my findings

9   that they are overbroad and, based on the information presently

10  before me, not proportional to the needs of the case.

11       So with -- I'm not, at this point, going to authorize a

12  seventh set of requests for production.

13       Ms. Pappy, do you -- do you even know what documents the

14  County has that -- well, are there any analyses or evaluations

15  of the alternative to incarceration and reentry programs, to

16  the extent they do (Inaudible) those documents exist?

17            MS. PAPPY:  I have no idea.

18            THE COURT:  I am going to respectfully ask you, for

19  Number 238, to look at whether there are any analyses or

20  evaluations.

21       And I'm not talking about stray emails.  I am talking

22  about something that is an actual analysis -- analysis or

23  evaluation of alternatives to incarceration and reentry

24  programming.

25            MS. PAPPY:  For what time period?

1          **THE COURT:**  For the relevant time period that we've

2   discussed.

3          **MS. PAPPY:**  I will do so.

4          **THE COURT:**  Go ahead, Mr. Swearingen.

5          **MR. SWEARINGEN:**  On my request for motion for leave to

6   file an RFP Set 7, I am disinclined to proffer or ask the Court

7   to file evidence of more emails about plaintiffs' efforts to

8   meet and confer, whether it be on RFP Set 5 or others,

9   especially given this morning's conversation, which I thought

10  was very productive.

11          But I do want to highlight how important, I think, certain

12  documents are to plaintiffs' request.  They are being denied on

13  the basis that we did not meet and confer over the past, you

14  know, month that we were trying to meet and confer on other

15  areas and being consistently shut down on.

16          I -- it's not clear how a limited set of additional

17  requests -- given Your Honor's perception that our requests for

18  production are drafted in an overly broad way and that we

19  didn't meet and confer on them, I don't understand how it would

20  prejudice defendants to have one more set of limited RFPs on

21  certain, specific document requests that are highly relevant to

22  plaintiffs' claims for which no documents have been produced or

23  few documents.

24          **THE COURT:**  Give me an example.

25          **MR. SWEARINGEN:**  The alternatives to custody

1    documents.  These are relevant to plaintiffs' Claim 9.  I

2    understand what you just ordered, Your Honor, and I don't have

3    a list in front of me.

4        But there are numerous other RFPs, including 239, 240,

5    241, 242, relevant to -- to RFP Set 9, for which defendants did

6    not produce documents, for which plaintiffs' counsel put in a

7    lot of hours, again, trying to ingest and understand what has

8    been produced over a two-week period and getting that index

9    together and, at the same time, struggling to meeting and

10   conferring on other issues with opposing counsel.

11       I do understand your concern about the drafting of many

12   requests and how we could have done so in a much more narrowly

13   tailored way, and we seek the opportunity to do so, and we

14   would be happy to -- to brief that through a motion for leave.

15           THE COURT:  How many additional RFPs are you talking

16   about?

17           MR. SWEARINGEN:  I would need to go back through the

18   list.  I don't have it off the top of my head, but I would -- I

19   would assume well under 50.

20           THE COURT:  Well under 50?

21           MR. SWEARINGEN:  Yes, Your Honor.

22           THE COURT:  Mr. Swearingen, we are at the point where

23   this is prejudicial to the defendants and their ability to

24   prepare for these depositions and expert discovery that is

25   coming up.

1          I did not put limits on your ability to serve requests for

2     production.  That was at the plaintiffs' request.  You have

3     served 200 and -- how many?

4               **MR. SWEARINGEN:**  -52.

5               **THE COURT:**  252.

6               **MS. PAPPY:**  252 plus 68 in the inspection request.

7               **THE COURT:**  And at this point, Mr. Swearingen,

8     respectfully, I am going to deny the request.  I'm not going to

9     further amend the pretrial schedule, which this would almost

10    certainly require, based on my findings that the requests for

11    production were not narrowly tailored.

12         They -- there may have been issues with meeting and

13    conferring between the parties, but it does appear to me that,

14    at the very least, there has not been meaningful effort to meet

15    and confer regarding the RFPs that are the subject of this

16    motion, as required by my order.

