Pages 1 - 56

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

```
DARRYL DUNSMORE, et al.,        )
                                )
          Plaintiffs,           )
                                )
   VS.                          )          NO. 20-CV-00406-AJB-DDL
                                )
STATE OF CALIFORNIA, et al.,    )
                                )
          Defendants.           )
_____)
```

San Diego, California
Friday, February 9, 2024

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    ROSEN BIEN GALVAN & GRUNFELD, LLP
                    101 Mission Street, Sixth Floor
                    San Francisco, California 94105
              **BY:  RICHARD VAN SWEARINGEN, ESQ.**


For Defendants:
                    BURKE, WILLIAMS & SORENSEN LLP
                    60 South Market Street, Suite 1000
                    San Jose, California 95113
              **BY:  ELIZABETH MARIE PAPPY, ESQ.**




Transcribed By:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                 Official Court Reporter

1    **Friday - February 9, 2024**                                    **1:00 p.m.**

2                        **P R O C E E D I N G S**

3                            **---oOo---**

4         **THE COURT:**  All right.  Good afternoon, everyone.

5         We are on the record in Dunsmore, et al., versus San Diego

6    County Sheriff's Department, et al., Case Number 20-CV-406.  We

7    are here for a continuation of the discovery hearing that was

8    conducted on February 6th.

9         May I have appearances from counsel, beginning with

10   plaintiffs' counsel.

11        **MR. SWEARINGEN:**  Van Swearingen for plaintiffs.

12        **THE COURT:**  Okay.  Thanks, Mr. Swearingen.

13        **MS. PAPPY:**  Elizabeth Pappy on behalf of all

14   defendants.

15        **THE COURT:**  Thank you, Ms. Pappy.

16        Just to repeat on the record what I told you both, I

17   really do appreciate you-all taking the efforts to travel to

18   San Diego for our hearing on Tuesday.  It was, I'm sure,

19   challenging for everybody to get down here and then get back

20   home, given the weather conditions we were all experiencing in

21   California.

22        So I really do appreciate it.  And I think it was, from my

23   perspective, a -- a productive hearing, and I'm looking forward

24   to working with you today.

25        I was able to review, very quickly, the transcript of

1   Tuesday's hearing that was prepared -- and when I say

2   "quickly," I mean the last couple of pages -- just to confirm

3   where we left off.

4        My understanding is that we had finished that hearing by

5   briefly discussing contractor activity reports, which was

6   RFP 78, and staffing plans, which was RFP 191, and then had

7   briefly started discussing the broader category of text

8   messages.  And I believe that the very quick instruction from

9   myself to you both was talk about RFP 78 and 191 and let's talk

10  further on Friday.  It was not memorialized in a written order.

11       So let me just ask this:  Mr. Swearingen, is there an

12  ongoing dispute, with respect to RFP 78, concerning contractor

13  activity reports that we should discuss this afternoon?

14       **MR. SWEARINGEN:**  I don't believe there's a dispute,

15  but there is an update that I'd like to -- to briefly get into

16  the record.

17       **THE COURT:**  Sure thing.

18       **MR. SWEARINGEN:**  Ms. Pappy and I met and conferred

19  earlier this morning about RFP 78, which is contractor activity

20  reports.

21       I discussed the many reports that are called for in the

22  NaphCare contract with the County, including monthly contract

23  compliance reports, automated reports regarding sick call

24  trends and issues, regular reports addressing operational and

25  administrative concerns and other monthly, quarterly, and

1    annual reports.  And Ms. Pappy reported that the County and the

2    Sheriff's Department do not maintain such reports.

3        So as far as I understand, given that the defendants do

4    not have those documents, I don't believe that there is

5    anything more to produce.

6        **THE COURT:**  Just -- I appreciate that, Mr. Swearingen,

7    and I appreciate you-all talking this morning.

8        Ms. Pappy, before you respond, if you're going to, I have

9    a quick question.

10       Is it your understanding, Mr. Swearingen, that, under the

11   contract between the County and NaphCare, those reports that

12   you just described are to be prepared by NaphCare and provided

13   to the County?

14       **MR. SWEARINGEN:**  Yes, Your Honor.

15       **THE COURT:**  So they would also be potentially produced

16   by NaphCare pursuant to the plaintiffs' subpoena to NaphCare,

17   if they exist at all?

18       **MR. SWEARINGEN:**  Yes, Your Honor.

19       **THE COURT:**  Okay.  Thank you.  I appreciate the

20   clarification.

21       Did you wish to be heard on that, Ms. Pappy?

22       **MS. PAPPY:**  Yeah.

23       The only thing that I want to repeat, for the -- so that

24   it's in the record, is that NaphCare didn't produce them in

25   response to the subpoena likely because they didn't generate

 1   them.

 2          **THE COURT:**  Understood.

 3      There was a dialogue with Mr. Smith regarding NaphCare

 4   reports during the hearing.  I don't recall the specifics, but

 5   it will be in the transcript and will be presumably something

 6   that is brought to my attention, if necessary.

 7      All right.  Thank -- thank you both for that.

 8      Request for Production Number 78.  That dispute is

 9   resolved as moot.

10      What about Request for Production Number 191 pertaining to

11   staffing plans, Mr. Swearingen?

12          **MR. SWEARINGEN:**  Yes.

13      We discussed that as well today on our very productive

14   meet-and-confer call that was conducted by Zoom and recorded.

15          **THE COURT:**  Great.

16          **MR. SWEARINGEN:**  And defendants agreed to produce

17   documents previously produced at Bates Range SD97886 through

18   97913.  Those were staffing reports for jail medical positions

19   for the date of March 10th, 2023.  Defendants agreed to produce

20   those also for March 10th, 2021, and March 10th, 2022.

21      And there was a dispute as to an Excel spreadsheet that

22   was produced at Bates -- Bates Document SD725946, and that was

23   an Excel -- Excel spreadsheet that showed the facility shifts

24   that were above or below minimum staffing levels.  Those were

25   produced for a long period of time, for a period of several

1    months, from February 10th, 2023, through June 29th, 2023.

2    And plaintiffs asked that they be produced for the entire

3    relevant period.  They're -- they're spreadsheets.  They look

4    like they can be easily downloaded, and we've requested that

5    they be produced for the January 1st, 2021, period through the

6    present, excepting the ones that have already been produced.

7    Defendants responded by -- by offering to produce the

8    similar dates, February 10th through June 29th, for 2021 and

9    2022.  And plaintiffs responded that we'd rather have the full

10   period.  It looks like an easy data set to download, and we'd

11   rather have the data through the present.

12        **THE COURT:**  I understand.

13   Ms. Pappy, what is your position with respect to the --

14   the burden that would be placed on the County to produce the

15   spreadsheets that Mr. Swearingen described for the time period

16   January 1st, 2021, through December 31st, 2023, the three-year

17   time period, as opposed to the February-to-June time period for

18   each of those three years?

19        **MS. PAPPY:**  I need to -- we need to correct something,

20   but I can come back to that.

21   So I want to answer your question directly, is I don't --

22   we produced six months, deeming it as sufficient, and -- for

23   191.  I want to be specific to 191, and we agreed to produce

24   the same six-month periods for 2022 and 2021.  And just in

25   terms of -- of that being sufficient for their purposes,

1    there's been no explanation as to why they need and why it's --

2    why they're somehow going to be prejudiced in the case as to

3    why they need a longer time period.

4        So I think the six months was a compromise, going back two

5    years.

6            THE COURT:  No.  I understand.

7        Before I ask Mr. Swearingen another question, what did you

8    want to correct, Ms. Pappy?

9            MS. PAPPY:  Well, the -- the staffing reports from

10   medical were actually -- we talked about this at the hearing.

11   They were actually requested in -- I had said Request for

12   Production Number 3, but I couldn't remember the exact request

13   number.  It's 39.

14       And so what we agreed, in meet and confer, as to 39, is to

15   produce the same report that we produced for March 10th, 2021,

16   and for March 10th, 2022.  So I just want to make -- make sure

17   that we're tracking our -- what these documents are responsive

18   to.  And then we talked about 191, and we had made this offer

19   and agreement to -- to provide the six-month time period.

20       So I just want the record to correctly reflect that the

21   agreement, with regard to the March 10th, 2021, and March 10th,

22   2022, is as to Request for Production Number 39, which asked

23   for medical staffing reports.

24           THE COURT:  Mr. Swearingen, could you explain for me,

25   from the plaintiffs' perspective, the relevance of the

1    spreadsheets that you described and why, you know, those

2    spreadsheets for the entire three-year time period that we are

3    discussing would be relevant to a claim or defense in the case?

4              **MR. SWEARINGEN:** Yes, Your Honor.

5        The spreadsheet at issue -- again, this is SD725946 -- was

6    produced in one spreadsheet. It has many tabs for the period

7    February 10th, 2023, through June 29th, 2023. And it shows,

8    for each of the facilities, the shifts that are above or below

9    the minimum threshold for staffing for that particular

10   facility.

11       So, for example, if I look at San Diego County Jail -- I'm

12   sorry -- Central Jail for a ten-day period, June 16th through

13   June 29th, it shows that there were 42 shifts below the minimum

14   staffing levels.

15       This is highly relevant to our claims. And because it's a

16   pattern and practice claim, it will help show the trend of the

17   jail's staffing over time, including whether it varies in

18   seasonality, whether it varies, you know, by vacation times,

19   for example, you know, winter breaks, and whether or not the

20   direction is going into achieving minimum staffing or

21   falling -- continuing to fall below.

22             **THE COURT:** Ms. Pappy, I'm inclined to agree with

23   Mr. Swearingen that these spreadsheets showing shifts that are

24   above or below the minimum thresholds for staffing are

25   relevant.

1        In that instance, it would -- I'd be looking to you to

2   explain to me the burden on the County of producing the

3   spreadsheets for the entire time period versus for a more

4   limited time period in each of those three years.

5        **MS. PAPPY:**  I don't -- I don't think the burden is

6   anything more significant.  I'm just suggesting that a six- --

7   a six-month time period provides the comparison that they want

8   for a three-year time period.

9        **THE COURT:**  I appreciate that point, Ms. Pappy.

10       Given Mr. Swearingen's explanation, I will respectfully

11  require the County to provide the spreadsheet showing the

12  shifts above or below the minimum thresholds for staffing for

13  the entire relevant time period, which, Mr. Swearingen, I'm

14  going to use throughout this hearing, if necessary, to refer to

15  the time period for three years, January 1st, 2021, through

16  December 31st, 2023.

17       Does that all make sense, Ms. Pappy?

18       **MS. PAPPY:**  Yes.

19       **THE COURT:**  All right.  Let's -- let's move on to text

20  messages, then.

21       I understand the plaintiffs have cited evidence in the

22  record before me that text messages are used by County

23  employees relating to the jail.  The question to my mind is,

24  given the number of County personnel that would potentially be

25  at issue in this case, and given the number of issues and the

1    breadth of those issues in this case, I would appreciate your

2    respective positions, and perhaps even agreement, as to whether

3    there should be some sort of parameters on a directive by me to

4    provide targeted topics for text message production.

5         Is this something that you-all had a chance to talk about,

6    Mr. Swearingen?

7              MR. SWEARINGEN:  Yes, Your Honor.

8              THE COURT:  Okay.  Well, what did -- if you could

9    start, Mr. Swearingen, tell me what the parties' positions are

10   and maybe even if there's an agreement.

11             MR. SWEARINGEN:  There is no agreement, Your Honor.

12             THE COURT:  Okay.

13             MR. SWEARINGEN:  I think that there's a difference in

14   party position --

15             THE COURT:  Okay.

16             MR. SWEARINGEN:  -- to who uses texts and why.  It's

17   our understanding, from the evidence that we've seen in this

18   case so far, that custody and medical staff at the jail do use

19   texts, just like most of us use texts in our everyday work

20   environments.

21        And I understand -- and I don't want to put words in

22   defense counsel's mouth, but I understand, from Ms. Pappy, that

23   it's defendants' position that texts are only used maybe among

24   command staff.  So when Ms. -- when Commander Ralph testified

25   that she uses texts for work, it was in connection with other

```
 1    higher level of staff as opposed to deputies and other people

 2    in the jail using text.

 3        And we disagreed on whether or not defendants should and

 4    would produce texts in connection with this litigation.

 5            THE COURT:  Okay.  Ms. Pappy, I do have some more

 6    questions, but if you'd like to be heard initially, I would

 7    appreciate that.

 8            MS. PAPPY:  Sure.

 9        So I'm going to talk about the medical.  There is no

10    evidence that medical staff communicate via text.  There --

11    we -- if you go back to the hearing on Tuesday, what you have

12    is Dr. Montgomery's email, in isolation, that they -- that they

13    put in the court record.

14        And as Dr. Montgomery explained to me, and I recited to

15    the Court on -- on Tuesday, Dr. Montgomery uses texts to

16    communicate with higher-ups at NaphCare but not in -- specific

17    to any person, just, "Hey, I need to talk to you about this."

18        And the only two people that he ever really talks to is --

19    I think it's the director -- director of medical and some other

20    administrative person, saying, "Hey, I've been trying to reach

21    you.  Can you" -- "can you contact me?"

22        So that's -- that's Number 1 on the medical side.  So

23    there's no evidence that -- that people are texting each other

24    about somebody's medical care.

25        What I also talked about on Tuesday was the TechCare
```

1    system, where they will -- they will communicate -- NaphCare

2    and staff at the jail will communicate with each other through

3    this -- I don't have the notes in front of me, but let's just

4    call it TechCare.

5         And it's a text -- it could be an instant message saying,

6    "Incarcerated Person Pappy needs" -- "needs some medication."

7    That's my understanding, that it might even contain someone's

8    name, and it might say she needs some -- some antibiotics or

9    something.

10        The problem with it is that it is not -- unless they --

11   unless they -- unless an action is taken with regard to

12   Pappy -- IP Pappy, nothing will show up in my medical record,

13   and that record -- and that message will not show up in my

14   medical records.  The two systems don't communicate with each

15   other so that that instant message goes straight into my

16   medical record.

17        Mr. Swearingen said, "Well, you know, it" -- you know, "We

18   want to see every one of these things or at least have a run of

19   the" -- "every ESI search term," now that we sort of ended it

20   on -- is it your original list of AB6, or is it my version that

21   I submitted to you and to the Court on, I think, the 8th of

22   December?  And why would I be looking for "thunderdome" or

23   "pocket" in TechCare?

24        So that is something that I said that I would explore, can

25   it be searched, because not every -- every non-email database

1   can be searched by ESI terms.  So can it be searched?  What --

2   how -- how voluminous is it going to be?  You know, what's --

3   what's involved?  And if we get too many hits, you know, I'll

4   go back to Mr. Swearingen.

5         But that's where we left the TechCare issue.  What I did

6   say was, yeah, I can understand why it would be relevant to see

7   the system, you know, see a smattering of printouts of, you

8   know, let's say, 30 days or 60 days, whatever -- whatever was

9   agreed upon, to see how the system works and see what kinds of

10  communications you see in there.

11        The problem with sort of relevance beyond that is those 60

12  instant messages aren't going to be tied to any medical records

13  that they have.  It may be included in the 173 that -- that

14  have been produced.  It may not.  So -- but I -- but I could

15  understand why they just want to see the way that the process

16  goes.  With -- so that's medical, and that's where we left

17  things.

18        With regard to command staff, I want to be clear because I

19  went back and read Commander Bavencoff's testimony.  And

20  it's -- it's three questions, and it asks her, "Do you

21  communicate with other staff via text?"

22        "Yes."

23        "And when you text, is that relating work issues?"

24        "Yes."

25        "And when you communicate on Teams, do you communicate

1    about work issues?"

2        "Yes."

3        This is to a commander, and I did not actually say that --

4    that only command staff communicate with each other.  It is

5    that -- that -- the way that it is explained to me and the way

6    that I previously, months ago, explained it to plaintiffs'

7    counsel is corrections officers in the -- in the jails do

8    not -- they're not texting each other saying, "Man down on the

9    sixth floor."  Because they have spotty communication, it is

10   not the way they're supposed to be communicate --

11   communicating.  They use walkie-talkies.

12       So when you're saying you need to go search all text

13   messages, there's not going to be very much.  I'm not saying

14   they don't, but you're -- proportionality -- why are we

15   searching hundreds and hundreds of corrections -- in the jail

16   staff's text messages, you know, for a needle in the haystack?

17   And then you're talking about Commander Bavencoff's and the

18   Assistant Sheriff text messages.

19       The volume of text messages that we're going to have to

20   search and run ESI messages -- or ESI search terms through

21   that -- I don't even know how they would do that.  They would

22   have to download all of the text messages from every single

23   person in the jail, which is why I have thought about -- I

24   don't want to give them these text messages for correction

25   staff versus this medical instant messaging thing.

1          **THE COURT:**  It -- okay.  I have a few questions for

2     you-all.

3          Just so I understand the different types of electronic

4     information that we're talking about, Number 1 are emails.  And

5     those have been addressed at our prior hearings, and those are

6     the subject of the briefing that's before me, which -- I

7     understand the issue on search terms.

8          **MS. PAPPY:**  Uh-huh.

9          **THE COURT:**  The second -- there's three buckets, as I

10    said.  That's Bucket 1.

11         The second bucket would be information that is inputted

12    into TechCare.  And for lack of a better way to describe it,

13    I'll talk about that as TechCare reports, even though it sounds

14    like it's not a formal report as we might think of it.  And the

15    third bucket would be text messages between County employees

16    and perhaps County employees and NaphCare.

17         So let's leave aside emails, because those have been

18    briefed by you-all, and the search terms that the County has

19    used.  I mean, that's already before me.  I want to focus on

20    TechCare and text messages.

21         With respect to the text messages that I understood were

22    at the heart of the motion, I hear your point, Ms. Pappy, that

23    cell service is spotty in the jail.  But that also does not

24    mean, as you pointed out, that County employees aren't using

25    text messages to communicate regarding relevant topics.

1    If there were to be an order from me directing the County

2    to produce text messages on a discrete topic or a discrete

3    temporal -- discrete time period -- excuse me -- how would the

4    County effectuate that directive?  What would you do?

5        **MS. PAPPY:**  They would have to -- well, first of all,

6    they have -- the employee has to have a County-owned device.

7    If they don't have a County-owned device, then the people would

8    have to bring them to the County and -- and let -- give us

9    permission to search them.

10    If it's a County-owned device, presumably, it's a

11    County-owned account.  They would have to go to Verizon or

12    whoever their carrier is.  They would have to, I guess, export

13    or however they -- I've seen them in other cases.  So I know

14    that it can be done, but export every single -- or maybe you

15    have to do it by phone -- export every single person's text

16    information into some sort of database and then conduct a

17    search of it.

18    If you're talking about every -- of the thousands of

19    employees in the Sheriff's Department, it -- I don't know how

20    or -- or -- I don't know how long it would take to do that.  I

21    don't know how long it would take to upload the information or

22    to conduct a search.

23    If it were limited to staff in the jails on a -- on a

24    certain day or within a certain month, that would obviously

25    limit it significantly.  But, again, you have to get the

1  phones.  I'm not sure that the phone companies maintain the

2  texts.  You would have get the individual phones and upload the

3  information and then conduct a search.

4          **THE COURT:**  I am not a technology expert.  I was

5  assuming -- and I want to hear from Mr. Swearingen on this --

6  that an order from me directing the County to search for text

7  messages on Discrete -- Discrete Topic Number 1 would require

8  something akin to the County directing custody staff, "Look at

9  your phones.  Search for any text messages on Discrete Topic

10  Number 1 and report to your supervisor, and then we will figure

11  out how to take photographs of those text messages or download

12  them somehow."  I'm not aware of text messages being maintained

13  by a provider, but I don't know.

14      Mr. Swearingen, do you have any insight into this from a

15  technology perspective?  And I'm asking these questions because

16  I do think it's relevant in determining whether I should direct

17  the County to search for text messages in the first place at

18  all.  And, secondarily, if the answer to that is yes, what

19  should be the scope of that search?

20      Do you have any -- anything that you can share,

21  understanding that you don't work for the County of San Diego

22  and you may not have any specific insight into their practices?

23          **MR. SWEARINGEN:**  I -- with that acknowledgment,

24  Your Honor, I do believe it's fairly easy.  I think that --

25  I've seen it done with -- with vendors, where a vendor comes in

1    and downloads information directly from someone's phone.  I

2    also believe that it may be able to be done -- performed

3    remotely with a set of instructions.  That's -- that's my best

4    knowledge.

5        I believe that, really, how it occurs, though, is that

6    it's a back-end search so that -- if, say, ten people brought

7    in their phones, then they would have all their texts

8    downloaded, and it would search their texts.  And you can do

9    parameter searches, you know, to/from certain individuals, or

10   search terms.  And that's how it would be conducted as opposed

11   to individuals self-selecting which text messages are

12   responsive.

13       I'm not sure if an individual -- how easy one can do that,

14   if one can actually search their own text threads for certain

15   parameters and, if so, how effective and accurate those

16   self-searches would be.  I think, really, it's -- like I said,

17   the vendor pulls either all texts or a subset of texts, or the

18   employee uploads all texts or a subset of texts, and then

19   search parameters are applied to them, just like any ESI.

20       And if I could add something else, in addition to the

21   discussion about texts, we talked about the deposition of

22   Commander Ralph.  We also took the deposition of

23   Commander Jones.  He's the commander of the facilities.

24       And the question posed to him was, "How do custody staff

25   and the Sheriff's Department communicate with each other?"

1       And Commander Jones responded, "Verbally, through email,

2    text messages, just like anybody else in a professional setting

3    or business would communicate with each other."

4       He also testified that they use IM -- IMs through

5    Microsoft Teams, as did Commander Bavencoff.

6       **THE COURT:**  I'm going to proceed with the

7    understanding that County employees in the jails use text

8    messages.

9       The -- the question to me is whether they're using their

10   own personal phone or they're using County-owned devices.  I

11   don't know how many individuals have County-provided cell

12   phones or if individuals in the jails have their own cell

13   phones.  And I also, secondarily, then, don't have an

14   understanding as to -- or enough information yet as to how one

15   would best focus what should be searched for.

16      I can tell you that I am not inclined to order the

17   production of every text message exchanged -- right? -- between

18   County employees in the jails relating to custody issues or

19   medical issues, and I don't understand that to be what the

20   plaintiffs are -- are asking for, either.  But I have not yet

21   been provided with either a joint proposal or competing

22   proposals for how best to limit this.

23      And I really do appreciate the fact that you-all were

24   talking this morning.  And this is a difficult issue, I think,

25   because it requires some better understanding of the technology

1    as it exists with respect to the County as well as then how to

2    apply that to parameters that will not be overwhelming in terms

3    of ESI.

4        Do you think this would be an appropriate topic for your

5    first weekly meeting, which I presume is going to happen next

6    week?

7            **MR. SWEARINGEN:**  Yes, Your Honor.

8            **THE COURT:**  I really think so.  And I think with the,

9    you know, renewed spirit of cooperation, there's a way to at

10   least narrow the dispute.  And if you can't resolve it

11   entirely, then I will.

12       But, Ms. Pappy, what I would really want to know is to

13   what extent do County employees working in the jails utilize

14   their own personal cell phones versus County-provided cell

15   phones?

16           **MS. PAPPY:**  Right.

17           **THE COURT:**  I'm not positive there's a legal

18   distinction for discovery purposes, but searching employees'

19   personal cell phones certainly would potentially raise issues.

20           **MS. PAPPY:**  We can get -- legally, we can require them

21   to turn over work material on their phones.  I can't force them

22   to give us their personal information off their phone.  So it

23   is up to them to give us the information -- say, "Okay.  I've

24   uploaded all of the text messages."

25       I can't force them to give me the phone to verify that.

1          **THE COURT:**  I understand, and I think that's why this

2    would be a good topic of discussion between the parties on

3    how -- how to deal with that.

4          I can tell you that I am inclined to require the County to

5    perform some sort of search for text messages, but the scope of

6    that search is where I really want the parties to focus because

7    it is potentially enormous.

8          And it needs to be a search that can be clearly defined,

9    whether it is for an entire three-year time period or perhaps

10   it is for a -- a much smaller time period, as a test of the

11   types of communications that are retrieved, and if we can do

12   this without building in further delay with potentially, based

13   on that data set, a further, more intrusive search.  I just

14   don't know what's going to be the most efficient.

15         So what I would do is I would ask you-all to add this to

16   your agenda for the first meeting between the parties that is

17   going to happen next week, whenever you do it.  And then I

18   would want to have a status report from you-all describing what

19   your positions are, whether there's some sort of an agreement

20   as to how we can proceed, with your understanding that I am

21   going to very much want to keep our current pretrial schedule

22   in place.

23         And so how can we accomplish that during this time period?

24   That would be helpful to me because it's an important issue,

25   but -- and one that I know you're trying to work through but, I

1    think, requires some additional information from everyone.

2        And primarily, Ms. Pappy, that's going to fall on you in

3    terms of figuring out everything we've talked about in terms of

4    the way phones are used in the jails.

5        **MS. PAPPY:**  Okay.  So can I ask a couple questions so

6    I know exactly what I'm --

7        **THE COURT:**  Of course.

8        **MS. PAPPY:**  I'm only looking at custody staff?  The

9    folks that are in the jails?  Folks that staff George Bailey?

10   Folks that staff SDCJ?

11       **THE COURT:**  When you talk about folks that are in the

12   jails, does that also include command staff?

13       **MS. PAPPY:**  It does not.  A captain -- there's a

14   captain at each facility, and it would include that captain,

15   but there are no commanders assigned to -- they don't work at

16   the jail.  They work in administrative offices.

17       **THE COURT:**  I think what I would want to do is put the

18   text messages into two groups.  The first group would be for

19   individuals working in the jails that would --

20       **MS. PAPPY:**  Okay.

21       **THE COURT:**  -- leading up to the captain.

22       If there is a separate, you know, group of command staff

23   that may have relevant text messages, presumably, that's a much

24   smaller group of people.  I don't know how many that would

25   entail.  I would like additional information on that --

1        **MS. PAPPY:**  All right.

2        **THE COURT:**  -- because I expect Mr. Swearingen is

3   going to be interested in text messages between individuals in

4   the jail, if they're relevant, but also perhaps between command

5   staff if there's relevant information in those text messages.

6       Is that correct, Mr. Swearingen?

7            **MR. SWEARINGEN:**  It is, Your Honor.

8        **MS. PAPPY:**  All right.  So that's -- that seems

9   doable.

10      And then the only thing (Inaudible) I'll comment is that,

11  while we were talking, I Googled how long Verizon -- I don't

12  know if Verizon's their provider, but Verizon keeps messages on

13  devices for 90 days; and if they're deleted, they only last

14  10 days.  So it's nice to talk about three years, but I'm just

15  not sure that -- that any of that is going to be available.

16      So I will undertake to figure this out.  We can use, like,

17  a test phone, for example, to find out how log information is

18  stored, and I will hopefully be able to report back to that

19  next Thursday, when we have our meeting.

20          **THE COURT:**  If you're scheduled to meet next

21  Thursday --

22          **MS. PAPPY:**  Uh-huh.

23          **THE COURT:**  -- when would be a reasonable time for

24  you-all to let me know at least as to this issue and what

25  progress you've made and what further actions you are

```
 1   requesting that I take?

 2           MR. SWEARINGEN:  How about the following Tuesday?

 3           THE COURT:  That's fine, and it doesn't have to be

 4   anything fancy.  I just want to understand the basics of what's

 5   going on and know how I can help you resolve this issue, if you

 6   haven't resolved it all yourselves, and we can go from there.

 7           MS. PAPPY:  Sounds good.

 8       That's the 20th?

 9           MR. SWEARINGEN:  It is, Pat.

10           MS. PAPPY:  Okay.

11           THE COURT:  So the third bucket of electronic

12   information that you describe, Ms. Pappy, is information that's

13   inputted into TechCare.

14           MS. PAPPY:  Uh-huh.

15           THE COURT:  And as I understood you to say,

16   information can be inputted into TechCare, but it -- it isn't

17   automatically transferred to an individual inmate's medical

18   records.  And even if it were transmitted there, it's going to

19   live there and would only be searchable if you pulled that

20   inmate's medical record.

21       Is that all correct, or did I misunderstand you?

22           MS. PAPPY:  No.  It is a messaging system, and the

23   message itself will never go into their medical record.  If a

24   medical response was provided -- "a medical response" --

25   medical service was provided --
```

1          THE COURT:  Right.

2          MS. PAPPY:  -- we examined the person and determined

3     they didn't need the medication, or we examined the person in

4     response to that message and determined they did need the

5     medication -- medication, that service would be provide --

6     would appear in their medical record.

7          THE COURT:  But not necessarily the message in -- the

8     initial message that resulted in the service being provided?

9          MS. PAPPY:  Correct.

10         THE COURT:  Do you have an understanding right now,

11    Ms. Pappy, as to the ability of the County to search the

12    messages that are sent through the TechCare system and how long

13    those messages are retained?

14         MS. PAPPY:  I do not.

15         THE COURT:  I think that would be another topic to

16    address at your meeting on Thursday.

17         And I assume you don't have that information, either,

18    Mr. Swearingen.

19         MR. SWEARINGEN:  I don't, Your Honor.  I'm familiar

20    with the TechCare messaging system.

21         But if I could just add --

22         THE COURT:  Sure.

23         MR. SWEARINGEN:  -- on instant messages, I think

24    equally, if not more, important -- I shouldn't compare because

25    I really don't understand the functionality of the TechCare

1    messages, but -- but both Commanders Ralph and Jones testified

2    to the use of Microsoft Teams instant messages, and I think

3    that those would be a potentially valuable source of

4    information as well.

5            THE COURT:  I understand, and I look at it similar to

6    the text message issue in that there may be relevant

7    information that's exchanged via Teams, but the volume of Teams

8    messages is potentially overwhelming.

9        Again, I don't know how long these messages are retained.

10   I just -- that would be something, too, Ms. Pappy, that I would

11   add to your list for discussion on Thursday, with the hope that

12   you would obtain more information from the County on the text

13   messages, the TechCare instant messages, as well as

14   Microsoft Teams.

15       And that can form the basis for your discussions with

16   Mr. Swearingen and his colleagues next Thursday.

17           MS. PAPPY:  Of course.

18           THE COURT:  May I ask you a favor?

19           MS. PAPPY:  Yes.

20           THE COURT:  Can you give me 30 seconds to get a cup of

21   coffee because --

22           MR. SWEARINGEN:  Yeah.

23           THE COURT:  -- I'm dragging a little bit.

24       Thank you.

25           MS. PAPPY:  Yes.

```
 1           THE COURT:  Give me one sec.
 2      And if you'd like to do the same and stretch your legs,
 3  please feel free.
 4           MS. PAPPY:  Thank you.
 5           MR. SWEARINGEN:  Thank you.
 6                       (Recess taken.)
 7           THE COURT:  Thank you.  I appreciate it.
 8      All right.  I understand the parties' respective positions
 9  regarding email and the search terms.
10      Let me ask you this.  I am preparing a written order
11  addressing the issues that are raised in the motion.  I
12  understand the parties' positions, as they are now, with
13  respect to the email searches that were conducted pursuant to
14  the order that I issued.
15      Is this something where the parties are -- remain at an --
16  their positions are unchanged from the motion, and you're ready
17  for me to issue an order on them, or is this something that you
18  want to talk about further on Thursday?
19      I -- I'll defer to you.
20           MS. PAPPY:  I think we're at an impasse.
21           THE COURT:  Do you agree, Mr. Swearingen?
22           MR. SWEARINGEN:  Yes.
23           THE COURT:  And, look, I appreciate your hesitation,
24  Mr. Swearingen, and I know it comes from a good place.  If you
25  are at an impasse on an issue, despite your best efforts, fair
```

1  enough.  Let me -- this one will be on me to issue a ruling,

2  understanding that the -- the text messages and TechCare

3  messages and Teams messages will be something that you-all will

4  discuss separately at your weekly meeting.

5       All right.  I think that takes us to Interrogatory

6  Number 25.  As I indicated on Tuesday, Mr. Swearingen, I don't

7  believe that this was ever raised before me prior to receiving

8  your motion to compel.  If I -- it was and I missed it, I --

9  you are welcome to correct me, but my initial view is that this

10 dispute about Interrogatory 25 does not appear to be properly

11 before me.

12      So why don't you go ahead, sir.

13           **MR. SWEARINGEN:**  Thank you, Your Honor.

14      The reason it wasn't before you is because we believed

15 that we had an understanding and an agreement among the parties

16 that it would be produced.  So it wasn't, at the time,

17 something that was in contention and at dispute for purposes of

18 the motion to compel.

19           **THE COURT:**  Ms. Pappy, what's your position on that?

20           **MS. PAPPY:**  I agree that it wasn't at dispute, and I

21 was surprised to see it in the motion because I don't

22 understand what the -- I still don't understand what the

23 dispute is because the spreadsheets, with as much of the

24 information that we had available, were produced.

25      So I don't know what the dispute is.

1    **THE COURT:**  Okay.  Let me look at Mr. Austin's

2    declaration.

3        Mr. Swearingen, what's the best way to resolve this issue?

4    If everyone had understood there to be no issue until you

5    received the defendants' January 11th amended response, and

6    understanding now that my preference would have been for there

7    to have been, you know, a prompt phone call to Ms. Pappy to

8    talk through the issue -- maybe there was, but let's move

9    forward.

10       Have you-all had a chance to discuss the contours of

11   the -- this snapshot data that you believe should have been

12   included in response to Interrogatory Number 25 but was not?

13       **MR. SWEARINGEN:**  No, Your Honor, and I think that this

14   may be, given the renewed effort of communication among the

15   parties, a good thing to place on the parties' agenda for the

16   Thursday meeting.

17       I think that -- with limited questioning as to whether or

18   not certain data exists, I think that we may be able to resolve

19   this, given our previous good-faith efforts among the parties

20   to work together to get some data produced on this.

21       **THE COURT:**  I think that makes sense, Ms. Pappy.  If

22   you are not sure what exactly is the dispute -- maybe there is

23   one; maybe there's not.  But if you want to talk about it more

24   now and ask me to resolve it, I'll consider that.

25       I'm not -- the record before me is challenging on this one

1    because I -- I read Mr. Austin's declaration, and it wasn't

2    clear to me exactly what was provided by the County and what

3    Mr. Austin is saying he could have been provided by the County

4    easily because he's gotten it in other cases, including from

5    the County, but was not provided here.

6         Maybe I missed it.  If I did, you can point that out to

7    me, but it's just not clear to me.

8         **MS. PAPPY:**  Yeah.

9         I don't -- I don't know what they're missing, either,

10   because -- because they never contacted me.  And I would just

11   ask that Counsel look at 723737 through 724114, which are

12   spreadsheets that contain -- I don't think all of it because we

13   can't put it on a way other than searching for people's

14   individual records to provide what's not there, but there's

15   spreadsheets with most of this information.

16        So maybe on Thursday, Counsel can tell me what's missing

17   from those spreadsheets.

18        **THE COURT:**  I think that's a good idea.

19        All right.  So I'm -- your Thursday meeting will include

20   the electronic information pertaining to TechCare text

21   messages, Teams messages, as well as the information provided

22   in response to Interrogatory Number 25.

23        I think that is the final issue that's raised in the

24   motion to compel that is Docket Number 489; is that correct,

25   Mr. Swearingen?

1    **MR. SWEARINGEN:** I believe it is, Your Honor.

2    **THE COURT:** Do you agree, Ms. Pappy?

3    **MS. PAPPY:** I'm sure that it is. Since -- since I

4 didn't file the motion, of course, it's -- it's everything.

5    **THE COURT:** All right, then.

6    (Laughter.)

7    **THE COURT:** Well, there are a few other things that we

8 do need to talk about, of course, but I appreciate you working

9 through those issues with me.

10    All right. Let's turn now to the motion to seal. That is

11 Docket Number 490. I will grant the motion to seal in that it

12 appears to me that Exhibits JJ and KK contain personally

13 identifiable information about detainees that should remain

14 confidential.

15    Although it would likely suffice to redact that

16 information from Exhibit JJ, it is a 65-page document, and that

17 would be extraordinarily burdensome to the plaintiffs to

18 require them to redact those individual entries.

19    Exhibit KK is -- is three pages and consists almost

20 entirely of personally identifiable information, and I do find

21 good cause to seal all three of those documents.

22    And I don't know that I mentioned Exhibit NN, but I

23 find -- I find good cause to seal. I understand the

24 plaintiffs' concern, but I believe the defendants have

25 established good cause to seal, given that Exhibit NN contains

 1  specifics about jail staffing.  I think it really doesn't -- it

 2  didn't help me in resolving the motion.

 3      So maybe, just big picture, I would ask you-all to be

 4  cognizant of the documents that are attached to pleadings for

 5  which there will need to be a motion to seal and, of course, a

 6  finding by me that either good cause or compelling reasons

 7  support the -- the sealing.

 8      So with that being said, I will grant the motion to seal

 9  as to Exhibits JJ, KK, and NN.

10      And, Mr. Swearingen, do I understand that plaintiffs

11  lodged the entirety of Volume 2 of your declaration under seal?

12  Because all that you are required and should be lodging under

13  seal are the -- the portions that you're actually trying to

14  seal, and I just want to make sure that we're doing that going

15  forward, if necessary.

16      **MR. SWEARINGEN:**  I don't have an answer to your

17  specific question, but the instruction going forward does make

18  sense, to only lodge those portions of a document that's filed

19  that need to be sealed -- under seal.

20      **THE COURT:**  Yes.

21      **MR. SWEARINGEN:**  If there are 1 of 20 exhibits, and

22  only 3 are -- are actually sealable, the other 17 should come

23  into the public record.  I do understand that.

24      **THE COURT:**  Okay.  Perfect.  Thank you.

25      All right.

1      **MR. SWEARINGEN:**  Your Honor, can I say one more thing

2  about the sealing motion before we move on?

3      **THE COURT:**  Sure.

4      **MR. SWEARINGEN:**  The documents at issue in the sealing

5  motion are -- you can see that they're marked "Confidential" in

6  the bottom left corner.

7      We've met and conferred with defendants about the

8  overdesignation of documents as confidential.  I think that

9  most of the documents that have been produced in this case have

10  been designated as confidential, even though they are not

11  confidential.

12      And I'd just like to put that on -- on the agenda for

13  Thursday for the parties to discuss, a mechanism for how to

14  more efficiently go through the documents, because, in

15  preparation of the motion to compel, there was an inefficient

16  plethora of emails that were traded back and forth with Counsel

17  about -- about the overdesignation of confidential documents.

18      And it's something that we continue to -- to meet and

19  confer about, and we want to do so in a way that doesn't result

20  in us -- or that may result in us just simply identifying all

21  of the documents that were overdesignated as confidential,

22  which are hundreds of thousands of documents, pursuant to the

23  protective order and asking counsel on the other side for

24  reasons why they shouldn't be not designated as confidential,

25  if that makes sense.

1      **THE COURT:**  You-all are free to put whatever you wish

2   on the agenda.  I'm not going to micromanage you on that.

3      I would say this.  What is going to be the most efficient

4   way for you-all to resolve that dispute, given -- over the

5   confidentiality -- confidentiality designations, given the

6   volume of documents produced?

7      Is it for there to be a negotiation -- a discussion in

8   advance regarding the entirety of the County's production, or

9   would it be more efficient to figure out, if you're going to

10  file something -- to reach out to Ms. Pappy and say, "Hey, we

11  want to use these documents as exhibits.  What do you think?"

12     I can see -- I can see it both ways, but what are your

13  thoughts, Mr. Swearingen, if you have any?  And I do agree this

14  is going to be something that's best discussed on Thursday.

15      **MR. SWEARINGEN:**  Yes.

16  We tried the latter course, Your Honor, in connection with

17  the motion to compel, and it -- you know, when -- when drafting

18  any motion, sometimes it feels like there's a rush, and you're

19  trying to get everything done.

20     And it resulted in the trading of, I would say, maybe a

21  dozen, maybe more, emails, some of which Ms. Pappy was asking

22  us to send the documents that she had produced to us to her so

23  that she could review, and just -- it took a ton of amount of

24  time that wasn't necessary, and that's what we're just trying

25  to avoid in the future.

1          **THE COURT:**  No.  I appreciate that, and I appreciate

2    you-all trying to avoid extra emails -- right? -- because -- go

3    ahead, Ms. Pappy.

4          **MS. PAPPY:**  May I be heard?

5          **THE COURT:**  Yeah, sure.

6          **MS. PAPPY:**  I don't -- I'm mildly annoyed that this is

7    being brought up for the first time in a discovery hearing.  It

8    really should have been something that Counsel had warned me

9    that we were going to talk about in the hearing today.

10         **THE COURT:**  Right.

11         **MS. PAPPY:**  I totally disagree with most of what was

12   said.  There were about two or three emails back and forth

13   between me and Ms. Chartoff.  They sent it to me at the last

14   minute.  I had suggested exactly the proposal that Your Honor

15   put on the table, and they were basically fine with it.

16       I mean, I understand they were under a time pressure, but

17   it got to be 6:00 o'clock at night, and they needed a response.

18   And I said, "I can't find these last two documents.  Can you

19   send them over to me?"

20       "Sure.  Here."  And we resolved it in a matter of two or

21   three emails.

22       So I am just troubled that this is being brought up now,

23   and I do not think we should talk about it next Thursday.

24   We're going to have too many things to talk about at

25   4:00 o'clock in the afternoon, when our meet-and-confer is set.

1          So I would ask, if we're going to right now agree to a

2    date, that Counsel continue to meet and confer with me about

3    it, and we talk about it in two weeks.

4          **THE COURT:**  You know, what you're going to do is talk

5    when there is a time that works for you both, and I think --

6          **MS. PAPPY:**  Yes.

7          **THE COURT:**  -- you can resolve this.

8          Look, you raised fair points on each side in terms of what

9    is the proper mechanism for handling confidentiality

10   designations.  I am confident that with, you know, the way that

11   we're going forward -- that this is something where you can

12   talk it through and really figure out how to do this.

13         So whether you talk about it on Thursday or you deal with

14   perhaps the more pressing issues of the production of the

15   electronic information and the other matters, I'll leave up to

16   you-all.  So let's keep going.

17         The next item I had is Request for Production Numbers 250

18   through 252.  I received Ms. Grunfeld's email from January 26th

19   that the plaintiffs served the five additional requests for

20   production on December 21st, and defendants have responded.

21         My understanding was that the parties were going to meet

22   and confer before the five RFPs were propounded so that the

23   plaintiffs understood precisely which data sets the County

24   maintains so that the plaintiffs could then ask for those

25   specific data sets.

1      Did that happen?

2          MR. SWEARINGEN:  Your Honor, if I could say, I recall

3      specifically from the December 20th hearing -- I believe that

4      there was a discussion that we should file those by the end of

5      the week, and we served -- or I'm sorry -- served those RFPs by

6      the end of the week, which we did so.  And then we got your

7      order on December 22nd, after we had served RFP Set 6 on the

8      21st.

9          We did, numerous times, try to meet and confer afterwards,

10     and we had a successful meet-and-confer today even, and I think

11     that that really may be the best use of this Court's time to

12     focus on where -- where the parties are with RFP Set 6.

13         THE COURT:  And you know what?  You are right,

14     Mr. Swearingen, and it was the end of a long hearing.  And I

15     did direct that the County -- excuse me -- the plaintiffs

16     propound them forthwith by the next day, and that then, I can

17     see, would put you in a bind with how do you negotiate them in

18     advance.  I own that one.

19         So -- well, no.  I do because I -- in thinking about it

20     now, I would have perhaps done it a little bit differently.  I

21     was trying to move things along to your benefit, but -- got it.

22         Tell me where you are with respect to each of those

23     requests and what relief, if any, you're seeking from me as to

24     250, 251, and 252.

25         MR. SWEARINGEN:  So the -- the -- we have sent to

1    defendants the information requested by our expert as to the

2    different fields, if you will, or the variables that he would

3    expect would be in some of the data sets at issue in 250, 251,

4    and 252.

5        We informed defendants' counsel, look, we don't know the

6    entirety of the data sets.  It would be helpful if we got a

7    data dictionary or some kind of, you know, information that

8    explained what other variables are included in the data sets.

9        The reason why is there could be a certain variable, and

10   I'll just use a variable that we were able to identify, for

11   example, location.  That's an issue -- that's a variable that

12   we want to hold constant in a multi (Inaudible) regression to

13   better understand whether the location, if holding that --

14   whether holding the location constant shows that, you know,

15   Black or Latinx individuals are stopped at a higher risk -- at

16   a higher rate than other individuals.

17       So we just want a better understanding of what's in the

18   data set.  We requested preliminarily that -- the data that we

19   think would be most useful and would appreciate hearing from

20   defendants about what other variables may exist in the data

21   sets.

22       **THE COURT:**  Okay.  So understanding that I told

23   plaintiffs to propound the RFPs, you know, by the end of the

24   week, which would have been either the 21st or the 22nd, and

25   you did that, has there not been a conversation between the

1    parties directly about what data sets the County maintains such

2    that the County can help educate the plaintiffs and your expert

3    what they have and what they don't have, and then maybe that

4    solves the issue?

5            MR. SWEARINGEN:  We tried numerous times to get that

6    information.  This morning was the most productive

7    meet-and-confer we've had.  And -- and at that meet-and-confer,

8    defendants' counsel identified three different computer

9    systems:  The 9-1-1 call system, the CAD system, and the RMS

10   system.  These are ones that we had identified in our emails to

11   opposing counsel.

12       And what -- I think the upshot of that was defendants

13   wanted more information from us as to which variables and

14   information that we wanted from those.

15           THE COURT:  So --

16           MR. SWEARINGEN:  I think that we have a better

17   understanding of what computer systems exist.  I think the

18   defendants now have a better understanding of the types of

19   information that we want.

20       And I hope that the conversation continues such that we

21   can get a full understanding of what the data set includes and

22   we can come to agreement on what will be produced.

23           THE COURT:  Ms. Pappy, what's your perspective on all

24   this?

25           MS. PAPPY:  Sure.

1      So the -- so they served the -- the requests, and we

2  responded to them and -- and produced documents.  We produced

3  summary documents.  They then wrote to us and wanted to meet

4  and confer.  We -- I asked them for the information that I was

5  provided this morning and was not provided it.

6      And then this morning, thanks to Your Honor's help on

7  Tuesday, you know, I was able to give them an estimate that it

8  actually takes 75 hours to download all of the information that

9  their experts said would take two to three hours to download,

10  and they have now provided -- and I agree that it would remain

11  confidential, that it wouldn't be used against their expert.

12      He -- he or she has provided us a list of, you know, "When

13  you give me the spreadsheets or the data sets, I need it to

14  include this information."  And I got that at 12:30 today, and

15  I'm going to send that off to the folks that maintain these

16  databases to say, "Okay.  What reports can we generate that

17  include this information?"

18      So that's a great step in the right direction, now that I

19  have this information.

20      **THE COURT:**  All right.  And with that in mind, what

21  are you asking for from me at this point or in the future?

22      **MR. SWEARINGEN:**  From plaintiffs, I guess to keep this

23  dispute open until resolved.  I think that it -- our request

24  would be it would be included in the JSRs going forward until

25  resolved just so that we, you know, keep it alive and with the

1  hopes of resolving quickly.

2        **MS. PAPPY:**  I would say maybe put it on the calendar

3  or the tickler reminder for March 7th, and hopefully we'll have

4  to report, "Please take it off because we've resolved it."  But

5  that should give me enough time because I just got this stuff,

6  but I'm going to get it off to my folks today.

7        **THE COURT:**  I don't want to live in the past.  I do

8  want to -- I do want to live in the future, and I've already

9  told you that I will -- I will try my best to own it, where I

10  can do a better job.

11        And I could have done a better job of giving you specific

12  directives with respect to these RFPs because Mr. Swearingen

13  correctly points out that in -- at the conclusion of the

14  December 20th hearing -- and I told Mr. Swearingen to serve the

15  additional five RFPs, you know, forthwith, basically, by the

16  next day or Friday.  That is -- that is correct.

17        But, you know, my order then, on December 22nd, directed

18  the parties to meet and confer, in person or via Zoom,

19  regarding the specific information that plaintiffs seek with a

20  mutual goal of allowing plaintiffs to craft RFPs that seek

21  specific information in the defendants' possession, custody, or

22  control.  And following good-faith meet-and-confer efforts, the

23  plaintiffs shall propound the RFPs by January 5th.  Then the

24  defendants shall respond by the 19th.  I get it.

25        So you know my expectations going forward, what I would

```
1    have hoped is when the plaintiffs, having done what I told you

2    to do orally at the hearing on the 20th, then saw my order from

3    the 22nd, would have said, "Okay.  Time out.  Phone call.

4    Zoom.  Here's what we want right away, if you want us to

5    repropound the RFPs along those lines," and maybe you would

6    have figured it out.

7         That is, I know, the spirit that is going to be utilized

8    going forward.  And I expect just what you're saying, that the

9    parties are going to be able to do that going forward.  My only

10   concern with this is that I want to give you -- and I want to

11   give you time to figure out this issue with your experts.

12        Is this issue really only relevant to expert discovery,

13   Mr. Swearingen, such that I can give you a month to figure it

14   out and not take us off track on the schedule?  Because you do

15   have, you know, expert disclosures that are due on May 10th.

16        MR. SWEARINGEN:  Again, I think that this could be

17   something that can be included in the -- in the JSR on

18   February 20th to keep us focused.  I would prefer to get this

19   earlier than March 7th off the parties' agenda.

20        And if I could add just very briefly, without going back

21   into old history, we did meet and confer once by phone

22   afterwards and traded many emails.  I'm sure the Court does not

23   want to see them, but --

24        THE COURT:  Correct.

25        MR. SWEARINGEN:  -- but many emails were traded on
```

1    RFP Set 6.

2        **THE COURT:**  I take you at your word, Mr. Swearingen.

3        Ms. Pappy, what do you think we should do to help you

4    resolve this and keep the -- things on track?

5        **MS. PAPPY:**  I think March 7th is a more realistic date

6    because I have to get this stuff to my people and get them to

7    give me a response.  You know, if you want an update on the

8    20th, that's fine, but I -- I'd just hate including things that

9    aren't fully vetted on the Court's calendar.

10       What is it that we have due on the 20th?  Can somebody --

11   can somebody remind me because --

12       **THE COURT:**  No problem.

13       What I had asked for you-all to do was to provide me with

14   an update on the -- your discussions regarding electronic -- or

15   ESI.

16       **MS. PAPPY:**  That's right.  That's right.  Yeah.

17       I just -- I think that's a little bit too soon because I

18   have to -- it may be as simple as I send them these parameters

19   that I just got, and they say, "Yeah, sure, we can" -- "we can

20   generate the data for" -- "for just that stuff," and it's as

21   easy as that, and so February 20th is no problem.

22       But if I can't, then I have to go back to plaintiffs'

23   counsel and say, "We can only get this, this, and this, can't

24   do this.  You know, is there some alternative your expert can

25   suggest?"

1          So a little bit of back-and-forth is -- may be required.

2          **THE COURT:**  And it may be, and I'm not ordering you to

3     complete Steps A, B, and C before February -- before

4     February 20th.  I would ask you just to give me an update.

5          **MS. PAPPY:**  Perfect.

6          **THE COURT:**  And if the answer -- if the update is,

7     "It's in progress.  We're on track to figure this out within

8     the next couple of weeks," great, but what I'm going to be

9     looking for is to figure out if there's something that we need

10    to do even earlier.

11         So just give me -- give me an update on that.

12         **MS. PAPPY:**  Sure.

13         **THE COURT:**  All right.  The next issue to address is

14    the issue of the jail inspection dates.  That was raised in

15    Mr. Swearingen's January 31st email.

16         Is this something that you are asking me to resolve?

17    Because I will, and I will set dates, if necessary; and I will

18    do that today, if necessary.

19         **MR. SWEARINGEN:**  I -- I would appreciate the

20    opportunity to discuss that.  I think some progress was made on

21    this morning's meet-and-confer call, but I would appreciate

22    your input into our present predicament, if you would.

23         **THE COURT:**  I would.  I'd be happy to give you input,

24    and then if you think it would be productive for you to take a

25    little bit more time, that is -- would be fine.

1      I am not inclined to order that the inspections proceed in

2  the absence of the County's lead counsel.  Ms. Coleman and

3  Ms. Pappy have been integrally involved in this -- every step

4  of this case since my involvement.

5      And I would be saying the same thing, Mr. Swearingen, if

6  the situation were reversed and this was -- you know,

7  Ms. Grunfeld was doing all of the inspections with Mr. Fischer,

8  and they weren't available.  I wouldn't require it to proceed

9  in their absence over your objection, either.  I do think that

10 is a reasonable request by them.

11     I think the difficulty, it seems to me, is the schedule of

12 your environmental conditions expert.  He or she may be very

13 busy.  I don't know why he or she is unavailable between now

14 and, it looks like, April 10th, but I understand.

15     I would ask the parties to explore a solution whereby, at

16 the very least, the ADA and safety and security experts do

17 their inspections and perhaps the environmental expert does an

18 inspection at a later date or, if you can agree to it and if

19 you can do this within the time period for expert disclosures,

20 that you perhaps agree that there should be a later date where

21 they could, all three, do it together.

22     I'm going to let you-all talk about that, but I will tell

23 you that I -- you know, I think the parties have been working

24 in good faith on this issue.

25     So I am mindful of everyone's busy schedules, but with the

1    understanding that I'm not going to require this to go forward

2    in the absence of Ms. Pappy and Ms. Coleman -- that they're --

3    you'll figure this out.

4              **MS. PAPPY:**  Yes, Your Honor.

5              **THE COURT:**  And if you can't, what I'm going to do --

6    if you can't figure it out, I'm going to set the dates, and I'm

7    going to do it on my own.

8         And those will just be the dates that everyone is going to

9    have to make themselves available, which, in my view, is the --

10    the least palatable alternative.  But it's not going to leave

11    me with anyone -- other than you printing out your

12    environmental expert's Outlook calendar and letting me look at

13    every date that he or she says that they're not available,

14    which I don't want to do.

15        All right.  Let's see.  We've handled the NaphCare motion

16    already.

17        Turning now to the last two issues that I -- well, the

18    last two issues that I have were -- that you-all raised were

19    the CIRB reports and the plaintiffs' responses to

20    interrogatories, and I do want to talk to you-all about setting

21    a further MSC and how we should do that.

22        And maybe this -- that's something that you-all need to

23    talk about, whether it is at this first weekly meeting or at

24    the weekly meeting after that, and we talk about further on

25    March 7th.  But I really want to get back on track with our

1   settlement conferences.

2       I know that we have had a lot on everyone's plates, and

3   continue to do, but I -- I really remain confident that we can

4   make progress on these different issues, and I want to keep

5   doing that.  So we'll talk about that at the very end, but let

6   me -- let me turn now to the issue of the CIRB reports.

7       And I have reviewed, again, my December 13th order

8   granting the plaintiffs' motion to compel production of the

9   CIRB reports, as well as my January 26th order approving the

10  County's redactions -- or proposed redactions for the initial

11  25 reports.

12      I have just recently issued a further order approving the

13  County's proposed redactions for the nine reports that were

14  provided to me most recently.

15      Ms. Pappy, am I correct that the 34 reports that have been

16  identified to me, both in your initial motion as well as in the

17  supplemental submission, include all of the currently available

18  CIRB reports for in-custody deaths at the county jails from

19  January 1st, 2021, to the present?

20      **MS. PAPPY:**  As long as nothing new has been issued,

21  which has not come to our attention, since we submitted that

22  additional nine, I -- I would assume somebody would have sent

23  them to us.  But I'm not aware of any additional -- additional

24  ones being issued.

25      **THE COURT:**  Do you agree that if additional CIRB

1    reports are issued going forward -- that they should be

2    produced consistent with the County's ongoing obligations to

3    supplement its document production?

4            **MS. PAPPY:**  Yes.

5            **THE COURT:**  I am going to respectfully deny the

6    County's request to stay my order.  I do find that the County

7    has not shown a likelihood of success on the merits.

8        First, there is an issue as to timeliness in terms of the

9    14 days to appeal my December 13th order granting the motion to

10   compel.

11       In addition, on the merits, the County does, you know,

12   reassert the arguments that were raised in its motion for all

13   of the reasons set forth in my December 13th order.  I

14   respectfully disagree, and I realize the County's position is

15   in good faith, but my order says what it says.

16       I do not believe that the pending appeal in the *Serna* case

17   provides a basis to stay my ruling.  The issue in that appeal

18   was not Judge Butcher's order directing the County to produce

19   CIRB reports -- oh.  I'm sorry.  I said *Serna*.  I meant *Greer*.

20   I apologize.

21       The -- the issue in *Greer* that is before the

22   Ninth Circuit, to my understanding, is not Judge Butcher's

23   order directing the County to produce CIRB reports in that

24   litigation.  It is, rather, Judge Ohta's order authorizing the

25   disclosure of those reports to the news outlets.

1    Now, there may be overlapping issues with respect to the

2 application of the attorney-client privilege that are at issue

3 in that appeal.  But given that the appeal may well not resolve

4 the issue as to whether the reports are privileged, I don't

5 find that there is a showing that the County may succeed on the

6 merits.

7    I do understand the County's argument that, once the

8 reports are produced in this litigation, it is impossible to

9 unring the bell in that the plaintiffs will have them.  That

10 was also the case in *Greer* and in -- following my rulings, in

11 *Morton* and in *Serna*.

12    The County, certainly, is within its rights to consider

13 whether to designate the CIRB reports under the protective

14 order in this case, meaning that they would used -- be used

15 only in connection with this litigation.

16    And I do find that that would be sufficient to protect the

17 County's interests with respect to maintaining the

18 confidentiality of the reports and, even if Judge Battaglia

19 were to sustain any objection to my ruling, that there would be

20 remedies available to the County, given that the plaintiffs'

21 counsel would not have disseminated the reports.

22    So for all of those reasons, I do respectfully deny the

23 motion to stay.  Given that the County has prepared all of the

24 reports for my review in camera, my tentative would be to

25 direct the County to produce the reports with the authorized

1  redactions on or before Friday, February 16th.

2      And with all of that in mind, Ms. Pappy, I know this is

3  not going the way that you had requested.  I'd be happy to hear

4  from you.

5          **MS. PAPPY:**  Change your mind?

6                      (Laughter.)

7          **THE COURT:**  I'm willing to listen with an open mind.

8          **MS. PAPPY:**  It's okay.  I was fully prepared for your

9  ruling.  We've properly briefed it, and -- and we will go

10 forward as --

11         **THE COURT:**  Very well.

12     Mr. Swearingen, do you wish to be heard?

13         **MR. SWEARINGEN:**  No, Your Honor.

14         **THE COURT:**  All right.  That resolves Issue Number 9.

15     And then Issue Number 10.  We addressed, at the

16 December 20th hearing, the plaintiffs' responses to

17 interrogatories propounded by the defendants.

18     And one issue that you had raised, Mr. Swearingen, was,

19 you know, certain difficulties in locating individuals who may

20 need to verify responses.  I understand that -- that

21 difficulty, and I just would like an update, if you can provide

22 me one, on where things are with respect to the responses.

23         **MR. SWEARINGEN:**  Thank you, Your Honor.

24     I believe that all of the responses are going to be on

25 time, pursuant to the extended timeline, except for maybe one,

1    in which case, we will ask for a short extension to -- to

2    complete our connection with that individual.

3              THE COURT:  And I would -- I would expect that you'll

4    discuss that with Ms. Pappy.  And to the extent that there's an

5    issue with just one set, perhaps that comes to me as a joint

6    motion.

7              MS. PAPPY:  Yeah.

8        I'm not -- I'm not anticipating -- if they need a little

9    bit of additional time, I'm sure that I will be agreeable.

10             THE COURT:  Well, then I will look out for any joint

11   motion to extend the time with respect to any individual who

12   has not been able yet to verify interrogatory responses.

13       I think that raises -- or addresses -- excuse me -- all of

14   the disputed issues before me.

15       Did I miss any, Mr. Swearingen?

16             MR. SWEARINGEN:  Not to my knowledge.  No, Your Honor.

17             THE COURT:  Okay.  Ms. Pappy, did I miss any?

18             MS. PAPPY:  No, Your Honor.

19             THE COURT:  All right.  Again, I really do appreciate

20   working through all of these with you both.  I know that

21   Tuesday's hearing was long, and today's is a bit shorter but

22   still almost an hour and a half, but I do very much appreciate

23   your involvement in it.

24       I know that you have folks that you're going to need to

25   speak with regarding further settlement discussions.  I would

1    simply ask that that's something that you-all add to one of

2    your agendas.  It doesn't have to be this Thursday -- you

3    probably have a full plate -- but maybe it's something that

4    you-all could talk through with your respective teams and,

5    perhaps at the second weekly meeting, talk through how we can

6    make progress.

7         I know that, when we were last together -- and I'll speak

8    in very general terms, given that we're on the record -- there

9    was a concern about having further settlement discussions

10   before you -- the plaintiffs received a ruling from me on the

11   manner in which they were going to conduct the jail

12   inspections.  That ruling has been issued.  The inspections are

13   ongoing.

14        Just know that I would very much appreciate the

15   opportunity to reengage with you-all to see if we can make some

16   progress on an issue-by-issue basis, which I continue to

17   believe is going to be the best way to resolve portions, or

18   maybe even all, of the case.

19             **MS. PAPPY:**  Agreed, Your Honor.

20        As you know, the County is -- is ready, willing, and able

21   immediately to engage in those settlement discussions.

22             **THE COURT:**  Well, let -- let's do it.

23        And if we can do it in conjunction with people being down

24   here already for additional inspections or in a way that is

25   most convenient for you-all -- obviously, we all have busy

1    schedules, and this is not the only case that any of us is

2    handling.  But it is an important one for me to work with

3    you-all on, and I'll do my best to accommodate you.

4         So just let me know, and my hope is that we can discuss it

5    further at the March 7th status conference.

6              MS. PAPPY:  Thank you.

7              THE COURT:  You bet.

8         All right.  That's all I've got.  Compared to Tuesday,

9    this was record time.

10         So, Mr. Swearingen, is there anything further we should

11    discuss, sir?

12              MR. SWEARINGEN:  No.

13         Thank you for -- for all your efforts, Your Honor.

14              THE COURT:  Thank you.

15         Ms. Pappy, anything we should discuss?

16              MS. PAPPY:  One question.

17              THE COURT:  Sure.

18              MS. PAPPY:  I disclosed -- I confessed to

19    Mr. Swearingen that I left all of my notes from the hearing in

20    a restroom at San Jose Airport.

21         Do you anticipate getting that ruling out -- I have the

22    transcript.  I just got it today -- as to what I was supposed

23    to look for and have the County (Inaudible)?  Are -- do you

24    anticipate getting that ruling out soon?  Because I know you

25    asked for Exhibit A.

1      **THE COURT:**  I -- well --

2      **THE LAW CLERK:**  Early next week.

3      **THE COURT:**  Early -- early next week.

4   **MS. PAPPY:**  Okay.

5      **THE COURT:**  We are working on it now.  It's not going

6   to come out today.

7   **MS. PAPPY:**  Okay.

8      **THE COURT:**  We've got -- we -- we are still going

9   through the transcript today.  And, candidly, I want to

10  double-check my notes to make sure that we're all accurate.

11  **MS. PAPPY:**  Okay.

12     **THE COURT:**  So I'm sorry to hear about the loss of

13  your notes in the restroom.

14  **MS. PAPPY:**  Okay.

15     **THE COURT:**  You know, given that we've got the

16  transcript, I -- we'll all work from that, and I'll get it out

17  to you early next week.

18     **MS. PAPPY:**  I just want to make sure that I'm jumping

19  on these things in a timely manner.  And I managed to salvage

20  two pages, but in washing my hands, it blended with the wall,

21  and I walked out.

22     So thank you.

23     **THE COURT:**  Okay.  Got it.

24     **MR. SWEARINGEN:**  I just wanted to acknowledge that the

25  person who prepared the transcript did so in record time, and I

1    wanted to appreciate their hard work.

2           **MS. PAPPY:**  Yes.

3           **THE COURT:**  You know, I -- I sent him an email

4    thanking him for that, and I will -- I'll send him a follow-up

5    email letting him know that you-all appreciate that.  That

6    actually -- that goes a long way.

7        So I'll let him know that when we are finished, and I'm

8    sure that he will be -- he'll be touched to hear that.

9        So thank you.

10          **MS. PAPPY:**  Tell him my thanks.  Yes.  Thank you.

11          **MR. SWEARINGEN:**  We sent him -- we sent him an -- we

12   sent him an email at 6:30 this morning.  He burnt the midnight

13   oil, for sure.

14          **THE COURT:**  Okay.  Got it.

15          **MS. PAPPY:**  Thank you.

16          **THE COURT:**  You bet.

17          **MS. PAPPY:**  Have a good day.

18          **THE COURT:**  I hope you both have a good weekend.

19   Enjoy some, hopefully, better weather, and I will look forward

20   to hearing from you on the 20th.  You know how to reach me if

21   we need to discuss anything in the meantime.

22          **MS. PAPPY:**  Yes.

23       Thank you.

24          **MR. SWEARINGEN:**  Thank you, Your Honor.

25          **THE COURT:**  Take care, everyone.

1    Bye-bye.

2         **MR. SWEARINGEN:**  Bye.

3              (Proceedings adjourned.)

**CERTIFICATE OF TRANSCRIBER**

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Southern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

DATE:  Thursday, February 15, 2024

_____/S/ James C. Pence-Aviles_____

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter