Pages 1 - 69

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

DARRYL DUNSMORE, et al.,           )
                                   )
            Plaintiffs,            )
                                   )
   VS.                             )        NO. 20-CV-00406-AJB-DDL
                                   )
STATE OF CALIFORNIA, et al.,       )
                                   )
            Defendants.            )
_____   )

                            San Diego, California
                            Friday, February 23, 2024

            **TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
                          OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                            ROSEN BIEN GALVAN & GRUNFELD, LLP
                            101 Mission Street, Sixth Floor
                            San Francisco, California 94105
                    BY:  **GAY CROSTHWAIT GRUNFELD, ESQ.**


For Defendants:
                            BURKE, WILLIAMS & SORENSEN LLP
                            60 South Market Street, Suite 1000
                            San Jose, California 95113
                    BY:  **ELIZABETH MARIE PAPPY, ESQ.**




Transcribed By:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                    Official Court Reporter

```
 1  Friday - February 23, 2024                        10:00 a.m.

 2                      P R O C E E D I N G S

 3                          ---o0o---

 4       THE COURT:  All right.  Good morning, everyone.

 5       We're on the record in Dunsmore, et al., versus San Diego

 6  County Sheriff's Department, et al., Case Number 20-CV-406.

 7       May I please have appearances from counsel, beginning with

 8  plaintiffs' counsel.

 9       MS. GRUNFELD:  Thank you, Your Honor.

10       Gay Grunfeld for plaintiffs and the certified class and

11  subclass.

12       THE COURT:  Thanks, Ms. Grunfeld.

13       MS. PAPPY:  Elizabeth Pappy appearing on behalf of all

14  defendants.

15       THE COURT:  Great.  Thank you, Ms. Pappy.

16       Good to see you both, and I very much appreciate the joint

17  status conference statement.  I know you-all have been very

18  busy, and I just -- it was -- it was detailed, and I do

19  appreciate it.

20       So I think what I would like to do today is go through the

21  status report, address the issues, and determine what requires

22  resolution by me, and then I would like to talk about

23  Ms. Grunfeld's email requesting a discovery conference.  And

24  I'm prepared to address those issues with you-all, and then we

25  can go off the record and talk about further settlement
```

1   discussions.

2        So starting with the joint status conference statement,

3   that was Docket Number 548.  I reviewed the statement, and

4   Issue Number 1 deals with production of text messages and

5   instant messages, which I'm going to -- which also includes

6   TechCare and Microsoft Teams and so forth, so general ESI.  And

7   I see the plaintiffs' proposal and the defendants' proposal

8   that are here.

9        Ms. Grunfeld, I know that this is the result of

10  discussions between the parties, which I really do appreciate.

11  Is this an issue that requires my resolution now, or do you

12  think there's benefit to further discussions between the

13  parties?

14       Where do things stand, ma'am?

15           MS. GRUNFELD:  Thank you, Your Honor.

16       The parties did discuss this at the February 21st recorded

17  Zoom meet-and-confer.  We also have made a proposal that I've

18  now refined a bit since -- since the joint statement was filed.

19           THE COURT:  Okay.

20           MS. GRUNFELD:  And what -- what -- I think the Court

21  could resolve it.  It's -- I mean, the issue seems to be the

22  texts that exist on the San Diego County-issued cell phones for

23  staff who are working in the jail, and that is what plaintiffs

24  are seeking.

25       We have asked that our original custodian list and our

1    original search terms be used.  We understand that defendants

2    feel that the Court has already resolved that issue against us.

3    If that is correct, then what we ask is that we be allowed to

4    submit 15 custodian phones, people -- deputies' names who can

5    be searched.  Their phones can be forensically downloaded.

6        We have consulted with e-discovery vendors, who tell us

7    that this is routinely done, that it is not expensive, that

8    these folks would not have to part with their work phones,

9    which we all know would be very, very difficult if it were for

10   an extended time, but that it can be done remotely.

11       And what we were trying to get is information about

12   communications about critical incidents occurring:  Deaths,

13   suicides, medical emergencies within the jail itself.  We

14   believe these are directly relevant to the claims in the third

15   amended complaint, and we believe that they were called for in

16   our document requests served long ago, and we need this

17   information to prepare for the PMKs and the expert reports that

18   are upcoming.

19       So I'm happy to answer questions, but I'd like the Court's

20   views on this because we do have a list of deputies.  We've

21   submitted -- we have not yet given that list to defendants, but

22   we can do that today.  We'd like them to search not only their

23   own custodian list, which they have already started for the

24   Teams messages.  We'd like those texts, and we'd like a few

25   additional people, 15 additional people.

 1          So I'll stop there.  Thank you.

 2          **THE COURT:**  No.  No.  I appreciate that.

 3          Ms. Pappy, of course, I want to hear from you.

 4          But I want to just make sure I understand the contours of

 5    what you're proposing, Ms. Grunfeld.  As I understood the issue

 6    in the report, the ESI includes text messages, and I'm going to

 7    put "Teams messages or communications and TechCare

 8    communications."

 9          Is what you are proposing, Ms. Grunfeld, specific to text

10    messages and -- leaving aside Teams and TechCare, which I

11    realize are different and -- well, just are different.

12          **MS. GRUNFELD:**  Our proposal, given the Court and

13    defendants' prior statements about overbreadth, is that we

14    forego TechCare.  But we do believe that ESI should include

15    text messages, which I define as the things we do on our

16    telephone where we communicate in writing, in texts.  Sometimes

17    they're called IMs.

18          **THE COURT:**  Uh-huh.

19          **MS. GRUNFELD:**  Sometimes they're called texts.

20    They're done on cellular telephones and instant messaging via

21    Teams.

22          **THE COURT:**  Okay.  So when we're talking -- go ahead.

23    Sorry.  I didn't mean to interrupt you.

24          Go ahead, ma'am.

25          **MS. GRUNFELD:**  We are willing to forego TechCare IMs

1    to relieve -- relieve the burden, if we could just please get

2    the other two types of communications in the jail, and we've

3    asked for a year.

4         We understand that defendants did not give cell phones to

5    some employees until six months ago.  Obviously, if that's the

6    case, then there won't be any prior to that time.  But if

7    certain people had San Diego-issued cell phones, which we

8    understand the command staff all do, going back a year seems

9    appropriate to us.

10        **THE COURT:**  Okay.  Thank you.  I appreciate those

11   answers.

12        So we're talking about phones issued by the County, and

13   you're talking -- your -- your proposal is for a one-year

14   period, and it is -- pertains to -- and I'm not trying to cabin

15   you.

16        When I say "text messages," I just want to make sure --

17   there's so many applications that I don't even know about.  I

18   want to make sure I know what we're talking about.  We're

19   talking about what you and I refer to as text messages, Teams

20   communications.

21        I'm not actually sure -- when you say "instant messages,"

22   I don't know what that means.  Just because there's -- like, I

23   know there's an IM function in various apps, but that term -- I

24   don't understand there's any sort of term of -- of art.

25        So when you say "instant messages," Ms. Grunfeld, again,

1    I'm not trying to cabin you unnecessarily.  I just want to make

2    sure I -- we're all on the same page as to the scope of what

3    you're looking for.

4           **MS. GRUNFELD:**  Thank you.

5       We don't yet know whether these phones are Androids or

6    iPhones, and so it's a little hard.  But if we could just use

7    the generic term "text" in whatever format those are, it's a

8    written communication that is done using a cellular device.

9           **THE COURT:**  Okay.  And then are the -- let's --

10   leaving aside whether a third party were to do this or whether

11   the -- somebody would search their own phone, for example, are

12   the categories of information that you are seeking for that

13   one-year period the same categories that are on Pages 2 and 3

14   of those four bullet points of the joint report, Ms. Grunfeld?

15          **MS. GRUNFELD:**  Well, these are the -- these bullet

16   points go to the -- the custodians.  The search terms -- we had

17   asked to use our search terms.  In other words, you need the

18   who and the what to search.

19          **THE COURT:**  Okay.  So these four bullet points -- that

20   was not clear to me from your report.  The bullet points refer

21   to the identity of the custodians.

22          **MS. GRUNFELD:**  Yes.

23          **THE COURT:**  Okay.  So then I -- and this search --

24   okay.  I -- I see.  I think I understand what you're saying.

25       Is it the plaintiffs' proposal that any search for text

1   messages would be done by a third party, or would it be done by

2   the -- the County in the manner that they -- they see fit?

3         **MS. GRUNFELD:**  Well, we could do our own searches if

4   we had the texts.  But, you know, we'll -- at this point, we

5   just want the texts.  I mean, if they want to do search terms,

6   that's fine.  We've given them comprehensive search terms.

7         As the Court is aware, we do not agree with the way they

8   cut our search terms.  I've given some examples of that on

9   Page 3 of the statement -- that's those bullet points --

10   examples of why the search terms that the County has been using

11   are inadequate.

12        They deleted all of our search terms about custody deaths,

13   emergencies.  I could -- I could provide more information, but

14   there's a number of terms we'd like to search in these texts.

15   So --

16        **THE COURT:**  Go ahead, Ms. Grunfeld.  I wasn't

17   interrupting you.

18        **MS. GRUNFELD:**  No.  I -- I -- you know, they're -- our

19   search term list was cut in half and modified.  We believe it

20   encompassed the issues we're looking for, deaths, you know, a

21   variety of issues that were cut out of -- of the -- I'm looking

22   for the list right now, but that's the list we would like

23   searched.

24        You know, we -- we had a proposal on June 22nd, 2023, for

25   86 terms, and "disabled" was deleted.  "Mold" was deleted,

1    "kill, crazy."  I mean, the list goes on of things that we

2    consider relevant.  Again, we're seeking the communications

3    about very serious issues that we allege are occurring in the

4    jails.

5               THE COURT:  Okay.

6          MS. GRUNFELD:  And so I don't know how much detail the

7    Court wants, but I -- I have the list here.  And that would be

8    our request, that these terms be searched for custodians in the

9    jail for one year.

10              THE COURT:  Got it.

11         No.  Thank you, Ms. Grunfeld.  I appreciate all of those

12   answers to my questions, and I do have a better understanding

13   of the plaintiffs' proposal at this point.

14         Ms. Pappy, I have also reviewed the defendants' position

15   on this, which is Pages 4 and 5 of the joint status report --

16   actually, sorry.

17         Ms. Grunfeld, let me -- one more question, if I could.

18   You said that you're -- you're requesting 15 custodians, but

19   are these -- these are 15 custodians in addition to the

20   custodians that the defendants have agreed to run; is that

21   correct?

22              MS. GRUNFELD:  Well -- so there's been an iterative

23   process, as the Court sees.  And in this joint status

24   statement, you know, we're asking for a group of custodians

25   that we understand -- who have been rejected.

1      So in the meet-and-confer, we were told that defendants

2  would either run their own list, or we could choose five

3  people.  Our position is that five people is too few.

4      So I have created a list of 15 people, and my request

5  would be that defendants run the 15 people that I have not

6  provided yet -- but I will -- who I have taken from incident

7  reports.

8          THE COURT:  Okay.

9          MS. GRUNFELD:  And, of course, some of those may not

10 even be at the jail, or -- or I may -- you know, I don't know

11 because I haven't given that to Ms. Pappy yet -- and

12 defendants' custody list.

13         THE COURT:  Okay.  Got it.

14     No.  Thanks, Ms. Grunfeld.

15     So I'm going to assume, for these purposes, that it's 15

16 additional custodians, is the plaintiffs' proposal,

17 understanding that you don't know at this point, Ms. Grunfeld,

18 whether those people all had county-issued cell phones or

19 whether they were at the jail.  Got it.

20     Okay.  All right.  Ms. Pappy, thank you for your patience.

21 I understand the County's position, that it has its ESI search

22 terms and custodian lists, and let me ask you this:

23     The County states that text messages and IMs are part of

24 the ESI order.  Has the County searched text messages -- and I

25 guess we're talking about texts and Teams, and you tell me if

1    we need to separate it because those are two different things,

2    in my view.

3        Has the County begun the process of collecting ESI

4    specific to text messages and instant messages as well as

5    Microsoft Teams messages from its list of custodians and its

6    list of search terms?

7            **MS. PAPPY:**  It is in process of running it as to

8    Teams.  We haven't done anything as to texts because we have no

9    agreement yet.

10           **THE COURT:**  Okay.  So as to Microsoft Teams, the

11   County is running its custodians and its search terms.

12       And what is your estimated date for the completion of

13   that, Ms. Pappy?

14           **MS. PAPPY:**  I think they started it a week ago, so

15   kind of right around the time the Court's order came out.  So I

16   would say another week or so, week or two, to run the search

17   and then get the information to plaintiffs' counsel.

18           **THE COURT:**  I do appreciate the additional information

19   about what -- who -- who has county-owned phones and who

20   doesn't.  That was something that we didn't know at the last

21   hearing, and so this is helpful.

22       Let me ask you this, Ms. Pappy.  There's no agreement yet

23   as to text messages, and what is the County's position as to

24   appropriate parameters for searching text messages?

25           **MS. PAPPY:**  Yeah, and I want to -- I want to -- I'll

1   answer that, but as part of that answer, I want to go back to

2   the question you asked Ms. Grunfeld as to whether this was

3   appropriate to be resolved by you today.

4       And the answer is no.

5       **THE COURT:**  Okay.

6       **MS. PAPPY:**  I'm -- I'm a little befuddled at what I'm

7   hearing today from plaintiffs about what their proposal is

8   because it is nothing close to what they talked about in our

9   meeting two days ago.

10       And understanding that the IDC request was put together

11   last Friday -- so we didn't have the benefit of the meeting

12   this week --

13       **THE COURT:**  Uh-huh.

14       **MS. PAPPY:**  -- but a proposal was made by me.  The

15   plaintiffs were looking like they were on board in concept.

16   They didn't agree with my number of five, but, of course, I was

17   going to propose a number they weren't going to agree with,

18   and -- and they were going to come back with something greater.

19       But the discussion on Wednesday was to the effect that the

20   reason that they wanted this information, from what they

21   explained, is -- is deaths and --

22       **THE COURT:**  Right.

23       **MS. PAPPY:**  -- and they called them critical

24   incidents.  I need -- I need something more specific than that,

25   but what I said was, "Okay.  Can you go back and look at

1    critical incident reports, which you have, and go" -- "you
2    obviously have all the deaths, and pick five," was my proposal.
3    "Pick five."
4            **THE COURT:**  Five what?
5            **MS. PAPPY:**  "Five incidents that you want."
6            **THE COURT:**  Okay.
7            **MS. PAPPY:**  It is -- I don't know -- I don't really
8    know what the proposal is today because they never responded to
9    that proposal.
10        But I said, "Pick five, and let's come up with a joint
11   list of people's names, whoever they are.  I don't" -- "you can
12   call them command staff, deputies, whoever they are.  Let's
13   come up with that list of those people who would be percipient
14   witnesses to whatever those incidents are" -- because that's
15   what I understand the plaintiffs are looking for here, is they
16   want to see communications from the people that were in the
17   thick of whatever is going on -- "and let's search those
18   folks."
19        And we never really got to the question at all of -- of
20   what search terms would be applied.  But their focus was on
21   these deaths and on critical incident reports, and so that's
22   how we left things.
23        And one of the other things that I said was, "Look, I am
24   firm in my position that you may not relitigate the ESI search
25   term list and custodian list."  They had the chance to do that.

1    They refused to compromise, and the Court made an order.

2        I take exception to the statement that we deleted issues

3    out of the search terms.  We did not.  We kept issues in but

4    removed search terms and modified search terms to make sure

5    that we actually captured their issues because their search

6    terms were coming up with way too many or were coming up with

7    none.

8        So -- so the search terms -- the entire ESI search term

9    list and the entire custodian list that plaintiffs gave us in

10   June -- my rhetorical question is:  What does that have to do

11   with any of the -- anything on any of those other than the word

12   "deaths," the word -- I don't know -- "use of force"?  But just

13   by way of example, those would be the only two search terms

14   that relate to what, at least plaintiffs represented to me, was

15   the reason for these searches.

16       So I'm not sure why we're talking about that whole -- I'm

17   a little confused about the fact that now we're talking about

18   the entire custodian list plus 15.  That certainly wasn't my

19   proposal.  That's not what plaintiffs were talking to me about

20   on Wednesday because the stated purpose for all of this is

21   deaths and -- and the critical incidents.

22       I hear them.  I heard them on Wednesday and said, "Look, I

23   am not telling you now that I'm willing to go away from that

24   ESI search term list, but come back with a proposal of" -- you

25   know, my suggestion was 5.  If they want 15, if they want them

1    to go back a year, those are all things that I would consider,

2    you know, potentially recommending to the County.

3        But -- so to suggest that today this can be resolved, I'm

4    yet again a bit blindsided by -- I never got this proposal from

5    them, and I'm -- and the County is not going to agree to the

6    original search term list or the original custodian list

7    because it's not proportional to what their stated purpose is:

8    Deaths, critical incidents.

9        So I would ask that you tell us to go back next Wednesday

10   and vet the proposal that I thought we were working on.  If

11   plaintiffs want to change it, they can send me an email.  I

12   can, you know, vet that with my client.  We can talk about it

13   next week, but this is not ripe for resolution.

14       **THE COURT:**  Okay.  I understand your position, and I

15   appreciate your position.

16       **MS. PAPPY:**  Oh.  One more thing, Judge, just to tell

17   you.

18       There's apparently a system, which plaintiffs educated me

19   on, where we can send a kit to the people.  It's a kit that --

20   that a service sends to -- I don't know if they send it

21   directly to the person or the County would distribute them --

22   but that you could just plug it into your phone, and it

23   downloads the requested information.

24       I have a request into my service for a price on that so

25   that, you know, once we were to compile this list of, I

1    thought -- of the deaths and -- and critical incidents folks,

2    we can figure out how many people there were, how much it was

3    going to cost, and kind of keep the conversation going.

4        So that is one other thing that I'm --

5            **THE COURT:**  Okay.

6            **MS. PAPPY:**  -- following up on for plaintiffs.

7            **THE COURT:**  Okay.  Well, first, I would note that I do

8    appreciate the fact that you-all were discussing this at your

9    most recent weekly meeting.

10        It is my true hope that the -- having these weekly

11    meetings is going to help you-all, you know, work through

12    certain issues.  And where you can't work through them

13    entirely, you know, come to me with the parties' positions

14    crystallized as best you can.

15        So let me ask you this, Ms. Grunfeld.  I assume -- assume

16    you were at the -- the last meeting between the parties, which

17    I guess was two days ago.  If you weren't, you can tell me, and

18    I don't want to ask you questions about it.

19            **MS. GRUNFELD:**  I was, Your Honor.

20            **THE COURT:**  Okay.  Great.

21        So was -- was that the discussion between the parties as

22    to utilizing a sort of an incident-based framework for

23    searching text messages rather than just, you know, a list of

24    search terms?  And if so, is that something that is worthy of

25    consideration?

1    Because I do -- tethering the text message searches to

2    specific use-of-force incidents or in-custody deaths does make,

3    at least initially, some sense to me to figure out who might

4    have relevant information, and then it's tied directly to

5    particular incidents.  And I'm not saying a certain number of

6    incidents is appropriate, five versus ten or whatever.

7        But is that -- is that an appropriate framework to

8    consider, Ms. Grunfeld?

9            MS. GRUNFELD:  Possibly, Your Honor.

10            THE COURT:  Okay.  Great.

11            MS. GRUNFELD:  First of all, thank you for your

12    extraordinary efforts in this case, and -- and I do believe

13    that the recorded Zoom mandatory meet-and-confers are going to

14    help us, and we've had two of those so far.  There will be two

15    more, before we meet with the Court on March 7th, to discuss

16    that issue further.

17            THE COURT:  Okay.

18            MS. GRUNFELD:  However, that is not sufficient to

19    resolve the many discovery issues that are outstanding in the

20    case, and one of the confusing issues right now is that we did

21    make a detailed proposal for the searching of text messages on

22    February 18th.

23        However, we are being told that defense counsel does not

24    want to receive written communication about these issues in

25    between the meet-and-confers.  So I have been waiting to send

1    further details about our proposal until I had an opportunity

2    to discuss this issue today.

3        We do not believe that critical incidents alone is

4    sufficient for two reasons:

5        First, we don't have all the information about everyone

6    who was there for every critical incident over the last year,

7    and we can broadly define critical incidents to include deaths,

8    medical emergencies, suicide attempts, suicides, overdoses, and

9    those kinds of things.

10       But it is very difficult to search all the documents that

11   we have, and we don't have all the documents.  For example, we

12   do not have the watch commander reports, where these incidents

13   are listed.

14       So for us to come up with custodians that are sufficient

15   is difficult, but we do have 15 names that we have available to

16   send, but we also think it should be broader.  And if

17   defendants want to run their custodian list, plus our 15 names,

18   that would work for us.

19       As for search terms, you know, we'd prefer our list.  If

20   they want to run their list, that would be a start.

21       **THE COURT:**  Understood, and I appreciate your

22   position, Ms. Grunfeld.  I guess what I'm having difficulty

23   understanding, quite honestly, is -- is what is the disconnect

24   right now?

25       Because I'm told that there's, you know, a discussion

 1  that's happening at your meet-and-confer and -- but that some

 2  communications are being sent; some communications are not

 3  being sent.  And I do not want to get into an argument about

 4  who should be emailing who and when and how.

 5       I think our collective goal -- your collective goal, which

 6  I fully support, is to reduce, you know, the -- you know, I

 7  don't want anybody barraging anyone else with emails in either

 8  direction -- that's no good -- but to promote, you know, the

 9  ability of the parties to communicate by email.

10       Ms. Pappy, you said that sometimes, you know, the

11  emails -- I think you referenced the ones from Ms. Chartoff --

12  are particularly helpful to you in framing issues.  And how do

13  we -- how do we go about doing that?  I -- I guess what I'm

14  understanding is, really, two very different views about what

15  happened two days ago.

16       And so here's what I think I want to do.  I think I'd like

17  to review the Zoom, and I want to understand this.  And I --

18  I'm not accusing either of you -- or suggesting, I should say,

19  that either of you is not being straight with me.  I -- I've

20  dealt with you enough and had the pleasure of dealing with you

21  both enough to not have that sense at all.

22       But I just -- I'm perplexed, and I think this is going to

23  help me to -- to figure this out.

24       So what -- how long was the meet-and-confer, Ms. Grunfeld?

25            MS. GRUNFELD:  A little over an hour, Your Honor.

1    **THE COURT:**  Well, I can't tell you that I'm, you know,

2    looking forward to listening to it.  But I can tell you that

3    this case -- I agree with you-all -- is very important.  And if

4    that is something that you think would be good use of my time,

5    then I'll listen to it.  You tell me.

6        I mean, was -- was the -- was the majority of it regarding

7    this particular issue?

8        **MS. PAPPY:**  We don't think so -- I don't think so.  I

9    mean, we covered a lot.  We've -- the meet-and-confers in

10   person have been, quite frankly, terrific.

11       **THE COURT:**  Great.

12       **MS. PAPPY:**  We haven't resolved every issue, but I --

13   you know, you can have the Zoom.  I'm happy to send it to you,

14   if you want it, but I don't want or need the Court to review

15   that Zoom.

16       We --

17       **THE COURT:**  Okay.

18       **MS. PAPPY:**  I think the problem here is that we were

19   mid-meet-and-confer, and having a presentation to the Court as

20   if, "Yeah, we can resolve this today" is -- is not consistent

21   with the conversation we had.  I think Ms. Grunfeld would --

22   would at least agree with that.

23       The substance of it, and the point of having these

24   meet-and-confers, is to work through these issues.  And I agree

25   with you.  Barrages of letters and emails in very short periods

1   of time is not productive.

2       But I want to make clear that we fully expect and

3   appreciate short, concise emails.  I think I sent one to

4   plaintiff yesterday saying, "Hey, this is an issue.  Can we

5   just tee it up for next Wednesday?"  Here's a little para- --

6   or sentence about what the issue is.

7       That kind of thing is extremely helpful, and that's what

8   Ms. Chartoff and I were essentially doing, is, "Here's the

9   bullet points.  Let's talk about them.  Put your response in

10  there."

11      So -- so those kinds of emails, I find extremely helpful.

12  It's the letters and the emails outlining, you know, positions

13  in argumentative ways that -- that just really don't move the

14  ball forward.

15      I -- I am -- I'm really adamant that I want this to

16  continue to go to the meet-and-confer because at least then we

17  can come back with a sense -- I did not hear anything at that

18  meeting on Wednesday that -- that they wanted not just the

19  custodian list for these incidents but because it doesn't make

20  any sense because those people don't necessarily have any

21  connection to it.

22      And these are issues I'd like to flush out next Wednesday,

23  and then if we -- we -- plaintiffs are -- you know,

24  bullet-point their position to me either in writing or in the

25  Zoom, and we're both on the same page, and we can come back and

1    say, "Okay.  Boop, boop, boop.  Here's the issues.  We need you

2    to decide them," it's a far more productive use and what I

3    thought the purpose of this process was.

4          So that would be my request, but I'm happy to send you the

5    Zoom, if you want it.

6               THE COURT:  I don't want it.  I mean, I really don't.

7          I mean -- and that's not to be rude to you-all but because

8    the idea was not for me to police every conversation that you

9    have.  That -- it's to really -- as a backstop in case it's

10   truly necessary.  And I hear what you're saying, that you don't

11   think it's truly necessary yet, Ms. Pappy.

12         So here's -- here's what I'm going to do.  I'm not going

13   to -- I'm not going to resolve this issue today.  You-all have

14   your weekly meeting next Wednesday, and I do want this to be at

15   the forefront of what you're discussing, whether it's a

16   continued discussion or something else or a different -- a

17   different direction.

18         And then I want to see you-all again next Friday to

19   understand if there's anything that needs to -- you know, what

20   needs to be resolved by me and how best to resolve it.

21         My only issue, Counsel, is that I have got -- next

22   Thursday and Friday are -- are fairly booked for me, and I'd be

23   looking at trying to fit you in at -- you know, Friday, it's --

24   it would have to be -- I have a discovery hearing at -- I

25   could -- well, actually, I could do it at 9:30 on Friday

```
 1   morning, if that works for you-all.
 2            MS. GRUNFELD:  Just one moment, Your Honor.
 3            THE COURT:  Sure.
 4       And I could actually do either 9:30, or I could do it at
 5   10:00.  I want to give you as many different times as possible.
 6            MS. GRUNFELD:  9:30 is fine with me.
 7            THE COURT:  Okay.  Great.
 8            MS. PAPPY:  Can -- 9:30 works for me.
 9            THE COURT:  Okay.  Great.
10            MS. GRUNFELD:  I would say, Your Honor, that we're
11   running out of time.  I mean, discovery closes April 16th.
12   Person most knowledgeable depositions begin March 18th.
13       So that's --
14            THE COURT:  I would respectfully respond that you were
15   ordered to resolve your ESI issues last July, and you didn't,
16   and it was never raised to my attention until much, much later.
17   And I am doing everything I can for you to try to help you move
18   forward.
19            MS. GRUNFELD:  Thank you, Your Honor.
20            THE COURT:  All right.  We're going to set a further
21   status conference and -- on Friday at 9:30.
22       And I will say this, and this is directed to everybody.  I
23   do not want any more proposals being provided to me -- or any
24   proposals -- not saying there have been -- but any proposals
25   provided to me that have not been flushed out between the
```

1    parties because, if there's something that anybody is hearing

2    for the first time with me, it doesn't do us any good.

3        And so that's what I'm expecting of you-all next week.

4    Whether it can happen in one meet-and-confer session or there

5    needs to be more than one, I will defer to you and your sound

6    judgment.

7        So we'll set this for March 1st at 9:30 a.m.  I'm not

8    going to require you to file anything before then because

9    that's a very tight turnaround for you-all, and I want to give

10   you this space to handle the other issues you need to.  But I

11   will expect to hear, you know, what you have been able to agree

12   to and, if there is an issue, how you best think I can resolve

13   it.

14       All right.  Issue Number 2 is Interrogatory Number 25, and

15   I'm told that the defendants are investigating whether the

16   information in Subsection (n) can be added to existing

17   spreadsheets or provided in a separate spreadsheet.

18       Do you have an update on that, Ms. Pappy?

19       **MS. PAPPY:**  I don't.  They're working on whether they

20   can -- those -- those spreadsheets were as of a moment in time,

21   and they're trying to figure out if they can get that

22   information as that moment in time, or Ms. Grunfeld's proposal

23   was, "Can you just produce new ones sort of, basically, as

24   of" -- "a snapshot in time as of today with the information in

25   (n) included in that spreadsheet?"

 1         And the third alternative is that if, for whatever reason,

 2    the information in Subsection (n) is not in the same database

 3    such that it can be included in those spreadsheets, figure out

 4    a way to produce that information.

 5         So that's what my folks are doing.

 6              THE COURT:  How much time do you need to resolve that

 7    issue?

 8              MS. PAPPY:  It's Friday.  I should -- in fact, I'll

 9    follow up with the client again right now -- I know that they

10    had tasked someone with it -- and see if I can't get an

11    update -- update and, hopefully, solution by next Friday.

12              THE COURT:  Okay.  I do want an answer by Friday as to

13    that, Ms. Pappy --

14              MS. PAPPY:  Yeah.

15              THE COURT:  -- just one way or the other, and then

16    I'll issue an appropriate order.

17         Ms. Grunfeld, do you wish to be heard on that issue,

18    ma'am?

19              MS. GRUNFELD:  No.  Thank you.

20              THE COURT:  All right.  Now, the third issue was

21    documents related to alternatives to incarceration.

22         Again, Ms. Pappy, I'm told you were investigating

23    additional documentation that may be available.  What -- do you

24    have any update for me?

25              MS. PAPPY:  Probation is pulling what they have, and

1  Sheriffs is pulling what they have.

2        THE COURT:  Can you get me a firm answer on that by

3  Friday for next week?

4        MS. PAPPY:  Oh, yeah.  I mean, hope- -- and hopefully

5  production; or, at a minimum, I will also update plaintiffs on

6  Wednesday.

7        THE COURT:  Ms. Grunfeld, do you wish to be heard on

8  Item Number 3, ma'am?

9        MS. GRUNFELD:  No.  Thank you, Your Honor.

10       THE COURT:  All right.  Then let's continue on the

11  record.

12     There are two issues that are raised in Ms. Grunfeld's

13  email.  The first relates to the defendants' subpoenas to the

14  California Department of Corrections, and the second involves

15  plaintiffs' responses to defendants' interrogatories.

16     I think we can -- I think we can resolve both of these

17  today.  So let's -- let's see if we can do that.  I would like

18  to help you do -- put a couple of issues behind you.

19     First, I would note that, for whatever reason, the -- I

20  pulled a representative subpoena.  I pulled the one to

21  Mr. Archuleta.  The subpoena requires compliance in the Central

22  District of California.

23     So any motion practice would need to be initiated there

24  and then could be transferred here with the consent of both

25  parties or upon a finding of exceptional circumstances by the

```
 1   Central District.
 2        So I -- but let's talk it through because my -- my
 3   expectation would be that this would come to me.  And I would,
 4   you know, welcome that, of course, given the work we've done
 5   together on the case.
 6        But just -- with that noted, let me ask you this,
 7   Ms. Pappy.  I see that there are two -- it looks like two
 8   subpoenas relating to every one of the named plaintiffs.  The
 9   first subpoena seeks medical records, and the second subpoena
10   seeks case summary, legal documents, and the ERMS file.
11              MS. PAPPY:  Uh-huh.  Yes.
12              THE COURT:  Is that -- is that generally correct?
13              MS. PAPPY:  Yes.
14              THE COURT:  All right.  Ms. Pappy, does the dispute
15   right now relate to both subpoenas or the subpoena seeking the
16   legal status and -- and ERMS files?
17              MS. PAPPY:  It -- I think it's fair to say that it
18   relates to both at the moment.
19        First --
20              THE COURT:  Okay.
21              MS. PAPPY:  -- as to the Central District, can --
22   can -- Ms. Grunfeld had -- had proposed withdrawing and
23   reissuing the subpoenas, which is, unfortunately, not
24   acceptable because we need these records for the plaintiffs'
25   depositions.
```

1    But how do we avoid the plaintiffs having to file anything

2  in the Central District?  I don't want to make them do that.

3        **THE COURT:**  I know you don't, and I don't, either, and

4  I want to help you.  But that's what Rule 45 requires, and I

5  want to help -- look, I want to help you-all avoid this.

6        **MS. PAPPY:**  Yeah.

7        **THE COURT:**  I really do.

8    So let's -- let's see if we can do that, understanding

9  that, if there -- if something was filed, it's going to come to

10  me.  And I am mindful of what Ms. Grunfeld noted, that we are

11  moving up against deadlines, and I do want to provide you with

12  rulings as quickly as possible.

13    So let me ask this:  Ms. Grunfeld, using Mr. Archuleta's

14  subpoena as an example, what's the objection to the subpoena

15  seeking medical information?

16        **MS. GRUNFELD:**  We have proposed that medical

17  information be provided up to three years prior to the filing

18  of the complaint, which would take us back to March 2017.

19        **THE COURT:**  Okay.

20        **MS. GRUNFELD:**  We don't agree that information is

21  relevant, but we understand that defendants could make a

22  credible argument.

23    And so we have made that proposal, and CDCR will not

24  produce the documents without an amended protective order of

25  some kind, and we have also sent that to defendants with that

1    suggestion.

2        So there, to our mind, is not a significant dispute

3    regarding medical records from CDCR.  The issue is the C-file.

4    That's what we'll be moving to quash on.

5            THE COURT:  Okay.  And that's -- that's in response to

6    the other subpoena?

7            MS. GRUNFELD:  Well, in my file, I only have one

8    subpoena, and it checks a number of boxes.  So I'm a little

9    confused by this discussion.

10       But --

11           THE COURT:  Okay.  Okay.

12           MS. GRUNFELD:  -- in any event, as far as the medical

13   records go, as long as defendants are willing to limit those --

14   because, for example, some of them go back to the 1980s and

15   '90s.  And we are not willing to agree that that's

16   proportional, relevant, or appropriate.

17       But we did propose a limited set of medical records under

18   the protective order, and we are eager to resolve that, if we

19   can.

20           THE COURT:  So just so we're clear, what I received

21   for each of these individual -- like Mr. Archuleta, there

22   appear to be two separate subpoenas.

23       One subpoena is to California Correctional Health Care

24   Services seeking medical records, and one subpoena is to the

25   California Department of Corrections seeking all the other

1  records:  Case summaries, legal documents, and ERMS files.  So

2  that's what I'm talking about, Ms. Grunfeld.

3      And does that -- are there two subpoenas for each of the

4  named plaintiffs, Ms. Pappy?

5          **MS. PAPPY:**  I think so.  I think you had to subpoena

6  those separate entities --

7          **THE COURT:**  Okay.

8          **MS. PAPPY:**  -- to get -- yeah.

9          **THE COURT:**  All right.  Let's focus in, then, on what

10  we'll call the medical record subpoenas.

11      You know, we had a lot of discussion, at our hearing on

12  the plaintiffs' motion to compel, Ms. Pappy, regarding the

13  relevant time period.

14      So I guess the question I have is:  Should we simply use

15  the same relevant time period, which is essentially a

16  three-year time period, for each of the named plaintiffs'

17  medical records?

18          **MS. PAPPY:**  We -- we agree -- we agree -- the

19  defendants agree to March 1st, 2017.

20      Here's the problem.  The CDCR is telling us we can't do

21  that.  It's too burdensome.

22          **THE COURT:**  Okay.  I see.

23          **MS. PAPPY:**  And -- and their complaint is -- and I had

24  emailed plaintiffs' counsel something yesterday after a

25  conversation that Susan and I had and that we had with CDCR to

1  try to resolve their issue, to resolve plaintiffs' and CDCR's.

2      So they keep their files not like the County does.  Like,

3  the County will have Ms. Pappy's records, and it's just a

4  chronological PDF.

5          **THE COURT:**  Uh-huh.

6          **MS. PAPPY:**  CDCR has labs, they have physical therapy,

7  they have medical, and they're all separate PDFs.

8          **THE COURT:**  Okay.

9          **MS. PAPPY:**  And so to go through each of those

10 manually -- so you'd have to go through and scroll and find --

11         **THE COURT:**  Okay.

12         **MS. PAPPY:**  -- March 1st, 2017.

13     And so the CDCR told us, "That's fine if we can do it

14 easily.  But if we can't, and if we have to scroll through

15 hundreds of pages" -- "pages of medical records, we're not

16 doing it."

17     So one of the things that we proposed is -- to plaintiff

18 is, look, because of their pushback -- we're fine with

19 March 1st -- is that if CD- -- let CDCR make the burden call.

20 And if they send us stuff that -- and they've told us they'll

21 agree that, where they can easily limit it to March 1st,

22 they'll do that.

23     But if there are huge portions of the file where they

24 can't, and it's burdensome to them, they'll send them to both

25 of us, and then we will agree in advance that those will not be

 1  used.  I don't -- I mean, I can send them to Gay's office.  I

 2  don't care, but they won't be used by anybody.

 3         **THE COURT:**  Why is that -- that sounds like the

 4  parties are in agreement, Ms. Grunfeld; is that right?

 5         **MS. GRUNFELD:**  Yes.

 6     I -- I didn't know what kind of communication was coming

 7  out of CDCR.  I was not privy to it, and I think we're actually

 8  talking about CHCF [sic] or whatever they're called, the

 9  medical --

10         **THE COURT:**  Yes, we are.  Yes, that's right.

11         **MS. GRUNFELD:**  Yes.

12     But in any event, yes, that will be fine.  Again, the

13  concept is let's have a time frame.  Let's have a protective

14  order.

15     And so I think we can work that out.

16         **THE COURT:**  I think so, too.

17     Okay.  No.  I appreciate that.  That is helpful to me, and

18  then the time frame that we had with all of the plaintiffs'

19  requests was the three-year period ending December 31st, 2023.

20  So it would be '21, '22, and '23.

21     I -- I'm not saying you have to agree to that with these

22  records, but that was -- when I had mentioned the relevant time

23  period earlier in this status conference, that's my

24  recollection of the relevant time period that we were utilizing

25  for purposes of our prior hearing.

1    **MS. PAPPY:**  Well, we were using that relevant time

2    period for what my clients had to produce, not necessarily --

3        **THE COURT:**  I understand.

4    **MS. PAPPY:**  -- prior medical records.

5    So what the agreement between the parties was was

6    March 1st, 2017, for -- for CDCR stuff.

7        **THE COURT:**  Okay.  If that's what you-all are going to

8    agree to, then fine, but it sounds like that can be resolved.

9    What is the area, then -- it sounds like the area of

10   disagreement is on this subpoena to CDCR.

11   And, Ms. Grunfeld, what do you specifically object being

12   produced, even if it's under the protective order?

13       **MS. GRUNFELD:**  So there are 11 categories to what we

14   call the C-file, Your Honor, and we object to nine of those as

15   having absolutely no bearing on the issues in this case and

16   being highly invasive of the privacy rights of our clients.

17       **THE COURT:**  This C-file is responsive to which one of

18   these?  I see there's "Case Summary" with four X's, "Legal

19   Documents" and "ERMS File" with two X's.

20   Which one is the C-file?

21       **MS. GRUNFELD:**  The entire ERMS file and the entire

22   SOMS file.

23       **THE COURT:**  Okay.

24       **MS. GRUNFELD:**  Those are just acronyms that basically

25   mean that the old C-file, which was a paper document, is now

 1    electronic.

 2            THE COURT:  So it's the ERMS and the SOMS acronyms

 3    that you are objecting to.

 4        Okay.  And there are 11 cat- -- there are 11, you said,

 5    categories of documents within ERMS and SOMS, and you object to

 6    nine of them?

 7            MS. GRUNFELD:  Yes, Your Honor.

 8            THE COURT:  Okay.

 9            MS. GRUNFELD:  We're willing -- the legal documents,

10    which are the first view -- you know, the case summary and the

11    legal documents, which are also part of ERMS and SOMS, even

12    though they're broken out separately in this subpoena -- those

13    are public records.

14        And so we would ask that they be put under the protective

15    order.  We're going to designate them confidential, but we have

16    no objection to CDCR producing those in this case to

17    defendants' counsel.

18        However, the remaining items, which are, you know, a whole

19    variety of documents:  Chronos, which are little statements

20    regarding safety, regarding classwork, regarding release

21    planning; Board of Parole hearings documents; psychological

22    interviews; disciplinary charges.

23        All of these documents are really tantamount to a

24    personnel file, and we believe that we have strong case law

25    that indicates that a plaintiff does not waive every privacy

1    right she has by bringing a lawsuit.

2         And I would submit that, particularly here, where

3    plaintiffs are serving as representatives for the class, they

4    have not waived all of their rights, nor is there any relevance

5    to pre-jail and post-jail conduct or behavior or activities or

6    interactions with other people.

7         And I would particularly direct the Court's attention to

8    two cases, *Gutierrez v. Mora*, 2019 Westlaw 8953125; and, just

9    this week, *Kovalenko*, 2024 Westlaw 664691, which is a

10   Magistrate Judge decision by Judge Hixson here in the

11   Northern District, in which he called attempts to get a

12   personnel file for a plaintiff the kind of fishing expedition

13   that courts consistently deny.

14        So we don't see the relevance.  We see the -- the harm and

15   the invasion of privacy and the lack of proportionality,

16   especially if you look at Mr. Dunsmore's -- they've asked for

17   these files under three different -- as I understand it,

18   different C-file numbers, you know, CDCR numbers going back

19   decades.

20        And so the relevance is -- is quite minimal.

21        **THE COURT:**  Can I ask you a favor?

22        **MS. GRUNFELD:**  Sure.

23        **THE COURT:**  I've blocked out an hour for you-all, and

24   I have Counsel calling me at 11:00 for a presettlement

25   conference call, but I want to finish our conversation.

 1    So can you give me one minute just to move that to 11:15?

 2  And I want to keep talking to you-all.

 3         **MS. GRUNFELD:**  Yes.

 4         **THE COURT:**  Give me just a sec.

 5    Thank you.

 6         **MS. GRUNFELD:**  Yes, Your Honor.

 7         **MS. PAPPY:**  Gay, what was that first case?  I got

 8  *Kovalenko* as the second -- first one.  What -- second one, but

 9  what's the first one?

10         **MS. GRUNFELD:**  It was in our letter to you.  It's

11  called *Gutierrez* -- *Gutierrez*, and it's 2019 Westlaw 8953125.

12  And that's out of the Central District, December 18th, 2019.

13         **MS. PAPPY:**  And is that a class action case?

14         **MS. GRUNFELD:**  No.

15         **THE COURT:**  All right.  Thanks for your patience.

16    So, Ms. Pappy, these records from CDCR are for records of

17  the 13 class representatives for time periods in which they

18  were not incarcerated in county facilities; is that correct?

19         **MS. PAPPY:**  Correct.

20         **THE COURT:**  So what is the relevance of the classwork,

21  if any, that they've completed in CDCR facilities or their

22  disciplinary records?  I mean, do you -- do you really want

23  these C-files?

24         **MS. PAPPY:**  Yes.

25         **THE COURT:**  Okay.  Why?

1          **MS. PAPPY:**  There are con- -- yeah.

2      There are confidential portions of these, which the CDCR

3  will not produce and we are not asking to be produced.

4  There's -- they're confidential for various state law reasons,

5  and CD- -- and we're not asking for those.

6      The -- the classwork that they've pre- -- they've -- I'm

7  assuming that's, like, a GED.  Ms. Grunfeld would know better

8  than I.  But, yeah, I would agree.  I don't really care if they

9  took their GED.  The -- the main point of contention -- we

10 never specifically talked about classwork.

11     The plaintiffs' communicated real concern was their

12 disability files -- I mean, their discipline files.  And the

13 two that -- that, to me, are the most significant -- and I

14 would agree to a time limitation.  We also never talked about a

15 time limitation.  We sort of never got past discipline -- are

16 psych and -- and discipline files.

17     I think those are extremely relevant to -- especially

18 historical to the class representatives, who are supposed to

19 have standing to represent -- fairly represent every single

20 class member on every single issue.  Not all 13 need to -- need

21 to relate to every single issue, but they need to have standing

22 to do that.

23     If -- if there's a psychiatric issue -- a historical

24 psychiatric issue that has caused lockdown, has caused

25 administrative -- administrative separation, has caused any

1   kind of -- of segregative housing in these people's past, that

2   is something that is relevant to the issues that we're

3   litigating here -- is that if Mr. Dunsmore comes -- and we'll

4   just use him as an example.   I'm not suggesting that this is or

5   isn't him -- but that if he comes into our facility and says,

6   "They overuse it.   They overuse lockdown, and they overuse

7   administrative separation and keep people in there for too

8   long," and yet Mr. Dunsmore has a long history of violence in

9   the prior prisons, constantly being put in there, yet, in our

10  case, he's saying, "I never do anything wrong.   I'm a perfect

11  model citizen in the facility," we can impeach him with the

12  history of his discipline from the prior facility.

13      And that applies to each and every one of these folks.

14  The psych is also extremely significant, essentially, for the

15  same reasons because, if there are historical discipline issues

16  relating to psychiatric issues, and he's saying now, "I

17  don't" -- "I have never engaged in any such conduct.   I do

18  not" -- "I don't have any psych issues that could be found in

19  medical records," then that is relevant to be able to impeach

20  the claims that they're being made -- that are being made, that

21  they're somehow being -- these individuals are somehow being

22  treated wrongly as representative of treatment that all people

23  get in these facilities, and they're saying, "There's nothing

24  wrong with me, and I've never had these problems before.   It's

25  just in the County Jail."

```
 1        That's why it's relevant.
 2            THE COURT:  So there -- I see that as sort of two
 3   distinct reasons that you're offering.
 4        One would be:  Are these class representatives adequate?
 5   And the second would be:  If somebody were to testify, how
 6   would you impeach them?
 7            MS. PAPPY:  Yes.
 8            THE COURT:  Okay.  So the first issue -- isn't that
 9   behind us?
10            MS. PAPPY:  No.
11            THE COURT:  I mean, the class has been certified.
12            MS. PAPPY:  No.
13            THE COURT:  So tell me -- tell me why this -- again,
14   leaving aside impeachment, tell me why that the adequacy of
15   these individuals as class representatives is still an issue.
16            MS. PAPPY:  Because a class certification is not a --
17   a, if you will, final determination of whether these people
18   are -- are proper class representatives.  If -- if discovery
19   uncovers that they are not proper class representatives, then
20   we can make a motion to decertify the whole class or -- or have
21   this person removed as a class -- a class representative.
22        Certainly, plaintiffs could replace somebody.  That's -- I
23   mean, I'm not arguing that issue, but they still have to --
24   they're still subject to attack on the merits, and the case law
25   is very clear on that --
```

1          **THE COURT:**  Okay.

2          **MS. PAPPY:**  -- which is one of the reasons I convinced

3    the County to stipulate to it, that --

4          **THE COURT:**  Right.

5          **MS. PAPPY:**  -- "They're going to get it anyways, but

6    you have a right to challenge this later."

7          **THE COURT:**  Sure.

8       Why are these -- when were these subpoenas issued?  It

9    was --

10         **MS. PAPPY:**  January?

11         **THE COURT:**  -- January 31st.

12      Okay.  I -- why wait until now?

13         **MS. PAPPY:**  We've been busy responding to document

14   production requests.

15                       (Laughter.)

16         **THE COURT:**  Okay.  No.

17      Okay.  That's the reason I -- okay.  Then -- all right.

18      Ms. Grunfeld, what is your position, ma'am, with respect

19   to the arguments Ms. Pappy is raising, that these --

20   specifically disciplinary and psych records -- those -- those

21   alone would be potentially relevant to adequacy of each of

22   these named plaintiffs as class representatives as well as

23   possible impeachment?

24      And if they were relevant in -- to a claim or defense, why

25   would production of those records, pursuant to an attorneys'

1    eyes only provision, be sufficient?

2        **MS. GRUNFELD:**  Your Honor, this is the first I've

3    heard these arguments.  So bear with me.  I think, given the

4    time -- I was told that they want these records to impeach my

5    client's credibility.

6        As far as relevance to the adequacy as representatives, I

7    don't get it.  These people are standing up and saying that the

8    jail is unconstitutional, and they want to talk about what

9    happened to them at the jail.  And we've agreed to have them

10   deposed, and we've done everything we can to cooperate with

11   that process.

12       **THE COURT:**  All right.  I saw your stipulation.  Thank

13   you for that.

14       **MS. GRUNFELD:**  Yes.

15       So it just feels very much like a fishing expedition, an

16   attempt to discredit my clients, who are doing a great service

17   to the people of San Diego.  Frankly, I don't know what's in

18   these records, but I do feel that they have some privacy rights

19   to their time in a different place before and after their

20   experience in the jail.

21       I am going -- I have drafted a brief on this issue.  Given

22   the timing constraints, I would ask on the record -- under the

23   Central District rules, we need seven days, and -- normally,

24   and I would ask that defendants agree to a shorter period.

25       I would like to give them our brief on Monday, and I would

1  ask that they be willing to return their portion on Thursday so

2  we can go ahead and get our motion to quash on file by, you

3  know, Friday the 1st, and then the motion to transfer would be

4  stipulated.

5      So --

6      **THE COURT:**  Can I -- can I interrupt with a question,

7  Ms. Grunfeld, please.

8      **MS. GRUNFELD:**  Sure.

9      **THE COURT:**  Ms. Pappy, you know, there presumably was

10 a reason to choose Titan Legal Services in Torrance as the

11 place of production, but -- I mean, the --

12     **MS. PAPPY:**  Not -- nothing magic other than --

13     **THE COURT:**  Right.

14     So --

15     **MS. PAPPY:**  -- that these places -- these places are

16 in -- and Ms. Grunfeld had suggested, "How about just changing

17 the address?"  I don't care, but --

18     **THE COURT:**  Right.

19     **MS. PAPPY:**  -- I don't want to re-serve the subpoenas.

20 I'm fine changing the address.  I'm just not going to re-serve

21 them.

22     **THE COURT:**  Well -- but if you were to -- I mean, I --

23 and, again, I'm not trying to tell you what -- you have the

24 right to serve subpoenas as you see fit, and then, of course,

25 there's process involved.

1    But, gosh, it would be easier for this just to be with a

2    place of compliance in San Diego, and then there would -- you

3    know, I hear what Ms. Grunfeld's concern is.  It's a legitimate

4    concern about the timing, and then we've already got so much on

5    our plate.

6    Is there truly an objection to re-serving the subpoenas

7    with -- on CDCR with a compliance location at Ms., you know,

8    Coleman's office in San Diego or some legal services in

9    San Diego and then giving us time for you-all to talk about

10   this and me to address it with you-all next Friday?

11   Because I -- I -- it really -- when I hear Ms. Grunfeld

12   saying that she was not aware of the -- the class

13   representative standing argument, like, that -- you know,

14   that's something that I -- I want to give you-all time to talk

15   about.

16   And I don't want to burden any of my colleagues in the

17   Central District unnecessarily with this, given the amount of

18   time that we've spent working out these issues.  And I

19   certainly don't want to impose unreasonable time deadlines on

20   Ms. Grunfeld, in particular, for filing her motion.

21   So what can we do to resolve this, Ms. Pappy?

22       **MS. PAPPY:**  Yeah.

23   I mean, I told them on Wednesday, "I don't want you to

24   have to do it, either.  Let's talk to the judge about what" --

25   "how we can make it so that you don't."

1    I want -- the CDCR has been given an extension.  We're

2    fine with just keeping that extension over -- is there a reason

3    why we can't just stipulate, between the plaintiffs and us,

4    that -- that the place for production will be changed to a

5    location in San Diego instead of re- -- instead of going

6    through the expense of re-serving them?

7              THE COURT:  I will leave that to you-all.  If you

8    agree that the place of -- the place of compliance is in the

9    Southern District of California, that is the requirement that I

10   look to.  It's -- which is -- I agree.

11             MS. PAPPY:  Right.

12             THE COURT:  I see how it's a bit of an artificial

13   distinction, perhaps, between agreeing that I can simply

14   resolve a dispute where the place of compliance is still in a

15   different district versus if you are both in agreement that the

16   place of compliance really should be in San Diego, then -- I

17   want to help you-all resolve this.

18        And, Ms. Grunfeld, I don't want you to have to scramble to

19   file this unnecessarily.

20             MS. PAPPY:  Yeah, and I don't -- I don't want to -- I

21   don't want them to file it, nor do I want to scramble to

22   resolve it.

23        So if the plaintiffs will stipulate -- sign a stipulation,

24   which I'm happy to prepare, that says that -- that we will

25   agree that the subpoenas are amended, we'll get that to CDCR so

1    that they know that they don't have to produce them in LA,

2    then, is that agreeable?

3            **THE COURT:**  Ms. Grunfeld, I don't want to put you on

4    the spot, but go ahead, ma'am.

5            **MS. GRUNFELD:**  Thank you.

6        What I -- what I think we need, to protect our clients, is

7    a stipulation, as you're suggesting.  And if you prepare

8    something, perhaps it could even say, "The subpoena served on

9    such-and-such a date," then say the address in Torrance, "are

10   hereby amended to say..."  And, in fact, Titan does have an

11   address in San Diego County.

12       So you could -- you know, we can all sign that, file it,

13   and then send it to CDCR.  That should be sufficient.

14           **THE COURT:**  I appreciate you-all being as practical

15   about that as you can, understanding the constraints of

16   Rule 45.

17       Let's say it comes to me, then.  What -- what should

18   happen, Ms. Grunfeld?  Do you think that there is room for

19   you-all to -- understanding Ms. Pappy's position that this goes

20   to adequacy of class representatives, and not discounting what

21   you're saying about the importance of people willing to stand

22   up and serve as class representatives -- but I see those as

23   distinct issues.

24       Is this something that, you know, just needs a briefing

25   schedule from me as soon as the stipulation is -- is filed, or

1    is this something that you think -- if we're limiting -- if

2    you-all agree on the medical records, can there be a further

3    agreement, or at least potential progress, when you talk on

4    Wednesday?

5         **MS. GRUNFELD:**  I don't think so, Your Honor.

6         The -- so I'd like a briefing schedule.  The mention of

7    psych records -- I'm not sure what that means because I don't

8    think those are in the C-file.  I think those are in the

9    medical file.

10        But when I refer to the psychological evaluation, that's a

11   Board of Parole hearings document, highly confidential.

12   Perhaps that would not even be produced.  I don't know because

13   they do weed out certain things.

14        But I can tell you that we are not going to agree that

15   people's disciplinary charges while they are in a different

16   prison at different time periods are, in any way, relevant to

17   the adequacy of the class representatives, and they are

18   invasive of people's privacy.

19        So I think we should brief it.

20        **THE COURT:**  Would there -- would it be the plaintiffs'

21   position that if there are, like -- let's say a named plaintiff

22   were to have engaged in some sort of disciplinary matter, and

23   that involved a false statement, for example, by that

24   individual.

25        Is it the plaintiffs' position that that information

1    should not be discoverable as impeachment information?

2         **MS. GRUNFELD:**  Yes.

3         **THE COURT:**  Why is that?

4         **MS. GRUNFELD:**  Well, first of all, I have extensively

5    litigated false RVRs in CDCR.  So a charge of a false statement

6    by CDCR is a meaningless hearsay statement.  They do not allow

7    due process in their RVR litigation and proceedings, and so I

8    do not believe that should be used to impeach anyone.

9         If there's other things in the C-file, I've already agreed

10   that they can have the publicly available information, and

11   they're also privy to all behavior incidents and everything

12   that happened in their own jail system.

13        **THE COURT:**  No.  I understand, and let me ask you

14   this, Ms. Grunfeld.  One thing that I'm sort of flushing

15   through is, you know, what exactly I would be ordering.

16        So let's say -- let's say I were -- I've been told that

17   there's this C-file -- or the ERMS file.  I don't know exactly

18   what it contains, and I don't know that necessarily -- it

19   sounds like maybe you-all don't know exactly what it contains

20   because you don't have it yet for each of these individuals.

21        So do you think it would even be possible for me to issue

22   an appropriately tailored order saying, "Okay.  CDCR, you

23   produce these specific items from the ERMS file but not these

24   specific items," or is that something that is best done with

25   a -- the parties seeing what's in the files and then with a

1    potential clawback?

2        I'm just trying to think this through because I don't know

3    what's in there, and I'm -- I'm hesitant to issue a ruling or

4    consider what -- I don't know the scope of what's at issue.

5        **MS. PAPPY:**  Well, why don't I -- for next Wednesday's

6    meet-and-confer, why don't I -- because we're in touch with the

7    CDCR attorney, why don't I ask him for a list, and I'll provide

8    that to plaintiffs' counsel, and maybe that will cause some

9    resolution or not.

10        But at least when it -- if it gets to a motion, they will

11    have the list, and we will have the list, and you will have the

12    list.

13        **MS. GRUNFELD:**  I have the list.  It's in -- it's in

14    Title 15, and I can provide it to you.  I mean, I have the list

15    of what would be in the file, and I'd be happy to send that

16    over.

17        **MS. PAPPY:**  Yeah.

18        I'll get -- I'll call the CDCR because I'd rather hear it

19    out of their mouth than in some title regulation because we all

20    know that they're not called the same thing.  That -- so I'll

21    get it from CDCR.

22        I'm happy to receive what Ms. Grunfeld wants to send, but

23    I think it's better to get it from CDCR's mouth so we all know

24    what we're talking about, and they know what we're talking

25    about, if the Court issues an order.

1          **THE COURT:**  It is not clear to me, Ms. Pappy, how

2    disciplinary files from different institutions would be

3    relevant to a claim or defense in this case.

4          And if there is going to be briefing on that, I really

5    want to understand that because it's just -- it doesn't -- if

6    we're talking about allegations of unconstitutional conditions

7    in the San Diego County jails, I just -- I'm just giving you a

8    heads-up that that's what I'm struggling with, Ms. Pappy, right

9    now, is why -- why does that open the floodgate for every time

10   one of the named class representatives allegedly engaged in,

11   you know, discipline?

12         I'm not sure that you would say that's analogous to the

13   plaintiffs' request for, you know, all grievances, for example,

14   relating to the jails, which I, if I recall correctly, denied

15   on a motion to compel.  And it does strike me that, you know,

16   overbreadth would be a true concern here for many of the same

17   reasons that I, you know, expressed at the prior hearing.

18         So, again, I'm not making -- issuing a ruling on that,

19   Ms. Pappy.  I -- but we are talking about, you know -- well,

20   we're talking about records that -- for which there is a right

21   to privacy, and I realize that the protective order often

22   accounts for that.  That was my ruling on the CIRB reports.

23         And so -- but, you know, every -- the entire psych file

24   for every one of the named plaintiffs, the entire disciplinary

25   file -- I really would want to understand why that is relevant

1  to a claim or defense and proportional to the needs of the

2  case, keeping those concerns in mind and the protective order.

3      So here's what I'm going to do.  I will await your

4  stipulation, and that will give us a better sense of the timing

5  on this issue.  Hopefully, the benefit of my just initial

6  thinking is helpful to you-all in trying to resolve this issue.

7      But if you can't, we will do a fast briefing schedule on

8  this, and I will issue a prompt ruling on it, most likely on

9  the record orally, so that we can move quickly and then follow

10  it up with a brief written order.  I don't want to take this

11  under submission if there needs to be briefing on it.

12      **MS. PAPPY:**  Sure.

13      And I -- if I may just briefly respond --

14      **THE COURT:**  Sure.

15      **MS. PAPPY:**  -- that -- that -- you know, credibility

16  is a huge issue, a huge issue.  And we have people claiming

17  things that are essentially unverifiable because -- because

18  they're just their statements.  They're not -- there are no

19  witnesses.

20      And the ability to attack credibility, yes, undercut these

21  people.  I don't -- this is litigation.  It's not personal.

22  It's litigation, and my client has a right to due process.  To

23  deny them information that goes directly to credibility, I

24  think, is -- would be an incorrect ruling on the law.

25      Now, if there's a discipline file that the -- the act that

1    caused the discipline that has nothing to do with it, first of

2    all, I'm not going to use it because I don't care about it.

3    But that is something that -- unfortunately, again, without

4    seeing the discipline file, I can't know which are -- which are

5    appropriate and which aren't.

6         So one of the solutions that we're, of course, going to

7    propose, because it sounds like this motion is going to happen,

8    no matter what, is that we get the records, and then we meet

9    and confer on which ones shouldn't be used, which ones should

10   be used, something like that, because a blanket, "You can't

11   have any discipline," even if it relates to, as Your Honor

12   pointed out, merits -- and I understand Ms. -- Ms. Grunfeld's

13   position about how bad the CDCR process is.

14        I'm sure CDR- -- -CR would probably disagree, but that's

15   for the trial judge to decide, whether something is -- is

16   admissible.  So --

17             **THE COURT:**  Okay.

18             **MS. PAPPY:**  -- with that said, I will get -- I will do

19   my homework and get the list from CDCR and ask them whether

20   there's any kind of list of what types of discipline -- is

21   there, like, a cover sheet that they can give to us to vet

22   that?  I kind of doubt it, but I'll find out.

23             **THE COURT:**  I would like to have more information on

24   that, and we -- because the dispute is really focused on

25   disciplinary records and -- and psych records.

```
 1        Am I correct, generally speaking, Ms. Grunfeld?

 2        MS. GRUNFELD:  We object to all aspects of the C-file

 3   other than the two I mentioned, all nine items at this time,

 4   and I would like to be copied on any communications with CDCR

 5   about my clients' files.

 6        MS. PAPPY:  I'm not going to copy Counsel on

 7   communications with the attorney about, "Can you send me a

 8   list?"

 9        THE COURT:  All right.

10        MS. PAPPY:  This is my -- my problem.  This is my

11   responsibility.

12        THE COURT:  Hang on.  Ms. Pappy, hang on.

13        I'm not going to order that anybody copy each other on

14   emails, based on this record.  That's something that you-all

15   can discuss amongst yourselves or between yourselves and the

16   CDCR attorney.

17        I wasn't trying to confine you unnecessarily,

18   Ms. Grunfeld.  I understood there were nine categories.  So I'm

19   not trying to say you can't object to anything else.  I just

20   thought those were the two -- the two big categories.  Is that

21   correct, or is there really more besides disciplinary and psych

22   records?

23        And if you're not sure, then you can just tell me that.

24        MS. GRUNFELD:  I believe there's more, Your Honor.

25   I'm pulling up my brief right now.  I mean --
```

1          THE COURT:  Okay.

2          MS. GRUNFELD:  -- I have the list.  I just don't have

3     it right in front of me.

4          THE COURT:  No problem.  No problem.  I was just --

5     I'm trying to just understand the scope of -- of the issue.

6          All right.  I will await your stipulation.  And then, as

7     soon as that happens, if I can resolve this issue, I will, and

8     I will speak with you about it next Friday as to how best to

9     proceed.

10         With respect to the medical records, though, is there any

11    reason to hold that up?  You-all are going to agree on it, and

12    that can go forward.

13         MS. GRUNFELD:  I believe we need a stipulation and

14    order from the Court, and I will look at whatever Ms. Pappy

15    sends over promptly.

16         THE COURT:  Why do you need an order from the Court on

17    the medical records, Ms. Grunfeld?

18         MS. GRUNFELD:  As I previously wrote to Ms. Pappy, the

19    protective order we have in place does not cover CDCR.  In my

20    last communication with CDCR's counsel, they said they needed a

21    protective order to produce the medical records.

22         So --

23         THE COURT:  Oh, I see.  You're talking about the

24    stipulation being for a protective order.  I didn't understand

25    that -- that aspect of it.

1        MS. GRUNFELD:  Well -- and I would ask that that

2   document recite the time frame.

3        THE COURT:  Okay.  Okay.

4        MS. GRUNFELD:  And it can say that, "To the best of

5   ability" or "This is what we plan to use" or -- you know, to --

6   to reflect the caveats that were discussed earlier today.

7        MS. PAPPY:  I'll -- I'll talk to Ms. Grunfeld about

8   that offline.  I'm not sure if it makes sense to include that

9   stipulation as a part of the protective order, adding them to

10  the protective order, because it's just a simple matter of

11  adding them.

12      But maybe the other stipulation --

13        THE COURT:  Okay.

14        MS. PAPPY:  -- we can combine them.

15        THE COURT:  All right.  Got it.

16      I will -- is that Mr. Murray?  Can you tell him to hold?

17  Thank you.

18      All right.  Then I'll look forward to your update on that

19  on March 1st at 9:30 a.m.

20      All right.  I know that there's a lot going on, but I,

21  again, was heartened to see, from you both, that you think --

22  oh, wait.  I'm sorry.  There's one more issue.  I apologize.

23      Can I cut to it, Ms. Pappy?

24        MS. PAPPY:  You can.

25        THE COURT:  I don't see the deficiency in these

```
 1    interrogatory responses.  I think that they are general in
 2    parts.
 3         But from reviewing Mr. Clark's and Mr. Archuleta's, I see
 4    that, throughout them, there are specific references to these
 5    individuals.  And I -- I -- given the nature of the case, I'm
 6    not surprised to see that there are some general statements
 7    about the alleged deficiencies, you know, on an
 8    institution-wide basis.
 9         But just for example, with respect to Mr. Clark, I would
10    note, on the bottom of Page 7 -- and I'm not going to get into
11    specifics on the record because that's private information --
12    there is information specific to Mr. Clark.  And that is not
13    the case for every interrogatory, but I would note that the
14    same is true on Pages 12 and 13.  I also saw it on Page 16.
15         And I haven't looked through the remaining responses to
16    give you examples, but it is not at all clear to me why these
17    would be insufficient.  I know that Mr. Archuleta's responses
18    also contains information specific to him, again, on Page --
19              MS. PAPPY:  Your Honor, maybe I can save you some
20    time.
21              THE COURT:  Yeah.
22              MS. PAPPY:  I don't -- I think -- I mentioned to
23    plaintiffs on Wednesday that -- that I would -- or maybe it was
24    two weeks ago -- that I would look back at Number -- well, the
25    Number 1s, and the Number 1 is, "What specifically happened to
```

1    you?"  And I agree with plaintiffs and with the Court that

2    there's -- that each of these people said, "These are the

3    things specific to me."

4        My problem is with the responses to Number 2 and Number 3.

5    And if -- if Your Honor will consider these as a trio, each

6    medical/mental/dental, and then the rest of the issues.

7        I asked -- we asked three questions -- essentially three

8    questions, and that was, "How did" -- "how do you think that

9    you were personally affected?"

10       And each of them provided pretty good detail.  I mean,

11   there are some unmeritorious objections sort of repeated

12   throughout these, but I'm not going to move to compel on that

13   because they're -- they're just superfluous to me.

14       But as to the 2 and the 3 and the trio, that's where I

15   don't have information.  And what you get is this sort of

16   incorporation, for example, on Number 2, of "They're

17   constitutionally inappropriate.  We're repeating everything

18   that we said in the complaint."

19       If Mr. Archuleta doesn't know how things -- how, you know,

20   his deficiencies should be addressed, then he just needs to say

21   that.  It should be a one-sentence response, not boilerplate

22   objections and a regurgitation of what's in the complaint.

23   What's in the complaint is not Mr. Archuleta's personal

24   knowledge, and I get that.

25       I'm not trying to play tricks here.  This is actually much

 1    easier than it seems, is that -- for example, I have a little

 2    trouble saying that he doesn't know in that -- I think

 3    Mr. Archuleta was the one who talked about he had a neck

 4    surgery and an ongoing neck problem.

 5        Well, wouldn't Mr. Archuleta's response to Number 2 be,

 6    "Well, they should have given me my neck surgery.  I should

 7    have had it by now.  I should have had it within a month.  I

 8    should have had it in two months"?  But he doesn't.  He doesn't

 9    say anything about what was inadequate about the system

10    vis-à-vis him.

11        I mean, maybe even it would have been satisfactory --

12    because I do it sometimes, and I'm not always opposed to it --

13    is "Please refer to the response above" if the response above

14    answers the question asked, which is, "What are you saying that

15    they should have done?"

16        Let me give you an -- the example of surgery.  In jail

17    facilities, they -- there is no constitutional right to every

18    single medical procedure available.  There's a -- there's a

19    legal standard, and so every person who wants a surgery doesn't

20    necessarily get it.  Whether an independent outside doctor

21    says, "Yeah, he should have it," that isn't the standard inside

22    of jails.

23        So is Mr. Archuleta saying that that should be the

24    standard inside of jails, that "I should have gotten this

25    surgery, and I should have gotten it in a month or two months

or three months"?  I have no idea, and he's supposed to be the

representative class member.

    I also understand and told plaintiffs that, "Look, I get

that some of this information is going to be subject to expert

testimony and that you can't know, and these people can't

know."  And I'm not asking to unfairly, you know, put it on

them and say, "Aha," at trial, "they didn't know."

    Just say, "It's subject to expert testimony.  This

responding party does not have that information."  That's an

appropriate response, and that applies to Number 3 -- again,

these are trios -- Number 3 as wells -- as well.  I asked them,

"Specifically, how did this affect you?"

    "Mr. Archuleta:  I live in pain on a scale of 1 to 10.

Every single day, I live in pain on a scale of 1 to 10."

            **THE COURT:**  But he answered that one.

            **MS. PAPPY:**  In Number 3?

            **THE COURT:**  Doesn't he incorporate Number 4, which

provides that specific information?

            **MS. PAPPY:**  No.  In Number 3, he says, "Plaintiffs" --

"subject to" -- "subject to, and without waiving the foregoing

objections, plaintiff and all members of the certified class

and subclass are affected by the failure to provide adequate

health care."  And then he incorporates Number 4.  That talks

about mental health.

    So what does mental health have to do -- have to do

```
 1   with -- oh.  I'm sorry.  I'm reading the wrong thing.  Number 3

 2   is mental health, and then he incorporates Number 4.  I

 3   apologize.  The -- yeah.  It's Number 2 as to the mental --

 4   medical -- that is one of my problems -- all right? --

 5   inadequate medical help.

 6        So Number 3 -- I don't understand why Number 4 is not in

 7   Number 3.  But, again, I'm not -- you wouldn't see a motion

 8   from me because he refused to respond to 3 but then

 9   incorporates the response for Number 4.  It seems a little

10   backwards, but let's just go with it.

11        Then if you look at --

12            THE COURT:  Is --

13            MS. PAPPY:  -- Number 5 -- and if you look at

14   Number 5, Your Honor -- I'm going to stop soon.  If you go to

15   Number 5, "Describe, in detail, the specific ways in which each

16   of the categories that affected you have to be changed."

17        Why isn't the response to that, you know, "For me

18   personally, I would" -- "I" -- "I should have had care in

19   30 days" or "I don't know.  It's subject to expert testimony"?

20   I don't understand why that information, which I consider to be

21   very necessary for our defense and possible summary judgment

22   motions, isn't being compelled of the plaintiffs.

23        I'm not asking them for anything difficult.  I'm actually

24   asking them for something easier than what was typed up in

25   these 30-plus-page responses.
```

```
 1          THE COURT:  Hang on real quick, please.

 2          MS. PAPPY:  I know you're time-pressed, Judge, and

 3   if -- and if we need to continue this to next Friday, I'm --

 4   I'm comfortable doing that.

 5          THE COURT:  Well, I guess the difficulty is I

 6   didn't -- I did not realize the specific interrogatories as to

 7   which you claim there were deficiencies, Ms. Pappy.

 8          MS. PAPPY:  Why don't I give you something further.

 9   You tell me when and in what format, and I can give you

10   something further to really hone in on the specifics --

11          THE COURT:  Well, I'd prefer you give Ms. Grunfeld

12   something further --

13          MS. PAPPY:  Oh, I know.

14          THE COURT:  -- if you haven't already.

15      Have you?

16          MS. PAPPY:  Yes.  We gave her a summary of what the

17   issues were --

18          THE COURT:  All right.

19          MS. PAPPY:  -- but let me revise it because, at the

20   time I gave it to her, it included Number 1.  So let me revise

21   it, shorten it.

22          THE COURT:  No.  I'm not trying to -- I'm not trying

23   to cut this short.

24      Ms. Grunfeld, do you wish to be heard on what Ms. Pappy

25   said?
```

1          **MS. GRUNFELD:**  Your Honor, we did discuss this, and we

2    believe that we have answered sufficiently and fully and

3    consistently with Rule 33.

4          And we also objected to these interrogatories as invading

5    the attorney-client privilege and the attorney work product

6    privilege because, obviously, the changes that need to happen

7    in the jail, which we have recited here -- but they are going

8    to be subject to further expert testimony, and that will be

9    provided on May 10th and following.

10         **THE COURT:**  Let me ask you this, Ms. Grunfeld.

11         If the answer is that specific -- let's just say, for

12   Number 2 -- Interrogatory Number 2, that, you know, the

13   specific ways in which each and every deficiency regarding

14   medical care must be changed to make it better -- I mean, your

15   clients are -- I mean, you know, I'd be hard-pressed to

16   understand how any, you know, County inmate would have that

17   information.  And all you can talk about is what -- what they

18   know.

19         Is the response for each of those that, truly, that is

20   going to be based on expert testimony?  I'm not trying to

21   confine you.  I'm asking you to think about this, and if it is,

22   is that the answer?

23         I don't know -- I haven't thought through any of this

24   because this is all on the fly, and I didn't know that 2 was

25   specific.  But is there a -- and I don't know specifically why

1    Ms. -- what Ms. Pappy is going to do with that.

2        So I'm not trying to put anyone on the spot here, but

3    maybe that's -- maybe that's an answer because I do think that

4    there is specific information for each of the two plaintiffs

5    whose responses I reviewed as to the -- those plaintiffs.

6        And if there are specific interrogatories as to which

7    Ms. Pappy believes that she's entitled to more information,

8    then maybe that additional information is truly in the form of

9    expert discovery.  I don't know.

10        Look, I don't -- I also don't want to kick every issue to

11    next Friday because I have got a number of other matters that

12    I'm going to need to attend to, but I can -- hmm.

13            **MS. PAPPY:**  I want to be efficient.

14        And I think that, at a minimum, I can pare these down

15    significantly from meet-and-confer and pare them down

16    significantly for the Court because -- I'll keep going as long

17    as you want to go today, Judge, but I know you have another

18    hearing, and I want to be more efficient about my presentation

19    to the Court, to save us time.

20            **THE COURT:**  It's not a question of how -- how -- what

21    I want to do.  It's a question of what I have to do --

22            **MS. PAPPY:**  I know.

23            **THE COURT:**  -- with respect to the other litigants --

24            **MS. PAPPY:**  I know.

25            **THE COURT:**  -- who are scheduled to appear before me.

1    All right.  If you think you can pare this down,

2  Ms. Pappy, and meaningfully do so, then you can tell me more

3  on -- on Friday.

4    And I will -- I'm going to block out at least a full hour

5  for you-all on Friday.  I want to make some real progress with

6  you-all.  So I'm going to block that out on my calendar now.

7    **MS. GRUNFELD:**  So, Your Honor, may I recite what we

8  need to do before Friday, so we're clear?

9    **THE COURT:**  Sure thing.

10    **MS. GRUNFELD:**  We're going to negotiate a stipulation

11  regarding the medical records and regarding the place of

12  compliance with the subpoenas, and we are going to continue to

13  meet and confer on the subpoenas and the texts and IMs and the

14  interrogatories.

15    Did I get everything right?  Because I'm not sure I'll be

16  able to get the transcript of this discussion before Wednesday.

17    **THE COURT:**  No.  Under- -- no.  I appreciate that,

18  Ms. Grunfeld.  I want to make sure that I'm on the same page

19  with you-all as well.  I think that's right.

20    Ms. Pappy, did you have anything else?

21    **MS. PAPPY:**  No, I do not.

22    **THE COURT:**  All right.  Well, let me ask you-all this,

23  then, just on the record.

24    I know that you've been busy, but when can we reengage on

25  settlement?  Because I think that -- I would like to move on

1  parallel tracks, and I think one could help the other and vice

2  versa.

3      So we've been -- it's been difficult over the last few

4  months, for understandable reasons, but I think that we had

5  talked about, you know -- well, dealing with the allegations

6  regarding overdoses in the jail or, you know, medical and

7  mental health care.

8      When can we reengage, and how can we best do that?  I do

9  want to understand that from your perspective.

10     Why don't I begin with you, Ms. Grunfeld.

11         MS. GRUNFELD:  We're available whenever the Court and

12  defendants are available, Your Honor.

13         THE COURT:  I think when we last spoke regarding

14  settlement, the consensus was, at least from the plaintiffs'

15  perspective, that you needed clarity from me on protocols for

16  the jail inspections to go before we could really talk more

17  about the mental health care and medical care in the jail.

18  You've had -- I've ruled on that.  You've resumed your

19  inspections of the jail.

20     So are we -- what should we address next, Ms. Grunfeld?

21         MS. GRUNFELD:  Well, I would suggest we continue with

22  what we had before, which was overdoses and the ADA, but we

23  could also try to address medical and mental health care.  We

24  did provide a detailed proposal in December on all aspects of

25  settlement.

1    So we're open to whatever works for everyone.

2          **THE COURT:**  Ms. Pappy, where should we start from your

3    perspective?

4          **MS. PAPPY:**  Yeah.

5    What was sent in December was a consent decree, and so I

6    think that the ADA -- I mean, we've been asking to go -- to

7    talk about the ADA for months.  So I would say ADA and drugs, I

8    think, are -- are logically the next place where everybody is

9    going to be prepared to talk.

10    And -- and once we get through those, I think -- and even

11    as we're at those, we can talk about where we are on plaintiffs

12    getting their medical experts up to speed and then start

13    talking about medical/mental/dental.  So I think that's the

14    order I would put them in.

15    And I don't see them as, like, we're not going to talk

16    about medical for months.  I just think that, to give everybody

17    time -- because I think -- actually, I'm not sure,

18    Ms. Grunfeld, whether your medical and mental health and dental

19    are done.

20    But just to give them time to synthesize the inspections

21    that they've had, let's do ADA and drugs first and then, with a

22    plan, at least now a tentative plan, to move to medical,

23    mental, and dental.

24          **THE COURT:**  Can we do it as soon as Friday, March 8th?

25          **MS. GRUNFELD:**  Yes, Your Honor.

```
 1            MS. PAPPY:  I can make myself available that day.  I

 2   need to check with my clients, but I should have

 3   decision-makers available.

 4            THE COURT:  I could also -- I don't know why I have a

 5   block available -- but I do -- on Tuesday, March 5th, in the

 6   morning.

 7            MS. PAPPY:  I would prefer the 5th simply because my

 8   husband and I will both be out of town on Friday the 8th,

 9   leaving my 20-year-old to care for my 13-year-old --

10                      (Laughter.)

11            THE COURT:  Got it.

12            MS. PAPPY:  -- which ends up in take-out pizza.

13       So --

14            THE COURT:  Understood.  Understood.

15       Ms. -- Ms. Grunfeld, do you want to confirm with your side

16   whether you'd be available for further discussions with me on

17   March 5th?  I guess -- most important is your schedule, ma'am,

18   because --

19            MS. GRUNFELD:  I can make March 5th work.

20       Is this by Zoom or in person?

21            THE COURT:  Well, that's what I want to ask you-all.

22       I mean, I don't want to have everybody incur the time and

23   expense of being here in person unless you really think that

24   we're going to be able to make some progress.  And we're

25   restarting this after a lengthy, you know, period of working on
```

1    other matters.

2        So I am always a fan of -- of sitting down and talking

3    through this.  That's how I think we made progress on the ADA.

4    That being said, I -- I'm here.  So, Ms. Grunfeld, you're the

5    one that has to travel and some of your colleagues, if they're

6    coming, the same with Ms. Pappy.

7        So what do you think makes sense, Ms. Grunfeld?

8        **MS. GRUNFELD:**  Well, we're already supposed to be with

9    you in person on March 7th.  So why not combine it with that?

10       **MS. PAPPY:**  And I'm a fan of in-person because it is

11   much easier for me to get my -- my people in the room and have

12   face-to-face conversations with them than, you know, Zoom and

13   somebody's not available.

14       I -- I just think it's more efficient to have --

15   especially because we're the ones -- plaintiffs are just

16   asking.  We're the ones giving.  I like having my people be

17   there, and I'd like having them have face time with you to hear

18   what you have to say, Judge.

19       **THE COURT:**  Remind me, Counsel.  Is March 7th for the

20   evidentiary hearing on the NaphCare issue?

21       **MS. GRUNFELD:**  No, Your Honor.  March 7th is the day

22   that we were, I thought, ordered to appear in person at noon to

23   discuss how things were going with the weekly status

24   conferences.

25       **THE COURT:**  No.  Fair enough.  I just -- what I

 1  honestly just couldn't remember is if that was something that

 2  we decided would be in person or -- or by Zoom, and I just -- I

 3  haven't looked at the transcript to refresh my recollection.

 4          **MS. GRUNFELD:**  You know, I -- I don't remember,

 5  either.  But for some reason, I thought we were coming, but --

 6          **THE COURT:**  Okay.  Okay.

 7          **MS. PAPPY:**  In person.  Your order was in person.

 8          **THE COURT:**  All right.  Well, then, how about this?

 9  Let me ask you-all something.

10      Would it make sense to do it on -- if you're going to be

11  here --

12          **MS. PAPPY:**  Yes.

13      Can I answer that?

14          **THE COURT:**  Yeah.

15      Well, here's my problem.  I have a criminal calendar in

16  the morning, and I have an MSC already set for that afternoon.

17  I can try to move that MSC to March 6th, but if I can't, would

18  you-all be available, instead of March 5th, then, on March 6th

19  for the settlement conference portion?

20          **MS. PAPPY:**  I -- I have to check with Ms. Coleman.  I

21  guess -- wait.

22      So you want to do the settlement on the 6th or the hearing

23  on the 6th?

24          **THE COURT:**  Right now, I am flexible on the 6th.  I

25  have -- I have obligations beginning at about 3:00 p.m., but I

```
1    can move other stuff around.
2         So if you think it would be helpful to you-all, I can move
3    everything to March 6th, the status conference and the
4    settlement conference, and I would be happy to do that to make
5    your lives easier.
6              MS. PAPPY:  I can do that.
7              MS. GRUNFELD:  Yes, Your Honor.
8              THE COURT:  Okay.  Let me work on that on my end.
9              MS. GRUNFELD:  Great.
10             THE COURT:  I don't mean to be rude and rush off, but
11   I've kept someone waiting for over a half hour.  So I'm going
12   to pop off.
13        I hope you-all have a great weekend.
14             MS. PAPPY:  Thank you.  Thank you for the time.
15             MS. GRUNFELD:  Thank you.  You, too, Your Honor.
16   Thank you.
17                       (Proceedings adjourned.)
18
19
20
21
22
23
24
25
```

## CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Southern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

DATE:  Monday, February 26, 2024

_____/S/ James C. Pence-Aviles_____

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter