<pre>
 1                  UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3  DARRYL DUNSMORE, ERNEST          )
    ARCHULETA, ANTHONY EDWARDS, REANNA)
 4  LEVY, JOSUE LOPEZ, CHRISTOPHER   )
    NELSON, CHRISTOPHER NORWOOD, and )
 5  LAURA ZOERNER, on behalf of      )
    themselves and all others        )
 6  similarly situated,              )
                                     )  No. 20-CV-0406-AJB-DDL
 7             Plaintiffs,           )
                                     )
 8  V.                               )  March 6, 2024
                                     )
 9  SAN DIEGO COUNTY SHERIFF'S       )
    DEPARTMENT; COUNTY OF SAN DIEGO; )
10  CORRECTIONAL HEALTHCARE PARTNERS,)
    INC.; LIBERTY HEALTHCARE, INC.;  )
11  MID-AMERICA HEALTH, INC.; LOGAN  )
    HAAK, M.D., INC.; SAN DIEGO COUNTY)
12  PROBATION DEPARTMENT, and DOES 1 )
    to 20 inclusive,                 )
13                                   )  Courtroom 14A
               Defendants.           )
14  _____)  San Diego, California

15

    TRANSCRIPT OF DIGITALLY RECORDED VIDEOCONFERENCED PROCEEDINGS
16                  (Discovery Conference)

17

18     BEFORE THE HONORABLE DAVID D. LESHNER, MAGISTRATE JUDGE

19

20

21

22

23  COURT REPORTER:         AMANDA M. LeGORE
                            RDR, CRR, CRC, FCRR, CACSR
24                          U.S. District Court
                            333 West Broadway, Suite 420
25                          San Diego, CA 92101
                            amanda_legore@casd.uscourts.gov
</pre>

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:        GAY GRUNFELD
                                RICHARD VAN SWEARINGEN
 3   (via Zoom)                 HANNAH CHARTOFF
     (via Zoom)                 ERIC MONEK ANDERSON
 4                              Rosen Bien Galvan & Grunfeld LLP
                                101 Mission Street, Sixth Floor
 5                              San Francisco, CA  94105-1738
                                (415)433-6830
 6                              ggrunfeld@rbgg.com
                                vswearingen@rbgg.com
 7

 8   (via Zoom)                 AARON FISCHER
                                Law Offices of Aaron Fischer
 9                              1400 Shattuck Avenue, Suite 12 - #344
                                Berkeley, CA  94709
10                              (510)806-7366
                                ajf@aaronfischerlaw.com
11
     (via Zoom)                 ISABELLA NEAL
12                              DLA Piper, LLP
                                401 B Street, Suite 1700
13                              San Diego, CA  92101
                                (619)699-2700
14                              isabella.neal@us.dlapiper.com

15

16   (via Zoom)                 CHRISTOPHER YOUNG
     (via Zoom)                 OLIVER KIEFER
17                              DLA Piper, LLP
                                4365 Executive Dr., Suite 1100
18                              San Diego, CA  92121
                                (619)699-4748
19                              christopher.young@us.dlapiper.com
                                oliver.kiefer@us.dlapiper.com
20

21

22

23

24

25
```

```
 1

 2    FOR DEFENDANT COUNTY OF
      SAN DIEGO:              ELIZABETH PAPPY
 3                           Burke Williams & Sorenson LLP
                             501 W. Broadway, Suite 1600
                             San Diego, CA  92101
 4                           (619)814-5800
                             epappy@@bwslaw.com
 5

 6
                             STEVEN INMAN, II
 7                           County Counsel, County of San Diego
                             1600 Pacific Highway
 8                           Room 355
                             San Diego, CA  92101-2469
 9                           (619)884-2931
                             steven.inman@sdcounty.ca.gov
10

11

12                          -0-

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Wednesday, March 6, 2024; 2:03 p.m.)

 2

 3                    P R O C E E D I N G S

 4

 5         THE COURT:  Hi.  Good afternoon, everyone.  Good to

 6  see you all again.

 7         THE CLERK:  Calling matter 3, 20-CV-0406, Dunsmore

 8  versus State of California, et al.

 9         THE COURT:  Good afternoon, everyone.

10         May I have appearances from counsel, beginning with

11  plaintiffs' counsel.

12         ATTORNEY GRUNFELD:  Good afternoon, your Honor.

13         Gay Grunfeld for plaintiffs and certified class and

14  sub-classes.

15         ATTORNEY SWEARINGEN:  Van Swearingen for plaintiffs.

16         ATTORNEY GRUNFELD:  And I think the remaining are on

17  Zoom.

18         THE COURT:  And that's fine.

19         Ms. Grunfeld, just for the record, so we can avoid

20  people trying to figure out how has to speak first, why don't

21  you just tell us who's here on behalf of the plaintiffs, and

22  we'll go from there.

23         ATTORNEY GRUNFELD:  Thank you.

24         We have Christopher Young, Isabella Neal, Oliver

25  Kiefer, Aaron Fischer, Eric Monek Anderson, and Hannah
```

1  Chartoff.

2         THE COURT:  Great.  Thank you.

3         And I know there are individuals whose appearance was

4  excused.

5         To everyone who's on the Zoom, thank you for being

6  here this afternoon.  I appreciate it.  And good afternoon to

7  you all.

8         Ms. Pappy, why don't you provide appearances on

9  behalf of the defendants.

10         ATTORNEY PAPPY:  Yes.  Good afternoon, your Honor.

11         Elizabeth Pappy on behalf of the defendants.  And on

12  Zoom is Steve Inman.

13         THE COURT:  Okay.  Great.

14         And I understand that Ms. Coleman is actually in

15  court this afternoon.  And I acknowledge that and would excuse

16  her appearance for the same reason that I excused certain

17  appearances from plaintiffs' counsel.

18         But I do appreciate everyone who is with us this

19  afternoon.

20         This is a follow-up to our status conference on

21  February 6th.  And I would like to start by acknowledging a few

22  things.

23         The first is that I personally have seen a very

24  robust and productive effort by both parties with respect to

25  both the discovery issues we've been working through, as well

1    as settlement.  And those efforts are robust.  They're

2    productive.  They are instances in which counsel on both sides

3    are zealously representing their clients.  But, as best I can

4    tell, are making serious efforts to do so as collaboratively as

5    possible.

6          After most people left on February 6th,

7    Mr. Swearingen and Ms. Kaul and Ms. Pappy stayed with me for

8    quite a bit longer to work through discovery issues.

9          Ms. Grunfeld and Ms. Pappy have -- and Mr. Swearingen

10   have engaged in multiple lengthy status conferences regarding

11   discovery issues.  And today we worked together for about four

12   hours on settlement-related issues.

13         And without getting into the details of the

14   settlement discussions on the record, I would simply note that

15   those discussions I found to be collegial and productive.  And

16   I am hopeful will bear some fruit moving forward.

17         So all of that I view as a truly positive sign.  And

18   I am hopeful that the system in place for the weekly meetings

19   between counsel -- I realize some requirements for agendas, and

20   so forth, are moving the ball forward.

21         I don't pretend that I know everything, however.  And

22   if there is a point at which you all believe that changes to

23   the protocol that I established would be beneficial to the

24   parties, I remain open to you telling me that.  If, on the

25   other hand, you think what is happening now is helping to move

1    the case forward, that's great.

2           So I would like to hear from you all, though, as to

3    how you think things are going generally under the protocol

4    that we have in place.  And then, at the conclusion of this

5    proceeding, we'll turn to the specific discovery matters.

6           And I really would appreciate hearing from everyone

7    who spoke during our hearing on February 6th.

8           I want to begin with you, Ms. Grunfeld and

9    Mr. Swearingen.

10          ATTORNEY GRUNFELD:  Thank you, your Honor.

11          From our perspective, we very much appreciate the new

12   process that's been in place.  We've had three meet-and-confers

13   on Zoom with the agendas and the timeline that the Court

14   ordered.  They have been very productive.  We will have another

15   one tomorrow afternoon.  So I -- I think we should keep that

16   process in place.

17          The only issue I can envision is sometimes there are

18   unavoidable conflicts, and it could be the case that there

19   might be one of the four mandated persons from the plaintiffs'

20   side who might need to be excused on a particular week.

21          And so I hope we would have a -- either an

22   understanding that if -- if we explain that in advance to

23   Ms. Pappy, that that would be okay from time to time.

24          THE COURT:  Understood.  Thank you.

25          Mr. Swearingen, do you wish to add anything, sir?

1          ATTORNEY SWEARINGEN:  I just echo my colleague's

2    comments and think that the recorded Zoom sessions are going

3    very well.

4          THE COURT:  Okay.  I would like to hear from the

5    other members of plaintiffs' counsel who spoke at the hearing

6    on February 6.  I think, Mr. Fischer, I started with you at the

7    time and put you on the spot.

8          I know you -- you may be in a place where it may be

9    difficult to speak.  And if it is, that's okay, and I

10   understand.

11         But is there anything you would like to add, sir?

12         ATTORNEY FISCHER:  Thank you, Judge.  Can you hear me

13   okay?

14         THE COURT:  I can.  Thank you.

15         ATTORNEY FISCHER:  Okay.  Again -- and thank you from

16   the (indiscernible).  I concur completely with Ms. Grunfeld and

17   Mr. Swearingen.  I think the weekly meetings have been very

18   helpful and also productive.

19         And I just want to extend gratitude to Ms. Pappy and

20   Ms. Coleman for their (indiscernible).  I think it -- it has

21   moved the discovery ball forward.

22         THE COURT:  Okay.  Thank you.  I appreciate that,

23   Mr. Fischer.

24         Mr. Young, how about you, sir?  Anything to add?

25         ATTORNEY YOUNG:  Thank you, your Honor, very much.

1          And I'm getting an echo.  Hopefully you're not.

2          The -- okay.  The meetings, I agree, have been very

3   productive.  The weekly telephonic meetings.  We have a time

4   set, but counsel have all been very flexible when those need to

5   be moved.  And the sessions, themselves, have -- to my

6   observation -- resulted in resolution of a number of disputes.

7   And there also, to my observation, have been far fewer emails

8   among counsel.  And those that have been exchanged have been, I

9   think, much more productive and sort of have a better tone, if

10  I can put it that way.

11         And, finally, there have been fewer letters.  And

12  those have also been, I think, very productive and directed at

13  specific issues that need to be resolved.

14         And so I would just also extend my thanks to my

15  co-counsel on the plaintiffs' side and counsel on the defense

16  side.  I think it's going well.

17         THE COURT:  Good.  Thank you, Mr. Young.  I'm glad to

18  hear that.

19         Ms. Pappy, how about you, ma'am?

20         ATTORNEY PAPPY:  I agree a hundred percent.

21         THE COURT:  Short and to the point.

22         ATTORNEY PAPPY:  Yes.

23         THE COURT:  Got it.

24         Well, look, I'm glad to hear that.  And I realize

25  that it's not always going to be perfect.  But I am glad to

1 hear that this has been an improvement.  And, most important,

2 will allow you all to continue to -- as I said -- zealously

3 represent your respective clients while moving the case forward

4 in a productive way.  With my ultimate goal being to have you

5 leave the courtroom after -- whether it's a trial or a

6 settlement, or whatever it may be -- and shake each others'

7 hands and -- and walk away as colleagues.

8   So with that being said, I -- I do think it makes

9 sense to continue the weekly meetings pursuant to my order,

10 which is Docket number 528.  And I would simply say this,

11 Ms. Grunfeld.

12   I -- I fully expect that you all will extend

13 appropriate professional courtesies and just general grace to

14 one another when personal and professional conflicts arise.

15   If something comes up unexpectedly for counsel on the

16 plaintiffs' side and somebody just can't be there, I trust you.

17 And I trust you to let Ms. Pappy know and that it won't be an

18 issue, and I will leave it to you all in that regard.  I do

19 think it's productive to have, otherwise, everyone who's in the

20 order participating.  But if circumstances require it, I

21 understand.  And not an issue on my end.

22   So with that being said, I don't have anything

23 further.  I'm really glad for this status report.  I know we've

24 got some work to do on discovery issues.  So anyone who is on

25 the Zoom, who wishes to sign off, is welcome to do so.

1            And, Mr. Fischer, good luck to the Berkeley

2    Hurricanes, in your last practice.

3            ATTORNEY FISCHER:  Thank you, Judge.  I'll stay on

4    for just a few more minutes.  But I appreciate it.

5            THE COURT:  All right.  To anyone who wishes to exit

6    the Zoom, you're welcome to do so now.  You, of course, are

7    welcome to stay on, if you wish.

8            UNIDENTIFIED SPEAKER:  Thank you, your Honor.

9            UNIDENTIFIED SPEAKER:  Thank you, your Honor.

10           UNIDENTIFIED SPEAKER:  Thank you, your Honor.

11           UNIDENTIFIED SPEAKER:  Thank you, your Honor.

12           THE COURT:  All right, Counsel.  We've got

13   Ms. Grunfeld, Mr. Swearingen, and Mr. Fischer on with us; as

14   well as Ms. Pappy.

15           Let's turn, now, to the various issues that are

16   before me.  I would like to start with plaintiffs' motion for a

17   protective order.  That was an oral motion that was made on

18   March 1st and subsequently briefed with the plaintiffs' motions

19   at Docket 574; and the defendants' opposition at Docket number

20   576.

21           I have reviewed both of those pleadings, and I'm

22   going to provide a tentative ruling.  And then I would be happy

23   to hear from counsel.

24           This motion arises from a subpoena that was issued by

25   the defendants to the California Department of Corrections and

1  Rehabilitation.

2          I should say there were multiple subpoenas for the

3  class representatives.  The subpoenas sought case summaries,

4  legal documents, as well as the E.R.M.S. -- that's E-R-M-S --

5  and S.O.M.S -- S-O-M-S -- file for each of these individuals.

6          The parties have met and conferred and resolved

7  almost all of the issues with respect to these subpoenas, which

8  is to your respective credit.

9          The remaining issue that requires resolution is the

10  subpoenas' request for each plaintiffs' entire E.R.M.S. and

11  S.O.M.S. files.

12          I understand from the plaintiffs' brief that the

13  E.R.M.S. file is the Electronic Record Management System, and

14  the S.O.M.S. file is the Strategic Offender Management System;

15  all maintained by CDCR.

16          As an initial matter, I find that a motion for a

17  protective order is the appropriate mechanism for the

18  plaintiffs to raise this issue pursuant to Federal Rule of

19  Civil Procedure 26(c).

20          A party may move for a protective order in regard to

21  a subpoena issued to a nonparty if the moving party believes

22  its own interests are jeopardized by the discovery that is

23  sought from the nonparty.  That, thus, confers standing on the

24  party to bring the motion.  That is *In Re Remec*, R-E-M-E-C,

25  *Securities Litigation*, 2008 Westlaw 2282647.

1          Under Federal Rule of Civil Procedure 26(c), the

2     Court may, for good cause shown, issue a protective order to

3     prevent -- or to protect, I should say, a party or person from

4     annoyance, embarrassment, oppression, or undue burden or

5     expense.   In addition, considerations of proportionality in

6     Rule 26(b) apply to documents that are sought from nonparties

7     through a subpoena, such as the subpoenas at issue here.

8          My tentative ruling is to grant the motion for a

9     protective order pertaining to the E.R.M.S. and S.O.M.S. file

10    for each of the named plaintiffs for the following reason.

11         On the record before me, the defendants have not

12    shown why a production of the entire E.R.M.S. and S.O.M.S. file

13    for each of the named plaintiffs is appropriate.   I am told

14    that the E.R.M.S. and S.O.M.S. files contain the entirety of

15    each plaintiff's, quote/unquote, C-file maintained by CDCR.

16    That is a central depository for documents, correspondence, and

17    reports pertaining to the inmate.   And include disciplinary

18    records, housing information, work reports, correspondence,

19    psychiatric reports in connection with the evaluations for

20    readiness for parole, and other types of documents.

21         We have discussed at length concerns regarding

22    overbreadth of discovery requests.   And in issuing my order on

23    February 14th I did deny multiple discovery requests propounded

24    by the plaintiffs, finding that they were overbroad and not

25    proportionate to the needs of the case.   And I respectfully

1    make that conclusion with respect to the subpoenas seeking the

2    entirety of the E.R.M.S. and S.O.M.S. reports for each of the

3    class representatives.

4          Discovery is limited to evidence that is relevant to

5    a claim or defense.  And it is not apparent from the record why

6    a requirement to produce the entire E.R.M.S. and S.O.M.S. file

7    is seeking information that is relevant to a claim or a

8    defense.

9          There is speculation that information within those

10   files may be relevant to challenge one or more named

11   plaintiffs' standing as class representatives, presumably

12   because there may be information that is so derogatory within

13   them that they're not adequate class representatives.

14         But I am hesitating, which is not apparent from the

15   record, because I think it's speculation.  And that, to me, is

16   the fundamental problem with this request.

17         In addition, I understand that the defendants wish to

18   review the E.R.M.S. and S.O.M.S. files to see if there is any

19   potentially impeachment information in those files.  And

20   notwithstanding the fact that discovery -- the scope of

21   discovery, I should say, is broad, it does seem to me that this

22   is -- this is just too far to go.  It is a -- it is a fishing

23   expedition to see what derogatory information may be in the

24   files.

25         And there -- as the defendants point out in another

1    pleading with respect to their opposition to the plaintiffs

2    seeking unsustained grievances against the San Diego sheriff's

3    employees, there's this two-way argument going about we're

4    going to have a trial within a trial.  And I think, frankly,

5    that point by both sides has merit.

6              If Mr. Archuleta were to have been alleged to have

7    engaged in some sort of improper conduct or rules violations

8    while at a CDCR facility, is that litigated in the trial before

9    Judge Battaglia?  It's going to be denied by Mr. Archuleta.

10   And I find that, based on the fact that we don't even know what

11   information is in those files, the fact that the files are

12   requested to be produced in their entirety and the fact that

13   they -- any relevance that they may have is outweighed by

14   privacy concerns that are relevant consideration under Rule

15   26(c), that the motion for a protective order should be

16   granted.  Limited, of course, to the E.R.M.S. and S.O.M.S.

17   files.

18             There was a reference in the plaintiffs' motion to

19   limitations on the use of the medical records at trial.  I --

20   it's not in the conclusion but it was somewhere in the body.

21   And I would just note that limitations on how evidence will be

22   used at trial is, of course, in the province of Judge Battaglia

23   and not me, so I'm not making any findings on that.

24             So, Ms. Pappy, I realize that's not going the way

25   that the defendants had requested, and I would be happy to hear

16

1    from you on my tentative.

2         ATTORNEY PAPPY:  Sure.  Your Honor, we're not going

3    to contest the tentative.  You -- you had telegraphed your

4    feelings about it before.  We briefed it.  And I would like to

5    say we're proud of our papers.  And if our papers weren't

6    persuasive, then there's nothing else that I can say here.

7         The one -- actually more a question, I guess, than

8    anything is that the CDCR -- so we had submitted a joint

9    stipulation.  Which I think, at this point, is moot.  Your

10   Honor -- I don't know if you just didn't rule on it or denied

11   it.  But we had a stipulation that I think is mooted out by

12   this oral motion and ruling.  But we still have an issue of

13   adding the -- getting CDCR to produce the documents subject to

14   the protective order.  And CDCR has specifically told us, in --

15   in the last week and a half -- I, unfortunately, haven't had

16   time to communicate to my -- to plaintiffs' counsel that they

17   want an order that medical records -- mental health records and

18   HIV positive results will be produced as a part of this.

19        So my question is this.  Do you need a separate

20   stipulation from counsel and I?  Or can you issue, as part of

21   the -- today's order that those records are to be produced by

22   the CDCR pursuant to the protective order in place?

23        THE COURT:  Is this the first you've heard of this,

24   Ms. Grunfeld?

25        May sound like this is all new, and I -- if you want

1    to be heard on this, I would be happy to.  It sounds reasonable

2    to me.  But what are your thoughts?

3              ATTORNEY GRUNFELD:  Well, we -- we had previously

4    discussed amending the protective order in the case; which, as

5    the Court knows, applies to the County and NaphCare.  And

6    they're named in the beginning of that amended protective

7    order.

8              And I have heard that CDCR will not produce any

9    medical records without an amended protective -- protective --

10   protective order.  So I'm very open to that.

11             This is the first I've heard about mental health and

12   HIV being specifically at issue.  Of course there are going to

13   be records related to those issues in 13 people's medical and

14   mental health files -- or medical files.

15             And as we say in our papers -- and as I've said in

16   our hearings -- our main concern is that those records be under

17   a protective order, be kept confidential, and that nothing go

18   back past March 2nd, 2017, in terms of our upcoming

19   depositions.

20             THE COURT:  Sure.  So I want to do whatever we can do

21   permissibly to get the documents to you both and to minimize

22   the burden on you all, given how many issues there are in the

23   case.

24             What -- do you think, Ms. Pappy, that the protective

25   order should be amended to include CDCR?  Or is CDCR simply

1  asking for an order from me --

2          You're nodding your head that it's the latter?

3          ATTORNEY PAPPY:  Yes.  They don't need to be a part

4  of the protective order.  I think it was plaintiffs' counsel

5  and I's desire to sort of take -- hopefully resolve a bunch of

6  issues through that subpoena.  But the CDCR just needs an order

7  from the Court.  And it needs -- apparently needs to

8  specifically reference mental health and -- and HIV.  The

9  medical -- please include that.  But they didn't actually need

10  that order from us.

11          THE COURT:  Okay.  So what -- okay.

12          ATTORNEY PAPPY:  An order that they should produce

13  medical, mental health, and HIV status records pursuant to the

14  protective order in this case.

15          THE COURT:  Could I ask you a favor?

16          I want to get this right.

17          ATTORNEY PAPPY:  Yes.

18          THE COURT:  And I don't want you to go back and

19  forth.  And I want Ms. Grunfeld to take a look at this.

20          This could be one sentence and -- two sentences in a

21  joint motion that -- with "it is so ordered" by me at the

22  bottom.  That, I think, would be the most expeditious way to

23  accomplish this.  That way you can give me exactly the language

24  that CDCR was requesting.

25          Ms. Grunfeld and Mr. Swearingen can take a look at

1    it.  It sounds like it won't be objectionable.  And you can

2    include a proposed order for me to sign.  Or it -- frankly, you

3    can simply put at the bottom, "it is so ordered," with my

4    signature block, and that would be fine, too.

5              ATTORNEY PAPPY:  I will do that.  Thank you.

6              THE COURT:  Sure.

7              Ms. Grunfeld, did you -- anything further that you

8    would like to be heard on with respect to the motion for a

9    protective order?

10             ATTORNEY GRUNFELD:  No.  Thank you, your Honor.

11             THE COURT:  I'm going to adopt my tentative ruling,

12   and I will issue an order just stating, for the reasons stated

13   at the hearing, the motion for a protective order is granted.

14   And I will look for the -- the proposed stipulation from you

15   all when you're back in your respective offices.

16             All right.  Let's turn now to the issues that were

17   raised in the parties' joint conference statement.  That is

18   Docket number 575.

19             I had an opportunity to review those issues.  I also

20   reviewed the prior status conference statement.  That's Docket

21   548, as well as the transcript from February 6th, which I think

22   pertains to the medical and custody records at issue.

23             So let's just take them one at a time.  I'm going to

24   give you my tentative ruling on each issue.  I'll give you an

25   opportunity to be heard.  And then, as I told you on March 1st,

1    it is my goal to give you rulings as quickly as possible and

2    allow you to move forward.

3            With respect to issue number one, production of text

4    messages and instant messages, I understand that the parties

5    have resolved issues involving production of Microsoft Teams

6    and TechCare messages.  And I -- I am grateful that you were

7    able to resolve that.

8            The sole issue pertains to text messages, and I

9    understand there's also referring to instant messages.  I'm

10   going to call them "text messages," just to make it a little

11   easier on myself.

12           When we were previously -- in a prior status

13   conference, I should say, there was a discussion about whether

14   the production of text messages should be pursuant to search

15   terms and custodians.  Or whether it should be, as I'll call

16   it, incident-based.

17           I understand, from both parties' proposals that are

18   in the March 5th status report, that the parties are now

19   both -- nobody is advocating for an incident-based text message

20   search, and so I will go beyond that as well.

21           The plaintiffs propose to retrieve text messages from

22   25 custodians for a one-year period with no search terms, and

23   allow the plaintiffs to review those text messages and

24   determine which are relevant to the case.

25           That, of course, is a deviation from the ordinary

1   practice where the responding party would perform searches and

2   produce relevant information.  But I understand the reasons why

3   the plaintiffs are requesting it.

4          Defendants, on the other hand, propose to use the

5   same 25 custodians identified by the plaintiffs and to search

6   for text messages utilizing the ESI search terms from

7   December 7th, 2023, and search for a one-year period from

8   January 1st, 2023, through December 31st, 2023.

9          In addition, the defendants would propose to produce

10  all text messages that are included in that conversation or

11  text thread that are in the same context as -- as the specified

12  search term.

13         On balance, I believe that the defendants' proposal

14  is the appropriate one.  I am willing to listen to additional

15  argument on this.  But I am not convinced that simply providing

16  every text message sent and received by these 25 individuals

17  for a one-year period is appropriate.

18         I don't doubt the good faith of plaintiffs' counsel

19  that they would immediately delete any privileged communication

20  or that they would ignore any communication that is totally

21  irrelevant to the case.  But given that we have -- given the

22  competing proposals, I should say, I find the defendants'

23  proposal to be the appropriate one.

24         Ms. Grunfeld, I realize that is not what you're

25  advocating.  If there's more you would like to tell me, I would

1    be happy to hear from you, ma'am.

2              ATTORNEY GRUNFELD:  I would like Mr. Swearingen to

3    speak to this, your Honor.  Although, I do want to correct

4    something I said last Friday.

5              THE COURT:  Okay.

6              ATTORNEY GRUNFELD:  I misspoke.  It's a complex case,

7    with many issues.

8              This was proposed to defendants.  I think I

9    erroneously said that I had not -- you know, that we had not

10   made this proposal.  But we did, as you saw in the text

11   exchange that was Exhibit A.

12             THE COURT:  I did see that, and I noted that

13   Mr. Swearingen had proposed this to Ms. Pappy.

14             So no big deal.  Record corrected.  Thank you,

15   Ms. Grunfeld.

16             Mr. Swearingen, I would be happy to hear from you,

17   sir.

18             ATTORNEY SWEARINGEN:  Thank you, your Honor.

19             I do want to recognize the good progress that was

20   made on agreement about the 25 custodians for the text

21   messages, as well as for the one-year period.

22             I do think that there is a difference in the one-year

23   period that the parties are suggesting.  Plaintiffs are

24   suggesting March 1st, 2023, to the end of February 2024.

25   Whereas, the defendants are suggesting the one-year period,

1    being the calendar year 2023.

2              Plaintiffs requested the more recent period because

3    of our understanding that many custodial officers who work in

4    the jail were not provided cell phones until summer 2023.  So

5    plaintiffs' one-year period would have a greater number of

6    potential responses, texts than defendants' would, if that --

7    if that understanding is correct.

8              THE COURT:  Let me ask you something, Ms. Pappy.

9              I understand Mr. Swearingen's point about the -- the

10   time frame only.

11             How much additional burden would it be to the

12   defendants to change the time frame from the 2023 calendar year

13   to January 1st, 2023, through -- what?  The end of February,

14   29th, 2024?

15             ATTORNEY PAPPY:  Not much.

16             THE COURT:  That was your time period,

17   Mr. Swearingen?  Or actually more than your time period?

18             ATTORNEY SWEARINGEN:  That's the time period:

19   March 1, 2023, to February 29, 2024.

20             THE COURT:  Ms. Pappy, I'm going to adopt the

21   defendants' proposal with one deviation to the time period, and

22   that is that the text messages shall be searched for the time

23   period January 1st, 2023, through February 29th, 2024.

24             Does that make sense, ma'am?

25             ATTORNEY PAPPY:  Yes.

1          ATTORNEY SWEARINGEN:  Your Honor, if I could add

2     additional argument on this issue?

3          THE COURT:  Oh, sure.  Go ahead.

4          ATTORNEY SWEARINGEN:  Thank you.

5          There are two other issues with respect to the text

6     messages.  The first one being that plaintiffs had originally

7     agreed, as you saw in Exhibit A to Docket 575, the joint

8     statement that the parties filed on March 5th --

9          THE CLERK:  I'm sorry to interrupt.  But could you

10    just pull it closer to you?  The mic?

11         ATTORNEY SWEARINGEN:  Is this better?

12         THE CLERK:  Yes.

13         ATTORNEY SWEARINGEN:  Thank you for letting me know.

14         So the -- the first issue is -- as we all know, the

15    way that we use texts is very different than the way we use

16    emails.  Emails tend to have a subject line and tend to have

17    everything laid out in them and tend to be part of a string.

18         In contrast, text messages often are just a few

19    words.  Sometimes, depending on who the texter is, sometimes

20    people do write complete sentences.  Sometimes people send five

21    texts that make up a complete sentence.

22         If we -- if the parties were to use search terms,

23    the -- the context of the text preceding and subsequent to the

24    search term that is hit upon matters a lot.  And that's why we

25    proposed, in that Exhibit A, that there be a uniform concrete

1    way to identify how many texts before and after that search

2    term applied.  We think it would be appropriate to do 20 before

3    and after.

4         If, however, it is left up to defendants' counsel to

5    review each hit and then to look and see whether or not the

6    texts before relate to that conversation and the texts after,

7    and maybe that conversation was interrupted by a different

8    conversation and was later followed back up on, it would be a

9    very, very laborious process.  And we feel it's going to take a

10   long time, when we're already well beyond the deadline for

11   production that the Court initially set for discovery.

12        So those are our two issues.  One, the uniformity of

13   the texts before and after; and just how long it's going to

14   take to produce these texts.

15        THE COURT:  Okay.  I appreciate that, Mr. Swearingen.

16        Ms. Pappy, I guess let's address those in the reverse

17   order, if we could.

18        I intend to impose a deadline of production for all

19   documents ordered produced in my February 14th order, of

20   March 15th.

21        Where do you stand on the searching for text

22   messages?  And will you be able to produce the text messages by

23   then?

24        ATTORNEY PAPPY:  Highly unlikely.  We have to get --

25   I was just talking to the sheriff's department counsel about

1    how we're going to get them.

2           And either the people are individually going to have

3    to come in and bring their phones -- which is fine -- or it

4    might be faster to send these kits.  But we don't have the kits

5    yet, and we have to get them distributed.  So let's just skip

6    the kits.

7           They have to get all of those folks to bring their

8    phones in.  And if today is the 6th, if somebody's on vacation

9    this week, if somebody's on vacation next week, that phone is

10   not -- they can't tran -- get to the physical location where

11   data services is.

12          So I would actually ask for another week after that,

13   just because I think the longest part of this is going to be

14   getting the data off of the phones.

15          The search part, that's -- that's a matter of a

16   couple -- two, three days.

17          I'm not concerned about reviewing the texts.  I'll

18   give you an example of the Teams messages.  I think, total, we

19   have about 300 with hit terms.  And that -- in the grand scheme

20   of things, that's nothing.  And I suspect that we're going to

21   have far less in texts.  And so I'm not worried at all about

22   getting the phones, downloading the information, and me having

23   the time to review it, to get it the week after March 15th.

24          THE COURT:  My understanding is that there are

25   depositions that are scheduled to occur the week beginning on

1    March 18th.

2          How is this going to affect the parties' ability to

3    complete these depositions; if at all?

4          ATTORNEY PAPPY:  I don't know.  They're not my

5    depositions.

6          THE COURT:  I know.  I'm going to ask Ms. Grunfeld

7    and Mr. Swearingen the same question.

8          ATTORNEY PAPPY:  Not at all.  I don't know.

9          THE COURT:  Okay.  Ms. Grunfeld, what's your position

10   as to these text messages and the 30(b)(6) depositions that are

11   scheduled to begin the week of March 18th?

12         ATTORNEY GRUNFELD:  Your Honor, we would like the

13   texts before we start the depositions.  But this may be part of

14   a larger conversation that we want to have in connection with

15   all efforts to resolve the inspection scheduling issues and the

16   case schedule in general.

17         But, of course, we want all of the documents; the

18   time to review them before Monday, March 18th, which is when

19   the first PMK deposition is scheduled to start at the present

20   time.

21         THE COURT:  And, Mr. Fischer, I know that you're on

22   mute because you're sitting in the airport.  If there's

23   anything that you would like to be heard on, during the course

24   of this hearing, just speak up.  Okay?

25         ATTORNEY FISCHER:  I appreciate it.  I will be

1    boarding shortly.  And -- and my co-counsel (indiscernible).

2    But thank you.

3            THE COURT:  Okay.  All right.  On this particular

4    issue, I'm going to adopt my tentative ruling with respect to

5    the 25 custodians, the use of the ESI terms from the

6    December 7th, 2023, and the time period that I provided of

7    January 1st, 2023, to February 29th, 2024.

8            I am going to rely on the County, as the responding

9    party, to produce -- as it said it would -- the text messages

10   preceding and following the text message that it's on a

11   particular search term to provide the entirety of the context

12   for that search term hit.

13           Let's talk, at the end, about timing.  I understand

14   your point, Ms. Grunfeld, and there are bigger issues.  So let

15   me just reserve on that for now.

16           ATTORNEY GRUNFELD:  Thank you, your Honor.

17           THE COURT:  With respect to the County's response,

18   the defendants' response to plaintiffs' interrogatory 25, I

19   thought we had made some progress on that last Friday.  But I

20   was a little bit surprised to see that there appears to be a

21   new proposal that the parties have not met and conferred on.

22           I'm looking at Docket number 575 and page 4.  Now

23   there's -- I'm now told there's a proposal for a random sample

24   of 50 individuals.  And -- but that it has not been discussed

25   with the plaintiffs and -- excuse me.  I think there's a

1    reversal.  I think you meant to say the plaintiffs have not

2    discussed if with the defendants.  I --

3           Is that correct?  Or is that my -- am I misreading

4    this?  If I am, that's fine.

5           You're saying that the -- you're saying you have

6    not -- that the defendants have not discussed their proposal

7    with you, Mr. Swearingen.  Is that right?

8           ATTORNEY SWEARINGEN:  That's correct, your Honor.

9           THE COURT:  I thank you for the correction.  I think

10   I have confused below and above.  So my misreading of what you

11   did.  Great.  I'm glad you talked about what you propose.

12          So let me just understand this.

13          Ms. Pappy, what exactly are you pulling?

14          ATTORNEY PAPPY:  They are -- so in -- since we had

15   our last meet-and-confer, my client has advised me that what

16   they -- if you'll recall in the context of this interrogatory

17   that it is a spreadsheet, and they wanted to know if we can

18   just add on to that spreadsheet.  And the answer to that is no.

19          And so what they were looking for -- or plaintiffs

20   were looking for is folks in -- in lockdown and, I'm assuming,

21   who was in there; how long were they in there; what was their

22   start date; what was their end date.

23          THE COURT:  Right.

24          ATTORNEY PAPPY:  What the client is able to

25   produce -- and I'm actually having them pull them.  Because, no

1  matter what, just pull them, and we'll produce them.

2          Is that it is a -- it's a PDF document for each

3  person that they'll put in lockdown for the -- I call it the

4  relevant time period; for '21, '22, and '23.  And it is -- it

5  relates to people who have a disciplinary -- not a disciplinary

6  hearing but a hearing.

7          Ms. Grunfeld would know better about this than I.

8  But when you go into lockdown, I guess there has to be a

9  hearing process because of the severity of lockdown.  And so

10  every single person that is put into lockdown, that has this

11  hearing process, they have this sheet.

12          Now, I can't tell you exactly what's on it because I

13  don't have an example of it yet.  But those are what were

14  provided.  So it will tell name.  It will tell date of

15  lockdown.  And -- and other particulars that they may not even

16  want but that are related to this hearing that they have.

17          THE COURT:  So I'm looking at your joint report from

18  February 20th, and there were four spreadsheets at issue with

19  Bates numbers ending in 61, 62, 63, and 64.

20          Are you saying, Ms. Pappy, that you are -- for each

21  individual who was identified on each of those four

22  spreadsheets, you're going to produce information that would

23  allow the plaintiffs to see when that individual was placed in

24  administrative separation?

25          ATTORNEY PAPPY:  More than that.  That more people --

1  people on those lists, and then everybody going back to

2  January 1st, 2021, to the present.

3          So in terms of the plaintiffs want a randomly

4  selected list of 50, they're going to get everyone.

5          THE COURT:  Now, I know you're hearing this

6  explanation for the first time, perhaps.  But that sounds

7  consistent with what we discussed.

8          If that's what you're getting, which is every

9  individual who's listed on those four spreadsheets, the date

10 that they were placed in administrative separation, as well as

11 perhaps more individuals, does that resolve the issue,

12 Mr. Swearingen?

13         ATTORNEY SWEARINGEN:  No, your Honor, it does not.

14         THE COURT:  Okay.  Explain to me why.

15         ATTORNEY SWEARINGEN:  First, we very much appreciate

16 the County's proposal.  Hearing it -- about it for the first

17 time, it is very nice to hear that the County is willing to

18 produce this information for '21, 2022 and 2023.

19         However, if the selection criteria is whether or not

20 the person had a hearing process, that will naturally select

21 those that actually had the process, and it will not include

22 anyone who didn't have the hearing.

23         And if there is a problem in San Diego County jail,

24 that people are placed in lockdown -- or administrative

25 separation for too long without a hearing process, it will not

1    capture any of those individuals.

2            THE COURT:  Got it.

3            Let me ask you this, Ms. Pappy.  We were using those

4    four spreadsheets as the basis for our discussion prior to

5    today.

6            Do you have any reason to believe that the records

7    you're pulling will not capture all of the individuals who are

8    listed on those four spreadsheets?

9            ATTORNEY PAPPY:  No.

10            Our understanding is that every single -- I thought

11   that every single person that goes into lockdown has to --

12   there has to be a start of a lockdown process.  Maybe the

13   person got out in 12 hours, and they just didn't need it.  But

14   that every single person has to have that hearing.

15            THE COURT:  Well, what Mr. Swearingen is saying is

16   that if there is an individual who's placed in administrative

17   separation or lockdown who doesn't have a hearing date, that

18   individual may be captured on one of these four spreadsheets.

19   But may not be captured in the documents that you are now

20   providing, which would reflect when that individual was placed

21   in administrative separation.

22            Is that correct, Mr. Swearingen?

23            ATTORNEY SWEARINGEN:  Yes, your Honor.

24            THE COURT:  All right.

25            ATTORNEY PAPPY:  And my response to that is that --

 1    that I'm going to give you more than 50.  So -- and I'm not

 2    going to select them.  They're just going to be given to me for

 3    every person that had a hearing.  And whether they had a

 4    hearing or not seems irrelevant in what they're looking for in

 5    this 50-random selection.  Because if a randomly -- if I put

 6    them on a pot and I pick out 50, 49 might have hearings or 32

 7    might have hearings and the others don't.  I don't -- or they

 8    all may have hearings.

 9            So I'm a little unclear as to why the County is

10    proposing is not sufficient because I'm giving you way more

11    than 50 of -- of a selection.

12            THE COURT:  The concern is perhaps speculative.  But

13    it is that there may be individuals who just didn't have

14    hearings, which would -- in and -- in and of itself -- be

15    evidence of, you know, improper custodial management practices.

16    And that those individuals would not be captured on -- well,

17    they would not be captured in the documents you're providing.

18            But let me ask you this, Ms. Pappy.  Well, let me

19    address this to Mr. Swearingen.

20            You're going to take the information that Ms. Pappy

21    sends you, and you're going to compare it to the individuals on

22    these spreadsheets.  Is that correct?

23            ATTORNEY SWEARINGEN:  Yes.  My understanding, from

24    what I just heard, is that these individuals that Ms. Pappy is

25    collecting are individuals who are on these spreadsheets.  So,

1    yes, we will compare it to the information that's in there.

2                THE COURT:  Okay.  So there may not be any -- there

3    may not be any dispute here.  It may be that the information

4    that you get from Ms. Pappy is going to include all of the --

5    all of the individuals on these four spreadsheets, 61 through

6    64.

7                ATTORNEY SWEARINGEN:  That's right.

8                THE COURT:  But you're saying maybe -- maybe it

9    won't?  And here is what I am saying.

10               If there is an issue with respect to individuals who

11   are on one of these four spreadsheets but for whom you do not

12   receive the date they were initially placed in administrative

13   separation, you may request an immediate discovery conference

14   with me, and I will most likely direct the County to provide

15   the administrative separation date for those individuals.

16               But I don't want to order something that may not

17   come -- be an issue at all.  Because it sounds like, from

18   Ms. Pappy, it probably is going to be covered.

19               But if it's not, you will have an opportunity to

20   raise this issue with me, and I will give you an immediate

21   ruling on it.

22               ATTORNEY SWEARINGEN:  Sounds like a good -- good

23   process, your Honor.

24               ATTORNEY PAPPY:  Can I ask what might be a silly

25   question?

```
 1              THE COURT:  Go ahead.
 2              ATTORNEY PAPPY:  Do they only want these PDFs for the
 3    people on the spreadsheet?
 4              THE COURT:  Yes.
 5              ATTORNEY PAPPY:  Okay.  How about I agree to do that?
 6              THE COURT:  I --
 7              ATTORNEY PAPPY:  It seems easier.
 8              THE COURT:  That would be fine with Mr. Swearingen, I
 9    presume.
10         Mr. Swearingen, do you agree?
11              ATTORNEY SWEARINGEN:  Yes.
12              ATTORNEY PAPPY:  Okay.
13              THE COURT:  Ms. Grunfeld, do you agree?
14              ATTORNEY GRUNFELD:  Yes.
15              THE COURT:  Perfect.
16         I understood you to be saying, Ms. Pappy, that it
17    was -- you could more easily or only search for individuals
18    with hearing dates.  And that's why you were going to do that
19    search.  But, yes, the most efficient way to make sure this is
20    not an issue is to simply provide the plaintiffs with the date
21    that each of the individuals listed on those four spreadsheets
22    was placed in administrative separation, so the plaintiffs can
23    see the length of time.
24              ATTORNEY PAPPY:  Yeah.  No.  Absolutely.  And they've
25    always made that clear.  It's just -- the discussion has always
```

```
 1   been what form that's going to take, which is what we've just,

 2   here -- so I -- I think that this is easy to do because the

 3   people's names, booking numbers, and J.I.M.S. numbers are on

 4   there.  We can just run a search that way.

 5             THE COURT:  Perfect.

 6             ATTORNEY PAPPY:  Okay.

 7             THE COURT:  Issue resolved.

 8             All right.  And the next issue that the parties raise

 9   is the deadline to produce documents that were ordered to be

10   produced in my February 14th order.

11             As I mentioned earlier, Ms. Pappy, I believe that a

12   month would be sufficient to produce the documents that were as

13   directed in my order, which would be on or before March 15th.

14             Leaving aside the text messages and -- because I

15   understand there are some additional issues, does that present

16   any other issues for the County?

17             ATTORNEY PAPPY:  The -- the request of the sheriff's

18   department was March 18th because they gave their employees a

19   deadline of the 11th to get them all of the documents.  And

20   they are just concerned that if somebody is not around -- they

21   want to be compliant, and they're very concerned about staying

22   compliant.

23             THE COURT:  Sure.

24             ATTORNEY PAPPY:  So that's the request.  It's just

25   until Monday instead of Friday.
```

1          THE COURT:  And the reason I was thinking Friday is
2     because you have a deposition set for Monday.  And I wanted to
3     provide Ms. Grunfeld and her colleagues with time -- I mean,
4     albeit, over the weekend which isn't ideal.  But time to review
5     the documents and decide if they wish to use any of them at the
6     depositions.
7          Let's just talk about this at the end of the hearing,
8     then.  Because I think it may be that we need to have a broader
9     discussion.
10          All right.  Medical and custody records.  Let me --
11     give me just a moment.
12          (Pause.)
13          ATTORNEY SWEARINGEN:  Your Honor, before we move on
14     to medical and custody records, there were a number of items in
15     Exhibit B that were not ordered to be produced; but, instead,
16     you had asked defendants to look to see whether or not the
17     documents did exist.  And I think that they would be -- I would
18     anticipate an opportunity for the parties to discuss whether or
19     not those documents would be ordered to be produced.  That
20     would include, for example, on Exhibit B, RFP number 82.
21          THE COURT:  I appreciate the reminder.
22          And as we -- I'm looking at multiple status reports,
23     trying to make sure that I've got the most recent information.
24          Give me just a moment.
25          (Pause.)

1          THE COURT:  Okay.  Got it.  Let's -- let's do that.

2    And I think that is appropriate.

3          And, Ms. Pappy, do you have any information on the

4    existence and volume of any watch commander logs?

5          ATTORNEY PAPPY:  Well, I -- we talked about this in

6    meet-and-confer.  And I know they exist, and we're pulling

7    them.  (Indiscernible.)

8          THE COURT:  Okay.  So they will be produced by

9    whatever date we discuss?

10         ATTORNEY PAPPY:  Yes.

11         THE COURT:  All right.  Fair enough.  Thank you.

12         Is the next -- the next one is RFP -- is it 137,

13   Mr. Swearingen?

14         ATTORNEY SWEARINGEN:  Yes, your Honor.

15         THE COURT:  All right.  And I think we had discussed

16   this in one of our status conferences as well.  I think it came

17   up on March 1st.  At least it was on our agenda.

18         ATTORNEY SWEARINGEN:  But -- but -- I do see, from

19   the exhibit, that these are being processed for production.  So

20   I'm not sure that there's a dispute.

21         It is one of those items, but I don't think that

22   there's a dispute, your Honor.

23         THE COURT:  Is there a dispute, Ms. Pappy?

24         ATTORNEY PAPPY:  No.

25         THE COURT:  Great.

| | |
|---|---|
| 1 | 174, 180, and 185.  The status indicates "being |
| 2 | processed for production."  Is there a dispute to resolve on |
| 3 | those, Ms. Pappy? |
| 4 | ATTORNEY PAPPY:  No. |
| 5 | THE COURT:  And is that the same for RFP 232? |
| 6 | ATTORNEY PAPPY:  Correct. |
| 7 | THE COURT:  Then -- give me one moment. |
| 8 | (Pause.) |
| 9 | THE COURT:  Refresh my memory, please, Counsel. |
| 10 | The -- we had discussed two categories of documents |
| 11 | that the County was looking into.  I believe one of them was |
| 12 | documents pertaining to alternatives to incarceration. |
| 13 | Candidly, that has slipped my mind. |
| 14 | Can you refresh my memory on that, Ms. Pappy? |
| 15 | ATTORNEY PAPPY:  I think it's number 137, if I'm not |
| 16 | mistaken.  And those have been -- I don't know if they've been |
| 17 | produced yet.  I know I reviewed them and instructed that they |
| 18 | be produced. |
| 19 | No, no, that's not it. |
| 20 | But I know that we have -- we -- I think |
| 21 | (indiscernible). |
| 22 | ATTORNEY GRUNFELD:  That one is not on the chart. |
| 23 | But we have discussed it in the meet-and-confers.  And those |
| 24 | are being produced, as I understand it.  So there is no dispute |
| 25 | there. |

1          ATTORNEY PAPPY:  Oh, I know what they are, Judge.  It

2   was 238 to 244.

3          THE COURT:  Right.

4          ATTORNEY PAPPY:  246 and 247.

5          Is that right?  Ms. Grunfeld.  Is that right?

6          I think that's right.

7          ATTORNEY GRUNFELD:  I don't remember, but I think it

8   was in --

9          ATTORNEY PAPPY:  I think that's right.

10         ATTORNEY GRUNFELD:  -- the February 20th status

11  conference.

12         ATTORNEY PAPPY:  238 to 244.

13         But, Judge, regardless of what the exact numbers are,

14  yes, we are in agreement.  And I think that I've already

15  processed them, and they may have actually been produced.

16         THE COURT:  Okay.  No.  Thank you.  And that's my

17  recollection from our status conference.  I was looking at page

18  24 of my order, which related to 238 through 244; 246 and 247,

19  pertaining to alternative-to-incarceration programs.

20         If there are no disputes and those documents are

21  being produced, then that is wonderful.

22         ATTORNEY SWEARINGEN:  Thank you, your Honor.  I

23  believe there may be one other one worthy of discussion, and

24  that would be RFP 156.

25         I -- I see the ruling that the defendants shall

1  confirm whether any responsive documents exist as to mental

2  health care programs for people at the jail.  And just didn't

3  want to omit that one from our discussion.

4       (Pause.)

5       THE COURT:  I don't recall that this came up in our

6  two most recent status conferences.

7       Ms. Grunfeld is shaking her head.

8       It did not.

9       So, Ms. Pappy, have you looked into this one yet?

10      ATTORNEY PAPPY:  The client is looking into it.  Our

11  medical person is on vacation this week, who pulls these

12  records.

13      If there's something there, it's got to be produced.

14  I don't --

15      THE COURT:  Okay.  Thank you for that confirmation.

16      ATTORNEY PAPPY:  I won't stand on it and say, yes,

17  they exist and I'm not going to produce them.  We'll produce

18  them if they exist.

19      THE COURT:  All right.  Very well.

20      Mr. Swearingen, thank you for raising that issue.  I

21  appreciate it.

22      Anything else we should discuss on the February 14th

23  order, in the follow-up?

24      ATTORNEY SWEARINGEN:  No, your Honor.  Thank you.

25      THE COURT:  Okay.  Let's talk, now, about medical and

1    custody records.

2            We discussed this on February 6th, and I reviewed the

3    relevant portion of the transcript from that discussion.

4            I think everyone is -- well, in agreement -- well, I

5    ordered that the -- the categories contained in Ms. Chartoff's

6    email from December 7th, 2023 -- that's Docket number 512,

7    pages 52 and 53 -- would be the categories the County would

8    use.  And that for each of the individuals for whom records

9    were being produced, it would include the medical and mental

10   health records for -- and the dental records for the specified

11   categories and then the corresponding custody records.

12           So, as I understand it, the issue is solely, the

13   number of records that would be produced in the different

14   categories.

15           Did I get all of that right, Mr. Swearingen and

16   Ms. Grunfeld?

17           ATTORNEY SWEARINGEN:  Very close, your Honor.  The

18   only other issue would be the methodology.  That is, how they

19   were picked.

20           THE COURT:  And I saw that as well.  But I also

21   thought that we had discussed the methodology and the criteria

22   would be the ten most recent or five most recent people from

23   the list.

24           I'm looking at page 164 in the transcript.  And maybe

25   this only applies in part.  But it was the -- I said:

1            "What criteria are you using to decide which ten

2            custodial and medical files?"

3            "Ms. Pappy:  Most recent.  Just the people that

4            are on the list currently, and then pull those

5            files."

6        And I said, "The ten most recent for everyone?"

7        And Ms. Pappy said, "Ten most recent, to the best

8            that they can."

9        Now, I don't know if that -- maybe I erroneously

10   understood that to mean just the ten most recent for each of

11   the bullet points because that then would resolve the

12   plaintiffs' concern about cherry-picking records.

13       But if I'm missed something, Ms. Pappy -- I'm not

14   trying to put words in your mouth beyond what was said at the

15   hearing.

16       Tell me what the County is -- is doing with respect

17   to the number of records and the criteria or the methodology,

18   beyond -- if it's different than what I just said.

19       ATTORNEY PAPPY:  It's not different than what you've

20   said.

21       And I think that the number of actual records -- I

22   may be wrong, but I think that discussion about -- was about

23   what was asked for.  They asked for ten, and we produced, I

24   think, five -- at least five, if not a few more for all of

25   them.  Except dental, I think we produced maybe 20 or 40.

```
 1    Whatever the number was that they asked for, we produced as to
 2    dental.
 3            Medical, though, the ten was just too much for us
 4    to -- it was 570 records.  Individual, you know, downloads of
 5    records that would have been required.
 6            So we -- we reduced the number.  And then the
 7    criteria is as I previously advised the Court.  I sent emails
 8    to counsel about what the criteria was.  And you see, I guess,
 9    sort of the remaining issues about criteria in the joint
10    statement.
11            THE COURT:  But I guess I don't -- well, let's talk
12    about criteria first.
13            There's -- there are discussions about people's
14    memory, then there's -- which would be their memory.  But then
15    there are also criteria that are based on the ten most recent
16    from a list.  Help me understand that distinction.
17            I'm looking at Ms. Chartoff's email.  And maybe
18    that's because memory applies to certain bullet points and a
19    list applies to other bullet points.  But help me understand
20    that, please.
21            ATTORNEY PAPPY:  Sure.  So the person who pulled the
22    records -- like, for example, you're not -- let's say somebody
23    with high blood pressure -- I think was one of the items on
24    that list.  It would be pretty easy to find five recent
25    individuals with high blood pressure.
```

1          But pregnancy is not something that you're -- there

2    isn't a pregnancy search term that can be used.  And so if they

3    know anybody who's currently pregnant or maybe just had a baby

4    because -- because they are in the position to know; they're a

5    supervisor.  And then she had to use her memory to remember

6    other people that had previously been pregnant.

7          So you can't run a list that says all of these people

8    have been pregnant while in custody over the last year or two.

9    There's no such list.

10         So -- so this particular person had to use memory for

11   something like that, for pregnancy.  Where it's not -- you

12   know, it's not a common occurrence amongst the jail population.

13   But everything else, where it was, you know, common conditions

14   that they can -- that they track, they just pulled the list and

15   said, "Okay, here's the five most recent."

16         THE COURT:  With respect to using the memory of an

17   employee, are there any categories contained in Ms. Chartoff's

18   email on -- for which you relied on memory because there wasn't

19   a list beyond the pregnancy?

20         ATTORNEY PAPPY:  Not that I'm aware of.  And

21   pregnancy was the one that -- it doesn't happen a lot in jails.

22         THE COURT:  You had mentioned 570 records.

23         ATTORNEY PAPPY:  Yes.

24         THE COURT:  I may have seen that in the joint report,

25   or it may not be in there.  But, regardless, what are you

1  talking about when you say 570?

2         ATTORNEY PAPPY:  So the way that the -- that the

3  December 7th email reads, if you add up all of the records that

4  they want -- they want ten examples of pregnancy.  They want

5  ten examples of high blood pressure.  Ten examples of all of

6  the various things that they want.  Those are 570 different

7  individual medical records.  And to pull that number of medical

8  records would have -- it took us weeks to produce what we did,

9  which was -- I don't know -- 175, I think.  The plaintiffs'

10  counsel counted.  I can't remember.

11         It took us weeks to do that.  Somebody -- two

12  people -- I think two or three people working full time to get

13  them downloaded.

14         So -- so to have to go and pull 570 within the time

15  frame that we had was simply not doable, in addition to the

16  fact that there's been no explanation, at this point, as to why

17  that number of records is necessary.  Because plaintiffs have

18  submitted somewhere close to 200 authorizations through the

19  medical records departments, and not through discovery.  I

20  think -- I think the joint statement says that.  Asking for the

21  medical records of folks who have given plaintiffs' counsel

22  authorizations to get their records.  So now they're

23  essentially up to 375.  And within those additional 200,

24  they're going to come across a lot of these different

25  conditions.

1          And I'll also point out that because of -- of the way

2     that they asked them -- which I don't -- I think that was the

3     only way they could ask them.  Is ten people with this

4     condition, ten people with these.  Is you're going to have a

5     lot of people with coincident conditions -- or I think they

6     call them comorbidities -- in the 200 that they're getting

7     pursuant to the medical authorization.  I find it hard to

8     believe that they're not going to cover every single thing that

9     they and their experts want in all of these medical records

10    that they have.

11         THE COURT:  Are you looking at Ms. Chartoff's email?

12         ATTORNEY PAPPY:  I'm not looking at it, but I have it

13    pretty ingrained in my brain.

14         THE COURT:  Well, I'm sure you do.  But I'm going to

15    ask you some specific questions.  So if you don't, I think it

16    would be -- let me know.

17         ATTORNEY PAPPY:  Sure.

18         THE COURT:  Ms. Chartoff's email contains, under the

19    "medical heading," 13 bullet points.

20         ATTORNEY PAPPY:  Um-hmm.

21         THE COURT:  Is the County producing five records for

22    each of those 13 bullet points?

23         ATTORNEY PAPPY:  More than five for each bullet

24    point.  Because if I recall correctly, there is a bullet point

25    that says, you know, ten records for each of the following.

```
 1   And so in the same bullet point, there's -- I don't know --
 2   five medical conditions.  So we produced five for each medical
 3   condition.  So it would actually be more than the 13 bullet
 4   points.
 5              THE COURT:  I see.  You're talking specifically about
 6   people being placed on withdrawal protocols and then with the
 7   following illnesses and they're multiple listed?
 8              ATTORNEY PAPPY:  Correct.
 9              THE COURT:  With respect to mental health, there are
10   13 bullet points.
11              ATTORNEY PAPPY:  Yes.
12              THE COURT:  Is the County providing at least five
13   records for each of those 13 bullet points?
14              ATTORNEY PAPPY:  Yeah.  I think they produced more.
15   I think they produced ten.
16              THE COURT:  But they're only -- ten are requested for
17   each bullet point, so --
18              ATTORNEY PAPPY:  Right.  They didn't listen to our
19   instructions.  But, hey.  Mental health folks did that.  That's
20   fine.  They produced them.  I didn't.  I didn't say, no, we're
21   only producing five.  They actually pulled ten.
22              THE COURT:  All right.  And then with dental, you
23   said that requests more records for individuals under the four
24   bullet points.  What did do you with respect to that?
25              ATTORNEY PAPPY:  Same thing.  I think each of these
```

1    is a separate -- I think there was 40 or 80 or -- there was a

2    lot.  We didn't cut these down very much because they were much

3    easier to run.

4              THE COURT:  All right.  All right.  Thank you.

5              I have a better understanding now.

6              Mr. Swearingen, Ms. Grunfeld, why is this

7    insufficient?

8              ATTORNEY SWEARINGEN:  Well, based on what we hear in

9    court today, there should be at least 50 percent or more of the

10   records requested actually produced.  Half of 570 is 265.

11             Is that right?

12             THE COURT:  Close enough.

13             ATTORNEY SWEARINGEN:  But, in reality, we got closer

14   to 175.  We got about 30 percent, not 50 percent.

15             So where that extra 20 percent is missing, I -- I

16   don't know.  But it is missing.  So I -- I -- I don't think we

17   received as many records as five of each ten that were

18   requested.

19             In addition, as to the methodology, I'm -- I'm a

20   little confused.  But the colloquy about producing the most

21   recent records -- when you say the most recent records, are

22   you, your Honor, saying the most recent bookings of people who

23   have these characteristics?  Or the most recent time that they

24   were seen?

25             THE COURT:  I'm not saying anything that detailed.

1    I'm repeating what was said during -- on February 6th.  And

2    then when everybody seemed to be in agreement, that this

3    list -- whatever it is -- for each of the bullet points would

4    then -- the defendants would go to the five most recent from

5    that list.  We didn't discuss what that list was.  I just

6    thought this was resolved.

7              ATTORNEY SWEARINGEN:  And I'm sorry.  I'm putting you

8    on the spot.

9              THE COURT:  You're not.

10             ATTORNEY SWEARINGEN:  It was a very good suggestion,

11   to go with the five most recent.

12             That eliminates the possibility of cherry-picking.

13   So I thought that was a great suggestion.  And what I

14   understood the Court to mean is the five most recent booking

15   numbers.  So, for example, if 20 people have a certain

16   condition in the past year, just look at the five most recent

17   booking numbers and pull that.  And that's what I understood

18   was done.  And I just -- from today's discussion, I'm not clear

19   whether that was the methodology that was used or not.

20             THE COURT:  I want to move beyond this issue.

21             Ms. Pappy, can you shed any additional light on that?

22             ATTORNEY PAPPY:  No.  I don't -- I don't think they

23   used -- they didn't use booking numbers.

24             They just went through J.I.M.S., largely.  There's a

25   flag for high blood pressure.  And they just said, let me, you

1    know, find the most recent J.I.M.S. flag.  Is that somebody

2    that was most recently booked?  I don't know.  But it's

3    probably -- you know, actually, I just don't know.  If

4    something -- would it be alphabetical?

5              THE COURT:  It doesn't matter.  The point is that it

6    would eliminate cherry-picking.

7              ATTORNEY PAPPY:  Yeah.  No, it was just a flag that

8    is -- shows up in J.I.M.S.  And they just picked five most

9    recent.  It might be most recent based on treatment.  I -- I

10    actually can't answer that.

11              THE COURT:  The relevant concern is that the County

12    would cherry-pick individuals.  I don't have any indication

13    that that happened.

14              Do you wish to be heard on that further,

15    Mr. Swearingen?

16              ATTORNEY SWEARINGEN:  As we indicated in our joint

17    status statement filed yesterday, I think that so long as

18    plaintiffs are able to timely receive the additional records

19    that they requested -- I think that we requested approximately

20    83 records in connection with the plaintiffs' tours or

21    inspections of the jail.  As long as we were able to timely

22    obtain those records, I -- I think that the -- the -- the issue

23    regarding methodology doesn't need to be discussed further.

24              THE COURT:  I'm not even sure what you're talking

25    about.

1          ATTORNEY SWEARINGEN:  Probably not.  I'm sorry.  I

2     can provide more context.

3          THE COURT:  I just -- I'm not going to condition

4     something on an issue that I don't know anything about.  I

5     think that this was discussed at the February 6th hearing.

6          The concern for cherry-picking was raised, without

7     making any findings that that was in fact the case.  The County

8     searched for the relevant conditions, as I understand Ms. Pappy

9     to be saying it, and picked the five most recent.

10          There's no information before me that there's any

11     cherry-picking or selective producing of records that is

12     happening, and I decline to order the County to change its

13     methodology based on the record before me.

14          The -- I do have one other question, though.

15     Mr. Swearingen, at the end of our discussion, on transcript

16     page 169, you asked to be told which records correspond with

17     which bullet point in Ms. Chartoff's email.

18          And if that happened, then I'm not sure why there

19     would be confusion over whether you got five records or six

20     records, or whatever it may be for each bullet point.  Because

21     you had said the County told you they're going to give you a

22     certain number, and you only got a certain number less than

23     that.

24          Did you receive the information from the County as to

25     which records corresponded with which of Ms. Chartoff's bullet

1  points?

2       ATTORNEY SWEARINGEN:  We did, your Honor.

3       THE COURT:  So what's -- I'm really having a hard

4  time understanding the problem.

5       ATTORNEY SWEARINGEN:  So the problem is -- what I was

6  trying to say earlier, in today's discussion, was we received

7  less than half of the records that were produced -- that were

8  requested.

9       THE COURT:  Oh.

10       ATTORNEY SWEARINGEN:  Of the 570, we received about

11  175, not 265.

12       THE COURT:  I don't count 570, by the way.  I mean --

13  well, maybe -- maybe that is.  If -- if -- are you counting --

14  so, for example, the bullet point that says ten records for

15  each of the people placed on withdrawal protocols for alcohol,

16  opiates, and benzo -- benzodiazepines, you're requesting ten

17  for each of those?  Or a total of 30?

18       ATTORNEY SWEARINGEN:  That's correct, your Honor.

19       THE COURT:  Oh, okay.

20       But -- understanding that.  So -- but -- why is that

21  insufficient, what the County has given you?

22       Tell me -- explain that to me.  Because maybe five is

23  arbitrary, but why isn't ten arbitrary?  Why don't you have

24  enough?

25       I mean, at a certain point, it's no longer

1    proportional to the needs of the case.  And I've heard some

2    specific information from Ms. Pappy about the burden that's

3    been associated with producing these records.  And it's not

4    clear to me why what the County has given to you is

5    insufficient; not even considering the independent requests for

6    medical records that the plaintiffs have made.

7            ATTORNEY SWEARINGEN:  These were requests that were

8    originally formulated with our experts.  These were numbers

9    that they agreed would be the records that they would want to

10   receive as part of their record review for their expert

11   reports.

12           THE COURT:  Okay.  I appreciate that, Mr. Swearingen.

13           Based on the information before me, I find that the

14   defendants have complied with the Court's order for production

15   of medical and custody records in terms of the scope of the

16   searches and the methodology for the searches.

17           I respectfully decline to order the defendants to

18   produce what they have already agreed to produce.  I do want to

19   talk about the timing for that production.

20           Ms. Pappy, have all of the medical and custody

21   records that the defendants identified for production in fact

22   been pulled and produced to the plaintiffs?  Or is that

23   ongoing?

24           ATTORNEY PAPPY:  I am chagrined to say that I have

25   had them all, and I have had them all for three weeks; but for

 1 | some internal glitch, they did not get processed for

 2 | production.

 3 | But I know that the -- the process of running them --

 4 | it takes a while to run them and get them stamped -- started

 5 | two days ago.  It was still going last night.  And as soon as

 6 | they are done -- should be done sometime today -- they're

 7 | going.

 8 | THE COURT:  All right.  I am going to respectfully

 9 | direct you to produce all of those records to the plaintiffs by

10 | no later that March 11th.

11 | ATTORNEY PAPPY:  That's fine.  Thank you, your Honor.

12 | THE COURT:  And, obviously, if they're finished,

13 | ready for production earlier, you'll produce them earlier.

14 | ATTORNEY PAPPY:  Absolutely.

15 | THE COURT:  All right.  Let's talk about the

16 | inspections, and then let's talk about the pretrial schedule.

17 | Give me just a moment.  I want to pull the current

18 | pretrial schedule.

19 | (Pause.)

20 | THE COURT:  Okay.  I've got the third amended

21 | scheduling order.  That's Docket number 479.

22 | And the fifth item in the parties' joint report

23 | pertains to the environmental expert's inspection.

24 | Is this the individual from South Carolina that we

25 | talked about before?

1              ATTORNEY GRUNFELD:  Yes, your Honor.

2              THE COURT:  All right.  So, currently, you have

3     expert disclosures on or before May 10th, and an expert

4     discovery cutoff of June 28th.

5              What's the issue with respect to your environmental

6     expert?

7              ATTORNEY GRUNFELD:  So, your Honor, that's the person

8     who can come in April, but counsel for the defendants are not

9     available.  So we had worked out a stipulation --

10             THE COURT:  Um-hmm.

11             ATTORNEY GRUNFELD:  -- that Ms. Graham would go to

12    South Bay and Central on May 15th and 16th, which is obviously

13    past the discovery cutoff.  And then we would extend expert

14    disclosures as to that one expert out to June 10th, for her.

15    And then rebuttals to June 28th.

16             And Ms. Coleman suggested, yesterday, that we

17    consider moving all of the expert reports and disclosures, et

18    cetera, asking the Court about that.  And that got us to

19    thinking about this current schedule.  It's been quite -- quite

20    grueling for everyone, as the Court is aware.

21             So what we are thinking is -- we wanted to

22    accommodate everyone's schedule:  Ms. Pappy's trial,

23    Ms. Coleman's vacation, this expert from South Carolina, the

24    whole -- everyone.

25             So we were wondering if the Court would consider, in

1    light of not only our schedule -- our third amended schedule

2    order but also the issues we discussed this morning, the need

3    to work on some projects for settlement, pushing everything by

4    three weeks.  Which would give us a little more time to prepare

5    for these very important PMK depositions.

6         We're very close on the schedule for that, by the

7    way.  The Court has ordered 40 hours.  We've asked that that be

8    done in a week, but we are flexible if it needs to be a week

9    and a half.  Ms. Pappy and Ms. Coleman are gathering the

10   people.  But it is difficult to prepare without having all of

11   the documents and then also like -- while doing these other

12   things.  So that was our general concept.

13        I have right in front of me the stipulation that we

14   reached, absent the issue of when are the experts going to be

15   disclosed.

16        And we would like, by the way, to keep the other

17   pretrial deadlines where they are.  So, for example, the

18   dispositive motions, the -- the October deadlines on page 2 of

19   the order, we think that we can meet those -- from plaintiffs'

20   perspective -- even if we got three extra weeks on the other

21   deadlines.

22        THE COURT:  So your request is to continue all

23   deadlines by three weeks?

24        ATTORNEY GRUNFELD:  Yes, your Honor.

25        THE COURT:  Ms. Pappy, what's your position on that

1    request?

2            ATTORNEY PAPPY:  I -- one-hundred-and-ten percent --

3    agree.  And one of the things that does relate to this morning

4    and why I would join wholeheartedly in their request and ask

5    the Court to seriously consider it is, you know, one of the

6    things that -- that crops out of potentially movement in the

7    right direction on the ADA issues is I think that the -- the

8    days and -- and most of the folks that were going to do those

9    inspections still need to do them because they're medical and

10   it's unrelated to what we were talking about this morning.

11           But Ms. Sanossian may not need to do an inspection of

12   one of the facilities.  So there is great benefit to getting

13   this additional breathing room to get them the documents.  To

14   understand, you know, whose PMK depositions they might want to

15   take as a part of the drug interdiction issue, in advance of

16   other people, to help with settlement.  And it would just be

17   lovely to have the room and the space of just three little

18   extra weeks to help us work through some of this stuff.

19           ATTORNEY GRUNFELD:  And may I just add -- I'm getting

20   a note here.

21           THE COURT:  Sure.

22           ATTORNEY GRUNFELD:  That three weeks may not be quite

23   enough for Ms. Graham.  Because if we went from the key date

24   now, it's April -- April 16th.  So three weeks -- we -- we

25   would need -- that would be May 7th.  So we would need four and

1    a half weeks for fact discovery to extend, for her to make it

2    to the -- or in some way she would have to be carved out of

3    the -- if we closed at another time, if that makes sense.

4            So she can't go on the current plan until May 15 and

5    16.

6            THE COURT:  I'm not inclined to change the entire

7    schedule around Ms. Graham's availability.  That is something

8    that could be worked out.  I do want to think this through some

9    of the dates that affect Judge Battaglia's schedule, obviously.

10           Let's -- leaving aside this issue of the 30 days --

11   or let's assume that a three-week extension is granted.

12           Ms. Pappy, is a deadline for the County to produce

13   all responsive -- remaining responsive documents, pursuant to

14   my orders of March 22nd, workable?

15           ATTORNEY PAPPY:  Absolutely.

16           And we are not opposed to -- I understand the Court

17   may have some concern about extending things to accommodate

18   Ms. Graham.  We don't have a problem with her being carved out,

19   just as she's currently carved out.

20           THE COURT:  Okay.  Got it.

21           ATTORNEY GRUNFELD:  And we -- we are fine with all of

22   that.  But we would like to extend the PMK depositions into the

23   second week of April.  Second half of April.  Excuse me.

24           ATTORNEY PAPPY:  Three weeks would get us that,

25   wouldn't it?  Right?  Yeah.

1          THE COURT:  Okay.  All right.  Understood.

2          I will consider that request, and I appreciate you

3    raising it.

4          ATTORNEY PAPPY:  Just one more -- one more thing to

5    add, as a plea for mercy, is I have that trial that I

6    anticipate will end by April 12th.

7          Ms. Coleman gets back from a month-long vacation, I

8    think, April 22nd.

9          THE COURT:  (Indiscernible.)

10         ATTORNEY PAPPY:  I know.  Ms. Coleman is lucky.

11         (Laughing.)

12         ATTORNEY PAPPY:  And so that extra three weeks and

13   them being able to move their PMK depos would do us a world of

14   good; to be able to get all of these documents to them, to get

15   the depos, survive my trial.  And then I will be able to come

16   to the PMK depos instead of Ms. Coleman.

17         THE COURT:  Okay.  No, I understand.

18         And, look, I am -- I am considering all of this in

19   the spirit of you all truly trying to work together to figure

20   out these issues and work collaboratively.  And it does not go

21   into this.

22         So, that being said, let me give that some thought.

23   And I will issue a further order on all of this as soon as I

24   can.  It -- I think those are all of the issues that are raised

25   in the joint status report.  Did I miss any, Mr. Grunfeld and

1   Ms. Swearingen?

2           ATTORNEY GRUNFELD:  No, your Honor.  I just wanted to

3   make sure we covered the motion to compel.

4           THE COURT:  Oh.  You mean the motion to compel 203 to

5   207?

6           Sure.  Did I set that for argument today?

7           ATTORNEY PAPPY:  No.  You said you would take it

8   under submission.

9           (Pause.)

10          THE COURT:  I'll be candid with you, Ms. Grunfeld, I

11  did quickly look at the defendants' opposition.  But I did not

12  focus on it because I was focusing on the motion for a

13  protective order and the parties' joint status report that were

14  before me today.

15          I think I understand the arguments, and I do plan to

16  issue an order on this as quickly as I can.  But if there are

17  any comments you would like to make on it, I -- go ahead.

18          ATTORNEY GRUNFELD:  Thank you, your Honor.

19          I wanted to just point out that -- well, it strikes

20  me, and I think the Court as well, that on the one hand, each

21  side is arguing:  Discovery is broad, discovery is narrow,

22  there's privacy rights, there's no privacy rights.  And that's

23  a difficult balance to achieve.  But I think there's a stark

24  difference between the two motions.

25          This motion to compel involves a central allegation

1   in our complaint about the lack of accountability.  And the

2   privilege issues were waived.  So that's a very different

3   posture from what was presented with our motion for protective

4   order.

5           And that's really the only comment I wanted to make,

6   is that the -- the investigation and discipline system that the

7   sheriff's department is running is central to whether they can

8   monitor and hold themselves accountable for their behavior

9   towards our clients.  And we believe these documents are quite

10  relevant and quite central to our safety and security

11  constitutional claim.

12          THE COURT:  Let me ask you a couple of questions,

13  then.

14          And, Ms. Pappy, I understand you weren't planning to

15  address this because my order did say that I would take it

16  under submission.  But I do, while I've got this in front of

17  me.

18          We have discussed, at length, concerns of overbreadth

19  and proportionality in connection with the plaintiffs' requests

20  for production and the defendants' subpoenas to CDCR.

21          So let me ask you something.  With respect to

22  Requests for Production number 207, that seeks all documents

23  relating to any incident, complaint, or investigation of

24  prejudice or discrimination, that would include complaints of

25  prejudice made by one employee against another employee,

1    wouldn't it?

2           And you can see where I'm going with this.  The scope

3    is -- I'm having a really hard time with that.

4           ATTORNEY GRUNFELD:  I see, your Honor.

5           I don't have that exact request before me, but it

6    should be amended to say, "Prejudice or discrimination against

7    incarcerated people."  And if it doesn't, that's the way it

8    should read because it is in the context of the third amended

9    complaint.

10          What we have are claims for race discrimination and

11   for safety and security.  And how the defendants investigate

12   and discipline those kinds of issues, staff misconduct, goes

13   directly to our claims.

14          THE COURT:  I understand.

15          With respect to number 206, it seeks all documents

16   relating to incidents and complaints and investigations of

17   dishonesty by jail employees.

18          That's not tethered to investigations of dishonesty

19   by employees in relation to an inmate.

20          It's any -- any time an employee was dishonest in any

21   manner would be covered by this RFP, would it not?

22          ATTORNEY GRUNFELD:  Yes, your Honor.  And it could be

23   narrowed.  But, again, if the system is on trial -- which it

24   is -- and the -- if the incident or grievance or complaint

25   about dishonesty is not handled in a -- in a -- in an unbiased

1   and prompt manner, that does suggest -- I'm not saying it would

2   be admissible at trial but it does suggest that there's

3   problems with the discipline and investigation system in just

4   the way that a sheriff's department is going to hold itself

5   accountable for all incidents of staff misconduct.  Including,

6   of course, those that are most central to our concerns, those

7   against incarcerated people.

8                THE COURT:  Okay.  Well, I understand.

9                I appreciate the additional information, and I

10  appreciate your distinction between the -- the CDCR subpoenas,

11  and the trial within a trial, and the allegations in the

12  plaintiffs' third amended complaint.

13               Ms. Pappy, I know you didn't come expecting to

14  address this motion because it -- I did say I was going to take

15  it under submission.  But to the extent you would like to make

16  any comments in response to my questions, help or otherwise, I

17  welcome you to do so.

18               ATTORNEY PAPPY:  I wrote it late last night.

19               THE COURT:  Okay.

20               ATTORNEY PAPPY:  So it's fresh in mind.

21               THE COURT:  Okay.

22               ATTORNEY PAPPY:  Well, I don't want to draw

23  distinctions between the CDCR.  I want to draw direct

24  corollaries to the CDCR request.

25               What I just heard was an explanation of why this

 1    information is relevant is because plaintiffs need to be able

 2    to prove how the department investigates.  That things

 3    aren't -- investigations aren't handled in a prompt manner.

 4    Why do you need unsustained findings?  Why aren't you asking

 5    about information about process?  Setting a PMK depo for

 6    somebody about process?

 7              Because everything that they have -- they have stated

 8    on the record today as to why they need unsustained findings --

 9    so that we are going to retry these in -- in trial in this

10    case -- and -- you know, so somebody -- somebody -- an employee

11    lied because they were trying to protect an IP or another

12    employee from an embarrassing situation that has nothing to do

13    with IP care -- we're -- we're going to subject these people to

14    all of that and violate the third-party rights of these

15    employees?  What they're looking for is process.  Why aren't

16    these requests specific and limited to process?

17              Unsustained findings are not going to show you

18    process in -- in any significant way to prove your -- that --

19    that can't be found in other ways without invading privacy

20    rights of these individuals who have been subjected to these

21    investigations that are subject to their constitutional privacy

22    rights.

23              I think it's -- it's a weighing and balancing.  And

24    that's certainly how I argued the motion.  But what I'm hearing

25    today is:  We want to know about process.  You don't need these

 1   records to learn about process.

 2              THE COURT:  Do you have 203 through 207 in front of

 3   you, Ms. Pappy?

 4              ATTORNEY PAPPY:  I in fact do.  I printed them out.

 5              THE COURT:  Okay.  All right.  They're at Docket

 6   number 547-2, pages 6 and 7.

 7              And my question is, Ms. Pappy, for 203, were all

 8   sustained -- were documents pertaining to all sustained --

 9   well, let me now ask you, what was produced in response to 203?

10              ATTORNEY PAPPY:  All sustained findings for every

11   single one of them.  All sustained findings.

12              THE COURT:  I see.

13              You mentioned a Rule 30(b)(6) deposition as, in the

14   County's view, the appropriate way to gather information

15   regarding process.

16              Is that a topic that is the subject of Rule 30(b)(6)

17   testimony?  Or that will be the subject of Rule 30(b)(6)

18   testimony?

19              I know I'm putting you on the spot, and you don't

20   have it in front of you, perhaps.

21              ATTORNEY PAPPY:  I don't -- I mean, it's -- can I

22   answer the second question first; that you haven't asked me

23   yet?  Which is, you know, it's a little -- little too little,

24   too late to be adding people to the 30(b)(6).

25              Is it included in any of these categories?  Let me

 1    see.   (Pause.)

 2            I mean, I guess it generically falls under safety and

 3    security.   I would think -- unfortunately, I'm going to have to

 4    let plaintiffs' counsel answer that question because I don't

 5    know.

 6            THE COURT:   I understand.   This was not on our agenda

 7    for today.

 8            Ms. Grunfeld, do you have an answer to that?

 9            ATTORNEY GRUNFELD:   We were looking through that

10    right now, your Honor.

11            But, respectfully, Rule 30(b)(6) will not suffice,

12    and we are not trying to invade third-party privacy rights.

13    And we said, at the end of this -- if the Court decides to

14    redact the names -- that could be another solution.

15            But if we looked at 203, incidents, complaints, and

16    investigations of employees' failure to intervene against

17    another employee using unnecessary or excessive force -- now,

18    that is about our clients.   And the problem with limiting this

19    to sustained findings is that unfortunately most correctional

20    systems do not sustain a lot of findings against their own.

21    That is well documented.   So the incidents, the complaints, the

22    grievances are the way to know what happened.

23            And the documents related to that -- the

24    investigation, the camera footage -- that is how we have a

25    window into how the system is working and whether the system is

1 | adequately protecting our clients.

2 |     So if you look at this 203, I don't know how many

3 | sustained incidents were produced in response to these four or

4 | five requests.  I was told it was a handful.  We are seeking

5 | the unsustained, as well, to determine why they were

6 | unsustained.

7 |     Were they unsustained because the incarcerated person

8 | was lying?  Or were they unsustained because a code of silence

9 | was used, and the reports were written in a cursory and biased

10 | fashion?

11 |     We can't know the answer to that without any of the

12 | underlying documents, and we can't take a good PMK deposition

13 | without the underlying documents to ask about.

14 |     THE COURT:  Okay.

15 |     ATTORNEY PAPPY:  If I may be heard?

16 |     THE COURT:  Sure.

17 |     ATTORNEY PAPPY:  As I have done before, I take great

18 | exception on behalf of my client to the notion that they do not

19 | punish people who violate the law.  And they have no evidence

20 | of that.  It's pure speculation.  It's -- it's based upon

21 | nationwide statistics that have nothing to do with my clients'

22 | facility.  We're here to litigate this facility and this

23 | sheriff's department.

24 |     And if there is some evidence that they engage in

25 | this code of silence and do not prosecute individuals who

1    engage in excessive force, drawing of guns, or discharge of a

2    firearm, then by all means bring it forth and substantiate the

3    reasons for these discovery requests.

4            There is nothing before the Court, in the motion that

5    was filed, that substantiates any notion that this department

6    does not prosecute vigorously each and every use of excessive

7    force in a complaint.

8            I would also point out that the plaintiffs have a

9    list of excessive force incidences.  It's a spreadsheet.  I

10   remember it because it's got a lot of information on it.  So

11   they have all of the excessive force -- they asked it under --

12   you know, for various -- anything involving bodily harm.  I

13   remember the request in my mind.  And they had a spreadsheet

14   with every single incident and, if I'm not mistaken, the name

15   of the deputy in there.

16           So, again, I go to a balancing of the privacy rights

17   of these folks.  And what we just heard was they absolutely

18   intend to come to trial and retry each and every one of these

19   employees for something that they were exonerated for, based

20   upon speculation.

21           How is that not an exact corollary of what we were

22   requesting of the CDCR and the Court denied?

23           THE COURT:  Let me ask you something, Ms. Pappy.

24           I want to understand a little bit more in -- about

25   the County's ability to search for responsive documents.

1    If -- if I were to say, for example, produce

2    complaints alleging excessive force by County employees in the

3    jail, regardless of whether those complaints are sustained or

4    not, I'm not talking about the total investigative file.  I'm

5    talking about the complaint.

6    How are those documents maintained?  How does that

7    search take place?

8    ATTORNEY PAPPY:  You're talking about complaints by

9    IPs against an individual?

10    THE COURT:  IIPs, you mean?  Incarcerated persons?

11    Just so the record -- no, just so the transcript is clear, yes.

12    ATTORNEY PAPPY:  No.  I'm not sure that I can narrow

13    it down to where there was an IIP complaint.

14    Every use of force is documented in this document

15    that I produced.  Every use of force.

16    They have -- if -- if a use -- if a deputy is engaged

17    in a use of force, they have to report it and document it.

18    THE COURT:  And what did you produce in that regard?

19    The spreadsheet?

20    ATTORNEY PAPPY:  Just the spreadsheet.  And I in fact

21    was looking last night to see if I could find it.  I think it

22    was one of the earlier -- maybe a Request for Production of

23    Documents 3.

24    But -- I can find it, and I -- I'm sure the

25    plaintiffs have it.  But it is every use of force.  So it not

1    just where -- where an incarcerated person complained about it.

2    That's actually a more narrow dataset than what we gave them.

3              THE COURT:  Well, what's on the spreadsheet, though?

4    Is it a list of incidents or does it contain information about

5    each incident?

6              ATTORNEY PAPPY:  There's details about each incident.

7              THE COURT:  Are you familiar with the spreadsheet to

8    which Ms. Pappy is referring to, Ms. Grunfeld?

9              ATTORNEY GRUNFELD:  I have heard about it.  I have

10   not reviewed it.  But I would like to ask what good it would do

11   to have a list of names.

12             We can't depose those people.  And if we go into a

13   PMK deposition and ask somebody, "What happened when this --

14   Officer Smith was accused of a use of force" -- how would they

15   possibly know?  That's why we asked for these underlying

16   documents.

17             And as for the idea that we're going to have a trial

18   within a trial, that's not our intention at all.  What we want

19   to do is assess, as our complaint alleges, whether they are

20   holding people accountable for excessive force or misconduct.

21   Those claims were not dismissed.  They are live claims.  And

22   these are relevant documents for which no objections were made

23   other than equally available -- clearly not; previously

24   requested -- no; and irrelevant.

25             So we really think that a subset, at least, of these

1    requests should be produced to allow us to assess the

2    disciplinary investigation system for a period of time.  The

3    time period the Court has already decided is relevant to these

4    injunctive relief claims.

5              THE COURT:  Okay.  I appreciate the additional

6    argument.  I understand the parties' positions.  And I really

7    do appreciate you all being here -- well, not quite all day.

8    But given your travel from Northern California, more than all

9    day for all three of you.

10             Thank you so much.

11             ATTORNEY GRUNFELD:  Thank you, your Honor.

12             ATTORNEY PAPPY:  Thank you, your Honor.

13             THE CLERK:  (Indiscernible) in recess.

14             (Conclusion of proceedings at 3:44 p.m.)

15

16                           --oOo--

17   I certify, by signing below, that the foregoing is a correct
     stenographic transcript, to the best of my ability, of the
18   digital recording of the audio proceedings had in the
     above-entitled matter this 21st day of March, 2024.  A
19   transcript without an original signature or conformed signature
     is not certified.  I further certify that the transcript fees
20   and format comply with those prescribed by the Court and the
     Judicial Conference of the United States.

21             /S/ Amanda M. LeGore

22             _____

23        AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

24

25