TABLE OF CONTENTS

EXHIBITS TO THE DECLARATION OF PRIYAH KAUL IN SUPPORT OF
PLAINTIFFS' POST-HEARING BRIEF REGARDING MOTION TO COMPEL
PRODUCTION OF DOCUMENTS BY NAPHCARE OF SAN DIEGO LLC

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| A | Official transcript of March 12, 2024 evidentiary hearing | 1 |
| B | Excerpt from County Contract Number 56617, Agreement with NaphCare, Inc. for Sheriff's Department Consolidated Health Care Delivery (NAPHCARE000616-000618) | 111 |
| C | Excerpt from NaphCare Health Care Policy & Procedure Manual – San Diego County, entitled "A-09 Procedure In The Event Of A Patient Death" (NAPHCARE031065, 31102-31105) | 115 |

# EXHIBIT A

Pages 1 - 108

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

| | | |
|---|---|---|
| DARRYL DUNSMORE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | NO. 20-CV-00406-AJB-DDL |
| | ) | |
| STATE OF CALIFORNIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Diego, California
Tuesday, March 12, 2024

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

Liberty Player Recording 9:02 a.m. - 11:44 a.m. = 162 minutes

**APPEARANCES:**

For Plaintiffs:
              ROSEN BIEN GALVAN & GRUNFELD, LLP
              101 Mission Street, Sixth Floor
              San Francisco, California 94105
        **BY:  PRIYAH KAUL, ESQ.**
              **RICHARD VAN SWEARINGEN, ESQ.**


For Third Party NaphCare of San Diego LLC:
              MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
              801 South Figueroa Street, 15th Floor
              Los Angeles, California 90017-3012
        **BY:  G. CRAIG SMITH, ESQ.**




Transcribed By:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
              Official Court Reporter

**Ex. A-2**

<u>**I N D E X**</u>

Tuesday, March 12, 2024 - Volume 1

<u>**NAPHCARE OF SAN DIEGO LLC'S WITNESSES**</u>                    <u>**PAGE**</u>   <u>**VOL.**</u>

<u>**BARKLEY, JUSTIN**</u>
  (SWORN)                                                     5      1
Direct Examination by Mr. Smith                               5      1
Cross-Examination by Ms. Kaul                                11      1
Redirect Examination by Mr. Smith                            57      1
Recross-Examination by Ms. Kaul                              60      1
Recross-Examination (Resumed) by Ms. Kaul                    78      1

<u>**E X H I B I T S**</u>

| <u>**PLAINTIFFS' EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 1 | 12 | 14 | 1 |
| 2 | 38 | 40 | 1 |
| 3 | 50 | 51 | 1 |

| <u>**COURT'S EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 1 | 67 | | 1 |
| 2 | 68 | | 1 |
| 3 | 68 | | 1 |

**Ex. A-3**

| | |
|---|---|
| 1 | **Tuesday - March 12, 2024**                                    **9:02 a.m.** |

2                        **P R O C E E D I N G S**

3                            ---oOo---

4          **THE COURT:**  Good morning.

5          **MR. SMITH:**  Good morning, Your Honor.

6          **MS. KAUL:**  Good morning.

7          **THE CLERK:**  Please be seated and come to order.

8      Calling Matter 1, 20-CV-0406, Dunsmore versus State of

9  California, et al., for an evidentiary hearing.

10         **THE COURT:**  And good morning.

11      May I have appearances from counsel, beginning with

12  plaintiffs' counsel.

13         **MS. KAUL:**  Good morning, Your Honor.  Priyah Kaul for

14  the plaintiffs.

15         **THE COURT:**  Good morning, Ms. Kaul.

16         **MR. SWEARINGEN:**  Good morning, Your Honor.

17  Van Swearingen for the plaintiffs.

18         **THE COURT:**  Good morning, Mr. Swearingen.

19         **MR. SMITH:**  Good morning, Your Honor.  Craig Smith on

20  behalf of Third Party NaphCare San Diego LLC.

21         **THE COURT:**  Great.  Good morning, Mr. Smith.

22      I appreciate everyone being here today for the continued

23  hearing on the plaintiffs' motion to compel.

24      When we were last together on February 6th, I set this

25  matter for an evidentiary hearing to provide the plaintiff with

**Ex. A-4**

1    an opportunity to cross-examine Justin Barkley, who submitted a

2    declaration in support of NaphCare's opposition to the motion

3    to compel.  That is Document -- or Docket Number, I should say,

4    503-7.

5        And, Mr. Smith, I believe that I informed you at the time

6    that it would be up to NaphCare whether you wish to use

7    Mr. Barkley's declaration as his direct examination testimony

8    or whether you wish to conduct a -- a direct examination in

9    court.  Regardless, I would provide the plaintiffs with an

10   opportunity to cross-examine Mr. Barkley.

11       What's your preference, sir?

12       **MR. SMITH:**  My preference is just a brief direct

13   examination in addition to the declaration.

14       **THE COURT:**  That would be just fine.

15       And then, for our purposes, I want to think through the

16   issues that are raised on the privilege assertions, and then I

17   want to talk to the parties about the chart that NaphCare

18   provided with its responses to the bullet points and -- and

19   come up with a plan for that.

20       But because Mr. Barkley is here -- and I do appreciate you

21   being here, sir -- why don't we go ahead and make good use of

22   his time and proceed.

23       So you may come up, Mr. Barkley.

24       **THE CLERK:**  Hi.  Please stand right here.

25       Can you raise your right hand?

**Ex. A-5**

1                          **JUSTIN BARKLEY**,

2 called as a witness for Third Party NaphCare of San Diego LLC,

3 having been duly sworn, testified as follows:

4         **THE WITNESS:**  I do.

5         **THE CLERK:**  Thank you.

6    You may take the stand.

7    Please state your name and spell your last name for the

8 record.

9         **THE WITNESS:**  Okay.  Is this good?

10         **THE CLERK:**  Yeah.

11         **THE WITNESS:**  All right.  It's Justin Barkley, and my

12 last name is spelled B-a-r-k-l-e-y.

13         **THE COURT:**  All right.  Thank you, Mr. Barkley.

14                **DIRECT EXAMINATION**

15 BY MR. SMITH:

16 **Q.**   All right.  Good morning, Mr. Barkley.

17    Can you state your position with NaphCare --

18 **A.**   Sure.

19 **Q.**   -- for the Court?

20 **A.**   Sure.

21    I'm the Chief Legal Officer.

22 **Q.**   Okay.  And we're here today to discuss morbidity and

23 mortality reviews that are conducted by NaphCare.  If you

24 could, tell us what the purpose is for conducting those

25 morbidity reviews.

1  **A.**   Sure.

2       So we do, at the corporate level, morbidity/mortality

3  reviews primarily for the purpose of helping me and my legal

4  team give legal advice to the company and also to receive

5  information that helps us give that legal advice, also to give

6  legal advice during the course of those meetings.

7  **Q.**   All right.  And are these morbidity and mortality reviews

8  done pursuant to the contract with County of San Diego?

9  **A.**   No.

10 **Q.**   All right.  Are these the site inspection reviews that are

11 conducted?

12 **A.**   No.  So the -- the documents that we mark "Privileged" in

13 our privilege log pertain to a corporate-level mortal- --

14 mortality and morbidity review.

15 **Q.**   All right.  And who attends those reviews?

16 **A.**   So since I took this position -- position in September,

17 that will be me, other members of our legal department, so

18 lawyers, a paralegal -- currently, it's a -- actually a nurse

19 paralegal who sort of runs point on having the documents

20 together and doing the prep work for that meeting and setting

21 the agenda -- or preparing the agenda, preparing the minutes

22 afterward, preparing the slide deck that's reviewed during the

23 meetings.

24      Also in attendance would be the County executives'

25 clinical leadership, so our Chief Medical Officer, other

1    corporate medical physicians, nursing staff, pharmacy --

2    pharmacists, and then our CEO, who is also an attorney.

3    **Q.**    All right.  Does anybody that provides health care to the

4    particular inmate who is deceased ever attend those meetings?

5    **A.**    No.  So these are, again, corporate-level leadership,

6    clinical and legal leadership.

7    **Q.**    And what is the purpose of having them at the meeting?

8    **A.**    What's the purpose of having the clinical leadership

9    there?

10    **Q.**    Yes.

11    **A.**    Sure.

12         So, you know, when we -- in our industry of providing

13    correction health care in jails and prisons, there is a high

14    propensity of any inmate death resulting in potential

15    litigation.  In fact, we report every death to our insurance

16    carrier.

17         And so one of the advantages of having those resources

18    available to our legal department, you know, corporate

19    physicians, corporate nurses, is that we can get the benefit of

20    their clinical expertise in evaluating that death on the front

21    end; right?  We don't have to go out and engage outside experts

22    to talk about standard of care, causation, deliberate

23    indifference standards.  We have a team available to us.

24         And so during the -- so we gather the information.  We

25    talk about it in the review.  We, as the legal department,

**Ex. A-8**

1   receive feedback from the clinical team about what issues may

2   or may not be there, defensibility of the case, weak points of

3   the case.  It informs our -- lots of our strategic decisions,

4   as the legal department, going forward.

5        You know, are we going to engage out- -- outside counsel?

6   Which outside counsel?  Do we want to engage in early

7   resolution or settlement talks?  Do we -- you know, which

8   experts do we want to try to -- you know, what type of experts?

9   We need a cardiology expert, we need a correctional standard

10  expert, what kind of experts we might have to engage.

11       So that's -- I would say that's the primary purpose we

12  have the clinical leadership involved.

13  **Q.**   Okay.  And there's also site inspection morbidity reviews

14  that are conducted as well; correct?

15  **A.**   Yes.  So we have our -- we have a policy, and at

16  different -- different facilities, different jails and prisons,

17  it's called different things.  Sometimes it's called a MAC

18  committee.  Usually, that stands for Medical Administration

19  Committee.

20       So it's, you know, us, the medical side, administration,

21  meaning the jail or prison administration, kind of a joint

22  committee where issues are discussed.  And that can include

23  reviews of similar events or deaths.  Sometimes there's a

24  separate CQI meeting.  Sometimes there's a separate

25  mortality/morbidity.

1        But, yeah, we -- it is -- it is our policy and practice

2   that, at each site level, there is some sort of review of the

3   death for the purpose of identifying issues and implementing

4   site-level corrections.

5   **Q.**   Okay.  And so the records that are at issue here in the

6   privilege log -- those are just with respect to the morbidity

7   and mortality reviews that are done on a corporate level;

8   correct?

9   **A.**   Correct.

10  **Q.**   And are those done at your direction?

11  **A.**   Since September, yes.

12  **Q.**   All right.  And are the documents that are submitted to

13  you for review also at your direction?

14  **A.**   Yes.

15  **Q.**   Okay.  I'm -- is there anything else you'd like to inform

16  the Court as to the primary purpose of conducting these?

17  **A.**   I would say that there are times within this process that

18  we, at the corporate-level review, also identify issues that

19  are opportunities for improvement.  Those are typically

20  referred down to the site level for that.

21        And that is certainly something -- from my perspective, as

22  the legal department, it's something we're doing, you know,

23  one, proactively, certainly to save lives and improve the care

24  we do, but also to posture the case for defense.  You know, in

25  this line of work, it's not necessarily just state level --

1  state law negligence malpractice that we're faced with as a

2  health care provider.  There are constitutional 1983 claims.

3      And, you know, one of the standards involved called the

4  *Monell* standard -- you know, that there's an acting -- have

5  direct liability against NaphCare.  A plaintiff would have to

6  show some sort of policy or custom; right?

7      So, you know, you'll sometimes see, as a result of those

8  meetings, making sure that we are doing things to address

9  issues that are revealed through those -- through this process

10 to avoid it becoming any kind of policy or custom, avoid

11 ratification by NaphCare that would allow an argument that it's

12 a policy or custom to let *Monell* liability attach.

13 **Q.**  All right.  And are those recommendations at your advice?

14 The legal department's advice?

15 **A.**  Typically, yes.  There's things that we're -- that we're

16 seeing and suggesting.  You know, it's an interactive process.

17 We have the legal knowledge.  They have the clinical knowledge.

18 That's why we have the meeting, to bring those two sides

19 together to come up with our -- our impressions and what we

20 need to do to have the case be defensible.

21      **MR. SMITH:**  Thank you.

22      I have nothing further.

23      **THE COURT:**  Just a moment before you begin your

24 cross-examination, Ms. Kaul.

25      Melissa, could you please make me copies, please.  I don't

**Ex. A-11**

 1   need tabs, just the underlying documents.  Thank you.  Great.

 2        Thank you, Mr. Smith.

 3             **MR. SMITH:**  Thank you, Your Honor.

 4             **THE COURT:**  Ms. Kaul, cross-examination?

 5             **MS. KAUL:**  Thank you, Your Honor.

 6                         **CROSS-EXAMINATION**

 7   **BY MS. KAUL:**

 8   **Q.**   Good morning, Mr. Barkley.

 9   **A.**   Good morning.

10   **Q.**   So you testified that you previously submitted a

11   declaration in this case in your capacity as the Chief Legal

12   Officer; correct?

13   **A.**   Correct.

14   **Q.**   Okay.  And prior to joining NaphCare in September of last

15   year, did you have another position with the company, or did

16   you come from another -- another place?

17   **A.**   It's sort of both.  So I briefly came to NaphCare in a

18   different capacity starting in July of last year.  I came from

19   the Office of Governor Kay Ivey of Alabama.  I was the Chief

20   Deputy General Counsel to her and her office, came to NaphCare

21   in July.

22        And the Chief Legal Officer was transitioning to a

23   different role within our family of organizations.  That job

24   became open.  I was encouraged to consider wearing a different

25   hat within the organization.  And so, starting September 1st, I

1   was the CLO.

2   **Q.**   Prior to September 1st, 2023, did you have any involvement

3   in the morbidity and mortality review committee meetings?

4   **A.**   I attended -- I know it would have been one or two, you

5   know, but in July and August -- I would have attended,

6   certainly, the August one.  I'm not sure that I attended the

7   July one.  I'm not sure it would have fallen within -- my start

8   date was July 17th.

9   **Q.**   And prior -- around July of 2023, you would not have had

10  any involvement with the morbidity and mortality review

11  committee meetings; correct?

12  **A.**   Correct.  I was not affiliated with NaphCare in any way.

13  **Q.**   Okay.  Understood.

14      You've testified, both here and in your declaration, about

15  the privilege log that was submitted in connection with this

16  case, and I want to go ahead and mark that as Exhibit 1 and ask

17  you a few questions about it.

18      (Plaintiffs' Exhibit 1 marked for identification.)

19  **BY MS. KAUL:**

20  **Q.**   And this is the document that was filed as Docket

21  Number 503-6, and bear with me just one moment, and I will pass

22  out copies.

23          **THE COURT:**  Do you have an exhibit list, Ms. Kaul?

24          **MS. KAUL:**  An exhibit list?

25          **THE COURT:**  Do you have an exhibit list?

```
 1              MS. KAUL:  I do not.

 2              THE COURT:  Okay.  Thank you.

 3              MS. KAUL:  Can I approach?

 4              THE COURT:  Sure.

 5              THE WITNESS:  Exhibit B?  Exhibit A?

 6   BY MS. KAUL:

 7   Q.    1.

 8        And, Mr. Barkley, your copy of this should have the slip

 9   sheet that was submitted with the filing.  But if you go ahead

10   and look, this is -- turn the page and see that this is the

11   privilege log.

12        Is this the privilege log that you reviewed in connection

13   with the case?  Does this look familiar to you?

14   A.    Yes.

15   Q.    Okay.  Did you help prepare this privilege log?

16   A.    No.

17   Q.    Okay.  But you did review it in the course of preparing

18   your declaration; is that right?

19   A.    That's correct.  Yes.

20   Q.    Okay.  And based on your review, were the representations

21   made in the privilege log accurate to the best of your

22   knowledge?

23   A.    Yes.

24   Q.    Other than outside counsel, are you aware of whether

25   anyone else assisted with the preparation of the privilege log?
```

**Ex. A-14**

1    **A.**    Internal lawyers within my department, yes.

2    **Q.**    Okay.  Anyone outside of the legal department of NaphCare?

3    **A.**    No, not to my knowledge.

4          **MS. KAUL:**  I'd like to move to admit into evidence

5    Exhibit 1.

6          **THE COURT:**  Any objection, Mr. Smith?

7          **MR. SMITH:**  No objections.

8          **THE COURT:**  Exhibit 1 is admitted.

9        (Plaintiffs' Exhibit 1 received in evidence.)

10   **BY MS. KAUL:**

11   **Q.**    Okay.  And one more question before we dig into some of

12   the details, Mr. Barkley.

13       Did you review each one of the 82 documents listed in the

14   privilege log?

15   **A.**    No.

16   **Q.**    Okay.  Which ones did you -- well, how many did you

17   review?

18   **A.**    Sure.

19       I reviewed all of the ones that dealt with the corporate

20   morbidity and mortality review.

21   **Q.**    So are those the agendas for those review committee

22   meetings?

23   **A.**    Those would have been -- the agendas would have been

24   included within that, yes.

25   **Q.**    And the presentations?

**Ex. A-15**

1    **A.**    Yes.

2    **Q.**    And the meeting minutes?

3    **A.**    Yes.

4    **Q.**    The privilege log also refers to HSA death summaries.  Did

5    you review any of those?

6    **A.**    Yes.

7    **Q.**    Okay.  It also refers to physician death summaries.  Did

8    you review those?

9    **A.**    Yes.

10   **Q.**    And what about the psychological autopsies referred to in

11   the privilege log?  Did you review those?

12   **A.**    Yes.

13   **Q.**    Okay.  Which documents did you not review?

14   **A.**    All right.  So, actually, I guess I did review everything

15   on this privilege log.

16   **Q.**    Okay.  Thank you.

17   I want to direct your attention to what is marked at the

18   top as ECF Page 4 of 26, and it's -- in particular, I want to

19   look at the first three rows of this chart, which are all on

20   this page.

21   And the first document here is listed as Document Number

22   Naph Privilege 1, and it is an agenda from the July 18th, 2022,

23   morbidity and mortality review committee meeting.

24   Do you see that?

25   **A.**    I do.

1    **Q.**   What kinds of information is included in these meeting

2    agendas?

3              **MR. SMITH:**   I would object.   That -- that calls for

4    attorney-client-privileged communications, and it's overbroad.

5    That's the heart of the hearing as to whether that information

6    is discoverable.

7              **THE COURT:**   I'm going to overrule the objection.

8         Mr. Barkley, the question is not asking you to describe

9    the contents of a specific agenda.   I realize that is at issue

10   in this proceeding.   The question is asking you to describe

11   generally what types of information might be included in the

12   agenda.   And as so framed, I would permit the question to

13   proceed.

14        You may answer, sir.

15             **THE WITNESS:**   Okay.   Sure.

16        It would include information about the cases that are

17   being reviewed.   It would include -- and it's really

18   primarily -- what I'm thinking about in the agenda would be --

19   I think there's some instructions, at the outset, of kind of

20   the things we're considering and talking about.

21        There's a list of patients whose deaths are being

22   reviewed.   That's the -- that's the primary information that I

23   remember being on these agendas.

24   **BY MS. KAUL:**

25   **Q.**   Do the agendas reference any of the facts and

1  circumstances surrounding the in-custody deaths that are being

2  discussed at the relevant meeting?

3  **A.**   It would certainly have, you know, the -- yeah, you know,

4  the name, the date of the event.  It may have some information

5  about, you know, a preliminary potential cause of death.  Those

6  are the things I can think of.

7  **Q.**   Contributing factors to the death?

8  **A.**   I don't recall typically seeing those in the agenda.

9  **Q.**   The length of time that the individual had been in

10  custody?

11  **A.**   Yeah.  I think it would have a date of incarceration and a

12  date of incident.

13  **Q.**   And any relevant medical information that pertained to the

14  death?

15  **A.**   Again, it may have some information about the -- something

16  about preliminary cause, you know?

17  **Q.**   The next document listed on the chart is a presentation

18  from the -- it looks like the July 18th, 2022, meeting --

19  **A.**   Right.

20  **Q.**   -- and these are PowerPoint presentations; correct?

21  **A.**   Yes.

22  **Q.**   What kind of information, generally speaking, is included

23  in these presentations?

24  **A.**   A lot of information, primarily -- sometimes it's the --

25  it's direct quotes from the medical chart or hospital records

1    or the physician or HSA death summary.  It is -- yeah, it's a

2    good -- fair amount of information about the death.  It's a

3    selection of relevant information prepared by the legal

4    department.

5    Q.    Where do the individuals who prepare this document obtain

6    the underlying information?

7    A.    Some of it comes from the physician death summary or HSA

8    death summary.  A lot of it comes from medical records, from

9    our electronic health record, TechCare, if there are external

10   hospital records or other kinds of health care records that are

11   available.  Sometimes there's an autopsy or a coroner's report

12   that's available.

13        That was your question, where the sources of the

14   information -- okay.

15   Q.    Do individuals who prepare these presentations ever speak

16   to clinical staff in the course of obtaining information that

17   might be pertinent to a presentation?

18   A.    Individuals who -- preparing the presentation -- I think

19   that would be the exception.  I think they're mostly getting

20   that information from documentary sources.

21        Now, there's communication; right?  I mean, there's a

22   death summary prepared by people that -- that would be involved

23   in the care that's being provided.  When you say "talk to,"

24   physically on the phone or -- I mean, I don't think that that's

25   typically what's happening, no.

**Ex. A-19**

1   **Q.**   That's a fair response.

2         In the course of preparing these presentations, do these

3   individuals ever communicate, correspond, or speak to, orally

4   or in writing, any clinicians or -- or providers?

5   **A.**   Yeah.  What I typically see is reminders to submit the

6   death summaries.

7   **Q.**   So the death summaries and the medical records -- that

8   would be key sources of information that go into preparing

9   these presentations.  Is that fair to say?

10  **A.**   Yes.

11  **Q.**   Okay.

12  **A.**   Sometimes one of those clinical leaders that will attend

13  the meeting will have looked at the case and would submit -- so

14  the person preparing the presentation, you know, on the front

15  end is a paralegal.  The current person who does it is a nurse

16  paralegal.

17        So it could be the case -- not that she is speaking to

18  on-the-ground clinicians but that one of our site corporate

19  physicians might have looked at the case, might have talked to

20  the provider on the ground, and might say to the paralegal --

21  or send her an email or something and say, "Hey, here's some

22  things that I saw that I want to make sure get discussed."

23  **Q.**   Discuss for what purpose?

24  **A.**   Discuss for the purpose of identifying issues that could

25  present exposure.

Ex. A-20

1  **Q.**  So your clinical leadership would say that they perhaps

2  found some medical issues that they want to be discussed for

3  the purpose of assessing litigation risk?

4  **A.**  Right.

5  **Q.**  Okay.  Not ever for the purpose of determining ways to

6  improve patient care?

7  **A.**  So I don't see how you separate the two, if I'm being

8  honest.

9     You know, the -- the things that we get sued for are

10  standard of care, for which we, as lawyers, typically engage

11  expert medical providers to tell us about standard of care,

12  causation, for which we engage these experts to tell us about

13  causation issues.

14     You know, as I was talking about earlier, you know, under

15  the *Monell* health standard, the extent to which something is a

16  policy or custom of NaphCare is at issue in this litigation.

17     And so steps we take to evaluate our systems, our

18  processes, and improvements we make and affirmations that,

19  "Hey, something that happened in this case is not the NaphCare

20  way, and it needs to be changed or addressed" is part and

21  parcel of defending that lawsuit.

22  **Q.**  So if NaphCare can get sued in connection with the death

23  of a patient in the jail, it wouldn't conduct any morbidity or

24  mortality -- mortality reviews?  Is that your testimony?

25  **A.**  So we have a two-layer process.  So there are -- we have a

**Ex. A-21**

1   policy that has us doing site-level reviews.  That's premised

2   on primarily -- you're familiar with the National Commission on

3   Correctional Health Care?

4   **Q.**   I am, but you can go ahead and explain what it is for the

5   Court.

6   **A.**   Sure.

7        So the National Commission on Correctional Health Care,

8   NCCHC, is an organization that kind of grew -- came about, I

9   guess, in the late '70s/early '80s in the wake of the

10  *Estelle v. Gamble* decision that set out the deliberate

11  indifference standard for the provision of health care in

12  correctional environments.

13       They lay out a set of standards that are intended to be

14  aligned with kind of the Eighth and Fourteenth Amendment

15  deliberate indifference standard, and they have surveyors who

16  can be accredited through NCCHC.  They have surveyors that

17  come, and if a facility/jail/prison wishes to be accredited,

18  they can have surveyors come and get accredited.  They have to

19  be reaccredited every so often by a survey team.

20       And so following NCCHC standards is a good way of

21  indicating through following the Eighth and Fourteenth

22  Amendment.  Our policies follow NCCHC standards, and so NCCHC

23  NaphCare policy does require that site-level review of any

24  death.

25       This corporate-level review, on the other hand, is driven

 1  by the legal department for the purposes of providing legal

 2  advice.

 3  **Q.**    San Diego County Jail isn't NCCHC-accredited, is it?

 4  **A.**    Not to my knowledge.

 5  **Q.**    You said that NCCHC standards are designed to be aligned

 6  with Eighth Amendment standards.  Aren't they also intended to

 7  be aligned with standards of care in the clinical and medical

 8  profession?

 9  **A.**    Sure, although, if you actually look at the standards,

10  it's not, you know -- if there's -- if there's a (Inaudible),

11  yes, you need to take these steps; right?  They're much more

12  basic than that.

13       They're about really constitutional deliberate

14  indifference things like access and process and, you know,

15  having policies that address those things.  They're not

16  clinical.  They're more policy process, access-to-care sort of

17  driven.

18  **Q.**    And aren't those important to ensure the safety of

19  patients?

20  **A.**    Absolutely.

21  **Q.**    Okay.

22  **A.**    That's why we follow them.

23  **Q.**    What are nurse paralegals?

24  **A.**    What are nurse paralegals?

25  **Q.**    What role do they play within NaphCare?

1    **A.**    Sure.

2          I mean, as a company that provides health care, we have

3    a -- well, we have lots of folks in our company who are nurses.

4    But we have, within our legal department, a particular person

5    who is in the legal department as a paralegal and also happens

6    to be a nurse.

7          And she uses her nursing knowledge to help with the

8    mortality and morbidity review, provide chronologies for cases.

9    I mean, she supports the lawyers in reviewing our cases, using

10   both legal and nursing knowledge.

11   **Q.**    The -- the next document listed on the privilege log,

12   NaphCare Privilege 3 --

13   **A.**    Uh-huh.

14   **Q.**    -- refers to the meeting minutes that mention the

15   July 18th, 2022, meeting.

16          And you said that it's a paralegal who takes the minutes

17   of these meetings; is that right?

18   **A.**    Correct.

19   **Q.**    And what information is included in the meeting minutes,

20   just as a general matter?

21   **A.**    The cases which we reviewed, whether -- you know, whether

22   that case is going to, you know -- so a lot of times, we don't

23   have full information at the initial review.  I would say the

24   most common piece of information we lack is a coroner's report

25   or an autopsy.

1       So whether that was available to us and discussed or

2   whether it's being -- that case is going to be sort of held

3   over until the autopsy is received, there can be

4   recommendations for follow-up quality improvement activities.

5   **Q.**   Do the meeting minutes reflect discussion by all meeting

6   attendees?

7   **A.**   They -- I would not say they're -- what was said by the

8   attendees during the meeting, no.   It's more of a reflection of

9   the outcome.

10  **Q.**   But the minutes aren't solely focused on the outcomes from

11  a legal perspective; correct?

12  **A.**   So when I say "outcome," I guess I mean the outcome of the

13  discussion.   There are recommendations sometimes for things

14  that can be done for areas of improvement.   I view those as

15  legal.   They reflect the advice that came from lawyers in the

16  meeting about things that we could do to improve.

17       And, as I said, I mean, that's -- you know, they're both.

18  I mean, the primary purpose is obviously to -- like I said, a

19  lot of inmate deaths -- in-custody deaths result in litigation.

20  And we're trying to put ourselves in the best position to

21  defend those, you know?

22       And part -- you know, whether it's because of the *Monell*

23  standard, making sure that we don't have policies and customs

24  that are contributing to deaths but also, you know, making sure

25  that we are, going forward, providing the best care we can,

1   sure.  That is a thing that happens.  It's not the primary

2   thing that happens.

3   **Q.**   Well --

4   **A.**   And even when it happens, I think it's part -- part of the

5   legal advice.  It's inseparable.  Providing good care is making

6   lawsuits more defensible.

7   **Q.**   Do the meeting minutes reflect, for instance, any opinions

8   of clinical staff regarding changes that can be made to

9   policies and procedures on the ground in the jail?

10  **A.**   Yes.  That -- again, it's -- it's not, you know, "The

11  corporate people said this.  The lawyers said that."  There's

12  one set of recommendations that comes out of the discussion

13  between the two halves.

14  **Q.**   But it could include a recommendation made by clinical

15  staff --

16  **A.**   Sure.

17  **Q.**   -- at the meeting that is adopted or decided to be

18  undertaken?

19  **A.**   Absolutely.

20  **Q.**   Okay.  If you look at the description for -- looks like

21  the first document listed here, the agenda from this meeting --

22  **A.**   Which -- which ECF page are you on?

23  **Q.**   The same one.

24  **A.**   Oh.

25  **Q.**   It's ECF Page 4 of 26.

**Ex. A-26**

1        And in the description, it says that the agenda was

2   prepared by Melissa Massengill, paralegal with the legal

3   department, at the direction of Brad Cain, NaphCare's Chief

4   Legal Officer.

5        Mr. Cain was your predecessor; is that correct?

6   **A.**   That's correct.

7   **Q.**   Okay.  And it says, in light of Mr. Cain's absence, the

8   meeting was chaired by Dr. Jefferey Alvarez, NaphCare's CMO.

9   Do you see that?

10  **A.**   Yes.

11  **Q.**   And "CMO" stands for Chief Medical Officer; right?

12  **A.**   That's correct.

13  **Q.**   Okay.  And that's not a legal position; correct?

14  **A.**   No.

15  **Q.**   So as we -- at this meeting, according to the privilege

16  log, it was not led by a member of the legal department; right?

17  **A.**   Correct.

18  **Q.**   Is it possible that Dr. Alvarez directed the preparation

19  of the documents that were discussed at this meeting?

20  **A.**   No.

21  **Q.**   How do you know?

22  **A.**   How do I know that Dr. Alvarez didn't prepare the --

23  because that's not the -- that's not the process.  It's done by

24  the paralegal in the legal department.

25  **Q.**   You don't have personal knowledge of who directed the

1  preparation of this document; right?

2  A.    That would -- no.  I don't -- I was not at NaphCare prior

3  to July 17th, 2023.

4  Q.    Okay.  And you don't have personal knowledge of whether

5  Dr. Alvarez, for example, provided input regarding the

6  information that he wanted to be included in the agenda

7  presentation and meeting minutes from this meeting; right?

8  A.    Well -- so how I described that earlier -- that can't

9  happen; right?  When Dr. Alvarez knows about a death, he looks

10  at it.  He says to, at that time, Melissa Massengill, "These

11  are some things I've identified to discuss."  Sure.

12      It couldn't be -- so your question, I think, was do I have

13  any personal knowledge.  I mean, no.  I do know a lot about how

14  the process works, and that's how the process works.

15  Q.  In your declaration -- and I can refresh your

16  recollection -- recollection with that document, if you need.

17  But you testified that, after September 1st, 2023 --

18  A.    Uh-huh.

19  Q.    -- the agenda's presentations and minutes from these

20  meetings are prepared either at your direction or at the

21  direction of a member of NaphCare's legal department.

22      Does that testimony sound accurate?

23  A.    Yes.

24  Q.    Okay.  Other than you, who would have directed preparation

25  of these documents after September 1st, 2023?

1   A.   Well, I've always directed the preparation of the

2   documents since September of 2023.  There has been one time

3   when I was not able to attend a meeting, and a lawyer within

4   our organization, with the title General Counsel for

5   Litigation, chaired the meeting in my absence.

6   Q.   All right.  If you could turn to ECF Page 18 of 26, I just

7   want to have -- go through other categories of documents.

8   A.   You said 18?

9   Q.   18.

10  A.   Okay.

11  Q.   And I'm looking at the row that's labeled "NaphCare

12  Privilege 58," to start.

13  A.   Okay.

14  Q.   Do you see that?

15  A.   Yes.

16  Q.   Okay.  This document refers to an HSA death summary.

17  You've also testified using that terminology already today.

18  Can you just briefly describe what the HSA death summary is?

19  A.   Sure.

20       I mean, it's a -- it's a summary of -- of information

21  related to the patient death.

22  Q.   It's prepared by one of NaphCare's health services

23  administrators; is that right?

24  A.   Correct.

25  Q.   That's not a legal position, is it?

Ex. A-29

1    **A.**    That's correct.

2    **Q.**    What is the role of the HSA with respect to patient care

3    in San Diego Jail?

4    **A.**    Patient care?  Well, San Diego is unique among NaphCare

5    clients in that there are -- there's nursing staff that are

6    direct County personnel; right?

7         So our HSA is overseeing -- so typically -- in a typical

8    NaphCare jail/prison facility, the health services

9    administrator is over the provision of health care for the

10    entire inmate population of the jail from -- from the

11    administration of it -- right? -- from the operational piece of

12    it.

13         So that would typically include the nursing, the medical,

14    and also the mental health side, general -- anything else we're

15    doing within the jail.

16         Here in San Diego, it's a little unique because the

17    nursing is not part of our contract but similar in the sense

18    that that person is the overall person responsible for

19    oversight of the provision of the inmate health care system.

20    **Q.**    Is it accurate to say that these summaries contain

21    information about a patient's clinical history?

22    **A.**    Yes.

23    **Q.**    Okay.  And they also contain information about the facts

24    and circumstances surrounding the death?

25    **A.**    Correct.

Ex. A-30

1   Q.   And they could include opinions and assessments by the HSA

2   about the circumstances surrounding the death?

3   A.   I believe they are -- they would not have that.  I mean,

4   it's possible.  I guess anybody can write anything in a form,

5   but the ones I see are really sort of fact-driven.

6   Q.   The HSA death summaries are prepared by the HSA,

7   regardless of whether NaphCare is aware of any actual potential

8   litigation arising out of the death; is that right?

9   A.   Correct.

10  Q.   The next row, NaphCare Privilege 59, refers --

11  A.   Well, what you didn't -- what you didn't ask me is where

12  those go and the purpose.

13       So --

14          THE COURT:  Let -- sir, you will -- your counsel will

15  have an opportunity for redirect examination.  So ask the

16  question -- answer the questions posed, please.

17  BY MS. KAUL:

18  Q.   The next row refers to the physician death summaries?

19  A.   Right.

20  Q.   These summaries are prepared by a NaphCare physician; is

21  that right?

22  A.   Yes.

23  Q.   Okay.  Not necessarily the treating physician or a

24  treating physician; is that correct?

25  A.   I mean, those are typically going to be one and the same,

```
 1    but there are larger facilities where there's both a physician
 2    medical director and staff physicians.  And typically it would
 3    be the medical director, but it could also be a staff
 4    physician.  It doesn't have to be -- doesn't have to be the
 5    treating physician.
 6    Q.    Who decides which physician would prepare a particular
 7    physician death summary?
 8    A.    That would be the medical director of the facility's
 9    decision, whether he or she would do it or have the treating
10    person do it.
11    Q.    And those summaries also contain information about
12    patients' clinical and medical history; right?
13    A.    Correct.
14    Q.    And what about those?  Do those include information about
15    the facts and circumstances concerning the death?
16    A.    That's correct.
17    Q.    And do they include potentially opinions or assessments
18    of -- by the -- by the physician about the death?
19    A.    They can include, you know, speculation about a tentative
20    cause of death, yes.
21    Q.    Speculation based on medical information; right?
22    A.    Well, based on -- correct.  Right.  Right.
23    Q.    Okay.
24    A.    So I don't mean that in a pejorative way, no, when I say
25    "speculation," but --
```

1   **Q.**   Sure.

2       Opinions and assessments --

3   **A.**   -- we don't -- we don't know; right?  You haven't had an

4   autopsy.  We don't know.

5   **Q.**   Opinions and assessments by the physician based on the

6   information that's available to them?

7   **A.**   Sure.

8   **Q.**   Okay.  Could they include opinions about what could have

9   been done differently in terms of patient care?

10  **A.**   Not -- not typically, from what I see, no.

11  **Q.**   Have you ever seen that?

12  **A.**   I can't recall a time that I've seen that.

13  **Q.**   Okay.  And the physician death summaries are prepared by a

14  physician, regardless of whether NaphCare is aware of actual

15  potential litigation arising out of the death; right?

16  **A.**   Correct, and I want to back up because -- I mean, you used

17  this phrase "contributing factor."  Those are certainly things

18  that the physicians -- which are opinion, I guess, or --

19  sometimes those contributing factors -- oops -- by the nature

20  of what they are, suggests something could have been done

21  better; right?

22      So --

23  **Q.**   Sure.

24  **A.**   -- you know, when I say I don't know whether I've seen

25  that, certainly, within -- sometimes it's implicit, in what is

1  listed as a contributing factor, that there's something that

2  could have been done differently.

3  **Q.**   Fair enough.

4       The next row, which is the last category of documents that

5  we'll talk about, is the psychological autopsy.  Do you see

6  that?

7  **A.**   Is this --

8  **Q.**   It's NaphCare Privilege 60.

9  **A.**   60?  Yes.

10 **Q.**   Okay.  The psychological autopsies are prepared by

11 NaphCare's San Diego mental health director; right?

12 **A.**   Yes.

13 **Q.**   Okay.  And that's an on-site position at the jail; is that

14 correct?

15 **A.**   Correct.

16 **Q.**   And it's not a legal position; right?

17 **A.**   No.

18 **Q.**   Okay.  What's that person's role with respect to patient

19 care in the jail?

20 **A.**   That person is overseeing the provision of mental health

21 to the inmate population and can also be providing direct care

22 of patients.

23 **Q.**   Okay.  The psychological autopsies are only prepared for

24 certain deaths at the jail; is that correct?

25 **A.**   Correct.

1    **Q.**    Which ones?

2    **A.**    Completed suicides.

3    **Q.    And these summaries also contain information about**

4    **clinical and medical history?**

5    **A.    Yeah.  Psych autopsies contain a lot of information.**

6    **Q.    What kinds of information?**

7    **A.    They can include what I would call sort of forensic kind**

8    **of information, information about, you know, their criminal**

9    **background history, their childhood, their family situation,**

10    **their support network, their level of education, religious**

11    **adherence or belief system, I mean, just a whole host of**

12    **socio- -- sociological data about the person.**

13    **Q.    Okay.  Could those also include opinions and assessments**

14    **of the mental health director related to the death or suicide?**

15    **A.    Yes, typically.**

16    **Q.    And these autopsies are also prepared, regardless of**

17    **whether NaphCare is aware of any actual potential litigation**

18    **arising out of the death; is that correct?**

19    **A.    Yes.  But, again, you know, there's a high propensity for**

20    **in-custody deaths to result in litigation, and that propensity**

21    **is even higher for in-custody deaths by suicide.**

22    Q.    But the autopsy -- psychological autopsy is prepared,

23    regardless of any assessment of actual or potential litigation

24    risk; right?

25    **A.**    Regardless of any assessment?

1  Q.    There's no prior assessment about actual potential

2  litigation risk to determine whether --

3  A.    No.  I disagree.

4  Q.    -- a psychological autopsy needs to be completed or not;

5  correct?

6          THE COURT:  Let --

7          THE WITNESS:  I'm sorry.  Yes.  Thank you.

8          THE COURT:  Let Ms. Kaul finish the question before

9  you answer, Mr. Barkley.

10         THE WITNESS:  No.  I made an assessment -- and my

11  predecessor, Brad Cain, has made an assessment -- that there's

12  significant risk of litigation in any in-custody death and a

13  heightened risk with respect to death by suicide.

14  BY MS. KAUL:

15  Q.    Okay.  According to the privilege log, these death

16  summaries, the physician summaries -- the death summary,

17  physician summary, and the psychological autopsies are all sent

18  to NaphCare's corporate office and legal department to notify

19  them of the death.

20      Do you see that in the descriptions to these documents?

21  A.    "For notification of death and in preparation for

22  corporate morbidity and mortality review committee meeting"?

23  Q.    Yeah.

24      I'm going to focus on the "notification of death" portion

25  to start.  Do you see that?

Ex. A-36

1    **A.**    Yes.

2    **Q.**    Okay.  Who is the person in the corporate office that

3    receives these documents?

4    **A.**    So we actually have -- it's an email address.  I think

5    it's notification at -- notification -- notifications that

6    HSA's medical director and other, you know, site-level

7    leadership are trained -- that those go to.  And there's a

8    distribution list of lots of folks in our corporate office that

9    are notified.

10    **Q.**    And those folks are not part of the legal department;

11    correct?

12    **A.**    Now --

13         **THE COURT:**  Hang on, Ms. Kaul.  I think Mr. Barkley

14    was still finishing his answer.

15    Go ahead and finish your answer, Mr. Barkley.

16         **THE WITNESS:**  Sure.

17    So the HSA death summary (Inaudible) corporate office --

18    I'm not aware -- I'll just be honest with you.  I'm not aware

19    of the physician death summaries or the psychological autopsies

20    going to that notification -- where it says "notification of

21    corporate office."  I'm aware that those would only go to our

22    nurse paralegal.

23    The HSA death summary would probably -- would go to that

24    wider audience, I think.

25    ///

BY MS. KAUL:

**Q.**    And I'm sorry.  I think I -- I missed a portion of your response.

**A.**    Sure.

**Q.**    Other than the HSA death summary, the other two, you think they only go where?

**A.**    The -- the nurse paralegal.

**Q.**    And are they circulated to anyone else?

**A.**    The clinical leadership that would be involved in the M&M review.

**Q.**    So when you're referring to a lot of people being involved in the corporate -- or be on the corporate email address that receives certain documents, you're referring to the HSA death summary; right?

**A.**    Right.

**Q.**    Okay.  And it's your understanding that the physician death summary and the psychological autopsy were for a smaller audience?

**A.**    Yes.

**Q.**    And that audience includes the attendees at the morbidity and mortality review meetings?

**A.**    Yes.

**Q.**    Okay.  And are you aware of whether they go to anybody else?

**A.**    No.

1  **Q.**    Do you know one way or another?

2  **A.**    I don't think they do, no.

3  **Q.**    What leads you to have that understanding?

4  **A.**    Because at various points throughout the month, the nurse

5  paralegal comes to me and says, "I don't yet have the physician

6  death summary for this death, and I need to get that from the

7  site," and we get it.  It comes to her.  She's my direct

8  report.  I see it comes to her.  I see what she sends out.

9  **Q.**    And who is the larger audience included in the corporate

10  office that receives HSA death summaries?

11  **A.**    So that's the notification site.  I'm -- I believe it

12  would still be people within because it's still going to be the

13  clinical executive leadership and our CEO.  So it's still going

14  to be that same audience of folks on the M&M committee.

15  **Q.**    And is notification emails about a patient's death --

16  again, they're sent, regardless of whether or not NaphCare is

17  aware of any actual potential litigation; correct?

18  **A.**    Correct.

19        (Plaintiffs' Exhibit 2 marked for identification.)

20        **MS. KAUL:**  I want to mark as Exhibit 2 a document --

21  an excerpt of a document that was produced to us.  It's the

22  Health Care Policy and Procedure Manual for San Diego County.

23  It begins with the Bates number NaphCare 31065, and the

24  excerpted section is titled "A-09.  Procedure in the Event of a

25  Patient Death."

 1         And just for the Court's awareness, it was produced to us,

 2    and it's labeled "Confidential," subject to the protective

 3    order.  But Counsel met and conferred prior to the hearing and

 4    agreed that it would not be subject to the protective order.

 5              **THE COURT:**  Thank you.

 6              **MS. KAUL:**  Thanks.

 7         May I approach?

 8              **THE COURT:**  Sure.

 9    **BY MS. KAUL:**

10    **Q.**   Mr. Barkley, do you recognize this document?

11    **A.**   Yes.

12    **Q.**   Okay.  And you're generally familiar with NaphCare's

13    policy and procedure manual for San Diego County?

14    **A.**   Yes.

15    **Q.**   Okay.  And you're generally familiar with this particular

16    policy versus a procedure in the event of a patient death?

17    **A.**   Yes.

18    **Q.**   Okay.  And NaphCare maintains -- maintains copies of these

19    in the ordinary course of its business; correct?

20    **A.**   That's right.

21              **MS. KAUL:**  Okay.  I'd like to move to admit Exhibit 2.

22              **THE COURT:**  Any objection, Mr. Smith?

23              **MR. SMITH:**  No objections.

24              **THE COURT:**  Exhibit 2 is admitted.

25              **MS. KAUL:**  Thank you.

1          (Plaintiffs' Exhibit 2 received in evidence.)

2    **BY MS. KAUL:**

3    **Q.**    I want to direct your attention to the first full page of

4    the policy.  This is Bates-stamped 31102.

5          And under the subsection "Policy," it states, "All patient

6    deaths require the performance of a clinically thorough

7    mortality review.  Deaths that are unexpected or occurring

8    under unusual circumstances should also be investigated in

9    accordance with state and local regulations."

10         Do you see that?

11   **A.**    Yes.

12   **Q.**    And is that an accurate statement of NaphCare's policy

13   with respect to the review of patient deaths?

14   **A.**    Yes.

15   **Q.**    And fair to say that NaphCare complies with this policy

16   through the actions of its morbidity and mortality review

17   committee?

18   **A.**    No.

19   **Q.**    Okay.  Can you explain that?

20   **A.**    Sure.

21         So when I spoke earlier about kind of the two-layer

22   review, this policy is referring to what would happen at a

23   facility level.  All the things we've been talking about are

24   corporate-level review.

25   **Q.**    Okay.  Does NaphCare conduct site-level reviews for

1    San Diego County Jail?

2    **A.**    Not to my knowledge.

3    **Q.**    Are you aware that that's a provision that's required in

4    the NaphCare/County contract?

5    **A.**    I don't know that I'm aware it's in the contract.  It's

6    certainly part of our policy that we would do it.  I would --

7    you know, it's my expectation it should be done, yes.

8    **Q.**    Okay.  But they're not being done; correct?

9    **A.**    That's correct.  That -- to my -- to my knowledge.  I

10   don't know that I have direct knowledge of that.  That's what

11   I've been told.

12   **Q.**    Now, turning to the next page, NaphCare 31103, under

13   the -- towards the bottom of the page, under the heading "Death

14   Due to Suicide," Subsection 3 refers to a psychological autopsy

15   report.

16        Do you see that?

17   **A.**    Right.

18   **Q.**    Is that the same as the psychological autopsy reports that

19   have been referenced in -- in the privilege log?

20   **A.**    Yes.

21   **Q.**    Okay.  Subsection A, below that, says, "This report will

22   provide detailed and comprehensive documentation of all

23   information and circumstances involved in the review of suicide

24   to identify trends and opportunities for improvement.  It is

25   expected that the primary psychiatric provider or psychologist

**Ex. A-42**

1    will gather input from the medical director or provider for

2    completion of this report."

3        Do you see that?

4    **A.**    Yes.

5    **Q.**    You are referenced to legal there; is that right?

6    **A.**    No.  There's no reference to legal there, no.

7    **Q.**    If you turn the page, NaphCare 31104, under the heading

8    "Morbidity and Mortality Review," Subsection 3 refers to an RHA

9    death summary.

10        Do you see that?

11    **A.**    Yes.  Yeah.  That's an NCCHC term, Responsible Healthcare

12    Authority.

13    **Q.**    Is that the same as the HSA death summary?

14    **A.**    Yes.

15    **Q.**    And so that's the same as HSA death summaries that have

16    been referenced in the privilege log; right?

17    **A.**    Yes.

18    **Q.**    Okay.  That same subsection refers to physician death

19    summaries.  Those are the same as the ones that we've discussed

20    as being referenced in the privilege log?

21    **A.**    Correct.

22    **Q.**    Okay.  So the HSA death summary or, here, RHA death --

23    death summary, as well as the physician death summary and the

24    psychological autopsies, are all part of the morbidity and

25    mortality review that's conducted pursuant to this policy;

1    right?

2    **A.**    Should be.

3    **Q.**    Okay.  And they are also part of your corporate-level

4    review?

5    **A.**    Yes.

6    **Q.**    Okay.  Subsection 1 here says that morbidity and mortality

7    meetings must be completed within 30 days of any death.  The

8    review should provide a summary of the facts surrounding the

9    patient's death in order to ascertain compliance with corporate

10   standard of care and to identify any

11   deficiencies/trainings/policies that may have contributed to

12   the patient death or emergency response.

13        Do you see that?

14   **A.**    Yes.

15   **Q.**    So the corporate morbidity and mortality review meetings

16   that you've been testifying about today -- is that performed

17   consistent with the subsection of this policy?

18   **A.**    No.

19   **Q.**    So the meetings that you've been discussing don't provide

20   a summary of the facts surrounding the patient's death?

21   **A.**    They could.

22   **Q.**    Okay.  And they could also provide that summary to

23   ascertain compliance with corporate standard of care?

24   **A.**    Yes.

25   **Q.**    Okay.  And to identify deficiencies and training and

1  policies that may have contributed to a patient death or

2  emergency response; right?

3  **A.**  Yes.

4  **Q.**  Okay.  Are the results of the corporate morbidity and

5  mortality review meetings shared with anyone outside the

6  meeting?

7  **A.**  No.

8  **Q.**  The information that's discussed regarding quality

9  improvement procedures -- are those discussed with providers?

10  **A.**  Yes but not, per se, as a result of the corporate-level

11  M&M review.

12  **Q.**  Sure.

13      And they may not be presented as such, but the outcomes of

14  the meetings, as may be reflected in terms of the meeting

15  minutes, are then possibly passed along to treating providers

16  in the course of improving patient care; right?

17  **A.**  Correct.

18  **Q.**  Okay.  Why is NaphCare not conducting its site annual

19  reviews in San Diego County?

20  **A.**  I do not know.

21  **Q.**  Have you been aware of that since you assumed your current

22  position?

23  **A.**  No.

24  **Q.**  When did you become aware of it?

25  **A.**  I honestly don't know if I became aware of it -- had

**Ex. A-45**

 1   become aware of it in the process of assisting the team

 2   responding to your subpoena.

 3   **Q.**    When you became aware of it, did you undertake any actions

 4   to correct that?

 5   **A.**    I did not, no.

 6   **Q.**    Okay.  Are you aware of how many deaths have been in the

 7   jail since you assumed your position?

 8   **A.**    In the San Diego County Jail?

 9   **Q.**    Yes.

10   **A.**    I don't know that off -- or I don't know that off the top

11   of my head, no.

12   **Q.**    Okay.  I guess they would have all been reviewed over the

13   course of these morbidity and mortality review committee

14   meetings since you joined; correct?

15   **A.**    That's correct.

16   **Q.**    Okay.  Because every death in the jail is reviewed by the

17   committee?

18   **A.**    That's correct.

19   **Q.**    The morbidity and mortality review committee meetings are

20   attended by individuals other than legal counsel; right?

21   **A.**    Which morbidity/mortality review committee?

22   **Q.**    Fair question.

23        The meetings that are -- for which the documents in the

24   privilege log were prepared.

25   **A.**    Sure.

1  Q.  Those meetings are also attended by members of the

2  clinical leadership I think you've testified about; right?

3  A.  Yes, that's right.

4  Q.  Okay.  A clinical team has an interest in ensuring proper

5  care of patients in the jail; right?

6  A.  Yes.

7  Q.  Okay.  That's their primary concern; right?

8  A.  Maybe their primary concerns, not the primary concern of

9  the meeting.

10  Q.  As assessed by you?

11  A.  As the person who directs that the meeting happen, yes.

12  Q.  Well, you direct the preparation of certain materials;

13  correct?

14  A.  Correct --

15  Q.  Yeah.

16  A.  -- and that the meeting happen.

17  Q.  I'm sorry.  You can finish --

18  A.  And also that the meeting happen, yes.

19  Q.  And at the meetings, just to be clear, members of clinical

20  leadership may provide their clinical opinions about patient

21  deaths; right?

22  A.  Yes.  That's what the heart of the -- of litigation about

23  a patient death is usually about.

24  Q.  And also at the heart of changes to practices in the jail

25  about patient care?

**Ex. A-47**

```
 1   A.   Sure, which also relates to the defense in litigation.

 2   Q.   Clinical staff are permitted to ask questions at these

 3   meetings?

 4   A.   Permitted to ask questions?  Yes.

 5   Q.   And they may make recommendations?

 6   A.   Yes.

 7   Q.   Okay.  And the meetings are also, I think, attended by

 8   members of NaphCare's management; is that right?

 9   A.   Our CEO attends.

10   Q.   Any other management-level individuals?

11   A.   I mean, you know, I'm a management-level person.  I'm also

12   a lawyer.  Our COO attends -- has attended some of them.

13   You'll see her name in the privilege log, but she is also a

14   nurse and a lawyer.

15        You know, in -- it's not unusual, in a health care

16   organization, for the management to also be clinical; right?  I

17   mean, hospitals -- the management of hospitals is often nurses

18   or physicians, and the same here.

19   Q.   Any other members of the management team, other than the

20   CEO, COO, and you, who attend these meetings?

21   A.   I have looked at the agendas and minutes.  I don't see a

22   single individual attending those meetings who is not clinical,

23   a lawyer, or a paralegal.

24   Q.   You mentioned that your CEO is a lawyer.  He doesn't serve

25   as CEO in a legal capacity, though; right?
```

1    **A.**   He's very hands-on with our legal department.

2    **Q.**   I'm sure he is, given the litigation risk involved in this

3    business.

4         However, as CEO, he's not serving the company in a legal

5    capacity; right?

6    **A.**   You know, when you are a lawyer, it's hard to turn that

7    education, training, and experience off.  I mean, there's a lot

8    of things that -- when I come to him with contract drafts, you

9    know, he's already done a legal analysis of that, that he's

10   ready to discuss, that I don't have to give him.

11        When I've been -- for example, when I served the Governor

12   of Alabama as her lawyer -- she's not a lawyer.  So I had to

13   explain things differently to her than I do to Brad.  So Brad

14   certainly uses the legal side of his brain.

15   **Q.**   Your COO doesn't serve the company in a legal capacity, do

16   they?

17   **A.**   Not directly, no.  She is a nurse, and she's certainly

18   involved in the clinical provision of care.

19   **Q.**   Okay.

20   **A.**   She's going to -- with me to a court hearing later this

21   week.  So she does -- is involved in some of our legal strategy

22   as well.

23   **Q.**   Wouldn't that be true of any executive leadership at that

24   level at a company like NaphCare?

25   **A.**   I think the fact that she's both a nurse and a lawyer in

1  all of our operations gives her a unique perspective to help me

2  assess risk in -- in litigation.

3  **Q.**  Just a few more questions, if you'll bear with me.

4      Do you know how many of the deaths that have been

5  discussed at meetings referred to on the privilege log actually

6  led to litigation?

7  **A.**  So the materials that we submitted to Your Honor in

8  camera -- I think about a third of those cases are in active

9  litigation.

10 **Q.**  You testified, during your -- in your direct testimony,

11 about morbidity and mortality reviews conducted -- or

12 referenced in the County's contract with NaphCare; correct?

13 **A.**  I don't know that I testified to that.

14 **Q.**  Well, you drew a distinction between morbidity and

15 mortality reviews performed pursuant -- that may be performed

16 pursuant to the contract as opposed to ones that are referenced

17 in the privilege log; correct?

18 **A.**  Sure.

19     So the ones that -- you know, the ones that you're saying

20 are pursuant to the contract -- I would say the site-level one

21 is pursuant to this policy, Exhibit 2, and then the ones that I

22 direct to occur are the corporate-level M&M, which is what the

23 documents in the privilege log and that were submitted in

24 camera relate to.

25 **Q.**  Okay.  I want to mark as Exhibit 3 the County's contract

1    with NaphCare, beginning with Bates Number NaphCare 542.  I'll

2    just ask you a few questions about that.

3         (Plaintiffs' Exhibit 3 marked for identification.)

4         MS. KAUL:  And for the Court's benefit, this -- this

5    also is marked "Confidential" on the document, but we've met

6    and conferred and agree that it is not.

7         It's a large document, but I just have a few questions

8    about a couple portions of it.

9    BY MS. KAUL:

10   Q.   Mr. Barkley, you are -- as tested -- as you testified to,

11   you're familiar with the County contract with NaphCare?

12   A.   Well, as you know, it's 137 pages.  So --

13   Q.   You're generally familiar that there is such a contract;

14   correct?

15   A.   I am familiar that there is such a contract.

16   Q.   And it looks something like this; correct?

17   A.   Yes.  Yes.

18   Q.   Okay.  And you're generally familiar with the contents of

19   it at a high level?

20   A.   At a high level.

21   Q.   Okay.  I won't quiz you on it.

22        MS. KAUL:  But I would like to move to admit as --

23   admit into evidence Exhibit 3.

24        MR. SMITH:  No objection.

25        THE COURT:  Without objection, the -- Exhibit 3 is

1  admitted.

2        (Plaintiffs' Exhibit 3 received in evidence.)

3  **BY MS. KAUL:**

4  **Q.**   I'd like to direct you to the page Bates-stamped

5  NaphCare 616.  It also says Page 75 of 137.  I'll give you a

6  minute to get there.

7  **A.**   Okay.

8  **Q.**   Okay.  And the subsection at the bottom, which is

9  2.3.47.5, says, quote, "Contractor shall conduct a formal

10 mortality review process at both the site and corporate level

11 wherein all available clinical aspects and treatment are

12 reviewed by the site and corporate committees."

13        "Contractor shall meet NCCHC standards on all mortality

14 reviews, and the policy and procedure of the patient deaths has

15 been developed and written in compliance with NCCHC Standard

16 J-A-09, Procedure in the Event of an Incarcerated Individual's

17 Death."

18        Do you see that?

19 **A.**   Yes.

20 **Q.**   So the contract references both site- and corporate-level

21 morbidity and mortality reviews.

22        Do you see that?

23 **A.**   Yes.

24 **Q.**   So does the work of NaphCare's corporate morbidity and

25 mortality review committee, as referenced in the privilege log,

1  fulfill this contract provision in part?

2  **A.**   Yeah.   I mean, I didn't even know that the contract

3  mentioned the corporate level.   But, yeah, if they're at -- if

4  they're saying we should do a corporate-level review, we are

5  doing a corporate-level review.

6  Q.   Okay.   So the committee meetings are performed, at least

7  in part, pursuant to contract; correct?

8  A.   Sure, but we do them for reviewing deaths at all the jails

9  and prisons across our -- across the country where we do work.

10 So they're not sole -- they're not -- those meetings are not

11 happening primarily because of this contract.   They're

12 happening primarily because Brad Cain asked that they should

13 happen.

14 Q.   And they also fulfill the provision of the contract?

15 A.   Sure.

16 **Q.**   If you go ahead to -- well, further down, Page NaphCare

17 617, Section 2.3.47.7 -- and the last line of that section says

18 that there are contractor's mortality review, but the goal is

19 to identify, evaluate, and improve the quality and efficiency

20 of health care, ensure accurate and timely reporting, and

21 reduce morbidity and mortality.

22      Do you see that?

23 **A.**   Yes.

24 **Q.**   Are those also goals of the morbidity and mortality review

25 meetings that are referenced in the privilege log?

1   **A.**   It's fair to say they are also goals, yes.

2   **Q.**   Okay.  Are you aware of any provisions in the contract

3   that require morbidity and mortality reviews for the purposes

4   of assessing litigation risk?

5   **A.**   Of the contract?

6   **Q.**   Yes.

7   **A.**   No.

8   **Q.**   You've testified at -- several times about the primary

9   purpose of the meetings and the documents referenced in the

10  privilege log being to facilitate the provision of legal advice

11  and to assess litigation risk?

12  **A.**   Right.

13  **Q.**   Is that memorialized anywhere in NaphCare's policies and

14  procedures that that's the purpose of these meetings?

15  **A.**   Not to my knowledge.

16          **MS. KAUL:**  Your Honor, can I have just one minute to

17  consult with my colleague?  I think I'm about done.

18          **THE COURT:**  Sure.

19          **MS. KAUL:**  Thank you.

20          **THE COURT:**  Mr. Smith, will you have any redirect for

21  Mr. Barkley?

22          **MR. SMITH:**  Maybe -- maybe just a question or two.

23          **THE COURT:**  Okay.  Do you want a moment to -- after

24  Ms. Kaul is finished, to gather your thoughts in determining

25  whether you'd like to do redirect and what you'd like to ask?

**Ex. A-54**

1        **MR. SMITH:**  Please.

2        **THE COURT:**  Okay.  We'll take a -- just a

3   couple-minute break after Ms. Kaul so you can collect your

4   thoughts, and then we can conclude with the parties'

5   examination.

6        **MR. SMITH:**  Thank you, Your Honor.

7        **THE COURT:**  Sure.

8      Do you need some more water, by the way?

9        **THE WITNESS:**  I probably shouldn't because I'm going

10  to have to visit the men's room otherwise.

11       **THE COURT:**  Well, we're going to take a short -- a

12  short break at -- we're going to take a short break after

13  Ms. Kaul is done so that --

14       **THE WITNESS:**  Okay.

15       **THE COURT:**  -- you can get some more water, and

16  Mr. Smith can decide what he wants to ask you on redirect.

17       **THE WITNESS:**  Thank you.

18       **THE COURT:**  You bet.

19     Go ahead, Ms. Kaul.

20  **BY MS. KAUL:**

21  **Q.**   Just a few more -- which I realize I had said before, but

22  I mean it this time -- a few more questions.

23       If, according to your testimony, the primary purpose of

24  the meetings is to assess litigation risk and provide legal

25  advice, why is that not memorialized in any of NaphCare's

1    policies?

2    **A.**   It doesn't need to be.   I mean, that's -- you know, with

3    the legal department, we're directing these things to happen.

4    We're preparing the documents.   We're directing the discussion.

5    That's what we do in the legal department.

6    **Q.**   Okay.  But, as testified here today, the purpose is

7    memorialized in the contract as well as in the policy and

8    procedure we discussed; right?

9    **A.**   This policy and procedure does -- is not what governs the

10   corporate-level M&M review.

11   **Q.**   It references documents that are used by the corporate

12   morbidity and mortality review committee, though; correct?

13   **A.**   Yes.

14   **Q.**   Okay.   Irrespective of whether there's any potential

15   active litigation arising out of a death, NaphCare would still

16   have to conduct a corporate-level review pursuant to the

17   contract; correct?

18   **A.**   The contract with San Diego does say that, yes.

19   **Q.**   And they would still have to conduct a site-level review

20   pursuant to contract; right?

21   **A.**   Yes.

22   **Q.**   And your testimony is that, irrespective of any potential

23   active litigation arising out of a death, NaphCare would still

24   have to conduct a site-level review pursuant to its policies

25   and procedures; correct?

```
 1   A.    That's correct, yes.

 2   Q.    Wouldn't they also have to conduct a corporate-level

 3   review pursuant to its policies and procedures?

 4   A.    If -- if not policy and procedure, you mean what the

 5   Chief Legal Officers have said should happen, yes.

 6         MS. KAUL:  I have no other questions subject to any

 7   potential redirect.

 8         THE COURT:  Okay.

 9         MS. KAUL:  Okay.

10         THE COURT:  Why don't we do this.  Let's take a short

11   break.

12      Mr. Barkley, I want to respectfully remind you that you

13   remain under oath.  So you're not going to talk to any of the

14   lawyers while we're on a break.

15      Mr. Smith, why don't you take a moment to gather your

16   thoughts for any redirect, and then I may have some questions

17   to follow up at the end of it.

18      So I want -- you feel free to step off the witness stand,

19   Mr. Barkley.

20         THE WITNESS:  Thank you.

21         THE COURT:  Yes, sir.

22      Let's take just a couple minutes, Mr. Smith, give you some

23   time.

24         MR. SMITH:  Sure.

25   ///
```

```
 1                  (Recess taken at 10:20 a.m.)

 2                (Proceedings resumed at 10:27 a.m.)

 3           THE CLERK:  We are back on the record.

 4      Please be seated.

 5           THE COURT:  All right.  Mr. Barkley, I would remind

 6  you that you are still under oath.

 7      Mr. Smith, do you have any redirect for Mr. Barkley?

 8           MR. SMITH:  I do, Your Honor, just briefly.

 9           THE COURT:  Sure.

10                  REDIRECT EXAMINATION.

11  BY MR. SMITH:

12  Q.   Good morning again.

13  A.   Good morning.

14  Q.   Are the committee meetings that were discussed with

15  respect to the privilege log shared with the County of

16  San Diego?

17  A.   No.

18  Q.   Has there ever been any NaphCare intention to share those

19  documents?

20  A.   No.

21  Q.   Is it your understanding the County of San Diego is aware

22  that these are confidential attorney-client meetings?

23  A.   I don't know that the County of San Diego knows that these

24  meetings happen.

25  Q.   All right.  Is there anything else that you would like to
```

Ex. A-58

1    elaborate on on your testimony that you want to get an

2    opportunity to share?

3    **A.**    Sure.

4        So in looking at what's been marked as Plaintiffs'

5    Exhibit 2, the NaphCare policy and procedure for San Diego

6    County, you know, there's lots of things that jump out to me

7    showing this is not the policy that's talking about the M&M --

8    the corporate M&M review that is the documents that we've

9    asserted the privilege with respect to.

10        So, you know, for example, this is Bates 31104.  You know,

11   Bullet Points -- Bullet Point 9 refers to where those documents

12   get placed within our NCCHC folder of SharePoint.  There was a

13   discussion about -- about site-level M&M reviews, which this

14   policy speaks to.  You know, the -- the standard at the -- this

15   policy, at the outset, states it's based on NCCHC Standard

16   A-09.

17        So when an NCCHC sur- -- in a facility that is accredited,

18   when the surveyors for NCCHC come, one of the things they would

19   be checking is, "Are you following the standard?"  And those

20   minutes from the site level would be available there for that

21   purpose.

22        And so the site-level M&M review process -- you know, 8

23   talks about the CQI involvement and doing the quality

24   improvement afterwards.  That -- if we were talking about those

25   documents, we would be talking about a very different thing

1   than talking about the corporate-level documents from the M&M

2   process that's directed by the Chief Legal Officer in the legal

3   department.

4       I also wanted to note there's an indication in this policy

5   about an M&M review can and should happen, like, as the -- oh,

6   here it is -- Bullet Point Number 2 on that same page, 31104.

7   M&M can be part of the MAC meeting as long as it's completed

8   within 30 days.

9       That's where I was talking about, I think, at the very

10  beginning of my testimony about -- different facilities will do

11  it a little differently, but some of them will do it as part of

12  that standing MAC meeting.

13      Those site-level meetings -- unlike the corporate

14  meetings, which are all NaphCare either legal or clinical

15  folks, at the site level, it's going to include custody,

16  classification, you know, other elements outside of NaphCare.

17      And if we're talking about those meetings, I think it

18  would be a lot closer question what the primary purpose is

19  because of the attendees, the fact that a lot of that results

20  in CQI improvement process on the back end at the facility

21  level.

22      But at the corporate level, where the legal department is

23  directing that, the primary purpose is for us to be in a better

24  position to defend litigation that's very likely to occur with

25  an in-custody death.

1    **Q.**  And these morbidity/mortality reviews that are subject to

2    the privilege log -- those have been occurring long before the

3    contract with San Diego?

4    **A.**  Correct.  Yes.  I -- I went back in our files and found

5    documents from as far back as at least 2011 showing NaphCare

6    has been doing this corporate-level process at the direction of

7    Brad Cain since at least 2011.

8    **Q.**  And are those meeting minutes and -- and records shared

9    with the different facilities?

10    **A.**  No.

11    **Q.**  Okay.  And when you say clinical staff attends, you're not

12    talking about the clinical staff that actually cared for the

13    inmate; correct?

14    **A.**  No.  I'm talking about our corporate-level clinical

15    leadership.

16          **MR. SMITH:**  All right.  I have nothing further.

17          **THE COURT:**  Any recross, Ms. Kaul?

18          **MS. KAUL:**  Very briefly.

19          **THE COURT:**  Sure.

20                   **RECROSS-EXAMINATION**

21    **BY MS. KAUL:**

22    **Q.**  Mr. Barkley, the -- at least some of the same documents

23    that are discussed at the corporate-level meetings are also

24    referred to in this policy and procedure; right?

25    **A.**  That's correct.

1    **Q.**    Okay.   And that's the death summary -- the HSA death

2    summary, physician death summary, and psychological autopsy;

3    right?

4    **A.**    Right.

5    **Q.**    And information from those can be used to develop the

6    agenda, presentation, and meeting minutes that are prepared for

7    and from the corporate-level meetings; right?

8    **A.**    Yes.

9    **Q.**    Okay.   And pursuant to this policy and procedure, which

10   is, according to your testimony, site-specific, it is intended

11   that the death summaries and psychological autopsies be shared

12   at a site level; right?

13   **A.**    Right, which is interesting.   If we were in any other

14   county, I would say we'd have a closer question.

15   **Q.**    Well, if NaphCare was complying with the contract and

16   performing site-level reviews pursuant to the contract, it

17   would be intended that these documents would be shared at the

18   site level; right?

19   **A.**    I don't accept the premise that NaphCare is necessarily

20   responsible for the fact that those don't occur.   I don't know

21   why they don't occur, but your question is, if we were doing

22   it, that would be compliant with the contract?   Is that what

23   you're saying?

24   **Q.**    The question is --

25   **A.**    I'm sorry.   Ask me your question again.   I got hung up on

**Ex. A-62**

```
 1  the beginning.
 2  Q.    Sure.
 3        If the site-level reviews were happening pursuant to the
 4  policy and procedure --
 5  A.    Okay.
 6  Q.    -- the death summaries and psychological autopsies would
 7  be shared at the site level with individuals outside of
 8  NaphCare; right?
 9  A.    If the -- if the policies were being followed, yes.  But
10  as a matter of fact, it's not.
11  Q.    That's not why you haven't directed site-specific reviews,
12  though; right?
13  A.    I don't direct site-specific reviews one way or the other.
14  Q.    Does it concern you that those reviews aren't happening?
15  A.    Yes.
16            MR. SMITH:  That's argumentative.
17            THE WITNESS:  I would like them to be happening.
18  BY MS. KAUL:
19  Q.    Why haven't you --
20            THE COURT:  I'll overrule the objection.
21  BY MS. KAUL:
22  Q.    Why haven't you directed that they happen since you became
23  aware that they weren't occurring?
24  A.    Because those site-level reviews are not a function of the
25  legal department.  Unlike the corporate reviews, those are
```

Ex. A-63

1    operations folks at the site level who need to make those
2    happen.  They have supervisors that need to make those happen.
3    **Q.**   Does the lack of any site-level review hamper the
4    corporate-level -- level review in any way, do you think?
5    **A.**   Not to my knowledge, no.
6    **Q.**   Other jails do site-specific reviews, other jails that --
7    where NaphCare provides health care services?
8    **A.**   Yes.
9    **Q.**   Okay.  And in those jails, do the site-level reviews
10   assist the corporate-level review in any respect?
11   **A.**   No.
12   **Q.**   Even though similar -- the same documents are used in both
13   reviews; right?
14   **A.**   Yeah.
15        So when I've had the opportunity to look at kind of what
16   happens at a site level -- again, because you've got everybody
17   around the table.  You know, there's a lot of review of the
18   emergency response, you know, both custody side and medical
19   side.  There's a lot of focus on particular limitations of the
20   facility or limitations -- particular characteristics of the
21   facility.
22        So your question was whether those site-level things
23   discuss a lot of the same things?  Is that what you're asking?
24   **Q.**   I think I can move on from that question.
25   **A.**   Okay.  Okay.

1  **Q.**   Just one more (Inaudible).

2      You testified previously that NaphCare complies with NCCHC

3  standards with respect to its reviews; is that right?

4  **A.**   The site-level reviews, yes.

5  **Q.**   The site-level reviews.

6      Does it comply with them with respect to corporate-level

7  reviews?

8  **A.**   I mean, having looked at the NCCHC standard and this

9  policy, you know, no.  Our corporate review is structured very

10 differently.

11 **Q.**   Do you know whether or not it complies with -- does not

12 comply with NCCHC standards?

13 **A.**   There is no NCCHC standard that would require a

14 corporate-level review.  So it's neither compliant nor

15 noncompliant.

16 **Q.**   Okay.  And with respect to the site-level reviews that are

17 not occurring but are referenced in this policy and procedure,

18 you're not aware of assessing litigation risk being the purpose

19 of those reviews; correct?

20 **A.**   I'm not aware of what's -- reviews that aren't happen --

21 you asked me I'm not aware of the purpose of reviews that

22 aren't happening?

23 **Q.**   That are intended to happen, yes.

24 **A.**   Okay.  I don't know that I can answer that question.

25      **MS. KAUL:**  Okay.  I don't have any other questions,

**Ex. A-65**

1    Your Honor.

2              **THE COURT:**  Okay.  Thank you, Ms. Kaul.

3              **MR. SMITH:**  Nothing further.

4              **THE COURT:**  Okay.  First, Mr. Barkley, I appreciate

5    you testifying this morning to provide additional information

6    regarding NaphCare's policies, and I do have a few questions

7    for you just to make sure that I'm correctly understanding

8    things, sir.

9         The first is:  From the testimony that you've provided, do

10   I understand correctly that, with respect to San Diego County

11   jails, NaphCare is not performing site-level morbidity and

12   mortality reviews?

13             **THE WITNESS:**  That's my understanding, yes.

14             **THE COURT:**  And that the documents that are referenced

15   in the privilege log and were submitted for in-camera review

16   all pertain to NaphCare's corporate-level morbidity and

17   mortality review?

18             **THE WITNESS:**  That's correct.

19             **THE COURT:**  Approximately -- well, since approximately

20   when, to your knowledge, has NaphCare been performing its

21   corporate-level morbidity and mortality reviews for in-custody

22   deaths?

23             **THE WITNESS:**  Yeah.

24        So as I mentioned earlier, in preparation for this, I kind

25   of went into our legal department drives, and I found documents

**Ex. A-66**

 1  as far back as 2011 referencing our corporate M&M reviews.

 2       **THE COURT:**  Was there any document that you found, or

 3  that you are aware of, that describes the -- the purpose behind

 4  the corporate-level -- I think you referred to them as the M&M

 5  reviews.

 6       **THE WITNESS:**  Yes.  Yeah, just a shorthand for

 7  "mortality and morbidity."

 8     Is there a document that lays out how they are to occur?

 9       **THE COURT:**  Yes, sir.

10       **THE WITNESS:**  No.  I think it's always been -- you

11  know, I learned how to do them from Brad Cain, who was my

12  predecessor.  I think he came up with the -- with the process

13  himself when he was in this role way back in time.

14       **THE COURT:**  When the corporate-level M&M review is

15  completed, culminating in the post-meeting minutes, is there

16  any further action that is taken with respect to memorializing

17  that M&M review in the form of a memorandum or otherwise?

18       **THE WITNESS:**  Not in the form of a memorandum.

19     So there are -- there are, for some of the reviews, some

20  recommendations.  And those recommendations will say things

21  like this -- this individual clinical leader, Dr. Whomever,

22  Nurse Whomever, will do follow-up education with the provider

23  or -- I don't know -- those kind of recommendations.

24     The follow-up that occurs now is typically an email that

25  referenced the nurse paralegal.  She'll follow up with those

 1 | individuals.  You know, if it says, "Dr. Alvarez, you're going
 2 | to do whatever," she will email Dr. Alvarez and say, "Hey, did
 3 | you do the thing you said you were going to do?"
 4 |     Dr. Alvarez emails back and says, "Yes, I did the thing I
 5 | was going to do," and that gets documented in the following
 6 | month's minutes as -- I think it simply says completed -- you
 7 | know, that the recommendations were completed.
 8 |         **THE COURT:**  I see.
 9 |     I'm going to mark as Court's Exhibit 1 Exhibit Numbers --
10 | I believe it is 71, 72, and 73 from the in-camera documents.
11 |     (Court's Exhibit 1 marked for identification.)
12 |         **THE COURT:**  And, Mr. Barkley, I realize that these are
13 | the subject of a pending privilege assertion --
14 |         **THE WITNESS:**  Right.
15 |         **THE COURT:**  -- and that plaintiffs' counsel does not
16 | have one.  So I'm not going to ask you, in a public hearing,
17 | about the specifics --
18 |         **THE WITNESS:**  Okay.
19 |         **THE COURT:**  -- of the documents.
20 |     Mr. Smith, do you have a copy of these exhibits?
21 |         **MR. SMITH:**  I do.
22 |         **THE COURT:**  All right.  And, Ms. Kaul and
23 | Mr. Swearingen, I realize that -- that you do not, but I do
24 | have some questions that I would like to ask Mr. Barkley about
25 | from them.

1        Do you have any objection to that, Ms. Kaul?

2            **MS. KAUL:**  No objection.

3            **THE COURT:**  I'm going to hand them over to you,

4    Mr. Barkley, if I could.

5            **THE WITNESS:**  Thank you, sir.

6            **THE COURT:**  I want to make sure that I understand the

7    documents.

8        Do I understand correctly that, for every in-custody

9    death, there is generated a -- an M&M committee agenda as well

10   as a PowerPoint presentation and then post-committee meeting

11   minutes?

12           **THE WITNESS:**  Yes.

13       (Court's Exhibits 2 and 3 marked for identification.)

14           **THE COURT:**  And Exhibits 71, 72, and -- or excuse me.

15   Court's Exhibits 1, 2, and 3 refer to Privilege Log Entries 71,

16   72, and 73.

17       So beginning with Court's Exhibit 1 -- Mr. Barkley, did I

18   happen to give you two copies of --

19           **THE WITNESS:**  You did --

20           **THE COURT:**  I thought I did.

21           **THE WITNESS:**  -- Your Honor.  You did.

22           **THE COURT:**  Thank you, sir.

23       All right.  Beginning with Court's Exhibit 1, are these

24   the -- or is this the agenda for the M&M committee meeting from

25   September 18th, 2023?

**Ex. A-69**

1          THE WITNESS:  Yes.

2          THE COURT:  All right.  Does this agenda reflect

3    any -- let me ask you a different question.

4         The -- the questions that are contained at the bottom of

5    Page 1 of Court's Exhibit Number 1 that are reflected in six

6    bullet points -- do those describe the purpose of the M&M

7    committee meeting?

8          THE WITNESS:  They're to guide the discussion in a way

9    that facilitates the purpose, yes.  And, you know, I'm going to

10   speak carefully about how I answer --

11         THE COURT:  Sure.  Of course.

12         THE WITNESS:  -- given what you cautioned at the

13   beginning.

14        But, you know, the first three kind of go to the heart of

15   what's typically at issue in litigation, and then the -- the

16   final three -- certainly, with a company like NaphCare that's

17   subject to constitutional 1983 claims under the *Monell*

18   Doctrine, those are -- kind of deal with those concepts of

19   ratification and policy and custom, making sure that, to the

20   extent we identify deficiencies that could have contributed to

21   the death -- that we are making sure those don't -- are not

22   policies and customs, nor are they ratified by us.

23         THE COURT:  Court's Exhibit 2 is the PowerPoint

24   presentation for that M&M committee meeting from

25   September 18th, 2023?

 1          THE WITNESS:  That's right.

 2          THE COURT:  And then Court's Exhibit 3 is the -- the

 3    minutes that follow that meeting from September 18th, 2023?

 4          THE WITNESS:  Yes, Your Honor.

 5          THE COURT:  All right.  And I see those minutes

 6    reflect that you attended the meeting; is that correct,

 7    Mr. Barkley?

 8          THE WITNESS:  I called it to order and chaired it.

 9    Yes, Your Honor.

10          THE COURT:  Very well.

11       In your view, Mr. Barkley, how did quality improvement

12    measures pertain to legal advice?

13          THE WITNESS:  Yeah.

14       I'll be honest with you.  It's hard for me to disentangle

15    the two.  You know, providing good care is mitigating my

16    client's risk, and I think that's particularly true when --

17    particularly true when the *Monell* standard is at play, where

18    it's not just about what happened in this particular incident,

19    but what does NaphCare, as a whole, do?  What are our policies?

20    What are our customs?

21       You know, providing -- putting my company -- my client in

22    a position to be able to defend litigation under those

23    circumstances, you know, goes hand-in-glove with the -- the

24    medicine.  So it's hard for me -- it's hard for me to separate

25    those two.  You know, I would also say, you know, in my mind,

 1   the primary purpose is to dive into what happened in this

 2   incident.

 3       I take a lot -- I personally -- I know the other attorneys

 4   in my group take a lot out of these meetings that then inform

 5   all of the decisions we make once we get -- sometimes we get

 6   a -- different jurisdictions call them different things but,

 7   like, a notice of claim.  (Inaudible) like a governmental

 8   entity.  You have to go through that administrative process

 9   first; right?

10       You know, sometimes they jump up as that.  Sometimes they

11   first appear post- -- post-death as somebody has requested to

12   look at the medical records, a plaintiff's lawyer, you know,

13   some pre-suit discovery-type information.  Sometimes the first

14   notice you get is the lawsuit.

15       And when we are -- and even before that, we are looking

16   at, you know, what experts we might engage, what law firm we

17   might send this to, how much of this do we think we can handle

18   in-house versus having to bring in experts -- or having to

19   bring in outside lawyers.  What's our -- you know, are we going

20   to pursue an early resolution?

21       We've had times where I and/or the lawyers in our

22   department have picked up the phone and -- and talked to family

23   members as a result of things we talked about and -- you know,

24   to try to work on resolving prelitigation issues.  We've talked

25   to plaintiffs' lawyers, using information we get from this

1    process, pre-suit to resolve potential litigation.

2        This is a valuable tool to me and my department to make

3    sure we're providing the best advice for the deaths we're

4    reviewing and mitigating risk going forward.

5        **THE COURT:**  Do the M&M committee agendas, PowerPoint

6    presentations, or minutes document any legal advice that is

7    provided by you or any other attorney on behalf of NaphCare?

8    And let's talk specifically about -- if you would like, about

9    71, 72 --

10        **THE WITNESS:**  Right.

11        **THE COURT:**  -- and 73 that are Court's Exhibits 1

12    through 3.  And then you're welcome to answer the question more

13    generally, if you'd like, sir.

14        **THE WITNESS:**  Sure.

15        All right.  So I would say, looking at Court's Exhibit

16    Number 3, you know -- so even on the ones -- can I just

17    (Inaudible) how to say this?

18        On the top of, well, Bates Levels 513, there's a patient

19    with the initials J.M. at the top.

20        **THE COURT:**  Yes, sir.

21        **THE WITNESS:**  And there's a recommendation or

22    nonrecommendation; right?

23        **THE COURT:**  Yes.

24        **THE WITNESS:**  Even that is informed by the lawyers

25    present in that review.  So the fact that it was reviewed and

1   that was the result has informed our -- I would consider that

2   to be legal advice.

3       Now, the language we use -- because it is clinicians, you

4   know, we speak in their language because we want them to be

5   able to speak to us, and then it helps us.  If we went to them

6   and said, "Do you think there's any deliberate indifference

7   here?" they wouldn't know how to answer that necessarily.

8       If we went to the clinical folks and said, "Tell us if

9   you" -- you know, they might be able to speak to standard of

10  care.  I find a lot of clinicians are able to speak to that.

11  But, you know, the language we use is clinical so that they are

12  comfortable in being able to answer those questions.

13      I would also say -- so -- also, in the middle of that same

14  page, there's a patient with the initials J.B., and there's a

15  quality improvement recommendation there.  That certainly

16  reflects advice from the legal department -- right? -- making

17  sure we're following our policy.  We don't want it to become a

18  custom that things are not being followed the way they're

19  supposed to, make sure we're meeting the standard of care.

20      So certainly -- so the -- speaking about the minutes,

21  that's where I would see a reflection of legal advice, attorney

22  mental impressions.

23          THE COURT:  I have a follow-up question, but I don't

24  want to cut you --

25          THE WITNESS:  Yes, sir.  Go ahead.

1      **THE COURT:**  If you're in the middle of your answer, go

2  ahead.

3      **THE WITNESS:**  No.  No.  Go ahead.

4      **THE COURT:**  I understand what you just said about the

5  minutes, Mr. Barkley.

6      Is there anything in the M&M committee agendas or

7  PowerPoint presentations that, in your view, would reflect

8  attorney legal advice, mental impressions, or assessments of

9  litigation risk?

10     **THE WITNESS:**  So the PowerPoint, Court's Exhibit 2 --

11  the selection of what is presented there, to me, represents

12  attorney mental impressions, work product.

13     This -- this is put together by a nurse paralegal who

14  reports to me based on guidelines that I've given her, that

15  Brad Cain gave her before, in terms of pulling out -- you know,

16  "Of the voluminous records that exist, these are the kinds of

17  things we want you to identify and pull out for discussion."

18     So the fact that these selections from the medical records

19  are presented here rather than others that could have been put

20  here but are not is a reflection of mental impressions of

21  attorneys in the legal department.

22     **THE COURT:**  I see.

23     **THE WITNESS:**  And I think Your Honor understands and

24  is aware of these also with respect to some of the patients.

25  It's not just a privilege objection but a relevance objection

1    because they are not San Diego patients.

2         THE COURT:  Understood.

3         THE WITNESS:  So looking at the agenda -- did I talk

4    about -- I'm sorry.  Did I talk about 1 or 3 before?  Was I

5    talking about minutes or agenda?

6         THE COURT:  You were talking specifically about the

7    minutes, Mr. Barkley.

8         THE WITNESS:  Okay.  So looking at the minutes, the --

9    the six bullet points you identified represent attorney

10   solicitation of information for the purpose of being -- being

11   able to make legal advice.

12       And then I would say the same thing about -- for each one

13   of these patients where there's a statement about whether or

14   not there are quality improvement measures, and those may or

15   may not be -- certainly reflects legal advice.

16        THE COURT:  Okay.  You may have mentioned this

17   already, Mr. Barkley, and so if I'm asking you again, I

18   appreciate your indulgence.

19        THE WITNESS:  Sure.

20        THE COURT:  But following the completion of the

21   minutes, for example, the minutes from September 18th, 2023 --

22   that is Court's Exhibit 3 -- who at NaphCare receives copies of

23   the minutes reflecting, you know, where there any quality

24   improvement measures or recommendations?

25        THE WITNESS:  To my knowledge, it's just the --

1  honestly just the legal department.  So our -- the nurse

2  paralegal prepares a draft of the issues, circulates it to me

3  and to other litigation attorneys in our legal department.  We

4  make comments and revisions, and they get filed away.

5       Now, I mention there's a process whereby we ensure the

6  recommendations are followed, but that's not through

7  distribution of the minutes.

8       THE COURT:  How are the recommendations from the M&M

9  committee memorialized if it's not in the minutes?

10      THE WITNESS:  So the -- the recommendations are

11  memorialized in the minutes.  The minutes have not been

12  distributed for the recommendations to be implemented.  There's

13  a different process for making sure the recommendations are

14  implemented.

15      THE COURT:  Explain that process to me, please.

16      THE WITNESS:  Sure.

17      So, you know, when you see a recommendation on here,

18  it's -- it's typically associated with an individual name.

19  Like, Dr. Whomever is going to do whatever he or she is going

20  to do.

21      The nurse paralegal will typically follow up on any --

22  sometimes they'll do it on their own.  They'll, you know -- or

23  say, "Hey, I had" -- "I did the thing.  I did the

24  recommendation," whatever it was.  If she doesn't get that from

25  them, she'll send them a reminder.  "Hey, remember at M&M, you

Ex. A-77

1    said you were going to whatever.  Have you done it?"  They

2    respond.

3            And once she has that email confirmation -- I don't think

4    that they're reflected in these September minutes, but in more

5    recent minutes, we have a section that specifically addresses

6    were recommendations completed or not.  And they'll simply say,

7    you know, the patient recommendations were completed, something

8    like that, that references the fact that she's got emails that

9    document they were done.

10          And the reason I changed the minutes to have that happen

11   was, you know, also dealing with risk of litigation, concern

12   that, you know, somebody would say, you know, "You identified

13   these deficiencies.  Why didn't you do anything about it?"  You

14   know, I wanted to make sure that we did something about it and

15   had some level of documentation that we had done something

16   about it, again, to defend against litigation.

17          THE COURT:  I appreciate you answering my follow-up

18   questions, Mr. Barkley.

19          Ms. Kaul, did you have any additional questions for

20   Mr. Barkley based on my questioning?

21          MS. KAUL:  Just one, Your Honor.

22          THE COURT:  Go -- go ahead.  You can do it from there.

23   That's fine.

24          MS. KAUL:  Okay.  Thanks.

25   ///

1                    <u>RECROSS-EXAMINATION (RESUMED)</u>

2    BY MS. KAUL:

3    **Q.**   Is the nurse paralegal a certified paralegal?

4    **A.**   I don't know what -- I -- I don't think we have -- you

5    mean like a -- through a private organization or through a

6    state license -- I mean, there's not a state licensure

7    component to that.

8    **Q.**   I'm wondering about the qualifications of your --

9    **A.**   Sure.

10   **Q.**   -- nurse paralegal as it relates to legal --

11   **A.**   Right.

12   **Q.**   -- practice.

13   **A.**   Right.  Right.

14        So to my knowledge, in the State of Alabama, to be a

15   paralegal is merely a function of education, training,

16   experience.  There is no certification requirement.

17   **Q.**   Your nurse paralegal is a certified nurse; correct?

18   **A.**   Registered nurse, yes.

19   **Q.**   Registered nurse.

20        **MS. KAUL:**  Okay.  That's all, Your Honor.

21        **THE COURT:**  Okay.  Thank you, Ms. Kaul.

22        Mr. Smith, did you have any follow-up questions for

23   Mr. Barkley?

24        **MR. SMITH:**  I do not, Your Honor.

25        **THE COURT:**  Okay.  You're excused, Mr. Barkley.

**Ex. A-79**

1      Thank you, sir.

2              **THE WITNESS:**  Thank you.

3              **THE COURT:**  And, Mr. Barkley, if you could just hand

4      back to Ms. Kaul the original exhibits that you've got, sir.

5      You can just actually leave everything right there.  It's even

6      easier.  Don't worry about it.

7              **THE WITNESS:**  Yeah.

8          I'm going to separate out Your Honor's in camera --

9              **THE COURT:**  Yes, sir.  Just leave -- leave the

10     in camera right there.

11             **THE WITNESS:**  Okay.  I will leave the in camera here.

12     All right.

13             **MS. KAUL:**  Thank you.  I appreciate that.

14             **THE COURT:**  And, Ms. Kaul, before I forget, I would

15     respectfully request that the plaintiffs provide an exhibit

16     list by the end of the week.  Just file it for your Exhibits 1,

17     2, and 3, please.  Okay?

18             **MS. KAUL:**  Will do.

19         Thanks, Your Honor.

20             **THE COURT:**  Great.

21         And what -- what, if any, request do you have with respect

22     to follow-up on this issue, Ms. Kaul?  Would you like the

23     opportunity to submit a post-hearing brief on this issue?

24     What --

25             **MS. KAUL:**  One moment, Your Honor.

 1          **THE COURT:**  Sure.

 2      And I'm going to ask you the same question, Mr. Smith.

 3          **MS. KAUL:**  I think, Your Honor, we would request

 4   additional briefing, keep it short, and support the -- the

 5   Court imposing a strict page limit.

 6      But I think, with the benefit of the transcript, and given

 7   the extensive testimony, that -- that would be helpful from

 8   plaintiffs' perspective.

 9          **THE COURT:**  How much time do you think you need to

10   prepare a post-hearing brief?

11          **MS. KAUL:**  With an expedited transcript, I think by

12   the end of next week.

13          **THE COURT:**  And when you said "a strict page limit,"

14   what are you thinking?

15          **MS. KAUL:**  We would do -- no more than five pages

16   would be fine.  I'm not even sure that we need that, but that's

17   what I would propose.

18          **THE COURT:**  All right.  Fair enough.

19      Mr. Smith, what's your position with respect to any

20   post-hearing briefing and, if so, whether there should be any

21   page limits at the time of any briefing?

22          **MR. SMITH:**  We're acceptable to briefing on this

23   matter and same page limit requirement that's -- that's

24   provided to plaintiff given to us for an opposition/surreply.

25          **THE COURT:**  All right.  So each side may submit a

**Ex. A-81**

 1    brief of no more than five pages on or before March 22nd, and I

 2    will issue a ruling on that portion of the motion to compel as

 3    quickly as I can.

 4        Is there anything further that we should discuss with

 5    respect to the motion to compel as to which there have been

 6    privilege assertions?  Because I do want to discuss with

 7    you-all, before we go, the supplemental status report that

 8    NaphCare provided yesterday.

 9            MS. KAUL:  Not for plaintiffs, Your Honor.

10            THE COURT:  Anything else on the privilege issues,

11    Mr. Smith?

12            MR. SMITH:  No, Your Honor.

13            THE COURT:  All right.  Well, let's -- and, again,

14    Mr. Barkley, thank you for traveling to be here today.  It was

15    very helpful, sir.

16        Mr. Smith, I appreciate the -- the supplemental status

17    report, and I don't want to speak in too big of a generality.

18    But it seems to me, in reviewing the -- I think it's 38 pages

19    that responds to the bullet points -- that there's basically an

20    agreement by NaphCare to produce responsive documents unless it

21    just doesn't have any documents.

22        Is that all correct, Mr. Smith?

23            MR. SMITH:  As to a majority of the bullet points,

24    there may be two or three that are at issue.

25            THE COURT:  Well, which ones are at issue?  And I --

1    let's use the ECF page numbers, please.

2         MR. SMITH:  Okay.  Well, Your Honor, when I traveled

3    down to San Diego and printed this out, it hadn't been filed

4    yet, the chart that had the response.

5         Plaintiffs' counsel --

6         THE COURT:  You -- why don't -- use the page number at

7    the bottom of the page instead, then.  That's fine.

8         MR. SMITH:  Okay.  Thank you, Your Honor.

9         THE COURT:  Sure.

10        MR. SMITH:  Well, just going in chronological order,

11   on Page 12, the first bullet point here, NaphCare is willing

12   to -- to produce the subcontracts subject to redactions with

13   the privilege log as to the financials within those contracts

14   as proprietary trade secret confidential business and

15   competitive advantage information.

16        THE COURT:  So your proposal, as to the production of

17   contracts between NaphCare and outside facilities and

18   specialists, would be to produce those contracts but redact the

19   financial component of them?

20        MR. SMITH:  Correct.

21        THE COURT:  Do you object to that, Ms. Kaul or

22   Mr. Swearingen?

23        MR. SWEARINGEN:  Yes, Your Honor.

24        THE COURT:  You do object?

25        MR. SWEARINGEN:  Yes, Your Honor.

1          **THE COURT:**  Why?

2          **MR. SWEARINGEN:**  The protective order in the case

3    specifically creates a procedure that allows for the protection

4    of proprietary information, including trade secret confidential

5    research development of commercial information.  And we believe

6    that the information can be protected through the protective

7    order without redactions, instead stamped "Confidential."

8          These are public county -- you know, NaphCare is a

9    provider of public services to the San Diego County Jail.  Its

10   contract with the County has dollar amounts in it that are not

11   redacted.  The dollar amounts that it -- that may be at issue

12   with outside facilities, including any caps for services or

13   restrictions on services, should be included without redaction.

14         If -- and, again, we've offered to NaphCare to produce it

15   as confidential under the protective order.

16         **THE COURT:**  Why isn't that good enough, Mr. Smith?

17         **MR. SMITH:**  Yes.

18         Well, first of all, it's irrelevant as to what the numbers

19   are.  It's not relevant to any claim or defense, and so our

20   position is that it's not discoverable.

21         And despite there being a protective order in place,

22   there's -- there's still a privilege that NaphCare would like

23   to assert with respect to these financials that give them a

24   competitive edge in the -- in the facility.

25         And so the -- just the distribution of documents to more

 1   people, more eyes, it's -- it's something that we object to,

 2   given the fact that it's irrelevant.

 3        **THE COURT:**  Well, is it your position that the

 4   contract between NaphCare and the outside facilities are

 5   irrelevant as a general matter or that the specific financial

 6   component of those contracts is irrelevant?

 7        **MR. SMITH:**  Well, as a general matter, it's

 8   irrelevant, but we're willing to produce them.  But then,

 9   certainly, the -- the financials don't give any probative value

10   to the standard of care provided or to any of the claims that

11   are raised.

12        So -- potentially, the information in the contract -- if

13   there were caps or restrictions or something like that noted in

14   the contract, which -- that doesn't exist, to my knowledge --

15   that, I guess, potentially could be relevant as to whether a

16   certain contract is capping work, something like that.

17        But as to the amounts paid, we don't see any relevance,

18   but --

19        **THE COURT:**  Mr. Swearingen -- oh.

20   I didn't mean to cut you off.  Go ahead, Mr. Smith.

21        **MR. SMITH:**  No.  That's it.

22        **THE COURT:**  Mr. Smith -- "Mr. Smith."

23   Mr. Swearingen -- excuse me -- would the plaintiffs object

24   to the production of those contracts between NaphCare and

25   outside facilities and specialists pursuant to a

**Ex. A-85**

1   "Confidential - For Counsel Only" designation?

2          **MR. SWEARINGEN:**  Yes, Your Honor.

3          **THE COURT:**  You would object to that?

4          **MR. SWEARINGEN:**  Oh.  I'm sorry.  We would accept

5   that.

6          **THE COURT:**  You do.

7       Okay.  Good.  That's right.  I thought we were saying the

8   same thing here.

9       Mr. Smith, what about that, then, with respect to

10  designating these materials as, colloquially, "Attorneys' Eyes

11  Only"?  If you want to take a moment to speak to Mr. Barkley,

12  that's fine.

13         **MR. SMITH:**  Generally, we're okay with "Counsel Only."

14  But, you know, given that that will give it an extra marking so

15  that the voluminous amount of records produced in this

16  matter -- and it's not accidentally used in the litigation, is

17  one of our concerns.

18      And then they probably -- so a "Counsel Only" designation

19  should be fine with that -- that admonition that we want this

20  information to be taken sensitively.

21         **THE COURT:**  Well, you're welcome to put that marking

22  on the contracts that you produce.  I don't think there's any

23  objection from the plaintiff to that if you're going to be

24  Bates-numbering it and, as part of the Bates number,

25  "Confidential - For Counsel Only, Pursuant to Protective

1    Order."

2        I think -- any objection to that, Mr. Swearingen?

3        **MR. SWEARINGEN:**  No.  Indeed, that's what's actually

4    called for in the protective order.

5        **THE COURT:**  So I think that that would alleviate a

6    concern, then, with respect to somebody not having a transcript

7    of this hearing.

8        Any further concerns with respect to that entry, which is

9    ECF Page Number 15 on Docket 588, Mr. Smith?

10        **MR. SMITH:**  No, Your Honor.

11        **THE COURT:**  All right.  Let's move on, then.

12        What are the other, if any, bullet points that -- as to

13    which there may be an issue between the parties?

14        And, by the way, I understand it's NaphCare's position

15    that these categories of documents are functionally a new

16    subpoena.  I did review the email correspondence between

17    counsel, and I understand that NaphCare is not waiving that

18    position, agreeing to produce just about everything in the

19    bullet points that the plaintiffs provided.

20        So that's not lost on me, either, just so you know,

21    Mr. Smith.  I realize you decided to just go along and produce

22    even where you think that the original subpoena was overbroad

23    and that -- we'll leave it at that.

24        So with that being said, what other additional disputes

25    are there, if any?

1    **MR. SMITH:**  Yes.

2        At -- I believe there should be another.

3        **THE COURT:**  Take your time.

4        **MR. SMITH:**  Oh.  On Page 32, second bullet point, it

5    seeks the financial audits of the entire NaphCare company, and

6    that's privileged information.  That's certainly irrelevant and

7    highly competent -- confidential and not subject to disclosure.

8        **THE COURT:**  So as I read Paragraph 13.7 of the

9    contract that is included in Exhibit 3 that we utilized during

10   the evidentiary hearing, it requires NaphCare to engage a

11   licensed certified public accountant to conduct an annual

12   financial audit of the organization, referring to NaphCare.

13       And Section 13.7 requires NaphCare to submit two copies of

14   the annual audit report to the County within 15 days after

15   receiving the audit report from the certified public

16   accountant.

17       Is that correct, Mr. Smith?

18       **MR. SMITH:**  That's my understanding, that it's done

19   once.  I believe it's part of the bidding process and that the

20   County is also aware that that is to be maintained as

21   confidential.

22       **THE COURT:**  Well, it may have been done -- you said

23   it's not done annually, which seems to be what the contract

24   requires.  If you want to take a moment to consult with

25   Mr. Barkley, that's fine.

1          I -- you're welcome to speak up, if you'd like,

2    Mr. Barkley.  That's fine.

3               MR. SMITH:  If I can ask --

4               MR. BARKLEY:  I don't want to --

5               MR. SMITH:  -- ask Mr. Barkley --

6               MR. BARKLEY:  I'm not licensed in the State of

7    California.  I don't know -- it's your courtroom.  You tell me.

8               THE COURT:  You're here as a representative of

9    NaphCare.

10              MR. BARKLEY:  Yes, sir.

11         Okay.  So -- well, we -- we submitted a summary of -- so

12    when a county like San Diego does a bid, one of the things they

13    want to evaluate is obviously the financial ability of the

14    entities that are bidding to be able to perform the work.  And

15    so we often submit a summary.

16         Public records laws being what they are, most of the bid

17    that we submit is public record.  But there are certain pieces

18    of it that the County recognizes, that we recognize are marked

19    "Confidential" but stay outside that process.

20         And so those financial documents are part of that.  And so

21    if anyone does a public record request for NaphCare submission,

22    they would get it without the things that we agree are

23    exceptions to the public record law because they're trade

24    secret or confidential.

25         Since the bid process, when we submitted those summary

1   financials, it's not been done on an annual basis since then.

2   I'm not aware if the County has requested it, and we have not

3   proactively submitted it.

4       **THE COURT:**  So you -- I'm sorry, Mr. Barkley.  You

5   said that NaphCare has not --

6       **MR. BARKLEY:**  Proactively -- so it's not been

7   requested of us, and we've not sort of proactively submitted it

8   on our own.

9       **THE COURT:**  But this is a -- this is a financial audit

10  of NaphCare; correct?

11      **MR. BARKLEY:**  Correct.

12      **THE COURT:**  Ms. Kaul, is that even responsive to

13  RFP 85, which is documents relating to monitoring and/or

14  auditing of health care provided to incarcerated persons?  I

15  understand -- if this were talking about an audit of whether

16  NaphCare is providing appropriate health care, that would be

17  one thing.

18     But if this is an audit -- a financial audit of NaphCare,

19  Mr. Swearingen, is this responsive to RFP 85?

20      **MR. SWEARINGEN:**  It is, Your Honor.  The -- NaphCare's

21  ability to -- NaphCare's funding and financial info- --

22  ability -- or abilities is relevant to the provision of care.

23     Indeed, as we look at Exhibit N to the Priyah Kaul

24  declaration in support of plaintiffs' motion to compel --

25  that's Exhibit N, ECF Number 488-4, at ECF Page 132 -- it

**Ex. A-90**

 1   states that, as of April 17th, 2023, there are $9.3 million of

 2   unpaid bills due to hospitals.

 3        Of the total outstanding claim, $4.6 million are past due

 4   to the 30-day threshold.  Due to lack of payment, some

 5   community providers do not want to see or accept our patients,

 6   which include, but not -- or -- but are not limited to --

 7   citing several different health care facilities.

 8        This is a corrective action notice that the County sent to

 9   NaphCare saying that, "We are concerned that our patients at

10   this jail are not going to be able to be served" -- "seen due

11   to NaphCare's inability to pay its bills."

12        **THE COURT:**  I see.

13        And I understand the universe of documents to include

14   every document pertaining to the initial bid that resulted in

15   NaphCare receiving this contract in -- was it 2022?  Is that

16   right?  June 2022?

17        **MR. BARKLEY:**  That's correct.

18        **THE COURT:**  And does NaphCare object to producing the

19   portion of the documents that Mr. Barkley referenced as -- that

20   might be subject to Public Records Act requests?

21        **MR. BARKLEY:**  Well, it's -- Your Honor, I would say

22   it's not subject to Public Records Act requests.

23        **THE COURT:**  Okay.

24        **MR. BARKLEY:**  The -- typically, in part of the bid

25   process, the County, you know, allows the vendor to identify

**Ex. A-91**

1    those parts that we think are exceptions.  They'll review that.

2    I guess they get a public record request when they agree with

3    that.  But, you know, it's a kind of trade secret or

4    confidential financial information that is typically not

5    provided pursuant -- you know, for -- under a public records

6    request.

7         I would also say it reflects NaphCare's financial

8    condition when it was bidding.  So it has nothing to do with

9    NaphCare while they're providing services to San Diego.

10        **THE COURT:**  And that was my next question.

11        Just to confirm, there have -- there has not been an

12   annual financial audit of NaphCare pursuant to Section 13.7 of

13   the contract between the County and NaphCare; is that correct,

14   Mr. Barkley or Mr. Smith, whoever wants to answer?

15        **MR. SMITH:**  No.  That's -- that's correct, my

16   understanding.

17        **THE COURT:**  Well, here's what I would say:

18        If -- I would direct NaphCare to determine whether there

19   is, or have been, any annual financial audits performed as

20   required by Section 13.7.  File a status report by -- excuse

21   me -- by Friday letting me know that.

22        And if there are no annual financial audits, it does not

23   appear to me that documents related to the -- the bidding would

24   be responsive to RFP 85.

25        What's your position on that, Mr. Swearingen?

**Ex. A-92**

1    **MR. SWEARINGEN:**  I -- I believe that it would,

2    Your Honor, in the sense that the County accepted NaphCare's

3    bid.  And if it wasn't financially solvent or incapable of

4    providing the levels of care required, that would be relevant

5    to plaintiffs' claims.

6        The corrective action notice that I referenced that was in

7    Exhibit 2, Ms. Kaul's declaration, include other statements by

8    the County that the County is concerned that NaphCare is not

9    paying for things like inspection fees and is denying claims

10   for medical care equipment.

11       **THE COURT:**  RF- -- I understand your position,

12   Mr. Swearingen.

13       RFP 85 seeks all documents relating to monitoring and/or

14   auditing of health care provided to incarcerated persons,

15   including, but not limited to, quality improvement, quality

16   assurance or clinical performance reviews, peer reviews,

17   in-service trainings, internal or external audits, technical

18   assistance reports, accreditations, contract monitoring

19   reports, minutes from quality assurance meetings, and health

20   care record reviews from June 1st, 2021, to the present.

21       I -- I conclude that financial documents submitted by

22   NaphCare in connection with the bidding process are not

23   responsive to RFP 85, which is, to my reading, specifically

24   directed to documents relating to the monitoring and/or

25   auditing of health care actually provided to incarcerated

1   persons during the NaphCare contract, which began in June of

2   2022.

3        So I would stand on my directive to you, Mr. Smith, to

4   determine whether there have been any financial audits

5   performed by NaphCare pursuant to Subsection -- or Section 13.7

6   and provide to the County and advise me of that in a status

7   report by not later than Friday.

8        Does that make sense, Mr. Smith?

9            MR. SMITH:  It does, and I will do.

10           THE COURT:  All right.  What are the other areas where

11  there might be a dispute, if any?

12           MR. SMITH:  As -- as to the bullet point records, I

13  believe that we were able to meet and confer last night and

14  reach resolution on the remaining ones.

15       So I'll defer to -- to plaintiffs' counsel if he has a

16  different understanding.

17           THE COURT:  Mr. Swearingen, are there any other bullet

18  points that you believe are at issue, sir?

19           MR. SWEARINGEN:  Real briefly, yes, Your Honor.

20       If you go to ECF Page 14 -- Mr. Smith, that's Page 11 of

21  your document -- the last bullet, I just referenced the

22  corrective action notice in which the County asserted that

23  NaphCare was delinquent with $9.3 million in unpaid invoices.

24       NaphCare's response indicates that it objects -- that it

25  disputes that it had $9.3 million in unpaid invoices and, on

 1   that basis, does not have any responsive documents.  It's our

 2   understanding, from both the corrective action notice and

 3   deposition testimony, a $9.3 million balance was outstanding

 4   and unpaid.

 5        So I think that that objection -- I understand if NaphCare

 6   doesn't have any responsive documents, but basing their

 7   objection on a dispute that it had $9.3 million in unpaid

 8   invoices does not seem to be a proper basis for the objection

 9   for not producing.

10        **THE COURT:**  All right.  Understanding that -- oh.  Go

11   ahead -- go ahead, gentlemen.

12        **MR. SMITH:**  Well, okay.  It's -- essentially, it's

13   NaphCare's position that there aren't records that reflect that

14   9.3 million was due and has been outstanding, and that has been

15   paid.  So there's no records -- there aren't responsive

16   records, but we have produced the responsive records to the CAN

17   that would reflect what our responses were to the CAN.

18        And I think that there's some -- in those documents, we

19   may still be compiling on some quitclaim documents as well that

20   would be reflective of documents that are related to the

21   corrective action notice.  So we don't object to producing

22   documents related to the corrective action notice and our

23   responses thereto.

24        And I guess we could search for some invoices, but it's

25   overbroad in nature.  I don't think it's responsive to RFP 20

1  or -- to begin -- to begin with.  And, you know, I'm not sure

2  exactly what invoices that -- that they would like us to show

3  that have been paid or unpaid.

4      So the corrective action notices and documents related to

5  those, we've been willing to produce.

6      **THE COURT:**  Would that satisfy the plaintiffs,

7  Mr. Swearingen, the production of NaphCare's responsive to --

8  responses to the corrective action notice or notices?

9      **MR. SWEARINGEN:**  We would also ask for payments of

10 the -- of the claims specifically because the corrective action

11 plan issued by San Diego states that, due to the lack of

12 payment, some community providers do not want to see or accept

13 outpatients, which include, but are not limited to, Podiatry at

14 Oxford, Alvarado, Vibra, and Kindred.

15     The timing of those payments would be relevant to the

16 access -- to patients' access of care.

17     **MR. SMITH:**  So there are claims reports that address

18 this that will show paid and unpaid and -- and should reflect

19 that.

20     So, I mean, we're -- we may be in agreement on this.

21     **THE COURT:**  All right.  With respect to -- to that, if

22 the claims reports will show what's been paid and what's

23 unpaid, then I think that would -- that would suffice.

24     And I would note that RFP 20 asks for documents relating

25 to policies and procedures for access to outside medical

**Ex. A-96**

1   facilities, specialists, and follow-up care.  This bullet point

2   is -- it is very specific, but it really is outside of the

3   scope of RFP 20.

4        And I think that NaphCare's willingness to produce the

5   documents, as you just stated, Mr. Smith, would go above and

6   beyond -- would certainly suffice to satisfy NaphCare's

7   obligations with respect to RFP 20.

8        With respect to -- well, that resolves that one.

9        Are there any others, Mr. Swearingen?

10        **MR. SWEARINGEN:**  As a result of last night's

11   meet-and-confer, with respect to RFP 27, the last bullet point,

12   which appears on ECF Page 22 at the very top -- Mr. Smith,

13   that's Page 19 of your document.

14        I just want to note, for the record, that the parties

15   agreed that NaphCare will look to see whether or not TechCare

16   can generate reports for one month of this data.  And if not,

17   NaphCare is open to looking to -- to provide the discharge

18   summaries for the first 20 people booked since July 1st, 2023,

19   who have since been discharged.

20        **THE COURT:**  Is that correct, Mr. Smith?

21        **MR. SMITH:**  Yes.  We're willing to do that.

22        **THE COURT:**  Do you need beyond March 22nd to do that,

23   Mr. Smith?

24        **MR. SMITH:**  Potentially.

25        **THE COURT:**  Mr. Barkley is nodding his head.

**Ex. A-97**

1        **MR. BARKLEY:**  Well, I just know what all -- is on some

2   of our IT team's plate right now.  So that will be helpful,

3   Your Honor.

4        **THE COURT:**  Well, let's -- look, first off, I am

5   grateful that you-all were able to meet and confer and resolve

6   the vast majority of these issues.

7        I did note in the minute order that I issued yesterday

8   that there is a deadline for San Diego -- there is a deadline

9   for San Diego County to produce documents by March 22nd so that

10  we can stay on track with the pretrial schedule, although the

11  pretrial schedule was recently amended pursuant to the parties'

12  joint request to provide three more weeks for each pretrial

13  deadline.  And I want to stick with the new pretrial schedule.

14       How much time does NaphCare need to produce the remaining

15  documents it has agreed to produce, leaving aside the -- the

16  issue of the privilege documents that were the subject of the

17  evidentiary hearing?

18       **MR. SMITH:**  I mean, as -- as to the records and the

19  chart that were just discussed, the majority of them can be

20  produced by the 22nd, and we've been working diligently to

21  produce them on a rolling basis.

22       And so we may just need a little bit additional time with

23  respect to this bullet point.

24       **MR. BARKLEY:**  If -- if I'm hearing the Court

25  correctly, that the County has essentially three more weeks, we

1  can do it within that same three weeks, if that's what

2  Your Honor is suggesting.

3          **THE COURT:**  It wasn't -- it wasn't quite that.

4          **MR. BARKLEY:**  Okay.

5          **THE COURT:**  The County was ordered to produce

6  responsive documents on or before March 22nd.

7      The -- what I mentioned was that I continued certain

8  pretrial deadlines by three weeks --

9          **MR. BARKLEY:**  Okay.

10          **THE COURT:**  -- to give the parties a little bit of

11  extra time --

12          **MR. BARKLEY:**  I see.

13          **THE COURT:**  -- to work through these issues.  However,

14  giving NaphCare three additional weeks, it would be challenging

15  because the parties have depositions scheduled.

16      Is there a 30(b)(6) deposition of NaphCare that is also

17  scheduled?

18          **MR. SMITH:**  Not scheduled but is subject to our

19  meet-and-confer and this hearing.

20          **THE COURT:**  Right.

21      So that deposition is going to need to go if we're doing

22  the additional fact discovery period.

23      And I expect, Mr. Swearingen, that the plaintiffs would

24  want the production from NaphCare before taking that

25  deposition.

1        MR. SWEARINGEN:  Yes, Your Honor.

2        THE COURT:  So with that being said, would the -- if

3    NaphCare produces whatever it can by March 22nd, and with the

4    fundamental understanding that NaphCare is going to be acting

5    in good faith and try to produce whatever it can by that date,

6    if there are additional documents that NaphCare just cannot

7    produce by March 22nd, would the plaintiffs object to an

8    additional week for NaphCare to produce those remaining

9    documents, Mr. Swearingen?

10       That would be March 29th.

11       MR. SWEARINGEN:  No, Your Honor.

12       THE COURT:  Would that help you out, Mr. Smith?

13       MR. SMITH:  It -- it would.  Some of these take longer

14   to cull and retrieve than others.

15       THE COURT:  Well -- and I am mindful that you are a

16   third party, although a third party who is integrally involved

17   in the events that are relevant to this litigation.

18       So what I will do, Mr. Smith, is direct NaphCare to work

19   as diligently as you can to produce all of the remaining

20   documents on or before March 22nd.  To the extent that there

21   are one or more categories of documents that just cannot be

22   reasonably gathered and produced by March 22nd, I would give

23   you until March 29th to do that.

24       And I'm not going to ask you to sit here right now and

25   tell me exactly what categories do you need an extension on.  I

 1   trust you will act in good faith.

 2        **MR. SMITH:**  Thank you, Your Honor.

 3        **THE COURT:**  And, frankly, the fact that you have come

 4   to this with an open mind to try to figure this out with

 5   plaintiffs' counsel does factor into my thinking in that

 6   regard.  And so I do appreciate that, Mr. Smith.

 7        What other issues should we address this morning, Ms. Kaul

 8   or Mr. Swearingen?

 9        **MR. SWEARINGEN:**  Two primary issues, one relating to

10   the subpoena regarding emails and texts, the second an

11   invitation to you to -- to join plaintiffs' counsel and experts

12   at the Central Jail inspection to be held on March 25th.

13        **THE COURT:**  Shouldn't that be a discussion that

14   includes counsel for the County?

15        **MR. SWEARINGEN:**  We informed County Counsel -- or

16   counsel for the County that we would so invite you, but we are

17   happy and open to having that discussion with them as well.

18        **THE COURT:**  I'd feel more comfortable with that.  I

19   would appreciate that you raise that with Ms. Pappy and

20   Ms. Coleman, and let's table that for now -- but I appreciate

21   that -- for March 25th, Mr. Swearingen.

22        Let's talk about ESI.  My understanding is that the

23   parties reached an agreement whereby there would not be any

24   specific search terms; is that correct, Ms. Kaul or

25   Mr. Swearingen?

**Ex. A-101**

1      **MR. SWEARINGEN:**  Initially, Your Honor, yes.  We did

2  agree that there would be no formal ESI protocol.  We did

3  continue to seek responsive emails and communications from

4  defendants throughout the meet-and-confer.

5      NaphCare's opposition to plaintiffs' motion to compel

6  stated that NaphCare cannot produce emails, minutes, or other

7  records absent ESI search terms.

8      As a result of that, on February 13th, in addition to the

9  chart that has helped NaphCare and plaintiffs very much

10  organize the documents, we sent an email proposing ESI protocol

11  that included 18 search terms and 10 custodians.  NaphCare

12  rejected that.

13      Subsequently, plaintiffs proposed an ESI protocol that

14  would attempt to get at many of the documents sought in the

15  RF- -- or in the requests in the subpoena that included only

16  7 custodians and 12 search terms.  NaphCare's counsel, through

17  extensive meet-and-confer last week, said they would not do any

18  ESI protocol.  Instead, we talked about producing emails.

19      On Friday, I informed NaphCare's counsel that I still

20  didn't understand what NaphCare had agreed to produce as far as

21  emails.  And subsequently, NaphCare responded by email saying,

22  "With respect to emails, we have a significant amount of emails

23  that are responsive and will be part of the supplemental

24  production."

25      At this point in time, I still don't understand

1    specifically the scope of emails that will be produced.   I

2    understand most, if not all, will be responsive only to RFP 19,

3    but there is -- but there is still ambiguity as to which emails

4    will be produced.

5        Plaintiffs would request -- plaintiffs met and conferred

6    with NaphCare and asked for emails responsive to RFPs 6, 8, 9,

7    16 through 28, 30, 31, 33 through 38, 44, 56, 57, 63, 76, 77,

8    84, and 85.

9            **THE COURT:**  What were the first two RFPs at issue?

10           **MR. SWEARINGEN:**  6 and 8.

11           **THE COURT:**  Let's look at Number 8.

12       What would be the purpose of an ESI search for Number 8?

13   I mean, it is obviously very, very broad, as drafted.   NaphCare

14   has essentially agreed to produce documents in response to --

15   or responsive to the seven bullet points that the plaintiffs

16   proposed.

17       But explain to me what -- what should NaphCare be

18   searching for with respect to emails in response to these

19   bullet points?

20           **MR. SWEARINGEN:**  So from the very several providers at

21   the jail who work on behalf of NaphCare, these would be

22   specific emails about whether -- about the -- about NaphCare's

23   policies and procedures relating to their formulary.

24       So, for example, whether or not --

25           **THE COURT:**  Which bullet point?

**Ex. A-103**

1          **MR. SWEARINGEN:**  Which bullet point in the middle

2    column?

3          **THE COURT:**  Yeah.

4       That -- those are the document -- those are a function of

5    what the new subpoena requests; right?

6          **MR. SWEARINGEN:**  They were the specific documents that

7    we identified in that February 13th email, but we separately

8    proposed a method for -- for addressing the -- the electronic

9    communications that was separate from this chart.

10          **THE COURT:**  Is that before me?

11          **MR. SWEARINGEN:**  It is, Your Honor.

12          **THE COURT:**  Where?

13          **MR. SWEARINGEN:**  It's in the joint status report.

14          **THE COURT:**  Right, but -- okay.

15       Show me, and maybe I can -- I do recall seeing that in the

16    joint status report.  It's not immediately apparent to me how

17    an ESI search for emails is going to generate responsive

18    documents beyond what NaphCare has already agreed to produce,

19    but go ahead.

20       You're talking about Docket Number 562?

21          **MR. SWEARINGEN:**  I am, Your Honor, at ECF Page 35.

22          **THE COURT:**  Are you talking about the emails back and

23    forth?

24          **MR. SWEARINGEN:**  Yes, Your Honor.

25          **THE COURT:**  I'm having trouble, Mr. Swearingen,

**Ex. A-104**

```
 1   because -- I know that the parties have tended to attach lots

 2   of emails to their pleadings, and that's fine, and I try my

 3   best to read them.

 4        But what am I supposed to take from ECF Page 35?

 5        MR. SWEARINGEN:  The -- ECF Page 35 is Ms. Kaul's

 6   email as of -- on February 13th identifying the ESI protocol

 7   that we had suggested to try to get some of the -- the

 8   electronic communications related to the requests for

 9   production in the subpoena to NaphCare.

10        As I said earlier, we've tried both getting responsive

11   emails and also proposing ESI protocol as a shortcut to getting

12   responsive emails.

13        THE COURT:  And my question is that NaphCare has

14   agreed to produce the seven categories of documents that are

15   contained at Docket 588, Pages 7 and 8.

16        Your request is that -- is what with respect to additional

17   production of documents?  Do you want --

18        MR. SWEARINGEN:  If there are emails, for example,

19   from -- from the -- the Chief Medical Officer at the jail or

20   from the -- a NaphCare doctor saying that the formulary for the

21   jail, the allowed medications that we are -- that the jail is

22   allowed to prescribe, or can prescribe, does not include, for

23   example, a medication for Hep C or does -- or, for the

24   medication-assisted therapy, does not include methadone instead

25   of just Suboxone.
```

**Ex. A-105**

1      If these were emails saying that, "Our policies and

2  procedures limit us or should be changed," those are the types

3  of emails that we would ask for.

4      **THE COURT:**  How would that be -- so using your

5  example, even taking Ms. Kaul's February 13th email that's

6  Page 35, how would it cap- -- how would your search terms

7  capture whether a Hep C medication is available?

8      **MR. SWEARINGEN:**  Those search terms would.  Those

9  search terms were more narrow than the document requests.

10     **THE COURT:**  All right.  Mr. Smith, what's NaphCare's

11  position?

12     **MR. SMITH:**  It's -- well, it's twofold.

13     The plaintiffs were given an opportunity to provide

14  bullet-pointed documents that were specific to these overbroad

15  requests.

16     One of these bullet-pointed documents requested

17  communications, and we actually responded to that with the

18  production of over a thousand emails, and we're willing to

19  produce the communications if it was specific to that one

20  bullet point.

21     The remaining of this is extremely overbroad and unduly

22  burdensome.  There's a lack of direction as to which types of

23  emails they're looking for and the ability to even search for

24  those types of emails as it relates back to the request for

25  production of documents.

**Ex. A-106**

 1      Moreover, running the ESI search just against five

 2   custodians generated almost a quarter million hits.  The

 3   ability of NaphCare to -- to cull through that type of email

 4   protocol is very limited.  To be able to even determine, "Okay.

 5   These are attorney-client emails.  Cull them out," we would

 6   probably need months to do a project like that.  It -- in fact,

 7   my calculation was that it would just take one person, at five

 8   minutes an email -- it would take thousands of days to do.

 9      It's -- it's extremely overbroad, burdensome, and beyond

10   the scope of what the subpoena required.  The requests were

11   vague and -- in general, to begin with, as to what

12   correspondence was sought.

13      We have been more than willing to cooperate with

14   plaintiffs' counsel and the Court and produce specific

15   standalone category documents as well as the bullet point that

16   asks for communications in this.  And I think we've gone above

17   and beyond and complied with the subpoena.

18         **THE COURT:**  Counsel, having reviewed the initial

19   subpoena in connection with the motion to compel, I did find

20   that the -- the categories at issue were overbroad.

21      I provided plaintiffs with an opportunity to list the

22   specific documents that were being sought.  The plaintiffs did

23   so, and NaphCare has essentially agreed to produce documents

24   responsive to just about every one of them, I believe 150 or so

25   bullet points.

1        You know, I'm not going to require NaphCare to adopt any

2   specific ESI protocol, given that the categories that are truly

3   before me in this subpoena are so overbroad.  To the extent

4   that NaphCare is producing emails in response to RFP Number 19,

5   which specifically seeks communications, it's going to do so.

6   But I'm not going to order NaphCare to engage in a further ESI

7   production.

8        I do find, based on the information provided by Mr. Smith,

9   that that further ESI search with the quarter million hits is

10  not proportional to the needs of the case and, given the volume

11  of the production that NaphCare is undertaking, that any

12  additional relevance to a claim or defense from the ESI search

13  term search that the plaintiffs are requesting is also not

14  proportional to the needs of the case.

15       Any other issues we should address, Mr. Swearingen?

16          **MR. SWEARINGEN:**  Not from plaintiffs' end, Your Honor.

17          **THE COURT:**  How about from NaphCare's side, Mr. Smith?

18          **MR. SMITH:**  None from us.

19       Thank you, Your Honor.

20          **THE COURT:**  Okay.  Counsel, I really do appreciate

21  everyone being here today.  I know everyone had to travel to be

22  here.

23       So thank you very much.

24          **MR. SWEARINGEN:**  Thank you, Your Honor.

25          **THE CLERK:**  That concludes our calendar.

**Ex. A-108**

1          We are now in recess.

2                    (Proceedings adjourned at 11:44 a.m.)

**Ex. A-109**

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4          I certify that the foregoing is a true and correct

5   transcript, to the best of my ability, of the above pages of

6   the official electronic sound recording provided to me by the

7   U.S. District Court, Southern District of California, of the

8   proceedings taken on the date and time previously stated in the

9   above matter.

10         I further certify that I am neither counsel for,

11  related to, nor employed by any of the parties to the action in

12  which this hearing was taken, and further that I am not

13  financially nor otherwise interested in the outcome of the

14  action.

15

16  DATE:  Friday, March 15, 2024

17

18

19

20          _____/S/ James C. Pence-Aviles_____

21       James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                     U.S. Court Reporter
22

23

24

25

Ex. A-110

# EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

inspections and calibrations of all the medical equipment. In the event that Edge Biomed is unavailable, Contractor shall obtain a replacement company to perform inspections, maintenance, calibration, and inventory of medical equipment.

2.3.46.  Software Compatibility

2.3.46.1.    Contractor shall ensure all software is 100% compatible with all current generation releases of the Operating System, Security Software, and Standard Computer Images within 90 days after the public release of the Operating System, Security Software, and 90 days after the first release of any new Desktop Computer Image (including Operating System, Security Software and Standard Office Applications) produced by the SDSD Data Services Division for general release within the SDSD Infrastructure. SDSD data services has final authority regarding installation and use of software.

2.3.47.  Unexpected Situations and Critical Incidents

2.3.47.1.    Contractor shall implement procedures to deal with unexpected situations and/or critical incidents. Contractor shall immediately notify designated SDSD staff of any unusual or extraordinary health event at the SDSD facilities including but not limited to an incarcerated individual's death, serious injury that may lead to death, or other serious health condition that might impact Contractor's staff or SDSD incarcerated individual(s).

2.3.47.2.    Contractor shall have a reporting system in place for staff to report incidents, occurrences, and near misses in a non-punitive, non-judgmental manner. Contractor's Policy and Procedure shall outline requirements for the following:

2.3.47.2.1.      Incident Reporting – events such as staff, patient, or visitor injury, emergency patient transports
2.3.47.2.2.      Occurrence Reporting – includes sentinel events such as patient death, serious illness or injury, serious suicide attempts
2.3.47.2.3.      Medication Variance Reports – medication errors, adverse medication reactions

2.3.47.3.    Contractor shall provide parallel oversight and corporate committees that are actively involved in Patient Safety. Committee functions shall include:

2.3.47.3.1.      Morbidity and Mortality
2.3.47.3.2.      Infection Control
2.3.47.3.3.      Environmental Safety
2.3.47.3.4.      Continuous Quality Improvement
2.3.47.3.5.      Compliance

2.3.47.4.    All patient deaths shall require the performance of a thorough clinical mortality review.

2.3.47.5.    Contractor shall conduct a formal mortality review process at both the site and corporate level wherein all relevant clinical aspects and treatment are reviewed by the site and corporate committees. Contractor shall meet NCCHC standards in all mortality reviews; policy and

CONFIDENTIAL: SUBJECT TO
PROTECTIVE ORDER

NAPHCARE000616
Ex. B-112

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

procedure for Patient Deaths has been developed and written in compliance with NCCHC Standard J-A-09, Procedure in the Event of an Incarcerated Individuals Death.

2.3.47.6.  Patient deaths that occur under unusual circumstances shall also be investigated in accordance with state and local regulations. Contractor shall ensure accurate information and timely reporting and investigation of any patient death that occurs within the detention facility as well as ascertain appropriateness of clinical care and identify any trends requiring further study.

2.3.47.7.  Contractor's Mortality Review process shall include a review of the incident and preceding treatment, a root cause analysis, review of relevant procedures and documentation, pertinent service reports, and recommendations for corrective action. The goal is to identify, evaluate, and improve the quality and efficiency of health care; ensure accurate and timely reporting; and reduce morbidity and mortality.

2.3.47.8.  Contractor shall complete a Clinical Mortality Review within 30 days of an incarcerated individual's death. The review shall provide a summary of the facts surrounding the patient's death to determine compliance with Contractor's standard of care and to identify any deficiencies, training, and/or policies that may have contributed to the patient death.

2.3.47.9.  Sentinel events shall be identified and reported from the site level to the corporate office as per the Patient Safety policy. Incident statements shall be received from all involved staff members as soon as possible and prior to the employee leaving the facility.

2.3.47.10.  At the corporate level, sentinel events shall be tracked and monitored for identifiable trends and are subject to Root Cause Analysis to determine what, if any, actions can be taken to prevent future occurrences. At the site level, these occurrences shall also be tracked and, in conjunction with the corporate group, analyzed for corrective action.

2.3.47.11.  In the event of a patient death, the medical record shall be closed. Any final documentation for the health record not in the file at the time of death must be placed in the record by the Program Manager, along with the date and time of placement and signature. The Program Manager is responsible for ensuring appropriate and complete documentation is entered into the health record as soon as possible after a patient death, ideally within 24 hours. This record shall then be locked by placing the "Inmate Death" flag. Once a record has been locked, no additional information can be entered into the record. The record cannot be unlocked at the site level once the flag has been set.

2.3.47.12.  The advanced clinical provider in the patient's overall treatment shall complete a "Death Summary – Physician" within seven business days of the death. The death summary shall review the clinical care received by the patient and make any suggestion for improvement in retrospect. The advanced clinical provider shall review the patient's medical record as well as any other documents during the review process. Once completed, the report shall be sent to the corporate office.

2.3.47.13.  Contractor shall perform a systems-based "Root Cause Analysis" review, through which a thorough analysis attempts to identify fundamental problems that led to the immediate issue. The goal for critical incident analysis is to solve problems before they escalate and prevent future problems through promotion of a risk avoidance attitude among the healthcare staff.

2.3.47.14.  In the event of a patient death, the first responsibility of site staff is to cooperate with and notify appropriate authorities, including jail command staff and the Medical Services Division Executive Team. Contractor site leadership and corporate staff shall also be notified. Involved staff shall complete incident reports, and the On-site Medical Director shall prepare a case

CONFIDENTIAL: SUBJECT TO
PROTECTIVE ORDER

NAPHCARE000617
Ex. B-113

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

summary and analysis of the care, with any recommendations for improvement. In the event of a suicide, the mental health director shall prepare a psychological autopsy.

2.3.47.15.    Analysis in the local committee shall take place in two stages. If a concern with the emergency response or immediate care is voiced, a first meeting shall be held as soon as practical and always within 30 days of the event, to allow for rapid correction of identified issues. A second meeting may be held at a future time once all relevant documentation, such as hospital records and autopsy reports, is available.

2.3.47.16.    Critical Incident Debriefing – Any staff who have been negatively affected by the self-harm, suicidal act or in-custody death shall be aided by trained mental health professionals in a timely manner.

2.3.48.  Health Insurance Coverage

2.3.48.1.    Contractor shall identify all incarcerated individuals with health insurance coverage, including Medi-Cal, using information provided by SDSD or information obtained in the intake process or health screening procedure.

2.3.49.  Utilizing Private Health Insurance Providers

2.3.49.1.    Contractor shall utilize private health insurance providers, including Health Maintenance Organizations (HMOs), when applicable for health services.

2.3.50.  Administrative Services Organization
2.3.50.1.    Contractor shall operate and manage an Administrative Services Organization as a prime or through a subcontract for the SDSD Medical Services.

2.3.51.  Administration of Services Related to Health Services Program

2.3.51.1.    Contractor shall perform the day-to-day administration of specific services related to each of the health service programs covered in this contract including but not limited to the following:

2.3.51.1.1.    Acting as the fiscal intermediary for SDSD health care programs described in this request
2.3.51.1.2.    Administrating and managing of data collection and analysis
2.3.51.1.3.    Enrolling and eligibility verification
2.3.51.1.4.    Processing claims and finances
2.3.51.1.5.    Responding to complaints, grievance and appeals as required by law or SDSD policy
2.3.51.1.6.    Managing provider reimbursement funds
2.3.51.1.7.    Documenting service delivery and utilization
2.3.51.1.8.    Maintaining of provider networks to ensure network adequacy and access
2.3.51.1.9.    Providing utilization management

2.3.52.  Uninsured Incarcerated Individuals

CONFIDENTIAL: SUBJECT TO                     NAPHCARE000618
PROTECTIVE ORDER
Ex. B-114

# EXHIBIT C

# HEALTH CARE
# Policy & Procedure Manual

---

## San Diego County

---



CONFIDENTIAL: SUBJECT TO
PROTECTIVE ORDER

# A-09 Procedure In The Event Of A Patient Death

**Effective Date:** 09/19/2018

**Policy Revised:** 02/26/2023

**NCCHC Standard:** A-09

**NCCHC Opioid Standard:** Procedure in the Event of an Inmate Death (O-A-10)

**NCCHC MH Standard:** Procedure in the Event of an Inmate Death (MH-A-10)

**ACA Standard:** Inmate Death (4-ALDF-4D-23); Notification (5-ACI-6C-02); Offender's Death (5-ACI-6C-01)

**Other Applicable Standard:** FMJS Chapter 9.2

## Purpose

To ensure accurate information and timely reporting and investigation of any patient death that occurs within the institution as well as ascertain appropriateness of clinical care and identify any trends requiring further study.

## Policy

All patient deaths require the performance of a clinically thorough mortality review. Deaths that are unexpected or occur under unusual circumstances will also be investigated in accordance with state and local regulations.

## Procedure

GENERAL PROCEDURES IN THE EVENT OF PATIENT DEATH

1) The RHA should notify the Vice President of Operations, Corporate Chief Medical Officer, and Corporate Legal Department immediately via email at notification@naphcare.com or telephone, if email is unavailable, of any patient death, including incident details.

2) A log will be maintained to include the following:

   a) Patient name or identification number;
   b) Age at time of death;
   c) Date of death;
   d) Date of clinical mortality review;
   e) Date of administrative review;
   f) Cause of death;
   g) Manner of death;
   h) Date pertinent findings or review(s) shared with staff; and
   i) Date of psychological autopsy.

3) The medical examiner or coroner is to be notified immediately and all steps will be taken to preserve the scene. The body is not to be removed without permission of the coroner, medical examiner, or the institutional authority. After proper medical examination, the body will then be released to the appropriate facility.

4) Following the death of a patient, whether natural, homicide, accident, under suspicious circumstances, or in any other unusual manner, the RHA or designee will immediately notify the onsite Medical Director and institutional authority. Family members should be notified by the institution's policies and procedures.

5) The Medical Emergency Code Report, completed at the time of the incident, and a copy should be forwarded to the corporate office via email at notification@naphcare.com.

   a) Only one Medical Emergency Code Report is completed for each incident. This report should be inclusive of all attendees at the event.

NAPHCARE031102
**Ex. C-117**

    b) After completion, the Medical Emergency Code Report should be scanned into the patient's TechCare record.

    c) Any staff with the need to document any additional comments concerning their specific intervention shall document that intervention in a Quick Note or SOAPE Note in the patient's health record.

6) The Death Summary-HSA should be filled out by the RHA using the patient record as reference.

    a) Referrals section should consist of any referrals within and outside the facility.

    b) If the RHA is unavailable, a designee will be appointed to complete the death summary.

    c) The report should be forwarded within seven (7) days to the corporate office via email at notification@naphcare.com.

7) A physician, preferably the medical director, will complete a Death Summary - Physician.

    a) The death summary will review the clinical care received by the patient and make any suggestion for improvement in retrospect.

    b) The physician should review the medical record as well as any other documents pertinent to the event during the review process.

    c) The report should be forwarded within seven (7) days to the corporate office via email at notification@naphcare.com.

8) Completed summaries by the RHA and Medical Director will not be placed in the patient's record.

9) The medical record is to be closed with a final note stating "Patient expired, case closed."

    a) Any final documentation for the health record not in the file at the time of death must be placed in the record by the RHA with the date and time of placement.

    b) The RHA is responsible for ensuring appropriate and complete documentation is entered into the health record as soon as possible after a patient death, ideally within 24 hours. The record should then be locked by placing the "Inmate Death" flag. Once a record has been locked by the RHA, no additional information can be entered into the record. The record cannot be unlocked at the site level after the flag has been set.

    c) In the event additional paperwork is found once the record is locked, a request should be sent to the corporate office. The Chief Medical Officer  or NaphCare Legal Counsel may then unlock the record temporarily to have the information placed into the patient's record as appropriate. The Inmate Death flag can then be placed back on the record to relock the chart.

## DEATH DUE TO SUICIDE

1) The RHA should notify the Vice President of Operations, Corporate Chief Medical Officer, and Corporate Legal Department via email at notification@naphcare.com or telephone, if email is unavailable, of any patient death, including incident details.

2) Above GENERAL PROCEDURES IN THE EVENT OF PATIENT DEATH are followed with the addition of the Psychological Autopsy Report form and the Suicide and Self-Harm Behavior Case Report.

3) Psychological Autopsy Report form is to be completed by the primary psychiatric provider or psychologist at the site level within fourteen (14) days.

    a) This report will provide detailed and comprehensive documentation of all information and circumstances involved in the review of a suicide to identify trends and opportunities for improvement. It is expected that the primary psychiatric provider or psychologist will gather input from the Medical Director or provider for completion of this report.

4) A Suicide and Self-Harm Behavior Case Report is also conducted by the Mental Health Director, psychiatric provider, or designee within seven (7) days of any suicidal action or behavior.

5) The Case Report and Psychological Autopsy Report will not be placed in the patient's health record.

6) Critical Incident Debriefing:

    a) Critical incident debriefings are available to all staff and patients who may have been affected by a completed suicide or serious attempt.

b) Critical incident debriefing provides affected staff and patients an opportunity to process their feelings about the incident

MORBIDITY AND MORTALITY REVIEW

1) A Morbidity and Mortality Meeting must be completed within 30 days of any death. The review should provide a summary of the facts surrounding the patient's death in order to ascertain compliance with corporate standard of care and to identify any deficiencies/training/policies that may have contributed to the patient death or emergency response.

2) The M&M meeting minutes should follow the guidelines set forth in the M&M Meeting Guidelines and Agenda and/or MAC Meeting Template. The M&M meeting can be part of the MAC meeting as long as it is completed within 30 days of the death.

3) The RHA death summary, physician death summary, Medical Emergency Code Report, Psychological Autopsy, Suicide and Self-Harm Behavior Case Report, any incident forms, hospital records (if applicable), ambulance records (if applicable), and autopsy report (if available) will be utilized during the M&M review.

4) If all documentation is not available (e.g., autopsy report, hospital records, ambulance records), the M&M meeting must still be done within the 30 day time frame and may be amended at a later date when the additional information is available.

5) During the review process, if it is determined that there is any indication that the decedent may have had an undiagnosed or untreated communicable disease, this finding must immediately be discussed with the responsible physician and Corporate Chief Medical Officer as these matters may require rapid action, such as appropriate communication with public health authorities.

6) For a case in which the cause of death is unclear or an undiagnosed communicable disease is suspected, all reasonable attempts will be made to obtain a complete autopsy to increase the understanding of the pathology of the disease.

7) For expected deaths, a modified death review process, which focuses on the relevant clinical aspects of the death and preceding treatment, may be followed.

8) Changes that are identified during the review process will be implemented and monitored through the facility CQI program in the form of a process quality improvement study. Results of the study will be documented in the facility CQI meeting minutes and should be shared with the treating staff.

9) The M&M meeting will be documented and placed in SharePoint in the Patient Death NCCHC folder with the patient's name within five (5) days of the meeting. Results of the review will be shared with the treating staff at the next scheduled staff meeting.

10) The RHA and physician death summaries, Psychological Autopsy, Suicide and Self-Harm Behavior Case Report, and the M&M meeting minutes, will not be a part of the patient record.

## Relevant Forms
No relevant forms for this policy.

## References

*Procedure in the Event of an Inmate Death (J-A-09). National Commission on Correctional Health Care: Standards for Health Services in Jails, 2018.*

*Procedure in the Event of an Inmate Death (P-A-08). National Commission on Correctional Health Care: Standards for Health Services in Prisons, 2018.*

*Procedure in the Event of an Inmate Death (O-A-10). National Commission on Correctional Health Care: Standards for Opioid Treatment Programs in Correctional Facilities, 2016.*

*Procedure in the Event of an Inmate Death (MH-A-10). National Commission on Correctional Health Care: Standards for Mental Health Services in Correctional Facilities, 2015.*

CONFIDENTIAL: SUBJECT TO
PROTECTIVE ORDER

*Inmate Death (4-ALDF-4D-23). American Correctional Association: Performance Based Standards for Adult Local Detention Facilities, Fourth Addition, 2004.*

*American Correctional Association: Standards Supplement, 2016.*

*Notification (5-ACI-6C-02); Offender's Death (5-ACI-6C-16). American Correctional Association: Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, 2020.*

*FMJS Chapter 9.2. Florida Model Jail Standards, 2022.*

*Death in Custody (CCR Title 15, Section 1046); Health Care Procedures Manual (CCR Title 15, Section 1206). California Code of Regulations: Adult Title 15 Minimum Standards for Local Detention Facilities, 2019.*

## Specific Site Addendum

## San Diego County

### Procedure

This site follows the policy and procedures as written above.

### Additional Forms

No additional forms for this policy.

### Provider Contact Information

No provider contact information for this policy.No references for this policy.

### Additional References

CONFIDENTIAL: SUBJECT TO
PROTECTIVE ORDER