UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, et al., <br><br> Defendants. | Case No.:  20-cv-406-AJB-DDL <br><br> **ORDER GRANTING PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY NAPHCARE OF SAN DIEGO LLC** <br><br> **[Dkt. No. 488]** |

**I.**

**INTRODUCTION**

NaphCare of San Diego LLC provides healthcare to individuals incarcerated in the San Diego County jails.  The issue presented is whether internal NaphCare records pertaining to its reviews of patient deaths in the San Diego jails are protected from disclosure by the attorney-client privilege and work product doctrine.

Having considered the parties' arguments and the evidentiary hearing testimony of NaphCare's Chief Legal Officer and conducted an *in camera* review of the disputed documents, the Court finds NaphCare has not met its burden to establish the attorney-client privilege and work product doctrine apply to the

documents in their entirety.  Moreover, the Court's *in camera* review does not reveal any legal advice or attorney-client communications memorialized in the documents that should be redacted prior to disclosure to Plaintiffs.  As such, the Court grants Plaintiffs' motion to compel but will provide NaphCare an opportunity to request specific redactions to the documents.

## II.

## FACTUAL BACKGROUND

### A.    Plaintiffs' Allegations

Plaintiffs are a certified class of individuals "who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities."  Dkt. No. 435 at 10.  Their Third Amended Complaint asserts multiple causes of action under 42 U.S.C. § 1983 against the County of San Diego and other defendants seeking declaratory and injunctive relief to "remedy the dangerous, discriminatory, and unconstitutional conditions in the Jail."  Dkt. No. 231, ¶ 4.

### B.    NaphCare's Contract with the County[1]

In April 2022, the County contracted with NaphCare to provide medical and mental health care to individuals incarcerated in County jail facilities.  Pl. Ex. 3 at NAPHCARE000565.  The contract provides, in relevant part, that "[a]ll patient deaths shall require the performance of a thorough clinical mortality review."  *Id.* at

---

[1]    The Court draws the facts regarding NaphCare's review of patient deaths from the declaration of NaphCare's Chief Legal Officer Justin Barkley (Dkt. No. 503-7), and from Barkley's testimony at the evidentiary hearing in this matter on March 12, 2024 (the "March 12 Hearing"). Dkt. No. 599 ("Barkley Trans."). The Court also draws from the exhibits reviewed with the witness during the March 12 Hearing.  These include Plaintiffs' Exhibits ("Pl. Ex.") 1 (NaphCare's privilege log), 2 (documents bearing Bates numbers NAPHCARE 031065 and NAPHCARE031102-05), and 3 (NAPHCARE000542-0678), and Court's Exhibits ("Crt. Ex.") 1 (NAPHCAREM&M000497-499), 2 (NAPHCAREM&M000500-511) and 3 (NAPHCAREM&M000512-515).  *See* Dkt. No. 596.

NAPHCARE000616.  This requires NaphCare to "conduct a formal mortality review process at both the site and corporate level wherein all relevant clinical aspects and treatments are reviewed by the site and corporate committees."  *Id.*  The contract further specifies the "goal" of the mortality review:

> [NaphCare's] Mortality Review process shall include a review of the incident and preceding treatment, a root cause analysis, review of relevant procedures and documentation, pertinent service reports, and recommendations for corrective action.  **The goal is to identify, evaluate, and improve the quality and efficiency of health care; ensure accurate and timely reporting; and reduce morbidity and mortality.**

> [NaphCare] shall complete a Clinical Mortality Review within 30 days of an incarcerated individual's death.  The review shall provide a summary of the facts surrounding the patient's death to determine compliance with [NaphCare's] standard of care and to identify any deficiencies, training, and/or policies that may have contributed to the patient death.

*Id.* at NAPHCARE000617 (emphasis added).[2]

## C.    NaphCare's Patient Death Reviews

Barkley joined NaphCare in July 2023 and assumed the position of Chief Legal Officer in September 2023.  Barkley Trans. at 6:16, 11:14-12:1.  He testified that NaphCare's Morbidity and Mortality Review Committee conducts monthly corporate-level reviews of deaths of incarcerated patients in facilities where NaphCare provides healthcare services.  *Id.* at 5:22-6:6.  There is no written policy governing the Committee's inmate death reviews,  *Id.* at 66:2-13.  Barkley had no involvement in the death reviews prior to joining NaphCare in July 2023, *id.* at 12:2-12, but information in NaphCare's files indicate the reviews date back to "at least 2011."  *Id.* at 60:1-7.

---

[2]    NaphCare does not conduct site-level reviews of deaths in San Diego jails.  *Id*. at 40:25-41:2.

1       1.      Documentation of deaths

2       According to Barkley, NaphCare personnel prepare multiple documents

3 following each patient death in the County jails:

4       A NaphCare health services administrator[3] prepares a "HSA death

5 summary" that contains "information about [the] patient's clinical history" and "the

6 facts and circumstances surrounding the death." *Id.* at 28:16-24, 29:20-25.

7       The NaphCare facility medical director or a staff physician prepares a

8 "physician death summary" that contains information regarding the decedent's

9 "clinical and medical history," "the facts and circumstances concerning the death,"

10 and possibly an opinion as to the cause of death. *Id.* at 30:18-32:7.

11      NaphCare's San Diego mental health director prepares a psychological

12 autopsy for suicide deaths. *Id.* at 33:4-34:2.  The psychological autopsy contains

13 information about the decedent's clinical and medical history and "sociological data

14 about the person." *Id.* at 34:3-12.  It may also include the mental health director's

15 opinions and assessments related to the suicide. *Id.* at 34:13-15.

16      NaphCare prepares the HSA death summary, physician death summary and

17 psychological autopsy irrespective of whether it is aware of actual or potential

18 litigation arising from the death. *Id.* at 34:16-21.

19      2.      Committee Meetings

20      Prior to each monthly Morbidity and Mortality Review Committee meeting, a

21 NaphCare "nurse paralegal" prepares an agenda and PowerPoint presentation.

22 Barkley Trans. at 6:16-23.  The Committee meeting agenda includes "information

23 about the cases that are being reviewed" and instructions "of the things we're

24

25 ───────────────

26 [3]    The health services administrator is a NaphCare employee who is "the
27 overall person responsible for oversight of the provision of the inmate health care
   system" in the San Diego County jails.  *Id.* at 29:2-19.  Health services
28 administrator is not a legal position.  *Id.* at 28:25-29:1.

considering and talking about." *Id.* at 16:16-20.  The PowerPoint presentation contains information about the inmate deaths to be discussed at the meeting.  *Id.* at 17:17-18:4.  The information comes from multiple sources, including the physician death summary, HSA death summary, medical records and the autopsy or coroner's report.  *Id.* at 18:5-12.  The agenda and the PowerPoint presentation each identify the identical six questions to guide the Committee's review of each in-custody death. *See* Crt. Ex. 1 at NAPHCAREM&M497; Crt. Ex. 2 at NAPHCAREM&M508.

The Committee meetings are attended by NaphCare's Chief Legal Officer, members of the in-house legal team, the nurse paralegal, the Chief Medical Officer, physicians, nursing staff, pharmacists and the CEO.  Barkley Trans. at 6:15-7:2.  Barkley testified on direct examination that the Committee meeting is "primarily for the purpose of helping me and my legal team give legal advice to the company and also to receive information that helps us give that legal advice, also to give legal advice during the course of those meetings." *Id.* at 6:3-6.  In addition, "there are times within this process that we, at the corporate-level review, also identify issues that are opportunities for improvement."  *Id.* at 9:17-19.

On cross-examination, Barkley testified that the Committee makes "recommendations sometimes for things that can be done for areas of improvement," *id.* at 24:13-14, but the Committee's discussions about improving inmate health care are "part of the legal advice" because "[p]roviding good care is making lawsuits more defensible."  *Id.* at 25:5-6.

A NaphCare paralegal takes the meeting minutes.  *Id.* at 23:16-18.  The minutes do not reflect "what was said by the attendees at the meeting" but are "more of a reflection of the outcome," including "recommendations for follow-up quality improvement activities."  *Id.* at 23:19-24:9.

/ / /

/ / /

## III.

## DISCUSSION

Plaintiffs issued a subpoena to NaphCare under Federal Rule of Civil Procedure 45 containing 88 document requests pertaining to NaphCare's provision of healthcare services at the County jails.  Dkt. No. 488-3.  Thereafter, Plaintiffs filed a motion to compel asserting that NaphCare had failed to produce documents responsive to multiple document requests.  Dkt. No. 488.  As relevant here, Plaintiffs seek production of documents responsive to subpoena request number 28, which seeks documents relating to "policies and procedures governing reviews of in-custody deaths," and request number 77, which seeks documents relating to "deaths of people incarcerated at the [County jails] from June 1, 2022 to the present."  Dkt. No. 488-3 at 177, 182.

NaphCare does not contest that the responsive documents are relevant and proportional to the needs of the case under Rule 26(b)(1).  *Appel v. Wolf*, No. 21-CV-1466-L-BGS, 2021 WL 5234424, at *4 (S.D. Cal. Nov. 9, 2021) ("[T]he scope of discovery through a subpoena under Rule 45 is the same as the scope of discovery permitted under Rule 26(b).").[4]  However, NaphCare contends the documents pertaining to its Committee review of patient deaths in the County jails – including the HSA death summaries, physician death summaries, psychological autopsies, meeting agendas, meeting presentations and meeting minutes – are protected from discovery by the attorney-client privilege and the work product doctrine.

/ / /

/ / /

/ / /

---

[4]   All citations and internal quotation marks are omitted unless otherwise noted.

**A.    Attorney-Client Privilege**

Federal law applies to assertions of privilege in this federal civil rights action. *See United States v. Zolin*, 491 U.S. 554, 562 (1989).  "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id*.  "However, since the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose" and "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).

The privilege "protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021).  The elements of the privilege are:

> (1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived.

*Martin*, 278 F.3d at 999.  "The burden is on the party asserting the privilege to establish all the elements of the privilege." *Id*. at 999-1000.

The attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390.  In the corporate context, the privilege "applies to communications between corporate employees and counsel, made at the direction of corporate superiors in

20-cv-406-AJB-DDL

1    order to secure legal advice." *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir.

2    1996).    Moreover, "fact-finding which pertains to legal advice counts as

3    professional legal services." *United States v. Rowe*, 96 F.3d 1294, 1297 (9th Cir.

4    1996) .

5          NaphCare asserts the attorney-client privilege applies to the entirety of each

6    HSA death summary, physician death summary, psychological autopsy, meeting

7    agenda, meeting presentation and meeting minutes.  As such, NaphCare bears

8    the burden to establish that each document was prepared for the purpose of

9    seeking legal advice or memorializes confidential communications between

10   attorney and client that were "made for the purpose of giving legal advice." *In re*

11   *Grand Jury*, 23 F.4th at 1091; *see also Chrimar Sys. Inc. v. Cisco Sys. Inc.*, No.

12   13-CV-01300-JSW(MEJ), 2016 WL 1595785, at *3 (N.D. Cal. Apr. 21, 2016)

13   (attorney-client privilege extends to document that "memorializes and reflects legal

14   advice rendered in a privileged conversation").

15         "Where the communication was made for dual-purposes, courts must

16   determine 'whether the primary purpose of the communication is to give or receive

17   legal advice, as opposed to business . . . advice.'" *Greer v. Cnty. of San Diego*,

18   634 F. Supp. 3d 911, 917-18 (S.D. Cal. 2022) (citing *In re Grand Jury*, 23 F.4th at

19   1091).  "When determining whether a document seeks legal advice, courts have

20   examined the *nature*, *content*, and *context* in which the document was prepared."

21   *LightGuard Sys., Inc. v. Spot Devices, Inc.*, 281 F.R.D. 593, 600 (D. Nev. 2012)

22   (emphasis in original).

23         The contract between the County and NaphCare was effective as of April 26,

24   2022, and all of the documents at issue were generated between July 2022 and

25   November 2023.  As noted above, the contract requires NaphCare to conduct a

26   "thorough clinical mortality review" for "[a]ll patient deaths."    Pl. Ex. 3 at

27   NAPHCARE000616.    Specifically, for each patient death, NaphCare must

28   "conduct a formal mortality review process at both the site and corporate level

1 wherein all relevant clinical aspects and treatments are reviewed by the site and

2 corporate committees." *Id.* "The goal is to identify, evaluate, and improve the

3 quality and efficiency of health care; ensure accurate and timely reporting; and

4 reduce morbidity and mortality." *Id.* at NAPHCARE000617.

5      The contractual obligation to conduct corporate-level reviews of patient

6 deaths with the goal of "improv[ing] the quality and efficiency of health care" and

7 "reduc[ing] morbidity and mortality," *id.*, exists independent of any desire by

8 NaphCare to assess its litigation risk arising from a patient death or seek legal

9 advice from its in-house counsel.   This obligation to conduct corporate-level

10 reviews for non-legal reasons weighs against NaphCare's assertion that every

11 document and communication pertaining to the Committee's death review process

12 during the effective period of the contract is "made for the purpose of giving legal

13 advice," *In re Grand Jury*, 23 F.4th at 1091, and thus protected by the attorney-

14 client privilege.   *See Fisher*, 425 U.S. at 403 (privilege "protects only those

15 disclosures necessary to obtain informed legal advice which might not have been

16 made absent the privilege"); *see also Wisk Aero LLC v. Archer Aviation, Inc.*, No.

17 21-cv-2450-WHO (DMR), 2023 WL 2699971, at *4 (N.D. Cal. March 29, 2023)

18 ("[n]o privilege can attach to any communication as to which a business purpose

19 would have served as a sufficient cause, i.e., any communication that would have

20 been made because of a business purpose, even if there had been no perceived

21 additional interest in securing legal advice") (alteration in original).

22      Looking beyond NaphCare's contractual obligation to perform corporate-

23 level death reviews for non-legal purposes, its assertion of privilege with respect

24 to every document relating to the Committee's patient death review process rests

25 on a faulty legal premise.   Barkley testified that the primary purpose of the

26 Committee review is "helping me and my legal team give legal advice to the

27 company and also to receive information that helps us give that legal advice, also

28 to give legal advice during the course of those meetings." Barkley Trans. at 6:3-6.

1  In his view, Committee discussions regarding improving patient care are "part of

2  the legal advice" because "[p]roviding good care is making lawsuits more

3  defensible." *Id.* at 25:5-6.  Barkley similarly testified that, in NaphCare's view,

4  improving patient care and assessing litigation risk cannot be separated. *Id.* at

5  20:1-8.

6       The Ninth Circuit has long held that "the attorney-client privilege is strictly

7  construed." *Martin*, 278 F.3d at 999.  A party must assert the privilege with

8  specificity, and "[b]lanket assertions are extremely disfavored." *Id.* at 1000.

9  NaphCare's position that any discussion involving in-house counsel regarding

10  improving patient care is privileged because improving care is inseparable from

11  "making lawsuits more defensible" is inconsistent with these precepts.  Adopting

12  NaphCare's position would allow parties to assert the privilege with respect to

13  business-related communications with in-house counsel so long as the

14  communication might make a potential future lawsuit "more defensible."  Indeed,

15  under this rationale, the privilege would extend to purely business-related

16  communications in the presence of in-house counsel so long as those decisions

17  would potentially make unspecified, future lawsuits "more defensible" and thus

18  allow an impermissible *de facto* blanket assertion of the privilege.  NaphCare cites

19  no authority for extending the privilege in this manner, and the Court declines to

20  do so.

21       Finally, the Court's *in camera* review of the NaphCare Committee documents

22  further supports the conclusion that the primary purpose of the communications at

23  the Committee's patient death review meetings is not to seek or receive legal

24  advice such that the attorney-client privilege protects the entirety of the documents

25  from disclosure.  *See United States v. Chevron Corp.*, No. C 94-1885 SBA, 1996

26  WL 444597, at *2 (N.D. Cal. May 30, 1996) ("The court may conduct an *in camera*

27  review of withheld documents to allow the client to demonstrate to the court that

28  the attorney-client privilege applies to segregable portions of the withheld

documents.").  None of the documents contain questions or statements by the Chief Legal Officer.  Moreover, the documents appear to contain purely factual summaries of the patient deaths and any "quality improvement measures" that were recommended.  The absence of legal advice in the Committee documents is further demonstrated by the questions that each meeting agenda and presentation directs the Committee to consider, which, without revealing the contents of the document, do not relate to the seeking or giving of legal advice.  *See* Crt. Ex. 1 at NAPHCAREM&M497; Crt. Ex. 2 at NAPHCAREM&M508.

It is true that the privilege applies to confidential "communications relating to" the seeking of legal advice, *Martin*, 278 F.3d at 999, which may include communications made by the client and communications made by the attorney that do not constitute legal advice *per se*.  But the absence of any communications with counsel, much less any readily identifiable legal advice contained in the documents is nevertheless relevant to the Court's assessment of whether the primary purpose of the communications was to give or receive legal advice.

The Court credits Barkley's testimony that, from his perspective as the Chief Legal Advisor, his role in the Committee meetings is to provide legal advice.  But the issue presented is whether the *primary* purpose of the documents generated for the meetings and the meetings themselves was to seek or provide to provide legal advice such that the documents pertaining to the meetings are protected in their entirety by the attorney-client privilege. *In re Grand Jury*, 23 F.4th at 1091. As the Second Circuit explained, "[t]he predominant purpose of a communication cannot be ascertained by quantification or classification of one passage or another," but "should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer." *In re Cnty. of Erie*, 473 F.3d 413, 420-21 (2d Cir. 2007).  Here, the documents do not, on their face, contain legal advice provided by the Chief Legal

1   Officer or other members of the legal team, and the "nature, content, and context

2   in which the document[s] w[ere] prepared," *LightGuard Sys., Inc.*, 281 F.R.D. at

3   600, does not support the conclusion that the documents were prepared to seek

4   legal advice.  On this record, NaphCare has not carried its burden to establish that

5   the primary purpose of the communications was to seek or provide legal advice.

6   As such, the Court concludes the attorney-client privilege does not apply to the

7   entirety of the documents at issue.

8        "[R]edaction is available for documents which contain legal advice that is

9   incidental to the nonlegal advice that is the predominant purpose of the

10  communication." *In re Cnty. of Erie*, 473 F.3d at 421 n.8; *see also Chevron Corp.*,

11  1996 WL 444597, at *2 ("[D]espite the overall nature of the document, the client

12  may assert the attorney-client privilege over isolated sentences or paragraphs

13  within a document.").  NaphCare's opposition does not address whether redactions

14  are appropriate if the Court were to conclude the attorney-client privilege does not

15  apply to the documents in their entirety.  Nevertheless, the Court will provide

16  NaphCare with an opportunity to propose redactions consistent with this Order.

17  **B.**    **Work Product Doctrine**

18       1.    <u>General Principles</u>

19        "The work-product doctrine is a 'qualified' privilege that protects from

20  discovery documents and tangible things prepared by a party or his representative

21  in anticipation of litigation." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119

22  (9th Cir. 2020).  "At its core, the work-product doctrine shelters the mental

23  processes of the attorney, providing a privileged area within which he can analyze

24  and prepare his client's case, and protects both material prepared by agents for

25  the attorney as well as those prepared by the attorney himself." *Id.*  The doctrine

26  "upholds the fairness of the adversarial process by allowing litigators to creatively

27  develop legal theories and strategies – without their adversaries invoking the

28  discovery process to pry into the litigators' minds and free-ride off them." *In re*

*Grand Jury*, 23 F.4th at 1093; *see also* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . .").

"In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the 'because of' test is used." *United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir. 2011). "In applying the 'because of' standard, courts must consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation." *Id*. at 568. "The party asserting work product protection has the burden to demonstrate it applies to the information in question." *Greer*, 634 F. Supp. 3d at 918.

2. Application to the Present Dispute

The work product doctrine applies if NaphCare establishes that each HSA death summary, physician death summary, psychological autopsy, agenda, presentation and minutes "would not have been created in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 568. However, as discussed above, NaphCare's contract with the County requires NaphCare to review patient deaths regardless of whether litigation is pending or anticipated. Pl. Ex. 3 at NAPHCARE000616. And even apart from the contract, Barkley testified that NaphCare's Committee reviews every patient death. Barkley Trans. at 32:13-16 and 34:16-21. As such, NaphCare has not met its burden to demonstrate the documents would not otherwise have been prepared absent the "prospect of litigation." *Richey*, 632 F.3d at 568; *see also Dunsmore v. San Diego Cnty. Sheriff's Dep't*, No. 20-CV-406-AJB-DDL, 2023 WL 8631663, at *7 (S.D. Cal. Dec. 13, 2023) (work product doctrine inapplicable to Sheriff's Department reports regarding review of in-custody deaths where Department policy required review "regardless of whether the County has received notice of litigation arising from the

incident at issue"), *objections overruled*, No. 20-CV-00406-AJB-DDL, 2024 WL 666341 (S.D. Cal. Feb. 16, 2024).

## V.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' motion to compel is **GRANTED.** The Court further orders as follows:

1.    By not later than **May 3, 2024**, NaphCare must produce to Plaintiffs the documents identified in its privilege log as NAPH PRIVILEGE 0001-0082.

2.    NaphCare may redact those portions of the documents pertaining solely to patient deaths at facilities not under the control of the San Diego Sheriff's Department.  If NaphCare contends that additional redactions to the documents are warranted, it must submit any such additional, proposed redactions for *in camera* review by not later than **April 29, 2024**.  NaphCare must highlight the proposed redacted text for each document.  The Court will promptly rule on any proposed redactions.

**IT IS SO ORDERED.**

Dated: April 23, 2024

_____
Hon. David D. Leshner
United States Magistrate Judge

20-cv-406-AJB-DDL