GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS AND TO COMPEL DEPOSITIONS**<br><br>Date:    May 15, 2024<br>Time:    9:00 a.m.<br>Crtrm.:  Via Remote Technology<br><br>Magistrate: Hon. David D. Leshner |

[4475153.3]

I, Van Swearingen, declare:

1. I am an attorney duly admitted to practice before this Court. I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs and the Certified Class and Subclasses. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration in support of Plaintiffs' Motion for Leave to Take Additional Depositions and to Compel Depositions of Sheriff Kelly Martinez, Dr. Peter Freedland, and NaphCare Onsite Leadership.

2. On December 22, 2023, Plaintiffs noticed the deposition of Theresa Adams-Hydar, Assistant Sheriff for the Detention Facility Services for February 8, 2024. Following the parties' scheduling discussions, on March 25, 2024, Plaintiffs served an amended notice for this deposition to be held on April 17, 2024.

3. I took the deposition of Theresa Adams-Hydar, Assistant Sheriff for the Detention Facility Services, on April 17, 2024. Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the rough transcript from Ms. Adams-Hydar's deposition. Before the deposition, sometime in March 2024, counsel for Defendants informed me that Ms. Adams-Hydar would be retiring from the Sheriff's Department at the end of March. At the deposition, Ms. Adams-Hydar confirmed that she retired on March 28, 2024.

4. During the course of the day-long deposition, I asked Ms. Adams-Hydar a number of questions about the Sheriff's Department's current plans to address issues in Plaintiffs' Third Amended Complaint, including as to plans related to medical care, mental health care, staffing at the Jail, and other issues.

/ / /
/ / /
/ / /
/ / /
/ / /

1  Ms. Adams-Hydar repeatedly informed me that she did not know the Sheriff's

2  Department's current plans or priorities for reform given that she had retired.

3       I declare under penalty of perjury under the laws of the United States of

4  America that the foregoing is true and correct, and that this declaration is executed

5  at San Diego, California this 24 day of April, 2024.

6

7  _____

8  Van Swearingen

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Ex. A-1

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

ROUGH DRAFT      ROUGH DRAFT      ROUGH DRAFT


This realtime transcript is provided for your immediate review of the proceedings and is not provided for nor meant to be used or cited in any type of court proceedings.


BY ATTORNEY SWEARINGEN:

Q    Good morning.

A    Good morning.

Q    My name is Van Swearingen.  I represent the plaintiffs.

Can you state and spell your name for the record, please.

A    Theresa Adams-Hydar.  T-h-e-r-e-s-a, A-d-a-m-s - H-y-d-a-r.

Q    Have you ever provided testimony in court before?

A    Yes.

Q    Have you ever been deposed before?

A    Yes.

Q    In connection with your sheriff's duties.

A    Yes.

Q    Can you tell me a little bit about the times you've been -- you've provided testimony?

Ex. A-2

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

A    I went to no formalized training.  I put
myself -- that was mandated.  So there's no mandated
training.  I attended a jail core class my first two or
three months in, that I sent myself to.  I attended ADA
training.  I think that's all related to -- specifically
jails.  It's -- I can't remember anything else.

Q    What was the jail core class?

A    It kind of focused on just the -- what jails --
how jails and probation kind of run and then the
leadership aspect of running jails.

Q    And how long did that last?

A    It was -- I went in for a week.  A week course,
40 hours.

Q    And what about the ADA training course?

A    ADA was four days.  And it just went over a
variety of biology (as heard) related to ADA.  There's
very little specific to jails on ADA, but it's just ADA
across the board.  And I think that jails was a new
area, and they had a section, and I wanted to learn
about that.

Q    When you became assistant sheriff, what were
the -- did anyone communicate what the priorities of
that position would be to you?

A    The Sheriff.

Q    And what did you understand those priorities to

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

be?

A    Make sure that the people that are in our custody are taken care of and that they are safe and the people that are working the jails are safe and make sure they receive whatever they need to stay in custody and be released with whatever resources we can give them to be successful after.

Q    Any other priorities?

A    That about sums it up.  I just -- we run the jails, and they come in.  We don't put them there, but our job while they're there is to keep them safe.  And we do reentry services, as we can, for those that are willing to do it.  We feed them, we clothe them, and we provide them medical care and programming, to the extent that they're willing to take it.

And we collaborate with outside entity says for reentry to make sure that when they leave, that, hopefully, we can get them some sort of housing or program so they can start, you know, successfully. Because those first few, you know, days out of custody are challenging.  And so that's kind of an above-and-beyond what jails actually do, because, technically, our job is custody and care.

Q    Did the Sheriff communicate any concerns about particular areas that she wanted you to focus on?

Ex. A-4

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

A    Well, at the time that I was hired, we had

the -- a lot of media attention.  And so her concern was

just making sure we were doing the things that we needed

to do that -- specifically the JLAC audit.  That came

out, I think, days before I was selected for that

position.  And just look at that audit and, you know,

what are we doing well, what are we -- what can we do

better.  And that was kind of her -- our conversation.

Q    And when you refer to the "audit," is that the

state auditor's report?

A    Yes, uh-huh.

Q    Besides the state auditor's report, were there

any other concerns the Sheriff expressed to you about

what to focus on as assistant sheriff?

A    I think that really kind of covers most of it,

with the audit.

Q    Did you ever see any discovery requests that

were served by Plaintiffs in this case?

A    I'm sure I have.  I'm sure that my legal

internally had -- I think I've seen them, but I didn't

handle the discovery.  That was completely handled by my

legal.  And, oftentimes, the -- most of the meetings

they have, I was included in those.  I maybe attended

one or two, just to make sure I was -- you know, "Hey,

no surprises.  What's going on?"  But that was it.  I

**Ex. A-5**

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

achieve goals that we established.

So I don't necessarily think it's specific to this lawsuit, if that makes sense. And I've asked a lot of people to do a lot of things in two year. So I don't know.

Q    It sounds like there may be some overlap, but nothing was done in response to this lawsuit? Or nothing was directed by you as a result of this lawsuit?

A    No. I mean, what I do is -- and what I direct and what I want my people to do is because it's what we've decided we want to do as a department for the DSB, Detention Services Bureau, for the good of incarcerated people or for the good of the employees who work there.

I don't -- I'm not necessarily going to be driven by a lawsuit, per se. I'm going to be driven by this is what we have been hired to do as a deputy sheriff, which is what I still am, and this is where we need to go, and this is how we're going to do it.

So not by a lawsuit, but by what our purpose is, what my job is, so.

Q    Are you aware of the settlement of certain ADA issues in this lawsuit?

A    I know there was discussion of that, and it might have been happening right as I retired. I don't even.

**Ex. A-6**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

Q    Do you recall a press release in about June of 2023 that discussed changes with respect to ADA that the Sheriff's Department was making?

A    Oh, yeah.  I know that -- yeah, the presentation that we did, the Sheriff's Department --

Q    Yeah.

A    -- that I spoke at.

Q    Yes.

A    Yes.  I remember that.

Q    Do you recall that there was a press release in connection with that?

A    Yes.

Q    Did you draft that, or did you help draft that?

A    Probably bits and pieces.  And our media puts it out, but I'm sure that they asked for all my stuff, talking about points, information.

Q    Do you know if they asked for Sheriff's input as well?

A    Oh, I'm -- well, she's going to approve it before it goes out.  So she approves everything that goes out.

Q    Were you involved in the implementation of the changes with respect to the ADA that were --

A    I was definitely involved in ADA and how we're going at -- at this level, but not at this level

**Ex. A-7**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

accountability for that entity.

Q    Did you regularly receive CLERB's findings of
its reports of investigations of the Sheriff's
Department?

A    I would get them from DIS, not from CLERB.

Q    Do you know if Sheriff Martinez received them
as well?

A    I don't know.  I would assume, but I don't
know.

Q    Do you recall the death of Anthony Chon --

A    No.

Q    -- in the jail?

A person who stated that he had shortness of
breath and was taken outside to the yard by deputies?

A    What year?

Q    I believe that CLERB's investigation took place
in 2022.

A    That's their investigation, but what year was
the death?

Q    It could have been before then.

A    Yeah.  I don't recall.  It doesn't sound
familiar.

Q    Understood.

Would you agree that stopping the flow of drugs
into the jails is important to reduce in-custody deaths?

**Ex. A-8**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

They allow that individual to pass that. And it could be narcotics. It could be they swallowed their pet turtle. I mean, nobody knows until the time it passes. And there's a process we use for those individuals for their own safety so they don't die of a rupture, and they then are placed into housing, and then they would pass it and share it on their own. To do that, then, with staff, like, how would you do that?

So there's a lot more to it when you body scan. It's just not body scan, "Oh, I see some. Could you please give it to me now?" There's a lot to it. So I think that's just been an education process to the public and to CLERB on what it is.

Q    Now, that you're retired, do you know whether the Department is considering body scanning?

A    I don't know.

Q    Or taking any other actions to deter or prevent staff from coming to the jail with drugs?

A    I don't know. They could have changed in two weeks. I don't know anymore.

Q    Do you think that mandatory drug tests -- well, does the Sheriff's Department conduct mandatory drug tests of staff?

A    The County has mandatory drug tests that are randomized.

**Ex. A-9**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

A    I don't.  I think it was East Mesa, but I can't
recall.

Q    The grand jury recommended that the Sheriff's
Department obtain high-volume scanners and scan all
incoming deliveries.

Do you agree or disagree with that
recommendation?

A    The -- definitely scanning of deliveries coming
in, like, produce at that type of thing, definitely has
its advantages.  And I know that we were looking, and we
started a perimeter group, perimeter security on the --
what we call the "Mesa," which is the Otay Mesa
compound, which has Rock Mountain, East Mesa, and George
Bailey.

And there's a security group in there that's
doing stops.  And part of that was looking at ways to
look at delivery trucks and scanning them, and that was
a very early pilot project, so.

Q    And the -- you know, during your tenure as
assistant sheriff, did the Sheriff's Department have any
plans to purchase additional high -- additional cargo
scanners?

A    I know it was talked about, but I -- there --
we haven't purchased anything like that.  But I don't
know what's happening now.

**Ex. A-10**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

by law?

A    That our policies and procedures are our policies and procedures that we develop.  Some policies and procedures may be as a result of legal mandates or state law, but not all are.

Q    So when is the determination made, if it's not a legal mandate, to put something in writing as a policy and procedure, as opposed to have it as a practice?

A    Well, the Sheriff decides that she wants it to be in policy, we put it in the policy.  Or if there's something we need -- if it is a legal mandate, we put it in policy.  If it's a government code, we might put it in policy.  If it's Title 15, we might put it in policy.

I don't really know other than that.  Something that might have been past practice that became policy. The problem with policy and procedure is when you get too specific, then you get kind of tangled into things, because technology changes, protocols change, laws change, expectations change.

So policy is actually a guideline, and it's what we use to refer to to do our job in certain aspects and certain situations, but it's not everything that we use to do our job.  So not everything needs to be memorialized in a written policy and procedure.

Q    How do people who are responsible for scanning

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

people coming back from the courts know that its their
responsibility to scan people?

    A    You probably have to ask the Court Services
Bureau, Because they're under the Court Services Bureau.

    Q    Is the Sheriff the person who's ultimately
responsible for what determines -- for what ultimately
becomes a policy or not?

    A    Yeah.  The Sheriff eventually has the final say
on policy and procedure.  We have committees.  They
review them.  They develop them.  It goes through a few
stages, and then the final one is through our Sheriff's
leadership council, which is the Sheriff, under,
assistant sheriffs, commanders.  But the Sheriff has the
final say on Yeah, no, or yes.  I'm going to do that.

    Q    Are you aware that sometimes people who
overdose on drugs are found to have carried drugs into
the jail on their bodies or been provided drugs by other
people who have smuggled drugs into the jail where there
was an abnormality in the body scanner image that wasn't
seen by jail staff?

    A    Are you asking me if I know of situations like
that or --

    Q    Of instances like that.

    A    -- is it common practice?

    Q    If you're aware whether that's happened in the

**Ex. A-12**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

you're alluding to, to the extent that they can.

Because we do have a female facility, and we really want

to make sure we have females in there.  And just better

to have the perspective of, not only men, but women work

in our facilities, too.  So yeah.  I mean, that's -- we

did a lot, as much as we could.

    Q    Do you know what the current efforts are, now

that you've retired, to address understaffing issues?

    A    No.  I see the recruiting stuff on the gyms and

Petco Park.

         ATTORNEY SWEARINGEN:  I'm going to mark this

next exhibit as Plaintiffs' Exhibit Number 7.  It's an

email from Jesse Johns to you and others, dated

September 1st, 2023.  And along with it, I'm going to

give you a copy of what I'm going to mark as Plaintiffs'

Exhibit 8, which is one of the attachments to this

email.

         (Exhibit Numbers 7 and 8 marked)

BY ATTORNEY SWEARINGEN:

    Q    For Exhibit 7, can you describe what this email

is discussing?

    A    It's a follow-up on MOT for DSB by Jesse Johns.

    Q    When you say "MOT," do you mean "mandatory

overtime"?

    A    "Mandatory overtime."

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

accreditation.  So once they're completely done, we'll

probably post those online, but I -- if one popped up

and it's there, it could be there, because it's already

one we followed.

          Does that make sense?

     Q    It kind of does.

          I'm guess what I'm --

     A    It's just the format is going to look a little

bit different.  So I can't see them mixing a current one

with a newly minted, accreditation-specific one, if that

makes sense.

     Q    Yeah.

          What I ultimately would like to know is whether

the policies have been implemented; that is, whether

there has been a formal directive from the Sheriff's

Department to the staff who work there saying this is

the new policy and this is what must be followed?

     A    Like I said, the NCCHC accreditation policies

are just the -- kind of the marriage of the two entities

together.  And there might be one or two things that

specifically are for accreditation, but it may already

very much be in our policy now.  So we're very much

following policy, with that eye towards accreditation.

     Q    Understood.

     A    It's --

**Ex. A-14**

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

Q    There could be a lot of overlap.

A    Yeah, a lot of overlap.

Q    I understand that the policies that are being
drafted and finalized may have a ton of overlap with the
current policies that are in place and being followed.

But I'm wondering, for those policies that have
been finalized, do you know if they have -- if there has
been a directive to jail staff that these are the newly
finalized policies; these are the ones that now take
place and should be followed?

A    I don't know if they've done that recently, and
I don't know if they've had that official rollout of
that.  Because -- and my focus as the assistant sheriff
was accreditation is a "nice to have."  It's not a
"mandatory to have."

It's not something that is required for a jail.
It's something that the Sheriff before this current
Sheriff wanted to achieve, and then COVID hit, and it
delayed us.  So -- and then staffing hit, and then we
on-boarded a new entity NaphCare.

So it's something we're striving for, but it's
not something that is causing a delay in service.  It's
not causing a lack of quality in service.  It's NCCHC
standards so we can be audited and reviewed, just like
our crime lab meets certain accreditation standards.

**Ex. A-15**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

A    I know that the number, I mastered.  And I

remember the number, but I know when heard it, I was

very pleased with it.

Q    Do you know what the Sheriff is doing now with

respect to addressing sick call waiting times for

psychiatric appointments?

A    No, because I'm not there.

Q    The middle of the page, right below the metric

that I just showed you, states that:  "There has been

unprecedented staff separation, what looks like of

correctional health care partners staff."

Do you know what that's describing?

A    I think, anecdotally, I remember the doctor

who -- I don't know if he just works there or he is an

owner or director -- had stated he had had people leave

his service since being subcontracted.  And that's what

he spoke to.  And then he was just trying to hire people

to fill those vacancies.  And I don't know specifically

why they were leaving, so.

Q    Okay.  Page 21 describes how, in February of

2024, there were 434 pending dental appointments, with a

maximum of 20 days waiting time.

A    I'm sorry.  You said 21.  I'm looking at the

wrong page.  Okay.  I'm sorry.  I'm on it.  I'm with

you.  Okay.  Go ahead.

**Ex. A-16**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

A    Yes.  It's normally my two perks, because,
unfortunately, our population doesn't take care of their
teeth when they're not in a facility, and their use of
drugs perpetuates poor teeth hygiene, therefore, pain.

Q    For those areas not carved out from NaphCare's
contract, will NaphCare continue to be the provider for
its contracted obligations, at least until its contract
expires?

A    Well, if I was still there, I would say yes,
but I don't know what will happen if the contract stays
in place.  I'm assuming that is the goal.

Q    But you don't know?

A    Don't know right now.

Q    Do you know when the contract with NaphCare is
set to expire?

A    It's set to expire five years from the time it
started.  So it's 2027, with a five-year extension --
ability to extend five years.

Q    Are you aware of some other reports about
deficient care by NaphCare in other jurisdictions?

A    I am.

Q    Do you think that the -- knowing everything you
know, if it was up to you, would you continue the
contract with NaphCare?

A    NaphCare is our provider.  We on-boarded them.

**Ex. A-17**

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

So, you know, that's the technology angle
that -- I don't think it's any surprise everyone is
looking at the AI for one thing or the other.  How that
will apply to jails, I think, remains to be seen.  But
that's definitely an angle going down the road in the
near future.

Q    Do you know if that's something the Sheriff's
Department plans to implement?

A    I don't know now.  I don't know.

Q    Who replaced you in your position as assistant
sheriff after you left?

A    Dustin Lopez.

Q    Did you meet with him about the position before
he took over?

A    A little bit, yeah, just to kind of tell him,
you know, This is what I deal with.  This is -- you
know, there's a lot of moving parts.  This is a jail.
He actually came over as a commander for two or three
month before and worked in DSB.  So he was exposed to
it.  So he had his own time in that position.

Q    When was that?

A    December 2023.

Q    Okay.

A    Uh-huh.  Maybe January.

Q    How many times did you meet with him regarding

**Ex. A-18**