GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF PRIYAH KAUL IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS AND TO COMPEL DEPOSITIONS**<br><br>Date: May 15, 2024<br>Time: 9:00 a.m.<br>Crtrm.: Via Remote Technology<br><br>Judge: Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner |

[4475156.3]

I, Priyah Kaul, declare:

1.    I am an attorney duly admitted to practice before this Court.  I am a senior counsel in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs and the Certified Class and Subclasses.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Motion for Leave to Take Additional Depositions and to Compel Depositions of Sheriff Kelly Martinez, Dr. Peter Freedland, and NaphCare Onsite Leadership.

2.    On August 10, 2023, Plaintiffs served NaphCare of San Diego LLC ("NaphCare") with a deposition subpoena noticing a deposition for September 20, 2023, as well as a subpoena for the production of documents related to NaphCare's provision of health care services in the Jail.  I served an amended deposition subpoena on March 27, 2024 once we set a new date for the deposition.

3.    Plaintiffs and NaphCare spent many months meeting and conferring, and briefing a motion to compel, *see* Dkt. 488, to resolve issues related to Plaintiffs' discovery requests.  NaphCare did not move to quash or submit written objections to Plaintiffs' deposition subpoena.  Rather, throughout the meet and confer process, NaphCare repeatedly confirmed that it intended to comply with the deposition subpoena.  The deposition was postponed repeatedly while Plaintiffs and NaphCare resolved issues related to the document subpoena.

4.    Pursuant to the Court's order, Dkt. 589, NaphCare was required to produce certain responsive documents by no later than March 22, 2024.  NaphCare made its latest document production on April 22, 2024, after the deposition of its Rule 30(b)(6) witness.

5.    On April 8, 2024, I met and conferred by Zoom with NaphCare's counsel, Craig Smith, who informed me that Angela Nix would appear as NaphCare's 30(b)(6) witness.  I had previously been informed that Dr. Michael Farrier, who was NaphCare's San Diego-based program director/health services

1 administrator, was supposed to be the 30(b)(6) witness.  After Dr. Farrier left

2 NaphCare, I was informed that they were looking for a replacement witness.  During

3 the April 8 meet and confer, I also learned that Ms. Nix was based in Alabama, not

4 San Diego.  Mr. Smith assured me that Ms. Nix would nonetheless be prepared to

5 testify about the topics set forth in the deposition subpoena.  After meeting with

6 Mr. Smith, I sent a confirming email asking for the names of the three individuals in

7 on-site leadership positions at the Jail, including the program manager (Dr. Farrier's

8 replacement), the medical director, and the mental health director.  I also noted that

9 we had not yet had a ruling on the motion to compel death records and that

10 NaphCare had not yet completed its document production.  I identified multiple

11 issues with the document production and asked that the documents be produced as

12 soon as possible.

13    6.    I took Ms. Nix's deposition on April 16, 2024.  Attached hereto as

14 **Exhibit A** is a true and correct copy of excerpts from the rough transcript from

15 Ms. Nix's deposition.  Ms. Nix testified that she did not speak to anyone other than

16 counsel to prepare for the deposition, and that she reviewed very few documents: the

17 deposition subpoena, documents related to the County's request for proposals by

18 health care contractors, the County's contract with NaphCare and attached staffing

19 matrix, and general policies and procedures.  *See* Exhibit A at 10.

20    7.    Ms. Nix was not able to answer many of my questions during the

21 deposition.  For example, Ms. Nix could not provide an estimate of the number of

22 vacant positions in the Jail allocated to be filled by NaphCare at any point during the

23 duration of the contract.  *See* Exhibit A at 25.  Ms. Nix did not know if there had

24 ever been vacancies in the psychiatrist position, which is supposed to be staffed by

25 NaphCare.  *Id.* at 29-30.  Ms. Nix was also unable to testify about many issues

26 related to the medication assisted treatment (MAT) program in the Jail, which is

27 NaphCare's responsibility to implement under its contract with the County.

28 Accordingly, I placed an objection on the record as to Ms. Nix's ability to testify

1   about certain topics in the subpoena.  That objection appears on page 119 of Exhibit

2   A, although it is mislabeled as "ATTORNEY SMITH" in the rough transcript.

3       8.      Ms. Nix also testified that the County had decided to carve out medical

4   providers (e.g., doctors and nurse practitioners) from its contract with NaphCare.

5   During the deposition, I learned for the first time that the contract for medical

6   providers had been awarded to Dr. Peter Freedland's group, Correctional Healthcare

7   Partners, which is currently a subcontractor of NaphCare's.  *Id.* at 55-56.  However,

8   Ms. Nix could not testify about when the new contract with Correctional Healthcare

9   Partners takes effect.  *Id.* at 57.

10      9.      On April 17, 2024, I emailed NaphCare's counsel re-asserting

11  Plaintiffs' objection to Ms. Nix as a 30(b)(6) witness, and listing numerous issues

12  for which Ms. Nix was not able to provide adequate testimony.  As I stated there,

13  Ms. Nix was unprepared to answer my questions regarding:

14  • Staff vacancies;

15  • CHP's reporting structure, policies, and practices as a sub-contractor of
       NaphCare;

16
17  • Draft policies and procedures provided to the Sheriff's Department by
       NaphCare;

18  • What certain entries mean on the TechCare reports produced to us (e.g.
       2/2023 offsite clinic report; 8/2023 offsite clinic report);
19

20  • The scope of responsibilities for NaphCare's discharge planners;

21  • The supply of critical medications currently provided to individuals at
       discharge;

22  • Delays in providing prescription eyeglasses to patients in the Jail;

23  • The status of unpaid bills to offsite providers;

24  • Acadia's role in the MAT program;

25  • The policies and procedures, or guidelines, followed by physicians in
       evaluating certain patients for the MAT program;
26

27  • Whether and how NaphCare addressed issues raised in the corrective
       action notice regarding its electronic health care records system;

28  • NaphCare's mental health training for Sheriff's Department staff; and

1    • Policies, procedures, and practices applying to the specialty mental
2    health units in the Jail.

3    10.    I requested that NaphCare's counsel make available its on-site

4    leadership (medical director, mental health director, and program manager) to fill in

5    the gaps in Ms. Nix's testimony. I also spoke with Mr. Smith by telephone on April

6    19, 2024 to further meet and confer about this issue. Mr. Smith responded on

7    April 19, 2024, stating that NaphCare would not stipulate to producing more

8    30(b)(6) witnesses for the noticed topics.

9    11.    On April 19, 2024, Plaintiffs submitted a request for an IDC on the

10   issue of NaphCare producing more 30(b)(6) witnesses. On April 24, 2024, we

11   conducted the hearing and will be meeting and conferring further and will then be

12   briefing the issue.

13   12.    Attached hereto as **Exhibit B** is a true and correct copy of the amended

14   deposition subpoena that Plaintiffs served on NaphCare on March 27, 2024.

15   I declare under penalty of perjury under the laws of the United States of

16   America that the foregoing is true and correct, and that this declaration is executed

17   at San Francisco, California this 24th day of April, 2024.

18
19   _____
20   Priyah Kaul
21
22
23
24
25
26
27
28

DECLARATION OF PRIYAH KAUL IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO TAKE
ADDITIONAL DEPOSITIONS AND TO COMPEL DEPOSITIONS

## TABLE OF CONTENTS
DECLARATION OF PRIYAH KAUL IN SUPPORT OF
MOTION FOR LEAVE TO TAKE ADDITIONAL DEPOSITIONS AND TO
COMPEL DEPOSITIONS

| DESCRIPTION | EXHIBIT | PAGE NO. |
|---|---|---|
| Excerpts from rough transcript of Deposition of Angela Nix | A | 1 |
| Subpoena to Testify at a Deposition to NaphCare of San Diego LLC | B | 23 |

[4137051.2]

# EXHIBIT A

Ex. A-1

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

ROUGH DRAFT        ROUGH DRAFT        ROUGH DRAFT


        This realtime transcript is provided for your immediate review of the proceedings and is not provided for nor meant to be used or cited in any type of court proceedings.


        Q    Good morning, Ms. Nix.

        A    Good morning.

        Q    We went over is this before we got on the record, but can you, for purposes of the record, just state your name again?

        A    Sure.  Angela Nix.

        Q    And are you represented by counsel here today.

        A    Yes.  I am.

        Q    Who is that?

        A    Craig Smith.

        Q    And have you have deposed before?

        A    I have.

        Q    How many times.

        A    Twice, I believe.

        Q    And ever on behalf of NaphCare?

        A    No.

        Q    When was the last time you were deposed?

        A    Probably between 2013, 2015, just...

**Ex. A-2**

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

conversations with counsel, can you describe for me what you did to prepare for the deposition?

A     Sure.  Of course, I read the actual notice of subpoena.  I reviewed policies and procedures.

Q     Which policies and procedures did you review?

A     Policies and procedures from NaphCare's perspective on -- for our jail facilities.

Q     For the San Diego jails specifically?

A     For the ones that we produce -- or provided to San Diego.

Q     Did you review any other documents?

A     I reviewed the staffing matrices and the RFP process and the contract.

Q     And when you refer to the "staffing matrix," are you talking about the one that was attached to the contract between NaphCare and the County?

A     That would be correct.

Q     Any other documents you reviewed to prepare for your deposition?

A     Those are the ones that I remember.

Q     Did you meet with your counsel to prepare for today?

ATTORNEY SMITH:  Objection.  Attorney-client privilege.  It's irrelevant, and it's also privileged as to whether we met.

**Ex. A-3**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

A    I would hope that I would have been made aware.

Q    What was the purpose of these trainings?

Well, let me rephrase.  I'll come back to that.

Does NaphCare employ staff in every jail facility?

A    For San Diego County?

Q    Yes.

A    Yes.  I believe we do.

Q    Among the positions in the jail that are allocated for NaphCare to fill, what percentage are currently vacant?

A    I would have to look at a report.  I couldn't tell you off the top of my head a percentage of what what's vacant.

Q    Do you know the approximate number of positions that are vacant among those that have been allocated for NaphCare to fill in the jail?

A    Not without looking at a report on it.

Q    More than five?

A    Again, I wouldn't know without looking at a report.

Q    Over the course of the contracts since it went into effect, on average what has the vacancy level been like for positions allocated for NaphCare to fill?

A    Again, without looking at a report, I wouldn't

Ex. A-4

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

BY ATTORNEY KAUL:

Q    The first provider position listed at the top of this document says "psychiatrist."

Do you see that?

A    Psychiatrist, yes.

Q    NaphCare provides psychiatrists for San Diego County jail facilities; is that correct?

A    That is correct.

Q    And is NaphCare the exclusive provider of psychiatrists?  And by that I mean are there any other subcontractors who provide psychiatrists for the jail?

A    For psychiatrists, not that I'm aware of.

Q    And the County doesn't employ psychiatrists for the jail, correct?

A    I'm not aware that the County employs psychiatry for the jail.

Q    During the duration of the contract, have there been vacancies in the psychiatrist positions in the jail?

A    Again, without seeing reports from a particular period of time, I couldn't tell you what particular positions were open, from memory.

Q    So you don't know if there have ever been any vacancies in the psychiatrist position; is that right?

A    I don't know that from memory, no.

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

Q    Are the psychiatrists who are assigned to
particular facilities also assigned to particular units
within those facilities?

A    I'm just looking at the location.

I'm not sure they break it out facility level
for their day-to-day assignments.

Q    On average, how many incarcerated people on
each psychiatrist's caseload?

A    Again, I would have to see that.  I don't have
that knowledge on a day-to-day basis.

Q    The next provider listed here are
psychologists, and you'll notice next to LCDRF there's
nothing listed.

Do you see that?

A    I do.

Q    Does that indicate that there's a vacancy or
there was a vacancy in that position?

A    That could indicate that there's a vacancy.

Q    Do you know whether that vacancy has been
filled since the production of this document?

ATTORNEY PAPPY:  Objection.  Calls for
speculation.  Vague and ambiguous.

THE WITNESS:  I don't see dates on the
document, so I wouldn't be able to speak to that.

**Ex. A-6**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

the facility, if -- of course if they're aware of when

their release is going to take place.

Q    Well, you're always aware of when someone is

going to be released, correct?  It's just a question of

how much lead time you have; is that fair to say?

A    No.

Q    Under what circumstances would you not be made

aware of an individual's discharge?

A    If they were released directly from court.

Q    Understood.

Any other circumstances in which you would not

be aware of an individual's release?

A    If they were, say, sent out to another

facility, whether it be a emergency department or other

things, we may not know if they're released from custody

at that point in time.

Q    Okay.  Any other circumstances where you

wouldn't be aware of discharge?

A    Those are the most common that I can think of.

Q    There are two discharge planners listed here,

and the "Facility" column lists Central Jail and Las

Colinas.

Are there individuals who work on discharge

planning or are responsible for discharge planning at

any of the other facilities?

**Ex. A-7**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

A      From a NaphCare staffing perspective?

Q      Yes.

A      Currently, not specifically at the other
facilities.  I don't know if these two assist with the
other facility discharges or not.

Q      Who would know that?

A      I'm sorry?  I didn't hear your question.

Q      You said that you did not know whether these
two assist at the other facilities.

Who would know that?

A      Our HSA could most likely tell us that.

Q      There are a number of other providers listed in
the rest of this document.

For which of these positions does NaphCare
subcontract?

A      On the last page of the spreadsheet,
Correctional Healthcare Partners, Dr. Freedland's staff.

Q      And, I'm sorry, I know I told you I wouldn't
make you read every line, but I went there.

Are there any other positions listed here for
which NaphCare subcontracts?

A      Ultrasound.

Q      Any others?

A      Iyas Masannat at the bottom of the last page, I
believe, is our pharmacy consultant.  I believe that's

**Ex. A-8**

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

to provide for that additional FTE, that additional

service.  That's not uncommon.

     Q    Are you aware that the County has had

discussions about carving out medical care from the

scope of the NaphCare contract?

          ATTORNEY SMITH:  Vague and ambiguous.  Lacks

foundation.

          You can respond, if you understand.

          THE WITNESS:  From -- medical services at what

level?

BY ATTORNEY KAUL:

     Q    At any level.

     A    At any level from what NaphCare currently holds

or --

     Q    Are you aware of any discussions that the

County has had about carving out medical care from the

scope of NaphCare's duties under the contract?

     A    From a medical provider perspective, I do know

that there was, I believe, an RFP for -- specifically

for medical providers.  I don't know the specifics of

that.

     Q    And it's a good point.

          But "medical providers," what do you mean by

that?

     A    Provider level is a physician's assistant; a

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

medical or mental health physician, whether it's a

medical doctor, MD, or a psychiatrist; as well as

mid-levels, which are, again, the physician assistants

and nurse practitioners.  "Medical services" can

encompass a lot more than that, though.

    Q    Understood.  And that's why I wanted to have

that distinction --

    A    Okay.

    Q    -- between providers any other kinds of staff.

So I appreciate that clarification.

        Are you aware of the outcome of those

discussions?

    A    My understanding is that that was awarded to, I

believe, Dr. Freeland's group.  That's my understanding.

I don't know if that's been an official response -- in

an official response or...

    Q    Do you have an understanding of when NaphCare's

operations with respect to providing medical providers

in the jail might cease and -- or terminate and another

entity might come in?

        ATTORNEY SMITH:  Lacks foundation.  Misstates

the testimony.  Vague and ambiguous.

        You can respond, if you understand.

        THE WITNESS:  Can you rephrase that?  I'm

sorry.

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

BY ATTORNEY KAUL:

Q    Do you have an understanding of when Naphcare's
responsibilities with respect to providing medical
providers in the jail might end or terminate and another
entity might come in to fill that need?

ATTORNEY SMITH:  It's overbroad.

Go ahead.

THE WITNESS:  I don't know of a timeline or
dates.

BY ATTORNEY KAUL:

Q    Okay.  How did you become aware of the RFP
process?

A    Through the normal process of -- and how we
deal with RFPs.  If we're interested in being a part of
that process or if we've been invited to that, since I
have worked with San Diego, I would have been made aware
of it.

Q    And if the proposal was such that NaphCare
essentially would have been replaced with respect to
medical providers in the jail, was NaphCare also able to
submit a new bid for that role?

A    I wasn't part of that process.  So I can't
speak to that specifically.

Q    What about generally?

A    Can you rephrase the question for me?

Ex. A-11

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

You testified about your understanding that there was an issue with a dentist providing care to or accepting patients due to lack of payment.

Are you aware of whether any of these four providers listed here did not want to see or accept patients due to lack of payment?

A    I'm not aware.

Q    Do you know whether it was discussed at any CAN meetings?

A    I don't know that it was verbally discussed or not.  I can't remember.  And as I said earlier, I can't say that I attended a hundred percent of them, so.

Q    Was it discussed at last Friday's meeting.

A    Specific to those four facilities?

Q    Yeah.

A    Not that I'm aware of, no.

Q    So you don't have any recollection of being made aware of any of these four providers not wanting to see or accept jail patients due to lack of payment; is that fair to say?

A    It's fair to say I don't remember specifics to those four in regards to payment or lack thereof.

Q    That does fall within the scope of your responsibility, to be made aware of such issues, correct?

75

**Ex. A-12**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

A    That's typically handled on the financial and billing side.

Q    Well, if patients are being turned away, wouldn't you be made aware of that as VP of nursing?

A    Our HSA would be made aware if there were issues on a day-to-day basis.

Q    You wouldn't expect to notified?

A    Not on a day-to-day basis.  If it was a trending problem, I would expect that there would be conversations had.

Q    If you turn the page, under 2.3, "Comprehensive Health Care Services."  This begins by saying: "Contractor must provide NCCHC compliant policies and procedures."  And then it goes on to list a number of topics.

Do you see that?

A    I do.

Q    Okay.  And earlier you testified that NaphCare had provided drafts of NCCHC compliant policies and procedures to the jail, correct?

A    Correct.

Q    When were those policies and procedures first provided to the jail?

A    It's my understanding that they were first provided prior to the June 1st start of the contract --

**Ex. A-13**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

A    I do.

Q    What's the role of Arcadia in -- with respect
to the MAT program?

A    I'm not sure that I can articulate that without
seeing documents or a contract related to it.  Let me --
can I reread it?

Q    Sure.

A    From my memory, the understanding I have of
Acadia is a community partner with the MAT program,
because if you establish a person on MAT, they have to
have a community-based program that they can go to once
released, to continue that care.  From my memory, that's
my understanding of Acadia.

Q    And so your understanding is that Acadia's role
with respect to the MAT program is only post-release for
continuity of care?

A    I don't know that it's only post-release.  I
haven't seen a contract or been part of the conversation
with -- directly with Acadia or in regards to Acadia.

Q    Do you know a timeline for Acadia assuming a
role with respect to the MAT program?

A    I don't know a timeline, no.

Q    Okay.  Can you turn to the next page.

Bullet Point 1 says:  "Currently San Diego is
maintaining patients verified on community doses of

**Ex. A-14**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

     A    Can you reask the question?

     Q    Sure.

          Is it possible that this policy is both under
review by the County and also in effect in the jail?

     A    I don't know that answer.

     Q    Do you know whether staff have been trained on
this policy?

     A    Without looking at education records, I can't
answer that.

          ATTORNEY SMITH:  And I'm going to put on the
recorded a formal objection to this witness's
preparation and ability to testify as to at least some
of the topics that are set forth in the deposition
notice, you know, including at least Issue 1(d),
"Medication Assisted Treatment (MAT) for incarcerated
people."

          There have also been questions for which
Ms. Nix hasn't been able to provide adequate testimony
with respect to 5, "Staffing and vacancy levels"; 1(i),
"Contracts with community providers for the provision of
medical care."

          That's where we are at this point.  Go ahead.

          ATTORNEY SMITH:  I'd like to respond that
Ms. Nix has adequately been able to testify as to all of
those categories.  The categories are overbroad in

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

say?

    A    Fair to say.

    Q    Okay.  Is there currently a comprehensive MAT

program in effect in the jail?

    A    I know that there -- the program is -- has been

developed, and it's growing as far as volume-wise.  From

a provider perspective, the providers have been hired.

And just -- and the documents we've already looked at,

the partnership with Acadia.  So from my point of view,

a comprehensive program is in place and in the works and

growing.

    Q    Other than continuing to enroll new patients or

bring new patients into the MAT program, are there other

steps that need to be taken, either by NaphCare or the

County, to fully implement the comprehensive MAT

program?

    A    I'm trying to think through that.

         I know that we are working with the County for

any additional needs that may be necessary as far as

staffing and discharge planning into the community.

    Q    Does the jail currently do anything to ensure

continuity of MAT treatment after release?

    A    The jail?

    Q    Yes, any of the staff at the jail.

    A    I can't speak to the County side of it.  I know

127

**Ex. A-16**

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

that from the NaphCare side, we partner with community

outreach, so to speak, community support, for anybody

that's participating in MAT.

        And we also confirm those that come in who have

said that they have or have recently been involved a MAT

program.  Then we're reaching out to those organizations

to confirm whether or not they're still active.

        From a nursing perspective, I can't speak to

the nursing process of it since that's not NaphCare

staff.

    Q    So when you say that there are partnerships

with community providers -- I think that's was the word

you used.  Did I get that right?

    A    Probably.  I don't remember.

    Q    All right.  Are there contracts that Naphcare

has with community providers that relate to continuity

of care and MAT treatment after release?

    A    I know there was mention in some of the

documents about Acadia.  As far as specific contracts

with community-based programs, I haven't seen any

specific to community-based Suboxone or methadone

clinics.

    Q    Do you know if there is a requirement that

individuals who are part of the MAT program in the jail

be provided with resources or education prior to their

**Ex. A-17**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

release to ensure continuity?

    A    Requirement from what perspective?

    Q    As a matter of policy.

    A    I know that they are educated on a lot of different areas, from mental health to medication compliance and the importance of keeping in contact with those community resources once they're released.

    Providing the ability to get their medications once they're released -- sorry.

    Q    Go ahead.

    A    That was my -- no.  I was just going to rephrase "released."  It didn't come all the way out.

    Q    Sorry about that.

    Who does that education or providing instruction?

    A    In general, it would be a collaborative effort between the MAT providers: the mental health staff, the nursing staff, as well as the discharge planners.

    Q    Is this written down in policy anywhere, the steps that you've described with respect to continuity of discharge upon release?

    A    Those specific steps, I don't know that it's that specific in a policy and procedure.

    Q    When nursing staff do their assessments of individuals who are in the detox program, are they

Ex. A-18

Q    Is there any stop in the progress of using the COWS/buprenorphine taper for withdrawal management at any pointy during the course of the contract?

A    I'm not aware of any stoppage of using the COWS/buprenorphine taper during the course of the contract.

Q    Below that it says:  "MAT induction was not conducted within six months," and I understand that mean within six months of the contract.

Is that an accurate statement?

A    To the best of my knowledge, yes.

Q    Below that, a few lines down, it says:  "SDSD will continue to monitor as program develops, as Naphcare's has only hired two NPs, with one MD for oversight, to hand a population of over 4,000 patients at seven different sites, with no plans for relief factor."

Do you see that?

A    I do.

Q    Do you think there's adequate staffing of the MAT program in the jail currently?

A    I know that staffing has been reviewed and evaluated.  And based on the increased needs of the patients, there may -- have -- an increase -- need to add more MAT providers.  I know that we have looked at

165

**Ex. A-19**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

that and are discussing that with the County.

Q    I don't know if that answered my question.

Is the current staffing for the MAT program
adequate to meet patient needs in the jail?

A    It would depend on how many of those 4,000-plus
patients are participating in the MAT program.

Q    Well, you've had discussions about staffing the
MAT program, right?

A    Yes.

Q    Okay.  Do you have an understanding of whether
currently the program is adequately staffed?

A    We've -- my understanding is we have identified
a need to add additional providers to the program, yes.

Q    So it's not adequately staffed.  That was my
question.

Okay.  I know that was an exhausting document.
You can set it aside for now.

A    Thank you.

ATTORNEY KAUL:  I am going to mark as Exhibit 7
a document Bates-stamped NAPHCARE 37976.

ATTORNEY SMITH:  Can we take a quick
five-minute break?

ATTORNEY KAUL:  Sure.

ATTORNEY SMITH:  All right.  Thank you.

ATTORNEY KAUL:  Let's go off the record.

**Ex. A-20**

ROUGH DRAFT TRANSCRIPT - UNCERTIFIED AND UNEDITED

Q    Would you have been made aware of that?

A    It depends on the situation.  If it were
something that needed my assistance in resolving, then I
would expect that I would have been made aware of that.

Q    And when you say if it had needed your
assistance in resolving it, under what circumstances
would something like that have been brought to your
attention.  And by "that" I'm referring to, to be clear,
availability issues of custody staff to support
NaphCare's provision of health care.

A    If, say, for instance -- the primary contact
would be the HSA, if there was a daily operational issue
related to being able to have access to the patients.

      If the HSA was unavailable, that may reach out
to me to -- whether it's communicate with the County
leadership, get some assistance in moving things along,
or identify the problem.  That's typically something
that the HSA would work through with the facility
operations.

Q    What's the process for coordinating with
custody staff to escort patients to dental or medical
appointments?

A    Okay.  In general, we would provide the command
staff a list of patients that needed to be seen, whether
it's medical or dental.  And we would coordinate with

225

**Ex. A-21**

ROUGH DRAFT TRANSCRIPT – UNCERTIFIED AND UNEDITED

if and when that occurred.

Q    Well, I'm asking since September 2023, are you aware of whether there have been continued issues with delays in the provision of prescription glasses?

A    I'm not aware that there has been continued delays.

Q    You would have been made aware?

A    If it was unresolved and they needed my assistance in resolving.

Q    Who would know if that continues to be an issue?

A    The HSA would typically be notified if that was -- continued to be an issue.

Q    Is it accurate that, as a matter of policy, the Sheriff's Department is supposed to provide a ten-day supply of critical medications at discharge?

A    As a matter of policy, I don't know specifics of the County policy.

Q    Does NaphCare play a role in ensuring a supply of medications at discharge?

A    I do know that we work with the County, as well as outside pharmacies, to assist in providing medications once a patient is released.

Q    But you don't know the required dosage?

A    I don't.  Not from memory, no.

**Ex. A-22**

# EXHIBIT B

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of California

| | |
|---|---|
| Darryl Dunsmore, et al. | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.    3:20-cv-00406-AJB-DDL |
| San Diego County Sheriff's Department, et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                        NaphCare of San Diego, LLC

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:  See Attachment A.

| Place:  DLA Piper LLP (US)<br>4365 Executive Drive, Suite 1100<br>San Diego, CA 92121 | Date and Time:<br>04/16/2024 9:00 am |
|---|---|

The deposition will be recorded by this method:    Stenographically via Court Reporter

❑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    03/27/2024

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Van Swearingen |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Plaintiff Darryl Dunsmore et al. , who issues or requests this subpoena, are:
Van Swearingen, Rosen Bien Galvan & Grunfeld LLP, 101 Mission St., 6th Fl., San Francisco, CA 94105;
415-433-6830; vswearingen@rbgg.com [additional attorneys listed on Attachment A]

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**Ex. B-24**

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  3:20-cv-00406-AJB-DDL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**Ex. B-25**

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

ATTACHMENT A

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
PRIYAH KAUL – 307956
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
pkaul@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California  92101-4297
Telephone:   (619) 699-2700
Facsimile:   (619) 699-2701
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Subclass

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION, ATTACHMENT A**<br><br>Judge:         Hon. Anthony J. Battaglia<br>Magistrate:  Hon. David D. Leshner<br><br>Date:        April 16, 2024<br>Time:        9:00 a.m.<br>Place:       DLA Piper LLP<br>                   4365 Executive Drive,<br>                   Suite 1100<br>                   San Diego, CA 92121 |

[4331103.4]

Ex. B-27

**DEFINITIONS**

Unless otherwise indicated, the following definitions and terms shall apply to these designated issues for deposition:

1. The term "DEFENDANT(S)" means the San Diego County Sheriff's Department, County of San Diego, and the San Diego County Probation Department.

2. The term "DOCUMENT" means any writing, however produced or reproduced, of every kind and regardless of where located, which is in YOUR possession, custody, or control, including drafts; or in the possession, custody or control of any servant or agent of YOU or of YOUR attorneys. The terms include the following: electronically recorded information such as electronic mail, texts, voicemails, html files, databases, data processing cards or tapes, computerized data, computer diskettes, or information otherwise contained on a computer's hard drive, disks or backup tapes; video tapes, audio tapes, view-graphs, or any information maintained on digital, electronic, magnetic or other media; and any other summary, schedule, memorandum, note, statement, letter, telegram, interoffice communication, report, diary, worksheet, list, graph, chart, or index, tape record, partial or complete report of telephone or oral conversation, transcript or minutes, compilation, tabulation, study, analysis, or other such writing or recording. The terms "DOCUMENT" and "DOCUMENTS" include any originals, all file copies, all other copies, no matter how prepared, and all drafts prepared in connection with such DOCUMENTS, whether or not used, as well as the file in which the DOCUMENTS are maintained. A draft or non-identical copy of a DOCUMENT, including a copy or duplicate of a DOCUMENT which has any nonconforming notes, marginal annotations or other markings, and any preliminary version, draft or revision of the foregoing, is a separate DOCUMENT within the meaning of these terms. The term "DOCUMENT" does not include any writing that constitutes a privileged or otherwise protected communication between YOU and YOUR

1  attorneys.

2      3.    The term "EMPLOYEE" means any employee, director, officer, owner,

3  contractor, agent, or any other person working for or on behalf of an entity.

4      4.    The term "HEALTH CARE" means the provision of care or services,

5  to identify and/or address health needs of an INCARCERATED PERSON in the

6  JAIL (including medical, mental health, dental care, and vision care needs), whether

7  those needs arise as a result of injury, illness, disease, age, or trauma, or care or

8  services provided for diagnostic or preventive purposes.

9      5.    The term "HEALTH CARE STAFF" means any person or entity

10  providing HEALTH CARE services, or providing administrative and/or support

11  services related to HEALTH CARE at the JAIL.

12      6.    The term "HEALTH INFORMATION" means any information,

13  whether oral or recorded in any form or medium, that is created or received by

14  NAPHCARE and relates to the past, present, or future physical or mental health or

15  condition of any patient, the provision of HEALTH CARE to any patient, or the

16  past, present, or future payment for the provision of HEALTH CARE to any patient.

17      7.    The terms "INCARCERATED PERSON(S)" or "INCARCERATED

18  PEOPLE" mean any person incarcerated, detained, or in the custody of the San

19  Diego County Sheriff's Department.

20      8.    The term "JAIL" means the San Diego County Jail, including all of its

21  facilities.

22      9.    The term "POLICIES AND PROCEDURES" means policies,

23  procedures, handbooks, advice, directives, training materials, forms, instructions,

24  and guidelines that comprise established standards, regardless of the author.

25      10.   The term "STAFFING PLAN" means any document showing the

26  minimum number and types of EMPLOYEES DEFENDANTS intend to work in the

27  JAIL and the minimum number of hours DEFENDANTS intend those

28  EMPLOYEES to work to staff the JAIL, including YOUR EMPLOYEES.

1     11.    The terms "YOU," "YOUR," and "NAPHCARE" mean NaphCare,

2  Inc., NaphCare of San Diego, LLC, and anyone acting on their behalf.

3     12.    The words "and" and "or" should be construed disjunctively or

4  conjunctively as necessary to make the Request inclusive rather than exclusive.

5                          **ISSUES DESIGNATED**

6       The issue as to which YOUR designee(s) shall testify is as follows:

7     1.    All POLICIES AND PROCEDURES and practices RELATING TO

8  medical HEALTH CARE at the JAIL, including but not limited to:

9              a.    staffing of medical HEALTH CARE professionals;

10             b.    custody staff's role in the delivery of medical care;

11             c.    screening and intake;

12             d.    medication assisted treatment (MAT) for INCARCERATED

13  PEOPLE;

14             e.    medical care for INCARCERATED PEOPLE entering the JAIL

15  under the influence of alcohol or drugs;

16             f.    continuity of medication and treatment for INCARCERATED

17  PEOPLE upon their arrival at the JAIL;

18             g.    the manner in which INCARCERATED PEOPLE may alert

19  HEALTH CARE staff of their medical needs;

20             h.    documentation of medical care;

21             i.    contracts with community providers for the provision of medical

22  care;

23             j.    confidentiality in the provision of medical care;

24             k.    diagnostic care and referrals to outside specialists;

25             l.    follow-up medical treatment for INCARCERATED PEOPLE

26  who return to the JAIL after receiving care from outside medical specialists;

27             m.    discharge planning and medical services; and

28             n.    quality assurance/quality improvement processes.

**Ex. B-30**

1      2.     All POLICIES AND PROCEDURES and practices RELATING TO

2 mental HEALTH CARE at the JAIL, including but not limited to:

3         a.     identification and tracking of INCARCERATED PEOPLE in

4 need of mental HEALTH CARE;

5            b.     staffing of mental HEALTH CARE professionals;

6            c.     custody staff's role in the delivery of mental HEALTH CARE;

7            d.     continuity of mental HEALTH CARE medications for

8 INCARCERATED PEOPLE upon their arrival at the JAIL;

9            e.     the timing of provision of mental HEALTH CARE in the JAIL;

10           f.     systems for providing mental HEALTH CARE treatment to

11 INCARCERATED PEOPLE with ongoing mental illness;

12           g.     confidentiality in the provision of mental HEALTH CARE;

13           h.     the housing of INCARCERATED PEOPLE at risk of suicide in

14 isolation units;

15            i.     the identification, treatment, tracking, and supervision of

16 INCARCERATED PEOPLE at risk of suicide;

17            j.     the provision of mental HEALTH CARE to INCARCERATED

18 PEOPLE with acute mental health needs;

19           k.     discrimination against and punishment of INCARCERATED

20 PEOPLE with mental HEALTH CARE needs in housing placements; and

21            l.     discharge planning and resources.

22      3.     All POLICIES AND PROCEDURES and practices RELATING TO

23 dental HEALTH CARE at the JAIL, including but not limited to:

24         a.     staffing of dental HEALTH CARE professionals, including at

25 dental clinics;

26            b.     screening and intake; and

27            c.     preventative and emergency dental care.

28      4.     All POLICIES AND PROCEDURES and practices RELATING TO

**Ex. B-31**

1   vision HEALTH CARE at the JAIL, including but not limited to the provision of

2   medically required eyeglasses.

3       5.      Staffing and vacancy levels for HEALTH CARE staff in the JAIL,

4   including YOUR STAFFING PLAN.

5       6.      YOUR CONTRACT(s) with DEFENDANTS, including negotiations

6   with DEFENDANTS about the CONTRACT(s).

7       7.      The division of responsibility for the provision of HEALTH CARE at

8   the JAIL between YOUR EMPLOYEES and DEFENDANTS' EMPLOYEES.

9       8.      All POLICIES AND PROCEDURES, DOCUMENTS, practices,

10  investigative materials, and staff disciplinary records RELATING TO deaths at the

11  JAIL, including HEALTH CARE provided to people who died at the JAIL and

12  mortality reviews.

13      9.      Means and methods of communication between YOU and JAIL

14  EMPLOYEES.

15      10.     ALL POLICIES AND PROCEDURES and practices RELATING TO

16  HEALTH INFORMATION management, including but not limited to YOUR

17  electronic document and medical records systems and maintaining the

18  confidentiality of INCARCERATED PERSONS' HEALTH INFORMATION.

19      11.     YOUR document preservation practices.

20

21

22

23

24

25

26

27

28