Pages 1 - 84

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

| | | |
|---|---|---|
| DARRYL DUNSMORE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | NO. 20-CV-00406-AJB-DDL |
| | ) | |
| STATE OF CALIFORNIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Diego, California
Friday, April 26, 2024

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

ROSEN BIEN GALVAN & GRUNFELD, LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105
BY:  **RICHARD VAN SWEARINGEN, ESQ.**
**GAY CROSTHWAIT GRUNFELD, ESQ.**
**ERIC D. MONEK ANDERSON, ESQ.**
**BENJAMIN WYCLIFFE HOLSTON, ESQ.**

DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California 92101
BY:  **CHRISTOPHER M. YOUNG, ESQ.**
**ISABELLA MARIA NEAL, ESQ.**
**OLIVER M. KIEFER, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Transcribed by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

1  **<u>APPEARANCES</u>:   (CONTINUED)**

2  For Plaintiffs:

3                          LAW OFFICE OF AARON J. FISCHER
                           1400 Shattuck Avenue, Suite 12, Number 344
                           Berkeley, California 94709

4                 **BY:   AARON J. FISCHER, ESQ.**

5

   For Defendants:

6                          BURKE, WILLIAMS & SORENSEN LLP
                           60 South Market Street, Suite 1000

7                          San Jose, California 95113
                  **BY:   ELIZABETH MARIE PAPPY, ESQ.**

8
                           BURKE, WILLIAMS & SORENSEN LLP
9                          444 South Flower Street, Suite 2400
                           Los Angeles, California 90071

10                **BY:   DEANN RIVARD, ESQ.**

11                         OFFICE OF COUNTY COUNSEL
                           1600 Pacific Highway, Room 355

12                         San Diego, California 92101
                  **BY:   STEVEN PAUL INMAN, II, ESQ.**

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Friday - April 26, 2024                      10:00 a.m.

 2                     P R O C E E D I N G S

 3                         ---oOo---

 4        THE COURT:  All right.  Good morning, everyone.

 5        We are on the record for a motion hearing in Dunsmore,

 6   et al., versus the San Diego County Sheriff's Department,

 7   et al., Case Number 20-CV-406.

 8        May I have appearances from counsel, beginning with

 9   plaintiffs' counsel?

10        MR. SWEARINGEN:  Van Swearingen on behalf of the

11   certified plaintiff class and subclasses.  I'm joined by my law

12   partner, Gay Grunfeld, and by plaintiffs' expert, Matthew Ross.

13        THE COURT:  Thank you, and good morning to all of you.

14        MS. GRUNFELD:  Good morning, Your Honor.

15        MS. PAPPY:  Good morning, Your Honor.  Elizabeth Pappy

16   on behalf of defendants.  And with me, I have Brent Jordan, who

17   submitted a declaration in opposition to the motion.

18        THE COURT:  All right.  Good morning to both of you.

19        And, Dr. Ross and Mr. Jordan, thank you both for being

20   here.  I do have a number of questions that I think will be

21   best answered by the two of you.  So I appreciate you both

22   taking the time.

23        All right.  The matter before us is plaintiffs' motion to

24   compel responses to Request for Production Numbers 250 through

25   252.  It is Docket Number 609.
```

1    I have reviewed the motion as well as the defendants'

2    opposition.  I have also reviewed the parties' joint status

3    report.  That is Docket Number 605.  That contains

4    Dr. Ross's -- is it Dr. or Mr. Ross?

5         **DR. ROSS:**  Doctor -- well, Mister -- whatever you feel

6    like, Your Honor.

7         **THE COURT:**  All right.  Well, as long as you don't

8    care, I'll probably just mix it up, and I just, you know, want

9    to be respectful of what everyone's preferences are.  So I

10   appreciate that it's no big deal to you either way.

11       All right.  So I've reviewed Dr. Ross's declaration with

12   that as well.

13       Here are my initial thoughts for the parties, and I want

14   to spend our hearing going through each of the categories at

15   issue.

16       Plaintiffs' ninth cause of action alleges a violation of

17   California Government Code 11135 and contains allegations

18   regarding not only the defendants' programs and treatment of

19   individuals while they are in custody but contains allegations

20   regarding the San Diego Sheriff's Department's alleged use of

21   state funds to overpolice black and Latinx communities and

22   further alleges that the Sheriff's Department and probation

23   department cause black and Latinx persons to be

24   disproportionally incarcerated in the jail.

25       Specifically, in carrying out policing programs, it is

1    alleged that the Sheriff's Department causes a disproportionate

2    adverse effect on the basis of race, color, national origin, or

3    ethnic group identification and that, as a result of the

4    County's policing practices, disproportionate numbers of black

5    and Latinx persons are arrested.  That is the third amended

6    complaint, specifically Paragraphs 401, 402, 504, and 505.

7        As noted in the order that I issued on April 2nd -- that

8    is Docket Number 606 -- denying the plaintiffs' motion to

9    compel with respect to Request for Production Numbers 203 to

10   207, we are all aware that Federal Rule of Civil Procedure

11   26(b)(1) governs the scope of permissible discovery and that

12   discovery must be relevant to a claim or defense and

13   proportional to the needs of the case.

14       And the allegations in a complaint generally dictate what

15   evidence is discoverable.  It is initially the burden of the

16   party seeking to compel discovery to establish that the

17   information they seek is both relevant and proportional to the

18   needs of the case.

19       On that prior motion, I found that plaintiffs have not

20   established that the information they sought was relevant and

21   proportional to the needs of the case, and I've undertaken that

22   same analysis with respect to the motion before me now.

23       One key difference between these two motions is that I do

24   have a declaration from Dr. Ross explaining why he is

25   requesting the specific information at issue.  And what I

1    really want to understand from the parties and, probably,

2    mostly from the County is with respect to each of the

3    categories of information at issue:

4        First, what information is available and what's not?

5        And then, second, if the information is available, but the

6    County asserts it should not have to produce it, I want to

7    understand why not.

8        I saw Ms. -- I appreciate Mr. Jordan's declaration.  But,

9    at least as I read it, I wasn't able to distinguish, for the

10   categories at issue, whether it wasn't being produced because

11   it doesn't exist, meaning the County doesn't maintain it the

12   way that Dr. Ross is seeking it, or the County has it but has a

13   different reason for why they should not produce it.

14       As to the latter question, I will note this at the outset,

15   and we can discuss the individual categories.  I agree that the

16   requested categories are broad.  The ninth cause of action is

17   broad in and of itself, and it survived a motion to dismiss.

18   And what I'm really going to be looking at is, again, if the

19   information exists, what is the County's position as to why its

20   production is not proportional to the needs of the case?

21       It is not going to be a persuasive argument to me, based

22   on the record as I understand it, to tell me that the

23   information -- the searches are going to be unreliable,

24   perhaps, or the information is not going to be relevant.

25       Ultimately, in any analysis, I -- the plaintiffs have the

1    better argument on that front, that any issues with Dr. Ross's

2    methodology will be appropriately raised in a *Daubert* motion or

3    in motions in limine with respect to the admissibility of any

4    evidence at trial.  The issue before me is really what evidence

5    Dr. Ross should have before him to perform this analysis.

6        I do have one question for you, Mr. Swearingen, before I

7    dig into the categories.  And that is that, with respect to the

8    ninth cause of action, without committing the plaintiffs to any

9    particular, you know, course of action at trial, is it your

10   expectation that the proof in support of that ninth cause of

11   action will depend largely on the statistical expert analysis

12   that Dr. Ross is undertaking?

13           **MR. SWEARINGEN:**  Yes, Your Honor.

14           **THE COURT:**  All right.  That's what I assumed from

15   reading the papers.

16       What I'd like to do is this.  I'd like to go through each

17   of the categories at issue, and I'd first like to understand,

18   from Mr. Jordan and Ms. Pappy, the County's position as to each

19   of those categories.  Is it -- what's available, what's not,

20   and if it's available, why shouldn't it be produced?

21       And then, Mr. Swearingen, I'll give you a chance to be

22   heard as to each category, but I think my understanding of that

23   threshold issue will be important.

24       And, Dr. Ross, I will probably chime in with questions for

25   you if there's issues about what -- what's important and what's

1    not.  I want to know, from your perspective, why it's

2    important.

3        So that we're all operating on the same document, I am

4    going to actually use Mr. -- let's see.  This would actually be

5    Docket Number 612-1 at Page 24.  It is Mr. Jordan's

6    declaration, and it has -- it looks -- it may have been a

7    copy-and-paste from an email, but it has what is -- will be

8    provided and what will not be provided in response to the RFPs,

9    and the information the County says they are not providing

10   is -- is lined out.

11       I'd prefer to start with that because, Mr. Swearingen, it

12   looks like there was some more information that was struck from

13   this than was included in your motion, and I just want to make

14   sure I know exactly what the County is saying they'll produce

15   and what they won't.

16           **MR. SWEARINGEN:**  Thank you, Your Honor.

17       And before we begin, can I make one note about the -- the

18   data that should not be at issue and that has been produced?

19           **THE COURT:**  Yeah, that would be great.

20           **MR. SWEARINGEN:**  Defendants have produced six Excel

21   spreadsheets with some of the data that is not X'ed out on

22   Page 24 that you referenced.  However, there are three types of

23   data that were promised, and that plaintiffs expected, that

24   were not produced in those six data sets.

25       One is the location of the event, the second is the

1  demographic information of the suspects, and the third is the

2  event number associated with several of the data sets that is

3  necessary to link them to the other master data sets,

4  effectively a unique identifier that would serve to merge the

5  data sets together and make the -- the data readable.

6      And as I understand from Mr. Rost -- Mr. Ross -- you can

7  ask him additional questions, but without these three

8  variables, he is not able to perform his analysis.  And that's

9  separate from the additional data that is sought through this

10 motion to compel.

11     **THE COURT:**  With respect to suspect demographic

12 information, I saw that there may have been issues with respect

13 to identity or demographic information pertaining to victims

14 and witnesses.

15     I assume that's not at issue here and that what you're

16 truly talking about is suspect demographic information to allow

17 Dr. Ross to perform his analysis; is that correct,

18 Mr. Swearingen?

19     **MR. SWEARINGEN:**  It is actually for both victim and

20 suspect.  We understand that victim data -- victim demographic

21 data has been produced but not suspect demographic data --

22 information.

23     **THE COURT:**  That's fine.

24     Have you talked to Ms. Pappy about this?

25     **MR. SWEARINGEN:**  I -- I have.  I -- she said that she

1    will look into it and will get back to me.

2          **MS. PAPPY:**  Not about the suspect versus the witness.

3          **THE COURT:**  All right.  Well, then, let's -- I

4    appreciate the heads-up, Mr. Swearingen.

5          Given that we've got everybody here, let's go through the

6    categories.  I want to understand what the County is telling me

7    they don't have and what they have that they don't think they

8    should produce.

9          So -- and, Mr. Jordan and Dr. Ross, what I'd like to do,

10   to make this as efficient as possible, is -- is ask you some

11   direct questions.  I'm not trying to put you on the spot and

12   make you uncomfortable, but I -- you-all know more than I do as

13   I'm trying to un- -- dig through this.

14         If, at any point, Counsel wishes -- you know, wants to

15   jump in, I -- that's fine, too, but I think that's going to be

16   the most efficient way to proceed.

17         So let me begin with you, if I could, Mr. Jordan.  Looking

18   at Page -- ECF Page 24 -- and this is Attachment -- looks like

19   Attachment 3.  That page contains Categories 1, 2, and 3.

20   Category 1 is the computer-aided dispatch data export.

21         Do you see that, sir?

22         **MR. JORDAN:**  I don't have it on my screen right now,

23   but I do know what you're talking about with the CAD -- CAD

24   data.

25         **THE COURT:**  All right.  Well, I think it's going to be

```
 1   important for us to look -- there's specific information that's
 2   lined out, and so -- I know that you're familiar with it, but I
 3   think we're going to be most efficient in having it up on the
 4   screen.
 5       Do you have access to that, Mr. Jordan?
 6           MR. JORDAN:  I don't believe I have it as of now.
 7       All that -- you're speaking to all the dockets;
 8   correctly [sic]?
 9           THE COURT:  Yeah, from -- Ms. Pappy, could you please
10   send Mr. Jordan --
11           MS. PAPPY:  Yes.  Yes.
12           THE COURT:  -- the document.
13           MS. PAPPY:  It's 620- -- it's 624, Your Honor?
14           THE COURT:  I have 612-1.
15           MS. PAPPY:  Oh.  612.  Got it.
16       Okay.  Brent, I'm sending it to you now.
17           MR. JORDAN:  Okay.  Perfect.
18           THE COURT:  All right.  Mr. Jordan, when you get it,
19   if you scroll down, there's the opposition brief, and then
20   there's your declaration, which has a number of exhibits.
21       I'm in -- I'm in the middle of your declaration,
22   specifically at Attachment -- it's actually -- I'm sorry.  It's
23   Attachment 3.  I think I said 4, but (Inaudible).
24           MR. JORDAN:  I'll let you know when I -- when I've
25   received it.
```

```
 1              THE COURT:  All righty.

 2              MS. PAPPY:  Brent, when you get it, it's 66 pages

 3    long.  And if you look at the top, it's where the page numbers

 4    are.

 5         Judge, if I'm not mistaken, we're talking about

 6    Page Number 24?

 7              THE COURT:  Correct.

 8              MR. JORDAN:  Okay.

 9              MS. PAPPY:  Okay.  Of 56.  56 -- it's 56 pages.

10              MR. JORDAN:  I've received it.  I'm just scrolling

11    down to it right now.

12         Okay.  At Page 24 -- let's see.  20 -- I see 250, 251,

13    252.  And -- and you're referencing the first one,

14    "Computer-Aided Dispatch"?

15              THE COURT:  Yes, sir.

16              MR. JORDAN:  Perfect.

17         On it.

18              THE COURT:  All right.  We're all there.

19         So let's look at Category 1, which has Subcategories A

20    through J, and there are strikeouts to portions of A through J.

21    And what I wanted to understand is whether those strikeouts are

22    because the information is not maintained in the manner in

23    which Dr. Ross is seeking it, or it is maintained, but the

24    County asserts that it should not be produced and, if so, the

25    reason for that.
```

1      So I think what I'd like to understand, from Mr. Jordan,

2  is whether the information exists or not, and if it does -- but

3  the position is it shouldn't be produced.  Ms. Pappy, that may

4  be more properly addressed by you.

5      So let's talk about "Event type."  I see that, in the

6  bullet, the County says they're producing -- or excuse me --

7  providing deputy-initiated activity for pedestrian and vehicle

8  stops.

9      Is that different from what Dr. Ross was seeking in

10  Subcategory A?

11          MR. JORDAN:  I believe we -- what we put in there,

12  which was deputy-initiated, which I believe we spoke to on one

13  of our meetings, was the event type, deputy-initiated event,

14  and related to traffic and pedestrian stops because the call

15  for service is not at the deputy's (Inaudible).

16      The deputy is just being assigned a call versus a

17  deputy-initiated would be initiated by that deputy.

18          THE COURT:  And was that an agreement between the

19  parties, that it would be limited to deputy-initiated versus

20  calls for service?

21          MR. JORDAN:  I believe so.  In that first meeting,

22  that's what we discussed, was the DIAs being the traffic and

23  pedestrian stops.

24          THE COURT:  Mr. Swearingen, do you agree that, as to

25  Subcategory A, the event type, deputy-initiated activity is --

1    is all that Dr. Ross needs?

2         MR. SWEARINGEN:  No, Your Honor.  Dr. Ross can talk --

3    can speak to his conversation with (Inaudible).  We understand

4    the County maintains both deputy-initiated activity as well as

5    calls for service, which are known as 9-1-1 calls, and Mr. Ross

6    seeks both.

7         THE COURT:  Is that correct, Dr. Ross?

8         DR. ROSS:  Yes.  We were looking for all activities in

9    that database, not just deputy-initiated activities.

10         THE COURT:  And what is the significance of your

11    ability to have both deputy-initiated events as well as calls

12    for service or 9-1-1 calls?

13         DR. ROSS:  When we're trying to estimate disparate

14    treatment in the decision to arrest, there's obviously vast

15    differences between different circumstances that lead up to an

16    arrest.  And, effectively, what I'm trying to do is hold as

17    much constant as possible around the circumstances that lead up

18    to an arrest.

19         And in order to do that, we need basically all of the

20    types of activities that are involved that lead up to an

21    arrest, not just, you know, deputy-initiated events or traffic

22    stops.  I mean, right now, this is effectively just a subset of

23    all possible activities that could lead to an arrest.

24         THE COURT:  Mr. Jordan, does the County maintain the

25    computer-aided dispatch data for both deputy-initiated events

```
 1    and calls for service?

 2              MR. JORDAN:  Yes, we do.

 3              THE COURT:  Why don't we do this, Ms. Pappy.

 4        So I'm not ping-ponging back and forth, why don't we go --

 5    I go through this with Mr. Jordan, and then you can tell me,

 6    "Hey, look, we have these things, but we shouldn't produce

 7    this, this, or this."

 8        Would that be okay with you?

 9              MS. PAPPY:  Yeah, that's fine.

10              THE COURT:  All right.  Let's go to -- so the

11    County -- the County maintains the information requested at

12    Subparagraph A; is that correct, Mr. Jordan?

13              MR. JORDAN:  Yes.  We -- we have event types for all

14    our computer-aided dispatch calls, whether deputy-initiated or

15    calls for service or otherwise.

16              THE COURT:  Okay.  Thank you.

17        Let's go to Subparagraph B, "Dates," slash, "times

18    associated with incident."  And then there's a strikeout for

19    "occurrence, reported, assigned," slash, "dispatched,

20    responded, cleared, et cetera."

21        What does that strikeout mean, Mr. Jordan?

22              MR. JORDAN:  On that, I believe the assigned and

23    dispatch -- we have occurrence, reported.  I think the one that

24    I know I was striking out, not for my purposes, was the

25    reported.  There is a case number that can be attached to a CAD
```

1  call, but it is not always accurate.

2      So connecting that, in that way, to cases down the road

3  isn't always the most accurate because the dispatcher is at --

4  it's at their will to put that case number in or not, but it's

5  better to -- once that goes to our RMS system, our report

6  management system, that is a better way to track what calls

7  were attached to what cases.  That was my only thing.

8      But we do have occurrence, reported, assigned, dispatch,

9  time of response, and time of clear.  We do have those

10  dispositions.

11          **THE COURT:**  All right.  Thank you.

12      Going to Subparagraph C, Mr. Jordan, "Badge number or

13  unique ID of all officers on scene" -- I understand this topic

14  applies to multiple requests, but just -- I'd like to go

15  through them individually.

16      So does the Sheriff's Department, you know, CAD data

17  include the badge number or other unique identifying number for

18  officers on the scene?

19          **MR. JORDAN:**  Yes.  It will -- it will host the primary

20  deputy on scene based on what's called their ARJIS, which is

21  very similar to a badge number, which is connect to --

22  connected to that individual.

23          **THE COURT:**  So it would be the badge number for the

24  primary officer but perhaps not every officer on scene?

25          **MR. JORDAN:**  Not every officer will be tracked in

1  that, yeah.

2        **THE COURT:**  And is the ARJIS number --

3        **MR. JORDAN:**  It's --

4        **THE COURT:**  Could that be used to otherwise identify

5  the individual officer but --

6        **MR. JORDAN:**  Yeah.

7        **THE COURT:**  Well, I mean, I get it's a unique number,

8  but it doesn't provide --

9        **MR. JORDAN:**  Yeah.

10       **THE COURT:**  -- a name or any other personally

11  identifiable information, does it?

12       **MR. JORDAN:**  No.  That would have to be connected to

13  our personnel department's database of the individuals that

14  work for the department.  So that would have to be connected.

15       **THE COURT:**  Okay.  I -- D, "Location of event,

16  latitude/longitude or street address."

17      And I see "street address" is struck.  What -- why is

18  that, Mr. Jordan?

19       **MR. JORDAN:**  We generally don't provide street

20  address, but we do have it, if needed, the approximate

21  lat/long.  And I believe I just read the report that came in

22  yesterday -- or the day before.

23      I think we had X/Y in there, and I think that's what

24  Swearingen was just speaking to with the -- with the location

25  data that wasn't there.  I think we had X/Y in there instead,

1    which -- they're requesting lat/long, which -- we just have to

2    transfer it to lat/long.

3        **THE COURT:**  But how is the data maintained?  Is it

4    both lat/long and street address, or could it be one or the

5    other?

6        **MR. JORDAN:**  It's street address and X/Y.  So in order

7    to get it to lat/long, we'd have to, you know, manipulate the

8    data a little bit to get the -- to get the lat/long to match

9    the X/Y, but there is a street --

10        **THE COURT:**  What's X/Y?

11        **MR. JORDAN:**  X/Y is just a different way of locating

12    on a map basically for geo- -- geolocating, like, the location,

13    basically.  It's lat/long, X/Y, and we also have the street

14    address as well.

15        **THE COURT:**  All right.  Thank you.

16        E, looks like there's no dispute.

17        F, "Civil charges resulting from the defense" -- or "from

18    the event" -- excuse me -- "and disposition for each charge."

19        Why is that struck, Mr. Jordan?

20        **MR. JORDAN:**  I'm not sure to that.  We do have

21    dispositions on these calls, but -- oh.  I know what it is.  It

22    doesn't specify the exact charge in that data set.

23        So if there is any charges to the case, there will be a

24    disposition that says there may be an arrest, warning,

25    citation, whatever it might be.  But if that ends up in being a

1  civil charge, it will actually be in the RMS system.

2      So it turns into a case, and it is no longer -- it's

3  attached to that call for service, but that call for service

4  does not say, you know, what civil charges were -- were brought

5  about, whether they were arrested, what specific criminal

6  charges, which I think is also in G as well.

7          THE COURT:  Is there a way to link the two?

8      MR. JORDAN:  Yeah.  It would be based off of -- if we

9  pulled arrests or citations or the RMS system, you would have

10 the event number that would connect to the original CAD call.

11 That would connect those two.

12         THE COURT:  Dr. Ross, why -- why is it important, if

13 at all, for you to have the civil or criminal charge as opposed

14 to the fact of arrest?

15     DR. ROSS:  We -- I think we discussed at our -- in our

16 meeting that if we had the ability -- if we have the ability to

17 link to the arrest data, then this would not necessarily be

18 needed.

19     So we -- we agreed on that point.

20         THE COURT:  So -- and, again, I appreciate that, and

21 I -- I mean, I do appreciate the fact that you were trying to

22 figure this out with Mr. Jordan, Dr. Ross.

23     Is -- is -- am I correct, then, that there's no dispute as

24 to F and G, that you're no longer seeking those?  I want to be

25 very specific.

1    **DR. ROSS:**  I think they're basically included in the

2    arrest data that was provided, that by linking those two data

3    sets, they effectively were producing that particular item.

4         **THE COURT:**  So there's no dispute as to F and G

5    anymore -- or there's no dispute --

6         **DR. ROSS:**  Correct.

7         **THE COURT:**  Okay.  All right.  Thank you.

8    H is "Unique IDs," and then there's a strikeout to the

9    remainder of it.

10   Can you explain that for me, Mr. Jordan, so I understand

11   it?

12        **MR. JORDAN:**  Yeah.  I believe this is -- we can

13   provide unique IDs.  I know we discussed with the unique IDs

14   for badge numbers, and that's a whole -- attached to a whole

15   'nother thing.

16   As far as linking, we do -- I believe there is the CAD

17   event numbers as well as the event numbers attached to the

18   arrest when we can get those attached as well as criminal

19   report numbers -- to attach those.  So I'm not sure -- I think

20   we provided the unique ID.  I don't know why the arrest is

21   struck out.

22   Other than the field sobriety, we -- we don't have a way

23   of -- there's no check box in our report management system, or

24   there's no marking system, for field sobriety test as well as a

25   temporary detainment or a frisk or search.  That's where that

1   narrative search comes into play.

2       So, basically, the event number is the only way connecting

3   all of these across the board, along -- paired with case

4   numbers.

5           THE COURT:  All right.  Well, with that being said,

6   Dr. Ross, are you seeking additional IDs beyond what you've

7   already received from the County?

8           DR. ROSS:  Yes and no.

9       So some of the data sets that were provided only have one

10  of the two identifiers, and some of them have what appear to be

11  the same identifier but are called different names.

12      So it's actually not clear on whether a consistent

13  identifier was provided across all of the data sets so that

14  they could be linked correctly.

15          THE COURT:  What are the two identifiers that you're

16  referencing, Dr. Ross?

17          DR. ROSS:  There's one called "Case Number," and then

18  there's "Case Number 2," and then there's "Event Number."

19      Some of the data sets have both case number and event

20  number.  Some of them just have a case number; some of them

21  just have an event number; and some of them have Case Number 2.

22          THE COURT:  "Case Number" -- is it -- and the number 2

23  when you say "Case Number 2"?

24          DR. ROSS:  Yeah, like, "2."  Yeah.

25          THE COURT:  All right.  Did you -- did you-all talk

1    about this?  I mean, it's interesting to me, but it probably

2    isn't the best use of all of our time to go through this right

3    now.  So I want to be mindful of that.

4         But have you had a chance to talk to Mr. Jordan about

5    that, Dr. Ross?

6              **DR. ROSS:**  I have not.

7         My understanding is Van has followed up with Counsel to

8    try to get clarification on exactly why the identifiers are

9    different across the data sets.

10             **THE COURT:**  Well, here's what -- here's what you-all

11   need to do:

12        In any future discussions on this issue, you and

13   Mr. Jordan need to be involved.  It's not going to work for

14   Mr. Swearingen or Ms. Pappy to try to figure this out.  That's

15   not -- they're really good lawyers, but it's not fair to either

16   of them.

17        You-all need to be involved in this because these -- there

18   are questions that we have that you-all can answer between

19   yourselves.  So please do that going forward.

20        "Priority of response" is not at issue, and then J is

21   "Whether an arrest was made."

22        Is that struck because you've already got enough data to

23   tell you that, Dr. Ross?

24             **DR. ROSS:**  I believe we do.  My only concern -- and,

25   again, I mean, this is somewhat because -- you know, it's not

1    necessarily clear exactly what and was not -- what was and was

2    not produced.

3        So, for instance, something that Mr. Jordan just said

4    raises some concern to me, which is that -- I think he said --

5    in terms of the arrest data that was provided, I think he said,

6    "Sometimes we're able to provide a CAD number to link it back

7    to the CAD data set."

8        So my impression was that they were providing a -- a -- a

9    data set of arrests that could always be linked back to the CAD

10   data set.  So if it -- if that's not the case, I think this

11   becomes more important, whether we have an indicator of whether

12   the particular CAD incident led to an arrest.

13       So I had assumed that, because the arrest data was

14   provided, and there was a CAD number provided, and the CAD data

15   was provided -- that these two would perfectly link.  I did

16   not -- I -- until this moment, I was not aware that not all of

17   these can be linked over.

18           **THE COURT:**  Can you provide some clarity on that,

19   Mr. Jordan?

20           **MR. JORDAN:**  Yeah.  They should be able to link over.

21   When I spoke to that, I was more saying that, with any data set

22   this large, there's going to be little things that don't link

23   up exactly.  There's, you know, thousands upon thousands of

24   rows of different things.

25       So, dealing with this data, I never am saying that's going

1   to, a hundred percent, on every single case in CAD -- you know,

2   entry is going to be exactly, across the board, functioning

3   correctly just because of the sheer amount of data that's in

4   there.

5       But on -- on all -- pretty much all cases of arrest, that

6   is going to have a case -- a CAD number attached to it, which

7   is the event number in this case, and it will definitely have a

8   case number attached to it as well.  That case number can also

9   be attached back to a call for service, if it was a call for

10   service, or deputy-initiated activity.

11       **THE COURT:**  What is the difference between a CAD event

12   number, a case number, a Case Number 2, and an event number?

13      **MR. JORDAN:**  So an event number is a CAD number -- and

14   sorry if I'm speaking in two different ways.  We reference it

15   in different ways.

16       **THE COURT:**  All right.

17      **MR. JORDAN:**  CAD -- CAD is basically our

18   computer-aided dispatch.  Somebody gets dispatched out to a

19   call.  It is either a call for service or a deputy-initiated,

20   meaning that the deputy initiated that call, a call for service

21   being that somebody called in responding to something.  Both of

22   those have those event numbers, those CAD event numbers.

23       As far as a case number, a case number is any time that a

24   case -- or a deputy is going to write paper on something, make

25   an arrest, an FI, so on and so forth.  Something happened

1    there, whether it was a crime or a dispute.  Whatever it is,

2    that -- it is now going to be a written case or incident.  That

3    then goes into the R- -- RMS system, the report management

4    system.

5        So that has a case.  Every time that case is updated or

6    taken over by, say, another detective or there's added

7    information, there is sometimes what's called a Dot 2, which I

8    believe that Case Number 2 is referencing.  And it's basically

9    just another -- a case number in there, but all the information

10   is attached to that original case.

11           **THE COURT:**  Is the case number --

12           **MR. JORDAN:**  So basically --

13           **THE COURT:**  -- different from the CAD event number?

14           **MR. JORDAN:**  What's that?

15           **THE COURT:**  Is the case number different from the CAD

16   event number?

17           **MR. JORDAN:**  Yes.  Those are two different -- because

18   they live in two different databases.  Once the call is closed,

19   every -- every -- it sends directly over to the RMS system, and

20   then CAD is never really updated again.  But the case is worked

21   within our RMS database.

22           **THE COURT:**  I see.

23           **MR. JORDAN:**  Yeah.

24           **THE COURT:**  Thank you.  That's helpful.

25           **MR. JORDAN:**  Yep.

1          **THE COURT:**  All right.  Ms. Pappy, with respect to

2     Category Number 1, it -- it sounds to me like the only real

3     issues in dispute are for Categories A and C, and you're free

4     to disagree with me on this.

5          But A is in terms of whether or not calls for service

6     should be provided, the 9-1-1 calls; and, in C, whether there

7     should be a badge number or unique identification for the

8     primary responding officer or deputy on the scene, which would

9     be the ARJIS number but no personally identifying information.

10         Do you wish to be heard on either of those?

11         **MS. PAPPY:**  Yes.

12         **THE COURT:**  Go ahead.

13         **MS. PAPPY:**  You know, the first one, event type --

14    given your comments at the beginning of the case, I mean,

15    it's -- it's -- the data is not going to be useful because

16    of -- if you include the calls because you've got mandatory

17    arrests under domestic violence, it doesn't matter what race

18    they are, gender they are.  They get arrested.

19         It includes service awards.  It includes all manner of

20    things that could never fairly be included in any sort of

21    analysis.

22         That said, you know, given your comments -- and,

23    obviously, we would be able to cross-examine this information.

24    Our own experts will -- will critique it.  You know, all I have

25    to say is it's not going to help the analysis.  It's going to

1    skew it, but you are right that that's not my problem to deal

2    with other than through cross-examination.

3        The -- the badge numbers, I am extremely concerned about.

4        **THE COURT:**  Go ahead.

5        **MS. PAPPY:**  There is nothing in the complaint,

6    nothing, directed to any specific deputy.  And the notion that

7    the plaintiff should be able to go on a fishing expedition to

8    attack a particular deputy, especially given what Mr. Jordan

9    told us today, that the only name that's going to appear is

10   probably the commanding or -- or, you know, the first person on

11   the scene type of thing -- it's not necessarily even a person

12   involved in any use of force or making the decision as to

13   whether somebody is stopped or arrested.

14       And so we're prosecuting these people in advance

15   without -- you know, their name isn't associated with anything.

16   It's nowhere in the complaint.  It's nowhere in any of the

17   discovery, and so I have a strenuous objection to any ability

18   to identify a specific officer.  That's not what this case is

19   about.

20       **THE COURT:**  Mr. Swearingen, I'm happy to give you an

21   opportunity to respond to that because I know that's a -- an

22   issue that the plaintiffs have raised.

23       Would you rather address that, or would you rather have

24   Dr. Ross address it?

25       **MR. SWEARINGEN:**  At a very level -- at a very high

1  level, I'd like to say a couple words and then hand it over to

2  Dr. Ross, if that's okay.

3          **THE COURT:**  Go ahead.

4         **MR. SWEARINGEN:**  We're not seeking the specific

5  identity of any officer, and we're not going to be making any

6  allegations about a specific officer.  Instead, this

7  demographic -- this -- this badge number is useful for Mr. Ross

8  to -- to complete apples-to-apples comparisons.

9      Dr. Ross, you can say it better than I can.  I'll turn it

10  over to you.

11         **DR. ROSS:**  Sure.  Yeah.

12      I mean, just to echo what Van said, we -- we requested a

13  unique, anonymized identifier for individual officers, and we

14  have no intention of going on and, you know, doing individual

15  officer analyses or looking at disparities for individual

16  officers.

17      The -- you know, as I mentioned before, the idea of doing,

18  you know, one of these rigorous disparity analyses is that you

19  want to hold as much constant about the circumstances leading

20  up to the decision to arrest as you can, and one of those

21  things is the officers that are involved in it; right?

22      There are officers that are, you know, engaged in varying

23  enforcement activities that differ by quite a bit.  And, in

24  fact, you know, I doubt that the County keeps detailed enough

25  records on what each officer is doing each day.

1    And one way that, you know, I've typically controlled for

2   this type of thing in, you know, past analyses that I've done

3   with this type of data is just to simply have an anonymized

4   identifier and basically to just include a control for the

5   officer.  The other issue is a -- is a more of a technical

6   point.

7    And so, you know, one of the standard statistical

8   assumptions that one has to make, when doing hypothesis tests,

9   is this IID assumption.  It's basically that all the

10  observations you're -- you're using are identical -- or are

11  identically distributed.  And in this case, they're not because

12  an individual officer might respond to one call, and their

13  likelihood to respond to another call is -- is impacted by, you

14  know, what they responded to previously.

15    And in order to control for that violation of that core

16  statistical assumption, you need to know which calls which

17  officer is -- is -- is responding to.  We don't need to know

18  the individual officer, but we need to know this -- you know,

19  this officer went to these calls this day.

20          **MS. PAPPY:**  May I respond?

21          **THE COURT:**  Let me ask a question first, and then

22  sure.

23          **MS. PAPPY:**  Yes.

24          **THE COURT:**  I understand also, Dr. Ross, that you are

25  seeking additional information beyond, you know, a badge number

1   or an ARJIS number for the officers, including the officers'

2   race -- race, ethnicity, sex, age, seniority, and LGBTQ+

3   status.

4        I don't know if the County maintains that information, but

5   why is that relevant in your analysis, beyond the identity, you

6   know, by badge number or ARJIS number?

7        **DR. ROSS:**  You know, I -- so I'm going to speak from

8   experience at this point.

9        So, you know, I've run hundreds of these disparity studies

10  across the country.  And by and large, you know, when you run

11  these types of analyses, there are often groups, not individual

12  officers but subsets of officers, that are engaged in

13  particular enforcement activities more than others.

14       And if we just conduct an analysis on disparities in the

15  decision to arrest, treating -- you know, across the department

16  as a whole, it often will mask that there are potentially

17  subsets of officers that are engaged in different activities.

18       So, for instance, in my experience, you know, I've run

19  into agencies where, you know, you identify a disparity.  And

20  if you do, if you look across different groups, you might find

21  that the disparity is really driven by the young -- you know, a

22  younger group of officers; right?  It might suggest that there

23  is potentially a training issue.

24       You might also not expect officers of one racial or ethnic

25  group to treat citizens of one racial or ethnic group exactly

1   the same way, and so it allows you to do that -- you know,

2   account for heterogenous behavior without actually identifying

3   the individual officers.

4        So it would look at differences in these disparities

5   across particular groups of officers.

6           THE COURT:  Mr. Swearingen, I understand what Dr. Ross

7   is saying, and I understand that -- why that would be relevant

8   in his prior evaluations of law enforcement agencies.

9        But, of course, here, we're talking about information that

10  must be relevant to a claim or a defense, and I'm struggling to

11  understand why -- let's say I agree with you that controlling

12  for the badge number or ARJIS number is something that would be

13  appropriate.

14       Why is an officer's LGBTQ status something that is

15  relevant to a violation of the Government Code in a manner that

16  should allow the discovery of that information to take place?

17          MR. SWEARINGEN:  Ultimately, Your Honor, plaintiffs,

18  in order to prove their claim, will need to present statistical

19  analysis.

20       The statistical analysis that Dr. Ross is describing

21  presents a more nuanced analysis.  It is more capable of

22  describing where the disparities are occurring on the one hand

23  and, on the other hand, allows for a remedy appropriate to that

24  particular group.

25       So, for example, if Dr. Ross found, as he has found in

1  other agencies, that younger, less experienced individuals are

2  more likely to drive disparate outcomes in arrests and/or

3  incarceration, those younger law enforcement officers may

4  receive more training, for example.

5          THE COURT:  No.  I understand, but when you're talking

6  about a remedy, you're talking about a remedy in the form of

7  injunctive relief; is that right, Mr. Swearingen?

8          MR. SWEARINGEN:  Yes, Your Honor.

9          THE COURT:  So if that's the case, then, am I correct

10 in understanding that a -- that a jury would decide the issue

11 of whether there is a violation of the specific Government Code

12 section, and it would be up to Judge Battaglia to determine the

13 appropriate scope of injunctive relief?

14     If that's the case, and given the sensitivity of this

15 data, would it be appropriate to defer the issue of this

16 particular data set until after any finding of liability and

17 then allow a supplemental analysis by Dr. Ross?

18          MR. SWEARINGEN:  It's a great question.

19     I think that Dr. Ross -- I think that -- if you take the

20 first point that I was making, allowing for a more nuanced to

21 allow -- analysis to understand what the issue is, I think

22 Dr. Ross can better explain than I can why having these data is

23 necessary -- is necessary to explain the differences in

24 outcomes.

25          THE COURT:  Go ahead, Dr. Ross.

1    **DR. ROSS:**  Yeah.  I'll just -- I'll give you sort of a

2    simple hypothetical.

3        You could imagine, you know, a policing agency where the

4    law enforcement officers are 50 percent from one racial and

5    ethnic group and 50 percent from another racial and ethnic

6    group.

7        If we don't -- you know, we would -- we would effectively

8    be assuming that all of those officers are treating minority

9    citizens in the same way when we do an analysis that doesn't

10   account for their own racial differences.  It's not necessarily

11   clear that white non-Hispanic officers are going to treat

12   Latinx citizens the same way as a Latinx officer would.

13       And so if you have, for instance, in this hypothetical,

14   50 percent of the officers engaged in disparate treatment and

15   50 percent that aren't, if you just add -- lump those all

16   together and aggregate it, you might find no disparity because,

17   on average, you have a disparity, no disparity, and you're

18   averaging it out and finding nothing.

19       So you -- I mean, if you -- if you don't have the ability

20   to do this type of heterogeneity analysis, it can often mask,

21   you know, disparate treatment that's going on for a large

22   subset of the law enforcement officers at an agency.

23       **THE COURT:**  I appreciate that, Dr. Ross.

24       Ms. Pappy, thank you for your patience.  You wanted to

25   respond?

1        **MS. PAPPY:**  Absolutely.

2        None of this evidence -- this data has anything to do with

3    the claims made in the case.  This is not a case claiming black

4    officers are arresting white suspects, white officers are

5    arresting black officers [sic].  This is a global claim, an

6    anonymous -- you don't need to know the race or anything about

7    any of these officers.

8        By the way, it would be illegal to ask an officer whether

9    they identify as LGBTQ.  It's subject to their privacy rights,

10   and they can only -- they can share it, if they want, but it's

11   not something that's going to be contained in anybody's file.

12       If -- if -- the claim, if you look at the complaint, is,

13   "Are you, as a department, overarresting?  Are you, as a

14   department, picking on/discriminating against a certain class

15   of people?"

16       Why they're doing it is utterly irrelevant.  What's

17   causing it?  Is it the LGBTQ segment of the department that has

18   decided that they are going to discriminate against other LGBTQ

19   or Hispanic or Asian?  That's not the subject of the complaint.

20       And -- and we're talking about going so far afield -- in

21   fact, I think Dr. Ross sort of explained it himself as to how

22   far afield this is, that he looks at those kinds of things, and

23   I can understand why he would look at those kinds of -- that

24   kind of information for training.

25       We're -- we're -- I mean, the plaintiffs have, throughout

1    this case, made very clear that it is not their responsibility

2    to come up with the solutions; it is our responsibility to come

3    up with the solutions.  They simply have to prove that there's

4    a problem and get -- to get that injunctive relief and then how

5    that injunctive relief looks.

6        Plaintiffs have repeated to me over and over and over

7    again, "It's kind of your problem, County."  And whether

8    they're right or wrong, it doesn't -- it doesn't matter.  It's

9    a legal question.

10        So I agree with the Court, on the one hand, that it's

11    premature to, if they are involved -- in what a specific remedy

12    is beyond just injunctive relief because all they've asked for

13    is injunctive relief, just plain old injunctive relief.  "Make

14    them fix it.  It is their job to figure out how to fix it."

15        So the complaint controls.  None of this is relevant to

16    any of the issues.  And, again, Dr. Ross explained it

17    perfectly:  "If I am going into a department and figuring out

18    how to train people, then I need this information."  But you

19    don't need this information to decide whether, as a department,

20    they are overarresting/overpolicing a particular population.

21        So we still object to it.  I haven't heard anything that

22    changes my mind and, in fact, information and arguments that

23    cement our position.

24            **THE COURT:**  Dr. Ross, in your -- performing your

25    statistical analysis, is there a distinction between obtaining

1  unique identifying information for the responding officer --

2  the ARJIS number, the badge number, for example -- as opposed

3  to knowing that officer's ethnicity or LGBTQ status?

4          DR. ROSS:  I'm sorry, Your Honor.  Are you -- are you

5  asking whether those are two separate, sort of independent

6  requests?  Is that the question?

7          THE COURT:  No.  I understand them to be independent

8  requests, but I guess what I'm -- what I'm really trying to get

9  at, Dr. Ross, is the claim here is that the Sheriff's

10  Department engages in policing programs and practices that

11  cause disproportionate numbers of black and Latinx individuals

12  to be arrested.

13          DR. ROSS:  Uh-huh.

14          THE COURT:  And I -- what I am trying to figure out --

15  hang on real quick.  Mr. Inman is trying to join.

16      What I am trying to figure out is, you know, how your

17  request for the unique identifying information for the officers

18  would apply to that -- coming to that conclusion as opposed to

19  additional information for the officers such as their ethnicity

20  or their LGBTQ status.

21      That -- so that's probably not the most articulate way to

22  ask the question, but -- and you can probably tell what I'm

23  really working through here, Mr. -- Dr. Ross, is why does it --

24  why does that latter set of information really matter in

25  reaching a conclusion, presumably from you, that

1    disproportionate numbers of black and Latinx individuals are

2    arrested?

3        I mean -- and the reasons why, as Ms. Pappy said, may or

4    may not be relevant in terms of liability as opposed to an

5    injunctive remedy.

6        So really long question, Dr. Ross.  Have at it, please.

7            DR. ROSS:  I think -- to be clear, I think the first

8    set of information, anonymized officer identifiers, is critical

9    to perform a rigorous statistical analysis by itself.

10           THE COURT:  Okay.

11           DR. ROSS:  I think, without the demographic

12   information, it is possible to conduct an analysis.  However,

13   the shortcoming of that would be that you're treating all

14   groups of officers the same, and there could be potentially a

15   large subset of officers that are engaged in disparate

16   treatment and a large subset of officers that are not engaged

17   in disparate treatment.

18       And it's not clear that -- ex ante, without that

19   information, it is not clear that you would be able to detect

20   the disparate treatment that's going on by, say, 50 percent of

21   the officers by just treating them all as equally and averaging

22   it out.

23           THE COURT:  No.  I appreciate that.

24       And that takes me to a question to you, Mr. Swearingen,

25   is -- you know, it sounds like what I hear Dr. Ross to be

1    saying is that the first -- anonymized identifying data is

2    critical.  Got it.

3         But the second group of information, race --

4    race/ethnicity of the officers -- it goes more to why.

5    Who's -- why -- why is this happening?  What is the cause of

6    it?  And I'm not sure that that's relevant at all to your cause

7    of action under the Government Code.

8         You need to prove, I think you're telling me, it's a --

9    there's a disproportionate effect because of the policing

10   practices and not necessarily why, and I'm concerned -- that's

11   what I'm struggling with, Mr. Swearingen.

12        I appreciate you helping me with that.

13            MR. SWEARINGEN:  Yeah.  I think the -- I don't know

14   how to disentangle that explanatory power of why it's happening

15   from -- from that it is happening.

16        I -- I would say that that is integrally interlinked and

17   useful to explaining what is happening with disproportionate

18   arrests, if there are disproportionate arrests, how they are

19   occurring.

20            THE COURT:  No.  I appreciate that.

21        Ms. Pappy, I think those are the only two areas of dispute

22   between the parties left for Category Number 1.  If I missed

23   something, let me know, and I'm going to ask Mr. Swearingen the

24   same thing.

25            MS. PAPPY:  No.  I think that's it.

1          Did we -- I mean, I don't think the unique identifiers was

2    a dispute.  I think that Mr. Jordan confirmed that they -- the

3    two data sets can be matched.  I'm not sure.  Was that a

4    dispute or --

5          **THE COURT:**  I understood it to be a dispute.

6          Mr. Jordan, did the data sets provided by the County

7    include unique identifiers for the officers involved in each

8    event such as a badge number or ARJIS number?

9          **MR. JORDAN:**  No, we did not put in the unique IDs to

10   those.  As far as the personnel -- the demographic aspect of

11   it, that's held by personnel.  So I don't actually have access

12   to that database.

13         But the unique identifier -- we did discuss possibly

14   creating a, like, unique identifier off of their ARJIS or badge

15   number, rather, and attaching those to the calls, as well as

16   the case -- cases that were presented.

17         The -- the only thing that I know we talked internally

18   about is that that can still -- even though anonymized, can

19   still be connected back to a deputy's PII, basically.  At any

20   point, anybody can CPRA arrest records within -- I believe it's

21   last 30 days.  I'm not a hundred percent on that, but it's a --

22   it's last 30 days and -- and basically get a full record of an

23   arrest.

24         So if you have an amount of data and you CPRA, you'd be

25   able to link up, or you can pull off of our public-facing CAD

1    data, and you would be able to technically link that to an

2    actual human being.

3            **MS. PAPPY:**  So -- so one thing that -- I don't -- I

4    mean, the concept -- it seems easy to me, but I know nothing --

5    is that -- that we have a unique identifier.

6        Is it all right if I can ask -- Judge, if I can ask my

7    person a question?

8            **THE COURT:**  Go ahead.

9            **MS. PAPPY:**  Can we just assign some other identifier

10   like Number 1, Number 2, Number 3, Number 4 --

11           **MR. JORDAN:**  Yes.  Yes.

12           **MS. PAPPY:**  -- and marry that?  Because that -- I

13   actually thought that we had done that, and I think we should

14   do that.

15       So if we can do it that way, and that would satisfy the

16   plaintiffs, Your Honor, that -- that seems to work for me.  I

17   don't have a problem with that.  I thought we had done it.

18           **THE COURT:**  Does that work for you, Dr. Ross?

19           **DR. ROSS:**  Yeah.  I just want to point out, though,

20   that I think there are two separate things kind of getting

21   confused here.  One is the unique officer identifier, and I

22   think what they just offered to provide would be sufficient,

23   separate from the demographic piece.

24       But the other one is that the unique identifier that links

25   individual events to criminal incidents -- those were provided.

1    So they were -- one or the other was provided in a number of

2    the data sets, but they weren't both provided in every single

3    data set, and it is not clear why they weren't provided.  They

4    were provided in some but not the others.

5        So maybe they don't exist in some of the data sets, but I

6    think we would just like a clear explanation of why -- why

7    there -- why there is only one in certain data sets and not

8    both.

9        **THE COURT:**  All right.  What -- I am going to issue an

10   order off on this motion, and it is absolutely going to include

11   a requirement that the parters -- parties -- excuse me -- meet

12   and confer on some of these granular issues that are going to

13   be best resolved by you-all, with the participation of Dr. Ross

14   and Mr. Jordan.

15       And I am confident that the question you just posed,

16   Dr. Ross, which is a fair one, can be answered directly by

17   Mr. Jordan.

18       We've got a number of other people who are signing on,

19   and -- but given that I have Dr. Ross and Mr. Jordan here,

20   everyone else who's not participating is welcome to keep their

21   cameras off and stay muted.  But we're going to continue to

22   work through these issues, given the time sensitivities

23   involved and the fact these gentlemen have made time to be

24   here.

25       So with that being said, I think I -- my questions as to

1   Category Number 1 have been answered, and with respect to --

2   you know, I'm going to look at Plaintiffs' Exhibit A, which is

3   Docket Number 609-1.  I will include this in an order.

4        But, Ms. Pappy, do be prepared for the order to require

5   that the County include 9-1-1 call data as part of the call for

6   service data, and I get that some of this you might have

7   thought was -- was produced.  I'm not going to find any fault

8   by the County in this one.  You've been going back and forth in

9   trying to figure this out.

10       So we'll -- given the information provided by Dr. Ross --

11  and everyone who's just logged in, as I mentioned a moment ago,

12  we are working through a number of issues relevant to RFPs 250

13  to 252.  We'll turn to the all-counsel portion of this as soon

14  as we can.  So if you're not participating, you're welcome to

15  turn your video off, and we'll get to that as soon as we can.

16       I am inclined to direct that the County provide a badge

17  number or other unique identifier for the officer at the scene.

18  It sounds like the most readily available data is -- or the

19  only available data electronically is for the primary

20  responding officer and not necessarily every other officer or

21  deputy who showed up; is that correct, Mr. Jordan?

22       **MR. JORDAN:**  Correct.  That is the most accurate

23  information, is going to be the primary deputy --

24       **THE COURT:**  Well, I -- I don't want to -- I don't want

25  to nitpick with you, but what -- what's accurate --

1        MR. JORDAN:  There --

2        THE COURT:  -- and what's not accurate, that's a

3   different --

4        MR. JORDAN:  There --

5        THE COURT:  What's available is what I want to know.

6        MR. JORDAN:  Yeah.  That is the most available.  It is

7   not always on there.  Like I said, our CAD system picks up

8   different things.  So I want to be the most open about it.

9        So there is -- there is sometimes deputy -- other deputies

10  assigned, but we don't always have the ability to -- to get at

11  that data.  It's not readily available in the database.

12       I will -- I will review that and ensure that, if we can

13  capture other deputies on scene, that will be included in the

14  data set.  But the primary (Inaudible) we use.

15       THE COURT:  But -- that's fine.

16  I'm not ordering you --

17       MR. JORDAN:  Yeah.

18       THE COURT:  -- to do something you can't do.

19       MR. JORDAN:  Yeah.

20       THE COURT:  Was that what you were going to say,

21  Mr. Swearingen?

22       MR. SWEARINGEN:  No, Your Honor.  I'm sorry.

23       THE COURT:  Did you have another point to make?

24       MR. SWEARINGEN:  No, Your Honor.

25       THE COURT:  Oh.

```
 1        Okay.  All right.  So that makes sense to me, Mr. Jordan,
 2   and thank -- thank you for that.
 3        I want to think through the further discussion that we've
 4   had about other nonpersonally identifiable information, the
 5   race, ethnicity, and LGBTQ status of the officers.  I am -- I
 6   need to think that through.  I'm not yet convinced that that is
 7   relevant to a claim or defense, although I understand the
 8   arguments on each side.
 9        Turning to Category Number 2, the records management
10   system, let me ask this.  That was -- that Category 2 was not
11   included in the plaintiffs' list of disputed items.
12        Mr. Swearingen, are there any items in Number 2 that are
13   disputed?
14        MR. SWEARINGEN:  I -- I believe that there may be an
15   issue with respect to the case numbers, Case Number 2s, and
16   event numbers linking up between the RMS data set and the other
17   data sets.
18        THE COURT:  All right.  Mr. Jordan, I don't know if
19   you can speak to that -- or, Dr. Ross, if you can speak to
20   that -- because I -- it sounds like a question for Mr. --
21        MR. JORDAN:  Yeah.  I -- I think the hiccup on that
22   is -- is there's -- sometimes there's different terminologies
23   where we pull these out, that the headers are a little
24   different, but all of it should connect through.
25        And I can obviously get with Dr. Ross and -- and get that
```

 1   squared away, but there should be a case and CAD number

 2   attaching pretty much all the way through.  So I'd be able to

 3   get with -- with him and -- and discuss that and clean that up.

 4          **THE COURT:**  All right.  Dr. Ross, do you wish to add

 5   anything on that issue?

 6          **DR. ROSS:**  On that issue, no, but I did want to point

 7   out -- I think the other thing is that I think defendants

 8   agreed to provide suspect information.  And from my reviewing

 9   the data that was sent, it appears to only be victim

10   information.

11       I'm not -- not totally sure about that because it at least

12   doesn't differentiate if it's suspect and victim, and we need

13   to -- if it's both of them, we need it to differentiate between

14   which is which.

15          **THE COURT:**  I'm putting you on the spot, Mr. Jordan.

16   And, again, you're going to be talking to Dr. Ross about this.

17   So if you have an answer, great.

18          **MR. JORDAN:**  Yeah.  Just to clarify for your -- your

19   information, basically, the suspect information is going to be

20   the arrest record demographic.  So it's going to be the

21   individuals that are arrested.  CAD does not always capture

22   suspect data, and if it does, it is not -- it is not very

23   accurate in times.

24       So we provided the arrest because that is going to be --

25   any time someone's arrested, they will have an actual

 1   demographic attached, where calls will not, as well as cases.

 2   Those suspect information is not always in there, and so we use

 3   the -- the arrest data as the demographic for that.

 4       **THE COURT:**  I would offer this just general

 5   observation for the defendants' benefit:

 6       I understand the desire to produce the most accurate data

 7   set.  However, if Dr. Ross is requesting data, and there are

 8   concerns about its accuracy, I am going to be inclined to

 9   direct that that information be produced, understanding that

10   the County will have the ability, on a *Daubert* motion or at

11   some later point, to say, "Hey, the analysis is faulty because

12   it relies on inaccurate data, and we said so."

13       So just so you know, Mr. Jordan, it's not that I'm trying

14   to have you provide data that's inaccurate.  I appreciate your

15   desire to provide accurate data, but it may be that Dr. Ross is

16   controlling for different factors.  And I am inclined to give

17   him the leeway for that, if he's requesting it.

18       So just a big-picture comment for your benefit.

19           **MR. JORDAN:**  Okay.  Thank you, Your Honor.

20       **THE COURT:**  Sure thing.

21       **DR. ROSS:**  Your Honor, might I just add one thing?

22       **THE COURT:**  Sure.

23       **DR. ROSS:**  Our -- our perception, from the prior

24   meet-and-confer, was that the witnesses and perpetrator

25   information wasn't available.  I think what we had initially

1    requested was all persons involved with the case and their

2    demographic information and the type-of-person role.

3        In my experience, most RMS systems have a person file,

4    which includes witnesses, victims, suspects, and then there's

5    demographic information available.

6        So I'm not clear, based on Mr. Jordan's response, whether

7    that information is actually not there or they weren't

8    providing it because of concerns about accuracy.

9            THE COURT:  Okay.  Go ahead, Mr. Jordan, if you know.

10           MR. JORDAN:  Yes.  There is witness profile, victim

11   profiles, just like the demographics were provided.  If the

12   witness information is there and there's demographics -- there

13   will not always be demographics, though.

14       As far as responding to that, I believe that was -- was my

15   counsel saying that it was not produced in litigation.

16           THE COURT:  Okay.  And leave aside any communications

17   you've had specifically with Counsel.

18       I -- I -- Ms. Pappy, do you wish to be heard on that?

19           MS. PAPPY:  Yeah.

20           THE COURT:  Go ahead.

21           MS. PAPPY:  On the witness piece of it, sure.

22       Witnesses have nothing to do with the claims in the case,

23   nothing.  It's who are you -- who are you stopping, who are you

24   arresting, you know, who are you questioning, not witnesses.

25   What would witnesses tell anybody in terms of the claims made

1    in the complaint?

2            THE COURT:  Understood.

3        Dr. Ross, can you explain, from your perspective, why

4    witness demographic information is relevant if you're already

5    receiving demographic information from the individuals being

6    arrested, which would seem to be the -- the relevant

7    information?

8            DR. ROSS:  It's not -- it's not just the demographics.

9    It's the number and presence of witnesses; right?

10       So like I said before, we're trying to hold as much

11   constant as we can, where we estimate a disparity between the

12   County and arresting different individuals.  And identification

13   of witnesses at the scene, identification of suspects are all

14   determinants to whether an arrest is ultimately made.

15       So it's not just the demographics.  It's the people that

16   are attached to a particular incident.

17           THE COURT:  Okay.

18           MS. PAPPY:  No.  Your Honor, it doesn't seem like it's

19   the -- the identity of the people.  It's the number of people.

20   Like, if there's more witnesses, I guess what we're going to

21   hear is, "If there's more witnesses, they're not going to get

22   arrested.  If there's less witnesses, then the Sheriff's

23   Department is going to do something inappropriate."

24       If that's the inquiry, then why isn't the data being

25   requested limited to that?

1      **THE COURT:**  I understand.

2          And, Dr. Ross, how would you respond to that so I

3   understand your position in doing your analysis?

4          **DR. ROSS:**  You know, like I said, I think we want --

5   you know, if you just took arrest rates by different

6   demographic groups and -- and compared them, it would not be,

7   you know, an analysis that would actually tell you anything

8   about disparate treatment.

9          In order to estimate disparate treatment, you have to hold

10  as much constant around the circumstances leading up to the

11  event as possible, and part of those circumstances is whether

12  there were witnesses on the scene.  And in order for us to hold

13  those things fixed and estimate disparate treatment, we need

14  information on those things.

15         I -- I would concede that, with respect to witnesses in

16  particular, I think the demographics are somewhat less of the

17  primary issue.  But we would need an identifier for how many

18  witnesses per incident there were.  With the suspects, for

19  instance, I think the demographic information is more critical.

20         **THE COURT:**  Sure.  No.  I understand.  I don't think

21  Ms. Pappy is disagreeing with you on the suspects part of it.

22         Ms. Pappy, is this information being produced to the

23  plaintiffs' counsel and Dr. Ross with an attorneys' eyes only

24  designation?

25         **MS. PAPPY:**  I don't remember.

```
 1        Mr. Swearingen?
 2            THE COURT:  Well, I'll tell you what.
 3                        (Laughter.)
 4        THE COURT:  That probably would be something that I
 5   assume you would consider if you are producing information,
 6   even if it's anonymized, and I think that's something that I'll
 7   take into account in -- in ruling on the request.
 8        Anything else we should discuss on Category Number 2?
 9            MR. SWEARINGEN:  I don't believe so, Your Honor.
10            THE COURT:  All right.  Ms. Pappy?
11            MS. PAPPY:  No, Your Honor.  No, Your Honor.
12            THE COURT:  Okay.  Let's move to Category 3, "Arrest
13   Records."
14        I see that the -- the only issue, with respect to
15   Category 3, is the badge number or unique ID number.  I am
16   going to resolve that issue in the order that I will issue
17   forthwith.
18        So are there any other disputes with respect to
19   Category Number 3?
20            MR. SWEARINGEN:  No, Your Honor.
21            THE COURT:  Ms. Pappy?
22            MS. PAPPY:  No, Your Honor.
23            THE COURT:  All right.  Now, let's go to
24   Category Number 4.
25        And for your benefit, Mr. Jordan, 4 through 8 are not
```

1    included in your -- on that same page.  They're included

2    beginning on Page 21 of the document that we were looking at

3    and then going on to Page 22, and Category Number 4 seeks use

4    of force data.

5         Dr. Ross, can you tell me why use of force data matters?

6    Because I do understand, from the defendants' brief, that use

7    of force is not referenced in the third amended complaint.  So

8    why is -- why is that data set relevant to you?

9              **DR. ROSS:**  Yeah.  In my experience, use of force is

10   highly correlated -- not always, but highly correlated -- with

11   an arrest.  And, again, you know, this goes to trying as best

12   we can to characterize differences in the circumstances that

13   lead up to a subject being arrested.

14        And this is part -- you know, resistance to police is part

15   of -- one of those things that we would want to know and hold

16   fixed when we're estimating disparate treatment in the arrest

17   decision.

18             **THE COURT:**  All right.  Leaving aside for a moment the

19   relevance of use of force data, Mr. Jordan, what information

20   does the County maintain?

21             **MR. JORDAN:**  You know, we maintain use of force data

22   through our DIS unit.  We basically have the connection to the

23   case or CAD number that it's attached to, the force used, date

24   and time, incident location, badge numbers of those

25   individuals, type of force applied, all available demographics.

1    I believe the demographics are in there on the citizens.  I

2    don't believe it's in there for the deputies.  That would be in

3    the personnel files, and -- and also went over the unique IDs

4    as well.

5         So those would be attached with the RMS report, case

6    number, as well as the CAD number as well.

7              THE COURT:  Ms. Pappy, did you want to be heard

8    with -- so that's the information that the County has that can

9    be produced in electronic format.

10        So the burden I don't see is an issue, but the relevance,

11   I understand, is something that you probably want to address.

12             MS. PAPPY:  Yes, Your Honor.

13        So as we indicated in our moving papers, and as I advised

14   Counsel in a meet-and-confer, I did a word search of the

15   250-page complaint for reference to use of force.  And it shows

16   up in seven different places, and absolutely none of them

17   relate to arrests --

18             THE COURT:  Right.

19             MS. PAPPY:  -- or disparate treatment in policing.

20   They all relate to jails.

21        This is -- this, again, seems like a fishing expedition

22   because the question isn't:  Was there use of force in an

23   arrest?  The question is:  Is there an arrest?  Are people

24   being arrested of black and Latinx background or ethnicity more

25   often than people who are not, than other racial groups,

1   transgender?

2       How is whether a use of force happened going to help

3   analyze whether that class of people is being arrested and

4   incarcerated more often?  It has nothing to do with whether

5   they were incarcerated.  It is, again -- again, a fishing

6   expedition and just a way to smear and attack the deputies,

7   especially because not every use of force -- a use of force is

8   a use of force because somebody fought arrest.

9       It doesn't mean it was a bad use of force.  It just was a

10  use of force, and either they were arrested peacefully or they

11  were not.  The point is they were arrested, and that's the only

12  thing that I've heard today as to the information that Dr. Ross

13  really needs from his analysis.

14          **THE COURT:**  Mr. Swearingen, do you wish to be heard?

15          **MR. SWEARINGEN:**  Yes, Your Honor.

16      Under Rule 401 of the Evidence Code, relevance is -- is

17  determined by whether a fact has a tendency to make another

18  fact more or less probable than it would be without the

19  evidence.

20      Mr. -- I'm sorry.  Dr. Ross has already explained that use

21  of force and resistance to arrest, information that is

22  contained in the data set, is highly correlated with whether or

23  not there are arrests.  So this information is plainly relevant

24  under 401.

25      And I would also disagree with Ms. Pappy's

1    characterization -- characterization that this is a fishing

2    expedition or we're trying to smear deputies.  Again, we're not

3    going to have any deputy's individual identities.  This isn't

4    for purposes of smearing individuals.  It's for purposes of

5    conducting Dr. Ross's analysis to determine whether or not

6    there are disproportional rates.

7            MS. PAPPY:  This, Judge, goes right back to the

8    question of the identity of the officers, the why, the -- the

9    "Who are these people who are making these decisions?"  It's

10   "What decision is being made?  Am I going to arrest this person

11   because they're black and they're Latinx, or am I not going to

12   arrest them because they are something else?"

13        That's the question.  It's not how they got to the arrest.

14   That is not a subject of this complaint.  I can see a lot of --

15   of causes of action in different claims that it might be

16   related to, but it's not related to the claim that's alleged in

17   the complaint, and that does limit what is discoverable.

18           MR. SWEARINGEN:  And if I could respond just briefly,

19   Your Honor, again, I don't think that Dr. Ross's analysis is

20   going to result in showing that particular deputies are using

21   force more than others.

22        I think that, instead, he's going to use this as a

23   variable to hold constant this particular factor of use of

24   force and/or resistance of arrest to ensure that his

25   reliance -- his analysis is more reliable.

1          **THE COURT:** Why don't we ask him.

2          **DR. ROSS:** I think that's exactly right.

3      I mean, if -- if I were to just take the arrest data set

4  and compare arrest rates of individuals across different

5  groups, I think the natural critique of that would be, you

6  know, you don't -- I mean, these circumstances are wildly

7  different about -- you know, there's crime rates that are

8  different across these groups. There's -- the incidents

9  themselves are different. The -- the response of the citizens

10  to the police officer during the incident are different.

11          And so, I mean, effectively, what this item and a number

12  of the other items subsequently are trying to do is get as much

13  information about what occurred during the event as possible so

14  we can do an apples-to-apples comparison of the decision to

15  arrest a minority individual versus a nonminority.

16          **MS. PAPPY:** Judge, I think --

17          **THE COURT:** Last one, Ms. Pappy.

18          **MS. PAPPY:** Absolutely. I hear you.

19      What about murder? I mean, what about the fact that they

20  were ultimately convicted of murder? What about -- what about

21  whether they were a pedophile?

22          What about -- I mean, there are so many things that

23  could -- that you could control for and would need a constant

24  data set that -- as to why -- what the circumstances were at

25  the time of the arrest that we could -- you know, we could

1  produce the entire communications department's files and the

2  whole Sheriff's Department about every crime.

3      Why use of force in and of itself?  That is no different

4  than any other factor that surrounds the arrests.  Their

5  complaint focus -- focuses on arrests.

6          **THE COURT:**  Okay.  All right.  Thank you, Counsel.

7      Let's continue on to Item Number 5.  I think we've

8  addressed this category, unique officer identifiers, and that

9  could be -- well, in a way that can be linked to the CAD and

10  RMS.  And I understand, from Dr. Ross, it doesn't have to be

11  ARJIS numbers or badge numbers if there's a concern that that

12  would be linked to, you know, public information requests or

13  public-facing databases.

14      That being said, what I don't know is the -- the burden --

15  if I were to order that, the burden on the County to come up

16  with a new set of unique identifiers.

17      So let me -- let me ask this:  Mr. Swearingen, do the

18  plaintiffs have any intention of utilizing an ARJIS number or a

19  badge number to seek information about any individually

20  identified officer or deputy?

21          **MR. SWEARINGEN:**  No, Your Honor.

22          **THE COURT:**  All right.  With that being said, if this

23  information -- if it is going to be produced, I will determine

24  the County how best to produce it.  And if you wish to create a

25  new set of individual identifiers for each deputy that is

1   somehow linked to the CAD data and the RMS data so that

2   Dr. Ross can use it, that's up to you.

3          But to the extent that that is -- causes a

4   disproportionate burden on the County to do that, I would

5   welcome a stipulation from the parties that the plaintiffs

6   would not engage in that sort of exploration and that the data

7   be produced as attorneys' eyes only, so long as Dr. Ross can

8   see it, so there would be some certainty that it would not

9   result in any disclosure of individual deputy names because I

10  understand that Dr. Ross doesn't need that.

11         Dr. Ross, if I said anything that is wrong or that makes

12  your life more difficult, let me know.

13         **DR. ROSS:**  No.

14         **THE COURT:**  All right.  I don't think there's anything

15  further to discuss on Category 5.

16         But, Ms. Pappy, do you wish to be heard on that one?

17         **MS. PAPPY:**  No, Your Honor.

18         **THE COURT:**  Mr. Swearingen?

19         **MR. SWEARINGEN:**  No, Your Honor.

20         **THE COURT:**  All right.  Let's, then, go to

21  Categories 6 through 8.

22         And what I would like to understand is, Number 1, why

23  this -- these categories are relevant to Dr. Ross's analysis.

24  And if they are relevant, what would be the objection to

25  utilizing a -- either the search terms proposed by Dr. Ross or

1    some subset of those search terms?  Because I'm not clear on

2    the burden to the County from this.

3        So, Mr. Swearingen, why don't I begin with -- well,

4    actually, no.

5        Mr. Jordan, my understanding is that the County does not

6    maintain this data in, you know, specific databases that can be

7    easily pulled but that you would need search terms and

8    narratives to pull it.

9        Am I correct in that understanding or not?

10           **MR. JORDAN:**  Correct.

11        So on 6, 7, and 8 -- for 6 and 7, the search-and-frisks

12    and sobriety tests, obviously, those are occurring out in the

13    field, but it would only be documented into a narrative form.

14    There's no box or check or -- or anything like that in the

15    database that we can pull.  We did search and do some more work

16    to ensure that.

17        As far as the temporary detentions on Number 8, there is

18    no way of really identifying whether -- if somebody was just

19    pulled out of a vehicle or just talked to, really.  The -- the

20    849 code that I was referencing, in a meeting I had with Ross,

21    was actually a -- not so much a temporary detention but a cite

22    and release.  So that would be an actual citation.  So that

23    would be under the arrest data anyways.

24        But as far as the search terms, a lot of the search terms

25    that were provided, we'd have to enter a singular word search

1    across all of our narratives for the years that are being

2    requested.  We'd have to take those reports back, and we'd have

3    to manually go through and read through that whole entire

4    report, ensure that that verbiage is being used in the context

5    of field sobriety tests or an actual search or frisk of an

6    individual or a vehicle, I'm guessing, in that matter.

7         And then, at that time, we'd have to take it and go,

8    "Okay.  This is" -- "this is one of the good ones," take that

9    and manually put it into a spreadsheet and do that for every

10   case for the last several years.

11        So as you can see, it would take my analysts -- I think I

12   put it in my -- my write-up.  It would take probably three to

13   five analysts several weeks to months to get through that data

14   because there is also going to be PII in there.  There's going

15   to be victim information in there, and we'd have to clean

16   through that if they wanted the actual verbiage of that

17   occurring --

18             **THE COURT:**  Let me ask you a --

19             **MR. JORDAN:**  -- if that makes sense.

20             **THE COURT:**  It does.

21        Let me ask you a question, Mr. Jordan.  Leaving aside any

22   manual review of the data that is generated from a search, I --

23   help me understand the burden to the County of utilizing these

24   search terms in the first instance to generate the initial

25   batch of data.

 1          So we've got -- and I'm going to look at Page -- Page 26

 2    of this document.  These appear to be the search terms that

 3    Dr. Ross has requested be utilized.

 4          **MR. JORDAN:**  Correct.

 5          **THE COURT:**  All right.  Are you saying that, to do

 6    this, you would have to -- you would have -- like, let's start

 7    with field sobriety tests.  You'd have to do a search for

 8    "field sobriety" and then a separate search for "FST" and a

 9    separate search for "SFST" and so forth, or could you do a --

10    utilize --

11          **MR. JORDAN:**  Like a (Inaudible)?

12          **THE COURT:**  Towards the middle, yeah.

13          **MR. JORDAN:**  Yeah.  Usually, most of the systems we

14    have, outside of our RMS system -- that function has not been

15    built to do what's -- like you're speaking to, like a Boolean

16    search --

17          **THE COURT:**  Yeah.

18          **MR. JORDAN:**  -- methodology or -- or anything like

19    that, where you can make a string together.  So we have -- we'd

20    have to enter those manually and -- and individually.  We

21    wouldn't be able to create kind of a word bank and shoot it

22    through.

23          So it would take a little bit of time.

24          **THE COURT:**  So you would have to perform a separate

25    search for each of the requested search terms?

1      **MR. JORDAN:**  Correct.

2      And then if there's duplicates, we'd have to clean out

3  those duplicates as well because if -- if something duplicates

4  in the narrative -- like, if they say "field sobriety tests"

5  and, in quotations, "FST," it's going to be picked up in both

6  those word searches.

7      So we're going to have to take that back and -- and ensure

8  that there's no duplications in the -- in the -- in what we're

9  providing.

10      **THE COURT:**  How do you deduplicate?

11      **MR. JORDAN:**  We would have to go off of probably case

12  number.  So we'd take the case number and look for the

13  duplicate case numbers and then review them either manually --

14  or if there's another way to -- to verify that these are the

15  exact same case.  And if it's in here twice, we would take that

16  out.

17      **THE COURT:**  I would like to have Mr. Swearingen and

18  Dr. Ross, I guess, either one of you, explain for me the

19  relevance of field sobriety tests, search-and-frisks, and

20  temporary detentions to Dr. Ross's analysis and then address

21  the -- the issues that I discussed with Mr. Jordan in terms of

22  the County's limitations on its ability to search and how we

23  should proceed, in your view.

24      So, Mr. Swearingen, I'll let you start, and then you can

25  turn it over to Dr. Ross whenever you wish.  Probably sooner

1    rather than later is good.

2                         (Laughter.)

3              **MR. SWEARINGEN:**  Thank you, Your Honor.

4         Just like the use of force data, each of these particular

5    events -- detentions, stop-and-frisks, field sobriety tests --

6    are highly correlated with arrests.  That's the relevance of

7    them under 401.

8              **THE COURT:**  Uh-huh.

9              **MR. SWEARINGEN:**  As to the difficulty, I think

10   Mr. Ross has extensive experience analyzing data sets from

11   hundreds of jurisdictions with this similar type of

12   information, and I think that he can explain, from his

13   experience, how to cut through the difficulty.

14             **THE COURT:**  Okay.  Thank you, Mr. Swearingen.

15        Dr. Ross?

16             **DR. ROSS:**  Thanks, Your Honor.

17        In my experience, many criminal justice agencies create --

18   you know, collect standalone data sets on these things.

19   However, I have worked with numerous agencies that do not, and

20   they cap- -- and these are captured just in the same way that

21   Mr. Jordan described, where it's captured in a text narrative

22   that the officer enters.

23        There is always a concern with producing text narratives

24   that there might be personally identifiable information.

25   There's a victim's name.  There's, you know, somebody's phone

 1    number, whatever.  And so, in the past, these type of string

 2    searches is how we've gotten around that.  In -- in my

 3    experience, this is a relatively -- if not a very easy thing to

 4    do.

 5         And the deduplicating issue that Mr. Jordan spoke about --

 6    you know, we're happy to do that on our end if we're simply

 7    provided a, you know, one/zero indicator of whether the term is

 8    present for a specific case or not.

 9         This is something, for instance, that you could do by

10    simply downloading all of the text data, opening it into an

11    Excel document, and putting in just an if-then statement, that

12    return date, one or a zero or yes or a no of whether that word

13    was in the context.

14         I think to -- you know, just to give some context on this

15    particular request, during the prior meet-and-confer with

16    Mr. Jordan, you know, he expressed concern about producing the

17    narratives because of the sensitive information that is in

18    there.

19         And this approach of the text search was something that he

20    and I had discussed during that meet-and-confer.  And at that

21    time, he seemed amenable to being able to do this in a

22    relatively quick fashion and producing this information.

23         So I think we were a bit surprised that there was then

24    pushback on fulfilling the request in this manner after that

25    meet-and-confer.

1          **THE COURT:**  Understood.

2      Ms. Pappy, do you wish to be heard on this one?

3          **MS. PAPPY:**  Yes, Your Honor.  Thank you.

4          **THE COURT:**  Please go ahead.

5          **MS. PAPPY:**  First -- yeah.

6      First of all, that meet-and-confer did not discuss search

7  terms such as what was sent, and the idea of -- of searching

8  was certainly discussed, and the County was certainly open to

9  it.  But when they tried to apply these search terms -- I'm not

10  going to repeat what Mr. Jordan said.  Mr. Jordan explained it

11  quite well.

12      You know, this information about field sobriety tests,

13  search-and-frisks, temporary detentions -- how is this

14  different than use of force?  How is this different than -- why

15  they were arrested isn't the point.  It's not what's alleged in

16  the complaint.

17      "You are arresting and incarcerating an overabundance of

18  black and Latinx citizens."  That is the claim.  The why -- the

19  stated why by the Sheriff's Department isn't important.

20      It's -- it's a field sobriety test.  They flunked it.

21  They were found to be drunk.  Well, obviously, if they got

22  arrest -- arrested, they know why they were arrested.  So why

23  does the conducting of a field sobriety test have anything to

24  do with what they're alleging in the complaint?

25      Search and frisk -- if it resulted in an arrest, it's

1  going to be -- I think it would be in the information that they

2  were provided.  But if -- if they were arrested, they're going

3  to have that information.  They probably already have that

4  information.

5      If it was a temporary detention -- sort of an oxymoron

6  because if they were temporarily detained and not arrested,

7  then it's not an arrest.  But, in fact, Mr. Jordan indicated --

8  I think he said that if a citation was issued, that would

9  actually show up in the data that was provided.

10      So I think that the proportionality issue is what is most

11  striking here, is that that -- yeah, it might be nice to have

12  this information.  The question is whether it's necessary and

13  it's proportionate to the needs of plaintiff to prove their

14  case that more people are arrested based upon a certain race

15  and ethnicity.

16          **THE COURT:**  Dr. Ross, could you -- well, go ahead,

17  Mr. Swearingen.

18          **MR. SWEARINGEN:**  It -- I was going to make three quick

19  points, the first one being this is integral to Dr. Ross's

20  statistical analysis and the same type of analysis that he

21  conducts in hundreds of other departments data, using variables

22  like these.

23      The second point is the County has expressed concern about

24  personally identifiable information.  Again, the creation of a

25  dummy one/zero or yes/no variable would obviate that.  But if,

1   for any reason -- in any of this data, if there's personally

2   identifiable information of victims or other people, we would

3   be happy to turn it back to defendants, just as we have with

4   their attorney-client privileged documents that have been

5   produced in this litigation.

6        And the third point is I think that it can be even more

7   streamlined if -- if Mr. Jordan and Dr. Ross could have a

8   conversation about the codes that are often used.  For example,

9   on Page 26, you'll see, from Number 3, "Temporary Detentions,"

10  one of the search terms is "849."  We understand that that's

11  the shorthand or the code that's often used.

12       We've asked for another conversation for Mr. Jordan and

13  Dr. Ross to -- to understand what are the common codes that

14  would hit on these search terms, and the County has denied us

15  that ability to have that conversation.

16       I think that if they just met, they would -- they would

17  very quickly get the search terms and be able to run the -- the

18  best search terms in the most efficient manner possible.

19            **THE COURT:**  Thank you, Mr. Swearingen.

20       Dr. Ross, could you please address the relevance of field

21  sobriety tests, search-and-frisk, and temporary detentions to

22  your analysis.

23            **DR. ROSS:**  You know, the way we typically -- so I --

24  look, I'm going to sort of answer this with, like, a high-level

25  statement, and then I'll get to specifics.

1          So, I mean, it's a difference -- the difference here is

2     between disparate outcomes and disparate treatment.  So like I

3     said before, if we were just to take the arrest data and look

4     at arrest rates between white non-Hispanic and Hispanic/Latino

5     individuals, that would capture differences in outcome, but it

6     would not capture differences in disparate treatment.

7          In order to estimate disparate treatment, you have to hold

8     as much constant about the incident leading up to the arrest as

9     possible.  And, you know, as defendants' counsel noted --

10    right? -- there -- obviously, there's tons more information

11    that the County holds in individual, you know -- you know,

12    records and -- and police reports, where it's just not feasible

13    for us to distill that down enough to conduct a statistical

14    analysis.

15         But what we're asking for here is really a set of

16    information that is readily available in their database in a --

17    in a parsimonious format that will allow us to control for as

18    much leading up to the arrest as we possibly can to get at that

19    desperate -- disparate impact piece, disparate treatment piece.

20         **THE COURT:**  I want to consider all the points that

21    you-all have raised on these issues, and I will issue a further

22    order.

23         What I would like to do is take a two-minute break and

24    then turn to the status conference with everyone here.  I would

25    like to excuse, with your permission, Dr. Ross and Mr. Jordan

```
 1   unless they have any interest in participating.

 2        You're welcome to, gentlemen, but you're not required to.

 3        Mr. Swearingen, anything further we should discuss on the

 4   motion to compel?

 5             MR. SWEARINGEN:  No, Your Honor.

 6        I just wanted to note briefly that Number 9, on Page 26,

 7   is the plaintiffs' request for RIPA data.  The parties agreed

 8   that plaintiffs would pursue this through a PRA request instead

 9   of discovery, as part of the negotiations.

10             THE COURT:  Right.

11             MR. SWEARINGEN:  (Inaudible) has represented that this

12   will be produced on May 9th, and I just want to mark that --

13   that date in the record.

14             THE COURT:  Okay.  Ms. Pappy?

15             MS. PAPPY:  No, I don't have any response to that.

16             THE COURT:  Dr. Ross, Mr. Jordan, thank you,

17   gentlemen.  I really do appreciate you taking an hour and a

18   half of your time to work through this with me today.  It has

19   been very helpful.

20        To all counsel, thank you for your patience.  I need to

21   get prepared for the second portion of this.  Give me about two

22   minutes, and I'll be back with you.

23             MS. PAPPY:  Thank you.

24             DR. ROSS:  Thank you.

25             MR. JORDAN:  Thank you, Your Honor.
```

```
 1                    (Recess taken.)
 2        THE COURT:  All right.  Thank you, Counsel.  I
 3   appreciate everyone's patience.
 4        Let's give Ms. -- Ms. Pappy just a minute.  We've been on
 5   since 10:00.  So she may have stepped away for a moment.
 6        All right.  Again, we're back on the record in
 7   Dunsmore versus San Diego County Sheriff's Department,
 8   20-CV-406.
 9        We have concluded the hearing on plaintiffs' motion to
10   compel further responses to RFP Numbers 250, 251, and 252, and
11   we are turning now to a status conference, with all counsel
12   present.
13        May I have appearances from counsel?  And it is fine for
14   lead counsel to identify everyone who's present on their side,
15   if you so wish.
16        So on behalf of plaintiffs, who's present?
17        MS. GRUNFELD:  Good -- good afternoon, Your Honor.
18   Gay Grunfeld for the plaintiffs.
19        I would actually ask that everyone please identify
20   themselves because I'm in Houston, and it's hard for me to see
21   all the names, if the Court would indulge that.
22        THE COURT:  No problem.
23        And for -- just so -- you probably know this already, but
24   I did grant Ms. Kaul and Ms. Coleman permission to continue
25   with their Rule 30(b)(6) deposition.  So I understand that they
```

```
 1   are not present this morning.

 2            MS. GRUNFELD:  Thank you, Your Honor.

 3            THE COURT:  Sure thing.

 4       On plaintiffs' side, you-all go ahead.

 5            MR. SWEARINGEN:  Van Swearingen for plaintiffs.

 6            MR. YOUNG:  Christopher Young, Your Honor, also for

 7   plaintiffs.

 8            MR. FISCHER:  Aaron Fischer for plaintiffs.  Good

 9   morning.

10            MR. ANDERSON:  Eric Anderson for plaintiffs.

11            MR. HOLSTON:  Ben Holston for plaintiffs.

12            MS. NEAL:  Isabella Neal for plaintiffs.

13            MR. KIEFER:  Oliver Kiefer for plaintiffs, Your Honor.

14            THE COURT:  Okay.  Thank you-all, and good morning to

15   you-all.

16            MS. PAPPY:  Good morning, Your Honor.  Elizabeth Pappy

17   appearing on behalf of defendants, and I'm pleased to introduce

18   Deann Rivard, also appearing on behalf of defendants, recent

19   addition to our firm and to our team in this case.

20            MS. RIVARD:  Good morning, Your Honor.

21            THE COURT:  Good morning.

22            MR. INMAN:  Good morning, Your Honor.  Steve Inman

23   also appearing on behalf of the County.

24            THE COURT:  All right.  Good morning to you as well.

25       Again, I appreciate everyone's patience.  We've been
```

1   working through a number of issues relating to RFPs, and I

2   wanted to make sure we had time to complete that because we had

3   Dr. Ross and Mr. Jordan on with us.

4       So with that being said, I would like to understand, from

5   the parties' perspective, how the weekly meet-and-confers are

6   going.  Are they productive?

7       I will note that I -- I do have multiple discovery issues

8   that are pending before me, and I'm not prejudging that the

9   fact that there are a number of discovery disputes means that

10  the meet-and-confers are not working.  Perhaps that's just the

11  nature of the case.

12      But it is something that has come to my attention, and I

13  do want to understand whether there are improvements that we

14  can make together as the case moves forward.

15      So I'd like to hear from plaintiffs' counsel first.

16      **MS. GRUNFELD:**  Thank you, Your Honor.

17      We highlighted this a little bit earlier this week, and we

18  discussed it at the Wednesday meet-and-confer (Inaudible)

19  Pappy, and I think both sides agree that this process that the

20  Court has agreed -- has created has been very helpful, and it

21  has made interactions smoother.

22      It has cut down on the number of emails, and we would like

23  to continue this -- this weekly process.  It does add some time

24  to the week, but it's well-spent, and we are -- we are abiding

25  by all of the strictures.  We send the agenda, we meet at a

 1  regular time, we send notes, and then it starts again.

 2      So despite the existence of the ongoing issues that the

 3  Court is addressing, I believe, from the plaintiffs'

 4  perspective, we (Inaudible) the process.  We think it is

 5  improvement.

 6      The only suggestion I have -- and I've discussed this with

 7  co-counsel -- would be if we could allow, on occasion, some

 8  submission of written communications to the Court.  We want to

 9  have the clearest and most accurate records of what is

10  discussed, and we're trying hard to do that.

11      And there are some times, as happened earlier this week,

12  where there seemed to be something of a disconnect between the

13  parties.  And I think, in some situations, that might be

14  addressed through writings that the Court might want to see.

15      As we are currently operating, the Court has ordered us

16  not to present any email communications or -- and I'm not sure

17  about letters, but I know emails are not allowed to be

18  submitted with our pleadings.

19      So that's the only thing I -- I could think of to change.

20  Otherwise, we would like to proceed with this for the next

21  several weeks.

22          **THE COURT:**  So what exactly are you proposing,

23  Ms. Grunfeld?  Because I thought you were telling me you wanted

24  to submit more things about informal disputes, but it sounds

25  like maybe you're saying you want to attach emails back and

```
 1    forth to pleadings.

 2         What exactly are you requesting?

 3              MS. GRUNFELD:  The latter, Your Honor.

 4              THE COURT:  All right.  Let me ask you this,

 5    Ms. Pappy:  Is that going to be helpful to my resolution of any

 6    issues that come up?

 7              MS. PAPPY:  No.

 8         I wholeheartedly agree with Counsel that the

 9    meet-and-confers have been helpful.  You know, a bunch of us

10    have all gone on vacations on both sides of the case.  So we

11    were a little -- sputtering along for -- for the last, I would

12    say, three weeks.  But I have found them to be very helpful.

13    It significantly cuts down on the communications.

14         I -- I just -- I don't want to change anything because

15    it's all working.  And I think, once you get into that

16    back-and-forth about he said/she said, it doesn't -- it diverts

17    from -- if we have an issue, we have to resolve it.

18         But I will -- I will -- I don't normally do this, but I

19    will sort of support the plaintiffs -- I think the things that

20    have been coming to -- in IDCs are things that we really have

21    tried to resolve but that we need court assistance on it,

22    and -- and so I -- like I said, I would normally take every

23    chance I could to argue about what they're doing.

24         But I -- I agree that we've tried.  We have the additional

25    depositions.  We have the sheriff's deposition.  Of course,
```

 1    that's not something, I mean, logically, that I can ever agree

 2    to.

 3        But -- but I hope you don't take the number of IDCs --

 4    because I think there's only been two that have come through --

 5    maybe the NaphCare one is confusing you that there's more

 6    discord between us than there really is, but -- but I think the

 7    process is going very well.

 8        And I don't -- I don't take any real issue with the IDCs

 9    because -- because we've -- we've done, I think, what you've

10    asked us to do.

11        **THE COURT:**  No.  And as I mentioned earlier, I'm not

12    prejudging that.

13        I trust that you're bringing to me issues that you truly

14    cannot resolve on your own.  And I fully anticipate that if I

15    were to look at one of your agendas, there would be multiple

16    issues that you were able to resolve on your own, and you're

17    only bringing me what you can't.  So I don't have a problem

18    with that.

19        I guess what I was trying to do, for the benefit of

20    everyone, considering the comments that were made at the

21    hearing -- I think it was back on around February 6th or so --

22    was that there were too many emails flying around and too much

23    stuff going -- coming to you, Ms. Pappy, from all directions

24    and vice versa, too.

25        And the idea was to cut down on the number of emails and

1    have an agenda and some notes, you know, a summary of the

2    meeting, and have it recorded via Zoom.

3        And the idea was that would benefit the parties, and it

4    would actually benefit me as well, if there is a discovery

5    dispute that I could resolve, an agenda -- or look at the

6    agenda and look at the notes, because, frankly, reading through

7    20 or 30 emails back and forth and trying to figure out email

8    strings is a big -- it consumes a lot of time.

9        And I, you know, have had pleadings in this case where

10   there are, you know -- you know, just a lot of emails attached,

11   and trying to dig through them isn't usually helpful to me.

12       So, Ms. Grunfeld, what -- what would be the downside with

13   just submitting to me the notes from the meeting about where

14   you've agreed to disagree on certain things, if you feel like

15   you need to attach something to your -- your motions?

16       I mean, have you felt that your -- the motions you've been

17   authorized to file have been incomplete without all of your

18   emails back and forth?

19           **MS. GRUNFELD:**  No, Your Honor.  I'm just trying to get

20   to the bottom of how there was such a disconnect last Tuesday

21   between my understanding of what had been produced and --

22           **THE COURT:**  Uh-huh.

23           **MS. GRUNFELD:**  -- Counsel's understanding.

24       And I'm trying to -- perhaps that would be the solution,

25   to write more in the notes, and perhaps those could be attached

1    to any IDC email because the IDC -- we only get one sentence,

2    and sometimes it's a little tricky to write that one sentence.

3        But that's -- that's really what's -- what's at issue here

4    for me.

5            **THE COURT:**  No.  I understand that, and -- look,

6    you're right.  I want to avoid situations where you're coming

7    before me and it becomes apparent, during our discovery

8    conference, that there has been a miscommunication.  It's no

9    good for you-all, and it's -- I mean, selfishly, it's not great

10   for me, either.

11       So with that being said, I do think that -- I mean, that

12   was the intent of the -- the notes from the call that you

13   passed back and forth, "Here's what we agreed on.  Here's what

14   we didn't agree on," and -- and that then takes the place of an

15   email barrage.

16       I mean, that -- that was the idea, and I don't have a

17   problem -- if there is going to be an IDC, and you-all have --

18   want to send me the notes reflecting that issue, that's okay.

19   I -- the idea behind my requirement the parties send me an

20   email initially is -- obviously applies to every case, and I

21   want to make sure that I just get a -- I don't get two pages of

22   argument about why someone's a terrible person or whatever.

23       So with that being said, I don't think that's what you-all

24   are talking about.  And, Ms. Grunfeld, I don't have a problem

25   with you or Ms. Pappy sending me the -- the notes in

1   preparation for a discovery conference if you think, in your

2   judgment, it would be helpful.

3       Again, I'm relying on you-all, as professionals, to -- to

4   give me what I need to help you resolve your disputes, if I

5   can.  So I would much prefer that to emails, but please don't

6   send me a discovery conference request and attach 14 agendas,

7   either.  That's not going to help me work through your -- your

8   issues.

9       So with that being said, do you think that would help us

10  resolve any further issues that come up in the case,

11  Ms. Grunfeld?

12          **MS. GRUNFELD:**  Yes, Your Honor.

13          **THE COURT:**  What do you think, Ms. Pappy?

14          **MS. PAPPY:**  No, Your Honor.  I don't think the notes

15  are necessary.  I don't care.

16      If you want to attach them, that's fine, but I don't think

17  they're going to help.

18          **THE COURT:**  I'm not going to preclude -- I'm not going

19  to preclude Ms. Grunfeld from attaching the notes, if she

20  wishes to.  They may or may not be helpful to me.  I will

21  decide it on a case-by-case basis, but I do -- look, I do take

22  to heart the fact that the weekly meet-and-confers have been

23  productive from Ms. Grunfeld's perspective and from Ms. Pappy's

24  perspective.

25      Mr. Fischer, what do you think?  I'm going to pick on the

```
 1    people I addressed back in February.

 2         So, Mr. Young, you're next.

 3                        (Laughter.)

 4         MR. FISCHER:  Well, I always appreciate being put on

 5    the spot.

 6         THE COURT:  Yeah.

 7         MR. FISCHER:  I'm a little more prepared this time,

 8    echoing that I've sat on nearly all of those meetings,

 9    contributing on the issues that I'm -- that I'm most tied to in

10    the case.

11         I think they're -- they are helpful.  They have both cut

12    down on the issues that have gone to IDC and, I think, sharpen

13    the ones that go to IDC in a good way, made it more clear

14    that -- just to -- I think it's resolved.  But just to echo

15    what Ms. Grunfeld said, the challenge -- the challenge in those

16    meetings sometimes is because of the vacations.

17         In summertime, there tends to be more vacations, which

18    everybody should take.  But sometimes, in those meetings,

19    the -- a conversation or emails with somebody else aren't --

20    the person on one side or the other -- and it goes both ways --

21    aren't present.

22         So I think of the -- Ms. Grunfeld's request more as an

23    organizational thing that just says -- not the back-and-forth

24    but, "Here's the status of these" -- "of these three things

25    that" -- "agreement on production.  County said they would not
```

1    produce this one.  County said they'll produce this one by this

2    date, this and not that," and then you have just that

3    back-and-forth.

4         And, organizationally, I think that's useful for the

5    parties and, in the rarer case where it needs to go to the

6    Court, for the Court to see that.  So that's my impression of

7    the -- the helpfulness of having that as an available option.

8    I think it -- I think it keeps us more focused and organized,

9    most of all.

10        Otherwise, I do think that the weekly meetings are going

11   fairly well.  The discovery is very busy in the case, as you're

12   aware.  And everyone has really, I think, tried to pull it

13   across the finish line together.

14        **THE COURT:**  Well, with that being said, I -- to the

15   extent that there is a -- a real benefit to me seeing a

16   confirming email, like, I don't want to say, you know, you

17   are -- you are banned from ever submitting it.

18        Just please use your discretion in doing so to really help

19   me focus on what matters and not wade through a back-and-forth,

20   you know, in an email exchange, which is not going to help me

21   assist you-all in resolving your disputes.

22        So, Mr. Young, what are your thoughts, sir?

23        **MR. YOUNG:**  Thank you, Your Honor.

24        It's only been four years since the pandemic started.  So

25   you'd think I'd be quicker on the unmute button --

```
 1                         (Laughter.)

 2           MR. YOUNG:  -- but here we are.

 3      I agree, Your Honor.  The conferences, from my

 4  perspective, have been very helpful.  I've participated in all

 5  or, I think, almost all of them.  They've all been very

 6  productive.  They've been almost entirely cordial.  Counsel

 7  have been cooperating both during the calls as well as -- you

 8  know, as to the logistics and the agendas and the notes and --

 9  and that sort of thing.

10      And, you know, to Your Honor's point -- and this has been

11  already mentioned by Counsel -- many issues have been resolved.

12  I mean, as I think back, perhaps a couple more could have been

13  resolved, but I don't know.  I think the parties are doing real

14  well.

15      I'd say -- you know, when I say "a few," I mean a few.  I

16  think there haven't been really any IDCs, that I can think of,

17  that have been anything that I've thought, "Well, gee, we could

18  have worked harder at this."

19      Certainly, there has been less email traffic and, you

20  know -- but, for very few exceptions, I think the -- the

21  temperature of the email exchanges and the letters has been

22  much lower and the tone, you know, far more constructive.  And

23  everyone's working together, certainly, way more than before

24  the weekly calls started.

25      So I certainly favor the calls remaining on calendar for
```

1  the time being.  If, you know, there's nothing to discuss in

2  some future call -- and we all touched on this on Wednesday,

3  actually, in our -- in our call.  You know, if a call is on

4  calendar and there's nothing to discuss, as with any regularly

5  scheduled call on all of our calendars, they can be skipped, or

6  they can just be very brief, and we can touch base.

7      Final note for me:  I think attaching the IDC -- or I'm

8  sorry.  Attaching the notes from the calls or the occasional --

9  occasional specific email, if someone thinks it necessary,

10  makes sense.  You know, I will say, if nothing else, the -- the

11  one-sentence limit in the IDCs has led to some creative

12  sentence structuring but --

13      THE COURT:  It's been impressive, the use of

14  semicolons.

15      MR. YOUNG:  It's -- it's -- my high school English

16  teacher would have a fit, in any event.

17      THE COURT:  All right.  Well, look, fair enough.  And

18  I trust you-all to give me what you think I truly need, and

19  I'll leave it at that.  And if we need to address it further,

20  you know, we can, but I think we are on the same page.

21      Look, I'm glad to hear that the weekly conferences are

22  productive.  I realize that you are extraordinarily busy with

23  discovery and that there are a number of deadlines that you

24  are -- are handling and that there are a number of things that

25  are happening on any given day in this case, given its scope,

 1   and I really do appreciate you-all taking the time to be here

 2   this morning.

 3         It is important, I think, for me to continue checking in

 4   with you-all and for people to raise, you know, any issues with

 5   respect to the order that I issued requiring these weekly

 6   conferences.  And if there's a way to make them better, to

 7   Ms. Grunfeld's suggestion about being able to submit the notes

 8   or an email, if necessary, then fair enough.

 9         I want to be respectful of everyone's time, but I also

10   want you-all to be able to litigate this case in a zealous and

11   professional manner, and I'm really glad that that is happening

12   for now.

13         So I will -- I agree with you-all that we should continue

14   with the weekly meet-and-confers, the weekly calls, as set

15   forth in my order.  I'm not going to make any changes to it

16   other than to note, again, that if anybody believes that I need

17   to see the notes of a weekly meeting, you can submit that; or

18   if I need to see a specific email, then you can send that to

19   me, and I will trust you on that.

20         While I've got you-all here, I would like to set a further

21   time for all of us to speak in this larger group.  What I would

22   suggest is Wednesday, May 29th, at 1:00 p.m.

23         Let me just ask Ms. Grunfeld and Ms. Pappy, for starters:

24   How does that look for you both?

25         **MS. PAPPY:**  Fine, Your Honor.

1          **MS. GRUNFELD:**  Yes, Your Honor.

2          **THE COURT:**  All right.  Obviously, if anyone is going

3   to be out of town on vacation or if there is a deposition that

4   is ongoing, I want you-all to move forward with the discovery

5   and to, you know, enjoy your personal lives.  I agree with

6   Mr. Fischer.  That stuff is important.

7      So just let me know in advance if someone is unable to

8   attend.  You can file a very quick joint motion, and I will

9   look favorably upon it, given what you've been able to

10  accomplish.

11     So I'll see this larger group on May 29th at 1:00 p.m.

12  And I know we've got some other dates on calendar as well, and

13  I'll look forward to continue working with you-all.

14     Anything further we should discuss, Ms. Grunfeld?

15          **MS. GRUNFELD:**  No, Your Honor, and thank you very

16  much.

17          **THE COURT:**  Sure thing.

18     Ms. Pappy, how about you, ma'am?

19          **MS. PAPPY:**  No, Your Honor.  Thank you.

20          **THE COURT:**  And -- open forum.  Anybody else?

21                       (Laughter.)

22          **THE COURT:**  All right.

23          **MR. YOUNG:**  Thank you, Judge.

24  Thank you, everybody.

25          **MR. FISCHER:**  Thank you, Your Honor.

1          **THE COURT:**  Have a good weekend, everyone.  Take care.

2          **MS. PAPPY:**  Thank you, Your Honor.  Take care.

3                    (Proceedings adjourned.)

1

2

3              **CERTIFICATE OF TRANSCRIBER**

4        I certify that the foregoing is a true and correct

5  transcript, to the best of my ability, of the above pages of

6  the official electronic sound recording provided to me by the

7  U.S. District Court, Southern District of California, of the

8  proceedings taken on the date and time previously stated in the

9  above matter.

10       I further certify that I am neither counsel for,

11  related to, nor employed by any of the parties to the action in

12  which this hearing was taken, and further that I am not

13  financially nor otherwise interested in the outcome of the

14  action.

15

16  DATE:  Monday, May 6, 2024

17

18

19

20       _____/S/ James C. Pence-Aviles_____

21       James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                   U.S. Court Reporter
22

23

24

25