Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA 92101-8474
Tel: 619.814.5800 Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
Tel: 408.606.6300 Fax: 408.606.6333

Deann R. Rivard (SBN 177482)
E-mail: drivard@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, Ste. 2400
Los Angeles, CA 90071-2953
Tel: 213.236.0600 Fax: 213.236.2700

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and SAN
DIEGO COUNTY PROBATION DEPARTMENT

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DEFENDANTS' AMENDED COURT ORDERED STATUS REPORT PER DKT. 620**<br><br>District Judge Anthony J. Battaglia<br><br>Magistrate Judge David D. Leshner |

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

1

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' AMENDED COURT ORDERED
STATUS REPORT PER DKT. 620

Defendants San Diego County Sheriff's Department, County of San Diego, San Diego County Probation Department provide the following Status Report to the Court pursuant to this Court's Order re: Plaintiffs' Objections to Defendants' ADA Plan, Dkt. 620:

**A.     Updating Policy and Training Staff.**

New ADA policies went into effect on May 30th, 2024, and training bulletins were distributed May 31st, 2024. In addition to the May 31st training bulletins, training will take place on an ongoing basis.

**B.     Physical Plant Changes and Interim Accommodation Plan.**

**1.     Toileting Area Dimensions.**

The available physical space for one toileting area in 8D is ¼ inch short of 60 inches (59.75").  The shower in the same area is part of the December 23, 2024 completion date remodel which will address the ¼ inch issue with regard to the toileting area. Plaintiffs contend that construction work should be undertaken now that would have to be demolished as part of the December 23, 2024 completion date remodel to provide the additional ¼ inch.  A diagram of the area is attached hereto as Exhibit A.

**2.     Feasible Restriction.**

The objectionable language ("feasible" and "available") was removed from the policy on Effective Communications.  A copy of the current policy is attached hereto as Exhibit B.

**3.     Extended Period of Time Remedial Measures/Remedial Measures.**

Any Incarcerated Person person with a mobility disability using a wheelchair in a housing module/fulltime (as opposed to intermittent use referring to individuals who only need wheelchairs for transportation long distances and do not use them in housing modules) are assigned single or bottom bunk of a double bunk bed on the lower tier of two story modules.  Individuals designated by medical staff as being

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' AMENDED COURT ORDERED
STATUS REPORT PER DKT. 620

intermittent wheelchair users are assigned a single bed or lower bunk of a double bunk bed on the lower or upper tier.  A copy of the housing policy is attached hereto as Exhibit C.

### 4.  Mobility Disability Housing Statistics

Attached hereto as Exhibit D are statistics on the median number of incarcerated non-wheelchair persons with mobility disabilities and the accessible beds identified in the ADA Plan at Page 15:6-24 will be available by  December 23, 2024.

### 5.  Intermittent Wheelchair Assignment to Lower Bunks/Single Bed.

Defendants have implemented a policy reflecting the assignment of both fulltime and intermittent wheelchair users to single or lower bunk beds in double bunks only. See Exhibit C hereto.

### 6.  Plans and Specification.

The parties are meeting on June 3rd, 2024 at 9:00 a.m. for a full day Settlement Conference with Magistrate Judge David Leschner to meet and confer with party representatives, counsel and each side's experts regarding the specific alterations underway pursuant to the ADA Plan.  Plaintiffs have been provided the architectural plans, and two drawings specific to toileting measurements in 8C and 8D, one of which is attached hereto as Exhibit A.

### C.  Sign Language Interpretation

#### 1.  WiFi Availability for Video Services/Sign Language Services

The Effective Communication policy was amended and is attached hereto as Exhibit A. The ADA Plan will be amended in accordance with this Order.

Each housing module at every facility has a Video Kiosk which can be enabled to provide "Purple" (VRS system or Video relay system) or closed caption phone service. Purple is enabled for persons identified by medical as needing sign language services. Sworn staff with phones have access to Lionbridge which can be used to

communicate with hearing impaired persons. Tablets with the VRI (Video Remote Interpreting) are also available at all facilities. Where there is a required need for a tablet, if Wi-Fi is not available the Defendants staff provide a temporary wireless access point. If a temporary wireless access point cannot be set up, the Incarcerated Person is transferred to alternate housing at the same or different facility in accordance with their classification and any other needs (ADA or otherwise).

### 2. Sign Language formats and languages.

Defendants have one certified deaf interpreter available and is searching for an additional provider with more than one to increase capacity. Defendants are investigating online foreign language interpretation services but have not received any specific information from Plaintiffs to assist in the search. Defendants will continue to meet and confer to see what other languages are being requested and are available.

### 3. Tracking.

Tracking is already taking place as set forth in the policy. See Exhibit B.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' AMENDED COURT ORDERED
STATUS REPORT PER DKT. 620

### D.    The New Policies Attached to the ADA Plan

The ADA Plan will be so revised. The Phone draft policy and Effective Communication draft policy were provided to Plaintiffs on March 8, 2024, prior to issuance of the Court's April 22, 2024 Order pursuant to ongoing settlement negotiations about the entire Fifth Cause of Action (ADA). New drafts of the Effective Communication and Housing and Evacuation plans were provided on May 1, 2024, Plaintiffs' comments were received and Defendants' expert (highly regarded by Plaintiffs' counsel) approved the final versions attached hereto as Exhibits B and E.

Dated:  May 31, 2024                    BURKE, WILLIAMS & SORENSEN, LLP


                                        By:   *s/ Susan E. Coleman*
                                        _____
                                             Susan E. Coleman
                                             Elizabeth M. Pappy
                                             Deann R. Rivard

                                        Attorneys for Defendants,
                                        COUNTY OF SAN DIEGO, SAN DIEGO
                                        COUNTY SHERIFF'S DEPARTMENT
                                        and SAN DIEGO COUNTY PROBATION
                                        DEPARTMENT

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

5

Case No. 3:20-cv-00406-AJB-DDL
DEFENDANTS' AMENDED COURT ORDERED
STATUS REPORT PER DKT. 620

# EXHIBIT A



78"

58"

45"

59.75"

F.D.

D Module
8402

This privacy partition
to be relocated
during shower
remodel before the
end of the year for
60"+

# EXHIBIT B

San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures

| | |
|---|---|
| **DATE:** | MAY 29, 2024 |
| **NUMBER:** | P.11 |
| **SUBJECT:** | EFFECTIVE COMMUNICATION |
| **RELATED SECTIONS:** | M.39, P.2 |
| **IN COMPLIANCE WITH:** | AMERICANS WITH DISABILITIES ACT OF 1990 |

PURPOSE

The San Diego Sheriff's Department has an obligation to provide all incarcerated persons equal access to programs, services and activities, as required by state and federal law, including the Americans with Disability Act (ADA). To ensure that communications with incarcerated persons with communication-related disabilities are as effective as reasonably possible, as communications with incarcerated persons without disabilities.

POLICY

Staff shall take appropriate steps, in accordance with this policy, to communicate effectively with people who have communication disabilities. Incarcerated persons shall not be subjected to discrimination based on their disability or be excluded from participation in or denied the benefits of services, programs, and activities for which they are otherwise qualified.

Effective communication is the responsibility of all staff working within the detention facilities when interacting with the incarcerated population. Staff shall provide reasonable accommodations, including auxiliary aids and services, when needed for effective communication to ensure that incarcerated persons with disabilities can participate as equally and fully as possible in jail programs, services, and activities for which they are otherwise qualified. Staff shall use the incarcerated person's documented preferred method of communication for all due process events, health care encounters, and structured programming, unless the preferred method would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

DEFINITIONS

REASONABLE ACCOMMODATION – Any modification or adjustment that is effective in enabling a qualified individual with a disability to participate in or benefit from a program, service, or activity. An accommodation is not reasonable if it would require a fundamental alteration of the nature of the Department's service, program, or activity, or result in an undue financial and administrative burden to the Department.

EFFECTIVE COMMUNICATION – A means of communication that is as clear and understandable to the individual with a disability as reasonably possible. The purpose of effective communication is to ensure that persons can communicate with, receive information from, and convey information to, the public entity/employee. This rule applies regardless of the format of the communication (e.g., written, spoken, electronic, etc.).

COMMUNICATION DISABILITY – Communication-related disabilities are disabilities that impact a person's ability to receive, process, or convey information to another person, including but not limited to, vision, hearing, speech, learning, or cognitive disabilities. Note: For vision related impairments, if the

individual has no substantial limitation to a major life activity while wearing "ordinary eyeglasses or contact lenses", and the individual is in possession of such lenses, then the individual's vision impairment is not a disability for the purpose of this policy.

AUXILIARY AIDS AND SERVICES – Communication tools or assistance used to communicate with people who have communication-related disabilities.  For examples of commonly used auxiliary aids and services, refer to Table 1 – *Commonly Used Auxiliary Aids and Services for Effective Communication.*  The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication preferred by the incarcerated person; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.

QUALIFIED INTERPRETER – An interpreter who, via in-person or remote service, can interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary.

DUE PROCESS – As defined for this policy section, "due process" refers to requirements for judicial, non-judicial, and administrative proceedings that protect an incarcerated person's life, liberty, or property interests. This includes, but is not limited to, notices of new charges, notice to appear, booking, discipline, grievance, classification, investigative, probation, and release processes.

HEALTH CARE ENCOUNTER – An interaction between a patient and health staff (to include medical, mental health, dental, and vision care) that involves an assessment, examination, treatment, counseling, and/or exchange of protected health information. This includes, but is not limited to, health screenings, sick calls, informed consent or refusal of health care, explanation of medication, treatment, or discharge instructions. This is also known as a clinical encounter.

STRUCTURED PROGRAMMING – Refers to in-custody and reentry programs and services that are managed by the Sheriff's Department Reentry Services Division (RSD) (e.g., education, self-help, AA/NA, vocational, work positions, or religious programs, services, or activities).  This includes communications between incarcerated workers and their supervisors that is outside the general day to day communication (e.g., training, performance evaluations, discipline).

**TABLE 1.**
***Commonly Used Auxiliary Aids and Services for Effective Communication***

| Hearing | Seeing | Understanding/Processing |
|---|---|---|
| • Hearing aid or cochlear implant<br>• Exchange of written notes<br>• Communication boards (pictures)<br>• Speaking louder<br>• In-person sign language interpreting (SLI)<br>• Video Remote Interpreting (VRI)<br>• Real-time Typed Text (e.g., UbiDuo)<br>• Closed Captioning (CC)<br>• Communication Access Realtime Translation (CART) captioning<br>• Lip reading<br>• Sound amplification device | • Optical readers<br>• Reading documents aloud<br>• Audio recordings<br>• Braille materials<br>• Large print materials (18 pt sans-serif font min.)<br>• Screen reading software<br>• Magnifier | • Simple language<br>• Slow speech<br>• One instruction at a time<br>• Provide instructions in writing<br>• Communication boards (pictures)<br>• Repeat instructions<br>• Extra time to orient to new procedures and understand new materials |

| Speaking | Reading | Writing |
|---|---|---|
| • Speech Generating Devices<br>• Communication boards (pictures)<br>• Qualified interpreters | • Reading documents aloud<br>• Qualified interpreter | • Scribes<br>• Voice to Text software |

<u>PROCEDURE</u>

I.    IDENTIFICATION OF COMMUNICATION-RELATED ACCOMMODATIONS

    A.    The identification of an incarcerated person who needs communication-related accommodations will generally occur during the receiving screening process of intake. However, the identification of communication-related needs and accommodations can occur at any time during an individual's incarceration.

        1.    All incarcerated persons shall be screened by a Registered Nurse (RN) during the intake medical screening process to identify disabilities and needed accommodations.

        2.    For any incarcerated person identified as having a disability that impacts their ability to communicate, the nurse will ask the incarcerated person for their preferred method of communication. The nurse will document any identified disability and preferred method of communication in the incarcerated person's medical record and communicate in that method, as necessary unless the preferred method would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

        3.    Any incarcerated person identified as having a disability that requires an accommodation will be sent to second stage medical to complete an ADA Functional Performance assessment.  The second stage RN shall document identified disabilities and needed accommodations in the incarcerated person's medical record and schedule the incarcerated person for a sick call with the medical provider within 3 days.

        If an incarcerated person bypasses second stage medical, the ADA Unit RN, or their designee, shall conduct an ADA Functional Performance assessment and complete appropriate documentation and scheduling.

        4.    Any incarcerated person who is identified as having a cognitive, mental health, or learning disability will be seen by a Qualified Mental Health Professional (QMHP) for an additional assessment that focuses on identifying needs related to cognitive, mental health, and learning disabilities. The QMHP shall document identified cognitive, mental health, or learning disabilities and necessary accommodations in the incarcerated person's medical record and schedule the incarcerated person for follow-up as appropriate.

        5.    All active accommodation Medical Instructions documented in an incarcerated person's medical records will populate in their Jail Information Management System (JIMS) record under Medical Instructions.  The ADA instructions and

specific accommodations are made available to sworn personnel via external reports.

B.   The Jail Population Management Unit (JPMU) Classification deputy that conducts the Classification Interview after the intake medical screening process also asks accommodation screening questions.

   1.   Incarcerated persons with disabilities will be housed or held at a facility that allows access to their reasonable accommodations.

   2.   If at any point during an individual's incarceration a staff member identifies that the person's housing or holding area does not meet physical accessibility and program access requirements consistent with their disability needs, staff shall confer with health staff and JPMU to identify the appropriate housing or holding area.

C.   If at any point during an individual's incarceration a staff member identifies that an incarcerated person has an effective communication need that is not identified in their JIMS Medical Instructions, the incarcerated person shall be immediately referred to health staff for assessment, which shall take place within 72 hours and sooner based on the urgency of the circumstances.

   1.   The incarcerated person will be assessed by health staff in accordance with the assessment process identified above.

   2.   The staff member who identified the effective communication need and routed the incarcerated person to health staff should document the incident in their appropriate records management system (e.g., JIMS, Offender360, or TechCare). Sworn staff should document the incident in an Incident Report within JIMS with the primary incident type code: "ISR, Inmate Status Report".

   3.   Health staff shall notify JPMU if the incarcerated person has added JIMS Medical Instructions that impact their housing or holding needs.

D.   Incarcerated persons with documented communication-related JIMS Medical Instructions will be offered an optional safety vest that identifies their effective communication needs.

   1.   Participation is voluntary.  The vest can be worn at the discretion of the incarcerated person.

   2.   If safety or security issues arise due to the use of the optional safety vest, staff shall document the incident as appropriate and notify the ADA Unit.

   3.   Incarcerated persons who misuse or damage/destroy vests are subject to disciplinary action.

## II.    PROVIDING COMMUNICATION-RELATED ACCOMMODATIONS

A.    Incarcerated persons with documented effective communication-related JIMS Medical Instructions shall be provided reasonable accommodations, as applicable, to ensure equal opportunities to participate in and benefit from services, programs, and activities for which they are otherwise qualified.

B.    At the beginning of each shift, staff assigned to each incarcerated person area shall review the ADA List included in the JIMS Web Floor Count (Updated) report, for the areas in which they are assigned to work.  The ADA List details notes for identified accommodations.

Staff shall familiarize themselves with incarcerated persons in their assigned areas that require accommodations for effective communication.

C.    Staff conducting business with incarcerated persons shall review the ADA List (or the unit equivalent list containing ADA information) to identify if the incarcerated person(s) whom they are conducting business with requires communication-related accommodations for effective communication.

D.    When an auxiliary aid or service is needed to provide effective communication in accordance with this policy, staff shall provide access to or furnish the auxiliary aid or service in a timely manner, subject to safety and security requirements, and in such a way as to protect the privacy and independence of the incarcerated person with a disability, unless the preferred method would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

It is important to properly assess the necessary communication, context of communication, and preferred method of communication of the individual with the disability, when furnishing auxiliary aids and services.

E.    During scheduled dayroom hours, incarcerated persons with communication-related disabilities shall be provided an equal opportunity to participate in and benefit from programs, services, and activities available to other incarcerated persons without disabilities for which they are otherwise qualified (e.g., telephone, television, reading material, etc.).

F.    Generally, the incarcerated person's preferred method of communication and the auxiliary aid or service requested by the incarcerated person should be honored.  Circumstances that remove the need to communicate in the incarcerated person's preferred method include:

1.    If the incarcerated person's preferred method of communication would result in a fundamental alteration of the nature of the service, program, or activity.

2.    If the incarcerated person's preferred method of communication would result in an undue financial or administrative burden to the Department.

3.  In emergency situations involving an imminent threat to the safety or welfare of any person.  Staff shall not be prohibited from performing their emergency response duties or be restricted in use of auxiliary aids and services that reasonably appear effective under the circumstances.

4.  If there is a safety and security concern with the preferred method and another equally effective means of communication is available.  Equally effective means that it would allow the person to participate in the activity, program, or service as well as the requested accommodation would have.

5.  Incidental contacts in areas where communication is not substantial, and an equally effective means is utilized.

III.  EFFECTIVE COMMUNICATION FOR DUE PROCESS EVENTS, HEALTH CARE ENCOUNTERS, AND STRUCTURED PROGRAMMING

A.  Staff shall communicate with incarcerated persons with communication-related disabilities using their preferred means of communication for all due process events, health care encounters, and structured programming, unless the preferred method would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

B.  Reading assistance shall be provided by staff for all visually presented information (e.g., forms, reports, documents, etc.) in cases where the incarcerated person requires such accommodation to understand written materials.

C.  Scribes or writing assistance shall be provided by staff to complete necessary forms or written complaints, grievances, etc. in cases where the incarcerated person requires such accommodation to access such jail procedures.

D.  Qualified interpreters are required for exchanges of information during due process events, health care encounters, and structured programming with incarcerated persons whose preferred method of communication is sign language.

1.  Each facility shall have access to Video Remote Interpreting (VRI) services which provides qualified interpreters for sign language.

a.  VRI services may be used to provide sign language interpretation unless the incarcerated person's JIMS accommodations state that in-person interpretation is required, or VRI does not operate properly.

b.  If staff determine VRI services are insufficient for the needs of the specific incarcerated person, staff shall provide an in-person sign language interpreter, unless the preferred method would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

2.  Each facility shall have access to in-person sign language interpretation services that provide a qualified in-person interpreter.

      a.    For non-emergency sign language interpreting services, please refer to the list of currently approved language contracts at: https://sdcountycagov.sharepoint.com/sites/InSite/fg3/pc/countywide/Pages/language.aspx

      b.    For emergency in-person sign language interpreting services, call (619) 398-2488.

      c.    For emergency in-person sign language interpreting services during the weekend, call (619) 398-2488. When prompted, press "5".

E.    All use of auxiliary aid devices (e.g., VRI or UbiDuo) or contracted services (e.g., in-person qualified sign language interpreter) for effective communication for due process events, health care encounters, and structured programming shall be documented by staff in their appropriate records management system (e.g., JIMS, Offender360, or TechCare). Staff utilizing JIMS shall document the use in the incarcerated person's "Inmate History" under "Event Type" as ADAE – "Effective Communication". All entries should notate the following:

    1.    The auxiliary aid or service utilized (e.g., sign language interpreter via VRI, UbiDuo, etc.);

    2.    How communication was determined to be effective, or if effectiveness could not be validated (e.g., "Incarcerated person responded to questions"; or "Incarcerated person was unable to convey or receive information due to their cognitive state"); and

    3.    Any associated case report, incident, or grievance numbers.

F.    If an incarcerated person refuses or waives use of their preferred method of communication for a due process event, health care encounter, or structured programming, this shall be documented by staff in the appropriate records management system (e.g., JIMS, Offender360, or TechCare), with relevant details noted in the Comments section.

If the incarcerated person refuses to participate in a due process event, health care encounter, or structured programming, this shall be documented as appropriate, with relevant details noted in the Comments section on how the refusal was communicated.

## IV.   AUXILIARY AIDS AND SERVICES

A.    All informational videos (e.g., Orientation Video) that are presented in detention facilities to incarcerated persons shall be equipped to play with audio and closed captioning.

B.    The Closed Captioning (CC) feature on televisions shall be turned on where an incarcerated person with an "ADA Hearing" Medical Instruction is located. If the CC feature is not functional, and cannot be fixed within a reasonable time, staff shall confer with JPMU to find an appropriate housing or holding area for incarcerated persons with "ADA Hearing" Medical Instructions that use CC.

C.      Auxiliary aids and services available through facility Correctional Counselors (e.g., large print books, Braille materials, magnifiers, etc.) shall be available upon request by an incarcerated person, via the Incarcerated Person Request form and process, or staff.

D.      Requests for reading and writing assistance, shall be honored by staff, in a reasonable time and in such a manner that does not impede jail operations.

E.      Incarcerated persons who misuse or damage/destroy auxiliary aids or services are subject to disciplinary action.

V.      TELECOMMUNICATION RELAY SERVICES

A.      All facilities shall be equipped with devices designated for Video Relay Service (VRS) communication. VRS shall be made available to incarcerated persons who use sign language to communicate with voice telephone users through video equipment, rather than through type text, or with other persons who use sign language to communicate via point-to-point video services.

B.      All facilities shall have phones for incarcerated persons, including the social visiting phones, equipped with adaptive feedback cancellation and amplification.

C.      All facilities shall be equipped with screen-equipped telephones that can enable Captioned Telephone Services (CTS) for incarcerated persons with communication disabilities who prefer to read spoken communications.

D.      All facilities shall be equipped with a Telecommunications Device for the Deaf (TDD) (e.g., Teletypewriter (TTY)), which shall be made available to incarcerated persons who need accommodations for communication-related disabilities, to send typed text over telephone lines.

E.      Telecommunication Relay Services (TRS) shall be available for incarcerated persons with communication disabilities whenever use of a telephone would be used by an incarcerated person without a communication disability. (Refer to DSB P&P Section P.2)

    1.      If a TRS device (e.g., TDD/TTY, CTS, or VRS) is not readily available in the incarcerated person's assigned housing module or holding area, staff shall honor requests to utilize the device in a timely manner, as subject to their assigned dayroom schedule, or as permitted during the intake process.  Such persons shall have at least the same amount of time to access the device as compared to similarly situated non-disabled individuals are afforded for regular telephone usage. Staff shall, whenever reasonably possible, provide individuals additional time for calls using a TRS device, to account for the fact that signed and typed conversations take longer than spoken conversations.

    2.      Any use of a TRS device outside of the incarcerated person's housing unit or holding area, shall be documented in the JIMS Operation Status Board, as appropriate (e.g., VRS, TDD).

VI.    AUXILIARY AIDS AND SERVICES: DEVICE LOGS, LOCATIONS, AND MAINTENANCE

A.    Each detention facility shall develop a written policy to identify the location of standalone auxiliary aid devices (e.g., VRI, UbiDuo, VRS, TTY/TDD, etc.) and their corresponding Auxiliary Aid Device Log.

B.    Frequent testing of auxiliary aids and services is essential to ensure effective communication. Each facility shall inspect auxiliary aid and service devices on a regular basis.

1.    Testing shall include inspection of battery-operated auxiliary aid devices to determine that they are charged and functioning.

2.    Facility Administrative Sergeant, or designees, shall ensure the testing of battery-operated auxiliary aid devices occurs at a minimum of once every week.  Device testing shall be documented on the associated Auxiliary Aid Device Log, notating the operating status and any submitted maintenance notifications, or updates on requested repairs.

C.    If an auxiliary aid device is not available at the requested time to use it due to maintenance or technical issues, and no other alike device is available for use, staff shall document that the auxiliary aid was "offline" on the device's Auxiliary Aid Device Log (if applicable) and in the appropriate records management system (e.g., JIMS, TechCare, or Offender360), and notify the Administrative Sergeant that the device is not working.

1.    The facility Administrative Sergeant, or designee, shall notify the ADA Unit if the device requires maintenance, and if applicable, Data Services' Help Desk.

2.    For afterhours support on 24/7 Sheriff's systems, contact the Sheriff's Communication Center at (858) 565-5030 and an on-call Data Services Division person will be dispatched.

3.    If the auxiliary aid device or service will not be available or operational at a facility in a reasonable time, an equally effective reasonable accommodation should be provided, if available, or staff shall confer with health staff and JPMU to identify appropriate housing.

D.    Each facility will designate staff to be responsible for reviewing and collecting Auxiliary Aid Device Logs on a monthly basis. Copies of the logs shall be forwarded to the ADA Unit on a monthly basis.

EXHIBIT C

| | |
|---|---|
| DATE: | MAY 29, 2024 |
| NUMBER: | I.22 |
| SUBJECT: | LOWER BUNK / LOWER TIER AND MEDICAL INSTRUCTION ASSIGNMENT |
| RELATED SECTIONS: | I.21; M.9; M.39 |

PURPOSE:

To establish minimum standards for the assignment and review of medical instructions for housing requirements for incarcerated persons.

POLICY:

Medical instructions for housing requirements (e.g., lower bunk and/or lower tier requirements) are determined by Sheriff's health staff due to physical impairments or mobility issues due to a disability, medical condition, or drug/alcohol withdrawal. Sworn staff will review and resolve any discrepancies in housing/bunk assignments due to medical instructions for housing requirements.  A lower bunk and/or lower tier placement is required when input by health staff.

PROCEDURE

I.    ASSIGNING MEDICAL INSTRUCTIONS FOR HOUSING REQUIREMENTS

   A.    Sheriff's health staff will determine and document what housing accessibility features an incarcerated person with a physical impairment or disability requires for their safety and appropriate housing assignment.

      1.    Accessible housing features may include, but are not limited to: ADA compliant cell, ADA compliant shower, bed location, clearance space, toilet grab bars, shower grab bars, shower bench/chair, lower bunk, lower tier, or lower bunk and lower tier.

      2.    Lower bunk and/or lower tier

         a.    The lower bunk and/or lower tier placement will be determined by health staff and entered into the incarcerated person's medical instructions.  It is a requirement when input by health staff.

         b.    The health staff's order for lower bunk and/or lower tier housing is considered a housing requirement to minimize the risk of injury to the incarcerated person or accommodate a disability.

         c.    Incarcerated persons without a medical instruction for lower bunk and/or lower tier may submit a Sick Call Request (J-212) form to request this type of bed assignment. A medical evaluation is required to determine the need to establish or reinstate an instruction for lower bunk and/or lower tier.

d.     If health staff determines a need for a lower bunk and/or lower tier housing requirement during the intake process, Jail Population Management Unit (JPMU) deputies will notate such housing requirement on the incarcerated person's face card.

e.     If lower bunk and/or lower tier medical instructions are determined after the incarcerated person has been housed, health staff will notify the housing deputies of the requirement.

C.     Medical instructions for housing requirements may fulfill a request for accommodation by an incarcerated person with a disability or be assigned as a precautionary measure for the safety and/or welfare of an incarcerated person.

If the health staff requirement for a lower bunk and/or lower tier housing restriction is established during the intake process, Jail Population Management Unit (JPMU) deputies will notate such housing restriction on the incarcerated person's face card. If the restriction is determined after the incarcerated person has been housed, health staff will notify the housing deputies of the restriction.

II.     MEDICAL INSTRUCTIONS FOR HOUSING REQUIREMENTS

A.     Medical instructions for housing requirements are viewable in JIMS as Medical Instructions, if applicable, in the incarcerated person's "Photo & Instructions" pop-up window.

B.     Lower bunk and/or lower tier housing requirements are defined as follows:

1.     "LOWER BUNK" indicates a lower bunk requirement without tier restriction.

2.     "LOWER TIER" indicates a lower tier requirement.

3.     "LOWER BUNK/LOWER TIER" indicates a requirement for a bottom bunk on the lower tier. Note: A middle bunk in a triple bunk does not qualify as a bottom bunk.

C.     Medical instructions for "ADA MOBILITY" and "ORTHOPEDIC DEVICE – WHEELCHAIR" have additional housing requirements, as follows:

1.     Incarcerated persons with the "ADA MOBILITY" medical instruction shall not be assigned to the top bed of a triple bunk.

2.     Incarcerated persons with the "ORTHOPEDIC DEVICE – WHEELCHAIR" medical instruction shall be assigned a bottom bunk on the lower tier and cannot be assigned to any bed in a triple bunk.  They shall be housed in ADA accessible housing.

3.     Incarcerated persons with "INTERMITTENT WHEELCHAIR" medical instruction or other mobility disabilities shall be individually assessed for accessible housing accommodation needs. With the exception that incarcerated persons with the "ADA MOBILITY" and "INTERMITTENT

WHEELCHAIR" medical instruction shall not be assigned to any bed in a triple bunk.

    a.    People with mobility disabilities will be assigned to accessible housing based on their accessibility needs, which may include accessible beds, grab bars, clearance space, and low bunk or low tier.

    b.    People with mobility disabilities will be provided accessible toileting based on their accessibility needs, which if appropriate shall have 2010 ADAS-compliant grab bars and other features.

    c.    People with mobility disabilities will be provided accessible showers based on their accessibility needs which, if appropriate, shall have 2010 ADAS-compliant grab bars and shower chairs.

III.    PROVIDING HOUSING REQUIREMENTS

    A.    All incarcerated persons who have been screened and determined to have a disability will be housed in a facility with the appropriate accommodations, unless the accommodation would result in a fundamental alteration, direct threat or safety and security risk, undue financial or administrative burden, or during an emergency situation.

    B.    Housing deputies will be responsible for assigning incarcerated persons with medical instructions for housing requirements the appropriate housing bed.

    C.    Housing bed assignments and changes should be reflected in the housing unit's JIMS Observation Status Board (OSB).

IV.    LOWER BUNK AND/OR LOWER TIER DISCREPANCIES

    A.    At the beginning of each shift, the watch commander or designee will review the "LOWER BUNK / LOWER TIER DISCREPANCIES" report in JIMS.

        1.    The watch commander or designee shall direct housing deputies to resolve any discrepancies.

        2.    Bunk and/or housing moves may be required to accommodate incarcerated persons with a lower bunk and/or lower tier designation.

        3.    In the event the number of incarcerated persons requiring a lower bunk and/or lower tier placement is greater than the beds available, JPMU deputies will be notified and must take action as set forth below in Section V.

        4.    Housing deputies will log the report review and reconciliation in the JIMS Area Activity Log utilizing the "LOW BUNK/TIER REVIEW" drop-down. Any discrepancies that remain unresolved due to an incarcerated person not being present in the housing area (e.g., court, medical appointment, etc.) will be noted in the "Notes" section of the log entry and the watch commander shall be notified.

    B.    Incarcerated persons shall accept bunk assignments as directed by staff. Incarcerated persons are not entitled to bunk location of choice and shall be subject to disciplinary action in accordance with Detention Services Bureau Policies and Procedures section O.1 for refusing a bunk assignment, including any lower bunk and/or lower tier assignment.

V.    EXCLUSION OF HOUSING ACCOMMODATIONS

    A.    If sworn staff is unable to accommodate disability related housing requirements, sworn staff shall confer with JPMU and health staff to determine appropriate housing options.

    B.    Incidents where disability related housing accessibility accommodations cannot be provided shall be documented in a JIMS Incident Report with the type code: "ADA – Americans with Disabilities Act."

        1.    The individual will be provided accessible housing as soon as it becomes available for the individual.

        2.    While the ADA housing renovations are in process, accessible housing will be provided as available.

        A single bunk or a bottom bunk of a double shall be provided to all incarcerated persons with wheelchairs or with a mobility disability that medical staff determines require lower bunk/lower tier placement. Portable shower chairs will be provided as an interim solution if an ADA compliant shower is not available.

VI.    REFUSING MEDICAL INSTRUCTIONS FOR HOUSING REQUIREMENTS

    A.    If health staff determines a need for lower bunk and/or lower tier housing requirements or accommodation, and an incarcerated person refuses to accept such as medical care or treatment, health staff will have the incarcerated person sign a Refusal to Accept Medical Care/Treatment (J-223) form, documenting their reason for refusing medical treatment.

        1.    Health staff must provide counseling to the incarcerated person about the importance of medical instructions for housing requirements.

        2.    In the event the incarcerated person refuses to sign the J-223 form, health staff shall sign the form documenting the reason for the refusal. Every effort should be made to obtain a second health staff witness to sign form; however, if a second health staff member is not present to witness the refusal, a sworn staff member may sign the second witness line.

    B.    Incarcerated persons with an "ADA MOBILITY" instruction may refuse to accept applicable housing accommodations.

        1.    The ADA Unit, or designee, shall interview the person in an attempt to resolve any concerns regarding the accessible housing assignment. Staff will document the interaction via a Body Worn Camera (BWC), as available.

2. If the incarcerated person still refuses the accommodated housing assignment after the interview, health staff will ask the person to sign a Refusal to Accept Medical Care/Treatment (J-223) form, documenting their reason for refusing medical treatment.

3. In the event the incarcerated person refuses to sign the J-223 form, health staff shall sign the form documenting the reason for the refusal. If a second health staff member is not present to witness the refusal, a sworn staff member may sign the second witness line.

# EXHIBIT D

**San Diego County Sheriff's Department**

**Detention Services Bureau**

**ADA Mobility Jail Population Statistics**

5/9/2024

### Average Daily Facility Population (ADP)

**\*Selected Medical Instructions:** ACE WRAP; ADA MOBILITY; AMPUTEE; BRACE; CANE; CAST; CRUTCHES; FALL PRECAUTIONS; INTERMITTENT W-CHAIR; PROSTHESES - LIMB;PROSTHETICS; SPLINT; WALKER; WHEELCHAIR

**Selected Facilities:** San Diego Central Jail (SDCJ)          **Selected Housing Areas:** SDCJ_3,SDCJ_4,SDCJ_5,SDCJ_6,SDCJ_7,SDCJ_8, *Excluding Floors 1 and 2*

**For Selected Date Range:** 7/1/2023 through 4/30/2024

|  | Average (ADP) | Median (ADP) | Min (ADP) | Max (ADP) |
|---|---|---|---|---|
| Overall Facility Average Daily Population | 827 | 827 | 732 | 921 |
| Incarcerated Persons with an active mobility-related medical instruction* | 103 | 105 | 73 | 125 |
| Incarcerated Persons <u>without</u> a wheelchair-related medical instruction | 50 | 51 | 27 | 65 |
| Incarcerated Persons <u>with</u> a wheelchair-related medical instruction | 53 | 50 | 41 | 68 |
| Wheelchair w/out Intermittent Wheelchair | 39 | 36 | 25 | 58 |
| Both Wheelchair & Intermittent Wheelchair | 1 | 1 | 0 | 3 |
| Intermittent Wheelchair w/out Wheelchair | 13 | 12 | 8 | 19 |

-ADP is based on a snapshot of the population taken daily at 12:00 a.m

-These statistics identify individuals who were placed in an area designated for housing at San Diego Central Jail during the specific date/time the daily population snapshot was taken.

-Wheelchair/Intermittent Wheelchair: These individuals may have other mobility-related medical instructions in addition to the wheelchair/intermittent wheelchair flag.

### Bookings

**Selected Medical Instructions:** ACE WRAP; ADA MOBILITY; AMPUTEE; BRACE; CANE; CAST; CRUTCHES; FALL PRECAUTIONS; INTERMITTENT W-CHAIR; PROSTHESES - LIMB;PROSTHETICS; SPLINT; WALKER; WHEELCHAIR

**Selected Booking Facilities:** San Diego Central Jail (SDCJ)          **For Selected Date Range:** 7/1/2023 through 4/30/2024

|  | Count | Avg Per Day | Min | Max |
|---|---|---|---|---|
| Total Facility Bookings (Excluding Not Fit For Jail Bookings) | 22,977 | 75 | 48 | 106 |
| Bookings with a mobility-related medical instruction **added <u>within 2 days</u> of book date** | 1,017 | 3 | 0 | 9 |
| Incarcerated Persons <u>without</u> a wheelchair-related medical instruction | 748 | 2 | 0 | 8 |
| Incarcerated Persons <u>with</u> a wheelchair-related medical instruction | 269 | 1 | 0 | 5 |

- These statistics identify individuals who were booked at San Diego Central Jail during the specified date/time. This does not reflect the length of time spent at SDCJ after booking. Additionally, **this does not reflect** individuals that had an ADA mobility instruction added after the 2 day mark.

EXHIBIT E

**San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures**

| | |
|---|---|
| **DATE**: | MAY 29, 2024 |
| **NUMBER**: | P.2 |
| **SUBJECT**: | TELEPHONE ACCESS |
| **RELATED SECTIONS**: | N.5, P.11, M.39 |

PURPOSE

To establish guidelines that will permit incarcerated persons to use telephones during normal operating procedures.

POLICY

All incarcerated persons will be provided reasonable access to a telephone beyond those telephone calls required by section 851.5 PC.  Sworn staff members shall not turn off telephones as a punitive measure when incarcerated persons delay their response to programs, services, medication distribution, etc.

Nothing in this section is intended to limit the authority of the facility commander to revoke an incarcerated person's telephone access as necessary to preserve institutional safety and security, nor prevent criminal activity.  When such action is taken, the facility commander shall implement a plan that allows an incarcerated person to contact their attorney and the courts by telephone.

PROCEDURE

I.      ACCESS TO TELEPHONES

        A.      Telephones will be located in areas accessible to incarcerated persons during dayroom or recreation time when they are allowed outside of their assigned cells or dorm living units. Telephone calls will be at no cost in accordance with County of San Diego Policy.

        B.      Incarcerated persons with communication-related disabilities who require reasonable accommodation to access a telecommunication system, shall be provided access to the appropriate telecommunication device or system which will facilitate communication, at no cost to the user.

                1.      Telecommunication Relay Services (TRS) allow a person with a communication-related disability to communicate by telephone in a manner that is functionally equivalent to telephone services used by persons without such disabilities.  In most cases, a caller with a communication-related disability accesses TRS through a non-conventional phone, such as a videophone or captioned telephone, and uses TRS to communicate with another individual who is using a conventional phone.

                2.      Incarcerated persons who utilize TRS or non-conventional phones (e.g., speech-to-speech relay, videophones, teletypewriters (TTY) or Telecommunications Device for the Deaf (TDD), or captioned telephones shall receive the same access to TRS or non-conventional phones as others receive to conventional phones,

except that these individuals shall be provided at least twice the minimum call time for calls made using a conventional telephone.

3.      Incarcerated persons who require the use of their hands to communicate using a non-conventional phone, such as individuals using a videophone or a TTY/TDD, shall not be restrained in a manner that restricts the use of their hands and arms for communication, unless there is a safety and security concern.

4.      Access to speech-to-speech relay services shall be permitted by dialing 1-877-632-9095 (for English) or 1-877-419-8440 (for Spanish).

5.      Access to non-conventional phones and other auxiliary aids and services shall be handled according to Detention Services Bureau Policy and Procedure (DSB P&P) Section P.11.

II.    DOCUMENTATION

A.      Generally, the use of a telephone is not documented in an incarcerated person's JIMS History as a "PHONE CALL" unless access to a telephone is restricted due to housing or holding cell requirements.

B.      If access to TRS or a non-conventional phone is not readily available in the housing unit or holding area of an incarcerated person who requires access to the device, the use of the device shall be documented according to DSB P&P Section P.11.

C.      For incarcerated persons in housing units with free access to telecommunication devices during their scheduled dayroom or recreation time, "DAYROOM/PHONE TIME" shall be logged in the JIMS Area Activity log.