```
 1                 UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   DARRYL DUNSMORE, ERNEST        )
     ARCHULETA, ANTHONY EDWARDS, REANNA)
 4   LEVY, JOSUE LOPEZ, CHRISTOPHER  )
     NELSON, CHRISTOPHER NORWOOD, and )
 5   LAURA ZOERNER, on behalf of     )
     themselves and all others       )
 6   similarly situated,             )
                                     )   No. 20-CV-0406-AJB-DDL
 7             Plaintiffs,           )
                                     )
 8   V.                              )   July 1, 2024
                                     )
 9   SAN DIEGO COUNTY SHERIFF'S      )
     DEPARTMENT; COUNTY OF SAN DIEGO; )
10   CORRECTIONAL HEALTHCARE PARTNERS, )
     INC.; LIBERTY HEALTHCARE, INC.; )
11   MID-AMERICA HEALTH, INC.; LOGAN  )
     HAAK, M.D., INC.; SAN DIEGO COUNTY)
12   PROBATION DEPARTMENT, and DOES 1 )
     to 20 inclusive,                )
13                                   )
               Defendants.           )
14   _____)   San Diego, California

15
     TRANSCRIPT OF DIGITALLY RECORDED VIDEOCONFERENCED PROCEEDINGS
16                    (Discovery Conference)

17

18      BEFORE THE HONORABLE DAVID D. LESHNER, MAGISTRATE JUDGE

19

20

21

22

23   COURT REPORTER:        AMANDA M. LeGORE
                            RDR, CRR, CRC, FCRR, CACSR
24                          U.S. District Court
                            333 West Broadway, Suite 420
25                          San Diego, CA 92101
                            amanda_legore@casd.uscourts.gov
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:      GAY GRUNFELD
                              RICHARD VAN SWEARINGEN
 3                            Rosen Bien Galvan & Grunfeld LLP
                              101 Mission Street, Sixth Floor
 4                            San Francisco, CA  94105-1738
                              (415)433-6830
 5                            ggrunfeld@rbgg.com
                              rswearingen@rbgg.com
 6

 7   FOR DEFENDANT COUNTY OF
     SAN DIEGO:               ELIZABETH PAPPY
 8                            Burke Williams & Sorenson LLP
                              501 W. Broadway, Suite 1600
 9                            San Diego, CA  92101
                              (619)814-5800
10                            epappy@@bwslaw.com

11

12

13

14                                  -0-

15

16

17

18

19

20

21

22

23

24

25
```

1          (Monday, July 1, 2024)

2

3              P R O C E E D I N G S

4

5          THE COURT:  Good morning, everyone.  We're on the

6   record in Dunsmore, et al., versus the San Diego County

7   Sheriff's Department, et al., Case number 20-CV-406.

8          We are here for a discovery conference that has been

9   requested by the plaintiffs.

10         May I have appearances from counsel, beginning with

11  plaintiffs' counsel.

12         ATTORNEY GRUNFELD:  Good morning, your Honor.  Gay

13  Grunfeld for the certified class.

14         ATTORNEY SWEARINGEN:  Good morning, your Honor.  Van

15  Swearingen for plaintiffs.

16         THE COURT:  Great.  Good morning to you both.

17         ATTORNEY PAPPY:  -- Pappy, on behalf of defendants.

18         THE COURT:  And good morning to you, Ms. Pappy.

19         We are here because I received an email from

20  Ms. Grunfeld on June 26th, seeking to reopen discovery to

21  investigate an allegation that individuals are sleeping on the

22  floor at Central jail in Units 8C and 8D.  And the plaintiffs

23  are requesting to obtain video footage of those units, as well

24  as a recorded body-worn camera interview of an unnamed

25  plaintiff.

4

1          This is opposed by the defendants.  And specifically

2   the assertion is made that the plaintiffs have not complied

3   with the dispute resolution procedure in the June 21st order.

4          So let me just, if I could, ask a couple of questions.

5   Because this is -- this is the issue that was raised by the

6   plaintiffs prior to our last settlement conference.

7          Is that right, Ms. Grunfeld?

8          ATTORNEY GRUNFELD:  Yes, your Honor.

9          THE COURT:  All right.  Let me just ask this,

10  Ms. Pappy.

11         Have the defendants investigated the allegation that

12  individuals were sleeping on the floor in Units 8C and 8D?

13         ATTORNEY PAPPY:  Yes.

14         THE COURT:  Just -- I'm not asking anyone to agree

15  with what you're going to tell me.  But based on the

16  defendants' investigation, what happened, if anything?

17         ATTORNEY PAPPY:  Nothing happened.

18         The general comment that people have been sleeping on

19  the floor -- people sleep on the floor all the time.  Their

20  back hurts, and they put their mattress on the floor.  It's

21  where they want to sleep.

22         I think the issue is more discrete in that there are

23  not -- plaintiffs are claiming there are not enough beds for

24  lower-tier, lower-bunk, wheelchair assigned folks.

25         And -- and we think -- we're not entirely sure.  But

1    we think that this complaint was generated -- and I told the

2    plaintiffs this already, during a settlement discussion.  That

3    there was a time where a gentleman had a flag, which would

4    indicate lower tier, lower bunk because of a surgery -- some

5    sort of an internal surgery.  And he -- the flag taken off

6    because the time had expired.

7         Well, kind of like between the time the flag was taken

8    off and -- who knows -- an hour later, somebody was assigned to

9    that bed; his flag was put on.  He was rechecked, as he should

10   have been by med.  And they said, "Flag back up."

11        And so there was a period of some -- short period of

12   an hour where there were two folks assigned to the same bed.

13   And so the person who was assigned to that bed second had a

14   mattress within -- I don't want to speculate because I can't

15   remember -- so I think it was less than 12 hours or eight

16   hours, something like that.  Somebody figured out, wait a

17   minute, this guy should have been moved.  Nope, not supposed to

18   be moved.  We need to reassign this guy.

19        And so that was the instance that started this

20   snowball.

21        Since then, plaintiffs have submitted all of these

22   declarations.  We've looked at 30 days of video, and the

23   declarations are false.

24        THE COURT:  All right.  I understand that that is your

25   position.

1          My question for you is this, Ms. Pappy.  What night --

2   or what dates did this alleged mixup with the double-bunk

3   assignment occur?

4          ATTORNEY PAPPY:  You know, I don't -- I don't actually

5   remember.  I think it was very early May or April.

6          THE COURT:  Because I'm looking --

7          ATTORNEY PAPPY:  -- time ago.

8          THE COURT:  -- I'm looking at the declarations from

9   Mr. Clark, for example.

10          ATTORNEY PAPPY:  Um-hmm.  (Nods head.)

11          THE COURT:  And he says -- I have two declarations.

12   One's dated May 24th, and one appears to be dated May 31st.

13          And he says that he's been in 8C since January 1st,

14   and that people sleep on the floor.  And I -- I understand the

15   question is whether people are sleeping on the floor because

16   they have to, not because they want to.

17          And he says that "last night" -- meaning May 23rd --

18   "an incarcerated person slept at a table because there was no

19   lower bunk.  And we informed staff."

20          He further says, on May 31st, that two men slept on

21   the floor from Friday until Monday, May 27th.

22          And it's your position, Ms. Pappy, that the County has

23   investigated this issue in Unit 8C and has determined that

24   whether -- that -- that if anybody slept on the floor, it was

25   because they chose to do so, not because there was not an

1  appropriate bed available to them?

2         ATTORNEY PAPPY:  Exactly.

3         THE COURT:  So my question to you is this.

4  Understanding that there is a declaration from Mr. Clark -- and

5  I realize you disagree with the assertions that are made in

6  it -- what is the objection, if any, to providing the

7  plaintiffs with, at least initially, a very focused discovery

8  directed to this particular declaration?

9         And I want -- Ms. Grunfeld, I appreciate your

10 patience.  I want to hear from you on this as well, of course.

11        Is there an objection to a limited discovery just to

12 determine whether or not the evidence would support this

13 assertion?  Because, of course, it's a serious one.

14        ATTORNEY PAPPY:  It's -- it's -- I think we need to

15 back up.  This is an issue that is covered by the

16 (indiscernible) settlement.  And I specifically direct the

17 Court's attention to the June 21st order, paragraph 4.

18        And this should have been covered by paragraph 4.  And

19 also subpart B specifically covers assignment of lower tier,

20 lower bunk for those who need it, for each person at SDCJ.

21        So the plaintiffs were obligated to follow the dispute

22 resolution protocols, which they didn't.

23        And I might point out that in those protocols they had

24 the absolute right to look at this video.  They just couldn't

25 use it for anything, ever.  They chose not to use these

1    protocols and to simply go around them, I suspect because they

2    don't want that restriction that they agreed to in the

3    settlement agreement.

4         So I'm -- I have been baffled, since day 1, as to why

5    they didn't go under this dispute resolution program; which

6    they don't need discovery.  If they had just used this

7    procedure, they could have had it.

8         And in discussions with them -- and I pointed this

9    out.  They finally were, like, "Well, fine.  Then just consider

10   our May letter as under this."

11        And I repeated to them, "Well, my concern is that if I

12   give you this thing, sort of in this fake procedure that you've

13   now said that we're going under -- even though there's been no

14   notice required under this order -- you're going to use this

15   video in some other way."  It will show exactly what we've

16   said.  It's actually 18-8C that we have video for, 24 hours a

17   day, for the entire month of May.  They chose not to use it.

18        So my position is you have to go under the dispute

19   resolution procedure, and you can see the video because you

20   have the right to see the video.  But you can never use it for

21   anything.

22        THE COURT:  So let me ask you this, Ms. Pappy.  Docket

23   number 620 is Judge Battaglia's order on the plaintiffs'

24   objections.  Are you referring to that order?  Or are you

25   referring to the underlying ADA plan, which I think was 416?

1              ATTORNEY PAPPY:  No, I'm referring to Docket 620.

2              THE COURT:  And which specific page?

3              ATTORNEY PAPPY:  The -- the dispute resolution starts

4     on page 9.

5              The fact that this is all covered under it is

6     paragraph 4 and then specifically subpart B.  But if you look

7     at the dispute resolution process, it says that either party

8     can -- can have an independent expert go in there.  If we fail

9     to resolve, we can go to your Honor, settlement conference.

10    And it says nothing said -- in paragraph 20, "Nothing said and

11    no document prepared in connection with the dispute resolution

12    proceedings shall be offered in evidence in any subsequent

13    judicial proceeding in this case."

14             They could have had this stuff -- Ms. Grunfeld --

15             THE COURT:  Can I interrupt you, Ms. Pappy?

16             ATTORNEY PAPPY:  -- (indiscernible) May 15th.

17             Yeah.

18             THE COURT:  So I think we have a bit of a disconnect

19    that I want to get straight.

20             Docket 620 is Judge Battaglia's order sustaining

21    certain of the objections.  That doesn't --

22             ATTORNEY PAPPY:  Oh --

23             THE COURT:  I think you're talking about the ADA

24    stipulation and order.

25             ATTORNEY PAPPY:  355.  Okay.  Just a few hundred off.

1    355.  Sorry.

2          THE COURT:  Okay.  No, that's okay.  I want to make

3    sure that we're talking about the same thing.

4          All right.

5          ATTORNEY PAPPY:  Paragraph 20 is what gives them the

6    right to see this stuff and -- and (indiscernible).

7          THE COURT:  All right.  Understood.

8          So your position, Ms. Pappy, is that the plaintiffs

9    are allowed -- or should be invoking the dispute resolution

10   procedures of Docket 355?

11         ATTORNEY PAPPY:  Yes.

12         THE COURT:  Okay.  Thank you.

13         Understanding your position.

14         Ms. Grunfeld and Mr. Swearingen, I would be happy to

15   hear from you all about the contention that this really is

16   subject to the dispute resolution procedures of the ADA order.

17   And if it's not, what I -- what you're asking for from me.

18         So, Ms. Grunfeld, go ahead, ma'am.

19         ATTORNEY GRUNFELD:  Thank you, your Honor.

20         Defendants have been all over the map about these --

21   this very -- as you said, very serious issue, which we brought

22   to the Court's attention on May 31st, with six declarations,

23   under penalty of perjury, saying that this is happening in the

24   ADA-accessible units.

25         Now, we've met and conferred multiple times.  We've

1    tried to get this video.  We're asking for an expedited

2    process.  We're asking that discovery be reopened under Rule

3    16(b)(4) and the standards of City of Pomona versus SQM, 866

4    F.3d 1060.  We believe that we meet those standards.

5            Now, why did we not invoke the dispute resolution

6    process outlined in the ADA settlement?

7            First of all, we understand that process to be

8    voluntary.

9            Second of all, from the beginning of bringing this

10   issue up, defendants have denied that it's occurring.  Well,

11   sometimes they say it's not occurring.  Sometimes they say it's

12   voluntary.

13           They have called our clients liars.  They have said

14   that I am interfering with jail operations, and I would like to

15   see the video.

16           Now, if you look at 355, paragraph 17 through 19, it

17   says a party may initiate dispute resolution process.  And it

18   says that after you serve a notice, then the neutral expert

19   will weigh in.

20           Well, there is no neutral expert.  This ADA plan

21   hasn't even been approved yet.  So -- and, also, the only

22   qualified independent expert that's going to be appointed under

23   this is about the accessibility of the beds.  This is a

24   different issue.

25           This is both an ADA violation, if people who need

1    accessible beds are being forced to sleep on the floor; and a

2    constitutional violation, if that is in fact occurring.

3           Now, our declarants say it has happened.  I don't

4    understand why it would be a big deal to let us see, as -- as

5    the Court is suggesting, the May video for 8C and 8D from

6    6:00 p.m. to 6:00 a.m., so that we can figure out if it's

7    happening or not.  There may be a multitude of reasons.  It may

8    not be happening.  We don't know.  All we know is what the six

9    declarants swore under penalty of perjury and what we've

10   provided on May 31st.

11          (Pause.)

12          ATTORNEY GRUNFELD:  Your Honor, you're on mute.

13          THE COURT:  Sorry.  I had you on mute because I was

14   printing out the -- the motion and order.  And I want to take a

15   moment just to look at that a little more carefully.

16          (Pause, referring.)

17          THE COURT:  All right.  Ms. Pappy, understanding that

18   Judge Battaglia did enter the order that is Docket 355, which

19   does contain the dispute resolution procedure and -- that

20   you're referencing -- and let's leave aside the issue of

21   whether it's -- it's voluntary or not.

22          I -- let's assume that it is required if one wishes to

23   seek relief under the order.

24          You know, Ms. Grunfeld points out that there is no

25   final ADA plan, at least as of now, because that is still

1    pending.  And hopefully it will happen soon.  But there's no

2    final ADA plan.  And there's no independent expert to review

3    these materials as Docket 355 contemplates.

4          So assuming you are correct, Ms. Pappy, that the

5    appropriate mechanism -- either now or at some point in the

6    future -- would be to invoke these dispute resolution

7    procedures and give these materials to an independent expert,

8    there isn't one right now.

9          And my question really is how should that affect the

10   way that we handle this issue for our purposes?

11         Go ahead.  I would like you to respond to that.

12         ATTORNEY PAPPY:  Well, it doesn't say that you have to

13   submit anything to an expert.

14         It says, "Following service of the dispute notice, the

15   parties shall undertake good faith negotiations at such times

16   and places as they deem sufficient.  If within 30 days" -- I

17   think of the notice.  I just -- "if in the 30 days after

18   service of the notice the parties fail to reside -- resolve the

19   dispute, either party may request the qualified independent --

20   independent experts most knowledgeable on the subject."

21         If you go back up to paragraph 17, it says:

22         "Any party may initiate the dispute resolution process

23   with respect to any matter covered by the stipulation."

24         Not just one covered by the neutral expert who's the

25   construction (indiscernible).  Any matter.  So that's -- that's

14

1   our response.

2           THE COURT:  No, I -- understood.

3           Let me ask this.  You have declarations, like

4   putting -- that have been submitted by the plaintiffs, making

5   these assertions.  I -- I am inclined to direct the County to

6   make a limited production.  I'm not talking about the

7   production that is requested in Ms. Grunfeld's email for

8   overnight footage for 17 days.  But targeted production.  Which

9   presumably would show that the allegations are substantiated or

10  perhaps that they are not.  Which then would raise, you know,

11  other issues, perhaps.

12          But what is -- let's say that I'm inclined to do that,

13  Ms. Pappy.

14          What is your position as to the appropriate scope of

15  any production of video footage?  Because it sounds like you --

16  the County's pulled this footage and has it in their

17  possession.

18          ATTORNEY PAPPY:  So I -- the scope should be that it

19  should be produced under this dispute resolution procedure.  It

20  should not -- you have to have good cause to reopen discovery.

21  And they haven't established good cause because they never

22  asked us for the video.  I mean, why not go under the dispute

23  resolution process, see the video, and then seek to reopen

24  discovery?

25          Because now what we're doing is we're exposing my

1    client to claims that are already covered by a settlement

2    agreement.  And we're just going to keep re-litigating the same

3    thing over and over and over again.  And there is a process in

4    place for that to happen.  I mean, technically, I guess, it

5    would be a contempt order that -- a request for contempt that

6    we are violating the order.

7              In terms of limited production under discovery, I -- I

8    mean, I think it should be limited to those individuals, and

9    they have to identify dates.  Because most of them don't

10   identify dates.  They just say, "I've been sleeping on the

11   floor."

12             THE COURT:  Mr. Clark does, though.  But let's use

13   Mr. Clark as an example.

14             ATTORNEY PAPPY:  Yeah, Mr. Clark.  So -- so Mr. Clark

15   was the first one.  And when Mr. Clark -- Mr. Clark happened to

16   be sitting at the door.

17             And when Sergeant Pike was given this information in

18   this May 23rd letter, eight days after Ms. -- Ms. Grunfeld

19   found out about it, Sergeant Pike walked into the unit.  And

20   Mr. Clark happened to be sitting at the door.

21             And Mr. Clark said, "Yeah, I've seen people sleeping

22   on the floor.  I think it's related to their back," or

23   something like that.  "And the lady lawyer told me not to tell

24   staff.  To call counsel first."  That's how this first came up.

25             So that specific allegation was investigated, and the

1    only thing that we could come up with in that time frame was

2    that one instance with a flag on and off situation.

3            So, again, if we're going under the dispute

4    resolution, I don't have a problem with letting them do -- you

5    know, specific to -- and if any declaration doesn't contain

6    dates, then it needs to be ignored.  But if this is under

7    discovery, I want the right to depose these people about these

8    declarations.

9            ATTORNEY GRUNFELD:  Your Honor, may I respond?

10            THE COURT:  Of course.  Go ahead.

11            ATTORNEY GRUNFELD:  So our concerns are beyond the ADA

12    order.  I just want to be clear about that.  Floor sleeping is

13    unconstitutional, if it's happening.  And we believe it has

14    happened in these units.

15            And I don't think that the incarcerated people should

16    be held to specific dates.  If the Court wants to order less

17    than the 17 days, we should look at the declarations.  And, you

18    know, some of them say, "within the past week" or "this month."

19            They don't necessarily give a date.  These were taken

20    rapidly, in -- in light of what we were hearing and our

21    concerns.  We have no objection if defendants want to take the

22    depositions of the individuals.  That's fine, if -- if they

23    think that would be useful.

24            But let's take a look at the video first, and see

25    what's been happening.  I hope I'm wrong.  I do.  But I have a

1    duty to the class to determine if this has occurred and how

2    prevalent it is before I move forward with further settlement

3    of this.  Because we thought that these issues were resolved.

4    We thought the ADA units were going to be made accessible, that

5    people were going to be getting lower-bunk, lower-tier housing.

6              And then we start hearing for the first time, on

7    May 15th, when I went to Central and I was approached by

8    someone who told me he had been on the floor for 17 days.  And

9    that is the first I -- I heard that this was actually

10   happening.  And I took steps as quickly as possible to find out

11   more.

12             So we would like to see the video, and we would like

13   to see the video interview of Mr. Clark.  We never tell our

14   clients don't contact the staff at the jail.

15             So we would like to see what it was that Mr. Clark

16   told Sergeant Pike as well.

17             ATTORNEY PAPPY:  If I may?

18             THE COURT:  Go ahead.

19             ATTORNEY PAPPY:  I'm extremely concerned about what

20   was just said.  Because the May 23rd letter didn't say anything

21   about 17 days.

22             That was one of the declarations that, as soon as

23   plaintiffs became concerned that we were going to raise this

24   issue to the Court, ran and got a declaration.

25             The May 23rd letter, eight days after counsel learned

1    of this very serious issue and didn't think it was important

2    enough to turn to Ms. Coleman, who was standing with her and

3    say, "This is an issue.  A dangerous issue."  She waited eight

4    days to write the letter.  And there's nothing in it like 17

5    days.

6         That was in one of these last-minute declarations that

7    your Honor got before the settlement conference.  That's my

8    concern with this, is that this should be going under the

9    dispute resolution process.  That's a very one-sided process.

10        Plaintiffs get to see this stuff.  I don't get to take

11   people's depositions.

12        It's proportionate to the situation, so that they can

13   figure out, you know, whether this floor sleeping is happening

14   or not.  Yet it protects the County from these -- what we

15   consider being baseless attacks that are ongoing.  Ongoing on

16   other issues that I hope you never hear about.  But that's my

17   concern.

18        THE COURT:  I understand.

19        Here's what I am inclined to do, Counsel.  And I will

20   elicit your thoughts on it.

21        I am inclined to direct that the County provide a

22   specified portion of the video for Unit 8C, as well as this

23   interview of Mr. Clark, pursuant to the dispute resolution

24   procedures of Docket number 355 so that it -- pending further

25   order by me, it will remain subject to those procedures without

19

1    prejudice to either parties' ability to seek to modify that and

2    use the materials later.  But I think it is important that the

3    plaintiffs have access to these materials, so that they can

4    evaluate these assertions that are being made.

5          I am going to limit the production to the video of

6    Unit 8C for the following time periods:

7          May 23rd at 8:00 p.m. to May 24th at 8:00 a.m.

8          And, second, May 25th at 8:00 p.m. to May 26th at 8:00

9    a.m.

10         I have picked those time periods because Mr. Clark's

11   declarations are very specific.  He states in his declaration

12   of May 24th that "Last night an incarcerated person slept at a

13   table because there was no lower bunk."  So that would be the

14   night of May 23rd into May 24th.

15         In addition, on May 31st, Mr. Clark declares that two

16   men slept on the floor from Friday night until Monday morning,

17   May 27th.  So the second date is going to be during the

18   weekend, where Mr. Clark is very specifically asserting that

19   people slept on the floor.

20         Ms. Pappy, again, I'm going to give everyone a chance

21   to be heard.

22         Do you have that video footage?  And how long would it

23   take to get that to Ms. Grunfeld and Mr. Swearingen?

24         ATTORNEY PAPPY:  We have it.  And I'm going to say

25   that they can cut out and put forward those by the end of the

1   week, certainly; including the fact that for -- the 4th is a

2   holiday.

3           THE COURT:  Why don't we -- why don't we make it

4   July 8, and that will give you time to provide the video.

5           Do you also have the video of this informal interview

6   of Mr. Clark by Sergeant Pike?

7           ATTORNEY PAPPY:  We do.  It's a body worn, so it's

8   isolated.

9           THE COURT:  All right.  Then that will be produced on

10  or before July 8, as well.

11          Again, this is currently subject to the dispute

12  resolution procedures, although that is without prejudice to a

13  modification of that requirement, depending on what the videos

14  show and about -- and on my ability to further think through

15  some of the arguments that you've raised.

16          Ms. Grunfeld, do you wish to be heard on my tentative

17  ruling on this matter?

18          ATTORNEY GRUNFELD:  Only briefly, your Honor.

19          We would ask that the Court also provide some specific

20  times and dates in 8D, the other ADA unit, based on the other

21  declarations.

22          THE COURT:  What declaration are you specifically

23  referring to with the time and date?

24          I'm not going to pick a date randomly.  That's why I

25  picked Mr. Clark, because he was so specific.

1        ATTORNEY GRUNFELD:  Yes.  Understood, your Honor.

2        I wasn't prepared to provide a specific, here, but --

3        THE COURT:  Take a moment.  That's fine.

4        ATTORNEY GRUNFELD:  (Pause.)

5        ATTORNEY SWEARINGEN:  Your Honor, I could -- if I may,

6   your Honor?

7        THE COURT:  Sure.

8        ATTORNEY SWEARINGEN:  I could point you to the

9   declaration of Devon Meyers.

10       THE COURT:  Okay.

11       ATTORNEY SWEARINGEN:  Who, in paragraph 6, in a

12  declaration signed on May 30th, states, "I have witnessed three

13  people sleeping on a mattress on the floor of module 8D as

14  recently as last week."

15       It doesn't have the exact dates.  But, your Honor,

16  from this case and from other cases, we know very well that

17  people who are incarcerated sometimes have difficulty, you

18  know, identifying dates with precision; unlike us who -- who

19  live and die by the calendar, days bleed together inside the

20  jail.

21       THE COURT:  Sure.  And I understand that,

22  Mr. Swearingen.

23       At this point, I'm going to limit my ruling to the

24  specific dates identified in Mr. Clark's declaration.  And,

25  again, that's without prejudice to further requests for video

1    footage.  It's going to be important for me to see what the

2    video on those dates that I'm ordering shows.

3              ATTORNEY SWEARINGEN:  And --

4              ATTORNEY GRUNFELD:  Would your Honor consider starting

5    at 6:00 p.m., instead of 8:00 on those dates?

6              THE COURT:  Yes.

7              ATTORNEY GRUNFELD:  Okay.  Thank you, your Honor.

8              THE COURT:  That's a fair request.

9              6:00 p.m. to 8:00 a.m. on -- so just to be clear,

10   May 23rd at 6:00 p.m. to May 24th at 8:00 a.m.

11             And then May 25th at 6:00 p.m. to May 26th at

12   8:00 a.m.

13             ATTORNEY SWEARINGEN:  And, your Honor, if I may point

14   out one other paragraph in another declaration.  That would be

15   the declaration --

16             THE COURT:  Go ahead.

17             ATTORNEY SWEARINGEN:  -- of Robert Duarte, who

18   discusses his time in 8C.  And he specifies a date with

19   precision.  There was no date available to him.

20             ATTORNEY GRUNFELD:  No bed.

21             ATTORNEY SWEARINGEN:  No bed available to him.  And he

22   says:

23             "The same evening, May 29th, I witnessed another

24             person sleep on the floor of the first level of

25             module 8C.  I observed that person use a cane.  I

1          understand that he was assigned a bunk on the

2          second level but had difficulty walking up the

3          stairs, so he slept on the first level that night.

4          During the morning of May 29th, he was helped up

5          the stairs to the second level."

6          THE COURT:  Hang on.  Hang on, Ms. Pappy.  Let me just

7    read this first.

8          ATTORNEY SWEARINGEN:  It would be paragraphs 6 and 7

9    of the Duarte declaration.

10         THE COURT:  Got it.  Stand by.

11         (Pause.)

12         THE COURT:  All right.  Ms. Pappy, so this request is

13   being made to include a third date, which would be May 28th at

14   6:00 p.m. to May 29th at 8:00 a.m., which is -- those are

15   specifically identified in this declaration.

16         What's your position on adding that third date for

17   Unit 8C, Ms. Pappy?

18         ATTORNEY PAPPY:  As long as that's the last one,

19   that's fine.

20         THE COURT:  I'm going to -- I'm going to grant that

21   request.

22         And so there will be this third date of May 28th at

23   6:00 p.m. to May 29th at 8:00 a.m., given the specificity.  And

24   this is all with Unit 8C.

25         I'm going to specifically deny the request to provide

1  video footage from 8D, given the lack of specificity.  But that

2  is without prejudice, depending on what these videos show.

3           Ms. Pappy, given that there are the three nights at

4  issue, as well as the short body-worn camera clip, is July 8

5  still a doable time period to get these to the plaintiffs?

6           ATTORNEY PAPPY:  That's fine.  (Nods head.)

7           THE COURT:  All right.  Does everyone have any -- or

8  does anyone have questions about treating these videos pursuant

9  to the dispute resolution process?  Meaning that they are not

10  for purposes of litigation, at least until further ordered by

11  me?

12           ATTORNEY GRUNFELD:  Understood, your Honor.

13           THE COURT:  All right.  Very well.

14           Ms. Grunfeld and Mr. Swearingen, is there anything

15  further we should discuss this morning?

16           ATTORNEY GRUNFELD:  Not that I'm aware of.

17           ATTORNEY SWEARINGEN:  No, your Honor.

18           THE COURT:  Ms. Pappy, how about you?

19           ATTORNEY PAPPY:  No, your Honor.  Thank you.

20           THE COURT:  Okay.  Great.  Well, it was good to see

21  you all.  And I'm looking forward to seeing you all soon.  And

22  I hope you all have -- well, I guess I'll see you on -- I was

23  going to -- soon, meaning Wednesday.  Right?

24           All right.  Let me ask you this.  Did that work out

25  all right for you all with respect to flights back and forth?

1          I want to make sure you all get home for the holiday.

2          ATTORNEY PAPPY:  Fine.

3          ATTORNEY GRUNFELD:  Thank you, your Honor.  I have a

4  1:25 flight.  So if I miss it, I can take a four o'clock.

5          THE COURT:  No.  I told you, we're going to have a

6  hard stop at noon, unless we're going to settle the entire

7  case.

8          ATTORNEY GRUNFELD:  Okay.

9          THE COURT:  And if we are, you can stay an extra hour,

10  maybe.

11          Okay.  See you all on Wednesday.  Travel safely.  Take

12  care.

13          ATTORNEY GRUNFELD:  Thank you, your Honor.

14          THE COURT:  Bye-bye.

15          (Conclusion of proceedings.)

16

17                          --oOo--

18  I certify, by signing below, that the foregoing is a correct
   stenographic transcript, to the best of my ability, of the
19  digital recording of the audio proceedings had in the
   above-entitled matter this 5th day of July, 2024.  A transcript
20  without an original signature or conformed signature is not
   certified.  I further certify that the transcript fees and
21  format comply with those prescribed by the Court and the
   Judicial Conference of the United States.

22          /S/ Amanda M. LeGore

23  _____

24     AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

25