GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF ERIC MONEK ANDERSON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO NAPHCARE'S MOTION FOR APPROVAL OF CONFIDENTIALITY**

Magistrate: Hon. David D. Leshner

Date:      September 3, 2024
Time:      11:00 a.m.
Crtrm:     3A

I, Eric Monek Anderson, declare:

1.      I am an attorney duly admitted to practice before this Court. I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs and the Certified Class and Subclasses. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration in support of Plaintiffs' Opposition to NaphCare's Motion for Approval of Confidentiality.

2.      On February 3, 2022, the California State Auditor issued a report titled "San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody." A true and correct copy of an excerpt from that report is attached hereto as **Exhibit A**. The entire report is available publicly at https://information.auditor.ca.gov/reports/2021-109/index.html and has previously been filed in this case, including at Dkt. 119-3, Ex. B.

3.      On January 25, 2023, the Sheriff's Department issued a "State Jail Audit Progress Report," a true and correct copy of which is attached hereto as **Exhibit B**. The progress report is available on the Sheriff's Department's website: https://www.sdsheriff.gov/Home/Components/News/News/1782/514?npage=3&arch=1.

4.      On March 12, 2024, Justin Barkley of NaphCare testified at an evidentiary hearing on Plaintiffs' motion to compel production of documents from NaphCare. The transcript of that hearing is available on the public docket at Dkt. 599, with a true and correct copy attached hereto for convenience as **Exhibit C**.

5.      On June 7, 2024, Plaintiffs took the deposition of Mr. Barkley, who was designated as NaphCare's 30(b)(6) witness. As reflected in the transcript of that deposition filed by NaphCare, NaphCare designated the entirety of that deposition and the associated exhibits confidential at the deposition.

6.      On July 6, 2024, my colleague Gay Grunfeld wrote to NaphCare's counsel to object to NaphCare's designation of the entire Barkley transcript and all

1  exhibits as confidential.  After a meet and confer Zoom call on July 9, 2024,

2  NaphCare maintained its position regarding the transcript and exhibits.

3      7.    On July 11, 2024, NaphCare's counsel agreed to de-designate an

4  excerpt from NaphCare's health care policy and procedure manual, A-09 Procedure

5  In The Event Of A Patient Death.  That document was Exhibit 25 to the deposition

6  of Angela Nix, who was designated as NaphCare's 30(b)(6) witness to discuss

7  topics not addressed by Mr. Barkley.  A true and correct copy of the procedure is

8  attached hereto as **Exhibit D**.

9      8.    Pursuant to the Court's July 18, 2024 order, Dkt. 683, Plaintiffs and

10  NaphCare further met and conferred about NaphCare's confidentiality designations,

11  including in a Zoom call on July 29, 2024 and later by email.  Plaintiffs proposed

12  redactions to certain documents designated confidential, which NaphCare rejected in

13  favor of more broad redactions.  After further review of the documents, Plaintiffs

14  have revised their proposed redactions, although they are only slightly different in

15  scope.  Attached hereto as **Exhibit E** are Plaintiffs' as-revised proposed redactions

16  to the documents.

17      9.    Attached hereto as **Exhibit F** is a true and correct copy of an article

18  available on the public website of the National Commission on Correctional

19  Healthcare, titled "Spotlight on the Standards: Procedure in the Event of an Inmate

20  Death."  The article is available at the following link:

21  https://www.ncchc.org/spotlight-on-the-standards/procedure-in-the-event-of-an-

22  inmate-death/.

23      10.   On the Sheriff's Department's website, the Sheriff's Department posts

24  summaries of the circumstances of deaths dating back to 2021.  The summaries are

25  all available at this link: https://www.sdsheriff.gov/resources/transparency-reports.

26  The Sheriff's Department also posts public news releases about deaths.  Attached

27  hereto as **Exhibit G** is a true and correct copy of one such news release about a

28  2024 death at the Jail identifying the person who died and the cause of death.

11.     On March 2, 2023, the Sheriff's Department posted a news release about the medical examiner's report in the case of Lonnie Rupard.  That news release linked to the San Diego County Medical Examiner's autopsy report for Mr. Rupard.  True and correct copies of the release and the report are attached hereto as **Exhibit H**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 23rd day of August, 2024.


*/s/ Eric Monek Anderson*
Eric Monek Anderson

DECLARATION OF ERIC MONEK ANDERSON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
NAPHCARE'S MOTION TO MAINTAIN CONFIDENTIALITY

# TABLE OF CONTENTS

Exhibits to the Declaration of Eric Monek Anderson in Support of Plaintiffs' Opposition to NaphCare's Motion for Approval of Confidentiality

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---------|-------------|----------|
| A | California State Auditor Report, San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody, February 3, 2022 | 1 |
| B | San Diego County Sheriff's Department: State Audit Progress Report, January 25, 2023 | 12 |
| C | Official Transcript of March 12, 2024 Evidentiary Hearing | 24 |
| D | NaphCare Health Care Policy and Procedure Manual, A-09 Procedure In The Event Of A Patient Death | 134 |
| E | Exhibits 17, 18, 19, and 21 to NaphCare 30(b)(6) Deposition of Justin Barkley, with Plaintiffs' Proposed Redactions – FILED UNDER SEAL | 146 |
| F | National Commission on Correctional Healthcare, Spotlight on the Standards: Procedure in the Event of an Inmate Death | 147 |
| G | San Diego County Sheriff's Department, Update: Death Investigation – San Diego Central Jail, January 30, 2024 | 153 |
| H | San Diego County Sheriff's Department, In-Custody Death Finding, March 2, 2023 | 156 |

# EXHIBIT A



# San Diego County Sheriff's Department

It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody

*February 2022*

**REPORT 2021-109**



**Exhibit A-2**

 **CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814

 **916.445.0255** | TTY **916.445.0033**

 For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* auditor.ca.gov

*For questions regarding the contents of this report, please contact our* Public Affairs Office *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternative format reports available upon request | Permission is granted to reproduce reports

**Exhibit A-3**

**Michael S. Tilden** *Acting State Auditor*



February 3, 2022
***2021-109***

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the San Diego County Sheriff's Department (Sheriff's Department) to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps it took to address these deaths. The following report details our conclusion that the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody.

From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

Furthermore, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action. In addition, the Citizens' Law Enforcement Review Board (CLERB)—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. CLERB also failed to investigate nearly one-third of the deaths of incarcerated individuals in the past 15 years, which means that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

In light of the ongoing risk to inmate safety, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes.

Respectfully submitted,

*Michael Til*

MICHAEL S. TILDEN, CPA
Acting California State Auditor

## Selected Abbreviations Used in This Report

| | |
|---|---|
| ADP | average daily population |
| BSCC | Board of State and Community Corrections |
| CDCR | California Department of Corrections and Rehabilitation |
| CLERB | Citizens' Law Enforcement Review Board |
| POBR | Public Safety Officers Procedural Bill of Rights |

**Exhibit A-5**

# Contents

Summary    1

Introduction    7

Chapter 1
The San Diego County Sheriff's Department Did Not Take Sufficient
Steps to Prevent the High Number of Deaths in Its Jails    13

Chapter 2
Neither the Sheriff's Department nor CLERB Has Taken Adequate
Action in Response to the Deaths of Incarcerated Individuals    33

Conclusions and Recommendations    53

Appendix A
In-Custody Deaths in California's 15 Largest Counties    59

Appendix B
Scope and Methodology    61

Responses to the Audit
Board of State and Community Corrections    65

   California State Auditor's Comments on the Response From
   the Board of State and Community Corrections    71

Citizens' Law Enforcement Review Board    75

   California State Auditor's Comments on the Response From
   the Citizens' Law Enforcement Review Board    79

California Department of Justice    81

San Diego County Sheriff's Department    83

   California State Auditor's Comments on the Response From
   the San Diego County Sheriff's Department    115

**Exhibit A-6**

Blank page inserted for reproduction purposes only.

# Summary

### Results in Brief

In accordance with federal constitutional law, the San Diego County Sheriff's Department (Sheriff's Department) has a responsibility to provide adequate medical care for individuals while they are in its custody. Nonetheless, from 2006 through 2020, a total of 185 people died in San Diego County's jails—more than in nearly any other county across the State. Some of these individuals were in custody for only a few days to a few months; others were waiting to be sentenced, set to be released, or about to be transferred to different facilities. Although any death is a tragedy, the high rate of deaths in San Diego County's jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices have undermined its ability to ensure the health and safety of the individuals in its custody.

Significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails. For example, studies on health care at correctional facilities have demonstrated that identifying individuals' medical and mental health needs at intake—the initial screening process— is critical to ensuring their safety in custody. Nonetheless, our review of 30 individuals' deaths from 2006 through 2020 found that some of these individuals had serious medical or mental health needs that the Sheriff's Department's health staff did not identify during the intake process. Some of these individuals died within four days of their arrest. Moreover, in one case we reviewed, an incident between two cellmates resulted in one's death. In this instance, the intake nurse did not identify that the perpetrator had a history of mental health issues. Had the perpetrator's mental health issues been identified properly at intake, the department's staff might have placed this individual in a different cell, leading to a different outcome.

When we evaluated the intake practices of three comparable counties, we found that the counties had procedures that are more comprehensive. For example, the San Diego Sheriff's Department relies on registered nurses to perform the mental health portion of its intake screening, even though these nurses may not specialize in mental health care. In contrast, the Riverside County Sheriff's Department's policy requires that a mental health clinician evaluate every individual at intake. Implementing similar policies could help the San Diego Sheriff's Department to more effectively identify mental health needs early.

**Audit Highlights . . .**

*Our audit of the San Diego County Sheriff's Department's response to deaths of individuals in its custody highlighted the following:*

» *Until the Sheriff's Department implements meaningful change to improve its provision of medical and mental health care in its detention facilities, it will continue to jeopardize the safety and lives of individuals in its custody.*

  • *We found multiple instances of individuals who requested or required medical and mental health care and did not receive it at all or in a timely manner.*

  • *In our review of deaths that occurred in the department's custody, deputies performed inadequate safety checks to ensure the well-being of those individuals.*

» *Some of the Sheriff's Department's policy deficiencies are the result of statewide corrections standards that are insufficient for maintaining the safety of incarcerated individuals.*

  • *The Board of State and Community Corrections should require mental health evaluations to be performed by mental health professionals at intake, and it should clarify and improve procedures for safety checks.*

» *The entities responsible for investigating in-custody deaths are not doing so in a thorough, timely, or transparent manner.*

  • *The department's Critical Incident Review Board should consistently review deaths by natural causes, increase public transparency, and take substantive steps to prevent similar future deaths.*

*continued on next page . . .*

**Exhibit A-8**

- *CLERB should prioritize the investigations of all deaths that occur in the department's custody and complete those investigations within the one-year statutory limit.*

In addition, the Sheriff Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not always follow up consistently— such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

For example, one individual urgently requested mental health services shortly after entering the jail. However, the nurse had not identified any significant mental health issues at intake and determined that the individual did not qualify for an immediate appointment. The individual died by suicide two days later—only four days after entering the jail. Although the Sheriff's Department's policy indicates that a face-to-face appraisal with an incarcerated individual should take place within 24 hours of a mental health care request to determine the urgency of that request, the department has not always had this policy. Further, this policy only applies to mental health requests and not medical health care requests. Thus, the Sheriff's Department does not ensure that it provides prompt care for all types of needs.

In addition to providing adequate health care, performing safety checks is a key component of ensuring the well-being of individuals in detention facilities. Conducting these checks—which state law requires hourly through direct visual observation—is the Sheriff's Department's most consistent means of monitoring for medical distress and criminal activity. Nonetheless, in our review of 30 in-custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy. In contrast, the Riverside County Sheriff's Department has a formal policy that requires supervising staff to regularly review videos of safety checks being performed, and it is thus in a better position to assess the quality of safety checks.

The problems we identified with the Sheriff's Department's policies are in part the result of statewide corrections standards that are not sufficiently robust. The Board of State and Community Corrections

**Exhibit A-9**

(BSCC) establishes in regulation the minimum standards that local detention facilities must follow. Every local jail system throughout the State uses these standards to create policies for inmate safety and care. However, some of the standards are insufficient for maintaining the safety of incarcerated individuals. For example, they do not explicitly require that mental health professionals perform the mental health screenings during the intake process. Further, they do not describe the actions that constitute an adequate safety check: rather, they simply state that safety checks must be conducted at least hourly through direct visual observation. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving the statewide standards is essential to ensuring the health and safety of individuals in custody in all counties.

In addition to its failure to adequately prevent the deaths of individuals in its custody, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action related to preventing deaths. The Sheriff's Department's internal entity for reviewing critical incidents, such as in-custody deaths, and identifying corrective measures—the Critical Incident Review Board—has not always taken substantive steps to prevent similar future deaths in the cases we examined. The primary focus of this board is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals. Further, this board generally does not review deaths from natural causes, which represented nearly half of the deaths of individuals in the custody of the Sheriff's Department during the 15-year period of our review. We are concerned that the Sheriff's Department considers the Critical Incident Review Board's reviews to be confidential under the attorney-client privilege and does not have a process to report the results publicly. Consequently, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future.

The Sheriff's Department has also not implemented certain key recommendations from external oversight entities. From 2006 through 2020, multiple external entities—including the San Diego County Grand Jury—have made recommendations to the Sheriff's Department in areas related to inmate safety. Although the Sheriff's Department implemented several of these recommendations, it did not take action on others, even though they were critical to improving the safety of individuals in its custody. For example, it did not implement recommendations that involved enhancing its safety checks and improving the way it communicates incarcerated individuals' mental health needs to its staff.

**Exhibit A-10**

To restore public confidence in county law enforcement, San Diego County voters approved the Citizens' Law Enforcement Review Board (CLERB) in 1990, a citizen-governed board. CLERB is responsible for reviewing complaints of misconduct and investigating deaths arising in connection with the actions of officers employed by the Sheriff's Department or Probation Department. However, CLERB has failed to provide effective, independent oversight of in-custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. CLERB has not independently interviewed witnesses or visited the initial scenes of the deaths. Further, it has not consistently performed thorough investigations, and it relies largely on the reviews the Sheriff's Department conducts.

Moreover, CLERB failed to review dozens of deaths in the Sheriff's Department's jails. State law generally requires that CLERB's investigations be performed within a year of discovery of the death or misconduct. Because CLERB did not consistently prioritize its investigations of deaths over other complaints of misconduct, it did not review 13 cases involving deaths in the Sheriff's Department's jails within the required time limit. Further, CLERB did not investigate an additional 40 deaths because it did not believe its rules and regulations required it to review natural deaths. As a result, it did not identify any weaknesses in the Sheriff's Department's policies or processes that may have contributed to these deaths nor develop any recommendations to address these weaknesses. Although CLERB currently reviews natural deaths, it lacks specific language in its rules and regulations requiring it to do so, thus raising concerns about whether its staff could exclude those reviews in the future.

Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes. Until the Sheriff's Department makes such changes, the weaknesses in its policies and practices will continue to jeopardize the health and lives of the individuals in its custody.

**Exhibit A-11**

# EXHIBIT B



SAN DIEGO COUNTY
SHERIFF'S DEPARTMENT

# PROGRESS REPORT

## UPDATE ON STATE JAIL AUDIT



**Exhibit B-13**

2023

# Committed to Improving

## A Progress Report One-Year After the State Audit on County Jails

On February 3, 2022, the California State Auditor released their report to the Governor and legislative leaders titled: "*San Diego County Sheriff's Department: It has failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody*" (Audit Report)[1]. The report provided findings over the last 15-years on data, protocol, and prevention procedures related to in-custody deaths of incarcerated individuals in the care of the San Diego County Sheriff's Department (Sheriff's Department).

During the extensive 6-month audit, representatives from the State Auditor's Office were provided access to Sheriff's Department records of in-custody deaths, policies, procedures, facility maintenance, and staff. The Department was cooperative and transparent during the audit review process. Upon the release of the Audit Report, and its accompanying recommendations, the Sheriff's Department issued a detailed response to each recommendation providing further information and context as it aligned to the bigger effort of improving the custodial setting in county jails[2].

Over the course of the past year, the Sheriff's Department remained steadfast in its commitment to improving conditions in county jails. The Sheriff's Department is undergoing changes to improve its healthcare service delivery model by renovating aging facilities, increasing staff, and implementing new programs and initiatives. The goal of these changes is to improve overall health care and treatment for those in our custody, improve rehabilitation opportunities, and reduce recidivism.

> *"Accountability, transparency, and the genuine commitment to doing better are the drivers to creating a new level of care to individuals in custody while supporting the needs of our detentions team."*
> **Sheriff Kelly Martinez**

---

[1] California State Auditor Report on San Diego County Jails **https://www.bsa.ca.gov/reports/2021-109/index.html**
[2] Sheriff's Department Response to State Audit of County Jails
**https://www.sdsheriff.gov/home/showpublisheddocument/4717/637794797354130000**

**2**

**Exhibit B-14**

## Holding Ourselves Accountable and Transparent

Throughout our history and especially in the past year, the Sheriff's Department has made a concerted effort to keep representatives from the San Diego State Legislative Delegation apprised of areas of interest, while maintaining lines of communication with the San Diego County Board of Supervisors (Board) and our communities. The Board has received updates on the progress of implementing new programming and initiatives across the jail system to prevent further deaths, in addition to hosting a formal Board Meeting presentation focused on the progress being made in San Diego County jails. Board support of the Sheriff's Department initiatives and investment in improving jail infrastructure and services, while bolstering staffing needs, demonstrates the collective sense of urgency and attention to improving the safety and security for those in our custody.

Community dialogue has also taken place as the Sheriff's Department met with community advocates, racial justice groups, as well as the San Diego County Human Relations Commission. These mutually beneficial exchanges facilitated opportunities for not only the Sheriff's Department to educate and share our initiatives and actions which are underway to improve conditions, but to have meaningful dialogue with community members, especially those who advocate for families that had loved ones die while in custody.

While the State Auditor indicated "*no single entity has sufficient oversight authority over the Sheriff's Department to require it to make meaningful changes… we believe that the Legislature should direct the Sheriff's Department to implement the changes we detail below,*" the Sheriff's Department respectfully disagrees with this statement. Sheriff Martinez has and continues to keep the efforts of improving jails at the forefront of her priorities. She believes the only way to develop and maintain the public's trust and confidence in this process is to promote transparency through open and honest communication.



**Exhibit B-15**

## Progress Report on State Audit Recommendations

The following section provides an update on the progress the Sheriff's Department has been implementing as it relates to the recommendations provided in the State Audit. The Audit focused on many recommendations directed towards the State Legislature, the San Diego Sheriff's Department, the Board of State and Community Corrections, and the San Diego County Citizens' Law Enforcement Review Board. For the purpose of this progress report, the Sheriff's Department will speak to recommendations directly impacting its operations and the status of either the completion, the progress, and/or if other action has been taken.

Several policy changes provided in the following section have been standard practices of the Sheriff's Department, however, in early 2023, they will be codified into policy to align with the Department's goal of earning accreditation from the National Commission on Correctional Health Care (NCCHC).

### RECOMMENDATIONS

*Legislature—All Sheriff's Departments and the California Department of Justice*

**To ensure that all sheriff's departments accurately report deaths that occur from incidents or conditions in county jails, the Legislature should amend state law to require sheriff's departments to report to the attorney general individuals who are released from custody after being transported directly to a hospital or similar medical facility and subsequently die in the facility. It should also amend state law to require sheriff's departments to provide the attorney general with all facts concerning the death, such as the cause and manner. The California Department of Justice should annually publish this information on its website.**

Since 2021, the San Diego County Sheriff's Department has been reporting to the California Department of Justice, if the Sheriff's Department became aware of any individual who was released from custody at a medical facility and subsequently died there. Additionally, in 2022, the Governor signed Assembly Bill 2761, which mandates sheriff's departments shall report the following information on their public internet websites (Penal Code section 10008(a)):

- The full name of the agency with custodial responsibility at the time of death;
- The county in which the death occurred;
- The facility in which the death occurred, and the location within that facility where the death occurred;
- The race, gender, and age of the decedent;
- The date on which the death occurred;
- The custodial status of the decedent, including, but not limited to, whether the person was awaiting arraignment, awaiting trial, or incarcerated; and
- The manner and means of death

The San Diego County Sheriff's Department on its own initiative has been providing similar data over the past two years in its public website www.sdsheriff.gov "Open Data Portal" and will be expanding its reports to include the additions listed in the new statute, which went into effect on January 1, 2023.

**4**

**Exhibit B-16**

*Legislature—San Diego Sheriff's Department*

**To ensure that the San Diego Sheriff's Department identifies individuals' medical and mental health needs at intake, the Legislature should require it to revise its policies to better align with best practices, as follows:**

- **Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them.**

   The Department is actively moving toward providing 24-hour mental health care in the facilities, including the availability of mental health professionals during the intake process at the receiving facilities. This includes hiring additional mental health staff and contracting for services with our current provider, NaphCare. We have implemented in-depth mental health care screening for every individual during the booking process. This includes utilizing Qualified Mental Health Professionals and tools like the Columbia Suicide Severity Rating Scale (C-SSRS) to better evaluate suicide risk and refer individuals to the appropriate mental health resources sooner. This is documented in our electronic healthcare record keeping system for referral and tracking.

   We have looked at the viability of implementing a mental health acuity level rating scale[3] to assist in the housing process, however, they are very system-specific and through our research we have learned simply mirroring another county is not feasible. The San Diego Sheriff's Department classifies and houses our incarcerated population based on several criteria including but not limited to current charges, criminal sophistication, ability to maintain in main line housing, documented safety risks and past behavior/actions while incarcerated. Making the shift to housing individuals by acuity level would create a need for acuity-based housing for each classification level, to include those who need to be kept separate for security reasons, those in protective custody, and other unanticipated housing issues. With this model, there is also a larger potential for the use of administrative separation housing for those who cannot remain in the general incarcerated person population, something we would like to steer away from as it limits access to programming opportunities and rehabilitative services.

- **Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.**

   Unlike many other counties, San Diego does not have a coordinated county health system or shared electronic health care records system. As a result, we cannot meet this recommendation as written. However, in May 2022, by way of our contract with NaphCare, jail medical staff continued using TechCare for all health care records. We were also able to gain access to SureScript, a system allowing

---

[3] A mental health acuity rating scale is an assessment tool used to identify the amount of mental health resources needed for an incarcerated person at the time of assessment, e.g., acute, moderately severe, severe, moderate, mild, minimum.

Exhibit B-17

staff to verify prescription medication history to assist with identifying previously diagnosed medical and mental health treatment, facilitate dispensing medications sooner, and decrease the timeline to provide follow-up care. Medical and mental health staff also gained access to StatCare, a 24/7 telemedicine provider, available for use when a provider is not on-site, and a consultation is needed. This system is used to supplement provider staffing and reduce wait times for addressing medical and mental health requests.

In April 2021, Qualified Mental Health Providers (QMHP), such as mental health clinicians, psychologists, psychiatrists, and psychiatric technicians, were granted "read-only" access to Cerner Community Behavioral Health (CCBH), a system currently utilized by San Diego County Mental Health. This breakthrough allowed QMHP's to review records at any point in the patient's custody, including during intake, to assist with determining treatment while in custody and appropriate housing. Additionally, the Sheriff's Department and County of San Diego Health and Human Services Agency (HHSA) are currently working collaboratively to create an interface between Cerner and TechCare to improve health information accessibility to our providers. The sharing of information with our community partners will facilitate a bilateral continuity of behavioral health care between agencies to positively impact patient care and promote the coordination of community care.

In June 2022, the Department also implemented voluntary drug and alcohol screening at intake. This process supplements questions from medical staff at intake and is used to confirm if someone is under the influence of drugs or alcohol. The results along with Clinical Institute Withdrawal Assessment Alcohol Scale (CIWA) and Clinical Opiate Withdrawal Scale (COWS) scoring allow for better treatment and management of withdrawal symptoms starting at intake and following an individual through their participation in the medication-based detoxification program for opioid and alcohol withdrawal.

**To ensure that the Sheriff's Department provides the necessary medical and mental health care to individuals incarcerated in its facilities, the Legislature should require it to do the following:**

- **Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.**

  In August 2022, the Department began the practice of requiring nurses to schedule an individual for an appointment with a provider upon receipt of two requests from an incarcerated individual regarding any condition. This is both a NaphCare protocol and National Commission on Correctional Health Care standard and will be adopted into the official department policies and procedures in early 2023.

- **Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request.**

  The nursing staff is currently doing face-to-face assessments within 24-hours of receipt of a request for medical services at the facilities. This process was implemented on December 15, 2022, and the practice follows National Commission on Correctional Health Care standards. This practice will be adopted into department policies and procedures in early 2023."

**Exhibit B-18**

- **Revise its policy to require more frequent psychological follow-up after release from the inmate safety program, including at least monthly check-ins.**

  The Department will be updating its policy in early 2023 which will integrate new language that will state: "*patients will be reassessed within 24-hours of being discharged from suicide watch by a qualified mental health professional or appropriately trained qualified health care professional on days where no qualified mental health professional is onsite*." This effort came about in late 2022 as part of the onboarding process with NaphCare. Therefore, the policies will require that Qualified Mental Health Providers follow-up with an individual within 24-hours of discharge from the Detentions Safety Program and will require at least monthly check-ins until the end of their incarceration.

- **Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.**

  Patients have the right to refuse medical and mental health care while in Sheriff's custody. Every effort is made to accurately document care refusals by incarcerated persons and varies depending on the situation at-hand, for instance:

  <u>Medication Refusals</u> - In the event a patient refuses prescribed medication, the nurse will counsel them on the potential impact and try to convince them to take the prescribed medication. If the patient declines, they will be asked to sign the refusal form, which will be witnessed by the nurse. If the patient refuses to sign, the nurse will sign the form and the accompanying sworn staff member will sign as a witness. A copy of the form will be placed into the health records system (TechCare) for reference.

  <u>Medical Appointment Refusal</u> - The patient will be counseled by medical staff, which may include a provider or nurse, regarding the potential effects on their health of missing the appointment and try to convince them to attend. If the patient still refuses the appointment, the patient will be given an opportunity to sign the medical refusal form. In the event the patient refuses to sign the refusal form, the nurse will sign the form. A copy of the form will be placed into the health records system (TechCare) for reference.

  <u>Mental Health Refusal</u> - If the patient refuses to meet with the Mental Health Clinician (MHC) at first attempt, the MHC will sign the refusal and have the patient sign the refusal as well. If the patient is unwilling to sign the refusal the MHC will sign the form as well as the accompanying sworn staff member, who will sign as a witness. A copy of the form will be placed into the health records system (TechCare) for reference. Additionally, the MHC will mark the scheduled appointment as "complete" and document as "refused" in their electronic health record and reschedule for a second attempt. Subsequent refusals may require additional follow-up.

  <u>Psychiatry Appointment Refusal</u> - If the patient refuses to meet with a psychiatrist, the rescheduling process is handled by Naphcare, and may include in-person or tele-psychiatry appointments.

**Exhibit B-19**

**To ensure that sworn staff properly perform safety checks, the Legislature should require the Sheriff's Department to do the following:**

- **Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.**

  Safety checks shall be conducted at least once within every 60-minutes. Efforts are made to not disturb a sleeping incarcerated person and still comply with the requirements of looking at the individual for any obvious signs of medical distress, trauma, or criminal activity. However, sleep patterns of the entire incarcerated population vary throughout the day, and it is not feasible to have a policy requirement that incorporates not waking an individual. Checking for obvious signs of medical distress or trauma may require waking the individual as some sleep in such a manner that it is difficult to meet the policy requirements without doing so.

  Hard count is conducted twice per day (1000-1200 and 2100-2300 hours). This count involves verbal or physical acknowledgment to the deputy from each incarcerated person. Another mechanism is through the visual verification of the incarcerated person's identity by comparing the person's wristband photo to the person's face to the Jail Information Management System record.

  There are four soft counts (0400-0500, 0600-0700, 1700-1800, and 1830-1930). The soft counts coincide with mealtimes and the start or end of shift. All soft counts require verbal or physical acknowledgment from each incarcerated person and count of the number of incarcerated persons in the module/area/unit.  The incarcerate person needs to respond during these counts and disturbing sleep may be necessary.

- **Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff members perform.**

  Current policy requires a sworn supervisor to review safety checks of one complete shift from each team on an ongoing monthly basis. The Jail Information Management System (JIMS) Area Activity Logs and corresponding video footage shall be utilized for the review of safety checks. Sergeants already review the JIMS Logs twice per shift and the Lieutenant once per shift. Video footage may vary on quality and availability depending on facility. As the body-worn camera program expands across all detention facilities, the Sheriff's Department has been able to supplement facility CCTV footage and can capture audio interaction between deputies conducting checks with incarcerated persons. The completed reviews are documented and reviewed via chain of command by the facility commander for which the review was conducted. Once reviewed and approved, records of the reviews are electronically retained at each facility for two years. Facilities are not limited on the number of reviews

**Exhibit B-20**

that can be conducted. Supplemental reviews may be conducted by whichever means the facility commander finds appropriate.

**To ensure that department staff promptly respond to unresponsive individuals, the Legislature should require the Sheriff's Department to revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow. The Legislature should also require that the Sheriff's Department provide sworn staff with additional training for starting CPR immediately and how to properly alert medical staff.**

Since April 2016, Detentions Policy required sworn staff to immediately call for a medical response, activation of 9-1-1 emergency medical services, and initiate CPR, as needed. In December 2022, the policy section reading, "*Absent rigor mortis or post-mortem lividity, all inmates with a potential for resuscitation shall be provided basic life saving measures*," was removed to address the State Audit's concern regarding sworn staff failing to initiate CPR given what they believed were exceptions as listed above. This change was also addressed in the Detentions Training Unit's CPR/First Aid Class, which includes how to properly communicate via radio for 9-1-1 and medical staff notification of an emergency, as well as initiate CPR and utilize the Automated External Defibrillator (AED) as appropriate. To emphasize the importance of implementing these changes, Command Staff regularly attends the required CPR First Aid Training classes to reinforce these changes to staff in training and is supplemented by ongoing collaborative training involving sworn and medical staff in emergency response at each facility.

**To ensure that the Sheriff's Department properly assesses the reasons for each in-custody death and makes prompt changes as necessary in response, the Legislature should require it to revise its policy to specify the following:**

- **Staff will provide a written report of each 30-day medical review to its management.**

Department policy states: "*A medical review of every in-custody patient's death shall be conducted within 30 days*." The Department facilitates several reviews, including a review by the In-Custody Death Advocate and Department Investigation Coordinator within a week of an incident. This review encompasses a synopsis of the incident, response by involved employees, and an update to the investigation. This review is completed prior to the Critical Incident Review Board's (CIRB) presentation. CIRB presentations consists of affected facility command, Division of Inspectional Services, Homicide, and Department Command Staff. The preliminary review addresses initial areas of the appropriateness of clinical care; assesses whether changes to policies, procedures, or practices are warranted; and identifies issues that require further study. Due to the early nature of these reviews, neither of these reviews have access to the Medical Examiner's reports as those are unavailable at the time of the reviews.

It should be noted that due to workload, the Medical Examiner's Official Cause of Death may take months to determine, which could affect the 30-day review report completed by the Chief Medical

*Exhibit B-21*

Officer. Therefore, the Sheriff's Department finds its two reviewing mechanisms to be effective and necessary to identify policy violations, changes that need to be made, or deficiencies in training.

In-custody death response and prevention measures are highly scrutinized at all levels during the reviews and can include items related to response, training, and current policies and practices. Recommendations can be made by anyone in the chain of command including facility and Department Command staff, as well the In-Custody Death Advocate and Department Investigation Coordinator, the CIRB Board, and the Chief Medical Officer. Recommended improvements are tracked by the Division of Inspectional Services to ensure implementation.

- **When warranted, the report should specify recommendations for changes to prevent further deaths.**

   In-custody death response and prevention measures are highly scrutinized at all levels during the reviews and can include items related to response, training, appropriateness of care, and current policies and practices. Recommendations can be made by anyone in the chain of command including facility and Department Command Staff, as well the In-Custody Death Advocate and Department Investigation Coordinator, CIRB Board, and the Chief Medical Officer. Recommended improvements are tracked by the Division of Inspectional Services to ensure implementation.

- **The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and identify issues that require further study.**

   In-custody death response and prevention measures are highly scrutinized at all levels during the reviews and can include items related to response, training, appropriateness of care, and current policies and practices. Recommendations can be made by anyone in the chain of command including facility and Department Command Staff, as well the In-Custody Death Advocate and Department Investigation Coordinator, CIRB Board, and the Chief Medical Officer. Recommended improvements are tracked by the Division of Inspectional Services to ensure implementation.

**To improve oversight of in-custody deaths and encourage meaningful action to prevent future deaths, the Legislature should require the Sheriff's Department to revise its policy to require that the Critical Incident Review Board review natural deaths.**

   On March 29, 2022, Sheriff's Policies and Procedures Section 4.23 was amended to require the Critical Incident Review Board review all in-custody deaths.

**To increase the transparency of the Sheriff's Department's reviews of in-custody deaths, the Legislature should require the Sheriff's Department to either make public the facts it discusses and recommendations it decides upon in the relevant Critical Incident Review Board meetings or to establish a separate public process for internally reviewing deaths and making necessary changes.**

   Upon completion of the Critical Incident Review of an in-custody death, the Sheriff's Department will publish a brief synopsis of the facts it discussed of the incident, any recommendations or action items,

**Exhibit B-22**

policy revisions resulting from the incident review, and the dates those items were accomplished. Currently, the Sheriff's Department is completing and posting these reviews for in-custody deaths that occurred beginning and after January 1, 2022.

**To ensure that the Sheriff's Department provides complete and prompt assistance to CLERB's investigations, the Legislature should require the Sheriff's Department to do the following:**

- **Revise its policy to include CLERB in its immediate death notification process.**

  On February 14, 2022, the Sheriff's Department signed a Memorandum of Understanding[4] to include a CLERB investigator in the death notification process.

- **Revise its policy to allow a CLERB investigator to be present at the initial death scene.**

  On February 14, 2022, the Sheriff's Department signed a Memorandum of Understanding to allow a CLERB investigator to have limited access to death scenes.

- **Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.**

  The Sheriff's Department has a well-established record of cooperating with and supporting CLERB's investigations. We are responsive to CLERB subpoenas, sworn employees are required to respond to CLERB queries via electronic Sheriff's Employee Response Forms (eSERFs), and have the option to speak with CLERB investigators during in-person interviews.

## Conclusion

The San Diego Sheriff's Department has leveraged the State Audit as an opportunity to reimagine the way services can be offered and delivered to those in its care and custody. Going beyond the audit recommendations, the Sheriff's Department has elevated its forward-thinking strategy by partnering with local and state entities to enhance its service delivery, address staffing shortfalls, bolstering medical and mental health care, creating new programming and processes, while using technology to our advantage.

---

[4] **SDSD and Citizen Law Enforcement Review Board MOU**

**Exhibit B-23**

# EXHIBIT C

Exhibit C -24

Pages 1 - 108

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

DARRYL DUNSMORE, et al.,          )
                                  )
            Plaintiffs,           )
                                  )
  VS.                             )        NO. 20-CV-00406-AJB-DDL
                                  )
STATE OF CALIFORNIA, et al.,      )
                                  )
            Defendants.           )
_____)

San Diego, California
Tuesday, March 12, 2024

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

 Liberty Player Recording 9:02 a.m. - 11:44 a.m. = 162 minutes

**APPEARANCES:**

For Plaintiffs:
                ROSEN BIEN GALVAN & GRUNFELD, LLP
                101 Mission Street, Sixth Floor
                San Francisco, California 94105
        BY:  **PRIYAH KAUL, ESQ.**
             **RICHARD VAN SWEARINGEN, ESQ.**


For Third Party NaphCare of San Diego LLC:
                MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
                801 South Figueroa Street, 15th Floor
                Los Angeles, California 90017-3012
        BY:  **G. CRAIG SMITH, ESQ.**

Transcribed By:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                Official Court Reporter

**Exhibit C -25**

```
 1                          I N D E X

 2      Tuesday, March 12, 2024 - Volume 1

 3

 4      NAPHCARE OF SAN DIEGO LLC'S WITNESSES         PAGE   VOL.

 5      BARKLEY, JUSTIN
          (SWORN)                                       5    1
 6      Direct Examination by Mr. Smith                 5    1
        Cross-Examination by Ms. Kaul                  11    1
 7      Redirect Examination by Mr. Smith             57    1
        Recross-Examination by Ms. Kaul               60    1
 8      Recross-Examination (Resumed) by Ms. Kaul     78    1

 9                        E X H I B I T S

10      PLAINTIFFS' EXHIBITS                   IDEN   EVID   VOL.

11      1                                       12     14     1

12      2                                       38     40     1

13      3                                       50     51     1

14      COURT'S EXHIBITS                       IDEN   EVID   VOL.

15      1                                       67            1

16      2                                       68            1

17      3                                       68            1

18

19

20

21

22

23

24

25
```

**Exhibit C -26**

1   **Tuesday - March 12, 2024**                              **9:02 a.m.**

2                       **P R O C E E D I N G S**

3                              **---oOo---**

4            **THE COURT:**  Good morning.

5            **MR. SMITH:**  Good morning, Your Honor.

6            **MS. KAUL:**  Good morning.

7            **THE CLERK:**  Please be seated and come to order.

8        Calling Matter 1, 20-CV-0406, Dunsmore versus State of

9    California, et al., for an evidentiary hearing.

10           **THE COURT:**  And good morning.

11       May I have appearances from counsel, beginning with

12   plaintiffs' counsel.

13           **MS. KAUL:**  Good morning, Your Honor.  Priyah Kaul for

14   the plaintiffs.

15           **THE COURT:**  Good morning, Ms. Kaul.

16           **MR. SWEARINGEN:**  Good morning, Your Honor.

17   Van Swearingen for the plaintiffs.

18           **THE COURT:**  Good morning, Mr. Swearingen.

19           **MR. SMITH:**  Good morning, Your Honor.  Craig Smith on

20   behalf of Third Party NaphCare San Diego LLC.

21           **THE COURT:**  Great.  Good morning, Mr. Smith.

22       I appreciate everyone being here today for the continued

23   hearing on the plaintiffs' motion to compel.

24       When we were last together on February 6th, I set this

25   matter for an evidentiary hearing to provide the plaintiff with

**Exhibit C -27**

1  an opportunity to cross-examine Justin Barkley, who submitted a

2  declaration in support of NaphCare's opposition to the motion

3  to compel.  That is Document -- or Docket Number, I should say,

4  503-7.

5       And, Mr. Smith, I believe that I informed you at the time

6  that it would be up to NaphCare whether you wish to use

7  Mr. Barkley's declaration as his direct examination testimony

8  or whether you wish to conduct a -- a direct examination in

9  court.  Regardless, I would provide the plaintiffs with an

10 opportunity to cross-examine Mr. Barkley.

11      What's your preference, sir?

12      **MR. SMITH:**  My preference is just a brief direct

13 examination in addition to the declaration.

14      **THE COURT:**  That would be just fine.

15      And then, for our purposes, I want to think through the

16 issues that are raised on the privilege assertions, and then I

17 want to talk to the parties about the chart that NaphCare

18 provided with its responses to the bullet points and -- and

19 come up with a plan for that.

20      But because Mr. Barkley is here -- and I do appreciate you

21 being here, sir -- why don't we go ahead and make good use of

22 his time and proceed.

23      So you may come up, Mr. Barkley.

24      **THE CLERK:**  Hi.  Please stand right here.

25      Can you raise your right hand?

**Exhibit C -28**

1          **JUSTIN BARKLEY**,

2   called as a witness for Third Party NaphCare of San Diego LLC,

3   having been duly sworn, testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.

6       You may take the stand.

7       Please state your name and spell your last name for the

8   record.

9              **THE WITNESS:**  Okay.  Is this good?

10             **THE CLERK:**  Yeah.

11             **THE WITNESS:**  All right.  It's Justin Barkley, and my

12  last name is spelled B-a-r-k-l-e-y.

13             **THE COURT:**  All right.  Thank you, Mr. Barkley.

14                  **DIRECT EXAMINATION**

15  BY MR. SMITH:

16  **Q.**   All right.  Good morning, Mr. Barkley.

17       Can you state your position with NaphCare --

18  **A.**   Sure.

19  **Q.**   -- for the Court?

20  **A.**   Sure.

21       I'm the Chief Legal Officer.

22  **Q.**   Okay.  And we're here today to discuss morbidity and

23  mortality reviews that are conducted by NaphCare.  If you

24  could, tell us what the purpose is for conducting those

25  morbidity reviews.

**Exhibit C -29**

1   **A.**   Sure.

2       So we do, at the corporate level, morbidity/mortality

3   reviews primarily for the purpose of helping me and my legal

4   team give legal advice to the company and also to receive

5   information that helps us give that legal advice, also to give

6   legal advice during the course of those meetings.

7   **Q.**   All right.  And are these morbidity and mortality reviews

8   done pursuant to the contract with County of San Diego?

9   **A.**   No.

10  **Q.**   All right.  Are these the site inspection reviews that are

11  conducted?

12  **A.**   No.  So the -- the documents that we mark "Privileged" in

13  our privilege log pertain to a corporate-level mortal- --

14  mortality and morbidity review.

15  **Q.**   All right.  And who attends those reviews?

16  **A.**   So since I took this position -- position in September,

17  that will be me, other members of our legal department, so

18  lawyers, a paralegal -- currently, it's a -- actually a nurse

19  paralegal who sort of runs point on having the documents

20  together and doing the prep work for that meeting and setting

21  the agenda -- or preparing the agenda, preparing the minutes

22  afterward, preparing the slide deck that's reviewed during the

23  meetings.

24      Also in attendance would be the County executives'

25  clinical leadership, so our Chief Medical Officer, other

**Exhibit C -30**

1  corporate medical physicians, nursing staff, pharmacy --

2  pharmacists, and then our CEO, who is also an attorney.

3  **Q.**   All right.  Does anybody that provides health care to the

4  particular inmate who is deceased ever attend those meetings?

5  **A.**   No.  So these are, again, corporate-level leadership,

6  clinical and legal leadership.

7  **Q.**   And what is the purpose of having them at the meeting?

8  **A.**   What's the purpose of having the clinical leadership

9  there?

10  **Q.**   Yes.

11  **A.**   Sure.

12        So, you know, when we -- in our industry of providing

13  correction health care in jails and prisons, there is a high

14  propensity of any inmate death resulting in potential

15  litigation.  In fact, we report every death to our insurance

16  carrier.

17        And so one of the advantages of having those resources

18  available to our legal department, you know, corporate

19  physicians, corporate nurses, is that we can get the benefit of

20  their clinical expertise in evaluating that death on the front

21  end; right?  We don't have to go out and engage outside experts

22  to talk about standard of care, causation, deliberate

23  indifference standards.  We have a team available to us.

24        And so during the -- so we gather the information.  We

25  talk about it in the review.  We, as the legal department,

**Exhibit C -31**

1    receive feedback from the clinical team about what issues may

2    or may not be there, defensibility of the case, weak points of

3    the case.  It informs our -- lots of our strategic decisions,

4    as the legal department, going forward.

5         You know, are we going to engage out- -- outside counsel?

6    Which outside counsel?  Do we want to engage in early

7    resolution or settlement talks?  Do we -- you know, which

8    experts do we want to try to -- you know, what type of experts?

9    We need a cardiology expert, we need a correctional standard

10   expert, what kind of experts we might have to engage.

11        So that's -- I would say that's the primary purpose we

12   have the clinical leadership involved.

13   **Q.**   Okay.  And there's also site inspection morbidity reviews

14   that are conducted as well; correct?

15   **A.**   Yes.  So we have our -- we have a policy, and at

16   different -- different facilities, different jails and prisons,

17   it's called different things.  Sometimes it's called a MAC

18   committee.  Usually, that stands for Medical Administration

19   Committee.

20        So it's, you know, us, the medical side, administration,

21   meaning the jail or prison administration, kind of a joint

22   committee where issues are discussed.  And that can include

23   reviews of similar events or deaths.  Sometimes there's a

24   separate CQI meeting.  Sometimes there's a separate

25   mortality/morbidity.

**Exhibit C -32**

1    But, yeah, we -- it is -- it is our policy and practice

2   that, at each site level, there is some sort of review of the

3   death for the purpose of identifying issues and implementing

4   site-level corrections.

5   **Q.**   Okay.  And so the records that are at issue here in the

6   privilege log -- those are just with respect to the morbidity

7   and mortality reviews that are done on a corporate level;

8   correct?

9   **A.**   Correct.

10  **Q.**   And are those done at your direction?

11  **A.**   Since September, yes.

12  **Q.**   All right.  And are the documents that are submitted to

13  you for review also at your direction?

14  **A.**   Yes.

15  **Q.**   Okay.  I'm -- is there anything else you'd like to inform

16  the Court as to the primary purpose of conducting these?

17  **A.**   I would say that there are times within this process that

18  we, at the corporate-level review, also identify issues that

19  are opportunities for improvement.  Those are typically

20  referred down to the site level for that.

21      And that is certainly something -- from my perspective, as

22  the legal department, it's something we're doing, you know,

23  one, proactively, certainly to save lives and improve the care

24  we do, but also to posture the case for defense.  You know, in

25  this line of work, it's not necessarily just state level --

**Exhibit C -33**

1  state law negligence malpractice that we're faced with as a

2  health care provider.  There are constitutional 1983 claims.

3      And, you know, one of the standards involved called the

4  *Monell* standard -- you know, that there's an acting -- have

5  direct liability against NaphCare.  A plaintiff would have to

6  show some sort of policy or custom; right?

7      So, you know, you'll sometimes see, as a result of those

8  meetings, making sure that we are doing things to address

9  issues that are revealed through those -- through this process

10 to avoid it becoming any kind of policy or custom, avoid

11 ratification by NaphCare that would allow an argument that it's

12 a policy or custom to let *Monell* liability attach.

13 **Q.**  All right.  And are those recommendations at your advice?

14 The legal department's advice?

15 **A.**  Typically, yes.  There's things that we're -- that we're

16 seeing and suggesting.  You know, it's an interactive process.

17 We have the legal knowledge.  They have the clinical knowledge.

18 That's why we have the meeting, to bring those two sides

19 together to come up with our -- our impressions and what we

20 need to do to have the case be defensible.

21        **MR. SMITH:**  Thank you.

22     I have nothing further.

23        **THE COURT:**  Just a moment before you begin your

24 cross-examination, Ms. Kaul.

25     Melissa, could you please make me copies, please.  I don't

**Exhibit C -34**

1  need tabs, just the underlying documents.  Thank you.  Great.

2      Thank you, Mr. Smith.

3          **MR. SMITH:**  Thank you, Your Honor.

4          **THE COURT:**  Ms. Kaul, cross-examination?

5          **MS. KAUL:**  Thank you, Your Honor.

6                    **CROSS-EXAMINATION**

7  BY MS. KAUL:

8  **Q.**  Good morning, Mr. Barkley.

9  **A.**  Good morning.

10  **Q.**  So you testified that you previously submitted a

11  declaration in this case in your capacity as the Chief Legal

12  Officer; correct?

13  **A.**  Correct.

14  **Q.**  Okay.  And prior to joining NaphCare in September of last

15  year, did you have another position with the company, or did

16  you come from another -- another place?

17  **A.**  It's sort of both.  So I briefly came to NaphCare in a

18  different capacity starting in July of last year.  I came from

19  the Office of Governor Kay Ivey of Alabama.  I was the Chief

20  Deputy General Counsel to her and her office, came to NaphCare

21  in July.

22      And the Chief Legal Officer was transitioning to a

23  different role within our family of organizations.  That job

24  became open.  I was encouraged to consider wearing a different

25  hat within the organization.  And so, starting September 1st, I

**Exhibit C -35**

1   was the CLO.

2   **Q.**   Prior to September 1st, 2023, did you have any involvement

3   in the morbidity and mortality review committee meetings?

4   **A.**   I attended -- I know it would have been one or two, you

5   know, but in July and August -- I would have attended,

6   certainly, the August one.  I'm not sure that I attended the

7   July one.  I'm not sure it would have fallen within -- my start

8   date was July 17th.

9   **Q.**   And prior -- around July of 2023, you would not have had

10  any involvement with the morbidity and mortality review

11  committee meetings; correct?

12  **A.**   Correct.  I was not affiliated with NaphCare in any way.

13  **Q.**   Okay.  Understood.

14      You've testified, both here and in your declaration, about

15  the privilege log that was submitted in connection with this

16  case, and I want to go ahead and mark that as Exhibit 1 and ask

17  you a few questions about it.

18      (Plaintiffs' Exhibit 1 marked for identification.)

19  **BY MS. KAUL:**

20  **Q.**   And this is the document that was filed as Docket

21  Number 503-6, and bear with me just one moment, and I will pass

22  out copies.

23          **THE COURT:**  Do you have an exhibit list, Ms. Kaul?

24          **MS. KAUL:**  An exhibit list?

25          **THE COURT:**  Do you have an exhibit list?

**Exhibit C -36**

```
 1              MS. KAUL:  I do not.

 2              THE COURT:  Okay.  Thank you.

 3              MS. KAUL:  Can I approach?

 4              THE COURT:  Sure.

 5              THE WITNESS:  Exhibit B?  Exhibit A?

 6    BY MS. KAUL:

 7    Q.   1.

 8         And, Mr. Barkley, your copy of this should have the slip

 9    sheet that was submitted with the filing.  But if you go ahead

10    and look, this is -- turn the page and see that this is the

11    privilege log.

12         Is this the privilege log that you reviewed in connection

13    with the case?  Does this look familiar to you?

14    A.   Yes.

15    Q.   Okay.  Did you help prepare this privilege log?

16    A.   No.

17    Q.   Okay.  But you did review it in the course of preparing

18    your declaration; is that right?

19    A.   That's correct.  Yes.

20    Q.   Okay.  And based on your review, were the representations

21    made in the privilege log accurate to the best of your

22    knowledge?

23    A.   Yes.

24    Q.   Other than outside counsel, are you aware of whether

25    anyone else assisted with the preparation of the privilege log?
```

Exhibit C -37

```
 1   A.    Internal lawyers within my department, yes.

 2   Q.    Okay.  Anyone outside of the legal department of NaphCare?

 3   A.    No, not to my knowledge.

 4         MS. KAUL:  I'd like to move to admit into evidence

 5   Exhibit 1.

 6         THE COURT:  Any objection, Mr. Smith?

 7         MR. SMITH:  No objections.

 8         THE COURT:  Exhibit 1 is admitted.

 9      (Plaintiffs' Exhibit 1 received in evidence.)

10   BY MS. KAUL:

11   Q.    Okay.  And one more question before we dig into some of

12   the details, Mr. Barkley.

13         Did you review each one of the 82 documents listed in the

14   privilege log?

15   A.    No.

16   Q.    Okay.  Which ones did you -- well, how many did you

17   review?

18   A.    Sure.

19         I reviewed all of the ones that dealt with the corporate

20   morbidity and mortality review.

21   Q.    So are those the agendas for those review committee

22   meetings?

23   A.    Those would have been -- the agendas would have been

24   included within that, yes.

25   Q.    And the presentations?
```

Exhibit C -38

```
 1   A.   Yes.

 2   Q.   And the meeting minutes?

 3   A.   Yes.

 4   Q.   The privilege log also refers to HSA death summaries.  Did

 5   you review any of those?

 6   A.   Yes.

 7   Q.   Okay.  It also refers to physician death summaries.  Did

 8   you review those?

 9   A.   Yes.

10   Q.   And what about the psychological autopsies referred to in

11   the privilege log?  Did you review those?

12   A.   Yes.

13   Q.   Okay.  Which documents did you not review?

14   A.   All right.  So, actually, I guess I did review everything

15   on this privilege log.

16   Q.   Okay.  Thank you.

17        I want to direct your attention to what is marked at the

18   top as ECF Page 4 of 26, and it's -- in particular, I want to

19   look at the first three rows of this chart, which are all on

20   this page.

21        And the first document here is listed as Document Number

22   Naph Privilege 1, and it is an agenda from the July 18th, 2022,

23   morbidity and mortality review committee meeting.

24        Do you see that?

25   A.   I do.
```

**Exhibit C -39**

1   **Q.**   What kinds of information is included in these meeting

2   agendas?

3          **MR. SMITH:**  I would object.  That -- that calls for

4   attorney-client-privileged communications, and it's overbroad.

5   That's the heart of the hearing as to whether that information

6   is discoverable.

7          **THE COURT:**  I'm going to overrule the objection.

8      Mr. Barkley, the question is not asking you to describe

9   the contents of a specific agenda.  I realize that is at issue

10  in this proceeding.  The question is asking you to describe

11  generally what types of information might be included in the

12  agenda.  And as so framed, I would permit the question to

13  proceed.

14     You may answer, sir.

15          **THE WITNESS:**  Okay.  Sure.

16     It would include information about the cases that are

17  being reviewed.  It would include -- and it's really

18  primarily -- what I'm thinking about in the agenda would be --

19  I think there's some instructions, at the outset, of kind of

20  the things we're considering and talking about.

21     There's a list of patients whose deaths are being

22  reviewed.  That's the -- that's the primary information that I

23  remember being on these agendas.

24  **BY MS. KAUL:**

25  **Q.**  Do the agendas reference any of the facts and

**Exhibit C -40**

1   circumstances surrounding the in-custody deaths that are being

2   discussed at the relevant meeting?

3   **A.**   It would certainly have, you know, the -- yeah, you know,

4   the name, the date of the event.  It may have some information

5   about, you know, a preliminary potential cause of death.  Those

6   are the things I can think of.

7   **Q.**   Contributing factors to the death?

8   **A.**   I don't recall typically seeing those in the agenda.

9   **Q.**   The length of time that the individual had been in

10  custody?

11  **A.**   Yeah.  I think it would have a date of incarceration and a

12  date of incident.

13  **Q.**   And any relevant medical information that pertained to the

14  death?

15  **A.**   Again, it may have some information about the -- something

16  about preliminary cause, you know?

17  **Q.**   The next document listed on the chart is a presentation

18  from the -- it looks like the July 18th, 2022, meeting --

19  **A.**   Right.

20  **Q.**   -- and these are PowerPoint presentations; correct?

21  **A.**   Yes.

22  **Q.**   What kind of information, generally speaking, is included

23  in these presentations?

24  **A.**   A lot of information, primarily -- sometimes it's the --

25  it's direct quotes from the medical chart or hospital records

**Exhibit C -41**

1    or the physician or HSA death summary.  It is -- yeah, it's a

2    good -- fair amount of information about the death.  It's a

3    selection of relevant information prepared by the legal

4    department.

5    **Q.**  Where do the individuals who prepare this document obtain

6    the underlying information?

7    **A.**  Some of it comes from the physician death summary or HSA

8    death summary.  A lot of it comes from medical records, from

9    our electronic health record, TechCare, if there are external

10   hospital records or other kinds of health care records that are

11   available.  Sometimes there's an autopsy or a coroner's report

12   that's available.

13       That was your question, where the sources of the

14   information -- okay.

15   **Q.**  Do individuals who prepare these presentations ever speak

16   to clinical staff in the course of obtaining information that

17   might be pertinent to a presentation?

18   **A.**  Individuals who -- preparing the presentation -- I think

19   that would be the exception.  I think they're mostly getting

20   that information from documentary sources.

21       Now, there's communication; right?  I mean, there's a

22   death summary prepared by people that -- that would be involved

23   in the care that's being provided.  When you say "talk to,"

24   physically on the phone or -- I mean, I don't think that that's

25   typically what's happening, no.

**Exhibit C -42**

1    **Q.**    That's a fair response.

2         In the course of preparing these presentations, do these

3    individuals ever communicate, correspond, or speak to, orally

4    or in writing, any clinicians or -- or providers?

5    **A.**    Yeah.  What I typically see is reminders to submit the

6    death summaries.

7    **Q.**    So the death summaries and the medical records -- that

8    would be key sources of information that go into preparing

9    these presentations.  Is that fair to say?

10   **A.**    Yes.

11   **Q.**    Okay.

12   **A.**    Sometimes one of those clinical leaders that will attend

13   the meeting will have looked at the case and would submit -- so

14   the person preparing the presentation, you know, on the front

15   end is a paralegal.  The current person who does it is a nurse

16   paralegal.

17        So it could be the case -- not that she is speaking to

18   on-the-ground clinicians but that one of our site corporate

19   physicians might have looked at the case, might have talked to

20   the provider on the ground, and might say to the paralegal --

21   or send her an email or something and say, "Hey, here's some

22   things that I saw that I want to make sure get discussed."

23   **Q.**    Discuss for what purpose?

24   **A.**    Discuss for the purpose of identifying issues that could

25   present exposure.

**Exhibit C -43**

1  **Q.**   So your clinical leadership would say that they perhaps

2  found some medical issues that they want to be discussed for

3  the purpose of assessing litigation risk?

4  **A.**   Right.

5  **Q.**   Okay.  Not ever for the purpose of determining ways to

6  improve patient care?

7  **A.**   So I don't see how you separate the two, if I'm being

8  honest.

9       You know, the -- the things that we get sued for are

10 standard of care, for which we, as lawyers, typically engage

11 expert medical providers to tell us about standard of care,

12 causation, for which we engage these experts to tell us about

13 causation issues.

14      You know, as I was talking about earlier, you know, under

15 the *Monell* health standard, the extent to which something is a

16 policy or custom of NaphCare is at issue in this litigation.

17      And so steps we take to evaluate our systems, our

18 processes, and improvements we make and affirmations that,

19 "Hey, something that happened in this case is not the NaphCare

20 way, and it needs to be changed or addressed" is part and

21 parcel of defending that lawsuit.

22 **Q.**   So if NaphCare can get sued in connection with the death

23 of a patient in the jail, it wouldn't conduct any morbidity or

24 mortality -- mortality reviews?  Is that your testimony?

25 **A.**   So we have a two-layer process.  So there are -- we have a

**Exhibit C -44**

1    policy that has us doing site-level reviews.  That's premised

2    on primarily -- you're familiar with the National Commission on

3    Correctional Health Care?

4    **Q.**  I am, but you can go ahead and explain what it is for the

5    Court.

6    **A.**  Sure.

7         So the National Commission on Correctional Health Care,

8    NCCHC, is an organization that kind of grew -- came about, I

9    guess, in the late '70s/early '80s in the wake of the

10   *Estelle v. Gamble* decision that set out the deliberate

11   indifference standard for the provision of health care in

12   correctional environments.

13        They lay out a set of standards that are intended to be

14   aligned with kind of the Eighth and Fourteenth Amendment

15   deliberate indifference standard, and they have surveyors who

16   can be accredited through NCCHC.  They have surveyors that

17   come, and if a facility/jail/prison wishes to be accredited,

18   they can have surveyors come and get accredited.  They have to

19   be reaccredited every so often by a survey team.

20        And so following NCCHC standards is a good way of

21   indicating through following the Eighth and Fourteenth

22   Amendment.  Our policies follow NCCHC standards, and so NCCHC

23   NaphCare policy does require that site-level review of any

24   death.

25        This corporate-level review, on the other hand, is driven

**Exhibit C -45**

1  by the legal department for the purposes of providing legal

2  advice.

3  **Q.**   San Diego County Jail isn't NCCHC-accredited, is it?

4  **A.**   Not to my knowledge.

5  **Q.**   You said that NCCHC standards are designed to be aligned

6  with Eighth Amendment standards.  Aren't they also intended to

7  be aligned with standards of care in the clinical and medical

8  profession?

9  **A.**   Sure, although, if you actually look at the standards,

10  it's not, you know -- if there's -- if there's a (Inaudible),

11  yes, you need to take these steps; right?  They're much more

12  basic than that.

13      They're about really constitutional deliberate

14  indifference things like access and process and, you know,

15  having policies that address those things.  They're not

16  clinical.  They're more policy process, access-to-care sort of

17  driven.

18  **Q.**   And aren't those important to ensure the safety of

19  patients?

20  **A.**   Absolutely.

21  **Q.**   Okay.

22  **A.**   That's why we follow them.

23  **Q.**   What are nurse paralegals?

24  **A.**   What are nurse paralegals?

25  **Q.**   What role do they play within NaphCare?

**Exhibit C -46**

1    **A.**    Sure.

2        I mean, as a company that provides health care, we have

3    a -- well, we have lots of folks in our company who are nurses.

4    But we have, within our legal department, a particular person

5    who is in the legal department as a paralegal and also happens

6    to be a nurse.

7        And she uses her nursing knowledge to help with the

8    mortality and morbidity review, provide chronologies for cases.

9    I mean, she supports the lawyers in reviewing our cases, using

10    both legal and nursing knowledge.

11    **Q.**    The -- the next document listed on the privilege log,

12    NaphCare Privilege 3 --

13    **A.**    Uh-huh.

14    **Q.**    -- refers to the meeting minutes that mention the

15    July 18th, 2022, meeting.

16        And you said that it's a paralegal who takes the minutes

17    of these meetings; is that right?

18    **A.**    Correct.

19    **Q.**    And what information is included in the meeting minutes,

20    just as a general matter?

21    **A.**    The cases which we reviewed, whether -- you know, whether

22    that case is going to, you know -- so a lot of times, we don't

23    have full information at the initial review.  I would say the

24    most common piece of information we lack is a coroner's report

25    or an autopsy.

**Exhibit C -47**

1        So whether that was available to us and discussed or

2    whether it's being -- that case is going to be sort of held

3    over until the autopsy is received, there can be

4    recommendations for follow-up quality improvement activities.

5    **Q.**   Do the meeting minutes reflect discussion by all meeting

6    attendees?

7    **A.**   They -- I would not say they're -- what was said by the

8    attendees during the meeting, no.  It's more of a reflection of

9    the outcome.

10   **Q.**   But the minutes aren't solely focused on the outcomes from

11   a legal perspective; correct?

12   **A.**   So when I say "outcome," I guess I mean the outcome of the

13   discussion.  There are recommendations sometimes for things

14   that can be done for areas of improvement.  I view those as

15   legal.  They reflect the advice that came from lawyers in the

16   meeting about things that we could do to improve.

17        And, as I said, I mean, that's -- you know, they're both.

18   I mean, the primary purpose is obviously to -- like I said, a

19   lot of inmate deaths -- in-custody deaths result in litigation.

20   And we're trying to put ourselves in the best position to

21   defend those, you know?

22        And part -- you know, whether it's because of the *Monell*

23   standard, making sure that we don't have policies and customs

24   that are contributing to deaths but also, you know, making sure

25   that we are, going forward, providing the best care we can,

**Exhibit C -48**

1   sure.  That is a thing that happens.  It's not the primary

2   thing that happens.

3   **Q.**   Well --

4   **A.**   And even when it happens, I think it's part -- part of the

5   legal advice.  It's inseparable.  Providing good care is making

6   lawsuits more defensible.

7   **Q.**   Do the meeting minutes reflect, for instance, any opinions

8   of clinical staff regarding changes that can be made to

9   policies and procedures on the ground in the jail?

10  **A.**   Yes.  That -- again, it's -- it's not, you know, "The

11  corporate people said this.  The lawyers said that."  There's

12  one set of recommendations that comes out of the discussion

13  between the two halves.

14  **Q.**   But it could include a recommendation made by clinical

15  staff --

16  **A.**   Sure.

17  **Q.**   -- at the meeting that is adopted or decided to be

18  undertaken?

19  **A.**   Absolutely.

20  **Q.**   Okay.  If you look at the description for -- looks like

21  the first document listed here, the agenda from this meeting --

22  **A.**   Which -- which ECF page are you on?

23  **Q.**   The same one.

24  **A.**   Oh.

25  **Q.**   It's ECF Page 4 of 26.

**Exhibit C -49**

 1          And in the description, it says that the agenda was

 2   prepared by Melissa Massengill, paralegal with the legal

 3   department, at the direction of Brad Cain, NaphCare's Chief

 4   Legal Officer.

 5          Mr. Cain was your predecessor; is that correct?

 6   **A.**   That's correct.

 7   **Q.**   Okay.  And it says, in light of Mr. Cain's absence, the

 8   meeting was chaired by Dr. Jefferey Alvarez, NaphCare's CMO.

 9   Do you see that?

10   **A.**   Yes.

11   **Q.**   And "CMO" stands for Chief Medical Officer; right?

12   **A.**   That's correct.

13   **Q.**   Okay.  And that's not a legal position; correct?

14   **A.**   No.

15   **Q.**   So as we -- at this meeting, according to the privilege

16   log, it was not led by a member of the legal department; right?

17   **A.**   Correct.

18   **Q.**   Is it possible that Dr. Alvarez directed the preparation

19   of the documents that were discussed at this meeting?

20   **A.**   No.

21   **Q.**   How do you know?

22   **A.**   How do I know that Dr. Alvarez didn't prepare the --

23   because that's not the -- that's not the process.  It's done by

24   the paralegal in the legal department.

25   **Q.**   You don't have personal knowledge of who directed the

**Exhibit C -50**

1  preparation of this document; right?

2  **A.**   That would -- no.  I don't -- I was not at NaphCare prior

3  to July 17th, 2023.

4  **Q.**   Okay.  And you don't have personal knowledge of whether

5  Dr. Alvarez, for example, provided input regarding the

6  information that he wanted to be included in the agenda

7  presentation and meeting minutes from this meeting; right?

8  **A.**   Well -- so how I described that earlier -- that can't

9  happen; right?  When Dr. Alvarez knows about a death, he looks

10 at it.  He says to, at that time, Melissa Massengill, "These

11 are some things I've identified to discuss."  Sure.

12     It couldn't be -- so your question, I think, was do I have

13 any personal knowledge.  I mean, no.  I do know a lot about how

14 the process works, and that's how the process works.

15 **Q.**   In your declaration -- and I can refresh your

16 recollection -- recollection with that document, if you need.

17 But you testified that, after September 1st, 2023 --

18 **A.**   Uh-huh.

19 **Q.**   -- the agenda's presentations and minutes from these

20 meetings are prepared either at your direction or at the

21 direction of a member of NaphCare's legal department.

22     Does that testimony sound accurate?

23 **A.**   Yes.

24 **Q.**   Okay.  Other than you, who would have directed preparation

25 of these documents after September 1st, 2023?

**Exhibit C -51**

1    **A.**    Well, I've always directed the preparation of the

2    documents since September of 2023.  There has been one time

3    when I was not able to attend a meeting, and a lawyer within

4    our organization, with the title General Counsel for

5    Litigation, chaired the meeting in my absence.

6    **Q.**    All right.  If you could turn to ECF Page 18 of 26, I just

7    want to have -- go through other categories of documents.

8    **A.**    You said 18?

9    **Q.**    18.

10    **A.**    Okay.

11    **Q.**    And I'm looking at the row that's labeled "NaphCare

12    Privilege 58," to start.

13    **A.**    Okay.

14    **Q.**    Do you see that?

15    **A.**    Yes.

16    **Q.**    Okay.  This document refers to an HSA death summary.

17    You've also testified using that terminology already today.

18    Can you just briefly describe what the HSA death summary is?

19    **A.**    Sure.

20        I mean, it's a -- it's a summary of -- of information

21    related to the patient death.

22    **Q.**    It's prepared by one of NaphCare's health services

23    administrators; is that right?

24    **A.**    Correct.

25    **Q.**    That's not a legal position, is it?

**Exhibit C -52**

1   **A.**   That's correct.

2   **Q.**   What is the role of the HSA with respect to patient care

3   in San Diego Jail?

4   **A.**   Patient care?  Well, San Diego is unique among NaphCare

5   clients in that there are -- there's nursing staff that are

6   direct County personnel; right?

7        So our HSA is overseeing -- so typically -- in a typical

8   NaphCare jail/prison facility, the health services

9   administrator is over the provision of health care for the

10   entire inmate population of the jail from -- from the

11   administration of it -- right? -- from the operational piece of

12   it.

13        So that would typically include the nursing, the medical,

14   and also the mental health side, general -- anything else we're

15   doing within the jail.

16        Here in San Diego, it's a little unique because the

17   nursing is not part of our contract but similar in the sense

18   that that person is the overall person responsible for

19   oversight of the provision of the inmate health care system.

20   **Q.**   Is it accurate to say that these summaries contain

21   information about a patient's clinical history?

22   **A.**   Yes.

23   **Q.**   Okay.  And they also contain information about the facts

24   and circumstances surrounding the death?

25   **A.**   Correct.

Exhibit C -53

1  Q.  And they could include opinions and assessments by the HSA

2  about the circumstances surrounding the death?

3  A.  I believe they are -- they would not have that.  I mean,

4  it's possible.  I guess anybody can write anything in a form,

5  but the ones I see are really sort of fact-driven.

6  Q.  The HSA death summaries are prepared by the HSA,

7  regardless of whether NaphCare is aware of any actual potential

8  litigation arising out of the death; is that right?

9  A.  Correct.

10 Q.  The next row, NaphCare Privilege 59, refers --

11 A.  Well, what you didn't -- what you didn't ask me is where

12 those go and the purpose.

13      So --

14          THE COURT:  Let -- sir, you will -- your counsel will

15 have an opportunity for redirect examination.  So ask the

16 question -- answer the questions posed, please.

17 BY MS. KAUL:

18 Q.  The next row refers to the physician death summaries?

19 A.  Right.

20 Q.  These summaries are prepared by a NaphCare physician; is

21 that right?

22 A.  Yes.

23 Q.  Okay.  Not necessarily the treating physician or a

24 treating physician; is that correct?

25 A.  I mean, those are typically going to be one and the same,

Exhibit C -54

1    but there are larger facilities where there's both a physician

2    medical director and staff physicians.  And typically it would

3    be the medical director, but it could also be a staff

4    physician.  It doesn't have to be -- doesn't have to be the

5    treating physician.

6    **Q.**   Who decides which physician would prepare a particular

7    physician death summary?

8    **A.**   That would be the medical director of the facility's

9    decision, whether he or she would do it or have the treating

10   person do it.

11   **Q.**   And those summaries also contain information about

12   patients' clinical and medical history; right?

13   **A.**   Correct.

14   **Q.**   And what about those?  Do those include information about

15   the facts and circumstances concerning the death?

16   **A.**   That's correct.

17   **Q.**   And do they include potentially opinions or assessments

18   of -- by the -- by the physician about the death?

19   **A.**   They can include, you know, speculation about a tentative

20   cause of death, yes.

21   **Q.**   Speculation based on medical information; right?

22   **A.**   Well, based on -- correct.  Right.  Right.

23   **Q.**   Okay.

24   **A.**   So I don't mean that in a pejorative way, no, when I say

25   "speculation," but --

**Exhibit C -55**

1   **Q.**   Sure.

2        Opinions and assessments --

3   **A.**   -- we don't -- we don't know; right?  You haven't had an

4   autopsy.  We don't know.

5   **Q.**   Opinions and assessments by the physician based on the

6   information that's available to them?

7   **A.**   Sure.

8   **Q.**   Okay.  Could they include opinions about what could have

9   been done differently in terms of patient care?

10   **A.**   Not -- not typically, from what I see, no.

11   **Q.**   Have you ever seen that?

12   **A.**   I can't recall a time that I've seen that.

13   **Q.**   Okay.  And the physician death summaries are prepared by a

14   physician, regardless of whether NaphCare is aware of actual

15   potential litigation arising out of the death; right?

16   **A.**   Correct, and I want to back up because -- I mean, you used

17   this phrase "contributing factor."  Those are certainly things

18   that the physicians -- which are opinion, I guess, or --

19   sometimes those contributing factors -- oops -- by the nature

20   of what they are, suggests something could have been done

21   better; right?

22        So --

23   **Q.**   Sure.

24   **A.**   -- you know, when I say I don't know whether I've seen

25   that, certainly, within -- sometimes it's implicit, in what is

**Exhibit C -56**

1    listed as a contributing factor, that there's something that

2    could have been done differently.

3    **Q.**   Fair enough.

4        The next row, which is the last category of documents that

5    we'll talk about, is the psychological autopsy.  Do you see

6    that?

7    **A.**   Is this --

8    **Q.**   It's NaphCare Privilege 60.

9    **A.**   60?  Yes.

10   **Q.**   Okay.  The psychological autopsies are prepared by

11   NaphCare's San Diego mental health director; right?

12   **A.**   Yes.

13   **Q.**   Okay.  And that's an on-site position at the jail; is that

14   correct?

15   **A.**   Correct.

16   **Q.**   And it's not a legal position; right?

17   **A.**   No.

18   **Q.**   Okay.  What's that person's role with respect to patient

19   care in the jail?

20   **A.**   That person is overseeing the provision of mental health

21   to the inmate population and can also be providing direct care

22   of patients.

23   **Q.**   Okay.  The psychological autopsies are only prepared for

24   certain deaths at the jail; is that correct?

25   **A.**   Correct.

**Exhibit C -57**

1   **Q.**   Which ones?

2   **A.**   Completed suicides.

3   **Q.**   And these summaries also contain information about

4   clinical and medical history?

5   **A.**   Yeah.  Psych autopsies contain a lot of information.

6   **Q.**   What kinds of information?

7   **A.**   They can include what I would call sort of forensic kind

8   of information, information about, you know, their criminal

9   background history, their childhood, their family situation,

10   their support network, their level of education, religious

11   adherence or belief system, I mean, just a whole host of

12   socio- -- sociological data about the person.

13   **Q.**   Okay.  Could those also include opinions and assessments

14   of the mental health director related to the death or suicide?

15   **A.**   Yes, typically.

16   **Q.**   And these autopsies are also prepared, regardless of

17   whether NaphCare is aware of any actual potential litigation

18   arising out of the death; is that correct?

19   **A.**   Yes.  But, again, you know, there's a high propensity for

20   in-custody deaths to result in litigation, and that propensity

21   is even higher for in-custody deaths by suicide.

22   **Q.**   But the autopsy -- psychological autopsy is prepared,

23   regardless of any assessment of actual or potential litigation

24   risk; right?

25   **A.**   Regardless of any assessment?

**Exhibit C -58**

1  **Q.**   There's no prior assessment about actual potential

2  litigation risk to determine whether --

3  **A.**   No.  I disagree.

4  **Q.**   -- a psychological autopsy needs to be completed or not;

5  correct?

6           **THE COURT:**  Let --

7           **THE WITNESS:**  I'm sorry.  Yes.  Thank you.

8           **THE COURT:**  Let Ms. Kaul finish the question before

9  you answer, Mr. Barkley.

10          **THE WITNESS:**  No.  I made an assessment -- and my

11  predecessor, Brad Cain, has made an assessment -- that there's

12  significant risk of litigation in any in-custody death and a

13  heightened risk with respect to death by suicide.

14 **BY MS. KAUL:**

15 **Q.**   Okay.  According to the privilege log, these death

16  summaries, the physician summaries -- the death summary,

17  physician summary, and the psychological autopsies are all sent

18  to NaphCare's corporate office and legal department to notify

19  them of the death.

20      Do you see that in the descriptions to these documents?

21 **A.**   "For notification of death and in preparation for

22  corporate morbidity and mortality review committee meeting"?

23 **Q.**   Yeah.

24      I'm going to focus on the "notification of death" portion

25  to start.  Do you see that?

**Exhibit C -59**

1  **A.**   Yes.

2  **Q.**   Okay.  Who is the person in the corporate office that

3  receives these documents?

4  **A.**   So we actually have -- it's an email address.  I think

5  it's notification at -- notification -- notifications that

6  HSA's medical director and other, you know, site-level

7  leadership are trained -- that those go to.  And there's a

8  distribution list of lots of folks in our corporate office that

9  are notified.

10  **Q.**   And those folks are not part of the legal department;

11  correct?

12  **A.**   Now --

13       **THE COURT:**  Hang on, Ms. Kaul.  I think Mr. Barkley

14  was still finishing his answer.

15     Go ahead and finish your answer, Mr. Barkley.

16       **THE WITNESS:**  Sure.

17     So the HSA death summary (Inaudible) corporate office --

18  I'm not aware -- I'll just be honest with you.  I'm not aware

19  of the physician death summaries or the psychological autopsies

20  going to that notification -- where it says "notification of

21  corporate office."  I'm aware that those would only go to our

22  nurse paralegal.

23     The HSA death summary would probably -- would go to that

24  wider audience, I think.

25  ///

**Exhibit C -60**

1  BY MS. KAUL:

2  Q.    And I'm sorry.  I think I -- I missed a portion of your

3  response.

4  A.    Sure.

5  Q.    Other than the HSA death summary, the other two, you think

6  they only go where?

7  A.    The -- the nurse paralegal.

8  Q.    And are they circulated to anyone else?

9  A.    The clinical leadership that would be involved in the M&M

10  review.

11  Q.    So when you're referring to a lot of people being involved

12  in the corporate -- or be on the corporate email address that

13  receives certain documents, you're referring to the HSA death

14  summary; right?

15  A.    Right.

16  Q.    Okay.  And it's your understanding that the physician

17  death summary and the psychological autopsy were for a smaller

18  audience?

19  A.    Yes.

20  Q.    And that audience includes the attendees at the morbidity

21  and mortality review meetings?

22  A.    Yes.

23  Q.    Okay.  And are you aware of whether they go to anybody

24  else?

25  A.    No.

**Exhibit C -61**

1   **Q.**    Do you know one way or another?

2   **A.**    I don't think they do, no.

3   **Q.**    What leads you to have that understanding?

4   **A.**    Because at various points throughout the month, the nurse

5   paralegal comes to me and says, "I don't yet have the physician

6   death summary for this death, and I need to get that from the

7   site," and we get it.  It comes to her.  She's my direct

8   report.  I see it comes to her.  I see what she sends out.

9   **Q.**    And who is the larger audience included in the corporate

10  office that receives HSA death summaries?

11  **A.**    So that's the notification site.  I'm -- I believe it

12  would still be people within because it's still going to be the

13  clinical executive leadership and our CEO.  So it's still going

14  to be that same audience of folks on the M&M committee.

15  **Q.**    And is notification emails about a patient's death --

16  again, they're sent, regardless of whether or not NaphCare is

17  aware of any actual potential litigation; correct?

18  **A.**    Correct.

19         (Plaintiffs' Exhibit 2 marked for identification.)

20         **MS. KAUL:**  I want to mark as Exhibit 2 a document --

21  an excerpt of a document that was produced to us.  It's the

22  Health Care Policy and Procedure Manual for San Diego County.

23  It begins with the Bates number NaphCare 31065, and the

24  excerpted section is titled "A-09.  Procedure in the Event of a

25  Patient Death."

**Exhibit C -62**

 1         And just for the Court's awareness, it was produced to us,

 2    and it's labeled "Confidential," subject to the protective

 3    order.  But Counsel met and conferred prior to the hearing and

 4    agreed that it would not be subject to the protective order.

 5              **THE COURT:**  Thank you.

 6              **MS. KAUL:**  Thanks.

 7         May I approach?

 8              **THE COURT:**  Sure.

 9    **BY MS. KAUL:**

10    **Q.**   Mr. Barkley, do you recognize this document?

11    **A.**   Yes.

12    **Q.**   Okay.  And you're generally familiar with NaphCare's

13    policy and procedure manual for San Diego County?

14    **A.**   Yes.

15    **Q.**   Okay.  And you're generally familiar with this particular

16    policy versus a procedure in the event of a patient death?

17    **A.**   Yes.

18    **Q.**   Okay.  And NaphCare maintains -- maintains copies of these

19    in the ordinary course of its business; correct?

20    **A.**   That's right.

21              **MS. KAUL:**  Okay.  I'd like to move to admit Exhibit 2.

22              **THE COURT:**  Any objection, Mr. Smith?

23              **MR. SMITH:**  No objections.

24              **THE COURT:**  Exhibit 2 is admitted.

25              **MS. KAUL:**  Thank you.

**Exhibit C -63**

1          (Plaintiffs' Exhibit 2 received in evidence.)

2    **BY MS. KAUL:**

3    **Q.**    I want to direct your attention to the first full page of

4    the policy.  This is Bates-stamped 31102.

5          And under the subsection "Policy," it states, "All patient

6    deaths require the performance of a clinically thorough

7    mortality review.  Deaths that are unexpected or occurring

8    under unusual circumstances should also be investigated in

9    accordance with state and local regulations."

10         Do you see that?

11   **A.**    Yes.

12   **Q.**    And is that an accurate statement of NaphCare's policy

13   with respect to the review of patient deaths?

14   **A.**    Yes.

15   **Q.**    And fair to say that NaphCare complies with this policy

16   through the actions of its morbidity and mortality review

17   committee?

18   **A.**    No.

19   **Q.**    Okay.  Can you explain that?

20   **A.**    Sure.

21         So when I spoke earlier about kind of the two-layer

22   review, this policy is referring to what would happen at a

23   facility level.  All the things we've been talking about are

24   corporate-level review.

25   **Q.**    Okay.  Does NaphCare conduct site-level reviews for

**Exhibit C -64**

1    San Diego County Jail?

2    **A.**    Not to my knowledge.

3    **Q.**    Are you aware that that's a provision that's required in

4    the NaphCare/County contract?

5    **A.**    I don't know that I'm aware it's in the contract.  It's

6    certainly part of our policy that we would do it.  I would --

7    you know, it's my expectation it should be done, yes.

8    **Q.**    Okay.  But they're not being done; correct?

9    **A.**    That's correct.  That -- to my -- to my knowledge.  I

10    don't know that I have direct knowledge of that.  That's what

11    I've been told.

12    **Q.**    Now, turning to the next page, NaphCare 31103, under

13    the -- towards the bottom of the page, under the heading "Death

14    Due to Suicide," Subsection 3 refers to a psychological autopsy

15    report.

16        Do you see that?

17    **A.**    Right.

18    **Q.**    Is that the same as the psychological autopsy reports that

19    have been referenced in -- in the privilege log?

20    **A.**    Yes.

21    **Q.**    Okay.  Subsection A, below that, says, "This report will

22    provide detailed and comprehensive documentation of all

23    information and circumstances involved in the review of suicide

24    to identify trends and opportunities for improvement.  It is

25    expected that the primary psychiatric provider or psychologist

**Exhibit C -65**

 1   will gather input from the medical director or provider for

 2   completion of this report."

 3        Do you see that?

 4   **A.**   Yes.

 5   **Q.**   You are referenced to legal there; is that right?

 6   **A.**   No.  There's no reference to legal there, no.

 7   **Q.**   If you turn the page, NaphCare 31104, under the heading

 8   "Morbidity and Mortality Review," Subsection 3 refers to an RHA

 9   death summary.

10        Do you see that?

11   **A.**   Yes.  Yeah.  That's an NCCHC term, Responsible Healthcare

12   Authority.

13   **Q.**   Is that the same as the HSA death summary?

14   **A.**   Yes.

15   **Q.**   And so that's the same as HSA death summaries that have

16   been referenced in the privilege log; right?

17   **A.**   Yes.

18   **Q.**   Okay.  That same subsection refers to physician death

19   summaries.  Those are the same as the ones that we've discussed

20   as being referenced in the privilege log?

21   **A.**   Correct.

22   **Q.**   Okay.  So the HSA death summary or, here, RHA death --

23   death summary, as well as the physician death summary and the

24   psychological autopsies, are all part of the morbidity and

25   mortality review that's conducted pursuant to this policy;

**Exhibit C -66**

1  right?

2  **A.**   Should be.

3  **Q.**   Okay.  And they are also part of your corporate-level

4  review?

5  **A.**   Yes.

6  **Q.**   Okay.  Subsection 1 here says that morbidity and mortality

7  meetings must be completed within 30 days of any death.  The

8  review should provide a summary of the facts surrounding the

9  patient's death in order to ascertain compliance with corporate

10  standard of care and to identify any

11  deficiencies/trainings/policies that may have contributed to

12  the patient death or emergency response.

13      Do you see that?

14  **A.**   Yes.

15  **Q.**   So the corporate morbidity and mortality review meetings

16  that you've been testifying about today -- is that performed

17  consistent with the subsection of this policy?

18  **A.**   No.

19  **Q.**   So the meetings that you've been discussing don't provide

20  a summary of the facts surrounding the patient's death?

21  **A.**   They could.

22  **Q.**   Okay.  And they could also provide that summary to

23  ascertain compliance with corporate standard of care?

24  **A.**   Yes.

25  **Q.**   Okay.  And to identify deficiencies and training and

**Exhibit C -67**

1  policies that may have contributed to a patient death or

2  emergency response; right?

3  **A.**   Yes.

4  **Q.**   Okay.  Are the results of the corporate morbidity and

5  mortality review meetings shared with anyone outside the

6  meeting?

7  **A.**   No.

8  **Q.**   The information that's discussed regarding quality

9  improvement procedures -- are those discussed with providers?

10  **A.**   Yes but not, per se, as a result of the corporate-level

11  M&M review.

12  **Q.**   Sure.

13      And they may not be presented as such, but the outcomes of

14  the meetings, as may be reflected in terms of the meeting

15  minutes, are then possibly passed along to treating providers

16  in the course of improving patient care; right?

17  **A.**   Correct.

18  **Q.**   Okay.  Why is NaphCare not conducting its site annual

19  reviews in San Diego County?

20  **A.**   I do not know.

21  **Q.**   Have you been aware of that since you assumed your current

22  position?

23  **A.**   No.

24  **Q.**   When did you become aware of it?

25  **A.**   I honestly don't know if I became aware of it -- had

**Exhibit C -68**

```
1   become aware of it in the process of assisting the team
2   responding to your subpoena.
3   Q.   When you became aware of it, did you undertake any actions
4   to correct that?
5   A.   I did not, no.
6   Q.   Okay.  Are you aware of how many deaths have been in the
7   jail since you assumed your position?
8   A.   In the San Diego County Jail?
9   Q.   Yes.
10  A.   I don't know that off -- or I don't know that off the top
11  of my head, no.
12  Q.   Okay.  I guess they would have all been reviewed over the
13  course of these morbidity and mortality review committee
14  meetings since you joined; correct?
15  A.   That's correct.
16  Q.   Okay.  Because every death in the jail is reviewed by the
17  committee?
18  A.   That's correct.
19  Q.   The morbidity and mortality review committee meetings are
20  attended by individuals other than legal counsel; right?
21  A.   Which morbidity/mortality review committee?
22  Q.   Fair question.
23       The meetings that are -- for which the documents in the
24  privilege log were prepared.
25  A.   Sure.
```

**Exhibit C -69**

1    **Q.**    Those meetings are also attended by members of the

2    clinical leadership I think you've testified about; right?

3    **A.**    Yes, that's right.

4    **Q.**    Okay.  A clinical team has an interest in ensuring proper

5    care of patients in the jail; right?

6    **A.**    Yes.

7    **Q.**    Okay.  That's their primary concern; right?

8    **A.**    Maybe their primary concerns, not the primary concern of

9    the meeting.

10   **Q.**    As assessed by you?

11   **A.**    As the person who directs that the meeting happen, yes.

12   **Q.**    Well, you direct the preparation of certain materials;

13   correct?

14   **A.**    Correct --

15   **Q.**    Yeah.

16   **A.**    -- and that the meeting happen.

17   **Q.**    I'm sorry.  You can finish --

18   **A.**    And also that the meeting happen, yes.

19   **Q.**    And at the meetings, just to be clear, members of clinical

20   leadership may provide their clinical opinions about patient

21   deaths; right?

22   **A.**    Yes.  That's what the heart of the -- of litigation about

23   a patient death is usually about.

24   **Q.**    And also at the heart of changes to practices in the jail

25   about patient care?

**Exhibit C -70**

1    **A.**   Sure, which also relates to the defense in litigation.

2    **Q.**   Clinical staff are permitted to ask questions at these

3    meetings?

4    **A.**   Permitted to ask questions?  Yes.

5    **Q.**   And they may make recommendations?

6    **A.**   Yes.

7    **Q.**   Okay.  And the meetings are also, I think, attended by

8    members of NaphCare's management; is that right?

9    **A.**   Our CEO attends.

10   **Q.**   Any other management-level individuals?

11   **A.**   I mean, you know, I'm a management-level person.  I'm also

12   a lawyer.  Our COO attends -- has attended some of them.

13   You'll see her name in the privilege log, but she is also a

14   nurse and a lawyer.

15        You know, in -- it's not unusual, in a health care

16   organization, for the management to also be clinical; right?  I

17   mean, hospitals -- the management of hospitals is often nurses

18   or physicians, and the same here.

19   **Q.**   Any other members of the management team, other than the

20   CEO, COO, and you, who attend these meetings?

21   **A.**   I have looked at the agendas and minutes.  I don't see a

22   single individual attending those meetings who is not clinical,

23   a lawyer, or a paralegal.

24   **Q.**   You mentioned that your CEO is a lawyer.  He doesn't serve

25   as CEO in a legal capacity, though; right?

**Exhibit C -71**

1    **A.**    He's very hands-on with our legal department.

2    **Q.**    I'm sure he is, given the litigation risk involved in this

3    business.

4        However, as CEO, he's not serving the company in a legal

5    capacity; right?

6    **A.**    You know, when you are a lawyer, it's hard to turn that

7    education, training, and experience off.  I mean, there's a lot

8    of things that -- when I come to him with contract drafts, you

9    know, he's already done a legal analysis of that, that he's

10   ready to discuss, that I don't have to give him.

11       When I've been -- for example, when I served the Governor

12   of Alabama as her lawyer -- she's not a lawyer.  So I had to

13   explain things differently to her than I do to Brad.  So Brad

14   certainly uses the legal side of his brain.

15   **Q.**    Your COO doesn't serve the company in a legal capacity, do

16   they?

17   **A.**    Not directly, no.  She is a nurse, and she's certainly

18   involved in the clinical provision of care.

19   **Q.**    Okay.

20   **A.**    She's going to -- with me to a court hearing later this

21   week.  So she does -- is involved in some of our legal strategy

22   as well.

23   **Q.**    Wouldn't that be true of any executive leadership at that

24   level at a company like NaphCare?

25   **A.**    I think the fact that she's both a nurse and a lawyer in

**Exhibit C -72**

1    all of our operations gives her a unique perspective to help me
2    assess risk in -- in litigation.
3    **Q.**    Just a few more questions, if you'll bear with me.
4        Do you know how many of the deaths that have been
5    discussed at meetings referred to on the privilege log actually
6    led to litigation?
7    **A.**    So the materials that we submitted to Your Honor in
8    camera -- I think about a third of those cases are in active
9    litigation.
10   **Q.**    You testified, during your -- in your direct testimony,
11   about morbidity and mortality reviews conducted -- or
12   referenced in the County's contract with NaphCare; correct?
13   **A.**    I don't know that I testified to that.
14   **Q.**    Well, you drew a distinction between morbidity and
15   mortality reviews performed pursuant -- that may be performed
16   pursuant to the contract as opposed to ones that are referenced
17   in the privilege log; correct?
18   **A.**    Sure.
19       So the ones that -- you know, the ones that you're saying
20   are pursuant to the contract -- I would say the site-level one
21   is pursuant to this policy, Exhibit 2, and then the ones that I
22   direct to occur are the corporate-level M&M, which is what the
23   documents in the privilege log and that were submitted in
24   camera relate to.
25   **Q.**    Okay.    I want to mark as Exhibit 3 the County's contract

**Exhibit C -73**

 1   with NaphCare, beginning with Bates Number NaphCare 542.  I'll

 2   just ask you a few questions about that.

 3        (Plaintiffs' Exhibit 3 marked for identification.)

 4        MS. KAUL:  And for the Court's benefit, this -- this

 5   also is marked "Confidential" on the document, but we've met

 6   and conferred and agree that it is not.

 7        It's a large document, but I just have a few questions

 8   about a couple portions of it.

 9   BY MS. KAUL:

10   Q.   Mr. Barkley, you are -- as tested -- as you testified to,

11   you're familiar with the County contract with NaphCare?

12   A.   Well, as you know, it's 137 pages.  So --

13   Q.   You're generally familiar that there is such a contract;

14   correct?

15   A.   I am familiar that there is such a contract.

16   Q.   And it looks something like this; correct?

17   A.   Yes.  Yes.

18   Q.   Okay.  And you're generally familiar with the contents of

19   it at a high level?

20   A.   At a high level.

21   Q.   Okay.  I won't quiz you on it.

22        MS. KAUL:  But I would like to move to admit as --

23   admit into evidence Exhibit 3.

24        MR. SMITH:  No objection.

25        THE COURT:  Without objection, the -- Exhibit 3 is

Exhibit C -74

1    admitted.

2            (Plaintiffs' Exhibit 3 received in evidence.)

3    **BY MS. KAUL:**

4    **Q.**    I'd like to direct you to the page Bates-stamped

5    NaphCare 616.  It also says Page 75 of 137.  I'll give you a

6    minute to get there.

7    **A.**    Okay.

8    **Q.**    Okay.  And the subsection at the bottom, which is

9    2.3.47.5, says, quote, "Contractor shall conduct a formal

10   mortality review process at both the site and corporate level

11   wherein all available clinical aspects and treatment are

12   reviewed by the site and corporate committees."

13           "Contractor shall meet NCCHC standards on all mortality

14   reviews, and the policy and procedure of the patient deaths has

15   been developed and written in compliance with NCCHC Standard

16   J-A-09, Procedure in the Event of an Incarcerated Individual's

17   Death."

18           Do you see that?

19   **A.**    Yes.

20   **Q.**    So the contract references both site- and corporate-level

21   morbidity and mortality reviews.

22           Do you see that?

23   **A.**    Yes.

24   **Q.**    So does the work of NaphCare's corporate morbidity and

25   mortality review committee, as referenced in the privilege log,

**Exhibit C -75**

1    fulfill this contract provision in part?

2    **A.**    Yeah.  I mean, I didn't even know that the contract

3    mentioned the corporate level.  But, yeah, if they're at -- if

4    they're saying we should do a corporate-level review, we are

5    doing a corporate-level review.

6    **Q.**    Okay.  So the committee meetings are performed, at least

7    in part, pursuant to contract; correct?

8    **A.**    Sure, but we do them for reviewing deaths at all the jails

9    and prisons across our -- across the country where we do work.

10   So they're not sole -- they're not -- those meetings are not

11   happening primarily because of this contract.  They're

12   happening primarily because Brad Cain asked that they should

13   happen.

14   **Q.**    And they also fulfill the provision of the contract?

15   **A.**    Sure.

16   **Q.**    If you go ahead to -- well, further down, Page NaphCare

17   617, Section 2.3.47.7 -- and the last line of that section says

18   that there are contractor's mortality review, but the goal is

19   to identify, evaluate, and improve the quality and efficiency

20   of health care, ensure accurate and timely reporting, and

21   reduce morbidity and mortality.

22        Do you see that?

23   **A.**    Yes.

24   **Q.**    Are those also goals of the morbidity and mortality review

25   meetings that are referenced in the privilege log?

**Exhibit C -76**

1   **A.**   It's fair to say they are also goals, yes.

2   **Q.**   Okay.  Are you aware of any provisions in the contract

3   that require morbidity and mortality reviews for the purposes

4   of assessing litigation risk?

5   **A.**   Of the contract?

6   **Q.**   Yes.

7   **A.**   No.

8   **Q.**   You've testified at -- several times about the primary

9   purpose of the meetings and the documents referenced in the

10  privilege log being to facilitate the provision of legal advice

11  and to assess litigation risk?

12  **A.**   Right.

13  **Q.**   Is that memorialized anywhere in NaphCare's policies and

14  procedures that that's the purpose of these meetings?

15  **A.**   Not to my knowledge.

16       **MS. KAUL:**  Your Honor, can I have just one minute to

17  consult with my colleague?  I think I'm about done.

18       **THE COURT:**  Sure.

19       **MS. KAUL:**  Thank you.

20       **THE COURT:**  Mr. Smith, will you have any redirect for

21  Mr. Barkley?

22       **MR. SMITH:**  Maybe -- maybe just a question or two.

23       **THE COURT:**  Okay.  Do you want a moment to -- after

24  Ms. Kaul is finished, to gather your thoughts in determining

25  whether you'd like to do redirect and what you'd like to ask?

**Exhibit C -77**

```
 1              MR. SMITH:  Please.
 2              THE COURT:  Okay.  We'll take a -- just a
 3    couple-minute break after Ms. Kaul so you can collect your
 4    thoughts, and then we can conclude with the parties'
 5    examination.
 6              MR. SMITH:  Thank you, Your Honor.
 7              THE COURT:  Sure.
 8       Do you need some more water, by the way?
 9              THE WITNESS:  I probably shouldn't because I'm going
10    to have to visit the men's room otherwise.
11              THE COURT:  Well, we're going to take a short -- a
12    short break at -- we're going to take a short break after
13    Ms. Kaul is done so that --
14              THE WITNESS:  Okay.
15              THE COURT:  -- you can get some more water, and
16    Mr. Smith can decide what he wants to ask you on redirect.
17              THE WITNESS:  Thank you.
18              THE COURT:  You bet.
19       Go ahead, Ms. Kaul.
20    BY MS. KAUL:
21    Q.   Just a few more -- which I realize I had said before, but
22    I mean it this time -- a few more questions.
23       If, according to your testimony, the primary purpose of
24    the meetings is to assess litigation risk and provide legal
25    advice, why is that not memorialized in any of NaphCare's
```

**Exhibit C -78**

1  policies?

2  **A.**   It doesn't need to be.   I mean, that's -- you know, with

3  the legal department, we're directing these things to happen.

4  We're preparing the documents.   We're directing the discussion.

5  That's what we do in the legal department.

6  **Q.**   Okay.   But, as testified here today, the purpose is

7  memorialized in the contract as well as in the policy and

8  procedure we discussed; right?

9  **A.**   This policy and procedure does -- is not what governs the

10  corporate-level M&M review.

11  **Q.**   It references documents that are used by the corporate

12  morbidity and mortality review committee, though; correct?

13  **A.**   Yes.

14  **Q.**   Okay.   Irrespective of whether there's any potential

15  active litigation arising out of a death, NaphCare would still

16  have to conduct a corporate-level review pursuant to the

17  contract; correct?

18  **A.**   The contract with San Diego does say that, yes.

19  **Q.**   And they would still have to conduct a site-level review

20  pursuant to contract; right?

21  **A.**   Yes.

22  **Q.**   And your testimony is that, irrespective of any potential

23  active litigation arising out of a death, NaphCare would still

24  have to conduct a site-level review pursuant to its policies

25  and procedures; correct?

**Exhibit C -79**

1    **A.**    That's correct, yes.

2    **Q.**    Wouldn't they also have to conduct a corporate-level

3    review pursuant to its policies and procedures?

4    **A.**    If -- if not policy and procedure, you mean what the

5    Chief Legal Officers have said should happen, yes.

6          **MS. KAUL:**  I have no other questions subject to any

7    potential redirect.

8          **THE COURT:**  Okay.

9          **MS. KAUL:**  Okay.

10          **THE COURT:**  Why don't we do this.  Let's take a short

11    break.

12        Mr. Barkley, I want to respectfully remind you that you

13    remain under oath.  So you're not going to talk to any of the

14    lawyers while we're on a break.

15        Mr. Smith, why don't you take a moment to gather your

16    thoughts for any redirect, and then I may have some questions

17    to follow up at the end of it.

18        So I want -- you feel free to step off the witness stand,

19    Mr. Barkley.

20          **THE WITNESS:**  Thank you.

21          **THE COURT:**  Yes, sir.

22        Let's take just a couple minutes, Mr. Smith, give you some

23    time.

24          **MR. SMITH:**  Sure.

25    ///

**Exhibit C -80**

```
1              (Recess taken at 10:20 a.m.)

2            (Proceedings resumed at 10:27 a.m.)

3        THE CLERK:  We are back on the record.

4     Please be seated.

5        THE COURT:  All right.  Mr. Barkley, I would remind

6  you that you are still under oath.

7     Mr. Smith, do you have any redirect for Mr. Barkley?

8        MR. SMITH:  I do, Your Honor, just briefly.

9        THE COURT:  Sure.

10              REDIRECT EXAMINATION.

11 BY MR. SMITH:

12 Q.   Good morning again.

13 A.   Good morning.

14 Q.   Are the committee meetings that were discussed with

15 respect to the privilege log shared with the County of

16 San Diego?

17 A.   No.

18 Q.   Has there ever been any NaphCare intention to share those

19 documents?

20 A.   No.

21 Q.   Is it your understanding the County of San Diego is aware

22 that these are confidential attorney-client meetings?

23 A.   I don't know that the County of San Diego knows that these

24 meetings happen.

25 Q.   All right.  Is there anything else that you would like to
```

**Exhibit C -81**

 1  elaborate on on your testimony that you want to get an

 2  opportunity to share?

 3  **A.**    Sure.

 4       So in looking at what's been marked as Plaintiffs'

 5  Exhibit 2, the NaphCare policy and procedure for San Diego

 6  County, you know, there's lots of things that jump out to me

 7  showing this is not the policy that's talking about the M&M --

 8  the corporate M&M review that is the documents that we've

 9  asserted the privilege with respect to.

10       So, you know, for example, this is Bates 31104.  You know,

11  Bullet Points -- Bullet Point 9 refers to where those documents

12  get placed within our NCCHC folder of SharePoint.  There was a

13  discussion about -- about site-level M&M reviews, which this

14  policy speaks to.  You know, the -- the standard at the -- this

15  policy, at the outset, states it's based on NCCHC Standard

16  A-09.

17       So when an NCCHC sur- -- in a facility that is accredited,

18  when the surveyors for NCCHC come, one of the things they would

19  be checking is, "Are you following the standard?"  And those

20  minutes from the site level would be available there for that

21  purpose.

22       And so the site-level M&M review process -- you know, 8

23  talks about the CQI involvement and doing the quality

24  improvement afterwards.  That -- if we were talking about those

25  documents, we would be talking about a very different thing

**Exhibit C -82**

1   than talking about the corporate-level documents from the M&M

2   process that's directed by the Chief Legal Officer in the legal

3   department.

4        I also wanted to note there's an indication in this policy

5   about an M&M review can and should happen, like, as the -- oh,

6   here it is -- Bullet Point Number 2 on that same page, 31104.

7   M&M can be part of the MAC meeting as long as it's completed

8   within 30 days.

9        That's where I was talking about, I think, at the very

10  beginning of my testimony about -- different facilities will do

11  it a little differently, but some of them will do it as part of

12  that standing MAC meeting.

13       Those site-level meetings -- unlike the corporate

14  meetings, which are all NaphCare either legal or clinical

15  folks, at the site level, it's going to include custody,

16  classification, you know, other elements outside of NaphCare.

17       And if we're talking about those meetings, I think it

18  would be a lot closer question what the primary purpose is

19  because of the attendees, the fact that a lot of that results

20  in CQI improvement process on the back end at the facility

21  level.

22       But at the corporate level, where the legal department is

23  directing that, the primary purpose is for us to be in a better

24  position to defend litigation that's very likely to occur with

25  an in-custody death.

Exhibit C -83

1    Q.   And these morbidity/mortality reviews that are subject to

2    the privilege log -- those have been occurring long before the

3    contract with San Diego?

4    A.   Correct.  Yes.  I -- I went back in our files and found

5    documents from as far back as at least 2011 showing NaphCare

6    has been doing this corporate-level process at the direction of

7    Brad Cain since at least 2011.

8    Q.   And are those meeting minutes and -- and records shared

9    with the different facilities?

10   A.   No.

11   Q.   Okay.  And when you say clinical staff attends, you're not

12   talking about the clinical staff that actually cared for the

13   inmate; correct?

14   A.   No.  I'm talking about our corporate-level clinical

15   leadership.

16           MR. SMITH:  All right.  I have nothing further.

17           THE COURT:  Any recross, Ms. Kaul?

18           MS. KAUL:  Very briefly.

19           THE COURT:  Sure.

20                    **RECROSS-EXAMINATION**

21   BY MS. KAUL:

22   Q.   Mr. Barkley, the -- at least some of the same documents

23   that are discussed at the corporate-level meetings are also

24   referred to in this policy and procedure; right?

25   A.   That's correct.

**Exhibit C -84**

1  **Q.**    Okay.  And that's the death summary -- the HSA death

2  summary, physician death summary, and psychological autopsy;

3  right?

4  **A.**    Right.

5  **Q.**    And information from those can be used to develop the

6  agenda, presentation, and meeting minutes that are prepared for

7  and from the corporate-level meetings; right?

8  **A.**    Yes.

9  **Q.**    Okay.  And pursuant to this policy and procedure, which

10  is, according to your testimony, site-specific, it is intended

11  that the death summaries and psychological autopsies be shared

12  at a site level; right?

13  **A.**    Right, which is interesting.  If we were in any other

14  county, I would say we'd have a closer question.

15  **Q.**    Well, if NaphCare was complying with the contract and

16  performing site-level reviews pursuant to the contract, it

17  would be intended that these documents would be shared at the

18  site level; right?

19  **A.**    I don't accept the premise that NaphCare is necessarily

20  responsible for the fact that those don't occur.  I don't know

21  why they don't occur, but your question is, if we were doing

22  it, that would be compliant with the contract?  Is that what

23  you're saying?

24  **Q.**    The question is --

25  **A.**    I'm sorry.  Ask me your question again.  I got hung up on

**Exhibit C -85**

1   the beginning.

2   **Q.**    Sure.

3       If the site-level reviews were happening pursuant to the

4   policy and procedure --

5   **A.**    Okay.

6   **Q.**    -- the death summaries and psychological autopsies would

7   be shared at the site level with individuals outside of

8   NaphCare; right?

9   **A.**    If the -- if the policies were being followed, yes.  But

10  as a matter of fact, it's not.

11  **Q.**    That's not why you haven't directed site-specific reviews,

12  though; right?

13  **A.**    I don't direct site-specific reviews one way or the other.

14  **Q.**    Does it concern you that those reviews aren't happening?

15  **A.**    Yes.

16          **MR. SMITH:**  That's argumentative.

17          **THE WITNESS:**  I would like them to be happening.

18  **BY MS. KAUL:**

19  **Q.**    Why haven't you --

20          **THE COURT:**  I'll overrule the objection.

21  **BY MS. KAUL:**

22  **Q.**    Why haven't you directed that they happen since you became

23  aware that they weren't occurring?

24  **A.**    Because those site-level reviews are not a function of the

25  legal department.  Unlike the corporate reviews, those are

**Exhibit C -86**

1  operations folks at the site level who need to make those

2  happen.  They have supervisors that need to make those happen.

3  **Q.**  Does the lack of any site-level review hamper the

4  corporate-level -- level review in any way, do you think?

5  **A.**  Not to my knowledge, no.

6  **Q.**  Other jails do site-specific reviews, other jails that --

7  where NaphCare provides health care services?

8  **A.**  Yes.

9  **Q.**  Okay.  And in those jails, do the site-level reviews

10 assist the corporate-level review in any respect?

11 **A.**  No.

12 **Q.**  Even though similar -- the same documents are used in both

13 reviews; right?

14 **A.**  Yeah.

15      So when I've had the opportunity to look at kind of what

16 happens at a site level -- again, because you've got everybody

17 around the table.  You know, there's a lot of review of the

18 emergency response, you know, both custody side and medical

19 side.  There's a lot of focus on particular limitations of the

20 facility or limitations -- particular characteristics of the

21 facility.

22      So your question was whether those site-level things

23 discuss a lot of the same things?  Is that what you're asking?

24 **Q.**  I think I can move on from that question.

25 **A.**  Okay.  Okay.

**Exhibit C -87**

1    Q.   Just one more (Inaudible).

2         You testified previously that NaphCare complies with NCCHC

3    standards with respect to its reviews; is that right?

4    A.   The site-level reviews, yes.

5    Q.   The site-level reviews.

6         Does it comply with them with respect to corporate-level

7    reviews?

8    A.   I mean, having looked at the NCCHC standard and this

9    policy, you know, no.  Our corporate review is structured very

10   differently.

11   Q.   Do you know whether or not it complies with -- does not

12   comply with NCCHC standards?

13   A.   There is no NCCHC standard that would require a

14   corporate-level review.  So it's neither compliant nor

15   noncompliant.

16   Q.   Okay.  And with respect to the site-level reviews that are

17   not occurring but are referenced in this policy and procedure,

18   you're not aware of assessing litigation risk being the purpose

19   of those reviews; correct?

20   A.   I'm not aware of what's -- reviews that aren't happen --

21   you asked me I'm not aware of the purpose of reviews that

22   aren't happening?

23   Q.   That are intended to happen, yes.

24   A.   Okay.  I don't know that I can answer that question.

25        MS. KAUL:  Okay.  I don't have any other questions,

**Exhibit C -88**

1    Your Honor.

2            **THE COURT:**  Okay.  Thank you, Ms. Kaul.

3            **MR. SMITH:**  Nothing further.

4            **THE COURT:**  Okay.  First, Mr. Barkley, I appreciate

5    you testifying this morning to provide additional information

6    regarding NaphCare's policies, and I do have a few questions

7    for you just to make sure that I'm correctly understanding

8    things, sir.

9        The first is:  From the testimony that you've provided, do

10   I understand correctly that, with respect to San Diego County

11   jails, NaphCare is not performing site-level morbidity and

12   mortality reviews?

13           **THE WITNESS:**  That's my understanding, yes.

14           **THE COURT:**  And that the documents that are referenced

15   in the privilege log and were submitted for in-camera review

16   all pertain to NaphCare's corporate-level morbidity and

17   mortality review?

18           **THE WITNESS:**  That's correct.

19           **THE COURT:**  Approximately -- well, since approximately

20   when, to your knowledge, has NaphCare been performing its

21   corporate-level morbidity and mortality reviews for in-custody

22   deaths?

23           **THE WITNESS:**  Yeah.

24       So as I mentioned earlier, in preparation for this, I kind

25   of went into our legal department drives, and I found documents

**Exhibit C -89**

1    as far back as 2011 referencing our corporate M&M reviews.

2            THE COURT:  Was there any document that you found, or

3    that you are aware of, that describes the -- the purpose behind

4    the corporate-level -- I think you referred to them as the M&M

5    reviews.

6            THE WITNESS:  Yes.  Yeah, just a shorthand for

7    "mortality and morbidity."

8        Is there a document that lays out how they are to occur?

9            THE COURT:  Yes, sir.

10           THE WITNESS:  No.  I think it's always been -- you

11   know, I learned how to do them from Brad Cain, who was my

12   predecessor.  I think he came up with the -- with the process

13   himself when he was in this role way back in time.

14           THE COURT:  When the corporate-level M&M review is

15   completed, culminating in the post-meeting minutes, is there

16   any further action that is taken with respect to memorializing

17   that M&M review in the form of a memorandum or otherwise?

18           THE WITNESS:  Not in the form of a memorandum.

19       So there are -- there are, for some of the reviews, some

20   recommendations.  And those recommendations will say things

21   like this -- this individual clinical leader, Dr. Whomever,

22   Nurse Whomever, will do follow-up education with the provider

23   or -- I don't know -- those kind of recommendations.

24       The follow-up that occurs now is typically an email that

25   referenced the nurse paralegal.  She'll follow up with those

**Exhibit C -90**

 1 │ individuals.  You know, if it says, "Dr. Alvarez, you're going

 2 │ to do whatever," she will email Dr. Alvarez and say, "Hey, did

 3 │ you do the thing you said you were going to do?"

 4 │     Dr. Alvarez emails back and says, "Yes, I did the thing I

 5 │ was going to do," and that gets documented in the following

 6 │ month's minutes as -- I think it simply says completed -- you

 7 │ know, that the recommendations were completed.

 8 │         **THE COURT:**  I see.

 9 │     I'm going to mark as Court's Exhibit 1 Exhibit Numbers --

10 │ I believe it is 71, 72, and 73 from the in-camera documents.

11 │         (Court's Exhibit 1 marked for identification.)

12 │         **THE COURT:**  And, Mr. Barkley, I realize that these are

13 │ the subject of a pending privilege assertion --

14 │         **THE WITNESS:**  Right.

15 │         **THE COURT:**  -- and that plaintiffs' counsel does not

16 │ have one.  So I'm not going to ask you, in a public hearing,

17 │ about the specifics --

18 │         **THE WITNESS:**  Okay.

19 │         **THE COURT:**  -- of the documents.

20 │     Mr. Smith, do you have a copy of these exhibits?

21 │         **MR. SMITH:**  I do.

22 │         **THE COURT:**  All right.  And, Ms. Kaul and

23 │ Mr. Swearingen, I realize that -- that you do not, but I do

24 │ have some questions that I would like to ask Mr. Barkley about

25 │ from them.

**Exhibit C -91**

 1          Do you have any objection to that, Ms. Kaul?

 2          **MS. KAUL:**  No objection.

 3          **THE COURT:**  I'm going to hand them over to you,

 4    Mr. Barkley, if I could.

 5          **THE WITNESS:**  Thank you, sir.

 6          **THE COURT:**  I want to make sure that I understand the

 7    documents.

 8          Do I understand correctly that, for every in-custody

 9    death, there is generated a -- an M&M committee agenda as well

10    as a PowerPoint presentation and then post-committee meeting

11    minutes?

12          **THE WITNESS:**  Yes.

13          (Court's Exhibits 2 and 3 marked for identification.)

14          **THE COURT:**  And Exhibits 71, 72, and -- or excuse me.

15    Court's Exhibits 1, 2, and 3 refer to Privilege Log Entries 71,

16    72, and 73.

17          So beginning with Court's Exhibit 1 -- Mr. Barkley, did I

18    happen to give you two copies of --

19          **THE WITNESS:**  You did --

20          **THE COURT:**  I thought I did.

21          **THE WITNESS:**  -- Your Honor.  You did.

22          **THE COURT:**  Thank you, sir.

23          All right.  Beginning with Court's Exhibit 1, are these

24    the -- or is this the agenda for the M&M committee meeting from

25    September 18th, 2023?

**Exhibit C -92**

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  All right.  Does this agenda reflect

 3     any -- let me ask you a different question.

 4          The -- the questions that are contained at the bottom of

 5     Page 1 of Court's Exhibit Number 1 that are reflected in six

 6     bullet points -- do those describe the purpose of the M&M

 7     committee meeting?

 8              THE WITNESS:  They're to guide the discussion in a way

 9     that facilitates the purpose, yes.  And, you know, I'm going to

10     speak carefully about how I answer --

11              THE COURT:  Sure.  Of course.

12              THE WITNESS:  -- given what you cautioned at the

13     beginning.

14          But, you know, the first three kind of go to the heart of

15     what's typically at issue in litigation, and then the -- the

16     final three -- certainly, with a company like NaphCare that's

17     subject to constitutional 1983 claims under the *Monell*

18     Doctrine, those are -- kind of deal with those concepts of

19     ratification and policy and custom, making sure that, to the

20     extent we identify deficiencies that could have contributed to

21     the death -- that we are making sure those don't -- are not

22     policies and customs, nor are they ratified by us.

23              THE COURT:  Court's Exhibit 2 is the PowerPoint

24     presentation for that M&M committee meeting from

25     September 18th, 2023?
```

**Exhibit C -93**

1           THE WITNESS:  That's right.

2           THE COURT:  And then Court's Exhibit 3 is the -- the

3    minutes that follow that meeting from September 18th, 2023?

4           THE WITNESS:  Yes, Your Honor.

5           THE COURT:  All right.  And I see those minutes

6    reflect that you attended the meeting; is that correct,

7    Mr. Barkley?

8           THE WITNESS:  I called it to order and chaired it.

9    Yes, Your Honor.

10          THE COURT:  Very well.

11       In your view, Mr. Barkley, how did quality improvement

12   measures pertain to legal advice?

13          THE WITNESS:  Yeah.

14       I'll be honest with you.  It's hard for me to disentangle

15   the two.  You know, providing good care is mitigating my

16   client's risk, and I think that's particularly true when --

17   particularly true when the *Monell* standard is at play, where

18   it's not just about what happened in this particular incident,

19   but what does NaphCare, as a whole, do?  What are our policies?

20   What are our customs?

21       You know, providing -- putting my company -- my client in

22   a position to be able to defend litigation under those

23   circumstances, you know, goes hand-in-glove with the -- the

24   medicine.  So it's hard for me -- it's hard for me to separate

25   those two.  You know, I would also say, you know, in my mind,

**Exhibit C -94**

```
 1   the primary purpose is to dive into what happened in this
 2   incident.
 3        I take a lot -- I personally -- I know the other attorneys
 4   in my group take a lot out of these meetings that then inform
 5   all of the decisions we make once we get -- sometimes we get
 6   a -- different jurisdictions call them different things but,
 7   like, a notice of claim.  (Inaudible) like a governmental
 8   entity.  You have to go through that administrative process
 9   first; right?
10        You know, sometimes they jump up as that.  Sometimes they
11   first appear post- -- post-death as somebody has requested to
12   look at the medical records, a plaintiff's lawyer, you know,
13   some pre-suit discovery-type information.  Sometimes the first
14   notice you get is the lawsuit.
15        And when we are -- and even before that, we are looking
16   at, you know, what experts we might engage, what law firm we
17   might send this to, how much of this do we think we can handle
18   in-house versus having to bring in experts -- or having to
19   bring in outside lawyers.  What's our -- you know, are we going
20   to pursue an early resolution?
21        We've had times where I and/or the lawyers in our
22   department have picked up the phone and -- and talked to family
23   members as a result of things we talked about and -- you know,
24   to try to work on resolving prelitigation issues.  We've talked
25   to plaintiffs' lawyers, using information we get from this
```

**Exhibit C -95**

 1   process, pre-suit to resolve potential litigation.

 2        This is a valuable tool to me and my department to make

 3   sure we're providing the best advice for the deaths we're

 4   reviewing and mitigating risk going forward.

 5             THE COURT:  Do the M&M committee agendas, PowerPoint

 6   presentations, or minutes document any legal advice that is

 7   provided by you or any other attorney on behalf of NaphCare?

 8   And let's talk specifically about -- if you would like, about

 9   71, 72 --

10             THE WITNESS:  Right.

11             THE COURT:  -- and 73 that are Court's Exhibits 1

12   through 3.  And then you're welcome to answer the question more

13   generally, if you'd like, sir.

14             THE WITNESS:  Sure.

15        All right.  So I would say, looking at Court's Exhibit

16   Number 3, you know -- so even on the ones -- can I just

17   (Inaudible) how to say this?

18        On the top of, well, Bates Levels 513, there's a patient

19   with the initials J.M. at the top.

20             THE COURT:  Yes, sir.

21             THE WITNESS:  And there's a recommendation or

22   nonrecommendation; right?

23             THE COURT:  Yes.

24             THE WITNESS:  Even that is informed by the lawyers

25   present in that review.  So the fact that it was reviewed and

**Exhibit C -96**

1  that was the result has informed our -- I would consider that

2  to be legal advice.

3      Now, the language we use -- because it is clinicians, you

4  know, we speak in their language because we want them to be

5  able to speak to us, and then it helps us.  If we went to them

6  and said, "Do you think there's any deliberate indifference

7  here?" they wouldn't know how to answer that necessarily.

8      If we went to the clinical folks and said, "Tell us if

9  you" -- you know, they might be able to speak to standard of

10  care.  I find a lot of clinicians are able to speak to that.

11  But, you know, the language we use is clinical so that they are

12  comfortable in being able to answer those questions.

13      I would also say -- so -- also, in the middle of that same

14  page, there's a patient with the initials J.B., and there's a

15  quality improvement recommendation there.  That certainly

16  reflects advice from the legal department -- right? -- making

17  sure we're following our policy.  We don't want it to become a

18  custom that things are not being followed the way they're

19  supposed to, make sure we're meeting the standard of care.

20      So certainly -- so the -- speaking about the minutes,

21  that's where I would see a reflection of legal advice, attorney

22  mental impressions.

23          THE COURT:  I have a follow-up question, but I don't

24  want to cut you --

25          THE WITNESS:  Yes, sir.  Go ahead.

**Exhibit C -97**

1      THE COURT:  If you're in the middle of your answer, go

2  ahead.

3      THE WITNESS:  No.  No.  Go ahead.

4      THE COURT:  I understand what you just said about the

5  minutes, Mr. Barkley.

6      Is there anything in the M&M committee agendas or

7  PowerPoint presentations that, in your view, would reflect

8  attorney legal advice, mental impressions, or assessments of

9  litigation risk?

10     THE WITNESS:  So the PowerPoint, Court's Exhibit 2 --

11 the selection of what is presented there, to me, represents

12 attorney mental impressions, work product.

13     This -- this is put together by a nurse paralegal who

14 reports to me based on guidelines that I've given her, that

15 Brad Cain gave her before, in terms of pulling out -- you know,

16 "Of the voluminous records that exist, these are the kinds of

17 things we want you to identify and pull out for discussion."

18     So the fact that these selections from the medical records

19 are presented here rather than others that could have been put

20 here but are not is a reflection of mental impressions of

21 attorneys in the legal department.

22     THE COURT:  I see.

23     THE WITNESS:  And I think Your Honor understands and

24 is aware of these also with respect to some of the patients.

25 It's not just a privilege objection but a relevance objection

Exhibit C -98

 1    because they are not San Diego patients.

 2            THE COURT:  Understood.

 3            THE WITNESS:  So looking at the agenda -- did I talk

 4    about -- I'm sorry.  Did I talk about 1 or 3 before?  Was I

 5    talking about minutes or agenda?

 6            THE COURT:  You were talking specifically about the

 7    minutes, Mr. Barkley.

 8            THE WITNESS:  Okay.  So looking at the minutes, the --

 9    the six bullet points you identified represent attorney

10    solicitation of information for the purpose of being -- being

11    able to make legal advice.

12        And then I would say the same thing about -- for each one

13    of these patients where there's a statement about whether or

14    not there are quality improvement measures, and those may or

15    may not be -- certainly reflects legal advice.

16            THE COURT:  Okay.  You may have mentioned this

17    already, Mr. Barkley, and so if I'm asking you again, I

18    appreciate your indulgence.

19            THE WITNESS:  Sure.

20            THE COURT:  But following the completion of the

21    minutes, for example, the minutes from September 18th, 2023 --

22    that is Court's Exhibit 3 -- who at NaphCare receives copies of

23    the minutes reflecting, you know, where there any quality

24    improvement measures or recommendations?

25            THE WITNESS:  To my knowledge, it's just the --

Exhibit C -99

1    honestly just the legal department.  So our -- the nurse

2    paralegal prepares a draft of the issues, circulates it to me

3    and to other litigation attorneys in our legal department.  We

4    make comments and revisions, and they get filed away.

5        Now, I mention there's a process whereby we ensure the

6    recommendations are followed, but that's not through

7    distribution of the minutes.

8        **THE COURT:**  How are the recommendations from the M&M

9    committee memorialized if it's not in the minutes?

10       **THE WITNESS:**  So the -- the recommendations are

11   memorialized in the minutes.  The minutes have not been

12   distributed for the recommendations to be implemented.  There's

13   a different process for making sure the recommendations are

14   implemented.

15       **THE COURT:**  Explain that process to me, please.

16       **THE WITNESS:**  Sure.

17       So, you know, when you see a recommendation on here,

18   it's -- it's typically associated with an individual name.

19   Like, Dr. Whomever is going to do whatever he or she is going

20   to do.

21       The nurse paralegal will typically follow up on any --

22   sometimes they'll do it on their own.  They'll, you know -- or

23   say, "Hey, I had" -- "I did the thing.  I did the

24   recommendation," whatever it was.  If she doesn't get that from

25   them, she'll send them a reminder.  "Hey, remember at M&M, you

**Exhibit C -100**

 1    said you were going to whatever.  Have you done it?"  They

 2    respond.

 3         And once she has that email confirmation -- I don't think

 4    that they're reflected in these September minutes, but in more

 5    recent minutes, we have a section that specifically addresses

 6    were recommendations completed or not.  And they'll simply say,

 7    you know, the patient recommendations were completed, something

 8    like that, that references the fact that she's got emails that

 9    document they were done.

10         And the reason I changed the minutes to have that happen

11    was, you know, also dealing with risk of litigation, concern

12    that, you know, somebody would say, you know, "You identified

13    these deficiencies.  Why didn't you do anything about it?"  You

14    know, I wanted to make sure that we did something about it and

15    had some level of documentation that we had done something

16    about it, again, to defend against litigation.

17         **THE COURT:**  I appreciate you answering my follow-up

18    questions, Mr. Barkley.

19         Ms. Kaul, did you have any additional questions for

20    Mr. Barkley based on my questioning?

21         **MS. KAUL:**  Just one, Your Honor.

22         **THE COURT:**  Go -- go ahead.  You can do it from there.

23    That's fine.

24         **MS. KAUL:**  Okay.  Thanks.

25    ///

**Exhibit C -101**

```
 1                    RECROSS-EXAMINATION (RESUMED)

 2   BY MS. KAUL:

 3   Q.    Is the nurse paralegal a certified paralegal?

 4   A.    I don't know what -- I -- I don't think we have -- you

 5   mean like a -- through a private organization or through a

 6   state license -- I mean, there's not a state licensure

 7   component to that.

 8   Q.    I'm wondering about the qualifications of your --

 9   A.    Sure.

10   Q.    -- nurse paralegal as it relates to legal --

11   A.    Right.

12   Q.    -- practice.

13   A.    Right.  Right.

14         So to my knowledge, in the State of Alabama, to be a

15   paralegal is merely a function of education, training,

16   experience.  There is no certification requirement.

17   Q.    Your nurse paralegal is a certified nurse; correct?

18   A.    Registered nurse, yes.

19   Q.    Registered nurse.

20         MS. KAUL:  Okay.  That's all, Your Honor.

21         THE COURT:  Okay.  Thank you, Ms. Kaul.

22         Mr. Smith, did you have any follow-up questions for

23   Mr. Barkley?

24         MR. SMITH:  I do not, Your Honor.

25         THE COURT:  Okay.  You're excused, Mr. Barkley.
```

**Exhibit C -102**

1        Thank you, sir.

2            **THE WITNESS:**  Thank you.

3            **THE COURT:**  And, Mr. Barkley, if you could just hand

4   back to Ms. Kaul the original exhibits that you've got, sir.

5   You can just actually leave everything right there.  It's even

6   easier.  Don't worry about it.

7            **THE WITNESS:**  Yeah.

8        I'm going to separate out Your Honor's in camera --

9            **THE COURT:**  Yes, sir.  Just leave -- leave the

10  in camera right there.

11           **THE WITNESS:**  Okay.  I will leave the in camera here.

12  All right.

13           **MS. KAUL:**  Thank you.  I appreciate that.

14           **THE COURT:**  And, Ms. Kaul, before I forget, I would

15  respectfully request that the plaintiffs provide an exhibit

16  list by the end of the week.  Just file it for your Exhibits 1,

17  2, and 3, please.  Okay?

18           **MS. KAUL:**  Will do.

19       Thanks, Your Honor.

20           **THE COURT:**  Great.

21       And what -- what, if any, request do you have with respect

22  to follow-up on this issue, Ms. Kaul?  Would you like the

23  opportunity to submit a post-hearing brief on this issue?

24  What --

25           **MS. KAUL:**  One moment, Your Honor.

**Exhibit C -103**

1       **THE COURT:**  Sure.

2       And I'm going to ask you the same question, Mr. Smith.

3       **MS. KAUL:**  I think, Your Honor, we would request

4    additional briefing, keep it short, and support the -- the

5    Court imposing a strict page limit.

6       But I think, with the benefit of the transcript, and given

7    the extensive testimony, that -- that would be helpful from

8    plaintiffs' perspective.

9       **THE COURT:**  How much time do you think you need to

10   prepare a post-hearing brief?

11      **MS. KAUL:**  With an expedited transcript, I think by

12   the end of next week.

13      **THE COURT:**  And when you said "a strict page limit,"

14   what are you thinking?

15      **MS. KAUL:**  We would do -- no more than five pages

16   would be fine.  I'm not even sure that we need that, but that's

17   what I would propose.

18      **THE COURT:**  All right.  Fair enough.

19      Mr. Smith, what's your position with respect to any

20   post-hearing briefing and, if so, whether there should be any

21   page limits at the time of any briefing?

22      **MR. SMITH:**  We're acceptable to briefing on this

23   matter and same page limit requirement that's -- that's

24   provided to plaintiff given to us for an opposition/surreply.

25      **THE COURT:**  All right.  So each side may submit a

**Exhibit C -104**

1    brief of no more than five pages on or before March 22nd, and I

2    will issue a ruling on that portion of the motion to compel as

3    quickly as I can.

4        Is there anything further that we should discuss with

5    respect to the motion to compel as to which there have been

6    privilege assertions?  Because I do want to discuss with

7    you-all, before we go, the supplemental status report that

8    NaphCare provided yesterday.

9            MS. KAUL:  Not for plaintiffs, Your Honor.

10           THE COURT:  Anything else on the privilege issues,

11   Mr. Smith?

12           MR. SMITH:  No, Your Honor.

13           THE COURT:  All right.  Well, let's -- and, again,

14   Mr. Barkley, thank you for traveling to be here today.  It was

15   very helpful, sir.

16       Mr. Smith, I appreciate the -- the supplemental status

17   report, and I don't want to speak in too big of a generality.

18   But it seems to me, in reviewing the -- I think it's 38 pages

19   that responds to the bullet points -- that there's basically an

20   agreement by NaphCare to produce responsive documents unless it

21   just doesn't have any documents.

22       Is that all correct, Mr. Smith?

23           MR. SMITH:  As to a majority of the bullet points,

24   there may be two or three that are at issue.

25           THE COURT:  Well, which ones are at issue?  And I --

**Exhibit C -105**

 1    let's use the ECF page numbers, please.

 2          MR. SMITH:  Okay.  Well, Your Honor, when I traveled

 3    down to San Diego and printed this out, it hadn't been filed

 4    yet, the chart that had the response.

 5          Plaintiffs' counsel --

 6          THE COURT:  You -- why don't -- use the page number at

 7    the bottom of the page instead, then.  That's fine.

 8          MR. SMITH:  Okay.  Thank you, Your Honor.

 9          THE COURT:  Sure.

10          MR. SMITH:  Well, just going in chronological order,

11    on Page 12, the first bullet point here, NaphCare is willing

12    to -- to produce the subcontracts subject to redactions with

13    the privilege log as to the financials within those contracts

14    as proprietary trade secret confidential business and

15    competitive advantage information.

16          THE COURT:  So your proposal, as to the production of

17    contracts between NaphCare and outside facilities and

18    specialists, would be to produce those contracts but redact the

19    financial component of them?

20          MR. SMITH:  Correct.

21          THE COURT:  Do you object to that, Ms. Kaul or

22    Mr. Swearingen?

23          MR. SWEARINGEN:  Yes, Your Honor.

24          THE COURT:  You do object?

25          MR. SWEARINGEN:  Yes, Your Honor.

**Exhibit C -106**

1      **THE COURT:**  Why?

2      **MR. SWEARINGEN:**  The protective order in the case

3  specifically creates a procedure that allows for the protection

4  of proprietary information, including trade secret confidential

5  research development of commercial information.  And we believe

6  that the information can be protected through the protective

7  order without redactions, instead stamped "Confidential."

8      These are public county -- you know, NaphCare is a

9  provider of public services to the San Diego County Jail.  Its

10  contract with the County has dollar amounts in it that are not

11  redacted.  The dollar amounts that it -- that may be at issue

12  with outside facilities, including any caps for services or

13  restrictions on services, should be included without redaction.

14      If -- and, again, we've offered to NaphCare to produce it

15  as confidential under the protective order.

16      **THE COURT:**  Why isn't that good enough, Mr. Smith?

17      **MR. SMITH:**  Yes.

18      Well, first of all, it's irrelevant as to what the numbers

19  are.  It's not relevant to any claim or defense, and so our

20  position is that it's not discoverable.

21      And despite there being a protective order in place,

22  there's -- there's still a privilege that NaphCare would like

23  to assert with respect to these financials that give them a

24  competitive edge in the -- in the facility.

25      And so the -- just the distribution of documents to more

**Exhibit C -107**

```
 1    people, more eyes, it's -- it's something that we object to,

 2    given the fact that it's irrelevant.

 3          THE COURT:  Well, is it your position that the

 4    contract between NaphCare and the outside facilities are

 5    irrelevant as a general matter or that the specific financial

 6    component of those contracts is irrelevant?

 7          MR. SMITH:  Well, as a general matter, it's

 8    irrelevant, but we're willing to produce them.  But then,

 9    certainly, the -- the financials don't give any probative value

10    to the standard of care provided or to any of the claims that

11    are raised.

12       So -- potentially, the information in the contract -- if

13    there were caps or restrictions or something like that noted in

14    the contract, which -- that doesn't exist, to my knowledge --

15    that, I guess, potentially could be relevant as to whether a

16    certain contract is capping work, something like that.

17       But as to the amounts paid, we don't see any relevance,

18    but --

19          THE COURT:  Mr. Swearingen -- oh.

20       I didn't mean to cut you off.  Go ahead, Mr. Smith.

21          MR. SMITH:  No.  That's it.

22          THE COURT:  Mr. Smith -- "Mr. Smith."

23       Mr. Swearingen -- excuse me -- would the plaintiffs object

24    to the production of those contracts between NaphCare and

25    outside facilities and specialists pursuant to a
```

**Exhibit C -108**

1    "Confidential - For Counsel Only" designation?

2         **MR. SWEARINGEN:**  Yes, Your Honor.

3         **THE COURT:**  You would object to that?

4         **MR. SWEARINGEN:**  Oh.  I'm sorry.  We would accept

5    that.

6         **THE COURT:**  You do.

7    Okay.  Good.  That's right.  I thought we were saying the

8    same thing here.

9    Mr. Smith, what about that, then, with respect to

10   designating these materials as, colloquially, "Attorneys' Eyes

11   Only"?  If you want to take a moment to speak to Mr. Barkley,

12   that's fine.

13        **MR. SMITH:**  Generally, we're okay with "Counsel Only."

14   But, you know, given that that will give it an extra marking so

15   that the voluminous amount of records produced in this

16   matter -- and it's not accidentally used in the litigation, is

17   one of our concerns.

18   And then they probably -- so a "Counsel Only" designation

19   should be fine with that -- that admonition that we want this

20   information to be taken sensitively.

21        **THE COURT:**  Well, you're welcome to put that marking

22   on the contracts that you produce.  I don't think there's any

23   objection from the plaintiff to that if you're going to be

24   Bates-numbering it and, as part of the Bates number,

25   "Confidential - For Counsel Only, Pursuant to Protective

**Exhibit C -109**

1  Order."

2      I think -- any objection to that, Mr. Swearingen?

3          **MR. SWEARINGEN:**  No.  Indeed, that's what's actually

4  called for in the protective order.

5          **THE COURT:**  So I think that that would alleviate a

6  concern, then, with respect to somebody not having a transcript

7  of this hearing.

8      Any further concerns with respect to that entry, which is

9  ECF Page Number 15 on Docket 588, Mr. Smith?

10         **MR. SMITH:**  No, Your Honor.

11         **THE COURT:**  All right.  Let's move on, then.

12     What are the other, if any, bullet points that -- as to

13  which there may be an issue between the parties?

14     And, by the way, I understand it's NaphCare's position

15  that these categories of documents are functionally a new

16  subpoena.  I did review the email correspondence between

17  counsel, and I understand that NaphCare is not waiving that

18  position, agreeing to produce just about everything in the

19  bullet points that the plaintiffs provided.

20     So that's not lost on me, either, just so you know,

21  Mr. Smith.  I realize you decided to just go along and produce

22  even where you think that the original subpoena was overbroad

23  and that -- we'll leave it at that.

24     So with that being said, what other additional disputes

25  are there, if any?

**Exhibit C -110**

1          **MR. SMITH:**  Yes.

2      At -- I believe there should be another.

3          **THE COURT:**  Take your time.

4          **MR. SMITH:**  Oh.  On Page 32, second bullet point, it

5  seeks the financial audits of the entire NaphCare company, and

6  that's privileged information.  That's certainly irrelevant and

7  highly competent -- confidential and not subject to disclosure.

8          **THE COURT:**  So as I read Paragraph 13.7 of the

9  contract that is included in Exhibit 3 that we utilized during

10  the evidentiary hearing, it requires NaphCare to engage a

11  licensed certified public accountant to conduct an annual

12  financial audit of the organization, referring to NaphCare.

13      And Section 13.7 requires NaphCare to submit two copies of

14  the annual audit report to the County within 15 days after

15  receiving the audit report from the certified public

16  accountant.

17      Is that correct, Mr. Smith?

18          **MR. SMITH:**  That's my understanding, that it's done

19  once.  I believe it's part of the bidding process and that the

20  County is also aware that that is to be maintained as

21  confidential.

22          **THE COURT:**  Well, it may have been done -- you said

23  it's not done annually, which seems to be what the contract

24  requires.  If you want to take a moment to consult with

25  Mr. Barkley, that's fine.

**Exhibit C -111**

1        I -- you're welcome to speak up, if you'd like,

2   Mr. Barkley.  That's fine.

3            **MR. SMITH:**  If I can ask --

4            **MR. BARKLEY:**  I don't want to --

5            **MR. SMITH:**  -- ask Mr. Barkley --

6            **MR. BARKLEY:**  I'm not licensed in the State of

7   California.  I don't know -- it's your courtroom.  You tell me.

8            **THE COURT:**  You're here as a representative of

9   NaphCare.

10           **MR. BARKLEY:**  Yes, sir.

11       Okay.  So -- well, we -- we submitted a summary of -- so

12  when a county like San Diego does a bid, one of the things they

13  want to evaluate is obviously the financial ability of the

14  entities that are bidding to be able to perform the work.  And

15  so we often submit a summary.

16       Public records laws being what they are, most of the bid

17  that we submit is public record.  But there are certain pieces

18  of it that the County recognizes, that we recognize are marked

19  "Confidential" but stay outside that process.

20       And so those financial documents are part of that.  And so

21  if anyone does a public record request for NaphCare submission,

22  they would get it without the things that we agree are

23  exceptions to the public record law because they're trade

24  secret or confidential.

25       Since the bid process, when we submitted those summary

**Exhibit C -112**

1    financials, it's not been done on an annual basis since then.

2    I'm not aware if the County has requested it, and we have not

3    proactively submitted it.

4         **THE COURT:**  So you -- I'm sorry, Mr. Barkley.  You

5    said that NaphCare has not --

6         **MR. BARKLEY:**  Proactively -- so it's not been

7    requested of us, and we've not sort of proactively submitted it

8    on our own.

9         **THE COURT:**  But this is a -- this is a financial audit

10   of NaphCare; correct?

11        **MR. BARKLEY:**  Correct.

12        **THE COURT:**  Ms. Kaul, is that even responsive to

13   RFP 85, which is documents relating to monitoring and/or

14   auditing of health care provided to incarcerated persons?  I

15   understand -- if this were talking about an audit of whether

16   NaphCare is providing appropriate health care, that would be

17   one thing.

18        But if this is an audit -- a financial audit of NaphCare,

19   Mr. Swearingen, is this responsive to RFP 85?

20        **MR. SWEARINGEN:**  It is, Your Honor.  The -- NaphCare's

21   ability to -- NaphCare's funding and financial info- --

22   ability -- or abilities is relevant to the provision of care.

23        Indeed, as we look at Exhibit N to the Priyah Kaul

24   declaration in support of plaintiffs' motion to compel --

25   that's Exhibit N, ECF Number 488-4, at ECF Page 132 -- it

**Exhibit C -113**

1    states that, as of April 17th, 2023, there are $9.3 million of

2    unpaid bills due to hospitals.

3         Of the total outstanding claim, $4.6 million are past due

4    to the 30-day threshold.  Due to lack of payment, some

5    community providers do not want to see or accept our patients,

6    which include, but not -- or -- but are not limited to --

7    citing several different health care facilities.

8         This is a corrective action notice that the County sent to

9    NaphCare saying that, "We are concerned that our patients at

10   this jail are not going to be able to be served" -- "seen due

11   to NaphCare's inability to pay its bills."

12        **THE COURT:**  I see.

13        And I understand the universe of documents to include

14   every document pertaining to the initial bid that resulted in

15   NaphCare receiving this contract in -- was it 2022?  Is that

16   right?  June 2022?

17        **MR. BARKLEY:**  That's correct.

18        **THE COURT:**  And does NaphCare object to producing the

19   portion of the documents that Mr. Barkley referenced as -- that

20   might be subject to Public Records Act requests?

21        **MR. BARKLEY:**  Well, it's -- Your Honor, I would say

22   it's not subject to Public Records Act requests.

23        **THE COURT:**  Okay.

24        **MR. BARKLEY:**  The -- typically, in part of the bid

25   process, the County, you know, allows the vendor to identify

**Exhibit C -114**

1  those parts that we think are exceptions.  They'll review that.

2  I guess they get a public record request when they agree with

3  that.  But, you know, it's a kind of trade secret or

4  confidential financial information that is typically not

5  provided pursuant -- you know, for -- under a public records

6  request.

7      I would also say it reflects NaphCare's financial

8  condition when it was bidding.  So it has nothing to do with

9  NaphCare while they're providing services to San Diego.

10     **THE COURT:**  And that was my next question.

11     Just to confirm, there have -- there has not been an

12  annual financial audit of NaphCare pursuant to Section 13.7 of

13  the contract between the County and NaphCare; is that correct,

14  Mr. Barkley or Mr. Smith, whoever wants to answer?

15     **MR. SMITH:**  No.  That's -- that's correct, my

16  understanding.

17     **THE COURT:**  Well, here's what I would say:

18     If -- I would direct NaphCare to determine whether there

19  is, or have been, any annual financial audits performed as

20  required by Section 13.7.  File a status report by -- excuse

21  me -- by Friday letting me know that.

22     And if there are no annual financial audits, it does not

23  appear to me that documents related to the -- the bidding would

24  be responsive to RFP 85.

25     What's your position on that, Mr. Swearingen?

**Exhibit C -115**

1    **MR. SWEARINGEN:**  I -- I believe that it would,

2    Your Honor, in the sense that the County accepted NaphCare's

3    bid.  And if it wasn't financially solvent or incapable of

4    providing the levels of care required, that would be relevant

5    to plaintiffs' claims.

6        The corrective action notice that I referenced that was in

7    Exhibit 2, Ms. Kaul's declaration, include other statements by

8    the County that the County is concerned that NaphCare is not

9    paying for things like inspection fees and is denying claims

10   for medical care equipment.

11       **THE COURT:**  RF- -- I understand your position,

12   Mr. Swearingen.

13       RFP 85 seeks all documents relating to monitoring and/or

14   auditing of health care provided to incarcerated persons,

15   including, but not limited to, quality improvement, quality

16   assurance or clinical performance reviews, peer reviews,

17   in-service trainings, internal or external audits, technical

18   assistance reports, accreditations, contract monitoring

19   reports, minutes from quality assurance meetings, and health

20   care record reviews from June 1st, 2021, to the present.

21       I -- I conclude that financial documents submitted by

22   NaphCare in connection with the bidding process are not

23   responsive to RFP 85, which is, to my reading, specifically

24   directed to documents relating to the monitoring and/or

25   auditing of health care actually provided to incarcerated

**Exhibit C -116**

1  persons during the NaphCare contract, which began in June of

2  2022.

3      So I would stand on my directive to you, Mr. Smith, to

4  determine whether there have been any financial audits

5  performed by NaphCare pursuant to Subsection -- or Section 13.7

6  and provide to the County and advise me of that in a status

7  report by not later than Friday.

8      Does that make sense, Mr. Smith?

9      **MR. SMITH:**  It does, and I will do.

10     **THE COURT:**  All right.  What are the other areas where

11  there might be a dispute, if any?

12     **MR. SMITH:**  As -- as to the bullet point records, I

13  believe that we were able to meet and confer last night and

14  reach resolution on the remaining ones.

15     So I'll defer to -- to plaintiffs' counsel if he has a

16  different understanding.

17     **THE COURT:**  Mr. Swearingen, are there any other bullet

18  points that you believe are at issue, sir?

19     **MR. SWEARINGEN:**  Real briefly, yes, Your Honor.

20     If you go to ECF Page 14 -- Mr. Smith, that's Page 11 of

21  your document -- the last bullet, I just referenced the

22  corrective action notice in which the County asserted that

23  NaphCare was delinquent with $9.3 million in unpaid invoices.

24     NaphCare's response indicates that it objects -- that it

25  disputes that it had $9.3 million in unpaid invoices and, on

**Exhibit C -117**

```
1    that basis, does not have any responsive documents.  It's our
2    understanding, from both the corrective action notice and
3    deposition testimony, a $9.3 million balance was outstanding
4    and unpaid.
5        So I think that that objection -- I understand if NaphCare
6    doesn't have any responsive documents, but basing their
7    objection on a dispute that it had $9.3 million in unpaid
8    invoices does not seem to be a proper basis for the objection
9    for not producing.
10           THE COURT:  All right.  Understanding that -- oh.  Go
11   ahead -- go ahead, gentlemen.
12           MR. SMITH:  Well, okay.  It's -- essentially, it's
13   NaphCare's position that there aren't records that reflect that
14   9.3 million was due and has been outstanding, and that has been
15   paid.  So there's no records -- there aren't responsive
16   records, but we have produced the responsive records to the CAN
17   that would reflect what our responses were to the CAN.
18       And I think that there's some -- in those documents, we
19   may still be compiling on some quitclaim documents as well that
20   would be reflective of documents that are related to the
21   corrective action notice.  So we don't object to producing
22   documents related to the corrective action notice and our
23   responses thereto.
24       And I guess we could search for some invoices, but it's
25   overbroad in nature.  I don't think it's responsive to RFP 20
```

**Exhibit C -118**

1   or -- to begin -- to begin with.  And, you know, I'm not sure

2   exactly what invoices that -- that they would like us to show

3   that have been paid or unpaid.

4       So the corrective action notices and documents related to

5   those, we've been willing to produce.

6       **THE COURT:**  Would that satisfy the plaintiffs,

7   Mr. Swearingen, the production of NaphCare's responsive to --

8   responses to the corrective action notice or notices?

9       **MR. SWEARINGEN:**  We would also ask for payments of

10  the -- of the claims specifically because the corrective action

11  plan issued by San Diego states that, due to the lack of

12  payment, some community providers do not want to see or accept

13  outpatients, which include, but are not limited to, Podiatry at

14  Oxford, Alvarado, Vibra, and Kindred.

15      The timing of those payments would be relevant to the

16  access -- to patients' access of care.

17      **MR. SMITH:**  So there are claims reports that address

18  this that will show paid and unpaid and -- and should reflect

19  that.

20      So, I mean, we're -- we may be in agreement on this.

21      **THE COURT:**  All right.  With respect to -- to that, if

22  the claims reports will show what's been paid and what's

23  unpaid, then I think that would -- that would suffice.

24      And I would note that RFP 20 asks for documents relating

25  to policies and procedures for access to outside medical

**Exhibit C -119**

1    facilities, specialists, and follow-up care.  This bullet point

2    is -- it is very specific, but it really is outside of the

3    scope of RFP 20.

4         And I think that NaphCare's willingness to produce the

5    documents, as you just stated, Mr. Smith, would go above and

6    beyond -- would certainly suffice to satisfy NaphCare's

7    obligations with respect to RFP 20.

8         With respect to -- well, that resolves that one.

9         Are there any others, Mr. Swearingen?

10        **MR. SWEARINGEN:**  As a result of last night's

11   meet-and-confer, with respect to RFP 27, the last bullet point,

12   which appears on ECF Page 22 at the very top -- Mr. Smith,

13   that's Page 19 of your document.

14        I just want to note, for the record, that the parties

15   agreed that NaphCare will look to see whether or not TechCare

16   can generate reports for one month of this data.  And if not,

17   NaphCare is open to looking to -- to provide the discharge

18   summaries for the first 20 people booked since July 1st, 2023,

19   who have since been discharged.

20        **THE COURT:**  Is that correct, Mr. Smith?

21        **MR. SMITH:**  Yes.  We're willing to do that.

22        **THE COURT:**  Do you need beyond March 22nd to do that,

23   Mr. Smith?

24        **MR. SMITH:**  Potentially.

25        **THE COURT:**  Mr. Barkley is nodding his head.

**Exhibit C -120**

1      **MR. BARKLEY:**  Well, I just know what all -- is on some

2  of our IT team's plate right now.  So that will be helpful,

3  Your Honor.

4      **THE COURT:**  Well, let's -- look, first off, I am

5  grateful that you-all were able to meet and confer and resolve

6  the vast majority of these issues.

7      I did note in the minute order that I issued yesterday

8  that there is a deadline for San Diego -- there is a deadline

9  for San Diego County to produce documents by March 22nd so that

10  we can stay on track with the pretrial schedule, although the

11  pretrial schedule was recently amended pursuant to the parties'

12  joint request to provide three more weeks for each pretrial

13  deadline.  And I want to stick with the new pretrial schedule.

14      How much time does NaphCare need to produce the remaining

15  documents it has agreed to produce, leaving aside the -- the

16  issue of the privilege documents that were the subject of the

17  evidentiary hearing?

18      **MR. SMITH:**  I mean, as -- as to the records and the

19  chart that were just discussed, the majority of them can be

20  produced by the 22nd, and we've been working diligently to

21  produce them on a rolling basis.

22      And so we may just need a little bit additional time with

23  respect to this bullet point.

24      **MR. BARKLEY:**  If -- if I'm hearing the Court

25  correctly, that the County has essentially three more weeks, we

**Exhibit C -121**

1   can do it within that same three weeks, if that's what

2   Your Honor is suggesting.

3          THE COURT:  It wasn't -- it wasn't quite that.

4          MR. BARKLEY:  Okay.

5          THE COURT:  The County was ordered to produce

6   responsive documents on or before March 22nd.

7       The -- what I mentioned was that I continued certain

8   pretrial deadlines by three weeks --

9          MR. BARKLEY:  Okay.

10         THE COURT:  -- to give the parties a little bit of

11  extra time --

12         MR. BARKLEY:  I see.

13         THE COURT:  -- to work through these issues.  However,

14  giving NaphCare three additional weeks, it would be challenging

15  because the parties have depositions scheduled.

16      Is there a 30(b)(6) deposition of NaphCare that is also

17  scheduled?

18         MR. SMITH:  Not scheduled but is subject to our

19  meet-and-confer and this hearing.

20         THE COURT:  Right.

21      So that deposition is going to need to go if we're doing

22  the additional fact discovery period.

23      And I expect, Mr. Swearingen, that the plaintiffs would

24  want the production from NaphCare before taking that

25  deposition.

**Exhibit C -122**

 1          MR. SWEARINGEN:  Yes, Your Honor.

 2          THE COURT:  So with that being said, would the -- if

 3     NaphCare produces whatever it can by March 22nd, and with the

 4     fundamental understanding that NaphCare is going to be acting

 5     in good faith and try to produce whatever it can by that date,

 6     if there are additional documents that NaphCare just cannot

 7     produce by March 22nd, would the plaintiffs object to an

 8     additional week for NaphCare to produce those remaining

 9     documents, Mr. Swearingen?

10          That would be March 29th.

11          MR. SWEARINGEN:  No, Your Honor.

12          THE COURT:  Would that help you out, Mr. Smith?

13          MR. SMITH:  It -- it would.  Some of these take longer

14     to cull and retrieve than others.

15          THE COURT:  Well -- and I am mindful that you are a

16     third party, although a third party who is integrally involved

17     in the events that are relevant to this litigation.

18          So what I will do, Mr. Smith, is direct NaphCare to work

19     as diligently as you can to produce all of the remaining

20     documents on or before March 22nd.  To the extent that there

21     are one or more categories of documents that just cannot be

22     reasonably gathered and produced by March 22nd, I would give

23     you until March 29th to do that.

24          And I'm not going to ask you to sit here right now and

25     tell me exactly what categories do you need an extension on.  I

**Exhibit C -123**

1    trust you will act in good faith.

2         **MR. SMITH:**   Thank you, Your Honor.

3         **THE COURT:**   And, frankly, the fact that you have come

4    to this with an open mind to try to figure this out with

5    plaintiffs' counsel does factor into my thinking in that

6    regard.   And so I do appreciate that, Mr. Smith.

7         What other issues should we address this morning, Ms. Kaul

8    or Mr. Swearingen?

9         **MR. SWEARINGEN:**   Two primary issues, one relating to

10   the subpoena regarding emails and texts, the second an

11   invitation to you to -- to join plaintiffs' counsel and experts

12   at the Central Jail inspection to be held on March 25th.

13        **THE COURT:**   Shouldn't that be a discussion that

14   includes counsel for the County?

15        **MR. SWEARINGEN:**   We informed County Counsel -- or

16   counsel for the County that we would so invite you, but we are

17   happy and open to having that discussion with them as well.

18        **THE COURT:**   I'd feel more comfortable with that.   I

19   would appreciate that you raise that with Ms. Pappy and

20   Ms. Coleman, and let's table that for now -- but I appreciate

21   that -- for March 25th, Mr. Swearingen.

22        Let's talk about ESI.   My understanding is that the

23   parties reached an agreement whereby there would not be any

24   specific search terms; is that correct, Ms. Kaul or

25   Mr. Swearingen?

**Exhibit C -124**

1          **MR. SWEARINGEN:** Initially, Your Honor, yes.  We did

2     agree that there would be no formal ESI protocol.  We did

3     continue to seek responsive emails and communications from

4     defendants throughout the meet-and-confer.

5          NaphCare's opposition to plaintiffs' motion to compel

6     stated that NaphCare cannot produce emails, minutes, or other

7     records absent ESI search terms.

8          As a result of that, on February 13th, in addition to the

9     chart that has helped NaphCare and plaintiffs very much

10    organize the documents, we sent an email proposing ESI protocol

11    that included 18 search terms and 10 custodians.  NaphCare

12    rejected that.

13         Subsequently, plaintiffs proposed an ESI protocol that

14    would attempt to get at many of the documents sought in the

15    RF- -- or in the requests in the subpoena that included only

16    7 custodians and 12 search terms.  NaphCare's counsel, through

17    extensive meet-and-confer last week, said they would not do any

18    ESI protocol.  Instead, we talked about producing emails.

19         On Friday, I informed NaphCare's counsel that I still

20    didn't understand what NaphCare had agreed to produce as far as

21    emails.  And subsequently, NaphCare responded by email saying,

22    "With respect to emails, we have a significant amount of emails

23    that are responsive and will be part of the supplemental

24    production."

25         At this point in time, I still don't understand

**Exhibit C -125**

```
 1  specifically the scope of emails that will be produced.  I
 2  understand most, if not all, will be responsive only to RFP 19,
 3  but there is -- but there is still ambiguity as to which emails
 4  will be produced.
 5      Plaintiffs would request -- plaintiffs met and conferred
 6  with NaphCare and asked for emails responsive to RFPs 6, 8, 9,
 7  16 through 28, 30, 31, 33 through 38, 44, 56, 57, 63, 76, 77,
 8  84, and 85.
 9          THE COURT:  What were the first two RFPs at issue?
10          MR. SWEARINGEN:  6 and 8.
11          THE COURT:  Let's look at Number 8.
12      What would be the purpose of an ESI search for Number 8?
13  I mean, it is obviously very, very broad, as drafted.  NaphCare
14  has essentially agreed to produce documents in response to --
15  or responsive to the seven bullet points that the plaintiffs
16  proposed.
17      But explain to me what -- what should NaphCare be
18  searching for with respect to emails in response to these
19  bullet points?
20          MR. SWEARINGEN:  So from the very several providers at
21  the jail who work on behalf of NaphCare, these would be
22  specific emails about whether -- about the -- about NaphCare's
23  policies and procedures relating to their formulary.
24      So, for example, whether or not --
25          THE COURT:  Which bullet point?
```

Exhibit C -126

1       **MR. SWEARINGEN:**  Which bullet point in the middle

2   column?

3       **THE COURT:**  Yeah.

4       That -- those are the document -- those are a function of

5   what the new subpoena requests; right?

6       **MR. SWEARINGEN:**  They were the specific documents that

7   we identified in that February 13th email, but we separately

8   proposed a method for -- for addressing the -- the electronic

9   communications that was separate from this chart.

10      **THE COURT:**  Is that before me?

11      **MR. SWEARINGEN:**  It is, Your Honor.

12      **THE COURT:**  Where?

13      **MR. SWEARINGEN:**  It's in the joint status report.

14      **THE COURT:**  Right, but -- okay.

15      Show me, and maybe I can -- I do recall seeing that in the

16  joint status report.  It's not immediately apparent to me how

17  an ESI search for emails is going to generate responsive

18  documents beyond what NaphCare has already agreed to produce,

19  but go ahead.

20      You're talking about Docket Number 562?

21      **MR. SWEARINGEN:**  I am, Your Honor, at ECF Page 35.

22      **THE COURT:**  Are you talking about the emails back and

23  forth?

24      **MR. SWEARINGEN:**  Yes, Your Honor.

25      **THE COURT:**  I'm having trouble, Mr. Swearingen,

**Exhibit C -127**

1    because -- I know that the parties have tended to attach lots

2    of emails to their pleadings, and that's fine, and I try my

3    best to read them.

4        But what am I supposed to take from ECF Page 35?

5            MR. SWEARINGEN:  The -- ECF Page 35 is Ms. Kaul's

6    email as of -- on February 13th identifying the ESI protocol

7    that we had suggested to try to get some of the -- the

8    electronic communications related to the requests for

9    production in the subpoena to NaphCare.

10       As I said earlier, we've tried both getting responsive

11   emails and also proposing ESI protocol as a shortcut to getting

12   responsive emails.

13           THE COURT:  And my question is that NaphCare has

14   agreed to produce the seven categories of documents that are

15   contained at Docket 588, Pages 7 and 8.

16       Your request is that -- is what with respect to additional

17   production of documents?  Do you want --

18           MR. SWEARINGEN:  If there are emails, for example,

19   from -- from the -- the Chief Medical Officer at the jail or

20   from the -- a NaphCare doctor saying that the formulary for the

21   jail, the allowed medications that we are -- that the jail is

22   allowed to prescribe, or can prescribe, does not include, for

23   example, a medication for Hep C or does -- or, for the

24   medication-assisted therapy, does not include methadone instead

25   of just Suboxone.

**Exhibit C -128**

1    If these were emails saying that, "Our policies and

2  procedures limit us or should be changed," those are the types

3  of emails that we would ask for.

4    **THE COURT:**  How would that be -- so using your

5  example, even taking Ms. Kaul's February 13th email that's

6  Page 35, how would it cap- -- how would your search terms

7  capture whether a Hep C medication is available?

8    **MR. SWEARINGEN:**  Those search terms would.  Those

9  search terms were more narrow than the document requests.

10    **THE COURT:**  All right.  Mr. Smith, what's NaphCare's

11  position?

12    **MR. SMITH:**  It's -- well, it's twofold.

13    The plaintiffs were given an opportunity to provide

14  bullet-pointed documents that were specific to these overbroad

15  requests.

16    One of these bullet-pointed documents requested

17  communications, and we actually responded to that with the

18  production of over a thousand emails, and we're willing to

19  produce the communications if it was specific to that one

20  bullet point.

21    The remaining of this is extremely overbroad and unduly

22  burdensome.  There's a lack of direction as to which types of

23  emails they're looking for and the ability to even search for

24  those types of emails as it relates back to the request for

25  production of documents.

**Exhibit C -129**

1     Moreover, running the ESI search just against five

2 custodians generated almost a quarter million hits.  The

3 ability of NaphCare to -- to cull through that type of email

4 protocol is very limited.  To be able to even determine, "Okay.

5 These are attorney-client emails.  Cull them out," we would

6 probably need months to do a project like that.  It -- in fact,

7 my calculation was that it would just take one person, at five

8 minutes an email -- it would take thousands of days to do.

9     It's -- it's extremely overbroad, burdensome, and beyond

10 the scope of what the subpoena required.  The requests were

11 vague and -- in general, to begin with, as to what

12 correspondence was sought.

13     We have been more than willing to cooperate with

14 plaintiffs' counsel and the Court and produce specific

15 standalone category documents as well as the bullet point that

16 asks for communications in this.  And I think we've gone above

17 and beyond and complied with the subpoena.

18     **THE COURT:**  Counsel, having reviewed the initial

19 subpoena in connection with the motion to compel, I did find

20 that the -- the categories at issue were overbroad.

21     I provided plaintiffs with an opportunity to list the

22 specific documents that were being sought.  The plaintiffs did

23 so, and NaphCare has essentially agreed to produce documents

24 responsive to just about every one of them, I believe 150 or so

25 bullet points.

**Exhibit C -130**

1          You know, I'm not going to require NaphCare to adopt any

2     specific ESI protocol, given that the categories that are truly

3     before me in this subpoena are so overbroad.  To the extent

4     that NaphCare is producing emails in response to RFP Number 19,

5     which specifically seeks communications, it's going to do so.

6     But I'm not going to order NaphCare to engage in a further ESI

7     production.

8          I do find, based on the information provided by Mr. Smith,

9     that that further ESI search with the quarter million hits is

10    not proportional to the needs of the case and, given the volume

11    of the production that NaphCare is undertaking, that any

12    additional relevance to a claim or defense from the ESI search

13    term search that the plaintiffs are requesting is also not

14    proportional to the needs of the case.

15         Any other issues we should address, Mr. Swearingen?

16         **MR. SWEARINGEN:**  Not from plaintiffs' end, Your Honor.

17         **THE COURT:**  How about from NaphCare's side, Mr. Smith?

18         **MR. SMITH:**  None from us.

19    Thank you, Your Honor.

20         **THE COURT:**  Okay.  Counsel, I really do appreciate

21    everyone being here today.  I know everyone had to travel to be

22    here.

23         So thank you very much.

24         **MR. SWEARINGEN:**  Thank you, Your Honor.

25         **THE CLERK:**  That concludes our calendar.

**Exhibit C -131**

1        We are now in recess.

2               (Proceedings adjourned at 11:44 a.m.)

**Exhibit C -132**

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4         I certify that the foregoing is a true and correct

5    transcript, to the best of my ability, of the above pages of

6    the official electronic sound recording provided to me by the

7    U.S. District Court, Southern District of California, of the

8    proceedings taken on the date and time previously stated in the

9    above matter.

10        I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties to the action in

12   which this hearing was taken, and further that I am not

13   financially nor otherwise interested in the outcome of the

14   action.

15

16   DATE:  Friday, March 15, 2024

17

18

19

20            /S/ James C. Pence-Aviles

21      James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                 U.S. Court Reporter

22

23

24

25

**Exhibit C -133**

# EXHIBIT D

A. NIX
06-07-2024

**Exhibit 25**

HOLLY A. SONNENBERG

# HEALTH CARE
## Policy & Procedure Manual

---

Full San Diego Policy Manual (With Site Addendums)

---



NAPHCARE000679

**Exhibit D -135**

Health Care Policy & Procedure Manual

# Table of Contents

INTRODUCTION

▶ Introduction

SECTION A: GOVERNANCE AND ADMINISTRATION

▶ A-01 Access To Care

▶ A-02 Responsible Health Authority

▶ A-03 Medical Autonomy

▶ A-04 Administrative Meetings And Reports

▶ A-05 Policies And Procedures

▶ A-06 Continuous Quality Improvement Program

▶ A-07 Privacy Of Care

▶ A-08 Health Records

▶ A-08 Health Records - Documentation Of Telemedicine For Inmate Care

▶ A-08 Health Records - Downtime Procedures

▶ A-09 Procedure In The Event Of A Patient Death

▶ A-10 Grievance Process For Health Care Complaints

SECTION B: HEALTH PROMOTION, SAFETY, AND DISEASE PREVENTION

▶ B-01 Healthy Lifestyle Promotion

▶ B-02 Infectious Disease, Prevention And Control

▶ B-02 Management Of Bloodborne Pathogen Exposures

▶ B-03 Clinical Preventive Services

▶ B-04 Medical Surveillance Of Inmate Workers

▶ B-05 Suicide Prevention And Intervention

▶ B-06 Contraception

▶ B-07 Communication On Patients' Health Needs

▶ B-08 Patient Safety

▶ B-09 Staff Safety

▶ B-09 Staff Safety - Needle Stick Prevention Plan

SECTION C: PERSONNEL AND TRAINING

NAPHCARE000680
**Exhibit D -136**

▸ C-02 Clinical Performance Enhancement

▸ C-03 Professional Development

▸ C-04 Health Training For Correctional Officers

▸ C-05 Medication Administration Training

▸ C-08 Health Care Liaison

▸ C-09 Orientation For Health Staff


SECTION D: ANCILLARY HEALTH CARE SERVICES

▸ D-01 Pharmaceutical Operations

▸ D-02 Medication Services – Controlled Substances

▸ D-02 Medication Services – General Guidelines & Distribution

▸ D-02 Medication Services – Medication Administration Record

▸ D-02 Medication Services – Medication Misuse And Diversion

▸ D-02 Medication Services – Medication Variances

▸ D-02 Medication Services – Non-Formulary Medications

▸ D-02 Medication Services – Pre-Pouring Of Medication

▸ D-02 Medication Services – Refusal Or Non-Adherence

▸ D-02 Medication Services – Self-Administration And Keep-On-Person

▸ D-02 Medication Services – Special Populations

▸ D-03 Clinic Space, Equipment, And Supplies

▸ D-04 On-Site Diagnostic Services

▸ D-05 Medical Diets

▸ D-06 Patient Escort

▸ D-07 Emergency Services And Response Plan

▸ D-08 Hospital And Specialty Care


SECTION E: PATIENT CARE AND TREATMENT

▸ E-01 Information On Health Services

▸ E-04 Initial Health Assessment

▸ E-05 Mental Health Screening And Evaluation

▸ E-08 Nursing Assessment Protocols And Procedures

NAPHCARE000681

**Exhibit D -137**

▶ E-08 Nursing Assessment Protocols And Procedures - Evaluation Following Use Of Force

▶ E-10 Discharge Planning

SECTION F: SPECIALIZED PATIENT SERVICES

▶ F-01 Specialized Services For Chronic Disease And Other Special Needs

▶ F-01 Specialized Services-Gender Identity And Gender Expression

▶ F-01 Specialized Services-Hunger Strike

▶ F-02 Infirmary Level Care

▶ F-03 Mental Health Services

▶ F-04 Medically Supervised Withdrawal And Treatment - Pregnancy Management

▶ F-04 Medically Supervised Withdrawal And Treatment - Medication Assisted Treatment

▶ F-06 Response To Sexual Assault

▶ F-07 Care For The Terminally Ill

SECTION G: MEDICAL-LEGAL ISSUES

▶ G-01 Restraint And Seclusion

▶ G-02 Restrictive Housing

▶ G-03 Emergency Psychotropic Medication

▶ G-04 Therapeutic Relationship, Forensic Information, And Disciplinary Action

▶ G-05 Informed Consent And Right To Refuse

▶ G-06 Medical And Other Research

GLOSSARY

▶ Glossary

NAPHCARE000682
**Exhibit D -138**

# A-09 Procedure In The Event Of A Patient Death

**Effective Date:** 06/01/2022

**Policy Revised:** 05/29/2023

**NCCHC Standard:** A-09

**NCCHC Opioid Standard:** Procedure in the Event of an Inmate Death (O-A-10)

**ACA Standard:** Inmate Death (4-ALDF-4D-23); Notification (5-ACI-6C-02); Offender's Death (5-ACI-6C-01)

**Other Applicable Standard:** Death in Custody (CCR Title 15, Section 1046); Health Care Procedure Manual (CCR Title 15, Section 1206)

## Purpose

To ensure accurate information and timely reporting and investigation of any patient death that occurs within the institution as well as ascertain appropriateness of clinical care and identify any trends requiring further study.

## Policy

All patient deaths require the performance of a clinically thorough mortality review. Deaths that are unexpected or occur under unusual circumstances will also be investigated in accordance with state and local regulations.

## Procedure

GENERAL PROCEDURES IN THE EVENT OF PATIENT DEATH

1) The Responsible Health Authority (RHA) should notify the Vice President of Operations, Corporate Chief Medical Officer, identified members of the San Diego County Sheriff's Office, and Corporate Legal Department immediately via email at notification@naphcare.com or telephone, if email is unavailable, of any patient death, including incident details.

2) A log will be maintained to include the following:

   a) Patient name or identification number;
   b) Age at time of death;
   c) Date of death;
   d) Date of clinical mortality review;
   e) Date of administrative review;
   f) Cause of death;
   g) Manner of death;
   h) Date pertinent findings or review(s) shared with staff; and
   i) Date of psychological autopsy.

3) The medical examiner or coroner is to be notified immediately and all steps will be taken to preserve the scene. The body is not to be removed without permission of the coroner, medical examiner, or the institutional authority. After proper medical examination, the body will then be released to the appropriate facility.

4) Following the death of a patient, whether natural, homicide, accident, under suspicious circumstances, or in any other unusual manner, the RHA or designee will immediately notify the onsite Medical Director and institutional authority. Family members should be notified by the institution's policies and procedures.

5) The Medical Emergency Code Report is completed at the time of the incident and a copy should be forwarded to the corporate office via email at notification@naphcare.com.

   a) Only one Medical Emergency Code Report is completed for each incident. This report should be inclusive of all attendees at the event.

NAPHCARE000735

**Exhibit D -139**

    b) After completion, the Medical Emergency Code Report should be scanned into the patient's TechCare record.

    c) Any staff with the need to document additional comments concerning their specific intervention shall document that intervention in a Quick Note or SOAPE Note in the patient's health record.

6) The Death Summary-HSA should be filled out by the RHA using the patient record as reference.

    a) If the RHA is unavailable, a designee will be appointed to complete the death summary.

    b) The report should be forwarded within seven (7) days to the corporate office via email at notification@naphcare.com.

7) A physician, preferably the medical director, will complete a Death Summary - Physician.

    a) The death summary will review the clinical care received by the patient and make any suggestion for improvement in retrospect.

    b) The physician should review the medical record as well as any other documents pertinent to the event during the review process.

    c) The report should be forwarded within seven (7) days to the corporate office via email at notification@naphcare.com.

8) Completed summaries by the RHA and Medical Director will not be placed in the patient's record.

9) The medical record is to be closed with a final note stating "Patient expired, case closed."

    a) Any final documentation for the health record not in the file at the time of death must be placed in the record by the RHA with the date and time of placement.

    b) The RHA is responsible for ensuring appropriate and complete documentation is entered into the health record as soon as possible after a patient death, ideally within 24 hours. The record should then be locked by placing the "Inmate Death" flag. Once a record has been locked by the RHA, no additional information can be entered into the record. The record cannot be unlocked at the site level after the flag has been set.

    c) In the event additional paperwork is found once the record is locked, a request should be sent to the corporate office. The Chief Medical Officer  or NaphCare Legal Counsel may then unlock the record temporarily to have the information placed into the patient's record as appropriate. The Inmate Death flag can then be placed back on the record to relock the chart.

## DEATH DUE TO SUICIDE

1) The RHA should notify the Vice President of Operations, Corporate Chief Medical Officer, and Corporate Legal Department via email at notification@naphcare.com or telephone, if email is unavailable, of any patient death, including incident details.

2) Above GENERAL PROCEDURES IN THE EVENT OF PATIENT DEATH are followed with the addition of the Psychological Autopsy Report form and the Suicide and Self-Harm Behavior Case Report.

3) Psychological Autopsy Report form is to be completed by the primary psychiatric provider or psychologist at the site level within fourteen (14) days.

    a) This report will provide detailed and comprehensive documentation of all information and circumstances involved in the review of a suicide to identify trends and opportunities for improvement. It is expected that the primary psychiatric provider or psychologist will gather input from the Medical Director or provider for completion of this report.

4) A Suicide and Self-Harm Behavior Case Report is also conducted by the Mental Health Director, psychiatric provider, or designee within seven (7) days of any suicidal action or behavior.

5) The Case Report and Psychological Autopsy Report will not be placed in the patient's health record.

6) Critical Incident Debriefing:

    a) Critical incident debriefings are available to all staff and patients who may have been affected by a completed suicide or serious attempt.

NAPHCARE000736

**Exhibit D -140**

b) Critical incident debriefing provides affected staff and patients an opportunity to process their feelings about the incident

## MORBIDITY AND MORTALITY REVIEW

1) A Morbidity and Mortality Meeting must be completed within 30 days of any death. The review should provide a summary of the facts surrounding the patient's death in order to ascertain compliance with corporate standard of care and to identify any deficiencies/training/policies that may have contributed to the patient death or emergency response.

2) The M&M meeting minutes should follow the guidelines set forth in the M&M Meeting Guidelines and Agenda. The M&M meeting can be part of the PICC meeting as long as it is completed within 30 days of the death.

3) The RHA death summary, physician death summary, Medical Emergency Code Report, Psychological Autopsy, Suicide and Self-Harm Behavior Case Report, any incident forms, hospital records (if applicable), ambulance records (if applicable), and autopsy report (if available) will be utilized during the M&M review.

4) If all documentation is not available (e.g., autopsy report, hospital records, ambulance records), the M&M meeting must still be done within the 30 day time frame and may be amended at a later date when the additional information is available.

5) During the review process, if it is determined that there is any indication that the decedent may have had an undiagnosed or untreated communicable disease, this finding must immediately be discussed with the responsible physician and Corporate Chief Medical Officer as these matters may require rapid action, such as appropriate communication with public health authorities.

6) For a case in which the cause of death is unclear or an undiagnosed communicable disease is suspected, all reasonable attempts will be made to obtain a complete autopsy to increase the understanding of the pathology of the disease.

7) For expected deaths, a modified death review process, which focuses on the relevant clinical aspects of the death and preceding treatment, may be followed.

8) Changes that are identified during the review process will be implemented and monitored through the facility CQI program in the form of a process quality improvement study. Results of the study will be documented in the facility CQI meeting minutes and should be shared with the treating staff.

9) The M&M meeting will be documented and placed in SharePoint in the Patient Death NCCHC folder with the patient's name within five (5) days of the meeting. Results of the review will be shared with the treating staff at the next scheduled staff meeting.

10) The RHA and physician death summaries, Psychological Autopsy, Suicide and Self-Harm Behavior Case Report, and the M&M meeting minutes, will not be a part of the patient record.

## Relevant Forms

death-procedure

death-summary-hsa

death-summary-physician

mm-meeting-guidelines-agenda

psychological-autopsy-report-form

suicide-and-self-harm-behavior-case-report

mac-meeting-template

man-down-assessment

risk-identification-occurrence-report

*Procedure in the Event of an Inmate Death (J-A-09). National Commission on Correctional Health Care: Standards for Health Services in Jails, 2018.*

*Procedure in the Event of an Inmate Death (O-A-10). National Commission on Correctional Health Care: Standards for Opioid Treatment Programs in Correctional Facilities, 2016.*

## References

*Inmate Death (4-ALDF-4D-23). American Correctional Association: Performance Based Standards for Adult Local Detention*

NAPHCARE000737
Exhibit D -141

*Facilities, Fourth Addition, 2004.*

*American Correctional Association: Standards Supplement, 2016.*

*Notification (5-ACI-6C-02); Offender's Death (5-ACI-6C-16). American Correctional Association: Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, 2020.*

*Death in Custody (CCR Title 15, Section 1046); Health Care Procedures Manual (CCR Title 15, Section 1206). California Code of Regulations: Adult Title 15 Minimum Standards for Local Detention Facilities, 2019.*

## Specific Site Addendums

## Central

### Procedure

1) In the event of a patient death, health staff at the San Diego Central Jail will notify Sheriff's Medical Administration to include:

    a) Captain

    b) Medical Service Administrator

    c) CMO

    d) DON

    e) MHPD (in the event of a suicide)

2) San Diego health staff will complete the Man Down template in TechCare in lieu of NaphCare's Medical Emergency Code Report.

3) Health staff will also utilize San Diego County policy MSD.D.1 Death of An Inmate On Site for notification and reporting structure.

### Additional Forms

No additional forms for this policy.

### Provider Contact Information

No provider contact information for this policy.No references for this policy.

### Additional References

## East Mesa

### Procedure

1) In the event of a patient death, health staff at the East Mesa Reentry Facility will notify Sheriff's Medical Administration to include:

    a) Captain

    b) Medical Service Administrator

    c) CMO

    d) DON

    e) MHPD (in the event of a suicide)

2) San Diego health staff will complete the Man Down template in TechCare in lieu of NaphCare's Medical Emergency Code Report.

3) Health staff will also utilize San Diego County policy MSD.D.1 Death of An Inmate On Site for notification and reporting structure.

NAPHCARE000738

**Exhibit D -142**

## Additional Forms

No additional forms for this policy.

## Provider Contact Information

No provider contact information for this policy.No references for this policy.

## Additional References

## George Bailey

### Procedure

1) In the event of a patient death, health staff at the George Bailey Detention Facility will notify Sheriff's Medical Administration to include:

   a) Captain
   b) Medical Service Administrator
   c) CMO
   d) DON
   e) MHPD (in the event of a suicide)

2) San Diego health staff will complete the Man Down template in TechCare in lieu of NaphCare's Medical Emergency Code Report.

3) Health staff will also utilize San Diego County policy MSD.D.1 Death of An Inmate On Site for notification and reporting structure.

## Additional Forms

No additional forms for this policy.

## Provider Contact Information

No provider contact information for this policy.No references for this policy.

## Additional References

## Las Colinas

### Procedure

1) In the event of a patient death, health staff at the Las Colinas Reentry Facility will notify Sheriff's Medical Administration to include:

   a) Captain
   b) Medical Service Administrator
   c) CMO
   d) DON
   e) MHPD (in the event of a suicide)

2) San Diego health staff will complete the Man Down template in TechCare in lieu of NaphCare's Medical Emergency Code Report.

3) Health staff will also utilize San Diego County policy MSD.D.1 Death of An Inmate On Site for notification and reporting structure.

No additional forms for this policy.

NAPHCARE000739

**Exhibit D -143**

## Additional Forms

## Provider Contact Information

No provider contact information for this policy.No references for this policy.

## Additional References

## Rock Mountain

## Procedure

1) In the event of a patient death, health staff at the Rock Mountain Detention Facility will notify Sheriff's Medical Administration to include:

    a) Captain
    b) Medical Service Administrator
    c) CMO
    d) DON
    e) MHPD (in the event of a suicide)

2) San Diego health staff will complete the Man Down template in TechCare in lieu of NaphCare's Medical Emergency Code Report.

3) Health staff will also utilize San Diego County policy MSD.D.1 Death of An Inmate On Site for notification and reporting structure.

## Additional Forms

No additional forms for this policy.

## Provider Contact Information

No provider contact information for this policy.No references for this policy.

## Additional References

## South Bay

## Procedure

1) In the event of a patient death, health staff at the South Bay Detention Facility will notify Sheriff's Medical Administration to include:

    a) Captain
    b) Medical Service Administrator
    c) CMO
    d) DON
    e) MHPD (in the event of a suicide)

2) San Diego health staff will complete the Man Down template in TechCare in lieu of NaphCare's Medical Emergency Code Report.

3) Health staff will also utilize San Diego County policy MSD.D.1 Death of An Inmate On Site for notification and reporting structure.

## Additional Forms

NAPHCARE000740

**Exhibit D -144**

Health Care Policy & Procedure Manual

No additional forms for this policy.

## Provider Contact Information

No provider contact information for this policy.No references for this policy.

## Additional References

## Vista

### Procedure

1) In the event of a patient death, health staff at the Vista Detention Facility will notify Sheriff's Medical Administration to include:

    a) Captain

    b) Medical Service Administrator

    c) CMO

    d) DON

    e) MHPD (in the event of a suicide)

2) San Diego health staff will complete the Man Down template in TechCare in lieu of NaphCare's Medical Emergency Code Report.

3) Health staff will also utilize San Diego County policy MSD.D.1 Death of An Inmate On Site for notification and reporting structure.

## Additional Forms

No additional forms for this policy.

## Provider Contact Information

No provider contact information for this policy.No references for this policy.

## Additional References

NAPHCARE000741

**Exhibit D -145**

# EXHIBIT E
## Under Seal

# EXHIBIT F


NATIONAL COMMISSION
ON CORRECTIONAL HEALTH CARE

# Procedure in the Event of an Inmate Death

Home  ›  Spotlight on the Standards  ›  Procedure in the Event of an Inmate Death

## Standards/Position Statements

## FAQs

## COVID-19 Resources                                                    ⌄

## Position Statements

**Exhibit F-148**



## Spotlight on the Standards

## Resources                                                            ⌄

**A-09 Procedure in the Event of an Inmate Death (important)**

The responsible health authority conducts a thorough review of all deaths in custody in an effort to improve care and prevent future deaths.

*– 2018 Standards for Health Services for jails and prisons*

As correctional health professionals, we strive to avoid preventable patient deaths. However, when an inmate dies, the death should be reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures or practices are warranted; and to identify issues that require further study.

The best way to answer these questions is to take a three-pronged approach to every inmate death, regardless of the cause: an administrative review, a clinical mortality review and a psychological autopsy if the death is by suicide. These three processes comprise a death review. This review is also required for deaths, whether natural or otherwise, that occur off-site while the facility is responsible for the inmate.

# Part 1: Administrative Review

Administrative reviews assess correctional and emergency response actions surrounding an inmate's death. They entail a review of the incident and facility procedures used; training received by involved staff; emergency response; and recommendations, if any, for change in policy, training, physical plant, medical or mental health services, and operational procedures. The administrative review should be conducted with the participation of custody staff.

**Exhibit F-149**



requirement has been eliminated. However, we recommend that a preliminary administrative review occur as soon as possible to identify any obvious areas for immediate improvement. As the administrative review continues in the months following the death (e.g., autopsy results, further findings), the review can be appended with applicable information.

# Part 2: Clinical Mortality Review

The clinical mortality review is an assessment of the clinical care provided and the circumstances leading up to a death. This review is to be conducted within 30 days to determine the appropriateness of the clinical care provided and the effectiveness of the clinical policies and procedures relevant to the circumstances surrounding the death. At least three key questions should be asked during this review: Could the medical response at the time of death be improved? Was an earlier intervention possible? Independent of the cause of death, is there a way to improve care?

Typically, clinical mortality reviews include a review of the incident and facility procedures that were implemented, training received by the staff involved, pertinent medical and mental health services, and reports involving the inmate. When a death is expected, a modified review process focusing on relevant clinical aspects of the death and the preceding treatment may be used. Similar to the administrative review, the clinical mortality review should also include recommendations, if appropriate, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

A clinical mortality review should be conducted separately from other formal investigations that might be required to determine the cause of death. It could be completed by a unit physician not involved in the patient's treatment, a central office or corporate physician, or an outside medical group.

# Part 3: Psychological Autopsy

A psychological autopsy, sometimes referred to as a psychological reconstruction or postmortem, is required within 30 days for all deaths by suicide. This written reconstruction of an individual's life emphasizes factors that may have led up to or contributed to the death. It is usually conducted by a psychologist or other qualified mental health professional and is



# Tracking Death Review Requirements

Because death reviews typically involve multiple disciplines (e.g., custody staff, health staff, mental health staff, coroner, others), investigatory documentation may not be readily available. Therefore, the 2018 standard requires that the responsible health authority maintain a log that includes the following:

• Patient name or identification number
• Age at time of death
• Date of death
• Date of clinical mortality review
• Date of administrative review
• Cause of death (e.g., hanging, respiratory failure)
• Manner of death (e.g., natural, suicide, homicide)
• Date pertinent findings of reviews shared with staff
• Date of psychological autopsy, if applicable

Maintaining a log with these components will help health care administrators ensure that all components of a death review are completed in a timely manner.

# Corrective Follow-Up

Finally, corrective actions identified through the review process should be implemented and monitored through the quality improvement program for systemic issues, and through the patient safety program for staff-related issues. Pertinent findings of death reviews should be communicated to treating staff to prevent similar situations in the future.

[This article first appeared in the Summer 2018 issue of CorrectCare.]

BACK TO SPOTLIGHT HOME PAGE

**Exhibit F-151**





1145 W. Diversey Pkwy.
Chicago, IL 60614

info@ncchc.org

Sitemap

NCCHC Foundation

NCCHC Resources Consulting

Online Store

Buyers Guide

Login

Privacy/Legal

© Copyright 2024 NCCHC

Privacy/Legal

**Exhibit F-152**

# EXHIBIT G

## Most Recent News Releases

# Update: Death Investigation - San Diego Central Jail

### *Suspect Arrested*

**Post Date:**          01/30/2024 7:24 PM

On January 16, 2024, around 2:30 p.m., Sheriff's Homicide investigators were notified 24-year-old Brandon Andrew Yates, an individual in Sheriff's custody, passed away at the San Diego Central Jail. We extend our sympathies to the Yates family and those affected by this death. A Sheriff's Family Liaison Officer will support the family as they deal with the loss of a loved one.

During their investigation, Homicide detectives developed probable cause to arrest 36-year-old Alvin McDonald Ruis, for Mr. Yates' death. Detectives arrested Mr. Ruis for 187(a) PC- Murder. Mr. Yates and Mr. Ruis shared a housing cell together.

Mr. Ruis was arrested on December 27, 2023, by the Chula Vista Police Department on the following charges: Domestic Violence, Willful Cruelty to a Child, Stalking, Burglary, Violation of a Court Order, Committing a Felony while out on Bail, and Violation of DV TRO. Mr. Ruis was a resident of Chula Vista at the time of his arrest.

As is the protocol for all in-custody deaths, the Sheriff's Homicide Unit responded and conducted a thorough investigation. The case has been sent to the District Attorney's Office for criminal proceedings. The cause of death will be determined by the Medical Examiner's Office.

To view the prior press release dated January 17, 2024, click      Here

Media Contact: Joseph Jarjura, Lieutenant
Joseph.Jarjura@sdsheriff.org
Homicide Unit / 858-285-6330

**Actualizar: Investigación de la muerte**

Muerte bajo custodia – San Diego Central Jail

*Resumen del incidente*

Exhibit G-154

El 16 de enero de 2024, alrededor de las 2:30 p.m., los investigadores de homicidios del alguacil fueron notificados de que Brandon Andrew Yates, de 24 años, un individuo bajo custodia del alguacil, falleció en San Diego Central Jail. Extendemos nuestras condolencias a la familia Yates y a los afectados por esta muerte. Un oficial de enlace familiar del alguacil apoyará a la familia mientras lidian con la pérdida de un ser querido.

Durante su investigación, los detectives de homicidios desarrollaron una causa probable para arrestar a Alvin McDonald Ruis, de 36 años, por la muerte del Sr. Yates. Los detectives arrestaron al Sr. Ruis por asesinato 187 (a) PC. El Sr. Yates y el Sr. Ruis compartían una celda de vivienda juntos.

El Sr. Ruis fue arrestado el 27 de diciembre de 2023 por el Departamento de Policía de Chula Vista por los siguientes cargos: Violencia doméstica, Crueldad intencional hacia un niño, Acecho, Robo, Violación de una orden judicial, Cometer un delito grave mientras estaba en libertad bajo fianza y Violación de DV TRO. El Sr. Ruis era residente de Chula Vista en el momento de su arresto.

Como es el protocolo para todas las muertes bajo custodia, la Unidad de Homicidios del Alguacil respondió y llevó a cabo una investigación exhaustiva. El caso ha sido remitido a la Fiscalía para su enjuiciamiento penal. La causa de la muerte será determinada por la Oficina del Médico Forense.

Para ver el comunicado de prensa anterior con fecha del 17 de enero de 2024, haga clic  aquí

Para Más Información: Teniente Joseph Jarjura
joseph.jarjura@sdsheriff.org
Unidad de Homicidios del Departamento del Alguacil (858) 285-6330

_Return to full list >>_

## SUBSCRIBE

Subscribe to receive updates.

| Email ⌄ |
|---|

| Email Address |
|---|

| SUBMIT |
|---|

**Exhibit G-155**

# EXHIBIT H

Exhibit H-156

# News List

# In-Custody Death Finding

**Post Date:**              03/02/2023 9:30 AM

46-year-old <u>Lonnie Newton Rupard</u> was in custody at San Diego Central Jail when he was found unresponsive in his cell on March 17, 2022. Sheriff's Deputies and Medical Staff performed lifesaving measures until he was transported to a hospital where he later died.

We extend our earnest sympathies to Mr. Rupard's family and friends during this very difficult time. We share in your grief for this immense loss. A Sheriff's family liaison is working with Mr. Rupard's family to update them on the investigation and support them as best as we possibly can.

Today, the San Diego County Medical Examiner's Office (M.E.) released its <u>autopsy report</u>. Mr. Rupard's preliminary cause of death is pneumonia, malnutrition and dehydration with COVID-19 viral infection, pulmonary emphysema and duodenal ulcer as contributing factors. The M.E. ruled his manner of death as homicide. We thank the M.E.'s Office for its thorough report and respect its findings.

As part of its process, the Sheriff's Internal Affairs Unit began an investigation in April of last year. Investigators are looking into the circumstances surrounding Mr. Rupard's death to determine any violation of department policy and procedure.

The Sheriff's Homicide Unit is also investigating the incident and will submit its findings to the District Attorney's Office for review. We will also provide our findings to the U.S. Attorney's Office for review by its Civil Rights Unit regarding any potential violations related to Mr. Rupard's death.

Since this incident, which occurred March 2022, several changes and advancements have been implemented within the Detention Services Bureau to help identify when a person in custody may need additional medical and mental health care. These changes have helped staff recognize when a vulnerable individual may not be able to advocate for themselves and staff need to intervene on their behalf.

- Wellness Checks – These checks are comprised of a Multi-Disciplinary Group (MDG) including sworn staff, mental health providers, nurses, correctional counselors and classification deputies. This group conducts one-on-one visits with incarcerated persons deemed most vulnerable. The wellness checks give deputies an additional opportunity to conduct hygiene inspections and allow maintenance staff to address any concerns about the cell or housing unit. The living conditions and hygiene of an individual can be an indicator that they may be in crisis.  Mental health clinicians and nurses assess the individual for any mental health or medical concerns and route them to the appropriate service provider for follow-up and recovery. These checks are done twice a week at George Bailey Detention Facility and San Diego Central Jail. They are conducted once a week at Las Colinas Detention and Reentry Facility and Vista Detention Facility.

- Collaborative Care Meetings – Each week, a multi-disciplinary group from each of the facilities discuss individuals in custody who may need additional care and/or may be at risk for harm. Sta      ers

**Exhibit H-157**

develop a course of action tailored to the individual's needs. These individuals could be those who receive Wellness Checks each week or an incarcerated person who may be behaving in a manner that is indicative of a possible mental health crisis or medical need.

- Sharing of Critical Information for Continuity of Care – It is common for forensic psychiatrists to provide mental health services or assessments to incarcerated persons within our facilities. For increased collaboration and continuity of care, the Sheriff's Department has required the psychiatrist to provide a briefing to Sheriff's Mental Health Staff prior to leaving the jail.  This enables Sheriff's Staff to provide the appropriate care to an individual immediately, instead of waiting for a written report in two weeks' time. We are also working to streamline the timely sharing of mental health information and medical records from the California Department of State Hospitals when they transfer people into our custody.

- Conservatorship – We established a process to request conservatorship of a person in our custody who is unable to care for themselves. Conservatorship allows the court to order medical decisions on behalf of a person who refuses or is not able to take care of themselves.

At the San Diego County Sheriff's Department, we are committed to the safety of the people entrusted in our care. We are resolved in our core values of recognizing the dignity and value of every human life. We have instituted many changes in the last year, as well as initiated several investigations to ensure policies and procedures are being followed. These improvements and transparency in communicating with the public uphold our culture of accountability. We will never shy away from demanding more from ourselves for more targeted reforms that advance the well-being of people in our custody.

## Hallazgo de Muerte Bajo Custodia

*Oficina del Médico Forense publica un informe sobre Lonnie Rupard.*

Lonnie Newton Rupard, de 46 años, estaba bajo custodia en la Cárcel Central de San Diego cuando lo encontraron inconsciente en su celda el 17 de marzo de 2022. Los oficiales del Alguacil y el personal médico tomaron medidas para salvarle la vida hasta que lo transportaron a un hospital donde murió más tarde.

Extendemos nuestras más sinceras condolencias a la familia y los amigos del Sr. Rupard durante este momento tan difícil. Compartimos su dolor por esta inmensa pérdida. Un enlace familiar del Alguacil está trabajando con la familia del Sr. Rupard para actualizarlos sobre la investigación y apoyarlos lo mejor que podamos.

Hoy, la Oficina del Médico Forense del Condado de San Diego (M.E.) publicó su informe de autopsia. La causa preliminar de muerte del Sr. Rupard es neumonía, desnutrición y deshidratación con infección viral por COVID-19, enfisema pulmonar y úlcera duodenal como factores contribuyentes. El ME dictaminó su forma de muerte como homicidio. Agradecemos a la Oficina del M.E. por su completo informe y respetamos sus hallazgos.

**Exhibit H-158**

Como parte de su proceso, la Unidad de Asuntos Internos del Aheriff inició una investigación en abril del año pasado. Los investigadores están investigando las circunstancias que rodearon la muerte del Sr. Rupard para determinar cualquier violación de la política y el procedimiento del departamento.

La Unidad de Homicidios del Alguacil también está investigando el incidente y presentará sus hallazgos a la Oficina del Fiscal de Distrito para su revisión. También proporcionaremos nuestros hallazgos a la Oficina del Fiscal Federal para que los revise la Unidad de Derechos Civiles con respecto a cualquier posible violación relacionada con la muerte del Sr. Rupard.

Desde este incidente, que ocurrió en marzo de 2022, se han implementado varios cambios y avances dentro de la Oficina de Servicios de Detención para ayudar a identificar cuándo una persona bajo custodia puede necesitar atención médica y de salud mental adicional. Estos cambios han ayudado al personal a reconocer cuándo una persona vulnerable no puede defenderse por sí misma y el personal debe intervenir en su nombre.

- Controles de Bienestar - estos controles están compuestos por un grupo multidisciplinario (MDG) que incluye personal juramentado, proveedores de salud mental, enfermeras, consejeros correccionales y ayudantes de clasificación. Este grupo realiza visitas individuales con las personas encarceladas consideradas más vulnerables. Los controles de bienestar brindan a los oficiales del Alguacil una oportunidad adicional para realizar inspecciones de higiene y permiten que el personal de mantenimiento aborde cualquier inquietud sobre la celda o la unidad de vivienda. Las condiciones de vida e higiene de un individuo pueden ser un indicador de que puede estar en crisis. Los médicos y enfermeros de salud mental evalúan a la persona en busca de problemas médicos o de salud mental y la derivan al proveedor de servicios adecuado para el seguimiento y la recuperación. Estos controles se realizan dos veces por semana en el Centro de Detención George Bailey y en la Cárcel Central de San Diego. Se llevan a cabo una vez por semana en el Centro de Detención y Reingreso de Las Colinas y en el Centro de Detención de Vista.

- Reuniones de Atención Colaborativa - cada semana, un grupo multidisciplinario de cada una de las instalaciones se reúne para hablar sobre las personas bajo custodia que pueden necesitar atención adicional y/o pueden estar en riesgo de sufrir daños. Los miembros del personal desarrollan un curso de acción adaptado a las necesidades del individuo. Estas personas pueden ser aquellas que reciben Controles de Bienestar cada semana o una persona encarcelada que puede estar comportándose de una manera que sea indicativa de una posible crisis de salud mental o necesidad médica.

- Compartir Información Crítica para la Continuidad de la Atención - es común que los psiquiatras forenses brinden servicios de salud mental o evaluaciones a personas encarceladas dentro de nuestras instalaciones. Para una mayor colaboración y continuidad de la atención, el Departamento del Alguacil ha requerido que el psiquiatra brinde una sesión informativa al Personal de Salud Mental del Alguacil antes de salir de la cárcel. Esto permite que el personal del Alguacil brinde la atención adecuada a una persona de inmediato, en lugar de esperar un informe escrito dentro de dos semanas. También estamos trabajando para agilizar el intercambio oportuno de información de salud mental y registros médicos del Departamento de          les Estatales de California cuando transfieren personas bajo nuestra custodia.

**Exhibit H-159**

- Tutela - establecimos un proceso para solicitar la tutela de una persona bajo nuestra custodia que no puede cuidar de sí misma. La tutela le permite a la corte ordenar decisiones médicas en nombre de una persona que se niega o no puede cuidar de sí misma.

En el Departamento del Alguacil del Condado de San Diego, estamos comprometidos con la seguridad de las personas confiadas a nuestro cuidado. Estamos resueltos en nuestros valores fundamentales a reconocer la dignidad y el valor de cada vida humana. Hemos instituido muchos cambios en el último año, así como también iniciado varias investigaciones para garantizar que se sigan las políticas y los procedimientos. Estas mejoras y la transparencia en la comunicación con el público mantienen nuestra cultura de responsabilidad. Nunca evitaremos exigirnos más a nosotros mismos por reformas más específicas que promuevan el bienestar de las personas bajo nuestra custodia.

*Return to full list >>*

## SUBSCRIBE

Subscribe to receive updates.

| Email ▼ |

| Email Address |

SUBMIT

**Exhibit H-160**



# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **RUPARD, Lonnie** | | ☐ | **2022-01007** |

| INVESTIGATOR | REPORTED BY | REPORT NG AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Fernanda Sanchez | Dr. Allen | UCSD Medical Center | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND T ME |
|---|---|---|
| 3/18/2022      0132 | 3/18/2022      0209 | 3/18/2022      0252 |

## DECEDENT

| DATE AND T ME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/17/2022      2351 | 10/1/1975 | 46 Years | Male | Filipino, White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| | | 03/17/2022 |

| COUNTRY OF RESIDENCE | OCCUPATION | PA D AUTOPSY |
|---|---|---|
| | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| UCSD Medical Center | Hospital |

| ADDRESS (STREET, CITY, STATE, Z P) |
|---|
| 200 W Arbor Dr, San Diego, California, 92103 |

SUMMARY

The decedent was a 46 year old, divorced, Asian male who was known to live a homeless lifestyle in San Diego. On the evening of 03/17/2022, the decedent was found unresponsive, while in custody at the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED). Upon arrival to the ED, medical staff continued CPR efforts, to no avail. Death was pronounced by a physician shortly after his arrival.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths in prison or while under sentence.

## INCIDENT

| LOCATION OF INC DENT | INC DENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INC DENT | INVESTIGAT NG AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/17/2022      Unk | San Diego Sheriff | Blumenshine | 2137 | 21-011838 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES  ☑ NO | | ☐ YES  ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| Dep. Costelow | Visually | 03/17/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATOR False | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES  ☐ NO | ☐ YES  ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSH P | DATE NOT FIED | NOTIF ED BY |
|---|---|---|---|
| ▮▮▮▮▮▮ | Son | 3/18/2022 | |

**Exhibit H-161**

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number | : 2022-01007 |
| | Investigator | : Fernanda Sanchez |
| | Date of Death | : 03/17/2022 |
| | Date Today | : 02/08/2023 |

## INVESTIGATIVE NARRATIVE

**Decedent:** RUPARD, Lonnie

**Antemortem Events:**
On 03/18/2022, the following information was obtained via an in-person interview with Deputy Costelow, ID 3804, of the San Diego Sheriff's Department (SDSO). On 03/17/2022 at approximately 2300 hours, the decedent was found unresponsive in module 74D of the San Diego Central Jail. Facility staff initiated cardiopulmonary resuscitation (CPR) efforts and the decedent was transported by paramedics to UCSD Medical Center Emergency Department (ED).

On 03/18/2022, the following information was obtained via an initial telephone call intake with Dr. Allen of UCSD Medical Center and was supplemented by medical records provided. Paramedics continued CPR efforts while en route to the UCSD Medical Center ED. Upon arrival to the ED at 2339 hours, the decedent was intubated, and medical staff continued CPR efforts, to no avail. Death was pronounced at 2351 hours by Dr. Allen.

On 03/18/2022 at 0132 hours, Dr. Allen notified the San Diego County Medical Examiner's Office of the death and jurisdiction was invoked.

**Past Medical, Surgical, and Social History:**
On 03/18/2022, the following information was learned via a telephone interview between Investigator Flores and the decedent's mother, ███████████, and his ex-wife, ███████. The decedent and his ex-wife divorced approximately 22 years prior, and they indicated he had another ex-wife named, ███ with whom he had a son named ███████████. The decedent also had a son with ███ named ███████████. He had a third child who was reported to have died in October 2018 ███████████████████████████████████
██████ The decedent never remarried and there were no additional children known. The ex-wife and the mother were unable to recall any medical conditions other than schizophrenia. The decedent would sometimes seek psychiatric help, but he was inconsistent about it. He had been given injections for his schizophrenia, but he was noncompliant with his medications, and he was known to become violent when he was not on his medications. As a result of the violence, he was "in and out" of jail. He had a past history of methamphetamine use, but the family was unaware of any instances of overdose or hospitalizations, and unaware of any current illicit drug use. They further relayed the decedent consumed alcohol, but they "wouldn't say" he had a drink problem.

Per medical records provided by UCSD Medical Center, the decedent had a medical history significant for psychotic disorder and unspecified stimulant use. He was reported to not be taking any medications.

**Scene Description:**
On 03/18/2022 at 0209 hours, I arrived on scene to the location of death at UCSD Medical Center's Emergency Department, Bed 6.

**Body Description:**
I viewed and adult male as he lied supine on a gurney, partially covered by sheets and a blue hospital gown. The decedent's lower left arm and left hand were over the sheets. The left arm was flexed at the elbow, with the palm of the left hand about the right shoulder. Around the left wrist was a medical bracelet bearing the name

**Exhibit H-162**

RUPARD, Lonnie. I photographed the position for documentation and moved the decedent's left arm and removed the sheets. Upon removal of the sheets, I noted the decedent to be an adult Asian male. His head was turned to the left. His right arm was extended and rested on the gurney, to the right of his right lateral torso. His legs were extended and in line with his torso. The decedent was nude. Signs of medical intervention included: a nasogastric tube, an endotracheal tube, defibrillator pads to the right upper chest and left lateral torso, an intravenous line to the left antecubital fossa, and a blood pressure cuff around the left upper arm. The decedent was warm to the touch. There was rigor in the extremities. There was blanching lividity manipulated with light pressure observed to the posterior aspect, consistent with the position I viewed him in. The decedent appeared to be incontinent of feces, and there were feces about the buttock area and the posterior aspect of the lower extremities and the soles of both feet; the posterior aspect was otherwise unremarkable.

There were scattered, crusting abrasions to the decedent's face and forehead, but the skull and facial bones were free of crepitus upon palpation. There was bilateral tache noire observed in the sclerae, but they were otherwise clear and free of hemorrhage. The eyes, ears, nares, and mouth were free of fluids. I was unable to examine the intraoral cavity due to the endotracheal tube in place, but there was blood noted inside the endotracheal tube. There were scattered crusting abrasions noted to the anterior aspect of the neck, but it appeared to be free of recent trauma or injury. The chest was free of crepitus upon palpation. The abdomen was emaciated. There were scattered, crusting abrasions to the feet. The arms and legs appeared to be free of significant trauma or injury. The fingernails of both hands were unbroken and free of trauma.

92M Transport personnel, E. Arenas, arrived on scene to assist with the decedent's body. A yellow identification band was affixed to his right leg. The decedent was placed in a new, clean, white vinyl pouch, and sealed with a blue, tamper-evident seal 2294384 at 0237 hours. He was then transported to the San Diego County Medical Examiner's Office (SDCMEO) for further evaluation.

After my return to the SDCMEO at 0252 hours, I received a telephone call from Detective Santiestebian, ID 7148, attempting to report this death. I explained that I had already responded to the scene and the decedent had already been transported to our office. I further relayed that prior to responding to UCSD Medical Center, I requested that Dr. Allen confirmed with the deputies on scene whether or not a crime scene investigation unit was responding. Dr. Allen did so and indicated no one else was planning on going to the scene, and thus I responded. Detective Santiesteban indicated that while SDSO had no concerns for foul play, he requested that a red seal be placed, and for a detective to attend the exam. At his request, I broke the blue seal and replaced it with a red, tamper-evident seal 4950993 at 0405 hours. I photographed the new seal for documentation and provided Detective Santiesteban with photographs of the seal.

Per a case note entered in by Forensic Autopsy Assistant Juana Reyes Chavez on 03/18/2022 at 0739 hours, due to there being a tear in the original white vinyl pouch, the decedent was re-bagged and was affixed with new red seal 4950349.

**Special Requests:**
Per Detective Santiesteban, SDSO does not have any charges pending and did not request a seal be placed for this case. However, he indicated Detective Blumenshine would like to attend the exam on Saturday, 03/19/2022.

**Identification:**
The decedent was visually identified by Deputy Costelow.

**Exhibit H-163**

**Antemortem Specimens:**
Per Dr. Allen, there were no antemortem specimens available for MRN# 31943869.

**Public Administrator:**
This case was not initially referred to the Public Administrator.

**Other Important Factors:**
There are no other important factors.

Signed: _____

**Fernanda Sanchez**
**Medical Examiner Investigator**

**Date Signed:** 03/19/2022

**Approved by:** _____

**Exhibit H-164**



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

### MEDICAL EXAMINER'S DEPARTMENT

5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215

http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LONNIE RUPARD | **ME#:** | 2022-1007 |
| **Place of death:** | UCSD Medical Center<br>San Diego, CA 92103 | **Age:** | 46 Years |
| | | **Sex:** | Male |
| **Date of death:** | March 17, 2022; 2351 Hours | | |
| **Date of autopsy:** | March 19, 2022; 0935 Hours | | |

---

CAUSE OF DEATH:     PNEUMONIA, MALNUTRTION, AND DEHYDRATION IN THE SETTING OF NEGLECTED SCHIZOPHRENIA

Contributing:     SARS-COV-2 (COVID-19) VIRAL INFECTION; PULMONARY EMPHYSEMA; DUODENAL ULCER

MANNER OF DEATH:     HOMICIDE

AUTOPSY SUMMARY:

I.     History of schizophrenia and other psychotic disorders with refusal to take prescribed medications while incarcerated.
    A.     Malnutrition and dehydration.
        1.     Height 69 inches, weight 105 pounds with a body mass index of 15.5.
        2.     Subcutaneous fat thickness 0.1 cm.
        3.     Decreased skin turgor.
        4.     Elevated postmortem vitreous sodium, chloride, and urea nitrogen: see Toxicology Report.
    B.     Acute bilateral bronchopneumonia; left lung weight 1030 grams, right lung weight 480 grams.
    C.     Superficial pressure sores of back and right foot.

II.     SARS-CoV-2 (COVID-19) virus detected in postmortem nasopharyngeal swab by nucleic acid amplification test.

III.     Pulmonary emphysema, moderate.

**Exhibit H-165**

AUTOPSY REPORT                    -2-                    LONNIE RUPARD 2022-1007

IV.    Duodenal ulcer, 2.5 x 2.0 cm without perforation.

V.    Minor acute and healing blunt force injuries of head, neck, torso, and extremities.

VI.    Remote right orbitofrontal cerebral contusion; see Neuropathology Consultation
       Report FA-22-0000070.

VII.    Resuscitation-related injuries.
        A.    Anterior rib fractures.
        B.    Pericardial sac laceration, right atrial and ventricular laceration with 75 mL of
              hemopericardium.

OPINION:  According to investigative information and review of records provided by the
San Diego County Sheriff's Department, on the early morning hours of December 19,
2021, this 46-year-old man was arrested by National City Police for a parole violation, and
directly booked into San Diego Central Jail.  The arresting officer reported the decedent
had a history of psychotic disorders with combative, assaultive, or hostile behavior.  During
intake, his vital signs were stable, and his recorded height and weight were 6 feet and 165
pounds, respectively.  He answered "no" to all the general medical assessment questions,
mental health screening questions, suicide risk assessment, substance use assessments,
and miscellaneous assessments.  During intake medical examination by a staff nurse, his
vital signs were stable.  He was described as alert and oriented x2, disheveled in
appearance, and verbally abusive but directable.  He refused a COVID-19 test.  He was
placed in a single occupancy cell.

On December 20, 2021, psychiatry sick call notes documented a history of psychiatric
illness on extensive medications, prior treatment at Patton State Hospital and maintenance
on mediations during previous incarceration.  Psychiatry was onsite but decedent refused
evaluation.  It was rescheduled for December 23, 2021; however, it was rescheduled
several more times due to time constraints.

On December 29, 2021, he had his initial psychiatry sick call evaluation.  The progress
note stated that he had a history of unspecified schizophrenia and other psychotic
disorders, ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████ The evaluation
occurred cell-side.  The psychiatrist noted he had fair hygiene, was shirtless but wearing
pants, and was standing by the cell door.  During the interview, he was irritable and
uncooperative.  He yelled and was verbally aggressive.  His mood was unable to be
assessed due to lack of cooperation.  He was deemed in no apparent distress, with no
signs of being a danger to self or others.  The psychiatrist's plan was to offer/start previous

**Exhibit H-166**

AUTOPSY REPORT                    -3-                    LONNIE RUPARD 2022-1007

psychiatric medications including Haldol, Cogentin, and Valproic acid.  Potential benefit, risk, side effects, and alternatives were discussed, including no medication; however, the decedent refused all medications and laboratory tests.  No signs requiring immediate psychiatric intervention were noted at the visit.  Follow-up to clinic was scheduled in four to five weeks or sooner, if needed.

Nursing records documented that he refused medications daily from December 20, 2021, through January 20, 2022.

A psychiatry sick call was requested on January 15, 2022, due to his refusal to take medications.  Per psychiatrist progress notes on January 20, 2022, due to his consistent refusal to take medication, his prescribed Haldol, Cogentin, and Valproic Acid, were discontinued.  It was noted that he was already scheduled for a follow-up visit.

On January 29, 2022, nursing progress notes documented the decedent was seen on housing floor following use of force by deputies without conducted electrical weapon (CEW) deployment.  The nurse noted a laceration between his eyebrows not actively bleeding, a small abrasion on the left side of his face, and some possible blood on his lips.  His breathing was even and unlabored.  He repeatedly stated "I don't need a medic.  Leave me alone, if you touch me, I'll kill you."  For safety reasons, the nurse was not able to further assess him.

On February 1, 2022, staff requested the decedent be seen by a qualified mental health professional for psychiatric illness.

On February 2, 2022, psychiatry sick calls note chronic care for psychotic disorders.  Psychiatry was onsite but decent refused and he was rescheduled for February 18, 2022.

On February 9, 2022, a wellness check was performed by a qualified mental health professional.  He was evaluated cell-side, standing at the front door.  He was uncooperative stating "I am fine, I don't want to talk to you."  He was unable to be fully assessed due to refusal and/or inability to cooperate.  His cell was clean with some debris.  Empty food trays were inside his cell.  He was free of any urine, feces, or flooding, and was moderately groomed.  He did not appear in any acute distress and there were no immediate safety concerns.  There was no threat to self or others and no distressing symptoms or major impairment.   The plan was for continued monitoring with follow-up wellness check in two weeks.

On February 20, 2022, progress notes indicated he was on lockdown.

On February 22, 2022, he was again seen by the psychiatrist.  The visit occurred cell-side.  During that visit, multiple attempts were made to engage him in conversation, but he

AUTOPSY REPORT                           -4-                    LONNIE RUPARD 2022-1007

refused to answer questions, rambled incoherently, and became verbally aggressive.  The psychiatrist observed him through his cell door window and noted he was awake, alert, shirtless, and wearing pants, initially sitting on his bed but then kneeling in his cell.  He appeared to be in no acute distress.   His cell room was "relatively clean, no flooding/gassing or smearing of feces."   The toilet was covered with a cloth and the content could not be visualized.  When he was again offered psychiatric medications, he continued to yell.  Due to his presentation, psychiatric history, legal status, and potential for decompensation, the plan was to continue to monitor him and offer treatment with follow up in six to seven weeks or sooner, if needed.  He had no signs of danger to self or other and the psychiatrist indicated he did not require immediate psychiatric intervention at that time.

On February 23, 2022, staff again requested the decedent be seen by a qualified mental health professional for a wellness check.

No additional sick calls or progress notes were documented from February 23, 2022, until March 17, 2022.

The decedent was reportedly last seen alive during cell checks on March 17, 2022, at approximately 2146 hours.  At 2248 hours, the decedent was found unresponsive in his bunk covered with a blanket and not breathing.  The decedent was pulled from the bunk and cardiopulmonary resuscitation (CPR) was administered.  Medics arrived and attached the Lucas CPR assist device.  The decedent was in asystole and changed to ventricular tachycardia.  He was shocked a total of three times and then remained in pulseless electrical activity.  The decedent was transported via medics to UCSD Medical Center where despite resuscitative efforts, he had no return of spontaneous circulation and was pronounced dead.  Deputies noted his cell was soiled with feces.  Old food that contained insect larvae was also in the cell.

A mental competency report dated March 24, 2022, documented that on March 14, 2022, three days prior to his death, the decedent was seen by a court-ordered psychiatrist for examination of mental competency to stand trial.  The psychiatrist noted the cell was dirty with trash throughout.  The toilet was full of excrement and the room was malodorous.  There was feces on the floor and food smeared on the walls.   The decedent was described as unkempt and dirty himself.  During the exam, the decedent was lying in bed in an uncomfortable manner with a blanket over his head.  The psychiatrist's diagnostic impression was psychosis not otherwise specified and stimulant use disorder per records.  The psychiatrist's final opinion was that he suffered from severe mental illness and was not competent to stand trial.  He recommended referral to a state hospital and that he be given antipsychotic medication involuntarily as allowed by law.

**Exhibit H-168**

AUTOPSY REPORT                    -5-                    LONNIE RUPARD 2022-1007

Reportedly the decedent refused court on December 27, 2021, and probation was revoked. He went to court on December 28, 2021, and the judge ordered he be held in custody by the San Diego County Sheriff. He went to court on January 3, 2022, and the judge ordered he be held in custody and probation remained revoked. He refused court on January 7, 2022, and January 13, 2022. He went to court on January 24, 2022, and the judge ordered he be held in custody and probation remained revoked. He was ordered to have a mental competency examination on March 9, 2022, and was set for an intervening hearing on March 18, 2022.

According to the decedent's mother and one of his ex-wives, he had no other medical conditions other than schizophrenia. He was inconsistent with treatment for his schizophrenia. He was known to become violent when he was noncompliant with his medications. He had a prior history of methamphetamine use and was known to consume alcohol.

The only medical records found under the decedent's name and date of birth in San Diego Health Connect medical record portal was a visit to the Logan Heights Clinic on May 21, 2021, ███████████

The autopsy was performed in the San Diego County Medical Examiner's Office on March 19, 2022, and documented a cachectic adult male with a body mass index of 15.5 (height 69 inches, weight 105 pounds), representing a 60 pound weight loss, or 36% total body weight, since the time of his arrest. He had decreased skin turgor and postmortem vitreous chemistry testing with elevated sodium, chloride, and vitreous urea nitrogen levels, altogether indicating dehydration. He had pulmonary congestion and edema, with acute bilateral bronchopneumonia. The right lung showed evidence of prior aspiration of gastric content with foreign body giant cells surrounding plant material. Both lungs had moderate pulmonary emphysema with patchy atelectasis. There was no microscopic evidence of diffuse alveolar damage, pulmonary thromboemboli, or microfibrin thrombi. Postmortem nasopharyngeal swab for SARS-CoV-2 (COVID-19) virus via nucleic acid amplification test was positive. Testing for influenza A and B virus was negative. He had no significant cardiovascular disease, liver disease, or kidney disease. A 2.5 cm x 2 cm ulcer was noted in the proximal duodenum and had no evidence of perforation. He had soft tan-brown-maroon material throughout the small intestine and soft brown stool throughout the large intestine with no additional small bowel or large bowel mucosal ulcerations or mass. He had several superficial pressure sores on his torso and extremities.

Several small recent and healing abrasions were identified on the face, neck, chest, back, and extremities. He had CPR-related anterior rib fractures with pericardial sac laceration and right atrial and ventricle lacerations with a small amount of hemopericardium.

**Exhibit H-169**

AUTOPSY REPORT                    -6-                    LONNIE RUPARD 2022-1007

Neuropathology consultation of the brain and dura documented a remote (old) small cortical contusion on the right orbital frontal region.  There was no evidence of acute brain injury or nutritional/metabolic brain injury; see Neuropathology Consultation Report FA-22-0000070.

Toxicology testing was negative for alcohol, common drugs of abuse, and medications (base and acid neutral screens).  Postmortem HIV and hepatitis B and C virus serology testing were negative.

Based on the autopsy findings and the circumstances of the death as currently understood, the cause of death is pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia, with SARS-CoV-2 (COVID-19) viral infection, pulmonary emphysema, and duodenal ulcer listed as contributing conditions.  Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death.  While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

**Exhibit H-170**

AUTOPSY REPORT                    -7-                    LONNIE RUPARD 2022-1007

IDENTIFICATION:   The body is received in a white body pouch sealed with tamper resistant read seal number "4950349."  The body is in a second inner white body pouch sealed with a second red tamper resistant seal number "4950993."  A yellow disposable tarp covers the body.  The body is resting on a green fitted sheet.  The body is identified by yellow Medical Examiner's identification bands fastened around the right ankle bearing the decedent's name and case number.  A second blue Medical Examiner's identification bearing the decedent's name, case number, and a weight of 105 pounds (as received) is secured to the right ankle after the inner body bag has opened.  There are no evidence bags on the head, hands, and feet.  A UCSD Medical Center hospital identification band bearing the decedent's name, date of birth, and medical record number "31943869" is secured to the left wrist.

WITNESSES:   I am assisted by Forensic Autopsy Specialist Stephen Hannum.  Also present during the autopsy are San Diego Sheriff's Department Homicide Team One Detective M. Blumenshine and Forensic Evidence Technicians M. Gervasoni and D. Racicot.

CLOTHING AND PROPERTY:  The body is clad in a short-sleeve blue shirt with green tag.  There are two vertical cuts up the front of the garment with some white material on the right front of the shirt and keratotic debris on the inner aspect of the shirt.

Received in an unsealed plastic bag in an inner brown paper bag with photo identification sticker bearing the decedent's name, date of birth, race and sex are the following items:
1.     Blue stripped long-sleeve sweatshirt.
2.     Pair of brown and black boots.
3.     Disposable blue face mask.
4.     Blue pants.
5.     Gray tank top.
6.     Black briefs.
7.     White and yellow metal wristwatch.
8.     In a separate white envelope labeled with the decedent's name and booking number "21149433" is $335.32 of U.S. currency; $100.00 dollar bills (two), $20.00 bills (six), $10.00 bill (one), $5.00 bills (one), quarter (one), nickel (one), pennies (two).

EVIDENCE OF MEDICAL INTERVENTION:
1.     An oxygen nasal canula is resting on the right cheek with tubing extending over each ear.
2.     An endotracheal tube is in situ in the mouth secured with a white fabric cord tied around the face and neck.
3.     A triangular defibrillator electrode is on the mid chest.  An oval defibrillator electrode is on the mid chest.  A rectangular defibrillator electrode is on the lateral left chest.

**Exhibit H-171**

AUTOPSY REPORT                    -8-                LONNIE RUPARD 2022-1007

A rectangular defibrillator electrode is adhered to the cut shirt.
4.      EKG electrodes are on the chest and abdomen.
5.      A pulse oximetry monitor is on the left index finger.
6.      Disposable blood pressure cuff is secured around the left upper arm.
7.      A single lumen intravascular catheter is in the left antecubital fossa.

## EXTERNAL DESCRIPTION

The body is of a well-developed, cachectic, 69 inch, 105 pound adult male with light to medium pigmented skin whose overall appearance is consistent with the reported age of 46 years.

The head is normocephalic. The injuries of the head and neck will be described in the injury section below. Several tan-brown serous crusted healing lesions surrounding hair follicles are along the left temporal scalp and occipital scalp. The thin brown scalp hair varies in length. It measures 1/2 inch along the mid frontal and parietal scalp and ranges from 2, up to 3 inches along the temporal and occipital hairline. The mustache measures 1-1/4 inch in the length and the mid chin goatee measures 2-1/2 inches in length. Sparse 1/2 inch facial hairs are along the jawline. There is prominence of the facial bones (orbital ridges and zygomatic arches). The eyes are sunken. The corneae are dull. The irides are brown. The conjunctivae have no hemorrhage, petechiae, or icterus. The nose is normally formed, and the nares are unobstructed. The lip mucosa is desiccated. The oral cavity has natural teeth in fair condition and an atraumatic mucosa. The ears are normally formed and without drainage. The neck is symmetrical.

There is pectus excavatum of the chest. There are cardiopulmonary resuscitative marks on the mid chest. There is prominence of the clavicles and ribs. The abdomen is scaphoid. The back is symmetrical. Abundant dry brown fecal material is on the buttocks and on the posterior lower extremities. There is decreased skin turgor along the torso and extremities. The upper extremities have no needle track marks or ventral wrist scars. The fingernails are short. A small amount of dry brown fecal material is on the thumbs and index fingers. There is a chronic deformity of the nail of the left index finger. The lower extremities show no edema, deformity, or amputations. The toenails are short. Dry brown fecal material is on the soles of the feet.

The genitalia are of an adult male. The penis is circumcised. The testes are palpable within the scrotum. Dry brown fecal material is on the perineum and around the anus. There is no trauma of the genitalia or anus.

SCARS:
1.      Multiple small irregular circular to short linear scars are on the forearms, knees, and shins.

**Exhibit H-172**

AUTOPSY REPORT                    -9-                    LONNIE RUPARD 2022-1007

2.    A vertically-oriented 3 x 1/16 inch linear scar is on the left elbow.
3.    A curvilinear 3/4 inch slightly cavitated scar is on the mid lower lip extending to the vermillion border.

TATTOOS:  Multiple black and polychromatic tattoos are on the torso and extremities.

POSTMORTEM CHANGES:  Rigor mortis is overcome with minimal force in the upper and lower extremities, neck, and jaw.  Livor mortis is posterior, purple-red and nonblanching to pressure.  The body is cool (refrigeration).  There is early green putrefactive discoloration along the lower abdomen.

PRESSURE INJURIES (PRESSURE SORES) OF TORSO AND EXTREMITIES:
An oval 1/2 x 1/4 inch superficially ulcerated lesion covered with tan fibrinous material is on the lateral left back overlying the lateral edge of the scapula.  Just lateral to this are areas of pink-tan skin slippage.  Similar appearing ulcerated pink-tan lesions covered with tan fibrinous material are on the lateral right back and posterior right shoulder ranging from 3/16 x 1/8 inch up to 3/4 x 1/2 inch.  A pink-red 1 x 1/2 inch lesion without central ulceration is on the right posterior superior iliac crest.  A pink-red superficial ulcerated lesion 5/16 x 1/8 inch is on the superior left sacral region.  Two areas of central intact skin surrounded by erythematous skin without definitive central ulceration are on the superior sacral region measuring 1/2 x 3/16 inch on the left and on the right measuring 3/4 x 1/4 inch.  A superficial pink-tan ulcerated lesion 5/16 x 3/16 inch is on the inferior sacral region.  Punctate and coalescing ulcerated lesions with peripheral erythema and central tan to tan-brown fibrinous material surrounded by an area of hypopigmentation is on the lateral inferior right hip over the femur covering an area 1-1/4 x 1 inch.

A pink-tan superficial ulcerated lesion 1/4 inch in diameter is on the right elbow.  The center of the lesion has tan fibrinous material.  A healing ulcerated lesion 1/2 x 1/4 inch is on the dorsal left forearm just below the elbow.  It is covered with a tan soft fibrinous material.

**INJURIES, EXTERNAL AND INTERNAL**

*There are blunt force injuries of the head, neck, torso, and extremities.  They are described by body region and labeled "A" through "C" for descriptive purposes only; no sequence is implied.*

A.    BLUNT FORCE INJURY OF HEAD AND NECK:
A tan-brown scabbed abrasion 1/4 inch in diameter is on the posterior right frontal scalp.  A dry tan-brown scabbed abrasion 1/4 x 1/16 inch is on the right frontal scalp just within the receding hairline.  A curvilinear 1/2 x 1/16 inch pink-red abrasion is on the superior right forehead.  A scabbed red-brown 1/16 inch

**Exhibit H-173**

AUTOPSY REPORT                    -10-                    LONNIE RUPARD 2022-1007

diameter abrasion is on the mid forehead.  A tan-brown scabbed 1/4 inch diameter healing abrasion is on the inferior right forehead just above the eyebrow.  A 1/2 x 1/4 inch scabbed red-brown abrasion is along the right brow ridge within the center of the eyebrow.  A 1/2 x 1/4 inch dry red-brown abrasion is on the left mid forehead.  A scabbed tan-brown 1/8 inch diameter abrasion is on the superior left forehead.  A dry red abrasion 3/16 x 1/8 inch is on the left brow ridge just above the eyebrow.  A dry tan-brown scabbed abrasion 1/16 inch in diameter is on the glabellum.  A cluster of four dry red-brown scabbed healing abrasions is along the inferior right orbit measuring up to 1/16 inch in diameter.  A tan-brown scabbed healing abrasion 1/14 inch in diameter is on the right cheek.  A dry tan-brown scabbed abrasion 3/16 x 1/8 inch is on the inferior left orbit.  A cluster of dry red-brown healing scabbed abrasions measuring up to 1/16 inch in diameter is on the left cheek.  An area of pink-red ecchymosis 3/4 x 1/2 inch is on the right chin.  A 1/16 inch diameter red abrasion is on the chin just below the vermillion border of the mid lower lip.

Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage.  A nearly symmetrical nodular bony deformity is present on the occipital bone measuring 1.5 cm in diameter on the right.  A similar 1 cm in diameter defect is on the left frontal skull.  There is no defect on the inner table of the skull.  The bone of the skull is thickened.  There are no skull fractures.  There is no epidural or subdural hemorrhage.  The brain and dura are retained for Neuropathologic Consultation; a separate report will be issued.

A cluster of dry punctate abrasions extends from the thyroid prominence to the anterior border of the left sternocleidomastoid muscle on the anterior neck covering an area 1-3/4 x 1 inch ranging in size from 1/32 inch in diameter up to 1/8 inch in diameter.  A dry red-brown scabbed healing abrasion with peripheral ecchymosis 1/2 x 3/16 inch is along the superior right neck just below the edge of the mandible.  A cluster of scabbed tan-brown healing abrasions measuring 1/32 inch in diameter is on the lateral right neck covering an area 1 x 3/16 inch.  Anterior neck dissection reveals no internal neck hemorrhage or fractures.

B.    <u>BLUNT FORCE INJURY OF TORSO</u>:
A scabbed red-brown peripherally hypopigmented and scarred healing abrasion 1/2 x 3/16 inch is along the medial aspect of the right clavicle.  A cluster of dry red-brown scabbed abrasions 1/16 inch in diameter (three) is on the anterior left clavicle.  A cluster of punctate and linear dry scabbed tan-brown abrasions is on the left upper chest just below the posterior margin of the clavicle covering an area 2 x 1 inch.  Pink-red ecchymosis is on the mid chest.  Three tan-red to tan-orange abrasions are on the mid chest ranging from 1/16 inch in diameter up to 1/2 x 1/4 inch in diameter.  Two linear partially interrupted partially scabbed tan pink-red

**Exhibit H-174**

AUTOPSY REPORT                    -11-                    LONNIE RUPARD 2022-1007

abrasions are on the lateral right sidewall of the body measuring 1/2 x 1/16 inch and 1/2 x 3/16 inch.

A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the superolateral right back.  A cluster of pink-red abrasions ranging from 1/8 inch in diameter up to 1/4 x 3/16 inch is on the right lower back.  Two parallel partially interrupted scabbed tan-brown healing abrasions with a small amount of peripheral ecchymosis are on the left buttock measuring 3 x 3/16 inch superiorly and inferiorly measuring 1-1/4 x 1/16 inch.

There are displaced minimally hemorrhagic fractures of the anterior right 5th through 8th ribs, and anterior left 4th through 7th ribs.  There is hemorrhage in the anterior mediastinal soft tissue.  There pericardial sac is lacerated.  The anterior right ventricle and right atrium have epicardial hemorrhage and focal laceration.  There is 75 mL of liquid blood in the pericardial sac.  These injuries are consistent with attempted cardiopulmonary resuscitation.

C.    <u>BLUNT FORCE INJURY OF EXTREMITIES</u>:
Two pink-red abrasions up to 3/16 inch in diameter are on the right elbow.  A scabbed peripheral hypopigmented and peeling lesion is on the dorsal surface of the right 5th finger over the metacarpophalangeal joint.  A healing scabbed abrasion 3/16 x 1/32 inch is on the dorsal surface of the right 3rd finger overlying the metacarpophalangeal joint.  A scabbed healing 1/16 inch in diameter abrasion is on the dorsal surface of the right thumb just distal to the metacarpophalangeal joint.

A cluster of healing tan-brown scabbed abrasions with peripheral hypopigmented skin are on the dorsal surface of the left upper arm measuring up to 3/16 inch in diameter.  A healing scabbed red-brown lesion 1/8 inch in diameter is on the dorsal left thumb overlying the interphalangeal joint.  A pink-tan abrasion 3/16 x 1/8 inch is on the dorsal surface of the left thumb overlying the metacarpophalangeal joint.  There is loss of the distal aspect of the nail on the left 2nd finger.  There is only a small amount of red-brown discoloration along the edge of the remaining nail.

Punctate and coalescing tan-brown abrasions are on the anterior right thigh measuring 1/32 inch in diameter covering an area 5 x 2 inches.  No abrasion, contusions, or ulcerations are on the remaining thigh, lower leg, or foot.

Punctate and coalescing scabbed red-brown abrasions are on the anterior left thigh covering an area 11 x 1-3/4 inches.  A pink-red abrasion 1/14 inch in diameter is on the lateral left malleolus.  A scabbed healing red-brown abrasion 1/4 x 3/16 inch is on the posterior left lower leg just above the heel.

**Exhibit H-175**

AUTOPSY REPORT                    -12-                    LONNIE RUPARD 2022-1007


*These injuries, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES:  The organs are in their normal situs.  The diaphragm is intact.  The abdominal fat pannus measures 0.1 cm.  There is 75 mL of liquid blood in the pericardial sac secondary to attempted cardiopulmonary resuscitation.  There are no pericardial adhesions.  There is no abnormal fluid accumulation or adhesions in the pleural or peritoneal cavities.  There is putrefactive discoloration of the abdominal viscera. The organs are otherwise covered by glistening serosal surfaces.

CARDIOVASCULAR SYSTEM:  The heart weighs 280 grams.  There is focal epicardial hemorrhage along the anterior right ventricle and right atrium with several small 0.1 cm to 0.3 cm lacerations.  The remaining epicardial surface is smooth and glistening.  The heart has an overall normal shape.  The coronary arteries have a normal origin and follow a right dominant course.  They are widely patent.  There is no atherosclerotic stenosis.  The ventricles are not dilated.  The left ventricle, right ventricle and interventricular septum measure 1.5 cm, 0.3 cm and 1.4 cm in thickness, respectively.  The myocardium is uniformly red-brown without pallor, hemorrhage, softening, or fibrosis.  The endocardial surfaces and four cardiac valves are unremarkable.  The coronary ostia are patent.

The aorta is elastic without atherosclerosis.  The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM:  The right lung weighs 480 grams, and the left weighs 1030 grams.  Both lungs have smooth pleural surfaces and mild anthracotic pigment deposition. Cross sectioning reveals subcrepitant pink-maroon parenchyma with consolidation in the left upper lung lobe.  There is no abscess, mass and no pulmonary thromboemboli. Mild to marked amounts of watery red fluid flowing from the cut surfaces.  The bronchi contain no foam, mucous plugging, or gastric content.

HEPATOBILIARY SYSTEM:  The liver weighs 1170 grams and has an intact capsule and uniformly red-brown parenchyma without nodularity, palpable fibrosis, hemorrhage, slippery texture, or mass.  The gallbladder contains 10 mL of green, viscid bile without calculi.  The mucosa is unremarkable.  The wall is not thickened.

The pancreas has red-tan, lobulated parenchyma without fibrosis, hemorrhage, masses, or chalky discoloration.

HEMOLYMPHATIC SYSTEM:  The spleen weighs 70 grams and has an intact capsule and unremarkable, purple-maroon parenchyma with a normal follicular pattern.  There are

**Exhibit H-176**

AUTOPSY REPORT                    -13-                    LONNIE RUPARD 2022-1007

no lymph node enlargements.  Liquid and clotted blood are recovered from the central and peripheral vasculature.

GASTROINTESTINAL SYSTEM:  The esophagus and gastroesophageal junction are unremarkable.  The stomach contains 60 mL of brown watery fluid without tablets, capsules, or solid food particles.  There is a 2.5 cm x 2 cm ulcer in the proximal duodenum just distal to the pylorus.  The ulcer base is tan-green with no hemorrhage.  The small and large intestine are open along the antimesenteric border revealing soft tan-brown to maroon content in the small intestine and soft brown stool in the large intestine.  There is putrefactive discoloration of the bowel mucosa with no ulceration, no mucoid content, and no hemorrhage.  The appendix is present.

GENITOURINARY SYSTEM:  The right kidney weighs 140 grams, and the left weighs 150 grams.  The capsules strip with ease from the smooth, red-brown subcapsular surfaces.  The corticomedullary architecture is unremarkable.  The pelves are not dilated.  The ureters maintain uniform caliber into an unremarkable urinary bladder.  The bladder contains 130 mL of dark yellow urine.  The prostate gland is symmetrical and unremarkable.  The testes are unremarkable palpated within the scrotum.

ENDOCRINE SYSTEM:  The thyroid gland is symmetrical and has red-brown parenchyma without masses or cysts.  The adrenal glands have the usual golden cortical ribbon and unremarkable medullae.  The pituitary gland is unremarkable.

MUSCULOSKELETAL SYSTEM:  The skeletal system is normally developed.  The ribs are not brittle.  The fractures to the ribs secondary to attempted cardiopulmonary resuscitation are described in the above injury section.  The clavicles, sternum, vertebrae, and pelvis are without fracture.  The musculature is normally distributed, red-brown, and otherwise unremarkable.

HEAD:  Reflection of the scalp reveals no soft tissue or subgaleal hemorrhage.  Slightly nodular deformities are noted on the outer table of the occipital bone and right frontal bone.  The skull is thickened on the cross section.  There is no epidural or subdural hemorrhage.  The skull is otherwise normally formed.  There are no skull fractures.

CENTRAL NERVOUS SYSTEM:  The unfixed brain weighs 1290 grams.  The brain and dura are retained for neuropathological consultation and a separate report will be issued.

NECK:  There is an endotracheal tube in situ.  The trachea and larynx are patent and lined by smooth, tan mucosa.  The hyoid bone, and tracheal and laryngeal cartilages are without hemorrhage or fracture.  The anterior strap muscles and paratracheal soft tissues are without hemorrhage.  The cervical vertebrae are intact without hemorrhage or fracture.  The tongue has no bite mark or hemorrhage.

**Exhibit H-177**

AUTOPSY REPORT                      -14-                LONNIE RUPARD 2022-1007

## **SPECIMENS**

TOXICOLOGY:   The following specimens are submitted for toxicology: central and peripheral blood, vitreous, urine, liver, and gastric contents.

MICROBIOLOGY:   Nasopharyngeal swabs for SARS CoV-2 (COVID-19) virus and influenza A and B virus were submitted.

HISTOLOGY:  Portions of tissues and major organs are retained in formalin.  Sections of heart, liver, lungs, and kidney are submitted for microscopic examination.

PHOTOGRAPHS:   Facial identification photographs, full-body external overall photographs, and additional photographs of selected autopsy findings are taken.

X-RAYS:  Full-body postmortem radiographs reveal medical equipment and several of the cardiopulmonary resuscitation related anterior rib fractures.

**Exhibit H-178**

AUTOPSY REPORT                    -15-                    LONNIE RUPARD 2022-1007


## MICROSCOPIC EXAMINATION

HEART (2 sections):  Sections show orderly cardiomyocytes with no fibrosis, necrosis, or inflammatory cell infiltrates.  There are few scattered chronic inflammatory cells in the epicardial adipose tissue.  The epicardial and myocardial vessels are unremarkable.

LIVER (1 section):  Section shows normal hepatic architecture.  There is sinusoidal congestion.  There is no steatosis, fibrosis, necrosis, or inflammatory cell infiltrate.

LUNGS (5 sections):  Sections from the upper, middle, and lower right lung lobes (slides 2 and 3) show a background of airspace dilation and terminal alveolar clubbing with patchy atelectasis.  The alveoli in the right lung sections contain variable amounts of edema fluid, extravasated red blood cells, pigmented and nonpigmented macrophages, rare squamous epithelial cells and few neutrophils.  Foreign body giant cell granulomas with central foreign plant material are noted in two of the three sections from the right lung.  There is no hyaline membrane formation.  The airways of the right lung are unremarkable.  There are no chronic bronchial asthmatic changes.  The vessels are congested without thrombosis.  There is extravasation of red blood cells surrounding one large artery and bronchus (slide 3).  Sections from the left lung show extensive neutrophilic infiltrate in the alveoli and bronchioles with flocculent edema fluid and extravasated red blood cells most extensive in the upper lobe of the left lung section (slide 4).  There is no significant fibrin deposition and no hyaline membrane formation.  Other areas from the lower lobe of the left lung (slide 5) show background of emphysematous changes with patchy areas of aspiration pneumonia characterized by neutrophilic infiltrate surrounding scattered squamous epithelial cells with adhered bacteria in bronchioles and alveoli.  There is no foreign material noted in the areas of inflammation.  The large bronchi are unremarkable.  The vessels are congested and unremarkable.

KIDNEY (1 section):  Section shows rare senescent glomeruli.  The glomeruli are otherwise unremarkable.  The tubular epithelium is autolyzed.  There is no tubulointerstitial fibrosis or inflammation.  The vessels are congested and unremarkable.


BS:cmh
D:  3/19/22    T:  3/21/22
Rev.  2/27/23 cmh


**Exhibit H-179**



# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
**CHIEF MEDICAL EXAMINER**

### DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895   FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **RUPARD, Lonnie** |
| Medical Examiner Number: | **2022-01007** |
| Date of Death: | **03/17/2022** |
| Time of Death: | **23:51** |
| Pathologist: | **Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/21/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| | | |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| Amphetamines | | Not Detected |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| Cannabinoids | | Not Detected |
| Carisoprodol | | Not Detected |
| Cocaine metabolites | | Not Detected |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| | | |
| Base Screen (GC/MS) | Peripheral Blood 1 | Not Detected |
| | | |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| | | |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **141 mmol/L** |
| **Creatinine** | | **0.9 mg/dL** |
| **Glucose** | | **1 mg/dL** |
| **Potassium** | | **12.0 mmol/L** |
| **Sodium** | | **158 mmol/L** |
| **VUN** | | **122 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

Approved and Signed:
06/27/2022

Audra L. Brown
Interim Forensic Toxicology Laboratory Manager

**Exhibit H-180**

## Outside Brain Autopsy Final Reports

Accession #:               FA-22-0000070              Date of Procedure:    3/17/2022 23:51 PDT
                                                      Date Received:        3/19/2022 09:35 PDT

### Final Diagnosis
1. **Remote neocortical contusion (1 cm), right orbitofrontal region**
2. **No evidence of acute traumatic brain injury seen**

### Case Information/Discussion
Outside Case Number:    2022-01007
Date of Examination:    June 20, 2022
Forensic Pathologist:   Bethann Schaber, MD
Originating Laboratory: County of San Diego Medical Examiner's Department

The autopsy neuropathology study demonstrated a small area of remote neocortical contusion in the right orbitofrontal region, consistent with focal remote traumatic brain injury. There was no evidence to suggest acute trauma or nutritional/metabolic brain injury seen.

     *Verified by: Jeremy Kieth Deisch*
     *Date: 25-JUL-22 08:35 (Electronically signed)*
JKD

### Neuropathology Gross
| | |
|---|---|
| Brain weight: | 1290 grams (fresh) |
| Plane of section: | Cerebrum: Coronal |
| | Cerebellum: Parasagittal |
| | Brainstem: Axial |
| Cerebral hemispheres: | Symmetric, without foci of softening or discoloration |
| Gyral pattern: | Unremarkable, appropriate for age |
| Gyral atrophy/edema: | Absent |
| Leptomeninges: | Thin and transparent, without exudate or hemorrhage |
| Herniations: | Absent |
| Cortical ribbon: | Remote neocortical contusion (1 x 0.5 cm), right orbitofrontal region. Cortical ribbon otherwise unremarkable |
| Gray-white junction: | Distinct throughout |
| Cerebral white matter: | Homogeneous, without foci of discoloration or mass lesion |
| Hippocampi: | Symmetric, unremarkable |
| Basal ganglia: | Symmetric, unremarkable |
| Thalami: | Symmetric, unremarkable |
| Ventricles: | Unremarkable throughout; no ventriculomegaly or compression seen |
| Shift of midline structure: | Absent |



**LOMA LINDA UNIVERSITY PATHOLOGY LABORATORY**
11370 Anderson Street, Suite 2950
Loma Linda, CA 92354
(909) 558-2392
PJ Wat MD, GW Saukel MD, JC Kerstetter MD, HL Rojas MD – Directors

| | | |
|---|---|---|
| Name: | **RUPARD, LONNIE** | |
| MR#: | 06555376 | |
| Encounter: | | |
| DOB/Age: | 10/1/1975 | 46 years |
| Location: | LLU-FMO | Pathology Referrals |
| Physician: | Physician,Default | |
| CC: | | |
| Order ID: | | |
| Page: | Page 1 of 2 | **Exhibit H-181** |

FIRST PAGE

## Outside Brain Autopsy Final Reports

| Accession #: | FA-22-0000070 | Date of Procedure: | 3/17/2022 23:51 PDT |
| | | Date Received: | 3/19/2022 09:35 PDT |

**Neuropathology Gross**

| Cerebellum: | Unremarkable, without foliar atrophy or focal lesion |
| Brainstem: | Unremarkable |
| Nuclear pigmentation: | Pigmentation of substantia nigra and locus coerulei appropriate for age |
| Vasculature: | Circle of Willis intact. No occlusive atherosclerosis or aneurysm seen |
| Cranial Nerves: | Unremarkable |
| Dura mater: | Dura mater unremarkable, without hemorrhage, exudate, or defect. Dural venous sinuses patent |
| Spinal cord: | Not examined |

Block Key:

A1:  Dura mater, pineal gland

A2:  Right orbitofrontal region with contusion

A3:  Right orbitofrontal region with contusion

A4:  Right hippocampus, mammillary bodies

A5:  Left hippocampus

A6:  Right frontal lobe parasagittal

A7:  Midbrain

A8:  Pons

A9:  Medulla, right cerebellar hemisphere

A10: Vermis, left superior temporal gyrus

**Neuropathology Micro**

Histologic sections demonstrate an unremarkable dura mater, without hemorrhage, hemosiderin deposits, or inflammatory exudate. The cerebral hemispheric sections from the region of the neocortical
contusions shows cavitation, rarefaction, and gliosis of the gyral crests, with scattered hemosiderin deposits and eosinophilic granular bodies. The remaining neocortex is well-populated with appropriately-formed neurons, without ischemic injury or gliosis. The leptomeninges are free of hemorrhage, inflammation, or significant hemosiderin deposition. The subcortical white matter is unremarkable, without axonal injury, gliosis, or myelin pallor. The hippocampus shows no neuronal loss or malformation. Proteinaceous neuronal inclusions are lacking either in supratentorial or pigmented brainstem neurons. The deep gray nuclei, brainstem structures, and hippocampal structures are histologically unremarkable. No pathologic inflammatory infiltrates, acute hemorrhages, or infectious organisms were seen. The pineal gland and mammillary bodies are unremarkable.

**Clinical History**

46-year-old male, found unresponsive while in custody in San Diego Central jail. Per report, was not eating and was malnourished. CPR was performed, death pronounced in Emergency Department. Acute and remote head trauma noted at autopsy.

---

| | LOMA LINDA UNIVERSITY PATHOLOGY LABORATORY | **Name:** | **RUPARD, LONNIE** |
| | 11370 Anderson Street, Suite 2950 | MR#: | 06555376 |
| | Loma Linda CA 92354 | Encounter: | |
| | (909) 558-2392 | DOB/Age: | 10/1/1975    46 years |
| | PJ Wat MD, GW Saukel MD, JC Kerstetter MD, HL Rojas MD – Directors | Location: | LLU-FMO    Pathology Referrals |
| | | Physician: | Physician, Default |
| | | CC: | **Exhibit H-182** |
| | | Page: | Page 2 of 2 |