GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPÚLVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS**<br><br>Judge:      Hon. Anthony J. Battaglia<br>Magistrate:Hon. David D. Leshner<br><br>Date:    March 6, 2025<br>Time:    2:00 p.m.<br>Crtrm.:  4A |

[4610722.17]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD .......................................................................................... 2

ARGUMENT ....................................................................................................... 2

I.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF
      DEFENDANTS' MEDICAL EXPERT, DR. OWEN MURRAY .................... 2

      A.    Dr. Murray's Opinions that the Jail Provides Adequate Medical
            Care Are Unreliable Because He Failed to Review In-Custody
            Deaths.................................................................................................... 3

      B.    The Conclusions in Appendix J that the Care Provided to
            Individual Class Members Met the Standard of Care and Any
            Opinions Resting on Those Conclusions Should be Excluded.............. 6

            1.    Dr. Murray Did Not Review Any Patient Records Himself......... 7

            2.    The Reviewers Did Not Apply a Definable Methodology
                  for Determining If Care Met the Standard of Care...................... 8

      C.    Dr. Murray's Opinions Regarding the Jail's Compliance with
            NCCHC Standards Are Unreliable. ..................................................... 10

      D.    Dr. Murray's Opinions Regarding Medical Screening and Sick
            Call Processes Are Unreliable. ........................................................... 12

      E.    Dr. Murray Admits He Is Not Qualified to Offer Opinions
            Regarding Treatment for Substance Use. ............................................ 14

II.   THE COURT SHOULD EXCLUDE THE TESTIMONY OF
      DEFENDANTS' MENTAL HEALTH EXPERT, DR. JOSEPH PENN ....... 14

      A.    Dr. Penn Failed to Review Records Related to In-Custody
            Suicides and Mental Health-Related Deaths. ...................................... 15

      B.    Dr. Penn Conducted an Unreliable, Standardless Review of
            Whether Patients Had Timely Access to Care...................................... 18

      C.    Dr. Penn Offered Opinions Regarding Staffing Without a
            Reliable Methodology.......................................................................... 20

      D.    Dr. Penn's Report Includes Lengthy Sections that Were
            Wholesale Copied-and-Pasted from His Report in *Jensen* and
            that Have No Application to the Jail.................................................... 21

      E.    Dr. Penn's Testimony Is Frequently Factually Erroneous or
            Contradicted by Other Parts of His Own Report. ............................... 22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS OF DEFENDANTS' EXPERTS

F.    Dr. Penn Is Unqualified to Offer Expert Testimony on Housing Placements................................................................24

G.    Dr. Penn Is Unqualified to Offer Expert Testimony on Substance Use Treatment.....................................................24

III.   THE COURT SHOULD EXCLUDE THE TESTIMONY OF DEFENDANTS' DENTAL EXPERT, DR. SCOTT REINECKE.................25

A.    Dr. Reinecke's Broad Opinions Regarding the Adequacy of Dental Care Are Unreliable Because They Do Not Rest on Any Articulable Methodology. .............................................25

B.    Additional Opinions of Dr. Reinecke Are Unreliable Because They Are Not Based on Sufficient Facts or Data. ................27

IV.   THE COURT SHOULD EXCLUDE THE OPINION OF DEFENDANTS' RACIAL DISCRIMINATION EXPERT, DR. BRIAN WITHROW, THAT THE COUNTY DID NOT RACIALLY PROFILE OR RACIALLY DISCRIMINATE AGAINST RACIAL MINORITY GROUPS ........................................28

V.    THE COURT SHOULD EXCLUDE SEVERAL OPINIONS OF DEFENDANTS' SAFETY AND SECURITY EXPERT, LENARD VARE ............................................................................30

A.    Mr. Vare's Opinion Regarding Custody Staffing Is Unreliable Because It Is Not Based on Sufficient Facts or Data in the Case........30

B.    Mr. Vare Is Unqualified to Offer Opinions Regarding the Adequacy of Treatment for Substance Use Disorder at the Jail...........31

C.    Mr. Vare's Opinion that the County Prevented 857 People from Further Harming Themselves or Completing a Suicide is Unreliable. .......................................................32

VI.   THE COURT SHOULD EXCLUDE OPINIONS OF DEFENDANTS' ENVIRONMENTAL EXPERT, HENRIETTA PETERS, THAT REST ON IMPROPER *EX PARTE* INTERVIEWS WITH CLASS MEMBERS...............................................................33

VII.  THE COURT SHOULD EXCLUDE TESTIMONY FROM DEFENDANTS' EXPERTS THAT DEFENDANTS COMPLIED WITH THE CONSTITUTION OR WERE NOT DELIBERATELY INDIFFERENT ................................................................34

CONCLUSION.......................................................................35

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS

# TABLE OF AUTHORITIES

**Page**

<u>**CASES**</u>

*A.B. v. Cty. of San Diego*,
2020 WL 4431982 (S.D. Cal. July 31, 2020)....................................................34

*Araujo v. Coachella Valley Water Dist.*,
2022 WL 4181004 (S.D. Cal. Sept. 12, 2022) .........................................passim

*C.B. v. Moreno Valley Unified School District*,
544 F. Supp. 3d 973 (C.D. Cal. 2021)....................................................28, 29

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) ................................................................18

*Coleman v. Brown*,
938 F. Supp. 2d 955 (E.D. Cal. Apr. 5, 2013)........................................33

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......................................................................................1

*Gen. Elec. v. Joiner*,
522 U.S. 136 (1997) ...............................................................................passim

*In re Canvas Specialty, Inc.*,
261 B.R. 12 (C.D. Cal. 2001).................................................................3, 32

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
524 F.Supp.3d 1007 (S.D. Cal. 2021)...............................................passim

*In re Novatel Wireless Secs. Litig.*,
2011 WL 5827198 (S.D. Cal. Nov. 17, 2011) .........................................8

*Jensen v. Shinn*,
609 F. Supp. 3d 789 (D. Ariz. 2022)...............................................passim

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ..............................................................................2, 3

*McCoy v. DePuy Orthopaedics, Inc.*,
2024 WL 1705952 (S.D. Cal. Apr. 19, 2024) ......................................7, 18

*Politte v. United States*,
2011 WL 2149917 (S.D. Cal. June 1, 2011) ...........................14, 24, 28, 31

*Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*,
752 F.3d 807 (9th Cir. 2014)...............................................................22, 25

*Samuels v. Holland Am. Line-USA Inc.*,
656 F.3d 948 (9th Cir. 2011)...............................................................12, 24

*San Diego Comic Convention v. Dan Farr Productions*,
2017 WL 4227000 (S.D. Cal. Sept. 22, 2017) ........................................passim

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
2007 WL 935703 (S.D. Cal. Mar. 7, 2007)........................................................2

*United States v. Hermanek*,
289 F.3d 1076 (9th Cir. 2002) ...........................................................................8

*United States v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020)..............................................................................8

*Woods v. Lecureux*,
110 F.3d 1215 (6th Cir. 1997).........................................................................34

**STATUTES**

Cal. Gov. Code § 11135 .........................................................................................28

Cal. Pen. Code § 13519.4 ......................................................................................29

**RULES**

Fed. R. Evid. 702 ...........................................................................................passim

Fed. R. Evid. 703 ........................................................................................7, 12

Fed. R. Evid. 704 ................................................................................................34

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS OF DEFENDANTS' EXPERTS

# INTRODUCTION

Defendants routinely expose San Diego County residents to dangerous, deadly, and illegal conditions in the County's Jail ("the Jail"). For years, outside entities including the California State Auditor, state and local legislators, non-profit entities, a San Diego grand jury, and the media have rung the alarm over the high number of deaths in the Jail. Since the filing of this class action complaint in February 2022, over 40 more people have died in the Jail. The County's Medical Examiner ruled two of those deaths as homicides as a result of Defendants' medical negligence. Meanwhile, the County has paid tens of millions of dollars in settlements to the families of individuals who died in the Jail. Still, the violations of state and federal law outlined in Plaintiffs' complaint persist.

In this litigation, Plaintiffs and Defendants each retained multiple experts to evaluate the conditions at the Jail. Pursuant to Federal Rules of Evidence 702, 703, and 704 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiffs now move to exclude all of the testimony of Defendants' medical, mental health, dental, and racial discrimination experts and portions of the testimony of Defendants' safety/security and environmental experts.

Defendants' medical and mental health care experts offered broad opinions about the adequacy of the care in the Jail without reviewing any of the deaths and suicides that are at the core of this litigation. In fact, Defendants' health care experts barely reviewed any patient records at all. Instead, they formed broad opinions about patient care based on poorly-performed record reviews by hired reviewers; the experts instructed those reviewers to apply subjective, standardless methodologies for evaluating care, then did nothing to verify that the reviewers work was accurate or consistent. In addition, Defendants' experts failed to consider highly-relevant evidence, and instead relied heavily, if not exclusively, on conversations with Jail staff to form their opinions. These and other failures render Defendants' experts' testimony unreliable and inadmissible.

**LEGAL STANDARD**

Under Federal Rule of Evidence 702, a witness may be qualified as an expert only if the expert (1) possesses "scientific, technical, or other specialized knowledge," (2) the expert's knowledge will "help the trier of fact to understand the evidence or to determine a fact in issue," (3) their testimony is "based on sufficient facts or data," (4) their testimony "is the product of reliable principles and methods," and (5) their opinion "reflects a reliable application of the principles and methods to the facts of the case." To ensure that Rule 702 is met, courts analyze (1) whether the reasoning or methodology underlying the testimony is valid (the reliability prong) and (2) whether the opinions offered will assist the trier of fact in reaching a conclusion necessary to the case (the relevance prong). *See Araujo v. Coachella Valley Water Dist.*, 2022 WL 4181004, at *2 (S.D. Cal. Sept. 12, 2022).

Courts have broad discretion in deciding how to measure reliability and in making the ultimate reliability determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). While the *Daubert* analysis generally focuses on the principles and methodology underlying an expert's testimony, rather than the ultimate conclusions, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" for it to be reliable. *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007).

**ARGUMENT**

**I.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF DEFENDANTS' MEDICAL EXPERT, DR. OWEN MURRAY**

Dr. Murray provided an expert report for Defendants regarding medical care at the Jail. *See* Declaration of Van Swearingen ("Swearingen Decl.") Ex. A-1–152.[1]

---

[1] All subsequent cites to Exhibits are Exhibits to the Swearingen Declaration.

He generally opined that that the medical care provided to class members is adequate and meets the standard of care. All of his opinions should be excluded because his analysis suffers from profound methodological flaws.

### A. Dr. Murray's Opinions that the Jail Provides Adequate Medical Care Are Unreliable Because He Failed to Review In-Custody Deaths.

Dr. Murray's report includes multiple broad opinions generally stating that the Jail provides adequate medical care. Those opinions include:

- "The current SDSO healthcare delivery system is neither indifferent nor insensitive to the medical needs of its IP patients," Ex. A-45;[2]

- "I found no evidence the SDSO is deliberately indifferent to the health, safety, or medical needs of its incarcerated population," *id.* at A-4; and

- "Our review of the SDSO healthcare delivery system demonstrated unequivocally that the SDSO is providing a level and quality of healthcare that is consistent with and, in many aspects, exceeds community standards. There is a clear and definite commitment on the part of the SDSO to ensure that timely and quality healthcare is available to all IPs within their jail facilities. There was no evidence of any deliberate indifference by the SDSO to the needs of the healthcare delivery system or the IPs in its care. In fact, we found just the opposite." *Id.* at A-41.

These opinions are inadmissible because Dr. Murray offered them without reviewing evidence related to in-custody deaths, which are critically relevant to the provision of medical care at the Jail.

An expert opinion is unreliable, and therefore inadmissible, if it is based on a biased or cherry-picked set of evidence. When the expert has only a "constricted and somewhat biased world view … [to] bas[e] his opinion on," this Court has explained that conclusions may not "be reliably drawn." *San Diego Comic Convention v. Dan Farr Productions*, 2017 WL 4227000, at *7–8 (S.D. Cal. Sept. 22, 2017) (citing Fed. R. Evid. 702(b)); *Kumho Tire Co.*, 526 U.S. at 142; *In re Canvas Specialty, Inc.*, 261 B.R. 12, 20 (C.D. Cal. 2001) ("[T]he expert must obtain

---

[2] As Plaintiffs argue in Section VII, *infra*, many of these opinions should also be excluded because they are improper legal opinions.

the right kind of data to support the conclusions drawn.").  Similarly, this Court has excluded expert opinions because they were based on a "cherry-picked selection of favorable data" which led to opinions that were "unduly results-driven, not good science, and therefore inadmissible."  *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F.Supp.3d 1007, 1035–40 (S.D. Cal. 2021).

Dr. Murray's conclusions are unreliable and inadmissible because they fail to consider crucial evidence in this case:  *documents and information related to in-custody deaths*.  Deaths in the Jail are a paramount issue in this litigation, and are directly related to the adequacy of medical care at the Jail.  *See, e.g.*, Pls.' Third Am. Compl., Dkt. 231 at ¶¶ 1–3.  Indeed, a 2022 report by the California State Auditor found that the Sheriff's Office "has a responsibility to provide adequate medical care for individuals while they are in its custody.  Ex. H-574.  "from 2006 through 2020, a total of 185 people died in San Diego County's jails—more than in nearly any other county across the State."  *Id.*  The State Auditor confirmed that the Jail had a higher rate of suicides and natural deaths (which can include deaths where deficient medical care is a factor) than jails in any other comparable county in the State.  *Id.* at H-588–589.  The State Auditor performed an in-depth review of 30 in-custody deaths, with an emphasis on deaths that occurred between 2016 and 2020.  *Id.* at H-591.  It concluded that "deficiencies with the way the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to [in-custody] deaths" and that the Sheriff's Department had "not consistently taken meaningful action ... when ... deaths have occurred."  *Id.* at H-586, H-606.  It further found in reviewing these deaths that medical staff failed to communicate medical and mental health needs at intake; failed to respond appropriately to some incarcerated person's repeated requests for help during the weeks preceding their deaths; and failed (along with custody staff) to respond appropriately to medical emergencies.  *Id.* at H-592–600.  A separate statistical study by Analytica Consulting in 2022 concluded that "total deaths in San Diego Jails surpass the

deaths expected based on the county's mortality rates"; that "[t]he number of excess deaths resulting from the actual and expected death difference is the highest in San Diego County" than any other comparable county in California; and that "San Diego County is the only county with a statistically significant number of excess deaths" in its Jail.  Ex. AA-1754–1755.  Two different medical examiners working for the San Diego County Coroner have found that the medical care provided to two people who recently died in the Jail was so deficient that they classified the deaths as homicides. Ex. J-834–872.

Notwithstanding the available evidence of serious and systemic problems with the medical care at the Jail highlighted by the deaths that have occurred, Dr. Murray did not offer any opinions regarding the medical care related to *any* in-custody death.[3]  Similarly, Dr. Murray did not review any materials related to the Jail's mortality and morbidity committee, which analyzes whether failures in care contributed to an in-custody death.  Ex. W-123:1–124:1.  He did not review whether the committee "was making appropriate conclusions with respect to whether deaths were preventable"; whether the committee was "making appropriate recommendations for changes to address any problems they found in the deaths"; or "whether the County implemented any of those recommendations."  *Id.* at W-123:16–124:1.  Instead, "all [Dr. Murray] want[ed] to do [was] validate that [the committee] existed."  *Id.* at W-126:10–127:9 ("Q: Does it not matter whether the M&M committee is doing a good job? … A: As I said, we were told it existed, and that was sufficient for myself.").

---

[3] Dr. Murray had a reviewer working for him draft cursory summaries, without any analysis, of the medical records, for five deaths that occurred in 2024, but Dr. Murray did not offer any opinions regarding those deaths.  *See* Ex. A-147-149; *see also* Ex. W-127:20-128:16 (confirming that five 2024 decedent records resulted in only "summaries and the reviews," without "analysis" or "recommendations," and that no other decedent records were reviewed).

1   Dr. Murray did not review any in-custody deaths even though he

2   acknowledged there has been great focus on deaths at the Jail, Ex. A-39; that "[i]n-

3   custody mortality is an important metric," *id.* at A-41; and that reviewing in-custody

4   deaths is "one of the most critical functions of any healthcare system, but especially

5   a correctional healthcare system." Ex. W-117:4–18. In contrast, Plaintiffs' medical

6   expert, Dr. Jeffrey Keller, reviewed numerous in-custody deaths that occurred in

7   2022, 2023, and 2024, and opined on widespread problems with care, including that

8   at least eight were preventable or possibly preventable. Ex. P-1175–1204; Ex. Q-

9   1401–1422. Dr. Keller reviewed documentation from the morbidity and mortality

10  committee and concluded that it was failing at its essential function to identify and

11  remedy problems with care that result in deaths or other sentinel events. Ex. P-

12  1168–1204; Ex. Q-1419. Dr. Keller also opined that it is impossible to evaluate the

13  adequacy of medical care at the Jail (or at any medical facility for that matter)

14  without reviewing whether deaths were preventable. Ex. Q-1398–1401.

15  Dr. Murray's cherry-picking of evidence—failing to examine the most

16  important available documents and information (medical records for decedents and

17  morbidity and mortality reviews) regarding the most important issue in the case

18  (deaths in the Jail)—demonstrates that his methodology is unreliable. Fed. R. Evid.

19  702(c) & (d). Moreover, his failure to review information about deaths shows that

20  his overall opinions about the adequacy of medical care at the Jail do not rest on

21  sufficient facts or data. Fed. R. Evid. 702(b). As a result, Dr. Murray's broad

22  opinions about the adequacy of care in the Jail are unreliable and should be

23  excluded.

24  **B.    The Conclusions in Appendix J that the Care Provided to
        Individual Class Members Met the Standard of Care and Any
25      Opinions Resting on Those Conclusions Should be Excluded.**

26  Appendix J of Dr. Murray's report contains summaries of the care provided to

27  81 current and former incarcerated people in the Jail and opinions regarding whether

28  that care met "standard of care." Ex. A-58–118. These summaries and opinions

1  form the basis for many of Dr. Murray's opinions.  They should be excluded
2  because they were performed by reviewers hired by Dr. Murray, each using a
3  standard Dr. Murray described as "unique" and "subjective," without Dr. Murray
4  taking any steps to confirm that the findings and opinions were accurate.

5        **1.**      **Dr. Murray Did Not Review Any Patient Records Himself.**

6        The conclusions in Appendix J that the care provided to 81 individual patients
7  met the "standard of care" must be excluded because Dr. Murray improperly
8  "parrot[ed] the opinions of other experts without independently investigating the
9  underlying evidence." *McCoy v. DePuy Orthopaedics, Inc.*, 2024 WL 1705952, at
10 *16 (S.D. Cal. Apr. 19, 2024); *see* Fed. R. Evid. 703 ("An expert may base an
11 opinion on facts or data in the case that the expert has been made aware of or
12 personally observed.").

13       The 81 summaries and opinions in Appendix J were prepared by five
14 reviewers hired by Dr. Murray, none of whom Defendants have sought to introduce
15 as experts in this case.  Ex. A-58–118.  The reviewers opined that the care provided
16 met the standard of care for 73 class members, met the standard of care "with
17 reservations" for two class members, and did not meet the standard of care for six
18 class members.  *Id.*[4]  Crucially, Dr. Murray did nothing to "independently
19 investigate" whether the summaries were accurate or whether he agreed with the
20 reviewers' opinion regarding the standard of care:  He did not review a single
21 medical record on which his reviewers offered opinions, nor did he discuss the
22 medical files with the reviewers.  Ex. W-74:14–18, W-76:24–77:4, W-101:16–22.
23 He simply took their findings and opinions at face value, without engaging in any
24 investigation of his own.  *Id.* at W-101:11–15 (The opinions in Appendix J "[a]re
25 the [opinions of] the individual reviewers', whose opinions I trust").  The opinions

26

27 [4] Plaintiffs' medical expert, Dr. Keller, reviewed 19 of these same medical files and
    disagreed with Dr. Murray's reviewers in nearly every file where the reviewers
28 concluded the care met the standard of care.  Ex. Q-1428–1433, Q-1465–1517.

1  of the reviewers and any of Dr. Murray's opinions that rest on the reviewers'

2  opinions should be excluded on this basis.

3              **2.    The Reviewers Did Not Apply a Definable Methodology for
                Determining If Care Met the Standard of Care.**

4

5          The reviewers' opinions regarding the standard of care should also be

6  excluded because the reviewers failed to apply a definable standard.  Courts

7  evaluating the reliability of an expert's methodology must "assure that the [expert's]

8  methods are adequately explained." *United States v. Valencia-Lopez*, 971 F.3d 891,

9  900 (9th Cir. 2020) (quoting *United States v. Hermanek*, 289 F.3d 1076, 1093-94

10 (9th Cir. 2002)).  This Court has repeatedly excluded expert opinions that "contain[]

11 no professional standards or principles," on the basis that those opinions are not

12 reliable.  *E.g.*, *In re Novatel Wireless Secs. Litig.*, 2011 WL 5827198, at *5 (S.D.

13 Cal. Nov. 17, 2011).  This Court has concluded that an expert's opinion is unreliable

14 when the report "lacks an explanation as to what methodology [the expert] uses" or

15 "why he chose to employ the factors he did."  *San Diego Comic*, 2017 WL 4227000,

16 at *7.  When the Court "does not know why [the expert] chose to focus on the

17 considerations he did, why the factors he chose were important, nor how much each

18 of these factors were weighted in coming to his conclusion," it is "unable to

19 determine how [the expert] formed his opinions nor has [the expert] demonstrated

20 that he has a proven methodology." *Id.* at *8 (citation and quotation marks omitted).

21         Dr. Murray's reviewers did not rely on any principles or standards in opining

22 that care at the Jail met the standard of care.  When asked what standard of care his

23 reviewers applied to each of the 81 patient reviews, Dr. Murray responded:

24 "[T]here is no standard of care.  When you're talking a standard, it really is a

25 subjective review of the record that [the reviewer is] looking at.  So there is no

26 standard to compare it to." Ex. W-81:8–12 ; *see also id.* at W-80:3–5 ("there is no

27 standard of care as you're looking at the totality of services."); *id.* at W-88:14–23

28 (describing the standard used by the reviewers as "unique"); *id.* at W-93:23–25

1    ("[I]t is not a standard, since I can't point to anything.").  He further acknowledged

2    that different reviewers with different backgrounds—as was the case with his

3    reviewers—may have applied different standards of care.  *See id.* at W-75:8–76:12,

4    79:25–81:12.  As Dr. Murray explained, the "subjective" standard of care "was left

5    to the reviewer to determine."  *Id.* at W-90:19–22.  He acknowledged that in some

6    cases, care for one medical condition may have been "terrible" but the findings in

7    Appendix J could still reflect that the "overall care met the standard of care."  *Id.* at

8    W-103:1–4.  Dr. Murray stated that he informed the reviewers to grade the care

9    provided on a scale of 0 to 100 and to indicate that the care met the standard of care

10   if the score was 80 or higher, but he did not provide the reviewers with "any

11   guidance for how they were supposed to score it" or "how they were supposed to

12   give it a number."  *Id.* at W-106:21–107:14.

13         Notably, in *Plata v. Newsom*, a class action case regarding medical care

14   provided by the California Department of Corrections and Rehabilitation ("CDCR"),

15   Dr. Murray rejected the exact methodology his reviewers used here.  Dr. Murray

16   criticized the other party's experts in *Plata* on the grounds that a "subjective review

17   of care provided to a particular patent … is not a statistically valid or sound method

18   of evaluating the overall quality of correctional healthcare that is delivered at a

19   specific institution or system."  Ex. E-558 at ¶ 16.  Nonetheless, by Dr. Murray's

20   own account, he based his opinions in this case on the same type of "subjective

21   review" methodology, without any defined standard of care.

22         Because Dr. Murray and his reviewers did not explain or apply any articulable

23   standard in opining that the medical records in Appendix J reflected care that met

24   the "standard of care," each of the "conclusions" in Appendix J should be excluded.

25   In addition, all opinions from the Murray Report that rest, in whole or in part, on the

26   conclusions in Appendix J, should be excluded, including but not limited to:

27   • "The records also reflected … close monitoring of new intakes with chronic
     medical conditions."  Ex. A-16; Ex. W-204:1–25 (testifying that conclusions

28

in Appendix J formed a basis for his opinions regarding intake, health assessments, and the sick call request process).

- "The records reviewed had documentation to support that this [outside referral] process worked exceptionally well." Ex. A-16.

- "Overall, the providers were attentive to the chronic care conditions of the IP records reviewed. The standard of care was followed in 93% of cases reviewed. In the remaining 7% of cases, there were minor deviations from the standard of care." *Id.*

- "Overall, there was evidence of high-quality care being provided to the IPs in the SDSO." *Id.*

- "Standard: Patients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence-based standards. Conclusion: SDSO meets the compliance indicators for this standard." Ex. A-37.

- "The medical record reviews of both medical and nursing services did not demonstrate deficient care." Ex. A-42.

- "The random chart reviews demonstrated high functioning and effective intake and nurse sick call processes. Provider chronic care was timely and consistent with a community standard of care. The current SDSO healthcare delivery system is neither indifferent nor insensitive to the medical needs of its IP patients." Ex. A-45.

- Dr. Murray's opinion that test results are timely. Ex. A-17-18; Ex. W-207:10–208:5 (testifying that the conclusions in Appendix J formed a basis for his opinion on this topic).

- The Jail has an adequate process for handling patients' refusals of care. Ex. W-215:22–216:1 (testifying that the conclusions in Appendix J formed a basis for his opinion on this topic).

- The subspecialty care provided by the Jail was adequate. Ex. A-18-20; Ex. W-78:20–21 (implying that the conclusions in Appendix J formed a basis for his opinion on this topic).

### C.    Dr. Murray's Opinions Regarding the Jail's Compliance with NCCHC Standards Are Unreliable.

In addition to requiring that an expert's methodology be reliable, Rule 702 requires that an "expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). As the Supreme Court has explained, an expert's mere "*ipse dixit*" that his opinion "is connected to existing data" is not sufficient; in that case, "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. a 146. When an

1   expert fails to "point[] to relevant evidence to support" his opinions "other than his

2   say so," those opinions are inadmissible.  *Incretin-Based Therapies*, 524 F. Supp. 3d

3   at 1045.

4       Dr. Murray failed to apply the facts of the case to establish whether and how

5   the Jail met standards promulgated by the National Commission on Correctional

6   Health Care ("NCCHC"); his opinions regarding compliance with NCCHC

7   standards should therefore be excluded.  The NCCHC is a standard-setting

8   organization in the field of correctional healthcare, which also surveys individual

9   correctional institutions and, when its standards are met, provides accreditation for

10  the facilities.[5]  NCCHC's standards are comprised of "compliance indicators" that

11  guide decisions on whether to grant NCCHC accreditation, something that the San

12  Diego County Jail has not achieved.  *See, e.g.*, Ex. I-704.  In 2017, the NCCHC

13  issued an exhaustive 139-page report in 2017 concluding that the Jail failed to meet

14  nearly all of the standards for adequate medical care.  Ex. I-694–833.

15      In his report, Dr. Murray opined that the Jail was "compliant with 93%

16  (33/39) [sic] of the Essential and 100% (20/20) of the Important 2018 [NCCHC]

17  Standards," without any explanation as to how he determined compliance and

18  without reference to any of the specific compliance indicators and whether the Jail

19  complied with each.  Ex. A-32; *see also id.* at A-32–38 (indicating his "conclusion"

20  regarding compliance for each NCCHC standard).  For each finding of compliance

21  with NCCHC standards, he provided no analysis and simply wrote "SDSO meets

22  the compliance indicators for this standard."  *See, e.g.*, *id.* at A-35.  Dr. Murray

23  explained during deposition that he "didn't get into all of the standards laying out all

24  of the particulars" needed for compliance with the NCCHC standards, nor did he

25  "lay out the evidence" that would support a finding that the Jail affirmatively met

26  those compliance indicators.  Ex. W-275:10–18.

27

28  [5] NCCHC, About Us, https://www.ncchc.org/about-us/ (last visited Dec. 16, 2024).

Because Dr. Murray neither "la[id] out all of the particulars" nor "la[id] out the evidence," *id.*, this Court is left with only Dr. Murray's "say so" that the Jail met some of the NCCHC standards. *See Incretin-Based Therapies*, 524 F. Supp. 3d at 1045. As a result, his opinions regarding the NCCHC standards should be excluded.

### D. Dr. Murray's Opinions Regarding Medical Screening and Sick Call Processes Are Unreliable.

Dr. Murray's opinions about medical screening and sick call processes—in particular, the charts contained in Appendices G, H, and I, Ex. A-49–57, as well as any conclusions based on those Appendices, *see, e.g.*, *id.* at A-12–14, A–31, A-45—should be excluded under both Rule 702 and 703. Appendices G and H purport to analyze the Jail's intake medical screening process (during booking) and initial health assessment process (within 14 days of booking), respectively. *See* Ex. A-49–55. Appendix I purports to analyze the Jail's sick call process, in particular, whether incarcerated people who submit requests for medical care are seen by a nurse within 24 hours of their request being received. *See id.* at A-56–57.

Dr. Murray did not review or evaluate these jail processes himself, nor did he familiarize himself with the review performed by his reviewer. As such, these Appendices should be excluded under Federal Rule of Evidence 703, which requires an expert opinion to be based on "facts or data … that the expert has been made aware of or personally observed." Fed. R. Evid. 703; *see also Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 951–53 (9th Cir. 2011) (an expert "lack[ing] … personal knowledge" regarding key elements of his testimony is "not qualified to testify" as an expert as to that opinion). Dr. Murray testified that he neither completed the audits in Appendices G, H, and I himself, nor provided instructions to the reviewer who completed the audits, nor checked the underlying medical records to validate the reviewer's conclusions, nor had knowledge of the methodology that the reviewer used. *See* Ex. W-55:1–5 ("I'm not sure exactly what methodology [the reviewer] used, but I am confident that [the reviewer] used a statistically appropriate

1  methodology"); *see also id.* at W-151:3–22 (Appendix H), W-154:3–155:5

2  (Appendix H), W-166:15–168:13 (Appendix G), W-170:8–22 (Appendix G), W-

3  177:17–25 (Appendix I), W-184:5–185:16 (Appendix I).

4          When confronted with multiple errors in those Appendices, Dr. Murray was

5  unable to explain his reviewer's reasoning or methodology.  For example, when

6  shown an error in Appendix I, in which the reviewer concluded that a nurse had

7  evaluated the patient within 24 hours of receiving a sick call request, but the medical

8  records revealed several days between receipt of the sick call request and the nurse's

9  evaluation, Dr. Murray stated: "I would have to discuss with [the reviewer], was this

10  the particular one he looked at?  Because, if I'm looking at this, I would agree; it

11  does seem like there are two different sets of dates there that would say it's not

12  compliant."  *Id.* at W-191:21–192:10; *see also id.* at W-156:14–18 ("Q: [W]ould

13  you agree that those are two examples where the jail did not comply with its own

14  policies?  A: I don't know.  I would have to ask [the reviewer] about those two.  I

15  don't know why he didn't explain those."); *id.* at W-200:1–201:22 ("Q: So do you

16  think Row 11 is an error on the worksheet? A: As I said, I don't know.  I mean, what

17  I know is that, as I said, I would need to get [the reviewer] to look at that to tell me

18  how he came up with that assessment.…  I know [the reviewer] wouldn't make that

19  mistake, so I'm not sure what [the reviewer] was looking at, even though we're

20  talking about this particular document right here.").

21          Dr. Murray's lack of knowledge of the facts underlying his opinions means

22  that he is unqualified to offer these opinions.  And, even assuming he were qualified

23  to offer those opinions, Dr. Murray's inability to explain the methodology or how

24  the underlying medical records were analyzed consistent with that methodology

25  renders his opinion unreliable.

26  / / /

27  / / /

28  / / /

### E.    Dr. Murray Admits He Is Not Qualified to Offer Opinions Regarding Treatment for Substance Use.

Dr. Murray opined that the Jail "provide[s] adequate medical care including medication assisted treatment (MAT) for incarcerated people with substance use disorder" and "provide[s] adequate medical care for incarcerated people entering the jail under the influence of alcohol and drugs."  Ex. A-42.  At his deposition, however, Dr. Murray testified "I'm not a substance use disorder expert."  Ex. W-131:23–24.  Because he is, by his own admission, not qualified to provide expert testimony regarding substance use and substance use disorders, all of his testimony on those topics should be excluded.  *See* Fed. R. Evid. 702 (witness can only offer expert opinion on subject on which they are "qualified"); *see also e.g. Araujo* , 2022 WL 4181004 at *5 (S.D. Cal. Sept. 12, 2022) (excluding testimony outside of witness's area of expertise); *Politte v. United States*, 2011 WL 2149917, at *1 & n.3 (S.D. Cal. June 1, 2011) (same).  All his opinions related to substance use treatment are inadmissible.

## II.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF DEFENDANTS' MENTAL HEALTH EXPERT, DR. JOSEPH PENN

Dr. Penn provided an expert report for Defendants regarding the mental health care system at the Jail.  *See* Ex. B-153–378.  Dr. Penn offered several broad opinions, including that:

- "SDSO provides a high level of care that meets and often exceeds community standards," *id.* at B-208;

- "[C]linically appropriate mental health and psychiatric evaluation and treatment services were, and continue to be, available to each of the named Plaintiffs, as well as to current and former (and future) SDSO IPs," *id.* at B-212;

- "The SDSO's current healthcare delivery system demonstrates a clear commitment to addressing the mental health and overall healthcare needs of its IPs," *id.* at B-213; and

- "[P]olicies, Procedures, and Standards, along with their implementation by both custody staff and ... NaphCare [the Jail's primary contracted mental healthcare provided'], adhere to nationally accepted, state, and county

1    practices.  They are carried out with due consideration for care, custody and
2    control, and demonstrate no deliberate indifference to the psychiatric and/or
     mental health needs of these IPs," *id.*

3    All of Dr. Penn's testimony should be excluded because of multiple, serious

4    methodological flaws with his work that undermine the foundation of his opinions

5    and render his testimony unreliable.

### A.    Dr. Penn Failed to Review Records Related to In-Custody Suicides and Mental Health-Related Deaths.

8    As explained by Plaintiffs' mental health expert, Dr. Pablo Stewart, a review

9    of the care provided to people who died by suicide or other reasons related to mental

10   illness "is foundational and essential to doing a proper assessment as to the

11   adequacy of a correctional mental health care system." Ex. O-1075.  Dr. Stewart

12   further indicated that expert review of such deaths is "especially relevant in this

13   case," given the high number of suicides and other mental-health related deaths in

14   recent years. *Id.*  Dr. Penn, however, failed to review records or assess substantive

15   information related to *any* such deaths.  As a result, Dr. Penn's conclusions about

16   the adequacy of mental health care at the Jail are unreliable because he failed to

17   consider essential evidence related to in-custody suicides and mental health-related

18   deaths.

19   Dr. Penn testified that he did not review any records related to any of the ten

20   completed suicides since 2019 nor any other in-custody deaths of people with

21   serious mental illness to determine whether the provision of mental health care was

22   appropriate.[6]  Ex. X-91:1–95:1.  Dr. Penn did not review psychological autopsies,

---

[6] Notably, there are many mental health-related deaths that were not suicides.
Plaintiffs' mental health expert and others have identified serious individual and
systemic failures that contributed to those deaths. *See, e.g.*, Ex. N-990–993 (death
officially designated as a "homicide" for "neglected schizophrenia; *id.* at N-939–941
(starvation death following untreated mental illness and intellectual disability); *id.* at
N-953 (man with serious mental illness killed by cellmate after mental health staff's
input regarding safe housing was rejected by custody staff).  Dr. Penn did not review
records for any of these deaths and did not consider them in reaching his
conclusions.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS OF DEFENDANTS' EXPERTS

which evaluate the decedent's psychological state to determine whether and how mental health needs (met or unmet) played a role in a death. *Id.* at X-91:1–4. Dr. Penn did not review records from the Jail's mortality and morbidity committee to determine whether those processes are functioning properly at the Jail. *Id.* at X-91:13–16.  Instead, Dr. Penn merely listed the names of the ten individuals who died by suicide. Ex. B-202–203.  Without conducting any analysis or comparison of suicides in the San Diego County jail to other jails in California or across the nation, Dr. Penn opined that the suicide rate at the Jail was "low." *Id.* at B-201.  Dr. Penn testified that it was unnecessary for him to review any individual suicides because, "for the purposes of this litigation and my role, I didn't believe that I needed to get into that level of detail.  I was more looking at the overall number of suicides per year.  That's the methodology in which I applied." Ex. X-81:16–21.

Dr. Penn's opinions regarding the overall adequacy of the mental health care system, including those in his Responses to Allegations 8 and 9 in his report, should be excluded as unreliable because he failed to consider essential information about people who died at the Jail as a result of their mental illness.  Ex. B-199–203 (Response to Allegation 8), *id.* at B-203–205 (Response to Allegation 9).  Just like Dr. Murray, Dr. Penn cherry-picked the information he reviewed, ignoring highly-relevant information that contradicted his conclusions.  For this case, Dr. Penn reviewed patient records for only the twelve named plaintiffs.  He then testified that, in the course of his records review, "I did not identify any mental health sequelae, *such as a suicide or death* or other psychiatric harm or damage, from any of these chart reviews." Ex. X-161 (emphasis added).  Of course, a person who has died at the Jail does not have standing to serve as a plaintiff in this case.  In other words, Dr. Penn's selection of records to review was *designed* in such a way for him not to identify any suicides or deaths.

As Plaintiffs' mental health care expert, Dr. Pablo Stewart, explained in his report and rebuttal report, the suicides and mental health-related deaths at the Jail

1  reflect profound systemic problems with the mental health care system at the Jail.

2  *See* Ex. N-996–1023; Ex. O-1074–1076.  Dr. Penn's failure to consider evidence

3  from this and other suicide deaths makes his methodology unreliable and his

4  opinions deficient.

5      Another court criticized Dr. Penn for similarly offering opinions about a

6  correctional mental health care system without reviewing suicide deaths.  In *Jensen*

7  *v. Shinn*, No. CV-12-00601-PHX-ROS (D. Ariz.), Dr. Penn testified on behalf of the

8  State of Arizona regarding the adequacy of the mental health care system in Arizona

9  prisons.  The *Jensen* court found that "Dr. Penn's methodology was deeply flawed"

10  and that numerous, significant aspects of his testimony had "no merit," were "of no

11  value," were "appalling and overwhelmingly contradicted by the evidence," and

12  "ma[de] no sense."  *Jensen v. Shinn*, 609 F. Supp. 3d 789, 843, 851, 853, 856-57,

13  862 (D. Ariz. 2022).  That court criticized Dr. Penn for finding only that the facility

14  "performs mortality reviews," without looking at whether "the reviews or policies

15  are effective, thorough, or competent."  *Jensen*, 609 F. Supp. 3d at 851.  And the

16  court noted that the Plaintiffs' expert's testimony about problems with particular

17  deaths was "unrebutted by Defendants."  *Id.*  The court found that many of

18  Dr. Penn's opinions were unreliable.  *Id.* at 843, 851, 853, 856-67.[7]

19      In the instant case, Dr. Penn testified that he used the same methodology to

20  evaluate the Jail's mental health care system that he used in *Jensen*.  Ex. X-110:11–

21  13 (stating he used "the same methodology that I applied in the Arizona litigation as

22  I applied in this San Diego case").  This Court should, as the *Jensen* court did, reject

23  Dr. Penn's testimony regarding in-custody suicides because of his failure to address

24  the suicides that occurred in the Jail.

25

26  ─────────────

27  [7] Though neither party filed a *Daubert* motion in *Jensen*, the court noted that any
*Daubert* challenges would have failed, *Id.* at 800.  Throughout its order, however,
the court made many findings about Dr. Penn's testimony that suggests exclusion

28  would have been warranted.

**B.    Dr. Penn Conducted an Unreliable, Standardless Review of Whether Patients Had Timely Access to Care.**

Dr. Penn's opinions regarding access to mental health care at the jail relies substantially on a medical record review contained in Appendix D to his report that was performed and drafted by other consultants he called "psychiatric helpers." Ex. X-172.  Dr. Penn conducted no review of these patient records himself.  *Id.* at X-164:24–166:10 ("Q: Did you review any records that they reviewed? A: No. I did not have enough time to do that.  If I had additional time, I would have done that.  I would have reviewed each and every case that they found an issue or concern with, but, frankly, I ran out of time so I did not have time to do that.").  In his report and at his deposition, Dr. Penn indicated that these reviews were central to his analysis and were "incorporated into my overall analysis and expert opinions."  Ex. B-162; *see, e.g.*, Ex. X-126:19–127:1.

Dr. Penn's failure to independently verify the work performed by his psychiatric helpers requires exclusion.  As explained in Section I.B.1, *supra*, "an expert witness cannot parrot the opinions of other experts without independently investigating the underlying evidence."  *McCoy*, 2024 WL 1705952, at *16.  He also failed to even discuss the reviews and findings with his helpers.  Ex. X-177:2–12 ("Q: So you spoke with them for minutes to give the initial assignment; correct? A: Correct.… Q: And you didn't have any communication with them up to the date you submitted your August 2024 report; is that correct? A: That's correct.").  These failures render the psychiatric helpers' opinions and Dr. Penn's opinions unreliable.  *See Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) ("An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions.").

Moreover, the psychiatric helpers' conclusions in Appendix D regarding access to mental health care are themselves methodologically unreliable.  Each of the 81 medical record summaries in Appendix D includes a conclusion as to whether

the "incarcerated person had access to care," which was defined to "mean[] that, in a timely manner, seen by a qualified M[ental] H[ealth ('MH')] professional, is rendered a clinical judgment, and receives MH care that is ordered." *See generally* Ex. B-309–58. Dr. Penn stated that he never discussed with the psychiatric helpers what (if any) standard of care they should apply. Ex. X-178:14–179:11.

The problems with the methodology in Appendix D are laid bare by contradictions within many of the summaries themselves. In multiple instances, the psychiatric helper's summary of a medical record states that the care was not "timely," but nevertheless concludes the patient had "access to care," a conclusion inconsistent with the methodology Dr. Penn asserts they were supposed to apply. *Id.* at O-1102–03. For example:

- For a patient with a history of suicide attempts, a reviewer identified a 24-day delay between the patient filing a health care request stating "I need to speak to a mental health counselor" and actually being seen by a mental health clinician. *See* Ex. O-1087. The reviewer called this a "not ideal delay," but still concluded the patient had "access to care." Ex. B-344–45.

- For a patient who had a two-month delay between psychiatric appointments during which time the patient sent "multiple requests asking why someone reduced his medications and begging for them to be restarted," a psychiatric helped wrote "that this gap in care (given medication change without communication to patient) is too long," Ex. B-348. The reviewer still concluded the patient had "access to care." *Id.*

- For a patient with diagnosed schizophrenia whose condition had been stabilized with antipsychotic medication while he was incarcerated at a state hospital, the reviewer identified a four-week delay between the patient's prescription expiring and any action taken by the Jail to resume his prescription. *See* Ex. O-1097. But the reviewer still concluded the patient had "access to care." Ex. B-358.

- For a patient with prescriptions for multiple essential psychiatric medications, the reviewer identified multiple instances where the prescriptions were allowed to expire without being reordered. *See* Ex. O-1099. But the reviewer still concluded the patient had "access to care." Ex. B-340–41.

This access-to-care/psychiatric helper methodology mirrors the methodology that Dr. Penn applied in *Jensen*. The *Jensen* court concluded that his "access to care" standard "was ambiguous, inconsistent and of no value," was "far from

1    objective, and much less scientific," and was not helpful because it did "not

2    carefully analyze if the care was medically acceptable." *Jensen*, 609 F. Supp. 3d at

3    856.  The court identified dozens of inconsistencies between the medical records

4    and Dr. Penn's review of access to care.  *Jensen*, 609 F. Supp. 3d at 856 n.30

5    (discussing Appendix 5, a table attached to the order, which listed "various patients

6    ... marked as having access but the accompanying notes for those patients

7    demonstrate otherwise"); *id.* at 924–25 (Appendix 5).  It therefore refused to

8    consider Dr. Penn's conclusions that rested on his psychiatric helpers' "access to

9    care" conclusions.  *See id.* at 856 ("Dr. Penn's methodology is … of no value.").

10       This Court should do the same here and should not consider Dr. Penn's

11   testimony in its entirety because the psychiatric helpers' opinions are unreliable and

12   Dr. Penn acknowledged that their "findings were incorporated into my overall

13   analysis and expert opinions."  Ex. B-162.

14       **C.    Dr. Penn Offered Opinions Regarding Staffing Without a Reliable
               Methodology.**
15

16       Dr. Penn's opinions on staffing are similar to his staffing opinions in *Jensen*,

17   both of which are standardless and based on unreliable *ipse dixit* assertion*s*.  *See*

18   *Joiner*, 522 U.S. at 146.  Dr. Penn rejected the use of any discernible standard to

19   evaluate mental health staffing levels.  As a result, those opinions should be

20   excluded, including his "Response[s] to Allegation[s] 1" and "2."  Ex. B-172–180.

21       Dr. Penn's report states that "[s]taffing levels in correctional settings should

22   be evaluated based on the clinical determination of whether adequate mental health

23   services are provided by the available staff."  *Id.* at B-173.  In opining that staffing

24   levels at the Jail are adequate, Dr. Penn relies only on the existence of Jail staffing

25   plans; he fails to conduct any review or assessment as to whether the number of staff

26   for each clinical position is adequate to meet the mental health needs of the Jail's

27   population, including whether the Jail maintains sufficient staff across different

28   shifts.  *Id.* at B-174–175.  In his deposition, Dr. Penn admitted that he did not

1  conduct a staffing analysis, that he did not review staffing numbers at all facilities,

2  and that he did not evaluate NaphCare staffing levels at all.  Ex. X-124:20–131:22,

3  146:9–151:10.

4      Dr. Penn took the same approach in *Jensen*, where he "claim[ed] 'staffing

5  levels should be assessed for a particular system based upon a clinical determination

6  that adequate mental health services may be, or are, provided by a particular number

7  of various types of professional staff" but then failed to conduct any such

8  assessment.  *Jensen*, 609 F. Supp. 3d at 843.  The *Jensen* court noted that Dr. Penn

9  engaged in "circular logic" in concluding that the defendant's staffing was adequate

10  because it had created a staffing requirement number, without actually assessing if

11  that number was adequate.  *Id.* ("Based on the evidence, it is nothing more than a

12  number pulled out of thin air.").

13      As in *Jensen*, Dr. Penn's determination that the Jail's staffing is adequate is

14  "pulled out of thin air."  *Id.* at 843.  His opinions on staffing are unreliable and

15  should be excluded.[8]

16      **D.    Dr. Penn's Report Includes Lengthy Sections that Were Wholesale**
        **Copied-and-Pasted from His Report in *Jensen* and that Have No**
17      **Application to the Jail.**

18      Parts of Dr. Penn's report were copied and pasted directly from his report in

19  *Jensen*, including sections containing information applicable to the Arizona prisons,

20  but with no discernable relationship to the San Diego County jails.  *See* Ex. O-1076–

21  1079, O-1109–1110, O-1125.  For example, Dr. Penn based a finding regarding the

22

23  ───────────────────
    [8] Dr. Penn's testimony here shares an additional similarity with his testimony in
24  *Jensen*—false assertions that he was prevented from speaking with incarcerated
    people.  Dr. Penn testified here that "in a perfect review I would be able to interview
25  or evaluate the plaintiffs."  Ex. X-109:22–23.  He claimed that he was prohibited
    from doing so.  *Id.* at X-109:22–110:3.  In reality, Plaintiffs agreed for Defendants'
26  experts to interview class members as long as Plaintiffs' counsel was present.  *See*
    Ex. G-565.  Dr. Penn gave almost identical testimony in *Jensen*, where he claimed
27  "he 'was not allowed to actually interview or evaluate any inmate.'" *Jensen*, 609 F.
    Supp. 3d at 842 n.24.  The court found that statement was "untrue" and that he could
28  have interviewed class members with plaintiffs' counsel present.  *Id.*

1  involvement of mental health staff in the use of clinical restraints on "numerous

2  interviews with nursing and mental health care staff *across the state*," which makes

3  no sense in the context of his review of the Jail.  *See id.* at O-1077–1078; Ex. B-194

4  (emphasis added).  This paragraph uses the same language as his *Jensen* report.  *See*

5  *id.* at Ex. O-1077–1078.  As Plaintiffs' expert describes, the factual description in

6  the paragraph is inapplicable to the San Diego County Jail system, including as

7  confirmed by the County's person-most-knowledgeable witness.  *Id.* at O-1077–

8  1078.

9      Other parts of his report also appear copied from his *Jensen* report and

10  inapplicable to the Jail.  *See e.g.*, *id.* at O-1079 (list of policies Dr. Penn purported to

11  review was identical to the list of policies in his *Jensen* report and includes policies

12  that do not exist for the Jail).

13      The inclusion of inapplicable, copied-and-pasted material casts doubt on the

14  entirety of Dr. Penn's report.  At a minimum, each of those copied and pasted

15  sections should be excluded under FRE 703, as they are based on facts from *Jensen*,

16  not from facts in this case.  *See* Ex. O-1076–1079, O-1109–1110, O-1125

17  (identifying copied-and-pasted sections on pages 38, 41, 49, and 51 of Dr. Penn's

18  report).  Any opinion that relies on this irrelevant testimony is also unreliable and

19  must be excluded.  *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807,

20  817 (9th Cir. 2014).

21  **E.    Dr. Penn's Testimony Is Frequently Factually Erroneous or**
      **Contradicted by Other Parts of His Own Report.**
22

23      Dr. Penn's report is rife with contradictory or erroneous testimony that

24  demonstrates that his overall conclusions are not based on a reliable application of

25  principles and methods to the facts of the case.  Fed. R. Evid. 702(d).

26      For example, Dr. Penn stated that "every I[ncarcerated] P[erson ("IP")]

27  receives a comprehensive mental health evaluation upon entry, with subsequent

28  screenings and evaluations conducted when an IP is transferred between SDSO

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS OF DEFENDANTS' EXPERTS

1  facilities." Ex. B-184.  In his deposition, however, Dr. Penn agreed that statement

2  was "not accurate," because there is not a practice for every incarcerated person to

3  receive a comprehensive evaluation.  Ex. X-289:16–290:14.

4         Dr. Penn stated in his report that "there has been no concentration of completed

5  suicides at any particular SDSO Complex (or custody level)."  Ex. B-202.  Dr. Penn's own

6  report, however, indicates that, across San Diego County's seven jail facilities, the

7  majority of completed suicides since 2019 (60%) have occurred at one jail facility—

8  Central Jail.  Ex. B-199, B-202–203.[9]  Dr. Penn's opinions are also directly contradicted

9  by his own psychiatric helpers' findings (on which he relied in reaching his opinions).  For

10 example:

- Dr. Penn found there are "no discernible delays in care nor any identifiable impediments in SDSO IP patients' access to and continuity of mental health care," *Id.* at B-174.  *But see* Ex. O-1086–1088 (rebuttal report summarizing 3 mental health-related deaths with serious delays in care, and 6 case examples where Dr. Penn's psychiatric helpers found delays and deficiencies in continuity of care).

- Dr. Penn found there is no evidence of "delays in the prescribing or delivery of psychotropic medications, nor in the provision of mental health treatment for new intake incarcerated persons at SDSO."  Ex. B-182.  *But see* Ex. O-1094 (Dr. Penn's psychiatric helper writing "I've seen many [] examples of expiring medications in [patient] charts, there does seem to be a systems issue"); *id.* at O-1096–1100 (rebuttal report summarizing at least 10 case examples from Dr. Penn's psychiatric helpers' reviews where such problems are identified).

- Dr. Penn found "incarcerated persons presenting with current mental health needs are promptly referred to and receive timely mental health services," Ex. B-185.  *But see* Ex. O-1102–1103 (summarizing four examples from the psychiatric helpers' reviews where such problems are identified, including statements that "I am very concerned," "It is my opinion that this gap in care . . . is too long," etc.).

- Dr. Penn found "SDSO IPs are provided private meeting spaces to maintain confidentiality during mental health encounters," Ex. B-197.  *But see* O-1110–1113  (summarizing case examples from the psychiatric helpers' reviews where confidentiality concerns are raised, including a helper's statement that "it doesn't look great that the jail was unable to meet [a patient's] request to be seen confidentially").

---

[9] This erroneous statement may be yet another example of Dr. Penn improperly copying from his report in *Jensen* in which he stated "[t]here is no concentration of completed suicides at any particular ADCRR Complex."  *See* Ex. O-1125.

1
2

**F.    Dr. Penn Is Unqualified to Offer Expert Testimony on Housing Placements.**

3    In multiple cases, this Court has excluded opinions offered by witnesses who
4    admitted that those opinions were outside their area of expertise. *See, e.g.*, *Araujo*,
5    2022 WL 4181004 at *5; *Polite*, 2011 WL 2149917, at *1 & n.3. Here, Dr. Penn
6    repeatedly testified that he lacked expertise in relation to "housing" or "placements"
7    for people with mental illness. Ex. X-163:11–21, X-238:2–8; X-278:7–279:23. His
8    lack of expertise means he is unqualified to offer opinions regarding housing
9    placements, requiring exclusion of his "Response to Allegation 7" and "Response to
10    Allegation 10" on the use of restrictive housing and isolation. Ex. B-197–198, B-
11    205–206.

12
13

**G.    Dr. Penn Is Unqualified to Offer Expert Testimony on Substance Use Treatment.**

14    Dr. Penn is unqualified to offer testimony on substance use treatment due to
15    his lack of knowledge of the facts in this case related to substance use treatment. A
16    witness is "not qualified to testify" as an expert if he lacks "personal knowledge
17    with regard to" relevant facts at issue. *Samuels*, 656 F.3d at 951–53. Here,
18    Dr. Penn admitted that he had not conducted any record review related to substance
19    use treatment, that he had not read the reports of Plaintiffs' substance use expert,
20    and that he "referred" analysis regarding substance use treatment "to Dr. Murray."
21    Ex. X-296:2–305:14. In his report, he included one anecdote about an overdose he
22    happened to witness during an inspection of the Jail, but he did not offer any opinion
23    as to the Jail's overall overdose treatment policies and practices, and defense
24    counsel confirmed he never reviewed medical records for the person that overdosed.
25    Ex. K-874; Ex. B-171. He scatters additional vague opinions on substance use
26    treatment throughout his report, including on screening for substances during intake,
27    Ex. B-167; withdrawal assessments, *id.* at B-209; treatment of opioid use disorder
28    including the Medication-Assisted Treatment ("MAT") program, *id.* at B-181, B-

1   187, B-212; and provision of Narcan at discharge, *id.* at B-175, B-207, B-212.  But

2   Dr. Penn simply does not have the requisite knowledge specific to this case to opine

3   on substance use, so those opinions should be excluded.  Dr. Penn's lack of

4   knowledge also makes any testimony he might offer on substance use unreliable,

5   which is an independent basis for exclusion.  *See Pyramid Techs.*, 752 F.3d at 817.

6   **III.   THE COURT SHOULD EXCLUDE THE TESTIMONY OF DEFENDANTS' DENTAL EXPERT, DR. SCOTT REINECKE**

7

8        Dr. Reinecke provided an expert report for Defendants regarding the dental

9   care at the Jail.  *See* Ex. C-379–395.  All of his opinions should be excluded because

10  he failed to apply an articulable methodology and he did not consider sufficient facts

11  and data to support his opinions.

12       **A.     Dr. Reinecke's Broad Opinions Regarding the Adequacy of Dental Care Are Unreliable Because They Do Not Rest on Any Articulable Methodology.**

13

14       Rule 702 requires that expert opinions be based on an articulatable

15  methodology and connect that methodology to the expert's conclusion with more

16  than an *ipse dixit*.  *See Joiner*, 522 U.S. at 146; *San Diego Comic*, 2017 WL

17  4227000 at *7; *Incretin-Based Therapies*, 524 F. Supp. 3d at 1045.

18       Defendants' dental expert, Dr. Scott Reinecke, made broad conclusions about

19  the quality of dental care at the Jail, including, but not limited to:

20    •   "Dental needs identified that required referral to an off-site specialty
          provider were documented and scheduled in a timely manner."  Ex. C-

21        382.

22    •   "It is evident in the dental records I reviewed, as well as the specialty
          referral data, that the SDSO, through NaphCare, has access to and

23        provides adequate dental treatment to the incarcerated population."  *Id.*
          at C-384.

24    •   "In my professional opinion, the SDSO has the necessary physical
          plant, infrastructure, staff, and equipment to deliver adequate dental

25        care that aligns with community standard."  *Id.* at C-385.

26    •   "SDSO through its vendor NaphCare is providing industry and

27        community standard dental services at each facility."  *Id.*

28  / / /

1  These opinions are inadmissible and should be excluded because (1) Dr. Reinecke

2  did not apply any defined standard of care, and (2) he did not explain how his

3  analysis of dental records led him to his conclusions.

4         In reviewing and summarizing the dental records of 30 class members,

5  Dr. Reinecke did not once opine in his report whether he believed any individual's

6  care was adequate.  In fact, Dr. Reinecke repeatedly stated that there is no applicable

7  standard that could apply in this case.  *See, e.g.*, Ex. Y-115:2–115:10 ("Q: So it's

8  your testimony that you are unable to opine on what the appropriate timeframe is in

9  San Diego for someone complaining of pain to be seen by a dentist? ... A: That's

10 correct.  I do not feel I am able to opinion on that, because I do not have enough

11 information."); *id.* at Y-117:16–118:1 ("the standard is in flux. … [W]e don't know

12 all the variables on site."); *id.* at Y-140:15–141:3 ("I would have to request for a

13 more clear understanding of standard of care because there's variations depending

14 on who you talk to.…  Because there is no policy and procedure that I've seen."); *id.*

15 at Y-160:20–22 ("I believe with all of my being that there is no one true standard

16 that can be applied to the dental profession."); *see also id.* at Y-52:16–19 ("Q: [I]n

17 the community, do you have a standard of care or timeframe that you require

18 patients complaining of pain to be seen by a dentist? A: No."); *id.* at Y-162:1–3 ("Q:

19 And did you consider the NCCHC standards on oral care services in drafting your

20 report? A: I did not.").  In contrast, Plaintiffs' dental expert, Dr. Jay Shulman,

21 identified specific timeliness standards for various dental complaints and analyzed

22 whether each patient whose chart he reviewed was provided care within that

23 timeframe.  *See* Ex. R-1547–1552.

24        When Dr. Reinecke was asked during his deposition whether the care

25 provided to those 30 patients met his own standard of practice, he replied:  "On

26 occasion, yes; and on occasion, no.  I've seen examples of both within these 30

27 charts."  Ex. Y-142:25–143:7; *see also id.* at Y-38:22–25 ("Q: So four months is not

28 an acceptable wait in your opinion? A: I cannot answer that with any certainty

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS OF DEFENDANTS' EXPERTS

1   because I feel I don't have enough information."). And yet, despite the fact that he

2   testified there was no applicable standard and that some care did not meet his own

3   personal standard, Dr. Reinecke offered the broad opinions listed above. Under

4   these circumstances, there is too great an analytical gap between the data

5   Dr. Reinecke reviewed and his opinions, leaving only Dr. Reinecke's say so that

6   dental care at the Jail meets the "community standard." As a result, Dr. Reinecke's

7   opinions are unreliable and should be excluded.

8   **B.    Additional Opinions of Dr. Reinecke Are Unreliable Because They
         Are Not Based on Sufficient Facts or Data.**

9

10      Multiple portions of Dr. Reinecke's report should be excluded because they

11  do not rest on sufficient—or sometimes any—case-specific facts. Fed. R. Evid.

12  702(b); *San Diego Comic*, 2017 WL 4227000 at *7–8.

13      Dr. Reinecke opines that Plaintiffs' allegation that "[t]he Sheriff's

14  Department's policies and procedures for preventive dental care are inadequate" is

15  "FALSE." Ex. C-384. However, Dr. Reinecke testified that he never reviewed the

16  Jail's policies and procedures. Ex. Y-58:10–16, Y-167:17–20. His opinions related

17  to the Jail's policies and procedures are therefore inadmissible.

18      Dr. Reinecke offered a number of opinions regarding the adequacy of dental

19  staffing at the Jail, including that "SDSO does maintain a sufficient number of

20  dental professionals to provide adequate dental services to the IPs in its care." Ex.

21  C-384. Dr. Reinecke testified, however, that in order to offer an opinion regarding

22  the actual staffing levels at the Jail, he would need access to at least one month of

23  staffing data. Ex. Y-154:8–11. He never reviewed such data. *Id.* at Y-154:12–14.

24  Accordingly, Dr. Reinecke's opinions related to staffing are inadmissible.

25      Finally, Dr. Reinecke opined that "[t]he quality monitoring for all providers

26  who serve at the seven SDSO facilities is appropriate." Ex. C-382. However,

27  Dr. Reinecke testified that he did not review any quality assurance documents;

28  rather, he explained that his "response was based on what [NaphCare's off-site

1  dental director] told [him], because [Dr. Reinecke himself] did not see any

2  evidence." Ex. Y-170:21–171:1.  Dr. Reinecke clarified that "if" what the

3  NaphCare dental director told him was "true," the Jail's dental quality monitoring

4  "could be considered appropriate if it's comprehensive enough." *Id.* at Y-171:6–7.

5  As a result, all Dr. Reinecke's opinions related to quality assurance are inadmissible.

6  **IV.  THE COURT SHOULD EXCLUDE THE OPINION OF
       DEFENDANTS' RACIAL DISCRIMINATION EXPERT, DR. BRIAN
7       WITHROW, THAT THE COUNTY DID NOT RACIALLY PROFILE
       OR RACIALLY DISCRIMINATE AGAINST RACIAL MINORITY
8       GROUPS**

9         Defendants' statistical expert, Dr. Withrow, opined that policing data

10  produced by Defendants did not show that the Sheriff's Department racially profiled

11  or racially discriminated against certain racial minorities under the standard for

12  "racial profiling" established in Assembly Bill 953.  He stated that he reached that

13  conclusion because the data does not include information regarding whether officers

14  knew a suspect's race prior to initiating a stop.  Ex. T-1578.  That opinion is

15  irrelevant to Plaintiffs' discrimination claims under California Government Code

16  § 11135 ("Section 11135"), which are set forth in Plaintiffs' ninth claim for relief

17  and which only requires Plaintiffs to establish that Defendants are engaging in a

18  practice that has a disparate impact on racial minorities.  *See C.B. v. Moreno Valley*

19  *Unified School District*, 544 F. Supp. 3d 973, 993 (C.D. Cal. 2021).  Accordingly,

20  this Court should exclude Dr. Withrow's opinions on racial profiling and racial

21  discrimination because they are irrelevant to this case.  *In re Incretin-Based*

22  *Therapies*, 524 F. Supp. 3d at 1035 (quoting *Daubert II*, 43 F.3d at 1315) (excluding

23  irrelevant expert testimony); *Politte*, 2011 WL 2149917 at *1 (excluding opinions

24  that were "irrelevant to the causes of action pled").

25         Dr. Withrow's evaluation of the data showed that the Sheriff's Department

26  arrested Black and Hispanic people at a higher rate than their respective percentages

27  of the population in San Diego County.  Ex. T-1569–1570.  For example,

28  Dr. Withrow found that Black people made up 5.5% of the population in the

1  County, but were 10.1% of the people arrested by the Sheriff's Department, and that

2  Hispanic people made up 34.9% of the population in the County, but were 38.3% of

3  the people arrested by the Sheriff's Department. *Id.* at T-1570–1571.

4      Dr. Withrow erred, however, in the conclusions he drew from his analysis.

5  Notwithstanding the observed disparities, Dr. Withrow opined that "the datasets

6  provided do not provide sufficient detail to confirm a pattern and practice of racial

7  discrimination within the enforcement activities San Diego Sheriff's Office." *Id.* at

8  T-1578.  Specifically, he opined that:

> neither of the datasets used in this analysis collects what is likely the most important variable – whether the officer *knew* the race or ethnicity of an individual prior to making the decision to stop. The term "racial profiling" in California includes the phrase "…reliance on, to any degree, actual or perceived race…" This means that, at minimum, the dataset must contain a variable measuring whether an officer is aware of an individual's race prior to initiating the stop as compared to after the stop.

14  *Id.* (emphasis in the original, quoting AB 953).  In relying on the definition of racial

15  profiling under AB 953 (codified at California Penal Code § 13519.4), Dr. Withrow

16  stated that Section 13419.4(e)'s definition requires that "prior knowledge of an

17  individual's race or ethnicity by the police officer is necessary to sustain an

18  accusation of racial discrimination (e.g. profiling)." *Id.* at T-1561.

19      Dr. Withrow's interpretation of the law as it relates to Plaintiffs' claims is

20  incorrect.  Plaintiffs have not brought claims under Section 13519.4, and are not

21  required to prove intentional racial discrimination to succeed on their Section 11135

22  claim.  Section 11135 requires that Plaintiffs meet their initial burden by showing

23  that "defendant's facially neutral practice causes a disproportionate adverse impact

24  on a protected class." *C.B.*, 544 F. Supp. 3d at 993.  Because Plaintiffs only need to

25  show a disparate impact, Dr. Withrow's opinions regarding whether the data

26  establishes that the Sheriff's Department racially profiled or racially discriminated

27  against racial minorities are irrelevant to this case.  Those opinions should therefore

28  be excluded.

1   **V.    THE COURT SHOULD EXCLUDE SEVERAL OPINIONS OF
          DEFENDANTS' SAFETY AND SECURITY EXPERT, LENARD VARE**

2

3        Mr. Vare provided an expert report regarding safety and security at the Jail.

4   *See* Ex. D-397–551.  A number of his opinions should be excluded.

5        **A.    Mr. Vare's Opinion Regarding Custody Staffing Is Unreliable
              Because It Is Not Based on Sufficient Facts or Data in the Case.**

6

7        This Court should exclude Mr. Vare's opinion that the Jail adequately

8   addresses staffing shortages with the use of overtime because he failed to review

9   and analyze available documents that would confirm whether his opinion was

10  accurate.  Ex. D-506; *see* Fed. R. Evid. 702(b), (c).  Documents produced by

11  Defendants show, for example, that during numerous two-week periods in 2023,

12  well over 300 shifts were not staffed in each two-week period, and that the policy of

13  mandatory overtime to fill those shifts did not work as intended.  Ex. L-880.

14  Mr. Vare testified that he did not review these reports or any other staffing data

15  produced in discovery to determine actual staffing levels at the Jail.  *E.g.*, Ex. Z-

16  221:20–222:20 ("Q: Did you review any data at all with respect to custody level

17  staffing. A: Not ... like day-by-day data.  Again when I was doing my jail tours, I

18  asked about minimum staffing and what happens when there aren't enough staff to

19  cover the shift and I was informed that they were using mandatory overtime to make

20  up the deficiencies. Q: Did you do anything to independently verify that? A: No. Q:

21  Did you request any data to look at to see whether or not shifts are being filled at or

22  above minimum staffing levels? A: No.").  Instead of reviewing data, he relied

23  solely on statements by Defendants' employees about using overtime to cover all

24  shifts.  Ex. D-507, D-509.  Under these circumstances, Mr. Vare's opinions are not

25  based on sufficient facts or data and are predicated on an unsound methodology.

26  *See* Fed. R. Evid. 702(b), (c); *Araujo*, 2022 WL 4181004 at *7 (excluding an expert

27  who "did not rely upon an objective source" and based their opinion on "speculation

28  and conjecture, rather than sufficient facts and data").  He chose not to review any

1  evidence that would be conclusive on the issue he was examining. As a result,

2  Opinion 11 of Mr. Vare's report, Ex. D-506–510, should be excluded.

3       **B.**    **Mr. Vare Is Unqualified to Offer Opinions Regarding the**
**Adequacy of Treatment for Substance Use Disorder at the Jail.**

4

5        Mr. Vare offers a number of opinions regarding the adequacy of the treatment

6  in the Jail for substance use disorders. Mr. Vare states that "Plaintiffs' claims that

7  the Sheriff's Office failed to provide adequate medical care including medicated

8  assisted treatment for incarcerated persons with substance abuse disorders is

9  inaccurate." Ex. D-459. He opines that data provided to him by Defendants

10 regarding the use of CIWA and COWS protocols (which are protocols for assessing

11 and treating withdrawal from alcohol and opioids) is "suggestive of a proactive

12 program to identify and provide treatment to all individuals who meet alcohol and

13 opiate withdrawal criteria at the time of booking." *Id.* at D-462–463. He also

14 opines, based on five letters from current and/or formerly incarcerated people (four

15 of which are anonymous), that the Medication Assisted Treatment ("MAT")

16 provided to incarcerated people at the Jail to treat them for opioid use disorder are

17 "direct evidence about the accomplishments of the [MAT] program."[10] *Id.* at D-

18 466.

19       Mr. Vare cannot offer these opinions because he lacks the expertise to do so.

20 An expert's admission that an opinion is outside their area of expertise is compelling

21 evidence that the expert is unqualified to give that opinion. *See, e.g.*, *Araujo*, 2022

22 WL 4181004 at *5; *Politte*, 2011 WL 2149917 at *1 & n.3; Fed. R. Evid. 702.

23 Here, Mr. Vare admitted that he is "not a medical expert." Ex. D-459; Ex. Z-

24

---

25 [10] These opinions are disputed by Plaintiffs' substance use expert, Dr. Kelly
Ramsey. Dr. Ramsey opines that the MAT program is inadequate based on gaps in

26 policies and procedures, the Jail's practice of operating outside of the standard of
care, and NaphCare's documented inability to provide a quality program.

27 Dr. Ramsey has spent her career working in addiction medicine and is currently an
addiction medicine physician and harm-reduction consultant. She reviewed

28 numerous medical records in forming her opinion. Ex. M-885, M-887–889.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS OF DEFENDANTS' EXPERTS

1  291:20–25, 292:24–293:4.  His opinions are based on his experience as a

2  correctional administrator.  Ex. D-399.  Mr. Vare attempts to rescue his opinions by

3  stating that his opinion "is not focused on the treatment itself" and that he has not

4  "considered whether MAT is medically necessary or appropriate. . . .  This opinion

5  only considers the existence of treatment programs and whether incarcerated

6  persons have access to such services." *Id.* at D-459.  But his opinions do cover the

7  adequacy of these medical programs.  Since he lacks the qualifications to opine on

8  that subject, Opinion 5 of Mr. Vare's report, Ex. D-459–466, should be excluded.

9       Finally, his opinions predicated on the letters from incarcerated individuals

10  about the efficacy of the MAT program should be excluded because they are based on

11  biased data.  *See id.* at D-463–466; *see also San Diego Comic*, 2017 WL 4227000 at

12  *7 (excluding an expert whose conclusions were "generated from a narrow field of

13  documents, most of which were provided to him by Defendants"); *Incretin-Based*

14  *Therapies*, 524 F. Supp. 3d at 1035–40; *In re Canvas*, 261 B.R. at 20.  Mr. Vare

15  admitted that the letters do not constitute a representative sample and may have been

16  cherry picked by counsel to include only individuals who had "positively benefited"

17  from their experience.  Ex. D-463.  Notably, Mr. Vare did not know how many

18  people wrote the letters, to whom they were written, or whether class members

19  provided Defendants permission to use the letters in this litigation.  Ex. Z-299:8–

20  301:23.  Accordingly, any opinions based on the letters should be excluded.

21  **C.   Mr. Vare's Opinion that the County Prevented 857 People from
          Further Harming Themselves or Completing a Suicide is
22        Unreliable.**

23       Mr. Vare opines that "857 individuals" were "prevented from further harming

24  themselves or completing their suicidal intent" from 2021 to 2023.  Ex. D-423.  He

25  bases this opinion on data from the County showing there were 857 incidents of

26  self-harm and attempted suicides during that time frame, and five suicides.  *Id.* at D-

27  422–423.  Mr. Vare provides no explanation for his conclusion that the Jail took

28  some action in all 857 cases to "prevent[]" a suicide.  Ex. Z-275:6–25.  This opinion

1   is factually wrong and deeply misleading, as Dr. Stewart explains in his rebuttal

2   report.  Ex. O-1062–1063 ("There are individuals almost certainly reflected on this

3   chart who in fact *did* further harm themselves and even committed suicide during

4   this three-year period," and providing specific examples).  This opinion should

5   therefore be excluded because "there is simply too great an analytical gap between

6   the data and the opinion proffered."  *Joiner*, 522 U.S. at 146.

7   **VI.    THE COURT SHOULD EXCLUDE OPINIONS OF DEFENDANTS'
         ENVIRONMENTAL EXPERT, HENRIETTA PETERS, THAT REST
8        ON IMPROPER *EX PARTE* INTERVIEWS WITH CLASS MEMBERS**

9        Defendants disclosed Ms. Peters as their expert on environmental issues at the

10  Jail.  Ex. U-1580–1593.  During Ms. Peters's deposition, Plaintiffs learned that,

11  during her Jail inspection, she conducted *ex parte* interviews of four class members

12  outside the presence of Plaintiffs' counsel and with an attorney from the County

13  present.  Ex. V-105:19–106:2, 121:3–132:9.  Plaintiffs agreed that Defendants could

14  interview class members during inspections only if Plaintiffs' counsel were present.

15  Ex. G-565.  Ms. Peters testified that she interviewed several class members,

16  including one incarcerated Health Services Assistant Training ("HSAT") program

17  participant, two incarcerated barbers, and one incarcerated porter.  Ex. V-126:19–

18  132:9.  Ms. Peters testified that her interview with the HSAT program participant

19  formed a basis for her opinions regarding the program, which "offers extensive

20  training to Incarcerated Person (IP) workers in bio-hazard cleaning and sanitation."

21  *Id.* at V-129:2–130:7; Ex. U-1584, U-1586 (describing HSAT program as an

22  "excellent program").

23       These *ex parte* interviews violated the parties' agreement and California Rule

24  of Professional Conduct 4.2 to refrain from contacting a represented party.  Under

25  similar circumstances in *Coleman v. Brown*, when experts retained by the CDCR

26  conducted *ex parte* interviews of incarcerated class members that were "presented in

27  an adversarial litigation context, against the interest of the interviewees," the court

28  struck the reports entirely.  938 F. Supp. 2d 955, 962, 968 (E.D. Cal. Apr. 5, 2013).

1   The Court could do the same here to safeguard class members going forward.  At a

2   minimum, the Court should exclude all of Ms. Peters's testimony that rests on the

3   improperly obtained evidence.  Fed. R. Evid. 702(b).

**VII.   THE COURT SHOULD EXCLUDE TESTIMONY FROM
         DEFENDANTS' EXPERTS THAT DEFENDANTS COMPLIED WITH
         THE CONSTITUTION OR WERE NOT DELIBERATELY
         INDIFFERENT**

7        "[E]xpert testimony consisting of legal conclusions is generally

8   inappropriate."  *A.B. v. Cty. of San Diego*, 2020 WL 4431982, at *5 (S.D. Cal.

9   July 31, 2020); Fed. R. Evid. 704.  Courts have barred experts from using specific

10  terms that have a specialized legal meaning distinct from ordinary usage.  For

11  example, in a Section 1983 case, the court barred an expert witness from testifying

12  using the term "deliberately indifferent" to describe defendants' conduct.  *See*

13  *Woods v. Lecureux*, 110 F.3d 1215, 1219–20 (6th Cir. 1997).

14       Defendants' experts repeatedly offered testimony on the ultimate legal issues

15  in this case, *i.e.*, whether Defendants complied with the Constitution and/or were

16  deliberately indifferent.  *See* Ex. A-4, A-41, A-45; Ex. B-173, B-208, B-212–213;

17  Ex. U-1581, U-1593; Ex. D-407, D-419, D-421, D-439, D-479, D-490, D-515–516.

18  All of this testimony should be excluded.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, the Court should exclude the portions of Defendants' expert's opinions identified above.

DATED:  December 16, 2024          Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Van Swearingen*
Van Swearingen

Attorneys for Plaintiffs and the Certified Class and Subclasses