17         I understand that people are busy.  You have a team of

18    approximately nine lawyers that is working on this case, and

19    I'm not saying that that takes care of it all, but the

20    resources are there.  Handling these matters the way they are,

21    your requests are being changed in court, and new requests are

22    being given to me in court.  This all should have happened long

23    ago, Mr. Swearingen.

24         I'm going to respectfully deny the request to serve -- for

25    leave to file additional requests for production, and I --

```
 1    well, I'll leave it at that.

 2          Go ahead, Mr. Swearingen.  You left off at 238.

 3          MR. SWEARINGEN:  RFP 239.  Defendants maintain

 4    demographic characteristics of participants in

 5    alternative-to-incarceration programs, and plaintiffs seek

 6    those reports.

 7          THE COURT:  Do you maintain these copies?  They're not

 8    subsequent --

 9          MS. PAPPY:  Yeah.

10          I would actually like to be heard on this because this --

11    239 is duplicative of an earlier request, where we produced the

12    racial identification of the people that were participating in

13    alternatives-to-incarceration programs.

14          I don't even think it was in Set 5.  I think it was in one

15    of the earlier requests, and this -- you're right.  We didn't

16    produce anything in response to this because we had already

17    produced it.

18          I don't -- you know, now this notion of demographics, in

19    general, is different than racial demographics, but they

20    already have it as to racial demographics.

21          THE COURT:  Is that correct, Mr. Swearingen?

22          MR. SWEARINGEN:  Not -- I'm unaware of that and

23    certainly not for the relevant time period.

24          THE COURT:  When you say you're -- Ms. Pappy is

25    telling me that it was requested previously.
```

1    **MR. SWEARINGEN:**  I -- I'm not aware it was.  I'm not

2    aware that demographic care -- the demo- -- the racial

3    demographics of participants -- of all participants in

4    alternative-to-incarceration pro- -- and reentry programs was

5    requested.

6        **MS. PAPPY:**  I specifically remember looking at the

7    document, and it has race on it.  Specifically, it was provided

8    to me by Probation, who manages the alternatives to

9    incarceration.  I can identify it for the Court so that you're

10   not put in a position of having to make a credibility call

11   here.

12       **THE COURT:**  Oh, I'm not making a credibility call.

13   Mr. Swearingen told me he doesn't -- he's not aware of it, as

14   he sits here.  He's not representing, definitely, it didn't

15   happen.  I appreciate that.

16       Ms. Pappy, I'm -- I'm taking you at your word that these

17   documents were already produced in response to an earlier RFP.

18   Again, the difficulty that I'm having is that these aren't

19   raised in a motion beyond this chart.  So I have no other

20   information to go by.

21       But I accept your representation, Ms. Pappy, and I would

22   deny the request to compel a further response to RFP 239.

23       Mr. Swearingen, what cause of action are we talking about

24   with respect to the alternatives to incarceration?

25       **MR. SWEARINGEN:**  I believe it's part of our ninth

 1    claim, Your Honor.

 2         **THE COURT:**  All right.  Here's what we're going to do:

 3         With respect to Requests for Production Numbers 238 to

 4    244, I'm going to take the parties at your word that there is

 5    going to be a renewed spirit of good-faith dialogue and

 6    cooperation with respect to meet-and-confers going forward.

 7         All of these requests appear to relate to the plaintiffs'

 8    ninth cause of action.  They were not briefed in the motion.

 9    The only information I have about them is that very summary

10    information contained in the chart, and I understand why they

11    are not contained in the defendants' opposition.

12         They also were not the subject of a meet-and-confer

13    between the parties at any point between September, apparently,

14    and the present.  In particular, they were not the subject of a

15    meet-and-confer, as required by my December 22nd order.

16         That being said, given Mr. Swearingen's representations

17    regarding the significance of these requests to the issues

18    raised in the ninth cause of action, I am directing the parties

19    to meet and confer, in generally, about document production

20    pertaining to the alternatives-to-incarceration programs and

21    what documents the County is willing to produce, understanding

22    that it has not had an opportunity to speak with the plaintiffs

23    about that.

24         I am directing the parties to prepare and file a joint

25    status report with each party's position on generally documents

relating to alternative-to-incarceration programming within two

weeks from today.  And then I will issue a ruling, if I find

that any further production is warranted, but that is in

addition to my earlier findings regarding the fact that this

really is not properly raised before me.

I do want to provide the parties an opportunity to meet

and confer on these documents because it does strike me that

there is room for agreement between the parties.

Is that clear, Mr. Swearingen?

**MR. SWEARINGEN:**  It is, Your Honor.

Thank you.

**THE COURT:**  Ms. Pappy, is that clear?

**MS. PAPPY:**  Yes, Your Honor.

**THE COURT:**  All right.  What's next, Mr. Swearingen?

**MR. SWEARINGEN:**  That's through 234.

I would respectfully ask Your Honor include RFPs 246 and

247 in the order regarding alternatives to incarceration.

**THE COURT:**  I agree with that.  They're part of the

same topic.  I'm not requiring the County to produce any

additional documents yet, and there may be document requests

that are -- as drafted, are too broad, but I also believe there

is a more limited universe of documents that would probably be

appropriate.

Again, that should have been handled well before today,

but we are where we are.

1        **MS. PAPPY:**  Can I be heard on that 246 and -47

2  briefly?

3        **THE COURT:**  Of course.

4        **MS. PAPPY:**  Your Honor, if you look at 246 and -47, it

5  is all data sets, all documents.  And -- and I think that, if

6  you look at 238 to 234, these overbroad requests should not be

7  included in that.

8      And we should be focusing on 38 through -- 238 through

9  244, which are actually more specific than 246 and 247, which

10  seem to be the "Give me all data relating to this topic."

11        **THE COURT:**  I understand your position on that, and

12  I'm going to include those in the topics for the parties to

13  discuss, but I'm not mandating what position the plaintiffs

14  must take or what position the County must take.

15      It may be that the County decides that producing all data

16  sets, as these RFPs request, is not appropriate under Rule 26,

17  in which case, you're going to tell me that in two weeks.  But

18  it may also be possible that you-all agree that, with respect

19  to this universe of -- really, universe of requests for

20  production, that additional documents -- there is some

21  additional, more narrowly tailored universe of documents that

22  can be produced.

23        **MS. PAPPY:**  Understood.

24        **THE COURT:**  I think that takes us to the end of the

25  (Inaudible); is that correct, Mr. Swearingen?

1      **MS. PAPPY:**  Yes.  Oh.  I'm sorry.  You didn't say

2  "Ms. Pappy."

3      **THE COURT:**  I did not.  Sorry.

4      Do you think that's it, Mr. Swearingen?  Is that right?

5      **MR. SWEARINGEN:**  I -- I believe I may have skipped one

6  set of documents.  I just want to go back through my list, if

7  you'd permit me the time to do so.

8      **THE COURT:**  Sure.

9      **MR. SWEARINGEN:**  RFPs 203 through 207 seeks

10  investigation of defendants' staff, and these, I believe, were

11  specifically discussed at the November 16th meet-and-confer and

12  have been carried through in the joint disputed items in my

13  December 18th letter regarding disputed items.

14      I do recall, from the meet-and-confer, defendants stated

15  that they would produce the sustained allegations but not the

16  unsustained allegations, and we seek both.

17      **THE COURT:**  Is that correct, Ms. Pappy?

18      **MS. PAPPY:**  Yes, and we produced the -- the sustained,

19  but this is a little more complicated when you're talking about

20  sworn peace officer records.

21      **THE COURT:**  On or before February 13th, 2024, the

22  plaintiffs shall file a brief, not to exceed five pages,

23  regarding Requests for Production Numbers 203 through 207.

24  Defendants are to respond on or before February 20th, not to

25  exceed five pages.

 1          I'm not going to order the production of these types of

 2    documents based solely on an entry in a chart.  These

 3    absolutely should have been raised before me in a briefing that

 4    would have explained to me why they are relevant, whether there

 5    are any privileges that apply.  And, instead, they're just

 6    included in a chart that -- and nowhere mentioned in the

 7    motion.

 8          MS. PAPPY:  Your Honor, just for the Court's

 9    information, which you probably know -- is, at least in state

10    court, it's called a *Pitchess* motion, when you want to get

11    sworn peace officer records.  And that process has to be

12    followed.  The County does not have the right to turn those

13    records over.

14          THE COURT:  Does that apply in federal court as well?

15          MS. PAPPY:  I'm not sure.  I need to figure it out

16    because we've never talked about these before.

17       So I don't --

18          THE COURT:  Well --

19          MS. PAPPY:  I mean, we talked about -- generally

20    speaking, I said, "I'll give you the public record stuff,"

21    which we did, but we -- they never met and conferred about the

22    unsustained stuff beyond just saying, "We want it."

23          THE COURT:  Do you need more time, then, than a week?

24          MS. PAPPY:  Absolutely.  I mean, it could be

25    subject -- they may have to file separate motions.

```
 1           THE COURT:  Well, right now, Ms. Pappy, I'll give you
 2    two weeks to respond, to February 27th.  And --
 3           MS. PAPPY:  Thank you.
 4           THE COURT:  -- if you need more time, you can tell me.
 5           MS. PAPPY:  Thank you.
 6           THE COURT:  All right.  Anything further,
 7    Mr. Swearingen, on your motion to compel the RFPs?
 8           MR. SWEARINGEN:  Just for my note-taking purposes,
 9    could you repeat plaintiffs' deadline?
10           THE COURT:  Sure.  February 13th.
11        Do you need more time?  I'm not trying to jam you up,
12    either, Mr. Swearingen.
13           MR. SWEARINGEN:  I think another week would be --
14    would be helpful to research the issue.
15           THE COURT:  I'll give you two weeks, February 20th.
16    And I'll give the County two weeks, March 5th.
17           MS. PAPPY:  Thank you.
18           THE COURT:  You're welcome.
19        We've been going for almost four and a half hours, and I
20    have parties who are expecting me for an early neutral
21    evaluation at 2:00 p.m.  I want to make whatever progress we
22    can until 1:30, and then I am going to continue this hearing.
23        It's going to have to be -- I can't do it at 1:00 p.m.
24    anymore.  It's going to have to be after that, but we've got
25    more issues to cover.
```

```
 1        So I will -- actually, given -- given the number of issues

 2   that we have to cover, we'll keep the hearing at 1:00 o'clock,

 3   and I'm going to move some other stuff around.  So we'll keep

 4   it at 1:00 o'clock on Friday.

 5        All right.  Let's turn to the issue of the individual

 6   custody and medical records.

 7        Ms. Pappy, I -- as I understood the parties' positions in

 8   the joint status report, essentially, what the defendants are

 9   doing is taking Ms. Chartoff's December 7th, 2023, email that

10   is at Docket Number 512, Page 52 and 53, and you are utilizing

11   that as your template for pulling samples of medical records

12   for inmates; is that correct?

13             MS. PAPPY:  That's correct.

14             THE COURT:  Is there anything in Ms. Chartoff's email

15   that the County is not willing to provide?

16             MS. PAPPY:  I'm going to pull it up, but on -- based

17   on memory, if it doesn't exist, we -- we're not providing it.

18   But because there were certain -- no.  I'm sorry.  That's not

19   right.

20        If we can't search it -- I told you that there was a JIMS

21   flag.  We relied on the head nurse's memory of who's pregnant,

22   who's not, you know, women who have been seen for OB/GYN

23   issues.

24        If there was no way for us to identify the condition

25   identified in those emails -- in that email by one of those
```

```
 1   methods -- methods, without going through medical records
 2   themselves, then it is not being produced.
 3           THE COURT:  Right.
 4      Do you -- do you want us -- would you like me to make you
 5   a copy?
 6           MS. PAPPY:  I'm going to find it.  I know I have it.
 7           THE COURT:  That's okay.
 8      Melissa, is that okay?  Is that okay?
 9           MS. PAPPY:  Here I go again.
10      Oh.  Thank you.  Sorry.
11      The withdrawal protocol is -- the people that we selected
12   aren't specific to alcohol, opiates, and Benzodiazepines.  It's
13   just people on withdrawal protocol.
14           THE COURT:  What criteria -- so which one is that?
15           MS. PAPPY:  It's the second dot, the second bullet
16   point.
17           THE COURT:  Okay.  So for the -- each of these
18   categories, what criteria are you using to decide which ten
19   custodial and medical files?
20           MS. PAPPY:  Most recent, just the people that are on
21   the list currently, and then pull those files.
22           THE COURT:  The ten most recent for everyone --
23           MS. PAPPY:  Ten most recent, to the best that they
24   could.  And the most recent, in some instances, went back to
25   the beginning of 2023.  There haven't been many pregnant women
```

1    in that time period.

2         THE COURT:  So for -- and for each of those

3    individuals, does the production -- or will it include their

4    complete custody and -- file and medical records?

5         MS. PAPPY:  Yes.

6         THE COURT:  And so, looking at the 13 bullet points

7    under "Medical," do you agree with each of those categories?

8         MS. PAPPY:  Yes.  There isn't one that was refused.

9    There isn't a single one that was refused.

10         THE COURT:  Not --

11         MS. PAPPY:  (Inaudible) some of them -- back into them

12    in different ways.

13         THE COURT:  All right.  And that is correct for the

14    separate 13 bullets points for mental health as well

15    (Inaudible)?

16         MS. PAPPY:  Yes.  Yes.

17         THE COURT:  And there were five -- four bullet points

18    for dental; is that correct?

19         MS. PAPPY:  Yes.

20         THE COURT:  It sounds to me, Mr. Swearingen, like the

21    defendants are doing what you asked them to do.

22         MR. SWEARINGEN:  What's being represented in the

23    courtroom today, I agree.

24         THE COURT:  I read the joint report to say that.

25         MR. SWEARINGEN:  I -- when I look at the email

```
 1    communication between the parties, I was --

 2              THE COURT:  (Inaudible) the report.

 3              MR. SWEARINGEN:  So --

 4              THE COURT:  No.  It's okay.  I'm not saying you're

 5    wrong.  I'm just saying, do you agree that right now, like,

 6    that's -- this is -- you're getting what you wanted?

 7              MR. SWEARINGEN:  It -- yes.  If we get the bullet

 8    points -- ten records from each of the bullet points, as

 9    Ms. Pappy just indicated, if they're sorted by the ten most

10    recent -- that was one of our concerns.

11              THE COURT:  Sure.

12              MR. SWEARINGEN:  You know, one of our experts

13    expressed a lot of concern about these being cherry-picked,

14    about the ways in which there are communications.  Certain

15    records have been chosen, for example, by somebody's memory,

16    but defense counsel wouldn't say whose memory.

17              THE COURT:  Can you -- can we just really do this in a

18    positive way?

19              MR. SWEARINGEN:  Yes.

20              THE COURT:  You're getting the ten most recent.  Does

21    that satisfy the plaintiffs?

22              MR. SWEARINGEN:  It does.  We -- we would love a

23    declaration or -- yes.  If it's the ten most recent, yes.  It

24    would be -- it would be helpful for our experts to understand

25    the criteria of selection.
```

1      **MS. PAPPY:**  Number 1, we didn't produce ten for each

2  because it would -- that adds hundreds more.  We've produced

3  about five for each of the medical, and dental -- I think they

4  produced 20 each.  Mental health -- there were five in some

5  instances, but I think mental health produced (Inaudible) more.

6      It is -- my problem with the full ten is that this is

7  going to take weeks of download.  I actually had my client tell

8  me exactly how long it took to download everything that we need

9  for 173 records, which is what the defendants are willing to

10  pull.

11      I object to any declaration from my clients about how they

12  were pulled.  It was work product.  It, again, suggests that my

13  client is lying and going through medical records and reviewing

14  them and then looking for the ones that have the healthiest

15  people, and that is simply not true and based upon nothing.

16      **THE COURT:**  So, Ms. Pappy, the categories that are

17  discussed in Ms. Chartoff's December 7th email are all

18  acceptable to the County.

19      But what you are saying, as I understand it, is that,

20  rather than ten records in every category that's requested, for

21  certain categories, certain bullet points, there will be five

22  records?

23      **MS. PAPPY:**  That's correct --

24      **THE COURT:**  And you --

25      **MS. PAPPY:**  -- with some more, none less.

1       **THE COURT:** All right. Here's what -- how long do you

2  think this is going to take?

3       **MS. PAPPY:** Well, they're -- they're done -- I'm

4  pretty sure they're done with the medical.  I instructed them

5  to do medical and mental health first -- and that includes

6  dental -- and then custody.

7     So I think I've still seen custody records coming in.  The

8  173 that, to date, took -- eight hours -- took about 225 hours

9  for staff to pull and upload -- I'm sorry.  More than that,

10  about 300 hours.

11       **THE COURT:** Then what I would request that you do is

12  when you produce -- when are you going to produce those

13  records?

14       **MS. PAPPY:** Medical is done, I think.  I think all

15  that's gone out.  The custody records are all we're working on,

16  and I think some of those might have gone out yesterday.

17       **THE COURT:** But what I want to understand, Ms. Pappy,

18  is what changes were made by the County to Ms. Chartoff's

19  proposal?  It sounds like what -- it sounds like the change

20  would be in the number of records produced.

21       **MS. PAPPY:** That is right.

22       **THE COURT:** I want to understand what that is.  Maybe

23  the plaintiffs will be okay with that.  Maybe they won't.

24  I'm -- I don't want to make that determination until I hear

25  from Mr. Swearingen after he's had a chance to look at

1   everything.

2       Based on the number of records you were providing,

3   Ms. Pappy, when do you expect the medical records and custody

4   records production to be complete?

5           **MS. PAPPY:**  Medical is done.  Custody should be

6   complete within the next week.

7           **THE COURT:**  Then here is what I would say:

8       You are on track, it sounds like, to comply, in large

9   part, with what plaintiffs requested.  There may be a reason

10  why the plaintiffs believe they needed ten instead of five.  I

11  don't know what that is right now.  Maybe the -- maybe they'll

12  be satisfied with what you've produced.  I don't know.

13      How long do you need to evaluate the records that you're

14  getting, Mr. Swearingen, and determine if you need additional

15  records for one or more discrete categories?

16          **MR. SWEARINGEN:**  That will depend on -- on how it is

17  produced and what information is produced in connection with

18  those medical and custody records.

19      It would be very helpful to identify -- for example, if we

20  take the first bullet point for medical health, ten records of

21  people identified as having an opioid use disorder, if

22  defendants will identify which records are responsive to that

23  so we don't have to sort through each one -- defendants

24  obviously know that information.

25      If they would produce that as well as the selection

1   criteria -- the selection criteria that they've told us is

2   different from what I understand is being told today.  If they

3   would produce what is their selection criteria, that would be

4   extremely helpful as well for our experts because they need to

5   be able to represent this is the methodology for how the

6   records that we are reviewing were produced.

7           **MS. PAPPY:**  There -- I'm sorry.  I apologize.

8           **THE COURT:**  I think the request to know which records

9   correspond with which bullet point -- does that sound

10   reasonable, Ms. Pappy?

11           **MS. PAPPY:**  Absolutely.

12     I have the names, and I can provide them -- you know, if I

13   get back home today, I can provide them probably tomorrow or

14   the next day.  They were already provided with the criteria.

15   So there's nothing more needed on that front.

16           **THE COURT:**  I think, to assist the plaintiffs in

17   reviewing the records in a timely manner, simply providing, you

18   know, this bullet point, "Here are the opioid use disorder

19   individuals" --

20           **MS. PAPPY:**  Uh-huh.

21           **THE COURT:**  -- "1 through 10" -- agreed.

22     I'm not going to -- I'm not going to set this for a

23   further hearing right now.  Obviously, if there's a dispute,

24   you're welcome to raise it with me after you meaningfully meet

25   and confer.  But it sounds like this issue is -- there's

1   nothing for me to rule on at this point.  I do find that the

2   defendants utilizing the plaintiffs' proposal is appropriate.

3        All right.  The next issue is contractor activity reports,

4   which is RFP Number 78.

5        I understand, from the defendants' opposition, that this

6   is moot; is that correct, Mr. Swearingen?

7            **MR. SWEARINGEN:**  No, Your Honor.  It's our

8   understanding that defendants have produced one contract --

9   contractor activity report.  That report identifies, by

10  provider, the count of booking numbers and the count of

11  completion dates, and that's it.

12       In contrast, when you look at defendants' contract with

13  NaphCare, it requires various types of reports, including

14  statistical daily reports pertaining to medical services

15  rendered, daily hospitalization reports, dental reports, in

16  order to analyze NaphCare's failure to effectively respond to

17  annual period cleanings and refusal to authorize root canals.

18  This is in Exhibit MM to my declaration at Page 677 through

19  678.

20       So I think that there are many other contractor activity

21  reports that exist but have not been produced, Your Honor.

22           **MS. PAPPY:**  That is incorrect.

23       In Request for Production of Documents Number 3, they

24  requested health care -- those health care reports, which were

25  produced.  Number 78 was a duplicate, slash, catch-all of all

```
 1   contractors.  We did not reproduce the medical ones.

 2        THE COURT:  Is that correct, Mr. Swearingen, that you

 3   received these contractor -- or medical contractor reports in

 4   your response to RFP 3?

 5        MR. SWEARINGEN:  RFP 3?  I'm going to pull it up.  If

 6   you give me one minute, I can do so.  But that was, I recall,

 7   during early expedited discovery as it related to ADA issues.

 8        And, actually, I don't think I have -- I'm sorry.  RFP

 9   Number 3 or RFP Set 3?

10        MS. PAPPY:  RFP Set 3.

11        THE COURT:  I had misspoke.  That was my fault,

12   Mr. Swearingen.

13        MR. SWEARINGEN:  Okay.

14        THE COURT:  I said "Number 3" and not meaning to.

15        MR. SWEARINGEN:  Okay.  This was --

16        THE COURT:  Okay.  And you know what, Mr. Swearingen?

17   I'm not trying to put you on the spot.  Hang on real quick.

18        Let me ask just -- let me just ask you, in the limited

19   time before I have to leave you to get to my other matter --

20   there may be an issue with contractor activity reports.  Talk

21   to Ms. Pappy.  Figure this out before Friday.  Okay?

22        MR. SWEARINGEN:  Yes, Your Honor.

23        THE COURT:  All right.

24        MS. PAPPY:  Yes, Your Honor.

25        THE COURT:  Staffing plans.
```

```
 1        Is that one moot, Mr. Swearingen?
 2             MR. SWEARINGEN:  We discussed that earlier in the
 3   line-by-line review.
 4             THE COURT:  Is it moot based on my rulings?
 5             MR. SWEARINGEN:  I'd have to go back to your rulings,
 6   Your Honor.  I'm sorry.  I don't have that in front of me.
 7             THE COURT:  Okay.  Think about that one, and you'll
 8   tell me on Friday.  Okay?
 9             MR. SWEARINGEN:  Yes, Your Honor.
10             THE COURT:  With respect to text messages -- and I'm
11   not going to rush this.  We're going to pick up again on Friday
12   at 1:00 p.m.
13        But, Ms. Pappy, what have the defendants agreed to provide
14   in terms of text messages?
15             MS. PAPPY:  We did not agree to produce any text
16   messages.  You saw in the briefing that the conversation
17   started about -- about staff in the -- nonmedical staff.
18             THE COURT:  Right.
19             MS. PAPPY:  And if there are any, they are
20   inconsequential.  That is not the way they communicate with
21   each other because of IT problems and the urgent need to use
22   walkie-talkies.
23        They produced, at the last hearing, this email from
24   Dr. Montgomery.  I have since had the opportunity to -- to get
25   information about what Dr. Montgomery was talking about in
```

1    that.  He was pushing back on NaphCare, who was saying that

2    they were having problems getting payments made because of IT

3    issues, and Dr. Montgomery said, "You could have communicated

4    with us in any of these various different ways, including text

5    messages."

6        Dr. Montgomery says that when he has a need to talk to

7    management at NaphCare, not specific to a patient, he may use

8    text message.  There is -- in TechCare, Tech instant messaging

9    alerts are built into the EHR.  I'm not sure what "EHR" stands

10   for, but it's something to do with the medical.  And they are

11   notes that are not -- they don't automatically go into

12   somebody's medical records.

13       So there are these instant messages, which is what

14   Dr. Montgomery was talking about in, I think, another section

15   of that email.  They are required to be printed out en masse

16   and reviewed, if they're responsive to something, because

17   they're not -- you can't search them by person or condition

18   or --

19           **THE COURT:**  Have the TechCare instant messages been

20   reviewed in connection with the document production in this

21   case?

22           **MS. PAPPY:**  No.  I just got the -- this information in

23   response to them bringing that email to the Court's attention

24   in December.  So I investigated what -- what is Dr. Montgomery

25   talking about, and I just got this information about this

 1  instant messaging that they use in TechCare.  So it's in a

 2  computer system.

 3          THE COURT:  That needs to be searched for manually?

 4          MS. PAPPY:  Yes.

 5      I would also point that if any chairs are provided to

 6  somebody in response to one of those messages, it goes into

 7  their medical record.

 8          THE COURT:  And -- Mr. Swearingen?

 9          MR. SWEARINGEN:  The -- the origin of the

10  meet-and-confer did not start with text messages being

11  constrained only to deputies.

12      Exhibit Q to my declaration, I believe, is the one that

13  has -- I'm sorry.  Maybe it's a different document, but in my

14  declaration is the meet-and-confer document stating that --

15  stating the parties' positions on text messages,

16  meet-and-confer from several months ago.

17      Since then, we have reviewed documents and ESI

18  suggesting -- well, stating that staff use -- jail staff use

19  text-messaging to communicate internally and with NaphCare.  At

20  the deposition of Christina Ralph, who is the commander of

21  detention operations -- earlier -- well, actually last month,

22  she confirmed that text messages are used to communicate work

23  matters.

24          MS. PAPPY:  This is the first I'm hearing of any of

25  this.

1          **THE COURT:**  Is that -- is any of this in your motion?

2          **MR. SWEARINGEN:**  It's in a -- it's in our filing from

3    January 30th on Thursday.  The deposition transcript, I

4    believe, is attached to that.

5       I have -- I think it may be as Exhibit P -- Exhibit PP, at

6    705, to my declaration as well.

7          **THE COURT:**  Where is it in the January 30th filing?

8          **MR. SWEARINGEN:**  Your Honor, it's -- it's actually

9    Exhibit PP to the motion to compel, Page 705.

10          **MS. PAPPY:**  What was filed on January 30th?

11          **THE COURT:**  It's your joint report.

12          **MS. PAPPY:**  Oh.

13          **MR. SWEARINGEN:**  I was referring to the -- to the

14    ex parte motion.

15          **THE COURT:**  Oh.  On the ex parte motion?

16          **MR. SWEARINGEN:**  Yes.

17          **THE COURT:**  All right.

18          **MR. SWEARINGEN:**  But it's in our motion to compel,

19    Exhibit PP, at 705.

20       Ms. Chartoff, at Line 13, asks, "How do you communicate

21    with other staff in the Sheriff's Department?"

22       Commander Ralph responds, "Verbally, through email,

23    through text messages, through Teams.  I think that's about

24    it."

25       Ms. Chartoff asks her, "When you text with people in the

 1   Sheriff's Department, is that about work issues?"

 2       Commander Bavencoff responds, "Yes."

 3       Chartoff --

 4           **THE COURT:**  So the testimony is -- go ahead.  You're

 5   reading.  Go ahead.

 6           **MR. SWEARINGEN:**  Ms. Chartoff continues, "And when you

 7   communicate on Teams, do you communicate about work issues?"

 8       Ms. -- I'm sorry.  Commander Ralph responds, "Yes."

 9           **THE COURT:**  And, Ms. Pappy, it's the County's position

10   that, with respect to the requests for production -- that there

11   should not be any effort by the County to inquire as to whether

12   anybody has responsive text messages?

13           **MS. PAPPY:**  I don't -- I'm -- can somebody tell me

14   where we're reading?

15           **THE COURT:**  No.  I think -- I want you-all to talk

16   about this before Friday because I have to go to my other

17   hearing now, and I'm already going to be late to it.  And, you

18   know, we've been going for almost five hours.

19       So I will see you again on Zoom at 1:00 o'clock on Friday,

20   and we will finish the remainder of the issues that are before

21   me.

22           **MS. PAPPY:**  Thank you.

23           **THE COURT:**  Thank you, everyone.

24           **MR. SWEARINGEN:**  Thank you, Your Honor.

25           **THE CLERK:**  That concludes our hearing.

1           We're now in recess.

2                      (Proceedings adjourned at 1:43 p.m.)

**CERTIFICATE OF TRANSCRIBER**

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Southern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

DATE:  Friday, February 9, 2024

/S/ James C. Pence-Aviles

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter